UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .   Chapter 11
IN RE:                        .
                              .   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND     .
DELAWARE BSA, LLC,            .
                              .   Courtroom No. 2
                              .   824 North Market Street
                              .   Wilmington, Delaware 19801
                              .
              Debtors.        .   Thursday, March 17, 2022
. . . . . . . . . . . . . . . .   10:00 A.M.
```

TRANSCRIPT OF CONFIRMATION HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

**TRIAL (DAY FOUR)**

APPEARANCES:

```
For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899

                         - and -

                         Andrew Hammond, Esquire
                         Glenn Kurtz, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020

Audio Operator:          Brandon J. McCarthy

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1  APPEARANCES (Cont'd):

 2  For the Debtors:          Michael C. Andolina, Esquire
                              WHITE & CASE LLP
 3                            111 South Wacker Drive
                              Chicago, Illinois 60606
 4
                              - and -
 5
                              Ernest Martin, Jr., Esquire
 6                            HAYNES & BOONE LLP
                              2323 Victory Avenue, Suite 700
 7                            Dallas, Texas 75219

 8
    For AIG Companies:        James Hallowell, Esquire
 9                            GIBSON DUNN & CRUTCHER LLP
                              200 Park Avenue
10                            New York, New York 10166

11                            - and -

12                            Ty Amass, Esquire
                              GIBSON DUNN & CRUTCHER LLP
13                            1801 California Street, Suite 4200
                              Denver, Colorado 80202
14
                              - and -
15
                              Richard Doren, Esquire
16                            GIBSON DUNN & CRUTCHER LLP
                              333 South Grand Avenue
17                            Los Angeles, California 90071

18
    For Tort Claimants:       Richard Pachulski, Esquire
19                            Alan Kornfeld, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
20                            10100 Santa Monica Blvd., 13th Floor
                              Los Angeles, California 90067
21

22  For the United            Thomas Macauley, Esquire
    Methodist Ad Hoc          MACAULEY LLC
23  Committee:                300 Delaware Avenue, Suite 750
                              Wilmington, Delaware 19801
24

25
```

1    APPEARANCES (Cont'd):

2    For the Coalition of        Cameron Moxley, Esquire
     Abused Scouts for          BROWN RUDNICK LLP
3    Justice:                   7 Times Square
                                New York, New York 10036
4

5    For Guam Abuse             Delia Lujan Wolff, Esquire
     Survivors:                 LUJAN & WOLFF LLP
6                               238 Archbishop FC Flores
                                Suite 300
7                               Hagatna, Guam 96910

8    For Sexual Abuse           Gilion Dumas, Esquire
     Claimants:                 DUMAS & VAUGHN
9                               3835 NE Hancock Street, Suite GL-B
                                Portland, Oregon 97212
10

11   For Gemini Insurance       John Baay, Esquire
     Company:                   GIEGER, LABORDE & LAPEROUSE
12                              701 Poydras Street, Suite 4800
                                New Orleans, Louisiana 70139
13

     For Century Indemnity:     Tancred Schiavoni, Esquire
14                              O'MELVENY & MYERS LLP
                                7 Times Square
15                              New York, New York 10036

16   For the Roman Catholic     Neil Lloyd, Esquire
     Ad Hoc Committee:          ARENTFOX SCHIFF LLP
17                              233 South Wacker Drive, Suite 7100
                                Chicago, Illinois 60606
18

19                              - and -

20                              Jeremy Ryan, Esquire
                                POTTER ANDERSON & CORROON LLP
21                              1313 N. Market Street, 6th Floor
                                Wilmington, Delaware 19801
22

     For Great American:        David Christian, Esquire
23                              DAVID CHRISTIAN ATTORNEYS LLC
                                105 W. Madison Street, Suite 1400
24                              Chicago, Illinois 60602

25

1   APPEARANCES (Cont'd):

2   For Hartford:              James Ruggeri, Esquire
                               SHIPMAN & GOODWIN LLP
3                              1875 K Street NW, Suite 600
                               Washington, DC 20006
4

5   For Continental           Laura McNally, Esquire
    Insurance and Columbia    LOEB & LOEB LLP
6   Casualty:                 321 North Clark Street, Suite 2300
                               Chicago, Illinois 60654
7

8   For National Surety,      Todd Jacobs, Esquire
    Corporation, and          BRADLEY & RICE, PC
    Fire & Casualty:          111 S Wacker Drive, Suite 5100
9                              Chicago, Illinois 60606

10  For the Church of Jesus   Robert Malionek, Esquire
    Christ of Latter-day      LATHAM & WATKINS LLP
11  Saints:                   1271 Avenue of the Americas
                               New York, New York 10020
12

13  For Zalkin, PCVA:         Robert Pfister, Esquire
                               KTBS LAW LLP
14                             1801 Century Park East, 26th Floor
                               Los Angeles, California 90067
15

16  For the Committee of      Edwin Caldie, Esquire
    Unsecured Creditors       STINSON LLP
    For Archdiocese of        50 South Sixth Street, Suite 2600
17  Agana:                    Minneapolis, Minnesota 55402

18  For the Ad Hoc            Joseph Celentino, Esquire
    Committee of Local        WACHTELL LIPTON ROSEN & KATZ
19  Councils:                 51 W 52nd Street
                               New York, New York 10019
20

21  For the U.S. Trustee:     David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
22                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
23                             Lockbox 35
                               Wilmington, Delaware 19801
24

25

1    <u>APPEARANCES (Cont'd)</u>:

2    For the Girl Scouts:        Eric Lopez Schnabel, Esquire
                                 DORSEY & WHITNEY (DELAWARE) LLP
3                                300 Delaware Avenue Suite 1010
                                 Wilmington, Delaware 19801
4

5    For the FCR:                Kenneth Enos, Esquire
                                 YOUNG CONAWAY STARGATT & TAYLOR LLP
6                                Rodney Square
                                 1000 North King Street
7                                Wilmington, Delaware 19801

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

MATTER GOING FORWARD:

3

1.  Third Modified Fifth Amended Chapter 11 Plan of
Reorganization for Boy Scouts of America and Delaware BSA, LLC
4   (D.I. 8813; Filed 2/15/22)

5

6

WITNESSES

7

DEBTOR'S WITNESSES:                                          PAGE

8

DOUGLAS KENNEDY

9

Direct Examination by Mr. Kornfeld                      8

10

Cross Examination by Mr. Amass                         18

11

Cross Examination by Ms. Lujan Wolff                   30

12

Redirect Examination by Mr. Kurtz                      31

13

ADRIEN AZER

14

Direct Examination by Mr. Kurtz                        37

15

Cross Examination by Mr. Doren                         50

16

Cross Examination by Ms. Lujan Wolff                  235

17

Cross Examination by Mr. Schnabel                     253

18

Cross Examination by Mr. Schiavoni                    288

19

Redirect Examination by Mr. Kurtz                     289

20

Re-Cross Examination by Mr. Doren                     301

21

Re-Cross Examination by Ms. Wolff                     306

22

EXHIBITS:

23

JTX 3031, 3034, 379, 3018, 3025, 3026, 2646

24

AIG 1358

25

1          (Proceedings commence at 10:03 a.m.)

2                THE COURT:  Good morning.  This is Judge

3   Silverstein.  We're here for the continued confirmation

4   hearing in Boy Scouts.

5                Mr. Abbott.

6                MR. ABBOTT:  Good morning, Your Honor.  As

7   discussed at the end of yesterday's hearing, we are going to

8   start with Dr. Kennedy.  I believe Mr. Kornfeld is going to

9   examine him, so I'll turn it over to Mr. Kornfeld.

10               THE COURT:  Thank you.  Mr. Kornfeld.

11               MR. KORNFELD:  Thank you, Your Honor.  For the

12  record, Alan Kornfeld, Pachulski, Stang, Ziehl & Jones, for

13  the tort claimants' committee.

14               Dr. Kennedy is present on the Zoom and is prepared

15  to be sworn, Your Honor.

16               THE COURT:  Thank you.

17               Dr. Kennedy, can you raise your right hand, please?

18  DOUGLAS KENNEDY, WITNESS FOR THE TORT CLAIMANTS' COMMITTEE,

19  AFFIRMED

20               THE COURT:  Please state your full name and spell

21  your last name for the record.

22               THE WITNESS:  Douglas A. Kennedy.  My last name is

23  spelled K-e-n-n-e-d-y.

24               THE COURT:  Thank you.  Mr. Kornfeld.

25               MR. KORNFELD:  Thank you, Your Honor.

1                        DIRECT EXAMINATION

2    BY MR. KORNFELD:

3    Q    Good morning, Dr. Kennedy.  Where are you testifying from

4    today?

5    A    Good morning.  I'm in Virginia Beach, Virginia.

6    Q    Is there anybody in the room with you?

7    A    There is not.

8    Q    Would you please tell the Court what you do for a living?

9    A    I am a tenured full professor at Virginia Wesleyan

10   University, where I've served as Associate Dean and, up until

11   recently, when I stepped down to devote full-time attention, I

12   was Department Chair for two decades.

13   Q    Dr. Kennedy, are you a survivor?

14   A    I am.  I'm a survivor of sexual abuse while I was in the

15   Boy Scouts.  I was violently abused and raped on multiple

16   occasions, while I was a camp staff member at a camp operated

17   by the Greater New York Councils.

18   Q    Are you one of the survivors that serves on the TCC?

19   A    I am.  There are nine members of the TCC, and I am one.

20   Q    Are you testifying here today on behalf of the TCC?

21   A    I am.

22   Q    Dr. Kennedy, would you please tell the Court a little bit

23   about the role and responsibilities in the TCC in these cases?

24   A    The TCC was appointed by the Department of Justice to act

25   as a fiduciary.  In that role, our responsibility was to look

1 out and advocate for the best interests of all claimants, not

2 any one particular group, but all claimants as a survivor

3 class.  And we were, essentially, assigned to make decisions

4 that we felt would be in everyone's best interests.

5 Q   Has the TCC, over the last two years, had meetings?

6 A    It has.  It has met in a -- in a normal week, we would

7 meet on Thursdays, along with our state court counsel, our

8 processionals, the attorneys that represent the TCC, as well

9 as financial and insurance professionals.  That normally would

10 occur on a Thursday.

11      And then, on a Sunday night, we would have TCC only

12 meetings, along with the -- with our attorneys and our

13 processionals, so we could talk through issues.

14      To this point, there have been -- I've been involved in

15 over 350 separate meetings.

16 Q   And you said you've been involved in 350 separate

17 meetings.  Are those 350 separate meetings that the TCC has

18 had during this case in fulfilling its duties over the last

19 two years?

20 A    They have been.  I have to admit, I've probably been

21 involved in -- in more than a member that isn't one of the --

22 the co-chairs.  But for whatever reason, I started keeping

23 track of those official meetings.  So those are meetings with

24 our professionals, mediation being included in that, as well.

25 Q   Does the TCC support confirmation of the plan that is

1  before the Court?

2  A    We do.

3  Q    Did the TCC support confirmation of the plan prior to

4  February 9th, 2022?

5  A    It did not.

6  Q    What happened on February 9th, 2022?

7  A    Essentially, enough portions of this plan changed.

8  Q    Did those changes cause the TCC to change its opposition

9  to support?

10  A    They did.

11  Q    Would you explain to the Court, in general, why?

12  A    Happy to.

13      The way that the TCC has been looking at this

14  bankruptcy, probably from the beginning has really -- and I

15  have to give my co-chair John Humphrey credit for this, when

16  he referred to it really as a "three-legged stool."  There

17  are, essentially, three portions of this bankruptcy that we've

18  been staring at.

19          The first, and maybe the one for many survivors,

20  has been the Ute or -- excuse me -- youth -- I said "Ute," I

21  was channeling my inner Joe Pesci for a second -- youth

22  protection measures.  I can't tell you how many survivors

23  contacted us and said, regardless of whatever financial result

24  comes of this, we want to make sure there is applicable and

25  appropriate youth protection measures.

1      So the youth protection changed in a significant way

2  when there was agreement on a youth protection executive that

3  would be hired; a youth protection committee, half of which

4  would be made up of survivors.  There would be changes in the

5  youth protection policies.  There would be a resolution or a

6  path to resolution of the IG files.

7      And for the TCC, one of the important portions of youth

8  protection was transparency, the ability for the public to

9  understand and third-party engagement to know whether or not

10  youth protection was working.  So all of those were a

11  significant change from the first plan.

12      The second portion of this three-legged stool was to

13  trust governance.  For -- come February, we had an independent

14  trustee and a -- and claims administrators that -- really,

15  being three former judges is kind of a dream team for

16  survivors, to have that level of independence and oversight

17  that it can trust.  As well, we had a change in the STAC that

18  we thought was more representative.  We also had acceptable

19  processes for future settlement, as well.

20      So the trust governance, which I think, for a lot of

21  people kind of -- I wouldn't say overlooked, but for a lot of

22  people wasn't their focus, was huge for the TCC.

23      And -- and then, lastly, the third leg of this stool was

24  the monetary portion.  While the dollar amount has not changed

25  significantly, we had a significantly changed or modified TDP

1  that allowed for alternative review.  And also, since we have,

2  I think, I approximately 15 non-settling insurers, there was

3  now a path and -- and trust, if you will, that survivors were

4  going to be able to pursue whatever legally obtainable

5  settlements they're entitled to.

6  Q    What was your role in connection with the negotiation of

7  the changes and improvements to the youth protection

8  procedures?

9  A    I -- well, the TCC, as -- as a whole, has been advocating

10 for a robust youth protection policy for the Boy Scouts since

11 our inception.  I was fortunate enough to be invited to Los

12 Angeles for mediation, where I sat down with the Boy Scouts.

13 We received a briefing.  But we also entered into negotiation,

14 and there was many, many rounds of back-and-forth where we

15 could insist upon what changes we want.  We wanted -- this was

16 also built off of the involvement of the Coalition Survivors

17 Working Group, which also had important input into this.

18      So this was -- that's a long answer for a short -- a

19 short answer would be I was involved in direct communication

20 with the Boy Scouts.

21 Q    And what was the TCC's role in connection with other

22 changes that are reflected in the February 9th TCC termsheet,

23 the changes you discussed, such as governance and trust

24 distribution procedures and potential future settlements?

25 A    Those -- those were all the result of the TCC getting

1  back into mediation in a serious way, as a result of the vote

2  from the first plan that went out.  So it was directly from

3  mediation and negotiation.

4  Q    You mentioned, in describing the changes that were

5  reflected in the termsheet, that the monetary components of

6  the settlements, the funding of the settlement trust had not

7  changed.  Why then does the TCC support the plan that is

8  before the Court?

9  A    Well, because that's one portion of one of those three

10  legs that I mentioned.  It is -- no doubt, it's an important

11  component.  But -- but it can't be looked at separate from

12  these three portions.

13      The TCC was willing to walk away from having any sort of

14  settlement if there wasn't significant improvement on all

15  three portions of this settlement.  And as it relates to the

16  monetary settlement, besides the fact that just the dollar

17  amount that was the removal of any sort of broad releases, it

18  was the assurance that there wouldn't be any insurance

19  settlements entered into without approval by the STAC.  It was

20  really a modified TDP that allowed for an alternative review.

21  So the dollar amount is critical, but it's just one portion of

22  an overall settlement.

23  Q    Does the TCC believe that the mechanism that was created

24  through the February 9th TCC settlement provides an

25  opportunity, a mechanism for future increased dollar amounts

1  that will potentially fund the settlement trust with increased

2  amounts?

3  A    It does.

4  Q    Let's turn to alternative to confirmation of the plan for

5  survivors.

6        Are there any alternatives to confirmation of the plan

7  that is before the Court that efficiently and expeditiously

8  lead to a resolution of the survivor claims --

9  A    No.

10 Q    -- that were filed in this bankruptcy?

11 A    No, there are not.

12 Q    Would you explain why not, please?

13 A    For survivors, a big portion of this bankruptcy is some

14 degree of resolution.  And if this bankruptcy does not go

15 through, as a group, it is going to put probably, in a best

16 case scenario, those survivors that had pending lawsuits back

17 into court.  For many, many survivors, there will be no

18 resolution.  They do not have a viable path forward.  We know

19 how long it takes for things to work through court, even under

20 that best case scenario.

21       But another thing that the TCC has been thinking about,

22 and that's the fact we -- we looked at who filed claims.  We

23 don't get to see individual claims, but we're allowed to ask

24 questions about broad numbers.  And -- and one of the

25 important issues that the Court needs to understand here is

1 that there's approximately 12,400 claimants, survivors over

2 the age of 70, 12,400; 2,200 of those are over the age of 80.

3 And the TCC really has looked at this and has thought long --

4 long and hard about how many more survivors are going to pass

5 away before there's resolution.

6     And as a survivor, I can tell you, having some degree of

7 resolution, it is an important component in your life.  And

8 the thought of throwing back over 12,000 claimants into a

9 situation where, basically, they've lost 2 years of their life

10 and perhaps there's no path forward, and they're never going

11 to, in their lifetime, see a resolution, that weighed heavy --

12 heavily on our mind.

13     We have a survivor on the TCC who is pushing 80 years

14 old and -- and is out driving for Door Dash to make ends meet.

15 We think about survivors like that, and we want there to be a

16 viable alternative to resolution, and we think that the

17 bankruptcy provides that.

18 Q    Does the plan potential approval by the Court start the

19 process of closure for survivors?

20 A    It does.

21 Q    Would you explain how it does that?

22 A    You know, every survivor has to follow his or her own

23 path.  But one of the worst parts about being a survivor is

24 not having closure, not knowing that your survivor is going to

25 see justice, feeling like your -- your abuse is never going to

1   be looked at, is never going to be assessed in -- in some way.

2        And -- and I don't want this to sound like the

3   bankruptcy is going to be a panacea and is going to make every

4   survivor satisfied.  It's -- trust me, it's not going to

5   happen.  But it provides the way to, I guess, finish that

6   chapter.  And even if the resolution is not one that a

7   survivor says, you know, I'm happy with this resolution, it

8   allows them to know what it is.

9        And -- and having that sense of it being unresolved and

10  never knowing is really a sense of powerlessness.  And that

11  sense of power -- powerlessness, I think, harkens back to

12  being a survivor and being in a powerless situation.  So, for

13  survivors to vote in this process, even if they voted to

14  reject this plan -- and the TCC respects that -- to have some

15  say, to know that their claim is going to be looked at by a

16  trust, to know that their abuse is now going to get addressed

17  in some fashion, rather than just being hanging out there,

18  that's critically important for a lot of survivors.

19  Q    You pointed to not all survivors voting to support

20  confirmation.  How is that, that the TCC supports

21  confirmation, when all survivors do not?

22  A    Yeah.  I -- I think that we realized from our first

23  meeting that we weren't going to be able to get 100 percent

24  agreement with -- with the TCC.  And all we could do was do

25  our very best for all survivors.  And we recognized that there

1  were going to be decisions that were going to be made that

2  were probably not going to be in the best interests of even

3  some members of the TCC.  But they needed to think about this

4  from the perspective of -- of all claimants.

5       So our -- our job, our goal was to get as many survivors

6  to the point where they could be educated and understand this

7  is probably the best we could do.  And we believe that getting

8  85 percent of survivors to that point is -- is a pretty good

9  result.

10 Q    And as a result, does the TCC firmly support approval of

11 the plan?

12 A    We do, at this point, yes.

13 Q    Do you believe that the voices of survivors were heard in

14 this case?

15 A    I do, I do.  The -- the TCC worked very, very hard to

16 communicate with survivors.  We held approximately 30 town

17 halls.  Most of those, we had a question-and-answer session on

18 Zoom.  We had attorneys on answering questions.  We -- we --

19 we very carefully did not answer any questions related to

20 anybody's personal claim.  But -- but survivors gave feedback,

21 they let us know how they were feeling.

22      We had an email address.  I can't tell you how many

23 messages I have read from survivors and tried to respond to.

24 I -- we have shared with those with members of the TCC, as

25 well, ones where survivors have agreed with us and not agreed

1  with us.

2      We have seen on the docket the hundreds of letters from

3  survivors that went to the Court, we have read those, as well.

4  And that was not easy.

5      We have -- we -- I am sure there are going to be

6  survivors out there that might hear this and say I didn't get

7  to communicate with the TCC.  We -- we had those avenues and

8  we held those town halls monthly and, when we got into the

9  voting periods, even more than monthly.

10 Q    Thank you.

11     To conclude your direct testimony, are there any

12 additional thoughts regarding the plan that you would like to

13 share with the Court?

14 A    Not at this time.

15 Q    Thank you very much, Dr. Kennedy for your direct

16 testimony.

17         MR. KORNFELD:  I pass the witness.

18         THE COURT:  Thank you.

19         Cross.

20         MR. AMASS:  Good morning, Your Honor, and Dr.

21 Kennedy.  My name is Ty Amass, I'm an attorney at Gibson, Dunn

22 & Crutcher, on behalf of the AIG Companies and the certain

23 insurers.

24                         CROSS-EXAMINATION

25 BY MR. AMASS:

1  Q    It's good to see you again, Dr. Kennedy.

2  A    Yes, Mr. Amass.  Long time no see.

3  Q    Indeed.  Just a couple of questions to go over.

4       Starting a little bit earlier in time than your

5  testimony had, there was a time when the TCC supported the

6  restructuring support agreement, right?

7  A    Correct.

8  Q    And I'll refer to that as the "RSA," and you'll know what

9  I'm referring to?

10 A    I will.

11 Q    And the TCC negotiated the terms of the RSA before

12 agreeing to it, right?

13 A    We were a party to that, yes.

14 Q    And it was weeks of negotiation, right?

15 A    Yes.

16 Q    And the TCC viewed the TDPs as an important component of

17 the RSA, correct?

18 A    Yes.

19 Q    And the TCC negotiated the terms of the TDPs before

20 entering into the RSA?

21 A    I -- I believe so.

22 Q    And in doing that, one of the goals of the TCC was to

23 have as many claimants, all the people it represents, receive

24 payments as possible, right?

25 A    As many valid claimants.

1  Q    And you recognize that there are states where the statute

2  of limitations is a complete bar to recovery on a claim,

3  right?

4  A    I -- Mr. Amass, I'm no lawyer.  I know -- I know broadly

5  what the statute of limitations are and how they could impact

6  a claim moving forward.

7  Q    Sure.

8       And part of the thinking for the TCC was being aware of

9  that and the fact that there are some states where certain

10 claims would be barred by the statute of limitations, right?

11 A    Yes, sir.

12           MR. KORNFELD:  Objection.  Calls for a legal

13 conclusion.

14           MR. AMASS:  Your Honor --

15           THE COURT:  Sustained.

16           MR. AMASS:  -- I asked about --

17           THE COURT:  But he --

18           MR. AMASS:  -- his thinking.

19           THE COURT:  But he's -- it was about his thinking.

20 BY MR. AMASS:

21 Q    And now let's talk for a minute about the process of

22 negotiating the TDPs as part of the RSA.

23 A    So we're -- just -- just to be clear, we're talking about

24 negotiating the TDP from the RSA.  And what time period are we

25 talking about here?

1  Q    So in advance of agreeing to the RSA and -- on July 1st

2  or so.  We will cover back and can talk about the most recent

3  round of negotiations.  But right, we're back in time and the

4  negotiations leading up to the TCC's decision to agree and

5  sign on to the RSA.

6  A    Okay.  So I just want to be clear on the time.  So we're

7  talking approximately nine, ten months ago.

8  Q    I'll trust your math on that because I'm not so great at

9  it, but yes.

10 A    Okay.  Well, I wouldn't -- I wouldn't trust my math.  But

11 I just -- there's been so much RSAs, third, fourth amendment

12 plan.  I just want to make sure we're talking about the same

13 thing.  I think we are.

14 Q    I think so, too.

15     So, in focusing just on the TDP negotiation process in

16 connection with the RSA, you agree with me in general that the

17 coalition tried to maintain as much control over that process

18 as possible, right?

19 A    I would.

20 Q    And it's fair to say that the coalition was controlling

21 the TDP drafting process, in the TCC's view, in connection

22 with the RSA, right?

23 A    I don't know if I would use the word "controlling."  Can

24 we agree that it had a lot of control?

25 Q    Sure.  And wasn't it the TCC's view at the time that --

1   again, just in connection with the RSA negotiations, that it

2   was the coalition that was controlling that process,

3   controlling the -- the document?  The edits had to go to the

4   coalition.

5   A    Yes, I'd agree with that.

6   Q    And indeed, it was your view that the coalition was at

7   least trying to control the whole process, right?

8   A    Yes.

9   Q    And the TCC believed that it needed the coalition's

10  support for changes that it wished to make to the TDPs in

11  connection with the RSA, right?

12  A    TDP, in connection with RSA.  Yes.

13  Q    And now, moving on to the Settlement Trust Advisory

14  Committee that was envisioned in the RSA, it was the

15  coalition's professionals that drafted the provision of the

16  plan that provided for five members of the STAC that shall be

17  collected by the coalition and two by the TCC, right?

18  A    I believe that's correct.

19  Q    And in the negotiation of the RSA, the coalition refused

20  to make any of the modifications to the composition of the

21  STAC that were requested by the TCC.  Isn't that right?

22  A    I believe that's correct.

23  Q    And now, moving forward a little bit in time.  After the

24  TCC's decision to sign on to the RSA, a time came when it

25  stopped supporting the plan that was outlined in the RSA,

1  right?

2  A    Yes.

3  Q    And one of the primary reasons that the TCC stopped

4  supporting the plan it agreed to in the RSA was because it no

5  longer believed that it would be an appropriate participant as

6  representative -- representatives of survivors, right?

7  A    Correct.

8  Q    And the TCC increasingly felt that its participation was

9  being diminished by the coalition, right?

10  A    Correct.  At that time, correct.

11  Q    And so you mentioned in your direct testimony that one of

12  the things that the TCC has done to help keep survivors

13  informed and up to date is to hold town hall meetings, right?

14  A    Yes.

15  Q    And those are recorded, correct?

16  A    They are recorded and posted on our website.

17  Q    And they also -- the TCC has also taken the step of

18  having the transcripts prepared of those town hall meetings

19  and posted those transcripts, right?

20  A    I believe so.

21  Q    Okay.  So, if we could turn to -- and Dr. Kennedy, let --

22  apologies.  My understanding was that you hopefully should

23  have received a binder, but that you may not have.  Did you,

24  in fact, receive that?

25  A    I did not.

1   Q    Okay.  Well, we'll put it up on the screen.  And if you

2   need us to move it around at all, hopefully, this won't be too

3   much of a challenge to work through.

4            MR. AMASS:  But if we could put up JTX-3031.

5   Q    Can you see that document, Dr. Kennedy?

6   A    I can.

7   Q    Do you see this is the certified transcript of the

8   October 28th, 2021 town hall -- TCC town hall meeting?

9   A    Yes.

10           MR. AMASS:  And now, if we could turn to Page 25 of

11  that document.

12  BY MR. AMASS:

13  Q    I just wanted you to see that it's John Humphrey.  And

14  he's the Co-Chair of the TCC, right?

15  A    He is.

16  Q    Someone you've worked with pretty closely throughout this

17  process?

18  A    Yes.

19  Q    And you'll recall, from October 28th, that's the time

20  period after the RSA, when the TCC had agreed to join the RSA,

21  but before the February 9th TCC termsheet, so this is a period

22  of time when the TCC was opposed to the plan that was on the

23  table at that point.  Do you recall that?

24  A    Yes.

25  Q    And Mr. Humphrey, on behalf of the TCC, was explaining to

1  survivors the TCC's thinking in keeping the survivors informed

2  of what the TCC was looking for.  Is that a fair assessment of

3  what was going on in that time period?

4  A    I think so.

5  Q    And he talked about those -- the three legs of the stool

6  that you had mentioned, and what I'd like to focus on is the

7  third.

8         MR. AMASS:  So if we could go down to Line 25 on

9  this page, and then if -- and it goes on to the next page a

10 little bit.

11 BY MR. AMASS:

12 Q    Do you see that Mr. Humphrey said:

13        "And then a last thing that is extraordinarily

14 critical to us is that, when this trust is formed and the

15 monies go in and the process starts, we think it's

16 extraordinarily important to have an independent trust

17 administer that is not in the game, so to speak."

18      Do you see that?

19 A    Yes.

20 Q    And that's an accurate statement, isn't it?

21 A    Yes.

22 Q    Okay.  And then he goes on to explain what he means by

23 being independent, and he says that:

24        "They report to the Judge or the Court, not to a

25 group of lawyers."

1        Do you see that?

2  A    Yes.

3  Q    And that was true when he said it, wasn't it?

4  A    Yes.

5            MR. AMASS:  Okay.  Your Honor, we would move

6  Exhibit JX-3031 into evidence.

7            MR. KORNFELD:  No objection.

8            THE COURT:  It's admitted.

9        (JTX-3031 received in evidence)

10           MR. AMASS:  And now, if we can -- we can put that

11 one down.  We've just got one more town hall to look at.  If

12 we could pull up JX-3034, please.

13 BY MR. AMASS:

14 Q    And you'll see this is another certified transcript of

15 the Boy Scouts of America Official Tort Claimants' Committee

16 Town Hall, December 9th, 2021.

17       And now this is the period when the TCC was expressing

18 its view about how survivors -- or how it would recommend for

19 survivors to vote, right?

20 A    That would be on the initial settlement that we voted on.

21 Is that right?

22 Q    Correct.  This is before --

23 A    Yeah.

24 Q    -- the TCC -- this is before the TCC settlement

25 agreement.  This is when survivors were first given the

1  opportunity to vote.

2  A    Yes.  Yes, thank you.

3         MR. AMASS:  And now if we could turn to Page 3.

4  Q    Again, I just want to show you here that it's Mr.

5  Humphrey who's speaking, didn't want you to think that I was

6  quoting you.

7         MR. AMASS:  And then if we can move on to Page 5.

8  Q    You'll see, at the top, in Line 1, he says:

9         "And then, finally, we want an independent trustee.

10  We don't want the trust run by attorneys."

11      Do you see that?

12  A    Yes.

13  Q    And that was the TCC's position, right?

14  A    At that time, yes.

15         MR. AMASS:  And then if we go on now to Page 9.

16  Oh, I'm sorry.  Excuse me.  Page 7.

17  BY MR. AMASS:

18  Q    And here, this is now the TCC's counsel, Mr. Pachulski.

19  And Mr. Pachulski is the TCC's counsel, right?

20  A    He is one of them, yes.

21  Q    Now, on Page 7 at the top here:

22         "The second, which John had mentioned, is we feel

23  very strongly that trust governance has to be truly

24  independent."

25      Do you see that?

1   A    Yes.

2   Q    And that was one of the important three legs of the stool

3   we talked about, right?

4   A    A portion of one of them, yes.

5   Q    And Mr. Pachulski says that:

6        "It should not be the TCC who controls that, it

7   should not be the coalition who controls it, it should not be

8   other lawyers, for instance, who control it.  It should be

9   truly independent."

10       Do you see that?

11  A    Yes.

12  Q    And that was the TCC's view at the time, right?

13  A    Yes.

14       MR. AMASS:  Your Honor, we would move Exhibit JTX-

15  3034 into evidence.

16       MR. KORNFELD:  No objection.

17       THE COURT:  Admitted.

18    (JTX-3034 received in evidence)

19       MR. AMASS:  And Your Honor, subject to any

20  redirect, we have no further questions.

21       THE COURT:  Thank you.

22       Mr. Kornfeld.

23       MR. KORNFELD:  Thank you, Your Honor.

24       MR. KURTZ:  Excuse me, Your Honor.  I actually have

25  a few questions unexpectedly, based on that cross-examination.

1        THE COURT:  Okay.  Then thank you, Mr. Kurtz.

2                    CROSS-EXAMINATION

3  BY MR. KURTZ:

4  Q    Good morning, Mr. Kennedy.  Glenn Kurtz from White & Case

5  on behalf of the debtors.  We haven't met.

6  A    Good morning, Mr. Kurtz.

7  Q    Good morning.  I just have a few questions for you, sir.

8         Is it fair to say that you did not draft the TDPs?

9  A    That I personally did not?  I did not.

10 Q    Did you have professionals negotiating the TDPs on behalf

11 of the TCC?

12 A    Yes.

13 Q    All right.  And did you, for instance, ever speak to or

14 negotiate with Adrian Azer about the TDPs?

15 A    Personally, no.

16 Q    And how about did you ever negotiate with Andy O'Neill

17 from White & Case with respect to the TDPs?

18 A    Personally, no.

19 Q    Did you ever have a copy -- strike that.

20        Were the TDPs ever input into your computer and worked

21 on?

22 A    I -- I'm not sure I understand your question.

23 Q    Let me withdraw it.

24        You mentioned some notion of control of the TDPs.  Would

25 you agree that, neither you, nor the TCC controlled the

1  debtors' input into the TDPs?

2  A    I would agree with that, yes.

3  Q    All right.  Thank you very much.

4         MR. KURTZ:  I have no further questions.

5         THE COURT:  Thank you.

6         Mr. Kornfeld.

7         MR. KORNFELD:  Thank you, Your Honor.  In

8  connection with the settlement that was reached --

9         MS. LUJAN WOLFF:  Excuse me.  I'm sorry, but I do

10 have a question before going to redirect.

11        THE COURT:  Okay.  Ms. Wolf.

12        MS. LUJAN WOLFF:  Thank you.  Delia Lujan Wolff of

13 Lujan & Wolff, LLP, representing certain survivors

14 (indiscernible)

15                    CROSS-EXAMINATION

16 BY MS. LUJAN WOLFF:

17 Q    And sir, I wasn't intending to question you, but I just

18 have one question for clarification.

19        And so, when Mr. Kornfeld questioned you earlier, he

20 asked you whether the TCC firmly supported the plan, and your

21 response was "yes, we do."  And so, in saying "yes, we do,"

22 were you saying that all committee members supported the plan,

23 or just that the TCC, after vote of the committee members,

24 supported the plan?

25 A    The -- the TCC acts as -- as one.  So my answer was

1  reflective of the sum total of votes in favor of the -- of the

2  plan.

3  Q    Okay.  And so that means that not every member of the TCC

4  supports the plan.  Is that correct?

5  A    My an -- I'm not trying to be evasive.  Are you asking me

6  if anyone voted to reject the plan?

7  Q    Well, I'm asking if you know whether all committee

8  members support the plan, as committee members?

9  A    I can -- I can only -- I can only speak to their -- to

10  their votes.

11  Q    Okay.  And so, to your knowledge, was it unanimous?

12  A    It was not.

13  Q    Okay.  Thank you.

14             THE COURT:  Thank you.

15             MS. LUJAN WOLFF:  I have no further questions.

16             THE COURT:  Thank you.

17             Let me ask:  Is there anyone else who has cross-

18  examination of Dr. Kennedy?

19        (No verbal response)

20             THE COURT:  Mr. Kornfeld.

21             MR. KORNFELD:  Thank you, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. KURTZ:

24  Q    Did any committee members vote against the plan that the

25  TCC agreed to enter into through the February 9th termsheet?

1  A    No, no committee members voted to reject it.

2  Q    Mr. Amass asked you a series of questions that went well

3  back into last year; as you said, nine or ten months ago.  I'm

4  just going to ask a couple of questions about that.

5       Nine or ten months ago, had the TCC reached any

6  agreement with the debtors or the coalition other than the RSA

7  that was extant for a couple of months?

8  A    I -- I'm sorry, Mr. Kornfeld.  Can you -- can you ask

9  your question again?

10 Q    Sure.  Let's break it down.  I'll make it -- I'll make it

11 simpler.

12 A    Thank you.

13 Q    With respect to the coalition, during parts of last year,

14 was the TCC and the coalition at times opposed to each other,

15 in terms of deciding on what was the path that the case should

16 take?

17 A    Yes.

18 Q    In January of 2022 -- fast-forward now -- did

19 negotiations start through the mediator over a potential

20 resolution of the TCC's disputes with the coalition, the

21 debtor, and others?

22 A    They did.

23 Q    Did those negotiations involve the TCC's participation?

24 A    They did.

25 Q    Would you briefly describe that participation?

1  A    Well, it was -- it was ongoing over several sessions.  We

2  had our professionals engaged, as well as some core counsel.

3  And then I was directly involved with three days, as well, on

4  site.

5  Q    Were the TCC's voice -- was the TCC's voice, in any way,

6  to use Mr. Amass' words, "diminished" during those

7  negotiations that took place in January into early February of

8  this year?

9  A    No.  I would say quite the opposite.

10 Q    Mr. Amass asked you questions about the independence of

11 the trust's governance.  Let me ask just a couple of questions

12 there.

13     Is the TCC confident that Judge Houser, along with

14 Judges Welch and Reagan, will be truly independent in their

15 governance and administration of the trust?

16 A    Yes, extremely.

17 Q    Why so?

18 A    Based upon their background and based upon the fact that

19 they have no prior relationship with any of the parties that

20 are involved.

21 Q    What about their background makes you confident in their

22 independence?

23 A    Well, these are three formal Federal Judges; they are not

24 professional trustee's, so to speak.

25 Q    Are they beholden in any way to any group of attorneys,

1  including plaintiffs' attorneys or tort attorneys?

2  A    I don't believe so.

3  Q    Is this a trust that you believe will be run by

4  plaintiffs' attorneys?

5  A    No, not at all.

6         MR. KORNFELD:  Your Honor, I have no further

7  questions at this time.

8         THE COURT:  Thank you.

9         MR. AMASS:  Nothing further, Your Honor.

10         THE COURT:  Thank you.

11         Dr. Kennedy, thank you for your testimony.  You're

12  excused.

13         THE WITNESS:  Thank you.

14     (Witness excused)

15         THE COURT:  Mr. Kurtz.

16         MR. KURTZ:  Hi.  Good morning, Your Honor.  Before

17  we proceed to the next witness and the matters relevant to the

18  next witness, I did want to highlight my understanding that

19  the materials that were just used in cross-examination with

20  Mr. Kennedy, as I understand it -- and I'll have to confirm

21  this -- were not premarked, they were not part of the record.

22  They weren't supplied, except exactly when they were shown to

23  the witness.  They were not impeachment materials.  And that's

24  sort of outside the protocols that we're supposed to be

25  following here.

1    I wanted to look a little deeper into it.  But I

2  wanted to highlight that parties need to get materials to

3  everybody they're going to use, and they needed to be marked.

4  And that wasn't impeachment material, and you can't -- if

5  you're going to try to use new materials, if that's the case,

6  as I'm told, then that has to be done in a forthright way,

7  with good cause shown, as opposed to just showing it and

8  moving through it before anybody can respond.  We'd like to

9  reserve the right to strike it as appropriate.

10    THE COURT:  Thank you.  I'll hear any motion that's

11  brought on that.

12    MR. KURTZ:  Thank you very much.

13    Yeah, we're at the point, Your Honor, of calling

14  the next witness, which is Adrian Azer.  There is, as Your

15  Honor knows, a motion to strike basically all of his

16  declaration, except maybe his name and where he works.  And so

17  I don't know if this is the appropriate time to hear it.  If

18  it is, of course, I'll cede the podium until the motion is

19  presented.

20    THE COURT:  It's the right time.  I have read

21  everything.

22    MR. KURTZ:  All right.  Terrific.

23    MR. DOREN:  Good morning, Your Honor.  Richard

24  Doren from Gibson, Dunn & Crutcher on behalf of the AIG

25  Companies.  And it's my privilege to appear, I guess on your

1  monitor.

2          Your Honor, as to the objections, as Your Honor

3  knows, they are primarily foundational in nature; personal

4  knowledge and the like.  And it may make sense for the Court

5  to defer judgment on the objections until after the witness'

6  testimony, evaluate what you've heard, and rule on the

7  objections at that point.

8          THE COURT:  Okay.  I'm happy to do that then.

9  Thank you.

10          MR. DOREN:  Thank you.

11          THE COURT:  Thank you, Mr. Doren.

12          MR. KURTZ:  Your Honor, the only thing I would say

13  about that is I don't actually think much of this is

14  foundational, and I'm happy to have the witness proceed.  It

15  was not my intention, however, to run him through anything but

16  a brief ten-minute direct.  And so, if we're going to sort of

17  hold off on the -- I mean, what I would have done is

18  introduced the declaration.  If we're going to hold off, then

19  I would reserve the right on redirect to go through any

20  material that anybody is going to now claim continues to have

21  a foundational deficiency.  I don't think any of it has a

22  foundational deficiency, which I intended to address by way of

23  motion prior to offering the declaration.  But I'm also happy

24  to have Your Honor hear it, subject, of course, to going back

25  and covering anything.

1            THE COURT:  Okay.  Let's --

2            MR. KURTZ:  All right.

3            THE COURT:  -- proceed.

4            MR. KURTZ:  Thanks.

5            So the debtors call Adrian Azer to the stand.

6            THE WITNESS:  Good morning, Your Honor.

7            THE COURT:  Good morning.  Mr. Azer, please raise

8   your right hand.

9   ADRIAN AZER, WITNESS FOR THE DEBTORS, AFFIRMED

10            THE COURT:  Please state your full name and spell

11   your last name for the record.

12            THE WITNESS:  Adrian Azer, A-z-e-r.

13            THE COURT:  Thank you.

14            Mr. Kurtz.

15                      DIRECT EXAMINATION

16   BY MR. KURTZ:

17   Q    Okay.  Good morning, Mr. Azer.

18        Now, before --

19   A    Good morning.

20   Q    Before turning you over for cross-examination, I want to

21   ask you who drafted the initial version of the TDPs?

22   A    I drafted them, along with Andy O'Neill at White & Case.

23   Q    All right.  And did anyone from the coalition or other

24   representatives of claimants provide any input into your

25   initial draft of the TDPs?

1   A     No, they did not.

2   Q     And did the coalition of any other claimant provide any

3   draft TDPs to you before you drafted TDPs?

4   A     No, we never got a draft from them.

5   Q     Had the coalition made any proposals before you drafted

6   the TDPs?

7   A     Yes, they had made two proposals in two different time

8   frames.  The first was February 2nd, and the second was right

9   before we actually filed the April 13th TDP, which was around

10  April 7th, 9th, 10th.

11       So the first proposal was -- was a termsheet.  It had

12  some vague terms in it.  A lot of it was unacceptable to the

13  debtor.  We just dismissed it out of hand.

14       The second one was, again, April 7th, around through the

15  10th.  So, at that time, Andy O'Neill were kind of hurriedly

16  drafting the TDPs because Ms. Lauria had told us that we

17  needed to get them on file by the 13th.  You know, we got

18  those termsheet.  Again, there were proposals we -- we

19  couldn't accept, didn't accept, and we didn't have time to

20  incorporate.  So, ultimately, they did not make it into the

21  April 13th version that was filed.

22  Q     Did any portion of those proposals by the coalition make

23  it into your initial draft of the TDPs?

24  A     No, they did not.

25  Q     Was there any party that provided you with any material

1  that you did, in fact, use, in your initial TDPs?

2  A    Yes.  Yes.  Hartford sent us a draft of the TDPs on

3  February 6th, Mr. Ruggeri actually sent it while he was at

4  Shipman & Goodwin.  Those were actually enormously helpful.

5  And in fact, we converted his PDF to a Word document and used

6  that as the template for us to start drafting.  And there were

7  lots of components to that that actually were -- we took.

8       So, for example, Hartford had proposed an expedited

9  distribution process.  We thought that made sense, so we took

10 that.

11      They also included scaling factors, so a lot of the

12 scaling factors that you see in the final TDP actually came

13 from the Hartford version that he sent on February 6th.

14 Q    In addition to working off of the Hartford TDPs, did you

15 consult with any other materials in drafting the TDPs?

16 A    Yes.  Yes.  So Andy O'Neill -- Andy O'Neill and I

17 obviously looked at other mass tort cases to see kind of how

18 TDPs were drafted, so we looked at, you know, asbestos,

19 opioid, talc, other sexual abuse cases, and we took some

20 general concepts from there.

21      So, for example, like most TDPs we saw had like a claims

22 matrix, so we figured that's something that we needed, as

23 well.  So, just other than general concepts, no.  We looked at

24 other stuff, but we only took general concepts.

25 Q    Did you or the others negotiating and drafting the TDPs

1  on behalf of the debtors ever give up control or the pen, so

2  to speak, of the TDPs to the claimants or to anyone else?

3  A    Absolutely not.

4  Q    Did the debtors ever lose interest in the content of the

5  TDPs?

6  A    Absolutely not.

7  Q    Can you explain that to the Court?

8  A    Yeah.  So, you know, as -- as our role, you know, we knew

9  we had to get a confirmable plan, and we needed something that

10  -- that the Court would approve; and so, therefore, we had a

11  really significant interest on -- as Ms. Lauria sometimes

12  says, is plainly just straight down the fairway, right?

13        We needed to make sure that we were taking into

14  consideration the interests of claimants, but also making sure

15  that we preserved the rights of our insurers, right?  That is

16  a significant asset to the estate, and we needed to make sure

17  that we were protecting our insurers' contractual rights.

18  Q    Did you negotiate any protections for the insurers'

19  contractual rights?

20  A    Absolutely.  That was, actually, probably the hardest

21  part of the negotiation and the most significant part of the

22  negotiation.

23        So there -- that kind of fell into two buckets, it --

24  like how I like to think about it.

25        The first bucket dealt with the process of the TDPs,

1    like how the trustee would evaluate claims.  So there are

2    probably four examples that are probably best suited to show

3    kind of the negotiations.

4         So the first is the insurers initially, when we gave

5    them the TDPs and the general criteria, the biggest complaint

6    we heard is, well, in the general criteria, you don't have a

7    requirement to show negligence.  And so, through the

8    negotiations, we actually modified, I think Subsection (c),

9    connection to scouting, to include language that says "may

10   bear legal responsibility."  That was meant to address the

11   insurers' point, right?  That, hey, you don't show negligence.

12   We couldn't limit it to negligence because there's lots of

13   other causes of action, so that was meant to be kind of all

14   encompassing of that.

15        The second one is, in the aggravating factors, we

16   actually had a reference to negligence.  But what it was meant

17   to be was actually more if you had -- if the BSA had notice,

18   then it was meant to allow for an increased dollar value, and

19   I guess the insurers were confused by that.  And so, again, we

20   modified that language to try to make clear our intent in the

21   aggravating factors it really is a knew or should have known

22   requirement.

23        And then, separately, in the IRO, which came about later

24   in the process, you know, initially, the claimants want it to

25   be a confirmed judgment, right?  And we basically said, no, it

1  can't be a confirmed judgment, that would be violative of the

2  insurers' contractual rights.  So what we negotiated is that

3  it out -- it actually was a settlement recommendation, right?

4  Because then they -- it could be presented to the insurers.

5       Fourth is there is an insurer participation section of

6  the independent review.  And through the negotiations, there

7  was some -- some effort to limit that, limit, you know, and

8  kind of prejudge their rights.  Again, we took all that out.

9  And then we also made it consistent with the concept of a

10 settlement recommendation.

11      So that's kind of what I call the "TDP process

12 negotiations."

13      And then there was a second -- second line of

14 negotiations relating to what was the no modification of

15 insurance rights, which is now the assignment of insurance

16 rights provision, which is Article 5(c) of the TDP.  We had

17 lots of negotiations around putting in and keeping protective

18 language that made sure that we weren't modifying, amending,

19 or supplementing the insurers' contractual rights.

20          MR. KURTZ:  Let me -- I'm going to pull up

21 Demonstrative Exhibit DDX-41.  If you can turn to the first

22 page of content, please.

23          And Your Honor, I'll just reference for the Court

24 that each of these documents is pulled from an exhibit, a

25 joint exhibit.  And the joint exhibit reference is in the top

1  column in each instance.

2  BY MR. KURTZ:

3  Q    Mr. Azer, what is this demonstrative --

4           MR. DOREN:  And --

5  A    That's a --

6           MR. DOREN:  -- Your Honor, I'll just say for the

7  record no objection.

8           THE COURT:  Thank you.

9           MR. KURTZ:  I hadn't even offered it, but thank

10  you.

11           MR. DOREN:  Well, as a demonstrative --

12           THE COURT:  As a --

13           MR. DOREN:  -- I might add.

14           THE COURT:  -- demonstrative.

15           MR. DOREN:  As a demonstrative, not as evidence.

16  BY MR. KURTZ:

17  Q    Mr. Azer, what is this?

18  A    Yeah, thank you.

19      So this is actually the negotiations of Article 5(c)

20  that I just referenced, right?  So we were negotiating out a

21  provision of the contract that dealt with trying -- you know,

22  what we meant not to modify the insurers' contractual rights.

23      So the first column, which is on May 26th of '21, that's

24  the coalition draft.  And so you're going to notice that the -

25  - the first time the coalition ever actually marked up the TDP

1   was on May 26th.  And what they did is they marked up our

2   April 13th version that was filed with the Court.  And so what

3   they did is they put in this *com oneri* language and some

4   limited language related to not modifying insurance rights.

5   So we looked at this, the debtors -- I, Adrian, looked at this

6   -- and said this isn't enough.

7        So, on 5/28, we sent back another draft that had more

8   expansive language.  And you'll notice that, in this draft, we

9   put in the specific language that:

10            "Nothing in these caps shall modify, amend, or

11  supplement or be interpreted as modifying, amending, or

12  supplementing the insurers' rights under the contracts."

13       So we sent that draft back to the coalition and the TCC.

14       And then, between 6/1 and 6/8, the insurers took it back

15  -- they -- I'm sorry, not the "insurers."  The claimants took

16  it back out, right?  They went back to kind of their more bare

17  -- what I'll call "bare bones language."  Again, that was just

18  not acceptable to me, as -- as counsel for the debtors.

19       And so, on 6/8, we went back to the old version, right?

20  We reinserted back the language that we thought that was

21  necessary to ensure preservation of the insurers' contractual

22  rights.

23       6/9, the coalition sends us -- sorry, I think that's

24  actually meant to say "coalition" at the top.  I apologize.

25  JTX-5 -- that -- I think we had a different version.

1     But what I'm saying is the coalition basically took it

2  back out.

3     And then, on 6/10, the coalition -- we had some

4  discussions with the coalition 6/8 -- between 6/8 and 6/10.

5  And we basically said like, look, we're not going to accept

6  this language being out, we think it's necessary to preserve

7  the insurers' contractual rights.

8     And ultimately, the coalition acceded to that language.

9  And that is, ultimately, the language that is in the current

10  version of the TDPs.

11     It's been slightly modified to actually give additional

12  protections to the insurers because they had some concern

13  about whether the debtors were trying to -- I think the next

14  slide shows this -- trying -- trying to make them pay self-

15  insured retentions.  And we just wanted to make sure that it

16  was clear that we're not trying to make them pay self-insured

17  retentions.

18     So, again, we -- we negotiated for this language.  It

19  was a hard-fought negotiation.  We, ultimately, ended up

20  winning.

21  Q   By the way, did you ever negotiation with Doug Kennedy,

22  Dr. Doug Kennedy?

23  A   I've -- I've actually never spoken to Mr. Kennedy.  I've

24  -- I've spoken to his counsel Mr. Stang, but I've never

25  actually spoken to Mr. Kennedy.

1  Q    Was Mr. Kennedy involved in the negotiations with the

2  debtors in formulating the TDPs?

3  A    I -- I never spoke to him.  I'm -- I'm not aware of that.

4  I've never even seen his name on emails.

5  Q    Okay.  Did the debtors intend for the TDPs to impair or

6  change in any way the insurers' rights, whatever they might be

7  under their policies?

8  A    Absolutely not.  That's why we were negotiating so hard

9  for Article 5(c) in the language in there.

10 Q    Did the debtors intend for the settlement trustee's

11 determinations to be binding on the insurers?

12 A    No.  We -- again, we weren't trying to prejudge anyone's

13 rights, insurers or otherwise.  That is for a coverage tort

14 that -- we did not mean for that to have any effect.

15 Q    Did the debtors intend for the settlement trustee's

16 determinations to bind future courts in any potential coverage

17 litigation?

18 A    No, we -- we did not.

19 Q    Okay.  In addition to what you did to protect the

20 insurers' rights under their policies, whatever they might be,

21 did you seek input from the insurers into the TDPs?

22 A    We did.  So, on June 25th, we actually sent an email --

23 or I'm sorry, "we."  Mr. Martin, who's co-counsel with me as

24 insurance coverage counsel, sent an email attaching the TDPs

25 to the insurers.

1      The reason we hadn't done it before that is we were

2  trying to get a document that was kind of, not fully baked,

3  but was enough aligned that we could actually present it to

4  them and start talking to them about it.

5      So, on June 25th, we actually sent them a draft of the

6  TDP for comment.  And we -- I think we asked for comments by

7  June 28th, although we actually didn't end up filing until

8  much later, so they had a longer period of time.

9  Q    And did the insurers, in fact, provide any input into the

10 TDPs?

11 A    So they did respond.  They -- they did not provide input

12 into the TDPs.  Instead -- so the emails we got back from the

13 insurers -- and this is in the record.  But the insurers

14 basically refused to provide comments.  They threatened us

15 with kind of multi-year litigation if we proceeded.

16     And third is they demanded that we go -- we use the

17 insurer draft, the Hartford initial draft that we got on

18 February 6th.  And what that would have been is -- is

19 basically abandoning, for intents and purposes, all the work

20 the debtors had done over the four months, you know, with our

21 advisors to find a TDP that actually worked for this case.

22     And they also were asking us to abandon all our

23 discussions with the coalition and basically just start over.

24 And that -- we couldn't do that.

25 Q    Did the insurers ever work constructively with the

1  debtors on the TDPs?

2  A    No.  So -- so we have email communications back and forth

3  with the insurers right around that time frame.  And

4  ultimately, what ended up happening is the insurers kind of

5  dug in.  And what ended up hap -- they -- they hired experts,

6  they basically challenged the process.  They weren't happy

7  with what we had negotiated, and they just were unwilling to

8  engage with us in a way to try to actually try to get the --

9  the document that we had into a place that could work for

10  everybody.

11  Q    Mr. Azer, does your declaration fairly represent your

12  testimony?

13  A    It does because I drafted it, along with a col -- a

14  colleague of mine at Hayes and Boone, Mr. Stoner.

15           MR. KURTZ:  All right.  And I'm going to offer the

16  declaration into evidence, Your Honor, along with the

17  demonstrative.  I appreciate the reservation, but I am going

18  to make the application.

19           THE COURT:  Mr. Doren?

20           MR. DOREN:  Again, Your Honor --

21           MR. KURTZ:  Now --

22           MR. DOREN:  -- conditional on our objections after

23  Your Honor hears the testimony, I have no objection to that.

24           THE COURT:  Okay.

25           MR. KURTZ:  And then the last thing I'm going to do

1  before the witness, Your Honor, is I'm going to ...

2  BY MR. KURTZ:

3  Q    Is someone in the room there with you, Mr. Azer?

4  A    There are three people in the room:  Our trial

5  technician; Mr. Stoner, who is directly across from me; and

6  Mr. Martin, who is here, as well.

7  Q    Okay.  So can one of those persons please open the cross

8  box that has been delivered to you, so it is handy for you, to

9  the extent that Mr. Doren intends to use it?

10  A    Yes.  I -- I think someone is doing that right now.  If

11  you'd just give us one second to get the box opened and the

12  binder.  Oh, it's already -- is it open?  Okay.  Great.

13          MR. KURTZ:  Otherwise, Your Honor.  I pass the

14  witness.

15          THE COURT:  Thank you.

16          THE WITNESS:  Mr. Doren, do you want me to get the

17  binder from the -- the binders from the box?

18          MR. DOREN:  That would be great.  Thank you.

19          THE WITNESS:  All right.  It's nice to meet you.  I

20  don't think we've met in this case before.

21          MR. DOREN:  I think you're right.  I don't think

22  we've met at all, sir.

23          THE WITNESS:  I don't think we've met at all.

24  That's right.  It's nice to meet you.

25          MR. DOREN:  You, as well.

1             THE WITNESS:  Do you want me to start with Volume

2   1, or is there -- are we going to go sequentially or --

3             MR. DOREN:  No, usually, they're --

4             THE WITNESS:  -- how would you like me to --

5             MR. DOREN:  The way these things usually work is I

6   ask the questions and provide --

7             THE WITNESS:  Oh --

8             MR. DOREN:  -- the --

9             THE WITNESS:  -- sorry.

10            MR. DOREN:  -- instructions --

11            THE WITNESS:  Sorry.

12            MR. DOREN:  -- and you answer them, so I'll let you

13   know.

14            THE WITNESS:  Okay.  Great.  I just have a lot of

15   materials in front of me.

16            MR. DOREN:  Your Honor, may I proceed?

17            THE COURT:  You may.

18            MR. DOREN:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. DOREN:

21   Q    Mr. Azer, you have been provided with three binders of

22   materials, which we had delivered to you in your office in

23   Dallas.  They are -- on the front page or the front cover of

24   each, there is a Bates range or JTX range.  And should you

25   need it, in the last of those binders, you will find both

1  volumes of your deposition and a copy of your declaration.

2      And Mr. Azer, so I know, do you have a copy of your

3  declaration kind of readily available at hand?

4  A    Other than what's in the binders, I don't have it.  So,

5  if you could direct me to it in the binders, that would be

6  great.

7  Q    Sure.  Why don't you go to the last tab in the third

8  binder?  And you might as well go ahead and remove that.  We

9  won't be -- we won't be referring to it constantly, but

10 regularly enough that that will probably save us some time.

11 A    If you can just give me one second.  I apologize.

12 Q    No worries at all.

13 A    Okay.  I have it.

14 Q    Thank you.

15     And other than the three binders, you have no other

16 materials in front of you today, correct?

17 A    No, sir.

18 Q    Thank you.

19     And I don't know if I heard this or not, so -- first of

20 all, as you say, you and I have never met, so it's a pleasure.

21 A    (Indiscernible)

22 Q    My name is Richard Doren, as I already said, I am with

23 Gibson Dunn, and I represent the AIG Companies.

24     And as I understand it, sir, you are a partner with the

25 law firm of Haynes and Boone, correct?

1  A    I am.

2  Q    And you are an insurance coverage lawyer, right?

3  A    Yes.  I'm a policyholder or coverage lawyer, yeah.

4  Q    That was my next question.  Your clients tend to be

5  policyholders.

6  A    Yes.  They're actually exclusively policy holders.

7  Q    Thank you.

8       And you're not a bankruptcy lawyer, are you?

9  A    Well, in another life I actually was.  I used to be at

10 Milbank Tweed and I used to be a bankruptcy litigator.  So my

11 big case was Lehman Brothers.  So I have some experience in

12 the bankruptcy world.

13 Q    And how long ago was that?  When was your last

14 experience with that?

15 A    I was at Milbank -- I was there from, I think, eight, to

16 twelve, thirteen, maybe somewhere around there.

17 Q    So roughly a decade ago would have been the last time

18 you were involved with bankruptcy litigation?

19 A    Yes.

20 Q    Now you are one of the lawyers representing the debtors

21 in this proceeding, correct?

22 A    I am.

23 Q    And specifically you are debtor's special counsel for

24 insurance recovery, correct?

25 A    We are.

1  Q    And you have served as insurance recovery counsel; in

2  other words, the Boy Scouts have been a client of yours sicne

3  about 2018, right?

4  A    That's correct.

5  Q    So prepetition?

6  A    Yes.   We represented the Boy Scouts prepetition in some

7  coverage matters.

8  Q    Now you personally haven't ever defended the Boy Scouts

9  in any underlying abuse claims, correct?

10 A    No.

11 Q    And have you ever represented any client in an abuse

12 claim?

13 A    No.

14 Q    And you don't have any personal knowledge of the

15 prepetition docket of abuse claims against the Boy Scouts,

16 correct?

17 A    I am not sure I can agree with that.   You know, we

18 interacted a ton with Mr. Griggs both prepetition and post-

19 petition regarding the docket because in order to deal with

20 the insurance issues we had to understand the claims and

21 understand the docket.

22      So prepetition I dealt with him to figure out what

23 claims we were tendering to the insurers and trying to get

24 recovery.   Then post-petition, obviously, I understood the

25 docket a bit because we were trying to work with Mr. Griggs to

1  formulate the TDP's.  So I'm not sure I can answer your

2  question the way that you want me to, but that is kind of how

3  I think about it.

4  Q    What I'm looking for today, sir, is the truth.

5  A    That is the truth.

6  Q    In your deposition -- and my question to you is simply

7  then other then what you learned from Mr. Griggs and his

8  colleagues at Ogletree you don't have any personal knowledge

9  about the underlying Boy Scouts docket, correct?

10 A    Other than my interactions with Mr. Griggs for coverage

11 purposes and formulating the TDP I do not.

12 Q    And the same would be said for the claims submitted

13 during these bankruptcy proceedings, correct?

14 A    Other than the caveat I just said which was I worked

15 with Mr. Griggs, no.

16 Q    Okay.  So the same could be said for those, correct?

17 A    Again, subject to the caveat I just mentioned I didn't

18 have a familiarity with the proofs of the claim or the

19 voracity.

20 Q    Thank you.

21      In this litigation you actively participated in the

22 representation of your client, correct?

23 A    Yes.

24 Q    You have attended hearings as counsel for the debtors?

25 A    I have.

1  Q     You have defended the deposition of BSA's general

2  counsel, Mr. Allen?

3  A     Mister -- I did defend Mr. Allen's deposition, but Mr.

4  Allen wasn't general counsel.  Mr. Allen, I think, was an

5  associate general counsel from 2010 to 2016.

6  Q     Okay.  So you know Mr. Allen's credentials well and you

7  defended his deposition, correct?

8  A     Again, I know Mr. Allen's credentials because I had to

9  defend his deposition well.

10  Q     And I understand Mr. Martin is there in the room with

11  you?

12  A     He is.

13  Q     He is not defending you today, correct?

14  A     No, he is not.  Mr. Kurtz is.

15  Q     And you worked with Mr. Martin to prepare Mr. Griggs for

16  his deposition, correct?

17  A     Yes.

18  Q     And you also took the deposition of Kathryn McNally, an

19  expert witness for the TCC, right?

20  A     I did.

21  Q     And Ms. McNally was providing testimony on claim

22  valuation issues, correct?

23  A     That is not what I deposed on her.  I deposed her on the

24  allocation side.  Mr. Kurtz deposed her on the valuation side.

25  Q     So you two gentlemen that we see on our screen deposed

1    Ms. McNally on behalf of the debtor, correct?

2    A    Yes.

3    Q    And you also prepared Ms. Gutzler for her deposition?

4    A    I did.

5    Q    And Ms. Gutzler -- that's Nancy Gutzler, is that

6    correct?

7    A    That's correct.

8    Q    And Ms. Gutzler is an expert witness for the debtors?

9    A    She is.

10   Q    And you also defended her deposition, correct?

11   A    I did.

12   Q    Will you be presenting Ms. Gutzler at trial next week?

13   A    I will not.  We made a determination that once I was a

14   fact witness I couldn't be an advocate for the court.  So I

15   have stepped back from that role being before the court as a

16   trial attorney.

17   Q    And by the way, just confirming, you haven't observed

18   any of this trial until you got to see all our smiling faces

19   this morning, correct?

20   A    No.  And I was actually joking with my one my

21   associates, so I'm not sure if they're happy they don't get to

22   talk to me or not.  I am going to assume their sad, but I have

23   not chatted with any of them.

24   Q    Now you have participated in a number of mediation

25   sessions in this case, correct?

1  A      I have.

2  Q      And as you have already said, you were one of the

3  lawyers responsible for negotiating the TDP's?

4  A      I was, yes.

5  Q      And that includes the version of the TDP's that was

6  submitted on February 15th, right?

7  A      Just to be clear February 15th, 2022, yes, I was

8  involved in that.

9  Q      Correct.  You have also been deposed twice in this case,

10 true?

11 A      I have.

12 Q      And both times you were presented as a 30(b)(6) witness

13 on behalf of the debtors, right?

14 A      Yeah, just to be clear, I was presented as a 30(b)(6) on

15 the good faith negotiations of the TDP because I was the

16 person who negotiated that.

17 Q      Sir, my question was simply when you appeared as a

18 30(b)(6) witness it was on behalf of the debtors, correct?

19 A      Yes, on that topic.

20 Q      And today you are here as a fact witness testifying on

21 behalf of your client, correct?

22 A      Yes, on the same topic that I was deposed on.

23 Q      Now you note in your written direct that you had two

24 guiding principles in drafting the TDP's --

25 A      Mr. Doren, do you want me to pull that in front of me?

1  Q     If you need it.  It's entirely up to you, it's your

2  testimony.

3  A     Okay.

4  Q     Now you recall, in your direct testimony, saying that

5  you had two guiding principles in drafting the TDP's, correct?

6  A     Yes.

7  Q     One of those was to create a fair and equitable process

8  to compensate direct abuse claimants that is consistent with

9  the BSA's prepetition practices, correct?

10 A     Yes.

11 Q     And for information about prepetition practices you

12 relied on Mr. Griggs and his colleagues because you had no

13 personal knowledge of those facts, correct?

14 A     That is correct.

15 Q     And your second principal, if you will, was to preserve

16 the rights of non-settling insurance companies, correct?

17 A     Yes.

18 Q     And -- sorry, I just received a note saying I'm out of

19 focus.

20       (Laughter)

21 A     Yeah, you are a little bit.  I apologize.  I wasn't

22 going to say anything.  I didn't know if it was a camera issue

23 for you.

24 Q     I prefer to think of it as soft focus.  When we can we

25 will get that fixed, Your Honor.  In the meantime I will

1  proceed and look ten years younger.

2  A    I think --

3  Q    Yes.

4  A    I thought someone just joined on the screen.  Sorry.

5  Q    Now you testified live here today on direct that the

6  debtor had no intention or anything contained in the TDP's to

7  bind on settling insurers, correct?

8  A    That is correct.

9  Q    And you had no intention -- the debtors and yourself had

10 no intention in drafting the TDP's of in any way impairing any

11 of the contractual rights that any non-settling insurers had,

12 correct?

13 A    That is correct.  We were not trying to pre-judge the

14 rights of the insurers and coverage.

15 Q    So as far as you are concerned the non-settling insurers

16 have every right -- it is your intention that the non-settling

17 insurers retain every right they have under each and every

18 insurance policy, correct?

19 A    Yes.  I mean so just to be clear what our intent was is

20 for coverage court to determine what those rights are.  We're

21 not getting them pre-judged here.  That is not the intent.

22 Q    Well, sir, the fact of the matter is you, as an

23 insurance recovery counsel for the Boy Scouts of America, are

24 familiar with their insurance policies, correct?

25 A    I am.

1  Q     And so you have a -- you have personal knowledge of the

2  contractual rights and duties that are set out in those

3  contracts, correct?

4  A     I do.

5  Q     And do you know, by the way, if the coalition or other

6  creditor groups intend that insurers have every right under

7  their policies, under the TDP's as written?

8  A     Yeah.  I can't speculate as to what their understanding

9  is.

10  Q     So at the end of the day, sir, when there is coverage

11  litigation what will matter most are the words contained in

12  the plan documents and the TDP's, correct?

13  A     I would think the answer is yes along with what the

14  court says.

15  Q     Well, let's include the court's order.

16  A     Yes.  I would imagine that those three things would be

17  what is really operative.

18  Q     So you, then, would not have any objection and the

19  debtors would not have any objection if this court concluded

20  that additional or different language was needed in the plan

21  documents or in the TDP's in order to assure that the

22  insurers' rights, as set forth in their prepetition contracts,

23  are preserved going forward, would you?

24          MR. KURTZ:  Objection, Your Honor.  That calls for

25  a legal conclusion.  It calls for the debtor's position.  We

1 | can address the debtor's positon at an appropriate time.  It's
2 | not for Mr. Azer, as a fact witness, to speak to, to those
3 | types of issues.

4 |         THE COURT:  Its not a legal conclusion.  Give me --

5 |         MR. KURTZ:  Maybe -- sorry, maybe a positional
6 | conclusion.  I don't think he -- the witness is on the stand
7 | to negotiate.

8 |         MR. DOREN:  Your Honor, this gentleman drafted and
9 | negotiated TDP's.  One of the issues here is what he intended
10 | and what he thought at each step of the way.  He has told this
11 | court that he believes every -- that it is the debtors
12 | intention that every single right under those policies be
13 | retained, preserved and they're going forward.  So I simply am
14 | asking him questions about the answers he has already given as
15 | to his intentions and as to his thought process during these
16 | negotiations.

17 |         MR. KURTZ:  And he had that testimony and we don't
18 | object to it, but now he's asking what happens in the future
19 | based on some confirmation argument and while I have no idea
20 | why that would be a problem that will be dealt with at another
21 | time.  I don't think the witness -- it's not asking the
22 | witness about historical negotiations, or understandings, or
23 | intents.  It's talking about future objections.  I think the
24 | time for future objections is in the future if any, and I'm
25 | not suggesting there will be any.

1          THE COURT:  I'm going to sustain the objection to

2   the extent it asks for the debtor's position.

3          MR. DOREN:  Thank you, Your Honor.

4   BY MR. DOREN:

5   Q    Mr. Azer, you, as the person who negotiated these TDP's

6   would have no objection to including any additional language

7   that this court found necessary in order to preserve and

8   reserve the rights of the insurers under their contracts post-

9   petition, would you?

10          MR. KURTZ:  Objection, Your Honor.  Mr. Azer has no

11  standing to make objections.  He is a representative of the

12  debtors, or a fact witness, or both, but he doesn't have an

13  independent position.  That is the same question that was just

14  sustained because they're asking for him to speak on behalf of

15  the debtors.

16          MR. DOREN:  Your Honor, I'm asking him to speak for

17  himself as the person who negotiated the document.  My

18  question was directly responsive to the objection and to the

19  sustained objection.

20          MR. KURTZ:  The negotiator has no standing in the

21  case to make objections.  He can speak to what he negotiated

22  and how he understood it, but he is not a party in interest.

23          MR. DOREN:  He's either a fact witness or he isn't,

24  Your Honor.

25          MR. KURTZ:  He is a fact witness.  We will

 1  stipulate to that, but he is not a party in interest.  He

 2  represents a party in interest.

 3          THE COURT:  I'm going to sustain the objection.

 4  There may be another way to ask the question, but I'm going to

 5  sustain the objection

 6  BY MR. DOREN:

 7  Q    Mr. Azer, do you believe that the terms of the TDP's, as

 8  currently pending before the court, provide the clearest

 9  delineation of the reservation of the insurers' rights that is

10  possible?

11  A    Yes.  That was our goal, right.  So when we put in the

12  language in Article 5(c), and I don't have it in front of me

13  anymore, that we're not going to modify, amend, supplement, or

14  alter, or nothing in here is meant to modify, amend,

15  supplement, or alter that is exactly what we were trying to

16  do.

17  Q    So your intention is that that includes all rights that

18  the insurers have under their policies, correct?

19  A    Yes.  Again, to the extent that --

20  Q    That's all I needed, sir.

21  A    Sorry, can I just finish my answer?

22  Q    Sure.

23  A    Sorry.  Let me finish my answer real quick.  So, yes,

24  subject to whatever coverage court determines they exist or

25  not we are not pre-judging it.  Our intent was to preserve the

1  insurers' contractual rights.

2  Q     When you say that you are going to preserve the rights

3  of the non-settling insurance companies to the extent that any

4  such rights exist you don't mean to suggest that the non-

5  settling insurers have no rights under their insurance

6  contracts with debtors, do you?

7  A     Let me tell you what I understood that to mean when I

8  wrote it is there are arguments that can be made in coverage

9  courts about breach and all the other stuff that, again, I am

10  not pre-judging. I have no idea whether they exist. I am not

11  asking the bankruptcy court to pre-judge it.  That is not what

12  we understand the court wants to do or is wanting to do.

13         So, again, subject to whatever a coverage court says we

14  are not asking the bankruptcy court to make any determinations

15  of the insurers' contractual rights.

16  Q     Now you dealt with -- I believe I heard you say that you

17  worked with Mr. Griggs prepetition on coverage issues related

18  to abuse claims involving the Boy Scouts.  Did I understand

19  that correctly?

20  A     That's correct.

21  Q     And when you did that the insurer -- were insurers

22  involved?  In other words, were insurers put on notice of

23  those claims?

24  A     Sorry, just to be clear, I worked with Mr. Griggs when

25  we were suing insurance companies in coverage litigation.

1  Q      So the answer would be yes, right?

2  A      Yes.

3  Q      So a claim was submitted?

4  A      Yes.

5  Q      Now you were involved in insurance recovery counsel to

6  recover on the claim, correct?

7  A      Yes, that's correct.

8  Q      And in the course of that work you understood that the

9  Boy Scouts insurers had the right to investigate those claims,

10 correct?

11 A      You're using a broad swath, it depends.

12 Q      Are you familiar, sir, with the concept of the duty to

13 investigate or the right to investigate under an insurance

14 contract?

15 A      I am.

16 Q      And you -- would you agree that generally speaking

17 insurers have the right to investigate claims tendered to

18 them?

19 A      So, again, Mr. Doren, you are asking for a broad based

20 statement that is really dependent on the position that the

21 insurer takes.  I am doing this based upon my practice as a

22 coverage attorney, right.

23        So if an insurer gets a claim and says I'm refusing

24 coverage then, no, they don't get the right to investigate

25 because they have denied the claim.  If they reserved rights

1 on a claim and they said, hey, we will defend and pay then,

2 yes, they get to investigate.  So it really depends on the

3 factual circumstances of the claim.

4 Q     So --

5 A     I can't give you a broad general statement is what I am

6 concerned about.

7 Q     All right.  So let's assume a claim is properly tendered

8 to an insurer, all right, and the insurer either accepts the

9 defense or accepts the defense with a reservation, all right.

10 A     Mm-hmm.

11 Q     Is that a yes?

12 A     Sorry, yes.

13 Q     And in that case does the insurer have the right to

14 investigate that claim?

15 A     So typically what ends up happening is, in my experience

16 as a coverage attorney, is -

17 Q     Sir, my question wasn't what happens.  My question was

18 does the insurer have the right to investigate the claim?

19 A     Yes.

20 Q     And does the insurer have the right to assess potential

21 liability defenses that the insurer may have?

22 A     Yes.

23 Q     And does the insurer have the right to assess the value

24 of the claim; in other words, what it might take to settle the

25 claim or what the potential exposure is?

1  A      Yes.

2  Q      And it has the right to conduct each of those

3  investigations and assessments independently, correct?

4  A      Yeah, they typically have claim adjusters who do that.

5  Q      On its own based on the facts it deems important,

6  correct?

7  A      Again, yes, they do it in consultation with counsel who

8  is typically retained by the policy holder.

9  Q      And the insurer also gets to agree whether or not a

10 claim will be settled, correct?

11 A      Again, subject to breach arguments, but typically yes.

12 Q      And, in fact, if a settlement is reached without the

13 consent of an insurer that would often preclude coverage,

14 correct?

15 A      No, I would disagree with that.

16 Q      Okay.

17 A      That is not accurate because --

18 Q      Thank you, sir.  Thank you for answering my question.

19 A      Sorry.

20 Q      And when the insurer determines at what price or whether

21 to settle a claim it also gets determined at what price, or at

22 what cost, or for how much money it is willing to settle that

23 claim, correct?

24 A      No, that's incorrect.  That is not how coverage works.

25 Q      Now how many -- have you reviewed any of the excess

1  policies issued by non-settling insurers?

2  A      I have.

3  Q      How many give or take?

4  A      More then I could count. I've looked at a lot of them.

5  Q      Bunches and bunches?

6  A      Yes.

7  Q      Okay.  Do you recall which insurers specifically?

8  A      I looked at Great American because I have dealt with a

9  claim addressing them. I've looked at some of the AIG

10 coverage.  I have looked at some of the Zurich coverage, some

11 of the Clarendon coverage.  I have looked at -- I am trying to

12 think of our other, kind of, lower level excess insurers, but

13 a lot of what I would call the right above the umbrella policy

14 coverage.  I have looked at a lot of those policies.

15 Q      Have you looked at any of the umbrella policies?

16 A      I have spent a lot of time with the primary and the

17 umbrella policies.

18 Q      I got you.  Let's go to those binders, please, and take

19 a look at JTX-3014.

20 A      So you're in Volume I, Mr. Doren, is that right?

21 Q      That should be Volume II and it should be toward the

22 back of Volume II.

23 A      I apologize.

24 Q      That is not your fault, sir.

25 A      I'm there.

1  Q    Sir, do you recognize this -- I'm sorry, Your Honor, we

2  will wait. I did not mean to begin to talk to the back of your

3  chair.

4           THE COURT:  That's okay. I've got it now.

5           MR. DOREN:  Thank you.  Again, Your Honor, it

6  should be, I think, second from last in Volume II.

7  BY MR. DOREN:

8  Q    Mr. Azer, do you recognize this document to be a

9  document produced by the Boy Scouts in this matter?

10  A    I do.

11  Q    And this is a Liberty Mutual umbrella policy, correct?

12  A    Do you mind giving me one second to look at the

13  declarations page?

14  Q    Not at all.

15  A    That's correct.

16  Q    And the effective dates or the effective period for this

17  policy is March 1st, 2003 to March 1st, 2004, correct?

18  A    That is correct.

19  Q    If you could turn, please to page 3014-7.  Let me know

20  when you're there?

21  A    I'm there.

22  Q    And you see the insuring agreement, the large block

23  heading, correct?

24  A    I do.

25  Q    And then if you go down there is A, B, C and then there

1  is a paren one and paren two, then below that it says Liberty

2  Mutual will.  Let me know when you have that.

3  A     I have it.

4  Q     And it says,

5       "Liberty Mutual will have the right and duty to defend

6  any suit."

7       Then if you go down further to the third line after the

8  comma it says,

9       "And may make such investigation and settlement of any

10 claim or suit as it deems expedient."

11      Do you see that language?

12 A     I do.

13 Q     And would you agree that is a contractual right of

14 Liberty Mutual under this policy?

15 A     So just to be clear, you guys actually need to look at

16 the primary policy because I think there is a deductible

17 endorsement here.  This is a matching deductible policy.  So I

18 actually think to answer your question you have to go look at

19 the endorsement which is the (inaudible) policy.  So if you

20 have the primary I can tell you what I think under that

21 matching deductible policy, because that is what it was a

22 matching deductible, that the policy holder actually had the

23 right to control the defense of these claims.

24 Q     Sir --

25               MR. KURTZ:  Excuse me, Your Honor.  Can Mr. Doren

1 stop interrupting?  He asked a question and he's getting the

2 explanation.

3          THE COURT:  Let's let the witness finish.

4          MR. DOREN:  Thank you, Your Honor.

5 BY MR. DOREN:

6 Q    Are you done, sir?

7 A    I was.

8 Q    Now when this policy, this umbrella policy, is impacted

9 by the claim and has responsibility for the claim Liberty

10 Mutual has the right to make such investigation and settlement

11 of any claim or suit as it deems appropriate -- expedient,

12 correct?

13 A    No.  Mr. Doren, that is what I am trying to explain to

14 you is you can't look at policy terms on how you read an

15 insurance policy.  You got to read the insurance policy along

16 with the endorsements because the endorsements modify the

17 contract.  So in order to answer your question you also have

18 to look at the primary policy here to figure that out.  I know

19 this for certain that the primary policies have a deductible

20 endorsement on it.  So you have to look at that primary policy

21 to see how that modifies the general terms in this insurance

22 policy.

23 Q    And, sir, is it your testimony that Liberty Mutual does

24 not have the contractual right to make such investigation and

25 settlement of any claim or suit as it deems expedient under

1  this policy?

2        (Audio interruption)

3            THE COURT:  Excuse me.  Excuse me, this is the

4  Judge and there is someone who is speaking on a live audio.

5  Thank you.

6            MR. KURTZ:  Just so the record reflects everything

7  that included "okay" on was not the witness in case there is a

8  dispute (inaudible).

9            MR. DOREN:  And to be clear, with Mr. Kurtz,

10 including the "okay." I don't want to impose that on Mr. Azer.

11           THE WITNESS:  Mr. Doren, would you mind repeating

12 your question, I'm sorry, given the interruption.  It would be

13 helpful to know what the question is again.

14           MR. DOREN:  Not a problem.

15 BY MR. DOREN:

16 Q    Is it your testimony, sir, that under this umbrella

17 policy Liberty Mutual does not have the right to make such

18 investigation of any claim that it deems appropriate?

19 A    No.  What I am telling you is how you read insurance

20 policies, especially when you're looking at umbrella policies

21 that follow from to primary policies, you have to go back to

22 the primary policy, you got to look at the endorsements, see

23 how the endorsements modify the rights of the insurers, and

24 given that this is a Liberty Mutual policy that is a matching

25 deductible policy -- and just to explain what that means is

1  the policy holder has to actually pay on a per current basis

2  the first million dollars, and this was also a matching

3  deductible policy the endorsements effect the rights of the

4  insuring agreement.  You can't just read that in isolation.

5  You have to look at the endorsements.

6  Q    Thank you, sir.

7       My question is under this insuring agreement, and let's

8  leave aside for a moment -- I appreciate your explanation

9  about the endorsements and the primary policy, I appreciate

10 that.  I think we and the court understand that needs to be

11 taken into account, but on the face of this policy if this

12 provision, as written, were to be enforced for a claim would

13 you agree that Liberty Mutual may make such investigation and

14 settlement of any claim or suit as it deems expedient?

15       MR. KURTZ:  I am going to object.  It completely

16 ignores the testimony that this provision works in conjunction

17 with other provisions.  So he can say this to say the words,

18 but the notion that this is -- that they have these

19 investigation settlement rights is exactly contrary to the

20 repeated testimony of Mr. Azer.

21       THE WITNESS:  Mr. Doren, like I said previously,

22 you have to --

23       MR. KURTZ:  Mr. Azer, you might want to wait for

24 the Judge.

25       THE WITNESS:  I'm sorry.

1            THE COURT:  I will sustain that objection.

2            MR. DOREN:  Thank you, Your Honor.

3  BY MR. DOREN:

4  Q    Mr. Azer, let's talk a little bit about the TDP's and

5  specifically you mentioned that there had been a proposed

6  termsheet sent over by the coalition back in February 2021

7  that was rejected by the debtor, correct?

8  A    That is correct.

9  Q    And can you please take a look, please, at Exhibit 375?

10 A    Mr. Doren, I just want to make sure that I'm on the same

11 page.  I have a binder one that says JTX 1 through 353 and JTX

12 1 through 416.  I should be in Volume I, right?

13 Q    Volume II, sir.

14 A    Sorry.  What document would you like me to look at

15 again, 375?

16 Q    Correct.

17 A    I got it.

18 Q    Sir, Volume I includes documents that begin with the

19 number 1 dash.  Apparently that was how the debtor produced

20 them.

21 A    Okay.

22 Q    So looking at Exhibit 375 -- let me know when you have

23 that in front of you.

24 A    I have it.

25 Q    And this is a document that was referenced in your

1   written direct and this is an email from counsel for the

2   Coalition to counsel at White & Case, correct?

3   A     That is correct.

4   Q     And you're not on this particular email, correct?

5   A     I am not.

6   Q     And this email states,

7         "Attached, please find the Coalition's proposed

8   termsheet describing…"

9         And then Romanette II is,

10        "Initial terms of trust distribution procedures."

11        Do you see that?

12  A     I do.

13  Q     Let's look, please, at the next tab, 376.  This document

14  is also referenced in your direct testimony.  Do you recognize

15  this to be the termsheet that was attached other than the

16  subsequent blocking out of privilege material?

17  A     Yeah, it was a preliminary termsheet that was provided

18  by Mr. Molton.

19  Q     Look, please at page numbered 4 in the bottom center.

20  Do you have that in front of you, sir?

21  A     I do.

22  Q     And in the fourth box down you see the heading claims

23  value matrix?

24  A     I do.

25  Q     And the Coalition stated that,

1        "The TDP shall include a claims value matrix

2   substantially in the form attached as Exhibit A."

3        Correct?

4   A    They did.

5   Q    And, of course, Exhibit A is -- it's either not here or

6   it's probably redacted, but that statement is contained in the

7   un-redacted portion, correct?

8   A    No.  Mr. Doren, Exhibit A is on the very back.  It's the

9   claim values.  It's on the very back of the document.

10  Q    I see.  Thank you.  You're on page 10?

11  A    Yeah.

12  Q    Okay.  Thank you. I appreciate that, sir.

13       So the Coalition was proposing at this point that the

14  TDP's include a claim value matrix, correct?

15  A    Yes.

16  Q    Also at page 4, below that, you see the determination of

17  claim value.  Do you see that?

18  A    I do.

19  Q    And it says,

20       "The TDP's shall set forth a claims assessment protocol

21  to determine the value of abuse claims based on the claims

22  value matrix."

23       Did I read that correctly?

24  A    You did.

25  Q    Then various categories of information are set out,

1  correct?

2  A     Correct.

3  Q     Then on page 5 of this document the last entry is

4  binding claims value determinations.  Do you see that?

5  A     I do.

6  Q     And it says,

7       "Determinations of values of approved settled claims and

8  tort election claims shall be binding on insurers."

9       Did I read that correctly?

10 A     You did.

11 Q     And did you understand the claimants back in February

12 2021 to be proposing that the values -- the allowance and

13 values of claims performed under the TDP's would bind

14 insurers.  That was their position?

15 A     We did.  That is why we rejected it.  We didn't agree

16 with that.

17 Q     That was my next question, sir.  You rejected this

18 termsheet outright as I think you testified to in your

19 deposition, right?

20 A     Yeah, we rejected it for three principal reasons.

21       One is, if you go back to the settlement value or tort

22 election, they wanted a system where they could basically kick

23 every claim out to the tort system.  We were not okay with

24 that.

25       Two is they wanted a claim matrix.  All TDP's have claim

1  matrixes, so we knew we had to include that.  We were

2  unwilling to agree to the values on Exhibit A.

3      Three is we were unwilling to agree to the binding

4  nature of the valuations.  That was just unacceptable to us.

5  Q    Thank you.

6      When you say the binding nature you mean you were -- it

7  was unacceptable to you that the determinations under the

8  TDP's or within the claim administration process generally be

9  binding on insurers, correct?

10 A    That is correct.  As I said in my direct that was not

11 our intent.

12 Q    Thank you.

13     And that was, in part, because you knew that any attempt

14 to bind the insurers to the claim value set under the TDP's

15 would breach contractual rights of those insurers, correct.

16 A    I wouldn't say it that way, Mr. Doren.  What I would say

17 is that we were trying to make sure that all contractual

18 rights are preserved.  So whatever the values are and how they

19 were supposed to be determined that is for a coverage court.

20 That is not for this bankruptcy court to determine.

21 Q    Let's take a look -- well in your written direct

22 testimony you also, and I believe actually this morning,

23 testified that Hartford sent the debtors a draft TDP in

24 February 2021.  Do you recall that testimony?

25 A    I do.

1    Q    And that -- and you told the court in your written

2    testimony that the Hartford TDP served as the initial

3    foundation for the debtor's TDP, correct?

4    A    That's correct.  I think, as I mentioned, we actually

5    converted the PDF to a Word document.

6    Q    Correct.  And you echoed that testimony again here this

7    morning.

8         Now in note seven, footnote seven of your direct

9    testimony you site the transmittal email from Hartford which

10   is JTX-380.  Could you take a look at that, please?

11   A    I have it.

12   Q    And you describe this as the transmittal cover email

13   from Hartford's counsel to you and others back on February

14   6th, 2021.  Do you recognize that as such?

15   A    I do.

16   Q    And this exhibit reflects two different attachments,

17   correct?

18   A    It does.

19   Q    It reflects -- the second attachment, if you will is a

20   privileged and confidential BSA trust distribution plan,

21   correct?

22   A    That is correct.

23   Q    And the first is a letter from J. Ruggeri to Ms. Lauria,

24   Mr. Andolina, Mr. Martin, etc., correct?

25   A    Yeah, that's a letter from Jim Ruggeri.

1  Q    Okay.  Now take a look, please -- well -- now this

2  letter, the cover letter is not specifically referenced in

3  either your written direct testimony or in the testimony you

4  provided this morning, correct?

5  A    I didn't reference it, no.

6  Q    Okay.  Let's take a look, please, at that letter which

7  is Exhibit 374 in your binder.  I'm sorry, let me take that

8  back, its 379 in your binder.  My apologies.  Do you have that

9  in front of you, sir?

10  A    I do.

11  Q    All right.  Do you recognize this as a February 5th,

12  2021 letter to you and your colleagues at Haynes & Boone and

13  White & Case from counsel for Hartford?

14  A    I do.

15  Q    And since this wasn't included with your declaration --

16  Your Honor, I want to move Exhibit JTX-379 into evidence.

17        MR. KURTZ:  No objection, Your Honor.

18        THE COURT:  Thank you.  Admitted.

19     (JTX-379 received into evidence)

20        MR. DOREN:  Thank you, Your Honor.

21  BY MR. DOREN:

22  Q    And this was, sir, the letter that Hartford sent over to

23  you along with the draft TDP's that you testified about,

24  correct?

25  A    It was.

1  Q    And at the top of page three of this letter counsel for

2  Hartford says,

3       "On January 28th, 2001 we asked BSA about TDP's,

4  including who is drafting the TDP's, the debtors intend to

5  file."

6       Do you see that statement?

7  A    I do.

8  Q    You said the claimants would surprise and concern

9  Hartford, correct, you said that?

10  A    I did not have this conversation.  So when you said

11  "you" that was not me having this conversation.

12  Q    Very well, sir.  So what I read was you, because it was

13  written in the letter --

14  A    Oh, I'm sorry.  Yes, you read it correctly.

15  Q    This is a statement Mr. Ruggeri made in this letter to

16  you and your colleagues back on February 5th, 2021, correct?

17  A    Correct.

18  Q    He then went on to say,

19       "We asked again on February 2nd and this time you said

20  everyone is drafting TDP's including BSA."

21       Correct?

22  A    That is what he wrote.

23  Q    And February 2nd is the same date you received the

24  Coalition's termsheet which you subsequently rejected, right?

25  A    Yeah, I don't know why Mr. Ruggeri said that.  It's

1  actually factually incorrect and contrary to the chronology.

2  At that point in time we hadn't even started drafting TDP's.

3  I didn't start drafting them till April 7th.

4          MR. DOREN:  Your Honor, I will move to strike

5  everything after "yeah."

6          THE COURT:  Yes.  I will strike it.

7  BY MR. DOREN:

8  Q    Sir, Mr. Ruggeri then goes on to say,

9      "Again, this surprised and concerned us because it is a

10 fundamental requirement of the Hartford policies that Hartford

11 and BSA cooperate to defend and resolve the claims."

12     Did I read that correctly?

13 A    You did.

14 Q    On the last paragraph on that same page, sir, and, in

15 fact, the last line of that paragraph Mr. Ruggeri states,

16     "Various provisions of the draft plan that BSA

17 apparently intends to file already impermissibly prejudiced

18 Hartford's rights including…"

19     Do you see that sentence?

20 A    I do.

21 Q    The first bullet point says,

22     "The plan improperly deprives Hartford of its

23 contractual right to defend and/or resolve abuse claims that

24 are to be tendered."

25     Correct?  That was a concern of Hartford's as stated in

1  this letter, correct?

2  A      That is what he wrote down.

3  Q      And in the third bullet point counsel for Hartford

4  stated,

5       "The plan improperly seeks a ruling, binding on BSA,

6  that the plan documents, including any TDP's, are a good faith

7  settlement of the abuse claims entered into without Hartford's

8  consent."

9       First of all, did I read that correctly?

10  A      You did.

11  Q      Secondly, do you know whether the plan documents today

12  include a finding that the plan documents constitute a good

13  faith settlement of abuse claims?

14  A      I thought the findings said that they're a fair and

15  equitable settlement, the TDP's were.  I don't recall.  I

16  think there is also a separate good faith finding.  I don't

17  recall the exact language, I'm sorry.

18  Q      That's all right, sir.  The next sentence, on the top of

19  page 4, counsel for Hartford said,

20       "This includes seeking a finding that the plan

21  constitutes a fair, equitable, reasonable settlement of the

22  abuse claims."

23       That is closer to the language you specifically

24  remember, correct?

25  A      I think the findings say fair and equitable settlement

1  related to the TDP.  Again, I don't -- if you give me the plan

2  I can look at it.  I just don't remember off the top of my

3  head the exact language.

4  Q    And Hartford's concern was that findings such as those

5  would be the antithesis of insurance neutrality, correct?

6  A    I have no idea.  I mean the next sentence such a finding

7  is the antithesis of insurance neutrality.  So I can read

8  that, what he wrote.

9  Q    Thank you.

10      Let's go down further on page 4 to the paragraph after

11  the bullet points.  Here, Hartford similarly has concerns

12  about any TDP's.  Do you see that?

13  A    I do.

14  Q    And it says,

15      "The proposed termsheet that the Coalition, which you

16  previously indicated would bear responsibility for drafting

17  the TDP's, heightened Hartford's concern that the TDP's will

18  compromise Hartford's contractual rights and represent an

19  unreasonable settlement of the abuse claims."

20      Do you see that language?

21  A    I do.

22  Q    And he went onto say that,

23      "Among other things, the TDP's must confirm that

24  Hartford has a right, under its primary policies, to defend

25  any suit against the insured seeking damages on account of

1  potentially covered bodily injury, and Hartford has the right

2  to settle any such claim or suit as Hartford deems

3  appropriate."

4      Did I read that correctly?

5  A    You did.

6  Q    And you understood that to be a requirement of

7  Hartford's to be included in any TDP's, correct?

8  A    I understood that Mr. Ruggeri raised that issue with us.

9  Q    They then go onto to say that,

10     "If BSA enters a settlement with the claimants by TDP's

11 or otherwise that takes away Hartford's right to defend and

12 settle claims.  BSA is in breach of its obligations to

13 Hartford.  Simply put, the TDP's must allow Hartford and any

14 other applicable insurer to assume the defense of any claim in

15 which case that claim must be resolved in the tort system not

16 through the TDP's."

17     And you understood back on February 5th, 2021 that that

18 was another concern and another demand being posited by

19 Hartford, correct?

20 A    We understood that was a demand being made by Hartford

21 that we disagree with.

22 Q    And on February 5th -- I'm sorry, on page 5 of the

23 February 5th letter, the third bullet point, Mr. Ruggeri

24 states,

25     "Neither the TDP's nor the plan should contain any

1  statement that claims values or a claims matrix represents the

2  reasonable or settled value for such claims.  Such a statement

3  would be prejudicial to BSA and its insurers and would breach

4  Hartford's contractual rights."

5       You knew that was another concern that Hartford had as

6  of February 5th, 2021, correct?

7  A    We knew that Hartford had raised that, yes.

8  Q    And did you agree or disagree with that one, sir?

9  A    Well I think we disagree the fact that we knew we had to

10 have a claims matrix.  Again, we weren't trying to bind the

11 insurers to the values that the trustee would set.  So I guess

12 what I would say is -- I don't know whether I would agree or

13 disagree with it to be honest with you.  I can tell you that

14 we weren't trying to bind the insurers to the values.

15 Q    So your intent, at the time, starting February 5th

16 forward, not off into the future, just to today was that

17 insurers have the right to litigate the value of a claim no

18 matter what and without regard to the value of the claim that

19 is established through the TDP's, correct?

20 A    No.  That is incorrect, Mr. Doren.

21 Q    That is not your position?

22 A    No.  Let me explain why.

23 Q    That's all right.  You will have a chance on redirect.

24 A    Okay.

25 Q    It is not your position that the non-settling insurers

1 | should have the right to litigate the value of claims in the
2 | tort system in coverage litigation without regard of what the
3 | settlement values establish through the TDP's was, correct?
4 | A    Mr. Doren, we don't agree that every claim should be
5 | litigated in the tort system.  The insurers contractual
6 | rights, as we understand them, is that if you approach the
7 | insurer with a settlement recommendation, which is what the
8 | trustee would give, the insurer has an option to either say I
9 | agree with the settlement recommendation or I disagree with
10 | the settlement recommendation.

11 |     If the insurer says they disagree with the settlement
12 | recommendation they have no obligation to pay and then you
13 | proceed to coverage litigation to see if it's recoverable or
14 | not.  But, no, we don't agree funda -- if your question is do
15 | they get to take every claim to the tort system no matter what
16 | the answer is no, that is not provided under contract.  So
17 | that is why I have a disagreement with you on this.

18 |     I agree with you that we did not need to -- when the
19 | trustee gives the amount that somehow that obligates the
20 | insurer to pay that is not what we intended.
21 | Q    And you would agree, sir, that when a settlement is
22 | reached an insurer who has not consented to that settlement
23 | generally has the right to litigate whether that settlement
24 | was reasonable or not, correct?
25 | A    They get to litigate the coverage issue.  They don't get

1  to litigate the underlying claim.  So if a policy holder says
2  I think there's a fair settlement in place, and I think you
3  should pay, the insurer has the right to say, no, I don't
4  think that is a fair settlement and deny coverage.  Then what
5  happens is the policy holder has a choice to either move
6  forward with a payment or agree with the insurer.  If the
7  policy holder says I agree with the payment then what ends up
8  happening is the policy holder and the insurer then go to
9  coverage litigation to fight about whether that payment was
10 reasonable.
11     So I guess there is a nuance there which is you don't
12 get to refight the underlying, you get to fight about the
13 coverage issues.
14 Q    Sir, if an insurer has a contractual right to defend a
15 case and to control the settlement of that case, and an
16 insurer and a policy holder settles without that insurer's
17 consent that insurer has the right to contest that settlement
18 correct?
19 A    Can you say your question one more time?  Sorry.
20 Q    If an insurer who has control of the claim in terms of
21 having a duty to defend, the right to investigate, and the
22 right to negotiate and settle, if the policy holder settles
23 that claim without the consent of the insurer then that
24 insurer has a right to contest the reasonableness of that
25 settlement, correct?

1  A      So --

2  Q      It's a yes or no question, sir.

3  A      -- the problem is you have a really long hypothetical.

4  Q      It's not a hypothetical, sir.  Its juts a straight-up

5  answer.

6  A      The answer is no, because insurers don't get the sole

7  right to control the defense.

8  Q      And if a policyholder, if an insurer has the right to

9  control settlements and the policy requires that any

10 settlement have the consent of an insurer and that

11 policyholder does not receive that consent, then that

12 settlement is not covered, correct?

13 A      No, that's completely antithetical to coverage law.

14 Q      Thank you.

15        By the way, sir, last night, we were served with a --

16 well, let me hold off on that for now.  Just one moment.

17        Now, we've looked at the February term sheet from the

18 Coalition.  You talked about the draft TDPs from the Hartford

19 and we've now looked at the cover letter expressing certain

20 issues by the Hartford.

21        Let's look now at about at your April 10, 2021, draft

22 TDPs.  And I believe you told the Court a few moments agree

23 that it was you and one other colleague that wrote this

24 document?

25 A      There was an associate, as well, as White & Case, Tuvia

1  Sandler, who was probably the -- he worked a lot on it, as

2  well.  So, there's obviously a team of folks.  I'm just naming

3  the partners who drafted it.

4  Q    Okay.  And I appreciate that.

5       So, there were two partners:  yourself and one other; is

6  that right?

7  A    That's correct.

8  Q    Okay.  And you were one of the partners primarily

9  responsible for the April 10 draft?

10 A    That's correct.  I dealt with kind of the insurance

11 issues on them, yep.

12 Q    Okay.  And that version of the TDP was drafted

13 exclusively by the debtors with no input from any claimant

14 constituencies, correct?

15 A    That's correct.

16 Q    So, that document, sir, is at JTX-445, which should be

17 in the same binder.  With a little luck, this will be the one

18 binder we spend most of our time in.

19      And do you have this document before you?

20 A    I do.

21 Q    And do you recognize this document to be a draft of the

22 TDPs that you were one of the primary authors of any

23 April 2021?

24 A    Yes.

25 Q    And I note at the top, it says "White & Case draft," but

1  in reality, you and one of your partners wrote this document?

2  A     I'm sorry, the partner was at White & Case; it's Andrew

3  O'Neill at White & Case.

4  Q     Got it.  Thanks for the clarification.

5        And by the way, if you could just look at the prior tab,

6  444, I understand this to be the transmittal email when you

7  sent this over to the Coalition, correct?

8  A     That's correct.

9  Q     And this was sent over on Sunday, the 11th of April in

10 2021, correct?

11 A     That's correct.

12 Q     Then you all actually filed TDPs with the Court on about

13 the 13th without any really substantive changes from this

14 draft, correct?

15 A     I have not compared the two, between this draft, but if

16 you're -- that's what you're representing to me, then I'll

17 accept that.  I just don't know that to be accurate.

18        I just -- I didn't look at it.  I know I spent a lot of

19 time between the 11th and the 13th kind of doing stuff,

20 because I went back and looked, so I don't know if were -- if

21 we changed words or not.  I just don't know.

22 Q     Understood.  Understood.

23        And you would stand by your written testimony if you

24 said, essentially, you sent them a draft but made no changes

25 in response to anything the Coalition --

1   A      Yeah.

2   Q      -- had to say and went ahead and filed with the Court?

3   A      Correct.  I'm not aware that we accepted any of the

4   Coalition's suggestions in their April term sheets.

5   Q      I appreciate that.

6          Now, in this draft, the debtors included the provisions,

7   or certain provisions to preserve the rights of non-settling

8   insurers; is that correct?

9   A      Yes.

10  Q      And those are, again, provisions that you all drafted,

11  without any input from claimants, correct?

12  A      Correct.

13  Q      And without any input from any insurers either, correct?

14  A      I think, that's right.

15  Q      And so, this was your best thinking as of April 10,

16  2021, as to what was necessary and appropriate, correct?

17  A      This was one approach we were contemplating.

18  Q      And it was an approach that you were willing to file in

19  court, correct?

20  A      Yes, absolutely.

21  Q      And it was an approach that you, as a coverage lawyer,

22  believed in?

23  A      Again, this was one approach we were contemplating.  We

24  knew this document would be negotiated, so this was a starting

25  point for us to talk to folks.

1    Q      It's your written work product, right, sir?

2    A      Yeah, I think so.

3    Q      That you, then, filed with this Court in April of 2021,

4    correct?

5    A      Yes, on behalf of the debtors.

6    Q      So, take a look, please, at Section 2.1, which is on

7    page 1, and under the general provisions stating purpose, do

8    you see that?

9    A      Yeah, one moment.

10   Q      Just a second.  I'll orient you in a second here.

11   A      Yeah, I got it.

12   Q      Okay.  Now, take a look at the last sentence there and

13   you wrote:

14            "The trust distribution procedures are intended to

15   balance the interests of reorganized BSA and the other

16   protected parties, holders of abuse claims, and the

17   non-settling insurance companies."

18            Correct?

19   A      Yes.

20   Q      And by balancing the interests, including those of the

21   non-settling insurance companies, you meant that you wanted to

22   ensure that no rights of any non-settling insurers were

23   impaired by the TDPs or the plan, generally, correct?

24   A      That's correct.

25   Q      Take a look, please, at Section 3.4, which would be on

1  Bates number 742 in the bottom right.  You may be the first

2  witness I've ever spoken to, I don't have to explain what a

3  Bates number is.

4        And you see the Section 3.4, sir, it says,

5  "Cooperation"?

6  A     I do.

7  Q     It says:

8              "The settlement trust shall perform all obligations

9  under the BSA insurance policies issued by the non-settling

10 insurance companies in order to maintain coverage and obtain

11 the benefit of coverage under such policies."

12       Do you see that?

13 A     I do.

14 Q     And, again, that was language that you thought necessary

15 and appropriate to include in these TDPs, correct?

16 A     Yeah, it was, obviously, what we were thinking at the

17 time.

18 Q     And the next sentence says:

19             "Such obligations shall include any requirement to

20 share documents, witnesses, or other information with the

21 non-settling insurance companies to the extent required under

22 the relevant insurance policies."

23       And, again, that was language that you thought was

24 necessary and appropriate at the time, correct?

25 A     Yeah, that's the appropriate thinking about at that

1  time.

2  Q     And, by the way, when you said, "Such obligations shall

3  include," you didn't mean that to be exclusive did you; you

4  intended that just to be examples of some of the obligations

5  that you may need to satisfy, correct?

6  A     Yeah, subject to the *caveat* "and to the extent

7  required," but yes.

8  Q     Depending on what's in the contract at issue, correct?

9  A     And depending on whether there's certain aspects of

10  coverage, like, for example, if you're in breach, then you

11  don't have to do this.  So, it just depends.

12  Q     And, similarly, if the policyholder doesn't want

13  insurance coverage for it, they don't have do those things

14  either, correct?

15  A     Right.  Well, if it's an uninsured claim or if

16  settlement covers, then sometimes you don't have do that,

17  that's correct.

18  Q     And then take a look, please, at Section 7.2, which is

19  at page 706 of the Bates range.

20        And do you have that in front of you, sir?

21  A     I do.

22  Q     And this section is called, "Rights of non-settling

23  insurance companies."

24        Do you see that?

25  A     I do.

1  Q     And in this section, you wrote:

2          "Nothing in the trust distribution procedures (a),

3  shall affect, impair, or prejudice the rights and defenses of

4  the non-settling insurance companies in any manner."

5          Do you see that language?

6  A     I do.

7  Q     And, again, depending on what rights the insurer has

8  under their contract, that would include their right to

9  investigate claims, correct?

10  A     Subject to their rights -- whatever right they have,

11  yes.

12  Q     Sure.

13          And their right to only pay settlements that are

14  reasonable, based on the facts of the specific claim, right?

15  A     Subject to all the coverage defenses, yes.

16  Q     And to only pay settlements in which it consents to in

17  advance, if that is what their contract provides, correct?

18  A     Yes, and that's subject to lots of coverage defenses

19  that may apply that would, by either take that away, but yes,

20  subject to those coverage defenses and arguments that those

21  rights don't exist, yes.

22  Q     Sure.

23          If you can nullify that right, then that right won't

24  apply.  But it was your intention --

25  A     Yes.

1  Q     -- in drafting, and it was your intention throughout the

2  time you were drafting these TDPs that the TDPs should not

3  nullify that right, to the extent it otherwise exists,

4  correct?

5  A     Yeah, my intention was for the Bankruptcy Court not to

6  decide that.  It's for the coverage court to decide that, not

7  this Court.

8  Q     Sir, my question wasn't who should decide it.

9        My question was whether it was your intention as you

10 were negotiating these TDPs, to assure that any contractual

11 right that an insurer had to consent to settlements, not be

12 impaired by anything in the TDPs.  That was your intention,

13 wasn't it?

14 A     I'm trying to answer your question.  I think I answered

15 your question.  I think I answered it in the previous one,

16 which is, what we were trying to do is preserve the rights

17 that exist and not have the Bankruptcy Court prejudge those

18 rights and for the coverage court to determine them, but I

19 think that's the best way I can answer your question.

20             MR. DOREN:  Your Honor, I'll move to strike

21 everything after, "it was our intent --"

22             THE WITNESS:  I don't know how to answer the

23 question.

24             MR. DOREN:  "-- to preserve those rights."

25             THE WITNESS:  Okay.

1          THE COURT:  I'll sustain that.

2          MR. DOREN:  Thank you, Your Honor.

3  BY MR. DOREN:

4  Q    It was also your intent, sir, to make sure that the

5  right -- any obligation of the insurer to cooperate with the

6  insurer, either in the investigation or defense of a claim,

7  also remain in place and intact, without regard to the TDPs,

8  correct?

9  A    Yes.

10 Q    And it was also your intent that the insurers be

11 permitted to investigate and consider what defenses it may

12 have -- they may have -- excuse me -- it's also your -- it was

13 your intent that the insurers be able to investigate and

14 defend those claims post-confirmation, correct?

15 A    Certainly to investigate, not necessarily to defend.  It

16 depended.  But certainly to investigate.

17 Q    Depended, in part, on whether they had the contractual

18 right to defend, correct?

19 A    Well, also the structure of the TDP, which is that if

20 it's a settlement recommendation, then the question was

21 whether you accept the settlement recommendation or not.  So,

22 that doesn't law them to take all the claims out to the tort

23 system and defend them individually, right.

24      So, again, the structure of the TDP is, it's a

25 settlement, here's a settlement offer, do you accept it or

1  not?

2  Q     And you would agree, sir, that if the contract provides

3  that settlements must be consented to by an insurer and the

4  insurer does not consent to a settlement, proposal, or

5  recommendation, that barring some other breach by the insurer,

6  that abdicates that right, that insurer does not have to pay

7  that settlement?

8  A     No.

9  Q     Okay.  Thank you.

10        So, sir, does it remain your position today that the

11  trust distribution procedures should not affect, impair, or

12  prejudice the rights and defenses of the non-settling

13  insurance companies?

14  A     Yes, that's what we tried to achieve in Article 5(c),

15  the language in Article 5(c).

16  Q     Well, here, sir, we're on 7.2.

17  A     Yes.  The answer to your question is yes.

18  Q     Thank you.

19        And 7.2(b) of this April 10 draft, you and your

20  colleagues went on to state that nothing in the trust

21  distribution procedures shall in any way operate to, have the

22  effect of impairing or having any *res judicata*, *collateral*

23  *estoppel*, or other preclusive effect on any party's legal,

24  equitable, or contractual rights or obligations under any

25  non-settling insurance policy in any respect.

1       And when you wrote that language back in April 2021, you

2   considered that to be something necessary and appropriate to

3   include in these drafts TDPs, correct?

4   A    Yes.

5   Q    And does that remain your position today --

6   A    I -- go ahead, I'm sorry.  Finish your question.

7   Q    No, that's all right.  I think I interrupted you and I

8   apologize.

9       -- and does that remain your position today?

10  A    Yes.  Yeah.  Yes, we want to make sure that we're not

11  affecting the legal or contractual rights of the insurers, via

12  the TDP process.

13  Q    Thank you.

14      Now, then it goes on to sub (c), which says:

15          "Nothing in the trust distribution procedures shall

16  otherwise determine the applicability or non-applicability of

17  any provision of any non-settling insurance policy and any

18  such rights and obligations shall be determined under

19  non-settling insurance policies and applicable law."

20      And, again, back in April 2021, you considered that to

21  be necessary and appropriate language to include in these

22  draft TDPs, correct?

23  A    Yes.

24  Q    And does that provision continue to reflect debtors'

25  position today?

1  A     Yes, and we think it's encompassed within the current

2  language.

3  Q     And directing your attention, please, to paragraph 10.1,

4  and that's on page 760, do you have before you, sir?

5  A     I do.

6  Q     This provision is entitled, "Nonbinding effect of

7  settlement trust and/or litigation outcome," correct?

8  A     It is.

9  Q     And it provides:

10        "Notwithstanding any other provision of these trust

11 distribution procedures, a decision by the settlement trust to

12 pay or not to pay any claim shall not be used in, be

13 admissible as evidence in, binding in, or have any *res*

14 *judicata*, *collateral estoppel*, or other preclusive effect in

15 any lawsuit or other proceeding against any other entity,

16 other than the settlement trust."

17        Did I read that correctly, sir?

18 A     You did.

19 Q     And that's language that you felt was necessary and

20 appropriate to include in this April draft, back in 2021,

21 correct?

22 A     It was.

23 Q     And does this remain your position today that this --

24 A     Yeah.  Yes.

25 Q     Thank you.

1  A     And, again, I think we've encompassed this within what

2  we tried to include in Article 5(c).

3  Q     Okay.  So, you believe that Article 5(c) includes the

4  substance what I just read to you from paragraph 10.1,

5  correct?

6  A     Yes.

7  Q     And that was certainly your intent in 5(c) was to

8  encompass each and every element of what I just read to you

9  from 10.1, correct?

10 A     Yeah, we were trying to preserve the right, the fact

11 that, again, whatever the settlement trust does, it doesn't

12 bind the insurers; that's what we were trying to encompass

13 within that.

14 Q     And so, in 10.1 -- so, again, I'm sorry, sir, I just

15 want to make sure I have a clear answer -- everything that I

16 just read you from 10.1, you believe 5(c) in the current

17 draft, is intended to encompass, correct?

18 A     I think that's right.

19 Q     Thank you.

20       And if it weren't included in that, you would want to

21 clean up the language in 5(c) so it were, right?

22 A     I think I did -- I hope I did a pretty good job.  I

23 think I did a pretty good job of encompassing it, so I think

24 it's encompassed within there.

25 Q     All right.  Now, I'm not critiquing you professionally,

1  sir.

2  A     I thought I tried to get that all in there.

3  Q     Thank you.

4        Now, from April through the end of June -- and I'm back

5  now in 2021 --

6  A     Sure.

7  Q     -- there was a significant amount of back and -- I'm in

8  focus, this is great.  I do look 10 years older now, and I

9  apologize for that, Your Honor -- now, from April through the

10 end of June, back in 2021, there was a significant amount of

11 back-and-forth, if you will, between the debtor and with the

12 Coalition and other claimant groups about the TDPs, correct?

13 A     That's correct?

14 Q     And there was, as I think you've already testified,

15 there was an exchange of drafts and redlines and the like, and

16 we saw a demonstrative that showed some of that, correct?

17 A     That's correct.

18 Q     Now, turn, please, to 481, which is the next tab, and

19 let me know when you have it.

20 A     I have it.

21 Q     And this is an email, which I believe is referenced in

22 your -- it is referenced in your written direct.  And it was

23 sent on May 12th, 2021, correct?

24 A     That's correct.

25 Q     And it's from Ms. Boelter, or Lauria, now -- pardon

1  me -- to Mr. Goodman, correct?

2  A    That's -- yes, that's correct.

3  Q    Among others.  Among others.

4  A    Right.

5  Q    And you were copied on this email, correct?

6  A    I was.

7  Q    And there's an attachment, and Ms. Lauria writes that

8  attached are a clean and blackline of the RSA.

9       And what's the RSA, sir?

10 A    I think it was the restructuring support agreement.

11 Q    Okay.  Thank you.

12      And blackline of the RSA and a draft of the CAP.  And

13 I'm going to ask you now so I don't -- I'm not awkward for the

14 next hour -- do you pronounce that -- do you call that CAP or

15 cap?

16 A    We reference it as "the CAP."

17 Q    Okay.  I'll do that, then.

18      And a draft of the CAP.

19      Now, what is that, sir?  What is the CAP?

20 A    So, we use interchangeably "TDP" and "CAP"; it's the

21 same thing.

22 Q    Okay.  And Ms. Lauria goes on to say, "We have not yet

23 shared these documents with your client."

24      And then in the next sentence she says, "We wanted to

25 get something over to you guys ASAP to narrow the issues and

1  see where we were at."

2       Do you see that?

3  A    I do.

4  Q    And so, when you received this email back on

5  May 12th, did you recognize that one of the goals of the

6  attachments was to try to narrow the issues with the Coalition

7  so that negotiations could be productive?

8  A    I think -- I don't know what Ms. Lauria was referencing.

9       What I understood Ms. Lauria was referencing was

10 actually RSA and I don't know what about the CAP, the TDPs she

11 was referencing.

12 Q    And were any changes made between the April 10 draft and

13 the May 12 draft in the TDP/CAP?

14 A    I don't believe so.  I don't recall that.

15      My first recollection is when we got comments back on

16 the TDP was actually May 26th from the Coalition.  So, I don't

17 think there were any changes between April and May 12th.

18 Q    So, and you don't recall, personally, having any

19 discussions with anyone over at the Coalition about the

20 TDP/CAP?

21 A    Not prior to May 26th; I don't have a specific

22 recollection of anything.

23 Q    And do you know whether any of your colleagues over at

24 White & Case did?

25 A    I don't think so, because I was talking to Mr. O'Neill

1  pretty regularly, so I would be surprised if there were

2  something else happening that I wasn't aware, but I can't tell

3  you 100 percent.  But I don't think so.

4  Q     Fair enough.

5        So, if you take a look, please, at 482 -- well,

6  actually, sir, I'm going to just ask you to take a quick look

7  at JTX-2473.  And I apologize -- no, I think that may even be

8  within the same binder, so I'm going to withdraw my apology.

9  A     I have it.

10 Q     Okay.  And if you'd look, please, at 2473 -- hang on a

11 second, here -- all right.  And you have that single-page

12 document in front of you?

13 A     I do.

14 Q     And do you see that this is from Matthew Linder?

15 A     I do.

16 Q     And Mr. Linder is a lawyer at White & Case, correct?

17 A     He is.

18 Q     And it's dated May 6th, correct?

19 A     It is.

20 Q     And it is from the agenda from May 6th meeting?

21 A     Yep.

22 Q     And this would have been about a week before the May 12

23 draft was sent over --

24 A     Yes.

25 Q     -- to the Coalition?

1        And Mr. Linder sets out that agenda, first of all, what

2   will be covered on the May 19 hearing, correct?

3   A     Yes.

4   Q     And by the way, let's -- just to be clear, this is an

5   email from Mr. Linder to Mr. Goodman, who counsel for the

6   Coalition, correct?

7   A     Yeah -- yes.

8   Q     And David Molton, who's also counsel for the Coalition,

9   correct?

10  A     Yes.

11  Q     And then various lawyers at White & Case for the debtor,

12  as well as one at Young Conaway, correct -- or two, rather?

13  A     Yes.

14  Q     Okay.  And so, it's a communication between the

15  Coalition and counsel for the debtor in Delaware and at

16  White & Case, correct?

17  A     It appears to.  I don't appear to be on it, so this is

18  the first time I'm seeing it.

19  Q     Okay.  Okay.

20        But you recognize those names to be --

21  A     Yes.  Absolutely, yes.  I know who those people are.

22  Q     Okay.  And you see Item 2 on the agenda for May 6th is

23  the trust distribution procedures, correct?

24  A     It is.

25  Q     And you were not -- and so, this is a meeting that you

1   apparently did not attend, correct?

2   A    I don't know that -- if it was an in-person mediation

3   meeting, I might have been there.  I don't know that for sure.

4   I don't -- I just don't have a recollection to calendar

5   whether that was just the teleconference or we actually going

6   up to mediations.

7        I attended a ton of the mediations, including in New

8   York, so I just don't know that.

9   Q    All right.  But you, personally, have no recollection of

10  participating in a discussion about the trust distribution

11  procedures on May 6th, 2021?

12  A    I don't.

13  Q    Thank you.

14       All right.  Sir, so, now, let's look, please, at

15  Exhibit 482.  And you'll see in the lower left -- I'm sorry,

16  do you have Exhibit 482 in front of you?

17  A    I do.

18  Q    All right.  And let's actually talk about the upper

19  right.  It shows what appears to be White & Case draft

20  5/12/2021; is that right?

21  A    It is.

22  Q    And, again, one of your colleagues at White & Case was

23  working with you in drafting, revising, and negotiating the

24  TDPs, correct?

25  A    Correct.

1   Q     If you look, please, at Section 2.1 of the purpose

2   section, do you have that in front of you?

3   A     I do.

4   Q     In this May 12 version, there's no reference to

5   balancing the interests of the non-settling insurers.

6         Do you see that?

7   A     I do.

8   Q     And do you know why that provision was removed?

9   A     Give me one minute.  I'm sorry, sir, Mr. Doren.  I just

10  want to look at the rest of the document, because I think we

11  might have moved some of the language to other places, and so,

12  like, I just want to make sure that's accurate.

13  Q     So, if it hasn't been -- assuming it's not elsewhere in

14  the document, do you know why it was removed?

15  A     I'm sorry, let's just answer your question, Mr. Doren.

16  I think, you know, we kept Section 7.1 of the agreement.  I

17  don't recall why we removed that language.

18  Q     Okay.  Thank you.

19        And then, go on, please, to Section 3.3, the cooperation

20  section.  Let me know when you have that in front of you.

21  It's at Bates number 140.

22  A     I do.  I have it.

23  Q     Thank you.

24        Now, the first sentence -- the first half of the first

25  sentence remains as it was in April.  It says:

1            "The settlement trust shall perform all obligations

2   under the insurance policies issued by the non-settling

3   insurance companies in order to maintain coverage and obtain

4   the benefit of coverage under such policies."

5        Do you see that?

6   A    I do.

7   Q    And do you recognize that from the language you drafted

8   back in April, right?

9   A    I do.

10  Q    And then it goes on to say:

11           "Other than any requirements that would interfere

12  with the allowance and valuation procedures set forth in," and

13  then there's basically a blank and blank of these CAP.

14       Do you see that?

15  A    I do.

16  Q    Do you know what that's referring to, "requirements that

17  would interfere with the allowance and valuation procedures"?

18  A    I think, what we were trying to encompass there is

19  allowing the trustee to, obviously, evaluate claims, but,

20  again, we were trying to, in the first part of the sentence,

21  basically say that nothing affects the insurance company

22  rights.

23  Q    Okay.  And just so the record is clear, Mr. Azer, I

24  think I referred to Young Conaway as counsel for the debtor.

25  They're actually counsel for the --

1  A      The FC -- FCR.

2  Q      Thank you.

3  A      Yep.

4  Q      Thank you.

5         And then in the second sentence, again, part of the

6  sentence is the same as it was in April 10, and that part is:

7              "Such obligations shall include any requirement to

8  share documents, witnesses, or other information with the

9  non-settling insurance companies to the extent required under

10 the relevant insurance policy."

11        And you recognize that language from April, right?

12 A      I do.

13 Q      And then it goes on to say:

14             "In connection with any coverage litigation,

15 pursuant to," and a blank, "and claim litigation, pursuant to

16 of these CAP."

17        Do you see that?

18 A      I do.

19 Q      Do you know who added that language?

20 A      I don't, off the top of my head.

21 Q      And so, it wasn't you, as best you can recall?

22 A      No, I'm not saying that.  I just don't remember.  If it

23 dealt with insurance, I probably dealt with it is what I'm

24 saying.  I just don't remember if I wrote -- when I wrote

25 those words or if I wrote those words.

1  Q      Fair enough.

2        And I didn't mean to suggest otherwise.  And as you look

3  at that, sir, you didn't have any recollection of this change

4  being made on May 12, before we saw it here, correct?

5  A      No, I hadn't remembered that we had revised the May 12th

6  draft.

7  Q      And then if you look at the second sentence -- oh,

8  excuse me, I apologize -- let's move on, actually.

9        Now, in the debtors' April 10 draft, Section 7.2 is

10  entitled, "The rights of non-settling insurance companies."

11       You remember that, right?

12  A      I do.

13  Q      When we go to the 7.2 in this draft, it's entitled,

14  "Presentment of insured abuse claims," correct?

15  A      It is.

16  Q      And this draft does not have a section entitled, "Rights

17  of non-settling insurance companies," does it?

18  A      One moment.  Not that I can see.

19  Q      And paragraph 7.4 is entitled, "Coverage

20  disputes," correct?

21  A      It is.

22  Q      And 7.4 includes the sentence:

23            "For the avoidance of doubt --"  I'm sorry, sir,

24  this is now the last full sentence on page 57.  It states:

25            "For avoidance of doubt, non-settling insurance

1  companies can only deny coverage based on coverage defenses

2  and not based on challenges to allowance or the allowed claim

3  amount."

4         Do you see that language, sir?

5  A     I do.

6  Q     Do you know who added that language?

7  A     I don't remember.

8  Q     And do you have any recollection of a decision made

9  between April 10 and May 12 to add that language?

10  A     So, Mr. Doren, I'm trying to remember -- recall back to

11  that period.  I know we were talking to folks about how this

12  process was going to work and I know there were a lot of fluid

13  drafts.  And so, this might have been just one of the fluid

14  drafts that was going around, but, obviously, it didn't end up

15  being what we ultimately marked off.  I don't remember this

16  specifically.  And that's, actually, the reason I don't

17  remember this version is because starting May 26th, I kind of

18  worked off a different version, so I don't recall this version

19  expressly.

20  Q     And, sir, this draft, if you look back at 481, this

21  fluid draft was one that was sent to the Coalition --

22  A     It was, yeah.  I'm not saying it wasn't.  It just,

23  ultimately, it's not the draft that we ended up negotiating

24  from.

25  Q     Very good.  Thank you.

1      And then the April 10 draft also included paragraph
2  10.1, which, as you testified earlier, set out all the things
3  you intended to accomplish and reserve for the non-settling
4  insurers.
5      Do you recall that?
6  A    I did.
7  Q    And here, 10.1 is limited and it's one-sentence long and
8  it refers only to indirect abuse claims, correct?
9  A    That's correct.
10 Q    And do you recall who deleted the rest of the language
11 from 10.1?
12 A    I don't.
13 Q    And you don't know why the rest of that language was
14 deleted either, do you?
15 A    Again, this draft ultimately became what we negotiated
16 from, so I don't recall why we had this draft.  I just don't
17 remember, but, ultimately, it kind of went in the waistband
18 (sic) is my recollection.
19 Q    Okay.  Thank you.
20      Well, let's get on to that May, that late-May draft,
21 sir.  In your written direct testimony, you refer to a
22 May 26th redline of the TDPs, correct?
23 A    I did.
24 Q    And then you also talked about the debtors' redline of
25 that May 26 draft on May 28, right?

1  A      I did.

2  Q      So, let's turn to May 28 and let's start with Exhibit

3  JTX-505.  And this is an email dated May 28th, correct?

4  A      It is.

5  Q      And it appears to be from the associate you mentioned

6  earlier, Mr. Sandler, correct?

7  A      It is.

8  Q      And, again, to counsel for the Coalition and others,

9  right?

10 A      Correct.

11 Q      And you are copied on this email, correct?

12 A      I am.

13 Q      And Mr. Sandler writes:

14         "Attached, please find a revised form of CAP with a

15 redline to the draft that Eric provided on Wednesday."

16      So, Wednesday, since this is Friday the 28th, Wednesday

17 would have been the 26th, right?

18 A      That's correct.  That's what I was referring to in the

19 demonstrative.

20 Q      Got it.  Got it.

21      So, just so I'm understanding what we're looking at, as

22 I understand it, the debtors would have received the draft

23 from the Coalition, accepted their redlines, to the extent

24 there were any, and then made their own on top.

25      Is that how that part of the process tended to work?

1  A      Yeah, I think that's probably fair.  That's typically

2  how redlines are passed back and forth.

3  Q      Okay.  Thank you.

4         All right.  So, let's take a look, please, at JTX-507.

5  Now, JTX-507 is the May 28 redline of the Coalition draft,

6  correct?

7  A      It is.

8  Q      And let's start by looking at the purpose section on

9  page 1.  And the Coalition's statement of purpose was to

10 obtain -- well, actually -- I'm sorry -- the debtors --

11 A      This is the debtors.

12 Q      I appreciate that.

13        The debtors' addition in the purpose provision is to

14 obtain insurance coverage for the allowed claim amount of such

15 allowed abuse claims that are insured abuse claims in all

16 cases, subject to all contractual, legal, and equitable rights

17 and obligations set forth in the applicable insurance

18 policies.

19        Did I read that correctly?

20 A      You did.

21 Q      And then further down in this paragraph, the debtors

22 also added that the settlement trustee shall implement and

23 more these CAP in consultation with the claim administrator,

24 claims processer, neutrals, future claimants representative,

25 appeals officer, non-settling insurance companies, if and as

1  required under the applicable insurance policies.

2       Did I read that correctly?

3  A     You did.

4  Q     And that was language you all added to this draft TDP?

5  A     That's correct.

6  Q     And this was language you added back between the 26th

7  and 28th of May with the goal of protecting and preserving the

8  rights of non-settling insurers; is that right?

9  A     That's correct.

10 Q     Turn to page 6, Article 5, and actually 5(b), "Trust

11 claim submissions."

12      Do you see that?

13 A     I do.

14 Q     And here, this paragraph discusses what a trust claim

15 submission should include and after the bold parenthetical, it

16 states:

17          "In order to properly make a trust claim

18 submission, even submitting abuse claimant must:  (A),

19 complete, under oath, the questionnaire to be developed by the

20 settlement trustee and the non-settling insurance companies."

21      Did I read that correctly?

22 A     You did.

23 Q     And so, the debtors included non-settling insurance

24 companies among those, along with the settlement trustee, who

25 would develop the questionnaire for claimants, correct?

1  A      We did.

2  Q      And that was because you knew that insurers would want a

3  role in identifying the types of information requested and

4  gathered about these different claims, correct?

5  A      We certainly understood that insurers would want to

6  understand the information being gathered.

7  Q      And would like to have a voice in what that information

8  was, correct?

9  A      Yes, that's where I kind of diverge with you, is we knew

10  they wanted to have a role in what they were going to be

11  gathering.  Whether they had the right to do that is a

12  different question.

13        And so, what we were trying to basically reflect here

14  is, like, look, to the extent that you can consult with them

15  and come up with a questionnaire that gives them the

16  information they want, there's no harm in doing that.  And so,

17  that's why we included the insurers there.  I'm not sure they

18  actually have a contractual right to that; it's just we were

19  trying to make sure they had a say.

20  Q      And the language, as you wrote it, is that there should

21  be a questionnaire to be developed by the settlement trustee

22  and non-settling insurance companies, correct?

23  A      Correct.

24  Q      Let's take a look at the next page at provision (c),

25  "cooperation."

1      Do you see that?

2  A    I do.

3  Q    And the first sentence that was in the draft provided by

4  the Coalition stated that:

5           "The settlement trust shall perform all obligations

6  under the insurance policies issued by the non-settling

7  insurance companies in order to maintain coverage and obtain

8  the benefit of coverage under such policies."

9      Now, that sounds a lot like what we saw in the May 12th

10  draft, doesn't it?

11  A    It does.

12  Q    So, it sounds like they were working off of that draft

13  to at least some extent, correct?

14  A    No, I think that was actually -- I don't know, I think

15  this was a markup of our April draft because I think this is

16  the same language in our April draft, as well.

17  Q    Well, you'd agree all that -- that'll just come down to

18  us comparing these documents and we're not taking the Court's

19  time, right?

20  A    Yeah, I think this was all from the April draft.

21      That's what we understood it to be, not off the May 12th

22  draft.

23  Q    Okay.  And then in your May 12 draft, you may remember

24  that you all had included language that said:

25           "Other than any requirements that would interfere

1 with the allowance and valuation provisions set forth in the

2 CAP."

3         Do you recall that?

4 A     I do.

5 Q     And here, the debtor is striking that language, correct?

6 A     That's correct.

7         And, Mr. Doren, (indiscernible) my testimony, that's why

8 I think this was the April draft, because I don't recall why

9 we did the May 12th draft, but, obviously, we didn't think it

10 was acceptable to have that language; that's why you see the

11 strikethrough of it in this draft.

12 Q     All right.  So, it is the debtors' position that the

13 language that we see here under "cooperation" as struck out is

14 inappropriate and shouldn't be in the TDP, correct?

15 A     Correct.  We agree.  That's why we struck it.

16 Q     Okay.  Thank you.

17         And then you go on in the next sentence to say:

18             "Such obligations shall include any requirement to

19 share documents, witnesses, or other information with the

20 non-settling insurance companies to the extent required under

21 the relevant ..."

22         And then you struck "insurance policies" because the

23 debtors had written, "in connection with any coverage

24 litigation, pursuant to Article 9 and claim litigation,

25 pursuant to Article 11 of these CAP," correct?

1  A      No.  Mr. Doren, you said the debtors wrote.  That would

2  be the Coalition wrote and then we struck.

3  Q      Thank you.  If I misspoke, I apologize.

4  A      Yeah.

5  Q      And do you recognize the language that's struck there

6  from the May 12 draft?

7  A      Again, I think, just to be clear, Mr. Goodman marked up

8  our April daft.  He put this in our April draft.  We, then,

9  struck it from the April draft when we sent the May 28th

10  redline.

11  Q      All right.  And then if we go down to under (d), the

12  section, "No modifications to insurance policies."

13         Do you see that?

14  A      I do.

15  Q      And this is the one, I think the one paragraph in this

16  draft that you spent the most time with in terms of your

17  written direct testimony.  And along with other edits, you

18  wrote about two-thirds of the way down:

19             "Pursuant to the terms of the plan and the

20  confirmation order, the settlement trust shall assume all

21  rights and obligations of the debtors under each BSA insurance

22  policy and shall abide by all contractual, legal, and

23  equitable rights, the non-settling insurance companies have

24  under the applicable insurance policies."

25         Correct?

1  A      Correct.  We wrote that.

2  Q      That was language added by the debtors in late May 2021,

3  correct?

4  A      Yeah, this was in the May 28th draft that we added.

5  Q      And then we go to Article 6, "Claims-allowance process."

6         And under "claims evaluation," the first part of the

7  first sentence says:

8             "The settlement trustee shall evaluate each

9  submitted trust claim individually and will follow the uniform

10 procedures and guidelines set forth below to determine, based

11 on the evidence obtained by the settlement trust," and then it

12 goes on.

13        And then turn over, please, to page 8, where the debtors

14 added:

15            "And after fulfilling any obligations in respect of

16 the insurance policies in the case of insured abuse claims."

17        And then it goes on, correct?

18 A      Correct.

19 Q      That was language added by debtor?

20 A      Correct.

21 Q      Now, take a look, please, as we continue.  You see

22 heading (c), "Settlement trustee review procedures"?

23 A      I do.

24 Q      Let's look over at page 9, paragraph 3, "Submitted abuse

25 claims that satisfy the general criteria," all right.

1  A      Yes.

2  Q      Now, this provision summarizes the circumstances in

3  which a claim will be deemed allowed under the TDP, correct?

4  A      Yes.

5  Q      And then the debtor, you -- and this would have been

6  language you personally added, right?

7  A      Yeah, I added this language.  I remember this.

8  Q      You then added:

9          "Provided, however, any such allowance," and by

10  that, you meant the allowance of a claim, correct?

11  A      Yes.

12  Q      "Any such allowance by the settlement trustee shall be

13  subject to any contractual, legal, or equitable rights the

14  non-settling insurance companies have under the applicable

15  insurance policies."

16      Correct?

17  A      That's correct.

18  Q      And that's language you added, because you thought it

19  was necessary and appropriate to include it in this provision

20  of the TDPs, correct?

21  A      Yes.  And, Mr. Doren, just to be clear, I was -- when

22  you asked me it's necessary and appropriate, I have the answer

23  to your question, which is I felt this was belt-and-

24  suspenders language, so, candidly, I was putting it in just

25  because I wanted to make sure that everything was really

1  covered.

2       And so, if you go back to the no-modification provision,

3  I actually had the same language in there.  And so I was just

4  trying to cover all bases.

5  Q    Okay.  So, what you were doing, as counsel for the

6  debtor, in trying to ensure that all rights of the non-

7  settling insurers were preserved was to be clear, correct?

8  A    Yeah.  The problem -- so, I --

9  Q    Correct?

10 A    -- I was trying -- yeah, no -- the answer is I was

11 trying to be clear.  I didn't accomplish it, based upon the

12 feedback that I got from everybody, which is actually --

13 Q    Well, we'll get there, sir.  We'll get there.

14 A    All right.

15 Q    But your intention -- you may have failed.  You may have

16 proven you're inadequate at your job, but your intention in

17 writing this at paragraph 3 was to make clear what rights were

18 preserved for the insurer -- non-settling insurers, correct?

19 A    Again, I was trying --

20       MR. KURTZ:  Your Honor, maybe we could skip the

21 commentary like, "You're inadequate at your job."

22       The comment from the witness was fair.

23 BY MR. DOREN:

24 Q    Sir, I'll ask again:  You added the language in

25 paragraph 3, because at the time, you were striving to make

1  very clear what rights were being preserved for non-settling

2  insurers, correct?

3  A    Yeah, I was trying to use a belts-and-suspenders

4  approach, so we tried to preserve all the insurers'

5  contractual rights.

6  Q    Okay.  And you saw nothing wrong with that, as you wrote

7  the language, right?

8  A    When I wrote it at the time, I thought I was

9  accomplishing that, but the feedback I got was the opposite.

10  Q    Okay.  And, by the way, this states:

11         "Provided, however, any such allowance by the

12  settlement trustee shall be subject to any contractual, legal,

13  or equitable rights the non-settling insurance companies have

14  under the applicable insurance policies."

15         That's what you meant to say, isn't it?

16  A    Yes.

17  Q    Okay.  Let's go on to the next page, please, and under,

18  "Allowed abuse claims" on page 10, paragraph (e), do you see

19  that?

20  A    I do.

21  Q    Now, this paragraph provides, generally, that the

22  trustee will use the TDP procedures to value claims, correct?

23  A    Right.

24  Q    Okay.  And then you added to this paragraph the

25  following language:

1        "Provided however (and as set forth more fully in

2   Article 7) that any valuation by the settlement trustee shall

3   be subject to any contractual, legal, or equitable rights the

4   non-settling insurance companies have under the applicable

5   insurance policies."

6        Correct?

7   A    I did.

8   Q    That was language that you added, correct?

9   A    Yes.

10  Q    And you intended that as a belt-and-suspenders to make

11  sure that everything was -- that you intended to preserve was

12  clearly stated, correct?

13  A    Correct.

14  Q    Then we go on to paragraph (f), "Claims determinations."

15       Now, well, actually, sir, since you referenced

16  Article 7 there, why don't we just go ahead and flip ahead and

17  that's to page 12.  Now, Article 7 is the section that refers

18  to claims matrix and scaling factors, correct?

19  A    It does.

20  Q    And it states that a final determination on the allowed

21  amount shall be deemed to be the protected party's liability

22  for each such abuse claim, correct?

23  A    Yes.

24  Q    And then to that provision, you added the following

25  language:

1           "Provided, however, that any allowed claim amount

2    determined to be the protected party's liability for a direct

3    abuse claim shall be subject to any contractual, legal, or

4    equitable rights the non-settling insurance companies have

5    under the applicable insurance policies."

6         Correct?

7    A    Yes.

8    Q    And you stated that and you told me that's more belt-

9    and-suspender language to make sure that what you intended for

10   encompass in the rights preserved for non-settling insurers

11   was clearly stated, right?

12   A    Yes.

13   Q    And you struck language that had been included by the

14   Coalition, correct?

15   A    That's correct.

16   Q    And the Coalition's language had said that -- I'm trying

17   to work with the redlines here, sir.  Give me one second --

18   that the protected party's legal obligation to pay such direct

19   abuse claim shall be determined to be -- shall --

20          MR. DOREN:  Matt, can you help me out here.

21   BY MR. DOREN:

22   Q    Here we go -- I'm sorry -- there we go.  We were reading

23   what was struck.

24         So, the protected party's liability for such abuse

25   claims -- the protected party's legal obligation to pay such

1   abuse claims irrespective of how much the holder of such abuse

2   claim actually receives from the settlement trust, pursuant to

3   the payment provisions set forth in Article 8.

4        In no circumstances, shall BSA's obligation to pay any

5   direct claim, abuse claim be determined to be any payment

6   percentage hereunder or under the settlement trust agreement,

7   other than a liquidated value of such direct abuse as

8   determined under the CAP.

9        That was language that you struck, correct?

10  A    We struck that language from there.

11  Q    Thank you.

12       Then let's go down, sir, if we can, to scaling factors,

13  which is actually on the next page, page 13.  And this

14  paragraph provides that the settlement trustee will utilize

15  the scaling factors to determine the proposed allowed claim

16  amount for each claim, correct?

17  A    Yes.

18  Q    And, again, you added that as belt-and-suspenders

19  language to make sure that everything you intended to preserve

20  in terms of non-settling insurers' rights was clearly laid out

21  in the TDPs; correct?

22  A    Yes.

23  Q    Let's turn to page 16, please.  And we're still in

24  Article 7 and page 16, the last provision in Article 7 is

25  called, "Allowed abuse claim calculus."

1          Do you see that, sir?

2  A    I do.

3  Q    And, whenever I see the word calculus, I try not to read

4  it, but as I understand this provision, what it sets out is

5  basically let us show you how this map would work under the

6  matrix and the scaling factors.  Is that a fair

7  characterization of what's going on in this paragraph?

8  A    Yeah.  So, Mr. Doren, how this paragraph works is we

9  used to be on a point system and so then we converted the --

10 we had to have a mechanism to convert the point system to

11 dollars, so that's what this provision was trying to do was

12 explain to the trustee how he converts points to dollars,

13 taken in consideration of the scaling factors.

14 Q    I gotcha, I gotcha.  Thank you.

15          And at the end of (d), after the figure $1,350,000,

16 you added the phrase, "Provided, however, that any

17 determination of value by the settlement trustee shall be

18 subject to any contractual, legal, or equitable rights the

19 non-settling insurance companies have under the applicable

20 insurance policies."

21          And, again, that was language you added back in May

22 2021, correct?

23 A    That is.

24 Q    And you called that belt and suspender language because

25 you wanted to make very sure that you were very clear about

 1  what rights you intended to reserve and preserve for non-

 2  settling insurance companies; correct?

 3  A    We were just trying to make sure that we were trying to

 4  preserve the non-settling insurers' contractual rights.

 5  Q    And in fact you stated in a couple other places that any

 6  determination of value by the settlement trustee shall be

 7  subject to any rights of the non-settling insurers, correct?

 8        (Background voices)

 9            THE COURT:  Mr. Watson, please mute your phone or

10  your audio.

11            Excuse me.  Mr. Doren?

12  BY MR. DOREN:

13  Q    Mr. Azer, do you need the question back?

14  A    Please, if you don't mind.

15  Q    I do not mind, sir.

16            And in fact there are other places in the agreement

17  where you had also added that any determination of value by

18  the settlement trustee shall be -- of a claim shall be subject

19  to any contractual, legal, or equitable rights of the non-

20  settling insurance companies; correct?

21  A    Mr. Doren, I think I only put it in one other place,

22  which is under 11(k), is the only other place I think I

23  inserted that language.  I don't see it in anywhere else, but

24  I might have missed it.

25  Q    All right, sir.  And let's go back, please, to page 10,

1  which is Article 6.  You may recall, we skipped ahead to

2  Article 7, once that was referenced, and now we're going to

3  come back and just hit a couple more.

4          And specifically, sir, let's look at 6(g), so -- on

5  -- which is on page 10.  I'm sorry.  Make it 6(f), "Claims

6  Determination."  And I'm sorry I'm steering you all around, so

7  let me know when you're there.  Page --

8  A     I'm there.

9  Q     -- 10 -- thank you --

10 A     I'm there.

11 Q     -- you're doing better than I am.  Page 10, the

12 paragraph entitled "Claims Determination."

13         Now, this provision describes generally that the

14 claimants must sign releases in order to be paid the allowed

15 claim amount; correct?

16 A     Yes, they have to execute the form of release that's set

17 forth in Section 8(d).

18 Q     Thank you.  And then you added to the end of this back

19 in May 2021, "Provided, however, that any such payment to and

20 release by the abuse claimant shall be subject to any

21 contractual, legal, or equitable rights the non-settling

22 insurance companies have under the applicable insurance

23 policies."  Correct?

24 A     Yes, I put that in.  And, sorry, Mr. Doren, I was

25 responding to your last question.  I only went forward, I

1  didn't go backward to look at previous articles.

2  Q    I understand.

3  A    Okay.

4  Q    The document shows what it shows.

5  A    Yes.

6  Q    I'm not playing "gotcha" like that.

7         So, Mr. Azer, this again is belt-and-suspender

8  language that you added to make very clear what you thought

9  you intended to reserve and preserve for non-settling

10  insurers; correct?

11  A    Again, we were just trying to use this belt-and-

12  suspenders approach to preserve the contractual rights

13  throughout the provision -- throughout the TDP.

14  Q    Because, as the special counsel for the debtor for

15  insurance recovery, you wanted to make very sure that the

16  contract explicit -- excuse me, that the TDPs explicitly

17  identified the rights to be preserved; correct?

18  A    We just want to make sure, between the article that we

19  looked at, which is the catchall and the specific sections

20  that we weren't -- we were trying to catch everything.  Again,

21  as I mentioned, people found it confusing, but we were trying

22  to do that.

23  Q    Okay.  And when you say people, you mean the Coalition

24  and your colleagues; correct?

25  A    Yes.  So, Mr. Doren, what ended up happening is we put

1  this --

2  Q     That's all right.  I didn't ask what happened --

3  A     Yes, yes.

4  Q     -- understanding that's who you're referring to;

5  correct?

6  A     Yeah, both our own team and the claimant team both said

7  this is really confusing to have it in lots of different

8  places where it could be in one place.  So that's -- yes, what

9  I'm talking about, both those teams I got that feedback from.

10 Q     And it's your belief that the language currently in the

11 TDPs encompasses everything we're looking at here?

12 A     Yes, yeah, absolutely.  So --

13 Q     It wasn't intended to exclude any of this, it was

14 intended to include all of this; right?

15 A     Yes, yeah, absolutely.  So Article 5(c) was --

16 Q     I got it, I got it, I got it.  I'm just asking --

17 A     Yes.

18 Q     -- to make sure I understand your testimony, now I do.

19 Thank you.

20 A     Yes.

21 Q     So let's go over to page 11, please.  And this will

22 actually be under 6(g), which begins at the bottom of page 10,

23 and it's called "Reconsideration of settlement trustee's

24 determination."  Do you see that?

25 A     I do.

1  Q      And, again, this section generally discusses the

2  procedures for the reconsideration of claim denials or the

3  reconsideration of the payment amount; correct?

4  A      Yes.

5  Q      And, again, I'll tell you, sir, all I'm doing is saving

6  all of us and the court reporter having to read these

7  provisions.  I'm just trying to encapsulate them so we know

8  what we're talking about, okay?

9          And at the top of page 11, the first full paragraph

10  discusses situations where if the reconsideration request is

11  granted; right?

12  A      Yes.

13  Q      And you added to this, "Provided, however, that any

14  reconsideration and subsequent allowance shall be subject to

15  any contractual, legal, or equitable rights the non-settling

16  insurance companies have under the applicable insurance

17  policies."  Correct?

18  A      I did.

19  Q      And, once again, that's the belt-and-suspender language

20  to assure that all of the non-settling insurers' rights are

21  fully and adequately preserved; correct?

22  A      Yes.

23  Q      And then the next paragraph, which addresses if a

24  settlement trustee determines upon reconsideration that a

25  submitted abuse claim is an allowed abuse claim, then certain

1  things will occur.  And at the end of that paragraph you again

2  added, "Provided, however, that any reconsideration and

3  subsequent allowance shall be subject to any contractual,

4  legal, or equitable rights the non-settling insurance

5  companies have under the applicable insurance policies."

6  Again, your belt-and-suspender language; correct?

7  A    Correct.

8  Q    Then down under Section 6(h), "Prevention and detection

9  of fraud."  Do you see that heading, sir?

10  A    I do.

11  Q    And the debtors added in the first sentence of

12  "Prevention and detection of fraud," that "In consultation

13  with the non-settling insurance companies, the settlement

14  trustee shall work with the claims administrator to cap

15  auditing" -- and then it goes back to the old language -- "to

16  institute cap auditing procedures and other procedures to

17  detect and prevent the allowance of abuse claims based on

18  fraudulent trust claim submissions."  Do you see that?

19  A    I do.

20  Q    And you all added that that would be done in

21  consultation with the non-settling insurance companies;

22  correct?

23  A    We did.

24  Q    Let's go, please, to page 17, and this is Article 9.

25  Let me know when you're there.

1  A     I'm there.

2  Q     And this -- Article 9 is entitled, "Presentment of

3  insured abuse claims to non-settling insurance companies for

4  payment."  Do you see that?

5  A     I do.

6  Q     And this provision addresses the submission of claims to

7  non-settling insurers; correct?

8  A     That's correct.

9  Q     And if you look over at 18 to section (b) where it talks

10  specifically about the presentment of insured abuse claims and

11  here, again, you state that -- or it is stated that "The

12  settlement trustee shall present each insured abuse claim that

13  is an allowed abuse claim, including the proposed allowed

14  claim amount, to the applicable non-settling insurance

15  companies for indemnification."  Then you added, "Pursuant to

16  the terms and conditions in the applicable insurance policies.

17         "Pursuant to the terms and conditions of the

18  insurance policies," and then you go on to talk more about the

19  process.

20         So, again, belt-and-suspenders language, is that

21  right, sir?

22  A     No, I don't think this is the same belt-and-suspenders

23  language, this was --

24  Q     Okay.

25  A     -- this is different --

1  Q      You use different language, I agree with that.

2  A      Yeah.

3  Q      Here, what -- and so let me ask.  What you're saying

4  here is that when claims are submitted for indemnification to

5  insurers, their obligation to indemnify those claims is

6  governed by the terms and conditions in the applicable

7  insurance policies; correct?

8  A      Yeah, I wouldn't use the term governed by, but obviously

9  we were trying to make sure that if there's an obligation to

10  submit the claim, that it submitted the claim under the terms

11  of the insurance policies.

12  Q      Then we go down to (d), "Coverage disputes."  And the

13  first sentence of this provision said, "For insured abuse

14  claims where a non-settling insurance company declines to

15  indemnify the settlement trust, the settlement trust will have

16  the right to pursue the non-settling insurance company in

17  coverage litigation for the non-settling insurance company's

18  share of the allowed claim amount for such claim."

19          You see that, correct?

20  A      I do.

21  Q      Then the next sentence is the one we saw back in the May

22  12th draft, which is non-settling insurance companies can only

23  deny coverage based on coverage defenses and not based on

24  challenges to allowance or the allowed claim amount" -- you

25  struck that, correct?

1  A     Yeah.  So, as I said, Mr. Doren, right, I don't --

2  Q     But you --

3  A     -- recall -- yes, I struck that, I struck that language.

4  Q     And you struck that because you did not think this

5  language belonged in the TDPs; correct?

6  A     Yes, I think that's right.

7  Q     And you struck that because you think this is an

8  improper statement; correct?

9  A     Yeah.  Again, what we ended up in the final TDPs is the

10  non-settling insurers can challenge the value of any claim

11  that's processed by the trust, so we removed that language.

12  Q     Thank you.  Then two lines further down there is the

13  sentence, "For purposes of this section, the dollar value of

14  an insured abuse claim shall be calculated based on the

15  allowed claim amount," and you struck that language as well;

16  correct?

17  A     We did.

18  Q     Because you also believed that that language was

19  improper to be included in the TDPs; correct?

20  A     No, I don't -- I don't think we thought it belonged in

21  that provision.  I don't think that was -- it's improper.  I

22  think it was just that didn't belong in that provision.

23  Q     All right.  Thank you, sir.

24              I'd like to go back to the graphic that we were

25  shown -- that you were shown this morning during your direct

1  examination.  And, specifically, if we could just look at that

2  May 28 column.  And this is where you're comparing the

3  protective language put in different drafts and how it evolved

4  between May 28 and June 10; correct?

5  A    Correct.

6  Q    And none of the language that we just reviewed is

7  identified or described as something that was included in the

8  May 28th draft; correct?

9  A    Isn't it down at the bottom, Mr. Doren, "Shall abide by"

10 -- maybe it's slightly different, maybe we --

11 Q    Well, sir --

12 A    -- cut-and-pasted it --

13 Q    -- your belt-and-suspender language --

14        MR. KURTZ:  Can the witness -- excuse me, can the

15 witness please finish the answer?

16        THE WITNESS:  Yeah, if we copied this wrong, then

17 it was meant to be, but -- it was meant to encompass what was

18 in -- let me go back to 5.  But, Mr. Doren, this was meant to

19 reflect D and I think this actually reflects D, what was in D.

20 BY MR. DOREN:

21 Q    I see, I see.  So now I'm tracking.  So it wasn't

22 intended to -- it wasn't intended to track what happened in

23 the allowed abuse claims provision 6(e); right?

24 A    No, no, it wasn't meant -- this --

25 Q    Right, it wasn't?

1   A      No, this was to reflect (d), subsection (d).

2   Q      And it wasn't intended to track what was in Article 7 on

3   claims matrix and scaling factors where there was an explicit

4   reservation; correct?

5   A      No, again, it was reflected to be (d).

6   Q      Okay.  And it wasn't intended to reflect what was in

7   Article 7 on the allowed abuse claim calculus where there was

8   a reservation; correct?

9            MR. KURTZ:  Objection, asked and answered.  The

10  witness has said --

11           MR. DOREN:  It's a different section.

12           THE COURT:  Different section, overruled.

13           THE WITNESS:  Yeah, again, it's meant to reflect

14  (d).

15  BY MR. DOREN:

16  Q      And it doesn't reflect what was in the reservation 6(f)

17  on claims determinations; correct?

18  A      Again, this is the catchall provision that's meant to

19  encompass all that language.

20  Q      But it doesn't.  This column, this document, does not in

21  any way refer to any of those other provisions and the

22  explicit reservations in them; correct?

23  A      No, that would have made for a really long

24  demonstrative.

25  Q      That's right.  All those reservations would add a lot of

1  length to this column.  And it doesn't make any reference to

2  column 6(h) regarding prevention and detection of fraud and

3  the inclusion of insurers in that effort; does it?

4  A    No because the -- again, Mr. Doren, the above title is

5  protection language in Article 5(c), that's what this is --

6  Q    So that's all that's shown, right?  That's all that's on

7  this demonstrative?

8  A    Correct.

9  Q    Okay.  And this, though, is being presented to the Court

10 as a complete and accurate and meaningful description of how

11 these draft TDPs changed over time regarding the reservation

12 of the rights of the insurers; is that right?

13 A    No, that's completely wrong.

14        MR. KURTZ:  Your Honor -- hold on -- I object.

15 It's a demonstrative, it has a heading; it was presented

16 exactly in accordance with the heading.  That's a

17 misrepresentation of what we did and I object to it.

18        MR. DOREN:  He can say no, Your Honor.

19        THE WITNESS:  Yeah, no, it's --

20        MR. KURTZ:  Please.  Let the Judge rule, please.

21        THE COURT:  I'll sustain the objection.

22        MR. KURTZ:  Thank you, Your Honor.

23        MR. DOREN:  Your Honor, we are about done with this

24 document.  If there's any interest in a ten or fifteen-minute

25 break, I would not be opposed, but of course that's at the

1    Court's discretion.

2            THE COURT:  Let's take ten minutes, but we are

3    going to stop right around 2 o'clock.  But let's take ten,

4    we've been going a while.

5            MR. DOREN:  Thank you, Your Honor.

6            THE COURT:  Thank you.

7        (Recess taken at 12:59 p.m.)

8        (Proceedings resumed at 1:14 p.m.)

9            THE COURT:  Mr. Doren, we're back on the record.

10            MR. DOREN:  Thank you, Your Honor.

11    BY MR. DOREN:

12    Q    Mr. Azer, you testified in your written direct that

13    there were June 1 -- there was a June 1 response from the

14    Coalition to the May 28 draft.  And that's in paragraph 32, if

15    you want to see it, but I'm not going to ask you anything

16    specific about that, I just want to look at that response.

17    A    Yes.

18    Q    So if you could please take a look at JTX-517.

19        (Pause)

20    Q    And, sir, this is a document that was referenced in your

21    written direct and you see that it is a June 1 email, June 1,

22    2021 email; correct?

23    A    It is.

24    Q    And it's from Mr. Goodman, counsel for the Coalition, to

25    counsel for debtors; correct?

1  A     Correct.

2  Q     And Mr. Goodman writes, "Subject to client review and

3  approval, attached find the Coalition's and the FCR's comments

4  to the revised claim allowance procedures."

5            And you understand this to be the draft that had

6  been sent over three days prior; correct?

7  A     Yes.

8  Q     And let's take a look, please, at that document.  It's

9  Exhibit 518, next tab.  And here again, as I understand, at

10  least what occurred in this document, changes were accepted

11  and the Coalition redlined their changes on top of that, is

12  that your understanding of what this document reflects?

13  A     I believe so.  This is the Coalition's revisions.

14  Q     Correct.  Okay, thank you.  I appreciate that.

15       (Background voices)

16            THE COURT:  Please mute your phones.  Excuse me.

17            MR. DOREN:  Thank you, Your Honor.

18  BY MR. DOREN:

19  Q     So going back to Article 1, section (a), "Purpose."

20  First of all, the Coalition here struck the language "in all

21  cases, subject to all contractual, legal, and equitable rights

22  and obligations set forth in the applicable insurance

23  policies."  Correct?

24  A     Yes.

25  Q     And they added a new sentence stating that "these CAP

1  are designed to provide fair, equitable, and substantially

2  similar treatment for all of the applicable abuse claims."

3  Correct?

4  A    Yes.

5  Q    And then, further down, they struck the non-settling

6  insurance companies from the list of entities that the

7  settlement trustee shall consult with in implementing and

8  administering the CAP."  Correct?

9  A    Correct.

10  Q    Let's turn to page 6, which is the general trust

11  procedures, and specifically to subsection (b), which is at

12  the top of page 7.  Do you have that in front of you?

13  A    I do.

14  Q    And the Coalition struck the phrase in the middle of

15  that paragraph the addition that the questionnaire would be

16  developed by the settlement trustee and the non-settling

17  insurance companies, the Coalition struck the reference to

18  non-settling insurance companies; correct?

19  A    Correct.

20  Q    And then if we go down to section (c), "Cooperation,"

21  the Coalition struck the entirety of the first sentence;

22  correct?  Other than the word "the."

23  A    Other than the word "the," yes.

24  Q    Yep, yep.  And so, after that redline -- excuse me,

25  after the striking, if you will, what the cooperation

1  provision says is that "the parties to the cooperation

2  agreement shall provide the settlement trust with documents,

3  witnesses, or other information as provided therein.  Other

4  than their cooperation agreement obligations owed to the

5  settlement trust, the settlement trust's counterparties to the

6  cooperation agreement shall have no obligation to act in any

7  capacity in the claims resolution process under these CAP."

8          Did I read that correctly?

9  A    You did.

10 Q    And there's no longer, after the Coalition's edit, any

11 reference at all to cooperating with non-settling insurers in

12 this cooperation provision; correct?

13 A    Correct, they deleted all this stuff.

14 Q    Going down then to subsection or paragraph (d), which

15 was entitled, "No modifications to insurance policies."  Do

16 you see that?

17 A    I do.

18 Q    And it is now, after the Coalition's edits, entitled

19 "Assignment of insurance policies."  Correct?

20 Q    And after the language was struck by the Coalition, that

21 sentence is now -- or that provision is now one short

22 sentence; correct?

23 A    It is.

24 Q    And that sentence is, "The BSA insurance policies have

25 been assigned to the settlement trust in accordance with the

1  bankruptcy code and pursuant to the confirmation order."

2  Correct?

3  A     That is.

4  Q     All other language about terms of the policies and --

5  well, every other words in that provision has been struck out;

6  correct?

7  A     They struck the protective language that we had put in.

8  Q     And if you turn, please, to the next page, page 8 and

9  Article 6, the claims allowance process, under section (b),

10  the claims evaluation, the Coalition struck the language "and

11  after fulfilling any obligations in respect of the insurance

12  policies in the case of insured abuse claims."  Correct?

13  A     It is.  I see it.

14  Q     And that's struck by the Coalition; correct?

15  A     It is.

16  Q     And if you turn to page 10 -- and, just for the record,

17  page 10 of part of Article 6(3), "Submitted abuse claims that

18  satisfy the general criteria."

19          And the Coalition struck your language that

20  "provided, however, any such allowance by the settlement

21  trustee shall be subject to any contractual, legal, or

22  equitable rights of the non-settling insurance companies that

23  the non-settling insurance companies have under the applicable

24  insurance policies."  Correct?

25  A     They struck that language.

1  Q     And if you'll go to page 11, please, paragraph (e),

2  "Allowed abuse claims," there again the Coalition struck your

3  protective language that "any valuation by the settlement

4  trustee shall be subject to the insurers' contractual, legal,

5  or equitable rights."  Correct?

6  A     Yeah, I think they struck the belt-and-suspenders

7  language throughout the document.

8  Q     Well, let's make sure.

9  A     Okay.

10  Q     In (f), which is the claims determination, there the

11  Coalition struck your language that "any such payment to and

12  release by the abuse claimants shall be subject to all rights

13  of each non-settling insurance company."  Correct?

14  A     Again, they struck the belt-and-suspenders language,

15  yes.

16  Q     And if you go, please, to page 14, under "Scaling

17  factors," here again they struck the language -- the Coalition

18  struck the language that "the scaling factors described below

19  to," and then they struck, "determine the proposed allowed

20  claim amount for each allowed abuse claim subject to any

21  contractual, legal, or equitable rights to the non-settling

22  insurance companies have under the applicable insurance

23  policies to the valuation or the dollars attributable."

24  Correct?

25  A     Yes, they struck the language; again, the belt-and-

1  suspenders language.

2  Q     And then they edited the following sentence.  So it went

3  from saying "the scaling factors are based on evidence

4  regarding the BSA's historical abuse settlements," to "the

5  scaling factors are based on evidence submitted to the

6  bankruptcy court regarding the BSA's and other putative

7  protected parties' historical abuse settlements."  Correct?

8  A     Yeah, they added the underlined language.

9  Q     And do you know who will be providing that evidence to

10  the bankruptcy court?

11  A     At least on the BSA's side, I think Dr. Bates will be

12  giving the information on the historical settlement values.

13  Q     Thank you, thank you.

14        And if you turn down to page 17, under (d),

15  "Allowed abuse claim calculus," you see that?  And at the end

16  of subsection (d), again, the protective language of "any

17  determination of value by the settlement trustee shall be

18  subject to the rights of the non-settling insureds" has been

19  struck by the Coalition; correct?

20  A     Yes, they struck the language, the belt-and-suspenders

21  language again.

22  Q     Now, paragraph 31 of your written direct, you state that

23  the belt-and-suspenders language was ultimately deleted in

24  future drafts of the TDP; correct?

25  A     It was.

1  Q      And the first time it was deleted was three days after

2  you had put it in; correct?

3  A      Yes.

4  Q      And it was deleted by the Coalition; correct?

5  A      Yes.

6  Q      Now, you say also at paragraph 31 of your written direct

7  that "the other attorneys involved in the negotiations of the

8  TDP, including attorneys representing the debtors, found this

9  language to be confusing and arguably ambiguous in light of

10 the general protection afforded to the non-settling insurance

11 companies under Article 5(c)."  Correct?

12 Q      And when you say arguably ambiguous, sir, you don't mean

13 to suggest that it is ambiguous, do you?

14 A      No, I actually think it ended up being ambiguous, right?

15 Using the principle of specific over the general, people

16 thought it was confusing for me to try to identify every

17 provision that applied versus having the general, which

18 actually was meant to cover all of it.  And so the reason we

19 took it out is people were like, well, wait a minute, if you

20 don't identify in each provision that may apply, how do you

21 know it doesn't apply, just have it in the catchall.

22         So that was -- yes, I think people thought it was

23 ultimately ambiguous as to the inclusion and that's why we

24 ultimately conceded to taking it out because we had the

25 general provision.

1  Q     And none of the language, none of these references to

2  valuation and liability and the various things where there

3  were line item reservations, none of those specific provisions

4  were added to, as you say, the blanket reservation; correct?

5  A     I don't think that's right, Mr. Doren.  We have the

6  language that says nothing shall be modified, amended, or

7  supplemented, or nothing herein shall modify, amend, or

8  supplement, and that's meant to encompass that.

9  Q     All right, all right, fair enough.  So, again, the

10 intention of your language is that all that be included.  And,

11 again, if this Court concluded that it would be better to

12 state with more specificity what's included to make that

13 provision clearer, that would be consistent with your intent

14 at the time you were drafting the TDPs; correct?

15         MR. KURTZ:  I'm going to object.  I think we've

16 been through this.  I don't think now is the time to negotiate

17 positions.

18         THE COURT:  Overruled.

19         THE WITNESS:  Again, if the Court feels like the

20 language we negotiated is not clear enough, yeah.  I mean, our

21 intent was to protect the insurers' contractual rights and not

22 to modify them.  So, if the Court deems it appropriate to put

23 additional language to make that clear, yeah, of course, we'd

24 be okay with it, the debtors would be okay with it.

25 BY MR. DOREN:

1  Q      Thank you, sir.

2         So we've talked a lot about 5(c) or we had begun

3  to, let's focus on that a bit, and let's go ahead and talk

4  about paragraph 33 of your written direct.  And I'm doing this

5  to try and save us a couple of drafts to review, if you will.

6         And in paragraph 33 of your declaration you discuss

7  that on June 8th the debtors responded to the Coalition's June

8  revisions and reinserted additional protective language into

9  Article 5(c); correct?

10 A      Correct.

11 Q      And the Coalition deleted that language; correct?

12 A      Yeah, I believe so, timeline-wise.  If you put up the

13 demonstrative, I can go through the timeline.

14 Q      Okay.  Well, we'll put it up so that -- I don't need you

15 to walk me through it, but if it helps you respond to the

16 questions I'm asking, that's fine.

17 A      That would be great.

18        (Pause)

19 A      Correct.  So --

20 Q      Okay.

21 A      -- June 8th, we put back in the language.

22 Q      Okay, got it, got it.  So, June 8th, you put the

23 language back in, and then -- and, by the way, now that the

24 belt-and-suspender language has been removed, the language

25 that we're looking at here, 5(c), is the only language in the

1  TDPs from that date forward that attempts to reserve the

2  rights of non-settling insurers; correct?

3  A     Again, we thought the -- yes, we thought the general

4  provision covered it.

5  Q     So yes is the answer?

6  A     Yes.

7  Q     Thank you.  And so let's look and I think it might -- I

8  think it might actually be 5(b) in the June 10, 2021 redline,

9  but that's okay.  Let's stick with the -- let's stick with

10 this graphic, and go ahead and take a look at kind of the

11 bottom language, if you will, on June 10.

12 A     Yes.

13 Q     And it says, "Nothing in these TDPs" -- we'll get it up

14 there -- "Nothing in these TDPs shall modify, amend, or

15 supplement, or be interpreted as modifying, amending, or

16 supplementing, the terms of any insurance policy or rights and

17 obligations under any insurance policy assigned to the

18 settlement to the trust."  And here we see the evolution from

19 May 28 to June 8 to June 10th; correct?

20 A     Yes.

21 Q     And you found the June 10th language to be comprehensive

22 enough and complete enough that you agreed to accept that as

23 the appropriate general reservation language; correct?

24 A     Correct.

25 Q     Now, the Coalition included some language, some new

1  language on June 10th; correct?  And let's take a look at

2  that.

3  A    Okay.

4  Q    And that's -- I'm sorry, sir -- and that is -- again,

5  back to our graphic, that's the language that says that "to

6  the extent such rights and obligations are otherwise available

7  under applicable law and subject to the plan and confirmation

8  order."  Correct?

9  A    Correct.

10  Q    And that's language proposed by the Coalition that the

11  debtors agreed to; correct?

12  A    Yeah, I can't remember -- Mr. Doren, the only reason I'm

13  pausing is I can't remember whether we worked through that in

14  a mediation session and all came to agreement or -- and that's

15  how it's reflected in the draft.  I just don't have a specific

16  recollection of how that came to be.

17  Q    Right.  And your written direct doesn't explain that

18  either; correct?

19  A    Mr. Doren, again, I just don't recall it.  I know we had

20  some discussions about it, I just don't recall.

21  Q    Yep, yep.  Okay.  So -- and so under this language

22  drafted by the Coalition, the insurers' rights are subject to

23  the plan and confirmation orders; correct?

24  A    Yes.

25  Q    And so let's take a look at the current proposed plan,

1  which is JTX-1-353, which is in binder number 1.  Let me know

2  when you have it, it's --

3  A      Yeah, give me one second.

4  Q      -- bulky.

5  A      I have it.

6  Q      Great.  Thank you.

7         And turn to page 114, please?  I'm sorry, when I

8  say 114, I mean 114 of 459, as stated at the top of the page.

9  A      I am there.

10 Q      And you see Article 9, "Conditions precedent to

11 confirmation and effective date."  Correct?

12 A      I do.

13 Q      And subheading (a) is conditions precedent to

14 confirmation of the plan; right?

15 A      It is.

16 Q      And if you turn to page 118, please.

17 A      I am there.

18 Q      And proposed finding (w) states that "the plan

19 documents, including the plan and the confirmation order,

20 shall be binding on all parties in interest, consistent with

21 applicable legal doctrines, including the doctrine of *res*

22 *judicata* and collateral estoppel, and Section 1141 of the

23 bankruptcy code and related legal authority."  Do you see

24 that?

25 A      I do.

1  Q      And you understand that the non-settling insurers are

2  parties in interest; correct?

3  A      I believe so.

4  Q      And so this finding would be binding on non-settling

5  insurers; correct?

6  A      Right, but, Mr. Doren, again, we were not trying to use

7  this finding to bind the non-settling insurers in subsequent

8  coverage litigation.  Again, subject to all coverage defenses,

9  it's not meant to change your rights.

10 Q      Do you promise, Mr. Azer, that nobody is going to try to

11 use this in subsequent coverage litigation, that's your

12 promise to me?

13 A      Mr. Doren --

14         MR. KURTZ:  Your Honor, objection.  He has no

15 foundation for that.

16         THE COURT:  Sustained.

17         THE WITNESS:  Yeah, Mr. Doren --

18 BY MR. DOREN:

19 Q      Mr. Azer, who is --

20 A      Can I finish --

21 Q      -- who will --

22 A      -- can I finish --

23 Q      No.

24         THE COURT:  No, there's no question to answer.

25         THE WITNESS:  Oh, okay.

 1            THE COURT:  I sustained the objection, it's --

 2            THE WITNESS:  Okay, sorry.  Sorry, Your Honor.

 3  BY MR. DOREN:

 4  Q    Mr. Azer, who will initiate any subsequent coverage

 5  litigation, if there is any, will it be debtor?

 6  A    No, it will probably be Judge Hauser who authorizes it.

 7  Q    It would be the trust -- it would be the settlement

 8  trustee; correct?

 9  A    It will be Judge Hauser.

10  Q    Who will be -- who will be -- whose authority and the

11  parameters of that authority will be defined by the plan;

12  correct?

13  A    Again, you're going outside my depth.  I'm not a

14  bankruptcy lawyer --

15  Q    Fair enough.

16  A    -- I'm sorry.

17  Q    Fair enough.  And so you don't know whether finding (w),

18  "the plan documents and the confirmation order shall be

19  binding on all parties in interest consistent with applicable

20  legal doctrines, including the doctrine of *res judicata* and

21  collateral estoppel," you don't know whether that will be

22  binding on non-settling insurers or not, is that what you're

23  saying?

24  A    I'm --

25            MR. KURTZ:  Objection, Your Honor, for what --

1  objection, Your Honor, for what purposes?  It's vague.  Are we

2  talking about for confirmation purposes or in subsequent

3  coverage litigation?

4         THE COURT:  No, I'm going to overrule it and see if

5  he can answer it.

6         THE WITNESS:  So, Mr. Doren, I can answer this from

7  like an insurance perspective, which is -- so, for example, if

8  the plan deals with anti-assignment clauses and the Court

9  says, hey, I'm going to assign the policies to the trust, I

10  presume the insurers can't re-litigate that assignment issue,

11  but otherwise I don't think we -- we weren't trying to use

12  this to affect their rights in coverage litigation, subject to

13  all applicable coverage defenses that may exist.

14  BY MR. DOREN:

15  Q     And so if the Court concludes that this could impact the

16  rights of insurers, you would have no problem with this

17  finding being struck; correct?

18         MR. KURTZ:  Objection.  We're back to the capacity

19  issue, Your Honor.

20         THE COURT:  Sustained.

21         MR. KURTZ:  He framed --

22  BY MR. DOREN:

23  Q     Mr. Azer, let's go back to Exhibit 445, the April 10,

24  2021 draft --

25  A     Yeah, give me a second --

1  Q      -- the TDPs.

2  A      -- Mr. Doren.

3         (Pause)

4  A      Mr. Doren, what page would you like me to turn to?

5  Q      It's provision 7.2, which begins on Bates page 756,

6  Bates number 756.

7  A      I'm there.

8  Q      And subparagraph (b) says, "Nothing in the trust

9  distribution procedures shall in any way operate to or have

10 the effect of impairing or having any *res judicata*, collateral

11 estoppel, or other preclusive effect on any party's legal,

12 equitable, or contractual rights or obligations under any non-

13 settling insurance policy in any respect."

14         Did I read that correctly?

15 A      You did.

16 Q      And that provision continues to represent your intent as

17 you negotiated the TDPs, including those currently pending

18 before the Court; correct?

19 A      Yeah, Mr. Doren, so I guess what I'm struggling with,

20 when I look at any respect, like going against the anti-

21 assignment issue, I presume that can't be re-litigated in a

22 coverage court because the court will determine -- I think

23 it's well settled that the court can basically override the

24 anti-assignment clauses.

25         So I guess what I'm looking at, when it says "any

1  respect," I guess that was probably too broad when we

2  initially drafted it.  We should have taken in consideration,

3  you know, things that the court is going to do as part of a

4  mass tort bankruptcy.

5  Q    Do you want to stand on that answer, Mr. Azer?

6  A    I don't -- what do you mean by that?  I don't -- is that

7  a question?

8  Q    Let's go on, please, to page 118 of -- sorry, my fault -

9  - of Exhibit 1353.

10  A    Okay.  Sorry, Mr. Doren, I'm just juggling two binders.

11  Just give me one second.

12  Q    I'm doing the same thing and so is the Court.

13          And specifically, sir, we're going to want to look

14  at finding (x), small (x) on page 118 of 459.

15  A    I'm there.

16  Q    And (x) or finding (x) says that "the procedures

17  included in the trust distribution procedures pertaining to

18  the allowance of abuse claims and the criteria included in the

19  trust distribution procedures pertaining to the calculation of

20  the allowed claim amounts, including all the various tools,

21  are appropriate and provide for a fair and equitable

22  settlement of abuse claims based on the evidentiary record

23  offered to the bankruptcy court."

24          Do you see that finding?

25  A    I do.

1  Q    And, once again, the language accepted by debtors as
2  proposed by the Coalition is that the rights of non-settling
3  insurers will be subject to the plan and the confirmation
4  order; correct?
5  A    Yes, it's subject to whatever the Court finds in the
6  confirmation order under 1129.  That's all this language is,
7  it's for 1129 --
8  Q    Thank you --
9  A    -- purposes.
10 Q    -- sir --
11 A    Okay.
12 Q    -- thank you, sir.
13       Let's go ahead and look at page 119, again, of 459,
14 and, specifically, finding (z).  Do you have that in front of
15 you?
16 A    I do.
17 Q    And finding (z) says, "The plan and trust distribution
18 procedures were proposed in good faith and are sufficient to
19 satisfy the requirements of Section 1129(a)(3) of the
20 bankruptcy code."  Correct?
21 A    Correct.
22 Q    And this is contained in a document to which TDPs are
23 attached, which says that the rights of the non-settling
24 insurers are subject to the plan and confirmation order;
25 correct?

1  A    Correct.

2  Q    Let's look, please, at finding (aa) immediately below

3  (z).  Do you see that?

4  A    Correct.  Yes, I see it.

5  Q    Now, this is a late addition, correct, this finding?

6  A    It is.

7  Q    This finding was part of the negotiations that completed

8  late on the evening of February 14; correct?

9  A    Around that time, yes.

10 Q    And was this provision required by the Coalition?

11 A    I think it was negotiated between the parties to be

12 included, I don't recall who specifically proposed it.

13 Q    Okay.  And proposed condition precedent (aa) is that

14 "the base matrix values in the trust distribution procedures

15 are based on and consistent with the debtors' historical abuse

16 settlement and litigation outcomes."  Correct?

17 A    Correct, that's what it says.

18 Q    And this is contained in the plan document; correct?

19 A    Correct.

20 Q    To which TDPs are attached, which says that all non-

21 settling insurers, their rights are subject to the plan and

22 confirmation order; correct?

23 A    Correct.

24 Q    Now, you testified a few minutes ago that Dr. Bates will

25 be testifying on behalf of debtors regarding historical claim

1  experience.  Do you recall that topic generally?

2  A     I remember I said that, yes.

3  Q     And in paragraph 12 of your declaration, your written

4  direct, you discuss Bates White and Dr. Bates a bit; correct?

5  A     No, it's not Dr. Bates.  We were dealing with the

6  consulting side of Bates White --

7  Q     I see.

8  A     -- it was not Dr. Bates.

9  Q     I gotcha, I gotcha, I gotcha.  But you did have calls

10  with the consulting side of Bates White about Dr. Bates'

11  expert reports, for example, and his rebuttal expert reports;

12  right?

13  A     Yeah, Mr. Doren, I think you're getting slightly

14  confused.  So we're coverage counsel, so I'm dealing with --

15  Q     I'm sorry, sir, is that yes or no?

16  A     No, the answer --

17          MR. KURTZ:  I'm sorry, can counsel not cut off the

18  witness?

19          MR. DOREN:  Talk on, Mr. Azer

20          THE COURT:  Go ahead.

21          THE WITNESS:  No, I didn't have calls with Dr.

22  Bates.

23          MR. DOREN:  Okay.

24      (Pause)

25          MR. DOREN:  Excuse me, Your Honor, my apologies.

1          THE WITNESS:  Mr. Doren, can I modify --

2          MR. DOREN:  Yes, sir.

3          THE WITNESS:  -- modify my answer.  I think I've

4   been on like one call.  So, to be honest, I don't want to say

5   no calls, I think I was on like one call with Dr. Bates.

6          MR. DOREN:  Okay.

7          THE WITNESS:  I don't want to represent that --

8   misrepresent that.

9   BY MR. DOREN:

10  Q    That's helpful, I appreciate that.  And if I were to

11  tell you that you were on a call immediately before his

12  original report was filed, would that sound accurate to you?

13  A    Yeah, I think it's like -- I can't recall --

14  Q    And if I told you --

15  A    -- I may have been on one call with him, or one or two.

16  I mean, it's just not a lot.  That's not my area, I'm not

17  dealing with that expert.

18  Q    I understand.  So you were -- you were on a few calls;

19  he wasn't your primary responsibility --

20  A    Yeah.

21  Q    -- but you may have been on some calls with Dr. Bates

22  over the course of the month of December; correct?

23  A    Over the course of the month of December.  I don't

24  remember the time frame.  Again, he's not --

25  Q    And you --

1  A      -- he's not my responsibility, so I just -- sometimes I

2  attend calls and it's not my lane, so I don't necessarily have

3  to be the focal point.

4  Q     Understood.  And if we looked at your billing

5  submissions from December, if we saw any references to those -

6  -

7  A     Yeah.

8  Q     -- they would be fairly modest, an hour here, an hour

9  there; right?

10  A     I don't know.  I mean, I've had calls with him, I just

11  don't -- one, two, a few?  But, again, I didn't have to take

12  the lead, so I didn't really have to worry about it.

13  Q     Okay, I gotcha.  That's helpful, thank you.

14          Now, you do know, though, that the debtors used

15  Bates White to provide guidance on the calculation of the base

16  matrix in the TDP; correct?

17  A     Generally, yes.

18  Q     And you used Bates White to provide guidance on

19  quantifying the appropriate scaling factors for any of the

20  aggravating or mitigating factors; correct?

21  A     Yes.  So we used Bates White for the math because I'm an

22  attorney, I'm not an economist or mathematician.

23  Q     And they had the data from which that math was

24  performed; correct?

25  A     Correct, they had all of the historical abuse data.

1  Q      And under the claims matrix that's included in the TDPs

2  you were negotiating, the objective was to mirror the amount

3  that a claimant would receive in the tort system absent the

4  bankruptcy; correct?

5  A      Correct.

6  Q      And you do recall, don't you, that Dr. Bates issued an

7  affirmative report in early December?

8  A      I do.  I don't even think I've read it, though.

9  Q      And do you know, sir, that after issuing his initial

10  opinions Dr. Bates did some additional analysis?

11  A      I do.

12  Q      And he reexamined the historical settlements for abusers

13  identified as having abused only a single claimant?

14  A      So, again, Mr. Doren, this was not my lane of

15  responsibility, so I don't actually think I read the reports.

16  So, put it this way, I can't remember reading the reports.

17  Q      Well, sir, are you aware that Dr. Bates has testified

18  that, based on his updated analysis, that for single-victim

19  abuser cases a significant discount from the base claim values

20  contained in the matrix is needed to reflect Boy Scouts'

21  responsibility under the tort system?

22              MR. KURTZ:  Your Honor, I'm going to object.  Dr.

23  Bates will testify, he can be cross-examined on his

24  conclusions.  This witness hasn't testified to devaluation

25  issues.  The finding is in a document, Your Honor will see

1  proof and will make a finding, if you're satisfied with the

2  evidence, but this is not an appropriate subject for cross-

3  examination of Mr. Azer.

4          MR. DOREN:  Your Honor, this witness drafted the

5  TDPs in which the claim matrix is included.  Dr. Bates, we

6  have a good faith basis to believe, will testify that a 90

7  percent discount is required on about 87 percent of the

8  claims, because they were single-abuser claims, and yet the

9  TDPs before this Court neither show reduced matrix amounts

10  from before that matrix was presented to this Court, nor does

11  it include a 90 percent discount scaler for single-abuser

12  claims.

13          We now have the witness whose job was to draft

14  these TDPs who has never read these reports and doesn't know

15  anything about these results, and that's reflect in the TDPs

16  in the absence of any change.

17          So I think it's very appropriate to probe what this

18  witness does and does not know about Mr. Bates' conclusions

19  and, to the extent changes were not made and he is

20  knowledgeable about them, why no changes were made.

21          MR. KURTZ:  Your Honor, that's sort of -- that

22  argumentative and incorrect recitation about Dr. Bates'

23  opinion is exactly the reason that this problematic and should

24  be taken up with Dr. Bates.  It's not how this works.  This

25  witness has said he's not familiar with the report, the

1  analysis, he hasn't read the reports.  He was involved in

2  connection with the TDPs.  He states he relied on Dr. Bates.

3        There's actually an application that's being made

4  to still be heard by Your Honor as to whether he had a

5  foundation for prepetition.  It's the same issue with Dr.

6  Bates, he didn't -- Mr. Azer hasn't purported to do any math,

7  he's testified he's not an economist or a mathematician.

8        The TDPs, he will confirm, if he wants -- if

9  counsel wants to ask him, he will confirm that he relied on

10 Dr. Bates and then counsel can try to -- try to cross-examine

11 Dr. Bates, but this is not the witness to support the evidence

12 that there will be payments substantially in full and that the

13 TDPs are fair and reasonable.

14        MR. DOREN:  Your Honor, in this gentleman's direct

15 examination he stated, "Bates White was provided and relied on

16 historical settlement data, and analyzed that data to provide

17 guidance in quantifying, to the extent practicable, the

18 historical claim values to provide guidance to the settlement

19 trustee in determining individual claims.  Bates White

20 provided guidance with respect to the calculation of the Bates

21 matrix value in the TDP and quantifying the appropriate

22 scaling factor for any of the aggravating or mitigating

23 factors to be consistent with prepetition practices.  The

24 debtors relied on Bates White's determination of these amounts

25 through an economic analysis of the BSA's historical

1  settlements between 2016 and 2020."

2          That is his sworn testimony, purportedly based on

3  personal knowledge, by the man who tells us he owns creation

4  of the TDPs.  I'd like to know what he knows about this.

5          MR. KURTZ:  Your Honor, yesterday he specifically

6  testifies there that he relied on Dr. Bates, that he has never

7  -- he didn't testify in the declaration and he didn't testify

8  today that he's familiar with the content or did a full

9  analysis.

10          THE COURT:  Well, let's find out --

11          MR. KURTZ:  And he's --

12          THE COURT:  -- let's find out if he is.  Overruled.

13          MR. DOREN:  Thank you, Your Honor.

14  BY MR. DOREN:

15  Q    So, Mr. Azer, I'll agree with Mr. Kurtz on -- let's cut

16  to the case here.  Have you ever read Dr. Bates' original

17  expert report?

18  A    Not that I recall.

19  Q    Have you ever read Dr. Bates' rebuttal report?

20  A    Not that I recall, not off the top of my head.

21  Q    Have you ever read Dr. Bates' supplemental expert

22  report?

23  A    Not that I recall.

24  Q    Have you ever read Dr. Bates' deposition?

25  A    No, I know I have not read that.

1    Q      Has anyone ever told you that Dr. Bates' rebuttal report

2    and supplemental expert report, as well as his deposition

3    testimony, all suggest that there should be a very significant

4    discount on the matrix values for single-abuser claims?

5    A      Again, it may have come up in a call, it sounds -- but

6    that's -- other than having tangential information about it,

7    that's pretty much all I have.

8    Q      No one has ever come to you and said that something --

9    that you should take a look at that and decide whether that

10   should be addressed in the TDPs or not?

11   A      Again, we didn't deal with Dr. Bates when drafting the

12   TDPs; we dealt with the consulting side of Bates White, not

13   Dr. Bates, we dealt with his colleague.  Uh --

14   Q      And, sir, are you suggesting -- I'm sorry, I apologize.

15   Go ahead.

16   A      No, that's okay.  Go ahead.

17   Q      So are you suggesting that the consulting side of Bates

18   White was giving you different answers than a testifying

19   expert on what the value of claims should be?

20   A      No, Mr. Doren, I'm just trying to tell you my lanes of

21   responsibility, like I said I drafted this with Andy O'Neill.

22   So Andy O'Neill was dealing with Bates White on the base

23   matrix values and what to put in, I was dealing with more of

24   the Bruce Griggs process side.  So I didn't -- I knew where it

25   was valid, I knew that he was relying on Bates White, which is

1  why I reflect in my testimony general statements that this is

2  what they did because I knew from Andy -- or, I'm sorry, Mr.

3  O'Neill that's what happened, but I was not intimately

4  involved in that part of the TDP, I just knew kind of what was

5  happening for Mr. O'Neill to get to that place.

6  Q    So you swore to that on personal knowledge based on what

7  somebody else told you somebody told them that Bates White was

8  doing, is that right?

9  A    No, that's not --

10          MR. KURTZ:  Objection, argumentative, Your Honor.

11          THE WITNESS:  -- that's not correct.

12          THE COURT:  It's a little argumentative.

13          MR. DOREN:  Fair enough, Your Honor.  I will back

14  into my corner.

15  BY MR. DOREN:

16  Q    So, Mr. Azer, from the time -- from any time in December

17  or January, did anyone come to you and say we've got a problem

18  with the values in the matrices?

19  A    No.

20  Q    Did anyone come and tell you we need to consider adding

21  a new scaler to address Dr. Bates's conclusions about single-

22  abuser claims?

23  A    No.

24  Q    Thank you, sir.

25          MR. DOREN:  Your Honor, I'm about to change topics

1  and I know we're a few minutes before the hour --

2           THE COURT:  This is a good time then if you're

3  going to change topics.

4           We will take our recess and be back here at 3:30.

5  And I'm really confident that I will be done with my consumer

6  docket by then, but if I'm a little bit late, please excuse

7  me.  Thank you.

8           COUNSEL:  Thank you, Your Honor.

9           THE COURT:  We're in recess.

10       (Recess taken at 1:54 p.m.)

11       (Proceedings resume at 3:34 p.m.)

12          THE COURT:  Okay.  We are back on the record.

13          Mr. Doren.

14          MR. DOREN:  Thank you, Your Honor.

15  ADRIAN AZER, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

16                  CONTINUED CROSS-EXAMINATION

17  BY MR. DOREN:

18  Q    Good afternoon, Mr. Azer.

19  A    Good afternoon, Mr. Doren.

20  Q    Sir, in your written direct, you testified that debtors

21  contacted the insurers in late June 2021.  Do you recall that,

22  generally?

23  A    Yes.

24  Q    And in fact, in your testimony, you referred to

25  correspondence from your partner Mr. Martin to counsel for

1  various insurers, correct?

2  A    Correct.

3  Q    And in the -- in your written testimony, you say that, in

4  the debtors' view, the insurers were not willing to engage

5  constructively to seek a mutually agreeable resolution with

6  any sort of creditor support.  Do you recall that testimony?

7  A    Yes.  Mr. Doren, can you point me to the paragraph, just

8  so I can --

9  Q    Yes, sir.

10  A    -- look at it?

11  Q    Yes, sir.  I have that as Paragraph 45 to 47, is where

12  that's located.

13  A    Yeah, I'm there, I am at those paragraphs.

14  Q    Make yourself comfortable with what I said.

15  A    Yes.

16  Q    Thank you.

17       So that was the debtors' view after this communication,

18  or this outreach, should I say, to insurers, correct?

19  A    Correct.

20  Q    And by "creditor support" in that testimony, did you mean

21  coalition support?

22  A    And FCR and the other claimant constituencies.

23  Q    Okay.  So by "creditor," you meant claimant

24  constituencies.

25  A    Yes, sir.

1   Q    And so, as you say in Paragraph 47, after that outreach,

2   the debtors continued to negotiate with the coalition and FCR

3   without the participation of the insurers, correct?

4   A    That was correct.

5   Q    All right.  Let's take a look, please, sir -- and this

6   will be in your third binder, and it's the first document in

7   your third binder.  It's JTX-3018.

8   A    Just give me a second, Mr. Doren.  I would --

9   Q    Go ahead.

10  A    I have the other two binders in front of me.

11  Q    Yep.  Yeah, this might be our first foray into Number 3.

12       (Participants confer)

13  Q    And so, first of all, sir, do you see that this is a June

14  30th, 2021 email from Mr. Martin to various counsel for the

15  certain insurers?

16  A    I do.

17  Q    I'm sorry?

18  A    I'm sorry.  Yes, I see -- I see the emails from Mr.

19  Martin on June the -- June 30th to the certain insurers.

20  Q    Thank you.  I think you just cut out on me for just a --

21  A    Oh, I'm --

22  Q    -- a second.

23  A    I apologize.  I didn't realize I was cut out -- cutting

24  out.

25  Q    Yeah, I don't think that was your fault.

1         All right.  So this is a -- this is an email chain

2    between counsel for various insurers and the debtors.  And as

3    you can see, you're copy -- you're on that email, as well.

4    A    I do.

5    Q    Okay.  And if we go down to page -- the very bottom of

6    Page 3, 3018-3, you see an email from Michael Rosenthal to

7    presumably a reply all.  Do you see that?

8    A    I do.

9    Q    And that's on June 30th, correct?

10   A    It is.

11   Q    And now Mr. Rosenthal is counsel, one of the lawyers for

12   the AIG Companies, correct?

13   A    Correct.

14   Q    And you see, if you -- if we switch over or carry over to

15   Page 4, he says:

16            "Ernest, while we are" --

17            MR. KURTZ:  Your Honor?  Excuse me, Your Honor.

18   I'm just going to interject.  I -- it's not clear that this is

19   part of the exhibit list.  Maybe counsel could make a

20   representation about that.  It doesn't even have a Bates

21   Number.  I'm not quite sure where it came from.  If we missed

22   that, counsel, I'm sure, will correct me, but otherwise, we

23   would object because it wasn't included in the witness list

24   [sic] and is not being used for impeachment purposes.

25            MR. DOREN:  Your Honor, it was added before cross-

1  examination.  And our understanding of the case management

2  order is that we're entitled to do that.

3         MR. KURTZ:  For impeachment (indiscernible) not for

4  (indiscernible) materials.

5         THE COURT:  For -- I'm sorry?

6         MR. DOREN:  Your Honor --

7         THE COURT:  What?  Mr. Kurtz, I didn't hear you.

8  For what?

9         MR. KURTZ:  I believe that the ability to add

10 additional documents during cross-examination is for

11 impeachment materials.  We can consult the order, but I do not

12 recall allowing people to simply bring up documents that had

13 never been marked into -- for introduction into evidence prior

14 to the cross-examination.

15        MR. DOREN:  Your Honor, I direct the Court's

16 attention to the case management order, the last paragraph

17 before the stipulation section at -- on Page 15, which states:

18        "Exhibits that any party seeks to introduce into

19 evidence during cross-examination or on rebuttal do not need

20 to be included on a party's exhibit list.  Objections to

21 exhibits offered during cross-examination or rebuttal shall be

22 made at the time the exhibit is offered."

23        I do not believe there is any limitation --

24        MR. KURTZ:  I withdraw the -- I withdraw the

25 objection, Your Honor.

1            MR. DOREN:  Thank you, sir.

2            THE COURT:  Thank you.

3   BY MR. DOREN:

4   Q    Mr. Azer, let me back up a bit, so we're together.

5         We are on Exhibit 3018, and we are reading the email at

6   the bottom of 3, carrying over to the top of Page 4.  And I

7   believe we have established that as an email --

8            MR. KURTZ:  I --

9   Q    -- from --

10           MR. KURTZ:  I apologize, Your Honor.  But was this

11  produced in the litigation?  Which would be a different ground

12  for exclusion, not whether it was -- being used for the first

13  time.  But it doesn't have a Bates Number.  It's not clear to

14  me that this was produced in the litigation.

15           Mr. Doren, can you give us information on that,

16  please?

17           MR. DOREN:  Your Honor, I honestly don't know the

18  answer to that.  But this is an email that includes Mr.

19  Martin, Mr. Azer, and it is on the topic of Mr. Azer's

20  testimony in his written direct.

21           MR. KURTZ:  And I don't believe one can use

22  information that wasn't produced in litigation, live, during

23  the course of a trial.

24           THE COURT:  Well, I don't know whether it was

25  produced or not produced.  It's part of the joint exhibit

1  list.  What does that signify --

2           MR. KURTZ:  I don't think that's --

3           THE COURT:  -- to me?

4           MR. KURTZ:  I don't think that's right, Your Honor.

5  I think that was added today by them unilaterally.  I don't

6  think it is a part of the joint exhibit list and it's not

7  Bates-numbered --

8           MR. DOREN:  It was added --

9           MR. KURTZ:  -- indicating --

10          MR. DOREN:  It was added for use in cross, Your

11 Honor, in -- within the last couple of days, is my

12 understanding.

13          MR. KURTZ:  I don't think you can use a document

14 that hasn't been produced in discovery to ambush.

15          THE COURT:  Okay.  If it wasn't produced, then I

16 won't permit it to be used.

17          MR. DOREN:  All right, Your Honor.  Thank you.  We

18 will investigate, but in the meantime, I will continue.

19 BY MR. DOREN:

20 Q    Mr. Azer, do you recall that, in response to Mr. Martin's

21 outreach, several insurers responded that they were prepared

22 and interested in participating discussions -- in discussions

23 of TDPs that are insurance-neutral?

24 A    Yeah, not -- chronologically, that's incorrect.  The

25 first response was by Mr. Rosenthal on June 28th, I think, at

1    1 p.m., where MR. Rosenthal said that providing comments would

2    be futile, threatened us with litigation, and told us we have

3    to go back to the -- to the insurers' TDP that Hartford

4    provided in February; so that, sequentially, what ended up

5    happening is Mr. Rosenthal emailed us, we emailed them back

6    and said this is not an appropriate response.

7        Then they all emailed and said, you know, okay, we want

8    a meet-and-confer, but we want to meet and confer because we

9    want you to go back to the insurer TDP.  And we responded and

10   said we can't go back to the insurer TDP, you're asking us to

11   abandon five months of work, we have to work with the

12   settlement framework that we have and get comments to that.

13   Q    And Mr. Azer, in fact, do you recall that, on June 30th,

14   2021, Mr. Rosenthal sent an email in which he stated that AIG,

15   too, is willing to meet and confer with the debtors to discuss

16   TDPs that are insurance-neutral and consistent with AIG's

17   insurance policies?

18   A    Act --

19   Q    Do you recall that, sir?

20   A    Actually, I think the statement was that he was willing

21   to meet and confer and revert back to the Hartford TDPs.

22          MR. DOREN:  Well, now, Your Honor, we have a

23   situation where the gentleman is testifying off of the

24   document --

25          THE WITNESS:  I didn't --

1              MR. DOREN:  -- in front of him.

2              THE WITNESS:  I didn't --

3              MR. DOREN:  Just a second, I'm talking to the

4    Judge, please, Mr. Azer.

5              My question was independent of the document --

6              THE COURT:  Uh-huh.

7              MR. DOREN:  -- it was what he recalled.  His answer

8    was based on his arguing over what the emails said.

9              One thing he said, too, is that I am incorrect, and

10   that what Mr. Rosenthal did was threaten litigation and not

11   respond in a constructive way.  And on that basis, Your Honor,

12   I would ask to use JTX-3018 for impeachment purposes.

13             MR. KURTZ:  Your Honor, Mr. Azer actually was

14   citing to a specific exhibit.  We'd be happy to bring it up

15   and you can review it.  It was a response, I think on June

16   28th, where you will confirm there was a threat of litigation.

17   So there's nothing to impeach.  That was accurate, it's

18   recorded, and we can put the exhibit in front of the Court if

19   there's any question about that.

20             MR. DOREN:  That sounds like --

21             MR. KURTZ:  And Mr. Doren knows that, as well.

22             MR. DOREN:  That sounds like rehabilitation, Your

23   Honor.  And we also watched the witness flip the page of 3018

24   as he testified.

25             MR. KURTZ:  Your Honor, counsel put it in front of

1  him, I objected to it.  Your Honor indicated it wouldn't come

2  in.  And now he's complaining that the -- you know, after he

3  put it front of the witness, the witness looked at it.

4            MR. DOREN:  To be --

5            MR. KURTZ:  That's --

6            MR. DOREN:  To be clear --

7            MR. KURTZ:  -- a little too --

8            MR. DOREN:  -- Your Honor.

9            MR. KURTZ:  -- a little too cute by half.

10           MR. DOREN:  I have no --

11           MR. KURTZ:  Excuse me.

12           MR. DOREN:  I have no --

13           MR. KURTZ:  Mr. Doren, please.  Mr. Doren, please,

14  let me finish.

15           There's nothing to rehabilitate.  The exhibit that

16  -- the letter that Mr. Azer was referring to is in the record

17  and can be reviewed, there's nothing to rehabilitate.  He

18  spoke to a letter, the letter threatened litigation.

19           MR. DOREN:  So -- I'm sorry, Your Honor.  First of

20  all, I have no complaints.

21           Secondly, apparently now the rules of evidence are,

22  so when a witness testifies in a manner inconsistent with one

23  document, you can show another document -- you can eliminate

24  the chance of impeachment or cross-examining him by referring

25  to another document in the record.

1          I'll do whatever the Court wants, obviously.  I

2  would just like to use this document for impeachment purposes

3  with this witness as to what the chain of events were around

4  these communications because now the record is completely

5  mischaracterized.

6          THE COURT:  I'm going to permit --

7          MR. KURTZ:  Your Honor, that's --

8          THE COURT:  I'm going to permit it now.

9          MR. DOREN:  Thank you, Your Honor.

10  BY MR. DOREN:

11  Q    Now, Mr. Azer, in our now dog-eared copies of Exhibit

12  3018, we are on Page 3, reading over to Page 4.  And it was

13  Mr. Rosenthal's email to you and Mr. Martin.  Do you recall

14  that, sir?

15  A    I do.

16  Q    And I'm sorry.  I don't know if it's on your end on mine.

17  A    I --

18  Q    But --

19  A    I do.  Can you hear me?

20  Q    Now I can.  Thank you.  Thank you.

21  A    Sorry.  Does this help with the audio?

22  Q    It does, actually, for me, yeah.

23  A    Okay.

24  Q    Yeah.  Thank you.

25  A    No, no apologies.

1 | Q    Such is the life we're living here.

2 | A    It's okay.

3 | Q    And at the top of Page 4, Mr. Rosenthal wrote:

4 | "While we are preparing a response to your email to

5 | me, AIG, too, is willing to meet and confer with the debtors

6 | to discuss TDPs that are insurance-neutral and consistent with

7 | AIG's insurance policies along the lines that Hartford

8 | proposed in February."

9 | Correct?

10 | A    That's what he wrote.

11 | Q    And then, if you go above Mr. Rosenthal's email on Page

12 | 3, there's an email from Scott Myers to Mr. Martin, correct?

13 | A    Yes.

14 | Q    And Mr. Myers is counsel, in-house counsel at Travelers,

15 | correct?

16 | A    He is.

17 | Q    And Mr. Martin -- or excuse me -- Mr. Myers wrote to Mr.

18 | Martin that:

19 | "Travelers is also interested in participating in

20 | discussions of TDPs that are insurance-neutral."

21 | Correct?

22 | A    That's what he wrote.

23 | Q    And then, on the next page, Page 2, Mr. Jacobs wrote:

24 | "Ernest, National Security Corporation and Interest

25 | Fire and Casualty Company are also interested in discussing

1  insurance-neutral TDPs with BSA."

2       Correct?

3  A    That's what he wrote.

4  Q    And then, on the first page of Exhibit 3018, Mr. Martin

5  responded to that string, correct?

6  A    He did.

7  Q    And he said:

8            "As we noted in our June 25 letter, we need to

9  have" -- "we needed to have any meet-and-confer occur by

10 Monday, June 28th.  That deadline has come and gone."

11      Correct?

12 A    He did.

13 Q    This is two days after the deadline?

14 A    It is.

15 Q    And well before any new TDPs were filed with the Court,

16 correct?

17 A    I can't remember whether we filed like July 1 or around

18 that time, so it was very close to our filing date.

19 Q    All right.  But certainly, negotiations about insurance-

20 neutral TDPs could have continued after that date, correct?

21 A    With whom?

22 Q    Mr. Martin --

23 A    Yes --

24 Q    -- then goes on to say:

25            "Attempting to delay this process through a meet-

1  and-confer now, notwithstanding that we could have spoken over

2  the weekend, jeopardizes the settlement offered by the TCC,

3  coalition, and FCR.  Further a TDP 'along the lines that

4  Hartford proposed in February' would scuttle the deal between

5  the debtors and the TCC, coalition, and FCR, and would

6  effectively require the debtors to negotiate a new set of

7  TDPs."

8       And did I read that correctly?

9  A    You did.

10 Q    And does that accurately reflect the debtors' position

11 with the non-settling insurers on June 30th?

12 A    Yes, it does.

13 Q    And in the Hartford TDPs, are the TDPs that form the

14 initial foundation for the TDPs proposed by the debtors,

15 correct?  That was your testimony earlier?

16 A    Yeah.  I think my testimony was we took parts of it and

17 we used that as the base, but we couldn't -- we rejected a lot

18 of it, too.

19 Q    I see.  Okay.  I missed that part of the testimony.

20 Thank you, sir.

21      Let's take a moment, please, and talk about statute --

22           MR. DOREN:  You can take that now, Matt.  Thank

23 you.

24 BY MR. DOREN:

25 Q    Let's just spend a few minutes on statute of limitations.

1    A    Sure.

2    Q    So, in April of 2021 -- and again, we're switching

3    between screens of two years here, so I'm talking last year,

4    April 2021 -- it was debtors' position that an applicable

5    statute of limitations should serve as an absolute bar to

6    recovery, correct?

7    A    I know we had statute of limitations in the general

8    criteria.  I didn't -- I just don't remember the exact

9    language we used, whether it was statute of limitations

10   subject to any exceptions, or whether there was just a statute

11   of limitations line.  I just -- I can't remember off the top

12   of my head.

13   Q    I got you.

14        But they were in some of the initial criteria.

15   A    They were in the --

16   Q    Is that --

17   A    They were in the initial general criteria, we had a

18   statute of limitations factor in the general criteria.

19   Q    And just so we're on the same page and the record is

20   clear, let's go back and take a look, please, at Exhibit 445.

21   And that is in your Binder Number 2.  And this is the April 10

22   draft, just to be clear.

23   A    Give me one moment --

24   Q    Of course.

25   A    -- Mr. Doren.

1  Q    Of course.

2  A    What page would you like me to go to?

3  Q    Yes.  Section 4.1, which is Bates Number 743.

4  A    I am there.

5  Q    Great.  Thank you.

6        And in Section 7 -- or 4.1, rather, your draft says that

7  this -- that:

8            "Settlement trustee shall evaluate each trust claim

9  submission individually."

10        And then it goes on:

11            "-- and the settlement trustee will either find the

12  abuse claim to be legally valid or invalid.  In order to make

13  this determination, among other things, the settlement trustee

14  must evaluate each claim to determine whether the evidence

15  viably supports a finding that:

16            "(1) the submitted abuse claim is timely and not

17  barred by any statute of limitations or repose, or by other

18  applicable law."

19        Do you see that?

20  A    I do.

21  Q    And does that refresh your recollection as to how that

22  was addressed in Exhibit 445?

23  A    Yeah.  So -- so, Mr. Doran, I think this is what I was

24  talking about, which is, yeah, we had the -- we had the

25  statute of limitations as a criteria.  But obviously, each

1  jurisdiction's statute of limitations has exceptions.  So what

2  we were saying is you got -- the trustee has got to look at it

3  and say is there a complete bar, is there some exception they

4  could apply that may allow for the claim to move forward.

5  That would just all be part of the calculus of evaluating the

6  statute of limitations or statute of repose.

7  Q    Sure, sure.  So, as you say:

8         "The settlement trustee must evaluate whether the

9  evidence viably supports a finding that the claim is timely

10 and not barred."

11       Correct?

12 A    Correct.

13         "-- subject to any exceptions to limitations or

14 otherwise."

15       But yes, correct.

16 Q    And then, in 4.2, you state that:

17         "If the settlement trustee finds that the evidence

18 submitted by the abuse claimant in a trust claim submission

19 does not support a viable claim, then the settlement trustee

20 shall make a determination that the claim is invalid and

21 provide written notice of its determination to the relevant

22 abuse claimant."

23       Correct?

24 A    Correct.

25 Q    Okay.  Thank you.

1       And in writing this, it was your intention to mirror the

2  Boy Scouts' historic experience with abuse claims, correct?

3  A    Absolutely.

4  Q    All right.  And over the course of the April and May

5  drafts, the claimants objected to having the statute of

6  limitations included as a threshold criteria, correct?

7  A    I think their position was that that's not how we treated

8  claims pre-petition, so they wanted -- they didn't think it

9  was consistent with how we did it previously.

10 Q    So your answer is that they did object.

11 A    It wasn't an objection, Mr. Doren.  We had -- just had

12 discussion about it, so I don't -- we -- we had a dialogue

13 about how we were -- claims were treated pre-petition, and

14 they raised this issue to us.

15 Q    They didn't accept this revision --

16 A    They did not.

17 Q    -- correct?

18 A    No, no.  That's correct.

19 Q    Okay.

20 A    They did not accept the provision for where it was.

21 Q    Thank you.

22      In the current proposed plan, the statute of limitations

23 is positioned, if you will, among the mitigating factors?

24 A    It is.

25 Q    Uh-huh.  And under the current TDPs, no claim can be just

1  outright denied, if you will, based on a statute of

2  limitations defense, correct?

3  A    So I think I -- I might have mentioned this -- or maybe I

4  didn't mention it.  I mentioned it in my deposition.  But you

5  know, when we -- when we encompass the legal responsibility

6  point in the -- in the general criteria.  That could be read

7  to encompass some statute of limitations analysis.

8       But you are correct, Mr. Doren, that the predominant

9  limitations analysis now is a mitigating factor, rather than

10  in the general criteria.

11  Q    And in the mitigating factors, the statute of limitations

12  cannot be used to eliminate any recovery -- or rather, should

13  I say all recovery, for an abuse claim, correct?

14  A    I think that the statute of limitations in the closed

15  states, the lowest recovery is .01 of the claim.  So you take

16  the claim number and multiply it times .01 to get some amount.

17  Q    Okay.  Okay.  Thank you.

18       Let's flip, if we could, please, sir, to -- and I

19  apologize for this because it's going to be back to Binder

20  Number 1.

21  A    Yeah, no problem.

22  Q    And this is Exhibit 1353, which we have been in before.

23  And let me know when you have the binder, and I'll tell you

24  what page.

25  A    I have the binder.

1  Q    Okay.  Thank you.

2        And the page is 189 out of 459.

3  A    I have it.

4  Q    And sir, this schedule -- do you -- and this document is

5  entitled "Schedule 1" to the TDPs.  Is that right?

6  A    It is.

7  Q    And the purpose of this schedule is to set out the

8  discount factor for different states related to statute of

9  limitations issues.

10  A    Correct.

11  Q    Is that correct?

12  A    That's -- that's correct.

13  Q    And so we have the top of the page the "legend," as it's

14  called here.

15        In open states, there is no discount.

16        And then, as you said, for closed states, the discount

17  can be anywhere from 90 percent to 99 percent, correct?

18  A    I think that's correct.

19  Q    Okay.  And in -- do you recall, sir, how a -- what a

20  "closed state" is defined to be?

21  A    Yeah.  So, Mr. Doren, this is -- this is where you run

22  into my limitation as -- as insurance coverage counsel.  We

23  talked to Mr. Griggs about this, and Ms. Ogletree at Deakins

24  had a significant role in drafting this.  So, if he told me it

25  was a closed state, I -- I kind of took it at face value

1  because I'm not a coverage abuse lawyer, so -- or I'm not an

2  abuse lawyer.  So I don't -- I wouldn't even try to define it

3  because I don't -- I don't have enough familiarity with it.

4  He just told me this is a closed date and there's -- that's

5  what it should get.

6  Q    So that task kind of was left to others, right?

7  A    Well, we -- well, specifically, not just "others."  It

8  was left specifically to Ogletree, as our national

9  coordinating counsel, right?  Like we basically said how would

10  you categorize these states.  And they came back and told us,

11  based upon their experience, how they would categorize it.

12  And I said okay, this is consistent with our pre-petition

13  practice, and they said yes, and I said okay.

14  Q    Okay.  And I notice -- and you can take my word for this

15  --

16  A    Okay.

17  Q    -- and if I'm wrong, I won't hold you to it -- I notice

18  there are eight states categorized as "closed."  And do you

19  see those closed states there?

20  A    I do.

21  Q    And do you know that Mr. Griggs has testified -- well,

22  I'll tell you that Mr. Griggs has testified in this matter

23  that, as a practical matter, the Boy Scouts didn't really see

24  any claims from about 25 states.  Were you aware of that, sir?

25  A    No.  So, again, I didn't know Mr. Griggs' testimony

1  because I didn't listen at all.  And so, if you're telling me

2  that's what he said, I have no reason to not believe you.

3  Q    And you have -- and sir, you have no personal knowledge

4  about how that fact factored in to the negotiations of these

5  discount factors?

6  A    No, I do not.  Again, we -- we deferred to Mr. Griggs on

7  the statute of limitations chart, and his -- his firm.  And

8  what he told us we basically adopted.

9  Q    Fair enough.  Fair enough.

10      And if you look at Page 2, down at the bottom, second --

11  second from the bottom, North Carolina.  Let me know when you

12  see that.

13  A    I do.

14  Q    And that is defined as an "open state," correct?

15  A    It is.

16  Q    And an "open state" has no discount for a statute of

17  limitations issue, correct?

18  A    That's correct.

19  Q    And sir, do you person -- are you personally aware of

20  whether the North Carolina reviver statute was found

21  unconstitutional by the North Carolina Supreme Court?

22  A    I -- again, I have no idea.

23  Q    Okay.

24  A    Like I'm -- I have no --

25  Q    Okay.

1  A    -- clue about any of the categorizations.  I'm -- I'm a

2  coverage lawyer; I'm not an abuse lawyer.  I have no idea

3  about reviver statutes.

4  Q    So, in terms of bringing the TDPs to their filing date in

5  February, you at least didn't go back to determine whether the

6  assumptions underlying these categories remained accurate.

7  A    No, I -- I did not.  I did not look at it.  If they're --

8  I have not.

9  Q    And you, sir, don't know how, you know, gray one, gray

10  two, gray three, kind of how those groupings were count --

11  were negotiated.

12  A    Other than a very general understanding from interacting

13  with Ogletree that the categorizations are meant to reflect

14  states with strong -- potentially stronger exceptions or

15  weaker exceptions, absent that general framework, no, I don't

16  have any understanding.

17  Q    Thank you.

18      Now we've talked about the most recent version of TDPs

19  as being the ones that were filed on February 15th, correct?

20  A    Correct.

21  Q    Okay.  And last Friday -- which seems so long ago now --

22  you testified as the debtors' 30(b)(6) witness on the

23  negotiation of those TDPs, correct?

24  A    I think last Friday, I -- I -- my testimony was

25  predominantly related to the independent review process and

1  any alterations to the TDP.  So I -- so, yes --

2  Q    (Indiscernible)

3  A    -- it was part of the TDP, but it was more focused on the

4  independent review process.

5  Q    And any changes to the --

6  A    And any --

7  Q    -- to the TDPs.

8  A    -- changes to the TDPs.  That -- that's correct.

9  Q    And those changes to the TDPs, I mean, one thing you made

10  clear to us was that they continued until just hours before

11  the TDPs were filed on the 15th, correct?

12  A    That's correct.  My recollection was those were kind of

13  the wee hours of the 14th and 15th that we were trying to

14  negotiate those with the claimant constituencies.

15  Q    And I remember, as I was introducing myself to the fast-

16  paced lifestyle of this case, I heard people talking about

17  missing the Super Bowl and Valentine's Day dinner and a few

18  other things to get this done.  Is that correct, sir?

19  A    Yeah.  And hopefully, my wife has forgiven me at this

20  point.

21  Q    And the purpose of those changes, or at least some of

22  those changes in the TDPs, were to address some of the

23  objections made by certain insurers, correct?

24  A    Yeah, absolutely.  The -- the two changes to the TDPs

25  were meant to address the insurer issues.

1  Q    And one of the objections from the insurers was there was

2  no requirement that there be proof of negligence before an

3  abuse claim would be accepted, correct?

4  A    That's correct.  That was one of the issues.

5  Q    Okay.  And what I'd like to do, sir, is show you Exhibit

6  3025, which is -- again, is in Binder Number 3.

7  A    Okay.  Hold on one second, please.

8       (Pause in proceedings)

9            MR. DOREN:  And Your Honor, just for the record,

10 I'd like to note that the email that we previously discussed

11 with Mr. Azer, about which we had the debate, was previously

12 produced.  For counsel's records, the Bates Number was BSA

13 Plan 01271592 through 1595.  So, in fact, they produced it to

14 us.  And my apologies for not using the Bates-numbered copy.

15           MR. KURTZ:  Thank you for that information.

16           AUTOMATED VOICE:  May I have your attention,

17 please.  May I have your attention, please.

18           MR. DOREN:  One moment, please, Your Honor.

19           MR. KURTZ:  I didn't know who that was an

20 instruction to.

21      (Pause in proceedings)

22           MR. DOREN:  I'm sorry, Your Honor.  What's going on

23 here is we're having a fire alarm, and I'm hoping it will just

24 quiet itself in the next 30 seconds.

25           AUTOMATED VOICE:  You may not have heard the alarm

1  because of the -- the alarm has been investigated and it has

2  been determined that it is safe for you to return to your work

3  area.  Elevators have returned to operation.  Thank you.

4         MR. DOREN:  So the purpose of the alarm was to tell

5  us we probably didn't hear the first alarm and there's nothing

6  to be worried about.

7         (Laughter)

8         THE COURT:  Yeah, typical.

9         MR. DOREN:  Yep, yep.

10         And Your Honor, if I may, now that we've had that

11  discussion, can I please move Exhibit 3018 into evidence?

12         MR. KURTZ:  No objection, Your Honor.

13         THE COURT:  Thank you.  It's admitted.

14         (JTX-3018 received in evidence)

15         MR. DOREN:  Thank you, Your Honor.

16  BY MR. DOREN:

17  Q    Mr. Azer, I believe, before we took our lives into our

18  hands over here, I had asked you to find your Binder Number 3,

19  and specifically within that JTX-3025.

20  A    I have it.

21  Q    Thank you.

22         And this first page is an email from Ms. DuBose of your

23  firm transmitting a redline version of the TDPs, correct?

24  A    Correct.

25  Q    And specifically sending them to the mediator Tim

1  Gallagher and others, correct?

2  A    Correct.

3  Q    And included in this exhibit or attached to this exhibit

4  is a copy of that redline.  Do you have that there with you?

5  A    I do.  Just, Mr. Doren, one clarification.  I think I

6  said this during my deposition, as well.  What I was confused

7  about in my deposition is whether this is a cumulative redline

8  or was just the debtors' redline.  So it is a redline attached

9  to the -- to the email.

10  Q    Okay.  Thank you.

11  A    No problem.

12  Q    So, if we go to Page 8977 -- and I'm talking about Bates

13  Numbers here.

14  A    Yes.

15  Q    And Provision B is entitled -- the provision entitled

16  "Process and Payment of Expedited Distributions."  Do you have

17  that there?

18  A    I do.

19  Q    And you'll see that there's a last sentence added -- or

20  two new sentences, rather, at the end, which say:

21        "The expedited distributions shall be paid from

22  settlement trust assets and not collected from any non-

23  settling insurance company.  Any abuse claim which has been

24  converted to an expedited distribution shall not be considered

25  an insured abuse claim."

1          Did I read that correctly?

2  A     You did.

3  Q     And was that language proposed by the debtors?

4  A     It was.

5  Q     And was the purpose of that change to eliminate the

6  question about whether there need to be any proof of

7  negligence for expedited claims?

8  A     No.  So the genesis of that language was we had made a

9  representation -- Mr. Linder had made a representation to the

10 Court that we weren't going to seek recovery of those.  But

11 then the coalition and FCR actually made a good point to us,

12 which is:  If that language was included, the Court would

13 effectively be making a coverage determination whether that --

14 those amounts were covered or not covered.

15         And so it was in -- inserted because of Mr. Linder's

16 statement.  It was also going to be removed because they made

17 that point to us, and we thought it was a good point that

18 we're not trying to prejudge any coverage here.  So why would

19 we include that?

20 Q     So you thought that removing them from the question of

21 whether or not there would be coverage meant that you were

22 making a coverage determination.

23 A     Yeah.  So what we were concerned about is -- when we

24 removed it, is they said like, look, you know, you don't know

25 whether it's insured or not insured.  And what you're asking

1  the Bankruptcy Court to do when you're saying that is to

2  prejudge that they're not insured, and we said that's a fair

3  point.  If we're not going to prejudge coverage for anything,

4  we shouldn't prejudge coverage for some subset of this.

5  Q    Thank you.

6       Let's turn to Page 15.  And I'm sorry.  I'm flipping

7  between Bates Numbers and exhibit numbers, so I'll stay with

8  the Bates Numbers.  978, next page.

9  A    I am there.

10 Q    Thank you.

11      And specifically, at the bottom, the general criteria

12 for evaluating submitted abuse claims.  Do you see that?

13 A    I do.

14 Q    And as you know, the prefatory language, if you will,

15 says that:

16           "The settlement trustee will evaluate the following

17 factors to determine if the evidence related to the submitted

18 abuse claim is credible and demonstrates by a preponderance of

19 the evidence of the evidence that the submitted abuse claim is

20 entitled to a recovery and should be allowed."

21      And then it sets out a number of criteria, correct?

22 A    Correct.

23 Q    And Criteria C is connection to scouting, correct?

24 A    Correct.

25 Q    And a provision was added to the end of the connection to

1  scouting criteria, so that the provision now reads that:

2       "The abuse claimant has provided information

3  showing or the settlement trustee otherwise determines that

4  the abuse claimant was abused during a scouting activity or

5  that the abuse resulted from involvement in scouting

6  activities" --

7       And then the new language:

8       "-- and a protected party failed to protect the

9  abuse claimant from abuse."

10      Do you see that language?

11 A    I do.

12 Q    And that's the language that was proposed by the debtor,

13 correct?

14 A    So that that's -- Mr. Doren, that's why I made the prior

15 comment.  I don't remember -- I would have been the drafter of

16 this, and I don't remember that language specifically.

17 Q    Okay.

18 A    And so that's why -- that's why I pause.  I just don't

19 remember drafting that.  I -- I remember that my intent was to

20 try to get the concept of legal responsibility in there.  I

21 just don't remember drafting that specific language.

22 Q    So you, personally, as you sit her today, don't know

23 where that language came from.

24 A    I -- I don't.  I'm sorry.  I would have been the one --

25 one working on this, and I just don't recall how that language

1  came to pass.

2  Q    Okay.  Thank you, sir.

3       Let's go, please to Bates Number 985.  And specifically,

4  this is the carryover of the discussion of aggravating scaling

5  factors.  All right?

6  A    Yes.

7  Q    And (ii) is for the category of abuser profile, correct?

8  A    Correct.

9  Q    And in the third line of that paragraph, there is a

10  sentence that reads:

11           "This factor is to be evaluated relative to a

12  hypothetical base case scenario involving a perpetrator as to

13  whom there is no other known allegations of abuse."

14       Now that language wasn't changed prior to the filing of

15  February 15, correct?

16  A    Correct.

17  Q    And so the base case for abuser profile -- and as I

18  understand the "base case," it's -- that's the assumed

19  scenario against which aggravating factors might be applied or

20  mitigating factors applied.  Is that fair?

21  A    That's correct.

22  Q    Okay.  And so the base case against which those factors

23  would be applied is where -- is a hypothetical involving a

24  perpetrator as to whom there is no other known allegations of

25  abuse, correct?

1   A    I see that language, yes.

2   Q    Thank you.  Oh, thank you.

3        All right.  And then we go down to (d), Sub (d) under

4   (ii).  And here -- and it has been proposed.  And the edit is

5   that there will be an aggravating factor of 2.0:

6            "-- if there is evidence of prior notice to the

7   protected party that the abuser had previously committed or

8   would commit abuse."

9        And sir, do you recall which party proposed that

10  language?

11  A    Yeah, Mr. Doren.  I -- I specifically remember doing this

12  language because the insurers had basically -- they said there

13  was some confusion about whether the establishment of

14  negligence was just an aggravating factor.

15       What we always meant by this provision was actually

16  meant to be like kind of a notice or knew or should have known

17  requirement to get to the aggravating factor because we had

18  pre-petition claims that involved that.  So what we were

19  trying to do is make it -- address the insurers' concern and

20  revise it to make it clear that this is more of a notice

21  issue.

22  Q    And so you removed the word "negligence" to make clear

23  that negligence was not the aggravating factor.

24  A    Cor --

25  Q    Is that what you're --

1   A    Correct.  That's -- that's correct.  We didn't want to
2   make -- we -- we were trying to address the insurers'
3   confusion about that, which was saying this is not meant to
4   be, if you show negligence, you get an aggravating factor.  It
5   was, if you're showing notice, that's what is the aggravating
6   factor.
7   Q    And should -- "knew or should have known," I believe is a
8   phrase you used?
9   A    That's what, ultimately, came in as the language in the
10  final version.  So this was our initial attempt to try to deal
11  with notice.  And then, based upon negotiations, we got to the
12  final language.
13  Q    And sir, do you consider notice or knew or should have
14  known an element of a negligence claim --
15  A    I --
16  Q    -- for a -- for example, negligent supervision?
17  A    I am -- so, Mr. Doren, again, I -- I do not know the
18  elements of, actually, a claim for negligent supervision; I am
19  not familiar with that.
20  Q    Okay.  Thank you.
21       And if we go over, please, to eight nine -- and I'm
22  sorry, sir.
23  A    Sure.
24  Q    But just staying on that for a moment.  Is that language
25  that you came up with on your own or did you get help with

1  that from some of your colleagues?

2  A    No.  I think we drafted it, initially.  Obviously, at

3  some point, we talked to Mr. Griggs at Ogletree to make sure

4  this is kind of consistent.  But what we were trying to

5  encompass there was the pre-petition experience, where the BSA

6  had notice; and, therefore, we would pay additional amounts on

7  -- on claims, based upon potential prior notice.

8  Q    And I don't want to pick nits here, but I'm just curious.

9  When you say "we drafted it," who is that we?

10  A    Adrian --

11  Q    I'm sorry.

12  A    I -- I was not speak -- meaning to speak colloquially.  I

13  drafted it.  I'm sure I talked to my colleagues at White &

14  Case, and we talked -- we reviewed it prior to circulating it.

15  But it would be I was the initial drafter.  I would consult

16  with the White & Case team to make sure we were all

17  comfortable with this.  And ultimately, we would -- we would

18  spin it out.

19  Q    Just for the record, if "we" was meant to be you, I think

20  you were speaking royally, not colloquially.

21  A    Oh, I'm sorry.

22         THE COURT:  Yeah.

23     (Laughter)

24  A    Again, I -- the royal "we."

25     (Laughter)

1  A    I am not the Queen or the King --

2  Q    Okay.

3  A    -- of anything.

4  Q    All right.  Sir, let's go, please, to Page 8986.  And

5  here, again, Section (e), please, "Mitigating, Scaling

6  Factors."  Do you see that?

7  A    I do.

8  Q    And here, again, we're dealing with a hypothetical base

9  case scenario.  That's defined in the first paragraph.  And

10  then the mitigating factors would be assigned against that.

11  Is that fair?

12  A    Yes.

13  Q    And here, there's been an addition made to the base case

14  scenario in the underlying language.  Am I interpreting that

15  correctly?

16  A    You are.

17  Q    Okay.  And the addition to the base case is that, along

18  with the other elements, there must be proof that a protected

19  party failed to protect the abuse -- or I'm sorry.

20       The base case scenario.  I misspoke.  The base case

21  scenario includes that a protected party failed to protect the

22  abuse claimant from abuse, correct?

23  A    That was added.

24  Q    And was that language that you drafted yourself, as well,

25  sir?

1   A    Yeah.  So, Mr. Doren, again, this is where I start getting

2   confused about the draft.  I -- I don't recall putting that

3   language in here or in the general criteria, so that's --

4   that's why I don't -- and I would have been the one working on

5   this.  So I just don't -- I don't have a specific recollection

6   about putting this language in.

7   Q    Fair enough.

8        Then let's go, please, to Page 987, which is the next

9   page, and down to the bottom of the page, (ii):

10           "Other Settlements, Awards, Contributions, or

11  Limitations."

12       Do you see that?

13  A    I do.

14  Q    And there, there's been an addition made which says that

15  -- well, I'll read the prefatory language:

16           "The settlement trustee may consider any further

17  limitations on the abuse claimant's recovery in the tort

18  system" --

19       And now the addition:

20           "-- including the lack of negligence by the BSA or

21  protected party."

22       And did you include that language, sir; did you draft

23  that?

24  A    Yes.  Yes, Mr. Doren, I did.

25  Q    Okay.  Thank you.

1      Please turn to the next tab in your binder, which is

2   Exhibit 3026.

3   A    I'm there.

4         MR. DOREN:  And Your Honor, I need to move into

5   evidence, please, Exhibit 3025.

6         THE COURT:  Any --

7         MR. KURTZ:  No objection, Your Honor.

8         THE COURT:  Thank you.  It's admitted.

9      (JTX-3025 received in evidence)

10        MR. DOREN:  Thank you, Your Honor.

11  BY MR. DOREN:

12  Q    Mr. Azer, are you with me at Exhibit 3026?

13  A    I am.

14  Q    And do you recognize the first page as an email from Mr.

15  Gallagher to counsel for the debtors?

16  A    I do.

17  Q    Okay.  And including you there in the middle, correct?

18  A    Correct.

19  Q    And that was sent on February 13th of this year, in the

20  evening, correct?

21  A    It was.

22  Q    Okay.  And this was forwarding claimants' markup of the

23  draft that the debtors had provided on the 11th.  Is that what

24  you understand us to be looking at?

25  A    Give me one second, Mr. Doren.  I think --

1  Q    Of course.

2  A    -- that's accurate.  Do mind just giving me a second to

3  look at the document?

4  Q    Please do.

5          MR. KURTZ:  While that's happening, Your Honor, I

6  just point out that it's not an email just to the debtors.

7  I'm sure that wasn't an intentional mischaracterization, but I

8  just wanted to make sure that was clear.

9          THE COURT:  I see a few others.

10          MR. DOREN:  The debtor --

11          THE WITNESS:  Yes --

12          MR. DOREN:  -- and others, for the record.

13          THE WITNESS:  Mr. Doran, it -- it is a markup of

14  the debtors' TDP.

15          MR. DOREN:  Thank you, sir.

16          Your Honor, I'd ask to move into evidence Exhibit

17  3026.

18          MR. KURTZ:  No objection.

19          THE COURT:  It's admitted.

20      (JTX-3026 received in evidence)

21          MR. DOREN:  Thank you, Your Honor.

22  BY MR. DOREN:

23  Q    Let's turn, if we can, please -- I'd like to look at a

24  few things in this markup.  And let's look at Page 3317,

25  again, sticking with Bates Numbers.  Let me know when you're

1  there.

2  A    I'm there.

3  Q    And here, at the bottom of Paragraph B, we see that the

4  claimants struck the language about:

5         "Expedited payment shall be made from settlement

6  trust assets and not collected from any non-settling insurance

7  company."

8         Correct?

9  A    That's correct.

10  Q    And that's for the reasons you described earlier --

11  A    Yeah --

12  Q    -- to the best of your knowledge?

13  A    Yes, Mr. Doren.  They -- they basically talked to us and

14  said, look, look, you're having the Bankruptcy Court prejudge

15  what's covered and we shouldn't do that in any regard, so ...

16  Q    Let's turn then, please, now, sir, to Page 3319, and

17  under Heading 2, the "General Criteria," and below that, Sub

18  (c), the "Connection to Scouting."  Tell me when you're there.

19  A    I'm there.

20  Q    And sir, here, the claimants rejected debtors' addition

21  of the language in "Connection to Scouting," correct?

22  A    Again, the only qualification, Mr. Doren, as I said, is I

23  don't remember drafting that language, so I -- I don't recall

24  where it came from.  But they certainly are rejecting it.

25  Q    Whoever proposed it, the claimants rejected it, right?

1  A     That's correct, yeah.

2  Q     All right.  Then let's look, please, if we can, at Page

3  3325, under "Abuser Profile."  Do you see that?

4  A     Yes.

5  Q     And the -- in this case, the claimants struck the

6  provision, as redrafted, as you had -- as you had proposed,

7  correct?

8  A     They had.

9  Q     And they rewrote it as a multiplier, if you will, of 1.25

10  to 2.0:

11           "-- if there is evidence of negligence of a

12  protected party."

13       So they, essentially, wanted to go back to the way it

14  was, correct?

15  A     Correct.

16  Q     And then if we go to page 3327, which is within the

17  mitigating scaling factors and the base case scenario there,

18  where you had made the admission two days before.

19       Do you recall this?

20  A     Again, Mr. Doren, I'm not trying to be picky, but,

21  again, I can't remember putting in that language.  So, when

22  you keep saying I put it in, I just don't remember that.

23  Q     And I'm not trying to be tricky.  I forgot which

24  paragraph you'd said that about, so ...

25  A     Yeah, it's this language, the protected party language.

1  I don't remember putting it in, in either place.

2  Q     All right.  So, this particular phrasing that was used

3  in two places is the language you don't recall having added

4  yourself?

5  A     Yes, sir.  I don't remember putting that language in.

6  Q     Thank you for the clarification.

7        So, as we look at the language that was proposed to be

8  included in the base case of the mitigating scaling factors,

9  the claimants rejected that, correct?

10  A     They did, yes.

11  Q     And then if we go over to the next page, page 328,

12  under, "Other settlements, awards, contributions, or

13  limitations," the claimants also rejected your proposed

14  language of including "the lack of negligence by the BSA or

15  protected party."

16        Correct?

17  A     They did; they rejected that.

18  Q     All right.  So, following this exchange and your receipt

19  of this on the evening of the 13th, this is when you all

20  presumably got together virtually and had negotiations about

21  how to work through these issues; is that fair?

22  A     That's fair.

23  Q     Okay.  And let's look at what the net result was, which

24  takes us back to 1-358.

25  A     Give me a second, Mr. Doren.

1  Q     Of course.

2        And that is the second document in Volume 1.

3  A     Oh, (indiscernible), sorry.

4        Mr. Doren, do you have a page number you want to refer

5  me to.

6  Q     Yes, I do.

7        If you're there, first of all, you know, let's be clear

8  on what we're looking at here.  This is the February 15th

9  filing and we'll be looking at a couple of provisions in the

10 redline of the TDPs, and so, I would direct your attention,

11 please, to page 174 of 304.

12 A     I'm there.

13 Q     Thank you.

14       Now, let's talk about the "general criteria" section.

15       And the first paragraph which sets out the language

16 about credible evidence and that demonstrates by a

17 preponderance of the evidence certain factors.

18       That remains the same, correct?

19 A     It did.

20 Q     And then there's new, revised language in subparagraph

21 (c), under -- excuse me, let me strike that and start over.

22 There's new, proposed language added to the "connection to

23 Scouting" criteria, correct?

24 A     That's correct.

25 Q     And that's paragraph (c), correct?

1  A      Correct.

2  Q      And now, under sub (c), the provision reads:

3          "The abuse claimant has provided information

4  showing, or the settlement trustee otherwise determines:  one,

5  that the abuse claimant was abused during the Scouting

6  activity or that the abuse resulted from an involvement in

7  Scouting activities and, two, that a protected party may bear

8  legal responsibility."

9          And the claimant groups agreed to this language; is that

10 correct?

11 A      They did, after a lot of arguing, but, yes, after a lot

12 of negotiation, yes.

13 Q      And who proposed this language?

14 A      So, Mr. Doren, so how it worked was we would get on Zoom

15 meetings and basically say, effectively, you're -- like you

16 said, if we would go back to the last document, right, they

17 deleted the language.

18         We said that was unacceptable to the debtors and then we

19 would sit down and work through language to -- that was

20 acceptable to all parties, but, basically, encompass the idea

21 that there had to be some showing of legal responsibility

22 within the general criteria to address the insurers' concerns.

23 So, it was a collective effort; people would work on the

24 language together.

25 Q      So, this is kind of the amalgamated result of an effort

1  by a lot of people on the evening of the 14th; is that fair?

2  A    So, Mr. Doren, the only question -- the only *caveat* to

3  that is, I don't remember if it was the 14th or over the

4  weekend.  A lot of those dates were bleeding together because

5  we were all working really hard.  But, ultimately, we came to

6  consensus on this language.

7  Q    And do you recall when, and, you know, how long before

8  filing this document, you reached that consensus?

9  A    I don't.  Everything was going really quickly and so --

10  and it was a really long weekend, so I don't recall off the

11  top of my head.

12  Q    Okay.  Thank you.

13  A    You're welcome.

14  Q    And I believe in your deposition, and whether it was in

15  your deposition or not, you know -- strike that.

16       In your deposition, you had a short discussion about

17  what a preponderance of the evidence is and I think you point

18  out that, as lawyers, we know that's more than 50 percent,

19  right?

20  A    Yeah, I think it's whatever the legal standard in the

21  states are; again, this is meant to be kind of a catchall, so

22  I don't know what the standard is in every jurisdiction, but

23  we generally had an idea of what "preponderance" was, based

24  upon my experience as a litigator.

25  Q    And, of course, the closing argument standard in every

1  jurisdiction is just that much, right?  Just a little bit

2  more.

3  A     Again, I'm not here -- I can't opine on the law of 50

4  states.

5  Q     Fair enough, sir.

6       And do you agree that kind of the dictionary definition

7  of "may" is possibility?

8  A     I don't know.  Do you want to show me the dictionary?

9       I mean, it's not mandatory, if that's what you're

10 asking.

11 Q     Okay.  And I guess what I'm trying to understand here

12 is, we're talking about a "greater than 50 percent"

13 probability, so even 50.1 percent, then it is possible that a

14 protected party bear legal responsibility.

15      That's the standard, right?

16 A     Yeah, I think if you look at the preamble and you look

17 at this language, it's -- you know, if we look -- let me

18 restart my answer.

19      When we were talking about this in the pre-petition

20 context, when we were talking to Mr. Griggs, right, he

21 basically would say, if someone could show me that we had a

22 legal responsibility based upon the information we get, this

23 criteria were meant to kind of emulate the liability phase of

24 looking at things.  And if we got comfortable enough that we

25 might have a preponderance of the evidence or may bear legal

1  responsibility, then you kind of transition over to the

2  valuation phase.

3      And so, that's what we were trying to encompass, via

4  this language, which was, okay, look, if the claimant came to

5  us and said, here's information and BSA may be responsible,

6  and we think it's a "preponderance of the evidence" standard;

7  guess what, that'll be enough to get us to kind of looking at

8  valuing the claim.

9  Q    So, your understanding from Mr. Griggs was that if

10 someone came forward with evidence that Boy Scouts were

11 negligent, then you'd go to a -- you may go to a valuation

12 phase?  I'm just making sure I understood.

13 A    Yeah, it's not just negligence, Mr. Doren; it could be

14 all kinds of other claims, so that's why we used the term

15 "legal responsibility," because it's meant to be negligence

16 and a bunch of other stuff that could come out.

17     Again, I have no idea what the claims are -- I'm not an

18 underlying abuse claimant -- but the reason we used that

19 language is to say if it's negligence and others, if you

20 satisfied this, we would look at it and say, Okay, do we think

21 there is a credible claim?

22 Q    Okay.  And that's what you believe this language

23 accomplishes?

24 A    Yes.

25 Q    And you were saying earlier that the notion of

1  negligence being over there and aggravating factors, that the

2  insurers were confused by the use of the word

3  "negligence" over there and that wasn't really was meant.

4  And I just want to make sure I understand, are you suggesting

5  that this language is where the need for proof of negligence

6  is incorporated?

7  A     Negligence and other causes of action; that's why we

8  used the term "legal responsibility," because there's more

9  than just claims for negligence.  Like, for example,

10 Mr. Doren, you keep saying "negligence," but most of the time,

11 I think the BSA was sued for negligent supervision, which I

12 have no idea whether it has different standards or not, but

13 we're just trying to be encompassing by that language.

14 Q     And negligent supervision is a cause of action for

15 negligence, right?

16 A     I think so.  I don't know if the criteria are the same.

17 I just -- I don't know that answer.

18 Q     All right.  And, sir, is there some reason why you

19 didn't just say, "negligence or other legal liability"?

20 A     Yeah, because I think we wanted to encompass all the

21 causes of action, right; so, we wanted to make sure we were

22 encompassing everything that could be out there, and this is

23 the reason we used that language.

24 Q     So, you couldn't say, "Negligence or any other causes of

25 action"?

1  A     Mr. Doren, we thought this was appropriate language to

2  encompass the concept that we were trying to achieve.

3  Q     Okay.  Okay.  Fair enough.

4        I don't want to pry into your personal life, Mr. Azer,

5  so I'll ask this as a hypothetical.  If you had a teenage

6  daughter and she told you that she may be home by midnight,

7  would that satisfy you as a parent?

8             MR. KURTZ:  Your Honor, I'm going to object; this

9  is a little far afield.  I'm not sure that Mr. Azer's

10 parenting skills are at issue.

11            THE COURT:  I don't think that's what he's going

12 for.  I'll permit him to answer.

13            THE WITNESS:  Just to be clear, I'm not -- when --

14 if my daughter is coming -- I don't have a teenage daughter

15 yet -- all my kids are too young -- but leaving that aside,

16 I'm not evaluating the veracity of my daughter's statement in

17 doing that.  So, your hypothetical is non-transferable to what

18 the analysis would be undertaken under this TDP structure.

19 It's apples to oranges.  You're not talking about the same

20 analytical risk analysis.

21            I'm not trying to see the risk of my daughter

22 coming home.  I hope she's home.

23 BY MR. DOREN:

24 Q     Have you ever used the phrase "anything is possible"?

25 A     Have I ever used -- no, that is not typically within my

1    lexicon.

2    Q     Have you ever objected at a deposition to a question

3    that asks if something is possible because it calls for

4    speculation?

5    A     I have certainly objected to calls for speculation at a

6    deposition.

7    Q     Let's flip now, please, to page 180 and we are under

8    "aggravating scaling factors," okay, and under that, the

9    abuser profile, and under that, (d), where the new redlines

10   appear, okay.

11   A     Yep.

12   Q     And here, this is the provision that, at one point in

13   time or a couple of points in time, it included the word

14   "negligence," correct?

15   A     Yeah, the -- well, just to be clear, we had stricken it

16   and changed it.  The Coalition and the claimants tried to

17   change it back to negligence and, ultimately, we rejected that

18   and ended with this language.

19   Q     And, again, this is negotiated language somewhere

20   between the 11th and the 14th, correct?

21   A     Correct.

22   Q     All right.  And the new standard, as agreed upon, is

23   1.25 to 2.0, if there is evidence that the protected party

24   knew or should have known that the buried had previously

25   committed or may commit abuse and failed to take reasonable

1  steps to protect the survivor from that danger or, two, of the

2  prior abuse or the foreseeability of the risk of abuse and

3  failed to take reasonable steps to protect the survivor from

4  that danger.

5      Who proposed that language?

6  A    Again, it was worked-on language, Mr. Doren.  We were

7  working with the claimant constituencies.  They were put --

8  you know, obviously, you saw the last draft, where they said

9  just "negligence."

10     We said, "That's not acceptable."

11     This is kind of more of a notice, aggravating factor,

12 and then we worked on the language, kind of, collectively.

13 Q    And, again, you believe notice is an aggravating factor,

14 rather than an element of a cause of action; is that right?

15 A    I do, because on our pre-petition practices, we

16 certainly had claims where the BSA had some form of notice.

17     The one that comes most to mind is the Hacker set of

18 cases and we ended up compensating those claimants higher than

19 other claims, where we didn't have that same type of notice.

20 Q    Well, and you realize, sir, that while notice -- well,

21 let me ask, so, is it your understanding that notice goes to

22 the quantum of liability, rather than, or instead of,

23 liability?

24 A    So, this -- again --

25 Q    Wait a minute.  Wait a minute.  I think I just made a

1  nonsensical question -- I asked a nonsensical question.  Let

2  me try again.  It's getting late in the day.

3  A    Okay.

4  Q    My question is this, sir:  Do you understand notice, in

5  any case, to be an element of the cause of action or do you

6  see it as simply a contributor to a determination of damages?

7  A    I'm going to ask your question specific to the TDP

8  because I can't speak more generally.

9  Q    Okay.

10 A    In the TDP, we were trying to account for the fact that

11 we had a pre-petition practice where the BSA, there was an

12 alleged notice against the BSA.  We would compensate those

13 claims at higher values because of that.  Again, the Hacker

14 cases are kind of the prototypical one where we had that issue

15 and we did compensate them at a higher value.

16 Q    Thank you.

17       And, sir, have you ever seen a jury instruction for a

18 negligent supervision cause of action?

19 A    I have not.

20 Q    So, you wouldn't know whether it looks a lot like

21 subpart (d) or not?

22 A    I don't.

23 Q    Okay.  Thank you.

24       And then let's go to page 182, the mitigating scaling

25 factors.  And here, sir, my only question is, that the base

1  case modification that you proposed regarding the failure to

2  protect or -- sorry -- the base case scenario regarding

3  failure to protect that had been in the draft at one point in

4  time and was struck by claimants, remained excluded, correct?

5  A    It remained excluded; that's correct.

6  Q    Okay.  And over, under "Settlements" on the next page,

7  "Settlements, awards, contributions, or limitations," there,

8  the addition of language regarding evidence of negligence or

9  the lack of evidence of negligence also remained struck,

10 correct; it's not there?

11 A    I thought the language was the "fail to protect"

12 language that was struck.

13      Am I misremembering that, Mr. Doren?

14 Q    Well, just so we are clear, let's make sure.  Let's go

15 back, if we can, please, to Exhibit 3026, which is Volume 3.

16 A    Yeah.  I apologize for not remembering correctly.

17 Q    That's all right.

18      And it is on page 3026-21 in the "other settlement

19 provisions."

20 A    Yes.  Yeah, that language was -- is not included.

21 Q    Okay.  And just so our record is clear, the language

22 that was struck in 3026 by the claimants on page 21 was the

23 phrase "including the lack of negligence by the BSA or the

24 protected party," correct?

25 A    Yeah, that was not included in the final draft.

1  Q      And that language remained out of the final, correct?

2  A      Correct.

3  Q      Thank you.

4         Sir, let's talk briefly about the independent review

5  option.

6  A      Sure.

7  Q      And the independent review option was another addition

8  to the proposed TDPs on February 15, correct?

9  A      They were.

10 Q      And before February 15, claimant recoveries under the

11 TDPs were governed by the base matrix, mitigating factors, and

12 aggravating factors, correct?

13 A      It was -- there were by the claim matrix and the scaling

14 factors; that's correct.

15 Q      And under the TDPs and, actually still under the TDPs,

16 if the claimant didn't like the award they were offered, they

17 could opt-out and litigate their claim in the tort system,

18 correct?

19 A      That's correct.

20 Q      And under the independent review option, if a claimant

21 does not like the award they get under the independent review

22 option, they can opt-out and go pursue a claim in the tort

23 system, correct?

24 A      That's correct.

25 Q      Now, the independent review option was proposed by the

1  claimants?

2  A     They were.

3  Q     And is it correct that the first time that the debtor

4  saw the proposed addition to the TDPs that included the

5  independent review option was January 25th of this year?

6  A     Mr. Doren, I think it was a standalone document that was

7  sent to us from the claimants.  I don't think it was appended

8  to the TDPs, but I think that's around the time frame.  I know

9  there's an email correspondence from

10 Mr. Patterson that included it.

11 Q     I appreciate the clarification on the communication.

12       And then from that point on, you were involved in the

13 negotiations of the independent review option?

14 A     We were.

15 Q     And the debtors have never conferred with any of the

16 non-settling insurers about the independent review option; is

17 that correct?

18 A     No, we didn't.  We thought you guys were entrenched in

19 your position, so no.

20 Q     So, let me make sure, because there were a couple of

21 negatives in there.

22       The debtors have never conferred with any of the

23 non-settling insurers about the independent review option,

24 correct?

25 A     Again, given your position with us, no.

1  Q     Okay.  And Dr. Bates had no role in the development of

2  the independent review option, correct?

3  A     Not that I recall.

4  Q     And under the independent review option, there's no cap

5  on the amount of damages that can be awarded to claimants,

6  correct?

7  A     Yes.  So, that's where I'm going to disagree with you.

8  So, it says, "five times or subordinated."

9        Actually, going back to what you were saying,

10 Mr. Doren, that was meant to emulate the TDP that allowed

11 someone to go out to the tort system and if they get more than

12 the TDP value, it just gets subordinated.  So, I think they

13 can get more than five times, but it has to be in line with

14 the subordination provisions that are kind of in-line with the

15 TDP.  That's what we were trying to do there.

16 Q     So, just to make sure I get that, so, you can get up to

17 $13.75 million or so for, for example, a penetration claim

18 that would be capped at about 2.7 under the matrix under the

19 independent review option, correct?

20 A     Yes, you can get up to 13.5 for a penetration claim

21 and --

22 Q     And --

23 A     Go ahead, I'm sorry.

24 Q     And that's five times, right?

25 A     Yes, uh-huh.

1  Q     And that claim, that five-times amount gets paid,

2  immediately, if you will, without being subordinated to any

3  other payments?

4  A     I don't think so.  You'd have to go back to the

5  (indiscernible).  I thought there was like an 80:20 split --

6  Q     Okay.

7  A     -- so, it's not as clean as you just get the money;

8  there's some allocation of dollars between the General Fund

9  and the Excess Award Fund, so no, it's not like a -- sorry, go

10 ahead.

11 Q     That's all right.  That's all right.

12       My only -- my real question is that $13.5 million, to

13 use your language, is not subordinated to any other claims,

14 correct?

15 A     No, that's correct.

16 Q     Okay.

17 A     It's not.  That portion is not subordinated because that

18 actually mirrored our pre-petition experience where we had

19 high-value claims.

20 Q     And if it ends up being a twenty-million-dollar

21 independent review or that the trustee accepts, then that

22 person has a right to the $20 million, but 6 and a half of

23 that are going to be subject to a subordination provision; is

24 that right?

25 A     So, two modifications to your answer.  One is, it's not

1 an award; it's a settlement recommendation that comes out of

2 the independent review, that the settlement trustee then has

3 to review and figure out whether he accepts.

4      But then, yeah, everything above 13.5 would be

5 subordinated.  Actually, the full recovery of all, I think,

6 direct abuse claims under the TDP.  So, unless everyone gets

7 paid out, that amount never actually gets paid out to the

8 specific claimant.

9 Q    And if approved, the Excess Award Funds will fund the --

10 will be funded from the proceeds from the Trust's collection

11 of insurance proceeds from non-settling insurers, correct?

12 A    That's correct.

13 Q    And the independent review option provides that the

14 independent review awards will be paid out of that Excess

15 Award Fund, correct?

16 A    So, it's a little bit more complicated than you said,

17 Mr. Doren.  The first million is paid out of the Trust and

18 then the remaining portion is paid out on the Excess Award

19 Fund up to the if the trustee accepts a settlement

20 recommendation.

21      That's why I said, it's a little more complicated than

22 what you're -- it's not as simplistic as you said.

23 Q    Well, the first million gets paid by the Trust?

24 A    Correct.

25 Q    Amounts above that, up to the five-time cap, assuming

1  the trustee has approved it, gets paid out of the Excess Award

2  Fund?

3  A    Correct.  I just don't remember whether it's kind of on

4  a *pro rata* basis.  I just don't remember the mechanics of the

5  payment; I'd have to look the document.

6  Q    Okay.  Now, debtors believed that the inclusion of an

7  independent review option would put significantly more

8  pressure on the insurers to reach a settlement, correct?

9  A    No, that's not -- I don't agree with that.

10       We included the independent review option because, I

11  think I said this in my deposition a few times, we recognized

12  that the TDP actually had an issue in the sense that we had

13  high-value claims, like the Hacker claims I just mentioned.

14       We had claims that were well in excess of $2.7 million

15  that were high-value, severe claims.  And what we said is,

16  okay, we need a methodology to deal with those claims, because

17  the TDP did not.

18            MR. DOREN:  And, Your Honor, I'll move to strike

19  everything after "no, I disagree with that."

20            MR. KURTZ:  I think that was a fair answer to the

21  question.

22            THE COURT:  I think it's a fair answer.

23            MR. DOREN:  Thank you, Your Honor.

24  BY MR. DOREN:

25  Q    Sir, we talked earlier about Ms. Nancy Getzler.

1    A      Yes.

2    Q      And she is an expert hired by the debtors, correct?

3    A      She is.

4    Q      And she was hired to render opinions on the debtors'

5    insurance program, aspects of it, allocation issues, I

6    believe, if I remember correctly?

7    A      Allocation issues.

8    Q      And, again, you were the lawyer who worked with

9    Ms. Getzler most directly; is that fair?

10   A      Yes.

11   Q      The insurance-recovery guy, insurance-allocation expert,

12   right?

13   A      Yeah, I mean, there are other people on our team that

14   were working with her, but, yes, I spent a lot of time with

15   Ms. Getzler.

16   Q      And you reviewed her reports?

17   A      I did.

18   Q      Did you provide her feedback on drafts?

19   A      Yeah.  Generally, I mean, they were pretty high-level.

20   She did a pretty good job on her --

21   Q      But you did give her a little feedback before they went

22   final?

23   A      Sure.

24   Q      And you prepared her for her deposition, correct?

25   A      I did.

1   Q      And you defended her on -- for her deposition on

2   February 1 of this year, correct?

3   A      I did.

4   Q      Let's take a look, please at Exhibit 1434.

5   A      Mr. Doren, what binder are you in?

6   Q      Well, as soon as I figure that out, I'll tell you.

7          (Counsel confers)

8               MR. DOREN:  Does he have it?

9   BY MR. DOREN:

10  Q      Okay.  Actually, sir, we don't have it in your binder,

11  so I'll just put it up on the screen.  And for everybody's

12  comfort, we won't be admitting this into evidence.

13          And, first of all, you see the cover page there of

14  Ms. Getzler's third, supplemental expert report?

15  A      I do.

16  Q      And do you recall that she filed the third, supplemental

17  expert report on March 2nd, 2022?

18  A      I do.

19  Q      Okay.

20              MR. DOREN:  And let's look at the first page, if we

21  can, Matt.  And go ahead and just give us a bigger page.

22  BY MR. DOREN:

23  Q      And you see that Ms. Getzler has the scope of the

24  report, facts and data considered, and then she sets out the

25  summary of opinions expressed in this third, supplemental

1  report, correct?

2  A    She does.

3  Q    And at paragraph 5, she says:

4         "The addition of IRO, combined with the

5  self-selection and (indiscernible) further explained by

6  Dr. Bates, creates additional pressure on unsettled insurers

7  to enter into a settlement with the BSA; therefore, in the

8  aggregate, there is the potential for more settlement value

9  from available, unsettled insurance under the IRO."

10        Do you see that, sir?

11 A    Yeah, she said that.

12        MR. DOREN:  And let's look at paragraph 12, please.

13 BY MR. DOREN:

14 Q    Paragraph 12 states in the second sentence:

15        "While the insurers had some incentive to settle

16 this coverage without the addition of the IRO, the IRO put

17 significantly more pressure on the insurers to reach a

18 settlement."

19        And she said that, as well, correct?

20 A    Yeah, she did.

21        MR. KURTZ:  Your Honor, I'm just going to object to

22 an effort, in effect, to impeach Mr. Azer with the opinions of

23 somebody who is not Mr. Azer and who was not involved in the

24 preparation of the IRO, under the TDPs or otherwise.

25        It's certainly an appropriate subject to

1   Ms. Getzler, but I don't think it's -- it's being used

2   improperly here.

3            THE COURT:  Well, the questions have been asked and

4   answered.

5   BY MR. DOREN:

6   Q     Mr. Azer, your understanding is that the debtors were

7   not involved in the negotiation of the settlement trust

8   agreement, correct?

9   A     I was not.  I think there were others on the debtors'

10  team who may have sat it, but I, personally, was not.

11  Q     And, sir, in your deposition last week, you told us that

12  regarding changes, modifications, revisions to prior versions

13  of the plan that are reflected in the plan or the settlement

14  trust, there's no one with the debtors that has more knowledge

15  than you, correct?

16  A     I don't think so.  I mean, I think there's other people

17  who sat in on them, but no one could -- no one has more

18  knowledge.

19  Q     And no one from the debtors' side was involved in that

20  process, whether they sat in or not, correct?

21  A     Again, I think other members of the White & Case team

22  sat in, but I don't -- I talked to the people before my

23  deposition and tried to figure out what exactly they heard and

24  they understood and they informed me.  So, when I made that

25  statement, I was basing it on the fact that they told me their

1  knowledge and I was conveying it as the corporate

2  representative.

3  Q     Got it.  Got it.  Thank you.

4           MR. DOREN:  Your Honor, before I step aside, when

5  we looked at Exhibit 1358, which was the February 15 filing

6  with the redline, I just want to make sure I'm following the

7  Court's preference and not moving something into evidence that

8  you do not want in evidence, since it is in the Court docket.

9           But if you want it in evidence, I will move.

10          THE COURT:  I don't think it -- well, this is the

11  redline.  Let's put the redline into evidence.

12          MR. DOREN:  All right.  Thank you, Your Honor.

13          So, I will move Exhibit 1358 into evidence.

14          THE COURT:  Okay.

15          MR. KURTZ:  For the record, the debtors have no

16  objection (indiscernible), at this point.  Thank you.

17      (AIG Exhibit 1358 received into evidence)

18          MR. DOREN:  And, Your Honor, I just also want to

19  confirm that the exhibits they were incorporated into      Mr.

20  Azer's written direct, which I have examined him on and have

21  not gone through the step of admitting, are, in fact, already

22  into evidence -- in evidence.

23          THE COURT:  On his direct?

24          MR. DOREN:  Pardon?

25          THE COURT:  On his direct?

1          MR. DOREN:  Yes, Your Honor; the written direct.

2   The written direct, Your Honor.

3          THE COURT:  Okay.  Well, are you withdrawing your

4   objection to his written direct?

5          MR. DOREN:  Sure, Your Honor.

6          Let's just go -- you read it for the way it

7   deserves.

8          THE WITNESS:  Okay.

9          THE COURT:  Mr. Kurtz, the exhibits?

10          MR. KURTZ:  Thank you, Your Honor.

11          I renew my motion to introduce the declaration and

12   each and every one of the exhibits exactly for the weight that

13   it's worth.

14          MR. DOREN:  No objection.

15          THE COURT:  They're admitted.

16          MR. DOREN:  Thank you, Your Honor.

17          Your Honor, I cede the microphone to the next in

18   order, and, of course, reserve for any recross.

19          THE COURT:  Thank you.

20          MR. KURTZ:  No, Your Honor, my understanding is,

21   (indiscernible) got notice that there would be cross-

22   examination by Ms. Dumas, Ms. Lujan Wolff, and a

23   representative of the Girl Scouts.

24          THE COURT:  Okay.

25          MS. DUMAS:  Your Honor, I emailed that I was not

1   going to cross-examine this witness.

2              THE COURT:  And that is?

3              MR. KURTZ:  Thank you very much.

4              MS. DUMAS:  I'm sorry, this is Ms. Dumas.

5              THE COURT:  Ms. Dumas, thank you.

6              MR. KURTZ:  I am -- so modified.

7              Thank you, Ms. Dumas.

8              THE COURT:  Thank you.

9              Mr. Azer, do you need five minutes or are you good?

10             THE WITNESS:  Can we take five minutes, Your Honor?

11             THE COURT:  Yes, we can.

12             THE WITNESS:  I've been drinking water.

13             THE COURT:  Yes, we can.

14             THE WITNESS:  Thank you.

15             THE COURT:  Let's take five minutes.

16             We're in recess.

17         (Recess taken at 4:48 p.m.)

18         (Proceedings resumed at 4:56 p.m.)

19             THE COURT:  This is Judge Silverstein.  We can go

20   back on the record.

21             Ms. Wolff?

22             MS. LUJAN WOLFF:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MS. LUJAN WOLFF:

25   Q    Delia Lujan Wolff from Lujan & Wolff, LLP.  I represent

1  survivors of abuse who are creditors in this bankruptcy case.

2       Good to see you, Mr. Azer.

3  A    Hi, Ms. Wolff.

4       How are you?

5  Q    I'm good.

6       I hope you're doing well.

7  A    I am.

8  Q    Now, sir, you said that the goal was -- that the plan

9  and the TDP not alter, modify, or supplement the terms in

10 insurance policies; is that correct?

11 A    That's correct.

12 Q    And these terms that you're referring to in insurance

13 policies, these are policy terms that were negotiated by the

14 parties to the policy, as well as terms imposed by law?

15 A    I have no idea.  A lot of these policies were issued

16 before I was born.

17 Q    Okay.

18 A    I have no factual knowledge.

19 Q    Okay.  But whatever the policy terms were for a

20 particular insurance policy, it was the goal to not modify

21 those terms; is that correct?

22 A    Modify, supplement, amend, yes.

23 Q    Okay.  Thank you.

24      Now, you also stated in your declaration that -- you

25 stated in your declaration that Haynes and Boone was retained

1  by BSA as insurance coverage counsel in January 2018.

2        That was more than two years before BSA filed for

3  bankruptcy?

4  A    That's correct, about two years, yes.

5  Q    And so, you advised the BSA on insurance issues in --

6  regarding pre-petition cases?

7  A    I did.

8  Q    Okay.  And are you familiar with the -- that BSA had

9  over 100 pre-petition cases in Guam?

10 A    I was.

11 Q    Okay.  And is it your understanding that the -- did the

12 Boy Scouts of America consider the Archbishop of Agana to be a

13 chartered organization?

14 A    I don't know.  I don't have an answer to that.

15 Q    To your knowledge, did the -- is it the position of the

16 BSA that the Archbishop of Agana is an insured under policies

17 issued to the BSA?

18 A    Again, I don't have a position.

19       My understanding is that chartered organizations and

20 sponsors are insured.  What the specific chartered

21 organizations are, I haven't even looked at the list -- it's a

22 huge list -- but I have no idea about the Guam cases.

23 Q    Okay.  And I'll just refer you to Joint Exhibit 2646,

24 which I will be sharing.

25 A    Okay.

1          MS. LUJAN WOLFF:  I believe, Your Honor, that a

2  binder was provided.

3          THE COURT:  It was.  Thank you.

4          MS. LUJAN WOLFF:  Thank you.

5          THE WITNESS:  Ms. Wolff, you didn't send us a

6  binder, by any chance?

7  BY MS. LUJAN WOLFF:

8  Q     I'm sorry, not a hard copy, but it was emailed to your

9  counsel.

10  A     Okay.

11  Q     And I'll be sharing it.

12  A     Great, thanks.

13  Q     So, this is marked Joint Exhibit 2646 and you see the

14  title here, it says, "Debtors' responses and objections to

15  Lujan Claimants first set of requests for admission to Boy

16  Scouts of America and Delaware BSA, LLC."

17          Do you see that, sir?

18  A     I do.

19  Q     And I'm just going to go all the way to the back page,

20  just so you know.  And so, this was a document that purports

21  to have been signed by Andrew Hammond of White & Case.

22          Do you see that?

23  A     I do.

24  Q     Okay.  And I'm going to go to page 4 -- I'm sorry --

25  page 5.  The first request here states:

1          "Request number 1:  Admit that the Archbishop of

2   Agana, formally known as has the Bishop of Agana, is an

3   additional insured of BSA insurance policies beginning in 1976

4   and to the present."

5          And in response, debtors state, response to request

6   number 1, you can read there's an objection that the BSA

7   provided, if you could read that, and then I'm going to go to

8   the second paragraph, okay.

9   A    Ms. Wolff, you want me to read it out loud?

10  Q    No, you can just read it to yourself, but then I will

11  read the second paragraph.  So, it's just a short objection.

12  A    Okay.

13  Q    Thank you.

14         Now, the second paragraph, it says:

15         "Subject to, and without waiving their general and

16  specific objections, the debtors admit that it is the debtors'

17  position that the Archbishop of Agana is an additional insured

18  under the BSA's general liability insurance policies,

19  incepting after January 1, 1976, and to the petition date."

20         Do you see that?

21  A    I do.

22  Q    And I read that correctly?

23  A    You did.

24  Q    Thank you.

25         Was it your understanding of the BSA's position that the

1  BSA insurance policies provide coverage for abuse claims

2  arising from childhood sexual abuse in Guam?

3  A    Yes, they do.

4  Q    Okay.

5        MS. LUJAN WOLFF:  So, Your Honor, at this time --

6        THE WITNESS:  Well, can I just modify that?

7        I mean, you're talking about the big coverage

8  program.  There are policies that have sex abuse exclusions.

9        So, if you're -- there are lots of policies in the

10  BSA insurance program that provide abuse.  There are some

11  policies that do not, because of sex abuse exclusions.

12       So, you just -- I can't make that big, general

13  statement, but I can tell you that there are a lot of

14  policies.

15  BY MS. LUJAN WOLFF:

16  Q    But the sexual abuse exclusions didn't occur until

17  after, sometime after the early '80s; is that correct?

18  A    It was the late '80s.

19       I just don't know when your claims are, so I can't say

20  that as a definitive statement.

21  Q    Okay.  But from the 1950s to 1982, is it your

22  understanding that the BSA insurance policies covered abuse in

23  Guam?

24  A    They covered abuse claims.  It's not jurisdictionally

25  limited.

1  Q     Okay.  Thank you.

2           MS. LUJAN WOLFF:  Your Honor, at this time, I move

3  to admit into evidence, Joint Exhibit 2646.

4           MR. KURTZ:  I have no objection, Your Honor.

5           THE COURT:  Thank you.  It's admitted.

6        (Exhibit JTX-2646 received into evidence)

7  BY MS. LUJAN WOLFF:

8  Q     Now, sir, some BSA insurance policies -- I'm sorry, let

9  me take this down -- some BSA insurance policies describe

10  sponsors and chartered organizations as additional insurers,

11  correct?

12  A     I think -- so, Ms. Wolff, just to be clear, there are

13  two policies in 1976 and 1977 that use the word "sponsors" and

14  then after 1978 -- and those policies are additional insurers,

15  but then there are other policies that use different policy

16  language and they're not additional insurers; they're

17  insureds.

18  Q     Okay.  And that was actually my next question, because

19  some policies have the definitions of the insured that include

20  sponsors or chartered organizations as insureds; is that

21  correct?

22  A     That's correct.

23  Q     Okay.  Now, the plan of reorganization, the third

24  modified, fifth amended plan, it has a chart that shows the

25  liability policies, the BSA insurance liability policies.

1    That's correct, right?  I believe that was Schedule 2 of

2  the plan?

3  A    Those are the BSA insurance policies.  I'm not sure it's

4  been updated or not, but that is Schedule 2.

5  Q    Okay.  And to the best of your knowledge, that insurance

6  chart that is, I believe it's Schedule 2 of the plan, it

7  reflects all of the liability policies that the BSA is aware

8  of that might provide coverage for abuse claims; is that

9  correct?

10  A    I believe so.

11  Q    And, of course, I'm not referring to -- when I talk

12  about Schedule 2, I'm not referring to any policies that were

13  bought by local councils or chartered organizations; I'm

14  referring only to policies that were bought by the BSA.

15    And so, your answer remains the same?

16  A    Correct.

17  Q    Okay.  Did the BSA pay policy premiums to the settling

18  insurance companies?

19  A    I have -- I presume so, but I have no factual basis to

20  say yes.  When I look at the policy, there's a premium; I

21  presume it was paid, but it was before my time.

22  Q    Do -- does the BSA contend that it has satisfied all the

23  conditions precedent to coverage from the settling insurance

24  companies for the abuse claims asserted in this bankruptcy?

25  A    I don't understand your question.  I'm sorry.

1      Can you rephrase?

2   Q    Yes.  So, the policies have conditions in order for the

3   insurer to get coverage.  Does the BSA contend that it

4   satisfied all the conditions under the policies to get

5   coverage from the settling insurance companies for the abuse

6   claims asserted in this bankruptcy case?

7   A    Ms. Wolff, I don't know how to answer your question.

8       When you settle with an insurer, you don't have to

9   satisfy the conditions; you're just settling with the insurer

10  and resolving the policy.  So, I don't understand how to

11  answer your question.  I'm sorry.

12      If you want, you can rephrase it again.  I'm just trying

13  to understand your question, but it doesn't make sense to me.

14  Q    Well, it's the BSA's position that it has a right to

15  coverage from the settling insurance companies; is that

16  correct?

17  A    We did assert that we had a right to coverage against

18  the settling insurance companies.

19  Q    Okay.  The BSA contends that the policies issued by

20  Hartford and by Century do not have aggregate limits that

21  apply to sexual abuse claims, correct?

22  A    That's correct; those policies do not have aggregate

23  limits.

24  Q    And the limit that would apply to a Hartford policy is a

25  per-occurrence limit; is that correct?

1  A      It's either a per-occurrence or a per-person limit.

2  Q      And for the Century policies, the limit that applies is

3  a per-occurrence limit or a per-person limit?

4  A      So, Ms. Wolff, I want to be really careful here, because

5  Century issued a lot of coverage over a long period of time.

6  Some of it was aggregated.  Some of it was not aggregated.

7        So, I want to answer your question, but you have to be a

8  little bit more specific about what policies you're talking

9  about.

10 Q      Let's say up until 1982, is it your understanding that

11 the Century policies had a per-occurrence or a per-person

12 limit?

13 A      Yes, subject to the deductibles, but yes.

14 Q      Okay.  Now, combining the primary and excess policy

15 limits, what were the total per-occurrence limits for the

16 period beginning January 1, 1976, and ending January 1, 1977?

17 A      I have no idea.

18 Q      In order to figure that out, is it true that I would be

19 able to just go to the chart in the plan, Schedule 2, and just

20 simply add the per-occurrence limit for the primary layer and

21 the per-occurrence limits for the excess layers, the excess

22 policies?

23 A      So, I think you could add -- you could go to Schedule 2

24 and look at the different limits of liability.  You could add

25 them and you could get what the amount of coverage in the

1  tower, if that's what you're asking me.

2  Q    Yes.  And so, let's say that if the primary policy had a

3  per-occurrence limit of $500,000 and the excess layer had a

4  primary -- I'm sorry -- the excess layer had a per-occurrence

5  limit of $10 million, is it correct, then, that the

6  per-occurrence limit for that year, when you add the two, is

7  $15 million per-occurrence?

8  A    I think you said five-hundred-thousand-dollar primary,

9  not a five-million-dollar primary.

10      So, I think what you're trying to say, would it be $10.5

11 million?

12      Yes, the limits of liability on a per-occurrence basis

13 would be $10.5 million.

14 Q    Under that scenario, correct?

15 A    Under that scenario; that's correct.

16 Q    Okay.  Now, to your recollection, did the per-

17 occurrence limits -- were the per-occurrence limits always at

18 least $11 million for the period between January 1, 1976 and

19 January 1, 1982?

20 A    I have no idea.  I mean, there are coverage charts that

21 we could look at.  It's a big program, so I haven't memorized

22 every year covered.  There are documents we could look at to

23 help that.  I know we have towers in those years, I just don't

24 remember what they are.

25 Q    Sure.  Okay.

1      Do the defense costs erode the policy limits under the

2  Hartford policies?

3  A    The debtors' position -- I think the debtors' position

4  is they don't, that it's limits -- it's defense, in addition

5  to limits.

6  Q    And for the Century policies, is -- did the defense

7  costs erode the policy limits under those policies -- Century?

8  A    Again, I think it was the debtors' position that it was

9  defense, in addition to limits.

10  Q    How many occurrences did the BSA determine were

11  triggered by the policies issued by Hartford, or any Hartford

12  company, for the claims filed in this bankruptcy?

13  A    I have no idea.  I'm sure there's documents we could

14  look at that show that.

15      I know Ms. Getzler has done allocations, but I don't

16  know off the top of my head.

17  Q    How many occurrences did the BSA determine were

18  triggered by the policies issued by Century, for the claims

19  filed in this bankruptcy?

20  A    Again, I --

21          MR. SCHIAVONI:  Your Honor, I'm going to object.

22          That calls for a legal conclusion and it's outside

23  the scope of the direct.

24          THE COURT:  Why isn't this outside of the scope?

25          MR. SCHIAVONI:  The direct examination was entirely

1  about this gentleman's --

2          THE COURT:  No, I'm not asking you, Mr. Schiavoni.

3  I'm sorry.

4          MR. SCHIAVONI:  Oh, I'm sorry, Your Honor.  I

5  apologize.

6          THE COURT:  Why isn't this outside the scope of the

7  direct?

8          MS. LUJAN WOLFF:  Well, Your Honor, the

9  declaration -- Mr. Azer testifies in his declaration that he

10 worked as insurance coverage counsel for matters in this

11 bankruptcy and so he did testify during that, that he was

12 involved, and has been involved, as coverage counsel for the

13 bankruptcy case.

14          And also, Your Honor, the pretrial order provides

15 that -- and, I'm sorry, I'm just going to try to take a look

16 at it -- the pretrial order provides that for efficiency's

17 sake and witness convenience, each witness will take the stand

18 only once.  And so parties who wish to question the witness

19 need to question the witness while he or she is on the stand.

20          And so, I believe that --

21          THE COURT:  Fair enough, then.  I'm going to permit

22 it, because Ms. Wolff could call Mr. Azer in her case.

23          MS. LUJAN WOLFF:  Thank you.

24 BY MS. LUJAN WOLFF:

25 Q    I'm sorry, before Mr. Schiavoni spoke, I believe,

1 Mr. Azer, I was in the middle of asking a question.  I'm going

2 to ask it again.

3     How many occurrences did the BSA determine were

4 triggered by the policies issued by Century for the claims

5 filed in this bankruptcy?

6 A     Again, I have no idea.  I know Ms. Getzler has run

7 allocations and that information is included in the

8 allocations, but I have no clue.

9 Q     Is it the position of BSA that there is an occurrence

10 triggered for each separate survivor's claim under the

11 liability policies issued by Hartford?

12          MR. KURTZ:  Your Honor, I'm going to object.  For a

13 while, I thought this was going in a slightly different

14 direction, so I didn't intercede.

15          Ms. Lujan Wolff is correct that there is, in the

16 pretrial order, an opportunity to call those witnesses that

17 you listed and would otherwise have introduced in your case in

18 chief, but Ms. Lujan Wolff did not list Mr. Azer, so he does

19 not fall in that category and, therefore, she is well outside

20 of where she's asked to permit about now.

21          MS. LUJAN WOLFF:  Your Honor, the Lujan Claimants

22 did identify, if I recall correctly, and I do believe that we

23 did identify Mr. Azer in our identification of witnesses,

24 which was timely filed.  Also, in the pretrial order, it does

25 state that the Lujan Claimants reserve the right to call the

1  debtors' witnesses and Mr. Azer is one of debtors' witnesses.

2          THE COURT:  Let me find my pretrial order.

3      (Pause)

4          MR. KURTZ:  Your Honor, one, I don't think that

5  that type of boilerplate reservation is sufficient notice and,

6  two, I think the requirement was 24 hours before the witness

7  took the stand and I don't think that -- which is --

8          MS. LUJAN WOLFF:  If I may, Your Honor?

9          MR. KURTZ:  -- Footnote 7.

10          THE COURT:  That's what it says --

11          MR. KURTZ:  Footnote 7.

12          THE COURT:  It's what it says, so I'm going to

13  permit the questioning.

14          MS. LUJAN WOLFF:  Thank you.

15  BY MS. LUJAN WOLFF:

16  Q    Sir, I'm sorry.  Let me repeat the question.

17      Is it the position of the BSA that there's an occurrence

18  triggered for each separate survivor's claim under the

19  liability policies issued by Hartford?

20  A    Yes, each abuse survivor constituted an occurrence.

21      It's the debtors' position that each survivor

22  constitutes an occurrence under the policies.

23  Q    Is it the Boy Scouts of America's position that there is

24  an occurrence triggered for each separate survivor's claim

25  under the liability policies issued by Century?

1  A     Yes, it's the same answer; we use the same occurrence

2  theory.

3  Q     Okay.  And so, let's say that if there were 70 claims

4  that would implicate insurance under Hartford's policies, then

5  the BSA would say that there are at least 70 occurrences, or

6  policy limits triggered for those claims, prior to 1982?

7  A     We would say there would be 70 occurrences.  There may

8  not be 70 policy limits.  It depends on the value of the

9  claim.  It depends on what's asserted.

10       So, there are 70 occurrences and then you'd have to

11  evaluate each claim as to what is the potential coverage

12  available.

13  Q     Thank you, sir.

14       To your knowledge, did anyone ask the Archbishop of

15  Agana whether it consented to the policy buybacks in the

16  settlement agreements with Hartford and Century before those

17  settlement agreements were executed?

18  A     Again, I have no idea.

19  Q     Okay.  And, sir, I'm going to direct you to what's

20  already been into evidence which is Joint Exhibit 379.

21            MS. LUJAN WOLFF:  And, Your Honor, that also in

22  Lujan Claimants binder.

23            THE COURT:  Thank you.

24            MS. LUJAN WOLFF:  I'm going to share the screen.

25  BY MS. LUJAN WOLFF:

1  Q      Okay.  Sir, do you see what I'm sharing here?

2  A      I do.

3  Q      And this is -- I'm going to scroll down -- it's Joint

4  Exhibit 379 and this is a letter from Jim Ruggeri of Hartford,

5  dated February 5, 2021, correct?

6  A      It is.

7  Q      And you saw this letter earlier when Mr. Doren

8  questioned you about it, correct?

9  A      I did.

10  Q      Now, I'm going to go to page 3 of the letter.  Now, in

11  the letter, Mr. Ruggeri states that -- and I'm going to read

12  this last -- it's the last paragraph here before the bullet

13  points, the last sentence of that paragraph.  It says:

14          "Various provisions of the draft plan that BSA

15  apparently intends to file already impermissibly prejudiced

16  Hartford's rights."

17          And then it says, "including," and then there are bullet

18  points there.

19          Do you see that, sir?

20  A      I do.

21  Q      I'm going to go to the -- not to these first three

22  bullet points -- I'm going to go to the second-to-the-last

23  bullet point on page 4 that Mr. Ruggeri provided here.

24          Now, it says here -- and please let me know if I need to

25  zoom in more, but I believe you should have a copy there.  It

1  should be a part of the Certain Insurers' exhibit list.  I'm

2  sorry, I don't know what tab it is, but it's Exhibit 379, but

3  I can zoom in.

4  A    No, I can read it, too.  Just give me one moment.

5  Q    Okay.  Thank you.

6  A    I have it.

7  Q    Now, sir, you see on page 4, the second-to-last bullet

8  point before the -- there's a paragraph there.  From the top

9  of the page, it's the second-to-last bullet point and I'm just

10  going to read it, okay, and this is one of the bullet points

11  provided by Mr. Ruggeri:

12      The plan purports to provide local councils, certain

13  chart -- certain contributing chartered organizations and

14  other nondebtors with the channeling injunction that would

15  effectively discharge those entities from their own liability

16  for the abuse claims.  Even if such a channeling injunction

17  would be appropriate as to any claims, and that is highly

18  dubious because the liabilities appear to be direct, not

19  derivative of the debtors' liability, this injunction

20  improperly purports to enjoin claims Hartford may have for

21  subrogation or contribution against these nondebtor entities.

22      Did I read that correct, sir?

23  A    You did.

24  Q    Okay.  And so, this was one of the concerns that

25  Hartford had regarding the plan, correct?

1   A     Yeah, I think this was on a very old version of the

2   plan, but yes.

3   Q     Well, sir, I don't have any other questions.  Thank you

4   so much.

5   A     Great.  Thank you.

6             THE COURT:  Thank you.

7             I understand someone from the Girl Scouts?

8             MR. SCHNABEL:  Yes, Your Honor.  Can you hear me?

9             THE COURT:  Yes, Mr. Schnabel?

10            MR. SCHNABEL:  Thank you.

11                         CROSS-EXAMINATION

12  BY MR. SCHNABEL:

13  Q     Mr. Azer, I would like to ask you about paragraph 66 of

14  your declaration.

15        Are you familiar with what's in that paragraph,

16  generally?

17  A     I am.

18  Q     Great.  And what I want to first focus on is the last

19  two sentences of that paragraph, and I'm just going do read it

20  to you:

21            "While the debtors believe there may be insurance

22  coverage if GS USA were to award damages, the debtors also

23  believe the underlying litigation involving GS USA is likely

24  to be dismissed, therefore, the GS USA's Class 7 claim will

25  not implicate insurance coverage in any way and would not be

1  subject to recovery under the plan."

2        Do you recall that?

3  A    I do.

4  Q    And do you believe that's true?

5  A    Yeah, I read the transcript from the summary judgment

6  hearing.

7  Q    Okay.  But did you attend the summary judgment hearing?

8  A    No, but I also conferred with counsel at Quinn Emanuel.

9  My client obviously has privilege; I can't tell you about

10  that.  But we talked about it, I read the transcript, so I

11  have an understanding.

12  Q    Are you a trademark expert?

13  A    I'm not.

14  Q    Do you know anything about trademark law?

15  A    Other than what I read by the Court that said that he

16  was going to dismiss your claims, no.

17  Q    Oh, has the Court issued an opinion yet?

18  A    He has not, not that I'm aware of.

19  Q    Okay.  There was a hearing in September, correct; is

20  that what you're talking about?

21  A    Correct.

22  Q    And you read a transcript about that hearing in

23  September, correct?

24  A    Along with talking to underlying defense counsel and my

25  client.

1  Q     Okay.  So, it's your client and underlying defense
2  counsel's opinion that the case will be dismissed?
3  A     And my reading of the transcripts.
4  Q     So, your opinion in reading the transcript is that the
5  case will be dismissed?
6  A     I think the judge said that.
7  Q     But I'm saying, that's your opinion of what the judge
8  said, correct?
9  A     I think the judge -- I read the transcript.  I -- my
10  understanding of the transcript is the judge said that he's
11  holding that your claims are going to be dismissed.  That's
12  how I read the transcripts.
13       That's why I said, "likely."  I didn't use definitive
14  language.  I said I read the transcript, I talked to my
15  clients.  That's how I read the transcript.
16  Q     Okay.  And -- but the Court -- are you aware whether the
17  Court has entered a judgment yet?
18  A     No, I know he has -- they had not entered the order yet.
19  Q     Okay.  And that hearing was back, you know, seven months
20  ago, correct?
21  A     Six or seven months, yes.
22  Q     Okay.  And if the Court does enter some sort of
23  judgment, there would be a right to appeal by either party,
24  depending on who prevails, correct?
25  A     I have no idea.  Sure, I presume so.  I have no clue.

1  Q     Yeah, so you're not sure whether there'd be a right to
2  appeal?
3  A     I presume there would be, given how the judicial system
4  works.  I presume you can go in whatever circuit you're in.
5  Q     But you're not sure?
6  A     Again, I presume you can go to the Second Circuit.
7  Q     Okay.  And you haven't reviewed the underlying
8  evidentiary record submitted to the Court in connection with
9  the Boy Scouts' summary judgment motion; is that correct?
10 A     No, I have not reviewed the entire record from Girl
11 Scouts -- the Girl Scouts matter.
12 Q     All right.  Let's move on to another sentence in your
13 declaration or testimony, I guess.  You state:
14       "Under the plan, each holder of a Class 7 claim has
15 a right to recover the full amount of its allowed claim
16 against the applicable insurance."
17       Do you recall that?
18 A     I do.
19 Q     And you believe that to be true?
20 A     I do.
21 Q     Okay.  So, in order to make that statement, you need to
22 have an underlying -- an understanding of the underlying
23 insurance policies at issue, correct?
24 A     I do.
25 Q     And you have that understanding of the applicable

1  insurance policies, correct?

2  A    Yeah, I reviewed the applicable insurance coverage.

3  Q    And you need to understand the policy limits to make

4  that statement?

5  A    Yes.

6  Q    And you need to understand, you know, what the policies

7  cover?

8  A    Yes.

9  Q    And you need to understand what the exclusions to the

10  policies are, correct?

11  A    Yes, among other things.  I mean, you also have to see

12  what the insurers' positions are, which they provided

13  reservation of rights letters, so I've looked at those, too.

14  Q    Okay.  But you also need to understand the nature of the

15  claims, correct?

16  A    You have to have -- sorry -- yeah, Mr. Schnabel, I'm a

17  coverage lawyer.  I look at all the time about what claims

18  are.  I don't have to have an in-depth knowledge of the

19  claims.

20       I have to have enough knowledge to figure out whether

21  they're covered and I read the insurers' letters.  It's about

22  coverage; that's my job on a day-to-day basis.

23  Q    Right.  So you need to have some understanding of the

24  nature of the claim --

25  A    Yes, some understanding.

1  Q     -- to see whether it applies to the insurance policy,
2  correct?
3  A     Yes.  But I don't have to be a -- yes, I do have to have
4  some understanding, but I do not need to be an expert in the
5  area is what I'm trying to convey.
6  Q     Understood.  Fair enough.
7        So, with regards to Class 7, you do have -- do you
8  have -- let me restate that since I just shifted my gear.
9        With regards to Class 7, you have some understanding of
10  the nature of the claims of the creditors in Class 7; is that
11  correct?
12  A     I do.
13  Q     Okay.  And to your knowledge, like, how many Class 7
14  claims have been filed?  How many people are in Class 7?
15  A     Yeah, so, Mr. Schnabel, this is awhile back that I
16  looked at this, but I think there's something like 40 non-
17  abuse claims or -- we settled a bunch of them, so some of them
18  have resolved, so I don't know the exact number.  But when we
19  were looking at it, it was like 40 or so.  And then we also
20  have the Girl Scouts' claim, as well.
21        So, but most of those are non-abuse claims circumstances
22  where Scouts were injured, not based on sexual abuse, but
23  based upon incidents at Scouting trips, in camps, and the
24  like.
25  Q     Okay.

1  A     I think there's a couple other stragglers, too, but I

2  don't exactly remember what those were.

3  Q     Okay.  And do you know the aggregate amount alleged of

4  the claims in Class 7 that are, I guess, that are left?

5  A     I don't, not off the top of my head.

6  Q     Do you have any general idea of it, just a ballpark

7  figure?

8  A     Yes, so, when we were looking at this, Mr. Schnabel, we

9  looked at the 40 claims and we looked at the coverage and I

10 think it's actually defined in the plan as the specified

11 insurance policies, which cover most of these claims, because

12 they're non-abuse, bodily injury claims.

13      And what we determined is that there's sufficient

14 insurance coverage on the post-23 -- post-2013 CGL policies to

15 cover any liabilities that would arise because those policy

16 years have limits of about $140 million.  So, back when I did

17 this, I certainly had more in-depth knowledge about all the

18 Class 7 claims, but at this -- sitting here today, given that

19 only Girl Scouts -- I really only have focused on Girl

20 Scouts -- but, yes, at some point, I had knowledge.

21 Q     Okay.  So, let's just talk about it, and I'm not -- you

22 know, you can round.  It's not -- you don't have to be -- I'm

23 not trying to peg you down to a specific number or anything

24 like that.

25      So, let's talk about the Class 7 creditors excluding the

1   Girl Scouts' claim, okay, for these years in question.

2         So, you mentioned 2013, kind of a seven-year period

3   pre-petition, like, why that seven-year period?

4   A    Because those are the period of claims where you

5   actually have non-abuse claims.  It starts in 2013 as the

6   first non-abuse claim and it goes through the data filing,

7   which is 2020, so we -- in the plan, we actually carved those

8   out.  So, for the Trust purposes, the Class 7 claimants can

9   recover from those CGL towers.

10  Q    Okay.  And the CGL towers, those are siloed by year,

11  correct?

12  A    Correct.

13  Q    So, 2013 has a tower of insurance coverage for those

14  handful of Class 7 creditors that are 2013 claims; is that

15  right?

16  A    I want to say yes to that.  I think the answer is yes to

17  that.

18  Q    Okay.

19  A    It's when the injury occurred, it triggers that policy

20  year.  I just don't know if we have, like, some injuries that

21  are multi-year injuries.  I think they're all single-year

22  injuries.  But if it's a multi-year injury, you would trigger,

23  potentially, more policies, but, again, I would have to go

24  look at the policy terms, but typically, it's a single- year

25  injury.

1  Q      Okay.  So, is it fair to say from 2013 to 2020, you may

2  have, you know, 1 to 10, or less, claims in each of those

3  years, given that there's only 40 Class 4 creditors right now,

4  correct?

5  A      Correct.  There are far less than -- it's not many.

6  Q      And so each year, there would be a handful of Class 7

7  creditors from 2013 to 2020, correct?

8  A      Yeah, that's correct.  I don't know how many.

9  Q      And so, just -- and I'm not -- again, just by, you know,

10 let's say there's five Class 7 creditors in 2017, and maybe

11 it's eight, maybe it's three -- it doesn't really matter for

12 the purposes of this question, so let's just say it's five --

13 is it your view that those five tort claimants that the

14 alleged liability of the Boy Scouts is far inferior or less

15 than the total amount of insurance coverage available for that

16 2017 year?

17 A      I think what we determined was there's enough insurance

18 coverage to provide coverage for the claim.

19 Q      Okay.  I apologize for my stutter there.

20 A      Oh, no.

21 Q      So, in essence, you know, if you've got a slip-and-

22 fall, you know, a broken arm, an arrow -- bow-and-arrow

23 accident, non-abuse claim -- and that bow-and-arrow accident

24 is actually a real claim, unfortunately -- if you have one of

25 those, you know, claims in that year, given that there's $140

1  million of coverage, it's almost impossible that if all those

2  Class 7 creditors were allowed in full, it would be almost

3  impossible for there not to be insurance coverage to have a

4  100 percent payout for those Class 7 creditors, correct?

5  A    Yeah, just to be clear, I think we -- again, we don't

6  know the liability that may ultimately come out from those

7  claims, but I think we estimated that we have enough

8  insurance.

9  Q    Do you -- with regards to these insurance policies that

10 are applicable to these non-abuse tort claims -- again, we're

11 carving the Girl Scouts out in this line of questioning --

12 A    Uh-huh.

13 Q    -- with regards to them, are defense costs, you know, do

14 they deplete the policy limits?

15 A    They do.

16 Q    Is that different, then, with regard to abuse claimants

17 that are creditors for those years or no?

18 A    No, it's the same.  So, on a post-2013 basis, defense

19 costs erode limits.

20 Q    Okay.  Are you aware, with regards to the abuse claims,

21 now -- so, not Class 7, but the abuse claims -- for those

22 seven years where the Class 7 creditors exist from 2013 to

23 2020, like, what's -- are you aware of, you know, what is the

24 grouping?  How many do we have of the abuse claimants in that

25 stack?

1  A     I don't know.  I couldn't tell you with any level of

2  precision.

3  Q     Okay.  And just so I'm clear, the $140 million of

4  availability, of insurance coverage availability exists for

5  each and every year from 2013 to 2020; is that correct?

6  A     Mr. Schnabel, I don't remember the exact towers and some

7  of those years are subject to erosion or exhaustion, so I

8  don't know how much is left, but most years, we had around

9  that level of insurance at the top end.  So, again, I just

10 don't know the exact limits, because I don't have the --

11 there's a chart that actually shows exhaustion and where we

12 are in the limits, so I just don't know how much money is left

13 in each year.

14 Q     Is that chart -- are you aware whether it's in the

15 exhibit or not in these proceedings or no?

16 A     I think it is.  I think Ms. Getzler performed an

17 exhaustion analysis that showed kind of what was left on each

18 policy year, and so I think that was one of the joint exhibits

19 that was submitted to the Court as part of her work.

20 Q     I'm sorry, you broke up in the last --

21 A     Oh, I'm sorry, can you hear me now?

22 Q     Yeah.  Yeah.  I had a glitch from the internet.

23 Can you just finish that again.

24 A     Yeah.  Yeah.  So, Ms. Getzler did an exhaustion

25 analysis -- an exhaustion/erosion analysis, and when I use

1  those terms, I mean how much money has been used in each of

2  those policy years and how much is remaining.  And so, she has

3  an analysis that reflects that and I believe that was

4  submitted as a joint exhibit.

5  Q    Are you aware of -- okay.  That's fine.  It is what it

6  is.

7       And, again, you believe that's the accurate -- then

8  that's the accurate piece of evidence for what availability is

9  for each year for those non-abuse tort claimants in  Class 7,

10  correct?

11  A    So, I don't want to speak for Ms. Getzler.  I think it's

12  our best estimate.  Like, sometimes it's not perfectly clear

13  where the dollars are, but we think it's materially correct.

14  Q    Okay.  All right.

15       So, let's now turn and talk about the Girl Scouts'

16  claim.

17  A    Uh-huh.

18  Q    And I mean, you're aware that the Girl Scouts' claim is

19  going to be liquidated and allowed or disallowed in the

20  District Court.

21       Is that -- are you aware of that?

22  A    So, I understand that there's some form of ruling out

23  there in some transcript and the Court is going to dispose of

24  it one way or the other.

25  Q    So, are you -- let me ask it another way -- are you

1  aware that the Bankruptcy Court lifted the automatic stay on a

2  limited basis to allow the District Court in the trademark

3  action to liquidate and allow or disallow the Girl Scouts'

4  claim?

5  A     So, I'm going to say this in a non-bankruptcy parlance.

6  I understand that the automatic stay was allowed and you can

7  proceed with your case.

8        Does that answer your question?

9  Q     I think that's good enough.

10 A     Okay.

11 Q     And as I said before, you're aware that the District

12 Court -- you stated the District Court hasn't ruled yet, so we

13 don't know what the final ruling is yet, correct?

14 A     I know that the District Court has not issued an order

15 at this time.

16 Q     Okay.  And are you aware that the Girl Scouts' claim has

17 three separate components?

18 A     Yes.

19 Q     And you're aware that one of those components relates to

20 damages in the approximate amount of $6.7 million for

21 corrective marketing.

22       Are you aware of that?

23 A     Yeah.  I think there are three buckets; it's that's one,

24 there are two others, but yes.

25 Q     Okay.  And corrective marketing, are you aware that that

1  relates to marketing that the Girl Scouts carried out in order

2  to correct the confusion caused by the Boy Scouts' alleged

3  infringement of the trademark.

4          Are you aware of that concept?

5  A    At a very high level.  I understand that's what you said

6  in your objection, but past that, I don't have a whole lot of

7  depth of understanding.

8  Q    Okay.  And you're also aware that a second component of

9  the Girl Scouts' claim is for attorneys' fees in connection

10  with the litigation and protection of its trademark?

11  A    I do.

12  Q    And you're aware that that claim is in excess of $5 and

13  a half million and running at this time; is that correct?

14  A    I do.

15  Q    Okay.  And you're also aware that -- are you also aware

16  that a third -- of the third component of the Girl Scouts'

17  claim is for disgorgement of the ill-gotten profits,

18  allegedly, ill-gotten profits that the Boy Scouts have made on

19  account of their marketing and infringement on the mark.

20          Are you aware of that?

21  A    Again, yes.

22  Q    I --

23  A    I'm sorry, go ahead, Mr. Schnabel.

24  Q    I said, Are you aware of that claim?

25  A    Yeah, I'm aware of it from reading your objection.

1  Q     Okay.  And you're aware that that's for approximately $5

2  million?

3  A     Yes.

4  Q     Okay.  And so, you add that all together, we're at 17 or

5  $18 million of a total alleged claim?

6  A     Correct.

7  Q     Now, the insurance policies that we were speaking about

8  before for the Class 7 creditors with the hundred-and-forty-

9  million-dollar approximate availability, those policies are

10 not applicable for the Girl Scouts' claims; is that correct?

11 A     That's correct.  You have your own policies that are

12 applicable to your claim.

13 Q     So, if either one, or all three of these components of

14 the Girl Scouts' claim is allowed, we couldn't recover or seek

15 any recovery at that hundred-and-forty-million-dollar stack,

16 correct?

17 A     No, because you don't allege bodily injury.  You're not

18 a non-abuse or an abuse claim.

19       You're a -- you fall under a D&O policy and a cyber

20 policy, because you're not alleging bodily injury.

21 Q     Right.  And so --

22 A     So, you have your own policies that are going to respond

23 to your claim.

24 Q     Well, they're not the Girl Scouts' policies?

25 A     They're the Boy Scouts' policies that are responding to

1 | the Girl Scouts' claim.

2 | Q     Right.  And those other policies that we were talking

3 | about before, are not applicable to the Girl Scouts' claims,

4 | correct?

5 | A     The CGL policies are not going to respond to the Girl

6 | Scouts' claims.

7 | Q     Okay.  And what -- there are three policies that apply

8 | to the Girl Scouts' claims or, arguably, are applicable to the

9 | Girl Scouts' claims; is that correct?

10 | A     There are three policies that are responding to the Girl

11 | Scouts' claim, that's correct.

12 | Q     Okay.  And one of them, you just mentioned, is kind of a

13 | D&O policy; is that right?

14 | A     I think there are two that are D&O policies.  There's a

15 | primary D&O.  There's an excess D&O.  And then there's a cyber

16 | policy that are all responding, as my recollection serves.

17 | Q     Okay.  And that's -- is it accurate that the cyber

18 | policy is Exhibit 1457 or -- let me ask it this way:  Those

19 | three policies that we believe are 1457, 1458, and

20 | Exhibit 1459.

21 |      Do you know that all three of those are in the record,

22 | are you aware of that or no?

23 | A     So, Mr. Schnabel, if I had a recollection of all the

24 | joint exhibits, I'd be amazing.

25 |      I don't.  So, I think they're in the record, but I

1  couldn't tell you that those are the exhibit numbers.  So, if

2  you're representing that to me, then I will take your word for

3  it, but I don't know the exhibit numbers.

4  Q    I believe -- I know it's true for the first two.

5       Is the D&O excess policy the Markel policy?

6  A    I believe so.  It's Markel that issued it --

7  Q    Markel.

8  A    -- and RSUI issued the primary policy.

9  Q    And so, when you look at the D&O, RUSI policy --

10 A    Uh-huh.

11 Q    -- it -- what it covers in its exclusions, does the

12 Markel excess policy just kind of piggyback on that?

13 A    I don't recall.  I mean, it's not uncommon for D&O

14 policies to follow (indiscernible) to the primary, but I just

15 don't recall off the top of my head.

16 Q    Okay.  Do you recall what the limits were with regards

17 to these three policies?

18 A    I want to say 10 each; $10 million each, is that close?

19 Q    I think that's pretty close.

20 A    Okay.  Great.

21 Q    And do you know whether there's any -- has there been

22 any deterioration of those limits, as to other claims or

23 defense costs?

24 A    Not other claims, but I think there's been some

25 deterioration -- erosion through defense costs.

1      And, Mr. Schnabel, just to be clear, there used to be a

2   fourth policy that was issued by Chubb and that used to pick

3   up some of the defense costs, but that has been exhausted.

4   Q     So, and when you say "defense costs" for that Chubb

5   policy, that was exhausted by the Boy Scouts' counsel in

6   defending the trademark action by the Girl Scouts?

7   A     Correct.

8   Q     Okay.  So, it's possible that that could happen again

9   with one of these three remaining policies; is that right?

10  A     Possible, not probable.  That would be a --

11  Q     Why not probable?

12  A     Because that's an enormous legal bill.  You would have

13  to have $20 million in legal fees.

14  Q     Well, for 10 each, you'd have to have $10 million in

15  legal fees, right?

16  A     Yeah, but that's not how they're working; they're

17  sharing defense.  So, if you actually blew them both out,

18  you'd have to have $20 million in legal fees.

19  Q     Well, you're not sure, but -- okay.  That's fine.  Math

20  is what it is.

21      Well, let's look at the policies themselves.  Are you

22  aware of any exclusions that might be applicable to the Girl

23  Scouts' claims against these three policies?

24  A     Sure.

25  Q     Okay.  And what exclusions might be applicable to the

1  Girl Scouts' claims?

2  A     Well, to be clear, the insurers have cited a bunch of,

3  in their reservation of rights letters, a bunch of exclusions.

4       I think what you're driving at is there is a provision

5  in the policies that says damages does not include

6  disgorgement, but that's subject to a final, non-appealable

7  ruling.

8  Q     So, when you say -- and does that apply for all three of

9  those policies, then?

10  A     I don't think so.  I think there's different language

11  between the RSUI and Beasley policies, if my recollection

12  serves.  I think one of them says "profits."  One of the --

13  the -- one of them uses the term "disgorgement."

14  Q     So, there'd be slightly different arguments because the

15  language is slightly different?

16  A     Well, Mr. Schnabel, the applicability of those

17  exclusions is predicated on a whole series of facts and

18  there's lots of different coverage law that's really

19  complicated.  It's actually one of the hottest topics in

20  coverage law right now.

21       So, whether it applies or not is subject to all kinds of

22  facts and speculation.

23  Q     And this issue we're talking about would then relate

24  most directly to the five-million-dollar disgorgement of

25  alleged, ill-gotten profits.  That's one of the three claims,

1  the three parts of the Girl Scouts' claim, correct?

2  A     Yeah.  So, Mr. Schnabel, I even hesitate to say that it

3  actually applies to that, because there would have to be a

4  whole series of events that would have to occur for that

5  exclusion to actually kick in.

6  Q     So, what are those series of events?

7  A     Yeah, so let me try to walk you through it.  So, one is

8  you guys would have to survive summary judgment, contrary to

9  the Court's statement.  Two is, at no point in time could we

10  settle the claim because --

11          UNIDENTIFIED:  You know what?  I have it on mute --

12          THE COURT:  Excuse me.  If someone can please --

13  everyone please check your audio.

14          MR. SCHNABEL:  I think that just got fixed, Judge.

15  I saw it go back on mute.

16          THE COURT:  Thank you.

17  BY MR. SCHNABEL:

18  Q     Sorry.  So, let's start again.

19      So, you were going to walk us through the series of

20  steps where this exclusion might be applicable.

21  A     Yeah, so, one is you would have to survive summary

22  judgment.  Two is you would have to not settle the claim at

23  any point in time; so, in other words, you would have to

24  literally go to judgment and actually go all the way through.

25      The language in the disgorgement provision includes what

1  we call "final, non-appealable language" and what that means

2  is that you have to go all the way through the appellate

3  system, get denied by the Supreme Court on cert, and then that

4  exclusion may kick in.  So, you cannot settle at any point in

5  time.

6        Three is, if you went to trial and you -- you'd have to

7  win.  And then four is, the jury would actually have to award

8  you on a basis that kicks in for the provision.  And then five

9  is, you'd have to go to coverage court to determine whether

10  the actual jury award fits within the ambit of the exclusion.

11        As I was saying, some of these policies are governed by

12  New York law and there's New York law that basically says,

13  absent Government order requiring repayment of that, it

14  doesn't fall within the disgorgement provision.  So, you would

15  have to get all the way through your case, win; take it all

16  the way up to appeal, win; not settle; and then you'd have to

17  go to coverage court and get a determination of whether that

18  ruling by a jury theoretically falls within the ambit of the

19  exclusion.

20  Q    So, do the other Class 7 claimants have to go through

21  any of that?

22  A    I mean, if they have insurance policies and they think

23  there's insurance disputes and the insurer says, guess what, I

24  don't think your claim is actually covered for some reason.

25  You take it subject to the insurance.

1      The debtors' position is that all of this stuff is

2   covered, but if an abuse -- I'm sorry, I didn't mean to say

3   "abuse" -- if a non-abuse claimant came in and says, I think

4   this is Scouting related and someone else came in and says,

5   This really had nothing to do with Scouting, it had to do with

6   some other program where you got hurt and they were trying to

7   seek insurance, they'd have to argue with the insurance.

8      Again, our position is that we think this is all

9   covered.

10  Q    Right.  But you just articulated a difficult path for

11  the Girl Scouts to actually recover on disgorgement of profits

12  and what I'm asking is, is that same path really applicable to

13  the other Class 7 claimants?

14  A    Yeah, just to be clear, Mr. Schnabel, I think I actually

15  gave you a pretty easy path, which is:  Settle your claim.  If

16  you settled your claim, then typically how the settlement

17  agreements work is the insurers pay for the entire portion of

18  the settlement.  So if you settled your claim, you'd probably

19  get the benefit of the insurance coverage.

20  Q    Well, I would think that any Class 7 creditor, if they

21  settled their claim, would get the benefit of insurance

22  coverage, correct?

23  A    That's right.  If you --

24  Q    And --

25  A    Sorry.

1  Q      No, go ahead.

2  A      You're treated no differently than every -- any Class 7

3  claimant, which is the insurers in your case are defending and

4  then (indiscernible) issues covered under a reservation of

5  rights.  If you settle your claim, you should have insurance

6  coverage for that.

7  Q      And if I don't -- if the Girl Scouts don't settle their

8  claim and go to judgment, then what is your analysis of the

9  insurance coverage?

10  A      That's the whole point that I'm trying to explain to

11  you, is you're running this on a whole set of speculative

12  facts, where I would actually end up having to figure out and

13  look at what the jury determination is and then based upon

14  that, I would have to evaluate the coverage.

15        So, you're asking me to go down --

16  Q      I --

17  A      Sorry.  Did you want me to finish?

18  Q      Go ahead.  I'm sorry.  Yes, please.

19  A      You're asking me to go down this whole path of

20  speculative occurrences and only at the very end, if you get

21  to the point where you have a very specific jury determination

22  and you can't make a coverage argument, is there an issue, but

23  that's a whole lot of ifs between now and then.

24  Q      I'm actually -- what I'm actually asking you is to just

25  assume that the Girl Scouts have an allowed claim for

1  disgorgement of profits and if that's the case, wouldn't this

2  exclusion kick in so there'd be no insurance coverage?

3  A      No, that's what I'm telling you.  This is like one of

4  the hottest areas of coverage law right now.  There's actually

5  New York case law and there's actually a case in Delaware

6  called TIA v Kraft that basically talks about that absent a

7  Government order, that provision doesn't kick in.

8        So, it's very dependent upon the facts of the case.  You

9  can't just say, well, if I got any disgorgement ruling,

10  wouldn't it be excluded?

11       The answer is no.  You'd actually have to go out to the

12  coverage law and look at it.

13  Q      So, there would be coverage litigation, then, if we had

14  an allowed "disgorgement of profits" claim?

15  A      No, I disagree with that, too.  I don't know if the

16  insurer is going to come back and say, If you actually went to

17  judgment, depending on how it's framed, they may look at it

18  and look at the case law and say, we agree with you, we can

19  pay this.

20  Q      Or they may not.  They may say, we disagree, correct?

21  A      Theoretically.

22       Right now, they are defending your claim and paying for

23  your claim.  That's what they've done.

24  Q      Is there any hot issue of coverage and exclusions

25  relating to the Boy Scout who was injured by a bow-and-arrow

1  accident at a Boy Scout-sponsored event?

2  A    Sure.  We've had issues with insurers about that

3  Class 7 issue, of course.  We have had issues about, you know,

4  people basically saying whether this is or is not a Scouting

5  event.  That has come up.

6  Q    And if it's not a Scouting event, then the Boy Scouts

7  weren't there, right?

8  A    It's not -- Mr. Schnabel, it's not black and white.

9        There's lots of circumstances and we have cases that

10  deal with this, where it's unclear whether it's a Scouting

11  event or not-Scouting event and then we have to deal with that

12  from the insurance perspective.

13  Q    But isn't that a difference between whether they have an

14  allowed claim against the Boy Scouts versus whether that

15  allowed claim against the Boy Scouts is covered by insurance?

16  A    I don't see a difference between the two.

17  Q    You don't see a difference about when someone makes a

18  claim against the Boy Scouts and the Boy Scouts say, That's

19  not my program, I'm not liable versus when someone makes a

20  claim against the Boy Scouts and the insurance company says, I

21  didn't insure that liability.

22        You don't see the difference between the two?

23  A    No, because in a lot of circumstances, Mr. Schnabel, you

24  can understand that the abuse -- the non-abuse claims, it's

25  not black and white, whether it's Scouting or not Scouting.

1   A lot of times it will be you have Scouts who are

2   actually doing some Scouting things and the question becomes,

3   well, you transitioned to another event.  I mean, I actually

4   have a very specific claim in mind where this is directly at

5   issue, whether there were -- it's unambiguous regarding

6   whether it was a Scouting event or a non-Scouting event and,

7   so, therefore, you may have exposure under the BSA policies

8   because it's unclear.

9   Q    If there weren't any insurance policies at all with

10  regards to any Class 7 creditor, right, and the Boy Scouts --

11  strike that -- the Girl Scouts had an allowed claim for

12  disgorgement of profits versus a slip-and-fall, non-abuse tort

13  claimant who had an allowed claim against the Boy Scouts,

14  they'd both be paid, correct?

15  A    So, I'm not -- so, this is where --

16  Q    I'm saying --

17  A    -- my limitation comes in.  I am not a bankruptcy

18  lawyer, so trying to ask me about how the structure of the

19  payments go, that is where I am outside my depth.

20  Q    Let me put it -- let me -- I'll ask it a different way.

21  A    Okay.

22  Q    With regards to the Class 7 creditors who are not the

23  Girl Scouts, if they have a claim, a valid claim against the

24  Boy Scouts, doesn't the insurance coverage kick in?

25  A    Yes, if they have a valid claim against the Scouts, they

1  have insurance coverage; that's our position.

2  Q    And if the Girl Scouts have a valid "disgorgement of

3  profits" claim against the Boy Scouts, you can't answer with

4  the same definitive answer, correct?

5  A    No, I think it is covered.  I am answering you with the

6  same definitive answer, which is I think both of your claims

7  are covered.

8       I think, just like with the non-abuse claims, right,

9  there's all kinds of issues that might arise, but we think

10  those claims are covered.  The same thing with yours; we think

11  your claim is covered.

12  Q    And you think our claim is covered because you disagree

13  that the exclusions you noted in these policies, you don't

14  think those exclusions apply; that's why you make that

15  statement, correct?

16  A    But it's the same thing with the non-abuse claims.  I

17  don't think any arguments that the insurers would raise to

18  say, we don't owe this money, is equally applicable to them,

19  too.  My position is, from looking at all the claims,

20  including your claim -- I've spent time with your claim both,

21  previously and in preparation for this testimony -- that you

22  have a covered claim.

23  Q    Right.  And I think the difference here, where we're

24  talking sideways with each other is that you're equalizing

25  whether there is a valid claim against the Boy Scouts versus

1  whether that valid claim is covered by insurance.

2       And what the Girl Scouts have a problem here is that

3  their valid claim for disgorgement of profits against the Boy

4  Scouts, if it happens, is not necessarily covered by insurance

5  and the other Class 7 creditors don't have that.

6       Is that a fair statement or no?

7  A    I understand that's your argument.

8       Again, I'm sitting here as a fact witness, not as a

9  lawyer.  I mean, I'm happy to engage with you outside of this

10 to talk about it but, as in my legal capacity, but I'm telling

11 you what my analysis is based upon looking at it, because it's

12 in my declaration and I'm trying to give you my perspective on

13 it.

14 Q    And your perspective is that the exclusion of profits

15 does not apply to the Girl Scouts if they have a valid claim,

16 that that insurance exclusion wouldn't apply, that we would be

17 able to beat that down, correct?

18 A    Yeah, I think you can -- again, assuming you don't

19 settle at any point in time between now and going to the

20 Supreme Court -- yes, I think there's a -- it would depend on

21 certain factors, but, yes, I think you have a covered claim.

22 Q    And -- but, you know, the insurance companies don't

23 agree with that?

24 A    No, that's not -- I completely disagree with that.

25      The insurance companies haven't taken a position on

1 this, right.  The insurance companies have issued reservation

2 of rights letters where they're paying the BSA's defense costs

3 and have reserved rights.  That doesn't mean that they agree

4 with you.

5      They just -- I am not aware of it in my entire practice,

6 right, I'm not aware of a single claim where an insurer just

7 accepts the coverage.  I've never had that happen.  It's

8 always subject to a reservation of rights, so you're no

9 differently situated than any other claimant in Class 7.

10 Q    And is it the debtors' position that the other claimants

11 in Class 7 will -- if they have allowed claims, would get a

12 hundred-percent recovery, correct?

13 A    Yeah, I think everyone in Class 7 will get their full

14 recovery.

15 Q    And you think the same applies with the Girl Scouts?

16 A    Yes.

17 Q    Okay.

18           MR. SCHNABEL:  Your Honor, if I could have two

19 seconds, I think I'm done --

20           THE COURT:  Yes.

21           MR. SCHNABEL:  -- just to look at my notes.

22           THE COURT:  Sure.

23      (Pause)

24           MR. SCHIAVONI:  Your Honor, I have one, maybe two

25 questions in support of the settlement.  If you want me to go

1 | after Mr. Kurtz, I just want to let you know I can go after

2 | him or before him, but it's in support of the settlement.

3 |         MR. KURTZ:  I'm happy to have Mr. Schiavoni go

4 | before me.

5 |     (Pause)

6 |         MR. SCHNABEL:  I do have one quick line.  This will

7 | be very brief, Your Honor.

8 |         THE COURT:  Okay.  Go ahead.

9 | BY MR. SCHNABEL:

10 | Q    Are you aware that the Boy Scouts breached a settlement

11 | agreement with the RSUI insurance policy, like a limited

12 | settlement agreement?

13 | A    No.

14 | Q    You're not aware that there's a dispute regards to

15 | reimbursement of defense costs under these policies?

16 | A    Yes.  Yes, I'm aware of that.

17 | Q    Okay.  And can you explain what happened with that or do

18 | you know?

19 | A    No, I absolutely know.  The problem is I might be

20 | breaching attorney-client privilege and common interest with

21 | the insurers, so I'm a little bit hesitant to disclose that.

22 | Q    Well, I mean there was a motion filed with the

23 | Bankruptcy Court for approval of that settlement.

24 |     Are you aware of that?

25 | A    Yes.  So, let me talk about it generally and maybe I can

1  answer your question.

2  Q    That's fine.

3  A    If RSUI and Beasley were not paying what we thought were

4  appropriate rates for Quinn Emanuel and we negotiated with

5  them to pay higher rates for defense costs.  And they had some

6  backlog and so that backlog, we were truing-up their payment

7  on that.

8  Q    And the debtors had an interest in doing that because if

9  the defense costs wasn't covered, they would have to pay it

10  themselves, correct?

11  A    Well, the defenses costs were being covered,

12  Mr. Schnabel.  It's just we thought they should pay a higher

13  rate, right.  They were paying whatever the panel rate is and

14  we said, no, given this litigation, you should pay a higher

15  hourly rate for the partners and associates working on the

16  matter.

17  Q    So, isn't it possible that going forward, the debtors

18  could compromise or do something with regards to these

19  insurance policies?

20  A    No, that would be absolutely impossible.  No insurer is

21  going to give us the money on the prospect that we may have

22  liability for you and release their policies that way; that's

23  just not how insurance companies work.  They're just not going

24  to give us the money and trust that there's not going to be an

25  issue.  That's just not how insurance functions.  I mean, I

1  have never had an insurer do that.

2  Q    Right.  But isn't there a possibility that BSA could

3  agree to waive certain rights under the policy to the benefit

4  of insurers that would be to the detriment of the Girl Scouts;

5  isn't that possible?

6  A    I don't even think it's possible.  I don't think we

7  could do that, just go out there and, basically, settle the

8  insurance program when we know we have a pending claim.  I've

9  never seen that done in my multiple years of practicing.

10       It's not even within the fathom of possibility.

11  Q    So, isn't that usually the case, because if an insured

12  did that and messed with their insurance policy, they would be

13  100 percent on the hook, right; they wouldn't have insurance

14  to cover the claim?

15  A    You know --

16          MR. KURTZ:  Your Honor, I'm going to object.  This

17  is getting a little far afield.  I think the testimony is

18  pretty clear that this isn't an intention or a practice in the

19  industry.

20          MR. SCHNABEL:  Right.  And my question is, the

21  reason why -- I'm sorry, Your Honor.

22          Well, Judge, the question I'm trying to get at --

23          THE COURT:  Yeah, let me hear your question again.

24  BY MR. SCHNABEL:

25  Q    The reason why -- you made a statement that it's not

1  possible that the Boy Scouts would compromise the insurance in

2  some way, correct; you made that statement?

3  A    I -- it would be nearly impossible.  I couldn't never

4  imagine them doing that.

5  Q    Correct.  Okay.

6      And I said the reason that that's the case, why an

7  insured would never compromise or mess with their insurance

8  policy is because, then, the claims would be 100 percent

9  against the insured and that's why the insured doesn't want to

10 try to waive or compromise the insurance, right?

11 A    I guess.  I'm not sure if I understand your question,

12 but, Mr. Schnabel, what I'll tell you is I've never had the

13 experience of any insurer just giving me money and saying,

14     You deal with the problem on a D&O side or a cyber side.

15 That just doesn't -- I've never had that experience and I've

16 been practicing awhile.  It would be groundbreaking if that

17 could actually happen.

18 Q    Does an insured -- an insured wouldn't typically cancel

19 or let an insurance policy lapse if there was a pending claim,

20 correct?

21 A    They can't lapse or cancel if there's a pending claim.

22 I mean, you already have -- so, Mr. Schnabel, your policies

23 are claims-made policies, which mean you have to make the

24 claim at the time of the -- within a time period versus an

25 occurrence-based policies, which is what we have.  So, you pay

1  for claims-made policies at the beginning so they would never
2  cancel or lapse.
3  Q     There are certain things an insured can do, which would
4  waive rights under an insurance policy, correct?
5  A     (No verbal response.)
6  Q     If an insured doesn't keep the insurance company
7  appraised of the litigation, there might not be insurance
8  coverage; is that right?
9  A     Subject to all kinds of conditions and factors and
10 breach.
11 Q     Right.  If the insured settles a claim and doesn't keep
12 the insurance policy (sic) apprised of the settlement, that
13 settlement might not be covered by insurance; isn't that
14 right?
15 A     It depends on a whole host of factors.
16 Q     But it could be an undisputed issue about, because the
17 insured waived its right to insurance coverage; isn't that
18 right?
19 A     Again, that would be subject to a whole host of coverage
20 issues that would have to be litigated and resolved.
21 Q     Correct.  And an insured typically does not try to do
22 that because if the insurance isn't available, then the
23 insured is liable for the claim; isn't that right?
24 A     No, an insurer doesn't do that because most insurers
25 comply with their -- they -- most insurers don't do that.

1    Mr. Schnabel, I understand you're asking me whether we

2   can sell off, we would sell off the policies.  I have never

3   seen an insurer who would be willing to enter into a

4   settlement, nor am I aware of any intent by the BSA to settle

5   out these policies.

6        No one has ever told me at any point in time that we're

7   going to settle out these policies, notwithstanding some of

8   the claims and I would be shocked if the insurers would ever

9   engage in a discussion that way.

10  Q    Because if they did that right now, then there'd be no

11  insurance and they'd be fully liable?

12  A    No.  I -- no insurer is just going to give me the money

13  on the assumption that we're going to get paid, right.  No

14  insurer is going to give me the money and say, Hey, here is

15  the amount of money because there's a risk that it might be

16  lower.  They don't want to do that.

17          MR. SCHNABEL:  Your Honor, I'm finished.  I can

18  save the rest for argument.

19          THE COURT:  Thank you.

20          Is there any other cross before I get to        Mr.

21  Schiavoni?

22      (No verbal response)

23          THE COURT:  I don't hear anyone.

24          Mr. Schiavoni?

25          MR. SCHIAVONI:  Thank you, Your Honor.

1                            CROSS-EXAMINATION

2    BY MR. SCHIAVONI:

3    Q     Mr. Schiavoni for Century Indemnity.

4          Mr. Azer, you were asked some questions by Ms. Lujan

5    Wolff about your position or the company's or Boy Scouts'

6    position on a number of occurrences.

7          Do you remember those questions?

8    A     I do.

9    Q     Okay.  Was there coverage litigation pending against the

10   Boy Scouts pre-petition?

11   A     There was.

12   Q     Is there coverage litigation pending now while the

13   pre-petition and other litigation on coverage pending against

14   the Boy Scouts?

15   A     Yes, but I believe it's all stayed.

16   Q     Right.  How many coverage actions are there pending that

17   are stayed?

18   A     There's the three State Court actions and then there's

19   the adversary proceeding.

20   Q     Okay.  Does the insurance coverage litigation that's

21   presently stayed include pending coverage litigation filed by

22   Hartford concerning the number of occurrences presented by

23   abuse claims by Boy Scouts?

24   A     It does.

25   Q     Ms. Lujan Wolff also showed you a letter drafted by

1  Mr. Ruggeri.

2        Do you remember that letter?

3  A    I do.

4  Q    And that letter, it wasn't authored this year, right; it

5  was authored last year sometime?

6  A    Correct, February of '21.

7  Q    Okay.  Has the plan changed in ways concerning the

8  causes she asked between now -- between the time the letter

9  was authored and now?

10 A    Yes, the plan has substantially changed.

11 Q    Okay.  Thank you, Mr. Azer.

12        I never thought I would -- as much as you and I have

13 worked together, I never thought I'd meet you in this

14 environment.  I've got that off my bucket list.  Thank you.

15 A    Thank you, Mr. Schiavoni.

16            THE COURT:  Thank you.

17            Mr. Kurtz?

18            MR. KURTZ:  Thank you, Your Honor.

19            I estimate maybe 10 minutes, maybe a little bit

20 less, so just some (indiscernible) things.

21            Can we start by pulling up JTX-379, please, and if

22 we could move to page 3 and to the first paragraph,

23 (indiscernible).

24                        REDIRECT EXAMINATION

25 BY MR. KURTZ:

1  Q      Mr. Azer, you don't recall -- you were asked some

2  questions about Mr. Ruggeri's letter and this paragraph.

3         Do you recall that?

4  A      I do.

5  Q      Did you ever have a conversation with Mr. Ruggeri in

6  which you stated that the Coalition was drafting the TDPs?

7  A      I did not.

8  Q      Did you ever have a conversation with Mr. Ruggeri where

9  you said everyone was drafting the TDPs?

10 A      I did not.

11 Q      And this letter is dated February 5th, 2021.

12        Do you see that?

13 A      That's correct.

14 Q      And when did you first begin actually drafting the TDPs?

15 A      April 7th.

16 Q      Okay.  So, two months and two days later.

17        Was it unusual for you to receive communications from

18 the insurers that you disagreed with during this time period?

19 A      No, we receive communications like these regularly.  We

20 responded in many instances, voicing our vehement

21 disagreement.

22 Q      And were the insurers trying to set up breach claims

23 during this time period?

24 A      That was understanding, yes.

25             MR. KURTZ:  You can put that to the side.

1  BY MR. KURTZ:

2  Q    You were asked a number of questions about some of the

3  identical insurance protected language that you would have

4  included in any series of paragraphs in one of the versions of

5  the TDPs.

6         Do you recall that?

7  A    I do.

8  Q    And there came a time when you removed all of those

9  provisions, other than the one provision that applied

10 generally across the board.

11        Do you recall that?

12 A    I do.

13 Q    Okay.  By the time that you made that change, had you

14 reached a conclusion about whether stating something one time

15 rather than multiple times in a single document have legal

16 effect?

17 A    I had.  Again, as I kind of articulated during

18 cross-examination, right, when I put that in, again, it was

19 belts-and-suspenders language.  I realized and thought about

20 the concept of specific over the general and so what we

21 determined is it's better to have the general provision than

22 try to have in every place we would need it, the specific

23 provision -- that actually made it ambiguous -- and so, we

24 felt the general provision did the trick and so, that's why we

25 took it out from the other places, because we thought the --

1  what is ultimately Article 5(c), did the job.

2  Q    By that, do you mean that if there happened to be a

3  paragraph that didn't include the protected *proviso*, that

4  there was a risk that there would be an interpretation under a

5  sort of well-settled rule of construction that the parties did

6  not intend to protect the insurer in that situation?

7  A    That's exactly right.  So, I tried to catch all the

8  provisions, but what I realized is I probably am not doing a

9  great job at doing it, and so we thought the general provision

10  covered all the other provisions, so why not rely on the

11  general provision.

12  Q    And on behalf of the debtors, did you have any intention

13  of diluting, in any fashion, the contract provision protecting

14  against an impairment or change in the insurers' rights and

15  (indiscernible)?

16  A    Absolutely not.

17  Q    All right.  You're also -- you had some language in

18  there about to the extent that they have those rights.

19      Do you recall that?

20  A    Yes.

21  Q    And can you explain to the Court what you meant by

22  including language in the protected provision that addresses

23  whether the insurers have their rights at all?

24  A    Sure.  So, when we were thinking about the Bankruptcy

25  Court and what its role was, it's not supposed to prejudge

1  insurance coverage rights, right.  There are lots of rights

2  out there.  There's rights where policyholders can assert

3  breach and, therefore, you waive conditions precedent.  There

4  are rights by insurers as to various provisions of the

5  policies.

6  　　　Our intent was for the Bankruptcy Court not to decide

7  any of them, right.  It's -- the mutual coverage court to

8  determine whether the insurers had these contractual rights

9  and what arguments the trustee has with regard to whether

10 those rights exist or not; again, all meant to be left to the

11 coverage court.

12 Q    Did you have any intention of changing the protections

13 when you removed the duplicative language that you would

14 otherwise inserted in various places in the TDPs?

15 A    No, again, we thought the language that said, "Nothing

16 herein modifies, amends, or supplements, or should it be

17 interpreted as modifying, amends, or supplementing," was meant

18 to protect all the insurers' contractual rights throughout the

19 provisions of the TDP.  It was meant to run throughout.  The

20 general provision was meant to run throughout.

21 Q    You were asked -- I'm going to change topics now -- you

22 were asked some questions about communications that you had

23 with a Dr. Charlie Bates.

24 　　　Do you recall that?

25 A    I do.

1  Q     Did you have communications with personnel at Bates

2  White about the claim values that were being involved for use

3  in the TDPs?

4  A     Yes, so we worked, interact -- Andy O'Neill obviously

5  took the lead, as I think I mentioned, but, you know,

6  obviously, I was part of calls and stuff with Drew Evans who

7  was the case -- (indiscernible) I'm sorry -- Bates White

8  individual who was responsible for that when we were drafting

9  the TDPs.

10 Q     And why did you communicate?  What were you -- what was

11 the role of the Bates White consulting team in connection with

12 your drafting of the TDPs?

13 A     So, they came up with the base matrix values and the

14 scalers.  Again, I'm not an economist.  I'm not a

15 mathematician.  I don't know how to normalize data to figure

16 out historical settlement dates and I didn't -- Mr. O'Neill

17 doesn't either, so we relied on them to help us with that

18 aspect and then to figure out the multipliers.  Again, we

19 needed somebody that mathematically worked and I am not that

20 person to do that.

21 Q     And did you include any language in the TDPs to allow

22 the trustee, ultimately, to determine the amount of the claim,

23 if any?

24 A     Yeah, throughout the TDPs there's lot of discretionary

25 language for the trustee to evaluate the claim and determine

1 the appropriate value that should be applied, based upon the

2 aggravating and mitigating factors that would also be applied,

3 so yes.

4 Q    And did you have an expectation that the settlement

5 trustee, which has now been designated as Judge Houser, would

6 be qualified and able to make reasonable determinations as to

7 the awards that would be made or not made under the TDP

8 procedures?

9 A    We absolutely felt that Judge Houser would be able to

10 look at our TDP, understand how to apply it, apply it fairly

11 and equitably, and use that to determine appropriate values.

12 Q    All right.  If we can pull-up the next page, please.  I

13 think its -- let me start with this, can you turn to the next

14 page, please.  I'm sorry, go a page back.  Do you have 659 up?

15 I'm trying to get to Bates No. 250, Great American 250.  Can

16 we pull-put in the first paragraph starting five lines down,

17 beginning "This alliance…"

18         Do you see where it says,

19         "This alliance contravenes the debtor's obligation under

20 the insurance policies to cooperate with and assist its

21 insurers in the investigation, defense and resolution of the

22 abuse claims and may avoid coverage under the policies."

23         Do you see that?

24 A    Yes.  Just to be clear this is an email from Mr.

25 Rosenthal that you are now referencing, correct?

1  Q    Correct.

2  A    Okay.

3  Q    What was your understanding of that allegation?

4  A    That they're basically trying to get out of their

5  coverage obligations.

6  Q    And if we go down two more lines or three lines where it

7  begins "The legal consequences."  He continued,

8       "The legal consequences under the policies to the

9  debtors and anyone purporting to stand in the debtor's shoes

10 or exercising any rights of the debtors that might flow from

11 the policies are severe."

12      What did you understand that language to mean?

13 A    Again, they were threatening us that if we, basically,

14 entered into any deal with the claimants or kind of proceeded

15 forward with the draft TDP's that they would argue that we

16 breached our coverage obligations.

17 Q    Mr. Rosenthal said,

18      "The choices the debtors have made here will, in our

19 opinion, leave it without access to coverage under prepetition

20 insurance policies.  Courts in post-bankruptcy coverage

21 litigation, including Congoleum and Fuller-Austin, have

22 recognized that the insurers' acts during its bankruptcy case

23 may vitiate its coverage.  The insurers reserve all rights to

24 assert the debtor's breaches as it defends the coverage that

25 might, otherwise, be…"

1    Do you see that?

2  A    I do.

3  Q    How did you interpret that statement by Mr. Rosenthal?

4  A    It was a threat.  It was a threat against the debtors.

5  Q    Let's move to the third point in Mr. Rosenthal's email.

6  He says,

7    "Thirdly, it is clear that the new plan, which we have

8  not yet seen, that is required by the RSA and termsheet will

9  not be insurance neutral.  Yet any plan that is not truly

10  insurance neutral and that impairs the rights of the insurers

11  under their policies is unconfirmable.  We believe our

12  arguments will be embraced by Judge Silverstein, but if not

13  then by the District Court or the Third Circuit and will

14  likely result in, as Jessica Lauria put it, "an epic fight"

15  that will play out in the courts over years."

16    Is this also language you relied on when you testified

17  that the insurers were threatening litigation?

18  A    This is the exact language I was relying upon when I

19  referenced that.

20  Q    And at this point the insurers hadn't even seen the

21  plan, yet they were threatening years long litigation in

22  claiming that the plan they hadn't seen yet was unconfirmable,

23  is that right?

24  A    That's correct.

25  Q    Fourth, if we go to the next paragraph,

1    "Fourth, given that the debtors now appear to have ceded

2  control of the plan process to the Coalition, TCC, and FCR,

3  whom we all know will not allow the debtors to agree to the

4  type of insurance neutrality language and provisions that,

5  among other things, are absolutely required to achieve the

6  debtor's expedited reorganization goal, it makes no sense for

7  us to provide specific comments to the documents much less

8  what is necessary, a total re-write."

9    Do you see that?

10 A    I do.

11 Q    And had the debtors ceded control of the plan process to

12 the Coalition, TCC, and FCR?

13 A    No, absolutely not.  Like I said --

14 Q    This --

15 A    Sorry, go ahead.

16 Q    No, please finish.

17 A    Like I said throughout my testimony, right, we were

18 playing it straight down the fairway, trying to protect

19 everyone's rights, including the insurers' contractual rights,

20 we just needed to work off the document that we had provided

21 and go from there, not a total re-write.

22 Q    Mr. Azer, you were asked some questions about the timing

23 on the request for input, but the final plan and TDP was filed

24 much, much later.  Did there ever come a time when the excess

25 insurers forwarded line specific comments or a draft TDP for

1  the debtors to consider?

2  A     No.  We never got any comments from the insurers at any

3  point in time on the TDP.

4  Q     Next topic.  Why was the language dealing with the

5  statute of limitations moved from the general criteria to the

6  mitigating factors in the final TDP's?

7  A     So we consulted with Mr. Griggs, who is our national

8  coordinating council.  We talked to Mr. Griggs about how

9  claims were handled on a prepetition basis.  Mr. Griggs

10 mentioned that he didn't really have that many claims that

11 were in those jurisdictions, but what he did say is when he

12 did have claims in those jurisdictions he still would settle

13 them, not necessarily close dates, gray states, he kind of

14 looked at the statute of limitations, understand there were

15 defenses to them and settle them out on a prepetition basis to

16 mitigate risk.

17        So the reason it was moved from the general criteria to

18 the mitigating is actually consistent with the prepetition

19 practices which its not a bar to recovery, it's something that

20 reduces the value of the recovery and that is why we moved it.

21 Q     One last very short area.  You were asked questions

22 about Ms. Gutzler's expert report and her conclusion about

23 perhaps the likelihood that excess insurers will finally come

24 to the table and make contributions at some point.  Do you

25 recall those questions?

1  A      I do.

2  Q      You were asked and maybe inferred that you agreed.  So

3  let me ask you the question.  Did you, at any time, when you

4  were negotiating the TDP's intend the IRO process to be

5  leveraged in order to compel the excess insurers to finally

6  come to the table and contribute funds to this important

7  cause?

8  A      No, absolutely not.  Again, we created the IRO process

9  because we understood that we had prepetition claims that

10 exceeded the $2.7 million, right.  There may be -- that is why

11 we did it.  We didn't do it to pressure any insurers.  We

12 didn't do it to create leverage.  Again, I have no idea what

13 the neutral is going to do with claims.  There may not even be

14 claims that go anywhere near there.  I have no idea, but we

15 did it because it was inconsistent with the prepetition

16 practices that we had and we need to make everything

17 consistent.  That was the goal.

18 Q      One last question, Mr. Azer.

19 A      Sure.

20 Q      So the premise of that line of questioning seemed to be

21 that allowing of procedure for outlier type claims, really

22 severe claims, to receive larger verdicts.  Somehow it would

23 be designed to lever a settlement with the excess insurers.

24 If you simply allowed people to go to the tort claim without

25 an independent review option would that, in your mind, create

1 any less exposure to the excess insurers?

2 A    It would be the same thing.  It would be the same risk

3 exposure, I would imagine, the excess insurers would analyze.

4 It's the same thing.

5 Q    To your knowledge is there caps in the tort system for

6 recoveries?

7 A    There is not.

8            MR. KURTZ:  I have no further questions, Your

9 Honor.

10            THE COURT:  Thank you.

11            MR. DOREN:  Just a couple, Your Honor.

12            THE COURT:  Mr. Doren, yes, within the redirect.

13            MR. DOREN:  Yes, Your Honor.  I think we all want

14 that.

15                    RECROSS EXAMINATION

16 BY MR. DOREN:

17 Q    Mr. Azer, if I could direct your attention back to

18 Exhibit 659 which you just reviewed with counsel.

19 A    Mr. Doren, is it in the binders or is it only on the

20 screen?

21 Q    Well, I have it in the binder that we made of documents

22 that were cited in your direct.  So -- but it is not in my

23 binder for you.

24 A    I don't appear to have it either.

25 Q    Let's just put it back up on the screen.  You and Mr.

1  Kurtz made it through it that way.  So we will try it as well.

2       So, Mr. Kurtz asked you questions about various

3  statements and paragraphs in Mr. Rosenthal's email sent at

4  1:49 p.m. on the 28th, correct?

5  A    Correct.

6  Q    And then if you go to the email first in that chain

7  that's an email sent by Mr. Martin to Mr. Rosenthal and many

8  others, by the way it was Mr. Rosenthal's email, in response,

9  correct?

10 A    Correct.

11 Q    And included in that email were threats, if you will --

12 I will just reservations or rights, it's too late to argue, to

13 pursue all claims including bad faith claims against the

14 insurers and the like, correct?  You will see that at the top

15 of the second page, I'm sorry.

16 A    Are you referring to Mr. Martin's email or Mr.

17 Rosenthal's email?

18 A    I'm referring to Mr. Martin's email.  We will get you

19 there.  Hang on.  This is the problem with not having it in

20 the binder.  Hang on.  So just that carryover sentence,

21      "The debtors, therefore, reserve all rights to pursue

22 all claims."

23      Do you see that in response from Mr. Martin?

24 A    Right.  So if you look at the top part --

25 Q    I'm just asking, sir, if you see that?

1   A     Yes, I see that language.  I do.

2   Q     So, basically, people were getting pretty upset with

3   each other this day, I would say, correct?

4   A     We were certainly stating our positions.

5   Q     Then if we go back to Exhibit 3018, the one we looked at

6   together earlier today.  So that is in the binder if you want

7   to look at it physically.

8   A     Sure.

9   Q     You will see that this email was actually sent later in

10  the day on the 30th, correct?  And by this email I really mean

11  --

12  A     Sorry, can I get to the document real quick, Mr. Doren?

13  Q     Absolutely, 3018.

14  A     Go ahead, Mr. Doren.

15  Q     Thank you.

16        So you see, for example, that Mr. Rosenthal's note was

17  sent on the afternoon of the 30th, correct? Then, again, you

18  have this string of emails and if, for example, you take a

19  look at, hang on one second here, Mr. Martin's note on page

20  3018-3 at the top of that page.  He says,

21        "Travelers is also interested in participating in

22  discussions of TDP's that are insurance neutral.  Travelers

23  disagrees with many statements contained in your earlier

24  email, but sees no point to debating them with you here now;

25  however, Travelers reserves the right to do so in an

1  appropriate forum."

2       Correct?

3  A    The answer --

4  Q    In -- sorry.  I apologize.

5  A    You read that correctly.

6  Q    Thank you.

7       So Mr. Rosenthal stated after the earlier exchange that

8  AIG is willing to meet and confer with debtors to discuss

9  TDP's that are insurance neutral, correct?

10 A    That is partially what he said.  Mr. Rosenthal said he's

11 willing to talk to us, but he wants us to start -- go back to

12 the Hartford TDP.  So his full statement was --

13 Q    I can read it for you.

14 A    Yeah --

15 Q    "AIG" --

16 A    -- I just want to make sure I --

17 Q    -- "AIG II is willing to meet and confer with the

18 debtors to discuss TDPs that are insurance-neutral and

19 consistent with AIG's insurance policies along the lines that

20 Hartford proposed in February."  Correct, that's what he said?

21 A    That's the full statement, that's correct.

22 Q    Thank you.  And then we talked about Mr. Martin's

23 response.

24          And then Mr. Jacobs wrote that National Surety and

25 Interstate are also interested in discussing insurance-neutral

1  TDPs with BSA.  "To date, our clients have systematically been

2  excluded from any discussion of TDPs and plan negotiations

3  generally.  We will respond separately to what we view as the

4  many inaccuracies in your communication below.  In the

5  interim, National Security and Interstate continue to reserve

6  all rights."  Correct?

7  A    So, Mr. Doren, I just think your -- the timeline is a

8  little bit messed up.  All the insurers sent these emails, Mr.

9  Martin responded to all of them in his email.  So --

10 Q    Yes, I --

11 A    --  the timing is -- yeah, sorry, go ahead.

12 Q    Understood, understood.  And then Mr. Martin sent his

13 email in response in Exhibit 3018; correct?

14 A    Well, this is one of the responses.  There are other --

15 there's actually another response to this too.

16 Q    This is the one in evidence; correct?

17 A    This is the one that's in front of me, but there's

18 another one as well.

19 Q    Okay, great.

20          MR. DOREN:  All right, no further questions, Your

21 Honor.

22          MR. KURTZ:  Your Honor, I have no further

23 questions.  I think we could release the witness.

24          THE COURT:  Oh, Ms. Wolff has a question.

25          MS. WOLFF:  Your Honor, yes, I just have a few

1  questions.  If I may, Your Honor?

2            THE COURT:  Yes.

3            MS. WOLFF:  Thank you.

4                     RECROSS-EXAMINATION

5  BY MS. WOLFF:

6  Q    Mr. Azer, when Mr. Schiavoni examined you, you testified

7  that the -- you testified that the plan has substantially

8  changed from February 2021 to the present; do you remember

9  that?

10 A    Yes.

11 Q    Isn't it true that the current plan provides for a

12 channeling injunction that releases non-debtors of liability

13 for abuse claims?

14 A    So, we're certainly releasing the local councils.

15 Q    Yes.  And also the current plan has a channeling

16 injunction that releases certain chartered organizations of

17 liability for abuse claims; correct?

18 A    Yes, the plan has provisions related to chartered

19 organizations.

20 Q    Yes, a channeling -- the plan contains a channeling

21 injunction that benefits certain chartered organizations;

22 correct?

23 A    Correct.

24 Q    Okay.  Now, during Mr. Schiavoni's examination, he also

25 asked you about insurance coverage actions and he mentioned to

1  you at least one of the defenses in the insurance coverage

2  actions, which is the number of occurrences that are triggered

3  by abuse claims; do you remember that?

4  A    I do.

5  Q    Now, isn't it true that the debtors believed that the

6  defenses or limitations that are raised by the insurers in the

7  insurance coverage actions to the scope of coverage are

8  without merit?

9  A    So, Ms. Wolff and Your Honor, I want to be careful here

10  because, obviously, I'm speaking in my capacity as a coverage

11  attorney and my legal opinions.  What I can tell you is we

12  filed a motion for summary judgment to address Hartford's

13  single-occurrence theory with the Court and we set forth our

14  position there that we thought they were wrong.

15          So, if I could limit my testimony to what was

16  publicly filed, that would -- if I could that and I think that

17  answers your question, that would be good.

18  Q    Well, I think I'm going to have to refer you to the

19  disclosure statement, the amended disclosure statement --

20  A    Sure.

21  Q    -- the solicitation version that was filed with the

22  Court on September 30, 2021.

23          MS. WOLFF:  And I'm sorry, Your Honor, I honestly

24  don't know if this is a Joint Exhibit, but it is -- I believe

25  I need to use it for impeachment purposes.  I'm just going to

 1  share my screen.  Thank you.

 2          MR. KURTZ:  Your Honor, I don't know how that could

 3  possibly be -- we'll see how that could be impeachment in

 4  light of what that answer was.

 5          THE COURT:  I'm not sure it could be either, but

 6  let's see what it is.

 7      (Pause)

 8  BY MS. WOLFF:

 9  Q    Okay.  So this is page 73 of 441 of the amended

10  disclosure statement.  It's Docket Number 6445, filed

11  September 30, 2021.  Do you see that, sir?

12  A    I do.

13  Q    Okay.  And here it says, the second paragraph, it talks

14  about the insurance coverage actions involving several of the

15  BSA's insurance companies, including Century, Hartford, and

16  Accident & Indemnity Company, and National Surety Corporation,

17  and Allianz.  Do you see that?

18  A    I do.

19          MR. KURTZ:  Is there any way you could increase the

20  size on that, Ms. Lujan Wolff?

21          MS. WOLFF:  Yes, yes, let me try.  I'm sorry.

22          MR. KURTZ:  I'm not saying I could, but I thought

23  maybe you could.

24          MS. WOLFF:  Is that better?

25          MR. KURTZ:  If you could just give it a few more

1  clicks, I'd appreciate it.  Thank you.

2  BY MS. WOLFF:

3  Q    Okay.  So what I was referring to is this second full

4  paragraph --

5  A    Sure.

6  Q    -- on page 73 of 441.  And so in this paragraph it talks

7  about the insurance coverage actions and then in the second

8  sentence it mentions that the insurance companies in those

9  actions assert that the BSA and local councils were not

10  entitled to coverage for specific sexual abuse claims based on

11  various coverage defenses, including, but not limited to, the

12  number of occurrences that were triggered by the abuse claims.

13  Do you see that?

14  A    Yes.

15  Q    Now, the final sentence of the paragraph states, "The

16  debtors believe that such defenses or limitations to the scope

17  of insurance coverage are without merit."

18          Did I read that correctly?

19  A    You did.

20  Q    And, to your knowledge, this part of the amended

21  disclosure statement has not been further amended by debtors;

22  correct?

23  A    I don't think so.  I don't --

24  Q    You don't think so?

25  A    I have no idea.  I don't know, I haven't looked at it

1  all, but I presume not.

2  Q    Okay, but you're not aware of the debtors changing their

3  position as stated in this final sentence of this paragraph;

4  correct?

5  A    No, no.

6  Q    Okay.

7           MS. WOLFF:  I have no further questions.  Thank

8  you.

9           THE COURT:  Thank you.

10           Mr. Kurtz, anything further?

11           MR. KURTZ:  Your Honor, I would just maybe let you

12  know for planning purposes -- first, I would like to thank you

13  because it's about 6:35, we're a couple hours past where I

14  think we're supposed to be.  You've done that all week and

15  it's very much appreciated.

16           Tomorrow, we certainly will have Brian Whitman and

17  Bishop John Shoal (ph).  It's also conceivable that we'll have

18  William Sugdon (ph) and maybe even James Patton.  That would

19  be a pretty ambitious day and maybe an optimistic day, but I

20  think that's where we could get at best.

21           THE COURT:  Okay.  Let me just -- that's what I was

22  looking for -- look at that again.

23           MR. KURTZ:  So I think that would be, if you were

24  looking at the pretrial, seven.  John Humphrey has been

25  removed.  So we would be up to eight, nine, ten, and with a

1   really optimistic 11.

2           THE COURT:  Okay, 11 I have as Mr. Patton.

3           MR. KURTZ:  Correct, correct.

4           THE COURT:  I don't think I've seen a declaration

5   from him yet, but I know I have Mr. Sugdon's.  And Mr. Whitman

6   does not have a declaration, he's going to be live.

7           MR. KURTZ:  Correct, Mr. Whitman will be live and

8   Mr. Patton is an FCR witness.

9           THE COURT:  Yes.

10          MR. KURTZ:  So I can't report on the state of his

11  declaration.

12          THE COURT:  Okay.  Thank you very much.

13          MR. KURTZ:  They probably are less optimistic than

14  I am, in which case there would still (indiscernible) --

15          THE COURT:  Ah, Mr. Enos.

16          MR. ENOS:  Good evening, Your Honor, Ken Enos,

17  Young Conaway Stargatt & Taylor on behalf of the FCR.  I

18  recognize Mr. Kurtz is unlikely to be kind of up to date on

19  where things stand.  We have spoken with one of his partners.

20  We are endeavoring to file the Patton declaration as soon as

21  possible, but I believe the agreement is we're going to file

22  it Saturday morning and Mr. Patton will go forward on Tuesday.

23          THE COURT:  Okay.  So either we're taking him out

24  of order or you're really pessimistic about where we're going

25  to be.

1          MR. ENOS:  We are certainly not as optimistic as

2  Mr. Kurtz.

3          THE COURT:  Okay.  Okay, that's fine.  We'll start

4  with Mr. Whitman live in the morning.

5          MR. KURTZ:  The first time I ever appeared in front

6  of a judge, I expressed optimism, and I was told, he who have

7  hope have despair.  So I'll leave it at that for today.

8       (Laughter)

9          THE COURT:  Okay.  Okay, thank you.

10          MR. ENOS:  Thank you.

11          THE COURT:  Mr. Azer, I guess I didn't say this,

12  your testimony is concluded.

13          THE WITNESS:  Thank you, Your Honor.  I appreciate

14  it.

15          THE COURT:  You're excused.

16       (Witness excused)

17          THE COURT:  Ms. Wolff?

18          MS. WOLFF:  Your Honor, I'm sorry, I'm embarrassed

19  to take up so much of the Court's time, but may I raise an

20  issue?

21          THE COURT:  Yes.

22          MS. WOLFF:  Thank you.  I believe it was a couple

23  of days ago when the Court indicated that, I guess, at least

24  the plan did not have to be moved into evidence because it's

25  part of the record.  And so my understanding is that, you

1  know, this is a very unusual bankruptcy case in that the main

2  creditor body has proofs of claim that are filed under seal.

3  And so all of my clients are survivors of abuse, all of their

4  proofs of claim are filed under seal.  And so, I guess the

5  question that I have, you know, given the sensitivities in

6  those proofs of claim, would -- does the Court require that

7  each of the proofs of claim, if I'm to reference them, if I'm

8  to reference -- make arguments regarding my clients' claims,

9  like years of abuse or who -- what claims they've asserted

10 against non-debtors or any other information, is Your Honor

11 requiring that those claims be specifically moved into

12 evidence?

13        It's my understanding that the debtors provided all

14 proofs of claim to the Court in some form, it could be part of

15 the hard drive or a disk -- I believe there was a disk that I

16 heard, but I just don't know how to deal with bringing the

17 proofs of claim before the Court and if I need to specifically

18 move each individual proof of claim into evidence.

19        THE COURT:  Why don't you talk with the debtors and

20 see if you can come up with an agreement on how they will be

21 in evidence.  And I certainly think there is a way to have

22 them into evidence to keep them confidential and for you to be

23 able to speak to them generally, but we need to make sure the

24 debtors and I guess the insurers, if that's -- if they're in

25 the loop on this as well, and any plan proponents.  Why don't

 1  we see if there's a way to do that?  I suspect there is.

 2          MR. KURTZ:  Your Honor, we'll work that through.  I

 3  don't think that's a problem.  We'll just need a little bit of

 4  notice of which ones they are so that -- no one could

 5  otherwise be expected, maybe even be familiar with any given

 6  set out of 82,000.  So if she really wants to know to use

 7  them, if we'll get a little notice.  But we can figure out a

 8  way to reference them without names.  We're not going to

 9  disclose names.

10          THE COURT:  Yes.  And if you're going to use them,

11  Ms. Wolff, specific ones to cross-examine or to put a witness

12  on, that's going to be a little bit different because people

13  do need to know then what's the proof of claim.  And so I

14  think if you have that conversation, we'll see if -- I suspect

15  there will be a resolution of how that can happen.  But I do

16  also think that I have a thumb drive or something with all

17  these proofs of claim on it and of course I'll let you know I

18  haven't looked at that.  So, if I need to look at something

19  too, I need to know that as well.  If you're talking

20  generally, I don't think I probably need to look at each proof

21  of claim; if you're going to be talking about specific proofs

22  of claim, then I may need to look at them and others should

23  know that as well.

24          Is that helpful?

25          MS. WOLFF:  Thank you, Your Honor, very helpful.

1  I'll work with the debtors.

2          THE COURT:  Thank you.

3          Anyone else before we adjourn for this evening?

4      (No verbal response)

5          THE COURT:  Okay, we're adjourned.  Thank you.

6          COUNSEL:  Thank you, Your Honor.

7      (Proceedings concluded at 6:41 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2             We certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of our

5      knowledge and ability.

6

7      /s/ William J. Garling                    March 18, 2022

8      William J. Garling, CET-543

9

10     /s/ Tracey J. Williams                    March 18, 2022

11     Tracey J. Williams, CET-914

12

13     /s/ Mary Zajaczkowski                     March 18, 2022

14     Mary Zajaczkowski, CET-531

15

16     /s/ Coleen Rand                           March 18, 2022

17     Coleen Rand, CET-341

18
       Certified Court Transcriptionists
19
       For Reliable
20

21

22

23

24

25