1

1          UNITED STATES BANKRUPTCY COURT
                DISTRICT OF DELAWARE
2

3   IN RE:                        .  Chapter 11
                                  .  Case No. 20-10343 (LSS)
4   BOY SCOUTS OF AMERICA AND     .
    DELAWARE BSA, LLC,            .  (Jointly Administered)
5                                 .
                                  .
6                                 .  Courtroom No. 6
                                  .  824 Market Street
7         Debtors.                .  Wilmington, Delaware 19801
                                  .
8                                 .  Friday, March 18, 2022
    . . . . . . . . . . . . . . . .  10:02 a.m.
9

10

              TRANSCRIPT OF ZOOM TRIAL (DAY 5)
11      BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
            CHIEF UNITED STATES BANKRUPTCY JUDGE
12

13  APPEARANCES:

14  For the Debtors:         Derek C. Abbott, Esquire
                             MORRIS, NICHOLS, ARSHT
15                             & TUNNELL, LLP
                             1201 North Market Street
16                           16th Floor
                             Wilmington, Delaware 19899
17

18

19

20  Audio Operator:          Brandon J. McCarthy, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Debtors:              Jessica C. Lauria, Esquire
                                 Andrew W. Hammond, Esquire
3                                Glenn M. Kurtz, Esquire
                                 WHITE & CASE, LLP
4                                1221 Avenue of the Americas
                                 New York, New York 10020
5
                                 Michael C. Andolina, Esquire
6                                111 South Wacker Drive
                                 Chicago, Illinois 60606
7

8  For the US Trustee:           David L. Buchbinder, Esquire
                                 OFFICE OF THE UNITED STATES TRUSTEE
9                                J. Caleb Boggs Federal Building
                                 844 King Street
10                               Suite 2207, Lockbox 35
                                 Wilmington, Delaware 19801
11

12 For AIG, on behalf of
   Certain Insurers:             James Hallowell, Esquire
13                               GIBSON DUNN & CRUTCHER, LLP
                                 200 Park Avenue
14                               New York, New York 10166

15                               Tyler H. Amass, Esquire
                                 1801 California Street
16                               Suite 4200
                                 Denver, Colorado 80202
17

18 For the Roman Catholic
   Ad Hoc Committee:             Jeremy W. Ryan, Esquire
19                               POTTER ANDERSON & CORROON, LLP
                                 1313 North Market Street
20                               6th Floor
                                 Wilmington, Delaware 19801
21

22 For Century Indemnity
   Company:                      Tancred Schiavoni, Esquire
23                               O'MELVENY & MYERS, LLP
                                 Times Square Tower
24                               7 Times Square
                                 New York, New York 10036
25

1   APPEARANCES (CONTINUED):

2   For the Ad Hoc
    Committee of Local
3   Councils of the Boy
    Scouts of America:         Joseph C. Celentino, Esquire
4                              WACHTELL, LIPTON, ROSEN & KATZ
                               51 West 52nd Street
5                              New York, New York 10019

6
    For The United Methodist
7   Ad Hoc Committee:          Edwin G. Rice, Esquire
                               BRADLEY ARANT BOULT CUMMINGS, LLP
8                              100 North Tampa Street
                               Suite 2200
9                              Tampa, Florida 33602

10
    For Liberty Mutual
11  Insurance Company:         Kim V. Marrkand, Esquire
                               MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
12                               AND POPEO, PC
                               One Financial Center
13                             Boston, Massachusetts 02111

14  For the Official
    Unsecured Creditors'
15  Committee of Guam:         Christine D. Arnone, Esquire
                               STINSON, LLP
16                             1201 Walnut Street
                               Suite 2900
17                             Kansas City, Missouri 64106

18
    For Lujan & Wolff
19  Claimants:                 Delia Lujan Wolff, Esquire
                               LUJAN & WOLFF, LLP
20                             238 Archbishop Flores Street
                               DNA Building, Suite 300
21                             Hagatna, Guam

22
    For Dumas & Vaughn
23  Claimants:                 Gilion C. Dumas, Esquire
                               DUMAS & VAUGHN, LLC
24                             3835 NE Hancock Street
                               Suite GLB
25                             Portland, Oregon 97212

1   APPEARANCES (CONTINUED):

2   For the Roman Catholic
    Diocese of Paterson:        Warren J. Martin, Jr., Esquire
3                               Rachel A. Parisi, Esquire
                                PORZIO, BROMBERG & NEWMAN, PC
4                               100 Southgate Parkway
                                Morristown, New Jersey 07962
5

6   For Gemini Insurance
    Company:                    John E. Baay, II, Esquire
7                               GIEGER, LABORDE & LAPEROUSE, LLC
                                701 Poydras Street
8                               Suite 4800
                                New Orleans, Louisiana 70139
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan        7
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6


7    WITNESSES CALLED
     BY THE DEBTORS:                                       PAGE
8
         BRIAN WHITTMAN
9        Direct examination by Mr. Hammond                     24
         Cross-examination by Mr. Baay                         66
10       Cross-examination by Mr. Buchbinder                   75
         Cross-examination by Ms. Lujan Wolff                  81
11       Cross-examination by Ms. Arnone                       84

12


13       BISHOP JOHN SCHOL
         Direct examination by Mr. Rice                        86
14       Cross-examination by Ms. Marrkand                    110
         Cross-examination by Ms. Lujan Wolff                 122
15

16


17       WILLIAM SUGDEN
         Cross-examination by Mr. Amass                       129
18       Cross-examination by Ms. Dumas                       137
         Cross-examination by Ms. Arnone                      158
19       Cross-examination by Mr. Buchbinder                  175
         Cross-examination by Ms. Lujan Wolff                 177
20       Redirect examination by Mr. Celentino                187
         Recross-examination by Ms. Arnone                    188

21

22

23

24

25

1                        EXHIBITS

2   EXHIBITS:                                      PAGE

3   JTX - 0772                                      65

4   JTX - 0775                                      65

5   JTX - 0865                                      65

6   JTX - 1006                                      65

7   JTX - 1057                                      65

8   JTX - 1418                                      65

9   JTX - 1451                                      65

10  JTX - 3035                                     122

11

12  EXHIBITS:                                      PAGE

13  DDX - 50                                        65

14  DDX - 51                                        65

15  DDX - 52                                        65

16  DDX - 54                                        65

17  DDX - 55                                        65

18  DDX - 56                                        65

19  DDX - 57                                        65

20  DDX - 58                                        65

21

22  DECLARATIONS:                                  PAGE

23  1) Declaration of William Sugden               127

24

25  Transcriptionist's Certificate                 197

1        (Proceedings commence at 10:02 a.m.)

2            THE COURT:  Good morning.  This is Judge

3   Silverstein.  We're back in the Boy Scouts confirmation

4   hearing.

5            Mr. Abbott.

6            MR. ABBOTT:  Good morning, Your Honor.  Derek

7   Abbott of Morris Nichols.

8            For some reason, Your Honor, the Court is not

9   appearing on the video --

10           THE COURT:  Ah --

11           MR. ABBOTT:  -- at least at my end.  I don't know

12  if others are able to see Your Honor or not.

13           THE COURT:  Okay.  Let's see if we can fix that.

14      (Court and court personnel confer)

15           MR. ABBOTT:  That worked.  Whatever happened, Your

16  Honor, we're able -- we can now see you.

17           THE COURT:  Okay.  Let me see.

18      (Court and court personnel confer)

19           THE COURT:  Okay.  We're good?

20           MR. ABBOTT:  We are.  Thank you, Your Honor.

21           And Your Honor, I want to pass it off, before we

22  start it with the real business of today, the -- to Ms.

23  Lauria for an important update on status, Your Honor, if I

24  may.

25           THE COURT:  Yes.  Ms. Lauria, good morning.

1        MS. LAURIA:  Thank you, Your Honor.  Jessica
2  Lauria, White & Case, on behalf of the debtors.

3        Your Honor, I'll be brief, but we did want to
4  bring to the Court's attention that, last night, the debtors
5  filed the twelfth mediators' report.  That was at Docket
6  Number 9386.  And that report announced to the Court and to
7  the parties that the debtors have reached an agreement with
8  the Roman Catholic Ad Hoc Committee.

9        We've all been working, Your Honor, behind the
10  scenes, while you've been hearing the evidentiary
11  presentations this week.  Mr. Ryan has been working very hard
12  with us, with Century, with the TCC, the FCR, the coalition,
13  the Ad Hoc Committee of Local Councils.  And we were very
14  pleased to reach the agreement that was announced yesterday
15  evening.

16        Just for the benefit of the Court, Your Honor, I'm
17  not going to rehash all of the terms of that agreement,
18  although it is brief and the termsheet can be found at that
19  docket number.  I'd say there are five or six key features to
20  it:

21        The first one, as the Court would expect, is that
22  the Roman Catholic Ad Hoc Committee will withdraw its
23  objections to the plan and will support confirmation of the
24  plan.  That includes withdrawing the objections that you
25  heard on, I think it was Monday morning, to the Whittman

1  declaration.

2          That's one reason, Your Honor, why we needed a

3  little bit more time.  We were continuing to work with Mr.

4  Ryan on those objections, but really on an overall resolution

5  to the Roman Catholic Ad Hoc Committee's objections.

6          The committee has also agreed to withdraw their

7  expert, so that takes two witnesses off of the list, that's

8  Mr. Averill and Ms. Kibler.  They were featured in the

9  pretrial order.

10          Second, Your Honor, the Roman Catholic Ad Hoc

11  Committee has agreed to support the Boy Scouts' and the local

12  councils through 20136, to improve and grow scouting over

13  that time period.  They've also agreed to support the Boy

14  Scouts' youth protection initiatives that you've heard about

15  this week.

16          Next, Your Honor, the -- all Roman Catholic

17  entities will be treated as participating chartered

18  organizations under the plan unless they specifically opt

19  out.  And I understand that Mr. Ryan and the Ad Hoc Committee

20  of Roman Catholics will work to convert those opt-outs back

21  into participating chartered orgs.

22          We will be establishing -- and again, this was

23  agreed to by the TCC, the FCR, and the coalition.  We will be

24  establishing a three-member chartered organization advisory

25  group to the settlement trustee; effectively, an advisory

1   committee like that a STAC.  But the intent of this advisory

2   committee is to provide chartered organization feedback on

3   issues that are particularly important to the chartered

4   organizations.  And a member of the Roman Catholic Ad Hoc

5   Committee will also be a member of that advisory group.

6           Your Honor, the debtors and the other parties to

7   this settlement have agreed that they won't object to a

8   substantial contribution request by the ad hoc committee up

9   to $1.5 million.

10          And then, finally, Your Honor, there were certain

11  terms that were in the plan, but I think were particularly

12  important to the Roman Catholic Ad Hoc Committee, that we

13  clarify those protections.  We thought they were clear, but I

14  think they wanted to make sure that they were crystal-clear.

15  We totally understand that and we agree to make those

16  changes.

17          So, with that, Your Honor, we've -- we're really

18  happy to take that objection off of your plate, and frankly,

19  to continue our partnership with the Roman Catholics, as very

20  important and critical chartered organizations to this -- to

21  the Boy Scouts of America going forward.

22          THE COURT:  Thank you.

23          MS. LAURIA:  I see Mr. Ryan and Mr. Schiavoni.  I

24  hope I stated or summarized the terms of the settlement

25  correctly.  But again, folks should refer to the termsheet if

1  they have any questions.

2          THE COURT:  Mr. Schiavoni.

3          MR. SCHIAVONI:  I was going to let Mr. Ryan go

4  first.  But I just wanted to thank him, Your Honor, for is

5  hard work, not just on this settlement, but also on the

6  Methodist settlement.

7          As you saw from the board minutes, I think the

8  other day, that were presented in evidence, we went together

9  into settlements of mediation, to some extent, with Mr. Ryan

10  and his various committee clients.  We worked hard together.

11  I'm glad to be back on the side -- the same side of the V

12  with Mr. Ryan, my good friend.  You know, these issues invoke

13  a great deal of passion and they're complex.  You've heard

14  this before, but I have never been in a negotiation like this

15  one, just the difficulty of it.

16          And there's two parties I'd like to just thank for

17  their effort that they put into this:

18          First of all, Mr. Kennedy and his committee.  You

19  saw him the other day.  They made themselves available, you

20  know, several times late at night, including the other day.

21  They're volunteers.

22          We appreciate, personally, that effort.  Their

23  lawyers Mr. Pachulski and Mr. Molton, who represents a

24  separate committee.  But they, themselves, also were

25  available, you know, 24/7.

1          And you haven't heard much about this, Your Honor,

2    and you won't because we're not going to talk about it.  But

3    you know, you have a mediator here, Tim Gallagher, who, you

4    know, privately, we're calling behind the scenes "Mr.

5    Hercules" for the effort he's made to get people in the same

6    room together, even when discussions have broken down.  It's

7    a 24/7 effort.  It's -- I think we've got him almost at the

8    end of -- his wits' end at this point.  But you know, he's --

9    this last round has really pushed him, and we're all

10   appreciative, I think, for Mr. Hercules or Mr. Gallagher

11   resolving this on St. Patrick's Day, so even better, Your

12   Honor.

13          There was significant support among the Catholic

14   charters going into this, there was an 80 percent vote in

15   favor.  Most had opted in.  But they had -- you know, they

16   had good faith questions and issues.  I think we've worked

17   those out, in large measure, with Mr. Ryan.  And there's

18   meetings with the remaining Catholic entities here.

19          The notion that -- I -- you know, you can't --

20   like the range of interests here from these charities to the

21   claimants to the banks to the insurers, I've never been in a

22   case where the parties are more different to start with.  So

23   we'll get to this in closing argument, but like the nature --

24   the notion that we have such a high level of support here for

25   the interlocking releases that are the glue that are tying

1  this all together, it's significant.  And it's something,

2  ultimately, that we'll talk about in closing, but it's

3  noteworthy.

4          Thank you, Your Honor, and thank you, Mr. Ryan.

5          THE COURT:  Thank you.

6          Mr. Ryan.

7          MR. RYAN:  Your Honor, I just wanted to echo what

8  Ms. Lauria and Mr. Schiavoni said.  It's been a tremendously

9  long and difficult negotiation for everybody.  You know,

10 we -- my clients only were in one part of it.  The multi-

11 faceted nature of this is something I've never seen, either.

12 You know, the White & Case's team commitment to going forward

13 with this has been incredible, what they're doing on a

14 negotiation basis, on a plan basis, and on a litigation

15 basis, all at the same time.

16         And we're very thankful for Mr. Schiavoni for

17 continuing to push forward.  Even in those times it got

18 tense, he was always resolution-oriented behind the scenes.

19         And I would also echo, you know, the efforts of

20 Mr. Gallagher, Your Honor.  I've never seen a mediator more

21 committed, who's working longer hours.  You know, he is --

22 he's up when we're up on the east coast, and he's up when

23 we're in bed on the west -- he's still up when we're all

24 going to bed.  I think he's sleeping about two hours a day.

25 So I hope Your Honor can have some appreciation of how hard

1  he's worked for this.

2         We're very pleased to have resolved our issues and

3  very pleased to be withdrawing our objection.

4         I can let Your Honor know I do have the parishes

5  for the Archdiocese of New York, they have executed their

6  opt-in form, so that is done.  All of the members of our

7  committee have executed the settlement agreement, I think

8  we're waiting one last receipt of the signature page.  And as

9  Ms. Lauria said, we're going to work with the debtors to

10 reach out to the rest of the Catholic organizations that have

11 opted out and explain to them why we believe it's a very good

12 result for the Roman Catholic Church, and why we would like

13 them to then opt back into the protected party status.  Thank

14 you, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Buchbinder.

17         MR. BUCHBINDER:  Thank you, Your Honor.  Good

18 morning.  Dave Buchbinder on behalf of the United States

19 Trustee.

20         The United States Trustee appreciates progress in

21 this case.  But progress in this case is often measured like

22 the Myth of Sisyphus, where you roll the ball up the hill one

23 foot and it drops back two feet.

24         Ms. Lauria has given you a report on the status

25 report filed last evening, but she didn't make a complete

1  report.  She told you the good stuff; she didn't tell you the

2  bad stuff.

3          I have three observations to make this morning to

4  add to the mediator's report:

5          The U.S. Trustee appreciates the fact that the

6  chartered organizations are going to have a subcommittee that

7  can provide advice to the trustee.  But as we saw yesterday,

8  the trustee's duties go only to the beneficiaries of the

9  trust, who are the direct abuse claims, and the trustee

10 doesn't have to accept any advice from any other committee.

11 Although we appreciate this as a small step in the right

12 direction, but it's sort of meaningless at this point in time

13 because it has no ability to enforce anything.

14         Number two, there's a pattern in this case in the

15 recent settlements (indiscernible) coalition, Pachulski,

16 Zalkin, and now the Catholics.  If they're going to get a

17 check, they're buying peace.  I'll just leave that where it

18 is for now.

19         The most important part of the new amendment

20 are -- is a plan amendment, a plan amendment that adds a new

21 definition to "Roman Catholic entities."  And this is

22 important because all of these entities are going to get a

23 release, more thousands of unknown persons to get a release

24 because "Roman Catholic entities" means:

25          "Each and every Roman Catholic parish, school,

1  diocese, archdiocese, association of religious or laypersons

2  in the United States or its territories that sponsored,

3  promoted, hosted, was involved with, or provided any support

4  in connection with scouting activities in any way, including

5  as a social service organization, ministry, camping ministry,

6  or by the use of a camp facility, camp retreat, or other

7  facilities in connection with scouting activities, regardless

8  of whether any of the foregoing entities is or was a

9  chartered organization at any time, or whether such

10  facilities were owed or leased by any of such entities or

11  third party."

12          Number 2:

13          "All entities listed or eligible to be listed in

14  the Official Catholic Directory since January 1910."

15          Number 3:

16          "All representatives of the foregoing, including

17  their attorneys, any affiliates, and the RCAHC.  However, no

18  perpetrator is or shall be a Roman Catholic entity."

19          "All the representatives" is another defined term

20  in the plan, which we'll deal with on another day.

21          But now that it's here, let's take a quick look at

22  the definition of "perpetrator," which is Definition 205 in

23  the latest version of the plan.  A "perpetrator" means:

24          "Any individual who personally committed or is

25  alleged to have personally committed an act of abuse that

1  forms the basis for an abuse claim.  The term 'perpetrator'

2  does not included any individual who did not personally

3  commit or is not alleged to have personally committed an act

4  of abuse that forms the basis for an abuse claim against whom

5  an abuse claim is nevertheless asserted or may be asserted,

6  including by virtue of such individual's position or service

7  as an employee or volunteer of the debtors or as a scout

8  participant, or by virtue of such individual's position or

9  service as an employer or volunteer of a local council or a

10  chartered organization, or as a scout participant."

11          And I believe that completes my report of the

12  status report and all of the points in it.  Thank you, Your

13  Honor.

14          Ms. Parisi -- ah.  You're muted.

15          MR. WARREN MARTIN:  Thank --

16          MS. PARISI:  Good morning, Your Honor.  Can you

17  hear me okay?

18          THE COURT:  Yes.

19          MR. WARREN MARTIN:  Yeah, thank you, Your Honor.

20  And Mr. Martin, as well as Ms. Parisi.  For some reason, I

21  think I'm showing up as my colleague's name, Ms. Parisi.

22          So Ms. Parisi and I represent the Roman Catholic

23  Diocese of Paterson, New Jersey.  And it might be a little

24  bit overly simplistic to say that the debtors had us at hello

25  because that's not quite the case.  But we have been a Roman

1  Catholic Diocese that has been supportive of the plan as it

2  has existed.  We evidenced our agreement to be a

3  participating chartered organization, gave notice of that,

4  joined as a mediation party in December, in order to become a

5  contributing chartered organization.

6          We are happy to see the ad hoc committee -- and

7  you know, folks might not be totally aware of the structure

8  of the Roman Catholic Dioceses in the United States, but they

9  are independent entities.  So I know the ad hoc committee

10 represents nine or so dioceses with one view.  We have had a

11 different view.  And we are, in fact, independent legal

12 entities.

13         We're happy to see this settlement.  I do have one

14 concern, which I think Mr. Ryan may have solved for me in his

15 presentation, but just a point of clarification:

16         Paragraph 2 of the termsheet, I'd like some

17 clarification that this is -- would not be deemed limiting

18 for organizations such as my client.  We have elected to be a

19 participating chartered organization, we have agreed to the

20 assignment that is necessary to do that, to contribute.  And

21 we are seeking to go a step further and become a contributing

22 chartered organization.

23         Paragraph 2, as this is written, would appear to,

24 at least from my client's perspective, create additional

25 obstacles to those steps that we've taken.  In other words,

1    unless the RCAHC withdraws its objection and the Archdiocese

2    of New York withdraw their objection, this might be read that

3    we wouldn't be treated as a participating chartered

4    organization.  And I'd like a representation from Ms. Lauria

5    or Mr. Ryan that that is not at all the intention of this

6    language, to eliminate those chartered organizations who have

7    already chosen to be participating.

8              MR. RYAN:  Your Honor, I'm happy to address from

9    that from the position of the Roman Catholic Ad Hoc

10   Committee.

11             Our goal in Paragraph 2 -- our goal in -- and you

12   know, you'll hear, I think, more from Bishop Schol about

13   this, too.  The goal of the Methodists and the Catholics to

14   the entirety of this case has been to look out for the

15   interests of all chartered organizations, not just those

16   denominations that spoke forward, and bring benefits to all

17   chartered organizations.

18             There is nothing in this settlement that is

19   intended to limit the ability of Mr. Martin or any other

20   current chartered organization that wants to achieve greater

21   protections and continue their negotiations with the debtors.

22   In no way, shape, or form are we trying to limit anybody.  We

23   have tried throughout these negotiations to bring clarity and

24   benefit to all charters, and then, through the definition of

25   "Roman Catholic entities," provide some level of comfort for

1  the Roman Catholic Church, similar to the level of comfort

2  that the United Methodist Church has with their definition

3  and their protections, although they are a contributing

4  charter, and we just lifting all Roman Catholic entities up

5  to the level of a participating chartered organization.

6         But we hope that those that want to continue

7  discussions with the other parties in the case towards larger

8  resolutions that work for those organizations, we would

9  encourage them to do so.

10        THE COURT:  Okay.  Thank you.

11        MS. LAURIA:  Your Honor, this is Jessica Lauria.

12 If I may just make a couple of comments, and then we'll turn

13 to today's evidentiary presentation.

14        One, I do believe I did actually mention both the

15 substantial contribution request, as well as the

16 participating chartered organization issue that Mr.

17 Buchbinder pointed out in my opening remarks.

18        I will say this:  The termsheet is very clear that

19 the Roman Catholic Ad Hoc Committee's substantial

20 contribution request is to be subject to a motion.  Mr.

21 Buchbinder can be heard when that motion is filed.

22        I'm sure, as the Court is aware, and as Mr.

23 Buchbinder will see and hear at that time, Mr. Ryan has been

24 a participant in this case for many months, working on behalf

25 of not only the chartered organization ad hoc committees that

1 he specifically represents, but also all other chartered

2 organizations.  But we'll have -- that's not before the Court

3 today, it's not before the Court in connection with this

4 plan.  The simple concept here is that the debtors and the

5 other parties won't object to that request.

6            Similarly, with respect to the definition of

7 "Roman Catholic entities," we are not expanding the

8 definition of "chartered organizations" or "representatives"

9 under the plan.  The groups of entities that were previously

10 captured by the plan's channeling injunction and release

11 provisions are still captured by the channeling injunction

12 and release provisions.  But just like the Methodist

13 entities, because the Roman Catholic entities have now

14 settled with the debtor and the estate and the TCC, FCR, and

15 coalition to be participating chartered orgs, they're looking

16 for some definition around who those participating chartered

17 orgs are.

18            We've always had a schedule on the claims agent's

19 website that lists the, I think 100,00 or so plus entities

20 that could be captured within the "participating chartered

21 organization" definition.  This simply provides additional

22 clarification to that.  But again, we'll deal with that in

23 closing argument, if the United States Trustee still has a

24 live objection at that time.

25            With that, Your Honor, I would propose that we

1  turn back to the evidentiary portion of today's -- or of the

2  confirmation hearing.  As Mr. Kurtz indicated yesterday, we

3  would like to get through as many witnesses as we can.

4         By the way, we think this resolution with the

5  Roman Catholic Ad Hoc Committee will greatly facilitate that,

6  not only because of the withdrawal of their witnesses, but

7  also reducing the amount of cross-examination of the debtors'

8  witnesses.

9         So we'll start with Mr. Whittman.  Mr. Hammond

10  will handle that.  You'll recall, Your Honor, that we had not

11  submitted a declaration for today's testimony of Mr.

12  Whittman.  We're expecting one to one and a half hours of

13  direct.  Based upon indications that we've seen, we're

14  thinking there could be about a half an hour of cross by

15  certain insurers, but we'll see when we hand the podium over.

16         After that, Bishop Schol with the United Methodist

17  Church will be testifying.  Mr. Ed Rice from the Bradley firm

18  will be presenting Bishop Schol.  We're expecting -- he did

19  not submit a declaration.  We're expecting around 30 minutes

20  of direct examination.  It's unclear to us if he's going to

21  be crossed; no one has indicated, at least to us, that he

22  will be.  But we'll ...

23      (Participants confer)

24         MS. LAURIA:  Oh, actually, I've just been informed

25  that the certain insurers are going to cross Bishop Schol.

1          And then, finally, we'd like to close out today

2   with the testimony of Will Sugden, who is a representative of

3   the Ad Hoc Committee of Local Councils.  Mr. Sugden did

4   present a declaration.  It's my understanding he's going to

5   be defended by Mr. Joe Celentino of the Wachtell firm.  He

6   did not -- we don't intend to provide any live direct; we

7   will rest of his declaration.  We understand that the Guam

8   TCC, certain insurers, and Ms. Dumas may have some cross-

9   examination for him, which may last a couple of hours.

10          THE COURT:  Okay.

11          MS. LAURIA:  And with that, I'll hand things back

12  over to Mr. Hammond, unless you have any questions, Your

13  Honor.

14          THE COURT:  I don't.  Thank you.

15          Mr. Hammond.

16          MS. LAURIA:  Thank you, Your Honor.

17          MR. HAMMOND:  Thank you, Your Honor.

18          Before I start, I believe you should have a binder

19  of Mr. Whittman's exhibits.  In addition, we have circulated

20  to the parties demonstrative exhibits, which are labeled DDX-

21  50 through 60.

22          THE COURT:  Yes.

23          MR. HAMMOND:  May I proceed, Your Honor?

24          THE COURT:  Mr. Whittman, I need to swear you in.

25  Will you raise your right hand?

1       BRIAN WHITTMAN, WITNESS FOR THE DEBTORS, AFFIRMED

2            THE COURT:  Will you please state your full name

3  and spell your last name for the record?

4            THE WITNESS:  Brian Whittman, W-h-I-t-t-m-a-n.

5            THE COURT:  Thank you.

6            Mr. Hammond.

7            MR. HAMMOND:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9  BY MR. HAMMOND:

10  Q    Mr. Whittman, would you please introduce yourself to the

11  Court?

12  A    I am a Managing Director with Alvarez & Marsal, and I

13  have served as the debtors' restructuring advisor since prior

14  to the Chapter 11 filing, beginning in August of 2019,

15  continuing through now.  I've worked with the debtors on a

16  wide range of matters.

17  Q    Could you please describe your educational background

18  since high school?

19  A    I attended the University of Illinois and received a

20  Bachelor's Degree in Accountancy and second Bachelor's Degree

21  in Finance.

22  Q    And what year did you graduate?

23  A    I graduated in 1994.

24  Q    Do you have any other professional certifications?

25  A    I'm a certified public accountant and a certified

1  insolvency and restructuring advisor.

2          MR. HAMMOND:  Can you call up JTX-1034?  And Your

3  Honor, this has already been admitted into evidence in

4  connection with Mr. Whittman's declaration.

5  BY MR. HAMMOND:

6  Q    But Mr. Whittman, can you tell the Court -- or identify

7  JTX-1034 for the record?

8  A    This is my CV.

9  Q    Mr. Whittman, is this current, to the best of your

10 knowledge?

11 A    It is.

12 Q    Mr. Whittman, would you please describe your work

13 experience since graduating from the University of Illinois?

14 A    I spent eight years at Arthur Andersen, primarily

15 working in the corporate restructuring group, advising

16 companies in distress through bankruptcy or out out-of-the-

17 court restructurings.

18      I then moved to AlixPartners in 2002.  I have been a

19 managing director there since 2008, primarily working with

20 companies in stress -- stressful situations or in bankruptcy

21 or restructuring situations, either as an advisor or, from

22 time to time, as an officer, either serving as a CFO or a

23 Chief Restructuring Officer, both for public and private

24 companies.

25 Q    And at what companies have you served as CFO?

1  A    I served as a CFO on PSAV, as well as Horizon Global.

2  Q    And what companies have you served as CRO for?

3  A    I was the CRO Of UCI International.

4  Q    Mr. Whittman, do you have any experience in preparing

5  financial projections or forecasts?

6  A    I do.  Virtually every engagement that I have had in my

7  career has involved either the preparation or the review of

8  financial projections.

9  Q    And do you have any experience in projecting compliance

10 with loan covenants?

11 A    I do.  My work typically involves addressing loan

12 covenant issues, whether from existing loan agreements,

13 negotiating amendments to loan agreements, or negotiating

14 covenants associated with new credit agreements.

15 Q    Have you ever offered testimony on the feasibility of a

16 plan of reorganization before?

17 A    I have.

18 Q    In what cases have you offered testimony on the

19 feasibility of a plan of reorganization?

20 A    I did in regarding the Tribune bankruptcy, also in

21 regarding UCI International, and most recently in Libbey

22 Glass.

23 Q    And what was the nature of your testimony in the Tribune

24 case?

25 A    In the Tribune case, I was the expert witness on

1  feasibility.

2          MR. HAMMOND:  Your Honor, at this time, I would

3  ask that the Court recognize Mr. Whittman as an expert on

4  financial restructuring.

5          THE COURT:  Is there any objection?

6          MR. BAAY:  No objection, Your Honor.  John Baay

7  with Gieger Laborde for Gemini Insurance Company and the

8  certain insurers.  We have no questions and no objections.

9          THE COURT:  Thank you.  I will accept Mr. Whittman

10  as an expert in that area.

11  BY MR. HAMMOND:

12  Q    Mr. Whittman, in connection with your work in this

13  matter, did you prepare any expert reports regarding

14  feasibility?

15  A    I did.  I submitted a report on December 5th, which was

16  amended and restated on December 29th, to account for

17  additional events that occurred in between those dates.

18  Q    And did you submit any supplemental reports?

19  A    I did.  I submitted a supplemental report to account for

20  the changing time line on emergence, as well as the 2021

21  actual results, and I submitted that about a week and a half

22  ago.

23  Q    Mr. Whittman, will you explain to the Court briefly the

24  process that you followed to analyze whether the debtors

25  would be able to meet their obligations as they came due, if

1  the plan is confirmed?

2  A    When I consider feasibility, I look first to the

3  projections, the preparation, and then understanding the

4  reasonableness of the financial projections, what liquidity

5  the projections indicate, and whether that liquidity is

6  sufficient to operate the business.

7      I looked to the debt structure and if the organization

8  would have the wherewithal to service that debt, what

9  financial covenants the debt includes and whether the

10 organization would be able to meet those financial covenants.

11     And then I stress-test the projections make sure that,

12 in a downside scenario, management would have time to take

13 corrective actions and still be able to operate the business

14 and meet its financial obligations.

15 Q    After conducting your analysis, did you reach any

16 conclusions as to whether the debtors' plan is feasible?

17 A    I did.

18 Q    And what conclusions did you reach?

19 A    The debtors' plan is feasible.  They have significant

20 liquidity to be able to meet their financial covenants and

21 service their debt.

22 Q    Let's start with financial projections.

23     As part of your work in this case, did you have any

24 involvement in the preparation of the debtors' financial

25 forecast and budgeting?

1  A    I did.

2  Q    What had -- what involvement did you have in that

3  regard?

4  A    Beginning in late 2020, I assisted the debtors with

5  preparing their 2021 bottoms-up budget, and then worked with

6  the debtors' management team to extrapolate the 2021 budget

7  and make reasonable assumptions to develop a five-year

8  business plan, including developing a model for that business

9  plan.

10     I reviewed actual performance as the organization moved

11 through 2021, updated those projections, including through

12 looking at and assisting with the development of the 2022

13 budget.  And that culminated in the updated financial

14 projections that are included in my report.

15          MR. HAMMOND:  Okay.  Could we turn to DDX-50?  And

16 for the record, DDX-50 is a slide titled:

17          "Updated Financial Projections Consolidated Income

18 Statement, 3/31/22 Effective Date."

19          THE COURT:  I am not finding that.  Just a second,

20 please.

21     (Pause)

22          THE COURT:  I've got it.  Thank you.

23          MR. HAMMOND:  May I proceed, Your Honor?

24          THE COURT:  Yes.

25          MR. HAMMOND:  Thank you.

1  BY MR. HAMMOND:

2  Q    Mr. Whittman, who prepared DDX-50?

3  A    I prepared it with the assistance of my team.

4  Q    And can you explain to the Court what is reflected on

5  DDX-50?

6  A    This document reflects and summarizes the financial

7  projections for the BSA and their related nondebtors on a

8  consolidated basis.

9       The first three columns reflect the actual results for

10  2019 through 2021, and the next four columns reflect the

11  updated financial projections for 2022 through 2025.

12       The top few rows provide information related to

13  membership.

14       The next section, entitled "Revenues" provides detail

15  on the organization's revenues.

16       The next section on operating expenses.

17       And then, coming to the bottom, the chart provides a

18  summary on the operating surplus or deficit of the

19  organization.

20  Q    Mr. Whittman, can you explain to the Court what

21  "operating surplus/deficit" refers to?

22  A    Operating surplus and deficit is analogous to EBITDA.

23  This is the organization's profit prior to considering

24  depreciation, amortization, interest expenses, restructuring,

25  and the like.

1      Notably, in 2019, you can see that the organization had

2  significant losses, $89 million of operating deficit.

3  Through significant actions of management, despite COVID, the

4  organization was able to cut that dramatically to a thirty-

5  one-million-dollar loss in 2020, and bring that to a positive

6  performance, positive $36 million, in 2021.

7  Q    Mr. Whittman, did you draw any conclusions from the

8  improved performance with respect to operating surplus of the

9  debtors from 2019 to 2021?

10 A    I guess.  It -- it really showed the ability of the

11 organization to make changes and manage its cost structure,

12 adapt to unforeseen circumstances, and put the organization

13 on the path to profitability.

14 Q    And Mr. Whittman, can I refer you to the column that

15 says, "Operating Surplus/Deficit After Restriction Release"?

16 A    Yeah.  So, at the bottom of the page here, first, as the

17 Court may recall the plan includes a settlement of a dispute

18 related to restricted assets.  As part of that settlement,

19 there is an agreement for the debtors to use $50 million of

20 restricted investments in accordance with their donor use

21 restrictions over the period of time shortly after emergence.

22     So you see, on that net assets restricted -- release

23 from restriction line is funds being released from

24 restriction to support operations.  In a typical year,

25 there's a relatively small amount that relates to specific

1  expenses that are incurred based on donor direction.  In 2022

2  and 2023, you see a more significant amount, $36 million and

3  26 million, respectively, which relates to honoring that

4  settlement.

5       And then the bottom line, the operating surplus after

6  release from restriction reflects the surplus the

7  organization generates in a particular year after utilization

8  of those restricted funds and, again, prior to servicing its

9  debt.

10 Q    And Mr. Whittman, what's the projected operating surplus

11 after restriction release for 2022 through 2025?

12 A    For 2022, it's $55 million; 2023, $54 million; 2024, $43

13 million; and 2025 is $48 million.

14 Q    And what's the projected total operating surplus from

15 2021 to 2025?

16 A    Two hundred and forty-four million dollars.

17          MR. HAMMOND:  Can you turn to Slide DDX-51,

18 please?

19 BY MR. HAMMOND:

20 Q    Mr. Whittman, in connection with your work, did you

21 compare the actual -- the debtors' actual financial

22 performance in 2021 to the forecasted financial performance

23 and the updated projections that you referenced?

24 A    I did.

25 Q    And can you explain to the Court how that comparison is

1 reflected on DDX-51?

2 A    Yes.  The first column is the actual results for 2020,

3 the second column, the actual results for 2021.  The column

4 reflects the updated financial projections that had been

5 included in my expert report for 2021, which had been based

6 on nine months of actual results and forecasted for the last

7 three months of the year.

8        What's reflected in the final two columns is a

9 comparison.  And if we focus in on the operating surplus row,

10 which is the gray-shaded row about three-fourths of the way

11 down the page, the actual operating surplus for 2021 was $44

12 million, which was about $23 million better than the updated

13 financial projections of $21 million.

14       And from a cash flow perspective, after debt service

15 and capital expenditures, the organization generated $50

16 million of free cash flow from operations, and that was $16

17 million better than the updated financial projections.

18 Q    And Mr. Whittman, what were the drivers for the improved

19 actual performance over the projected performance, as

20 reflected in DDX-51?

21 A    The improved performance was generated by two

22 categories:

23       First, there are a numbers of what I called "permanent

24 favorable items."  First, on the other expense line, $9

25 million of favorability reflects the organization's continued

1   management of benefits expenses, as well as other expenses,

2   such as travel and third-party services.

3        Next is supply operations, both from a revenue

4   perspective and an expense perspective, outperformed.

5   Revenue was $4 million higher than expected in the fourth

6   quarter, and expenses were $2 million lower than expected in

7   the fourth quarter.  All of those are positive developments

8   that I would expect to carry forward.

9        In addition, there were some timing favorability,

10  whereby the registration fees and the (indiscernible)

11  revenues, which are also labeled "unit charter fees," were

12  approximately $3 million favorable to forecast each, that

13  being a timing difference that would reverse in 2022.

14  Q    Mr. Whittman, did you draw any conclusions from this

15  comparison of the debtors' actual financial performance to

16  the debtors' updated projections?

17  A    I did.  I believed that the projections for 2022 through

18  2025 were reasonably conservation.  This -- this positive

19  result in 2021 further de-risks the projections going

20  forward.

21  Q    And just for the record, who prepared DDX-51?

22  A    I prepared this, with the assistance of my team.

23  Q    And jumping back to the financial projections for a

24  moment.  Are there any key assumptions with respect to the

25  plan that underlie the financial projections?

1  A    Yes.

2  Q    The business plan and the financial projections assume

3  the current plan of reorganization that is in front of the

4  Court.  So, for example, the plan of reorganization specifies

5  the initial capital structure of the reorganized debtors,

6  including the JPMorgan debt, the eighty-million-dollar note

7  issued to the settlement trust, the critical 42.8-million-

8  dollar foundation loan, which provides exit financing to the

9  organization.  All of that is incorporated into this business

10 plan and financial projection.

11     In addition, the plan contains releases for the local

12 councils, the related nondebtors, and the chartered

13 organizations.  Those releases are important and an important

14 assumption on which this business plan is developed.

15 Q    And how would the projections be impacted if you didn't

16 -- if you did not assume the releases would be provide under

17 the plan?

18 A    Absent the releases, as it relates, for example, to the

19 chart -- I'm sorry -- to the local councils, I would expect

20 there to be significant local council bankruptcy filings.

21 And that would place extreme pressure on membership, which,

22 in turn, would reduce revenue and, as a result, reduce the

23 cash flow generated by the organization.  That, in turn,

24 would render this plan not feasible.

25 Q    And how would the releases to the chartered

1  organizations impact the projections under the plan?

2  A    Similarly, chartered organizations not receiving

3  releases would have an impact on membership revenue that

4  we've seen over the last several months, a significant

5  organization and effort by the chartered organizations.  And

6  I believe that, absent these releases, there would be an

7  impact on the operations of the business, on the membership,

8  and that that also, given the position of the organization,

9  would render the plan not feasible.

10  Q    Mr. Whittman, what are the main factors which drive the

11  BSA's financial performance?

12  A    The primary driver of the BSA's financial performance is

13  membership.  Membership is the heart of the organization.  It

14  drives the membership revenue to the organization, it drives

15  supply sales and indirectly impacts virtually every other

16  line on the P&L.

17  Q    And what factors do you need to consider when

18  forecasting the projected membership of the BSA?

19  A    Membership is -- is driven by two immediate factors:

20      One, since membership is on an annual basis, what

21  portion of the membership is renewed and is retained by the

22  organization annually, versus the portion that leaves.

23      And two is the amount of recruitment of new members

24  that the organization is able to successfully generate each

25  year.

1           MR. HAMMOND:  Can you turn to DDX-52, please.

2  BY MR. HAMMOND:

3  Q    Mr. Whittman, who prepared DDX-52?

4  A    I prepared DDX-52, with the assistance of my team.

5  Q    Okay.  And can you explain to the Court what is

6  reflected on DDX-52 with respect to youth additions?

7  A    The top portion of the chart reflects, first, the

8  historical numbers of youth additions, starting with 521,000

9  in 2016, declining that to 474,000 in 2018, and then 405,000

10 in 2019.  I'll note that 2019 was impacted by the departure

11 of the Church of Jesus Christ of Latter Day Saints, and then,

12 in 2000 and -- 2020, which was heavily impacted by the COVID

13 crisis.

14      And then, going to the right, the financial

15 projections, the updated financial projections reflected a

16 rebound 210,000 additions in 2021, 279,000 in 2022, and then

17 a fairly flat path from there.  I will note that the 2021

18 additions were achieved and slightly exceeded, and that

19 reflected about 155 percent growth of the actual additions in

20 2020.

21 Q    Mr. Whittman, can you explain what's reflected on DDX-52

22 with respect to the retention of membership?

23 A    Yes.  In terms of retention, again, you can see, to the

24 right, that the retention levels for the main programs of

25 scouting, Cub Scouts, and Scouts BSA were very consistent

1  between 2016 and 2019.  There was some drop-off in the Cub

2  Scout retention in 2020.

3      And then the expectation -- and this is exactly what

4  happened -- is that, in 2021, there was a significant decline

5  in retention for Cub Scouts driven by the lack of programming

6  that occurred in 2020, due to the restrictions from COVID.

7  We saw continued strong retention, however, at the Scouts BSA

8  level in 2021.

9      And then, from a forecast perspective, we very

10 gradually returned that Cub Scout retention level back to

11 where it was in 2020, not back to where it was previously.

12 And we maintained that retention level for Scouts BSA that we

13 were able to achieve in 2020 and in 2021 on a go forward

14 basis.

15 Q    So, in terms of the projections, how do the actual

16 recognized retention rates from 2016 to 2020 compare to the

17 retention rates in the financial projections?

18 A    The historical rates were higher.

19 Q    Mr. Whittman, did you do anything in this case to assess

20 the reasonableness of the membership projection?

21 A    I did.  After we developed the additions and the

22 retention rates with the management team, I wanted to look at

23 the resulting total membership and how that total membership

24 trend going forward compared to the historical membership

25 trend, in order to make sure that the membership projections

1 were reasonable.

2 Q    And did you prepare any illustrations to reflect these

3 historical trends?

4 A    I did.

5         MR. HAMMOND:  We're going to skip a slide and go

6 to DDX-54.

7 BY MR. HAMMOND:

8 Q    Mr. Whittman, who prepared DDX-54?

9 A    I prepared this with the assistance of my team.

10 Q    And can you explain to the Court what is reflected on

11 the historical and forecasted membership levels in DDX-54?

12 A    This reflects that, from 2010 through 2019, there was a

13 gradual decline in scouting membership.  The bottom part of

14 this chart reflects the youth members and the top part in red

15 reflects the adult volunteers.  In the aggregate, from the

16 end of 2010 through the end of 2019, on a compounded annual

17 basis, there was a negative growth rate negative 3.3 percent.

18 Q    Mr. Whittman, were there any developments with respect

19 to BSA membership in 2019 that were reflected?

20 A    As I discussed the -- a moment ago, the TCJC departed.

21 They announced their departure in twenty -- in late 2018.

22 They -- that actually became effective at the end of 2019.

23 And the way the membership works, those members dropped off

24 the -- the rolls January 1st of 2020.  So, essentially, on an

25 adjusted basis, the membership at the end of 2019, after the

1    TCJC departure, declined to 2,358,000.

2    Q    And Mr. Whittman, what were the actual membership levels

3    in 2020 and 2021?

4    A    Again, heavily impacted by COVID, you saw a moment ago

5    the very low recruiting levels in 2020.  The membership

6    dropped to 1,692,000 in 2020, and then a more graduate

7    decline to 1,432,000 in 2021.

8    Q    And what are the -- what are the projections going up to

9    2025?

10    A    Through 2025, we expect membership to end 2025 at

11    1,415,000.

12    Q    And how do the projections compare to the historical

13    compound annual growth rate?

14    A    So this is the comparison I mentioned a moment ago that

15    I wanted to do to validate the underlying projections.  And

16    when I did, I looked to the end of 2020 (indiscernible)

17    incorporating the significant impact of COVID, compared that

18    to the end of 2025.  And from the end of 2020 to the end of

19    2025, membership declining with a compounded annual growth

20    rate of negative 3.5 percent, which is slightly worse than

21    the historic rate of 3.3 percent negative.

22    Q    Mr. Whittman, if you took out the impact of COVID from

23    the 2019 projections and assume the decline from the loss of

24    TCJC, what would be the membership, assuming a negative 3.5

25    percent on annual growth rate?

1   A    If I did that analysis, the BSA would have approximately

2   1.9 million members at the end of 2020 -- 2025, so

3   approximately 50,000 doll -- more that are included in the

4   forecast.

5   Q    Are you assuming any recovery from COVID in the

6   membership projections?

7   A    Not from the majority of the impact of COVID, no.

8   Q    Have you calculated the compound annual growth, assuming

9   the department of TCJC in 2019, based on the current

10  projections in 2025?

11  A    Yes.  If we took the calculation at the 2019 level as

12  adjusted for the departure of the TCJC, and compared that to

13  the end of the 2025, that would be a negative compound annual

14  growth rate over that time frame of a negative 8.2 percent,

15  which is approximately 2 and a half times worse than the

16  historic trend of the organization.

17  Q    Mr. Whittman, how, if at all, did your analysis affect

18  your assessment of the reasonableness of BSA's membership

19  projections?

20  A    This provided me with comfort that the membership

21  projections were reasonable.

22  Q    Mr. Whittman, in connection with your work in this

23  matter, did you consider any potential upsides to the BSA

24  projected membership from 2022 to 2025?

25  A    I did.

1   Q    And what are the potential upsides to membership?

2   A    Most notably, I considered the fact that the BSA had

3   been in quite a bit of turmoil during the preceding decade.

4   There were disputes around membership and -- and who would be

5   admitted.  Notably, during this period, scouting was opened

6   to homosexual youth; and, then, in 2018, towards the end of

7   2018, to females.

8        Further, throughout this decade, there had been

9   considerable publicity about the historic abuse and the

10  impact that that might have had on the numbers during that

11  ten-year period.

12  Q    Has there been any growth in female membership since it

13  was opened in 2018?

14  A    There has.  Scouting, today, is comprised probably --

15  between 10 and 15 percent of female members.  And I believe

16  that that has an upside opportunity for the organization, in

17  terms of putting some of that historical turmoil behind it

18  and allowing that growth to continue.

19  Q    And in connection with your work, did you consider if

20  there are any risks to the BSA of achieving its membership

21  projections from 2022 to 2025?

22  A    I did.  I considered risks around youth protection, as

23  well as risks among chartered organization departures, among

24  other factors.

25  Q    We had talked earlier about the departure of the TCJC.

1  Was there anything unique about the TCJC's relationship to

2  the BSA that led to a departure of 530,000 members in 2019?

3  A    There was.  The TCJC, which had been one of the BSA's

4  long chartered organization relationships back near to its

5  founding over a hundred years ago, was a particularly unique

6  relationship from the standpoint that the TCJC essentially

7  had its youth parishioners becoming members of scouting and

8  its adult leaders become leaders of scouting troops, and paid

9  for, at an aggregate level, those memberships, rather than

10  the members paying on an individual level.

11     In addition, when the TCJC departed, most notably the

12  TCJC created an alternative program to serve as its

13  (indiscernible) program in lieu of scouting and departed and

14  had its members move to that program.

15  Q    Are there any other chartered organizations of the BSA

16  that have relationships with the BSA similar to the TCJC?

17  A    No, there are not.

18  Q    Mr. Whittman, what was the risk to membership with the

19  disaffiliation of chartered organizations that you considered

20  in connection with your work in this matter?

21  A    At the time, I was preparing these projections, there

22  was a significant degree of tension related to the United

23  Methodist Church, as well as the Roman Catholic Church.

24  There was a risk that some of the churches within those

25  organizations could depart scouting, and that that would have

1  a negative impact on membership.  And I considered that

2  within some of my downside sensitivities for the plan.

3          MR. HAMMOND:  Could we turn to Tab 7, which is

4  JTX-1006?

5      (Pause)

6          MR. HAMMOND:  Page 2.

7  BY MR. HAMMOND:

8  Q    Mr. Whittman, have you seen this document before?

9  A    I have.

10 Q    What is it?

11 A    This is a press release issued by the United Methodist

12 Church, specifically from the United Methodist Ad Hoc

13 Committee, which is a group that the church had created to

14 negotiate and address the issues raised by the Boy Scouts of

15 American bankruptcy.  And in this press release, the United

16 Methodist Ad Hoc Committee -- and this was on December 2nd,

17 2021 -- recommended that all of its churches within the

18 United Methodist Church, all of the individual churches, vote

19 no on the BSA bankruptcy plan.

20         MR. HAMMOND:  And can we turn to Tab 6, which is

21 JTX-725?

22     (Pause)

23         MR. HAMMOND:  And can we turn to Page 2, the BSA

24 plan, ending in 331?

25 BY MR. HAMMOND:

1  Q    Mr. Whittman, have you seen this document before?

2  A    I have.  This is an email from Bishop David Bard from

3  the United Methodist Church, I believe the head of the

4  Minnesota Conference of the United Methodist Church, in which

5  he encourages the churches in his conference no longer to

6  charter BSA troops and packs but does offer the possibility

7  of entering into facilities use agreements.

8           MR. HAMMOND:  Can we turn to the next page here,

9  the bottom?

10  BY MR. HAMMOND:

11  Q    Is this what you're referring to, Mr. Whittman?

12  A    That is what I'm referring to.

13  Q    What is a "facilities use agreement"?

14  A    A facilities use agreement is, much as this email says,

15  essentially a lease, so a lease to allow a Boy Scout unit to

16  use space within the church.

17           MR. HAMMOND:  Can we turn to Tab 5, please, which

18  is JTX-772?

19  BY MR. HAMMOND:

20  Q    Mr. Whittman, can you -- have you seen this document

21  before?

22  A    I have.

23  Q    What is this document?

24  A    This is the facilities use agreement or a form of the

25  facilities use agreement that was developed with the United

1  Methodist Church.

2  Q    Okay.  Now, in connection with the projections, did the

3  BSA have any plans in place to address potential departures

4  of chartered organizations?

5  A    We did.  The BSA had plans to look at opportunities to

6  shift units from one chartered organization to another, to

7  enter into facilities use agreements such as this to allow

8  units to continue to meet in a particular chartered

9  organization's space, but to shift the charter arrangement to

10  a direct relationship with a local council or to shift it to

11  a group of parents.  All of those contingency plans, again,

12  would be helpful, to the extent there was the departure of a

13  particular chartered organization, although not necessarily

14  to the extent --

15          AUTOMATED VOICE:  Five hundred dollars for dental

16  coverage and up to eighty-three dollars every month --

17          THE COURT:  Excuse me.  Please mute your audio.

18      (Pause)

19          THE COURT:  I think we're okay.

20          MR. HAMMOND:  Should I continue, Your Honor.

21          THE COURT:  Okay.  We're back.

22          THE WITNESS:  All of these contingency plans would

23  have been useful for the departure of a single group of

24  chartered organizations, but that likely would have fall

25  short if there were multiple organizations.

1  BY MR. HAMMOND:

2  Q    Mr. Whittman, how, if at all, did you do the risk that

3  chartered organizations were disaffiliated from the BSA at

4  the time you were considering your membership?

5  A    I considered it to be relatively low; although, the

6  chartered organizations were threatening some departures at

7  the time.  I believed that the treatment under the plan, the

8  releases under the plan that provided to chartered

9  organizations in exchange for the insurance rights that they

10  are contributing to the trust ultimately were reasonable and

11  would not give the chartered organizations a reason to

12  depart.

13  Q    Has anything happened to date, since you compared your

14  expert reports, that has impacted your view of the risk to

15  membership associated with the disaffiliation of chartered

16  organizations?

17  A    Yes.  There has been several key developments.

18  Q    What developments were those?

19  A    First, after I issued my expert reports and before I

20  issued my reports during December 2021 the BSA reached a

21  settlement agreement with the United Methodist Ad Hoc

22  Committee under which the committee agreed to support the

23  plan, withdrawal objections, and to encourage the United

24  Methodist Churches to support scouting and work to grow

25  scouting through 2036.  That significantly de-risks any of

1  the departure from the United Methodist Church.

2      I should note that the United Methodist Church is the

3  single largest chartered organization.  The units that it

4  charters represent approximately 20 percent of the youth

5  membership of scouting.

6      The second development was that as the plan came into

7  the final form that it is today following the settlement with

8  the TCC.  The plan contains what I would view as reasonable

9  releases that are tied to the insurance rights the chartered

10 organizations are giving up.  So in other words, I believe

11 that the chartered organizations feel that they are well

12 treated or properly treated under the plan.  That has been

13 evidenced by the fact that relatively few chartered

14 organizations have either opted out of that treatment or have

15 objected to the plan.

16     Finally, this morning's announcement from Ms. Lauria

17 that we have reached an agreement with the Roman Catholic Ad

18 Hoc Committee in which that committee is, again, going to,

19 similar to the Methodists, work to grow scouting through

20 2036.  All of that significantly -- essentially, from my

21 perspective turns what had been a risk factor to the

22 projections into an

23 upside opportunity.

24 Q   Mr. Whittman, just a point of clarification.  How many

25 members are affiliated with the Roman Catholic Church?

1  A    The Roman Catholic Church is the second largest

2  chartered partner today and represents approximately 12

3  percent.  The units chartered by Catholic Churches represent

4  approximately 12 percent of the youth membership of the BSA.

5  Q    You had mentioned youth protection earlier as a risk

6  factor that you considered.  Have any developments to date

7  since the time you prepared your report minimized the

8  potential risks associated with these protections?

9  A    There have.  Since the development of my report the

10 settlement with the TCC takes the foundation of the existing

11 BSA youth protection measures, the enhancements that had been

12 agreed upon with the coalition and further expands those

13 efforts and reduces the risk that failures in youth

14 protection would be a downside risk to membership.

15 Q    Mr. Whittman, I would like to turn subjects for a

16 minute.  I would like to talk about the five year business

17 plan. Now that we have completed membership can you turn to

18 JTX 865, please, which is tab one in your binder.

19      Mr. Whittman, can you explain to the court what JTX 865

20 is?

21 A    This is a presentation that I prepared together with

22 the management team at BSA to detail out the assumptions

23 behind the five year business plan.  This presentation was

24 prepared to support the business plan that was included in

25 the disclosure statement back in September of 2021.

1    Q      Can we turn to page 3, please.

2          Mr. Whittman, can you just explain to the court, at a

3    very high level, what the contents of this business plan are?

4    A      Sure.  This plan has what you would expect from a

5    financial statement perspective, an income statement, a

6    balance sheet and a cash-flow.  It goes through each of the

7    key areas of the business in terms of, as we said,

8    membership, components of the business such as the High

9    Adventure Base, the supply group, other sources of revenue.

10   On the expense side head count, other operating expenses,

11   other key liabilities such as the pension plan, various risks

12   and opportunities as well as how this business plan fits in

13   with the plan of reorganization in terms of the capital

14   structure and what happens on the effective date in terms of

15   the sources and uses of cash.

16   Q     And can we turn to slide 8 in the declaration, please.

17   And can we turn to the next slide.

18         Mr. Whittman, can you explain what is reflected on

19   slide 8?

20   A     This slide summarizes some of the key assumptions

21   behind those same areas of the business plan in terms of

22   membership, supply, High Adventure Bases.  It continues on to

23   talk about the other components of the business plan.

24   Q     Can we turn to slide 9, please?

25   A     These being some of the key expense components of the

1  business plan.

2  Q     Can you detail what some of the key expenses are to the

3  business plan?

4  A     Payroll and benefits is one of the largest expenses of

5  the BSA.  There is expense associated with the supply

6  operation including a payroll and benefits versus that

7  operation as well as purchases of inventory.  There is the

8  operation of the High Adventure Bases and various other

9  expenses.

10 Q     Mr. Whittman, earlier today you mentioned you had

11 prepared a model.  Can we turn to JTX 1057? Mr. Whittman,

12 explain to the court what JTX 1057 is?

13 A     This is the Excel model that was developed by my team

14 under my direction that we used to document assumptions that

15 we developed with management as well as to then take those

16 assumptions and generate an income statement, balance sheet,

17 and cash-flows to 2025.  This version of the model it is the

18 version that supports the updated financial projections that

19 were based on here to date September results for 2021.  It

20 was included in my expert report.  This particular tab that

21 we're on at the moment are the assumptions around membership

22 and that some of the same items we were going through a

23 moment ago.

24 Q     And can we turn to the other assumptions tab?

25       Mr. Whittman, can you just explain to the court what

1  some of the other assumptions are aside from those that we

2  just walked through in the business plan?

3  A     This tab details out, essentially, all of the other

4  assumptions that drive the five year model.  Their

5  assumptions are around operating expenses.  There are

6  assumptions around the supply business in terms of sales per

7  youth.  As we move down there's assumptions around the

8  expenses to the supply operation.  As we continue to move

9  down there's expenses with payroll, assumptions on the High

10 Adventure Bases including on a High Adventure Base the High

11 Adventure Base bases.  The revenue and the expenses

12 associated with each of the High Adventure Bases.

13       As we continue to move down there are assumptions on

14 other revenues including from events, and contributions and

15 requests.  There are assumptions on other corporate payroll.

16 Assumptions on liability insurance which is the most

17 significant expense of the organization as well as other

18 expenses and down to capital expenditures and the debt

19 service costs.

20 Q     Was this the formation -- these assumptions are the

21 formation of the projections that were prepared?

22 A     They are.

23 Q     Can you turn to DDX 55, please? Actually 55 is a slide

24 title, estimated operating surplus and liquidity impact of

25 delayed effective date for March to June 2022.

1          Mr. Whittman, who prepared DDX 55?

2    A     I prepared this with the assistance of my team.

3    Q     And why was this document prepared?

4    A     As we approach this confirmation hearing given that now

5    we had actual results for 2021 we also had a different

6    timeline.  As I believe I mentioned, the financial

7    projections had assumed an emergence of March 31st.  Given

8    that we're sitting here on March 18th that is not happening.

9    So I wanted to look at an emergence out as late as June 30th

10   of 2022 and confirm that with the latest information that my

11   assessment on the business plan is feasible remained

12   unchanged.

13   Q     And based on your analysis here what was the impact on

14   the debtor's liquidity as changing the emergence date from

15   March to June?

16   A     Unfortunately, as you can see in the very bottom row

17   that by -- there's some timing that moves the number up and

18   down, but by the time you get to 2024 and 2025 the impact of

19   the delay in emergence is that the BSA will have $20 million

20   loss of liquidity as a business plan then it would have had

21   emergence occurred sooner.

22   Q     And, Mr. Whittman, there's a box in red on slide DDX

23   55, can you explain what that box refers to?

24   A     That is the latest projection in terms of how much cash

25   the BSA will have at emergence after effectuating various

1 transactions that occur on the effective date and immediately

2 after the effective date.

3 Q    And how was the $27 million calculated?

4 A    I calculated that with the assistance of my team.

5 Q    Can we turn to JTX 1418 which is behind tab three?

6      Mr. Whittman, can you explain what JTX 1418 is?

7 A    This is a presentation that I prepared to the

8 bankruptcy taskforce of the board of directors that was

9 presented on February 15th, 2022.

10 Q    And can we turn to page 2?

11     Mr. Whittman, can you explain to the court where on

12 page 2 the $27 million is referenced?

13 A    Yes.  If you look four lines from the bottom the line

14 titled estimated starting unrestricted liquidity for

15 reorganized BSA, and you go four columns in to the column of

16 June 2022 you can see $26,638,000; that is the $27 million

17 referenced on the other slide.

18 Q    And how was that number calculated?  Can you just

19 explain the column under June 2022?  Can you explain how we

20 arrived at $26,638,000?

21 A    Sure.  We start with the expected cash that reorganized

22 BSA would have heading into the emergence process.  Then if

23 you look at the requirements of what the BSA is required to

24 pay or reserve for on the effective date.

25     First, BSA would need to reserve for the professional

1  fees, the accrued, but unpaid professional fees of the

2  effective date.  That amount is just under $64 million and

3  that would be inclusive of all the professionals of the

4  debtors, the TCC, the UCC, the FCR, JP Morgan, everything

5  that is paid for by the debtors.

6       The next line reflects $20,950,000; that is the reserve

7  for the Coalition claim for substantial contribution.

8       Then the next subtraction, if you keep moving down, is

9  $7,808,000; that is for administrative claims and other

10  payments that are required to be paid on the effective date.

11  It is inclusive of the $2 million Hartford administrative

12  claim, it is inclusive of the convenience class claims that

13  are paid out on the effective date.  Also, on the effective

14  date, BSA receives its exit financing in the form of a

15  foundation loan; that is $42.8 million.

16       The result is that BSA at the effective date will first

17  have $7,888,000 and then as I mentioned there is a settlement

18  restricted investments and under that settlement the BSA is

19  agreed to use $50 million over time in accordance with the

20  youth restrictions.  They have identified approximately $19

21  million that can be used in relatively short order.  So we

22  reflect that $19 million as becoming available to the BSA at

23  that time which leaves us with our starting liquidity for

24  reorganized BSA of $26.6 million.

25  Q    Mr. Whittman, can you go to the very top slide there

1  and it says below reflects youth proceeds of Scouting U NDC

2  and assumes accelerating availability of $19 million of

3  restricted cash to June 30th, immediately post-emergence.

4  Can you explain to the court what that refers to?

5  A    Yes.  As part of the agreement with the TCC as now

6  embodied in the plan the BSA negotiated to be able to use the

7  proceeds of the Scouting U sale and the pending sale of the

8  National Distribution Center in order to help bridge and fund

9  the organization for the movement of the assumed effective

10  date of the plan from March to the end of June.  That

11  provided approximately $15 million which helped to bridge

12  that gap.

13       Also as part of that there was an agreement to share

14  some of that money back to the trust depending on the cash

15  position of the organization at the effective date.  If you

16  look at the effective date transactions, when I went through

17  the June column I didn't speak about this that both of the

18  numbers of are zero.

19       If you looked at March, for example, there would have

20  been $9 million going to the trust under the original formula

21  in the plan and additionally another $7 million going to the

22  trust for the sharing agreement on the proceeds of the sale

23  of those two buildings.  Unfortunately that -- both of those

24  numbers dissipate to zero by the time you reach June.

25       I would also just point out that as you move to the

1  right not only have those numbers reached zero, but when you

2  get to July of 2022 BSA would be starting with negative cash,

3  negative $4,876,000 prior to releasing those assets and

4  restrictions.  That means that BSA is unable to pay all of

5  the administrative costs that are required to be paid and

6  reserved for in emergence.

7  Q    Mr. Whittman, can we turn to DDX 56, please, regarding

8  estimated capital structure?  Mr. Whittman, who prepared DDX

9  56?

10  A    I was -- this was prepared by my team under my

11  direction.

12  Q    And can you explain to the court what is reflected on

13  DDX 56?

14  A    DDX 56, at the top, reflects the capital structure for

15  the debtors both pre-emergence and post-emergence as

16  discussed by in the plan.  So if you look at the effective

17  date column you can see the JP Morgan secured debt as of the

18  effective date, the issuance of the BSA settlement trust note

19  for $80 million, the commitment to the core value cash pool

20  of $25 million and the receipt of the foundation loan of $73

21  -- sorry, $42.8 million which gives BSA a starting debt of

22  $409 million.  The BSA, of course, puts the abuse liability

23  behind it which results in a deleveraging of BSA down to that

24  $409 million going forward.

25        The bottom part of the page reflects that at the end of

1  2022 BSA would have a secured leverage ratio of 9.7 times

2  which would go down to five times by the end of 2025, and a

3  total leverage ratio of 14.9 times which would go down to 7

4  times by the end of 2025.

5  Q     Mr. Whittman, in connection with your work in assessing

6  feasibility did you consider the leverage that the debtors

7  could support?

8  A     I did.

9  Q     Did you have an opinion as to whether the debtors could

10 support this amount of leverage?

11 A     I did.  I do.  While the leverage ratio is high there

12 is several important reasons why the BSA is able to support

13 this debt based on its plan.

14 Q     What reasons are those?

15 A     First of all the debt all has long maturities.  Other

16 than the $25 million core value cash pool all other

17 components of a maturity of 10 or more years.  So there is a

18 significant period of time where this debt could be paid.

19       Secondly, 80 percent of the debt that BSA has is fixed

20 rate debt.  So BSA is not going to be exposed to what we have

21 all been reading in the news about the increases in interest

22 rates.  The interest rates, themselves, are relatively low.

23 The JP Morgan debt is around 2 percent.  The settlement trust

24 loan and foundation loan in the 5 to 6 percent range.

25       Finally, the amount of total debt service, which climbs

1  over the first couple of years, ultimately reaches about $40

2  million a year in total debt service; that is principal and

3  interest.  That amount is less than the operating cash-flow

4  that is being generated by the BSA and, therefore, the BSA is

5  able to meet its debt service.

6  Q    Mr. Whittman, did you consider at all the loan

7  documents?

8  A    I did.  As I mentioned earlier, in considering

9  feasibility, loan covenants are an important measure.  The

10 only financial covenants contained within the debt are the JP

11 Morgan debt has two financial covenants which I focused on.

12 The foundation loan has the same two covenants but set at a

13 looser level.  So the only two that matter for feasibility

14 are the JP Morgan covenants.

15 Q    Can we turn to JTX 1-451 which is tab ten in your

16 binder.  Can we turn to page 2 of 85 at the top?

17      Mr. Whittman, can you explain to the court what is

18 reflected in JTX 1-451?

19 A    This is one of the three JP Morgan credit agreements.

20 When I referred to the JP Morgan debt before there are three

21 components to that debt; the 2010 bond debt which is being

22 restated, the 2012 bond debt which is being restated, and the

23 credit agreement which covered a prior revolver and term loan

24 which is being restated.  I should note that all three of

25 those agreements have the same financial covenants.

1   Q     Can we turn to PDF page 50 or Section 6.3 in JTX 1-451

2   which is on page 42.

3         Mr. Whittman, when you referred to financial covenants

4   earlier is this what you were referring to?

5   A     It is.

6   Q     Can you explain to the court what covenants you were

7   referring to specifically?

8   A     So 6.3(a) is the first covenant.  This is the minimum

9   liquidity covenant which reflects that the BSA together with

10  the related non-debtors needs to have a certain amount of

11  liquidity.  It's tested twice a year, so the end of June and

12  the end of December beginning with December 31st of 2022.

13  Q     Can you turn to 6.3(b), please?

14        Mr. Whittman, what is reflected in Section 6.3(b)?

15  A     This is the second financial covenant.  This is a

16  consolidated debt service coverage ratio which compares the

17  operating surplus of the BSA to the amount of debt service.

18  It specifies, again, this is something that is tested at June

19  and December of each year.  The ratio changes over time, but,

20  for example, during the first three tests of December 31st,

21  2022 through December 31st, 2023 the required ratio is one to

22  one.

23  Q     Mr. Whittman, in connection with your work in this

24  matter did you prepare any analysis to determine whether the

25  debtors could comply with these loan covenants, and the new

1  liquidity covenant, and the debt service covenant?

2  A     I did.

3  Q     Can we turn to slide DDX 57, please?

4       Mr. Whittman, can you explain to the court what is

5  reflected on DDX 57 with respect to debt service coverage?

6  A     This is my analysis of the debt service coverage ratio

7  based on the updated numbers that we spoke about a moment ago

8  reflecting a June 30th emergence.  What you can see in the

9  top row, this is the total operating surplus after the

10 release from restriction.  That is the number we saw on an

11 earlier slide and that is the basis for the calculation of

12 the covenant.  The other component of the covenant

13 calculation is the estimated prior 12 month debt service.

14     I will note that the debt service in a calculation of

15 the covenant only includes three of the four components of

16 debt.  It includes the JP Morgan debt, the foundation loan

17 and the core value pool.  It does not include the settlement

18 trust notes and that is why you see numbers here that top-off

19 around $27 to $28 million whereas the total debt service tops

20 off about $40 million.

21 Q     Based on your analysis did you reach any conclusions as

22 to whether the debtors would be able to comply with the debt

23 service coverage ratios?

24 A     I did.  I calculated the ratio which is reflected in

25 the gray bar.  I compared that to a number below which is the

1  ratio required under the credit agreement.  You could see,

2  for example, December 2022 we have a coverage ratio of 2.8

3  times as compared to the covenant of one time.  From a

4  cushion standpoint on a dollar basis the cushion at that

5  point is $29 million or 64 percent.  The cushion ranges

6  anywhere from $19 to $29 million in terms of the operating

7  surplus on a percentage basis between 40 and 64 percent.

8      In my experience covenants are often set at a 10 to 20

9  percent cushion and I found this cushion to be reasonable in

10 terms of BSA's ability to meet these covenants.

11 Q    Mr. Whittman, based on your experience as a financial

12 restructuring expert do the debtors have sufficient financial

13 cushion under the debt service covenant to meet --

14 A    They do.

15 Q    And, Mr. Whittman, can we turn to the bottom portion of

16 the slide that refers to minimum liquidity on restricted cash

17 investments.  Did you analyze whether the debtors could

18 comply with the minimum liquidity covenant in the JP Morgan

19 (inaudible)?

20 A    I did.  So here at the top line is the liquidity of

21 both the BSA and the related non-debtors as specified in the

22 credit agreement and approved forecast that we went through a

23 moment ago.  I compared that to the covenant levels and, for

24 example, the December 2022 estimated unrestricted cash and

25 investments $31 million is $11 million higher than the $20

1  million covenant level.  You can see across the page that

2  cushion ranges from $10 to $34 million and between 23 and 49

3  percent.

4  Q    Mr. Whittman, did you reach any conclusions, based on

5  your analysis, of the debtor's projected financial

6  performance as compared to the requirements and the minimum

7  liquidity covenant?

8  A    I did.  The cushion, again, is substantial and

9  reasonable in light of my experience with other covenants.

10 Q    And in connection with your work in this matter did you

11 conduct any stress testing to assess the feasibility of the

12 plan?

13 A    I did.

14 Q    Can you turn to DDX 58, please?

15      Mr. Whittman, who prepared DDX 58?

16 A    I prepared this with the assistance of my team.

17 Q    Can you explain to the court what is reflected on DDX

18 58?

19 A    The top portion recaps the projections that we just

20 went through.  On the bottom portion of the slide I assume

21 that there are 50,000 fewer additions of youth members in

22 2022.  I then compare and run through the impact that that

23 would have using the financial model that we discussed.

24      I see that, first, from an operating surplus covenant

25 standpoint, while the cushion is lower there remains cushion

1  on the operating surplus from 2022 to 2025 as reflected on

2  the green highlighted ratios and is the cushion amount.

3      Second, I looked at the liquidity and while the

4  liquidity wouldn't be lower than in the financial projections

5  you would still have anywhere from 29 going up to 60, then

6  back down to $49 million of liquidity.  That amount would

7  still have cushion to the financial covenant as reflected in

8  the green shaded bar.

9      Importantly, not only is there cushion throughout the

10 four year period, but this is a unilateral assumption on the

11 downside, simply taking up 50,000 members does not reflect

12 any actions by management to control costs or take any

13 mitigating steps associated with that downside.  The past two

14 years have shown management has and will take those steps.

15 Further, this analysis shows that there is ample time for

16 management to take those steps.

17 Q    Mr. Whittman, after conducting your analysis of the

18 debtor's projected financial performance, as compared to

19 their future obligations, did you form an opinion as to

20 whether the debtors will be able to meet their financial

21 obligations as they come due throughout the forecast period?

22 A    Yes, I did.  I am comfortable that the debtors can meet

23 their financial obligations as they come due during the

24 period, maintain sufficient liquidity to operate the business

25 and meet their financial covenants.  In other words, I

1  believe the debtor's plan is feasible and remains feasible.

2          MR. HAMMOND:  Your Honor, at this point in time I

3  would like to introduce JTX 0865, 1418, 1057, 772, 725, 1006,

4  and 1-451, along with DDX 50, 51, 52, 54, 55, 56, 57, and 58.

5          THE COURT:  Are there any objections?

6          MR. BAAY:  Your Honor, again, John Baay for

7  certain insurers.  I was trying to follow those numbers. I am

8  assuming that none of those numbers represent his expert

9  report.  I don't think they did.  To the extent that the

10  demonstrative, obviously, is being introduced for that

11  purpose we don't have any objection.

12          THE COURT:  Mr. Hammond, can you confirm that

13  these were the exhibits that you used during the examination?

14          MR. HAMMOND:  That is correct, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          MR. BAAY:  Thank you, Your Honor.

17          THE COURT:  They're admitted.

18      (Exhibits JTX 0865, 1418, 1057, 772, 775, 1006, 1-451,

19  DDX 50, 51, 52, 54, 55, 56, 57, 58 received into evidence)

20          MR. HAMMOND:  No further questions, Your Honor.

21          THE COURT:  Mr. Baay, I want to take five minutes.

22  My screen is doing something funny, and I want to correct

23  that, and give you a moment to get your thoughts together for

24  cross.

25          MR. BAAY:  Your Honor, if we could make it ten

 1  minutes I think the cross will actually even be better.

 2            THE COURT:  Yes, 10 minutes.

 3            MR. BAAY:  Thank you, Your Honor.

 4            THE COURT:  Thank you.

 5        (Recess taken at 11:36 a.m.)

 6        (Proceedings resumed at 11:50 a.m.)

 7            THE COURT:  This is Judge Silverstein.  We're back

 8  on the record.

 9            Cross-examination, Mr. Baay.

10            MR. BAAY:  Good morning.  Again, Your Honor, John

11  Baay, Gieger Laborde & Laperouse, for Gemini Insurance

12  Company and certain insurers.

13                      CROSS-EXAMINATION

14  BY MR. BAAY:

15  Q    Good morning, again, Mr. Whittman.

16  A    Good morning, Mr. Baay.

17  Q    When you testified earlier on direct you used, and

18  determined, and gave the court your opinion that the plan is

19  feasible.  In that respect you are not -- feasibility doesn't

20  require a guarantee of success, but rather a reasonable

21  assurance of success, agreed?

22  A    I agree.

23  Q    And some of the factors that you went through in your

24  direct, and that courts and experts like yourself look at to

25  determine feasibility are things like the adequacy of the

1  debtor's capital structure, correct?

2  A     Correct.

3  Q     And the earning power of the business organization,

4  correct?

5  A     Correct.

6  Q     I would like to talk to you about a couple of things

7  that you did mention or did not look at to determine

8  feasibility.

9         Matt, if you could pull-up, please, from the fifth --

10  sorry, third modified, fifth amended plan at Docket 8813, and

11  its JTX 1-353.  And please go to Article IV(a)(3)(w).  I

12  believe it's on page 118 of 459 on the PDF.

13         Are you able to see that?

14  A     I can.

15  Q     And it reads,

16         "The plan documents, including the plan, and the

17  confirmation order shall be binding on all parties in

18  interest consistent with applicable legal doctrines,

19  including the Doctrine of *res judicata,* and collateral

20  estoppel, and Section 1141 of the Bankruptcy Code, and

21  related legal authorities."

22         Correct?

23  A     Correct.

24  Q     And would you agree that plan documents including the

25  TDP's are the trust distribution procedures?

1   A     I am aware that those are an exhibit to the plan so,

2   yes, I would agree with that.

3   Q     And you would agree, as several people have already

4   testified, that the settling insurers -- the - sorry, the

5   non-settling insurers are parties in interest, correct?

6              MR. HAMMOND:  Objection.  Are you asking for a

7   legal definition?  Is he asking for him to opine on what is

8   within the legal definition of parties in interest or --

9   BY MR. BAAY:

10  Q     Just your understanding of whether or not the non-

11  settling insurers are parties in interest.  Do you have an

12  understanding one way or the other?

13  A     The non-settling assurers are certainly parties to --

14  who have an interest in the case and are here at the

15  confirmation hearing. So from a non-legal lay perspective I

16  think so.

17  Q     Fair enough.  You did not take this specific provision

18  into account in arriving at your opinion that the plan is

19  feasible, did you?

20  A     My understanding of feasibility is that I determine

21  feasibility based on the assumption that the court has

22  confirmed the plan of reorganization.  So the -- any issues

23  with provisions in the plan would have already been addressed

24  in that the court would have confirmed the plan of

25  reorganization and that is the basis on which I consider

1  feasibility.

2  Q    Okay.  But in measuring  your -- the factors that we

3  talked about and that you talked about on direct you didn't

4  look at whether or not the Doctrine of *res judicata* is going

5  to apply to this plan, did you?  I didn't hear that on your

6  direct.

7  A    No, I did not.

8  Q    Okay.  Or the Doctrine of collateral estoppel, same

9  question?

10 A    No, I did not.

11 Q    If we could take a look now at Paragraph (x), little x,

12 of that same section. And in this particular section it

13 reads, and I'm not going to read the whole thing, but it

14 states that the court will find,

15      "The procedures included in the trust distribution

16 procedures pertaining to the allowance of abuse claims and

17 (ii) the criteria included in the trust distribution

18 procedures pertaining to the calculation of the allowed claim

19 amounts, including the trust distribution procedures, claim

20 matrix, the base matrix value, the maximum matrix values, and

21 the scaling factors each as defined in the trust distribution

22 procedures are appropriate and provide for a fair and

23 equitable settlement of abuse claims based on the evidentiary

24 record offered to the bankruptcy court."

25      Do you see that part that I have read?

1  A      I do.

2  Q      Okay.  And you didn't take this specific provision into

3  account at arriving at your opinion that the plan is

4  feasible, did you?

5          MR. HAMMOND:  Objection.  Your Honor, based on his

6  prior testimony he assumed that the plan is confirmed.

7          MR. BAAY:  I am asking him about this specific

8  provision whether this is a critical provision and he

9  considered it in offering his expert opinion.

10          THE COURT:  Overruled. You can answer.

11          THE WITNESS:  I don't see the relevance of this

12  particular provision to my consideration of feasibility.  As

13  I stated, feasibility -- in accordance in terms of the plan

14  provision on feasibility are the capital structure, the

15  releases, ensuring that the debtor and the entities that

16  support the debtor and debtor's business going forward are

17  able to move on.

18  BY MR. BAAY:

19  Q      I agree a hundred percent.  So a finding that the TDP's

20  are "appropriate and provide for a fair and equitable

21  settlement of abuse claims" is not necessary or relevant to

22  making the plan feasible, agreed?

23  A      I couldn't opine as to whether or not it's necessary to

24  make the plan confirmable.  Again, my assumption is once the

25  plan is confirmed that the plan is feasible.

1   Q     Right.  The question was not with respect to

2   confirmation.  Your narrow scope is feasibility, correct?

3   A     Correct.

4   Q     So this provision, as I read the appropriateness and

5   whether or not these settlements are fair, is irrelevant to

6   find that your opinion that the plan is feasible not

7   confirmable, correct?

8   A     It is not relevant to my opinion that the plan is

9   feasible, that is correct.

10  Q     Okay. Let's show, please, the next finding, Paragraph

11  (y), I am just going to focus on the top part.  I am happy to

12  show you the whole paragraph, but I want to focus you on this

13  finding that the right to payment that the holder of an abuse

14  claim has against the debtors, or another protected party, or

15  a limited protected party is the amount of such abuse claim

16  ad determined under the trust distribution procedures.

17  Again, same question we had been asking about these others.

18  This particular finding is not necessary for your decision on

19  feasibility, correct?

20  A     Correct.  I don't see a connection between this finding

21  and the analysis of the feasibility of the plan.

22  Q     Thank you.

23        The last one I would like to show you is one that has

24  been recently added. So I am sure you did not look at it when

25  you originally gave your opinion, but it's Paragraph (aa), if

1  you could put that up please.  This was added with the last
2  modification and reads,
3       "The base matrix values of the trust distribution
4  procedures are based on and consistent with the debtor's
5  historical abuse settlements and litigation outcomes."
6       Again, this provision is not critical to your finding
7  that the plan is feasible, correct?
8  A    Correct.
9  Q    Mr. Whittman, I would like to switch topics briefly.
10 Are you familiar with the term toggle plan?
11 A    I am.
12 Q    Okay.  And in bankruptcy terms a toggle plan and a
13 toggle is like a switch.  It refers to a plan that has two or
14 more alternatives, correct?
15 A    That is how I understand it to be used and how it was
16 used in the BSA case.
17 Q    Correct.  The second amended plan which was back in
18 April of 2021 and the third amended plan from June of 2021,
19 those plans can be described as toggle plans, correct?
20 A    Each of those plans contained a toggle.  So, yes, they
21 could be.
22 Q    Thank you.
23       In those toggle plans, depending on the vote by the
24 claimants and other conditions satisfied by the debtors, the
25 court could confirm the plan as a global resolution plan

1    meaning that it would include channeling injunction and

2    release for the local councils among others, correct?

3    A      Correct.

4    Q      If the court was unable to confirm the plan as it was

5    in the second and third amended plans, those toggle plans,

6    due to specific issues related to the release or channeling

7    injunctions protecting the local councils then that plan

8    would become, what you called it in your deposition, a BSA

9    only plan, correct?

10   A      That is correct.

11   Q      And the overall difference between the BSA only plan is

12   that the BSA would emerge from bankruptcy and there would be

13   no channeling injunction or release in favor of the local

14   councils, right?

15   A      The local councils and presumably the chartered

16   organizations as well.

17   Q      Fair enough.  The BSA only plan that was proposed as an

18   alternative option in the second amended plan and third

19   amended plan was a feasible plan, correct?

20   A      It was feasible at that time.

21   Q      Okay.  And at that time you were giving your testimony

22   as a representative of the debtors pursuant to Rule 30(b)(6),

23   correct?

24   A      I'm not sure which time or deposition you're referring

25   to.  I have given depositions as a 30(b)(6) witness for the

1  debtors on multiple occasions.

2  Q    Okay, fair enough.

3          MR. BAAY:  Can we take a look at the deposition

4  from December 7th?  And I believe we can go to -- why don't

5  we go up first to page 12, lines 8 through 14.

6          THE COURT:  Mr. Baay, do you know if I have this

7  somewhere?

8          MR. BAAY:  Yes, ma'am, you do.  I believe all of

9  the designations have been provided to Your Honor.  I do not

10 believe they have been put in evidence yet, as I think there

11 are some objections that you still need to rule on in some of

12 those.  So they will be -- my understanding is that we're

13 going to deal with that as a housekeeping issue at some

14 point, but not this morning, if that's okay.

15         THE COURT:  Okay.

16         MR. HAMMOND:  Your Honor, is there some

17 impeachment here?  I'm not --

18         THE COURT:  We're going to find out.

19         MR. BAAY:  He just testified that he wasn't sure

20 whether in December 7th he was testifying as a 30(b)(6)

21 deposition, I'm just referring him back to his deposition to

22 refresh his recollection on that point.

23         THE COURT:  Okay.

24         THE WITNESS:  I apologize, Mr. Baay, I didn't

25 realize you had made a specific date reference.  Yes, on

1 December 7th, I was testifying at a deposition as a 30(b)(6)

2 witness.

3 BY MR. BAAY:

4 Q    Okay.  Let me get to that.

5     (Pause)

6 Q    And back on December 7th, if we use that as the time

7 reference, you believed that a BSA-only plan would still be

8 feasible; correct?

9 A    On December 7th, I considered that a BSA-only plan

10 could at that point be feasible; not necessarily the BSA-only

11 plan from the second or third amended plan, but that some

12 form of a BSA-only plan could still be feasible.

13 Q    Great.  Thank you.

14         MR. BAAY:  That's all the questions I have.

15         THE COURT:  Okay.  Is there anyone else who wishes

16 to cross-examine?  Mr. Buchbinder?

17         MR. BUCHBINDER:  Thank you, Your Honor.  I think

18 -- there we go.  Can you all hear me now?

19         THE COURT:  Yes.

20         MR. BUCHBINDER:  Thank you, Your Honor.  I have a

21 few minutes of questions, I believe it will be less than 15.

22                        CROSS-EXAMINATION

23 BY MR. BUCHBINDER:

24 Q    Mr. Whittman, do you recall your testimony from a

25 little while ago that, I believe, the Methodists and

1  Catholics each constitute about 12 percent of the chartered

2  organization memberships?

3  A     What I testified was that the Methodist chartered units

4  that represent approximately 20 percent of the youth

5  membership of the BSA, and then for Catholics it is

6  approximately 12 percent.

7  Q     So that leaves us with 68 percent, correct?

8  A     Correct.

9  Q     Okay.  Now, of that 68 percent of the remaining

10 chartered organizations, some of them are public schools or

11 private schools; is that correct?

12 A     A very small number of chartered organizations would be

13 schools, but I believe there may be some.

14 Q     Do they have an ad hoc committee?

15 A     I am not aware of an ad hoc committee representing

16 those parties, no.

17 Q     Okay.  And there are chartered organizations that are

18 Fraternal Order of Police associations; isn't that correct?

19 A     There are some; a relatively small number, but there

20 are some.

21 Q     Are you aware that they have an ad hoc committee?

22 A     I'm not aware --

23 Q     Or do you know if they have an ad hoc committee?

24 Excuse me.

25 A     I'm not aware of any ad hoc committee associated with

 1  those groups, no.

 2  Q    Okay.  There are American Legion halls that are

 3  chartered organizations, are there not?

 4  A    There are some, yes.

 5  Q    Do you know if they have an ad hoc committee?

 6  A    I don't know if they do or not.

 7  Q    There are VFW halls and chapters that are chartered

 8  organizations, are there not?

 9  A    There are.

10  Q    Do you know if they have an ad hoc committee?

11  A    If they do, I'm not aware of one appearing in this

12  case.

13  Q    There are private businesses that sponsor troops or

14  dens; do you know if they have an ad hoc committee?

15  A    I'm not aware of one appearing in this case.

16  Q    There are even towns that are chartered organizations;

17  isn't that correct?

18  A    I believe there are some.

19  Q    Do you know if they have an ad hoc committee?

20  A    I'm not aware of one appearing in the case.

21  Q    What other sorts of organizations are chartered

22  organizations?

23  A    Chartered organizations include other religious

24  denominations -- and, again, when we talked -- the chartered

25  organizations are the individual churches, but there are

1  churches in various denominations, synagogues, there are

2  other civic organizations other than the ones you mentioned,

3  there are groups of parents, all of those types of groups

4  serve as chartering organizations.

5  Q    And so other than the Methodists and other than the

6  Catholics and other than the Church of Jesus Christ, are you

7  aware of any religious organization that has an ad hoc

8  committee functioning in this case?

9  A    I am aware that various other chartered organizations

10  have appeared in this case and that they're represented in

11  this case, I don't know if that was -- if they had an ad hoc

12  committee or what those representations were.

13  Q    And at approximately how many chartered organizations

14  would 68 percent of the chartered organizations be at this

15  point in time?

16  A    At this point in time, there are approximately, I

17  believe it's around 28,000 chartered organizations sponsoring

18  approximately 45,000 units, those being Scouts BSA troops or

19  Cub Scout packs and the like.  Some of those would be, again,

20  a part of -- it would be Catholic churches, Methodist

21  churches and so forth, and others would be the other

22  organizations.

23  Q    I understand.  So give me your rough idea of what 68

24  percent of, I think, 45,000 is?

25  A    So we'd be talking about in the neighborhood of 20-

1   some-odd thousand.

2   Q     So most of the chartered organizations do not have an

3   ad hoc committee; isn't that correct?

4   A     They don't have an ad hoc committee, I'm not -- I'm not

5   really sure what that means, but they do not -- to my

6   knowledge.  Again, they may have ad hoc committees that have

7   not appeared in the case, but not that has appeared in the

8   case.

9   Q     Thank you, Mr. Whittman.

10             Now, looking at another part of your testimony, I

11  believe it's DDX-55.

12             MR. BUCHBINDER:  Counsel, if you could pull that

13  up?  It's probably much easier for you than for me.

14       (Pause)

15             MR. BUCHBINDER:  Actually, this -- I'm looking for

16  the page that shows the emergency payments to the Coalition.

17  Is that on this exhibit or is this 50 -- or is that 56?

18             MR. HAMMOND:  It's on -- it's not on a

19  demonstrative exhibit.  It is -- if we go to JTX-1418, slide

20  2.

21             MR. BUCHBINDER:  No, actually, I was looking at

22  one of your demonstratives that showed the number -- there we

23  go.

24             MR. HAMMOND:  It's --

25             MR. BUCHBINDER:  That --

1    MR. HAMMOND:  -- (indiscernible) it's not --

2    MR. BUCHBINDER:  -- that's the page.

3  BY MR. BUCHBINDER:

4  Q    Mr. Whittman, do you see the line item for the

5  Coalition payments?

6  A    I do.

7  Q    And you see the column July 22 and $21 million

8  subtracted?

9  A    I do.

10  Q    Okay.  Now, that's there.  The February 9th settlement

11  that resulted in a third modified fifth amended plan, that

12  term sheet added a $3.5 million payment supposedly to the

13  Zalkin Group; is that correct?

14  A    It is for the -- what I believe is defined as the

15  Pfau/Zalkin professionals, there's a CAP of three and a half

16  million dollars --

17  Q    Thank you.

18  A    -- for a claim, a substantial contribution claim.

19  Q    And is that reflected on this page of the exhibit?

20  A    The way that -- it is not because the way the plan

21  structured, that is not paid out of the BSA, that's paid out

22  of the trust.

23  Q    By the way, does the trust have a budget?

24  A    I'm not aware of what the trust's budget is or if it

25  has one at this time.

1  Q     Thank you.  Would your answer be the same with respect

2  to the new agreement today to pay to the Roman Catholic Ad

3  Hoc Committee a substantial contribution payment of 1.5

4  million?

5  A     The answer would not be the same.  That is not

6  reflected in here, so that part is the same; however, that

7  $1.5 million would come out of the reorganized BSA over the

8  course of two years.

9  Q     So your projections here would need to be modified to

10 account for that million and a half dollars?

11 A     That -- yes, although I would note that that $1.5

12 million is, A, certainly within the margin of error and, B,

13 it may be offset by (indiscernible) professional fees between

14 now and the effective date.

15 Q     Thank you, Mr. Whittman.

16         MR. BUCHBINDER:  I have no further questions.

17         THE WITNESS:  Thank you.

18         THE COURT:  Any other cross-examination?

19         I see that two participants have raised their

20 hands.  Ms. Wolff?

21         MS. LUJAN WOLFF:  Thank you, Your Honor, just very

22 briefly.  Thank you

23                    CROSS-EXAMINATION

24 BY MS. LUJAN WOLFF:

25 Q     Now, Mr. Whittman, my name is Delia Lujan Wolff from

1 Lujan & Wolff LLP, I represent certain survivors of abuse,

2 and I just have a few questions.

3          Sir, when looking at feasibility, is a goal of

4 feasibility of a plan that a business that's a going concern

5 emerge from bankruptcy as a going concern?

6 A    Certainly, for a plan to be feasible, you need to have

7 a -- the reorganized debtors need to be able to emerge and

8 show that their business plan can support the obligations of

9 the business, the capital structure, that there's sufficient

10 liquidity, and that it is unlikely that emergence would

11 likely be followed by a liquidation.

12          So I hope that answers your question.

13 Q    And so, at the time that you prepared your expert

14 report, I believe it was December 5, 2021, you looked at the

15 operating expenses of both the debtors in this case?

16 A    I did.

17 Q    And what were the operating expenses of Delaware BSA

18 LLC?

19 A    Delaware BSA LLC has no operating expenses, other --

20 I'm sorry, it has no operating expenses other than, I believe

21 there's a de minimis amount of bank fees associated with its

22 bank account.

23 Q    Okay.  And did you consider how the plan -- or you

24 realized that at the time of your expert report the plan --

25 and I believe that at that time it was the solicitation

1  version of a plan, being the modified fifth amended plan of

2  reorganization, you're aware that at that time Delaware BSA

3  would be -- if the plan got confirmed, then Delaware BSA LLC

4  would be dissolved on the effective date of the plan;

5  correct?

6  A    Yes, I am aware of that.

7  Q    Okay.  And so Delaware BSA LLC, at the time of your

8  expert report, would not emerge from bankruptcy as a going

9  concern, it would have -- instead of reorganizing, it would

10  have dissolved; is that correct?

11  A    That's correct, it -- my report took that into account.

12  Q    Okay.  So your report took into account the fact that

13  Delaware BSA LLC was not a business that was a going concern

14  from its inception; is that correct?

15  A    No, I -- no, I disagree with that.

16  Q    Wasn't the Delaware BSA LLC created for the purpose of

17  enhancing the basis for bankruptcy venue in Delaware and to

18  minimize the risk of frivolous venue transfer litigation?

19  A    It was created for the purposes of minimizing the risk

20  that parties would argue that, despite other bases for the

21  BSA having venue in Delaware, that it would eliminate those

22  potential arguments, which would have created additional

23  costs for the estate, correct.

24  Q    Okay.  And there was no other purpose for the creation

25  of Delaware BSA LLC; correct?

1  A     Not to my knowledge.

2             MS. LUJAN WOLFF:  Okay.  I have no further

3  questions.  Thank you.

4             THE COURT:  Thank you.

5             Ms. Arnone, am I pronouncing that correctly?

6             MS. ARNONE:  Hello, Your Honor.  Ms. Arnone,

7  actually --

8             THE COURT:  Arnone.

9             MS. ARNONE:  -- and thank you.  I am counsel for

10  the Guam committee and I have just a question or two.

11                     CROSS-EXAMINATION

12  BY MS. ARNONE:

13  Q     At the time that the modified fifth amended plan was

14  submitted on September 30th, 2021, it was your opinion that

15  the plan was feasible; correct?

16  A     I had not issued a report with my opinion until

17  December 5th, but, yes, my opinion is that the plan as it

18  stood at that time, which wasn't, I believe, modified between

19  September 31st and December 5th, was feasible.

20  Q     Thank you.

21             MS. ARNONE:  No further questions.

22             THE COURT:  Thank you.

23             Anyone else?

24         (No verbal response)

25             THE COURT:  I don't see anyone.

1          Redirect, Mr. Hammond?

2          MR. HAMMOND:  No redirect, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Whittman, thank you.  You're excused.

5          THE WITNESS:  Thank you, Your Honor.

6       (Witness excused)

7          MS. LAURIA:  Your Honor, this is Jessica Lauria.

8  Our next witness is Bishop Schol, who's going to be presented

9  by Mr. Rice.

10          THE COURT:  Okay.  Bishop Schol, I need to swear

11 you in.  Can you raise your right hand, please?

12          JOHN SCHOL, WITNESS FOR THE DEBTORS, AFFIRMED

13          THE COURT:  And please state your full name and

14 spell your last name for the record.

15          THE WITNESS:  John Schol, S-c-h-o-l.

16          THE COURT:  Thank you.

17          Mr. Rice?

18          MR. RICE:  Thank you, Your Honor, Ed Rice on

19 behalf of the United Methodist Ad Hoc Committee.

20          And, as a preliminary matter, I'd just like to

21 alert the Court and the other participants that I'll be

22 referring to a couple documents today; they're Exhibit JTX-1-

23 311 and JTX-1-363.  That's the United Methodist term sheet

24 and then an addendum to the United Methodist term sheet,

25 which is contained within the 363 exhibit.  Together, those

1    form the United Methodist settlement agreement.

2              Currently, I don't plan on having them put on the

3    screen, but I nevertheless wanted to give parties an

4    opportunity to know what I would be referring to.

5              THE COURT:  Thank you.

6                        DIRECT EXAMINATION

7    BY MR. RICE:

8    Q     Bishop Schol, where do you live?

9    A     I live in Delmar, New Jersey.

10   Q     And where are you testifying from?

11   A     Delmar, New Jersey.

12   Q     And, if it's not self-evident, can you please describe

13   for the Court what your job or profession is?

14   A     I'm a United Methodist clergyperson serving as a bishop

15   at the United Methodist Church, overseeing the New Jersey and

16   Eastern Pennsylvania areas, which includes 900 United

17   Methodist congregations.

18   Q     And can you please generally describe your work history

19   with the United Methodist Church?

20   A     Well, I was in seminary at Boston University, I was --

21   in my second year, I served as a pastor in a church just

22   outside of Boston.  I served there for two years.  Upon

23   graduation, I was assigned to a cooperative ministry in

24   Philadelphia, where I started out as an associate pastor and

25   later became the executive director of the cooperative

1   ministry.  I did a lot of outreach ministry in the community.

2           And following that, in 1994, I became the urban

3   staff person for the United Methodist Church, worked

4   primarily across the United States and a little bit outside

5   the country.

6           Then, in 1997, I became the pastor of West Chester

7   United Methodist Church in West Chester, Pennsylvania.

8           Following that, in 2004, I was elected and

9   consecrated a Bishop at the United Methodist Church, oversaw

10  the Maryland United Methodist Churches.

11          In 2012, I was assigned to New Jersey, to oversee

12  the New Jersey churches, and just this last year Eastern

13  Pennsylvania was also added to my territory.

14  Q    And, sir, are you a member of the United Methodist Ad

15  Hoc Committee?

16  A    Yes.

17  Q    And are you testifying on behalf of the United

18  Methodist Ad Hoc Committee?

19  A    Yes.

20  Q    Does the United Methodist Ad Hoc Committee support

21  confirmation of the debtors' plan?

22  A    Yes, it does.

23  Q    And has it always supported confirmation of the

24  debtors' plan?

25  A    No, it has not.

1  Q    Bishop Schol, at this time I'm going to ask you a few

2  questions about the organizational structure of the United

3  Methodist Church.  And I'll start by just asking you, how

4  generally is the United Methodist Church organized?

5  A    The United Methodist Church is a large, complex body

6  and the first thing I need to make clear is that there

7  actually is no existence of the United Methodist Church.  It

8  does not have a headquarters, it does not have one person

9  that oversees the organization; it's not an incorporated

10 body.  Instead, it is a group of affiliations that include

11 congregations and regional bodies called annual conferences.

12       We generally, as I may have mentioned, are a

13 dispersed organization, and authority and power is given out

14 to different entities around the world.

15       The best way to describe the United Methodist

16 Church is that it's actually a governmental system and, if I

17 could compare it to the United States Government, we are very

18 much organized as the United States Government, state

19 governments, and municipalities.

20       So we have what is called a general church, we're

21 a global body all around the United -- all around the world,

22 with churches in the United States, Asia, Europe, and also

23 Africa.  And the general church is made up of three bodies;

24 it has a legislative body called the general conference, it

25 meets every four years; it has a judicial body, called the

1  judicial council, that serves like our Supreme Court; and it

2  has a Council of Bishops, bishops from all around the world,

3  that is the executive branch of our general church

4  government.

5        Then we also have what we might compare to state

6  governments, these are regional bodies.  Sometimes they

7  incorporate a whole state, sometimes a portion of the state,

8  and sometimes they're made up of multiple states.  These

9  bodies, called annual conferences, meet once a year in a

10  session to approve mission and initiatives, goals for the

11  regional body.  Those delegates to that particular body are

12  made up of layperson and one clergyperson from each of the

13  churches represented in that region.

14        And then also there are the local churches.  And

15  we have approximately 40,000 United Methodist congregations

16  all around the world, approximately 30,000 in the United

17  States, and each congregation also has its governing

18  structure that would include various committees and bodies.

19  We do have what is called a board of trustees in our local

20  churches, but it does not function like a board of trustees,

21  as one might think with a nonprofit corporation, the board of

22  trustees primarily focuses on property issues.  It has a

23  church council that gathers all the different groups in the

24  congregation for decision-making, it has a personnel body

25  that oversees the pastor and any staff within that

1  congregation.

2              And as you can think about, as we are structured

3  here in the United States as a governmental system, the

4  Federal Government has certain responsibilities and a

5  Constitution, that's the way our general church functions.

6  State governments have their own organizations and have their

7  own set of laws and function under those.  And then also the

8  local church has its policies that guide local church

9  decision-making.

10             I should also mention that we do have 13 general

11 church agencies.  These would be agencies that would oversee

12 particular parts of the ministry of the general church and

13 they are often separately incorporated bodies with their own

14 board of directors.

15 Q     Thank you, Bishop.

16             Who has authority over whether a United Methodist

17 church will or will not become a, for instance, chartered

18 organization?

19 A     That is a local church decision, it's governed by the

20 local church and its organization.  And so only the local

21 church can determine if they are going to have a connection

22 with the Boys Scouts of America, or an AA group or an NA

23 group, or any other organization like that.

24 Q     And, for example, would you be able to as a bishop in

25 your annual conference dictate to a church that it either

1  will or will not be a chartered organization?

2  A    I do not.

3  Q    What is the role of a bishop in the United Methodist

4  Church?

5  A    A bishop is primarily a spiritual leader.  As I

6  mentioned earlier, we were formed at the same time the United

7  States Government was forming and, if you know anything about

8  U.S. history, you know they had a difficult time identifying

9  what the title of the President of the United States would be

10 and so they settled in on president as a presider, somebody

11 who presided over meetings.  Bishops are also called

12 presiders, we preside over meetings.  And we also have the

13 charge to protect the theology and beliefs and liturgy and

14 discipline of the United Methodist, and we also oversee the

15 regional bodies and the staff connected with those regional

16 bodies -- the goals, the mission -- and budgets of those

17 regional bodies.

18 Q    And who or what are the United Methodist Men?

19 A    The United Methodist Men, I think as you're referring

20 to, is one of our general agencies.  I talked about that, we

21 have 13 general agencies, and the United Methodist Men is one

22 of our general agencies, although many of our congregations

23 also have a fellowship missional group called United

24 Methodist Men as well.

25 Q    And do they have any relationship to the Boy Scouts?

1  A    Our United Methodist Men, the general agency is the

2  agency charged with working with the Boy Scouts of America to

3  help implement Scouting programs through United Methodist

4  congregations.

5  Q    And just to complicate the organizational structure

6  just a little bit more, are there other Methodist

7  denominations besides the United Methodist Church?

8  A    Yes, there are, all around the world.  Here in the

9  United States, there are 38 different Methodist

10  denominations.

11  Q    And what is the United Methodist Church's connection

12  with these other Methodist denominations?

13  A    Well, it could vary, but it would be as if you looked

14  up Johnson in the phone book, you would see all these

15  Johnsons listed, but it wouldn't necessarily mean they're all

16  related or have relationships with one another.  And so, just

17  as there are many different Methodist denominations, it does

18  not mean that we all have a formal relationship or working

19  together.

20  Q    I'm going to ask you some questions now about our

21  committee.  When was the United Methodist Ad Hoc Committee

22  formed?

23  A    It was formed in early 2001.

24  Q    And what was the purpose of that committee?

25  A    The purpose of that committee was to help organize to

1  participate in the mediation and bankruptcy process for

2  United Methodist chartering organizations.

3  Q    And can you generally describe the makeup of the

4  committee members?

5  A    The committee is primarily made up of chancellors.

6  Chancellors within the United Methodist Church are the

7  general councils for our regional bodies, what we call our

8  annual conferences, and these are active United Methodist men

9  and women all across the country that relate to a particular

10  annual conference.  They are often Sunday school teachers --

11  our ad hoc committee, we have Sunday school teachers; we also

12  have parents of Boy Scouts and Eagle Scouts, we have a mother

13  of two.  We have chancellors who help to organize mission

14  projects.  And we also have chancellors participating in the

15  ad hoc committee that are actively engaged in Scouting,

16  either at the local level or the council level, or even some

17  participation in the national level.

18        We also had two representatives from our United

19  Methodist Men and two bishops represented on the ad hoc

20  committee.

21  Q    And when did you become a member of the committee?

22  A    I became a member of the committee in July of 2021.

23  Q    And do you know why you were added to the committee?

24  A    I was added particularly because the ad hoc committee

25  really didn't have authority -- it only had the authority to

1 recommend and did not always have the influence to help

2 things happen within the denomination.  And so I was brought

3 on to help with communication, operationalizing certain

4 things, and helping to influence participation of our

5 congregations and our regional bodies in this important

6 matter.

7 Q     And were you selected as the point person on the United

8 Methodist Ad Hoc Committee to represent the committee at

9 mediation sessions?

10 A     Yes, that is correct.

11 Q     And can you just generally describe, you know, your

12 roles on the committee?

13 A     Well, I was a member of the ad hoc committee, I was

14 also a member of the mediation team and, as you mentioned, I

15 also participated in the mediation sessions.

16         Additionally, set up another team, which I was the

17 team leader for, it was made up of leadership from regional

18 bodies to help with communication, to help with the work that

19 needed to happen in local churches and also our regional

20 bodies.

21 Q     And are you on the Council of Bishops?

22 A     Yes, I am.

23 Q     And has the Council of Bishops played a role related to

24 this case or taken any action in connection with this case?

25 A     Yes, they have.

1  Q     Can you please describe that?

2  A     On one particular matter, it was a very difficult

3  decision for us in the process of the mediation process when

4  we felt that things that we were engaged in and advocating

5  for were not moving forward, that there were things that were

6  moving forward without us.  That our Council of Bishops,

7  after significant deliberation, indicated that if the United

8  Methodist chartered organizations and its entities were not

9  part of the settlement agreement, that we would recommend to

10 the church that we no longer participate in Scouting

11 ministries and also remove from what is called our book of

12 discipline, our passages in our book of discipline about

13 Scouting and associated with the United Methodist Men.

14 Q     Are you generally familiar with the United Methodist

15 Church's, you know, relationship with BSA and Scouting?

16 A     Yes.

17 Q     And how long has the United Methodist Church had a

18 relationship with the Boy Scouts?

19 A     Our formal relationship began in 1921, 1921.

20 Q     And do you know about how many, approximately, United

21 Methodist Churches currently are chartered organizations?

22 A     At the beginning of 2021, we had 6,183 chartered

23 organizations.

24 Q     And did you hear Mr. Whittman's testimony earlier that

25 approximately 20 percent of the members are from United

1  Methodist chartered churches?

2  A      That would be accurate.

3  Q      Do you know the approximate number of Scouts and troops

4  that are chartered by United Methodist churches who are also

5  congregation members of the United Methodist Church?

6  A      Well, you know, it really varies from troop to troop.

7  Our agency for the United Methodist Men did do a survey at

8  one time.  We had, approximately, somewhere around 15 percent

9  of youth who are part of our United Methodist congregations

10 who are also part of Scouting.  The Scouting program through

11 United Methodist congregations is a community program that's

12 really open to all young people in the community.  I myself

13 participated in Scouting.  When I grew up in Philadelphia, I

14 was part of Troop 122 at the St. James United Methodist

15 Church, and approximately -- we had more Scouts that were

16 members of the church.  We had approximately, I would say,

17 probably 30, 35 percent of the youth in Scouting were members

18 of the church and also, in terms of Scout leaders, there was

19 only one assistant Scout leader who was a member of the

20 church, all the other Scout leaders were from the community.

21 Q      And what is the connection between a United Methodist

22 Church and a Scout troop, the charters?

23 A      Well, it is through the chartering relationship, an

24 agreement -- could you ask further or explain further what

25 you mean by the question?

1  Q    Well, are all the relationships the same or are some of
2  the relationships different, or is it --
3  A    Yes.
4  Q    -- just generally describe it.
5  A    That's helpful.  So, because each church has its own
6  authority and governance, it really establishes its
7  relationship with the Boy Scouts of America through the
8  chartering program.  We have some churches that largely allow
9  Scouts to use their facilities.  We have many congregations
10 in the United Methodist Church that are smaller
11 congregations, older congregational members, so they don't
12 necessarily have children of their own, but the Scouting
13 program continues in the congregation and it works with youth
14 in the community.
15          So sometimes it's a matter of using the building,
16 sometimes there are volunteers from the church, and sometimes
17 there are youth from the church.  So it can really vary from
18 church to church.
19 Q    Bishop Schol, I want to turn now to the mediation
20 process.  Obviously, you shouldn't testify about things that
21 were said in those sessions, but just a little bit about the
22 process.  I think you testified earlier you were the client
23 representatives in the various mediation sessions that the
24 United Methodist committee participated in; is that right?
25 A    That's correct.

1    Q      And did you attend those sessions in person?

2    A      Yes.

3    Q      And where were those -- where were the sessions

4    conducted?

5    A      The sessions were conducted in Los Angeles, New York

6    City, and there was also one session in Colorado -- Denver,

7    Colorado, when United Methodist leaders met with BSA

8    leadership, just about chartering.

9    Q      And did you participate in any of the mediation

10   sessions via Zoom?

11   A      Yes, I did.

12   Q      And can you just generally describe the extent of

13   effort devoted by the committee to the mediation process?

14   A      Well, the ad hoc committee for the United Methodist was

15   very engaged.  There were sessions that even ad hoc members

16   attended on Zoom.  And the ad hoc committee was highly

17   engaged in the entire process.  At times, it was meeting

18   weekly or several times a week, and when there was not as

19   much work, it would be every other week.  The subcommittees

20   would meet frequently.  And when there were needed decisions

21   to be made, meetings would be called.  But the ad hoc

22   committee, through its counsel and also myself, were actively

23   engaged in all the mediation sessions, participating fully.

24   Q      Did the mediation process involving United Methodist

25   ultimately result in a settlement?

1  A      Yes, it did.

2  Q      At this point, Bishop Schol, I want to ask you some

3  questions about the settlement.  And I guess I'd start -- and

4  for the parties, those settlements, as I mentioned earlier,

5  are evidenced in Exhibits JTX-1-311 and JTX-1-363.

6              But, Bishop Schol, what were the primary

7  considerations of the committee in reaching the United

8  Methodist settlement agreement?

9  A      Well, as United Methodist, our first and -- our first

10 concern was the survivors and our full commitment was to the

11 healing of the survivors.  The United Methodist Church, when

12 there is what is called a complaint filed against either a

13 clergyperson or a layperson, the first thing we want to hear

14 in what we call a just resolution process, where we bring in

15 people together to try and find a resolution, a just

16 resolution, is to first understand the harm that was done and

17 to address the harm that was done.

18             And so one of the first things I and others wanted

19 to better understand was what is it that survivors understood

20 as the harm and what were the things that survivors most

21 wanted done by the United Methodist Church.  In our work to

22 try and understand that, we understood several things.

23             First of all, an acknowledgement that harm was

24 done.  And that also, for survivors that wanted to have the

25 opportunity, they could share their experience with somebody

1 in leadership with the organization.  Secondly, survivors

2 wanted to make sure that steps and things would be done to

3 ensure the safety of youth going forward.  And, thirdly,

4 education about sexual abuse and how to prevent sexual abuse.

5 And, fourth, remuneration for the harm that was done.

6         And so, in our approach to the settlement and

7 working toward a settlement, those were the things that we

8 always kept before us.  We wanted to make sure as the United

9 Methodist Church we would address all four of those issues.

10         And we also wanted the survivors to know our deep

11 sorrow and that we are sorry for what has happened to

12 survivors throughout this time and even this process.  To be

13 honest with you, for some of us in the process, we understood

14 that there were certain things that needed to occur, that

15 there were certain things that needed to be addressed and

16 looked at, but we always wanted to make sure that the

17 survivors were not a number, but they were human beings, and

18 that we would do everything we could to maintain the dignity

19 of the survivors.

20         To that end, as it related to that aspect of our

21 settlement, we committed to do several things.  First of all,

22 we committed that we would train leaders in the United

23 Methodist Church to receive the experiences of survivors,

24 that any survivor, particularly that participated in a United

25 Methodist chartering organization, would have the opportunity

1  to meet confidentially to share with that leader their

2  experience, and also to share what their hopes were for the

3  United Methodist Church going forward.

4          The second was that we would review all of our

5  policies as a United Methodist Church as it relates to abuse,

6  and we have a program called Safe Sanctuaries, and review all

7  of those policies in all of our United Methodist

8  congregations in the United States and also as it relates to

9  any of our regional bodies.  We are planning to undertake

10 approximately the review of 30,000 Safe Sanctuary policies.

11

12 A    We are planning to undertake approximately the review

13 of 30,000 Safe Sanctuary policies.

14      Thirdly, we committed to report about the BSA

15 reorganizational plan and through stories and our

16 communications and our regional bodies' newspapers, as well

17 as in church newsletters and to talk about child sexual abuse

18 and what we, as United Methodists are doing and what we call

19 the Church to continue to do to keep young people safe.  And

20 lastly, a (indiscernible) settlement of $30 million.

21      In addition to that, we also committed to the future of

22 Scouting and we think this is very important, as well.  While

23 there are the survivors who were harmed, we also believe that

24 the Scouting Program is an important initiative and it is

25 serving young people all across the United States and even

1  outside the United States.

2      I, myself, on my iPad, I have pictures that come up

3  from, that are stored in my iPad, every day and recently

4  there was a picture of me being greeted by a young Scout in

5  2010 when I was the bishop over Maryland.  And I contacted

6  that pastor and just said, You know, what's happened to this

7  members, where is he today?

8      And he said, the young person is now in New York City

9  and studying art and is doing quite well.

10     And I'd like to think that the Scouting Program,

11 connected with our congregation and the Boy Scouts of

12 America, made some difference in that young person's life in,

13 inner-city Baltimore.  And there are thousands, you know,

14 over a million, young people across the United States, and so

15 Scouting and the continuation of Scouting is very important

16 to us.

17     We have committed to help and assist in the growth of

18 Scouting through 2036.  We have also committed to work with

19 the Boy Scouts however we can to support leadership of

20 Scouting and organization of Scouting through our

21 congregations.  We are presently working with the Boy Scouts

22 of America on a new relationship statement and agreements,

23 particularly through our congregations.

24     You know, there's been a lot of misunderstanding about

25 the United Methodist Church not re-chartering with the Boy

1    Scouts.  What we said was we were going to pause re-

2    chartering and continue with present charters until the

3    bankruptcy matter is resolved.  But we have been working

4    earnestly with the Boy Scouts to develop new relationship

5    statements that certainly strengthen child protection and

6    also clarify the relationship.

7        Additionally, the letter that was sent to the Boy

8    Scouts from our Council of Bishops in terms of withdrawing

9    from Scouting, that letter and commitment has been withdrawn

10   and that we are committed to continuing to help Scouting

11   prosper through United Methodist congregations.

12       We have also committed to be a part of the Survivor

13   Working Group.  I've actually attended to meetings of the

14   Survivor Working Group and I believe that that will be the

15   basis for a new committee on youth protection of the Boy

16   Scouts and we have committed to participate in that and be

17   helpful in, in any way we can.

18       So, these are many of the agreements that we've made in

19   our settlement and why that was -- again, the reason that

20   that was important for us was that we were looking for a just

21   resolution in terms of our moving forward.

22   Q    You had mentioned some monetary remuneration, $30

23   million.  Where did that come from?

24   A    That $30 million will come from offering plates from

25   across The United Methodist Church in the United States.  It

1    will come through our regional bodies; as I mentioned

2    earlier, we have 54 regional bodies called "annual

3    conferences" and we have worked with each of those

4    conferences to share their commitments to help raise that

5    money for the survivors.  And so, we have a plan of

6    communicating the commitments that I've already just outlined

7    to you and for each annual conference, each regional body to

8    make a commitment to each one of those.

9         We gave people a particular time period.  This is not

10   very easy in a short period of time.  We signed our

11   settlement agreement on December 23rd, if I remember

12   correctly.  At that time, we had to move very quickly on

13   several things.  First, was to change our "no" votes to "yes"

14   votes and that was right before Christmas and through the

15   Christmas season.  We had up until the end of the year.

16        There was a massive effort to work with all of our

17   chartered organizations who had filed proof of claim to

18   change their votes from "no" to "yes."  We were quite

19   successful with that.  Some of our people working Christmas

20   Eve and right up on New Year's Eve, helping congregations to

21   work through the process on that.

22        We also had to communicate with our 54 conferences and

23   their leadership and to have them, by February 1st, send back

24   to us their commitment to raise the $30 million; also, to

25   recruit volunteers to hear the stories and experiences of

1  survivors, also to commit to publish stories, as I mentioned

2  before, and also to review the Safe Sanctuary policies

3  through their congregations and the regional body.

4       I can report that by February 1st, all 54 conferences

5  had reported and all committed 100 percent to each of the

6  commitments.  As someone said to me, that's the first time in

7  the history of The United Methodist Church that everybody got

8  everything in on time and everybody made 100 percent

9  commitment.

10 Q    Bishop Schol can you just generally describe for the

11 Court, you know, what happens if the payment is not made.

12 A    We understand that if the payment is not made, that we

13 will not receive releases for our chartered organizations and

14 that any money that we have raised already would be returned

15 to our congregations and regional bodies.

16      What I can tell you is, also, we, in our settlement

17 agreement, have three years to raise that.  But we also found

18 out that it would take three years for survivors to receive

19 that money.  And when our leaders, and we had probably -- at

20 one point, I counted 272 leaders from The United Methodist

21 Church all working together on this -- when they found out

22 that there would be a delay for the survivors, people began

23 to look at, could they actually borrow money to up-front that

24 money.

25      And I am happy to say that 95 percent of the dollars we

1  anticipate will come in, in the first year and we want to

2  work with the others to try and get that all completed within

3  the first year so that survivors do not have to wait for

4  United Methodist settlements.

5  Q    Bishop Schol, the settlement agreement that the United

6  Methodist Committee reached, United Methodist reached with

7  the Boy Scouts and other constituents, do you believe that

8  that's a fair settlement?

9  A    What occurred is not fair and there's nothing that

10 anybody can do for the survivors that will make it fair.  And

11 so, when you ask me this question, Is it fair, all I can say

12 is that we've done our best to work toward a just resolution.

13       Our resolution really tries to take into account all

14 the things that survivors are asking for.  In terms of our

15 financial settlement, I'll be honest, we were concerned about

16 that, not just because the difficulty of raising that,

17 particularly from congregations and particularly because some

18 of these claims are older claims and congregations where

19 those claims occurred are no longer the same congregation;

20 first things, one of the congregations in New Jersey in the

21 1970s was an all-white congregation.  It had several hundred

22 worshippers.  Today, in that urban community, that

23 congregation has about 25 or 30 worshippers, African-

24 American, Caribbean, Filipino; it's just a completely

25 different congregation today.  The other was that we were

1  promised that the Boy Scouts would care for liabilities as it
2  related to Scouting.
3      And so, there were all these factors that we took into
4  consideration, but in the end, we decided that we needed to
5  do our part, and so we tried to best understand what was
6  reasonable for our part and we based our settlement on the
7  settlement of the Boy Scouts councils and looked at what
8  their payment was per claim for all of the claims against the
9  Boy Scouts and looked at our claims that were assigned to us
10 through trench 6 and based our settlement on that, you know,
11 the correspondence between those two.  And our settlement is
12 within two dollars of what the Boy Scouts councils are paying
13 for a settlement.
14 Q    That's on a per-claim basis?
15 A    That's correct; on a per-claim basis.
16 Q    So, Bishop Schol, I'm about done, but I just wanted to
17 give you an opportunity if there were any additional thoughts
18 that you believe were important to share with the Court or
19 the parties?
20 A    Well, we heard at the beginning of the session, the
21 appreciation for what's been done in this mediation session.
22      Having been an active participant, I can't agree with
23 everything that was said at the beginning of our court
24 session today.  Everybody worked hard.  Everybody really did
25 their best.  There were many challenges along the way.

1  Everybody kept moving toward resolution.

2       I think the other thing that I would like to share is

3  that there were several -- Century Insurance, Roman Catholic

4  Church, The United Methodist Church, and others -- that were

5  concerned about other chartered organizations and the

6  releases for those other chartered organizations.  We are

7  fortunate because we have a chancellor system, lawyer system

8  within The United Methodist Church that we were able to

9  organize.

10      As you have already heard, there are many different

11  kinds of chartered organizations that don't have the same

12  kind of organization that The United Methodist Church does.

13      And so, the Roman Catholics and we, Century, and others

14  all worked together to try and receive a release for all

15  chartered organizations.  As a matter of fact, in our term

16  sheet, originally, we were going to help raise another $100

17  million from chartered organizations so that all charters

18  could receive releases.  That was signed in our term sheet.

19      We recognized that there was a change, there was a

20  needed change so that things could move forward and that was

21  taken out of our term sheet and that all chartered

22  organizations would go through the Settlement Trust.

23      We are still committed to all chartered organizations

24  because Scouting really depends on those chartered

25  organizations to move forward.  The chartering organizations

1 are small, nonprofit, small churches all trying to do their

2 best and we just believe that we should all move forward in

3 this process.  So, The United Methodist Church is willing to

4 do whatever it can to assist with any other chartered

5 organizations in helping them to also gain releases.

6      You know, I believe that if we all don't move forward

7 and we all don't move forward together, it's not in the best

8 interests of survivors, of present scouts, future scouts, and

9 all the organizations involved.  And so, it's my hope that we

10 find a way to help all the chartered organizations to gain

11 their releases.

12      I would also just like to say to the survivors that you

13 are the heroes, that you have brought this to our attention

14 and I just want to thank you for bringing this to our

15 attention so that we could have the opportunity to address

16 these concerns.  Thank you.

17           MR. RICE:  Your Honor, I don't have any further

18 questions.

19           THE COURT:  Thank you.

20           Let's take five minutes and then, Ms. Marrkand, I

21 understand you may have questions?

22           MS. MARRKAND:  Yes, Your Honor.  Just a few.

23           THE COURT:  Is there anyone else who has questions

24 for Bishop Schol?

25      (No verbal response)

1           THE COURT:  Ms. Wolff I see your hand.

2           Okay.  We're going to take five minutes and then

3   we'll come back.

4           We are in recess.

5        (Recess taken at 1:06 p.m.)

6        (Proceedings resumed at 1:11 p.m.)

7           THE COURT:  This is Judge Silverstein.  We're

8   going to go back on the record.

9           I do not see Mr. Rice.

10          MR. RICE:  I'm sorry, Your Honor.  I'm here.

11          THE COURT:  Okay.  Thank you.

12          Ms. Marrkand?

13          MS. MARRKAND:  Good afternoon, Your Honor.

14                      CROSS-EXAMINATION

15   BY MS. MARRKAND:

16   Q    Good afternoon, Bishop Schol.

17        My name is Kim Marrkand and I represent Liberty Mutual

18   and I'll be asking you a series of limited questions on

19   behalf of Liberty Mutual and Certain Insurers.  But before I

20   do that, Bishop Schol, I'd like to thank you for

21   acknowledging the pain of the survivors, so thank you very

22   much.

23        I'd like, now, to turn to my questions.  And as I

24   assured your counsel Mr. Rice, when I spoke with him

25   yesterday, I do not have a long -- or many questions.  And I

1  know the Court understands, and I understand from your direct

2  testimony that you chaired the bankruptcy leadership team of

3  the United Methodist entities and that in that capacity, it

4  sounds like you attended numerous mediation sessions; is that

5  correct?

6  A     Yes, that's correct.

7  Q     All right.  And just a few minutes ago when Mr. Rice

8  asked you about the term sheet settlement agreement, I

9  understood you to say that you believed that it was in the

10 best interests of the United Methodist entities, as well as

11 the Boy Scouts and other parties; is that right?

12 A     I said, I -- whatever I said, what I meant was I

13 believe it helps all of us to move forward.

14 Q     Excellent.  Okay.  Thank you.

15       And I believe I heard you a few minutes ago, you

16 testified that all the parties that were involved in the

17 process that led up to the execution of the term sheet on the

18 settlement agreement that was executed on behalf of the

19 United Methodist entities, worked very hard to achieve that

20 resolution; is that right?

21 A     That is correct.

22 Q     Okay.  And Bishop Schol, given your very hands-on

23 involvement, did you have -- in this process -- did you have

24 a general practice with respect to reviewing certain

25 pleadings or legal documents that were filed in this

1 | particular bankruptcy case?

2 | A    I didn't -- I did review legal documents that were

3 | filed.

4 |       Is there's something specific that you're asking about?

5 | Q    Okay.  That's exactly where I'm going.

6 |            MS. MARRKAND:  And, Your Honor, we did deliver to

7 | chambers the one exhibit that has been marked for

8 | identification as JTX-3035.

9 | BY MS. MARRKAND:

10 | Q    And Bishop Schol, I know you received a copy, and do

11 | you have that in front of you?

12 | A    I can get that, yes.

13 | Q    Okay.

14 | A    I have that.

15 | Q    Thank you.

16 |       And just to -- whichever is easier, Bishop Schol, it's

17 | also on the screen.

18 | A    Thank you.

19 | Q    All right.  And you'll see that what's been marked for

20 | identification, which is awfully small to read on the screen,

21 | but it is there, is entitled, "Notice of filing of proposed

22 | findings of fact, conclusions of law, and order confirming

23 | the third-modified, fifth amended Chapter 11 plan of

24 | reorganization for Boy Scouts of America and Delaware

25 | BSA, LLC."

1        Do you see that?

2   A    Yes, I do.

3   Q    All right.  And if you turn a few pages into -- well,

4   before -- I'm sorry, let me strike that and start over.

5        And you see that this particular document, Bishop, is a

6   document that the debtors have filed with the Court saying,

7   in effect, Judge, these are the findings of fact and

8   conclusions of law and proposed confirmation order we would

9   like you to enter.

10        Do you understand that?

11  A    I do.

12  Q    Okay.  So, would you now turn to page 2.  There's an

13  Exhibit A attached, but let's -- there we are -- page 2 of

14  115.

15        And I'm now going to -- and let me assure you, Bishop,

16  even though this document is 115 pages, I'm only going to ask

17  you about a few pages and a few paragraphs.

18  A    Okay.  Thank you.

19  Q    Okay.  So, if you would now turn to page 6 of 115 and

20  tell me when you have that.

21  A    I have that.

22  Q    All right.  And I'm going to direct your attention to

23  (I).  Do you see that that's entitled, "Findings of fact and

24  conclusions of law"?

25  A    Yes.

1  Q    All right.  And underneath that appears language:

2            "It is hereby found, determined, and concluded

3  that ..."

4        Do you see that?

5  A    I do.

6  Q    All right.  And in subparagraph (a), it is denominated

7  as, "Findings of fact and conclusions of law," and the

8  debtors have included in a language here that -- let me read

9  it to you:

10            "The findings and conclusions set forth herein and

11 in the record of the confirmation hearing, constitute the

12 Court's findings of fact and conclusions of law, pursuant to

13 Rule a 52 of Federal Rules of Civil Procedure, as made

14 applicable, herein, by Bankruptcy Rules 7052 and 9014."

15        And then it has some extra language.

16        Did I read that correctly?

17 A    Yes.

18 Q    Okay.  Thank you.

19        And would you now turn to page 20 -- pages 20 and 21 of

20 Section 115, and, in particular, Section (n).

21 A    I have that.

22 Q    All right.  Do you see that Section (n) is entitled,

23 "Plan proposed in good faith" and then it cites to some

24 provisions of the Bankruptcy Code?

25 A    I see that.

1  Q     All right.  And I'm not going to read the whole

2  paragraph, Bishop, but the very first sentence reads:

3         "The plan is the product of the good-faith process

4  through which the debtors have conducted the Chapter 11 cases

5  and reflects extensive, good faith, arm's-length

6  negotiations."

7        And then it has a series of other parties.

8        Well, let me -- so the record is clear, let me start

9  over:

10        "The plan is the product of the good-faith process

11  through which the debtors have conducted the Chapter 11 cases

12  and reflects extensive good faith, arm's-length negotiations

13  among the debtors, the ad hoc committee, the creditors'

14  committee, the tort claimants' committee, the future

15  claimants representative, the Coalition, JPM, and other key

16  stakeholders, including arm's-length, good faith mediations

17  through the Court-appointed mediator."

18        And did I read that correctly, Bishop?

19  A     Yes.

20  Q     Okay.  And would you now turn to the last sentence on

21  the next page in Section (n).

22  A     Yes.

23  Q     All right.  And the last sentence reads:

24        "For the avoidance of doubt, the finding and

25  determination that the plan and distribution procedures were

1  proposed in good faith and are sufficient to satisfy

2  Section 1129(a)(3), shall not be binding on the settling

3  insurance companies, TCJC, or the United Methodist entities."

4        Did I read that correctly?

5  A    Yes, you did.

6  Q    All right.  Now, I'm going to ask you, Bishop, to

7  please turn to page 52 of 115, and I'm going to bring up

8  Section --

9  A    I have that.

10 Q    Oh, I'm sorry, I think I jumped over (o).

11       Would you go back to page 50 -- as a matter of fact, I

12 know I did -- page 50.  And you're at page 50 of 115?

13 A    Yes, I am.

14 Q    All right.  Thank you.

15       And you see Section 00 or, actually, I believe

16 it's (o)(o), is denominated, "Insurance assignment"?

17 A    Yes.

18 Q    All right.  And it reads:

19            "The insurance assignment is authorized and

20 permissible by applicable law, as provided in the plan,

21 notwithstanding any terms of any policies or provisions of

22 non-bankruptcy law that are argued to prohibit the delegation

23 assignment or other transfer of such rights and the

24 Settlement Trust, (1), is a proper Defendant for abuse claims

25 to assert the liability of the protected parties to trigger

1  such insurance rights and, (ii), is a proper Defendant for

2  post-1975 chartered organization abuse claims to assert the

3  liability of the limited protected parties to trigger such

4  insurance rights.  For the avoidance of doubt, this finding

5  and determination shall not be binding on the settlement

6  companies, TCJC, or the United Methodist entities."

7         Did I read that correctly?

8  A     Yes, you did.

9  Q     Now, I only have two more, Bishop Schol.  I'm giving

10 you a heads-up.

11        And now I'm going to ask you to turn to page 52 of 115,

12 Section (r)(r).

13 A     I have that before me.

14 Q     Thank you.

15        And turning to Section (r)(r), you see it is

16 denominated, "Abuse Claims Settlement"?

17 A     Yes.

18 Q     All right.  And it reads:

19        "The Abuse Claims Settlement represents a sound

20 exercise of the debtors' business judgment, is in the best

21 interests of the debtors' estates, complies with Section 1123

22 of the Bankruptcy Code, and is approved, pursuant to

23 Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

24 For the avoidance of doubt, this finding and determination

25 shall not be binding on the settling insurance companies,

1  TCJC, or the United Methodist entities."

2       And did I read that correctly, Bishop?

3  A    Yes, you did.

4  Q    All right.  And if you would now turn to, it's going to

5  be pages 55 and 56 of 115 pages, and, in particular,

6  Section (b) -- (d)(d)(d).

7  A    I have that.

8  Q    Thank you.

9       And do you see this section is entitled, "Trust

10  distribution procedures"?

11  A    Yes.

12  Q    Okay.  Now, this goes over, would you agree with me,

13  Bishop, to a second page?

14  A    Yes, it goes over to 56 of 115.

15  Q    Right.  And it's three paragraphs and I'm going to ask

16  your indulgence, Bishop, and the Court's indulgence, even

17  though this is a couple of paragraphs, to read this aloud and

18  then end with my final question.

19       So, going back to the trust distribution procedures,

20  paragraph one -- (I)(A):

21            "The procedures included in the trust distribution

22  procedures pertaining to the allowance of abuse claims and,

23  (b), the criteria included in the trust distribution

24  procedures pertain to the calculation of the allowed claim

25  amounts, including the trust distribution procedures claim

1 | matrix, base matrix values, maximum matrix values, and
2 | scaling factors (each is defined in the trust distribution
3 | procedures), are appropriate and provide for a fair and
4 | equitable settlement of abuse claims.  Based on the
5 | evidentiary record offered to the Court, as required by, and
6 | in compliance with Section 1123 of the Bankruptcy Code and
7 | Bankruptcy Rule 9019, provide adequate and proper means for
8 | the implementation, as required by, and in compliance with
9 | Section 1123 of the Bankruptcy Code, comport with the
10 | requirements for the issuance of the channeling injunction
11 | under Section 105(a) of the Bankruptcy Code and, otherwise,
12 | comply with the Bankruptcy Code and applicable law.
13 |       For the avoidance of doubt, this finding and
14 | determination shall not be binding on the settling insurance
15 | companies, TCJC, or the United Methodist entities."
16 |       And did I read that correctly?
17 | A     Yes.
18 | Q     Notwithstanding my asking for your indulgence, Bishop,
19 | I'm going to direct your attention to paragraph 2 and the
20 | section there that discusses the right to payment to a holder
21 | of an abuse claim.  And do you see that at the end of
22 | paragraph 2, the following sentence:
23 |           "For the avoidance of doubt, this finding and
24 | determination shall not be binding on the settling insurance
25 | companies, TCJC, or the United Methodist entities."

1       Do you see that, sir?

2    A    Yes, I do.

3    Q    And did I read that last sentence correctly?

4    A    Yes, you did.

5    Q    And turning to the last paragraph in Section (b)(d)(d),

6    paragraph 3.

7         Do you see that?

8    A    Yes, I do.

9    Q    Okay.  And paragraph 3 reads:

10        "The base matrix values in the trust distribution

11   procedures are based on, and consistent with the debtors'

12   historical abuse settlements and litigation outcomes.  For

13   the avoidance of doubt, this finding and determination shall

14   not be binding on the settling insurance companies, TCJC, or

15   the United Methodist entities."

16        And did I read that correctly?

17   A    Yes, you did.

18   Q    Bishop Schol, having focused on these particular

19   sections of the proposed order, which has been marked for

20   identification as JTX-3035, do you recall reading any of the

21   provisions that I just highlighted for you?

22   A    I -- to be honest, I have read so much material, I

23   cannot recall if I read this specifically.  But I know our

24   counsel has read through all of this and has explained it to

25   our Ad Hoc Committee and the Ad Hoc Committee is supportive

1   of it.

2   Q    All right. And that's -- I think you may have answered

3   my final question but let me just say it or ask you for the

4   record.

5       With respect to the language in the last sentences of

6   Sections (n), (o)(o), (r)(r), and (d)(d)(d), is it true that

7   the United Methodist entities required the debtors to include

8   that language in the proposed order?

9   A    That was part of the mediation. I'm trying to recall

10  anything specific about those conversations in the mediation

11  session.

12      But I know that there was a lot of back-and-forth, as

13  it related to the documents and editing of the documents, and

14  that this was included.

15  Q    Thank you very much, Bishop Schol.

16        MS. MARRKAND: Your Honor, given -- I don't have

17  any further questions -- given what I understand your

18  practice about, and what the parties have been doing is not

19  moving into evidence, pleadings. It is not the intention of

20  the Certain Insurers to move Exhibit JTX-3035 into evidence

21  unless that would be helpful to the Court.

22        THE COURT: I think, given your questions, let's

23  put this document into evidence, as the proposed finding.

24        MS. MARRKAND: Thank you, Your Honor.

25        So moved.

1                THE COURT:  Any objections?

2          (No verbal response)

3                THE COURT:  I hear none.

4                It's admitted.

5          (Exhibit JTX-3035 received into evidence)

6                MS. MARRKAND:  Thank you, again, Bishop Schol.

7                THE WITNESS:  Thank you.

8                THE COURT:  Thank you.

9                Ms. Wolff, I believe you had some questions?

10               MS. LUJAN WOLFF:  Yes, just a few, Your Honor.

11   Thank you.

12                         CROSS-EXAMINATION

13   BY MS. LUJAN WOLFF:

14   Q    Hello, Bishop Schol.

15        My name is Delia Lujan Wolff from Lujan & Wolff, LLP in

16   Guam.  I represent survivors of abuse, and as their advocate,

17   I have sat through hours of their tears recounting the abuse.

18        And, sir, wouldn't you agree that survivors didn't

19   choose to be creditors, owed a debt by the Boy Scouts, the

20   local councils, or chartered organizations?

21   A    Could you repeat the question, please.

22   Q    Wouldn't you agree -- I'm sorry, I'll say it slower --

23   wouldn't you agree that survivors didn't choose to be

24   creditors, owed a debt by the Boy Scouts, the local councils,

25   or the chartered organizations?

1    A    I'm sorry, I'm having difficulty picking up one word.

2         If I could just repeat that one more time.  I'm sorry.

3    Q    Wouldn't you agree that survivors didn't choose to be

4    creditors in this bankruptcy case, owed a debt by the Boy

5    Scouts, the local councils, or chartered organizations?

6    A    And when you say, "choose to be creditors," could you

7    explain that to me.

8    Q    Survivors didn't choose to be harmed and to be owed

9    compensation for that harm.

10        Would you agree with that?

11   A    I would agree that survivors did not choose to be

12   harmed.

13   Q    And would you agree, sir, that it's important to

14   survivors of abuse that they have a say in how their child

15   sexual abuse claims are resolved?

16   A    I believe that they should be represented in the

17   process, yes.

18   Q    You said that the United Methodists are looking for a

19   just resolution moving forward and that a goal is that all

20   chartered organizations could receive releases, correct?

21   A    I believe I've said that it's our hope to find a just

22   resolution, our goal to find a just resolution for survivors,

23   yes.  And that it was also our hope that all chartered

24   organizations would receive releases; that's correct.

25   Q    Isn't it important that a just resolution between the

1 survivor of abuse and a chartered organization, include two

2 parties who both consent to the terms of the settlement,

3 including the settlement amount?

4 A    Would you please repeat the question.

5 Q    Yes.  Isn't it important that a just resolution between

6 the survivor of contribution and a chartered organization,

7 include two parties who both consent to the terms of that

8 settlement, including the settlement amount?

9 A    In The United Methodist Church, when we work toward a

10 just resolution, we're generally working with two parties,

11 and so that's something that we always work for.  I would say

12 that this is something very different than what I've worked

13 with in The United Methodist Church where there are so many

14 entities and so many survivors, so how to answer that

15 question, I'm not sure.

16 Q    You're aware, sir, that of the survivors, according to

17 the debtors' solicitation agent, there are 2,845 people who

18 identified The United Methodist Church as a chartered

19 organization and who voted on this plan.

20      Are you aware of that, sir?

21 A    Yes, I am.

22 Q    And of taking into consideration just those survivors

23 who voted and not the survivors who didn't vote, but just the

24 voting survivors, wouldn't you agree that, you know, with the

25 $30 million contributed by The United Methodist Church, that

1  that comes down, just looking at the 2,845 voters, that

2  that's an average of $10,500, approximately, per voting

3  survivor?

4  A    That seems about right.  I can't do the math that

5  quickly in my head.

6  Q    Shouldn't a survivor of abuse decide for himself or

7  herself whether that is an acceptable amount to compensate

8  for a loss of their childhood innocence?

9  A    The United Methodist Church would always want people to

10  have some say, or a say in, you know, any particular

11  settlement.  It's my understanding that survivors had the

12  opportunity to vote on this settlement, which also included

13  the United Methodist contribution.  So, it's my understanding

14  that survivors did have a say in whether to accept it or not.

15  Q    But you understand that not everyone voted to accept

16  this plan, correct?

17  A    I do understand that.

18         MS. LUJAN WOLFF:  I have no further questions,

19  Your Honor.  Thank you.

20         THE COURT:  Thank you.

21         Mr. Rice, any redirect?

22         MR. RICE:  No, Your Honor.

23         THE COURT:  Okay.  Thank you.

24         Thank you, Bishop Schol, for your testimony.

25         You're excused.

1            THE WITNESS:  Thank you very much.

2       (Witness excused)

3            THE COURT:  Ms. Lauria?

4            MS. LAURIA:  Your Honor, as I think I mentioned

5    previously, our next witness is Will Sugden.  This might be a

6    good time to take a brief lunch break if that works for the

7    Court.

8            THE COURT:  It is, and we will reconvene at 2:30,

9    Eastern.

10           MS. LAURIA:  Very good, Your Honor.  Thank you.

11           THE COURT:  We're in recess.

12      (Recess taken at 1:39 p.m.)

13      (Proceedings resumed at 2:39 p.m.)

14           THE COURT:  We're back on the record.  My

15   apologies for being late.

16           Ms. Lauria?

17           MS. LAURIA:  Thank you, Your Honor.

18           For the record, Jessica Lauria.  The debtors call

19   their next witness, which is Mr. William Sugden.

20           As I mentioned previously, Mr. Celentino will be

21   handling Mr. Sugden's testimony today.

22           THE COURT:  Thank you.

23           MR. CELENTINO:  Good afternoon, Your Honor.

24           For the record, Joseph Celentino, Wachtell,

25   Lipton, Rosen & Katz, on behalf of Ad Hoc Committee of Local

1  Councils.

2          As Ms. Lauria indicated, I'm here with Mr. Sugden

3  to present and defend him as a witness.  Your Honor, we filed

4  Mr. Sugden's declaration on Monday at Docket Number 9316.

5      (Phone ringing)

6          MR. CELENTINO:  I'm sorry, Your Honor.

7          Your Honor, if you'll excuse us one moment?

8          THE COURT:  Yes.

9      (Pause)

10          MR. CELENTINO:  Thank you, Your Honor.

11          Nothing like a little excitement.  Apologies for

12  that.

13          Let me pick up where I was.  We filed Mr. Sugden's

14  declaration at Docket Number 9316 this past Monday.  That --

15  I understand that a binder of his declaration and the

16  exhibits was delivered to Your Honor.  I hope you have that.

17  Excellent.

18          Your Honor, there are no objections to

19  Mr. Sugden's declaration and with one typo correction that

20  Mr. Sugden will advise the Court of momentarily, we would

21  move for the admission of the declaration and its exhibits.

22          THE COURT:  The declaration and exhibits are

23  admitted as Mr. Sugden's direct.

24      (Sugden Declaration and exhibits received in evidence)

25          MR. CELENTINO:  Thank you.

1        Your Honor, would you -- would it be helpful for

2    Mr. Sugden to read into the record the typo I described, the

3    two typos?

4        THE COURT:  Let me swear in Mr. Sugden first and

5    then we can do that.

6        Please raise your right hand.

7      (Oath administered)

8      WILLIAM S. SUGDEN, WITNESS FOR THE DEBTORS, AFFIRMED

9        THE WITNESS:  Yes, I do.

10       THE COURT:  Please state your full name and spell

11   your last name for the record.

12       THE WITNESS:  William Stuart Sugden, S-u-g, as in

13   George, d, as in David, e-n.

14       THE COURT:  Thank you.

15       MR. CELENTINO:  Mr. Sugden, I understand that

16   there are two typos in your declaration that you would like

17   to correct on the record?

18       THE WITNESS:  There are.

19       Your Honor, in paragraph 7 of my declaration, the

20   second-to-last sentence running from page 4 to page 5 that

21   refers to winter 2021 to March of 2020; it should be winter

22   of 2021 to March 2021 -- March of 2022.  I apologize for

23   that.

24       The second is paragraph 62, the second-to-last

25   sentence on page 39.  It references an expected value of

1  $103,025,318.  It should read:  $102,556,412.

2            And I will note for the record that the correct

3  number appears in the next paragraph; paragraph 63 refers to

4  the correct number.

5            THE COURT:  Okay.

6            MR. CELENTINO:  With those two clarifications,

7  Your Honor, and on the understanding that Mr. Sugden's

8  declaration is admitted into evidence, we do not

9  anticipate -- we do not plan to offer any live testimony on

10  direct from Mr. Sugden, but, instead, are happy to make him

11  available for cross-examination.

12            THE COURT:  Thank you.

13            Mr. Sugden, do you affirm the statements made in

14  your declaration with the noted changes that you have just

15  advised on the record?

16            THE WITNESS:  I do.

17            THE COURT:  Thank you.

18            Cross?

19            MR. AMASS:  Thank you, Your Honor.  Ty Amass from

20  Gibson Dunn, on behalf of the AIG and Certain Insurers.

21            May I proceed?

22            THE COURT:  You may.

23                         CROSS-EXAMINATION

24  BY MR. AMASS:

25  Q    Good afternoon, Mr. Sugden.

1        Good to see you, again.

2  A    Good to see you.

3  Q    Your declaration talks about the process that the Ad

4  Hoc Committee went through to generate a formula to calculate

5  each local council's contribution, right?

6  A    Correct.

7  Q    Is that fair to say that the Ad Hoc Committee's view

8  was that the contribution of the local council would make

9  under the formula was not fair and equitable if the local

10 council was going to be asked to pay more than the law

11 allows?

12 A    Yes, I think that's correct.

13 Q    And the Ad Hoc Committee viewed differences in

14 jurisdictions' statute of limitations as an important factor

15 to assess the allocation between councils, right?

16 A    It was one a number, yes.

17 Q    And it was an important factor, wasn't it?

18 A    Correct.

19 Q    And I'm correct that most local councils are located in

20 jurisdictions that have not enacted a revival window for

21 lapsed statutes of limitations, right?

22 A    That's correct, yes.

23 Q    Indeed, many local councils are in jurisdictions where

24 the State Constitution would prevent revival of time-barred

25 claims even if a revival window was passed by the

1  Legislature, right?

2  A      There are a number.  I don't recall off the top of my

3  head how many, no.

4  Q      Sure.  But it was many of them; at least, that's what

5  you say in your declaration, was that many of the local

6  councils are in states where the constitution would prevent

7  revival of the time-barred claims even if a revival window

8  was passed by the Legislature, right?

9  A      That's correct, yes.

10  Q      And most local councils don't have experience

11  litigating abuse claims in the tort system, do they?

12  A      That's correct.

13  Q      And they don't have that experience because they've

14  never been sued for abuse claims, right?

15  A      Many have not, to the best of my understanding; that's

16  correct.

17  Q      And, indeed, those local councils may never have the

18  experience of litigating in a tort system, right?

19  A      Are you asking me to speculate about that?

20  Q      Well, no.  I'm actually reading your declaration back

21  to you in certain -- in one paragraph.  It may just be

22  easier, we can put that out if that would make things a bit

23  easier.

24  A      Sure.

25             MR. AMASS:  Matt, if we could please put up Mr.

1   Sugden's declaration.

2   BY MR. AMASS:

3   Q     And you recognize this is your declaration, right?

4   A     Yes, I do.

5            MR. AMASS:  If we could go to page 12 of the

6   declaration, please.

7   BY MR. AMASS:

8   Q     And you'll see at the bottom there, point five, it

9   talks about nonparticipation by even a few local councils

10  could have a cascading effect where other local councils

11  would opt-out from a global settlement and, instead, elect to

12  defend abuse claims in the tort system, and then it goes on

13  to the next page, using insurance.

14       And now, what I actually want to focus on is just at

15  the end of that paragraph, which we're now an page 13, and it

16  says:

17            "This is especially so because most local councils

18  are located in jurisdictions that have not enacted revival

19  windows --"

20            MR. AMASS:  Sorry, Matt.  I'm actually starting a

21  little bit earlier than that.

22       (Pause)

23            MR. AMASS:  There we go.  The joy of the

24  technological fun of doing this over Zoom.  I apologize.

25  BY MR. AMASS:

1  Q     So, I'll start again:

2            "This is especially so because most local councils

3  are located in jurisdictions that have not enacted a revival

4  window for lapsed statutes of limitations and, indeed, many

5  local councils are located in jurisdictions where the State

6  Constitution and case law interpreting the State

7  Constitution, would prevent revival of time-barred claims,

8  even if a revival window was passed by the Legislature."

9        Did I read that right?

10 A     You did.

11 Q     And that is still your testimony, right?

12 A     Correct.

13 Q     And then it says:

14           "Additionally, those local councils do not have

15 the experience, and may never have the experience, of

16 defending abuse claims in the tort system."

17       Right?

18 A     That's correct.

19 Q     And when it says here, "those local councils"; that's

20 referring to the prior sentence, where it's talking about the

21 local councils located in jurisdictions that have not enacted

22 a revival window, right?

23 A     That was my intent in writing it, yes.

24 Q     And so those local councils may never have the

25 experience of litigating in the tort system because claims

1 against them would be barred by the applicable statutes of

2 limitations in those jurisdictions, right?

3 A    Correct.

4 Q    And so, one of the challenges that the Ad Hoc Committee

5 faced in gaining local council participation is that local

6 councils in states that have not enacted a revival window are

7 facing liability as a result of this bankruptcy that they

8 would not have faced if this bankruptcy did not exist, right?

9 A    Can you repeat that question, please.

10 Q    Sure.  So, one of the challenges in gaining local

11 council participation is that local councils in states that

12 have not enacted revival windows are facing liability as a

13 result of this bankruptcy that they would not have faced if

14 this bankruptcy did not exist.

15 A    I'm not sure I would agree with that characterization.

16 Q    You agree, though, that the formula is calculated to --

17 the intent of the formula is to figure out the contribution

18 of each local council to an amount that will be used to

19 settle the claims that have been asserted in this bankruptcy,

20 right?

21 A    Correct.

22 Q    And you'd agree that, as you said in your declaration,

23 that many of these local councils have never faced any

24 liability because of the statutes of limitations applicable

25 in their jurisdiction, right?

1   A      Correct.

2   Q      And, indeed, they may never, even without settling this

3   liability, may never face such claims because the

4   constitutions in their states don't permit a revival window

5   to be passed by the Legislature, right?

6   A      That's correct.

7   Q      And so, the liability that they're contributing to

8   settle here in this bankruptcy is liability that they

9   wouldn't be facing if it weren't for this bankruptcy, right?

10  A      So, there certainly are local councils in jurisdictions

11  that have not enacted a revival window where it is possible

12  for the State Legislature to later enact such a revival

13  window and they may later face that risk in their

14  jurisdiction's tort system, and that is one of the items that

15  is being settled through this proceeding.

16       There are other forms of liability, contingent

17  liabilities that local councils may face that I reference in

18  my declaration, such as a potential risk related to a pension

19  termination that is not being settled, per se, through the

20  formula, and the plan, but they are avoiding the risk of that

21  potential, future contingent liability of becoming a real,

22  present potential liability.

23  Q      Sure.  And I understand that, but I think that's

24  speaking to a different issue than what I was asking you

25  about.

1        So, in your formula, one of the factors that way weighs

2   into every local council's contribution is how many claims

3   have been asserted against that local council, right?

4   A    Correct.

5   Q    And that's true, even for the local councils, they're

6   in jurisdictions with the statute of limitations, where

7   there's been no revival window and the constitution, as you

8   say in your declaration, prohibits the passing of a revival

9   window, right?

10  A    Correct.

11  Q    And so, their liability is being determined based on

12  claims that could not be brought in the tort system, right?

13  A    Their contribution amount to the Local Council

14  Settlement contribution is being allocated; it's not

15  liability being assessed.  It's a contribution that has been

16  requested by the Ad Hoc Committee.

17  Q    I appreciate that distinction and for making that

18  clear.

19       It's a contribution that is going to pay the claims

20  that have been asserted or to the Trust and then be used to

21  pay those claims; is that right?

22  A    Correct.

23  Q    But those are claims that, for that group, or the group

24  that they're in, states with statutes of limitations where

25  they have not enacted a revival window and the constitutions

1  of those states would not permit that, that is a liability

2  that wouldn't be paid under the tort system, right?

3  A    I'm not -- I'm not a tort lawyer.  I'm not sure that I

4  accept that, that is necessarily the case.

5  Q    Sure.  But, but, at least as you say here, they may

6  never have the experience of litigating --

7  A    They may never -- that was not the question that you

8  asked.

9  Q    Sure.  I wasn't impeaching you with it; I was just

10  trying to make sure that we're on the same page.

11  A    Yes.

12  Q    And those were some of the main challenges that the Ad

13  Hoc Committee faced in getting a formula together that would

14  work with the local councils, right?

15  A    That's correct.

16          MR. AMASS:  Your Honor, subject to any redirect or

17  anything else that comes up, I have nothing further for

18  Mr. Sugden.

19          THE COURT:  Any other cross-examination?

20          Ms. Dumas?

21          MS. DUMAS:  Yes.

22          Thank you, Your Honor.

23                    CROSS-EXAMINATION

24  BY MS. DUMAS:

25  Q    Okay.  Mr. Sugden, and am I pronouncing that correctly?

1   A      You are.

2   Q      All right.  Thank you.

3          I represent some of the abuse claimants in this case

4   who are objecting to the plan, so I'd like to ask you a few

5   questions based on your declaration testimony.

6          How many members of the Ad Hoc Committee were there?

7   A      There are eight local councils represented on the Ad

8   Hoc Committee.

9   Q      All right.  And none of those members were from the

10  West Coast, correct?

11  A      So, there was -- one of the members is Grand Canyon

12  Council from Arizona; another is the Denver Area Council in

13  Colorado.

14  Q      Okay.  And Arizona is not on the coast, is it?

15  A      Fair enough.

16         It's in the West -- I think of it as being in the

17  Western United States.

18  Q      And Colorado isn't on the Pacific Ocean, is it?

19  A      As someone who lives in Georgia, everything seems West

20  to me.

21  Q      Okay.  But California, Oregon, and Washington, none of

22  those -- no councils from those states were on the Ad Hoc

23  Committee, were they?

24  A      That's correct.

25  Q      Okay.  And no state -- no council located in the

1  Pacific Northwest was on the Committee.  And so we don't

2  quibble about this, Oregon, Washington, Montana, Idaho; none

3  of those councils were on the Committee, were they?

4  A     That's correct.

5  Q     Are you familiar with any of the past claims litigated

6  against any of the councils located in California, Oregon,

7  Washington, Montana, or Idaho?

8  A     I am aware that certain claims have been litigated in

9  those jurisdictions.  I don't know the details or the

10  specifics of them, no.

11  Q     So, do the details of those past, litigated claims play

12  into the formula that you used in negotiating the settlement

13  of the local councils?

14  A     Could you repeat that question.

15  Q     Yes.  Since you were not familiar with the details of

16  those past, litigated claims, did the details of those past,

17  litigated claims against councils located in California,

18  Oregon, Washington, Montana, or Idaho, play into the formula

19  that you used in negotiating the settlement with the local

20  council local councils?

21          MR. CELENTINO:  Object to form.

22          Ms. Dumas, if you could clarify what you mean by

23  "play into."

24  BY MS. DUMAS:

25  Q     Did you use the details of those prior, litigated

1  claims when you came up with the formula that you used to

2  negotiate the settlement with the local councils?

3  A     No.

4           MS. DUMAS:  If we could pull up your declaration,

5  and I know you have it in front of you --

6           MR. CELENTINO:  So, we have a copy of it here.

7           Would it be helpful for it to be in front of Mr.

8  Sugden or do you expect the screen share would be sufficient?

9           MS. DUMAS:  I think a screen share will be

10  sufficient.  I'm not going to go into a lot of it; I just

11  have a few paragraphs that I'd like to look at.

12           MR. CELENTINO:  Then, that's fine.  Great.

13           MS. DUMAS:  And can I have a helper pull it up?

14  Do you have a helper; if not, we can -- I'll just read it --

15  read my sentence out loud for you while it's in front of you.

16           MR. CELENTINO:  No, we can assist.  What

17  paragraph?

18           MS. DUMAS:  Paragraph 26, sub (c), sub (iii).

19  It's a long paragraph.  There you go.  That part.  There it

20  is.  There you go.

21  BY MS. DUMAS:

22  Q     And I want to focus your --

23           MR. CELENTINO:  Just --

24           MS. DUMAS:  Was that paragraph 26?

25           MR. CELENTINO:  You know, Ms. Dumas, I'm going to

1  put it in front of him, just so he has the full context of

2  the paragraph, as well, if that's all right.

3          MS. DUMAS:  Thank you.  Please do.

4      (Pause)

5          MS. DUMAS:  And I'll wait for you to do that.

6      (Pause)

7          MR. CELENTINO:  Paragraph 26?

8          MS. DUMAS:  Sub (c), sub (iii).

9          THE WITNESS:  Three little (i)s; I'm there.

10 BY MS. DUMAS:

11 Q    Okay.  I'd like to focus your attention on the second

12 sentence that says:

13          "Nonparticipation by even a few local councils and

14 the associated risk that those local councils would later

15 become economically unviable as a result of state tort

16 litigation would increase the economic pressure on the

17 reorganized BSA and remaining local councils, threatening

18 their own financial viability."

19      Did I read that correctly?

20 A    You did.

21 Q    Okay.  During your negotiations of the Local Council

22 Settlement, was the concern that the local councils,

23 themselves, would go bankrupt?

24 A    So, I want to -- and I can answer that in two cases.

25 There were really two sides to the negotiation; it was the

1  negotiation opposite the claimant representatives to

2  establish the base amount of the formula -- of the

3  contribution amount, and then there was the allocation

4  between and among the local councils.

5       Think you're referring to the latter part of, I'll call

6  it the "negotiation" and, yes, I mean, that was a material

7  concern of the Ad Hoc Committee, in terms of allocating

8  the -- allocating the aggregate, settlement, and contribution

9  amount between and among the local councils.

10 Q    Okay.  So, to be clear, when you were negotiating with

11 the local councils, there was a material concern that at

12 least some of the local councils would go bankrupt; is that

13 correct?

14 A    So, and not to quibble with how you phrase it, but

15 there was a concern that if the request was too high of them,

16 they would not participate of the global deal and they might

17 go bankrupt thereafter, because of the impact of tort

18 litigation in State Court.

19 Q    And that was because they would face their own sexual

20 abuse claims in State Court if they didn't participate in

21 this bankruptcy and those State Court tort claims would force

22 them into their own bankruptcy; is that correct?

23 A    That is what I intended by that sentence, yes.

24 Q    And was that a concern that was discussed throughout

25 the negotiations with the local councils when you were

1  talking about the amount that they would contribute?

2  A     So, this was a -- these were discussions that ran for a

3  very long time.  I think this was -- I would call that just a

4  "basic principle" of the Ad Hoc Committee in terms of how it

5  was approaching this exercise.  And I think that repeated to

6  local councils on a number of occasions.

7  Q     Okay.  So, the risk of local council bankruptcy was an

8  issue that was discussed on numerous occasions.

9       Did I get that correct?

10  A     That's correct, yes.

11  Q     Was the risk of local council bankruptcy also a concern

12  that the Ad Hoc Committee excused with claimant

13  representatives?

14  A     Yes.

15  Q     Are you aware of any analysis that was done of which

16  local councils would most likely face bankruptcy based on the

17  sex abuse claims identifying them in this bankruptcy?

18  A     So, again, I want to make sure that my -- the sentence

19  that you're referring to is taken in the proper context.

20       Our focus was on making sure the basic premise of the

21  Ad Hoc Committee --

22  Q     Excuse me.  I'm not talking about that sentence.

23       I was asking you a general question.

24            MR. CELENTINO:  Ms. Dumas, can the witness please

25  finish his answers before you ask additional questions?

1          THE WITNESS:  I just want to make sure that when I

2   say that it was a general principle, what I'm referring to is

3   not the State Court litigation, forcing the local council

4   into bankruptcy, but rather, the amount of the local

5   council's requested settlement contribution and so high that

6   if they were to accept it, that would force them into a

7   bankruptcy.

8          MS. DUMAS:  Okay.  Move to strike the

9   nonresponsive portion of his answer.

10  BY MS. DUMAS:

11  Q    I appreciate that, but that was not my question.

12       My question was, are you aware of any analysis being

13  done of which local councils would most likely face

14  bankruptcy based on the claims identifying them in this

15  bankruptcy proceeding?

16  A    I'm not aware of any, no.

17  Q    Based on any discussions that you had during this

18  bankruptcy proceeding, are you aware of which local councils

19  would most likely face bankruptcy if they had to face tort

20  claims in the State Court's tort claim process?

21         MR. CELENTINO:  Did you understand that question?

22         THE WITNESS:  I think so.  I think my answer to

23  your question is, the local councils in the states with open

24  revival windows would likely be the most -- would be the most

25  likely candidates to be forced to file for bankruptcy because

1  of that State Court litigation.

2  BY MS. DUMAS:

3  Q     Did any other local councils, other than those in

4  states with open windows, raise concerns to you that they

5  would likely face bankruptcy if this deal didn't go through?

6  A     Because of State Court litigation or just generally?

7  Q     Because of state sex abuse tort litigation?

8  A     I don't recall.

9  Q     Now, I understand your point that there were two

10  components to the deal with the local councils:  one that was

11  the overall amount and then, two, there was the allocation.

12      And that was all explained in your declaration, so I'm

13  not going to walk you through that.

14      But I have some specific questions about the formula

15  that I want to ask you about.

16  A     Of course.

17  Q     Now, it's correct, isn't it, that the final version of

18  the formula limits each local council's contribution to no

19  more than 30 percent of its total net assets, correct?

20  A     That is actually not correct.

21  Q     Okay.  What is the -- in the final version, what is the

22  limit?

23  A     So, the limit -- I'm going to get into a little bit of

24  detail here --

25  Q     And if I need to clarify my question, I am not talking

1  about any of those provisions that you used to "bridge the

2  gap" --

3  A      Okay.

4  Q      -- I am only talking about the basic formula.

5  A      That's correct, then; it's the "bridge the

6  gap" mechanisms that may push it above 30 percent in certain

7  instances.

8  Q      Okay.  So, setting aside those "bridge the gap"

9  provisions, in the final version of the basic formula, is it

10  correct that each local council's contribution is limited to

11  no more than 30 percent of its total net assets?

12  A      Correct.

13  Q      Okay.  And then, again, setting set aside the "bridge

14  the gap" provisions, is it correct that the final version of

15  the formula limits each local council's contribution to no

16  more than 30 percent of its total liquidity?

17  A      That's correct -- no, strike that -- I'm sorry, that is

18  not necessarily correct.

19         In the final iteration of the formula, there is a base

20  count of 30 percent and then there are three features that

21  can increase that liquidity guardrail to as much as 45

22  percent.

23  Q      Okay.  And what are the three things that could

24  increase it to 45 percent?

25  A      Do you want me to try to recall it from my declaration

1  or may I refer to my declaration?

2  Q      And, in fact, if you can just point us to the

3  paragraph, you won't even have to walk through them.

4  A      Sure.  So, if you -- paragraph 36(b), that's page 23,

5  and really, I'm focused on page 24 toward the end is the

6  language that I'm focused on.

7  Q      Okay.  And that paragraph explains how they each could

8  go -- each of those three things could raise it by 5 percent

9  each for a total of 45 percent?

10 A      Correct.

11 Q      Okay.  Thank you.

12        Again, and I don't know if -- setting aside any "bridge

13 the gap" provisions, is it correct that no local council

14 would pay more on a per-claim basis than an amount equal to

15 five times the average per-claim amount contributed by any

16 local council?

17 A      Five times the average paid by all local councils, not

18 (audio interference).

19 Q      Okay.  Thank you.

20        With that clarification?

21 A      Yes, that's correct.

22 Q      And what is --

23 A      Also, would it be -- would it be helpful -- do you need

24 the demonstrative on the screen any longer?

25 Q      No.  You can take that down.  Thank you.

1          And what is the average, per-claim amount paid by all
2    local councils under the formula?
3    A    I don't have that committed to memory.
4    Q    Do you have a ballpark for us?
5    A    I don't, I'm sorry.
6    Q    Is it roughly $10,000?
7    A    I -- I simply don't know, sitting here today.
8    Q    Okay.  Is it, roughly, $100,000?
9    A    Ma'am, I -- if I had a copy of the current version of
10   the formula, I could identify that.  I simply don't have it
11   committed to memory.
12   Q    And it's correct, isn't it, that under the formula, and
13   setting set aside the "bridge the gap" -- no, excuse me, let
14   me start over.
15        It's correct, isn't it, that under the final version of
16   the formula, no local council will pay more than $10 million?
17   A    It is correct that no local council was asked by the Ad
18   Hoc Committee to contribute more than $10 million.  I believe
19   there's one council that has decided to contribute an entire
20   property that's estimated to be worth a little over $13
21   million, but that's an anomaly thing.
22   Q    All right.  And my question was, did the formula,
23   itself, set a cap of $10 million on the amount that any local
24   council is required to pay, correct?
25   A    The formula sets a cap of $6 million and then there's a

1   "bridge the gap" that can be as much as $4 million.

2   Q     Okay.

3   A     For a total of $10 million.

4   Q     For a total of $10 million, right.

5         And that total cap of $10 million applies, no matter

6   how many claims are -- name a local council, correct?

7   A     Correct.

8   Q     And that ten-million-dollar total cap applies no matter

9   what the nature of any -- what the nature of the sex abuse

10  claims are, correct?

11  A     That's correct.

12  Q     And that ten-million-dollar cap applies no matter what

13  the statute of limitations is in the jurisdiction where the

14  local council is located, correct?

15  A     That's correct.

16  Q     And that ten-million-dollar cap applies no matter what

17  the total assets of that local council might be, correct?

18  A     That's correct.

19  Q     Okay.  And the ten-million-dollar cap applies no matter

20  whether that local council would be facing its own

21  bankruptcy, if not for this plan, correct?

22  A     That's correct.

23  Q     Was there any adversary proceeding filed to test the

24  restricted designation of the local council assets?

25  A     (Indiscernible) of the local council assets?

1    I'm not aware that there was.

2    Q    Okay.  Are you aware that there was such an adversary

3    proceeding against the BSA to test the restricted asset

4    designation of their restricted assets?

5    A    I'm aware one was filed, yes.

6    Q    Okay.  But there was no such challenge to the local

7    council assets, correct?

8    A    I don't believe that there was.

9    Q    Once you had the formula in place and once the -- there

10   was agreement on the amount of the Local Council Settlement,

11   it took the Ad Hoc Committee only three weeks to get all the

12   local councils to contribute to their contributions under the

13   formula, correct?

14   A    No, that's not correct.

15   Q    Can I direct you to paragraph 50 of your declaration.

16   A    Yes, I'm there.

17   Q    Okay.  And in the middle of that paragraph, doesn't it

18   say:

19          "In the approximately three-week period, during

20   which the Ad Hoc Committee focused its campaign to solicit

21   letters of intent, representatives of the Ad Hoc Committee

22   held hundreds of phone calls with members and representatives

23   of local councils and attended dozens of local council board

24   meetings; as a result of these efforts, by the end of July,

25   the Ad Hoc Committee had received letters of intent from the

1  vast majority of local councils for the amounts of their

2  contributions under the formula, plus any "bridge the gap"

3  amounts, and determined that local councils would

4  collectively be willing," and it continues on, I guess, the

5  next page to say, "and able to make up the five-hundred-

6  million-dollar, direct financial contribution, contemplated

7  under the RSA and to support the DST note."

8         Did I read that correctly?

9  A    You did.

10  Q    Okay.  So, doesn't that -- doesn't your testimony say

11  that it took you approximately three weeks to line up all of

12  the contributions from the local councils?

13  A    No, it doesn't; it says the "vast majority."

14         As I stated in paragraph 53, by September 30th, 2021,

15  we had secured all -- had secured letters of intent from all

16  local councils.  It was -- the time period was longer than

17  three weeks.

18         Most of them were received in the first three weeks.

19  Some of them were received in two -- if memory serves,

20  approximately mid- to late-August.

21  Q    Okay.  Well, local --

22            MS. DUMAS:  Oh, you can take that down.  Thank

23  you.

24  BY MS. DUMAS:

25  Q    The local councils have to contribute their own

1  insurance to the Settlement Trust, correct; even the pre-1976

2  policies from non-settling insurers?

3  A    They have to contribute their own and their rights as

4  additional insurers under the National BSA policies, correct.

5  Q    Okay.  And in -- and the local councils, if they are

6  unable to transfer their rights under their own insurance

7  policies, they're required to take reasonable steps to pursue

8  their insurance benefits for the benefit of the Settlement

9  Trust, correct?

10 A    I believe that's correct, yes.

11 Q    Okay.  What steps are the local councils required to

12 take to pursue insurance benefits under their own policies if

13 they're unable to transfer them?

14 A    I believe that you're referencing language that is in

15 the plan.  If you could point me to that language, that would

16 be helpful.  I'm familiar with the language that you're

17 talking about, I just have not committed it to memory.

18 Q    Okay.  I'm actually referring to paragraph 66 of your

19 declaration.

20 A    Okay.

21 Q    Okay.

22 A    Could you repeat your question, please.

23 Q    Yes.  It says -- your testimony says:

24        "I understand that if a local council is unable to

25 transfer its rights to any proceeds under the BSA insurance

1  policies or the local council's insurance policies, it is

2  required to take reasonable steps to pursue those insurance

3  benefits for the benefit of the Settlement Trust and transfer

4  any recoveries to the Settlement Trust."

5  A    Yes, I said that.

6  Q    Did I read that correctly?

7  A    You did.

8  Q    Okay.  So, my question was, what steps will the local

9  councils be required to take to pursue insurance benefits

10  under their own policies if they are unable to transfer them?

11  A    I believe that the language in the plan, and I defer

12  entirely to what that language is, but I believe that

13  language is, they are required to take steps, as may be

14  requested, reasonably requested by the settlement trustee or

15  words to that effect.

16  Q    What is the enforcement mechanism to require them to do

17  that?

18  A    I don't recall.

19  Q    Is there an enforcement mechanism to require the local

20  councils to do that?

21  A    I don't recall.

22         MS. DUMAS:  And if we could move to paragraph 69

23  of your declaration.

24         THE WITNESS:  I'm there.

25  BY MS. DUMAS:

1  Q      Okay.  Oh, yes.

2         That paragraph, I'm not going to ask you the details of

3  this, except there's a line near the top that mentions that

4  since 2014, the form of the charter agreement that local

5  councils have executed with chartered organizations, each

6  year, contains the following language, and then it goes on to

7  discuss an indemnification agreement between chartered

8  organizations and the local councils.

9         So, my question to you is, is it your understanding

10 that chartered organizations had some kind of indemnity

11 agreement with local councils since 2014?

12 A      (Indiscernible) testimony that this language appears in

13 the form of a charter agreement.  I know that certain

14 chartered organizations have asserted that it had certain

15 consequences here.  The language is what the language is in

16 the charter.

17 Q      Okay.  But that language only starts to appear in 2014?

18 A      That's my best understanding, yes.

19 Q      Okay.  Are you aware of any language like that, prior

20 to 2014?

21 A      In the form of charter agreement?

22 Q      Correct.

23 A      I am not aware.

24 Q      Okay.  And are you aware of any similar language in the

25 charter agreements between local councils and the BSA?

1   A       In the charter agreement between local councils and the

2   BSA, with respect to chartered organizations or with respect

3   to BSA or with respect to local councils?

4   Q       The charter agreements between local councils and the

5   BSA.

6   A       Again, I'm sorry -- I'm not trying to be difficult -- I

7   just want to understand what indemnity language are you

8   referring to?  This indemnity language?

9   Q       Any kind of indemnity language.

10  A       I believe that there is, and I submitted a form of the

11  charter agreement from my counsel, I believe that there is,

12  in the charter application, I believe there is similar

13  language.

14  Q       And what year was the example language -- excuse me --

15  what year was the exhibit that you just mentioned?

16  A       I think it was 2020, and I may be confusing -- I'm

17  sorry, I may be confusing myself between the application,

18  which is Exhibit 1 and the charter agreements.

19          If you would put documents in front of me, I would be

20  happy to review them.

21  Q       Okay.  But you were referring to a 2020 document, when

22  you described --

23  A       I believe so, yes.

24  Q       Okay.  Since reaching the Local Council Settlement in

25  this case, has there been a change in the number of local

1  councils?

2  A    I believe that there are currently 250 local councils

3  and I believe that, at that time, you know, in approximately

4  late June or early July, there were 251.  I believe that

5  there was one merger, but I don't recall which two councils

6  merged.

7  Q    Okay.  And is the BSA in the process of merging

8  multiple councils to eliminate up to another 200 of them?

9  A    I have no knowledge of that.

10 Q    Okay.  And is the BSA in the process of eliminating the

11 Local Council Pension Fund?

12 A    I am not aware of any steps being taken by National BSA

13 in that regard.

14 Q    Okay.  During the negotiations with the Local Council

15 Settlement, I believe you also say in your declaration that

16 you worked with other constituent parties to negotiate

17 interrelated settlements; is that correct?

18 A    Yes.

19 Q    Okay.  Was the -- did you work with the Ad Hoc

20 Committee for the Methodist organization?

21         MS. DUMAS:  You can take the exhibit down.  Thank

22 you.

23         THE WITNESS:  Yes, we did.

24 BY MS. DUMAS:

25 Q    Okay.  Was the per-claim amount of the Local Council

1  Settlement relevant to the negotiations with the Methodists

2  in coming up with the amount of their settlement?

3  A    So, I want to be sensitive here, because I believe that

4  was part of the mediation and I believe I'm restricted in

5  disclosing that mediation, privileged information.

6  Q    I don't know that you are, now that we are at trial.

7           MR. CELENTINO:  Ms. Dumas, no matter can introduce

8  evidence as to what happened in mediation at trial or at any

9  proceeding, is my understanding.  I don't have the textbook

10 rule in front of me, but I do believe Mr. Sugden is correct

11 as to that.

12 BY MS. DUMAS:

13 Q    Okay.  Well, is the per-claim amount of the Local

14 Council Settlement related in any way to the per-claim amount

15 of the Methodist settlement?

16 A    I don't believe so.  I don't believe so.

17 Q    Bishop Schol was the witness before you.

18      Did you hear any of his testimony?

19 A    I heard small pieces of his testimony.  I didn't nod

20 hear the whole thing.  I did not hear what you were

21 referencing.

22 Q    Okay.  I'll represent to you that he testified that the

23 per-claim settlement for the Methodists is within two dollars

24 of the per-claim settlement of the local councils.

25      Is that just a coincidence?

1  A      So, I don't know what -- I don't know how the

2  Methodists were focused on negotiating from their

3  perspective.

4         From the perspective of the Ad Hoc Committee, we were

5  very focused on trying to help the parties facilitate a

6  global settlement before the Methodist Ad Hoc Committee.

7  Q      Okay.

8              MS. DUMAS:  Those are all my questions.  Thank

9  you.

10             THE COURT:  Thank you.

11             Is there any other cross?

12             MS. ARNONE:  Yes, Your Honor.

13             THE COURT:  Yes, Ms. Arnone?

14             MS. ARNONE:  Well, thank you.

15                        CROSS-EXAMINATION

16  BY MS. ARNONE:

17  Q      Mr. Sugden, I am counsel for the unsecured creditors'

18  committee for the bankruptcy of the Archbishop of Agana, a

19  Corporation Sole, which is a very long phrase, so we are just

20  going by "Guam Committee."

21  A      Understood.

22  Q      Okay.  Is the Aloha Council a member of the Ad Hoc

23  Committee of Local Councils?

24  A      They are not.

25  Q      Have you personally been in contact with any

1  representative of the Aloha Council through your work on the

2  Ad Hoc Committee?

3  A    I don't recall, specifically.  I may have been in a

4  conversation with them, but I don't have any specific

5  recollection.  I know that others have been -- other members

6  of the Ad Hoc Committee have been.

7  Q    Okay.  In your declaration, you discuss the purpose of

8  the supplemental LC contribution, so I want to ask you about

9  that.

10       On February 18th of 2022, the debtors filed a

11  supplemental disclosure regarding plan modifications and a

12  summary of chartered organizations' options under the

13  debtors' modified plan of reorganization.  That's also a big

14  mouthful.  That one is Docket Entry 8904 and that's

15  JTX-1-361.

16       And I believe that your counsel should have that for

17  you.  I sent that yesterday.

18            MR. CELENTINO:  We do.  Would you like us to put

19  it in front of the witness?

20            MS. ARNONE:  Yeah, that would be fantastic.

21            Your Honor, this is the supplemental disclosure,

22  but I can screen share it -- okay.  Perfect.  There we go.

23  BY MS. ARNONE:

24  Q    So, page 2, under the title of "Summary of modified

25  plan changes," there's a paragraph that starts:

1       Under the December 18th, 2020 -- so it's the third

2   paragraph, there we go:

3           "Under the December 18th, 2021, version of the

4   plan, certain supplemental contributions from the local

5   councils and the BSA entitled certain chartered organizations

6   to potential protections against all Scouting-related abuse

7   claims as contributing chartered organizations/protected

8   parties under the channeling injunction.

9           These additional contributions are now being

10  treated as consideration for the proposed extension of the

11  preliminary injunction for limited protected parties,

12  following the effective date of the modified plan for 12

13  months, subject to potential extension.  Chartered

14  organizations will be required to make a separate monetary

15  contribution in order to become a contributing chartered

16  organization under the modified plan, as set forth below."

17      Is this representation from the debtors in the

18  supplemental disclosure statement accurate?

19  A    I believe it is, yes.

20          MS. ARNONE:  And you can take that down now.

21  BY MS. ARNONE:

22  Q    The eleventh mediator's report, including the TCC

23  settlement term sheet, filed with the Court on

24  February 10th, 2022, also reflected this payment of the

25  supplemental LC contribution as consideration for the

1   extension of a preliminary injunction that would benefit the

2   limited protected parties, correct?

3   A      I believe that's right, yes.

4   Q      Okay.  The opt-out chartered organizations are not

5   limited protected parties under the plan of reorganization,

6   correct?

7   A      I'm sorry, could you repeat that.

8   Q      Sure.  The opt-out chartered organizations are not

9   limited protected parties under the plan of reorganization,

10  correct?

11  A      I believe that's correct, yes.

12  Q      So, the supplemental LC contribution was not given for

13  the opt-out chartered organizations, correct?

14  A      I believe that would be correct.  I believe that would

15  be correct, yes.

16  Q      Okay.  So, in your declaration, you state at a couple

17  of places, I think in paragraphs 56 and 57, that the

18  supplemental LC contribution was consideration for

19  protections under the plan for chartered organizations.

20         But based on your testimony, it sounds like, actually,

21  the supplemental LC contribution is consideration for the

22  preliminary injunction, benefiting certain chartered

23  organizations, which are the participating chartered

24  organizations, or the limited protected parties, correct?

25  A      Can I -- I'm sorry, I (indiscernible).

1          MR. CELENTINO:   (Indiscernible) -- I'm sorry, I

2  (indiscernible) thing.

3          MS. ARNONE:   Sorry, that was a big mouthful.

4          MR. CELENTINO:   Do you find -- first, do you mind

5  repeating the question, just because I lost it.

6          And, second, obviously, Mr. Sugden's legal opinion

7  as to the effect of different plan provisions is not an

8  appropriate source of testimony or not an appropriate subject

9  for testimony.

10          MS. ARNONE:   Okay.  Well, I'm talking about his

11  declaration.

12          MR. CELENTINO:   Understood.  If you could repeat

13  the question, I was noting (indiscernible).

14          MS. ARNONE:   Okay.  Well, should we pull up his

15  declaration?  It might be easiest if we see his declaration.

16  I think you said -- do you have that in front of him?

17          MR. CELENTINO:   Yes.  Do you have it, Mr. Sugden?

18          THE WITNESS:   Yes, I do.

19  BY MS. ARNONE:

20  Q     So, in paragraph -- I'm flipping to it, too -- in

21  paragraphs 56 and 57, so I guess let's start with 56.

22  (Indiscernible) in here.  I'm sorry.  That's a long

23  paragraph.  Hold on.

24          (Pause)

25  BY MS. ARNONE:

1  Q      Okay.  Well, I know it's in 57, so let's look at it in
2  57.  It says, at the beginning of 57:
3              "The supplemental LC contribution serves as
4  consideration to facilitate the protections under the plan
5  for chartered organizations that have not yet become
6  contributing chartered organizations."
7        And then at the very end, the last sentence also says:
8              "The supplemental LC contributions being made on
9  behalf of chartered organizations, as part of the chartered
10 organization contribution."
11       And what I'm getting at here is based on your
12 testimony, that what you meant to say there was that the
13 supplemental LC contribution was consideration to facilitate
14 the protections under the plan for certain chartered
15 organizations that have not yet become contributing chartered
16 organizations.
17       And on the last sentence, that the supplement LC
18 contributions being made on behalf of certain chartered
19 organizations as part of the chartered organization
20 contribution; is that correct?
21             MR. CELENTINO:  Did you understand that question,
22 Mr. Sugden?
23             THE WITNESS:  I think I did.
24             The -- when you say, "certain chartered
25 organizations," I think you mean participating chartered

1   organizations, which I reference in the clause that you

2   omitted in the first sentence.

3   BY MS. ARNONE:

4   Q    Well, it says, "that have not yet become contributing

5   chartered organizations, which would also include opt-out

6   chartered organizations."

7   A    Understood.  I'm just referring to the next line that

8   specifically references participating chartered

9   organizations.

10  Q    Okay.  Why don't --

11  A    (Indiscernible) opt-outs.

12  Q    Sure.  I just wanted to make sure that we're on the

13  same page here, that the supplemental LC contribution was

14  being made on behalf of the participating chartered

15  organizations --

16  A    Correct.

17  Q    -- not opt-out chartered organizations, correct?

18  A    Correct.

19  Q    Okay.  Perfect.

20       Okay.  Are you aware that the Archbishop of Agana has

21  been a debtor in bankruptcy since before the Boy Scouts filed

22  for reorganization?

23  A    I am heard through the course of these proceedings that

24  the Archbishop of Agana has filed for bankruptcy.  I did not

25  know the precise timing of it, though.

1    Q    Okay.  Because the Archbishop of Agana is a debtor in

2    its own bankruptcy, it would not have been a participating

3    chartered organization under the modified, fifth amended plan

4    that was filed on September 30th, 2021, which I'm calling the

5    "solicitation version," unless it notified debtors' counsel

6    that it would agree to assign certain of its insurance

7    rights, correct?

8    A    I believe that's correct, yes.

9    Q    Okay.  So, only if the Archbishop of Agana had opted in

10   to become a limited protected party, would the archbishop

11   receive the benefit of channeling injunctions and claim

12   releases under that modified, fifty amended plan that was

13   filed September 30th, correct?

14   A    I believe that's correct.  I cannot -- that's an old

15   claim.  I've not reviewed it recently.

16   Q    Well, actually, I've got it up here.  That'd be

17   helpful.  Let me find it.

18        Actually, I did also send this to your counsel.

19            MR. CELENTINO:  Yeah, we can put it in front of

20   the witness if that would be helpful.

21            And, I'm sorry, can you pronounce your last name

22   for me just so I get it right.

23            MS. ARNONE:  Sure.  It's Arnone.

24            MR. CELENTINO:  All right.  Thank you, Ms. Arnone.

25            MS. ARNONE:  Absolutely.  Everyone asks.

1    MR. CELENTINO:  And Celentino, that's a hard one,

2  too.

3    (Laughter)

4  BY MS. ARNONE:

5  Q    So, I think this is under the -- I'll find the page,

6  I'm sorry -- big plans, too?

7    (Pause)

8    MS. ARNONE:  Almost there.  I've been in the

9  (indiscernible) for a while here.

10 BY MS. ARNONE:

11 Q    Okay.  Yeah, here we go.

12    So, it's definition 176 in the solicitation version of

13 the plan, which I am showing as page 29.

14 A    I'm there.

15 Q    And I can do a screen share here.  Hold on.

16    MS. ARNONE:  Sorry.  I see it blocked for me.

17    THE COURT:  Ms. Arnone, you can share.

18    Try again, please.

19    (Pause)

20    MR. CELENTINO:  Ms. Arnone, I think we could

21 potentially pull it up for you, if that would be helpful?

22    MS. ARNONE:  Oh, I'm sorry, I just need to

23 continue one thing here.

24 BY MS. ARNONE:

25 Q    Okay.  Do you see that definition 176, is that what

1  you're seeing?

2  A    I do see it and I have reviewed it on the copy in front

3  of me.

4  Q    Okay.  Perfect.

5       So, I think it states here in the middle on the second

6  sentence, actually:

7           "Notwithstanding the foregoing, with respect to

8  any chartered organization that is a debtor in bankruptcy as

9  of the confirmation date, such chartered organization shall

10 be a participating chartered organization only if it advises

11 debtors' counsel in writing that it wishes to make a

12 participating chartered organization insurance assignment and

13 for the avoidance of doubt, absent such written advisement,

14 none of the chartered organization's rights (indiscernible)

15 the abuse insurance policies shall be subject to this

16 insurance assignment."

17      And then it says, "a list of chartered organizations

18 that are not participating chartered organizations is

19 attached, hereto, as Exhibit K."

20      Now, I actually have to see if I can find Exhibit K

21 real quick.

22 A    I think it's page 237.

23 Q    Thank you.

24      Okay.  Here we go:

25          "The following is a list of chartered

1  organizations that the BSA is aware are currently debtors in

2  bankruptcy.  If the BSA becomes aware of additional chartered

3  organizations in bankruptcy, it will promptly revise this

4  exhibit."

5       And then it listed, "Number one, is Archbishop of

6  Agana, a Corporation Sole, a Chapter 11 debtor in

7  possession."

8       Did I read that correctly?

9  A    You did.

10 Q    Okay.  So, the Archbishop of Agana would not have been

11 a participating chartered organization and would not have

12 been a limited protected party under the modified, fifty

13 amended plan, correct?

14       MR. CELENTINO:  Ms. Arnone, just to be clear, if

15 you're asking Mr. Sugden to provide a legal interpretation of

16 plan documents, that is only proper subject of fact

17 testimony.

18       MS. ARNONE:  Okay.

19       MR. CELENTINO:  We object.

20       MS. ARNONE:  Well, we've seen it, I think, at this

21 point; it's on the exhibit.

22       THE COURT:  Sustained.

23 BY MS. ARNONE:

24 Q    All right.  Mr. Sugden, in paragraph 69 of your

25 declaration, you state that local councils will not

1    contribute to the Settlement Trust unless indemnity,

2    contribution, and subrogation claims from insurers and

3    chartered organizations against local councils are released

4    and channeled.

5         Did I describe that correctly?

6    A    And I'm just opening it up, but in sum and substance,

7    you did.

8    Q    Okay.  I'm sorry, have you gotten there?

9    A    Oh, I'm sorry.  I've got the page.

10   Q    That's okay.

11        So, that was your testimony, correct, that local

12   councils will not contribute to the Settlement Trust unless

13   indemnity, contribution, and subrogation claims from insurers

14   and chartered organizations against local councils are

15   released and channeled and provided in the plan; is that

16   correct?

17   A    Yes, I think the text is a little different than that,

18   but in substance, it's correct, yes.

19   Q    Okay.  What insurers are you talking about in paragraph

20   69 of your declaration that you contend might have

21   contribution or subrogation claims against the local

22   councils?

23             MR. CELENTINO:  Objection; misstates the

24   testimony.

25             THE COURT:  Can you repeat the question.

1         MS. ARNONE:  Yes.

2    BY MS. ARNONE:

3    Q    What insurers -- I can look back at the exact language

4    in the declaration, I'm sorry -- what insurers are you --

5         MR. CELENTINO:  I can maybe short circuit this a

6    little bit.  My only point, Ms. Arnone, is that Mr. Sugden

7    does not contend that particular insurers in his declaration

8    have indemnity claims against local councils.  He doesn't

9    state particular insurers.

10         MS. ARNONE:  Okay.  I see that.

11    BY MS. ARNONE:

12    Q    Okay.  So, you mentioned there, Mr. Sugden, that the

13    local councils will not contribute to the Settlement Trust

14    unless indirect abuse claims, which includes contribution and

15    subrogation claims from insurers and chartered organizations

16    against local councils are released and channeled.

17       So, assuming that there were valid contribution,

18    indemnity, or subrogation claims from insurers, I'm wondering

19    what insurers are being referenced there.

20    A    (No verbal response.)

21    Q    Are you meaning -- I'm sorry -- let me rephrase this.

22       When you say those claims from insurers and chartered

23    organizations, are you meaning the insurers of the chartered

24    organizations?

25    A    No, I don't think I'm meaning anything that specific.

1 | The import of this sentence is really focused on the indirect

2 | abuse claims and my intent was to say that, essentially,

3 | unless a local council has protection from both, direct abuse

4 | claims, not referenced in this paragraph, as well as indirect

5 | abuse claims, they would not make the contributions that the

6 | Ad Hoc Committee sought from them.

7 | Q    Okay.  The plan has something called a "judgment

8 | reduction provision."

9 |      Are you familiar with the concept of the judgment

10 | reduction provision?

11 | A    I am broadly familiar with it --

12 | Q    Okay.

13 | A    -- but I probably could not answer many specific

14 | questions, but if you want, I'm happy to try.

15 | Q    No, I won't ask specific.  I think this one will be for

16 | your general knowledge.

17 |      Let's say that an insurer is defending a chartered

18 | organizations and pays a judgment on an abuse claim.  When

19 | the just reduction provision is applied, the insurer will not

20 | have a contribution claim against a settling insurance

21 | company for having paid more than its share of the judgment,

22 | correct?

23 |           MR. CELENTINO:  I'm going to object to that

24 | question.  They're asking -- there's no way that question

25 | could be asking for anything other than Mr. Sugden's legal

1  opinion on a subject he just testified he doesn't have any

2  knowledge of.

3           THE COURT:  Sustained.

4  BY MS. ARNONE:

5  Q    Does the plan contain any provision that says, upon

6  plan confirmation, the liability of joint tortfeasors will be

7  several only, and not joint?

8  A    I don't recall.

9  Q    Does the plan contain any provision saying that upon

10 plan confirmation, if the survivor asserts an abuse claim

11 against another tortfeasor that is not protected by the

12 channeling injunctions or releases, that the other tortfeasor

13 will not be held liable for a protected party share of causal

14 liability or fault?

15 A    I don't recall if it says that.

16 Q    In considering whether to approve this third amended

17 plan of reorganization, did the Ad Hoc Committee of Local

18 Councils review the terms of any plans of reorganization that

19 were filed in other bankruptcies also arising from childhood

20 sex abuse claims against organizations?

21 A    That is -- that would really be a question for our

22 counsel.  I'm not sure that -- I don't recall and I don't

23 know if they did or not.

24 Q    You don't recall having any discussions about whether

25 other plans of reorganization around the country would have

1  provisions in them that would sever the joint liability of

2  the tortfeasors and make it several only?

3       MR. CELENTINO:  Mr. Sugden, I'm going to caution

4  you only to answer that question to the extent you can do so

5  without invading attorney-client privilege.

6       THE WITNESS:  I don't recall.

7  BY MS. ARNONE:

8  Q    Do you know whether the Archbishop of Agana has

9  asserted that the Aloha Council has a written, contractual

10 obligation to indemnify the Archbishop of Agana for claims

11 asserted against the archbishop in its own bankruptcy?

12 A    I don't know one way or the other.

13 Q    Do you know who would know the answer to that?

14 A    Could you can the question -- I'm sorry -- could you

15 ask the question again?

16 Q    Sure.  Do you know whether the Archbishop of Agana has

17 asserted that the Aloha Council has a written, contractual

18 obligation to indemnify the Archbishop of Agana for claims

19 asserted against the Archbishop of Agana in its own

20 bankruptcy?

21 A    I would think that the Archbishop of Agana and

22 representatives of the Aloha Council would probably be the

23 best people to answer that question.

24 Q    Okay.  And so I want to go back to paragraph 69 of your

25 declaration.

1  A      I'm there.

2  Q      You state that since 2014, a form chartered

3  organization agreement has language -- there you go -- that

4  states with the following language:

5            "The local council agrees to indemnify the

6  chartered organization in accordance with the resolutions and

7  policies of the National Executive Board of the Boy Scouts of

8  America."

9        MS. ARNONE:  Perfect, thank you.

10 BY MS. ARNONE:

11 Q    And I know that you spoke earlier about this, as well,

12 so I'll try not to duplicate any questions, and I think I

13 really only have one.

14      If there is such a written indemnity agreement, is it

15 the position of the local councils that it applies only to

16 allegations of abuse from 2014 to the present?

17            MR. CELENTINO:  I think you're asking for an

18 answer to a legal question there, Ms. Arnone.

19            I direct -- we object on that basis.

20            THE COURT:  Sustained.

21            MS. ARNONE:  That's fine.

22            No further questions, Your Honor.

23            THE COURT:  Thank you.

24            Other cross?

25            Mr. Buchbinder?

1          MR. BUCHBINDER:  Thank you, Your Honor.

2          I just have a brief, handful of questions and I'll

3  try to take my hand down.

4                    CROSS-EXAMINATION

5  BY MR. BUCHBINDER:

6  Q     Mr. Sugden, is any local council a debtor in this case?

7  A     No.

8  Q     Are you aware of any local council being a debtor in

9  any case?

10 A     I am not.

11 Q     Other than the church of Jesus Christ, the United

12 Methodists, and now the Roman Catholic Ad Hoc Committee, are

13 you aware of any other chartered organization that has

14 entered into a settlement agreement with BSA that it has

15 actually executed?

16 A     I am not.

17 Q     Are you aware -- well, is any chartered organization a

18 debtor in this case?

19 A     No.

20 Q     Is it your understanding that to be a participating

21 chartered organization, the chartered organization doesn't

22 have to do anything, except exist?

23          MR. CELENTINO:  Are you asking for Mr. Sugden's

24 interpretation of the plan, Mr. Buchbinder?

25          MR. BUCHBINDER:  I'm asking for his understanding,

1  yes.  If he doesn't understand, then he can say so.

2          MR. CELENTINO:  You can go ahead, if you can

3  answer it.

4          THE WITNESS:  We were walking through -- so, I

5  think that's sort of the default rule.  I think they were

6  walking through in some of the earlier questioning, how

7  the -- the exception to that, with respect to chartered

8  organizations that are in their own bankruptcy proceeding.

9  BY MR. BUCHBINDER:

10 Q    Well, actually, that wasn't my question, Mr. Sugden.

11      My question was simpler.  Is there anything that under

12 the current plan, a participating chartered organization, is

13 there any affirmative action the chartered organization has

14 to take under the current version of the plan to become a

15 participating chartered organization?

16         MR. CELENTINO:  Mr. Sugden -- or Mr. Buchbinder,

17 Mr. Sugden's interpretation of the plan is not relevant and,

18 otherwise, would be a legal conclusion.  There's no way that

19 question can be anything other than a legal conclusion, or if

20 it does, it's not relevant (indiscernible).

21         THE COURT:  I'll overrule it, to the extent that

22 Mr. Sugden has an understanding.

23         THE WITNESS:  My understanding is that if the

24 chartered organization is a debtor in its own bankruptcy, it

25 does have to take affirmative steps under the plan to be a

1  participating chartered organization.  If it is not, then it

2  does not.

3  BY MR. BUCHBINDER:

4  Q    So, then, you participate just by being in existence?

5  A    You would have to be a chartered organization and, you

6  know, as a chartered organization, you have certain rights as

7  an additional insured under insurance policies.

8  Q    And to be a participating chartered organization in

9  this plan, you don't have to take any affirmative action

10 whatsoever?

11 A    Except if you're a debtor in your own bankruptcy;

12 that's correct.

13 Q    Thank you.

14         MR. BUCHBINDER:  I have no further questions, Your

15 Honor.

16         THE COURT:  Thank you.

17         Is there any other cross?

18         Ms. Wolff?

19         MS. LUJAN WOLFF:  Thank you, Your Honor.

20         Delia Lujan Wolff from Lujan & Wolff, LLP,

21 representing certain survivors of abuse.

22                   CROSS-EXAMINATION

23 BY MS. LUJAN WOLFF:

24 Q    Good afternoon, Mr. Sugden --

25         THE COURT:  Ms. Wolff --

1          MR. CELENTINO:  Ms. Wolff, we can't see your

2   video.  I don't know if it's possible to turn it on.

3          MS. LUJAN WOLFF:  I'm sorry.  Can you see me now?

4          MR. CELENTINO:  Yes, I do.

5          MS. LUJAN WOLFF:  Thank you.  Sorry about that.

6   BY MS. LUJAN WOLFF:

7   Q    Okay.  So, Mr. Sugden, during Ms. Dumas' cross-

8   examination of you, you referenced a 2020 document in which,

9   I guess, a 2020 document, an indemnity agreement between BSA

10  and the local councils; is that true?

11  A    So, I think that that was a document that I had gotten

12  a little bit confused on.  I believe I was referencing

13  Exhibit 1 to my declaration, which is the charter application

14  between my counsel and the National BSA for 2020.

15  Q    So, given your clearing up your confusion that you had

16  yearly, is it still your testimony, then, that there is a

17  2020 -- I'm sorry -- is it still your testimony that there is

18  a written document, a written indemnity agreement between the

19  Boy Scouts and the local councils?

20  A    I don't -- I'm not aware of one.

21  Q    Okay.  Thank you.

22       And you mention in your declaration that the Ad Hoc

23  Committee of Local Councils entered into a restructuring

24  support agreement in the summer of 2021.

25       Do you remember that?

1  A       Yes, I do recall that.

2  Q       Yes.  And that restructuring support agreement, did

3  that have the support of all of the local councils?

4  A       The Ad Hoc Committee was the signatory to that.  No

5  local council was a signatory to that.

6  Q       But no local councils objected to that RSA; is that

7  correct?

8           MR. CELENTINO:  Ms. Lujan Wolff, do you mean no

9  local councils filed objections to the RSA?

10 BY MS. LUJAN WOLFF:

11 Q       To your knowledge, sir, did any local councils disagree

12 with the terms of the RSA?

13 A       I don't believe that any filed objections.  I did not

14 communicate with all of them related to the RSA.

15         The Ad Hoc Committee did hold numerous Zoom sessions,

16 but we did not take a poll or anything like that of local

17 councils.

18 Q       And the RSA required, or under the RSA, the local

19 councils would be giving a five-hundred-million-dollar

20 contribution to the Settlement Trust and there's also a note;

21 is that correct?

22 A       And as well as the insurance rights.

23 Q       Thank you.  And so the RSA also provided that -- and

24 I'm just going to read it -- I can show you the motion filed

25 with the Court to approve the RSA, if that's okay with you,

1   just so there's no confusion.  Okay?  Let me share my screen.

2        (Pause)

3   Q    I'm sorry, I'm not able to share my screen, but let me

4   ask you if you --

5             THE COURT:  We're getting you there.  You can try

6   again, please.

7             MS. LUJAN WOLFF:  Thank you.

8        (Pause)

9             MS. LUJAN WOLFF:  Thank you, Your Honor.  That

10  worked.

11  BY MS. LUJAN WOLFF:

12  Q    So this is the debtors' motion for entry of an order

13  pursuant to Sections 363(b) and 105(a) of the bankruptcy

14  code, authorizing the debtors to enter into and perform under

15  the restructuring support agreement, and granting related

16  relief, filed at Docket 5466, filed July 1, 2021.  Do you see

17  that, sir?

18  A    Yes.  The screen is quite a ways away from me, I'm not

19  able to read the individual words on it -- thank you, that's

20  much better.

21  Q    Does that help?  Thank you, sir.

22  A    That's much better.

23  Q    Just let me know if you can't read anything.  Okay?

24  A    I can --

25  Q    So do you recognize this motion?

1  A      I recall the motion, yes.

2  Q      Okay.  I'm just going to go to, I believe it's page 7

3  that contains certain terms.  And it says here, paragraph 11,

4  "The key terms and provisions of the amended plan proposed

5  under the RSA will include the following," okay?

6          So these are key terms that the parties agreed to

7  support for an amended plan.  And so let's go to the next

8  page.

9          Contributing chartered organization settlement

10 contribution.  It states here that "the parties shall work in

11 good faith to develop a protocol for addressing participation

12 by chartered organizations in the benefits of the channeling

13 injunction.  Such settlements may occur prior to the

14 effective date with the consent of all parties.  Do you see

15 that, sir?

16 A      I do.

17 Q      So, at the time of the RSA, which -- at the time of the

18 RSA -- or under the terms of the RSA, the parties agree to

19 support a $500 million contribution by the local councils and

20 the note and the transfer of insurance rights.

21         And, as to the chartered organizations, the parties

22 were required to develop -- to work in good faith to develop

23 a protocol for addressing participation by chartered

24 organizations in the benefits of the channeling injunction.

25         Did I say that correctly?

1   A      Yes.

2   Q      Okay.  And so the RSA did not require that chartered

3   organizations receive the benefits of a channeling

4   injunction; is that correct?

5   A      I think it's fair to say that the RSA left open the

6   treatment of chartered organizations and really, very shortly

7   thereafter, the primary parties to the RSA began working

8   intensively on trying to fulfill this obligation to negotiate

9   in good faith.  In fact, my recollection is that, within days

10  of this, the Coalition had come up with an initial proposal

11  that was presented to, among others, the ad hoc committee.

12  Q      Okay.  So you're saying it left open, it left open this

13  addressing participation by chartered organizations, but,

14  again, it did not require that chartered organizations get

15  releases or the benefits of a channeling injunction; correct?

16  A      It had -- this was an open issue at the time and it was

17  very clear to the ad hoc committee, and the ad hoc committee

18  had stated as much on the record and otherwise, that an

19  acceptable resolution with respect to chartered organizations

20  was absolutely a condition of local councils, in the ad hoc

21  committee's view, to getting local council participation in

22  the settlement.  And when we went out around this time to

23  local councils and solicited the letters of intent, those

24  letters of intent were expressly conditioned on, among other

25  things, an appropriate settlement and resolution of chartered

1  organizations.

2  Q    So what you're saying is that, after the parties

3  entered into this restructuring support agreement, the local

4  councils changed their mind and decided that they required --

5  they required releases and channeling injunctions benefitting

6  chartered organizations?

7          MR. CELENTINO:  Objection, misstates testimony.

8          THE WITNESS:  That's not correct.

9  BY MS. LUJAN WOLFF:

10  Q    Okay.  Now, you're saying that -- you mentioned that

11  there was a letter -- letters of intent and you also

12  discussed letters of intent in your declaration.  Who drafted

13  the letters of intent?

14  A    I believe that the first draft was drafted by Wachtell,

15  Lipton.  I know I looked at and I'm confident I made comments

16  to the form. And I expect that we shared the form of letters

17  of intent, certainly with national BSA, and I suspect we

18  would have probably shared them with most or all of the

19  parties to the RSA.

20  Q    And so the Wachtell firm is counsel to the Ad Hoc

21  Committee of Local Councils; correct?

22  A    That's correct.

23  Q    And how soon after the Ad Hoc Committee of Local

24  Councils entered into the RSA did it draft this letter of

25  intent?

1  A    So all of this was occurring very close together in

2  time.  I believe that the -- my best recollection is that the

3  letter of intent was drafted prior to entry into the RSA and

4  I believe that we would have -- we, the ad hoc committee,

5  would have sent out letters of intent on or about June 18th

6  of 2021 in connection with the presentation of what I refer

7  to as the final iteration of the formula to local councils.

8  Q    Okay.  And the letters of intent, did they require that

9  chartered organizations get a release and the benefits of a

10 channeling injunction?

11 A    So I believe that the form of letter of intent is

12 attached as an exhibit to the plan.  If memory serves, there

13 is language in the letters of intent that condition the non-

14 binding commitment of the local council to make the requested

15 contribution on, among other things, an acceptable resolution

16 of treatment of chartered organizations under the plan.  This

17 was absolutely the essential focus of the ad hoc committee in

18 the negotiations.

19 Q    So the letters of intent have not changed in their

20 form, they are still the same -- it is still the same letter

21 of intent that you're referring to that's an exhibit to the

22 current plan, it's still the same one that the Wachtell firm

23 drafted sometime soon after the RSA; is that your testimony?

24 A    No.  My recollection is that the form of letter of

25 intent was drafted before execution of the RSA, not after.

1    Q    But you'll agree that the letter of intent form is not

2    an exhibit or incorporated into the RSA?

3    A    I don't believe it is; I don't recall, though.  It's --

4    Q    Instead --

5    A    -- I don't recall.

6    Q    -- when it comes to treatment of the contributing -- of

7    chartered organizations under the RSA, it is that paragraph

8    that I read, this key term of the RSA on page 7 of 30 of

9    debtors' motion, correct, that's where it talks about

10   chartered organization treatment?

11   A    As of July, roughly July 1st, 2021, correct.

12   Q    Okay.  And so you're saying that it changed, the

13   treatment of chartered organizations changed after this

14   motion was filed with the court?

15   A    It changed quite substantially.  This was not a --

16   given the constraints of, you know, frankly, the clock at

17   that time and the necessity to make progress in the

18   negotiation, this was -- this was left as a material open

19   issue at the time of execution of the RSA and thereafter the

20   parties engaged in very intensive and good faith settlement

21   discussions around the proposed treatment of chartered

22   organizations.  That was done in conjunction with, among

23   others, the TCJC, the Methodist, the Catholics, and others,

24   as well as all of the parties to the RSA.

25   Q    And so, although you say that this was an open issue

1  regarding the chartered organizations, the local council --

2  the RSA still provided that the local council contribution

3  would be the 500 million, plus the note, plus the transfer or

4  insurance rights; correct?  That part was not open?

5  A    That part had been -- that was what we had -- that one

6  of the principal areas of negotiation that led to the RSA.

7  Q    The letter of intent that -- this was signed by all the

8  local councils?

9  A    We have signed letters of intent from all of the local

10 councils, that's correct.

11 Q    And the local councils' contribution is contingent on

12 the local councils -- on there being an acceptable resolution

13 of chartered organizations, is that what it says?

14 A    On the treatment of chartered organizations under the

15 plan or words to that effect, yes.

16 Q    Okay.  I have no further questions.  Thank you, sir.

17 A    Thank you.

18             THE COURT:  Thank you.

19             Any other cross-examination of Mr. Sugden?

20       (No verbal response)

21             THE COURT:  I don't see any hands.

22             Mr. Celentino, any redirect?

23             MR. CELENTINO:  Your Honor, if you wouldn't mind,

24 can we take two minutes for me to look over notes and I hope

25 to be very quick, if any.

1           THE COURT:  Thank you.  We'll take five.  We're in

2   recess.

3           MR. CELENTINO:  Thank you, Your Honor.

4       (Recess taken at 4:13 p.m.)

5       (Proceedings resumed at 4:18 p.m.)

6           THE COURT:  Mr. Celentino?

7           MR. CELENTINO:  Thank you, Your Honor.  I will

8   keep it very quick.

9                     REDIRECT EXAMINATION

10  BY MR. CELENTINO:

11  Q    Mr. Sugden, you were asked a number of questions just

12  now about chartered organizations and the releases and

13  contributions involved being under the plan, do you remember

14  those --

15  A    I do.

16  Q    -- questions generally?

17  A    Yes.

18  Q    Have you listened to all of the hearings in this matter

19  -- or most of the hearings in this matter?

20  A    I've listened to most of the hearings, not all.

21  Q    Mr. Sugden, would the settling insurers have made their

22  contributions to the settlement trust without the releases of

23  chartered organizations?

24  A    Absolutely not.

25           MR. CELENTINO:  Nothing further, Your Honor.

1            THE COURT:  Okay.  Does that prompt anyone to ask

2    anything?  It prompts Ms. Arnone.  Go ahead.

3            MR. ARNONE:  Thank you.

4                    RECROSS-EXAMINATION

5    BY MS. ARNONE:

6    Q    Mr. Sugden, do you have personal knowledge of your

7    conclusion that the settling insurance companies would not

8    have made the contributions that they are making under the

9    plan in the absence of the releases and injunctions?

10   A    Yes, I do.

11   Q    What's the basis of your personal knowledge?

12   A    Statements from their counsel, among others, made to

13   me.

14   Q    Have you ever had circumstances in complex negotiations

15   where a party tells you that something is a deal breaker and

16   then they change their mind later?

17   A    Sure, yes.

18           MS. ARNONE:  No further questions.

19           THE COURT:  Thank you.

20           Anyone else?

21        (No verbal response)

22           THE COURT:  I do not see any hands.

23           Thank you for your testimony.  You're excused.

24           THE WITNESS:  Thank you, Judge.

25        (Witness excused)

1          MR. CELENTINO:  Your Honor, I understand that Mr.
2     Andolina from the White & Case is on the screen.

3          THE COURT:  Mr. Andolina?

4          MR. ANDOLINA:  Good afternoon, Your Honor, Mike
5     Andolina of White & Case on behalf of the Boy Scouts of
6     America.

7          Your Honor, thank you for your extraordinary
8     patience in getting us through all three witnesses today.  If
9     the Court would like, the debtors certainly are prepared to
10    go forward with Makeda Murray, who is our next witness, but
11    we understand that we've come to 4:15 on a Friday when Your
12    Honor has been extraordinarily patient and, on behalf of the
13    debtors, we thank you for that patience.  And I'm sure I
14    speak for all the parties in this case.

15         So I defer to Your Honor's wishes with respect to
16    whether we start the weekend now or we proceed with Ms.
17    Murray.

18         THE COURT:  No, we're going to start the weekend.
19    I have not read Ms. Murray's declaration and I understand
20    there is an objection and that the debtors just filed some
21    response to that.  So I have not read any of that.

22         MR. ANDOLINA:  And, Your Honor, with respect to
23    that, we will endeavor over the weekend to try to resolve any
24    issues that we can with respect to Ms. Murray.

25         Before we break, Your Honor, I did have one

1    housekeeping matter that I'd like to raise with the Court.

2    Pursuant to the pretrial order on page 9, footnote 8, the

3    debtors reserve the right to call a member of the survivors

4    working group to testify.  We notified the parties yesterday

5    of our intent to call Mr. Christopher Meidl, who is a member

6    of the survivors working group.  We'd like to call Mr. Meidl

7    on Tuesday.  We believe his testimony, based on my most

8    recent conversations with counsel for the survivor working

9    group, will be 45 minutes to an hour.

10            We did not hear any objection or response from any

11   of the participating parties but, obviously, we wanted Your

12   Honor's permission and to slot Mr. Meidl in on Tuesday.

13            THE COURT:  Okay.  And he's just going to come in

14   by live testimony then?

15            MR. ANDOLINA:  That's correct, Your Honor.

16            THE COURT:  It's okay with me.  What happened to

17   Mr. Patton, where is he?  He was supposed to be next.

18            MR. ANDOLINA:  So, Your Honor, I think, as Mr.

19   Kurtz may have notified the Court yesterday, Mr. Patton is

20   not available until Tuesday.  We intend to proceed, with the

21   Court's permission, with Ms. Murray to start Monday, followed

22   by Dr. Bates.  It will probably not surprise the Court to

23   know that we expect Dr. Bates probably will take the

24   remainder of the day Monday.

25            THE COURT:  Okay.  And then Mr. McGill (ph) is

1  Tuesday?

2          MR. ANDOLINA:  Yes, Mr. Meidl, M-e-i-d-l, will be

3  Tuesday, yes, Your Honor.

4          THE COURT:  Okay.  Mr. Hallowell?

5          MR. HALLOWELL:  Thank you, Your Honor.

6          In advance of the weekend, the certain insurers

7  would like to briefly discuss deposition designations.

8          Pursuant to the scheduling order, the certain

9  insurers and other parties have prepared designations from

10  the depositions that we've taken during discovery.  My

11  understanding is that those designations have been submitted

12  to chambers.  There are also objections, counter

13  designations, and the responses to the counter designations.

14          We'd like to flag three issues.  First, we've now

15  had the benefit of a week of hearing testimony.  Based on

16  this and assuming that Your Honor has not had the opportunity

17  to review the designations before now, the certain insurers

18  propose to review the depositions that have been submitted to

19  you by us already and see if some of them can be limited or

20  withdrawn.  It may be that we can pare down some of our

21  designations based on the testimony that we've had so far.

22          Second, as I mentioned during the final pretrial

23  conference, the certain insurers intend to play the video

24  from a select few of these depositions in court during the

25  presentation of our case in chief next week.  We expect that

1  this presentation will be limited to three hours or less.

2          We plan to work this weekend to focus on those

3  limited deposition designations we'd like to present in this

4  way.  We will provide notice of what we will show to the

5  parties in advance, so that they can be certain that counter

6  designations are incorporated and objections resolved.

7          Third, for the designations that we do not submit

8  by video, which will be the majority, we would propose to

9  introduce those designations into the record in written form

10 after you've had the opportunity to resolve any objections.

11 We'd like to know if Your Honor has a preference for how this

12 gets done, for instance, highlighted transcript as marked

13 exhibits or in some other manner.

14          THE COURT:  Well, I have the highlighted

15 transcripts, right?  I mean, that's what's been given to me.

16          MR. HALLOWELL:  You do, but there hasn't been any

17 resolution of objections to the highlights.

18          THE COURT:  Right.  So, from what I understand, we

19 may winnow down what's been handed to me by either the

20 certain insurers withdrawing certain of their designations

21 over the weekend.  I don't know if the video was captured in

22 the designations in the binders or not.  But for those not by

23 video, once we work through the objections, then, yes, I

24 think they should be admitted into evidence.

25          I'm hoping, of course, that we're not being

1  repetitive of anything that's in the -- that's been offered

2  by live.  And I guess my question is, if we've had the live

3  witness, why do we have the deposition designations?

4          MR. HALLOWELL:  Your Honor, we propose to submit

5  deposition designations from witnesses who are unavailable.

6  What we're talking about are typically the law firm

7  deposition designations --

8          THE COURT:  Okay.

9          MR. HALLOWELL:  -- that we took earlier, they're

10 people outside of a hundred miles from the courthouse.

11         THE COURT:  Okay, okay.

12         MR. ANDOLINA:  Your Honor, I think Mr. Kurtz would

13 like to address the Court with respect to this issue.  He's

14 been sort of leading the charge on our side.  So if I could

15 allow him to take the podium?

16         THE COURT:  Sure.  Mr. Kurtz?

17         MR. KURTZ:  Good afternoon, Your Honor, Glen

18 Kurtz, White & Case, on behalf of the debtors.

19         We'll work with Mr. Hallowell and try to get

20 through.  We don't have any particular issue, obviously, with

21 getting depositions in where it's appropriate.  We appreciate

22 any effort to pare that down.  We share Your Honor's concern

23 as to whether there are live witnesses or not live witnesses.

24 If they're outside of the hundred miles and they're otherwise

25 subject to that unavailability rule, then of course we know

1  that and we wouldn't raise that as an objection.

2          Really, the only objection that I wanted to

3  mention is I see no value to a video, to three hours of video

4  depositions before Your Honor.  I think that's highly unusual

5  in a bench scenario.  Your Honor, I suppose, will decide if

6  you want to use precious trial time on that exercise.  Most

7  people consider that to be pretty burdensome.  And we

8  certainly would not suggest that three hours of trial time be

9  dedicated to watching depositions when the designations are

10  available, they can be referenced in closing as appropriate,

11  they can be reviewed by Your Honor as appropriate.

12          And if Your Honor sees something where you

13  actually believe you need to see how that question was

14  delivered and how that answer was delivered, you can always

15  go to that.  But for all the parties to sit through three

16  hours of deposition video seems to me to be pretty

17  unproductive.

18          MR. HALLOWELL:  Your Honor, obviously, we

19  completely disagree with that.  You've asked us to highlight

20  for you the evidence that we would like you to consider,

21  there's no better way to highlight for you evidence that we

22  would like you to consider than by showing you these limited

23  deposition designations that we will show you.

24          I'd also like to point out, Your Honor, that each

25  side -- well, so far, just one side has presented its own

1  case in its own way.  We've had limited declarations and live

2  testimony, limited live testimony and declarations, every

3  flavor of the rainbow for the debtors.  This is the manner in

4  which the certain insurers have determined that we would like

5  to proceed with these witnesses.  It's a limited amount of

6  time and we would like to go forward.

7          THE COURT:  I'm going to let you --

8          MR. ANDOLINA:  Your Honor, I would say --

9          THE COURT:  I'm going to let them present their

10  case their way, it's three hours.

11          MR. HALLOWELL:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Okay.  So I'm going to hold off, though, reviewing

14  the deposition designations I do have until I see whether or

15  not any are being withdrawn.

16          MR. HALLOWELL:  Thank you, Your Honor.  And we

17  will do that as promptly as we can, but it may not be first

18  thing Monday morning so we can give some consideration to our

19  very busy teams.

20          THE COURT:  Sure.  Ms. Wolff?

21          MR. HALLOWELL:  Thank you.

22          MS. LUJAN WOLFF:  Your Honor, I also exchanged

23  deposition designations with the parties, there were also

24  counter designations.  And, Your Honor, I'm sorry, but that

25  hasn't been provided yet to chambers, but I will get that to

1  you, it should be there Monday, with the assistance of my co-

2  counsel.  Thank you.

3              THE COURT:  Thank you.

4              Anyone else?  Any other logistical issues we can

5  discuss?

6          (No verbal response)

7              THE COURT:  Okay, then thank you.  We are

8  adjourned and I'll see you Monday morning.

9              COUNSEL:  Thank you, Your Honor.

10              THE COURT:  Thank you.

11          (Proceedings concluded at 4:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

1

2          We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                    March 19, 2022

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                    March 19, 2022

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17  /s/ Mary Zajaczkowski                     March 19, 2022

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22  /s/ Coleen Rand                           March 19, 2022

23  Coleen Rand, CET-341

24  Certified Court Transcriptionist

25  For Reliable