## Exhibit A

| RCAHC's References to Desai March 9 Tr.[21] | Desai March 9 Tr. quote |
|---|---|
| 21:13-24:10 | Q. Is it the Debtor's position that in agreeing to Paragraph 9, which is entitled: Release of Settling Insurers in the Century Term Sheet, Debtors validly exercise their business judgment?<br><br>MR. ANDOLINA: Objection to form. You can answer.<br><br>A. Yes, that is the Debtors' position.<br><br>BY MR. LLOYD:<br>Q. Please explain why Debtors validly exercise their business judgment in agreeing to Paragraph 9 in this release of Settling Insurers in the Century Term Sheet.<br><br>A. While the negotiations were taking place with various parties, including Century/Chubb, counsel for the Debtors had provided several updates to the Bankruptcy Task Force, along with the National Executive Committee and the National Executive Board of the Boy Scouts of America and in actively providing us with real-time information, providing us with the efforts that are being made to secure agreements with various insurers prior to an upcoming plan filing deadline, and at this time, prior to a deadline on the vote that was needed for survivors of historical abuse, coupled with the various parameters that the BSA, through the Bankruptcy Task Force, the bankruptcy -- I'm sorry, the National Executive Committee and the National Executive Board, our counsel were instructed to continue to negotiate with insurers like Century/Chubb in order to effectuate a meaningful resolution that would allow for additional dollars to be placed into the Settlement Trust to, again, achieve one of the BSA's principal objectives, which is to equitably compensate all the victims of sexual abuse.<br><br>Q. And are you, as you sit here today, without getting into privileged communications with your counsel, able to provide any additional information about the information that the Bankruptcy Task Force or the National Executive Committee received as part of the exercise of the Debtors' business judgment in agreeing to Paragraph 9?<br><br>MR. ANDOLINA: Objection to form. |

---

[21] *See* March 9, 2021 Desai Deposition Transcript, relevant portions attached as Ex. 5 to the Hammond Declaration.

|  |  |
|---|---|
|  | A. On a very generic high level, without getting into attorney-client related communications, I can share with you that counsel for the Debtors along with -- and when I say "counsel," I not only mean bankruptcy counsel, but also insurance counsel with Haynes and Boone along with other advisors that the BSA has in this process. Furthermore, in consultation with the Ad Hoc Committee on local councils headed up by Mr. Mason, there were several conversations related to various pros, cons, options as to what needed to occur from a negotiation perspective in order to get Century/Chubb to the table and how other non-settling entities, such as certain Chartered Organizations would be treated if they were not participating in negotiations that were actively taking place at this time, because as you will recall, at this juncture, in December of 2021, the BSA, along with the Coalition and the FCR had already effectuated a resolution with the Hartford, but that resolution contemplated the ability of the Debtor and other settling parties to continue to work in good faith to ensure adequate protection for various and, in fact, all Chartered Organizations. So there were conversations related to the interplay, if you will, of prior settlements, the interplay and the need for continuing to negotiate to secure additional dollars in order to equitably compensate victims of abuse, how Chartered Orgs would be treated under this type of settlement agreement and/or the terms of it that were being negotiated, along with who would be a settling party that would join in these discussions in order to effectuate a formal settlement, what that would mean to the overall timeline, if you will, for emergence and/or a confirmation hearing for the BSA and how this could continue to, like the Hartford Agreement, serve as a building block for allowing other parties to be a Settled Party |
| 34:3-35:4 | Q. Why is it necessary for Participating Chartered Organizations to make the assignment of independent insurance coverage?<br><br>MR. ANDOLINA: Objection to form; beyond the scope, calls for a legal conclusion and I'm going to instruct him not to answer.<br><br>BY MR. LLOYD:<br>Q. Whose decision, Mr. Desai, was it, to not ask for an assignment of Opt-Out Chartered Organizations of their insurance rights?<br><br>MR. ANDOLINA: Objection to form.<br><br>MR. SCHIAVONI: I'll object to form also.<br><br>A. My understanding of this Agreement or this Term Sheet, as you're showing me, is based upon active negotiations between various parties and what I can tell you is that -- as a member of the bankruptcy task for, the NEC and the Board, our advisors thoroughly provided us with information related to the negotiations. But we, as a Bankruptcy Task Force, NEC and Board, authorized our advisors to negotiate in the best interest of the organization, and in an effort to equitably compensate all victims of abuse, such that what you see |

| | |
|---|---|
| | before you today in the Century Term Sheet is a product of very active negotiations amongst the parties to this agreement. |
| 52:5-54:14 | Q. And did those updates include the bids and asks by various negotiating parties?<br><br>MR. ANDOLINA: Object to the form.<br><br>A. The updates, again, at a high level, did include what certain parties were wanting -- willing to negotiate on and what our parameters were in response based upon several conversations with counsel for us, amongst members of the BTF and the NEC and the Board.<br><br>Q. And this is going to be a question that's going to go back to where we were at the very beginning of the deposition, so you may be able to answer it and you may be allowed to answer it, and you may not be. So I just want to ask it, and we'll take a little pause for Mr. Andolina to make whatever objections or instructions he has. Please tell us everything that you recall, sir, about the updates that you received from counsel during the negotiation of the Century Term Sheet.<br><br>MR. ANDOLINA: Objection to form. I'll allow Mr. Desai to testify in terms of his recollection of cadence, but not with respect to specific positions that may have been exchanged in the mediation nor with respect to any advice provided by counsel. So with those caveats, you can answer to the best of his ability.<br><br>MR. LLOYD: And Mr. Andolina, just to clarify, so you're invoking attorney-client and mediation privilege?<br><br>MR. ANDOLINA: Correct.<br><br>MR. LLOYD: Thank you for that clarification. Go ahead, Mr. Desai.<br><br>A. So at or near this timeframe, in the fall/winter of 2021, the Bankruptcy Task Force, the NEC, along with our advisors, met with more regularity than I can recall and not only in terms of meetings, but also various email exchanges with counsel, coupled with phone calls amongst, not only members of the Task Force and Board, but we continued to receive, sometimes real-time updates on where things were in terms of active negotiations, and at other times, we would receive more formalized updates and presentations during our meetings from our advisors as to kind of where things evolved to following a week or a few days of negotiations, and based upon certain timeline benchmarks, either established by the Court or the parties, the Bankruptcy Task Force would meet regularly to engage in conversation, to look at the terms, to provide input to our advisors. Following that, recommendations would be made and then would be voted upon by the National Executive Committee and then the Board, to then allow for our advisors to have negotiating parameters and limits, if you |

| | |
|---|---|
| | will, for what the BSA, as well as other parties affiliated with the BSA, could agree to. |
| 63:6-23 | Q. The -- like I told you, Mr. Desai, I said I'd probably ask at least one bad question in this. So when the Bankruptcy Task Force and the National Executive Committee was briefed by its insurance and restructuring advisors, was the – was the National Executive Committee and the Bankruptcy Task Force told, in the -- we're here at the time Of the Century Term Sheet, so in the December 2021 time period, where the Chartered Organizations that had been previously affiliated with the -- the TCJC, what bucket they fell within?<br><br>MR. ANDOLINA: Objection to form. You can answer without revealing specifics of those conversations.<br><br>A. I believe I understand what you're asking, Mr. Lloyd.· And so the answer to your question simply is yes. |
| 71:1-73:25 | Q. Is it the Debtors' testimony that in including this definition -- I beg your pardon -- including this definition in Paragraph 42, BSA Cash Sharing Amount, in the Third Modified Fifth Amended Plan, that the Debtors were validly exercising their business judgment?<br><br>MR. ANDOLINA: Objection to form.<br><br>A. Yes.<br><br>BY MR. LLOYD:<br>Q. Please tell us why that is.<br><br>A. I would tell you again, reiterating my prior responses, but based upon advice in consultation with our financial advisors, and given that, at the time that this Plan was filed, Docket entry 8814-1, the parties, meaning BSA, Coalition, FCR, Settled Insurers and now the TCC, were all in active negotiations in order to continue to build more consensus for support of this plan and to provide, again -- to achieve the resolutions that the BSA sought out to achieve, which were to equitably compensate all victims of abuse and to emerge as an ongoing organization.· We felt that this negotiated term was in proper exercise of our business judgment.<br><br>Q. And, again, just to make sure that we're not talking over each other and Mr. Andolina has the opportunity to make his objection, as you sit here today, are you able to tell us who first proposed this provision?<br><br>MR. ANDOLINA: Objection to form and I'm going to instruct him not to answer based on mediation confidentiality.<br><br>MR. LLOYD: If we can turn, please, to Paragraph 59, please.· We're still in the Definitions section. |

BY MR. LLOYD:
Q. Mr. Desai, I'm directing your attention to Paragraph 59, which is titled: Chartered Organization Contribution. Do you see that, sir?

A. Yes.

Q. And this Paragraph 59, which appears in the blue text, is new to the Third Modified Fifth Amended Plan from the Second Modified Fifth Amended Plan. Do you see that, sir?

A. Yes.

Q. And is it the Debtors' position that including this new definition in the February 15th, 2022 plan, the Debtors validly exercised their business judgment?

MR. ANDOLINA: Objection to form.

A. Yes.

BY MR. LLOYD:
Q. And beyond the answer that you just gave when we were discussing Paragraph 42, definition of Exhibit 4, is there anything that you would like to add in respect to the Debtors' exercise of its business judgment in putting the definition that's in Paragraph 59 in the Third Modified Fifth Amended Plan?

MR. ANDOLINA: Objection to form.

A. The only thing I would add would be that this was a term that was the product of active negotiations, some of which I participated in myself at mediation, in order to get additional parties to become signatories to a more globalized settlement agreement.

Q. I don't mean to belabor the point but just to ask and let Mr. Andolina make his objection. As you sit here today, can you tell us who first proposed this first definition that's in Paragraph 59?

MR. ANDOLINA: I'm going to object on mediation confidentiality and instruct the witness not to answer.