## Exhibit 5



*Confidential*

Transcript of the Testimony of

**DEVANG DESAI**

March 09, 2022

**IN RE BOY SCOUTS AND DELAWARE BSA**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

1  IN THE UNITED STATES BANKRUPTCY COURT
   FOR THE DISTRICT OF DELAWARE
2

3                        CASE NO. 20-10343 (LSS)

4                        (Jointly Administered)

5  IN RE: CHAPTER 11
   BOY SCOUTS OF AMERICA AND
6  DELAWARE BSA, LLC,

7           Debtors.
   _____

8

9                 ***CONFIDENTIAL***

10

11      Remote videotaped deposition of DEVANG DESAI,

12  held via videoconference on Wednesday, March 9, 2022,

13  beginning at approximately 9:30 a.m. Eastern Time,

14  the proceedings being recorded stenographically by

15  Jennifer L. Wielage, Certified Realtime Reporter,

16  Certified Court Reporter-NJ, and transcribed under

17  her direction.

18

19

20

21

22                                   COPY

23

24

25

IN RE BOY SCOUTS AND DELAWARE BSA

Page 2

```
 1   A P P E A R A N C E S :
 2   MORRIS, NICHOLS, ARSHT & TUNNELL
     1201 North Market Street, 18th Floor
 3   Wilmington, Delaware 19899-1347
     BY:  SOPHIE ROGERS CHURCHILL, ESQ.
 4   srchurchill@morrisnichols.com
     Attorneys for the Debtor
 5
     --and--
 6
     WHITE & CASE, LLP
 7   1221 Avenue of the Americas
     New York, New York 10020
 8   BY: MICHAEL ANDOLINA, ESQ.
     mandolina@whitecase.com
 9   BY:  MICHAEL JAOUDE, ESQ.
     Mjaoude@whitecase.com
10   Attorneys for Boy Scouts of America
11
     NORTON ROSE FULBRIGHT US LLP
12   2200 Ross Avenue
     Suite 3600
13   Dallas, Texas 75201-7932
     BY:  MICHAEL BERTHIAUME, ESQ.
14   mberthiaume@nortonrose.com
     Attorneys for J.P. Morgan Chase Bank, N.A.
15
     CROWELL & MORING LLP
16   590 Madison Ave Floor 20
     New York, New York 10022
17   (212) 223-4000
     BY:  TACIE YOON, ESQ.
18   tyoon@crowell.com
     Attorneys for Zurich Insurance Company
19
20   COZEN O'CONNOR
     1201 Market Street, Suite 1001
21   Wilmington, Delaware 19801
     (302) 295-2000
22   BY:  MARLA BENEDEK, ESQ.
     mbenedek@cozen.com
23   Attorneys for Endurance
24
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2   O'MELVENY
     Times Square Tower
 3   7 Times Square
     New York, New York 10036
 4   (212) 326-2000
     BY:  TANCRED SCHIAVONI, ESQ.
 5   tschiavoni@omm.com
     Attorneys for Century
 6
 7   ARENT FOX SCHIFF
     233 South Wacker Drive
 8   Suite 7100
     Chicago, IL 60606 USA
 9   (312) 258-5500
     BY:  NEIL LLOYD, ESQ.
10   nlloyd@afslaw.com
     Attorneys for Roman Catholic Ad Hoc Committee
11
     POST & SCHELL, P.C.
12   100 Overlook Center
     Suite 200
13   Princeton, NJ 08540
     (609) 924-3333
14   BY: KATHLEEN KERNS, ESQ.
     kkerns@postschell.com
15   Attorneys for Argonaut/Colony
16   YOUNG CONAWAY STARGATT & TAYLOR, LLP
     1000 N King Street
17   Wilmington, Delaware 19801
     (302) 571-6600
18   BY:  KEN ENOS, ESQ.
     kenos@ycst.com
19   Attorneys for Future Claimants Committee
20
21   PACHULSKI STANG ZIEHL & JONES
     780 3rd Avenue
22   34th Floor
     New York, New York 10017
23   (212) 561-7700
     BY:  JEFFREY L. SCHULMAN, ESQ.
24   jschulman@PasichLLP.com
     Attorneys for Tort Claimants Committee
25
```

Page 4

```
 1   A P P E A R A N C E S :
 2
     SIMPSON THACHER & BARTLETT LLP
 3   3330 Hillview Avenue
     New York, New York 10017
 4   (650) 251-5000
     BY:  DAVID ELBAUM, ESQ.
 5   Attorneys for Federal Insurance Company and
     Westchester Fire Insurance Company
 6
 7   GIBSON DUNN & CRUTCHER, LLP
     200 Park Avenue
 8   New York, New York 10166-0193
     (212) 351-3804
 9   BY:  JAMES HALLOWELL, ESQ.
     jhallowell@gibsondunn.com
10   BY:  AMANDA GEORGE, ESQ.
     ageorge@gibsondunn.com
11   Attorneys for AIG
12   GIEGER, LABORDE & LAPEROUSE, LLC
     701 Poydras Street
13   Suite 4800
     New Orleans, Louisiana 70139
14   (504) 561-0400
     BY:  JOHN E.W. BAAY, II, ESQ.
15   jbaay@glllaw.com
     Attorneys for Gemini Insurance Co.
16
17   CHIPMAN BROWN CICERO & COLE, LLP
     1313 North Market Street
18   Suite 5400
     Wilmington, Delaware 19801
19   (646) 741-1431
     BY:  MARK DESGROSSEILLIERS, ESQ.
20   mdegross@chipmanbrown.com
     Attorneys for Survivor Jane Doe
21
22   MOUND COTTON WOLLAN & GREENGRASS LLP
     30A Vreeland Road Suite 210
23   Florham Park, NJ· 07932
     (973) 494-0603
24   BY:  PAMELA MINETTO, ESQ.
     pminetto@moundcotton.com
25   Attorneys for Indian Harbor Insurance Company
```

Page 5

```
 1   A P P E A R A N C E S :
 2   COZEN O'CONNOR
     1201 N Market Street
 3   Suite 1001, Wilmington, Delaware 19801
     (302) 295-2000
 4   BY:  MARLA BENEDEK, ESQ.
     mbenedek@cozen.com
 5   Attorneys for Traders and Pacific Insurance,
     Endurance America Abuse Claimants
 6
 7   REGER RIZZO & DARNALL LLP
 8   1521 Concord Pike #305
     Wilmington, Delaware 19803
 9   (302) 477-7104
     BY:  MEGAN HALTER, ESQ.
10   mhalter@regerlaw.com
     Attorneys for Travelers
11
12
13   POTTER ANDERSON
     Hercules Plaza
14   1313 North Market Street, 6th Floor
     P.O. Box 951
15   Wilmington, Delaware 19801
     (302) 984.6000
16   BY:  JEREMY RYAN, ESQ.
     jryan@potteranderson.com
17   BY:  JESSE NOA, ESQ.
     jnoa@potteranderson.com
18   Attorneys for Roman Catholic Ad Hoc
19
20   LOEB & LOEB, LLP
     321 North Clark Street
21   Suite 2300
     Chicago, IL 60654
22   BY:  EMILY STONE, ESQ.
     estone@loeb.com
23   BY:  LAURA K. McNALLY, ESQ.
     lmcnally@loeb.com
24   Attorneys for CNA
25
```

Page 6

```
 1   A P P E A R A N C E S:
 2   ALVAREZ & MARSAL
     600 Madison Avenue
 3   New York, New York 10022
     (212) 759-4433
 4   BY:  RYAN WALSH, ESQ.
     Attorneys for BSA
 5
 6   KTBS LAW
     1801 Century Park East
 7   26th Floor
     Los Angeles, California
 8   BY:  SASHA M. GURVITZ, ESQ.
     sgurvitz@ktbs.com
 9   Attorneys for Pfau Cochran Vertesis Amala PLLC and
     Zalkin Law Firm, P.C
10
11
12
     ALSO PRESENT:  REBEKAH ROTHSTEIN, DOCUMENT
13   TECHNICIAN, CHRIS WEISS CALHOON, VIDEOGRAPHER, CHRIS
     MEIDL, DELIA LUJAN-WOLFF, Guam Bar Association
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1       DEPOSITION SUPPORT INDEX
     DIRECTION TO WITNESS NOT TO ANSWER
 2
 3            Page Line
 4            34    8
              43   25
              73   25
 5            78    2
              83    4
 6
     REQUEST FOR PRODUCTION OF DOCUMENTS
 7
              Page  Line
 8
 9
          STIPULATIONS
10
11        Page    Line
12
13        QUESTION MARKED
14        Page    Line
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1            I N D E X
 2
 3       W I T N E S S
 4
     Testimony of:
 5
 6   DEVANG DESAI            PAGE NO.
 7
     EXAMINATION BY MR. LLOYD:        9
 8   EXAMINATION BY MS.             125
     LUJAN-WOLFF:
 9
10
11       E X H I B I T S
12
13   NUMBER      DESCRIPTION      PAGE
14
     Exhibit 1   Roman Catholic Ad Hoc    11
15               Committee's 30(b)(6)
                 Notice to the Debtors
16   Exhibit 2   Debtors' Amended Notice  14
                 of Deposition
17   Exhibit 3   Century Term Sheet       19
     Exhibit 4   Notice of Filing of      68
18               Debtors' Third Modified
                 Fifth Amended Chapter 11
19               Plan of Reorganization
                 and Blackline Thereof
20   Exhibit 5   Hartford Settlement     110
     Exhibit 6   Zurich Insurance        114
21               Settlement Agreement
     Exhibit 7   Clarendon Insurance     117
22               Agreement
     Exhibit 8   Century/Chubb Settlement 119
23               Agreement
24
25
```

Page 9

```
 1        THE VIDEOGRAPHER:  We are now
 2   recording and on the record.
 3        My name is Chris Weiss-Calhoon,
 4   certified legal videographer, retained by Reliable
 5   Court Reporting.
 6        This is a video deposition in the
 7   United States Bankruptcy Court for the District of
 8   Delaware.
 9        Today's date is March 9th, of 2022.
10   The time on the monitor is 8:07 a.m. Eastern Time.
11   The deposition's being held virtually and we have a
12   document technician today, Rebekah Rothstein, in the
13   matter and -- we're here in the matter of In Re:  Boy
14   Scouts of America and Delaware BSA, LLC.
15        The deponent is Devang Desai and the
16   attorneys will be on the stenographic record.
17        The court reporter is Jennifer
18   Wielage and will now administer the oath.
19   DEVANG DESAI, having been first duly sworn according
20   to law, testifies as follows:
21   EXAMINATION BY MR. LLOYD:
22        Q.    Good morning, Mr. Desai.  My name is
23   Neil Lloyd, and I'll be taking the lead today.  I
24   don't think we've met before.
25        A.    Yes, sir.  Good morning to you.
```

Page 10

1          Q.      Good morning.  You're the same
2   individual who's testified several times in this
3   matter; is that correct?
4          A.      I am, yes.
5          Q.      So I'm not going to go over a lot of
6   different ground rules, but there's two things I'd
7   appreciate just getting out there before we get into
8   the substance.
9          The first is, as we've all become
10  more familiar with Zoom, I have found that the
11  standard thing of, sort of anticipating questions and
12  anticipating answers, has become more fluid.  When we
13  were new to this technology a couple of years ago,
14  that was a little bit more challenging.
15         So I want to say that I have seen
16  that sometimes I'm not completely sure when a witness
17  has finished an answer and so I'm going to try to
18  make sure that I don't talk over you.  If I do, I'm
19  not intending to, but we'll just try to make sure
20  that that's clear.
21         The second is, because of the nature
22  of the deposition that the Court has granted us, and
23  based on the discussions we've had with the Debtors'
24  counsel, it is conceivable that in this deposition
25  with you today, there may be more than the normal, I

Page 11

1   would say, situation of objections, whether based on
2   mediation privilege, attorney-client privilege,
3   litigation work product.
4          And so, in the same vein, I'll ask my
5   question, maybe we just, you know, take a short
6   breath because Mr. Andolina will need to make his
7   record, give you whatever instructions he has, so
8   that we have a clear record for the Court.
9          And, of course, all the other rules
10  of the deposition apply:  If you need a break, if you
11  need anything else, we'll -- you know, you can do
12  that.
13         If you don't understand a question,
14  please, you know, I'm not interested in setting you
15  up, tricking you or anything like that.  We're just
16  trying to get information here and it's entirely
17  conceivable I'll ask a couple of bad questions in
18  this deposition and that's not intentional.
19         All right.  With that, if the
20  reporter would please put in the chat and mark as the
21  first exhibit, the Roman Catholic Ad Hoc Committee's
22  30(b)(6) Notice to the Debtors.
23         It's dated January 13, 2022.
24         (Exhibit 1, Roman Catholic Ad Hoc
25  Committee's 30(b)(6) Notice to the Debtors,

Page 12

1   was marked for Identification by the court
2   reporter.)
3   BY MR. LLOYD:
4          Q.      All right.  Mr. Desai, and if you
5   could please -- well, let's keep it at the first page
6   here.
7          Mr. Desai, I'm showing you a
8   four-page document.  This was -- it's filed at Docket
9   No. 8295, and it's the Roman Catholic Ad Hoc
10  Committee's Notice of Deposition to Boy Scouts of
11  America and Delaware BSA, LLC, the Debtors, in these
12  Chapter 11 cases.  And this was filed on January the
13  13th of 2022.
14         If we could please go to the third
15  page and under Deposition Topics, the first one
16  reads:  The treatment of Claims of Chartered
17  Organizations under the Plan and Trust Distribution
18  Procedures.
19         Do you see that, sir?
20         A.      I do.
21         MR. ANDOLINA:  Mr. Lloyd, apologies.
22  Before you continue, the document that I'm working
23  off of is a document that was served on us, I believe
24  yesterday, which is the Second Amended Notice of
25  Deposition.

Page 13

1          Is there a reason you're providing an
2   earlier version here?
3          MR. LLOYD:  There is, and I'll get
4   there and will be quick about it.
5          MR. ANDOLINA:  Okay.
6          MR. LLOYD:  All right.
7   BY MR. LLOYD:
8          Q.      So, Mr. Desai, are you being
9   designated by -- is it your understanding that you're
10  being designated by the Debtors today to testify
11  about this Topic 1, the treatment of claims of
12  Chartered Organizations under the Plan and Trust
13  Distribution Procedures?
14         MR. ANDOLINA:  Objection to form.
15  We're working off of, Mr. Lloyd, the Second Amended
16  Notice of Deposition and we've negotiated the topics
17  that Mr. Desai is going to be testifying about.  So I
18  don't know why you're asking about a prior deposition
19  notice that's been superseded.
20         MR. LLOYD:  It hasn't been superseded
21  and part of the negotiations were and the Court
22  specifically ordered a deposition on this topic and
23  I'm just making a record, Mr. Andolina.
24         If Mr. Desai is not the witness who's
25  going to be prepared to testify, I think he can

Page 14

1  answer the question and we can move on.
2  BY MR. LLOYD:
3       Q.    So do you understand the question,
4  sir?
5       **A.    I do understand the question.**
6       Q.    And are you the witness who's been
7  designated to testify about this topic today?
8       **A.    I have been.**
9       Q.    You can take that down and we can
10  move now to the Debtors' Amended Notice of
11  Deposition, which is dated March the 8, 2022.
12           (Exhibit 2, Debtors' Amended Notice
13           of Deposition, was marked for Identification
14           by the court reporter.)
15           THE REPORTER:  So this is 2?
16           MR. LLOYD:  This is No. 2.  Thank
17  you.
18  BY MR. LLOYD:
19       Q.    Okay.  And Mr. Desai, I'm showing you
20  what has been marked as Exhibit 2.  This is the
21  Debtors' Notice of -- Second Amended Notice of the
22  30(b)(6) Deposition of the Debtors, the RCAHC's
23  Second Amended Notice of 30(b)(6) Deposition to the
24  Debtors.
25           MR. LLOYD:  And if we could scroll,

Page 15

1  please, to Topic No. 10.  Two more pages, please.
2  There we go.  Right.  That's fine.
3  BY MR. LLOYD:
4       Q.    And Mr. Desai, Topic No. 10 reads:
5  The Debtors' understanding of and exercise of their
6  business judgment in agreeing to the following
7  paragraphs of the Century Term Sheet, 9, 10, 11, 13,
8  14 and 15, paren, as it relates to Chartered
9  Organizations, closed paren.
10          Do you see that, sir?
11       **A.    I do see it, yes.**
12       Q.    And I read that correctly?
13       **A.    You have read that correctly.**
14       Q.    And do you understand that you have
15  been designated by the Debtors today to testify about
16  Topic No. 10?
17          MR. ANDOLINA:  Objection to the form
18  of the question and before the witness answers,
19  pursuant to our negotiations and my discussion with
20  counsel, Mr. Desai will be testifying today on Topics
21  10, 11, 12, 13 and 14, with respect to the Debtors'
22  exercise of their business judgment.
23          We have informed the RCAHC that we
24  will produce a different witness, to the extent there
25  are questions that relate to the Debtors', quote,

Page 16

1  understanding with respect to those one, two, three,
2  four, five categories.
3          So the witness can answer but that's
4  what he's been prepared to testify on.
5       **A.    Yes.**
6  BY MR. LLOYD:
7       Q.    And subject to all appropriate
8  objections, you are prepared today to testify about
9  Topic No. 10?
10       **A.    I am.**
11       Q.    And just so the record is clear,
12  Mr. Andolina is correct, we were informed, about 7:45
13  eastern, that testimony would be limited to the
14  exercise of business judgment today and that a
15  separate witness on Friday would be testifying about
16  the Debtors' understanding.
17          Okay.  If we can move to Topic No.
18  11 -- we're still on Exhibit 2, please.  If we can
19  have that on the screen.  Thank you.
20          So that we don't have to belabor the
21  point, Mr. Desai, and I assume, given Mr. Andolina's
22  prior comment, what I'm going to do is limit my
23  question in terms of your preparation and your
24  designation for the next four that we go through,
25  that your testimony is limited to the exercise of

Page 17

1  business judgment and it's not about the Debtors'
2  understanding.  All right?
3       **A.    Fair enough.**
4       Q.    Okay.  So I'm going to read the
5  question because that's going to just read it into
6  the record but we understand the limitation that
7  Counsel has made in his objection.
8          Okay.  So Topic 11 is the Debtors'
9  Understanding and Exercise of their Business
10  Judgment, including the following provisions of the
11  February 15, 2022 Plan, including all revisions to
12  prior versions of such provisions, Article I-A
13  Section 42, 45, 59, 86, 177, 184, 196, 215 and 269
14  and 294, Article IV-S, as in Sam, and W, as in water;
15  Article V, M, as in Mary and S, as in Sam, Article X,
16  D, as in David, F, as in Frank, G, as in George, H,
17  as in hot, J, as in jelly.  The Document Appendix as
18  it relates to Chartered Organizations and the Trust
19  Distribution Procedures (as it relates to Chartered
20  Organizations).
21          Do you see that, sir?
22       **A.    I do.**
23       Q.    And subject to the limitations that
24  your Counsel has put on the record, you're prepared
25  to testify today on those topics, in respect to the

IN RE BOY SCOUTS AND DELAWARE BSA

Page 18

1  exercise of the Debtors' Business Judgment?

2      A.      I am.

3      Q.      If you look at Topic 12, it reads:
4  The Debtors' understanding and exercise of their
5  business judgment in entering into the Hartford
6  Insurance Settlement Agreement as it relates to
7  Chartered Organizations, the Hartford Insurance Term
8  Sheet, as it relate is to the Chartered Organizations
9  and the Hartford Insurance Draft Agreement (as it
10  relates to Chartered Organizations).

11      Do you see that, sir?

12      A.      Yes.

13      Q.      And subject to the limitation that
14  your counsel has made, you're prepared today to
15  testify about the Debtors' exercise of their business
16  judgment in respect to Topic No. 12?

17      A.      I am.

18      Q.      We'll look at Topic No. 13.  It
19  reads:  The Debtors' understanding and exercise of
20  their business judgment in entering into the
21  Clarendon Insurance Settlement Agreement, as it
22  relates to the Chartered Organizations and the
23  Clarendon Insurance Settlement Term Sheet, as it
24  relates to Chartered Organizations.

25      Did I read that correctly, sir?

Page 19

1      A.      Yes.

2      Q.      And again, subject to the limitation
3  that your counsel has put on the record, you're
4  prepared today to testify about the Debtors' exercise
5  of their business judgment in respect to Topic 13?

6      A.      I am.

7      Q.      I'm sorry.  I didn't hear your
8  answer.

9      A.      I am.

10      Q.      And finally, Topic 14 reads:  The
11  Debtors' understanding and exercise of their business
12  judgment in entering into the Zurich Insurance
13  Settlement Agreement as it relates to Chartered
14  Organizations and the Zurich Insurance Term Sheet as
15  it relates to Chartered Organizations.

16      Do you see that, sir?

17      A.      Yes.

18      Q.      And subject to the limitation your
19  counsel has put on the record, are you prepared to
20  testify today as to the exercise of the Debtors'
21  business judgment in respect to Topic No. 14?

22      A.      I am.

23      MR. LLOYD:  If can we please mark as
24  Exhibit 3, the Century Term Sheet.

25      (Exhibit 3, Century Term Sheet, was

Page 20

1      marked for Identification by the court
2      reporter.)

3  BY MR. LLOYD:

4      Q.      Just so you see -- to orient you,
5  Mr. Desai, so this -- the Century Term Sheet was
6  attached to a mediator's report and the -- so this
7  document at the beginning says -- it has a document
8  identification number of 7772.

9      We're going to scroll through,
10  although it says page 1 of 3, the Century Term Sheet
11  is an attachment.  So if we can scroll through,
12  please, a few pages.

13      If we can just go back one page here
14  to this top exhibit where it says Exhibit A.  Okay.

15      So Mr. Desai, you can see there's a
16  header at the top here and it's dated December 14,
17  2021.

18      Are you with me?

19      A.      I am.

20      Q.      And it says Exhibit A, Century and
21  Chubb Companies Term Sheet.

22      Do you see that, sir?

23      A.      Yes.

24      Q.      Okay.  If we can keep scrolling
25  through, please.

Page 21

1      We are going to go to Paragraph 9.
2  So this is a lengthy paragraph, but you've seen this
3  before today; is that correct, sir?

4      A.      I have, yes.

5      Q.      Is it the Debtor's position that in
6  agreeing to Paragraph 9, which is entitled:  Release
7  of Settling Insurers in the Century Term Sheet,
8  Debtors validly exercise their business judgment?

9      MR. ANDOLINA:  Objection to form.
10  You can answer.

11      A.      Yes, that is the Debtors' position.

12  BY MR. LLOYD:

13      Q.      Please explain why Debtors validly
14  exercise their business judgment in agreeing to
15  Paragraph 9 in this release of Settling Insurers in
16  the Century Term Sheet.

17      A.      While the negotiations were taking
18  place with various parties, including Century/Chubb,
19  counsel for the Debtors had provided several updates
20  to the Bankruptcy Task Force, along with the National
21  Executive Committee and the National Executive Board
22  of the Boy Scouts of America and in actively
23  providing us with real-time information, providing us
24  with the efforts that are being made to secure
25  agreements with various insurers prior to an upcoming

IN RE BOY SCOUTS AND DELAWARE BSA

1    plan filing deadline, and at this time, prior to a
2    deadline on the vote that was needed for survivors of
3    historical abuse, coupled with the various parameters
4    that the BSA, through the Bankruptcy Task Force, the
5    bankruptcy -- I'm sorry, the National Executive
6    Committee and the National Executive Board, our
7    counsel were instructed to continue to negotiate with
8    insurers like Century/Chubb in order to effectuate a
9    meaningful resolution that would allow for additional
10   dollars to be placed into the Settlement Trust to,
11   again, achieve one of the BSA's principal objectives,
12   which is to equitably compensate all the victims of
13   sexual abuse.
14        Q.     And are you, as you sit here today,
15   without getting into privileged communications with
16   your counsel, able to provide any additional
17   information about the information that the Bankruptcy
18   Task Force or the National Executive Committee
19   received as part of the exercise of the Debtors'
20   business judgment in agreeing to Paragraph 9?
21        MR. ANDOLINA:  Objection to form.
22        A.     On a very generic high level, without
23   getting into attorney-client related communications,
24   I can share with you that counsel for the Debtors
25   along with -- and when I say "counsel," I not only

1    mean bankruptcy counsel, but also insurance counsel
2    with Haynes and Boone along with other advisors that
3    the BSA has in this process.
4             Furthermore, in consultation with the
5    Ad Hoc Committee on local councils headed up by
6    Mr. Mason, there were several conversations related
7    to various pros, cons, options as to what needed to
8    occur from a negotiation perspective in order to get
9    Century/Chubb to the table and how other non-settling
10   entities, such as certain Chartered Organizations
11   would be treated if they were not participating in
12   negotiations that were actively taking place at this
13   time, because as you will recall, at this juncture,
14   in December of 2021, the BSA, along with the
15   Coalition and the FCR had already effectuated a
16   resolution with the Hartford, but that resolution
17   contemplated the ability of the Debtor and other
18   settling parties to continue to work in good faith to
19   ensure adequate protection for various and, in fact,
20   all Chartered Organizations.
21             So there were conversations related
22   to the interplay, if you will, of prior settlements,
23   the interplay and the need for continuing to
24   negotiate to secure additional dollars in order to
25   equitably compensate victims of abuse, how Chartered

1    Orgs would be treated under this type of settlement
2    agreement and/or the terms of it that were being
3    negotiated, along with who would be a settling party
4    that would join in these discussions in order to
5    effectuate a formal settlement, what that would mean
6    to the overall timeline, if you will, for emergence
7    and/or a confirmation hearing for the BSA and how
8    this could continue to, like the Hartford Agreement,
9    serve as a building block for allowing other parties
10   to be a Settled Party.
11        Q.     If we could scroll to the next page,
12   please.
13             Mr. Desai, I'm showing you Paragraph
14   10 of Exhibit 3, which is a paragraph that carries
15   over on to the next page, but the heading here is:
16   Participating Chartered Organizations.
17             And are you familiar with this
18   paragraph of Exhibit 3 of the Century Term Sheet?
19        A.     I am generally familiar with it, yes.
20        Q.     Is it your understanding that
21   participating Chartered Organizations and Opt-Out
22   Chartered Organizations received different treatment
23   under the Century Term Sheet?
24        MR. ANDOLINA:  Objection to the form
25   as outside the scope of the 30(b)(6).  He can answer

1    in his individual capacity.
2        A.     As I understand it, the definitions
3    associated with a participating Chartered
4    Organization versus an Opt-Out Chartered Organization
5    or a contributing charter organization are different
6    and our advisors did provide us with thorough
7    information, as well as certain presentations about
8    the various differences that Chartered Orgs,
9    depending on the label you attach, whether it's
10   participating, contributing or opt-out, would receive
11   under the plan.
12             And I also recall that Ms. Lauria
13   provided that kind of education information to the
14   Court at a hearing that I participated in via phone,
15   and I recall that there's also a PowerPoint
16   presentation that Ms. Lauria showed to the Court,
17   which helped illustrate the interim in which the
18   various Chartered Orgs would be treated depending on
19   their designation.
20        Q.     What contribution does a
21   participating Chartered Organization have to make to
22   receive the benefits in the Century Term Sheet?
23        MR. ANDOLINA:  Objection to form.
24   Same objection with respect to scope and I'll
25   have that as an ongoing objection to questions that

1  are beyond the business limitation.
2        **A.    A Participating Chartered**
3  **Organization is one by its very definition as**
4  **indicated in the document, that does not object to**
5  **the Debtors' plan of reorganization and, in so doing,**
6  **the Participating Chartered Organization would**
7  **receive a release, depending on what timeframe we're**
8  **talking about, for claims associated with sex abuse.**
9        **For example, claims associated on a**
10  **pre-'76 timeframe, the participating Chartered**
11  **Organization would receive a release as it pertained**
12  **to Settling Insurers for Abuse Claims only and for**
13  **post-'76, the participating Chartered Organization**
14  **would receive the benefit of the channeling**
15  **injunction, which would provide them with the**
16  **release.**
17        Q.    If we look in Paragraph 10 toward the
18  bottom -- and we can read as much of this as you want
19  for context -- but if we look down toward the bottom,
20  there's Romanette i, about seven lines from the
21  bottom that begins:  Romanette i, each of the
22  Participating Chartered Organization's rights.
23        Do you see that?
24        **A.    I do.**
25        Q.    So I'm going to read that section

1  again.  If there's more that you need for context,
2  we'll go back.
3        It says:  Each of the participating
4  Chartered Organization's rights, titles, privileges,
5  interests, claims, demands or entitlements under the
6  Settling Insurers' Policies and any other insurance
7  policy issued by the Settling Insurers with respect
8  to claims for causes of action involving abuse claims
9  concerning such coverage for Abuse Claims.
10        So -- and, you know, I'm going to
11  withdraw that question, Mr. Desai, and I apologize.
12  I'm going to try again.
13        If we go up a few more lines, it
14  says, starting "in addition."
15        Do you see where I'm reading there,
16  in the middle of the paragraph?
17        **A.    Bear with me one second.  I do, yes.**
18        Q.    It says:  In addition, in order to
19  obtain the benefit of 1, the Settling Insurer policy
20  injunction and 2, the full post-'75 injunction,
21  Participating Chartered Organizations shall be
22  required to make, or be deemed to make, the following
23  contribution to the Trust, defined term,
24  Participating Chartered Organization Settlement
25  Contribution, colon, A, the participating

1  organization Insurance Assignment; B, to the extent
2  of any rights, claims or interests not assigned to
3  the TRUST pursuant to the Participating Chartered
4  Organization Insurance Assignment, the waiver and
5  complete release of, i, each of the Participating
6  Chartered Organization's rights, titles, privileges,
7  interests, claims, demands or entitlements under the
8  Settling Insurers' Policies and any other insurance
9  policy issued by the settling insurers with respect
10  to claims or causes of action involving abuse claims
11  concerning such coverage for abuse claims.
12        Do you see that sir?
13        **A.    Yes, sir.**
14        Q.    And I read that correctly?
15        **A.    You have.**
16        Q.    Okay.  So Romanette i, which we've
17  talked about, lists policies for that -- it says:
18  Settling Insurer policies.
19        Do you have an understanding that
20  those policies referred to policies of the BSA and
21  the local councils?
22        MR. SCHIAVONI:  Objection to form.
23        MR. ANDOLINA:  Same objection.  I'll
24  also object on scope.
25        **A.    My understanding of a Participating**

1  **Chartered Organization and what this document, as**
2  **you've read, indicates is that a Participating**
3  **Chartered Organization would receive the benefit of a**
4  **release or the channeling injunction for claims**
5  **strictly limited to abuse -- scouting-related Abuse**
6  **Claims and a Chartered Organization would not, does**
7  **not, will not, lose any of its other insurer rights**
8  **for any policy, for any claim that is not defined to**
9  **be a scouting-related Abuse Claim.**
10        Q.    If we go to Romanette ii, which
11  carries over, and again, the predicate here is the
12  earlier language that said:  In addition, in order to
13  obtain the benefit of the Settling Insured policy
14  injunction and the full post-1975 injunction,
15  Participating Chartered Organizations shall be
16  required to make or be deemed to make, and then we
17  just talked about No. i.
18        Romanette ii says:  Any claim held by
19  the Participating Contributing Chartered Organization
20  that is attributable to or arises from is based upon,
21  relates to or results from -- and if we could see if
22  we can scroll a little bit so we have both that text
23  and the next:  Thank you, in whole or in part,
24  directly, indirectly, derivatively, including through
25  any insurance policy issued by the Settling Insurers,

Page 30

1  alleged abuse claims that occurred prior to the
2  petition date against the Settlement Trust, the
3  Debtors, reorganized BSA, the local councils, any
4  contributing Chartered Organization or Settling
5  Insurers.
6        So this phrase, "any other policy
7  issued by a Settling Insurer" -- "to any insurance
8  policy issued by a Settling Insurers," I beg your
9  pardon; what's your understanding of what that phrase
10 refers to?
11        MR. ANDOLINA: Objection to form.
12        MR. SCHIAVONI: Objection to form.
13        MR. ANDOLINA: And it's outside the
14 scope of the witness's testimony and I'm going to
15 instruct him not to answer.
16        As I said, Mr. Lloyd, we will produce
17 a witness to answer questions or make objections to
18 questions that relate to the Debtors' understanding,
19 but this witness is a volunteer board member. So
20 asking him the Debtors' understanding of a superceded
21 term sheet is not an effective use of anyone's time.
22 BY MR. LLOYD:
23        Q.    Is it your testimony, Mr. Desai, that
24 in entering into Paragraph 10 of the Century Term
25 Sheet, Exhibit 3, that the Debtor validly exercised

Page 31

1  its business judgment?
2        A.    Absolutely.
3        Q.    Please tell us the basis for that.
4        A.    I will defer you, Mr. Lloyd, to my
5  prior answer a few months ago concerning how the
6  Debtor came to authorize the entry into this
7  agreement.
8        I would also add on to there that
9  based upon conversations with our counsel,
10 considering all of the other factors that I had
11 previously laid out and based upon various
12 conversations held by, not only the Bankruptcy Task
13 Force, our National Executive Committee and the
14 board, we felt that it was the right thing to do to
15 enter into this agreement with Century/Chubb.
16        MR. LLOYD: If you could scroll up
17 again to the title for Paragraph 10, please, in
18 Exhibit 3. Thank you.
19 BY MR. LLOYD:
20        Q.    So again, Mr. Desai, this title on
21 Paragraph 10 is: Participating Chartered
22 Organizations.
23        You see that, correct?
24        A.    Yes, sir.
25        Q.    Can we agree that Paragraph 10, by

Page 32

1  definition, doesn't apply to Opt-Out Chartered
2  Organizations?
3        MR. ANDOLINA: Objection to form.
4        A.    I believe, just looking at this
5  document, it's solely discussing what a participating
6  Charter Org is.
7        Q.    Are you aware of any requirement,
8  under this Term Sheet, that an Opt-Out Chartered
9  Organization, make an insurance assignment similar to
10 the insurance assignment that we were just discussing
11 for Participating Chartered Organizations?
12        MR. ANDOLINA: Objection to form.
13        A.    I would ask if you could just pull
14 that provision up so I can look at it and be happy to
15 answer your question if I can.
16        Q.    Absolutely.
17        MR. LLOYD: Let's scroll down,
18 please. Couple more. There we go, to Paragraph 13.
19 Thank you. That's great.
20 BY MR. LLOYD:
21        Q.    Mr. Desai, I'm showing you Paragraph
22 13 of Exhibit 3, which has the title: Opt-Out
23 Chartered Organization.
24        You were previously discussing the
25 assignment that Paragraph 10 requires for

Page 33

1  Participating Chartered Organizations and so my
2  question, again, with Paragraph 13 in front of you
3  now, for Opt-Out Chartered Organizations, are you
4  aware of any requirement that an Opt-Out Charter
5  Organization make a similar assignment of insurance?
6        MR. ANDOLINA: Objection to form.
7        A.    The document doesn't speak to that at
8  this provision, Section 13.
9  BY MR. LLOYD:
10        Q.    When you say the document doesn't
11 speak to it, does it say anything in Paragraph 13
12 about requirements for an Opt-Out Chartered
13 Organization to make an assignment of insurance
14 rights?
15        MR. ANDOLINA: Objection to form.
16        A.    It does not say anything about an
17 Opt-Out Chartered Organization waiving their
18 insurance rights subject to the very nature of what
19 an Opt-Out Chartered Organization. They're an entity
20 that is objecting to the Plan and the only benefit
21 that they are receiving, based upon negotiations from
22 various parties, including certain chartered
23 partners, is a limited release based upon what a
24 settled insurer is contributing and an Opt-Out
25 Chartered Organization is not losing any of its

IN RE BOY SCOUTS AND DELAWARE BSA

Page 34

1  insurance rights as it relates to any other type of
2  claim that is not a scouting-related abuse claim.
3      Q.    Why is it necessary for Participating
4  Chartered Organizations to make the assignment of
5  independent insurance coverage?
6          MR. ANDOLINA:  Objection to form;
7  beyond the scope, calls for a legal conclusion and
8  I'm going to instruct him not to answer.
9  BY MR. LLOYD:
10     Q.    Whose decision, Mr. Desai, was it, to
11 not ask for an assignment of Opt-Out Chartered
12 Organizations of their insurance rights?
13         MR. ANDOLINA:  Objection to form.
14         MR. SCHIAVONI:  I'll object to form
15 also.
16     A.    My understanding of this Agreement or
17 this Term Sheet, as you're showing me, is based upon
18 active negotiations between various parties and what
19 I can tell you is that -- as a member of the
20 bankruptcy task for, the NEC and the Board, our
21 advisors thoroughly provided us with information
22 related to the negotiations.
23         But we, as a Bankruptcy Task Force,
24 NEC and Board, authorized our advisors to negotiate
25 in the best interest of the organization, and in an

Page 35

1  effort to equitably compensate all victims of abuse,
2  such that what you see before you today in the
3  Century Term Sheet is a product of very active
4  negotiations amongst the parties to this agreement.
5      Q.    If we can go back to Paragraph 9,
6  please.  And toward the bottom, yeah, that's great.
7  Thank you.  Actually, if you can scroll up just a
8  little bit more, please.  I'm sorry, I misspoke.  If
9  you could scroll down just a little bit more, please.
10 Thank you.
11         We can agree, Mr. Desai, that
12 Paragraph 9 requires Participating Chartered
13 Organizations to release Settling Insurers, correct?
14         MR. ANDOLINA:  Objection to form.
15     A.    I believe the document indicates what
16 a participating Chartered Organization is required to
17 do.  I don't necessarily believe that the document
18 requires them to give up, broadly, all of their
19 rights for any and everything.
20     Q.    I appreciate that clarification, sir.
21         The release is for abuse policies,
22 correct?
23         MR. ANDOLINA:  Objection to form.
24     A.    The release would be for any
25 scouting-related abuse claim.

Page 36

1          MR. LLOYD:  And if we can scroll up
2  just a little bit more, please.  Thank you.
3          Just a little bit more.  Thank you.
4      Q.    And if we look at b in the release,
5  Mr. Desai, part of what is being released is any
6  other insurance policy issued by the Settling
7  Insurers covering claims or causes of action for
8  abuse claims with respect to such coverage for Abuse
9  Claims.
10         Do you see that, sir?
11         MR. ANDOLINA:  Objection to form.
12     A.    I do see that language, yes, sir.
13 BY MR. LLOYD:
14     Q.    And are you aware of any similar
15 requirement that an Opt-Out Chartered Organization
16 give this kind of release?
17         MR. ANDOLINA:  Objection to form.
18     A.    Again, I would defer to the terms of
19 the document.
20 BY MR. LLOYD:
21     Q.    If we could turn to Paragraph 11,
22 please.  It's a few paragraphs down.
23         It's entitled:  Protection
24 Afforded -- I beg your pardon, Protections Afforded
25 to Insureds and Coinsureds and it says:  On the

Page 37

1  Release Date, all abuse claims against insureds and
2  coinsureds covered under insurance policies issued by
3  the Settling Insurers shall be channeled under the
4  Settling Insurer Policy Injunction and released.
5  Pending the occurrence of the Release Date, all such
6  Abuse Claims shall be enjoined pursuant to the
7  post-petition interim injunction as provided herein.
8          Do you see that, sir?
9      A.    I do.
10     Q.    And it's the Debtors' position that
11 in agreeing to Paragraph 11 of the Century Term
12 Sheet, the Debtors validly exercised their business
13 judgment; is that correct?
14     A.    Yes, it is.
15     Q.    And I appreciate your answers in
16 respect to Paragraphs 9 and 10.
17         Do you have anything to add in
18 respect to the exercise of the Debtors' Business
19 Judgment as it respects Paragraph 11?
20     A.    No, sir.  I would defer to my prior
21 answers.
22     Q.    If we could go to Paragraph 13,
23 please.  So Paragraph 13, Mr. Desai is called:
24 Opt-out Chartered Organizations.
25         Do you see that?

Page 38

1    A.    I do.

2    Q.    And is it your testimony that the

3  Debtors validly exercised their business judgment in

4  entering into Paragraph 11 -- 13 -- I beg your

5  pardon. Let me withdraw that question.

6         Is it your testimony, sir, that the

7  Debtors validly exercised their business judgment in

8  agreeing to Paragraph 13 of the Century Term Sheet.

9    A.    Yes, it is.

10    Q.    And as with your prior answers to --

11  that we've discussed in Paragraphs 9 and 10, do you

12  have anything to add with respect to the Debtors'

13  exercise of its business judgment concerning

14  Paragraph 13?

15         MR. ANDOLINA:  Objection to form.

16    A.    The only thing I would add,

17  Mr. Lloyd, as it relates to this particular provision

18  for opt-outs is that because negotiations continued

19  well beyond the entry into the Century Term Sheet,

20  there was a pathway that was allowed for within these

21  documents, particularly the Century Term Sheet, just

22  like in the Hartford Settlement Agreement, that

23  allowed for parties to continually work in good faith

24  to ensure support for the Plan, along with providing

25  additional contributions to the Trust to equitably

Page 39

1  compensate victims and if an entity was an Opt-Out

2  Chartered Org, they had a pathway available to them

3  through continuing negotiations beyond this date of

4  December 14, 2021, in which they could become a

5  contributing or a Participating Chartered Org subject

6  to the conditions that are specified in this

7  provision.

8    Q.    And what would be required for them

9  to become a Participating Chartered Organization, if

10  they had been an Opt-Out Chartered Organization?

11         MR. ANDOLINA:  Objection to form.

12    A.    As indicated here, there would need

13  to be a financial contribution as well as certain

14  assignments and releases as indicated in Sections 9

15  and 10 of this document and they would also then be a

16  party that would not be objecting to the plan of

17  confirmation as filed.

18  BY MR. LLOYD:

19    Q.    And the financial contribution that

20  you mentioned, that's something that would either

21  have to be made by the Participating Chartered

22  Organization or on its behalf?

23    A.    That would be correct.

24         MR. ANDOLINA:  Objection to the form

25  of the question.

Page 40

1  BY MR. LLOYD:

2    Q.    And is it the Debtors' position that

3  the deemed assignment of additional insured rights of

4  a Participating Chartered Organization, in policies

5  issued to the local councils by Settling Insurers,

6  would be an insufficient contribution?

7         MR. ANDOLINA:  Objection to the form

8  of the question; scope. Calls for a legal

9  conclusion.

10         MR. SCHIAVONI:  Objection to form.

11    A.    I would answer that question,

12  basically, saying that if a Chartered Organization

13  wanted to become a participating or contributing

14  Chartered Org, the rights that they would be giving

15  up are solely limited to any settled insurer rights

16  pertaining to a scouting-related abuse claim.

17    Q.    I appreciate that answer, sir.  My

18  question was a little different.

19         Is it the Boy Scout's position that

20  the additional insured rights that a Chartered

21  Organization has, excuse me, in local council

22  policies, that those rights -- I beg your pardon --

23  that those rights have no value?

24         MR. ANDOLINA:  Objection to form.

25         MR. SCHIAVONI:  Objection to form.

Page 41

1    A.    I -- I don't understand your

2  question, but I don't believe that is an accurate

3  statement.

4  BY MR. LLOYD:

5    Q.    So the -- so the Debtors believe that

6  the additional insured rights that Chartered

7  Organizations have in local council policies have

8  value?

9         MR. ANDOLINA:  Objection to the form;

10  beyond -- clearly beyond the scope of 30(b)(6)

11  testimony.

12         You can answer to the extent you can

13  on an individual basis.

14    A.    I think that any additional insured

15  has certain rights under a contract and I would defer

16  to the terms and conditions of that contract.

17  BY MR. LLOYD:

18    Q.    Right.  Well, you previously

19  disagreed with me, sir, when I said:  Is it the

20  Debtors' position that those additional insured

21  rights have no value, and so --

22         MR. SCHIAVONI:  Objection to form.

23         MR. LLOYD:  I haven't finished my

24  question.

25         MR. SCHIAVONI:  Oh, I thought you

Page 42

1  were testifying.
2           MR. LLOYD:  I'll let you object.
3  Please, I'll try again.
4  BY MR. LLOYD:
5      Q.     Mr. Desai, you previously testified
6  that you disagreed that the additional insured rights
7  that Chartered Organizations have in in local council
8  policies, you disagreed that those rights had no
9  value.
10          Do you recall that testimony?
11          MR. SCHIAVONI:  Objection to form;
12  mischaracterizes the prior testimony.
13          MR. ANDOLINA:  Same objection.
14     A.     Mr. Lloyd, I don't believe I
15  specifically agreed with that statement.
16          What I said was that any Chartered
17  Organization that is an opt-out, has a pathway which
18  they can become a contributing or participating
19  organization and that the only things that they would
20  be waiving, releasing, would be their rights
21  associated with a scouting-related abuse claim.  And
22  so if you would like a -- in terms of your question
23  or statement about value, my response to that is,
24  again, there is value in the type of rights that an
25  entity would have vis-a-vis the contract.

Page 43

1  BY MR. LLOYD:
2      Q.     So the sentence that I'd like to
3  focus on in Paragraph 13 of Exhibit 3 says:  No
4  Chartered Organization that is an Opt-Out Chartered
5  Organization may become a Contributing Chartered
6  organization, unless, (a), a financial contribution
7  is made by or on behalf of such Opt-Out Chartered
8  Organization.
9          Do you see that, sir?
10     A.     Yes.
11     Q.     And so my question to you is:  Is it
12  the Debtors' position that the foregoing of
13  additional insured rights in local council policies,
14  would count under this paragraph as a financial
15  contribution?
16          MR. ANDOLINA:  Objection to form.
17  It's an inappropriate hypothetical.  It also only
18  identifies one provision of three in the specific
19  paragraph that you're referring to.
20          MR. SCHIAVONI:  Objection to form.
21          MR. ANDOLINA:  It's also far beyond
22  the scope of this Notice.
23          THE DEPONENT:  Do you want me to
24  answer?
25          MR. ANDOLINA:  No.

Page 44

1           MR. LLOYD:  You're instructing him
2  not to answer the question?
3           MR. ANDOLINA:  Can you reask the
4  question in a non-objectionable way?
5      Q.     Did you understand the question, sir?
6           MR. ANDOLINA:  Why don't you read it
7  back?  Can the court reporter, please read it back?
8           (Designated question was read back.)
9           MR. ANDOLINA:  Same objection to form
10  and scope.
11     A.     So my -- my understanding of that
12  statement is that this provision specifically asked
13  for a financial contribution.
14  BY MR. LLOYD:
15     Q.     And so your understanding is that a
16  financial contribution would be money above and
17  beyond any value that was placed on additional
18  insured rights that Chartered Organizations might
19  have in local council policies; is that correct?
20           MR. ANDOLINA:  Same objection.
21           MR. SCHIAVONI:  Object to the form.
22           MR. ANDOLINA:  With respect to scope
23  and form, but you can answer, on an individual basis.
24     A.     I think you can't look at this
25  provision or this one -- this one word in a vacuum,

Page 45

1  Mr. Lloyd.
2           You have to consider what exactly the
3  Chartered Organization is seeking to obtain a full
4  release for, number one.
5           Number two, what timeframe the
6  Chartered Organization is seeking to receive a
7  release for.  And given that set of precursors, it
8  may be required that in addition to the rights that a
9  settling insurer is contributing to the Trust on
10  behalf of a Chartered Organization, which is also a
11  beneficiary of a release for that scouting-related
12  abuse claim, if a Chartered Organization wants to
13  receive a full and complete release for any
14  scouting-related abuse claim that is not affiliated
15  with a settling insurer, there might need to be
16  additional negotiations on terms, be it financial or
17  otherwise, that would need to be arrived at for an
18  Opt-Out Chartered Organization to obtain a free and
19  clear or full release for any liabilities associated
20  with them.
21     Q.     Can the Debtors exercise in its
22  business judgment and agreeing to entering into the
23  Century Term Sheet, if the Debtor presented with any
24  analysis that valued the additional insured rights
25  that a participating Chartered Organization would be

Page 46

1  giving up by becoming a participating Chartered
2  Organization the rights in additional -- to
3  additional insurance in the local council policies?
4           MR. ANDOLINA: Objection to the form;
5  compound.
6           MR. SCHIAVONI: It's outside the
7  scope of the notice.
8           THE REPORTER: What's that?
9           MR. SCHIAVONI: I object that it's
10 outside the scope of the notice.
11      A.    I don't understand your question,
12 Mr. Lloyd. So if you wanted to reask it and/or break
13 it down, I'm happy to give it a try.
14 BY MR. LLOYD:
15      Q.    Thank you, Mr. Desai.
16           So you previously testified that
17 you've been designated by the Debtors to testify
18 about the Debtors' exercise of its business judgment
19 in agreeing to enter into the Century Term Sheet.
20           You recall that testimony?
21      A.    Yes, sir.
22      Q.    And that exercise of business
23 judgment, you've testified extended to the Debtors'
24 Agreement to Paragraph 13 of Exhibit 3, the Century
25 Term Sheet; is that correct?

Page 47

1           MR. ANDOLINA: Objection to form.
2      A.    While I didn't specifically say the
3  business judgment extended to a particular provision,
4  what I did say is that we exercised business judgment
5  in evaluating taking into account all the advice we
6  had received from our professional advisors and based
7  upon input from the various parties, including
8  Chartered Organizations and the ad hoc group of local
9  councils, we authorized our advisors to use their
10 best efforts to negotiate a resolution.
11      Q.    And it's your testimony today, sir,
12 that the Debtors' Agreement to Paragraph 13 of the
13 Century Term Sheet was a valid exercise of the
14 Debtors' business judgment; is that correct?
15           MR. SCHIAVONI: Objection to form.
16           MR. ANDOLINA: Objection to form.
17      A.    Again, taking the entire Term Sheet
18 into account as the total deal, yes.
19 BY MR. LLOYD:
20      Q.    In looking at the second sentence of
21 Paragraph 13, which says that no Chartered
22 Organization is an Opt-Out Chartered Organization may
23 become a contributing Chartered Organization unless,
24 and it has three conjunctive requirements. You need
25 to meet all three of these requirements.

Page 48

1           The first is, (a), the financial
2  contribution is made by or on behalf of such Opt-Out
3  Chartered Organization.
4           Do you see that, sir?
5      A.    Yes.
6      Q.    So my question to you is: In
7  receiving information that the Debtors evaluated in
8  exercising their business judgment to enter into the
9  Century Term Sheet -- to agree to the Century Term
10 Sheet, was one of the things that the Debtors
11 considered, a value of additional insured rights to
12 participate in Chartered Organizations in local
13 council policies?
14           MR. ANDOLINA: Objection.
15           MR. SCHIAVONI: Objection; asked and
16 answered and outside the scope.
17      A.    As I understand it, the requirement
18 at Section 13(b), requires that a Chartered Org
19 agrees to provide the assignments and releases set
20 forth in Section 9 and 10 above on this document that
21 I'm not looking at right now.
22           But in order to become a Contributing
23 Chartered Organization, the Opt-Out Chartered
24 Organization under this provision would need to
25 assign or release their insurer rights related to

Page 49

1  scouting-related abuse claims, if there is a Settling
2  Insurer involved, because, Mr. Lloyd, as you would
3  suspect, no settling insurer would want to have
4  hanging out there a scouting-related abuse claim if
5  it's not been fully resolved by way of a settlement
6  agreement or otherwise.
7      Q.    I appreciate that clarification,
8  Mr. Desai.
9           In exercising its business judgment
10 concerning Paragraph B of Paragraph 13, which you
11 were just pointing to: Such chartered organization
12 agrees to provide the assignments and releases as set
13 forth in Sections 9 and 10.
14           Did the Debtors receive any
15 information as to the value of the assignments and
16 releases that would be provided in Sections 9 and 10
17 for participating Chartered Organizations?
18           MR. ANDOLINA: Objection to form;
19 asked and answered; scope.
20           MR. SCHIAVONI: Same objection.
21      A.    Mr. Lloyd, I would defer to my prior
22 answers concerning business judgment and I would
23 also, perhaps, indicate that, in considering this
24 entire document as a whole of the Century Term Sheet,
25 we, as the Bankruptcy Task Force, we, as a National

IN RE BOY SCOUTS AND DELAWARE BSA

Page 50

1  Executive Committee, or we, as a National Executive
2  Board, were provided with information, presentations,
3  not only from our restructuring council but also from
4  our insurance council, in addition to our financial
5  advisors, coupled with the need to ensure protection
6  for Chartered Organizations because they are an
7  integral part of the Boy Scouts of America and to
8  continue to build upon a Settlement Trust that would
9  allow for the organization to emerge and continue to
10  exist and equitably compensate victims.
11          Considering all these things, as well
12  as all the information we were provided, we continue
13  to trust in our advisors to actively negotiate with
14  the settling parties, particularly on this agreement
15  with Century and its counsel, a resolution that was
16  adequate to everyone involved.
17      Q.    In your role as a member of the BSA
18  Bankruptcy Task Force and the Executive Board, have
19  you seen any analysis that attempted to value the
20  additional insured rights of Chartered Organizations
21  in the local council policies?
22          MR. ANDOLINA:  Objection to the form;
23  scope.
24      A.    I recalled seeing some presentations
25  concerning policies that were available, are

Page 51

1  available and to whom and what timeframe in which
2  they existed, the coverages associated with those
3  policies, the types of policies they were, and aside
4  from that and ongoing conversations that surrounded
5  that presentation, I don't recall seeing anything
6  else.
7      Q.    Okay.
8          MR. LLOYD:  Mr. Desai, we've been
9  going about an hour.  Are you doing all right?  Do
10  you want a break?  How are you feeling?
11          MR. ANDOLINA:  Let's take about --
12  can we take ten, Mr. Lloyd?
13          MR. LLOYD:  We absolutely can.
14          MR. ANDOLINA:  Thank you.
15          THE VIDEOGRAPHER:  Okay.  Going off
16  the record at 9:07 eastern time.
17          (A brief recess was taken.)
18          THE VIDEOGRAPHER:  We are back on the
19  record at 9:23 a.m. eastern time.
20  BY MR. LLOYD:
21      Q.    If we could turn, please, to
22  Paragraph 9 of Exhibit 3, which is the Century Term
23  Sheet.
24          Mr. Desai, during the time that the
25  Century Term Sheet was being negotiated, was the

Page 52

1  Bankruptcy Task Force and the Executive Committee
2  provided with contemporaneous updates about the state
3  of the negotiations?
4      A.    Yes, we were.
5      Q.    And did those updates include the
6  bids and asks by various negotiating parties?
7          MR. ANDOLINA:  Object to the form.
8      A.    The updates, again, at a high level,
9  did include what certain parties were wanting --
10  willing to negotiate on and what our parameters were
11  in response based upon several conversations with
12  counsel for us, amongst members of the BTF and the
13  NEC and the Board.
14      Q.    And this is going to be a question
15  that's going to go back to where we were at the very
16  beginning of the deposition, so you may be able to
17  answer it and you may be allowed to answer it, and
18  you may not be.
19          So I just want to ask it, and we'll
20  take a little pause for Mr. Andolina to make whatever
21  objections or instructions he has.
22          Please tell us everything that you
23  recall, sir, about the updates that you received from
24  counsel during the negotiation of the Century Term
25  Sheet.

Page 53

1          MR. ANDOLINA:  Objection to form.
2  I'll allow Mr. Desai to testify in terms of his
3  recollection of cadence, but not with respect to
4  specific positions that may have been exchanged in
5  the mediation nor with respect to any advice provided
6  by counsel.
7          So with those caveats, you can answer
8  to the best of his ability.
9          MR. LLOYD:  And Mr. Andolina, just to
10  clarify, so you're invoking attorney-client and
11  mediation privilege?
12          MR. ANDOLINA:  Correct.
13          MR. LLOYD:  Thank you for that
14  clarification.  Go ahead, Mr. Desai.
15      A.    So at or near this timeframe, in the
16  fall/winter of 2021, the Bankruptcy Task Force, the
17  NEC, along with our advisors, met with more
18  regularity than I can recall and not only in terms of
19  meetings, but also various email exchanges with
20  counsel, coupled with phone calls amongst, not only
21  members of the Task Force and Board, but we continued
22  to receive, sometimes real-time updates on where
23  things were in terms of active negotiations, and at
24  other times, we would receive more formalized updates
25  and presentations during our meetings from our

IN RE BOY SCOUTS AND DELAWARE BSA

Page 54

1  advisors as to kind of where things evolved to
2  following a week or a few days of negotiations, and
3  based upon certain timeline benchmarks, either
4  established by the Court or the parties, the
5  Bankruptcy Task Force would meet regularly to engage
6  in conversation, to look at the terms, to provide
7  input to our advisors.
8          Following that, recommendations would
9  be made and then would be voted upon by the National
10 Executive Committee and then the Board, to then allow
11 for our advisors to have negotiating parameters and
12 limits, if you will, for what the BSA, as well as
13 other parties affiliated with the BSA, could agree
14 to.
15     Q.    When you say "other parties
16 affiliated with the BSA," what do you mean by that,
17 sir?
18     A.    So --
19          MR. ANDOLINA:  Objection to form.
20 You can answer.
21     A.    I'm referring to our local councils
22 as well as we -- at this time, while these
23 negotiations with Century were taking place, you
24 know, you can't just take it into a vacuum.  I mean,
25 there were ongoing negotiations with the Catholic

Page 55

1  constituency, the Methodist constituency and, you
2  know, other insurers that our advisors were working
3  with in order to effectuate more resolutions,
4  because, again, given the timeline of events, keep in
5  mind that the voting deadline was in December as well
6  as extended by the Court, so it was critically
7  important to the Debtor to continue to engage in more
8  and more resolutions to obtain more victim support
9  for the plan in order to proceed to a confirmation
10 hearing on a timely basis.
11     Q.    In addition to more victim support,
12 was it the Debtors' goal to also obtain more support
13 from Chartered Organizations?
14     A.    Absolutely.
15     Q.    If we can turn to Paragraph 10 of
16 Exhibit 13, Exhibit 3, I beg your pardon, and the
17 beginning of it.  Thank you.  We covered the middle
18 of this earlier, Mr. Desai.  I'm going to cover the
19 beginning of it briefly.
20          So after the heading Participating --
21 the title Participating Chartered Organizations,
22 Paragraph 10 reads:  Under the Amended Plan and as a
23 condition to the Effective Date, waiver of which
24 shall require the prior written consent of, among
25 others, the Settling Insurers -- I'm going to pause

Page 56

1  there.
2          Do you have an understanding of who
3  the "among others" are in that first sentence that I
4  read?
5          MR. ANDOLINA:  Objection to the form;
6  scope.
7     A.    My understanding of who "among
8  others," I think it is just a description for
9  Settling Insurers there.  It's spelling it out and
10 "Settling Insurers" is a defined term and in addition
11 to them, it could potentially mean parties to the
12 Settlement Agreement here, which are Coalition, FCR,
13 Ad Hoc, so I would defer to the document.
14     Q.    Thank you.  So I'm going to read
15 again:  Under the Amended Plan and as a condition to
16 the Effective Date, waiver of which shall require the
17 prior written consent of, among others, the Settling
18 Insurers.  In order to obtain the benefit of the
19 Settling Insurer Policy Injunction and to the full
20 post-1975 injunction, Participating Chartered
21 Organizations shall be required to provide or be
22 deemed to provide -- and let me just pause there --
23 it may be in your personal capacity, but do you have
24 an understanding of what the phrase "deemed to
25 provide" means in this context?

Page 57

1          MR. ANDOLINA:  Objection to form and
2  scope.  You can answer in your personal capacity, if
3  you know.
4     A.    Personally speaking, "deemed to
5  provide" would mean to me that an entity as being
6  described here, participating Chartered Org would
7  have to exercise some type of instrument, if you
8  will, that would, as the rest of the sentence goes,
9  allow for an assignment of their insurance price
10 pursuant to the terms and conditions of this
11 document.
12 BY MR. LLOYD:
13     Q.    Thank you.  Shall be required to
14 provide or be deemed to provide the following
15 assignment of their insurance rights, the, quote,
16 Participating Organization Insurance Assignment,
17 unquote, as a defined term.
18          And it continues:  And it continues:
19 Any and all of the Participating Chartered
20 Organizations' rights, titles, privileges, interests,
21 claims, demands or entitlements, as of the Effective
22 Date to any proceeds, payments, benefits, Causes of
23 Action, choses in action, defense or indemnity, now
24 existing or hereafter arising, accrued or unaccrued,
25 liquidated or unliquidated, matured or unmatured,

1  disputed or undisputed, fixed or contingent, arising
2  under or attributable to, and then there's a listing
3  **A through F.  A is the abuse insurance policies**
4  **(including the Settling Insurers policies), B, any**
5  **other insurance policies issued by a Settling**
6  **Insurance Company that cover Abuse Claims with**
7  **respect to any coverage for Abuse Claims, C, the**
8  insurance settlement agreements (including the
9  agreement) and the claims thereunder, the proceeds
10  thereof, D, the types of claims, listed in the
11  insurance actions definition in the Plan (including
12  the respect to the insurance policies issued by the
13  settling insurers), E, the insurance action
14  recoveries (including with respect to the Settling
15  Insurers' policy) and F, the participating Chartered
16  Organizations Insurance actions.
17         Do you see that?
18     A.    I do.
19     Q.    And is it your understanding that
20  that language that I just read, in Paragraph 10 of
21  Exhibit 3, the Century Term Sheet, in agreeing to
22  that language, as part of the Century Term Sheet, the
23  Debtors had validly exercised their business
24  judgment?
25         MR. ANDOLINA:  Objection to form.

1     A.    Yes, it is.
2  BY MR. LLOYD:
3     Q.    And you had previously testified
4  about the various factors that went into the Debtors'
5  exercise of their business judgment.
6         With respect to this first part of
7  Paragraph 10 that we were just discussing, do you
8  have anything to add to your prior testimony in
9  respect to the considerations that the Debtor made in
10  exercising its business judgment?
11     A.    No, sir.
12     Q.    Now, I think you had testified that
13  part of the -- the exercise of your business judgment
14  included being advised about various of these
15  provisions, we're focused on the Century Term Sheet,
16  in conversations, I think you mentioned Ms. Lauria
17  and other individuals from White & Case.  Do you
18  recall that?
19         MR. ANDOLINA:  Objection to form.
20     A.    Yes.
21  BY MR. LLOYD:
22     Q.    Okay.  And here, too, we'll do the
23  little dance, if you will:  What do you recall about
24  the advice that the Debtors were specifically given
25  by their counsel in respect to entering into the

1  Century Term Sheet?
2         MR. ANDOLINA:  I'll allow Mr. Desai
3  to answer with the same restrictions as I previously
4  provided regarding instructing him not to provide any
5  attorney-client communication information, nor to
6  reveal mediation protected provisions.
7         With that caveat, I think he can
8  respond.
9     A.    As indicated previously, Mr. Lloyd,
10  the Task Force, the NEC and the Board participated in
11  innumerable numbers of meetings with our advisors,
12  Haynes and Boon, on insurance-related issues and
13  certainly our structuring counsel White & Case.
14         In terms of information outside of
15  attorney-client materials, I can tell you that the
16  BSA, the Bankruptcy Task Force, NEC and Board had
17  many conversations relative to what it would mean to
18  be a contributing Opt-Out Participating Chartered
19  Organization, recognizing the fact that the Boy
20  Scouts of America values its relationship with
21  Chartered Organizations and in order to achieve the
22  spirit that was contemplated under the Hartford
23  Agreement, where the parties would continue to work
24  in good faith to resolve and bring under the tent,
25  any and all Chartered Organizations to the extent

1  possible to release and absolve of them of any
2  scouting-related abuse claims.
3         Having those various conversations,
4  seeing the presentations, being provided with
5  explanations on charts and PowerPoints on what it
6  means to be one of these three categories of a
7  Chartered Org and how it would interplay with prior
8  settlements, future settlements or all things that
9  were actively discussed by the Board with our
10  advisors and in totality, eventually authorizing our
11  advisors to enter into this deal with Century/Chubb.
12     Q.    As part of the information that you
13  received from your restructuring and your insurance
14  counsel, was the Bankruptcy Task Force and the
15  Executive Board given specific information about
16  particular charters in particular of the buckets that
17  you just described participating opt-out and
18  contributing?
19         MR. ANDOLINA:  Objection to form,
20  compound and I just want to clarify, Mr. Lloyd, I
21  think you referred to the National Executive Board,
22  which, for the record, met less frequently than the
23  National Executive Committee.
24         If you'd like him to respond with
25  respect to the BTF and the National Executive

Page 62

1   Committee, that may provide more clarity to his
2   answer.
3            MR. LLOYD:  I appreciate that,
4   Mr. Andolina.
5   BY MR. LLOYD:
6        Q.    So, yeah, let me rephrase the
7   question, Mr. Desai, because I realize there are a
8   lot of organizations and I appreciate that.
9            So when, as a member of the
10  Bankruptcy Task Force and the National Executive
11  Committee, you were briefed and the Debtors then were
12  briefed on about, as you were just describing,
13  Participating Chartered Organizations, contributing
14  Chartered Organizations, Opt-Out Chartered
15  Organizations, as part of those briefings that you
16  received, was the Bankruptcy Task Force and the
17  National Executive Committee told which types of
18  Chartered Organizations fit within each of those
19  three buckets?
20           MR. ANDOLINA:  Objection with respect
21  to types.  Just so we have a clear record, are you
22  talking about which specific chart -- was the BTF and
23  NEC advised of the various specific Chartered
24  Organizations that had resolved?
25           And I don't mean to over-speak here,

Page 63

1   but I just want to make sure the record's clear on
2   this.
3            MR. LLOYD:  No, I appreciate it.
4   It's -- we'll try it a third time.
5   BY MR. LLOYD:
6        Q.    The -- like I told you, Mr. Desai, I
7   said I'd probably ask at least one bad question in
8   this.
9            So when the Bankruptcy Task Force and
10  the National Executive Committee was briefed by its
11  insurance and restructuring advisors, was the -- was
12  the National Executive Committee and the Bankruptcy
13  Task Force told, in the -- we're here at the time Of
14  the Century Term Sheet, so in the December 2021 time
15  period, where the Chartered Organizations that had
16  been previously affiliated with the -- the TCJC, what
17  bucket they fell within?
18           MR. ANDOLINA:  Objection to form.
19  You can answer without revealing specifics of those
20  conversations.
21       A.    I believe I understand what you're
22  asking, Mr. Lloyd.  And so the answer to your
23  question simply is yes.
24  BY MR. LLOYD:
25       Q.    Okay.  And do you recall which bucket

Page 64

1   the TCJC fell within?
2        A.    Well, I think it depends on the time
3   frame we're talking about.  Because if you look back
4   to figure out when the TCJC effectuated a resolution,
5   they had obviously become a full-fledged contributing
6   Chartered Organization, and so around the timeframe
7   that we're talking here with Century, I previously
8   referenced that in addition to the negotiations
9   taking place with Century, our advisors were also
10  actively negotiating with the Methodist, the
11  Catholics and various other insurers.
12           And so, for example, using the
13  Catholics and the Methodists, they, at the time that
14  the Century agreement was being contemplated, were at
15  the table, actively negotiating, and could have
16  become a contributing Chartered Organization and
17  eventually, as we know, I'll fast forward the story,
18  the Methodists did effectuate a resolution, which
19  would now have -- now deemed them a contributing
20  Chartered Org and the Catholics decided to not.
21           MR. ANDOLINA:  And I would just
22  instruct Mr. Desai not to -- I think that answer does
23  not reveal any mediation communications, but I'd
24  instruct him, in answering Mr. Lloyd's questions, to
25  avoid any -- revealing anything about those

Page 65

1   negotiations.
2            MR. LLOYD:  If you -- we can turn to
3   Paragraph 13 of Exhibit 3, please.
4   BY MR. LLOYD:
5        Q.    This is, Mr. Desai, the Opt-Out
6   Chartered Organization, I beg your pardon, paragraph
7   of Exhibit 3 that we were discussing previously.
8            And I believe you testified -- you
9   used the phrase "pathway," about providing a pathway
10  to becoming a contributing Chartered Organization.
11           Do you recall that testimony
12  generally?
13       A.    Yes, sir.
14       Q.    At the time that the Century Term
15  Sheet was entered into, other than the Roman Catholic
16  entities, who else could have become a contributing
17  Chartered Organization that was not already a
18  contributing Chartered Organization?
19           MR. ANDOLINA:  Objection to form.
20  Beyond the scope.
21           You can answer in your individual
22  capacity.
23       A.    Personally speaking, I can tell you
24  that the Boy Scouts of America has relationships with
25  many Chartered Organizations beyond some of the

Page 66

1  larger ones that you just referenced.
2             And so, by way of an example, if a
3  particular Chartered Org had either advised the
4  organization or the Court that they were going to
5  file an objection or opt-out of this process, they
6  would be one of those groups that could convert
7  themselves from an opt-out to a participating or
8  contributing, based upon the provisions in this
9  paragraph.
10      Q.      In December -- excuse me -- of 2021,
11  is it your understanding that all other Chartered
12  Organizations, besides the Roman Catholic entities,
13  were already going to be protected by the injunction?
14             MR. ANDOLINA:  Objection to the form
15  of the question.
16      A.      I don't necessarily -- as I sit here
17  today, I probably couldn't tell you which specific
18  Chartered Organizations opted out.
19             Obviously, we're aware of the -- of
20  certain Diocese within the Catholic church that have
21  lodged an objection and are now deemed Opt-Out
22  Chartered Organizations.
23      Q.      If we can go to Paragraph 14, please.
24  Mr. Desai, this is listed as the Post-Confirmation
25  Interim Injunction.

Page 67

1             Do you see that, sir?
2      A.      I do.
3      Q.      The -- this particular provision
4  included in the Century Term Sheet, is it the
5  Debtors' position that in including this provision,
6  Paragraph 14, that the Debtors validly exercised
7  their business judgment?
8             MR. ANDOLINA:  Objection to form.
9      A.      Yes.
10  BY MR. LLOYD:
11      Q.      And with respect to Paragraph 14, do
12  you have any additional information to provide, in
13  respect to the exercise of business judgment, that
14  you have not already revealed to us in respect to the
15  prior Paragraphs 9, 10, 11, 13, that we've been
16  discussing?
17      A.      No, sir.
18      Q.      Can we turn to Paragraph 15, please.
19  This is -- Paragraph 15 of Exhibit 3, the Century
20  Term Sheet is titled:  Abuse Claims Under Policies
21  Issued to Chartered Organizations.
22             Do you see that, sir?
23      A.      Yes, sir.
24      Q.      I'm sorry.  I didn't hear your
25  answer.

Page 68

1      A.      Yes, sir.
2      Q.      Okay.  Thank you.  And with respect
3  to this particular paragraph, is it the Debtors'
4  position that in agreeing to this paragraph as part
5  of the Century Term Sheet, the Debtors validly
6  exercised their business judgment?
7      A.      Yes, it is.
8      Q.      And as we were discussing previously,
9  apart from the information that you've provided to us
10  in respect to the exercise of that judgment for
11  Paragraphs 9, 10, 11, 13, do you have anything to add
12  with respect to the exercise of the Debtors' business
13  judgment as it concerns Paragraph 15?
14      A.      I do not.
15             MR. LLOYD:  Okay.  All right.  Let's
16  move to -- we're going to put in the Black Line of
17  the Third Modified Plan.  That will be Exhibit 4.
18             MR. ANDOLINA:  Can we get five
19  minutes so I can grab copies of that?
20             MR. LLOYD:  Absolutely.  Let's go off
21  the record for five.
22             MR. ANDOLINA:  Thank you.
23             THE VIDEOGRAPHER:  Okay.  Going off
24  the record at 9:49 eastern time.
25             (Exhibit 4, Notice of Filing of

Page 69

1  Debtors' Third Modified Fifth Amended Chapter
2  11 Plan of Reorganization and Blackline
3  Thereof, was marked for Identification by the
4  court reporter.)
5             (A brief recess was taken.)
6             THE VIDEOGRAPHER:  All right.
7  Everything is recording and we are back on the record
8  at 9:53 eastern time.
9  BY MR. LLOYD:
10      Q.      So if we could -- so Mr. Desai, what
11  I'm showing you that's been marked as Exhibit 4 and I
12  guess -- do you have a copy of this in front of you?
13      A.      I do.
14      Q.      Okay.  Wonderful.  So just for the
15  record -- so the record is clear, the -- this is a
16  filing that's dated February 15 of 2022 and the
17  caption is The Notice of Filing Debtors' Third
18  Modified Fifth Amended Chapter 11 Plan of
19  Reorganization and Blackline Thereof, and this is a
20  preliminary.
21             If at any time, Mr. Desai, you would
22  prefer to do a comparison that's a side-by-side, you
23  know, with the December 18th plan and the February
24  15th plan, please just let me know.
25             The reason I've put this document in

Page 70

1   front of you is that the Debtors created it and I'm
2   really trying to be efficient in terms of talking
3   about, with you about the differences between --
4   between the two.
5           Since the Debtors created it, I
6   didn't figure there would be any controversy about
7   that, but as I say, if it gets too much reading a
8   bunch of strike-outs and highlights and things, just
9   let me know and we'll pull up some other documents.
10          So if we could please turn then to
11  Article 1A, Section 42, so it's going to be a few
12  pages down.
13          Okay.  Mr. Desai, I'm showing you --
14  this is on Page 17 to 18 of 304, there's a filing
15  identification with the Bankruptcy Court of document
16  No. 8814-1 and we're looking at Paragraph 42 that's
17  titled:  BSA Cash Sharing Amount.
18          Do you see that, sir?
19  A.      Yes, sir.
20  Q.      And the -- this definition appears in
21  the Third Modified Fifth Amended Plan, not in the
22  Second Modified Fifth Amended Plan, something that we
23  know because it's here in this highlighted text.
24          Are you following me?
25  A.      Yes.

Page 71

1   Q.      Is it the Debtors' testimony that in
2   including this definition -- I beg your pardon --
3   including this definition in Paragraph 42, BSA Cash
4   Sharing Amount, in the Third Modified Fifth Amended
5   Plan, that the Debtors were validly exercising their
6   business judgment?
7           MR. ANDOLINA:  Objection to form.
8   A.      Yes.
9   BY MR. LLOYD:
10  Q.      Please tell us why that is.
11  A.      I would tell you again, reiterating
12  my prior responses, but based upon advice in
13  consultation with our financial advisors, and given
14  that, at the time that this Plan was filed, Docket
15  entry 8814-1, the parties, meaning BSA, Coalition,
16  FCR, Settled Insurers and now the TCC, were all in
17  active negotiations in order to continue to build
18  more consensus for support of this plan and to
19  provide, again -- to achieve the resolutions that the
20  BSA sought out to achieve, which were to equitably
21  compensate all victims of abuse and to emerge as an
22  ongoing organization.  We felt that this negotiated
23  term was in proper exercise of our business judgment.
24  Q.      And, again, just to make sure that
25  we're not talking over each other and Mr. Andolina

Page 72

1   has the opportunity to make his objection, as you sit
2   here today, are you able to tell us who first
3   proposed this provision?
4           MR. ANDOLINA:  Objection to form and
5   I'm going to instruct him not to answer based on
6   mediation confidentiality.
7           MR. LLOYD:  If we can turn, please,
8   to Paragraph 59, please.  We're still in the
9   Definitions section.
10  BY MR. LLOYD:
11  Q.      Mr. Desai, I'm directing your
12  attention to Paragraph 59, which is titled:
13  Chartered Organization Contribution.
14          Do you see that, sir?
15  A.      Yes.
16  Q.      And this Paragraph 59, which appears
17  in the blue text, is new to the Third Modified Fifth
18  Amended Plan from the Second Modified Fifth Amended
19  Plan.
20          Do you see that, sir?
21  A.      Yes.
22  Q.      And is it the Debtors' position that
23  including this new definition in the February 15th,
24  2022 plan, the Debtors validly exercised their
25  business judgment?

Page 73

1           MR. ANDOLINA:  Objection to form.
2   A.      Yes.
3   BY MR. LLOYD:
4   Q.      And beyond the answer that you just
5   gave when we were discussing Paragraph 42, definition
6   of Exhibit 4, is there anything that you would like
7   to add in respect to the Debtors' exercise of its
8   business judgment in putting the definition that's in
9   Paragraph 59 in the Third Modified Fifth Amended
10  Plan?
11          MR. ANDOLINA:  Objection to form.
12  A.      The only thing I would add would be
13  that this was a term that was the product of active
14  negotiations, some of which I participated in myself
15  at mediation, in order to get additional parties to
16  become signatories to a more globalized settlement
17  agreement.
18  Q.      I don't mean to belabor the point but
19  just to ask and let Mr. Andolina make his objection.
20          As you sit here today, can you tell
21  us who first proposed this first definition that's in
22  Paragraph 59?
23          MR. ANDOLINA:  I'm going to object on
24  mediation confidentiality and instruct the witness
25  not to answer.