## Exhibit 6

                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                  .   Chapter 11
IN RE:                            .
                                  .   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND         .
DELAWARE BSA, LLC,                .
                                  .   Courtroom No. 2
                                  .   824 North Market Street
                                  .   Wilmington, Delaware 19801
                                  .
                  Debtors.        .   September 21, 2021
. . . . . . . . . . . . . . . .   10:00 A.M.

           TRANSCRIPT OF TELEPHONIC OMNIBUS HEARING
       BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
               UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899

                         - and -

                         Jessica C. Lauria, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020


Audio Operator:          Brandon J. McCarthy, ECRO

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:        Matthew E. Linder, Esquire
                             Laura Baccash, Esquire
 3                           WHITE & CASE LLP
                             111 South Wacker Drive
 4                           Chicago, Illinois 60606

 5   For Century:            Tancred Schiavoni, Esquire
 6                           O'MELVENY & MYERS LLP
                             Times Square Tower
 7                           7 Times Square
                             New York, New York 10036
 8
     For the FCR:            Robert Brady, Esquire
 9                           YOUNG CONAWAY STARGATT & TAYLOR LLP
                             Rodney Square
10                           1000 North King Street
                             Wilmington, Delaware 19801
11
     For Tort Claimants:     James Stang, Esquire
12                           PACHULSKI STANG ZIEHL JONES LLP
13                           919 North Market Street, 17th Floor
                             Wilmington, Delaware 19801
14
     For the Ad Hoc          Richard Mason, Esquire
15   Committee of Local      WACHTELL, LIPTON, ROSEN & KATZ
     Councils:               51 West 52nd Street
16                           New York, New York 10019

17   For the Coalition of    David Molton, Esquire
     Abused Scouts for       BROWN RUDNICK LLP
18   Justice:                7 Times Square
                             New York, New York 10036
19
     For the U.S. Trustee:   David Buchbinder, Esquire
20                           UNITED STATES DEPARTMENT OF JUSTICE
21                           OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
22                           Lockbox 35
                             Wilmington, Delaware 19801
23
     For the AIG Companies:  Michael Rosenthal, Esquire
24                           GIBSON, DUNN & CRUTCHER LLP
                             200 Park Avenue
25                           New York, New York 10166
```

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the United Methodist  Jeremy Ryan, Esquire
    and Roman Catholic Ad     POTTER ANDERSON & CORROON LLP
 3  Hoc Committee:            Hercules Plaza
                             1313 North Market Street, 6th Floor
 4                           P.O. Box 951
                             Wilmington, Delaware 19801
 5
 6  For Numerous Firms and    Irwin Zalkin, Esquire
    Claimants:               THE ZALKIN LAW FIRM, P.C.
 7                           1441 Broadway, Suite 3147
                             New York, New York 10018
 8
 9  For Zurich Insurers:      Mark Plevin, Esquire
                             CROWELL & MORING LLP
10                           3 Embarcadero Center, 26th Floor
                             San Francisco, California 94111
11
12  For Zalkin Law Firm:      Thomas Patterson, Esquire
                             KTBS LAW LLP
13                           1801 Century Park East, 26th Floor
                             Los Angeles, California 90067
14
15  For the Committee         Joseph Celentino, Esquire
    Of Local Councils:       WACHTELL, LIPTON, ROSEN & KATZ
16                           51 West 52nd Street
                             New York, New York 10019
17
18  For HMM Victims:          Evan Smola, Esquire
                             HURLEY MCKENNA & MERTZ, P.C.
19                           20 S. Clark Street, Suite 2250
                             Chicago, Illinois 60603
20  For Guam Abuse            Delia Lujan Wolff, Esquire
    Survivors:               LUJAN & WOLFF LLP
21                           238 Archbishop FC Flores
                             Suite 300
22                           Hagatna, Guam 96910

23

24

25
```

MATTERS GOING FORWARD:

1. Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 2295, filed 3/2/21)

2. Debtors' Motion For Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief (D.I. 2618, filed 4/15/21)

3. Motion for Leave to Exceed Page Limit Requirement for Objection of the Tort Claimants' Committee to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 3529, filed 5/10/21)

4. Motion for Leave to Exceed Page Limit Requirement for (i) Objection of Century Indemnity Company to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief and (ii) Century Indemnity Company's Objections to the Debtors' Solicitation Procedures and Form of Ballots (D.I. 3858, filed 5/12/21)

5. Motion for Leave to Exceed Page Limitations Regarding Debtors' Reply in Further Support of Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I. 4102, filed 5/16/21)

6. Motion for Leave to Exceed Page Limitations Regarding Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving the Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 4111, filed 5/16/21)

7. Motion to Exceed Page Limitations with Respect to Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement (D.I. 6054, filed 8/17/21)

8. Tort Claimants' Committees' Motion to Adjourn the Hearing to Consider Approval of Disclosure Statement and Solicitation Procedures for the Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I 6222, filed 9/15/21)

9. Motion for Leave to Exceed the Page Limits Regarding Debtors' Amended Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving the Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 6250, filed 5/16/21)

1          (Proceedings commence at 10:13 a.m.)

2              THE ECRO:  Please make sure your microphones are

3    muted.

4              THE COURT:  Good morning.  This is Judge

5    Silverstein.  We're here in the Boy Scouts of America

6    bankruptcy, Case Number 20-10343.

7              Let me reiterate what was just said.  If you are

8    not speaking, please make sure you are muted.  We have a lot

9    of people in the hearing.  It will make a big difference.

10             I'll turn it over to debtors' counsel.

11             MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

12   of Morris, Nichols, Arsht & Tunnell, here for the debtors.

13             And this is, obviously, a busy week for the Court

14   and a busy week for the parties.  I'd like to turn the podium

15   over now to Ms. Lauria to give the Court a quick update and

16   then a suggestion or two, if we may.

17             THE COURT:  Ms. Lauria.

18             MS. LAURIA:  Thank you, Your Honor.  Jessica

19   Lauria, White & Case, on behalf of the debtors.

20             As Mr. Abbott mentioned, we'd like to start today's

21   hearing, as I think we've been doing for most hearings, with a

22   very brief update to the Court.  I think that will frame the

23   issues that are going to be in front of the Court today.

24             And then, as we've looked through the agenda, we

25   have some thoughts on how to proceed, and maybe I'll turn to

1  that, if I may, at the conclusion of that update.

2        Your Honor, as you undoubtedly saw, and we're

3  pleased to report that, since we last met, the debtors have

4  announced two additional settlements with critical parties in

5  the Chapter 11 cases.  The debtors, the coalition, state court

6  counsel, the FCR, and the ad hoc committee have now reached a

7  resolution with Hartford.

8        I want to pause on that for a moment, Your Honor,

9  because one thing you may not have seen is we announced late

10  last night that state court counsel supporting that agreement,

11  originally that was at 73 percent of the abuse claimants.

12  That number has now increased to 81.3 percent of state court

13  counsel representing 81.3 percent of abuse claimants

14  supporting that settlement.

15        We have worked extraordinarily hard, the coalition

16  worked extraordinarily hard to gather the support of those

17  parties to the Hartford deal.  And we're just very happy to be

18  in front of you today, Your Honor, with having put what we

19  hope to be a very difficult and contentious situation with

20  Hartford behind us.  Not only does that resolve Hartford's

21  disclosure statement and plan objections, which Your Honor had

22  a preview of at the RSA hearing, but it also puts in excess of

23  $130 million more into the trust than was previously on the

24  table.  So that's a significant increase in the Hartford

25  contribution to the settlement trust.

1    We've also announced, Your Honor, that we reached

2  an agreement with one of the chartered organizations, the

3  Mormon Church or "TCJC," as we've been referring to them in

4  our pleadings.  In addition to resolving the TCJC disclosure

5  statement objections and the TCJC plan objections, the TCJC

6  has agreed to put $250 million into the settlement trust.  So,

7  since the last time we were before the Court, we have

8  announced an additional billion dollars going into the

9  settlement trust.

10    I would be remiss if I did not thank the very hard

11  work of our mediators.  I think all parties involved will

12  agree that they have literally worked every day, every night,

13  weekends included, to deliver on these very critical

14  settlements, in order to enable us to move forward.  So you

15  will hear more about that today, I'm sure, as we get to the

16  motion to adjourn the disclosure statement hearing.

17    But again, as we sit here today, we're very pleased

18  to announce that we've resolved what I think we saw as a very

19  significant impediment with moving this case forward; namely,

20  the mutually exclusive nature of the deal with the coalition

21  and with Hartford, and that is now resolved.

22    Your Honor, with that, I'd like to turn to today's

23  agenda.  Certainly, the disclosure statement is Item 1 on the

24  agenda, but the Court does have pending before it a motion to

25  adjourn the disclosure statement hearing that was filed by the

1  TCC.  Your Honor entered the motion to shorten on that motion

2  to adjourn, so that puts it forward today at 10 a.m.

3          I think what we would propose to do, just cognizant

4  of the volume of paperwork that has been filed in connection

5  with the disclosure statement, we would propose to, of course,

6  first proceed on the motion to adjourn, take about an hour,

7  hopefully less, to do that.  I don't want to presume Your

8  Honor's ruling on that motion to adjourn.  Obviously, the

9  debtors and other co-proponents have something to say about

10  it.

11          But if the Court is inclined to move forward on the

12  disclosure statement, just the way we would set up that

13  presentation is Mr. Linder and Ms. Baccash from White & Case

14  are prepared to walk the Court through the objections to

15  disclosure in the disclosure statement topic by topic, in

16  accordance with the chart that was filed with the Bankruptcy

17  Court, attached as, I believe, the second exhibit to our

18  disclosure statement reply.

19          We are cognizant, Your Honor, that a number of

20  parties have raised truly what are confirmation orders.  We've

21  thoroughly briefed those issues, we believe the other parties

22  have briefed those issues.  Everyone is going to have their

23  opportunity to be heard with respect to confirmation issues at

24  the confirmation hearing.  So, Your Honor, we weren't

25  intending to address the confirmation issues as part of our

1  disclosure statement presentation, unless of course there are

2  some that Your Honor would like to hear about, in which case

3  of course we're happy to do that.  And either White & Case,

4  Haynes & Boone, or one of the other co-proponents of the plan

5  would address those issues.  So that would be the disclosure

6  statement hearing.

7         We know we have time with the Court today, I think

8  throughout the course of today.  I believe we have time with

9  you reserved for the rest of the week.  Optimistically, I'd

10 like to say we'll be done with the disclosure statement today,

11 but I am cognizant of the volume of issues.  So, if we get to

12 the disclosure statement, I suspect it will bleed into

13 tomorrow.  Although rest assured, Your Honor, the debtors'

14 approach is, if folks think we haven't disclosed something,

15 we're willing to add disclosure.  And I think you'll hear that

16 repeatedly from Mr. Linder and Ms. Baccash.

17         After the disclosure statement, we would turn to

18 the solicitation procedures, address issues with those.

19         After the solicitation procedures, we would address

20 issues pertaining to confirmation scheduling and the

21 confirmation scheduling order.

22         As the Court is undoubtedly aware, we have Thursday

23 already this week as a regularly schedule omnibus hearing.

24 There are a handful of matters set to go forward on Thursday,

25 including apparently the TCC has now filed a motion to

1  terminate the debtors' exclusivity, have requested that that

2  be heard on shortened notice on Thursday.  We will, of course,

3  be prepared to deal with that at that time and to resolve any

4  other lingering issues, again, assuming the disclosure

5  statement and solicitation procedures should go forward.

6          That's how we were planning to proceed.  Obviously,

7  we'll take any guidance from the Court and proceed how the

8  Court would like us to, but that was our vision.  And with

9  that, Your Honor, happy to talk about that or just turn

10  directly to the motion to adjourn.

11          THE COURT:  Thank you.  I do not have any

12  questions.  And I think it does make sense to turn to the

13  motion to adjourn first.

14          So let me hear from the TCC.

15          MR. STANG:  Well, good morning, Your Honor.  James

16  Stang, Pachulski, Stang, Ziehl & Jones, for the tort claimants

17  committee.

18          Your Honor, I'm going to try to keep the focus on

19  the continuance of the disclosure statement hearing and not

20  combine this with the discussion regarding the TCC's motion to

21  terminate exclusivity, which was filed on the same day as our

22  motion to continue this hearing and not, as some people might

23  gather from Ms. Lauria's comments, just filed.  So they're

24  very different and they -- the reasons for each are different.

25          So why should we have a continuance of this hearing

1   when we've got -- oh, Your Honor, I don't quite see how many

2   participants there are.  But at one point, as we were

3   convening this hearing, there were over 300 people on this

4   call.  The reasons is that the debtor, for many of us, 3

5   working days before this hearing, filed over 1,000 pages of

6   disclosure statement and plan.

7          And the debtor really says one thing out of one

8   side of its mouth and one side [sic] out of the other side of

9   its mouth.  What is says on the left side is look at what we

10  have accomplished, we have an enhanced Hartford deal, we have

11  an LDS deal -- TCJC, Mormons, I'm sure people will use

12  different titles as we go through today's hearing -- and we

13  have a chartered organization protocol deal, look at what we

14  have accomplished, and we are well on our way to the

15  reorganization.  And out of the right side of their mouth,

16  they go this is no big deal from a disclosure perspective, we

17  can just keep on going based on the disclosure statement

18  objections that were filed, I don't know, many, many months

19  ago, and some of which have been supplemented.

20         But last, I guess it was Wednesday morning, just

21  after midnight going into Wednesday, they filed over 1,000

22  pages of additional materials.  So is it a big deal?  For us,

23  it is a big deal.  They certainly say it's a big deal.  And

24  that big deal warrants an opportunity for people on this call

25  who were not privy to the latest round of mediations -- and

1  that would include the TCC, Your Honor -- not in the room, if

2  you will, when these negotiations came to fruition, to be able

3  to look at this thousand plus pages and figure out whether

4  additional disclosure is necessary.

5          I recognize that a lot of people, and perhaps even

6  the TCC, have used the disclosure statement hearing as an

7  opportunity to raise confirmation objections.  And it is

8  important for the disclosure statement issues and the

9  confirmation issues to be separated because oftentimes they're

10  distinct.  Oftentimes, they're not, but oftentimes they are.

11  And we should try to keep an eye on what we're doing right now

12  in this case is trying to find an adequate disclosure

13  statement.

14          Now, in addition to saying, hey, it's not a big

15  deal, this isn't really something you -- you've heard about

16  this already, TCC, you knew we were going to have insurance

17  company settlements, well, yes we did.  And not that long ago,

18  the coalition and the FCR and the committee said Hartford is

19  dead on arrival, and part of that was the lack of disclosure.

20          There has been an increase in the money.  I would -

21  - and when we -- I don't know.  When Ms. Lauria talks about

22  how we're now up to -- not we -- how the proposed

23  (indiscernible) Hartford settlement are now up to 81.3 percent

24  because sometimes those votes matter.  Perhaps those people

25  should know that, on average -- there are 24,000 claimants in

1  the Hartford unit.  That comes to thirty -- not quite $33,000

2  per person.

3          So, when those people signed up to support the

4  Hartford deal, did they know that?  Because it's not in the

5  disclosure statement.  It's not a lot of money for someone who

6  was penetrated, masturbated, masturbated somebody else, but

7  that's what you're looking at.  And people -- this disclosure

8  statement needs to analyze that information.

9          We'll get into valuation at some point in this

10 hearing, the valuation of claims and how the debtor presents

11 the valuation, *vis-a-vis* what's going into the settlement

12 trust.  But one of the big arguments for why we should go

13 forward today is look at all the people who have signed up for

14 this deal.

15          Well, let's look at that for a moment because what

16 you've got, in effect, is the TCC, nine men appointed by Mr.

17 Buchbinder's office, who have spent literally -- I haven't

18 actually added it up, Your Honor, it's got to be into the

19 thousands of hours collectively, in two meetings a week and

20 meetings with the state -- with us, with the state court

21 counsel.  They're up to three meetings a week.  These nine men

22 participate in every one of those calls.

23          I dare say, I'd like to hear the participation of

24 the actual survivors in the analysis of these settlements at

25 the coalition level, as opposed to their lawyers, at the

1  coalition level.  And of course the FCR doesn't have a

2  constituency he can consult with, or probably doesn't.  We

3  have nine men who are seriously engaged in this.

4         And what we have on the other side is, frankly,

5  mass tort lawyers, and I sat down this morning to try to

6  figure out what this settlement means to the mass tort

7  lawyers.  I took -- they took -- they've got a billion-eight.

8  I deducted the high end of the estimate of the expenses for

9  the trust.  I took a one-third contingency fee.  And I came

10 out to $483 million.

11        So I've got $483 million arguing for going forward

12 today and 9 men who are joined by a couple of thousand other

13 people in the representations of the other joining parties.  I

14 think there are at least 15 law firms that have asked to

15 continue this hearing.  You know, you talk about David and

16 Goliath.  But let's really understand what's going on here, in

17 terms of the economics of pushing the hearing forward today.

18        What we are asking for, two more weeks to review

19 over a thousand pages.  And how many people are actually

20 speaking through the coalition?  Well, we all remember back to

21 the 2019 hearing days of this case, when you said that -- in

22 effect, you said you can't tell people they're members of the

23 coalition and have them have to opt out.  They have to opt in,

24 they have to show an interest in being part of this

25 organization.

1          So I don't know how many people they currently

2    claim are members of the coalition.  I generally deal with

3    about -- I'll use the number 70,000.  Well, 18,000 of their

4    clients responded and said we wanted to be members of the

5    coalition -- which, by the way, at the time, was -- had no

6    financial problems for them.  Of course, that's not true today

7    because, as you pointed out at the RSA hearing, with the fees

8    of the coalition's bankruptcy professionals, they are now

9    paying something.  So those people were told, hey, it's coming

10   off the top, an extra what now, $15 million, you are paying

11   something for being a member of the coalition that even those

12   of you who didn't want to be members of the coalition are

13   paying something.  You know, would those 18,000 people still

14   raise their hands and say I want to be part of it.

15          So, when they talk about, hey, we delivered the

16   votes for this, so keep it going, Judge, don't give us the two

17   weeks, just remember how many people are actually saying that,

18   how many people they could garner support for a free

19   participation in the coalition, and what the economics are of

20   the two weeks that we're talking about when we're talking

21   about who's speaking up for enhanced disclosure and meaningful

22   understanding of over a thousand pages, versus let's get it

23   done today and tomorrow.

24          Your Honor, and just a final touch on kind of who's

25   on what side.  I don't have a headcount for you.  But since

1  the bar date, my office, Mr. Lucas, and some people in the

2  trenches received several calls, sometimes over a dozen calls

3  a week, from people saying who's my lawyer, I know I have one,

4  but I can't remember who it is.  I think that's a reflection

5  on how claims by some people were solicited or what their

6  marketing was like.

7            And then we get the call -- and we -- Mr. Lucas,

8  who's on the call today, he takes those calls.  He goes to the

9  claims chart and finds the lawyer for that person and tells

10  that person here's who your lawyer is.  And then we

11  occasionally get, hey, I couldn't get that lawyer to return my

12  call, aren't you my lawyer.  Of course, we have to deal with

13  that misconception.  So this is not 81.3 percent of the people

14  who were actually abused saying I want these settlements and I

15  have adequate information so I can go forward.

16            The issues relating to the disclosure issues

17  relating to these three linchpins are significant.  And as I

18  said earlier, there's going to be a lot of people saying, hey,

19  but you knew about this.  Well, look, honestly -- I'll always

20  be honest with you, Judge -- we knew there was a Hartford

21  settlement of three hundred fifty million, we all knew that.

22  The Mormon settlement had been discussed in mediation.  But

23  there's a lot of disclosure that's necessary regarding the

24  Mormon claims and whether creditors are going to be told of

25  that -- when they're asked to vote to approve the Mormon

1  settlement that's not in there.

2          And while Ms. Lauria may be willing to add as much

3  information as we may ask for as the BSA, I suspect we will

4  have our differences as to what should really go in there.  I

5  haven't heard the LDS step up and say we will let anything you

6  want about us, so that people can understand that settlement

7  because I get it, Judge, sometimes votes matter.  And when you

8  hear 81 point -- I don't know if the 81.3 percent was for

9  Hartford or whether that was for Hartford and the Mormons or

10 the Mormons alone.  But when you hear that, those people in

11 the plan are being asked to vote for that settlement.  Maybe

12 they'll be asked -- given the opportunity to vote for one and

13 not the other.  I don't know.  We'll get to that at

14 solicitation.

15          But this isn't the 9019 motion.  And even if it

16 were, you would probably want to know whether it gets creditor

17 support.  And creditors need to know more information about

18 the Mormon settlement, the Mormon Church's ability to pay on

19 these several thousands of claims that apply to them before

20 they say yes or no on the plan that, in effect, asks them to

21 vote for the settlement.

22          And then we have the chartered organization

23 protocol, something that -- I might have missed it -- I don't

24 think Ms. Lauria said was one of their great accomplishments.

25 But when you read the papers, they certainly -- the various

1  parties certainly support it.  Well, that essentially says, if

2  you were abused after January 1, '76, the settlement trust

3  gets an assignment of the insurance rights and those chartered

4  organizations otherwise walk free.  We call it a "freebie."

5  It's not entirely free, there is an insurance assignment.

6  Whether it can be effectuated or not, I don't know, we'll find

7  out that down the road.  But that's essentially what it says.

8  And if you were abused pre January 1, '76, no resolution.  So

9  I have a pretty good idea of what's going to happen there it's

10 going to be the same deal but we'll see.

11         What do we know about that?  Has anyone presented

12 an analysis of what the insurance coverage is for the post

13 January 1, '76 claims?  Because you're not getting any money

14 out of anybody except the Mormons, no money coming from the

15 Catholics, no money coming from the Methodist, no money coming

16 from the Jews, no money coming from the (indiscernible)

17         And there's a suggestion that somehow it's

18 optional, you know, that those parties -- that those chartered

19 organizations that want to do that assignment would be able to

20 do so.  Well, who wouldn't want to do that assignment?  I

21 mean, it's free, it's not costing you a dime.  Heck, you

22 didn't even really pay for the insurance policies that are

23 being assigned, you were just added on as an additional

24 insured.  You'd have to be some interesting organization to

25 say no to that one.

1          But we have no information as to the gaps in the

2    insurance coverage as compared to the claims.  What is the

3    insurance program for the post January 1, '76 claim?  What is

4    the liability of the chartered organizations for those claims.

5    If they're -- if you're an estate, will you allocate

6    liability?  What's the appropriate allocation to the chartered

7    organization and who will be codefendants -- or could -- would

8    have been codefendants?  None of that information is there.

9          We get pages and pages and pages of information

10   about the local councils.  And while we have issues about how

11   it's been projected and the content of some of that, the

12   debtor certainly has improved from where it was.  We don't see

13   that kind of disclosure regarding the Mormon Church.  We don't

14   see that kind of disclosure regarding the other chartered

15   organization, who, post January 1, '76, are getting a free

16   ride, in terms of writing a check.

17         And we're asking for two weeks to highlight to the

18   Court what the deficiencies are.  And I get the fact that have

19   spent, I don't know what, 10, maybe 15 minutes explaining to

20   you what we think the deficiencies are --

21         THE COURT:  Uh-huh.

22         MR. STANG:  -- are evidence that we must have had

23   enough time to review it all.  Otherwise, how could I speak so

24   eloquently about the issue for the continuance?  Well, we're

25   working really hard to try to figure it out because we have no

1  idea what you're going to do regarding this continuance

2  request.

3        But we don't have complete mastery of all the

4  things that were going on in this amended plan or certainly in

5  the disclosure statement.  And if we don't have it, where we

6  have the resources, not just because I have a firm of a lot of

7  really good bankruptcy lawyers, but we've been involved -- we

8  have been around the mediation.  It's not perfect, but we've

9  been around it.  But folks like Mr. Zalkin, just new, Mr.

10  Patterson, new to it.  And I don't know the names of every

11  single lawyer that filed the joinder, though I appreciate that

12  they did.  They knew even less than we did.

13        And I just want to say one more thing, Your Honor,

14  and then I think I'm done in terms of this continuance

15  business, and that's a comment about the mediation.  And you

16  may remember that, when the mediators filed their first

17  mediation report, the TCC and the FCR were quite critical of

18  that announcement of the JPMorgan/creditors' committee deal.

19  We thought it was inappropriate for the mediators to file that

20  statement, the FCR joined in that.

21        Well, the sixth mediators' report is also very

22  disturbing.  From the TCC's perspective, the mediators should

23  not be filing these reports.  The local rules talk about

24  keeping the Court advised as to status, talking about a final

25  report.  But this sixth report goes way over the line.  And

1   how is that so?  Because part of this drumbeat of let's keep

2   it going, let's keep it going is, hey, we had a mediation,

3   everybody was engaged, and the mediators, if you read between

4   the lines, they're behind this settlement, so, Judge, you

5   know, let's not let any moss or grass grow under our feet.

6          Well, the first paragraph of the sixth mediators'

7   report recites there are three mediators.  But if you bother

8   to look at the signature line, only two of them signed it, Mr.

9   Finn (phonetic) did not.  They don't even say in a footnote

10  this is a report from two of the three mediators, and it is a

11  report from two of the three mediators.

12         And if the Court were to, in some kind of

13  appropriately confidential hearing or meeting, find out why

14  Mr. Finn didn't sign the report, it might be of interest to

15  you.  But it certainly belies the notion that the three

16  mediators are all on board with the report.

17         The mediators say that they express no opinion on

18  the merits of the settlement.  Well, that's true, they say

19  that.  But then they go on to say that there will be further

20  settlements that may maximize the value of the estates -- of

21  the estates, implying that these settlements that are in their

22  report, in fact, maximize the value of the estates.  They do

23  not.  You sit -- when you sit there and you hear -- and you

24  look at the 24,000 claims that are within the Hartford unit

25  and run the TDP values that this debtor, that this coalition,

1  that this FCR all agreed upon that RSA, it does not pencil out

2  to a lot of value.

3          And as I said before about, you know, whether

4  survivors know how much that settlement yields to them on

5  average, you can run the numbers, so that a penetration

6  claimant can see, using the base amount in the TDPs or the

7  high-end amount discounted by the agreed-upon statute of

8  limitations, like a statute of limitations that the debtor

9  agreed to, the coalition agreed to, the FCR agreed to, that we

10 agreed to, and you can run that number -- Mr. Lucas will do it

11 for you because he does it for me -- you'll see what this

12 really pencils out to, and we'll see if 81.3 percent of the

13 people think this is really a good deal.

14          So, Your Honor, that's why we should have a

15 continuance.  There are lots of things to talk about.  But

16 when we get essentially three working days of opportunity to

17 review over a thousand pages, it's not right.  It just isn't

18 right.  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Let me hear from others who filed objections and

21 have something additional to add.

22          MR. SCHIAVONI:  Your Honor, if there's -- if there

23 are any other plaintiffs, we'd ask to hear from them, but we'd

24 speak after them if there are no others that want to speak.

25          UNIDENTIFIED:  Good morning --

1    THE COURT:  Let me hear if there are others that

2  would like to speak.

3    UNIDENTIFIED:  Good morning, Your Honor.

4    UNIDENTIFIED:  Your Honor, we would like to be

5  heard.

6    THE COURT:  Okay.

7    MR. STANG:  Your Honor, this is Mr. Stang.  May I

8  suggest this?  There are certain people who are what I call my

9  state court counsel.  These are people who represent survivors

10  on the committee.  I believe Mr. Hurley -- that's mister -- or

11  I can't see --

12    UNIDENTIFIED:  (Indiscernible)

13    MR. STANG:  (Indiscernible) you might want to start

14  with that group.  Then there are other state court counsel who

15  are -- who represent mediation parties.  That would be, for

16  example, Mr. Patterson and Mr. Zalkin.  And then there are

17  others who aren't actually part of the mediation parties.  I'm

18  just trying to -- rather than people going -- speaking over

19  each other, saying I'll go, I'll go, maybe you want to kind of

20  call that kind of role and see if we can go through the list

21  that way.  I'm not trying to give someone an advantage, but

22  I'm just trying to suggest an organization (indiscernible)

23    THE COURT:  Okay.  Why don't people raise their

24  hands on the Zoom call or not, and I'll do it that way?  I've

25  got someone in the conference room.

1          MR. SMOLA:  Thank you, Your Honor.  Evan Smola for

2     the HMM victims.  We represent approximately 4,000 victims in

3     this case, about 150 of which have independent tort claims

4     involving the TCJC.  I'm also proud to represent Bob Grier,

5     one of the member of the Official Tort Claimants Committee.

6          If I could just have about two minutes of the

7     Court's time.  Can you hear me okay?

8          THE COURT:  Yes, and certainly.

9          MR. SMOLA:  Thank you, Your Honor.

10         Since this plan was filed and these announcements

11    were made, our office has fielded quite literally hundreds of

12    phone calls from our clients, and we have done our best to

13    both process the plan and the disclosure statement and explain

14    it to our clients in a very short period of time.

15         And one of the things I would tell the Court is

16    that, having spoken with many dozens of these men over the

17    last six days or so, this process can be either healing and

18    cathartic for them, or it can be harmful.  And if they

19    understand what they're voting for and they're well informed

20    and they have a clear message from the debtors as to their

21    rights and their responsibilities, it can be a beneficial

22    process to them.  If, on the other hand, they are confused by

23    the disclosure or they don't understand where to look for

24    certain information within the disclosure, it is going to be a

25    harmful process to them.

1            I have spent the last six days on the phone with

2   many of the lawyers on this call right now, in an effort to

3   understand the plan and disclosure statement myself, so that I

4   can explain it to my clients.  And as recently as about 20

5   minutes before this call, there were elements of the plan and

6   disclosure statement that, despite having read it multiple

7   times, I didn't understand.

8            There are three things that were very glaringly

9   apparent to me in my initial read of the plan that were

10  problematic, and Mr. Stang mentioned a few of them.  But one

11  is that the TCJC seeking what will end up being non-consensual

12  third-party releases, and there is a void of information

13  disclosed about the claims against them, about their assets,

14  about their calculation of their own liabilities, and about

15  their ability to pay.  That's the first major problem.

16           The second major problem is there is no calculation

17  whatsoever of the value of the assignments of insurance rights

18  by chartered organizations post 1976.  There are years where

19  there's 20 million in coverage left and 2,000 claims.  The

20  value of those insurance rights are *de minimis*.  There are

21  other years where there is a lot of insurance coverage for not

22  a lot of claims.  There is no calculation of the value of

23  those rights, and those are going to involve, once again, non-

24  consensual third-party releases for chartered organizations.

25           The third major problem is the Hartford settlement.

1  We can all talk about whether that's a good settlement or not.

2  It's very difficult for a victim to understand how that number

3  was arrived at, what liability that Hartford pays, and what

4  percentage of that exposure they ended up paying for.  Those

5  are three very glaring deficiencies in the disclosure

6  statement.

7           They are issues I have not been able to explain to

8  my clients.  And I don't think that having two week to fix

9  these problems, in light of how long we've been working on

10  this case, should be a major issue.  And for that reason, we

11  join in TCC's motion for further time to evaluate.  Thank you,

12  Your Honor.

13           THE COURT:  Thank you.

14           Mr. Patterson.

15           MR. PATTERSON:  Thank you.  Good morning, Your

16  Honor.

17           We join the TCC's motion to adjourn, I think it was

18  Friday, after we spent a whole day, several of us, trying to

19  make sense of the settlements that had been announced and what

20  the impact of those settlements would be on creditors'

21  recovery.  And for us, we were not able to accomplish that

22  task, and we believe that significant additional disclosure is

23  required in order to make sense of this.

24           There's no indication of what the history of

25  settlements is with the TCJC, no indicate -- or judgments, no

1  indication of the history of settlements or judgments with the

2  participating chartered organizations, no indication of what

3  their available assets are, no indication of what the

4  available insurance is that's being assigned.  And these are

5  essential elements for people to decide whether or not to

6  support a plan that either forgives, liquidates, or eliminates

7  these potential sources of recovery.

8           Your Honor, the Hartford settlement increment of

9  about $125, spread over the 40,000 claimants who have rights

10 under the Hartford policy, is about $3,000.  The total billion

11 dollars of announced settlements amounts to somewhere around

12 $12,000 across the 80,000 claimants.  We think there needs to

13 be disclosure of indicative values for certain kinds of

14 claims, given the settlements that have taken place, what are

15 the estimated recoveries for claimants in the case.

16          With regard to the TCJC and other potential

17 settlements with chartered organizations, what is the source

18 weighting with regard to those recoveries?  If Mr. Zalkin's

19 client has a claim against the TCJC, and the TCJC is paying an

20 amount into the estate, how much will the claimants that have

21 claims against the TCJC receive under that?  How much will be,

22 as I say, thrown into the pot of porridge and just shared

23 among all the claimants?  There's no indication of that and,

24 therefore, no ability to assess the settlement.

25          With regard to the local council settlements, that

1  has now been reduced to allocations among the local councils.

2  But again, what is the basis for that allocation?  What is the

3  history of settlements or judgments against local councils?

4  What are the claims?  You know, there's no information that

5  people can use to assess how this settlement, now that it's

6  liquidated on a per local council basis, affects my rights,

7  versus the state of nature or other alternatives.

8           Your Honor, these are very significant settlements,

9  and the disclosure statement does not even make an effort to

10 go through the conventional Martin factors with regard to any

11 of them.  What is the probability of success?  What is the --

12 are there likely difficulties in collection; that is, what are

13 the available assets of chartered organizations, including

14 like TCJC?  What is the complexity?  And ultimately, what are

15 the interests of creditors viewed with the settlement and

16 viewed without the settlement?

17          So we have endeavored to give some indication of

18 the kinds of questions that we would have.  And whether we

19 treat this as a disclosure statement objection to this version

20 or whether it just makes sense for the debtor to go back and

21 address these basic elements, so that we can look at it, you

22 know, I think the latter is preferable, Your Honor.  This just

23 isn't close and we need another opportunity to evaluate how

24 the debtor is going to address these essential elements in

25 order to be able to effectively comment on these settlements.

1  Thank you, Your Honor.

2           THE COURT:  Thank you.

3           Mr. Schiavoni.

4           MR. SCHIAVONI:  Your Honor, I tend to think that

5  lawyers look at issues like this from their own perspective,

6  and I'm at fault or benefit it from looking at it from that

7  perspective.  But a friend of mine, who's a retired judge,

8  told me that good briefs and enough time make for good

9  decisions.  And I think the starting point, in thinking about

10 an adjournment, is the benefit, really, that the Court might

11 derive from it because the changes that were made and the

12 extra briefs that were filed on Friday would impose an almost

13 herculean effort on the best of jurists -- and we have the

14 best of jurists here -- to try to get through what was there.

15          The issues that we have before the Court, to be

16 clear, are complex issues.  It's -- I think the Court, first

17 and foremost, would benefit by having a little extra time here

18 in looking at some of these issues.  I think you'd also

19 benefit from having the benefit of just a little supplemental

20 briefing on the changes that have been made to the disclosure

21 statement and the impact on that.  I think you -- the Court

22 would also benefit from the fact that the parties might have

23 an opportunity to try to work out some of the disclosure

24 statement issues concerning the additions and the additional

25 time to lessen the burden on what the Court would have to

1    decide in connection with these issues.  That's the first and

2    foremost perspective I'd ask you to take in looking at this.

3            Looking at it from my selfish self-interests, okay,

4    I have had problems in trying to get through these documents

5    to understand the changes.  I don't have in front of me, you

6    know, from my perspective, the insurance assignments that are

7    built into the LDS settlement.  And the provisions of the

8    Hartford settlement that would deal with claims back and forth

9    among other insurers are important to me.  And I -- and we

10   don't even have the agreements to look at, at this stage.

11   Those remain moving targets at this moment.

12           But in addition to that, and really most important,

13   this assignment involving the charters is extremely unusual in

14   nature.  I have never seen anything like it in 30 years of

15   practice.  It's a negative notice assignment of non-debtor

16   coverage --

17           THE COURT:  Uh-huh.

18           MR. SCHIAVONI:  -- for which -- it would be the

19   equivalent of the Court issuing a notice that, like unless one

20   objects, you -- you know, your house is going to be assigned

21   to the trust, but don't worry, you'll get a release in

22   connection with it.  The legal issues behind that and just the

23   implementation issues behind it, I fundamentally don't

24   understand at this point.

25           But what is clear to me about it is that its

1  potentially an enormous issue for this case, for the country

2  because it's like what this is going to do is -- the few

3  charters, I think, who have read to it have referred to it as

4  a "deathtrap assignment."  And imagine that.  It's like what

5  it appears to do is, in order to relieve the local councils of

6  contractual obligations they own post '76 to these -- to the

7  charters, they release that coverage, but they don't release

8  the earlier coverage.

9          So they end up with a sort of half-release with

10  continuing litigation, but without resolution of the issue, so

11  that the bankruptcy could end up potentially as one where

12  hundreds of millions of dollars go out the door to pay claims,

13  but there's no finality to anything.  All the claims end up

14  being re-morphed into suits, not against the Boy Scouts -- and

15  this is really what this is -- what this case is all about --

16  but as like a roving set of locusts to fall upon every charity

17  in the country.

18          There's 5,000 charities on this list, plus.  My

19  children's schools in Manhattan here are on that list.

20  There's dozens of institutions in Delaware on that list.  I'd

21  be shocked if any of them even have any sense of this negative

22  assignment change that's been added in the last 4 days to --

23  you know, in order to marshal to be heard and participate.

24  It's a -- it's an incredibly significant issue.  And to sort

25  of go out with it with virtually no disclosure, no briefing,

1  no understanding on it on 4 days is -- you know, it imposes a

2  herculean effort on the Court and on counsel, but it's -- it

3  leaves us all with not really understanding the situation in

4  connection with having to make decisions on it.  So I need

5  that time, I would like that time to work with the debtor to -

6  - sort of to better understand it and with the charities.

7            And I'll tell you I thought this case was poised to

8  resolve the charity issues, which are of enormous importance,

9  on a scale that's sort of beyond the interest of everybody --

10  just, you know, everybody's unique clients on this call.  And

11  I think what happened here is the Boy Scouts thought they were

12  just -- they were just up against the wall, and they rushed

13  out.

14            So the second point I'd like to make is I think the

15  Boy Scouts need this time to better position themselves.  They

16  clearly feel that they're under pressure because of the motion

17  to terminate exclusivity.  I think -- I don't -- you know,

18  they're not going to be in a position to say it, but I think

19  they felt they just had to rush out with whatever they had

20  when they had it to hold this hearing date.

21            And I think -- you know, the saying is "haste makes

22  waste."  I think they went out with something that is

23  catastrophic to the Boy Scouts because, unless they get these

24  charters out, the plan is not feasible.  I mean out of the

25  case in their entirety.  And I think they were close, I think

1  they were close to doing it, to getting that achieved, but

2  they went out the way they did.

3         The Court has the ability, though, it seems to me,

4  in crafting any adjournment, to basically maintain the status

5  quo.  There's a motion, I understand, out there on -- to

6  terminate exclusivity.  But the Court can stage those motions

7  in a fair way in connection, so that nobody loses any time

8  here, it seems to me, and in a way that might not offend Mr.

9  Stang and his constituents, so that they had more time and

10  their motion gets to be heard fairly at the appropriate time.

11         The third point I'd make is I really think this is

12  an adjournment that benefits everybody.  It's -- you know, I

13  don't want to say I'm joining Mr. Stang in something because

14  it's almost on my bucket list to sort of be on the same side

15  as him in something.  He's, you know, a very zealous advocate.

16  I would rather have someone less zealot on the other side, and

17  I mean that as a compliment to Mr. Stang.  But you know, he

18  has worked on this case, I think, with passion and diligence.

19         I will note that, you know, his member

20  constituents, many of them are on the call.  You know, we

21  tried, at an appropriate time, you know, to pitch to them.  I

22  think they take this matter seriously, I would agree with him

23  on that.  And I think there's a sort of personal element with

24  this that, you know, if these fellows want additional time, I

25  think it's just -- there's a lot of passion here.  If they --

1  I don't -- I think we owe them the respect of giving them that

2  time because I think it will help cooler heads make decisions

3  about things.

4         And you know, in that regard, I -- look, I do join

5  Mr. Stang in saying that I don't think the mediators ought to

6  be making factual statements, very respectfully to them.  I

7  know they mean -- they only meant well by it.  But I -- it

8  just -- it's -- it sort of has set off folks on different

9  sides.  I hope they don't do that again.  But I -- there is a

10  mediation scheduled for the 30th.

11         You know, I will say that, for the first time,

12  we've had some talks with folks here.  There is some prospect.

13  You know, one does say -- when the pot is at its maximum boil

14  is sometimes when you -- you know, you see it -- you see

15  progress being made.  I'm hopeful with that, you know, despite

16  the vehemence of and the zealotness [sic] of some of Mr.

17  Stang's papers, that maybe that we are there.  At that point,

18  we'll see.  But I think, you know, the two weeks would also

19  subsume within it this mediation that's been scheduled.

20         So, Your Honor, for all those reasons, I join in

21  asking for an adjournment, not just on my behalf, but the

22  others that joined our joinder, and there were many insurers,

23  in asking for it.  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. SCHIAVONI:  I'm also -- Your Honor, may I add

1    that, candidly, I'm completely exhausted after yesterday?

2    Your Honor has physical stamina.  It's like I -- you did a

3    twelve-hour hearing yesterday with -- forgive me for

4    mentioning this, but it's a compliment to you -- one half-hour

5    break for lunch and five minutes in the afternoon.  It's like

6    I'm getting -- you're going to push me into retirement

7    prematurely.  I cannot go to seven o'clock like that again, I

8    don't think.  But you know, it's like terrific, you know, you

9    got everything done, I appreciate that.  So thank you, Your

10   Honor.

11              THE COURT:  Okay.  Mr. Rosenthal.

12              MR. ROSENTHAL:  Yes, Your Honor.  Can you hear me?

13              THE COURT:  I can.

14              MR. ROSENTHAL:  Thank you.  Michael Rosenthal on

15   behalf of the AIG companies.

16              As Mr. Schiavoni said, we did join the TCC motion.

17   I have to say, Your Honor, I don't want to duplicate

18   everything that the other parties have said.  And it is true

19   that it -- we are, indeed, strange bedfellows with the TCC on

20   this particular motion.

21              But I think, Your Honor, the problem here is that

22   this is -- this is a problem of the debtors' own making.  And

23   what the parties -- I hear the parties saying here is,

24   basically, they haven't had time to review these documents,

25   these voluminous documents, to understand exactly the

1  implications of these documents.  And that, Your Honor,

2  violates the due process rights of the parties and it violates

3  the Bankruptcy Rules, which are designed to allow a specific

4  amount of time.  Yes, it can be shortened.  But three business

5  days to review these thousands of pages of documents is simply

6  too short.  It's not fair and reasonable and it doesn't comply

7  with the Bankruptcy Rule or due process.

8         An additional two weeks, as everyone has said,

9  would allow the parties not only to review and evaluate these

10  documents and present their arguments and their additional

11  disclosures that they think are appropriate and discuss those

12  disclosures with the other parties, but as Mr. Schiavoni said,

13  it also would include the mediation scheduled for the 30th and

14  the 1st, where there may be additional progress to resolve

15  some of these issues.

16         We are really rushing this, Your Honor, and there

17  is no need to do it.  Everyone understands that it's in the

18  interest of the debtor to try to emerge from bankruptcy as

19  quickly as possible.  But that does not mean that the Court

20  can trample on the rights of other parties.  Thank you, Your

21  Honor.

22         THE COURT:  Thank you.

23         Mr. Zalkin.

24         MR. ZALKIN:  Thank you, Your Honor.

25         So far, you've heard from professionals, from the

1  bankruptcy lawyers insurance counsel on their concerns and

2  difficulties of time required to try to digest the disclosure

3  statement.  Let me give you a perspective from someone who

4  represents actual claimants, actual sexual abuse survivors.

5          I don't have thousands of clients.  We probably

6  have maybe a couple of hundred, at best.  And I have to answer

7  questions that they are asking me about what meaning of this

8  new plan the disclosure statements tell me and do they give me

9  enough information to answer those questions.  And anyone who

10 can -- who sits here and tells you that thousands of claimants

11 have had an adequate opportunity to get that -- the answers to

12 their questions from their counsel based on this disclosure

13 statement I think is giving you -- is being disingenuous.

14         I've spent hours, dozens of hours, maybe 30, 40, 50

15 hours reading through the disclosure statement, trying to read

16 through the plan, speaking with our professionals, and trying

17 to get my arms around what these disclosures mean and what

18 exactly is going to -- what can I tell my clients.  Let me

19 give you just a quick example of a problem.

20         I have Mormon clients.  They're seeing that there's

21 a Mormon settlement.  That settlement sounds like a lot of

22 money.  But then, when we do talk about how is that going to

23 get distributed, how is that going to get spread out, who is

24 going to participate is going to the -- into the trust and get

25 diluted in the trust, is it going to go strictly to the Mormon

1  claimants, it doesn't say.  I don't know.

2          And if the insurance (indiscernible) and along with

3  that, 250 million are insurance assignments does that mean

4  that, if I have a Mormon client who was abused by the same

5  perpetrator partly in scouting, partly in another context

6  Mormon context, and I want to pursue the claim against that --

7  the Mormon or the LDS Church for the abuse that occurred in

8  the non-scouting context, am I precluded from doing it by this

9  settlement?  I don't know the answer to that.

10          So it -- we need time.  We need time, in all

11  fairness to those of us who have to spend the time to talk to

12  our clients, who are very concerned.  I get calls frequently

13  from clients, asking what does this mean, what does that mean.

14  They're following the Court's docket.  They're trying to

15  understand what is happening and what -- how is this going to

16  affect them and how is this going to affect their kids.

17          And just this rushing this through because the Boy

18  Scouts want to get this done because the claimants' counsel

19  with mass tort lawyers want to get this done, who have never

20  represented a survivor in their lives, is unfair to the people

21  who really deserve the time to understand what's going to

22  happen to them and their lives.  Thank you.

23          THE COURT:  Thank you.

24          Is there anyone else before I go back to Ms.

25  Lauria?  Mr. Plevin.

1          MR. PLEVIN:  Thank you, Your Honor.

2          I just wanted to point out that we do have -- as

3 Mr. Schiavoni said, more time would allow the parties to do a

4 better job of presenting issues to the Court.  Just as we were

5 signing on to the hearing this morning at 7 a.m. Pacific time,

6 where I am, I received an email from one of the debtors'

7 coverage counsel, Mr. Azer, inviting me to talk with him about

8 our disclosure statement objections to the fourth -- to the

9 disclosure statement for the fourth amended plan, which we

10 filed on August 17th, 35 days ago.  He told me that he had

11 reached agreement with some other carrier on a description of

12 their coverage, and now he wanted to talk to me about the

13 specific changes that we had requested in the disclosure

14 statement back in August.

15          Well, that was at 7 a.m., the hearing -- 7 a.m.

16 Pacific time.  The hearing started immediately thereafter.

17 Obviously, I'm not going to have a chance to talk to Mr. Azer

18 about that today or to exchange drafts with him.  And it's an

19 -- just an example of how additional time will help the

20 parties and the Court have a better decision-making process

21 and perhaps lead to resolution of disclosure issues and maybe

22 even more with this mediation coming up.  And that's all I

23 have to say.  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Anyone else before I go back to Ms. Lauria?

1          (No verbal response)

2                  THE COURT:  Ms. Lauria.

3                  MS. LAURIA:  Thank you, Your Honor.

4                  Your Honor, I want to start by saying we reject all

5     of the statements made by opposing parties that we are somehow

6     rushing this through.  The debtors have waited for this day

7     for months.  Indeed, if you ask my client, they will tell you

8     that they waited for this day for nearly 18 months.  In fact,

9     this is the fifth time we have noticed out a disclosure

10    statement hearing in this case.  At each of those junctures,

11    we were told by parties, including the very same parties that

12    Your Honor heard from today, that they weren't ready.

13                 We filed a plan on the petition date with the

14    disclosure statement.  That was February 2020.  We were told

15    by the TCC at that point in time that they were not ready,

16    that they would not negotiate with us until the bar date

17    occurred.  We had the bar date in November 2020.  We

18    negotiated, we mediated, in fact, with the very same parties

19    that you heard from today, Your Honor.  We had all-day Zoom

20    mediations throughout December, January.

21                 Your Honor will recall that, in January, there were

22    a number of us that declared we wanted to have in-person

23    mediation, that we would get COVID tested, get vaccinated, so

24    we started in-person mediation and started scheduling

25    disclosure statement hearings at that point in time.

1          I'm glad Mr. Patterson said the word "porridge"

2    because I've analogized our disclosure statement to Goldilocks

3    and the Three Bears.  The disclosure statement is too hot, the

4    disclosure statement is too cold.  But these same parties are

5    never going to say the disclosure statement is just right.

6          It is time to move on with our disclosure statement

7    hearing.  We have told parties repeatedly that if they would

8    like to draft additional disclosure to address the number of

9    objections that they articulated today and those in their

10   disclosure statement objections.  We would be happy to put

11   that into our disclosure document.

12         I think it's really important to note, Your Honor,

13   that the plan and the disclosure statement, the TDP, the

14   liquidation analysis, the debtor's business plan these are all

15   the same documents that were filed way back on July 2nd.  In

16   fact, if you look at the disclosure statement and plan while

17   all of the parties today that were advocating for the

18   adjournment wanted to say that they had received thousands of

19   pages of additional disclosure, if you look at the disclosure

20   statement itself the redlining from the July 2nd is literally

21   17 pages of strike outs and additions; 17 total pages and a

22   270 plus page document.

23         If you look at the redlining of the plan document,

24   itself, it's literally five pages of deletions and additions

25   total in a document that is close to nearly 200 pages.  This

1  is the plan that was embodied in the RSA, that was filed on

2  July 2nd, that was litigated in the context of the RSA; that

3  is the plan that forms the basis for the plan that is before

4  the court today and the disclosure statement that is before

5  the court today.

6        Just because the RSA order wasn't entered does mean

7  that the debtors and certain of the other parties have

8  departed from the core plan that was always before the court.

9  Now we heard at the RSA hearing that there were very

10  fundamental issues with Hartford, not only the Hartford prior

11  settlement which has been on the table since April, and the

12  debtor's justifications for the Hartford prior settlement have

13  bene on the table since April.

14        We heard at the RSA hearing, and Your Honor took

15  note of, there were very significant issues with Hartford.

16  Those issues went to the core of the plan, the plan process

17  and the disclosure statement.  Hartford was raising very

18  significant disclosure statement concerns.  We resolved those

19  concerns.  That is what we are supposed to do.

20        TCJC had raised significant disclosure statement

21  and plan concerns.  We resolved those concerns.  That is what

22  we are supposed to do.  Mr. Schiavoni stood before the court

23  and has argued for months that there are chartered

24  organization issues.  We resolved the charter organization

25  issues.  And that, by the way, was not a rush job; it's the

1  product of several months of mediation, 18 months of being in

2  this bankruptcy case, parties working around the clock to work

3  on solutions and come up with the solutions that are embodied

4  in the plan.

5          By the way, Your Honor, this exactly -- this is

6  exactly what the debtor should be doing.  The debtors and the

7  other parties are, essentially, being punished by the movants

8  for their efforts to resolve disclosure statement objections

9  and plan objections.  In fact, if you take what we've heard at

10  face value the debtors would have been better off to not

11  resolve Hartford, to not resolve TCJC, to not resolve

12  chartered organization issues.

13          Wait until the disclosure statement hearing this

14  week concludes and announce those resolutions next week

15  because as Mr. Stang noted, our plan has always contemplated

16  that we could enter into additional insurance settlements and

17  chartered organization settlements during the course of the

18  solicitation period and notice those out to parties during the

19  course of that period.

20          So literally I would have been better served as the

21  debtor to not resolve issues so that I could get through my

22  disclosure statement hearing this week then to resolve them

23  that week.  That is not the right result for this case.  It is

24  not the right result for any other case.  The bankruptcy

25  process is designed to encourage settlement.  That is exactly

1    what we did.

2         With respect to folks saying that they didn't have

3    time to review the documents, we are literally only talking

4    about three aspects of the plan.  All of the parties who are

5    complaining today have asked us, in the weeks leading up to

6    this hearing, do you intend to go forward with the disclosure

7    statement hearing on the 21st.  I personally have said, and

8    the other members of the White & Case team have said

9    unequivocally, yes, we do.

10        So when we boil it down, Your Honor, it's not

11   because parties have had insufficient time to evaluate the

12   disclosure statement or the plan of the reorganization.  The

13   issue is that the parties that want to adjourn have

14   fundamental objections to the base plan, that would be Century

15   and the other insurers, or Hartford and the TCJC settlement

16   that would be the plaintiff firms that you heard from as well

17   as Mr. Stang.

18        There is no amount of additional disclosure that is

19   going to change their mind.  The TCC has filed a motion to

20   terminate exclusivity not because they don't understand the

21   plan and the disclosure statement that is in front of them,

22   it's because they don't like them.

23        Your Honor, we have a number of disclosure

24   statement objections that need to be reviewed and need to be

25   resolved.  You have seen our replies.  You have seen the

1  charts that we have filed.  You see in the agenda that there
2  are literally over 100 objections that we need to start
3  plowing through.  We have the luxury of this entire week in
4  front of Your Honor.  I know it probably doesn't sound like a
5  luxury to you after, it sounds like, the day you had
6  yesterday, but understanding that you have a very busy
7  calendar we view this as a luxury to have four days in front
8  of this court.

9          We think we should use this time to our advantage.
10 If folks want to push the Hartford, TCJC, chartered
11 organization disclosure issues to Friday of this week, which
12 by the way we have reserved, the debtors are more than happy
13 to do that.  We can get an expedited version of the
14 transcript, I'm sure we were taking very good notes here
15 today, and can start reviewing those disclosure issues right
16 away.

17         Again, Your Honor, we don't think any amount of
18 additional disclosure is going to make a difference to some of
19 these parties.  We're happy to take whatever they want us to
20 say, put their name on it, slap it to the back of the
21 disclosure statement and get this process kicked off.  We're
22 happy to do that with TCJC, Hartford and the chartered
23 organization issues, and we're happy to work through this week
24 to work through those issues.  The fact of the matter is we
25 have a lot in front of the court already that has nothing to

1  do with those three issues.

2          We heard a lot of confirmation objections from the

3  parties in their motion to adjourn.  I am not going to go

4  through and address those confirmation objections or the

5  objections that folks have to the settlements that are before

6  the court.  We're going to be prepared to demonstrate at the

7  confirmation hearing why we think the plan should be

8  confirmed, why we think the settlements that are before the

9  court should be approved.

10          It's time to move on with getting this debtor out

11  of bankruptcy.  It is unacceptable to continue to delay this

12  disclosure statement hearing given the volume of issues and

13  the time we have in front of the court.  And while I

14  understand that getting the debtor out of bankrutcy may not be

15  a goal of some of the parties that you heard from today, if

16  not most of the parties that spoke prior to me, it is the goal

17  of the Boy Scouts of America and it is the goal of Chapter 11

18  of the Bankruptcy Code to reorganize debtors and to move them

19  out of bankruptcy.

20          We deserve to have our disclosure statement heard

21  this week, Your Honor.  We deserve to have it heard starting

22  today.  We're happy to restructure the argument to accommodate

23  folks, but we think the disclosure statement, as we hope you

24  will find, needs to be approved and it needs to be approved

25  this week so we can move on.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Since I went back to Ms. Lauria I see many hands

4    that have been raised.  I will give parties an opportunity to

5    address this issue in what hopefully will be a non-duplicative

6    fashion.

7          Mr. Molton?

8          MR. MOLTON:  Thank you, Judge.  Can you hear me?

9          THE COURT:  I can.

10          MR. MOLTON:  Okay.  I will try to be brief, Your

11    Honor, but I've got to address some of the things that were

12    said.

13          David Molton, Your Honor, respectfully, for the

14    coalition of abuse scouts for justice.  I am with Brown

15    Rudnick as you understand, Judge.

16          I just want to note that from the get go respond to

17    some of the attacks that, unfortunately, happened whenever it

18    seems that there are differing views and differing strategies

19    instead of dealing with those strategies for dealing with

20    those different views on the merits we get attacked; the

21    coalition seems to be attacked.

22          Indeed, Your Honor, today the colloquy from Mr.

23    Stang is like back to the future because a year ago him and

24    the insurers stood together making those very same attacks

25    that we almost heard today to prevent us from having a role,

1  an active role in this bankruptcy.

2          And, Your Honor, I just want to state and we'll get

3  to it more later when we get to confirmation and some of the

4  issues, but I am going to put forward the point that but for

5  our involvement in this case the debtor would not be in the

6  position it is now.  But for our involvement in this case you

7  would have not resolved, first of all, the Boy Scout issue and

8  the local council issue which was done earlier this year which

9  set the predicate for the resolutions that have happened today

10  or last week.  But for the coalition's involvement in this

11  case you would have not had the resolution of a very thorny

12  Hartford issue, a very good LDS Mormon settlement, and a very

13  good resolution of the chartered organization issue; all of

14  which happened as a result of our involvement.

15          Whenever one wants to disagree with our views and,

16  again, as Mr. Stang does note we represent 18,000 plus

17  directly in the law firms associated with us represent over

18  60,000 of the 80 or so thousand proof of claim claimants, it

19  seems like the fallback mantra is attack the plaintiff.  Just

20  attack it and, you know, basically create some headlines.

21  Your Honor, I am going to reject that entirely.  I know Your

22  Honor isn't paying attention to that.

23          We have made huge efforts in this case to cooperate

24  and work in mediation and outside mediation with all the

25  mediation parties, all the parties in this case, all of our

1  friends on the tort claimant's committee.  Indeed, Your Honor

2  may note, that just a very short time ago the coalition and

3  the TCC were arm and arm on our RSA on the basis of the very

4  plan that is in front of you.  As Ms. Lauria said, there's not

5  much difference.  It was a TCC plan.  Indeed, we worked very

6  hard together to get the Boy Scout contribution and the local

7  council contribution.

8           I just want to say, Your Honor, that the fact that

9  there have been disagreements as to go forward, as to various

10  issues, maybe those disagreements, and we may need to part

11  ways is maybe we have, but we will see, over the Hartford

12  settlement, Mormon settlement, LDS settlement and the

13  chartered organization resolution.  But that has no excuse to

14  retreat to vitriol and indicta that have no place in this

15  courtroom, have no place in this case and don't operate in any

16  way to move the case forward.

17           You know, Your Honor, the TCC and its members are

18  fiduciaries for all of the claimants in this case, not just

19  the nine members who are serving very hard.  And I can see

20  that point.  I have worked with them in mediation, Judge.  We

21  have had sessions together.  We have worked together.  But not

22  just for them, and not just for the lawyers who represent

23  them, many of whom have inventories and will be getting

24  attorney's fees as well, Your Honor.

25           Also I want to note, Your Honor, and not just for,

1   as Mr. Stang said, the several thousand, you know, others who

2   have joined, the several thousand claimants represented by

3   lawyers who have joined the request for adjournment.  Your

4   Honor, one thing you should note is, you know, Mr. Patterson

5   and Mr. Zalkin, both very fine lawyers, may have differing

6   views on how this case should progress and what the results

7   should be.  Indeed, Your Honor, both of them were on the other

8   side of the TCC just a few weeks ago objecting, in some

9   capacities, to the very RSA that was in front of Your Honor.

10  Indeed, I know that Mr. Zalkin and Mr. Patterson submitted

11  very fine briefs dealing with various issues, much of which go

12  to confirmation that related to a plan that the TCC helped

13  offer.

14          So it may be that many lawyers like Mr. Zalkin,

15  like others, would rather have BSA do a get out of bankruptcy

16  by itself without channeling injunctions and without non-

17  debtor releases so that they can pursue their cases in states

18  of their choosing and hope to ring the bell in the tort

19  system.  So be it.  I understand that, Your Honor.  I

20  understand that position and it's one that can be argued and

21  one that can be weighed.

22          The bottom line, Your Honor, is that the

23  fiduciaries for the plaintiffs in this case don't just

24  represent those 2,000.  They represent all of the 80,000 plus

25  proof of claimants and I would ask that, albeit the committee

1  may differ as to strategy and going forward, it refrain from

2  invective and vitriol that has become so infected in this case

3  and should not be stood for.

4         I do want to say a few words, Your Honor, just to

5  supplement what Ms. Lauria said about the various settlements

6  because I think it's important for Your Honor to understand

7  what was done.  The Hartford settlement, indeed, resolves a

8  very difficult issue that was, otherwise, on Your Honor's

9  desk, the first Hartford settlement. It resolves whatever

10 claims, administrative claims, Hartford may have purported to

11 have as a result of the Boy Scouts request and movement all of

12 that settlement.

13        What does it do, Judge?  It gives us $787 million

14 hard.  No most favored nation clause.  I know Ms. Lauria

15 mentioned its more than -- its about 137 million more than the

16 prior Hartford settlement, but that is, as Your Honor said,

17 the 650 number was a headline cap; it wasn't a real number,

18 Your Honor.  I've been through this before and I'm not going

19 to belabor you.  You know our position, you know that here was

20 a most favored nation clause in there with respect to Century

21 which claims its balance sheet and financially challenged

22 that, otherwise, would reduce that amount, arguably, below 500

23 million, arguably to 400 million or even less depending on the

24 settlement.

25        So from our perspective, Your Honor, that was a

1  major achievement, a major, major creation of value to these

2  men.  These survivors who have been waiting on this plan need

3  to vote, need to go forward and we need to get on with this

4  case.

5       Your Honor may also know, from the Hartford

6  settlement, that 137 million of that doesn't wait until final

7  non-appealable order.  It is put into the trust and able to be

8  used on the effective date, on the effective date.  That joins

9  the local council contribution and the Boy Scouts contribution

10  and brings the trust on the effective date to near a billion

11  dollars in cash, no small matter.  No easy task to negotiate

12  with an insurance company as well, Your Honor.

13       Second, Your Honor, the remaining money isn't kept

14  by Hartford until final non-appealable order, Your Honor.  We

15  negotiated that that is deposited into an independent escrow

16  with investment authority and discretion with the trust

17  subject to Hartford's reasonable approval so that the trust

18  and the victims can make net income from the investment and

19  keep that net income and use it to pay their claims.  As I

20  said, Your Honor, (indiscernible) Hartford settlement

21  terminates the prior Hartford settlement thereby taking a huge

22  issue out from your desk, out from your chambers, and

23  resolving it here by way of the plan.

24       Needless to say, Judge, we will go into, you know,

25  other reasons why the Hartford settlement is fair, equitable

1  and should be approved.  This is not the time.

2          The LDS settlement, again, we think a huge, huge

3  move of progress in this case.  Mr. Stang noted that there are

4  only several thousands of claims that deal with LDS or which

5  name LDS.  I think it's important to note, Your Honor, that

6  the TDP that was negotiated in part and part of, what I call,

7  the RSA plan, a plan that the TCC negotiated with  us and a

8  TDP that the TCC negotiated with us.  You know, it's clear if

9  you just read that TDP, Your Honor, Section 9(f) and other

10  sections that that Hartford money is earmarked for folks who

11  have -- not Hartford money, that LDS money, Mormon money is

12  earmarked for folks who have claims, scouting claims against

13  the Church of the Latter Day Saints.

14          I know that there has been a lot of press releases

15  and notices to the press that talk about the value per claim

16  of the LDS settlement in terms of 80,000 claims.  Judge, some

17  of this has been put out by the TCC.  They know better, they

18  know what the TDP says and they know what the value of the

19  claims will be for those; as Mr. Stang says, several thousand

20  claims.

21          In any event, Judge, again, similar to the Hartford

22  deal LDS isn't keeping this money.  They are putting it into

23  an independent escrow with investment authority in the trust

24  until final non-appealable order.  Again, we look forward to

25  defending that.  Also, Judge, I do want to say, but I had to

1  respond to the statements, you know the mud thrown against the

2  wall, the coalition who has, you know, the lawyers of the

3  coalition have good relations with the TCC lawyers, they talk

4  all the time, we have worked together and we look forward to

5  overcoming the recent mud ball of this morning, and

6  continuing, Your Honor, to be productive and to progress this

7  case to an equitable solution for all the survivors.

8         Getting to Ms. Lauria's point, Your Honor, the time

9  is now to move.  The survivors have been waiting for a long it

10 me, some for decades.  We have now provided the means and

11 wherewithal whereby this case can move to resolution and

12 monies can start being distributed upon plan confirmation and

13 the effective date.  The survivors need this case to move,

14 Your Honor.

15        You know what, Your Honor, if this isn't a good

16 settlement, if these settlements aren't good, if the chartered

17 organization solution doesn't work or is something that should

18 not -- the constituents, the victims don't want they all voted

19 down, but you got to get this case to a vote, Your Honor.

20 That is what today is about. I would urge Your Honor, from our

21 perspective, we believe, that the framework of the case, the

22 framework of the -- the gist of the plan which is, again, a

23 TCC coalition, FCR, local council, and debtor negotiated plan

24 other than the three things that Ms. Lauria said, which were

25 newly added, which is the LDS settlement, the Hartford

1  settlement, both of which are term sheets which are not

2  reached, as well as the chartered organization fix.  Again,

3  not a major read.

4          We think, Your Honor, it's time to get the move on.

5  Your Honor knows that the burn rate in this case is $10 to $15

6  million of administrative costs per month.  That is money that

7  would, otherwise, go to victims, Your Honor.  And we just

8  respectfully ask Your Honor to move past the hyperbole and

9  let's get to the merits of what we do in this bankruptcy court

10  to get to a disclosure statement hearing.  Let's address

11  whatever needs to be fixed in the disclosure statement, let's

12  get to the solicitation issues, and let's get this out to

13  vote.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Mr. Mason?

17          MR. MASON:  Yes. Thank you, Your Honor.  Can you

18  hear me?

19          THE COURT:  I can.

20          MR. MASON:  I'd like to pick up just very briefly

21  on what Mr. Molton said at the end about time and about the

22  consequence of delay and focus on that for no more than a

23  minute or two from the scouting and local council perspective.

24          When I hear Mr. Stang for the TCC and when I hear

25  some of the other proponents of an adjournment, and when I

1   read their papers I really think that they're asking for two

2   weeks as, frankly, the beginning.  The TCC, of course, has

3   asked for exclusivity to be terminated and have said in their

4   papers that they really want a BSA plan and a TCC plan to go

5   out on the same pace which, of course, would mean much longer

6   then a two week delay.

7           Our concern is that if that's really the agenda

8   here, and it's not a hidden agenda, they made it quite, quite

9   clear in their papers which didn't take that long to read that

10  we're talking about far more than two weeks.  And even a two

11  week delay, Your Honor, has consequences.

12          This is not a debtor, as Your Honor well knows,

13  that produces a product, that generates a cash flow, that pays

14  for its costs, and that can pay for the professionals fees

15  which, as Mr. Molton had indicated, are quite voluminous in

16  proceeding.  This is a non-profit.  It depends on membership

17  fees and it depends on fundraising.  We are now in the

18  critical season.

19          The BSA, as Mr. Whittman has testified to

20  previously, has liquidity issues. It's got liquidity today,

21  but if you extend out the timeline beginning in two weeks and

22  extending thereafter there are severe issues starting next

23  year.  And even that would depend on the successful fall

24  recruiting season and a fundraising season. I can you, Your

25  Honor, from my own observations that folks out there who are

1  involved in scouting are paying very close attention.

2          Mr. Stang and others referred to Mr. Small and the

3  calls that they get from claimants, which I completely

4  respect.  I get calls from volunteers. I meet with volunteers.

5  They ask me extraordinary questions.  It's as if the school

6  teacher, and the fireman, and the police officer are all

7  bankruptcy lawyers.  They know about this hearing today.  They

8  know what Your Honor did at the RSA hearing and they ask very

9  sophisticated questions about what is the effect on the BSA

10  case of this or that.  Questions that made me feel like I was

11  completely unprepared.

12          A delay in the disclosure statement hearing at this

13  critical time doesn't just sort of get noticed by a few

14  people.  It gets noticed by thousands of people.  Why is that

15  important; because they are the people on whom we rely for the

16  continued service of the mission.  What the dual goals of this

17  case, both to compensate survivors and to ensure that the

18  mission survives.  They are inextricably intertwined.

19          Our fear, our concern is that a delay of the kind

20  that the objectors or the proponents of adjournment are really

21  suggesting is not just a little short couple of days, is not

22  just two weeks, but we are now into the fall.  And I'm not

23  sure, Your Honor, frankly, that we get out of it once we got

24  into it.  And to say what that means specifically we have, and

25  Ms. Lauria had said this before, and it's in the papers, we

1  have letters of intent from local councils, all 251 for one

2  half billion dollars, an extraordinary expression of the

3  support that local councils have for this process moving

4  forward.  If we have delay, Your Honor, if that becomes

5  imperiled then the whole project becomes imperiled.  That is

6  what we think we should avoid.

7           Now there have been disclosure statement objections

8  raised even during this colloquy by the folks who want an

9  adjournment.  Our view is let's roll up our sleeves right now

10 and get into it so that we can address those objections, have

11 the disclosure statement in the best condition possible and

12 have it considered by Your Honor for approval.

13          This morning, for example, I received a set of

14 suggestions from our friend Mr. Ryan who, I think, is on the

15 screen representing a couple of the ad hoc committees for the

16 chartered organization.  We found that very constructive and

17 we're prepared to roll up our sleeves and address his

18 disclosure issues.  I know that Ms. Lauria feels the same

19 about that and about the disclosure statement objections that

20 she's gotten even during the course of this hearing.  That is

21 what we are here to do.

22          We would urge Your Honor to move forward with the

23 disclosure statement hearing and not adjourn it.  Thank you.

24          THE COURT:  Thank you.

25          Mr. Brady?

1    MR. BRADY:  Good morning, Your Honor.  Robert Brady

2  on behalf of the FCR.  I will try not to duplicate per Your

3  Honor's instructions.

4    We do support the debtors, the coalitions, and the

5  ad hoc committee's position that we have to get this

6  disclosure statement under way.  As you heard from Ms. Lauria

7  and Mr. Molton significant progress has been made.  We are a

8  far cry, Your Honor, from where we were in May when the court

9  said, and I know I quote this to you often, but the court said

10  to solicit a plan that has not abuse survivor support is not

11  an attractive option, but neither is engaging in

12  (indiscernible) litigation that has the potential to end the

13  Boy Scouts as it currently exists.

14    The debtors heard you, Your Honor, and they now

15  have an insurer settlement that has significant survivor

16  support.  They now have a chartered org settlement that has

17  significant survivor support.  The templates are in place with

18  these settlements and there is going to be more to come.

19  There is informal and formal mediation going on.  The formal

20  mediation is scheduled for next week.

21    Your Honor, if every time there is a new settlement

22  and the court resets the disclosure statement hearing it will

23  never get done.  This is a very complicated case; probably the

24  most complicated I've worked on in more than 30 years.  There

25  are many inter-related issues, many moving parts, but we need

1   to get started, Your Honor.

2            What you have heard today are people have

3   disclosure issues with this plan.  So let's get underway.

4   It's going to take some time to get this disclosure statement

5   approved.  So we need to get started.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.

8            Mr. Ryan?

9            MR. RYAN:  Good morning, Your Honor.  Thank you.

10  Jeremy Ryan on behalf of the United Methodist ad hoc committee

11  and the Roman Catholic ad hoc committee.

12            I just wanted to correct -- it seems like there is

13  an impression, Your Honor, that had a resolution in this

14  chartered organization.  What's in the plan is, as we view it,

15  a positive step, but it's not a resolution that was the

16  product of discussions with us or is it anything that my two

17  clients support.  So when Your Honor is making these decisions

18  I don't want Your Honor to be under the impression that these

19  are actually -- what's in the plan is a product of a

20  resolution, settlement or agreement with chartered

21  organizations other than perhaps the Latter Day Saints.

22            We did not join in Mr. Stang's request or Mr.

23  Schiavoni's joinder.  I will say that from our perspective a

24  little more time is better for the reasons that Mr. Schiavoni

25  pointed out and that we do believe that settlements are

1  possible and are not far away.  And hearing Mr. Mason's

2  concerns about the precarious position of Boy Scouts we do

3  think, from our perspective, that Boy Scouts will be better

4  served coming in with the actual support of the chartered

5  organizations to provide a future and financial security going

6  forward.

7          If the Boy Scouts choose to go forward today on a

8  disclosure statement, if Your Honor chooses to go forward

9  today, we will deal with that as Mr. Mason said we have

10  provided comment.  We think a couple more weeks would be

11  productive, but that is not our decision to make.  We didn't

12  want you to make the decisions you have to make right now

13  under the misimpression that we do have a resolution.

14          Thank you.

15          THE COURT:  Thank you, Mr. Ryan.

16          Mr. Buchbinder?

17          MR. BUCHBINDER:  Thank you, Your Honor.  I will try

18  to be brief.  I want to make four points.

19          First of all, I think this case is not like

20  Goldilocks and The Three Bears, it's a merry-go-round because

21  every time a new plan is filed someone gets on the merry-go-

22  round, someone gets off the merry-go-round or someone switches

23  where they're sitting on the merry-go-round, but it's a merry-

24  go-round.

25          I hope that every time the debtor reaches an

1  agreement with a party who don't see another plan because

2  we'll be here indefinitely.  Perhaps restructuring support

3  agreements with individual parties be incorporated into a plan

4  would be better, more efficient, and save months of

5  litigation.  Having said that, the fifth amended plan does

6  raise a number of disclosure statement issues.  I've had a

7  chance to look at some of them and I will just briefly

8  highlight some of the major ones I see.

9         The provisions for the chartered organizations,

10  which Mr. Ryan confirms weren't negotiated, at least not with

11  him, they create voting issues; how are the participating

12  chartered organizations going to know that their insurance

13  rights are being taken away from them and they have an

14  opportunity to object or opt out of that.  Shouldn't the

15  chartered organizations, because of this treatment be

16  separately classified and has the debtor addressed the legal

17  authority for taking away the rights of third-parties that

18  aren't debtors who effect the rights of other third-parties

19  who are not debtors.  These issues are (indiscernible) by

20  these brand new chartered organization provisions.

21         Next, let's look briefly at the local council

22  contribution. Some of the earlier iterations of the plan have

23  told us that we were going to be promised reports of

24  commitments by local councils by dates that have long since

25  passed.  And I appreciate the fact that Mr. Mason had just

1  represented that a number of the local councils have signed

2  commitment letters.  So amending the disclosure statement and

3  those exhibits to, as they say in the movies, show us the

4  money.

5           Finally, and I don't know why it's been in a vacuum

6  this morning, it's not just that the thousand or so pages of

7  documents was filed with about three days to review them, it

8  was also when they were filed.  As Judge Walrath has observed

9  nothing is inadvertent in Delaware.  The debtor chose to file

10 hundreds of pages of a revised plan and disclosure statement

11 in the hours proceeding the Jewish holiday of Yom Kippur.

12 Then during the middle of Yom Kippur the debtor filed a 100

13 page brief explaining that the disclosure statement should be

14 approved now and we should move forward.

15          I don't know why it's been in a vacuum this

16 morning, but the three days that thousands of people have had

17 to review the thousand pages have that gloss over it which for

18 a number of people would have prevented them from looking at

19 the documents at all until sometime Friday.  So some people

20 had three days' notice of these documents and many people had

21 less than three days' notice.  This is not the first time that

22 this debtor has filed significant numbers of claims over

23 holiday weekends.

24          I think all of the parties have demonstrated that a

25 short delay will be very helpful for the parties and may help

1  progress this case along.  Thank you, Your Honor.

2            THE COURT:  Thank you.

3            Those are all the hands I see before I go back to

4  Mr. Stang.

5        (No verbal response)

6            THE COURT:  Mr. Stang?

7            MR. STANG:  Thank you, Your Honor.

8            Your Honor, I will try not to do these just

9  serially, but I may end up having to do that.  Ms. Lauria said

10  we deserve to have the disclosure statement heard today.  The

11  debtor doesn't deserve anything.  Survivors deserve adequate

12  information.  And Mr. Buchbinder made a very good point, it

13  wasn't just the filing of the plan and disclosure statement,

14  but the 80 page brief plus the exhibits pose another

15  monumental amount of work to get through.

16            Now Mr. Molton, and he does this a lot, refers to

17  everyone in the case as his friends.  Well, you know, -- and I

18  think he does it to try to disarm a little bit. I think he

19  does it to suggest to people these disputes aren't really

20  serious, they're between friends; friends can always work

21  things out.  Well it's not about friendship.  It is about

22  giving creditors an adequate amount of information.

23            He also raised an issue, and I don't want to turn

24  this into exclusivity hearing, but he said that if the deal is

25  no good then you have to vote it down.  Well we don't have the

1  luxury of that time.  The Boy Scouts tell you how they are,

2  essentially, a melting ice cube.  At the BSA level that may be

3  true.  We will get to Mr. Mason in a moment because it is true

4  when it comes to local councils.  In fact, the glaciers are

5  getting bigger with the local councils.

6       If we're going to have adequate information then

7  creditors should be given a choice, not just thumbs up/thumbs

8  down, but I like this plan verses that plan.  We will get to

9  that at some point.  If you shorten time we will hear it this

10 week.  If you don't we will hear it on regular notice.

11      I want to address this issue of the RSA because Mr.

12 Molton repeatedly refers to the existing plan as almost the

13 TCC plan.  What was really going on there.  Why has the TCC

14 backed off?  Well, first of all, the RSA wasn't approved.

15 That is not a matter of whether you signed an order or not.

16 You were presented an RSA, there were elements of it you

17 rejected.  So I don't know about, you know, a half-baked RSA,

18 but it was not the RSA that was presented to you that you

19 approved.  You approved it with at least two buts.

20      So then comes, you know, about nine days later

21 August 27th comes on the calendar.  The RSA terminates on its

22 own.  It just had a drop dead date not for your approval, it

23 just expired.  Well what was it about the RSA that really gave

24 the TCC a reason to negotiate all the elements via governance,

25 the TDP's themselves, the early tort out; it was that the TCC

1  had a veto right on settlements.  None of those RSA parties

2  could agree to a settlement without our approval.

3         Now I suspect that they regretted that the other

4  RSA parties regretted that.  I can't tell you, and I won't

5  tell you, what was going on in the mediation, but let's just

6  say that when we had that veto right there were no settlements

7  and when we lost that veto right suddenly there were a bunch

8  of settlements.  So maybe someone can explain to themselves

9  how that happened and why that happened, but we gave up an

10  awful lot to have the influence and, in effect, control over

11  these settlements.  As soon as that was gone Mr. Molton says

12  but for the coalition we wouldn't have local council's

13  solutions, the Hartford solution, the Mormon solution, the

14  chartered organization solutions. You know, maybe those

15  weren't the right solutions.  I could get Mr. Schiavoni to

16  agree to some if I went to his number.

17         So we will find out at a later date whether one

18  should be taking credit for those.  That goes in part to this

19  issue of the attorneys in the coalition.  You said at the RSA

20  hearing we will see if you make your substantial contribution.

21  And what Mr. Molton did was, basically, argue why the plan

22  should be confirmed.  We are here today to find out, at this

23  hour, if the disclosure statement should be continued.  Most

24  of what he said had nothing to do with the need for the

25  continuance.  But I wanted you to understand that RSA dynamic.

1  It is extremely important because we will be accused time,

2  and time, and time, and time again that we are backtracking.

3          I don't know if Mr. Buchbinder mentioned it in

4  reference to us, but the merry-go-round, yeah, we got off

5  because the merry-go-round no longer was playing the music

6  that the other people had agreed to which was to give us a

7  meaningful say in these settlements.  That went away.  They

8  didn't take it away from us, but, you know, no one called me

9  to say, hey, Jim, would you like to have the RSA continued

10 past August 27th.  You know why they didn't do that, because

11 they didn't want us involved with that level of influence over

12 these settlements.

13          Mr. Mason talks about how the two weeks cost money.

14 Your Honor, our financial advisors tell us that between

15 February 2021 and June 2021 the total assets of the local

16 councils went up over $18 million.  The reason for that is

17 that is that a very substantial part of their investments,

18 collectively, are in long term investments.  And the market,

19 as of yesterday anyway, has been doing very well.

20          So in six months, not -- four months the reporting

21 to us shows an $80 million increase and when Mr. Mason talks

22 about the risk of a two week delay maybe he should tell you

23 that none of his letters of commitment are binding, not a

24 single one.  On their face they are not.  And they are also

25 not binding because unless it's a chartered organization

1  resolution that money comes flying off the table.  So unless
2  people are prepared to give up their ability to sue a
3  chartered organization.  (indiscernible)for after January 1976
4  his money is gone. It is headed for the exit.

5        Mr. Brady talks about survivor support.  And I
6  know, and maybe it was a -- you know, everyone is talking
7  fast, taking notes, Mr. Molton referred to an inventory that
8  he talked about with a number of people that a lawyer
9  represents. It's not inventory, Mr. Molton, these are people.
10 And when Mr. Brady talks about survivor support that was my
11 point.  You know, are the survivors actually speaking when
12 they have, through their attorneys, when you're looking at the
13 mass tort dynamic of this case.  I don't think I have
14 used(indiscernible), I don't think I have used vitriol.

15       My point about the mass tort element of this was to
16 make sure you understood the commitment that my committee
17 members have and their involvement and who you really are
18 hearing from when people say we have 80 plus percent approval
19 of a particular deal.

20       Your Honor, I really want to focus this on the
21 extension request, not on exclusivity, not on the merits of
22 the disclosure statement one way or another.  By the way, we
23 have been invited by the mediators.  Again, it's the
24 mediators; I don't know if that's two mediators, or three
25 mediators because there is no explanation about that.  That

1  mediation and the run-up to that mediation could be used to

2  try to resolve disclosure statement objections.

3           I know Ms. Lauria doesn't believe that that is

4  going to happen, at least I don't think she does.  Others have

5  suggested we're not sincere.  We do want survivors to see a

6  resolution of this case.  We don't like the resolution in

7  these settlements that were presented.  That is true, but that

8  is beside the point when we're in a disclosure statement

9  hearing.  That is not the point of a disclosure statement.

10 We're not here to try to convince you to stop the plan, a plan

11 from going forward.

12           Thank you, Your Honor.

13           THE COURT:  Thank you.

14           Well we're two hours into this hearing and what I

15 have heard just convinces me that we need to start working on

16 disclosure statement issues.  I am very sensitive to the

17 timing of the filing of the documents and the timeframe in

18 which attorneys have had to review the documents, as I have

19 also had that timeframe in which to review documents, but we

20 need to start on the many objections that have already been

21 filed to find out what is remaining of the objections to the

22 fourth amended plan and that will give parties some time to

23 work on the objections to the fifth amended plan while that is

24 ongoing.

25           People clearly have read the documents.  They have

1   opinions about the documents.  We can work through all of

2   those truly disclosure statement objections.  We already have

3   a document that is a few inches thick, another inch may not be

4   the best solution.  People really do need to be able to get

5   information from the disclosure statement to know how to vote.

6   More information, unless its salient information, is not

7   always best. I think everybody's experience would tell you

8   that.  But we can add the information that is necessary to

9   make this disclosure statement contain adequate information.

10          More importantly, given what I have seen in this

11  case I don't think that adding more information to this

12  disclosure statement is going to be the end of the information

13  gathering.  If it were going to be the end of the information

14  gathering I might post-pone this hearing, but I don't think

15  it's going to be.

16          So we need to get to the point, if we haven't

17  already, that discovery is going to start.  Nobody commented

18  on that, but that is something that I have been giving

19  substantial thought to.  And in order to get to that point we

20  need to get past this point.  So we're going to get started.

21  We will see where we end up, but I don't see a benefit in the

22  delay.

23          I think, as I've said, people have read and

24  understood what this plan does, what the three new aspects of

25  it do. I will confess to having some questions about some of

1  that that will presumably get answered this week.  Another

2  couple of weeks simply pushes this off and I think the

3  discussions need to happen now. I think the resolutions need

4  to happen now.  So, again, I am sensitive to the timeframe

5  because I had the same timeframe, but I see no reason not to

6  get started.

7           I think it was important to hear everyone's views

8  this morning which is why, in a somewhat uncharacteristic

9  fashion, I didn't ask questions.  Let's try to keep this to

10 disclosure statement issues.  I recognize people disagree with

11 portions, maybe all in some instances, of the plan, the

12 resolutions that have been reached, the resolutions that may

13 be reached, but let's try to keep this to disclosure statement

14 issues which is what we are here for today.

15          In the meantime I've got a list of what has been

16 put forth today as more disclosure statement issues.  I'm sure

17 that all of you have been making your lists as people have

18 been speaking.  I think that is actually very helpful, another

19 reason why I let parties speak.  I hope that we can work

20 cooperatively though the issues.

21          So let's take, I've got 12:05, till 12:15.  I am

22 not going to take the lunchbreak quite yet.  Let's take till

23 12:15.  We will go till, maybe, 1:30 and then we will take a

24 break.  I think that will help us frame up some issues and get

25 started.

1          So thank you very much everyone for your comments

2     this morning.  And we're in recess until 12:15.  Thank you.

3          (Recess taken at 12:06 p.m.)

4          (Proceedings resumed at 12:21 p.m.)

5          THE COURT:  This is Judge Silverstein.  We're back

6     on the record.

7          MS. LAURIA:  Thank you, Your Honor.

8          Again, Jessica Lauria, White & Case, on behalf of

9     the BSA.

10         That brings us, then, to our disclosure statement

11    presentation.  As I alluded in my opening remarks, Mr. Linder

12    and Ms. Baccash of White & Case, are going to take the lead in

13    walking through the disclosure statement objections and the

14    disclosure statement changes on behalf of the debtor.

15         We are, of course, here.  I'm here in the courtroom

16    or in the virtual courtroom, as well.  Haynes and Boone is

17    here.  We will likely have some tag teaming at potential

18    points with our co-proponents.

19         Mr. Kurtz is here to help address confirmation

20    scheduling when the time comes, but we're here to march

21    through this document with Your Honor.  So, with that, I'd

22    like to hand the podium over to Mr. Linder.

23         MR. STANG:  Your Honor, this is Mr. Stang.

24         May I make a comment or maybe a question before we

25    get started?

1          THE COURT:  Okay.

2          MR. STANG:  The first is, I'm looking at the brief

3   the debtor filed, which is at -- excuse me -- was filed as

4   Docket 6249.  It was filed on September 16th.

5          And at PDF 109 to 218, the debtors starts a chart

6   and I'm just wondering aloud whether that's going to be the

7   format for addressing the objections.  So, that's a question.

8          Then the second question is, under debtors' have

9   added disclosure or the debtors' response – the debtors' have

10   added disclosure -- on the very first line it says, The

11   disclosure statement now includes, and I'm focusing on the

12   word "now."

13          The TCC's objections were filed to a disclosure

14   statement that was several iterations ago and I would

15   appreciate it if counsel could be clear as to when these

16   additions were made, because as you've indicated, we're

17   working through stuff that has been on file for a while and

18   there's some stuff that is new.  And if debtors' counsel could

19   be clear as to when this addition was made, it would help me

20   and my team prioritize what we need to look at during breaks

21   and in the evening.  So, those are my two questions/comments,

22   Your Honor.

23          MR. LINDER:  Your Honor, if I may?

24          Matt Linder of White & Case, on behalf of the

25   debtors.  I'm prepared to lay out for the Court a proposed way

1   forward on the disclosure statement that I think will squarely

2   address the questions that Mr. Stang posed.

3           THE COURT:  That's fine.

4           MR. LINDER:  Your Honor, I would propose to, as I

5   think Mr. Stang assumed, walk through the response chart that

6   was appended to our reply.  We had structured the response

7   chart by issue, so we propose to go through each issue, touch

8   on it briefly, orient the Court and parties as to whether the

9   debtors have included in the disclosure statement, items that

10  respond to many of the objections, keeping in mind, that as

11  Mr. Stang alluded, there have been several iterations of the

12  disclosure statement and this is a compendium, if you will, of

13  objections that have been filed over time.

14          So, many of them have been addressed and are viewed

15  by incremental disclosure, but we propose to for each issue

16  step through them and then anyone who has a remaining live

17  objection can lay that objection at the appropriate time.

18          THE COURT:  Okay.  And I'm assuming in your

19  response chart that the reference in the disclosure statement

20  to the disclosure statement is to the redline or is to the

21  fifth amended disclosure statement?

22          MR. LINDER:  That's correct, Your Honor.

23          And, specifically, just for the benefit of everyone

24  on the line, the reply that we're using was filed last week

25  and this is the exhibit that's appended to it.  And the

1  references are, in fact, to the fifth amended version of the

2  disclosure statement.

3          THE COURT:  Okay.  So, those are the documents that

4  I have in front of me.  That's what I was assuming that we

5  were working with, but, certainly, everyone, find the correct

6  documents.

7          MR. LINDER:  And then, in addition, Your Honor, we

8  propose to keep that handy, the redline of the disclosure

9  statement that the debtors filed at Docket 6214, at Exhibit B,

10  and a redline of the plan filed with the same docket number as

11  Exhibit A.  Those redlines are comparisons of the disclosure

12  statement related to the fifth amended plan against the fourth

13  amended version of the disclosure statement.

14          THE COURT:  Okay.  That is what I have, so that's

15  Docket 6214-2 for the disclosure statement and 6214-1 for the

16  plan.

17          MR. STANG:  Your Honor, I would simply ask Mr.

18  Linder when he starts to make references to specific sections,

19  because some of these sections go on for pages and pages, if

20  he could alert us to the PDF number that he's looking at and

21  whether he's using the redline as he's going to be talking us

22  through certain things or the actual redline version.

23          THE COURT:  I think he's going to do that so we can

24  all follow.

25          MR. LINDER:  What I'll be referring to --

1  predominantly, I'll be referring to the page numbers at the

2  bottom of the redline of the disclosure statement filed at

3  Docket 6214, and in some instances, I may refer to the Docket

4  stamp at the top, but when I do so, I'll make it clear what

5  I'm referring to so that everyone can be on the same page with

6  respect to what we're looking at.

7          THE COURT:  Thank you.

8          MR. LINDER:  So, as Ms. Lauria previewed for the

9  Court, Your Honor, I'll be kicking off the debtors'

10  presentation of the disclosure statement and before we jump

11  into the chart, I'd just like to provide a bit of background I

12  think we've addressed, at least preliminarily, how we will

13  address the objections, but I'd like to provide a little bit

14  of background about it was intended to be an abbreviated fact

15  and the long history of how we got here today on this version

16  of the disclosure statement if I may.

17          The journey of this disclosure statement that

18  (indiscernible) Your Honor, again (indiscernible) 2021 when

19  the debtors filed the second amended plan related to the

20  disclosure statement at Docket 2592 and 2594.  The debtor

21  received approximately 105 objections to the disclosure

22  statement at the May 6th 2021, objection deadline and the

23  debtors filed proposed amendments to that plan and disclosure

24  statement on May 16th at Docket 4107 and 4108.

25          Many of those objections, Your Honor, were

1  duplicative of one another or substantially identical, in the

2  case of plaintiffs' firms who filed objections to the

3  disclosure statement.

4          On April 16th, 2021, the mediators filed their

5  second report which announced the initial Hartford settlement.

6  Which has since been superseded by the termsheet that was

7  filed late last Tuesday night.

8          As the Court will recall, the disclosure statement

9  was initially scheduled to be heard on the May 19th hearing.

10  There were several other matters that were scheduled to go

11  forward that day and it did go forward as to the estimation

12  motion, as well as the debtors' exclusivity extension motion.

13  At the culmination of that May 19th hearing, the Court

14  adjourned the disclosure statement to May 25th, and

15  subsequently, the hearing on the disclosure statement, as Ms.

16  Lauria noted yearly, was continued several times, finally,

17  until today, September 21st.

18          The intervening four months have been quite

19  eventful.  As an initial matter, the debtors have been

20  mediating, both, in person and virtually, essentially, nonstop

21  in an effort to resolve disputes and reach settlements and as

22  the parties have referenced, there's continued mediation

23  that's scheduled to occur later this month and we hope

24  significant progress will continue to be made.

25          On June 18th, just to pick up the thread, Your

1  Honor, on the disclosure statement, the debtors filed a third

2  amended plan and related disclosure statement at Docket 5368

3  and 5371.  The third amended plan incorporated the progress

4  that had been made as of that date in RSA negotiations.  That

5  included the (indiscernible), the BSA settlement note,

6  increased BSA and local council contributions, and at that

7  time, an indication that the debtors may seek termination from

8  the (indiscernible) obligations under the Hartford settlement.

9        Subsequently, on July 1st, the debtors entered into

10 the restructuring support agreement and filed a fourth

11 (indiscernible) version of the plan, the fourth amended plan,

12 and disclosure statement at Dockets 5484 and 5485.  The fourth

13 amended plan incorporated the RSA terms and removed what was

14 then called the TSA toggle plan as an alternative, removed

15 that from the plan.

16        As of August 16th, which was the objection deadline

17 for the fourth amended plan, Your Honor, there were 70

18 supplemental objections filed with respect to the disclosure

19 statement for the fourth amended plan.  Again, a significant

20 portion of those objections were materially identical to one

21 another and in the case of certain plaintiffs' counsel.

22        The Court heard arguments on the RSA in mid-August.

23 It culminated in the Court's ruling on the RSA on August 19th.

24 Approving the RSA with certain exceptions related to Hartford

25 and coalition professional fees, and the RSA parties permitted

1  the RSA to expire by its terms on August 27th, in large part,

2  due to (indiscernible).

3        Finally, Your Honor, this brings us to the more

4  recent past.  Only last week, the debtors signed settlement

5  termsheets with Hartford, The Church of Jesus Christ of Latter

6  Day Saints.  Those termsheets are pending to the sixth

7  mediator's report, filed at Docket 6210.

8        As the parties noted in each of the Hartford and

9  TCJC settlements that were supported by the coalition, the

10  FCR, the ad hoc committee of local councils, and attorneys

11  representing, as of last night, approximately 66,900 holders

12  direct abuse claims which, again, is more than 81 percent of

13  the number of unique timely non-duplicative abuse claims filed

14  in the cases.

15        So, just to sum up, Your Honor, there are

16  approximately 175 objections to the DS that have been filed.

17  About 70 of those are substantially identical to one another.

18  We believe that certain of the objections, particularly, with

19  respect to the third and fourth amended plan, have been

20  resolved with changes that we've made over time to the

21  disclosure statement and in light of the -- (indiscernible)

22  changes that is the disclosure statement that you have before

23  you today, Your Honor.

24        Turning now to the formal resolutions served on the

25  objections, we have been working hard on the debtors' side to

1  resolve the disclosure statement objections that are capable

2  of being resolved, without the Court ruling.  We had more than

3  a dozen objections that have been formally withdrawn or

4  otherwise resolved and I'll briefly step through what those

5  are.

6          The first objection filed by Hartford, Docket 6058;

7  TCJC at Docket 3263, 3266, and 6009; the coalition, Docket

8  3569; the FCR at Docket 3565; and Evanson Insurance Company

9  (phonetic) at Docket 6038, have each been withdrawn by notices

10 filed on the docket.

11         We've also agreed with six additional parties, Your

12 Honor, to resolve debtors' perspective disclosure statement

13 objections based on the following reservation of rights,

14 which, Your Honor, if it would be okay, I will read into the

15 record at this point?

16         THE COURT:  Yes.

17         MR. LINDER:  We have resolved the disclosure

18 statement objections filed by Knights of Columbus, the Roman

19 Catholic Archbishop of San Francisco, the Episcopal Church,

20 the unsecured creditors committee, the Archbishop of Agana,

21 the Roman Catholic Archbishop of Los Angeles, and its related

22 BSA chartered organizations, as well as the Roman Catholic

23 Diocese of Brooklyn, New York, on the understanding that any

24 plan-related objections that these parties wish to assert will

25 be preserved in all respects (indiscernible) confirmation.

1 (Indiscernible).

2         THE COURT:  Excuse me.  Somebody is unmuted.  Can

3 everybody please make sure that you're muted, except for Mr.

4 Linder.

5         Mr. Linder?

6         MR. LINDER:  Thank you, Your Honor.

7         The debtors also reserve their rights to oppose any

8 such confirmation arguments at the appropriate time.

9         Additionally, Your Honor, the Girl Scouts have

10 agreed not to proceed with their disclosure statement

11 objection, based on a reservation of rights that they would

12 like to read into the record at the conclusion of the debtors'

13 presentation of the disclosure statement.

14         Then, finally, Your Honor, I'll turn to the our

15 approach to the objections.  I think you heard, Your Honor, or

16 at least I heard Your Honor would be your preference to take

17 up what we characterize as the material changes between the

18 fourth amended and the fifth amended plan provisions of the

19 disclosure statement, rather than addressing them up front,

20 that I understand goes to the end of the chart and address

21 those after we have worked through all of the items that we

22 view as holdover issues to the fourth amended plan.

23         THE COURT:  Yes.

24         MR. LINDER:  Would that be acceptable to Your

25 Honor?

1            THE COURT:  Yes.

2            MR. LINDER:  Thank you very much.

3            I'll turn to the legal standard before we proceed

4    with the chart.  Your Honor, Section 1125, of course, applies

5    to the approval of the disclosure statements.  Section 1125(b)

6    provides that before solicitation votes on a plan of

7    reorganization, holders of claims or interest must receive the

8    written disclosure statement, approved by the Court, as

9    containing adequate information.

10            Section 1125(a), in turn defines adequate

11    information, in pertinent part, as information that's far as

12    reasonably practicable in light of the nature and history of

13    the debtor, its books and records, that would enable a

14    hypothetical investor to make an informed judgment about the

15    plan.

16            In considering whether the disclosure statement

17    includes adequate information, according to what the plan will

18    consider and may consider, in connection with this analysis,

19    complexity of the case, the benefit of additional information

20    to creditors, and the cost of providing additional

21    information.

22            The debtors have taken pains, Your Honor, to

23    prepare the disclosure statement with the requirements of

24    Section 1125 in mind.  We would submit that the disclosures

25    are, already, as we know, voluminous and comprehensive.

1  There's more than 240 pages of disclosures, not including the

2  exhibits appended to the disclosure statement.  For example,

3  there are 30, more than 30 risk factors to be considered by

4  holders of claims in making their decision about whether to

5  vote to accept or reject the plan.

6          The debtors believe that their disclosure statement

7  satisfies Section 1125.  With that being said, Your Honor, we

8  certainly are approaching this hearing with the mindset of

9  being cooperative, working with parties to the extent that

10  additional information would be beneficial to incorporate that

11  information into a revised version of this disclosure

12  statement.

13          Without further adieu, Your Honor, I propose to

14  turn to the objection response chart.  And the first issue on

15  the objection response chart pertains to the debtors' assets

16  and the debtors' contribution to the settlement trust.  A

17  high-level summary of this objection is what I think we'll do.

18  There's 40 -- we've organized the DS objections into 40 fraud

19  categories.

20          With respect to each one, at the outset, Your

21  Honor, I will articulate, briefly, what the objection is; that

22  is not intended to be a comprehensive description of each and

23  every objection that is subsumed under the heading on the

24  chart.  But in the interest of moving the pace we'll give a

25  brief articulation before walking the Court through the

1  disclosures that we've made in the document.

2         So, for the first one, Your Honor, debtors; assets

3  and contributions.  Certain parties' object to the disclosure

4  statement on the basis that it fails to include adequate

5  disclosure regarding the value of the debtors' own

6  contributions to the settlement trust.

7         We would note, Your Honor, that the debtors'

8  contribution settlement trust are largely, I think virtually

9  unchanged from the fourth amended plan.  Many of these

10  objections were filed before the third amended plan was filed,

11  back on June 18th, and so, they do not account for certain of

12  the changes that we've made, incrementally to provide

13  additional disclosure in a form that could be easily digested

14  by a creditor as to exactly what is being contributed to the

15  trust by the BSA and how those contributions, the quantum of

16  those contributions may change over time, taking into account

17  the anticipated date of the debtors' emergence.

18         As the parties are aware, one component of the BSA

19  settlement trust contribution is the debtors' unrestricted

20  cash and investments as of the effective date.  Net of the

21  proceeds of the foundation (indiscernible) in the amount of

22  $42.8 million, the allowed administrative expense claims, the

23  professional fee reserve, the creditor representative fee cap,

24  and allowed priorities, secured and convenience claims.

25         The debtors minimum unrestricted cash from

1  investments at emergence, as I mentioned, Your Honor, is

2  variable.  It fluctuates depending upon the estimated timing

3  of emergence.  We've included disclosure on page 144 of the

4  redline with respect to the variability of the debtors' cash

5  at emergence.

6           The other components of BSA's contribution are non-

7  cash, are largely non-cash contributions.  There's

8  (indiscernible) proceeds of the sale of the warehouse and

9  distribution center, subject to a lease back agreement, the

10  net sale proceeds of the scouting University property sale

11  that the Court approved several months ago, the contribution

12  of the artwork, oil and gas interests, and the BSA settlement

13  trust that would be another $80 million.

14           We've included in the disclosure statement, Your

15  Honor, a bullet point description on page 13 of the redline,

16  as well as on page 15 and 16 of the redline, a table with some

17  (indiscernible) of the contribution, the value of each of

18  those components.

19           We've also included in the disclosure statement,

20  Your Honor, a table at pages 22 and 23, that shows the

21  fluctuation over time of the components of the contribution,

22  an illustrative emergence date of December 31st of this year

23  and March 31st of next.

24           Certain objectors raised issues, Your Honor, with

25  respect to the restricted properties of the BSA and how that,

1 the interplay between our restricted properties and our

2 contributions to the settlement trust.  BSA will not be

3 contributing restricted properties to the settlement trust.

4 　　　　　Exhibit E to the DS contains the debtors' financial

5 projections and Exhibit E(1), which I believe begins on page

6 404 of the actual filing stamp at the top of the document,

7 that is a retained properties list and that list enumerates

8 categories of property that the debtors believe are either

9 subject to enforceable restrictions imposed by donors or,

10 otherwise, are core to the debtors' charitable mission and,

11 therefore, it's not subject to the claims of abuse creditors.

12 　　　　　Finally, the other principal component of the

13 debtors' contribution of course contribution of the debtors'

14 rights under what are defined in the plan as the BSA insurance

15 policies, Article III(f) of the disclosure statement, on pages

16 55 to 65 provides an extensive articulation of the background

17 about the insurance program of the debtors that they

18 maintained over the years, how the insurance program has

19 varied over the decades, and we've also included several risk

20 factors containing insurance coverage matters and those risk

21 factors can be found at pages 277 to 281 of the redline.

22 　　　　　We believe, Your Honor, that this is a

23 comprehensive disclosure.  We've made efforts to improve it

24 over time.  We'd submit, therefore, that with respect to this

25 issue, that the disclosure statement contains adequate

1  information.

2           THE COURT:  Okay.  Thank you.

3           I think the way we should handle this is, again, to

4  use your hand buttons and if you have, still, disclosure

5  statement objections with respect to information in this first

6  category, then I'll hear from you.

7           I see you, Mr. Stang.

8           MR. STANG:  Thank you, Your Honor.

9           Your Honor, the debtors should be filing a most-

10 current version of the lease back requirement agreement.  This

11 has been in the plan for an extended period of time.  It's

12 simply -- they say in the response that it's not been executed

13 at this time, but they don't say the status of it and whether

14 there is a substantially completed draft of it.  It's an

15 important aspect of the real estate that is being contributed

16 and the debtor should disclose that.

17          MR. LINDER:  Your Honor, I'll respond to that

18 discrete issue.  Again, for the record, Matt Linder of White &

19 Case.

20          The lease back requirement is made clear in the

21 plan as to what that is.  I believe, based on memory, it's a

22 requirement that in connection with the sale of the warehouse

23 and distribution facility, that that facility be leased back

24 to the BSA for successive terms of two years, totaling a 10-

25 year lease back.  That facility contains a warehouse and

1  distribution center that the BSA will continue to need access

2  to for the years to come.

3         What I will say, Your Honor, is I know that there's

4  been a marketing effort ongoing with respect to that facility.

5  It may come to pass, Your Honor, that the debtors, similar to

6  what we did for the scouting university property, file a sale

7  motion and then in which case, we would put that out on notice

8  to all creditors that in terms of that particular lease back,

9  would be squarely before the Court, we propose in terms of the

10 sale leaseback requirements in the abstract, we propose that

11 that's -- we have proposed that that be filed with a plan

12 supplement, which I think it's in.

13         MR. STANG:  Your Honor, I don't understand --

14         THE COURT:  Mr. Linder --

15         MR. STANG:  I apologize.

16         THE COURT:  Mr. Linder, does the agreement exist?

17         I understand -- well, I guess what I'm

18 understanding is that it hasn't been executed because there

19 has been no sale of the property yet; is that right?

20         MR. LINDER:  That's correct, Your Honor.  There's

21 been no sale of the property.

22         What we were contemplating would be that there

23 would be a form, a lease back agreement filed at the

24 appropriate time.

25         And I've just been told on page 16 of the redline,

 1  there's a footnote, Footnote 24 -- and I'm trying to find it -

 2  - what it says, and it relates to the chart containing the

 3  BSA's, the components of the BSA settlement contribution.

 4  This is estimated to have $11.6 million in sale proceeds and

 5  the estimated, based on an estimated value from our third-

 6  party broker opinion of value and the support for that value

 7  is based on current negotiations with the potential purchaser

 8  that I alluded to.  And the two offers to the property, my

 9  understanding is and the footnote supports this, it

10  contemplates a lease back to BSA at current market rates.  The

11  3 percent annual increase is, again, I believe, the term for a

12  10-year lease back, I think, in increments of two-year

13  renewables.

14            So, again, the agreement doesn't exist at the

15  moment.  At most, it may be a draft form and being negotiated

16  with the prospective purchaser.  I don't think there's any

17  need for us to file a form at this stage when we have a

18  reasonable (indiscernible) of the value of the property,

19  subject to that lease back requirement.

20            THE COURT:  Okay.  I'm not going to require that a

21  form of lease back requirement agreement be submitted at this

22  point when we don't even have a sale yet.  I think the

23  disclosure here as to what the debtors anticipate is

24  sufficient and I'm not sure what the detail of the actual

25  document on a lease back agreement is -- really provides

1  anybody in terms of information necessary to vote on a plan.

2          MR. LINDER:  Thank you, Your Honor.

3          THE COURT:  Mr. Stang -- are there further

4  disclosure statement issues, further information needed with

5  respect to this category?

6          MR. STANG:  Not from -- the committee doesn't have

7  any other objections, Your Honor.

8          THE COURT:  Thank you.

9          Is there anyone else who feels --

10          MR. PATTERSON:  Yes, Your Honor.

11          THE COURT:  Ah, Mr. Patterson.  Thank you.

12          MR. PATTERSON:  Thank you, Your Honor.

13          I know that not all the faces show up at the same

14  time in front of Your Honor.

15          Just a very quick question that related to the

16  basis for evaluating the art work at $59 million.  I know, at

17  times, the debtor has retained different entities to evaluate

18  different kinds of assets, but this particular number isn't

19  footnoted to an appraisal or an estimate of value, so we would

20  like clarification of that.

21          THE COURT:  Thank you.

22          Mr. Linder?

23          MR. LINDER:  Your Honor, Mr. Patterson is correct.

24  The valuation of the artwork is based on historical -- I'm not

25  sure -- I don't want to use the term of art incorrect -- but

1  appraisals or reviews by brokers.  The debtors would be happy

2  to add an appropriate footnote to the portion of this chart on

3  page 16 of the redline that explains to holders of claims how

4  that $59 million estimate was calculated.

5           THE COURT:  Yes, I'd like a footnote added with the

6  basis of the $59 million.

7           Anything further, Mr. Patterson?

8           MR. PATTERSON:  No, thank you, Your Honor, on this

9  category.

10          THE COURT:  Thank you.

11          Is there anyone else whose hand I am not seeing?

12      (No verbal response)

13          THE COURT:  Okay.  Let's move on to the next

14  category.

15          MR. LINDER:  Thank you, Your Honor.

16          The next category contains similar objections with

17  respect to third-party contributions to the settlement trust.

18  A third party has objected to the disclosure statement on the

19  basis that it does not contain adequate disclosure on the

20  value of the non-debtor contributions.

21          As Your Honor is probably well aware, the plan

22  currently contemplates non-debtor contributions to the trust

23  from four categories.  Those categories begin with the local

24  councils.  The local councils have agreed to make an aggregate

25  contribution in the amount of $600 million.  That's comprised

 1   of a minimum of $300 million in cash, up to $200 million in

 2   real property, and a $100 million note to be issued by the

 3   Delaware Statutory Trust, formed on the effective date and

 4   funded by local councils over time.

 5            The terms of the contributions, the form of the

 6   local council letter of intent, the local council balance

 7   sheets, with respect to each of the 251 local councils, and

 8   the local councils' property valuations from what the local

 9   councils collectively own hundreds of properties across the

10   country.  Those are all included in the disclosure statement,

11   Your Honor.  Those are at pages 13 and 14 of the redline,

12   Exhibit B of the disclosure statement, with respect to what I

13   believe is the letter of intent, and Exhibit D(1) and D(2)

14   with respect to balance sheet and the property valuation

15   broken out on an individual basis.

16            I'll just propose that to finish off the four

17   categories and then we can open it up to anyone who has

18   objections.  Contributing --

19            THE COURT:  Why don't we take them a category at a

20   time.  Let's deal with the local councils.

21            MR. LINDER:  I'm happy to do that.

22            THE COURT:  And I do note and my recollection is

23   that there are now, there is more information provided by

24   council by council.

25            So, let's -- let me see if anyone has an objection

1   to the information that's been supplied, with respect to local

2   councils.

3           Mr. Stang?

4           MR. STANG:  Thank you, Your Honor.

5           Your Honor, this is a very, very important part of

6   the disclosure statement objection.  And this is something

7   that we haven't seen, I believe, until the latest disclosure

8   statement was filed.

9           There is going to be either the context of the

10  solicitation motion discussion, which we will have later

11  during this hearing, be it today or tomorrow, and the

12  confirmation, a real focus on whether the local councils are

13  putting up enough money.  And that may be – and property --

14  and that may be in the context of the best interest test.  It

15  might be in the context of the Master Mortgage settlement.

16  But this part is really, really important and I'm glad that

17  you stopped Mr. Linder at this point, because this is very, a

18  very sustainable discussion.

19          At a very high level, the problem with the way the

20  debtor has disclosed the information is that a survivor cannot

21  look at the claims against the New York council, and I'm going

22  to pick New York as an example as consistently as I can so

23  make sure Mr. Mason pays attention. If you're looking at the

24  New York local council, you have to go through at least three

25  charts, if not more to answer a simple question.  How much do

1  they have and how much are they paying?  And what are they

2  paying to get, in terms of the claim?

3          You have to go to separate exhibits and try to

4  piece that together.  And I'm going to go back and point out

5  exactly where the problem is, but at a slightly more granular

6  level, you don't know what is at book and what is at fair

7  market value.  The charts are not consistent in their

8  presentation in that regard, and that's obviously for non-cash

9  and non-investment assets.

10          You also can't tell which of the assets, at least

11  by category, are restricted or unrestricted.  The balance

12  sheets say at the bottom, unrestricted assets, restricted

13  assets.  It doesn't tell you if the restrictions are on the

14  cash and investments.  It doesn't tell you if the restrictions

15  are on the real estate.

16          And so, at a -- just for recap, very critical,

17  because you're going to hear from people.  I want to know how

18  much my local council defendant is paying, what is it its

19  ability to pay, and how do creditors of that local council

20  fair under the plan.

21          Now, there's no source waiting (indiscernible)

22  under the plan for local councils.  It's all going into the

23  trust.  It's not like the treatment for the chartered

24  organizations, if that treatment still survives in the Mormon

25  settlement.  Honestly, I thought the Mormons were in the

1  latest version of the termsheet that I see, silent on that, so

2  I don't know where they stand.

3         But that's what people want to know, *vis-a-vis*, the

4  local councils.  They may also want to know that *vis-a-vis*,

5  the chartered organizations, but I guess we'll get to that

6  cluster of objections in a few minutes.

7         So, Your Honor, this information that we're talking

8  about is in Exhibit D and what they've done is they've taken

9  and gone to -- and I'm going to try to do this, Your Honor, in

10 a -- I only have so many screens -- so, I'm looking at the

11 non-redline version of the disclosure statement and I'm going

12 to page -- where am I -- I'm sorry, Judge -- so, Exhibit D

13 starts at PDF page 286 and you've got the various notes.  I

14 don't have any particular comments about the notes.

15        And then as you scroll down, you get to PDF page

16 300, and this is a summary liquidation analysis of the debtor

17 and related non-debtor entities, and as you scroll down

18 further, you get a kind of similar summary analysis through

19 the local councils' organizations.

20        And here, they make the adjustment between book

21 value and fair market value, but they don't do it on a

22 council-by-council basis.  Now, keep that in mind, Judge.

23 This summary analysis does not tell the creditor of the New

24 York council what the value is of the local -- of certain

25 assets, because it's a summary that takes all of the local

1  councils together.

2           So, now let's go down -- and that's why this

3  doesn't work for the question that a creditor will have:  How

4  much does my local council got?

5           So, as we -- then we go to Bates stamp -- I'm sorry

6  -- PDF 311 of 406.  Here, they start giving you the balance

7  sheets for the local councils and so as you can see on this

8  page -- I've got to blow this up for myself -- you can see at

9  the bottom, they have unrestricted net assets and restricted

10 net assets.  And that's not an unusual balance sheet

11 presentation, but since cash is king, we don't know how much

12 they or the Greater Alabama council, which is the first member

13 council on the sheet, how much of that $5.85 million is cash

14 and how much of it is real estate.

15          Because we've done an analysis and it's been shared

16 with each of the local councils of what their cash needs are

17 and what their operating expenses are for two years and we've

18 looked at that from an unrestricted cash perspective.  And I'm

19 not here to argue about disclosure, of what kind of expenses

20 they have, and how much cash they'll need over the next two

21 years; that may happen at the confirmation hearing, when we go

22 to the metropolitan mortgage factors and the best interest

23 test.

24          But this doesn't cut it because you don't know

25 where the restriction is.  The other thing that is happening

1  is that at the land, buildings, and equipment line, which is

2  the second line under assets, we don't know how much of that

3  is the land and we don't know how much of that is -- which has

4  been appraised, because, you know, not every piece of property

5  has been appraised, but a lot of it has been appraised --

6  we'll talk about the adequacy of the appraisal evaluation

7  information in a moment, but we don't know how much is

8  buildings and equipment.  It's massed together and in some

9  cases, we are informed that the equipment has significant

10 value, but we don't see it broken out.

11        So, also, Exhibit 1, and if you look in the upper

12 right hand corner of this page, Your Honor, you'll see Exhibit

13 1 -- there's also going to be an Exhibit 2.  It's not -- so,

14 you have an exhibit to an exhibit.

15        It doesn't show information regarding the value of

16 the unappraised land, buildings, and equipment on a council-

17 by-council basis.  So, let's go down to -- and, Your Honor,

18 I'd ask you to go to PDF page 334 of 406.  This is what we

19 refer to as Exhibit 2, and what they've done here is council

20 by council, they have shown you valuations.

21        But what they haven't done is, first of all, it

22 would be nice if they totaled this up at the bottom.  I don't

23 think that is that really that hard to do.  But it only shows

24 the property that was appraised by CBRE, which is our

25 appraiser, the TCC's appraiser.  The JLL, which I believe is a

1   brokerage firm.  I do not believe it's an appraisal firm, but,

2   you know, we'll take that up when the time comes on, you know,

3   whether these values satisfy the standards or not.  And a

4   couple of properties valued by Keen who is also a marketing

5   entity.

6            But most of the property is approved by -- I'm

7   sorry -- I've been corrected that JLL is the BSA appraiser and

8   I apologize for that.

9            Yet, these don't show you valuations for the

10  unappraised property.  And the unappraised properties are --

11  there are about 288 properties that were not valued by Keen,

12  JLL, or CBRE, and the property information doesn't indicate

13  that there are properties that have not been valued.

14           If you look at what we see at the top, local

15  council property value information.  Now, they try to fix this

16  by Footnote 9, but Footnote 9 says or realize this is Footnote

17  9 to the disclosure statement, if I remember correctly.  They

18  say, well, 60 percent of the value is in the liquidation

19  analysis, but that 60 percent is based on tax assessments and

20  on book value, which are notoriously certainly from tax

21  assessments, notoriously low around the country because these

22  are nonprofits, the tax assessors all over the country don't

23  spend a lot of time valuing them, and so my experience has

24  been -- and I dare say everyone's experience that deals with

25  tax assessments for nonprofit entities, will tell you that

1    these numbers often, more than often, simply don't reflect the

2    real value of the property.

3             So, we have 288 properties -- Footnote 9, by the

4    way, Your Honor, is at PDF page 302 of 406 -- it doesn't --

5    the disclosure not clear that there's a substantial amount of

6    value that may not be accounted for and, frankly, the

7    footnote, which refers to tax assessments and book value,

8    should have additional comments that these values may not be

9    accurate so that people know that the 60 percent of the X the

10   X is maybe a dartboard kind of result.

11            At the end of the day, we have a list, which I'm

12   more than happy to share with the Boy Scouts and the local

13   councils, as to what they need to do it on a single

14   spreadsheet.  Again, the goal here is for a creditor to be

15   able to look at their council defendant and say, how much have

16   you got?

17            So, what they need to do is identify the land,

18   buildings, and equipment that have been appraised as

19   unrestricted, the same category that's unappraised, is

20   unrestricted, and then the flip of that is, land, buildings,

21   and equipment that's been appraised and restricted and that,

22   that is unappraised and restricted.  They need to break out

23   the long-term investments by unrestricted and restricted and

24   their cash for that matter.

25            And then finally on their claims, Your Honor, they

1  do make an effort to identify the claims, but -- and I'm just

2  trying to scroll down to -- I think it's -- I'll find the PDF

3  number for you here in a minute, Your Honor -- here we go --

4  it starts at, first, I would direct Your Honor to page 368 of

5  406, and I just want to make clear, my understanding, at

6  least, when they say unique and timely abuse claim count, the

7  "unique" threw me at first.  That means that they've gotten

8  rid of the duplicates.

9         So, timely abuse claim count, because this adds up

10 to about the 82.5 -- not quite the 82.5 we mentioned -- these

11 are people who filed timely proofs of claim.  This has nothing

12 to do with the statute of limitations under State law.

13         THE COURT:  Okay.

14         MR. STANG:  So, then we scroll down to the next

15 chart and, again, we've got unique and timely, and then we

16 have not barred.  And I think that there needs to be more

17 disclosure, because I -- again, Your Honor, this is something

18 that I believe was just produced -- as to what they mean by

19 not barred.

20         We have had a lot of discussions with

21 (indiscernible) about what's barred and not barred, but this

22 doesn't -- I think they need to be clearer about what they

23 mean by that, because there have been a lot of assumptions

24 made, and we've gone through the data with the debtor as to

25 their view of what is barred and not barred.

1          But more importantly, and this is something that

2    they don't do at all, they don't tell the survivor the value

3    of the claims, again, against their local council.  Now, how

4    would they do that?

5          Because none of these claims have been valued by a

6    Court in terms of a judgment, so -- but we know that there are

7    scenarios for each of these categories.  We know that the

8    penetration claims have a base amount of $600,000, and then

9    there are scaling factors.  We know what those scaling factors

10   are.  We don't know what they are for each individual, but we

11   know what they are.

12         But what we do know is a negotiated, agreed-upon

13   statute of limitations discount for every state.  That's not

14   something that -- now, there are ranges there, admittedly.

15   They're not very broad ranges and one could, I guess for

16   purposes of trying to communicate with creditors here, give a

17   midpoint range or do the high-low, depending if there are --

18   except for the window states, the claims are -- have a high-

19   low for each state.

20         I would point out, by the way, Your Honor, that

21   just because you're in a state that does not have a window, it

22   does not mean that the claim is not time-barred.  You could

23   have a 20-year-old filing a proof of claim in a state where

24   the statute of limitations is 23, and they would not be time-

25   barred.  So, some people think it's only about window states -

1  - it's not.  Even in states that have very difficult statute

2  of limitations, Florida, for example, there are many claims

3  that are within the statute because they're just within the

4  statute.

5          Mr. Lucas has a better idea as to the numbers on a

6  given state.  He practically has that at his fingertips if the

7  Court wanted to know that, but I just wanted to point that

8  out.

9          So, the problem with the chart at exhibit -- I'm

10  sorry -- at -- I'm trying to find the top -- at PDF 369 of

11  406, it doesn't tell you anything about the value.  We could

12  run that analysis.  I could tell you in (indiscernible)

13  crossroads how many penetration claims there are.  I mean,

14  they've done it.  The debtor has it.  How many penetration,

15  masturbation, groping, whatever the claims are; we know the

16  base amounts.  We know that the statute of limitations

17  discount.  And that should be given.

18          And so creditors need --

19          THE COURT:  Mr. Stang, what I hear you saying is

20  there are a lot of charts that have information and you want

21  them put together in a different way, that's what --

22          MR. STANG:  I want them put --

23          THE COURT:  -- I hear you saying.

24          MR. STANG:  Yes, I want them put together in a

25  different way so that those three questions could be answered

1  and I want them to be consistent on what is -- I want them to

2  identify restricted/unrestricted appraised/unappraised --

3             MR. LINDER:  May I respond, Your Honor --

4             THE COURT:  Yes --

5             MR. LINDER:  -- a response?

6             THE COURT:  -- I'd like a response to that.  Thank

7  you.

8             MR. LINDER:  Yeah, I'm happy to.

9             Your Honor, just as an initial manner, Mr. Stang

10  repeatedly said that these are charts are new; that's just

11  incorrect.  The only new chart that was submitted with the

12  fifth amended version of the disclosure statement is the

13  individual local council contribution.  And, if I'm not

14  mistaken, the only comment there from Mr. Stang is that

15  there's no totaling of the individual amounts in the

16  respective columns, and that's something that's easily

17  remedied.  So I hope, with that, I can just move on to the

18  other charts.

19             MR. STANG:  Your Honor, just to interject -- we did

20  in our disclosure statement objection refer to, I think we may

21  have used the term dashboards.  This was the financial

22  analysis that the committee did on every single local council

23  and we asked that there be an electronic link to those

24  dashboards.  So the questions that we're asking now go to the

25  information that would have been in the dashboards.

1          So I just -- and, Mr. Linder, I apologize.  It's,

2   you know, my fire hose just can't drink from it fast enough.

3   But this issue of how to present the information so that

4   survivors can understand it on a council-by-council basis is

5   an objection that we made when we filed our initial disclosure

6   statement objection.  I'm sorry to interrupt.

7          MR. LINDER:  Your Honor, to finish my thought, so

8   the only thing that's changed for the fourth amended plan is

9   the TCC expressly endorsed under the RSA to the fifth amended

10  plan version of the disclosure statement is the -- that's the

11  only thing that's changed is the totaling of the individual

12  contributions.  The balance sheets have not changed, the

13  individual local council property listing has not changed, and

14  the abuse claims data appended to the DS as Exhibit F, that

15  has not changed either.  But I'll move on to the substance,

16  Your Honor.

17         MR. STANG:  Your Honor, just one comment about

18  that.

19         THE COURT:  No --

20         MR. STANG:  He has --

21         THE COURT:  -- we can't keep going -- no, no --

22         MR. STANG:  Okay, fine.

23         THE COURT:  -- we can't keep doing that.  Mr.

24  Linder is speaking.

25         MR. STANG:  I'm sorry.  I understand, Your Honor.

1          MR. LINDER:  Your Honor, the first point that Mr.

2   Stang made was that there should be or needs to be an

3   adjustment from book value to fair market value on a council-

4   by-council basis.  My supposition, although I would really

5   have to confer with our advisers at Alvarez & Marsal, is that

6   there is probably a way that we can do that and show the

7   adjustment in greater detail, if that's necessary.  I don't

8   know that it is necessary given that our position is that, if

9   the liquidation analysis is to account for claims retained by

10  our creditors, the BSA's creditors against local councils,

11  that analysis is properly done on an aggregate basis and not

12  on an individual basis.

13          So that granular detail, the debtors would submit

14  that it's not necessary, but we're certainly willing to

15  explore -- in the spirit of cooperating with the TCC's

16  request, explore doing that.

17          With respect to GAP -- with respect to showing --

18  if you're looking at a local council balance sheet and looking

19  at the line that describes unrestricted assets and restricted

20  assets, I just want the Court to be aware that the way that

21  the BSA has compiled that information is it's taken straight

22  out of the BSA's PeopleSoft accounting system.  The accounting

23  -- there's no way to delve within those totals, those

24  subtotals for restricted and unrestricted assets, to break out

25  individual restricted and unrestricted assets, that would

1  require -- that's just not consistent with GAP accounting,

2  it's not broken out on the balance sheets that the BSA

3  maintains.  It would have to be a reconstruction done by the

4  debtors.  We would submit that it's not cost effective or

5  value added to have to undertake that extensive analysis.

6        Further, Your Honor, with respect to there were

7  references to property, as well as buildings, equipment, we do

8  not have breakouts of individual PP&E values for local

9  councils, that's also not feasible for the debtors to

10  undertake.

11        My response globally, Your Honor, with respect to

12  property, which I believe is the bulk of what Mr. Stang was

13  addressing, is that if there are disagreements that the TCC

14  has with the way that the debtors have presented the

15  information, that the TCC proposes language that we can

16  include in a revised version of the disclosure statement,

17  making clear what it views as the issues that will be

18  addressed at confirmation with respect to valuation of local

19  council properties.  Ultimately, these are confirmation issues

20  as to local council property valuations.

21        THE COURT:  What about the 288 un-appraised

22  properties?  Why do I have 288 un-appraised properties when

23  we, I think, approved retention of at least two appraisers?

24  Are these properties that aren't worth appraising?  Why is

25  that?

1          MR. LINDER:  Your Honor, my understanding is that a

2   combination of JLL, CBRE, and individual local council

3   appraisers have appraised the vast majority of the properties.

4   We will certainly go back and look at what the delta is with

5   respect to the un-appraised properties and we can include, at

6   a minimum, I would expect on -- this is Exhibit D2 listing all

7   the individual council properties -- whatever indicia of value

8   we do have for those properties.

9          THE COURT:  Okay.  I think it just needs to be

10  addressed in some way and, if there are un-appraised

11  properties, I think that has to be disclosed, but I don't

12  understand how we would have a value for them if they've been

13  un-appraised.  So I think that just has to be disclosed.

14          As far as the assets, restricted or unrestricted,

15  if the debtor doesn't have the information, they don't have

16  the information.  So to ask that they provide information that

17  they don't have doesn't make a lot of sense to me and I'm

18  still not sure why that granular level of detail is going to

19  be necessary.

20          MR. LINDER:  Your Honor, not to interrupt, but I

21  was just informed that the properties that represent the delta

22  between the total number and the 728 properties listed on the

23  exhibit, the reason that you presumed is correct that they're

24  not worth appraising.  The TCC and the BSA's respective

25  appraisers only evaluated properties that were selected for

1  appraisal because there was presumed to be value in those

2  properties.  So I just wanted to add that additional

3  information that I was just handed in real time.

4           THE COURT:  So I got lucky on my guess as to why.

5  Okay.

6           MR. LINDER:  I don't know -- I don't think it was

7  luck, Your Honor, but you were right.

8           THE COURT:  Okay.  Okay --

9           MR. LINDER:  Go ahead, Your Honor.  I'm sorry.

10          THE COURT:  I was looking at the other issues that

11 need to be addressed.  I think those were the property issues.

12          MR. PATTERSON:  Your Honor, may I be heard briefly

13 on that?

14          THE COURT:  Yes.

15          MR. PATTERSON:  Mr. Stang began his presentation by

16 saying what the claimants need in order to assess the plan is

17 an estimate of what they get under the plan and an estimate of

18 what they would get without the plan.  And, in order to make

19 that meaningful, we really do need the liquidation values of

20 the local councils broken out and claims identified, so that

21 people can assess, if this were a liquidation, what would they

22 get because, in a liquidation, an individual claimant doesn't

23 have a claim against the pot of porridge, it has a claim

24 against Orange County or New York Greater Council or what have

25 you.

1           THE COURT:  I think, Mr. Patterson, what I heard

2   with respect to that -- and that was the next part to get to -

3   - is that we've got a lot of charts with various information

4   in it and I think we have by local council the claims, the

5   types of claims, the property each of them has.  And I'm

6   looking at the redline toward the end where we have a

7   significant amount of information about the local councils.  I

8   heard Mr. Stang say he wanted it in a different type of chart

9   which was more inclusive, so you didn't have to flip through

10  three or four charts.  And I have to confess that and I

11  didn't, as I did it on a previous occasion, pick one local

12  council and trace it through to see what information I had.

13          So I agree that that's what somebody would have to

14  do and then somebody would have to take, if they wanted to,

15  the values and the TDPs and apply it to all that information

16  that we have.  So I guess the question is do we need -- first

17  of all, is there a piece of information that's missing, and,

18  second of all, do we need it to be reorganized -- the

19  information we have to be reorganized in some fashion that

20  currently doesn't exist within a disclosure statement?

21          MR. STANG:  Your Honor, the biggest piece of

22  information that's missing, as opposed to trying to make these

23  charts user friendly, is the value of the claims by local

24  council.  That's easy to determine.  And so -- because -- so

25  when survivor looks at it --

1          THE COURT:  Well, it's easy to determine if you

2    make certain assumptions, right?  You have to --

3          MR. STANG:  Well --

4          THE COURT:  -- make a lot of assumptions to figure

5    that out.

6          MR. STANG:  But not really.  You have a base amount

7    for each category and you have the state where the abuse

8    occurred, so you have the ranges of discounting.  In a window

9    state, there's no discounting at all.  So a penetration claim

10   in California is $600,000, base amount, 2.7 max.  If you want

11   to just call it base amount, let people know that's what

12   you're calling it, if you want to show them both scenarios,

13   show them both scenarios.  But, you know, it's not particular

14   complicated, we've done it.

15         MR. LINDER:  Your Honor, if I could just briefly

16   respond to the point about showing claim values by local

17   council.  This is a point we've discussed with our economic

18   consultant Bates White.  What they would tell you is, it's not

19   easy to determine what the value is per council and the reason

20   for that is not because we don't have a reasonable idea of how

21   many claims have been asserted that relate to a particular

22   individual local council, it's because we have to make very

23   difficult assumptions about the validity of the claims

24   asserted against local council, and that's not something that

25   we believe is appropriate to do and in fact might be -- might

1  achieve the opposite of what Mr. Stang intended to achieve if

2  we were to go down that road.

3          MR. STANG:  Well, I'm not sure what Mr. Linder

4  thinks my intention is.  My intention is that -- you know, no

5  one has filed a single claim objection in this case, Your

6  Honor, not the debtors, not the local councils, not the

7  insurance companies, not one.  And so I don't know, you know,

8  what people are going to say about how many people are going

9  to take the expedited payment or how many claims are actually

10  valid because that argument is down the road with some of the

11  discovery you referenced, but I don't know what assumptions

12  Mr. Linder is talking about.

13          They agreed, subject to, you know, proving it at

14  the confirmation hearing, that a penetration claim base amount

15  is $600,000.  The Boy Scouts did that.  The Boy Scouts agreed

16  -- and I can't remember the exact discounts, but that in

17  Oregon there's a discount of, I don't know, ten, fifteen

18  percent.  And, again, it's a range, but my point is they've

19  agreed to that.  So what's the big deal?

20          THE COURT:  Well --

21          MR. STANG:  I could take 600,000 and multiply it

22  times the number of penetration claims, in Oregon discount it

23  by the discount for Oregon, and tell you what the value of the

24  claim is, if you assume they're valid and if you assume the

25  base amount.

1          THE COURT:  So isn't that the question, though?  I

2   mean, if -- we often see disclosure statements that have a

3   range of what the debtor thinks the claims are worth in a

4   particular base --

5          MR. STANG:  Yes.

6          THE COURT:  -- based on a high and a low, but they

7   do assume, I think, some valuation -- evaluation of the claims

8   themselves, and we haven't done --

9          MR. STANG:  Well, Your Honor --

10         THE COURT:  -- an evaluation of them here, because

11  that's what the debtor will say.  The debtor will say in their

12  footnote, you know, this excludes duplicate claims and claims

13  we think we have a defense to and whatever.  So there's a

14  basis from discounting from the filed claims, if you will, to

15  a different number.

16         So the question is here, where there hasn't been an

17  evaluation of any individual claims and there's not going to

18  be under at least the plan that's proposed by this Court and

19  prior to voting, then what do we do?  And --

20         MR. PATTERSON:  Well, I think -- I apologize, Your

21  Honor -- I think what we're looking for is kind of

22  illustrative values.  We're looking for, if you filed a claim

23  and it is for this degree of abuse in this state against this

24  local council, here's what you're likely to get under the plan

25  based on the settlements to date and here's what you would get

1  in a liquidation, based on our liquidation analysis and based

2  on treating the claim at the same level for these purposes.

3  But it's just illustrative, it's not intended to be more than

4  that, but it's just to give people an idea of what they're

5  going to get, what they would get under other circumstances.

6          And it can include, you know, what you would get

7  from the debtors' assets, exclude the local council

8  contribution in a liquidation or however you want to do it,

9  but it's just to give people a comparison.

10          MR. STANG:  Your Honor, Mr. Patterson and I may not

11  agree on absolutely everything, but those TDP values were the

12  result of negotiations with the Boy Scouts, the FCR, the

13  Coalition, and the TCC.  And so they -- you know, the Boy

14  Scouts going back, it may even be in their (indiscernible)

15  information pleading, it was a long time ago, said that the

16  liabilities were between two and a half and $7 billion, that

17  couldn't possibly be the figure based on the TDP values that

18  they negotiated to try to prove at a confirmation hearing that

19  those were whatever the findings require you to say about it.

20          So there's a claims analysis out there, there's an

21  ability to present the creditors what they're going to get as

22  a valuation of their claims, and then compare that to what

23  they may actually get, because the disclosure statement fairly

24  says don't expect to get $600,000 necessarily, you may, you

25  may not, but this is just your value, it depends a lot on what

1  the recoveries are from different sources.

2           So I think the debtor just doesn't want to show how

3  poor the returns are from the local councils based on the

4  contributions they're making because, while we negotiated a

5  settlement with the local councils under the protections we

6  got under the RSA, because what I was alluding to earlier when

7  I said we've got to have a real say about the insurance

8  settlements.  Because, right, that's the brass ring, insurance

9  settlements, sacrifice everything so you can get to the

10 insurance?  Well, they told us, they showed us how much

11 they're prepared to sacrifice, a lot.

12          And so that deal is off.  The creditors need to

13 know how much those local councils are actually -- settlements

14 are actually going to get them in the context of value of the

15 claims per the TDP.

16          THE COURT:  Okay.  I think there's a lot of

17 information about that in the disclosure statement.  What I

18 hear is you want -- and maybe some illustrative examples can

19 be added, I think that's maybe a good suggestion that there be

20 some illustrative values, but they're going to have a lot of

21 assumptions to them.  And --

22          MR. STANG:  Your Honor --

23          THE COURT:  -- so I'd like the parties to work on

24 that and see if there are some illustrative examples that can

25 be added to perhaps guide someone as to how to determine what

1  they believe they would receive if they have a valid claim and

2  maybe that's a resolution because I do think that the first --

3  objections I got to the first statements that we don't have

4  any information about the local councils, I think there's been

5  a lot of addition to the disclosure statement on that; it may

6  not be perfect or what everyone wants, but I think that

7  there's been a lot of information added and --

8           MR. STANG:  Your Honor, I would just say there

9  really isn't very much in the disclosure statement of anything

10  that tells you -- tells anyone what these claims are if you

11  applied this simple base, you know, objective part of the

12  TDPs, which is base amount, maximum amount, and valuation

13  discounts.  And I heard what you said about, you know, are all

14  the claims valid, I don't know, but, until they're not, they

15  are.  Until people make the election for the expedited pay,

16  everyone has participated, that's why you hear us, you know,

17  doing averages by 82,500 people.  If someone has credible

18  information that tells how many expedited payments are

19  actually going to be taken, please speak up at some point in

20  this hearing, but I don't think that exists.

21           So I don't think there is very much there that

22  takes the TDP values that currently are in the plan and tell

23  creditors how much we're talking about via for the Hartford

24  settlement, the Mormon settlement, or this local council

25  analysis.

1          MR. LINDER:  Your Honor, you touched on a point

2   earlier that I'd like to address, which is that it's common

3   for debtors to include an aggregate range of recoveries with

4   respect to a particular class.  The debtors have proposed a

5   range, it is from $2.4 billion to $7.1 billion.  What I would

6   suggest, Your Honor, is that what a claimant can do -- and we

7   can make it clearer in that this is a methodology that we

8   really could apply to any particular claimant -- is outlined

9   in footnote 39 on page 29 of the redline of the disclosure

10  statement, and this is a footnote to the recovery chart, just

11  to orient Your Honor.

12          MR. STANG:  Mr. Linder, can you tell me what page

13  that is on the un-redlined, are you able to do that?

14          MR. LINDER:  I'm not, Mr. Stang.  I'm looking at

15  the redline version only.

16          THE COURT:  That's what I'm looking at.

17          COUNSEL:  It's still footnote 39, Jim, you should

18  be able to find it from that.

19          MR. STANG:  Yeah, I'll find it, I'll find it.  I'm

20  almost there.

21          MS. LAURIA:  It's on page 26, Mr. Stang, of the

22  clean --

23          MR. STANG:  Thank you.

24          MS. LAURIA:  -- page 32 of 406 of the PDF.

25          MR. STANG:  Thank you.

1            MR. LINDER:  Once you're there, Mr. Stang, I'll

2     proceed.

3            MR. STANG:  Well, Your Honor, the 2.4 to $7.1

4     billion was done --

5            MR. LINDER:  With all due --

6            THE COURT:  I'm sorry --

7            MR. STANG:  -- with the TDP --

8            THE COURT:  -- Mr. Linder, go ahead, and then I'll

9     hear from you, Mr. Stang.

10           MR. STANG:  Okay.

11           MR. LINDER:  Thank you, Your Honor.

12           MR. STANG:  Okay.

13           MR. LINDER:  What this sets forth, Your Honor, is

14    that -- is essentially how our calculation of the recovery

15    range was estimated, which is we used -- to determine a

16    percentage recovery of the holder of a direct abuse claim

17    under the plan, we take the BSA settlement contribution as of

18    the date certain, we add $500 million -- and it should say

19    $600 million  -- for the local council contribution -- I see

20    it says $100 million DST notes so then add $600 million, plus

21    the Harford settlement contribution, plus the TCJC (ph)

22    settlement contributions, and you divide it and divide between

23    the value that lies within the range, you take into account

24    the costs allocable to the settlement trust, and you take --

25    for a particular holder of an abuse claim, you take the value

1   that's set forth in the claims matrix and you do simple

2   multiplication by the percentage, that's the product of that

3   formula.

4           What we do is we could give more explanation about

5   how that's to be done.  That will yield an estimated value

6   based on cash contributions to the settlement trust.  That

7   does not take into account recoveries that the trust may

8   generate from insurance.  As we say in the chart, the

9   estimated recovery percentage at the low end is from 231, 73

10  percent on account of a claim, plus insurance rates, which the

11  debtors expect to yield up to 100 percent recovery on account

12  of the direct abuse claims.

13          So I think all the pieces are there, Your Honor,

14  and I think if we're to go to the lab with the TCC on trying

15  to come up with illustrative examples, I worry about the

16  intricacies of doing that when all the building blocks for

17  accomplishing that I think are already in the disclosure

18  statement.

19          MR. STANG:  Your Honor, the problem with the

20  footnote -- I mean, it's fairly simple math, add up the total

21  settlements and divide it by the range of claimants.  I think

22  the problem is that that 2.4 to 7.1 is not based -- unless Mr.

23  Linder says that that's their analysis based on the TDP

24  values, but I don't think -- and this number has been out

25  there for a long time, this 2.4 to 7.1, and it was out there

1  long before the TDPs were negotiated.  And so if the debtors'

2  position is this is the range that the TDPs are going to

3  generate and assumptions about fraudulent claims, as people

4  like to call them, or the expedited payment -- and that --

5  we'll have to figure out where that is on the disclosure

6  statement, but I think this number, this range is not

7  reflective of the TDP and --

8           THE COURT:  Well, you just disagree with their

9  expert then.  I mean, that's just a disagreement with their

10 expert, but this is their expert's -- this is their expert's

11 estimated range; it may be right and it may be wrong, but

12 that's what they're using.  You want them to use something

13 else.

14          MR. STANG:  I want them to use the number that they

15 negotiated with the Coalition.

16          THE COURT:  Well, but that's a number for valid

17 claims, right?  So I don't know because I haven't done the

18 math to figure out where this fits, but this is their expert's

19 number and you want them to use something else.

20          MR. STANG:  Well, Your Honor, we just -- I don't

21 know all these moving parts and the -- anything the way

22 everybody else knows it, I haven't been involved that long,

23 but I think -- you know, as the Court recognized a little

24 while ago, what would really help people is the illustrative

25 values and I think that's the key, and we'll work with the TCC

 1  and the debtors either (indiscernible) --

 2            MR. LINDER:  Your Honor --

 3            MR. STANG:  -- and all we need to do is just make

 4  sure that whatever assumptions are embedded in that

 5  illustrative value are made clear.

 6            THE COURT:  And I think --

 7            MR. LINDER:  Your Honor --

 8            THE COURT:  -- that's going to be the tricky part

 9  is to come up with some way to do that that all parties can

10  agree on.  I'm willing to let you, and I think you should,

11  give it a shot and let's see what we come up with.  And I hear

12  the issue here.  If anyone else wants to weigh in on this

13  particular issue, I'll hear that, and then we're going to take

14  a break, but we're going to move on from this issue, but I

15  think there should be an attempt to see if there can be an

16  illustrative example recognizing that the parties disagree on

17  some certain basic facts here.  So give some thought as to how

18  we're going to bridge that gap and I will give some thought to

19  that too, but I understand the ask, I don't think it's

20  necessarily an unreasonable ask, but I think there's some

21  challenges to it.

22            MR. LINDER:  I think that's the key, Your Honor.

23  We can certainly work with the TCC, Mr. Patterson, to put

24  together illustrations, I think bearing in mind that the

25  debtors' range, 2.4 to $7.1 billion, is worlds away from the

1  TCC's estimate, which was over a hundred billion dollars.  So

2  I think if we can compare the two to create illustrative

3  examples using different valuations, I think that may be a

4  pathway.  Again, we're happy to work -- to work through these

5  issues in the interest of getting this plan out for a vote, so

6  we will work them on that in good faith --

7        MR. STANG:  Your Honor, I'd just like to make one

8  more comment because I know that other people had their hands

9  up and it goes back to this RSA argument.  We did enter into

10 the RSA and everyone knows that.  We never waived our

11 disclosure statement objection.

12       THE COURT:  I'm not saying --

13       MR. STANG:  We supported --

14       THE COURT:  -- you did --

15       MR. STANG:  -- I just want you to know --

16       THE COURT:  -- and we don't need to get into that,

17 okay?

18       MR. STANG:  Okay.

19       THE COURT:  We're dealing --

20       MR. STANG:  I just wanted to make that clear.

21       THE COURT:  -- we're dealing with disclosure

22 statement objections.

23       MR. STANG:  I just wanted to make it clear what we

24 did and didn't do.

25       THE COURT:  Okay.  I see some hands up.  Are they

1   on this particular issue?  And, if they are, I'm happy to hear

2   from you.  Mr. Schiavoni?

3           UNIDENTIFIED:  Not on this issue, Your Honor, on

4           THE COURT:  Okay.

5           UNIDENTIFIED:  -- the category, but not on the

6   issue.

7           THE COURT:  Okay.

8           MR. SCHIAVONI:  So, Your Honor, I do think there's

9   a whole overlay on our issues, Mr. Rosenthal's and mine.  I

10  don't -- I would like to break for lunch, but it's like --

11  because it does implicate other things, but it goes directly,

12  directly to this issue that they're getting into, I'd like to

13  address it after lunch.

14          THE COURT:  Okay.  Let's -- oh, Ms. Wolff?

15          MS. WOLFF:  Yes, Your Honor, hello.  I am Delia

16  Lujan Wolff, I'm with Lujan & Wolff LLP from Guam, I represent

17  75 survivors who were abused in Guam, and I would just like to

18  add on to what Mr. Stang said earlier regarding the lack of

19  disclosure as to what constitutes non-barred, a non-barred

20  claim against a local council.

21          And of course the information that we believe is

22  lacking in -- you know, as to what constitutes a non-barred

23  claim is does that term -- how does that relate to claims that

24  have actually been filed against local councils before the

25  expiration of the statute of limitations.  And, as an example,

1  most if not all of my clients have claims against the Aloha

2  Council in Hawaii and Guam is an open window jurisdiction, the

3  statute was abolished.  And Hawaii had an open window, but it

4  expired, it closed, the revival window closed last year about

5  -- around May.  And so the question that I would want -- or

6  the information that would be helpful to my clients for them

7  to make an informed judgment would be how many lawsuits were

8  actually filed by creditors to this bankruptcy against local

9  councils, including the Aloha Council.  That's important

10 because if outside of this bankruptcy my clients' recoveries

11 would be affected by how many claims were timely filed against

12 the Aloha Council and any other relevant council.

13            I also want to point out that by creating the

14 distinction between barred and non -- I'm sorry, creating a

15 distinction non-barred, I'm assuming that the number that's in

16 the unique claims, the unique and timely claims would be  --

17 would also include barred claims.  And so the question I had

18 is what is that number and what does it mean to be barred but

19 timely claim.  And information that's lacking, that continues

20 to be lacking is what are the future and unknown claims, not

21 just against the BSA, but against the local councils, and

22 that's important because it's my understanding that, despite

23 the bar date having passed in this case, that victims are

24 suing local councils, victims who haven't filed claims in this

25 bankruptcy.

1              And so these are liabilities of the local councils

2    and it appears to me, although I haven't completed a review of

3    this form of the plan and disclosure statement, it appears

4    that the local councils with their limited contribution going

5    to the settlement trust, it appears that in exchange for that

6    the settlement trust is going to have to pay off all of these

7    future and unknown claims against the local councils as

8    distinct from future claims against the BSA.

9              And as to assets, the disclosure statement

10   continues to lack adequate information regarding the local

11   council-only insurance policies.  They make reference to it in

12   the disclosure statement, but -- and they also have a list in

13   the plan, there's a list of what they've uncovered, a list of

14   local council policies, even claim numbers and the insurers,

15   they have that information, they're able to provide it, and

16   yet they fail to inform creditors of what the limits are.  And

17   I'll just note that Aloha Council is one of those councils

18   that is listed as having policies from '72 to approximately

19   '78 and I have no idea what those limits are.  Those are

20   valuable assets that are supposedly being contributed as a

21   settlement.

22             Another question that continues to not

23   (indiscernible) is Boy Scouts, but it also relates to the

24   local councils, and that is what about the 1976 and 1977

25   Hartford insurance policies?  It appears that there may have

1  been a settlement that the Boy Scouts entered into, the Boy

2  Scouts being the named insureds under these policies, and if

3  there was a settlement, you know, they've never really

4  answered the question do they have an interest in those

5  policies, the Hartford '76 and '77 policies.  And that's

6  important because -- as to the local councils because they say

7  that, well, there's ambiguous language as to whether or not

8  the -- I'm sorry, the chartered organizations were additional

9  insureds under the '76 and '77 policies, but is that relevant

10  if there are no policies if there's been a settlement?  And,

11  if there's been a settlement with the Boy Scouts, how does

12  that affect the interests of the local councils?  And that's

13  important also to my clients, Your Honor, because my clients

14  are all direct-action plaintiffs.  We have a right to directly

15  sue the insurers regardless of whether we use Boy Scouts or

16  not or the local councils.

17          And if there is no interest that the chartered

18  organizations have in the 1976 and 1977 policies, then why are

19  they getting a free ride if they give a so-called assignment,

20  which I find very legally unsound, I've never heard of an

21  implied assignment, but if they don't have an interest in the

22  '76 and '77 policies, then why are they being let off the hook

23  for those years?  And they just refuse to explore or explain

24  sufficiently what is the status of '76 and '77.

25          And, Your Honor, that's about all I have.  Thank

1  you.

2  THE COURT:  Thank you, Ms. Wolff.

3  We're going to take a lunch break.  I do -- and

4  some of your issues have not yet been addressed by the debtors

5  and we will get to them as we continue on, but I do want to

6  recognize one thing that Ms. Wolff said that we talked about

7  before that probably was left open, which is an explanation,

8  although it may be intuitive to those of us who have been in

9  the case a long time, what a timely-filed claim means versus a

10  non-barred claim, et cetera.  If you could footnote those

11  charts so that people understand what those terms mean when

12  they're reviewing them because it's not -- it's probably

13  counterintuitive that you could be both timely and barred.  So

14  let's make sure that that is appropriately footnoted so that

15  counsel and their clients understand that.

16  So we're going to take a lunch break and then we

17  will start back again with the issues.  And, Mr. Linder, to

18  the extent that Ms. Wolff's comments relate to things we've

19  already spoken about, please address them.  If they're going

20  to be addressed in the future, let me know that as well, so

21  that Ms. Wolff is aware of that, and then we can start back.

22  I see two other hands; I see Mr. Buchbinder and Mr. Schiavoni.

23  We'll start back with them after the lunch break, which we're

24  going to take an hour, so we'll come back at 2:45 Eastern.

25  And, Mr. Rosenthal, I see you as well, we'll get to you.

1            Thank you.  We're in recess.

2            COUNSEL:  Thank you, Your Honor.

3       (Recess taken at 1:47 p.m.)

4       (Proceedings resume at 2:44 p.m.)

5            THE COURT:  This is Judge Silverstein.  We're ready

6   to get back on the record.

7            MR. LINDER:  Thank you, Your Honor.  Once again,

8   Matt Linder of White & Case for the debtors.

9            Prior to the break, Your Honor, I believe you

10  indicated that the debtors should respond to Ms. Lujan Wolff's

11  comments as they related to topics that we are currently

12  addressing.  Would you like me to start there?

13           THE COURT:  Yes.

14           MR. LINDER:  Your Honor, I think there are,

15  according to my notes at least, four categories of objections

16  that counsel highlighted, two of which I think are appropriate

17  to address now, and then the balance we will be addressing.

18           One is additional disclosure with respect to

19  debtors' view of applicable statutes of limitations.

20           The second is disclosures with respect to lawsuits

21  pending against non-debtor -- what we call the related -- I

22  believe we call the "related BSA entities, in the context of

23  the preliminary injunction.

24           The third was disclosures with respect to future

25  claims.

1          And the fourth was local council interests and the

2   effect of the proposed Hartford settlement on those interests

3   in insurance policies.

4          What I would propose to do, Your Honor, is to

5   address the statute of limitations point and the lawsuits

6   against local councils and reserve the future claims and

7   Hartford issues for later in the presentation.

8          THE COURT:  Okay.

9          MR. LINDER:  With respect to statutes of

10  limitation, Your Honor, the trust distribution procedures that

11  we filed with the fourth amended plan, attached to that is a

12  scheduled called "Schedule 1."  We inadvertently did not file

13  it with the TDP attached to the fifth amended plan.  That was

14  an oversight and we're happy to make sure that that is

15  correctly promptly, Your Honor.  We may have a few changes,

16  which we've discussed with counsel to our supporting parties.

17         But with respect to disclosure, Your Honor, we

18  would submit that that schedule categorizes all 50 states and,

19  I believe, territories, it categorizes them in one of five

20  levels that I'll explain.

21         One category is open, and those indicate states or

22  territories that -- where the statute of limitations for abuse

23  claims is currently open.  That's obviously where it's most

24  likely that a claim would survive a motion to dismiss for --

25  based on the claim being time barred.

1            And then there's three levels that we call "Grade
2    1," "Grade 2," and "Grade 3."  And those categorizations are
3    the degree of likelihood that the statute may open; the
4    favorability of case law that pertains to, among other things,
5    the discovery rule, which would potentially be sufficient to
6    revive a claim that might otherwise be time barred.  And so
7    Grade 1, Grade 2, and Grade 3 reflect a great deal of
8    negotiation between and among the debtors, the TCC, the
9    coalition, and the FCR, in the context of the restructuring
10   support agreement, which obviously is no longer in place, but
11   that's the context within which we formulated that schedule.

12           So, on that topic -- and I'm sorry.  The fifth
13   category is closed.  And those are the states where it's
14   clear, either because that the state constitution does not
15   permit the opening of (indiscernible) window or otherwise that
16   those claims cannot be brought for historical abuse.  So, with
17   that disclosure, Your Honor, we would submit that no further
18   disclosure is necessary.

19           THE COURT:  Okay.  On that topic, I did go look for
20   that because I recall seeing that before.  So was it attached
21   to the fourth, but it just didn't make it onto the fifth?

22           MR. LINDER:  Correct, Your Honor.  That's --

23           THE COURT:  Okay.

24           MR. LINDER:  That was our (indiscernible)

25           THE COURT:  Okay.  Well, in my mind, that addresses

1  the statute of limitation issue that was raised, and it's

2  parties best to negotiated -- it was a negotiated point on the

3  -- of the scaling factors.  And I think that's what it is.

4  The parties may disagree with the -- with that scaling factor,

5  but it's been disclosed.

6          MR. LINDER:  Thank you, Your Honor.

7          MR. SCHIAVONI:  Your Honor, if I may?  Just on that

8  particular issue, I think what you heard from Mr. Linder was

9  the statute of limitations was negotiated to the exclusion of

10  the insurers.  And we just ask that it be candid and not say

11  that it's a negotiated issue.  It's negotiated among the

12  parties that he just said and that the insurers were not

13  included in that.

14          We have -- as you might guess, we intensely dispute

15  some of the analysis of the statute of limitations, including,

16  among others, just -- like just very plainly, California is

17  put down as an open state.  In fact, it has a very extensive

18  anti-fraud provision in it, which makes it very hard to file a

19  claim.  And we actually see very few claims there.  The local

20  councils in California have pointed that out, but you know,

21  they weren't in the negotiation either.

22          So, you know, that's why I would just ask that it

23  say that it was negotiated among the parties that Mr. Linder

24  listed and not the insurers.

25          MR. LINDER:  We're happy, Your Honor, to indicate

1   who it was negotiated amongst.  But I would correct Mr.

2   Schiavoni's incorrect statement that local councils were not

3   involved because, through the Ad Hoc Committee of Local

4   Councils, they were, in fact, involved, and there is

5   representation of California councils.

6            MR. SCHIAVONI:  No, the local council ad hoc

7   committee represents all of eight councils.  They've written

8   us that many times.  They say they don't speak for the

9   individual councils.  And the particular council that has

10  objected was not on the -- was not, in fact, on the ad hoc

11  committee, in any event.

12           THE COURT:  Okay.  Well, let's just indicate, if,

13  in fact, there's an indication -- and I don't have the page in

14  front of me -- just an indication of how those numbers arose

15  and my recognition that those are the scaling factors in the

16  trust distribution procedures isn't a comment on whether

17  they're appropriate or they're not appropriate or can be

18  challenged or not.  It's just a recognition that that's what

19  the scaling factors are in the trust distribution procedures,

20  and that's the plan proponents' view of what they are.

21           MR. LINDER:  Thank you, Your Honor.

22           With that, I'd propose to move on to disclosure

23  with respect to pending lawsuits, I believe was the request

24  against local councils.

25           The -- I would note that, for the preliminary

1  injunction order, which has been carried forward on what I

2  believe is five occasions by consent order.  There are

3  schedules to that consent order, which are updated once a

4  month.

5          Schedule 1 to the consent order is a list of all

6  pending abuse actions against local councils or chartered

7  organizations.  These are what I believe are called the "BSA

8  related entities."

9          Schedule 2 to the consent order is a list of all of

10 those BSA related entities.

11          So an action is enjoined by the preliminary

12 injunction to the extent it appears on those schedules.  So

13 the fact is that those are in the public record.  To the

14 extent that those -- that the Court determines it's

15 appropriate to be included in the disclosure statement, we can

16 certainly add it.

17          I don't know that it achieves much, given how

18 voluminous that list is.  I mean, I think there are

19 approximately 800 actions listed on Schedule 1, it's a great

20 deal of paper, potentially provide a summary of how many

21 actions are pending against particular councils.  Those are

22 just ideas.  But the bottom line, Your Honor, is that is in

23 the public record, so we can certainly discuss how we can

24 incorporate that into the disclosure statement.

25          THE COURT:  Okay.  Well, I don't think we need to

1  attach the list that's attached to the preliminary injunction.

2  But why don't you reference it and give people the most recent

3  docket number to go take a look themselves?

4           MR. LINDER:  Very good, Your Honor.  We'll do that.

5  Thank you.

6           I believe where we were, Your Honor, was we were

7  discussing objections with respect to third party

8  contributions, and we were specifically discussing local

9  council contributions.  Your Honor, I understand there are

10  additional parties who may want to state their objections to

11  the disclosure statement on that basis, so I can yield the

12  podium back to them.

13           THE COURT:  Okay.  Mr. Schiavoni.

14           MR. SCHIAVONI:  So, Your Honor, I'm looking at the

15  chart and the blackline that's on page -- I think it's Page

16  309.  It's the one that lists all the local -- it lists all

17  the local councils and the total dollar amount of their

18  contribution.  And I make, you know, two suggestions about

19  that:

20           First of all, I think the information about the

21  number of suits pending could be very helpfully and rationally

22  and easily presented by just creating a column where you could

23  put the number of suits, you know, pending against each one of

24  the councils, you know, right in a row there, which would, you

25  know, provide information I think more meaningfully than just

1  simply referring to like where you can go get a list, so to

2  speak, because I think the point being made is that they

3  wanted to see how the numbers corresponded to the actual

4  particular councils.  That's point one.

5          Point two is related, bit it's actually a very big

6  picture point, overall.  And that is, if you look down to the

7  total contribution number, you see that, in most instances,

8  the contribution is under a million dollars by the individual

9  councils.  In some cases, it's slightly more.

10          The coverage program that the Boy Scouts had, we

11  talked about this earlier in this case.  The program had, in

12  the later years, very significant retained limits, and then

13  other policies had deductibles, and then there were uninsured

14  periods.

15          The retained limits are periods where the

16  Scouts/local councils accepted responsibility affirmatively

17  for the funding of claims within that period.  The retained

18  limits are un-aggregated.  That means that, as, you know,

19  dollar one claims come in, they all get -- they get -- they

20  fall in the retained limit and are the obligation of the -- of

21  those parties to pay.

22          As a practical matter this meant that, in the tort

23  system, you know, by and large, more than half of the claims

24  would fall in those retained limits, and the vast bulk of them

25  were consumed in the limit, so that, you know, a significant

1  amount of the funding, on a day-to-day basis, pre-petition,

2  was actually coming based on that contractual obligation from

3  those parties.

4         What essentially -- what we would suggest is that

5  another column be added, and that this discussion of what the

6  valuation is of the claims against the councils.  I think

7  there's a real reason why the debtors didn't want to

8  separately disclose this, and it goes directly to this issue.

9  And it goes to the issue of the substantial nature of the

10 contribution and also, fundamentally, the reasonableness of

11 what they did with the TDPs because what you'd see, if you

12 presented the claims -- if you did this -- if you did this,

13 interestingly enough, pre-bankruptcy and post-bankruptcy, it's

14 quite dramatic.  Okay?

15        But on a post-bankruptcy TDP basis, the scale of

16 the liability has like, you know, exploded because they

17 granted a TDP that basically allows just about any claim

18 possible down the line and puts very high values on them.  But

19 when the local councils settle, when the Boy Scouts settle,

20 they didn't -- they -- like the valuation that they attribute

21 is in no way in accord to what those TDP values are.  It's

22 like what it would show is that, for most of the local

23 councils, the contribution that they're making is less than

24 even one claim would impair on an un-aggregated SIR retained

25 limit.

1          So I don't know if you follow that, Judge.  But

2  because the limit -- the retained limit is a million dollars

3  in most of those years.  If a claim came in the door for a

4  hundred thousand, three -- every claim that would come in

5  under a million bucks would be -- that falls in those years

6  would be the obligation of the Scouts to pay.  And that's why

7  most of the liability was in the Scouts, you know, somewhere

8  between 50, 60 percent pre-petition.

9          So, when they sat down in these negotiations

10 without any insurers there among themselves, they -- and we've

11 said this before.  Did they strike a hard deal?  Yeah, they

12 did.  It's like they negotiated at arm's length to drive a

13 price for themselves where they valued the claims at somewhere

14 in the neighborhood of 6,000 bucks.  And that was -- that

15 reflects what they were going to pay.  It's like they were on

16 the hook in those SIRs.  They drove a valuation that's far

17 less than what their obligation is under the SIRs.

18          They then, after they capped their liability, they

19 put in a TDP that generates these fantastical numbers.  Okay?

20 But when you -- if you're assessing the substantial nature of

21 the contribution, you'd want to look at, you know, in theory,

22 like what they valued these TDPs at.

23          We think the TDPs are wrong, we're -- you know,

24 just to be a hundred percent clear.  And we think that these

25 are non-debtor entities that are being relieved of their

1  contractual obligation to us to fund those SIRs.  And the

2  plan, in essence, foists on us the obligation to fund those

3  that isn't there.

4        So I think that information, a chart, just adding a

5  column that shows the valuation of the claims that would fall

6  in there for each of the local councils would be informative,

7  both to assess the substantial nature of the contribution of

8  the -- of each of the local councils with respect to the

9  claimants and with respect to how -- you know, how our

10  obligation for those SIRs is being extinguished between --

11  again, among non -- among two non-debtors, that obligation is

12  going to be extinguished.

13        MR. LINDER:  Your Honor, if I may?  Again, Matthew

14  Linder for the record.

15        The first request from Mr. Schiavoni was to add a

16  column to the contribution chart that's attached to the

17  disclosure statement as Exhibit C that lists the number of

18  lawsuits pending against each local counsel.  You know, it

19  occurs -- it occurred to us that that is a -- that is

20  marginally useful information, at best, given the fact that

21  the number of suits pending obviously don't correlate,

22  necessarily, to the number of claims filed.

23        We're hearing a lot of parties would like us to

24  reshuffle all of the schedules that we've appended to the

25  disclosure statement and cut some and paste it to others.  Mr.

1  Schiavoni appears to have successfully navigated the

2  schedules.  So we would propose to leave it as it is, given

3  that that information, the number of claims, is appended to

4  the DS as Exhibit F as in Frank.

5          And I can address the other points Mr. Schiavoni

6  made --

7          THE COURT:  I --

8          MR. LINDER:  -- as well.

9          THE COURT:  Yeah, I would like you to.

10         But another column, especially with the lawsuits

11 filed, I don't see the particular informational benefit to

12 that because it doesn't correlate to the claims that have been

13 filed.  So I'm not sure what that -- it's a piece of

14 information, and I guess it can provide some information to

15 parties.  But I'm not sure --

16         MR. SCHIAVONI:  Your Honor, it would be --

17         MR. ZALKIN:  Your Honor, this is Irwin Zalkin.  If

18 I may, I can address the question if you don't mind.

19         THE COURT:  Okay.

20         MR. ZALKIN:  (Indiscernible) --

21         THE COURT:  Mr. Zalkin.

22         MR. ZALKIN:  -- why it would be important.  Thank

23 you.  I'm sorry to interrupt.

24         But in New York, we just had a window closed.  And

25 a survey was done by one of the attorney firms in our group of

1  the dockets of all of the Courts in New York to determine how

2  many cases were actually filed and would be timely filed, and

3  I think that number was 262.  Yet, we have I think it's

4  somewhere in the neighborhood of 1,700 claims against the New

5  York -- the Greater New York Council.  So it's 262 against the

6  New York Council -- Greater New York Council.

7          So the issue there is, of those numbers of claims,

8  did they perfect those claims against the third party, against

9  the councils and against the any charter organizations, which

10  are there's an (indiscernible) channel those claims into the

11  bankruptcy and the impact that that would have.  So I think

12  it's important that we have the data as to what -- at least in

13  states where we have windows that have just closed -- Montana

14  I think there's a couple of others -- to determine if those

15  claims were perfected at least as against those third parties.

16          I know there was an injunction or there is an

17  injunction against proceeding on those claims but not against

18  filing those claims, to perfect those claims as timely under

19  those -- the windows that are closing.  So I think that that

20  kind of information is important to us, to assess where we

21  stand with those who have filed claims versus those who may

22  not.

23          Does that make sense?  Did I --

24          THE COURT:  Yeah, that does make sense.

25          Mr. Linder, do you have a response to that?  Is

1   that part of what's getting added then?  It should be being

2   added to the injunction schedule, right?

3          MR. LINDER:  If -- I just want to clarify what Mr.

4   Zalkin is requesting.  I think what the difference is between

5   what you're requesting, Mr. Zalkin, and a -- what is currently

6   depicted on Exhibit F is the number of lawsuits filed against

7   local councils, as opposed to the number of claims asserted in

8   our bankruptcy case.  And just to be clear, we only have a

9   record of those lawsuits to the extent that they have been

10  brought to our attention and are listed on the preliminary

11  injunction schedule.

12         So, if the request is that we add to Exhibit F, in

13  an appropriate place, the number of lawsuits against

14  particular councils, the debtors can add that.

15         THE COURT:  Okay.

16         MR. ZALKIN:  Is that based on what somebody is

17  telling you or is that based on some effort on the part of the

18  debtor to determine that?

19         MR. LINDER:  Mr. Zalkin, we make extensive efforts

20  to be comprehensive with our -- we have every interest in

21  ensuring that the preliminary injunction stays as many cases

22  against BSA related entities as possible.

23         MR. ZALKIN:  Okay.  Thank you I'm sorry.

24         THE COURT:  Okay.  Now my Exhibit F -- because I

25  just want to make sure I understand.  My Exhibit F is "Abuse

1  Claims List Composite."

2        MR. LINDER:  Well, what we can do, as an

3  alternative approach, Your Honor -- and that is expressed in

4  our view about which is the best approach -- we could add to

5  Exhibit C, as an alternative, the number of claims asserted

6  against a council and the number of lawsuits of which we have

7  a record against each council, if that would -- if that would

8  be a more logical approach.

9        THE COURT:  I'm not sure which place is best, but I

10  think -- oh, I see, it's behind that.  Okay.  I was looking at

11  the aggregate.  Yeah, I think either place works, so Exhibit

12  F, with the unique and timely filed claims.  Is that what

13  you're suggesting, and it would go as two columns there? Okay.

14  That makes sense.

15        MR. LINDER:  Correct, Your Honor.  We will make

16  modifications to that --

17        THE COURT:  Okay.

18        MR. LINDER:  -- schedule -- that exhibit, rather.

19        The next point that Mr. Schiavoni addressed really

20  was pertaining to insurance coverage disputes --

21        THE COURT:  Uh-huh.

22        MR. LINDER:  -- and perhaps how they related to

23  whether or not a local council -- proposed local council

24  contribution is or is not substantial under the applicable

25  factors of the Master Mortgage test.

1    With respect to -- with respect to retained limits

2    and deductibles under insurance policies, I would only note

3    that the debtors have worked with counsel to certain insurers,

4    including Liberty, Great American, Zurich.  Not all of those

5    insurers maybe agreed on the language, with Liberty and Great

6    American, I don't think they've agreed with Zurich to include

7    in the disclosure statement information with respect to

8    retained limits and deductibles and the scope of the parties'

9    disagreement with respect to how those provisions operate.

10    Those disclosures are made between Pages 55 and 65

11    of the disclosure statement, if you're looking at the redline.

12    So it's -- if we're inclined to turn there, I believe it's on

13    Page 58, there's a new blue paragraph of added text at the

14    bottom of Page 58, and there may be other language in this

15    section.

16    I wasn't expecting to address this issue at this

17    juncture.  But suffice it to say, Your Honor, if there is

18    language that Century would like to add that accurately

19    reflects its position with respect to retained limits,

20    deductibles, or frankly, any other aspect of the debtors' or

21    the local councils' insurance programs, we would invite

22    Century to share the language with us, and we will consider

23    it.

24    MR. SCHIAVONI:  Your Honor, there is no dispute

25    that the policies have retained limits and deductibles, that's

1  a fact.  There is no dispute that the local councils are non-

2  debtors and that we're non-debtors.  It's like what the fact

3  is that would inform voters is to know the dollar amount of

4  the claims that fall in those deductible because, as is

5  readily apparent, and with at least some of them you would see

6  is that, to the extent it's a million-dollar retained limit or

7  deductible, however you characterize it, it's like most of

8  them aren't even making a single un-aggregated contribution

9  towards that obligation.

10        And that obligation is one -- that's a contractual

11  obligation owed from one non-debtor to another that we're --

12  it's like we're being completely -- not only are we believe

13  relieved of our ability to look to them to pay those amounts,

14  but they, in turn, turned around and they settled on that

15  basis.  Okay?  And then, after they capped their liability

16  that their total obligation was going to be 600,000 bucks or

17  something, under a million, they turned around and signed a

18  TDP that explodes the claims, you know, way up into different

19  numbers.

20        It's in no way proportional, what the TDP ended up

21  with, to what the claimants and the local councils, in a,

22  quote, "arm's length negotiation" negotiated was the value of

23  their contribution.  So it goes directly to the reasonableness

24  of the TDP and it goes to assessing the reasonableness of

25  their contribution, if the TDP is correct.

1          The two things can't live in the same world.

2          THE COURT:  So I --

3          MR. SCHIAVONI:  They can't -- yeah.

4          THE COURT:  Well, I understand.  This is a

5    variation of what Mr. Stang was saying earlier.  So I

6    understand that issue.  And I will say that I, quite frankly,

7    heavily notated the section of the disclosure statement

8    dealing with the insurance issues.  And I haven't wrapped my

9    head completely around the SIR and retained limits issues.

10          But am I right that there's a dispute between the

11   debtors and the insurance companies as to how they can be

12   appropriately treated in a plan?  And that's an issue I will

13   have to grapple with, if, in fact, there's not a resolution

14   with the insurance companies on that issue.  Am I correct on

15   that?

16          MR. LINDER:  Your Honor --

17          MR. SCHIAVONI:  So, Your Honor --

18          MR. LINDER:  -- You're correct --

19          MR. SCHIAVONI:  I --

20          MR. LINDER:  -- on that, Your Honor.  And I would

21   just also note that we have a risk factor on Page 279 of the

22   redline that pertains specifically to obligations to pay

23   deductibles and self-insured retentions under certain of the

24   insurance policies.  Those span both BSA and local council

25   insurance policies.  So, in terms of disclosure, Your Honor,

1  we've done it.

2          We agree with Your Honor, as well, that this is

3  legal argument that Mr. Schiavoni is making that is properly

4  heard at confirmation.  I question whether there's additional

5  information that could allow a hypothetical investor to make

6  an informed decision about this admittedly complex issue.

7          I see that Ms. Quinn, whose insurance coverage

8  counsel for the future claimants representative, has her hand

9  raised, and I think we should hear from her, as well --

10          MR. SCHIAVONI:  But --

11          MR. LINDER:  -- because we're --

12          MR. SCHIAVONI:  But Your Honor --

13          MR. LINDER:  -- (indiscernible)

14          MR. SCHIAVONI:  -- let me just make the basic point

15  that there is -- they're going to contend that there's a legal

16  issue about how to apply it in bankruptcy.  But there isn't a

17  legal issue about the fact that they exist and that pre --

18  without a bankruptcy, what the obligation would be.

19          It's quite clear that the local councils, outside

20  of bankruptcy -- and that was the choice they faced when they

21  were in the negotiations.  They faced paying those

22  deductibles.  Those are being taken away from us, and the

23  legal implications of that will flow, and we'll address that

24  at confirmation.

25          But as far as assessing their -- the nature of

 1 their contribution, whether it's substantial or not, you would

 2 measure it against what they'd otherwise be obligated for

 3 outside of bankruptcy here.  And that is something that having

 4 those facts, both the claimants need those facts and we need

 5 those facts.  And those facts are extremely informative about

 6 things that we think go to the core of what's wrong with the

 7 plan.

 8            THE COURT:  Well, it sounds like --

 9            MR. SCHIAVONI:  And --

10            THE COURT:  -- you know those facts.  So I'm trying

11 to figure out what it is, from a disclosure statement point of

12 view, that you need.

13            MR. SCHIAVONI:  Okay.

14            MR. PLEVIN:  Your Honor, Mark Plevin for the Zurich

15 insurers.

16            We filed a disclosure statement objection that was

17 specifically limited to the SIR issues.  I am prepared to

18 discuss those now or later.  I understand from Mr. Linder's

19 chart with the disclosure statement that its number fifteen

20 out of the issues that he wanted to discuss.  So I am prepared

21 to wait if that is the order of the day.

22            The reality, from our perspective, is that there

23 should not be a dispute.  The law is clear, the policies are

24 clear, if there is a dispute it's a manufactured dispute and

25 it is misleading to tell claimants that there is a dispute

1  because there really isn't one.  We sited case law and policy

2  language in our objection, and I will be prepared to talk

3  about that later or now if you would prefer.

4        THE COURT:  I'm not prepared to talk about that

5  now, but I do recall the filing and I did read it at one point

6  which alerted me to this issue.  It's an issue that I haven't

7  dealt with before.

8        For disclosure statement purposes I think the

9  question is what do parties need to know.  The insurance

10  companies clearly have their position and I think need no

11  further information on that.  You are prepared to argue the

12  issues, but I guess what I am trying to figure out, and I'm

13  not convinced so far, is that there is a necessary change to

14  the schedules of the local councils to address this issue; the

15  schedules being the claim information we have and the

16  contributions each is making.  That is where I'm not seeing an

17  informational gap there.

18        I hear the issue.  I think what we should do with

19  that is that if there is any additional language that, Mr.

20  Schiavoni, your clients need to be put into this section --

21  let me say this, I'm going to hear the SIR issue later which

22  is, looking at where we are today, we're not getting to issue

23  fifteen.  So I will have a chance to go back and look at that

24  filing before we hit issue fifteen.  I will see what I think

25  needs to be addressed there.

1        If there needs to be some cross reference from the

2    schedule we were looking at to the discussion of the insurance

3    issues, you know, maybe we can do that so that people

4    recognize that they may be intertwined for purposes of doing

5    this analysis.  But what is going to be necessary to prove

6    with respect to substantial contribution is kind of an

7    interesting question to.

8        MR. SCHIAVONI:  Your Honor, so we will address this

9    later, but just one very quick point so we don't forget, and

10   we can take it up later, is that, you know, I understand the

11   issue conceptually, I don't have the ability, really, to run

12   how -- you know, like the debtor is saying that they have come

13   up with these valuations and they have these numbers.  They

14   have the ability to sort them into the individual councils.  I

15   don't necessarily have that same ability.  So that is

16   something I can't do and I think that is informative.

17       I also think, Your Honor -- again, we can take this

18   up later, but there is something about numbers that all things

19   about these numbers are important in context.  You know, in

20   assessing the substantial nature of the contribution the

21   context is important in assessing how these TDP's came up the

22   context is important.  Seeing how the claims against each of

23   these entities lay-up against the actual, you know,

24   contribution and then what would fall into the SIR or

25   deductible, whatever you want to call it.  There is a

1  difference, by the way, but whatever you put what it is it

2  would give significant context to what has happened here.  It

3  would allow everyone to make a more informed decision.

4          THE COURT:  I am not sure that an individual

5  survivor is going to get that nuance.  That is what I am

6  trying to figure out.  What goes into here that is helpful

7  information and what is going to be the subject of objection

8  and further discovery and confirmation.

9          So I am really thinking of the information that is

10 going to be helpful to an individual abuse survivor and what

11 we have added is number of claims, number of lawsuits.  I

12 think that is information that will be helpful.  And I think,

13 quite frankly, it's going to make the point that you want made

14 anyway because the SIR's are just additive to that.

15         MR. SCHIAVONI:  Your Honor, I had another separate

16 point on this not involving SIR's, but involving, I think,

17 this topic, this topic that is up for discussion.  I am not

18 sure how you are doing things here.  Are you hearing others on

19 -- I don't know if Mr. Stang is common in SIR's, in which case

20 I will stand down, but, otherwise, I would move to the next

21 topic.

22         THE COURT:  Yeah, we're done with SIR's for now.

23 We're going to hit it on topic fifteen.

24         MR. SCHIAVONI:  Your Honor, my other point here was

25 just on the local council contribution.  The disclosure

1  statement indicates that the contribution is, in fact,

2  conditioned upon and dependent upon an "acceptable" resolution

3  of the indemnity issues and insurance issues with respect to

4  the chartered organizations.  And it's not clear from the

5  disclosures whether the charters have a, in essence,

6  termination right and if they do when it is that -- when it is

7  exercisable.  Is it before solicitation, after?  And if they

8  do have a termination right what is it that is -- do they have

9  full discretion on what is an acceptable resolution.

10          All those issues remain unclear to me and I think

11  they're tied, frankly, to the amendment that was made adding

12  this, sort of, death trap partial assignment for the charters

13  the other day.  It's like the plan is, sort of, dependent upon

14  all those issues I think having clear specificity on them is

15  significant for everyone.

16          MR. LINDER:  Your Honor, in response to that point,

17  and to be clear, Mr. Schiavoni is referring to Exhibit B in

18  the disclosure statement.  Exhibit B is a form of the local

19  council letter of intent.  Each local council, each of the 251

20  local councils has executed a letter of intent expressing its

21  willingness to make the contribution that is set forth on

22  Exhibit C to the settlement trust upon the effective date.

23          One of the terms of the letter of intent is that it

24  is subject to certain principal conditions.  Certain of those

25  conditions are ministerial or governance related in nature.

1 Some of them are related to the local council satisfaction

2 with the scope of the channel injunction and releases.

3          Certain of the conditions are relating to the

4 aggregate amount of all local council contributions, but there

5 is Subsection C of the form of letter of intent states that

6 it's subject to acceptable resolution of insurance and

7 indemnity issues with respect to our chartered partners to be

8 negotiated including through the use of channeling injunction

9 and/or voluntary releases.

10          I hesitate, Your Honor, to speak for local

11 councils, but what I will say is they have a similar

12 perspective to the BSA on the topic of chartered

13 organizations.  Chartered organizations are the arms and legs,

14 and the lifeblood of scouting.  They are the organizations

15 that sponsor units, that actually carry out the Boy Scouts

16 charitable mission.

17          So it is critically important to local councils

18 that, indeed, as reflected on Exhibit B a condition to their

19 contribution that there be a satisfactory resolution of

20 chartered organization issues in connection with the plan.

21 What Mr. Schiavoni has suggested I think obscures the issue

22 that the local council determines that it wishes not to make a

23 contribution and does not want to receive the benefit of the

24 channeling injunction and releases it can simply decide that

25 it's not satisfied and it will not receive those benefits.

1          It's the BSA's express goal in these cases to

2   insure a global resolution of abuse claims in connection with

3   scouting, and that includes all local councils and that

4   includes as comprehensive a resolution as possible for

5   chartered organizations.

6          MR. SCHIAVONI:  Your Honor, all that begs the

7   question of is there -- what the request is to add the

8   disclosure to, one, do the locals, in fact, have a termination

9   right, you know, based upon the charter contribution; two, is

10  that entirely in their own discretion, there should be

11  disclosure on it; three, when is it exercisable.  If the

12  answer is its exercisable at any point short of the moment

13  before they make their payment fine, but it's just not clear

14  when it's exercisable by.  Four, I didn't even realize this, I

15  thought it was exercisable, you know, by them collectively.

16  It sounds like it may be exercisable by them individually.

17         We would just ask for disclosure on -- clear

18  disclosure, it's a critical issue, on those five points.

19         MR. LINDER:  Your Honor, on page 14 of the redline

20  of the disclosure statement there is a bullet that states as

21  follows,

22         "Each local councils' commitment to make its

23  respective contribution to the trust is dependent upon, among

24  other things, an acceptable resolution of insurance and

25  indemnity issues with respect to chartered organizations."

1            I don't know what more disclosure needs to be

2   added.  There is no temporal nature to this condition.  Again,

3   these are third-party non-debtors.  If they do not

4   participate, we very much hope they will, we believe they

5   will, but if they don't want to participate --

6            MR. SCHIAVONI:  I think if we could just add to

7   that that the exercise of that right is not temporally limited

8   and that it's in the discretion of the charters to determine

9   what they individually view as acceptable.  It's not an

10  adjudicated issue about whether it's acceptable or not.  It's

11  in their discretion.  If it's not, let's say so.  But it is

12  not clear to me that that was the -- it's just not clear to me

13  how that works, to be honest.  And we haven't been able to get

14  a clear answer about it up till now.

15           MR. CELENTINO:  Your Honor, this is Joe Celentino

16  with Wachtell Lipton on behalf of the ad hoc committee.  May I

17  be heard momentarily on this?

18           We would be happy to work with Mr. Schiavoni and

19  Mr. Linder on language that would resolve Mr. Schiavoni's

20  issue here.  I think the basic concept is not a terribly

21  difficult one and we can work on that language that will

22  satisfy the parties.

23           THE COURT:  I think that is appropriate because the

24  letters of intent are expressly non-binding.  I think it's

25  important for the parties to understand that a local council,

1  one or more, could determine not to contribute and that that

2  can happen even after confirmation, right, because -- well, I

3  don't know.  I guess that is a question, Mr. Schiavoni has

4  asked it, and I think it's an appropriate question.

5           I think people need to understand the nature of the

6  commitment.  And given that the plan anticipates chartered

7  organizations coming along down the line I don't know, since

8  this is a local council by local council decision that some

9  local council whose chartered organizations or substantial

10 chartered organizations might decide to opt-out or not opt-in

11 could affect someone.

12          So I think that is appropriate.  And I do think

13 that survivors would want to know that.  And I understand in

14 saying that if it's a little amorphous, but I think whatever

15 it is that needs to be spelled out.

16          MR. PATTERSON:  Your Honor, this is an objection

17 that we had also intended to raise and we would like to be

18 included with my colleague from Wachtell Lipton and Mr. Linder

19 with regard to the language.  I think it would also be

20 appropriate to disclose, if it's the case, and I understand it

21 to be based on what Mr. Linder said, that in the event one or

22 more local councils opt-out the plan is, nevertheless,

23 confirmable and the debtor intends to confirm it

24 notwithstanding the failure of some local councils to

25 participate.

1          THE COURT:  They are subject of discussion.

2          Mr. Rosenthal?

3          MR. ROSENTHAL:  Yes.  Thank you, Your Honor.

4 First, Michael Rosenthal of Gibson Dunn on behalf of the AIG

5 Companies.

6          Your Honor, we have broader disclosure statement

7 objections as to generally whether the DS should be approved,

8 but we are going to reserve those for the end.

9          I do want to jump in here because this is a point I

10 wanted to make.  First, I commend Mr. Linder.  This 115 page

11 summary is incredible.  I'm sure he probably did it last

12 night, but the issue of what happens if chartered

13 organizations -- an acceptable arrangement can't be reached

14 with chartered organizations is also tied to the issue of what

15 happens with local councils.

16          The disclosure now is that if the entire $600

17 million is not contributed then no local council gets a

18 release, that is one disclosure. What is not disclosed, and I

19 just would ask Mr. Linder to -- maybe it is in there, maybe I

20 have missed it.

21          If there is no local council release, that is the

22 local councils don't participate, does the plan fail?  Is the

23 local council contribution a condition precedent to the plan?

24 Similarly, if one or more local councils don't contribute can

25 other local councils fill the gap and, effectively, preserve

1  the releases for everyone?  Finally, you know, that local

2  council that doesn't contribute does it get the benefit of the

3  release and channeling order in any event if the full $600

4  million is raised from other parties?

5       I mean these are all questions that I think

6  somebody would want to know.  They are interrelated,

7  obviously, to the questions related to the chartered

8  organizations.

9       THE COURT:  Well at least some of that would appear

10 to be some risk factor issues where I would think it would be.

11      MR. ROSENTHAL:  We're happy to work with White &

12 Case to review that language and see if we can get some

13 answers and clarify some of the language.

14      MR. LINDER:  Your Honor, there are a lot of risk

15 factors so I appreciate the parties patience in bearing with

16 us as we navigate them, but I believe on page 274 of the

17 redline we have a risk factor that relates to participation by

18 local councils.  I am happy to read it.  I believe it covers

19 the risk that local councils do not make the contributions set

20 forth in the letter of intent or that the level of

21 contributions do not pass muster at confirmation, and the

22 ramifications that that may have vis-à-vis confirmation of the

23 plan.

24      I will reiterate, Your Honor, to respond to Mr.

25 Rosenthal's point that the debtors do not view this as a

1 piecemeal issue.  The debtors view the $600 million as a

2 unitary settlement for all local councils.  We intend for all

3 local councils to emerge from this case with the protections

4 of the channeling injunction.

5          THE COURT:  I do see the paragraph you are

6 referring to, Paragraph 14, in the risk assessment section.  I

7 would ask the parties to look at that and make any further

8 disclosures here or elsewhere with respect to this issue, but

9 I think it's a valid area of disclosure and, quite frankly,

10 somewhat central to, as I understand, how the plan works.

11          So let's make sure that everyone understands, in

12 fact, the contributions being made and what happens if, in

13 fact, one or more local council determines not to participate.

14          MR. BUCHBINDER:  Your Honor, may I be heard?

15          THE COURT:  Mr. Buchbinder?

16          MR. BUCHBINDER:  Thank you, Your Honor.

17          I've had my hand up for so long and it is relevant

18 to this issue, and I have a very simple suggestion that is in

19 line with the comments I made earlier this morning.

20          Mr. Mason indicated, in his comments earlier, that

21 some councils have actually signed letters of intent.  If that

22 is the case why don't we add a column or why don't we color

23 code the exhibit list to indicate which councils have, in

24 fact, submitted a letter as of the present time and that will,

25 I think, answer a number of the questions we have been

1  discussing for the last 20 or 30 minutes, or help to answer

2  them.

3          I think the inclusion of the risk factor in the

4  disclosure statement is helpful and I think the rest of the

5  questions are answered because they go to the feasibility of

6  the plan at the confirmation hearing.  I think adding some

7  reference to has already signed a letter of intent might be

8  very helpful.

9          That is my comment.  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. LINDER:  Your Honor, I can represent to the

12  court that our understanding is that 100 percent of local

13  councils have executed the letter of intent.  And,

14  accordingly, each local council listed on Exhibit C to the

15  disclosure statement has dollar amounts next to its name that

16  it has committed through those letters of intent to contribute

17  to the trust.

18          MR. BUCHBINDER:  Why don't you add language to the

19  --

20          MR. CELENTINO:  We'd be happy to add a footnote to

21  that effect.

22          MR. BUCHBINDER:  Make it explicit and I think that

23  would resolve that question.

24          MR. LINDER:  We're happy to do that.

25          THE COURT:  Okay.  Thank you.

1          Anyone else who wasn't included on this issue that

2   feels they should be in the discussion please contact Mr.

3   Linder or Mr. Celentino.

4          Next?

5          MR. LINDER:  The next issue, Your Honor, this is a

6   subsection of issue two and that is with respect to

7   contributing chartered organizations.  That is a group of

8   chartered organizations that will receive the full benefit of

9   the channeling injunction and releases against all abuse

10  claims.  Currently there is exactly one contributing chartered

11  organization and that is TCJC, via its $250 million cash

12  contribution.  Ms. Lauria already previewed that previously.

13  And we can certainly get into TCJC at the end of our

14  proceeding through the reply chart as we discussed.

15         In terms of disclosure, Your Honor, with respect to

16  chartered organizations and then becoming a contributing

17  chartered organization we described that process and the other

18  possibilities for chartered organizations in the plan redline

19  at page 14.  We added, as well, disclosures surrounding how a

20  chartered organization may also become a contributing

21  chartered organization after the effective date.  We proposed

22  specific procedures with respect to that process as well.

23         A lot of the objections, and I think these are

24  largely stale objections, to the third amended plan perhaps

25  before we made this there is no, you know, rubric for becoming

1   a contributing chartered organization, that the TCJC

2   negotiations occurred in mediation among mediation parties and

3   through those negotiations those also produced a term sheet.

4   So we think we have included sufficient disclosure, but, of

5   course, if any parties have suggestions for how we can improve

6   that disclosure we are more than happy to consider it.

7              MR. SCHIAVONI:  Judge, there is -- I mean to be

8   clear, LDS or TCJC, whatever it is called, the Church of

9   Latter Day Saints it's a former chartered organization.  There

10  is no chartered organization that has achieved protective

11  party status.  There is no disclosure anywhere in the

12  disclosure statement that explains in any way how the Boy

13  Scouts would continue their obligation to assist in the

14  defense of the charters post-petition as their pursued, the

15  5,000 of them or, for that matter, how these elements of --

16  there is no -- when you hear there is no rubric on how to

17  resolve them they're to independently negotiate any notion

18  that there is a like a negotiation going on for 5,000 charters

19  is completely fantasy.

20             There is no disclosure whatsoever on how they are

21  supposed to be defended and the level of cooperation they're

22  supposed to get from Boy Scouts post-petition in connection

23  with that defense.  You know, including the protection of

24  privileged information which is the subject of disclosure

25  statement objections by the charters.

1          THE COURT:  Okay.  Well I am not sure with respect

2   to that objection -- I don't know.  Mr. Linder, do you have a

3   response to that?

4          MR. LINDER:  Not really, Your Honor.  It was a

5   little difficult to follow exactly what Mr. Schiavoni is

6   proposing that we do.  I think the best way to understand it

7   is what will the relationship be between the chartered

8   organizations that are continuing with the BSA post-petition

9   in relation to abuse claims.  You know, I think there will

10  certainly continue to be support from the BSA of chartered

11  organizations post-emergence in all respects.

12         So I don't -- with respect to the document

13  agreement I think is what Mr. Schiavoni was referring to in

14  terms of the treatment of privileged information that

15  agreement will control what is transferred to the trust and

16  the privileges to which the settlement trustee will exceed on

17  the effective date. That is a document that will be filed with

18  the plan supplement.  That is made clear within the disclosure

19  statement.

20         MR. SCHIAVONI:  Judge, you see the problem, as we

21  just went through it, it's the local council contribution is

22  the biggest thing the Boy Scouts are putting forward.  It's

23  conditioned on an open ended discretionary assessment by them

24  about whether the charters have been adequately treated.  You

25  have heard from Mr. Linder that they are essential to the

1  continued feasibility of the debtor.  You have heard from Mr.

2  Linder that there is no protocol for resolving the 5,000 local

3  councils.  We've heard that there is not a single one of them,

4  the actual charters, has achieved that status.

5          I can't tell you, I guess, what's happened in

6  mediation, but there are not 5,000 entities on a mediation

7  list being mediated.  We've got the debtor's schedule in front

8  of you showing you how close confirmation is that they want to

9  put forward.  Then we've got an absolute devoid of any

10  disclosure in the disclosure statement about what is supposed

11  to happen to 4,900 and probably 50 local councils as they go

12  into litigation post-confirmation.

13          What privileged information is going to be turned

14  over by the estate to the claimants and then used in lawsuits

15  against them, how they are going to cooperate in providing

16  theme with -- how the reorganized debtor would cooperate in

17  providing them witnesses and assistance in defending those

18  suits.  There is a complete void of any disclosure on that at

19  all.

20          MR. LINDER:  Your Honor, we reject the assertion

21  that there is a void.  Keep in mind, please, that we are

22  talking about contributing chartered organizations.  Because

23  it's virtually impossible to have thousands of chartered

24  organizations participate in the mediation we have crafted,

25  together with the other parties in the mediation, a proposal.

1  It's the participating chartered organization proposal that

2  would, in exchange for chartered organization insurance rights

3  under the BSA's and local councils insurance policies issued

4  from 1976 to the petition date, in exchange for the

5  contribution of those insurance rights all of those chartered

6  organizations would receive full and complete releases, and

7  the benefit of the channeling injunction to the extent a claim

8  that arose during the period for which they had rights under

9  that shared insurance program.

10         That is the way we are going to address what I

11  expect will be virtually all of the chartered organizations

12  say for, potentially, the largest chartered organizations.  By

13  the way, those chartered organizations are listed on a

14  schedule, they're listed on Exhibit F, I think toward the back

15  of Exhibit F.  In terms of a mechanism to address chartered

16  organizations that proposal, which we believe has tremendous

17  value, is how we're going to implement that.

18         MR. SCHIAVONI:  Judge, it's totally critical to

19  understand this. It's like what you just heard was they're not

20  granted protected party status.  They are being granted only

21  protection post '76, not pre '76.  They will all go into the

22  tort system from pre '76.  Every one of the 5,000 will go in.

23  That is how things are postured right now.

24         Why is the post '76 protection being put in place?

25  It's not because of "shared" insurance, many of those are the

1  ones with SIR's.  It's because there is a contractual

2  obligation with the local councils and with the debtors, the

3  non-debtor local councils to provide a contractual indemnity.

4  That is what is set out in the LDS proof of claim.  It is what

5  was set out in the charters objections to the disclosure

6  statement that the debtor is getting themselves -- the non-

7  debtor local councils are getting themselves out of a

8  contractual obligation to indemnify those folks by, basically,

9  giving them, you know, a pass for post '76, but throwing them

10 into the tort system for everything pre '76.

11          It's not clear this spotty insurance that they have

12 there, many years not being insured and the years that here is

13 its combined single limits on the policies.  It's a complete

14 disaster and there is no disclosure of that.  There is no

15 disclosure of how that is going to -- it's actually almost

16 deceptive how it's been presented right now.  You've heard it

17 that we have a "solution" for the charters that we have

18 resolved the problem.  What they have resolved is the

19 contractual indemnity claim against a non-debtor, okay, and

20 for that you have seen what the non-debtors have paid; under a

21 million bucks a piece.

22          MR. LINDER:  Your Honor, we are now very far afield

23 form the disclosure statement.  Mr. Schiavoni let's recall

24 represents Century Indemnity Company.  He does not represent

25 chartered organizations.  He is doing a lot of advocacy on

1  their behalf. So I would respectfully suggest that we move on

2  to the next objection.

3          MR. SCHIAVONI:  Your Honor --

4          THE COURT:  I was going to call on Mr. Ryan.

5          MR. RYAN:  Thank you, Your Honor.  You know, as Mr.

6  Mason said, we've sent over some high level comments earlier.

7  We do think the disclosure statement has a tremendous amount

8  of work to do globally with all of the changes that have

9  occurred in the last week to explain to chartered

10 organizations what is going on, how the rights are impacted

11 under the various avenues of the plan.

12         If they go to a contributing chartered

13 organization, if they are participating or limited

14 participation, and it's not a full and complete release post

15 1976, Your Honor.  The debtor should be candid with you on

16 that.  The right to assert claims against chartered

17 organizations and their own insurance post 1976 which is one

18 of the disclosures that needs to be made.

19         However, in being productive and also with the

20 comments that you made this morning, Your Honor, we have given

21 a high list of initial issues that we think need to be

22 addressed so that all chartered organizations can understand

23 in plain English what is going on.  And to be clear, for

24 context, Your Honor, while there are 84,000 survivors they all

25 have counsel.  You've got thousands and thousands of chartered

1  organizations who are going to get 1,000 pages dumped on their

2  doorstep who don't have counsel.

3          So my clients are critically concerned that all

4  chartered organizations get something that clearly explains

5  how their rights are going to be effected.  Now right now one

6  of the most important problems is all chartered organizations

7  are not scheduled to get anything.  Only those who filed

8  proofs of claims under the debtor's solicitation procedures

9  are scheduled to receive information.

10          So you have thousands of organizations whose rights

11  are being effected who under the solicitation procedures order

12  that was filed last week aren't getting any notice, aren't

13  getting any disclosure and aren't getting any ability to opt-

14  out as we have been able to see from this solicitation

15  procedures order.

16          All that being put aside we have given comments and

17  we would like to be able to work through those offline without

18  300 people having to endure all of that.  Mr. Schiavoni's

19  comments also concerns we have about the impact of insurance

20  rights and the impact of what happens if you do elect limited

21  partner participation as a charter.

22          What Your Honor said at the beginning is let's see

23  what is out there from the prior disclosure statement

24  objections and at the end of this hearing, because it's going

25  to be a multi-day hearing, I think we're all resigned to that,

1  let's get into what has been put into the fifth amended plan.

2  What I would ask for is to not have to belabor the record on

3  all of these issues.  Let us, as the Catholic and Methodist

4  charting organizations, work with these proposing parties to

5  see how much progress we can make behind the scenes and then

6  let's come back at the end and see what's still open because

7  we're on issue 2B right now, Your Honor.

8           We would like to be productive.  We would like to

9  get a disclosure statement out.  And as the coalition put out

10  for the survivors, we think really what people need, if you're

11  a charter and you're some volunteer who gets home from work

12  and (indiscernible), is they need something that is short and

13  in plain English that accurately and honestly tells them this

14  is what is going on, these are your options, these are the

15  consequences; not 1,000 pages.

16           So we would like to work with the debtors and the

17  other proponents towards that goal.

18           THE COURT:  I think that makes sense.  I will say

19  that there are questions that had been raised about the

20  treatment -- about the chartered organization mechanism that I

21  did have questions about after reading the disclosure

22  statements.  So I think that should be the subject of

23  discussion.  That does include what was the magic of year 1976

24  since it didn't seem to track any of the insurance program.

25           So I think that is all -- that should all be

1   addressed.  And those parties that want to be involved in that

2   that really need to be involved in that should contact whoever

3   from the debtor is going to spearhead that discussion with Mr.

4   Ryan.  And I also agree that a plain English description of

5   the mechanism should be drafted because I do think it will be

6   difficult for the volunteer organizations who are not

7   represented to comprehend the 300 pages and focus in on

8   exactly what is happening to them.

9           MR. STANG:  Your Honor, on behalf of the TCC, we

10  had two or three observations about this chartered

11  organization protocol or program.

12          The first one is, the disclosure statement should

13  explain what the debtors' views are regarding the claims

14  against the chartered organizations.  There are literally tens

15  of thousands of claims that did not identify chartered

16  organizations.

17          And so, when the debtor has a chart that says there

18  are this number of claims against the Methodists, against the

19  Catholics, I think that's a little deceptive, because,

20  frankly, there's no such thing as a claim against the Catholic

21  Church.  You have a claims against Dioceses.  You have claims

22  against Parishes.  And they are different and distinct, and I

23  probably know that better than anyone on this call, but there

24  are literally thousands and thousands of claims that are not

25  being evaluated in connection with this release and the debtor

1  should explain what it did to evaluate the claims that are now

2  being given, you know, essentially, a release only for the

3  assignment of insurance for the post-January 1, '76 period.

4          The second thing that the disclosure statement

5  should address is the fact that there are several years, at

6  least '76 and '77, when BSA sold back its insurance policies,

7  and there may be no insurance to cover the claims that would

8  otherwise, you know, be protected *vis-a-vis*, the chartered

9  organization defendants.

10          How many claims fall in those years?  What is the

11 effect?

12          Because if the brass ring here is, we get to get to

13 the insurance, well, you don't have insurance for some of

14 these years and the Boy Scouts need to explain what the impact

15 of that is, given their analysis of the claims, *vis-a-vis*, the

16 charters.

17          And somewhat connected to that is, what is the

18 effect of dilution on the recoveries of survivors?

19          I mean the chartered organizations are not putting

20 anything in, other than their insurance rates.  That's part of

21 the evaluation of the business judgment of the debtor, I

22 guess, as to why it's doing this for solely an insurance

23 assignment but magnifying that is the fact that there were

24 some years where there was no insurance at all.  So, those are

25 things that the disclosure statement should be addressing.

1              And I am more than happy to participate in the

2    process that you were talking about, but I didn't want to let

3    those issues go uncommented.

4              MR. LINDER:  Your Honor, with respect to the

5    analysis of claims in terms of how many claims relate to, you

6    know, X, Y, Z chartered organization, that is work that the

7    debtors, with the assistance of their advisors, have done,

8    and, in particular, Bates White, and we can certainly propose

9    additional disclosures on that point.

10             MR. PATTERSON:  In that regard, the disclosure

11   statement provides that Bates White estimated the liability at

12   2.4 to $7.1 billion.

13             Is that the debtors' liability or is that the

14   liability of, also, the local councils and the chartered

15   organizations?

16             And I'm not asking you, Mr. Linder; I'm asking that

17   the debtor disclose the answer to that question.

18             MR. LINDER:  And here I'm looking, Mr. Patterson,

19   at page 86 of the redline --

20             MR. PATTERSON:  Yes.

21             MR. LINDER:  -- and I don't think it's ambiguous

22   that Bates White estimates the value of these claims is within

23   that range.

24             The range, to the extent that it is unclear, we can

25   specify that it is the aggregate value estimated value of the

1  claims; it's not a portion of the parties, against which those

2  claims are asserted.

3              MR. PATTERSON:  As against all defendants.

4              MR. LINDER:  Correct.

5              MR. PATTERSON:  Okay.

6              MR. LINDER:  We can make that clear, to the extent

7  that it's not.

8              MR. PATTERSON:  Thank you.

9              MR. ROSENTHAL:  Your Honor, Michael Rosenthal,

10 again.

11             Matt, is that right, because it's only been -- it's

12 only a claims estimation by Bates White based on the claims

13 that were filed by the bar date.  So, doesn't that only relate

14 to the debtors' claims and not local councils' claims, which

15 weren't subject to the bar date or chartered organizations'

16 claims?

17             MR. LINDER:  It is a valuation of the abuse claims.

18 Those would include -- I'm trying to think of the difference

19 between the populations you're describing,

20 Mr. Rosenthal.

21             When we use the term "abuse claims," we're thinking

22 about maybe 2,200 proofs of claim, non-duplicative proofs of

23 claim, the value of those claims against, you know, Scouting

24 and related claims that are represented by those proofs of

25 claim, you know, as well as future claims, which are subsumed

1  within the definition of "abuse claims."

2        MR. ROSENTHAL:  But only against BSA and filed by

3  the bar date, and so we don't have -- I think Mr. Patterson

4  was asking, is that an aggregate value for all claims that

5  might include local councils and chartered organizations, and

6  I'm not sure that's right, because there was no bar date for

7  filing of claims against them.

8        If you assume they overlap 100 percent, I can see

9  that, but I'm not sure they do.

10       THE COURT:  Okay.  Well, that's a discussion that

11  should happen offline and the appropriate, the correct

12  characterization of the Bates White's valuation should be

13  reflected.

14       MR. LINDER:  Understood, Your Honor.

15       The bar date notice was clear that if someone -- if

16  there was a claim that was asserted against BSA and a

17  chartered organization or BSA and a local council, that claim

18  was required to be asserted in the case by the bar date.

19       So, it is a comprehensive valuation of Scouting and

20  abuse-related claims.  We will certainly make it clearer in

21  the description of the valuation.

22       THE COURT:  Okay.  Next?

23       MR. LINDER:  Thank you, Your Honor.

24       The next topic, subtopic within the third-party

25  contributions is the settling of insurance companies.

1    Currently, there is one settling insurance company and that's

2    Hartford.  Ms. Luria outlined, in broad strokes, the terms of

3    that agreement, and, again, we'll get to that at the end of

4    the reply chart.

5            We addressed that, we addressed the process by

6    which a settling insurance company can become -- an insurance

7    company can become a settling insurance company and, in turn,

8    an affected party under the plan.

9            And we also address -- and that's on page, I

10   believe, 14, similar to chartered, contributing chartered

11   organizations does.  Again, there's more of a rubric, given

12   that there are specific years that insurance companies issued

13   policies in, so there's a little bit -- there's a better

14   ability to allocate claims to policy and, in turn, to

15   insurers.

16           And there's also a discussion, and one of the new

17   provisions in the plan is being clear about how an insurance

18   company can become a settling insurance company, even after

19   the effective date by negotiating an agreement with the

20   settlement trustee, which is subject to a Court-approval

21   process, within the first 12 months, following the effective

22   date, subject to an extension of that initial settlement

23   period.

24           THE COURT:  Any outstanding objections to that

25   discussion?

1          MR. PATTERSON:  Your Honor, not to that, but I want

2   to apologize, because I didn't realize when we moved that we

3   were moving off of chartered organizations and the local

4   councils, and I wanted to invite Mr. Zalkin to make some

5   remarks regarding that liability, which I think is important

6   for the parties to appreciate.  It bears directly on

7   disclosure.

8          THE COURT:  Okay.  I saw him.  Mr. Zalkin?

9          (Pause)

10          MR. ZALKIN:  Thank you, Your Honor.

11          I know this has been a long day; quite frankly, I

12   don't know how you all do this.  I've spent a long day in

13   trial and I'm more exhausted just in these few hours than I am

14   in a normal trial day.

15          But I thought, and Mr. Patterson and I thought it

16   might be helpful for you, and maybe others, to just talk very

17   quickly about context.  And I wanted to use an example of a

18   case involving the Orange County Council in California and

19   just how, when you roll this out, these questions get raised

20   or will be raised or have been raised by our clients, and our

21   difficulty in answering these questions, based on the

22   disclosure statements.

23          What I'm going to use as an example of a case where

24   the liability is primarily, if not entirely, against the local

25   council.  There is, in California, potentially, you might have

1    a razor-thin argument against the BSA and you probably have no

2    case against the chartered organization, under the facts that

3    I'm about to go through.

4              In 1977, Drew was 14 years old.  He was a member of

5    a Mormon unit that was a troop that was within the

6    jurisdiction of the Orange County Council.

7              The Orange County Council owns a wilderness camp;

8    it's called "Lost Valley."  It's a facility that is used by

9    troops within that council, sometimes troops outside of the

10   council.  They go there for summer programs.  They go there

11   for school breaks.

12             The facility has a full-time staff, one of whom is

13   a ranger who lives on the premise; he has a private residence

14   on the premises.  There's no alcohol allowed anywhere, but in

15   his private residence.

16             There are senior counselors that attend and that

17   work there, paid for by the council, who are over the age

18   of 18.  There are junior counselors, who are minors, aged 14

19   and 15, generally.  And there are volunteers, default

20   volunteers who will come up and work around the facility doing

21   maintenance and so on; they're usually former scouts

22   themselves.

23             Joe is one of those volunteers.  Joe is a likable

24   guy.  He makes friends with most of the kids and the

25   counselors.  Everybody seems to like Joe.

1          Drew, on one weekend, unbeknownst to his own unit

2    or his own troop, decided with his friend, to take another

3    troop member to go up on a weekend and do some volunteer work.

4    That was encouraged by the Council and by the troops.

5          He arranges or it is arranged for him that Joe will

6    come and pick him up and his friend to take them up to the

7    camp, because he's too young to drive; he's 14 years old.  And

8    Joe comes and picks him up.  He goes to pick up the friend.

9    The friend is in some kind of trouble from school and his

10   parents say, No, you can't go up.

11         So, Drew goes up along with Joe, and along the way,

12   Joe had already proposed that they go on a little camping

13   adventure before they -- this is on a Friday -- so they spend

14   the night, Friday night out in the woods, and then go out to

15   the camp over on Saturday morning.  They go up on Friday

16   night.  They stop at this remote kind of, camp facility on the

17   way.

18         Joe had brought a bunch of liquor, beer with him,

19   and he gets Drew drunk.  They go into the tent.  Drew starts

20   to fall asleep or is asleep.  He is awakened with Joe

21   performing oral -- or orally copulating.

22         He scared to death.  Joe is a big guy.  He doesn't

23   know what to do.  He freezes.  He's shaken.  He's scared.  And

24   he pretends to just be an I sleep through the whole thing.

25         The next morning, it's very awkward.  They get in

1 Joe's truck.  They go to the camp.  He gets out of the truck.

2 There's a counselor at the camp who sees him; he sees there's

3 something amiss with him.  He approaches Drew and says, What's

4 wrong, Drew?

5         And Drew proceeds to tell him everything that

6 happened.  Now, this counselor knew about Joe, because this

7 counselor, himself, had an experience with Joe on a camping

8 trip where Joe -- the same thing happened; although the

9 counselor was an adult, they got to drinking too much, they

10 were sharing a tent, and Joe attempted to assault him in the

11 tent, but he resisted that assault, but he never reported it

12 to anybody.

13         And he was also aware that Joe had been alone at

14 the ranger's residence with other junior counselors, and

15 senior counselors drinking.  This was something that would

16 happen frequently at the ranger's cabin and there were two

17 incidents where these (audio interference).

18         Joe took them into a private bedroom -- took one of

19 them at different times -- into a private bedroom.  There were

20 two bedrooms in the home, and assaulted them, sexually

21 assaulted them in the bedroom.

22         The counselor who he had assaulted, the adult

23 counselor was present on one of these occasions.  He was

24 suspicious as to why Joe was in that room for so long.  It was

25 against the rules under the Boy Scout policies, where they

1  have a two-deep policy, where they can't be one-on-one with an

2  adult; a minor can't be.

3         So, he knocks on the door.  The guy tells him --

4  Joe tells him, oh, I'm just getting to sleep.  I'll be out in

5  a minute.

6         The end result of this is they do report it to the

7  police, ultimately, but the council is told what happened and

8  it is reported to the police.  Joe is arrested and he's

9  criminally, I think he takes a plea.

10         Under the facts of this case, my best case is

11  against the local council.  I don't have, really, a claim

12  against the chartered organization, because nobody knew what

13  was going on.

14         The Boy Scouts, well, maybe I have a case in

15  California that, under some agency theory, possibly; possibly

16  not.  But if I do, it's thin.

17         Maybe I have a claim against the Boy Scouts for

18  some -- for the problems that they had with their policies and

19  lack of training and education to scouts that should be

20  provided under the policies.  Maybe I've got a claim under

21  there, but I really don't need the Boy Scouts, because the

22  Orange County Council has substantial assets.  They've got in

23  the neighborhood of, I think $44 million in assets; $38

24  million of which is unrestricted, $6 million of which is

25  restricted, ostensibly restricted.

1           And they -- and this occurs in 1977.  Well, I've

2    got Hartford as an insurer with no aggregate limits.  If I

3    were to pursue this case in the State Court system, I am

4    confident, based on the 40-some-odd years of trial experience

5    and 20-plus years of doing nothing but sexual abuse survivor

6    cases, that I'm going to settle this case somewhere in the

7    neighborhood of two and a half to $3 million, minimum, and if

8    I take it to trial, I have a very good probability of getting

9    a jury to give me a verdict of somewhere between seven and $10

10   million.

11          That's what I'm giving up, or my client is giving

12   up, I should say.  So, he's got some serious questions about

13   why he should give this up.  One is, why is -- is it

14   reasonable for him to ask, is it reasonable for me to ask that

15   the Boy Scouts explain why it is -- or the councils explain

16   why it is that with the $44 million in assets, $38 million

17   unrestricted, they're contributing $13 million; why is that?

18   Is that a fair question?

19          My client is going to ask me that question.  He's

20   going to say to me, How is that possible?  Why so little?

21          And my client is going to ask me, well, if there's

22   supposedly 277 cases against this council, what's the value of

23   all of those cases?  Where do I sit in relationship to these

24   other folks?

25          Now, in all likelihood, if this was not a

1  bankruptcy case and we were proceeding in State Court, this

2  would become a coordinated proceeding.  We would have 277

3  cases coordinated before a single judge and we would run into

4  much of the same questions and problems that you all face in a

5  bankruptcy.  And we would need to know to resolve these cases

6  and resolve those claims, we'd need to know, what are the

7  value of all of these claims?  What is the aggregate value of

8  all of these claims?  What are the total assets of the

9  organization, itself?  What is the insurance coverage and the

10 available insurance coverage?  And then we would be able to

11 sit down and try and work out a negotiation, if possible.

12        But what I can't tell my client is, I can't tell

13 him, what is the aggregate value of these 277 cases.  I heard

14 Mr. Linder say today, Well, that's really too hard to

15 determine; there's so many nuances and it's so difficult.

16        I can tell you if you get a group of state lawyers

17 who do this work into a room, and we could probably figure

18 those out pretty quickly, or we'd get, at least a good

19 sampling of those, as Mr. Patterson recommended.  We could

20 probably figure that out pretty quickly.

21        Or you use the TDP values that they all agreed to

22 and provide that information in the disclosure statement.  So,

23 as to the Orange County Council, we have determined that the

24 aggregate value of the claims against the Orange County

25 Council is X.

1        And then I can go to my client and I can say, okay,

2  now, here's where you sit, based on what is being proposed.

3  Here's what you are giving up to vote in favor of this plan.

4        So, I don't have that ability at this point.

5        There's a question of the -- and I don't want to

6  get in too deep into the weeds about insurance, but you have a

7  lot of insurance -- the Hartford policies, what we don't know

8  is, what are the triggering mechanisms for the Hartford

9  policies?  Is it a continuous trigger?  Is it a side trigger?

10  What's the trigger for these policies?

11        I don't know that information from this.  I can't

12  determine as to whether, you know, this settlement with

13  Hartford makes any sense or not, because I don't know what the

14  real value of the policies is to my client.  That's an issue.

15        So, I don't -- I mean, I think there's more that I

16  could go on to.  I know there's been a lot, but I just wanted

17  to be quick about it.  So, I think these are real, real

18  questions and I think we should be able to ask the Boy Scouts

19  to include, or the local councils to include some information

20  as to why they're contributing what they're contributing when

21  they have assets that are substantially more than that, than

22  what they're contributing.

23        I think we should have the ability to know what the

24  aggregate values are.  It's get somebody to do that kind of

25  analysis for us so we can talk to our clients and give them an

1   understanding of what they're giving up in the tort system to

2   vote in favor of this plan.

3            And I don't want to get into the weeds, again,

4   about insurance, but there's a lot of questions that I would

5   have about the Hartford policy and this Hartford settlement

6   that are not included in these disclosure statements at all.

7            So, thank you, Your Honor.

8            MR. STANG:  Your Honor, in connection with the

9   valuation that we touched upon earlier in the case, over the

10  course of the lunch break, committee counsel with BRG, has put

11  together a chart that we're going to send over to BSA that

12  shows the TDP valuation that we discussed and, also, as a

13  percentage of those valuations, what is being contributed by

14  the local councils versus what they contend are their

15  unrestricted assets.  We will share that information with Mr.

16  Patterson, because we think, fundamentally, the valuation that

17  the debtor used is two point and change to $7 billion is not

18  what the TDPs contemplate.

19           So, we're going to send over an insert for a

20  narrative, and also some charts that we think will, at least

21  for the local council contribution, address some of

22  Mr. Zalkin's concerns, and I hope that the Boy Scouts and the

23  local councils will give that serious consideration, because

24  this, as I said earlier, is a very fundamental issue.

25           THE COURT:  Well, thank you, to both of you, and,

1  certainly, you should send that over to the Boy Scouts and
2  let's see what counsel's response is.

3         But let me posit this question, as well, which is
4  not meant to minimize any of the concerns that are being
5  raised -- if you get this information, are you going to not do
6  any discovery?

7         Because, if that were the case, which is not any
8  experience, if that were the case, then there might be a whole
9  lot more information that would go into a disclosure
10 statement, and some of the information -- and I understand,
11 Mr. Zalkin, why you want all the information you want -- I'm
12 not so sure that the parties would agree on the values of the
13 claims.

14        So, what I'm trying to figure out is, is there
15 going to be no discovery?  Because if there's going to be no
16 discovery, that's a whole different hearing that I'm having,
17 but that's not how it works in bankruptcy.  That's not my
18 experience in bankruptcy.

19        I think that no matter what's in this disclosure
20 statement, people are going to be asking for discovery.  And I
21 think, Mr. Stang, you are going to be asking for discovery,
22 and I don't know who else will be.

23        But there's only so much information that can be
24 put in a disclosure statement and it's never what everybody
25 wants.  And my job, I think, is to strike the balance and to

1   make sure that the information is adequate.  It may not be in

2   the form that everybody wants.  It may not be what everybody

3   needs -- strike that.

4          It may not be what everybody thinks they need, but

5   that's my job.  And I don't anticipate, however, that if I put

6   in all this information, if I permitted it all to be put in,

7   that we would have no discovery.

8          So, that's what I'm balancing here and -- but if I

9   have that commitment from people, maybe we'll go a different

10  direction.  I suspect I won't get that commitment.

11         MR. LINDER:  Your Honor, I don't want to disappoint

12  any of my newfound friends, who are the insurance lawyers.

13  There will be discovery from the committee regarding the

14  reasonableness of the settlements that are proposed.  There

15  will be discovery on the LDS of the settlement that has been

16  proposed.  And we are fashioning, you know, other discovery

17  requests that we think may be appropriate for the chartered

18  organizations.

19         But there is some basic information that's out

20  there, and I don't want to belabor, again, the TDP issue.  We

21  do have negotiated agreements on some valuation ranges and

22  while it is true that we will get into the weeds of these

23  particular settlements and whether they're fair or reasonable,

24  survivors are going to be asked to vote on information that

25  they will not be privy -- they will not be privy to

1  information that's being produced in the discovery.

2           So, you're right.  It's a tough balance, but we

3  think it can be achieved.

4           THE COURT:  Okay.  Well, please, send over your

5  information and we'll see if there's agreement to it.  And if

6  there's not, then I'll decide that issue.

7           But nobody's ever going to be satisfied with a

8  disclosure statement; that's just not the way it works.  And I

9  will tell you, Mr. Zalkin, these days, particularly on Zoom,

10 are very exhausting.  I would much prefer for there to be a

11 live hearing here.

12          MR. ZALKIN:  Yeah.

13          THE COURT:  Okay.  Let's -- I don't know, Mr.

14 Linder, if you have a particular response to anything or if

15 we're going to move to the next topic.  But I think there have

16 been offers to make some -- talk about revisions to the local

17 council section.  Let's see where those end up.

18          MR. STANG:  Your Honor, if I might, I know --

19 people should lower their hands after they've been called on.

20          Mr. Moelis (phonetic), who had previously not

21 raised his hand, has his hand up.  He represents a committee

22 member.

23          I'm not trying to -- I'm just pointing out, Judge,

24 that some people have left their hands up and I didn't

25 want --

1          THE COURT:  Okay.  Well, I didn't see a hand.

2          MR. STANG:  Well, there he is.  He was there a

3  moment ago.

4          MR. LINDER:  Your Honor, I think, from our

5  perspective, Your Honor, we have covered the third-party

6  contributions.  We are mindful of the time limitations that we

7  have this week, and the fact that we're really only on and

8  turning to issue no. 3 of 40, and, you know, the reply chart

9  is really not the only component of this week's proceedings,

10  so we would like to continue moving apace.

11          THE COURT:  Let's move on.

12          MR. LINDER:  Your Honor, Number 3, we've described

13  it as objections relating to the utilization and, quote,

14  unquote, pooling or allocation of third-party contributions to

15  the settlement trusts.

16          As an initial matter, Your Honor, we think this is

17  really legal argument best-suited for confirmation;

18  notwithstanding that, we have included disclosure on this

19  issue.  I'll describe the issue briefly and then I'll point

20  the Court and the parties to the disclosure we've included in

21  the amended DS.

22          These objections, essentially, argue that it is

23  improper for reported strong claims against financially

24  stronger or well-insured nondebtors to recover more than other

25  -- or that they should recover more than other weaker claims.

1   This, again, we think this is a disguised confirmation

2   objection.  It's not properly considered now.

3            The real objection is that you should take funds

4   contributed by third parties, for example, funds contributed

5   by a chartered organization and you should allocate those

6   funds to claims that relate to that chartered organization or

7   take funds from a particular insurer and allocate those funds

8   to recoveries for claims that fall within that particular

9   insurer's coverage year.

10           We -- of course, the TDP provides that there may be

11  source, what we call "source-affected waiting" and there is

12  the ability of the settlement trustee to use a portion -- and

13  we've heard from Mr. Moulton today, and, in fact, I think they

14  highlighted this in their statement that they filed last

15  night, that they intend for the TCJC contribution to be used

16  either predominantly or entirely to satisfy TCJC claims.

17           Parties may have arguments, legal arguments as to

18  the propriety of that construct; again, we think that's best-

19  suited for confirmation.  But we've included a risk factor

20  addressing the so-called pooling or allocation arguments.  The

21  risk factor is on pages 281 of 282 of the redlined document.

22  It addresses the allocation of settlement trust assets from

23  different sources, to pay claims that may be differently

24  situated.

25           Again, this includes the source-affected waiting

1  mechanism that provides for a portion of contributing

2  chartered organizations settlement amounts to be allocated to

3  holders of claims against that entity if they meet certain

4  requirements.

5         We've disclosed the risk.  We don't agree with

6  plaintiffs about what this risk may be, but we've disclosed

7  the risks that the plan and the TDP may not be approved or may

8  be changed with respect to the pooling issue, and that certain

9  settlement trust assets will be allocated only to holders of

10  claims against certain protected parties and not others, and

11  that that may, in turn, affect recoveries for differently

12  situated holders of abuse claims.

13         As to the actual source-affected waiting language,

14  Your Honor, we have a comprehensive summary of the trust

15  distribution procedures in the disclosure statement.  That's

16  on page 239 of the redline.  The trustee's discretion about

17  allocating the proceeds of settlement trust assets, that is

18  covered on page 217 of the redline.

19         Again, Your Honor, from our perspective, we believe

20  that we've addressed the disclosure aspect of this issue.  We

21  understand that parties, you know, have arguments surrounding

22  this issue.  We believe those should be reserved for

23  confirmation, and that we've accomplished all we need from a

24  disclosure standpoint.

25

1          THE COURT:  Okay.  Is there any further objections

2   to the issues surrounding the allocation of the settlement

3   trust assets?

4          MR. PATTERSON:  Not to the disclosure, Your Honor,

5   no.

6          THE COURT:  Okay.  Thank you.

7          MR. LINDER:  Your Honor, the next issue -- issues

8   four and five are related.  The heading on the sections are,

9   respectively, liquidation analysis and best interest test.

10  Those, obviously, are related or they're one in the same.  I

11  would like us to think about issues four and five as four

12  being the foundation for certain assumptions in the

13  liquidation analysis and you can think about five that's

14  really the scope of the analysis.

15         So taking four first there are objections from a

16  number of parties that the liquidation analysis does not

17  explain the basis for whether factual or legal for the debtors

18  or local councils belief that certain assets of the local

19  councils are restricted or indicate how much each local

20  council will distribute from their unrestricted assets.

21         This objection in particular, Your Honor, under

22  heading number four, is an old objection. I think it was

23  raised, perhaps in response to the third amended disclosure

24  statement.  We have continued to recline the liquidation

25  analysis over time.  I believe without including an attachment

1   to the liquidation analysis its approximately 25 pages of

2   assumptions, narrative about why those assumptions were made

3   and projected recoveries under hypothetical liquidations, or

4   the BSA.

5          We have not only done a liquidation analysis, and

6   we maintain that there is, at least, an argument that as a

7   non-profit corporation, given that we cannot be converted

8   involuntarily to Chapter 7 that the best interest test may not

9   pertain to it at all, but we certainly will not rest on that

10  position.

11         We have prepared a liquidation analysis and not

12  only have we prepared it for the Boy Scouts of America, we

13  have also taken into account the claims that would be

14  retained, the abuse claims that would be retained against non-

15  debtors, in particular the local councils in the event of a

16  BSA liquidation.  We believe the liquidation analysis, and

17  just for reference, Your Honor, this is attached to the

18  disclosure statement as Exhibit D, we believe it fully

19  discloses the assumptions that form the basis for the analysis

20  including with respect to the liquidations of the respective

21  local councils in the event of a BSA Chapter 7 case which is

22  the subject of, certainly, the insurers objections.

23         Most of the other objections to the liquidation

24  analysis, again, predate the third amended plan.  We have

25  remedied those over time by continuing to refine the analysis

1 including, as a result of feedback from other parties in

2 interest, mediation.  To the extent parties believe the

3 debtors have not provided sufficient basis for their position

4 with respect to restricted assets of local councils this is

5 another issue that is properly addressed at confirmation.

6          Local councils have, on their balance sheets

7 entries for unrestricted and restricted assets, respectively.

8 As I mentioned earlier there is not an ability of the BSA to

9 pull out information from the accounting system to get more

10 detail without, again, undertaking a very painstaking effort

11 to recreate what the breakdown might be.  That is a

12 confirmation issue in terms of the allocation between

13 restricted and unrestricted assets.

14          For purposes of today I think it should suffice

15 that we have not included restricted assets in the liquidation

16 analysis.  Our assumption is that in a liquidation, whether

17 it's of the BSA or the local councils, although there may be

18 nuances at a local council liquidation in terms of the

19 reversion of property under certain circumstances to the BSA

20 after debts to the local council level are satisfied.

21          We had not assumed that restricted assets can be

22 used to pay general creditors under the laws of many, if not

23 most states the attorney general or other governmental

24 entities that would ensure that those assets are used for a

25 purpose that is, substantially, identical to what they were

1  donated for.  We have attached all of the balance sheets from

2  the local councils to the liquidation analysis as Exhibit D1.

3  We have also attached the property valuations that we

4  discussed into which we will be making certain changes in

5  response to the earlier colloquy with the court.

6          With that, Your Honor, I would conclude by saying

7  that we believe the liquidation analysis makes all of the

8  appropriate assumptions and disclosures, and we would submit

9  that this issue is covered.

10          THE COURT:  Okay.  Thank you.  I see two hands.

11  Mr. Rosenthal?

12          MR. ROSENTHAL:  Yes, Your Honor, Michael Rosenthal

13  for the AIG companies.

14          Your Honor, we have a question about the

15  liquidation analysis that I don't think we need to spend time

16  at this hearing, but we will raise it with Mr. Linder and, if

17  we can't get a satisfactory answer, we may come back to the

18  Court at a later hearing.

19          THE COURT:  Thank you.  I think that's an

20  appropriate way to handle things.

21          Mr. Patterson?

22          MR. PATTERSON:  Just one question, Your Honor, and

23  that is, I looked forward and didn't see it, but is there any

24  material in the liquidation analysis or has the debtor done

25  any investigation with respect of the ability of the chartered

1  organizations, including the participating chartered

2  organizations, to respond to their liability in the tort

3  system?

4          MR. LINDER:  I'm not sure I fully understand the

5  question, Mr. Patterson.  Would you mind -- would you mind

6  asking --

7          THE COURT:  Yeah, I'm not sure I got it either, Mr.

8  Patterson.  Can you say it again?

9          MR. PATTERSON:  Sure.  Has the debtor done any

10 investigation with regards to the chartered organizations'

11 assets that would show that the chartered organizations could

12 or could not fully respond to their liability in the tort

13 system on account of the abuse claims?

14         MR. LINDER:  Your Honor, I think Mr. Patterson's

15 question is a variation on the analysis that the debtors have

16 conducted with respect to local councils.  To put it just in -

17 - just articulate it in short form, there is not unanimity

18 among the approach of different courts about how you account

19 for claims that would under a Chapter 11 plan be channeled to

20 a trust, but in a Chapter 7 be capable of being retained and

21 asserted against a party --

22         COUNSEL:  The community has the TCC thing

23 (indiscernible) --

24         MR. LINDER:  Pardon me?

25         THE COURT:  Excuse me.  People, please make sure

1  you're muted.  I'm getting someone's cross-conversation.

2          MR. LINDER:  There's not unanimity among the courts

3  in terms of whether you look at just claims asserted against

4  the debtors or whether you also look at claims retained

5  against third parties.  We have --

6          THE COURT:  For releases before --

7          MR. LINDER:  For the liquidation analysis in terms

8  of --

9          THE COURT:  For the liquidation analysis.

10         MR. LINDER:  -- (indiscernible) best-interest test.

11  The question that Mr. Patterson poses I think can be answered,

12  if you assume that that is an appropriate analysis to conduct,

13  you would look at an analysis similar to the -- I believe it

14  was the Quigley case in the Southern District of New York.

15  You don't look at the assets of this third party non-debtor,

16  you look rather at whether the recovery against that -- sorry,

17  the recovery you'd obtain in the bankruptcy case is equal to

18  or comparable with what you could expect to obtain in the tort

19  system against the third party non-debtor based on historical

20  judgments or settlements.

21         So the short answer to the question is that is not

22  included in the liquidation analysis.  The debtors have not

23  conceded that it's appropriate to include that analysis.

24  Again, that is an issue that should be raised at confirmation.

25         THE COURT:  Okay.  So the answer is no, Mr.

1 Patterson.

2           MR. PATTERSON:  Could the debtor include a

3 statement, maybe somewhat shorter than Mr. Linder's statement,

4 that the debtor has not conducted an investigation of the

5 assets of the chartered organizations and put that in the

6 liquidation analysis, without conceding that it's applicable

7 or relevant?

8           MR. LINDER:  Yes, we have not conducted any

9 investigation of those assets; we will include that statement

10 in our revised version of the liquidation analysis.

11           MR. PATTERSON:  Thank you, Your Honor.  Thank you,

12 Mr. Linder.

13           THE COURT:  Thank you.

14           Mr. Stang?

15           MR. STANG:  Thank you, Your Honor, a couple of

16 points.

17            We have been going back and forth with Mr. Linder

18 for some time about the PBGC's claim and whether it should be

19 secured or unsecured.  We believe it should be shown as

20 unsecured, the debtor shows it as secured.  We don't need to

21 get through a long explanation in a disclosure statement as to

22 why we disagree, but we do.  We believe -- and the debtor

23 says, well, it doesn't matter because the fact is the PBGC is

24 going to get paid in full anyway, whether they're secured or

25 unsecured.  We think that there's a swing of 600 to $800

1  million in difference depending on whether the PBGC is secured

2  or unsecured.

3          We would like to have a statement in the disclosure

4  statement of the TCC's position on this.  And Mr. Linder can

5  show that the debtor disagrees, but the TCC contends that.

6  And Mr. Lucas can provide him that language, if he hasn't done

7  so already, but we think this is a material misstatement of

8  the liquidation analysis when showing the PBGC as secured.

9          If you want to get into the details of why we think

10 it's unsecured, Your Honor, I can do that now.

11         THE COURT:  No.

12         MR. STANG:  The second point is --

13         MR. LINDER:  If I could just, Mr. Stang, before you

14 move on to your second point?  Yes, we will include the

15 language that you propose; we have not seen it, but if Mr.

16 Lucas could share it with our team.  We will review it, we

17 will note that we disagree with it, and we will refine our

18 position as well to make it clear what our position is with

19 respect to the PBGC claim, but that proposal generally is

20 acceptable.  Thank you.

21         MR. STANG:  Second, Your Honor -- I'm sorry, I've

22 got some outdoor street noise, I apologize -- is the

23 liquidation analysis of the local councils, it's not an issue

24 necessarily of Ditech or Quigley and what you look to.  Under

25 the governance documents, these charters to the local councils

1    -- or the charter to the local councils is an annual event.

2    The Boy Scouts can terminate the charters or they can let them

3    lapse and not renew them.

4          Now, there are legal disputes, at least with the ad

5    hoc local council committee and possibly with the Boy Scouts,

6    as to the exact nature of their relationship and whether one

7    can simply let a charter expire, but if the charters do

8    expire, then the governance documents talk about what happens

9    to their assets.  So this isn't a matter of do I look to a

10   third party to see if I can recover against them and whether

11   that analysis should be in the disclosure statement as part of

12   the liquidation analysis.  A Chapter 7 trustee has no reason

13   to renew the charters of the local council.  The Chapter 7

14   trustee might very well rescind them.  And if BSA is in

15   liquidation, I'm not quite sure what the local councils are

16   doing anyway.  So the presumption -- I suspect the local

17   council charters would not be renewed, Boy Scouts under a

18   Chapter 7 are not -- is not in existence.

19         And so this isn't -- maybe when this is for

20   confirmation and we argue about the best-interest test, but

21   this is not a matter of having to look to a third party whose

22   existence continues outside of that of the debtor if the

23   debtor is in a Chapter 7.

24         So, again, Your Honor, maybe that's left for the

25   argument about best interests --

1            THE COURT:  Their disclosure, is that -- what

2    disclosure do you want?  Or is that an argument at

3    confirmation?

4            MR. STANG:  We can make that at argument at

5    confirmation, Your Honor.

6            THE COURT:  Okay.

7            MR. STANG:  Okay.  The chartered organization

8    disclosure says that the recovery under -- would be greater

9    under a plan than would be under a Chapter 7 liquidation, I'm

10   not sure how that's true.  The chartered organizations aren't

11   paying anything under the plan.  How could you -- I mean, if

12   we're going to go back into the Ditech-Quigley world, how

13   could you possibly say that in a Chapter 7 by the Boy Scouts

14   those with claims against the chartered organizations aren't

15   going to get anything except an insurance assignment?  I mean,

16   that's not possible.

17           So I don't understand the disclosure when it says

18   that the recoveries are presumed to be greater under a plan

19   than they would be under a Chapter 7 when the plan is a

20   giveaway to the chartered organization claims for January 1,

21   '76 and thereafter.

22           THE COURT:  Why isn't that a Quigley issue?

23           MR. STANG:  Well, they're not disclosing the value

24   of those claims.

25           THE COURT:  Or Purdue issue at this point, but

1  yeah.

2          MR. STANG:  I guess we can rename it, but they're

3  not giving any disclosure as to the value of those chartered

4  organization assets.

5          THE COURT:  I don't think that you would under a

6  Purdue analysis.

7          MR. STANG:  Well, Your Honor, I don't think Purdue

8  is right.

9          THE COURT:  Well, it may not be, but how is that

10  not an issue then?  That's what I'm saying.

11          MR. STANG:  Well, it may be --

12          THE COURT:  So it's a legal issue that you can

13  argue and if you're right -- and I'm not expressing a view,

14  but if you're right, you know --

15          MR. STANG:  Then there --

16          THE COURT:  -- is there some disclosure issue here?

17  What's --

18          MR. STANG:  Yeah.

19          THE COURT:  -- the disclosure you want other than

20  that you disagree?

21          MR. STANG:  Well, if they're taking the position

22  that under Chapter 7 there is no recovery from a chartered

23  organization, they should just be -- I don't know that they

24  actually --

25          THE COURT:  Does it say that?

1          MR. STANG:  Well, it kind of says that, I think.

2    It says that it's assumed that the proceeds under a plan

3    provide for a global -- with a global resolution are greater

4    than under a Chapter 7.  I don't know how they say that.

5          THE COURT:  Well, because you disagree with their

6    legal theory.  So is there a disclosure statement issue or do

7    you just disagree with their legal theory?

8          MR. STANG:  Well, I certainly disagree with their

9    legal theory and I guess if you determine that I'm right and

10   they're wrong, then I don't know how you compare -- they're

11   not getting -- I guess it's a legal argument, Your Honor.

12         THE COURT:  Okay.

13         MR. LINDER:  Your Honor, with that concession, I

14   won't respond, Your Honor.

15         THE COURT:  Okay.  Mr. Buchbinder?

16         MR. BUCHBINDER:  Thank you, Your Honor, Dave

17   Buchbinder on behalf of the U.S. Trustee.

18         I have two issues in this area, the first one is

19   that the liquidation analysis places no value on the Chapter 7

20   estate's potential insurance assets in the liquidation

21   analysis.  And the debtor indicates on page 32 of 6249-2 that

22   "such recoveries are uncertain and expected to be lowered in a

23   liquidation due to the difficulties of obtaining insurance

24   recoveries," and so forth and so on, but that doesn't mean

25   they're zero.

1        I was a Chapter 7 trustee for many years and I

2   would be taking a careful look at all of the policies in this

3   case.  I think, at a minimum, the debtor should at least

4   provide a range for what it thinks the insurance policies

5   might be worth in a Chapter 7 scenario.  That is an issue a

6   Chapter 7 trustee would look at with, in this case, great

7   intensity.  That's my first concern here.

8        My second concern here gets to the issue that Mr.

9   Stang brought up a moment ago.  And I'll recognize that this

10  argument posed by the debtor that somehow 1129(a)(7) does not

11  apply to it is a legal issue, but I think it should be stated

12  as a risk factor what the debtors' options would be if the

13  debtor is wrong in its theory because, if it's wrong in its

14  theory, it means that the debtors' options going forward would

15  be limited to I think one of four things:  reaching agreement

16  on a fully consensual plan; satisfying 1129(a)(7); subjecting

17  the case to dismissal, which could be involuntary; or

18  voluntarily converting to Chapter 7.

19       Just because the debtor posits its theory on the

20  fact that it may not be involuntarily converted does not

21  otherwise exempt it from the express confirmation requirements

22  of the bankruptcy code and I think -- if it's not already in

23  the disclosure statement, I think there should be a paragraph

24  written as a risk factor what it means if the debtor is wrong

25  in its theory that 1129(a)(7) does not apply to it because

1   then that would raise these issues of property rights and

2   value of assets of local councils and other assets raised by

3   the other objectors.

4           Thank you, Your Honor.

5           THE COURT:  Thank you.  I think I recall the debtor

6   saying it doesn't think it's subject to 1129(a)(7), but that,

7   if it is, it meets the requirement.  Am I wrong?

8           MR. LINDER:  That is correct, Your Honor.  We were

9   not simply resting on that argument; we are undertaking a full

10  liquidation analysis and the alternative to mitigate against

11  the risk that would be posed if we did take that position.

12          We also have a risk factor, Your Honor, I think

13  it's number 33 within the risk factor section -- I'm

14  struggling to find the page -- 285 that talks about the

15  consequences if the debtors cannot satisfy Section 1129(a)(7).

16  So I think, in light of that disclosure -- I'll turn to the

17  insurance point in a second -- in light of that disclosure and

18  how we've constructed our arguments, I don't think any

19  additional disclosure is required.

20          THE COURT:  Okay.  Thank you.

21          Yes, Mr. Buchbinder, if you could take a look at

22  what's now paragraph 33 on page 285 of the disclosure

23  statement and see if you have any concerns about that, but it

24  seems to, at least by the title, address your issue.

25          MR. BUCHBINDER:  I think I would like to have them

1  add some language as to what the options would be if they are

2  incorrect in their approach, and I'll just send Mr. Linder or

3  Ms. Balter (ph) or both of them a separate email in that

4  regard.

5         THE COURT:  Okay, thank you.  I appreciate that and

6  I'm sure they'll look at it.

7         MR. LINDER:  Thank you, Mr. Buchbinder.

8         As to the insurance question, it's actually -- it's

9  not accurate to characterize our liquidation analysis as

10  ascribing no value to insurance recoveries in a hypothetical

11  Chapter 7 for the BSA.  We actually assume that recoveries

12  from insurance would be materially the same in a Chapter 7 and

13  a Chapter 11 case.  We think that's being generous from just a

14  realities-of-the-case perspective.  By aggregating settlements

15  of coinsureds under the insurance policies, we are maximizing

16  recoveries through the trust from insurance.

17         So we are certainly giving due consideration to

18  what would happen between Chapter 7 and Chapter 11 with

19  respect to insurance.

20         MR. BUCHBINDER:  Show me the money.

21         THE COURT:  Is there a specific footnote to the

22  liquidation analysis that -- or I'm sure it's probably right

23  in there as a line item on the insurance?

24         MR. LINDER:  There is, Your Honor, and I'm on page

25  6 -- I'm sorry, page 320 of 405, if you're look at the Bates

1  stamp at the top of Docket 6214-2.  This is page 6 of Exhibit

2  C -- I'm sorry, D, and it's -- if you're looking at the

3  redline, there's two paragraphs at the top which have blue

4  text in them, the second of which talks about -- I believe

5  talks about insurance.  What it states at the beginning of the

6  third sentence, Your Honor, is, "The liquidation analysis does

7  not account for any recovery from insurance proceeds

8  irrespective of whether the insured claim relates to abuse on

9  the basis that recoveries from such proceeds are assumed to be

10  materially the same or greater under a plan of reorganization

11  providing," quote-unquote, "'global resolution of abuse

12  claims' than under a Chapter 7 liquidation."

13          And then the footnote addresses the point that I

14  just made, which is that we believe that the value of

15  insurance will be maximized in the plan because local councils

16  are initial insureds under many of the policies.

17          MR. SCHIAVONI:  Your Honor, I just -- logically,

18  that presentation doesn't make any sense at all that the two

19  would be the same.  Your Honor had sort of an extensive sort

20  of presentation on this in Imerys when J&J talked about

21  lifting the automatic stay and letting the claims go forward.

22  The two follow just totally different paths, what you would

23  get under a liquidated cash-out versus individual claims

24  being, you know, presented, you know, the bad claims being,

25  you know, essentially filtered out and the other claims being

1  resolved.

2          It's a totally different analysis, you can't

3  present it as apples to apples and it's -- the disclosures, I

4  think -- it's not I think, it's fundamentally misleading to

5  suggest it's the same.  You know, you have to just describe

6  what the two paths would be that, you know, a claim in the

7  tort system would go against the policy and it would be

8  adjudicated to the extent there's coverage.  It's not the same

9  settlement dynamic in the two because the propensity to sue

10 and the pathing of the claims is completely different.

11         THE COURT:  I'll have to think about that because

12 it's --

13      (Pause)

14         THE COURT:  -- because the debtors' recovery on

15 insurance, on its insurance policies --

16      (Pause)

17         THE COURT:  Well, I have to think about that.  Do

18 you have a response to that, Mr. Linder?

19         MR. LINDER:  Our position would be, Your Honor,

20 that the way we at least think about it is it's our -- it's

21 our claimants' recoveries from insurance under Chapter 7

22 versus a Chapter 11 and, given that these are all scouting-

23 related abuse claims for bringing together a trust in Chapter

24 11, that provides the most favorable conditions to maximize

25 the value of those insurance policies versus a Chapter 7 and I

1  think that -- I think Mr. Schiavoni made the point about a

2  propensity to sue in a Chapter 7.

3          MR. BUCHBINDER:  Your Honor, a Chapter 7 trustee

4  would have the benefit of all the defense provisions in all

5  the contracts, among other things.  A Chapter 7 trustee would

6  be able to negotiate and have approved by the Court

7  settlements of separate claims.  And perhaps the simple

8  solution, if as the debtor contends the numbers are similar,

9  okay, we have a plug number for the Chapter 11 plan right now,

10 let's plug 787 million into the liquidation analysis and the

11 numbers are similar.

12          THE COURT:  You know, that was my initial thought

13 when you said that, Mr. Buchbinder, is that there would be a

14 line item, but whether there is or there isn't, if they cancel

15 out, it doesn't matter.  I mean, if they -- you know, if

16 they're the same, then the bottom line doesn't change.

17          So I'm --

18          MR. LINDER:  Our position, Your Honor, is that that

19 -- it's a reasonable assumption to make that it would

20 effectively cancel each other out.  The propriety of that

21 assumption, I would submit, is a confirmation issue.

22          MR. SCHIAVONI:  It's just not consistent with the

23 showing that would be made -- that was made in connection with

24 the J&J.  I mean, what would happen is a claim that went

25 forward in the tort system would get whatever recovery is

1  available then under the coverage and the rest against the Boy

2  Scouts' remaining assets and, you know, whereas under the TDP,

3  there are just a lot more claims and they all get paid, you

4  know, on a pared basis.  It's a totally different analysis.

5           MR. STANG:  Your Honor, I also don't understand

6  what Mr. Linder is talking about.  A Chapter 7 trustee isn't

7  able to put together a plan that puts different kinds of abuse

8  survivors into a class and has them share this $787 million if

9  we're talking about Hartford, this is about the perspective of

10  what an individual will recover in a Chapter 7.  I don't

11  understand how --

12           THE COURT:  Okay.

13           MR. STANG:  -- we just equate the two -- the

14  settlement here to what would happen in a Chapter 7.  I mean,

15  it's a little bit of what Mr. Schiavoni was talking about, but

16  I think we're forgetting that this is a best-interest analysis

17  that -- or the liquidation test is for a best-interest

18  analysis, which is an individual creditor's test, not what

19  would happen in some class of creditors that doesn't exist in

20  a Chapter 7.

21           THE COURT:  Right, but it's an individual creditor

22  test based on a recovery from what it would get in a debtor

23  reorganization versus a debtor Chapter 7.

24           MR. STANG:  Right.

25           THE COURT:  So the insurance claims should be the

 1  debtors' insurance claims and how would they be treated in an

 2  11 versus a 7, right?  So that's why I'm thinking about this

 3  sentence.  So I'm --

 4          MR. STANG:  I'm not sure I agree with that, Your

 5  Honor.  It's what a creditor would receive in a Chapter 7 case

 6  --

 7          THE COURT:  Uh-huh.

 8          MR. STANG:  -- not what the debtor -- that would

 9  not -- and --

10          THE COURT:  From the debtor.  That's what he gets

11  in a Chapter 7 case, he gets it from the debtor.  He may have

12  claims against other people too, but what does he get from the

13  debtor?

14          I'm going to think about this.  We're not going to

15  go that much longer tonight.  We can -- you all can talk about

16  this offline too, if there's any way to accommodate this

17  question but, quite frankly, as I'm talking out loud, which is

18  dangerous, this seems to me to be a disagreement over what

19  happens over what happens in a 7 versus an 11 and, if in fact

20  the debtors are incorrect about this, then they may not meet

21  the best-interest test, you know, so -- but that's a legal

22  position.

23          Their position is disclosed, we know what their

24  position is; it may be wrong, but it's disclosed.  So, from a

25  disclosure standpoint, I think it's there, but I will give

1  this some more thought overnight and you all can also talk

2  about it.  But it's disclosed, whether it's right is a

3  different question.

4            MR. STANG:  Well --

5            MR. LINDER:  Your Honor, we don't have anything

6  further on the liquidation analysis, unless there are other

7  parties that want to be heard.

8            MR. STANG:  By the way, Your Honor, just -- and

9  especially I want to -- the best-interest test does not say

10  what the creditor would receive from the debtor.  It says what

11  the creditor received or retained if the debtor were

12  liquidated under Chapter 7, that's not the same thing.  And I

13  know this gets back to the Purdue comment you made a few

14  minutes ago, but that --

15            THE COURT:  If the debtor were liquidated, not if

16  somebody else was liquidated, but --

17            MR. STANG:  Well, how about the insurance --

18            THE COURT:  -- that's an argument you can make to

19  me at the appropriate time.

20            MR. STANG:  Right.  I'm just saying -- we're

21  talking about the insurance companies and not -- it's not a

22  distribution from the debtor, it's what they would -- what

23  rights they would receive or retain in a Chapter 7, and I

24  think there's a difference when we're talking about the

25  insurance issues.  I don't think it's just swapping the same

1  numbers.

2          THE COURT:  Maybe and you may convince me, but the

3  question is, as a disclosure statement item, has the debtor

4  disclosed its position.  And I think everybody seems to

5  understand the position because everybody is arguing about it.

6          (Pause)

7          THE COURT:  Receive or retain, that language is

8  used in a few places in the code.  So we can debate that

9  later, but the question is is there a disclosure statement

10 issue.  And let's move to the next issue, if it's quick.  And,

11 as I said, I will give this some thought and you all can talk

12 to and see if there's a way to fix any disclosure statement

13 issue on this.

14          MR. SCHIAVONI:  Judge, isn't it fundamentally

15 misleading to suggest that if -- like the reading on this

16 liquidation clause suggests that, if you're a reader, that

17 your outcome is going to be the same either way when it's

18 really not.  I mean, if somebody had a claim in '78 and they

19 can go against a Hartford policy in a liquidation, they might

20 -- and they can prove the claim and there's coverage for the

21 full amount, they'd walk away with the full amount; if they

22 lose, they get nothing.  Under the plan, they -- so they end

23 up, in essence, with a hundred percent recovery; in the plan,

24 they end up with just a percentage.

25          Now, granted, it also pays a lot of claims that

1  probably wouldn't get anything, but the meritorious claim

2  would get a deep discount.

3          MR. LINDER:  Your Honor, what I would suggest at

4  this juncture is that if parties believe that the debtors'

5  assumptions with respect to what would happen vis-a-vis

6  insurance in the Chapter 7 versus our case, if our assumptions

7  are incorrect, that they submit language to us and we will

8  consider including it in the liquidation analysis.  I think

9  that's the best way to close this issue off.

10          MR. SCHIAVONI:  But, I mean, look, they clearly are

11  incorrect, the assumptions.  I mean, if someone won in the

12  tort system against a Hartford policy here, they'd walk away

13  with a hundred percent recovery; if they lost, they get

14  nothing.  But, under the plan, they end up with a discount no

15  matter what.

16          MR. LINDER:  We fundamentally disagree with Mr.

17  Schiavoni.  It's not a tort system versus Chapter 11, it's a

18  Chapter 7 recovery versus a Chapter 11 recovery.

19          MR. SCHIAVONI:  But that -- in Chapter 7, you're in

20  the tort system.  You're in the tort system in a 7.

21          MR. PATTERSON:  You're certainly in the tort system

22  as to the local council and the chartered organizations.

23          THE COURT:  Yes, that's true.  And so the question

24  is, what does this -- what analysis are we looking at?  What's

25  the analysis, the proper analysis, and what's the requirement.

1          So it sounds like people have different views on

2    this and their different views are based on a legal theory, a

3    legal argument.  And so I think Mr. Linder's position --

4    suggestion is a good one and let's see if it can be resolved.

5    And, if it can't, then I'll make the call on it --

6          MR. PATTERSON:  Your Honor --

7          THE COURT:  -- but I think it's based on different

8    legal positions.

9          MR. PATTERSON:  I mean, from our standpoint, Your

10   Honor, we disagree with the manner in which the liquidation

11   analysis is conducted, but we think it's a confirmation issue.

12         THE COURT:  Yes, exactly.  So that's what I think

13   it is and based on different theories, okay?  And, again, if

14   we get to a point and there's no resolution, then I'll have to

15   decide it, but for disclosure statement purposes, the debtor

16   has clearly disclosed its position, but if there's -- but

17   they've offered to put in other language that people want to

18   say why they disagree.

19         MR. STANG:  Your Honor, not to take a huge step

20   backwards, but this is essentially what we were talking about

21   with the chartered organization, the question I raised, and

22   I'll see if I can convince Mr. Linder to sort of replicate

23   whatever we can do on this issue back to the chartered

24   organization concern because it's really kind of the same

25   thing.

1          MR. LINDER:  With that, if Your Honor is up for it,

2     recognizing that the 5 o'clock hour is approaching, I think

3     that the next section hopefully, knock on wood, will be quick,

4     if you're willing to address it.

5          THE COURT:  Sure.

6          MR. LINDER:  And that's under the heading "Third

7     Party Bankruptcies."

8          Certain objectors have argued that the disclosure

9     statement lacks disclosure that certain chartered

10    organizations, including, as just by way of example, the

11    Archbishop of Agana from Guam, are in bankruptcy and fails to

12    disclose a specific, quote, "exceptional treatment of debtor

13    chartered organizations."  Your Honor, I believe this was an

14    objection, and I don't have the exact note in front of me, but

15    I believe it was filed by the -- by Ms. Luan Wolff, and this I

16    believe is based on -- I believe it was filed at a point

17    before the debtors filed the amended disclosure statement to

18    the fifth plan.

19          There is -- there have been filings in the Guam

20    Archbishop case by BSA with respect to the intersection of

21    these cases.  The plan, as Your Honor is aware, has been

22    revised to modify the treatment of chartered organizations

23    that are in bankruptcy --

24          THE COURT:  Yes.

25          MR. LINDER:  -- with respect to the participating

1  chartered organization proposal.  The presumption that we have

2  that the chartered organization is deemed to have opted in is

3  reversed with respect to chartered organizations and it's not

4  just the Archbishop of Agana that are in bankruptcy.  So they

5  would have to affirmatively opt in to become a limited

6  protected party.

7            And those entities that are chartered organizations

8  and also in bankruptcies of which we are aware are attached to

9  the disclosure statement -- I'm sorry, to the plan as Exhibit

10  K.

11            With that, Your Honor, I don't believe this

12  objection is outstanding any longer.

13            THE COURT:  Okay.  Has that objection been

14  resolved?  I did note the change in the disclosure statement,

15  the identification of those non-debtors that are in bankruptcy

16  elsewhere, there are debtors elsewhere.  Are there any

17  questions remaining on this?

18            MR. STANG:  Your Honor, this is Mr. Stang.  I don't

19  know if Ms. Luan is still on, she lives in Guam and I can't

20  begin to calculate the time difference and whether it's in the

21  middle of the night for her or not.

22            I do know from having spoken with her that coming

23  out of at least the that coming out of at least the Diocese of

24  Agana bankruptcy, the bankruptcy court made a finding that the

25  automatic stay applied to the treatment of any insurance

1 policies that might run in favor of it.  And so I don't know

2 if this resolution addresses that.  If she were living on the

3 East Coast, I wouldn't speak up for her, but she's in the

4 middle of the Pacific and it may be that's why she's not on.

5 Perhaps we could give her a shot tomorrow morning if she shows

6 up.  And I'll email her and let her know that this came up and

7 that she should appear tomorrow if she's still concerned about

8 it.

9          THE COURT:  Okay.  I'll consider it resolved unless

10 Ms. Lujan Wolff raises it.

11          MR. STANG:  Okay.

12          MR. LINDER:  Your Honor, I'm happy to keep going,

13 if you're amenable to it.

14          THE COURT:  Well, I think item 6 is also --

15          MR. LINDER:  That was item 6, I believe, Your

16 Honor, that we just covered.

17          THE COURT:  Okay, yeah, so that was 6.

18          MR. SCHIAVONI:  Mercy, Your Honor, for --

19          THE COURT:  Yeah, I think the next one looks like a

20 larger issue.  So it's 5 o'clock, we're going to be going

21 tomorrow, clearly.  And I don't know a better approach to

22 this.  If someone has a suggestion, that's fine, but I do find

23 that disclosure statement hearings are somewhat painful

24 regardless of the lead time that people have to work out their

25 objections.  So we're going to continue tomorrow.

1          (Pause)

2          THE COURT:  We're going to start at 10:00.  I won't

3    go earlier for the benefit of those on the West Coast.  And I

4    have a 2 o'clock confirmation hearing, I understand it's

5    unopposed.  So I'm going to be taking a break at about 1:30,

6    probably until -- well, we'll say 1:45.  I'm going to assume

7    that could take no more than an hour and then we'll come back,

8    just so you understand my time frame tomorrow.  And we'll

9    continue on.

10          Okay, any other --

11          MR. PLEVIN:  Your Honor, do we use the same sign-in

12   tomorrow?

13          THE COURT:  Thank you.  Mrs. Johnson tells me we

14   use the same Zoom link tomorrow.

15          MR. PLEVIN:  And thank you for the 10 o'clock

16   start.

17          THE COURT:  Sure.  Okay, any other questions before

18   we adjourn?

19          Okay.  Thank you everyone.  I appreciate your time

20   today.

21          COUNSEL:  Thank you, Your Honor.

22        (Proceedings adjourned at 5:03 p.m.)

23                       CERTIFICATE

24

25

1      We certify that the foregoing is a correct transcript

2  from the electronic sound recording of the proceedings in the

3  above-entitled matter.

4
   /s/Mary Zajaczkowski              September 22, 2021
5  Mary Zajaczkowski, CET**D-531

6
   /s/Coleen Rand                    September 22, 2021
7  Coleen Rand, AAERT Cert. No. 341

8
   /s/William J. Garling             September 22, 2021
9  William J. Garling, CE/T 543

10

11 /s/ Tracey J. Williams            September 22, 2021
   Tracey J. Williams, CET-914
12

13

14

15

16

17

18

19

20

21

22

23

24

25