**<u>Exhibit 7</u>**

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3                                    .    Chapter 11
     IN RE:                          .
4                                    .    Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND       .
5    DELAWARE BSA, LLC,              .
                                     .    Courtroom No. 2
6                                    .    824 North Market Street
                                     .    Wilmington, Delaware 19801
7                                    .
                     Debtors.        .    September 22, 2021
8    . . . . . . . . . . . . . . . . .    10:00 A.M.

9         TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                    UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12
     For the Debtor:           Derek Abbott, Esquire
13                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               WHITE & CASE LLP
17                             1221 Avenue of the Americas
                               New York, New York 10020
18

19
     Audio Operator:           Brandon J. McCarthy, ECRO
20

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Matthew E. Linder, Esquire
                              Laura Baccash, Esquire
3                             WHITE & CASE LLP
                              111 South Wacker Drive
4                             Chicago, Illinois 60606

5
    For Century:             Tancred Schiavoni, Esquire
6                            O'MELVENY & MYERS LLP
                             Times Square Tower
7                            7 Times Square
                             New York, New York 10036
8
    For the FCR:             Robert Brady, Esquire
9                            Edwin Harron, Esquire
                             YOUNG CONAWAY STARGATT & TAYLOR LLP
10                           Rodney Square
                             1000 North King Street
11                           Wilmington, Delaware 19801

12
    For Tort Claimants:      James Stang, Esquire
13                           PACHULSKI STANG ZIEHL JONES LLP
                             919 North Market Street, 17th Floor
14                           Wilmington, Delaware 19801

15  For the Ad Hoc           Richard Mason, Esquire
    Committee of Local       WACHTELL, LIPTON, ROSEN & KATZ
16  Councils:                51 West 52nd Street
                             New York, New York 10019
17
    For the Coalition of     David Molton, Esquire
18  Abused Scouts for        BROWN RUDNICK LLP
    Justice:                 7 Times Square
19                           New York, New York 10036

20                           - and -

21
                             Eric Goodman, Esquire
22                           601 Thirteenth Street NW, Suite 600
                             Washington, D.C. 20005
23
    For the AIG Companies:   Michael Rosenthal, Esquire
24                           GIBSON, DUNN & CRUTCHER LLP
                             200 Park Avenue
25                           New York, New York 10166
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the United Methodist  Jeremy Ryan, Esquire
    and Roman Catholic Ad     POTTER ANDERSON & CORROON LLP
3   Hoc Committee:            Hercules Plaza
                              1313 North Market Street, 6th Floor
4                             P.O. Box 951
                              Wilmington, Delaware 19801
5

6   For Numerous Firms and    Irwin Zalkin, Esquire
    Claimants:                THE ZALKIN LAW FIRM, P.C.
7                             1441 Broadway, Suite 3147
                              New York, New York 10018
8

9   For Zurich Insurers:      Mark Plevin, Esquire
                              CROWELL & MORING LLP
10                            3 Embarcadero Center, 26th Floor
                              San Francisco, California 94111
11

12  For Zalkin Law Firm:      Thomas Patterson, Esquire
                              KTBS LAW LLP
13                            1801 Century Park East, 26th Floor
                              Los Angeles, California 90067
14

15  For the Committee         Joseph Celentino, Esquire
    Of Local Councils:        WACHTELL, LIPTON, ROSEN & KATZ
16                            51 West 52nd Street
                              New York, New York 10019
17

18  For HMM Victims:          Evan Smola, Esquire
                              HURLEY MCKENNA & MERTZ, P.C.
19                            20 S. Clark Street, Suite 2250
                              Chicago, Illinois 60603

20  For Guam Abuse            Delia Lujan Wolff, Esquire
    Survivors:                LUJAN & WOLFF LLP
21                            238 Archbishop FC Flores
                              Suite 300
22                            Hagatna, Guam 96910

23  For the Girl Scouts:      Eric Lopez Schnabel, Esquire
                              DORSEY & WHITNEY LLP
24                            300 Delaware Avenue, Suite 1010
                              Wilmington, Delaware 19801
25
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the U.S. Trustee:    David Buchbinder, Esquire
                             Hannah McCollum, Esquire
3                            UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
4                            844 King Street, Suite 2207
                             Lockbox 35
5                            Wilmington, Delaware 19801

6
    For Hartford Financial:  Philip Anker, Esquire
7                            WILMERHALE
                             250 Greenwich Street
8                            New York, New York 10007

9                            - and -

10                           James Ruggeri, Esquire
                             SHIPMAN & GOODWIN LLP
11                           1875 K Street NW, Suite 600
                             Washington, DC 20036
12
    For the Church of Jesus  Adam Goldberg, Esquire
13  Christ of Latter Day     LATHAM & WATKINS LLP
    Saints:                  1271 Avenue of the Americas
14                           New York, New York 10020

15
    For Abuse Survivors:     Paul Mones, Esquire
16                           PAUL MONES, P.C.
                             13101 Washington Boulevard
17                           Los Angeles, California 90066

18

19

20

21

22

23

24

25
```

<u>MATTERS GOING FORWARD</u>:

1. Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 2295, filed 3/2/21)

2. Debtors' Motion For Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief (D.I. 2618, filed 4/15/21)

3. Motion for Leave to Exceed Page Limit Requirement for Objection of the Tort Claimants' Committee to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 3529, filed 5/10/21)

4. Motion for Leave to Exceed Page Limit Requirement for (i) Objection of Century Indemnity Company to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief and (ii) Century Indemnity Company's Objections to the Debtors' Solicitation Procedures and Form of Ballots (D.I. 3858, filed 5/12/21)

5. Motion for Leave to Exceed Page Limitations Regarding Debtors' Reply in Further Support of Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I. 4102, filed 5/16/21)
6. Motion for Leave to Exceed Page Limitations Regarding Debtors' Omnibus Reply in Support of Debtors' Motion for Entry

1  of an Order (I) Approving the Disclosure Statement and the
2  Form and Manner of Notice, (II) Approving Plan Solicitation
   and Voting Procedures, (III) Approving Forms of Ballots, (IV)
3  Approving the Form, Manner, and Scope of Confirmation Notices,
   (V) Establishing Certain Deadlines in Connection with Approval
4  of the Disclosure Statement and Confirmation of the Plan, and
   (VI) Granting Related Relief (D.I. 4111, filed 5/16/21)

5
6  7. Motion to Exceed Page Limitations with Respect to Certain
   Insurers' Supplemental Objection to Motion for Approval of
7  Debtors' Disclosure Statement (D.I. 6054, filed 8/17/21)

8  8. Tort Claimants' Committees' Motion to Adjourn the Hearing
   to Consider Approval of Disclosure Statement and Solicitation
9  Procedures for the Fifth Amended Chapter 11 Plan of
   Reorganization for Boy Scouts of America and Delaware BSA, LLC
10 (D.I 6222, filed 9/15/21)

11 9. Motion for Leave to Exceed the Page Limits Regarding
   Debtors' Amended Omnibus Reply in Support of Debtors' Motion
12 for Entry of an Order (I) Approving the Disclosure Statement
   and the Form and Manner of Notice, (II) Approving Plan
13 Solicitation and Voting Procedures, (III) Approving Forms of
   Ballots, (IV) Approving the Form, Manner, and Scope of
14 Confirmation Notices, (V) Establishing Certain Deadlines in
   Connection with Approval of the Disclosure Statement and
15 Confirmation of the Plan, and (VI) Granting Related Relief
   (D.I. 6250, filed 5/16/21)
16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 9:59 a.m.)

2             THE COURT:  Good morning.  This is Judge

3    Silverstein.  We are here in our continued disclosure

4    statement hearing in Boy Scouts of America, Case 20-10343.

5             Let me see debtors' counsel.

6             MR. ABBOTT:  Good morning, Your Honor, Derek Abbot

7    of Morris, Nichols, Arsht & Tunnell, here for day two.

8             Your Honor, I think we ought to get right to it, so

9    I'm going to cede the podium back to Mr. Linder to continue

10   where we left off yesterday, if I may.

11            THE COURT:  Yes, thank you.

12            Mr. Linder.

13            MR. LINDER:  Good morning, Your Honor.  Matt Linder

14   of White and Case on behalf of the debtors.

15            Where we left off yesterday, Your Honor, just to

16   orient everyone and to orient the Court to -- back to the

17   reply chart we are talking through, we left off after having

18   concluded Item 6.  This is on Page 35 of the chart under the

19   heading Number 7.  We've dominated these issues as issues

20   pertaining to protected parties and the channeling injunction.

21            THE COURT:  Okay.  Thank you.  And --

22            MR. LINDER:  The objections --

23            THE COURT:  -- just a moment, Mr. Linder.

24            Let me remind everyone to make sure they are muted.

25   I'm hearing somebody's typing.  Thank you.

1          Mr. Linder.

2          MR. LINDER:   Thank you, Your Honor.

3          The objections within this category pertain to a

4  perceived failure to disclose sufficient facts relating to the

5  channeling injunction, in relating -- in relation to the

6  chartered organizations.  Specifically, the objectors have

7  questioned whether the contributions are substantial, they

8  seek information regarding the assets of and the claims

9  against the chartered organizations.  The objectors are also

10 requesting additional information regarding chartered

11 organizations' rights under BSA insurance policies.

12         So I will break that down into components, Your

13 Honor, in walking you through the categories of disclosure the

14 debtors have included in the disclosure statement.

15         Preliminarily, however, I would note that of course

16 the sufficiency of any third-party contribution to the trust

17 is analyzed under the Master Mortgage factors, and that will

18 be substantiated and evidence will be adduced at confirmation

19 as to whether the debtors have satisfied those factors with

20 respect to third-party non-consensual releases.  The issue is

21 not before the Court today in connection with the disclosure

22 statement.

23         As to disclosure itself, Your Honor, there's really

24 six categories of disclosure that I would just like to

25 highlight under this heading:

1          The first is with respect to the treatment of

2  chartered organizations under the plan.  We went through this

3  yesterday, so I won't spend much time on it here.  Suffice it

4  to say that we have outlined the various possibilities for how

5  a chartered organization will be treated under the plan.

6  Those range from no participation at all, in terms of no

7  protection of the channeling injunction as to abuse claims to

8  the participating chartered organizations, to the contributing

9  chartered organizations.  And again, although we've covered it

10  before, those are on Pages 17 to 20 of the redline version of

11  the disclosure statement.

12          The second category of the six that I'm going to

13  touch on briefly is how a chartered organization may become a

14  protected party, including after the effective date.  I would

15  orient the Court to Pages 23 to 25 of the redline.  23 and 25,

16  I believe, pertain predominantly to the channeling injunction.

17  It does include a discussion of chartered organizations, how

18  they may be protected by the channeling injunction.  It walks

19  through the treatment of chartered organizations, in terms of

20  how they may become a protected party even after the effective

21  date.

22          One item that I would highlight for Your Honor,

23  this is one of the six items, but I'll address it now since it

24  is on page -- at the top of Page 24.

25          The disclosure statement makes clear that the

1  debtors have created a website link through the Omni website.

2  There will -- there either has or will soon be posted on that

3  link a comprehensive list of protected -- of potential

4  protected parties.  And this would include all of the

5  chartered organizations for which BSA has a record, so that

6  parties are on notice that these are individual chartered

7  organizations that may become protected parties during the

8  case, subject of course to the Court's entry of a confirmation

9  order approving that treatment, or potentially post-effective-

10  date subject to the procedures that we have proposed for

11  approval of post-effective-date addition to the list of

12  protected parties.

13         The third category, Your Honor, of disclosure is

14  with respect to the insurance rights of chartered

15  organizations.  I know there was some discussion yesterday of

16  the import of the 1976 start date for the participating

17  chartered organizations in -- I think it's on Page 60 and 61

18  of the redline of the disclosure statement.  This is within

19  the ten or so pages that really walks through the debtors'

20  historical insurance program.

21         But on -- at the bottom of Page 60 and continuing

22  on to Page 61, the debtors make clear that, beginning in 1976,

23  that's the first -- that's the first date at which the debtors

24  believe the chartered organizations had coverage under their

25  policies as named or additional insureds.  From the period

1   from 1976 to '77, the policies used the word "sponsors."  And

2   from 1978 onward, the policies denominated the charter

3   organizations as charter organizations.

4           I would note, parenthetically, Your Honor, that

5   certain chartered organizations have asserted that they have

6   rights under the debtors insurance program pre-dating 1976.

7   We have also disclosed those arguments in the disclosure

8   statement.

9           Finally, Your Honor, I would note that, as we

10  mentioned yesterday, Exhibit F, the very last page is a list

11  of the top 20 chartered organizations, in terms of the number

12  of abuse claims asserted against those chartered organizations

13  as a result of the debtors' analysis of the proofs of claim.

14          With that, Your Honor, I'd certainly cede the

15  podium to anyone who has an objection in this category. Again,

16  the category is the channeling injunction and the chartered

17  organizations' potential coverage under the channeling

18  injunction.

19          THE COURT:  Okay.  Thank you.

20          I will hear from others.  And as with yesterday,

21  let's use the hand raising, which I see -- function, which I

22  see some are doing.  And let me remind everybody we are here

23  on disclosure statement.

24          Mr. Schiavoni.

25          MR. SCHIAVONI:  Your Honor, the disclosure on the

1   charters that we just heard is fundamentally misleading in a

2   key respect, and then there's an inadequate disclosure in

3   another respect.

4           The presentation that the '76 date is driven by

5   availability of coverage is not at all what's reflected in the

6   objections that were filed by the limited number of charters

7   that were aware of what was going on and that were actually

8   represented by counsel.

9           If you look at the LDS objection, they refer

10  specifically to promises of a contractual indemnity by BSA and

11  the BSA board and by the local councils.  It's like the --

12  what flows from that were that there were claims by the

13  charters directly against the non-debtors, the non-debtors

14  local councils and against Boy Scouts, for promises that they

15  would be indemnified and covered in all respects with respect

16  to any claims.

17          In the same promise --

18          THE COURT:  A contractual -- a contractual --

19          MR. SCHIAVONI:  Right.  That's the assertion --

20  that's the assertion in the submissions and there's board

21  minutes that reflect this by the -- you know, by the Boy

22  Scouts.

23          There is, in fact, no coverage in the later years

24  under these retained limits and deductibles.  That's been

25  carried -- that would be, in essence, an -- you know, an

1   exposed claim by the -- you know, here, it's like this -- the

2   '76 cutoff was done to get the non-debtor local councils and

3   the Boy Scouts out of claims back against them in connection

4   with those objections that were made by the -- by the charters

5   sort of in the know.  The other charters are left without any

6   knowledge of that, basically, and with the -- and with the

7   prior period uncovered.

8           The way this deathtrap assignment works is it's

9   non-consensual.  It's a -- it's basically -- the theory is

10  negative notice; that they notice the charters to -- is that

11  charter will somehow get a six-thousand-page -- or whatever

12  it's going to be -- disclosure statement, and if they don't

13  object, their coverage, you know, post '76 will be assigned

14  and they will give up their rights as against the non-debtors

15  themselves for any promises that they made with respect to

16  ensuring that they would be fully indemnified for any kind of

17  claim.  And they will basically, for the pre '76 period, lose

18  any protections that they would have had with the Boy Scouts

19  or the -- or the local councils assisting them in the defense

20  of the claims.  There's very spotty insurance pre '76

21  available to them.  It's a very significant issue in that

22  respect; the lack of, I think, real candor about the

23  disclosure here.

24          The other part of it is it's really tied to two

25  other key issues:

1            The local council contribution to the plan, you

2    know, we went through the language yesterday, it's contingent

3    on them hitting a specific target.  And you know, each and

4    every local council has the right to pull its contribution if

5    it isn't satisfied with the release delivered to the charters.

6    The assumption here, you know, by the way, was all wrong that

7    the charters would get full protection.  So it -- the local

8    council contribution could fall out, going into confirmation.

9            In addition, if you read the Hartford settlement

10   termsheet -- and it was one of the reasons why we wanted to

11   have an adjournment, so we would have the full Hartford

12   settlement -- the Hartford settlement is also -- has a

13   provision in it that requires the delivery of an assignment of

14   the local council coverage without respect to this '76 cutoff

15   or not.  It's a provision in the termsheet that goes directly

16   to -- I think it's titled "Charters."

17           Exactly what it means, yeah, is somewhat ambiguous,

18   I have to say.  It's one of the reasons we wanted the full

19   settlement agreement.  But it promises an assignment with

20   respect to the Hartford coverage pre '76, whatever it might

21   be, and there's a lot of unknown, you know, coverage here.

22   Hartford gets an unknown release.  That was part of it, also.

23           So I -- it's like  this disclosure, I think, has to

24   mention, you know, what's in the objections by the charters

25   about the direct claims they have, irrespective of insurance;

1  that it was a promise of full indemnification that was made in

2  the objections,  And there has to be disclosure of the -- like

3  -- and you know, we were going to work on this with them.  We

4  didn't get a draft from them, but --you know, of the

5  connection to how the monies fall out if they don't deliver

6  these releases, you know, otherwise.

7          And by the way, it also just creates, you know, a

8  complete inability to resolve the case if nobody can be given

9  a release here because all the claims can re-morph themselves

10 back through, you know, the charters coming in because you

11 understand like what fundamentally is happening here is, for

12 each and every claim, you know, the assertion is that somehow,

13 you know, all three of them are involved in the claim.

14         So that if the -- it's one of the reasons, Judge,

15 in connection with the RSA you got extensive briefing from us

16 all about how the RSA was like essentially delivering illusory

17 relief.  So the Boy Scouts -- so you have a claim where a

18 charter is involved, the local council is involved, and the

19 Boy Scouts.  And the -- you know, if you only release one of

20 them and not the other two, the whole claim gets re-pled into

21 one or the other of them here.

22         So it's an essential provision of the whole plan

23 that needs to be addressed and needs to be more robustly

24 described.  And this element that's missing entirely, the

25 suggestion that this is really driven by, you know, what the

1  coverage program is, is completely inconsistent with

2  everything we've heard up until, you know, this hearing.

3         THE COURT:  Okay.  Well it strikes me that what

4  it's driven by is -- I don't know.  But I know what it says.

5  And I'm assuming that Mr. Ryan -- who I don't see, but who

6  said that he was going to be working with parties on language

7  that addressed the chartered organizations -- would include

8  language with respect to their positions if he felt that was

9  appropriate.  And it does seem, to me, an issue for the

10  chartered organizations to raise and to address, to the extent

11  that they don't understand the treatment.

12         I do remember, generally, the position taken by

13  certain charters -- and it might have been LDS -- that --

14  about a contractual right, and then there could also be policy

15  rights, so -- and those are fundamentally two different things

16  that may or may not be treated differently for different

17  purposes.  But I do recall that -- generally, that argument.

18  So I'm assuming that Mr. Ryan is going to be addressing

19  language with respect to that, again, if he feels it's

20  appropriate.

21         I'm not sure I think the language, so far, subject

22  to it being amended to address Mr. Ryan's concerns, is

23  necessarily misleading.  It just may not be as fulsome as it

24  needs to be to address the chartered organization concern.  So

25  I will hear from Mr. Ryan, but I think this is fundamentally

1   an issue for the chartered organizations, though I understand

2   the general interest of everybody in every aspect of this

3   case.

4          MR. LINDER:  Your Honor, thank you.  Again, Matt

5   Linder, for the record.

6          We appreciate your comments and we appreciate Mr.

7   Ryan's willingness to work with us on crafting the additional

8   disclosures.  We've already been in touch with him and will

9   attempt to continue to be in touch with him on this issue

10  related to purported indemnity rights and all other issues

11  that he believes should be included in supplemental

12  disclosures.

13         THE COURT:  Mr. Ryan.

14         MR. RYAN:  That's correct, Your Honor.  Jeremy

15  Ryan, on behalf of the Methodist and Catholic ad hoc

16  committees.

17         We are going to work productively offline on a lot

18  of these issues.  But I mean, I do want to state that the

19  issues Mr. Schiavoni raises, you know, going back to the point

20  yesterday, people are still digesting this and thinking all

21  these things through.  You know, he raises some very good

22  issues.  Some of them we have thought of; some of them,

23  frankly, we haven't thought of.  So, you know, we will look to

24  Mr. Schiavoni and the other carriers, who have relationships

25  and an interest with the chartered organizations because of

1  the insurance, to make sure that all chartered organizations

2  are getting the full disclosures that they need to make

3  informed decisions.

4          So, you know, we will be working offline, you know,

5  cooperatively with BSA, but we do think Mr. Schiavoni is

6  raising some very good points and we will expect him and his

7  comments to be a positive -- positively received part of that

8  process of getting full some disclosures to chartered

9  organizations.

10          THE COURT:  Okay.  Thank you.

11          Mr. Rosenthal.

12          MR. ROSENTHAL:  Yes, Your Honor.  Michael Rosenthal

13  of Gibson Dunn on behalf of the AIG companies.

14          I don't want to repeat what Mr. Schiavoni said, and

15  I appreciate what Mr. Ryan said.  I was just going to mention

16  that it does tie in to the points we were making yesterday

17  about the effect of not having chartered organizations on

18  board, and how that impacts the local council contribution.

19          I also believe, Your Honor, that we should be

20  discussing an additional disclosure, which is -- my client,

21  for example, if we were to settle, if we were to decide to

22  settle, we would want -- as Mr. Schiavoni said, we would want

23  a full and complete release of all of our BSA-related

24  obligations, which might predate 1976.

25          So, from my perspective, Your Honor, it seems to me

1  there should be some kind of disclosure, so that we wouldn't

2  have to resolicit for that reason; some kind of disclosure

3  that some of the insurers may, in fact, want or demand in any

4  settlement, a full release of their chartered organization

5  exposure related to BSA, which is, as Mr. Schiavoni said, what

6  Hartford has also requested.  But we are happy to work with

7  the debtor for -- you know, for some additional disclosure on

8  that point.

9            THE COURT:  Okay.

10            MR. LINDER:  Your Honor, I --

11            THE COURT:  Thank you.

12            MR. LINDER:  Your Honor, I think that's a fair

13  point.  To illustrate it, in terms of the Hartford settlement

14  agreement, there is a term in that termsheet that addresses

15  this; that the debtors and the other supporting parties will

16  work to obtain comprehensive releases of the chartered

17  organization.  We need to obviously do that in a manner that

18  works.

19            And so I think adding disclosure that other

20  insurers, in addition to Hartford, may insist on that as a

21  term to their respective settlement agreements, is entirely

22  appropriate.  And we are happy to work with Mr. Rosenthal.

23            MR. SCHIAVONI:  The real problem --

24            THE COURT:  Thank you.

25            MR. SCHIAVONI:  The real problem, Judge, is it

1  doesn't say what will happen if they don't actually do that.

2  And there are -- there is no indication they're doing that

3  right now.  I mean, there is 4,900 of these other charters.

4  There's no way they are going to individually deal with them,

5  you know, between now and confirmation.

6              THE COURT:  So that's a --

7              MR. SCHIAVONI:  So --

8              THE COURT:  -- risk factor and I assume it's in the

9  risk factors somewhere; and if it's not, we'll deal with it.

10             I understand the uncertainty.  But if -- I mean,

11 you're just illustrating the fact that, if we wait for 4,900

12 and -- and in fact, I think it's multiples of that -- to get a

13 deal with everyone, that will be 25 years from now.  I mean, I

14 think that we have to move, if -- and listen, the plan will be

15 confirmable or it won't.  But there's no way we can wait until

16 -- maybe not 25 years, but next year, and we may not have a

17 deal with every single charter.  And I understand the

18 uncertainty that that creates and we'll have to see who votes

19 and we'll have to see how it comes out and whether the plan is

20 confirmable.

21             But I'm hearing the debtors saying that the

22 immediate issue should be subject to further language in the

23 disclosure statement and I'll let the parties work on that.

24             Mr. Patterson.

25             MR. PATTERSON:  Thank you.  Good morning, Your

1  Honor.  Tom Patterson for Zalkin and Pfau firms.

2          Your Honor, we believe there should be additional

3  disclosure, with respect to our objection, that the scope of

4  release of chartered organizations goes beyond the permissible

5  bounds of this Court's jurisdiction and the applicable

6  authorities and providing for a release of chartered

7  organizations' independent liability to the survivors.

8          And I thought, in that regard, it might be helpful

9  for the Court to hear from Ms. Dumas, who represents a claim,

10  so we can just put it in factual context, and then we can talk

11  about what the disclosure might provide.

12          So, Ms. Dumas, could you address the Court please?

13          MS. DUMAS:  Yes, thank you.

14          My name is Gilian Dumas and I am in Portland,

15  Oregon.  I represent 65 claimants, mostly in the Pacific

16  Northwest and California.

17          But I want to talk about one California case in

18  particular to emphasize that these cases are not cookie

19  cutter.  They don't have, you know, blanket liability that is

20  exactly the same.  You know, the sponsoring organization, the

21  local council and the Boy Scouts, you can't just say it's

22  exactly the same across all these three different entities

23  because they are not.

24          And the example I want to give is one of our cases

25  that's in California, it's a filed lawsuit.  And the liability

1  against the sponsoring organization is definitely stronger

2  than it is against the local council or the BSA.  And in this

3  case, our client was abused in 1981 by a Church of Christ

4  volunteer, who was at the time a choir volunteer and our

5  client was in the choir, and that man also went on to become a

6  pastor.  He was a choir volunteer and a pastor of the church

7  for 30 years.  He was also a scout master at a troop sponsored

8  by that church, and our client was in the scout troop with

9  that man.

10         So, yes, our client filed a lawsuit against the Boy

11  Scouts, the local council and the Church of Christ, and he

12  filed a claim in the Boy Scout bankruptcy.  But to use the

13  term, the "target defendant" is the Church of Christ.  Under

14  this proposal, this Church of Christ would get a blanket

15  release for this client and everyone else who comes forward.

16         But there's no disclosure of how many claims -- and

17  this is a problem I want to raise.  There's no disclosure of

18  how many claims this particular church is facing.  I think

19  there may be some disclosure about the number of claims, the

20  Church of Christ is a national entity, but not -- but this

21  particular church in L.A.

22         There's no disclosure of the value of claims

23  against this church.  And we know from litigating similar

24  claims against churches, working with the Zalkin firm in

25  California, the value of claims against churches where

1   there's, you know, notice of a perpetrator or other bases for

2   liability, that the value of his claim alone could top $10

3   million in front of a jury, and the settlement value could be

4   two to $5 million.  But there's no disclosure of the value of

5   the claims against this church in California.

6           There's no disclosure of the assets of this church

7   or its non-BSA insurance that is likely available.  This

8   church was not operating only under -- as a named insured

9   under the BSA policy.  Obviously, it has its own insurance.

10          And so we have no basis on which to counsel our

11  client to agree to a plan that includes releasing this church

12  from liability only in exchange for zero contribution from

13  this church, other than a release for -- of insurance coverage

14  that's already available to him through his claim for the

15  local council and the BSA.  So the disclosure statement does

16  not give us the information we need to counsel this client.

17          And I just wanted to raise that as one example of

18  many that I could have plucked from, from our very limited pot

19  of 65 claims.  And I'm sure the hundreds of clients -- or

20  hundreds of attorneys on this call could come up with similar

21  examples.  And that's -- thank you.  Thank you for giving me

22  this opportunity.

23          THE COURT:  Thank you.

24          Mr. Linder.

25          MR. LINDER:  Your Honor, I think the fundamental

1  objection that Mr. Patterson raised is with respect to the

2  scope of the claims that will be released, the abuse claims

3  that will be released under the plan.  You know, that's -- we

4  disagree with his characterization; that is, releasing

5  chartered organizations from their own independent liability.

6         If you read the definition of "abuse claims," it's

7  scouting-related abuse claims that are being proposed to be

8  released through the channeling injunction.  We don't need to

9  debate that language now.  This is a disclosure statement

10 hearing.

11        If Mr. Patterson would like us to add language to

12 the disclosure statement that sets forth his position that he

13 disagrees with the scope and the permissibility of the breadth

14 of the channeling injunction with respect to chartered

15 organizations, Mr. Patterson can draft language and he can

16 send it to us for review.  Otherwise, that should be addressed

17 at confirmation.

18        THE COURT:  Okay.  Thank you.

19        I do think it's a confirmation issue, but I do

20 think Ms. Dumas' example is illustrative of issues we are

21 going to have to deal with.  And I -- but I think there are

22 some separate issues there, in terms of the scope, in terms of

23 the example where the perpetrator was a member of the church,

24 leader of the choir, pastor, and then also had a position with

25 the BSA.

1          I don't think anybody is suggesting that the church

2  would be absolved of liability for non Boy Scouts related

3  liability for that perpetrator's abuse, if there is any

4  liability, not to suggest one way or the other.  But we are

5  going to have that issue where there are multiple capacities.

6  And certainly, I'm not reading the plan to suggest that

7  anything beyond Boy Scout related abuse is encompassed in any

8  channeling injunction or any release.

9          Now I recognize that still may have issues with

10  respect to the Boy Scout related channeling and release.  But

11  I view those as two fundamentally different issues and I

12  thought it was clear.  But Mr. Patterson, if you have language

13  to suggest that you think makes it more clear, particularly

14  with respect to the non Boy Scout related liability of any

15  protected party, please work with the debtors on that.

16          MR. PATTERSON  Your Honor, Tom Patterson.

17          We will prepare some language.

18          And just so the Court appreciates part of the issue

19  we are raising, the definition of "release" in the plan refers

20  to liability that derives -- and there is a long list of

21  things.  But included in that list is "in whole or in part."

22  And that language arguably brings in situations of the kind

23  that Ms. Dumas referred to, where a chartered organization

24  associated individual comitted acts of abuse with respect to

25  individuals in the context of scouting, outside the context of

1  scouting, and so on.  A there are two points I want to raise

2  with that:

3          The first is that there is the implication that the

4  non-scouting conduct could be smuggled in.

5          But the second point and the broader point is that,

6  with respect to the abuse that took place, the Boy Scouts was

7  irrelevant to it.  I mean, it happened to be part of the abuse

8  took place in the scouting atmosphere or context.  But that

9  isn't to say that this is Boy Scout liability.

10          I mean, in all cases, we have to remember that --

11  and we talk about the three sort of segments of liability.

12  But there's actually a fourth, and the fourth is the

13  perpetrator.  We never talk about the perpetrator.  And the

14  real question in many of these cases, which drives what the

15  independent liability of any particular one of the silos has,

16  is:  Who is that individual associated with?

17          And when you have an individual who was brought to

18  the context by a chartered organization, was under their

19  supervision, was selected by them, and in the case that Ms.

20  Dumas referred to, was hired by them entrusted with clerical

21  duties by them; that is a comprehensive set of liability for

22  that chartered organization that is really irrelevant to the

23  Boy Scouts.

24          And so, you know, we -- I think, in an earlier

25  case, we talked about the form of release as being the tail

1  wagging the dog.  I think this is a flea on the tail of a dog,

2  wagging the dog.  And, so obviously, this is a confirmation

3  issue.  We will work with Mr. Linder to draft appropriate

4  language in the disclosure statement, so that people are aware

5  of this issue and aware of what the plan seeks to do, and

6  we'll just reserve for later.  We appreciate your time, Your

7  Honor.

8            THE COURT:  Thank you.

9            Mr. Buchbinder?

10           MR. BUCHBINDER:  Thank you, Your Honor.  Whoops,

11 whoops.  Here we are.  Thank you, Your Honor.

12           I just raise to -- rise to raise a point of

13 information.  I did some double-checking while we've been

14 hearing this discussion, and I do not believe that the debtor

15 ever included in its master mailing matrix or its schedules --

16 and I had a chance to pull them quickly -- the vast majority

17 of -- the vast majority of the chartered organizations don't

18 have any notice of what's going on here today, and have no

19 notice of all of these provisions having been cooked into a

20 plan that will affect all of their rights.

21           Those are some of the issues that I have raised

22 with counsel, and I will let the Court know that I am working

23 with Mr. Ryan and the debtor on these issues.  But I did some

24 double-checking, and the vast majority of the chartered

25 organizations have not had any notice and do not know what is

1  going on.  Thank you, Your Honor.

2         THE COURT:  Thank you.

3         MR. LINDER:  Well, Your Honor, as to notice, we

4  noticed out each and every chartered organization for which

5  BSA has contact information.  They were all provided with the

6  notice of commencement of the Chapter 11 cases.  I believe

7  there were -- in the bar date notice, as well.  And I believe

8  there were forty-plus thousand chartered organizations who

9  received those notices.  So we can certainly continue to

10  liaise with Mr. Buchbinder offline, but we just fundamentally

11  disagree about the scope of notice provided to those parties.

12         THE COURT:  Okay.  Thank you.

13         Mr. Stang.

14         MR. STANG:  Good morning, Your Honor.  How are you?

15         THE COURT:  Morning.

16         MR. STANG::  Let me get my hand down, so we don't

17  show me as wanting to speak on every issue.

18         So, Your Honor, I would appreciate it if Mr. Linder

19  could go back to Page 24 and explain -- because I've read it

20  three times, and I have a little uncertainty as to what it

21  means, this is Page 24 of the redline -- as to the process for

22  how the Court is involved and what "notice and opportunity"

23  for hearing means when we are dealing with post-confirmation

24  settlements because I'm finding it difficult to understand.

25  And perhaps if no one else is, he could at least indulge

1  committee counsel to explain it because -- and I'm just trying

2  to turn to it myself, Your Honor.

3           MR. LINDER:  Your Honor, I'm happy to address that.

4           MR. STANG:  And Your Honor, on the redline, it's

5  that big block --

6           THE COURT:  I know.

7           MR. STANG:  -- paragraph.

8           THE COURT:  I'm there.

9           MR. STANG:  Okay.

10           MR. LINDER:  Your Honor, we filed the fifth amended

11  plan.  We made a good faith attempt to put specific procedures

12  around how chartered organizations and insurance companies

13  could, following the occurrence of the effective date, become

14  protected parties or limited protected parties in the case of

15  a chartered organization who opted not to become one prior to

16  the effective date.  The -- those are in Article 4 of the

17  fifth amended plan.  I believe it's Sections -- I believe it's

18  Sections J, K and L of Article 4.

19           The way to think about this is with respect to

20  parties with chartered organizations, who, following the

21  effective date, would become contributing chartered

22  organizations and, in turn, protected parties, the full

23  benefits of the channeling injunction.

24           My understanding, Your Honor, is that we would --

25  the settlement trustee, rather, would file a notice.  We would

1  enter into a proposed settlement agreement along the lines of

2  the types of agreements that were -- we entered into with

3  TCJC, the termsheet that is subject to definitive

4  documentation.

5           There would then be, within 30 days of execution of

6  that agreement, a notice filed on the docket of the Chapter 11

7  cases.  That notice would be served out appropriately. Parties

8  would have an opportunity to object.  And if there are no

9  objections, the parties could seek to have an order entered by

10  the Court.  That's the same process that is proposed to be

11  followed with respect to the insurance companies, becoming

12  settling insurance companies and protected parties.

13           The one difference, Your Honor, in the third

14  bucket, with respect to chartered organizations who wish to

15  become participating chartered organizations after the

16  effective date, is that it would be a notice procedure without

17  requiring an objection period or a hearing.

18           MR. STANG:  So, Your Honor, what confused me was,

19  at the end of the first sentence of that paragraph, the next

20  sentence begins:

21           "Likewise, any chartered organization that is not"

22  --

23           And I didn't understand the difference between what

24  settlement scenario there was in the first sentence and what

25  there was in the second sentence because the "likewise"

1   alerted me to, well, this is different, so read this next

2   sentence because there is something different here.

3            And that's what I didn't -- because the first

4   sentence talks about not a contributing charter may become a

5   protected party, and then it says any charter that is not a

6   participating charter may become a participating charter.  And

7   I'm just confused about these different capacities that are

8   possible under this post-effective-date scenario.  So that's

9   what confused me.  And I have a couple of additional --

10            THE COURT:  Okay.

11            MR. STANG:  -- questions --

12            THE COURT:  Well, I would have --

13            MR. STANG:  -- about this.

14            THE COURT:  I would have thought "likewise" would

15   have meant similar, and not different, but, okay.  So maybe

16   take the word "likewise" out and -- because there's a

17   difference.  There's a difference.

18            MR. STANG:  I don't --

19            THE COURT:  A chartered organization that wants to

20   become a contributing chartered organization, there's a

21   notice, a hearing, and an opportunity for objection.  And if

22   there is an objection, then I'll have a hearing; and if

23   there's no objection, then I'm not required to have a hearing.

24   But for a chartered organization that wants to become a

25   participating chartered organization, there's simply a notice.

1  There's no opportunity for objection and a hearing.  That's

2  how I read it.  So we can decide whether that's appropriate,

3  but that's how I read it.  Is it really that confusing?

4          MR. STANG:  Well, it's confusing because I'm not

5  sure I appreciate the distinction between the protections

6  afforded to a -- to this organization if it's a contributing

7  chartered organization versus a participating chartered

8  organization.

9          MR. LINDER:  Your Honor --

10          THE COURT:  Okay.

11          MR. STANG:  And I understand --

12          THE COURT:  That's a different issue.  That's a

13  different issue and that's not this paragraph.

14          MR. STANG:  Well --

15          MR. LINDER:  Your Honor --

16          MR. STANG:  -- is that right?

17          MR. LINDER:  -- if I could interject.  The TCC has

18  known about the participating chartered organization

19  architecture for several months.  It is completely beyond --

20  it strains credulity to -- for Mr. Stang to say, here, today,

21  that he doesn't understand the difference.

22          I think this is an issue that we need to work

23  through with Mr. Ryan to make sure that -- as he's requested,

24  that all of these disclosures be articulated in a way that's

25  easy to understand.  So I think, to the extent that the

1  language can be clarified to just make clear the differences

2  between the different categories of potential protected

3  parties post-effective-date, we are certainly happy to do

4  that.

5          The propriety of the different categories of

6  protected parties and how we notice them out and how we seek

7  approval of them -- or the trustee, rather, seeks approval of

8  them after the effective date, again, that's something that

9  should be discussed at confirmation.

10         MR. STANG:  You know, Your Honor, whether I

11  understood it or not, this is going to be read by a layperson.

12  And these definitions are really, really dense.  And frankly,

13  Mr. Linder, time and time again, says, well, you should have

14  understood what this meant.

15         Well, whether I understood it -- and I don't,

16  actually -- is almost beside the point.  Will a layperson?

17  There are a lot of unrepresented people here, Your Honor, in

18  this case.  Will they understood these distinctions and

19  appreciate why a court approval is required in one instance

20  and not the other?

21         Now, you know, whether court approval is required

22  in one instance and not the other is maybe beside the point

23  because, you know, we -- people can object to the process and

24  that's not for today.  But he keeps on falling back on what

25  you should know.  Well, you know what?  I'm not talking to

 1  thousands and thousands and thousands of people to explain to

 2  them what their rights are.  That is his job.  That is his

 3  clients' job through this disclosure statement.

 4          And if there needs to be a key somewhere that says,

 5  if you're a contributing chartered organization, then this is

 6  what the impact is on a survivor, versus whether it is a

 7  protected party, whether one is subsumed within the other.

 8  They need it make that clear because, frankly, I think most

 9  people's heads spin --

10          THE COURT:  I think --

11          MR. STANG:  -- when they try to understand these

12  distinctions.

13          THE COURT: I agree that this is a complicated plan.

14  And what I hear that the -- Mr. Linder saying is that they

15  will be working with Mr. Ryan to come up with language that

16  will make clearer, to the extent one can, the difference

17  between the participating and the contributing chartered

18  organizations and what the consequences of each one is.  So

19  let's see that language.

20          And Mr. Stang, if you still have a problem with it,

21  we can address it, but the --

22          MR. STANG:  Okay.

23          THE COURT:  -- point in this paragraph -- and this

24  paragraph deals with notice and --

25          MR. STANG:  Okay, Your Honor.  We'll see what they

1  come up with.

2          The last sentence says:

3          "Such settlement will be deemed binding, absent

4  objection, within 15 days."

5          Earlier, in the middle of this paragraph, there's a

6  reference to 30 days.  It's -- I think that perhaps that last

7  sentence should say "such insurance settlement" to make it

8  distinct from the 30 days, if, in fact, they are intending to

9  make it distinct.  I mean, I honestly can't tell.  I just

10 think --

11         THE COURT:  Okay.

12         MR. STANG:  -- that's a little confusing.  You've

13 got 30 and 15 going on in the same paragraph.

14         But I have some other comments, Your Honor.

15         MR. LINDER:  Your Honor, obviously, the parties

16 need to read the words around the numbers to understand what

17 the numbers mean.  But again, we are going to -- we are going

18 to craft something that we intend to be, as Your Honor said

19 rightly, as clear as we can be here in the complexity of the

20 provision.

21         MR. STANG:  Okay.  Your Honor, the second thing is

22 -- and perhaps this was addressed.  And if I am being

23 redundant, I would like you to tell me, as opposed to Mr.

24 Linder telling me.  I don't know that we have heard from the

25 local councils as to whether they are satisfied, for the

1  purposes of their commitment letter, with the deal with the

2  chartered organizations on the January 1, '76 and forward

3  issue.

4          I understand that the commitment letter is

5  conditional, but we have a settlement proposal now that deals

6  with at least the January 1, '76 and thereafter issues.  And I

7  don't know that I've heard that the conditions in their

8  commitment letter have been satisfied as to at least that body

9  of claims because, if it isn't, then I suspect that we will

10  soon hear that the pre January 1, '76 claims are going to be

11  subject to the same kind of deal.  Now that's my speculation.

12  I don't know what's going to happen.  But I don't know that

13  we've heard from the local councils about the impact on their

14  conditional commitment for the January 1, '76 and thereafter

15  protocol that's been offered.

16          And I've heard a couple of times, Mr. Linder has

17  said, well, BSA this and that, BSA knows this and that.  And I

18  know this isn't a joint plan, but in effect it is.  This is

19  really a joint plan with the local councils.

20          THE COURT:  Well --

21          MR. STANG:  And --

22          THE COURT:  -- I think this is a subset of Mr.

23  Schiavoni's issue about termination of the commitment letters

24  and when are we going to know and that kind of thing.  I think

25  that's a subset of this.  So I'm trying to think where we left

1  that, but I think that's an important issue.

2          Where did we leave that, Mr. Linder?

3          MR. LINDER:  We were drafting language, Your Honor,

4  to make -- to put some clarity around provisions of the local

5  council, the local council letters of contribution -- I'm

6  sorry -- letters of intent, that's where we left that at.

7          In response to Mr. Stang, again, we've made this

8  clear, there is a risk factor, Risk Factor 14, that speaks

9  directly to local councils not being satisfied with the

10 treatment.  As I mentioned before, this isn't something that's

11 tied necessarily to temporal -- it's not -- it doesn't have a

12 temporal aspect.  But we, the debtors, working with the ad hoc

13 committee, are going to be revising the language to make this

14 issue clear, in terms of whether the local councils are

15 satisfied, what happens if they are not satisfied, what are

16 the consequences of that.

17         MR. SCHIAVONI:  Your Honor, I reached out

18 yesterday, right away, to the ad hoc committee's counsel at

19 Wachtel.  They very politely took my call and we spoke about

20 this.  My understanding is that they were going to share us

21 language.  I'm drafting my own language and we'll work

22 together.

23         My understanding, Mr. Linder, is, you would work

24 together with us on that and we would submit something after

25 we've looked at it.

1          MR. LINDER:  That's correct, Mr. Schiavoni.  I

2    didn't mean to imply otherwise.

3          I think we received a draft of some language from

4    our friends at Wachtel today.  We are turning the disclosure

5    statement as this hearing is ongoing.  So rest assured we will

6    collaborate with Mr. Schiavoni and the ad hoc committee.

7          THE COURT:  Okay.

8          MR. STANG:  And Your Honor --

9          THE COURT:   And I think --

10         MR. STANG:  -- what --

11         THE COURT:  -- Mr. Stang's -- and I think Mr.

12   Stang's comment is a fair one, to be included within the

13   issues that are being addressed.

14         MR. STANG:  Thank you, Your Honor.

15         And Your Honor, one last point.  The exhibit that -

16   - well, two, actually.  The exhibit -- and I was trying to

17   find it as we were talking and I just couldn't do it.  But

18   there's an Exhibit K that lists the non-participating

19   chartered organizations.  That shows a couple of Catholic

20   dioceses that I believe are in bankruptcy and have that whole

21   issue about the effect of the bankruptcy on the --

22         THE COURT:  Right.

23         MR. STANG:  Okay.  So that's the starting list.  I

24   mean, but even that starting list is incomplete.

25         The Archdiocese of Santa Fe has at least one Boy

1  Scout claimant that I personally know of, and I do not believe

2  it has settled, that claimant has settled.

3             MR. LINDER:  Mr. Stang, the list -- the Exhibit K

4  list, it doesn't purport to be a comprehensive list of every

5  diocese that's in bankruptcy.  We have the dioceses that are

6  in bankruptcy that are also chartered org -- either chartered

7  organizations past or present, or as to which -- I think as to

8  which claims have been filed asserting that there is liability

9  on account --

10            MR. STANG:  Well, I think you --

11            MR. LINDER:  -- (indiscernible)

12            MR. STANG:  -- missed Santa Fe, so you might want

13 to check, and there aren't that many --

14            THE COURT:  Okay.

15            MR. STANG:  -- Catholic dioceses --

16            THE COURT:  Well, Mr. Stang, if you know -- if you

17 know of any diocese that are in bankruptcy that are not

18 listed, please inform the debtors --

19            MR. STANG:  I will, Your Honor.

20            THE COURT:  -- and they will check as well, and

21 include them --

22            MR. STANG:  Thank you.

23            THE COURT:  -- if necessary.

24            MR. STANG:  The next issue on the same exhibit,

25 Your Honor, is whether, in fact, these dioceses are the

1  chartering organizations.  In many, many dioceses around the

2  country, the parishes are separately incorporated from the

3  diocese itself.  I have lived this since 2004, this issue of

4  what is the corporate structure of the diocese.  And so I

5  believe that the actual chartering organization may well be a

6  parish and not the diocese itself.  And they are not the same

7  thing if you talk to a diocesan attorney.

8          THE COURT:  Okay.

9          MR. STANG:  And so, you know --

10         THE COURT:  Okay.

11         MR. STANG:  -- you're right, Mr. Schiavoni keeps on

12 referring to 4,900.  I don't -- it's forty-nine -- it's more

13 like 49,000, you were right, Judge.

14         THE COURT:  Right.

15         MR. STANG:  And so --

16         THE COURT:  So I think the debtor has the

17 information that it has with respect to who the -- who is in

18 bankruptcy.  And one would think that would be easily

19 determinable, if you have a name.  So --

20         MR. STANG:  Well, it's --

21         THE COURT:  -- if there are --

22         MR. STANG:  It's not an --

23         THE COURT:  -- others that you're aware of that are

24 in bankruptcy, if it's the parish and not the diocese, you can

25 provide that information.  But again, one ought to be able to

1  search the bankruptcy dockets and find out who is in and who

2  isn't.

3          MR. STANG:  Your Honor, I had actually moved on

4  from the bankruptcy issue.  I don't care whether the entity is

5  in bankruptcy or not.  The question is:  Have they correctly

6  identified the chartered organization?  Because I have been

7  informed that the chartered organization is -- again, we're

8  using the Catholic context, but not the bankruptcy context --

9  that the chartered organization is not the diocese, which is a

10 corporate entity under civil law, but, in fact, is the parish,

11 which is a civil -- in almost every -- in many, many contexts,

12 is a separate civil entity.  And so --

13          THE COURT:  Okay.

14          MR. STANG:  -- they list, the diocese of -- I don't

15 know, we'll call it Los Angeles.  If they did, well, that's

16 not the same as Saint Monica's Parish down the street from my

17 house.  They are different.  And to tell someone that the

18 chartered organization that is or isn't in is the diocese,

19 well, the diocese may not even be the chartered organization

20 and I --

21          THE COURT:  But you don't --

22          MR. STANG:  -- (indiscernible)

23          THE COURT:  -- know that for sure.

24          MR. STANG:  I have --

25          THE COURT:  You don't --

1          MR. STANG:  -- been informed --

2          THE COURT:  -- apparently, know that for sure

3   because you just said it may not be.  So there can only be

4   information that the debtor knows.

5          MR. STANG:  Well, I would suggest the debtor go

6   talk to Mr. Ryan because I have been informed and -- well,

7   Your Honor --

8          THE COURT:  The debtor --

9          MR. STANG:  -- I've been informed --

10          THE COURT:  -- is talking to Mr. Ryan.

11          MR. STANG:  (Indiscernible)

12          THE COURT:  And if Mr. Ryan has that issue -- if

13   Mr. Ryan has that issue, he'll raise the issue.

14          MR. STANG:  Well, I don't know if Mr. Ryan has the

15   issue.  I've got the issue.  Creditors --

16          THE COURT:  I am not --

17          MR. STANG:  -- are entitled --

18          THE COURT:  How does --

19          MR. STANG:  -- to know --

20          THE COURT:  -- your issue get resolved in terms of

21   debtor knowledge in a debtors' disclosure statement?

22          MR. STANG:  Well, I am asking the debtor to pull

23   upon its resources, which include access to Catholic Mutual

24   insurance company, multiple Catholic dioceses on the ad hoc

25   Catholic committee -- and by the way, this could extend to the

1  Methodists and the Episcopalians.  They have corporate

2  structures that distinguish between the diocese and the

3  parish.  And "parish" may not be the right word in every

4  religious context.  But they are different.

5        And creditors, if they are going to be informed and

6  if they are going to be informed as to the chartered

7  organizations that are not participating, they need to be

8  correctly named.  And it's not just what the debtor has.  The

9  debtor is in constant contact with these religious entity

10  representatives.  And they should -- it should ask and it

11  should take that information and either say, look, we don't

12  know the name of every single parish -- though I don't know

13  how that's possible -- or you know, in fact, it is the

14  diocese.  But I -- Judge I --

15        THE COURT:  Okay.  Well, the debtor says --

16        MR. STANG:  -- (indiscernible)

17        THE COURT:  -- it has served or noticed out 40,000

18  plus chartered organizations, so, presumably, it knows who its

19  chartered organizations are.

20        MR. STANG:  Right.

21        THE COURT:  If it's mistaken, that could have a

22  consequence down the line for proper notice in any number of

23  contexts.  But the debtor has said that they have noticed out

24  to 40,000 plus chartered organizations.  I have to assume the

25  debtor knows who it's chartered organizations are.

1          MR. STANG:  So I'm going to -- in the interest of

2    saving forests, perhaps the debtor will simply link this

3    exhibit list because I hope it's not going to list 40,000

4    names.  Right now, there's only one chartered organization out

5    of 49,000 that's not -- you know, that's actually

6    participating in this.  But he'll do it however he wants to

7    fashion the notice.

8          The last issue, Your Honor, is the schedule -- and

9    this one I couldn't find -- where they have the list of --

10   it's the claims analysis, where they show how many claims are

11   against the Methodists, how many claims are against the

12   Catholics.  That, again, is simply inaccurate.

13         You -- if you were to file a lawsuit against the

14   Roman Catholic Church in the United States, your lawsuit would

15   be dismissed.  There is no such civil entity.  Frankly --

16         THE COURT:  Okay.

17         MR. STANG:  I'm not even --

18         THE COURT:  Okay.

19         MR. STANG:  -- sure there's such --

20         THE COURT:  So should we delete this?  Should this

21   exhibit come out?  Is it inaccurate and useless, so it

22   shouldn't be in here?

23         MR. STANG:  I don't know, but it is certainly not a

24   reasonable classification.  When people are trying to figure

25   out how many -- why are we doing this?  They are trying to

1  demonstrate to creditors the scope of the claims against the

2  chartered organization, so that people can evaluate whether or

3  not they want to vote for a plan that has chartered

4  organizational releases.  I mean, it's like saying I'm suing -

5  -

6              THE COURT:  I understand --

7              MR. STANG:  -- the --

8              THE COURT:  -- your issue perfectly.  I understand

9  it perfectly.  So I'm asking you:  If this is inaccurate, is

10 your ask that it come out?

11             MR. STANG:  No, my ask is that, if they are going

12 to explain to creditors how many claims there are against a

13 particular chartered organization, they should do that, and

14 not lump them together by broad categories of -- be it

15 religious or civic organizations, that, frankly, in the

16 context of the religious organizations, doesn't even actually

17 exist.  There's -- you know, and the Catholics are the ones

18 that I have personal knowledge about.  I mean, it's just --

19             THE COURT:  Okay.

20             MR. STANG:  I think it's --

21             THE COURT:  I understand.

22             MR. STANG:  -- (indiscernible)

23             THE COURT:  Thank you.  Mr. Linder --  I totally

24 understand what you're saying.

25             MR. STANG:  Okay.

1              THE COURT:  Mr. Linder.

2              MR. STANG:  Thank you.

3              MR. LINDER:  Your Honor, as an initial matter, I

4   would just note that we added this exhibit, Exhibit F, to the

5   disclosure statement at the request of the TCC.  There are, as

6   you acknowledged, tens of thousands of chartered

7   organizations.  Because of how we are negotiating and who is

8   participating in the mediation, it's not individual parishes

9   participating in the mediation, that's not the way it's

10  happening.

11             Mr. Ryan's client is an ad hoc committee of

12  Catholic -- Roman Catholic entities.  There is a United

13  Methodist ad hoc committee.   There is a -- the Episcopal

14  Church is participating in the mediation.

15             We haven't misled anyone.  If you look at the last

16  page of Exhibit F, what it doesn't -- what it doesn't say is

17  individual chartered organizations.  It says, "Chartered

18  Organization Group."  So we have structured it in that

19  fashion, given how the debtors are approaching negotiations

20  with respect to potential contributions by those chartered

21  organization groups.  Now there may be intricacies, in terms

22  of how a group may collect a potential contribution, and I

23  think that's way outside the scope of what we are trying to

24  accomplish here.

25             I think Mr. Stang's approach -- and he articulated

1  it in one very skeletal paragraph of their exclusivity

2  objection -- he wants every individual parish, elementary

3  school to make their own individual contribution, monetary

4  contribution, to the trust and get a release.  You'll hear

5  more about that whenever the Court decides to hear the

6  exclusivity termination motion.

7           But in short, the way Mr. Stang is articulating the

8  way this schedule should be filed, it's not necessary and the

9  debtors don't believe any disclosure -- additional disclosure

10 or any changes needs to be made.

11          MR. STANG:  Your Honor --

12          THE COURT:  Okay.

13          MR. STANG:  -- my --

14          THE COURT:  So let me ask this question, let me ask

15 this question.  I actually did assume that this was added at

16 the request of the TCC, though I didn't know.  But I guess the

17 question is:  Is this helpful information or is it not helpful

18 information?

19          And I am not familiar with -- well, I'm generally

20 familiar with most of these organizations.  I don't know how

21 they are all structured.  But you know, it does make sense to

22 me that a chartering organization is a school, it is a Kiwanis

23 club, it is a church, it is a synagogue.  It is not some

24 overarching organization.

25          But I do understand the way that the debtor is --

1  except for maybe the Mormon Church, I do understand that the

2  way the debtor is -- the way certain chartering organizations

3  are participating is through an ad hoc group, which is --

4  which encompasses specific parishes, churches, entities within

5  the organization, the sort of umbrella organization.  So I

6  guess my question is:  Is this helpful information?  If it's

7  not, then maybe it should -- or if it's misleading, then maybe

8  it should come out.

9          But what I am not going to require the debtor to do

10  is list 40,000 plus chartered organizations and attempt to

11  figure out what -- how many claims are against each one.  I

12  don't even know if that's possible, but -- and I understand

13  parties would like that granular information, and maybe the

14  debtors will tell me it's possible and I'll change my mind.

15          But my real question is:  If this if this

16  information is actually somehow misleading and unhelpful, then

17  let's not have it in here.  I don't want somebody to be misled

18  to think that there are 3,886 claims against its particular

19  Methodist Church on the corner.  Okay?  So I don't want

20  someone to think that and be misled.  And that's the question

21  --

22          MR. STANG:  Okay.

23          THE COURT:  -- Is this information helpful or is it

24  not?

25          MR. STANG:  Your Honor, from the committee's

1    perspective, it is certainly useful to know how many "Catholic

2    claims" there are, when we are sitting down with the committee

3    that purports to be able to deliver money on behalf of

4    chartered organizations.  So, if the diocese of Los Angeles is

5    able to -- if you'll allow me -- pass the hat amongst the

6    parishes in L.A. and -- the ones that are chartered

7    organizations, and be the channel by which that contribution

8    is delivered, we can assess whether it has to be an a

9    chartered organization by chartered organization level for

10   determining whether confirmation standards have been met.

11          But I do think it's -- and perhaps we can -- and

12   you said something which made me think there is possibly

13   probably an answer here, and it's what Mr. Linder added.

14   There -- I don't know what this chartered organization group

15   is.  So maybe a footnote that says the -- I don't know whether

16   I call it -- the group names do not necessarily reflect

17   whether the group, Judaism or Catholicism, is a chartered

18   organization.  And these groups may actually be a label for

19   multiple chartered organizations, something like that, because

20   people shouldn't be misled.

21          I mean, the Catholic Church is a very complex

22   organization with literally thousands and thousands of

23   separate civil entities.  So that's what I suggest.  That's

24   what we should do.

25          THE COURT:  Okay.  Well, if that's fine.  I'll let

1  the debtors -- you guys can decide.

2           If this exhibit, though, was for the purpose of the

3  committee knowing, claims so that they can speak with parties

4  in mediation, then it shouldn't be in the disclosure

5  statement.  The disclosure statement goes to the individual

6  survivors and claimants who are going to vote and gives them

7  useful information, not the committee.  The committee has the

8  information.

9           But Mr. Linder, I'll let you caucus with your group

10 and see.  I do think, if it's going to stay in, it could have

11 a better indication of what it is and maybe the reason it was

12 created.  Okay?  So -- okay.

13          MR. LINDER:  We will --

14          THE COURT:  I think we've --

15          MR. LINDER:  We will --

16          THE COURT:  -- beaten this horse.

17          MR. LINDER:  Yeah, we have.  We will draft -- we

18 will add a footnote, Your Honor, and we will attempt to make

19 it crystal clear what this list purports to represent and what

20 it doesn't.

21          THE COURT:  Okay.  Can I make an observation with

22 respect to the charts we have?  Because I did spend a little

23 bit of time with them last night.  It would be helpful, I

24 think -- and I have the redline in front of me, so it's harder

25 to look at -- if the -- if they could all be structured in the

1 same fashion.  And by that I mean:  If we are doing it

2 alphabetically, then can they all be alphabetical?  If we are

3 doing it by council number, can they all be by council number,

4 so that you can actually trace through somebody?

5          And I think that the local council list, which is

6 one of the first exhibits, the Local Council Settlement Trust

7 Contribution is by local council number.  But then, when I get

8 to some of the others they're -- well, some seem to be by

9 local council number, maybe, but some seem to be alphabetical.

10 I don't know.  And maybe they got rearranged because, again,

11 I'm looking at the redline.  But can we just make sure they

12 are all in the same -- organized in the same fashion, so

13 parties can easily find their council?

14          MR. LINDER:  That's not a problem, Your Honor.  I

15 actually noticed that, too, within Exhibit D, with respect to

16 certain listings, properties, local councils.  And we will

17 adopt, I think, either an alphabetical approach or some other

18 consistent approach among --

19          THE COURT:  That's the word I wanted, thank you.

20 Some consistent approach, so that they are more easily

21 readable and comparable.

22          MR. LINDER:  Very good, Your Honor.

23          THE COURT:  Thank you.

24          Okay.  Next.  Do I have any hands up for -- I don't

25 think so.

1          MR. STANG:  Your Honor, Ms. Lujan's hand is up.

2          THE COURT:  Yes.

3      (No verbal response)

4          THE COURT:  Ms. Lujan Wolff, you need to unmute.

5          MS. LUJAN WOLFF:  Sorry.  Thank you.

6          Your Honor, regarding the chartered organizations

7  in bankruptcy, the debtors did respond to the objection that I

8  made in the last -- my last two objections.  However, the

9  disclosures are not clear to me and I just want to give some

10  background.

11          The reason why the objection was made is because

12  most of my clients -- the implicated chartered organization is

13  the Archbishop of Agana, in Guam, which is a Chapter 11 debtor

14  since 2019.

15          And the debtors did disclose that now there is a

16  new treatment regarding Chapter 11 debtors, who -- chartered

17  organization not being -- or having to opt in, I guess, to

18  become participating chartered organizations, to be these

19  limited protected parties.  So the question that I have,

20  really, is:  What does it mean to not be a participating

21  chartered organization, which the Chapter 11 chartered

22  organizations are presumed to be?

23          And I understand that the nonparticipating

24  chartered organizations will not receive the benefit of a

25  release or a channeling injunction as to post 1976 claims.

1   And I assume that there is also not going to be the -- this

2   implied assignment for which the BSA later tries to secure

3   actual assignments, so I understand that.

4          But the question I have is:  If these

5   nonparticipating chartered organizations, you know, having

6   that status, does that still mean that they are going to be

7   treated in the same way as they were treated under the

8   original Hartford settlement, which is simply that the rights

9   are not against -- I guess the -- BSA's position was that the

10  chartered organizations' rights were not totally extinguished.

11  They were simply channeled to the settlement trust and the

12  chartered organization was then to, I guess, potentially

13  recover.  So it's not clear to me.

14          It's -- in some parts of the -- I believe it was in

15  the reply.  The reply might have been clearer than the actual

16  disclosure statement and plan regarding this.  And it was made

17  -- it was stated that the rights of these Chapter 11 chartered

18  organizations are not affected, and so it just needs to be --

19  I need to understand what does that mean.

20          Does that mean that the Hartford -- let's say the

21  Hartford sale does not include a sale of the Chapter 11

22  chartered organizations' rights to these policies.  Is that --

23          THE COURT:  Okay.  Let me have Mr. Linder responds

24  to that.

25          MR. LINDER:  Thank you, Your Honor.  I'm trying to

1  locate just the page where this is described.  I'm happy to

2  describe it, but I want to make sure I tie it to the language

3  in the disclosure statement, so if you'd give --

4             THE COURT:  Yes.

5             MR. LINDER:  -- just give me a few seconds here to

6  locate the language.

7             THE COURT:  Uh-huh.

8        (Pause in proceedings)

9             MR. LINDER:  Okay.  I think I -- I believe I've

10  found it, Your Honor.  And I know we said we were going to

11  reserve Hartford issues to the end, but I think it's

12  appropriate to address it in this context, if I may.

13             So the -- if a participating -- if a chartered

14  organization --

15             THE COURT:  What page are you on, Mr. Linder?

16             MR. LINDER:  I'm sorry.  I'm on -- I'm looking at

17  Page 112 of the redline.

18             THE COURT:  Thank you.

19             MR. LINDER:  The heading is "Sale of Hartford

20  Policies."

21             If a chartered organization, Your Honor, either --

22  one that is not in bankruptcy, elects not to be a

23  participating chartered organization; or, in the case of the

24  Archbishop of Agana, is automatically presumed not to be a

25  participating chartered organization, the construct that we've

1  created to the plan and which is reflected in the disclosure

2  statement is that that chartered organization will retain all

3  of its rights under all insurance policies which it -- in

4  which it asserts an interest.

5         There is a -- there is a caveat to that, of course,

6  which is, in the context of any proposed settlement with an

7  insurance company, including Hartford -- and this is the

8  language that I will read -- that would be -- that retention

9  of interests in insurance policies is subject to a policy --

10  any policy buyback in connection with an insurance settlement.

11  That includes Hartford.

12         So, in connection with the Hartford settlement,

13  they will be -- those policies will be sold by the debtors in

14  their estates to Hartford.  They will be sold free and clear

15  of all interests of the estates and other interests, including

16  interests of chartered organizations, to the extent that they

17  have such interest in the policies; free and clear pursuant to

18  Sections 363, 1123, and/or 1141 of the Bankruptcy Code, and

19  other applicable law.

20         THE COURT:  Okay.  Can we have -- or maybe this is

21  part of what Mr. Ryan is going to be dealing with.  But in the

22  part that discusses the treatment for chartered organizations

23  and their options, can there be a paragraph or a few sentences

24  that discusses the impact of not becoming a participating or

25  contributing chartered organization, so that it's right there?

1    MR. LINDER:  Your Honor, we think that's an

2 important additional disclosure and it will be in our revised,

3 sort of up-front analysis -- up-front overview of chartered

4 organization treatment under the plan.

5    THE COURT:  Okay.  Thank you.

6    MS. LUJAN WOLFF:  And so, I'm sorry, Your Honor.  I

7 -- so if I can just clarify with Mr. Linder.

8    So even with a Chapter 11 chartered -- debtor

9 chartered organization, which has the protection of an

10 automatic stay that's issued from its own bankruptcy, even in

11 that situation, the BSA's intention is to (indiscernible) the

12 chartered organizations' interests in the policies as part of

13 the sale, as part of a buyback to an insurer, including

14 Hartford?

15    MR. LINDER:  Your Honor, we dispute that the sale

16 would constitute a violation of the automatic stay of any

17 chartered organization that's in bankruptcy.

18    But we have disclosed, again, in connection with

19 the Hartford settlement, that, if there is a chartered

20 organization in bankruptcy that asserts an interest in one or

21 more of the Hartford policies, and to the extent that the

22 Bankruptcy Court or other court with jurisdiction determines

23 that the sale would constitute a violation of that chartered

24 organization's automatic stay, then the parties to the

25 Hartford settlement will seek a determination from the Court

1  that they may proceed with the sale or other relief from the

2  stay to effectuate the sale of the policies.  So we believe

3  that's adequately disclosed in the disclosure statement.

4          THE COURT:  Okay.  So, Ms. Wolff, you have an

5  opportunity to object, and then there will be a resolution of

6  that.  And you'll be letting me know what your -- what the

7  Court has ordered.

8          MS. LUJAN WOLFF:  Thank you, Your Honor.

9          And if I can -- and I apologize if some of this was

10  already covered during the end of yesterday's hearing.  But

11  the objection that I had regarding protected parties and

12  channeling injunctions, which remains to -- which remains

13  unanswered, goes back to -- well, includes -- well, starting

14  with the chartered organizations' identities and what their

15  assets and liabilities are.

16          Now I understand that there was discussion now

17  about 40,000 plus chartered organizations.  And when I made

18  the objection, the response by the debtors was look to the

19  omniagentsolutions.com website, and there are two links

20  provided.  I went to both, and I was unable to find any list

21  of 41,000 plus chartered organizations.  And so maybe I'm --

22  maybe it's somewhere else, but the information that they

23  provided does not lead me to the 40,000 plus.

24          The other question -- the other part of the

25  objection that I had was that's 41,000 that the Boy Scouts

1  have identified as current partners.  What about the past

2  partners?  How many more chartered organizations are there? If

3  there are just 41,000 current ones, considering that the local

4  council number has dwindled to 200 -- approximately 251 now,

5  there used to be many more local councils in the past.

6              And so I believe this is important, and they

7  understood that and that's why they provided the links.  But

8  it is important to -- for them to disclose who these chartered

9  organizations are, especially since there is going to be

10 automatic treatment, automatic presumed assignments for these

11 non-debtor chartered organizations.

12             THE COURT:  Thank you.

13             Mr. Linder?

14             MR. LINDER:  Yeah.  On that point, Your Honor, as I

15 mentioned there is a hyperlink to the Omni website.  That link

16 may not yet be live, given that it is a solicitation-related

17 item.  It's intended to disclose to individuals entitled to

18 vote on the plan who those chartered organizations are.  We

19 are happy to expedite that and make it available sooner.  But

20 the intent had been to make that live as soon as solicitation

21 went out, such that the parties receiving a ballot and other

22 packages could review it.

23             THE COURT:  Is that a list of current chartered

24 organizations or does it include former?

25             MR. LINDER:  I believe it's predominately current

1 chartered organizations, and there are some former chartered

2 organizations listed on it.

3          You know, with respect to who may become a

4 protected party, the -- well, let me start from the beginning.

5 The participating chartered organizations will be, you know,

6 any chartered organization that has or had rights to those

7 policies.

8          With respect to settlements that may occur post-

9 effective-date, it's hard for me to imagine that there would

10 be a settlement just with a former chartered organization.

11 Certain chartered organizations may have merged into others,

12 for example.  But our intent in putting the list together was

13 to construct a list of who may, after the effective date,

14 become a protected party.

15          THE COURT:  Okay.

16          MS. LUJAN WOLFF:  And Your Honor, if I may

17 continue.

18          I also believe that, like the disclosures, the

19 disclosures that the debtors have made regarding local

20 councils, I think that they also need to make disclosures

21 regarding these third parties that are going to get releases

22 and channeling injunctions.  I think that that's essential for

23 any creditor to determine whether or not the substantial

24 contribution has been made in order to deserve such a broad

25 release and channeling injunction.

1          And I think, also, that it's -- it also -- I

2   believe I also read that insurance companies, settling

3   insurers who also are getting, not just the buyback, but they

4   are also getting the benefit through the plan of a channeling

5   injunction, I did read, I believe, that the -- that the test

6   would be did the insurer make a substantial contribution.  And

7   so we're looking at the same test, it appears to me, of

8   whether or not these third parties made substantial

9   contributions to deserve releases in channeling injunctions

10  under the plan.

11         And so as to the insurance companies, I think it

12  would also be appropriate, if they are going to get the

13  benefit of that, and if it's a substantial contribution

14  analysis, that we get the information that we need to

15  understand whether or not their insurance buybacks are

16  substantial -- I'm sorry -- the amounts.

17         The other part of the objection that I had is

18  similar to an objection that the trustee had originally filed

19  in May.  And the -- that is:  What authority, what ownership

20  do the debtors have over survivors' rights against third

21  parties?  What ownership do they have to settle these claims

22  against third parties?  Before a bankruptcy -- my

23  understanding is bankruptcy does not endow with greater -- a

24  debtor with greater rights.

25         And so the disclosure that I feel is necessary to

1  counsel my clients is:  What is the authority?  What is the

2  ownership that the -- that the Boy Scouts have over these

3  claims in order to reach settlements?  And an example of that

4  have is the settlement with the Latter Day Saints, the TCJC.

5          But my objection, also, was not just as to that.

6  It was also:  What authority does a settlement trustee have,

7  what ownership does a settlement trustee have who only gets an

8  assignment of the Boy Scouts rights, after reorganization,

9  after the Boy Scouts have successfully reorganized?  What is

10 the authority that the settlement trustee has in that -- you

11 know, in that setting, to settle with third parties such as

12 chartered organizations?  And I don't think that that has been

13 disclosed in response to my objection.

14          THE COURT:  Okay.

15          MR. LINDER:  Your Honor, I'm happy to address those

16 --

17          THE COURT:  Yes.

18          MR. LINDER:  -- those points.

19          With respect to the -- what I believe it was the

20 first point, which is how do we -- how do we determine if a

21 settlement party is making a substantial contribution.  That

22 is part of, as you know, Your Honor, the Master Mortgage

23 factors.  That is something that needs -- evidence will need

24 to be adduced at confirmation to determine whether a

25 contribution is substantial.

1          The debtors, as Your Honor observed, only have the

2    information that we have.  While we have balance sheet

3    information for local councils because they are part of our

4    accounting system, we do not have that information with

5    respect to other potential protected parties, and so we cannot

6    disclose that, nor do we think that is the appropriate way to

7    conduct the analysis.  Again, that's an issue for

8    confirmation.

9          And we will be adding a footnote -- I think we

10   discussed this with Mr. Patterson yesterday.  We will be

11   adding a footnote to the disclosure statement, indicating that

12   we have not undertaken any third -- any analysis of the third

13   parties' assets.

14          There may have been another -- the second point, I

15   believe, was what is the -- what is the BSA's authority to

16   settle third-party claims.  Again, this is a confirmation

17   issue.  It re -- the Court has jurisdiction to authorize the

18   settlement of claims that are related to these proceedings,

19   and that is evidence that we will put forward at confirmation

20   in connection with our desired approval of third-party

21   releases.

22          The last point, I think, relates to a subject that

23   we had denominated later in the chart.  I'm happy to address

24   it now.  And that relates to -- if you will give me just a

25   minute to find it.  Yeah, that is -- it's Number 18.  Your

1    Honor, if we want to address it now, we can; otherwise, we can

2    wait.  But maybe, in the interest of efficiency, we can just

3    do it now because I think it is -- it's really just Ms. Lujan

4    Wolff's objection.

5              THE COURT:  Okay.

6              MR. LINDER:  And I'm happy to point out where this

7    is on the objection chart if I can find it with any -- it's on

8    Page 60, I believe, Your Honor, of the response chart,

9    although I don't know that the one I'm looking at is

10   necessarily the filed version.

11             In any event, Your Honor, the objection was that

12   the disclosure statement lacks adequate information with

13   respect to notice and an opportunity to be heard with respect

14   to the settlement trustee's objections to claims.  Again, this

15   is a TDP issue.

16             The disclosure statement, at Page 225, contains a

17   discussion of the trustee's ability to review and, based on

18   his independent determination, allow or disallow an abuse

19   claim.  This is a routine provision that's included in mass

20   tort trust distribution procedures, trust agreements.  But

21   again, we have disclosed how that will operate.  As to the

22   justification for why it should be permitted to operate, we

23   will make that as part of our confirmation case.

24             THE COURT:  Thank you.

25             I do believe that some of the issues that were

1  raised by Ms. Lujan Wolff are legal issues that we will have

2  to grapple with at confirmation.  But I do think that we've

3  picked up issues from the disclosure statement, and so I think

4  it has disclosed those matters sufficiently, so that they can

5  be addressed at confirmation.

6          MS. LUJAN WOLFF:  And Your Honor, if I may.  Just

7  to address what Mr. Linder was referring to, and that was just

8  the notice and meaningful opportunity to -- like to make

9  objections.  I wasn't referring to the settlement trustee's

10 notice and meaningful opportunity to do that.  I was referring

11 to creditors' notice and meaningful opportunity to do that.

12 And so it's -- there's just no disclosure about that and

13 there's no ability for any creditor who doesn't have access to

14 claims to do that.

15         And I just wanted to point that out that, that is

16 something that I believe that the rules permit and there is

17 just a lack of disclosure in this disclosure statement to --

18 for any creditor to be able to comply with the rules and make

19 the judgment calls that they would want to make regarding

20 whether to make objections.  Thank you.

21         THE COURT:  Thank you.

22         MR. LINDER:  On that point, Your Honor, under the

23 plan, the trustee will be vested with the sole authority to

24 administer, review, allow, or disallow claims.  It will be to

25 the preclusion of any creditor or any other party-in-interest

1   who objects to the abuse claim post-effective-date.  Again,

2   that's a legal issue that's best suited for confirmation.

3          THE COURT:  And I recognize others have raised that

4   as well, so it will, I'm sure, be addressed.

5          MR. SCHIAVONI:  And Judge, there are disclosure

6   issues about the settlement trustee himself.  At some point,

7   we'd like to get to that.

8          THE COURT:  Okay.  I'm assuming that's in here

9   somewhere?

10         MR. LINDER:  It is, Your Honor, and we'd like to

11  really stick to our agenda here --

12         THE COURT:  Let's continue --

13         MR. LINDER:  -- so --

14         THE COURT:  Let's continue on in order.

15         MR. LINDER:  Thank you, Your Honor.

16         The next section is -- and a lot of this, I'll

17  note, will begin to be repetitive, so I will make my best

18  efforts not to cover ground that we have already covered.

19  Everybody will have opportunity to raise issues, to the extent

20  that they believe I am skipping over them, at the appropriate

21  item as we walk through the chart.

22         The next heading at least is "Chartered

23  Organization Treatment".  I recognize that that heading alone,

24  it seems repetitive of what we've covered.  But I think there

25  are important items to address within this category; in

1 particular, the treatment of chartered organization claims and

2 insurance --

3          MR. SCHIAVONI:  Mr. Linder, could you just give us

4 the number?  What's the number on that?

5          MR. LINDER:  This is -- sure.  This is Number 8 on

6 our objection response chart.

7          MR. SCHIAVONI:  Okay.  Thank you.

8          MR. LINDER:  Your Honor, as we've discussed several

9 times now, there is disclosure with respect to how chartered

10 organizations are treated.  We are continuing to work on that

11 with Mr. Ryan and others, to make sure that is cogent and

12 understandable.

13          Importantly, the Court should be aware and parties

14 know that there is a class under the plan of indirect abuse

15 claims, I believe it's Class 9.  There are more than 14,000

16 such claims, virtually all of which are contingent,

17 unliquidated claims for contribution, indemnification,

18 subrogation, and the like, related to abuse claims.

19          Many of the objections that were filed prior to the

20 filing of the fourth amended -- fifth amended plan, took issue

21 with the manner we proposed to treat indirect abuse claims.

22 The reason that's -- the reason this issue is relevant in the

23 context of chartered organizations, Your Honor, is because the

24 vast, vast majority of those claims are held by chartered

25 organizations.

1        Importantly, the debtors have amended the trust

2   distribution procedures to eliminate what purported to be an

3   across-the-board subordination of indirect abuse claims to

4   direct abuse claims.  That is no longer in the TDP.  Under

5   these TDPs, indirect abuse claims are -- in addition to longer

6   being subordinated, will recover subject to the criteria set

7   forth in the TDP *pari passu* with holders of direct claims.

8        In terms of where this disclosure is in the

9   disclosure statement, I believe it's on Page 240, and that

10  talks about indirect claims under the trust distribution

11  procedures; that's within the TDP summary section of the

12  disclosure statement and it's also addressed within what I

13  believe is the recovery chart.  It's on page 31 of the redline

14  at Footnote 42.

15        Your Honor, I really do think that that was the

16  main issue.  Again, I don't want to pass over anyone's

17  objections on any of these topics, so I would cede the podium

18  to folks who want to be heard on this topic.

19        THE COURT:  Okay.  Do I have any outstanding

20  concerns about Topic 8?  Mr. Patterson.

21        MR. PATTERSON:  Thank you.  Good morning, Your Honor,

22  Tom Patterson.

23        On page 188 of the red line disclosure statement,

24  there is a description of releases relating to chartered

25  organizations, and that description of the release keys-off

1 the definition of abuse claims, which you'll see in Romanette

2 (i) in the whole third line from the bottom, and other

3 provisions as well.

4          Nowhere in the this provision, is there a restriction

5 that the release is confined to Boy Scouts, or anything else.

6 On its face, it applies to all abuse claims, and the

7 definition of abuse claims in the plan is not itself confined

8 to Boy Scouts-related activities.

9          MR. LINDER:  Your Honor, I think Mr. Patterson's

10 comments are based on a misunderstanding of these releases.

11 These are the only new releases that were added to the plan in

12 the fifth amended version.  They were added because in the TDP

13 settlement it calls for a mutual release, a release on the one

14 hand of -- by TCJC, of certain other settling parties; of all

15 claims relating to abuse, along with certain other matters,

16 they are listed with the Romanettes at the beginning -- I'm

17 sorry, at the end of the paragraph.

18          So the releases relate to abuse claims. The case is

19 the plan, or any claims that could have been asserted, on the

20 one hand by the contributing chartered organizations against

21 the -- what have been called the settlement parties and in the

22 next paragraph, the settlement parties of the contributing

23 chartered organizations.

24          So this is a completely intramural release among

25 settling parties, relating to among other things, abuse

1   claims.  So this release would not purport to affect the

2   rights of holders of abuse claims as an initial matter.

3   And as a second matter, we disagree with Mr. Patterson's

4   characterization of the way that the abuse claim's definition

5   is structured.  We have addressed that before.

6            His rights to argue that that is an inappropriate

7   scope are preserved in their entirety.

8            THE COURT:  Okay.  So what I'm hearing you say is

9   that, this new paragraph F, on page 188 of the red line, is a

10  -- you said intramural, but it's an intra-settlement party

11  release, fully consensual intra-settlement party release, that

12  does not apply to anybody who is not a settling party of that

13  particular agreement which is, what? I'm not sure that's --

14  it's in the general release section.

15           MR. LINDER:  It is, your Honor, you described it

16  with 100 percent accuracy.  It is a fully consensual release

17  on the one hand, a contributing charter organizations, of

18  which right now there is one TCJC, are releasing what we have

19  defined as the -- I think we have defined them as the

20  settlement parties.

21           Again, those are the debtors reorganized BSA, the

22  related non-debtor entities, local councils and other

23  protected parties, as well as Hartford, the FCR coalition, in

24  the settlement trust and on the other hand, a release by the

25  settlement parties by the of the contributing chartered

1  organizations.

2          THE COURT:  Can we recaption that or retitle it to

3  make that clearer because certainly by the title, which I'm

4  sure there's something in here that says that doesn't matter

5  what you call it, but can we retitle it --

6          MR. LINDER:  Yes.

7          THE COURT:  -- to make that clear, because it's not.

8          MR. LINDER:  Yes, we are more than happy to retitle

9  it in a way that makes it clear what the scope is.

10          THE COURT:  Okay.  And Mr. Patterson, if, upon your

11  reread, because I will confess that I certainly haven't read

12  this in detail; if upon any reread, you think that's not the

13  case, then please reach-out to Mr. Linder, and let's get that

14  resolved.

15          MR. PATTERSON:  Thank you, your Honor, this is one

16  of the issues of trying to do this on this basis.

17          THE COURT:  Understood.

18          MR. PATTERSON:  And we still do have concerns, but I

19  need to work my way through, I think, about 236 definitions to

20  get there.  But I'm up to 140, so we'll get there.

21          THE COURT:  Okay.  Anyone else on this particular --

22  issue eight?

23          Mr. Schiavoni?

24          MR. SCHIAVONI:  Yes, Judge, on issue eight, on the

25  treatment of the charters, on how the TDP is supposed to work,

1  there still isn't a description in here of the contractual --

2  if someone doesn't opt to take the -- or let me say, opt-out,

3  that the contractual indemnity issues, that there's a

4  contractual indemnity present, or at least it's contended --

5          THE COURT:  The asserted contractual indemnity?

6          MR. SCHIAVONI:  Right.  There's no disclosure of

7  that at all, period, it's presented as an insurance issue.  I

8  would say the description of those rights or contended rights,

9  or the board minutes about them should be disclosed.

10         The other point here is just, in the treatment of

11 like -- like, this is -- you're going to be plowing new ground

12 at confirmation in dealing with this -- these issues about a

13 plaintiff-appointed trustee acting in an adjudicatory

14 capacity, adjudicating claims.  All three charters raise the

15 point, which, you know, we have an equal interest in in what

16 the evidentiary protections are of this sort of pseudo-judge

17 making findings whether it's intended to be res judicata, and

18 if not, you know, his findings or whether there's going to be

19 any evidentiary protections, as against the charters, with

20 respect to his adjudications.

21        THE COURT:  So I know Mr. Green's an issue.  I don't

22 know if he's on this list or not. I think he probably should

23 be, because there were disclosure statement issues with

24 respect to them, so we will get to Mr. Green; and then, with

25 respect to evidence and findings, I mean, I certainly do

1  expect to get those kind of issues.  I'm not sure if they are

2  disclosure statement issues or not, but let's continue on with

3  the list and maybe that's more a time when we will get to Mr.

4  Green.

5       MR. SCHIAVONI:   Judge, I'm not, I wasn't in a sense

6  raising Mr. Green and whether he's conflicted or not.  But

7  it's -- even in the chart that you have here, all three of the

8  charters raise -- or at least two of them raise, the fact that

9  there's no disclosure about the lack of res judicata and

10 evidentiary protections for the chartered organizations, and

11 how the TDPs are going to be applied.

12      One way or the other, is the way this is going to work,

13 is that the TDPs are intended to have a res judicata impact on

14 his determinations or not.  Is that the intent one way or the

15 other here?

16      MR. LINDER:  Your Honor, I believe Mr. Schiavoni is

17 addressing a topic -- when he's referring to the res judicata

18 effects of terminations made pursuant to the TDP.  That's

19 denominated as item 13 on the agenda, and I propose given what

20 I expect will be additional objections on that topic, to

21 address that in turn.

22      UNIDENTIFIED SPEAKER:  Okay.  Let's address it

23 together.

24      MR. LINDER:  The one other point in the interest of

25 completeness, Mr. Schiavoni raised was with respect to

1  asserted indemnification rights on the part of chartered

2  organizations.  We will add to the disclosure statement, an

3  appropriate section that addresses those.

4       As an initial matter, however, the debtors dispute

5  that there are contractual indemnity owed to charter

6  organizations across the board.  There are very limited --

7       THE COURT:  I thought we had dealt with that earlier

8  and we were going to address that with a new paragraph, the

9  asserted contractual rights and whatever the position the

10  debtor has.

11       MR. LINDER:  We will articulate our position in a

12  revised version of the disclosure statement.

13       THE COURT:  Okay.

14       MR. LINDER:  I think with that, Your Honor, unless

15  there are any other objectors, we would like to move into the

16  insurance section of -- at least the immediate insurance

17  section of the reply chart.

18       MR. PATTERSON:  Just before we get to that I have

19  one remaining issue, Your Honor, if I might?

20       THE COURT:  Mr. Patterson.

21       MR. PATTERSON:  Thank you, your Honor.  Tom

22  Patterson.

23       On page 186 of the disclosure statement, entitled --

24  the section entitled "Release by Holders of Abuse Claims,"

25  there is a provision for a release by shoulders of abuse

1  claims of all the protected parties, and their respective

2  property from all abuse claims.  The protected parties

3  includes contributing chartered organizations and other

4  nondebtor entities and I just wanted to ask Mr. Linder whether

5  the intent is to provide those entities from a release of all

6  abuse claims, irrespective of their involvement with scouting.

7          MR. LINDER:  No.  I think I've said maybe five or

8  six times today that, the abuse claims that are being

9  channeled to the trust, being released by holders of the abuse

10 claims, relate to scouting.  It's in the definition of Boy

11 Scouts claims.

12         MR. PATTERSON:  Can we turn to definition of abuse

13 claims so you can help me out here? Because --

14         MR. LINDER:  Your Honor, we can look at it.

15         MR. PATTERSON:  I see your point.  We can do this

16 off-line.  I apologize.  It's more complex than I expected.

17         THE COURT:  Yes, let's do that off-line.  That's

18 been my understanding from the beginning and that's what this

19 should reflect.

20         MR. PATTERSON:  Okay.

21         MR. LINDER:  And our position, Your Honor, is what

22 it does reflect.

23         THE COURT:  Right, but let's take a look at it and

24 you can walk Mr. Patterson through it off-line at some point.

25         MR. LINDER:  Absolutely, Your Honor.  We would then,

1  propose, your Honor, I think Mr. Patterson is the last

2  objector for category 8, is move on to category nine of the

3  objection reply chart --

4         THE COURT:  Yes.

5         MR. LINDER:  -- which is insurance coverage risks.

6  Essentially, Your Honor, and these, again, I think many of

7  them have been superseded, although I don't doubt there will

8  be discussion of these issues.  Article 3F of the disclosure

9  statement, in terms of disclosing insurance risks, provides

10  extensive information regarding coverage defenses that have

11  been asserted by insurance companies.

12         In particular, your Honor, if we can turn to page 64

13  and 65 of the redline version of the disclosure statement, we

14  have a section that's under heading six, of article -- I think

15  this would be 3F6, that's entitled, "Post-petition defenses

16  asserted by insurance companies," there is a laundry list,

17  Your Honor, of insurance defenses that have been raised.  I

18  don't think I need to go through each and every one of them

19  here.

20         Once I've completed my presentation on this topic,

21  we can hear objections.  Of course we have also added a list,

22  or extensive risk factors, surrounding insurance coverage

23  issues and that would be from pages 277 of the red line

24  version of the plan, to 279, starting with risk factor 22,

25  which is insurance coverage risks related to insurance

1  neutrality and certain of the trust distribution procedures.

2  Again it's a very long list.

3          Item 23 is an insurance coverage risks relating to

4  retentions and deductibles.

5          24 is risks related to assignment of insurance

6  rights, both by the BSA, by local councils, by chartered

7  organizations.

8          Finally, your Honor, 25 is risks related to the

9  insurance provisions in article ten of the plan, article 10M,

10  to be specific.

11          We think these disclosures are comprehensive, Your

12  Honor, but I'd be happy to hear from objectors to the extent

13  that they believe additional disclosure is warranted.

14          THE COURT:  Mr. Rosenthal?

15          MR. ROSENTHAL:  Yes, Your Honor, Michael Rosenthal

16  of Gibson Dunn, for AIG.

17          Your Honor, we had reached an agreement with the

18  debtors, I think, on language that was to be added and I think

19  it was added.  We just have not been able to parse through the

20  latest disclosure statement to make sure that there were no

21  changes to that but we'll work with Mr. Linder on that.

22          THE COURT:  Thank you.

23          Anyone else?

24      (No verbal response)

25          THE COURT:  Okay.

1    MR. LINDER:  Your Honor, that brings us to item 10,

2  which has been captioned, "Insurance utilization."  These

3  objectors argue that the disclosure statement does not

4  provide adequate information with regard to how insurance

5  rights proposed to be assigned to the trust will be utilized,

6  or the risks associated with that assignment.

7    The disclosure statement explains, Your Honor, that

8  the assets contributed to the settlement trust will be

9  administered by the Trustee and used to resolve abuse claims,

10  in accordance with the trust documents.  The relevant

11  components of the disclosure statement on that issue begin --

12  it begins at page 13 of the red line -- take a minute to flip

13  there.

14    I think this is the second paragraph on page 13,

15  with respect to how the assets that are contributed to the

16  trust are administered by the trustee.  They will be used, of

17  course, to process liquidated pay abuse claims, fund expenses

18  of the settlement trust.

19    Importantly, they will not be used to make the

20  expedited distribution to holders of claims who elected to

21  make the expedited distribution to holders of claims who

22  elected to take the  expedited distribution.

23    The next component of disclosure is pages 202 to

24  224, which --

25    THE COURT:  Mr. Linder, I'm sorry, can you say that

1  again?  The assets contributed to the settlement trust will

2  not be used to make the expedited distributions?

3         MR. LINDER:  The assets that will be used to make

4  the expedited distributions will be the cash contributions to

5  the settlement trust, as opposed to -- I guess what we can

6  loosely refer to as unliquidated insurance rights contributed.

7         THE COURT:  Okay.  Thank you.

8         MR. LINDER:  At pages 202 to 224, Your Honor, there

9  is a section that addresses the settlement trust.  The

10  transfer of assets to the trust goes through -- a lot of this

11  is the contents of article four of plan of reorganization,

12  provides a great deal of disclosure on how assets contributed,

13  including insurance assets, will be contributed to the trust

14  and used.

15         The trust agreement further provides, Your Honor,

16  that the insurance settlement assets, including insurance

17  rights, will be used to pay abuse claims and compensate the

18  trustee and reimburse expenses.  I believe that particular

19  disclosure is within the section I just referenced on page

20  211.

21         That concludes the disclosures, so I would cede the

22  podium to any objectors on this topic.

23         THE COURT:  Thank you.

24         Mr. Schiavoni?

25         MR. SCHIAVONI:  Your Honor, forgive me, I think I

1  had the mute button when Mr. Linder was on the prior section,

2  on insurance; although, I don't know whether it belongs there

3  or here.

4          But the addition of the negative notice assignment

5  of coverage, is one to which we have issued a reservation of

6  rights and objection to the Boy Scouts on.  There is no

7  disclosure of the insurance risk associated with the negative

8  notice assignment.

9          What it effectively does is, without having an

10  affirmative consent, it assigns the coverage, you know,

11  against the anti-assignment provisions in the policies of a

12  non-debtor, to this plaintiff controlled trust and grants to

13  the plaintiff controlled trustee the right to adjudicate

14  claims against that coverage.

15          We think fundamentally it will result in the voiding

16  of the coverage and we have served, you know, a reservation of

17  rights on the Boy Scouts with regard to that.  We did hope to

18  get some discovery or some basic further information about

19  what this is, but there's no disclosure that by doing this

20  they may void all the coverage associated with it.

21          THE COURT:  Okay.  So we need to add that to the

22  factors in the insurance section, if, in fact,  it's not in

23  there.

24          MR. LINDER:  Your Honor, it is in there. This is

25  risk factor number 24, on page 280. It's captioned, "Insurance

1  assignment risks."

2          The last sentence of which says,

3          "To the extent that such assignment is not allowed,

4  the assets contributed to the settlement trust to satisfy

5  these claims will be reduced, or insurance coverage may be

6  voided by the assignment."

7          MR. SCHIAVONI:  Your Honor, this is a general

8  assertion.  It isn't one that's specific to the negative

9  notice assignment. They are just saying, sort of like, with

10 regard to any of the assignments done in connection with the

11 matter, this one is -- this charter assignment is different,

12 and it should be called-out separately, especially for the

13 charters, what the impact of it is.

14         THE COURT:  Okay.

15         MR. LINDER:  I think the difference between what we

16 have in the plan -- or I'm sorry, in the disclosure statement

17 and what I've just read, Your Honor, which does, to be clear,

18 talk about contributing charter organizations and citing their

19 rights.  It should add a reference to participating chartered

20 organizations, I think that -- at least, I'm not seeing it in

21 my quick scan, and we are happy to add a reference in this

22 risk factor to what Mr. Schiavoni has referenced as the

23 negative notice approach to that assignment.

24         THE COURT:  Yes.

25         MR. SCHIAVONI:  Instead of using all these

1  definitions, couldn't we just have a straight provision that

2  says, by the debtor  executing on this, without affirmative

3  consent, from either us or from the claimants -- from the

4  charters; that they risk voiding all the coverage.

5         THE COURT:  I think you can come up with some plain

6  English language to add to this.

7         MR. SCHIAVONI:   Okay.  I'm happy to work with them

8  on that. The other provision that is, in essence sort of new,

9  and new in the sense from the last four days, is in the

10  Hartford settlement, there's a provision that says that the

11  TDP will attach to it a release and that that release will

12  release -- like, taking money from the trust, you will -- you

13  have to -- you're deemed to accept this release, and provide a

14  release for the debtor -- for a variety of parties, including

15  Hartford and the chartered organizations.

16         I don't think we've seen that release.  If it is

17  among all these papers in the last four days, mea culpa, I

18  haven't seen it, I would ask for an opportunity to see it.  It

19  -- just point it out to me.  But the disclosure of what it's

20  about, there's no disclosure on there, and how it impacts us

21  to the judgment reduction provision.

22         MR. LINDER:  Your Honor, the releases contemplated

23  by the TDP, are not the releases -- at least the one that Mr.

24  Schiavoni is referring to at the moment -- I'll put this back

25  up for a second.  There is a $3,500 expedited distribution.

1  You take that, you need to execute a release in favor of all

2  chartered organizations.

3         There are other releases referenced, conditional

4  releases in the TDP.  None of the releases.  They all require

5  the claimant that's receiving a distribution from trust

6  distribution procedures to affirmatively sign a paper making

7  releases.

8         Mr. Schiavoni is correct, those forms of releases

9  are not attached to the TDP, at present.  They are described

10 with particularity in the TDP themselves.  We had intended to

11 supplement that at the time of the plan supplement, through

12 the actual forms of releases, but again I think this is more

13 form-over-substance.

14        As to the risk that that poses to insurance

15 companies, including Mr. Schiavoni's client, I'm happy to

16 discuss it with him off-line.

17        MR. SCHIAVONI:   Your Honor, to be clear, the

18 releases are not described with particularity, they may be in

19 the Hartford settlement agreement, when it's drafted and

20 submitted, but in the term sheet it just says that the

21 settling insurers, or Hartford may be the definition there,

22 shall be included as releasees, and any form of release

23 attached to the TDP, under the amended plan, to the same

24 extent as BSA, local council's, charters, and such that the

25 claims for coverage, for claims of abuse, are not to be made

1  under the policies, etc., etc.

2        Ir's like there's no description of like what the

3  releases are, okay.  That's that seems to be a really, like,

4  vital issue, not one that you would want to get, you know,

5  months from now on the plan documents -- like, whatever are

6  going to be provided then.  This is a today issue, it seems to

7  me, for the solicitation and not a yesterday, or you know, a

8  future issue.  So there is no description of particularity

9  about what these releases are.

10        THE COURT:  I guess I'm assuming it would be a

11  complete release, right, or Hartford isn't going to be selling

12  it's -- buying it's policy back.

13        So what more do you need to know than, it's a

14  complete release?

15        MR. SCHIAVONI:  Okay.  That's fine if that's a

16  complete release for the charters, and that's a condition

17  precedent to the Hartford settlement, and we'll deal with the

18  risk factors associated with that in the other write-up, and

19  that's good news.

20        THE COURT:  With the caveat that Mr. Patterson has

21  been raising about what's an abuse, you know, claim.

22        MR. SCHIAVONI:  Right.

23        THE COURT:  I guess I'm making that assumption.

24  Okay.

25        MR. LINDER:  Your Honor, I think, before we took

1  that detour, we were in the insurance utilization section; and

2  if anyone else has anything there we can address it, otherwise

3  I'll propose to move on.

4           THE COURT:  I think we can move on.

5           MR. LINDER:  Thank you, your Honor.

6           Item 11 is one that I propose to skip.  It's

7  settlement trust contributions, and it's talking about

8  contributions of insurers, their insurance, including local

9  councils and chartered organizations, in order to receive a

10  release.

11          We have added extensive disclosure about each of the

12  parties that either is proposed to or might receive a release

13  and the benefit of the channeling injunction under the plan.

14  We have added information about the potential parties that

15  could in the future receive those releases and injunctions.

16          So with that, we propose to move to the next topic.

17  But, of course, I defer to Your Honor.

18          THE COURT:  Does anyone who's listed under here,

19  under topic 11, have an objection?

20       (No verbal response)

21          THE COURT:  I don't see anyone.  Let's move-on.

22          MR. LINDER:  Thank you, your Honor.  This may also

23  be an item we have covered, but let's go through it.  This is

24  the insurance assignment.  Certain objectors have argued that

25  there is insufficient information in the disclosure statement

1  with respect to the risks posed by the insurers' positions

2  that they have taken, with respect to the assignment of

3  insurance rights to the trust.

4          Again, the disclosure statement now does include

5  information that's been added since those objections were

6  interposed, relating to the insurance assignment risks.  I

7  think we actually just went over them about 15 minutes a go,

8  including risk factors and the particular risk factor on this,

9  I believe, is on page 280 -- yeah, it's the section we just

10 revisions to for purposes of clarity.

11         So again, Your Honor, even though we have talked

12 about the insurance assignment, I think we can keep moving,

13 but we should pause and see if there's anyone who raised an

14 objection in this category that hasn't been heard yet.

15         THE COURT:  Yes, is there anyone on this category

16 12?  I see several objections that were filed that still has

17 an outstanding disclosure objection.

18     (No verbal response)

19         THE COURT:  I don't see anyone.  Let's move on.

20         MR. LINDER:  Thank you, your Honor.

21         Item 13 is titled, "TDP binding effect on  insurance

22 companies."  There are objections on this topic that assert

23 that the disclosure statement fails to disclose the insurer's

24 arguments, that the values in the TDP, that is the matrix

25 values coupled with the scaling factors, are not binding on

1  the insurers and that insurers continue to indemnify their

2  insurance, may be capped at the amounts that insurers paid --

3  I'm sorry, insurance paid into the trust.

4        In addition, the objectors contend that the

5  disclosure statement needs to disclose that the law remains

6  unsettled, and the trust distribution procedure awards are not

7  binding, and that the exposure of insurers are capped at their

8  contribution, then each claimant may receive a fraction of the

9  amount of their claim.

10        As an initial matter, your Honor, I believe what

11  many of these objections take issue with, are certain of the

12  findings and orders listed in article nine of the plan, and

13  in-turn in the summary section of the disclosure statement

14  that contains those conditions precedent to confirmation, and

15  their effect on the insurance companies. That is of course a

16  legal matter that should be addressed at confirmation, and not

17  at this stage.

18        The disclosure statement does provide additional

19  disclosure, in the form of risk factors associated with the

20  insurers arguments, surrounding the TDPs and does include

21  arguments related to the findings and orders.

22        Where I would direct the Court is, I believe page

23  279 of the red line, and this is item -- item No. 4, and it

24  reads that -- just up to the preparatory language, so I'm

25  capturing the full context -- these are arguments that the

1  plan in the TDP appoint a trustee that the debtors' insurance

2  companies maintain is not disinterested, in a process that

3  prevents the insurance companies from objecting to claims, and

4  taking discovery in the manner they assert their entitled to.

5  Going down here, I guess this is a separate heading.

6  So I apologize.  It's an argument that the plan and the trust

7  distribution procedures that result in findings that the

8  claims evaluations are fair, reasonable and good in faith; and

9  the insurers allege that this could lead to misuse and post-

10  confirmation coverage litigation; that addresses that risk

11  factor.

12  In addition, on page 281, risk factor 25 relates to

13  article 10M of the plan which is entitled, "Insurance

14  provisions."  What we disclose in this risk factor, your

15  Honor, is a risk that there will be extensive litigation

16  concerning the provisions of the plan and the bankruptcy

17  court's findings and conclusions in support of confirmation.

18  We disclose that the litigation may be costly, extremely

19  costly, and time-consuming and that may delay emergence, which

20  would have extreme negative consequences on the debtors

21  ability to reorganize successfully.

22  While the debtors believe that we have mitigated

23  some of this risk by adjusting the minimum cash to emerge

24  with, from bankruptcy, the prolonged timeline caused by this

25  potential litigation is problematic. It's also likely, we

1  disclosed further down in this provision that, there may be

2  appeals taken from the confirmation order. If it's confirmed

3  with the insurance provision found in article 10M of the plan,

4  that also proposes cost-risks and timing-risks.  It's also

5  possible that the bankruptcy court will not confirm the plan,

6  with article 10M as drafted, and that will require the debtors

7  to amend their language prior to confirmation and their risks

8  associated with that.

9        There may be other items, your Honor, that certain

10 insurers wish to discuss.  I see that Mr. Rosenthal has raised

11 his hand, so I would propose to cede the podium to him, and

12 we can take it from there.

13       THE COURT:  Okay.  Mr. Rosenthal, everybody's

14 favorite article.

15       MR. ROSENTHAL:  Thank you, your Honor.

16       Your Honor, all I would say about this is that, we

17 are reviewing it, and I would note for example in paragraph

18 four, on page -- very difficult to track this on a computer --

19 279 of the disclosure statement, the insurer's argument is not

20 just that it could lead to misuse of confirmation coverage

21 litigation, but that these -- the kind of findings that the

22 court is being asked to make would render the plan un-

23 confirmable, and alter the insurance rights -- insurer's

24 rights improperly.

25       I'm not sure that we need to discuss it on -- at the

1  hearing.  But I do think because -- I do think, and I'm

2  certainly at the end of this hearing, I hope your Honor will

3  give me an opportunity to make an argument about why -- why

4  the disclosure statement should not be approved, just on a

5  more general basis, but at this stage, I do -- we'd like to

6  work with Mr. Linder to make sure that the arguments, if they

7  are not decided at this stage, if they go to confirmation,

8  that the arguments are accurately stated.

9            THE COURT:  Okay.  Thank you.

10           I will tell you, I will be looking carefully at the

11  findings, that the -- that the debtors and others are asking

12  me to make, with respect to insurance -- to make certain that

13  they don't go further than I'm permitted to go as a

14  bankruptcy court.

15           So I'm certainly aware of this issue, I think I

16  stated on multiple occasions, I don't expect to be issuing

17  coverage decisions, and while that's a broad category, some of

18  the things, we know, fall into that.  Other things may hit on

19  the edges of it that I may not be comfortable with.

20           So to the extent that the plan proponents, or those

21  in support of the plan, are going -- to put it in the

22  vernacular, going from pigs to hogs, then there may be an

23  issue.

24           Anything further on this particular category?

25           MR. SCHIAVONI:   Your Honor with, leave of the

1   court, if I can just ask Mr. Linder: Was this the category

2   where you wanted to discuss disclosure about Mr. Green, or is

3   it another -- is it another number?

4         MR. LINDER:  No, that's another number. I believe

5   Ms. Baccash will be handling that this afternoon.

6         MR. SCHIAVONI:  Okay.  I apologize, Your Honor.

7   Thank you very much.

8         THE COURT:  Thank you.  Okay.  I think we can move

9   on.

10        MR. LINDER:  Thank you, your Honor.  The next one

11  is, I think, quick.  This is entitled, "Insurance set-off",

12  but it really relates to letters of credit, issued by JPM

13  support, the debtors obligations under the Liberty Insurance

14  program. Liberty had filed an objection, your Honor,

15  essentially arguing that, while we had included language in

16  the disclosure statement that was satisfactory to it's -- we

17  had not addressed it in the plan, in the same manner.

18        I can confirm, your Honor, that through

19  modifications to article five of the plan, we have resolved

20  the objection, the language has been reviewed by Liberty and

21  by JP Morgan, so  unless I am mistaken, I think this item is

22  covered-off.

23        THE COURT:  Okay.  Anyone have outstanding issues,

24  with respect to 14?

25        (No verbal response)

1          THE COURT:  I don't see anything or hear anyone.

2    Let's go to 15.

3          MR. LINDER:  This is another topic, group of topics,

4    related to insurance coverage disputes.  In essence, your

5    Honor, the objectors argued the disclosure statement is

6    misleading, incorrect and incomplete.  We heard a little bit

7    of this from Mr. Plevin yesterday, with respect to retained

8    limits, deductibles, etc.

9          We have resolved certain parties' objections in this

10   category.  Liberty Mutual's objection has been resolved, and

11   will include revised language in the disclosure statement, I

12   believe it's on page 58, to add language memorializing their

13   contentions, with which the debtors and other supporters of

14   the plan disagree.  I believe we may have resolved this

15   language with Great American, maybe not, or I know we are

16   continuing to work on it with Counsel to Zurich and other

17   insurers.

18         So we are certainly hopeful that we can come to

19   agreement on language that accurately describes the debtors'

20   position, and the insurer's position.  I know that one of

21   their positions is that we are incorrect and -- but for the

22   disclosure, we think that we can put this issue to rest.  But

23   unless Your Honor would like me to orient the Court to the

24   provisions of the disclosure statement that currently deal

25

1   with these disputes, what I would propose is for the parties

2   that have these objections to speak.

3           MR. PLEVIN:  Your Honor, this is Mark Plevin, for

4   the Zurich insurers.  As you know we filed an objection on

5   behalf of our clients, and other insurers, regarding the SIR

6   provisions.  I have gotten -- clearly Mr. Linder has a lot on

7   his plate and he has a lot of plates in the air.  He may not

8   have seen -- I just got an e-mail a few minutes ago from

9   counsel for the coalition, and also from Ms. Quinn, who I

10  believe is insurance counsel to the FCR and the committee;

11  asking if we could reserve on this issue because they are

12  working on plan modifications and disclosure statement changes

13  that would address my issues.

14          And so I think to let that process play out, we

15  ought to defer this.  I'm hopeful that, based on the e-mails

16  we can come to an understanding.  If not, we'll be back to

17  argue this, later in the hearing.

18          THE COURT:  Okay.  Thank you.

19          MR. SCHIAVONI:  Your Honor, if I can just ask that

20  the coalition include us, and Liberty Mutual, and if they

21  otherwise want to try to resolve the SIR issues, to include us

22  in those discussions.

23          THE COURT:  Okay.  That's the ask.  I assume it's

24  been heard.

25          So let's push that, and see if can be resolved with

1  everyone.

2          MR. LINDER:   Thank you, Your Honor. We'll work to

3  accomplish that today.

4          The next objection category is, with respect to

5  disclosures of the number of abuse claims, the type of abuse,

6  abuser information.  I believe these objections were filed

7  quite some time ago, and my hope is that initial disclosures

8  made would resolve these objections.  Article 4N of the

9  disclosure statement, I believe this is pages 86 to 91, that

10 provides a thorough discussion of the abuse claims and the

11 debtor's estimate as to the range of value of those abuse

12 claims.

13         That was prepared with the assistance of Bates

14 White, which again, is the debtor's abuse claims consultant.

15 We also -- since the filing of these objections, added

16 Exhibit F to this disclosure statement.  Again, your Honor,

17 that contains charts listing abuse claims by allegation type;

18 counts of abuse claims by local counsel; counts of claims by

19 local counsel and allegation type; and lastly, what we

20 discussed just a few minutes ago on the final page of the

21 exhibit, counts by chartered organization. This is what we

22 refer to as the abuse claims composite and that's Exhibit F

23 to the disclosure statement.

24         I know certain aspects of these topics  were

25 touched on yesterday, and so I cede the podium to those who

1    have live objections to this topic.

2         THE COURT:  Okay.  Thank you.

3         Is there anyone?  We did discuss these charts

4    yesterday, but is there any further disclosure statement

5    issues on this topic?

6        (No verbal response)

7         THE COURT:  I do not see any hands or hear --

8         MR. SCHIAVONI:   Just very briefly, we would like to

9    add two lines to this.  I mean, the fact of the matter is,

10   that Bates White provided to everybody an even lower estimate

11   that's in this range.  This is, effectively, an agreed-upon

12   range between the debtors and some group of the claimants, as

13   part of an overall deal, but they gave us a lower range.

14        So we would just like, you know, a couple lines, or

15   just a line that says that, Century contends that Bates White

16   provided an even lower range of numbers to the parties, before

17   filing the disclosure statement.

18        MR. LINDER:  Your Honor, what Mr. Schiavoni just

19   represented, is -- is not the debtors' position.  Our range is

20   as set forth in the disclosure statement, it's also incorrect

21   that that is the range that has been endorsed by the other

22   supporters of the plan, the coalition, the future claimant's

23   representative and state court counsel supporting the Hartford

24   and TCJC settlements.

25        There is a footnote in the disclosure statement, may

1  not even be a footnote but there's a statement in the

2  disclosure statement -- and we added this in connection with

3  our September 15th filings -- indicating that they do not

4  agree with the debtors range, and I would caution Mr.

5  Schiavoni that, to the extent he is disclosing matters

6  discussed in mediation, that is a violation of the local rules

7  and the court's mediation order.

8          MR. SCHIAVONI:   It's fine if this is just a

9  statement of ranges on behalf of just the Boy Scouts.  But the

10 assertion is that it's a representation of Bates White's

11 position.  And to be clear, as a matter of fact, Bates White

12 has given us a lower range, and it's like Century would just

13 like that reflected, or if it's going to refer to these as

14 sort of an endorsement by Bates White, then it should have our

15 additional disclosure, that we contend that Bates White

16 provided a lower number.

17         THE COURT:  I don't -- I don't think I can resolve

18 this in the sense that if this is where Bates White landed, I

19 don't know what they did to get there.  That will be an issue.

20 But if this is where Bates Whites landed at 2.4 to 7.1, and

21 that's their estimate, then it is.

22         MR. LINDER:  Your Honor, Century disagrees with the

23 valuation and have a different valuation.  I think the right

24 way to approach this is for us to note that the other

25 supporters of the plan disagree with the range.  We can also

1  note that certain insurers, including Century, dispute the

2  valuation.

3         MR. SCHIAVONI:  Well as long as we can refer to

4  Bates White as part of that, we think Bates White is lower --

5  lower numbers, which they provided to us, are -- are ones

6  that should be considered, it's like -- so I'm happy -- to

7  that effect --

8         MR. LINDER:  Your Honor.  This is inappropriate,

9  Your Honor, for Mr. Schiavoni.

10        The only conversations we've had with Mr. Schiavoni

11  have been in the context of mediation.  It is completely

12  inappropriate for Mr. Schiavoni to flagrantly violate --

13  MR. SCHIAVONI:   I am not -- I am not talking about anything

14  that was said in a mediation.

15        THE COURT:  Okay, counsel.

16        MR. SCHIAVONI:  I am talking about the Bates White

17  report that was generated --

18        MR. LINDER:  Your Honor, my objection stands, and it

19  is entirely inappropriate.

20        THE COURT:  Okay.  Counsel, here's where we are

21  going to land, which is that:  If thedebtors and Bates Whites

22  are comfortable with the representations that are in the

23  disclosure statement, then that's what they are, okay.  Of

24  course they are subject of discovery, of course -- but it

25  sounds like the attack I'm getting is more as to credibility,

1  to something different.

2          Now, I will say -- no, I won't.  But I'm not going

3  to refer to some different or earlier or other value that

4  Bates whites may have had at some point or provided to someone

5  for some purpose which I don't know what it is.  But I think

6  the debtor and Bates Whites should be very comfortable with

7  how this is reflected in the disclosure statement and if

8  they're not comfortable upon review, it should be changed.

9  But they need to be comfortable, Counsel and Bates Whites.

10          MR. LINDER:  Understood, Your Honor.

11          THE COURT:  Okay.

12          MR. SCHIAVONI:   And we'll take them up on the

13  invitation, your Honor, to have a line that says we contest

14  the numbers.

15          MR. STANG:  Your Honor, may I have a moment?

16          THE COURT: Yes, Mr. Stang, I hear you but I don't

17  see you.

18          MR. STANG:  I'm sorry.  I apologize.

19          THE COURT:  That's okay.

20          MR. STANG:  Maybe this is a good moment to give you

21  an update on what we did over the evening as we were talking

22  about claims valuation and potential payment.

23          So we probably, late Pacific time yesterday, sent

24  over to the debtor a proposed insert that utilizing the TDP

25  base amount and max amounts, and utilizing the statute of

1  limitation discounts, because the planactually does go to

2  valuation of claims and the TDP's do.  Our opinion as to what

3  the different percentages of payment would be by category of

4  abuse.

5         So at the settlement that we have on hand, minus the

6  administrative expenses, conservative administrative expenses

7  of the trust, this is how much is distributable and this is

8  what a penetration claim would get under a base scenario,

9  under a maximum scenario, this is what they would get given

10  the statute of limitations discounting -- we tried to do this

11  in a summary fashion.

12         So we have proposed to the debtor an insert to the

13  disclosure statement that consistent with my understanding of

14  your position about what creditors should be told and where in

15  the disclosure statement they should be told it, more up

16  front, than at page 220-whatever, what our view is, our view

17  of the percentage payments by the TDP valuation.

18         Here, the debtor, we have been through this before

19  yesterday, I know you probably don't want to hear it again

20  that we have a different view as to the claims because we rely

21  on what the plaintiff says, these are your TDP values.  And so

22  I want you to know we have done that.

23         This morning we sent over to Alvarez the underlying

24  files on how we calculated this and we are hoping during the

25  break to have an opportunity for BRG, our financial advisor

1  and Alvarez, the debtors' financial advisor, to discuss how we

2  came to these numbers.  But we will be revisiting with you and

3  submitting to you our proposed insert so the creditors can see

4  what we believe are the distributions in these different abuse

5  tiers based on a TDP valuing methodology.

6        MR. LINDER:  Your Honor, what Mr. Stang described is

7  what we discussed yesterday which I think we described it as

8  illustrative claim values or claim recoveries.  We did

9  receive that Mr. Stang's team.  We are reviewing it.  We have

10  concerns with the methodology but we will be preparing our own

11  counter insert from the debtors' perspective and we will be

12  doing that as soon as possible.

13        THE COURT: I will let that -- thank you, Mr. Stang.

14  I will let that play out.

15        Mr. Rosenthal?

16        MR. ROSENTHAL:  Your Honor, thank you.  I would only

17  say that we obviously would like to see what Mr. Stang has

18  proposed and may have some reservations and comments that we

19  want -- that we want to make to the analysis that he intends

20  to present, even if illustrative.

21        MR. STANG:  Your Honor, not quite ready for a

22  national audience yet but we will make sure everybody has

23  access to it as we go into a hearing about it and give it as

24  much advance notice as possible.

25        THE COURT: Thank you, Mr. Stang.

1    MR. LINDER:  Your Honor, there are two topics left

2   that I propose to address before a short break if that's okay

3   with Your Honor, or I'm happy to break now.   Whatever you

4   would prefer.

5    THE COURT:  No, I'm not going to break because I've

6   got to break at 1:45. So I'm happy to take a five-minute break

7   if parties would like that.  Why don't we do that because

8   we've going but then let's come back and we are going to keep

9   -- we are going to keep moving.

10     So let's take five.  We're in recess.

11    (Recess taken at 12:23 p.m.)

12    (Proceedings resumed at 12:30 p.m.)

13    MR. LINDER:  Sorry for that delay, Your Honor.

14    THE COURT:  Its okay.

15    MR. LINDER: I think where we are in terms of

16   walking through the chart is number 17.  23relates to future

17   claims and in particular, the objection that there is no

18   estimate of the number of future claims in the disclosure

19   statement and there's a lack of clarity regarding the

20   treatment of future claims including the amount of money set

21   aside for future claims.

22    As an issue matter, the definition of abuse claims,

23   Your Honor, as well as the Bates White valuation range of 2.4

24   to 7.1 aggregate billion dollars on account of abuse claims

25   those are both concepts that are inclusive of future claims to

1  the extent those are ultimately determined to be viable.

2       If you look at page 65, 67 of the red line and

3  disclosure statement, I believe that talks about -- that

4  discusses who future claimants would be.  Again, those are the

5  claims held by individuals who as of the petition date have

6  not obtained  18 years of age or were not aware of their

7  claims as a result of suppressed memory, to the extent that

8  concept is recognized by the highest appellate court of the

9  relevant state.

10      And then if you flip to page 222, this is the

11 excerpt of the trust distribution procedures relating to the

12 treatment of future abuse claims.  In order to be eligible

13 for compensation, they need to have had a claim that arose

14 from abuse prior to the petition date, qualify as either a

15 minor as of the petition date or have repressed memory

16 subject to what I just mentioned in terms of being recognized

17 by the relevant jurisdiction.  They need to submit the future

18 of abuse claims to the trust in accordance with the TDP at a

19 time when it would be allowed as timely under applicable law,

20 or if it's not timely, it will be subject to the provisions of

21 the trust distribution procedures that would adjust the value

22 of the claim on the basis that it not be timely.

23      That is the extent, Your Honor, of the disclosure

24 with respect to future claims.  There is no dollar amount or

25 range of dollar amounts attributable to future abuse claims.

1   Again, we believe it's subsumed within the total abuse claims

2   population.  This is not -- this is very different future

3   claims scope than an asbestos case, for example, where there

4   is true latency of the claim and so we believe that we have

5   adequately disclosed, but certainly we should hear from the

6   objectors.

7           THE COURT: Thank you.

8           Anyone wish to be heard with respect to future

9   claims?

10          Ms. Lujan Wolff?

11          MS. LUJAN WOLFF:  Thank you. Yes, this is the first

12  time for me to hear the $2.4 to $7.1 billion estimate of value

13  of the abuse claims includes future claims.  It was my

14  understanding that it only included the current known body of

15  82,500 claims.  But if that's the case, that the Boy Scouts

16  able to arrive at an estimate of the aggregate value including

17  future abuse claims, then I believe that they need to

18  disclose how they arrived at that number.

19          What is the estimate of total future claims that

20  they used to -- in calculating, in arriving at this aggregate

21  the estimated value we haven't done that.  And they also

22  haven't provided an estimate of the number of future and

23  unknown claims against protected parties under the plan that

24  would include each of the local councils and chartered

25  organizations who are proposed to be protected parties, as

1  well as insurers,  settling insurers, including Hartford.

2        These disclosures need to be made and again I'm

3  assuming that if the 2.4 to 7.1 aggregate number includes

4  future claims, I'm assuming that's the future claims they are

5  aware of against the debtors and not these non-debtors.  They

6  need to make that disclosure because under the plan, all

7  future and unknown claimants who have claims not just against

8  the debtors but also these protected parties, local councils,

9  chartered organizes and insurers they are all going to be

10  treated the same way.  They are all going to share it in the

11  same very limited pot of money.

12        So when survivors reading this disclosure statement

13  and plan, they are thinking, 82,500, and calculations are

14  being made looking at this number, but that could easily be

15  double the amount.  We could be looking at 200,000 people, and

16  so the Boy Scouts need to disclose what portion of this $2.4-

17  $7.1 billion value includes futures.

18        They need to disclose -- and that's just to the BSA.

19  They also need to disclose information about the total number

20  of future and unknown claims against the nonparties and also

21  their estimate of the value because everyone is sharing in his

22  limited pot of money -- a survivor just has no -- no way --

23  it's impossible for them to have an idea of what his or her

24  share may be.

25        THE COURT:  Mr. Linder?

1          MR. STANG:  Your Honor --

2          MS. LUJAN WOLFF: There notice needs to be disclosure

3    -    -

4          MR. LINDER:  My response, Your Honor, would be that

5    as an initial matter these are just future claims that relate

6    to -- they are the same, subject to the same definition of

7    abuse such that it's tied to scouting-related abuse liability.

8    But again, liabilities asserted by claimants who are qualified

9    within the future claims definition.

10         In terms of the amount that has  been reserved for,

11   the proposal is that this is going to be handled through the

12   determination of the initial payment percentage through the

13   trust distribution procedures.  The settlement trustee in

14   consultation with the settlement trust advisory committee and

15   the future claimants representative will it be to be in place

16   post-effective date and will agree upon an appropriate initial

17   distribution percentage the holders of direct abuse claims.

18         It's appropriate in the context that in the sense

19   that it will be sufficient to reserve adequately for the

20   number of future -- number and quantum of future abuse claims

21   that they anticipate may be asserted during thelife of the

22   trust.

23         MR. STANG:  Your Honor, may I have a moment on this?

24   I tried to assert myself before Mr. Linder started speaking.

25         THE COURT:  Yes.

1          MR. STANG:  Your Honor, the FCR has thrown his full

2   fiduciary weight behind this claim, and he and his firm have

3   received both pre-petition, because he was engaged by the

4   debtor as a future claims rep filed prior to the bankruptcy, I

5   think for almost -- if not a year, at least a year before the

6   bankruptcy filing.  He and his firm have received millions of

7   dollars in fees associated with his responsibilities.

8          He should be able to tell creditors what his

9   conclusions are today as to the number of people who fall

10  within these categories, the abuse that he projects the

11  creditors have have suffered and the valve those claims as a

12  component of what we are talking about because, as Mr. Linder

13  just said, this will affect how much comes out in the initial

14  payment percentage.

15         Now, if he doesn't know that, after all that work,

16  then creditors should be told that he doesn't know it, but

17  there have been enormous estate and pre-prepetition resources

18  put to this job and we have never been told how many, what

19  levels of abuse, or how much his work has enabled him to opine

20  on.

21         MR. LINDER:  Your Honor, I do understand that work

22  has been done.  Obviously the FCR's counsel can speak to that

23  further if appropriate.   Obviously, they have retained Ankura

24  as their consultant on these matters.

25              THE COURT:  Mr. Harron?

1        MR. HARRON:  Thank you, your Honor, for the record

2   Ed Harron on behalf of future claimant's rep.

3        Mr. Linder is correct.  We do have a view of the lue

4      of the future claims that fall within the scope of this

5   court order appointing Mr. Patton.  If the court would like us

6   to do so, we can include it in the disclosure statement.  It's

7   a forecast.  It may not be suseptable to the level of

8   precision that others may like and what will happen when we

9   put it in is that we get some -- it's just another source of

10  contention.  The insurers will depose based on a forecast,

11  will litigate will the extent to which the forecast is binding

12  on that.

13        So in other cases we have left it to the

14  constituents who are paid from the trust to use the forecast

15  to negotiate a payment percentage but if Your Honor feels that

16  the number should be in the disclosure statement we'll put it

17  in there.

18        MR. STANG:  Your Honor, what Mr. Harron refers to as

19  a possible point of contention I point to as a point of

20  information.

21        THE COURT: Okay.  Well I think the FCR can draft

22  something to put in as a point of information, and I suspect

23  whether it's in or not the FCR and his team are going to be

24  subject to discovery, anyway.

25        MR. HARRON:  You're probably right about that.

1          THE COURT: So let's put it in.

2          MR. HARRON:  Will do, your Honor.

3          MR. LINDER:  May we move to the next topic, Your

4    Honor.

5          THE COURT: Yes.

6          MR. LINDER:  The next one, I believe we skipped

7    ahead previously and addressed it, it was about allowing

8    creditors to have notice and an opportunity to be heard with

9    respect to claims objections.

10         THE COURT: Yes.

11         MR. LINDER:  So we'll skip ahead then to number 19

12   which is attorneys' fees.  The objection, Your Honor, is that

13   there is not clarity in the disclosure statement with  respect

14   to the potential dissolution of distributions to holders of

15   claims by amounts paid to counsel.

16         I think this objection, Your Honor, is really split

17   into two subcomponents.  The first of those is that there are

18   claims of -- there are attorneys' fees that will be payable by

19   individual abuse claimants to their own, what we refer to as

20   state court counsel. The debtors are not privy to those

21   contractual arrangements so we don't have a basis to estimate

22   what those might be so we don't have any disclosure on that

23   point in he disclosure statement.

24         When we say that there's a range of values, that is

25   -- that is the aggregate recoveries claimants can expect to

1    receive on account of their claims that would, of course, be

2    subject to whatever deductions they made from those funds on

3    account of their own attorneys' fees or otherwise.

4         The second category is something that we have

5    included extensive disclosure on which is -- which is

6    professional fees accrued and payable in connection with the

7    bankruptcy case. We had disclosure concerning the debtors

8    estate professional fees incurred to date as well as estimates

9    of future estate professional fees; that's at page 284 of the

10   red line.

11        There's a paragraph on page 284 that advises with

12   respect to the amount of fees and expenses accrued to date and

13   the projected fees through the end of the year, and then each

14   successive month there will be incurred by the estates

15   additional amounts on account of professional fees.  The way

16   that the contributions to the trust are structured is such

17   that the more attorneys' fees and other professional fees are

18   accrued, the lower the amount of cash contribution from BSA.

19        There's also a disclosure, Your Honor, on page 153

20   and 54 with respect to the coalitions restructuring expenses.

21   And what we include it in here, it's really the same

22   provision that's included in the revised version of the

23   provision that was in the fourth amended plan that that's been

24   advised to the fifth amended plan in light of Your Honor's

25   ruling in connection with the RSA.  Obviously, those fees, if

1  allowed by the court at the culmination of the case, those

2  fees will also be a deduct by the cash that's going to be

3  distributed to the BSA by the trust.

4           So we propose for anyone that has an objection on

5  this point to raise it.

6           THE COURT: Okay.  Anyone have an  objection?

7           Mr. Schiavoni?

8           MR. SCHIAVONI:   Your Honor, there's two or three

9  issues embedded here.  The first is when the plan, when this

10 plan was modified three or four days ago, it was added into it

11 the very fees that were the subject of the RSA rulings were

12 added into the -- directly into the plan.  So there ought to

13 be disclosure that the amount of the payout is going to be --

14 because that's how it's set up, the payout to the settlement

15 trust I think is going to be reduced by how the fees work.

16 That's one thing.

17          Mr. Linder may have suggested that's in here or not;

18 if it is, so be it, then that's addressed.   The other issue

19 is just we will have a separate argument at the end of the

20 disclosure why at this point those fees should be taken out of

21 the plan, we believe, but there should be disclosure that they

22 were  subject to rulings during the RSA hearing that the fees

23 themselves should be -- if they are going to be sought, they

24 be sought as part of a motion at the end of the case.  They

25 are being embedded in the plan, and it's actually, sort of,

1    worse under the RSA because the caps are taken off and there's

2    no   requirement in the plan that they be tied to substantial

3    contribution in any way.

4              Again, we can make that -- we want to make that as

5    an argument at the end why they should just be taken out but

6    if they are included here, I think there needs to be some

7    basic disclosure about what the rulings were  in the

8    disclosure statement hearing and that there's apparently been

9    no further -- there was no -- in the disclosure statement

10   hearing stage, it was clear there was no provision of any

11   documents backing up the fee request to them be granted by the

12   debtor.

13             We had an outstanding -- extensive outstanding

14   document request on these fees to both the coalition and the

15   Boy Scouts.  In advance of the hearing we asked them to

16   produce any documents concerning this, assuming in light all

17   of the guidance of the RSA that they have now subsequently

18   turned over a large number of documents to the Boy Scouts and

19   those were part of the decision-making, nothing whatsoever was

20   produced.

21             The position remains that all discussions of the

22   fees in connection with the plan, and about the plan, and

23   anything about the fees is completely subject to mediation

24   privilege.  The implication of that there ought to be

25   disclosure; if they are going to pay these fees, no documents

1  were provided in connection with them.

2         Again we would like to make an objection at the end

3  and we also have a little motion to compel on it because we

4  think although in many ways you might look at this as the tail

5  wagging the dog. I think this tail has wagged the dog of

6  getting these fees paid in many ways and if you had

7  disclosure you would see how important it  was that these fees

8  get paid and how they influenced and tainted a lot of actions

9  in connection with the plan for which good faith findings are

10  being sought.  But we will  address that if Your Honor takes

11  up our  motion to compel at some point but that's one issue

12  about the fees.

13         The second one, and it's sort of a little bit

14  interrelated there, was Your Honor did make the comment in her

15  findings, or the recognition, or whatever it was, that there

16  was at the beginning when they -- during the 2019 arguments, I

17  think there was a representation, or assertion, or finding, or

18  whatever it was, that these fees would not be foisted on the

19  other clients of the coalition on the rest of the estate, like

20  they now are, okay.

21         When you read through the disclosure statement

22  overall, there's definitely the impression that these will be

23  your payouts, but the debtors' assertions that they don't

24  know what the terms are of engagement or whatnot, we know with

25  absolute certainty the coalition that was formed by Mr.

1  Kosnoff what the payouts are to the coalition members.

2          We know that in part because they were presented to

3  the lenders under subpoena, these hedge funds that have backed

4  them, including one run by a group of Russian émigré's

5  charging and having an interest in these claims.  But the take

6  is 40 percent and you have that disclosure in all of the

7  retention agreements and we have simply suggested that there

8  be a candid disclosure that the coalition -- you know, we

9  presented a pie chart.  We just put the pie chart in that

10 shows that 40 percent of the payout of any of these claims is

11 going -- is going to the coalition lawyers and on top of that,

12 these coalition fees, professional bankruptcy fees are going

13 to be paid on top of that, and you know, it's significant.

14 It's the driver of the whole case.  It is not the tail of the

15 dog; it is the tail driving the dog.

16         So we do think there should be some disclosure in

17 Connection with both of those issues together and we would

18 like to take up whether the fees should be in the plan or not

19 at the end of the disclosure statement hearing.

20         By the way, Judge, I will add one thing in the

21 opioid MDL litigation there was recently, you know, the judge

22 in that case built into the case that you could not have fees

23 like this, 40 percent for processing claims, okay.  I mean,

24 like you see how this plan is going to work.  You fill out --

25 you fill out 15 questions in a proof of claim, and then you

1    give it to Mr. Green, who we'll talk about in a minute when we

2    get to it, his connections to the coalition, and he processes

3    it.

4         You just don't get fee awards in the states at that

5    kind of rate unless there's extraordinary work that goes into

6    the case. It's like here, that kind of take on this, it's

7    extraordinary.  So in the MDL litigation, the judge said,

8    look, I'm not going to pay out millions of dollars and have

9    most of it, almost half of it go to the plaintiffs lawyers, is

10   just not right.  He crafted a whole remedy regarding that and

11   that was one of the things we suggested be put in the

12   provision; that there are  alternatives to deal with this, so

13   voters  could consider it in connection with the plan.

14        THE COURT: Well, I think that's interesting and I

15   noted that recently and I noted that in connection with some

16   asbestos trust, I think, and maybe the suggestion of reduced

17   fees in Purdue -- although I wouldn't swear to that.

18        But I think there are a lot of factors that would go

19   into that and the first, of course, is that it's a private

20   contract between an attorney and his client.  And I would

21   presume that any -- well, it doesn't impact the size of the

22   fund.  It impacts what the client ends up with and the client

23   knows what is his arrangement is with his lawyer presumably.

24        So whether there's has been any discussion about a

25   reduction in fees for  claims that are just the subject of the

1   trust, because certainly for lawyers who have been working on

2   their clients' cases for years prior to the bankruptcy,

3   there's a  difference.   That's why I'm not sure how I  get

4   involved in this.

5          Although I would certainly welcome certainly some

6   agreement by plaintiffs' firms that are only putting in claims

7   into the trust; that they think it would be equitable and

8   appropriate for their client and consistent with the trauma

9   their clients have been through to reduce their fees but I'm

10  not sure exactly what I do about that.  So that's an

11  interesting topic we can put on the side burner perhaps.

12         As far as the coalition fees, I see Mr. Molton's

13  hand up and I'll certainly hear from him, and Mr. Buchinder I

14  see his hand up, and Mr. Stang's.

15         So let me we are had others with respect to

16  disclosures.  But with respect to the fact that individual

17  claimants have arrangements with their lawyers, they know how

18  to factor those into their recoveries because they have those

19  individual arrangements with their lawyers.

20         Let me hear from Mr. Molton.

21         MR. SCHIAVONI:  Your Honor, if I could just add one

22  thing to answer your question. On the coalition retention

23  agreements, which we have, all of them or virtually all of

24  them limit the representation just to this bankruptcy.  So

25  they are very different from the retention agreements by

1  someone, say, like Mr. Hurley of the Hurley firm who was

2  engaged prepetition in litigation who tried cases, who - I

3  don't have his retention agreements but I suspect they are not

4  limited to just this bankruptcy engagement.

5          That specific limitation is exactly the kind of

6  thing that in the MDL case the judge focused on as a rationale

7  for the ruling and we would like to bring a motion before Your

8  Honor that would explain the bases on which the court could

9  rule on this.  We think it's also a disclosure statement

10  issue.  But we don't think that these fees are -- are legally

11  viable in the states that they are charged in the first place.

12  But that would be the subject of a motion that we'll bring.

13          In order for the parties to basically have any kind

14  of -- to have a -- to spark a discussion of it, there needs to

15  be some basic disclosure of what's going on, and I would not

16  assume that the claimants all have a solid handle of this

17  because you remember in connection with the advertising

18  motion,   there was either an acknowledgment or  findings

19  there that there was that was false advertising going on, that

20  AIS in particular was arguing, and you will see it when we get

21  to solicitation, the retention agreement presents it as a

22  membership organization; that they were joining as members.

23          And yes, granted we are dealing with some of these

24  folks signing things at the end of the day but whether they

25  all they have a solid handle on this given the nature of the

1   sizing that took place is something that is unique to this

2   case that would enhance and be even more of a basis for

3   findings and more on the MDL about the size  of the payouts.

4           MR. STANG:  Your Honor, may I --

5           MR. SCHIAVONI:  You can't really have a 40 percent,

6   and the $10 million, and $1 million a   month living at the

7   same time in any event.

8           MR. STANG:  Your Honor, might I suggest that before

9   Mr. Molton speaks you hear from the people who want to comment

10  on this so he doesn't come off and on, and off and on, and he

11  hears it all at once.

12          THE COURT:  Sure, Mr. Stang.

13          MR. STANG:  Your Honor, just as a point  of

14  information, many months ago I sat down  personally and looked

15  at the retainer  agreements that were filed in the 2019

16  statement and then compared it to the number  of clients that

17  those law firms alleged -- I  shouldn't say alleged --

18  represent, and I came to the conclusion that approximately

19  20,000 claimants had entered into agreements  that said the

20  law firm was supposed to provide nothing more than

21  representation -- provide representation only in the context

22  of the bankruptcy case.  Now that's not an  exact-exact number

23  but that was  approximately.

24          My focus is not really on what Mr. Schiavoni just

25  talked about in terms of whether one should modify the fee

1 arrangement between the survivor and the law firm.  But

2 rather, just to emphasize as a subpart of what he alluded to,

3 this disclosure statement  should say that a representation

4 was made to the court that the fees and expenses of the

5 bankruptcy professionals for the coalition were not going to

6 be charged to the constituency of the coalition and that under

7 this arrangement they are being born not only by those people

8 but by all creditors.

9         It is possible, if it's important to you, to

10 understand how much the coalition law firms are receiving,

11 that's a really, really easy calculation because if you use

12 the TDP values discounted by the statute of limitations and

13 tracked it to the law firms its not hard to compute.  So Bates

14 White has all that, and as Mr. Schiavoni pointed out you have

15 the retainer agreements for many of the firms.

16         I'm not sure all of the law firm partners -- I'm

17 sorry, law firm coalition members have filed retention

18 agreements but the big ones have, and as we get into more

19 discussion about the scope of those retainer agreements -- as

20 I said it takes care of the bulk of it. But the point really

21 is creditors should know that the representation made to the

22 court about the burden of these fees at the beginning of the

23 case is being over ridden if this plan is confirmed.

24         THE COURT:  Thank you, Mr. Rosenthal.

25

1      MR. ROSENTHAL:  Yes, Your Honor.  Just two points

2 following up on what's being said.

3      First, in terms of disclosure, as Mr. Schiavoni

4 said, this does represent an attempt by the coalition to have

5 their fees paid without complying with what the Court

6 previously directed which is that -- pursuant to a showing of

7 substantial contribution.  If this plan goes out, as is, it

8 should be reflected in the disclosure statement that the

9 failure that that requirement to pay those fees without any

10 showing of substantial contribution may render the plan

11 unconcfirmable; the Court has previously said it would

12 require such a finding.  If, in fact, there is an intent to

13 approve this under a substantial contribution standard, then I

14 think that should be included in the plan and in the

15 disclosure statement so that parties know it would only be

16 approved under a substantial contribution standard.

17      The second point, Your Honor, is that, you know, I

18 think there should be an  additional disclosure that given the

19 split now between the official tort claimants committee and

20 the coalition, and proof of substantial contribution when they

21 have distinctive interests, you know, may be  difficult.

22      THE COURT:  Okay.  Thank you.

23      Ms. McCollum, welcome.

24      MS. MCCOLLUM:  Thank you, Your Honor.

25      First, I just wanted to let you know that Mr.

1  Buchbinder had to step off of this hearing to take another

2  hearing.  So I am subbing in for him.

3        I wanted to echo Mr. Rosenthal's comments which is

4  Your Honor had ruled that the coalitions fees were to be

5  pursuant to -- evaluated pursuant to a substantial

6  contribution standard and the disclosure statement should note

7  that, and the consequence of them failing to make that

8  showing.

9        So thank you, Your Honor.

10        THE COURT:  Thank you.

11        Okay.  Mr. Molton?

12        MR. MOLTON:  Thanks, your Honor.  Can you hear me?

13        THE COURT:  I can.

14        MR. MOLTON:  I guess I've been given another handful

15  to deal with.  I'll do my best.

16        I am going to first deal with something that really

17  isn't within my purview but I need to comment on and that's

18  the question of a contract fees between the private warriors

19  and their clients.  Other folks who, the actual lawyers which

20  include well beyond the coalition lawyers, include lawyers for

21  the TCC, lawyers for other folks who are appearing here today.

22  I imagine some -- I know Tanc like's to use the 40 percent,

23  I'm  sure that they differ according to their states,

24  according to various markets.

25        I will say, Your Honor, because I do have some

1  personal knowledge, albeit I don't represent in Purdue, I'm on

2  the other side, so to say.  I'm representing governmental

3  entities who have their issues with respect to and reach their

4  own consensual agreements with respect to their own private

5  lawyers attorneys' fees.  And I say their own consensual

6  agreements.

7        I do believe that the 140 or so proof of claim

8  personal injury claimants in Purdue, their private contractual

9  agreements with their attorneys was not impaired, addressed,

10 modified affected, but I will let other folks  deal with that

11 and who have more knowledge than I do.

12        Again, I've heard a lot of merits arguments infused

13 into what should be disclosure arguments.  My recollection,

14 Your Honor, although Your Honor,  you know, certainly can tell

15 me if I'm wrong, is that Your Honor agreed with Judge Dorsey

16 with  respect to the RSA issue which was the debtors' business

17 judgment and granting post-petition fee contract under the

18 debtors  business judgment, your Honor, adhered to his ruling

19 that the debtors business judgment would be informed by a

20 substantial  contribution, not necessarily that 503(b)

21 applied, I don't think that was how I read your ruling, but,

22 again ,that will be left for another and better day.

23        I do note, Your Honor, one of the things we have

24 always, unfortunately, have to dealwith it in this case, is

25 folks making statements and not telling the complete story.

1 And the complete story of our 2019, which Your Honor approved,

2 by the way, by way  of Docket Entry No. 1572 on October 23,

3 2020, contained our supplement to amended a verified statement

4 that the coalition, pursuant to Bankruptcy Rule 2019, and I'll

5 refer it to you and then I'm going to leave it because I'm not

6 going to argue it now. We'll leave that for another day.

7            As to the merits is paragraph 2.  The coalition

8  acknowledges that neither it nor the state court counsel will

9 charge back the fees of any of the coalitions professionals to

10 the individual surivors in any way including by reducing an

11 individual survivor cash distribution.  Now everybody that

12 you've heard talk leaves it at that, but the paragraph goes

13 on, Your Honor; provided, however, underscored that the

14 coalition seeks its right to seek a substantial contribution

15 claim and/or seek a reimbursement for the fees and expenses

16 incurred by coalition counsel under a Chapter 11 plan.

17            That's the sentence, the clause that my friends --

18 and I'll use -- I want to go to Mr. Stang again.  He

19 criticizes me for using the term "my friends."  That was

20 taught to me by the Ninth Circuit in his state when me, as a

21 young lawyer just coming out of the prosecutor's office

22 referred to folks, my colleagues on the other side as

23 adversaries, and the panel said, "We in California don't talk

24 that way that you guys talk in New York.   We use the term "my

25

1  friends."  And I've used it ever since.  So nothing nefarious

2  about that, Judge.

3       In any event, my friends have just, you know,

4  referred to the first sentence there, but not the second

5  clause of that Paragraph 2.  I do want to note, your Honor,

6  that that is exactly what we have done.  We have reached a

7  plan settlement with the debtors and have included that in the

8  plan.  Your Honor, to the extent that there needs to be

9  evidence under, and -- and we would submit, Your Honor, as

10  Judge Drain held just recently in Purdue in his decision which

11  he recently gave in his modified opinion at page 24 entered on

12  the 17th of this month, Docket 3786; Case No 19-023649

13  basically said these sort of planned settlements and post-

14  petition fees, contrary to the U.S. Trustee's position that

15  only, you know, 543(b) or 503(B)(3) applies are governed by

16  1129 (a)(4) and 9019.

17       This is not the time or the place, Judge, to argue

18  that.  My friends at the U.S. Trustees Office, whose position

19  was rejected by Judge Drain emphatically, will argue their

20  position, we will argue ours, Your Honor will make the

21  decision, this is a disclosure issue and you know, from our

22  perspective, Judge, the  disclosure that has been made on the

23  page Your Honor referred to is more than adequate we think to

24  inform the voting on creditors of the deal and of the

25  circumstances.

1        Again, Your Honor, as I said yesterday, I don't

2   think we'd be here doing this but for the substantial

3   contribution of the coalition, but again that's a matter for

4   another day, if that standard at all applies to 1129(a)(4) and

5   9019.

6        Again, your Honor, with respect to the plan, the

7   fees are going to have to be reasonable.  As Judge Drain held,

8   they are subject to a reasonableness requirement and clearly

9   nobody is being asked to be paid right now.  And whatever

10  evidence and  documentation, including by the fee examiner,

11  which we have agreed to, is going to happen will happen then.

12       In any event, Judge, we think that the disclosures

13  are sufficient.  As I said, our own 2019, which Your Honor

14  approved set forth the basis on which the coalition's fee

15  agreement is contained in the plan.

16       Thank you, your Honor.

17       THE COURT: Okay.  Thank you.

18       Well, I think it's evident that this provision

19  hasn't   escaped anybody's notice and so I think it's probably

20  sufficient.  But I think it's also acceptable to include a

21  provision -- include acouple sentences on the fact that this

22  isn't the first time that this request has been made and my

23  ruling, and if Mr. Molton wants the sentence -- complete

24  sentence in Paragraph, I think you said 2, of his -- the

25  agreement or the 2019, whichever it was,   statement could be

1  included as well.

2       MR. MOLTON:  Thank you, Your Honor.  I appreciate

3  it.

4       THE COURT:  Thank you.

5       MR. PATTERSON:  Your Honor, could I be just heard on

6  one final note to that?

7       THE COURT:  Mr. Patterson, yes.

8       MR. PATTERSON:  Thank you, Your Honor.  Tom

9  Patterson.

10       Your Honor, it wasn't clear to us whether or not the

11  coalition counsel intended to comply with the standards set

12  forth in 503(b).  And I gather that they do not I believe that

13  they  have to comply with that standard.  I think the

14  disclosure statement should say that the coalition seeks these

15  fees notwithstanding 503(b) or that they do not believe they

16  have to make a showing under 503(b).

17       THE COURT:  I think, Mr. Molton, it would be

18  appropriate to say what you think -- I don't think you have to

19  say notwithstanding this, but you can say we're seeking it

20  under, what did you say, 1129(a)(4) and whatever the other

21  section was.

22       MR. MOLTON:  Yes, Your Honor, 9019.

23       MR. PATTERSON:  Thank you, Your Honor.

24       THE COURT:  Thank you.

25       MR. SCHIAVONI:  Your Honor, we would just like to

1   reserve to argue again at the end with Mr. Rosenthal on non --

2          THE COURT:  I take it I'm going to have a few

3   arguments like that.  So that is fine.

4          MR. MOLTON:  Judge, if I could make one last

5   statement.  Needless to say that is my position. If Your Honor

6   requires me to show substantial contribution we're ready to

7   go.

8          THE COURT:  Yeah.  My -- I do recall agreeing with

9   Judge Dorsey that 363 was an appropriate vehicle, I think is

10  what I may have said, an appropriate vehicle to bring -- for a

11  debtor to bring the request.  1129 might also be an

12  appropriate vehicle.  I will have to think about that, but I

13  think I did say -- well, I said what I said and I don't want

14  to go back and misstate what I said previously. I said what I

15  said.

16         I think we have a little more time, Mr. Linder.  So

17  let's see if there is another one of these we can knock off.

18         MR. LINDER:  Your Honor, the last one I am planning

19  to cover before I turn the podium over to my colleague, Ms.

20  Baccash, is number 20 on the reply chart.  This is an

21  objection, I believe it's been remedied by Century that the

22  confirmation hearing notice and other places within the

23  documents stated that every single major creditor constituency

24  supported the plan.  Century took issue with that language and

25  we have removed it from the  disclosure statement and the

1  other documents.

2          THE COURT: Okay.  Anything further on number 20?

3      (No verbal response)

4          THE COURT: Okay.

5          MR. LINDER:  So Your Honor, if you want to take

6  advantage of the next 30 minutes, I will just switch places

7  with my colleague and we'll continue on.  Thank you.

8          THE COURT: Let's do that, please.  Thank you.  And

9  then we will take an hour and 15 minutes break.  At least

10  that's my best guess.

11          MS. BACCASH:  Good morning, Your Honor, Laura

12  Baccash for the debtors.

13          Let's pick-up where we left off on number 21.

14  Number 21 of the chart refers to objections that -- the

15  disclosure statement lacks information regarding the first

16  encounter agreement which is the name that has been used for a

17  1996 settlement between BSA and Century related to the

18  handling of certain abuse claim disputes including the

19  definition of occurrence under the policies.

20          Since those objections were lodged we have added an

21  entire section to the disclosure statement on page 62 of the

22  redline.  Additionally on page 241 of the redline we have

23  indicated that the rights and obligations under the first

24  encounter agreement will be assigned to the trust.  We don't

25  believe that any further disclosure is necessary but I'll turn

1   it over to see if anyone else has anything.

2          THE COURT:  Okay.  Anyone have anything further on

3   the first counter claim?

4          MR. ROSENTHAL:  Yes.

5          THE COURT: Yes, Mr. Rosenthal.

6          MR. ROSENTHAL:  Your Honor, I was looking at the

7   first statement on the disclosure statement on page 62 and I

8   noticed there was a deletion of a sentence at end that says

9   certain parties contend that the FDA's only applicable to

10  Century; however the debtors disagree and I would ask that --

11  first, I don't   understand why that sentence was deleted and

12  would propose that it be reinserted because there are still

13  some parties, including any client, who believe that that

14  agreement is not binding on them as a non-party.

15         THE COURT:  Response to that, Ms. Cash?

16         MS. CASH:  That's not a problem.  We will add that

17  sentence back in.

18         MR. ROSENTHAL:  Thank you.

19         THE COURT:  Ms. Lujan Wolff -- is it or Lujan or

20  Wolff?  Am I mispronouncing your name totally?

21         MS. LUJAN WOLFF:  Your Honor, you're saying is

22  perfectly.  Either way is fine.  Ms. Wolff is easier.

23  Whatever Your Honor prefers is acceptable. Thank you.

24         Yes, your Honor, I had an objection regarding this

25  and it concerns -- well, the Boy Scouts have included this

1 || first encounter agreement in the disclosure statement, I

2 || guess, to show limits of the insurance coverage, but they need

3 || to also explain the limits to that limitation.  They say that

4 || that first encounter agreement has been followed by other

5 || insurers.  They need to say if it hasn't been followed by

6 || other insurers, and I believe it was Mr. Rosenthal of AIG,

7 || that is an example of an insurer who doesn't abide by that

8 || agreement.

9 ||         So I think its important when the BSA wants to

10 || disclose that there are -- you know, that there is limited

11 || coverage.  They need to show that that limit is not as

12 || substantial as they're leading people to believe.

13 ||         Thank you.

14 ||         THE COURT:  Thank you.

15 ||         Well I think that sentence is getting added back in

16 || and I think that advises people that certain parties, you can

17 || say certain insurance companies, contend that the FDA is only

18 || applicable to Century.

19 ||         MS. LUJAN WOLFF:  Your Honor, I would also request

20 || the added that direct action -- certain direct action

21 || plaintiffs or survivors also were non-parties to this

22 || agreement.  They have rights divested in these insurance

23 || policies and I believe that also needs to be disclosed.

24 ||         THE COURT:  I would suspect that there are a lot of

25 || survivors who might think that this does not apply to them.

1    So I think its appropriate to indicate that certain parties

2    include insurance companies and certain survivors.

3            MS. BACCASH:  We'll make that change, Your Honor.

4            THE COURT:  Thank you.

5            MS. BACCASH:  If there's nothing else, we'll move on

6    to item number 22 on the chart, Your Honor.

7            THE COURT: Yes.

8            MS. BACCASH:  These objections were all filed prior

9    to the revised Hartford agreement and so, therefore, you know,

10   likely do not address that. I believe we agreed we could cover

11   disclosures related to the new plan provisions at the end of

12   the chart.  So I would propose that we move onto number 23

13   right now.

14           THE COURT:  Yes.  I agree.  We will take Hartford at

15   the end so parties have more of a chance to come up with their

16   objections to disclosure.

17           MS. BACCASH:  Great.  Moving onto to number 23,

18   these objections have to do with the plan summary document

19   that was prepared originally by the RSA party and then revised

20   by the coalition and FCR, and refiled.  So I would propose to

21   hand the   podium over to counsel for the coalition or FCR to

22   address these.

23           THE COURT: Okay.

24       (No verbal response)

25           THE COURT:  Nobody's taking you up on that.

1          Let me ask is this objection still live?  Does any

2     objector still have an issue?

3          Mr. Stang?

4          MR. STANG:  Thank you, your Honor.  Your Honor, my

5     concern goes to an issue that may have been touched upon in

6     part when we were discussing the coalition law firm.  In two

7     spots in the plain English document, which by the way the TCC

8     was very involved in drafting when we were RSA parties.  I

9     don't want you to have any misunderstanding or misconception

10    about that.  There are at least two places where the survivor

11    is told that it is the survivor's responsibility to facilitate

12    communication with state court counsel, coalition or

13    otherwise; we're talking about all the state court counsel.

14    We're not picking out one firm or another.  That it is the

15    client's responsibility to facilitate  communication so that

16    their vote preference is reflected on the master ballot.  And

17    we'll get to the solicitation issues later.

18          It is not the client's responsibility under rules of

19    professional conduct to reach out to the law firm and tell the

20    law firm what its preference is on a settlement that is the

21    subject of something that's probably now thicker in terms of

22    the disclosure statement than most phone books. The rules of

23    professional conduct say that --

24          THE COURT:  You don't have to convince me of that,

25    okay.  I agree.  So I'd like to see where it is in the --

1 where that is in this and I'll hear from somebody to the

2 contrary, but I will tell you that I do not believe it's the

3 clients responsibility to reach out to the lawyer.

4         MR. HARRON:  Your Honor, its Ed Harron for the FCR

5 because the baton was passed to us.  We didn't have I an

6 active  role in drafting this because the futures don't vote

7 by definition.

8         THE COURT:  Right.

9         MR. HARRON: But I think that what we should do is we

10 should -- Mr. Stang is right, his office was instrumental in

11 preparing the document. He has a lot of good ideas.  We all

12 have the same goal to make sure that the voters are accurately

13 and fully informed.

14         So why don't we just table this and make sure we

15 incorporate comments that Mr. Stang has and we'll put it to

16 the back of the pew.

17         THE COURT:  Well I'm happy for you guys to work on

18 that and address that issue, but as I said I agree with Mr.

19 Stang on that.

20         Mr. Stang, do you have any other issues?

21         MR. STANG:  No, Your Honor.

22         THE COURT:  Thank you.

23         Mr. Rosenthal?

24         MR. STANG:  Well, Your Honor, I'm sorry.  Just kind

25 of a head's up if you will, I apologize for saying no and then

1  saying but.  The TCC is preparing its own communication to the

2  survivor constituency that we would want included in the

3  disclosure -- in the solicitation package.  That letter was

4  drafted yesterday.  It is being circulated to the committee

5  members themselves this morning.

6           Professor Kennedy, one of the co-chairs is

7  specifically working on a certain aspect of it regarding non-

8  monetary protections and we will have it out to the parties in

9  interest as soon as we get the feedback from the client, but I

10 wanted you to know that we were doing it.

11          THE COURT:  Thank you.

12          Mr. Rosenthal?

13          MR. ROSENTHAL:  Yes, Your Honor.  We have a number

14 of difficulties with this.  We wouldn't have an issue with a

15 mere letter supporting approval of the plan. That's fairly

16 routine and typical.  We agree that 500-page document probably

17 is to some more confusing than it is helpful.  However, to the

18 extent that this purports to be a plain English summary, which

19 it does, it seems to us that that falls clearly within 1125

20 and something that other parties should be able to comment on

21 and that the court   should have to approve because for people

22 who receive this, they will see plain English summary.  They

23 will assume it's been approved by the Court.  They will read

24 that document as opposed to the disclosure statement.

25          We want to make sure that if that happens, that the

1  document itself is correct and not misleading.  Now obviously

2  we don't want that document to expand to 500 pages either but

3  at the same time, we don't want it to -- to exclude or

4  inappropriately  state things that are -- that are actually

5  either not accurately described or fail to describe other key

6  aspects.

7          THE COURT: Okay.  I'm looking at this and I will

8  tell you, I glanced at and I haven't read it in detail either

9  but -- and I'll hear a response to that but first let me go to

10  Mr. Buchbinder.

11          MR. BUCHBINDER:  Thank you, your Honor.  Dave

12  Buchbinder again for the United States Trustee.

13          Your Honor, I've seen both of these letters or

14  summaries. I haven't had a chance to vet them in detail either

15  and I don't know that it would be a meaningful exercise for us

16  to do that and spend additional time.  Perhaps the solution

17  would be to indicate for each of these letters to indicate

18  that they have not proved by the court and they are not the

19  opinions of the  representatives who are sending them.

20          With respect to the coalition they could send this

21  letter or this summary to their clients without having to seek

22  court approval because they are their clients.  The tort

23  claimants committee is an in a different position but I think

24  if both of the letters in their present form were to indicate

25  that they are a summary of the plan and disclosure statement

1  as indicated with whatever other caveats the court thinks

2  ought to be put into them that might be the way to proceed

3  with these documents at the present time rather than to try to

4  rewrite them in what would actually be plain English that

5  someone off the street could understand but that's for another

6  day.

7  I think that's the solution for these two documents

8  at this time and that's all I have to say on this point, Your

9  Honor.

10  THE COURT:  I've only seen one document. Are there

11  two?

12  MR. STANG:  There was a prior version of this, Your

13  Honor.

14  THE COURT: Got it.

15  MR. STANG:  But, Your Honor, I think Mr. Buchbinder

16  misses the point in part.  The coalition law firms will send

17  whatever communication they want out to their clients.  They

18  are required to inform their clients under ABA rules which we

19  eluded to earlier.

20  This is for the people who don't have a lawyer.

21  This is for -- I think there are at least 5,000 people who

22  don't have counsel and God knows how many people who don't

23  know they have counsel because we get those inquiries all the

24  time.  So its for them as much as anyone.

25

1        Now some law firms would appreciate (indiscernible)
2  version as well because they do not have the number of clients
3  that would warrant filing through hundreds of pages which it
4  will end up being.  So as to the unrepresented parties I think
5  they do need something cleaner and there are -- I told you at
6  the beginning of this earlier in this hearing that we had a
7  view as to the valuation of claims and what the percentage
8  payouts are.  If we're going to have a court endorse documents
9  that's a very important part.

10        One bankruptcy judge in California who didn't tell
11 us to refer to ourselves as friends said creditors have two
12 questions; how much and when.  Well the when there's a big
13 question mark.  The how much is something that the debtor has
14 a view on and we have a view on.  So if this is going to
15 become a communication that benefits all survivors those
16 scenarios should be in there.

17        Again, this is something that perhaps people could
18 go back and work on and come back to you to see if we have an
19 agreement.  That is my reaction to what Mr. Buchbinder said.

20        THE COURT: Well lawyers in Delaware have friends too,
21 they're also in good voice.  So it just depends on how long
22 they've been practicing.

23        Mr. Ryan?

24        MR. RYAN:  Your Honor, I just wanted to echo, not my
25 issue on these communications, but really that what my clients

1  are intending or would like the plain English summary for

2  chartered organizations.  There are tens of thousands of

3  chartered organizations -- going back to Mr. Buchbinder's

4  point there is tens of thousands of unrepresented chartered

5  organizations.  They need something that is official that is

6  sanctioned by the court that is far simpler then the hundreds

7  or thousands of pages that they are going to get.

8          So I certainly agree with Mr. Buchbinder on a lot of

9  the points he's made today, but I do think that is our

10 intention of what we are asking for, for a plain English

11 summary for chartered organizations as well as what Mr. Stang

12 is saying.

13         THE COURT:  Okay.  I hear that and as I said earlier

14 it makes sense to me.  Do I hesitate a little because,

15 obviously, whatever goes out has to be accurate if it's been

16 approved by the Court.  And so I want to take some time with

17 this document, which I will do and review it to see whether it

18 seems a fair summary because I do think whoever said that this

19 document may be the only thing they read, if it's provided, is

20 probably a fair comment, notwithstanding that this will say

21 somewhere, read the disclosure statement.  I think that's a

22 fair, practical comment.

23         MR. BUCHBINDER:  Dave Buchbinder.  I will add that

24 if parties want could cooperate to fine tune the document so

25 they all agree on it I'm absolutely fine with that as well.

1          THE COURT: Mr. Schiavoni?

2          MR. SCHIAVONI:   Your Honor, I think the charter

3    issue raises a different one.  I had envisioned that the

4    charters would get a separate summary that would focus on

5    their issues, so lake that's my assumption on how its being

6    dealt with.

7          As far as weighs been put together for the, I guess

8    the other creditors, just as you read it, I think one of the

9    things you're going to find is that it doesn't contain any

10   specific disclosures about the litigation risk that the plan

11   proposes.  It doesn't have anything about the coverage

12   defenses, any of the issues about the risk associated with the

13   coverage that follow from how they have approached the

14   insurance.

15         So, it's like I've got it that it's supposeded to be

16   quote in plain English but the -- the disclosure statement is

17   supposed to be in plain English after all.  It does -- like

18   this is not an accurate summary of the plan.  I think the

19   coalition should be able to send whatever letter it wants and

20   the TCC should address what it wants separately like the

21   trustee has suggested.

22         THE COURT: I'm going to consider these comments as I

23   read the plain English.  And I would say we used to have plain

24   English disclosure statements.  I've been practicing that

25

1   long, but we started dumping the plan into the disclosure

2   statement a long time ago.

3            MR. ROSENTHAL:  Long time ago.

4            THE COURT: And a plan of this complexity, in any

5   event, regardless, is, I would say, a daunting document for an

6   unrepresented person to read.  So I hear the concerns that a

7   plain  English document may, if not be inaccurate, might be

8   not as full some or complete as one would hope, and I will

9   keep that in mind as I read through this.

10           Okay.  We've got ten minutes.  Ms. Baccash, is there

11  something that you think we can do in ten minutes or no?

12           MS. BACCASH:  Yes, your Honor, I think we can move

13  on to number 24 and probably get it finished off.

14           THE COURT: I'm sorry, before we do that, Mr.

15  Goodman, did I leave you out?

16           MR. GOODMAN:  Yes, your Honor.  I just wanted to x

17  add that we are more than happy to consider comments that

18  anyone has to the proposed summary.  This is a document that

19  did originate with the TCC so I can't take full credit for

20  everything that it says. But, you know, we do believe that it

21  would be helpful.  In fact, Judge Montali in (indiscernible)

22  required something along these lines given the constituency.

23           If the insurers think that there are juts or tweaks

24  that immediate to be made we are receptive and I am happy to

25  get on the phone and have those discussions that we can get

1  something done because I do think it would be helpful for the

2  survivors just the same as it would be helpful for the

3  chartered organizations.

4            That's all, Your Honor.

5            THE COURT:  Thank you.

6            Ms. Baccash?

7            MS. BACCASH:  Your Honor, moving on.  Number 24,

8  this is an old objection, Your Honor, that was filed in the

9  first round of objections and basically asserted that the

10  disclosure statement didn't provide an adequate description of

11  the retained assets.  I think we've already touched on this

12  entire objection but we do  now have a list of the retained

13  assets to the liquidation analysis.

14            Additionally, on page 48 of the redline of the

15  disclosure statement, we set forth our justifications for

16  these   assets being considered retained assets.  We also do

17  note on page 49 the TCC adversary that has since been stayed.

18  We believe that   those disclosures, there is no -- nothing

19  else needed.

20            THE COURT: Okay.  Any further -- any comments by

21  anybody on this topic?

22        (No verbal response)

23            THE COURT:  Okay.  Check that one off the list.

24            MS. BACCASH:  Should we move on and do one more?

25            THE COURT: If you think we can.

 1          MS.BACCASH:  This one is going to be a bit longer

 2  since it has to do with Eric Green.

 3          THE COURT:  Okay.  Well, let's let that one wait,

 4  then.  We'll get into Mr. Green.

 5          I will make this comment.  I was surprised to see

 6  his name pop up again in the case.  I'm not saying it's a bad

 7  thing, and I'm willing to listen to people, but I was a little

 8  surprised.   So I'll leave with you that thought.

 9          We are going to take a break till 3 o'clock Eastern.

10  I think that's sufficient time for me to get through my two

11  o'clock.  I will apologize in advance if I'm a little late to

12  the hearing.  But it will not be earlier than 3 o'clock.  So

13  if you are back on at three that will be sufficient.

14   22      So we are in recess.  Thank you very much.  I think

15  we made a lot of progress this morning and I appreciate it.

16  Thank you.

17      (Recess taken at 1:36 p.m.)

18        (Proceedings resume at 3:05 p.m.)

19          THE COURT:  Okay.  Good afternoon, Counsel.  This

20  is Judge Silverstein.  We're back again on the record in Boy

21  Scouts.

22          Ms. Baccash.

23          MS. BACCASH:  Good afternoon, Your Honor.

24          Turning now to Number 25 on the objection chart,

25  this object -- these objections relate to disclosures around

1  the TDPs, Your Honor.  And with the exception of one of the

2  objections, all of them were filed prior to the filing and the

3  incorporation of the current TDPs into the disclosure

4  statement.

5          The disclosure statement now includes a

6  comprehensive description of the claims matrix and the scout

7  scaling factors, which will be used to assign a value to the

8  abuse claim.

9          The disclosure statement also discusses how the

10  trustee will evaluate each of the claims and the procedures

11  which he will -- which he will apply in order to come to the

12  value.

13          The disclosure statement also now describes what

14  will happen when -- once the settlement trust terminates.

15  That's on Page 27.

16          And the disclosure statement now identifies the

17  proposed settlement trustee, Eric D. Green.  Additionally, we

18  added a risk factor on Page 274 around the appointment of Eric

19  Green.

20          On Page 211, where we discuss his proposed

21  appointment, we also added a footnote describing -- stating

22  that his appointment as mediator was subject to an objection

23  and describing that.

24          The disclosure statement also advises as to how the

25  settlement trust advisory committee will be established and

 1  who will appoint the members of that committee.  That's on
 2  Page 212.
 3         And finally, the debtors also disclose that they
 4  will be submitting their document agreement, which used to be
 5  called the "cooperation agreement" with the plan supplement,
 6  proposed for November 2nd, which is well in advance of the
 7  proposed November 16th voting deadline.
 8         With that, Your Honor, we think that there has been
 9  adequate disclosure and we are open to others (indiscernible)
10         THE COURT:  Thank you.
11         Let me hear from anyone who has an issue with the
12  disclosure.  Mr. Schiavoni.
13      (No verbal response)
14         THE COURT:  Mr. Schiavoni, you need to unmute.
15         MR. SCHIAVONI:  Sorry.  Your Honor, we served Mr.
16  Green and his corporations with subpoenas shortly after the
17  disclosure statement hearing when the prior Schedule 1 was to
18  be heard.  Mr. Green kept changing the date of his response,
19  so it would be after the disclosure statement hearing.  That
20  was the last one.
21         Then they moved it, compliance, again.  Then we
22  couldn't get -- then we -- it finally came out that they
23  withheld hundreds and hundreds of documents responsive to our
24  inquiries about the connections that he had to the plaintiffs'
25  lawyers in this case.

 1          We've since, you know, brought a motion to compel.

 2   We have a log attached to it with the hundreds of documents

 3   that he's withheld.  He maintains that everything -- every

 4   document that has anything --

 5          MR. HARRON:  Excuse me --

 6          MR. SCHIAVONI:  -- to do with --

 7          MR. HARRON:  -- Your Honor.

 8          MR. SCHIAVONI:  Yeah.

 9          MR. HARRON:  The motion to compel is not on today's

10   agenda.

11          MR. SCHIAVONI:  That's right.  It goes to

12   disclosure issues about it.

13          THE COURT:  Okay.

14          MR. HARRON:  Well, then --

15          THE COURT:  I'm going to let --

16          MR. HARRON:  -- if you're arguing the merits of it

17   --

18          THE COURT:  Mr. Harron, I'm going to let Mr.

19   Schiavoni continue and then you can respond.

20          Mr. Schiavoni.

21          MR. SCHIAVONI:  So the documents that have been

22   withheld, they -- they're all -- they're -- it's like -- it's

23   hundreds of documents about Boy Scout communications with

24   plaintiffs' lawyers in this case, including there are some

25   with Mr. Molton.

1        There are some documents where he's exchanged

2   communications with Paul Finn (phonetic), who is someone he's

3   known for some time, and with -- and a few with Mr. Gallagher

4   (phonetic), you know, that I think -- like that we were copied

5   on, so we know what they are.  They're not really mediation

6   communications at all, they're ones about what the disclosures

7   were necessary for in connection with the mediation.

8        The point of it is the nature and substance of the

9   connections are all -- they're all in these documents, and we

10  just -- you know, we would ask that the -- it's the most over-

11  breadth assertion of mediation privilege there really could be

12  because he was never appointed mediator, he never participated

13  in any of the mediations in this case.

14       He's come up with this sort of argument that these

15  documents were in preparation for mediation, which I'm unaware

16  of any such, you know -- there is no case authority supporting

17  such a proposition.

18       There are, we think what we're going to find here,

19  very extensive connections between them, and that, you know,

20  it's like we all practice in bankruptcy, we know how things

21  are done.  It's like this is going to be -- there's a, you

22  know, round robin of connections with the Brown Rudnick firm

23  using him and employing him in other cases and Mr. Patton, and

24  it's like, you know, who gets what patronage jobs in

25  connection with each assignment.  I think that's what we're

1  going to find here.

2          And we just think it would be appropriate to go

3  forward with that before -- and have those documents in hand,

4  you know, as far as making, you know, disclosures of what the

5  conflicts are.  There's no reason to sort of not have those

6  documents, so we can make the actual disclosures of what they

7  are, rather than just state in some generic way, you know,

8  that he's asserted to be conflicted.  We might as well put

9  right in there what the connections are.

10          So we do think that motion should be heard at some

11  point.  I'm not arguing the merits of it, so to speak, now,

12  but that it should be heard sometime this week perhaps, so

13  that we can, you know, have those documents to complete the

14  disclosure statement.  So we do think it's in connection with

15  that.

16          And we do think that, otherwise, just generic

17  disclosures about him potentially having conflicts isn't

18  really enough; that like the individual claimants would want

19  and we would want to know the specific nature of the ties, in

20  order to make some thoughtful assessment of it.

21          THE COURT:  Okay.  Okay.  Let me hear Mr. Rosenthal

22  first.  And then, Mr. Harron, I'll let you respond.

23          MR. ROSENTHAL:  Your Honor, Michael Rosenthal for

24  the AIG companies.

25          It may be appropriate to let Mr. Harron respond.

1  My issue doesn't relate to Mr. Green.

2           THE COURT:  Ah, okay.  Thank you.

3           Then I'll let Mr. Harron respond.

4           MR. HARRON:  Thank you, Your Honor.

5           First of all, I just wanted to note that the motion

6  to compel is not before the Court.  And the innuendo and

7  threat, you know, that Mr. Schiavoni tries to draw from that

8  motion is inappropriate, the reference to patronage jobs and

9  whatnot.

10           But we wanted to note for the record that we think

11  Professor Green is an excellent choice because of his

12  experience and his integrity, and Your Honor noted his

13  experience and integrity when you ruled on the mediator

14  motion.

15           In the -- it was under -- our understanding from

16  the denial of the mediator motion that that denial was based

17  on his friendship with Mr. Patton, which has been fully

18  disclosed from the beginning of the case.  We don't think

19  that's -- that that relationship has much, if any, bearing on

20  the appropriateness of Mr. Green to be the trustee.  As future

21  rep, Mr. Patton will not be filing claims with the trust;

22  there's no opportunity for him to curry favor and have his

23  future claimants get paid at the expense of other claimants.

24  That's not how these trusts work.

25           And you know, the insurers haven't provided any

1  merit-based opposition for Mr. Green.  We assume the reason

2  that insurers don't like Mr. Green is because he has extensive

3  experience in resolving claims against insurance companies.

4          I think another reason that the insurers are

5  bringing this up is strategic.  And Your Honor, when I went

6  back and looked at the transcript from your ruling on the

7  mediator motion, Your Honor noted that sometimes these motions

8  are made for strategic reasons.

9          And why do I bring this up?  Well, I want to turn

10  back to the big picture for a moment.  And we were a little

11  troubled by Your Honor's comment this morning, even though it

12  may have been in jest, but we're neither hog, nor pig, Your

13  Honor.  We agree that the insurance is an important asset of

14  the bankruptcy estate.  And our goal through the plan findings

15  is to make sure that the bankruptcy doesn't result in the

16  insurers obtaining a discount, as compared to how much they

17  have to pay to the survivors of abuse where BSA

18  (indiscernible) in the tort system, plain and simple.  We

19  don't think the bankruptcy should provide them with a

20  discount.

21          And this goal of no discount is fully consistent

22  with obligations of (indiscernible) pardon me -- estate

23  fiduciaries to maximize the value of insurance.  It's also

24  fully consistent with 524(e), which says the discharge of the

25  debtors should not relieve third parties from their liability.

1  In all the insurance policies, it's standard language in

2  insurance policies that the insurer shouldn't get a discount

3  as a result of the bankruptcy of the insured.

4          Your Honor, the insurers don't want neutrality.

5  That's a false premise.  And when we get to confirmation,

6  we'll make that very clear.  They want a benefit from this

7  proceeding at the expense of the survivors of abuse.  This

8  strategy is plain from the insurers' conduct to date.  The

9  insurers try to gain that discount by disrupting and delaying

10 these proceedings unless we settle with them.

11         The Court can take judicial notice of this fact

12 from this disclosure statement hearing.  Yesterday and today,

13 and I assume for the balance of the hearing, the insurance

14 lawyers will continue to raise issues in which they have

15 little or no interest.  And among those issues is who should

16 be the trustee of a survivors trust.  The insurers have no

17 legitimate interest in this.  It's just another place where

18 they're --

19              THE COURT:  Aren't they --

20              MR. HARRON:  -- throwing mud --

21              THE COURT:  -- funneled to the trust?

22              MR. HARRON:  Your Honor, it's --

23              THE COURT:  Are they --

24              MR. HARRON:  Who knows?

25              THE COURT:  -- or are they not?

1          MR. HARRON:  Who knows, Your Honor?

2          THE COURT:  No.

3          MR. HARRON:  We --

4          THE COURT:  What does --

5          MR. HARRON:  We assume --

6          THE COURT:  -- the plan provide?

7          MR. HARRON:  Yeah, the plan provides that they'll

8  be channeled to the trust.

9          THE COURT:  Okay.  So they're beneficiaries --

10          MR. HARRON:  Well --

11          THE COURT:  -- of the trust.

12          MR. HARRON:  They're incidental beneficiaries, if

13  at all.  And Your Honor, at some -- you're just empowering the

14  type of behavior that you see --

15          THE COURT:  No, I'm not --

16          MR. HARRON:  -- when you --

17          THE COURT:  I don't think --

18          MR. HARRON:  -- called us pigs --

19          THE COURT:  -- I'm empowering --

20          MR. HARRON:  -- and hogs earlier --

21          THE COURT:  -- anything.

22          MR. HARRON:  -- in the hearing.

23          THE COURT:  I think I'm looking at what this plan

24  provides for.  And I'm very interested in -- because I have no

25  knowledge of the history of why the beneficiaries of the trust

1   get to name who it is, whether it's the insurance beneficiary

2   or the survivor beneficiaries, and this whole idea that there

3   should be a trust advisory committee.  I'm very interested in

4   all of this.

5              But no, I'm just looking at your plan -- not yours

6   -- the debtors' plan and what it provides.  And I also think

7   that -- we've had the discussion about insurance neutrality.

8   I think it was this case, right?

9              MR. HARRON:  It was.

10             THE COURT:  And --

11             MR. HARRON:  It was.

12             THE COURT:  And so you know my views on that.

13             But the question will be -- and as I've already

14  said, I'm not deciding, to my knowledge, so far, insurance

15  coverage issues.  So I don't -- I'm not going to have a policy

16  in front of me to evaluate that says this loss -- this is what

17  this policy covers.

18             MR. HARRON:  We -- we'll --

19             THE COURT:  It covers loss.  I'm not going to be --

20             MR. HARRON:  But --

21             THE COURT:  -- interpreting --

22             MR. HARRON:  -- those are not --

23             THE COURT:  -- what "loss" --

24             MR. HARRON:  -- findings --

25             THE COURT:  -- means.

1      MR. HARRON:  -- (indiscernible) nature.

2      THE COURT:  I'm not going to be interpreting those

3 issues.

4      MR. HARRON:  We agree, Your Honor.

5      THE COURT:  Well, I'm not sure.  And that's what

6 I'm going to be looking at with respect to the findings.

7      MR. HARRON:  And we'll establish the

8 appropriateness of those findings at the appropriate time.

9      But if Your Honor is going to take the broad view

10 that the insurers can raise issues with respect to any part of

11 the plan that touches them, regardless of how tangentially,

12 we're in for a very long proceeding.

13      THE COURT:  Well, I don't know.  But give me

14 authority that I shouldn't when you've put them as a trust

15 beneficiary.  Okay?  So that's fine.

16      There may be things beyond what they should be

17 objecting to, and we'll get to that.  But remember that I also

18 have other survivors who are -- I have survivors who are

19 objecting this plan, as well.  So there are many things that

20 the insurers have raised that now I have survivors raising, as

21 well.

22      MR. HARRON:  I understand that, Your Honor.  And

23 hopefully this hearing has illustrated the challenges of this

24 case.

25      THE COURT:  Very much so.

1          MR. HARRON:  And for example, you have the insurers

2    arguing yesterday that the local councils are paying too

3    little.  And today they're arguing that the chartered

4    organizations need to all be included in the release.

5          THE COURT:  You're right.

6          MR. HARRON:  No matter what resolution is reached

7    with the beneficiaries, the insurers will complain about it

8    until they're settled.

9          THE COURT:  That could very well be.  And I think

10   there are many parties in this case that have taken, over

11   time, different positions.

12         MR. HARRON:  Right.  And what distinguishes the

13   insurers from most of those parties?  And this is true in most

14   commercial cases.  The claimants and the debtor have an

15   interest in emerging because, when this case is over, the

16   debtor gets finality and the claimants get paid, but insurers

17   don't share that interest.  They're happy to delay and drag

18   this out forever.

19         THE COURT:  Well, I don't --

20         MR. HARRON:  They're third-party --

21         THE COURT:  -- think I've --

22         MR. HARRON:  -- beneficiaries --

23         THE COURT:  -- permitted --

24         MR. HARRON:  -- (indiscernible)

25         THE COURT:  -- that delay.  I don't think I've --

1          MR. HARRON:  I --

2          THE COURT:  -- permitted that delay.  We're right

3   on disclosure statement.

4          MR. HARRON:  You're not permitting it, but I wanted

5   to make sure Your Honor was fully aware of what their strategy

6   is.

7          THE COURT:  I understand, I think, everybody's

8   strategy.

9          MR. HARRON:  Thank you, Your Honor.

10          THE COURT:  Okay.  Mr. Rosenthal.  Oh, I'm sorry.

11  Mr. Stang, let me go to you first, then I'll come back to

12  (indiscernible)

13          MR. STANG:  Actually, Your Honor, I'd be happy to

14  defer to Mr. Rosenthal, if that is okay.

15          THE COURT:  That's fine.

16          Mr. Rosenthal.

17          MR. ROSENTHAL:  Okay, Your Honor.  Michael

18  Rosenthal.

19          Your Honor, my issue is more of a disclosure issue,

20  it's not related to Mr. Green.  You know, the insurers'

21  position is that the TDPs, in face, have criteria that render

22  the plan unconfirmable under the Global Industry Technologies

23  standard that the Third Circuit adopted.

24          And so we believe, Your Honor, that there should be

25  a disclosure at least of that risk that things, such as

1  allowing claims which are barred by the statute of

2  limitations, that don't have a required showing of negligence,

3  you know, that -- you know, that can't be objected to, that go

4  -- that those kinds of things, which would not be allowed if

5  the Court were deciding these claims under 502, that those

6  inflate the liability.  And we believe that that -- there

7  should be a disclosure at least in the disclosure statement

8  about the risk of that argument being made, and I don't see

9  it.

10           THE COURT:  Ms. Baccash.

11           MS. BACCASH:  Your Honor, if you turn to Page 277,

12  we have a (indiscernible) risk factor.  One of the -- the

13  first bullet says that confirmation of the plan would

14  materially increase the quantum of liability that the debtors'

15  insurance companies would face when compared with that which

16  they -- would have existed in the tort system (indiscernible)

17  other ones here, too.

18           I think, you know, that Page 278, the plan and

19  trust distribution procedures allow the settlement trustee to

20  base decisions regarding the applicable statute of limitations

21  or choice of law based on considerations that are

22  inappropriate.  The next one is that deferral -- you have an

23  entire section here on the trust distribution procedures and

24  the many issues that insurers have with them.

25           MR. ROSENTHAL:  And Your Honor, in response to

1  that, I would say, one, thanks for pointing those out.  We

2  will look at them.  I think the one I did not hear was a risk

3  factor that it may render the plan unconfirmable.

4          But Your Honor --

5          MS. BACCASH:  (Indiscernible) --

6          MR. ROSENTHAL:  -- what I would suggest again --

7          MS. BACCASH:  -- work with you on --

8          MR. ROSENTHAL:  Yes.

9          MS. BACCASH:  -- (indiscernible) covered, but we

10  were trying to actually cover all of them, so --

11          MR. ROSENTHAL:  Understood.  Thank you.  We'll work

12  with you.

13          THE COURT:  Thank you.

14          Okay.  Mr. Humphrey, I see your hand up.  But are

15  you a member of the tort claimants committee?

16          MR. HUMPHREY:  Yes, I am the chairman of the tort

17  claimants committee.

18          THE COURT:  Okay.  But --

19          MR. HUMPHREY:  I'd like to be heard on this matter.

20          THE COURT:  Well, you have counsel.  I'll permit

21  you to be briefly heard.  I appreciate -- I see that you and

22  Dr. Kennedy have been attending these hearings over the course

23  of the case and are attending these lengthy hearings.  I'll

24  permit you briefly to address parties.  But you --

25          MR. HUMPHREY:  Thank you --

1          THE COURT:  -- do have --

2          MR. HUMPHREY:  -- Your Honor.

3          THE COURT:  -- counsel.  Uh-huh.

4          MR. HUMPHREY:  I will be brief.  Once again, John

5    Humphrey, Chairman of the TCC and abuse survivor.

6          And I just wanted to emphasize to Your Honor about,

7    you know, one of the things that survivors struggle with is

8    trust, in general.

9          THE COURT:  Uh-huh.

10          MR. HUMPHREY:  And I think, as it comes to the

11   trust and the people running the trust, survivors aren't

12   clear, now that the coalition is an adversary for the TCC,

13   that they're going to get a fair shake, that their claims

14   won't go to the bottom of the heap.

15          And so they're really looking to you, Your Honor,

16   to ensure that -- not only that the people that get selected

17   are fully disclosed, but the processes are as well, so that we

18   get a fair and equitable outcome.  And that's all I have to

19   say.  Thank you.

20          THE COURT:  Thank you.  And I appreciate that

21   comment.

22          MR. STANG:  Your Honor --

23          THE COURT:  Mr. Stang.

24          MR. STANG:  -- if I'm the last standing, a couple

25   of things on the disclosure regarding Mr. Green.

1          First, I don't think that the discussion should be

2    relegated to a footnote.  There's a lot of stuff in here that

3    probably should be in footnotes, but this isn't one of them.

4          The second thing is -- and I agree with Mr.

5    Schiavoni -- there are relationships that Mr. Green has with

6    other professionals in the case.  And while I'm not -- I won't

7    go to the far -- and by the way, I personally have never been

8    involved in a case representing Mr. Green, and I had spoken

9    with him as a potential candidate for different roles.  I'm

10   not even sure my firm has much -- had much in the way of

11   representation of him.

12         But you know, I don't necessarily like the you

13   scratch my back, I'll scratch yours scenario that Mr.

14   Schiavoni put out.  But I think survivors -- and this echos a

15   little bit of what Mr. Humphrey was saying -- they should

16   know.  And if -- obviously, I'm not asking to poll every

17   lawyer that's made an appearance in this case, but the major

18   players -- the coalition professionals, the TCC professionals,

19   the people who are involved in this stack -- should say

20   whether or not they have professional relationships -- and I

21   think, if I remember correctly, we even went into personal

22   relationships -- with the proposed trustee, and I think that

23   would be appropriate for survivors.

24         So I think we should raise it -- elevate it out of

25   a footnote, and I think there should be more complete

1  disclosure regarding relationships.

2         MS. BACCASH:  If I can respond, Your Honor.  The

3  debtors fully support the appointment of Eric Green.  We think

4  his resume speaks for himself -- speaks for itself.  And we

5  are okay with moving this disclosure out of the footnotes.

6         THE COURT:  And what page is that on again?  I

7  flipped --

8         MS. BACCASH:  It's on --

9         THE COURT:  -- pages.

10        MS. BACCASH:  -- Page 211; 211, Footnote 93.

11      (Pause in proceedings)

12        THE COURT:  Okay.  Well, I don't see why we

13 shouldn't have a provision that talks about his conflicts, if

14 there are any -- or let me -- "conflicts" is the wrong word --

15 his connections, if there are any between those who selected

16 him and Mr. Green.

17        And as we all know, the bankruptcy community is a

18 small community; people do know each other.  There's nothing

19 nefarious about that.  But I think that connections matter,

20 and I think it is fair to take a look at them because this TDP

21 -- these TDPs give the settlement trustee significant

22 discretion and significant resolution authority over multiple

23 issues.  And that, itself, may not be unusual.

24        But as with many things in mass tort cases, because

25 these are my first ones, I'm learning on the job.  And I am

1 sort of curious why the development of the case law has gone

2 this way.  Let's put it that way -- or the development, not

3 even of the case law, but the trusts themselves have gone this

4 way.  And I assume I'm going to be educated on that.

5 　　　　　So I think the connections are wholly appropriate.

6 I don't know that I -- I haven't looked at the motion in front

7 of me, the motion to compel.  I don't know that I need to wait

8 for all of that.  But certainly, I think there's some basic

9 information beyond what's here that could be provided.  And I

10 would ask the parties, in the first instance, to draft

11 something, debtors draft something, circulate it, and let's

12 see if we can come to some agreement on it.

13 　　　　　Mr. Molton.

14 　　　　　MR. MOLTON:  Can you hear me, Your Honor?

15 　　　　　THE COURT:  Yes.

16 　　　　　MR. MOLTON:  Yeah.  I just want to comment on all

17 this.

18 　　　　　You know, we came into the case late in the game,

19 in July, as you know -- I've probably said that a number times

20 -- July of 2020.  I know that the issue of Eric Green as

21 mediator was already in front of the Court by then.  And even

22 as we came into the case, I know that people were talking

23 about a prospective role for him as a trustee.

24 　　　　　So one of the things I do want to say, Your Honor,

25 is it's no secret -- and I think that this is what Mr. Stang

1  was alluding to, if not Mr. Schiavoni, who knows it -- is

2  that, you know, digitally, next door to Your Honor is Judge

3  Shannon with the Takata Trust with Eric Green as Trustee of

4  the Takata Trust.  And I had the distinct honor of working for

5  the Takata Trust, so that will be one of the disclosures.

6         I do want to put on the record, Your Honor, that my

7  experience in that very, very important work that has gone on

8  in front of Judge Shannon for a number of years, is to say

9  that the fear from Mr. Humphrey, as he's expressed it -- which

10 I think is understandable and one that should be noted,

11 meaning that everybody gets a fair treatment -- the experience

12 that I've seen with respect to the Takata Trust is one of

13 complete -- as Your Honor noted, and I just read it, Your

14 Honor's holding.  You're not questioning the integrity or the

15 experience of the proposed trustee, who, again, will be given

16 an extremely challenging, extremely challenging situation.  I

17 work, Your Honor, for the trustee of the PG&E Trust, who is a

18 different person, and I understand the complexities and

19 challenges of a trust of this magnitude.

20        And I think what Your Honor should know, if we ever

21 get down to it, is that, at the end of the day, what the

22 selection reflects is not --

23             UNIDENTIFIED:  (Indiscernible) can you hear me?

24             THE COURT:  I've got -- somebody needs to mute.

25             MR. MOLTON:  Is not the innuendo, which we've seen

1  a lot of in this case, of some -- you know, some of the --

2  some of the speakers, but really a desire to get somebody in

3  who can really tackle an -- what will be an extremely

4  challenging situation in a fair, equitable, and efficient

5  manner.  So that's what I have to say, Judge.

6               THE COURT:  Thank you.

7               MR. HARRON:  May I make just --

8               THE COURT:  Mr. Harron?

9               MR. HARRON:  Yeah, I just want to make -- Your

10 Honor, if it pleases the Court, I just want to make a brief

11 clarification.

12              I completely agree that, you know, if survivors

13 have concerns about or interests in who's going to be the

14 trustee, they should be vetted.  The TCC previously explored

15 it with Mr. Green, but we should have a dialogue and make sure

16 that the survivors are all comfortable with his selection.

17              One of the points I was trying to convey is, to the

18 extent that Mr. Schiavoni was trying to have the Court draw

19 inferences from the status of his motion to compel, I didn't

20 think that was appropriately before the Court.

21              THE COURT:  Thank you.  I'm not drawing any

22 inferences from it.

23              Mr. Rosenthal.

24              MR. ROSENTHAL:  Yes, Your Honor.  Just listening to

25 all of this, now I do have a little comment about Mr. Green,

1  but it's -- but again, it's a disclosure issue.

2          It -- you know, all of this suggests that Mr. Green

3  may be the trustee or he may not be the trustee.  And I just

4  wonder if there should be some risk factor about what happens

5  if he is not the trustee.  I assume people will go forward.

6  And you know, whether that would be a decision, it should be

7  highlighted that that would be a decision for the Court to

8  make at confirmation.

9          THE COURT:  Ms. Baccash, am I right that that's

10 been disclosed as a risk factor or am I mis-remembering?

11         MS. BACCASH:  No.  Yes, you're right.  There is a

12 risk factor on Page 274, Your Honor, and the call-out that his

13 appointment may be objectionable.

14         THE COURT:  Page 274?

15         MS. BACCASH:  Yes, it's --

16         THE COURT:  Ah --

17         MS. BACCASH:  -- Number 12.

18         THE COURT:  -- Number 12.

19     (Pause in proceedings)

20         MR. SCHIAVONI:  Your Honor, if I may?  Just one

21 last point connected to this.

22         The reason why Mr. Green's contacts are a

23 disclosure issue -- and it goes partially to your question,

24 which you raised I think the Imerys proceeding and earlier,

25 you now, or, you know, just a few minutes ago about the

1  history of these appointments, is that -- and we cite this

2  case law in the motion to compel.

3          The trustee, under -- is supposed to be independent

4  in his decision-making.  The independence is even more

5  important, it's a higher standard than with respect to the

6  mediator, in a mediator role.

7          In most of the mass tort cases, by the time they

8  reach, you know, the final legs of confirmation, there's been

9  sort of broad-based resolution of many of the disputes, you

10  know, not all of them.  There have been many that have gone on

11  to confirmation.

12          But there's a very different role for a trustee

13  when he's just allocate -- he's just taking the money that's

14  in a fixed pot and allocating it among the claimants in a

15  case, versus a role where he's -- which, at this point, in

16  this case -- and maybe it changes.  But at this point in the

17  case, you know, in that kind of situation, there has to be

18  some sort of independence among and between the claimants for

19  the trustee.

20          But in a case where, here, it's envisioned to be --

21  sort of be in a pseudo-adjudicatory kind of capacity against

22  the claim -- the -- I guess the claimants themselves, Boy

23  Scouts/the insurers, he's got to have independence all the way

24  around.  And you know, that kind of disclosure is directly

25  relevant to us, to know whether he meets the standard for

1   independence as required.  It's also, in this case, because of

2   the split in the claimants, the independence is important to

3   know between them.  The motion that we have is (indiscernible)

4   you know, would provide information that's informative of

5   that.

6           But you know, that's the reason for this.  The TAC

7   that -- you know, you'll be hard-pressed to find a lot of case

8   authority that blesses the formation of TAC members and the

9   trust.  It has a whole developmental history, but it's not one

10  that's blessed by a lot of authority, you know, in large part

11  because, once the trust is sort of running, if it's just

12  functioning in its capacity of allocating money among the

13  claimants -- and as -- you know, as a trust for, say, a class

14  action settlement might be.  It's a very different capacity

15  than a trustee who's, in essence, generating claim dollars by

16  making adjudicatory decisions.

17          THE COURT:  Okay.  Well, thank you.  I -- as I

18  said, I stand ready to be educated on that topic.  But I have

19  heard and I have ordered that we're going to have disclosure

20  of Mr. Green's connections.  And I will deal with the -- deal

21  with the discovery issue.  But I think, for purposes -- well,

22  let me -- the parties will draft something and we'll take a

23  look at it and circulate it and we'll see.  But I assume that

24  that can be done fairly promptly.

25          MS. BACCASH:  Yes, Your Honor.  We will draft

1  something and circulate it.

2          THE COURT:  Okay.

3          MS. BACCASH:  And moving on to Number 26 on the

4  objection chart.  This -- these objections have to do with

5  abuse claims description and the description of how we came to

6  the valuation range of 2.4 to $7.1 billion.  I think, for the

7  mot part, this has probably been subsumed within other

8  objections.  But you know, we do disclose, on Pages 86 to 91,

9  the methods that Bates White used to determine the range of

10  values, based on historical settlement data.

11          And we also have the Exhibit F, which we've

12  discussed also, which sets forth all of the abuse claims by

13  allegation type and by counts against local councils, as well

14  as by counts against certain of the chartered organization

15  groups.

16          Additionally, one of the objections -- and I should

17  note all of these objections were filed in the first round of

18  objections, and so that's also why there's probably nothing

19  left to discuss in this category.

20          But they requested more information of the indirect

21  abuse claims, so we do now have a section on Page 91, where we

22  discuss the amount of indirect abuse claims that have been

23  filed, but they are, for the most part, contingent and

24  unliquidated, filed by chartered orgs.

25          We also have inserted a risk factor on Page 274

1  that has to do with those indirect claims and what their --

2  you know, a potential allowance could have on direct claims.

3            With that, we think that we have adequately

4  disclosed everything in this category.

5            THE COURT:  Thank you.

6            Let me hear from anyone who has an objection here.

7  Mr. Stang.

8            MR. STANG:  Thank you, Your Honor.

9            I don't have a good -- sitting here, a good sense

10  of the time line of this disclosure statement section and the

11  creation of the TDPs, which themselves give base values and

12  maximum values and a host of adjustment factors, one of which

13  is objective, which is the statute of limitations.

14            So I think the disclosure statement should tell

15  creditors whether this value range is consistent with the TDP

16  claim valuation process that's in the plan itself.  I

17  understand it describes at length what Bates White did, but it

18  doesn't say whether or not Bates White used the TDP process

19  that, again, sets out a base value for each category of abuse

20  and at least one discounting factor, which is the statute of

21  limitations.

22            I think creditors -- there's a divergence of

23  opinion here about the value of the claims.  And I respect,

24  though I disagree with what the debtor has said and what Bates

25  White has said.  But creditors are sitting here going, okay,

1  the Boy Scouts are saying 2.7 to 2.4 to 7.  Other people are

2  telling me -- and someone threw -- I think they thought they

3  were throwing it in my face -- that we have said its 102

4  billion.  I think creditors need to have some explanation as

5  to what -- whether Bates White was using any aspect of the TDP

6  process to come up with that value.

7            THE COURT:  Ms. Baccash.

8            MS. BACCASH:  Yes, Your Honor.  They did, and the

9  TDPs are based on historical data, all provided by Bates

10  White.  And we can make further disclosure on this, if

11  necessary.

12            THE COURT:  Okay.  Well, I understand Bates White

13  to have used the historically resolved -- BSA's historically

14  resolved abuse claim and certain other publicly available

15  information, and then they considered these four factors that

16  I think are repeated a few times throughout the disclosure

17  statement.

18            And I guess the question is, although I don't think

19  that the debtor has to explain the difference between -- has

20  to explain or account for a difference because, quite frankly,

21  from what I'm hearing, the survivors may be confused about the

22  values because people are going to put different values out

23  there.

24            But I guess I'm assuming -- am I correct?  Am I

25  correct that Bates White didn't do a -- the kind of -- didn't

1  use the TDP values in the way in which Mr. Stang suggests?  Am

2  I right on that?  I mean, it seem -- would seem to be a matter

3  of math that they didn't.

4          MR. STANG:  Well, I don't think that was directed

5  to me.

6          THE COURT:  No, it's not.  It's directed to Ms.

7  Baccash.

8          MS. BACCASH:  Yeah.  Well, they -- Bates White did

9  apply the TDP values, but let me consult internally one

10 second.

11         MR. STANG:  But Your Honor --

12         THE COURT:  Yes.

13         MR. STANG:  -- I don't want to --

14         THE COURT:  Let's hang on.

15         MR. STANG:  Can I -- I just want to say one thing

16 because I know counsel is going to consult for a moment.  And

17 I have to be careful here because Bates White's reports were

18 provided to the committee and a host of other parties in a

19 mediation context, and so I can't -- and we're going to get,

20 at some point, to a discussion about what can or cannot be

21 privileged as we go to the confirmation hearing.  But for the

22 moment, I'm going to be careful because I think somebody took

23 great umbrage yesterday about talking about the Bates White

24 report.

25         But Bates White made certain assumptions about a

1  proof of claim that had informational deficiencies and how to

2  deal with that claim.

3          THE COURT:  Okay.

4          MR. STANG:  I'm not going to say what they did.

5  But they looked at claims -- look, Your Honor, you've heard me

6  say literally tens of thousands of claimants didn't put down

7  the chartered organization.  Probably hundreds, if not

8  thousands, of people didn't identify their perpetrator.

9          Bates White went through a process that evaluated

10  informational deficiencies.  The TDPs are different than what

11  Bates White did.  So to -- it can't be -- and from what I know

12  -- that Bates White used the TDPs to come up with those

13  valuations because I know they treated certain things

14  differently.

15          MS. BACCASH:  It -- Your Honor, Bates White

16  prepared the values based on historical settlements and the

17  TDPs were prepared based -- prepared and developed based on

18  those Bates White values.  We don't believe that the TCC is

19  applying those values correctly.

20          MR. STANG:  Well, Your Honor, I'm -- this is -- I'm

21  not saying counsel is being unfair; the process is unfair.  I

22  would love to tell you what Bates White did in its claims

23  analysis and how that differs from the TDP, but I can't.

24          THE COURT:  Okay.  So the subject is disclosure,

25  not discovery, not cross-examination, not yet.  So what I'm

1 trying to figure out is if there needs to be any type of

2 disclosure -- and quite frankly, there's four pages here -- of

3 -- well, I don't know that there can be formulated anything

4 that -- Mr. Stang, what you want is some reconciliation

5 between Bates White and how you perceive the TDPs to be

6 applied.

7       MR. STANG:  I think that's a little more than what

8 I really want, Your Honor.  I would like that, but not for the

9 disclosure statement.

10       THE COURT:  Well --

11       MR. STANG:  I think the debtor should say whether

12 or not -- it's actually a sentence or two -- whether or not

13 Bates White employed the valuations and scaling factors and

14 the plan's TDPs in coming to its figure.  I don't need a

15 reconciliation today.  But I think people should at least know

16 whether they employed the base and maximum amounts and the

17 scaling factors that are in the TDPs that are in the plan.

18       MS. BACCASH:  Your Honor, we can take a shot at

19 putting together a few sentences to explain the relationship.

20       THE COURT:  Okay.

21       MR. PATTERSON:  Your Honor --

22       THE COURT:  Mr. Patterson.

23       MR. PATTERSON:  -- Tom Patterson.  Could I speak

24 very briefly to this?

25       THE COURT:  Yes.

1          MR. PATTERSON:  This kind of information is

2    essential because what claimants are going to do, all of them,

3    is look at the TDP values for what their claim is, and then

4    they're going to look at the overall estimate of claims to try

5    to figure out where they fit and what they're going to get.

6    And if those two numbers are calculated on a very different

7    basis or it's not clear that you shouldn't do that exercise,

8    then -- I think then it risks being materially misleading.

9          So I think, if it's -- if the description that is

10   on these pages, 90 and 91, is conditioned in a way so that

11   people will not do that mechanical calculation, then I think

12   that that will go a long way to helping with regard to this

13   issue.

14          MR. STANG:  Yeah.  Your Honor, this mechanical

15   calculation method that Mr. Patterson referred to, in the

16   chart -- and every disclosure statement has it -- it tries to

17   project the percentage people are going to get paid.  This

18   goes to something we are putting together that we shared with

19   the debtor, that we haven't had a chance to discuss offline

20   yet, about our view of what those percentages should be and

21   their view.

22          But you know, they present it as a -- in that chart

23   -- I can't remember what page it is -- that abuse creditors

24   could get as much as a hundred percent.  Now that's based on

25   their -- I presume their range.  So I echo Mr. Patterson's

1 concern.  We need to make sure creditors understand if we're

2 talking apples to apples or apples to oranges when we're

3 discussing valuations because could -- look, we could say the

4 scaling factor wasn't applied aggressively enough for a serial

5 perpetrator, and Bates Wright says, yeah, that gives you an X

6 percent increase and we want it to be X plus more percent.

7 That's a difference of opinion.  But if, conceptually, we're

8 approaching this differently, then I think people need to know

9 that.  So thank you, Your Honor.

10         MS. BACCASH:  Your Honor, just to quickly reply,

11 I've already said the methods are linked.  We will add a

12 sentence or two clarifying that.

13         THE COURT:  Okay.  Thank you.

14         Mr. Schiavoni.

15         MR. SCHIAVONI:  Yeah, I think, ultimately, you'd

16 find that the first statement by the Boy Scouts' counsel there

17 was a little bit more accurate about how they did the analysis

18 and that the two aren't linked whatsoever.  It's like they

19 generate wildly different outcomes because the TDPs just

20 generate a completely different outcome than what you heard

21 counsel say was what they tried to generate from what happened

22 in the tort system.

23         But I want to just talk about the indirect abuse

24 claims, and it's sort of a related point.  The S -- you know,

25 the indirect abuse claims are not adequately disclosed.  What

1   we heard from the debtor earlier, they haven't -- and we heard

2   from Mr. Plevin that they have agreed to provide us with

3   further changes on the SIRs.  So I think -- I just suggest

4   that I can't -- I won't comment on this right not because it's

5   like, until we see that SIR revision, it -- which it sounds

6   like they're prepared to make, I -- the disclosure on the

7   indirect abuse claims is directly tied to that.  So I think

8   the final revision on this awaits that, Your Honor, because

9   the two are tied directly.

10          It's like the -- what -- you know, you heard some

11  suggestion earlier that like we were arguing out of both sides

12  of our mouth, that like the local councils weren't paying

13  enough.  The point I was trying to make -- and it's tied to

14  this SIR point, right -- is that the liability of the Boy

15  Scouts/local counsels is proportionate to the amount of

16  claims.

17          If they value the claims at one number in the tort

18  system, they're paying about -- they're paying somewhere in

19  the 50 percent, 60 percent range.  If you inflate that number

20  dramatically, the dollar amount that falls in the retained

21  limit inflates dramatically.  Okay?  So that, yeah, we do

22  think the local councils valued, in an on -- in their

23  negotiations what they had to pay using what they really

24  thought maybe the claims might be worth, and that generated

25  the numbers you saw in that chart, many of which were under a

1  million dollars per local council.

2           But they then turned over the pad on the TDP, which

3  generates a totally different number.  And that number would

4  go in the SIR, and that number would go in the indirect abuse

5  claim.  It inflates the indirect abuse claim proportionately

6  to how the TDP inflates the claim.  And that, we will await --

7  what we have is the comments on the SIR to make comments on

8  this indirect abuse disclosure.  Maybe we resolve it, maybe we

9  have agreement on it.

10          THE COURT:  Okay.  Thank you.

11          Mr. Rosenthal.

12          MR. ROSENTHAL:  Yes, Your Honor.  Just one comment.

13          We will be very interested in the -- what is added

14  to the disclosure statement and Mr. Stang's input on this

15  because it's very difficult under the TDPs.  The trustee has

16  wide discretion on any number of factors.  So I don't know how

17  you pick -- in terms of sort of comparing apples to oranges,

18  how you pick a -- do you pick the low end?  Do you pick the

19  high end for purposes of this kind of calculation?  And it

20  needs -- you know, so that will be extremely difficult.

21  That's actually one of our -- one of our confirmation issues,

22  as well.

23          THE COURT:  Okay.  Okay.  Are there any more

24  comments on this issue?  We're going to let the debtors draft

25  and circulate some language.

1          (No verbal response)

2                THE COURT:  Okay.

3                MS. BACCASH:  Okay, Your Honor.  Moving on to

4    Number 27 of the objection chart.  This has to do with

5    disclosure around the insurance programs.  Again, this

6    objection was in the first round of objections.  Since then,

7    we have added comprehensive disclosure.

8                Pages 55 to 64 contain a description of the

9    insurance programs and insurance-related disclosures.

10               Additionally, on Page 55, we do disclose that

11   certain of the insurance policies after 2013 do cover both

12   abuse and non-abuse claims.  And we discuss that we do not

13   believe that those policies will be exhausted by just the non-

14   abuse claims.

15               With that, we think that we have disclosed

16   adequately.

17               THE COURT:  Okay.  Comments, questions.  Mr.

18   Schiavoni, is that your hand?

19          (No verbal response)

20               THE COURT:  You're muted.

21               MR. SCHIAVONI:  Sorry, Your Honor.

22               It's the same comment about -- it's the same hand,

23   same comment about the SIRs.  So we're hopefully going to

24   resolve that.  I'm very hopeful about that and it will result

25   in some change here.

1          THE COURT:  Okay.  Okay.  Thank you.  Anything

2   else?

3          MR. SCHIAVONI:  No, that's it, Your Honor.

4          THE COURT:  Okay.  I don't see anyone else, so we

5   can move on.

6          MS. BACCASH:  All right.  Your Honor --

7          MR. SMOLA:  Your --

8          MS. BACCASH:  -- moving on to --

9          MR. SMOLA:  Your Honor, I'm sorry to interrupt.  I

10  did have a question about this particular section, if I could

11  be heard for just a moment.

12          THE COURT:  Yes.

13          MR. SMOLA:  Evan Smola.  I represent about 4,000

14  victims in this case.

15          And one of the issues that I have with this section

16  is with respect to dis -- clear disclosure of years in which

17  there are no aggregate limits.  There are -- there is a

18  paragraph, it is the second paragraph on Page 57.  And it

19  says:

20          "The insurance policies between 1962 and 1982 had a

21  per-occurrence limit of $500,000."

22          THE COURT:  Uh-huh.

23          MR. SMOLA:  It later says that there are several

24  decades in which there are no aggregate limits.

25          I under -- I know the answer to this question

1  because I've been a part of the mediations.  But I need to

2  disclose to my clients, when they evaluate how they're going

3  to vote for settlements like the one reached with Hartford,

4  exactly how much exposure Hartford has, based on which years

5  do not have aggregate limits.

6          Frankly, there is a chart.  I think, all together,

7  the insurance charts total about eight pages.  It's not

8  particularly voluminous.  I would like to disclose that to my

9  clients; or, at the very least, I would like to be assured

10  that my disclosure of those non-aggregate years to my clients

11  are not subject to mediation privilege.

12          So I think this paragraph or this page should

13  include a specification of which years do not have aggregate

14  limits, as opposed to just saying there are decades of

15  coverage with no aggregate limits.

16          THE COURT:  Ms. Baccash.

17          MS. BACCASH:  To the extent that these are not

18  confidential, *vis-a-vis* the insurers, we would be happy to

19  disclose that.  Perhaps the insurers can weigh in, if that's

20  something that is confidential.

21          MR. SMOLA:  Well, I mean, Your Honor, when I advise

22  a catastrophically injured client about what to do with their

23  claim, my duty to that client is to find all of the insurance

24  to cover that claim.  I represent 4,000 catastrophically

25  injured clients, and I need to disclose to those clients what

1  insurance covers their claim.

2          I don't understand how this could be something

3  subject to confidentiality, when I don't think any personal

4  injury lawyer can advise their clients about an insurance

5  resolution without knowing the insurance.

6          THE COURT:  Let me hear from other parties,

7  insurance companies, if anyone objects.  Mr. Rosenthal.

8          MR. ROSENTHAL:  Your Honor, we'll have to consult

9  with our client and perhaps the other insurers about that.

10          I am certain of one thing, that there is quite

11  likely a dispute, in many instances, about whether there are

12  or are not aggregate limits, and that would be part of any

13  disclosure, as well.

14          THE COURT:  Okay.  I appreciate the effort to

15  coordinate on that.  And if the disclosure is subject to

16  dispute, then that will be disclosed, as well.

17          I will say --

18          MS. BACCASH:  Your Honor --

19          THE COURT:  I will say -- and it's not just in

20  response to this particular question, so I don't want it to be

21  viewed that way -- that I understand disputes over coverage, I

22  understand disputes over legal theories, I understand disputes

23  over how one might value something.  But there are no

24  alternative facts in the -- in certain matters.  Okay?  Facts

25  are facts and policies are policies.  And that sounds maybe

1  too simplistic, and I recognize they're complicated documents

2  and other things are complicated.  Again, I'm not aiming that

3  just at this particular issue.

4          But I just put that out there because the courtroom

5  is not a place for alternate facts.  And we can all decide

6  what those facts mean and how they should be used and how they

7  can be appropriately used, but facts are facts.  So, again,

8  not aimed at this specific issue, but the thought has occurred

9  to me over the course of the last couple of days in more than

10 a few instances.

11         MR. SCHIAVONI:  Judge, maybe I can help you on

12 this, on I thin what the issue is.  I think this chart -- I'm

13 not exactly positive what Evan is referring to.

14         But I think this chart may be a debtors' attorney

15 work product generation.  It's -- you know, the coverage here

16 goes back to when Woodrow Wilson -- or the allegations of

17 coverage, when Woodrow Wilson was president.  Okay?  Large

18 blocks of policies have not been found, you know, there's

19 disputes about what exists, what is a policy, there's all

20 those things.  So I don't think this is so much about

21 alternative facts, as it is about attorneys having made

22 assumptions and putting them in something and shared them on

23 that basis.  Okay.  And that's -- like I don't know, they can

24 find some way to disclose what they have.  But it's -- there's

25 been no monkey business about like, you know, hiding the facts

1  themselves.  Some things are just unclear.

2           THE COURT:  Fair enough.

3           MR. SMOLA:  Well, Your Honor --

4           THE COURT:  If things are unclear, then they're

5  unclear.

6           MR. SMOLA:  Your Honor, I don't think it's unclear

7  that there is a five-hundred-thousand-dollar per-occurrence

8  policy with no limits in a year where there's 2,900 claims.  I

9  think I should be able to disclose that to my clients when

10 they evaluate -- and in order to evaluate insurance

11 settlements.

12          THE COURT:  And --

13          MR. SMOLA:  I --

14          THE COURT:  And if there is a policy that exits and

15 people know about it, then that's one thing.  If it's -- and I

16 did read some in here about they haven't found a policy that

17 exists for a certain year, and people are going to be looking

18 at peripheral evidence, tangential evidence to prove up that a

19 policy existed, then I suppose there can be a dispute over

20 that.

21          So I do -- as I say, I'm not pulling this out just

22 for this particular issue, but there may be known hard facts

23 and then there may be some assumptions parties have made based

24 on indirect evidence, and those are different things.  And I

25 would think your client would want to know that, as well,

1    what's a hard fact of I've got a policy in my file and I

2    don't.  So I think that's what I'm hearing about the fact that

3    there could be some disagreements.

4           But we're going to get something from the debtor,

5    so -- or I'm sorry, wrong.  Mr. Rosenthal is going to

6    coordinate, in the first instance, and we'll see if there --

7    we'll see what we come up with that, and please keep Mr. Smola

8    in the loop on that.

9           MR. SMOLA:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Anyone else?

12       (No verbal response)

13          THE COURT:  Okay.  Ms. Baccash --

14          MS. BACCASH:  All right.

15          THE COURT:  -- (indiscernible)

16          MS. BACCASH:  Your Honor, moving on to Number 28 on

17   the objection chart.  This objection has to do with disclosure

18   impact on claimants who may have direct action rights.

19          We have updated the disclosure statement on Page 65

20   to directly disclose what we believe to be their rights and

21   the dispute.  And we believe, with that, there's probably

22   nothing else that needs to be disclosed.

23          THE COURT:  I'm sorry.  Can you point me to that

24   page again?

25          MS. BACCASH:  Page 65 --

1            THE COURT:  65.

2            MS. BACCASH:  -- Number 8, direct -- yeah,

3   direction action.

4            THE COURT:  Thank you.

5            MS. BACCASH:  Uh-huh.

6        (Pause in proceedings)

7            THE COURT:  Okay.  And I know Ms. Wolff had that

8   issue, too, so I do see that disclosure.

9            Mr. Stang.

10           MR. STANG:  Thank you, Your Honor.

11           The problem with the insert is that it's not

12  correct.  These claims are not derivative claims.  They are --

13  in fact -- I know, in Wisconsin, you don't even have to sue

14  the tortfeasor, you can just sue the insurance company.  So,

15  when you --

16           THE COURT:  But aren't there some --

17           MR. STANG:  -- say the --

18           THE COURT:  Aren't there some cases out there

19  where, in fact, courts have permitted this?  And there may be

20  cases where they haven't.

21           MR. STANG:  I'm not --

22           THE COURT:  And there may -- the use of the word

23  "derivative" is -- in different contexts, is tricky.

24           MR. STANG:  Well, then we should take it out.

25           MS. BACCASH:  Your Honor, we'll remove the word

1  "derivative."

2          THE COURT:  Such claims, whatever.  These types of

3  claims, whatever.  I think there is -- at least my

4  recollection of the reading I have done is there seemed to be

5  cases on both sides of this issue.

6          MR. STANG:  Your Honor, Ms. Lujan Wolff has her

7  hand up.

8          THE COURT:  Yes.

9          MS. LUJAN WOLFF:  Thank you, Your Honor.

10         Yes.  I did read the section pointed out by the

11  debtors and did not seem to fully address the objection. The

12  other part of the objection is its not just the lack of

13  disclosure that there are additional rights, additional

14  statutory rights, claims that are being given up or resolved

15  without the consent of survivors, but it's also what are

16  survivors getting in exchange for this.  There just seems to

17  be no recognition, no acknowledgement.  I think that does need

18  to be disclosed if they're getting nothing.  So I -- and if

19  they're getting something then what is the protection, what is

20  the competition.

21         I would also note, Your Honor, in response to the

22  court's question about have there been other cases where

23  direct action creditors, I guess, those rights weren't

24  recognized.  Part of the other objection that we made is we

25  did raise -- I recognize that this is a legal issue, but we

1  did raise the McCarran-Ferguson Act.  We raised that issue

2  that federal statute may allow Guam Law to reverse, preempt,

3  any conflicting federal statute including bankruptcy law.  I

4  would just point out that the coalition did attempt to address

5  that.

6           Again, Your Honor, what is the adequate protection

7  or compensation that would be afforded these survivors who are

8  giving up additional rights and yet being treated in the same

9  way of the survivors who do not have these rights.

10          Thank you.

11          THE COURT:  Thank you.

12          MS. BACCASH:  Your Honor, all of the claimants are

13 being channeled to the trust and are being -- the trust is

14 distributing based on the trust distribution procedures.  This

15 is a legal dispute I believe and probably not appropriate in

16 this disclosure statement context.

17          THE COURT:  It's a legal dispute, I agree.  Is this

18 -- I don't recall this being a scaling factor.  Is it a

19 scaling factor of any type?

20          MS. BACCASH:  I don't believe it is, no.

21          THE COURT:  Okay.  Well I think that the disclosure

22 is sufficient.  I think what we have are legal issues that

23 will have to be addressed as to whether this is appropriate,

24 whether -- there could be a number of confirmation objections

25 surrounding this, so I will have to address it at the time if

1  it's not resolved.

2          MS. BACCASH:  Thank you, Your Honor.

3          THE COURT:  I don't see any other hands on this. I

4  think we're at 28.

5          MS. BACCASH:  We're actually at 29 now, Your Honor.

6          THE COURT:  29.

7          MS. BACCASH:  Moving on.  So 29, Your Honor, has to

8  do with the BSA operations and for the most part deals with

9  pension plans.  Again, this was filed prior to our fulsome

10 disclosure on pages 53 and 54 which now describe the pension

11 plans of the Boy Scouts.

12          Additionally, we added a risk factor on page 270

13 related to the PBGC and the liability for termination of the

14 pension plan including for the contingent proofs of claim that

15 have been filed by the PBGC for over a billion dollars against

16 the debtors.  We disclosed also in that risk factor that they

17 would be able to assert those claims against the control group

18 and all of the local councils are part of that control group.

19          THE COURT:  Any outstanding objections on the

20 adequacy of disclosure with respect to the pension plan?

21          Mr. Stang?

22          MR. STANG:  Sorry, Your Honor, I jumped the gun,

23 not on the pension plan but on membership numbers.

24          THE COURT:  Okay.  We will move on then.

25          MR. STANG:  Okay.  Should I speak or should we give

 1  counsel a chance to address?

 2          MS. BACCASH:  Your Honor, we disclosed on page 47

 3  information regarding revenues and membership numbers.

 4          MR. STANG:  Your Honor, let me just take a look at

 5  that for a moment, please.  Your Honor, I'd like to know the

 6  dates of these numbers.  I'm looking at the last paragraph and

 7  I see the disclosure.  I have no idea what these dates are and

 8  when this was put in.

 9          I think Boy Scouts should tell you how often they

10  internally get information on their registration and renewal

11  numbers.  It says they're not finalized, but they must be

12  finalized as of some date.  So I think the Boy Scouts should

13  be forthright about what their numbers are.

14          We know, because we live in this world, that COVID

15  is effecting the schools continuously around the country.

16  Schools are a major source of BSA Cub Scout programs and

17  probably Boy Scout renewal, if not Boy Scout -- new Boy Scouts

18  joining.  And we should have more specific data with dates as

19  to the numbers.

20          THE COURT:  Well this --

21          MS. BACCASH:  Your Honor?

22          THE COURT:  Go ahead.

23          MS. BACCASH:  We inserted these dates and they were

24  tied to the date of the disclosure statement.  We are happy to

25  make that more apparent.

1           MR. STANG:  And, Your Honor, this talks about their

2    retention rates.  Well, you know, the common reader has no

3    idea what they thought they were going to retain.  You know,

4    is that higher or lower then historically what they had?  I

5    mean I can hit a retention rate of $650,000 but if I'm coming

6    down from a million from last year that's not too impressive.

7    Yeah, I met my retention rate, but you haven't told me how

8    many people there are.

9           MS. BACCASH:  Your Honor, these are tied our

10   business plan and that is what we are talking about.

11          THE COURT:  Is it tied to the projections?

12          MS. BACCASH:  Yes, it is.

13          THE COURT:  That is what I would assume it is tied

14   to the projections and that it's in the projection figures.

15   If you want to say as of the date I think that's fine.

16          MS. BACCASH:  Will do.

17          THE COURT:  I mean, quite frankly, it is going to

18   be very difficult to know the impact of COVID, future COVID on

19   these numbers.  So, you now --

20          MS. BACCASH:  Your Honor, we even have a risk

21   factor having to do with that.  Give me one moment and I can

22   find it.

23          MS. LAURIA:  Your Honor, this is Jessica Lauria.

24          If Ms. Baccash is referring to the COVID-19 risk

25   factor it's on page 271 of the disclosure statement.

1              THE COURT:  Thank you.

2              MR. STANG:  Your Honor, I don't know if there is a

3   statement somewhere in the disclosure statement as to the

4   membership direction over the last several years.  Telling me

5   that we're meeting the number that's in our financial

6   projections doesn't show me a trend.  It just tells me that

7   we're projected to have this number and we think we're

8   financially feasible at that number, but trends are important.

9              I just would ask the Boy Scouts if there is

10  somewhere in this disclosure statement a grab or some easily

11  readable document that shows the trends for membership for Cub

12  Scouts, Boy Scouts.

13             THE COURT:  And you think survivors are going to

14  look at that?

15             MR. STANG:  I don't know.

16             THE COURT:  Again, I'm trying to think of

17  disclosure versus what you might what in discovery versus what

18  you are going to show me at confirmation.  If your argument is

19  that the plan is not feasible because of the trend numbers

20  that's a confirmation issue.  I think even whatever you get

21  you're going to be taking discovery on this.

22             MR. STANG:  Your Honor, obviously, you will make

23  the call on this.  Creditors might want to know if the Boy

24  Scouts who argue that they must survive, and go forward, and

25  take care of over some future period of time millions of boys

1  whether it's actually an institution that's viable in terms of

2  just whether people want to be a member.

3         THE COURT:  Well don't you think that the last year

4  and a half has thrown a wrench into everything?

5         MR. STANG:  Probably.

6         THE COURT:  Yeah.  So I don't know that anybody is

7  going to look at it and think that the Boy Scouts in 2022 or

8  2023 couldn't make up their numbers because things get back to

9  "normal" or maybe they won't because things will never get

10 back to "normal."

11        MR. STANG:  Your Honor, one more comment and then

12 maybe the horse is no longer (indiscernible).  While COVID

13 does have impact on the Boy Scouts, over the last, I'm doing

14 this from memory, 10 or 15 years this is an organization whose

15 membership has been in steady decline.  It had nothing to do

16 with COVID. It had lots of things to do -- part of it was

17 probably the abuse stuff, some of it is changing patterns

18 about --

19        THE COURT:  All their after school options, that's

20 right.  They got a thousand after school options.  I assume

21 that the Boy Scouts know that there is a thousand after school

22 options.  So I will let you explore that, but I think for

23 purposes of disclosure statement we're good.

24        MR. STANG:  Okay.  Thank you, Your Honor.

25        THE COURT:  Thank you.

1          MS. BACCASH:  Just too quickly add this

2     (indiscernible) do set forth the membership numbers for 2019,

3     2020, 2021.  So I think we actually do disclose exactly what

4     is being requested.

5          MR. STANG:  No, it doesn't disclose the historical

6     trends, but I'll let it go from here, Your Honor.  It doesn't

7     do what I was asking for.

8          THE COURT:  Okay.

9          MS. BACCASH:  Your Honor, number 30 on the

10    objection chart has to do with avoidance actions.  Again, this

11    is another old objection that asks that we would disclose

12    avoidance actions.  We have done so on page 16, footnote 22,

13    discloses the debtor's believe that pursuing those actions

14    would not yield a return.

15         THE COURT:  Any outstanding objection?

16       (No verbal response)

17         THE COURT:  Okay.  I don't see anyone, we can move

18    on.

19         MS. BACCASH:  Your Honor, number 31 on the

20    objection chart has to do with statutes of limitations.  The

21    objectors argue that the disclosure statement does not address

22    how claims will be treated given pending statute of

23    limitations in multiple jurisdictions.  The disclosure

24    statement now provides further disclosure on claims treatment

25    under the TDP's with respect to pending statute of limitation

1  reforms including options to defer the termination of their

2  proposed allowed amount for up to 12 months from the effective

3  date of the plan to see if the statute of limitations revival

4  occurs.  That, Your Honor, is on page 229.

5          Additionally, on page 236, the trust distributions

6  adequately addressed the evaluation procedures that go into

7  assessing claims, one of them being the statute of limitations

8  that would be applicable.  We believe that this is full

9  disclosure with respect to this objection.

10          THE COURT:  Let me hear if there are further -- if

11  there are outstanding objections with respect to the statute

12  of limitations issue.

13          MR. SCHIAVONI:  Your Honor, (indiscernible) risk

14  factors that -- like I don't want to belabor this, but we

15  disagree entirely with --

16          THE COURT:  Excuse me for a second. Somebody is --

17  I'm hearing someone's entire conversation.

18          MR. SCHIAVONI:  Sorry.

19          THE COURT:  That's not you.  Please whoever is

20  speaking other than Mr. Schiavoni make sure you're muted.

21          Mr. Schiavoni?

22          MR. SCHIAVONI:  Your Honor, maybe if we could just

23  add some text that says, basically, Century disagrees entirely

24  with the statute of limitations analysis how it's presented.

25          MS. BACCASH:  Your Honor, we do have risk factors

1  on page 278 that states specifically that the insurers are

2  objecting to the plan and distribution procedures that allows

3  the settlement trust to make decision regarding the applicable

4  statute of limitations or choice of law.  We also have one

5  that says that they also disagree with the fact that you can

6  allow claimants to defer the termination up to 12 months.  I

7  think we have it covered.

8          MR. SCHIAVONI:  No, we don't.  Here is why; it's

9  how it's treated by the trustee under the TDP which is just

10  what those two risk factors went through.  This presentation

11  is, in essence, the debtor's presentation of how the statute

12  of limitations worked, how they would apply.  We disagree with

13  -- and that is really what their lawyers were telling them

14  before they went into bankruptcy. We disagree with the legal

15  presentation of the statute of limitations.  It's not

16  accurate.

17          So, you know, if we could just add that you could

18  add that to the -- I suppose if you want to put in the risk

19  factors, but we disagree with the presentation on how the

20  statute of limitations worked.

21          MS. BACCASH:  Your Honor, we think it's covered,

22  but if he would like us to add something else we would be

23  happy to do that.

24          THE COURT:  Good.  Why don't you work with him?  I

25  am not sure I understand, quite frankly, what you mean by you

1  think their presentation is incorrect.

2          MR. SCHIAVONI:  There's a write-up, for instance,

3  that all the cases could file in the District of Columbia or

4  New Jersey and we just don't think that's consistent with

5  where the case is jurisdictionally that they can file all of

6  DC.  So we could have an elaborate counterpoint opinion on it,

7  but I just don't want any concession that we haven't said

8  anything about that here.  We would like just that.

9          THE COURT:  Okay.

10         MR. SCHIAVONI:  And I will work with her on that.

11         THE COURT:  I just put something at the front of

12 this that says Century disagrees with everything the debtor

13 says here and then we would be good.

14     (Laughter)

15         MR. SCHIAVONI:  I don't know if you're baiting me,

16 Judge.

17         THE COURT:  Okay.  You're going to work with them,

18 right?

19         MR. SCHIAVONI:  Yes.

20         UNIDENTIFIED SPEAKER:  I'm sure we can find

21 something that Tanc agrees with.

22         THE COURT:  We are under no other illusion, Mr.

23 Schiavoni, about some of these positions.

24     (Laughter)

25         THE COURT:  Go ahead.

1           MS. BACCASH:  Your Honor, thank you.  Turning now

2  to number 32.  This objection has to do with alleged failure

3  to describe prepetition settlements that were entered into

4  between the debtors and insurance companies.  We now have

5  described those in Page 62 and 63.

6           We explain that the BSA's insurance companies

7  generally defended and indemnified the BSA companies against

8  abuse claims.  And in certain years in which BSA's insurance

9  policies were exhausted, insolvent or settled the BSA would

10  fund the settlement of both of these claims.

11          We go onto explain the other insurance actions that

12  are pending.  We believe that that is full disclosure.

13          THE COURT:  Let me hear any outstanding objections

14  with respect to the disclosure of the insurance program.

15      (No verbal response)

16          THE COURT:  I don't hear anything.

17          MS. BACCASH:  Your Honor, moving onto number 33

18  this one, I believe, has been remedied with a change to the

19  plan that is also disclosed in the disclosure statement.  It

20  has to do with certain claims that Century has alleged against

21  Sidley Austin for their representations of the debtors prior

22  to the petition date.  We have carved those out of the consent

23  or release and the exculpation.  We believe with those changes

24  this objection has been resolved.

25          THE COURT:  I recall seeing that.  Are we resolved,

1  Mr. Schiavoni?

2       (No verbal response)

3            THE COURT:  You're muted.

4            MR. SCHIAVONI:  Yes, the exculpation has been

5  modified.

6            THE COURT:  Okay.  Thank you.

7            MS. BACCASH:  Your Honor, number 34, I think, we

8  can also skip over as this was addressed by Mr. Linder

9  earlier.  It has to do with the letter of credit and the

10 agreed upon language we already had in the disclosure

11 statement.

12           THE COURT:  That is my recollection.  Is there any

13 issue with the letter of credit language?

14      (No verbal response)

15           THE COURT:  I think we're good.

16           MS. BACCASH:  Moving on, Your Honor, to number 35

17 this is an issue that has to do, again, with the document

18 agreement and as I -- we also went over this previously, we

19 will be submitting the document agreement with the plan

20 supplement on, we're proposing, November 2nd on the current

21 proposed timeline which is well in advance, its two weeks in

22 advance of the voting deadline.  We believe at that time, you

23 know, parties can take a look at that document and assess it.

24           THE COURT:  Any issues with that?

25           MR. SCHIAVONI:  Judge, I mean -- Your Honor, how

1  does providing disclosure of how this works after the

2  disclosure statement is approved, how does that resolve

3  whether the disclosure is adequate?  I mean this is a key

4  issue not just for us, but indirectly for the charters because

5  the claim comes through the charters.

6         You know, what privileged documents are going to be

7  turned over and what aren't, you know, it seems to me like

8  that is a today disclosure not one after the disclosure

9  statement hearing is over.

10        THE COURT:  Well I think this is going -- if there

11  is an issue I think it's certainly going to be the subject of

12  objection to confirmation.

13        Let me hear from Mr. Ryan.

14     (No verbal response)

15        THE COURT:  You need to unmute, Mr. Ryan.

16        And I really do appreciate everyone muting.  So I

17  am fine with saying you need to unmute.  Go ahead.

18        MR. RYAN:  Thank you.  I was just going to say

19  these are some of the issues we're looking to work with

20  offline of what needs to be in there so a chartered

21  organization can assess the different paths, what their life

22  looks like if they do or don't opt into releases and are, you

23  know, exposed, you know, to pre '76 claims in the tort system.

24        THE COURT:  Okay.  So there may be a resolution

25  percolating on this, Mr. Schiavoni.

1              Mr. Stang?

2              MR. RYAN:  I don't want to promise that, but we

3   hear Mr. Schiavoni's comments.  We believe they are relevant

4   to the charters who are preparing to make informed decisions.

5              THE COURT:  Okay.

6              MR. RYAN:  These are the kind of issues we can

7   bring up offline with the scouts.

8              THE COURT:  Mr. Stang?

9              MR. STANG:  Your Honor, my position is really

10  simple, why?  Why not produce it now?

11             THE COURT:  Does it exist?

12             MR. STANG:  I have no idea, but this has been in

13  there --

14             THE COURT:  I'm not asking you.

15             MR. STANG:  Oh, okay.

16             THE COURT:  Does it exist?

17             MR. STANG:  This has been in there for a very, very

18  long time.

19             THE COURT:  Yeah, I'm sure it has been.

20             MS. BACCASH:  Your Honor, we are still in the

21  process of drafting that document.  It's not something we can

22  include right now.

23             THE COURT:  I'm going to let you guys talk, but let

24  me hear from others.  Mr. Smola?

25             MR. SMOLA:  Yes, Your Honor.  Can you hear me okay?

Case 20-10343-LSS    Doc 9446-7    Filed 03/23/22    Page 199 of 303

198

1          THE COURT:  I can.

2          MR. SMOLA:  With respect to -- Mr. Schiavoni

3 mentioned this a bit, the documents available to a victim from

4 either a chartered organization or the BSA are relevant to the

5 valuation of their claim.  So it is really important that

6 victims understand, particularly, we have one settlement with

7 the TCJC, what is going to be available to them from the

8 trustee to prove their claim, or verify their claim, or get

9 their claim in a category in which they are compensated well

10 or fairly.

11          So I think I agree that this is something that

12 should be disclosed because in the absence of understanding

13 what documents are available to a victim I don't know how to

14 advise my clients on the plan.

15          THE COURT:  I think -- I could be wrong, Mr. Smola,

16 but I think this issue documents the debtor's documents that

17 are privileged and how they're going to be protected once

18 transferred to the trust, not what is available to the abuse

19 survivors which is another category of documents which I would

20 understand why you would want to know about. I don't know,

21 quite frankly, it's not something I focused on, so I am not

22 sure if there is anything in the disclosure statement about

23 it.

24          This particular issue, am I correct, Ms. Baccash,

25 that this is going to the protection --

1          MS. BACCASH:  Yes.

2          THE COURT:  -- of privileged communication --

3   debtor's privileged communications.

4          MS. BACCASH:  That is correct, Your Honor.  It

5   really doesn't have to do with claimnats' communications.

6          THE COURT:  Okay.

7          MR. STANG:  Your Honor, it's a layer of the onion.

8   What -- it goes from the debtor to the settlement trust,

9   whether or not that is privileged, and then the settlement

10  trust to a survivor under --

11         THE COURT:  I don't know that it goes from there to

12  there.  I don't know that it does that.  That is not how I --

13  I read a really interesting article, I think it was by Russ

14  Silberglied a bunch of years ago about the importance of

15  dealing with the debtor's privilege issues in a plan.  I think

16  that is what that is going to.

17         I don't think it's talking about and, oh, by the

18  way, when the settlement trustee gets privileged documents

19  it's going to hand them out to people.  That could be a

20  different.  I understand that issue, but this is -- I don't

21  think this is the same thing.

22         MR. STANG:  But if the trustee gets the documents

23  as privileged status that will restrict his or her ability to

24  give them over to the survivor, whatever that protocol is

25  going to be.

1         THE COURT:  It might.

2         MR. STANG:  Right, it might.

3         THE COURT:  And explain to me why I should -- did

4  you want me to suggest that at this point there should be no

5  privilege protection?

6         MR. STANG:  I want them to get their document

7  drafted that they have been talking about for probably months

8  and get it over to us.

9         THE COURT:  I don't know.  That may be an objection

10  to this provision, but that document I am almost positive is

11  not going to say and, oh, by the way, the trustee is going to

12  hand these documents over.  So you may have an objection when

13  you see it.  I understand the issue and I understand if I was

14  a plaintiff's lawyer why I would want that information, but I

15  guess that is a different issue.

16         Mr. Zalkin, I know you want to weigh-in on this.

17         MR. ZALKIN:  Yes, I do.  I would like to know if

18  the document that is being prepared would, at least, identify

19  the category of documents, the universe of these documents

20  that will be considered under this question of privilege and

21  how they will be protected because it's important to us.  We

22  need to know, as -- I'm hearing some --

23         THE COURT:  Excuse me.  I'm getting -- excuse me,

24  Mr. Zalkin.  I'm getting cross chatter again.  Please check

25  your audio.  Thank you.

1        Mr. Zalkin?

2        MR. ZALKIN:  Yeah, as Mr. Smola pointed out the

3  ability to present the claims on behalf of our clients and

4  where those claims are going to fall out in terms of how the

5  matrix works for the TDP is -- those documents or some of

6  those documents that the Boy Scouts may have are going to be

7  important to us in making our case on behalf of our clients.

8        I just want to make sure that, at least, in terms -

9  - I'm not asking to do a privilege log or provide a privilege

10  log at this point, but, at least, identify what categories of

11  documents are they talking about and that are included within

12  this group of documents that are an issue for this disclosure.

13  Does that make sense?

14        THE COURT:  I do understand what you are saying.  I

15  will let the debtors respond to this.  And I guess I should

16  clarify that I don't know that any documents, per say, will be

17  turned over to the trustee because the BSA is still there.  So

18  I don't know  how this is going to work, but, Ms. Baccash, do

19  you have a response to Mr. Zalkin's question or not?

20        MS. BACCASH:  I see Mr. Goodman is on the line if

21  we could let him respond for the coalition.

22        THE COURT:  Sure.  Mr. Goodman?

23        MR. GOODMAN:  Yes.  Eric Goodman, Brown Rudnick,

24  for the coalition.

25        I just wanted to let the court know that this is an

1  agreement that is very much under construction.  There is

2  other language in the RSA that dealt specifically with the

3  turnover records and transfer of privileges.  We were far

4  along in negotiations with the debtors and the local councils

5  on these issues.

6           We are now going back and reconsidering a number of

7  these issues in light of the chartered organizations

8  participation in the mediation and some of the issues that

9  they have raised including issues raised by the Church of

10 Jesus Christ of Latter Day Saints in these proceedings.

11          So I just want to be clear that this is not a

12 document that exists yet.  This is not something that has been

13 fully baked.  As the court has observed, these are very

14 complicated issues and we're trying to get all of them right

15 and we're going to continue to work on that in the mediation

16 and, otherwise, to try to get this done as soon as we possibly

17 can.  I just wanted to make that very clear to the court.

18          THE COURT:  So the document doesn't exist yet so it

19 cannot, obviously, be attached to the disclosure statement.  I

20 would encourage the parties to work on it among the many other

21 things that have to be documented and would hope it could be

22 provided as soon as possible. If it's available before the

23 supplemental plan date, which we will get to the schedule, I

24 am not sanctioning any schedule yet, and be made available to

25 people that would be helpful.

1          Certainly everybody's rights with respect to the

2   actual document are, you know, preserved for when the document

3   exists and is disclosed.  It is not unusual to have certain

4   documents that are not available at the time of disclosure

5   statement.

6          MR. ZALKIN:  Your Honor, Irwin Zalkin again.  My

7   concern is what is it that will be disclosed within the

8   document.

9          THE COURT:  I'm sorry, say that again?

10          MR. ZALKIN:  My concern is what is it that will be

11  disclosed within the document --

12          THE COURT:  Right.

13          MR. ZALKIN:  -- so that we can have an

14  understanding of what is behind that.

15          THE COURT:  That may be in the document and if it's

16  not then there are ways to address that as well.

17          MR. ZALKIN:  Thank you.

18          THE COURT:  Thank you.

19          Anyone else with respect to the privilege issue?

20          Mr. Goodman, you hand is still up.  Is that a

21  leftover?

22       (No verbal response)

23          THE COURT:  Okay.  Next?

24          MS. BACCASH:  Your Honor, number 36 has to do with

25  (indiscernible) settlement that was -- an objection brought by

1 the Girl Scouts which we have resolved; however, they would

2 like to read a reservation of rights into the record.  I'm not

3 sure if counsel to the Girl Scouts is on, but if they are now

4 would be a good time.

5          THE COURT:  Mr. Schnabel?

6          MR. SCHNABEL:  Thank you, Your Honor.  For the

7 record it's Eric Lopez Schnabel of Dorsey & Whitney on behalf

8 of the Girl Scouts of the United States of America.

9          Might I just point that we are halfway through this

10 list.  So congratulations on that.

11          Your Honor, two quick points with regards to

12 objections.

13          First, the Girl Scouts objected raising a

14 disclosure issue as to class seven which are the non-abuse

15 litigation claimants.  What we basically said is that the

16 disclosure statement lacked adequate information necessary for

17 such claimants, including ourselves, to understand feasibility

18 of the plan and/or understand the basis for the classification

19 and treatment of the Girl Scouts claim vis-à-vis the other

20 non-abuse litigation claimants.

21          The debtors provided additional information, put it

22 in the disclosure statement and that resolves our disclosure

23 issue.  Your Honor, it does not resolve our confirmation

24 issue.  The Girl Scouts are, arguably, the only non-abuse

25 litigation claimant in that class that will not receive 100

1   percent of its allowed claims.  In fact, we're going to

2   receive much less.  That is a confirmation objection.  We will

3   bring that at confirmation and we also have other confirmation

4   objections which we didn't bother putting in the disclosure

5   statement objection and we will raise that also at the

6   appropriate time.

7         Your Honor, the second point is we just have to

8   respond to Paragraph 58, which is at page 30 of their reply,

9   this is Docket 6249, and at Paragraph 58 the Boy Scouts state,

10        "Girl Scouts objection is particularly improper

11  because it is a member of the creditor's committee which

12  bargained extensively with the debtors at arm's length and in

13  good faith for the treatment afforded to unsecured creditors

14  under the plan."

15        Then the paragraph goes onto describe, which is

16  really a baseless allegation, that the Girl Scouts somehow

17  reversed course or flip flopped on the committee's settlement.

18  The allegations, Your Honor, are mistaken conjecture at best.

19  Frankly, they are disappointing.

20        The committee has its own counsel and that counsel

21  speaks for the committee.  My firm is not counsel to the

22  committee and we have not, do not, and have never purported to

23  speak for the committee.  Conversely, the committee counsel

24  has not spoken for the Girl Scouts and they have never

25  purported to do that.

1          Its, frankly, not that confusing and the Boy Scouts

2   know it.  At times the committee and one or more of their

3   individuals members may take different positions in the case

4   and this is one of those cases where the committee settlement

5   (indiscernible) for general unsecured non-abuse creditors

6   except for the Girl Scouts.  We have been singled out and that

7   is why the Girl Scouts filed its objection to the DS and that

8   is why we will file our objection to plan confirmation.

9          Our membership, frankly, Your Honor, on the

10  committee should be a non-issue with regards to us furthering

11  our own individual creditor rights.  So I just take issue with

12  that Paragraph 58 and, you know, we will see you at

13  confirmation.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.  It's a non-issue for me as

16  well.  Individual committee members have their rights to

17  protect their own individual interests.  Thank you.

18          Next issue.

19          MS. BACCASH:  Your Honor, moving onto to issue

20  number 37 and I should state, Your Honor, we are nearly done

21  with the adequate disclosure issues so we are well over

22  halfway.  This issue, Your Honor, has to do with creditor

23  distributions and disclosure regarding how the settlement

24  trust will be distributing the kinds of contributions that are

25  being made to the settlement trust.  Most of these have

1  already been covered in prior objections.  So I don't know

2  that there is anything left here.

3          We do set forth the contributions that will be made

4  to the settlement trust on pages 13 to 15.  We disclosed the

5  approximate recovery percentages, pages 26 to 32.  We go

6  through the trust distribution procedures.  We don't believe

7  that there is further disclosure that is necessary anymore

8  with respect to these objections.

9          THE COURT:  Thank you.

10          Mr. Buchbinder, this was the United States Trustees

11  objection.  Are you satisfied with the disclosures that have

12  been made in response to this?

13          MR. BUCHBINDER:  Item 37, yes, Your Honor.

14          THE COURT:  Thank you.

15          MS. BACCASH:  Moving on, Your Honor, to item number

16  38, this was also from the United States Trustee and I believe

17  this was also resolved.  The consensual releases includes

18  administrative expense claims and priority tax claims.  We

19  have removed those from the releasing claim holder definition

20  and I think that should resolve the objection.

21          THE COURT:  Mr. Buchbinder?

22          MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

23  the U.S. Trustee.

24          It only partially resolves the objection.  It does

25  so in the plan, but I want to note that in the solicitation

1  materials the notice still includes an opt-out for

2  administrative and tax claimants.  I will bring it up again on

3  the solicitation procedures, but that needs to be conformed to

4  the change in the plan.

5          That is my only comment, Your Honor.

6          MS. BACCASH:  We will take a look at that and, of

7  course, conform it.  Its probably just an oversight.

8          THE COURT:  It happens.

9          MS. BACCASH:  Your Honor, number 39 has to do with

10  the trust distribution procedures.  Basically, objectors here

11  have argued that we failed to describe the claims matrix

12  scaling factors.  Really, this seems to be more of an

13  objection to those scaling factors that we used, you know,

14  which is more of a confirmation issue.  We do fully disclose

15  all of these things and have been over this numerous times

16  already in this hearing.

17          THE COURT:  Okay.  Let me ask, are there issues

18  with respect to the adequacy of the disclosure related to the

19  trust distribution procedures?  Mr. Smola?

20          MR. SMOLA:  Yes.  Just very briefly, Judge, and I

21  may be jumping the gun on this.  There is a $250 million TCJC

22  settlement and there are no trust distribution procedures that

23  articulate how that money will be allocated amongst TCJC

24  victims.  So I expect that that is forthcoming.  And to the

25  extent it is I reserve my objection for then.  That is the

1 | only objection I have relevant to the TDP's at present.

2 |       MS. BACCASH:  I think we will address that, Your

3 | Honor, when we address the TCJC settlement.

4 |       THE COURT:  Okay.

5 |       MR. SMOLA:  Thank you.

6 |       THE COURT:  Okay. So hang onto that one, Mr. Smola.

7 |       Mr. Rosenthal?

8 |       MR. ROSENTHAL:  Yes, Your Honor.  I just want to

9 | make sure, there was another category that seemed to also be

10 | an objection to trust distribution procedures and I think we

11 | got an answer from White & Case that, you know, there were

12 | risk factors already embedded and we might be commenting on

13 | those.  This seems to be almost the same category, just a

14 | different number.

15 |       MS. BACCASH:  Yes.  We agree.

16 |       MR. SCHIAVONI:  The other thing that fell in this

17 | category was disclosure of the release that's to be made part

18 | of the TDP's that is referred to in the Hartford settlement.

19 |       THE COURT:  Okay.  Yes, I believe we've had those

20 | discussions previously and there is to be some further

21 | discussion offline about that.

22 |       Anything else in this category?

23 |    (No verbal response)

24 |       THE COURT:  Okay.  Number 40.

25 |       MS. BACCASH:  Your Honor, number 40 is basically a

1  repeat of what we just dealt with, with the direct action

2  statutes.  So I believe we have already covered this.

3          THE COURT:  Thank you.

4          I think so, but please, again, check your audio.

5  I'm getting cross conversation.

6          I believe this is what we have discussed before

7  with respect to direct action statutes, Guam and presumably

8  any other direct action statute out there.

9          MS. BACCASH:  Yes.

10          THE COURT:  Okay.

11          MS. BACCASH:  We would propose, Your Honor, to the

12  extent that this meets with what you would like is to now turn

13  back to the three new things that were added to the plan and

14  the disclosures around them, the TCJC settlement, the Hartford

15  settlement and the chartering org deal.  Perhaps go through

16  those to the extent possible.

17          THE COURT:  Why don't we start on that and see

18  where we end up.

19          MS. BACCASH:  I'm going to switch places with Mr.

20  Linder.  One moment.

21          THE COURT:  Thank you.

22          MR. PATTERSON:  Your Honor, I would just like to

23  say for Mr. Linder's benefit that its rare indeed that a

24  starting pitcher comes back into the game.

25          (Laughter)

1        MR. LINDER:  Thank you, Your Honor.  As we

2   discussed previously we wanted to touch on what we view as the

3   three main components of the fifth amended plan in terms of

4   what was changed versus the fourth amended plan.  Again, as

5   Ms. Baccash noted, the three pillars, if you will, of the

6   fifth amended plan are the Hartford settlement, the TCJC

7   settlement and the participating chartered organization

8   treatment.

9        So if I may, Your Honor, I will start with the

10  Hartford settlement.  Since the objections were filed, Your

11  Honor, on September 15th the debtors filed its fifth amended

12  plan; that included the terms of the new Hartford settlement.

13  That settlement, of course, supersedes the initial Hartford

14  settlement that was entered into on April 15th.

15       The settlement terms are described in summary

16  fashion on pages 107 to 117 of the redline document.  It

17  describes that Hartford is purchasing and the debtors are

18  selling the general liability policies issued by Hartford to

19  the debtors.  It's selling those policies where BSA was the

20  first named insured.  As further consideration, Hartford was

21  able to become a settling insurance company and by extension

22  of party under the plan; thereby, received the benefits of the

23  injunctions and releases upon confirmation of the plan.

24       The principal difference is between the initial

25  Hartford settlement and the revised Hartford settlement are

1  the increased settlement amounts of a gross amount of $787

2  million.  I say gross because there is also a $2 million

3  administrative expense claim that will be payable to Hartford

4  on the effective date to resolve its claims for purported

5  damages arising from the debtor's failure to proceed with the

6  initial Hartford settlement.

7         $137 million of the total amounts of the settlement

8  is payable to the trust on the effective date as Mr. Molton

9  mentioned, I believe, yesterday regardless of whether the

10  confirmation order and affirmation order have become final and

11  non-appealable the settlement amount is not subject to any

12  most favored nation provision and that is in contrast to the

13  initial Hartford settlement which was subject to potential

14  reduction based on any settlement that the debtors may have

15  reached with Century.

16         Importantly, Your Honor, I know Ms. Lauria

17  mentioned this, but I will mention it again, the Hartford

18  settlement is supported by the coalition, the FCR, the ad hoc

19  committee of local councils and attorneys representing

20  approximately 81 percent of holders of direct abuse claims.

21  We filed two nights ago a revised Schedule 1 to the Hartford

22  termsheet and that lists each firm that represents abuse

23  claimants that supports the Hartford settlement and next to

24  those firms' names are the number of direct abuse claimants

25  that those firms have represented to us that they represent.

1          In addition, Your Honor, the debtors have a

2    fiduciary out under the Hartford settlement.  Upon the

3    exercise of that provision or upon the occurrence of certain

4    other specified events the debtors have agreed to support

5    Hartford's request for an additional administrative claim.

6    When I say additional I mean in addition to the $2 million

7    that will be payable under the new settlement.

8          If the further settlement is terminated due to the

9    fiduciary out or due to the other specified events in the term

10   sheet including, for example, the debtor's failure to pursue,

11   defend rather, an appeal of the confirmation order we have

12   agreed that we will support Hartford's request for an

13   additional administrative expense claim up to -- I'm sorry, in

14   the amount of $23.61 million.

15         The disclosure statement also outlines, again, on

16   pages 107 to 117, the summary which includes the other salient

17   terms of the settlement including the history of the

18   negotiations between the parties, factors that support, in the

19   debtors' view, the reasonableness of the settlement, other

20   material terms that are memorialized in the Hartford termsheet

21   and will be definitively documented in a settlement agreement

22   with Hartford.

23         Your Honor, we believe this is comprehensive

24   disclosure with respect to the Hartford settlement and with

25   that we would step back and if anyone has comments, or

1    questions, or objections this would be the time.

2         THE COURT:  Mr. Smola?

3         MR. SMOLA:  Thank you, Your Honor.

4         This sort of harkens back to my original objection

5    to the disclosure of the BSA insurance program and the

6    adequacy of that disclosure. I have been trying to think about

7    disclosure objections in terms of do I have enough information

8    to advise my client.  Relative to the Hartford settlement I do

9    not.

10        For example, in the year 1972 Hartford has a

11   $500,000 per occurrence limits with no aggregate.  There are

12   2,934 claims for that one year.  That is $1.467 billion in

13   exposure for a single year of Hartford coverage.  This

14   coverage and the exposure should be clearly articulated in the

15   plan so that individuals voting on the plan can decide whether

16   or not the Hartford buyback is a buyback for 5 cents on the

17   dollar, 50 cents on the dollar or 90 cents on the dollar

18   relative to the coverage provided.

19        None of this is disclosed.  It is the most opaque

20   paragraph of the entire disclosure statement that has to do

21   with the non-aggregate years of coverage.  That is not a

22   mistake.  That should be clarified and crystal clear to

23   victims voting yay or nay on this particular plan.

24        Thank you.

25        MR. LINDER:  Your Honor, just briefly.  While Ms.

1  Baccash was finishing her excellent presentation I did email

2  Mr. Smola to begin our dialog with respect to additional

3  disclosures we can make about insurance policies with

4  aggregate or no aggregate limits, the years of those policies.

5  So I intend to continue that dialog and I would hope that we

6  can address the concerns that he just raised.

7          THE COURT:  I will let you have that discussion.

8          MR. LINDER:  And just to be clear, Your Honor, what

9  I am eluding to really is just pure factual information about

10 aggregate limits and the like.  Mr. Smola, also it occurred to

11 me, made some characterizations of what those policies in

12 terms of liability would imply.  Needless to say, there is

13 fundamental disagreement about liability. So I think it's not

14 appropriate for our disclosures to the extent it's

15 characterized by liability.

16         THE COURT:  I understand there may be disputes over

17 that, but I think to the extent that there are facts, and you

18 and Mr. Smola, and perhaps other hands I see up can have

19 discussions about that and come up with appropriate

20 disclosure.  I will let you have those discussions.

21         Mr. Ryan?

22         MR. RYAN:  Thank you, Your Honor.

23         We have similar concerns on behalf of the chartered

24 organizations.  I mean one of the -- I'm not going to use the

25 term resolution for those who were affected by it didn't

1  negotiate it, but the treatment of chartered organizations for

2  pre 1976, you know, there are substantial years of coverage of

3  Hartford that interrelates to a couple issues, but the

4  disclosure statement description of settlement would lead

5  chartered organizations to believe that they have all the

6  benefit of all the insurance out there.  It's not disclosing

7  that Boy Scouts is, when they say pre 1976 and you keep all

8  the coverage that it is actually (indiscernible) to Hartford.

9  Nowhere is it disclosed how much of that they are losing.

10        The problem with disclosure is to lead people to

11  believe that they are retaining all the pre 1976 insurance

12  rights they have and to not disclose them is actually minus

13  the first or the second largest carrier of Boy scouts and

14  that's a -- you know, those types of issues, there's

15  information that needs to be included so chartered

16  organizations can truly understand what is being offered to

17  them to not be told that they have all their insurance rights

18  when there's one buyback on the table and that they're

19  planning others.

20        It's that kind of communication not only to the

21  disclosure statement in plain English, but there has already

22  been a very aggressive communication campaign from the local

23  councils of Boy Scouts directly to chartered organizations

24  about this plan already that are containing that type of

25  misinformation that we need to address.

1          THE COURT:  Okay.  Well clearly the effect of the

2    Hartford settlement on multiple parties is an issue and that

3    needs to be explained appropriately.

4          Mr. Zalkin?

5          MR. ZALKIN:  Your Honor, thank you.  For the record

6    I know Mr. Smola brought up that the policies of one of the

7    points of information we would want to know regarding the

8    policies is (indiscernible) aggregate limits (indiscernible)

9    versus other limitations that may exist in the policies.

10   There is also the question of what privilege is the policy

11   coverage.  We have various types of triggers, it continues to

12   trigger (indiscernible), a first encounter trigger.

13          These are very important for us to know in order to

14   make the calculous of what is the scope of the coverage that

15   Hartford is exposed to and how does that -- what the

16   settlement is reflected in this case.  What is the amount of

17   that discount based on what their exposure is using not only

18   the aggregate limit to that question or no aggregate limit

19   question and also (indiscernible).

20          I am not sure where we stand with these policies if

21   they are being disclosed or not disclosed entirely because I

22   think under the federal rules of civil procedure that we're

23   entitled to policies, to the entire policy.  We should be able

24   to see those policies, but I'm not sure where that is.

25          THE COURT:  As an initial disclosure?

1          MR. ZALKIN:  Well I don't know if it necessarily a

2    disclosure, but at least the disclosure, maybe, should

3    indicate to some extent what those policies reflect or what

4    these policies cover or what limitations there may be in these

5    policies.

6          So when I talk to my client I have to say, you

7    know, this is a good settlement, this is not a good

8    settlement.  I can do some kind of an analysis of what the

9    coverage is or what is the extent of the potential coverage

10   for my client under this policy.

11         THE COURT:  That I understand.  I asked an

12   imprecise question.  When you said you have a right to them

13   under the federal rules my question really went to that.  Is

14   that an initial disclosure or is that -- what is that?

15         MR. ZALKIN:  I don't know what the bankruptcy world

16   is.  If I would have given you a case one of the first things

17   I would do is request discovery of the insurance policies

18   under the federal rule of civil procedures.

19         THE COURT:  That is discovery.

20         MR. ZALKIN:  That may not be applicable in

21   bankruptcy and I am not an expert in that.  What I am just

22   trying to understand is how can I tell my client, when I am

23   sitting down and trying to evaluate their claim that is

24   covered during the Hartford coverage years what -- now that is

25   being capped by the settlement and that settlement money is

1  going to be diluted among potentially 80,000 plus claimants.

2  What am I supposed to tell him with respect to whether he

3  should vote for this or not vote for this.

4          I have to know what he is giving up.  What he could

5  have received potentially under the Hartford policy.  So one

6  thing I know and what I understand is there's years with no

7  aggregate limits so I can tell him, well, we're not going to

8  be -- we can give them the 500,000 per occurrence, but now

9  what is an occurrence? How is -- what is the trigger?

10          THE COURT:  My understanding is there may be

11 disputes over what an occurrence is.  So that is going to be

12 the problem.

13          MR. ZALKIN:  I agree.  There has got to be -- well,

14 at least I should know what is Hartford claiming is that case.

15 So, at least, you know, maybe we have a dispute, maybe we

16 don't have a dispute, but to this day all I know is that

17 there's a per occurrence $500,000 with no aggregate limits.  I

18 don't know anything else.  I don't know if I have a claim that

19 could exceed the $500,000 by the terms of the policy or not.

20          I think that is important information to have.

21 Whether I could get it now or I have to wait to get it later,

22 I don't know, but in advising my client as to whether it makes

23 sense, the settlement that they have come up with makes any

24 sense or not it's a point of information that I think is very

25 important for all claimants to have.

1          THE COURT:  Thank you.

2          Mr. Buchbinder?

3          MR. BUCHBINDER:  Thank you, Your Honor.  Dave

4   Buchbinder again on behalf of the United States Trustee.

5          I have two concerns with the new disclosure on the

6   Hartford settlement.  The first one is I think that it would

7   be appropriate for them to make a reference at their materials

8   on page 111 about the fiduciary administrative claim that

9   appears several pages later because there is no reference to

10  the larger potential claim on page 111.

11         Second, in the later area where they do discuss the

12  term for the $23.61 million additional administrative claim

13  they should state the basis of what comprises that $23.6

14  million because looking at this sum and the fiduciary out it

15  reminds of the breakup fee dealt with by Judge Sontchi in the

16  Energy Futures case, and the amount of this penalty for

17  exercising the fiduciary out would seem to be so high that it

18  would chill the debtor from exercising the fiduciary out.

19  That is not a disclosure statement issue, but I raise that for

20  the court's consideration.  The disclosure statement issue is

21  they should state what that $23.61 million is based upon.

22         THE COURT:  Mr. Linder?

23         MR. LINDER:  Your Honor, just with respect to --

24  first with respect to Mr. Zalkin we do state on page 109, in

25  the first paragraph under the heading BSA, Hartford background

1  and this is describing some of the circumstances that support

2  the reasonableness of the settlement.

3           In litigation with Hartford they raised a number of

4  defenses that if successful could substantially reduce or even

5  eliminate coverage including that the BSA breached commissions

6  to coverage and that the abuse claims arise out of a single

7  occurrence under applicable law.  So I just wanted to address

8  that for Mr. Zalkin's benefit.

9           Turning to Mr. Buchbinder's request I wasn't -- I

10 have to admit I really wasn't following the first comment.

11 This is a comprehensive summary.  Both administrative claims,

12 both what we termed as the B administrative claim and the

13 additional administrative claim are contained within this

14 summary.  At page 115 carrying over to page 116 that is the

15 provision that describes the circumstances under which the

16 Hartford additional administrative expense claim would be

17 payable.  If we need to put it in a different spot we can do

18 it.  I just wanted to point that out.

19           I will express no views on Mr. Buchbinder's

20 comments with respect to the terms under which that fee

21 wouldn't be payable (indiscernible).

22           THE COURT:  I think his first comment was you have

23 a heading that says Hartford administrative expense claim

24 which deals with the $2 million, but the $23.61 million is not

25 as obvious.  So maybe there needs to be a reference to that.

1            MR. LINDER:  We can certainly make it be more

2   prominent.  Point taken, Your Honor.

3            THE COURT:  And --

4            MR. BUCHBINDER:  I think --

5            THE COURT:  Go ahead, Mr. Buchbinder.

6            MR. BUCHBINDER:  Thank you, Your Honor.  Sorry to

7   interrupt.  In addition I think they should state in a

8   paragraph or less, it's up to them how long it takes to say

9   what the basis of the $23.6 million is.  It's a number.  What

10  is it based upon?  The others are confirmation issues, but the

11  basis of what the $23.6 million comprises is a disclosure

12  statement issue.  They should disclose what it comprises.

13           MR. LINDER:  The $23.61 million number, Your Honor,

14  is 3 percent of $787 million.  It is, as Mr. Buchbinder said,

15  akin to a fee.  It is in line with what is customary in terms

16  of breakup fees that are presumably approved in this district.

17  And we think it's appropriate under the circumstances at that

18  level.

19           THE COURT:  Okay.  Well, I think you can say the

20  basis then as you've articulated it and put it in.  I'll note,

21  of course, I haven't approved it yet.  Okay?

22           MR. LINDER:  Of course, Your Honor.

23           THE COURT:  And I'm not doing that in connection

24  with the disclosure statement.

25           Okay.  Mr. Patterson.

1          MR. PATTERSON:  Your Honor, just a couple of

2    points.  First, on the insurance policies, Federal Rule of

3    Civil Procedure 26(a)(1) requires that insurance policies be

4    turned over at the inception of litigation without request,

5    without a discovery request and --

6          THE COURT:  I wondered about that, which is why I

7    asked.  It's been a while for me.

8          MR. PATTERSON:  Right, Your Honor, and when you

9    said that, is it initial disclosure, that hit some sort of

10   antiquated part of my reptilian brain, I thought that I had

11   heard that phrase somewhere, so we did look it up.

12         So I think that the policies should be made

13   available for everybody.

14         THE COURT:  Well, I got lucky again.  Okay.

15         MR. PATTERSON:  Second, Your Honor, just sort of

16   globally, this is a settlement -- and this is going to come up

17   again with respect to the other settlements and the Third

18   Circuit has a rubric for analyzing settlements -- in every

19   case I've been in where there's a disclosure statement

20   involving a plan where one of the (indiscernible) which is a

21   settlement, and the disclosure statement addresses, you know,

22   the conventional Martin factors with regard to the settlement

23   and it says, here's what people argued, here's what the back-

24   and-forth was, here's what was in dispute, here's what the

25   risk was, and, you know, as a result, the debtor recommends

1  the settlement or whoever it is recommends the settlement.

2  And someone has to recommend the settlement, someone has to

3  stand behind it and has to represent, you know, someone's

4  business judgment, presumably the debtor and maybe others.

5          The interest of creditors, we always hear about the

6  X percent of people who stand behind the settlement, those are

7  the lawyers who represent -- I mean, this isn't a meaningful

8  number, one; and, two, it's only one of the four factors for

9  approving a settlement.  And so I think -- and particularly in

10  light of the fact that the people who are getting the recovery

11  are not necessarily the people who are paying the price of the

12  settlement because the proceeds are just going into a pot, I

13  think it's particularly important that the disclosure

14  statement address with some particularity what the risks were,

15  what was sought, you know, what the ranges of recovery were

16  and why the debtor, if the debtor recommends the settlement,

17  it does so.

18          MR. LINDER:  Your Honor, if I could respond to each

19  of the points Mr. Patterson raised?  Bankruptcy Rule 9014(c)

20  provides -- and I'm parsing the rule as we speak, I'm trying

21  to find the reference -- it provides that Federal Rule 26, as

22  incorporated by Rule 7026, shall not apply in a contested

23  matter unless the court directs otherwise and it lists, among

24  other things, mandatory disclosure under 26(a)(1), pretrial

25  disclosure under 26(a)(3), et cetera.  So I don't think this

1  is the -- and it says "shall apply."

2        So I'm looking back here -- yeah, that's right.  So

3  we have provided copies of our insurance coverage within the

4  scope of this case under a protective order, Your Honor, so we

5  can certainly discuss it with Mr. Patterson.

6        THE COURT:  Okay.  And what about his request for

7  disclosure about the analysis of the Martin factors?

8        MR. LINDER:  The analysis, Your Honor, I think, you

9  know, we may not have couched it in terms of expressing some

10  of the Martin factors, but we did include a section of our

11  disclosure, it's on page 109 under subheading A, where we

12  discuss all of the background and the reasons, the complexity

13  of the litigation with Hartford.

14        The conclusion of that -- it's really in plain

15  English, Your Honor, but the conclusion is that this is, in

16  our business judgment, a good faith settlement and compromise

17  of complex disputes; it will avoid the costs, risks,

18  uncertainty, and delay associated with that protracted

19  litigation while providing the certainty of payment on account

20  of abuse claims.  And that's all in light of the recitation we

21  have in the first three paragraphs of page 109 beginning under

22  that heading.

23        So, from our perspective, Your Honor, we've

24  substantiated that position.  That's really it on that score.

25        MR. PATTERSON:  With respect, Your Honor, the

1  addressing of the factors in that fashion could support almost

2  any settlement with almost any insurer in almost any case just

3  to change out the names.  I think we need some particularity

4  with respect to the amounts that were discussed and proposed,

5  the amount of liability that Hartford could have, and a little

6  more meat on those bones, which, as I say, I think are

7  somewhat generic in the categories of things that insurers

8  could raise in almost any case.

9          MR. LINDER:  With respect, Your Honor, this is not

10  cookie cutter.  There is a pretty long history of litigation

11  between the Boy Scouts of America and Hartford and it's

12  addressed with particularity in these paragraphs.  I don't

13  really -- I don't really believe it's appropriate to discuss

14  mediated negotiations in a disclosure statement in terms of

15  amounts that were exchanged with Hartford, I find that -- I

16  think that's completely inappropriate.  We think this

17  disclosure is more than adequate.

18          THE COURT:  I think the disclosure probably is

19  adequate for disclosure statement purposes, but I think what

20  you're hearing is that certain plaintiff counsel believe that

21  they need more information in order to advise their clients to

22  vote in favor of the settlement.  So I suppose the lack of

23  further information may discourage some of them from advising

24  their clients to vote yes, and so that's something the debtors

25  should consider with respect to whether they're willing to put

1  more information into the disclosure statement or not.

2          Let me hear from Mr. Anker since you represent

3  Hartford.  You need to un-mute, Mr. Anker.

4          MR. ANKER:  Well, then the answer to my question

5  whether you could hear me okay was no.

6          THE COURT:  No.

7          MR. ANKER:  And, Your Honor, I apologize in

8  advance, I have a quite hungry dog.  So if you hear someone

9  crying in the background, it's not me, but it might be my dog.

10          Your Honor, let me just step back one second.  I

11  think some of the lawyers here are selling themselves a little

12  bit short.  Mr. Smola and Mr. Zalkin and colleagues, Mr.

13  Patterson, are all very experienced plaintiff lawyers, they

14  know what they think, and there may be a disagreement with a

15  small minority of the plaintiff lawyers thinking this

16  settlement is inadequate and the vast majority, if the

17  Coalition (indiscernible) counsel has signed on represent the

18  clients they say they represent overwhelmingly in favor.

19          Everyone knows what the facts are here, people can

20  disagree on what the outcome could be.  In a litigation, the

21  ultimate outcome here could be a lot less than 787 million for

22  all sorts of reasons and perhaps it could be more, but I've

23  done a lot of this for many years and I've never seen a

24  disclosure statement discussing litigation that, for example,

25  goes into the bid-and-ask in mediation of what different

1  parties have offered and not offered, and this is already a

2  two to 300-page document.  The overwhelming majority of the

3  claimants are advised by counsel, there is an official TCC,

4  there is a coalition, there's an FCR, there are a lot of

5  representatives here, making this document longer and having a

6  if there were litigation, the debtors would assert X, Hartford

7  would say not X, and have that go on for three more pages is

8  not going to meaningfully move the needle in terms of

9  disclosure.

10         The standard is 1125, which is simply that there be

11  adequate information under the circumstances, and the

12  circumstances here include how long this case has gone on, all

13  that has preceded it, all that has occurred in court, and all

14  the counsel involved.

15         So I think the disclosure is adequate.  Certainly,

16  everyone will have an opportunity at confirmation to make

17  their arguments as to why the plan is or is not confirmable.

18         Thank you, Your Honor.

19         THE COURT:  Thank you.  Let me ask you -- Mr. Smola

20  earlier asked about certain factual information about policies

21  and I know that with respect to other insurance companies Mr.

22  Rosenthal is going to be canvassing his clients to see what

23  might be available, so my question is, what about some basic

24  factual information about existing policies?

25         MR. ANKER:  On that front, I'd prefer if Mr.

1   Ruggeri, who knows the coverage issues, could speak to them

2   rather than I do.  But I think you're right, Your Honor, when

3   you said earlier as to questions like trigger and occurrence,

4   they're all quite hotly disputed, these are not black-and-

5   white facts.

6           THE COURT:  Okay.  Thank you.  I did notice Mr.

7   Ruggeri pop up.  Mr. Ruggeri.

8           MR. RUGGERI:  Thank you, Your Honor, James Ruggeri,

9   also for Hartford.  In fact, I emailed back and forth with Mr.

10  Rosenthal on that very issue to make sure Hartford would be in

11  the loop on those sorts of disclosures.  I also, I think it

12  was a few days ago on the 17th, corresponded with Mr. Smola on

13  some of the questions that he had about some of the Hartford

14  policy issues.

15          There is a fair amount of disagreement on legal

16  issues.  There's a fair amount of insurance jargon that's used

17  and I'm not sure we and they use that jargon the same way, so

18  we do need to get through it, but I heard you loud and clear

19  in terms of disclosure of facts.  A lot of the facts, the

20  policy documents are in the data room, which is produced by

21  the debtors.  We did file, they wanted to know our position on

22  the various coverage issues or the pending adversary

23  complaint, I think it's about 30 pages long that we filed in

24  the Delaware court, so that is out there publicly available as

25  well.

1          So there is a lot of information already out there

2   about the facts, but we are not averse to having a dialogue

3   with the other parties to make sure they understand additional

4   basic facts to the extent they don't.

5          THE COURT:  Thank you.

6          Let me go to Mr. Stang, then I'm going to go to Mr.

7   Rosenthal, then I'll come back to Mr. Smola and Mr. --

8   somebody else, wait a sec -- in any event, I already forgot

9   the order I said.  So who did I say next?

10          MR. STANG:  It's me, Your Honor, I get to go next.

11          THE COURT:  Okay, Mr. Stang.

12          MR. STANG:  Your Honor, back to the theme of

13   creditors want to know two things, how much and when.  Nowhere

14   did I see a statement as to how much creditors will receive as

15   individual creditors from this settlement.  And I understand

16   all the issues about the TDP and we don't know how much an

17   individual claim is going to be based, but we do -- we can

18   compute an average.  This settlement has been ballyhooed as

19   the greatest thing since sliced bread.  If you take 90 percent

20   of the settlement amount and divide it by the 82,500 people,

21   this settlement gets you $8,563 per person.  People should be

22   told that.  Seven eighty seven sounds like a lot of money, but

23   when you reduce it to the number of creditors in the case,

24   that's the number.  They should be told that.

25          That's it.

1              THE COURT:  Mr. Linder?

2              MR. LINDER:  Your Honor, I would only point out

3    that while the assets being contributed to the trust are not

4    necessarily devoted to -- by insurance companies are not

5    necessarily devoted to claimants in a particular year, this is

6    a trust, it is taking assets from numerous sources.  I would

7    point out that just simply dividing $787 million by 82,200 is

8    not the right approach.  Not all of those abuse claimants have

9    claims arising in those years and Hartford shouldn't be

10   expected to make a contribution based on the claims of every

11   single abuse creditor.

12             MR. STANG:  So then I would ask Mr. Linder to tell

13   me, based on the Bates White valuation, how much people -- how

14   many -- what's the liability in the Hartford years, so that

15   people can say, okay, Hartford's contribution should be based

16   on Hartford's risk.

17             Now, the fact of the matter is creditors are being

18   asked to vote on this entire settlement.  So, you know, it's

19   not like the Hartford people are just voting on the Hartford

20   settlement.  If the debtor is proposing that, we should know

21   that, because there are lots of subsets we can analyze from

22   that perspective.  But if he doesn't want to put in what the

23   average is per person, tell us how many cents on the dollar,

24   given their estimation of the liability for the Hartford

25   years, the 787 amounts to.  It's as simple as that.

1              THE COURT:  Okay.  I don't happen to think the

2    average number --

3              MR. STANG:  I think they should be told the average

4    as well, Your Honor, but --

5              THE COURT:  I don't think that number means

6    anything because we don't know what the amount of the claims

7    is and we don't know how many valid claims there will be at

8    the end of the day.  So I'm not sure that number means

9    anything, but, more importantly, you can do it in three

10   seconds if that's the number you want.  So the information is

11   in there to do that calculation if someone thinks it's a

12   relevant calculation.

13             MR. STANG:  Well, the average may be in there and,

14   frankly, I don't know, it's a sentence, if you want to do the

15   average, but what we don't know is how much of their 2.4 to $7

16   billion is for the Hartford years, we don't know that.  I

17   don't know that, no one has told me.

18             THE COURT:  Okay.

19             MR. STANG:  So how much are we getting from

20   Hartford for its risk given their valuation of the claims.  I

21   can tell you how much we think it is given our valuation using

22   TDP numbers that everyone has agreed to and statutes that

23   everyone has agreed to, I can do that.  They're going to

24   scream bloody murder about that because they don't buy the

25   number, but let's at least hear what their number is.

1          MR. LINDER:  Your Honor, from a global level, the

2    way that the debtors look at this is that there is obviously

3    insurers whose policies correspond to a portion of the

4    liabilities.  The liabilities in the aggregate fall in a range

5    from 2.4 to $7.1 billion, Hartford -- the Hartford settlement

6    was negotiated based on their allocated portion of that

7    liability.

8          MR. STANG:  Right.  How much was that?

9          MR. LINDER:  Jim --

10          MR. STANG:  How much was it?  I'm asking for a

11    disclosure of what the debtor thinks the liabilities are given

12    the -- in Hartford payments (indiscernible) so if you want to

13    look at it from a Hartford creditors' perspective, that's not

14    how the money is being distributed.

15          People can say, oh, Hartford is getting away with

16    paying ten cents on the dollar given the debtors' valuation or

17    80 cents on the dollar, but I think creditors are entitled to

18    know when they're voting on a settlement what -- given the

19    debtors' own valuation of claims for the Hartford years, what

20    Hartford is paying as a percentage of those claims.  You know

21    that number, you negotiated based on that number.  So why

22    don't you tell the survivors whose insurance policies are --

23    if you will, their insurance policies, if you will -- being

24    taken out from under them what the cents on the dollar is.

25          MR. LINDER:  Mr. Stang --

1         THE COURT:  Okay.

2         MR. LINDER:  -- the point I was trying to make is

3  that you merely divide the $787 million by a point on the

4  range, on that range from 2.4 to 7.1.  And what we will show

5  at confirmation when the settlement is before the Court for

6  approval, which it's not today, is that the settlement falls

7  above the lowest point in the range of reasonableness --

8         MR. STANG:  So you're not going to advocate --

9         MR. LINDER:  -- (indiscernible) burden --

10        THE COURT:  Okay, let's --

11        MR. STANG:  -- (indiscernible) people --

12        THE COURT:  Okay.

13        MR. STANG:  -- Your Honor, they're going to

14 advocate that part of the settlement --

15        THE COURT:  We're getting --

16        MR. STANG:  -- standards is the vote of all these

17 people and people are voting without knowing the information

18 as to how this settlement plays out as a percentage of that

19 liability.

20        THE COURT:  Well, I think there is a fair amount of

21 information that has been given.  I hear you want additional

22 information, that request should be directed to me and not to

23 Mr. Linder.

24        MR. STANG:  Sorry.

25        THE COURT:  And I want to hear the remainder of the

1 objections.

2          Mr. Ryan?

3          MR. RYAN:  Thank you, Your Honor, a variation of

4 Mr. Stang and a brief response to Mr. Anker.  There were tens

5 of thousands of chartered organizations, you know, what Mr.

6 Linder has said are the arms, legs, and lifeblood of the

7 organization, who aren't represented by counsel, who are about

8 to lose the benefit of the Hartford insurance for the pre-1976

9 years.  So there does -- this is not a case where you can rely

10 on the fact that many people are represented by counsel, we

11 know that there's tens of thousands who aren't who are vital

12 to the success and survival of the organization.

13          With respect to that, they are entitled to know,

14 since the treatment is -- the default treatment if they do

15 nothing is that they are left on their own in a tort system

16 pre-1976, they're entitled to know how many claims there are

17 in the tort system pre-1976, what are the values of those

18 claims, what is the total insurance available, and then what's

19 the insurance available net of the Hartford buyback.  Those

20 are the kind of things that people need to understand to make

21 an honest decision as to whether they object to this plan or

22 not because remember, as Mr. Schiavoni has said, if a

23 chartered organization takes any one of a number of steps,

24 they're out completely.  All the buybacks count against them

25 and they get absolutely no releases.  I mean, this is a

1  Draconian plan with respect to chartered organizations.  You

2  either take what is being offered or you get absolutely

3  nothing.

4          So people deserve to know what the world looks like

5  pre-1976, how many claims are there, what is the value of

6  those claims.  And with respect to the Hartford settlement,

7  how much insurance is nominally there for those and what does

8  that look like afterwards, so they can decide how exposed they

9  really are in the tort system pre-1976.  Because I'll tell

10 you, Your Honor, and as I referenced earlier, there's a very

11 aggressive campaign underway right now by the Scouts and the

12 local councils to the church level of chartered organizations

13 saying, don't worry about pre-1976, it's really not that big

14 of a deal.

15         So we're very concerned.  The chartered

16 organizations are already being minimized with what the

17 exposure is for pre-1976 in aggressive communications before

18 this Court has approved the disclosure statement.  There's

19 nothing in the disclosure statement that allows anyone to

20 determine what those exposures are, what the effect of a

21 Hartford buyback is, what the effect of a Century buyback

22 would be, because we know from the plan they want to do

23 further things.  These are things that need to be disclosed

24 for people to make honest and informed decisions.  And I'll

25 say it again, extrajudicial communications being made right

1 now need to conform with what this Court ultimately approves

2 as an accurate and honest disclosure statement, and that's not

3 going on right now.

4              MR. LINDER:  Your Honor, if I could respond?

5              THE COURT:  Yes.

6              MR. LINDER:  I'll begin with the last point and,

7 you know, I think the prospect of -- the suggestion that

8 extrajudicial communications between principals of BSA and the

9 chartered organizations needs to adhere to a Court-approved

10 form, I just don't think that's necessary, but that's -- I'll

11 move on from that topic.

12             As to the rights of chartered organizations in

13 Hartford policies, as an initial matter, we describe in, I

14 believe it's page 55 to 65 of the disclosure statement that

15 the chartered organizations' rights under BSA insurance

16 policies began in 1976 when the language, the sponsor's

17 language began to be included in those policies.  In 1978, the

18 language changed to chartered organizations.  Be that as it

19 may, the policies that are being sold, the Hartford policies

20 that are being sold (indiscernible) to BSA -- I'm just going

21 to read it from page 112 of the disclosure statement -- "they

22 will be sold," those policies, "by the debtors and their

23 estates to Hartford free and clear of all interests of the

24 estates, and any person or entity other than the estates,

25 pursuant to Sections 363, 1123 and/or 1141 of the bankruptcy

1  code under the plan, provided that the rights, if any, of

2  chartered organizations under the policies shall be treated

3  under the plan in accordance with" -- the sections that I just

4  listed -- "and other applicable law."

5              That is the effect, Your Honor, of the proposed

6  sale on chartered organizations' interests in the policies as

7  to what exactly is being lost, the bankruptcy code expressly

8  speaks to precisely this type of situation and how those

9  rights are affected.

10             MR. RYAN:  Your Honor, Mr. Linder speaks with

11 respect to the sale of BSA policies, that's -- you know, this

12 buyback is broader than that.  And I will go back to the plain

13 English request for unrepresented people, that's as clear as

14 mud to someone who is looking at a thousand pages of

15 disclosure statement, at the end of their day to go to a

16 volunteer organization to try and figure out what they should

17 do and continue the relationship with Boy Scouts.

18             THE COURT:  What besides the Hartford policies are

19 being bought back?

20             MR. LINDER:  That's the scope of the sale, Your

21 Honor; it's the Hartford policies issued to BSA.

22             THE COURT:  That's what I thought, but I thought

23 Mr. Ryan said there was something more than that.  Maybe I

24 misheard.

25             MR. RYAN:  Well, that's what -- and, Your Honor,

1  this is part of dealing with all this on the fly is our

2  concern is that it reaches into local council policies, but

3  even if it's just BSA policies and to the extent the chartered

4  organizations have a right to look to those policies.  They

5  should know --

6             MR. LINDER:  Your Honor, the local --

7             MR. RYAN:  -- they should know the economic impact

8  on available coverage.  Whether Boy Scouts believes that

9  there's actually none or not, as you said, they're facts as to

10  policy years and there are honest debates as to coverage.

11             THE COURT:  Well, I think we're going to get those

12  facts as to policy years and I'd like -- I'm hearing that Mr.

13  Rosenthal and Mr. Ruggeri are looking at that, I'm hearing

14  that policies are available in a data room.  So I'd like that

15  conversation to happen and see if in fact -- see that if we

16  can get the facts out there that that solves a majority of the

17  problems, recognizing that there are disagreements about what

18  the terms of the policies mean, how they're being interpreted,

19  maybe how they were historically interpreted.

20             So I think, though, that the facts are what we need

21  to really work with.

22             Mr. Zalkin?

23             MR. ZALKIN:  Thank you, Your Honor.  I agree with

24  you.  In the bankruptcies that I've been involved with in the

25  Catholic abuse cases, the disclosures have included usually a

1  chart and that chart would indicate the years of abuse, the

2  number of claimants that fall within those years, the carriers

3  that have coverage for those years, and the basic terms of

4  those coverages.  In other words, how much per occurrence; how

5  an occurrence is being defined under the policy; whether there

6  are aggregate or non-aggregate limits; whether there are --

7  and in earlier years maybe not as applicable, but anti-

8  stacking provisions in the policies; things like that that are

9  just very basic terms.  So that when we look at this very

10 important settlement that we have an understanding of what the

11 discount is based on the potential exposure that this carrier

12 has and how much are claimants giving up in terms of what

13 their potential recovery could be, and that is absolutely

14 critical.

15          This is a huge part of this case is this Hartford

16 settlement and whether it's reasonable, whether it's fair,

17 whether compared to what -- the exposure that the Hartford

18 has.  And they aren't telling us what they determined their

19 exposure to be.  Maybe if they want to tell us what did they

20 consider their exposure to be and how much of a discount

21 they're getting, that would be interesting to know.  I think

22 that would be an interesting disclosure for us to know.  But,

23 in the absence of that, I understand Mr. Ruggeri saying I can

24 go hunt the lawsuit in the district court or I can go through

25 a database and try to find this information, but this is

1  information they should provide; this is information they

2  have, they have these policies, they know these policies, they

3  can put this together and give us this disclosure so we know

4  what we can tell our clients to do -- or what we can advise

5  our clients to do under these circumstances, or at least they

6  can make an informed consent as to whether this settlement

7  makes any sense or not.

8              THE COURT:  Thank you.

9              MR. LINDER:  Your Honor will be pleased to know

10  that there's an email now in which Mr. Zalkin, Mr. Smola, Mr.

11  Schiavoni, Mr. Ruggeri, and I are -- we are all on the same

12  email and we're exchanging proposals for how we might be able

13  to display the information that the various individuals are

14  requesting.  So we're working on it and we hope to be able to

15  come up with that in short order.

16              THE COURT:  Thank you.  And Mr. Rosenthal.

17              MR. SMOLA:  Your Honor, can I --

18              MR. LINDER:  And Mr. Rosenthal.  How could I forget

19  Mr. Rosenthal?

20              MR. SMOLA:  If could just have just --

21              THE COURT:  Mr. Smola.

22              MR. SMOLA:  -- 30 seconds.  There is a single

23  paragraph in this disclosure statement on page 57 of the

24  redlined version about the years 1962 to 1982 that state

25  "there is a per occurrence limit of $500,000."  Forty five

1  thousand, nine hundred and thirty seven claims fall in that

2  time frame, 45,000-plus claims.  There is no specification

3  about which years have aggregates and which do not; there is

4  no specification about a total exposure for that time frame.

5  And I agree with Mr. Linder, we are now discussing this, but -

6  - I appreciate the point that this is available in the data

7  room, I am not permitted to disclose anything in the data room

8  to my clients, it is confidential pursuant to this Court's

9  order.  So this is information that needs to be in the

10  disclosure statement.

11          Thank you, Judge.

12          THE COURT:  Thank you.

13          Okay, Mr. Schiavoni.

14          MR. SCHIAVONI:  So, Judge, in the preamble to the

15  Hartford settlement agreement it says that -- the term sheet

16  is going to set forth some material terms and it says that

17  other material terms will be in the settlement agreement

18  itself.  So the term sheet was signed some time ago, now a

19  week ago.  I'm sort of assuming here that this agreement is

20  either done or it's close to being done and that, you know,

21  there's a catch-up here going on that by the -- you know, will

22  turn this next draft of the term sheet, but we'll have the

23  Hartford agreement and can look at it and it will resolve

24  other issues about it by just seeing it in the next couple of

25  days.

1        So I don't know if Mr. Linder can give us any time

2    frame on that, but I think that's -- I'm not using the word

3    "delay," I'm staying away from "delay," I got that, but if

4    that's in the near term here, I think it sort of solves a lot

5    of my issues about just understanding what's in the term

6    sheet.

7            MR. LINDER:  Your Honor, it's in process.  The term

8    sheet is intended to memorialize all of the material terms of

9    the agreement.  I don't expect that there will be any

10   revelations through the filing of a full document, but, with

11   that said, we are working as expeditiously as we can to have a

12   complete, definitive agreement drafted, agreed, and executed.

13           THE COURT:  Okay.  Thank you.

14           Okay, anything further on the Hartford settlement?

15           Okay, people have their jobs to do.

16           MS. WOLFF:  Your Honor, I'm sorry --

17           THE COURT:  Oh.

18           MS. WOLFF:  -- if I may very briefly.  I just

19   raised my hand.  I apologize.

20           THE COURT:  Ms. Wolff.

21           MS. WOLFF:  Yes.  I previously raised the issue of

22   whether or not the -- and I think there was no discussion on

23   it because it was saved for now, discussion on Hartford, but

24   it was whether or not the debtors have an interest in policies

25   in 1976 and '77.  The Boy Scouts simply have not revealed

1  whether or not they have an interest.  And this is important

2  because, if they have no interest, then those policies are not

3  a part of the bankruptcy estate and they should have no

4  ability to rope in any interests that anyone else would have

5  in those policy years, including the chartered organizations

6  and direct action claimants.  And so that --

7          THE COURT:  When you say they have no interest,

8  what do you mean?

9          MS. WOLFF:  It's my understanding that there may

10  have been a settlement of the Boy Scouts' interests in the

11  Hartford policies for '76 and '77.  And this was -- I say this

12  because it was raised in an objection to the disclosure

13  statement filed by the TCC in May, and so this has been an

14  objection that we've raised, but the Boy Scouts have not

15  clearly addressed whether they actually own an interest in the

16  Hartford policies in '76 and '77.

17          THE COURT:  Okay.  Mr. Linder?

18          MR. LINDER:  Your Honor, if you could give me a

19  moment just to confer with my colleagues?

20          THE COURT:  Yes.

21      (Pause)

22          MR. LINDER:  Your Honor, I think what Ms. Wolff is

23  describing -- I'm trying to get back to my page here -- it may

24  be discussed in the prefatory language that describes the

25  background that underlies the Hartford settlement.  And this

1  is paragraph 2 under the heading of "BSA-Hartford Background"

2  on page 109 of the disclosure statement.  There is a

3  contention that Hartford has made outside of litigation that

4  the BSA's access to certain of its policies is limited,

5  including a contention that we released and extinguished

6  certain policies for the period from January 1976 through 1978

7  through a prepetition settlement.  I believe that's what Ms.

8  Wolff is referring to.  Nonetheless, Your Honor -- and I don't

9  -- I have the list of policies that are subject to the sale,

10  it's appended to the Hartford term sheet.  I don't know if it

11  includes those policies or not, but, regardless, there is a

12  body of Hartford policies that were issued to BSA that are

13  proposed to be sold.

14          So, from my perspective, if there's no interest in

15  the policies, then I don't know what the issue is.  If we do

16  have an interest in them, then they're our property and we're

17  seeking to sell them.

18          MS. WOLFF:  Well, Your Honor, the issue is, if the

19  Boy Scouts don't have an interest in those policies and others

20  do, then how can there be a free-and-clear sale of non-estate

21  property?  How can it be free and clear of others' interests

22  if the Boy Scouts don't even have an interest?

23          And there's also the justification of giving

24  chartered organizations a broad release from doing nothing,

25  from staying quiet, beginning in 1976, just because they have

1   an interest in what (indiscernible) Boy Scouts insurance

2   policies when that may not even be the case.  And so that's

3   just the disclosure that we're requesting, do the Boy Scouts

4   actually have an interest in the 1976 and '77 policies.

5            THE COURT:  Well, that may be a disputed issue, as

6   I'm reading the disclosure statement.  If it's not a disputed

7   issue, then I would expect that it wouldn't -- when we get the

8   factual information that it wouldn't be listed as a policy,

9   but if it's a disputed issue, then I suspect the policy is

10  going to be on the list.

11           But I see what you're referring to, Ms. Wolff, and

12  just from the way this is written, Hartford has also contended

13  outside of litigation, I think there could be a disagreement.

14           MR. LINDER:  Your Honor, I would just point out,

15  I'm looking at Exhibit A to the Hartford term sheet, there are

16  two policies listed, these are the alleged -- known and

17  alleged BSA insurance policies issued by Hartford, there is a

18  1976 and a 1977 policy listed, and I defer to Mr. Anker and

19  Mr. Ruggeri as to whether they consider those policies to be

20  part of the sale or not.  I just merely point out the fact

21  that, notwithstanding the position that we've outlined in the

22  disclosure statement, those policies are in fact listed on the

23  schedules of the term sheet.

24           MR. RUGGERI:  Your Honor, James Ruggeri for

25  Hartford.  There is a dispute over the scope of the release

1  under those policies, and I think Mr. Linder and I will confer

2  about what information we can provide about the releases under

3  the 2010 agreement, but it is debtors' position that they did

4  retain an interest in those policies.

5          THE COURT:  Okay.  So we'll look for information on

6  that.  Thank you, Ms. Wolff.

7          Anyone else?

8          MS. WOLFF:  And I'm sorry, Your Honor, I did have a

9  further comment, a further objection, and just regarding the

10 Hartford settlement.  We're told that the -- that the debtors

11 are to settle with the chartered organizations and to secure

12 the chartered organizations' rights or claims to coverage

13 under Hartford abuse insurance policies, and so what hasn't

14 been disclosed is what happens if there's a failure to settle

15 with the chartered organizations and to secure the chartered

16 organizations' rights and claims under these insurance

17 policies.

18         THE COURT:  Thank you.

19         Do we have a risk factor on that, Mr. Linder, or is

20 that included somewhere else?

21         MR. LINDER:  Your Honor, I'm fairly confident we do

22 have a risk factor relating to the contingency that chartered

23 organizations, that there's no comprehensive solution for

24 them.  We're just checking.

25         THE COURT:  Okay.  Well, if there's not one, I

1   think one should just be added.

2           MR. LINDER:  We'll do that, Your Honor, if there's

3   not one.  Thank you.

4           THE COURT:  Thank you.

5           Anything else?

6           MS. WOLFF:  Nothing, thank you.

7           THE COURT:  Thank you, Ms. Wolff.  Okay.

8           MR. LINDER:  Your Honor, I think with that we can

9   move on to the TCJC settlement, if it's not -- I know the hour

10  is growing a little bit late, but I believe, Your Honor, if we

11  want to --

12          MR. STANG:  Your Honor, before we do that --

13          THE COURT:  Yes.

14          MR. STANG:  -- before we do that, I'm not quite

15  sure where we've left off.  Is it the debtor is supposed to,

16  having heard all these objections, come back with a response?

17  You said there's a lot of work to do and I agree, but I'm just

18  not sure what your expectations are.

19          THE COURT:  My expectation is that the email that

20  Mr. Linder talked about that's been circulated among the

21  various parties is going to result in some kind of a chart or

22  other information dealing with the insurance policies.  And I

23  understand that Mr. Rosenthal and Mr. Ruggeri will be working

24  with parties with respect to that and something that contains

25  facts, recognizing that there are disputes.

1           MR. STANG:  Right.  We haven't addressed -- and we

2    did a me-too on that email trail, by the way, Your Honor --

3    there was lots of questions asked by me, I believe by Mr.

4    Ryan, Mr. Zalkin and others, about trying to understand the

5    amount of the liability that the Hartford policies were meant

6    to cover and I didn't know where you came out on that.

7           THE COURT:  I think I -- the factual information is

8    going to be what these policies cover and it's going to --

9    we're going to see that.  And then people can take a look at

10   it, given all of the disputed issues that are out there, and

11   you can make your own assessment.  The debtors have made an

12   assessment and I guess we'll end up with a contested issue,

13   but let's get the basic information to people and recognize

14   that there are going to be disputes over coverage, there's

15   going to be disputes over the amounts of claims, there's going

16   to be disputes over how you would apply the scaling factors,

17   there's going to be all kinds of disputes.  So let's just get

18   the basic factual information out there.

19           Mr. Buchbinder?

20           MR. BUCHBINDER:  Thank you, Your Honor.  I wanted

21   to inquire as to how late the Court wanted to go tonight.  I'm

22   seeing the faces and I'm hearing everyone, and I think we're

23   beginning to lose our effectiveness and we might all be more

24   productive if we came back to this at 10:00 in the morning or

25   whatever time in the morning you want to start.

1          THE COURT:  Well, I was kind of debating which is

2  better, do I keep people here and we get done sooner or do we

3  -- or what.

4          Mr. Ryan?

5          MR. RYAN:  I was going to bring up the same issue,

6  Your Honor.  I know, you know -- and certainly I am coming

7  across as tired and I am, but going back to the being

8  productive, I know BSA and the local councils are working on

9  the documents we've been talking about for the last two days

10  with respect to the chartered organizations, they're not going

11  to turn that -- the last I heard from one of the local council

12  lawyers was it's going to be later in the week.  I think it's

13  probably not productive to argue over -- especially with

14  respect to the chartered organizations, to have argument over

15  the chartered organizations while we're trying to get

16  something productive accomplished.  We may spend a lot of time

17  arguing over things we don't need to and we may -- you know,

18  we may just go down roads we don't need to go.

19          My suggestion would be that we find out when things

20  can get turned and we come back -- with respect to the

21  chartered organizations we come back and, you know, let Your

22  Honor know the open issues.  I mean, there's been a lot of

23  references in the last two days as to those -- even raised --

24  issues I haven't raised but the carriers have raised or

25  plaintiffs have raised of stuff that's going to be going into

1   that -- into those documents, that's a lot of work to do.  I

2   appreciate how hard White & Case is working on all of that,

3   but I think, rather than argue about what should be in

4   something that I believe people are productively trying to

5   draft together, that maybe we take the time to get that and

6   then, if there are open issues, we come back on those open

7   issues.  I know that there are -- people have some of the

8   confirmation, confirmability disclosure statement objections

9   that they want to at least address with the Court, I don't

10  know about 6:30 tonight when we still have to come back to do

11  that.

12          So my suggestion would be we find out when we can

13  get that turn -- selfishly, of the documents that have yet to

14  be created for the charters, when we get that turn and maybe

15  that's the most productive way, rather than have 300 people on

16  Zoom for another eight hours tomorrow is let's have people

17  trading drafts and put pen to paper and come back later when

18  we can have more focused and intelligent discussions about

19  what remains.

20          MR. LINDER:  Your Honor, I'd like to suggest that

21  we take a five-minute recess, if we may, so that the parties

22  can discuss amongst themselves what an appropriate game plan

23  should be, and the debtors can put forward what they'd like to

24  achieve.  You heard our position yesterday in terms of the

25  need to move forward as efficiently as possible.

1            THE COURT:  Yes --

2            MR. SMOLA:  Your Honor, can I just raise one thing,

3  just to make things hopefully productive?  Mr. Linder, can you

4  --

5            THE COURT:  Mr. Smola.

6            MR. SMOLA:  -- if there is going to be a TCJC trust

7  -- sub-TDP or trust distribution procedure that's in process,

8  can you let us know that, so that -- that may be something we

9  can work offline on.

10            THE COURT:  Okay.

11            MR. LINDER:  We can -- yeah, we can have those

12  discussions.

13            THE COURT:  Okay.  Let's take ten minutes and we

14  can have discussions.  I would also like to know, since I have

15  on my calendar that tomorrow is an omnibus day, what is --

16  what else is there on that schedule.  So you can let me know

17  when we get back.

18            MR. LINDER:  I'll let you know when we get back,

19  Your Honor.

20            THE COURT:  Okay.  Thank you.  We're going to take

21  ten minutes.  We're in recess.

22        (Recess taken at 5:52 p.m.)

23        (Proceedings resumed at 6:06 p.m.)

24            THE COURT:  Okay, this is Judge Silverstein.  I

25  think I'm a few minutes late, but let's see where we are.

1      (Pause)

2          MS. LAURIA:  Your Honor, this is Jessica Lauria.

3  We were just sidebarring with the White & Case conference

4  room; they should be coming online any moment now.

5          THE COURT:  Sure.

6          MR. LINDER:  We are back.  Thank you, Your Honor,

7  for permitting us that brief recess and it was productive.

8          What we propose to do, Your Honor, is just to

9  outline I think how the debtors would like to proceed and then

10 maybe ask a few questions of the Court, if we may.  What we

11 propose to do for the balance of today, Your Honor, is just

12 complete what we think is really the last issue, which is the

13 TCJC settlement, I think that would be a productive use of

14 time and hopefully not take too much time.  And then I think

15 we should talk about tomorrow.

16         Your Honor had asked prior to us breaking for that

17 short recess what was on the limited agenda for tomorrow.  My

18 recollection, Your Honor, is that there were four matters

19 scheduled for hearing tomorrow, two of them have been

20 submitted under certification of counsel, and so we would not

21 think that any hearing would be required on those matters.

22 One was the motion for an extension of the period, the removal

23 period under Section 1452; one was an uncontested motion to

24 settle a non-abuse litigation claim and that was the Lehr

25 motion.  There are two motions as to which a pro se objection

1   has been filed, those are also motions to settle non-abuse

2   litigation claims.  I think we can get through that agenda

3   tomorrow, Your Honor, in less than an hour.

4           So we would propose to start the day tomorrow with

5   that agenda.  And then, Your Honor, I think we have three DS

6   issues left, the first of those would be any confirmation

7   issues.  From the debtors' perspective, we believe we've fully

8   briefed all of the issues that have been characterized as

9   potentially rendering the disclosure statement -- I'm sorry,

10  the plan patently unconfirmable.  What we'd ask is if Your

11  Honor is inclined to hear any argument on those matters and if

12  you could give us an indication of whether you are and, if so,

13  which of those issues you're inclined to hear argument on

14  tomorrow.  I think that would be the first of the DS issues we

15  would turn to after the agenda tomorrow for the omnibus.

16          THE COURT:  Okay.  Well, I was planning to re-

17  review those tonight to see what was on the list.

18          MR. LINDER:  Your Honor, we have a cheat-sheet

19  here, if it would be helpful to --

20          THE COURT:  I'm looking at your list at the end of

21  the chart.

22          MR. LINDER:  Okay.

23      (Pause)

24          MR. SCHIAVONI:  Your Honor, I would ask you to give

25  some thought to possibly doing --

1           THE COURT:  I'm hearing someone.

2           MR. SCHIAVONI:  -- that argument, which we could

3    limit to an hour or two, at the end -- you know, when we

4    finally turn the full disclosure statement.

5           THE COURT:  I'm thinking that I'm willing to hear

6    some answers, but if what you were saying is that -- I'm

7    willing to hear some of these arguments, but I'm probably

8    going to limit the amount of time that each person can raise

9    their arguments, because I did read the objections and

10   responses and, while I think I might be able to give some kind

11   of comment -- and I hesitate to do that because apparently in

12   May I changed the direction -- you would think I changed the

13   direction of a case in May when I had no intention of doing

14   so, so I hesitate to do that, but I will tell you quite

15   candidly, I am doubtful that I'm going to buy an argument that

16   something is so -- that something in the plan is patently

17   unconfirmable and that there would be no way that the plan can

18   be confirmed.

19           I understand the complexities of this plan.  When I

20   say that, I say I understand the issues, these issues that

21   people have stated, not that I have made up my mind on the

22   complex issues that are involved, but that there are complex

23   issues involved.  And the -- so I'm doubtful that I'm going to

24   find that this plan shouldn't be sent out for a vote, but I am

25   willing to hear people's, I would suggest to you, best

1  argument that you have among the many that you may have made,

2  as to why I shouldn't solicit this plan.

3          And I will say where I would like to focus some

4  time is on the solicitation procedures to make certain that if

5  we do solicit the plan that we do so in a way that's

6  appropriate under the circumstances of this case.  And I plan

7  to spend some time with those solicitation procedures to make

8  sure I fully understand them and recognize that just because

9  it's always been done this way before is not perhaps going to

10  be the answer to how it should be done here.

11          So the parties have raised issues with respect to

12  voting, and those of you involved in Imerys know that in that

13  case I just on Monday had a hearing related to the vote of one

14  master ballot and I haven't ruled yet on whether that person

15  will be permitted to change their vote, but it raised a host

16  of issues.  And in particular I'm going to be looking at the

17  certification that's required to submit a master ballot.  I

18  want to make sure that the lawyers who do so understand the

19  seriousness with which I take that certification, the

20  diligence that they should be doing to ensure that they can

21  vote their clients' claims, and that they -- and that they're

22  certifying to me that their clients have abuse claims in this

23  case.  And so I'm going to be taking a look at that

24  certification in particular.

25          So I'm very interested in the solicitation

1  procedures and that's going to be as much a focus, if not

2  more, of mine in what I have a chance to take a look at than

3  the confirmation-related issues.  So I hope that's helpful in

4  terms of you preparing for argument in front of me.

5          Mr. Rosenthal, you have a question?

6          MR. ROSENTHAL:  I do, Your Honor.  What you just

7  said suggests something -- and of course my phone would go off

8  right when you said it -- suggests something to me.  I mean, I

9  wonder whether it's more effective given your guidance to

10  spend tomorrow, or maybe Friday too, having the debtor turn

11  the disclosure statement so we know what we're talking about

12  in terms of the disclosure statement document.  We can come

13  back to the Court the first part of next week, we can argue --

14  we can make the arguments to the extent that we want to about

15  patently unconfirmable, but also, and more importantly

16  perhaps, we can be prepared to talk with you about these

17  solicitation issues and, you know, we could wrap it up -- we

18  could wrap it all up then.

19          I do think that the solicitation is going to be

20  quite an interesting subject for this particular case because

21  of things that have happened here and because of what happened

22  in Imerys on Monday.  And I also would point out to the Court

23  the interesting fact that you know that we have a mediation

24  scheduled for Thursday and Friday of next week.

25          MR. LINDER:  Your Honor, if you want to respond to

1  that, I'm happy to stand down, but we had a proposed game plan

2  that I was only about halfway through when Mr. Rosenthal --

3            THE COURT:  Okay.

4            MR. LINDER:  -- made his comments.  What we were

5  going to propose, Your Honor, and I think in light of your

6  helpful guidance and your focus on solicitation, what we would

7  propose is to, after the limited agenda tomorrow, we can go

8  straight to solicitation, the debtors are ready.  The

9  solicitation procedures have not changed in quite some time,

10  unlike the plan itself.

11            So really the other two issues left are

12  solicitation and scheduling; we would propose to address both

13  of those issues tomorrow.

14            In parallel, Your Honor, we've been keeping track

15  of all of the disclosure statement revisions, and the

16  supplemental inserts and charts and so forth, and the debtors

17  are committed to filing by Friday at close of business a

18  proposed solicitation version of the disclosure statement.

19  What we would further suggest, keeping in mind, Your Honor,

20  that you have a busy schedule and we're aware of that,

21  scheduling sometime next week, perhaps a short -- even an hour

22  to go through those limited changes to the disclosure

23  statement to the extent that there are any outstanding issues

24  among the parties.  So that puts us, the debtors, in a

25  position where we can continue to adhere to our very tight

1  time frame.

2          THE COURT:  Okay.  Thank you.

3          Mr. Patterson?

4          MR. PATTERSON:  Your Honor, I just wanted to

5  mention that, according to my checklist, I'm not sure we have

6  fully discussed the other of the three pillars -- the third of

7  the three pillars to the plan as Mr. Linder described, the

8  participating chartered organization settlement and associated

9  mechanism.  So I think there's two big bites left on the

10 disclosure.

11         And we completely concur with Your Honor regarding

12 solicitation.  We have a number of inputs with respect to that

13 that we hope will be helpful to the Court.

14         THE COURT:  Okay.  Yeah, I think the suggestion

15 from Mr. Ryan was that since parties are working on the

16 participation -- the participating chartered organizations

17 global issue that we not address that tonight, and to me makes

18 some sense because we'll have something we can circulate and

19 then see if there are remaining issues.

20         I'm assuming that the debtors want to go forward

21 with the TCJC issues because -- to see what's out there.  And,

22 quite frankly, it would be nice to see what's remaining and to

23 know what needs to be worked on.  With the chartered

24 organizations, we know there's work and we know it needs --

25 it's at least in progress.  So I'm tempted, even though it's

1  6:25, to get those issues out there on TCJC and let's just see

2  what they are, if we can.

3           And for tomorrow I would like to take the agenda

4  items, the non-disclosure statement items first, so that

5  whoever is participating in that, if it's a pro se person --

6  and I don't know and Mrs. Johnson isn't here to know whether

7  that person has registered to participate.  I certainly have

8  had active participation by some pro se parties, so I don't

9  know, but I'd like -- I'm going to take that first.  I'll look

10 at the other matters tonight too.  And I want to keep us on

11 track, so what I'm trying to figure out is the best way to

12 address the solicitation issues.  Maybe what we do, to give

13 some people a little bit more time, is to -- and make sure

14 they're focused on them -- is I'll take the omnibus at 10:00

15 and maybe we'll start the solicitation procedures at 1 o'clock

16 Eastern.

17          MR. SCHIAVONI:  Judge, if I could just be heard on

18 the solicitation.  We filed a very in-depth --

19          THE COURT:  Mr. Schiavoni.

20          MR. SCHIAVONI:  -- we filed a very in-depth brief

21 on it.  Your Honor, you know when we moved on the 2004 we

22 brought it up at every hearing thereafter.  We issued

23 subpoenas within 48 hours of the order being entered

24 authorizing the subpoenas to the chartering -- chartering --

25 to the aggregators.  They're document subpoenas, that's what

1  was -- those were initially authorized.  They're not

2  returnable until the 24th; we don't have compliance from any

3  of them right at this moment yet.  It's like those documents

4  are -- you know, inform the record about what happened here.

5            Your Honor, we did make, I think, a robust record

6  about the submissions of the proofs of claim on which the

7  votes will be based.  The signatures, we have uncontested

8  evidence in about those signatures, but to actually close out

9  on the breadth of the abuses and specifically who they were by

10  we needed to take -- I mean, I know like taking any counsel

11  depositions is the last thing anyone wants to do, but we

12  needed to take some at least.  Mr. Kosnoff, for instance,

13  specifically in his 2019 refers to abuses by an unnamed

14  person.

15            You know, I can go forward with these document

16  subpoenas, we'll get those documents, but it's like we needed

17  some of those -- and Your Honor indicated that you'd sort of

18  come back and address that issue -- it's like we needed at

19  least a small number of them to kind of like flesh out, you

20  know, the full extent of it.  We can argue it on the record

21  you have before you, but it's like, you know, we did

22  everything we could at every stage to move this record

23  forward.  There's been an enormous amount of like discussion

24  about disclosure of everything except discussion about the

25  disclosure of these claims and how we got to 82,000.

1          So I do think that material, if you schedule the

2    argument after the revised disclosure statement was before

3    you, you know, in another week or two, you'd have a full --

4    you know, you'd have at least what responses we get from the

5    aggregators in that time and, if we could take two or three of

6    the lawyer depositions in the interim, I think it would flesh

7    out what -- you know, some of the things that happened.

8          THE COURT:  Well, I appreciate that, but I think

9    we're going to start and I'll see if I have enough information

10   to be able, with the assistance and benefit of everyone

11   thoughts, to be able to craft something that's going to be

12   able to address the issues that may come up at confirmation in

13   the context of how we solicit.  So I'm going to start that and

14   we'll see where we are.

15         Mr. Ryan?  You're muted, Mr. Ryan.

16         MR. RYAN:  Thank you, Your Honor.  I was going to

17   say, at least with respect to the chartereds, there's two

18   issues, which is one on solicitation.  I think they're really

19   going to follow the plain language, getting to the plain

20   language document for chartered organizations, because one of

21   the -- the first thing you'll hear out of me is 16 pages of

22   the plan cut-and-paste into a ballot that's not going to all

23   chartered organizations isn't going to do it, it needs to be a

24   plain English ballot.  I know how frustrated my mom is when

25   she gets some class action notice and calls me up and can't

1  make -- you know, four or five pages that have, you know, been

2  gone over and gone over by a district court judge, the ballot

3  is incomprehensible.

4         So, at least from my perspective, if we're going to

5  get the plain English explanation, they should be plain

6  English ballots, so the ballots are going to follow the form

7  of the work we have yet to do.  I would love to get this all

8  behind us.  I will tell you that, if we spend and consume a

9  day in court tomorrow, there's no way, not having seen a

10  single turn of anything and the documents that didn't exist as

11  of yesterday morning that have to be created whole cloth with

12  respect to the chartered organizations and all the issues we

13  have here, there's no way there's going to be anything

14  consensual that we don't have to come back for if the debtors

15  want to spend a day in court tomorrow and also then file

16  something close of business Friday that they think is

17  solicitation-ready with respect to chartered organizations.

18         I think we are all much better served getting to

19  solicitation if we can do some of that wood-chopping on

20  drafting now, I think it will make solicitation arguments go

21  easier, I think it will get us more quickly to a place -- if

22  they're going to file something on Friday, I won't have ahead

23  of time to really review it.  We're going to have a longer

24  hearing sometime next week to discuss it. I really think it

25  makes sense to draft (indiscernible) on the last two days.

1  I'm not trying to drag this out.  Let's come back Monday or

2  whatever it is, but the more time we have to draft

3  consensually for all this wood there is to chop I think is

4  better than spending another ten hours in court tomorrow.

5           That's just my plea to you.  If we want to do

6  something like TCJC tomorrow that's kind of isolated to get

7  something out of the way while other people are drafting,

8  maybe that makes sense, but I just -- I hear Mr. Linder's

9  proposed schedule and it's admirable, but then I hear that I'm

10 going to then spend eight hours in court tomorrow and I don't

11 know when they're going to get me, you know, the -- and I

12 don't know how long it's going to be.  I mean, I know the

13 Coalition's plain English is 30 pages long and people still

14 don't agree whether that's plain English or not.  It's going

15 to take more than the 24-hour turnaround to do these things,

16 so let's be honest about that and let's use time efficiently

17 so that we can get everything turned around before Your Honor

18 with as few issues as possible, because the one thing I can

19 guarantee Your Honor after the last 18 hours in court is

20 there's going to be open issues that people don't agree on

21 with respect to chartered organizations -- you know, facing

22 the chartered organizations and then also from the plaintiffs

23 as to what's disclosed about them for the plaintiff-facing

24 disclosures.

25           THE COURT:  Well, I can guarantee Mr. Linder that

 1   we're not looking at a one-hour hearing next week.

 2        (Laughter)

 3            THE COURT:  So that's not like within the realm of

 4   reality.

 5            MR. RYAN:  But that's just -- and I -- that's my

 6   suggestion, Your Honor, is I see the amount of drafting that

 7   has to be done and there are a lot of people who are trying to

 8   do some little bits of work here.  I know I promised Mr.

 9   Molten, you know, something yesterday that I thought I'd be

10   able to turn to and I haven't been able to turn to.  We're not

11   getting the work on our desks moved along and I think this

12   case would benefit -- and getting two solicitations and

13   getting this phase passed us, let's all give it some time for

14   pencil and paper.

15            MR. LINDER:  Your Honor, I can assure you as an

16   initial matter White & Case is taking the lead on drafting and

17   it is far more than just the plain English chartered

18   organization work product.  We're working around the clock to

19   make sure that we get this done for our client and for the

20   estates, that we move this case along as quickly as we can.

21            So, again, we reiterate, we'd like to get these

22   documents as far along as we can by the end of the week, we'd

23   like to file them.  We'd like to come back next week.  I

24   understand Your Honor's comment that it's going to take more

25   than an hour and that's fine, provided that you have the

1  availability, but we really would like to continue to push

2  through so that next week we could be in a position where we

3  put all these issues behind us.

4         THE COURT:  Well, I hear Mr. Ryan on the need to be

5  able to take a look at the documents that are going to be

6  turned, but -- so I think -- so I understand an argument that

7  a day off to focus on that is helpful, but if the debtors want

8  to go forward tomorrow, recognizing that that could create

9  problems for counterparties having time to review documents or

10  time to be working on the work that they have based on the

11  last couple of days, then we can do that.  There's some

12  tradeoffs to that.

13         MR. LINDER:  Could we ask Your Honor, Your Honor's

14  availability next week?

15         THE COURT:  Yeah, I was afraid you were going to do

16  that.

17      (Laughter)

18         THE COURT:  So I had a one-day trial come off on

19  Monday, so that's now open.  I supposedly have a sale hearing

20  on Tuesday, but that's been kicked many times and I can't tell

21  you whether that's going to go forward or not.

22         I have time Wednesday afternoon.  I'm guessing I

23  have time on Thursday and I know my Friday is free.  I need to

24  shore up some of this with Mrs. Johnson.  I'm guessing that

25  what's probably going to come off -- if anybody here can tell

1   me what's on for Cyrus on the 30th, that would be great.  I

2   can't think of a thing that should be on, but I don't know.

3        MR. LINDER:  I think if we could take solicitation

4   tomorrow in any event, Your Honor, because that may require

5   changes to documents as well and that can be done over the

6   weekend in advance of a hearing next week, whatever date that

7   might be on, that would be our suggestion.

8        THE COURT:  I'd like to start solicitation tomorrow

9   in the afternoon, whatever time I said, which I don't even now

10  remember, and because that may take longer than we think and

11  I'd like to hear some arguments.

12        And I understand, Mr. Schiavoni, that you believe

13  additional information might be helpful, but I read your

14  papers and I think you probably have enough to make your

15  arguments on.

16        Mr. Goodman?

17        MR. GOODMAN:  Yes, Your Honor.  And I had put my

18  hand up before you said that, but in support of what Your

19  Honor just said, I would just like to note -- and I was not in

20  attendance at the Imerys hearing on Monday, I heard about it,

21  and I just wanted the Court to know that what -- the

22  procedures that we, you know, worked on and proposed here were

23  not based on Imerys, they actually are patterned off of the

24  PG&E procedures.  And the reason why I just wanted to flag

25  that for the Court right now is that the firms in PG&E that

1 used the master ballot did not report 100 percent yes, they

2 did not report 100 percent no, that's not how it works.  The

3 firms functioned more as hubs in terms of collecting votes,

4 but the clients were the ones who voted, and that's more in

5 line with what we think should happen in this case.

6        So, if the Court is concerned that this could be a

7 repeat of Imerys, if you do look at the procedures and they

8 look at all similar to Imerys, I would tell you that that is

9 an amazing coincidence.  I personally have not read the Imerys

10 procedures and I don't even know how they work, but that was,

11 you know, clearly not our intent and my hope is that it's not

12 a day-long hearing for that reason.

13        THE COURT:  Thank you.  And let me say, since I'm

14 commenting on another case when I don't have counsel in front

15 of me -- not to suggest that the procedures themselves were

16 problematic, but they raise concerns that I see no reason not

17 to strengthen the procedures in a different case.  And there

18 is one aspect at least that I will not repeat in any other

19 case, but -- and that's this presumption issue.  But, aside

20 from that, this was on its own facts an issue for me, so -- of

21 a very specific law firm.

22        So, in any event, I will take a look at this.

23 We're going to start tomorrow -- what time did I say?

24        COUNSEL:  I believe we're at 10 o'clock, Your

25 Honor.

1    MR. LINDER:  Start the omnibus at 10 o'clock --

2    THE COURT:  Ten o'clock is the omnibus.

3    COUNSEL:  And 1 you said for the solicitation.

4    THE COURT:  Yeah, 1 for the solicitation.  So if

5 you're not interested in the omnibus hearing, which I can't

6 imagine most of you are, you have no -- you do not need to

7 show up for that.

8    MR. STANG:  And should we use the link applicable

9 to the omnibus?

10    THE COURT:  You know what, good question.

11    MR. ABBOTT:  Your Honor, Derek Abbott here.  We

12 have heard from Ms. Johnson, she did want us to remind

13 everyone that it is a new, fresh link tomorrow, I believe it's

14 on the omnibus agenda and folks who have signed up should have

15 received a separate new login, and we understand that to be

16 good for the balance of the day, Your Honor.

17    THE COURT:  Okay.  Thank you, Mr. Abbott.

18    MR. STANG:  Thank you, Mr. Abbott.  Thank you, Your

19 Honor.

20    THE COURT:  Any other logistical questions?

21    MR. LINDER:  Were we going --

22    THE COURT:  Okay.  So are we hitting TCJC tonight?

23    MR. LINDER:  That would be our proposal, Your

24 Honor.  I think, given that it's the last domino here, we

25 think we should tip it over.

1          THE COURT:  Okay, let's see if it can be done

2    quickly and, if not, we'll at least see what we've got here.

3          MR. LINDER:  Okay.  Your Honor, as you're aware, at

4    the same time the debtors entered into the superseding

5    Hartford agreement, we also entered into a settlement with the

6    Church of Jesus Christ Latter-day Saints, that is summarized

7    in Article 5(r)(4) of the disclosure statement, which is at

8    pages 117 to 122 of the redline in terms of our summary and

9    explanation of the settlement.

10          The terms of the settlement, Your Honor, is that

11   TCJC is going to contribute $250 million, plus its rights

12   under the -- what are defined under the plan as the abuse

13   insurance policies, to the supplement trust, and those will be

14   contributed upon the confirmation order and affirmation order

15   having become final and non-appealable.  In exchange for those

16   contributions, TCJC will become a contributing chartered

17   organization under the plan and receive the benefits of the

18   injunctions and releases as a protected party.

19          Like the Hartford settlement, Your Honor, the TCJC

20   settlement is supported by the Coalition, the FCR, the ad hoc

21   committee, and attorneys representing more than 81 percent of

22   holders of direct claims.  Again, it's structured in a similar

23   fashion, appended to the sixth mediator's report with the term

24   sheet, attached to that as Schedule 1 is the list of

25   supporting state court counsel.

1          Like the Hartford agreement, Your Honor, the

2    debtors have a fiduciary out under the TCJC settlement.  There

3    is no fee, administrative expense payable in connection with

4    the exercise of that fiduciary out.

5          The disclosure statement outlines the other salient

6    terms of the settlement, including the history of -- the long

7    history of the relationship between the Boy Scouts and TCJC,

8    the justification for the settlement, other factors supporting

9    the reasonableness of the settlement, and the other material

10   terms that are set forth in the term sheet.

11         Your Honor, we believe that there is comprehensive

12   disclosure with respect to this settlement.  If parties wish

13   to be heard, we would cede the podium to them.

14         THE COURT:  Okay.  And where -- can you direct me

15   to the disclosure statement pages that I should be looking at?

16         MR. LINDER:  Yes, Your Honor, it is page 117 of the

17   redline and I think it's five pages, so it ends -- it begins

18   on 117 and ends on 122, Your Honor.

19         THE COURT:  Thank you.  Okay.

20         Mr. Goodman?

21         MR. GOODMAN:  Yes, Your Honor, I wanted to speak on

22   this just to make one point very, very clear for the record.

23   Again, Eric Goodman, Brown Rudnick, counsel for the Coalition.

24         The trust distribution procedures that were filed

25   back in July state and make clear that the contribution being

1  made by a chartered organization like the TCJC is already

2  earmarked for abuse victims who have Scouting-related claims

3  against the TCJC, and that's something that was done before

4  the TCJC settlement came into being, before a term sheet with

5  the TCJC was drafted and filed with the Court.  And I just

6  want to note that I think the fact that the Coalition, and at

7  the time working with the TCC and the FCR, agreed that

8  chartered organization contributions like this would be

9  earmarked and allocated in this way I think did help

10  facilitate us reaching a settlement with the TCJC because they

11  knew going into it that, if they did make a contribution, that

12  those funds would go to survivors who have TCJC-related

13  claims.  And I just wanted to be very clear that that's how

14  the trust distribution procedures currently work and that's,

15  you know, how they have worked for some time.

16          THE COURT:  Let me ask you another question because

17  it's already come up.  In terms of the vetting of TCJC/BSA-

18  related claims, are the scaling factors and the valuations the

19  same as for all other claims?

20          MR. GOODMAN:  The earmarking of the settlement

21  funds really speaks to the payments that will be made to the

22  claims.  How the claims are evaluated under the matrix and the

23  various, you know, factors that would adjust, there would be a

24  slight modification because the current claims matrix would

25  scale a claim down if the survivor has a claim against a

1  chartered organization that is not a protected party with the

2  expectation being that they would pursue potential recovery

3  against that chartered org if they didn't choose to release it

4  in connection with the trust.  Since the TCJC is making a

5  contribution of $250 million plus other rights that are being

6  assigned, that scaling factor obviously would not apply to

7  those claims.  But other than that the answer is, yes, that

8  they would be evaluated in essentially the same way.

9           I thought you were going to ask me about how we

10  were going to make certain that only TCJC claims were paid

11  and, if you have that question, the answer was going to be

12  that's one of the issues that we're still working on in the

13  document agreement that we're trying to get resolved.  But we

14  are trying very hard to make sure that we have an appropriate

15  process in place so that we can work with the TCJC to make

16  certain that these funds are appropriately allocated and

17  distributed.

18           THE COURT:  Thank you.

19           Mr. Stang?

20           MR. STANG:  I think Mr. Smola should go first.

21           THE COURT:  Sure.  Mr. Smola?

22           MR. SMOLA:  Thank you, Jim.  Thank you, Your Honor.

23           I wanted to just provide very briefly a real world

24  example of how this is complicated for plaintiff's lawyers to

25  explain to their clients.  I have a case that is filed in

1   Arizona, it is a timely-filed case; there are no statute of

2   limitations issues with respect to that case.  The individual

3   began Sunday school at the age of nine; he began to be

4   sexually abused by his TCJC Sunday school teacher between the

5   ages of ten and about twelve.  That Sunday school teacher then

6   started a Scout troop in connection with the TCJC and

7   continued to abuse him for another three years.  The TCJC's

8   own documents state that the bishop and his counselors oversee

9   all aspects of Scouting within the TCJC.

10          So I have a case where the genesis of the abuse is

11  the connection to the LDS.  I don't understand, fundamentally,

12  how that claim is treated with respect to this $250 million

13  settlement.  I don't know whether the claim is enhanced

14  because the abuse started earlier, I don't know whether I need

15  to object to the entirety of the settlement to preserve my

16  client's rights in Phoenix, so that he can continue to pursue

17  his tort claim against the TCJC.  I don't have any sort of --

18  it's been referred to as a sub-TDP, I don't have any

19  information about how that claim will be valued in that siloed

20  money that goes towards TCJC victims.  And I have reached out

21  to TCJC repeatedly on this and other claims and not received

22  answers.

23          So, frankly, there's virtually nothing disclosed

24  other than the number with respect to the TCJC settlement and

25  I'm under no -- I'm in no position to advise that client

1  whether to vote yes or no or whether to file objections.

2          TCJC has the hardest issue in the entire case and

3  that is to deliver non-consensual third party releases to an

4  entity that has no continuing business relationship with the

5  BSA and has, you know, frankly, over the life of this case

6  increased its net assets by about $9 billion.  There's no -- I

7  think if you asked their attorneys they would say, we can pay

8  full value on all of these claims.  And that's a real issue

9  for me when I advise these clients as to what to do moving

10  forward.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Linder.

14          MR. LINDER:  Your Honor, the allocation of the $250

15  million to holders of claims, Scouting-related abuse claims

16  that involve TCJC, from the debtors' perspective, this is

17  really a matter of timing and source-waiting.  This concept,

18  as Mr. Goodman mentioned, it exists in the TDP.  The $250

19  million will be used to pay TCJC claimants and only TCJC

20  claimants under the matrix without any alterations as compared

21  to holders of claims that relate to other chartered

22  organizations and still those holders are paid in full in

23  accordance with the matrix.

24          That is the most straightforward way I think we can

25  articulate what is proposed to be done with the settlement

1  contribution.

2          THE COURT:  Okay.  And so there's no sub-TDP, as

3  Mr. Smola referenced, and I don't read any sub-TDP.

4          MR. LINDER:  No, there's only one TDP, Your Honor,

5  and it's the TDP that's attached to the plan I think as

6  Exhibit 1, that is the TDP.  There may be sections of the TDP

7  that pertain to some claimants and others, this would be one

8  example where there would be a source waiting, you take the

9  funds contributed from TCJC and allocate them to a specific

10  population of claimants, but, no, there's no separate TDP.

11          MR. SMOLA:  So, Your Honor, could I ask --

12          THE COURT:  But within that allocation, within that

13  allocation, that subset of claims, then they'll be evaluated

14  pursuant to the TDP and then paid out pro rata pursuant --

15  which might not be quite the right word, but pursuant to the

16  TDPs and --

17          MR. LINDER:  Correct.

18          THE COURT:  -- and their ultimate resolution of a

19  claim by the settlement trustee.

20          MR. LINDER:  Yes, Your Honor.

21          THE COURT:  Okay, let me ask a further question.

22  Then in Mr. Smola's example the young boy started -- I think

23  he said started Sunday school at nine and then, three years

24  later, the TCJC employee started a Boy Scouts troop.  The

25  claims that that young boy may have, that man now may have for

1  ages nine through twelve that's unrelated to BSA, as I

2  understand the factual scenario, is that in any way being

3  released, that claim, under the plan?

4          MR. LINDER:  The key aspect, Your Honor, of what

5  you just articulated is you said that if the claims are

6  unrelated to BSA.  Again, I think we've said it before and

7  we'll say it again, we are not purporting to enjoin claims

8  against chartered organizations for abuse that are unrelated

9  to BSA and Scouting.

10          THE COURT:  And that's the answer I expected to

11  hear, but I wanted to make sure I heard it.

12          MR. SMOLA:  Well, I don't know how to parse out

13  these two claims.  I mean, if TCJC wants to represent they are

14  not going to move to dismiss any of the claims in Arizona that

15  we have articulated that predate BSA's involvement, then that

16  would be great; I don't think that is what the releases in

17  this case call for.

18          THE COURT:  Well, I can tell you that I don't see,

19  at least at this point, how I could possibly release under any

20  circumstance, under any -- under any view of third party

21  releases liability unrelated to the BSA.

22          MR. SMOLA:  Okay.  Thank you, Judge.

23          THE COURT:  Thank you.  I think that was a helpful

24  example just to again emphasize what I think is the case and

25  how I read the plan.  And if TCJC thinks otherwise, which I

1  doubt they do, they need to rethink their position.

2          Mr. Stang.

3          MR. STANG:  Thank you, Your Honor.  Your Honor, my

4  comment goes to basically the same issue that I raised in

5  connection with the Hartford settlement.  The disclosure

6  statement goes to great pains to state that these TCJC claims,

7  which total I guess what has been tendered to the TCJC 7700,

8  but if you look at the paragraph on page 118, the second full

9  -- first full paragraph, they break out a little bit how this

10 number developed.  There was first a tender of 2850 claims,

11 and then there was an additional 650 and then there was

12 another 4700.  So -- and the last sentence of that paragraph

13 says that the debtors have identified those claims, I assume

14 in doing so they actually reviewed the claims.  Again, the

15 debtors should tell the TCJC survivors how much on the dollar

16 is being paid given the debtors' valuation of the proofs of

17 claim.

18          THE COURT:  Well, let me hear a response.

19          MR. LINDER:  Your Honor, I think we've had this

20 exact discussion now in several different contexts.  Again,

21 telling -- for us sitting here at the disclosure phase, for us

22 to be able to tell claimants who have asserted abuse claims

23 that relate to TCJC what the value of their claims are is not

24 possible.  We can apply the same -- you can apply the same

25 methodology that we've discussed in terms of the proportion of

1   claims that are TCJC-related and how that relates to our

2   aggregate range of our valuation, but what Mr. Stang is asking

3   for is not something that we will be able to provide through

4   disclosure.

5          MR. STANG:  So, Your Honor, I -- using very rough

6   math, if ten percent of the claims in the case are TCJC

7   claims, should I then assume that the liability -- for

8   disclosure statement purposes that the liability is whatever

9   ten percent of -- 270 million to 400 -- to 700 million?  I

10  mean, is that what -- if that's what Mr. Linder is saying --

11         THE COURT:  I think --

12         MR. STANG:  -- then that --

13         THE COURT:  -- I haven't seen the Bates -- I

14  haven't seen the Bates White analysis, but I assume there's

15  all kinds of assumptions within that analysis, and for anyone

16  to know what the amount of their claim is or the aggregate

17  amount of any particular groups of claims is is -- is a number

18  on which people are going to disagree.

19         MR. STANG:  Well, I have no -- Your Honor, I don't

20  dispute that at all --

21         MR. LINDER:  We (indiscernible) Your Honor to make

22  assumptions about --

23         MR. STANG:  Excuse me, Mr. Linder, I was speaking

24  to the Court.

25         I understand there will be a dispute about this,

1  but the Boy Scouts have put out a value range, they know,

2  because Bates White has looked at every single claim, how many

3  of those claims are TCJC claims, be it 7,000 or 2400, which is

4  a number that was bandied about, or a much lower number that

5  was presented at mediation.  All I'm saying is, given that

6  they have done the analysis, they should be able to tell TCJC

7  claimants what they believe the values are for those claims.

8           And so, Your Honor, we went through this with

9  Hartford.  I really don't understand why this is so hard to

10  do.  They have analyzed every single claim in this case.

11          THE COURT:  With all kinds of assumptions.

12          MR. STANG:  Right, so there are assumptions.  So

13  what?  Let them --

14          THE COURT:  And so giving someone information with

15  all kinds of assumptions is not really then giving them any

16  information.

17          MR. STANG:  Why?

18          THE COURT:  Mr. Patterson.

19          MR. PATTERSON:  Thank you, Your Honor.  Just a

20  couple of points.

21          First, I just wanted to note that the debtors'

22  estimates of recovery -- and I'm looking at page 261 under

23  footnote 105 -- provides estimates of recovery that include

24  the TCJC settlement effectively being spread across all claims

25  for purposes of establishing that average.  I think for

1  purposes of disclosure it seems to me that the $250 million

2  TCJC contribution should be excluded from that calculation in

3  terms of coming up with an aggregate percentage.  I see Mr.

4  Linder nodding, so I think I'm on a roll.

5          MR. LINDER:  I was having a sidebar, Mr. Patterson.

6          What I think I can tell you is that the TCJC amount

7  has been excluded from the bottom of the range and it has been

8  included in the top end of the range.  So just to give a

9  little bit more color on what that footnote is describing.

10  And we would be happy to clarify it to the extent helpful.

11          MR. PATTERSON:  I really think the preferred

12  disclosure would be to exclude it because those aggregate

13  percentage numbers look what people are going to receive.  You

14  could put in the footnote that the percentage will be

15  increased for holders of TCJC related claims by the 250.

16          MR. LINDER:  That's fine, Mr. Patterson.

17          THE COURT:  I think that is a fair comment.

18          MR. LINDER:  Thank you.

19          MR. PATTERSON:  See I knew it.

20          Second, Your Honor, I just wanted to note that on

21  page 239 where affected waiting is described.  I will give you

22  a minute.

23          THE COURT:  Okay.

24          MR. PATTERSON:  That source effected waiting

25  provides only that the settlement trustee will establish a

1  portion of non-BSA sourced assets.  So it is not specified

2  that these are going to be, as Mr. Goodman indicated or

3  implied, earmarked.  Now maybe the TCJC settlement agreement

4  will provide for earmarking, but all this does is say a

5  percentage.  There is a lot of room between 199.

6           MR. ROSENTHAL:  Your Honor, I'm sorry.  Mr.

7  Patterson, what page are you referring to?

8           MR. PATTERSON:  239.

9           MR. ROSENTHAL:  Thank you.

10          THE COURT:  Okay.  Can you respond?  I may need to

11  hear that again, but Mr. Linder may have gotten what you said.

12  Go ahead.

13          MR. LINDER:  I would be happy to respond, Your

14  Honor.  The language that Mr. Patterson is referring to on

15  Page 239 is under heading (indiscernible) and what it states

16  is that notwithstanding the initial payment percentage and

17  supplemental payment percentage is applied a portion of non-

18  BSA sourced assets shall be allocated among, only among abuse

19  claims that essentially relate to a particular chartered

20  organization.

21          THE COURT:  Okay.

22          MR. LINDER:  Mr. Patterson is focusing on the words

23  a portion of from -- I think this is really -- I think this is

24  actually technically correct.  I think you could add a word or

25  maybe two words to make it more clear.  I was really intended

1  to mean all or a portion of.  100 percent is a percentage.  I

2  think it also bears keeping in mind, however, that depending

3  on how the trustee processes claims that relate to TCJC may,

4  in fact, be the case that $249 million of the $250 million is

5  sufficient to satisfy all of those claims in full in which

6  case the million dollars would be to holders of claims that

7  relate to other chartered organizations or local councils.

8           MR. GOODMAN:  Your Honor, if I might interject.  I

9  actually think the language as drafted is already clear on

10  this issue.  If you look at the definition of non-BSA sourced

11  assets and, again, the TDP was drafted long before there was a

12  TCJC settlement.  The definition refers to any assets received

13  in connection with the global settlement involving the debtors

14  or the settlement trust on the one hand and a chartered

15  organization that becomes a protected party on the other hand.

16           There could be more then one chartered organization

17  in this case that decides to make a substantial contribution

18  and become a protected party under the plan.  So, again, if

19  the TCJC is coming in then, obviously the portion that it is

20  contributing would be so earmarked if there is another

21  settlement with another chartered organization I think we

22  would expect the same treatment.

23           We didn't have the benefit or the knowledge at the

24  time.  I think this was put together to know that we would

25  have, you know, one at this point.  That, I think is the

1  explanation for the reason why it says portion if that is

2  helpful.

3          THE COURT:  Because the definition of non-BSA

4  sourced assets is an aggregate sort of definition and not an

5  entity by entity definition.

6          MR. GOODMAN:  Yes.

7          MR. PATTERSON:  I think --

8          THE COURT:  It could be clearer though that if it

9  comes in from a specific non-BSA source that that is going to

10  be earmarked for the claims that relate to that non-BSA

11  source.  That is the issue as I'm hearing it.

12          MR. PATTERSON:  This was the only reference I could

13  find to source waiting anywhere.  It didn't provide for

14  earmarking. It provided for a discretionary set aside.  So if

15  Mr. Goodman or Mr. Linder could point to me where the

16  earmarking provision of the plan, the TDP, the  trust or some

17  other document is then I would be relieved and that would

18  resolve my question.

19          THE COURT:  Yeah, I think there needs to be some

20  reference -- why don't you give this a shot and we will take a

21  look at it and see. I understand the issue.  I understand what

22  I'm hearing is no disagreement about the issue, it's just a

23  question of the language to ensure that non-BSA sourced assets

24  that comes from a particular chartered organization goes to

25  creditors who hold claims against that chartered organization.

1          MR. LINDER:  I think this could be well served,

2  Your Honor, to Mister (indiscernible) point from an additional

3  sentence or two just clarifying rather than have to trace the

4  definition back to the TDP.

5          THE COURT:  Fair enough, let's do that.

6          MR. PATTERSON:  Third, Your Honor, I just wanted to

7  go back to your statement that your understanding of the plan

8  was that it does not and could not release claims that are

9  unrelated to the BSA.  At the moment there is nothing in this

10  plan that says that and I think one of the reasons why people

11  are concerned is that the definition of abuse claim provides

12  that it is enjoinable.  I'm on the plan, its definition 18.

13          THE COURT:  I'm with you.

14          MR. PATTERSON:  So what it says is that -- and I

15  mean let us just start by admitting that a 26 or 28 line

16  definition is, itself, a bit of challenge; however, if we just

17  start and take it in chunks the first 12 lines is it means a

18  liquidated claim.  Then there is a proviso that is about 12

19  lines down.  With respect to that proviso it says that with

20  respect for contributing chartered organization it's limited

21  in certain ways.

22          Then it provides -- I'm just trying to find the

23  words.  I am on the redline plan.  Is the court on the clean

24  or the redline?

25          THE COURT:  I'm on the redline.

1           MR. PATTERSON:  So at the top of page 5 on the

2    redline about eight lines down you will see that it says

3    protected party or limited parties allege to be responsible in

4    connection in whole or in part with the contributing chartered

5    organization in sponsorship in one or more scouting units.

6    That is the operative definition at the moment.

7           The kinds of cases that Mr. Smola was describing

8    and that other people are dealing with are cases where -- I'm

9    going to let the court read for a minute.

10          THE COURT:  I'm with you.

11          MR. PATTERSON:  Okay.  Thank you, Your Honor.

12          Are cases where individual survivors are abused

13   inside the scouting context, outside the scouting context.

14   And there is -- abusers don't confine their abuse to a

15   specific context.

16          THE COURT:  Sadly.

17          MR. PATTERSON:  Yeah.  And so Mr. Smola -- the case

18   Mr. Smola described is someone who was abused first outside

19   the scouting context and then later inside the scouting

20   context.  There are cases that are the reverse.  There are

21   cases where individual perpetrators associated with a

22   chartered organization have clerical responsibilities, non-

23   clerical responsibilities, periodic scouting responsibilities

24   and over time abuse individuals in all those contexts.

25          So I think it's very important for us to understand

1  this because when we come to define -- first, appreciate that

2  our view is that in these contexts what is really happening is

3  that the Boy Scout involvement is extremely incidental to the

4  abuse that is taking place. And what's happened is that an

5  employee or volunteer associated with a chartered organization

6  is abusing people.  Sometimes they do it as a scout and

7  sometimes they do it not as a scout.  This is with respect to

8  the chartered organizations responsibility and liability as a

9  matter of state law.

10          The Boy Scouts are a completely irrelevant party to

11  this dispute.  They may, in some circumstances, they or the

12  local council, may constitute an additional defendant because

13  some of the abuse took place in the scouting context or

14  because of that.  But the BSA is only an incidental defendant

15  to this.  The core of the action, what Ms. Dumas described

16  yesterday in plaintiff's terms, the target defendant, who did

17  it?  It's a chartered organization.

18          So you are going to hear from us more.  This is

19  really a confirmation issue, Your Honor, but the reason we

20  wanted the court to hear from Mr. Smola, Ms. Dumas yesterday,

21  Mr. Zalkin is to understand and appreciate, as I'm sure the

22  court does, but understand it in certain factual contexts that

23  the liability that on the face of it is sought to be released

24  here is completely separate from the Boy Scouts.

25          So we're going to have to work on this.  I don't

1 | have an answer today other then, you know -- I don't have an
2 | answer today that will keep Mr. Linder nodding, I will put it
3 | that way.  But this is a major, major issue and we don't think
4 | that this kind of conduct can properly be enjoined or that
5 | people, entities like the TCJC, can buy a pass by making a
6 | contribution to a trust in the BSA and get a clean bill of
7 | health with respect to their liability.

8 |          THE COURT:  Okay.  And I think of this maybe
9 | improperly and I was never, you know, a plaintiff's lawyer.
10 | So I am speaking way out of turn.  I think of this as the case
11 | going to trial against all these various defendants and a jury
12 | having to apportion liability as to each defendant.  And each
13 | case could be different, right.  So each case turns on its own
14 | specific facts and each case is different.

15 |          If, for example, in the way you are couching the
16 | claim, with BSA being, what you say, incidental, although I've
17 | seen many lawsuits where BSA is a defendant, and if a jury
18 | apportioned 10 percent of liability, and I am, obviously,
19 | making up numbers, to BSA and 20 percent liability to the
20 | chartered organization, the BSA chartered organization, and 50
21 | percent to the church, and whatever is left 20 percent
22 | somewhere else what I view, so I need to be corrected if I'm
23 | wrong, as being released here, assuming I can grant the
24 | releases, is the 10 percent to the BSA and the 20 percent to
25 | the chartered organization, but not the 50 percent allocation

1 to the church unrelated to BSA.

2         I know juries make these kinds of allocations all

3 the time about a particular defendant's share of liability.

4 So that is, sort of, how I thought about the BSA's share and

5 the third-party releases.  I could be thinking of it

6 incorrectly.  So people can correct me on this, but I don't

7 see how I can release, in this context of the BSA bankruptcy,

8 assuming releases are even appropriate, liability unrelated to

9 BSA.

10         We can quibble about what related to BSA means, but

11 this example that --

12         MR. PATTERSON:  Mr. Smola.

13         THE COURT:  Smola, thank you.  That Mr. Smola, I

14 lost your picture.

15         MR. SMOLA:  Sorry, Judge.  I tried to get back on

16 quickly.

17         THE COURT:  This example that Mr. Smola gave me I

18 think highlights the issues appropriately as to what we are

19 dealing with here and chose the complications here.  That one

20 where you can see abuse before BSA was even on the scene I

21 think highlights the issue.

22         For me, unless I can be persuaded otherwise, that

23 first three years and perhaps beyond, but the easiest part is

24 to pull off the first three years not releasing here.  It's

25 not going to be released here.  So I hear the issues and I

1  understand the importance of them.  And I understand their

2  complicated.

3          MR. MONES:  Your Honor, may I speak?  This is Paul

4  Mones.

5          THE COURT:  Mr. Mones?

6          MR. MONES:  Good afternoon, Your Honor.  I have not

7  spoken at the hearing, these hearings over the last few days I

8  think probably except for maybe one or two people I have been

9  doing this a little bit longer than most other people on the

10 Zoom here.

11         I think your analysis is exactly correct.  I think

12 that the way that the Boy Scouts over the years have dealt

13 with charter organizations individual liability, that is to

14 say a priest who runs the Boy Scout and also runs altar boys

15 or Evan Smola's excellent example.  I don't think the Boy

16 Scouts themselves, and I would like to hear from them if they

17 disagree, I don't think they will, ever expected that they

18 would be releasing liability for the actions of -- and I like

19 that priest qua priest, I haven't heard that since law school,

20 but the act description, and I think we got really, really

21 complicated here and I think it's fairly simply.

22         I think Your Honor encapsulated this very clearly

23 and I think we just have to size up the language to make it

24 clear, but based experientially, if that counts for anything,

25 in litigation over the last 25 or 30 years where the church

1  has run, whether it's a catholic church or a protestant church

2  and you have a minister running a scout troop, or a rabbi in

3  the case I had, that person had a completely different

4  liability because their employment agreement was completely

5  different.  Often times they are paid employees as opposed to

6  volunteers and the insurance architecture is completely

7  different.

8          Anyway, thank you for the opportunity.  I basically

9  was just giving you, in essence, a pat on the back in terms of

10 that is exactly the correct analysis.

11         THE COURT:  I'm having a good day.

12         Needless to say, but I guess maybe we should say

13 this, the perpetrator is not being released here either.  That

14 is not envisioned in any way, in any fashion, in the plan, the

15 TDP's or elsewise.

16         Mr. Janci?

17         MR. LINDER:  Your Honor, we carved perpetrators out

18 from every possible aspect of plan releases.

19         THE COURT:  Yes, from day one. I know the Boy

20 Scouts intended to do that.  I just thought it would be

21 appropriate to say that.

22         Mr. Janci?

23         MR. JANCI:  Thank you, Your Honor.  Can you hear me

24 okay?

25         THE COURT:  I can.

1          MR. JANCI:  Well I appreciate the court clarifying

2    its views on claims that are solely or primarily liability

3    based or a liability for the TCJC.  I have litigated many

4    claims on behalf of victims against TCJC and we are concerned

5    about that issue.

6          Just one example in this bankruptcy we filed a

7    claim in Federal Court in Oregon against the LDS Church only

8    alleging abuse that was only related to the LDS Church

9    expressly saying that it was not related to the Boy Scouts. It

10   was added to the schedule in this case and stayed.

11         So we're glad to hear that the court is taking an

12   appropriate view of the scope of releases, but I just wanted

13   to offer that because it explains, in part, why there is

14   concern on behalf of some of the victims' lawyers in this

15   case.

16         And since I don't want to outstay my welcome I just

17   wanted to comment on two other items.  One, specific to the

18   disclosure statement about the TCJC settlement and the issue

19   of TCJC liability.  There is no discussion about the fact that

20   the TCJC has independent documentation about its own notice

21   about sexual abuse and perpetrators in the TCJC.  I think that

22   that is important that victims be told what is going to happen

23   with that type of documentation and whether it's going to be

24   available because under the TDP whether there are other

25   victims is a factor.  The church has its own red flags.  It

1  has its own documentation and there is no discussion in the

2  disclosure statement about whether victims will have any

3  access to that in proving up their claims.

4          Secondly, there is a statement that the TCJC

5  predominately participated in scouting in states that

6  currently have closed statutes of limitations such as Utah.

7  That is a quote.  There is no information provided about

8  claims in other states where the TCJC had an expansive

9  presence including Oregon, Washington, California, New Mexico,

10  Arizona, Montana; all states that have either windows or

11  liberal statutes of limitations.

12          I think personally that that statement in the

13  disclosure statement creates an impression that the statute of

14  limitations is an instrumentable hurdle on most of these

15  claims and I think survivors deserve to have more specific

16  information about that.

17          I am happy to answer any questions, Your Honor, but

18  those are my comments.

19          THE COURT:  Thank you.  Can you tell me where that

20  statement is, do you know, in the disclosure statement or Mr.

21  Linder who is just totally fluent in this may also know that.

22          MR. LINDER:  It is approximately 117 of the BS

23  redline.

24          THE COURT:  So, Ms. Lauria, Mr. Linder has earned

25  his pay today, his bonus.  See I put in a plug for you.

1          (Laughter)

2          MS. LAURIA:  We'll be ordering a copy of the

3  transcript and submitting it to management.

4          UNIDENTIFIED SPEAKER:  How do you keep track of

5  that, Mr. Linder?  Approximately 117, second paragraph.

6          MR. LINDER:  So I think there is a statement, on

7  the statement with respect to closed states such as Utah.  I

8  believe it's -- it should be --

9          UNIDENTIFIED SPEAKER:  Bottom of 118, top of 119.

10         THE COURT:  Yes.

11         MR. LINDER:  I see.  So the first four words on

12  page 119, Your Honor, at the end of the sentence.  We can

13  certainly add more context around this, Your Honor.

14         As Mr. Janci stated, Utah is certainly not the only

15  state in which TCJC related claims arose.  I don't think

16  anyone intended to opt from this to that implication.  So to

17  the extent it would be helpful, Your Honor, we can certainly

18  add discussion with the other states.

19         THE COURT:  I think so.  Again, that is a factual

20  issue, so let's make it factual.

21         Okay.  I see that Mr. Goldberg's hand has been up

22  for quite some time.  So Mr. Goldberg?

23         MR. GOLDBERG:  Thank you, Your Honor.  Adam

24  Goldberg of Latham & Watkins on behalf of the Church of Jesus

25  Christ of Latter Day Saints.

1            I thought it would make sense for me to just

2    briefly address one or two points before the court if the

3    objectors have concluded their remarks.

4            THE COURT:  I waited to get to you till the end and

5    I don't see any other hands.  So, yes, please.

6            MR. SMOLA:  Your Honor, I apologize.  I have one

7    last small objection.

8            THE COURT:  Okay.

9            MR. SMOLA:  It's to the definition or the

10   construction of the word "earmarked."  I don't think that the

11   disclosure statement is specific as to whether this is

12   earmarked for 7,700 claimants, which has been a number bantied

13   about in terms of TCJC responsibility, or whether it is

14   earmarked for 2,300 claimants or 300 claimants or 50

15   claimants.  I think that information should -- just to give a

16   rough idea to our clients as to how this money is being

17   distributed would be useful.

18           Thank you.

19           MR. LINDER:  Your Honor, on that point that is

20   necessarily a disputed factual issue.  We just don't know at

21   this point, really, the earmarking of the funds, $250 million,

22   they're earmarked for holders of allowed claims through the

23   TDP that are determined to be TCJC claims.

24           So while the debtors believe it's on the higher end

25   of the range between -- I think the TCJC analysis shows about

1  300 claims and ours shows something much higher.  That number

2  will only be ascertained through the trust distribution

3  process.

4          THE COURT:  I think that is what we know is we are

5  not going to know the holders of valid claims against the

6  church until that claims process is through.

7          MR. SMOLA:  Can we implement a range saying that

8  TCJC claims only 300 valid claims, BSA claims it maybe upwards

9  of 7,000.  I mean do I explain to a client that they should

10 expect, on average, $100,000 or $600,000.

11         THE COURT:  Well that is hard because that is such

12 a factor.  It's not only the number of claims, but it's the

13 type of claims and that it's the scaling factors.  That is why

14 that is a very difficult thing to do.  I understand where you

15 are coming from and why you want that information, but I am

16 not sure --

17         MR. SMOLA:  TCJC has the information.  They have

18 evaluated the claims.

19         THE COURT:  Well they may have a very different

20 view of the validity of some of these claims.

21         Let me hear from Mr. Goldberg.

22         MR. GOLDBERG:  Thank you, Your Honor.  Again for

23 the record Adam Goldberg of Latham & Watkins on behalf of the

24 Church of Jesus Christ of Latter Day Saints.

25         Just on this last point I think the disclosure

1   statement does state already that in the church's analysis the

2   number is that our analysis found that 324 claimants that the

3   debtors identified related to the church may have value in the

4   tort system. So I think that would be one aspect of the range,

5   but, again, whether the outcome of that issue would, again, be

6   subject to the TDP's and claims resolution.

7           I think, Your Honor, I just wanted to make a very

8   brief remark understanding our and the context of this

9   hearing.  First, which is really that I agreed with Mr.

10  Patterson's remark that this is a confirmation issue.  The

11  scope in terms of the release that would be provided to the

12  church and other contributing chartered organizations is

13  something that we look forward to addressing with the other

14  parties before Your Honor.  We welcome the positions taken by

15  the various parties and the remarks from Your Honor at this

16  hearing.  We look forward to continuing dialog behind the

17  scenes with the parties as this process continues.

18          For the purposes of this hearing, as a disclosure

19  statement hearing, we do think that the disclosure statement

20  adequately describes the terms of the release which I think

21  the definition of abuse claims is really one of the key

22  aspects as identified in both the term sheet that was filed

23  with the mediators report as well as the latest plan.

24          I think the discussion before the court today was

25  helpful in helping to frame the issues that would be before

1  the court at confirmation.  For the purposes of today we do

2  not have a positon on any particular claim and I think that I

3  took the discussion in the context of hypotheticals as opposed

4  to reaching any conclusions before this org as to whether or

5  not any claims asserted by any individual will or will not, in

6  fact, be covered by the release and by what amount.  We look

7  forward to further discussions before the court on these

8  issues in connection with confirmation.

9          THE COURT:  Thank you.  And, obviously, I wasn't

10  speaking to any particular claim because there is no

11  particular claim in front of me, nor, quite frankly, would

12  there ever be because I am not entitled to determine personal

13  injury claims, a specific injury claim.

14          I think you have my views, everyone has my views,

15  nowhere I think I can go.  Again, if there is some argument to

16  the contrary I will certain hear that at confirmation, but

17  this is where I think it comes down assuming releases, I can

18  grant the third-party releases in this context at all.  I am -

19  - so we are definitely talking hypothetically about scenarios.

20          Mr. Zalkin?

21          MR. ZALKIN:  Thank you, Your Honor.  I have a

22  question and it's really in response to what I just heard from

23  Mr. Goldberg. I just want to make clear Mr. Linder, on behalf

24  of the debtor, made it very clear that his understanding of

25  the debtors' position is that non-scouting related activity,

1  you know, on the part of the TCJC or any other sponsor is not

2  to be included in the releases you have indicated is your

3  inclination.

4          Does Mr. Goldberg, is he prepared to make that same

5  representation on behalf of the TCJC?

6          THE COURT:  Well I don't know that I'm going to put

7  him to that -- this isn't cross examination of Mr. Goldberg.

8          MR. ZALKIN:  I'm not cross examining him.  I'm just

9  trying to understand is do we have a meeting of the minds.  He

10  is indicated that the current definition of abuse is adequate

11  and we feel that that is a broad definition because it

12  includes anything related to scouting and related to can have

13  -- it legally can have a lot of different meanings and conduct

14  where scouting is introduced through a perpetrator in scouting

15  and that is subsequently continued to be abused in another

16  context.  In some states that is related to scouting and could

17  create liability on the part of whatever the scout

18  organization it's an issue.

19          So I just want to make sure that we're all on the

20  same page in this disclosure that the conduct that is not

21  related to scouting, for example, in Mr. Smola's example, that

22  is not being released and the Mormons agree to that, the

23  debtor agrees to that.  That is what should be the defined in

24  the disclosure statement clearly.  I am just trying to

25  understand is that the case.

1          MR. SMOLA:  I am going to echo Mr. Zalkin and it

2   has very practical reasons for this case.  In my factual

3   scenario that I presented to the court do I need to file an

4   objection to a non-consensual third-party release in this case

5   for that client or do I not need to because TCJC is not going

6   to move to dismiss that complaint in Arizona based on its own

7   conduct.  It's very practical.  It will dictate how many

8   objections this court gets.

9          THE COURT:  I would like you guys to have that

10  discussion offline and let's see where we end up.  One thing

11  that I think that we all know, even though we try to avoid it,

12  is I can rule on what is in front of me and how another court

13  will interpret it is not something that I can control.  I

14  could think of different fixes to this issue, but I'm going to

15  let you guys talk.  I am not going to make Mr. Goldberg make a

16  statement on the record on his client's position which he may

17  or may not be prepared to do and he's just heard my expressed

18  views of things.  I think it's consistent.

19          If, in fact, the church believes something

20  different then what I have stated then there may not be a

21  settlement, I don't know.  So I think for tonight's purposes

22  the conversation has been useful, it's been useful to me and

23  hopefully useful to those at the hearing, the ones who have

24  stuck it out here.  So that is where I think we're going to

25  leave it for tonight.

1           Are there any other issues related to TCJC so that

2   we make sure, and in a sense I think it has been useful that

3   both the debtors and the church understand the issues

4   certainly for purposes of disclosure statement, but they know

5   what may be coming down the pike at confirmation or what you

6   may be able to, in fact, agree upon so that we don't have

7   those confirmation objections.

8           (No verbal response)

9           THE COURT:  I am not seeing any further hands.

10           MR. PATTERSON:  We're here for people to talk to us

11   when they want to talk to us, Your Honor.

12           THE COURT:  I think everybody should be talking.

13   Thank you.

14           So I think that is the end of tonight.  I am going

15   to see people who are interested in those couple of non-

16   disclosure statement issues at 10 tomorrow morning.  I will

17   see the rest of you at one to discuss or, at least, begin

18   discussion solicitation issues.

19           MR. ABBOTT:  Your Honor, just one more reminder.

20   New link for tomorrow should be good for all day.  Everybody

21   should have that.  It's not today's link.

22           THE COURT:  Thank you, Mr. Abbott.  Everyone check

23   on the new agenda, the agenda for tomorrow.  Thank you.

24           Thank you to everyone.  I appreciate everybody's

25   participation today.  We're adjourned.

1          (Proceedings concluded at 7:33 p.m.)

2

3                          CERTIFICATE

4

5          We certify that the foregoing is a correct transcript

6  from the electronic sound recording of the proceedings in the

7  above-entitled matter.

8
   /s/Mary Zajaczkowski              September 23, 2021
9  Mary Zajaczkowski, CET**D-531

10

11 /s/Coleen Rand                    September 23, 2021
   Coleen Rand, AAERT Cert. No. 341
12

13 /s/William J. Garling             September 23, 2021
   William J. Garling, CE/T 543
14

15 /s/ Tracey J. Williams            September 23, 2021
   Tracey J. Williams, CET-914
16

17

18

19

20

21

22

23

24

25