1

<pre>
 1                      UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                                   .
 6                                 .  Courtroom No. 6
                                   .  824 Market Street
 7            Debtors.             .  Wilmington, Delaware 19801
                                   .
 8                                 .  Monday, March 21, 2022
     . . . . . . . . . . . . . . . .  10:00 a.m.
 9

10
                    TRANSCRIPT OF ZOOM TRIAL (DAY 6)
11         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
12

13   APPEARANCES:

14   For the Debtors:          Derek C. Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT
15                                & TUNNELL, LLP
                               1201 North Market Street
16                             16th Floor
                               Wilmington, Delaware 19899
17

18

19

20   Audio Operator:          Brandon J. McCarthy, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1    APPEARANCES (CONTINUED):

2    For the Debtors:              Jessica C. Lauria, Esquire
                                   Andrew W. Hammond, Esquire
3                                  Glenn M. Kurtz, Esquire
                                   WHITE & CASE, LLP
4                                  1221 Avenue of the Americas
                                   New York, New York 10020
5
                                   Michael C. Andolina, Esquire
6                                  111 South Wacker Drive
                                   Chicago, Illinois 60606
7
                                   Jesse Green, Esquire
8                                  Southeast Financial Center
                                   200 South Biscayne Boulevard
9                                  Suite 4900
                                   Miami, Florida 33131
10

11   For the US Trustee:           David L. Buchbinder, Esquire
                                   OFFICE OF THE UNITED STATES TRUSTEE
12                                 J. Caleb Boggs Federal Building
                                   844 King Street
13                                 Suite 2207, Lockbox 35
                                   Wilmington, Delaware 19801
14

15   For AIG, on behalf of
     Certain Insurers:             James Hallowell, Esquire
16                                 Mitchel Karlan, Esquire
                                   GIBSON DUNN & CRUTCHER, LLP
17                                 200 Park Avenue
                                   New York, New York 10166
18
                                   Betty Yang, Esquire
19                                 2001 Ross Avenue, Suite 2100
                                   Dallas, Texas 75201
20

21   For the Roman Catholic
     Ad Hoc Committee:             Jeremy W. Ryan, Esquire
22                                 POTTER ANDERSON & CORROON, LLP
                                   1313 North Market Street
23                                 6th Floor
                                   Wilmington, Delaware 19801
24

25

1  APPEARANCES (CONTINUED):

2  For the Ad Hoc
   Committee of Local
3  Councils of the Boy
   Scouts of America:          Joseph C. Celentino, Esquire
4                              WACHTELL, LIPTON, ROSEN & KATZ
                               51 West 52nd Street
5                              New York, New York 10019

6
   For The United Methodist
7  Ad Hoc Committee:           Edwin G. Rice, Esquire
                               BRADLEY ARANT BOULT CUMMINGS, LLP
8                              100 North Tampa Street
                               Suite 2200
9                              Tampa, Florida 33602

10
   For Liberty Mutual
11 Insurance Company:          Kim V. Marrkand, Esquire
                               MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
12                               AND POPEO, PC
                               One Financial Center
13                             Boston, Massachusetts 02111

14 For the Official
   Unsecured Creditors'
15 Committee of Guam:          Christine D. Arnone, Esquire
                               STINSON, LLP
16                             1201 Walnut Street
                               Suite 2900
17                             Kansas City, Missouri 64106

18
   For Lujan & Wolff
19 Claimants:                  Delia Lujan Wolff, Esquire
                               LUJAN & WOLFF, LLP
20                             238 Archbishop Flores Street
                               DNA Building, Suite 300
21                             Hagatna, Guam

22
   For Dumas & Vaughn
23 Claimants:                  Gilion C. Dumas, Esquire
                               DUMAS & VAUGHN, LLC
24                             3835 NE Hancock Street
                               Suite GLB
25                             Portland, Oregon 97212

1    APPEARANCES (CONTINUED):

2    For the Roman Catholic
     Diocese of Paterson:        Warren J. Martin, Jr., Esquire
3                                Rachel A. Parisi, Esquire
                                 PORZIO, BROMBERG & NEWMAN, PC
4                                100 Southgate Parkway
                                 Morristown, New Jersey 07962
5
     For Gemini Insurance
6    Company:                    John E. Baay, II, Esquire
                                 GIEGER, LABORDE & LAPEROUSE, LLC
7                                701 Poydras Street
                                 Suite 4800
8                                New Orleans, Louisiana 70139

9    For Tort Claimants:         Alan Kornfeld, Esquire
                                 PACHULSKI STANG ZIEHL & JONES LLP
10                               10100 Santa Monica Blvd., 13th Floor
                                 Los Angeles, California 90067
11
     For Zalkin and Pfau
12   Cochran:                    Thomas Patterson, Esquire
                                 KTBS LAW LLP
13                               1801 Century Park East, 26th Floor
                                 Los Angeles, California 90067
14
     For Century Indemnity
15   Company:                    Tancred Schiavoni, Esquire
                                 O'MELVENY & MYERS, LLP
16                               Times Square Tower
                                 7 Times Square
17                               New York, New York 10036
18
     For the FCR:                Kevin Guerke, Esquire
19                               Robert Brady, Esquire
                                 YOUNG CONAWAY STARGATT & TAYLOR LLP
20                               Rodney Square
                                 1000 North King Street
21                               Wilmington, Delaware 19801

22   For the Coalition of
     Abused Scouts for
23   Justice:                    Cameron Moxley, Esquire
                                 BROWN RUDNICK LLP
24                               7 Times Square
                                 New York, New York 10036
25

1                                INDEX

2    MOTIONS:

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6

7    WITNESSES CALLED
     BY THE DEBTORS:                                         PAGE
8

9          MAKEDA MURRAY
           Direct examination by Mr. Green               23
           Cross-examination by Ms. Yang                 29
10         Cross-examination by Ms. Dumas                56
           Cross-examination by Mr. Moxley               83
11         Redirect examination by Mr. Green             87

12

           CHARLES BATES
13         Direct examination by Mr. Kurtz               90
           Cross-examination by Ms. Dumas               248

14

15

16

17

18

19

20

21

22

23

24

25

1                                    EXHIBITS

2   <u>EXHIBITS</u>:

3   JTX - 1540

4   JTX - 1501

5   JTX - 1598

6   JTX - 1500

7   JTX - 1544

8   JTX - 1600, 1601, 1602, 1603

9   JTX - 1503

10

11  <u>EXHIBITS</u>:

12  DDX - 9 through 43

13  DDX - 77 through 83

14

15
    <u>DECLARATIONS</u>:                                    <u>PAGE</u>
16
    1) Declaration of Makeda Murray                      29
17
    2) TCJC Declaration                                 244
18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:03 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here for the Boy Scouts of America

4  bankruptcy case, 20-10343, for our continued confirmation

5  hearing.

6          Let me remind all of those who are not speaking to

7  mute your audio, as well as your video.  Thank you.

8          Mr. Abbott.

9          MR. ABBOTT:  Good morning, Your Honor.  Derek

10  Abbott of Morris Nichols here for the debtors.

11          Your Honor, I'm going to turn it over to Ms. Lauria

12  for some preliminary matters today, if I may.

13          THE COURT:  Yes.  Ms. Lauria.

14          MS. LAURIA:  Good morning, Your Honor.  Jessica

15  Lauria, White & Case on behalf of the Boy Scouts.

16          Your Honor, we thought it might make sense to begin

17  the week with a discussion of what we think this week is

18  going to look like and get some guidance from the Court as we

19  look towards next week because, unfortunately, I think we're

20  not going to be completely done with both our case-in-chief

21  and the insurers' case-in-chief.  I think we'll be done, but

22  I don't believe they will.

23          So, just walking through the week, as we see it,

24  today, we're starting with Makeda Murray with the Bates White

25  firm.  She'll -- her direct is by declaration.  There may be

1   some limited live direct of her, in light of some of the

2   opposition that we heard to her CV, but we expect that that's

3   going to be very limited, and Jesse Green from White & Case

4   is going to be presenting her.  We understand the certain

5   insurers have around 30 minutes of cross-examination, as well

6   as Ms. Dumas, I believe, has indicated she has about 30

7   minutes of cross-examination.

8           We'll then move right into Dr. Charles Bates.  Mr.

9   Kurtz is going to be presenting Dr. Bates.  We think Mr.

10  Kurtz's direct will last around three hours.  We do have a

11  handful of parties that have indicated they want to cross-

12  examine Dr. Bates.  The certain insurers have indicated they

13  need approximately two hours, Ms. Dumas has indicated she

14  needs approximately one hour.  And then we've also been

15  advised by both the FCR and the TCC that they would like to

16  cross-examine Dr. Bates.  We don't have a time period yet for

17  their cross-examination.  But it is our hope and our

18  expectation that, despite the number of parties that want to

19  cross-examine Dr. Bates, we would like to get him off the

20  stand today, if possible.

21          Tomorrow, we're expecting three witnesses:

22          First, the FCR Mr. Patton will be examined

23  tomorrow.  He submitted a declaration as his direct

24  testimony.  As I understand it, there have been a number of

25  objections to that declaration, which may necessitate some

1    live direct testimony from Mr. Patton.  We also understand

2    that, I believe either Ms. Lujan or the Guam TCC intends to

3    cross-examine him.

4         Chris Medill (phonetic) from the Survivor Working

5    Group will go on.  And this, you'll recall Mr. Andolina

6    indicated when we were, I think, at the end of the day

7    Friday, that Mr. Medill, who is a survivor, wanted to address

8    the Court.  We expect that will take about an hour.  Arik

9    Preis from the Akin Gump firm is actually going to be

10   handling his direct examination, and no one has indicated

11   that they want to cross-examine him.

12        And then, finally, we'll close out Tuesday with

13   Nancy Gutzler.  Ernest Martin from Haynes and Boone will

14   handle her direct examination.  It will be a short direct

15   examination to compliment her declaration.  We understand

16   that the certain insurers have about an hour of cross.  And

17   there may be another party, I can't recall if it was Ms.

18   Dumas or Ms. Lujan Wolff who also indicated that they had a

19   brief cross-examination of Ms. Gutzler.

20        We're hoping that that -- we get through all of

21   those witnesses by the end of the day on Tuesday, so that

22   we're kicking Wednesday off with the two TCJC witnesses that

23   were identified, as well as Katie Nownes, who's the

24   representative from Omni, the claims and solicitation agent.

25        And then Aaron Lundberg, who is the youth

1  protection expert that was retained by the debtors.  We would

2  expect to have -- he may not be crossed at all, but that

3  could spill into Thursday morning, if my estimates are too

4  optimistic.

5          So, by the time we get into Thursday, if this all

6  holds true, I think the debtors will be done with their

7  evidentiary case-in-chief, and then we will be turning to the

8  plan opponents.

9          As I understand it, the certain insurers still have

10 eight witnesses that they intend to call live on direct, so

11 not by declaration.  And I understand the Lujan claimants

12 still -- while they indicated they had a number of parties,

13 we've been working with them to narrow the issues with

14 respect to those parties.  And I think, as I sit here today,

15 Ms. Lujan Wolff will call two live witnesses who are

16 survivors in her group.  And that would be the rest of the

17 evidentiary presentation, subject to potential rebuttal

18 issues, which we'll address as they come up.

19         So that's how we see the evidentiary presentation.

20 No matter how I slice it, Your Honor, I don't see us

21 concluded by Friday.  So one of the issues we wanted to raise

22 with the Court today was the Court's calendar for the

23 continued evidentiary presentation, as well as for closing

24 arguments.

25         THE COURT:  I do not have my calendar in front of

1  me.  I will get it.  But yes, I don't see us finishing this

2  week.

3        (Pause in proceedings)

4        THE COURT:  So, next week we have been trying to

5  keep open.  I do have some matters Wednesday morning, I don't

6  know whether they're going to come off or not.  And I have a

7  commitment Friday morning that's definite.  So that, on

8  Friday, we wouldn't be starting until probably noon.  I have

9  to double-check that, but probably noon, no earlier.

10        Mr. Moxley.

11        MR. MOXLEY:  Good morning, Your Honor.  Just very

12  quickly, I wanted to note -- it's Cameron Moxley of Brown

13  Rudnick on behalf of the coalition.  Just a flag.

14        Ms. Lauria had mentioned there were a number of

15  parties who had intended to cross-examine Dr. Bates.  The

16  coalition may -- emphasis on "may," Your Honor -- have some

17  questions for him, as well.  I just wanted to provide that

18  for the Court.  Thank you.

19        THE COURT:  Thank you.

20        Mr. Hallowell.

21        MR. HALLOWELL:  Thank you, Your Honor.

22        Similarly, by way of update, I wanted to make clear

23  I believe, in the recitation of expected cross-examination

24  for the FCR, the Lujan claimants, and the Guam claimants were

25  included.  I just wanted to make sure that the certain

1  insurers are included in that, as well.  We will expect

2  cross-examination of the FCR.  And as for the others, on

3  Tuesday, it remains to be seen.

4           THE COURT:  Okay.  Thank you.

5           MS. LAURIA:  Your Honor, if I may.  And we

6  appreciate the additional time that you're able to provide

7  us.  I know it's pretty extraordinary to get three weeks out

8  of a Federal Bankruptcy Judge's calendar, sitting in

9  Delaware, so we very much appreciate that.

10          One, I guess, followup question is:  Assuming we

11  can get through the insurers and the Lujan Wolff evidentiary

12  presentation next week, are you -- is it the Court's desire

13  to immediately go into closing arguments at the conclusion of

14  the evidence?  Certainly, from the debtors' perspective, as

15  you know, we're trying to keep a very tight time line here,

16  so we can get in front of the District Court for affirmation,

17  and then ultimately cause the plan to go effective.

18          If Your Honor confirms the plan, and we're

19  obviously very optimistic that that will happen, but wanted

20  to understand, from the Court's perspective, if, at this

21  point, you've formulated any views on when you would like

22  closing?

23          THE COURT:  I'm going to want closing shortly after

24  the end of the evidentiary presentation.  I'll probably want

25  a day or so to prepare for that, myself.  And I'll have a

1  better sense of that as we continue, and I'll give a date for

2  that.  But I will want at least a moment to prepare for that.

3         MR. HAMMOND:  We understand, Your Honor.  That

4  makes sense.

5         THE COURT:  Mr. Patterson.

6         MR. THOMAS PATTERSON:  Thank you, Your Honor.  Good

7  morning.  Tom Patterson for the Pfau/Zalkin entities.

8         Your Honor, I just wanted to note that, in her

9  recitation of the witnesses, Ms. Lauria inadvertently omitted

10  Mr. Jason Amala.  We have a limited objection the definition

11  of "mixed abuse claims," in connection with the TCJC

12  settlement, and Mr. Amala will be testifying on our behalf

13  with regard to that.

14         Your Honor, we will be reaching out to the certain

15  insurers today with regard to scheduling Mr. Amala in

16  connection with the other objecting parties.  Mr. Amala is

17  testifying for a very limited purpose, we don't expect to

18  take it -- it to take a great deal of time.  But Mr. Amala is

19  otherwise occupied in another case the latter part of this

20  week, so we will be looking to put him on next week, in

21  connection with the opposition cases.

22         THE COURT:  Thank you.

23         MR. THOMAS PATTERSON:  And Mr. Hallowell, we'll be

24  reaching out to the certain insurers with regard to

25  appropriate scheduling of that, in conjunction with your

1  efforts, as well.

2           MR. HALLOWELL:  Thank you, Mr. Patterson.

3           THE COURT:  Okay.

4           MS. LAURIA:  So, with that, Your Honor, I think,

5  from the debtors' perspective, we're ready to start the week.

6  I will hand the podium over to Mr. Jesse Green from White &

7  Case, who will be handling our next witness.

8           THE COURT:  Thank you.

9           MR. GREEN:  Good morning, Your Honor.

10          THE COURT:  Mr. Green.

11          MR. GREEN:  Jesse Green of White & Case on behalf

12  of the debtors.

13          The debtors next witness is Makeda Murray.  The

14  debtors filed Ms. Murray's declaration last Monday, it's

15  found at Docket Number 9317.

16          As explained in the declaration, Ms. Murray is an

17  expert in data processing and management and processed over

18  117,000 proofs of claim filed in this case to create the

19  Trance 6 data set, which was relied upon by Dr. Bates.

20          No declaration [sic] to the declaration itself were

21  filed.  The certain insurers did file an objection to some of

22  the exhibits in the declaration.  That's found at Docket

23  Number 9366.  That objection was filed last Thursday, more

24  than 48 hours after Ms. Murray's declaration was filed.

25          As explained in the debtors' response to the

1   objection, which is at Docket 391 [sic], not only was the

2   objection untimely, but it was filed without any advance

3   notice to the debtor, notwithstanding Section 6 of the

4   pretrial order, which requires the parties to confer in good

5   faith regarding exhibits and other issues.

6          There's no excuse for the certain insurers' failure

7   to confer, nor for their delay, as the exhibits they are

8   objecting to have been known for them -- to them for months

9   because they are attached to Ms. Murray's expert reports.

10  Unfortunately, the certain insurers' failure to confer is an

11  ongoing pattern in this case.  In any event, the debtors

12  indicated in their response that they would not be seeking

13  the introduction of Exhibits 2, 3, and 4 at this time.  The

14  debtors conferred with the certain insurers over the weekend,

15  and unfortunately, again, the certain insurers are not

16  withdrawing their remaining objections.

17         Among other things, the certain insurers object to

18  the introduction of Ms. Murray's CV.  Now the certain

19  insurers have raised this objection even though no one has

20  challenged Ms. Murray's qualifications in this case, and

21  other experts have -- other witnesses have had their CVs

22  introduced already, such as Mr. Whittman and Mr. Burnett.  In

23  addition, the certain insurers themselves included its CVs in

24  their own exhibit list, which is found at Docket Number 9199.

25         Moreover, the whole purpose of the parties'

1 agreement to submit declarations in lieu of direct

2 examination was to streamline the trial.  If the parties are

3 going to object to CVs on the basis of hearsay, this defeats

4 the whole purpose of the declarations.

5         Nonetheless, in light of the continuing objection

6 to the CV, the debtors propose offering short direct

7 examination of Ms. Murray on her background and

8 qualifications and the work she has performed in this case,

9 if that is acceptable to the Court.

10        THE COURT:  Well, let me hear if there's still

11 objection to the CV and why.

12        MS. YANG:  Thank you, Your Honor.  Betty Yang with

13 Gibson Dunn on behalf of AIG and the certain insurers in this

14 case.

15        Your Honor, we take very seriously the allegation

16 that we have made frivolous objections in this case, and so

17 we want to make sure the Court has the full context of

18 exactly what we're objecting to.

19        Ms. Murray has submitted a forty-two-page

20 declaration in lieu of direct testimony, and we have not

21 objected to a single paragraph of that declaration.  And we

22 have similarly not filed any sort of motion to try to limit

23 or exclude Ms. Murray's declaration in any way.  And so Ms.

24 Murray's live testimony, as the debtors have elected to

25 present it in her declaration, is already coming in, in full,

1  without objection from the certain insurers.

2  What we have objected to is the attempt by the

3  debtors to introduce into the evidentiary record hearsay

4  documents, including her -- previously, her expert reports,

5  which I understand have now been withdrawn, and then the

6  appendices to those expert reports, including her CV.

7  Now our understanding, Your Honor, is that it is

8  black-letter law in this district, and just about every other

9  one that I'm aware of, that out-of-court statements in expert

10  reports and those appendices are the definition of hearsay

11  and are generally inadmissible, unless there is an exception

12  that applies.  And these kinds of attachments to the expert

13  reports are out-of-court statements being offered for the

14  truth of the matter asserted just as much as the body of the

15  report themselves are.

16  And Your Honor, we're certainly sensitive to the

17  fact that, with respect to the documents at issue with Ms.

18  Murray, those documents are not of a special significance to

19  either party.  And candidly, we're a little bit lost as to

20  why they're even being offered when Ms. Murray's direct

21  examination is already coming in, in full, and her

22  qualifications are not being challenged.

23  But the reason we've maintained those objections,

24  Your Honor, is that we want to be clear that, by agreeing to

25  accommodate the debtors' decision to present direct evidence

1  in the form of declarations, that we are not somehow opening

2  the door or waiving any rights with respect to expert reports

3  coming in more generally.

4          And for example, Your Honor, it was very concerning

5  to us that the debtors have now filed multiple submissions,

6  where they have made statements, such as -- and I'm reading

7  from the response to our objection that was filed this

8  morning:

9          "The parties have agreed to proceed by a

10  declaration in lieu of live testimony, meaning that Dr.

11  Bates' CV is no more hearsay than his declaration."

12          And Your Honor, we fundamentally disagree with that

13  statement.  Like I said, we have agreed and have not objected

14  to Ms. Murray's declaration and have agreed that that can

15  serve in lieu of live testimony for Ms. Murray and other

16  witnesses in this case.  But we disagree that we have, in any

17  way, opened the door to allowing expert reports or other

18  archetypical hearsay to come in more generally than that.

19          And if I could briefly speak to the timing of our

20  objections, it just patently untrue that our objections were

21  filed late.  Ms. Murray's declaration was served after 9 a.m.

22  on Monday, March 14th.  And that means, under the pretrial

23  order, that the clock did not begin to run until 9 a.m. on

24  March 15th.  And our objections were served before 9 a.m.,

25  less than 48 hours later, and so our objections were timely.

1  We have carefully studied our obligations under the pretrial

2  order, and we have met those obligations here.

3          And Your Honor, we didn't want to burden the Court

4  with an unnecessary written submission over the weekend.  But

5  if it would be helpful to provide citations to case law --

6          THE COURT:  No.

7          MS. YANG:  Thank you, Your Honor.  In that case,

8  I'll turn the mic over.

9          THE COURT:  Thank you.

10          So I understand Exhibits 2, 3, and 4, which are the

11  debtors' informational brief, Ms. Murray's expert report, and

12  Ms. Murray's rebuttal expert report are not being sought to

13  be introduced into evidence.  Is that correct, Mr. Green?

14          MR. GREEN:  That's correct, Your Honor.

15          THE COURT:  Okay.  What about the -- okay.  I see

16  the others are exhibits, wihch, quite frankly, I don't have

17  because they're probably voluminous.  What about the other

18  exhibits, aside from the *curriculum vitae*?

19          MR. GREEN:  Your Honor, Exhibit 5 to the

20  declaration is the protective order that was cited in Ms.

21  Murray's affirmative report.  Protective orders are public

22  record and falls under the public record hearsay objection

23  [sic].

24          Also, it's not even hearsay.  It's -- we're not

25  using the protective orders to prove the truth of any matter

1   asserted therein.

2             THE COURT:  What are you using it for?

3             MR. GREEN:  It's just to have the completeness of

4   materials that Ms. Murray relied on in connection with

5   forming her affirmative report.

6             THE COURT:  Okay.  Well, I'm not going to -- this

7   is the protective order in this case?

8             MR. GREEN:  Correct --

9             THE COURT:  Yeah, I'm not --

10            MR. GREEN:  -- Your Honor.

11            THE COURT:  -- going to admit it as an exhibit.

12            And what about Exhibits 6, 7, and 8?

13            MR. GREEN:  Exhibits 6 and 8 are lists of materials

14   that Ms. Murray relied on in connection with her test --

15   expert testimony.  Again, this is not an example of -- the

16   material is not being used to prove the truth of the matter

17   asserted therein, so it's not hearsay.

18            And I'd also point out that the certain insurers

19   themselves have listed several similar materials in

20   connection with their own experts in this case on their

21   exhibit list, which is found, again, at Docket Number 9199.

22   And it's Items 701, 703, 705, 710, 712, and 715.  It's just a

23   list -- in each case, it's a list of materials that the

24   expert relied upon, so that Your Honor knows exactly what the

25   expert considered in preparing his or her opinion.

1          THE COURT:  Okay.  Well, I'm not hearing a real

2    challenge to any of this, in terms of her opinion itself.

3    I'm not sure that they need to -- they're hearsay.  But --

4    materials relied upon -- yeah, they're hearsay.

5          But if the parties are going to admit them for all

6    experts, then I'll permit them.  If they're not, then they're

7    hearsay and I'll exclude them.  I don't know if the parties

8    have an agreemente on it or not.  I'll let you all talk

9    afterwards.

10          MS. YANG:  Thank you, Your Honor.

11          THE COURT:  You can --

12          MS. YANG:  We'd be pleased to do so.

13          THE COURT:  You can provide brief testimony about

14    Ms. Murray's background.

15          MR. GREEN:  Okay.  Thank you, Your Honor.

16          And before I proceed to that, one final exhibit was

17    -- Exhibit 7, which is a list of search terms that Ms. Murray

18    used in identifying exactly where the records were associated

19    with certain charter organizations.  Again, we haven't heard

20    an explanation why this list of search terms would be

21    considered hearsay.  This is also disclosure that was

22    required under the rules.  And so, again, we ask the Court to

23    deny any objection to that Exhibit 7.

24          THE COURT:  I mean, doesn't she really talk about

25    that in her declaration, in essence?

1     MR. GREEN:  Correct.  In Paragraph 68 of her

2  declaration, she mentions that she ran search terms.  And so

3  we -- there's a citation.  This is at Page 31 of her

4  declaration, at the very top.  There's a citation to Exhibit

5  D of the affirmative report that includes -- and that is a --

6  the list of search terms that she used.

7     (Pause in proceedings)

8     THE COURT:  Ms. Yang, I understand it's hearsay.

9  But why is it objectionable, in the sense that we're trying

10  to have an understanding of what terms were used in the

11  search?

12     MS. YANG:  Yes, Your Honor.  Our objection is

13  really just one in general and making sure, like I mentioned,

14  that we're not cracking the door open.  We have no -- we are

15  not trying to be tricky with this particular exhibit.  Ms.

16  Murray's ultimately opinions based on this analysis are going

17  to come in.  If Your Honor would find it helpful to admit

18  this list, we have no strenuous objection to that.

19     THE COURT:  Okay.  I think it will.  You're not

20  cracking open the door here with respect to hearsay

21  objections just because we're proceeding by way of

22  declaration.

23     MS. YANG:  Thank you, Your Honor.

24     THE COURT:  Thank you.  We'll admit her search

25  terms.

1        MR. GREEN:  Thank you, Your Honor.

2        And we're now prepared to proceed with direct.

3        THE COURT:  Ms. Murray, I'll need to swear you in.

4   If you would raise your right hand, please.

5   MAKEDA MURRAY, WITNESS FOR THE DEBTORS, AFFIRMED

6        THE COURT:  Please state your full name and spell

7   your last name for the record.

8        THE WITNESS:  Makeda Susan Murray, M-u-r-r-a-y.

9        THE COURT:  Thank you.

10        Mr. Green.

11                    DIRECT EXAMINATION

12   BY MR. GREEN:

13   Q    Good morning, Ms. Murray.

14   A    Good morning.

15   Q    Could you please, before we begin, tell us where you're

16   physically located right now?

17   A    I'm currently located in Washington D.C., at the Bates

18   White offices.

19   Q    And is there anyone in the room with you today?

20   A    There is no one in the room.

21   Q    Okay.  Could you please summarize your educational

22   background beginning with college?

23   A    Sure.  I graduated from Howard University *summa cum*

24   *laude* in 2007, with degrees in mathematics and economics.  I

25   then also earned an MBA from the Wharton School in 2014 in

1  strategic management.

2  Q    What does "*summa cum laude*" mean?

3  A    *Summa cum laude* means with highest distinction.

4  Q    And when did you start at work?

5  A    I start work in 2012.

6  Q    So what did you do between 2007 and 2012?

7  A    Between 2007 and 2012, I was an actuarial analyst at

8  Willis Towers Watson in their retirement practice.

9  Q    Did you do any work related to data processing and

10  management?

11  A    I did.  At Towers Watson, I processed an analyzed claims

12  data, evaluated pension benefit redesign options, and

13  developed funding and expense valuations for large corporate

14  clients.

15  Q    And where did you work after you graduated from Wharton?

16  A    After I graduated from Wharton, I started at Bates White

17  in July of 2014.

18  Q    And what title did you have when you started at Bates

19  White?

20  A    I stated Bates White as a senior consultant.

21  Q    Have you had any change in title since then, since that

22  time?

23  A    I have?

24  Q    And what was the first change?

25  A    I was promoted to manager in January of 2018, and I was

1  also promoted to principal in January of 2022.

2  Q    Okay.  And what kind of work have you done at Bates

3  White?

4  A    At Bates White, I lead teams on matters involving

5  forecasting, liability valuation, and damages estimation.  I

6  specialize in the processing and management of complex data

7  sets for use in support of expert testimony in litigation and

8  settlements.

9  Q    Have you worked on any mass tort cases?

10  A    I have.

11  Q    Can you describe some of them, generally?

12  A    I have worked on --

13  Q    (Indiscernible)

14  A    -- a couple of mass tort cases involving asbestos

15  claims, as well as auto manufacturing cases.

16  Q    Have you worked on any cases where there's been hundreds

17  of thousands of claims?

18  A    I have.

19  Q    Please describe the kind of work you did in those case?

20  A    I have worked on cases involving asbestos claims for

21  companies that have historical liabilities, and where we

22  manage and evaluate hundreds of thousands of claims on a

23  quarterly basis.

24  Q    Now what have you been asked to do in this case?

25  A    In this case, we were asked to process and standardize

1  the POC submissions from claimants in this bankruptcy.

2  Q    Is your prior experience relevant to that task?

3  A    It is.

4  Q    Can you explain how so?

5  A    I have worked on numerous types of data across a number

6  of industries and data types, including, but not limited to

7  asbestos claims data, on product liability claims data

8  (indiscernible) loan data, telecommunications data, mass

9  casualty events data, and now sexual abuse claims date.

10 Q    Do you know how many proofs of claim from survivors were

11 filed in this case?

12 A    As of the Tranche 6 data, more than 117,000 POC

13 submissions were submitted in this case?

14 Q    Could you explain the process by which you converted the

15 POC data into the Tranche 6 data?

16 A    Sure.  Over time -- and we've produced six tranches of

17 data in this case -- we downloaded from Omni the POC

18 submissions at a given point of time, and then manually

19 reviewed and standardized those data based on a pre-approved

20 standardization list that was agreed upon in November of

21 2020.

22       After standardization or after manual review, we

23 processed the data in Stata, which is a statistical software

24 package that is commonly used at Bates White, and compiled a

25 record level list or a record level database of the POC

1 | submissions as of a given date.  That record level list was
2 | also consolidated to produce a unique and timely claims list.
3 | So, as of the Tranche 6 database, we produced a record
4 | level 100,000 -- containing 117,000 records, as well as a
5 | claims list containing 82,000 consolidated claims.
6 | Q    How many hours did you spend developing the Tranche 6
7 | data?
8 | A    I have personally spent more than 1,000 hours on the
9 | data processing of the -- of the claims in this case.  My
10 | team has spent more than 10,000 hours on claim file review
11 | and data processing.
12 | Q    Now why was there more than one set of tranche data?
13 | A    There was more than one set of tranche data to account
14 | for the fact that claimants were allowed to make multiple
15 | submissions, they were allowed to amend their submissions
16 | through time; and, as such, the process of manually reviewing
17 | and standardizing the data was an ongoing one.
18 | Q    Okay.  And what was considered in developing the
19 | tranches?
20 | A    In developing the tranches, we were looking at using the
21 | standardization list that was agreed upon by all the parties,
22 | as well as producing an analysis database that accurately and
23 | consistently represented the P -- the claimants' responses to
24 | the POC questions.
25 | Q    And what did you do to ensure that the data sets were

1 | accurate?

2 | A    We produced, as I said before, numerous tranches.  We

3 | also opened ourselves up for feedback from all the relevant

4 | parties, and we received a lot of feedback from said parties,

5 | which we reviewed and incorporated, as necessary.  The

6 | parties have also done their independent sampling exercises,

7 | which indicate that there is a very small error rate in the

8 | data.  Through time, we have also done sampling exercises to

9 | evaluate the accuracy of the data in the -- in the tranches.

10 | Q    Could you describe generally the part -- types of

11 | parties you heard feedback from?

12 | A    We received feedback from plaintiff groups, as well as

13 | insurer groups in this case.

14 | Q    Were there any instances where you rejected certain

15 | feedback?

16 | A    There were.

17 | Q    And why is that?

18 | A    We rejected feedback if the feedback did not reflect

19 | what was actually provided on the claimants' POC submissions.

20 |         MR. GREEN:  All right.  Your Honor, I have no

21 | further questions.  And I now move for the introduction of

22 | Ms. Murray's declaration into evidence and tender her as an

23 | expert on the topics discussed (indiscernible) move to cross.

24 |         THE COURT:  Thank you.

25 |         Ms. Yang.

1        MS. YANG:  No objection, subject to the pending

2   issue about the CVs, Your Honor.

3        THE COURT:  The declaration is admitted.

4     (Murray Declaration received in evidence)

5        THE COURT:  And Ms. Murray is accepted as a witness

6   -- as an expert on the matters set forth in her declaration.

7        Ms. Dumas.  I'm sorry.

8     (No verbal response)

9        THE COURT:  You're muted, Ms. Dumas.  Ms. Dumas,

10  you're muted.

11       MS. DUMAS:  Whenever you get around to cross-exam,

12  I will go whenever it's my turn.

13       THE COURT:  Thank you.

14       Ms. Yang, do you have cross-exam?

15       MS. YANG:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17  BY MS. YANG:

18  Q    Good morning, Ms. Murray.  We've never had the pleasure

19  of meeting.  My name is Betty Yang, and I'm an attorney at

20  Gibson Dunn, and I'm going to be asking you some questions

21  today on behalf of AIG and the certain insurers.

22  A    Nice to --

23  Q    To start --

24  A    -- meet you.

25  Q    You, too, ma'am.

1       To start off, I'd just like to confirm the division of

2   labor between you and Dr. Bates, who I understand we'll be

3   hearing from next.

4       Now Bates White was retained by the debtors in this case

5   to estimate the total value of the proofs of claim in the

6   bankruptcy as if they had been resolved in the tort system,

7   correct?

8   A    Yes, correct.

9   Q    And also to provide analysis of data regarding the

10  debtors' historical settlements?

11  A    Correct.

12  Q    And also the claiming trends evidenced by the proof of

13  claim forms, correct?

14  A    Correct.

15  Q    And if I refer to the proof of claims sometimes as

16  "POCs," will you know what I'm talking about?

17  A    I will.

18  Q    Thank you.

19      And your primary role in this assignment was to lead the

20  processing and the standardization of the data.  Is that

21  correct?

22  A    That's correct.

23  Q    And then Dr. Bates, who we'll hear from next, relied on

24  your data set to perform the various valuation analyses,

25  correct?

1  A    Correct.

2  Q    All right.  And I have just a couple of quick followup

3  questions about the data set itself, following up on your

4  direct examination.

5       Now BSA's claims noticing agent in this case was company

6  called "Omni," correct.

7  A    Correct.

8  Q    Meaning Omni was the entity that actually received the

9  proofs of claim.

10  A    That's right.

11  Q    And then, as of July 2nd, 2021, Omni had received a

12  total of about 117,000 proofs of claim.  Is that your

13  understanding?

14  A    Correct.

15  Q    So that was the set that you started with for your

16  analysis, correct?  For the Tranche 6 data?

17  A    Well, we ended with 117,000.  We started with slightly

18  more.

19  Q    I gotcha.

20       And what you did to the Omni data is that you, first of

21  all, removed from the set all of the POCs that were untimely,

22  correct?

23  A    No.  So we processed the data as of the -- the cutoff

24  date, July 2nd.  But before producing the Tranche 6 record

25  level data, we excluded records that were flagged as void.

1 And the data set also currently includes withdrawn claims

2 that we have a flag for in the data.  And those get excluded

3 before (indiscernible)

4 Q    Sure.  Thanks for the clarification.

5      So there were a few different categories of claims that

6 were excluded from the ultimate Tranche 6 data set, correct?

7 A    That were excluded from either the record level and/or

8 the claim level, correct.

9 Q    Got it.

10     So you mentioned the voided or withdrawn claims,

11 correct?

12 A    Correct.

13 Q    And then some -- another set of claims that were

14 excluded eventually from the ultimate Tranche 6 data were

15 claims where the particular claimant didn't make a single POC

16 by the cutoff date, correct?

17 A    Correct.

18 Q    And then you mentioned that you also performed a de-

19 duplication process to remove duplicate submissions.  Is that

20 correct?

21 A    We ran through a de-duplication process to consolidate

22 duplicates.

23 Q    Got it.

24     And so, after you performed all of these and other

25 analyses, you reduced the overall Tranche 6 data from the

1 117,000 down to a set of 82,209 proofs of claim.  Is that

2 correct?

3 A    Correct.

4 Q    And that is the set of proofs of claim that you

5 determined to be unique and timely claims based on your

6 analysis.

7 A    Correct.

8 Q    And that's what we refer to in this case as the, quote,

9 "Tranche 6 data."

10 A    Correct.  It's the --

11 Q    And --

12 A    -- Tranche 6 de-duplicated data, yes.

13 Q    Thank you.

14      And that's the set of data that Dr. Bates relied on for

15 the purposes of his valuation analysis, correct?

16 A    Correct.

17 Q    All right.  So, if we could turn to the standardization

18 that you applied.  And just so we're all on the same page,

19 I'm going to use the term "standardization" in this context.

20 What we're referring to is applying a set of protocols to

21 make sure that the information reported in the 82,000 POCs is

22 reported in a consistent way.  Is that correct?

23 A    Correct.

24 Q    And the standardization was necessary in part because

25 there were inconsistencies in the POC data.  Is that correct?

1  A    It was also necessary because there were a number of

2  different question types and formats in the data.  And in

3  order to make a database that would be efficient for analysis

4  purposes, we had to transform (indiscernible) text into a

5  consistent format that would be easy for use.

6  Q    Sure.

7      So one reason that the standardization was necessary was

8  because the proof of claim questions varied, in terms of the

9  format.

10 A    Correct.

11 Q    And then another reason that the standardization was

12 necessary is because there were inconsistencies between the

13 proofs of claim regarding how the information was reported.

14 A    Correct.

15 Q    And you also saw conflicting information in some proofs

16 of claim when -- especially when there were multiple

17 questions that get to the same subject matter, for example.

18 A    Correct.

19 Q    And there were proofs of claim that were also missing

20 information, correct?

21 A    Correct.

22 Q    So, as some examples, when you were doing your analysis

23 in this case, you saw proofs of claim where the checkbox

24 response in the proof of claim was inconsistent with and in

25 conflict with the long-form written description.  Is that

1  correct?

2  A    Correct.  So, to the extent that there were

3  inconsistencies on the POC form, those inconsistencies are

4  reflected in the POC data.

5  Q    Sure.

6       So, as an example, this would be like if somebody

7  checked a box saying that they had been abused on time, but

8  then, in the written description section, reported that they

9  had been -- reported multiple incidents of abuse.  Is that

10  correct?

11  A    Correct.

12  Q    And in doing your analysis in this case, you also

13  observed instances in which claimants provided conflicting

14  information regarding the type of abuse alleged, correct?

15  A    It's possible.

16  Q    So that would be like if one proof of claim said that

17  the type of abuse alleged was penetration, in one instance,

18  but then, in a different section of the proof of claim, said

19  that the abuse type was groping, for example, correct?

20  A    It's more likely that they would have submitted multiple

21  submissions that had different abuse levels.  The POC form

22  has checkboxes for allegation, so the claimants were able to

23  check as many or as few boxes as they desire.

24  Q    Thank you for that clarification.  So let me just make

25  sure I understand.

1    So what you're saying is some -- to the extent there

2  were inconsistencies regarding the type of abuse alleged,

3  that sometimes appeared in the context of one particular

4  claimant submitting duplicate proofs of claim that were

5  different, in terms of the boxes checked for type of abuse,

6  correct?

7  A    Correct.

8  Q    That was a phenomenon that you observed in the proof of

9  claim data.

10  A    I can't say we directly observed it, but I wouldn't be

11  surprised if it occurred.

12  Q    And you also -- your team had a process for dealing with

13  this, right?  When you saw inconsistencies like this, you

14  recorded then most of your allegation.

15  A    Correct.  So the POC data includes the checkbox response

16  for each of the allegations that are off line on the POC

17  form.  But we also included a Bates White allegation field

18  that is the most severe of the allegations that were checked.

19  Q    Thank you.

20    And you also observed in the course of doing your work

21  regarding the proofs of the claim [sic] inconsistencies

22  regarding how the date of abuse was reported.  Is that

23  correct?

24  A    Correct.

25  Q    So --

1 │ A    The --

2 │ Q    -- some of --

3 │ A    Sorry.

4 │ Q    No, go ahead.

5 │ A    The abuse timing field was a long-form text field, and

6 │ so there was a lot of variability in how the claimants

7 │ responded to that question.

8 │ Q    Sure.

9 │      So some claimants might have provided more specific

10 │ information, like, for example, month and year of abuse,

11 │ correct?

12 │ A    Correct.

13 │ Q    But then there were other proofs of claims that would

14 │ have only included a season indicator, correct?

15 │ A    Correct.

16 │ Q    And then there were other proof of claims that included

17 │ only what you call an "ambiguous date range" -- "decade

18 │ range."  Is that correct?

19 │ A    That's correct.

20 │ Q    And then, in some of the proofs of claim that you saw,

21 │ there was actually multiple different types of date indicator

22 │ information provided that, in fact, conflicted with each

23 │ other.  Is that correct?

24 │ A    Yep, it happened.

25 │ Q    And so an example of what would be if the proof of claim

1  said that the abuse happened when the claimant was 17, but

2  then, elsewhere in the same proof of claim, said that it

3  happened when the claimant was in first grade.  That was an

4  example that you gave in your report, correct?

5  A    Correct.  That information would have happened in the

6  same question, though.

7  Q    Thank you.

8      And you also saw proofs of claim, in doing your analysis

9  in this case, that had conflicting information regarding

10 where the alleged abuse occurred.  Is that correct?

11 A    That's correct.

12 Q    And so there were instances where, for a single

13 claimant, it was alleged that abuse was -- occurred in

14 California, in one instance, and also simultaneously alleged

15 that the abuse occurred in Florida, for example, correct?

16 A    Well, it might not always be simultaneous.  But we do

17 have instances where claimants reference multiple abuse

18 states.  And we also have instances where the claimant

19 provided multiple submissions, and the abuse states on those

20 would be (indiscernible)

21 Q    And when that happened, you would record all of the --

22 in your analysis, would record all of the states where the

23 abuse was alleged to have occurred, correct?

24 A    Correct.

25 Q    And then there were still more POCs, on top of what

1  we've discussed already, that just provided no response at

2  all to some of the POC questions and left some fields blank.

3  Is that correct?

4  A    That's correct.

5  Q    And so your standardization process was designed to take

6  all of these varied POC responses and the blanks and the

7  conflicting information and missing information and compile

8  them and report them in a consistent way, correct?

9  A    Correct.

10 Q    And I also want to spend a second to talk about the

11 boundaries of your scope and what was outside the scope of

12 your project task in this case.

13      Your standardization process did not include any steps

14 to verify the credibility or veracity of any of the proofs of

15 claim.  Is that correct?

16 A    That's correct.

17 Q    You're aware, in your line of work, that, unfortunately,

18 sometimes fraudulent claims are submitted in the course of a

19 bankruptcy or other mass tort proceeding.

20 A    It appears, but we had no reason to believe that it was

21 occurring in this case.

22 Q    But it was outside the scope of your work to determine

23 whether it was occurring.  Is that correct?

24 A    Correct.

25 Q    So you performed no analysis to quantify the extent to

1  which it was occurring in this case, correct?

2  A    We did not attempt to validate the veracity of the

3  claimant information, correct.

4  Q    Thank you.

5       For the purposes of your work here, you did not exclude

6  from the Tranche 6 data set any claims on the basis that you

7  believe they were lacking in credibility or validity,

8  correct?

9  A    Correct.

10 Q    And even among the valid claims in the data set, it's

11 possible that there are still duplicates in the 82,209

12 claims, correct?

13 A    It's possible, although the duplication process was a

14 very extensive one.  But I wouldn't see that we would have

15 necessarily captured the entirety of all duplicates in the

16 data.

17 Q    Sure.  You cannot definitively say that your de-

18 duplication process identified all of the potential

19 duplicates in the data, correct?

20 A    We cannot.  But what we will see is that there are a lot

21 of records in the data where more de-duplication would have

22 led to over-consolidation and likely false positives

23 identification of potential duplicates.

24 Q    Sure.

25      And so you were conservative in treating a claim as a

1  duplicate for the purposes of your analysis, correct?

2  A    I wouldn't say that we were conservative.  I think our

3  process involved an extensive look at 35 combinations of 4

4  fields for matching purposes.  And so we attempted to strike

5  the right balance, in terms of identifying potential

6  duplicates, given the information that was present in the POC

7  data.

8  Q    Okay.  Now, if, in fact, there are duplicates in the

9  data set, the effect that that would have is that Dr. Bates'

10  aggregate liability valuation would be too high.  Is that

11  correct?

12         MR. GREEN:  Objection.  Lack of foundation.

13         THE COURT:  What's the objection?

14         MR. GREEN:  Lack of foundation.

15         MS. YANG:  Your Honor --

16         THE COURT:  Overruled.

17         MS. YANG:  -- this is -- thank you, Your Honor.

18  BY MS. YANG:

19  Q    You can answer, Ms. Murray.

20  A    I cannot speak to the effect of Dr. Bates' model.  But

21  if there are potential duplicates still in the data and the

22  information -- how they are valued would depend on whether or

23  not the information is consistent across them.  And so I

24  cannot speak to the what the valuation of those claims would

25  look like in this model.

1  Q     Sure.

2        But can we agree that, if there are, in fact, still

3  duplicate claims in your data set, that would mean that some

4  claims that should not be counted toward the aggregate

5  valuation analysis could potentially be counted?

6  A     It's possible.

7  Q     And similarly, if, in fact, some of the claims were not

8  valid or were fraudulent, that would have the impact of

9  making doctor -- could have the impact of making Dr. Bates'

10 aggregate liability valuation too high.

11 A     As I said, I can't speak to the details of Dr. Bates'

12 valuation model, as well as the values that these claims

13 would be assigned.  But it's possible that, if there are

14 potential duplicates yet in the data -- or sorry -- potential

15 claims in the data that are invalid, that might be the case.

16 I have no reason to believe that, though.

17 Q     Sure.

18       But it's just a matter of mathematics that, if we're

19 valuing more claims, rather than less claims, the aggregate

20 potential liability could go up.

21 A     It could.

22 Q     Thank you.

23       I'd like to turn now a little bit to focus a little bit

24 on the results of your analysis; and, in particular, to ask

25 you about JTX-1077.  I understand that a CD of this -- it's a

1  big Excel file, and I understand a CD has been provided.  You

2  can feel free to look at it on your computer if you'd like.

3  A    All right.

4  Q    I think it will probably be easier to just look at the

5  shared screen when we pull that up.

6  A    Okay.

7        MS. YANG:  And just for the record, Your Honor,

8  this is JTX-1077.  That was admitted as an exhibit, along

9  with Ms. Murray's declaration on direct.

10  BY MS. YANG:

11  Q    So, just to confirm, Ms. Murray, JTX-1077 is the results

12  of your standardization and de-duplication process.  Is that

13  correct?

14  A    Correct.

15        MS. YANG:  And if we can just scroll all the way to

16  the bottom of this spreadsheet.

17  BY MS. YANG:

18  Q    Then we can see that the spreadsheet reflects the set of

19  82,209 proofs of claim that we've been discussing as the

20  Tranche 6 data.  Is that correct?

21  A    Correct.

22  Q    And then, across the top of this chart, what we can see

23  is various columns that correspond to a field in the proof of

24  claim form or a field that was added by Bates White,

25  correlating to a claim feature.  Is that correct?

1  A    That's correct.

2  Q    Now, as one part of your analysis in this case, you

3  standardized data from the proofs of claim regarding the

4  abuser identity.  Is that correct?

5  A    Correct.

6  Q    And to set the stage a little, in the pre-petition tort

7  settlements, 100 percent of the settlements identified the

8  perpetrators at issue by both first and last name, correct?

9  A    That is my understanding.

10 Q    All right.  Now the POCs, on the other hand, tell a

11 different story, correct?

12 A    Correct.

13 Q    So, if we look at JTX-1077, Column F in this chart it

14 titled "Abuser Name, Categorization."  Is that correct?

15 A    Correct.

16 Q    And what this field is referring to is what type of

17 information was included in a proof of claim regarding the

18 identity of the abuser, correct?

19 A    Correct.

20      MS. YANG:  And Matt, if you can click the drop-

21 down.

22 BY MS. YANG:

23 Q    And we can see that there are five possible fields for

24 this column, correct?

25 A    Correct.

1  Q    And the first possible -- the first possible response to

2  this, it says, "(1) Name provided."  Is that correct?

3  A    Correct.

4  Q    And that categorization refers to proofs of claim that

5  identified the abuser by both first and last name, correct?

6  A    Correct.

7          MS. YANG:  And so, Matt, if you could please check

8  the box to filter this.

9  BY MS. YANG:

10  Q    If we filter the 82,209 proofs of claim for just those

11  that set the -- fit the category of having provided both the

12  first and last name of the abuser in the proofs of claim,

13  then we can see --

14          MS. YANG:  And I think we're going to have to

15  magnify that, Matt.

16      (Pause in proceedings)

17  BY MS. YANG:

18  Q    Well, I can't see it on my screen.  I'm not sure if you

19  can see it on your screen, Ms. Murray.

20      But we can see, from doing this filtering process, that

21  there are 30,501 proofs of claim identified -- that

22  identified the abuser by the first and last name, correct?

23  A    I can't see it on my screen.  It's actually saying

24  19,000 eight something.  Do you mind highlighting F?  It

25  might be easier for me to do it myself.  Hold on one second.

1  Q    Yeah, that might be easier, Ms. Murray.

2  A    Yep, 30,501.

3  Q    Okay.  Thank you.

4       So, just so I have a clean record on this, if we filter

5  your data set for only the proofs of claim where the proof of

6  claim identified the abuser by both first and last name, we

7  see that there are 30,501 of the 82,209 proofs of claim that

8  fit this category, correct?

9  A    Correct.

10  Q    That's only about a third of the proofs of claim in the

11  Tranche 6 data set, correct?

12  A    Correct.

13  Q    And the remaining 50,000 or so claims did not identify

14  the abuser by first and last name, correct?

15  A    Correct.

16  Q    So this is a significant difference between the proof of

17  claim population and the historical settlement population,

18  correct?

19  A    Correct.

20  Q    And you agree that, in the tort system, it would be

21  difficult to establish liability if you can't identify the

22  perpetrator, correct?

23            MR. GREEN:  Objection.  Lack of foundation.

24            THE COURT:  Sustained.

25  BY MS. YANG:

1  Q    All right.  Moving on, Ms. Murray.

2          MS. YANG:  If we could turn next to Column H of the

3  next exhibit.

4  BY MS. YANG:

5  Q    And please, you know, continue to feel free to use the

6  version on your computer instead, if that's easier to see.

7  But we will do our best to make it visible for everyone else.

8  A    Okay.

9  Q    So Column H in the same spreadsheet is titled "Abuser

10 Claim Count."  Is that correct?

11 A    Correct.

12 Q    So this column refers to the number of other claimants

13 who have accused the abuser identified in a particular proof

14 of claim, correct?

15 A    Correct.

16 Q    And again, we're looking at the drop-down here.  There's

17 a whole range of values from one and going up, correct?

18 A    And a value of one in this field means that the abuser

19 associated with a particular proof of claim has not been

20 accused by any other claimants.  Do I understand that

21 correctly?

22 A    You do.

23 Q    And any of the values greater than one reflect a repeat

24 abuser with multiple victims, correct?

25 A    Correct.

1  Q    So, if we filter this data for claims with just a one in

2  Column H, we see that 71,206 of the Tranche 6 bankruptcy

3  claims involve a single abuser.  Is that correct?

4  A    Correct.

5  Q    And that's about 87 percent?

6  A    Yes.

7  Q    And that leaves about 13 percent of the bankruptcy

8  claims that name a repeat abuser, correct?

9  A    Correct.

10  Q    And that's compared to over 90 percent of the

11  settlements that involved a repeat abuser, correct?

12  A    That might be correct.  I can't verify the -- the

13  number.

14  Q    Sure.

15      You would agree with me that, if there are 13 percent of

16  repeat abusers in the Tranche 6 data and over 90 percent of

17  the historical settlements involved repeat abusers, that

18  would be a significant difference between the bankruptcy

19  claim population and the settlement population.

20  A    Assuming your figures are correct, yes.

21  Q    Now you also performed analyses regarding the

22  application of the statute of limitations to the proofs of

23  claim, correct?

24  A    Correct.

25  Q    And I'm going to take this in reverse order and first

1  confirm what you were not asked to do for the purposes of

2  your statute of limitations analysis.

3      You were not asked, as part of your engagement, to

4  quantify the impact of any state statute of limitations on

5  the value of the claim, correct?

6  A    Correct.

7  Q    Have you seen the TDPs in this case?

8  A    I'm familiar with the TDPs, but I haven't studied them.

9  Q    Sure.

10     Are you familiar, generally, with the fact that, for

11  statute of limitations purposes, the TDPs categorize states

12  according to the categories of open, closed, gray one, gray

13  two?

14  A    Yes.

15  Q    And you played no role in sorting states into these

16  categories for limitations purposes, correct?

17  A    Correct.

18  Q    And you played no role in determining the scaler that

19  would be appropriate to apply for each one of these

20  categories, correct?

21  A    Correct.

22  Q    Nor were you asked to process data for someone else to

23  perform that analysis, correct?

24  A    Correct.

25  Q    Are you aware of anyone at Bates White participating in

1  the determination of which scalers to apply for the statute

2  of limitations purposes in the TDP?

3  A    I am not aware.

4  Q    So, now turning back to what you were asked to do, you

5  were asked to categorize the claim data according to whether

6  it was barred or not barred by the statute of limitations.

7  Is that correct?

8  A    One (indiscernible) question, Ms. Yang.  Would you mind

9  not sharing, so I can see your face on the screen?

10  Q    Sure.  We can -- we're about to get back into Exhibit

11  1077.

12  A    Got it.

13  Q    But let's --

14  A    Okay.

15  Q    -- take it down for now.

16  A    No problem.  It's fine.

17  Q    So just to repeat my question.

18      You were asked to categorize the claim data according to

19  whether it was barred or not barred by the statute of

20  limitations, correct?

21  A    We were asked to (indiscernible) a presumptive SOL

22  standard on the basis of the claimant information, as well as

23  information we had about the state-level statutes of

24  limitations.

25  Q    Thank you.

1       And in performing that analysis, you relied on

2  instructions from the debtors' counsel at Ogletree.  Is that

3  correct?

4  A    That is correct.

5  Q    So I'm glad you asked me to take down the other exhibit

6  because I -- we actually have a different one first.

7            MS. YANG:  If we could turn to JTX-0387.

8  BY MS. YANG:

9  Q    And this is, again, another one where it might be easier

10  for you to just open it on your own computer, Ms. Murray.

11  A    Okay.

12           MS. YANG:  And JTX-0387, which, again, for the

13  record, was admitted as part of Ms. Murray's direct.

14  BY MS. YANG:

15  Q    This chart reflects the results of your analysis

16  regarding the BSA historical settlements.  Is that correct?

17  A    Correct.

18           MR. KURTZ:  Your Honor, I apologize.

19  (Indiscernible) I just wanted to point out (indiscernible) am

20  I echoing, Your Honor?

21           THE COURT:  You are.

22           MR. KURTZ:  (Indiscernible)

23           MS. YANG:  I apologize, Your Honor.  I did not

24  believe that that chart was produced with any confidentiality

25  label.  But out of an abundance of caution, we'll just stop

1  the sharing.  I don't think it should impact our examination.

2          THE COURT:  Okay.

3  BY MS. YANG:

4  Q    So, Ms. Murray, you have the JTX-0387 in front of you,

5  correct?

6  A    Correct.

7  Q    And this table reflects the results of your analysis

8  regarding BSA's historical settlements, correct?

9  A    Correct.

10 Q    And Column S in this spreadsheet is titled "Statute of

11 Limitations," correct?

12 A    Correct.

13 Q    And this is the column in which your team has made a

14 determination on whether the claim in question was, on its

15 face, barred, or alternatively, not barred by the statute of

16 limitations, correct?

17 A    Correct.

18 Q    And so, if we filter for just the not barred claims in

19 the historical settlements, we see that there are 217 out of

20 the 262 historical settlements that involved claims that were

21 timely.  Is that correct?

22 A    Correct.

23 Q    And that's about 83 percent?

24 A    Yep.

25          MS. YANG:  Now let's turn back to JTX-1077.

1  Q    And this is, again, to ground everybody on what we're

2  looking at, your analysis with regard to the proof of claims,

3  as opposed to the historical settlement, correct?

4  A    Correct.

5  Q    And if we looked at Column BC in JTX-1077, this column,

6  again, reflects the results of your analysis with respect to

7  the statute of limitations for the proofs of claim in the

8  bankruptcy.  Is that correct?

9  A    That is correct.

10 Q    And so, if we, again, filter here in the proof of claim

11 spreadsheet for the not barred field, we see that only 28,000

12 of the 82,000 proofs of claim are -- fit the not barred

13 category for statute of limitations purposes.  Is that

14 correct?

15 A    That's correct.

16 Q    That's only about a third of the proofs of claim,

17 correct?

18 A    Correct.

19 Q    And according to your analysis, the remaining two-thirds

20 are barred by the statute of limitations.

21 A    Correct.

22 Q     So this is another significant difference between the

23 proof of claim population and the historical settlement

24 population?

25 A     Correct.

1  Q     And then finally you also performed standardization on

2  information regarding to whether the debtors knew or perhaps

3  should have known about the alleged abuse, correct?

4  A     Correct.

5  Q     And if we look at Column A-P in Exhibit 1077 this

6  column is titled "Reported Abuse to Scouting."  Is that

7  correct?

8  A     That is correct.

9  Q     And that is exactly what it sounds like, this

10 identifies the proofs of claim where the alleged abuse was

11 reported to a member of the scouting organization, correct?

12 A     Correct.

13 Q     And a value of zero in this field reflects that the

14 claim was not reported?

15 A     Correct.

16 Q     And a value of one reflects that the claim was reported

17 to someone within the scouting organization?

18 A     Based on the claimants response to the POC, yes.

19 Q     Thank you.

20       So if we filter for claims with a value of zero in

21 Colum A-P of JTX 1077 we see that 70,802 of the 82,209

22 bankruptcy claims never reported the abuse to scouting,

23 correct?

24 A     Correct.

25 Q     That is almost 90 percent?

1  A      Yep.

2  Q      And then if we look next at Column A-Q that column is

3  titled "Reported Abuse to Law Enforcement."  Correct?

4  A      Correct.

5  Q      Again, that is what it sounds like, this column

6  reflects the POC's where the alleged abuse was reported to

7  law enforcement?

8  A      Correct.

9  Q      And, again, a value of zero here reflects that the

10  claim was not reported to law enforcement?

11  A      Correct.

12  Q      And a value of one reflects that the claim was reported

13  to law enforcement, correct?

14  A      Correct.

15  Q      So if we filter for claims with a value of zero in

16  Column A-Q we see that 78,145 of the 82,209 bankruptcy claims

17  never reported the abuse to law enforcement, correct?

18  A      Based on that POC, correct.

19  Q      That is about 95 percent?

20  A      It is.

21  Q      Do you have any knowledge of how, if at all, these

22  fields that we were looking at reported abuse to scouting and

23  reported abuse to law enforcement were incorporated into the

24  TDP's?

25  A      I do not know.

1           MS. YANG:  Thank you.  No further questions.

2           THE COURT:  Thank you.

3           Ms. Dumas.

4           MS. DUMAS:  Yes.  Thank you, Your Honor.

5                       CROSS EXAMINATION

6  BY MS. DUMAS:

7  Q    Ms. Murray, good morning.

8  A    Good morning, Ms. Dumas.

9  Q    I am Gilion Dumas.  I represent several of the

10 objecting abuse claimants in this case.

11      Is this the first case you have worked on involving sex

12 abuse claims?

13 A    It is.

14 Q    And it's correct that you were involved, a large part,

15 in processing BSA's historical settlement data to be used for

16 setting the abuse claims values in the BSA valuation model?

17 A    Correct.

18 Q    All the data that you have received on historic abuse

19 claims, did that come from Ogletree Deakins; BSA's national

20 coordinating council?

21 A    Correct.

22 Q    When you talked about the team at Bates White that you

23 worked with how many people were on that team?

24 A    The size of the team has fluctuated over time.  At the

25 inception we numbered about three people.  Over time more

1  than 30 people helped work on the case.

2  Q    I'm sorry, did you say one to three.

3  A    At the beginning of the case we started out with three.

4  Over time more than 30 people have worked on the case.

5  Q    Oh, more than 30.  Okay.

6       Where did they physically work when they were manually

7  going through the proof of claims?

8  A    We -- at the time that we were manually reviewing the

9  proofs of claim we were working from home because of COVID.

10  Q    Okay.  And where were the team members -- where did

11  they live?

12  A    They primarily lived in DC.

13  Q    Were -- did you ever -- were you -- excuse me, was your

14  job to oversee the team?

15  A    There was another employee at the firm that did the

16  direct overseeing of the team, but I managed the team as well

17  as the workflow.

18  Q    Did you personally do any of the manual review of the

19  proofs of claim?

20  A    I reviewed some of the manual review.  I did not

21  personally do the manual review.

22  Q    Did you ever physically, yourself, watch any of the

23  team members do their manual review either as part of the due

24  diligence or part of the review process to just make sure

25  that they were doing it right?

1  A     I reviewed documents -- sorry, I reviewed files that

2  had already been reviewed (inaudible) accuracy.

3  Q     On page 8 of your declaration, and I can either show it

4  to you or you could just take a look at it, I just have a

5  quick question before I get into some of the lengthier things

6  I'm going to ask you about.

7        On page 8 of your declaration there's a chart at the

8  top -- oh, actually, Ally, could you take that down.  We

9  don't need my notes on the screen.  Thanks.

10       On the top of your declaration there is a little chart

11 summarizing some of the more recent settlements.  Did you get

12 that little chart from Ogletree Deakins?

13 A     No.  We compiled the chart ourselves.

14 Q     Okay.  The top line it talks about -- the first line

15 lists eight claims that had been, in the past, dismissed

16 without payment.  Do you see that line?

17 A     Eight claims?

18 Q     Sorry, 11 claims dismissed without payment.

19 A     I see it.

20 Q     Okay.  Do you know if all those claims were dismissed

21 involuntarily, that is by a court order adverse to the

22 plaintiffs?

23 A     I have no idea.

24 Q     So could that also include cases that were voluntarily

25 dismissed or abandoned by a plaintiff for whatever reason?

1  A      It could.

2  Q      Okay.  Do you know how many of those 11 cases that were

3  dismissed at the trial level might be on appeal now in an

4  appellate court?

5  A      I have no idea.

6  Q      Okay.  So you are familiar with the proof of claims

7  form used in this case, correct?

8  A      I am.

9  Q      Okay.  I'm going to show you what was marked earlier in

10 this case as JTX-2874.

11         Ally, could you pull that up?

12         Do you recognize that as one of the proofs of claim

13 used in this case?  Does that look familiar?

14 A      It looks familiar, yes.

15 Q      Okay.  And I'm just using this as an example.  In

16 extracting standardized data from the proof of claims your

17 team used a list of standardized data fields, correct?

18 A      Would you mind repeating the question?

19 Q      Yes.  In extracting standardized data from the proof of

20 claims your team a list of standardized data fields, correct?

21 A      We used an agreed upon standardization list.

22 Q      Okay.

23 A      So a list of the fields that parties were interested in

24 having standardized.

25 Q      But the fields you used did not include any damages

1  data, correct?  Nothing about the effects of the abuse?

2  A     Correct.

3  Q     And, Ally, could you jump to page 10 of that exhibit,

4  please.

5        Part 5(a) of the proof of claims form on page 10, do

6  you see there at the top where it says "Part 5 impact of

7  sexual abuse?"

8  A     I see it.

9  Q     Okay.  Part 5 of the proof of claims form has a bunch

10 of check the box responses, correct?

11 A     Correct.  Those responses are included in the tranche

12 data.

13 Q     Okay.  But they're not -- are they included in the data

14 points that your team collected?

15 A     I don't understand the question.  It was included in

16 the download from Omni because Omni provided responses to all

17 the questions in the POC form.  And because these are check

18 boxes we included them as ones or zeros in the tranche data.

19 Q     Okay.  Is that on the spreadsheet that Ms. Yang showed

20 you earlier?

21 A     Actually I misspoke, it is not.

22 Q     Okay.  So none of these check boxes are included on

23 that spreadsheet, are they?

24 A     Correct.

25 Q     But you could have included all of these check boxes

1   about the impact of sexual abuse on that spreadsheet of

2   standardized data that your team collected, correct?

3   A    We could have, but it wasn't on the initial

4   standardization list.

5   Q    Okay.  So none of these check boxes of the impact of

6   sexual abuse was included in that tranche six data, correct?

7   A    Correct, because it wasn't on the list.

8   Q    And you can take that down now, Ally.  Thank you.

9        In your declaration, and I don't need to pull this up,

10  but you talked about that if a claimant indicated a range of

11  the number of times they were abused your team noted the

12  lowest number on the data that they collected, is that

13  correct?

14  A    (Inaudible).  Would you mind pointing it out for me?

15  Q    Yes.  Hang on one moment and I will find that, but not

16  pull it up.  Hold on a minute.

17       Specifically, you note in your declaration that the

18  number of times abused is identical to the minimum abuse

19  count.

20           THE COURT:  Do you know what paragraph that is,

21  Ms. Dumas?

22           MS. DUMAS:  Yes.  I will pull that up right now.

23  Hang on one second and I will direct you to it.

24  BY MS. DUMAS:

25  Q    In paragraph 56 and Paragraph 55 of your declaration.

1        Ally, don't pull that up, please.

2        But if you could look at that, please, Ms. Murray.  So

3   in Paragraph 55 of your declaration you talk about how if

4   somebody gave a range of the number of the times they were

5   abused, say if they said they were abused five to ten times,

6   your team would note five times as the number of abuse.  Is

7   that correct?

8   A     Correct.

9   Q     Okay.  And so in Paragraph 56 your declaration says

10  number of times abused is identical to min abuse count, is

11  that correct?

12  A     Correct.

13  Q     And "min" in that context means minimum, correct?

14  A     Correct.

15  Q     Okay.  You could have coded the number of times abused

16  as the maximum times given in that range, couldn't you?

17  A     We could have.

18  Q     Is there any reason why you could not have used the

19  maximum time instead of the minimum time?

20  A     (Inaudible) in a number of instances the range was so

21  large that the minimum seemed to be a better indicator then

22  the maximum.

23  Q     In your opinion?

24  A     In my professional opinion.

25  Q     Was that the opinion shared by the claimants?

1  A      No claimants -- no claimant or claimant group ever

2  questioned the methodology we employed for the number of

3  times abused.

4  Q      Did you discuss it with the claimant's constituencies

5  before you chose to use the minimum number rather than the

6  maximum number?

7  A      I think it might be in the standardization list, but if

8  not we opened up the data processing for feedback and we

9  never received any.

10  Q      On Paragraph 60 of your declaration you talk about the

11  criteria relevant to the statute of limitations.

12  Specifically you are talking about a statute of limitations

13  table that you received from Ogletree Deakins.  In Paragraph

14  60 of your declaration you referred to criteria relevant to

15  the statute of limitations as the abuse survivor age, years

16  since discovery of the injury, and whether there is revival

17  window, among other things.  Is that an accurate description

18  of your testimony?

19  A      Correct.

20  Q      Okay.  And in Paragraph 6(c) of your declaration you

21  say Bates White then applied the SOL criteria for each of the

22  states, a record provided in the location of abuse fields.

23  Di I read that correct?

24  A      You did.

25  Q      It looks like there might be a word missing in that

1  sentence, perhaps between states and a record, maybe the word

2  for or to?

3  A     No.  It basically means that Bates White applied the

4  (inaudible) criteria for each of the states a record

5  provided.

6  Q     Okay.  And what criteria did they apply, the age of the

7  person and whether there was a window?

8  A     No.  So we have a statute of limitations table that was

9  based on a memo that was provided to us by Ogletree.  We use

10  the claimants birth date, abuse timing, abuse date

11  information and compared it to the (indiscernible) table in

12  order to determine a presumptive bar for that claim.

13  Q     Okay.  Did you apply, in any way, the criteria

14  mentioned in Paragraph 60 of years since discovery of injury?

15  A     So you might recall that the POC form does not include

16  explicit information about years since abuse discovery.

17  Q     Okay.

18  A     In that case we made an assumption about years since

19  abuse discovery that was based on their last date of abuse

20  using last date of abuse as a proxy for when they would have

21  discovered their abuse because there was no explicit year

22  since discovery information provided on the POC form.

23  Q     Okay.  So when you looked at that table describing the

24  statute of abuse in the different states that was provided to

25  you by Ogletree did you see that there are some states,

1 including my state of Oregon, that has a discovery provision

2 in its statute of limitations that allows people to bring

3 claims many years later when they make a discovery between

4 the abuse and its causal connection to their injuries?  Did

5 you read that on the table that Ogletree sent you?

6 A    So we saw that there were a number of states that had

7 years since abuse discovery statutes.  Given the fact that

8 there is no information on the POC form, however, about year

9 since abuse discovery in order to incorporate that

10 information as part of our analysis we made an assumption

11 about when their year since abuse discovery was.

12 Q    So your assumption was just based on the last year of

13 abuse being a, what you call, discovery of abuse.  Am I

14 hearing you right?

15 A    For lack of better information, for more complete

16 information because that question is completely missing from

17 the POC form.  In order to include years since abuse

18 discovery as part of our analysis we made an assumption about

19 when that would have occurred based on the information that

20 we had at hand.

21 Q    Okay.  But to be clear you were not measuring years

22 from a discovery of a connection between abuse and injury.

23 You were simply measuring years of what you assumed was a

24 connection of discovery of abuse?

25 A    We were making the best possible assumption based on

1  the information that we had at hand.

2  Q    Okay.  And your chart that you then amassed, based on

3  your analysis of the data, only notes barred and not barred,

4  correct?

5  A    Correct.

6  Q    And in the category of barred it also includes all of

7  the claims based on your assumption that a claim was barred

8  under a discovery statute of limitations if it was so many

9  years past the last date of abuse.  Is that correct?

10  A    If in consideration of all the different pieces of the

11  analysis the claim was ultimately found to be barred that

12  would include claims that had potentially been around through

13  the years since abuse discovery and found to be barred, yes.

14  Q    Under your interpretation of those discovery statutes

15  of limitations?

16  A    Under our -- well, based on a lack of information and

17  our best assumptions about how to (inaudible) that

18  information, yes.  The alternative would have been to exclude

19  years since abuse discovery from the analysis entirely.  We

20  (inaudible) do that.

21  Q    Okay.  You could have marked those claims that are in

22  states with those types of statutes of limitations as

23  unknown, or undetermined, or some other kind of indication,

24  correct?

25  A    That is correct, but you also have to remember that

1  barred or not barred determination will not ultimately

2  prevent any claimant from compensation under the plan.

3  Q     But it did effect the aggregate potential liability

4  analysis performed by Dr. Bates, correct?

5            MR. GREEN:  Objection.  Lack of foundation.

6            THE COURT:  Yeah, lay a foundation.

7  BY MS. DUMAS:

8  Q     Did the barred and not barred analysis go in -- barred

9  and not barred determination go into the analysis used by Dr.

10 Bates?

11 A     It is my understanding that he used it, yes.

12 Q     Okay.  So by including that -- by including those

13 states with discovery statutes of limitations and just

14 marking them barred or not barred under your interpretation

15 of them that could have effected Dr. Bates's aggregate

16 potential liability analysis, correct?

17 A     It might have, but alternatively if we had assigned

18 those missing or unknown designations I cannot speak to how

19 Dr. Bates would have quoted those or valued those.

20 Q     Okay.  Just to be clear, you don't -- you didn't go to

21 law school?  You are not a lawyer, correct?

22 A     I am not a lawyer.

23 Q     Did you do -- did you document in any way the data

24 showing how many cases or claims are from states that have

25 those kind if discovery statutes?

1  A     Currently it does not include an indicator of how many

2  states had an abuse since discovery started.  Years since

3  abuse discovery started.

4  Q     And are -- does your data include any analysis of how

5  many claims that are from those kinds of states with

6  discovery statutes that are beyond the age limit part of

7  (inaudible) statutes.  Those statutes usually have two parts;

8  one you have a certain age to bring it and then you have to

9  bring it within the discovery part?

10 A     There was no indication our data would tell whether or

11 not a claim made it past the year since abuse discovery

12 statutes.

13 Q     Okay.  So looking at your data in the claims listed as

14 barred there is simply no way to know from that bar without

15 going through and re-crunching the data which ones might be

16 in a discovery -- a state with a discovery statute and know,

17 just because it says barred, whether it is part of the --

18 whether it falls within that discovery part of the statute,

19 correct?

20 A     We did provide abuse date information.  So to the

21 extent you know that there are states with a year since abuse

22 discovery statute it would be relatively easy to identify

23 which claims could potentially be effected by that analysis.

24 Q     So we would have to go through, and cull all that, and

25 re-crunch it, right?

1   A      It would be a matter of identifying the claims based on

2   the abuse date information in the data base, but yes.

3   Q      Okay.  I would like to pull-up, and I think I did this

4   right, Exhibit JYX-0986 which is an exhibit to your

5   declaration.  If you could look at your version on your

6   computer I have a redacted version to use in court where I

7   did redact the names of claimants and abusers.

8   A      Okay.

9   Q      Ally, can we pull that up?

10         Okay.  Now I would like you to look at yours because I

11  think it would make it easier for you to look at yours on

12  your screen.

13  A      Okay.

14  Q      Now Bates White received all of the data on historic

15  settlements from Ogletree Deakins, correct?

16  A      Correct. The file that Dr. Bates ultimately uses for

17  rebuttal, I think, comes from Carl by way of Ogletree.

18  Q      And I want to just explain a few things before we go

19  through it.  Everything highlighted in blue I highlighted

20  because I'm going to talk to you about it.  Anything

21  highlighted in yellow or green was already highlighted on

22  your exhibit.

23         This spreadsheet is for all historical data going back

24  -- it includes data going back to 2010, correct?

25  A      Correct.

1  Q     Okay.  Did you see any of the underlying documentation?

2  A     I did not.  We relied on the data as it was provided.

3  Q     Did you ask to see any of the underlying documentation?

4  A     It is (inaudible) that we did.  We (inaudible) as it

5  was provided.

6  Q     Did you know that the list is missing six cases settled

7  in Oregon in 2010 for $2.2 million each?

8  A     I did not know that.  To the extent that that is true

9  its possible.

10 Q     Now assuming that Ogletree had included an additional

11 2010 settlement of $2.2 million each on this list of historic

12 settlements would that additional data have been relevant?

13 A     I cannot speak to the relevance of the data.  I can say

14 that it would be six (inaudible) out of almost 600 and that

15 we would be looking at $2.2 million out of I think $266

16 million.  So the relevance if something that I cannot speak

17 to because I am not privy to Dr. Bates analysis.

18 Q     Okay.  Would you have included those settlements in

19 your data analysis?

20 A     If we were aware of it and if they had been brought to

21 our attention we would have included that in our analysis.

22 Q     Did Bates White ask Ogletree Deakins to double check

23 its list of settlements to make sure that no settlements were

24 missing?

25 A     We did not.  We relied on the list as it was provided.

1  Q     Did Bates White ask any of the claimant constituents to

2  check this list of historic settlements to see if anything

3  was missing?

4  A     We did not.  We relied on the data that was provided.

5  Q     Okay.  Did Bates White ask any of the insurers to check

6  the list of historic settlements to see if anything was

7  missing?

8  A     We did not.

9  Q     And if we could jump down to line 27.  And that, if you

10 can see it, is an Oregon claim and it shows, at the last

11 column there, closed dismissed MSJ.  Do you see that?

12 A     I do.

13 Q     Do you know if that is one of the 11 claims on your

14 little chart in your declaration that was shown as dismissed

15 and given a no value on your little summary chart?

16 A     Well my little summary chart is based on claims from

17 2016 through 2020.  So if --

18 Q     And that one is 2018?

19 A     This one is 2018.  Like I said, that would have been

20 included, but I cannot say for sure.

21 Q     And --

22        MR. KURTZ:  Your Honor, I do want to point out

23 that we are periodically seeing claimant names on the screen

24 here which I think is -- I think what's happening is when Ms.

25 Dumas highlights a line it seems to un-redact the claimants

1 name.  So I just rise to make that known.

2        MS. DUMAS:  I will -- why don't you scroll down,

3 Ally, so that we can't see that name.  Scroll down, down,

4 down.  Take that down and I will fix it before we show it

5 again.

6 BY MS. DUMAS:

7 Q    That claim I just showed you from 2018 that was

8 dismissed are you aware that that case is actually on appeal

9 right now?

10 A    I am not aware.

11 Q    If -- I will have you assume if a case is on appeal do

12 you agree that it should not be shown as dismissed with a

13 value of zero if it's still on an active appeal?

14 A    I am not a lawyer so I cannot do make any

15 representations as to what should or should not be included

16 on this list.  We relied on this list based on Ogletree's

17 expertise as national coordinating council.

18 Q    Did Ogletree Deakins share any data with you on the

19 number of cases dismissed at the trial court level, but that

20 are currently on appeal?

21 A    They did not.

22 Q    Do you have any data on the success rate of defendants

23 in cases before the Oregon Court of Appeals?

24 A    I do not.

25 Q    If a case is still pending in the court of appeals and

1  simply on stay because of this bankruptcy is it accurate to

2  consider it a closed case on your list?

3  A     If it appears as a closed case on my list, as I said,

4  we relied on the expertise of Ogletree. We are not a law firm

5  and we are not lawyers.

6  Q     And -- so you used Ogletree Deakins data to calculate

7  how many abusers identified in historic settlements back to

8  that 2010 on that list were named in the proof of claims,

9  correct?

10  A     Correct.

11  Q     And if we could take just two minutes so I can black

12  out those other names that popped up I will get that correct

13  exhibit to my person or, Ally, do you have the ability to

14  black out that whole column?

15      She does.  She will do that and get it back up.  Thank

16  you.

17      (Pause)

18      While she is doing that I can ask my next question.  Do

19  you know why Bates White was asked to determine how many

20  multi-claim abusers there were that crossed over between the

21  historic settlements and the proof of claims?

22  A     I know that Dr. Bates was interested in being able to

23  estimate the number of multi v. single claim abusers in both

24  data sets.  I do not know for what purpose.

25  Q     Were you also -- thank you.  Earlier when Ms. Yang was

1 asking you questions I believe you said that all the historic

2 settlements had the names of the abusers, but if I could have

3 Ally, scroll through this list, sort of, down so that you can

4 look at the Column G that names the abusers.  Ally, if you

5 could just scrolling down that to the bottom.

6      Ms. Murray, you will see some white gaps there in that

7 column of abusers especially as we start going down.  There

8 is some white gaps and as we go down further there is a

9 couple more.  Then we start getting a lot more, and a lot

10 more, and a lot more, and a lot more.

11 A    Ms. Dumas, I think Ms. Yang might have been referring

12 to the (inaudible) list of BSA historical settlements that we

13 used, the list of 262, and not this list of 573.

14 Q    Okay.  When you were comparing the list of historical

15 settlements to find multi-claim abusers you did use this list

16 of 500 and some abusers to make that comparison, correct?

17 A    Correct.

18 Q    And this list of 570 some settlements with all of these

19 abusers is missing a number of abuser names, correct?

20 A    Correct.  What I will say though is my understanding is

21 that Dr. Bates team might have done additional work on the

22 list to identify abusers.  But based on my job -- my job was

23 to process and standardized the list as is.

24 Q    Okay.  And your job also included comparing this list

25 to the proof of claims to identify the multi-claim abusers,

1  correct?

2  A     Correct.

3  Q     Okay.  Mr. Bates -- Dr. Bates did not do any additional

4  work to identify the multi-claim abusers, correct?

5            MR. GREEN:  Objection, lack of foundation.

6            THE COURT:  Sustained.

7  BY MS. DUMAS:

8  Q     Do you know if Dr. Bates, himself, did any work going

9  through the proof of claims to identify multi-claim abusers?

10 A     I do not know if Dr. Bates did additional work.  His

11 team might have (inaudible) POC's we are here talking about

12 the historical settlements.

13 Q     Right.  Your team was tasked with finding multi-claim

14 abusers in the proof of claims, correct?

15 A     Correct.

16 Q     Do you know if Dr. Bates and his team went through the

17 proof of claims looking for multi-claim abusers?

18 A     I'm not sure I understand the question.  We

19 standardized the abuser name information that was provided by

20 the claimants.  As to the extent they provided multiple

21 abuser names that were full names those would have been

22 characterized as -- those would have been incorporated into

23 our analysis for multi v. single claim abusers.

24 Q     Okay.  But that wasn't quite my question.  My question

25 was it was your team who was looking for the multi-claim

1  abusers, correct?

2  A    Yes.  In the POC data, correct.

3  Q    Did Dr. Bates do a separate analysis of the proof of

4  claims looking for multi-claim abusers?

5            MR. GREEN:  Objection, foundation.

6            MS. DUMAS:  I'm trying to establish a foundation

7  by asking her.

8            THE COURT:  Yes, overruled.

9            THE WITNESS:  I am not certain.  They may have

10  done subsequent to my team's work.

11  BY MS. DUMAS:

12  Q    Do you have any reason to believe they did?

13  A    I have no reason to believe they didn't.

14  Q    Did you see any documentation of such an analysis?

15  A    I am not privy to Dr. Bates analysis, so I would not

16  have seen any documentation of such.

17  Q    When you were doing your analysis of the proof of

18  claims looking for a comparison of the historic settlements

19  on this chart and looking for multi-claim abusers did you ask

20  Ogletree Deakins to fill-in the missing names of the abusers

21  on this chart?

22  A    We did not.

23  Q    Would that missing information had been relevant to

24  your analysis?

25  A    It was represented to us that the information from 2016

1  to 2020, during which time Ogletree was national coordinating

2  council, was fulsome.  The information prior to 2016, when

3  they were not national coordinating council, as you can see

4  there are more gaps in that information.  Whether or not they

5  would be able to -- their representation was that they were

6  unable to provide that information.

7  Q    I move to strike her non-responsive answer.

8           MR. GREEN:  Your Honor, I think the answer was

9  completely responsive to the question posed.

10          THE COURT:  I am going to overrule that.

11 BY MS. DUMAS:

12 Q    My question was would that information have been

13 relevant if you had it?

14 A    It would have been relevant if we had it, but we used

15 and relied upon the data as was provided to us.

16 Q    Did -- when you were doing your analysis looking for

17 multi-claim abusers did you -- I didn't understand from when

18 you were answering questions for Ms. Yang when you did your

19 analysis looking for multi-claim abusers did you also compare

20 the abusers identified in proof of claims internally compared

21 to looking at the historic settlements?

22 A    I am not sure I understand the question.

23 Q    Did you look for abusers identified more than once in

24 the proof of claims?

25 A    We did.

1    Q    Okay.  Did Bates White also look for abusers identified

2   in BSA's ineligible volunteer files and compare those to

3   names in the proof of claims in this bankruptcy?

4   A    I did not.

5    Q    So limiting your analysis to the names of abusers on

6   the list of historically settled claims that did not give you

7   a list of all abusers in the Boy Scouts, correct?

8   A    I have not basis for knowing whether or not the list of

9   abusers on this historical settlement spreadsheet represents

10  the entirety of abusers in the Boy Scouts.

11   Q    Now I am going to ask you about a few specific things.

12  I would like to direct you on this document to line 66. Do

13  you see line 66 here and -- there you go, that is a historic

14  settlement from 2015 in Oregon involving a, it says, number

15  of historical claims brought against abuser 11 to 20

16  involving one adult, penetration, the abuse happened in 1967

17  to 1986, 50 to 100 times, the case was settled in 2015 for

18  $4.9 million.  Do you see that?

19  A    I do.

20   Q    Okay.  Then I would like to show you a different

21  exhibit which is -- I provided a number of exhibits to your

22  attorney.  I would like to show you what has been marked as

23  JTX-2874.

24        Your Honor, this was what part of the original exhibits

25  that were produced to you, the joint exhibits.  I didn't give

1  you a witness binder for this because it's going to be so

2  short that I didn't want to give you a whole bunch and have

3  you just look at that.

4       So do you see the exhibit sticker there?

5  A    I do.

6  Q    And then I'm going to jump to page 3.  Do you see my

7  name and my firm name there?

8  A    I do.

9  Q    Okay.  This is one of the claims that my client has

10  filed and then I'm going to show you the bottom of page 5.

11  Do you recognize this as the part of a proof of claim where

12  they ask the nature of the sex abuse there in part four?

13  A    I do.

14  Q    Okay.  Is that the space on the document where Bates

15  White -- where your team members looked to find the names of

16  the perpetrators, Section 4?

17  A    Yes.

18  Q    Please look at the top of page 6. Is that the actual

19  space on the form where a claimant was supposed to write the

20  name of the perpetrator or, at least, as much of the name as

21  they could remember?

22  A    It is.

23            MR. GREEN:  Your Honor, there's a name on the

24  document.

25            MS. DUMAS:  Yes, there is, but that is not a --

1  that is not a privileged document and is not a privileged

2  name.

3       We can't hear you, Judge.

4            THE COURT:  I think that's right.  It's not --

5  this is a perpetrator.

6  BY MS. DUMAS:

7  Q    So do you see at the top of that document where it

8  identifies Clyde Brock (ph) as the assistant scout master?

9  A    I do.

10 Q    And then I will have you look at your copy of the

11 historic settlement chart.  Do you see that same name there

12 at line 66?

13 A    I do.

14 Q    Okay.  In your declaration where you have a list of 49

15 multi-claim abusers do you see the initial CB anywhere?

16 A    One second.  I do not.

17 Q    Okay.  Then I would like to quickly show you the

18 related documents.  Can we pull-up Exhibit JTX-2875?

19      Okay.  Then, again, page 3, there's my firm name.  And

20 then page 6, do you see there at the top and do you see that

21 same name there Clyde Brock?

22 A    I do.

23 Q    Have you assumed that this is a brother of the other

24 guy?

25 A    Ms. Dumas?

1  Q      Yes.

2  A      Ms. Dumas, the table that I show in my declaration is a

3  table of abuser names that were updated from single claim

4  abusers to multi-claim abusers based on our identification.

5  Based on the historical settlements file this guy already was

6  assigned -- this guy was already flagged as a multi-claim

7  abuser.  So he would not have appeared on this table.  Does

8  that make sense?

9  Q      No, because that is a table of multi-claim abusers.

10 Why did he not show-up on your table of multi-claim abusers?

11 A      No.  It is a table of single claim abusers that have

12 been updated.  If you look at Figure 5 in my declaration the

13 original abuser frequency category for all of these abusers

14 is zero to one or one.  Then we have an updated abuser

15 frequency category that shows the updated multi-abuser count.

16 So Clyde Brock would not have showed up on this list because

17 in historical settlements he was already flagged as a multi-

18 abuser.

19 Q      Can we pull-up that historic settlement chart, Ally, to

20 show that.  So where -- so where it says 11 to 20 does that

21 mean he already is a multi-claim abuser?

22 A      We would have already designated him as a multi-abuser.

23 This is a number of historical claims brought against that

24 abuser.

25 Q      But those are historical claims.  Are they claims in

1  the bankruptcy?

2  A    The table in my report or my declaration is based on

3  updating of the historical settlement abuser names to reflect

4  any updates based on the POC data.  So he would not appear

5  here.

6  Q    Okay.  Can -- then, Ally, could you scroll through that

7  document that is up on the screen there.  Go a little bit

8  slower.  Keep going down.

9        So any of these ones that have numbers that already

10 show historic claims those are already identified as multiple

11 claim abusers in your analysis?

12 A    Correct.

13 Q    Without showing up on your chart below?

14 A    So they would not show-up on my chart below because my

15 chart below looks at single claim abusers in the historical

16 settlements that were updated to multi-claim abusers as a

17 result of our merging the POC (inaudible).

18 Q    Okay.  Then let me just check my notes and I think I'm

19 done.

20       Is there any place where you have a full list of the

21 multi-claim abusers in your --

22 A    There is no case where I have a full list of multi-

23 claim abusers in my reports, declarations, or supporting

24 materials.

25            MS. DUMAS:  Those are all my questions.  Thank

1  you.

2          THE WITNESS:  Thank you.

3          THE COURT:  Thank you.

4          Is there any -- Mr. Green.

5          MR. GREEN:  Your Honor, I have a very short

6  redirect.  May I please have a couple minutes to --

7          THE COURT:  Mr. Moxley wishes to ask some

8  questions, I assume.

9          MR. GREEN:  Sorry.

10          MR. MOXLEY:  Yes, Your Honor, I would.  Thank you,

11  Judge.

12                      CROSS EXAMINATION

13  BY MR. MOXLEY:

14  Q    Good morning to you, Ms. Murray.  My name is Cameron

15  Moxley, I am with the law firm of Brown Rudnick on behalf of

16  the Coalition of Abused Scouts for Justice.  Good afternoon.

17  A    Good morning.

18  Q    Early afternoon, late morning, yes.

19       Ms. Murray, you were asked some questions by both Ms.

20  Yang and Ms. Dumas about single claim abuser v. multi or

21  repeat abusers.  Do you recall those questions?

22  A    I do.

23  Q    Just for the record what do you mean by a single

24  survivor claim?

25  A    So a single claim abuser is an abuser that is only

1  attached to one claim in the POC data.

2  Q    And what do you mean by a repeat or multi-abuser claim?

3  A    A repeat or multi-abuser would be one that is listed

4  numerous times or at least two times in the POC data.

5  Q    Okay.  And at JTX-1077, which was a spreadsheet that

6  was attached to your declaration, I believe, and that Ms.

7  Yang asked you some questions about the classifications in

8  that spreadsheet that you were shown was that based on

9  information that is known as of -- well, as of what date was

10 that information?

11 A    That would have been information as of July 2nd.

12 Q    July 2nd of 2021, is that right?

13 A    Yes.

14 Q    And, Ms. Murray, are you aware that if the plan is

15 confirmed all of the abuse claims will be processed by a

16 settlement trust?

17 A    I am aware.

18 Q    Have you been involved, Ms. Murray, in bankruptcies

19 where a settlement trust is created to resolve tort claims?

20 A    I have not.

21 Q    Is it your understand, based on what you know about

22 this case, that as the settlement trust processes claims

23 abusers that are currently unknown may become known as

24 claimants provide information to the settlement trustee?

25 A    That is my understanding.

1  Q     And, Ms. Murray, as the settlement trust processes

2  claims and additional abusers are identified many of the

3  claims that are presently identified as single survivor

4  claims become clearly repeat or multi-abuser claims?

5  A     They might. So the single v. multi-claim reference is

6  tied to the abuser and not necessarily the claimant.  So we

7  were looking to identify abusers that appeared multiple times

8  across claims as opposed to flagging claims as multi-claims.

9  Do you understand? It's an abuser reference as opposed to

10 claimant reference.

11 Q     Right.  So as more abuser information becomes available

12 as claims are processed under the settlement trust process it

13 may be that abuser -- it becomes clear that an abuser had

14 multiple victims, correct?

15 A     Correct.

16 Q     Okay.  Ms. Murray, you testified that Bates White did

17 not do anything to verify the voracity of any data in the

18 proof of claim forms, is that right?

19 A     That is correct.

20 Q     And you testified that many proofs of claim at this

21 time do not identify the abuser by first and last name, is

22 that right?

23 A     That is correct.

24 Q     Does that mean, Ms. Murray, that any proof of claim

25 form that does not identify the abuser by first and last name

1   is by default coded as a single survivor claim?

2   A     So one thing I would to clear up is that in Exhibit

3   1077 this abuser claim count in Column H is actually the

4   number of abusers that the claimant mentioned or referenced

5   in the POC form.

6   Q     Okay.

7   A     It isn't an indicator of single or multi-abusers in the

8   data.

9   Q     So if -- I understand.  As abuse claims are processed,

10  Ms. Murray, by the settlement trust many claimants may

11  provide information that is sufficient to identify the abuser

12  where it's not currently in the data.  Is that correct?

13  A     That is my understanding.

14  Q     Okay.  Sitting here today, Ms. Murray, do you think

15  that Bates White has sufficient information to know how many

16  abuse claims will ultimately involve repeat abusers?

17  A     I think we (inaudible) to know how many abuse claims

18  currently involve multiple abusers, how many will ultimately

19  involve multiple abusers I think is unknowable.

20  Q     So there could be a significant shift post-confirmation

21  between what are presently known as single abuse claims v.

22  what may become multi-abuse claims.  Is that correct?

23  A     It's possible if you assume that the claimants that

24  provided deficient abuser name information and are able to

25  provide more fulsome information.

1  Q      It's possible if they are able to provide more fulsome

2  information that that shift could happen, correct?

3  A      It could.

4              MR. MOXLEY:  Thank you, Ms. Murray.

5              I have no further questions, Your Honor.  Thank

6  you.

7              THE COURT:  Thank you.

8              Is there any other cross examination?

9         (No verbal response)

10             THE COURT:  I don't see anyone.

11             Let's have redirect or do you want a few minutes?

12             MR. GREEN:  Your Honor, I can go ahead now.  Thank

13  you.

14                     REDIRECT EXAMINATION

15  BY MR. GREEN:

16  Q      Ms. Murray, you discussed standardization (inaudible)?

17  A      I did.

18  Q      Were those negotiated with the TCC?

19  A      They were negotiated with multiple parties.

20  Q      The TCC?

21  A      The TCC.

22  Q      Was the FCR another?

23  A      It is my understanding that they might have been.  I

24  can't be certain.

25  Q      And the Coalition?

1  A     Yes.

2  Q     You received comments from those constituencies in

3  creating (inaudible), correct?

4  A     We routinely received comments as well as data sets

5  that they asked us to review.  We reviewed and updated those

6  data as necessary or as we deemed appropriate.

7  Q     You also provided an updated data to those groups?

8  A     We did.

9  Q     And those were updated frequently?

10 A     They were.  As I said, we provided six tranches over

11 time.  Those tranches would incorporate any updates to the

12 records that were indicated by the parties as we went along.

13        MR. GREEN:  Thank you. Your Honor, I have no

14 further questions.

15        I have one housekeeping note.  I wanted to clarify

16 for the record whether Exhibits 9 through 43 of Ms. Murray's

17 report or declaration were entered into the record.  There

18 were not objections filed to those exhibits.

19        THE COURT:  If there were no objections filed to

20 the exhibits then they will be admitted.

21     (DX Exhibits 9 through 43 received into evidence)

22        MR. GREEN:  Thank you, Your Honor.

23        THE COURT:  Thank you, Ms. Murray, for your

24 testimony.  You are excused.

25        THE WITNESS:  Thank you, Your Honor.

1        (Witness excused)

2              THE COURT:  Mr. Kurtz.

3              MR. KURTZ:  Good afternoon, Your Honor.  If we

4    could have just a very short break so that we could place the

5    witness in the room before the camera for Your Honor.

6              THE COURT:  We will take 10 minutes.  We will

7    reconvene at 12:15.

8              MR. KURTZ:  Thank you very much, Your Honor.

9              THE COURT:  We're in recess.

10        (Recess taken at 12:04 p.m.)

11        (Proceedings resumed at 12:16 p.m.)

12              THE COURT:  This is Judge Silverstein.  We're back

13    on the record.

14              Mr. Kurtz.

15              MR. KURTZ:  Good afternoon, Your Honor.  Glenn

16    Kurtz from White & Case on behalf of the debtors.

17              The debtors call Dr. Charles Bates to the stand.

18              MR. BATES:  Good morning, Your Honor -- good

19    afternoon, I guess, at this point.

20              THE COURT:  Thank you.  Good afternoon.

21              Dr. Bates, can you raise your right hand, I need

22    to swear you in.

23              DR. CHARLES BATES, DEBTOR WITNESS, SWORN

24              THE COURT:  Please state your full name and spell

25    your last name for the record.

1          THE WITNESS:  My name is Charles Edgar Bates, B-A-

2    T-E-S.

3          THE COURT:  Thank you.

4          Mr. Kurtz.

5          MR. KURTZ:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. KURTZ:

8    Q     Dr. Bates, could you briefly describe for the court

9    your educational and professional background?

10   A     Certainly, Mr. Kurtz.  I started at the University of

11   California San Diego where I was studying mathematics and

12   economics; the same as Ms. Makeda.  Also, I also received

13   high honors from my degree.

14        I became interested at that time, in particular, in

15   studying use of mathematics with a purpose of studying

16   problems involved with data, data generating processes which

17   I am going to describe at this point and that became the

18   subject of my research at the University of Rochester where I

19   got my PhD under a man who eventually became my partner, Dr.

20   Howard White, who is a famous econometrician.

21        Then at that point when I was studying that material I

22   then went and was hired by the Department of Economics at

23   Johns Hopkins University where I spent seven years as an

24   assistant professor doing econometric research upon the

25   limits of data and the ability of us to draw inference from

1 data based on the properties of the underlying data, the data

2 generating process.

3    I have used that term now twice, the data generating

4 process is, essentially, the properties that basically result

5 in the data that we use and we analyze for solving various

6 kinds of problems.  My particular focus is how varied can

7 that data be, what are the limits to that underlying property

8 of that data, the data comes out of the property.

9    Processes that may be uncertain or have various

10 elements, whether its scientific data or financial and

11 economic data, and be able to draw proper inference from that

12 data is something that is very involved and was the study of

13 my scientific inquiry which I did starting from the time of

14 my early 20's through the next 20 years.  I finished at Johns

15 Hopkins University when I first took the job in private

16 practice at KPMG. My first application of the those skills

17 was to estimate the asbestos liabilities associated with the

18 National Gypsum Company.

19    As you can see from the slide that is on the chart here

20 I am currently chairman and founder of Bates White LLC which

21 I did 20 years ago.  That followed on seven years at,

22 basically, after having been at KPMG where I built up my

23 first practice, focused on the applications of the research

24 into the ways in which data could be used to draw inference

25 about mass torts in general.

1    I started off with my study at KPMG at National Gypsum

2  Company.  I applied it at that time to things like insurance

3  under-writing, as well as mass estimation of large pieces of

4  property.  I once did an estimate of estimating the real

5  estate value of a 1900 mile long pipeline where you had to

6  use, sort of, mass estimation techniques on real estate to do

7  that.

8    So the underlying core of all of my work has basically

9  been on how you analyze the data and develop proper

10  techniques to draw proper inference from the data based on

11  the underlying properties of that data.

12    The next slide that we have here shows, basically, a

13  list of the fields of my expertise in general.  In addition

14  to studying about the data I studied economics and the way in

15  which economic models are used for that purpose of drawing

16  proper inference as well.  So the economics of this is pretty

17  important for understanding how data are generated, how they

18  come about in particular taking into account of the

19  incentives of the people who basically lead to the data that

20  you wind up receiving.

21    The particular field of study applying these kinds of

22  techniques to mathematical techniques is called econometrics

23  which is the field that I studied in my particular field of

24  expertise in my background.

25  Q    How many times have you been hired as an expert to

1  value claims?

2  A     Thousands of times in the last 30 years.  As I

3  mentioned here, I started with the National Gypsum, working

4  on the National Gypsum matter.  I worked the mid-1990's on

5  the Fiberboard matter that related to the Ortiz of the

6  Supreme Court, the class action settlement involved mass

7  analysis of mass valuation of lots of asbestos claims.

8       Here is a list or chart of many of them.  Most recently

9  on the list is the one that is from Garlock in the matter

10 that I worked on for the company.  Garlock was a manufacturer

11 of gaskets which led to over the years hundreds of thousands

12 of asbestos lawsuits against them.  I worked for a decade on

13 for their financial reporting work and helping them

14 understand about the financial liability associated with

15 those claims that was derivative of the underlying tort

16 liability when they got sued by these claims.  Eventually in

17 the bankruptcy where I served as their expert on that matter.

18      That relates back to these are a list of the number of

19 those companies on behalf of insurers some of them, some of

20 them on behalf of debtors, some of them are financial

21 creditor committees.  Generally for this kind of work I have

22 worked for those types of parties.

23 Q     Typically how many claims do you value on this matters?

24 A     The asbestos cases usually involved sometimes as few as

25 tens of thousands, but typically over the years it's involved

1  hundreds of thousands of claims of different types.  The

2  matter (inaudible) which is a product called diacetyl which

3  led to "popcorn lung."  Those would be much smaller in terms

4  of the number of claims, but they used similar types of

5  techniques.

6  Q    Have you ever testified at trial to claim valuation?

7  A    Particularly I testified at trial a claim valuation at

8  bankruptcy -- the Garlock bankruptcy is the case that comes

9  to mind.

10  Q    Approximately how many claims did you value in the

11  Garlock bankruptcy?

12  A    Approximately 100,000.  The focus was on a smaller

13  subset of those, but 100,000 cases.

14  Q    Did the court credit your expert valuation opinion the

15  Garlock case?

16  A    The court did, yes.

17  Q    Have you testified in any other venues?

18  A    Yes, I have.  I have testified in bench trials a number

19  of times, but most notably was the most interesting was the

20  testimony in front of the Senate Judiciary Committee in the

21  mid-2000's relating to a bill that was proposed to create a

22  national trust to handle all asbestos cases. I testified on

23  that case to valuate the way in which that trust would work

24  and the implications that that trust to the expenditures that

25  would be required to fund that trust.

1  Q      And what happened to that bill before Congress?

2  A      Well the day after I testified there was an opinion

3  article about in the Wall Street Journal which was crediting

4  my testimony and was sometime afterwards where Congress

5  rejected the bill.

6  Q      Do you have any experience in structuring TDP's and in

7  developing claim matrixes?

8  A      Yes.  That has been part of this work going back.  I

9  mentioned the National Gypsum matter in the early 1990's.  I

10 was working there for the financial creditors committee and

11 at that time I helped for them design and write a proposal

12 for a TDP, trust distribution procedure, at that time for

13 handling personal injury claims involving various types of

14 asbestos claims, mesothelioma, lung cancer, and the like.

15        That has been a part of all the matters that I have

16 dealt with or a large part of the matters that I have dealt

17 with over the years is either evaluating the trust

18 distribution procedures or actually critiquing them and

19 offering as to them or designing them themselves.  In the

20 Garlock matter I think the trust distribution procedures that

21 we wrote helped write and design there are form of those

22 being used by that trust today.

23        MR. KURTZ:  Your Honor, at this time we proffer

24 Dr. Bates as an expert on the subject of claim valuation, and

25 mass tort matrixes, and TDP structures.

1          THE COURT:  Any objections?

2      (No verbal response)

3          THE COURT:  I hear no objections.  He is accepted

4  as an expert as such.

5          MR. KURTZ:  Thank you, Your Honor.

6  BY MR. KURTZ:

7  Q    Dr. Bates, what were you asked to do in this case?

8  A    Well I had four assignments, basically.

9      The first assignment was to estimate the value of the

10  abuse claims, that is the claims that are documented in the

11  proof claim forms that were provided in this case, as though

12  they were tort claims as if they had been filed as claims in

13  the tot system and resolved in the tort system.

14      The second assignment that I was asked to do was help

15  create the base matrix values and scalers for the trust

16  distribution procedures so that (inaudible) those items which

17  were those factors that were to be used by the trustee to be

18  able to emulate the tort system and replicate the kinds of

19  values that these things would have received had they been

20  filed as tort claims.

21      I was most recently asked to help to evaluate the

22  impact of the -- in the review option that was added to the

23  TDP, otherwise known as the IRO, and its impact on my

24  opinions, and its impact on the value of the abuse claims,

25  the recoveries of the trust based on that IRO being added to

1  the tort.

2      As well as I was asked to evaluate the claims in -- the

3  abuse claims against the TCJC, the Church of Jesus Christ,

4  (inaudible) against them relative to what the tort value

5  would have been.  Essentially, were their contributions,

6  essentially, sufficient to cover what would be the expected

7  expenditure associated with those claims.

8  Q    Did you reach any conclusions with respect to those

9  four assignments?

10 A    Yes.  The first assignment about the value of the abuse

11 claims there is, first to note, considerable uncertainty

12 about what that value is and my estimate is that the value of

13 those claims, had they been brought in the tort system based

14 on what we know and at this time, is somewhere between $2.4

15 and $7.1 billion; a fairly wide range.

16     Over the course of my investigation, as new information

17 has developed and I learn more about the cases, which is

18 happening virtually every week in this case as rapidly as its

19 occurred, I was able to narrow that range somewhat in terms

20 of I still believe that that full range is what is

21 appropriate and right for the claims given the uncertainty,

22 but more likely it's in the lower cortile of that range;

23 namely somewhere between $2.4 and $3.6 billion.

24 Q    And what was the conclusion that you reached as to the

25 second assignment relating to the TDP claim values?

1 A    The TDP's claim value, the estimate -- the TDP's, I

2 think, are well-structured, well-structured.  The base matrix

3 values and scalers that are at hand for the trustee to be

4 able to valuate the individual claims and assign to them

5 appropriate values that would be consistent with those claims

6 as if they were filed in the tort system, but perhaps even

7 better than that in that they would be able to be

8 consistently applied and equitably applied across all of the

9 claimants by having the same procedures used for all of them.

10 Q    And what was your conclusion about the IRO, the option,

11 the review option, the independent review option that was

12 included in the TDP's in connection with the settlement of

13 the TCC?

14 A    Well, first, the independent review option does nothing

15 to diminish the value -- it does not affect my opinion about

16 the tort value of the claimants at all.  What it does is it

17 enhances the recovery options for the trust and, in fact,

18 releases what is, otherwise, probably maybe an (inaudible)

19 that the trust had that kept the values of the claims for the

20 most severe class $2.7 million and this provided an

21 opportunity for the occasional rather extreme case to bring a

22 case against the trust which would be evaluated and if there

23 were, in fact, excess insurance available for paying that

24 claim then the claimant could receive an enhanced amount.

25 Basically removing, essentially, a windfall that the excess

1   insurers had obtained in the original draft of the TDP.

2   Q    Can you also share your opinion as to the fourth matter

3   relating to the TCJC (inaudible)?

4   A    Yeah, I think in summary the settlement of the TCJC is

5   sufficient to cover its expected liability of the midpoint of

6   the range is what I have estimated.

7   Q    And are your conclusions with respect to the TCJC

8   settlement described in your declaration dated March 17th,

9   2022?

10  A    They are.

11          MR. KURTZ:  Your Honor, we treated those

12  separately.  That is filed at Docket 9388.  We will address

13  admission of that at the end of the examination.

14  BY MR. KURTZ:

15  Q    Dr. Bates, let's start with your first conclusion.  Can

16  you explain to the court what you did to determine the

17  aggregate value in the tort system of the current abuse

18  claims?

19  A    Not surprising, given my description and background,

20  the first thing I did was look at the data.  There are, in

21  fact, two primary data sets here, one which is the historical

22  data that was provided by Ogletree and has been referenced by

23  Ms. Murray, the other is the data that was constructed by Ms.

24  Murray's team on the proof of claim form data.

25          So I began by looking at initially the data that was

1  the historical data.  If I could ask to bring up Exhibit DDX-

2  69 which is an exhibit that I created to summarize the data.

3  I think some of these elements are already discussed and

4  apparent from discussions that went on this morning in the

5  cross-examination of Ms. Murray.

6      I divided the data into two pieces.  So there are 573

7  records of claims from 573 claims from the past that were

8  filed as tort claims against the BSA.  These claims relate

9  back primarily to 2011.  There are four claims in the data

10  settled well from 2010.  So the counter coverage of it is

11  pretty much from 2011 to the prior period just prior to the

12  bankruptcy of the BSA.

13      What this chart is designed to show is in the period

14  here, which I call the Ogletree area, which is covered from

15  the time in about 2016 when the firm of Ogletree took over as

16  national coordinating council for the BSA they listed 262

17  claims that they have resolved, listed as resolved, or at

18  least in their mind, in that time period.

19      Of those claims we know what the abuse allegation is,

20  occasionally, particularly for some of the lower value

21  claims.  We know 52 of them don't have the abuse allegation.

22  And by abuse allegation I mean the type of -- the category of

23  abuse that was alleged by the survivor.  The most severe

24  category meaning the ones that involve sexual penetration.

25  The next category being those involved various sex acts, in

1  particular oral sex, as well as the next category down

2  masturbation, as well as various kinds of groping and

3  touching claims.  So that is data that is recorded in the

4  data base along with the historical data.

5       As well, you can see in that second column -- that

6  third column here that there were two claims which the abuser

7  was not identified.  So Ogletree kept a fairly complete

8  record of the claims with regard to, at least, these two

9  categories which I think are going to be central to the

10 analysis that we are going to do.

11      The period -- the 311 records that we get from the

12 period pre-Ogletree did not come from a process of

13 maintaining the data the same way that Ogletree did when it

14 took over the data.  These data actually come out of a

15 system, the Boy Scouts financial, probably financial

16 recording system called Risk Connect (ph) and it's used for

17 the purpose of probably generating insurance bills and

18 maintaining the financial records of the data.

19      So that purpose, from that data you wouldn't have

20 necessarily kept track of where the abuse allegation was or

21 where the abuser was because these kind of data base systems,

22 data tracking systems, Risk Connect, are generally applied

23 for many kinds of tort claims, not just sexual abuse claims,

24 but slip and fall cases, a wide variety of alternative kinds

25 of things for which they might have insurance claims on.

1      As you can see, as apparent from this, 289 of those

2   cases did not even maintain -- they did not have identity of

3   the abuse allegation.  Somebody would have to have gone back

4   somewhere and found those records at some point and generated

5   that data which would be an expensive time consuming process

6   as well as 227, as Ms. Murray mentioned earlier today at the

7   cross examination, many of the abuser allegations were not on

8   this as well.

9      So, in fact, they only have 10 claims for that period

10   were which, in fact, have the information on both of these.

11   We have the amounts associated with the pay, because that is

12   the way the data was kept.  We tend to have the year in which

13   the information on when that amount was paid, but not

14   necessarily the details about the claims which would be

15   useful for trying to evaluate the claims.

16      So we started off on that point and for this reason for

17   much of my analysis, in particular for my first report, I

18   relied on the data from the initial -- the Ogletree era, the

19   262 data points that we have from there.  It's a relatively

20   small amount of data to use to try and evaluate -- to attach

21   value to 82,209 abuse claims, but it does provide us guidance

22   about that in order to ascribe the data and analysis of the

23   guidance that I used to do that process.

24      So the next slide, DDX-70 --

25   Q    Before we move on, Dr. Bates, in addition to the fact

1  that the pre-Ogletree data was insufficient in identifying

2  aspects of the claims that were important to you, was there

3  any other reason that you relied on the Ogletree data?

4  A     Well, okay.  One very important reason is that it is --

5  I could have access to Ogletree to actually ask them

6  questions about it.  So when Mr. Griggs testified here in

7  this matter I have, essentially, had telephone calls with Mr.

8  Griggs at times to ask him about that data.  It's part of my

9  process in underlying the data.  So when things are missing I

10  can ask him questions about that.

11      The data in this period is consistent with (inaudible)

12  period of the last five years.  So there is a common -- not

13  just that the data is kept, but there is a common defense

14  posture that is maintained by the company as overseen by Mr.

15  Griggs and was mentioned (inaudible).

16  Q     Now when we looked at DDX-69 there is 573 claim

17  amounts.  Did you pull together that data in JTX-1540?  Maybe

18  we can pull-up just how you look at that.

19  A     Is this the format of the data collection that is the

20  basis for DDX-69?

21      Excuse me, just a moment, I accidentally hit the button

22  on my screen which -- there it is.  Never mind, I've got it

23  now.  Thank you.

24      This has -- this looks the right data set.  (Inaudible)

25  names and claimants names.  Can you scroll to the bottom?

1  Yeah, so this includes all of the 573 records, not just the

2  262 which was the primary focus of my analysis.

3  Q    This includes all of the data that was evaluated,

4  whether it was used or not pre-Ogletree and during the

5  Ogletree period, is that fair?

6  A    Correct.  And particularly during the rebuttal phase as

7  well we looked at all of this data because of the (inaudible)

8  entire data.  It's become -- it's informative.

9          MR. KURTZ:  Your Honor, we offer JTX-1540 into

10  evidence.

11          MR. KARLAN:  No objection.

12          THE COURT:  It's admitted.

13      (JTX-1540 received into evidence)

14  BY MR. KURTZ:

15  Q    Why don't we move to DDX-70 and let me ask you, Dr.

16  Bates, what, if anything, did you observe in the claim values

17  when you reviewed the Ogletree data?

18  A    Can we use DDX-70 for a second, please?  In tabular

19  form this is a summary of those 262 records that summarize my

20  first observation of the data which provides with a -- the

21  first thing I noticed about it is there is a wide variation

22  of values in this data.  And in particular you can see that

23  the data had, as discussed earlier, 11 claims that were

24  listed without a payment amount on them as this is dismissed

25  in various ways.

1    There were a large number of claims here which were

2 resolved for just four and five figure payments.  By that I

3 mean settlements which were less than $100,000.  So this

4 table is to summarize the wide variation in settlement

5 amounts.  The settlement amounts in the table range all the

6 way from claims that were various few thousand dollars all

7 the way up to the high end which is the very worst case which

8 were in the high seven figures, which is why I have listed

9 and broke them down by four, five and six figure -- four,

10 five figure settlements, six figure settlements and seven

11 figure settlements.

12    In particular I noticed that there were a large value

13 number of lower value claims that had averaged around $37,000

14 in addition to the higher value claims that are up in the

15 seven figures.

16    DX-71 --

17 Q    Before we move let me just -- I just want to focus on

18 this for a second.  So the most claims -- 115 claims were

19 resolved, is that an average of 37,000 claims -- I'm sorry,

20 $37,000?

21 A    That is correct.  They varied between -- in that

22 category they vary between what was $3,000 up to $99,000.

23 Q    When you average out the majority of these claims the

24 amount that was paid to resolve them was approximately

25 $37,000?

1 A    Right.  And as we can see at the bottom of the chart

2 here the middle value, the center of the range as measured by

3 the counter claims is about $100,000 meaning 50 percent of

4 the claims are above that amount, 50 percent are below that

5 amount.  And the mean of the value is $650,000 which is a

6 very large difference between the mean and the median which

7 basically tells us something right away that these data are

8 highly skewed is the term that we use statistically to

9 describe it meaning that most of the values in the data are

10 actually represented in a small number of claims.

11    So in particular here, just 60 percent of the dollars

12 are 10 percent of the claims.  And (inaudible) claims

13 represent less than 10 percent of the (inaudible).  So it's

14 really quite striking how concentrated the value of these

15 claims are in just a few claims.  This is just a graphical

16 representation of the same data where the blue bars indicate

17 the number of claims.  The average is listed at the top.

18 Q    And a mean is an average.  Can you explain what a

19 median represents?

20 A    A median, as I just described, is the amount that is in

21 the middle.  So if I can think of, sort of, three ways of

22 describing the data, a data range in terms of how it might

23 be, the first thing you might think of whenever I tell you

24 what the range of value the first thing you might think of is

25 just the entire range.  So when I say that the values go from

1  zero to $100,000 the middle of that range is $50,000.  So the

2  middle is one descriptor of it.

3      The statistical technique is -- the statistic is called

4  the median and the median is where you rank order the data

5  from top to bottom and you look in the middle of that range,

6  the 50 percentile which is the data point which tells you

7  where 50 percent of the values are.  And in this data the

8  median is at $100,000.  So it's actually right in the middle

9  of this chart would be the division between where the median

10 would be.

11     That is in contrast to the mean which is, essentially,

12 take the total value of the claims, divide it by the counter

13 claims which gives you what the average is as weighted by the

14 value of the claims.  That number would be a lot larger.

15 Q    So here the median is $100,000 and the mean is $650,000

16 or almost six and a half times more.  What does that tell you

17 about the claims?

18 A    Well, I think, actually there is another picture of

19 these claim values, I think, which is actually more revealing

20 and its DDX-72.  These are the same data, right. The only

21 difference here is what I have done now is I have broken the

22 data up into a type of graph that is called a histogram where

23 you divide the data up into bins by size.  Here I have

24 divided it up into four bins where the data is -- it shows

25 you, in this case, the min being zero to $300,000; $301 to

1  $600,000; $601 to $900,000; and then claims that are over

2  $900,000.

3       This data has a rather unique pattern to it in that we

4  have 55 percent or so of the claims here all have a value of

5  less than $300,000 -- excuse me, let me back up for just a

6  second.  I forgot to mention that these are actually just a

7  subset of claims.  These are the claims which were the

8  penetration claims, the most severe category.

9       So this pattern exists for each of the categories of

10 abuse claims, but the values are slightly different because

11 more severe categories have higher values typically then the

12 lower severe categories.  So, for example, I am going to use

13 this, the penetration claims to represent this pattern of the

14 data which I think is quite telling.

15      Here we can see that there are 55 percent of these

16 abuse claims are less than $300,000 and there is very few of

17 abuse claims that are in the middle of this range until we

18 get to the top of the range at $900,000 and now we, again,

19 get many more claims proportionately.  So more than a third

20 of the claims or about a third of the claims are over

21 $900,000 in this original data set of 262 claims here are the

22 most recent data that we have.

23 Q    Were you able to identify any explanation for the wide

24 swings in the value of the historical claims?

25 A    Yes.  I mean I think this was one of the most

1  interesting inquiries about this data.  I think that, in

2  fact, an example given by a couple of verdicts, actually,

3  against the BSA that had a small number of cases that went to

4  trial, but a number of verdicts -- a couple of verdicts, I

5  think, are very telling which explain why the settlements

6  come out the way they did.

7       Of course, the reason I go to verdicts is because

8  settlements are all done in anticipation of the prospect of

9  what a verdict might be should the case actually be tried to

10  conclusion.  That has happened a few times in the BSA's

11  existence.

12       The two verdicts that I have in mind, one of them was

13  mentioned in this case already and it's a case relating back

14  in 2010 involved an abuser and his name was Timur Dykes who

15  was a repeat abuser who actually his name was kept in, what

16  they called at that time, the ineligible volunteers file

17  which they now refer to as the VSD which is a record that the

18  BSA kept on individuals who should not be allowed to be in

19  the Boy Scouts as volunteers.

20       He was on that list and yet he was continuing to be a

21  Boy Scout.  That case went to trial in Oregon.  I think Ms.

22  Dumas was the law firm that actually represented them.  The

23  case was awarded by the jury for $1.4 million and then a high

24  punitive damage award on top of that.

25       In contrast there is another case in which an

individual named Martin Turner was the accuser -- excuse me,
the abuser and in that case it went to trial and in that case
the Boy Scouts did not receive notice of the case.  He, in
fact, abused three brothers and the case was actually a case
where the Boy Scouts were actually awarded 5 percent
responsibility share.  The verdict sheet comes out and shows
that the abuser, himself, perpetrator was the primary source
of responsibility for these acts, was attributed to 75
percent liability.  The kids' parents, for their part in not
overseeing the kids, was assigned 12 percent responsibility.
The wife of the abuser was assigned another 8 percent
responsibility for not -- she was aware of what he was doing
as well.

       And the Boy Scouts were assigned 5 percent
responsibility for the fact that the individual was allowed
and somehow was able to get himself alone with the boys
instead of, essentially, the rule that the Boy Scouts have
which is only two adults at a time are supposed to be with
the kids so no adult is alone with the kid.  So they assigned
him a small share of vicarious liability 12 percent for --
excuse me 5 percent.  Each of the boys received, essentially,
$25,000 each for their share.

       Now I bring up these two cases because they highlight
the importance of the institutional liability in these cases.
So, of course, the perpetrator is the primary person who is

1   responsible for the acts and the question on a case when it

2   comes to an institution like the Boy Scouts or any of the

3   other institutions, which are often sued, on these cases is

4   did they exercise their proper judgment and oversight in the

5   cases.  If the jury judges that they did then they will be

6   assigned little, if any, institutional responsibility.  In

7   the verdict cases that (inaudible) studied they only looked

8   at cases where the institutions were deemed to be

9   responsible.

10       The contrast where the cases are ones where the

11  individual -- the jury determined that the institution failed

12  and did not exercise proper oversight, say the individual was

13  an employee that they had a high degree of control over, they

14  did not properly exercise the oversight of them they allowed

15  in the case of somebody like the Boy Scouts, the case like I

16  mentioned before, involving the abuser Timur Dykes, there the

17  Boy Scouts had the name of the individual in their files

18  already and yet he was allowed to continue to be a Boy Scout

19  and Boy Scout leader, and allowed to abuse on multiple

20  occasions. In that case there is a high degree -- a high

21  likelihood that a case would involve and result in a high

22  level of institutional responsibility for the acts.

23       So cases that are settled, essentially, the parties who

24  are working on the settlement of these cases are evaluating

25  to what extent would an organization, in this case the BSA,

1  be held responsible for the acts of the perpetrator.  The

2  level of institutional responsibility, I think, plays a large

3  role in determining where the settlement comes out on these

4  cases.

5  Q    Let me pull-up DDX-74, please.  Can you walk the court

6  through this table or this chart?

7  A    Right.  So this is a version of the same chart that I

8  just showed you where before, Judge, it was colored all in

9  blue.  I have added some orange to this and this relates to

10 something that I was uncovered about the cases which involve

11 the Boy Scouts.

12      Just to describe the chart the parts that are in orange

13 are the cases in which involve a once identified abuser.  The

14 term has had several -- has made several references to it

15 this morning of different ways. I call them once identified

16 abusers because within the data that I have I am able to

17 identify that abuser once within the data as one survivor

18 associated with them

19      Repeat abuser cases are those in which the name appears

20 on multiple -- as an abuser of multiple survivors within the

21 data.  Why is that particularly relevant here?  Basically,

22 whether or not an individual perpetrator was a onetime -- one

23 occurrence -- excuse me, once identified abuser or repeated

24 abuser really informs on whether or not the Boy Scouts, the

25 BSA would be in a position to actually know about the

1   individual as an abuser.  It's a proxy for that information.

2        It's not always the case that a once identified abuser

3   that the Boy Scouts didn't know about it.  You will notice

4   that in the far right hand bar there is a little orange strip

5   down at the bottom that involves -- that is a one case which

6   is a former employee of the local council who abused a young

7   man numerous times over an extended period of time and it

8   appears that somebody else in the organization was aware

9   about that.  He is an older teenager and presumably

10  (inaudible), but it is an act of abuse and it went on for an

11  extended period of time.  The Boy Scouts had notice and were

12  definitely settled that case under the premise that they

13  would receive a large share of responsibility if that case

14  proceeded to trial.

15       In contrast, the cases down on the right, which are

16  much lower value cases, are all cases which have once

17  identified abuser and presumably are cases in which they have

18  a much lower likelihood of being able to have had notice of

19  the case being involved.

20       The cases in blue are the cases in which involve repeat

21  abusers.  You will see that those fall -- those run the

22  entire the spectrum.  The cases that are the worst, right,

23  that are at the top all involve significant repeat abusers

24  particularly with individuals that were, in some cases, known

25  about and they were able to get back into the organization in

1  some place through a volunteer for a different location and

2  abuse again.  The damage on those cases is particularly the

3  highest ones, as particularly severe and extensive and the

4  harm done is extensive.

5       The ones at the bottom are cases many times that share

6  the same properties of damage to the individuals.  So they

7  involve repeat abusers.  They involve significant harm to the

8  survivors, but other parties are -- the BSA is not the party

9  that is primarily responsible for the damage.

10      A notable case here is the case of Briar (ph), the

11  cases that have been referred to (inaudible) cases.  They

12  involve a Catholic priest who essentially had access and much

13  of the abuse was actions centered around his role as a

14  Catholic priest and as a teacher of the individuals and not

15  involved with scouting or scouting activities.  There was

16  some involvement in those -- some abuse involved in scouting

17  activities as well, but to a much lower extent.  Those cases,

18  for example, settle very much like in the mid five figure

19  settlements reflective of the low institutional

20  responsibility of the BSA.

21  Q    We will come back to that before moving to your

22  methodology.  This graph reflects the fact that every single

23  (inaudible) victim abuser falls in the lowest category with

24  the one exception that would explain --

25  A    They all do except for the one exception. So that one

1  exception shares the properties of the repeat abuser cases

2  and they have prior notice of it or, at least, chance of more

3  notice.

4  Q    So after analyzing the data what valuation methodology

5  did you use to determine an aggregate value for the current

6  abuse claims that have been brought against the BSA in these

7  bankruptcy cases?

8  A    So I picked a methodology that is standard for mass

9  tort cases.  It's referred to as the name frequency severity

10  modeling.  And I am going to distinguish it from a different

11  way of doing the methodology.  What distinguishes during the

12  -- what distinguishes frequency severity modeling is that we

13  are going to come up with a representative value, average

14  value for a group of claims and we're going to find a group

15  of claims and identify a count of those claims (inaudible)

16  multiply one by the other to say within each group of claims,

17  category of claims which as a common set of valuation

18  properties what the value of those claims would be; the

19  average of those claims times the frequency of the claims.

20      So, for example, if I was to know that 100 claims were

21  worth $500 each then I would know that I would have $5,000 in

22  aggregate for the claims. I wouldn't know the value of any

23  individual claim, but I know what the average is for the

24  group.  That is a methodology which I have used in every mass

25  that has ever been done, that I am aware of, valued using

1  that kind of a methodology.

2      I contrast that with an approach which could be an

3  approach where you could go and try and take each one of the

4  items to be valued, look at the characteristics of them

5  individually, try to assign a value to each of them and then

6  add up to get to the total.  That is just not possible here.

7  We don't even have the data to do that, that will be the

8  assignment of the trust and the trustee, and the rules that

9  come up there to basically come up with a value of the

10 individual claims.

11     Here we get guidance from the historical claims about

12 the values of the claim, what distinguishes higher value

13 claims from lower value claims come up with a reasonable

14 estimate of what the average value of those claims would be

15 based on guidance from the historical data and our analysis

16 we do of the data to come up with an estimate for groups of

17 claims and apply the values to those claims and then add up

18 the total to come up with an aggregate valuation of the

19 claims in total.

20 Q    Is the frequency severity methodology accepted and

21 utilized as reliable in the valuation community?

22 A    It's the -- yes, it's the methodology that I have seen

23 and used in virtually every case that I have ever, ever done.

24     I should mention that within that methodology it's not

25 just an evaluation of the value as I described it, but also a

1  testing a value through what is called scenario analysis

2  where what you do is you evaluate the assumptions that you

3  make in coming up with your value and your partitioning of

4  the claims.  Then test whether or not those assumptions apply

5  broadly to the estimate that you came up with to, basically,

6  see if things were to change and that they will be different

7  in some way in the data, how would that impact your analysis.

8  That is an intrical part of that approach.  It's an essential

9  part of it and it's what I have done here as well as I have

10 done in the past in other cases.

11 Q    Just to make sure we all understand what you have done

12 here have you valued any individual abuse claims?

13 A    No. I couldn't tell you the value of any individual

14 claims here.  That is something that the trustee will have to

15 do or the TDP.

16 Q    Okay.  So what did you value?

17 A    I valued the corpus of the claims in total coming up

18 with an estimate; in this case a range of values that I think

19 reflects what the value of these claims would have been in

20 total had they been resolved in the tort system as filed

21 claims.

22 Q    Did you create these benchmarks by rule categories?

23 A    I did.  I established a set of categories to evaluate

24 the claims which is -- I have actually prepared an exhibit

25 which shows the conclusions and the values that I used to --

1  Q      Hold on, pull-up DDX-75.  What does this table reflect?

2  A       This table reflects the groups of -- six groupings of

3  the claims that I used to evaluate the aggregate value of

4  claims.  So I broke the claims into six groups, that is I

5  broke the proof of claim forms, the abuse claims, into six

6  groups based on those claims for which I had one identified

7  abuser, whether the abuser that was identified in the claims

8  was identified once or repeated, and the repeated abuser

9  claims.

10       I then also segmented into three categories of claims;

11 penetration claims, other sex acts, and the groping and

12 touching claims.  I have used more categories -- fewer

13 categories here then were used by the trust distribution

14 procedures because of the limitations as the data.  So I

15 aggregated some of the claims together to come up with a

16 better proxy of what the value is.

17       Within each of these categories of the data each of

18 these groups that could be a fairly wide range of values,

19 both higher ones and lower ones, but by segmenting the data

20 in this way I have been able to identify and segment

21 reflective of the by mobile nature that I illustrated in the

22 prior demonstratives of the final nature of the underlying

23 data.

24       So we attached, find out what an average value that we

25 think is reasonably representative of each of the categories

1  of data based on my study of the historical data as well as

2  my understanding of the abuse claims from looking at

3  comparables like other trust and what they have done.

4  Q    Just to highlight the point is these are average

5  benchmarks.  Are they representative of a typical claim?

6  A    They would be representative of claims -- well the

7  range of claims within each of these categories.  So there is

8  no one claim that is typical.  A common average, just taking

9  one average and applying it to all the claims would be a

10  mistake here because the claims have -- we can see that there

11  is some extreme differences in the value of the claims based

12  on these characteristics.

13  Q    And how did you calculate the benchmarks for the

14  penetration marks?

15  A    I used the historical claim data to do that.  If you

16  have the exhibits that we had before, if you actually go back

17  and look at DDX-74, the prior slide, you can see that the two

18  values that I am using for the penetration claims one falls

19  in the category here that is in the far right, which is where

20  most of the claims are for the one time abuser claims,

21  whereas the claims for the repeat abuser, because of the

22  higher values in the bars on the left, lose the average value

23  for those claims up into that higher range.  So I think the

24  value is reflective of that for each one of these categories.

25  Q    Did you mean to say that the lower value claims are on

1  the far left?

2  A    Excuse me, apologies. I almost raised my left hand when

3  you said please raise your right hand.  I'm sorry.

4  Q    How did you determine after you mathematically

5  calculated the benchmarks for the penetration claims by using

6  the historical data?  How did you determine the benchmark

7  values for the other sex acts and the groping and the

8  touching claims?

9  A    For those I looked at the values of the other claims as

10 well.  Again, there is a fairly wide range of values on these

11 claims and smaller numbers of them, but in general I found

12 that there's a step down in the valuation between the claims

13 and I used that relationship between the values based on

14 several different analysis to come up with these values.

15 Q    And what did you do after you calculated the benchmark

16 values?

17 A    Well the first -- the next thing I did was actually

18 turn my attention to the POC claims, the data, the abuse

19 claims that are reflected in the data base which has eight

20 hundred -- 82,209 POC's in them. I looked at that data to see

21 what extent I could use the information that I learned from

22 studying the historical data to attach values to those claims

23 and segment those claims.

24      So the first thing we do, in looking at that data --

25 well, let's understand first there are some basic differences

1  to that data from the historical data.  It is data that comes

2  about as a result of a 12 page questionnaire that each one of

3  the claimants filled out.  This is much different then what

4  you have for the historical data in which information about

5  the claims may be kept in some sort of a legal record

6  somewhere, but for the most part it's not kept in a

7  consistent well coated manner, a well collected manner as

8  these data are.

9      These data cover, as we saw from the illustrations this

10  morning, a wide range of different areas and what I have to

11  try and do with this is find portions of that data that are

12  in -- that overlap with the historical data or consistent

13  with it so that I have a way of thinking about the value of

14  the abuse claims and the data that are given to me by the

15  proof of claim forms relative to what I know about the

16  historical data.

17      I know information about the abusers.  I know

18  information about the allegations for many of the claims, but

19  a number of the characteristics about the severity of the

20  injury caused and so on other than knowing what the

21  allegation is are just not recorded in the historical data

22  and what we have to leave to the trust to be able to evaluate

23  it.

24      So the first thing I am looking for is which of the

25  proof of claims forms data that I have, the abuse claims data

1  that I have is most represented by the historical data that I

2  have.  So as a starting point I want to find the claims which

3  are, essentially, would look like the tort claims, the

4  historical claims that I got.  There is a couple of features

5  of them that probably stand in the way of them being tort

6  claims in the same way that the historical claims are.  So I

7  have to address that.

8      So first thing that was mentioned earlier today, if we

9  bring up slide DDX-76, which is a summary that I did of the

10  proof of claim form data based on the main provider, you saw

11  some investigation of this and articulation of this earlier

12  today in the cross examination of Makeda Murray. This is a

13  tabulation that shows the most basic information about who

14  identified and who could identify their abuser.

15      As was mentioned earlier today, all the historical

16  claims, when they were resolved, the name of the abuser was

17  (inaudible).  So when we think about this initially as the

18  first step in my process I'm going to start with the claims

19  of individuals for purposes the claims of individuals who

20  actually could provide the name of their abuser.  I will then

21  treat them in one way and then I will, basically, take the

22  other claims where they could not identify the abuser and I

23  will reserve that for consideration in the scenario analysis.

24      So I am going to construct a basic benchmark value as

25  an initial benchmark value based on the claims that most look

1  like the historical tort claims and then I'm going to

2  evaluate that relative with scenario analysis considering

3  other factors for the claim.

4      So what did I do here? I -- so I see that there are

5  four, five categories here of abuser name status.  Some just

6  left it blank, but many said I don't know the name of the

7  individual.  Some, 10,288, gave a physical description of the

8  abuser.  There were those that who basically could give a

9  partial name; his name was Bob, his name was Mr. Smith, but

10 rather than a full name.

11     For purposes of my initial analysis given that in

12 addition to naming the abuser, giving the names of the

13 abuser, these individuals also gave names like what troop

14 they belong to, where they went to scouts, what time period

15 they went to scouts.  Many of these individuals who have this

16 partial information, I think, when it comes to the time of

17 the trust or if they had gone through a tort discovery

18 process would have bene able to identify the abuser.

19     So to be a proxy for that process I'm not going to

20 limit myself for the initial valuation just the ones who

21 could give the full name, but I am also going to include the

22 ones who give a partial name as well.  Then later I will

23 (inaudible) mentioned include and consider the impact of

24 having any of the other ones be able to prove-up their names.

25     So I am going to assume for the purposes of the

1  analysis that you have partial names and you will have other

2  corroborating information you would be able to actually

3  identify the person.  So I will start with a group of claims

4  here of 48,072 as being the first step in defining a group of

5  claims that most look like the tort claims that were actually

6  received value.

7  Q    Thank you, Dr. Bates.

8       Before moving to additional steps you took to identify

9  an appropriate claim pool against which to assign benchmark

10 values you mentioned a couple of times that you have

11 accommodated the possibility of other claimants coming

12 forward and providing the information that is missing here. I

13 think you called that a scenario analysis.  I just want to

14 make sure everybody (indiscernible) with you.  Can you just

15 describe what you mean by that?

16 A    What I mean is that I'm going to a subsequent step

17 consider the possibility in particular of what would be the

18 impact on my initial benchmark value which I am going to

19 construct of having more individuals come forward and be able

20 to identify who their abuser is.

21      I think that particular fact, that particular aspect of

22 the data is one of the reasons why the abuse range that I

23 estimate is as wide as it is and goes as high as it does

24 because, as the discussion earlier today made clear, if an

25 individual comes forward who did not know the name or which

1  we have only a partial name here, but is able to, basically,

2  more fully identify the name that has, first of all, the

3  effect on the fact that they now have a claim where they have

4  been able to identify the name, and meeting that hurdle of

5  the tort system of being able to identify their abuser.

6        It can also have the impact of identifying an

7  individual as maybe being a repeat abuser who in this

8  analysis would be treated as a onetime abuser.  So it could

9  have a multiplicative effect in that regard in that it would

10 move them from one category of abuse claims into another and

11 could raise the value of -- the potential value of those

12 claims. I think that is the area which has the biggest range

13 of uncertainty here.  It will be resolved by the trust, the

14 TDP, but I think that is the one single element that I think

15 is largely reflective of a wide range of the estimates that I

16 provide here.

17 Q    And so, in short, you have a broad range that's

18 designed to accommodate both negatively and positively as

19 claims get developed further?

20 A    Correct, and I will describe those in my analysis

21 later.  I called them -- in my reports, I called them plus

22 factors and minor factors, to borrow from the language that's

23 used in some other analogies, those things that would add to

24 the value of the claim relative to the benchmark would be

25 plus factors, those things that would subtract from that

1  value I would call minus factors.

2  Q    Okay.  And you mentioned some uncertainty in the data

3  that you had access to.  Do you have an expectation as to

4  whether the settlement trustee will have uncertainty when the

5  settlement trustee is tasked with the job of determining

6  claim values?

7  A    Well, the settlement trustee has a process by which,

8  when she's evaluating the claims will have allowed the

9  claimants to basically go through a process of figuring out

10  additional information that's needed to value their claims

11  and the opportunity to supplement for that purpose.

12         So she will have, at the time when she has it,

13  considerably less uncertainty, I'd be much more certain about

14  what the value of the claims and what the aspect -- the

15  attributes of the claims are that she's valuing.

16         MR. KARLAN:  Your Honor, move to strike as

17  speculation.

18         MR. KURTZ:  Your Honor, that is the analysis that

19  the expert -- he is an expert and he has more than adequate

20  basis to offer his views on how he got to his conclusions.

21         THE COURT:  I'm going to --

22         MR. KARLAN:  If he's simply -- I'm sorry, Your

23  Honor.

24         THE COURT:  Go ahead.

25         MR. KARLAN:  If he's simply explaining how he got

1  to his conclusion, that's fine, but he's clearly guessing

2  about what will happen in the trust process and what

3  information the trustee will have.

4          MR. KURTZ:  Your Honor, I think the way we can

5  question the witness is we go -- I think he -- it's not

6  guessing, the TDPs do identify the information that will --

7  I'll tell you what, let me rephrase the question.

8  BY MR. KURTZ:

9  Q    We're going to get to this, but let me just jump ahead

10 for these purposes.  Are you familiar with the TDPs?

11 A    I am.

12 Q    And you're familiar with the types of information that

13 is available to the settlement trustee?

14 A    I am.

15 Q    And do you believe that that information would be

16 adequate to eliminate the uncertainty that you testified

17 about in connection with your valuation that resulted in a

18 broad range of values that stand between 2.4 and $7.1

19 billion?

20 A    Yeah, I believe --

21         MR. KARLAN:  Your Honor, if -- may I be heard,

22 Your Honor?  If the witness is being asked whether in

23 formulating his opinions he assumed that during the trust

24 process a material number of claimants will be able to

25 provide the settlement trustee with significantly more

1  information than is presently available, if that's what he

2  assumed, I have no objection to him so testifying.  What I'm

3  objecting to is him testifying as a fact that significant

4  numbers of claimants are in fact going to come forward with

5  more information, that's guessing.

6           THE COURT:  I agree.

7           MR. KURTZ:  Your Honor, just to be clear, I don't

8  think the witness has said -- he said there is a process,

9  that if that process is not followed and that information is

10 not supplied, then presumably the settlement trustee will be

11 in the same position that we are in today.

12          THE COURT:  I agree with the objection.

13 Sustained.

14 BY MR. KURTZ:

15 Q    Was it your understanding that the settlement trustee

16 would have the ability to obtain additional data where -- to

17 extent there was any uncertainty in the data that is

18 available today to the proof of claims?

19 A    The trust distribution procedures have that opportunity

20 and I think require the trustee to develop an additional

21 questionnaire to gather additional information for the use in

22 valuing these claims.

23 Q    Okay.  Let me -- thanks for further explaining the

24 methodology.  Let's go back now, though, to the claims that

25 you calculated for -- as to which you assigned benchmark

1  values.  You had just selected claims that had abuser names

2  or partial abuser names, did you make any other

3  determinations about the claims that would be assigned

4  benchmark values for purposes of your valuation?

5  A    Yes, Mr. Kurtz, I did.  I prepared another

6  demonstrative which summarizes those and reflects the

7  quantification of those, it's called DDX-77, which --

8           MR. KURTZ:  If we could pull up (indiscernible) --

9           THE WITNESS:  So --

10 BY MR. KURTZ:

11 Q    -- but can you walk the Court through your calculation

12 of this?

13 A    Certainly.  At the top of this chart, you can see on

14 the left-hand side, which is the reason for the exclusion on

15 account of POC -- and let me make clear what I mean by the

16 word exclusion here -- I hope it's clear by this point -- is

17 for the initial benchmark calculation that I'm going to use,

18 the claims are excluded for that purpose; they aren't

19 excluded from my valuation, they will be set aside in the

20 initial stage and valued separately or part of a

21 consideration when I do the scenario analysis.

22           So we start in the column labeled "Count of POC,"

23 you can see we start the 82,209 unique and timely claims, as

24 identified by Ms. Murray and her team, subtracting off the

25 ones for which we have -- did not name, at least partially,

1   the abuser of 34,137.  We're left with the 48,072, which is

2   the fourth row in this table.

3            The next step was to basically identify the claims

4   that were not presumptively barred.  And, by that, I mean

5   claims which have no legal hurdle to establishing the value

6   as a tort claim.  So we use the analysis that Ms. Murray

7   described to identify claims that, on their face, appear

8   presumptively barred, and then we will subsequently address

9   the value of those claims separately.

10  Q    When you say presumptively barred, you're referring to

11  the statute of limitations bar?

12  A    I'm just -- I'm referring to -- I'm sorry, yeah, it's

13  referring to statute of limitations bar based on

14  (indiscernible) consideration of the date and state

15  considerations, the rules that outlined according to that,

16  not taking account of all of the kinds of exceptions that

17  might exist, the factual-basis exceptions that might exist,

18  for which we do not have the data to address at this time.

19  Q    And how many claims were subject to this presumptively

20  barred --

21  A    Well --

22  Q    -- statute of limitations assumption?

23  A    Of the 48,000 which had named their abuser in some way,

24  that's 31,215.

25  Q    So that leaves you with 16,857 claims.  What did you do

1  next?

2  A      And then on that point, of course, we removed claims

3  for which the abuse is not alleged to occur as a minor, which

4  removed 86 claims, and also we removed another 658 claims

5  which did not identify the abuse allegation, leaving us with

6  an initial pool of claims to be valued of 16,113, which most

7  closely resemble the claims that were valued within -- that

8  we had value in the historical data.

9  Q      And, just for purposes of clarity, did you only ascribe

10  value to 16,113 claims within the proof of claim pool?

11  A      No, Mr. Kurtz, that's just the first step in the

12  process.  We'll deal with the additional claims by

13  consideration through the scenario analysis.

14  Q      And were you satisfied, in your expert opinion, that

15  these 16,000 claims or so were best represented by reliable

16  data?

17  A      Yes, the data that I have that is essentially from the

18  most recent time period for which the time period where

19  Ogletree oversaw the defense and collected the data that was

20  provided to us for use for that purpose.

21  Q      Now, we know that you've explained that you were using

22  the historical settlements from the Boy Scouts to value the

23  current claims.  Are there differences between the historical

24  claim pool and the current claim pool that impact value?

25  A      There are several of them which I think are fairly

1  significant.  I prepared a chart here to show you the impact,

2  one of the impacts of it (indiscernible) expect to see.  This

3  is DDX-78.  And I'll spend a few minutes going through this

4  chart because the feature that I'm talking about here in the

5  data is the fact that, within the data -- and I think this

6  came up within the testimony this morning that said, within

7  the POC data, there are far fewer repeat abuser claims, that

8  is claimants who identify an abuser that has been identified

9  more than once, than there is the historical claim data,

10 which is comprised primarily of repeat abuser claims.

11         And that's not surprising about the historical

12 data.  After all, within the history of abuse claims

13 litigation, his primary focus of much of the mass tort

14 litigation has been on cases in which we have repeat abusers

15 and those individuals who have abused multiple times.  That

16 was, I think, one of the startling features of the data that

17 we got, aside from just the extraordinary number of claims

18 that were presented, but also the fact that, within these

19 claims, the number of abusers that we found that were unique

20 and not identified by anybody else.

21         So we went from a place where we had in the

22 historical data over 90 percent of the claims involved claims

23 with repeat abusers to a situation in the POC data for what

24 we can identify at this time as repeat abusers is only 22, 23

25 percent of the claims, that is, over three quarters of them

1  are once-identified abusers.

2          So that as background, this chart, this comparison

3  here shows you one thing, I've made one small difference.

4  I've taken the chart on the left and I've re-proportioned the

5  amounts that are in orange and blue to reflect the fact that

6  the parts in orange are eight and a half percent in the chart

7  on the left and 77 percent on the chart on the right.  So I'm

8  maintaining the proportions of the claims between repeat-

9  abuser and abuser across the value distribution, but I've

10  just changed the proportion of them, which is repeat abuser

11  versus non-repeat abuser, with one caveat.  I've maintained

12  the assumption that the -- a number of employee cases which

13  would emerge are the single-abuser cases in which you would

14  have discovered prior notice or they would have been employee

15  or something of that sort remains at 1.6 percent of the total

16  because of the -- that's a one-time event here, so we'll

17  assume that the frequency of that is replicated in the other

18  data.

19          So the purpose of this -- this is why this chart

20  is labeled pro forma, I want to make sure that we get this

21  clear what we've done here, which is this is trying to give

22  one a first impression and a first understanding of what must

23  the data look like if all the data in the POCs and the claims

24  to be valued were reflective of these two attributes of the

25  historical data, repeated user, one-time abuser.

1       Since there is such a large, such a large -- much
2  larger portion of the POC data involves once-identified
3  abusers, which are typically much lower value, you would
4  expect to see most of the claims in the lowest bin, and
5  that's why that bin on the left in the left -- in the right-
6  hand chart is so much higher.
7       So it is, essentially -- so, just to be clear, the
8  only thing that's changed here is to change the proportions
9  of once-identified abuser claims and the repeat abuser claims
10  to reflect that change from eight and a half percent in the
11  historical data to the 77.4 percent in the POC data.
12  Q    So --
13  A    I'm going to use these charts a couple of times to
14  explain when we're talking about POC data because this is
15  reflective of the way the value distribution should look in
16  the POC claims valued as tort claims; that is, most of them
17  will be in the lowest-value bucket because of the nature of
18  those claims.
19  Q    Just to make sure we're all clear on this, the chart on
20  the left is the data from the BSA historical penetration
21  claims; is that right?
22  A    Correct.
23  Q    And it is almost all blue because 91 and a half percent
24  of those cases involve a repeat abuser; is that right?
25  A    That is correct.

1    Q      And the chart on the right is your pro forma allegation

2    based on the current abuse claims, the abuse claims that are

3    set forth in -- for the presently in the proof of claims; is

4    that right?

5    A      Correct.

6    Q      And those, instead of having 91 and a half percent

7    repeat abusers, these only have 22 or so -- 22 or 23 percent

8    repeat abusers?

9    A      Correct.

10   Q      And what does that tell us, in your expert opinion,

11   about the relative value of the current claim pool as

12   compared to the historical settlements?

13   A      This fact alone tells us that the value of the POC of

14   the abuse claims will on average be much lower than the

15   historical claims for the reason -- for that reason alone.

16   Q      In addition to the difference between a serial abuser

17   and a one-time abuser, or at least an abuser with a single

18   victim, did you identify any other value-impacting features

19   that differentiate between the current claim pool and

20   historical claim pool?

21   A      I did.  I think one of them -- one of the biggest

22   questions in my mind that I've considered dealing with these

23   claims is how could there have been so many of these claims

24   that were filed when there were so few tort claims?  Why is

25   it we have 82,000 POC claims and only five --

1  Q      I do want to clarify that but, before we get there, did
2  you consider the age of claimant in your analysis?
3  A      Yes, I did.
4  Q      And can you explain to the Court how age factors into
5  the values based on the data that you analyzed?
6  A      Yes.  Another feature of the abuse claims data is that
7  the claimants are typically older than the claims that are
8  brought historically.

9            If we actually look back, these claimants, many of
10 them go -- these claims are derivative of abuse that took
11 place many years ago, including in the '50s, '60s, and '70s,
12 much less the '80s and the '90s, and in fact most of them are
13 from the periods, the highest frequency of them comes from
14 periods more than 50, 60 years ago.  And that's reflective of
15 -- tells us something about the value of the claims.  If we
16 look at the historical values of the claims, the age of the
17 claimant is highly reflective of the value of the claim as
18 well, and I've prepared another chart for that, which is
19 called DDX-79.

20           So this is just looking at the overall value of
21 some of the groups of claims that we have and I prepared this
22 chart to illustrate this.  Because -- again, because of the
23 sparsity (sic) of the data, I've had to group them into small
24 categories, but for the claims that were -- I'll refer to
25 individuals that were under 54, we can see that the average

1  age of these claim -- the average value of these claims

2  historically was in excess of seven figures.  For the claims

3  that were resolved for individuals who were between 54 and

4  63, the value of those claims was significantly less as

5  reflected on this chart.  And for those over 63, the values

6  were even lower.  And I've divided this and provided this by

7  -- comparisons by, through all allegations, the penetration

8  claims and summary of the other sex acts.

9          Notably is that ten percent of the claims in the

10  proof of claim form data are over the age of 70.  There is

11  almost no claimants over the age of 70 in the historical

12  data, there are only two that I've been able to identify, and

13  both of those were just simply low -- mid-five-figure kinds

14  of settlements where they were.

15          So, clearly, the distance from when the abuse

16  occurred matters a lot because all of these are cases which

17  involve an individual, a survivor who was abused in their

18  childhood, less than the age of 18, and this is the age at

19  which they are bringing forward the claim and there are,

20  other than just -- there are obviously incumbent difficulties

21  in the tort litigation which lower the value of the claim

22  that that age difference in time makes.

23  Q     And, just so we have a clear record, the data

24  demonstrates that where you had -- when you took into account

25  all allegations of abuse that claimants that were under the

1    age of 54 had an average value of $1,336,262?

2    A    Yes, mid -- low-seven-figure settlement, yes.

3    Q    And then when you had a claimant between the age of 54

4    and 63, the historical data demonstrates that the value of

5    $349,762, which is approximately a third of the under-54 --

6    A    Even less --

7    Q    -- (indiscernible) --

8    A    -- yeah.

9    Q    Even less.  And then, as to claimants over 63, you

10   calculated based on the historical data a claim value of

11   $118,235, which is about even a third of the --

12   A    Yes, again --

13   Q    -- 54-to-63 claimants?

14   A    -- quite a bit less, yes.

15   Q    All right.  And less than ten percent of the claim

16   values for those claimants that were under 54 (indiscernible)

17   age?

18   A    Correct.

19   Q    And you're saying that the claim pool here even

20   includes -- what did you say, ten percent includes claimants

21   that are over 70 and --

22   A    Over 70.

23   Q    And, in your expert opinion, what impact would that

24   have on claim value?

25   A    Based on this historical value, those claims would

1  typically be lower-value claims.

2  Q      Lower than 118,000 for all allegations?

3  A      On average, that would be a reasonable assumption.  And

4  the next -- I've prepared a chart which actually shows you

5  how the distribution of values goes.  I made reference to a

6  summary statistic on this, but you can see the green bars

7  here --

8  Q      So we're on DDX-80; correct?

9  A      DDX-80, right.  The green bars here are reflective of

10 the distribution of ages of the claimants in the POC data,

11 whereas the blue bars are reflective of the distribution of

12 the ages in the historical data.

13         So these are, again, a histogram that showed the

14 data divided into three categories and the height of the bar

15 shows you the percentage of the claimants who fall within

16 that category.  So, for example, at the lower end, under the

17 age of 54, almost 60 percent, 58 percent of the claimants

18 were under the age of 54, whereas just slightly over 40

19 percent of the claimants in the POC data are under the age of

20 54.  And then contrast on the far right, just over 12 percent

21 of the claimants in the historical claim data were over 63,

22 whereas 25 percent of the claimants in the POC are in that

23 age category.

24         So this change in the distribution of the age of

25 the claimants, reflective of that age, if you compile those

1  two facts together, the proportion of the claims that fall

2  within each bin, and the relative value of the claims

3  historically that were in each bin, would indicate an overall

4  average decrease in the value of the abuse claims relative to

5  historical claims of 20 percent decrease; that is, their

6  values would be 80 percent of the values that are measured.

7       So that if I had a claim value that was

8  approximately for the base claim value, average value for a

9  one-time abuser claims of 212,500, that would mean that in --

10 and from the historical data, the comparable value for the

11 claims in the POC data reflective of the change in the age,

12 would be $170,000, a 20 percent reduction, because the one

13 group is older than the other group and reflective of lower

14 claim values.

15 Q    And those conclusions are fully supported by the data?

16 A    Those are what the data tells us about the differences

17 in the claim pools.

18 Q    And do you have a tabulation of the data that underlies

19 these tables and is in JTX-1501?

20 A    Let's see.

21      (Pause)

22 A    All right, are we bringing up --

23 Q    No, go ahead, go ahead.

24 A    Oh, no, no, the --

25 Q    We're talking for JTX-1501, which is the

1  (indiscernible) data.

2  A    Oh, okay, so this is -- the figure itself, if you look

3  under the tab found below which say R, period, Figure 30,

4  there, that's -- well, you have to format that data to be

5  able to see this.  If you highlight those cells, B-2 through

6  C-4, just highlight that whole page, right click on that.

7  Right click, pick the percentage time -- there you go.

8          These are the actual summary of the data, the data

9  that underlies it comes from the data that basically were two

10  separate exhibits that we've seen earlier today, one of them

11  is the data that is the historical claims data -- I don't

12  know the exhibit number to that one -- the other one is the

13  tranche 6 data that Ms. Murray referred to earlier today,

14  which would also have the age of -- we compute with that the

15  age of the claimants that would be from that data.

16          MR. KURTZ:  Your Honor, we offer JTX-1501 into

17  evidence.

18          MR. KARLAN:  Just this page?  I have no objection

19  to this --

20          MR. KURTZ:  What's embedded -- this

21  (indiscernible) was embedded with embedded boxes --

22          MR. KARLAN:  Yeah, if what's being offered is

23  what's on the screen, I have no objection.

24          THE COURT:  Is this 1501 or is there a whole

25  spreadsheet behind this?

1          MR. KURTZ:  Your Honor, I think the witness has

2   testified that the underlying data that this summarizes has

3   been admitted into evidence in connection with this exemplar.

4          THE COURT:  Okay, got it.  Yes, then this is

5   admitted.

6        (Exhibit JTX-1501 received in evidence)

7          MR. KURTZ:  Thank you, Your Honor.

8   BY MR. KURTZ:

9   Q    Dr. Bates, I had cut you off when I think you were

10  starting to provide an opinion about the pattern of filing,

11  the sort of increase in filing that occurred in connection

12  with this bankruptcy case and what your views are on that and

13  how that, if at all, impacts your valuation.  So let me ask

14  you to explain to the Court your views in that regard.

15  A     Certainly.  I sort of jumped over to that because I

16  think this is one of the most important things in my

17  consideration of the value of these claims, and that is

18  really trying to get at the heart of why it is that we have

19  so many more claims here than were filed historically and why

20  it is that 82,000 claims were filed as reflect -- and what's

21  very -- what's very apparent, the difference between seeing

22  about 50 claims per year on average filed as tort claims and

23  82,000 claims here filed, and so many of these from some time

24  ago, is that we have a very different data-generating

25  process, as I talked about and used it as the technical term

1  earlier today.  But what that basically means here is

2  something different underlies the process by which this data

3  come about and what is that.

4        In my study of this, I've come to essentially that

5  there are two conclusions of this, one which is essentially

6  has to do with -- reflective of the privacy concerns of the

7  individuals who were the survivors themselves, as well as the

8  economic considerations of the survivors and the recovery

9  attorneys who work with them when they bring a lawsuit.

10       Clearly, these individuals are concerned about

11  privacy, 98 percent of them did not check the box on the

12  proof of claim form that says that their proof of claim form

13  could be private, 85-plus percent of them said they'd never

14  told anybody about the abuse when it occurred, and they

15  clearly are -- everything that I've read about them in this

16  case indicates that there is a hesitancy to bring forward

17  their case in a public forum or even -- perhaps even to talk

18  about it within their family.  But a large number of them,

19  obviously, are willing to bring their claims forward for the

20  sake of being compensated, if that can be done in a

21  reasonable, respectful way which guards -- safeguards their

22  privacy.

23       On the other hand, the recovery attorneys as well

24  have not mass-recruited these claims until this bankruptcy.

25  This is a group of attorneys collectively that has mass-

1  recruited lots of different kinds of tort claims and these

2  claims have been known about for many years.  We had -- there

3  is passive recruiting that goes on on the internet and has

4  for years.  If you were to do internet searches regarding

5  sexual abuse claims, the first things that will pop up are

6  the names of various law firms asking you to talk with

7  someone about your claim, if you should like, and how you

8  could get at that -- get -- consider filing a claim, if you

9  like.

10         And in fact there's -- actually, ever since the

11 case that we talked about earlier here in 2010 with Timur

12 Dykes was the person who was the abuser and was in the

13 eligible volunteer files, many of those records from those,

14 the eligible volunteer files, were turned over in discovery

15 in that case and on -- have been published on the internet.

16 You can go to a site on the internet for the LA Times and put

17 in the name of someone you believe is an abuser and find out

18 whether or not that person was in the files at the time that

19 those were released.  My understanding is not all of those

20 files were released and those were files that were available

21 at that time, but many of them were made public at that time.

22         And yet, despite that, there has been no active

23 recruiting in the same way with television ads like you will

24 see for mesothelioma ads or for cases having to do with the

25 use of Roundup or other toxic torts.  You can spend a day

1  watching something like CNN on a Saturday, you'll see a

2  number of these ads that are there.  That's an expensive

3  investment to go and recruit those ads and you have to have

4  the prospect of having claims come forward that could be

5  sufficiently successful to bring those claims.  And there are

6  a couple of barriers to those on a legal front.  The statute

7  of limitations issues that we talked about create the

8  prospect of those cases having to be more -- more battles in

9  the litigation over that; that means it's more additional

10 expense.  These cases, when brought individually as tort

11 claims, have considerable expense associated with them.

12        And an analysis of these claims, which I've done

13 and I'm going to describe here, is that, unless the value of

14 these claims in tort is sufficiently high, it will not

15 overcome either the cost concerns of the recovery attorneys

16 which represent -- because they have to be able to make

17 enough money off these cases to pay for the costs and a

18 reasonable return on the cases to make it worth their while,

19 and the amount of money that's there has to be sufficient to

20 basically be able to entice the individuals, if you will, to

21 be willing to overcome their privacy concerns sufficiently to

22 bring a case forward.

23        Granted, many of these cases, even in public

24 forums, can be brought forward as John Doe cases or Jane Doe

25 cases.  They are, most of the cases that we've seen sexual

1  abuse cases actually are filed in that manner.  The cases

2  that I described to you earlier today, the second one

3  involving the Martin Turner cases, involved the three boys,

4  we only know them as A, B, and C; Adam, you know, Bob, Cole

5  Doe as those cases, we don't know who they are.  So there are

6  ways of managing it, but you still have to deal with -- so

7  there are privacy concerns, there's hesitancy there, but it

8  does matter.

9          But in the essence --

10 Q    Let me just -- let me ask you, do you think there's a

11 difference, though, between having your name published and

12 somehow embarking on a multi-year litigation and keeping that

13 private, including with hearings in court and absences for

14 depositions and the like?

15 A    Absolutely -- I mean, yes, I agree with that.  This

16 form here presents an opportunity to lower the barriers of

17 that -- addressing both the privacy concerns and the

18 financial concerns of the costs of the case.  All right?

19         So, to address these issues, I created a

20 simulation where -- which is a device, a mathematical device

21 that I used, a modeling device I used to be reflective of the

22 fact that how is it that you could have so many cases out

23 there that were not brought as tort cases and, yet, would

24 come forward in this forum, and the answer to that, I think,

25 is that this forum overcomes both the privacy -- overcomes

1  the hesitancy concerns, as well as overcoming the financial

2  concerns by lowering the cost of bringing these cases.

3          These cases with -- for example, just think about

4  it for a moment, if you bring a case that is going to return

5  you $100,000, a litigation case, and the attorney who is the

6  recovery attorney is going to take 40 percent of the value of

7  that case plus, you know, the expenses associated with that,

8  he's going to have to be able to deliver that case on less

9  than $40,000 in professional time in doing that.  That's not

10  a large -- that's not much money to do on a case which

11  involves depositions, discovery, building a case, taking the

12  case to trial.  If that case was worth seven figures, now

13  that can be worth the expense.

14          So, at the lower end of the valuation of these

15  cases, we don't see and won't see within the historical data

16  the cases which are at the low end of the value spectrum;

17  that is, when we are talking about cases which are like the

18  five-percent responsibility share of the verdict that I talk

19  about, which would give you a $25,000 return per case, that

20  simply is not worth anybody's effort to recruit and prosecute

21  those claims because the economics don't justify it.  They

22  are transaction costs, in the language of the economics

23  field, that are sufficiently high that they stand in the way

24  of many of these cases ever having been brought.

25          And so I've created a simulation to show how some

1  of the properties of the data could in fact reveal how we

2  could get cases which have value in the tort system, as

3  brought cases that are here, what they would settle for would

4  be something that was -- had value to it, but not sufficient

5  to justify bringing the cases on a tort on a case-by-case

6  basis because that process is so much more expensive than it

7  is to bring that in this case where, brought en masse, it's

8  worth the effort to do -- to work the cases up, put them

9  through an administrative process where they can be assigned

10 their proper value.  And that process then, basically, it can

11 be paid for and is more than sufficiently paid for by the

12 contingency fees that the recovery attorneys can get in

13 bringing those cases forward.

14 Q    And did you run the economic simulation that you're

15 referring to?

16 A    Yes.  Let me show that simulation because it's a little

17 bit detailed and complex but, hopefully, it will be

18 illustrative and we can do that.

19        Can you bring up DDX-81 for me, please?

20        So this is a table.  Let me take a few minutes to

21 explain it because it's not clear, but what we start here

22 with is a claim which I listed across the top several

23 categories of potential responsibility for the valuation of

24 the claim.  So when you see across the top it has a row that

25 says, D, one-twelfth value; C, one-sixth value; B, one-third

1  value; A, two-thirds value, that means that these are cases

2  in which the expectation, for example, on an A claim would be

3  one in which the BSA would be assigned a two-thirds share

4  responsibility for a case that, for the purpose of this

5  simulation, would at full value be worth $1.8 million.

6        So, if we have a case of 1.8 million as an average

7  value -- and it's a hypothetical at this point, but it's not

8  atypical for what an abuse claim might be of a pain and

9  suffering claim -- if the BSA was to respond -- be assigned

10  two-thirds share responsibility, that would be, as seen in

11  the second row underneath the A value, $1.2 million is there.

12        In contrast, if we go down to the left-hand row,

13  down to the D column, a place where the BSA was assigned a

14  one-twelfth share -- and I picked these values just because I

15  went to two thirds, take half of that, take half of that,

16  take half again -- for the simulation, I just simply posited

17  some reasonable range of values on this.  On a claim of that

18  sort, a one-twelfth value claim would be worth $150,000.

19        So what that means is, if you were and I were

20  sitting here at opposite ends of the table, negotiating over

21  the value to settle a claim, which if it went to trial was

22  going to be 1.8 million, and we expected that -- we both

23  expected that I'm going to lose, but that I'm going to

24  basically be two-thirds share responsibility, we should

25  reasonably be able to settle that case for 1.2 million, is

1  what that would be the prospect of.

2         So, if that case was brought in an open

3  jurisdiction where we don't have a battled fight over the

4  statute of limitations rules, then I would expect that those

5  would be the values we pay.  And that's the row that -- right

6  underneath the headers that says, "Open," on the left.  All

7  right?  And it says settlement discount, a hundred percent --

8  that's not actually a discount, that's a settlement value,

9  it's not discounting it at all.  So we're multiplying the

10  hundred percent times the factor that's in the row which is

11  the light blue.  And for each one of those rows across that

12  it's exactly the same number, that is -- so it's as if the

13  numbers that I brought, the cases I bring are represented in

14  an open jurisdiction with no statute of limitations -- or a

15  claim which has no statute of limitations problems, what the

16  value of that case would be.

17         Reflective of that is, let's suppose for a moment

18  now that if we take that case into a state which has an issue

19  of statute of limitations, maybe it's one like the case that

20  -- a state like Dumas was talking about in which some factual

21  basis could overcome the statute of limitations rules or

22  there's a 50-50 chance that a particular judge would rule in

23  the favor of it.  And we both have a basic understanding of

24  about approximately 50 percent would be a likelihood of this

25  case making it past the statute of limitations through a

1   legal fight, which is an expensive process but, nonetheless,

2   for the purpose of this simulation, we're going to set that

3   cost aside, though it is a consideration for the attorneys in

4   bringing it, and let's suppose that that case could then

5   settle for -- we would settle that case at a 50-percent

6   discount.

7           So what we're talking about here is if the

8   prospect of the case is that I would get a value at $150,000

9   if it was an open state.  In a closed state, reflective of

10  the fact that I have a 50-50 chance, I and the other parties

11  should negotiate a settlement that is about half that or

12  about $75,000.

13          Now, I -- and that analysis applies to each one of

14  these.  As I go across the rows, I apply that 50 percent of

15  the values of the row from above, which is the hundred

16  percent, and see what's the expected value of the settlement

17  in those jurisdictions given that the parties agree that it's

18  approximately a 50-percent discount for each one of these

19  types of cases.

20          Now, the coloring of the boxes.  You'll notice

21  that some of these boxes are orange and some of them are

22  white.  So I've made an assumption here for the purpose of

23  this simulation that if the return on the case is not at

24  least $200,000, I'm not going to bring the case as the

25  plaintiff's attorney.  So I'm not going to take retention

1  because why would take the retention -- if it takes me at

2  least, you know, $80,000, which is 40 percent of the

3  $200,000, to work up the case and get it to the point where,

4  if I was to have to litigate the case, and I need to get at

5  least 80 -- you know, $80,000 to make it worth my while, if

6  the return -- expected return on the case is less than

7  $200,000, my expected return on this case is less than the

8  $80,000 and is not worth it, I can't take the case.

9         So all the boxes in orange here are boxes -- are

10  situations, combinations of the value from the top and the

11  statute of limitations discount that I've applied here on the

12  left based on the state, right, of what the expected value of

13  the case is, and any case that's in one of those categories

14  would not be brought.  It would not be accepted by retention

15  from the lawyers because when a case is coming in, a recovery

16  attorney is going to initially do an analysis of recording

17  some of the information, take an intake form on it, and is

18  going to decide whether or not this is a retention that I can

19  accept.  And, if it doesn't have sufficient prospect of

20  recovery, they're not going to take the case.

21         So the orange boxes are the ones where it doesn't

22  meet the economic viability threshold for a tort case and the

23  white boxes are the ones where it does.

24  Q    Did you then apply those simulations and those

25  assumptions to the proof of claim?

1  A      I did.  I made an additional slide here, which is a

2  demonstrative, which is DDX-82 -- this was in my rebuttal

3  report -- which shows how that would apply to a hypothetical

4  group of 47,433 claims, all right, and into these categories.

5         And I've partitioned the claim counts into these

6  categories to achieve two -- to achieve two goals that are --

7  that come out of the case.  One is that we know historically

8  there were 517 cases that were actually settled for money in

9  that list of the historical -- the 573 cases we have.  So I'm

10 going to set the numbers in this chart such that the number

11 of cases that are in the right boxes has to be 517 because

12 those are the ones that were actually filed.

13        The case that I'm going to do, the number 547,433,

14 is not an arbitrary number; it was picked because the number

15 of cases that satisfy the assumptions to be valued by the

16 Claro Group in its study was 460,916.  So, in doing this in

17 the rebuttal report, I was using this to demonstrate that you

18 could get 46,916 valuable -- cases that have value in the

19 tort system -- claims in the bankruptcy process, but only 517

20 claims in the tort system, of which out of the total of

21 47,433.

22        So across the top again are the labels to the --

23 Q      This applies on the claims, so this includes all the

24 claims that are otherwise presumptively subject to the

25 statute of limitations bar?

1  A      No, those claims are in here.

2  Q      That's what I'm saying.

3  A      Yes, this includes all of them.

4  Q      The 46,262 claims includes all of the claims that

5  otherwise you have categorized as presumptively barred by the

6  statute of limitations; is that right?

7  A      Yes, those are all in here.

8  Q      All right, go on.

9  A      Because they would be subject -- here, you would have

10  claims, in the way they did the calculations, of 16,662 in

11  open jurisdictions, that would be about 35 percent of the

12  claims, and the rest would be in -- of those 47,000-plus

13  claims, would have been alternate jurisdictions, which had

14  some different likelihoods of being -- overcome the statute

15  of limitations bar.

16            Just to pause for a second on that, the

17  percentages I used for the likelihoods of being able to pass

18  the statute of limitations bar, those are given by the trust

19  distribution procedures and I borrowed those figures for this

20  purpose, and for reasons we can talk about a little bit

21  later.  The -- for parts of these reasons as well, the

22  historical data won't have much information on those claims

23  and the value of those claims because they weren't brought

24  for the reasons that we're talking about here.  They had to

25  have sufficient economic value, despite that statute of

1  limitations, to have been brought and only a small number of

2  them did, and because of that -- that selection process, as

3  we would call that, they don't actually have -- you don't

4  have an observation on those values that you could use for

5  this purpose in the historical data, you have to rely on an

6  outside source.

7  Q    Can you walk us through your table of abuse claim

8  filing thresholds?

9  A    Okay.  So we know that what we have to result with is,

10  in assigning the percentage of the claims to different

11  categories, we have to wind up with 517 claims that are paid

12  and have value in the tort system for the past, that's where

13  -- that's where we're (indiscernible) to.  The second thing

14  we know is that the value of those claims is about 260-plus

15  million dollars.  That's the row here which says "Total

16  settlements."  So we -- and we know that the average

17  settlement of those claims is around 500-plus thousand

18  dollars across this time period.

19          So that's the source, the anchoring data that

20  we're using.  And then we're saying here is, all right, what

21  must the rest of the claim pool have looked like in order for

22  us to have basically gotten 517,000 tort claims, but almost

23  47,000 bankruptcy claims.  So what must the numbers be in the

24  orange bar, in the orange cells in order for us to get to

25  that number, and this chart shows us how we do that.

1          So, for example, it shows us since we have -- and

2   let me take the first one -- under the column D, if the

3   claims there have underlying them a prospect of one-twelfth

4   value for the claims, that would explain why it is that such

5   a large number, 16,251, of the claims that are in the open

6   jurisdictions have not filed their claim.  The value of those

7   claims is not sufficient to overcome the economic and

8   hesitancy hurdles required for the claimants to have brought

9   that claim as a tort claim.

10          In this -- in this forum, those claims are

11  valuable to be brought, they have value associated with them,

12  they have an expected liability associated with them, but

13  it's below the level at which they would be worth being

14  brought as tort claims.  That's the -- under the column which

15  says one-twelfth value and open jurisdictions, the 16,251.

16  Because we know that there are large numbers of these claims

17  which are in open jurisdictions that could been brought, they

18  do not have statute of limitations problems, but they were

19  not brought.  The value of those claims is such they must be

20  below whatever that threshold is, that economic threshold is

21  for bringing the claims.

22  Q    Which you have assumed for these purposes at $200,000?

23  A    That's an assumption, it's $200,000.  That's a fairly

24  large amount of money for these people in this pool given the

25  education levels for these people, their wealth would be a

1   mid -- low six figures kinds of settlements, as typical of

2   the wealth of these people, so $200,000 would be a lot of

3   money.

4   Q    But what's your basis for saying the wealth of this

5   claim pool would be in the low six figures?

6   A    Oh, I've looked at data in the past having to do with

7   the wealth of individuals by education level and age.  That

8   data is tabulated, it's available publicly.  The census data

9   has it out there because it's collected on census forms.  So

10  you can see that data that is public and well available.  But

11  it does vary by age.  The median wealth of individuals at

12  these age categories and these education levels is probably

13  in the -- between 200 and $300,000.

14  Q    And when you say at these ages, what ages are you

15  referring to?

16  A    I'm talking about the ages here that we've seen, which

17  is in the mid-50s up through the 70s.

18  Q    Okay.  And what was -- do you know what the numbers

19  would be when they were younger, yet still able to file a

20  lawsuit had they been so inclined?

21  A    The wealth -- their wealth would have been lower,

22  though it typically is still, essentially, six-figure kind of

23  wealth, but lower than the 300 range.

24  Q    All right.  So the value of these claims would have

25  met, if not exceeded their total --

1  A      It would have been --

2  Q      -- (indiscernible) --

3  A      -- probably their biggest asset other than their house

4  in their wealth portfolio, if you want to look at it that

5  way.

6  Q      And what does it tell you that claimants did not pursue

7  an asset if an asset had been worth the equivalent of their

8  own otherwise lifelong net worth?

9  A      I mean, I think that's -- that's emblematic of how th4e

10 value of these claims must be considerably lower than that

11 because that's -- it seems that would matter a lot.

12 Q      Can you go back and complete your discussion of your

13 abuse claim filing threshold simulation?

14 A      Right.  So, I mean, that -- the value of the other

15 claims, again, as we see, in order to basically obtain

16 essentially the end result of the numbers that we know came

17 about is such that this is the distribution of the numbers

18 that fall within the various states.  It's not the only one,

19 but they're all going to look similar to this, but what they

20 would show is that, though the individual value of each of

21 these claims is low, too low to be filed as tort claims,

22 except the -- in the rare cases, the aggregate value of these

23 claims can be worth several billion dollars, which is what

24 the line down here on total abuse claim value is, is a

25 summary of that, and that the average value of those claims

1  is approximately, for this simulation, would work out to be

2  about $74,000.

3          So I think that is -- there were several

4  assumptions underlying this simulation, it is a simulation,

5  because we cannot directly observe these -- a number of these

6  factors.  That is why it is that we use simulations is

7  because we can show what the results would be under a set of

8  -- small set of assumptions, and then evaluate those

9  assumptions for their validity in terms of reasonableness and

10  in terms of characterizing what we observe.  But I believe

11  these are reasonable numbers and the outcome which explains

12  the -- explained why the outcomes that we see of an abuse

13  value, a value of the abuse claims, which is ten times higher

14  than what we saw in the historical values and we have so many

15  more claims, it's because the average value of these claims

16  is below the threshold at which these claims would have been

17  brought in the tort system.

18  Q    And what would be the total abuse claim aggregate

19  liability under this simulation?

20  A    Under this simulation, it would be just under three and

21  a half billion.

22  Q    And do you believe this is a reasonable simulation

23  based on -- in your expert opinion, based on economic

24  principles and --

25  A    I believe this is a reasonable simulation.

1   Q      You mentioned in your testimony economic barriers to

2   filing lawsuits based on attorneys, do you recall that?

3   A      Yes.

4   Q      In addition, do you have experience in that area?

5   A      I've evaluated the costs of litigation and the

6   implications, the cost of litigation on the filing of claims

7   for a long-time -- I mean, it was a fundamental part of my

8   testimony in front of Judge Hodges in the Garlich (ph) matter

9   was basically studying the relationship between settlements

10  and costs and expected tort liability of the claims, that is

11  an essential study of mine for my research program for the

12  last 30.

13          It's a field of study called Guan economics where

14  they study the relationship between settlements, the impact

15  of settlements and the impact of costs, and of trial outcomes

16  on settlements that will occur.

17  Q      And, in addition to your own expertise and experience,

18  did you identify any evidence of this attorney-driven barrier

19  in the tort system?

20  A      Yes, I mean, there's documents here that were filed as

21  part of 2019 of Mr. Kosnoff that basically support exactly

22  this phenomenon that I'm talking about.

23  Q      We're going to pull up JTX-1-225, which is part of --or

24  is the Kosnoff 2019 statement.

25          And I'm going to ask to pull to paragraph 11,

1  which is PDF page 4 on the pleading.  And if we could

2  highlight starting with the word "While" in the third --

3  A    We have to move parts of it because it's covering it.

4  Q    Yeah, if you can't read that, I will read it into the

5  record.

6  A    I can see it.

7  Q    Can you please read that statement into the record that

8  was filed in the Kosnoff 2019 --

9  A    I think this is in the context of recruiting cases for

10  the bankruptcy here, the kind of advertising process that I

11  was talking about earlier today of using mass methods, mass

12  advertising methods to find the claimants here.  And it's,

13  "While that advertising effort slowly developed, Mr. Kosnoff

14  reached out to men who had contacted Kosnoff law firm

15  earlier, seeking representation, but whose cases the firm had

16  declined due to the statute of limitations issues."

17           I think that's an illustration of what I was just

18  talking about.

19  Q    The fact that attorneys won't take cases that are

20  subject to substantial risks, including statute of

21  limitations?

22  A    Well, the difference between taking those cases,

23  because they clearly did take the cases here, but --

24  Q    They --

25  A    -- they took them in the context of the bankruptcy, but

1  they didn't take them in the context of the tort system

2  because for exactly the economic threshold questions and

3  risks associated with being able to obtain a representation

4  for --

5  Q     And how many --

6  A     -- recovery in the tort system.

7  Q     And how many survivors was Kosnoff representing in

8  connection with the proof of claims?

9  A     I think his firm and their coalition represents 15,

10  16,000 cases at least, something in that neighborhood.

11  Q     So those are 15 to 16,000 claimants that otherwise

12  couldn't get representation.  Did you determine what number

13  of Kosnoff clients were subject to statute of limitations

14  bars in the tort system?

15  A     I think it's about two thirds of them or so, I'm not --

16  I don't recall precisely.

17  Q     But somewhere in the 10,000 or so range?

18  A     Something like that, that's my -- that's my

19  recollection.

20  Q     I'm going to ask you now to turn to -- same document,

21  Exhibit B, page 12.  And I'm also -- did you identify any

22  evidence that attorneys committed to representing claimants

23  only with respect to the proofs of claim and not in the tort

24  system?

25  A     Yes.  I mean, I think that's reflective of the

1   recognition of the economics of this, but we saw that in the

2   document you're bring up here as well.

3   Q    Okay.  So this is a retention agreement by AIS, Abused

4   In Scouting, which includes a number of attorneys, Kosnoff,

5   the AVA Law Group, and Eisenberg Rothweiler?

6   A    Yes.

7   Q    And did that engagement agreement address the scope of

8   representation?

9   A    It does.

10  Q    Can we pull up, please, the scope of representation?

11        Okay.  Can you read in to the record the scope of

12  representation for the 15,000 clients represented by AIS?

13  A    Yeah, I'll read the first sentence.  "By signing this

14  engagement agreement, you understand and agree that the AIS

15  counsel is committed to representing you only" -- emphasis in

16  the original -- "in connection with the February 18th, 2020

17  bankruptcy filing where I related global resolution of sex

18  abuse claims against BSA," which are two elements of

19  representation, one is the bankruptcy or the other is a

20  related global resolution of sex abuse claims, that is only

21  in connection with being done collectively with a large group

22  of claimants, not an individual tort claim representation to

23  prosecute the claims.

24  Q    Okay.  And added to -- well, strike that.

25        MR. KURTZ:  Your Honor, I offer JTX-1-225 into

1  evidence.

2        MR. KARLAN:  No objection.

3        THE COURT:  Admitted

4     (Exhibit JTX-1-225 received in evidence)

5  BY MR. KURTZ:

6  Q     Before I get to your aggregate benchmark value in this

7  case, I would like to ask you generally, have you reached a

8  conclusion about how these differences in claims pools, as

9  between the historical claim pool and the current claim pool,

10 have you reached a conclusion as to how that impacts value?

11 A     I think that the -- at a typical -- the average value

12 of the claims in the POC, the abuse claims, will be lower

13 than what we saw historically for a couple of the reasons

14 that I've described here today.

15 Q     Now, have you prepared an aggregate benchmark valuation

16 in this case?

17 A     I have.

18 Q     All right.  And can we pull that up, please?  It's at

19 DDX-83.

20        And let me just start by asking you what your

21 aggregate benchmark value is.

22 A     Well, let's first properly characterize this.  This is

23 the initial stage of my valuation, so this is what I called

24 in my report the initial aggregate benchmark valuation.

25 Q     Right.

1  A     it's not meant to be the conclusion, it's not a summary

2  of what the value of the claims is, but rather the starting

3  point or the core claims that were most represented by the

4  historical claims that I talked about earlier today.

5            So this is not a conclusion of the valuation, this

6  is the first starting point, if you will, of what the

7  valuation is that we will then work from.

8  Q     But you created an aggregate benchmark value and then

9  you allowed for pluses and minuses to account for differences

10 in claims and improvements in claims in and matters like

11 that, is that right?

12 A     Precisely.

13 Q     So I'm asking you what is your --

14 A     And additional claims.

15 Q     Right.  My question is, what is your initial benchmark

16 valuation in this case right now?

17 A     The initial benchmark value of this case is $2.5

18 billion.

19 Q     All right.  And that's reflected at the bottom right

20 box in this table?

21 A     Correct.

22 Q     Okay.  Can you walk the Court through your calculation

23 of this initial benchmark valuation?

24 A     Okay.  So this table here represents the collection of

25 the six categories that I discussed earlier where we picked a

1  benchmark value to use, with the addition of three other

2  categories that we've partitioned the data in usefully as

3  well that are reflective of the fact that there are other

4  discounts off of what the BSA would owe if there were outside

5  relationships that needed to be taken into account in doing

6  that valuation.

7          So the categories here are first broken out, as

8  you can see on the left-hand side, the pieces -- the headers

9  that are most out-dented, it's the penetration claims, the

10  other sex acts claims, and groping and touching.  And as you

11  can see the side where it says penetration, that's a hundred

12  percent; that means those were the cases on the valuation

13  valued at a hundred percent.  Other sex act claims were off

14  of that value, discounted to a 54 percent value, and,

15  similarly, then cutting that valuation in half again.

16          That's reflected over here for the once-identified

17  abuser claims, which is the next -- also, with each one of

18  those categories we identified the claims which are first --

19  associated with once-identified abusers versus those that are

20  repeat abusers.  And then you can see, continuing down, the

21  very first entry underneath that are then three additional

22  separations where it says "no other relationships," a hundred

23  percent, other -- one other relationship, 50 percent, and two

24  or more relations to 25 percent.

25          What's that reflective of is the fact that, if you

1 have a claim that is -- on which the individuals on their

2 proof of claim form identified outside relationships, that

3 is, non-BSA-related relationships that they had with the

4 abuser, that that would typically reflect a discount in the

5 value of which claims are resolved.

6 　　　　　So we talked about earlier how the case of the

7 situation with the Guam cases of Brouillard had a significant

8 outside relationship of -- with his role as the combination

9 of a teacher and a Catholic priest, and the abuse that took

10 place in that context, in addition to associated with

11 Scouting, and that represented a fairly deep discount on the

12 case.

13 　　　　　There's not a lot of guidance in the data on how

14 that should be applied here, the outside relationships.  It's

15 recognized by all the parties that they would in fact

16 represent a discount off the value it would be if it was

17 strictly abuse that was based on events that are surrounded

18 by Scouting.  So, absent that additional guidance, I used the

19 assumption of a 50-percent -- I guess there were one or more

20 relationships, assuming that if there were one other

21 relationship that it would be divided equally between the two

22 parties that were otherwise responsible.  And if there were

23 two or more relationships, I assigned a 25-percent discount.

24 　　　　　It probably would go down if there were additional

25 relationships.  I think this is a fairly conservative

1   assumption in that regard based on what I've seen about the

2   data, but I think that's the modeling assumptions that I used

3   here.

4          That pattern is reflected all the way down the

5   chart.  The second column is going to reflect the

6   calculations that were done to get to the value of the

7   average value of the case in column B that is going to start.

8   So let's move over to column B.  Under the label here -- I

9   don't know if you can highlight that for me -- the number

10  that says 170,000 that is right there, that value is the same

11  as I mentioned earlier today when I testified, if you look at

12  the title of this chart, summary benchmark valuation using

13  the value of 212,500 for penetration claims involving one-

14  time abuser and a 20-percent reduction for the age of the

15  abuse claims.  That is that calculation, 212,500 times 80

16  percent, 20 percent discount, gives you 170,000.

17         So that's the starting point for the once-

18  identified abuser claims where there are no other outside

19  relationships and that will be the average claim value for

20  that pool which is going to be applied in that case to the

21  number of claims in the proof of claim data.  The abuse

22  claims data, which have that attribute, which is just to the

23  left of that number, 170, is the number 2,458; that is the

24  number of claims that fall into that category.

25         Similarly, if we drop down four boxes from that to

1  -- from -- to the value of 780,000, that is a reflection of

2  using the benchmark value that we presented earlier today,

3  which was for the repeat abuser claims for penetration

4  claims, was $975,000, with a discount, again, of 20 percent

5  on that, gives you a value of $780,000, reflective of the

6  older age of that population typically.  And so that is the

7  average value that we apply to that pool of claims, which

8  just to the left of that you'll see 688 claims for that

9  regard.

10        And so we're starting off with those two initial

11  benchmark values for these claims and then applying the

12  reflective discounts on whether or not there is an additional

13  relationship or whether there is two more relationships and

14  the count of claims for each one of those.  That is then --

15  and for purposes -- we tabulate on the far right-hand side

16  what is the product of those two values in each row.  So 688

17  claims times 780,000, says that these claims are about --

18  account for about $537 million for those 688 claims.

19        Similarly, on the one we talk about before where

20  we had the one-time abuser claims, once-identified abuser

21  claims with 2,458 claims, times 170,000 gave you $418 million

22  for those two claims.

23        We apply that for the other rows in this chart,

24  for the other sex acts, the discount.  The 170,000 is then

25  discounted by the 54 percent, that is for the values that I

1    gave you earlier today about the relative value of the other

2    sex acts claims, was -- gave you a value of 91,800, which is

3    in the row labeled -- right there, that's correct, you've got

4    it -- that gives you another $300 million worth of claims.

5            And we continue that on through to the end.

6            Just to be clear, to explain a couple of other

7    numbers here, if you go to the very top row underneath the

8    headers, you'll see a row that says penetration, a hundred

9    percent, and then you'll see just -- in two boxes over to the

10   right, you'll see where it says 5,645, that is actually the

11   sum of all of the claims that are in the penetration.  So all

12   of the six boxes directly below that with numbers add up to

13   that number.  So that tells you all of the penetration claims

14   that we have for -- in terms of doing the value.

15           Similarly, if you go to the far right, you'll see

16   if you take the number that is one billion three hundred

17   twenty nine thousand two hundred and seventy-some thousand

18   five hundred, that is the sum of the six boxes that are

19   directly below that and represents the value that this

20   analysis ascribes to the penetration claims.  And then, if

21   you look at the number that is between the one billion three

22   number and the 5,645, it gives you an average, that's the

23   average valuation of two thousands -- 235,470, that's the

24   average value that we are ascribing to the penetration claims

25   in this analysis.

1          So, similarly, you can go down above each -- at

2    the top row above each group of claims, whether it's

3    penetration claims, other sex act claims, or the groping and

4    touching, is the summary of the values for each of those

5    groups, and then at the very bottom is the summary overall,

6    which is where we have, adding up all of the totals, we have

7    two and a half billion dollars, an average value of 155,000

8    each for the 16,133 claims, which look most like the

9    historical claims can (indiscernible) --

10   Q    All right, Dr. Bates, let me take you back to an

11   earlier -- I won't put it up, but do you remember the

12   (indiscernible) chart and it demonstrated that from the

13   historical -- in the historical database, 91.5 percent of the

14   claims involved a multi-abuser claim, do you recall that?

15   A    Correct.

16   Q    How many single-abuser claims, or what you call once-

17   identified abuser claims, exist in Ogletree data that

18   supports the $212,500 benchmark for penetration?

19   A    Well, four of them.

20   Q    Four of them, okay.  And did you search the pre-

21   Ogletree data to find other examples of value associated with

22   once-identified abusers?

23   A    I did.

24   Q    And how many did you -- did you find any?

25   A    Yes, I did.  We know they will be there.  If you recall

1   from the very first chart I showed, there are almost 300

2   cases which don't have abuse allegation listed.  We know that

3   those claims when they were resolved, the abuse allegation

4   was known, it was -- we have the (indiscernible) and we also

5   have the representation from the attorneys that when the case

6   was resolved they knew the abuser, they know what the

7   allegations of abuse were in some detail.  So we know that

8   they're there.

9           And so then we went and tried to find those claims

10  to see in some way, to see if we could identify additional

11  information about those claims that would allow us to verify

12  or prove up that -- and understand which of those additional

13  claims were penetration claims.  That's an arduous process.

14  We were through some ability to some find some of those,

15  either by doing -- looking within, having -- asking the BSA

16  to help try to find some of those claims.  They were able to

17  identify some documents associated with some of those claims

18  and tell us about those claims.  That process was one that

19  gave us that information rather late in this process.  So

20  it's not been included in this data, but it's there.

21  Q    So how many single-abuser, once-identified abuser

22  penetration claims did you locate in the pre-Ogletree data?

23  A    We found about 16 of them.

24  Q    And did you calculate an average value for those

25  single-abuser claims --

1  A      I did.

2  Q      -- for penetration?

3  A      Yes, I did.

4  Q      And what was the value of single-abuser claims

5  involving penetration in the pre-Ogletree database?

6  A      The average was slightly lower, 150,000 maybe would be

7  he average overall.

8  Q      Okay, thank.

9           Is your valuation, which is recorded on DDX-83, is

10  that -- was that generated from a model?

11  A      Yes, it's demonstrated from a model.

12  Q      And if we call up JTX-1598.  Let me ask you whether

13  this file, this is a file model that supports or generates

14  even the calculations of your aggregate -- your benchmark

15  aggregate valuation that we just went through as reflected on

16  DDX-83?

17  A      Yes, it's in the -- in through this page and the other

18  pages in this Excel spreadsheet have those calculations.

19           MR. KURTZ:  Your Honor, I offer JTX-1598 into

20  evidence.

21           MR. KARLAN:  No objection.

22           THE COURT:  It's admitted.

23      (Exhibit JTX-1598 received in evidence)

24      (Recess taken at 2:33 p.m.)

25      (Proceedings resume at 3:30 p.m.)

1            THE COURT:  Okay.  This is Judge Silverstein.

2  We're back on the record.

3            UNIDENTIFIED:  (Indiscernible)

4       (Pause in proceedings)

5            THE COURT:  Mr. Kurtz.

6            MR. KURTZ:  Thank you, Your Honor.

7  BY MR. KURTZ:

8  Q    Dr. Bates, right before we broke, you had testified as

9  to an initial benchmark valuation of approximately $2.5

10 billion.  Is that the original valuation that you calculated

11 of the current abuse claims in this case?

12 A    No.  To be clear, the calculation to the -- of the base

13 claims in total as a range has not changed, but the initial

14 benchmark has, as a reflection of the development of knowing

15 and the transpiring of events that were sort of anticipated

16 as being things that might occur over the course of time that

17 would affect the uncertainty and where we are within that

18 range.

19      So I've prepared an exhibit that summarizes this, if I

20 can bring up DDX-84, which we'll go through this.

21 Q    Yeah, so --

22 A    We -- I initially prepared an estimate within in the

23 range around that estimate, the valuation estimate, in this

24 frame of 2021, and in the -- in anticipation of the

25 disclosure statement, really.  So the valuation, at that

1 time, established the range of two point four seven point one

2 billion [sic], that was based on an initial benchmark

3 valuation at 4.75.

4     That was based on the Tranche 4 data that was available

5 at that time, and it's also based on the historical data an -

6 - exactly as it was presented to us by -- by Ogletree at that

7 -- at that time.  And in particular, it had some labeling on

8 some of the data that I didn't discover until more recently

9 that was -- needed to be updated to property adjust for the

10 analysis in the data.

11     What we haven't actually talked about, what the

12 scenarios that we -- we did were.  We had talked about the

13 Tranche 4 data was the data, the POC data that existed in the

14 Spring of 2021.  And as Ms. Murray testified that, between

15 then and July, the data was updated a couple of times by the

16 -- the submission of additional forms that -- in the POC,

17 updated information from the claimants.  I processed that,

18 and it was ongoing.  And in fact, it has -- has, in effect,

19 gone on some more, but -- though the data was walked down as

20 of -- of July 2nd, at that time.

21     But as you can see down below, we have a list of what

22 are called the "plus factors" and the "minus factors."  All

23 right.  So not to put too fine of a point on it, but as --

24 when we had the initially valuation at that time of 4.75, we

25 went through a process of considering what were the various

1  things that could make the value, the aggregate value, higher

2  than what it was and what could make it lower.

3      And the things that we -- I considered in doing that

4  were elements which would expand the pool of claims which had

5  value beyond the 16,000 that we talked about -- I've

6  mentioned some of that earlier today -- as well as the minus

7  factors, which were things that would actually lower the

8  value.

9      And at that time, I had not yet simply implemented a --

10  the plus -- the minus factor, which was the ages of

11  survivors, which is the first one listed at the bottom, and -

12  - and which would have a negative effect on -- on the value.

13  So it briefly goes -- goes through those.

14      The top one of the plus factors is called "SOL."  That

15  stands for the statute of limitations.  And as I've -- I've

16  mentioned here, we don't have a lot of guidance from within

17  the data about what the S-O -- the statute of limitations,

18  this half would be.  We know that it -- it should be there,

19  we know that the parties all have acknowledged that it would

20  be there.

21      We know from the behavior of the plaintiffs filing the

22  cases and from the (indiscernible) statement about their

23  decisions on which they retained, but that's an important

24  element that's been discussed a number of times here.  And we

25  viewed that as being something that could have an impact on

1  the -- the value of the claims that would raise the value of

2  both, the value that we estimated in -- in the spring.

3       We know that the abusers, as I've talked about, that we

4  could ident -- update the information on the abusers, which

5  ones had named their abusers and which ones didn't.  And we -

6  - we consider that to be still a possibility.

7       We identify that, by (indiscernible) process, you could

8  have an update on which records were multiple abusers and

9  which were -- were not multiple abusers.  That could affect

10 the valuation of the claims, as could when -- whether the --

11 the abuse was reported or not could make a difference for

12 essentially whether or not there was notice to the Boy Scouts

13 on the claim, which might affect what the valuation of the

14 abuse would be.

15      The next one says "young abuse survivors."  It

16 essentially refers to the fact that -- that, you know, a

17 number of survivors, the age at which the abuse took place

18 could be updated, as well as claims about how many of them

19 were minors at the time.

20      The fact that there is an exception to the abuse claims

21 having to be filed in this bankruptcy by the -- the date,

22 which is the fact that some of the abuse -- abuse survivors

23 that are out there, who did not file claims maybe didn't file

24 claims because there's minors -- they're minors now and they

25 won't reach the age of majority until after this process, and

1  so they still would be eligible to bring their claims in the

2  trust when they turn -- they reach the age of majority at

3  some point in the future.

4      So they're -- in the parlance that we used here, we call

5  that "future claims."  But those are claims for which they

6  would qualify as -- for meeting the terms of the bar date

7  here, in this bankruptcy, because they have not reached the

8  age of majority to make the -- the -- the legal decisions to

9  make the -- to bring their claim forward.

10      Similarly, there is a potential for claims which could,

11  essentially, discovery that the abuse took place in the

12  future, that they have now.  There's a theory -- it's a

13  contested theory -- on whether or not -- between the parties,

14  on whether or not there are individuals who would actually

15  have repressed the memory of their being claims.

16      But we went through an analysis to investigate that, as

17  well, and noticed, in particular, digging deeply into the --

18  the -- to the POCs and the data that they recorded there,

19  that the -- the number of cases of 86,209 which made

20  reference to any kind of a discovery through a repressed

21  memory at some point in their life is actually very small.

22  And I think that's a pretty good indication that this is not

23  a factor that makes a big difference, though we want to take

24  account of that in our consideration.

25          UNIDENTIFIED:  Yes (indiscernible) stock market.

1  Every day, he works on --

2          THE COURT:  Excuse me.

3          UNIDENTIFIED:  -- (indiscernible)

4          THE COURT:  People need to make certain their audio

5  is muted.

6  BY MR. KURTZ:

7  Q    You can continue, Dr. Bates.

8  A    And as we discussed, the things that would make the

9  claims' value -- the values be lower are the age of

10  survivors.  The population of the POCs is older, we've talked

11  about that.

12      That (indiscernible) did not actually take account of

13  the fact that there are lower values when the abuse that's

14  taken place is perpetrated, not by an adult, but by a youth.

15  Many of the proof of claim forms do designate that.  It's not

16  a high percentage, but there are (indiscernible) there.

17      The other thing is, is that there are potentially

18  missing relationships identified.  That is, in particular,

19  the way the POC form is written, it actually has a checkboxes

20  for the number of outside relationships that are there, and

21  it has checkboxes for one, two, three, four, the -- the

22  nature of the relationships.  Is it a -- is it a teacher?  Is

23  it a coach?  Is it a priest?  Is it a neighbor?  Is it

24  somebody in the community?  Other for you to fill in.  But it

25  didn't ask for a count in any way, but that's a tabulation we

1  did.

2       What is not in that box is one that says no outside

3  relationships.  So you can't distinguish within this data

4  between where there's no outside relationships,

5  affirmatively, versus where somebody didn't actually fill in

6  the data.  And in none of these elements of the data here is

7  it filled in completely, is -- are the data there, except for

8  the name of the abuser.  And in cases -- some cases, that's

9  actually listed as a Doe.  But the -- but -- so it's not

10 possible to know with this data, and the trustee will have to

11 account for that omission -- omission in the POC form, once

12 she does her analysis and values the claims individually.

13      And then there's the bottom part, which is the minus

14 factor, which was -- summarized is what we call "unobserved

15 hesitancy," and/or, more broadly, the combination of the

16 unobserved hesitancy and the economic valuation threshold

17 that I discussed earlier today.

18      And those things were taken into account when we did the

19 initial data, where we did an initial benchmark valuation of

20 4.75.  We had -- and consideration of those various plus and

21 minus factors.  I considered what the alternative impact of

22 those were, I tested my -- what those various things might

23 be, in terms of individually considering what impact they

24 might have.  Would it affect the severity of the claims?

25 Would it affect the number of claims that were there?

1    And in -- in coming to that conclusion, I -- I decided

2   that -- included that in a range of approximately 2.4 to 7.1,

3   which is about 50 minus -- plus or minus 50 percent from the

4   4.75, is a reasonable range, in light of what those factors

5   could do and my sensitivity testing on those.

6       It's not a precise calculation.  The data to do a

7   precise calculation of the uncertainty just does not exist

8   here, so we have to do it and -- on the basis of some

9   judgment, or what I referred to in my report as a "spot

10  experiment," which is a way of considering the impact of

11  various kinds of -- what the analysis could yield, what the

12  impact could be of various factors, in the absence of real

13  world data, which it allows you to test it, a -- a recognized

14  method for using deductive logic to try and get a handle on

15  something, though it can't give us a precise number.

16      We do have a sense of what's the direction they could

17  go.  And then, balancing off of the nature of the factors and

18  what information we do know, allows us to -- allows me to

19  essentially exclude some value -- some alternatives here of

20  that as being remote and outside the range of realm of

21  possibility and others to be too little of an impact, but not

22  within the range of and too little of an impact.  So I -- I

23  settled on this range at that time of about plus or minus 50

24  percent.

25      The third column here is labeled "Fall of '21" -- "'21."

1   By this time, we now have the Tranche 6 data to work with, so

2   we've had an update on the data.  Several thousand of the

3   claimants now have updated who the names of the abusers are,

4   the allegations of abuse that they have, so we have an

5   updated data.

6        In addition, four states have enacted revival statutes,

7   which basically have moved thousands of claims from the

8   position of -- of not valued to -- not -- not being an open

9   jurisdictions to being open jurisdictions, so that adds to

10  the -- to the value of the claim.  And when we did the

11  analysis there, we came up with a higher number.

12       Notably, this -- the data at this time has a feature to

13  it, which, in the course of my continued investigation, and I

14  discovered was not accurately recorded in the data, the

15  historical data we have.  And that is -- I think we saw that

16  earlier today in the spreadsheet of the historical data that

17  was put up on the screen, which was that the -- historically,

18  they had a record of -- somebody had tried to keep track or

19  tried to identify in the past what were the claims that

20  involved a repeat abuser and how many of those claims were

21  there.

22       And I discovered, in the course of doing my own research

23  and trying to understand why it was within the data that I

24  had, in the historical data that I had, that there were high-

25  value claims involving one-time abusers.  I -- so what

 1  underlied those factors?  And this was before I was able to -
 2  - to conclude (indiscernible) because that's an important
 3  element here because it leads to what did this data tell us
 4  about the value of a once identified abuser (indiscernible)
 5       So I took the list -- and this is in -- essentially,
 6  even after my first report had gone in.  And reacting to the
 7  report I saw from -- from the Claro Group, where they had
 8  provided me a set of verdicts and the analysis that they did,
 9  which I described to you -- to Your Honor a little bit
10  earlier.  These -- these verdicts had drawn a clear
11  distinction between the driving factor between a high-value
12  case against the BSA, as distinct from a low-value case
13  against the BSA, was within the category of cases which are
14  of the same abuse category had wide variation of amounts.
15  And so that led me to the discovery about the nature of -- of
16  the responsibility (indiscernible) so, in the historic data
17  that I have at this time, which has dozens of cases which are
18  listed as being one-time abuser cases, what caused those to
19  be the high-value ones.
20       And so I went and I looked at the first one, and I
21  actually went on the internet.  And I said is this case
22  actually identifiable on the internet.  And the first thing I
23  found, through -- through the high-value case, was that this
24  case was actually, through the news story, a case that
25  involved repeat abusers -- a repeat abuser.  And I went and I

1  looked in the POC data, and sure enough, the same abuser

2  showed up in the POC data.  So it's mislabeled in the data,

3  so the person who compiled that data wasn't paying particular

4  attention to that feature of the data and didn't do a

5  comprehensive analysis.

6      I did it to the next second highest data point.  And

7  again, I found this individual as being -- sometimes it was

8  even within the historical data itself, and sometimes it was

9  in the POC data, and sometimes it was in the -- in the

10  newspapers, and sometimes it showed up on this New York Times

11  -- excuse me -- LA Times database that I talked about, which

12  had a record of what the ineligible volunteers were.  And you

13  could put the name in and find that the person had actually

14  been identified previously as -- as an abuser; and, hence,

15  was a repeat abuser at the time.

16      I kept going down through the claim values that I had

17  for the ones that were in the seven figures, and I worked my

18  way down the list.  And I got all the way down to the fact

19  where I could tell I reached the value that was of 3.7, so

20  it's $375,000 for an oral sex case, and $300,000 in the case

21  of a penetration claim.

22      The highest value for a case that I could separately

23  identify through this kind of an analysis as being a one-time

24  abuser in the fact that, in the -- in the sense that I

25  couldn't identify other -- other survivors who had basically

1  been abused by the same individual, except for one.

2       And that one was the one that I talked about earlier

3  day, which was when I -- and I asked Ogletree about it, and

4  identified for me that this was, in fact, a case of an

5  employee who had a longer term abuse period for -- with this

6  one young man.  And -- and they were concerned about taking

7  this case to court because it appears as if somebody else in

8  the organization knew about it.

9       So I had to go through an analysis and I had my team go

10 through the process of looking for all cases in both the --

11 the historical data and in the POC data, and identify all

12 cases where somebody was -- had showed up and -- more than

13 once, across both of the data sets, and labeled them as being

14 repeat abusers.  And only the cases which showed up once in

15 both of these files that I have that I labeled them as being

16 once identified abusers.

17      And that's what the term means, like once identified in

18 the record of 82,209 abuse claims, plus the 573 cases that we

19 have going over the entire ten-year being, as being once

20 identified abusers place.

21      And when I did that analysis, the average value that was

22 associated with a one time -- once identified abuser cases

23 dropped from around 650,000 down to the $212,500, with most

24 of them -- with -- and it making it very clear that most of

25 the once identified abuser cases that we have in the POC data

1  must be the ones that are subject to this -- this -- this

2  situation of not being -- of not being -- having a value

3  sufficiently above the economic threshold to -- to actually

4  have filed they claim as a tort claim.

5       So, in addition, in -- in -- then, after implementing

6  that change, which is reflected in the data that I just

7  showed you that affects the benchmark value, it drops the

8  benchmark value down to $2.5 billion, as reflected here.  But

9  there still remain the other, and -- and leads me to the

10 conclusion that there was -- the ultimate value was likely in

11 the lower quartile, meaning between 2.4 and 3.6.

12      I still believe that the overall range of 2.4 to 7.1 is

13 a range that is a feasible range for the outcome of -- of the

14 proper value of the -- of the tort claims before the factors

15 that are additionally identified below.  Outside that range,

16 I think the likelihood is remote that it would be any of

17 those.  I think it is highly likely that the range is within

18 this range, 2.4 to 7.1.  But the most likely portion of that

19 range is in the lower quartile.

20      The factors that I identified below as being of -- the

21 impact of, effectively, have claims under the statute of

22 limitations, which would be -- potentially have some value as

23 filed claims, as was discussed by Mr. Griggs, Mr. Burnett,

24 and discussed under the questioning of Ms. Dumas, is -- it's

25 clear that's there.

1    I still -- as I mentioned earlier, I think that the --

2  the fact that the abuser information is only partially

3  identifiable, and it could, in fact, not only affect the

4  value of an individual claim that was reflected by

5  (indiscernible) the status of an individual claim is a once

6  identified versus repeat abuser case, but also affecting any

7  other claims that shares -- another claim that shares that

8  same abuser that's now been updated has the potential for

9  increasing, as do the other factors that I've talked about

10 here.

11    I think the factors -- most of the factors that I've

12 discussed that are the minus factors are, I think, reasonably

13 reflected in the -- in the lower calculation here of the

14 benchmark value here.  But the other factors still remain.  I

15 think the likelihood that those other factors would take you

16 significantly above -- above the lower quartile is less

17 likely than you would be in that lower quartile range for a

18 number of these factors.

19    But that's how the information that came to me was

20 developed.  That's why the benchmark value has changed and

21 how it's changed over this time period.  But why I have

22 retained the original range as being, I think, still the

23 range, albeit wide range, reflective of the uncertainty we

24 have and the limitations today that we have here for the

25 appropriate and reasonable range for the valuation of the

1  abuse claims in the -- as tort claims, as filed tort claims

2  and what they would settle, had they been filed in the tort

3  system.

4  Q    If I may briefly follow up on a little bit of that.

5       You mentioned the phrase "thought experiment," which I

6  think has been used by non-scientists pejoratively from time

7  to time in this case.  And I'd like to ask you if -- whether

8  that is a phrase that is accepted and utilized in scientific

9  communities.

10 A    Virtually all the time, as a routine matter.  People in

11 seminars will talk about, well, let's do a thought experiment

12 on this.  And what they're really saying is let's posit a

13 hypothesis here, and let's use our deductive reasoning and

14 knowledge that we have collectively here to understand what

15 the impact of this might be.

16      A simple example.  In science, they do things like this

17 all the time, we've been doing it for -- for a couple of

18 hundred years.  You want to posit what's the impact -- you

19 have a hypothesis.  You know, what -- if you drop a feather

20 and a bowling ball, from the top -- or a cannon ball --

21 sometimes it was thought about and discussed in the science

22 before -- off the top of the Leaning Tower of Pisa.  If we

23 were to remove the air, which of these two would hit the

24 ground first?

25      You can't build a tube and evacuate all the air from

1   around the Leaning Tower of Pisa and literally test this.

2   You have to use your reasoning about what the -- the impact

3   is and bring the science that you under -- understand to bear

4   on it.  And so you've come -- your basis science would say,

5   well, that leads me to believe that -- that they would fall

6   at -- at the same rate.

7        Now, in fact, over time, people have literally tried to

8   test that by basically building vacuum chambers and dropping

9   various objects in to see if they had an effect because

10  science, at the time this was done, did not have -- fully

11  understand.  And you know, within the world of someone like

12  Isaac Newton, where he basically modeled the laws of gravity

13  as he was done, came up with his -- his universal laws of the

14  way gravity work, at least prior to the time of Einstein.

15  That was the -- the way in which you could test something

16  like that conceptually, which then leads to mathematical

17  models, if you had the data, or scientific experiment, if you

18  -- if you had the data.

19       So, yeah, it's -- it's well used.  And probably some of

20  the most famous ones are the (indiscernible) experiments that

21  Einstein did, which talk about relativity --

22  Q    Is --

23  A    -- but --

24  Q    Is it used far more often than from minds like Einstein

25  and Isaac Newton?

1  A    Well, no, it's used by scientists in general, so I -- I

2  -- you can do that in a lot of cases.  You know -- you know,

3  I'm not an Einstein, so ...

4  Q    We'll let the Judge decide that.

5     Did you, at any point -- when you changed your benchmark

6  value from 4.75 to $5.84 billion, did you change your

7  methodology in any way?

8  A    No, that's just an update in data and information that

9  we have.

10  Q    When you changed your evaluation -- your initial

11  benchmark valuation from $5.84 billion to $2.51 billion, did

12  you change your methodology in any way?

13  A    No.  That's just a pure update of the data and the

14  information we have in the calculations of the average values

15  that were associated with repeat abuser, the one time

16  identified abuser.

17  Q    And do you have a reasonable degree of confidence as an

18  expert in claim valuation that your range of 2.4 to $7.1

19  billion is an appropriate valuation range for the current

20  abuse claims?

21  A    I believe it is.  I think, to a reasonable degree of

22  scientific certainty, that would be the range, based on the

23  information.  It's a wide range, albeit reflective on the

24  uncertainty that exists.  But I think that range is a

25  reliable range for that purpose.

1  Q    And do you have a reasonable degree of confidence as an

2  expert in claim valuation that the value of the current abuse

3  claims will fall within the lower quartile of 2.4 to $3.6

4  billion?

5  A    I -- I do.  I think that is reflective of the most

6  likely outcome, based on what I know at this time.

7  Q    Okay.  Now, in your benchmark valuation, you apply your

8  benchmark values to approximately 16,000 claims.  Have you

9  calculated an aggregate value for the current abuse claims

10  that assumes all the time barred claims are valid and -- and

11  assigns value to that?

12  A    And yes, I have.  And I've summarized that in another

13  (indiscernible) exhibit, which is DX -- DDX-85.

14        MR. KURTZ:  Okay.  Could we pull up DDX-85?

15  Q    And can you walk the Court through your aggregate

16  valuation, making the assumption that each and every one of

17  the presumptively time barred claims is -- would be brought

18  in the tort system and have value?

19  A    Right.  I mean, as -- as Your Honor can see, this is a

20  similar chart to the one that we showed you already.  It --

21  down at the bottom row, it has the totals.  And you can see

22  here, now, that the total aggregate amount has been updated

23  to be just slightly over 3.8 billion at the bottom, right-

24  hand corner.  That is in yellow.

25        And in addition, if you look at the sum -- sum total

1  down at the bottom of the count of POC, the number of abuse

2  claims for which this is attached to, that number is

3  approximately 46,000 abuse claims.

4      And it -- this chart is essentially the compilation of a

5  series of tables that look like the first one.  And each one

6  of those is constructed by replacing the values that are in -

7  - that I identified originally as being the once identified

8  abuser penetration claim value and the repeat abuser

9  identification claim value with the amounts that were on the

10  front sheet, but then discounted by amount to be reflective

11  of what the trust distribution procedures have identified as

12  being the possible value of the claims, which, in the various

13  groups of states, you have a gray one, gray two, gray three,

14  the items that we used before, of the claims.

15      So, essentially, each one of those individual sheets has

16  the count of claims within each of these categories for each

17  of those groups of states.  We apply the appropriate

18  discounts.  We do the same multiplication to get the totals

19  in the rows in the column labeled -- excuse me -- the column

20  labeled "Aggregate Amount."

21      And the, across all of those sheets, starting with the

22  one that was the initial 16,000, we have the ones for the

23  gray state are -- gray one states are added to that, then the

24  gray two, gray three, and the closed jurisdictions, as well.

25  Sum those up, and we see that that adds to the initial

1  benchmark valuation of 2.5 billion, another additional 1.3

2  billion, getting you up to about 3.8 billion.

3      Reflective of the fact that, as we can see, with the

4  discounts that the statute of limitations would apply to

5  those cases, the overall average will be lower now,

6  reflective of the fact that the claims themselves are subject

7  to the discount before the statute of limitations.

8  Q    All right.  And the -- this aggregate valuation assumes

9  35,766 claims are brought, including each and every claim

10  that otherwise would be subject to a statute of limitations

11  defense?

12  A    Yeah.  I mean, it's not literally an assumption directly

13  of that number.  It is, in fact, a tabulation of the numbers

14  of claims which are in each of those states that have a named

15  abuser, that have a known allegation, and -- and according to

16  the criteria before.  And that sums up to the total of

17  45,766.

18  Q    And you testified earlier that you don't believe that

19  45,776 claims actually have value (indiscernible)

20  A    Well, that's a possibility, right?  That that will

21  occur, if all of those -- they -- those claims actually meet

22  the criteria otherwise for the claims and these valuations.

23  They would have that value.  I think that the --

24  Q    I guess what I'm asking you is, does this satisfy your

25  economic analysis that the claim thresholds would not be

1  crossed for many of these otherwise presumptively time-barred

2  claims?

3  A    Yes.  Just set that assumption aside, that is, this is

4  the value as if they had been filed as a tort claim.  So,

5  ignoring for a broad experiment here, the transaction costs

6  associated with filing and bringing claims and prosecuting

7  claims, had those claims actually been brought and those

8  expenses incurred, these are the predicted values of what the

9  STAC claims would have settled for; albeit, they would have

10  been losers because the costs of the -- losers financially

11  because for them to (indiscernible) is because the costs for

12  prosecuting and bringing those claims would far exceed the

13  value of these claims.

14  Q    Does your aggregate valuation account for future

15  claims?

16  A    It does account for that, but I account to it through a

17  separate analysis that, that is part of why the range is what

18  it is.

19  Q    And what conclusions did you reach about the potential

20  (indiscernible) on future claims?

21  A    I believe that there will be perhaps a few hundred of

22  those (indiscernible) and I am prepared to first demonstrate

23  why that is the number that I expect to occur.

24        We can change slide DX-86.

25  Q    So, explain the chart to the Court.

1  A      Yes, I will.

2         Your Honor, this chart has on the horizontal axis, the

3  claimants, each of the abuse claimants, which has that

4  information within the dataset; what their birth month is,

5  that is when we have the information that is provided about

6  their date of birth or month of birth.  It is put in here

7  onto the chart.

8         Each of these blue dots reflects the count of claims

9  for each of the dates that we have by month of the number of

10 claims that have that month as their date of birth.  So, the

11 vertical axis here is the count of claims.  So, you can see

12 that we reach upward to, in some days in the individuals born

13 in the early 1960s we can see that some of the claims, up to

14 300 a day, were filed in the abuse claims.  And so, this

15 chart allows you to see how the claims have declined as we

16 have moved to younger and younger claimants over time.

17        Now, prior to the periods of the 1960s, now we are

18 going back to people who were at this point, over 60 years

19 old, all right, so the decline of the claims before this time

20 is reflective of two things.  One is the age of these

21 claimants; we are starting to have claimants who have no

22 longer -- who have deceased prior to this process beginning

23 here, and also the fact is reflective of the fact that the

24 number of participants in Boy Scouting is something that

25 increased through the period of the '30s through the '40s,

1  '50s.  It's reflective of the increase in the population.

2  So, we see that increase.

3      And then subsequent to that time period, we are

4  advancing forward here, people born in 1960, you know, they

5  would, at the time of their abuse, they would have been in

6  the period of the 1970s.  Given that the average age of abuse

7  of these claimants is somewhere around 10 or 11 years old, I

8  am sorry to report, that that decline then that we see after

9  that is reflective of two patterns that occur.  One is that

10 there is, during the period of the '70s through the '80s, a

11 decline in the mid-80s, a decline in Scouting participation,

12 as well, but then that flattens off.

13     And then subsequent to that, the decline is

14 attributable, I believe, to the advent of the youth

15 protection program, aided by additional enhanced technology

16 of the internet and things like the ability to develop

17 educational material that could be widely disseminated, that

18 began in the mid-1980s.  The Boy Scouts establishing a task

19 force whose purpose it was to identify ways and techniques

20 and education programs that could be used to disseminate

21 information about what training could happen, what kinds of

22 techniques could be used to educate the population and, in

23 effect, one of those important ones is just the ability at

24 this point to create a database of information that you could

25 do data-tracking and track claims.

1    I have often said outside, prior to this case, a long

2 time ago, in the future sometime, people are going to think

3 the world started at about 1984, because that's the time

4 period where computer technology got to the point where wide-

5 scale use of electronic databases that could be queried came

6 into existence.  Companies started building database of

7 prices, of costs, of customers, of customer information.

8 Certainly in the Boy Scouts, at this point, they could start

9 to create a database where they could record information of

10 who the ineligible volunteers should be.

11    You would also have the police and the states, there in

12 various jurisdictions across the country, starting to create

13 electronic databases of people with records so that those

14 could be checked electronically, which prior to that time, a

15 background check might be, pick up the phone, call the local

16 sheriff and say, What do you think about Joe Smith; is he a

17 good guy or not?

18    You could actually check people's records in a much

19 more systematic and comprehensive way.  You could disseminate

20 the same.  You could use experts that could create training

21 materials that could be disseminated electronically.

22    So, just basically, with the advent of those programs,

23 you can see the decline in the number of count of claimants

24 by each of the birth years, which I think is highly

25 reflective of the decline in the actual abuse rates that

1  actually occurred.

2      When you reach the period here on the right of the

3  chart where the colors of the dots change from blue to green,

4  is we have now reached the age at which the claimants

5  themselves are under the age of majority.  And so, this is

6  the area where the claimants are likely to have come from,

7  from the abuse claimants to being abused claimants who are

8  not yet identified are in the pool of the plan.

9      So, if we advance to the next slide, I can show you the

10  analysis that I did on that and that is essentially to

11  (indiscernible) what I've done here is scaled down the axis

12  on the left from the range of 400 down to 600 to essentially

13  magnify the focus on the period of the time to the right.

14      I've also cut it a little bit short in time so we can

15  see how the trend -- so we can see the emerging trend of the

16  decline in the counts of claims as we move through times of

17  the youth protection programs that are in place and the

18  enhancements to that program that are improved through time

19  and the decline in the number of cases that we get.

20      So, I used some standard estimation technology,

21  estimation procedures types of analyses called "regression

22  analyses," which basically are going to use the data from the

23  past, estimate the rates of decline, consistent with the data

24  and the kinds of things that underline the data, and project

25  forward what, at the rates that we saw the decline, the rates

1    that we saw and observed the claims gone forward for the

2    people who, once they have reached the age of maturity, what

3    would be the expected rate of claiming that you would see for

4    each of those years into the future if those rates continued

5    and that trend continued.

6         And that's given by the red dots, which are the point

7    estimates for each of those years.  The little gray whiskers

8    around those are, in fact, the rate confidence intervals, 90

9    percent confidence interval; that is the range of statistical

10   uncertainty that we can estimate from the prior data about

11   what the average rate of (indiscernible) eventually reported

12   if this trend continues.

13        So, where you can see there, the red dots are above the

14   green dots, that's showing you the gap between what we

15   predict would occur once we account for all of these claims

16   coming forward in the future and what actually did occur.

17        And the difference between those counts here is

18   accounting for the range of statistical uncertainty is about

19   400 claims.

20   Q    And is a regression analysis a reliable, accepted

21   statistical methodology for predicting results?

22   A    In the hands of the experienced professional, yes.

23   Q    Are you an experienced professional --

24   A    I am.

25   Q    -- in applying -- performing regression analyses?

1  A     I am.  I have used these techniques for 50 years.

2  Q     And just to the state the obvious, why use a 95 percent

3  confidence (indiscernible) -- is that an accepted standard of

4  deviation confidence interval for statistical analyses?

5  A     It's a commonly reported one.  It reflects a high

6  degree of confidence.  So, it takes a range that, as a, sort

7  of a standard that people use, it allows people to do a

8  cross-analyses compares on the same basis.

9        You could use other degrees of confidence, but that's

10  the level which is reflective of what is usually used to be

11  reflective of a high degree of confidence.

12  Q     And does a 95 percent confidence level mean that the

13  results, statistically speaking, is 95 percent likely to be

14  correct?

15  A     What it means is that the actual value is 95 percent

16  likelihood to be within the range that is there.  So the

17  actual value that underlies the point estimate of a red dot

18  has a 95 percent chance of being within the range of the

19  little oysters around that point.

20  Q     And did you avail the statistical model that you relied

21  on in performing your regression analyses, in reaching your

22  conclusion about approximately 400 future claims?

23  A     I did.

24             MR. KURTZ:  Your Honor, that model is JTX-1500 and

25  I move to introduce it into evidence.

1      MR. KARLAN:  No objection.

2      THE COURT:  It's admitted.

3      (Exhibit JTX-1500 received into evidence)

4      MR. KURTZ:  Okay.  Your Honor, we're going to move

5   to the second assignment.  I don't want that to sound like

6   we've just started, because we haven't.  Just like these

7   claim (indiscernible) are verifiable, so (indiscernible)

8   these subject matters, but let me start with that.

9   BY MR. KURTZ:

10  Q     So, that means I'm going to move to your second

11  assignment which related to the TDP structures and a claims

12  matrix.  And you testified earlier that you had a lot of

13  claims data to assist in the development in the TDP claims

14  matrix values and the (indiscernible), and I'd like you to

15  ask -- and I would like to ask you to describe that work to

16  the Court.

17  A     All right.

18  Q     Thank you.

19  A     So, the first thing I want to do in describing that

20  work is to take another step and put another couple of charts

21  up which just show a different way of looking at the data,

22  that I can use that summarizes a number of different

23  attributes -- a number of different claim types at once that

24  I used.

25      So, if you could bring up DDX-88.  This is a chart

1  which is a type of chart here that I'll take a couple of

2  minutes just to describe for you.  It's called a "box and

3  whisker" chart.  It's one that statisticians and economic

4  modelers and statistical modelers use to represent a number

5  of attributes of the data all at the same time and be able to

6  do comparisons across them.

7      So, across the bottom, we have all of the categories

8  which are used in the trust distribution procedures to

9  categorize the claims and value the claims.  So, you can see,

10 rather than using the three categories that I used for the

11 tort value (indiscernible), the TDP has broken those out into

12 five categories here, total.

13      On the vertical axis --

14 Q    And those five categories are within the TDPs?

15 A    They are.  They are defined by the TDPs.  So, that's

16 why we are switching to this way of (indiscernible) the data.

17      The vertical axis shows the range of values that, as I

18 sold you earlier, there's a wide range of values for each of

19 these claims ranging from all the way down to just a few

20 thousand dollars, all the way up to almost $10 million and

21 that's reflective of this chart.

22 Q    Are those dots that are above the bars, are those

23 settlement results?

24 A    Yes, they are.

25      And I'm going to describe all the pieces of the chart

1 so that we can do that and we'll switch to a more detailed

2 version of this in just a moment.  But I wanted to start off

3 here because you can see several things.  So, first, let me

4 go through the process of describing and interpreting what

5 the charts mean for us and why it's called a "box and

6 whisker" chart.

7      As Mr. Kurtz was just referring to, there are a series

8 of dots above the box and the whisker.  So, the box is the

9 blue box, all right; it covers a range of the data.  The

10 whisker, it covers a broader range and extends out from the

11 box upward.  And then there are dots above it.

12      The dots above it that he referenced are what the

13 statistical procedure and Excel, which uses common

14 procedures, statistical procedures for this purpose, has

15 identified as what it calls the "outliers"; that is, those

16 are the claims which are extraordinarily outside the range of

17 what the rest of the data is used.  So, that is a well-

18 defined procedure for identifying places that are

19 sufficiently rare in the occurrence, that they are separated

20 outed and illustrated by the individual dots.

21 Q    And that's automatically generated by the software?

22 A    That's automatically generated by the software, as are

23 all the other parts of this chart.

24      The whiskers that extend to the outside of the blue box

25 cover the full range of values which are not described, not

 1  considered to be outliers.  So, for the penetration claims,

 2  claims which occur in a sufficient frequency to be not

 3  considered outliers fall in this range that is very close,

 4  essentially zero, up to the range of just over $2 million.

 5        And for each of these, you can see the decline across

 6  to the lower types of claims that we see.  The upper end

 7  declines, the whiskers tend to decline as we move through the

 8  severity of the categories.

 9        The blue box, itself, looking at the blue box as a

10  whole, is an area of the claims which is referred to as the

11  "interquartile range" which is an area of consideration that

12  basically encompasses the middle 50 percent of the data.  So,

13  the top whisker encompasses this top 75 percent -- excuse

14  me -- the top 25 percent of the values.  The bottom, the area

15  below, the blue box on the bottom whiskers captures the

16  bottom 25 percent.

17        The bottom of the box is known what's known as the

18  "twenty-fifth percentile."  The top of the box is the

19  "seventy-fifth percentile."  And the line in the box in the

20  middle is the median.

21        So, we literally go from the bottom observation, the

22  bottom of the whisker, to the twenty-fifth percentile; that

23  is where the first quarter of the observations and settlement

24  data.  We then go to the next line, which is the median,

25  which tells us where the next quarterly observations are.

1      Then the next quarter above -- next line up at the top

2   of the box is where the next quarterly observations are.  And

3   then the next quarter, from the top of the box to the top of

4   the whisker is where the last quarter, the upper quartile of

5   the values are, and above that are the outliers.

6      There's one addition --

7   Q    (Indiscernible) so, the bottom of the box to the

8   first -- the bottom of the box represents the bottom 25

9   percent of claim values?

10  A    Yes, that is the twenty-fifth percentile.  Twenty-five

11  percent of the values are below that line.

12  Q    And the top of the box reflects the top 25 percentile

13  of claim values?

14  A    Twenty-five percent of the values are above that line.

15  Q    Okay.  And the line that's sort of towards the bottom

16  is the median; meaning, it is the middle claim --

17  A    That is the --

18  Q    -- that is the value of the claim in the middle of the

19  claim?

20  A    Correct.  That is the one that's in the middle.

21      And the one piece we haven't described yet is the X.

22  And the X is the average value of the claims, right, which is

23  what we have identified.

24      So, previously, we talked about the median and the

25  average, and this gives us the rest of the full range of

1  values, as well as where the outliers are.  So, not having

2  explained that, I am going to essentially magnify this a

3  little bit and we are going to focus on the range here, which

4  is actually on the next chart, DDX-89.

5  Q    And just before you do that, can you just explain again

6  why there is such a significant difference between the

7  average value and the median value.

8  A    That's reflective of the skewness of the data that we

9  talked about earlier today.  The reflection of the fact that

10 as we said, there are 90 -- so, two-thirds of the data here

11 only capture 90 percent of the value, whereas the top, you

12 know, top-third data captures, you know, 90 percent of the

13 value, so ...

14 Q    So, the fact that there are really a small number of

15 very high-value claims brings up the average and does not

16 bring up the median?

17 A    Correct.  The median would not be affected by the size

18 of the claims on the outside on the extremes, whereas the

19 average would be pushed upward because of those outliers that

20 are out there.

21 Q    Now, we move to DDX-89, which is more of a close-up.

22 A    More of the close-up.  I'm going to say there have a

23 couple of pieces of information added to it, all right.

24     So, first of all, I tapped this chart at what is the

25 maximum value for the penetration claims in the trust

1  distribution procedures, which is $2.7 million, absent the

2  IRO.  So, if the General Fund claims, that is those claims

3  which follow the procedures outside the IRO, they would have

4  a maximum cap that is determined by the way the scalers can

5  be applied to what is called the base matrix value, which

6  I'll describe at this point.

7        So, in addition to having the range of the values here,

8  what I have on this, as well, is a line, which is a redline,

9  which is reflective of what we call the "base matrix

10 value" that we have chosen to use with the scalers that we

11 constructed.  And the base matrix values here were selected

12 so -- for the utility in using the procedures with the

13 scalers that are defined in the trust distribution procedures

14 themselves, to be able to replicate the base matrix values.

15       We're going to talk about those scalers have, what are

16 called "mitigating" and "aggravating" scalers and I'm going

17 to shift to be demonstrating to you how those scalers work in

18 just a moment.  But that's what these values are.

19       So, you can see that the one for penetration claims,

20 the value of 600,000 is well above the median, but well below

21 the average, reflective of the fact that the average is drawn

22 up so dramatically by the high values in the outliers on the

23 data.  And, similarly, as I showed you before, the claims

24 step down in value as we move from the left in the

25 penetration claims down to the least of your claims that are

1  on the right on the touching claims, the touching-clothes

2  claims, and they step down in a manner that serves the

3  utility of valuing the claims in each of the categories using

4  these scalers that are defined so that we have a common, this

5  set of factors that are under consideration and the scalers

6  that can be used in combination with the different base

7  matrix values, which will step down as we move through the

8  severity of these.

9       And this is the kind of procedure that is used in

10 trusts that have been established for other sexual abuse

11 trusts and is the kind of procedure that is used in other

12 cases.

13      What's a little bit (indiscernible) here is the use of

14 the scalers reflective of the uncertainty and the work the

15 trustee is going to have to do to be able to use those

16 scalers to (indiscernible) the values.  And hopefully in the

17 next charts, I will explain to you and give you some examples

18 about how those scalers would work, to be able to emulate the

19 tort values.  But this is a reflection of the fact that these

20 scalers that we picked, the base matrix values that we picked

21 here in combination with the scalers are consistent with the

22 tort values.  As you can see, they are reflective there.

23      They're interior to the range.  Each one of these is

24 well within the range of values that you get for the claims.

25 You have to be able to basically start from a point somewhere

1    in the middle of the range, move upwards to adjust for more

2    severe factors that affect the value of the claim.  Move

3    downward to reflect the fact that some of the claims, and

4    most of the claims will have lower values, as reflected by

5    the fact that each of these cases, even the historical data

6    with the median, is well below -- it's below -- in some

7    cases, well below the base matrix value, which is reflective

8    of most of the claims will, to emulate the tort values, be

9    scaled downward from the base matrix value, but that's by

10   design.  That is the way the trust distribution procedure

11   works and it will be based on the information that the

12   trustee collects.

13   Q     So, I want to make sure that we all follow what your

14   procedure is here.  You start with a base value for -- by

15   these side, severity categories; is that right?

16   A     Correct.

17   Q     And then you take that base value and you adjust it

18   upwards, as appropriate, using aggravating scaling factors?

19   A     Correct.

20   Q     And you adjust it downward, as appropriate, using

21   mitigating scaling factors?

22   A     Correct.  And we'll illustrate -- I have a chart that

23   illustrates that if you'd like.

24   Q     And is the base -- and it's always a multi-part test.

25         It starts -- or procedure -- it starts with a base

1  value and then you apply mitigating, aggravating scaling

2  factors, as appropriate?

3  A    Yes, you can.  The base matrix value, itself, doesn't

4  tell you anything without actually addressing the scalers and

5  how they affect the value, themselves.

6  Q    So, it is not intended that any of these base values

7  you'd apply to a particular claim?

8            MR. KARLAN:  Objection; leading.

9            THE WITNESS:  No.

10           MR. KURTZ:  Your Honor, I just want to make sure

11 this is clear.  This is -- I could let Dr. Bates speak, but

12 it'll probably take a little bit longer.  I'll leave it up to

13 you.

14           THE COURT:  Yeah, I'm going to overrule that.  He

15 recapping.

16 BY MR. KURTZ:

17 Q    All right.  And -- go ahead.

18 A    And just to respond, there is actually no penetration

19 claim in the historical data that is $600,000 itself; they

20 are all above it or below it, all right.  And the procedures,

21 themselves, have been designed to basically reflect above --

22 the kind of factors that would raise it above that value and

23 the kind of factors that would be below that value.

24      But since you want -- you have a design matrix, a

25 claims -- trust distribution procedures, which has they both

1  capture the values associated with the lower values of the

2  once-identified abuser claims, typically, and the higher

3  values of the repeat-abuser claims, typically, you need to

4  pick something that is in the middle of that range.

5  Q    And just so the record is clear, what is the base value

6  for penetration claims?

7  A    $600,000.

8  Q    And what is the base value for all oral sex claims?

9  A    $450,000.

10  Q    And what is the base value for masturbation claims?

11  A    $350,000.

12  Q    And what is the base value for groping and touching on

13  clothed claims?

14  A    Those are $175,000.

15  Q    And what is the base value for touching clothes?

16  A    That's $75,000.

17       These are defined in categories.  That is sort of the

18  adult abuser category, base matrix value.

19       When it's youth-on-youth abuse, each of those would be

20  stepped down one category.  So, the penetration claims of

21  youth-on-youth abuse, it would be $450,000 there because it

22  moves down one tier, as defined in the trust distribution

23  procedures and so on.

24  Q    Okay.  And can you explain to us the aggravating and

25  mitigating scaling factors that are used in determining a

1  claim based on (indiscernible)?

2  A     Right.  So, the aggravating scalers basically fall into

3  three categories.  There are aggravating scalers which start

4  on the base matrix and scale upward reflective of the number

5  of occurrences that -- a number of claimants who have

6  identified a particular abuse survivor reflective of the fact

7  that multiple -- the more times a user is identified, the

8  more often -- the more chance that there would have been for

9  the BSA to discover that.

10      There's also a scaling factor that's reflective of the

11  nature of the abuse and severity of the abuse, the repeated

12  nature of the abuse.  That's another scaler, which there was

13  some question by Ms. Dumas this morning to Ms. Makeda (sic)

14  about those characterization on the POC form.

15      At this point, the trustee will have to implement

16  those.  We don't have information in the historical data for

17  a comparison basis, so that would be reflected in that

18  information, as well as there's a third factor, which is

19  called the -- essentially, the impact of the abuse on the

20  survivor.  And, again, that's not available in the

21  information in the historical data, though, it is recorded in

22  the checkboxes and descriptions that are in the POC data.

23      So, that information will be useful for the trustee to

24  use for those.

25      For the mitigating factors, there are primarily two

1  forms of them.  There's really one overall mitigating factor,

2  but it's primarily of the form of, in one case, what are the

3  discounts that are applied to the claims per the statute of

4  limitations by the various states where the claims are

5  brought.  And there's a schedule of those that's provided as

6  part of the TDP.  And I borrowed those values earlier in

7  those analyses in which we did.

8      And then there is another said of mitigating -- another

9  mitigating factor that is, basically, capturing -- reflective

10 of all the other factors that would affect in the tort

11 system, why a claim might not be worth as much as it is.  And

12 in my own mind, that properly reflects the fact that the

13 institutional responsibility of the BSA will, when it is in

14 the range like the cases that I talked about with something

15 like Brouillard or the cases like the individual tort cases

16 that I talked about, the claim that went to trial, where the

17 BSA was assigned a 5 percent responsibility, reflective of

18 the case that the BSA, in many of these cases, particularly

19 in the ones identified as abuser cases, would have a low

20 percentage of institutional responsibility reflective of

21 that.

22     Those scalers are implemented in a way the mitigating

23 scalers can run anywhere from zero up to 1.  And by scalers,

24 what we mean here is you take the base matrix value and you

25 multiply the scaler times the base matrix value to get the

1  impact -- to get the value of the claims.

2       The aggravating scalers, of the three that I just

3  described, two of them have a range of values of 1 to 1 and a

4  half.  One of them has a range from 1 to 2.  The 1, having

5  done with the repeat abuser or the prior-notice scaler, would

6  have a value up to 2.

7       If you multiplied 1 and a half times 1 and a half times

8  2, you will get a maximum value for the aggravating scalers

9  of 4.5.  So, the aggravating scalers can range anywhere from

10  1 to 4.5.  The mitigating scalers can range anywhere from

11  zero to 1.

12       So, reflective of the fact now that starting with the

13  base matrix value of for the penetration claims is 600, you

14  can have, essentially, through the use of these scalers and

15  apply these categories, running anywhere from zero, a claim

16  that is essentially disallowed in that fact or the fact that

17  BSA has no responsibility, up to $600,000 times 4.5, which

18  would get you to 2.7.

19       So, the chart here that's on the screen right now,

20  which is DDX-90, is an illustration of how that could

21  possibly work.  We start off with the base matrix value of

22  600.  So, we are using the statistic ram chart that we did

23  before, which showed the summary of the *pro forma* of the

24  abuse claims that would be reflective of what you could

25  expect to get if you just had a straight extrapolation of the

1  tort values to the abuse claims, as I have discussed before.

2       And starting off with base matrix value, excuse me,

3  that's right in the middle of the chart, $600,000, the

4  mitigating scalers would take you down to the left, lower-end

5  of the value that would be applied, the allowed value of the

6  claim and the aggravating scalers would move it upward.  And

7  these scalers can be used, not just alone, but in

8  combination, all right.

9  I have another slide here, which is the next one, which is --

10 Q    Before we move on to the next slide, I mean, so, the

11 Certain Insurers have retained a rebuttal expert, a

12 Mr. Sarsella, who says that your TDP base value should have

13 started at $200,000.

14      Are you aware of that?

15 A    I am aware of that.

16 Q    And would it make a difference in TDP claim valuation

17 process to adopt a base value of $200,000?

18 A    Well, you could.  There's nothing magic about 600,

19 other than the fact that it's useful to have that value in

20 the middle, because it then gives you a basis by which you

21 can use mitigating scalers to essentially find claims and

22 attach value to claims which have a lower level of

23 institutional responsibility and then as a starting point,

24 scale upward to reflect the different levels of BSA

25 responsibility that is reflective in the higher frequency of

1   identification of the abuser that's correlated with the high-

2   value tort claims, where the claims which had repeated

3   abusers.

4   Q    So, we see from DDX-90, the way that a base value of

5   600 works in terms of the ability to go up to the high

6   numbers and the ability to move down to the low numbers.

7        Have you prepared a chart that would reflect the same

8   scenario, but starting with a $200,000 baseline?

9   A    I have.  That's DDX-91.

10  Q    All right.  Can you pull that out.  Thank you.

11       Can you walk the Court through a TDP scaler procedure

12  that sets the base value at $200,000, rather than $600,000.

13  A    Well, if you were going to use a $200,000 base matrix

14  value instead of a $600,000 matrix value, you would have to

15  modify the scalers and, in fact, introduce an additional

16  scaler in order to be able to actually emulate the tort data

17  in the way that I have described.

18       So, what this slide would show that in order to reach

19  the upper limit, you would have to actually have an

20  aggravating scaler which would maximize -- would have a

21  maximum value of up to 13 and a half to get up to the same

22  2.7 cap.  So, if you were to use, for example, only a scaler

23  of say, 3, as is referenced in Mr. Sarsella's report, that

24  would only get you up to $600,000.  You'd miss all of the

25  upper range of the values, which we know have occurred and we

1  would not be emulating the tort value.

2  Q    (Indiscernible) $200,000 times 13.5 -- to take $200,000

3  up to $2.7 million, you would have to have an aggravating

4  factor of 13.5.?

5  A    Right.  So, you would have to redefine and rescale your

6  aggravating scalers to take it up to 13 thirteen five,

7  instead of the way in which they're designed now.

8       The other thing is that because the $200,000 is sort of

9  in the middle of the range of the once-identified abuser

10  claims at the lower end of the range, you would have to,

11  basically, be able to come up with another scaler that would

12  be able to move you from the average value to the values

13  which were slightly above average or higher above average.

14       So, to get to a $300,000 claim identified within the

15  once-identified abuser claims, you have no mechanism, which

16  he is currently identifying for doing that to be reflective

17  of that value.  Not every claim is average.  There are some

18  claims which have a higher value.  There are $300,000

19  (indiscernible) claim values.  To represent those, you're

20  going to have to come up with a new scaler that would move

21  you from the average to the higher value.

22       Now, you could do that, it's just a different TDP.

23       Clearly, mathematically, you could do that; it's just

24  that you'd have to add in something else and define within

25  the TDP and the guidance to the trustee about what that would

1  be.  At this point, we don't have the factors and the
2  information to do that, that the trustee will be in a
3  position to develop when she does her work.
4      On the lower end here, you clearly have a smaller range
5  and the use of the mitigating scalers here, so you would have
6  to use sort of more finer gradations and math to reflect the
7  different values that are below the $200,000.
8      It's doable.  It's just, I think, would be less
9  convenient, and you have to build some additional structure
10 that's not in the current TDP.
11 Q    Can you walk us through an example of how a sixty-
12 thousand-dollar penetration claim value could result from the
13 base values and the scaling factors that have been set forth
14 in the TDPs.
15 A    Sure.  Again, there's a couple of different examples
16 here of the way the scalers (indiscernible) with what we can
17 use.  So DDX-92 is a reflection of the fact that if you had a
18 claim that was -- that came in, which was reflective of a
19 low-level of institutional responsibility for the BSA, you
20 would, in fact, the way you would implement it is apply a 10
21 percent mitigating scaler; that is, you multiply the $600,000
22 by a 10 percent -- this would be a once-identified abuser
23 claim.
24     It would probably be one in which there is little BSA
25 responsibility, no notice of the abuse that took place,

1  perhaps some infraction on the limitations on having the

2  individual present, the abuser present with the survivor and

3  by himself, in fact, some bit of a failing of the institution

4  of the BSA in some respect, but reflective of what we saw in

5  the kind of case that was the tried case.

6  Q    And can you walk the Court through an example of a

7  higher-value case run through the (indiscernible).

8  A    Yeah, so, let's look at DDX-93, which is reflective of

9  the case -- and this is the settlement value that we have of

10  a single-abuser case, which had a settlement value of $1.75

11  million.  That was a case, which, like you said, is once-

12  identified, so it wouldn't have an automatic scaler, but

13  there was prior notice, which would basically -- and

14  particular prior notice with someone else in the organization

15  knowing would probably warrant, perhaps, the maximum value

16  for the aggravating scaler, which would be for the abuser

17  profile of 2.0.

18      Also, this repeat abuse took place over an extended

19  period of years and it rightly had, if we had a "circumstance

20  of abuse" scaler that was 1.46 and additional to the

21  aggravating scaler for the abuser profile of 2.0, you would

22  get a value multiplying $600,000, first, by two, to get $1.2

23  million, then by 1.46, would get you to 1.75.

24      So, that's how the scalers could, for example, be used

25  to show how you would get from a base matrix value to a

1   replicated value, given the facts and circumstances of a case

2   that would warrant $1.75 million.

3   Q    Have you also prepared an illustration that applies the

4   both, aggravating and mitigating factors to a claim?

5   A    Certainly.  It's called DDX-94.  This is a case that is

6   similar to, perhaps conceptually, think of this as like the

7   case that would have been the Brouillard case, the Guam cases

8   that we talked about, in which even though we have a repeat

9   abuser, a lot of aggravating factors associated with it, it

10  also had a small institutional responsibility.

11      The scalers for the repeat abuser on the aggravating

12  scalers would escalate the values of that claims here to,

13  assuming it's the maximum, but given that it's a 10-plus

14  abuser, would automatically be a 2.0 effect there.  Assuming

15  for the one purpose of this example that the nature of abuse

16  and impact of abuse were typical for the repeat-abuser cases,

17  it wouldn't -- and (indiscernible) the other scaling factors

18  because they are already some level of abuse and the impact

19  is already in the base matrix value itself, but because the

20  low-level of responsibility, assuming it's like a 5 percent

21  mitigating scaler, you would, in fact, in combination, have

22  the 2.0 aggravating scaler applied to the 600,000 would have

23  given you a claim value that is an intermediate step of $1.2

24  million of the 5 percent mitigating scaling factor that would

25  give you a settlement value of $60,000, which is reflective

1   of the circumstances akin to what we described in those cases

2   that would give you this outcome.

3        And this is how the trust distribution procedures

4   (indiscernible) base matrix value and the scaling factors

5   could replicate this kind of a tort outcome that has both of

6   these features in it.

7            MR. KURTZ:  Can we call up DDX-73, please.

8   BY MR. KURTZ:

9   Q    Let me ask you a new question.  So, are Hacker and

10  Brouillard both claims that involved serial abusers?

11  A    They are.  They are.

12       And two of the most notorious ones, at least.

13  Q    These are some of the worst abusers that the Boy Scouts

14  has had to deal with?

15  A    Well, certainly in terms of the frequency of their

16  actions and the ways in which they circumvented any kind of

17  detection, or at least, they excluded Hacker -- had been

18  essentially a Boy Scout was discovered -- a Boy Scout leader

19  was discovered to be an abuser, excluded, kept in the files,

20  moved state, used a fake name, got himself introduced again.

21       Also became a scout leader again and repeatedly abused

22  multiple times.

23       He is -- both claimants for him show up both in the

24  historical data, as well as the POC data, as they do for

25  Brouillard.  They're in both the datasets.

1  Q      And what was the average resolution value for claims

2  that involved Hacker?

3  A      Well, for Hacker, these were cases that were proceeding

4  to trial with the prospect of multiple cases of large

5  punitive damages.  Each one of the abusers -- the survivors

6  of Hacker, a group of them were all going to be testifying in

7  each other's case, giving great validity to the accusations,

8  the repeated nature of the descriptions of the abuse that

9  took place.  Hacker, himself, would say and testify that, you

10  know, the Boy Scouts should have stopped him.  The BSA should

11  have stopped him.

12      And in the prospect, in the face of that kind of

13  testimony and that outcome where the BSA was figuring they

14  were going to get hit numerous times with large punitive

15  damage awards, settled those cases on an average for mid-

16  seven figures.

17      Brouillard, on the other hand --

18  Q      So, the record is clear, is the average settlement for

19  Hacker $5.5 million?

20  A      To the nearest -- to rounding.  It would be 5.6, but

21  yes.

22  Q      And what was the other settlement for claims involving

23  Brouillard?

24  A      That's closer to $58,000.

25  Q      All right.  So, approximately 10 percent?

1  A      It's 10 percent.

2  Q      And Brouillard, those are multiple Guam claims,

3  correct?

4  A      Those are claims that are from Guam, yes.

5  Q      All right.

6          MR. KURTZ:  And pull back up DDX-94, which was an

7  illustration of how the TDP -- how the trustee -- how the

8  settlement trustee using the TDPs could replicate the

9  Brouillard result.

10 BY MR. KURTZ:

11 Q      Do you have any reason to believe that the TDP base

12 values and scalers are insufficient to allow the settlement

13 trustee to replicate claim values in the tort system,

14 consistent with how these matters were resolved pre-petition?

15 A      No, I don't.  And, in particular, in conjunction with

16 the process of accumulating the data and building a set of

17 database information about the abuse claims and then building

18 the scalers off of that, I think they will do a good job of

19 doing it.

20 Q      And do you believe that the TDP procedures provide a

21 stronger basis for the determination of claims, consistent

22 with historical claim values pre-petition?

23 A      I think they are -- they will be a strong way of

24 replicating the kinds of values that are consistent with the

25 tort values, but, in fact, in many ways will be better than

1  the tort system, because they will be -- can be applied

2  consistently, across Defendants -- you can collect the

3  information to do cross-claimant comparison.  You can rank

4  order the information across each of the kinds of categories

5  that the trustee is to consider in making a determination.

6       So, you will be in a position of more consistently know

7  what are extreme cases, what are typical cases, what are

8  less-extreme cases on the abuse that's there.  And so, I

9  think it will be better than it would be from the tort system

10  and it would be more consistent and equitably applied in a

11  manner, but reflective of the value of the case in the tort,

12  what you would have gotten on average.

13  Q    Is there any reason to believe that Judge Houser will

14  be less capable of accurately determining claims than other

15  triers of fact?

16            MR. KARLAN:  Objection; no foundation.

17            THE WITNESS:  No.

18            THE COURT:  I'm sorry, the objection?

19            MR. KARLAN:  No foundation.

20            MR. KURTZ:  Your Honor, the witness has been

21  certified as an expert in TDP structures and claim values.

22            MR. KARLAN:  The witness has not testified he

23  knows Judge Houser or is a lawyer.

24            THE COURT:  Sustained.

25  BY MR. KURTZ:

```
1   Q     Dr. Bates, do you have any reason to believe that any
2   settlement trustee will be less qualified or capable of
3   determining the value of the current claim pool, based on the
4   use of the TDP procedures than other triers of fact in the
5   tort system?
6               MR. KARLAN:  I --
7               THE WITNESS:  I do not.
8               MR. KARLAN:  May I object?
9               I don't understand the question.
10              THE COURT:  I'm not sure I do either.
11              MR. KURTZ:  I'm asking Dr. Bates whether he has
12  any reason to believe that the settlement trustee set up in
13  the TDPs will be positioned, at least, as well as the
14  determiners of claim values in the tort system.
15              MR. KARLAN:  For what -- you can take it for
16  whatever it's worth, Judge.
17              THE COURT:  I can you can answer, yeah.
18              THE WITNESS:  I don't believe any person who is
19  doing their job diligently who applies the procedures, like
20  the TDP, and gathers the information that will be useful,
21  appropriate for answering these questions (indiscernible)
22  would be able to, basically, arrive at what would be
23  reasonable outcomes, consistent with the tort history that
24  would be fair and equitable.
25  BY MR. KURTZ:
```

1  Q      In your expert opinion, is the combination of base

2  values and scalers set forth in the TDPs consistent with the

3  debtors' historical abuse claim settlement values?

4  A      They are.

5  Q      Have you run a simulation of the abuse claims through

6  the TDPs?

7  A      I have.

8  Q      Okay.

9         MR. KURTZ:  Can we pull up DDX-96, please.

10  BY MR. KURTZ:

11  Q      Can you walk the Court there your simulation.

12  A      This is a reported simulation that was in my

13  (indiscernible).  I implemented the simulation of the TDP

14  based on the values, the information that is currently in the

15  POC on the abuse claims.  By that, I mean we can't actually

16  run the claims through the TDP because there's lots of

17  information missing, so I'm going to have to do a simulation

18  where I make some assumptions.

19       I'm going to assume that, for example, in doing this,

20  that the mitigating scalers are reflective of the average

21  from the tort simulation that I showed you before, where I

22  calculated the relative percentages of the claims that would

23  fall in each one of the columns through the tort simulation,

24  which gave us approximately a 10 percent average mitigation

25  scaler for the tort claim values, in order to replicate the

1  pattern of filings and resolutions that we saw at that time.

2      I don't information which are how we would get about

3  the actual nature of and impact of abuse scalers, so what I'm

4  going to go that purpose is take by assumption, all of the

5  claims that have an abuser who was named in the historical

6  data, as well, which represent the higher -- the ones that

7  were reflective of a higher impact and assume that people who

8  have those same abusers will be at a maximum value that we

9  would have there.

10     I then applied the various SOL factors based on where

11 the states are.  We applied these factors based on what the

12 abuse allegation is.  And we will run all of the claims

13 through the trust distribution procedures.

14     One of the first things we did here was also assume

15 that all of the claims which did not have information that

16 would qualify them as having named their abuser or named the

17 allegation, we assumed for the purposes of this simulation

18 that they would take the expedited payment amount that was

19 offered to claimants when they could have elected when they

20 voted for or against the plan.  That's the top row here of

21 this chart.

22     The part on the left where it said payments exceeding

23 $200,000 filing threshold, that's, again, reflective of the

24 assumption that we made of that underlying -- the tort claim

25 simulation.  The payment size is essentially, you know,

1  descriptive of the payment size category that we're using.

2      And then we essentially put all the claims that did not

3  have name their abuser, at least, partially, and did not

4  qualify otherwise, because they didn't name an allegation or

5  they were over the age of 18, if they had taken the expedited

6  payment, there would have been 35,000, nearly 35,000 of those

7  collecting a total of $120 million.

8      And, in fact, only about 7,000 did, so to the extent

9  that those others, at this point, will -- they would assume

10  in that case, they would either not be allowed at the current

11  basis, but rather than entering them in here at zero, I'm

12  going to enter them at $3500 because this chart was created,

13  this analysis was done prior to the vote when that took

14  place.  So, this is just reflective of the way it was there.

15  So, that would have reduced the value for these claims.

16      Obviously, if the sensitivity analysis or the

17  (indiscernible) factors, which I otherwise identified were to

18  come into play, that would also affect the value of these,

19  too.  But taking it at face value for what it was that I had

20  at the time and taking the statute of limitations factor

21  (indiscernible), the Trust would pay out almost 42,000 claims

22  in the four-and five-figure settlement range, mostly

23  reflective of the lower degree of responsibility and the

24  lower categories of abuse, rather than relative to the

25  penetration claims.

1    There would be almost 1,800 of the claims that would

2    fall into the six-figure settlements.  And then but even a

3    larger number, that would, in fact, have been above the

4    $200,000 threshold that we assumed for the insurance claims,

5    that would basically be the bulk of the value of all the

6    claims from the trust were the claims that were over the

7    $200,000 threshold, which would be the claims that are most

8    reflective of the claims that received value in the tort

9    system with an average value to those claims of approximately

10    $540,000, as reflected in the fifth row down from the top.

11    In total, using this method of valuing claims,

12    according to the procedures of the TDP, we would have

13    computed a value here for the trust of approximately $3.4

14    million and an average of all claims of 42,000, or in terms

15    of the claims which were not taking the expedited payment of

16    about 3.3 billion and reflective of about $69,000 or $70,000

17    average.

18    Below that, I have isolated out and divided the claims

19    up into the categories by the abuse category.

20  Q    In your expert opinion, is this a reasonable simulation

21  of the TDPs, given historical data?

22  A    Given the information that's currently known about the

23  claims at this time, I think it's a reasonable demonstration

24  of the way the TDPs work.  And based on what we know about

25  the claims now (indiscernible) reasonable reflection of what

1  we might expect to come out of the TDPs when they are

2  implemented.

3  Q    All right.  Did you create a model to generate this

4  simulation?

5  A    I did.

6        MR. KURTZ:  Your Honor, JTX-1544 is the model that

7  was created to generate this simulation and we would offer it

8  into evidence.

9        MR. KARLAN:  Can you just blow it up for my

10  benefit.  Sorry.  Thank you.

11        MR. KURTZ:  Of course.

12        MR. KARLAN:  Yeah.  No objection.  Thank you.

13        THE COURT:  It's admitted.

14      (Exhibit JTX-1544 received into evidence)

15        MR. KURTZ:  All right.  Your Honor, I'm going to

16  move to the third area.  And the fourth area is actually

17  subject to declaration, so to some extent, this is the final

18  area, as well.

19  BY MR. KURTZ:

20  Q    And Dr. Bates, I want to now ask you about the plan's

21  independent review option.  Can you explain how the

22  independent review option works.

23  A    Sure.  Basically, I mean, I will -- basically, in its

24  basic elements of it, there's some (indiscernible) to it, but

25  it is basically covered.

1      The idea behind the independent review option is that

2 an individual who believes that their claim would be worth

3 more than the $2.7 million cap for the penetration claim and

4 so on for the other categories of claims, may, at their

5 discretion, select to have their claim independently reviewed

6 by an alternative person.  It's supposed to be a retired tort

7 judge; a judge who has experience in overseeing and trying

8 tort claims.  To have that claim evaluated in a separate, but

9 more rigorous and required -- not rigorous -- procedure than

10 would be used, according to the General Fund TDP claimants.

11      Many of the kinds of things that would be required of

12 this process are an option for the trustee to use for the

13 general claimants, but typically would not be used in the

14 same way (indiscernible) most of the claims would be very

15 likely be resolved at lower values in a much more expedited,

16 information-collecting, and evaluation process.

17      But here, an individual who believed that their claim

18 was worth a lot, they can, in fact, put in and request to

19 have their claim treated in this separate process.  They have

20 to pay for the additional expense that would be associated

21 with having this claim evaluated.  It is going to be a lot

22 less than it would be in terms of the tort process, but it

23 would still require them to pay -- put in an amount of two

24 trenches -- $10,000 each -- $20,000, to defray the costs of

25 the additional work and evaluation of their claim.

1    There would be required additional discovery required

2  on the case and, notably, as well, assuming this was a case

3  that actually triggered a particular excess insurance policy,

4  the individual -- the insurance policy would receive notice

5  of that and be asked to participate and would be in a

6  position to participate in this process to raise issues of

7  concern about the valuation.

8    The claimant would have to have a claim that is not

9  barred by the statute of limitations.  So, there's statute of

10  limitations, as well.

11    A claimant who selects this option, right, has the

12  prospect of getting more than $2.7 million.  There must be --

13  in fact, they must believe that there is insurance available

14  to trigger those policies; otherwise, it would not be

15  economically rational for them to do so.

16    If they basically go through this process, have their

17  claim reviewed and if this judge makes a recommendation for

18  the claim value back to the settlement trustee, who will,

19  basically, either accept or reject that recommendation.  If

20  that settlement is rejected, then it could be zero, but if

21  the settlement is rejected -- is accepted, then the Plaintiff

22  will basically be paid the first million dollars of whatever

23  award they got.

24    Let's assume for the purposes of this discussion it's a

25  five-million-dollar award that they have and a particularly

1  severe case of repeated abuse and a particularly severe case

2  of impact on the individual on the nature of the abuse so

3  that it, in fact, would be a case that is like one of those

4  very rare cases that was up in the range of mid-seven

5  figures.  That case, if it received an award of $5 million,

6  would then be paid $1 million out of the General Fund -- not

7  the 2.7 that they probably would have qualified for -- and

8  the rest would be paid out of the proceeds of bills to the

9  (indiscernible) to the excess insurers for the amount, the

10  additional $4 million to cover the expense of the claim.

11      All right.  So, they, basically -- $1 million would

12  come out of the General Fund and they would have a bill for

13  the additional $4 million, which would be paid into an Excess

14  Fund.  And how much of that claim the individual would get

15  out of the Excess Fund is a function of whether the insurance

16  policies, themselves, have a cap on the aggregate limits of

17  the policy or whether there was no aggregate cap.

18      If there's no aggregate cap, the amount of money, the

19  $4 million goes into the Excess Fund and the $4 million goes

20  to the abuse claimant who selected the IRO.

21      If it's subject to a cap so it erodes the limits of the

22  policy, which strikes from the remaining value of that policy

23  as an asset of the trust, it would basically go 80 percent to

24  the abuse claimant who settled -- who filed a claim and was

25  awarded the extra -- the five-million-dollar claim and

1  20 percent would go into the General Fund.

2        So, the nature of that, the way that that process works

3  there is that on a claim-by-claim basis, in this manner,

4  individuals who believe their claim is being tapped by the

5  IRO and there is available insurance to cover those claims,

6  to have that cap released by going through the IRO process,

7  (indiscernible) themselves to the additional risks of this --

8  this additional scrutiny that's required, but -- and the

9  additional raising of potential concerns or what additional

10  defenses might be through the (indiscernible) insurers'

11  participation.  But should they, in fact, receive the award,

12  then they would receive a higher amount and reflective of the

13  fact that that's what the insurance was there for and what it

14  accomplished.

15        So, how does this work?  So, the General Fund claimants

16  are not (indiscernible), all right.  The General Fund

17  claimants are not affected; in fact, they get -- they get

18  relieved from paying $1.7 million out of $2.7 million that

19  would otherwise have gone to this claimant, right.  They

20  also, if the case of where an insurance policy is capped,

21  would receive an extra 20 percent of the fund.  In this case,

22  an extra, you know, amount of money -- a million dollars --

23  well, $800,000, because they would get $800,000 of $4 million

24  and 20 percent would go into put into the General Fund.

25        So, the General Fund claimants would be made better off

1  by the fact that the asset pool of General Fund is now larger

2  and the General Fund is, in fact -- pays out the claimants

3  with a payment rate that is determined by the size of the

4  General Fund, relative to the value of the claims that are

5  there.  So, any enhancement to the General Fund is spread,

6  *pro rata*, against all of the claimants who are -- who will

7  receive payments from the General Fund.

8       The abuse claimants are made better off, the abuse

9  claimant who selected the IRO is made better off, to the

10 extent that he wins a larger award.  He wouldn't be any worse

11 off if he didn't receive a larger award, but that's the risk

12 that he selected and he opted for.  So, he's bought the

13 option of taking that risk.  So, there's no loss, a

14 diminution of value to him because that was the option that

15 he selected.

16      The excess insurers, they pay more, but it's only to

17 the extent that they got a windfall from the original TDP,

18 which capped itself at 2.7.  So, they aren't actually made

19 worse off, relative to what the policies are worth; they're

20 just made -- they just now have that windfall removed from

21 them by this process, which is something that they, in the

22 windfall (indiscernible) probably in the way the trust was

23 constructed originally.

24      Now, there's more complications in this in the way if

25 there's a general settlement with the insurers.  So, if

1  there's an excess policy which does an insurance buyback, the

2  funds there are split 80 percent to the Excess Fund,

3  20 percent to the General Fund.  That raises a complication

4  in the calculation to say whether or not the loss of the

5  policy, itself, diminishes the value of the General Fund,

6  relative to the value they would have had, because, after

7  all, claimants over a million dollars to trigger those

8  policies would have been covered by that excess insurance

9  policy.  We would have lost that.

10       They would, in the current -- the structure prior to

11  the IRO, any settlements with the excess insurers would have

12  gone 100 percent in the General Fund.  But the value of those

13  policies are worth less now without the IRO, so the value of

14  that settlement would have been less.  So, it's not

15  immediately obvious whether it's to the benefit or the

16  detriment of the General Fund claimants if you were to

17  actually have an insurance buyout, except the settlement

18  trustee is the fiduciary for the General Fund claims, too.

19       And the settlement trustee is only going to make that

20  deal if it enhances the value of the general claims;

21  otherwise, she can just agree and say, No, I'm not going to

22  settle.  I'm going to bill these claims one at a time, which

23  we know from the prior discussion, has no adverse effect on

24  the general claimants and only (indiscernible) will be.

25       So, the backstop here, which ensures that the General

1  Fund is not diminished by the IRO, is the role of the trustee

2  in having to approve the fund because she would never accept

3  the settlement of the funds if the value of the settlement

4  was not sufficient to overcome the deficiencies that I

5  described earlier.

6  Q    Does the IRO impact your valuation conclusions?

7  A    It does not.  It has no impact on the trust valuation

8  of the claims.

9  Q    Does the IRO affect the potential recoveries to

10 claimants?

11 A    It increases the potential recoveries to the claimants.

12 Q    In your expert opinion, is the IRO consistent with the

13 BSA pre-petition tort system settlements?

14 A    Yes, to the extent that there was insurance available

15 to pay those higher awards.  And the fact is that there were

16 claims, outliers, albeit, but a small number of claims that

17 would have been affected by -- impacted by having the cap.

18 And this removes that cap, and so they were made better off.

19          MR. KURTZ:  Your Honor, I just have a couple of

20 housekeeping matters at this point.  There are claim-specific

21 files that were used in the valuation.  It's JTX-1600 and I

22 would offer that into evidence.

23          MR. KARLAN:  What number was it, Glenn, I'm sorry?

24          MR. KURTZ:  1600, Mitch.  It's JTX-1600.

25          MR. KARLAN:  May I have one moment, Judge?

1            THE COURT:  Yes.

2            MR. KURTZ:  And, Mitch, I (indiscernible) --

3            MR. KARLAN:  Yes, please do.  Thank you.

4            MR. KURTZ:  JTX-1600, 1601, 1602, and 1603.

5            MR. KARLAN:  These were all created by the

6  witness, Glenn?

7            MR. KURTZ:  (Indiscernible.)

8            MR. KARLAN:  If they are, I have no objection.

9  BY MR. KURTZ:

10 Q    Dr. Bates, who created the valuation models that

11 support your valuation?

12 A    I did.

13            MR. KARLAN:  No objection.

14            THE COURT:  They're admitted.

15       (Exhibit JTX-1600, 1601, 1602, and 1603 received into

16 evidence)

17            MR. KURTZ:  Your Honor, I'm going to now offer

18 into evidence the demonstratives that we used throughout the

19 examination this afternoon, particularly.

20            MR. KARLAN:  No objection.

21            THE COURT:  If there's no objection, they're

22 admitted.

23       (Exhibits DDX-77 through 83 received into evidence)

24            MR. KURTZ:  And, Your Honor, lastly, I offer --

25 this is Dr. Bates' declaration, which addresses the TCJC

 1  settlement, a portion of his opinion that we did not cover at

 2  all in his direct examination today.

 3        MR. KARLAN:  Your Honor, I think I may have gone a

 4  little too fast on my last answer.

 5        I was not aware we were going to be admitting

 6  demonstratives.  We have a separate procedure in the pretrial

 7  order for distributing those to us in advance and vetting

 8  them.  I don't know that we've needed any.

 9        MR. KURTZ:  Mr. Karlan, we distributed the

10  demonstratives to you --

11        MR. KARLAN:  In accordance with the pretrial

12  order, I --

13        MR. KURTZ:  -- in accordance with the pretrial

14  procedure, prior to (indiscernible) yesterday.

15        MR. KARLAN:  Yeah.  No, no, you definitely obeyed

16  the procedure for giving us the demonstratives, but why are

17  they coming into evidence?

18        MR. KURTZ:  Your Honor, they were testified about

19  today.  They are expert slides.  Pretty traditional to

20  introduce expert slides, rather than entire reports during

21  the (indiscernible) and examination at all, so it will help

22  Your Honor in considering the evidence later, rather than

23  trying to remember what you were looking at, which otherwise

24  would have been (indiscernible).

25        And just based on testimony, you can imagine

1   (indiscernible) with the slides.  It is, in my experience,

2   very customary to take smaller portions of the work product

3   that was otherwise set forth in an expert report and

4   introduce it at trial in support of the testimony that you

5   receive.

6           MR. KARLAN:  Judge, this is not the first time

7   that my experience that Mr. Kurtz's haven't matched.  I'm not

8   suggesting I'm smarter than him, but if this were a jury

9   trial, for example, which I know it's not, neither the expert

10  reports, nor the demonstratives would go into the jury room.

11          MR. KURTZ:  Your Honor, if we were in a trial, he

12  could lie and put all of these -- draw them, prepare them,

13  and produce them and they would go to the jury room.

14          I will also note that the Certain Insurers kicked

15  off this trial by introducing a demonstrative exhibit, which

16  was an unauthenticated blackline about my presentation.  So,

17  this is not without precedent, like the Certain Insurers in

18  this case.

19          In any case, I do believe it would help Your Honor

20  in considering the issues later and I am sure that Mr.

21  Karlan, even though we have a different experience, probably

22  has the experience where juries ask to see a demonstrative

23  and were allowed to.

24          MR. KARLAN:  Not unless there's consent.

25          The demonstrative that came into evidence, Judge,

 1  was an admission by the debtors.

 2          THE COURT:  Okay.  Well, it's not my experience --

 3          MR. KARLAN:  (Indiscernible.)

 4          MR. KURTZ:  There was a redline.  The file

 5  indicated a redline.

 6          THE COURT:  I remember what it was, but I think --

 7  well, that's different.

 8          It's not my experience that demonstratives are

 9  introduced into evidence, which is not to say I may not look

10  at it, because I put notes on it, so I might.  But I don't

11  know that it has to come into evidence.

12          MR. KURTZ:  Your Honor, whatever that best helps

13  you, but I will just point out that we are using a labeled

14  demonstrative of what we're talking about is expert valuation

15  work product.  Is a series of numbers.  Nobody could be

16  expected to recall all of the numbers.  It is the type of

17  slides that are introduced into evidence.

18          It's not demonstrative in the sense that reviewing

19  any, you know, a timeline, a graphic, or animation.  It is

20  literally the expert valuation.

21          THE COURT:  Okay.

22          MR. KURTZ:  And I don't know how you could be

23  expected --

24          THE COURT:  It is useful to me because it has all

25  of this on it, so I'll admit it as part of his testimony.

1          MR. KARLAN:  Judge, can I just say for the record

2     that these exhibits, which, if you're taking them into

3     evidence, as what they now are, were not given to us during

4     discovery, were not given to us off the joint exhibit list,

5     were not given to us with the witness' declaration, and were

6     not given to us until a few hours ago.

7          MR. KURTZ:  I've looked at it, Your Honor, and the

8     valuations, in fact, were part of an expert report.

9          Disclosure was made a long time ago.  Depositions

10    were taken and this is not surprise material.

11         MR. KARLAN:  But the expert reports are not coming

12    into evidence.  I mean, that's been the pattern throughout

13    the trial.

14         MR. KURTZ:  I believe I wasn't suggesting that it

15    goes into evidence as an expert report.  I was responding to

16    the notion that there hasn't been adequate disclosure

17    (indiscernible) so counsel could prepare for the cross-

18    examination.

19         MR. KARLAN:  There has not been compliance with

20    the pretrial order if these are exhibits.  That's really not

21    in dispute, Mr. Kurtz.

22         MR. KURTZ:  I will (indiscernible) --

23         MR. KARLAN:  It's not.

24         THE COURT:  Okay.  Okay.

25         I'm going to actually take it under advisement and

1  I'll make a decision about whether I admit them into

2  evidence.

3          MR. KURTZ:  Thank you, Your Honor.

4          Lastly, I've either done this or not -- my method

5  didn't do it comprehensively -- we'd move into evidence the

6  TCJC declaration and the exhibits, which includes, well, the

7  following exhibit, JTX-1503, which is the TCJC valuation

8  model, supporting the testimony, produced along with the

9  (indiscernible).  It's been marked as an exhibit.

10          THE COURT:  And that's the declaration at

11  Docket 9388?

12          MR. KURTZ:  Correct, Your Honor.

13          THE COURT:  Okay.

14          MR. KARLAN:  We submitted written objections to

15  some portions of the, I think it was just the exhibits, I

16  believe.

17          MR. KURTZ:  It was.  I think the objection was it

18  hadn't been produced, but I think they were probably produced

19  by December 10, along with the expert materials.

20          MR. KARLAN:  I did see that in your response this

21  morning, Mr. Kurtz, and I haven't had a chance to

22  independently confirm that.  But if what you say in that

23  pleading is correct, then that objection will be withdrawn.

24          MR. KURTZ:  Thank you, Counsel.

25          THE COURT:  Okay.  Then the declaration and that

1 | exhibit are admitted.

2 |        (TCJC Declaration received in evidence)

3 |        (Exhibit JTX-1503 received into evidence)

4 |             MR. KURTZ:  Your Honor, I have no further

5 | questions or requests.

6 |             THE COURT:  Okay.  Mr. Karlan, how long do you

7 | think you're going to be on cross?

8 |             MR. KARLAN:  Your Honor, we had about four hours

9 | of direct.  I suspect it's about two hours of cross.

10 |             But if I might make a proposal, Your Honor?

11 |             I gather that there are two proponents that intend

12 | to question the witness and I would respectfully suggest that

13 | they should go before me.

14 |             THE COURT:  I agree.

15 |             MR. KURTZ:  I think they are considerably shorter

16 | and maybe that helps "bridge the gap" to the extent that we

17 | viewing today as having some time left over.

18 |             THE COURT:  Okay.

19 |             MR. KURTZ:  Okay.  Thank you, Your Honor.

20 |             THE COURT:  Thank you.

21 |             Mr. Kornfeld?

22 |             MR. KORNFELD:  Good afternoon, Your Honor.

23 |             Alan Kornfeld for the TCC.  Your Honor --

24 |             THE WITNESS:  Your Honor, may I have five minutes

25 | to use the facilities?

1          THE COURT:  Yes, you may.

2          THE WITNESS:  Thank you.

3          THE COURT:  Uh-huh.

4          We're in recess.

5     (Recess taken at 5:17: P.m.)

6     (Proceedings resumed at 5:31 p.m.)

7          THE COURT:  We're back on the record.

8          Mr. Kornfeld?

9          MR. KORNFELD:  Thank you, Your Honor.

10          For the record, Alan Kornfeld, Pachulski Stang

11  Ziehl & Jones, for the TCC.

12          Your Honor, first, to clarify the TCC's position

13  in this case and, in particular, with respect to this

14  witness, the TCC is, as you know, a proponent of the plan.

15          The TCC strongly believes the plan should be

16  confirmed.

17          That said, the TCC filed a limited objection for

18  the sole purpose of requesting that the Court refrain from

19  making any findings that survivors will be paid in full.

20          That limited objection is at Docket Number 8812.

21  So, with respect to this witness, we have sort of an

22  interesting hybrid position; again, we are a supporter of the

23  plan.

24          Your Honor, with respect to how much time I have

25  for the cross-examination/direct examination of Dr. Bates,

 1  because it will be both, I am estimating possibly an hour and

 2  a half, possibly more.  I would submit at this time, my

 3  preference is if there's somebody who has, in contrast to Mr.

 4  Karlan and I, a short examination, maybe it makes sense to

 5  have that short examination now and I would be happy to start

 6  tomorrow morning.

 7          THE COURT:  Yeah, that makes some sense.

 8          Mr. Kornfeld, let me ask this question.  So, I

 9  also note that I have a lot of binders for Ms. Gutzler that

10  are on a shelf in my chambers, and I right that she's the TCC

11  expert?

12          MR. KORNFELD:  No, Your Honor.  Ms. Gutzler is

13  debtor expert.  She is an insurance allocation expert who

14  will testify, among other things, to the availability of

15  insurance and excess insurance.

16          THE COURT:  Okay.  Do I have -- what am I thinking

17  about them -- do I have -- never mind, then.  I'm --

18          MR. KORNFELD:  Your Honor, maybe I should make

19  sure that you have the TCC's binder that was delivered to

20  chambers and provided to all parties on Friday, with respect

21  to the exhibits that we may use with Dr. Bates; that's one

22  binder only.

23          THE COURT:  Well, I have two binders that came, it

24  looks like, separately.  So, I have one that's marked

25  "FCR" and I have another one that's not marked; that might be

1  yours.  So, I do have two binders.

2          MR. KORNFELD:  Yeah, ours has nine tabs in it, the

3  first four of which I'm going to really be focused on; those

4  are his reports.

5          (Pause)

6          THE COURT:  I'm not sure this is yours.

7          Well, I'll find it before tomorrow if it was

8  provided, but this one starts with Dr. Bates' deposition and

9  then a December 5th report and then debtors' response to the

10 tort claimant's committee status report.  That's going to

11 have a report attached.

12         MR. KORNFELD:  Yeah, that's not ours, Your Honor.

13         THE COURT:  Okay.  This sounds like yours?  No?

14         MR. KORNFELD:  We'll run this to ground and make

15 sure you do have what we're going to refer to.

16         THE COURT:  Thank you.

17         Okay.  Let's see if there's anybody else who we

18 can get in who has, like, an hour of cross or less.

19         MR. GUERKE:  Good afternoon, Your Honor.

20         Kevin Guerke from Young Conaway, on behalf of the

21 FCR.  I don't know if I have less than an hour.  I might have

22 an hour, possibly longer, but I couldn't represent to you now

23 that it's less than an hour.

24         MS. DUMAS:  Your Honor, I have probably much less

25 than half an hour.

1    THE COURT:  Oh, well, Ms. Dumas, then, you are the

2  winner.

3    (Laughter)

4    THE COURT:  Let's do your cross and then I'd

5  actually like to have a discussion without Dr. Bates present,

6  with Mr. Kornfeld and Mr. Guerke.

7    So, Ms. Dumas, let's start with your cross.

8    MS. DUMAS:  Okay.  Thank you.

9    CROSS-EXAMINATION

10  BY MS. DUMAS:

11  Q    Dr. Bates, were you here in the courtroom when

12  Ms. Murray testified?

13  A    I did.  I observed.

14  Q    Okay.  Thank you.

15    And I should introduce myself.  I am Gilion Dumas.  I

16  represent several of the abuse claimants who are objecting to

17  the plan.

18  A    Good afternoon.

19  Q    Good afternoon, or evening for you.

20    Now, you testified earlier about that Timur Dykes trial

21  in Oregon.  So, you were aware of that trial when you were

22  doing your work in this case?

23  A    I became aware of it as the case progressed.

24  Q    Okay.  And when you were looking at the historically

25  settlements during your work on this case, did you talk to

1  Ogletree Deakins about the settlements in that <u>Timur Dykes</u>

2  trial?

3  A     I did not.  I didn't -- at that time, I didn't know

4  until recently that there were settlements related to that.

5  Q     All right.  Did you know that the list of historical

6  settlements is listing the settlements related to that <u>Timur</u>

7  <u>Dykes</u> trial, specifically, the six cases related to that

8  trial that settled in 2010 for $2.2 million each?

9  A     I believe that most of the settlements, well, the vast

10 majority of settlements, prior to 2011, are not in the data

11 that we have.

12 Q     Okay.  But there are some cases from 2010 that are on

13 that list of historical settlements, correct?

14 A     There are four, yes.

15 Q     All right.  And assuming that Ogletree Deakins had

16 included those six 2010 settlements of $2.2 million each,

17 would those have been relevant to your analysis?

18 A     They may, depending on some questions that I would have

19 about them; how they were recorded, as well as what the facts

20 are about those, so ...

21 Q     Would you have included those settlements in your data

22 analysis?

23 A     They might have shown up somewhere; again, it depends

24 on how and where -- how they were recorded and who the abuser

25 is, who the -- what the allegations are for, when they

1   occurred, and the other circumstances around them.  But for

2   the most part, for the initial work that I've done, except

3   for some limited circumstances, I have only used data that

4   was post -- well, back in 2016 and later, so it's unlikely

5   they would, because it wouldn't change the fact that the vast

6   majority of the data, prior to the Ogletree era of 2016,

7   doesn't have the abuse allegation or the abuser's name on it,

8   so I wouldn't know how to properly weight those cases if they

9   were in there anyway, for that data period.  But it might

10  have.

11  Q    Speaking of that, when you got that chart of the

12  historical settlements prior to -- that included historical

13  settlements prior to Ogletree Deakins' involvement, and it

14  had that missing information, you talked about going back to

15  Ogletree Deakins and trying to fill in that information.

16      Do you remember your testimony on that point?

17  A    I did, yes.

18  Q    Okay.  Did you also try to get that information from

19  any of the Plaintiffs' constituencies in this case, like the

20  Coalition attorneys?

21  A    I did not.  I did not.

22  Q    Okay.  Did you try to get any of that information from

23  the tort claimants committee's attorneys?

24  A    I did not.

25  Q    Okay.  Because we're talking about cases that only go

1  back to 2010, correct?

2  A    As far back as (indiscernible) perspective, yes.

3  Q    Okay.  In doing your work on this case, when you were

4  comparing the list of abusers on the historical settlements

5  to the named abusers in the proofs of claim, was it your

6  conclusion that there were only a total of 49 abusers who

7  were named in both, the list of historical settlements and on

8  the proofs of claim?

9  A    (Indiscernible) the number, I have a tabulated number

10 which are identified within the data, I certainly I think

11 have already made clear that I don't know that we have

12 everyone identified, but that's what I identified in the

13 data.

14     I can't remember anything about the number you

15 mentioned, 49; I haven't tabulated that.

16 Q    Did you read Ms. Murray's declaration that she

17 submitted in this case?

18 A    I haven't read the declaration, no.  I saw her report

19 earlier, but I passed to read the declaration.

20 Q    You testified at great length about the various data

21 points that you were looking at when you were trying to come

22 up with settlement values that you used.

23     But would you agree that the historic settlements only

24 can tell you so much if you're looking at data points; isn't

25 that right?

1   A     I'm not sure what you're referring to, but generally,

2   the way I interpret the question, the answer to that is,

3   obviously, yes.  I used information and thought about things

4   outside those data points in making my positions about that.

5   Q     Okay.  Well, a lot goes into knowing why a case

6   settles, right; like, how close to trial the case might be or

7   what Plaintiff's damages are or what else is going on in a

8   Plaintiffs' life or what county is case is filed in, not just

9   what state the case might be filed in, or the nature of the

10  noticed evidence, not just that there is noticed evidence;

11  all those things factor into the value of a settlement,

12  correct?

13  A     (Indiscernible) the jury has been drawn, the judge that

14  they have, the ability of the individual to present their

15  case; there are many, many factors which go into making --

16  that get discounted into the taking into account in coming up

17  with a settlement.

18  Q     And none of those factors are reflected on just that

19  chart of historical settlements, are they?

20  A     No.  No, many of them are not.

21  Q     In your aggregate value estimates, one of the factors

22  that you used to either increase or decrease, now as I'm

23  saying it, I don't remember if it was an increase or a

24  decrease, was whether or not the abuse was reported, correct?

25  A     I think that was a factor that we didn't know how to

1  account for in the data.  I did not make an adjustment for

2  that.

3       And I understand your confusion because, which way it

4  will go, but the cases that we have from the past, typically,

5  the abuse was reported somewhere.  Certainly, relative to the

6  tried cases, the abuses were, and the cases that were studied

7  from trial verdict, had the abuse reported and in relatively

8  near proximity to when the abuse had occurred.

9       Here, we are at these cases, as they're older, are

10 reflective of that.  I don't think it's a significant factor

11 in the analysis or even that I have the data to do much with

12 it, because I didn't consider it as a -- I think I have the

13 impact of that was small, so ...

14 Q    Okay.  When you had that demonstrative exhibit where

15 you had the three benchmark things, could by pull that up so

16 I can ask you about it.

17          MS. DUMAS:  And Mr. Kurtz, do you remember which

18 of your demonstratives that was, where you had the

19 July benchmark and then the autumn of 2021 benchmark and then

20 the current benchmark?

21          MR. KURTZ:  DDX-84.

22 BY MS. DUMAS:

23 Q    Yeah.  There, under "plus factors," you have abuse

24 reported.

25       Do you see what I mean?

1   A       Yeah, I do.

2   Q       Okay.  And so, there you're talking about whether the

3   abuse was reported by the claimant, correct?

4   A       Correct.

5           Yes, if the abuse had been reported in the past and

6   that's likely to have been a case, a situation which would

7   have increased the values relative to the other abuse claims.

8   Q       Okay.

9   A       But many of them never reported the abuse.

10  Q       Correct.

11          And under the TDPs or in this whole bankruptcy process,

12  we will know whether a claimant, himself -- I'll use

13  "himself" because most of the claimants are male -- we'll

14  know whether a claimant, himself, reported the abuse and you

15  can factor that in, as you did.

16          But there's no way for a claimant to know whether

17  someone else reported abuse, is there?

18  A       No.

19  Q       So, there's no discovery process for a claimant, under

20  the TDPs, to find out if someone prior to him, reported an

21  abuser to the BSA, is there?

22  A       Meaning, whether or not an abuser was a repeat abuser,

23  because it's, basically, in your story, you're talking about

24  reported the abuse of that survivor.  I'm not sure what

25  you're talking about.

1  Q      Reported that that abuser had abused a different

2  person.  If some other victim had come forward and reported

3  that abuser and nothing had happened, which is a common

4  scenario, there's no way for a claimant in this bankruptcy to

5  have access to that kind of discovery, like they would have

6  in litigation, correct?

7  A      Well, the trust -- no, that's wrong -- the trustee

8  would have that information and would use that in evaluating

9  a claim of that individual.  Clearly, it would go and look up

10 to see whether or not that abuser was reported by somebody

11 else.  She'd have to do that in order to do her job.

12 Q      How would the trustee have that information without

13 being able to do depositions of witnesses or otherwise engage

14 in fulsome discovery in the way that a claimant's attorney

15 would be able to do in tort litigation?

16 A      So, you mean not somebody who was already in the abuse,

17 the POC data, in the abuse claims?

18 Q      Exactly.

19 A      So, somebody who never filed a claim here, so you're

20 saying have -- yes, if there was somebody else who was not in

21 this data, generally, I assume, unless it's perhaps in the

22 DSD files, which I believe that the trustee will have access

23 to, that could have been something she could look at.

24      But if there's just somebody out there, unless that

25 person comes forward in some way, unless a person finds that

1  person and brings it in, I don't know how it would be brought

2  in.  Presumably, if that information is available to them and

3  they wanted to go and try to retrieve that, put out an ad, a

4  notice, and say, Did anybody else ever get abused by this

5  person, and that information came in, I would assume they

6  would attach that to their claim and it would be considered

7  by the trustee.

8  Q    Okay.  So, private investigation is pretty much the

9  only option available to a claimant to get information that

10 they would otherwise get through the discovery process; is

11 that what you think they could do?

12             MR. KURTZ:  I'm just going to object.  It

13 misstates the testimony.  Dr. Bates was referring, then, to

14 information outside of any of the (indiscernible) proofs of

15 claim.  So this is anticipating there is a different claimant

16 and, therefore, they don't know who abused that different

17 claimant, but there's 82,000 data points, otherwise.

18             THE WITNESS:  Yeah.

19 BY MS. DUMAS:

20 Q    Okay.  So, when you were talking about the other point

21 on your chart here that is a minus factor is missing

22 relationships, correct?

23 A    Yes.

24 Q    Okay.  And that's when a claimant may have a

25 relationship with the abuser through a different

1 | organization, right, or a family relationship or something,
2 | correct?
3 | A    That might have been.  There's a series of text boxes
4 | on the POC, which listed a number of them, including an
5 | "other" box for (indiscernible).
6 | Q    Okay.  And, but I want to ask you about a scenario
7 | where a claimant might have a relationship with the Scout
8 | volunteer and that Scout volunteer also plays a role in an
9 | organization that is the chartering organization, for
10 | example.
11 |      And I will use the example that you used, and you used
12 | it a couple of times, Father Brouillard, who was both, the
13 | Scout leader and a church person, right?
14 | A    That's correct.
15 | Q    Now, if your testimony is that BSA liability in those
16 | situations is low because the other relationship was what led
17 | to the abuse, which reduces BSA's liability, well, then, in
18 | this case, where claims against the other organization are
19 | getting channeled and liability is being released because
20 | that other organization is the chartering organization,
21 | shouldn't your estimated values include 100 percent of all
22 | liability of the related parties if they are all going to get
23 | a release in this case?
24 | A    No, I think you're confusing two things here.
25 |      The related party liability is associated with acts

1  that were done in the -- related to Scouting.  So, it's abuse

2  that occurs, relating to Scouting activity.

3      If the chartered organization also has other activities

4  in which the abuse took place that is not related to

5  Scouting, that's not a channeled -- that's not a protected

6  party in that case.  So, in that case, the person, the

7  chartered organization would have independent liability and

8  is not affiliated with -- associated with the Scouting

9  activity.

10     So, they're only protected, the insurance only applies

11 if -- for activities that occurs in connection with Scouting.

12 So, for the example that we have here, to the extent that

13 individuals were primarily abused by Brouillard in connection

14 with their activities as part of their -- the Catholic

15 Church, as an altar boy, in school, and not related to Boy

16 Scout activities, I don't think those are protected, as those

17 are not associated with Boy Scouting activity and they would

18 not be protected and come under the auspices of the

19 insurance, the Boy Scouts insurance, which is released and

20 would not be a -- so, they would have independent liability.

21 Q    And how did -- did you -- well, excuse me.

22     You did not go through and make the factual

23 determination of which organizations were enmeshed in

24 Scouting or which claims weren't Scout-related or which

25 claims were when you made your analysis, did you, at least

1  chartering organizations?

2  A    No, it's not a question of whether the organization or

3  the -- all of the organizations the protected parties have

4  some relation to Scouting, but they also have activities

5  otherwise and to the extent that the abuse occurs in

6  relationship to activities which are not related to Scouting,

7  that's an independent liability that is not, even if it's the

8  same individual, it's an independent liability that is not

9  part of this matter, not channeled to the Trust.

10 Q    Okay.  So, you had to make some pretty big and general

11 assumptions to reach your aggregate value estimates, correct,

12 when it came to figuring out chartering organization

13 percentages of liability?

14 A    No, that's not the way the estimate was done, Ms.

15 Dumas.

16      Here, we have settlement data which presumably took

17 account of the percentages of the type that you're mentioning

18 when they did the settlement.  We don't have the underlying

19 information to view them independently.  That would have

20 affected the average values that we see.

21      That's part of the reason why we don't necessarily --

22 we don't -- we have a degree of uncertainty that we do, with

23 regard to these cases and why the range of valuations is

24 broad as it is.  But to the extent that there is not done an

25 analysis of that level, of a claim-by-claim kind of level

1   that would be required that would be done by the TDP, by the

2   trustee, using the procedures of the TDP on a plan basis,

3   that's when that would be taken into account.  But you can't

4   take account of that here.

5   Q    Okay.  And likewise, for the statute of limitations

6   analysis that you included, just like I asked Ms. Murray this

7   morning, your analysis only took into consideration barred or

8   not barred, correct; you had no category for claims that fell

9   within a discovery part of a statute of limitations, correct?

10  A    I think that would be an incorrect characterization.

11  Because we did, as we demonstrated here, our entire analysis

12  was based on the states, based on a classification of the

13  states by Ogletree into gray 1, gray 2, gray 3, the close

14  dates, and the percentages that are in that data, they -- we

15  have use for that.  That is on the table and part of the TDP

16  is reflective of the kind of concerns that you are

17  expressing, whether or not the cases are likely to be ones

18  that would pass statute of limitations on factual grounds as

19  opposed to just strictly the date considerations.

20       So, I think to say that we didn't take into account of

21  that would be entirely incorrect.  It was taken account of in

22  that basis.  I don't think that -- no, I don't think that the

23  (indiscernible) overestimate of the impact that that would

24  have, given the history of those claims and the filing of

25  those claims in the past, I think it's (indiscernible).  So,

1  I would disagree with that statement.

2  Q    Okay.  That wasn't my question, though.

3       When you were -- when you analyzed the proofs of

4  claim --

5            MS. DUMAS:  And you can take that document down.

6  Thank you.

7  BY MS. DUMAS:

8  Q    -- you had a list where you had -- where you started

9  with a number of claims and then you subtracted a certain

10 number based on people who couldn't identify an abuser.  And

11 then you subtracted another number based on the number of

12 claims that were presumptively barred.

13      And so, you went through the proofs of claim and you

14 had a number of people who you believe were -- are

15 presumptive barred under their statute of limitations,

16 correct?

17 A    That's the first step in the analysis.  And as I said,

18 when I did that, those claims that were segmented out for

19 that purpose would be dealt with in a separate analysis

20 later, which I also (indiscernible), which added across all

21 of those cases to the base benchmark value, added about $1.3

22 billion to the baseline estimate.

23 Q    Okay.

24 A    So, they were not valued at zero for my analysis on any

25 of the analyses I did, because they were included in my

1  consideration of the plus factor of the SOL limitation, which

2  was created as a plus factor at that time because, strictly

3  because I had initially excluded them from the benchmark

4  value.  So, relative to the benchmark value, to the extent

5  that there were additional claims that would be

6  (indiscernible) value from statute of limitations

7  considerations, albeit at a discounted settlement amount,

8  they would be in addition to that amount, which is what I

9  have shown in the testimony I gave earlier today.

10 Q    In your review of the historical settlements, did you

11 see any trend that claims brought in states that had

12 discovery statutes of limitations had any discount built into

13 them?

14 A    I don't think you can properly estimate any discount

15 from the historical settlement data related to the statute of

16 limitations because of the filing threshold, (indiscernible)

17 on a filing threshold.  Essentially, the economic filing

18 threshold would be applied by -- as the Plaintiff attorneys

19 would apply it differentially because of the other aspects of

20 the case, which would make the case more or less valuable.

21      So, just to give you an example, I -- if you have two

22 cases which are both worth $300,000 and their settlement

23 value, if they were an open claim, but you're in a

24 jurisdiction which you, basically, judge there would be a

25 50/50 chance of that claim being settled and getting a

1  discount, so you would settle it for $150,000, if that's

2  below the filing threshold, you see the one claim and you

3  don't see the other.

4       On the other hand, if that case in the district with

5  the statute of limitations was a $600,000 claim, it would

6  still be worth it to file it because that would result, you

7  know, with a 50 percent discount and a $300,000 claim.

8       So, now I've got two settlements; one which is $300,000

9  in an open district and one which is $300 (sic) in a district

10  which has a 50 percent factor on it, all right.  The value of

11  the -- the inherent value of those cases in the open district

12  would be a 50 percent discount, but I have no basis to

13  measure that because I don't see the lower-value claims, too.

14       They both look like they're the same value.

15       And, in fact, if you, basically, just go through the

16  claims, evaluate the historical claims based on the statute

17  of limitations discount and do it properly, you wind up

18  finding no difference in the average of the values in the

19  claim pool for exactly this reason.  You can't see the lower-

20  value claims that have not been brought because of the

21  statute of limitations (indiscernible).  So, you have to

22  basically go to an outside source about how the claim values

23  are impacted by the people who settled the claims, which is

24  of what I understand to be the case, whatever the process was

25  that wound up with the discounts that were applied here.

1      But the settlement data itself, the historical

2   settlement data won't be informative of that unless you have

3   some other instruments, some other basis by which to know and

4   judge the discount.

5   Q    Okay.  Because you do not know any of the underlying

6   facts of the claims that settled historically, correct?

7   A    There's just way too little data here to be able to

8   take it down to the large number of factors and to be able

9   just to kind of (indiscernible) the effects.  Just simply

10  even isolating out the impact of just two factors here,

11  repeat abuser versus degree of abuse, is small, relative to

12  the number of claims that are settled here, due to the kind

13  of exercise (indiscernible) to disentangle that would require

14  vastly more claims because of the details and much better

15  information.

16      So, at this point, we can only take account of the

17  number of claims that we have and the guidance that they can

18  provide us, which point us in this direction.  But it's

19  insufficient and inadequate for us to be able to disentangle

20  the SOL status and the impact that it has on the claim values

21  on jurisdiction-by-jurisdiction or much less, a claim-by-

22  claim basis.

23  Q    So, your answer was no?

24  A    That's what I said there.

25  Q    Okay.  And I take that no Plaintiffs' attorney has ever

1  hired you to screen their cases about what they're going to

2  hire -- about what cases they're going to take or not, have

3  they?

4  A    Were you talking about all kinds of cases?

5  Q    Sex abuse Plaintiffs have never hired you to screen

6  their cases, have they?

7  A    No, not sex abuse Plaintiffs, no.

8  Q    Okay.  Thank you.

9           MS. DUMAS:  That's all my questions.

10          THE COURT:  Thank you.

11          So that we know, who else, besides the TCC and the

12  FCR, are planning to question Dr. Bates?

13          MR. MOXLEY:  Your Honor, it's Cameron Moxley of

14  Brown Rudnick, on behalf of the Coalition.

15          We may, and, again, it's just a "may," have

16  questions, but we may not.

17          THE COURT:  Okay.  And Ms. Wolff, I see your hand.

18          MS. LUJAN WOLFF:  Yes, Your Honor.

19          I am compelled to examine, but my preference, Your

20  Honor, is to question Dr. Bates after the plan proponents.

21          Thank you.

22          THE COURT:  Very good.

23          Okay.  Then I think we've achieved what we can

24  achieve today.

25          Dr. Bates, I -- you're excused for this evening.

1  Please do not discuss your testimony with anyone and we'll

2  start again tomorrow morning at 10:00.

3          I would like to speak with Mr. Kornfeld and I

4  forget who was on for the FCR.

5          But Dr. Bates, I prefer you not to be in the room

6  for this discussion.

7          THE WITNESS:  I'm excused, then, for now?

8          THE COURT:  Yes, you're discussed.  Thank you.

9          THE WITNESS:  Thank you.  I'll see you tomorrow,

10  Your Honor.

11          THE COURT:  I'll see you tomorrow.

12          (Witness excused)

13          MR. KURTZ:  The witness has left the room.

14          THE COURT:  Thank you.

15          So, I would like to understand, better understand,

16  perhaps, why the TCC and FCR are going to be, in effect,

17  crossing Dr. Bates, given that they are in support of this

18  plan.

19          MR. KORNFELD:  Your Honor, I'll start.

20          The issue with Dr. Bates that I want to bring out

21  in the cross is that he hasn't valued any individual claims,

22  that that is going to be something for the trustee, the

23  claims administrators, pursuant to the Trust and the TDPs to

24  do.  He is uncertain, as you heard him say, time after time,

25  regarding the aggregate value of claims.  His range is 2.4 to

1  7.1 and then he talks about the lower quartile.  So, it is a

2  very, very broad range.

3          THE COURT:  Uh-huh.

4          MR. KORNFELD:  It's a -- there's uncertainty about

5  the broad range.  There's very little data.

6          You will hear, with respect to the 212,

7  five-hundred-thousand-dollar reduced value for a

8  single-abuser penetration claim, that that value that is

9  applied to 13,000 claims is -- I'm sorry -- to 35,000 claims

10 is based on four claims, the average of four claims.  So,

11 that value is the lower quartile value and we don't believe

12 the lower quartile value is a legitimate or well-reasoned

13 value.

14          That said, we also don't believe, as we set forth

15 in our limited objection, that you need to find value here in

16 order to reach the conclusion that there is a mechanism for

17 substantial payment, other than Bates' original range of 2.7

18 to $7 billion.

19          So, in a nutshell, that's what we want to elicit

20 for Bates and put on the record, with respect to the

21 valuation issues that he's testified about.

22          MR. BRADY:  And, Your Honor, for the FCR -- Robert

23 Brady -- we're in the same place.

24          You'll recall, the TCC and FCR and the Coalition

25 all brought an estimation motion earlier in the case.  It was

1  objected to by the debtors, the insurers, and a number of

2  parties.  You will also recall from the term sheet that we

3  have with the TCC and the debtors and the Coalition, we made

4  very clear our concerns over Dr. Bates' report and it not in

5  any way be deemed a binding estimation of the debtors'

6  liability.  That the debtors, the Settlement Trust, and other

7  parties aren't bound by his view of valuation of the

8  aggregate abuse claims.  So, we have some concerns with his

9  rebuttal report and supplemental report, and we can bring

10 that out on cross.

11         But our primary limited objection, which is still

12 pending, is that the Court not be put in a position where

13 it's finding that the aggregate liability of abuse claims is

14 consistent with Dr. Bates' range; in particular, his rebuttal

15 report, which focuses on the lower quartile.

16         MR. KORNFELD:  And, Your Honor, if I just may add,

17 the significance of all of this, to put it in perspective, is

18 with respect to getting at excess insurance and not having a

19 finding here that makes that possibility impossible.  So, we

20 want, with respect to this issue, to have the opportunity to

21 get at, which Ms. Gutzler will testify to is $4 billion of

22 excess insurance, if the Trust and the trustee can legally

23 prove that there is entitlement to that excess insurance.

24         And our fear is that the insurers will say, Well,

25 Dr. Bates came up with this valuation that is at a lower

1  quartile.  There is $2.7 billion in the trust already.

2  Everybody has been paid in full.  When we're seeking new

3  coverage, then, the response from the insurers is, go home,

4  you're not entitled to it.

5          So, that's our concern and fear and that's why

6  we're cross-examining.

7          THE COURT:  Okay.

8          MR. KURTZ:  Your Honor, maybe I can try to direct,

9  at least address some of the more direct concerns, because,

10  obviously, we were as surprised as Your Honor was to have

11  plan proponents in a position that felt adverse to us with

12  respect to witnesses and findings.

13          I think it is driven by a concern that we don't

14  share, but most certainly a legitimate concern.  I think it

15  is a twofold concern.  I think you have heard there is one

16  concern and that's somehow this is going to become a binding

17  determination of any single, individual claim.  And I think

18  we can all agree, maybe, based on the testimony we have here,

19  it is not intended that Dr. Bates is testifying that he

20  hasn't done a single, individual value for any claims.  These

21  are aggregate claims.

22          The second issue is that having him determine

23  aggregate claim values somehow will restrict or limit the

24  ability of the settlement trustee to individually calculate

25  values for every one of the claims.  It will not.  There

1   is -- it is clear in the plan.  It is clear in our findings

2   that the sole discretion for making determinations with

3   respect to individual claims will reside with the settlement

4   trustee and under the terms of the TDP and not with respect

5   to our valuation expert.

6           The third issue is maybe the cute one, because

7   then you'll appreciate the irony here about --

8           THE COURT:  The irony, yeah.

9           MR. KURTZ:  -- binding bindings in the future.

10          We remain consistent, as the debtors, that nobody

11  is binding anybody, other than Your Honor will bind yourself

12  for 1129(a) purposes for confirmation.  So, just as the

13  Certain Insurers don't want to be bound by a claim finding,

14  neither do the Plaintiffs.

15          We don't see any way that Your Honor would be

16  asked to -- we're not asking you to, or would be inclined

17  to -- we're not asking you to or would even be able to make a

18  finding that somehow relieves the excess insurers from

19  liability under their policies, based on the claim values

20  that are all going to be determined by the settlement

21  trustee.

22          So, we've got a little bit of concern on both

23  sides and I think neither side should have a concern.  We're

24  here for confirmation.  We're not here for future converse

25  litigation and so we don't think any finding about payment is

1  substantially in full, it is a binding that somehow relieves

2  the excess insurers of their obligations going forward, nor

3  do we think that it relieves them of any defense that they

4  may have.

5        So, I think it is an overlay where people think

6  down the road, someone is going to be sneaky and someone is

7  going to get an advantage.  Neither one should, and I think

8  Your Honor can be pretty clear about what you're intending,

9  but I will be clear what the debtors are intending, which is

10  findings for purposes of 1129 only.

11        THE COURT:  Okay.  Well, we're going to take up

12  cross in the morning.  I just think parties should be wary of

13  what evidence they decide to put in front of me or challenge,

14  because I will have to make certain findings for confirmation

15  and if you undercut the findings that I have to make for

16  confirmation, that could be problematic for confirmation.

17        And I do see the irony here, with respect to the

18  findings that Plaintiff representatives, I'll say broadly

19  speaking, want me to make and then don't want me to make.

20  So, you can certainly choose to go forward with your

21  examination, certainly, it may be appropriate, but I --

22  I'm -- I don't think in my now almost -- I'm in my eighth

23  year on the bench, I don't think I have had hearings where

24  the proponents have chosen to cross-examine other proponents'

25  witnesses to undercut the testimony that they are providing.

1   So, I will leave it at that.

2           We will start again tomorrow morning at 10:00.

3           COUNSEL:  Thank you, Your Honor.

4           THE COURT:  Thank you.  We're adjourned.

5       (Proceedings concluded at 6:16 p.m.)

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 22, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    March 22, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     March 22, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                           March 22, 2022

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable