<pre>
 1                      UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                                   .
 6                                 .  Courtroom No. 6
                                   .  824 Market Street
 7            Debtors.             .  Wilmington, Delaware 19801
                                   .
 8                                 .  Tuesday, March 22, 2022
     . . . . . . . . . . . . . . . .  10:00 a.m.
 9

10

                     TRANSCRIPT OF ZOOM TRIAL (DAY 7)
11          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
12

13   APPEARANCES:

14   For the Debtors:        Derek C. Abbott, Esquire
                             MORRIS, NICHOLS, ARSHT
15                              & TUNNELL, LLP
                             1201 North Market Street
16                           16th Floor
                             Wilmington, Delaware 19899
17

18

19

20   Audio Operator:        Brandon J. McCarthy, ECRO

21   Transcription Company: Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1 | APPEARANCES (CONTINUED):

2 | For the Debtors:                 Jessica C. Lauria, Esquire
                                     Andrew W. Hammond, Esquire
3 |                                  Glenn M. Kurtz, Esquire
                                     WHITE & CASE, LLP
4 |                                  1221 Avenue of the Americas
                                     New York, New York 10020
5 |
    For the US Trustee:             David L. Buchbinder, Esquire
6 |                                  OFFICE OF THE UNITED STATES TRUSTEE
                                     J. Caleb Boggs Federal Building
7 |                                  844 King Street
                                     Suite 2207, Lockbox 35
8 |                                  Wilmington, Delaware 19801

9 |
    For AIG, on behalf of
10 | Certain Insurers:               James Hallowell, Esquire
                                     Mitchel Karlan, Esquire
11 |                                 GIBSON DUNN & CRUTCHER, LLP
                                     200 Park Avenue
12 |                                 New York, New York 10166

13 | For the Guam Committee:         Christina Arnone, Esquire
                                     STINSON LLP
14 |                                 1201 Walnut Street, Suite 2900
                                     Kansas City, Missouri 64106
15 |
    For Lujan & Wolff
16 | Claimants:                      Delia Lujan Wolff, Esquire
                                     LUJAN & WOLFF, LLP
17 |                                 238 Archbishop Flores Street
                                     DNA Building, Suite 300
18 |                                 Hagatna, Guam

19 | For Dumas & Vaughn
    Claimants:                      Gilion C. Dumas, Esquire
20 |                                 DUMAS & VAUGHN, LLC
                                     3835 NE Hancock Street
21 |                                 Suite GLB
                                     Portland, Oregon 97212
22 |
    For Tort Claimants:             Alan Kornfeld, Esquire
23 |                                 PACHULSKI STANG ZIEHL & JONES LLP
                                     10100 Santa Monica Blvd., 13th Floor
24 |                                 Los Angeles, California 90067

25 |

1  APPEARANCES (CONTINUED):

2  For Zalkin and Pfau
   Cochran:              Thomas Patterson, Esquire
3                        KTBS LAW LLP
                         1801 Century Park East, 26th Floor
4                        Los Angeles, California 90067

5
   For the FCR:          Kevin Guerke, Esquire
6                        Robert Brady, Esquire
                         YOUNG CONAWAY STARGATT & TAYLOR LLP
7                        Rodney Square
                         1000 North King Street
8                        Wilmington, Delaware 19801

9  For the Coalition of
   Abused Scouts for
10 Justice:              Cameron Moxley, Esquire
                         BROWN RUDNICK LLP
11                       7 Times Square
                         New York, New York 10036
12
   For Continental
13 Insurance and Columbia
   Casualty:             Laura McNally, Esquire
14                       LOEB & LOEB LLP
                         321 North Clark Street, Suite 2300
15                       Chicago, Illinois 60654

16                       Maria Sawczuk, Esquire
17                       GOLDSTEIN & MCCLINTOCK LLP
                         501 Silverside Road, Suite 65
18                       Wilmington, Delaware 19809

19
   For the Committee of
20 Unsecured Creditors
   For Archdiocese of
21 Agana:                Edwin Caldie, Esquire
                         STINSON LLP
22                       50 South Sixth Street, Suite 2600
                         Minneapolis, Minnesota 55402
23

24

25

1                                  INDEX

2    MOTIONS:

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6

7    WITNESSES CALLED
     BY THE DEBTORS:                                         PAGE
8
          CHARLES BATES
9         Cross-examination by Mr. Karlan                     11
          Cross-examination by Ms. Wolff                      59
10        Cross-examination by Ms. Arnone                     73
          Redirect examination by Mr. Kurtz                   75
11

12        JAMES PATTON
          Cross-examination by Ms. McNally                   101
13        Cross-examination by Mr. Buchbinder                216

14

15   DECLARATIONS:                                          PAGE

16   1) Declaration of James Patton                         101

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:02 p.m.)

2                THE COURT:  Good morning.

3                UNIDENTIFIED:  Good morning, Your Honor.

4                THE COURT:  We're back on the record with the Boy

5    Scouts confirmation hearing.

6                MR. ABBOTT:  Good morning, Your Honor.  Derek

7    Abbott on behalf of the debtors.

8                Your Honor, as you will recall, we were in the

9    middle of Dr. Bates' testimony yesterday.  I'm going to turn

10   it back over to Mr. Kurtz to give you an update on where that

11   all stands.

12               THE COURT:  Thank you.

13               MR. KORNFELD:  Your Honor --

14               MR. KURTZ:  Good morning, Your Honor.  I'm going to

15   ask to turn it over first to Mr. Kornfeld, and then I will

16   have a couple of remarks myself.

17               THE COURT:  Thank you.

18               MR. KORNFELD:  Thank you very much, Your Honor.

19   For the record, Alan Kornfeld, Pachulski, Stang, Ziehl &

20   Jones, for the TCC.

21               Your Honor, the TCC, the FCR, and the coalition

22   have heard the Court.  We thought long and hard about the

23   comments that you made at the end of yesterday's hearings.

24   We have reviewed and discussed the daily transcript and had a

25   series of discussions.

1          We continue to be a plan supporter, and we are not

2  going to cross-examine Dr. Bates.  Our decision was made and

3  informed by:

4          First of all, Dr. Bates' testimony, which we

5  carefully listened to and included the point that he did not

6  value any individual claims, that that will be done by the

7  trustee.

8          Mr. Kurtz's comments at the end of the hearing that

9  the debtors do not seek any findings based on Dr. Bates'

10  testimony that bars any survivor and/or the settlement

11  trustee from assessing available insurance, including excess

12  insurance.

13          And the TCC's settlement termsheet with the debtors

14  and others that deals, at Page 9, with certain points with

15  respect to Dr. Bates' testimony and conclusions that will be

16  included in the proposed confirmation order.  Among those

17  points, with respect to Dr. Bates' valuation conclusions, is

18  that the debtors and settlement trust are not bound to any

19  allocation of liability to any insurance.

20          So, obviously, Your Honor, first and foremost, in

21  light of your comments, we will not be cross-examining Dr.

22  Bates.  All of us -- the coalition, the FCR, and the TCC --

23  do reserve the right to redirect -- to further redirect Dr.

24  Bates if appropriate at the appropriate time.  Thank you,

25  Your Honor.

1            THE COURT:  Thank you.

2            MR. BRADY:  Yes, Your Honor.  Robert Brady for the

3    FCR.  That's accurate.

4            We also went back and looked at the debtors'

5    response to our motion to strike Dr. Bates' rebuttal report.

6    And based on those comments and the facts that Mr. Kornfeld

7    laid out, we're comfortable not cross-examining Dr. Bates,

8    but again, reserve the right, if necessary, to further

9    redirect, if that becomes necessary.

10            THE COURT:  Thank you.

11            MR. MOXLEY:  And Your Honor, just for the record,

12    Cameron Moxley, Brown Rudnick, on behalf of the coalition.

13            The same comments from us, Your Honor, with the

14    same reservations (indiscernible)

15            THE COURT:  Thank you.

16            Mr. Kurtz.

17            MR. KURTZ:  Thank you.  Good morning, Your Honor.

18    Glenn Kurt from White & Case on behalf of the debtors.

19            In the first place, let me thank you for raising

20    this awkward situation, which got to a result that we think

21    makes a lot of sense.  And I also appreciate and want to

22    thank our friends over at the TCC, the coalition, and the FCR

23    for allowing this to move forward into maybe a more rational

24    (indiscernible)

25            We did talk a little yesterday when we were

1   addressing this, and I appreciate it.  I tried to make

2   comments that I think are consistent with our position

3   yesterday.  And Mr. Brady references a motion that they

4   brought to strike, and our response was -- I think also was

5   consistent.

6           But it is important to them that we be clear, that

7   I be clear on what the debtors are doing.  And frankly, it's

8   important to the debtors, as well.  These are pretty serious

9   issues.

10          We do seek a finding that the plan provides a

11  mechanism for payment substantially in full.  We do not --

12  and I want to emphasize "not" -- seek a finding as to any

13  individual claim.  We have not submitted proof, and we do not

14  intend to submit proof as to any individual claim.

15          The -- so I don't see how the Court could determine

16  an individual claim, which would otherwise perhaps require

17  82,209 mini-trials or 82,902 claim estimations.  That's not

18  anything we've ever set out to do, that's not anything I

19  think Your Honor could do or would do.

20          And most importantly, at least with respect to how

21  individual claims get resolved, is the plan is unambiguous

22  that they get resolved by a settlement trustee in accordance

23  with the guidance and the terms of the trust distribution

24  procedures.  So, on that piece of it, I think we've tried to

25  be clear from the beginning and I hope it's clear now.

1    The other half of it is this notion that the

2 certain insurers are somehow going to be able to take an 1129

3 finding relating to payment substantially in full

4 (indiscernible) plan provides a mechanism for a payment

5 substantially in full, and somehow use that to avoid their

6 obligations under the clear terms of their excess policies.

7 It is important to us that that is not the case.

8    The excess insurance policies are a very, very

9 substantial asset of the estates.  They are worth billions of

10 dollars, potentially.  They are being assigned to the trust.

11 And so nothing about a confirmation finding is intended or we

12 believe could be used by the excess insurers to avoid this

13 obligations under the policies.

14    Now I can't prevent them from making arguments in

15 the future, but I think Your Honor has been pretty clear that

16 determinations are going to be made with respect to any

17 coverage action that gets brought, which means they continue

18 to refuse to sort of engage, will be addressed by a coverage

19 court in the future.

20    So that's my remarks prior to bringing in Dr.

21 Bates.  I did want to note that -- on a scheduling matter,

22 that we have a witness, Chris Medell, who is a survivor and a

23 member of the survivor working group, had scheduling issues

24 that require that he be -- that he testify tomorrow, at 10

25 a.m. on Wednesday.  It may work that that falls right into

1   place in accordance with the schedule.  If it does not, we

2   intend to stop what we'd be doing -- which I think would be

3   Mr. Patton, maybe someone else -- suspend that, allow a

4   survivor to testify, and then recommence with whoever was

5   disrupted, if anyone.

6           My understanding is no one intends to cross, so I

7   don't think it will be terribly disruptive.  But I did want

8   to give the Court some (indiscernible) that we do have a

9   scheduling issue that requires a particular witness to be

10  accommodated on Wednesday morning at 10, irrespective of

11  where we think we are with any other witnesses.

12          THE COURT:  Okay.  Thank you.

13          MR. KURTZ:  With that --

14          THE COURT:  I -- I'll note that I will make

15  findings that are necessary for confirmation and warranted by

16  the evidence, and that will be with respect to all issues.

17  And the parties' determination of what are appropriate and

18  are not appropriate findings will not necessarily guide that

19  on all issues.

20          Okay.  Let's --

21          MR. KURTZ:  I understand, Your Honor.  I was mostly

22  trying to make sure we were clear what the debtors are asking

23  for --

24          THE COURT:  Yes.

25          MR. KURTZ:  -- and the evidence that we think we

1  are introducing, and the importance, of course, of preserving

2  estate assets.

3          But with that, Your Honor, we are prepared to call

4  Dr. Bates back to the stand.

5      (Pause in proceedings)

6      (Participants confer)

7      (Pause in proceedings)

8          THE COURT:  Give me one second here.

9      (Pause in proceedings)

10      (Participants confer)

11  CHARLES BATES, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

12          THE COURT:  Okay.  Dr. Bates, let me remind you

13  that you are still under oath.

14          And --

15          THE WITNESS:  Yes.

16          THE COURT:  -- I guess we're going to Mr. Karlan

17  then.

18          MR. KARLAN:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20  BY MR. KARLAN:

21  Q    Good morning, Dr. Bates.  I don't know that you'll

22  remember me.  We met --

23  A    (Indiscernible)

24  Q    I think we met at your deposition.  Yes, I'm Mitch

25  Karlan --

1   A     (Indiscernible)

2   Q     -- and I'm with Gibson, Dunn & Crutcher, and I represent

3   the AIG companies, and also coordinating with certain

4   insurers in this case who are objecting to the plan.

5         Dr. Bates, so I don't have to interrupt you later, do

6   you have handy with you the plan, which has the TDPs in it,

7   and also your rebuttal report in evidence?

8   A     I'm sure that they will get them to me (indiscernible)

9   binder here.

10  Q     I'm not going to use them right this second, but I

11  thought it made sense to just get this out of the way, so

12  you'll just have it.

13  A     I'll just double-check to make sure they're here.

14  Q     Thank you, sir.

15  A     (Indiscernible) report (indiscernible) plan, that's part

16  of the plan.  Where is the rebuttal report?  That's the --

17         UNIDENTIFIED:  Mitch, are these in the materials

18  you provided?

19         MR. KARLAN:  Yes.

20         THE WITNESS:  (Indiscernible) check with

21  (indiscernible) I don't see a tab with the rebuttal

22  (indiscernible) here (indiscernible) back of that

23  (indiscernible) thank you (indiscernible) yes, I think it has

24  both of those (indiscernible) the plan is in front of that.

25  Here it is.  Okay.  Great.

1            MR. KARLAN:  As I said, we're not --

2            THE WITNESS:  All right.

3            MR. KARLAN:  We don't need them right this second,

4  but it will save time later.  All right, sir.

5            THE COURT:  Mr. Karlan, before you start, did you

6  send me a binder of cross-examination --

7            MR. KARLAN:  Yes, Your Honor.  The -- I think the

8  only items that we're going to use today are the two that I

9  just mentioned.

10            THE COURT:  Okay.  I don't see it.  I'll ask my

11  staff, who's listening, to be looking for it.  I have the

12  plan.  I'm not sure I have the rebuttal report.

13            MR. KARLAN:  The rebuttal report to the -- if this

14  is helpful, Judge, is in evidence at JTX-3007-11.

15            THE COURT:  Could one of you all get that for me,

16  please, 3007-11?

17            Thank you.  Okay.

18            MR. KARLAN:  I look forward to the day when I can

19  say "may I approach," that's ...

20            THE COURT:  It would be nice.

21            Okay.  I'm sorry. You can begin.

22            MR. KARLAN:  All right.

23  BY MR. KARLAN:

24  Q    Dr. Bates, in the five years before the petition date,

25  that is 2016 and on, the Boy Scouts settled 262 claims of

1  sexual abuse, correct?

2  A    That's my understanding, yes.

3  Q    I'm sorry, Dr. Bates.  I'm not able to hear you.  Are

4  you -- is your mic up?

5  A    Can somebody tell me?  One, two, three.

6  Q    There you go.  Okay.

7  A    Hear me now?

8  Q    Yes, sir.  But I didn't hear the answer to the question.

9  I'm sorry.

10  A    That's -- that's my understanding, yes.

11  Q    Okay.  And the large majority of those claims involved

12  what you've categorized and defined as "repeat abusers," not

13  single abusers, correct?

14  A    (Indiscernible)

15  Q    I'm -- yeah, there's a little -- a little lag.  I see

16  your lips saying that's correct.

17  A    That's correct.

18       You can't hear me?  Having trouble with the sound here.

19  Q    Now we hear you, now we hear you.

20  A    Are we having -- we're having trouble with sound?

21       (Participants confer)

22  A    Are we having trouble hearing this?

23  Q    Oh, that's better.  That's better.

24  A    Can you hear me (indiscernible)

25             MR. KURTZ:  We have a technical person trying to

1  (indiscernible)

2          MR. KARLAN:  I see, I see.

3          MR. KURTZ:  (Indiscernible)

4          MR. KARLAN:  Thank you.

5          THE WITNESS:  (Indiscernible) one, two, three.

6  Testing one, two, three.

7          MR. KARLAN:  Very good.

8      (Participants confer)

9          MR. KARLAN:  All right.  Shall I proceed?

10          THE WITNESS:  If you can hear me.

11  BY MR. KARLAN:

12  Q    Okay.  So let's -- I'm going to --

13          MR. KURTZ:  Your Honor, can you hear the witness?

14      (Court and court personnel confer)

15          THE WITNESS:  Can we hear everybody?

16          MR. KARLAN:  Yeah, I think that's good.

17          THE WITNESS:  (Indiscernible) Your Honor, can you

18  hear me, as well?

19          THE COURT:  Yeah, that's better.  I noticed

20  yesterday that you were really clearer in the first time; and

21  then, when we took a break, it was less clear, so ...

22          MR. KURTZ:  Do we want test again and --

23          THE WITNESS:  I can test again.

24          MR. KURTZ:  Is that any better?

25          THE WITNESS:  Four score and seven years ago, our

1  forefathers brought forth into this nation ...

2          MR. KARLAN:  Very good.  All right.  Let's try it

3  again, Doctor.  I'm going to back up one question to make

4  sure we have it in the transcript.

5  BY MR. KARLAN:

6  Q    The large majority of the 262 pre-petition settlement

7  claims -- settlements were -- involved repeat abusers, not

8  single abusers, correct?

9  A    That's correct.

10  Q    And --

11  A    Over 90 percent of cases, yes.

12  Q    Over 90 percent.  It's -- I think your report says it's

13  243 out of 262, correct?

14  A    I don't have the numbers in front of me, but I could

15  verify, but it sounds about right.

16  Q    All right.  And for penetration claims, roughly the same

17  percentage applies; 91 percent of the settlements involved

18  repeat abusers.  And you may want to look at yesterday -- one

19  of yesterday's demonstratives, DDX-74, for that proposition.

20  A    That's correct.

21  Q    Okay.  And 8.5 percent of the settled penetration claims

22  involved repeat abuser -- sorry -- single abusers, correct? A

23  Once identified within our database, yes.

24  Q    Okay.  And the average settlement -- again, we're

25  focusing on these 262 pre-petition settlements.  The average

1  settlement for the repeat abuser claims was about 3 times

2  higher than the average settlement for the single abuser

3  cases.  Is that correct?

4  A    Average is three times higher?  To what are you -- which

5  point are you referring to?  I don't have the numbers in

6  front of me.

7  Q    Let's --

8  A    (Indiscernible) so what are you looking at?

9  Q    Okay.  Let's look at your rebuttal report.

10        MR. KARLAN:  Judge, were you able to find a copy --

11        THE COURT:  No --

12        MR. KARLAN:  -- in chambers?

13        THE COURT:  -- I don't have it.

14        MR. KARLAN:  Okay.

15        THE COURT:  Give me a minute --

16        MR. KARLAN:  Okay.  I'm going to put --

17        THE COURT:  -- please.

18        MR. KARLAN:  Okay.

19     (Court and court personnel confer)

20        THE COURT:  Okay.  I have a version, I have a copy

21  of it.

22        MR. KARLAN:  Thank you, Judge.

23  BY MR. KARLAN:

24  Q    So -- and Doctor, you have yours, as well?

25  A    Yes.

1  Q    Okay.  I'm going to display up on the screen here for

2  you Figure 1, which is on Page 5 of your rebuttal report.

3  A    Yes.

4  Q    And looking at that, do you agree with me that the

5  average settlement in the repeat abuser claims pre-petition

6  was about three times higher than the average settlement in

7  the single abuser claims?

8  A    That's -- that's not quite right.  You're -- you've --

9  you're pointing to a chart that had a different -- excuse me

10 -- purpose to it because this is -- removes one of the claims

11 from the one-time abuser, so --

12 Q    And --

13 A    -- to get the average overall.

14      Now the one-time abuser is a David Bruce -- once

15 identified abuser, David Bruce Smith is a once identified

16 abuser, the employee claim.  So, if you want to talk about

17 the overall average, you would have to include that.  And if

18 you add that in, that would be about $520,000 for the once

19 identified abusers.  It's 212,500 for he ones excluding that

20 one-time abuser claim.

21      Similarly, for the other -- for the repeat abusers, you

22 would have to average in the Louis Breyard (phonetic) cases

23 and the Thomas Hacker (phonetic) cases.  That would bring the

24 overall average up because of the heavy weight on Thomas

25 Hacker.

1       So, excluding certain claims, the outliers in each group

2   (indiscernible) for this purpose.  I don't think the Breyard

3   claims are (indiscernible) but the Hacker one would

4   definitely be considered.  That -- your figures for those two

5   segments are -- are correct, but not for the overall

6   averages.

7   Q    Okay.  And the reason the Smith settlement is separated

8   out by you, in your chart, is that this is the case you

9   discussed yesterday, which, although it was a one-time

10  abuser, there was substantial evidence of institutional

11  liability, correct?

12  A    That's my understanding, yes.

13  Q    Okay.  And the -- as you show on your chart, if we

14  exclude the Smith case, the average settlement for a single

15  abuser penetration case pre-petition -- and when I say "pre-

16  petition," I'm referring to 2016 forward, the Ogletree era --

17  was about $212,000, correct?

18  A    Correct.

19  Q    And the median settlement for those -- for that category

20  of claims was even lower than $212,000, correct?

21  A    You're talking about the median for those four claims?

22  Q    Yes, sir.

23  A    I don't have them in front of me, but I don't -- I don't

24  have it in front of me.  It's only four claims, so I'm not

25  sure the distinction between the mean and the median is going

1  to mean a whole lot here, but yes.

2  Q    When you look at DDX-88 from yesterday, does that

3  refresh you that the median settlement for this category of

4  claims was materially lower than the average.

5  A    It includes both repeat abuser and once identified

6  abusers.  This includes all of the claims, right?  So that is

7  correct.  Here, the overall average is just over a million

8  dollars, and the median is $250,000.  But that includes both

9  repeat abusers and once identified abuser claims --

10  Q    Okay.

11  A    -- as well as the outliers.

12  Q    And we've been talking about the Ogletree era, which is

13  the 2016 and forward.  But the available data that was

14  available to you, incomplete as it may have been, for the pre

15  2016 era indicates that the average settlement of a single

16  abuser penetration claim before 2016 was never lower than

17  212,000, correct?

18      (No verbal response)

19  Q    I think you may have answered, sir, but I didn't get it.

20  A    (Indiscernible) correct.

21          MR. KURTZ:  Are we still having difficulties?  I

22  don't know if we should try to switch rooms.  I don't know

23  what other people see, but Dr. Bates' doesn't seem synced to

24  me, but it really only matters what others think.

25          MR. KARLAN:  That was the first problem I had on

1  that last answer.

2          MR. KURTZ:  Could -- maybe -- when we get to a

3  break, maybe we'll try to set up the room that other

4  witnesses have testified in.  I haven't noticed the same

5  problem in that room.

6          THE COURT:  Okay.  Thank you.

7          MR. KURTZ:  (Indiscernible) check it out.  We'll

8  let you know when we're ready to move.

9          MR. KARLAN:  Judge, it's okay with us if -- it's up

10 to you, Judge.  We're happy to do it now, if that's what

11 everybody wishes.

12         MR. KURTZ:  Well, why don't you at least give us a

13 few minutes to set it up --

14         THE COURT:  Yes.

15         MR. KARLAN:  Okay.

16         MR. KURTZ:  -- (Indiscernible)

17         MR. KARLAN:  Okay.  Very good.

18 BY MR. KARLAN:

19 Q    So -- and I apologize, Doctor.  So the answer to my

20 last question was "that's correct."  Yes?

21 A    If we could just repeat and go back --

22 Q    Sure.

23 A    -- we'll make sure that I got it right.

24 Q    Absolutely.

25      You looked at what was available to you --

1        MR. KARLAN:  You can take that chart down.  Thank

2   you.

3   BY MR. KARLAN:

4   Q    You looked at what was available to you, in terms of

5   data, pre 2016, and you concluded that the average settlement

6   of a single abuser penetration case prior to 2016 was even

7   lower than $212,000.

8   A    Yes.  But if I include the cases that I have in the

9   record right now, that would bring the average down slightly

10  to around two hundred.  I have looked at other cases which

11  indicate that the average is maybe even lower.  But I think

12  that's -- there's more work that would have to be done to

13  validate that.  But yes, that's what the -- that's what I

14  observed.

15  Q    And I think yesterday you used the figure 100,000,

16  correct?

17  A    No, one fifty.

18  Q    One fifty.  Thank you, sir.

19       Now, in the Ogletree era -- we've talked about this a

20  little bit already this morning -- there's only one -- every

21  single abuser penetration claim settled for less than

22  $300,000, correct?  Except one.

23  A    Except one.  Yes, that's correct.

24  Q    And that one is the one you and I already just alluded

25  to briefly, which is a case where there was some material

1  evidence of institutional responsibility, correct?

2       (No verbal response)

3  Q    Now, see, that one I missed again.  I see your lips

4  moving.

5  A    Correct.

6  Q    Okay.

7  A    I can just give a thumbs up if it (indiscernible)

8  Q    Yeah, I'm hoping the court reporter is getting all of

9  this.

10 A    I'm used to use these little emojis with my kids, you

11 know.

12 Q    For repeat abuser penetration claims --

13       MR. KARLAN:  If we could put that chart back up

14 please from his rebuttal report.

15 BY MR. KARLAN:

16 Q    For repeat abuser penetration claims, the average

17 settlement was about $668,000, correct?  Not including

18 Hacker.

19 A    Not including Hacker and Breyard.

20 Q    And if we include Hacker, it's materially hacker --

21 materially higher than that, correct?

22 A    So I think, if you use all of them -- yeah, but I won't

23 spec -- I vaguely recollect, but we don't -- I don't need to

24 go there.  It's over a million dollars if you include all of

25 them.

1  Q    Yeah, but that's not my question.

2       If we include Hacker, the average settlement pre-

3  petition for a repeat abuser penetration claim is materially

4  higher than 668,000, correct?

5  A    Yes.  It brings -- yes, those claims bring the values up

6  a lot --

7  Q    So the --

8  A    -- yeah.

9  Q    So the gap -- if we include Hacker, the gap between

10 single and repeat abuser penetration settlement grows,

11 correct?

12 A    Hacker raises the number, yes.

13 Q    Okay.  Now, by the way, you mentioned, I think yesterday

14 -- and correct me if I'm wrong -- that, in the Hacker case,

15 there was some material risk of punitive damages, which led

16 to this high settlement, correct?

17 A    That's my understanding.

18 Q    And punitive damages, you know, are not insured,

19 correct?

20 A    That's my understanding.

21 Q    Okay.  Now the historical single abuser settlements were

22 lower than those for repeat abuser cases, in part, because --

23 and I'm going to quote you here -- In the tort system, quote:

24        "-- the chance of a liability finding against the

25 Boy Scouts of America would be lower than for single victim

1  cases."

2      Correct?

3  A    Sorry.  I missed your predicate (indiscernible)

4  Q    Sure.

5      The historical single abuser settlements that you looked

6  were lower than those for repeat abuser cases in part

7  because, in the tort system, the chance of a liability

8  finding against the Boy Scouts of America would be lower for

9  a single victim case, correct?

10 A    That's my conclusion, yes.

11 Q    Now, even if we lump the single abuser pre-petition

12 settlements and the repeat abuser pre-petition settlements,

13 it's still true, is it not, that about half or close to half

14 of the 262 historical settlements -- claims, rather, were

15 settled for less that $100,000.

16 A    Is that a question?

17 Q    Yes, sir.

18 A    Sorry.

19 Q    Yes, sir.

20 A    (Indiscernible) --

21 Q    Is that correct?

22 A    -- a statement.  That's correct.  Yes, the median --

23 Q    All rigiht.

24 A    -- is $100,000 --

25 Q    Thank you, sir.

1  A    -- which is 50 percent above that number or 50 percent

2  below.

3         MR. KARLAN:  Glenn, I don't mean to be difficult,

4  but I do think we should change.

5         MR. KURTZ:  Absolutely.  If this is a problem,

6  let's move -- I'm not exactly sure (indiscernible) do you

7  want me to inquire?  How do you want me to communicate we're

8  ready?

9         THE COURT:  Why don't we take a break for ten

10 minutes?  And we'll come back and see if you're ready.

11        MR. KURTZ:  Thank you very much.

12        THE COURT:  Thank you.  We're in recess.

13     (Participants confer)

14     (Recess taken at 10:32 a.m.)

15     (Proceedings resume at 10:44 a.m.)

16        THE COURT:  Okay.  Mr. Karlan.

17        MR. KARLAN:  Thank you, Your Honor.

18 BY MR. KARLAN:

19 Q   Dr. Bates, let's turn our attention, please, to the

20 proofs of claim that you looked at.

21 A   Okay.

22 Q   Ninety-eight percent of the eighty-two thousand proofs

23 of claim were submitted by people who had never sued the Boy

24 Scouts prior to the bankruptcy, correct?

25 A   Yes, all but about 2,000 of the 82,000 (indiscernible)

1  correct.

2  Q    And of the 82,000 proofs of claim that you reviewed,

3  your opinion is that about 70,000 of them are of such low

4  value that, if not for this bankruptcy, the claimants would

5  have had serious difficulties finding a lawyer willing to

6  handle the case, correct?

7  A    How many did you say?

8  Q    Seventy thousand.

9  A    At least that many, yes.

10  Q    Thank you.

11      Of the 82,000 proofs of claim, 98 percent of the abusers

12  that were identified were not employees of the Boy Scouts of

13  America, but were, instead, volunteers who did not work for

14  the Boy Scouts, correct?

15  A    That's my understanding, they were nearly all

16  volunteers, yes.

17  Q    And therefore, those factors have come together to help

18  you form the opinion that, quote:

19          "The link between the abuser and institutional

20  responsibility is tenuous for most of the proofs of claim,

21  correct?

22  A    It's -- yes, it's weaker than it would be than if they

23  were employees, certainly.

24  Q    But it's tenuous, generally, for the majority of them,

25  correct?

1  A    I believe that's correct.

2  Q    Okay.   In fact, the level of institutional

3  responsibility, in your opinion, for the vast majority of the

4  proofs of claim would be in the low single digits, correct?

5  A    That's what I believe, yeah.

6  Q    All right.  So let's turn back to this issue of the

7  single and repeat abusers.  We discussed it in the context of

8  the historical settlements.  Now I'd like to discuss it in

9  the context of the proofs of claim.

10      Of the 82,000 proofs of claim, about 87 percent are

11 claims being raised about single abusers, correct?

12 A    I believe that's right.

13 Q    And that's a -- I'm using round numbers here.  I'm the -

14 -

15 A    Sure.

16 Q    I'm the one in this --

17 A    (Indiscernible)

18 Q    I'm the one in this case who's not *summa cum laude* of

19 anything.  I had forgotten the difference between "median"

20 and "mean" until you helped me yesterday.

21      That's about 71,000 proofs of claim, correct?

22 A    Correct.

23 Q    Okay.  And that's -- to state the obvious here, that's

24 sort of the mirror image or the opposite of the experience

25 you saw with respect to the historical settlements, where the

1 vast majority were single abuser claims.

2 A    Yes.

3 Q    Pardon me.  I'm -- I said that wrong.  I'm sorry.

4    The vast majority were repeated abuser claims.

5 A    Repeat abuser, correct.

6 Q    Okay.

7 A    Also repeat abusers in the historical, mostly repeated -

8 - one time -- once identified abusers in the POC claims.

9 Q    Okay.

10 A    Yes, sir.

11 Q    And your opinion, in general, is that, for perhaps

12 70,000 of the proofs of claim, if these were left to the tort

13 system, for all of the reasons you and I have been discussing

14 so far this morning -- inability to find a lawyer, volunteers

15 and not employees, low values of the claim, all of these

16 things -- you think about 70,000 of the proofs of claim, if

17 left to the tort system, would not have significant value,

18 correct?

19 A    Well, they wouldn't have been filed because their value

20 will be below the threshold at which that would be worthwhile

21 to file a claim.  So transactions costs are keeping them from

22 basically being retained -- have -- retaining counsel to

23 prosecute their claim.

24 Q    Okay.

25 A    Yes.

1  Q    So am I right -- and we'll get to the TDPs in a moment.

2  But am I right that, under the TDPs, claims that were never

3  going to be filed in the tort system because they're not

4  worth enough will, nonetheless, receive some claim, some

5  award from the trust?

6  A    If they had been filed in the tort system, they would

7  have gotten some value, and that's what I estimated.  It's

8  low, many of them, the vast majority of them in the range of

9  mid five figures.  But that would be -- but they would have

10 value if they were filed.

11 Q    But they weren't filed because, in the tort system,

12 they're not worth enough to be filed, correct?

13 A    That's right.  It's low, but not zero.

14 Q    Well, it's too low to give them any value in the tort

15 system, correct?

16 A    No.  If they were filed in the tort system, they would

17 have had value.  I mean, they are -- their value is too law

18 to make it worth the effort to recruit them and do the

19 investment in recruiting them and retaining them.  But when -

20 - as we see in examples of the cases that were filed, which

21 turned out to be of that type, they do have some value, just

22 not worth the effort from the transaction costs of

23 prosecuting claims.

24 Q    Were you asked, in designing the T -- we're jumping

25 ahead a little bit.  But were you asked, in designing the

1  TDPs, to design a system that would replicate the Boy Scouts'

2  pre-petition experience in the tort system?

3  A    No.  It's to emulate the values the claims would have

4  gotten, had they been filed as claims in the tort system.

5       (Pause in proceedings)

6            MR. KARLAN:  Could we please put up the plan --

7  which is JTX-1-353, I believe -- at Page 119 of 459?

8  BY MR. KARLAN:

9  Q    Dr. Bates, it's completely up to you if you want to

10 wrestle with that big document, or I'm going to put them on

11 the screen if you -- if that's easier for you.

12 A    Oh, if you can put them on the screen and blow it up,

13 that would be fine.

14           MR. KARLAN:  Okay.  So, yeah, could we blow up

15 Paragraph (aa), please?  Thank you.

16 BY MR. KARLAN:

17 Q    So, just to give you some context, Dr. Bates, this is

18 from a portion of the plan that lists certain findings that

19 the plan proponents are asking the Court to make in

20 confirming the plan, and this is one of those findings.

21 Okay?  And I'll just read it to you:

22           "The base matrix values in the trust distribution

23 procedures are based on and consistent with the debtors'

24 historical abuse settlements and litigation outcomes."

25       Do you see that?

1  A    I do.

2  Q    If --

3  A    I agree with that.

4  Q    And is that part of -- or is that the assignment you

5  were given when you were asked to design the base matrix

6  values and scalers?

7  A    Correct.

8  Q    Okay.

9  A    Well, my --

10  Q    So --

11  A    That -- that was the target, yes, was to make --

12  Q    Okay.

13  A    -- (indiscernible)

14  Q    Okay.

15  A    Yes.

16  Q    Okay.  And you'll agree with me that, if the evidence

17  doesn't support that finding, the Judge shouldn't make it,

18  correct?

19           MR. KURTZ:  Objection, Your Honor.

20           MR. KARLAN:  I'll withdraw.

21  BY MR. KARLAN:

22  Q    So, for the 70,000 some claims that were not worth

23  enough to have ever been filed in the tort system, for those

24  70,000 claims, the base matrix values are not consistent with

25  the debtors' historical abuse settlements and litigation

1  outcomes.  Can we agree?

2  A    The -- the base matrix values have to be matched with

3  the scalers to attach to -- to achieve the values.  It's not

4  the base matrix values themselves, but base matrix values

5  with the scalers.

6  Q    Do you believe that 70,000 of the proofs of claim are

7  going to get nothing out of the trust?

8  A    No, I don't believe that at all.

9  Q    Okay.  So some -- there's going to be some award for

10  these claims that you opine, without contradiction in this

11  record, are not worth enough to have ever been filed in the

12  tort system, correct?

13  A    They will receive low values in the TDP.  It can

14  (indiscernible) what they would have received had they been

15  filed as claims in the tort system.

16  Q    Whether they're low or not you and I are going to

17  discuss in a moment.

18       But they're going to get something, correct?

19  A    Yes.

20  Q    Okay.  And that is -- can we agree -- is not consistent

21  with the debtors' historical abuse settlements and litigation

22  outcomes.

23  A    I don't agree with that.

24  Q    Okay.  Let's turn now to the matrix, my favorite movie.

25  I felt a little bad for you yesterday because you testified

 1  for four hours about the matrix, and nobody ever gave you a

 2  copy to look at.  So could you turn to the matrix in the

 3  plan?  It's -- I believe it's Page 167 of 459.

 4       (Pause in proceedings)

 5  A    I'm there.

 6  Q    All right.  I'm trying to get you to Article 8 if -- let

 7  me know when you're there.

 8  A    Article 8?

 9  Q    Yes, sir.

10  A    Do you put it on the screen or do I --

11           MR. KARLAN:  Let's turn to the -- yeah, turn to the

12  page, 167.

13           THE WITNESS:  Yeah, I've got the -- the matrix.

14           MR. KARLAN:  Okay.

15           THE WITNESS:  I've got the -- it's on the screen,

16  if that's what you're referring to.

17           MR. KARLAN:  Okay.  Very good.

18  BY MR. KARLAN:

19  Q     By the way, did you simply provide the numbers that are

20  in the chart, or did you write the words that are in Article

21  8?

22  A    I -- I provided the numbers.

23  Q    Okay.  Do you know who wrote the words?

24  A    No.

25  Q    Were you asked to approve the words?

1  A     Well, we read them, I read them after --

2  Q     That's not my --

3  A     -- they were done.

4  Q     That's not my question.  We've all read them, whether we

5  wanted to or not.

6  A     Oh, yes.

7  Q     Were you asked to approve them?

8  A     Approve them.  They asked -- I was asked whether or not

9  they were consistent with my understanding, and I asked about

10 the step down and the tiers, and that was explained to me,

11 and said sure, that makes sense to me.

12 Q     Who asked you to do that, sir?

13 A     I'm not quite sure how it was relayed to me, but it came

14 through counsel to the debtors.

15 Q     Were you involved in the negotiations of the words of

16 Article 8?

17 A     I was involved in no negotiations, no.

18 Q     Are you generally aware now that they went through some

19 changes over time?

20 A     Not specifically.  I'm not surprised.

21 Q     Do you know whether the version -- withdrawn.

22       Did you -- were you asked to read one version of Article

23 8 or several?

24 A     I've seen it at -- at various times, and I -- I have

25 seen changes in Article 8 overall, over time.

1  Q     And do you know --

2  A     (Indiscernible)

3  Q     Do you know which --

4  A     (Indiscernible)

5  Q     I'm sorry, sir.  I'm sorry.  Are you done?

6  A     I think so, yeah,

7  Q     Do you know which version of Article 8 you said -- I

8  don't want to repeat your words -- what you said about it?

9  A     I -- I've seen it in each -- I saw it in the disclosure

10 statement itself.  And I've seen it in the plan as it existed

11 before, the second modified plan.  And I saw it in the third

12 modified plan.

13 Q     And you appreciate that the language has changed in

14 certain ways, correct?

15 A     Yes, that's my understanding.

16 Q     Okay.  All right, sir.  So the way the matrix works is -

17 -

18         MR. KARLAN:  If we can turn to the next page,

19 please.

20 BY MR. KARLAN:

21 Q     Is that there are several categories of abuse

22 identified, correct?

23 A     Yes.

24 Q     And then the matrix posits a -- what's called a

25 "hypothetical base case" for each category of abuse, correct?

1  A    Yes.

2  Q    And then, for each category of abuse, assuming the facts

3  of the hypothetical base case, the chart -- the matrix lists

4  a sum of money, and that's called the "base matrix value,"

5  correct?

6  A    That's correct.  That's the benchmark, yes.

7  Q    And in some cases, there may be facts that, within the

8  express terms of the procedures, warrant an adjustment up or

9  down from the -- from the base matrix value, correct?

10  A    Well, I disagree with your use of the word "sum" there.

11  I think all cases have to be evaluated in terms of the

12  scalers, and virtually all of them will have a movement

13  either up or down from the base matrix value.

14  Q    And I think you've tested that, for the single abuser

15  penetration claims, for example, they have to go down 90

16  percent, correct?

17  A    Typically.

18  Q    Okay.  Now there's nothing in the matrix itself or the

19  scalers that identifies 90 percent as a -- as anything,

20  correct?  The number 90 percent doesn't appear anywhere in

21  these -- in this document.

22  A    No, that's -- that's an estimate of the way the result

23  would come out.  That depends on the facts of the individual

24  cases, what the -- the settlement trustee finds in doing her

25  work.

1 | Q    Uh-huh.  And there's nothing in the TDPs that compels

2 | the settlement trustee to take a 90 percent haircut off of a

3 | single abuser penetration claim, correct?

4 | A    Well, I -- I think, if she implements the plan properly

5 | --

6 | Q    Can you --

7 | A    -- (indiscernible) --

8 | Q    Can you --

9 | A    -- (indiscernible)

10 | Q    -- answer my question?

11 | A    Yes.

12 | Q    Can you answer my question?

13 | A    There --

14 |        MR. KURTZ:  I think he is.

15 | A    There is, yes.

16 | Q    There is?  What words compel a 90 percent haircut on a

17 | single abuser penetration claim.

18 | A    I didn't --

19 | Q    Take your time.

20 | A    -- say that words compel a 90 percent.  What I said was

21 | --

22 | Q    That was --

23 | A    -- for --

24 | Q    -- my question.

25 |        MR. KURTZ:  (Indiscernible) can the -- this is

1   going to make for a pretty bad record.  Can we have the

2   witness answer -- finish his answers, please?

3            MR. KARLAN:  I mean, the --

4            THE COURT:  Yes.

5            MR. KARLAN:  The witness is answering a question I

6   didn't ask --

7            THE COURT:  He may --

8            MR. KARLAN:  -- Your Honor, which --

9            THE COURT:  He may be, but let him finish his

10  answer --

11           MR. KARLAN:  All right.

12           THE COURT:  -- and you can take him back.

13           MR. KARLAN:  Okay.  Very good, Judge.

14           THE WITNESS:  The -- the matrix -- the TDPs require

15  the trustee to essentially evaluate the claims based on their

16  -- what they would have been evaluated in the tort system,

17  taking account of all defenses and all other factors that

18  would affect the value of the claims.  And I believe that, in

19  total, typically, for the single abuser cases, that would

20  result in a -- scalers that would reduce the factors to less

21  than 10 percent.

22  BY MR. KARLAN:

23  Q    In other words, 600,000, down to something less than

24  60,000.

25  A    Approximately.

1  Q    Okay.  Now I want to ask you a specific question.  If

2  you can answer it yes or no, I'd ask you to do so.  If you

3  can't answer it yes or no, just tell me, and I'll move on.

4       Is there anything in the TDPs that compels the

5  settlement trustee to give a 90 percent haircut to single

6  abuser penetration claims off of the base matrix value?

7  A    I don't think that's strictly a yes/no answer.

8  Q    Okay.  I'll move on.  Thank you, sir.

9       Now will you agree with me that the hypothetical base

10 case in the TDPs posits a single abuser?

11 A    It does.

12 Q    Okay.  And where there's a multiple -- where the abuser

13 is a repeat abuser, that is a potential aggravating

14 circumstance, correct?

15 A    That's not, I don't think, a -- possible.  That one is

16 compelled.

17 Q    That's -- you're absolutely right.  Very good.

18      So, if there's a -- if it's a repeat abuser --

19         MR. KARLAN:  And now I'm on Page 170 of 459.  The

20 witness may find this helpful.

21 BY MR. KARLAN:

22 Q    The little (a), (b), and (c) there.

23 A    If you can just show it on the screen, that would be

24 helpful.

25 Q    Okay.  Right.  If it's a -- if it's a repeat abuser, the

1   base matrix value gets increased by these numbers, correct?

2   A    Correct.

3   Q    If it's a single abuser, there is no express reference

4   to a mitigating factor that would correspond or be the mirror

5   image of these (a), (b), and (c); correct?

6   A    Not specifically, with a specific amount in the same

7   way if --

8   Q    Because they --

9   A    -- (indiscernible) factor.

10  Q    Because the base -- not base -- the hypothetical base

11  case assumes a single abuser; correct?

12  A    With a high degree of -- obviously, from the context, a

13  fairly high degree of institutional responsibility based on

14  the history of the claims, has to be; otherwise, he value

15  doesn't make sense.

16  Q    Otherwise, the value doesn't make sense; correct?

17  A    Sure.  It's designed to be used with a mitigating

18  scaler, which means we have to start it with a relatively

19  high value so that, through the use of a scaler which is

20  between zero and one, we reduce the value to the appropriate

21  level for all of the individual base once-identified abusers;

22  otherwise, you have to divine a different scaler which could

23  move up or down.  Since we defined the scaler as being one

24  that moved down, it has to be that you have to start from a

25  relatively high level and discount from it because that's the

1  way scaler is defined; they match together, they aren't

2  independent of each other.

3         MR. KARLAN:  Move to strike as nonresponsive

4  everything after yes.

5         MR. KURTZ:  Your Honor, it's precisely responsive

6  and I think it should be considered as helpful to

7  understanding how this works.

8         THE COURT:  Overruled.

9  BY MR. KARLAN:

10  Q    So I think you've told me this before, Dr. Bates, but

11  just so we're all on the same page, prior to the petition

12  date, with the exception of that one case, which is on

13  special facts, the Boy Scouts never settled a single-abuser

14  penetration case for anywhere near $600,000; correct?

15  A    In no record that I have seen, yes.

16  Q    In your opinion -- and we'll move on, just so we're --

17  your opinion is that the 90-percent discount has to be

18  applied to the vast majority of single-abuser penetration

19  claims?

20  A    Well, I think that's approximately the average of what

21  it would be across them.  There will be some that will be 95

22  percent, some that will be 50 percent.  It depends on the

23  cases and the facts, but typically, typically, for cases with

24  single abusers, the low level, likely low level of

25  institutional responsibility, without some other factual

1  basis for it, which would, as illustrated by the verdict that

2  we saw, typically results in a low percentage assignment of

3  responsibility to the BSA; not zero, but small.

4           MR. KARLAN:  Could we look, please, at

5  subparagraph (d), right below the things that are on the

6  screen?

7  BY MR. KARLAN:

8  Q     So take a moment and -- or get yourself to where we

9  are, sir, and then I'll ask you a question.

10 A     I'm familiar with this.

11 Q     Okay.  This is the piece of the TPDs (sic) that express

12 -- that expressly talks about institutional responsibility;

13 correct?

14 A     Well, expressly, because there is judgment to be used

15 in this one.  This is the one that you would use when you

16 have a particular case of a once-identified abuser, say an

17 employee, for which there is -- say or in a case where you

18 have a prior notice, that would be something where there's

19 some discretion here, so that's what it's pointing out.

20 Q     Okay.  So let me read this -- or at least some of this

21 to you, just so we're all focused on it.  This is calling for

22 an aggravating scaler -- or a multiplier, as I would call it

23 -- of 1.25 to two times if there is evidence that -- I'm

24 going to say the Scout -- oh, no, I'm sorry, that's the BSA

25 -- "if there is evidence that the BSA knew or should have

1  known; one, the abuser had previously committed or may commit

2  abuse and failed to take reasonable steps to protect the

3  survivor from that danger; or, two, of the prior abuse or the

4  foreseeability of the risk of abuse and failed to take

5  reasonable steps to protect the survivor from that danger."

6          So, first, did I read that okay?

7  A    Yes, you did.

8  Q    All right.  So I'd like you to think about a case where

9  the evidence does not establish either of those two things;

10 that is, there is no evidence that the BSA knew or should

11 have known of either one or two.  Are you with me?

12 A    I am.

13 Q    So, in that case, there would be no occasion to apply

14 the aggravating scaler of 1.25 to two; correct?

15 A    You're talking about a once-identified abuser case?

16 Q    Yes, because that --

17 A    The once-identified --

18 Q    -- because that's the hypothetical base case.

19 A    Correct, okay.

20 Q    Okay?

21 A    I'm with you.

22 Q    So at that point we simply revert to the base matrix

23 value; correct?

24 A    There are also mitigating scalers that have to be

25 applied.

1  Q     Well, there's nothing in -- can we agree on this much:

2  there's nothing in this section (d) that says that, if there

3  is no evidence of either of those two things, there shall be

4  a mitigating scaler of X, that's not how this works; correct?

5  A     The description is not in section (d), it comes later.

6  Q     Okay.  Let's just focus on (d), okay?

7         Now, is there anyplace in the TPDs where there is

8  a prescribed --

9  A     Excuse me, Mr. Karlan, that's TDP.

10 Q     I'm sorry?

11 A     TDP, trust distribution --

12 Q     Oh, I'm sorry --

13 A     -- procedures.

14 Q     -- I'm sorry.  I've been tripping over that for weeks

15 and I apologize.

16 A     It's easy to do.

17 Q     Okay.  Can we agree that there is no place in the TDPs,

18 trust distribution --

19 A     Trust procedures.

20 Q     -- procedures -- thank you, sir -- where is a

21 prescribed numerical downscaler or mitigating multiplier for

22 cases where there is no evidence that the Boy Scouts knew or

23 should have known?

24 A      No, it's a mitigating scaler that has limits between

25 zero and one, so there's reduction.  It doesn't say

1  specifically that, but it does say, "Settlement trustee may

2  consider any further limitations on the abuse claimant's

3  recovery in the tort system," and I think that's what it's

4  designed to capture.

5  Q     And you're referring to -- let's see if I can even find

6  it -- you're referring to --

7  A     (e) sub --

8  Q     Thank you.  Go ahead, go ahead.

9  A     (e) and then (indiscernible) --

10  Q     (a)(2) -- (a)(2), I think it is, right?

11  A     Correct.

12  Q     On page (indiscernible) --

13  A     Yes --

14  Q     -- okay, on page --

15  A     -- it's (indiscernible) --

16  Q     Is that what you -- is that -- that first sentence of

17  (2), that's what you were just referring to in your answer?

18  A     Right, that's the catchall that's supposed to capture

19  the overall impact, overall valuation in the tort system,

20  considering other factors that are not addressed explicitly

21  elsewhere.

22  Q     Who told you that?

23  A     That's my interpretation of it.

24  Q     Okay, but you didn't write this?

25  A     I didn't write that sentence, no.

1  Q      And you didn't write any part of these TDPs except the

2  numbers; correct?

3  A      Well, not quite.  I helped construct the language on

4  the base -- the hypothetical benchmark cases for which you're

5  supposed to be referencing.

6  Q      Including that they're single-abuser cases?

7  A      Correct.  And this is what I had in mind when I wrote

8  that.

9  Q      And you know that this sentence -- maybe you don't know

10 -- do you know whether this sentence was in all the

11 variations and versions and drafts of this document?

12 A      As I sit here today, I don't know, but it's -- that's

13 what it's there to capture.

14 Q      But you -- sir, I'm not trying to quarrel with you or

15 denigrate you -- you don't know that?  You don't know who

16 even wrote this; correct?

17 A      Well, I certainly know that it was there and that was

18 basically what gave me the comfort that -- why it was being

19 addressed and the way I was thinking about the base matrix

20 values and the scalers were being properly applied.

21 Q      All right, let's see if we can agree.  You are telling

22 the Court -- and I have no objection to it -- that when you

23 sit down and read this final version of this document and you

24 get to this sentence, you read it in a certain way; correct?

25 A      I read it in a certain way, I read it as --

1  Q     You read it the way you read it?

2  A     I read it as meaning that the trustee is to apply what

3  she understands about the tort system from her learning about

4  the history of the BSA before applying the base matrix values

5  and scalers as this is what she is to take account of, which

6  is these are limitations in the tort system to the value of

7  the claims, the very things you're describing.

8  Q     Would you agree with me that there are a lot of

9  paragraphs and sentences in Article 8 that are quite precise

10  and mathematical and numerical and that this is not one of

11  them?

12  A     I'd agree with that.

13  Q     Is there any reason why the TDPs shouldn't say in plain

14  words what your opinion is, namely, that $600,000 is almost

15  never an appropriate award for a single penetration -- pardon

16  me -- single-abuser penetration claim?

17  A     I'm afraid I didn't think about it that way, Mr.

18  Karlan, because --

19  Q     Fair enough --

20  A     -- the way I was thinking about it --

21  Q     -- fair enough.  So --

22        MR. KURTZ:  Finish your answer, please.

23        THE WITNESS:  Because of the way I was thinking

24  about it in terms of defining what the base matrix value did,

25  which had to capture a point near the middle of the entire

1  range so that you could appropriately aggregate or mitigate

2  down to reach the different levels of institutional

3  responsibility.

4        MR. KARLAN:  Judge, could I have three minutes

5  just to -- I just want to organize myself.  I have moved

6  farther along in my outline than I thought I had.

7        THE COURT:  Yes.

8        MR. KARLAN:  Thank you, Judge.

9        THE COURT:  We'll take a five-minute recess here.

10       (Recess taken at 11:13 a.m.)

11       (Proceedings resumed at 11:21 a.m.)

12       MR. KARLAN:  Should I proceed, Judge?

13       THE COURT:  Yes.

14  BY MR. KARLAN:

15  Q    Dr. Bates, I want to change topics in a moment, but

16  let's just finish for two seconds on these procedures.

17       Could you look at page 167 of 459 of the plan?

18  And we'll put it up on the screen as well.

19  A    If you can put it on the screen?

20  Q    Sure will, sure will.

21       (Pause)

22  Q    It's paragraph (a) entitled, "Claims matrix."  Yeah,

23  there we go.  One, two, three, four, five lines down.

24       (Pause)

25  Q    You're familiar with that sentence, sir?

1   A     I can see it, yes.

2   Q     But you've read it before?

3   A     Yes.

4   Q     So the base matrix values that you came up with and are

5   now in the plan, under the plan, quote, "represent the

6   default allowed claim amount for an allowed abuse claim,"

7   correct?

8   A     That's the language in the plan, yes.

9   Q     Okay.  And we talked a little bit about the

10  hypothetical base case; I just want to make sure we're all

11  agreeing with what it is.

12          MR. KARLAN:  If we could look at page 170 of 459

13  and paragraph (ii) at the top?  Yep, right there.

14  BY MR. KARLAN:

15  Q     The second sentence reads, "This factor is to be

16  evaluated relative to a hypothetical base case scenario

17  involving a perpetrator as to whom there is no other known

18  allegations of abuse."

19          Did I read that correctly?

20  A     That's the starting point.

21  Q     That's the starting point.  That's a single abuser,

22  correct?

23  A     Right, because we scale upward relative to that value

24  for repeat abusers in different categories.

25  Q     Thank you, sir.

1          All right, now I'd like to change subjects and go

2   to the statute of limitations for a moment.  In the proofs of

3   claim, sir, you and your staff found that there were tens of

4   thousands of proofs of claim that on their face are

5   presumptively barred by the applicable statute of limitations

6   in their state; correct?

7   A    Yes, applying just the --

8   Q    It's (indiscernible) --

9   A    -- (indiscernible) yes -- no, I think it's -- I think I

10  should clarify.  It applies just -- applying just the time

11  restrictions, yes, that's what we meant.

12  Q    Okay.  And many of the proofs of claim allege acts of

13  abuse that are from 30 years or more ago; correct?

14  A    Yes, most of them are from a long time ago.

15  Q    The abuse year that generated the largest number of

16  proofs of claim was 1972; correct?

17  A    That's about right, mid-'70s -- early to mid-'70s, yes.

18  Q    In your initial report, sir, and in your rebuttal

19  report you assigned those claims -- that is, claims that were

20  presumptively time-barred, you assigned them a value of zero;

21  correct?

22  A    No, that's just for establishing the initial benchmark,

23  aggregate benchmark, and then subsequently address that

24  otherwise in the overall consideration of the scenarios,

25  which affects the overall range.

1   Q      Let me ask --

2   A      They are valued -- yes.

3   Q      Let me ask you a different question.  In your rebuttal

4   report, in calculating what you have described as your

5   benchmark valuation, you assigned claims that were

6   presumptively time-barred, you valued them at zero; is that

7   correct?

8   A      For the initial benchmark, aggregate benchmark

9   valuation, that's correct, but that's the starting point.

10  Q      Now, the TDPs do not permit the settlement trustee to

11  completely disallow and award no value to claims -- to most

12  of the claims that are presumptively time-barred; is that

13  correct?

14  A      Except under the IRO, yes.

15  Q      We'll come to the IRO later, but is my question -- is

16  the answer to my question yes?

17  A      The answer to the question is except under the IROs;

18  otherwise, the prescribed scaling factors may be used.

19  Q      And the prescribed scaling factors do not permit the

20  settlement trustee to completely disallow a claim and give it

21  zero value based on the statute of limitations; correct?

22  A      Not solely on that factor --

23  Q      And that's --

24  A      -- (indiscernible) that's my understanding.

25  Q      And that's true even for claims from those states --

1  and we've heard a lot of testimony about how there's a wide

2  variety of states, but there are some states that are at one

3  extreme end of the spectrum where there's kind of no out and,

4  even as to claims from those states, the settlement trustee

5  still has to give some money to the claimant; correct?

6  A    Yes --

7  Q    And --

8  A    -- apropos what Mr. Griggs said about settling the

9  claims.

10  Q    And Mr. Griggs also told us that for 25 of the 50

11  states in the Union, the Boy Scouts of America have never had

12  an abuse case; correct?

13  A    No, he's not looking more comprehensively.  The number

14  is more like 43, they've received claims and about 43 in the

15  ten-year period.

16  Q    Mr. Griggs testified about the period where he was

17  national coordinating counsel; is that fair?

18  A    I think he was giving an impression, I don't think he

19  had the actual calculation.

20  Q    Really?  Was he -- did the debtors' counsel bring that

21  to the Court's attention?

22          MR. KURTZ:  Objection.

23  BY MR. KARLAN:

24  Q    Are you impeaching Mr. Griggs' testimony?  I'm a little

25  confused.

1  A     I --

2           MR. KURTZ:  Objection.  This is just

3  argumentative, Your Honor.

4           THE COURT:  Well, I think he can explore the

5  statement that the witness just made.

6           MR. KURTZ:  Right, but I don't he's appropriate to

7  talk about what debtors' counsel did, I don't know if there

8  was any opportunity or any obligation or any benefit to -- I

9  don't think the witness testified that he ran a precise

10 calculation.  I think he talked about what he generally got

11 and I think that's what this witness has testified to about

12 as well.

13 BY MR. KARLAN:

14 Q     Did you observe Mr. --

15           MR. KARLAN:  -- I'll withdraw the question, Judge.

16 BY MR. KARLAN:

17 Q     Did you observe or listen to Mr. Griggs' testimony?

18 A     I did.

19 Q     Did you hear him say that there were 25 states where

20 the Boy Scouts of America had never had a sex abuse claim, at

21 least in his -- at least in his tenure?

22 A     I did, yes.

23 Q     Did you hear him say that in those states the Boy

24 Scouts of America did not even retain local counsel?

25 A     I heard him say that, yeah.

1  Q      Would you agree with me that, at least for those

2  states, the awarding of money to claimants whose claims are

3  otherwise barred, facially, by the statute of limitations, is

4  not consistent and reflective of the prepetition tort

5  experience of the Boy Scouts?

6  A      No, that's not -- I think that's inconsistent with what

7  Mr. Griggs said.  If I may explain?

8  Q      No, it's not the time for that, sir.

9  A      Okay.

10  Q      Now, you did design many of the scalers that are now in

11  the procedures; correct?

12  A      There's a small number of scalers that are used.

13  Q      And you helped design some of them; correct?

14  A      I helped -- I helped put a scaler to the factors that

15  were identified as being things that would be mitigating or

16  aggravating.

17  Q      But as to the statute of limitations scalers you played

18  no role; correct?

19  A      That's correct.

20  Q      And the reason you played no role was that, in your

21  professional judgment, there was not enough historical data

22  to come to a professional judgment about what those scalers

23  ought to be; correct?

24  A      Not within the data that I've seen, no.

25  Q      So the scalers that are in the procedures for statute

1    of limitations were, at least as you understand, simply the

2    product of the lawyers; correct?

3    A    That's my understanding.

4    Q    And, not to put too fine a point on it, they're just

5    inventions; correct?

6    A    I assume that the individuals who were negotiating them

7    and talking about them had some experience on which they were

8    basing it and I didn't have any information which contradicts

9    it.

10   Q    You think that the Coalition and TCC lawyers had more

11   insight into these facts than you?

12   A    I have -- as I explained, there's no data here, for the

13   reasons that I --

14   Q    Right.

15   A    -- (indiscernible) in my testimony --

16   Q    Right.  Therefore --

17   A    -- how (indiscernible) --

18   Q    -- therefore, they're inventions --

19            MR. KURTZ:  Excuse me --

20            THE WITNESS:  -- because --

21            MR. KARLAN:  I'll withdraw the question.

22        (Pause)

23   BY MR. KARLAN:

24   Q    Just one housekeeping thing.  We're almost done, Dr.

25   Bates.  You showed a demonstrative yesterday, which -- and

1  I'll find it, if you need me to -- that I think said that 77,

2  roughly, percent of the proofs of claim were from single

3  abusers, but I thought you testified elsewhere and indeed

4  today that it's 87 percent.  So I just wanted to make sure

5  the record is clean on that.

6  A    I'm (indiscernible) that for the -- if we look at the

7  chart -- if you look at DDX-78, for example --

8  Q    Yes, sir.

9  A    -- this is talking about penetration claims only and

10  there the once-identified cases represent 77.4.  The

11  confusion you may have has to do with probably the treatment

12  of claims which are -- which no abuser is identified and some

13  time for articulating that, how many -- what percentage of

14  the POCs actually identify a repeat abuser, which is a

15  smaller percentage than of the claims that have identified

16  the abuser, what percentage of those are repeat abuser

17  because of the missing abuser cases.

18  Q    So tell me if this is right, sir.  The difference

19  between the 87 number that I've seen in some places,

20  including your testimony today, and the 77 number that's on

21  DDX-78, the difference is that there was, what, ten percent

22  that don't identify the abuser at all?

23  A    Well, that would account for the ten percentage points

24  difference (indiscernible) of the claims to make that happen,

25  but yes.

1  Q      Fair enough, all right.  Last topic, sir.  One of your

2  assignments from debtors' counsel was to estimate the total

3  value of the Boy Scouts abuse claims as of the petition date

4  as though they were tort system claims against the Boy

5  Scouts, assuming these claims were resolved at values

6  consistent with the sexual abuse claims Boy Scouts resolved

7  through the tort system prepetition; is that correct?

8  A      That's correct.

9  Q      And you did that; correct?

10 A      Yes, I did.

11 Q      And your opinion is that the total value of proofs of

12 claim filed by the abuse claimants in this bankruptcy case,

13 if resolved in the tort system in the manner such claims were

14 resolved prepetition, is between 2.4 and 7.1 billion; is that

15 correct?

16 A      That's correct.

17 Q      And within that range your opinion is that the most

18 likely value is between 2.4 and 3.6 billion; correct?

19 A      Correct.

20 Q      Now, under the terms of the proposed plan of

21 reorganization, you're aware that various parties and the Boy

22 Scouts have agreed to make cash contributions to the

23 settlement trust; correct?

24 A      That's my understanding.

25 Q      And the total thus far of those contributions is $2.7

1  billion; correct?

2  A      That comports with what I've heard.

3           MR. KARLAN:  All right, nothing further at this

4  time, Judge.  Thank you.

5           THE COURT:  Thank you.

6           Other cross-examination?  Ms. Wolff.

7           MS. LUJAN WOLFF:  Thank you, Your Honor.

8                      CROSS-EXAMINATION

9  BY MS. LUJAN WOLFF:

10  Q      Good morning, Dr. Bates --

11  A      I --

12  Q      -- my name is Delia --

13  A      I guess it's more good morning where you are.

14  Q      It's technically, yes, morning, a.m.

15           Sir, my name is Delia Lujan Wolff and I represent

16  certain survivors of abuse, and I'm just going to ask you

17  some questions.  Okay?

18  A      Okay.

19           THE WITNESS:  Is there a way to turn this volume

20  down a little bit --

21           MR. KURTZ:  Yeah, I --

22           THE WITNESS:  -- it's very loud.

23           MR. KURTZ:  -- I'm sure you --

24           MS. LUJAN WOLFF:  Can you hear me okay?

25           THE WITNESS:  Oh, yeah, very loud, that's what the

1  problem is.

2          MR. KURTZ:  You're really loud.

3          THE WITNESS:  The speakers they have in this room

4  are quite loud.

5          MS. LUJAN WOLFF:  Oh, I'm sorry.

6          MR. KURTZ:  Yeah, just a little bit.

7          THE WITNESS:  He's just turning down one.  Go

8  ahead, we're fine.

9  BY MS. LUJAN WOLFF:

10 Q    Okay.  If I'm speaking too loudly, then I'll lower my

11 voice.  Just let me know, pleas.

12 A    It's all right, Ms. Wolff.  It's not on your end.  It

13 was jus where the speaker is here and the volume.

14 Q    Okay.  Thank you.

15          Now, sir, yesterday and today you mentioned the

16 words Guam and Brouillard maybe about 20 times.  You must

17 have done a deep dive into those cases?

18 A    I paid attention to them, what I could find out about

19 them, at least enough to do the work that I was doing, yeah.

20 Q    Now, you've identified 69 cases in Guam that settled

21 before the BSA filed for bankruptcy, right?

22 A    That's my recollection.

23 Q    And these are all the Guam cases that factored into

24 your analysis in preparing your expert reports in this

25 matter?

1  A    Those were all the ones that were associated with

2  Brouillard.  I don't recall if there were any other Guam

3  cases, but those are the ones I associate with him.

4  Q    And any Brouillard -- you know, I actually say

5  Brouillard, so I'm sorry if I -- I've been saying that -- I

6  mean, when I say Brouillard, that's who I'm referring to.

7  You say Brouillard, but those are the cases that you looked

8  at when you talk about Brouillard cases; is that correct?

9  A    Yes.

10 Q    Okay.  Now, those 69 cases, those are the Guam and

11 Brouillard cases that you considered in performing the work

12 that debtors hired you to do; is that correct?

13 A    That's correct.

14 Q    And in considering those 69 cases, did you ever review

15 the sworn testimony provided in those cases by the -- the

16 sworn testimony of the plaintiffs?

17 A    I did not.

18 Q    Did you ever review case files in those matters?

19 A    No, I did not.

20 Q    Did you ever contact the attorney representing the

21 plaintiffs in those matters?

22 A    No, I did not.

23 Q    Did you ever try to obtain information as to why the

24 plaintiffs' attorneys settled at the amounts that they

25 settled?

1  A     I have an understanding of that from defense counsel,

2  but not the plaintiffs' counsel.

3  Q     Okay.  And when you say you have an understanding from

4  defense counsel, can you identify who you refer to?

5  A     Mr. Griggs.

6  Q     Bruce Griggs?

7  A     Griggs.

8  Q     Okay.  So Bruce Griggs identified those 69 cases to

9  you?

10 A     The data PACE (ph) had them.  So, indirectly, yes, he

11 provided the file that had those cases listed.

12 Q     Okay.  Thank you, sir.

13        And so you have no idea how many plaintiffs among

14 those 69 cases were represented by the same lawyer?

15 A     I did not review that, no.

16 Q     Okay.  And so can you tell me how long you spoke to Mr.

17 Griggs regarding the 69 cases that settled?

18 A     It was just part of a longer discussion about a number

19 of the cases and it was just one of the items and what

20 distinguished these cases, and that's what he told me.

21 Q     And that was during one meeting that you had with Mr.

22 Griggs?

23 A     Correct.

24 Q     Okay.  And so, sir, Mr. Griggs did not assist you in

25 the valuation of these -- the claims that have been filed in

1  this bankruptcy case; correct?

2  A    He supplied some information and answered my questions.

3  I did the work.

4  Q    Okay.  And that was during that one meeting?

5  A    I'm not sure what "that" is in the sentence.  I talked

6  with him in one meeting about these claims.

7  Q    Okay.  Well, how many other meetings did you have with

8  Mr. Griggs other than discussing these claims in which he

9  provided you information that you used to value these 82,000

10 claims?

11 A    I've had two or three, four -- maybe four discussions

12 with Mr. Griggs, something like that.

13 Q    So maybe a total of less than ten hours discussion with

14 Mr. Griggs?

15 A    Oh, certainly.

16 Q    Certainly less than ten hours; right?

17 A    Certainly less than ten.

18 Q    As a matter of fact, any discussions with Mr. Griggs

19 would be reflected in the fees, the fee applications that you

20 would have provided as part of this case; correct?

21 A    Maybe.  I may have written it down, I don't recall.

22 Q    But it should be there; correct?

23 A    It should be.

24 Q    Okay.  So, sir, are you aware that prepetition there

25 were at least 140 cases that were filed in Guam against the

1  BSA?

2         MR. KURTZ:  Objection, assumes facts not in

3  evidence.

4         THE WITNESS:  There are --

5         THE COURT:  Uh --

6         THE WITNESS:  -- (indiscernible) --

7  BY MS. LUJAN WOLFF:

8  Q    Are you aware of -- you talked about -- we talked about

9  the 69 cases, are you aware of there being more than the 69

10 cases that had been filed in Guam before the BSA filed for

11 bankruptcy?

12        MR. KURTZ:  Your Honor, same objection.  I don't

13 (indiscernible) I don't know if there's any proof on this,

14 Your Honor; if there is, if it's supported, if it's not.

15        If she wants to find out if this witness has

16 information about it, that's appropriate too, but otherwise

17 it assumes facts not in evidence.

18        MS. LUJAN WOLFF:  Your Honor, I'm asking if he

19 knows of cases other than the 69 cases that are prepetition

20 in Guam?

21        MR. KURTZ:  That's not the phraseology, but I have

22 no objection to that phraseology.

23        THE COURT:  Okay, yes.  Please answer that.

24        THE WITNESS:  I believe there are approximately an

25 equal number of claims in the proof of claim forms that are

1  from Guam.  I did not look to see whether they had been --

2  had prior litigation marked or not, but there certainly are

3  that many there in the proof of claim forms.

4  BY MS. LUJAN WOLFF:

5  Q    Okay.  And so you have no -- okay.

6          Your firm was hired to review the proofs of claim

7  in this case; correct?

8  A    Our firm was hired to compile the data from those proof

9  of claim forms into an electronic form that I could use to --

10 could avail myself of to do -- use mass estimation techniques

11 to estimate the overall value of the claims.

12 Q    Okay.  And you became aware that there were -- you said

13 approximately equal number of -- approximately equal number

14 of proofs of claim alleging abuse in Guam?

15 A    Right, I believe that there's another approximately 70

16 claims.

17 Q    But you didn't actually review these approximately 70

18 proofs of claim, did you?

19 A    No, I did not -- I did not review those; I've reviewed

20 others, but I did not review those.

21 Q    So you have no idea how advanced those cases were

22 prepetition; correct?

23 A    I have no -- I have no knowledge about how advanced any

24 individual case in the 82,000 is.

25 Q    And you have -- you've never tried to contact any --

1  well, you've never tried to contact any lawyer in Guam to

2  figure out why cases settled or why cases didn't settle;

3  isn't that correct?

4  A    Not those specifically, no.  I didn't isolate out any

5  individual cases that way except for cases that were

6  particular exemplars that we talked about.  We talked about

7  those cases en masse; we talked about individual cases that

8  had particularly high value, why cases might have high value,

9  why they have low value, but not the facts and circumstances

10 of any particular cases beyond what I've already said.

11 Q    You talked about -- quite a bit about institutional

12 responsibility of the BSA; do you remember that?

13 A    I do.

14 Q    Sir, are you a lawyer?

15 A    I am not.

16 Q    You're not trained in the law; correct?

17 A    Correct.

18 Q    And so you've never researched -- conducted any legal

19 research as to institutional responsibility in terms of

20 negligence?

21 A    Not as a legal matter, no.

22 Q    You've never conducted research into -- legal research

23 into institutional responsibility as to intentional conduct

24 of the BSA?

25 A    I'm not a lawyer; I have not done that research.

1  Q      You've never conducted legal research into duties that

2  an institution would owe to protect -- duties of care of an

3  institution to protect a child from child sexual abuse?

4  A      That has not been my research, no.

5  Q      You've never done any legal research into the duty of

6  care that Boy Scouts chartered organization partners would

7  owe to protect a child from child sexual -- excuse me, from

8  sexual abuse?

9  A      As I said, I've never done any legal research.

10 Q      Okay.  Thank you.  That frees up my examination.

11         Sir, now, you've talked about independent

12 liability of -- you've mentioned independent liability of,

13 for instance, a church.  Do you know what I'm referring to?

14 A      I believe you're referring to the discussion on this

15 topic yesterday where we talked about activities that were

16 Boy Scouts-related versus activities that were not Boy

17 Scouts-related that may involve the same individuals, but may

18 create independent liability in those circumstances.

19 Q      Okay.

20 A      That's what you're referring to?

21 Q      Yes, sir.  Thank you.

22         So when you're talking -- when you mention

23 independent liability, since you've never done any legal

24 research into institutional responsibility, isn't it correct

25 that you can't -- when you say independent liability, you

1  can't say with certainty that that is legal liability?  Do

2  you know what I am trying to say?

3  A     I --

4             MR. KURTZ:  I'm just going to object to the form.

5             THE WITNESS:  I don't.

6             MS. LUJAN WOLFF:  No?  Okay.

7  BY MS. LUJAN WOLFF:

8  Q     So when you say independent liability, again, that is

9  not -- the source of that term is not from any legal research

10 that you conducted; correct?

11 A     No.  It's just from my general understanding of why it

12 is that in one circumstance you might have an individual

13 (inaudible) as a responsibility and another individual you

14 might not because there is actually -- even though the same

15 individual was involved in some cases with the BSA and there

16 were some abuse associated with that, a much larger portion

17 of it or a portion which created the problem actually

18 occurred outside of the context of any BSA activity

19 associated with a church activity, a church function,

20 something else.

21 Q     So this independent liability that you are talking

22 about is, basically, an assumption that you, yourself,

23 arrived at, correct?

24 A     That is my understanding of the context that would

25 create a difference in circumstances.

1  Q     And that is your understanding of a context based on

2  your review of what makes these -- why the Brouillard case

3  might be different from, let's say, a hacker case, correct?

4  A     For example.

5  Q     Okay.  And, sir, again, when you talk about the 262

6  prepetition cases that settled before the Boy Scouts filed

7  for bankruptcy you didn't look at the other prepetition cases

8  -- not just Guam, but you didn't look at the other

9  prepetition cases that didn't settle, correct?

10  A     No, I didn't have the information on the cases that did

11  not settle.

12  Q     You had no data points as to any case, any prepetition

13  case, that didn't settle, correct?

14  A     Well I have the information in the POC for the

15  individuals who checked the box and said they had prior

16  litigation, but I don't have -- outside of what is in the

17  proof of claim forms for each of those survivors I don't have

18  any other information on that.

19  Q     Now aside from the Guam cases that were filed as part

20  of this case, this bankruptcy case, in which there are proofs

21  of claim filed you didn't look at any of the other

22  prepetition cases, proofs of claim that didn't settle,

23  correct?

24  A     I did not separate out and segment out those that were

25  prepetition -- claimants that had filed a claim prepetition,

1  I didn't do a separate analysis on those, no.  I have

2  identified that there were approximately just under 2,000 of

3  them.

4  Q     You mentioned that Brouillard was a teacher, that one

5  of his relationships with a plaintiff -- again, in the 69

6  cases in Guam that settled you mentioned that he was a

7  teacher, do you remember that?

8  A     I said that, yeah.  I think that's true.  If that's not

9  I was misinformed.

10 Q     Okay.  So you have no idea whether -- you have not

11 looked at the complaints in those cases to verify whether or

12 not that relationship was actually alleged by the plaintiffs

13 in those cases, correct?

14 A     That's correct.

15 Q     You have no idea how many times any single one of those

16 69 plaintiffs in Guam who settled were abused during scouting

17 events, correct?

18 A     I don't have that information.

19 Q     You have no idea how many of those -- how many of any

20 of those 69 plaintiffs were abused in non-scouting

21 activities, correct?

22 A     I don't have the -- I didn't do an analysis.  I don't

23 have the information on the individuals.

24 Q     And so, sir, when you conducted your analysis of the

25 aggregate value of the 82,000 plus proofs of claim filed in

1  this case your analysis, you know, is not meant to value any

2  single claim that was filed in this case, correct?

3  A    Correct.  I distinguished the methodology that I used

4  as being one that did not do that, but rather applied a top-

5  down aggregate approach as opposed to a claim by claim

6  evaluation which we then added up.  So we did not do that.

7  Q    Okay.  And I just want to talk about that 90 percent

8  deduction or the 90 percent reduction in value based on

9  single abuse -- single -- non-repeat abusers.  Do you know

10  what I am referring to, sir?  I believe it was part of your

11  rebuttal expert report.

12  A    I know what you're talking about, Ms. Wolff.

13  Q    Okay.  Thank you.

14        So that 90 percent reduction that's not a reduction in

15  value that you have ever applied in any of your previous --

16  in any of the previous jobs that your firm has been hired to

17  value -- to give an aggregate value of claims, correct?

18  A    I don't know what you are saying.  I haven't applied a

19  90 percent reduction.  I have done a series of analysis which

20  indicate that that would be a result, but that is not

21  something I applied.  It's not an assumption.

22  Q    Okay.  Now this is the first case in which your firm

23  has been hired to analyze child sex abuse claims, correct?

24  A    That's not correct.

25  Q    I'm sorry, but this is the first mass tort child sex

1   abuse bankruptcy that your firm has been hired to analyze

2   claims?

3   A     That is not correct.

4   Q     I'm sorry, what was the other case that you worked on?

5   A     I would have to check with counsel on whether those are

6   disclosed or not.  This is the -- to be clear, this is the

7   first case that I have worked on other than just some general

8   consulting on methodology, but this is the first case that I

9   have worked on if that helps.

10  Q     That helps, sir.

11        So your expert reports were conducted -- you were the

12  lead in preparing your expert reports in this matter,

13  correct?

14  A     These are my reports.

15  Q     Only your reports, right?

16  A     These are my reports, yes.

17        MS. WOLFF:  I have no further questions.  Thank

18  you so much, Dr. Bates.

19        THE WITNESS:  Thank you, Ms. Wolff.

20        THE COURT:  Thank you.

21        Any other cross?

22        MS. ARNONE:  Your Honor, this is Christina Arnone

23  on behalf of the Guam Committee.  I have just a couple of

24  questions.

25        THE COURT:  Ms. Arnone.

1    MS. ARNONE:  Thank you.

2              CROSS EXAMINATION

3  BY MS. ARNONE:

4  Q    Dr. Bates, I heard you testify yesterday and I am

5  trying to understand the basis for some of your testimony.

6  So I think yesterday I was hearing you testify that

7  Brouillard -- and I also mispronounced his name, so I'm

8  apologies, Ms. Wolff, but I don't think that Mr. Brouillard

9  deserves the respect of pronouncing his name correctly

10 anyway.

11        So I heard you testifying yesterday about Brouillard's

12 abuse and that it was your understanding that the abuse for

13 the prepetition settlements that there was a significant

14 amount that related to church related abuse or that was non-

15 scouting related abuse. Is that correct?

16 A    That is the explanation that I was given on why it was

17 that there was a low percentage paid.  The --

18 Q    Who gave you that explanation?

19 A    Mr. Griggs.

20 Q    Mr. Griggs?

21 A    Yes.

22 Q    And then I thought I also heard you say, yesterday, at

23 one point that you were determining the amount of scouting v.

24 non-scouting abuse based on the amounts of the settlement

25 that you assumed that those settlements reflected the amount

1  of institutional responsibility on the part of BSA.  Is that

2  correct?

3  A    The last part of your sentence I agree with, yes.  I

4  didn't quite understand the first part, but, yes, my

5  understanding is that the values that they paid, mid-five

6  figure settlements, is attributable to the fact that they had

7  a low institutional responsibility for the BSA.

8  Q    I thought I heard you testify yesterday at one point

9  that the amount of -- that you thought that the amount of the

10  settlement was reflecting the amount of institutional

11  responsibility on the part of BSA, is that correct?

12  A    I think that is saying the same thing, yes.

13  Q    Okay.  So you were assuming, based on what Mr. Griggs

14  told you, and the amount of prepetition settlements that the

15  abuse by Brouillard was predominately church related abuse?

16  A    I was -- I assumed that's the (inaudible) because of

17  his positon as a priest, yes.

18  Q    Okay.  But you didn't review any of the proofs of claim

19  that were filed in the Boy Scouts case that allege abuse by

20  Fr. Brouillard, correct?

21  A    I don't recall looking at any of those.  I have looked

22  at hundreds of others, but I don't recall those.

23  Q    And you didn't review any of the complaints filed in

24  the over 140 lawsuits filed in Guam?

25  A    I reviewed no complaints.

1  Q    Did Mr. Griggs provide you a breakdown of the analysis

2  done by BSA as to the amount of incidents of abuse that

3  occurred that were scouting related v. non-scouting related?

4  A    I didn't get into that.  No, he did not provide it.

5  Q    So you didn't have any facts or data other than the

6  word of defense counsel to make an assumption that Fr.

7  Brouillard's abuse was predominately church related, is that

8  right?

9  A    That is the impression I have, yes.

10              MS. ARNONE:  No further questions.

11              THE COURT:  Thank you.

12              Any other cross?

13          (No verbal response)

14              THE COURT:  I don't see any.  Redirect.

15              MR. KURTZ:  Very briefly, Your Honor.

16                      REDIRECT EXAMINATION

17 BY MR. KURTZ:

18 Q    Dr. Bates, I think you will recall having testified

19 rather extensively yesterday that your procedure under the

20 TDP's is to start with a base value and then to apply

21 scalers, aggravating scalers, for increases and mitigating

22 scalers for decreases.  Do you recall that testimony?

23 A    Yes, I do.

24 Q    And I want to pull-up JTX 1-353.  Go to internal page

25 14, but, otherwise, page 167 of 459.  Can we pull-up (a),

1  please, the claim matrix.

2      You were asked by Mr. Karlan whether the Bates value

3  was a default number which seemed to be different to me then

4  what you had said about using it as a starting point prior to

5  the application scalers.  Do you remember Mr. Karlan reading

6  this language to you?

7  A    Yes, I recall him reading that language.

8  Q    All right.  But he stopped before the sentence was

9  over.  So I just want to get into the record this is the

10  Bates matrix value column for each tier represents the

11  default allowed claim amount for an allowed abuse claim

12  assigned to a given tier.  I think he stopped there.  Let's

13  continue, in each case, based on historical abuse settlement

14  litigation outcomes which included release for all BSA

15  related parties, including the BSA, and all putative

16  protected parties to such actions prior to application of the

17  scaling factors described in Article 8(d).

18      Is that consistent with your understanding of how the

19  TDP's were structured and how they operate?

20  A    Yes.  That's what I was eluding to in the answer to his

21  question.

22  Q    Right.  So is there any default value that applies on

23  the TDP's as you understand it?

24  A    I think this is just, sort of, discussion over the

25  language, the word "default" and what it means.  I think it

1  has several meanings.  I think of that word in this context

2  as meaning starting point.

3  Q      Then prior to the application (inaudible)?

4  A      Exactly.

5  Q      Then the only other area I was going to ask you about

6  is Mr. Karlan had gone through what the average was of the

7  single abuser claims for penetration four settlements which

8  was in $25,000 range.  Do you recall that?

9  A      I do.

10 Q      And I think you were indicating to Mr. Karlan that

11 there was a fifth settlement which I believe is $1.75

12 million, is that right?

13 A      And do you know what the average, therefore, of all of

14 those single abuser penetration claims were?

15 A      $520,000.

16 Q      Okay.  It was $520,000 in reasonable proximity to the

17 baseline of $600,000?

18 A      I think the relevant part is that $600,000 is

19 intermediate between the extremes and, therefore, requires

20 that basically using a combination of both matrix values and

21 the scalers, mitigating and aggravating, to get to either of

22 the ranges in which the claims have actually been observed.

23           MR. KURTZ:  I have no further questions, Your

24 Honor.

25           THE COURT:  Thank you.

1          MR. KARLAN:  Nothing further, Your Honor.

2          THE COURT:  Thank you.

3          Dr. Bates, you're excused.

4          THE WITNESS:  Thank you, Your Honor.

5     (Witness excused)

6          MR. KURTZ:  Your Honor, I think the next witness

7   up is Mr. James Patton.  He will be presented (inaudible) by

8   the FCR.  I am assuming it is Mr. Guerke who is going to do

9   that since he's appeared all of a sudden.

10          THE COURT:  Okay.

11          MR. GUERKE:  Good afternoon, Your Honor.  Kevin

12  Guerke from Young Conaway on behalf of the FCR.  I will be

13  handling Mr. Patton's testimony today.

14          THE COURT:  Let me just rearrange here for a

15  moment.

16          Mr. Guerke.

17          MR. GUERKE:  Thank you, Your Honor.

18          The FCR's direct testimony will be offered by

19  declaration like other witnesses in this case.  We received

20  objections to his declaration from certain insurers who filed

21  a response today to those objections.  Nearly every paragraph

22  received vague objections for lack of foundation, relevancy,

23  undisclosed non-lay witness testimony.

24          Mr. Patton is the court appointed --

25          MS. MCNALLY:  Your Honor, I apologize for

1  interrupting, sir, would it be possible to exclude the

2  witness from this conversation?

3          THE COURT:  Mr. Patton, I don't know if you're in

4  the same room or where you are, but if you could excuse

5  yourself from this conversation and we will let you know when

6  to come back.

7          MR. PATTON:  Somebody send me a text.  Thank you,

8  Your Honor.

9          THE COURT:  Thank you.

10          MS. MCNALLY:  Then, Your Honor, it is our

11  objection so I would prefer, if it's okay with you, if we

12  could present those objections before we hear rebuttal to

13  them.

14          THE COURT:  Fair enough.  Ms. McNally.

15          MS. MCNALLY:  Thank you, Your Honor.  Good

16  morning.  Laura McNally on behalf of Continental Insurance

17  Company and for the certain insurers.

18          Your Honor, this is an expert report or a legal

19  brief. I'm not sure which one it is, but it is not proper

20  fact testimony.  I would like to go through the many reasons

21  why that is.

22          First, this is opinion testimony.  There can be no

23  doubt this document is rife with opinion testimony.

24          Paragraph 12,

25          "I believe the plan represents a reasonable

1  resolution."

2          Paragraph 22,

3          "I believe the contribution is substantial."

4          Paragraph 30,

5          "I believe the issuing of the injunction is

6  necessary."

7          Paragraph 40,

8          "I believe the TDP's are fair."

9          Paragraph 40 again,

10         "I believe it's appropriate for the bankruptcy

11 court to render findings."

12         Paragraph -- same paragraph, he says it,

13         "My opinion is based on my own for whatever

14 reason."

15         Paragraph 47,

16         "I believe the safeguards are adequate."

17         Paragraph 68,

18         "I believe the criteria are appropriate."

19         This is opinion testimony and there can be no

20 question about that.  More than that, more than my view of

21 it, if you look in the binder we sent you, Your Honor, we

22 included interrogatory answers. Interrogatory number three,

23 if I can -- I will wait a second while you pull it up, we can

24 also show it on the screen.

25         THE COURT:  I don't have that binder either. I am

1  not certain what is happening here with the certain insurers

2  cross binders.

3          MS. MCNALLY:  Okay.  Well for this part of the

4  argument, Your Honor, I can show some things on the screen.

5  It's not critical that you have the binder handy.

6          Interrogatory number three, we asked,

7          "If you contend the values, including the base

8  values, and the maximum values, and scaling factors set forth

9  in the TDP, are fair and equitable, as used in the plan, set

10  forth all facts."

11          Now we had an objection back: "Calls for a legal

12  conclusion."

13          Interrogatory number four,

14          "If you contend the values and scaling factors set

15  forth in the TDP are fair and reasonable, as used in Section

16  1129 of the Code, set forth all facts supporting this

17  contention."

18          Objection includes this line,

19          "The FCR further objects to this request to the

20  extent it calls for a legal conclusion."

21          These are directly the opinions we're now seeing

22  and we got this objection legal opinion.  So it's a legal

23  opinion.

24          Now, was it disclosed? It was not disclosed as an

25  expert.  In fact, the FCR has produced no expert reports.

1  They certainly did not produce an expert report that included

2  all of these opinions.  And, as I just read, we asked for

3  certain of these things in discovery.  Not only did we get

4  objections, we got this answer,

5           "Subject to and without waiving the foregoing the

6  FCR has not yet taken a position as to whether the value s

7  and scaling factors set forth in the TDP's are fair and

8  equitable.  The FCR's support of the plan of TDP's to date

9  has been based on representations and information provided by

10 the debtor through privileged mediation communication.  The

11 FCR's positon on this issue is subject to evidence provided

12 by the debtor and in accordance with plan confirmation."

13          We didn't get an answer.  We got that.

14          Question number four, when we asked,

15          "Are the values fair and reasonable?"

16          Same answer,

17          "The FCR has not yet taken a position."

18          So when did this all happen?  When were they

19 uncertain of their view?  When was this served on us?  This

20 was served on us March 7th, a week before the trial.  March

21 7th, 2022, just days ago signed by the witness himself.  As I

22 recall, it was signed under penalty of perjury.

23          Most interesting to me, Your Honor, if you look

24 down at the bottom at the document number of these discovery

25 responses it's a document -- you know, these -- I'm in --

1 these are document management systems where each document

2 newly created gets a new number.  That number, 291 and it

3 goes on.

4 Now we look at the declaration filed with the

5 court that lays forth all of these opinions.  That number is

6 lower.  That number starts with 290.  Suggesting that that

7 declaration was, at least, begun.  There are (inaudible)

8 versions here.  It was, at least, begun before we got a

9 rebuff to our discovery request.  These opinions were

10 requested.  They were either required under Rule 702 or they

11 were, at a minimum, requested in the interrogatories.  We did

12 not receive them.

13 Now in the response the FCR says these are just

14 lay opinion, we don't need to do disclosures.  I'm not sure

15 how that relieves them of their interrogatory obligations,

16 but still they say it is Rule 701.  So let's talk about Rule

17 701.  And I have provided -- and we have here this is Rule

18 701.  There are some requirements of Rule 701.  First, the

19 information has to be rationally based on the witness's

20 perception and it has to be based on non-specialized

21 knowledge.

22 Now the advisory committee notes explain what is

23 the purpose of Rule 701; why is it here.  The advisory

24 committee notes for the 2000 amendments describe the

25 prototypical examples.  Prototypical examples of Rule 701

1  testimony is things like appearance of persons or things; he

2  looked drunk, he seemed tired.  Identity; looks like that

3  guy.  Manner of conduct; he was being erratic.  Competency of

4  a witness; he seemed out of it.  Degree of light or darkness;

5  it was hazy that day.  How is the sound; it was loud.  What

6  was the size; it was huge.  Weight, distance, endless number

7  of items that cannot be described factually.  That is the

8  purpose.  Those are the types of opinions that come in under

9  Rule 701, not a retained expert who spends the beginning of

10 his report talking about all his experience.  That is

11 specialized knowledge.

12        Now requirement number one, it has to be based on

13 the witness's perception, I will get back to that, and,

14 second, not within the specialized knowledge.  Now the

15 amendments in 2000 talk about the importance.  That is when

16 they added this letter C.  It wasn't originally in 701, but

17 it was added.  The 2004 amendment notes say it was amended to

18 eliminate the risk -- this is the exact reason,

19        "To eliminate the risk that the liability

20 requirements set forth in Rule 702 would be evaded through

21 simple expedient of proffering an expert in lay witness

22 clothing."

23        By channeling testimony that -- this is what it

24 continues,

25        "By channeling testimony to Rule 702 the amendment

1 ensures that a party will not evade the expert witness

2 disclosure requirements set forth in Federal Rule of Civil

3 Procedure 26 by simply calling an expert witness in the guise

4 of a lay person."

5         That is exactly what is going on right here.  This

6 is exactly what is going on right here.  So how do we know?

7 Well, let's see, we start with the declaration Paragraphs 5

8 through 8 with a lengthy qualification section.  If you are a

9 fact witness just giving your explanation of it was loud, he

10 seemed out of it, you don't need all this description of your

11 qualifications.

12         These cases that are selected here are specialized

13 experience in mass tort bankruptcies.  So it's not just I'm a

14 lawyer who knows about bankruptcy.  Its I'm a lawyer who

15 knows about bankruptcy in the unique context of mass torts.

16 That is specialized knowledge.

17         Mr. Patton, to his credit, says the quiet part out

18 loud,

19         "For the reasons described above, as well as my

20 own experience as the future claims representative in these

21 cases and others, I believe…"

22         That is in Paragraph 68.  He is admitting,

23 specialized knowledge right here.  It has been separately in

24 Rule 701, it has to be based -- the information has to be

25 based on personal knowledge.  This is also a requirement

1  under Rule 602 for foundation.  The witness may testify only

2  to a matter only if evidence is introduced sufficient to

3  support a finding that the witness has personal knowledge of

4  this matter.

5          The cases that permit Rule 701 lay testimony

6  require that that lay testimony be based upon personal

7  knowledge of the witness.  Now throughout this process --

8  throughout this declaration, excuse me, there are many

9  descriptions of things that happened. It's sort of like voice

10 of God narration throughout the process.

11         It's not the first person story of James Patton as

12 described.  Its statements about what debtors believed, what

13 Century believed, what the claimant representatives

14 collectively did.  There are a few scattered here and there

15 statements that use the term "I", but often its "I believe."

16 It's not "I did," it's not "I saw," it's not "I said"; its "I

17 believe."  Otherwise, most of the descriptions throughout

18 this thing are based on this, kind of, third-party view of

19 what happened without any statements that establish that this

20 individual is describing things he personally witnessed.

21         Now how do we know?  Why don't we just get up and

22 ask him.  Well here are things we do know.  In his deposition

23 he was asked,

24         "The plan, the TDP's plan, did you personally

25 participate."

1            We were talking about negotiation.  His answer,

2            "Well, through my team there were a lot of

3    conversations and discussions regarding the TDP and trust

4    agreement that I had with my team.  I did not personally

5    participate in negotiations over the plan with anybody."

6            It's right there.  Now that was in November.

7    Okay, let's see that happened after that.  Now on February

8    11th I think we will all recall this mission accomplishment

9    announcement of February 11th Ms. Lauria said that,

10           "The big reveal of the new plan is the result of,

11   at least by my count, fifteen days of in-person mediation

12   over the course of the last five weeks or so."

13           So what is five weeks from there, that's January.

14   Well we have the January bills of the FCR.  We don't know

15   what is in February because we haven't seen it yet.  We have

16   the January bills.  Those bills would demonstrate who

17   attended the mediation.  They don't show a single time Mr.

18   Patton wrote attended a mediation.  We see other people,

19   there certainly were others, but there aren't time entries

20   from Mr. Patton saying he attended a mediation.

21           We talked about the mediation with his team, no

22   doubt.  I am not making the statement that he is inventing

23   any of this; that is certainly -- I am absolutely not taking

24   that position.  My point is, Your Honor, this is not based on

25   his personal observation.  This is based on hearsay and for

1  that reason it fails 602, but for that reason also it cannot

2  qualify as lay opinion testimony.

3          So, Your Honor, we ask that this declaration not

4  be permitted to substitute for direct testimony.  If he were

5  on the stand saying these words they should all be stricken

6  because they fail to comply with the discovery rule, they

7  fail to comply with the requirement of personal knowledge,

8  they fail to meet the burdens of Rule 702, they're prejudiced

9  to the insurers, and they do not -- as to relevance we did

10  make relevance objections.

11          We made relevance objections, Your Honor, because

12  they fail that all of these predicate steps Mr. Patton's

13  views are not relevant to issues on confirmation.  It is not

14  about the good faith of the FCR.  Confirmation is asking

15  about the issues, the debtor's business judgment, the good

16  faith of the debtor.  And for that reason we don't think his

17  personal views divorce from the foundational requirements

18  that the rules of evidence have any relevance to what we are

19  doing here.  For that reason this should all be excluded.

20          THE COURT:  So you're not suggesting, are you,

21  that an FCR who happens to be a lawyer, and has personal

22  knowledge couldn't testify about his participation in the

23  case, are you, or his observations or thoughts on why as an

24  FCR he approved or didn't approve a particular settlement, or

25  supports, or doesn't support a plan.

1    MS. MCNALLY:  Your Honor, there is no rule -- I'm
2  not saying that he is barred from ever putting testimony like
3  that into a trial.  It has to be done properly.  If it's
4  asked about in discovery it needs to be answered.  If it's an
5  opinion -- so in the example you just gave can you testify
6  about what he did.  Sure, I did this, I did that, I did this,
7  I did that; fine, its fact testimony.  That second part of
8  what you said, why he thought it was fine, why it's a good
9  idea, that is opinion testimony.

10    Sure it's a hassle to have to go through the
11  requirements of the rules, but the rules are what they are.
12  Those are expert opinions that should be disclosed in
13  advance.  Maybe that is not what always happens.  I will
14  grant you that, maybe that is not always what happens, but
15  that is what the rules require.

16    The fact that many parties might not mind is, sort
17  of, beside the point.  We mind.  We mind and we were raising
18  the rules of evidence and the rules of civil procedure to say
19  this is not appropriate.  Without consent -- I mean here's
20  the thing, without consent this should not be allowed to be
21  dumped on us days after, under penalty of perjury, saying we
22  don't know our opinions on these.

23    THE COURT:  Well that I would like to hear about.
24  So let's say we had a CFO of a corporation speaking about the
25  company's finances.  Is he giving lay expert testimony and

1  does he have to have an expert report on that or is he just

2  testifying because it's his job.

3        MS. MCNALLY:  Well that is a good example, Your

4  Honor.  There are actually cases on that exact point. I think

5  it's even referenced in the rules to say in that case the

6  individual -- that is proper -- whether I would agree with

7  that is -- there is case law on that point.  There is a lot

8  of case law on this point.  There is case law on that point

9  that when an executive, who is describing his business --

10  business judgment is the fact at issue.

11        The FCR's view of the world is not really a fact

12  at issue.  A CEO's finances might be a fact at issue and he's

13  explaining why he did what he did offered for a purpose other

14  than their opinion, its offered to explain, for example, why

15  he took certain steps or didn't take certain steps for that

16  limited purpose, it's not offered for his opinion as the

17  validity of the opinion, its offered to explain things that

18  he did.  There are cases exactly on that point.  There are

19  not cases on this one.

20        THE COURT:  Okay, because there is not a lot of

21  FCR's running out there in the world.  He was appointed as

22  the FCR.

23        MS. MCNALLY:  He was.  And in that capacity -- I

24  apologize, Your Honor, in that capacity he has filed a brief

25  in support of confirmation, a response to the objections

1  challenging confirmation.  He lays -- I don't think if you

2  were to line these two up, the brief in support and his

3  declaration, you are going to be surprised.  He makes all of

4  these assertions in his legal brief because that is,

5  essentially, what this is.  This is a legal brief created

6  after interrogatories were closed, after trial testimony was

7  underway, massaged along the way to address points that are

8  in a legal brief and to the extent they're not they should

9  have been disclosed, either interrogatories or under Rule

10  702.

11              THE COURT:  Thank you.

12              Mr. Guerke.

13              MR. GUERKE:  Thank you, Your Honor.

14              The first point I would like to make is that none

15  of that that was included in that presentation were presented

16  in the objection that was filed with the court that we

17  responded to.

18              Mr. Patton is the court appointed future claimants

19  representative. He represents a constituency that does not

20  have a voice in this case.  Mr. Patton is a plan supporter.

21  His testimony describes the reason why he supports the plan.

22  Like the representative for the TCC Mr. Patton will describe

23  his role in the case and the reasoning's why he supports this

24  plan through the declaration.

25              As the court noted in the Imerys case the FCR is a

1  guardian ad litem for those who cannot represent themselves.

2  One of the primary reasons Mr. Patton was appointed was

3  because of his extensive experience with mass tort

4  bankruptcies.  His views in this case are certainly relevant.

5  He has been identified as a trial witness.  He was deposed in

6  this case and he responded to discovery.

7         He is not being offered as an expert witness under

8  Rule 702; although, his personal knowledge and experience in

9  mass torts has informed his reasoning and decisions that he

10 has made in this case. Any views or opinions offered are lay

11 witness opinions based on his personal participation,

12 knowledge and real time perceptions of events that occurred.

13        I will note in Paragraph 4 of his declaration it

14 states,

15        "This declaration is based upon my personal

16 knowledge and experience in these Chapter 11 cases, my review

17 of various documents and other due diligence.  This

18 declaration describes my recollection and analysis at this

19 time based on the information currently available to me."

20        So it is based on his personal knowledge and he

21 has described it as being based on his personal knowledge.

22 The FCR, for some of the parts where he's describing

23 documents it's generally background on those documents,

24 foundation for his declaration, the reasoning why he supports

25 the plan.  Mr. Patton will be subject to cross examination

1  and the court will give his testimony the weight it deems

2  appropriate.

3           I don't think under the circumstances that a

4  proffer is necessary to establish his personal knowledge, but

5  we're prepared to make a proffer if that is required.

6           THE COURT:  So let me ask about the responses to

7  discovery.  And I don't have them in front of me, but the

8  responses to discovery which were just served on March 7th.

9           MS. MCNALLY:  Your Honor, I apologize.  I got word

10  that the binder is there, it just didn't -- did you have it?

11          THE COURT:  No, I don't.  We're going to take a

12  break at some point and I am going to see if I can find it.

13          MS. MCNALLY:  Okay.

14          THE COURT:  I apologize for that, but the clips

15  that were shown reflect that the response to questions about

16  the TDP's were met with this is a legal response.  So is he

17  testifying on a factual matter with respect to the TDP's, but

18  -- I don't understand that response to the question.

19          MR. GUERKE:  Your Honor, I don't have the

20  interrogatory in front of me, but I recall it was put up on

21  the screen.  It related to a specific scaling factor

22  question. I don't believe the specific scaling factor

23  question is addressed in the declaration; however, the

24  overall structure of the TDP's is described in the

25  declaration.  In many respects it's a cut and paste with

1 citations, but that is the process -- those are important

2 elements to Mr. Patton's ultimate decision to support the

3 plan and is describing the background.

4          THE COURT:  Okay.  I need to see the discovery.  I

5 would like -- Mr. Guerke, I would like you to have it and be

6 able to give me a response as to why given the response that

7 was just filed on March 7th to discovery Mr. Patton should be

8 able to testify at all inconsistent with that response.  I'm

9 not say it is because I don't have it in front of me.  So I

10 need to get it.  I would like you to have an opportunity to

11 look at it and that is what I am, quite frankly, most

12 interested in.

13          Other than that I think cross examination on his

14 personal knowledge is wholly appropriate and I will let you

15 do that.  But what I am more concerned about is the discovery

16 responses.

17          MS. MCNALLY:  Your Honor, for Mr. Guerke's benefit

18 those discovery responses are also in the binder materials

19 that we provided earlier this morning.

20          THE COURT:  Okay.  And when do you think the

21 binder came over, this morning?

22          MS. MCNALLY:  Let me see what I can find out here.

23          THE COURT:  For some reason I'm not getting those.

24          MS. MCNALLY:  I'm just getting a text here.  Hold

25 on.

1          THE COURT:  Thank you.

2          MS. MCNALLY:  We have confirmation of delivery.

3   We can check on the time.  I apologize.

4          THE COURT:  Okay.  Was it this morning, do you

5   know?

6          MS. MCNALLY:  Yes, it came in this morning.  It

7   came in during Dr. Bates's testimony.

8          THE COURT:  Oh, okay.  Thank you.

9          Let's take five minutes.  Let's see if -- well,

10  let's take 10 minutes so you can get the discovery and I can

11  find the binder.  Then we will come back.

12         MS. MCNALLY:  Thank you.

13         THE COURT:  We're in recess.

14     (Recess taken at 10:30 p.m.)

15     (Proceedings resumed at 12:44 p.m.)

16         THE COURT:  This is Judge Silverstein.  We can go

17  back on the record.

18         General statement, parcel seems to be running a

19  little bit behind on the delivery of binders.  So please give

20  them enough leeway to get stuff over here on time.  We just

21  got Dr. Bates's cross-exam binder and we have just gotten the

22  one for Mr. Patton.  So I do have the one for Mr. Patton.

23  But just as a general statement.

24         MS. MCNALLY:  Apologies, Your Honor.

25         THE COURT:  Mr. Guerke, I am looking at the

1   interrogatory responses which were sworn to on March 7th of

2   2022 and in particular interrogatories three and four which

3   ask questions regarding the values, including the base values

4   and maximum values and scaling factors, and whether they are

5   fair and equitable as that term is used in the plan and in

6   the findings.  The response is some objections, it does say

7   legal conclusion, etc., but it says,

8              "Subject to and without waiving the foregoing, the

9   FCR has not yet taken a position as to whether the values and

10  scaling factors set forth in the TDP's are fair and

11  equitable."

12             Then it does go on and that was on March 7th.  So

13  when did the FCR have an opinion, take a position?

14             MR. GUERKE:  Your Honor, the interrogatories

15  address specifically the values and scaling factors to the

16  TDP's.  Mr. Patton's declaration describes the structure of

17  the TDP's.  He talks about the general criteria of the TDP's

18  and that they achieve a substantially similar payment for

19  claimants.  It's not the focus -- the scaling factors and

20  value are not the focus.  We believe it's consistent -- the

21  interrogatories and declarations are consistent although they

22  are slightly different subjects.

23             As far as the timing goes, Your Honor, this has

24  been a process and Mr. Patton's views have been informed by

25  evidence that has been presented in this case and what has

1  led to the confirmation trial.  In the event there is a

2  specific sentence that is objectionable we would suggest that

3  that specific sentence would be addressed with a scalpel and

4  not some wholesale exclusion of his testimony.

5          The last thing I will say, Your Honor, is they're

6  out to cross-examine Mr. Patton potentially and they're free

7  to ask him questions about his process and what documents he

8  reviewed, his personal knowledge and the sequence of events.

9  But they are asking about addressing two different concepts.

10          THE COURT:  He had an opinion on the $3,500

11  expedited distribution and he answered that in detail with

12  what supports that.

13          MS. MCNALLY:  Your Honor, if I may point the court

14  to Paragraph 71 of the declaration which refers specifically

15  to findings X and Z.  Particular citations.  Finding X asks

16  is the one that says the criteria included in the TDP's

17  pertaining to the calculation of and it lists values, scaling

18  factors.  That is letter X, its right there.  This

19  representation about high level approval is just simply

20  inaccurate.

21          So he cites to those findings, he cites to other

22  findings and he then says I view the findings, and he

23  repeatedly through the many remaining paragraphs talks about

24  on a wholesale basis approving the findings.  He doesn't say

25  I approve the findings except for the values which I am not

1  too sure about.  He says as a whole opining on the findings.

2           THE COURT:  Do you have a response to that?  Do

3  you have a response to Paragraphs 70 through 77 which

4  specifically address the findings?

5           MR. GUERKE:  Those paragraphs describe Mr.

6  Patton's views based on his role as the FCR.  He is

7  experienced with these trusts and an explanation on why he

8  supports the plan.  Why the findings are important to his

9  constituency.

10          THE COURT:  Okay.  So why didn't he respond to

11 interrogatory three and four with that type of response,

12 answer?

13          MR. GUERKE:  As stated, Your Honor, in the

14 interrogatory -- may I have a moment, Your Honor?

15          THE COURT:  Yes.

16      (Pause)

17          MR. GUERKE:  Those are about why the findings are

18 necessary, not about the facts underlying the findings.

19 Also, in our interrogatory response the FCR states that his

20 position was subject to evidence provided by the debtors and

21 others in accordance with plan confirmation.

22          MS. MCNALLY:  Your Honor, this was days ago the

23 evidence that has come into trial is a surprise to no one.

24 This is simply too cute.  We asked for this information and

25 it should have been disclosed.  It shouldn't be -- this is

1  backstop of information that other witnesses have not been

2  able to provide and it is inappropriate to be adding it

3  through this vehicle.

4          THE COURT:  Well I question whether Paragraphs 70

5  through 77 are even -- are not argument.  I don't know

6  exactly what they are.  I am troubled by these discovery

7  responses, lack of response.

8          I am going to give Ms. McNally a lot of leeway in

9  her cross examination and I am likely to exclude a lot of

10  this testimony, but I would like to hear his personal

11  knowledge and I would like to hear when he formed his views

12  and we will go from there.  I think that certainly some of

13  this testimony is going to be excluded.  I am not sure, quite

14  frankly, how much.

15          MS. MCNALLY:  Thank you, Your Honor.

16          THE COURT:  It's almost one o'clock.  We're going

17  to take the lunch break and then we will start the

18  examination.  I am going to read the declaration again in

19  light of the discovery responses and the arguments I have

20  heard.  So we are going to take our break now.  It's 12:54.

21  We will come back at two o'clock and we'll start.

22          MS. MCNALLY:  Thank you, Your Honor.

23          THE COURT:  We're in recess.

24      (Recess taken at 12:54 p.m.)

25      (Proceedings resume at 2:01 p.m.)

1          THE COURT:  Okay.  This is Judge Silverstein.
2   We're back on the record.

3          I've reviewed the -- Mr. Patton's declaration, in
4   light of the discovery responses.  And I'm not going to
5   permit Mr. Patton to testify with respect to anything that
6   speaks to the fair and equitable findings or how the words
7   "fair and equitable" -- or "fair and reasonable" -- whether
8   the values and scaling factors in the TDPs are "fair and
9   reasonable," as that term is used in Section 1129.  So I'm
10  not going to permit him to testify on anything responsive --
11  that would have been responsive to Interrogatory Number 3 and
12  Number 4, given the responses that were actually made.

13         As far as the remainder of the objections, I'll
14  hear the cross on his personal knowledge and take it from
15  there.

16         MS. MCNALLY:  Thank you, Your Honor.

17         THE COURT:  Okay.

18         MR. GUERKE:  Thank you, Your Honor.

19         Again, Kevin Guerke from Young Conaway on behalf of
20  the FCR.  Mr. Patton --

21         MS. MCNALLY:  Do we want to swear the witness --

22         THE COURT:  He's just talking.

23         Go ahead, Mr. Guerke.

24         MR. GUERKE:  Mister --

25         MS. MCNALLY:  I apologize.

1            MR. GUERKE:  Mr. Patton has joined, Your Honor, and

2  we request that his declaration be admitted into evidence,

3  subject to the ruling you just made.  And he's prepared for

4  cross-examination.

5            THE COURT:  Okay.  Thank you.  I will admit it,

6  subject to the rulings that I've just made.

7        (Patton Declaration received in evidence)

8            THE COURT:  And Mr. Patton, I'm going to swear you

9  in.  Can you raise your right hand, please?

10 JAMES PATTON, WITNESS FOR THE FCR, AFFIRMED

11           THE COURT:  Please state your full name and spell

12 your last name for the record.

13           THE WITNESS:  My name is James Leland Patton, Jr.,

14 and my last name is spelled P-a-t-t-o-n.

15           THE COURT:  Thank you.

16           Ms. McNally.

17                       CROSS-EXAMINATION

18 BY MS. MCNALLY:

19 Q    Good afternoon, Mr. Patton.

20 A    Good afternoon.

21 Q    Thank you for your time.

22      During the lunch break, did you speak with anyone?

23 A    I did.

24 Q    Who did you speak with?

25 A    I spoke with my counsel.

1  Q    Did you discuss, in any way, any aspect of your

2  testimony at all today, other than the timing?

3  A    I did.

4  Q    And please describe that conversation.

5        MR. GUERKE:  Objection, Your Honor.  Objection,

6  Your Honor.  It's attorney/client privilege.

7        MS. MCNALLY:  Could we start with can you describe

8  --

9        THE COURT:  Yeah.

10       MS. MCNALLY:  -- the subject of the conversation?

11       THE COURT:  Yes, let's start with that.

12       THE WITNESS:  So we discussed that there was a

13  question raised about -- that -- with respect to the

14  objection that was filed yesterday or the day before with

15  respect to my declaration, that that had been raised and was

16  discussed and -- which I had seen.  It has to do with the

17  question of whether or not as a lay witness, testimony, and

18  that the -- Judge Silverstein was going to rule on some of

19  the issued that had been raised once we returned.

20  BY MS. MCNALLY:

21  Q    Did you -- were you -- did you review any additional

22  materials in -- after the -- during the lunch break?

23       MR. GUERKE:  Objection, Your Honor.

24  Attorney/client privilege and work product.

25       THE COURT:  Not as the -- that's a yes or no.

1     THE WITNESS:  Yes.

2  BY MS. MCNALLY:

3  Q    And what materials did you review?

4     MR. GUERKE:  Same objection --

5  A    I looked at --

6     MR. GUERKE:  -- Your Honor.

7     THE COURT:  Are you --

8     MS. MCNALLY:  Your Honor --

9     THE COURT:  -- directing --

10    MS. MCNALLY:  Your Honor, it's simply asking what

11  materials he looked at.  There's no -- there's no counsel in

12  that conversation.

13    THE COURT:  I guess it depends on who gave him the

14  documents to review.  Let's find out.

15  BY MS. MCNALLY:

16  Q    Sir, are you in -- are you -- where are you?  Is there

17  anyone in the room with you?

18  A    No.

19  Q    Is your counsel along wtih you in the room?

20  A    No.

21  Q    I mean, in the vicinity.

22  A    No.  Well, same general building, but no.

23  Q    Okay.  Thank you.

24    How did you determine what materials to review?

25  A    Well, I have a copy of the pleading you filed.  And I

1  took a look at my declaration.  And I was told that there was

2  an issue with respect to our discovery responses, so I -- I -

3  - I -- I asked for and looked at some of that material.

4  Q    Okay.  All right.  Well, then we're all caught up, it

5  appears.

6       Let's start with your declaration.  As I understand your

7  dec -- see that your declaration looks like there are three

8  kind of main parts:

9       There's the first part that talks about your background;

10      A center part that talks about what happened in the

11  negotiations;

12      And a third part at the end that kind of walks through

13  your thoughts on those things.

14      And that's going to be just roughly the road map I use

15  today.

16      So let's start with your background.  In Paragraph 7 of

17  your declaration, you talk in some detail about prior

18  representations.  Do you have the declaration for -- handy?

19  A    I do.  Paragraph 7, I got it.

20  Q    Okay.  I should ask:  Who drafted this declaration?

21  A    A lot of people.  It's -- it was worked over pretty

22  thoroughly.  I changed a great deal of it, others changed a

23  great many parts of it.  I don't think it has an author, in

24  that sense that there's a drafter.  But it's -- it's a --

25  it's a document that I spent an awful lot of time working

1  over.

2  Q    Like how much would you say?  You said "an awful lot of

3  time."

4  A    I don't know.  Many hours.  It takes -- just to read it

5  once can take close to an hour, if you read it carefully, so

6  many hours.

7  Q    More than -- you, personally.  I just want to be clear

8  because, as you probably were told by your counsel, this is

9  an issue for your testimony.  When I say "you," I mean you,

10  personally; you, as a human you.

11  A    I mean me --

12  Q    And not like --

13  A    -- personally.

14  Q    Yes, okay.

15  A    Yeah.

16  Q    So, when you -- so "many hours" being like --

17  A    More than -- more than -- more than 10, for sure, and I

18  would say less than -- certainly less than 30 --

19  Q    Okay.

20  A    -- but --

21  Q    Thank you.

22  A    -- a lot.

23  Q    And when it says at the bottom "DOC16," does that mean

24  this is the sixteenth version of this document?

25  A    Yes, the sixteenth version of this document.  I don't

1  know that it is the sixteenth version of the declaration

2  because we may have started afresh.  But it's certainly the

3  sixteenth version of this iteration.

4  Q    Okay.  There might have even been other documents under

5  other document numbers earlier, but at least this one, that's

6  the sixteenth version of this one.

7  A    That's correct.

8  Q    And when did you start working on it?

9  A    I don't recall.

10 Q    Well, a month?  Was it -- was it this month?

11 A    Not this month, for sure.  I don't actually recall.

12 Q    Was it this year?

13 A    Well, some of the material comes from content that we

14 borrowed from -- from prior documents that I worked on.  So,

15 in that sense, it goes back quite a bit.  I don't even know

16 if it was this year.

17 Q    Sure.

18       And on -- and this is a good example of what I was just

19 saying.  I asked you about you, not about "we."  So when did

20 --

21 A    I'm talking --

22 Q    -- you (indiscernible)

23 A    -- about me.  I'm talking about --

24 Q    Okay.

25 A    -- me, yeah.

1  Q     So you started working on it maybe last year?

2  A     Well, some of the material in here is material that --

3  for example, what you're looking at right now, it comes

4  straight from another document, it's years old --

5  Q     Sure.

6  A     -- that I worked on (indiscernible)

7  Q     Okay.  So, conceptually, it dates back to the

8  representations that you list in Paragraph 7.

9  A     Correct.

10 Q     I'm just going to try and -- like I don't want this

11 examination to be the rest of our lives here, so I'm going

12 just going to be really particular in my questions.  My

13 question is --

14 A     Sure.

15 Q     -- creation of your trial declaration.  Did that start,

16 contemplated as your trial declaration, this year?

17 A     I don't know.

18 Q     Okay.  Possible last year?

19 A     It's possible.  I -- I just -- I just, frankly, don't

20 know.

21 Q     Okay.  All right.  Let's look at Paragraph 7, and

22 actually Paragraph 6 is -- it's a little -- no, let's go with

23 7.

24       7 is -- talks about prior representations.  And it

25 starts, "My firm and I have represented," and then there are

1  subparts that talk about Young Conaway represents.  So I want

2  to get -- kind of pull that apart a little bit.

3      Part -- Section (a):

4          "Young Conaway represented the legal representative

5  for future claimants in the following cases" --

6      And then there is quite an impressively long list.  Were

7  those -- are you on all of those cases?

8  A    I am on all those cases, some -- and the older they are,

9  the more front-line my role might be.  But to -- to a

10  significant extent, I'd say the vast majority of these, I had

11  a great deal of time working on.  Some I may have been less

12  involved in the day-to-day work.

13  Q    Uh-huh.  Uh-huh.  Just for kind of a gauge, if you say

14  "great deal of time," like on a monthly basis, what counts as

15  a "great deal of time" in your mind?

16  A    Well, I would say, for the last -- well, the last two

17  years, just for an example, I've been billing at round -- I'm

18  not sure what it averaged -- seventeen, 1,800 a year, under

19  billable hours a year.  And for the last two years, almost

20  all my time has been in the mass tort area.

21      Now there's another major case I've been working on,

22  which is the Zohar case.  But my involvement in that has

23  declined over the last two years.  So I would say I've been

24  spending about 1,500 hours a year on mass tort lit.

25  Q    Sorry, my question isn't precise enough.

1    I am -- you were saying on a particular case?

2  A    No, no.  That's what (indiscernible)

3  Q    And -- no.  My question is on -- you said on these

4  cases, I spent sub -- whatever the amount of time was,

5  substantial, I can't remember --

6  A    Uh-huh.

7  Q    -- the adjective.

8    What in your mind, on a particular case, on a monthly

9  basis, counts as a substantial amount of time?  Ten hours, a

10  hundred hours?

11  A    Oh --

12  Q    What counts in your mind --

13  A    Well --

14  Q    -- on a -- per month?

15  A    All right.  So -- so, for the last -- let's take the

16  last two years.  The last two years, I've been working on

17  this case.  I've been working on the Imerys case.  I've been

18  working on the Paddock case.  I've been working on the

19  Mallinckrodt case.

20  Q    Sir, I hate to interrupt, but you're not answering my

21  question.  It is not --

22  A    (Indiscernible)

23  Q    -- tied to your particular -- I'm trying to get a sense

24  of what, in your mind, qualifies as a substantial amount of

25  time on a monthly basis for a case.  Like what is the number

1  of hours, where you say, heck, yeah, that's substantial?

2  What are we talking about, in terms of hours, to qualify for

3  that adjective?

4  A    I don't use the adjective the way you've described it,

5  I'm sorry.  A substantial amount of time on a case is

6  something that's -- the rhythm of a case is something that

7  unfolds in a way that doesn't allow for a steady state of

8  work, except during certain peak periods, a steady state of

9  work on a particular case.  So a "substantial amount of time"

10 would be, in my mind, the way I use the term, that I play a

11 role in the case that -- that required that I stay actively

12 involved in the case on a continuous basis and episodically

13 for, you know, the -- a lot of time into it.  These cases

14 last for years, as you know.

15 Q    Right.  Well, we're going to come back to those points.

16 Thank you.

17       So let's talk about Part (a).  You have 27 matters in

18 Part (a), and you were involved in all of those 27 is what I

19 hear, right?

20 A    Yes.

21 Q    Now 25 of them are asbestos related?

22 A    I -- I don't know.  But I -- if you've counted

23 correctly, I'll accept your representation.

24 Q    Okay.  Of these, one is opioid?

25 A    Mallinckrodt is opioid, yes.

1  Q    And one is tetrachloroethylene?

2  A    Trichloroethylene, yes.

3  Q    Sorry.  Thank you.

4  A    (Indiscernible)

5  Q    And then the rest are asbestos.

6  A    I believe that is probably -- in this list -- hang on --

7  you have Imerys in here.  Some of these are also -- are

8  asbestos and talc -- or sorry -- and silicone.

9  Q    Okay.

10 A    Let's take Kaiser Aluminum as just an example

11 (indiscernible) --

12 Q    Well, to help refresh you, in the first few line -- the

13 first two lines of this paragraph, you say, "The following

14 asbestos bankruptcy cases."  Okay.

15 A    Correct.

16 Q    Let's just do this.  None of these involve sexual abuse.

17 A    That's true.

18 Q    Okay.  And then number -- Part (b):

19         "Young Conaway currently represents the Legal

20 Representative for Future Claimants in the bankruptcies" --

21     And you list five more cases.  Yes?

22 A    Yes.

23 Q    And when you said your -- Young Conaway, did that mean

24 you personally were involved in all of the -- are involved in

25 all of these?

1  A    Yes.  And there's Mallinckrodt, which appears at the end

2  of (a), ought to be added to (b) because it's -- we've gotten

3  through the confirmation hearing, but we're still in appeals,

4  so ...

5  Q    Okay.  And of these six cases then, none of these are

6  sexual abuse cases, either.

7  A    That's true.

8  Q    All right.  And then Part (c), I'm going to have the

9  same questions.  Your legal -- represents the Legal

10  Representative for Future Claim -- Claimants in connection

11  with -- connection with asbestos and other claims.  And of

12  these, you're involved in all of them personally, all the

13  ones in Part (c)?

14  A    Yes.

15  Q    And none of these are involving sexual abuse.

16  A    That's correct.

17  Q    All right.  And then you mentioned you represented the

18  debtor in Fuller-Austin.  That's not a sexual abuse case,

19  it's --

20  A    That's --

21  Q    -- asbestos.

22  A    That's correct.

23  Q    And then, at Paragraph 8, you represented the Catholic

24  Diocese of Wilmington in a bankruptcy case stemming from

25  clergy sexual abuse.  Yes?

1    A    Yes.

2    Q    Okay.  Now that -- you didn't put the docket number or

3    the Court in here, but that was in this district?

4    A    Yes.

5    Q    Okay.  And now, in that case, that's your only prior

6    experience on sexual abuse mass torts, right?

7    A    Well, I'm not sure it's a mass tort case, but it's

8    certainly my only prior experience with a sexual abuse driven

9    bankruptcy.

10    Q    Okay.  There were over a hundred sexual abuse claimants

11    in that case?

12    A    Yes.

13    Q    You're not sure if that's a mass tort bankruptcy?

14    A    There's a -- definitely -- there is a difference that is

15    importance when we move from hundreds of cases to tens of

16    thousands of cases.  And --

17    Q    Okay.

18    A    -- that --

19    Q    So the distinction is simply that maybe the hundred

20    something doesn't count as mass tort.  Is that your point?

21    A    Correct.

22    Q    Okay.

23    A    Correct.

24    Q    Okay.  Now, in that case, you were not working on behalf

25    of anyone seeking compensation, right?

1  A    That's correct.

2  Q    And you weren't aligned in any way in that case with

3  contingency fee counsel when you were doing your

4  negotiations, right?

5  A    In the sense that we were on opposite sides of the

6  negotiations, you are correct.

7  Q    Okay.

8  A    At different points, we may have been aligned on --

9  Q    Sure.

10 A    -- issues.

11 Q    Fair, fair.

12       And ultimately, you did, in that case, get a hundred

13 percent claimant support for the plan?

14 A    I don't know.

15 Q    All right.  You represented the debtor?

16 A    Yes.

17 Q    Okay.  Is it good news to you that you got hundred

18 percent support from -- of the plan?

19 A    I, frankly, can't recall --

20 Q    Okay.

21 A    -- what -- what -- what my mood was when I got that --

22 got the --

23 Q    All right.

24 A    -- voting results.

25 Q    Okay.  Okay.  Well, let's talk about the -- your role as

1  the FCR in this case.

2      You were appointed by this Court to be the future claim

3  -- represent the future claimants, right?

4  A    That's correct.

5  Q    And there was some litigation over what the scope of

6  future claimant would mean, right?  Do you recall?

7  A    I recall a discussion -- a dispute or an argument, if

8  you will, but I don't know -- I don't know if it turned into

9  a fight in front of the Judge, in the sense of litigation.

10  Q    All right.  Well, in the end, the court order has --

11  defines your -- essentially, your portfolio of who qualifies

12  as a future claimant, right?

13  A    That's correct.

14  Q    And that that definition is different from the version

15  proposed in the original motion, isn't it?

16  A    That's correct.

17  Q    So there are really only two categories now of who

18  qualifies as a future claimant, right?

19  A    That is correct.

20  Q    And one would be those who were not yet 18 as of the

21  date of the bar date?

22  A    That's -- the petition date.  Yes, that's --

23  Q    The --

24  A    -- correct.

25  Q    Okay.  Thank you.  The petition date.  So not yet 18 as

1  of the petition date, right?

2  A    Yes, that's correct.

3  Q    Okay.  And the others are those who -- and I'm just

4  going to read here.  It says:

5            "We're not aware of such abuse as a result of

6  repressed memory, to the extent the concept of repressed

7  memory is recognized by the highest appellate court of the

8  state or territory where the claim arose."

9       Right?

10 A    That sounds --

11 Q    All right.

12 A    -- accurate.

13 Q    Okay.  So you understand that that's not just generally

14 people who are saying like I didn't put it together or I

15 didn't realize.  That isn't enough under the -- excuse me --

16 under this definition, correct?

17 A    Well, they -- one needs to have -- one needs to be in a

18 state where the highest court has recognized recovered memory

19 as a viable theory, and one has to satisfy that standard

20 applicable in that state, in order to have a claim.  And it's

21 those people who meet both those requirements that I'm

22 speaking for, that I'm representing.

23 Q    Okay.  Let's take those two groups in turn.

24       The first will be the ones who were not 18 as of the bar

25 date -- or I'm sorry -- as of the petition date, so children.

1  A    Correct.

2  Q    Now we -- I noticed you were logged in doctor -- during

3  -- doctor -- during Dr. Bates' testimony yesterday.  Were you

4  watching that testimony?

5  A    Yes.

6  Q    Okay.  And I'm sure you recall then he had a

7  demonstrative that showed like a -- the slope of claims over

8  time.

9  A    Yes.

10  Q    And there was a dramatic downward slope in the number of

11  claims in recent years.  You'll agree with that --

12  A    (Indiscernible)

13  Q    -- that that was on his chart?

14  A    On his chart, yes.

15  Q    Okay.  Now you haven't -- you're not offering any expert

16  opinion to rebut that data, are you?

17  A    I am not.

18  Q    And so, even as to the limited challenge the FCR

19  originally filed as to Dr. Bates, it never really quibbled

20  with the idea that there was a dramatic decline going

21  forward, you know, over time in the number of claims filed

22  per year.

23  A    I'm not sure --

24  Q    Based --

25  A    (Indiscernible)

1  Q    -- on the --

2  A    I don't believe --

3  Q    -- abuse -- I'm sorry.

4  A    If I understand your question correctly, it's not true.

5  We have a difference of opinion about how many claims are

6  likely to arrive in the future from the universe of

7  individuals who were children before the bankruptcy.  But for

8  purposes of this confirmation process, that is not something

9  that the Court is being asked to determine or needs to

10  determine.

11  Q    Okay.

12  A    It's something --

13  Q    Sir --

14  A    -- (indiscernible)

15  Q    Sir, that's not my question.  Again, not my question.

16  A    Okay.

17  Q    We're going to talk about projections for the future.

18      By my question is:  Dr. Bates made statements about

19  abuse in years.  And in more recent years, the number of

20  abuse in those years is dramatically declining.  And you have

21  not filed any objection or challenge to that conclusion, as

22  to the number of abuse in recent years, in his data.

23  A    There is no pleading to that, other than my statement in

24  the disclosure statement about our view with respect to

25  claims that I represent.  And that's -- that's on record.

1   Q    Okay.  So now you're also -- now, in terms of other

2   things you're not offering opinion on, you have not offered

3   any expert opinion for confirmation on the -- on the number

4   of states that would qualify for the repressed memory lane of

5   your portfolio, right?

6   A    That's correct.

7   Q    And you haven't -- and you're not doing so today.

8   A    (Indiscernible)

9   Q    But it's --

10  A    It depends on whether you ask me, but at this point, I

11  am not.

12  Q    Now, of the two groups, substantially all of them are

13  going to be in the child under 18 category, as opposed to the

14  repressed memory category, right?

15  A    That's correct.  We think there are about 11,000

16  children and probably less than 40 recovered memory claimants

17  will make it through the -- through to submit a claim to the

18  trust and --

19  Q    Okay.

20  A    -- be paid.

21  Q    Now I didn't ask you about the number.  But I did ask

22  you a moment ago about offering expert testimony.

23       You have -- you are not offering any expert testimony in

24  this confirmation as to the number of claimants there are,

25  are you?

1  A     Not unless you ask me a question that initiates it.

2  Q     And you have not offered, even in discovery, in the

3  disclosure of expert opinions, you did not provide a report

4  from anybody talking about the number of future claims, did

5  you?

6  A     That's correct.

7  Q     Okay.  So I noticed -- let's talk about who your team

8  is.  I think, in your declaration, you talk about your team.

9  You mentioned -- is it Ankura -- is that how you say it --

10  A     Yes.

11  Q     -- Consulting?

12  A     Yes.

13  Q     You sought court approval to hire Ankura, correct?

14  A     That's correct.

15  Q     And you just -- you describe -- this is Docket 496 --

16         MS. MCNALLY:  We're not offering it.  We're just --

17  in case anybody wants to look at it.

18  BY MS. MCNALLY:

19  Q     In Docket 496, you -- the purpose was, among the things

20  that Ankura would do, would be estimating the number and

21  value of future abuse injury claims.  Do you --

22  A     That's correct.

23  Q     -- recall that?

24  A     That's correct.

25  Q     And you also listed, in Paragraph 11(h):

1          "Providing expert testimony and reports related to

2    the foregoing, and assisting the future claimants

3    representative in preparing and evaluating reports and

4    testimony by other experts and consultants."

5        Do you recall that?

6    A    I -- I don't have it in front of me, but that sounds

7    accurate.

8    Q    All right.  So, through the end of January of this year,

9    Ankura has requested fees of more than $1.4 million in this

10   case.  Does that sound right to you?

11   A    I'll -- I'll take your word for it.

12   Q    You -- do you approve Ankura's bills --

13   A    I do.

14   Q    -- as the future claimant -- does that sound right to

15   you?

16   A    I -- I -- I don't have any reason to dispute it.

17   Q    Okay.  So -- but nevertheless, with them on your team

18   approved to do such thing, you have not filed a report on the

19   number for confirmation on the number of claims that you are

20   expecting.

21   A    Of course not.

22   Q    Okay.

23   A    That's not an issue.

24   Q    Well, in your -- it's not --

25   A    It's not --

1   Q    -- (indiscernible)

2   A    -- before the Court.

3   Q    It's not before the Court.  Okay.

4        So let's talk about the plan negotiation then.  Let's

5   talk about the plan negotiation.  And it starts at Paragraph

6   12 of your declaration.  And if you have it handy, I think

7   that will be useful.

8   A    I have it.

9   Q    Now, in the session -- in this section, you recount

10  that, in many ways --

11            MS. MCNALLY:  We don't -- we don't need to have it

12  up.  That's okay.

13  BY MS. NEWMAN:

14  Q    You recount the history of a lot of details about the

15  mediation process, right?

16  A    Yes.

17  Q    Now fair to say you did not attend most of the in-person

18  mediations?

19  A    I attended Miami, I attended two in LA, and I attended

20  New York once or twice.  I think that we had mediation

21  sessions that were running, during certain stretches, almost

22  weekly.  So it is probably safe to say that most were

23  attended, not by me physically, were attended by my team

24  members.  I -- I -- I think I accept your characterization

25  that I did not attend, physically, most of the mediation

1  sessions.

2  Q    And when you did --

3  A    Apparently --

4  Q    -- attend --

5  A    Apparently -- apparently, the majority.

6  Q    Certainly a majority, you did not attend.

7  A    Attend physically, correct.

8  Q    Okay.  And so, when you say I did not "attend

9  physically," we were in a pandemic.  So does that -- were you

10  suggesting -- well, did you mean to suggest to this Court

11  that you attended by Zoom most -- the others?

12  A    So some I attended by Zoom, at least for part of the

13  time, but ultimately concluded that that was a complete waste

14  of time, and that the only meaningful way to participate is

15  to --

16  Q    (Indiscernible)

17  A    -- have my team --

18         MS. MCNALLY:  I'm going to move to strike anything

19  other than answers to my questions.

20  BY MS. NEWMAN:

21  Q    And we'll just be done with this much quicker if you

22  just answer the questions I'm asking.

23      Did you mean to say, when I didn't attend person --

24  "physically," that you did attend, but you attended in some

25  other manner?  Is that what you intended to suggest?

1  A    No, I'm telling you what I intended.

2  Q    So, no, you did not intend to suggest that.

3  A    I did not intend to suggest that.

4  Q    Okay.  Thank you.

5       And when you --

6  A    I intended --

7  Q    -- did attend --

8  A    -- something else.

9  Q    Okay.  And when you did attend, you put it in your

10 bills, attended the media -- that you attended the mediation.

11 A    If I attended physically and was there physically, it

12 showed up in my bills as attended physically.

13 Q    Okay.

14 A    The other kind of participation shows up in my bills as

15 either worked on mediation issues or worked on negotiation

16 issues, something to that effect because I couldn't honestly

17 say I was attending the mediation, but I was doing work that

18 was related to the topic that was being mediated.

19 Q    Are you attending this trial, sir?

20 A    Yes.

21 Q    All right.  So someone would say -- if you would --

22 someone said did you attend the trial, you would say you did,

23 even though you're just on Zoom, right?

24 A    So some of it I attended by reading transcripts, you

25 could say; some of it I attended by sitting here today and --

1  or sitting here on other days.  But I attended the trial

2  without watching every second of trial time.

3  Q    Right.

4       And you wouldn't say, for example, today or yesterday

5  when you were watching Dr. Bates, work on trial issues,

6  right?  You would say you attended the trial.

7  A    Correct.  If I'm here --

8  Q    Correct.  Okay.

9  A    If I'm here on Zoom, I'm attending.  If I'm -- if I'm

10  being called into a conversation about what was happening in

11  the trial and trial strategy, I would say work on trial

12  issues.

13  Q    Right.

14       And so --

15  A    (Indiscernible)

16  Q    -- for example --

17  A    (Indiscernible)

18  Q    So, for example, if someone called you after trial and

19  said here's what happened and gave you an update, that would

20  be work on trial issues, not attended trial --

21  A    If it happened --

22  Q    -- right?

23  A    -- during the trial, I would -- it would also say that.

24  And --

25  Q    Okay.

1  A    -- even if I walk into their room to watch part of the

2  trial, that's what I would say.

3  Q    Okay.  Thank you.

4       So now let's start with the -- who -- I want to get into

5  like your particular role because I hope you'll agree with me

6  that the declaration is not completely clear on the things

7  you're describing that you did personally, versus you heard

8  about happening through others.  Okay?

9       Now it's fair to say, isn't it, that you did not

10  participate -- personally negotiate the version of the plan

11  that was solicited for vote last fall, right?

12  A    Some I did.

13  Q    Okay.  Well, do you remember your deposition on November

14  30th?

15  A    Yes.

16  Q    All right.  I'd like you to open your deposition, which

17  is in the materials I provided to you.

18  A    This is the notebook that arrived -- the single

19  notebook?

20  Q    Yeah, it is in there.  I can tell you what tab it is,

21  but I'm sure you'll -- if you flip to it, you'll see -- it

22  should be the --

23  A    I have my deposition transcript.  Which page do you wish

24  me to look at?

25            MS. SAWCZUK:  Laura, I think you're frozen.

1        (Pause in proceedings)

2            MS. SAWCZUK:  Your Honor, this is Maria Sawczuk.

3   I'm Ms. McNally's co-counsel.  I'm just going to make sure

4   that she is trying to get back on.

5            THE COURT:  Yes.  Thank you, Ms. Sawczuk.

6        (Pause in proceedings)

7            MS. SAWCZUK:  Your Honor, I'm trying to reach her

8   by phone.  I will -- may we have like a ten -- five-minute

9   recess, until I can see if I can reach her?

10           THE COURT:  Yes, let's take five minutes and see

11  where we are.  Thank you.  We're in recess.

12           MS. SAWCZUK:  I apologize, Your Honor.  Thank you.

13       (Recess taken at 2:37 p.m.)

14       (Proceedings resume at 2:43 p.m.)

15           THE COURT:  I understand we have Ms. McNally back.

16           MS. SAWCZUK:  We did a second ago.  There she is.

17           THE COURT:  Okay.

18           MS. MCNALLY:  This pandemic has been on for two

19  years, this is the first time this has happened.  I really

20  apologize.

21           THE COURT:  Okay.

22  BY MS. MCNALLY:

23  Q    So where were we?  We were about to talk about your

24  deposition.

25       And I think, right before the break, you said -- and my

1  question to you was that you didn't personally negotiate the

2  solicitation version of the plan.  That is where we were.

3  And you didn't agree with me, right, sir?

4  A    Yeah.  I said there are some -- some components of the

5  plan -- well, certainly in the larger sense -- that I did

6  personally negotiate.

7  Q    Okay.  So, if we look at Page 126 of your deposition

8  that was on November 30th of last year.

9  A    I have it.

10 Q    And starting at Line 7, the question:

11          "The plan, the TDPs/plan, did you personally

12 particulate?"

13      And you answered:

14          "I did not participate -- well" --

15      I'm sorry.  You said:

16          "Well, through my team, there were a lot of

17 conversations and discussions regarding the TDP and trust

18 agreement that I had with my team.  I did not personally

19 participate in negotiations over the plan with anybody."

20      And then you said:

21          "I did participate in some direct discussions with

22 the TCC and the coalition over the TDP."

23      Did I read that correctly, sir?

24 A    Yes.

25 Q    Okay.  Now you didn't, in Paragraphs 12 to 40 of your

1  declaration, disclose how many of the mediation sessions you

2  personally attended, did you?

3  A    I don't believe I did.

4  Q    No.

5       Or how many you didn't.

6  A    That's correct.

7  Q    And I'm sure your team told you that the issues relating

8  to what happens in the mediation has been an area of some

9  disagreement among the parties throughout this case, right?

10 A    Can you repeat the question, please.

11 Q    That the areas of what is protected by mediation

12 privilege has been an area of some dispute in this case?

13 A    Yes, we have some rulings, yes.

14 Q    We have rulings as to the TDPs, but the parties

15 continue to, up through the discovery into March, parties

16 were disagreeing about the scope of the mediation privilege,

17 yes?

18 A    I'll take your word for it.

19 Q    Okay.  And in your declaration here, you don't -- were

20 the things you didn't describe because of your obligations on

21 the mediation privilege?

22 A    With respect to the TDP negotiations?

23 Q    You talk more than the TDPs in this declaration, don't

24 you?

25 A    I'm asking, so that I understand your question, there

1  were -- there are elements in here that could have been

2  discussed associated with the negotiations with insurers, for

3  example, that we avoided because of mediation privilege.

4  Q    And there are some areas that you described at a high

5  level in here, referring to the mediation, but you don't give

6  detail as to those, and is one of the reasons because of the

7  mediation privilege?

8  A    Well, I can think of a specific example.  I don't know

9  what -- do you want to point me to a specific example? -- but

10 one comes to mind, and that is, as I just mentioned,

11 discussions about negotiations with insurers.

12 Q    Right.  So, for example, as to the settling insurers or

13 the TCJC settlement, you mention those in the declaration and

14 give kind of evaluations that you think they were positive,

15 essentially, but you don't provide any detail because of the

16 mediation privilege; is that right?

17 A    Well, I do provide some detail where I can, where

18 there's information that's available to me and it was for my

19 negotiations, but it came from outside the mediation or it

20 existed outside of the mediation and I could, therefore, talk

21 about it.

22 Q    Okay.  Well, I wasn't talking about what you did talk

23 about.  I am talking about things you didn't talk about.

24      There are things you didn't talk about in here because

25 of the mediation privilege?

1  A    (No verbal response.)

2  Q    Let me just -- I just want to make sure I'm not asking

3  unfair questions.

4      There are things -- when I'm asking you questions about

5  why you put something in or didn't put something in, in this

6  declaration, is it fair to ask you that question, because it

7  sounded like, in a way, this was a bit of a group project.

8  A    So, I put in what I -- I didn't --

9          MR. GUERKE:  Your Honor, I object, based on

10 attorney-client privilege and work product document.  Based

11 on the strategy of drafting the declaration and the

12 application of the mediation privilege as being asked by

13 counsel.

14         MS. MCNALLY:  Your Honor, this has -- this

15 declaration is not a legal brief.  This declaration is

16 substituting for live testimony.

17         And so, if -- on live testimony, I would be

18 permitted to say, Are there things you're not telling us

19 because you're asserting the mediation privilege?  Are there

20 things you left out because you weren't permitted to talk

21 about it in the mediation privilege?

22         And those are the nature of my questions.

23         THE COURT:  Overruled.

24         Do you want to repeat your question?

25         THE WITNESS:  Oh, I'm sorry.  I wasn't sure where

1  we were.  I apologize, Your Honor.

2           THE COURT:  No, that was --

3           THE WITNESS:  But, yes.

4           THE COURT:  I'm overruling.

5           You can respond.  Yeah.

6           THE WITNESS:  So, I believe you've asked the

7  question:  Were there things that I left out?

8           We created the declaration and then double-

9  checked, were there things that were in there that we

10 couldn't say.

11          And there's one item that I can think of that we

12 concluded that we were planning to say and ended up saying

13 because it was information that existed outside of, and

14 independent of the mediation process.

15          There wasn't anything that I can think of, that we

16 didn't say or that we -- that I, that I wanted to say and

17 didn't say because of the mediation privilege.

18 BY MS. MCNALLY:

19 Q    Okay.  I appreciate your clarification there at the end

20 about the first person we're using here.

21      So, in this declaration, is it a fair takeaway to say

22 that it is shaped, in some ways, by your decision to declare

23 privilege over certain aspects of the mediation?

24 A    I think what I said is it was not shaped, no.

25 Q    There are some things -- there are some aspects of the

1  mediation -- you, in these paragraphs, describing the

2  mediation, starting at 20 going to around 40, there are

3  things you don't have in there because of the mediation

4  privilege?

5  A     Yeah, that's not true.

6  Q     Okay.

7  A     That's not --

8  Q     So -- now, let's talk about the mediations you

9  attended.  And right before the break, maybe the internet cut

10 out because it didn't -- it was not enjoying this

11 conversation about what it means to attend, but I am going to

12 say attend.  My definition when I say, "attend," means you,

13 personally, were there, or you, personally, were on a Zoom or

14 a phone call and you were substituting for being in the room,

15 okay.  So, when I say, "attend," that's what I mean, all

16 right.

17 A     Okay.

18 Q     And when I say, "attend," I don't mean someone else

19 told you that day; someone else is relaying what is going on.

20 That is not attending, as I am going to be using the term.

21 A     What happens if it's both?

22 Q     If you are participating -- if you are in the room, if

23 you are on the Zoom, in the call, even if you are just

24 sitting there quietly, but you are part -- you -- a

25 substitute for being in the room, I am using that term to

1   mean attend, all right.

2   A      I understand.

3   Q      If you are unclear when I say that word, what it means,

4   you can just -- I'll ask that you ask for an explanation,

5   okay.

6   A      Okay.

7   Q      All right.  Now, your January bills don't indicate that

8   you attended any mediations; is that accurate from your

9   memory?

10  A      So, the definition you gave me doesn't allow for a

11  precise answer, so, if you will, I will try to answer in a

12  way that's consistent with what happened.

13         I did not physically go to the January mediations.  I

14  did participate in portions of the mediations at various

15  times in principal part by looking at the draft language that

16  was being generated in those mediations or in those

17  discussions by various parties and having conversations with

18  my representatives who were there during the mediation.

19         And there were -- this goes back to my struggle with

20  your definition -- mediations lasted, in many cases, from --

21  the sessions would last for multiple days and my involvement

22  tended to be one where I received a document or an email with

23  the language that was being proposed and a phone call and a

24  conversation and a recap of where things stood with respect

25  to the bid-and-ask, and then I would participate through that

1  mechanism.

2  Q    Okay.  Sir --

3  A    That fairly describes what was happening in January.

4  Q    All right.  Not my question, but I appreciate the

5  background.

6        So, it is -- I don't want you to take from my

7  questions, in any way, that you didn't know -- that you were

8  not being informed, that you were just, you know, on vacation

9  or something.  I'm just trying to be pretty precise, because

10 I'm sure you're familiar with your state rules, being pretty

11 precise about what you personally observed and what we were

12 told, and what you personally saw.  And what was relayed to

13 you by your team, as trustworthy as they might be, they are

14 not on the witness on the stand.  So, that's where I am --

15 there's the nature of these questions, okay.

16       So, my review of your time records for January indicate

17 no entries that say you attended.  It doesn't mean that you

18 didn't add value, but I see no entries that say that you

19 attended the mediation in January.

20       Does that --

21 A    You were correct.  I did not use that terminology.  As

22 I explained, that was terminology I used when I physically

23 arrived at a mediation session and stayed for several days.

24 Q    And I did not -- okay -- and I did not see entries that

25 say something like, I was on -- I did not attend, but I was

1  in a Zoom of the mediation, in your entries, right?

2  A    No, I used that term, I used the phrase for the work

3  that I was doing in that kind of context either, work on

4  negotiations or work on mediations.

5  Q    Okay.  And in all of January, you billed 61 hours to

6  the Boy Scouts?

7  A    I'll take your word for it.

8  Q    Okay.  Which is pretty consistent with December, with

9  62 hours; is that right?  Sixty point something?

10  A    I don't know.  I'll have to take your word for it.

11  Q    Does that sound about right?

12  A    I don't know.  I don't have any reason to argue that

13  you're not looking at my fee application.

14  Q    And your fee application was accurate to your best

15  recollection at the time?

16  A    Yes.

17  Q    Okay.  So, then, let's look at February.  We have the

18  good fortune that you just submitted today, during the lunch

19  break, we were served with your February bills.

20      Were you aware of that?

21  A    No.

22  Q    Okay.  Well, we just have those.  We got them today.

23      So, I apologize, they're not in your binder or anywhere

24  else because, like, literally right before we started here,

25  we saw your February bills.

1          And among those, I see that you had 90 hours in

2   January billed to the Boy Scouts matter, which was the most

3   in any month that you've been in this engagement.

4          Does that sound right to you?

5   A    Did you say January?

6   Q    Yeah.  February, sorry, February.

7   A    In February?

8   Q    Uh-huh.

9   A    Yeah, it certainly could be.

10  Q    And now, of those, however, if we look at when you bill

11  things in February, 30 of those hours, just under 31, were

12  before the announcement on February 11th that a deal had been

13  struck and 60ish were after that.

14         Does that sound right to you?

15  A    That's probably right.  I mean, certainly, if that's

16  what the application says, that's accurate, but I think that

17  is -- I think that is fair.

18  Q    So, the remaining 60 hours, looking at those entries,

19  you were tied up with a significant amount of time over the

20  dispute of who might be -- "dispute" might be too strong of a

21  word; let me rephrase it -- the remaining 60 hours, you were

22  tied up with questions related to who would be the trustee.

23  A    Yes.

24  Q    And that took a significant amount of your time after

25  February 11th?

1  A      Yes.

2  Q      To the point where the amount of time you spent on that

3  rivaled the amount of time you spent in December and the

4  amount of time you spent in January on all plan issues?

5  A      Yes.

6  Q      Okay.  And if we look at your February bill for any

7  entry that talks about attending a mediation, there's just

8  one, right?

9  A      I don't know.

10 Q      And that is on February 25th, long after the final plan

11 had been circulated; is that your memory?

12        MR. GUERKE:  Objection, Your Honor.  He said he

13 doesn't know.

14        THE COURT:  Sustained.

15 BY MS. MCNALLY:

16 Q      Do you remember attending any mediations before

17 February 25th?

18 A      Yes.

19 Q      In February?

20 A      Quite a few -- oh, I don't know.

21 Q      Okay.  All right.

22        Well, let's talk about negotiating the TDPs.  That

23 shows up -- here's what I'm going to do with your

24 declaration, sir.  In many ways, this is like an overview, an

25 overview of a lot of things, an overview of what happened and

1   an overview of what the plan provides.

2        And just in the interests of time and the shortness of

3   life, I am not going to revisit all actions in this case or

4   all aspects of the plan and the TDPs.

5        So, I am going to be focusing on certain things.  I'm

6   going to try to be efficient with our time here and also not

7   repeat things that other witnesses who have firsthand

8   knowledge have addressed.

9        So, I'm going to ask that you just stay with me as I

10  ask about particular things, all right.

11  A    Okay.

12  Q    So, the TDPs first come up in paragraph 27 of your

13  declaration.

14  A    I'm there.

15  Q    Okay.  And you even define it in paragraph 27 and you

16  state:

17            "The debtors, the AHCLC --"  that's the local

18  councils, right?

19  A    Yes.

20  Q    -- "the Coalition and I negotiated with the TCC and

21  certain State Court counsel for abuse claims."

22        Is that true?  That's what it says?

23  A    Yes.

24  Q    Okay.  Now, when you say, "And I," do you mean you, as

25  you, or do you mean you as your team?

1   A    Well, in this case, I did, but my team did, as well.

2   Q    Okay.  Now, when you use this term, and I'll admit I

3   never heard it before this case, that's State Court counsel,

4   do you see that?

5   A    Yes.

6   Q    All right.  So, State Court is not like a specialty for

7   law.  I specialize in State Court, right.

8        And in these cases, defense counsel are also in that

9   State Court, right?

10  A    I'm sorry, there is -- there is abuse litigation

11  pending in State Court; is that the question you're asking?

12       I'm not sure I understand the question.

13           THE COURT:  Ms. McNally, you're muted.

14           MS. MCNALLY:  Apologies there.

15  BY MS. MCNALLY:

16  Q    So, when you say "State Court counsel" in this sentence

17  and elsewhere in this case, State Court counsel has a

18  particular meaning beyond people who appeared in State Court,

19  yes?

20  A    That's correct.

21  Q    Right.  And it does, and, in particular, as to these

22  abuse cases, State Court counsel does not mean counsel in

23  State Court defending cases?

24  A    Yes.  This is referring to the lawyers who represent

25  abuse claimants.

1  Q      Okay.  Plaintiffs' personal injury attorneys?

2  A      Yes.

3  Q      And those, Dr. Bates referred to as "recovery

4  attorneys."

5         Do you understand those to be the same people?

6  A      I don't recall him using that term, but --

7  Q      Okay.

8  A      --  I suspect if we're all talking about the lawyers

9  who represent personal injury claimants in the context of

10  abuse litigation against the Boy Scouts, it's, as I said,

11  it's a known universe of law firms.

12  Q      All right.  And I'm going to use, today, I'm going to

13  use the term "Plaintiffs' counsel" or "Claimants' counsel,"

14  I'm going to be referring to those people by that name, which

15  I think, here, is what you call "State Court counsel."

16  A      That's fair.

17  Q      Okay.  Now, you were aware at the time that almost

18  without exception, those attorneys were paid a contingency

19  fee?

20  A      That's my expectation and my understanding of the way

21  their business model works.  I don't believe I discussed

22  their fee arrangements -- I didn't discuss their fee

23  arrangements, but that is a presumption is one that I make.

24  Q      Okay.  Thank you.

25         And so, those individuals, by that nature, had a

1  personal stake in the outcome of this process?

2  A    Well, I think all lawyers have a personal stake in the

3  outcomes of their litigation.  The economics are different,

4  but ...

5  Q    They have a personal, financial stake tied to the size

6  of the outcome for their clients in this case?

7  A    It is correct that their fee is tied to the size of the

8  recovery in a context where they have a contingency-fee case.

9  That's (indiscernible).

10  Q    Thank you.

11       And given the number of claims and the values at issue

12  in the TDPs, that number could exceed a billion dollars; are

13  you aware of that?

14  A    Well, it's a -- there's a math exercise one can do just

15  for fun, which is if you assume that every single contract

16  and every single Plaintiff is a contingent-fee contract and

17  it's for a third, and there's $3 billion that's paid to

18  claimants, a billion dollars would end up going to fees.

19       If that's all your asking, then that is the correct

20  exercise of math.

21  Q    This certainly is not the first time that you have gone

22  through that exercise, right?  Like, live with us right now,

23  is this the first time that you've done that math to realize

24  the (indiscernible) have more than a billion dollars at

25  stake?

1   A      Multiply 3 billion by one-third.

2          I don't know.  I'm sure it's not.

3   Q      Okay.  And, certainly, because as the FCR here, that

4   would be a thing that you would have on your mind -- the

5   people that I'm dealing with, what do they have at stake --

6   isn't it?

7   A      So, I certainly bear in mind, to the best of my

8   ability, the kinds of pressures and leverage that are

9   available in negotiating with my counterparties.  I'm not

10  quite sure how this specific point or on my negotiations in

11  this case, I don't believe it did.

12  Q      Okay.  My question:  As the FCR with fiduciary

13  obligations to people who are now children, certainly it

14  occurred to you to consider the motivations of individuals

15  you were negotiating with, who personally stood to gain more

16  than a billion dollars, right?

17  A      You strike "who personally stood to gain" as an

18  accurate statement.  That's true with everybody I negotiated

19  with.

20  Q      And you're saying it did not -- you did not consider

21  their personal -- the personal gain of the individuals you

22  were negotiating with?

23  A      I don't believe the size of their potential fee or

24  contingency arrangement factored into my negotiations with

25  them.

1  Q      Why?

2  A      They had a variety of --

3  Q      Sir, I think you've answered my question.  Thank you.

4         Now, in paragraph 27, you say, fortunately, the parties

5  were able to reach an agreement, which included a Settlement

6  Trust governance structure that requires consent of at least

7  five of the seven members of the STAC and approval by the FCR

8  to approve certain transactions.

9         Do you see that language in paragraph 27?

10 A      I do.

11 Q      All right.  Now, the STAC, we have spent time in court,

12 as you have seen, because you've been attending the trial, we

13 all know that those are the Settlement Trust Advisory

14 Committee, right?

15 A      Yes.

16 Q      Now, this perm here, that the STAC be at least five of

17 the seven members approved, that term that you're referring

18 to there, that wasn't requested by the debtor, was it?

19 A      I don't have knowledge of that one way or the other.  I

20 did not learn of it from the debtor, that's for sure.

21 Q      And you, in your personal knowledge, have no knowledge

22 of the debtor saying, It's really important to you that

23 there's five of seven STAC members that approve various

24 things.

25         No one -- the debtor never told you that, right?

1  A      That's correct.

2  Q      And even as to hearsay, nobody said this idea was

3  suggested by the debtor, was it?

4  A      Not to me.

5  Q      Okay.  Now, those STAC members, the seven STAC members

6  are all contingency fee representatives of current claimants?

7  A      That is correct.  Well, they are all representatives of

8  current claimants.

9         As I said earlier, my presumption is they work on a

10  contingency-fee arrangement with their clients.

11  Q      And as you say, and the tautology would say, then, that

12  those people all have a personal stake, the size of which

13  would depend in some way on the outcome of these

14  negotiations?

15  A      Their fee is dictated by the success or failure of

16  their litigation, yes, and the size of their recovery.

17  Q      And giving rights, then, to these individuals who stood

18  to gain, personally, you were okay with that on behalf of

19  current children and individuals who have a personal gain are

20  just -- are the ones designing this system, you were okay

21  with that?

22  A      There's an awful lot to unpack in that statement.

23         So, by this system, are we talking about the five out

24  of seven --

25  Q      Sir, let me ask you again.

 1  A     -- or are we talking about the entire TDP.

 2  Q     Let's talk about the --

 3              MR. GUERKE:  Your Honor, I object.  And I'd ask

 4  that the --

 5              MS. MCNALLY:  I'll rephrase the question.

 6              MR. GUERKE:  -- witness be allowed to continue his

 7  answer and not be cut off routinely.

 8              THE COURT:  Yes, the witness will be able to

 9  complete his answer, but he asked a question, so I think

10  we're back to Ms. McNally.

11  BY MS. MCNALLY:

12  Q     Right.  And I was just -- all I was -- I was

13  interrupting simply just to say that was a fair question.

14        Let me ask you again.  Particularly, as you mentioned

15  here, this trust governance change that requires the consent

16  of five of seven members, that -- I'm referring to that

17  language in your declaration.

18  A     Okay.

19  Q     Now, as a fiduciary of current children, current as to

20  the plan, you were okay with the idea that these five of

21  seven personally benefiting STAC members would have such a

22  large role in designing things such as the questionnaire and

23  making decisions as to who the trustee gets to hire.  That

24  was fine with you?

25  A     Are we focusing on the dictated internal governance

1  provision or just the fact that there's, as in every mass

2  tort case, a committee of Plaintiffs' lawyers that advise the

3  trustee and participate in trustee operations?  Which is your

4  focus?

5  Q    My focus is what I said in the question.

6       Language in your declaration, written by you or someone

7  else, paragraph 27.

8  A    Okay.  So, the five to seven doesn't change my

9  calculus.  I looked at it pretty carefully because it runs

10  the risk of creating a deadlocked STAC.

11      Our trusts all have been created and, actually, they've

12  run quite successfully with this creation.  Johns-Manville

13  made a mistake and we had to fix it, and we added the FCR to

14  the life of the Trust to institute the fix.

15      But the role of the STAC, or TAC in other asbestos --

16  other mass tort cases, asbestos and others -- is tantamount

17  to the operation of the Trust and they serve a number of

18  functions to assist the trustee.

19  Q    I appreciate that, and I apologize for cutting you off.

20      You're not answering my question and I move to

21  strike --

22           MR. GUERKE:  Objection.

23           MS. MCNALLY:  -- and I move to strike everything

24  beyond answering my particular question about whether he was

25  fine with these provisions on behalf of his client.  That was

1  all I was asking; not about Johns-Manville, not about

2  strategy.  That was a narrow question and I move to strike

3  everything else.

4         MR. GUERKE:  Your Honor, I ask, again, that the

5  witness be allowed to answer the question and complete his

6  answer.

7         The question changed.  She asked generally about

8  paragraph 27.  There are about 10 lines in paragraph 27 and

9  Mr. Patton was answering that question.

10        And I would ask the Court that it not be stricken

11  and that he be allowed to continue his answer.

12        MS. MCNALLY:  Your Honor, I asked about one

13  sentence that I have read now, several times, into the

14  record.  I am asking about that sentence relating to trust

15  governance, five of seven votes, and the STAC; that is all.

16  Not the history of trusts in mass torts.

17        THE COURT:  I'm going to strike the part of the

18  answer that deals with history and I would see if we can

19  focus on the questions.

20        And then, of course, Mr. Guerke can ask you any

21  questions he wants to on redirect.

22        THE WITNESS:  Okay.  I will try.

23        The short answer is, I was concerned.

24  BY MS. MCNALLY:

25  Q    Okay.  Good.  Thank you.

1        Now, in exchange, you also say this in paragraph 17

2   through 27.  I'm going to just ask you about this.  Listen to

3   the part of it I'm reading; that's what I'm going to ask you

4   about.

5   A     I'm sorry, which paragraph?

6   Q     27, still.

7   A     Oh, okay.

8   Q     "In exchange for these amendments to the Settlement

9   Trust's governance structure and TDPs, the TCC and other

10  certain State Court counsel agree to support the plan that is

11  currently before the Bankruptcy Court."

12        Do you see that?

13  A     I do.

14  Q     And when you say, "These trust governance" --  sorry.

15        And when you say, "These amendments to the Settlement

16  Trust governance structure," that's what we have just been

17  talking about in the prior sentence:  changes to the

18  governance structure?

19  A     Yes.  Yes.

20  Q     Okay.  All right.

21        It says here, "The TCC and other certain State Court

22  counsel agreed ..."

23        Do you see that language?

24  A     I do.

25  Q     Now, the certain -- "other certain State Court

1  counsel" you had in mind were primarily, or maybe entirely:

2  Pfau Cochran Veretis Amala, PLLC, and Zalkin Law Firm, right?

3  A    I think that's fair.

4  Q    And that's -- they're known in the plan as Pfau/Zalkin,

5  Pfau/Zalkin?

6  A    Okay.

7  Q    Yes?

8  A    I -- I'll take your word for it.  I think that's how

9  they're identified.

10 Q    I mean, you've reviewed the plan, right.  You've seen

11 that's what they're called in the plan, yes?

12 A    I have to take your word.

13 Q    Okay.  So, now, in addition to -- I'm sorry -- as part

14 of these amendments, one thing that was added was that

15 Pfau/Zalkin contingency -- contingent group -- sorry -- the

16 Pfau/Zalkin contingent got a seat on the STAC, right?

17 A    Yes, that's true.

18 Q    So, now, they had a role in getting to choose the

19 neutrals, right?

20 A    That's correct.

21 Q    They had a role in getting to draft the questionnaire

22 or approve the draft of the questionnaire to claimants?

23 A    That's correct; as a member of a larger committee, yes,

24 that's correct.

25 Q    And they have a role in approving the professionals

1  hired by the Trust?

2  A    Again, as one of seven, but, yes, they have a voice.

3  That's a better way to describe it, to my satisfaction.

4  Q    And they also have a role in deciding the professionals

5  hired by the claim administrator?

6  A    That's correct -- yes, a voice is a better way to put

7  it, as one of seven, but yes.

8  Q    So, they were added to the STAC as part of the

9  amendments that ultimately obtained their consent to this

10 deal?

11 A    I think that's right, but the -- the reason I'm

12 hesitating is because I can't recall if there was any

13 discussion about including them prior to this round of

14 negotiations.  But, certainly, at the end of these

15 negotiations, they were now a member of the STAC --

16 Q    And before the negotiations they weren't?

17 A    -- to be in them.

18 Q    And in the solicitation version, they weren't?

19 A    That is correct.  I just can't recall --

20 Q    Now, another thing that was -- excuse me, I didn't mean

21 to step on you there.

22 A    No, I was just going to say what I was -- the reason I

23 was pausing is I can't recall if there had been an evolution

24 around the STAC membership that preceded this last bit of

25 negotiation with the TCC, but that's my only hesitation.

1    Q    And is part of the reason that you have that hesitation

2    that you weren't the one directly negotiating these terms?

3    A    No.

4    Q    Okay.  Now, another thing that changed was that

5    these -- there was a new provision added permitting

6    reimbursement of Pfau/Zalkin restructuring fees up to

7    $3.5 million, right?

8    A    That's correct.

9    Q    That was newly added to obtain their consent?

10   A    We had their consent and it was newly added.

11   Q    You think as a coincidence it was added and you

12   obtained their --

13   A    No.

14   Q    Okay.

15   A    No.

16   Q    And that $3.5 million that was added is to be paid from

17   Settlement Trust assets?

18   A    That's correct.

19   Q    So, now, you are as a fiduciary, not to their clients,

20   but to fiduciary clients.

21       Current children, you are okay with that payment, and

22   that STAC assignment to obtain consent of these lawyers who

23   have personal contingency interests in the outcome?

24   A    It's not uncommon for parties who have been actively

25   involved in structuring the Trust and in negotiating with the

1  debtor.  We have seen the same arrangement in Mallinckrodt;

2  it was approved.  And it's a -- it's a feature that has a lot

3  of precedent.

4  Q    Thank you.

5        MS. MCNALLY:  I move to strike.  Not my question.

6        We're not discussing other cases.  My questions --

7  and so, I move to strike, Your Honor.

8        THE COURT:  Mr. Guerke?

9        MR. GUERKE:  Your Honor, he's being asked this

10 vague question:  You are okay.  And whatever that means, he's

11 trying to answer the question.

12       THE COURT:  I'm going to overrule that objection.

13       MS. MCNALLY:  All right.  I should have been more

14 precise.

15 BY MS. MCNALLY:

16 Q    You signed the final plan documents on behalf of the

17 FCR, acknowledging your assent to these provisions, correct?

18 A    I signed as the FCR, yes; that's true.

19 Q    Yes, thank you.

20       You signed as the FCR on behalf of -- as the FCR,

21 assenting to these provisions?

22 A    I did sign, yes.

23 Q    And I think what you were just describing is that this

24 often happens, that a squeaky wheel gets cut into the deal.

25       Is that, essentially, what you were saying?

1  A      No.

2  Q      Okay.  So, let's talk about who drafted the TDPs.  Now,

3  I am sure you have been attending this trial?

4  A      Yes.

5  Q      I mean, virtually attending the trial?

6  A      I've not seen every single day.

7  Q      Okay.

8  A      But I've participated in a variety of ways, including

9  watching and reading transcripts and so forth.

10  Q      Okay.  So you, I'm sure, recall that this question of

11  who drafted the TDPs, has been in the air.

12         So, now I'll give your version, all right.

13  A      Okay.

14  Q      Paragraph 34, you say:

15         "The debtors had originally drafted the TDPs and

16  as I understand, used the draft TDPs provided by Hartford, a

17  primary insurer, as the template to formulate the debtors'

18  draft TDPs.  I did not support the early version of the TDPs

19  that was submitted with the prior plans."

20  A      I see that.

21  Q      And that's your testimony?

22  A      Yes.

23  Q      Okay.  So, they submitted the first draft, but it was

24  your view, at the time, that that effort was a flawed

25  attempt.

1  A      That is correct.  It was flawed in one particular

2  respect --

3  Q      Okay.  Thank you.

4  A      -- that made it a failure.  There were aspects of it

5  that we liked.

6  Q      Okay.  And as a result, the Coalition started over and

7  prepared a new set of TDPs that were the document that was

8  ultimately -- you ultimately supported?

9  A      Well, they started -- what we did after that failed

10 plan, in fact, there was a version of TDP terms that the

11 Coalition created and that I participated in, that predated

12 the debtors' TDP and, in fact, there was an effort to have

13 the debtor take onboard those TDP provisions that the debtor

14 rejected.

15        When we started to work on what would become,

16 ultimately, now the TDPs that are before the Court, there

17 were, the aspects of the debtors' TDP that I said made it

18 fatally flawed, needed to be completely rewritten.  The

19 aspects of the debtors' TDP that had to do with the matrix

20 and the scaling factors were preserved.

21        And so, the Coalition took up the responsibility of

22 being the person to gather our respective thoughts --

23 "our" being the other representatives of the claimant group,

24 the TCC, and also the debtor, to generate the sort of next

25 round of materials for the development of the TDP.

1      And the Coalition was the party that took

2  responsibility to be the, I'll call it the "scrivener," or

3  the "clearinghouse for gathering" was (indiscernible)

4  creating the document.  It was on -- it resided -- it

5  lived -- as I understand it, anyway, the (indiscernible)

6  document began (indiscernible) and growing, it resided on the

7  Coalition's computer, primarily.

8      And --

9  Q    Thank you.

10 A    -- that's the -- it took a fair amount of intense work

11 to get to the point where there was an agreed-based upon

12 document, and, in fact, the changes that we made --

13 Q    Mr. Patton, you're -- we're, like, way beyond my

14 question here.  So, if I could interrupt, you can have these

15 long discussions with your counsel on redirect.  I would just

16 like to stay with my questions, please.

17     Like, my question is now, from what I hear you're

18 saying is consistent with what I heard before that the pen

19 was wielded by the Coalition legal team.

20 A    Somebody has to bang the keyboard.

21 Q    I know.

22 A    They were the ones who were the scrivener and the

23 clearinghouse and it was -- it lived on their computer.

24 Q    Do you mean to suggest that they were, essentially,

25 like a word-processing department or that they were the ones

1  doing more than simply being a scrivener and putting things

2  on their computers?

3  A    All right.  So, that's about where we left off when you

4  interrupted my last answer.

5      A great deal of the drafting, particularly for this

6  document, because it came together over a relatively short

7  period of time, happened with multiple parties sitting in a

8  room --

9  Q    Uh-huh.

10 A    -- with one person mastering, working the keyboard, as

11 we were drafting language and making proposed changes real

12 time.  I participated in some of that by Zoom.  My lawyers

13 were there, physically, and it was a process where language

14 would be proposed, it would be considered, it would be

15 changed within, sometimes, a matter of minutes, as to the

16 various parties participating.

17     The debtor had representatives there, participating in

18 this process, as well.

19 Q    Okay.  Thank you.

20     Now, your legal team was quite involved in this

21 process?

22 A    That's correct.

23 Q    So, that legal team includes you, obviously, right, and

24 also members of the Young Conaway firm?

25 A    Well, I am a client, but I am also a lawyer, so that's

1  undeniable, yes, and members of the Young Conaway firm --

2  Q    I meant you were part of the legal team.  You were

3  working as --

4  A    And members of -- I'm sorry, go ahead.

5  Q    To clarify, you are the client, but you were

6  participating on the legal team, right?

7  A    Well, I was participating and, ultimately, the -- I was

8  a member of the team and I had legal knowledge.

9  Q    Okay.

10  A    I don't want you to say I was being my own lawyer, if

11  that's (indiscernible).

12  Q    I wouldn't suggest such a thing.

13       And then, also, was Ankura advising you in this work?

14  A    At which point in time?

15  Q    In the TDP process.

16  A    In the entire TDP process, from start to finish,

17  they -- with respect to the TDP, itself, once we designed --

18  they were involved at the beginning in a fairly important way

19  in thinking about how to design the TDP.

20       Once we designed the TDP, frankly, the way I thought it

21  needed to be designed -- I was a principal advocate for

22  this -- which was to abandon the structure that had been

23  proposed by the debtor, which was definitely unfavorable to

24  future claimants and designed --

25  Q    Any question is Ankura --

1   A      I understand.

2   Q      -- did Ankura play a role in negotiating the TDP?

3          That's all I need to know, not your thoughts about the

4   world.  Your thought of this question.  Was Ankura involved

5   in negotiating the TDP, question mark?

6   A      Well, now you changed it to negotiations.

7          Ankura had a role up until the point where the TDPs

8   were structured in such a way that we were assured that

9   future claimants would be treated the same as present

10  claimants --

11  Q      Okay.  Thank you.

12  A      -- in which case the size -- just let me finish -- in

13  which the size of the future claims became, or the total

14  claims became considerably less important.  I needed them to

15  be involved, though, because once this plan is confirmed, the

16  implementation of the TDP and the creation of a specific

17  payment percentage, or the initial payment percentage, is

18  going to require very detailed work from Ankura.

19         And so, their -- they can try and design something that

20  would enable them to fulfill their function on the other side

21  of confirmation at setting payment percentages, was

22  important.

23  Q      So, the answer to my question is, yes; they were

24  involved in the process of setting up the TDPs?

25  A      At some level, and at a declining level --

1  Q      Okay.

2  A      -- it got clearer with respect to the structure of the

3  TDP.

4  Q      And then also on your team was members of the -- at

5  least one member of the Gilbert firm, Gilbert, LLP?

6  A      That's correct.

7  Q      Okay.  And they were advising you on insurance issues?

8  A      That's correct.

9  Q      Okay.  And I think you said that your team had

10 involvement in the discovery portion of the plan negotiations

11 to one degree or another, at least the plan in existence at

12 the time of your deposition?

13 A      I think that's right.  There were some provisions of

14 the plan that were of no particular consequence to us.

15 Contract assumption decisions by the debtor, of course, were

16 not something that we paid any attention to.

17 Q      Okay.  So, let's talk about, then, the role of the

18 trustee, okay.

19 A      Uh-huh.

20 Q      And that would be certainly an area that you did have

21 some interest in working on?

22 A      Yes.

23 Q      And you worked on it and there were other aspects that

24 members of your team worked on it, where you did not attend

25 personally?

1   A      That's true.

2   Q      Okay.  Now, when we talk about the role of the trustee,

3   that's not a single -- there's no expectation that a single

4   person, no matter how impressive, would be doing all of the

5   work of the trustee, right?

6   A      Quite the contrary.

7   Q      In fact, it's -- I think you've described it as, it

8   would require an army?

9   A      The faster the parties' desire to have these claims

10  resolved, the more man-hours, person-hours, human-hours are

11  needed to get the job done.  And 80-some-thousand claims,

12  quite particularly with the system designed under this TDP,

13  will require a lot of work to evaluate.

14  Q      My question, you have described it as requiring an

15  army?

16  A      In a certain -- particularly in a circumstance where

17  there's a desire to evaluate claims as fast as humanly

18  possible.

19  Q      Is that the goal, as fast as humanly possible?

20  A      The goal is to pay claims in a way that all claims are

21  treated in a substantially similar manner.

22  Q      Uh-huh.

23  A      That goal is, from my point of view, one of the primary

24  purposes of the TDP and the work that I was doing on the TDP;

25  essentially, to ensure that the last claimant, which is going

1  to be probably one of my constituents, is treated in a manner

2  that is substantially similar to the first claimant.

3  Q     How long do you think it's going to take?

4  A     Well, decades.  A child who, let's say -- let's

5  imagine, as unpleasant as it is, that there's an 8-year-old

6  child who's in Scouting that was abused right before the

7  bankruptcy case.  And let's imagine they're in a jurisdiction

8  where the statute of limitations would be applicable to them;

9  gives them some decades to file a claim -- and there are some

10 jurisdictions once they reach an age of maturity.

11      So, we will have to design a process for allocating the

12 funds and the TDP is now designed to do this, to enable this,

13 such that trusts, the trustee, and the FCR engage in an

14 iterative, annually, or perhaps more frequently process, of

15 evaluation how many dollars have gone out, to what context of

16 claims, in what numbers, and what do we expect the future to

17 look like.

18      We will always be wrong.  And the way these trusts

19 work -- the way this trust will work is one of attempting to

20 take stock and evaluate on a frequent basis and make

21 adjustments to the payment percentage, and perhaps other

22 adjustments to the functioning of the TDP, so that we are

23 successful at paying that last claimant in a manner that's

24 substantially similar to the first claimant.

25      That's the --

1  Q      Okay.  Well, aside from --

2  A      That's the --

3  Q      Sorry.

4  A      -- that's the goal, as far as I am concerned.

5  Q      My question was, how long?

6         So, aside from the fact of, like -- set aside from the

7  fact of someone who is 8, having until they are 18 to do

8  something, how long do you think it will take -- it should be

9  expected to take to get through the current abuse claims?

10  A      Well, I just tried to visualize how we're going to --

11  how the Trust is going to review claims and let's take them

12  into two categories.  We've got the matrix claims and we've

13  got the independent review claims, which generate two

14  timelines.

15         The matrix claims have a requirement that a claimant

16  fill out -- and one more *caveat* -- there's a front-end design

17  challenge that the Trust will have to meet before it can

18  begin proceeding in evaluating claims and that will take some

19  period of time.  But let's, for purposes of trying to answer

20  your timing question, each claimant is going to submit a

21  response to a questionnaire.

22         The trustee has the power to ask or to demand the

23  claimant (indiscernible) examine, and also to require the

24  claimant to essentially respond to an interview.  And if we

25  just assume that from the point of view of the Trust after

1  receiving questionnaire, it takes a total of three hours to

2  go from picking up the questionnaire to completing the

3  various, the (indiscernible), then you need three hours times

4  82,000, minus the folks that will take an expedited payment

5  and minus the folks that take the independent review.  You

6  can pick whatever number you want, but you have a starting

7  point in calculating how many person hours it will take to

8  get through those claims.

9        And the three-hour estimate is just a SWAG on my part.

10  Once the trustee begins working through the details of the

11  design for claim evaluation and making sure that whatever

12  system is employed and however many people are employed to

13  implement the system are operating in a consistent manner

14  across similar claims, which is a challenge into itself, we

15  will then have a better idea of exactly how long it will

16  take.

17        But, you know, if you want to do three times 80,000,

18  that gives you a rough order of magnitude of the person-hours

19  needed and it will tell how many individuals we're going to

20  hire to do that work.

21  Q    Okay.  You said SWAG.  Three hours is SWAG.

22        Is that "scientific wild-ass guess"; is that that you

23  mean by SWAG?

24  A    Yes.

25  Q    Now, what is the front-end time?

1    You said there's a front-end; that's like developing

2 the questionnaire and setting up the office and hiring

3 people.  Is that what you mean by the "front end"?

4 A    We also will have to -- that's part of it -- we will

5 also have to -- the trustee will also want to make sure that

6 there is -- or the claims administrator, if the

7 responsibility is evolved to them, will have to make sure

8 that there are systems in place, training in place to make

9 sure that the Claim Evaluator A is producing results that are

10 consistent with the results of Claim Evaluator B, such that

11 we have similar claims being treated in a similar way.

12    And there's a great deal that goes into achieving that

13 goal from establishing what kinds of criteria are going to be

14 used for the implementing the scaling factors to what kinds

15 of questions are asked in interviews.  And if the trustee

16 hires an existing group of claim evaluators, which she,

17 and/or the claims administrator, may well do, those kinds of

18 problems or those kinds of challenges can be met much more

19 quickly than if there's a desire to build a team from

20 scratch.

21 Q    Okay.

22 A    So, there's an awful lot of -- there are an awful lot

23 of decisions that immediate to be made and quite a bit of

24 work that will need to be done to develop a claims

25 administration process that functions properly.

1  Q     Did you hear Mr. Burnett's testimony earlier this

2  week -- last week?  Did you hear --

3  A     Well, I --

4  Q     Let me re-ask that question.

5        Did you hear Mr. Burnett's testimony last week?

6  A     I read his transcript.

7  Q     Okay.  Mr. Burnett, you will recall, envisioned a much

8  more thorough process than three hours per claimant.

9        Do you agree with that, that he -- that he's

10 envisioning something different by his testimony?

11 A     I believe -- I don't recall.  I don't recall that he

12 put an hour count on it.

13 Q     Do you recall that what he described would happen is

14 not humanly possible to do in three hours?

15 A     Well, you may well be right.

16       And I'm not offering three hours as anything other than

17 a SWAG; I'm just trying to create a metric so we can

18 calculate the magnitude of the problem.  I think three hours

19 times 80,000 is a lot of hours, so I'm not sure Mr. Burnett's

20 model is achievable ever.  There's a balance that will have

21 to be struck in order to allow claims to get paid.

22 Q     And when you say that his model is not achievable, are

23 you saying that what he's contemplating, the depth of the

24 work to be done by the trustee's staff is not practical under

25 the system you're envisioning; is that what you're trying to

1  say?

2  A    Yeah.  There's a -- I'm really engaged in a math

3  exercise, rather than in the details.

4      But if we imagine that it takes 100 hours per claim,

5  two things happen.  One, the claims administration process

6  becomes incredibly expensive and, two, it becomes so slow and

7  unwieldy that, you know, people will start dying in

8  significant numbers before we are able to reach their claims

9  and pay them.

10 Q    Uh-huh.

11 A    So, the process that is ultimate employed by the

12 trustee is going to be one that is, I believe -- I would

13 encourage her to adopt one -- that strikes a fair balance

14 between the needs of fairly resolving claims and paying

15 victims and the needs of designing a process that allows for

16 enough time and information for claims to be fairly resolved

17 and evaluated.

18     But we don't -- those details have yet to be worked

19 out.  It's up to the trustee to wrestle those to the ground

20 in consultation with us.

21 Q    Uh-huh.  It sounds like there's some recognition, at

22 least on your part, if not on Mr. Burnett's part, that

23 some -- this plan requires some sacrifice to expediency?

24 A    It's a settlement; of course, it's not a system that's

25 designed to take every claim and litigate it to a resolution

1  in front of a jury.

2  Q    Well, as it happens, you just came to my next topic and

3  I want to talk about your view that this plan mirrors the

4  pre-petition handling of verdicts and settlements on sex

5  abuse claims.

6        That is your view, isn't it?

7  A    My view is that with respect to the matrix and the

8  scaling factors, the debtors have told us that this reflects

9  their history and we're relying on that.  And, in fact,

10  that's one of the reasons -- oh, wait a minute -- Your Honor,

11  I'm about to talk about a finding, but it's -- one of the

12  reasons that I have taken the position that and we are

13  dependent upon the debtors establishing this set of matrices

14  and scaling factors, not the structure, with respect to how

15  claims get evaluated and how we assure that the last claim is

16  treated like the first claim, but the values assigned to a

17  claim and the scaling factors are entirely dependent upon the

18  debtor making their case.

19  Q    Uh-huh.

20  A    And there's -- and in that regard, it's been important

21  to us that they succeed in making that case and that Judge

22  Silverstein includes that they did make their case.

23  Q    Okay.  Well, it's like you have my outline in front of

24  me (sic), because my next question was, where did that belief

25  come from, that this does mirror their pre-petition conduct?

1     So, am I right, sir -- let me just -- let's try and

2   focus a little bit -- am I right that your opinion on this

3   topic about mirroring pre-petition claims-handling is based

4   exclusively on things you have learned from someone else?

5   A     I am not giving an opinion that the matrix and scaling

6   factors are appropriate; I've been clear about that.

7       The debtor, in fact, early on, it was a hard fight.

8   They said, we will not let you in without a battle to the

9   death to look at our history, because we're afraid the

10  insurers will use that to undermine or destroy or argue the

11  obligation to insurers and destroy and will violate the

12  cooperation clause, so we will represent to you that these

13  values in this matrix and these scaling factors are

14  consistent with our settlement history.

15      And we said, Okay.  You're going to have to -- that's

16  going to be your burden at confirmation.  And to back that

17  up, we are going to want a finding from the judge, from the

18  judge to conclude that you have met that burden.

19      And I recognize that we all don't want to provide

20  ammunition to the insurers to abdicate from their

21  responsibility under their insurance policies, and that was a

22  very delicate situation.  So, with respect to the matrix

23  values and the scaling factors, I am relying on the debtor

24  making their case.

25      With respect to the question of whether or not this TDP

1 is designed in such a way that the last claim will be

2 treatment like the first claim, that they will all be treated

3 in a manner that is fair and equitable, *vis-a-vis*, each

4 other, not whether the amount is fair and equitable, but

5 whether they'll be treated in a manner *vis-a-vis*, each other,

6 that's fair and equitable.

7      That, I have an opinion about and I think I have

8 designed a system that achieves that goal, whether --

9 Q    Okay.  I'm not asking you about that goal.

10      I'm asking you about the matrix values and the matrix

11 and claims being consistent with pre-petition -- I'm focusing

12 on that point.

13      So, what I hear you saying is, your view is that's

14 their burden.  That's for them to prove and it is not my

15 personal knowledge to support as the FCR.

16 A    Other than listening to the testimony so far, I think

17 they have done a good job of proving it, but you are correct;

18 it is their burden to prove and I think they have done well.

19 Q    Okay.  That's nice of you to offer your view.  It

20 wasn't part of the question and I would strike your view on

21 your evaluation of whether they've met it.

22      I am asking the basis of your statement in your

23 declaration, that you are simply saying what others have told

24 you from the debtor.  That's all, right.

25 A    Let's go back to my declaration.  What sentence are we

1  looking at?

2  Q    Am I right that you did not have a personal involvement

3  in the Boy Scouts' claims prior to this bankruptcy, other

4  than the work you did, like, in anticipation of the

5  bankruptcy.  But you don't have, like, a history defending

6  or, in any way, interacting with Boy Scouts' claims?

7  A    Before the bankruptcy case, other than negotiating a

8  potential pre-negotiated or pre-pack plan and evaluating the

9  claims history, in that context, I have no other

10  involvement -- I had no involvement with the Boy Scouts in

11  the tort system.

12  Q    And you didn't follow their litigation in the tort

13  system to see what's happening in real time?

14  A    No -- well, I take that back.  I take that back.

15      There was litigation happening during the year and

16  change that I was involved before the bankruptcy and I did

17  follow that litigation.

18  Q    Okay.  I'm going to consider the bankruptcy and, like,

19  the pre-buildup period into the category of during the

20  bankruptcy.

21      So, before bankruptcy was a glimmer in anyone's eye,

22  you were not following bankruptcy tort litigation or Boy

23  Scouts' litigation?

24  A    Right before -- yes, let's use my engagement letter.

25      Before I was engaged by the Boy Scouts, pre-petition, I

1   was not following tort litigation as to the Boy Scouts.

2   Q    And you didn't negotiate any tort settlements?

3   A    No, I did not.

4   Q    And you didn't review any tort settlements as they were

5   occurring?

6   A    Before that moment, that's correct.

7   Q    Okay.  And you have not reviewed litigation files in

8   this case during your engagement?

9   A    My team may have.  I have not.

10  Q    Okay.  All right.

11       So, looking at page 52 -- I'm sorry -- paragraph 52,

12  you say:

13            "Criteria were based on the criteria that the

14  debtors utilized in their petition practices --"  sorry, let

15  me read it again:

16            The criteria were based on certain -- on the

17  criteria that the debtors utilized in their pre-petition

18  practices of settling and/or litigating abuse claims.

19       Do you see that sentence?

20  A    I do.

21  Q    That is, you are conveying there, a representation from

22  the debtor?

23  A    That is correct.  This was -- these were included in

24  the original plan and this was included in the original

25  disclosure statement and this has been their position since

1  the beginning of the first time --

2  Q      Uh-huh.

3  A      -- and the scaling factors were introduced.

4  Q      Right.  Just a moment, here.

5         See, and this is what I was talking about in terms of

6  where's the personal knowledge in your statement here.  This

7  paragraph is written to describe what someone has told to

8  you.  It might be right or might not be right, but it's

9  simply -- it is not a representation that you have personally

10 confirmed or lived with or have knowledge of these facts.

11 A      Well, the debtor has made these representations in

12 public filings, so --

13 Q      Right.  And that paragraph 52 does not say, It has been

14 represented to me -- I have been told, does it?

15 A      (No verbal response.)

16 Q      All right.  Let's move on.  We're getting bogged down.

17 I'd like to move the --

18         MR. GUERKE:  Objection, Your Honor.

19         That's addressed in paragraph 50.

20 BY MS. MCNALLY:

21 Q      Now, let's look at the next -- I'm sorry, there was an

22 objection.

23         THE COURT:  Okay.  I'm going to overrule the

24 objection but suggest that you don't need to argue with the

25 witness.

1        MS. MCNALLY:  Thank you.  I apologize.

2   BY MS. MCNALLY:

3   Q     Let's look at paragraph 53, and this is a similar

4   point.

5        You have a sentence here -- it's kind of long, but I'll

6   read it:

7            The abuse types base -- hold on a second -- the

8   capitalized words mean that what they mean in the plan,

9   right?  That's what you intended by using these capitalized

10  words?

11  A     Yes.  Yeah, because they're not otherwise defined here.

12  Yes.

13  Q     Yeah.  The abuse types, base matrix values, maximum

14  matrix values, and scaling factors were selected and derived

15  based on the debtors' pre-petition experience with the

16  intention of achieving a fair and reasonable abuse claim

17  valuation range in the light of the best available

18  information considering the settlement verdict and/or

19  judgment that abuse claimants received in the tort system

20  against the protected parties, absent the bankruptcy.

21       Do you see that language; that's my question.

22  A     Yes.

23  Q     Okay.  Now, giving the judge's ruling, I'm not going to

24  be asking you about the fair and reasonable component of that

25  sentence, but what I want to ask you about in that sentence

1    is, again, are you conveying the debtors' position conveyed

2    to you?

3    A      If I -- counsel pointed out, if you go back to the

4    beginning of this conversation in the declaration at

5    paragraph 50, what I am relaying, rather clearly, is that the

6    debtor and through the disclosure statement -- the debtor,

7    through the disclosure statement and, otherwise, makes clear

8    that this is what they are putting forward.

9          And, frankly, this is there, up through 53 --

10   Q      Uh-huh.

11   A      -- this is explaining the predicate for what comes

12   after --

13   Q      Okay.

14   A      -- which is what -- how -- this sets the frame for

15   claims getting valued.  We explain we're getting this from

16   the debtors' disclosure statement.

17         And then, as we move forward, I talk about what happens

18   in the mechanics of getting claims evaluated and when there's

19   a dispute.  And that part is where the debtors' role ends, if

20   you will, and where -- not well -- it's where the reliance on

21   the debtors' history ends and trust design kicks in and I

22   have a lot of views about whether we designed an effective

23   trust.

24         But to have it make sense, you have to understand what

25   the matrix describes and what the -- how the scaling factors

1  work.

2  Q    Okay.

3  A    This is -- this is just -- this is an explanation so

4  that the rest of the declaration can make sense.

5  Q    Thank you.

6       So, what I'm taking from these paragraphs is, this

7  is -- you are providing context.  You are not affirmatively

8  providing factual, firsthand knowledge; you're just providing

9  context for the things and opinions you give later in your

10 report, in your declaration?

11 A    It's the debtors' burden to establish that the matrix

12 and the scaling factors are consistent with their history.

13 Q    Okay.

14 A    I've said that in prior pleadings.  It's -- I don't how

15 to emphasize it any more than that.

16 Q    All right.

17            MS. MCNALLY:  Your Honor, I'm about to move into a

18 new area and if you wouldn't mind, I could really use a

19 bathroom break.

20            THE COURT:  Yes.  Let's take a -- well, what time

21 is it?

22            It's 3:58.  We'll come back at 4:05; five after

23 the hour.

24            MS. MCNALLY:  Thank you.

25            THE WITNESS:  Thank you.

1          THE COURT:  We're in recess.

2      (Recess taken at 3:58 p.m.)

3      (Proceedings resumed at 4:09 p.m.)

4          THE COURT:  Ms. McNally?

5          MS. MCNALLY:  Thank you.

6  BY MS. MCNALLY:

7  Q    I'd like, now, to turn to the claim, some details of

8  the claims process.  We're not going to go through all of

9  them; they've been discussed extensively so far in this case.

10      But would you agree with me, and I think based on your

11  prior testimony, you will, do you agree with me that,

12  procedurally, this process is dramatically different from the

13  pre-petition experience in the tort system?

14  A    Procedurally.  Well, yes and no.

15      Like I said, it's clearly -- setting a bar date,

16  creating a trust, and building the procedures into the trust

17  that assure equal treatment when you have something that's

18  radically different from the ad hoc serious of negotiations

19  that have happened at state -- at various local litigation

20  levels with counsel around the country.

21      So, I'm not aware that there was a procedural roadmap

22  that existed in the hands of the Boy Scouts for settling

23  claims that could be compared to this at all.  So, the

24  procedure here exists, where I'm unaware of any procedure

25  existing (indiscernible).

1  Q     So, the fact that there is a procedure, it sounds like
2  you're saying, the fact that there is a procedure is a big
3  difference?
4  A     To the best of my knowledge, they did not have one.
5        And so, from (indiscernible) that would be radically
6  (indiscernible).
7  Q     And that there's no formal adversarial party is another
8  difference?
9  A     Well, we have -- we do have an adversarial party in the
10 sense that -- I don't know quite how to put this -- what
11 we're doing is negotiating a set of procedures right now with
12 adversaries, including you -- this is your time to come
13 forward and say, I don't like the procedures, and object to
14 the procedures and say there's something wrong with them --
15 bad faith, not fair, whatever it is.
16       And so, the design, now, is quite adversarial; it's
17 obvious.  And then, the subsequent claim where a claim comes
18 forward with a claim and presents that claim under those
19 procedures to the trustee is a process that is adversarial in
20 the sense that -- well, it is adversarial in the sense
21 that -- in two senses.
22       If the claimant doesn't follow the procedures, the
23 claim is denied and there's a dispute-resolution that
24 (indiscernible) involves exiting to the tort system, in fact.
25 And the trustee and the claimant are adversarial in that

1  sense.

2       And there's also an element in the implementation of

3  the TDPs and the evaluation of claims where there's a degree

4  of adversarialness that comes in where the claimants who have

5  to be paid are anxious about how much is being paid to the

6  present claimant or whether the present claimants who are in

7  the queue for evaluation are being properly evaluated.

8       And, of course, my hypothetical last person paid is the

9  one who's most acutely concerned about missteps, errors, and

10 waste over paying claims inappropriately.  I had a him --

11 it's going to be a "him" -- because every misspent penny and

12 every error is borne by the last claimant and is borne not at

13 all by the first claimant, so --

14 Q    We'll definitely talk about that aspect in a moment.

15      I'm not really talking about, like, the conceptual

16 conflicts among the claimants for who gets what money; I'm

17 talking about in the handling of a claim, in the tort system,

18 you have somebody on the other side who's putting you to your

19 burden, who is your adversary and not your fiduciary.

20      And there is no such person in this system for claim --

21 A    Well, there's one right now.  I --

22 Q    -- resolution, putting set aside the IRO.

23 A    So, there's one right now.  We are in an adversary

24 process to design the system.

25 Q    Do you think we're handling claims right now, sir?

1    A      No, but we're designing the system to handle claims.

2    So, this is quite adversarial.

3    Q      Okay.  Thank you.

4          Not my question.  My question is, handling the

5    particular claims in the claims matrix process --

6    A      Uh-huh.

7    Q      -- is quite different from pre-petition in that you

8    don't have someone who's your adversary on the other side?

9    A      That's not entirely true.

10          You are correct the trustee is a fiduciary, but this is

11    unlimited funds.  And in that context, there is a degree of

12    adversarialness that comes from the responsibility that that

13    fiduciary posed to every other claimant.

14          Now, I will concede to you that it's nothing like what

15    happens in a context where there's active litigation and the

16    Boy Scouts stand on one side, perhaps, or perhaps not, with

17    an insurer joined with them and a claimant and his counsel is

18    on the other side and they are negotiating a deal.  But we

19    are past that step in the sense that we are negotiating today

20    with you as an adversary, the frame for making every

21    subsequent deal.

22    Q      Uh-huh.

23    A      And you have the right, which you are exercising today,

24    to challenge whether or not we have designed an appropriate

25    settlement mechanism and whether or not it's fair and whether

1    or not it treats claimants equitably.

2    Q    So, the matrix approach -- well, one other difference.

3    One other difference is, obviously, in the tort system, you

4    don't have a matrix that you know in advance before you fill

5    out any forms like a questionnaire --

6    A    That's not necessarily true.

7    Q    -- or a complaint --

8    A    That's not necessarily true.

9         And I don't know that, as I said, in Boy Scouts, what

10   they had here, but in the tort system, it is not at all

11   uncommon for there to be settlement agreements with law firms

12   that represent multiple claims where the claimants -- where

13   the debtor and the Plaintiffs (indiscernible) the insurance

14   company, have an agreement that if the Plaintiffs' firm comes

15   forward with a claim that satisfies certain characteristics,

16   that claim will be paid a particular amount of money.

17        They're called inventory deals.  These are quite

18   common.

19   Q    Okay.  Thank you.

20        I'm glad you clarified a misunderstanding you're having

21   in my questions.

22        I am talking about the -- not the settlements, not

23   handling claims as inventory; I'm not talking about that,

24   sir.  I'm talking about in the court system.  This is

25   different from the court system.

1  A     That is --

2  Q     In the court system, for example, there is no matrix

3  where you can figure out, in advance, what you will be paid

4  before you file your complaint, right?

5  A     Well, if there's an inventory deal, you obviously know

6  what you're going to be paid before you file your complaint

7  and you typically settle before you file any complaint.  So,

8  that's a very common feature, particularly in a mass tort.

9         Now, you are correct that what we're doing here today

10 is creating a settlement mechanism that will hopefully, for

11 those that choose the matrix approach, eliminate litigation.

12        We're designing a system that's supposed to, if we do

13 it right, encourage all those who might sue, to settle.

14        And it's a -- so, it's a pre-litigation context.  It's

15 not unlike the inventory system that we see in a number of

16 other mass tort cases and, frankly, with respect to any mass

17 tort, law firms develop an understanding of the kinds of

18 values that they can achieve in their jurisdiction with

19 respect to a claim of a given type against a particular

20 Defendant.

21 Q     Mr. Patton --

22 A     So, I'm not quite sure what it is you're comparing.

23 Q     Mr. Patton, let me ask you kind of a simple question.

24        This isn't -- like, I'm not calling for, like, a speech

25 or a -- it's a simple question.

1    In your experience, do you view childhood sexual abuse
2  as something that is handled properly on an inventory basis?
3  A    I think that there is a possible future, yes.  I -- the
4  short answer is, I can easily imagine a very healthy and
5  sensible approach that would avoid a bankruptcy that,
6  perhaps.
7    If the insurers were interested in funding it, they
8  would have allowed the system to unfold where people who were
9  abused to come forward and reach a resolution on an inventory
10 basis.  Yes, I think that would, in fact, be quite fair for
11 all parties involved.
12 Q    Have you ever personally worked with, on a
13 representative basis, someone who, as a child, was repeatedly
14 sexually abused?
15 A    Can you read that back, please.  I'll repeat it.  Just
16 read it back.
17 Q    Look, there's nothing for me to read, so I'll --
18 A    Oh, I apologize.  I'm sorry, I'm thinking of a
19 deposition.  I apologize.
20    Just say it one more time, please.
21 Q    Have you ever represented -- let me just say it this
22 way --
23 A    No.  No.
24 Q    -- have you ever represented anyone --
25 A    No.  No.  Not in connection with abuse.  I've not

1   represented an abused person in connection with abuse.

2   Q    Have you spent time reviewing, personally, the files of

3   any childhood sexual abuse victim, the full case files, all

4   the way through?

5   A    We've talked about this.  No.

6   Q    Okay.  Well, I'm going to move on.

7        The matrix approach.  I'm in the matrix approach.

8   Those will be processed, for lack of a better word, by the

9   trustee's staff?

10  A    Correct.

11  Q    And those staff, whoever -- and the retention of that

12  staff requires approval of five of the seven STAC members?

13  A    Yes.  Well, or, you know, if -- ultimately, if that

14  can't -- let's put it this way.  If the STAC is broken, we'll

15  have to find another -- and can't function -- we'll have to

16  find another solution to it.

17       But the way the current document is drafted, the

18  proposition is the STAC has to approve by a single majority.

19  Q    Okay.  And the supermajority, the way that the

20  supermajority shakes out with this STAC, it means it requires

21  at least one member of the Coalition team?

22  A    Yes, at least one member of the TCC and one member of

23  the Coalition team would have to -- one way or the other, you

24  would have to have somebody join.

25  Q    Uh-huh.

1  A    I'm not quite sure how much Judge Silverstein

2  understands.  So, we've got three and three, largely,

3  representatives; three from the Coalition and three from the

4  TCC and a representative from the Pfau/Zalkin group.  So, on

5  the theory that you need five, you would have to have

6  three -- a unanimous vote among one group of three -- I'm

7  just presuming for purposes of this conversation only that

8  they would operate as a unit -- plus Pfau/Zalkin, plus the

9  vote from the TCC.

10     Now, I have no reason to expect that as this unfolds,

11  that (indiscernible) is going to operate with those voting

12  blocs behaving in the way I just outlined.  But assuming they

13  behaved in that fashion, the question -- the answer to your

14  question is, yes, you would have to have one entire voting

15  bloc plus Pfau/Zalkin, plus a member of the other voting bloc

16  to get to a 5:7 outcome.

17  Q    Right.  We can figure out a different permutation about

18  (indiscernible) --

19  A    Correct.

20  Q    -- and are you aware that the Coalition, the attorneys

21  from the Coalition who are members of the STAC have at least

22  10,000 claimants in their personal representations for each

23  of those individuals, are you aware of that?

24  A    Not the precise numbers, but I am aware that they have

25  a large number of clients, in the thousands.

1  Q     And a corresponding large, personal stake in the awards

2  given to their clients, by way of their contingency fees?

3  A     Yes, we said before the larger the award, the bigger

4  the fee.

5  Q     The larger the award, and also the larger number of

6  claimants in your inventory?

7  A     Well, it's a claim-by-claim, but if you have more

8  clients and more clients on a contingency-fee basis and if

9  they all get -- if they were all victorious, you get more

10 fees.  That's, again, straightforward.

11 Q     Okay.  And then on an independent review side, the

12 neutral is similarly chosen, the neutrals?

13 A     I think -- they're similarly chosen in what sense?

14       What do you mean "similarly"?

15 Q     You need -- they require approval by five members of

16 the STAC.

17 A     Right.  That's an approval process, not a choosing

18 process.

19 Q     You're aware, certainly, that this -- a selection of

20 the trustee found a roadblock when the STAC members were not

21 able to agree to the -- at this required five, for the

22 selection of the trustee?

23 A     I racked up a lot of hours; yes, I'm very aware of it.

24 Q     Right.  That was the 60 hours in February; many of

25 those hours was on that issue.

1  A      Correct.

2  Q      And, ultimately, they were unable to reach an

3  agreement?

4  A      That's correct.

5  Q      That could happen for other decisions the STAC needs to

6  make, as well?

7  A      And I believe that we have a concrete, straight-line

8  dispute resolution mechanism for --

9  Q      I want to talk about that, yeah.

10 A      -- for every instance where the STAC is not able to

11 make a decision, except for a few.

12        And in those few, there's also, you know, there's a

13 backdoor solution, I believe.

14 Q      Right.  Let's talk about that.  So, paragraph

15 Section 8.16 of the Settlement Trust agreement provides a

16 dispute resolution process when the STAC is unable to get to

17 five on something that requires them to get to five,

18 including retention of professionals.

19 A      Yeah.  So, I'm sorry, which paragraph?  Let me open it

20 up.  It's paragraph 8 point --

21 Q      I think it's 8.16.

22 A      Hold on.  It's not 8.1.  It's --

23 Q      One six, I believe.

24 A      8.16, yes.  Okay.

25        Where are we?

1  Q      I've got the right -- I've got the right code number

2  here.

3  A      8.16 is the --

4  Q      Dispute resolution.

5  A      Yes.

6  Q      Uh-huh.

7         So, as I read this process, I just want to make sure

8  this is your understanding, first, you have 30 days of

9  informal discussions, up to 30 days of informal discussions,

10 yes?

11 A      Yes.  Yes.  Yes.

12 Q      And then you have, the one side has to send its formal

13 statement of position, yes?

14 A      Yes.

15 Q      And the other side has 30 days to draft a counter-

16 statement?

17 A      Yes.

18 Q      And then there's 30 more days where the parties confer

19 once again?

20 A      Yes.

21 Q      And then after that, if there's no resolution, there's

22 an opportunity for judicial review?

23 A      Yes.

24 Q      So, my math says that could be, it could be 90-plus

25 days --

1  A      It could be.

2  Q      -- before you even start asking for help from the

3  judge.  Nobody is even allowed to ask for help from the judge

4  under this provision, until after three months have passed.

5  A      That's true, if you follow these timelines.  That would

6  be --

7  Q      And the -- among the decisions that this would apply to

8  are things like who this trustee may hire?

9  A      That's correct.  Well --

10 Q      And we --

11 A      Wait.  Wait.  Wait.

12        I think there may actually be a provision that suggests

13 that it's excluded from the dispute-resolution mechanism.

14        Bear with me.

15        In any event, to the extent that that is a provision

16 that gets resolved through this pathway, this -- I think you

17 counted the days correctly.

18 Q      Okay.  Thank you.

19        Now, one of -- and as I said, that would be my last

20 question -- professionals hired by the trustee.  I think in

21 an earlier answer, you were offering this thought that

22 perhaps the trustee would retain a professional organization

23 to do the claims-handling-and-review processing procedures.

24        You didn't use those terms, but that concept.

25 A      Yes.

1  Q    Uh-huh.

2       And that was in, when we were talking about the three-

3  hours-per-claim part of the math calculation.

4  A    Yes, there are firms that do claims administration.

5  Q    So, do you agree with me that it is, at least,

6  conceivable that there could be an impasse on the question of

7  which of these claims-processing firms the trustee decides to

8  select, whether it's one favored by the Coalition-type

9  members or it's one favored by others on the STAC; that could

10 be an issue of some dispute?

11 A    That could be an issue of some dispute, correct.

12 Q    And while that dispute is being handled, months could

13 be passing by without even the setup required to get the

14 review underway?

15 A    That's -- of course.

16 Q    And that has nothing to do with how much the trustee

17 has done a really good job finding exactly the right

18 organization to do the work, right?

19 A    Well, in your hypothetical, you've got a --

20 Q    In my hypothetical --

21 A    -- yeah, you've got a stuck STAC.  And in that context,

22 the solution is to either work through the dispute-resolution

23 processes or there's also, I believe, the avenue of seeking

24 to make a proposal.  The trustee would make a proposal, the

25 FCR would make a proposal to amend the Trust and trigger the

1  dispute resolution with respect to the Trust amendment to

2  address this --

3  Q     And the Trust amendment, itself, requires five of the

4  seven STAC, right?

5  A     No, no, no.

6        I understand, but you would end up working your way

7  through, ultimately, to the Court.  And it would take time to

8  work through these dispute-resolution mechanisms if you'd go

9  all the way to the Court.

10       Now, I will say --

11 Q     So, no matter --

12 A     Go ahead.

13 Q     So, no matter how fair Judge Houser may have been in

14 selecting the professionals with whom she wants to work, she

15 could be boxed out of advancing her cause for three months or

16 more before she is able to select the professionals she wants

17 to work with, right?

18 A     That is possible, yes.

19 Q     Okay.  And as the representative of future claimants,

20 now children, as that representative, you have signed this

21 structure -- you have signed onto this structure?

22 A     I have -- I have signed up to it; I'm not thrilled with

23 it, but I've signed up to it, yes.

24 Q     Okay.  So now I'm going to move on to talk about some

25 of the findings.  I am going to skip your views on certain of

1   the findings in light of the Court's ruling earlier today.

2          And I want to be very clear that I'm not going to

3   be asking you any questions that might revisit that topic, so

4   please don't interpret any of my questions to be bearing in

5   any way on findings X or -- I believe it's Z.

6   A    Well, let me ask a question, just so we're all on the

7   same page.  As I understand the ruling, I'm not supposed to

8   talk about any findings as they may pertain to the matrix or

9   to the scaling factors, but with respect to the rest of the

10  TDP and how it works, to the extent a finding is relevant to

11  that, that -- I mean, for example, Your Honor -- well, I'm a

12  witness --

13          THE COURT:  Why don't --

14          THE WITNESS:  -- for example --

15          THE COURT:  -- Ms. McNally, why don't you ask your

16  question?

17          THE WITNESS:  Yeah, yeah.

18          MS. MCNALLY:  Okay.

19  BY MS. MCNALLY:

20  Q    Findings X and Z, findings X and Z you address in --

21  let me get to the right page.  I'm sorry.

22      (Pause)

23  Q    Let's start at paragraph 71.  Are you there?

24  A    I am.  I'm sorry, yes.

25  Q    All right.  So paragraph 71, among the things you say

1  about it are that it requires findings that the plans are --

2  those -- the plan and TDPs are appropriate, good faith, et

3  cetera; right, it says that?

4  A    Yes.

5  Q    And in support of that you cite to 524(g) and

6  1129(a)(3)?

7  A    Yes.

8  Q    You say that Section 524(g) guides all mass tort

9  bankruptcies?

10 A    Yes.

11 Q    Now, the language of 524(g) does not by its terms say

12 it applies to -- I'm sorry, the language of 524(g) by its

13 terms does not say that it guides all mass tort bankruptcies;

14 do you agree with me?

15 A    That's true.  524(h) sheds a little light on this

16 question --

17 Q    Right.  524(g), by its terms, does not do so?

18 A    No, 524(g) is an asbestos-specific solution.

19 Q    Okay.  And 1129(a)(3), you say -- you cite to

20 1129(a)(3) -- 1129(a)(3) requires that the plan has to be

21 proposed in good faith; right?

22 A    Correct.

23 Q    And I think you would agree with me that, for example,

24 finding X refers to more than the plan, it refers to trust

25 distribution procedures and compliance --

1  A      I don't --

2  Q      -- right?

3  A      If you think that the trust distribution procedures and

4  trust agreement are not part of the plan -- in other words,

5  if you're making the argument that we could exclude the

6  treatment of an entire class of creditors from a plan and

7  find the rest of the plan is in good faith and satisfy

8  1129(a)(3), I think you're wrong.

9          The trust distribution procedures and the TDP are

10 the plan.  In fact, it's just a very long-winded description

11 of the treatment of the members of that class --

12 Q      When this document --

13 A      -- and it is --

14 Q      Sorry, I thought --

15 A      -- the plan --

16 Q      -- you were done.

17 A      It is the plan.  In fact, this bankruptcy was filed

18 because of this class of creditors.  So I don't -- I mean,

19 Judge Silverstein is going to rule however she rules, but I

20 don't quite understand if there's even a possibility the plan

21 can be confirmed if the principal component parts can't

22 satisfy 1129(a)(3).

23 Q      So 1129(a) -- this document, you recall, in several

24 places says things like the plan, the TDPs, it has a list of

25 things.  It doesn't say just the plan; it says the plan and

1  other documents.  You see that throughout the plan; right?

2  A    So, yes, I see those words.  I understand what you're

3  saying.

4  Q    Okay.

5  A    I think your premise --

6  Q    I can see you --

7  A    -- I think your premise --

8  Q    -- find this amusing --

9  A    -- is flawed.

10  Q    -- I'm not trying to be amusing here.

11        Do you think that by listing those other

12  components that that makes -- that is just surplusage?

13  A    So in terms of the document that you're reading, my

14  declaration, and in many of the other documents, it's the

15  only way to speak with clarity, the -- but from a legal point

16  of view, the trust distribution procedures and the trust

17  agreement are part of the plan.  It's -- if it were possible

18  to write it down on a single page, it would have been dropped

19  into the plan as a description of the treatment of that

20  class.  It's just -- you know, it's just the way it is.

21  Q    It's just the way it is?  Okay.  So you believe -- I'm

22  just trying to understand your -- I really don't need like a

23  law school course on this, sir, I'm trying to just identify

24  your position.

25        Is it your position that all of the findings that

 1  must be made as to the plan must also be made as to the TDPs,

 2  the trust agreement, and every single thing else, they all

 3  have to be made independently in findings under 1129(a)(3),

 4  is that your view?

 5  A    Well, I don't know quite how to get into this without

 6  getting didactic with you.  For example --

 7  Q    Well, that was a yes-or-no question.  And you could

 8  just say, yes, that's my view or, no, that's not my view, but

 9  that was just simply a yes-or-no question.

10  A    Well, but you have premises that were vague and so it

11  is unanswerable.  If the court finds a plan is fair and

12  equitable, then it finds the component parts of the plan to

13  be fair and equitable in their operation.  The decisions --

14  the list of assumed contracts and the decision to assume

15  them, all of which are integral to the operation of a plan,

16  and the plan proponents have to behave in a way that's -- not

17  fair and equitable, I'm sorry, in good faith -- the plan

18  proponents have to behave in a way that is in good faith.

19            And it's a -- there are two ways to look at this.

20  The plan, from the point of view of the confirmation process,

21  is a bundle of documents, one of which is called the plan,

22  and there are other additional documents that are component

23  parts of it, often as appendices or exhibits, and they each

24  have also their own name.

25            So we -- when we talk about the documents that

1  comprise the larger plan -- or that the larger plan

2  comprises, we give them names, like Schedule A of assumed

3  contracts, and the trust agreement, the TDP, but the plan, in

4  a legal sense, in terms of what's being confirmed, is the

5  entire collection that is -- it contains these component

6  parts.

7  Q    Let's look at finding W.  This is addressed in

8  paragraph 75.  Finding W, if you have it in the plan itself,

9  I don't know that you quote it in your document here.

10  A    Oh, in the plan itself?

11  Q    Yeah.

12  A    Bear with me.

13  Q    Well, you quote a bit of it.  So that's fine, you can

14  look at 75.  It says, "The plan documents" -- now, here you

15  spell it out -- "The plan documents, including the plan and

16  the confirmation order, shall be binding on all parties in

17  interest, consistent with applicable legal doctrines,

18  including the doctrine of *res judicata* and collateral

19  estoppel, Section 1141 of the bankruptcy code and related

20  authority."

21  A    I see that.

22  Q    Okay.  And you say it's important to you that the plan

23  include assurances that the insurers cannot re-litigate

24  matters already decided by the bankruptcy court after the

25  insurers have had ample opportunity to address them.  The

1  notion -- which I think people generally say to mean lie --

2  that a party could litigate a claim to -- matter to

3  conclusion, receive a determination of that issue from this

4  bankruptcy court, and then assert such a determination is not

5  binding on them is quite simply nonsensical.

6          Is that your opinion, sir?

7  A    Yep.

8  Q    Let's take those apart a little bit.  Now, the insurers

9  haven't -- nobody has litigated any claims here; right?

10 A    As far as I know, no abuse claims have been litigated

11 in this bankruptcy case.

12 Q    And in fact that was a very important part of the first

13 part of this testimony this morning was the FCR and TCC

14 dropping their objection to Dr. Bates because no claims are

15 being litigated here; right?

16 A    That's correct, no claims are being litigated -- no

17 individual claim -- a claim allowance process is not underway

18 with respect to -- or completed with respect to any abuse

19 claim.

20 Q    And it couldn't even happen because -- for all the

21 reasons about all this setup stuff you talked about before;

22 right?

23 A    No, it could happen.  You're free to object to a claim,

24 if you wish.

25 Q    Right.  There's no claim -- for people who want to

1 | proceed in the claims process, there is at this moment --
2 | even as to the $3500 people, but for the people who aren't
3 | taking the $3500, there is no mechanism in place for their
4 | claims to be evaluated, adjudicated or anything else at this
5 | point?
6 | A    That's not true.  You have the right to object to every
7 | single proof of claim that's been filed, if you wish.
8 | Q    There is no opportunity for a claimant to have his
9 | claim processed at this time?
10 | A    If -- you mean affirmatively?  Well --
11 | Q    Yes.
12 | A    -- a filed claim is deemed allowed.  So until -- unless
13 | and until you or some other party objects to it, it resides
14 | as a deemed allowed claim, and what we would be replacing
15 | that with as part of the confirmation is the structure that
16 | is captured in the trust and TDP that is now an additional
17 | step that has to be complied with for every claimant who's
18 | filed a proof of claim in order to achieve an allowed claim.
19 | But, as we stand today, there is a mechanism for you to
20 | challenge any claim, if you wish.
21 | Q    And at this point there is no mechanism for that person
22 | to go through this TDP process or the IRO process set forth
23 | in the plan, it's --
24 | A    That is --
25 | Q    -- not yet ready?

1  A    That is true, this has not been approved by the Court.

2  That is correct.

3  Q    And even if right today at 4 o'clock -- 5 o'clock your

4  time the Judge said, done, approved, there still would be no

5  mechanism because there are things that have to happen first;

6  right?

7  A    That is -- that is correct.  For the practical

8  processing of claims, there are, as I've testified already,

9  quite a few steps that have to be taken in order for a claim

10  to be presented and evaluated by the trust.

11  Q    And the questionnaire the claimants have to complete

12  hasn't even been drafted yet?

13  A    That's correct.

14  Q    And hasn't been approved by the required five STAC

15  members, contingency fee counsel with an interest, they

16  haven't even --

17  A    That's correct.

18  Q    -- approved it yet; right?  Okay.

19  A    That's correct.

20  Q    And there have been no determinations as to the

21  coverage obligations of the non-settling insurers in this

22  case?

23  A    That's correct, and there won't be any, as far as I

24  know.

25  Q    Okay.  Now, you're familiar as a lawyer of many years

1   about how claim and issue preclusion works in litigation,

2   right?

3   A      Yes.

4   Q      It's a comparative process, isn't it?

5   A      I don't know what you mean.

6   Q      You look at what was done before and you compare it to

7   what parties want to do now, and you evaluate does that other

8   thing, does that prior thing bar the position to be taken

9   now, comparing then to now, that's the whole nature of issue

10  and claim preclusion, isn't it?

11  A      Uh, well --

12         (Pause)

13  A      I suppose -- so let me try to reframe it in a way that

14  I understand it.  If the -- if the action in the future is

15  something that has already been decided in the -- that

16  requires a decision has already been decided in the past as

17  between those parties, then the opportunity to reevaluate it

18  is not real absent an appeal by --

19  Q      Let me --

20  A      -- so I don't know --

21  Q      -- it looks like --

22  A      -- if we're going (indiscernible) --

23  Q      -- you're struggling with my question.

24            So, in other words, issue and claim preclusion,

25  collateral estoppel, *res judicata*, whatever terms you want to

1    use, are context-dependent on the intended use in the second

2    action.

3    A    Uh --

4    Q    You need to know what that context is to determine

5    whether those doctrines apply.

6    A    Well, you would certainly need to know a variety of

7    things to -- like the identity of the parties, but I don't

8    think intent is an element of it -- as you use the word

9    intent, I don't think intent is an element of it.

10   Q    You need to know, the then and the now, you need to

11   know the context, you'll agree with me?

12   A    Sure.  So if -- well, let me put it this way.  I'm not

13   sure I agree with you because I'm not quite sure I understand

14   what you're asking.

15         If -- let's start with the now.  The now, all the

16   judge can do now is to say here is my order and it is binding

17   on all parties.  And a subsequent court -- not this court --

18   I mean all this court can do, all Judge Silverstein can do is

19   say this is my order, this order is binding on all parties,

20   everyone is bound by the principles of *res judicata* and

21   collateral estoppel.  If someone later wants to pursue

22   something and convince a court that -- or, for that matter,

23   this court -- that that new something is not subject to the

24   principles of collateral estoppel or *res judicata*, nothing

25   precludes -- nothing here, nothing Judge Silverstein does can

1   preclude that future event or that outcome because, sitting

2   here now, we don't know what that hypothetical future is.

3   But --

4   Q    Right.

5   A    -- but --

6   Q    Okay, thank you.  And --

7   A    I'm not done yet.  You're talking about the here-and-

8   now thing.  But it's inappropriate for the court to say I'm

9   going to conclude that my -- inappropriate is -- I think I

10  would say ill-advised for the court to say I'm going to

11  conclude now that my decisions are not subject to collateral

12  estoppel or *res judicata*, they're advisory in some sense.

13          That's -- you know, we're resolving issues today

14  and, once resolved, my view is they need to stay resolved;

15  otherwise --

16  Q    Okay.  So, under --

17  A    -- we're wasting --

18  Q    -- that approach --

19  A    -- (indiscernible) time.

20  Q    So, in order to avoid wasting time, I really don't want

21  to be doing that, so would you say the point of finding W is

22  to say something more than the rulings here are final, is

23  that all that that is supposed to be doing?

24  A    So (indiscernible) is doing more than that in the sense

25  of we have had insurers ask for rulings in court orders that

1  say the findings -- in the bankruptcy cases -- that the

2  findings of the court are not applicable to them, we're

3  saying the opposite of that -- or not the opposite of that,

4  what we're saying is we're not -- we're not inclined to hand

5  out that special privilege in this case.  No one gets a free

6  pass.  Everybody is here fighting and we will get the ruling

7  we get from Judge Silverstein with no special outs for

8  insurers or anybody else.

9  Q    Okay.  Well -- just a moment.

10           You represented the Diocese of Wilmington, we

11 talked about early --

12 A    Yes.

13 Q    -- yes?  You didn't have any provision like this in

14 that plan, did you?

15 A    I have no idea.

16 Q    If it would refresh your recollection, the confirmation

17 order is in your binder, feel free to look at it.

18 A    Which tab is it?

19 Q    Nine, maybe?  Nine, it should be 9, I believe.

20 A    My binder only goes to 7.  Hold on.  Oh, there's

21 another set of binders.  Hold on.

22      (Pause)

23 A    No, that's not it either.  I don't have -- I don't have

24 a binder with --

25 Q    All right.  I'll --

1  A      -- this 9 --

2  Q      -- so let's -- this is a peripheral point.  I'm just

3  going to move on because I understand the Judge needs to

4  stop.

5              MS. MCNALLY:  Your Honor, for planning purposes,

6  what time do you need to stop today?

7              THE COURT:  5:15.

8              MS. MCNALLY:  Okay.  Thank you.

9  BY MS. MCNALLY:

10  Q    You don't recall a term like this in the Wilmington

11  order?

12  A    I don't recall one way or the other.

13  Q    Okay.  Now, there's another finding I want to talk

14  about is Y, finding Y.  In paragraph 74, you say, article --

15  finding Y, essentially, "of the plan requires a finding that

16  the amount of a survivor's claim in this bankruptcy is not

17  determined by the size of the asset pool available to pay the

18  claim."

19              Okay.  Now, since we only have 25ish minutes, I'm

20  just going to ask that you listen to my questions and answer

21  my questions --

22  A    Okay.

23  Q    -- on this finding.

24              Now, finding Y, you quote -- you described part of

25  it, but you didn't describe all of it, did you?  There's

1  another part.  The paragraph starts -- it also has a finding

2  that "the right to payment that the holder of an abuse claim

3  has against the debtors, or against a protected party or a

4  limited protected party, is the amount of such abuse claim as

5  determined by the trust distribution procedures"?

6  A     Yes.

7  Q     That part is also in there and not quoted in your

8  declaration; right?

9  A     I don't see it in my declaration and I do recall that

10  it is part of the finding, yes.

11  Q     Okay.  And, by not including it, did you intend to not

12  endorse that part of the finding Y?

13  A     No, the key point is to establish that it's -- the

14  amount of the liability is the claim allowed --

15  Q     Again --

16  A     -- not the amount --

17  Q     -- I would just ask that you answer the question I'm

18  asking.

19  A     I endorsed --

20  Q     I'm not asking --

21  A     -- I endorsed the whole finding.

22  Q     Okay.  Thank you.

23          So what that means is that no matter the amount of

24  the award -- and in the independent review there's no upper

25  limit -- no matter the amount of the award, the decision of

1  the neutral is the right of entitlement for the claimant?

2  A    That's right.  We're trying to avoid what happened in

3  Fuller with the state court when we didn't have specific

4  language coming out of a confirmed bankruptcy plan.

5  Q    And that Fuller -- when you say Fuller, you mean Fuller

6  Austin, the case you were in --

7  A    Yeah.

8  Q    -- in the earlier -- on your disclosures earlier?

9  A    Yes.  We had a state court that assumed that the amount

10  of the claim was the amount paid to the claimant --

11  Q    Okay.

12  A    -- and that extra money --

13  Q    Sir --

14  A    -- extra money --

15  Q    -- again, I would really appreciate if you would just

16  stay with me and answer the questions I'm asking.

17          When you say Fuller, it's a case where you were a

18  party in the case and it came out where you were unhappy with

19  the outcome; right?

20  A    The bankruptcy case was fine.  What happened in state

21  court was the state court --

22  Q    Had rejected --

23  A    -- concluded -- concluded that, because we didn't have

24  language like this in the plan, there was no obligation to

25  pay the claimant if extra money came into the trust.  I found

1  that --

2  Q    Okay.  Thank you.

3  A    -- crazy, but the lack of explicit provisions was --

4  led to a terrible outcome.  So --

5  Q    So that was -- when you say in the state court, now

6  we're talking about a coverage action?

7  A    In California, after -- it began before the bankruptcy

8  and continued after.

9  Q    Okay.  So this provision is intended to address an

10 outcome in a coverage action that you were unhappy about?

11 A    In part.

12 Q    All right.

13 A    It's also intended to establish the rights of claimants

14 vis-a-vis each other.

15 Q    And in addition, sir, that type of a provision was not

16 included in Wilmington, obviously; right?

17 A    Yes, it was not.  We didn't create a trust with a

18 distribution like this; it was not a mass tort case.

19 Q    It was only a hundred and some abused children?

20 A    Correct.

21 Q    Okay.  So no upper limit, the claimant can take that

22 outcome and after --

23 A    That's what the court --

24 Q    -- going through the (indiscernible) so it be $40

25 billion, that --

1  A     That --

2  Q     -- this finding says that is the allowed amount that

3  can then be pursued in a coverage action?

4  A     Yes.

5  Q     Okay.  All right.  Now let's talk about the coverage

6  action for a second.

7          The professionals that may be hired include

8  professionals to pursue insurance recovery; right?

9  A     Yes.

10 Q     And oftentimes -- and those, that would be the

11 insurance coverage counsel to the trust, that's the role --

12 A     Well, and perhaps as well, but yes.

13 Q     Okay, thank you.  And oftentimes, typically, that role

14 is a contingency fee role?

15 A     Sometimes yes, sometimes no.  It depends on --

16 Q     (Indiscernible) --

17 A     Well, no, it depends on the firm.

18 Q     Okay.  Now, then if it is a contingency fee or

19 partially contingency fee, it is -- the payment then is based

20 on the recovery that that firm obtains in the coverage

21 actions?

22 A     Well, right.  If it's a contingency fee, I assume

23 that's correct.

24 Q     And in paragraph 73 of your declaration here you said

25 the insurance assets transferred to the trust could be worth

1  billions of dollars?

2  A    Yes.

3  Q    Now, I recall you have not provided any valuation

4  expert to talk about the amount of the potential insurance

5  assets transferred; right?

6  A    That is correct.

7  Q    And in fact an expert -- and I'll just lay -- you know,

8  tying a foundation in the next witness -- the next witness to

9  come has submitted a report that says that number is in the

10 under four hundred, at the top 400 million-ish range.  And

11 you have not disputed that, have you?

12 A    I --

13         MR. GUERKE:  Objection, Your Honor.

14         THE WITNESS:  It's not an issue -- correct,

15 there's nothing to dispute.

16 BY MS. MCNALLY:

17 Q    Okay, but let's just take your word for it, let's say

18 it is billions.  If that's the case, the contingency fee

19 counsel seeking to do insurance coverage work for the trust

20 could bring in millions of dollars in contingency fee

21 payment; right?

22 A    Yes.  We're doing a math exercise.  Yes, if a -- if

23 there's a law firm hired to do insurance litigation and if

24 that law firm takes it on a contingency fee basis, and if

25 it's, you know, ten percent, pick your number, and if it's a

1  billion dollars of insurance, then we can calculate the fee.

2  I agree with the basic math.

3  Q    Okay.  Now, among the firms that do that work, one that

4  does a fair amount of that work and of which you're familiar

5  is Gilbert LLP; is that right?

6  A    Yes, that's correct.

7  Q    And Gilbert LLP is your coverage counsel in this

8  action?

9  A    That's correct.

10 Q    And those lawyers who are from that firm and on your

11 team were involved in drafting the provisions we just covered

12 -- the finding, for example, to address the Fuller Austin

13 problem -- weren't they?

14 A    Yes, they were.

15 Q    And there's nothing in this plan at any place at all

16 that would preclude the lawyers who drafted that coverage --

17 coverage-focus term from them getting the assignment of doing

18 the coverage litigation and having the potential of obtaining

19 hundreds of millions of dollars for themselves as contingency

20 fee counsel to the trust, is there?

21         MR. GUERKE:  Objection, calls for speculation.

22         MS. MCNALLY:  It should not require speculation to

23 know what's in the trust agreement.

24         THE COURT:  Yeah -- no --

25         THE WITNESS:  There --

1          THE COURT:  -- overruled.

2          THE WITNESS:  -- there's nothing in the trust

3    agreement that prevents the trustee from hiring any

4    particular firm for anything.

5    BY MS. MCNALLY:

6    Q    Including the particular firm that wrote the finding

7    that will give them an advantage in later coverage action and

8    that was the intention in putting that finding in this

9    agreement?

10   A    Not at all, that's not the intention for putting the

11   finding in this agreement, and their drafting of these

12   provisions were designed to prevent the trust from being

13   punished or penalized by a lack of clarity around the notion

14   that we're paying on a payment percentage.  And the Fuller

15   Austin debacle was that the amount paid was the amount of the

16   claim, even though it was ten -- I'm thinking of a number --

17   let's say it was only ten cents on the dollar of a claim.

18          So what we're making clear is the amount of the

19   allowed claim is the debt and, if more money comes in, we

20   will increase the payment percentage and pay more against the

21   debt.

22   Q    Right, it's a coverage issue, it's a coverage issue.

23   Whatever that coverage issue is, this finding --

24   A    Well, it's not --

25   Q    -- is addressing a coverage issue?

1  A    It's not just coverage.  We also have chartered

2  organizations to settle with, we have -- and it's also an

3  issue as between claimants, when we distribute funds against

4  -- to claimants with competing claims and interests.

5        So knowing the claim amount is -- the liability is

6  important for a variety of purposes, but it's a court issue.

7  Q    Okay.  Now --

8  A    It's a problem we have faced with courts that, frankly,

9  don't really understand bankruptcy plans and --

10  Q    And those are coverage courts --

11  A    -- it's (indiscernible) --

12  Q    -- right?  Those are coverage courts you're talking

13  about, the court issue is a coverage court; right?

14  A    Yeah, let me --

15  Q    Okay.

16  A    -- let me make it simple.  If you --

17  Q    No, I would appreciate -- I'm really short on time

18  here, sir, so I would really appreciate if I could ask my

19  questions.  Your counsel can ask you to elaborate, if he

20  wants.

21        You know, if the goal here is not to be

22  predetermining coverage issues, why don't you -- why don't we

23  just put that in the plan?

24  A    We aren't determining coverage issues.

25  Q    Okay.  Would you oppose a finding that this plan and

1  its incorporated documents do not adjudicate coverage issues

2  of the non-settling insurers?

3  A    I think that's in here.  We are not deciding any of the

4  rights that you have under your contracts.

5  Q    And would you oppose a finding that notwithstanding any

6  provisions of the plan, notwithstanding any provisions of the

7  plan and its incorporated documents, nothing should be read

8  to impair any insurer's contract rights?

9  A    No.  We are arguing about whether this trust agreement

10 is fair and equitable and I want that decided today.  I don't

11 want to have to fight that question in 50 courts with 50

12 different carriers when we can't fix it, but today we can fix

13 it.  If there's a problem with the trust agreement and the

14 TDPs, now is the time to address it, but --

15 Q    Thank you.  Not my question.  My question is, would you

16 oppose --

17 A    No.

18 Q    -- a provision --

19      MR. GUERKE:  Objection, Your Honor.  I ask that

20 the witness be allowed to complete his answer.

21      THE COURT:  I think --

22      MS. MCNALLY:  It was a yes-or-no question and his

23 answer was clearly no, plus a bunch of other things.  I would

24 like to be precise on the question I'm asking and get an

25 answer to my question.

1          THE WITNESS:  I will not agree to an order that

2   says this has no impact on you.  You're here fighting, it has

3   an impact.

4   BY MS. MCNALLY:

5   Q    Okay, that's fine.  That wasn't my question.

6          My question is, would you oppose a finding that

7   says, notwithstanding any provisions, nothing herein shall be

8   read to impair an insurer's contract rights?

9   A    I don't know what impair means.  We're not adjudicating

10  any of your contract rights, I will --

11  Q    Okay.

12  A    -- agree with that.

13  Q    Okay.

14         MS. MCNALLY:  I don't have any further questions

15  then.  Thank you.

16         THE COURT:  Okay.  Thank you.

17         Mr. Guerke, we have ten minutes.  I have another

18  work-related commitment.  So we have ten minutes.  Can you

19  get -- ah, Mr. Buchbinder.  I'm sorry.

20         MR. BUCHBINDER:  Good afternoon, Your Honor.  The

21  cross-examination has inspired me to want to ask, I think,

22  about five minutes of questions.

23         THE COURT:  Please.

24         MR. BUCHBINDER:  Give me just a second here to

25  look.

1                        CROSS-EXAMINATION

2  BY MR. BUCHBINDER:

3  Q     Mr. Patton, section -- let me get the right page --

4  section 5.13(b) of the trust distribution procedures -- and I

5  think that's page 222 of Exhibit 353 -- 5.13(b) says that the

6  trustee shall consult with the STAC and the FCR on each of

7  the following:  an annual estimate of the budget for the

8  trust operating expenses.  Do you have that, sir?  Is that

9  correct?

10 A     Oh, you're in the trust agreement?  That sounds right,

11 yes.

12 Q     I'm on page 222 of pleading 8813, which is Exhibit 353.

13 I believe it's 5.13 of the trust, either --

14 A     If you could --

15 Q     -- (indiscernible) TDP (indiscernible) --

16 A     Oh, this is --

17 Q     -- it's page 222 --

18 A     -- (indiscernible) yes, yes, yes, I see where --

19 Q     Okay.

20 A     -- yes.

21 Q     In your discussions with the proposed STAC, have you

22 had any discussions about a first annual operating budget?

23 A     No, not yet.

24 Q     So, on top of all the other questions Ms. McNally asked

25 you about timing to organize the trust, there's no concept

1  yet of a budget?

2  A    That's correct.  I think we need the trustee first.

3  Q    Okay.  Now, in some of your testimony earlier you

4  testified that if you took the three hours and 82,000 claims,

5  I did the quick arithmetic and would you agree with me that

6  that's about 246,000 hours?

7  A    I'll trust your math.  It's a lot --

8  Q    Okay.

9  A    -- yep.

10 Q    All right.  So if I assume that someone working full

11 time, 40 hours a week, is working 160 hours a month, and that

12 works out to 1920 hours a year on a 12-month year, the

13 arithmetic I came up with was, just for three hours to review

14 each claim, 128.3 man or woman hours.  That's a lot of time,

15 isn't it?

16 A    Wait a minute, I think you mean 120 people to do it in

17 a year, I think is what you're saying.

18 Q    Well, yeah, that -- but what kind of people?  You

19 talked about claims administrators.  Those are the kinds of

20 people -- and you've been a Chapter 7 trustee, haven't you,

21 Mr. Patton?

22 A    Yes.

23 Q    I've been a Chapter 7 trustee too.  So I'm going to

24 talk to you in Chapter 7 trustee lingo for a couple minutes.

25           The kinds of claims administrators you're talking

1  about, they're the kinds of claims administrators that they

2  look at credit card bills, they look at commercial bills;

3  they don't analyze sexual abuse claims, do they?

4  A    No, I'm actually talking about a different kind of

5  claims administrator.  There's an industry out there of firms

6  that handle mass tort claims -- and I believe there are some

7  that have handled abuse claims, but I'm more familiar with --

8  Q    Thank you, Mr. Patton.  Thank you, thank you.  Let me

9  proceed to my next question.

10 A    Okay.

11 Q    There are a number of --

12        MR. GUERKE:  Objection, Your Honor.  Again, I'd

13 like Mr. Patton to have an opportunity to answer the

14 questions that have been asked.

15        THE WITNESS:  That's all right.

16        MR. BUCHBINDER:  He answered the question, Mr.

17 Guerke.  I don't have a lot of time, so I would like to

18 proceed.

19        THE COURT:  You can proceed.  I think Mr. Patton

20 is done with that answer.

21        MR. BUCHBINDER:  Thank you, Your Honor.

22 BY MR. BUCHBINDER:

23 Q    Now, there are a number of provisions in the plan-

24 related documents that require the trust to preserve the

25 confidentiality of the document, the underlying documents

1  that they're going to share regarding what have been called

2  the ineligible volunteer files and a lot of related

3  confidential material; right?

4  A    Yes.

5  Q    So the trust is going to have to take special

6  procedures to maintain the custody and security of those

7  records, isn't it?

8  A    Yes.

9  Q    And it's going to have to take into consideration that

10  important fact when it hires a claims administrator or

11  determines to hire a separate staff so the records can be

12  better maintained and their security controlled in a better

13  way; correct?

14  A    Yes, maintaining security is going to be important and

15  the staff will have to be trained to -- in a variety of

16  levels of security surrounding different categories of

17  documents.  But, yes, that's an important part of this.

18  Q    And that's all going to take time too?

19  A    Yes, training the staff, even if we hire an existing

20  team, will take time.

21  Q    And before you can train the staff, you're going to

22  have to figure out what you're going to have to train them?

23  A    Yes.

24  Q    And someone is going to have to develop a training

25  manual?

1  A      Probably; something to that effect, yes.

2  Q      Okay.  So you also talked about two categories of

3  claims, the matrix claims and the IRO claims.  Do you

4  remember that testimony?

5  A      I believe so.

6  Q      Isn't there a third group of claims to distribute here,

7  the so-called expedited distribution claims?

8  A      Yes.

9  Q      So you left those out.  Let's talk about those for a

10 couple minutes.  Someone is going to have to review all of

11 those; correct?

12 A      That's correct.

13 Q      And go through the process to determine how to allow or

14 not allow them; correct?

15 A      That's correct.

16 Q      And then you're going to have to distribute them and

17 the whole idea is to distribute them quickly; isn't that why

18 they're called expedited?

19 A      Well, to distribute them more quickly than the others.

20 I think you've pointed out --

21 Q      All right.

22 A      -- how long it may take to pay the others.

23 Q      Well, considering all of the questions that Ms. McNally

24 has asked and that I've asked, and the need for the trustee

25 to hire professionals and to determine whether to keep it in-

1  house or hire claims administrators, develop training, come

2  up with a budget -- oh, by the way, it's possible that the

3  trustee is going to decide that, if she needs to keep

4  everything in-house to protect and maintain the security of

5  the records, she's going to need to rent space, isn't she?

6  A    I don't really know.  That's possible.

7  Q    Does she need a budget for that?

8  A    Yeah, as I said, there are groups that can be hired to

9  provide those kinds of functions, but she may well want to

10 set up her own office.

11 Q    Okay.  So, based on all that, do you think that the

12 expedited distribution claimants will get their money any

13 time soon?

14 A    I think they will get their money sooner than the other

15 claimants, probably by a wide margin.  The (indiscernible)

16 designed it to make that possible.

17 Q    Well, let's see.  Do you think within a year or two

18 years?

19 A    I wouldn't be surprised if they're getting a payment

20 within the next 18 months, I think that's -- I think that's

21 achievable.  It's hard to -- it's actually difficult to say

22 for sure, but I think based on my past experience that is an

23 achievable moment for them to begin receiving payments.

24 Q    Okay.  So that's the earliest time you could conceive

25 of them starting to get money, a year and a half?

1  A     That's probably about right.

2  Q     Okay.  And there's no budget at this point in time,

3  there's no staff, and we've already seen dysfunction within

4  the staff; is that correct?

5  A     They were unable to reach a decision about the trustee

6  selection, yes.

7          MR. BUCHBINDER:  I have no further questions, Your

8  Honor.  Thank you.

9          THE COURT:  Let me ask, is there any other party

10  who's going to cross-examine Mr. Patton?

11          MR. CALDIE:  Hi, Your Honor.  Yes.  Edwin Caldie

12  on behalf of the Guam committee.  We intend to cross-examine

13  Mr. Patton tomorrow.

14          THE COURT:  Okay.  And Ms. Dumas?

15          MS. DUMAS:  Yes, I have some short cross-exam,

16  probably too long to get through tonight, but I can get it

17  done in the morning.

18          THE COURT:  And Ms. Wolff?

19          MS. LUJAN WOLFF:  Yes, just a few questions, Your

20  Honor.  Thank you.

21          THE COURT:  Okay.  Well, I apologize, but I have a

22  work-related commitment that I have to attend to this

23  evening.  So we're going to continue tomorrow at 10 o'clock.

24          Mr. Patton, please do not speak to anyone about

25  your testimony.

1          THE WITNESS:  Of course, Your Honor.

2          THE COURT:  And let me just pull my calendar.

3      (Pause)

4          THE COURT:  Okay, I just wanted to double check.

5  Yeah, we're good tomorrow, so 10 o'clock Eastern tomorrow

6  morning.

7          Thank you, everyone.  We're adjourned.

8          COUNSEL:  Thank you, Your Honor.

9      (Proceedings concluded at 5:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                 March 23, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                 March 23, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                  March 23, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                        March 23, 2022

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable