```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                     .  Chapter 11
                               .  Case No. 20-10343 (LSS)
4   BOY SCOUTS OF AMERICA AND  .
    DELAWARE BSA, LLC,         .  (Jointly Administered)
5                              .
                               .
6                              .  Courtroom No. 6
                               .  824 Market Street
7           Debtors.          .  Wilmington, Delaware 19801
                               .
8                              .  Wednesday, March 23, 2022
    . . . . . . . . . . . . . . .  10:00 a.m.
9

10

                        TRANSCRIPT OF ZOOM TRIAL (DAY 8)
11          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
12

13  APPEARANCES:

14  For the Debtors:          Derek C. Abbott, Esquire
                              MORRIS, NICHOLS, ARSHT
15                               & TUNNELL, LLP
                              1201 North Market Street
16                            16th Floor
                              Wilmington, Delaware 19899
17
                              Jessica C. Lauria, Esquire
18                            Glenn M. Kurtz, Esquire
                              WHITE & CASE, LLP
19                            1221 Avenue of the Americas
                              New York, New York 10020
20
    Audio Operator:           Brandon J. McCarthy, ECRO
21
    Transcription Company:    Reliable
22                            The Nemours Building
                              1007 N. Orange Street, Suite 110
23                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
24                            Email:  gmatthews@reliable-co.com

25  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Ernest Martin, Jr., Esquire
                             HAYNES & BOONE LLP
3                            2323 Victory Avenue, Suite 700
                             Dallas, Texas 75219
4
                             Arik Preis, Esquire
5                            AKIN GUMP STRAUSS HAUER & FELD LLP
                             One Bryant Park
6                            New York, New York 10036

7  For the US Trustee:       David L. Buchbinder, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
8                            J. Caleb Boggs Federal Building
                             844 King Street
9                            Suite 2207, Lockbox 35
                             Wilmington, Delaware 19801
10

11
   For AIG, on behalf of
12 Certain Insurers:         James Hallowell, Esquire
                             Mitchel Karlan, Esquire
13                           GIBSON DUNN & CRUTCHER, LLP
                             200 Park Avenue
14                           New York, New York 10166

15 For the Guam Committee:   Christina Arnone, Esquire
                             STINSON LLP
16                           1201 Walnut Street, Suite 2900
                             Kansas City, Missouri 64106
17
   For Lujan & Wolff
18 Claimants:                Delia Lujan Wolff, Esquire
                             LUJAN & WOLFF, LLP
19                           238 Archbishop Flores Street
                             DNA Building, Suite 300
20                           Hagatna, Guam

21 For Dumas & Vaughn
   Claimants:                Gilion C. Dumas, Esquire
22                           DUMAS & VAUGHN, LLC
                             3835 NE Hancock Street
23                           Suite GLB
                             Portland, Oregon 97212
24

25

1  APPEARANCES (CONTINUED):

2  For the FCR:                    Kevin Guerke, Esquire
                                   Robert Brady, Esquire
3                                  YOUNG CONAWAY STARGATT & TAYLOR LLP
                                   Rodney Square
4                                  1000 North King Street
                                   Wilmington, Delaware 19801
5
   For Continental
6  Insurance and Columbia
   Casualty:                       Laura McNally, Esquire
7                                  LOEB & LOEB LLP
                                   321 North Clark Street, Suite 2300
8                                  Chicago, Illinois 60654

9  For Century Indemnity:          Tancred Schiavoni, Esquire
10                                 O'MELVENY & MYERS LLP
                                   7 Times Square
11                                 New York, New York 10036

12 For the Committee of
   Unsecured Creditors
13 For Archdiocese of
   Agana:                          Edwin Caldie, Esquire
14                                 STINSON LLP
                                   50 South Sixth Street, Suite 2600
15                                 Minneapolis, Minnesota 55402

16
   For Hartford:                   James Ruggeri, Esquire
17                                 SHIPMAN & GOODWIN LLP
                                   1875 K Street NW, Suite 600
18                                 Washington, DC 20006

19 For Tort Claimants:             Alan Kornfeld, Esquire
                                   PACHULSKI STANG ZIEHL & JONES LLP
20                                 10100 Santa Monica Blvd., 13th Floor
                                   Los Angeles, California 90067
21
   For Great American:             David Christian, Esquire
22                                 DAVID CHRISTIAN ATTORNEYS LLC
                                   105 W. Madison Street, Suite 1400
23                                     Chicago, Illinois 60602

24

25

1                                    INDEX

2    MOTIONS:

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6

7    WITNESSES CALLED
     BY THE DEBTORS:                                              PAGE
8
          CHRISTOPHER MEIDL
9         Direct examination by Mr. Preis                          6

10

          JAMES PATTON
11        Cross-examination by Mr. Caldie                         39
          Cross-examination by Ms. Dumas                          112
12        Cross-examination by Ms. Wolff                          125
          Cross-examination by Mr. Ruggeri                        139
13        Cross-examination by Mr. Schiavoni                      150
          Redirect examination by Mr. Guerke                      160
14        Recross examination by Ms. Arnone                       164
          Recross examination by Ms. Wolff                        172

15

16

     EXHIBITS:
17
     JTX-292
18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:02 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're back at the Boy Scouts confirmation

4  hearing.

5          Mr. Abbott?

6          MR. ABBOTT:  Good morning, Your Honor.  Derek

7  Abbott from Morris, Nichols for the debtors.

8          Your Honor, as we mentioned early in the day

9  yesterday, we're going to take one witness slightly out of

10  order this morning, assuming the Court finds that

11  appropriate.  I believe Mr. Preis from Akin Gump is going to

12  examine that witness and introduce the testimony, so I'm

13  going to turn that over to him, if I may.

14          THE COURT:  Okay.  Thank you.  Yes, we will take

15  the witness out of order.

16          Mr. Preis?

17          MR. PREIS:  Good morning, Your Honor.  Arik Preis

18  from Akin Gump Strauss Hauer & Feld.

19          Can you hear me?

20          THE COURT:  I can.

21          MR. PREIS:  Thank you.

22          And thank you, Your Honor, for accommodating Mr.

23  Meidl's testimony this morning.

24          THE COURT:  Okay.  Then let me swear you in, Mr.

25  Meidl.

1  CHRISTOPHER MEIDL, WITNESS FOR THE COALITION OF ABUSED SCOUTS

2  FOR JUSTICE, AFFIRMED

3          THE COURT:  Please state your full name and spell

4  your last name for the record.

5          THE WITNESS:  Christopher Donald Alan Meidl; Meidl

6  is M-e-I-d-l.

7          THE COURT:  Thank you.

8          Mr. Preis.

9          MR. PREIS:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11  BY MR. PREIS:

12  Q    Good morning.

13  A    Good morning.

14  Q    If you could, can you just reintroduce yourself to the

15  Court?

16  A    Yes, my name is Chris Meidl.  I'm 60 years old.  I'm a

17  *pro se* claimant in the case.

18  Q    Thank you.

19          MR. PREIS:  Your Honor, the first five or seven

20  minutes of Mr. Meidl's testimony will involve some testimony

21  that could be triggering for survivors.  By agreement with

22  the debtors, I intend on putting thumbs up when we are done

23  with that testimony so that survivors starting now and for

24  the next, call it, five to seven or eight minutes, if they

25  want to, can mute their Zooms.

1          THE COURT:  Okay.  Thank you.

2          MR. PREIS:  Thank you.

3  BY MR. PREIS:

4  Q    Mr. Meidl, what state did you grow up in?

5  A    Wisconsin.

6  Q    And were you interested in being a Boy Scout when you

7  were growing up?

8  A    I was.  I grew up in a household with a grandfather,

9  father and uncle who were scouts, they didn't really

10  accomplish or move forward with scouting.

11      But one of the things that compelled me to be interested

12  in scouting and go forward with scouting was I grew up also

13  in an abusive household.  My father was physically abusive of

14  me, things I prefer not to say on the record.  He was busy

15  all the time.  All three of the men I mentioned were

16  functional alcoholics.  And so I spent a lot of time out of

17  the house, and scouting seemed like a great opportunity for

18  me to get away and do something that was exciting.

19      And I had -- I had a lot of father hunger, so I was

20  looking for someone to take me under his wing and mentor me,

21  and scouting seemed a perfect opportunity.

22  Q    Thank you.

23          MR. PREIS:  Your Honor, somebody has a -- their

24  video on.  It's "975 BSA Team Trial Viewing."  Thank you.

25          Thank you, Mr. Meidl.

1  BY MR. PREIS:

2  Q    At what point did you decide that you wanted to become a

3  Boy Scout?

4  A    My Eagle Scout application says May 1st, 1972.  And at -

5  - at that point, it was -- I guess I was in fourth grade, and

6  they were getting ready to head out on a camp out and summer

7  camp was coming up in July, so it seemed like a perfect time.

8       As I mentioned, I grew up in difficult household.  And

9  if I may, I kind of went out of the frying pan and into the

10  fire.  My first camp out involved a scout master walking by

11  each tent and throwing a few beers in there and a porn

12  magazine.  Some of those images, I've never forgotten.  They

13  were so grotesque to a ten-year-old boy.

14       And then I really didn't have much time in scouting

15  until the first incident of abuse which was three months

16  later, on the eve of my eleventh birthday, at our scout camp.

17  Q    Thank you.

18       Do you want to talk a little bit about your experience

19  when you were a Boy Scout?

20  A    Yes.  I would say I had a great duality because I loved

21  being a scout and I was determined to become an Eagle Scout;

22  vigil, honor, anything else that I -- Order of the Arrow,

23  that I could accomplish.

24       But the other part of the duality was the abuse.  The

25  first incident -- and I'm not going to explain much because

1  this went over the course of 1972 to 1976, 1977.  But on my

2  first camp out, we were around the camp fire, singing very

3  filthy songs.  The Man from Nantucket, some probably know

4  that, which the punch line is something to the effect of a

5  man who can self-copulate.  I didn't really know what that

6  meant, and little did I know that was a setup.

7      So we were drinking, singing these songs.  And at the

8  end of the time -- it was dark and we were under -- around

9  the fire -- our scout master said all you guys line up, we're

10 going to have a soft hands contest.  Again, I was

11 competitive, I was active, I was precocious.  I thought, I

12 don't know what that means, but sure, contest, I'll do that.

13      So we all lined up on the other side of the fire, and I

14 was -- as it happens, looking at the scout master.  I was on

15 the far left end of the line.  He went down, he said palms

16 up, everybody put their palms up, so he could inspect our

17 hands.  And we got to the end of the line, felt my, you know,

18 un-labor-scarred hands and said we have a winner.  The prize

19 was to go get my things and sleep in his tent.  I thought

20 that was a great thing, sleep with the scout master three

21 months in, I have a mentor.

22      I took my things and went to the tent.  He came in.  I

23 had my sleeping bag all set up.  And he said -- the first

24 thing he said, well, what we o with scouts is we sleep in the

25 nude because that's the best way to retain our body

1  temperature.  I went okay.  Ten years old, sure.  Took off my

2  clothes and threw them at the end of my sleeping bag.  And he

3  told me to keep my sleeping bag unzipped, which I thought

4  odd.

5      And we talked very briefly.  And the first thing I knew,

6  he was -- he put his hand above my chest on my neck and began

7  to -- to rub on me.  And as he passed over my chest, he said,

8  oh, you feel just like my wife, except, you know, no little

9  boobies here.  Then he proceeded down my body and groped me,

10  digitally penetrated me, which is, you know, an anatomical

11  and genteel way to say digitally raped me.  He had me

12  masturbate him.

13      And through this whole thing, from the time he crossed

14  my chest, the best way I can explain it is I was dissociated.

15  I know that now from therapy.  I just went to a different

16  place.  It was so confusing and shocking to me and

17  conflicting, that I couldn't put my head around it at all.

18      I remember him falling asleep.  I remember gathering my

19  things and going back to my tent.  And I was thankful that my

20  tent mate was asleep.

21      From that point forward, I don't even know how I kept

22  going in scouting, other than I was very determined.  I -- in

23  retrospect, I see that he, not only put something inside me -

24  - and this continued in other ways and forms.  If you go down

25  the claims matrix, I hit all of the numbers.  He put himself

1  inside me and he put in shame.

2      He infected me with something that I haven't been able

3  to get completely rid of.  It was like a -- it's like a

4  virus.  It damaged my mind, my body, my relationships.  He --

5  he took innocence from me.  And I love words, and that word

6  means unharmed, undefiled.  And I was no longer undefiled.  I

7  didn't even know what that meant.  He took away my ability to

8  be intimate.  I couldn't share with my wife, you know, my

9  sexuality, my inner thoughts because they were dark.

10      He took away my identity. I spent years doing everything

11  I could think to do to, to be like other kids.  I just -- you

12  know Pinnochio Syndrome, I just wanted to be a real boy.

13      My wife once said to me that I took the best years of

14  her life with my anger and my addiction, my mental health

15  issues.

16      And through it all, I -- I achieved.  I did what I

17  wanted to do and I got out.  I didn't "age out," like scouts

18  and scouters say.  I didn't continue, though I really had

19  wanted to, there were other men I admired.  But I got out

20  before my eighteenth birthday and -- and that was that.

21  Q    Thank you.  Thank you, Mr. Meidl.

22      So you were in scouts from age ten until how old?

23  A    Seventeen and a half, almost eighteen.

24  Q    And -- I'll let you take a second.

25  A    Thank you.  I can't see through my glasses now.  There

1  you are.

2  Q    And you started to allude to this a second.  But since

3  you left scouting, when you were between 17 and 18, can you

4  give us an explanation of what your life has generally been

5  like with regard to the after effects of --

6  A    Yes.

7  Q    -- (indiscernible)

8  A    Yes.  I'd have to go back quickly to the campfire and

9  the first camp out with, you know, two beers.  Coming from a

10  family of alcoholics, I don't know if I have a genetic

11  disposition.  I don't think so because I haven't -- I've been

12  clean and sober for 17 years.  But I learned to drink.  I

13  also taught myself to throw up, so I could drink more and

14  seem cooler, which morphed into years of bulimia nervosa,

15  treatment for bulimia, child trauma.  I had a heart attack

16  from exercise addiction, chemical and alcohol addictions from

17  the time I was 10 until -- I don't know what I was, 45 in

18  2004, 43.

19       The amount of time I spent in treatment after -- I -- I

20  really had latent onset PTSD, which means it took me a very

21  long time to really understand why I was so driven, why I was

22  so performance oriented, perfectionistic.  And that

23  (indiscernible) happened when our oldest son asked me to join

24  scouting when he was ten.  And my father died at the same --

25  same time.

1    And the only way I can describe it is the ground opened

2  up and swallowed me, it just swallowed me.  And all those

3  things, the shame that had been inside me, the infection, the

4  lack of identity, the inability to be intimate, I just

5  couldn't fight it off anymore and my body broke down, my mind

6  broke down.  I had -- I went into treatment the first time in

7  2001, to Menninger, which was in Topeka, Kansas at the time,

8  in the Professionals in Crisis Program.  And they put me both

9  there and in the addictions program.

10    I think I've been in treatment, inpatient residential,

11  intensive outpatient, addiction treatment, eating disorder,

12  child trauma, psych hospital nine times total since 2001.

13  The last was 2012.  That was the eating disorder.  I've taken

14  innumerable medications.

15    I've had multiple diagnoses, the first one because I was

16  so controlling was -- excuse me -- borderline personality

17  with narcissistic tendencies, which my -- when I moved to

18  Nashville, my Vanderbilt psychiatrist said absolutely not,

19  you have child trauma and complex PTSD, which really was the

20  turning point moving towards sobriety, proper medications,

21  and the need -- et cetera.

22    So, in a couple of words, it's been -- it's been

23  torture.  It's been torture to come out of that.  It's

24  destroyed my career, the lost time, income, the spent money.

25  It's a lot.

1    I'll -- I'll say that my proof of claim is 120 pages

2  long, peppered with my treatment history, medication

3  treatment, therapy history.  So I hope that answers your

4  question.

5  Q    Thank you.

6    Did there come a time when you began communicating with

7  other former Boy Scouts about their experiences and yours?

8  A    Yes.  I -- the first time, really, at any measure was,

9  early on in the bankruptcy process, I found a forum, a

10  scouter forum, and watched it, I guess they say "lurked" in

11  social media, watching what was being said relating, and

12  noting that there really wasn't a survivor voice.  So I spoke

13  up.  And after that, many survivors staring speaking up, as

14  well, some of whom I've become friends with since then, which

15  is very comforting.

16    So that's branched out.  I've made contact offline with

17  several of them.  And it's been very rewarding and comforting

18  to know that there's a -- you know, a fellowship of survivors

19  because I've never had that.

20  Q    Thank you.

21    MR. PREIS:  At this time, Judge Silverstein, I'm

22  just putting a thumbs up in case survivors want to unmute

23  themselves.

24  BY MR. PREIS:

25  Q    Mr. Meidl, did you ever decide to reconnect with Boy

1  Scouts?

2  A    I did.  And I can say, in retrospect, the timing was

3  pretty bad.  In the late fall of 2019, through a professional

4  friend/contact, who I knew was an Eagle Scout and actively

5  involved locally in scouting, he told me about an opportunity

6  to be a benefactor to the local council.  There are multiple

7  ways to do that.  And if you -- if you did, you became a

8  member of their Heritage Society and would be put on the

9  executive board.

10      And I've X'ed over that tremendously, talked to my wife,

11  other family members, and they all thought I was out of my

12  mind.  But I loved scouting, as I said, you know, dual

13  perception of my experience, and I thought it was time --

14  that it was time to do that, and so I did, made the donation.

15  I'm not throwing attention to that, but that was the

16  mechanism.  Went to the banquet and I cried.  No one knew

17  why, other than my wife.  And I thought, you know, this --

18  this is a mark, it's a mark in the -- stake in the ground,

19  and I can go forward and become involved and help kids.

20  Q    How did -- and I guess, a few months later, after that,

21  tell us what happened with Boy Scouts and how that made you

22  feel.

23  A    Right.  I guess I should have created that.  Excuse me.

24  I'm going to mute, so I can cough.

25      That's better.

1    As, you know, fate would have it, poor timing, I was

2 reading the Wall Street Journal, when I saw the announcement

3 from BSA, Roger Mosby's statement that Boy Scouts had filed

4 for Chapter 11.  The dual goals of the bankruptcy would be

5 creating an avenue to emerge as a new entity and allow

6 scouting to pursue its mission, its, you know, longstanding

7 mission, and equitably compensate all those who were abused

8 in scouting.

9    And the resolution, the stake in the ground that I had

10 thought I had made was pulled out and thrown into the sea.

11 And I was back in a ground opening up because I had to decide

12 was I going to be involved in this, was I going to submit a

13 claim, was I going to go through the entire process of

14 unpacking and unearthing and exposing everything that

15 happened to me again.  And for my family, honestly, and for

16 the opportunity to be a part of that fellowship of survivors,

17 I decided I would.  And I was heartbroken, really.

18 Q    And I guess did you come to Delaware for the committee

19 formation meeting?

20 A    I did.  When anything like this happens and I feel like

21 I don't have control, I kind of kick back into that obsessive

22 compulsive personality.  And I wanted any measure of control

23 or involvement that I could get.

24    So, oddly, I think the day before applications were due,

25 I found it.  I don't know -- I don't recall how, if it was on

1  the docket, probably.  And I -- I filled it out.  I probably

2  had it -- had it overnighted, and booked my ticket to go and

3  apply to be on the tort claimants committee.

4  Q    And tell us what happened at the formation meeting and

5  how you felt after that.

6  A    Well, three things happened, really.  One was I was in a

7  room with 85 or so Boy Scouts abuse survivors and an absolute

8  bevy of attorneys.  Walking into that room, that, I guess,

9  you know, banquet room at the hotel, I saw seven-year-old,

10  ten-year-old, fourteen-year-old, seventeen-year-old men, boys

11  who were looking for a voice and an opportunity to be heard.

12      When my time came to be interviewed, I went and spoke

13  with Mr. Buchbinder and his committee.  I laid out why I

14  thought I was a good candidate.  One of the reasons I thought

15  I would be a good candidate is because I was independent, I

16  had no other dog in the hunt, no attorney, I was *pro se*.

17      But as fate would have it, I was not selected.  I was

18  very disappointed, very disappointed.  I went away sad, but

19  determined, okay, there's got to be something else I can do,

20  so ...

21  Q    So, after you weren't selected for the TCC, what did you

22  with regard to the Boy Scouts Chapter 11 case prior to the

23  survivor working group?

24  A    Well, knowing nothing about bankruptcy, I involved

25  myself in every phase, every possible thing I could get my

1  hands on, signed up for documents, signed up for email alerts

2  as to what's going on the docket.  I attended every hearing

3  virtually.  I -- I mean virtually and not almost.  You know,

4  virtually, I was on every hearing, I think.  Maybe I missed

5  one.  Everything I could find on the internet, I looked at.

6      I became very familiar with who was writing about

7  bankruptcy:  Wall Street Journal, Bloomberg, LA Times, USA

8  Today, Reuters.  I could tell you all the names of those

9  authors who had written on the case.  So I guess, again, back

10 to that manic involvement.  Get everything I can in front of

11 me, so it doesn't run me over.

12 Q   At what point did you come to hear about something

13 called the "survivor working group"?

14 A   Well, again, I was watching all the tort claimants

15 committee town halls.  And I found out that the coalition was

16 also going to do virtual meetings, so I started attending

17 them.  I didn't even know if I could that because I'm not a

18 coalition client, but I -- I did.  And so I got every bit of

19 information that was coming out.

20     And then, probably November 1st or 2nd, there was an

21 announcement that they were forming this survivor working

22 group to engage with the Boy Scouts to talk about youth

23 protection.  And it was around the same time that there were

24 announcements.

25     Anne Andrews, I think, was fundamental in the process of

 1 negotiating with the Boy Scouts to get survivor

 2 representation on the national board and on the local council

 3 boards.  And I understand that she was also instrumental in

 4 creating the survivor working group, and I'm grateful to her

 5 for doing that.

 6 Q    So then take us through what happened after you heard

 7 about the survivor working group for the --

 8 A    Well, as --

 9 Q    -- coalition.

10 A    Sorry.  As is my -- my form, I saw an email address that

11 I could connect with coalition attorneys and put my name in

12 the hat, which I did immediately, as I got that email

13 probably on that town hall, and I'm pretty certain about

14 that.  So that went in.  I think I got one response from that

15 coalition attorney.

16      And then I was told I would be contacted by someone, and

17 that someone was you.  We had at least two calls, as I

18 recall.  In any event, the first call -- and if we had the

19 second one, in the second one, was my expression of great

20 suspicion.  As a survivor, the last thing I want to do is be

21 used.  I didn't want to be a banner, a flag to garner votes.

22 It was -- I had no interest in that.  I can't control the

23 economics.  I have one vote and then a voice.

24      And so, if there was going to be a legitimate commitment

25 -- and you know that I pushed you hard on that, didn't trust

1  you, didn't trust the coalition, didn't trust the Boy Scouts,

2  didn't know who was serious.  So, as I pushed and pushed and

3  pushed, and you assured me that we would have a significant

4  role, I recall you effectively said, as -- as this plays out

5  and works, I'm not going to let it come to naught.

6       So I was selected, and then we started gearing up for

7  meetings between the survivors who had come forward, some of

8  whom had already been a part of a little cohort that the

9  coalition had put together.  And we had kind of meet-and-

10  greets, let's have the survivors get to know each other.  And

11  -- and that was the first time, running between whatever that

12  was, November 3rd and November 12th.

13  Q    And before we start to talk about the work of the

14  survivor working group, can you just name the -- the members

15  of the survivor working group?

16            THE WITNESS:  Your Honor, is it okay for me to

17  refer to my list, so I don't bungle this?

18            THE COURT:  Yes.

19            THE WITNESS:  Thank you.

20            These are the members of the survivor working

21  group:  Richard Ballard (phonetic), James Bills (phonetic),

22  Jason Cippoletti (phonetic), Paul Costello (phonetic),

23  Antoine Foye (phonetic), Alan Johnson (phonetic), Michael

24  Lipari (phonetic), Alexandra McGowan (phonetic), me, Greg

25  Nowicki (phonetic), Robby Pierce (phonetic), John Zakowicz

1  (phonetic), Michael Taylor (phonetic), Drew Tessierre

2  (phonetic), and Paul Favor (phonetic).

3  Q    Thank you.

4       Can you give us an idea of the makeup, of the

5  composition of the survivor working group, the different

6  types of people who are on it, who you just listed?

7  A    I -- yeah, I'll try to do that respectfully.  I think we

8  had a fair amount of diversity.  And thankfully, as Alex

9  McGowan came and others came, we added to that.  Her voice

10 was tremendously important as a woman abused in scouting.

11      We had great economic background, employment,

12 educational diversity.  We ended up having some gender

13 diversity, sexual orientation diversity, race/ethnicity

14 diversity, if I haven't said that.  And we did -- we just had

15 a range of people from all over the country at all manner of

16 scouting abuse experience.

17 Q    And did the survivor working group engage consultants or

18 work with consultants?

19 A    I -- I believe the coalition did on our behalf, so, of

20 course, one of them -- our attorney had facilitated, that

21 being you.

22      We also had James McChunken (phonetic), who -- a former

23 FBI -- high-ranking FBI officer, who was involved in a range

24 of investigations on sex crimes, and also now is a security

25 expert.

1       And we had one other consultant, a survivor who prefers

2   not to be named.

3   Q    And did the survivor working group take part in any

4   negotiations regarding the economic settlements in the plan?

5   A    No.

6   Q    Did the survivor working group take a formal position

7   with regard to any of the economic settlements in the plan?

8   A    No.

9   Q    What were the general goals of the survivor working

10  group?

11  A    Well, fueled and motivated by the -- the fact that all

12  of us, 14 of 15 of us, were unprotected children in scouting.

13  The -- the simple goal was:  How can we enhance what the Boy

14  Scouts are doing now, what we think they're not doing, and

15  move to a point that, in the eventuality that the Boy Scouts

16  emerge from bankruptcy, we will have left the youth

17  protection, the child protection programs -- someone's --

18           THE COURT:  Excuse me --

19  A    -- microphone is --

20           THE COURT:  -- Mr. Meidl.  Excuse me.

21           Please mute your audio.  Please check.

22           THE WITNESS:  Thank you.

23           THE COURT:  Thank you.

24           THE WITNESS:  So, centrally, to help the Boy Scouts

25  protect children.

1  BY MR. PREIS:

2  Q    Did you think, prior to the survivor working group

3  getting started, that the survivor working group would be

4  able to achieve those goals?

5  A    Going back to our phone calls, pretty much no.  I was

6  still very dubious and felt like we could just be that --

7  that flag planted in an effort to garner more -- more votes.

8  So I -- I'm just not a trusting person from the jump.  People

9  have to prove it.

10  Q    Did there come a time when the survivor working group

11  first met with Boy Scouts?

12  A    Yes, there was.  As I said earlier, between early

13  November and November 12th was the, you know, get to know

14  each other time and process.  And on November 12th, we had

15  our first meeting, a series of meetings, ten, one of which

16  was just with counsel.  So we were involved in that.

17         And I'll just skip through them really quickly and -- if

18  you don't mind.  And then I'm happy to answer any questions

19  about the individual meeting.

20         The first meeting on the 12th was with BSA management,

21  national management, which included, of course, Roger Mosby,

22  John Mosby, Joe Zirkman I think, Mr. McGowan was on, Heidi

23  Steppe, and a number of others, including a local council

24  representative, who represented the Ad Hoc Committee of Local

25  Councils, Tony Haines.  And I definitely would like to come

1  back to him.  We met with Praesidium, their child protection,

2  youth protection experts that they hired at the time, and

3  still retain, I believe.  We met with Tony Haines, who I

4  mentioned.  We met with Tracy Techau, who is another CEO

5  scout executive from -- he's from the Atlanta area, and Jason

6  Baldridge, who works with him on youth protection.  We met

7  with the National Executive Committee.  And we met with

8  management again, a time or two.

9  Q    And did you meet with any --

10 A    (Indiscernible)

11 Q    -- (indiscernible) organizations?

12 A    Yes.  I apologize to -- to him and to you.

13     We met with Bishop John Schol, the representative from

14 the Ad Hoc Committee of the United Methodist Church.

15 Q    So let's go back.

16     Tell us about the first meeting you had with BSA

17 national.  That's the first meeting that the survivor working

18 group (indiscernible) --

19 A    Right.

20 Q    -- BSA.

21 A    That meeting, I would -- common parlance these days is

22 you -- you -- you lean in or you lean out.  That was

23 definitely a lean out meeting for everybody on both sides,

24 not knowing how we were going to approach them, them -- us

25 not knowing how they were going to approach us, if they were

1  going to be serious, what we were going to accomplish, if

2  anything.  This is kind of the feeling out process.

3       And because we deemed our process a listening tour, we

4  didn't want to come locked and loaded to -- to blast them.

5  And we may -- we did share some of our stories at the outset,

6  each of us.  And I think that was very important, so they

7  could get to know, not only what we had to say and think

8  about youth protection, but who we were, who we are, and what

9  we've gone through.

10      And I -- and I would -- kind of the punch line -- and I

11 don't mean to draw attention to myself.  But the punch line

12 at the end was I looked at Roger Mosby virtually and said,

13 well, whether or not you guys are going to be serious, I

14 don't know, and so -- living in the south and with a Georgia

15 -- Georgian wife -- I said, well the proof of the pudding is

16 going to be in the eating, we'll see if you're serious.

17      May I -- may I make one other comment --

18 Q    Sure.

19 A    -- about that?

20      At that meeting, with all my distrust, I was gaining

21 some because they said good things, and they were receptive.

22 that's when we met Tony Haines, who was the scout executive

23 from -- scout executive from the Greater Jackson Council in

24 Mississippi.

25      And Tony, he provided a linchpin for me in my thinking

1   and perked up my ears and piqued my interest because, as a

2   survivor himself from another institution, not scouting, he

3   was tearful, he was powerful, he was committed and passionate

4   about youth protection.  And he helped me feel grounded in

5   that meeting, that we had a chance of doing something

6   important.

7   Q     Thank you.

8         Can you tell us a little bit about the meetings you had

9   with -- and separately with Tony Haines and then with the

10  local council (indiscernible)

11  A     Yes.  As I said, I felt Tony was very important.  And

12  when I went into this, just kind of looking at it from a best

13  practices standpoint, I just kept -- I kept asking, and I

14  asked you, and I think I said within the group who is doing

15  this well, there has to be somebody who's doing this very

16  well, it just can't be the case that we have 252 or whatever

17  local councils, and somebody is not crushing it.  Somebody

18  has to be passionate about this.

19        And I -- at the initial meeting with the management, and

20  then in this meeting with Tony, that was absolutely

21  confirmed.  He was doing things above and beyond what were

22  written down.  He wasn't just committed to the protocols, the

23  procedures, and the training.  He was taking it to another

24  level.  And that -- and that was so important to me.

25        And so I asked him, okay, where are the other Tony

1  Haines, who are -- who's out there.  And he referred us to

2  Tracy Techau and Jason Baldridge in Atlanta, and we had a

3  similar meeting with Tracy, and that was confirmed.  They're

4  doing all kinds of excite -- exciting things:  Engaging law

5  enforcement locally, holding a big conference to bring in

6  other youth-serving organizations.

7      They have -- they've baked youth protection into their

8  culture, such that it's not a pain in the neck.  It's what

9  they do, it's who they are.  They even have, you know, vests

10  and books and tchotchkes with "youth protection" on it.

11  They're not afraid, neither Tony, nor Tracy and Jason are

12  afraid to talk about youth protection very openly, and make

13  sure that it's a -- that people find it a joy to do.  It's

14  about protecting children, so it should be.

15  Q    Thank you.

16      And can you tell us a little bit about the meetings you

17  had with the NEC, the National Executive Committee, the

18  board?

19  A    As you have seen, I'm not afraid to weep.  And -- and

20  tears mean a lot to me in this context because you can say

21  you're sorry, you can write publicly that you're sorry, but

22  sorry and sorrow came from the same root, and I needed to see

23  sorrow.  I really did.  And that's why Tony was so important.

24      And in the National Executive Committee meeting, not

25  everyone, but a number of the members wept, and I'm talking

1  about wept to the point that they couldn't speak for 30

2  seconds.  That -- that was so important.  I can't -- if

3  you're not a survivor or someone who's gone through this kind

4  of trauma, tears are cleansing.  They show sincerity.

5  There's just nothing like that, to witness someone feeling

6  your pain, stepping into it, not trying to solve for X, or

7  create a solution.

8       And we did have some substantive conversation.  But it

9  was mostly about we are going to see to it -- speaking now

10 for the National Executive Committee, we are going to see to

11 it -- it that we do better.  The other thing, besides

12 emotion, best practices that I was looking for is someone who

13 would say not on my watch, not on my watch.  And -- and they

14 said that, in effect.

15 Q    And before we leave the listening tour, did the survivor

16 working group try to meet with Michael Johnson, the former

17 youth protection executive at the BSA?

18 A    You did or we did.  And you made contact with -- with

19 BSA a number of times.  The survivor working group was, I

20 would say almost adamant that we needed to meet with him to

21 find out what happened, what he had done, what he wanted to

22 do.  And for whatever reason, we weren't allowed or made

23 available to him, and vice-versa.

24 Q    After the listening tour was over, what did the survivor

25 working group do next --

1    A    (Indiscernible)

2    Q    -- to get -- go ahead.

3    A    I'm sorry.

4        It was December 16th, when we formally put together an

5    issues list.  And we didn't put it forward as a terms or

6    demand letter or termsheet.  It was a -- issues, these are

7    the things that we see that are prob -- problems.  And we, of

8    course, hinted at some of the solutions, based upon the

9    issues that we presented.

10   Q    And did -- who did you present that issues list to?

11   A    We presented it to the Boy Scouts, the executive

12   management, national executive management.

13   Q    And did you hear back from BSA?

14   A    Eventually, a month or so later.  We were unsure why

15   that was, other than the logistics of managing the vote and

16   everything that went along with that.  That was not a kind of

17   happy moment in the process because we certainly couldn't

18   understand what was a long moment of de-prioritization.  So,

19   fortunately, we did get a response and we could go forward

20   from there.

21   Q    And in what form did BSA respond?

22   A    They sent us a list of their own questions, asking about

23   what we meant and what we recommend and how we could do this,

24   that, or the other thing, based upon the issues that we

25   presented, which seemed a little odd at the time.  But that

1 facilitated another meeting to talk about our issues and talk

2 about their questions, which I think happened on January

3 21st.

4 Q    And what happened at that meeting, if you recall

5 anything specific?

6 A    Well, there was a measure of incredulousness by some of

7 our members, asking questions like why are you asking us to

8 do your work or your research or these questions -- we

9 presented issues that we were looking for answers to, and we

10 -- we got questions back.  So it was kind of a push and pull

11 you process, which is typical in negotiation.  But it seemed

12 a little odd at the moment.  And we just -- we went from

13 there to see what might happen next.

14 Q    And what happened next from -- did you get anything from

15 BSA?

16 A    I don't believe we did.  I think that was the point at

17 which we saw that, in the context of mediation, the Boy

18 Scouts put together their termsheet.  So it was submitted

19 onto the record at that time.

20 Q    And by the "termsheet," you mean a youth protection

21 termsheet.

22 A    Correct, yeah.  The non-monetary components addressing

23 youth protection.

24 Q    And do you remember roughly when that was, when we got

25 the first -- first draft of that?

1  A     January 30th, I believe.

2  Q     Okay.  And what happened after that?  What did the

3  survivor working group do?

4  A     Well, this was the time we really started negotiating

5  the process, negotiating terms, pushing back on them, asking

6  them for justifications why things were out mainly, why

7  component parts of our issue list had dropped.  Classic, you

8  know, redline/blackline process of how do we get to where we

9  all want to be, where there's a measure of satisfaction.  And

10 so, yeah, that was eight days or so of negotiation.

11 Q     And before we get to the specifics of the termsheet, was

12 the survivor working group joined in these negotiations by

13 the TCC --

14 A     Technically --

15 Q     -- (indiscernible) how did that work?

16 A     Yeah, technically not joined, but we had two flanks,

17 which I was excited about because I know, from watching and

18 listening to town halls and looking on forums and seeing

19 things on the TCC website, that there are those there who are

20 perhaps expert or very studied in youth protection and very

21 passionate about it, as well.  And any survivor that can come

22 to the table and help with youth protection is a great thing.

23        And so we had a unique leverage opportunity to vote

24 (indiscernible) 73 percent, the survivor working group

25 already having been engaged since November 12th with BSA.

1    And the TCC came at it strong, as anyone who's listened to

2    their town halls have -- has heard.  So I know Dr. Kennedy

3    and John Humphrey and other members of the TCC were

4    negotiating simultaneous, but not in the same room, virtual

5    room.

6    Q    Well, and can you tell us, as these negotiations ended

7    up, whether things that you were particularly focused on that

8    ended up being part of the termsheet?

9    A    Me, personally, or the survivor working group.

10   Q    The -- let's start with the survivor working group.

11   A    There were a number of things that were very important

12   to us, and several of us concurred on the point that the BSA

13   should make survivor acknowledgment, to some degree, that

14   there should be some public recognition of the fact that this

15   happened in scouting.  So that element is seen both in

16   survivors on the national board, local council boards, and

17   monuments to abuse survivors on High Adventure Bases.  So

18   that was very important to us.

19        Enhanced auditing and reporting very important to us.

20   We had a number of provisions -- seventy-two-hour rule,

21   background checks, et cetera -- that were in the kind of

22   protocols, policies, and procedures training areas, that we

23   hoped to see, and eventually were in there.

24        The (indiscernible) the culture that I was talking about

25   earlier, standardization, looking across the organization,

1  having conferences, emulating some of what Tony and Tracy are

2  doing showed up in there, in not so many words, but a variant

3  of those components are in there.

4      And then, for me, the most important thing that -- the

5  most important thing to me at that time, as well as now, in

6  retrospect -- everything is important, everything is

7  important, but this is a go forward commitment -- and that is

8  to create the youth protection committee, which will be made

9  up of members of the Boy Scouts, local council

10 representatives, chartered organizations representatives --

11 I'm hopeful that that will be Bishop Schol at least -- and

12 then survivors from the TCC and recommended by the TCC,

13 perhaps outside survivors and the survivor working group.

14     And the critical component that we negotiated hard was

15 the group had to be composed of at least half survivors, so

16 that we weren't just a voice shouting in the wilderness, that

17 we had significant sway, and that the survivor working group

18 would literally be touching any and every component of youth

19 protection within scouting --

20 Q    (Indiscernible)

21 A    -- eventually.

22 Q    Let me just -- you mean the youth protection committee,

23 not the survivor working group.

24 A    Correct, yes.  The youth protection committee.

25 Q    If you could, just before we kind of talking a bit -- a

1 little bit about what happened with the termsheet.  In your

2 opinion, were the negotiations successful?

3 A    My wife is a great negotiator, and she said, if anybody

4 feels like they win unilaterally, it probably wasn't

5 successful.  And if everybody feels like they left some

6 things on the table, it probably was.  So that would

7 summarize my feeling, our feelings.

8       There were some things that were important that didn't

9 get in there, for various reasons.  The BSA had some

10 provisions that they added on their own from the -- from the

11 get-go in the initial termsheet that was submitted.  So, in a

12 word, yes.

13 Q    Have you -- because you were intimately involved in the

14 negotiations on behalf of the survivor working group, have

15 you spoken to or communicated with survivors who are not part

16 of the survivor working group about the youth protection

17 termsheet in the plan?

18 A    I have, both on and offline.  And I'm going to speak of

19 the survivors and scouters.  I think, universally, I would

20 that that people are pleased that it's moved forward that

21 there are enhancements.  Not everybody is thrilled about

22 things that may not have made it in there.

23       Overall, though, survivors -- survivors who are not --

24 there are some who are not inclined to see Boy Scouts emerge

25 at all.  So I completely respect their opinion, but they

1  would not be happy with anything regarding youth protection

2  or not.  So, overall, yes.

3      I think there was gratitude for the work that was done,

4  of course, by the TCC, which I mentioned -- very grateful for

5  what they did -- and by the survivor working group.

6  Q    Given the current state of BSA, which now includes the

7  youth protection termsheet and the proposal for the YPC,

8  which was important for you, do you have a view of BSA's

9  efforts towards youth protection?

10 A    I do.  Enough is never enough.  And with the addition of

11 these non-economic terms within the plan, it's much better.

12 I can feel comfortable with that.  And I'm particularly

13 excited -- if that's the proper word -- about the youth

14 protection committee because I know that there will be

15 embedded survivors.  So, overall, I'm pleased.  Am I

16 satisfied that it's done?  No.  But I'm -- yeah, I'm,

17 overall, pleased.

18 Q    And do you support confirmation of the plan?

19 A    Simple question, complicated answer.  But the -- the

20 short answer is yes, I absolutely do.  It's complicated

21 because I don't know everything about the economics.

22 Frankly, I don't -- I'm not going to say I don't care because

23 I do.  It was a very important part of me getting involved.

24     But I -- I know how torturous this experience was, not

25 just for me, but for many other survivors.  And to be two-

1  plus years into this, with all the machinations, all the

2  money spent, all the pain of ripping off our scabs to file

3  those proofs of claim and watch this slog on, I -- I would

4  say it's just time.  It's time for survivors to know that we

5  have something on the books.

6      I'm not so naive as to think this is over because I

7  listen to hearings and I hear what's being said in the cross

8  and direct examination.  Whatever happens, I don't know.  I

9  don't control that.  So, yes, I do.

10 Q    A few last questions.

11     You mentioned earlier that your ten-year-old wanted to

12 become a Boy Scouts.  Obviously, your ten-year-old is now

13 much older.  If any of your children wanted to put your

14 grandchild in scouting, and given the -- the new protections

15 you've negotiated for and what -- and the new YPC, what would

16 you say?

17 A    The first thing I would say, based upon the fact that

18 they know about my abuse, is let's talk through this, out of

19 the hearing of your child, my grandchild, let's talk about

20 what this means, let's talk about -- further about my

21 experience, let's talk about my work on the survivor working

22 group.

23     At that time, which would be sometime down the road, if

24 I have any involvement in the youth protection committee or

25 know about what they're doing, I would say these are the

1  other things that have happened and what we've done to
2  enhance youth protection.
3       I would also say -- and I know this based upon
4  listening, virtually listening to scouters who are involved -
5  - that, if you decide to do that, if your child wants to do
6  that, be involved actively, not passively.  Go to everything
7  you can, be as committed to scouting as a scouter and as a
8  parent as your child wants to be, and if, at any point, you
9  want to talk with someone about this, if there's anything you
10 see, I happen to know some people, we can put you in touch
11 with them, you can ask them about youth protection, you can
12 make suggestions.
13      And hopefully, by that time, there will be a very
14 receptive year at BSA national, in the form of a youth
15 protection committee, so that parents, volunteer scouters,
16 local council executives and employees will know who to call,
17 that there will be a contact component because I know full
18 well, from speaking with those scouters, that they don't feel
19 like they have that voice.  And hopefully, we can be a voice
20 both -- we, the youth protection committee survivors -- both
21 for survivors, scouts -- I can't say both, there are three --
22 for scouters, survivors, and kids who are scouts.
23 Q    Thanks.
24      One last question.  You started today by talking about
25 your experience as a scout and your application for the TCC,

1  that you did not get selected.  At any point in all of this,

2  did you think you'd be here today, testifying in support of a

3  plan that has youth protection provisions that you, yourself,

4  were instrumental in negotiating as part of the survivor

5  working group?

6  A    A very specific question.

7  Q    Yes.

8  A    I don't know that I thought that specifically.  But as I

9  stated early on, I was very determined to find some way into

10 this process.  I just needed to.  I didn't want to see

11 emergence without doing something to help survivors, to help

12 scouts now and future scouts.

13      So I'm pleased, I'm blessed by the opportunity.  But I -

14 - if I may say, I'm not utterly surprised because I was

15 determined to do something.

16 Q    Thank you.

17 A    You're welcome.

18          MR. PREIS:  Your Honor, I have no further

19 questions.

20          THE COURT:  Thank you.

21          Does anyone have any questions of Mr. Meidl?

22      (No verbal response)

23          THE COURT:  I do not see anyone.

24          Mr. Meidl, thank you for your service on the

25 survivor working group, and thank you for your testimony

1  today.

2           THE WITNESS:  You're welcome.  And thank you, Your

3  Honor.

4           THE COURT:  Thank you.  You're excused.

5           THE WITNESS:  Thank you.

6       (Witness excused)

7           THE COURT:  Okay.  We're going to take five

8  minutes, and then we'll come back and continue with Mr.

9  Patton's testimony.  We're in recess.

10       (Recess taken at 10:56 a.m.)

11       (Proceedings resumed at 11:06 a.m.)

12           THE COURT:  We are back on the record in the

13  middle of Mr. Patton's testimony and it's time for cross.

14           MR. CALDIE:  Hello, Your Honor.  Edwin Caldie on

15  behalf of the Guam Committee.

16           If Mr. Buchbinder was completed I think I was next

17  in line.

18           THE COURT:  Mr. Patton, you're still under oath.

19           THE WITNESS:  I understand, Your Honor.

20           THE COURT:  Mr. Caldie.

21                     CROSS EXAMINATION

22  BY MR. CALDIE:

23  Q    Good morning, sir.  How are you?

24  A    I'm fine, thank you.  You?

25  Q    Good.  Thanks for being here.  My name is Edwin Caldie,

1 I represent what is called the Gaum Committee.

2     If I use that term is that familiar enough to you?  Do

3 you know what that means?

4 A    Yes.

5 Q    Okay.  You talked with Ms. McNally yesterday.  There

6 was a period where there was a legal argument and you were

7 asked to hop-off for a moment.  Do you remember that?

8 A    I do.

9 Q    And then you talked with Ms. McNally afterwards about

10 discussions with your attorneys yesterday regarding your

11 testimony during the period when you weren't testifying. You

12 mentioned you talked to them about the argument on the

13 objecting to your declaration and the like.  Do you recall

14 that conversation with Ms. McNally?

15 A    Yes.

16 Q    And Ms. McNally asked you if you talked with your

17 attorney, you said you had.  Was anyone else present during

18 your conversation with your attorney?

19 A    No.

20 Q    Okay.  And did you converse with anyone else other than

21 your attorney during that period you referred to yesterday?

22 A    No.

23 Q    Did you -- in between your testimony yesterday and your

24 testimony today did you have any conversations about your

25 testimony with anyone?

1  A    Mr. Guerke reminded me that in addition to not talking
2  to anyone about my testimony I should also not review any
3  documents.
4  Q    Okay.  Anything else, sir?
5  A    No.
6  Q    Thank you.
7       You talked with Ms. McNally yesterday about your
8  declaration, who wrote, etc.  Do you recall that?
9  A    I do.
10  Q    And when was the latest version of your declaration
11  completed, sir?
12  A    Late this past Friday.  Well into the evening, maybe
13  even Saturday morning.
14  Q    Thank you.
15       Did you add material at that time pertaining to the
16  necessity of third-party releases, channeling injunctions, or
17  policy buy-backs for settling insurers?
18  A    No.  I don't believe those edits on Friday touched on
19  the topics you listed.
20  Q    Thank you.
21       And just to clarify, sir, any of the testimony in your
22  declaration relating to those same topics, insurer, third-
23  party releases, channeling injunctions, or policy buy-backs,
24  or the reasonableness, or necessity of those things, is any
25  of the testimony in your declaration on those topics offered

1  as expert testimony?

2  A     No.

3  Q     Is all of your testimony regarding those issues in your

4  declaration based on your firsthand experiences?

5  A     Yes.

6  Q     In other words, the entirety of your declaration

7  testimony on issues of third-party releases, buybacks,

8  injunctions, and the reasonableness and necessity of those

9  things is based on what you personally heard, saw, etc.,

10 using your five senses in the course of this case.  Is that

11 right?

12 A     Well, yes. If we include in that, as we were moving

13 through the various negotiations, there were certainly

14 moments in time when what I heard was a report from my

15 counsel about positions taken as negotiations, and moves, and

16 counter-moves unfolded, but, yes.

17 Q     Okay.  Understood.  Thank you.

18       So I wanted -- we're going to look at your declaration

19 in a few different places today, sir.  We will start with

20 Paragraph 14.  Do you have that with you?

21 A     I do.  One moment and I'll find Paragraph 14.  I'm

22 there.

23 Q     I need to do a *mea culpa* here at the beginning because

24 I am not technically savvy.  So I don't know how to put

25 documents up on the screen, but I don't think we're going to

1  need to do that here, but it's possible we will have to put

2  one or two things up later.  I know that there is some angel

3  on the line that can do that sort of thing for us.  I'm

4  hopeful that they are here today as well, just as a head's

5  up.

6       For now we don't need to put anything up.  In Paragraph

7  14 of your declaration you discuss the fourth amended plan of

8  reorganization that was filed on July 2nd, 2021.  Is that

9  accurate?

10 A    Yes.

11 Q    And this plan included a resolution of liabilities for

12 the debtors and local councils for the sum of $850 million

13 and was -- it required the debtors to abandon a settlement

14 that they had with Hartford.  Is that right?

15 A    That is correct.

16 Q    Then if we could move just down a ways to Paragraph 16

17 of your declaration.  You testified there, sir, that Hartford

18 increased its contribution to the settlement trust to $787

19 million and, I'm quoting now,

20      "That amount was not subject to reduction based on the

21 terms of settlements with any other insurance company."

22      To the best of your ability to track what I was doing

23 there did I read your testimony accurately?

24 A    Yes.

25 Q    All right.  Then scooching down just a bit further in

1 Paragraph 19 you mention that settlements with Hartford --

2 let me ask you this, the TCJC that's a defined term in your

3 declaration.  What does that refer to, sir?

4 A    It's the Mormons to make it as generic as possible.

5 Q    I'm good with colloquial, it's easier.

6       So in Paragraph 19 you say the settlements with

7 Hartford and the Mormons were incorporated into the fifth

8 amended plan that was filed in September of 2021, is that

9 right?

10 A    That is correct.

11 Q    In Paragraph 20, just moving down one, is it your -- do

12 you say there that you believe the Hartford settlement at

13 that point in time was reasonable and that the Coalition

14 agreed it was reasonable?

15 A    I'm sorry, yes.

16 Q    Thank you.

17       But at that point further negotiations continued,

18 right?

19 A    Yes.

20 Q    With the idea of getting more settlements in the door,

21 is that accurate?

22 A    Yes.

23 Q    So we missed a short moment in time that's not in the

24 declaration, I just wanted to circle back on it.  On

25 September 30th, 2021 the debtors filed what became the

1  solicitation version of the plan, that was called the

2  modified fifth amended plan, right?

3  A    I -- well I will trust you on the date, but, yes.  The

4  modified fifth plan was filed, yes.

5  Q    And that was after -- yeah, after the events that you

6  mention in Paragraph 20, for example, of your declaration.

7  Is that right?

8  A    After the -- I'm sorry, after Paragraph of that --

9  Q    Let me --

10 A    Yes, you are correct.  It identified the fifth amended

11 plan in Paragraph 19 and the in Paragraph 20 I'm describing a

12 bit of the history.

13 Q    Okay.  Thank you.

14      So I just want to shift now to talk about Paragraph 25,

15 please, of your declaration.

16 A    Yes.

17 Q    And there I am going to quote and I'm going to start at

18 the beginning of that paragraph, sir, and I will just ask you

19 if I have quoted it correctly when I am done reading, but it

20 says there,

21      "In addition, these further negotiations also resulted

22 in the debtors and local councils contributing tens of

23 millions of dollars more in assets on behalf of chartered

24 organizations to the settlement trust."

25      Did I read that right?

1  A      Yes.

2  Q      And there, in that sentence I read, are you referring

3  to the chartered organization contribution as that phrase is

4  defined in the plan?

5  A      I believe so.  I would have to look at the definition

6  to be sure, but I believe so.

7  Q      Okay.  I think that's good enough and I will just say

8  for the record and represent to you, sir, that it's in

9  Paragraph 59 of the definitions.  To save time I don't think

10  we have to go there for purposes of our conversation.

11       So who are the certain chartered organizations that are

12  receiving additional protections as a result of that

13  contribution that you refer to there in Paragraph 25 of your

14  declaration?

15  A      I believe who are receiving the benefit of the -- I

16  believe what we are talking about here is -- I mean what the

17  reference is to is to chartered organizations who are limited

18  protected parties, but to be precise we should go to the plan

19  and read the definitions.

20  Q      We could, but let me see if we can get there without

21  going to all that effort, especially due to my technical

22  limitations.

23       We have -- is it fair to say that there were certain

24  chartered organizations who got the benefit of that

25  contribution and those that didn't elect to opt-in in the

1  earlier versions of the plan; did not get the benefit of that

2  contribution?

3  A    The concept is really capturing the economics of the

4  fundamental requirement that we confront with our insurers

5  and the settling charters, for that matter, that scout

6  related abuse claims that, let's focus on the insurers, could

7  be brought against a settling insurer under one of the

8  policies that they have issued.  When they settle with us the

9  deal was that those claims need to be channeled to the trust

10  in exchange for which the settling insurers will pay the

11  trust the amount in the settlement.

12       So since the settlements benefit the settling chartered

13  organizations, since they are getting full protection under

14  the channeling injunction from all abuse claims, and since

15  the settlements are not possible without these release

16  provisions --

17  Q    Well, let me -- I think we may be getting a bit afield

18  from my question.  So let me rephrase it.  If the Archdiocese

19  of Agana, which did not opt-in or has not yet opted in -- if

20  a chartering organization like the Archdiocese of Agana does

21  not opt-in do they get the additional protections that were

22  created through the chartered organization contribution?

23  A    Are they opt-outs or are they silent?

24  Q    So, yeah, they're opt-outs now.  Back then there was no

25  such thing as an opt-out and so I'm trying to avoid that

1  terminology.  Earlier versions of the plan -- later it came

2  to be defined as an opt-out chartered organization

3  A     Right.

4  Q     So we can just use that retroactively, I guess.

5  A     Yeah.

6  Q     At that point in time, back in September, under that

7  plan, which was then just the modified fifth amended plan as

8  opposed to the -- back then if the Archdiocese of Agana

9  failed to opt-in, effectively, an opt-out organization, did

10  they receive the additional protections given by the

11  chartered organization contribution?

12  A     At that moment -- I would have to go back and look, I

13  can't recall.

14  Q     Fair enough.

15        The chartered organization contribution does not pay

16  any amounts on behalf of what are now called opt-out

17  organization, opt-out chartered organizations, right?

18  A     Well there are no designated amounts to specific

19  charters if that is what you are asking.

20  Q     I see.

21        Opt-out chartered organizations fall within the

22  definition of chartered organizations of the plan, right?

23  A     I believe so, yes.

24  Q     And so looking back at Paragraph 25 -- this is a very

25  minor point, I admit, but I work with insurance lawyers who

1  love definitions, frankly.  So under Paragraph 25 of your

2  declaration you mentioned that contributions were made for

3  participating chartered organizations.  You say chartered

4  organizations that these contributions were made for

5  participating -- for chartered organizations.  Shouldn't it

6  instead say participating chartered organizations?  Wasn't

7  the contribution only made for participating chartered

8  organizations?

9  A    I'm not sure that's true.  We have to go back and pick-

10 up the document.  I am not sure that's entirely true.  It's a

11 -- it's something that we can determine from reviewing

12 documents, so it's an objective fact.  One way or the other

13 I'd have to go check.

14 Q    All right.  Let's do that.

15      The supplemental local council contribution was made as

16 consideration for the extension of a 12 month temporary

17 injunction, is that right?

18 A    Where are we looking?

19 Q    Let me see here.  Sorry.  Thank you, sir.

20      Its docket -- well, it's the modified fifth amended

21 plan -- sorry, on February 18th a supplemental disclosure was

22 filed as Docket Entry 8904.  It's also, if it's easier to

23 find, Exhibit JTX 1-361.

24           THE COURT:  Could you say that again, Mr. Caldie?

25           MR. CALDIE:  Absolutely.  Which is easier to find,

1  the docket entry or the exhibit number?

2         THE COURT:  The exhibit number.

3         MR. CALDIE:  JTX 1-361.

4         THE COURT:  Thank you.

5         MR. CALDIE:  Thank you, Your Honor.  Forgive the

6  delay.

7  BY MR. CALDIE:

8  Q    We're looking on page 2 and we're looking under the

9  title "Summary of Modified Plan Changes."

10        Tell me when you see that, sir?

11 A    I see it on the screen.

12 Q    Great.  And I think reading a quote, it says,

13        "Under the December 18th, 2021 version of the plan

14 certain supplemental contributions from the local councils

15 and the BSA entitled certain chartered organizations to

16 potential protections against all scouting related abuse

17 claims as contributing chartered organizations/protected

18 parties under the channeling injunction.  These additional

19 contributions are now being treated as consideration for the

20 proposed extension of the preliminary injunction for limited

21 protected parties following the effective date of the

22 modified plan for 12 months, subject to potential extension."

23         The last piece,

24        "Chartered organizations will be required to make a

25 separate monetary contribution in order to become

1  contributing chartered organizations under the modified plan

2  as set forth below."

3      Did I read that accurately?

4  A    Yes.

5  Q    And so I think, you know, we can continue to go through

6  this or I think we can probably agree now that Paragraph 25

7  could be slightly more precise if the word "participating"

8  was placed in front of chartered organizations at the end of

9  that first sentence.  Would you agree with me on that?

10 A    I am not sure.

11 Q    Okay.  That's fine.

12 A    I'm not sure.  Frankly, I'm not a hundred percent sure.

13 Q    Thank you.  Let's go up to Paragraph 23 of your

14 declaration.  There you say that,

15     "Counsel for Century made clear, during the disclosure

16 statement hearing, securing an outcome required a full

17 release from abuse related liability for Century and Chubb

18 Companies."

19     Then you go on to say that,

20     "This was not surprising to me based on my experience

21 in other cases.  Insurers typically seek complete certainty

22 and peace as part of any settlement in a mass tort context,

23 that is a complete release from liability arising from any

24 underlying tort claims."

25     I want to ask you about the first sentence of that

1  declaration. The third amended modified -- excuse me, the

2  third modified fifth amended plan doesn't actually purport to

3  release Century and Chubb from all abuse related liability,

4  right?

5      (No verbal response)

6  Q    Let me lead you a little further so that you are more

7  comfortable. I think it is only scouting related abuse

8  liability from which they are released, isn't that right?

9  A    Are we focused on the capital defined term abuse?

10  Q    We are.  Right, that is termed in the plan -- it's

11  defined in the plan to mean only BSA related abuse.  So my

12  point being in Paragraph 23 of your declaration the,

13      "Abuse related liability is too broad."

14      Right?

15  A    I think we just established that abuse, by definition,

16  is only scout related.

17  Q    Right.

18  A    So I think it's accurate.

19  Q    So let me propose, I think what you might have meant

20  here instead was liability concerning Abuse, Claims as

21  opposed to abuse related liability.  I think we got our wires

22  crossed.  Abuse is not defined in the plan as only BSA

23  related abuse.  So here it sounds as if you are testifying in

24  your declaration that abuse beyond BSA related abuse was

25  being released or channeled.

1    A    To the extent, as an ambiguity surrounding, that the

2    plan and everything else is quite clear that we're only

3    dealing with -- in fact, only can deal with the context of

4    this bankruptcy claims that are under the jurisdiction of the

5    court.  So that is just scouting related abuse claims, not

6    abuse claims of any other or against any other entity by any

7    other creditor outside of this bankruptcy case.

8    Q    Thank you.  I appreciate that clarification.  And thank

9    you for bearing with me.

10         I believe we can take the document down if the court

11   would like or if the angel, the technical angel out there

12   would like.

13         I want to talk with you a little bit about your view

14   that releases of abuse claims were really a requirement for

15   Century and Chubb.  That is your perspective, right?

16   A    Yes.

17   Q    And the scope of releases per the abuse claim

18   definition actually changed for the settling insurers is

19   between December of 2021 and February of 2022, right?

20   A    It may have.

21   Q    The modified fifth amended plan, by that again there

22   have bene so many versions, so I will say the September 30th

23   version of the plan that was actually sent to creditors.

24   That did not contain an injunction and channeling of all

25   claims insured under policies issued by the settling

1  insurers, isn't that right?

2  A    I don't have it in front of me, but, you know, the

3  document says what it says.

4  Q    Okay.  Was it your impression at that time that the

5  version of the plan sent out to creditors contained an

6  injunction and channeling of all the claims insured under

7  policies by the settling insurers?

8  A    As of that time, I can't recall.  Too much has happened

9  in between.

10  Q    I didn't hear the last thing you said, sir.

11  A    I said too much has happened in between. I, frankly,

12  can't recall.

13  Q    Okay.  Did that effect your valuation at later times

14  the fact that a plan had been actually sent out for

15  solicitation that did not include an injunction and

16  channeling of all claims insured under policies issued by the

17  settling insurers?

18  A    That proposition didn't come into my valuation

19  calculation.

20  Q    So under the fifth or that same version of the plan,

21  the one that was actually sent out, if a chartered

22  organization was an opt-out chartered organization their

23  liabilities wouldn't be channeled to the trust or enjoined,

24  isn't that right?

25  A    I'm sorry, which version of the plan are we talking

1 about?

2 Q    The one that was called the modified fifth amended.

3 That -- it's easier for me to remember if I say the September

4 30th version of the one that was actually sent out to

5 creditors originally -- well, I'm not sure "originally" is

6 the right word, but the one that was sent out to creditors in

7 September or early October.

8       Under that version if a chartered organization was an

9 opt-out chartered organization their liabilities would not be

10 channeled to a trust or enjoined, isn't that right?

11 A    I am not sure, frankly.

12 Q    Did you consider those terms of that plan when

13 concluding that such provisions were necessary to settling

14 insurers?

15 A    I am not sure I understand the question.  We have the

16 plan that we have today for confirmation.  --

17 Q    I am asking about what happened between a prior plan

18 and the current one.  The prior plan did not include certain

19 injunctions.  I am asking you if you considered the fact that

20 a prior plan that was actually sent out to creditors did not

21 include all of the things that you now say are necessary for

22 settling insurers. I am wondering if you considered that in

23 concluding whether all of the current things in the current

24 plan were necessary.

25 A    So I concluded that the things that are in the plan are

1  necessary because --

2  Q     I'm asking if you considered a specific thing and I

3  need to ask that you answer my question.  Did you consider

4  the terms of the plan and, in specific, certain channeling

5  injunctions that were lacking from an earlier version of the

6  plan when considering whether the channeling injunctions in

7  the current one are necessary?

8  A     What the plan said wasn't part of the consideration,

9  it's what the insurers said in order to close the deal.

10  Q     What did the insurers say to you, sir?

11  A     The insurers said they needed a complete release.

12  Q     The insurers said this to you?

13  A     We had conversations -- yes, and they said it out loud

14  as well, in a public forum.  Yes.

15        So the necessity question --

16  Q     Sorry, did you negotiate with the insurers on the issue

17  of necessity, sir?

18  A     Yes.

19  Q     Okay.  And do you remember talking with Ms. McNally

20  yesterday about your deposition testimony?

21  A     Yes.

22  Q     Which is now a matter of record in this case too.  I

23  believe you agreed with that testimony yesterday, isn't that

24  right?

25  A     I don't believe I was asked to agree with my testimony,

1  but we did talk about it.

2  Q    Okay.  Did you say, in the deposition testimony

3  referenced yesterday, now a matter of record, that you did

4  not personally negotiate the plan with anybody?

5  A    I believe that is correct.  The plan provisions that

6  are in the plan I personally could not negotiate plan

7  provisions myself face to face.  There are other -- well, in

8  this context we had this conversation yesterday.  In this

9  context I am talking about the document called the plan, not

10  plan in the larger 1129 context of all of the related

11  documents because I did have very specific negotiations with

12  a variety of parties surrounding documents such as the TDP.

13      Also, as I said earlier today, and this is consistent

14  with my deposition, plan provision negotiations that were

15  undertaken by me were undertaken through my counsel.

16  Q    I am asking about --

17  A    We're talking about the plan document itself.

18  Q    So you -- when you say that the insurers told you

19  something are you saying they told you through your counsel

20  or they told you and you heard it with your own ears?

21  A    My own ears.  When we're talking about this provision

22  with respect to complete release I heard it with my own ears.

23  Q    Okay.  When was that conversation?

24  A    Well we had at disclosure statement hearing where, I

25  believe, Mr. Schiavoni said it rather clearly and then we had

1  negotiations in and out of the mediation process.  We also

2  had conversations there with respect to the terms of

3  insurance settlements?

4  A     And so at the -- when you say that you heard them say

5  at the disclosure statement hearing are you referring to a

6  position taken on the record by an attorney advocating for

7  their client?

8  A     It was an attorney.  So I presume they were advocating

9  for their client.

10  Q     We will come back to those other conversations in a

11  bit.

12        So Hartford agreed to pay $787 million, right, under

13  the plan circulated in September or at the end of September

14  of last year?

15  A     Yes.

16  Q     Thank you, sir.

17        And Hartford was not entitled to a channeling

18  injunction of all abuse claims asserted against its insurers

19  under that version, was it not?

20  A     I will take your word for it.

21  Q     In Paragraph 31 of your declaration, if we could slide

22  down there, you state -- we're looking at the last sentence

23  of that paragraph, sir.  You state,

24        "Without the channeling injunction in its current form,

25  including with respect to participating chartered

1  organizations, etc., settling insurance companies" -- sorry,

2  I have to start again.

3       "Without the channeling injunction in its current form,

4  including with respect to participating chartered

5  organizations and opt-out chartered organizations, settling

6  insurance companies would not have entered into the insurance

7  settlements."

8  A    I see that.

9  Q    Did I read that correctly?

10  A    Yes.

11  Q    Okay.  Hartford agreed to pay $787 million in September

12  2021, isn't that right, under the version of the plan that

13  circulated at that time?

14  A    I will take your word for it.  I believe they did.

15  Q    So if that is true it appears that a channeling

16  injunction against opt-out chartered organizations for those

17  years that it insured was not necessary, right?

18            MR. RUGGERI:  Your Honor, James Ruggeri.

19  Objection to form.  It mischaracterizes the termsheet in the

20  Hartford settlement agreement.

21            THE COURT:  I am going to overrule it.  Let the

22  witness answer.

23            THE WITNESS:  I think we can summarize all of this

24  by pointing out that the plan that is being confirmed with

25  respect to which confirmation is being sought is not the plan

1  you are referring to.  There were several thing with respect

2  to that plan that were -- that rendered it difficult, if not

3  impossible, to consummate.  Insurer negotiations were still

4  ongoing to one degree or another with respect to implementing

5  the deals.  Frankly, you are asking me questions about

6  precise moments in time.  I can't tell you where we were in

7  those discussions before and after the circulation of that

8  plan with respect to finalizing and correctly capturing the

9  settlement with the insurers.

10  BY MR. CALDIE:

11  Q    Was the Hartford settlement finalized at the time that

12  plan was circulated, sir?

13  A    Its not binding until the court approves it.

14  Q    I see.

15  A    So it's not final until Judge Silverstein says it is.

16  Q    Were the terms of the Hartford settlement fully

17  resolved at the time that that plan was circulated to

18  creditors, sir?

19  A    I don't know.

20  Q    Is it possible or likely, from all of your experience

21  in this case and relevant to your conclusion, that these

22  injunctions are critical and necessary?  Is it likely, in

23  your mind, that Hartford agreed to pay $787 million and have

24  that plan circulated for the review of creditors without

25  first securing all of the bells, and whistles, and

1 protections that it required?

2 A    I don't know that Hartford agreed to having it

3 circulated.  That is part of one of your premises.  The

4 debtor went out with a solicitation and I am unaware one way

5 or the other whether Hartford's consent was sought.  In terms

6 of my prior experience, it's quite consistent with my prior

7 experience that there are amendments and revisions to a plan

8 leading up to it and, frankly, even following confirmation to

9 (inaudible) documents to complete the final details of a

10 negotiation.

11 Q    Is it consistent with your experience, sir, to submit a

12 settlement to a court without approval of the terms by a

13 counterparty?

14        MR. RUGGERI:  Objection.  Lack of foundation, Your

15 Honor.  Misstates the record.

16        MR. CALDIE:  I'm sorry, he just referred to his

17 experience and he's speaking from it. I would just like to

18 know if that experience also counsels his answer to this

19 question.  The court is free to weigh its evidentiary value.

20        THE COURT:  Overruled.  You can answer.

21        THE WITNESS:  Yes.  It is not unusual, as parties

22 are moving toward a settlement, particularly with a deadline

23 in a case for a motion to be filed to seek approval of a

24 settlement and for the court to hear, at the hearing, that

25 there have been some amendments to the settlement and it's

1  now being sought to be approved in a revised form to one

2  degree or another.  That is not unusual.  In fact, objections

3  are often filed to the terms of a settlement that trigger

4  further negotiations.  They get implemented at the time of

5  the hearing.

6  BY MR. CALDIE:

7  Q    Of course.  That is not responsive to my question.

8       My question is it within your experience to see parties

9  who are counter parties to a settlement not agree and yet

10 have a debtor submit a settlement agreement with that party

11 for consideration by the court?

12            MR. RUGGERI:  Objection, Your Honor.  It misstates

13 the record.  The Hartford settlement was not submitted to the

14 court until February 15th, 2022.  Mr. Caldie is referring to

15 a termsheet which the court heard a lot about that was filed

16 back on September 14th, 2021.  The settlement agreement was

17 not finalized until February 2022.  That is when it was

18 offered to the court.  Objection.  Lack of foundation, Your

19 Honor.

20            THE COURT:  You can cross on it.  Answer the

21 question, please.

22            THE WITNESS:  I'm sorry, what is the question

23 again?  I apologize.

24 BY MR. CALDIE:

25 Q    Is it common, in your experience for a debtor to submit

1  a settlement agreement to a court when the counterparty to

2  the settlement agreement hasn't yet agreed on the terms?

3  A    Yes, it is common.

4  Q    I see.  So where were we.  Do you recall what portion

5  of the Hartford settlement for $787 million was agreed to in

6  mid-September 2021, was to be made on behalf of opt-out

7  chartered organizations?

8  A    No.

9  Q    And at that time the modified fifth amended plan didn't

10  have an injunction channeling any claims against opt-out

11  chartered organizations, did it?

12  A    I will take your word for it.

13  Q    Also, the modified fifth amended plan didn't have any

14  release or injunction of all claims that are insured under

15  the settling insurer policies, did it?

16  A    I am not sure that is accurate, but I have to go back

17  and review the claim.

18  Q    So is Hartford now paying more than $787 million to get

19  additional releases of chartered organizations that first

20  showed up in December's plan?

21  A    They are paying $787 million cash and they are getting

22  releases that we negotiated to deliver to them for that

23  money.

24  Q    Are they paying more --

25  A    I think we --

1  Q     I'm sorry, sir, that's not responsive.  Perhaps I

2  miscommunicated my question. I am asking if Hartford is now

3  paying more than $787 million to get the new releases of

4  chartered organizations that first showed up in December's

5  version of the plan?

6  A     I am not sure they're new, at least in Hartford's mind,

7  and they are not paying any more than $787.

8  Q     What portion of the Hartford's settlement for $787

9  million agreed to in September 2021 will enjoin claims -- I'm

10  sorry, this is a very convoluted question.  I will help you

11  by taking a moment with it.

12      Do you recall or do you know what portion of the $800

13  million Century and Chubb settlement was made on behalf of

14  opt-out chartered organizations?

15  A     It wasn't negotiated in that kind of way.

16  Q     I see.  But you can evaluate the scope of releases and

17  injunctions?  You can't evaluate the reasonableness of those

18  things thoroughly, can you, without knowing the components

19  and details?

20  A     I can.

21  Q     Okay.  There has to be some way for the court to accept

22  whether it's a reasonable amount to be paid, right?

23  A     That is -- well, yes, there has to be a way to assess

24  whether it's a reasonable amount to be paid.  My assessment

25  was based on the risks to litigation, collection, and the

1  rewards to the trust in exchange for getting $800 million.

2  Q    I see.  How did those risks and other valued factors

3  change between September of 2021 and December of 2021 in your

4  view?

5  A    I don't think the risks associated with Century, with

6  the Century policies in pursuing Century have not changed.

7  Nothing happened to Century, nothing happened during that

8  window that I am aware of -- runoff, but I was unaware of

9  anything that happened that changed the risk.  So there is --

10  there has been no change in insurance coverage law that I am

11  aware of during that period.

12  Q    Okay.

13  A    So this profile has been the same since we began

14  negotiating.

15  Q    Did anything change between September and December --

16  would the same be true for Hartford that none of your valued

17  factors changed between September and December of 2021?

18  A    I am not entirely sure.  Hartford had the added issue

19  of the risk of an administrative claim against the estate as

20  a result of the Hartford settlement that was reached by the

21  debtor in connection with their second amended plan.

22      I can't recall if there were developments with respect

23  to the treatment of that claim in the time period you are

24  talking about.  That is a possible element of the Hartford

25  negotiations that may have fallen during that, I don't know.

1  Q      So as of September 2021 that administrative claim issue
2  was already ripe, right?
3  A      I just told you I really can't remember where in the
4  timeline we wrestled that to the ground.
5  Q      Well you referred to this administrative claim issue.
6  At what time did that administrative claim allegedly come to
7  be?
8  A      Well Judge Silverstein approved the plan support
9  agreement, but indicated that with respect to the components
10 of the plan support agreement that dealt with the debtors
11 amending the Hartford settlement and the potential for an
12 administrative claim Your Honor was not going to rule.  That
13 created -- it didn't create, but it shined a spotlight on
14 this risk.  So I suppose it came to be, at the moment we
15 signed the RSA and it became front and center following Judge
16 Silverstein's ruling.
17 Q      I see.  Had that occurred or not by September 30th of
18 2021?
19 A      The approval of the RSA was the prior spring or summer.
20 Q      I'm sorry, I was referring to Judge Silverstein's
21 ruling.  You know what, that's a matter of record and we can
22 leave that.
23        So were there any earmarked amounts within the Hartford
24 $787 million settlement or the Chubb/Century $800 million
25 settlement?

1  A      Not that I am aware of.  If there's something

2  specifically captured in the settlement agreement it would

3  be.  I am not aware of it.

4  Q      Thank you, sir.

5          So we have had experts or, I don't know about experts,

6  witnesses involved in this case talking about whether the

7  Mormons settlement amount was sufficient for its own portion

8  of fault.  Where is the assessment in the plan or elsewhere

9  of whether each settling insurers' contribution to the

10 liabilities of opt-out chartered organizations is sufficient.

11 Is there any such analysis?

12 A      In the plan or disclosure statement?

13 Q      Anywhere.

14 A      I don't believe there is an analysis in the plan.

15 Whether there is something in the disclosure statement I'd

16 have to go back and read.  It's been a while.

17 Q      How can the court analysis whether the non-debtor opt-

18 out chartered organizations are each making a sufficient

19 contribution in order to receive a release of liabilities if

20 the opt-out chartered organization isn't making a separate

21 contribution on its own?

22 A      I believe you are viewing the question from the wrong

23 end of the equation.

24 Q      Okay.  Is there a way for the court to analyze that

25 that you can identify for the court?

1  A    Sure.  We're creating -- in this context we're creating

2  a trust to which claims are going to be channeled and claims

3  are going to be paid.  The question for me and I believe for

4  the court is, is the consideration that is being paid to the

5  trust on behalf of the insurers a reasonable, fair and

6  equitable settlement in light of the benefit to the claimants

7  whose claims are being channeled.  It's -- the insurers

8  proceeds, which are a very substantial portion, majority

9  portion, frankly -- well, a majority portion of the value for

10 the trust comes from --

11 Q    I didn't ask anything -- I didn't ask about insurers.

12 My question literally said nothing about insurance companies.

13        What I'm asking about is -- and let me clarify --

14 I'm asking, is there any way you can identify for this Court

15 to analyze the sufficiency of a single chartered organization

16 -- an opt-out chartered organization's contribution on a

17 chartered organization-by-chartered organization basis,

18 right, can the Court anywhere view anything that allows it to

19 analyze each chartered organization's contribution to

20 determine whether or not it is sufficient?

21 A    At this point, the only thing in the record is an

22 aggregate analysis --

23 Q    Thank you.

24 A    -- which I believe is more than sufficient for this

25 purpose.

1  Q     Thank you.  And, again, you're not offering expert

2  testimony today; correct?

3  A     Not unless -- not unless an examiner elicits it, no.

4  Q     Right.  And I did not elicit the last part of your

5  response, right, about whether --

6  A     That --

7  Q     -- about whether it's sufficient?

8         I'm simply asking, sir -- now I'm going to ask you

9  another question, very similar -- is there anything on the

10 record for the Court to analyze on an insurer-by-insurer

11 basis that relates to claims being addressed by payments, is

12 there any way for the Court to get underneath the numbers

13 being contributed by insurers to determine whether those

14 contributions are sufficient in a detailed fashion?

15 A     I think the answer is yes.

16 Q     Okay.  Is it your testimony that the releases are

17 necessary because the BSA wouldn't have secured these record-

18 high payments from settling insurers without them?

19 A     Yes.

20 Q     Okay.  But how can we evaluate the necessity from that

21 vantage point?  The only vantage point being offered,

22 apparently, without understanding the details of what was

23 paid for with those -- you know, in exchange for those

24 releases?  We can't look at it in detail, can we?

25 A     We don't actually know the details of the claims that

 1  are being released.  I'm not sure I understand the nature of

 2  your conundrum.

 3  Q      Sir, do you know the details of the claims being

 4  released?

 5  A      No, of course not.

 6  Q      And it doesn't really make sense that these critical

 7  payments were secured before the scope -- well, I'll say this

 8  because you were noncommittal in our conversation earlier.

 9  And I don't mean that in a negative sense, to be clear, I

10  just mean I want to respect the specifics of your testimony.

11           It wouldn't really make sense that critical

12  payment amounts were secured, would it, before the scope of

13  so-called necessary injunctions and releases were fully

14  defined.  Does that make any sense?

15  A      Yes.

16  Q      Okay.

17  A      We're able to --

18  Q      Isn't it strange --

19  A      -- (indiscernible) --

20  Q      -- that additional bells and whistles -- and by that I

21  mean enhanced injunctions and releases, et cetera -- were

22  provided to -- they were given to settling insurers after

23  their so-called necessary payment amounts were set?  That's

24  backwards, isn't it?

25  A      No.  We're able to chew gum and walk at the same time.

1  This is a process that -- like most complex Chapter 11s,

2  where we move forward to the confirmation hearing, set a

3  deadline for ourselves, and pull the negotiations forward

4  such that we get them done in time for confirmation.

5            It is -- the scenario you're describing that you

6  think makes more sense where issues get resolved in a

7  perfectly serial fashion is just not the way it works or can

8  work.  A settlement with respect to one issue often affects

9  the resolution of another issue and it's an iterative process

10 that requires -- it requires a dynamic negotiation, exercised

11 with multiple parties, with the goal of being done by today

12 in this case.

13 Q    I see.  You mentioned a couple of times in your

14 declaration, sir, that these payments by settling insurers

15 are record-setting; is that fact relevant to your conclusion

16 that payments were reasonable under the circumstances and

17 that extra contractual sweeteners were needed to secure these

18 payments?

19 A     No, no, it's actually relevant to my sense that what

20 we've successfully built here in terms of the funding of the

21 trust, in light of the claims coming to the trust, was a

22 positive outcome for claimants, that we collectively, on

23 behalf of the claimants' side, did a good job.

24 Q    I see.  Are you aware of any other bankruptcy case in

25 which more than 80,000 survivors of childhood sexual assault

1  are asserting claims?

2  A      There are no others, I don't believe.

3  Q      Okay.  And so --

4         (Pause)

5  Q      I've lost my place.  Pardon me, sir.

6         (Pause)

7  Q      What part of the Century and Chubb settlement was made

8  in exchange for the channeling injunction for opt-out

9  chartered organizations?

10  A      I think I answered that already.  We did not negotiate

11  an amount based on component parts.

12  Q      The claims that are going to be enjoined and channeled

13  are broader than just for the periods covered under the

14  policies issued by the settling insurance companies; is that

15  right?

16  A      You mean all claims channeled?  Yes, all claims that

17  are being channeled are all claims against the Scouts and

18  other protected parties relating to abuse in connection with

19  Scouting.

20  Q      Right.  So the claims, if they allege abuse at a point

21  in time during which one of the settling insurer policies --

22  well, I guess this is a different point.

23         Are claims going to be released if they allege

24  abuse at any point in time during a period when settling

25  insurer company policies were providing coverage to the opt-

1  out chartered organizations?

2  A    I'm not sure I understand the question.  If the -- as I

3  understand what was struck yesterday with respect to settling

4  insurers, claims -- Scouting abuse-related claims that could

5  hit -- that the policies issued by settling insurers would

6  respond to are being channeled to the trust and in such a way

7  that the claims can't be pursued against an entity -- these

8  are Scouting-related claims -- can't be pursued against an

9  entity for the limited -- we're talking about opt-outs -- for

10  the limited purpose of -- or in the context where that would

11  trigger a liability on the part of the settling insurer.

12  Q    Okay.  To your knowledge, sir, did the analysis of the

13  contributions being paid by settling insurers, did you take

14  into account that the plan being proposed would release

15  claims against the Archbishop of Uganda that are currently

16  being negotiated with the Archbishop in the Archbishop's own

17  bankruptcy proceeding?

18  A    No, I was not focused on that -- I personally was not

19  focused on that.

20  Q    And that's because your constituency is future

21  claimants; right?

22  A    Well, I don't know if it's because or not, I just was

23  not focused on that.

24  Q    I mean, you -- when you have a client, is it fair to

25  say, you look at events within a large, complex case like

1  this one from the perspective of your client?

2  A     Well, yes.  To be clear, the future children and

3  recovered-memory claimants that I'm representing are not my

4  clients but, yes, of course, we all come to the case with the

5  perspective and goal of protecting the interests of either

6  our clients or our beneficiaries, if you're a fiduciary like

7  I am.

8  Q     Gotcha.  And that's a fair distinction because you

9  represent a constituency as opposed to specific individuals;

10  right?

11  A     That is correct.

12  Q     The plan is proposing to enjoin and channel to the BSA

13  trust claims that are being negotiated in another bankruptcy

14  proceeding, isn't that true?

15  A     I'll have to take your word for it.

16  Q     In paragraph 30 of your declaration -- and I'll have

17  you turn to that --

18  A     I have it.

19  Q     Thank you.  You opine as to your belief concerning

20  whether the channeling injunction is necessary to secure

21  contributions from protected parties.  We don't have to read

22  it aloud, actually, but if you would just take a moment to

23  look at it.  The last -- actually, the last sentence there I

24  do want to refer you to.  It says, "I believe the issuance of

25  channeling injunctions under the plan are necessary to secure

1  the contributions by protected parties to the settlement

2  trust."

3             Did I --

4  A    Yes.

5  Q    -- read that right?

6  A    Yes.

7  Q    And in paragraph 14 of your declaration -- I'm going to

8  ask you to scroll back up that way -- you note that the

9  fourth amended plan of reorganization, way back in July -- on

10  July 2nd of 2021, you note there that the debtors and local

11  councils were going to chip in $850 million; is that

12  accurate?

13  A    Yes.

14  Q    And by roughly September 15th of 2021, Hartford was in

15  for 787 million; is that right?

16  A    I'll take your word for it.

17  Q    Okay, as to the date -- I mean, you know the amount is

18  accurate, right, but --

19  A    Correct, correct, correct.

20  Q    And by September 30th the ad hoc committee of local

21  councils had received commitments of over 500 million in cash

22  and real property from local councils, which was more than

23  the anticipated local council contribution set out in the RSA

24  back in July, isn't it?

25  A    It may have been.  Again, I -- those are documented

1  facts.

2  Q    Thank you, sir.

3          December 18th, 2021, the plan was first modified

4  to incorporate a channeling injunction to channel all claims

5  covered by policies issued by the settling insurers; right?

6  A    I'll take your word for it.

7  Q    Did you consider the expanding scope of the channeling

8  injunction between September and December a relevant part of

9  your analysis regarding the necessity of the channeling

10  injunction?

11  A    I don't believe it was our view that we were expanding

12  the scope.  I think what we were doing was trying to

13  accurately capture the scope or the intended scope such that

14  we matched up the emerging terms of the settlement with the

15  insurers with the plan provisions.

16  Q    But that was the first time the plan said claims

17  against opt-out chartered organizations were going to be

18  enjoined; right?

19  A    (Indiscernible) --

20  Q    In December of 2021, wasn't that the first time the

21  plan said that claims against opt-out chartered organizations

22  would be enjoined?

23  A    I'll take your word for it.

24  Q    My question to you is, were you aware of that then and

25  did you evaluate that as part of your consideration as to

1  whether these injunctions were necessary?

2  A     I think you've got a false premise and that is that --

3  Q     I see.

4  A     I think you have a false premise.

5  Q     I see.  Do you recall -- I'll just ask -- that can be

6  resolved through reference to the documents, you are correct

7  about that, sir, and, if I'm wrong, I'm wrong and, if I'm

8  right, I'm right, I guess.  But I'll just ask, do you recall

9  evaluating that issue between September and December of 2021

10 when evaluating the necessity of channeling injunction for

11 settlements?

12 A     The only way that that issue the way you frame it would

13 be evaluated would be did I think I could sort of stick it to

14 the insurers, force them to perform or to close a deal in a

15 way that's consistent with how you characterized the state of

16 play at that moment, and I didn't think of it in those terms

17 and I didn't think there was that opportunity available to

18 me.  We were working on finalizing and accurately reflecting

19 the agreed-upon terms.

20            So the scenario you're setting up is one where it

21 suggests that I could -- that that was something I could take

22 to the court, get a court order and enforce as against, say,

23 Century at that moment in time, and that's not -- those

24 weren't the facts on the ground and that was not how we

25 evaluated it.

1  Q     Were you directly involved in negotiations with the

2  insurers during the period from September 2021 to December

3  2021?

4  A     I was some and my counsel was very involved.

5  Q     To your knowledge, sir, at any point during those three

6  months did anyone ever ask the insurance companies or

7  communicate to the insurance companies that, if they wanted

8  more protections, they had to pay more money?

9         MR. GUERKE:  Objection, Your Honor.  My objection

10 is based on a mediation privilege and 408, to the extent the

11 question is asking for protected negotiation communications.

12        MR. CALDIE:  We're confident 408 does not cover

13 this.  If the debtor wants to assert the mediation privilege,

14 I suppose that's okay.  It's their burden and this is their

15 fact witness.  I'm simply trying to get underneath whether or

16 not there's a basis for a determination necessity.

17        THE COURT:  Okay, I'm going to overrule the

18 objection.  You can answer.

19        THE WITNESS:  I think you asked me was I aware of

20 a very specific --

21        MR. CALDIE:  No (indiscernible) --

22        THE WITNESS:  -- if you can restate it

23 (indiscernible) --

24        MR. CALDIE:  No problem --

25        THE WITNESS:  -- and I'm not a lawyer --

1        MR. CALDIE:  -- I'll restate it --

2        THE WITNESS:  -- but go ahead --

3        MR. CALDIE:  -- I would like an answer to my

4   specific question, please.

5   BY MR. CALDIE:

6   Q    My question is this:  At any point between September

7   and December of 2021, are you aware of anyone communicating

8   to the insurance companies that, if they wanted additional

9   protections, they needed to pay more money, yes or no?

10  A    If they wanted additional protections, they needed to

11  pay more money.

12       (Pause)

13  A    Between those dates.  It's not clear to me that

14  additional protections were being negotiated over at that

15  time, so --

16  Q    I'm just asking the question.  I asked a yes-or-no

17  question.  Are you aware of a communication like that or not?

18       (Pause)

19  A    It's hard -- it's actually hard to say.  I think you've

20  got a premise in there that makes it difficult for me to give

21  a yes or no answer.

22  Q    Okay.  The lack of a yes will be fine.

23       So at all points in time, to the best -- you know,

24  during the period from September, let's say, all the way

25  through February when the final version of the plan was

1  complete, to the best of your knowledge and based on your

2  involvement in mediation conversations and the like, the

3  debtors' financial experts, had they concluded that the plans

4  being proposed were feasible?

5  A    I don't know when that conclusion was reached by the

6  debtors.

7  Q    Okay, that's fair.  You didn't object to any of the

8  iterations of the plan on behalf of your constituency, did

9  you?

10 A    I did not -- well, the first one.

11 Q    Oh --

12 A    We didn't file an objection, but the very first plan

13 was one we could not support.

14 Q    Ah, I see.  So there was an informal objection process

15 and then negotiations that followed?  I won't ask about the

16 details.  Is that right, though?

17 A    It never moved forward for solicitation and vote, so

18 there was not a formal objection deadline, as far as I can

19 recall -- maybe there was.  That's far enough back I'm not

20 actually not a hundred percent certain but, in any event, we

21 did not support that plan in whatever forum was necessary to

22 express that support within the context of the procedures in

23 play at the moment.

24 Q    Okay, thank you.

25          For how many of the protected parties was a

1  release of survivor claims against the Archdiocese of Agana

2  necessary to fund their respective contributions?

3  A    I don't know.

4  Q    Okay.  Going back to paragraph 23 of your declaration,

5  sir -- and we went through this before, so I won't read the

6  language aloud again, but there is one spot there where your

7  declaration says that providing a release in order to secure

8  the settlement was appropriate.  Is that right, did I say

9  that accurately?

10 A    Given the risks of recovery, yes, in the litigation

11 (indiscernible) litigation, but yes.

12 Q    Okay.  So you said it was appropriate to provide the

13 release.  You weren't describing here who is providing the

14 release, so I wanted to ask you some specifics.  In regard to

15 your conclusion of appropriateness, do you mean the debtors'

16 release of the settling insurers --

17 A    I included --

18 Q    -- (indiscernible) --

19 A    From my point of view, I'm talking about the economics

20 and -- of the benefit delivered to the trust.  I believe

21 you'll have to talk to insurance counsel about the precise

22 mechanics of how the release is being effectuated.  It's a

23 contract between the debtors and Century, and I'm guessing

24 it's going to be effectuated through a buyback.

25           So my understanding of how this would be

1  implemented is there's a channeling injunction that channels

2  claims to the trust, so that they can't pursue Chubb, and

3  that the contract as between Chubb and the debtors, to the

4  extent we're talking about that policy, is -- I'm guessing is

5  being bought out.  But that's something that people who

6  understand insurance policies and their mechanics better than

7  I do are focused on my behalf.

8  Q    I see.  And did you consider -- does whether or not a

9  buyback of insurance policies occurs, if that's the manner of

10 effectuation, to use your terminology, does that matter

11 whether or not there's a buyback to your constituency?

12 A    You know, you'd have to ask my insurance counsel

13 whether the choice of mechanism matters --

14 Q    So I'm --

15 A    -- and I --

16 Q    -- asking about -- not about the legal analysis, but

17 about the bases for your conclusions and your decisions in

18 your role.  In your role, did you consider when you made your

19 decisions relating to this plan and conclusions about

20 necessity, including the decision to support this plan, did

21 you consider whether or not the effectuating mechanism of

22 policy buybacks was good or bad for your constituency?

23 A    I relied on my counsel to make sure that the mechanism

24 that was used in the context of the insurance contract and

25 insurance law was the appropriate mechanism to deliver to my

1  constituency the benefits of the settlement.

2  Q    I see.  Okay.  So, in regard to your conclusion of

3  appropriateness of the releases, did you mean to include in

4  that statement that you thought that the debtors' release of

5  the settling insurers was appropriate?  Is it fair to say you

6  believed the debtors' release of the settling insurers was

7  appropriate?

8  A    I -- to the extent a release from the debtors is

9  necessary, then -- in order to effectuate the settlement,

10  then the answer is yes.

11  Q    To what extent --

12  A    And --

13  Q    -- is it necessary?  You qualified your statement; to

14  what extent is it necessary?

15  A    We're now getting into insurance contract law and --

16  Q    We're not --

17  A    Well --

18  Q    -- I'm asking about conclusions in your declaration,

19  conclusions that you've reasserted here today on the record,

20  and I need to understand the basis for them and I think the

21  Court does too.  I'm asking you, you said, to the extent they

22  are necessary, it's appropriate to release the settling

23  insurers, for the debtor to release the settling insurers,

24  I'm asking you -- your qualification, your word -- to what

25  extent is it necessary for the debtor to release the settling

1  insurers?

2          MR. GUERKE:  Objection, Your Honor, to counsel

3  interrupting Mr. Patton's answers.

4          THE COURT:  Well, he's asked a question now, Mr.

5  Patton can answer.

6          THE WITNESS:  Yeah --

7          MR. CALDIE:  I'm sorry, Your Honor.

8          THE WITNESS:  You'll have to ask an insurance

9  expert --

10 BY MR. CALDIE:

11 Q    But you exercised your judgment on that issue, sir.

12         MR. SCHIAVONI:  He wasn't finished, Your Honor; he

13 wasn't finished.

14         THE COURT:  I'm not sure if he was or not.

15         THE WITNESS:  Look, the answer to the question

16 that you're asking, right, and you're focusing me on

17 paragraph 23 where I say, "providing such a release in order

18 to secure the settlement was appropriate given the risks of

19 recovery from Century," whatever was necessary in the context

20 of the insurance contract and insurance law to effectuate our

21 deal, and that is a fairly technical -- in my view, a fairly

22 technical question that requires expertise that I don't have

23 and that I obtained through hiring sophisticated insurance

24 counsel and relied on them to do the -- to do a good job in

25 terms of obtaining and effectuating the settlement, that's --

1  that -- those steps in the background to effectuate the deal

2  and obtain the benefits of the deal are what I think is

3  appropriate.

4         In terms of what kinds of documents need to be

5  executed as between the debtor and the insurers or others in

6  order to implement this, I don't know.

7  BY MR. CALDIE:

8  Q    I see.  So did you delegate -- is it fair then, based

9  on what you've just said, to understand that you delegated to

10  your insurance counsel the analysis of whether or not the

11  debtors' release of the settling insurers was necessary?

12  A    Well, I relied on them to advise me about whether or

13  not the settlement that was negotiated was going to

14  accomplish the benefits and goals that I thought we had

15  obtained through negotiation.  I didn't deputize them to

16  speak on my behalf in the sense that I think you're

17  describing.

18  Q    No, I don't mean to speak on your behalf, sir.  Thank

19  you for clarifying that.  What I'm asking is who exercised

20  judgment to determine that the debtors' release of the

21  settling insurers was necessary?  Did you exercise that

22  judgment or did your insurance attorneys exercise that

23  judgment?

24  A    I don't see anywhere in here where I'm saying the

25  debtors' release of the insurers is necessary --

1  Q      So --

2  A      -- so I'm not sure -- I remain confused about what

3  we're talking about here.

4  Q      Okay.  Well, let me ask you then, is the debtors' of

5  the settling insurers necessary?

6  A      I don't know.  Look, in a buyback exchange, is that a

7  release or is that some other form of transaction?  I believe

8  we wandered down a path involving terms that I suspect have

9  some very specific meaning in the area of insurance contract

10 law and insurance law generally, and you're asking me

11 questions that I'm not really equipped to answer because I

12 don't know the nuances behind those terms.

13 Q      So -- I see.  So is it your testimony that a release is

14 appropriate, that the debtors' release of the settling

15 insurers is appropriate?

16 A      Look, the paragraph -- the sentence above it says "a

17 complete release from liability arising from any underlying

18 tort claims," that's the release we're talking about.

19 Q      I read the declaration, sir; I'm trying to ask you what

20 it means.  And so what I'm asking you is, is it your

21 testimony that the debtors' release of the settling insurers

22 is necessary?  And I've asked that and I got an answer, but

23 it wasn't a yes or no.

24         So now I'm asking you, is it your testimony the

25 debtors' release of the settling insurers is appropriate?

1  A    I don't -- you'll have to tell me if the debtors'

2  release of the settling insurers is necessary to effectuate a

3  complete release from liability arising from any underlying

4  tort claims and -- or is simply a release from all of the

5  underlying liabilities sufficient.  I don't know the contract

6  law well enough to answer the question the way you phrased

7  it.  What I'm talking about here, which I think is clear, is

8  that a complete release from liability arising from the

9  underlying tort claims is appropriate in exchange for the

10 value that's being received, what my folks called the tort

11 claims --

12 Q    The census that you've now quoted -- I'm sorry, go

13 ahead, sir.

14 A    I was going to say, if in order to accomplish that

15 outcome something specific is needed from the debtor -- and

16 it may well be -- that, in my mind, is a question of

17 execution mechanics.  The goal is to exchange money from the

18 insurers for a release of the insurers from liability arising

19 from the underlying tort claims.

20 Q    Okay.  So are buybacks part of the plan, to your

21 knowledge?

22 A    I don't know.  I don't know specifically how the

23 settlements are going to be effectuated, I just don't recall.

24 Q    I see.  Okay.

25 A    I think it may be, but I don't recall specifically.

1  Q    Okay.  I want to more fully understand your conclusion

2  that the releases for settling insurers are appropriate, the

3  very thing we're talking about.  It's appropriate for one

4  debtor -- is it appropriate, based on your experience and

5  your understanding, for one debtor in a bankruptcy to force a

6  nonconsensual release of insurance rights of another debtor

7  in bankruptcy that's faced with its own claims that would be

8  covered under the same policies?

9  A    Yes.

10 Q    I see.  You think it's appropriate to release any

11 survivor claim and all insurance assets for it if the claim

12 is only partially covered under the insurance policies issued

13 by the settling insurance companies?

14 A    It may be.  You'll have to be a bit more specific.

15 Q    I can try to give you an example here.  And I'll be

16 candid with you, we're outside my area of expertise as well.

17 So I can commiserate to some extent.

18          A claim for abuse from 1973 to 1980, say it's

19 covered by a Century policy only for the period from January

20 1978 to 1980, right?  So it's five years after the abuse

21 started that the insurance kicks in.  But the plan would

22 release the whole claim, right, including for the five years

23 of abuse that isn't insured under the policy that we're

24 talking about?

25 A    I believe that's right.  If it touches the policy, then

1  the decision was made that that gets channeled and released

2  such that the claimant can enjoy the benefits of the funds

3  that are being made available by the insurer and available

4  under the trust.  I believe that's right, but that's, again,

5  something that we can work through the document to determine.

6  Q    True.  There's a downside to the claimant there, isn't

7  -- you mentioned that they can enjoy the benefits of the

8  payments, but isn't five years of their abuse being channeled

9  and released entirely and perhaps they would have rights

10 relating to that that are now un-pursuable?

11 A    It's -- yes, there is a tradeoff, without a doubt.

12 Q    So, in your opinion, they ought to be getting more than

13 through this plan than they would be if this plan left them

14 alone, don't you think?

15 A    I think the -- my focus and my opinion is on whether

16 we've structured a plan that treats claimants fairly and

17 there are aspects of this that are significantly

18 advantageous.  We heard yesterday, for example -- or the day

19 before yesterday -- no, maybe yesterday -- Dr. Bates talking

20 about claims that have values that are low enough that it's a

21 impediment to a recovery because -- in the tort system

22 because of the high hurdle rate that litigation represents.

23 I can't answer the question the way you framed it as they

24 should be getting more.  They may be getting something under

25 the settlement that they simply would not get at all.

1    It's not the kind of calculus that you're

2  describing that goes into determining whether or not the plan

3  is fair and reasonable and treats claimants in a manner

4  that's fair and equitable.

5  Q    I understand that there are positive things and I

6  appreciate you bringing that up.  Money is better than no

7  money, that's for sure, and that there are claims with low

8  values that perhaps would be harder to pursue in the tort

9  system.  In evaluating whether the protections for settling

10  insurers under the plan were necessary, how did you go about

11  balancing all of those various competing interests and

12  considerations?

13  A    Well, at a macro level, we had coverage -- for example,

14  with Chubb -- Century, there's coverage litigation that was

15  pending prepetition, we have some significant litigation risk

16  with respect to Chubb in terms of obtaining their funds, we

17  have also some collection risk associated with Century, it's

18  in runoff, and the only way to approach this kind of

19  negotiation given the competing interests of all of the

20  different types of claimants arising in all of the different

21  years, with all of the different kinds of injuries, is to

22  view them not as isolated constituent parts, but as a part of

23  a larger whole and as -- and in the context of what's the

24  benefit of resolving all of that litigation risk and all of

25  that collection risk and resolving it now, for money now, for

1  the collective whole.  And any other approach, frankly, leads

2  to -- leads to an impossibly complex and impossible-to-

3  execute negotiation strategy.

4  Q    Did you perform any micro -- to use your term, micro,

5  macro, I'll follow up on that -- did you undertake any micro-

6  level analysis at all that, for example, took account of the

7  high or low values or the evidentiary issues pertaining to

8  specific claims at all in coming to your determination that

9  the insurer protections were necessary?

10 A    Can you ask the question again?

11 Q    Did you conduct any micro-level analysis as to the

12 value of claims, their relative strength, evidentiary issues,

13 that sort of thing, micro-level analysis, did you conduct any

14 of that in analyzing whether or not the settling insurer

15 protections are necessary under the plan?

16 A    Well, my constituents represent a class with respect to

17 which that analysis is impossible.  There are no micro-level

18 facts available for that group.

19 Q    Sure.

20 A    With respect to claims that were filed in the

21 bankruptcy and/or the settlement history that was available,

22 we don't have micro -- from the Boy Scouts, we don't have

23 micro-level information with respect to the claims that were

24 litigated.  And the short answer is, no, we did not do a

25 micro-level claim-by-claim analysis of the proofs of claim to

1  arrive at this conclusion.

2  Q    So, in your opinion, are these releases appropriate

3  even though they've been objected to by claimants who have

4  direct action rights against the settling insurers?

5  A    Well, I'm assuming that will get resolved by Judge

6  Silverstein but, in terms of the deal that we've structured,

7  I think the releases are appropriate.

8  Q    Okay.  But I'm not asking you about the deal you've

9  structured, I'm asking, in your judgment -- because I assume

10 that you sort of did a 360-degree evaluation before

11 concluding that the releases were appropriate, am I right?

12 A    I don't know what you mean by that.

13 Q    I mean, I think -- did you consider all factors that

14 you believed to be relevant before concluding that the

15 releases were appropriate?

16 A    The -- I don't even know how to answer that.  I

17 considered what I considered in terms of determining whether

18 or not the releases were appropriate.

19 Q    And you still view them as appropriate even though the

20 people with direct action rights are -- they've been

21 hamstrung by the automatic stay in Guam since long before

22 this bankruptcy was even filed, still appropriate?

23 A    I think the deal is a -- I think the releases are

24 appropriate, I think the deal that we structured with the

25 settling insurers and the protected parties is appropriate.

1  I believe that you all are in a fine position to obtain a

2  determination from the Judge if they are appropriate with

3  respect to your very specific circumstances.

4  Q    Okay, thank you.

5  A    That's -- it's not my job to protect the particular

6  interests of your particular constituents.

7  Q    But was it your job before concluding in testimony

8  before this Court that the releases were appropriate and

9  necessary, was it your job to consider relevant factors

10 before providing that testimony?

11 A    It was my job to consider the factors that I believed

12 important to the analysis that I was undertaking.

13 Q    Okay.  So that's what I'm asking and so I'll ask it

14 this way, then.  You said you considered what you considered,

15 so they -- these people with direct action rights were not

16 allowed to take action against insurers due to that preceding

17 bankruptcy injunction in Guam, was that relevant to your

18 analysis of necessity?

19 A    I did not think about that as part of my analysis; that

20 was not part of my calculus.

21 Q    Okay.  You mention in your declaration that, in your

22 experience, insurers want "complete certainty and peace" --

23 and I believe that's a quote -- when they settle; is that

24 right?  Complete certainty and peace; did you say that?

25 A    What's in my declaration?  What paragraph are we

1   speaking of?

2   Q    You know, I think it's that same one, sir.  That's a

3   fair question.

4   A    Paragraph 23?

5   Q    Yeah, we may have to do the old control --

6   A    Okay, "complete certainty and peace."  Yes, that was

7   the phrase I used.

8   Q    Thank you.  To your knowledge, does any of the

9   insurance contracts being settled in this case require the

10  settling insurer receive complete certainty and peace in

11  exchange for paying out on the claims that actually hit its

12  policies?

13  A    I'm not aware of an insurance contract that says that.

14  Q    And, to your knowledge, do those words, complete

15  certainty and peace, appear anywhere -- I guess you -- in any

16  of the insurance contracts relevant to this case?  Perhaps

17  you just answered that, to clarify.

18  A    I think I just did.

19  Q    Thank you.  Now, are you aware of any other duty, sir,

20  borne by the debtor or its local councils under their

21  insurance contracts to provide complete certainty and peace

22  to any settling insurer?

23  A    I'm not aware of one; there may be one, but I'm not

24  aware of one.

25  Q    Thank you.  To your knowledge, do the insurance

1  policies issued by the settling insurance companies require

2  the policyholders to agree to buybacks?

3  A    I actually have no idea what's in those policies.  So

4  the answer is, to my knowledge, I have -- I don't have

5  knowledge one way or the other with respect to that, so I

6  don't have affirmative knowledge that such a provision is in

7  there, nor the contrary.

8  Q    So -- okay.  In your opinion, is it appropriate to give

9  insurance companies something more than what they bargained

10  for when issuing their policies simply because the deal they

11  strike at that point turned out to be a bad bargain for them?

12  A    Oh, I don't know how to answer your question because

13  you modified it with the "simply because" part of it.

14  Q    Well, the question is the question; you're not

15  answering anything beyond what I've asked.  So I'll ask --

16  I'll repeat it and ask --

17  A    As it again.

18  Q    In your opinion, is it appropriate to give insurance

19  companies something more than what they bargained for when

20  issuing their policies simply because the deal they struck at

21  that point turned out to be a bad bargain for them?

22  A    I don't believe I've ever had a negotiation in my

23  experience of mass tort bankruptcies where we negotiated a

24  settlement on the -- where simply because it's a bad bargain

25  was an element of the negotiations.  The negotiations --

1  Q     Well, that's (indiscernible) --

2  A     -- (indiscernible) --

3  Q     -- but it's not responsive.  Can you just answer my

4  question, please?

5  A     I'm trying (indiscernible).  Go ahead.

6  Q     I'm simply asking a question.  It's yes-or-no.  It

7  doesn't -- in your opinion, is it appropriate to give

8  insurance companies something more than they bargained for

9  when issuing their policies, simply because the deal they

10 struck turned out to be a bad bargain for them?

11          MR. SCHIAVONI:  Objection to form.

12          MR. GUERKE:  Objection, Your Honor; lack of

13 foundation and assumes facts not in evidence.

14          MR. CALDIE:  I'm asking for the basis for his --

15          THE COURT:  He's asking for what he considered.

16          MR. CALDIE:  I'm sorry, go ahead, Your Honor.

17          THE COURT:  He's asking for what he considered and

18 this witness gave a lot of opinions.

19          Overruled.

20          THE WITNESS:  I can't answer your question because

21 you're asking me if it's appropriate to do this thing and

22 this thing has never been done in my experience, so I don't

23 know how to answer.

24 BY MR. CALDIE:

25 Q     Sir, I have to ask you to answer the question.  I think

1  you have to answer the question.

2  A     I think I just did.

3        If you ask it again, I'll try it again.

4  Q     I disagree.

5        MR. CALDIE:  Your Honor, I'd ask for a direction,

6  that he answer the question.

7        THE COURT:  I think he has.

8        MR. SCHIAVONI:  Your Honor --

9        THE COURT:  I think you don't like the answer, but

10 I think he answered it.

11       MR. CALDIE:  All right.  I'll move on.

12 BY MR. CALDIE:

13 Q     According to your testimony, at least some insurers are

14 insisting on releases for themselves, not only for claims

15 pending in the bankruptcy, but also for any future claims

16 under liability policies; is that right?

17 A     In the sense that we're talking about my constituency,

18 I believe that's correct.

19 Q     Okay.  And as the future claims representative, or

20 claimants representative, pardon me, the releases of rights

21 against the insurers for any claims that might be asserted

22 against the trust in the future, that is uniquely important

23 to your constituents, right?

24 A     That's correct.

25 Q     And that's because there won't be any more insurance

1  coverage to pay those claims; is that right?

2  A     Well, that's not true.  There is insurance coverage

3  that's not been settled.  I don't think that's accurate.

4  Q     That's true.  So, there just won't be any insurance

5  coverage relating to those specific policies, the settling

6  insurer policies; is that right?

7  A     That is correct, with respect to Century, for example,

8  we are settling for $800 million and abuse claims, which

9  includes my constituency are releasing their claims against,

10 as against Century.

11 Q     Did you have some kind of formula to determine -- with

12 that in mind, did you conduct an analysis of how much money

13 you would need to cover future, likely future claims?

14 A     In the -- well, not in the context of these insurance

15 negotiations.  Our focus on the size of the claim pool,

16 present and future, became -- it really became irrelevant for

17 this part of the proceeding once we negotiated a TDP that

18 provided for a payment percentage and a 502 annual review of

19 claims.  In that context, each claim will be treated in

20 substantially the same manner, hopefully, by design,

21 regardless of how much money comes into the trust.

22       I've oversimplified, but that's a design feature that

23 requires the trustee and FCR to this to settle on a payment

24 percentage and adjust that payment percentage, but that's not

25 to a today problem.

1    So, the "how much money is necessary to pay" question

2  became secondary to the question, whether or not we devised

3  and designed a trust that will, regardless of how much money

4  becomes available to the trust, will be in a position to

5  fairly treat present and future claims and do so in a fair

6  and equitable manner through time.

7  Q    And so, how did you -- and, again, I assume that part

8  of being able to treat future claims, specifically, fairly

9  and equitably over time, a big part of that would be the

10  amount of money available to pay those future claims,

11  wouldn't it?

12  A    No.  In theory, if you have a dollar is, you know

13  figure out, as best you can, how many claims there'll be,

14  what their magnitude will be when they arrive and you

15  allocate and then pay a portion now and you save the balance

16  for the future.  And each claim gets their share of that

17  dollar.  So, it could be five billion or 500 million.  The

18  design is what ensures the equal treatment, not the dollar

19  amount.

20  Q    I see, with respect, specifically, to equal treatment;

21  now, I'm tracking.

22    Okay.  And so, how did you go about evaluating -- let

23  me just scratch that.

24    In your evaluation of what would be needed to ensure

25  fair treatment of future claimants going forward, did you

1  factor in Guam's statute of limitations, or lack thereof?

2  A    That level of specificity, we have the ability when we

3  set the payment percentage and the payment stream, the

4  ability and the requirement to take that into account.  It's

5  not necessary yet.

6  Q    In determining -- I'm sorry, go ahead.

7  A    That's so -- just let me be clear -- statutes of

8  limitations vary and so, as we said -- as I said in an

9  earlier question yesterday, a child today who turns 18 in a

10  couple of years will have however long he or possibly she has

11  under their state statute of limitations to come forward with

12  a claim.

13       So, as we're designing some of the details of how to

14  set the payment percentage and manage the distribution of

15  funds, there'll have to be a very careful review of all of

16  the relevant statutes of limitations that will come into play

17  with respect to -- and I'm focusing on children for the

18  moment -- with respect to my children, who mature and come

19  forward to present claims to the Trust.

20       But the details of a particular jurisdiction's statute

21  of limitations are not yet relevant.  We have designed

22  something that enables us to take into account those factors

23  at the appropriate time.

24  Q    Okay.  Thank you.

25       In paragraph 69 of your declaration -- scroll down a

1  little ways with me --

2  A    I have it.

3  Q    -- you would conclude that -- and let me just point you

4  to a specific sentence.  The last sentence, you note that:

5         "These settlements, of which the TDPs are an

6  integral part are fair, reasonable, and equitable to adduce

7  claims."

8       On what basis do you conclude that it's fair,

9  reasonable, and equitable to blames to be forced to release

10 rights when a nondebtor joint tortfeasor that is actively

11 negotiating now over its rights in bankruptcy would be

12 released as well.

13      Did you consider that, I should ask?

14 A    I could you could say I considered the question of

15 whether or not it was appropriate for a claimant who has a

16 claim that is partially against an entity that is insured,

17 say, by Century, for some years and not -- and concluded that

18 that deal or that component of the deal made sense because it

19 made it possible to accomplish this outcome.

20      And to create some perspective, we know, and we knew,

21 that the -- from the litigation history of the Scouts and the

22 settlement history of the Scouts, that there were, compared

23 to the proofs of claim filed, a claim -- the numbers of

24 claims that came forward to be paid was tiny, compared to the

25 claims that came forward in the context of the bankruptcy

1  case and the bar date on the filings of the proofs of claim.

2      So, when it came to the question -- when I think about

3  this, when it came to the question of what to do with respect

4  to the claims that straddle the Century policy -- yours, for

5  example -- it seemed to me that there was -- that it was a

6  good thing, that it was fair and equitable to enable us to

7  capture the Century money and to fund this trust so that that

8  claimant could come to the trust and get paid and give up the

9  litigation right.

10      The balance, to me, seemed appropriate.

11  Q    And you mentioned a specifically claimant there, sir.

12      Did you evaluate it on a claimant-by-claimant basis?

13  A    Of course not.

14  Q    Okay.  Now, how do you get to the macro, without the

15  micro?

16  A    I just described how.

17  Q    Anything else?

18  A    Well, I think we designed a TDP that allows those

19  claimants to pursue their claims and receive recoveries that

20  could ultimately be quite substantial if we're successful at

21  capturing additional insurance.

22  Q    Can you assure the Court, as you sit here today, sir,

23  that you have personal knowledge of all discussions and

24  negotiations relating to policy buybacks when you concluded

25  they were necessary and appropriate to secure a deal with the

1  settling insurers?

2  A    Of course not.

3  Q    Can you assure the Court, as you sit here today, you

4  had personal knowledge of all discussions, negotiations

5  relating to third-party releases when you concluded they were

6  necessary and appropriate?

7  A    Of course not.

8  Q    You filed the applications in this case, right?

9  A    Yes.

10  Q    Those applications accurately reflect the time you

11  spent in the case?

12  A    No, it's probably a little light (indiscernible)

13  various under recorder.

14      (Laughter)

15  BY MR. CALDIE:

16  Q    As a fellow bankruptcy lawyer, (indiscernible) need to

17  laugh at your response in any kind of mocking way.  I just

18  know what you mean.  Thank you.

19      Do they provide, to the best of your knowledge, your

20  understanding, and recollection, the detail necessary to

21  accurately describe the things you've done for your clients

22  in this case, sir?

23  A    Yes, within the context of the rules of disclosure and

24  the (indiscernible), yes.

25  Q    Thank you.

1      And have you provided any services in this case that

2 are not generally memorialized in your fee applications,

3 understanding the qualification you just gave?

4 A     No.

5 Q     You have counsel in this case; is that right?

6 A     Yes.

7 Q     And who is that, sir?

8 A     It's Young Conaway and the Gilbert firm.

9 Q     Okay.  Is it one -- state fair to says that the Gilbert

10 firm focused on analysis of insurance defenses and similar

11 issues?

12 A     That's true.

13 Q     And did those firms file fee applications?

14 A     They did.

15 Q     And you reviewed those applications before they were

16 filed?

17 A     I did.

18 Q     When you reviewed those applications --

19 A     In some cases -- I take it back -- in some cases, I had

20 my counsel review them, but go ahead.

21 Q     So, your counsel reviewed their own fee application?

22 A     No, we're talking about Gilbert.

23 Q     Oh, I'm sorry.  So, Young Conaway would review

24 Gilbert's fee application, for example?

25 A     Yes.

1  Q    I see what you mean.  Okay.  I just wanted to make sure
2  I understood.

3       So, in reviewing those that you did review of the fee
4  applications, you did review -- did you confirm that they
5  only billed for their time spent and for things they actually
6  did?

7  A    I took them at their word on that.  I did not engage in
8  an interview with the billers to determine that question.

9  Q    Did anything look out of the ordinary on those
10 applications you reviewed, sir?

11 A    No.

12 Q    So, I'll represent to you that we looked through time
13 entries for you and your counsel dating back to May of 2021.

14      In the period from May 2021 to present, that would
15 capture the period in which you gathered information,
16 relevant to deciding whether third-party releases were
17 necessary and appropriate, right?

18 A    I don't think so.

19 Q    You would --

20 A    I believe even before the bankruptcy started, we knew
21 going in that given the structure of the Scouts and the
22 insurance, and there was a pre-petition insurance mediation
23 that took place, that this was a case like most mass tort
24 cases that the third-party releases would all be required.

25 Q    Okay.  Did you attend all mediation sessions in this

1  case from May 2021 to December 2021?

2  A     I know I was asked about that yesterday and I gave

3  detailed answers.

4  Q     That's right; I recall that.  Thank you, sir.

5        And one thing did not -- well, I'm not sure it matters

6  all that much.  In the interests of time, I'm actually going

7  to move on.

8        Did your legal -- did you or your legal counsel cover

9  every mediation, one way or the other of you?

10 A     Everyone that was one where we were invited.  There

11 were mediation sessions with subgroups that did not include

12 us.  But I believe we had somebody at every single mediation,

13 at mediation sessions where it was expected that we would

14 attend.

15 Q     Did you ever hear with your own ears, someone say on

16 behalf of Hartford, that Hartford would not settle this case

17 until they received third-party releases and policy buybacks?

18            MR. GUERKE:  Objection, Your Honor; mediation

19 privilege.

20            THE COURT:  I don't know if that occurred in the

21 mediation or not.

22            Overruled.

23            THE WITNESS:  I, frankly, can't recall.

24 BY MR. CALDIE:

25 Q     And, again, did you ever hear with your own ears,

1  someone on behalf of Century or Chubb, say that they wouldn't

2  settle this case unless they received third-party releases

3  and policy buybacks?

4  A     I think I did.

5           MR. GUERKE:  Objection, Your Honor; it implicates

6  mediation privilege.

7           THE COURT:  Same --

8           MR. SCHIAVONI:  This is asked and answered, Your

9  Honor.  There were prior answers on this.

10          THE COURT:  Same response.

11          You can answer.

12          THE WITNESS:  You know, I did answer him before.

13  I think I did.

14          THE COURT:  You can answer it again.

15          THE WITNESS:  Yeah.  No, no, I mean, I think I

16  did, Your Honor; that was my answer.

17      (Laughter)

18  BY MR. CALDIE:

19  Q     You conclude in your declaration that third-party

20  releases and policy buybacks are necessary and appropriate,

21  but you can't know for certain what's in another party's

22  mind, right?

23  A     Unless they tell me, I don't know how I could, you're

24  correct, and even then, one can't be sure.

25  Q     And would you agree that sometimes in the context of

1  complex negotiations, parties claim that a deal -- that an

2  issue is a deal-breaker when it really isn't; have you ever

3  seen that?

4  A     Sure.

5  Q     Did any of the settling insurers agree to things in the

6  final version of the plan they refused to accept in

7  earlier -- earlier in the process?

8           MR. GUERKE:  Objection, Your Honor; mediation

9  privilege and confidential negotiations (indiscernible) to

10 the extent it was.

11          THE COURT:  I don't think this question implicates

12 what was said, no.

13          THE WITNESS:  Well, I think we can answer, in any

14 event, just based on the history of the Hartford negotiations

15 that the answer is yes.  It's clear from the way those

16 unfolded.

17 BY MR. CALDIE:

18 Q     When parties articulated their positions and offers in

19 the case -- and, again, without going into the detail of

20 content -- did the parties separate out for you which aspects

21 of their offers and positions were deal-breakers and which

22 aspects they'd be willing to abandon later on in

23 counteroffers?

24 A     Well, now, we are getting into mediation nuance and

25 information communicated through a mediator.  That's the kind

1  of nuanced signaling that is very much alive in the

2  mediation.

3          MR. GUERKE:  We object, Your Honor, on mediation

4  privilege grounds.

5  BY MR. CALDIE:

6  Q    Yeah.  And let me clarify, there's no need to get into

7  things that the mediator said or that parties specified in --

8  you know, I'll withdraw the question; it's not that

9  important.

10      So, how did you go -- do you have -- can you point to

11  anything you perceived in this case directly with your own

12  five senses, Mr. Patton, that allowed you to distinguish

13  between deal points that were deal-breakers and deal points

14  that were not?

15  A    I -- yes, there were communications involving the

16  mediator.  I'm trying to recall the specifics -- well, I

17  shouldn't recall the specifics.

18  Q    Yeah, no need.

19  A    But, yes, that's actually a fairly common experience.

20  Q    Okay.  So, without going into detail of content, what

21  is it that you perceived with your five senses that allows

22  you to distinguish between deal-breakers and non-deal-

23  breakers?

24  A    Well, in a mediation, it's often fast, so the mediator

25  will often signal.  There's also, just in the context of a

1  negotiation, in the way positions are articulated or

2  presented, parties advertently or inadvertently will

3  communicate something about which elements of their position

4  are critical and which ones aren't.

5       And we do the same in the opposite direction when we

6  are negotiating from our position.

7  Q    And is that perfectly reliable, your ability to

8  evaluate the difference between deal-breakers and non-deal-

9  breakers?

10  A    No.

11  Q    During the subset of mediation sessions that you

12  attended personally, were you included in all discussions and

13  negotiations?

14  A    No.  There were many breakout negotiations involving

15  subgroups.  The mediation sessions would last for days.

16  Q    And as you sit here today, do you have any basis for

17  knowing how many discussions you were left out of?

18  A    There is no way to know.

19  Q    Do you have any basis for knowing what was said or

20  represented in the sessions to which you were not invited?

21  A    Sometimes we would have a report of them and other

22  times no.

23  Q    Were you privy to all conversations and negotiations

24  relating to third-party releases?

25  A    No.

1  Q     Were you privy to all conversations and negotiations

2  relating to policy buybacks?

3  A     No.

4  Q     Do you have any way of knowing how many conversations

5  and negotiations took place that you were not a part of,

6  relating to third-party releases or policy buybacks?

7  A     No.

8          MR. CALDIE:  Your Honor, if we could take a very

9  short recess, I believe that I can wrap up quickly after

10 that.

11         THE COURT:  Let's take five minutes.

12         MR. CALDIE:  Thank you so much.

13         THE COURT:  We're in recess.

14      (Recess taken at 12:59 p.m.)

15      (Proceedings resumed at 1:06 p.m.)

16         THE COURT:  Mr. Caldie?

17 We're back on the record.

18         MR. CALDIE:  Thank you, Your Honor.

19         And, actually, I have no further questions.  I

20 just want to thank Mr. Patton.

21         THE COURT:  Okay.

22         THE WITNESS:  My pleasure.

23         THE COURT:  Thank you.

24         I know we had other cross-examination.  Ms. Dumas,

25 how long do you think you're going to be?

1           MS. DUMAS:  Oh, I imagine half an hour, maybe.

2           THE COURT:  Okay.  Let's do that --

3           MS. DUMAS:  Okay.

4           THE COURT:  -- and then we'll take -- I don't know

5  if there are any others, I don't recall, but let's go ahead.

6           MS. DUMAS:  Yeah, I believe Ms. Lujan Wolff has

7  questions.

8           THE COURT:  Okay.

9                     CROSS-EXAMINATION

10  BY MS. DUMAS:

11  Q    Mr. Patton, my name is Gilion Dumas.  I represent

12  several of the abuse claimants that are opposing the plan.

13  And I might jump around a little so that I don't duplicate

14  what you've already been asked.

15       So, the future -- as a future claims representative,

16  you're acting on behalf of people who were abused prior to

17  when the plan is confirmed, correct?

18  A    No, prior to the petition date.

19  Q    Oh, prior to the petition date, okay; that is a

20  clarification that I wanted to know.

21       But future claimants are defined only as minors and, to

22  use a colloquialism, those with repressed memories, correct?

23  A    Yes, limited to those with repressed memories in states

24  where the highest courts recognize that theory.

25  Q    Okay.  And people who are minors now, right?

1  A      Who were minors as of the petition date, so abused as

2  of the petition date, minors as of the petition date.

3  Q      Okay.  But the definition of future claimants does not

4  recognize people who -- well, let me back up.

5         As for people who have repressed memories, they're

6  included in the definition of future claimants because they

7  did not know they had a claim as of the petition date; is

8  that correct?

9  A      Broadly, yes.

10 Q      Okay.  But the definition of future claimants does not

11 recognize who didn't know they had a claim as of the petition

12 date and who are in states who have statutes of limitations

13 with that discovery provision, the connect-the-dot states, if

14 you will.

15        Do you know what I'm talking about when I talk about

16 discovery provisions and statutes of limitations?

17 A      So, generally, I don't know if this helps, but by our

18 count, roughly half the states, maybe 50 -- maybe 26 states

19 where jurisdictions recognize at the highest court level

20 recovered memory as a theory and that leaves roughly half the

21 states that don't satisfy the Court's order, with respect to

22 my constituency, at least as I understand it at this point.

23 Q      Okay.  I'm not talking about recovered memory, however.

24 A      Okay.

25 Q      Are you familiar with statutes of limitations for child

1   abuse that, for example, might say something like, You can

2   bring a claim at any time up to say, age 26, age 40, age 52,

3   or you can bring a claim after that age, as long as you bring

4   it within, say, three years or five years of when you make

5   the connection between your childhood abuse and your injury.

6         Are you aware of statutes of limitations worded like

7   that?

8   A     I am.

9   Q     Okay.  And the concept behind them, you would agree, is

10  that some people may always remember that they were abused,

11  but don't make the connection between their abuse and their

12  injury until some later date, correct?

13  A     I believe that's the theory behind what the statute

14  says.

15  Q     Okay.  And the definition of future claimants does not

16  recognize people with claims under those kinds of statutes of

17  limitations, correct?

18  A     That is correct.  The Court order does not include that

19  subset or that set.

20  Q     And even though people in states with those kinds of

21  statutes of limitations, those kinds of statutes of

22  limitations recognize that those people, under the law of

23  those states, don't have a claim, don't know they have a

24  claim until they make that connection, correct?

25  A     You said, "even though."

1        It is correct that they were not included.  The parties

2    who negotiated my order, which did not include me, it's the

3    debtors' and the Plaintiffs' group, did not include that set

4    of people in my constituency when the order was finally

5    negotiated and presented to Judge Silverstein for

6    consideration.

7    Q    And I think believe earlier you mentioned that you

8    believe there might be, maybe 40 people who come forward in

9    the future who have repressed memories.

10   A    That's -- somewhere in that neighborhood is what our

11   estimate is.

12   Q    All right.  And have you done any kind of analysis of

13   how many people might possibly come forward in the future and

14   say, Hey, I just made the connection between my abuse and my

15   injuries.  Can I bring a claim?

16   A    Earlier on, I believe in the pre-petition period, we

17   were beginning to attempt a model all the claims that would

18   likely come forward, as a starting point, without regard to

19   statutes of limitations, just to get a sense of the

20   magnitude.

21       But then the case was filed and the direction of the

22   structure of sort of who I was going to represent changed, so

23   apart from those early discussions, we did not focus on that

24   set you're describing.

25   Q    Okay.  So, if those people do come forward in the

1   future, they will not be an allowed to bring a claim as a

2   future claimant; is that correct?

3   A     They are not a future claimant.

4         They will be -- we will want to think about them when

5   we set our payment percentage.  There's a mechanism that the

6   Bankruptcy Code recognizes for filing a late claimant

7   requesting that it be allowed and there's case law that

8   suggests that that could continue even after confirmation

9   and, in fact, there's a mass tort case or two that talks

10  about this.

11        So, that category will need to be taken into account in

12  some fashion because a possible path forward is for that

13  individual to come forward, come to the Court and say, I want

14  to file a proof of claim and I should be allowed to do so for

15  the reasons you just outlined, underlying the policy behind

16  the statute of limitations.

17  Q     And there's --

18  A     And whether or not the Court would allow that or not

19  (indiscernible).  It's a case-by-case analysis.

20  Q     Okay.  But they're not part of the future claims

21  constituencies that you represent?

22  A     That's true; I do not represent them.

23  Q     Okay.  They'd have to go through, basically, the basic

24  bankruptcy law right to bring a late case, yes?

25  A     Yes, to get into the trust; yes, that's correct.

1  Q     Were you -- did you do any analysis of the assets of

2  chartering organizations as part of your role in negotiating

3  any of this?

4  A     We did do some.  There were an awful lot of charters,

5  but we did look at assets to an extent.

6        In the context of the TCJC, however, the asset picture

7  was not the driver; it was the liability feature.

8  Q     Other than the TCJC, did you look at -- did you do an

9  analysis of the assets of all the chartering organizations?

10 A     No.

11 Q     So, you can't say if the chartering organizations are

12 contributing adequately to the settlement fund for the claims

13 that are asserted against them?

14 A     Well, the chartering organizations, they are not

15 settling.  The chartering organizations are only providing

16 insurance in the sense that they're making available --

17 they're participating for their opt-out.  But the

18 contribution is that they are making it possible for us to

19 settle insurance with settling insurers and allowing us to,

20 in the future, settle with non-settling insurers.

21       And so, it was not -- we aren't getting assets, other

22 than the insurance asset from those entities, so the other

23 assets of those entities were not germane.

24 Q     Okay.  Earlier your we asked about whether you had

25 analyzed the liability of any of the chartering organizations

1  and after a while, I believe your answer was no.  And you

2  also now say that you didn't analyze the assets of the

3  chartering organizations.

4       So, there was no analysis of either the liability or

5  the assets of the chartering organizations; is that correct?

6  A    No, I think I've answered it.  There are assets that

7  are insurance assets and there are liabilities that are

8  abuse, Boy Scout abuse claim liabilities.

9  Q    Okay.  But you don't know the amount of the liability

10 of the abuse claims against the chartering organizations and

11 you don't know assets, other than insurance of the chartering

12 organizations, correct?

13 A    It is correct that I do not know the particular size of

14 the universe of claims against a particular chartering

15 organization, nor do I know the size of the non-insurance

16 assets of a non-settling chartering organization.

17 Q    I also heard you say earlier in your testimony, you

18 estimate that there could be as many as 11,000 minors who

19 will come forward in the future; is that your estimate?

20 A    Yes.

21 Q    And those claims are all going to be paid out of the

22 Settlement Trust, correct?

23 A    Yes, well, assuming they're allowed.  Coming forward

24 and being allowed is different, but yes.

25 Q    Okay.  And money needs to be held back to pay all of

1  the allowed claims, correct?

2  A    Well, we need to set a payment percentage that is

3  designed to pay all allowed claims in substantially the same

4  manner.  I guess you could call that holding it back.  You

5  also have to cover the expenses.

6  Q    And you talked a lot about how future claims need to be

7  fairly treated under the TDP, correct?

8  A    All claims.

9  Q    All claims.

10     But no additional money is going to be coming into the

11 trust and earmarked for future claims, right?

12 A    That is correct.  Additional money coming into the

13 trust is a hope for an outcome.  It will come from insurers

14 and chartering organizations that settle with us or through

15 the independent review option, for example, or the STAC TDP

16 elections and other avenues.

17     But there is no contemplation that the funds are going

18 to come into the trust and be earmarked for something we

19 would call future claims.

20 Q    And did you listen to the testimony of Dr. Bates?

21 A    Yes.

22 Q    All the numbers that he was talking about, the number

23 of claimants and the amount of money that he estimates will

24 be needed to pay those claimants, he was only talking about

25 the number of claimants that are currently in the bankruptcy

1  now, right?  He was not talking about any of -- any new

2  future claimants coming in, correct?

3  A    I believe he did estimate future claimants, but he had

4  a much smaller number than I did.

5  Q    Okay.  But when he was talking about his aggregate

6  estimate of how much this would cost, he was talking about

7  the 82,000 proofs of claim that are in right now, right?

8  A    I'm not sure that's correct.  I believe he testified

9  that he included in his analysis, the universe of future

10  claims and recovered memory claims, you know, the future

11  claims.  I'm sorry.

12  Q    That's what you believe?

13  A    I think he said he did, yes.

14  Q    When you were testifying earlier about your description

15  of being fairly treated by establishing a mechanism for

16  treating all claimants the same just a little while ago, you

17  were really talking about pro rata payments to claimants,

18  right?

19  A    Yes.  It's not just pro rata, but it's also assuring

20  that there's a likelihood that we're going to be able to

21  design a system so that similar claims get treated and

22  evaluated in a similar fashion.

23       But the notion is that we establish a mechanism when it

24  comes to the money side of this, such that the money is --

25  such that we establish a payment percentage so that, as I put

1  it in simplistic terms, so that the last claim gets evaluated

2  and paid the same as the first similar claim of a similar

3  type.

4  Q    You've used that term a lot, "a mechanism, a fair

5  mechanism" and things like that, but none of that talks about

6  whether all the claimants will be paid substantially in full,

7  does it?

8  A    No.

9  Q    Okay.  You mentioned several times that you envision

10  the future claims process being open for decades; is that

11  what you believe is going to happen?

12  A    Well, I think the claim process, future or otherwise,

13  will be open for decades, or has the potential to be.  It's

14  just the simple consequence of both, how the TDP is

15  structured and some of the options in the TDP.  And the

16  independent review mechanism could, any given claim could

17  take quite a while to resolve.

18  Q    Yeah.  Thank you.  That wasn't my question.

19       Will the future claimants have decades to come forward,

20  as you envision this?

21  A    Probably.  We will have -- to be fair to individuals

22  who have, who are children who live in a jurisdiction or have

23  available, a jurisdiction to them for pursuing a claim, a

24  statute of limitations that allows them decades to come

25  forward, we will have to take that into account.

1      Now, there are end of trust options that if we are

2   convinced that that is likely to be a small number, we can

3   imagine designing a revision to the trust after the vast

4   majority of claims have been resolved to design something

5   that's more efficient.

6      And there are a variety of tools that are theoretically

7   available to us down the road.  But in simple terms, the math

8   behind what we designed in order to be fair to people,

9   creates a potential for this to be open for decades.

10      And, frankly, that's -- you know, my first mass tort

11   asbestos case confirmed back in '96 and it's still up and

12   running.  And asbestos is very different from abuse, but

13   it's -- the design features that were used to accommodate

14   those temporal challenges are familiar to us.

15   Q    Okay.  But the reason you believe it's going to be open

16   is because there are some statutes of limitations that are

17   very long and you think that the people who are minors now

18   should have as long as their statute of limitations is to

19   come forward; is that what you're saying?

20   A    I think that's what the TDP provides.

21   Q    Okay.  And there are even several states and

22   territories that have eliminated the statute of limitations

23   for child sex abuse, correct?

24   A    I believe that's true, yes.

25   Q    Okay.  So, we're talking about, basically, keeping the

1  trust open for, you know, the oldest living Cub Scout, right?

2  A     Well, potentially, yes.

3  Q     Okay.  Now, you could have set it up -- and by "you," I

4  don't mean you, personally, but you, as part of the

5  negotiating process -- you could have set it up with a time

6  limit, right?  So, say, everyone who was a minor at the date

7  of filing, when those people turn 18 plus one year or plus

8  two years and then have a deadline by which they have to

9  bring claims.

10       The future claims committee could -- the future claims

11  claimants could have had a deadline such as that to come

12  forward.  That could have been an option, right?

13  A     In theory.  I don't think I would ever agree to that,

14  but in theory, you could impose the deadline that an 18-year-

15  old who turns, once they turned 18 had to come forward in the

16  next two years and depending on whatever statute of

17  limitations apply, sure.

18  Q     Okay.  Because the people who filed proofs of claim in

19  this case, many of them had extended statutes of limitations

20  or no statute of limitation or an open window and, yet, they

21  had a claims bar date by which they had to file their proof

22  of claim, correct?

23  A     They have a bar date, yes.

24  Q     Okay.  And setting a similar bar date for future

25  claimants would obviate the need to keep the trust open for

1  potentially 90 years, until the last Cub Scout shuffles out

2  of this mortal coil, right?

3  A    Maybe.  It depends.

4      You've identified a class in our earlier conversations

5  that arguably could come back and seek to open, to file a

6  late claim, well beyond those time periods.  So, your

7  counterfactual has complexity to it that doesn't necessarily

8  mean you could close the trust a whole lot faster.

9  Q    Okay.  And let me just check my notes here, but I think

10  I am done.

11      You raised concerns earlier that there wasn't

12  sufficient money in the Settlement Trust to pay future

13  claimants, didn't you?

14  A    No.

15  Q    You've never raised those concerns?

16  A    No.

17  Q    Okay.

18          MS. DUMAS:  I have no further questions.  Thank

19  you.

20          THE COURT:  Thank you.

21          Let me ask, who else has cross-examination?

22          I know Ms. Wolff.  Anyone else?

23          MR. RUGGERI:  Your Honor, James Ruggeri for

24  Hartford.  I may have a little bit.

25          THE COURT:  Okay.  We're going to take a lunch

1  break then and we'll be back at 2:30.

2              And, again, please, Mr. Patton, do not discuss

3  your testimony with anyone during the lunch break.  Thank

4  you.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  We're in recess.

7         (Recess taken at 1:29 p.m.)

8         (Proceedings resumed at 2:32 p.m.)

9              THE COURT:  This is Judge Silverstein.  We're back

10  on the record for cross.

11              And I believe Ms. Wolff is up.

12              MS. LUJAN WOLFF:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14  BY MS. LUJAN WOLFF:

15  Q    Good afternoon, Mr. Patton.  My name is Delia Lujan

16  Wolff, from Lujan & Wolf, LLP.  I represent certain survivors

17  of abuse who have asserted claims in this case.  And I just

18  have some quest -- a few questions for you.

19       Now, sir --

20  A    Good afternoon.

21  Q    -- you testified -- good afternoon.

22  A    I'm sorry.

23  Q    Sorry.

24       You testified that you believe there are about 11,000

25  minors and about 40 repressed memory survivors who will

1  assert compensable future claims in this matter.  Is that

2  correct?

3  A    I think that's about right.

4  Q    Okay.  When did you first arrive at that conclusion?

5  A    Well, my experts were working on the project, honestly,

6  before the disclosure statement.  I -- and some -- sometime

7  before the disclosure statement.  In fact, we -- we started

8  to get -- started to get more precise with our estimate.

9  Q    Okay.  And so you're talking about before the disclosure

10  statement --

11  A    Was filed.

12  Q    -- the solicit --

13  A    Yeah.

14  Q    Okay.  So approximately September 29, 2021.  Is that

15  correct?  Around that time?

16  A    If -- if that's when it was filed, it's before that time

17  I'm speaking of now.

18  Q    Okay.  And so that would have been the first time that

19  the FCR, the future claimants representative's, yours, that

20  your estimate of the number of future claims was, I guess,

21  conveyed beyond the debtors in this case.  Is that correct?

22  A    No.  I think the claimants groups knew that I thought

23  there was a substantial population of minors who could file

24  claims.  The -- the -- the filing of proofs of claim in such

25  large numbers caused to reevaluate what the likely universe

1  of proofs -- of future claims would be, compared to what we

2  thought at the beginning of the bankruptcy case.

3      So somewhere between the running of the bar date and the

4  -- and the disclosure statement -- which is obviously a long

5  period of time, almost a year -- we began forming views about

6  the size of the future constituency.  And we had

7  conversations -- I had conversations with various claimant

8  representatives about how large that might be or how small.

9  Q    But as to the precise -- well, I won't say "precise."

10     But as to the estimate of about 11,000 minors and 40

11 repressed memory survivors, that was first conveyed at the --

12 around -- at the time of the filing of the disclosure

13 statement in support of the modified fifth amended plan,

14 correct?

15 A    That's fair.

16 Q    Okay.  And sir, what do you believe is the amount of the

17 BSA's liability for future abuse claims?

18 A    Well, we attempted to create a number.  And my expert --

19 an amount.  And my expert attempted to generate an estimate

20 based on how the claims would end up being valued through the

21 TDP.  And I believe they came up with a number of about 5

22 billion, in terms of the allowed amount of claims.

23          MR. KURTZ:  Your Honor, Glenn Kurtz.  I'm just

24 going to object to this line of questions.  There's no expert

25 testimony on this, and this witness can't back door an expert

1  analysis that we haven't had an opportunity to in -- before

2  Your Honor challenge or hear.

3          MS. LUJAN WOLFF:  Your Honor, he's the FCR.  He's

4  testified about the number of claims.  I believe it's fair to

5  question him as to the value of those 11,040 claims.

6          MR. KURTZ:  I don't think the witness is qualified

7  to function as an expert as to either the number of claims or

8  the value of those claims.  He's specifically repeating

9  hearsay of an expert that's not before the Court.

10          MS. LUJAN WOLFF:  Mr. Kurtz didn't object to his

11  expert's arrival at 11,040 claims.

12          MR. KURTZ:  I do object to that.  There's no expert

13  testimony.

14          THE COURT:  Well, he's been testifying --

15          MS. LUJAN WOLFF:  There was --

16          THE COURT:  -- about that --

17          MS. LUJAN WOLFF:  -- no earlier --

18          THE COURT:  -- throughout the -- throughout his

19  testimony, so I'm going to overrule this objection.

20          MS. LUJAN WOLFF:  Thank you.

21  BY MS. LUJAN WOLFF:

22  Q   Now, sir, you testified about the channeling injunctions

23  are part of this plan.  And I want to refer you to Joint

24  Exhibit 379 that was already admitted into evidence.

25          MS. LUJAN WOLFF:  And I apologize, Your Honor.  I

1  haven't -- I didn't realize that I was going to bring this

2  up, so I didn't send a binder.  But it is already admitted

3  into evidence, and it was admitted as part of Mr. Desai's

4  testimony.

5          THE COURT:  Okay.

6          MS. LUJAN WOLFF:  It should be found in the certain

7  insurers' exhibit binder, I believe.  But I'm going to share

8  my screen.

9  BY MS. LUJAN WOLFF:

10 Q    Now, sir, do you see what I'm sharing here?  It's a

11 letter dated February 5, 2021.

12 A    Yes, I do.  It's on the screen.

13 Q    Okay.  And so I just want to scroll down, just so you

14 can see that it's been marked as Joint Exhibit 379.  Do you

15 see that?

16 A    I do.

17 Q    And so I'll represent to you that this has already been

18 admitted into evidence, and it's a letter from -- you can --

19 it's a letter dated February 5, 2021, from Shipman & Goodwin

20 It says there "James P. Ruggeri."  And it's to various

21 debtors' counsel.  Do you see that?

22 A    I do.

23 Q    Okay.  So I'm just going to direct your attention first

24 to Page 3 of this letter.

25     So this letter -- and it's the last paragraph before the

1  bullet points, the last sentence.  In this letter, Mr.

2  Ruggeri -- who you understand that to be counsel for

3  Hartford, correct?

4  A    That's correct.

5  Q    Okay.  So, in this letter, Mr. Ruggeri states:

6         "Various provisions of the draft plan that BSA

7  apparently intends to file already impermissibly prejudice

8  Hartford's rights, including" --

9       And then Mr. Ruggeri has bullet points that go into the

10  fourth page.  Do you see that?  I'm going to go --

11  A    (Indiscernible)

12  Q    -- to the fourth --

13  A    Okay.  Go ahead.

14  Q    And the second-to-the-last bullet point here is -- I'm

15  going to direct your attention to this.  And so I'm just

16  going to read it and ask you if I've read it accurately.

17         "The plan purports to provide local councils

18  certain chart" -- "certain contributing charter organizations

19  and other nondebtors with a channeling injunction that would

20  effectively discharge those entities from their own liability

21  for the abuse claims.  Even if such a channeling injunction

22  would be appropriate as to any claims, and that is highly

23  dubious because the liabilities appear to be direct, not

24  derivative of the debtors' liability.  This injunction

25  improperly purports to enjoin claims Hartford may have for

1   subrogation or contribution against these nondebtor

2   entities."

3        Did I read that correctly, sir?

4   A    Yes.  And then it cites to a plan provision.

5   Q    Yes, thank you for that.

6        And so the question I have for you is:  Did Hartford

7   convey to you Hartford's high doubts that the channeling

8   injunction would be appropriate as to any claims because the

9   liabilities appear to be direct, not derivative of the

10  debtors' liability?  And I'm referring to the channeling

11  injunction provided to local councils, certain contributing

12  chartered organizations, and other nondebtors.

13  A    No.

14  Q    Did Hartford convey that to you?

15  A    No.

16  Q    If Hartford had conveyed that to you, would that have

17  been relevant to your analysis of whether the releases of

18  nondebtors was necessary to the insurance settlement with

19  Hartford?

20  A    I -- I don't really know quite how to answer that.  I

21  mean, we were settling with Hartford and this topic never

22  came up.  I -- I -- and I don't agree with the proposition,

23  so ...

24  Q    But you believe it's an important consideration whether

25  or not these channeling injunctions are even legal.

1    MR. SCHIAVONI:  Objection to form, Your Honor.
2  This -- the question is inherently misleading since the
3  letter is referring to a different plan.
4    MS. LUJAN WOLFF:  Your Honor, it's referring to
5  channeling injunctions that benefit local councils and
6  chartered organizations and -- as well as other nondebtors.
7  And it's still in the same -- it's still in the current plan,
8  Your Honor.
9    THE COURT:  Overruled.
10    MR. SCHIAVONI:  It's a citation -- okay.
11    THE COURT:  Overruled.
12  BY MS. LUJAN WOLFF:
13  Q    And so, sir, I believe that the question that I had was:
14  Don't you agree -- and I don't believe that you answered it,
15  so I'm sorry that -- if I -- if you did.  I just -- I don't
16  recall an answer, so please allow me to repeat it.
17    Do you believe that the -- that Hartford's high doubts
18  of the channeling injunction legality is an important factor
19  to consider when you're deciding -- or I guess in the
20  analysis of whether the releases of these nondebtors is
21  necessary to an insurance settlement?
22  A    No.
23  Q    You don't believe that's important.  Okay.
24  A    No, I don't think their doubts are important to me.
25  Q    Okay.  And what analysis have you done as FCR of the

1  liabilities, the direct or derivative liabilities of local

2  councils; what analysis have you done?

3             MR. GUERKE:  Objection.  Asked and answered.

4             THE COURT:  Possibly.  But I'll let him answer the

5  question.

6             THE WITNESS:  Well, I -- I touch -- I talked about

7  this a great deal.  So the -- we've -- we undertook an

8  analysis of the claims history.  We -- through Ankura.  We

9  participated in a review of the information that was being

10 generated by the debtor and by Bates White and by others in

11 analyzing the proofs of claim.  And we also developed a body

12 of work surrounding the design of the trust agreement and the

13 TDPs.  And -- and accompanying that is a great deal of -- of

14 legal work surrounding the theories associated with

15 channeling claims.  And some of that legal work was done

16 decades ago in connection with earlier mass tort cases.  So

17 it's -- but I've -- I've touched on your topic in one way or

18 another several times in answers through the deposition --

19 through this testimony.

20 BY MS. LUJAN WOLFF:

21 Q    But you didn't review proofs of claim to ascertain

22 nondebtors' liability, correct?

23 A    I -- no, I did not.

24 Q    Okay.  Let me just stop sharing my screen.

25      Now, sir, you've stated in your declaration that:

1        "Section 524(g) of the Bankruptcy Code guides all

2  mass tort bankruptcies."

3        Do you remember that in Paragraph 71 of your

4  declaration?

5  A    I said something close to that for sure.

6  Q    However, wouldn't you agree that the plan that the

7  debtors are asking to confirm, wouldn't you agree that it

8  doesn't meet the requirements of Section 524(g), all the

9  requirements?

10  A    I don't think I agree with that.

11  Q    Well, let me ask.  You're familiar with section -- with

12  11 U.S.C., Section 524(g).  Is that correct?

13  A    Yes.

14  Q    Okay.  Isn't one of the requirements of a channeling

15  injunction in Section 524(g) that the trust established in --

16  that the trust established in such an asbestos bankruptcy,

17  that the trust own or be entitled to own a majority of voting

18  shares of the debtor or the parent corporation or a

19  subsidiary of the debtor that's -- that is also a debtor?

20  Isn't that correct?

21  A    In the literal sense, yes.  But with respect to that

22  specific provision, we are receiving --

23  Q    Well, sir --

24  A    -- essentially -- oh, okay.  The -- the -- that

25  provision, in terms of our asbestos cases, there's honor

1  largely in the breach.  And --

2  Q    And you know that this is an -- obviously, this isn't an

3  asbestos case, correct?

4  A    Correct.

5  Q    And obviously, the plan does not provide that the trust,

6  the settlement trust owns any voting shares of the BSA -- or

7  any voting rights as to the BSA.  Isn't that correct?

8  A    Well, it's a charitable organization, and so it -- it's

9  a square peg in a round hole when it comes to that specific

10 provision of 524(g).  And as I've said, in this context,

11 that provision has -- has no particular relevance.

12 Q    Well, it's a nonprofit, but it's governed by the

13 national executive board, correct?

14 A    That's one of the governing bodies, yes.

15 Q    And the national executive board consists of voting

16 members, correct?

17 A    (Indiscernible) I -- I -- I'm assuming it operates

18 through some democratic process, yes.

19 Q    Okay.  And so the plan does not give the trust any

20 voting rights as part of the national executive board.  Can

21 you agree that that's correct?

22 A    That is true, there's nobody on the national executive

23 board.

24 Q    And --

25 A    Well, let me take that back.  I'm pretty sure that's

1  right.  I -- I was -- I -- I'm trying to recall where the

2  individuals will reside who are going to be advising the

3  scouts as part of the child protection plan.  But --

4  Q    Well, whether there are any voting rights given, there's

5  certainly not a majority of voting rights provided to the

6  settlement trust, correct?

7  A    That is true.

8  Q    Okay.  Well, sir, so you testified that there are about

9  -- that you believe the value of the -- you believe that the

10 -- well, let me ask you.

11     Is it your understanding that future abuse claims would

12 be timely under the relevant statutes of limitations?

13 A    It -- if a -- if a future claim is -- it's a state law

14 question, state by state.  And it depends on when it's

15 actually submitted to the trust.  So a timely filed claim by

16 one of my constituents is a timely filed claim.  But the

17 statute of limitations is a -- applicable to that claim under

18 state law, is one of the measures of timeliness with respect

19 to my claims.

20 Q    So you haven't taken -- you don't have a specific

21 position on whether all of the future abuse claims that are -

22 - will be asserted are timely under a relevant statute of

23 limitations.  You haven't -- you don't -- you haven't

24 analyzed that.

25 A    Well, they -- they are -- they are a -- there are no

1  known future claims.

2         UNIDENTIFIED:  (Indiscernible)

3         THE COURT:  Please continue --

4         THE WITNESS:  So --

5         THE COURT:  -- Mr. Patton.

6         THE WITNESS:  So I'm dealing in every case with a

7  hypothetical claim.  There's no claim for me to analyze, no

8  existing claim for me to analyze.

9  BY MS. LUJAN WOLFF:

10 Q    Okay.  But you believe that the total value of the

11 future abuse claims is -- I'm sorry -- that you believe the

12 value of the future abuse claims is about 21 percent of the

13 total value of direct abuse claims, correct?

14 A    Well, if you add -- the math is you add the eleven that

15 I have to the eighty-two, which gives you ninety-three.  And

16 my team had concluded that, under the TDP, that eleven of the

17 ninety-three would be worth five.  And -- and eleven out of

18 ninety-three -- I'm not sure what the percentage is, but

19 that's -- that's how you get to the -- that's how you get to

20 the answer to your question --

21 Q    Okay.  So --

22 A    -- mathematically.

23 Q    -- it would be 11,000 divided by 93,000 claims.

24 A    (Indiscernible)

25 Q    That's what you mean?

1  A    From a claim count, yes.

2  Q    Okay.

3         MR. GUERKE:  Objection, Your Honor.  These

4  questions are outside the scope of -- of the direct.  They're

5  also asking --

6         MS. LUJAN WOLFF:  (Indiscernible)

7         MR. GUERKE:  They're also asking for expert

8  opinion.

9         MS. LUJAN WOLFF:  Your Honor, this is following up

10  on his estimate, which was not objected to again, regarding

11  the 11,000 abuse -- future abuse claims.  He's been

12  testifying about -- about this, not just in his declaration,

13  but also in his live testimony.  This is, again, I guess a

14  repeat objection for -- you know, from just a couple minutes

15  earlier.  And Your Honor, that's also my last question.

16         THE COURT:  Overruled.

17         MR. GUERKE:  Your Honor, it's not in the -- I'm

18  sorry.  It's not in the declaration.

19         THE COURT:  Overruled.

20         THE WITNESS:  Did I --

21         MS. LUJAN WOLFF:  Thank you --

22         THE WITNESS:  -- answer the question?

23         MS. LUJAN WOLFF:  Yes --

24         THE WITNESS:  Okay.

25         MS. LUJAN WOLFF:  -- you did.

1            THE WITNESS:  Okay.

2            MS. LUJAN WOLFF:  Yes, you did.  Thank you so much.

3            I have no further questions.

4            THE COURT:  Thank you.

5            Anyone else?

6            MR. RUGGERI:  Your Honor, James Ruggeri for

7  Hartford --

8            THE COURT:  Mister --

9            MR. RUGGERI:  -- if it's okay.

10           THE COURT:  Mr. Ruggeri.

11           MR. RUGGERI:  My timing couldn't be better that I

12  follow my letter that Ms. Lujan Wolff again used with another

13  witness.

14                       CROSS-EXAMINATION

15  BY MR. RUGGERI:

16  Q    But I was pleased to see -- Mr. Patton, James Ruggeri

17  for Hartford -- that you continue to disagree with everything

18  I say in writing, so thank you for that.

19       (Laughter)

20  Q    Mr. Patton --

21  A    An old --

22  Q    -- I want to --

23  A    An old pattern.

24  Q    There you go, there you go.

25       I want to ask you a few questions about -- in followup

1  to what Mr. Caldie asked you earlier today.

2      Mr. Caldie asked if you heard, with your own ears, your

3  own ears, whether Hartford needed third-party releases as

4  part of its settlement.  You recall that testimony, right?

5  A    I do recall him asking if I heard it with my own ears,

6  yes.

7  Q    And you said, with your own mouth, that you couldn't

8  disclose mediation communications, and I appreciate that.

9      But my question, Mr. Patton, is whether you were

10 listening in at the hearing that we had on December 21st,

11 2021.  Were you listening in on that hearing?  That was a --

12 that was a hearing following the plan supplement when the

13 certain insurers asked the Court to reschedule some of the

14 schedule that we had in place.

15 A    I may have -- yes, I may have been listening in on that

16 one.

17 Q    And did you hear, with your own ears, Mr. Anker's

18 presentation that day, and that he said that anyone who

19 thinks that the insurers are going to pay hundreds of

20 millions of dollars without obtaining complete peace for

21 claims related to scouting is not living in the real world?

22 You heard him say that, right?

23 A    That certainly sounds familiar.

24 Q    It certainly sounds like Mr. Anker, doesn't it?

25 A    And it sounds like Mr. Anker.

1  Q    Okay.  Okay.  Thank you.

2       And again, your own ears, right?

3  A    Yes.

4  Q    Okay.  Mr. Patton, Mr. Caldie also asked you about the

5  basis for your statement that you weren't surprised that the

6  insurers wanted complete peace.

7       In addition to what Mr. Anker said in this case -- and

8  you and I have known each other going back to the '90s,

9  haven't we?

10 A    Yes.

11 Q    I look a little younger.  But you and I were both

12 involved in Celotex in the '90s, and Fuller-Austin, weren't

13 we?

14 A    Yes.

15 Q    And you've done many settlements, you went through

16 yesterday your CV and all the bankruptcy work that you've

17 done.  You've worked on dozens of mass tort bankruptcies,

18 correct?

19 A    Yes.  Yes.

20 Q    And you've been part of negotiating dozens, if not

21 hundreds of settlements with insurance companies, including

22 my client Hartford, right?

23 A    Yes.

24 Q    And your opinion for your lack of surprise is based on

25 your experience, in part, in those other bankruptcies,

1  including negotiations with my client Hartford and what

2  Hartford insists on as part of settlements, right?

3  A    That's correct.

4  Q    All right.  Mr. Patton, Mr. Caldie also asked you if

5  it's appropriate to give insurers more than they bargained

6  for.  Remember that question?

7  A    That's not quite how he put it, but I do remember the

8  question.  It had to do with something about a bad bargain.

9  Q    A bad bargain.  And that's my question.  You and I

10 disagreed on what the bargain is with regard to my client's

11 obligations under the insurance contracts my client issued,

12 don't we?

13 A    That's often the case, yes.

14 Q    And it's often the case, when we're successful, that

15 we're able to resolve our disagreement over that bargain

16 through a settlement agreement, as we've done here, correct?

17 A    That's correct.

18 Q    Okay.  Mr. Patton, I want to ask you a couple of

19 questions about what Mr. Caldie was referring to when he

20 asked what Hartford receives for payment of $787 million, and

21 whether Hartford would agree to pay that amount without

22 having all the bells and whistles negotiated.  Do you

23 remember those questions?

24 A    Yes.

25 Q    Okay.  And you said something to the effect of, in

1  Patton-speak, that, hey, these parties can walk and chew gum

2  at the same time.  Do you remember that answer?

3  A    I think I did say that.

4  Q    Okay.  I want to direct your attention --

5          MR. RUGGERI:  And Your Honor, I do apologize

6  because I wasn't expecting to ask any questions today.  But

7  if we could, Ms. Rolane (phonetic), put on the screen JTX-

8  1292, which is a copy of the sixth mediator's report.  I

9  believe the Court is familiar with that.

10          THE COURT:  Yep.

11  BY MR. RUGGERI:

12  Q    Mr. Patton, that's the sixth mediators report that

13  you're familiar with.  That was filed on September 14, 2021,

14  correct?

15  A    Yes, I've seen it.

16  Q    And if you go to the page after the report, the Exhibit

17  A is the Hartford termsheet.  Do you see that, sir?

18  A    Yes, that looks like the Hartford termsheet.

19  Q    And the FCR and Hartford are both parties to that

20  termsheet, correct?

21  A    That's correct.

22  Q    Okay.  And this is not the parties' definitive written

23  agreement, is it?

24  A    No.

25  Q    And directing your attention to the bottom of the -- to

1  where, at the bottom of the first paragraph, it says:

2          "The parties will prepare a definitive written

3  settlement agreement, consistent with this termsheet, that

4  will include additional material terms."

5      Do you see that?

6  A    Yes.

7  Q    Again, this isn't the parties' definitive settlement

8  agreement, and it also doesn't include all the material terms

9  that were part of the definitive agreement, correct?

10 A    Correct.

11 Q    Okay.  But if you turn to Page 3 of the termsheet,

12 (vii), do you see there's a provision for release of

13 Hartford?

14 A    I see the paragraph, yes.

15 Q    Okay.  Then, if you go to the top of Page 5 of 29, do

16 you see where it says at the very top -- at the very top, it

17 says:

18          "If another settling insurer receives broader

19 releases of causes of action and claims under its abuse

20 insurance policies than those provider to Hartford, Hartford

21 shall receive the benefit of those broader releases."

22      Do you see that, sir?

23 A    I do.

24 Q    And that would apply to an agreement -- a settlement

25 agreement with Century, wouldn't it?

1  A    That's correct.

2  Q    And is Century with Zurich?

3  A    Yes (indiscernible) Zurich.

4  Q    And is Century with Clarendon?

5  A    And with Clarendon, yes.

6  Q    Okay.  And then, if you look at (viii), right below

7  that, we have a provision that specifically refers to

8  chartered organizations.  Do you see that?

9  A    Yes.

10  Q    And that says:

11        "The trust shall secure an assignment or otherwise

12  obtain to the" -- "resolve to the parties' satisfaction the

13  issue of the chartered organization' rights and claims to

14  coverage."

15       Isn't that what that says?

16  A    That's correct.

17  Q    That was a term of our termsheet, right?

18  A    That's correct.

19  Q    Okay.  And then, if you look at (xi), "Trust

20  Distribution Procedures," you'll see right there, there's a

21  provision requiring Hartford to be included as releasees for

22  any claims that are paid pursuant to the TDPs.  Do you see

23  that, sir?

24  A    I do.

25  Q    Okay.  Now, a couple of months later -- directing your

1  attention to JTX-1303 -- the debtors filed a plan supplement.

2  And again, I put the first page on the screen.

3         MR. RUGGERI:  Again, my apologies, Your Honor, for

4  not having it before you.

5  BY MR. RUGGERI:

6  Q    But you're familiar with this document, the plan

7  supplement filed by the debtors on November 30th, 2021.

8  A    Yes.

9  Q    Okay.  And if we turn to Exhibit -- I'm not sure which

10 exhibit is --

11        (Participants confer)

12 Q    -- I, there is a -- an inclusion of we'll say a "draft"

13 of the Hartford settlement agreement.  Do you see that?

14 A    Yes.  J, yes.

15 Q    Okay.  J.  My apologies, Mr. Patton.  Thank you.

16        And then, if you go to Footnote 1 of that draft, this

17 document says expressly:

18        "This document remains subject to ongoing review

19 and material revision in all respects."

20        Do you see that?

21 A    I do.

22 Q    The document filed -- the draft document filed on

23 November 3 of 2021 was not the parties' definitive agreement,

24 was it, Mr. Patton?

25 A    That's correct.

1 Q    And now I'll direct your attention, sir, to JTX-1356.

2 This is a notice of filing made by the debtors on February

3 15th, 2022.  You're familiar with this --

4 A    I've seen --

5 Q    -- document, correct?

6 A    Yes, I'm familiar with it.

7         MR. RUGGERI:  And now, if you go to Exhibit -- I

8 believe it's I-1.

9 BY MR. RUGGERI:

10 Q    But attached to this documents, we have the actual

11 definitive Hartford settlement agreement, don't we?

12 A    I think so.

13 Q    We're trying to get to the top, so we'll identify that

14 for you.

15         MR. RUGGERI:  It is page ...

16 A    Yes.

17         MR. RUGGERI:  There we go, right there.

18 Q    That's the Hartford settlement agreement.

19      And I won't cause Ms. Rolane to go to the back.  But it

20 is signed by the parties on February 14th, 2022.  And that

21 corresponds with your recollection of on or about the date

22 that it was signed, correct?

23 A    That sounds about right.

24 Q    And again, this is the definitive settlement agreement.

25 This contains all the bells and whistles for which Hartford

1  has agreed to pay $787 million, correct?

2  A    I believe that's correct.

3  Q    And then, if you go to Page 32 of 117 of this settlement

4  agreement, you see bankruptcy-related obligations, including

5  Section (b), releases.  Those are the releases that we

6  bargained for, correct?

7  A    Yes.

8  Q    And subparagraph -- or Paragraph (c), that's the local

9  council provisions, bankruptcy-related local council

10  provisions we bargained for, correct?

11  A    Correct.

12  Q    And then Subparagraph (d), that's the chartered

13  organizations.  That the provision we bargained for with

14  regard to the chartered organizations, correct?

15  A    Correct.

16  Q    And do you see that it says:

17       "The Hartford protected parties shall be protected

18  under the plan and confirmation order against liability,

19  loss, or expense with respect to any claim by any chartered

20  organization arising out of or relating to coverage for abuse

21  claims under any Hartford policy or any other insurance

22  policy issued or allegedly issued by any Hartford protected

23  party, to the extent provided under the plan."

24       You see that, don't you, Mr. Patton?

25  A    Yes.

1  Q    That's what we bargained for and that's what Hartford

2  agreed to get in exchange for $787 million, correct?

3  A    That's correct.

4  Q    And then one final point here, Mr. Patton.

5         MR. RUGGERI:  If you'd go to para -- Section 7,

6  "Releases."  It's Page 44 of 117.

7       (Pause in proceedings)

8         MR. RUGGERI:  We're getting closer.  It's right

9  there.

10  BY MR. RUGGERI:

11  Q    And that provision sets forth the releases that we

12  bargained for as part of this agreement, correct, Mr. Patton?

13  A    Yes.

14  Q    And that's one of the bells and whistles that we agreed

15  to, in exchange for $787 million, correct?

16  A    That's correct.

17  Q    Thank you, Mr. Patton.

18         MR. RUGGERI:  That's all I have.

19         THE COURT:  Thank you.

20         Anyone else?  Ms. Arnone.

21         MS. ARNONE:  Yes, Your Honor.  I -- well, I can let

22  counsel for Century go first.  But I did want to raise with

23  Your Honor that what has been happening here with the

24  attorneys for Hartford and Century, who are plan proponents,

25  are effectively redirecting the witness, it appears.  And so

 1  we would request to be able to recross-examine the witness,

 2  if that's -- that's what we're requesting.

 3          THE COURT:  If you have questions that stem from

 4  this, you will be allowed to ask.

 5          MS. ARNONE:  Okay.  Thank you.  I can let Century's

 6  counsel go first.

 7          THE COURT:  Mr. Schiavoni.

 8          MR. SCHIAVONI:  Thank you, Your Honor.  And this is

 9  questioning in support of the settlements.

10                      CROSS-EXAMINATION

11  BY MR. SCHIAVONI:

12  Q    Mr. Patton, hello.

13  A    Hello.

14  Q    You've met me in connection with the negotiation of this

15  plan, have you not?

16  A    Yes.

17  Q    We participated in Zoom calls together.  Am I right --

18  correct?

19  A    That's correct.

20  Q    And those Zoom calls were about the settlement of

21  Century in this case.  Am I right?

22  A    That's correct.

23  Q    And whatever your time sheets may say, I saw you there;

24  you were there, negotiating with me, right?

25  A    That's correct.

1  Q    Okay.  And the whole Century team was there, negotiating

2  team, participating in those negotiations, not just me,

3  right?

4  A    Yes.  And I -- I saw you in our live meetings, as well.

5  Q    Okay.  You went through with Mr. Ruggeri some of the

6  stuff about termsheets, then draft settlement agreements, and

7  then settlement agreements.  And I just -- I'm just concerned

8  there was a little confusion in Mr. Caldie's questioning

9  about, temporally, when things were entered into, so I want

10 to just bring you back to that.

11      Was this the practice of the plan proponents, was it the

12 practice to incrementally try to do a deal through

13 termsheets, drafting settlement agreements, and then

14 implementing them through the plan?

15 A    Well, yes, I think that is not unique to this case.

16 It's a complicated negotiation and document.

17 Q    Okay.

18 A    Yes.

19 Q    And there's nothing -- there's nothing peculiar about

20 negotiating a complex deal in your background in dealing with

21 mass torts --

22 A    No.

23 Q    -- in that way, right?

24 A    No.

25 Q    Now, just as far as temporally when these different

1  agreements were entered into, the Hartford termsheet, am I

2  correct, was entered into before the Century termsheet?

3  A    Yes.

4  Q    And the Hartford termsheet was entered into in or about

5  September 14, 2022 [sic].  Am I right?

6  A    Well, we just saw it, so that sounds about right.

7  Q    Okay.  That's -- the Hartford termsheet is JTX-292.

8         MR. SCHIAVONI:  Your Honor, I'll move that into

9  evidence if it's not into evidence.  I think it's got a date

10 in it.

11         THE COURT:  Any objections?

12     (No verbal response)

13         THE COURT:  It's admitted.

14     (JTX-292 received in evidence)

15         MS. ARNONE:  No objection.

16         MR. SCHIAVONI:  Okay.

17 BY MR. SCHIAVONI:

18 Q    After the Hartford termsheet was entered into, sometime

19 later you entered into a termsheet with Century.  Am I right?

20 A    That's correct.

21 Q    And the Century termsheet is JTX-2738.  That termsheet

22 wasn't entered into until December of 2022 [sic].  Am I

23 right?

24 A    Well, I can't be precise, but that sounds about right.

25         MR. SCHIAVONI:  And why don't we just -- I have my

1  local counsel to bring up the exhibits, Your Honor.

2          Mr. Stamoulis, could you bring up our termsheet,

3  2738?

4          THE COURT:  Okay.

5          MR. SCHIAVONI:  And why don't you just got to the

6  last page of the termsheet, Mr. Stamoulis?

7      (Pause in proceedings)

8          MR. SCHIAVONI:  Okay.  Then just pick a signature

9  page with a date.

10          MR. STAMOULIS:  There go.

11 BY MR. SCHIAVONI:

12 Q   All right.  There's Mr. Mosby's signature.  Does that

13 refresh your (indiscernible)

14 A   That sounds about right.  My signature is a couple of

15 pages down.

16     There you go.  That's me.

17     (Pause in proceedings)

18 A   I think you're frozen, Mr. Schiavoni.

19          THE COURT:  Yeah.  Mr. Stamoulis, can you hear me?

20     (No verbal response)

21          THE COURT:  Okay.  It looks like Mr. Schiavoni is

22 trying to get himself back on.

23          UNIDENTIFIED:  This is Chris.

24          MR. STAMOULIS:  Your Honor, I can hear you.  I

25 didn't know how to unmute myself without removing the share,

1  so I ...

2       (Laughter)

3            THE COURT:  Can you let Mr. Schiavoni know?  Well,

4  I assume he knows he was frozen.

5            UNIDENTIFIED:  (Indiscernible)

6            THE COURT:  He's off.

7            MS. STAMOULIS:  Yes.  I'm texting him --

8            UNIDENTIFIED:  Fine, thanks.

9            MS. STAMOULIS:  -- at this moment.

10           MS. ARNONE:  Your Honor, while we're waiting, can I

11  address something procedurally?

12           THE COURT:  Yes.

13           MS. ARNONE:  Several times throughout the course of

14  these proceedings, there have been objections lodged by

15  attorneys who are not purporting to put the witness up on

16  direct and are being lodged by lawyers that are being

17  testified about.  And in the last examination, in fact, we

18  heard a leading question from one of the lawyers whose client

19  was being testified about.

20           When that occurs, I'm just wanting to make sure

21  that the record is reflecting who is making the objection.

22  And then, you know, to the extent that we should be objecting

23  to that happening procedurally, you know, we would object to

24  that.

25           THE COURT:  Okay.  Thank you.

1          MR. STAMOULIS:  Your Honor, Mr. Schiavoni is

2   working on reconnecting --

3          THE COURT:  Thank you.

4          MR. STAMOULIS:  -- so I apologize for the technical

5   difficulties.

6       (Pause in proceedings)

7          MR. STAMOULIS:  He should be on momentarily, Your

8   Honor.

9          THE COURT:  Thank you.

10          MR. SCHIAVONI:  Your Honor, I apologize.  It is

11   beyond me why things like this happen.

12           THE COURT:  It's the world we live in.

13           Okay.  Go ahead.  Continue.

14           MR. SCHIAVONI:  I don't have too much, Your Honor,

15   honest to goodness.

16   BY MR. SCHIAVONI:

17   Q    Mr. Patton, does this refresh your memory that the

18   Century term sheet was entered into on December 12 of 2021?

19   A    Yes.

20   Q    And this was several months after the Hartford term

21   sheet, right?

22   A    Yes.

23   Q    And you entered into, later, settlement agreements with

24   both Century and Hartford; am I right?

25   A    The definitive agreements, yes.

1  Q     And that didn't happen until February so (audio

2  interference); am I right?

3  A     Until February, yes, I believe that's correct.

4  Q     Okay.  And Mr. Ruggeri brought your attention to

5  certain provisions in his settlement agreement that made

6  reaching a resolution of the charters' releases a condition

7  precedent to closing with Hartford; am I right?

8           MS. ARNONE:  Objection, Your Honor.  This

9  attorney -- his client is a plan proponent and they're asking

10 repeated leading questions.

11          I haven't objected up to this point, but it seems

12 to me like these are leading questions being lodged here,

13 Your Honor.

14          MR. SCHIAVONI:  I'm just bringing him back to the

15 line of questioning, Your Honor; that's all.

16          THE COURT:  Okay.  You can bring him back to the

17 line of questioning, but, yes, let's not ask leading

18 questions on, essentially, redirect.

19 BY MR. SCHIAVONI:

20 Q     Okay.  Mr. Patton --

21 A     I recall the provisions that we just looked at, that

22 you're referring to.

23 Q     Okay.  Was the -- am I correct that -- well, were the

24 provisions that Mr. Ruggeri brought your attention to, the

25 ones about the charter releases, were they also disclosed and

1  discussed in the disclosure statement, itself?

2  A    Well, I think there was a discussion about them in the

3  disclosure statement.

4  Q    Let's see if we can bring up the disclosure statement

5  for a second.

6  A    Yeah, bring it up, because that's a document I haven't

7  looked at for a while.

8        MR. SCHIAVONI:  Mr. Ruggeri, can you -- or not

9  Mr. Ruggeri -- Mr. Stamoulis, can you bring up for me

10 JTX-1-296.

11        This is the disclosure statement.  It's on the

12 docket as 6445, page 14 to 15.

13        Now, can you go to page 14, please, for me.  It's

14 the very bottom of the page.

15 BY MR. SCHIAVONI:

16 Q    And in that last bullet point, there's a discussion of

17 Hartford's monetary contribution, or proposed contribution.

18       All right.  And if you go to the next page, okay, in

19 the second sentence there, Mr. Patton, it says:

20        "Hartford's contribution is subject to resolution

21 of chartered organization rights to Hartford policies in a

22 manner that is acceptable to Hartford."

23       Have I read that correctly?

24 A    Yes.

25 Q    And was that an issue, how to resolve the charters,

1  that was being discussed -- the release for the charter

2  claims, all right, was that an issue that was being discussed

3  into the end of the year as part of the settlement?

4  A    Yes.

5           MS. ARNONE:  Objection that this misstates the

6  document.  The document is talking about releases of

7  Hartford, not about releases of the chartered organizations.

8           MR. SCHIAVONI:  The sentence is what it is.

9           THE COURT:  Let me hear the question again.  Let

10 me hear the question again.

11          But I'm not sure why -- I mean, we can all read

12 the document, so do I need Mr. Patton to tell me what the

13 document says?

14     (Pause)

15          THE WITNESS:  I think Mr. Schiavoni may be frozen

16 again.

17          MR. SCHIAVONI:  No, I'm here.  I think we have an

18 answer to the question, actually, I mean, so, let me move on

19 to the next question.

20 BY MR. SCHIAVONI:

21 Q    Mr. Patton, did the local councils also say as a

22 condition to their funding under the terms of the deal that

23 they had, that they reach a satisfactory resolution of

24 releases to charters, releases involving charters?

25 A    Something to that effect, yes.

1  Q     Okay.  And my question is, going into the end of the

2  year, the end of 2021, were you still negotiating an

3  appropriate mechanism to allow for releases of charters to

4  provide for the funding from insurers and from the local

5  councils to the plan?

6  A     Yes.

7  Q     At the time that the September 30 solicitation version

8  of the plan was issued, this is September 30, 2021, Century

9  had not yet reached a settlement; am I right?

10 A     That's correct.

11 Q     And Century, at the September disclosure statement

12 hearing, objected to the disclosure statement; am I right?

13 A     Yes, I believe they did.

14 Q     Okay.  And you reviewed portions of the disclosure, or

15 you attended, you indicated, the disclosure statement hearing

16 or listened in on it; am I right?

17 A     Or read the transcripts or a combination.

18 Q     Okay.  I want to bring you to page -- to the hearing

19 transcript, JTX-1495; this is the hearing transcript for

20 September 21.

21        MR. SCHIAVONI:  Mr. Stamoulis, can you pull that

22 up.

23        Go to page 15, line 7.  If you can scroll down a

24 little further.  Scroll up.  I may have the wrong page here.

25        All right.  Well, Your Honor, I'm not as fast as

1  Mr. Ruggeri with these pages, unfortunately.

2  BY MR. SCHIAVONI:

3  Q    But, Mr. Patton, did you -- do you recall whether there

4  were statements made at the disclosure statement hearing in

5  September by Century about the necessity for receiving

6  releases, full releases in order to provide funding under the

7  plan?

8  A    I believe they did make that point at the disclosure

9  statement hearing.

10 Q    And were those statements consistent with the

11 statements that you heard during the disclosure -- in

12 connection with trying to reach a settlement with Century?

13 A    Yes.  It's consistent with almost every negotiation

14 I've had with any insurer in a mass tort case.

15         MR. SCHIAVONI:  Your Honor, I have no further

16 questions.

17         Thank you very much, Mr. Patton.

18         THE COURT:  Thank you.

19         Let's see if there's any other redirect first,

20 Ms. Arnone.

21         So, Mr. Guerke?

22         MR. GUERKE:  Your Honor, Kevin Guerke for the FCR.

23 I have some redirect questions.

24         THE COURT:  Yes, Mr. Guerke?

25                 REDIRECT EXAMINATION

1  BY MR. GUERKE:

2  Q     Good afternoon, Mr. Patton.

3  A     Good afternoon.

4  Q     Do you recall yesterday being asked about the

5  TDP-drafting process?

6  A     Yes.

7  Q     You discussed various roles that the different parties

8  plays; do you recall that testimony?

9  A     Yes.

10 Q     Do you have your declaration in front of you,

11 Mr. Patton?

12 A     Yes, I do.

13 Q     Can you take a look at paragraph 37, please.

14 A     I have it.

15 Q     When you discussed the Coalition's involvement in the

16 drafting process yesterday, but the Coalition collecting

17 comments from the survivors' side of the file?

18 A     Yes.

19 Q     I want to ask you about the other side of the TDP

20 negotiating and drafting process, and that is on the debtors'

21 side.

22       Were drafts sent back-and-forth between the survivor

23 groups on one side and the debtor groups on the other side?

24 A     I think that's true at various stages, yes.

25 Q     Did the survivors' side send collective comments that

1  you described yesterday to the debtors' side of the table in

2  that back-and-forth?

3  A    Yes, we did not have I'll call it a "creditors'

4  side" negotiations or drafting sessions or exchanges with the

5  debtors' side on a one-off basis.  We, on the creditors'

6  side, were drafting and, frankly, negotiating among

7  ourselves, and then there'd be the negotiation with the

8  debtors.  That was the primary function.

9       And there may have been, in terms of very short

10  strokes, as we got close to the filing deadline, there may

11  have been moments where that was happening with simply

12  proposed language going back-and-forth, but that was the

13  process.  We, on the creditors' side formed a view and

14  proposed language, then worked it out with the debtors' side.

15  Q    I believe yesterday you described that process as being

16  "intense"; is that what you recall?

17  A    Well, surrounding the RSA, when we were trying to get

18  things finalized there, I recall a fair amount of intensity

19  at that point, in terms of time pressure.

20  Q    About the TDPs?

21  A    Yes.

22  Q    All right.  I want to focus on the TDPs.

23       Can you describe how the debtors were involved in that

24  intense back-and-forth drafting process.

25  A    Well, they received -- it was a negotiation.  They

1 received our collective views and we wrestled to the ground,

2 our competing views of what the final version of the document

3 should look like and the result is what was filed.

4      We exchanged drafts and got to a conclusion.

5 Q    Thank you, Mr. Patton.

6           MR. GUERKE:  Those are my questions, Your Honor.

7           THE COURT:  Okay.  Thank you.

8           Ms. Arnone, do you have any questions on the

9 redirect?

10           MS. ARNONE:  Yes, the cumulative redirect?

11           THE COURT:  Yes.

12           MS. ARNONE:  Yes, I do.  Okay.  Thank you.

13           MR. GUERKE:  Your Honor, I have a possible

14 objection here.  Could I ask who Ms. Arnone represents?

15           MS. ARNONE:  The Guam Committee.

16           MR. GUERKE:  And didn't Mr. Caldie also represent

17 the Guam Committee?

18           MS. ARNONE:  That's right.

19           MR. GUERKE:  We object as being procedurally

20 improper to have different attorneys involved in the same

21 questioning of a witness; one objecting, one asking questions

22 back-and-forth, and we object to Ms. Arnone asking any

23 questions.

24           MS. ARNONE:  Well, I can tell you, Your Honor, the

25 problem is that Mr. Caldie had to step away for another

1  commitment, which leaves it to me, and also, you know, we

2  just lodged an objection that plan proponents have been

3  randomly objecting when they're being testified about

4  throughout the course of this proceeding.

5          THE COURT:  If Mr. Caldie is not available, I will

6  permit it.  So, thank you, you may proceed.

7          MS. ARNONE:  Thank you.

8          And I'm sorry, he's not available.

9                    RECROSS-EXAMINATION

10 BY MS. ARNONE:

11 Q    Mr. Patton, to your knowledge, is it common in mass

12 tort cases for insurers that agreed, at least tentatively, to

13 a particular settlement amount to require the debtors to send

14 drafts of the plan of reorganization to them before filing?

15 A    Yes.

16 Q    It is common?

17      Do you know whether the debtors emailed a draft of the

18 September 30th plan to Hartford before it was filed?

19 A    I have no idea.

20 Q    To your knowledge, did the fifth amended plan that was

21 filed on September 15th, 2021, enjoin the channel plan

22 against opt-out chartered organizations?

23 A    The September plan we're talking about?

24 Q    The September 15th plan.  I believe --

25 A    Okay.  Yeah, we talked about this.

1        And I don't have a clear recollection of where we were

2   with respect to the concept of opt-outs.

3   Q    Okay.

4   A    That was my earlier answer.

5   Q    So, the September 15th -- so, actually, I think the

6   term sheet with Hartford was dated September 14th, correct?

7   A    I forgot.  And we just looked at it.  I can't remember.

8            MR. GUERKE:  Your Honor, I object.

9            If counsel is going to ask specific questions

10  about specific documents, the witness should have an

11  opportunity to see those documents.

12           THE COURT:  He can.  He just saw it.  We can find

13  it again.

14           MS. ARNONE:  Sorry, Your Honor.  I wasn't prepared

15  for this.  Let me see if I can find it.  I wasn't the one who

16  pulled it up.

17       (Pause)

18           MR. RUGGERI:  Would you like us to pull it up?

19           MS. ARNONE:  No, I --

20           MR. RUGGERI:  It's JTX-1 -- it's JTX-1292, if

21  you're looking for the term sheet.

22           MS. ARNONE:  I have the file-stamped copy that I

23  can screen share here.  It's not the JTX one, but I have the

24  file-stamped one pulled up that works.

25           I'm sorry, hang on.  Let me see if I can get this

1   to screen share.

2        (Pause)

3   BY MS. ARNONE:

4   Q    Okay.  You have the Hartford term sheet pulled up,

5   correct?

6   A    That's it.

7        I see the exhibit page.

8   Q    Yes.  This was the term sheet, right, that was filed as

9   an exhibit on September 14th, 2021, that memorialized the

10  settlement as it existed at that time with Hartford, correct?

11  A    Well, all I see is the exhibit page, but I think

12  you're -- I think the next page will validate your statement.

13  Q    Yeah.  Sorry.  I had the Zoom screen in the way here.

14  We're doing this all on the same laptop.

15  A    There you go.

16       Yes.

17  Q    So, September 14th, 2021.

18       And I think that this is a pretty simple question that

19  I had here, was the September -- the plan that was filed on

20  September 15th, 2021, the next day, memorialized some of this

21  additional settlement, right?  It memorialized the TCJC

22  settlement that had been reached by that point and the

23  Hartford settlement and the fact that those were settling

24  insurers now, at that point, right?

25  A    Right.  It reflected the facts that those settlements

1  had been reached, yes.

2  Q    So, regardless of whether Hartford's lawyers saw and

3  approved the filing of the modified, fifth amended plan

4  before September 30th, they had a chance to review the plan

5  that was on file on September 15th for at least two weeks,

6  correct?

7  A    As I said, I don't know that they were sent a copy of

8  the plan, but that's not uncommon for that to happen.

9  Q    Correct.

10      How much did it cost, do you think, to solicit the plan

11  vote?

12  A    I have no idea.

13  Q    Was it millions of dollars?

14  A    I have no idea.  I'm sure it was, but I don't know.

15  Q    To your knowledge, were there any communications from

16  Hartford to BSA between September 15th, 2021, and

17  September 30th, 2021, that were like, Hey, don't file this

18  thing without an injunction of all the claims that are

19  covered under our insurance policies.  Don't solicit the vote

20  of 90,000 creditors without this injunction.

21      To your knowledge?

22  A    I have no idea.

23          MR. GUERKE:  Objection; compound and lack of

24  foundation.

25          MS. ARNONE:  I can move on.

1       THE COURT:  It was compound.

2       Yeah, move on.

3  BY MS. ARNONE:

4  Q    To your knowledge, were there any communications

5  between Hartford and the Boy Scouts between

6  September 15th, 2021, and September 30th, 2021, saying,

7  Hartford doesn't give you permission to file this plan and

8  solicit voting on that because it doesn't enjoin all the

9  claims covered under our insurance policies?

10 A    I have no idea.

11      MR. GUERKE:  Same objection, Your Honor.  And

12 also, Mr. Patton lacked personal knowledge of communications

13 of other parties.

14      MS. ARNONE:  I'm asking about his knowledge.

15      THE COURT:  Yeah, but he's been talking about day

16 about that and Mr. Ruggeri asked him all questions about

17 that, so overruled.

18 BY MS. ARNONE:

19 Q    You knew, Mr. Patton, right, that the Boy Scouts

20 couldn't make material modifications to the plan in a way

21 that would take away rights of creditors without re-

22 soliciting the vote, correct?

23 A    That's not true.  The law is a little more nuanced than

24 that.

25 Q    Oh, it is?

1       So, if the plan that was sent out for vote on

2    September 30th, 2021, allowed claims to be brought against

3    opt-out chartered organizations, and then that was later

4    taken away, do you think, in your opinion as the FCR, do you

5    think they might not have had to go re-solicit the vote over

6    that modification?

7    A    That's correct.

8    Q    Do you think they could have not resolicited the vote,

9    even though these took away, later, the rights of third

10   parties, of tort claimants, abuse survivors to assert claims

11   against chartered organizations that had not opted into the

12   plan?

13   A    It's a materiality test.

14       And to answer your question, I have the same answer

15   that I gave just a minute ago.

16   Q    Okay.  So, you were shown, earlier, by Hartford's

17   lawyer, the term sheet that was entered into on

18   September 14th and we just went over that, correct?

19   A    Yes, I -- yes.

20   Q    We showed you a lot of provisions in there about

21   releasing rights to insurance coverage; do you remember that?

22   A    I recall the provisions I was shown, yes.  We did talk

23   about releasing Hartford.

24   Q    Do you understand there's a difference between

25   releasing rights to insurance coverage and releasing a third-

1  party organization from its tort liability?

2  A    You mean mechanically -- you can achieve the same ends

3  in many respects by approaching it from eliminating the

4  liabilities or releasing the insurer.

5       But to the extent you're talking about two different

6  pathways, (indiscernible) represent two different pathways.

7  Q    Are you aware that courts might not enforce a policy by

8  that if the party wasn't released --

9  A    I'm not --

10 Q    -- that's insured under that policy?

11 A    I'm not familiar with that (indiscernible) law, one way

12 or the other.

13 Q    All right.  I'm just a little perplexed, I'm sorry,

14 about your testimony that you think those are similar

15 releases.

16      You think it would do the same thing, legally, to

17 release the insurance companies from liability for coverage

18 obligations that they owe to a tortfeasor, you think that

19 would just effectively legally operate to release the

20 survivors' claim against the tortfeasor?

21           MR. GUERKE:  Objection; compound and asked and

22 answered and very confusing.

23           THE COURT:  Well --

24           MS. ARNONE:  But I don't think he's answered it,

25 or to the extent he did, I'm sorry.  I can move on.

1          THE COURT:  I think a lot of this is argument, but

2  you can -- why don't you move on.

3  BY MS. ARNONE:

4  Q    Okay.  If Hartford received extra -- oh, I'm sorry, let

5  me go back.

6          So, Hartford's lawyer also showed you provisions in the

7  term sheet, as I recall, that said that if Hartford -- if

8  another settling insurance company received broader releases

9  under its policies than those that Hartford had negotiated to

10  that point, then Hartford would get the benefit of the

11  broader releases; is that right?

12  A    Yes, there's a paragraph that said essentially that, or

13  a couple of sentences that said essentially that.

14  Q    Okay.  So, if Hartford received extra releases than

15  what it had negotiated only because of provisions in the term

16  sheet that allowed it to get the benefit of another insurer's

17  releases, then what consideration was being paid by Hartford,

18  in addition to that, out of that $787 million for those extra

19  releases of the chartered organizations?

20  A    Well, that $787 million was given in exchange for the

21  provision that allowed them to get those extra releases.  If

22  you recall, we didn't like the original Hartford deal because

23  of a "most favored nation" clause.  This is a "most favored

24  nation" clause.

25          Because of a different "most favored nation" clause

1  that they had negotiated in (indiscernible), that that one

2  would have had on the value of the Hartford deal.

3       So, the existence of a "most favored nation" clause in

4  a term sheet as something that's negotiated over and paid

5  for.

6  Q    So, if no other insurance company had negotiated for a

7  release of all claims under the settling insurer policies,

8  then Hartford never would have gotten that either, correct?

9  A    That's true.  That was the gamble they were taking and

10 we were taking.

11 Q    It was a gamble?

12 A    Well, it's a negotiation, but yes.

13         MS. ARNONE:  I don't have any further questions,

14 Your Honor.

15         THE COURT:  Thank you.

16         Anyone else?

17         Ms. Wolff?

18         MS. LUJAN WOLFF:  Yes, Your Honor.  Thank you.

19         THE COURT:  Your video is off, Ms. Wolff.

20         MS. LUJAN WOLFF:  Oh, I'm sorry.

21         THE COURT:  Okay.  Thank you.

22         MS. LUJAN WOLFF:  Thank you.

23                    RECROSS-EXAMINATION

24 BY MS. LUJAN WOLFF:

25 Q    Mister, I would like to direct your attention to, I

1  believe it was the Century term sheets, Joint Exhibit 273,

2  and I am going to see if I can share that with you, okay?

3  A      Okay.

4  Q      Do you see that, sir, the seventh mediation report?

5  A      I see it.

6  Q      And it's marked Joint Exhibit 2738, okay.

7         And you saw this earlier when Mr. Schiavoni was

8  examining you.  I'm going to go to -- I'm going to go down

9  to, I believe it's Exhibit A, which is the Century and Chubb

10 companies' term sheet.

11        Do you see that?  So, this is the settlement term sheet

12 between BSA and other parties, as well as the Century and

13 Chubb Companies.

14        Do you see that?

15 A      Yes.

16 Q      Okay.  Great.

17        So, let us scroll down.  And you see this, in a date --

18 this was filed with the Court, December 14, 2021?

19 A      Yes.

20 Q      I'll scroll down to a, in particular, I guess,

21 paragraph that is in this term sheet.

22        Now, it's paragraph 12 and this concerns bankrupt

23 chartered organizations.

24        Do you see that?

25 A      I do.

1 Q    Okay.  Now, please bear with me, but I feel that I need

2 to read this for the record:

3          "The BSA shall use best efforts to work with the

4 Roman Catholic Ad Hoc Committee and the chartered

5 organizations that are debtors in bankruptcy, the eighth

6 bankrupt entities identified on Exhibit K to the amended

7 plan, which may be amended to the extent that additional

8 chartered organizations file for bankruptcy protection, prior

9 to entry of the confirmation order of the bankrupt chartered

10 organization to attain written consent for them to consent to

11 the terms hereof and the agreement.

12     To the extent that a bankrupt chartered organization

13 will not provide written consent to this term sheet and the

14 agreement, the parties will use reasonable efforts to jointly

15 resolve such non-consent, which may, upon the consent of the

16 parties, include excluding such bankrupt chartered

17 organization from the protections and benefits otherwise

18 provided herein and in the agreement, provided that the

19 failure to obtain such consent, as it applies to the

20 applicable bankrupt chartered organizations shall not be

21 deemed a breach of the agreement by any party or a failure to

22 satisfy a condition to the effectiveness of the agreement or

23 the amended plan.  The parties consent to the foregoing

24 provisions covering the settling insurers to apply to any

25 other settling insurance company."

1      Did I read that correctly, sir?

2  A    I believe you did.

3  Q    So, under this agreement that you are -- this is a term

4  sheet that you are a party to, correct, as the FCR?

5  A    Yes.

6  Q    (Audio interference) this agreement, then, it was

7  possible that, and I'm going to see if I can highlight for

8  you, that bankrupt chartered organizations would be excluded

9  from the protections and benefits otherwise provided herein

10 and in the agreement.

11     Do you see that?

12 A    That they'll (indiscernible) for the possibility, yes.

13 Q    Yes, okay.

14     So, it's possible that a bankrupt chartered

15 organization would not receive the benefits of a settling

16 insurance channeling injunction, correct?

17 A    Well, to be strict about it, it's possible for them to

18 be excluded from, what's the phrase here, "the benefits

19 and --"

20 Q    Oh, I'm sorry.

21 A    Excluded from the --

22 Q    Do you see that?

23 A    Yeah, there it is:  From the protections and benefits

24 otherwise provided herein, and in the agreement.

25     That's the operative phrase.

1   Q     Okay.  So, it's possible that a bankrupt chartered
2   organization that does not consent to the term sheet that
3   opts out, will not receive any protection or benefits from a
4   Century and Chubb Companies' agreement, correct?
5   A     From the -- yeah, from the otherwise provided herein.
6   The benefits otherwise -- let's try it again.
7         Protections and benefits otherwise provided herein,
8   we're saying that would stay the same.
9   Q     Okay.  So, you agree with what I said?
10  A     Well --
11  Q     Now, this is the term sheet and you testified earlier
12  that this was not the definitive document.  So, let's turn to
13  the definitive document, please, and that would be Joint
14  Exhibit 0001-363, and I am going to pull that up.
15        I know it's -- let me just zoom in, sir, if you could
16  bear with me.
17        Do you see that, sir?  It says:
18             "Noticing of filing of Exhibits I-2, I-3, I-4, and
19  J-2 to debtors' third modified, fifth amended Chapter 11 plan
20  of reorganization."
21  A     I see it.
22  Q     And that's Docket 8907.
23        And let me just scroll down so you can see that it is
24  marked as Joint Exhibit 1-363.
25        Do you see that, sir?

1  A      Yes.

2  Q      Okay.  So, you see here that it says Exhibit 1, and

3  then, just, if you can follow, I guess, what is it, the

4  cursor?  It says Exhibit 1 is the fully executed version of

5  the Century and Chubb Companies' settlement agreement.

6       So, I am going to direct your attention to Exhibit 1.

7  Just please bear with me.

8       Okay.  I am sorry.  This doesn't seem to include it for

9  some reason.  I'm not sure why.

10            MS. LUJAN WOLFF:  But, Your Honor, if I may pull

11  up the filed version that I have?

12            This is a Joint Exhibit for this.  I'm not sure

13  why the Joint Exhibit excludes Exhibits 1 to 3.

14            THE COURT:  It's in 8817.

15            MS. LUJAN WOLFF:  Okay.  I'm sorry.

16            THE COURT:  Yeah.

17  BY MS. LUJAN WOLFF:

18  Q      But what I'm showing you here, sir, is -- and I'm going

19  to refer back to the Joint Exhibit 1-63 and you see that that

20  is Docket 8907.  Do you see that?

21  A      Yes.

22  Q      Okay.  And I'm going to -- I'm sorry, I have to refer

23  to my copy, which is -- do you see here on the bottom 8907-1,

24  filed February 18, 2022?

25  A      I see that.

1  Q    I'm just going to scroll up, just so you know what

2  you're looking at.  Okay.  So this is the notice of their

3  exhibits, I-2, I-3, I-4, and J-2, 8907.  Okay?

4           And, I'm sorry, but this is the filed copy.  I

5  have to scroll down to Exhibit 1, which is the Century and

6  Chubb companies' insurance settlement agreement.  Do you see

7  that?

8  A    I do.

9  Q    Great.  So I'm just going to go to the agreement

10 itself, which you see here is between -- it's dated February

11 14, 2022, entered into between and among Century and Chubb

12 companies, the Boy Scouts of America and Delaware BSA LLC, as

13 well as other parties, including the future claimants'

14 representative, being you; correct?

15 A    Correct.

16 Q    Okay.  So I'm just going to go to the paragraph 11 --

17 sorry -- and I'm not going to -- I'm sorry, it's paragraph

18 12.  And I'm not going to read this, all of it, but I'm going

19 to point out to you a particular sentence here starting with,

20 "The parties will use reasonable" -- do you see where my

21 cursor is, sir --

22 A    Yes.

23 Q    -- can you see that?  Okay, thank you.

24           So the sentence that starts here on this line,

25 "The parties will use reasonable efforts to jointly resolve

1  such non-consent, which may, upon the consent of the parties,

2  including excluding such bankrupt chartered organization from

3  the protections and benefits otherwise provided herein,

4  provided that the failure to obtain such consent as it

5  applies to the applicable bankrupt chartered organization

6  shall not be deemed a breach of this agreement by any party

7  or a failure to satisfy a condition to the effectiveness of

8  this plan."

9        So, sir, would you agree that this is an identical

10  sentence to what we just saw in the Century term sheet?

11  A    Well, I think it probably is.  I will take your word

12  for it.

13  Q    But this paragraph 12, which deals with bankrupt

14  chartered organization, again -- and I'm going to go -- I'm

15  sorry, if I -- just to make it clear, I mean, I feel like

16  maybe I should go to the sentence above that.  "To the extent

17  that a bankrupt chartered organization does not agree to

18  provide written consent to the terms of this agreement, such

19  bankrupt chartered organization shall automatically be deemed

20  to be an opt-out chartered organization for all purposes

21  hereunder" -- it says that -- "however, the parties will use

22  reasonable efforts to jointly resolve the non-consent and

23  there may be benefit" -- I'm sorry -- "there may be

24  consequences to such non-consent, including excluding such

25  bankruptcy chartered organization from the protections and

1  benefits provided by this agreement."

2           So, in other words, sir, in this definitive

3  Century and Chubb companies' agreement that was filed with

4  the court as a plan supplement, wouldn't you agree that that

5  -- that there is the possibility that a bankrupt chartered

6  organization would not receive the benefits of -- the

7  benefits and protections of -- that are provided in this

8  settlement agreement?

9  A    That sentence preserves -- or reflects that that

10  possibility exists, yes.

11  Q    Okay.  So what this means is that it's possible that a

12  bankrupt chartered organization would not receive the

13  benefits of a settling insurance injunction; correct?

14  A    Well, all I'm prepared to say is that this sentence

15  says that it's possible that they won't receive the

16  protections and benefits provided herein.

17  Q    And herein means --

18  A    You're asking me to connect something that I would need

19  some time to read the documents to be able to connect

20  definitively.

21  Q    Okay.  I think you've answered my questions.  Thank you

22  so much, sir, again.

23  A    Thank you.

24           THE COURT:  Thank you.

25           Anyone else?

1          (No verbal response)

2               THE COURT:  Excellent.  Mr. Patton, your testimony

3     is concluded.

4               Mr. Guerke, I'm assuming you don't have any

5     follow-up to those questions, correct?

6               MR. GUERKE:  That's correct, Your Honor.

7               THE COURT:  Okay.  Thank you.

8               Mr. Patton, you're excused.

9               THE WITNESS:  Thank you so much.

10          (Witness excused)

11               MS. MCNALLY:  Your Honor, as a housekeeping

12     matter, can I raise an issue with the Court?

13               THE COURT:  Yes.

14               MS. MCNALLY:  Yesterday, we got a ruling from Your

15     Honor relating to the scope of the declaration and what would

16     come in and what would come in and what would not come in.

17     We have suggested to counsel for the FCR that it would be

18     helpful to the record on appeal -- or, hopefully, if we don't

19     need it, that would be great, but to have a record of exactly

20     what was the direct testimony that was admitted, and we had

21     offered to work together on a version that had redactions.

22     The FCR's counsel has another view and would not like to do

23     that.  So we told him that we would raise with Your Honor the

24     idea of creating a redacted declaration that would be the

25     admitted direct testimony of this witness.

1          THE COURT:  Mr. Guerke?

2          MR. GUERKE:  Your Honor, the insurers objected to

3  certain parts of Mr. Patton's declaration, the Court made a

4  ruling, a specific ruling that parts were excluded, and then,

5  after that ruling, the insurers asked question after question

6  on the subjects that were covered by the Court's ruling.  The

7  value of the scaling factors were repeatedly asked.

8          Mr. Patton identified that subject in his

9  declaration and his testimony was consistent with it.

10  Counsel asked about 1129 over and over again.  She asked

11  about all the findings over and over again, specifically

12  findings X, W, Y.  Paragraphs 71, 73, 74, 75, all the

13  paragraphs that the insurers objected to and partly the Court

14  addressed in its ruling have now been waived, the door has

15  been opened.  We ask that the entire declaration be admitted

16  into evidence.

17          THE COURT:  Okay.

18          MS. MCNALLY:  Your Honor, if I may respond?

19          THE COURT:  Mm-hmm.

20          MS. MCNALLY:  I was very careful, I did not ask

21  about your narrow finding as to fair and equitable, fair and

22  reasonable.  That is not -- there were no questions as to

23  that.  Nevertheless, even if they had been excluded in normal

24  direct testimony, if those issues had -- if the door had been

25  opened, there would have been further questions.  You don't

1  go back in time and undo testimony that had been excluded.

2  We think it was a narrow ruling and we should have clarity on

3  what part of the direct actually came in.

4              THE COURT:  Okay.  It was a narrow ruling and I

5  wondered at points in time whether, notwithstanding my

6  ruling, you asked questions regarding the subject, and I

7  would have to go back and look.  So that's what I'll have to

8  do, unfortunately, because I do -- as I said,

9  contemporaneously with your questions, some of them, I

10 wondered whether you had asked questions about areas that I

11 had excluded the testimony on.

12             So I'll go back and look at that, I'll spend my

13 time on that.  Okay.  And maybe you didn't, I don't know, but

14 it did occur to me contemporaneously with the questioning, so

15 I'll have to look at it.  So I'll reserve.

16             MS. MCNALLY:  Okay.  Thank you, Your Honor.

17             THE COURT:  Mm-hmm.

18             Mr. Abbott?

19             MR. ABBOTT:  Thank you, Your Honor.  I see Mr.

20 Martin has appeared.  Your Honor, the next witness in order

21 is Ms. Gutzler.  Mr. Martin will be handling that.  And while

22 I recognize we're not at the end of the day, we're late in

23 the day.  I just wanted to make sure the Court wanted to

24 start a new witness now or hear the Court's druthers on that.

25             THE COURT:  Mr. Martin, how much -- well, wait.

1  She had a declaration, right?

2         MR. MARTIN:  Yes, Your Honor, she did.

3         THE COURT:  Because I read it.  Are you doing any

4  live with her?

5         MR. MARTIN:  Yes, Your Honor.  So I have about 45

6  minutes of live -- limited live direct with her.  And of

7  course there are objections that have been raised by the

8  certain insurers to sections of the declaration, as well as

9  exhibits, that we would need to address.

10        THE COURT:  Okay.  Mr. Christian?

11        MR. CHRISTIAN:  Thank you, Your Honor.  This is

12 David Christian; I represent Great American, Continental, and

13 other excess insurers, and I'm speaking today on behalf of

14 the certain insurers.  We do have objections.  I think the

15 objections may take a little while to wade through.

16        There was an affidavit filed yesterday, along with

17 the debtors' response to our objections, attempting to submit

18 thousands of pages of supposed business records.  We're going

19 to have to get into that.  There may be issues with the

20 demonstrative that's been proposed.

21        So I'm not taking a view one way or another in

22 what order we do things or what we do right now and for how

23 long, but I think we're going to have some time on those

24 issues before we get to the direct testimony.

25        THE COURT:  Okay.  So let's take a ten-minute

1    recess and then we'll get into those gating issues.

2            COUNSEL:  Thank you, Your Honor.

3            THE COURT:  Okay.  Thank you.  We're in recess.

4        (Recess taken at 3:57 p.m.)

5        (Proceedings resumed at 4:11 p.m.)

6            THE COURT:  Okay, gentlemen, before we get into

7    Ms. Gutzler, my chambers has been getting some questions

8    about documents on the docket and whether they can be

9    referred to in closing arguments if they haven't been

10   admitted and other questions.

11           I think I said in the beginning, filings made in

12   the court -- I don't take judicial notice of an entire

13   docket.  That's what I'm often asked to do.  I don't do that,

14   I don't know what that means, I don't understand that

15   concept.

16           I'll add to that:  filings in the court are not

17   evidence and they're generally not evidence, but they can be

18   evidence.  For example, we just had the Hartford term sheet

19   that people were talking about and, if the Hartford term

20   sheet is relevant to, for example, Mr. Patton's consideration

21   of his position on something, then that's evidence and should

22   be admitted into docket; not because it was filed with the

23   Court, but because it is a document that has evidentiary

24   import in the case and it's evidence.

25           So that's what I mean by documents that have been

1    filed.  So if there is a document in the case which is of

2    evidentiary value, importance, use, then, yes, it will be

3    admitted into the record, if it's been used with a witness,

4    et cetera.  I'm not sure I can get more specific than that, I

5    don't really think I should have to.  But it doesn't mean you

6    can't argue off of something, I guess, but let's make a

7    difference and a distinction between filings and evidence.

8           And I also said that just because something was

9    entered into evidence at a hearing a year ago has nothing to

10   do with what's being entered into evidence for this hearing;

11   this is a self-contained hearing.

12          So I hope that is helpful to people.  If there is

13   some document that somebody used prior to this that they

14   didn't move into evidence because they thought that I would

15   just not take any filings into evidence and that needs to be

16   corrected, we can correct that.  But that's how I think

17   evidence works.

18          MR. MARTIN:  Thank you, Your Honor.  That's very

19   helpful, we appreciate that.

20          THE COURT:  Okay.  Ms. Gutzler.

21          MR. MARTIN:  Yes, Your Honor, Ms. Gutzler is our

22   next witness from the debtors and I will be presenting her.

23   As Mr. Christian mentioned, there are some objections that we

24   would like Your Honor to consider and rule on.

25          THE COURT:  Okay.  Mr. Christian?

1          MR. CHRISTIAN:  Thank you, Your Honor.  David

2   Christian, again, on behalf of certain insurers.

3          First of all, I don't know if Ms. Gutzler is on

4   the line but, before we proceed, I'd like her to be excused

5   before we discuss the objections.

6          MR. MARTIN:  Yes, Mr. Christian, she is not in the

7   room where I am located, she is in a separate conference

8   room.

9          MR. CHRISTIAN:  Very good.  Thank you, Mr. Martin.

10         Your Honor, if it makes sense to you, I thought I

11  would start with two of the exhibits that we've objected to

12  because I think that will help guide a lot of the rest of the

13  discussion about the objections.

14         THE COURT:  Okay.

15         MR. CHRISTIAN:  I may turn out to be mistaken

16  about that, but I can be cautiously optimistic.

17         And I want to point the Court to JTX-7 and JTX-10,

18  which on our side we have begun referring to as the Mega

19  exhibits.  And let me say at the outset, I'm going to

20  describe some things about these Mega exhibits, I may turn

21  out to be mistaken because these are voluminous and we have a

22  large team that's been working very hard to get our hands

23  around all of them, but it's very possible that some

24  understanding I have is mistaken or that I make a mistake

25  myself in presenting this to you.  So, for that, I apologize

1    in advance.

2        This saga starts with JTX-7, which is described in

3    Ms. Gutzler's exhibits to her declaration as data site

4    documents.  This is over half a million pages and it includes

5    volumes of materials wholly unrelated to insurance.

6        We believe that JTX-10 is a subset, a reproduction

7    of some of JTX-7.  That exhibit is described as BSA and LC

8    insurance policies.  And we base our guess that this is a

9    subset of JTX-7 based on the Bates numbers assigned to the

10   documents in JTX-10.  That is over a quarter of a million

11   pages and we've estimated it at 23,000 separate documents.

12   And it definitely includes documents unrelated to and

13   irrelevant to insurance.

14        Just by way of example, it includes BSA

15   organizational documents, it includes local council articles

16   and bylaws, it includes local council charter renewals, it

17   includes JPMorgan debt documents.

18        This, Your Honor, presented a problem for the

19   debtors when we objected to JTX-10.  That's what Ms. Gutzler

20   purportedly reviewed and relied upon in making her

21   declaration.

22        And so yesterday, while we were in trial, the

23   debtors filed a response to our objections that included an

24   affidavit by Ms. Kutz (ph), that's at Docket Number 9429-1.

25        And I'd like to give the Court a minute to find it

1  and then --

2          THE COURT:  Got it.

3          MR. CHRISTIAN:  -- point you to the second --

4  okay.  Thank you, Your Honor.  I'd like to point you to the

5  second paragraph numbered 3.

6          THE COURT:  Okay.

7          MR. CHRISTIAN:  Part of that paragraph reads as

8  follows:  "The general liability policies issued to BSA

9  attached hereto as Exhibit A are complete and accurate copies

10 of the original versions of the documents maintained by BSA

11 in the regular course of its business."

12         There are several problems with this statement.

13 First, no policies are attached to the affidavit; second,

14 they are not complete and accurate.  And, obviously, we've

15 had this for just over 24 hours, so there are lots of

16 inaccuracies we may not have uncovered or that I don't know

17 about because they're inaccuracies related to some other

18 insurance company's policies that are not my client, but let

19 me give you some examples I know about here today.

20         As for my client, Great American, the versions of

21 our policies referenced in Exhibit A are not the same as the

22 certified copies produced by us to the debtors earlier in

23 this case.  AIG advises me that, although most of its

24 policies are correctly listed, the version of six of its

25 policies identified in the Exhibit A are either more or less

1 pages than the version identified as supposedly complete,

2 accurate, and original in the Kurtz affidavit.

3       They also mention that the Kurtz affidavit

4 actually failed to include two of the national policies that

5 they issued to BSA and produced at some point.  General Star

6 notes that these supposedly complete, accurate, and original

7 versions of some of its policies in the Kurtz affidavit

8 include extraneous materials from other policies or summaries

9 from a broker.

10       The debtors appear to omit the endorsements from

11 some Old Republic policies.  In one instance, the policy in

12 JTX-10 is about 50 to 60 pages long, while the actual policy

13 with endorsements produced by Old Republic earlier in this

14 case is between 600 and 700 pages long.

15       And, Your Honor, if you now turn to the exhibit --

16 excuse me, affidavit, I'd like to give you a couple of

17 examples of descriptions on the face of the exhibit that

18 indicate inaccuracies.

19       For example -- and I'm looking now at page 5 out

20 of 17 of the ECF version of the document.  You'll see on the

21 second line a reference to a Blades report on insurance from

22 October of 1961.  That's not an insurance policy.  On that

23 same page, about in the middle of the page, there's another

24 reference to a Blades report on insurance from October 1951,

25 also not an insurance policy.

1        If you turn now, Your Honor, to page 16 out of 17

2    in the ECF document, I would like to point to two other

3    examples.  There's a Tank (indiscernible) policy, oh, I'd say

4    about three fifths of the way down, for the Florida Sea Base.

5    That may be some sort of insurance policy, but it's not a

6    general commercial liability insurance policy covering sex

7    abuse claims.

8        Further down the page, I would say about a fifth

9    of the way from the bottom, there's a Yacht Hull LIU renewal

10   policy.  Again, it might be an insurance policy or it might

11   be evidence of an insurance policy, but it's not a general

12   commercial liability policy that has anything to do with

13   insurance for sex abuse claims against the BSA.

14       That brings me to Federal Rule of Evidence

15   902(11), which requires, quote, "Before the trial or hearing,

16   the proponent must give an adverse party reasonable written

17   notice of the intent to offer in the record" -- this is the

18   business record that they seek to exempt from the hearsay

19   rules here with this affidavit -- "and must make the record

20   and certification available for inspection, so that the party

21   has a fair opportunity to challenge them."

22       Now, I do not think the slightly more than 24

23   hours we've had with these voluminous documents is a fair

24   opportunity to challenge them and I don't think it satisfies

25   the rule for a business records exception to the hearsay

1  rule, but I do know that just with the time we've had we have

2  been able to determine lots of reasons to doubt the

3  trustworthiness of these business records, supposed business

4  records.

5          And so I think that indicates a lack of

6  trustworthiness under Federal Rule of Evidence 803(6)(e) and,

7  therefore, we would ask the Court to sustain our objection on

8  hearsay grounds.

9          MR. MARTIN:  Your Honor, may I respond?

10          THE COURT:  Yes.

11          MR. MARTIN:  Thank you, Your Honor.  Mr. Martin

12  with Haynes & Boone for the debtors.

13          I need to give context here because this is a

14  little bit disturbing to me.  As soon as the objections were

15  filed by the certain insurers, I immediately reached out --

16  and this was days ago, several days ago -- to reach out to

17  them to say let us come together to try to resolve these.  We

18  actually had a meet-and-confer two days ago, at which time I

19  said to them we were not using these documents -- many of the

20  documents that are set forth and attached to Ms. Gutzler's

21  declaration, they were not being used -- they were not going

22  to be used other than through a 703 rule, meaning that we

23  weren't intending to admit them into evidence.

24          We told them we do want and we would like the

25  insurance policies in evidence because this case, of course,

1   involves -- a big part of it involves the insurance policies.
2   We told them that we were willing to produce a custodian who
3   would prove the documents up as the business records of BSA.
4   They seemed to be very receptive to that, that seemed to
5   appease them and they were fine with that, and at which time
6   we then filed it -- showed it to them, filed it.  And they
7   said, well, we'll get back to you.  They never got back to us
8   at all and now we're hearing for the first time this is a big
9   problem for them.

10          What Mr. Christian fails to tell you, this is a
11  business records affidavit, that's all it is.  It is to show
12  that these are the records of BSA.  What's more is the
13  certain insurers have had all of the insurance policies not
14  for days, not for months, but since the very beginning.
15  These policies have been in the data room for months and
16  months and months, there is no question about that.  And for
17  them to now, the day of, without a courtesy to me, to tell me
18  that now they're changing their mind concerning a business
19  records affidavit is preposterous and it should not be
20  tolerated.  These gamesmanships are just the kind of thing
21  that we should not be dealing with concerning a very simple
22  premise here; these are the policies of BSA, the policies are
23  at issue in this case.

24          And what's more is we're not submitting them for
25  the truth of the matter asserted, we're submitting them

1 because these are what our expert, our allocation expert

2 relied upon in considering and preparing her allocation

3 analysis.

4          Now, do we want some of these policies in

5 evidence?  Yes, and I'll tell you why.  Not all of them, but

6 they're important because we want to be able to demonstrate

7 to Your Honor an important and quite evident fact, and that

8 is that the policies throughout the many decades that belong

9 to the BSA demonstrate a unity of interests between the BSA,

10 between local councils, and also chartered organizations,

11 they show a unity of interests.

12          And I remember I told you this when I was talking

13 to you about Mr. Griggs, when I told you that it was

14 important to show you that the lawsuits, many of the

15 prepetition lawsuits were filed against the BSA, were filed

16 against local councils, were filed against charters.  And I

17 said I'm also going to show you later on that the policies

18 likewise demonstrate a unity of interests.  Why?  Because

19 they insure BSA, they insure the local councils, they insure

20 the chartered organizations.  That's why we want to show them

21 to you.

22          And, look, I am sorry that there are a lot of

23 documents here, I -- that's just the fact of the matter is.

24 BSA has 85 years of policies.  Are we going to use all of

25 them?  No, but they were all relied upon by Ms. Gutzler in

1  coming to her opinions that she will share with Your Honor

2  concerning allocation and how those policies operate to

3  provide the kind of protection that would be provided to the

4  abuse victims.

5          So this is nothing more than a business records

6  affidavit and they have had plenty of notice of it.  So I

7  think that argument should be summarily rejected.

8          And as far as the other exhibits that are in and

9  attached to Ms. Gutzler's declaration, again, those are

10  provided pursuant to Rule 703.  And, as Your Honor knows, 703

11  specifically says an expert may base an opinion on facts or

12  data in the case that the expert has been made aware of or

13  personally observed.  And it goes on to say, "but if the

14  facts or data would otherwise be inadmissible, the proponent

15  of the opinion may disclose them to the jury" -- obviously,

16  we don't have a jury, but to Your Honor -- "only if their

17  probative value in helping the jury evaluate the opinion

18  substantially outweighs their prejudicial effect."

19          And, Your Honor, nobody here thinks that you're

20  going to be prejudiced, nobody thinks that, and we think this

21  would be helpful for Your Honor to know the full scope of the

22  insurance that's available to the BSA and the full scope of

23  the insurance that's available to the local councils.  And

24  for those reasons, Your Honor, we ask that the insurers'

25  objections be rejected and overruled.

1          MR. CHRISTIAN:  Your Honor, David Christian again.

2   May I take a moment to respond?

3          THE COURT:  Yes.

4          MR. CHRISTIAN:  Thank you, Your Honor.

5          First, as to Rule 703, it says in its middle

6   sentence, "If experts in a particular field have reasonably

7   relied on those kinds of facts or data in forming an opinion

8   on the subject, they need not be admissible for the opinion

9   to be admitted."  That speaks to the opinion.

10         Ms. Gutzler will testify, we'll cross-examine her,

11  Your Honor will get her opinion.  It is not the data she

12  relied upon that gets into evidence.

13         Second, in the third sentence that Mr. Martin just

14  quoted to you, he put an emphasis in a different place than I

15  would if naturally reading that sentence.  It says, "The

16  proponent of the opinion may disclose them to the jury only

17  if their probative value in helping the jury evaluate the

18  opinion substantially outweighs their prejudice effect."

19         A couple of observations about that.  First of

20  all, Your Honor is not going to review the 5,000-plus

21  policies that Ms. Gutzler said she relied upon and so there

22  is no way that Mr. Martin can carry his burden under Rule 703

23  to show that their probative value will outweigh the

24  potential prejudice.  And you may say, well, what's the

25  prejudice?  I think we've outlined to you the ways in which

1  these documents are incomplete and inaccurate just giving a

2  surface review to the proposed business records affidavit

3  over the last day, day and a half.

4         And so we don't think the exception to the normal

5  rule that those materials do not come into evidence should

6  apply here.

7         The other thing I'd like to point out -- and I

8  think Mr. Martin is just speaking loosely, but I want to be

9  clear and precise on this point.  Ms. Gutzler certainly

10 reviewed some insurance policies, it's probably true she

11 reviewed a lot of insurance policies, but she does not claim

12 and the debtor does not claim that she reviewed all of these

13 policies or relied on all of these policies.

14        And, if I may, I'm going to quote from part of her

15 deposition transcript.  This is at page 124, lines 12 through

16 24 of her deposition that was conducted on February 1st,

17 2022.

18        I asked the question, "Am I right that Exhibit 9

19 to your report has a spreadsheet that includes over 5,000

20 lines listing separate insurance policies?"

21        Answer:  "Yes, that's correct."

22        Question:  "And so it would be virtually

23 impossible for you to have reviewed all the policies

24 yourself; right?"

25        Mr. Azer objected to form.

1         The witness answered, "It would be very difficult

2  for me to have reviewed them all, yes, and I have not stated

3  that I did that."

4         So, Your Honor, if all we're talking about here is

5  the acknowledgment that Ms. Gutzler relied upon some of the

6  insurance documents from the debtors' data room dump, then

7  those documents don't come into evidence.  She can be

8  examined about them when she testifies.  If we're talking

9  about something more than that, they are hearsay, they do not

10  satisfy the business records exception, and our objection

11  should be sustained.

12         MR. MARTIN:  Your Honor, may I respond?

13         THE COURT:  Yes.

14         MR. MARTIN:  So Mr. Christian, of course, is

15  ignoring what's in her declaration, which they have not

16  objected to.  If you look at paragraph 33 and also paragraph

17  30 -- actually, you will start with paragraph 30.  "Having

18  collected extensive information, she says, regarding the

19  scope of coverage available to the BSA, local councils, and

20  chartered organizations under policies issued to the BSA and

21  local councils since the 1930s and aggregating that

22  information into a database, I was tasked with modeling the

23  coverage potentially available for abuse claims for purposes

24  of evaluating" -- and then she sets out the purpose for which

25  she was evaluating those policies.

1    And then in paragraph 33 she says, "As noted
2  *supra*, KCIC collected extensive information regarding
3  policies issued to the BSA and local councils since the 1930s
4  and coded that information in a database.  Specifically, KCIC
5  added relevant evidence of policy terms to the policy
6  database tracking all available information about the policy,
7  including the insurer, the policy number, the limits, the
8  dates, the named insured, applicable exclusion," and it goes
9  on and on.

10    So, yes, while maybe she didn't personally do it,
11  her team did, and of course that's reasonable for having to
12  review 85 years of insurance policies.  But the fact of the
13  matter is that insurance is a major part of this plan, it is
14  the major asset or one of the major assets of this plan.

15    We're not asking you, Your Honor, to review every
16  single policy, but we think that that asset should be made
17  evidence of the record.  We're not talking about -- we're
18  talking about a thumb drive that has these documents.  We
19  will be highlighting for Your Honor certain policies and
20  you'll hear certain policies, but we're not asking you to
21  review every single policy.  But, as you can tell from her
22  declaration, she did and KCIC did look at the policies and
23  did code the necessary information that was necessary for her
24  to do an allocation.  And when you hear her testimony, you'll
25  see what kind of information she was looking for in doing her

1  allocation, thereby making this relevant.

2          MR. CHRISTIAN:  Your Honor, David Christian again.

3  I might be able to say something that could be helpful to the

4  efficiency here.

5          Mr. Martin many not have wanted to mention it

6  because he doesn't want to violate any confidentiality

7  restrictions, but one thing we proposed more then once in

8  this case is that we would stipulate to the admission of our

9  versions of the policies that we produced as complete and

10 accurate versions.

11         I can't speak for every non-settling insurance

12 carrier on this subject, but I have heard Mr. Martin say a

13 couple times now that they don't need to get all the policies

14 into evidence.  They want to point you to some specific

15 things. I know you're not going to look at all the policies

16 and we know the witness didn't look at all the policies.

17         So if they want to point you to particular things

18 or they want some of them to point you there is a way to get

19 there, but I don't think it's with a last minute business

20 records affidavit that is plainly incomplete and inaccurate.

21         MR. MARTIN:  Your Honor, these are the business

22 records of the company. I mean that is the whole purpose of

23 actually --

24         THE COURT:  They might be, but, Mr. Martin, you're

25 telling me you don't want me to review all these policies and

1  I, of course, am not going to.  So what I am trying to figure

2  out is, yes, they may be relevant; yes, Ms. Gutzler certainly

3  relied on them for her declaration, nobody is suggesting that

4  is not the case; she, obviously, reviewed certain of them and

5  her team reviewed, and they put them in a database, and they

6  did whatever she says they did, they coded them, etc.

7        What is the real purpose of putting them into the

8  evidentiary record as opposed to putting into the evidentiary

9  record some sampling of the various policies that shows what

10  you want to prove which is the unity of interests so that the

11  policies would actually be of some use rather than dumping

12  into the record thousands and thousands of pages that I am

13  not going to look at.

14        MR. MARTIN:  Your Honor, I want to do what is the

15  right thing, the most efficient thing for the court.  If it

16  means that I can select some subset from this body of

17  documents with no objection from anyone then absolutely, I'm

18  happy to do that.  I was hoping to get some reaction from the

19  certain insurers after I reached out to them with trying to

20  resolve this and I was stonewalled, I didn't get any kind of

21  response.  It's very frustrating that we're having to air

22  this out to you.  I apologize that we're doing that.

23        I am happy, more than happy to take some subsets

24  from those -- from this large group of documents to do that

25  if Your Honor will permit us to do that.

1      MR. CHRISTIAN:  Your Honor, we've met and

2  conferred with Mr. Martin for an hour and a half after court.

3  He has not been stonewalled, he has not been ignored, he has

4  not gotten a reaction.  We proposed a stipulation that we

5  would stipulate to the completeness, authenticity, accuracy

6  of the policies we produced to him during this case with

7  Bates numbers.  Again, we can't say every single non-settled

8  insurer falls into that category, but my clients do.  I know

9  others do too.

10      MR. MARTIN:  We saw the impracticality of that,

11  Your Honor, because there were so many carriers and we

12  thought that the easiest thing to do was just a business

13  records affidavit.

14      THE COURT:  Okay.  I get the business records

15  affidavit, but, quite frankly, dumping all these policies

16  into the record is unhelpful because I'm not going to look at

17  them and I'm telling you right now I'm not going to look at

18  them.  I don't think I need to look at every policy, nor

19  could I, to rule on confirmation.

20      So I am going to direct the parties to see if

21  there can be an agreed upon subset of representative

22  insurance policies that can be put into the record. If there

23  can't be then I will make a ruling on this.

24      MR. MARTIN:  Thank you, Your Honor.

25      THE COURT:  That is what I would like the parties

1  to do.

2          MR. MARTIN:  We will do that, Your Honor.  Thank

3  you.

4          MR. CHRISTIAN:  Your Honor, as it relates to a lot

5  of other documents, I don't want to start to be repetitive or

6  cumulative about a lot of these points, and I have tried to

7  listen carefully to what Mr. Martin is saying about the

8  purpose of identifying these exhibits. I think with respect

9  to the vast majority of them if there is an understanding or

10  a ruling from Your Honor that these are things that Ms.

11  Gutzler says she relied upon under Rule 703, and she's going

12  to testify about them, I don't think we need to do much more

13  with them and perhaps if there are particular ones that for

14  some specific reason need to come into evidence for some

15  limited purpose we can handle that on the limited direct that

16  the debtors have proposed for Ms. Gutzler.

17          I am not sure that there is anything that really

18  needs to come into evidence if it's just about what she

19  relied upon in the opinions that she is going to testify

20  about, but maybe there is something that I am missing from

21  the debtor's perspective.  Then she relied upon, also, Dr.

22  Bates's reports that are identified as exhibits.  We

23  understand that she relied upon Dr. Bates's reports, but as I

24  think has been discussed more than once during this trial

25  generally expert reports don't come into evidence.

1    So I am happy to address specific things, but I

2  don't want to spend the next half hour talking about our

3  objections if it's much to do about nothing.

4    MR. MARTIN:  I think it's much to do about nothing

5  because, as I indicated earlier, Your Honor, with respect to

6  the other documents we had identified those under Rule 703

7  only we're not intending to admit those into evidence anyway

8  so I don't think that's an issue.  That is what we had told

9  them two days ago.

10    THE COURT:  Sounds like that is not an issue.

11    MR. CHRISTIAN:  Thank you.

12    Your Honor, if it's acceptable to the court and

13  Mr. Martin we did object to certain statements in the report

14  as well.

15    THE COURT:  Yes.

16    MR. CHRISTIAN:  So I will turn to that now.  Most

17  of the statements we objected to or about half, maybe, are

18  objected to because they are legal opinions outside the scope

19  of the witness's expertise.  We also objected on the basis of

20  foundation.  I can start reading and arguing with respect to

21  particular excerpts, but, number one, I would like to avoid

22  that and the court probably wants me to avoid doing that.

23  Number two, I think I would generally just characterize a lot

24  of them as having reached conclusions, as making conclusory

25  statements about insurance coverage.

1            A couple things about that.  Number one, Your

2    Honor said, till you're blue in the face, that you're not

3    having a coverage trial and you're not going to be making

4    insurance coverage determinations.  Your Honor entered an

5    order on Monday granting, in part, our *motion in limine* with

6    respect to Ms. Gutzler.  It makes clear that the evidence is

7    not being offered for purposes of making insurance coverage

8    determinations.  Ms. Gutzler's report -- pardon me, her

9    declaration says she is not submitting and intending to make

10   determinations or opine on conclusions about insurance

11   coverage issues.

12           So just to take the very first example, and,

13   again, I promise I'm not going to read all of these to you,

14   just to take the very first example that I think illustrates

15   the point.  Paragraph 10 says these policies would be

16   applicable once the primary insurance coverage was exhausted.

17   Then she talks about attachment in a parenthetical.  She says

18   the vast majority of these excess policies provided coverage

19   with no aggregate limit.  Then she explains what that means

20   as a matter of insurance coverage law. Then she talks about

21   those without an aggregate limit paying many times the per

22   current limits without exhausting.

23           Okay.  Well there is a lot of conclusions about

24   the law as applied to these contracts built into that

25   statement.  Moreover, as Your Honor has already observed, we

1 sometimes in this case paint with a really broad brush. I

2 mean these policies covered many decades, they have different

3 language in them, they have different terms and conditions.

4 So one policy may not be true of another. By the way, even

5 if two policies had similar language, different states law

6 might apply to them, there might be different arguments that

7 are available depending on nuances in the policy language.

8 As Your Honor knows, I don't need to document this

9 for you, there are lots of disputes about insurance coverage

10 here. Many of those have not reached the stage of testing

11 because for pre-bankruptcy insurance coverage litigation that

12 was in some cases with primary carriers, but you have a whole

13 host of excess insurance companies in various years that may

14 not have been the subject of the claims that were at issue in

15 that litigation or that may never have been breached or

16 implicated by the prepetition claims.

17 So long story short, we can go through each of the

18 paragraphs to which we have objected, but I think in the main

19 it's about the conclusory statements that appear to resolve

20 insurance coverage issues on very complicated matters

21 involving, as we have seen, 5,000 insurance policies coverage

22 decades, subject to state law perhaps of different states.

23 So we object on the basis that they're legal

24 conclusions that should not be permitted. They also, in many

25 cases, (inaudible), but let me finish with this; if it's just

1  context for Ms. Gutzler to explain her thinking and its

2  coming in for that limited purpose recognizing the ruling on

3  the *motion in limine,* recognizing what Your Honor has said,

4  recognizing what Ms. Gutzler says with the limits of what she

5  is doing, you know, that is one thing.  If these statements

6  are being offered for evidentiary value for the truth of the

7  matter asserted we object.

8          THE COURT:  Mr. Martin.

9          MR. MARTIN:  Thank you, Your Honor.

10          I think we're two ships passing in the night here.

11 I mean I think we have said till we're blue in the face we

12 are not asking the court to make insurance determinations,

13 but we're talking about basic information.  Is the policy per

14 occurrence?  Does it have an aggregate?  You could read it.

15 You look at the policy and it says what it is, whether it's

16 an occurrence or an aggregate.  That is basic reading the

17 document information.  Those are not legal conclusions.

18          Let's just start with number ten, the excess

19 policy attaches if the value of a claim exceeds the primary

20 limit.  Of course it does, that is what excess policies are.

21 They only come into effect after the primary limit is

22 exhausted.  That is shown on the document.

23          Next comment, the vast majority of these excess

24 policies provided per occurrence coverage with no aggregate

25 limit.  You find that on the document.  It will say on the

1 declarations page whether or not there is an aggregate or

2 not.  That is just reading the document.  Policies can pay

3 many times the per occurrence limits without exhausting.

4 That is basic information.  That is insurance 101.  We are

5 not asking the court, were not asking any court to make any

6 kind of coverage determination, it's just reading the

7 document.  That is not a legal opinion whatsoever.

8            THE COURT:  I'm not reading these as legal

9 opinions.  That is not how I am reading them, nor how I am

10 considering them.  I view these more like what Mr. Martin

11 says, these are facts that this witness takes from the

12 insurance policies that she has reviewed, talking about what

13 she says the availability of potential insurance coverage.

14            I am not reading them as a legal opinion that, in

15 fact, for example, in 11, that's the easiest, that there is

16 $3.6 billion available for -- well, I'm not reading it as a

17 legal decision that there is $3.6 billion of coverage that

18 the insurers owe, but rather during this period there is a

19 face value of $3.6 billion of aggregate limits of liability

20 that is available after accounting for settlements and prior

21 exhaustion.  I assume that is math.

22            I think Paragraph 11 is math.  That is how I am

23 reading it.  So that is the easiest one to look at.  I am not

24 reading it as a legal opinion, nor do I think Ms. Gutzler

25 says that she is providing a legal opinion, nor do I believe

1 | she is a lawyer.  So I am not reading it that way.

2 |       MR. CHRISTIAN:  That is very good, Your Honor.

3 | David Christian, again, for certain insurers.

4 |       First of all, if you are reading it the way you

5 | are reading it I think that is an appropriate, sort of,

6 | qualification on the statements.  I guess I just want to be

7 | clear for the record, and I know from Your Honor's statement

8 | that this isn't an issue for you, but, you know, some of

9 | these things that Mr. Martin says are just reading the piece

10 | of paper are often more than that.

11 |       People pay Mr. Martin and his firm millions of

12 | dollars to litigate these issues and, you know, sometimes he

13 | wins, I'm sure, and sometimes he loses, but the point being

14 | these things he is talking about, like do aggregate limits

15 | apply, you know, how do they apply, what is the attachment

16 | point, when does a claim or a policy attach to a liability

17 | can be complicated questions --

18 |       THE COURT:  No doubt.

19 |       MR. CHRISTIAN:  -- of which we have trials longer

20 | than this one.  So I just don't want there to be confusion

21 | about that in the record.  If Your Honor is reading this, you

22 | know, this is forming, sort of, context of the way the

23 | witness is explaining what she did and what she concluded.  I

24 | think that is perfectly fine.

25 |       Thank you.

1          THE COURT:  That is how I am reading this.

2          MR. CHRISTIAN:  Thank you, Your Honor.

3          I have one other, sort of, preliminary objection

4   matter and I don't bring it up last because it's less

5   important than the others, but it just seemed to make sense.

6   Now that we have gotten that out of the way there is both an

7   exhibit on the list and a demonstrative that are coverage

8   charts.  They are different.

9          I guess I don't fully understand, from the

10  debtor's perspective, whether they, especially after hearing

11  Mr. Martin's argument today, intend on offering a coverage

12  chart into evidence and if so which coverage chart that is

13  and whether there will be a different one that is the exhibit

14  to the direct testimony and then the one that is going to be

15  used as a demonstrative during the live portion of the direct

16  testimony.

17         I guess before I, you know, tilt at windmills

18  here, I want to find out what the debtors intention is so

19  that we're arguing about the right thing.

20         MR. MARTIN:  That is a fair point because the

21  demonstrative exhibits are what we would like the court to

22  take a look at.  We would like to use the demonstrative

23  exhibits in the direct examination of Ms. Gutzler, not what

24  is currently listed as an exhibit to her declaration.

25         So I hope that answers that.  We would like to go

1  with what we have marked as DDX-98 through 103.

2          MR. CHRISTIAN:  Thank you, Mr. Martin.  That is

3  very helpful clarification.

4          I guess I would ask, Your Honor, are we then

5  having the debtor's withdrawal JTX-1040 as an exhibit that's

6  proposed in connection with the direct testimony of Ms.

7  Gutzler and then we will deal with the demonstrative or are

8  you sustaining your objection as to JTX-1040?

9          MR. MARTIN:  If I could respond, Your Honor,

10  before you comment on that.

11          THE COURT:  Yeah.

12          MR. MARTIN:  The only thing I would say is that

13  the coverage charts there reflected in Ms. Gutzler's

14  declaration they still -- they are there because that is what

15  she may have used at one point in time.  What we are -- what

16  I would like the court and Ms. Gutzler to review during her

17  live testimony is the demonstrative exhibit because it is a

18  more fulsome -- it covers more time -- a bigger time period.

19          So I would say that with respect to the one that

20  is attached to her exhibit that is something that she relied

21  upon or used and, therefore, that would be covered under 703,

22  but with respect to the one that I would like the court to

23  take a look at and consider in connection with her testimony

24  is DDX-98 through 103.

25          MR. CHRISTIAN:  Your Honor, I know Mr. Martin

1 isn't on the stand here, but if I could ask another

2 clarifying question.  Mr. Martin, is JTX-1040 the same or

3 different then the coverage chart that would have been

4 included in the matter she considered in connection with her

5 reports listed at JTX 13-5?

6            MR. MARTIN:  It should be the same.

7            MR. CHRISTIAN:  Okay.  So I don't think we need to

8 do it twice.  I acknowledge that she looked at a coverage

9 chart and considered that in forming her opinions and I think

10 that is covered by the opening materials considered list the

11 JTX 13-5.

12            So, again, happy to have Mr. Martin withdrawal

13 JTX-1040 or have you sustain our objection.  It makes no

14 difference to me.

15            THE COURT:  It sounds like its duplicative is what

16 you're saying.

17            MR. CHRISTIAN:  Yes, Your Honor.

18            THE COURT:  The question I have -- and so if it's

19 duplicative we only need it once I would assume.  The

20 question I have is in terms of the demonstratives are you

21 suggesting they're coming into evidence or we're just using

22 them as demonstratives because I realize I left that issue

23 open before, but demonstratives are not evidence.  So I was

24 tired, it was the end of the day.  Demonstratives are not

25 evidence.  So what are you suggesting on that front?

1          MR. MARTIN:  Yeah, I understand that.  Your Honor,

2    thank you for bringing that up.  I actually think that as a

3    demonstrative it's extremely helpful and I will tell you why.

4    I mean we're talking about 85 years of coverage here.  I must

5    confess, I'm a coverage lawyer and have been doing this for

6    35 years, I teach insurance law and I've been doing that for

7    17 years, and I still need a coverage chart because I need it

8    to organize the information in a thoughtful way, in an

9    organized way.

10          I think that that is going to be extremely useful

11   for the court as we're talking about all of these issues,

12   we're talking about aggregate limits, we're talking about

13   time periods, how many limits, etc., and would I like the

14   court to admit it, yes.  Do I think you can under 703, I

15   think you can under 703 and under 1006.  Rule 1006 would be a

16   summary of the huge amount of information that we're going to

17   be talking about.  I think it is useful for the court, it's

18   beneficial and not prejudicial to the court.

19          THE COURT:  Well, I think --

20          MR. CHRISTIAN:  Your Honor --

21          THE COURT:  -- you can present a demonstrative,

22   and I can see it, and I can use it, and it can help me as I

23   deliberate.  I don't know if it needs to come into evidence.

24          MR. MARTIN:  That's fine, Your Honor.  Of course

25   you are the one that I care about understanding and being

1  able to use it in a manner that will be useful to you.  That

2  is all I care about.

3          THE COURT:  Okay.

4          MR. CHRISTIAN:  Your Honor, may I just say a few

5  words for the record about that?

6          THE COURT:  Yes.

7          MR. CHRISTIAN:  David Christian, again, for

8  certain insurers.  Thank you, Your Honor.

9          First of all, I agree with where Your Honor's head

10 it as and you sort of read my mind thinking about the earlier

11 demonstrative that I think you said you took some notes on,

12 then sort of after the fact we had to figure out what we are

13 going to do with that.  I think you are correct that it

14 doesn't come into evidence.  I think you're correct that a

15 coverage chart is helpful.

16         Mr. Martin is right that, you know, in cases of

17 this type.  We all look at coverage charts to help us get our

18 head around things. I want to be clear about several items,

19 though, for the record.

20         Number one, Mr. Martin mentioned Rule 703.  We

21 acknowledge that Ms. Gutzler looked at and relied upon a

22 coverage chart.  That doesn't come into evidence.  I want to

23 be clear, because you're the finder of fact in this case,

24 you're like the jury in a jury trial, and the demonstrative

25 would normally not come into the jury room.

1        Now am I going to tell Your Honor that you
2   shouldn't look at this very helpful thing to help you get
3   your head around things even though you are the finder of
4   fact, no, I'm not going to tell you that.  What I am going to
5   suggest to you, though, is that there are inaccuracies.
6   There are disputes around this coverage chart.  It is not
7   evidence of the coverage.

8        You know, Your Honor has already ruled *in limine*
9   that none of this is being considered for purposes of
10  determining the insurance coverage and, indeed, that is what
11  Ms. Gutzler says in her declaration.  So with all those
12  limitations and caveats, you know, I think it does meet some
13  of the, sort of, standards of the case law for Your Honor to
14  use it for what it is worth and it's a visualization of one,
15  perhaps, incomplete and inaccurate version of a lot of
16  voluminous documents.

17       Let me add, when I keep talking about inaccuracies
18  and incompleteness that is not meant to criticize Mr. Martin,
19  or the debtors, or anybody else working on this case.  When
20  you talk about over 5,000 insurance contracts covering
21  decades that are complicated documents -- I think you heard
22  me mention one of them maybe six to seven hundred pages for
23  one contract. We are talking about over 5,000 of them.  There
24  are bound to be inaccuracies or even if there are not
25  inaccuracies disputes that are hard to depict.  Of course,

1  this depiction doesn't cover all those terms and conditions,

2  all those details in those more than 5,000 contracts, some of

3  which have hundreds of pages.

4        So I think with the appropriate limits that's

5  perfectly appropriate.  You know, if this were a jury trial

6  we would be asking for a limited instruction for the jury

7  about what they're going to see.  I guess I am just offering

8  these comments for the record and if I may be bold enough to

9  say it is, sort of, the limiting instructions for Your Honor

10 as the finder of fact.  That is all I have.

11        MR. MARTIN:  If I could --

12        THE COURT:  Okay.

13        MR. MARTIN:  -- comfort Mr. Christian knowing that

14 the insurers would be all up in arms about a demonstrative

15 aid and you could see it, it's in the document itself.  On

16 every single page I included the note, this coverage chart is

17 intended for illustrative purposes only although reasonable

18 efforts have been made to depict the coverage accurately the

19 information on this chart should not be used as a definitive

20 source of information.  That includes, but is not limited to

21 any depiction of exhaustion or erosion of relevant limits of

22 liability.

23        So I have given that to them, I have put it right

24 smack on the document on every page.  I know Your Honor will

25 not be moved or prejudiced by anything, you will take it for

1   what it's worth.  I trust you completely.

2           THE COURT:  That may also be a first.

3       (Laughter)

4           THE COURT:  I think we've worked this through. I

5   am comfortable with the demonstrative given the long

6   discussion we've had with respect to it. I understand it.  We

7   will use it appropriately in the context in which it has been

8   delivered.  As with respect to the duplicative exhibits, if

9   they're duplicative, you know, pick one and we will go with

10  it.

11          MR. CHRISTIAN:  Thank you, Your Honor.

12          MR. MARTIN:  Your Honor, in terms of timing how

13  would you like to proceed? I know that the time is now five

14  o'clock there in Delaware.  My witness is here.  I must say I

15  don't like the idea of splitting up a direct and then

16  followed by cross the next day.  Your Honor, I want to do

17  what you would like to do.

18          THE COURT:  If that is your preference, which I

19  kind of figured it would be, that is fine.

20          MR. MARTIN:  Okay.

21          THE COURT:  We wouldn't start the cross in any

22  event because I wouldn't leave her in the middle of cross.

23          MR. MARTIN:  Okay.

24          THE COURT:  So we will start in the morning at 10

25  my time.

1          Ms. McNally.

2          MS. MCNALLY:  Thank you, Your Honor.

3          I just wanted to revisit the issue we raised

4  earlier before the break and certainly do not want to put

5  more things on your plate.  So we have considered what would

6  be involved for our request and have decided just to

7  withdrawal it and let the record stay where it is.

8          With that I would just thank you for your offer,

9  but we will just say no thanks.

10          THE COURT:  I appreciate that.  Thank you.

11          Anyone else?  Mr. Karlan, right.

12          MR. KARLAN:  It is, Judge.  I think we got the

13  wrong label on the screen.  I'm sorry.

14          Judge, we have all heard the statements you just

15  made with respect to demonstratives.  As you may or may not

16  know within the last few hours the debtors filed a little

17  mini brief in support of their position that the

18  demonstratives that Dr. Bates prepared should come into

19  evidence.  May we assume that that issue is now closed and

20  that we don't need to respond further?

21          THE COURT:  Yeah, I didn't know that, but, yeah,

22  the issue is closed.

23          MR. KARLAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Schiavoni.

25          MR. SCHIAVONI:  Your Honor, you -- he indicated at

1  the beginning of that argument or maybe it was your ruling

2  that if there was any confusion you had intended that

3  pleadings or things that had been filed on the docket could

4  come into evidence if they were, sort of, specifically

5  referred to or used as evidence and that people should, sort

6  of, speak up now I think was how I took it.

7        So, Your Honor, there were two transcripts from

8  the disclosure statement hearing that these were the ones

9  that I tried to call-up awkwardly and I got it wrong and what

10  not, I got the wrong one up.  The witness referred to

11  statements made in both of these.  One is the September 22nd,

12  2021 hearing transcript and I had the line number wrong when

13  I called it up.  The other one is the one that Mr. Ruggeri

14  referred to, but I also was planning to refer to is the

15  December 21st, 2021 hearing transcript.

16        One is marked JTX-1508, the other one is marked

17  JTX-1495.  We would offer those two transcripts into evidence

18  not for the truth of the matter asserted, but just for the

19  express statements of the settlement insurers, in one case

20  AIG, that these releases were absolutely essential.  I think

21  we refer to these in closing.  This is foundational evidence

22  for some of Mr. Patton's material, but it's also -- when you

23  look at the timeline and precisely what was said it really

24  explains the essential nature of the releases.

25        So it's not for the truth of the matter, it's for

1  that this was what was -- its notice of the statements and

2  the positions of the parties, if we could give the specific

3  line numbers and in the sense limit it in that regard.

4        THE COURT:  Well why don't you check with the

5  representatives of the various Guam entities who I think are

6  the parties that were part of that examination and let's see

7  if they have any objections and if not we can do it, they can

8  be entered with the specific limitation, but why don't you

9  speak with them and see if there is an agreement or not on

10 it.

11       MR. SCHIAVONI:  Thank you.  I will reach out to

12 Ms. Arnone and Ms. Wolff.

13       THE COURT:  Ms. Wolff, Mr. Caldie, I think there

14 was someone else.

15       MR. RUGGERI:  Your Honor, clarification.  James

16 Ruggeri.  It actually is JTX-1509, not 508.

17       THE COURT:  So you all work that out, talk about

18 it, and if you have something let me know.

19       Ms. Wolff.

20       MS. WOLFF:  Yes, Your Honor.  Just following up on

21 what Mr. Schiavoni mentioned which was briefs, filings with

22 the court.  Your Honor, to the extent that it hasn't already

23 been admitted into evidence I move, Your Honor, to admit the

24 Century termsheet that was the mediators report, that's Joint

25 Exhibit 2738.  I apologize, Your Honor, I still have not yet

1  been able to locate a joint exhibit with the plan supplement

2  having Exhibit I-2 which is the Century and Chubb Companies

3  settlement agree, the definitive document.  I will continue

4  to search for that, Your Honor, and hopefully bring it up

5  tomorrow I that's okay, Your Honor.

6         THE COURT:  That's fine.  Again, let's talk with

7  those who were part of that witness testimony.  I am going to

8  assume there would be no objection, but let's have that

9  discussion and if there is an agreed upon set of exhibits for

10  Mr. Patton's testimony that weren't part of the record

11  already that need to be we can fix that.

12         Mr. Karlan.

13         MR. KARLAN:  Your Honor, just picking up on this

14  repeated theme of pleadings and filings that have not been

15  expressly put into evidence, and I apologize for this,

16  perhaps I should have done it with Dr. Bates.  Numerous

17  witnesses and counsel have referred to the agreement between

18  the TCC and the debtors pursuant to which the TCC became a

19  plan supporter.  That was filed with the court. I am told

20  that that is JTX-1350.  We would ask that that be admitted

21  into evidence.  1-350, sorry.

22         THE COURT:  Okay.  I assume that won't be an

23  issue, but, again, I would ask that you have that discussion

24  with whomever the appropriate counsel on the other end of the

25  testimony was.

1          MR. KURTZ.

2          MR. KURTZ:  Thank you, Your Honor. I just wanted

3  to note that we submitted for Your Honor today a short brief

4  on the demonstratives.  They are, in fact, admissible under

5  Federal Rules of Evidence 611 and 1006.  It's pretty routine.

6  I will highlight the distinction, maybe, between pictorials

7  of animations and things that maybe Your Honor is kind of

8  knee jerk thinking of as demonstratives as compared with

9  summaries, evaluations which are, as I had mentioned, I think

10 customarily, almost uniformly admitted.

11         We did give you cases, authority and rules so that

12 Your Honor could consider this with a little more record then

13 just the comments that I had made and Mr. Karlan had made as

14 well.  I wish I had a docket number for you, but I know it

15 was filed this afternoon.

16         THE COURT:  Okay.

17         MR. KURTZ:  Thank you very much.

18         THE COURT:  Thank you.

19         Anyone else?

20     (No verbal response)

21         THE COURT:  Thank you.  We are adjourned for this

22 evening.  We will start with Ms. Gutzler in the morning.

23     (Proceedings concluded at 5:08 p.m.)

24

25

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    March 24, 2022

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    March 24, 2022

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                    March 24, 2022

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                    March 24, 2022

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable