```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                      .  Chapter 11
                                .  Case No. 20-10343 (LSS)
4   BOY SCOUTS OF AMERICA AND   .
    DELAWARE BSA, LLC,          .  (Jointly Administered)
5                               .
                                .
6                               .  Courtroom No. 6
                                .  824 Market Street
7           Debtors.           .  Wilmington, Delaware 19801
                                .
8                               .  Thursday, March 24, 2022
    . . . . . . . . . . . . . . .  10:07 a.m.
9

10                  TRANSCRIPT OF ZOOM TRIAL (DAY 9)
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
11               CHIEF UNITED STATES BANKRUPTCY JUDGE

12
    APPEARANCES:
13
    For the Debtors:          Derek C. Abbott, Esquire
14                            MORRIS, NICHOLS, ARSHT
                                & TUNNELL, LLP
15                            1201 North Market Street
                              16th Floor
16                            Wilmington, Delaware 19899

17                            Jessica C. Lauria, Esquire
                              Glenn M. Kurtz, Esquire
18                            WHITE & CASE, LLP
                              1221 Avenue of the Americas
19                            New York, New York 10020

20  Audio Operator:           Brandon J. McCarthy, ECRO

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:          Ernest Martin, Jr., Esquire
                          HAYNES & BOONE LLP
                          2323 Victory Avenue, Suite 700
                          Dallas, Texas 75219

                          Arik Preis, Esquire
                          AKIN GUMP STRAUSS HAUER & FELD LLP
                          One Bryant Park
                          New York, New York 10036

For the US Trustee:       David L. Buchbinder, Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          J. Caleb Boggs Federal Building
                          844 King Street
                          Suite 2207, Lockbox 35
                          Wilmington, Delaware 19801


For AIG, on behalf of
Certain Insurers:         James Hallowell, Esquire
                          Mitchel Karlan, Esquire
                          GIBSON DUNN & CRUTCHER, LLP
                          200 Park Avenue
                          New York, New York 10166

For the Guam Committee:   Christina Arnone, Esquire
                          STINSON LLP
                          1201 Walnut Street, Suite 2900
                          Kansas City, Missouri 64106

For Lujan & Wolff
Claimants:                Delia Lujan Wolff, Esquire
                          LUJAN & WOLFF, LLP
                          238 Archbishop Flores Street
                          DNA Building, Suite 300
                          Hagatna, Guam

For Dumas & Vaughn
Claimants:                Gilion C. Dumas, Esquire
                          DUMAS & VAUGHN, LLC
                          3835 NE Hancock Street
                          Suite GLB
                          Portland, Oregon 97212

APPEARANCES (CONTINUED):

For the FCR:                    Kevin Guerke, Esquire
                               Robert Brady, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
                               Rodney Square
                               1000 North King Street
                               Wilmington, Delaware 19801

For Continental
Insurance and Columbia
Casualty:                      Laura McNally, Esquire
                               LOEB & LOEB LLP
                               321 North Clark Street, Suite 2300
                               Chicago, Illinois 60654

For Century Indemnity:         Tancred Schiavoni, Esquire
                               O'MELVENY & MYERS LLP
                               7 Times Square
                               New York, New York 10036

For the Committee of
Unsecured Creditors
For Archdiocese of
Agana:                         Edwin Caldie, Esquire
                               STINSON LLP
                               50 South Sixth Street, Suite 2600
                               Minneapolis, Minnesota 55402

For Hartford:                  James Ruggeri, Esquire
                               SHIPMAN & GOODWIN LLP
                               1875 K Street NW, Suite 600
                               Washington, DC 20006

For Tort Claimants:            Alan Kornfeld, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
                               10100 Santa Monica Blvd., 13th Floor
                               Los Angeles, California 90067

For Great American:            David Christian, Esquire
                               DAVID CHRISTIAN ATTORNEYS LLC
                               105 W. Madison Street, Suite 1400
                               Chicago, Illinois 60602

1 | APPEARANCES (CONTINUED):

2 | For Great American:        Konrad R. Krebs, Esquire
                               CLYDE & CO., LLP
3 |                           340 Mt. Kemble Avenue
                               Suite 300
4 |                           Morristown, New Jersey 07960

5 | For the TCJC:             Robert J. Malionek, Esquire
                               LATHAM & WATKINS, LLP
6 |                           1271 Avenue of the Americas
                               New York, New York 10020

7 |

8 | For the Zalkin Law Firm
    and Pfau Cochran Vertetis
9 | Amala, PLLC:              Robert J. Pfister, Esquire
                               KTBS LAW, LLP
10 |                          1801 Century Park East
                               26th Floor
11 |                          Los Angeles, California 90067

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                              INDEX

2    MOTIONS:

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6

7    WITNESSES CALLED
     BY THE DEBTORS:                                        PAGE
8

9        NANCY GUTZLER
         Direct examination by Mr. Ernest Martin           9
         Cross-examination by Mr. Christian                47
10       Cross-examination by Ms. Arnone                   80
         Cross-examination by Mr. Plevin                   155
11       Cross-examination by Mr. Schiavoni                160
         Cross-examination by Mr. Lee                      182
12       Cross-examination by Mr. Ruggeri                  182
         Redirect examination by Mr. Ernest Martin         189
13       Recross-examination by Mr. Christian              194
         Recross-examination by Ms. Arnone                 195
14

15       PAUL RYTTING
         Direct examination by Mr. Malionek               205
16       Cross-examination by Mr. Krebs                   225
         Cross-examination by Mr. Pfister                 231
17       Cross-examination by Ms. Dumas                   249
         Cross-examination by Mr. Buchbinder              257
18       Redirect examination by Mr. Malionek             260
         Recross examination by Mr. Pfister               263
19

20

21

22

23

24

25

1                                    EXHIBITS

2   EXHIBITS:                                              PAGE

3   JTX-2075                                                 26

4   JTX-2960                                                 45

5   JTX-2961                                                 45

6   JTX-1-280                                               160

7   JTX-3-1                                                 194

8

9   DECLARATIONS:                                          PAGE

10  1) Declaration of Paul Rytting                          46

11  2) Declaration of Nancy Gutzler                        204

12  Transcriptionists Certificate                          268

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 10:07 a.m.)

2           THE COURT:  Good morning.  This is Judge

3   Silverstein.  We're back on the Boy Scouts confirmation.

4           Mr. Abbott.

5           MR. ABBOTT:  Good morning, Your Honor.  Derek

6   Abbott of Morris Nichols for the debtors.

7           As discussed at the end of the day yesterday,

8   we're going to go right to Mr. Martin and Mr. Gutzler's

9   testimony.

10           THE COURT:  Thank you.

11           MR. ERNEST MARTIN:  Thank you, Your Honor.  Ernest

12   Martin for the debtors.

13           I think Your Honor knows we're going to proceed

14   with Ms. Gutzler.  Ms. Gutzler's direct testimony, as Your

15   Honor knows, was submitted by declaration, which is reflected

16   in Docket Number 9398.  We have some limited live testimony

17   from Ms. Gutzler, which I think will take approximately 45

18   minutes, just for your scheduling, Your Honor.

19           Nobody has challenged Ms. Gutzler's

20   qualifications.  And Your Honor may recall, she was the

21   subject of a motion in limine, a very limited issue.  So,

22   consistent with the agreement of the parties and this Court's

23   ruling, which is reflected in Docket Number 9411, Ms.

24   Gutzler's testimony will not be provided for the purpose of

25   determining insurance coverage issues, including the certain

1  insurers' rights and obligations under their insurance

2  policies.  I wanted to make sure that Mr. Christian heard

3  that and knew that as we proceed.

4          And in light of those developments, Your Honor, we

5  offer Ms. Gutzler as an expert to be offered for the matters

6  set forth in her declaration in her limited live testimony

7  hereafter.

8          MR. CHRISTIAN:  Your Honor, David Christian on

9  behalf of the certain insurers.

10          I appreciate Mr. Martin's remarks here at the

11  beginning.  And subject, both to Your Honor's order in limine

12  and your rulings yesterday, we have no objection.

13          THE COURT:  Thank you.

14          Ms. Gutzler will be accepted as an expert for the

15  matters set forth in her declaration and subject to the

16  discussions that we've had and rulings that have been made.

17          Ms. Gutzler --

18          THE WITNESS:  Yes.

19          THE COURT:  -- can you raise your right hand?  I

20  need to swear you in.

21      NANCY GUTZLER, WITNESS FOR THE DEBTORS, AFFIRMED

22          THE COURT:  Please state your --

23          MR. ERNEST MARTIN:  Good --

24          THE COURT:  -- full name --

25          MR. ERNEST MARTIN:  -- morning --

1          THE COURT:  -- and spell your last name for the

2  record.

3          THE WITNESS:  Nancy Ann Gutzler, my last name is

4  spelled G-u-t-z-l-e-r.

5          THE COURT:  Thank you.

6          Mr. Martin.

7                   DIRECT EXAMINATION

8  BY MR. ERNEST MARTIN:

9  Q     Good morning, Mr. Gutzler.

10         Very briefly, would you please describe for the Court

11  the scope of your engagement for the BSA?

12  A     Yes.  I was asked to do a number of things on behalf of

13  the BSA:

14         The first was to do an overview of the BSA local

15  council insurance coverage.

16         I was also asked to -- to look at the -- whether there

17  was a mechanism in place to substantially pay all claims.

18         I was also asked to look at the independent review

19  option and determine whether or not that changed my opinion.

20         And I was also asked to look at the various insurance

21  settlements that had been made, to determine whether they

22  were reasonable settlements.

23  Q     And did you address those areas in your declaration?

24  A     Yes, I did.

25  Q     All right.  And by the way, Ms. Gutzler, who actually

1 drafted your declaration?

2 A    The first draft of my declaration was prepared by

3 Haynes and Boone, and I was very active and spent hours

4 reviewing it and editing it, so it is my declaration.

5 Q    And did you approve it?

6 A    I did.

7 Q    So, Ms. Gutzler, I want to focus, not on all of your

8 opinions that are set forth in your declaration, but just a

9 couple of those.  And I would like to start with your

10 overview of the insurance programs that you reviewed.

11     Could you please explain to the Court what insurance

12 programs you did review?

13 A    Yes.  I did a review of the Boy Scouts national

14 insurance coverage, and I also did a review of the local

15 council insurance coverage.

16 Q    And so let's start with the BSA national insurance

17 program.  Just very generally, what did you consider in your

18 review of the BSA national insurance program?

19 A    Well, in order to review the national program, we

20 looked at a significant number of insurance policies, we did

21 some insurance archeology work.  But in order to prepare the

22 coverage, we looked at all those policies and put them into a

23 database.

24 Q    And so you used a word I want you to explain to the

25 Court.  You used the word "archeology."  What is "insurance

1 archeology"?

2 A    Well, insurance archeology is the process we go through

3 to --

4          UNIDENTIFIED:  (Indiscernible)

5 A    -- to locate as many insurance policies and

6 information, whether it's policies or evidence of policies.

7      To do that, we worked with the Boy Scouts to look at

8 their digital records and their hard copy records.  We

9 provided that on information on search terms to use and

10 things to look for.  So we gathered correspondence, meeting

11 minutes, actual policies, any sort of information we could

12 gather together to put together the policy information.

13 Q    So I'm going to reserve until later the consideration

14 of insurance independently to the local councils.  I want to

15 focus you on just the BSA national program.

16          MR. ERNEST MARTIN:  And for that, we've got our

17 trial technician here, Pete.  Would you please pull up

18 Demonstrative Exhibit 98 through 103?

19          And Your Honor, I think you should have that in

20 your materials.

21          THE COURT:  I do --

22          MR. ERNEST MARTIN:  And so --

23          THE COURT:  -- thank you.

24 BY MR. ERNEST MARTIN:

25 Q    And so, Ms. Gutzler, I draw your attention to DDX-98.

1  Could you please explain to us, what are we looking at here?

2  A    Yeah, DDX-98 is a graphical depiction of the insurance

3  policy information we have in our database for the Boy

4  Scouts.  It's -- it is along the bottom will show the years

5  or the policy years in question.  And up the lefthand side is

6  a scaling or how much insurance coverage is available in

7  those years.  There's a legend, as well.  And the legend

8  helps understand what the color-coding is and certain other

9  aspects.

10       So this particular page shows the Boy Scouts' insurance

11  coverage from 1935 to 1962.  If you notice, all of the boxes

12  are highlighted in an orange color.  That indicates that that

13  is already settled coverage.

14       Additionally, each of these policies has a little

15  marking of "PO," which indicates that these policies only

16  have a per occurrence limit and not an aggregate limit.

17  Q    So let me stop you there.

18       So can you explain to us, what does it mean when you

19  talk about a "per occurrence limit"?

20  A    Well, insurance policies have limits or amounts that

21  they will pay.  Some have only a per occurrence limit, and

22  others also have an aggregate limit.

23       So a per occurrence limit is the amount that an

24  insurance policy will pay for each and every occurrence.  So,

25  if there are multiple incidents or multiple occurrences that

1  happen in that policy period, that occurrence limit will be

2  paid for each one.

3       If the policy also has an aggregate limit, then that's

4  just the maximum total that policy will pay, maybe for

5  multiple occurrences added up, but there will be a maximum

6  once you reach the aggregate limit.

7  Q    And so this chart that we're looking at, DDX-98, shows

8  that the policies from 1935 to 1962 had no aggregate.  Is

9  that right?

10 A    Right.  Our indication of "PO" means only a per

11 occurrence limit.

12 Q    Okay.

13       UNIDENTIFIED:  (Indiscernible.)

14 Q    Thank you.

15       MR. ERNEST MARTIN:  Let's look at the next slide,

16 please.

17 BY MR. ERNEST MARTIN:

18 Q    So, Ms. Gutzler, I'm showing you DDX-99.  Could you

19 explain to the Court what we're looking at here?

20 A    Yep.  This is, again, a graphical depiction of the nine

21 -- of the coverage from 1962 to 1980.  Again, along the

22 primary or first layer of coverage, all of the policies have

23 only a per occurrence limit.  And in fact, the excess

24 policies, which start in 1969 -- so that's the first time you

25 see a policy above the initial layer of coverage -- all of

1  these policies also have only a per occurrence limit.

2       You also see the introduction of a green shading now.

3  The green indicates that these are policies that are

4  available, meaning they have not settled yet with the Boy

5  Scouts.

6  Q    So I notice that these policies also have the

7  designation "PO."  So, again, what does that mean?

8  A    That, again, means that these policies have a per

9  occurrence limit without an aggregate limit.

10 Q    And so that would apply, as well, to the excess

11 coverage, as well?

12 A    Yes.

13 Q    Okay.

14       MR. ERNEST MARTIN:  Let's go to the next chart,

15 please.

16 BY MR. ERNEST MARTIN:

17 Q    So you see here DDX-100, Ms. Gutzler.  What are we

18 looking at now?

19 A    This is a chart that shows the period of 1980 through

20 1990.

21       The -- well, sort of the things to point out

22 particularly on this chart is that, at that period of 1983,

23 at the end -- beginning of 1983 the policies along the

24 primary layer no longer have the "PO" in them, which means

25 they start to have aggregate limits.

1         Also, you'll notice the introduction of some hash

2   marks.  The hashing indicates that those policies have been

3   exhausted by pre-petition claims, so that would mean they're

4   no longer available.

5         The red is -- would indicate the coverage is insolvent.

6         And the gray indicates that the coverage has an

7   exclusion for sexual abuse claims.

8         In addition, starting in 1986, you notice some stars

9   that are showing up on the policies.  And that would be the

10  primary and the first excess layer.  Those stars indicate

11  that the policies have a matching deductible.

12  Q    Okay.  You used another term here that I want to make

13  sure that we all understand.  What is a "matching

14  deductible"?

15  A    A matching deductible is just a policy that -- where

16  the deductible amount of the policy matches the limit of the

17  policy.  So, essentially, the -- while the insurer might pay

18  the claim, the policy holder would have a deductible and

19  would reimburse the insurer dollar for dollar.

20  Q    I also notice the designation "PO" in -- some years

21  after 1986.  What does that mean to you?

22  A    So that would indicate, in 1986 and 1987, in the

23  primary layer, matching deductible, that those policies do

24  not have an aggregate limit.

25            MR. ERNEST MARTIN:  Okay.  Would you go to the

1 next slide, please.

2 BY MR. ERNEST MARTIN:

3 Q    So I'm showing you DDX-101, Ms. Gutzler.  What are we

4 looking at here?

5 A    DDX-101 is the period of 1990 through 2000.  Similar to

6 the last chart, we still have the matching deductibles along

7 the primary and first excess layer.  All of these policies

8 are listed without the designation "PO," which means we have

9 an aggregate limit.

10        You'll notice, again, some settled coverage, but

11 significantly more coverage now.  So, as the towers get

12 higher, that would indicate there's more available insurance

13 coverage.  So, for the first few years on the chart, you

14 know, in excess of 100 million, and by the late '90s, you

15 know, $150 million worth of coverage.

16 Q    So more green means more coverage?

17 A    More green means more available, unsettled coverage.

18        MR. ERNEST MARTIN:  Let's go to the next slide,

19 please.

20 BY MR. ERNEST MARTIN:

21 Q    So you're looking at DDX-102, Ms. Gutzler.  What are we

22 looking at here?

23 A    This is the period 2000 through 2008.  Again, very

24 similar to what we've been looking at, the tower years now or

25 the years of coverage are in the hundred-and-fifty-ish, just

1  less than 150 million.  Again, a lot of green, unsettled

2  insurance coverage.

3        MR. ERNEST MARTIN:  Okay.  Let's go to the last

4  slide, please.

5  BY MR. ERNEST MARTIN:

6  Q    What are we looking at here?  This is DDX-103.

7  A    So this is the last page of the Boy Scouts coverage.

8  It's from 2008 through 2020.  Same thing, at the primary

9  layer, we have the matching deductibles, though the "PO" has

10  shown back up.  So, beginning in 2008, again, those matching

11  deductibles at the primary layer have no aggregate limit.

12       What we notice is substantial coverage in all the

13  years, and most of it is green, unsettled coverage, in the

14  range of $200 million per year.

15  Q    So, Ms. Gutzler, after reviewing and considering the

16  BSA insurance program that spans 85 years, did -- do you have

17  any general observations about the BSA insurance program?

18  A    Sure.  Well, I think just some general things to point

19  out is, from the period 1935 up and through 1983, the

20  coverage is essentially all per occurrence based, meaning

21  non-aggregated, no aggregate limits on those policies.

22       Again, we had talked about the maximum deductible

23  program that started in 1986 and runs through 2018.

24       I guess the other -- you know, we looked at a lot of

25  green coverage, unsettled coverage.  And sometimes people

1  ask, okay, what's the value of the total coverage, can you

2  tell me how much is there in total.  And I would say that's

3  not really something you can easily do when you have so much

4  coverage that per occurrence based without an aggregate

5  because you wouldn't know the value of those policies until

6  all claims have hit and been paid.

7       But just starting in 1983, when aggregate limits were

8  introduced, I can -- I can tell you from the compilations of

9  coverage I've done that there's $3.6 billion worth of

10 available aggregated coverage just from that time period

11 forward.  And that takes out settled insurers, as well as

12 policies that are exhausted by pre-petition claims.

13 Q    And that's just focusing on the BSA national program.

14 Is that right?

15 A    That's right.

16 Q    Okay.  Now, based on your review of the BSA's national

17 insurance program, other than BSA, what other entities were

18 listed as insureds under the BSA insurance program?

19 A    Other than the BSA, we saw listings of insurance for

20 local councils, as well as chartered organizations, in

21 certain years.

22 Q    And can you be more specific in terms of those years,

23 where you found listed in the program the local councils?

24 A    Yes.  Well, beginning in 1975, we saw that local

25 councils were added to the policies as additional insureds by

1  endorsement.  And then, beginning -- and so that continued

2  from 1985 through nineteen -- I'm sorry.  Am I saying eighty?

3  Q    I think you said eighty.

4  A    I'm sorry.  Seventies.  Let me start that over, since I

5  got the wrong decade.

6       1975 is when the local councils were added to the

7  coverage, and that continued from '75 to '77.  And in '78,

8  they were added as named insureds, as well.  So all local

9  councils were covered under those policies.  There were also

10  some coverage prior to 1975, where local councils opted in to

11  certain policies, but again, all local councils covered

12  starting in 1975.

13  Q    And other than local councils being listed as insureds

14  during the program issued to the BSA national, were there

15  other entities listed as insureds?

16  A    Yes.  There were chartered organizations who became

17  listed as insured under the policies starting in 1976.

18       MR. ERNEST MARTIN:  You can take that down.  Thank

19  you so much.

20  BY MR. ERNEST MARTIN:

21  Q    Let's turn now, Ms. Gutzler, to insurance offered

22  separately to the local councils.  What I mean by that is

23  separate and apart from the BSA national program.

24       How did you become familiar with what insurance was

25  being offered to the local councils, again, independent from

1  BSA's national insurance program?

2  A      Again, through our policy archeology work.  We worked

3  directly with local councils to help gather as much policy

4  evidence, policies and evidence of policies that they had.

5  Again, we -- we suggested search terms, we helped them look

6  through their documents.  But we gathered all of the

7  information we could from the local councils and compiled

8  that together into a database.

9  Q    And what were you able to find as you did that exercise

10  in looking for insurance and policies issued independently to

11  the local councils?

12  A     Well, we found a significant number of independent

13  local council policies, so dating back into the '40s, I think

14  it is, where we found policies that local councils had

15  procured on their own that would cover their liabilities.

16         We also found certain -- I guess I'll call them "local

17  council programs" or evidence of offerings of coverage to

18  local councils.  We found that certain updated Boy Scouts

19  policies actually covered local councils through a program

20  called the "scout blanket liability program."  That started

21  in the 1960s.

22         So we essentially found a variety of different

23  programs, in addition to the fact that local councils are

24  covered on all Boy Scouts policies in 1975.

25  Q      And so, generally, were you able to identify certain

1  insurers that offered that kind of program or those kinds of

2  policies to the local councils, again, independent from the

3  national program?

4  A    Yeah.  There were some Hartford policies in the early

5  '70s, where certain local councils were able to opt into

6  those policies.

7       We also found some evidence of some AIG program

8  through -- well, with R.F. Lyons, which was a national

9  broker.  And we found some information on a program there

10  that indicated coverage was available for local councils.

11  And we found listings of those policies and the local

12  councils that went along with them, as well.

13  Q    And so I want to camp a little bit more on what KCIC

14  and yourself did, in terms of actually locating those

15  policies.

16       You talked about organizing a large scale search.  Can

17  you be more specific, in terms of what was done?

18  A    Yes.  Well, again, we started by asking the Boy Scouts

19  to send, you know, all information they had.  And that,

20  again, included policies and all kinds of other

21  correspondence and notes.  We reached out to all local

22  councils for the same.

23       And then we undertook a very large scale policy review,

24  where we reviewed all of the policy evidence that we had,

25  whether it was policies or just information about a policy.

1  And we did -- we basically compiled that into a database, so

2  that we could analyze the full profile of insurance.

3         So there were certain assumptions we made when we had

4  evidence of policies, but not the actual policy itself.

5  But -- but in large part, we had policy information for --

6  for many of the policies.

7  Q    And do you know if any of the policy information was

8  provided by insurers?

9  A    Yes.  Yes.  Through counsel, we reached out to the

10 insurers, as well.  And certain insurers did provide coverage

11 information to us, as well, and we incorporated that.

12 Q    So, Ms. Gutzler, based on your review of those policies

13 that you found providing insurance to the local councils,

14 what other entities did you come to learn were listed as

15 insureds under those local calls -- local council insurance

16 policies?

17 A    Under certain of the local council policies, we were

18 also able to identify that chartered organizations were

19 insured on some of them.

20 Q    Okay.  Thank you.

21        I want to turn your attention now to the allocation

22 analysis that you performed.  I'm not going to ask you to

23 repeat all of your opinions that are stated in your

24 declaration on allocation analysis.

25        But generally speaking, what work did you have to do to

1  arrive at your allocation analysis?

2  A     Well, an allocation -- I guess just a step back.  An

3  allocation is the process of taking all of the insurance

4  claims -- so the individual, underlying claims -- and

5  applying them to the insurance coverage information.  And to

6  do that, you need an allocation methodology.

7        So we have to have claims, we have to have policies,

8  and we have to have a methodology.  But putting those three

9  things together, we're able to model what would happen under

10  the assumptions we used if those claims were allocated to the

11  insurance policies.

12  Q     And so what information do you need, in order to

13  perform an allocation analysis?

14  A     Well, on the coverage side, we need to have specifics

15  about the policies.  And the main things that are necessary

16  in order to perform an allocation:

17        We have to have the limits, so we need to know whether

18  there's a per occurrence limit and what amount is, and the

19  same with the aggregate, whether there is one and what those

20  limits would be.

21        We need to have the start and end dates of the policies

22  that we know that -- when they were in effect.

23        We would have to know whether those policies contained

24  exclusions to exclude abuse claims.

25        We would need to know who the named insureds -- or

1  who's insured under each of the policies.

2       I think that's mainly what we -- limits, dates,

3  insureds, exclusions on the policy side.

4  Q    And on the liability side, what information are you

5  looking at?

6  A    So, for the liability side, we need to have the

7  underlying claims.  So -- and with each of those claims, we

8  need to have a liability amount, so what's the claim worth.

9       We need to know the date that the claim would be

10 allocated to coverage.  In the work that we've did -- done,

11 that's the first date of abuse.

12      We also need to know if there's local councils

13 associated with those claims, to be able to determine whether

14 there's also local council policies that would pay for those

15 claims.

16 Q    Okay.  And --

17 A    And that's it.

18 Q    And Ms. Gutzler, are you offering an opinion that this

19 is the insurance -- insurers' actual liability?

20 A    No, I'm not.  It -- it is a model using, like I said,

21 the assumptions we had regarding coverage claims and

22 allocation methodology.

23 Q    So I'd like to show you JTX-2075.

24      MR. ERNEST MARTIN:  Pete, if you could put that on

25 the screen, please.

1  BY MR. ERNEST MARTIN:

2  Q     We're looking at a lot of information in this document.

3  Can you tell us what this is, please?

4  A     Sure.  And -- yeah.

5        So this is a compilation of the -- all the policy

6  information that we've been discussing this morning.  So it

7  includes -- it's a listing.  Each line indicates a separate

8  policy, or at least policy period.

9        So it would -- this is -- this is basically a

10 compilation of our work.  It describes whether it's local or

11 BSA program coverage, who are the local councils, the

12 insurers involved, the policy numbers, the start and end

13 date.

14       And then we have a variety of information about the

15 limits:

16       Whether they're first primary layer or the next layer;

17       Whether they have aggregate limits and what those

18 limits are.

19       We -- we include the prior exhaustion, to the extent

20 there is any.

21       Then we have a coverage category that we use to -- to

22 categorize things, whether there's solvent coverage,

23 insolvent coverage, matching deductible policies.

24       We have a column for whether the charters are insured

25 or not insured or unknown at this time;

 1       And other just identifying fields, how -- which local

 2   counsel are covered.  Is it all or specific policy types.

 3       Then we have some information about what kind of

 4   evidence we had to -- to make -- to get that information, so

 5   whether it was a specific policy or whether we had something

 6   else, whether it was a certificate of insurance or we used an

 7   assumption of some sort.

 8       And then the -- the last column really is just whether

 9   or not we included it in our allocation.

10   Q    And what information -- strike that.

11       Did you use this information in performing our

12   allocation analysis?

13   A    Yes, we did.

14            MR. ERNEST MARTIN:  Okay.  Your Honor, I'd move to

15   admit Exhibit JTX-2075 into evidence.

16            MR. CHRISTIAN:  Your Honor, David Christian for

17   certain insurers.

18            Again, subject to the order in limine and Your

19   Honor's determinations yesterday, we have no objection.

20            THE COURT:  Thank you.  It's admitted.

21       (JTX-2075 received in evidence)

22   BY MR. ERNEST MARTIN:

23   Q    Now (indiscernible).

24            UNIDENTIFIED:  (Indiscernible.)

25            THE COURT:  Excuse me.  This is a reminder that

1  everyone mute their audio.  Thank you.

2          Mr. Martin.

3          MR. ERNEST MARTIN:  Thank you, Your Honor.

4  BY MR. ERNEST MARTIN:

5  Q    Ms. Gutzler, in performing an allocation, I think you

6  had mentioned that it requires certain assumptions.  Do you

7  remember that?

8  A    Yes.

9  Q    What assumptions did you make in performing your

10 allocation analysis?

11 A    Well, we made some factual assumptions related to

12 insurance coverage.  So, where we had evidence of -- some

13 evidence of coverage, but not all of the information, we

14 needed to perform an allocation, we made certain factual

15 assumptions.

16         And then we made some other allocation methodology

17 assumptions that would be more legal assumptions, that we

18 worked with counsel to prepare.

19 Q    So I think you talked a little bit about the

20 assumptions regarding coverage or policies.  Anything further

21 to add to that concerning that assumption?

22 A    Yeah.  I mean, by and large, we had some -- the most

23 evidence we had was actual policies, or pretty close to

24 policies, declaration pages, things like that.  Some

25 assumptions we had to make.

1       For example, something like we had a policy, a three-

2   year policy, let's say, from 1965 to 1968.  And we had the

3   insurer -- we had the policy, so we knew the insurer, the

4   limits, all of the details we would need.  And that policy

5   indicated it was a renewal of a policy number.  But we didn't

6   have any other evidence of that particular policy.

7       So that would be an example of a factual assumption,

8   where we would have assumed that the renewal was the same --

9   or the policy that was being renewed was the same as the one

10  that we had in evidence.

11  Q    And given your experience and your review of the policy

12  information, did you consider those to be reasonable

13  assumptions to make?

14  A    Yes.  I -- I think, for modeling, those are very

15  reasonable assumptions.

16  Q    Let's talk about the other assumptions that you made.

17  I think you said there were some legal assumptions.  Would

18  you please describe what those assumptions were?

19  A    Yeah.  We made some legal assumptions related to the

20  trigger of coverage, the number of occurrences for the

21  claims.

22      We also made some legal assumptions regarding certain

23  of the matching deductible policies and whether they had

24  aggregate limits that applied.

25      And we also made an assumption regarding joint and

1 | several liability.

2 | Q    So I want to camp for a moment on your assumptions

3 | regarding "trigger" and "occurrence."  Those are terms that

4 | maybe a layperson may not understand.

5 |     So could you please explain to us what you mean by

6 | "trigger" and what you mean by "occurrence" --

7 | A    Yes.

8 | Q    -- and the assumptions regarding those?

9 | A    Sure.

10 |     So, when we're talking about trigger, we're talking

11 | about the event -- of the event that occurs which would

12 | trigger a policy, so the event that occurs that would make a

13 | particular policy liable to pay for a claim.

14 |     In this instance, the trigger that we used was the date

15 | of first abuse.  And that was the single date trigger we used

16 | for all claims.

17 |     For the occurrence, an occurrence is sort of the

18 | grouping that you might group claims together, to determine

19 | the -- how many times a policy would pay.

20 |     So, in this instance, in this case, we used the

21 | survivor occurrence, so that each survivor was grouped

22 | together to be a single insurance for application to the

23 | insurance policies.

24 | Q    And so, on trigger, were there other assumptions that

25 | you could have made to use a different approach on trigger?

1    A      Yeah, there's -- there's other approaches to trigger.

2    There's a continuous trigger approach that could have been

3    used, whereas that would be from the first date -- let's say

4    the first date of abuse through an end date.  That might be

5    the date of -- of filing a claim, it might be the date -- the

6    last date of abuse.  But it would be continuous, meaning all

7    policies in that time frame would be triggered.

8    Q      And with respect to the occurrence, the -- what you

9    called the "survivor approach," are there alternative

10   approaches or assumptions that you could have made with

11   respect to occurrence?

12   A      Yes.  We could have done each incident of abuse was an

13   occurrence.  So, if someone was abused five times, there

14   might be five separate occurrences there.

15          We also could have said that abuse -- Boy Scouts abuse

16   is one occurrence across the board, that's the "occurrence"

17   definition.

18   Q      Okay.  And so -- but you chose to apply the first abuse

19   on trigger and the survivor approach on occurrence.

20          Would you please explain to the Court why you believed

21   that those assumptions were reasonable to make?

22   A      Yes.  So we looked at a variety of different things to

23   determine whether we thought those were reasonable legal

24   assumptions:

25          We had the first encounter agreement, which was an

1  agreement between INA, Century, and the Boy Scouts in 1996.

2  And that agreement indicated that INA, Century, and the Boy

3  Scouts would -- would adopt a first encounter trigger for

4  claims.

5      We also looked at some other letters I've been able to

6  review from insurers subsequent to that agreement that state

7  that they agree to use a first encounter trigger, as well as

8  a survivor occurrence approach.

9      Additionally, we received some information from the Boy

10  Scouts, it was called the "risk connect system."  The risk

11  connect system is essentially their database of historic pre-

12  petition claims.  In looking at that information, we were

13  able to determine that it appeared at least that each

14  survivor was grouped together as a single occurrence and

15  allocated to a single date.

16  Q    So let me show you a document.

17      MR. ERNEST MARTIN:  Pete, if you could bring up

18  BSA Plan Bates Number 00510023.

19  BY MR. ERNEST MARTIN:

20  Q    And Ms. Gutzler, what are we looking at here?

21  A    This is a letter.  The first page after this would be

22  the first encounter agreement.  So it's the agreement between

23  Century, INA, and the Boy Scouts.

24  Q    Okay.  So let's just take a look at that.

25      This is an agreement.  Who is it between?

1  A     The Boy Scouts, along with INA and Century Indemnity.

2  Q     Okay.  And what did you understand this agreement to

3  be?

4  A     This is the -- what -- what I've been calling it, the

5  "first encounter agreement."  It has a section within the

6  agreement that says that they will consider the date of first

7  abuse or the first encounter as the single trigger date.

8  Q     Okay.  And where are you looking, in terms of the

9  application of that first encounter?

10  A     So Paragraph 7 reads:

11         "The 'first encounter rule' shall mean that, for

12  purposes of determining coverage under any policy, the date

13  of occurrence pertaining to any sexual molestation claim

14  shall be the date when the first act of sexual molestation

15  took place, even if additional acts of sexual molestation or

16  additional personal injuries arising therefrom also occurred

17  in subsequent policy periods.  And all damages arising out of

18  such additional acts of sexual molestation or additional

19  personal injuries shall be deemed to have been occurred" --

20  "incurred during the policy year when the first act of sexual

21  molestation took place."

22  Q     Okay.  And so --

23         MR. ERNEST MARTIN:  You can take that down.  Thank

24  you.  I appreciate that.

25  BY MR. ERNEST MARTIN:

1  Q     So this is something you considered in arriving at the

2  conclusion that applying a first abuse trigger was a

3  reasonable assumption?

4  A     (Indiscernible)

5           MR. ERNEST MARTIN:  And Pete, would you please put

6  up JTX-2958, please?

7           (Pause)

8  BY MR. ERNEST MARTIN:

9  Q     Ms. Gutzler, what are we looking at here?

10  A     This is a letter from St. Paul Surplus Lines to the

11  Director of Insurance and Risk Management with the Boy

12  Scouts.  In this letter, there's a section where she -- she

13  essentially says that they agree with the first encounter

14  approach, as well -- I think just the first encounter

15  approach.  So:

16           "Please let this serve to confirm St. Paul Surplus

17  Lines' position regarding trigger of coverage for sexual

18  abuse claims.  Then, accordingly, all past and future sexual

19  abuse claims will be recognized as triggering coverage under

20  the only" -- "the one policy in which first touch occurred."

21  Q     Okay.  And this is something you reviewed in connection

22  with your allocation analysis?

23  A     Yes, I've reviewed these.

24           MR. ERNEST MARTIN:  Go to the next page, please.

25  BY MR. ERNEST MARTIN:

1    Q      What are we looking at here?

2    A      This is a letter from CNA Insurance Company, to Marsh

3    McLennan, which is their broker.  And it also reads that:

4           "Each such individual molested/abused shall

5    constitute a separate occurrence as it respects the per

6    occurrence limit, and the coverage trigger shall be

7    recognized as the date of first occurrence or first

8    encounter."

9           So that would indicate, again, an acceptance of the

10   first encounter trigger, as well as the survivor occurrence.

11          MR. ERNEST MARTIN:  And the next page, please.

12   Q      What about this one here?

13   A      This is a fax cover sheet.  It describes a phone

14   conversation between Zurich, and again, I believe it's Marsh:

15          "Per our phone conversation with respects to the

16   child molestation afforded by our policy, each individual

17   molested/abused child shall constitute a separate occurrence

18   as respects per the per occurrence limit, and the coverage

19   treatment shall be recognized as the date of first incurrence

20   or first encounter."

21   Q      What about the next page?

22   A      Firemen's Fund, a Firemen's Fund letter that, again,

23   reads similarly to the others.  I can read it if you want,

24   but it, again, accepts both the first encounter --

25   Q      No, no --

1 | A      -- trigger --

2 | Q     No need to.

3 |            MR. ERNEST MARTIN:  Let's go on to the next one,

4 | please.  The next page, please.

5 | BY MR. ERNEST MARTIN:

6 | Q     This one is a little hard to read.  But what do you

7 | make of this?

8 | A     Again, this is another letter from Firemen's Fund.  And

9 | in reading this letter, again, they accept the first

10 | encounter trigger, as well as a "survivor occurrence"

11 | definition.

12 |            MR. ERNEST MARTIN:  Okay.  Next letter.

13 | A     This is a letter from the Chubb Group of Insurance

14 | Companies.  In reading through this letter, again, I see the

15 | same acceptance of the first encounter trigger, as well as

16 | the survivor occurrence approach.

17 |            MR. ERNEST MARTIN:  And the last page, please.

18 | A     And the last page is Great American and same.  This is

19 | on behalf of the Great American Excess and Surplus Insurance

20 | Company.  And it also reads that they accept the first

21 | encounter and -- and survivor occurrence trigger.

22 | Q     And Ms. Gutzler, upon reviewing these letters, what did

23 | you arrive at?

24 | A     Well, after reviewing these letters along with the

25 | first encounter agreement, I arrived at the conclusion that

1  the assumption to use a first encounter trigger and a single

2  -- survivor occurrence were reasonable assumptions.

3           MR. ERNEST MARTIN:  Okay.  Thank you, Pete.  You

4  can remove that from the screen.

5  BY MR. ERNEST MARTIN:

6  Q     Let's talk about the aggregate assumption that you said

7  that you made.  Can you explain to the Court what that

8  assumption was, please?

9  A     Yeah.  There -- I understand there's a dispute between

10 parties as to whether or not the policies with the matching

11 deductible for the period from 1988 through 2008 have an

12 aggregate limit that applies.  So that -- there's a dispute

13 regarding that.  The assumption that we used was that an

14 aggregate limit does apply to those policies.

15 Q     Okay.  And just very briefly, what do you understand

16 this dispute to be?

17 A     Well, my understanding is that there's a dispute as to

18 whether or not that there is an aggregate with those

19 policies.  I think the dispute also involves, to the extent

20 that Boy Scouts or the policyholder were unable to pay the

21 deductible, whether that would revert back to the insurer and

22 whether it would have a deductible in that instance -- I'm

23 sorry -- an aggregate.

24 Q     And so you applied an aggregate in your assumptions.

25 Is that correct?

1  A      That's right.

2  Q      An aggregate limit.

3  A      An aggregate limit.

4  Q      Would you explain why you considered making that

5  assumption to be reasonable?

6  A      Well, yeah.  There were settlements reached with

7  certain insurance carriers, including Zurich Insurance

8  Companies and Clarendon and just based on where those

9  policies are in the Boy Scouts coverage, meaning they sit

10  above those matching deductible policies.

11  Q      Would it help to see the chart again, so we can --

12  A      That would --

13  Q      -- see what --

14  A      -- be great.

15  Q      -- it is?

16         MR. ERNEST MARTIN:  Pete, could you pull up again

17  Demonstrative Exhibit DDX-102, please?

18  BY MR. ERNEST MARTIN:

19  Q      Okay.  And so please continue.

20  A      Sure.

21         So, just focusing on the first year, the 2000 year, the

22  policy that is highlighted right now is an American Zurich,

23  so that's a Zurich policy.  It is settled.  But it's a policy

24  whose limits are $12 million of limits in excess of $7

25  million.  So that means that that policy would be required to

1  pay once the liabilities exceeded $7 million.

2      So, again, the matching deductible policies are below

3  them.  And the primary policies, the one we're talking about,

4  if that policy did not have an aggregate limit, then each and

5  every claim that hit that coverage year -- so when the first

6  encounter was in that year, each claim would first be

7  allocated to that Liberty Policy because it would, un-

8  aggregated, have a per occurrence limit.  And -- and then

9  only amounts in excess of a million dollars per claim would

10 move up the tower year to additional policies.  If that

11 policy had an aggregate limit, the Liberty policy, then, once

12 it pays a million dollars on any one claim or multiple claims

13 combined together, you would move up the tower year.

14 Q    And so what did you learn about the Zurich and

15 Clarendon settlements that led you to believe that your

16 assumption in applying an aggregate limit was reasonable?

17 A    With the allocation modeling we did, where, again, we

18 did assume an aggregate limit for those policies, the Zurich

19 Companies were allocated in the range of sixty-five, $70

20 million under my modeling.  If I were to run my modeling with

21 those primary policies not having an aggregate limit, Zurich

22 was allocated about a half a million dollars of liability.

23     Zurich settled with the Boy Scouts for fifty-two and a

24 half million dollars.  So, for my, you know, sort of looking

25 at that, it certainly seemed to me that Zurich -- and then

1  Clarendon is sort of the exact same situation -- certainly

2  must have had some thought process as to those policies

3  having an aggregate limit if they were making a settlement of

4  that value.

5  Q    And so, based on that, you believed applying an

6  aggregate limit was a reasonable assumption.

7          MR. ERNEST MARTIN:  Okay.  Thank you, Pete.  You

8  can remove that from the screen.

9  BY MR. ERNEST MARTIN:

10  Q    The last assumption, Ms. Gutzler, was a joint and

11  several liability assumption.  Can you explain what that is

12  and why you applied that assumption?

13  A    Yes.  So the -- the last assumption that we used was

14  that the -- that joint and several liability applied.  What

15  that means to me is that, when there are multiple parties who

16  are potentially liable for a claim, that each of them is

17  jointly and severally liable, meaning any one of them could

18  be liable for the full claim.

19      I spoke with Bruce Griggs, who's the national

20  coordinating counsel for the Boy Scouts.  And when -- in

21  speaking with Mr. Griggs, he explained to me that -- that the

22  joint and several liability was something the Boy Scouts had

23  followed for his many years of -- of doing the work that he

24  did in settling the claims.  He also indicated to me that,

25  from his understanding, that most states follow a joint and

1  several liability for abuse claims.

2  Q    And so, based on your information from Mr. Griggs, did

3  you believe the assumption that you made concerning joint and

4  several liability was a reasonable assumption?

5  A    Yes.

6  Q    Okay.  I want to turn your attention now, Ms. Gutzler,

7  to your allocation analysis and -- and you opinions

8  concerning whether there is a mechanism for payment of all or

9  substantially all of the claims.

10      What conclusions did you reach regarding whether there

11  exists a mechanism to pay all or substantially all of the

12  abuse claims?

13  A    Well, in -- in reviewing the modeling that we did and

14  all of the available insurance coverage, as well as all of

15  the settlements that have been entered into to date, taking

16  all that into account, I did determine there is a mechanism

17  to pay all or substantially all claimants.

18      How we get there, like I said, there is already a

19  substantial amount of money contributed to the settlement

20  trust, in excess of $2.7 billion.

21      Additionally, there is a substantial amount of

22  insurance coverage that's not yet settled.  And in doing the

23  analysis we did, we were able to determine, even after

24  allocation, there's $4.2 billion of remaining limits between

25  Boy Scouts and local council coverage that has not yet been

1  settled.

2       Also in our allocation model, there's a significant

3  amount allocated to non-settled insurers for the claims that

4  we did allocate.

5       In addition to that, there are other organizations,

6  charter organizations, that may, at some point, reach a

7  settlement and contribute to the trust.

8       So, taking all those things into account, along with

9  the independent review option part -- portion of the TDP, I

10 -- I determined there was a mechanism to pay or substantially

11 pay all claims.

12 Q    So you mentioned the independent review option.  Let's

13 focus on that just for a moment.

14      Did you review the independent review option that's

15 included in the proposed trust distribution procedures?

16 A    Yes, I did.

17 Q    Okay.  What is your understanding of what the

18 independent review option is?

19 A    Well, at a high level, it is a -- it's a process.  It

20 gives claimants the ability to have their claim reviewed

21 independently, so that -- and rather than accepting the TDP

22 award, if they think their claim is worth more than the

23 maximum for the TDP, they can have an independent review and

24 potentially be awarded a multiple of -- of that amount.

25 Q    And based on your understanding, how are those amounts

1  -- through the independent review option, how are they

2  funded?

3  A    Those amounts would be funded by the excess -- the

4  excess fund, which is, essentially, funded by non-settled

5  insurance.

6  Q    And do you have an opinion on how the independent

7  review option might affect the insurance?

8  A    Yeah.  I think that the independent review option

9  really gives claimants a more direct way of having their

10  claim reviewed.  Claimants always could have opted out into

11  the tort system to have their claim reviewed or -- or

12  adjudicated.  But the -- the independent review option gives

13  them a more direct way to do that.

14      I think then that, along with, you know, self-

15  selection, meaning -- I think Dr. Bates talked about this,

16  too -- claims will look at the insurance coverage and self-

17  select, based on if there's a -- if their claim is in a year

18  with a lot of coverage.  I think that puts additional

19  pressure on the non-settling insurers to reach a settlement

20  with the Boy Scouts.

21  Q    And does this independent review option change your

22  opinion with regard to the mechanism for payment of all or

23  substantially all of the claims?

24  A    No.  I -- I still -- I still believe there's a

25  mechanism to pay all or substantially all claims.

```
 1   Q     Okay.  The last thing I want to talk to you about, Ms.
 2   Gutzler, is:  Are you familiar with the Class 9 notice?
 3   A     Yes.
 4   Q     Okay.  What do you understand that to be?
 5   A     I'm not sure I know the legal terms.  But it was a
 6   notice related to non -- to -- I have to think of the word --
 7   non --
 8   Q     Indirect --
 9   A     Indirect --
10   Q     -- abuse claims?
11   A     -- abuse claims.  I'm sorry.
12   Q     Okay.
13   A     Indirect abuse claims.
14   Q     And so did KCIC prepare any materials for the Class 9
15   notice?
16   A     We did.
17   Q     Okay.  What materials did they prepare?
18               UNIDENTIFIED:  (Indiscernible)
19   A     In connection with that Class 9 notice, we prepared an
20   insurance coverage chart.
21               MR. ERNEST MARTIN:  Okay.  Could you -- Pete,
22   could you please show JTX-2960, please?
23   BY MR. ERNEST MARTIN:
24   Q     Is what is reflected in JTX-2960 the materials that
25   were prepared by KCIC for the Class 9 notice?
```

1   A      Yes.

2           MR. ERNEST MARTIN:  Okay.  And could you also pull

3   up JTX-2961, please?

4   BY MR. ERNEST MARTIN:

5   Q      Okay.  What are we looking at here, Ms. Gutzler?

6   A      2961 is a listing of all local council hearing, and

7   it's in -- and apparently in -- or into two different tabs.

8   So there's a settled tab, which shows the local council

9   coverage for insurers that have settled with the Boy Scouts,

10  and then there's an unsettled tab, which shows the local

11  council policies that have not yet settled with the Boy

12  Scouts.

13  Q      Okay.  And were these materials that were prepared for

14  the Class 9 notice?

15  A      Yes.

16  Q      And who were they provided to?

17  A      Well, we provided them to counsel, and I believe then

18  counsel loaded -- or put those on Omni.

19  Q      Okay.  And that would be both JTX-2960, the coverage

20  charts, as well as this document.

21  A      That's right..

22          MR. ERNEST MARTIN:  Okay.  Your Honor, we move

23  JTX-2960 and JTX-2961 into evidence.

24          MR. CHRISTIAN:  Your Honor, objection.  These are

25  materials that the witness relied upon.  Under Rule 703, they

1  don't come into evidence; her opinion comes into evidence.

2          MR. ERNEST MARTIN:  Your Honor, we're not

3  introducing these for the truth of the matter asserted, just

4  simply to demonstrate that these were provided to be provided

5  in connection with the Class 9 notice, that's all.

6          MR. CHRISTIAN:  The witness has testified to that.

7          MR. ERNEST MARTIN:  But it's important to see what

8  -- exactly what was provided.

9          THE COURT:  Yeah, I'm going to overrule this

10  objection.  This is factual as to what was provided in

11  connection with the Class 9 notice.  So they're admitted.

12      (JTX-2960 received in evidence)

13      (JTX-2961 received in evidence)

14          MR. ERNEST MARTIN:  Thank you, Your Honor.

15          Your Honor, that is all the questions that I have

16  for this witness.  And I would, just for purposes of making

17  sure that we get -- we have the exhibits -- and I move that

18  all of the exhibits that are attached to Ms. Gutzler's

19  declaration be admitted into evidence, subject to those

20  documents that were raised by Mr. Christian, and which we

21  already indicated we would just use as 703.  But the rest of

22  them that were not objected to, we ask that those be admitted

23  into evidence.

24          MR. CHRISTIAN:  Your Honor, David Christian for

25  certain insurers.

1            To the extent there are documents that weren't

2   objected to, we have no objection, obviously.  But as I

3   understand it, the Court has ruled with respect to our

4   objections yesterday.  And I don't think Mr. Martin is

5   seeking the introduction of any of those exhibits.  But just

6   for the sake of clarity, we would continue to object to those

7   things we objected to.

8            MR. ERNEST MARTIN:  That's correct, Your Honor.

9   I'm just referring to those that were not objected to, to

10  make sure that those are -- those get into evidence.

11           THE COURT:  Okay.  I will admit those.  And what I

12  would like with respect to that is an agreed upon list, so

13  that I know which ones are in.

14           MR. CHRISTIAN:  Very well.  Will do, Your Honor.

15       (Certain Gutzler Declaration Exhibits received in

16  evidence)

17           MR. ERNEST MARTIN:  Ms. Gutzler is available now,

18  Your Honor, for cross-examination.

19           THE COURT:  Thank you.

20           MR. CHRISTIAN:  Your Honor --

21           THE COURT:  Cross-examination.

22           MR. CHRISTIAN:  -- David Christian for the certain

23  insurers.

24            I'm prepared to proceed right now; or if, the

25  Court or the witness needs a break, I'm happy to accommodate

1  that, as well.

2           THE COURT:  Ms. Gutzler, do you need a break?

3           THE WITNESS:  No, I'm good.

4           THE COURT:  Okay.  Let's good.

5           MR. CHRISTIAN:  Okay.  Very good.  Thank you, Your

6  Honor.  And thank you, Ms. Gutzler.

7                      CROSS-EXAMINATION

8  BY MR. CHRISTIAN:

9  Q    Again, my name is David Christian.  I represent a

10 number of excess insurance companies, and I'm here to cross-

11 examine you on behalf of the certain insurers who object to

12 the plan.  You and I met at your deposition, so it's nice to

13 see you again.

14 A    You, too.

15 Q    Thank you.

16      Do you have --

17           MR. CHRISTIAN:  And Your Honor, do you have the

18 materials that we submitted for Ms. Gutzler's cross-

19 examination?  You should have a binder from us.

20 BY MR. CHRISTIAN:

21 Q    And Ms. Gutzler, I'm going to start with what is Tab 1

22 in the binder delivered to the Court, and this is your

23 declaration.  Do you have that in front of you?

24 A    I do.

25           MR. CHRISTIAN:  And Your Honor, you have it, it

1  looks like?

2          THE COURT:  I do.

3          MR. CHRISTIAN:  Good.  Thank you.

4  BY MR. CHRISTIAN:

5  Q    Is the document behind Tab 1 your declaration?

6  A    Yes.

7  Q    Okay.

8  A    Yes, it is.

9  Q    And I think you testified on direct examination that

10  Haynes and Boone helped you prepare this declaration.  Is

11  that right?

12  A    Yes, they helped draft it.

13  Q    Okay.  And that's Mr. Martin and Mr. Azer, right?

14  A    Correct.  And potentially some other associates, as

15  well.

16  Q    Okay.  Very good.

17          And you understand that Haynes and Boone is the

18  debtors' insurance recovery counsel?

19  A    Yes, I do.

20  Q    So, in other words, it's their job to go get insurance

21  for the claims in this case, right?

22  A    Yes, I think, as coverage counsel, that's -- that's

23  correct.

24  Q    Okay.  Great.

25          Can I ask you to turn to Page 3?  And I want to direct

1  your attention to Footnote 4.

2          MR. CHRISTIAN:  And Mr. Spalding (phonetic), if we

3  could put that up on the screen, please?

4  BY MR. CHRISTIAN:

5  Q    Are you there, Ms. Gutzler?

6  A    Yes.

7  Q    Okay.

8          MR. CHRISTIAN:  Can you highlight Footnote 3 -- or

9  pardon me.  Bear with me one second.

10        (Pause)

11         MR. CHRISTIAN:  I think we're -- I'm looking at

12  Document Number 9398 on the docket.  Is that what we have,

13  Mr. Spalding?

14         THE COURT:  Uh-huh.

15  And there should be a Footnote 4 on Page 3 that begins "the

16  views expressed.

17  BY MR. CHRISTIAN:

18  Q    And there should be a Footnote 4 on Page 3 that begins,

19  "The views expressed."  Do you see that?

20  A    Yes.

21  Q    And I'm going to read it to you, and you tell me if

22  I've read it correctly.  Okay?

23  A    Uh-huh.

24  Q    "The views expressed herein, including those regarding

25  the BSA and local council insurance programs, the

1  appropriateness of any assumptions used in this report or any

2  other matter are my own and do not necessarily represent the

3  views of any other party to this case."

4        Do you see that?

5  A    Yes.

6  Q    Okay.  When you say your "own views" and not "any other

7  party," what you mean by "other" is other than the Boy Scouts

8  of America, the debtors in this case, right?

9  A    So I think it's -- it's -- these are my opinions, the

10 opinions that are in here are opinions that I have reached.

11 Q    On behalf of the Boy Scouts.

12 A    On behalf of the Boy Scouts.

13 Q    So when you say "any other party," you mean other than

14 the Boy Scouts, right?

15 A    Yes.

16 Q    Okay.  Thank you.

17       Turn to Footnote 57 on Page 12, if you would.

18 A    Okay.

19 Q    And let me read this, and you tell me if I read it

20 correctly.

21        "Allocation modeling is used to estimate the value

22 of an insurance program based on a set of assumptions and a

23 certain liability amount.  By apportioning the underlying

24 liability; i.e, underlying claims data, to policies according

25 to their terms and applicable law, it is possible to estimate

1  the total value of available coverage based on which policies

2  are triggered and how much coverage those policies provide to

3  claims.   This is a routine analysis that is performed by both

4  insurers and insureds to evaluate the potential coverage

5  available to pay underlying claims."

6         Did I read that correctly?

7  A    Yes.

8  Q    Okay.  So, first of all, there's a set of assumptions,

9  right?

10  A    Correct.

11  Q    And it's about potential coverage, right?

12  A    Yes.

13  Q    And those assumptions may or may not turn out to be

14  true, right?

15  A    Correct.

16  Q    And the potential coverage may or may not exist, right?

17  A    Right.  I think -- yes.  I think both the assumptions

18  and the coverage would be something that will be determined,

19  potentially, at a later date.

20  Q    And you were given the assumptions for this declaration

21  by Mr. Azer, right?

22  A    Well, I don't -- I wouldn't say -- not all assumptions.

23  I already discussed some legal assumptions that we were given

24  by counsel and that we've assessed.   But there are certainly

25  other assumptions that -- well, for example, the liability

1  amounts, which were assumptions we were using from Dr. Bates.

2        And then, additionally, like I said, we had certain

3  assumptions we had to make regarding insurance coverage and

4  regarding local councils and which policies applied.  So I

5  think some of the assumptions are legal assumptions we were

6  given by counsel; others were assumptions that we applied, as

7  well.

8              MR. CHRISTIAN:  Okay.  Mr. Spalding, can we put up

9  Tab 2?  This is the declaration -- or pardon me -- the

10  deposition transcript for Ms. Gutzler.

11 BY MR. CHRISTIAN:

12 Q    And Ms. Gutzler, do you have that in front of you?

13 A    I do.

14 Q    Can you turn to Page 127, please?

15      (Pause)

16 A    Okay.

17 Q    Do you remember during your deposition when I asked you

18 about some of the assumptions you were making?  And here,

19 we're talking about one of your assumptions, not all of them

20 I'll concede.  And at Line 20, I asked you:

21            "Did you decide on that assumption?"

22        And your answer was:

23            "No, that assumption was provided to me by

24 counsel."

25        And I asked:

1    "When you say 'counsel,' do you mean Mr. Azer?"

2    And you said:

3    "Yes."

4    Do you see that?

5  A    I do.

6  Q    Okay.  And that was true then, and it's true today,

7  right?

8  A    Well, yes.  But I think that was a specific assumption

9  regarding, I think, matching deductibles.  And -- and I

10 already discussed this morning that that assumption was a

11 legal assumption that was provided to us by counsel.

12 Q    Okay.  And can you turn to Page 134, please?  This is,

13 again, about the deductibles you were talking about.  And at

14 Line 19, I'm asking you about the assumptions on disputed

15 issues in your report, and I said:

16    "Being aware that there were multiples views on

17 those issues, why did you elect to choose the present -- to

18 present that one scenario based on that one set of

19 assumptions?"

20    Mr. Azer objected to form.  And you said, on Page 135

21 now:

22    "Well, we worked with counsel to discuss the

23 options and the different scenarios that we would present,

24 and that was where we landed, in terms of how we were going

25 to present that coverage."

1       And then I asked you again:

2            "So you've made a decision based on your

3  consultations with and instructions from Haynes and Boone.

4  Is that correct?"

5       Mr. Azer objected to form.  And you said:

6            "Yeah, I would say so."

7       Do you see that?

8  A    Yes.

9  Q    And that was true then and it's true today, right?

10 A    Yes.

11 Q    Okay.  So, as I understand the clarification you're

12 offering today, you were given legal assumptions by Mr. Azer,

13 and then you made some other factual assumptions.  Is that

14 right?

15 A    Correct.

16 Q    Did Mr. Azer give you any of the factual assumptions?

17 A    I don't know if I would say he gave them to me.  But we

18 did work with counsel and talked about some of the

19 assumptions that we were going to make and how those would

20 apply.  So I think, in consultation with counsel, yes, we did

21 come to some of those assumptions.  But we certainly didn't

22 walk through every assumption with him to say do you want us

23 to do this or this and what do you think.  So I -- I think

24 it's a broad question that I can't answer with a simple yes

25 or no.

1 Q    So you had to make lots of assumptions.

2 A    Well, I think all of the assumptions that we made are

3 listed in my first report, in terms of related to coverage.

4 So there were a fair number of different assumptions.  They

5 didn't apply to that many policies.  In other words, we had

6 policy evidence for most of the policies that we -- we had.

7 So I think, yeah, there are -- there are different types of

8 assumptions we made.

9     I think my first report also talks about some of the

10 assumptions we had to make with regards to local counsel from

11 the information that was in the proof of claim.  So, yeah, I

12 think there's a variety of different assumptions that are

13 outlined in my reports.

14 Q    So you got legal assumptions from Mr. Azer, and then

15 there were some factual assumptions you made in consultation

16 with Mr. Azer, and all together, there were lots of

17 assumptions that had to be made.  Have I got that basically

18 right?

19 A    Well, I think, again, you're misrepresenting to say,

20 "lots of assumptions."  I think there are many different

21 assumptions.  I don't know that they apply to lots of

22 different things.

23     I also said that I consulted with Mr. Azer, we worked

24 through some of those with him.  I didn't say we did that

25 with every assumption.  But yeah, we worked with counsel on

1  the reasonableness of our assumptions, just as much as we did

2  on the legal assumptions.

3  Q    Okay.  Thank you.

4      Let's turn back to your declaration, and I'd like you

5  to turn to Paragraph 31, please.

6      (Pause)

7  A    Okay.

8  Q    And do you see where it says, in Paragraph 31, that you

9  testified that there are multiple methods of allocating.  And

10 you go on to say that the rules varied by state or by

11 agreement.  Do you see what I'm describing?

12 A    Yes.

13 Q    Okay.  And when you say they're by agreement, that

14 includes the policies' terms and conditions, right?

15 A    Uh ...

16 Q    In other words, the policies are a contract, right?

17 A    Yes.

18 Q    Okay.  And they have their terms and conditions, right?

19 A    Correct.

20 Q    And that's an example of an agreement of the parties,

21 right?

22 A    Well, I think the policy is a contract.  Whether or not

23 the parties agree on what that contract says, I think is

24 something that some -- certainly, in the work I've done,

25 there seems to be many different pieces of a policy that the

1  parties don't agree what that actually means, but --

2  Q    No doubt you're right about that, and I appreciate that

3  comment, Ms. Gutzler.

4      I guess I'm asking you to say something a little more

5  narrow than that, and that is:  The contract itself is an

6  agreement between the insurer and the insured, right?

7  A    Correct.

8  Q    Okay.  So that's one kind of agreement that could vary

9  how things should be allocated, right?

10 A    Yes.

11 Q    Okay.  And there might be other agreements, as you're

12 describing, or there might be disagreements about how to

13 apply those agreements, right?

14 A    That's right.

15 Q    Okay.  Good.

16     And you also mentioned the rules vary by state.  And

17 state law might differ, right?

18 A    Yes.

19 Q    Okay.  And the state law that's applicable to a

20 particular policy or contract might be different for

21 different policies, right?

22 A    Yeah.  I think it depends on what kind of dispute

23 you're talking about.  But yes, there could be different

24 state laws related to different policies.

25 Q    And you're not offering any opinions on which state's

1  law applies to which policies, are you?

2  A    No, I'm not.

3  Q    Okay.  I'm just going to spend a minute or two

4  clarifying some of the things you said in your live testimony

5  today, now, about some of these variations, if you will.

6  A    Okay.

7  Q    I'm just going to make sure the record is clear and the

8  Judge understands what it is you're opining here today.

9       First of all, you spent a fair amount of time with Mr.

10 Martin going through the coverage chart and talking about

11 there are policies that have per occurrence limits, but no

12 aggregate limits, and then there are policies that have

13 aggregate limits.  Do you remember that testimony?

14 A    Yes, I do.

15 Q    Okay.  And I think, several times, you said, in talking

16 about the difference between those things, that the limits

17 were the amount available to pay a claim.  Do you recall

18 that?

19 A    Yes.  The limits are the amount the policy would pay

20 for a claim.

21 Q    Okay.  And I guess I want to clarify with you that's

22 the amount up to which a policy would pay, right?

23 A    Correct.

24 Q    In other words --

25 A    (Indiscernible)

1  Q    -- just because there's a claim doesn't mean that

2  policy pays that amount, right?

3  A    Right.  I mean, if a -- if a claim is determined to go

4  to that policy, then that is the maximum per occurrence limit

5  or aggregate limit the policy --

6  Q    Yeah.

7  A    -- would pay.

8  Q    It's a maximum.  But there would still have to be

9  coverage, and there would still have to be a determination of

10  the amount covered, right?

11 A    Right.

12 Q    Okay.  And you also testified at one point that, as

13 there was more green on the demonstrative exhibit, there was

14 more coverage.  Do you recall that?

15 A    Yeah, since green represented available, non-settled

16 coverage.  Yes.

17 Q    Okay.  And I appreciate that clarification because what

18 I want to ask you to explain is:  There may be less in

19 available limits in a year that's green on the demonstrative

20 exhibit, right?  Because some of the settled coverage is for

21 policies you said had no aggregate limits, right?

22 A    (No verbal response.)

23 Q    In other words, just because the tower reaches higher

24 in a year --

25 A    Uh-huh.

1  Q      -- doesn't necessarily mean there's more coverage

2  available in that year.  Am I right?

3  A      Right.  I mean, to the extent that coverage is settled,

4  then it's not available anymore.

5  Q      Okay.  So let's talk -- I mean, just to illustrate the

6  point that I'm trying to get at, let's imagine the

7  settlements that are proposed as part of this plan are not

8  consummated because the claim isn't approved, because the

9  settlements aren't approved, whatever reason, right?

10  A      Okay.

11  Q      My only point is that the taller towers don't

12  necessarily mean more available coverage, right?

13  A      I -- I think they do.

14  Q      So --

15  A      I'm not sure I follow why you're -- why you're asking

16  that because, yes, the -- the higher the tower, the more

17  available policy limits in that tower.

18  Q      But if that tower had aggregate limits and a shorter

19  tower did not, depending on the assumptions about

20  occurrences, there might be more coverage in the shorter

21  tower with no aggregate limits, right?

22  A      Correct.

23  Q      Okay.

24  A      I said -- yeah.  And I think I said that this morning.

25  You can't value a policy that only has a per occurrence

1  limit.

2  Q      Okay.  Right.

3         So more green doesn't necessarily mean more coverage,

4  right?

5  A      Not necessarily.

6  Q      Okay.  It depends on the assumptions and it depends on

7  coverage determinations, right?

8  A      Right.  And I mean, I think, when I said that, I was

9  referring to the green as non-settled coverage, which is

10 what's available --

11 Q      Okay.

12 A      -- so --

13 Q      I appreciate the clarification.

14         MR. ERNEST MARTIN:  I'm sorry.  Could you let her

15 finish, please?

16         MR. CHRISTIAN:  Oh, I'm sorry.  I thought she was.

17         THE WITNESS:  No.  To the extent that -- that the

18 policies are -- listed as "PO" are settled policies, then I

19 think that it is an accurate statement that the green

20 represents more available coverage.

21 BY MR. CHRISTIAN:

22 Q      Okay.  I appreciate the clarification.  You're saying,

23 for your testimony here today, that, because Century and

24 Hartford have settled, we've sort of put that money in the

25 bank, and then there's other coverage that's unsettled that

1  remains available.

2  A      That's right.

3  Q      Okay.  I understand.  Thank you.

4         Now we've talked about these assumptions and various

5  scenarios.  And I guess I just want to make sure I

6  understand.  You could run literally thousands of models with

7  all these policies and all of these claims and all the

8  assumptions and get different results every time, right?

9  A      I could absolutely run thousands of models.  So, yeah,

10  I think if you change different things, different policy

11  terms, any different -- there are so many variations you

12  could run.  I'm not sure that I would say every one of those

13  would give a different result, it certainly depends on what

14  the permutation is.  But -- but yes, there are thousands of

15  modeling variations you could do.

16  Q      Thank you, appreciate that.

17         Turn back to your declaration, if you would, to

18  Paragraph 35, which is on Page 13.

19  A      Okay.

20  Q      And it says there that this report covers thousands of

21  policies, doesn't it?

22  A      Yes.

23  Q      Okay.  And now I'd like you to look at what was Exhibit

24  9 to your initial expert report; that's Tab 8 in your binder,

25  or at least it's Tab 8 in the Judge's binder.

1        (Pause)

2              MR. CHRISTIAN:  And Mr. Spalding, can we scroll

3   down to the last line that has data in it?

4              MR. ERNEST MARTIN:  Does this come with a

5   magnifying glass?

6              MR. CHRISTIAN:  I actually keep one on me just for

7   that reason, Mr. Martin.  We're not going to have to read

8   anything, don't worry.

9   BY MR. CHRISTIAN:

10  Q    But as I think Mr. Martin has suggested, and as

11  everybody has been able to see as we scroll to the last line,

12  we're talking about many pages of very fine print.  Is that

13  right?

14  A    Yes.

15  Q    And if we added them all up, we'd get to over 5,000

16  alleged policies, wouldn't we?

17  A    I think so.  This is -- this is Schedule C to the plan,

18  right?  This -- so this was -- this was Schedule C to the

19  plan.  The modeling that I used in the compilation of

20  coverage we looked at this morning during my direct is the --

21  is the coverage we used for the modeling.

22  Q    Okay.

23  A    There may be differences between them.

24  Q    If that would help.

25              MR. CHRISTIAN:  Let's -- if we don't mind, put up

1  that chart from earlier this morning.

2            Mr. Martin, do you have that at your fingertips

3  or --

4            MR. ERNEST MARTIN:  Sure, I can get -- Pete, could

5  you put up 2075, please?

6        (Pause)

7            MR. CHRISTIAN:  Okay.  And let's scroll all the

8  way through this.  Again, we don't have to read every line

9  item or even try.

10 BY MR. CHRISTIAN:

11 Q    This is what you relied upon in making your

12 declaration.  Is that right?

13 A    Correct.

14 Q    Right.

15 A    This is --

16           MR. CHRISTIAN:  And if we --

17 A    -- the insurance --

18           MR. CHRISTIAN:  could just --

19 A    -- coverage that we relied on.

20           MR. CHRISTIAN:  Okay.  And if you can get to the

21 last line with data in it.  And it may take us a moment.

22 BY MR. CHRISTIAN:

23 Q    Can you read what that line number is?

24 A    Five thousand, one hundred and seventy.

25 Q    And am I right, that indicates that there are over

1  5,000 insurance policies that you had to rely upon to reach

2  your conclusions and opinions here?

3  A     Yeah, I would say insurance policies or annual periods.

4  So not each and every one of these is a separate policy.

5  Q     Okay.

6  A     Right?  So, if there's a three-year period that's

7  covered by an insurance policy, on my listing, that would be

8  indicated as three separate lines.

9  Q     Okay.  I appreciate that clarification.

10 A     So -- but -- but yes, I -- over 5,000 policy periods.

11 Q     Okay.  And you didn't review all of those policies, did

12 you?

13 A     Personally?  No, I did not.

14 Q     And nobody on your team reviewed all of those policies,

15 right?

16 A     Yes.  Actually, I think any policy information we

17 received has been reviewed by someone on my team.

18 Q     Okay.

19 A     That's -- that's how we arrived at the dates and

20 limits, insurers, policy numbers that we used.

21 Q     Let's turn back to your deposition transcript at Tab 2,

22 please.  And I'd like to point you to Page 119.

23 A     Okay.

24 Q     Actually, turn to Page 124, please.

25             MR. ERNEST MARTIN:  I'm sorry.  One what?

1           MR. CHRISTIAN:  One two four.

2           MR. ERNEST MARTIN:  Okay.  Thank you.

3  BY MR. CHRISTIAN:

4  Q    Do you see, at Line 12, where I asked you:

5           "Am I right that Exhibit 9 to your report is a

6  spreadsheet that includes over 5,000 lines listing separate

7  insurance policies?"

8        And you answered:

9           "Yes, that's correct."

10        And I asked you:

11           "It would be virtually impossible for you to have

12  reviewed all the policies yourself, right?"

13        Mr. Azer objected to form.  And you answered:

14           "It would be very difficult for me to have

15  reviewed them all, yes, and I have not stated that I did

16  that."

17        Do you see that?

18  A    Yes.

19  Q    And so that was true then, and it's true as you testify

20  here today, correct?

21  A    I think -- yeah, it's true that I, personally, did not

22  review every --

23  Q    Okay.

24  A    -- single one of those policies.

25  Q    So let's talk about what your team did.

1         Am I right that you mentioned a moment ago they had to

2   look at every policy to get things like beginning and end

3   dates and limits?  Is that it?

4   A     Yes.

5   Q     But they didn't read every policy, did they?

6   A     Well, as part of the consulting work that KCIC did with

7   the Boy Scouts, yes, we did a full-scale policy review and

8   read the policies, yes.

9   Q     Read every page of every policy.

10  A     I'm sure that would be a bit of a stretch.  I don't

11  know that I could say someone read every page of every

12  policy,   but --

13  Q     That would be a bit of a stretch.

14        Do you know that some of the policies here might be

15  over 600 pages, with all their terms and conditions?

16  A     Yes.

17  Q     Okay.  And -- okay.  Thank you --

18  A     So I --

19  Q     -- for that.

20  A     -- didn't say they read every page of every policy,

21  but --

22  Q     Okay.

23  A     If I could finish.

24        We -- you know, KCIC, as part of our business, is in

25  the business of policy review.  So we do have trained people,

1   we know how to look at policies.  We know where to find terms

2   and conditions.

3        When we do a policy review, we're typically looking for

4   certain types of information, as requested by counsel or our

5   client.  So, yes, we look through the policies in depth.  But

6   you know, if we come to an endorsement that's for automobile

7   coverage, we would not read that page.

8            MR. CHRISTIAN:  Your Honor, I'd move to strike

9   everything after the answer to my question.

10           MR. ERNEST MARTIN:  She was answering the

11  question.

12           THE COURT:  Yeah.  No --

13           MR. CHRISTIAN:  She was going on about what KCIC

14  does for its other clients.

15           THE COURT:  Overruled.

16           MR. CHRISTIAN:  Thank you, Ms. Gutzler for that

17  clarification.

18  BY MR. CHRISTIAN:

19  Q    You're not offering an opinion on the completeness of

20  the policies that you or somebody at KCIC reviewed, are you?

21  A    No.

22  Q    Okay.

23  A    No.  My listing, I think, does indicate when we had

24  policy evidence versus secondary evidence, but -- but no, I'm

25  not saying every policy review was complete.

1  Q      Okay.  And you're especially not offering that opinion

2  with respect to policies you didn't review yourself, right?

3  A      Well, I reviewed a significant number of insurance

4  policies.  My team has -- has -- had many, many discussions

5  with me about the process.  As I said, at KCIC, we do this

6  work regularly and I'm involved in it regularly.  So, while I

7  didn't review every single page of every policy or even every

8  policy, I -- I do -- I have looked at a significant amount of

9  them to verify that the information we used is accurate with

10 what the policy says.

11 Q      Okay.  Well, let's talk for a few minutes about what

12 you did review.  Let's return, if you would, to your

13 deposition transcript behind Tab 2, and I'd like to start at

14 Page 119.

15 A      Okay.

16 Q      And here, again, at the top of Page 119, you say what

17 we've already talked about, and that is that you didn't look

18 at every policy.

19     And then you say, starting at Line 10:

20          "I did not keep a list of which specific policies.

21 I know I looked at some of the Hartford policies.  There were

22 a variety of different policies, some of the scout blanket

23 policies, but I didn't keep track of specifically which ones

24 I looked at.  As a part of my preparation, I looked through a

25 lot of the policy evidence we had.  Okay?"

1      And then, if you skip down to Line 24, I asked you:

2           "You referred to, I think, 'blanket policies.'

3  Are you referring to Century policies or INA policies when

4  you made that statement?"

5      And you said:

6           "Yes, the INA scout blanket."

7      Do you see that?

8  A    I do.

9  Q    Okay.  So you looked at Hartford policies and you

10 looked at Century policies, right?

11 A    Among many others, yes.

12 Q    Okay.  And let's talk about the others.

13     If you'd turn to Page 122, you mentioned Old Republic,

14 Liberty, and INA.  Do you see that at Lines 2 through 3?

15 A    Yes.

16 Q    Okay.  And then, at Page 123, at the top, you say:

17          "I looked at certain policies for each of the

18 different carriers and had matching deductible policies, some

19 primary and some first layer or excess."

20     Do you see that?

21 A    Yep.

22 Q    Okay.  And at your deposition, you didn't recall

23 looking at any other polices than the ones we just talked

24 about, right?

25 A    Right.

1 Q      Okay.

2 A      I stated that I had looked at many other policies, but

3 I didn't keep a list.  And with 5,000 lines of policy

4 information, I could not have indicated everything I looked

5 at, at that point.

6 Q      Right.

7 A      Since that --

8 Q      And I --

9 A      -- point --

10 Q      -- asked --

11 A      -- I've continued to look at many policies.

12 Q      Okay.  Which policies have you looked at between your

13 deposition and your testimony here today?

14 A      Again, I can't tell, with a list of 5,000 policies,

15 which ones I looked at.  But I looked at many different local

16 council policies, I looked at many different insurer

17 policies.

18 Q      Right.  And --

19         MR. ERNEST MARTIN:  I'm sorry.  She's not through.

20 Please let her finish.

21         MR. CHRISTIAN:  Oh, I'm sorry.  I thought she was

22 done.

23         THE WITNESS:  I -- I was done.

24         MR. CHRISTIAN:  Okay.

25         MR. ERNEST MARTIN:  (Indiscernible)

1      MR. CHRISTIAN:  That's what I thought.  Thank you.

2  BY MR. CHRISTIAN:

3  Q    And as we discussed at your deposition, I asked you

4  that it would be virtually impossible to look at more than

5  5,000 policies, and you said very difficult, right?

6  A    For me, personally --

7  Q    Okay.

8  A    -- I said, yes.

9  Q    I appreciate that.

10     And just while we're on the subject, you didn't

11 investigate or analyze the parties' performance under any of

12 those policies, right?

13     MR. ERNEST MARTIN:  Objection.  Vague.

14 A    I'm not sure I understand your question.

15 Q    Okay.  You didn't analyze or investigate whether one

16 side or the other had maybe breached the contract.

17 A    No --

18 Q    Okay.

19 A    -- I did not.

20 Q    Okay.  You didn't make any analysis or investigation of

21 any kind of performance under the policies, right?

22 A    No, I didn't.

23 Q    Okay.  Thank you.

24     Let's turn back to your declaration, please, at Tab 1,

25 Paragraph 42, which is, I believe, on Page 16.

1           (Pause)

2    A     Okay.

3    Q     And you say here -- and I'm not going to read every

4    word of the paragraph, but take your time and read it, if

5    you'd like.  Here, you describe having allocated tens of

6    thousands of claims across thousands of liability policies,

7    right?

8    A     Yes.

9    Q     And that -- those thousands of liability policies you

10   refer to in the declaration are the same 5,000 policies

11   identified on the spreadsheet that Mr. Martin examined you

12   about earlier, right?

13   A     Correct.

14   Q     Okay.  And you say you did this allocation, quote,

15   "based on the advice of the debtors' counsel."  Do you see

16   that?

17   A     For the legal assumptions, yes.

18   Q     Okay.  The legal assumptions.  Thank you for that

19   clarification.

20         And those came from Mr. Azer, right?

21   A     Correct.

22   Q     And you say here that they were necessary to form your

23   opinions.  Is that right?

24   A     Yes.

25   Q     And you conclude that they are, nonetheless,

1  reasonable.

2  A      Correct.

3  Q      Am I right that there are different assumptions for

4  allocation that might also be reasonable?

5  A      There could be, yes.

6  Q      Yeah.  Maybe not all the thousands of variations that

7  we talked about earlier, but there are multiple reasonable

8  assumptions resulting in multiple reasonable allocations,

9  correct?

10  A      Yes, I think that's right.  I mean, I said they were

11  reasonable, given the information that I've been able to

12  review.

13  Q      Okay.  Fair enough.

14          Turn back to Paragraph 30, if you would, which I think

15  runs from para -- Page 11 and carries on to Page 12 of your

16  declaration.

17  A      Okay.

18  Q      So I don't want to preclude you from reading the entire

19  paragraph in context, but I want to point you to the part of

20  it that's on the carryover on to Page 12, where you say:

21              "The opinion is not offered" --

22          Your opinion in this declaration is not offered, quote:

23              "-- for the purpose of binding non-settling

24  insurers."

25          Do you see that?

1    A      Yes.

2    Q      And it's not for the purpose of, quote:

3              "-- requiring this Court to decide coverage

4    issues."

5           Do you see that?

6    A      Yes.

7    Q      Okay.  And you stand by, I presume, that position here

8    today, right?

9    A      I do.

10   Q      Okay.  Good.

11          And you describe this report, in your opinion -- pardon

12   me -- I keep calling it a "report" -- your declaration and

13   your opinion as describing what coverage may be available.

14   A      That's right.

15   Q      And it's based on potential aggregate values of the

16   claims, right?

17   A      Yes.

18   Q      So it's fair to say that the coverage may not be

19   available and the aggregate values for the claims may be

20   different, right?

21   A      I think that's with any of the assumptions I used,

22   whether they were related to the potential aggregate value or

23   something else, right, could differ, and that would change

24   the answer.

25   Q      Okay.  Fair enough.

1       And I'm right, in reaching these conclusions in your

2   declaration, you relied on Dr. Bates' modeling.  Is that

3   correct?

4   A    Yes.

5   Q    Did you hear Dr. Bates testify at this trial?

6   A    I heard some of it.

7   Q    Okay.  And did you hear the part where he said he

8   didn't value any individual claims as part of his analysis?

9   A    Yes, I did.

10  Q    Okay.  And so one couldn't determine the coverage for

11  any particular claim based on his analysis, right?

12  A    Well, Dr. Bates did provide us with his valuation on a

13  claim level, so he was able to provide us with by claim

14  liability amounts for his --

15  Q    Well --

16  A    -- he called a "simulation."

17  Q    Okay.  So I'm going to read to you the transcript of

18  day six of this trial at Page 151.  Dr. Bates was asked:

19          "Just to make sure we all understand what you've

20  done here, did you value any individual abuse claims?"

21      His answer:

22          "No, I couldn't tell you the value of anybody --

23  any individual claims here.  That's something that the

24  trustee will have to do with the TDPs."

25      Do you recall that testimony?

1  A      I think I heard that, yes.

2  Q      Okay.  So Dr. Bates, on whom you relied, did not value

3  any individual abuse claim, right?

4  A      Like I said, Dr. Bates did his aggregate valuations,

5  and he did provide us with a simulation of those aggregate

6  values on a claim basis.

7  Q      Okay.  Thank you.

8         So let's turn to Paragraph 134 of your declaration, and

9  I believe that's on Page 41.

10 A      Okay.

11 Q      And this is about the individual review option or the

12 IRO.  I take it you know what I'm referring to if I say the

13 "IRO."

14 A      Yes.

15 Q      Okay.  Good.

16        And it says, in Paragraph 134 of your declaration:

17            "One effect of the IRA may be to create additional

18 pressure on non-settling insurers to enter into a settlement

19 with the trust."

20        Right?

21 A      Correct.

22 Q      And I believe you testified that that's your opinion on

23 direct examination by Mr. Martin this morning, right?

24 A      I did.

25 Q      And you're offering that opinion on behalf of Boy

1  Scouts of America, right?

2  A      Well, yes.  One effect of the IRO --

3  Q      Thank you.

4  A      -- may be to create additional pressure, so yes.

5  Q      Were you present for Mr. Azer's testimony in this

6  trial?

7  A      I was not.

8  Q      Okay.  Would you be surprised to learn that he denies

9  that?

10  A      I wouldn't be surprised, one way or the other.  I

11  haven't spoken to him about it.

12  Q      Okay.  Good.

13        Can we turn now to your third supplemental report?

14  That's Tab 6 in the cross-examination binder.

15  A      Okay.

16  Q      Turn to page -- Paragraph 5 on Page 3, please.

17  A      Okay.

18  Q      There, you said:

19            "The addition of IRO combined with the self-

20  selection incentive, further explained by Dr. Bates, creates

21  additional pressure on unsettled insurers to enter into a

22  settlement with the BSA."

23        Do you see that?

24  A      Yes.

25  Q      So it does create pressure on the unsettled insurers.

1  Is that right?

2  A    Yeah, combined with the self-selection that Dr. Bates

3  described.  Yes --

4  Q    Okay.

5  A    -- I think so.

6  Q    And that was your opinion when you issued this report,

7  and it's your opinion here today, right?

8  A    Yes, that's correct.

9  Q    Okay.  Turn to Paragraph 12, which goes from Pages 5 to

10 6 in your third supplemental report.

11      (Pause)

12 Q    Do you see where it says:

13         "While the insurers had some incentive to settle

14 this coverage without the addition of the IRO, the IRO puts

15 significantly more pressure on the insurers to reach a

16 settlement."

17      Do you see that?

18 A    Yes.

19 Q    And that was your opinion then, and that's your opinion

20 here, today?

21 A    Correct.

22 Q    Okay.  And that opinion is on behalf of Boy Scouts of

23 America.

24 A    Yes.

25 Q    Okay.  Thank you, Ms. Gutzler.

1          MR. CHRISTIAN:  I have no further questions, Your

2    Honor.

3          THE COURT:  Thank you.

4          Is there any other cross-examination of Ms.

5    Gutzler?

6          Ms. Arnone?

7          THE COURT:  Ms. Arnone?

8                    CROSS-EXAMINATION

9    BY MS. ARNONE:

10   Q    Hello, Ms. Gutzler.  My name is Christina Arnone.  I

11   think we've met already.

12   A    Yes.

13   Q    But I represent what we're calling the Guam Committee.

14        Do you know what that is?

15   A    I do.

16   Q    Okay.  So, I won't give you the long, long name that's

17   difficult.

18        First, I want to ask you a few basic questions about

19   coverage under the BSA policies for certain years.  Now, you

20   testified earlier that beginning January 1st, 1976, the BSA

21   policies insured sponsors and chartered organizations,

22   correct?

23   A    I believe I used the word "chartered

24   organizations," but yes, chartered organizations, correct.

25   Q    Okay.  And some of the policies include the chartered

1  organizations under the definition of "who's an insured"; is

2  that correct?

3  A     Yes.

4  Q     And then some policies actually include the chartered

5  organizations under "named insured endorsements"; is that

6  correct?

7  A     Correct.

8  Q     And then some policies list the chartered organizations

9  as "additional insureds," correct?

10 A     I think so, yes.

11 Q     Okay.  Do you recall which policies had chartered

12 organizations as the named insureds under "named insureds

13 endorsements"?

14 A     I believe that the -- in 1978, the policies there did

15 include them as named insureds.  I think it was the '76 and

16 '77 policies that had sponsors included.  I think that was my

17 endorsement.  I don't exactly remember where I

18 (indiscernible) the endorsement for the first year, and then

19 "who's an insured?" for the second.  I could look at the

20 policies again, but I can't exactly remember every specific.

21 Q     Okay.  I was just wondering if you kind of recalled

22 some off the top of your head.

23       So, you testified earlier that the per-occurrence

24 limits apply at both, the primary layer and the excess layer.

25 So, to get to a total, per-occurrence amount for any given

1  policy year, you add together the primary and the excess

2  layers, correct?

3  A    Well, I think it -- there's certain years where the

4  per-occurrence limit with no aggregate.  I'm not just talking

5  about with no aggregate, but there are certain years where

6  there's a per-occurrence limit at the first layer and the

7  next layer with no aggregates.  Not all of the policy years

8  have that same description of coverage.

9  Q    So, for example, from 1976 to 1980, the primary layers

10  and the excess layers were per-occurrence with no aggregates,

11  correct?

12  A    Yes, that's correct.

13  Q    Okay.  And so, then, for those years, for example, you

14  would just add together the primary and the excess policy

15  limit to get to a per-occurrence amount, the per-occurrence

16  limit?

17  A    I don't think that I would say you add them together,

18  because one comes first, but --

19  Q    Right.

20  A    Right.  So, if a particular claim is allocated to that

21  policy year, first, the primary would pay up to its per-

22  occurrence limit and then you would reach to the next layer

23  for its per-occurrence limit.

24  Q    Sure.  Assuming the claim was valuable enough to

25  trigger into the excess layer, that's how it would work,

1  correct?

2  A    Yes, that's correct.

3  Q    Okay.  Combining the primary and excess policy limits,

4  then, what were the total per-occurrence limits for the

5  period from January 1st, '76, to January 1st, '77?

6  A    (No verbal response.)

7  Q    Do you have chart in front of you?

8  A    No, if you could put chart up, I could --

9  Q    I can screen share if you have it there.

10        MR. ERNEST MARTIN:  Ms. Arnone, I'm happy to have

11  the chart put up.

12        Could you put up the coverage chart for that time

13  period, please.

14        THE WITNESS:  Okay.

15  BY MS. ARNONE:

16  Q    Okay.  So, Ms. Gutzler, from '76 to '77 --

17  A    Uh-huh.

18  Q    -- what were the total per-occurrence limits available

19  for that policy year for abuse claims?

20  A    There was a five-hundred-thousand per-occurrence limit

21  at the primary layer and then above that was a policy that is

22  a ten-million-dollar per-occurrence limit, and then there's

23  also a policy that's, it's actually part -- partway through

24  '76, that has a five-million-dollar per-occurrence limit, as

25  well.

1  Q     Okay.  So, for part of that year, '76 to '77, the per-

2  occurrence limit would be 15.5 million, if a claim went all

3  the way up through that tower?

4  A     That's right.

5  Q     Okay.  And then I don't want to waste time necessarily

6  going through each of those for each of these years, but it

7  looks like, to me, from this chart, at least for '76 through,

8  what do we have here, through '80, the early parts of '80,

9  you have per-occurrence limits of at least 10.5 million; is

10 that correct?

11 A     Well, I think it's -- some of the years are 15 because

12 they're 5 and excess of 10.5, but somewhere in the range of

13 10 to 15 million.

14 Q     Okay.

15         MS. ARNONE:  And then can we flip to the next page

16 for '80 to -- yes, perfect.  Okay.

17 BY MS. ARNONE:

18 Q     And then, so, similarly, from 1980 through 1982, let's

19 say, we have per-occurrence limits of over 15 million; is

20 that correct?

21 A     In 1980, yes.

22 Q     Okay.

23         MR. ERNEST MARTIN:  Was your question to 1982,

24 though?

25 BY MS. ARNONE:

1  Q      Oh, yeah.  I'm sorry.

2         So, for 1982, if you want to look at that one

3  separately.  So, from '80 to '81, we have per-occurrence

4  limit of over 15 million, then from '81 to' 82, we have the

5  primary layer on a per-occurrence basis, correct?

6  A      Yes.

7  Q      But then you don't show PO for the others, so what does

8  that reflect?

9  A      Well, a couple of those policies are, they have hash

10 marks on them, which means they're exhausted by pre-petition

11 claims.

12 Q      So, they're insolvent?

13 A      Well, yeah, insolvent or closed.

14        And then the policies above that are listed without a

15 per-occurrence -- I'm sorry -- with an aggregate limit.  I

16 think those are policies that were part of a settlement

17 agreement between certain parties.  They are for state and

18 that's why they're shown that way.

19 Q      Okay.  Were they originally per-occurrence?

20 A      Honestly, I don't know.  I think so, but I don't know.

21 Q      Okay.  And then, so, before January 1st, 1978, there

22 were no policy deductibles; is that correct?

23 A      Right.  Those didn't -- weren't in those time frame

24 yet.

25 Q      And beginning January 1st, 1978, there is a two-

1  hundred-and-fifty-thousand-dollar deductible that's being

2  reflected from '78 to '79 and '79 to '80; is that correct?

3  A     Correct.

4  Q     Okay.  And those deductibles would be owed on a per-

5  occurrence basis, correct?

6  A     I don't know.  I didn't examine those.  We treated

7  those policies as a single, per-occurrence limit of 250,000.

8  Q     Oh, for the primary layer?

9  A     Yes.

10  Q     And then are there any policy deductibles from 1980 to

11  1983?  I couldn't tell from the chart.

12  A     No.

13  Q     Okay.  And the defense costs don't erode the policy

14  limits under any of the policies from 1976 to 1982, correct?

15  A     I don't believe so.  We didn't do any allocation of

16  defense costs in our modeling, but I don't believe those

17  policies -- I do believe those policies pay -- defense does

18  not erode their limits; that's my understanding.

19  Q     Yeah, and I think there was something about it in your

20  declaration, so that's why I was asking.  I'm sorry.

21        You reviewed quite a few of these policies, correct;

22  that was your testimony earlier?

23  A     Yes.

24  Q     Do you recall seeing any "separation of insurance"

25  provisions in the policies as you reviewed them?

1  A     I did not review them for that.

2  Q     Okay.  Do you recall any provisions in the policies

3  saying that bankruptcy or insolvency of the insured would not

4  relieve the insurer of obligations under the policy?

5  A     Again, I did not review the policies for that kind of

6  information.

7  Q     Okay.  So, it's the position of the Boy Scouts that

8  there's an occurrence triggered for every separate survivor's

9  claim under the liability policies in place from, let's say,

10  1976 to 1982, correct?

11  A     For every survivor -- not every survivor's claims, but

12  for each survivor.  For each survivor.

13  Q     So, if they had multiple perpetrators, you would treat

14  it as one occurrence still?

15  A     Yes, we treated it as a survivor occurrence.

16  Q     Okay.

17  A     So, each survivor is a single occurrence.

18  Q     Okay.  So, two people, two separate people that are

19  affiliated with the BSA, let's say, had committed the abuse,

20  you would have still treated that as one occurrence for that

21  survivor?

22  A     That's right.

23  Q     Okay.  So, if an insured, under the Boy Scouts'

24  policies were facing, let's say, 50 claims of abuse, as I

25  understand it, the Boy Scouts' position is that there would

1  be 50 separate occurrences, correct?

2  A      If there are 50 survivors?

3  Q      Yes, 50 survivors.

4  A      Yes.

5  Q      Thank you for that clarification.  (Indiscernible) a

6  lot clearer.

7         Now, I think earlier you testified about creating an

8  allocation chart, is that correct, on a per-claim basis?

9  A      I'm not sure there's an allocation chart.  I'm not

10 sure.  I don't really follow that.

11 Q      Okay.  Sorry.

12        Did KCIC look at the values that Dr. Bates gave for

13 every separate claim and create a chart of how much coverage

14 would be available for each survivor's claim?

15 A      Well, our allocation model does that calculation, yes.

16        So, I don't know that we provided a chart, but the --

17 in the modeling, that is exactly what happens; a particular

18 claim is allocated to the insurance coverage based on the

19 methodologies we're using and we get a by-policy result from

20 that allocation for each claim.

21 Q      Okay.

22             MS. ARNONE:  And Mr. Martin -- sorry, I'm going to

23 stop for a second -- Mr. Martin, I think earlier there was

24 testimony about the allocation model and that was admitted

25 into evidence.  We didn't see that in the documents that were

1  provided for Ms. Gutzler's cross-examination.

2           And maybe -- and I went back and looked and I

3  couldn't find it.  If that's been admitted into evidence, is

4  that something you could screen share?

5           MR. ERNEST MARTIN:  Sure.  Pete, would you put up

6  JTX-2075, please.

7           MS. ARNONE:  I'm sorry, we tried to go back to the

8  JTX documents, too.

9           MR. ERNEST MARTIN:  Is the one that you were

10 referring to?

11          MS. ARNONE:  Yes.

12          MR. ERNEST MARTIN:  Okay.

13          MS. ARNONE:  Okay.

14 BY MS. ARNONE:

15 Q    So, Ms. Gutzler, did you determine how many occurrences

16 the Boy Scouts -- I'm sorry -- how many occurrences were

17 triggered by the policies that were issued by Hartford?

18 A    So, yes.  In our modeling, we would have allocated each

19 of the individual claim values that were provided to us by

20 Dr. Bates to the insurance coverage.  And so, yes, we would

21 be able to determine for a particular Hartford policy, how

22 many claims we allocated to that policy and for what value.

23 Q    And is that information that's shown on JTX-2075?

24 A    No, I think JTX-2075 is just a compilation of all of

25 the insurance coverage and the limits.  It doesn't have

1 anything to do with or show the allocation results.

2 Q    Okay.

3          MS. ARNONE:  Have you not -- I'm sorry -- have you

4 not, Mr. Martin, produced the actual allocation model that

5 has those allocation results?

6          MR. ERNEST MARTIN:  Objection.  I'm not sure what

7 the question is.  Could you clarify your question, please.

8          MS. ARNONE:  Sorry, yes.

9          I'm just trying to understand.  So, the witness is

10 talking about, you know, the amount of insurance that's

11 available and having, you know, prepared an allocation model

12 and I'm just trying to understand if the allocation model is

13 being provided or offered into evidence so that we can

14 explore the testimony about the amount of each insurer's

15 exposure.

16          MR. ERNEST MARTIN:  Is there a question for the

17 witness?

18          MS. ARNONE:  Yeah, let me pose a question for the

19 witness.

20 BY MS. ARNONE:

21 Q    How many occurrences did you determine were triggered

22 by the policies issued by Hartford for the claims that were

23 filed in the bankruptcy?

24 A    And that's part of the allocation modeling results, so

25 I can't sum up in my head right here how many of those claims

1  were allocated to Hartford.

2  Q     Is there a document that would help you be able to do

3  that?

4  A     Well, as part of my declaration, there was a JTX-1047

5  that lists the allocation results on a policy level.  So, I

6  would be able to, looking at that, sum up the amounts

7  allocated to any Hartford policy.

8        It is not on a claim-by-claim level, though, so I

9  couldn't say, And that represents 1402 claims.

10       So, the claim-by-claim policy results are not -- I

11  don't believe those are in an exhibit.

12 Q     Okay.  So, I have the JTX that you just referred to.

13       Did you say, "1047"?

14 A     Yes.

15 Q     Okay.  I have that pulled up.

16            MS. ARNONE:  We can screen share this really

17  quickly.  It's never quickly for me to screen share anything;

18  it's just not fast.

19 BY MS. ARNONE:

20 Q     Ms. Gutzler, is that what you were referring to as

21  JTX-1047?

22 A     No.

23       Maybe I gave you the wrong number.

24 Q     Let me see.  Let me make sure that I've got --

25 A     I'm sorry, I did give you the wrong number.

1          I don't know.  Maybe it wasn't a part of my --

2               MR. ERNEST MARTIN:  Maybe I can help.  I think it

3    may be JTX-1186.

4               THE WITNESS:  Oh, yeah.  That one sounds familiar.

5               MS. ARNONE:  Okay.  We'll see if I can find that.

6               And that was provided, Mr. Martin.  It would be

7    documents for her declaration?

8               MR. ERNEST MARTIN:  Yes.

9               MS. ARNONE:  Let me see if I can find it.

10              THE WITNESS:  It's going to be an Excel file.

11              MR. ERNEST MARTIN:  That's what I was going to

12   say:  It's an Excel file.

13              MS. ARNONE:  Oh, here it is.  All right.

14              Oh, no, my Excel started not responding.  Okay.

15              Here it is.  Let me see if I can screen share

16   this.  No, I started scrolling down here.  Let me see if I

17   can --

18          (Pause)

19              MS. ARNONE:  Well, there we go.  Very delayed.

20   BY MS. ARNONE:

21   Q    So, this is what you're referring to?

22   A    Yes.  So, you could, if you were at the top of the

23   policy or the listing, you could go to the insurer tab.  The

24   column is labeled "insurer," which over to the left.

25   Q    Sorry.  I'm juggling the Zoom screen and this.

1        Okay.  So, here you've got -- here, your group,

2  Century, the particular policy insurer, policy number,

3  starting and end date --

4  A     Yep.

5  Q     -- cancel date -- sorry.

6        Okay.  Am I getting here to where you're --

7  A     Yes.  So, those bluer, lighter-blue columns show the

8  various evaluations that we ran of Dr. Bates and so in any

9  version you want to look at, if you wanted to look at the,

10  like, the 3.3 billion TDP distribution, you could look,

11  either filter to Hartford and you would be able to see how

12  much was allocated to each Hartford policy in that

13  simulation.

14  Q     Okay.  So, in this simulation, you were taking the

15  amount that would go into the TDP, or that might be assumed

16  to go into the TDP, and then allocated those out among

17  policies; is that correct?

18  A     Yes.  So, for example, the 3.3 TDP simulation, I

19  believe, had about 47,000 claims that had an individual

20  amount.  So, each of those 47,000 claims was then allocated

21  on a one-by-one basis to the insurance coverage, based on the

22  date of first abuse and the coverage that was available in

23  those years.

24  Q     Okay.  And so, if you took all the claimants who filed

25  proofs of claim in the bankruptcy and ran their claim's value

1  through an insurance model on a claim-by-claim basis, would

2  the amount of available coverage be much higher than this 2.4

3  billion, 3 billion, 3.3 billion?

4       Do you see what I'm saying?

5  A    I think so.

6       So, I think what you're asking is, after allocating

7  each claim-by-claim, is there still additional available

8  coverage?

9  Q    No.  I guess what I'm asking is, if you took Dr. Bates'

10 claim-by-claim valuation, given the nature of the abuse and

11 whatever he took into consideration to arrive at a value, and

12 then you ran those through an allocation model on a

13 claim-by-claim basis, would the amount of available coverage

14 be much higher than 2.4 billion?

15 A    Yes, I think I'm understanding your question.

16      There's more than $2.4 billion of insurance coverage

17 and I think I already mentioned this morning, I couldn't give

18 you a total value of the insurance coverage because so much

19 of it is on a per-occurrence basis.  So, there were -- if

20 you're asking me, is there more than $2.4 billion worth of

21 coverage that's available, I believe the answer to that is

22 yes, but I couldn't give you an exact amount because of the

23 per-occurrence.  And I could certainly say at these levels

24 there was available coverage because the claims were

25 allocated to that.

1  Q     Sure.  In fact, the maximum potential exposure to any

2  given insurer would be, if they were issuing per-occurrence,

3  with no aggregate policies, the maximum exposure to any given

4  insurer would be the number of occurrences I guess here, the

5  number of claimants, times the policy limit, right?

6  A     The number of claimants that have an abuse date that

7  falls within their policy period times the per-occurrence

8  limit.  I think you also have to take into account if there's

9  over coverage.  So, if there's both, the Boy Scouts' coverage

10 and the local council coverage at the same time, then you

11 would not necessarily allocate that whole claim, per-

12 occurrence to one policy.

13       So, I don't think it's as simple as just that straight

14 math.

15 Q     Right.  And, in fact, if you did that in this case,

16 because the Boy Scouts had a whole lot of insurance coverage

17 essentially every year -- and I know I'm characterizing

18 that -- but they had, you know, for many years, they had more

19 than $10 million.  If you were just taking, you know, each

20 claimant that filed a proof of claim in the bankruptcy and

21 timesing (sic) that by 10 or $15 million, that would be a

22 whole lot of insurance coverage, right?

23       Far more than $3 billion, I assume.

24 A     Sure.  Based on simple math, yes.  If you took that

25 number times 10 or 15 million, you would exceed 3 billion.

1  Q    Okay.  So, I asked earlier whether -- how many

2  occurrences the Boy Scouts determined were triggered by the

3  policies issued by Hartford for the claims that were filed in

4  the bankruptcy.

5      Can you give me an answer to that.  Did you run those

6  calculations?

7  A    We did.  In order to answer that question, we would

8  have to look at the Tranche 6 data provided by Dr. Bates and

9  look at how many claims have a date of abuse that fall within

10  a Hartford Insurance policy time frame.  And you'd have to do

11  that to be able to get that number.

12      And I think, again, that would give you the number of

13  claims that would potentially be allocated to Hartford under

14  that particular liability assumption --

15  Q    And did --

16  A    -- in those particular claims.

17  Q    And did you do that analysis, did KCIC perform that

18  analysis?

19  A    That's part of the modeling analysis.  That's exactly

20  what the modeling analysis is, to take the claims, one by

21  one, and allocate them.

22      Did I sum up exactly how many went to Hartford?

23      No.  I could, but I didn't do that.

24  Q    Okay.  So -- okay.

25      But I assume the answer to the question would be the

1  same if I asked you about the per-state policies,

2  specifically, too?

3  A     Yes, I would have to do the analysis.

4  Q     Sure.  And Century?

5  A     Correct.

6  Q     And the other Chubb Companies?

7  A     Yes, any companies.

8        The model does it.  We have it on a claim-by-claim

9  basis, but I didn't sum it up that way.

10 Q     Did you sum it up that way when you were determining

11 the reasonableness of the settlement agreements?

12 A     No.  In order to determine that, I looked at the total

13 amounts allocated to the policies.

14 Q     Based on the amount that would be going into the TDP,

15 potentially, correct?

16 A     I'm not sure I follow "based on the amount going into

17 the TDP."

18        But do you mean, despite based on the settlements with

19 those insurers -- I guess I don't follow what you mean by

20 "going into the TDP."

21 Q     Okay.  So, actually, I think this comes later.  Let me

22 get into this with you later when I ask about those

23 conclusions and your analysis.  That might be easier, because

24 I know you have a chart in your declaration at paragraph 62

25 that kind of discusses that, so I think maybe once we get to

1  that chart, it would be a little bit clearer what I'm trying

2  to ask.  I apologize.

3  A     Okay.

4  Q     Okay.  So, you testified earlier that you used the

5  first-encounter rule to determine the policies that would be

6  implicated, correct, if there were -- or did you do that for

7  all the policies?

8  A     We used the first-encounter rule for all the claims in

9  order to allocate them to the policies.

10  Q     Okay.  So, under this, you would trigger only the

11  policy tower that was in place in the year the claimant was

12  first abused, correct?

13  A     Yes.

14  Q     And you didn't include any subsequent years of abuse,

15  correct?

16  A     No.  Just allocated the total claim value to the first

17  abuse date.

18  Q     Okay.  And in your declaration, and earlier with

19  Mr. Martin, you were testifying that you did that because, in

20  part, because of an agreement between BSA and Century that

21  dates back to 1996, where it was agreed that that's how it

22  would be done, correct?

23  A     Yes, in part.  Uh-huh.

24  Q     And then what was the other part?

25  A     The other part was the letters we walked through with

1 various insurers, agreeing to use a first-encounter trigger.

2 I also discuss the data I'll be using from the Boy Scouts for

3 their pre-petition claims and how that was allocated.

4 Q    I'm sorry, I'm not sure that I understood the very last

5 part.

6        You also considered?

7 A    Yeah, we received from the Boy Scouts, a list -- I

8 called it the risk-connect data -- but it's essentially their

9 database, a dataset of historic, pre-petition claims and how

10 they classified those claim costs and what policy year they

11 allocated them to.  So, we reviewed that, as well.

12 Q    Sure.  So, the first-encounter rule was consistent with

13 how the Boy Scouts' insurers, or some of the insurers, at

14 least, had been handling claims before?

15 A    Correct.

16 Q    Okay.  In assessing the reasonableness of that

17 agreement, because I believe you testified earlier that you

18 were assessing the reasonableness of that agreement, as well,

19 in assessing the reasonableness of that agreement to use the

20 first-encounter rule, did you also consider whether the

21 amount of coverage that was available would be enough to pay

22 any single survivor's abuse claim?

23        MR. ERNEST MARTIN:  Objection; mischaracterizes

24 the evidence.  I think you said that she used -- she found

25 the agreement reasonable.

1           She was talking about her assumptions.

2           THE COURT:  I think -- sustained.

3           Why don't you rephrase that question.

4           MS. ARNONE:  Sure.

5 BY MS. ARNONE:

6 Q    And I think it's in your declaration that you concluded

7 that that agreement was a reasonable, that it was reasonable

8 to use that first-encounter based on the Boy Scouts'

9 agreements with its insurers, right?

10 A    What I said was that the assumption to use the first-

11 encounter agreement for a trigger of coverage was a

12 reasonable assumption.  I did not opine on whether the

13 agreement, itself, was reasonable.

14 Q    Okay.  Sure.

15           And so in evaluating whether it was reasonable to use

16 the first-encounter rule, did you consider whether the amount

17 of coverage would be sufficient to pay any single survivor's

18 abuse claim?

19           MR. ERNEST MARTIN:  Objection; vague.

20           THE COURT:  Let's see if the witness can answer

21 it.

22           THE WITNESS:  I would say no.

23           What I -- it was a legal assumption that was

24 provided to me and what I did to assess whether that

25 assumption was reasonable was to look at the first-encounter

1  agreement and the agreements from many insurers to use that

2  particular date.

3  BY MS. ARNONE:

4  Q    Okay.  So, in assessing the reasonableness, you didn't

5  look at the coverage chart that was provided and, for

6  example, think, well, there's, you know, over $10 million in

7  coverage for any given year after, let's say, 1976.  So,

8  there's probably -- assuming that you only get to run up the

9  tower on the first-encounter year, that's a reasonable

10  position to take, also because there's plenty of insurance

11  coverage?

12  A    No, I didn't make that assessment.

13  Q    Okay.  In paragraph 48 of your declaration --

14        MS. ARNONE:  And, you know, if somebody wants to

15  pull that up for me, I would be very grateful.  Thank you so

16  much.

17  BY MS. ARNONE:

18  Q    So, in paragraph 48, and earlier you also testified to

19  this, you were talking about the other theories that could

20  have been used for the number of occurrences, correct?

21  A    Yes.

22  Q    And you say that a multi-occurrence approach, for

23  example, would be to treat each active abuse as a separate

24  occurrence, correct?

25  A    Yes.

1  Q      Okay.  And then a third approach would be to treat all
2  abuse as one occurrence, correct?
3  A      Yes.
4  Q      Are you aware of any other approaches to determining
5  the number of occurrences in childhood sex abuse cases?
6  A      I'm sure that -- I think anyone could come up with a
7  multitude of different ways one could do it.  These were just
8  several that I listed.
9  Q      Sure.  For example, have you heard of a "per-survivor,
10 per-policy period, per-perpetrator" test being used for the
11 number of occurrences in child sex abuse cases?
12 A      I haven't come across that, no.
13 Q      Do you know what approach is used asbestos cases, by
14 chance?
15 A      For a trigger of coverage?
16 Q      Yes.
17 A      Yeah.  I've done a significant amount of asbestos work
18 and most of the work I've done in asbestos has used a
19 continuance-trigger approach.
20 Q      And is that on a "per-claimant, per-policy period"
21 basis?
22 A      Claimant -- certainly on a per-claimant basis.
23        I'm not sure what the per-policy period adds to that.
24 Q      Sure.  So, instead of having just one claimant get one
25 limit, in asbestos cases, to your knowledge, do they often

1   also trigger another policy year for every year in which they

2   were exposed to asbestos, for example?

3   A      Yes, that's what a continuance trigger is.

4   Q      Sure.

5   A      Exactly.

6   Q      Okay.  You say in your declaration that you also

7   reviewed local council policies, correct?

8   A      I did state that, yes.

9   Q      Did you review any insurance for the Aloha Council,

10  specifically?

11  A      Yes.

12  Q      Do you remember what insurers issued policies to the

13  Aloha Council?

14  A      I believe there was some Century Insurance.  My guess

15  would be that it was the Scout blanket policies, because they

16  insure so many councils.  I suspect that there is some

17  American Reinsurance, Nat Union Fire; again, because those

18  are particular policies that insured many, many councils.

19         But I don't know if I could come up with every insurer

20  for any local council.

21  Q      Okay.  No, that's fair.

22         Do you know if those policies by Century that you were

23  just talking about, do you know if they also insured

24  chartered organizations?

25  A      Yes, I believe the Scout blanket policies that we

1  identified as Scout blanket policies did insure chartered

2  organizations.

3  Q    Do you know what years that those Century policies

4  would have started to insure chartered organizations under

5  the local council policies?

6  A    I believe the Scout blanket policies run from around

7  1965 to 1971ish.  That's, essentially, the period of time

8  where INA offered that program.  I think there may be some

9  that continued a little bit after that, that may be from '65

10 to '71.

11 Q    Okay.  So, from 1965 to 1971, it's possible that INA

12 was issuing policies that would ensure the Aloha Council,

13 plus chartered organizations within the Aloha Council?

14 A    Sure, that's possible.

15 Q    Okay.  Did you review those policies as part of your

16 review process?

17 A    Well, I did review many Scout blanket policies.

18       Whether I reviewed specific ones for the Aloha Council

19 or not, I'm not sure, but the Scout blanket policy forms from

20 1965 to '71, did insure chartered organizations from my

21 recollection of the review I did.

22 Q    Okay.  I think you also noted in your declaration that

23 certain Hartford local council policies also added sponsors

24 as insured by endorsement.

25       Do you recall that?

1  A     Yes, I do.

2  Q     Okay.  Do you know if any of these Hartford local

3  council policies would have been issued to the Aloha Council?

4  A     I don't remember whether or not the Aloha Council opted

5  into those policies.  I just don't remember specific

6  councils.

7  Q     Okay.  Also, do you know whether the Aloha Council was

8  insured under any insurance policies issued through

9  Clarendon?

10  A     I believe that the Clarendon policies, local council

11  policies are in the much later time frame than -- and I think

12  that given that time frame, they would have been insured, but

13  I don't remember specifically.

14      And just to sort of go back to my Hartford answer, if

15  you're talking about The Hartford policies, there are certain

16  Hartford policies that insured all chartered organizations,

17  but not all Hartford policies did.  So, there's a little bit

18  of a, you know, it depends on what you're talking about and

19  what time frame.

20      And in the exhibit that you were looking at with all of

21  the policies, the 5,000 lines, you can, on a policy-by-policy

22  basis, pull up that chart, find the policy, and I could tell

23  you whether or not the determined chartered organizations

24  were or weren't insured.

25      So, my preference, if we have specific policies, is to

1  pull that up, because I just can't remember the answer to

2  every question -- the answer to every policy.

3  Q    Sure.  Is that reflected on the chart?  Would I be able

4  to look at that chart, too, and tell whether the chartered

5  organization was alleged to be insured under that policy?

6  A    Yes, you could.

7  Q    Okay.  I won't make you go through the painstaking

8  process if I can review it myself.

9      Okay.  If your declaration could be pulled up again,

10  I'm going to ask you about paragraph 52?

11      (Pause)

12          THE WITNESS:  Okay.

13  BY MS. ARNONE:

14  Q    And you're talking about recognizing a dispute between

15  BSA, its primary insurers, and certain other insurers as to

16  the treatment of deductibles under these policies.

17      And my question is, are you talking here in paragraph

18  52, about the policies from 1988 to 2008?

19  A    Yes.  They're introduced in paragraph 51.

20  Q    Sure.  Okay.  I just wanted to clarify that.

21          MS. ARNONE:  And then if we could go to

22  paragraph 62.

23  BY MS. ARNONE:

24  Q    Okay.  So, here's the chart that I was talking about

25  earlier being in paragraph 62.

1        Actually, I think it might be easiest if you could just

2   explain for me what this chart represents, with respect to

3   each insurer; in other words, you -- how did you -- so,

4   you've got 2.4 billion, 3 billion -- TDP distribution:  3.3

5   billion, 3.6, 3.6.

6        Can you explain where those numbers came from.

7   A    Yes.  So, the -- sort of starting across the top, there

8   are different valuations that we performed allocation

9   modeling on.  So, we received these from Dr. Bates.

10       We did a 2.4 billion distribution that we followed the

11   Bates, like, tort distribution; we did a three-billion-dollar

12   TDP distribution that was prepared by Dr. Bates; a 3.3 TDP; a

13   3.6 TDP; and then also, a 3.6 billion-dollar Bates White tort

14   distribution.

15       The difference between the TDP and the Bates White tort

16   is the number of claims that Dr. Bates valued in those

17   simulations.  So, using one of them, so using the 2.4

18   billion, Bates White tort distribution, we took those

19   individual claims he valued, which, in total, added up to 2.4

20   million --

21             MR. ERNEST MARTIN:  Billion.

22             THE WITNESS:  Billion, sorry.  Everything I just

23   said, I meant to be "billion."

24             We took the claims that added up to the value of

25   2.4 billion.  We put them through our allocation model.  So,

1  on a claim-by-claim basis, distributed them to the policies

2  based on the assumptions we talked about, and the resulting

3  numbers are listed there as to what was allocated to those

4  carriers.

5          So, Century/Chubb was allocated $1.25 billion of

6  that 2.4 in that simulation, and so on:  Hartford, 477

7  million -- billion -- million; Zurich, 73; Clarendon, 3.8.

8  BY MS. ARNONE:

9  Q    Okay.  So, did you do that, based on, like, a

10 percentage basis?

11 A    No, we did it by taking each individual claim that Dr.

12 Bates provided us.  So, he provided us the claims and the

13 value of those claims.

14        So, claim 1, let's just claim 123 was an eight-hundred-

15 thousand-dollar claim with a date of abuse of 1982.  We

16 allocated that claim to the policies in the 1982 year and

17 those policies are each associated with an insurance carrier.

18        We did that claim-by-claim, and then we summed up the

19 results to those carriers.

20 Q    Gotcha.  Okay.  That helps me understand this.

21        So, these are -- this chart is based on the claims

22 values that Dr. Bates provided to you on a claim-by-claim

23 basis, correct?

24 A    That's one of the factors that goes into these numbers,

25 yes.

1  Q     Sure.  So, a jury, for example, might award a different

2  judgment on any given claim, correct?

3  A     Yes.

4  Q     Okay.  And the amount of insurance coverage that's

5  available would look different if, for example, a jury

6  awarded $15 million to a claimant, instead of, you know, $2.2

7  million, right?

8  A     Yes, I think to the extent any of the claim values are

9  different, so not just from a jury award, but from -- as I

10  said, these are simulations; no one yet knows exactly how

11  much each individual claim will be valued at -- but, yes, to

12  the extent there's a different value that comes from a jury

13  or from anything else, it would impact the results of the

14  allocation --

15  Q     Okay.

16  A     -- or I think I should say "likely impact."

17  Q     Sure.  And it's your understanding that Dr. Bates

18  came -- arrived at the per-claim value based on historical

19  settlement data?

20  A     I'm not going to testify as to how Dr. Bates arrived at

21  these different valuations.

22  Q     Okay.  But if Dr. Bates' claims valuations were

23  inaccurate in different respects, you wouldn't have had any

24  basis to know that or to challenge it, correct?

25  A     Right.  And I think Dr. Bates characterizes his

1  valuations as "simulations"; they're not intended to be a

2  final value for any individual claim.

3  Q    Sure.  Okay.

4        So, in paragraph 61 of your declaration, you can go to

5  that.

6  A    Okay.

7  Q    So, you say here:

8             "I evaluated settlements between the debtors and,

9  one, Hartford; two, Century/Chubb; three, Zurich; and four,

10  Clarendon, respectively."

11        Did I read that right?

12  A    Yes.

13  Q    Okay.  So, BSA tasked you with evaluating the

14  reasonableness of these settlements; is that correct?

15  A    Yeah.  I'm not sure I would describe it as that, as

16  much as -- yeah, I guess so; looking at the settlements and

17  what we know about the coverage and the simulations of the

18  claims, did they seem like reasonable settlements.

19  Q    Okay.  And so when you were doing this evaluation, you

20  were considering a monetary amount of the proposed

21  settlement, correct?

22  A    Yes, that's correct.

23  Q    Okay.  Did you -- did KCIC assess the reasonableness of

24  any of the other terms of the settlement agreements?

25  A    I don't believe so.  I did not.

1  Q     Okay.  So, to your knowledge, KCIC did not assess

2  whether the scope of the releases in the settlement

3  agreements were reasonable, in light of the amount of money

4  that the insurers were offering to pay, correct?

5  A     That's correct; we did not assess that.

6  Q     Okay.  Did KCIC assess whether the policy buybacks in

7  the settlement agreements were reasonable, in light of the

8  amount of money that the settling insurers were offering to

9  pay?

10 A     Yes, I think that's exactly what we assessed in

11 relationship to the allocation to the insurance coverage from

12 our models.  So, it was a -- it was limited to the value of

13 the settlement compared to the value of the allocation under

14 our simulations for modeling.

15 Q     Okay.  Did KCIC assess whether the insurers were paying

16 any consideration for releases that they were giving other

17 chartered organizations?

18 A     (No verbal response.)

19 Q     I'm sorry, let me rephrase this.  Let me rephrase this.

20 I think that was too vague.

21       Did KCIC success whether the insurers were paying any

22 consideration for chartered organizations for liabilities

23 that were not insured under their policies?

24 A     We did not assess that.

25 Q     Okay.  So, in assessing the reasonableness of the

1  settlement amounts, did KCIC consider that future coverage

2  rights would be lost; was that something factored into KCIC's

3  evaluation?

4  A    We assessed the settlement as it relates to the

5  allocation modeling that we did.  So, it was limited to,

6  under the allocation scenarios we provided and the value of

7  the settlement, did that seem like a reasonable assessment?

8       But, yes, we are aware that the policies, then, would

9  not be available to future claims.

10 Q    Okay.  So, you didn't attempt to evaluate, for example,

11 how many future claims might be brought against the trust

12 that would be covered under the policies that were being

13 bought back?

14 A    No, we did not; again, we did it based on the

15 valuations that we used.

16 Q    Okay.

17          MS. ARNONE:  And if we could jump to paragraph 60

18 of your declaration.

19          MR. ERNEST MARTIN:  Did you say, "60"?

20          MS. ARNONE:  60, yes.

21          MR. ERNEST MARTIN:  Okay.  Thank you.

22          MS. ARNONE:  Sorry.

23 BY MS. ARNONE:

24 Q    Okay.  So, you say here:

25          "In my experience, various factors should be

1  considered when evaluating a settlement of insurance

2  coverage, including:  one, litigation risks; e.g., insurance

3  coverage defenses, estimated value of current claims, prior

4  exhaustion levels, prior settlements; two, the insurer's

5  financial position; three, estimates of the value of current

6  claims in evaluation of how those valuations overlap with the

7  potentially available coverages; and, four, expense of

8  coverage litigation, including both, the actual litigation

9  expense and the time-value of money, as it relates to delayed

10  payment to the insured.  In my experience, both insurers and

11  insureds take these factors into account when negotiating a

12  settlement amount."

13      Did I read your testimony correctly?

14  A    Yes.

15  Q    Okay.  So, you mentioned litigation risks in here and

16  you include, for example, insurance coverage defenses.

17      Do you any specialized training to help you evaluate

18  the validity of insurance coverage defenses?

19  A    I wouldn't describe it as to evaluate the validity of

20  them, but I do have experience in evaluating the -- for

21  assessing the value of them, right.  So, if there's a

22  litigation risk surrounding particular -- does a policy have

23  an exclusion or not, then we would be able to evaluate, well,

24  if it did, what would that do to the allocation results.  And

25  we do that all of the time.

1       So, yes, there are -- we do modeling for insurance

2   coverage defenses to determine what the value of that factor

3   would be for the -- of the insurer and for the policyholder.

4   Q    How do you determine the value of an insurance coverage

5   defense, like, how do you assess the strength of the

6   insurer's coverage defense?

7   A    Well, I there are certain coverage defenses that you

8   can -- I guess I wouldn't describe it as the strength of the

9   defense, so much as the impact of the defense.

10      So, for example, we talked a lot about the matching

11  deductible policies and whether they have aggregates or not.

12      We are able to value with a deductible and with a --

13  I'm sorry -- with an aggregate and without an aggregate, what

14  does an allocation look like to a particular insurer.  So, I

15  do think that there's modeling that can be done to assess the

16  value of those, but not necessarily the strength.

17  Q    Sure.  Okay.

18      So, when you're considering, for example, Hartford's

19  argument that there might only be one occurrence per policy

20  year, you don't have any means, or at least you don't perform

21  any analysis of whether that's a good argument or not; is

22  that correct?

23  A    Yeah.  I would, again, say we can perform analysis to

24  determine the results of what would happen, but, yeah, we

25  would not say how strong that argument -- we wouldn't do the

1  work to say is that a good or a bad argument; that would be a

2  legal determination made by coverage counsel.

3  Q     Sure.  So, does coverage counsel give you their

4  assessment of the reasonableness of a given coverage

5  argument, based on case law, for example?

6  A     Maybe sometimes they do.  I think we spend a lot of

7  time talking with counsel about a variety of things, but

8  that's not a factor that goes into the modeling that we do.

9  Q     Okay.  So, in the modeling that you did for Hartford's

10 potential exposure, you took a discount for their, for a

11 potential discount for their argument that there might only

12 be one occurrence per policy, but you didn't undertake any

13 effort to sort of assess whether that was a reasonable

14 position; is that correct?

15 A     Right.  And I wouldn't describe it as a took a

16 discount.

17       What I'm describing in this paragraph is that both

18 parties, an insurer and insured, would look at all of these

19 different factors when they are trying to evaluate and

20 negotiate a settlement.

21 Q     Okay.  And so, in addition, in your experience, a

22 policyholder would also be considering the strength of any

23 given coverage position by the insurers, right?

24 A     Would coverage counsel do that?

25       I think so.  Yeah, sure.

1   Q      Okay.  In your declaration -- I'm sorry -- back at

2   paragraph 60, you also mention evaluating or that various

3   factors that are considered when evaluating settlement of a

4   coverage claim includes the expense of coverage litigation,

5   correct?

6   A      Yes.

7   Q      Do you have any specialized training to help you

8   evaluate how long and costly it might be to litigate

9   different coverage issues?

10  A      No, I don't have specialized training in that area.

11         I've been involved in many coverage-litigation cases,

12  so I understand that they are very expensive and can take

13  years.

14         But, again, it's just a factor listed that both, the

15  policyholder and the insured, would take into account when

16  negotiating a settlement.

17  Q      Sure.  And, for example, some defenses that are raised

18  by insurers are legal in nature, for example, how much is the

19  per-occurrence limit; that is something that a Court can

20  decide based on a policy, itself?

21  A      (No verbal response.)

22  Q      But you didn't undertake any effort to determine

23  whether, for example, that coverage defense might be decided,

24  you know, early on in litigation with just a resolution of

25  that one particular legal issue; is that correct?

1  A    Correct.  We didn't try to take everything that might

2  be argued or disputed and determine when or what the value of

3  that would be.  These are just factors that I think both

4  sides would consider when negotiating a settlement.

5  Q    Sure.  And some of those other coverage defenses, that

6  would mean asserted by the insurers, for example, the

7  aggregate-retention issue, that's something else that might

8  be decided just by a Court as a legal question without doing

9  a bunch of fact discovery, but you didn't take that into

10  consideration in assessing reasonableness, correct?

11  A    Yes.  Again, these are listings of considerations a

12  policyholder and an insurer would take into account.

13      I did not do an assessment of each of those and take a

14  percentage or anything for each individual one.

15  Q    Okay.  So, you weren't taking into consideration -- I'm

16  sorry, let me rephrase this question.

17      When you were assessing the reasonableness of the

18  settlement, were you taking into consideration anything that

19  coverage counsel told you about the strength of the defenses?

20  A    I wouldn't say about the strength of the defenses,

21  necessarily, but, yeah, in assessing these settlement amounts

22  related to the amount allocated, we certainly talked with

23  coverage counsel about the extensive disputes between the

24  parties.

25      So, I've had conversations with counsel about Hartford,

1  since you brought that one up, in particular, about the

2  various litigations that have been involved between Hartford

3  and the BSA over the years and how contentious that is.  So,

4  I did speak with counsel about those types of things, yes.

5  Q    Sure.  Do you recall having any conversations with

6  counsel about BSA position on the number of occurrences?

7  A    Yes.  Again, that's one of the legal assumptions that I

8  used on the number of occurrences, that it's based on the

9  survivor, and that was a legal assumption that I worked

10  through with counsel.  So, yes, I had that conversation.

11  Q    Okay.  So, did counsel tell you -- let me start again.

12  I'm going to rephrase this.

13       Did counsel indicate to you that the insurers'

14  positions -- that Hartford's position, I should say, that

15  there's just a single occurrence, was not reasonable in my

16  insurance case law?

17  A    I don't know that we had that conversation.  They

18  definitely indicated to me that that was a position that

19  Hartford was taking, or has taken in the past, but we didn't

20  discuss the strength or weakness of it.

21  Q    Okay.  In paragraph 67 of your declaration --

22           MS. ARNONE:  If we could just pull that up?  Thank

23  you so much.

24  BY MS. ARNONE:

25  Q    So, in paragraph 67, here, you say, Pursuant to the --

1  sorry, I'll just read the whole paragraph, actually:

2         "The BSA, Hartford, the Ad Hoc Committee, the

3  future claimants representative, and Coalition agreed in

4  principle on settlement terms as memorialized in the Hartford

5  Insurance Settlement Agreement, the approval, which is

6  incorporated into the plan.  Pursuant to this settlement,

7  Hartford will contribute $787 million to the Settlement Trust

8  if the debtors' plan of reorganization is confirmed.  In

9  evaluating the Hartford Settlement, I took into account

10  several settlement considerations, including the BSA's

11  contentious coverage disputes with The Hartford."

12        And I think you mentioned this earlier, but -- so, BSA

13  asked you to evaluate The Hartford Settlement and the

14  reasonableness of The Hartford Settlement; is that correct?

15  A    Yes, to look at that settlement in relationship to the

16  allocations to determine its reasonableness.

17  Q    Okay.  Was KCIC asked to give my presentation to the

18  BSA about the reasonableness of the proposed Hartford

19  Settlement?

20  A    Not that I'm aware of.

21  Q    Okay.

22         MS. ARNONE:  And then if we can skip to paragraph

23  75 of your declaration, we can add a little bit.

24         MR. ERNEST MARTIN:  Your Honor, if I may?

25         I've been trying to wait as long as I can, but

1  we've been going almost three hours.  I was wondering if we

2  could make take a short break and then come back?

3             THE COURT:  Yes, we can.  Let's take 10 minutes.

4             Ms. Arnone, do you know how much longer you have,

5  more or less?

6             MS. ARNONE:  It may be 45 minutes.

7             THE COURT:  Okay.

8             MS. ARNONE:  Yeah, I'm happy to take a break.

9             THE COURT:  Why don't we take -- and are there

10 others who are going to cross-examine?

11            I see one hand.

12            Okay.  Let's take a 10-minute break, then.

13            We're in recess.

14            MR. ERNEST MARTIN:  Thank you.

15        (Recess taken at 12:46 p.m.)

16        (Proceedings resumed at 12:57 p.m.)

17            THE COURT:  Okay.  So, back on the record.

18            Ms. Arnone?

19            MS. ARNONE:  Thank you.

20 BY MS. ARNONE:

21 Q    Okay.  I think we were at paragraph 75 of the

22 declaration.

23            MS. ARNONE:  Okay.  Thank you.

24 BY MS. ARNONE:

25 Q    So, you say here that:

1          "Having evaluated multiple factors, potentially

2    affecting the value of The Hartford coverage, I believe there

3    was a reasonable basis for the BSA to agree to release its

4    rights under The Hartford policies in return for a

5    seven-hundred-and-eighty-seven-million-dollar contribution to

6    the Settlement Trust."

7          Correct?

8    A     Yes.

9    Q     When did you do your evaluation?

10   A     (No verbal response.)

11   Q     I'm sorry.

12         When did you evaluate The Hartford Settlement for

13   reasonableness?

14   A     I don't know specifically when.  I think it was in one

15   of my reports that we did that.  But, obviously, after the

16   settlement, after the settlement amount was known and our

17   allocation results were complete.

18   Q     Okay.  So, BSA didn't ask KCIC for its opinion about

19   reasonableness of The Hartford Settlement before agreeing to

20   the amount?

21   A     No.

22   Q     And then your conclusions about reasonableness of that

23   settlement are based on the values that are shown in the

24   charts in paragraph 62 of your declaration, correct?

25   A     Yeah, it's based on those values, along with the other

1 factors that I said we thought about:  the coverage

2 litigation and defenses, and from knowing the allocation

3 results, the settlement amount and the other issues involved.

4 I said there was a reasonable basis for that settlement.

5 Q    Sure.  And I think you testified earlier, this chart is

6 not actually purporting to reflect Hartford's real maximum

7 exposure, right?

8 A    This chart purports Hartford's exposure under the

9 valuation scenarios that are listed.

10 Q    From Dr. Bates?

11 A    Dr. Bates provided those valuations, yes.

12 Q    Sure.  So that Hartford, for example, that

13 $477,535,263, for example, under a 2.4-billion-dollar claims

14 value assessment, that number isn't, for example, just taking

15 the number of occurrences times the policy limits, correct?

16 A    No.  It's the results in an allocation model.

17 Q    Sure.  And if you just took the number of occurrences

18 that you had calculated for Hartford times the number of

19 policy limits, it would be much, much, much higher?

20 A    I took the number of occurrences and determined which

21 ones were applicable to Hartford that would likely give me

22 the same results; that's what we did.

23      So, we took each claim, which is an occurrence in the

24 way I'm defining it.  So, each survivor's valuation looked at

25 its date of first abuse, which is what had indicated what

1  policy we put it to, and we allocated that.  So, if that went

2  to a Hartford per-occurrence limit every single time, then,

3  yeah, it would be the value times the per-occurrence limit up

4  to the maximum of that limit.

5  Q    So, I'm sorry, I think I was being confusing there.

6       I meant, if you were weren't considering the valuation

7  that Dr. Bates put on a claim, the number would look

8  different than 477 million; it would be higher than that in

9  some circumstances, correct?

10  A    Higher in some; lower in others, yeah.

11  Q    Sure.  How many claims did you run through your

12  allocation model?

13  A    I believe the Bates White tort distribution scenarios

14  was in the range of 16,000 claims and I believe the TDP,

15  Bates White numbers were in the 47,000 range.  I believe it's

16  in one of my reports, but I think those are about right.

17  Q    Did you run 47,000 claims through your allocation

18  model, then?

19  A    In the TDP simulations, yes.

20  Q    So, in the chart in paragraph 62 of your declaration,

21  those numbers are based on 47,000 claims?

22  A    The ones that list the Bates White TDP distribution are

23  based on a valuation for 47,000 separate claims.

24  Q    Okay.  So, the 3 billion TDP distribution column, the

25  3.3 billion TDP distribution column, the 3.6 billion TDP

1  distribution column, and the 3.61, those are based on 47,000

2  claims, correct?

3  A    There are three of them, and I think you read off four,

4  but the ones that say, "TDP distribution" are based on an

5  allocation of 47,000 claims.

6  Q    Yes, I see that.  Sorry.

7      So, the 2.4 billion and the 3.6 billion ones are Bates

8  White tort distribution; that's what that reflects, correct?

9  A    Correct.

10 Q    And then how were those -- how many claims did you run

11 through those models?

12 A    Those simulations from Dr. Bates had about 16,000

13 claims that were valued.

14 Q    So, the 2.4 billion is only for 16,000 claims?

15 A    That's the number of claims valued under the Bates

16 White tort distribution, yes.

17 Q    So, when you say that Hartford's exposure was somewhere

18 between $477,535,263 and $716,358,000, that's based on 16,000

19 claims?

20 A    Those two, so the bookends on the left and the right,

21 where it says, "Bates White tort distribution," you know, are

22 based on scenarios where Dr. Bates valued 16,000 claims to

23 get to that aggregate amount; again, those are simulations

24 that Dr. Bates prepared.

25 Q    Okay.  What about the other 70,000 claims?

1 A    In those simulations, he did not put a value on those

2 claims.

3 Q    So, if we added in the other 60 or 70,000 claims,

4 whatever that is, it wouldn't be 477 million or 716 million;

5 it would be something many times that?

6 A    Well, I believe the way that Dr. Bates -- and I don't

7 want to get too much into Dr. Bates' work -- but he did an

8 aggregate valuation.  So, he is really coming to his

9 aggregate amount of valuation and then he does simulations to

10 distribute those across certain claims.

11    So, it's a simulation; again, his tort distribution

12 simulation, those 16,000 claims have a value.  The others

13 have a value of zero.

14 Q    Oh, okay.

15    So, if we assumed that all those other claims did have

16 value in the tort system, then this estimation of Hartford's

17 exposure at 477 million and 716 million would be off,

18 correct?

19 A    It depends on how they're valued.

20    If the aggregate valuation remained 2.4 billion, but

21 each claim had a valuation to it, it would certainly change

22 the numbers under any of the insurers.

23 Q    Okay.  But just so I understand -- I want to make sure

24 I understand this, I'm sorry -- your conclusion that

25 Hartford's exposure is between $477,535,263 and $716,358,283,

1   that is based on only 16,000 claims being valued in that,

2   correct?

3   A      For the two numbers you read to me, yes.

4   Q      Okay.  Thank you.  I kind of understood that.

5          Did you run any calculation of future abuse claims or

6   any assumptions about how many future abuse claims there

7   might be?

8   A      No, I did not.

9   Q      So, the FCR in this case, I'll represent to you, has

10  testified that there might be, he's estimated there might be

11  11,000 future claims.

12         That's not something that KCIC was asked to take into

13  consideration when determining Hartford's potential exposure,

14  correct?

15  A      Correct.  We used the work done by Dr. Bates.

16         So, to the extent his numbers take those into account,

17  then, yes.  But we used his valuations and did not allocate

18  additional amounts.

19  Q      Okay.  You mentioned earlier that you did an valuation

20  of this on a claim-by-claim basis.

21         Did Dr. Bates give you a value for each claim on a

22  claim-by-claim basis for the 16,000 claims or the 47,000

23  claims?

24  A      Yes, he did.

25  Q      Did he give that to you for 16,000 claims or for 47,000

1  claims?

2  A      For both.

3         In order to prepare an insurance allocation, you have

4  to have the valuation, an aggregate valuation on a claim-by-

5  claim basis.  So, for both, the Bates White tort

6  distribution, as well as the TDP distribution, he provided us

7  with values for each claim.

8  Q      Okay.  So, he said like, proof of claim number 1, I

9  valued at $200,000, and then you ran that through the

10 allocation model; is that correct?

11 A      Yes.

12 Q      Okay.  So, you didn't attempt to categorize the claims,

13 for example, based on the nature of the abuse or the length

14 of the abuse, correct?

15 A      No, not at all.

16 Q      Okay.  Dr. Bates did that and someone did it, correct?

17 A      Yes.

18 Q      Okay.  So, were your conclusions about the

19 reasonableness of The Hartford Settlement based on the values

20 in your chart in paragraph 62 of your declaration?

21 A      Yeah, it was based on the values in my chart on

22 paragraph 62, along with the other factors that we discussed

23 earlier.  So, it's an assessment as to whether there was a

24 reasonable basis for that settlement, given the allocation,

25 as well as the litigation risks between Hartford and BSA;

1  that, all combined together, is what helped me or got me to

2  that it was at least a reasonable basis to make that

3  assumption --

4  Q    Sure.  So, you didn't --

5  A    -- for a settlement claim.

6  Q    Sure.  So, you didn't take into account that there were

7  60 or 70,000 some other proofs of claim that had been filed

8  in the bankruptcy because Dr. Bates wasn't taking that into

9  account, correct?

10  A    Well, I think it's -- I think that's a factor, too.

11       So, I think there's a factor that both, the insured and

12  the insurer, would take into account.  So, the two parties

13  negotiate in a settlement and part of that negotiation, in

14  their minds, I'm sure, is, well, what if there's more claims?

15       What if the value of the claims is higher or what if

16  the value of the claims is lower?

17       So, I do think those are all factors that go into the

18  insured, as well as the insurer, making a determination as to

19  a settlement amount.

20  Q    Sure.  Were, there were more claims, right?

21  A    There were more proofs of claim, yes.

22  Q    Sure.  And you didn't --

23  A    I think there's a question -- you have the proofs of

24  claim for 82,000 and I think both sides would take into

25  account factors as to whether or not all of those claims

1  would get a value and would get paid and what those values

2  would be.  So, I just think that's a factor that both sides

3  would look at.

4  Q    Okay.  But you were evaluating the reasonableness of

5  the settlement, also.  Did you take into account, in

6  evaluating the reasonableness of that settlement, that -- I'm

7  trying to actually run the calculations as to how many --

8  there were 82,000 claims.  That would be 66,000 claims not

9  valued in that chart, correct?

10  A    Under two of the assumptions, yes.  But there's other

11  valuations there that value 47,000.

12  Q    Okay.

13  A    So, I think what I did was, looked at that in totality

14  and said, as an insurer, as an insured, they would take those

15  things into account.

16      So, in fact, The Hartford Settlement being seven

17  eighty-seven, perhaps that's some of the things that Hartford

18  took into account when they reached their settlement amount.

19  It's more a variety of different factors both sides would

20  evaluate.

21  Q    Okay.  So, you just mentioned that the 47,000 are taken

22  into account with the other columns with the 3 billion TDP

23  distribution column, the 3.3 billion distribution column, and

24  the 3.6 billion TDP distribution column; is that correct?

25  A    Yes.

1  Q      Was -- okay.

2         So, those columns, when you arrived at that amount, was

3  that assuming that there was 3 billion in the TDP to

4  distribute?

5  A    I don't think there's money in the TDP to distribute.

6  I'm not sure I follow that question.

7  Q    Okay.  So, you say -- sorry, let me rephrase it.

8         So, under that second column in paragraph 62 of your

9  declaration, it says, 3 billion TDP distribution and then you

10 have Hartford's exposure at $698,331,465.

11        And I'm saying, with that 3 billion TDP distribution,

12 is that based on valuing 47,000 claims, claim-by-claim, and

13 then coming up with their values and in determining how much

14 coverage would be available to pay them or is it based on

15 assuming that there's 3 billion in the trust and then

16 allocating that out to the insurers?

17 A    Well, your second part of that scenario, I don't even

18 understand.

19        But it is based on a valuation of 47,000 claims that,

20 when added together, reach a total of $3 billion; that was

21 prepared by Dr. Bates.

22 Q    Okay.

23 A    And the numbers on this chart show once you take those

24 claim-by-claim and allocate them to the insurance policies,

25 that's how much was allocated to Hartford's policies,

1    combined.

2    Q       Okay.   Just a second.

3            (Pause)

4    BY MS. ARNONE:

5    Q       When you were evaluating Hartford's exposures, did you

6    also determine the amount of coverage available under

7    policies that were issued directly to chartered organizations

8    by Hartford?

9    A       No.   The allocation that we prepared only included Boy

10   Scouts' national policies, as well as local council policies;

11   some of which insured chartered organizations, but we did not

12   have coverage available for chartered organizations.

13   Q       Sure.   So, you went looking at, for example, Hartford

14   policies that might have been issued directly to an

15   archdiocese somewhere in the United States; is that correct?

16   A       No, I didn't look at those.

17   Q       Sure.   And would you answer be the same for all the

18   other insurers, you didn't look at, for example, any policies

19   that might have been issued by Century or Chubb Companies

20   directly to a chartered organization?

21   A       Right.   I mean, there's 41,000 chartered organizations

22   and we were not able to get the policy information or to get

23   that kind of information from those chartered organizations.

24           So, there's no way we could assess that.

25   Q       Okay.   And this might be duplicative -- sorry -- but

1    I'm going to ask it, just in case:  If the policies don't

2    insure the BSA, but were issued to a chartered organization,

3    so they insure only the chartered organization, did you

4    consider the amount of coverage that might be available to

5    the chartered organization from Hartford for sexual abuse

6    claims?

7    A    No, I think I just answered that question, but there's

8    no way that I could consider that.

9    Q    Okay.  Sorry.  Thank you.  I thought it might be

10   duplicative, but I wanted to make sure.

11        Were you aware, at the time that you evaluated the

12   reasonableness of The Hartford Settlement that Hartford would

13   later ask for a release of its obligations under policies

14   that were issued directly to chartered organizations by

15   Hartford?

16            MR. RUGGERI:  Your Honor, James Ruggeri for

17   Hartford.

18            Objection to form.

19            MS. ARNONE:  Well, I object to Mr. Ruggeri

20   objecting.

21            THE COURT:  Overruled.

22            MR. RUGGERI:  I've been quiet for a long time.

23   Thank you.

24            THE COURT:  Overruled.

25            THE WITNESS:  No, I was not aware at the time I

1  determined the reasonable basis for the settlement.

2  BY MS. ARNONE:

3  Q     Sure.  And that would probably be another reason not to

4  have considered the coverage available to the chartered orgs

5  under their own policies issued by Hartford, correct?

6  A     Well, if I didn't know about them, I wouldn't have had

7  a way to decide not to use them for that reason.

8  Q     Sure.

9        (Pause)

10 BY MS. ARNONE:

11 Q     Sorry, I'm going through my questions.  I think you

12 answered some, so I'm trying to make sure I'm not re-asking

13 them.

14       In your reasonableness evaluation, did you consider

15 whether the insurers were also wanting to be released from

16 coverage obligations to other insureds, like the chartered

17 organizations?

18            MR. ERNEST MARTIN:  Objection; asked and answered.

19            THE WITNESS:  Yeah, that is not something I

20 assessed or was aware of.

21 BY MS. ARNONE:

22 Q     Okay.  In your reasonableness evaluation, did you

23 consider that the insurers were trying to get releases of

24 other insureds' rights under those policies while leaving

25 them exposed to liability, still?

1    MR. ERNEST MARTIN:  Objection; asked and answered.

2    THE WITNESS:  No.

3    THE COURT:  I think it's "no."

4    THE WITNESS:  I think it's starting to get a

5  little bit of a legal, some legal terms, too --

6    MS. ARNONE:  Sorry.  I will move on.  I will move

7  on.

8    (Pause)

9  BY MS. ARNONE:

10  Q    Okay.  In paragraph 77 of your declaration --

11    MS. ARNONE:  If you could go to that.

12    THE WITNESS:  Okay.

13  BY MS. ARNONE:

14  Q    Do you see there, the coverage defenses raised by --

15  I'll wait until it's on the screen, sorry.

16    MS. ARNONE:  If someone could share it.

17  BY MS. ARNONE:

18  Q    Okay.  So, you say there that the coverage defenses

19  raised by Hartford posed a significant risk that coverage

20  litigation would result in rulings that could substantially

21  reduce the value of coverage available under Hartford's

22  policies, Hartford's assertion that all abuse claims are a

23  single occurrence, but have dramatically reduced to the

24  coverage available under its policies, and potentially other

25  insurers' policies, as with a Court ruling that the BSA's

1  secondary evidence coverage was insufficient to prove that 26

2  million and per-occurrence limits existed.

3      Did you evaluate the likelihood that Hartford would

4  succeed on a single-occurrence theory when you evaluated The

5  Hartford Settlement?

6          MR. ERNEST MARTIN:  Objection; asked and answered.

7          THE COURT:  Sustained.

8  BY MS. ARNONE:

9  Q    In evaluating reasonableness, did you consider whether

10 the Boy Scouts might be entitled to legal fees if they

11 succeeded in establishing coverage under the BSA policies for

12 the insurers and breached obligations to BSA?

13 A    Can you repeat that?

14 Q    Sure.  If in evaluating reasonableness, did you

15 consider whether the Boy Scouts might be entitled to get

16 their legal fees back if they succeeded in establishing

17 coverage under the Boy Scouts policies from any insurers that

18 had been in breach of their obligations to BSA?

19 A    No.

20 Q    Sorry.  I'm trying to get rid of questions here.

21    (Pause)

22       MS. ARNONE:  Well, let's go to paragraph 83 of

23 your declaration.

24 BY MS. ARNONE:

25 Q    You talk in here about Century coverage defenses in the

1  coverage litigation and one of these that you mention is the

2  statute of limitations.

3      And to be honest, I'm a little perplexed by this

4  argument, because I think statute of limitations is a defense

5  to liability, not a coverage defense.

6      Did you understand this argument that was being made by

7  Century as to how that's a coverage defense?

8  A    I just -- I understand that Century raised those issues

9  as part of their litigation or discussions with the Boy

10 Scouts.

11 Q    Okay.  That's fine.

12     And then in paragraph 95, if we could jump to that,

13 you're talking about the Zurich Settlement and you're saying

14 here that Zurich, the settlement might be at risk with Zurich

15 if the policies were determined to have no aggregate limits

16 because these policies have matching deductibles; is that

17 correct?

18 A    It doesn't say that the settlement would be at risk,

19 but the amount allocated to the Zurich coverage would be at

20 risk or would be lower.

21 Q    Okay.  And then, I don't need to read the whole

22 paragraph, but three sentences in, it says:

23          "In such a circumstance, the BSA would be required

24 to pay virtually all claims which did not exceed the per-

25 occurrence limit for such matching deductible policies,

1  regardless of the number of abuse claims in the relevant

2  policy term.  If Zurich succeeded in arguing that the

3  matching deductible policies have no aggregate limit, the

4  majority of coverage for abuse claims allocated to Zurich's

5  excess policies would be at risk."

6      Did I read that correctly?

7  A    Yes.

8  Q    Okay.  So, in order for you to assess the

9  reasonableness of the settlement, did counsel provide you

10  with any information about how courts usually handle the

11  situation when a debtor in bankruptcy can't pay the

12  deductibles or SIRs?

13  A    I had discussions with counsel about that.

14  Q    What did counsel tell you?

15  A    That in situations where the policyholder can't pay the

16  deductible, it would potentially revert back to the insurer.

17  Q    Did they tell you that courts often have it where the

18  claimant goes against their judgment and the amount of

19  judgment is reduced by the amount of the deductible or the

20  retention, in order to avoid giving insurers a windfall?

21  A    I don't believe we discussed it in those kinds of

22  terms.

23  Q    Sure.  So, how did you assess that this was a

24  significant risk to weigh in determining the reasonableness

25  of the settlements if counsel had indicated to you that the

1  deductibles might not be owed?

2  A     Well, I think I discussed this, this morning in my

3  direct, but we ran the insurance allocations using an

4  aggregate limit for those primary policies.  We also ran them

5  without applying an aggregate limit.

6       And when I ran the evaluations through the model

7  without the aggregate limits in those policies, the

8  allocation to Zurich was essentially zero.

9  Q     Sure.  So, you were running it from a numbers

10  perspective.

11       You weren't evaluating the strengthen or weakness of

12  Zurich's position that those deductibles might still be owed,

13  even though the BSA is a debtor in bankruptcy; is that

14  correct?

15  A     Right.  Again, I just am raising particular points that

16  both sides would take into account when negotiating a

17  settlement.

18  Q     Sure.  And I'm only asking you about these because of

19  the conclusions that these were reasonable, so I'm trying to

20  get -- and I know that part of your conclusions about

21  reasonableness, as you've testified, are about these coverage

22  defenses.  And so I am trying to get an understanding of what

23  you knew at the time that you were concluding that these were

24  reasonable about the strength of those coverage defenses.

25       And this is one of those issues where I think

1  policyholders that are debtors in bankruptcy would say that

2  they don't owe that deductible under current case law and so

3  I apologize, but that's why I'm asking you, because you're

4  talking about the reasonableness here.

5        Okay.  So, I think in paragraph --

6           MS. ARNONE:  Oh, actually, I'm sorry, let's go to

7  paragraph 100 of your declaration.

8  BY MS. ARNONE:

9  Q    You say:

10          "Based upon my experience in evaluating insurance

11  coverage settlements, the coverage defenses raised by Zurich

12  pose a considerable risk that coverage litigation can result

13  in rulings, which substantially reduced the value of coverage

14  for abuse claims available under Zurich's policies.

15          Furthermore, although not yet raised by Zurich as

16  a coverage defense, the possibility of a court ruling that

17  the matching deductible policies issued by Zurich had no

18  aggregate limit, could risk the majority of excess coverage

19  available to pay abuse claims."

20        Did I read that correctly?

21  A    Yes.

22  Q    Okay.  And so, in that last sentence, I think we talked

23  about the last part of that already, but what I want to ask

24  you about is the phrase "although not yet raised by Zurich as

25  a coverage defense."

1       Were you evaluating -- when you were evaluating

2  reasonableness, you were taking into consideration a coverage

3  argument that Zurich had not yet raised?

4  A    Yeah.  I mean, I think I said this a multitude of

5  times, but what I was assessing was whether there was a

6  reasonable basis for the settlements that were reached.  And

7  in doing that, I understand that both sides, policyholders

8  and insurers, will consider a variety of different defenses,

9  or coverage positions, in reaching those conclusions.

10 Q    Sure.  Okay.

11      MS. ARNONE:  Sorry.  Let's skip to paragraph 116

12 of your declaration.

13 BY MS. ARNONE:

14 Q    And, here, you're talking about the additional sources

15 of funding and you state in your declaration:

16      "Based on KCIC's allocation modeling, existing

17 sources of secured contributions and my experience with

18 evaluating settlements in mass tort insurance coverage, I

19 believe there is a mechanism in place for the payment of all,

20 or substantially all of the abuse claims, with additional

21 funding from three sources:  number one, additional

22 settlements with insurers for policies that receive

23 allocations under KCIC's allocation modeling; number two,

24 settlements with insurers for policies that did not receive

25 allocations under KCIC's allocation modeling; and number

1 three, additional contributions from chartered

2 organizations."

3        Did I read that correctly?

4 A     Yes.

5 Q    Okay.  Actually, I want to talk about number three.

6        Did you assume, in making this conclusion, that there

7 was a mechanism in place for the payment of all, or

8 substantially all, of the abuse claims, did you assume that

9 the chartered organizations would contribute under the plan

10 even if they are receiving releases for claims that are

11 insured under settlement insurer policies?

12 A    I didn't consider it in that way.  This consideration

13 really is that there are additional, potential sources of

14 funds and I just lay out what those funds are.  Additional

15 contributions from chartered organizations would be one of

16 those.

17 Q    Okay.  Sure.

18        And I guess I'm just inquiring about the incentive that

19 chartered organizations would have to contribute to the plan

20 and receive additional protections.

21        So, you weren't evaluating, one way or the other, what

22 incentives a chartered organization may or may not have to

23 join the plan of reorganization and become contributing

24 parties that actually pay money?

25 A    No, I was really assessing, based on the settlement

1  with the Methodists and the TCJC, that there are additional

2  chartered organizations that may have an incentive to settle,

3  as well.

4  Q    Sure.  And, in fact, at the time that you prepared this

5  declaration, the Roman Catholic Church had not -- the Roman

6  Catholic Ad Hoc Committee had not settled yet with the

7  debtors; is that correct?

8  A    I don't know.  I think it kind of happened about the

9  same time, as far as I understand it.  I'm not exactly sure

10  of the timing.

11  Q    Okay.

12          MS. ARNONE:  And so, let's go to paragraph 127 of

13  your declaration.

14      (Pause)

15  BY MS. ARNONE:

16  Q    You talk here about, there's over 41,000 chartered

17  organizations in the United States, including numerous other

18  large, chartered organizations.

19      Was the Roman Catholic Church one of those numerous

20  other large, chartered organizations that you're referencing

21  in your declaration?

22  A    Yes, I would say that's one of them.

23  Q    Okay.  Were you considering them to still be in a

24  position where they had not settled with the debtor at the

25  time that paragraph 127 was drafted?

1  A    I think at the time that was drafted, I was considering

2  that there is still the potential for a financial

3  contribution from the Roman Catholic Church.

4  Q    Okay.  And is that still the case today, do you believe

5  there's still a potential for a financial contribution from

6  the Roman Catholic Church?

7  A    I haven't -- I have no information that would indicate

8  otherwise.

9  Q    Sure.  And are you aware that the Roman Catholic

10  Church -- well, the Roman Catholic Ad Hoc Committee has

11  agreed to recommend to the Roman Catholic Church members and

12  to the Roman Catholic Church that they become what's known as

13  participating chartered organizations, where they will

14  provide the trust only with their insurance rights under the

15  BSA policies?

16  A    Am I aware that that's the recommendation?

17  Q    Yes.  Are you aware that that's part of the settlement

18  agreement that the Roman Catholic Ad Hoc Committee reached

19  with the debtors?

20  A    Yeah, I don't want to step into an area that's not my

21  expertise, but, yes, generally, I am aware of that.

22  Q    Sure.  If the Roman Catholic Church never contributed

23  to the trust as a contributing chartered organization,

24  because they're already going to be released for all post-

25  1975 claims under the plan without any monetary contribution,

1  would that impact your conclusion that there is a mechanism

2  to pay all, or substantially all, of the abuse claims?

3  A     Not necessarily.  I think I mentioned multiple sources

4  of additional funds, including insurance and other

5  contributions from chartered organizations.  So, no, I don't

6  think that would alter whether there's a mechanism in place

7  for that, for payment of all claimants.

8  Q     And then paragraph 127, also sticking with that, you

9  say:

10             "Any entity that wants a permanent injunction --"

11  this is right in the middle of the paragraph, I'm sorry -- it

12  says:

13             "But any entity that wants a permanent injunction

14  will need to reach a settlement with the trust."

15        Do you see that there?

16  A     Yes.

17  Q     Are you aware that the plan proposes to permanently

18  enjoin claims even if there has been no money contributed

19  individually by those chartered organizations?

20  A     I'm not sure of the details of that.

21  Q     Okay.  Are you aware that the plan proposes to

22  permanently enjoin claims that are asserted against a

23  chartered organization that is not agreeing to transfer

24  insurance rights to the trust?

25  A     Again, I think that's -- you're getting in an area

1  that's really not where my expertise is, so I don't want to

2  go down that road and start trying to determine the details

3  of that.

4  Q    Sure.  And I apologize, I'm just trying to explore your

5  conclusion about whether there's a mechanism in the plan to

6  pay all, or substantially all, of the claims.

7       I apologize, but I need to go back to another topic

8  here, which is the reasonableness of the settlement

9  agreements and your conclusions about the reasonableness of

10  the settlement agreements.

11  A    Okay.

12  Q    I am going to screen share a document that is JTX-975.

13       When I say I'm going to screen share it, that means

14  you've got to give me a minute here, because I'm terrible at

15  it.  Hold on, it doesn't look right.

16       Hang on just a second.  Let me make sure I've got the

17  right PDF pulled up.  There, now it should work.

18       Okay.  So, this document is marked as JTX-975.

19       Have you seen this document before?

20  A    I believe so.

21  Q    Now, this appears to be reflecting at presentation that

22  KCIC put together; is that correct?

23  A    Yes, that Jonathan Terrell from KCIC put together.

24  Q    Did you help Jonathan put this together?

25  A    I did not.

1  Q    Okay.  Were you in attendance at the presentation that

2  appears to have been given about this?

3  A    No, I wasn't.

4  Q    Was there a presentation, I should say, given about

5  this on November 21, 2021?

6  A    I have been told there was.  I was not there, so I

7  assume so.

8  Q    But you've seen this document before; is that correct?

9  A    I've seen a redacted version of this document, yeah.

10 Q    Okay.  And I will represent to you that this is a

11 document that was shared by debtors' counsel as one that

12 might be used in your examination on direct, so -- and I did

13 not see it asked about.

14      So, I'm flipping down through this document and I note,

15 as you noted, that there were redactions to this document,

16 correct?

17 A    Yes.

18 Q    So, we're seeing here on page 11 of 29, at the top,

19 it's called "Analysis of proposed settlement."

20      Is that correct?

21 A    Yes.

22 Q    And then on page 12 of 29, it says, "Comparable

23 analysis of Hartford Settlement."

24      Correct?

25 A    Yes.

1  Q     And then both of these pages are fully redacted,

2  correct?

3  A     Yes.

4  Q     And I think if we scroll down, there's a -- sorry, on

5  15 of 29, there's a page called "As produced."  And then as

6  we keep scrolling, there's further redactions for privilege

7  and then here, again, we've got, on page 26 of 29, this is

8  the same slide, Analysis of proposed settlement; it's marked

9  "privileged."  Page 27 of 29, Comparable analysis of Hartford

10 Settlement is marked "privileged."

11       Now, you said that you've viewed the slide before,

12 right?

13 A     I'm not actually sure that I have seen this particular

14 presentation, because neither of these slides look familiar

15 to me.

16 Q     Neither of these slides look familiar to you?

17 A     No.

18 Q     Did you provide content for these slides that were

19 used?

20 A     I did not.

21 Q     Okay.  So, you weren't involved in the analysis, and I

22 think I should actually say at the beginning of this, this

23 appears to be an analysis of the Century Settlement

24 Agreement, correct?

25 A     Yes --

1  Q      And --

2  A      -- I (indiscernible).

3  Q      Sure.  So, on page -- I'm sorry -- on page 11 out

4  of 29, this slide says "Analysis of proposed settlement";

5  it's completely redacted.

6         So, presumably, that was an analysis of the Century

7  Settlement Agreement, correct?

8  A      Presumably, yes.

9  Q      And that was a KCIC analysis of the proposed settlement

10 agreement?

11 A      I think it was an analysis done by Jonathan Terrell at

12 KCIC as part of our consulting role.

13 Q      Okay.  And do you know what this slide contained, as to

14 the analysis of the proposed settlement?

15 A      No.

16 Q      But only on page 12 of 29, this slide you know what

17 this slide said as to the comparable analysis between the

18 Century Settlement and The Hartford Settlement?

19 A      No.  The only variation of this presentation that I

20 have seen is after a redaction.

21 Q      Okay.  So, you've never seen the unredacted version of

22 these slides at all?

23 A      Correct.

24 Q      Okay.

25         MS. ARNONE:  Your Honor, at this point, we do want

 1  to lodge an objection that the information that was

 2  apparently evaluated during the time when BSA was entering

 3  into these settlement agreements is not being provided and

 4  that, nevertheless, we have a witness testifying as to the

 5  reasonableness of those settlement agreements through

 6  declaration testimony when this information is being

 7  shielded.

 8          MR. ERNEST MARTIN:  If I could respond, Your Honor?

 9          I'm not quite sure.  This witness says she had not

10  seen this document, but Ms. Arnone has not asked her about

11  what she does know, so I'm not sure why we're talking about a

12  document that this witness hasn't even seen.

13          THE COURT:  Why is it attached to her -- is it

14  attached to her declaration?

15          MR. ERNEST MARTIN:  It is --

16          MS. ARNONE:  Did -- sorry, go ahead.

17          MR. ERNEST MARTIN:  It is, in redacted form.

18          THE COURT:  And she hasn't seen it?

19          MR. ERNEST MARTIN:  She -- well, she has not seen,

20  obviously, what's been redacted, but as the witness said, she

21  has seen the parts of it that have not been redacted.

22          THE COURT:  Yeah, she did testify to that.

23          MS. ARNONE:  And I apologize, Your Honor, but we

24  were planning to object that it appears that the

25  attorney-client privilege, to the extent it ever existed, has

1 been waived by the debtors having, you know, affirmative

2 testimony by a witness that these settlement agreements are

3 reasonable and that this information should be provided.  But

4 this witness, you know, has testified that she doesn't have

5 knowledge of what this slide says, so I don't have anyone to

6 ask, I guess, about the content of the slide.

7        MR. ERNEST MARTIN:  But she can ask questions about

8 the items that are not redacted.

9        MS. ARNONE:  But I want to ask questions about the

10 items that are redacted, because these appear to be directly

11 relevant to the question of whether the settlement agreements

12 were deemed to be reasonable and it seems to us that under

13 Rule 502 of Federal Rules of Evidence, that the

14 attorney-client privilege has been waived over these because

15 there was a disclosure made in a federal proceeding and the

16 waiver appears to have been intentional and that there is

17 declaration testimony that these were reasonable settlement

18 agreements.  The disclosed and undisclosed communication for

19 information concern the same subject matter of the testimony

20 and they are, in fairness, to be considered together.

21        MR. ERNEST MARTIN:  But this witness, you're asking

22 this witness what this witness knows about and what this

23 witness has reviewed in connection with her testimony

24 concerning the reasonableness of the settlement.

25        You can ask her all kinds of questions about what

1  she knows.

2          MS. ARNONE:  But it's Jonathan Terrell who would

3  know the content of those slides, for which the debtor has

4  waived attorney-client privilege?

5          MR. ERNEST MARTIN:  No.  Ms. Gutzler has performed

6  her own independent analysis, which you haven't even asked

7  her about.

8          THE COURT:  I do think she's testifying about her

9  analysis of the reasonableness of the settlement, but what I

10  don't think you've answered, Mr. Martin, is the

11  attorney-client privilege and work product waiver argument.

12          Why is it either, not relevant, or what's your

13  response?

14          MR. ERNEST MARTIN:  What is important is what this

15  particular witness reviewed, this expert witness reviewed in

16  making her determination on the reasonableness of the

17  settlement.  She has testified that she has not reviewed any

18  information that is privileged.  If she had reviewed

19  information that was privileged, there might be an argument

20  of waiver.

21          But because she has stated she has not reviewed the

22  information that is redacted and she has her own independent

23  analysis, there is no reason to even go down any kind of

24  waiver path.  There has been no waiver.

25          MS. ARNONE:  Well, I would disagree that there has

 1   been no waiver.  They have a witness testifying in open court

 2   about the reasonableness of these settlement agreements.

 3   They submitted a declaration that pertains to the

 4   reasonableness of these settlement agreements and I would

 5   disagree that there has been no intentional waiver.

 6           There has been an intentional waiver of the

 7   attorney-client privilege.  This is a subject matter waiver.

 8   They have witnesses testifying about this and I view this as

 9   a subject matter waiver that's governed by Rule 502.

10           And if we need to reserve the right to call

11   Mr. Terrell to the stand so that we can get his knowledge of

12   what is contained in those slides, then we would reserve the

13   right to do that.

14           MR. ERNEST MARTIN:  But we're talking about this

15   particular witness.

16           THE COURT:  Yeah.  I think we're talking about this

17   particular witness and this particular witness did not review

18   these documents, the redacted portions of these documents.

19   Her opinion is not and her testimony is not based on the

20   redacted portions of these documents.

21           If you want to raise an attorney-client privilege

22   waiver issue, generally, with respect to this document, I

23   don't think it's in the context of this witness' testimony.

24   You can raise it and I'll consider it.

25           MS. ARNONE:  Sure.  And can the Guam Committee

1  reserve the right to call Jonathan Terrell?

2        THE COURT:  I don't know what our pretrial stip

3  says about that, but we'll take a look at it.

4        MS. ARNONE:  Okay.  Well, and this was

5  unanticipated, Your Honor.  These documents were just

6  provided to us over the weekend.

7        THE COURT:  Okay.

8        MS. ARNONE:  So, we wouldn't have had any knowledge

9  about that after the time that we were asked to determine

10 whether we were going to present witnesses.

11       MR. ERNEST MARTIN:  I am told that is not correct,

12 that they have had this document for quite some time.  So, I

13 would need to verify that, but I have been told by my

14 colleague that that is not correct.

15       THE COURT:  Okay.  Let's do --

16       MS. ARNONE:  Yeah, we I --

17       THE COURT:  -- the questioning of what this witness

18 knows and then we certainly can address your issue, Ms.

19 Arnone.

20       MS. ARNONE:  Sure.  Well, I think, Your Honor, that

21 I didn't have any further questions for Ms. Gutzler about her

22 reasonableness determination.  I think I did ask her about

23 that reasonableness determination sort of throughout my

24 cross-examination and I think I addressed all the different

25 issues that I wanted to address, in particular.

1           THE COURT:  Thank you.

2           THE WITNESS:  Can I actually say something?

3           MR. ERNEST MARTIN:  No.

4           THE COURT:  No.  Okay.

5           MS. ARNONE:  I'm going to stop the screen sharing.

6           THE COURT:  If someone can take that down.  Thank

7  you.

8           Okay.  I did not see any other hands for cross-

9  examination.

10          MR. SCHIAVONI:  Oh, I'm sorry, Your Honor.  I had a

11  couple of things.

12          THE COURT:  Oh.

13          MR. SCHIAVONI:  But, I don't know.  It's redirect,

14  I suppose.  I never know what to call it.

15          THE COURT:  Okay.  So, now I see a lot of people.

16          And Mr. Martin, are you going to have redirect?

17          MR. ERNEST MARTIN:  A few, yes.

18          THE COURT:  What I'm trying to determine is, is

19  this the time to take a lunch break or not.

20          MR. ERNEST MARTIN:  I think so, Your Honor.

21          THE COURT:  Okay.  We're going to take a lunch

22  break.  It is 10 minutes before 2:00.  We are going to take

23  an hour.  We will be back here at 10 minutes before 3:00

24  Eastern time.

25          MR. ERNEST MARTIN:  Thank you, Your Honor.

1          THE COURT:  We're in recess.

2          Ms. Gutzler, please do not speak with anyone

3  regarding your testimony, during the break.

4          THE WITNESS:  Okay.

5      (Recess taken at 1:51 p.m.)

6      (Proceedings resumed at 2:50 p.m.)

7          THE COURT:  Okay.  This is Judge Silverstein.

8  We're back on the record.  Mr. Plevin.

9          MR. PLEVIN:  Good afternoon, Your Honor.  My

10  questions are, I think, in the nature of redirect.  But if

11  there's nobody else who has cross, I guess I'm situated like

12  Mr. Schiavoni in that regard.

13          THE COURT:  Okay.  Is there any other cross?  I

14  don't see anyone.  Mr. Plevin.

15          MR. PLEVIN:  Okay.

16                    CROSS-EXAMINATION

17  BY MR. PLEVIN:

18  Q    Good afternoon, Ms. Gutzler, how are you?

19  A    I'm good.  How are you?

20  Q    Do you recall Ms. Arnone questioning you about

21  Paragraph 100 of your declaration?  And could I ask the

22  Haynes & Boone team to pull that up, please?

23  A    Yes.

24  Q    And in particular, Ms. Arnone focused on the second

25  sentence of that paragraph, which I'll read.  "Furthermore,

1  although not yet raised by Zurich as coverage defense, the

2  possibility of a Court ruling that the matching deductible

3  policies issued by Zurich had no aggregate limit could risk

4  the majority of excess coverage available to pay abuse

5  claims"; did I read that correctly?

6  A    You did.

7  Q    I would like to show you Exhibit -- Joint Exhibit 1-

8  280.  And particular -- in particular, if you could look at

9  Page 5 -- well, actually, let's stop on Page 1 for a second.

10       Have you seen this before, Ms. Gutzler?

11  A    I'm not sure.  If so, it was a long time ago.  But I'm

12  not sure.

13  Q    Okay.  I -- I will represent to you that this a

14  disclosure statement objection that was filed earlier in this

15  case by the Zurich Insurers who I neglected to mention to you

16  I represent the Zurich Insurers.  So it was filed by the

17  Zurich Insurers and other Insurers as well on August 17,

18  2021; do you see that?

19  A    Yes.

20  Q    Okay.  And if we could go to Page 5, please?  There's a

21  paragraph there -- there's a heading that says that says the

22  Zurich policies are subject to SIRs of at least $1 million

23  per occurrence; do you see that?

24  A    Yes.

25  Q    And if you read the rest of the paragraph, it says that

1  all of the Zurich policies -- I'm starting now in, I guess,

2  the third sentence, which is the fourth line down.  Are you

3  able to see that okay, Ms. Gutzler?

4  A     I am, yep.

5  Q     Okay.  It says all of the Zurich policies sit above and

6  follow Form 2.  Underlying polices that explicitly contain

7  per occurrence SIRs of at least $1 million and potentially up

8  to 4 million in some years, which continue to apply even when

9  coverage underlying the Zurich policies is exhausted; do you

10  see that?

11  A     Yes.  I do.

12  Q     And then it goes on to say that these SIRs have no

13  aggregate limit, which means they must be satisfied for each

14  separate occurrence, no matter how many occurrences there may

15  be; do you see that?

16  A     Yes.

17  Q     And then it says in practical effect this means that

18  even if all underlying coverage below a particular Zurich

19  policy were exhausted, a judgment in an amount less than $1

20  million would not be entitled to any payment from that Zurich

21  policy; do you see that?

22  A     I do.

23  Q     Were you aware that Zurich had made these arguments in

24  the case?

25  A     Again, I don't know that I've seen this document.  I

1  know there are disputes as to whether the aggregate limits

2  apply in those underlying policies between the insurers and

3  BSA.  Whether, specifically, I knew Zurich, I'm not sure.

4  Q    Okay.  And if we could briefly look at Page 8?  Again,

5  this is JTX1-280.  And starting on the bottom of Page 8, you

6  see there's another heading, and I just want to point out

7  that the -- the first sentence states, with respect to the

8  SIRs, the disclosure statement confusingly muddles the issues

9  by attempting to conflate deductibles contained in the

10 primary layer of coverage with the SIRs contained in policies

11 above the primary layer; do you see that?

12 A    Yes.

13 Q    Were you aware that Zurich and the Debtors had a

14 dispute about whether the Zurich policies sat above matching

15 deductibles or self-insured retentions?

16 A    Again, not specifically related Zurich.  I've -- I've

17 heard some issues surrounding the deductibles and SIRs.

18 Q    Okay.  If you go to the top of Page 9, in the first

19 line, there's a sentence that states the disclosure statement

20 also nowhere reflects the reality that the SIRS apply on a

21 per-occurrence basis, which is another factor that makes the

22 putative indemnification obligation of Zurich and other

23 excess insurers unlikely to attach; do you see that?

24 A    Yes.

25 Q    So do you now understand that Zurich, in fact, made the

1  arguments that are referred to in Paragraph 100 of your

2  declaration?

3  A    Yes, I think so.  Without reading this entire document,

4  just the sentences you've pulled out --

5  Q    Go ahead, I'm sorry.

6  A    I was going to say yes, it seems that they made those

7  arguments.  I think my sentence says not raised as a coverage

8  defense, so that could be in litigation as opposed to just a

9  statement.  I don't know, but I -- I don't know that I've

10  seen this document, so.

11  Q    Okay.  When you said in paragraph -- in -- in your

12  earlier testimony that if the matching deductibles were

13  subject -- were not subject to aggregate limits -- let -- let

14  me start over, because I -- I got that confused.  If -- if --

15  earlier in your testimony, you said that if the matching

16  deductibles were not subject to aggregate limits, that

17  Zurich's obligation would be essentially zero; do you recall

18  that testimony?

19  A    I said that under the valuation scenarios that I ran.

20  Yes.

21  Q    Right.  And the arguments that I just showed you that

22  Zurich made in its disclosure statement objections, do you

23  understand that those are, essentially the same arguments as

24  saying that the matching deductibles do not have aggregate

25  limits?

1  A      Again, without reading that document in totality, it

2  certainly seems that that's the same type of argument.

3  Q      Okay.

4            MR. PLEVIN:  Your Honor, I have no further

5  questions.  I would ask, unless this falls in the -- the rule

6  about pleadings that JTX1-280 be received in evidence not for

7  the truth of the matter asserted therein, but simply to show

8  that Zurich made those arguments in that paper that was filed

9  in August of 2021 in this case.

10            THE COURT:  Any objections?

11            UNIDENTIFIED:  No objections.  No objections.

12            THE COURT:  It's admitted.  It may have come in

13  already with the declaration, but it's admitted.

14      (JTX-1-280 received in evidence)

15            MR. PLEVIN:  Thank you.  And thank you,

16  Ms. Gutzler.

17            MS. GUTZLER:  Thank you.

18            THE COURT:  Mr. Schiavoni.

19                      CROSS-EXAMINATION

20  BY MR. SCHIAVONI:

21  Q      Hello, Ms. Gutzler.  We haven't met before, have we?

22  A      I don't think so.

23  Q      I didn't work with you on your expert report in your

24  declaration, did I?

25  A      No, you did not.

1  Q     And -- and nobody from Century worked with you on your

2  expert report or your -- your declaration, did they?

3  A     No.

4  Q     Okay.  You refer, in your declaration starting around

5  Paragraph 82, to pending coverage litigation between BSA and

6  Century; do -- do you recall that generally, ma'am?

7  A     Yes.

8  Q     Okay.  And were lost policies an issue in the pre-

9  petition coverage litigation?

10 A     I think there was some issue or issues raised regarding

11 evidence of policies.

12 Q     Okay.  In -- in the disclosure statement, in this case,

13 the one that was filed on September 15, 2021, there's a

14 statement on Page 54 that -- and let me just read it to you,

15 and I'm going to ask you whether it's correct or not.  To

16 date, the BSA and local councils have been unable to locate

17 either copies of a number of the insurance policies it

18 believes were issued to local councils, or secondary evidence

19 of their existence, colon, and then it says however, some of

20 the secondary evidence does not provide specific terms of the

21 insurance policies, such as limits of the policy.  Period.

22       Is -- is that correct that -- that policy -- that --

23 that the BSA and local councils were unable to locate copies

24 of a number of their insurance policies?

25 A     I have no reason to believe it's incorrect.

1  Q    Okay.  And in going through the pre-1971 policies,

2  ma'am, can -- am I correct that BSA has never been able to

3  locate any pre-1962 policies issued by INA to the Boy Scouts

4  for the local councils?

5  A    If we want to pull up the exhibit with my 5,000

6  policies, I can check that, but I don't know, specifically.

7  I can't -- I can't say off the top of my head that there's

8  any policies in those years with or without policy evidence.

9  We can look, but I just can't tell you off that top of my

10 head whether that's true or not.

11 Q    Okay.  What I'm trying to get at is something

12 different.  Were there entire periods of time, where you were

13 not able, and didn't have copies of actual policies for --

14 for an INA, for instance?

15 A    Well, I don't know if there are entire periods of time

16 where I didn't have copies because I wouldn't know that they

17 exist.  I mean, again, my listing shows specifically where we

18 had policy evidence versus secondary evidence, and so we

19 could look at that to determine what kind of evidence we had

20 if there was additional other missing policies, that's

21 possible.

22 Q    Okay.  How do you denote in your chart when you only

23 had secondary evidence of the possible existence of a policy?

24 A    There is a column in that chart that lists -- I think

25 it's called evidence, but I'm not sure exactly if it says

1  evidence, but under -- for each line, it has either a PE,

2  which stands for policy evidence, or an SE that stands for

3  secondary evidence.

4  Q    And tell us, what was the difference in your

5  designation between PE and SC?

6  A    It's PE and SE.  The PE indicated that we had policy

7  evidence, so an actual copy of the policy or a declaration

8  page from a particular policy.  Secondary evidence means that

9  we had other information that indicated a policy existed, so

10 that could be a renewal -- I -- like I described this

11 morning.  It could be references to policies in meeting

12 minutes, or in correspondence, so there's a variety of

13 different things that could be used or were used as secondary

14 evidence.

15 Q    Okay.  And when you had only secondary evidence, could

16 that be something like, just like you referred to?  Just a

17 meeting minute that said geez, there was coverage pre-'62?

18 A    Well, if it was that vague, there was coverage pre-'62,

19 we wouldn't have included that because without a -- an

20 insurer name or some sort of -- there's nothing to allocate

21 to in that situation, so the -- the main purpose of what I

22 pulled together was to do an insurance allocation, so just a

23 -- a memo saying we had a bunch of coverage before 1962

24 wouldn't have been enough.  And in fact, on that listing of

25 5,000 policies, there are a number of policies where the

1    policy evidence is listed -- I should say secondary evidence

2    is listed, but the insurance carrier name is unknown, and we

3    did not include those policies.

4    Q    Okay.  Were there times, ma'am, when you had secondary

5    evidence of -- of a possible name of the carrier, and -- and

6    a policy, but you didn't have direct evidence of what the

7    limit was of the policy?

8    A    Yes.

9    Q    And in those instances, did you make assumptions about

10   what the limit would be?

11   A    Yes, we did.  I'm -- I think the example I gave this

12   morning was -- was actually an example of that where we had a

13   renewal of the policy --

14   Q    Um-hum.

15   A    -- and the policy that we had did contain limits, and

16   it was -- it stated specifically it was a renewal of a policy

17   number, and so without that policy that preceded those, we

18   were able to assume through secondary evidence that the

19   policy existed.

20   Q    Okay.  But what you would do -- one of the things you

21   assume sometimes was what the limit of the policy was, right?

22        When you had other evidence and maybe a particular

23   carrier issued the policy, right?

24   A    Yes.

25   Q    Okay.  And when you had something like just meeting

1  minutes, in -- indicating that coverage was issued, was

2  another thing that you assumed was what the specific terms

3  were of the policy?

4  A    Well, I think, you know, as I mentioned this morning,

5  what we needed for purposes of allocation for an insured --

6  insurer name, the policy dates, the per-occurrence and/or

7  aggregate limits, and what the -- who the covered parties

8  were under those policies.  We did not use other specific

9  policy terms necessarily in our allocations, so we did make

10 assumptions on certain secondary evidence as it relates to

11 dates and limits.

12 Q    Okay.  And -- and on one of the other things

13 you -- you made assumptions were the actual terms of the

14 policy; am I right?  Because you didn't have copies of the

15 policies when you only had secondary evidence.

16 A    If by terms you mean limits and policy dates, things

17 like that, yes.  Those -- some of those assumptions were

18 used, and they're -- they're outlined in that 5,000 policy

19 listing.

20 Q    Okay.  And there were some times where you only had

21 endorsements, but they -- or the -- strike that.  There were

22 some times where you only had the declaration page of a

23 policy; am I right?

24 A    Yes.

25 Q    Okay.  And that would be denoted by -- would you put a

1  PE in your chart when that was the case?

2  A    I believe so, and I -- I think there's also a column

3  that says whether there was policy or declaration.  So there

4  is another column next to the PE or SE that says,

5  specifically what we had.  So again, we could look at it and

6  see where it says declaration, but I believe the declarations

7  were coded as policy information.

8  Q    Okay.  And where you only had the declaration page, am

9  I correct that the declaration pages pre-'71 didn't have a

10  list of them -- of what endorsements were attached to the

11  policies?

12  A    Correct.  If we only had a declaration page, we would

13  not have had the endorsements as well.

14  Q    Okay.  And the endorsements are -- are part of the

15  insurance policy contract itself; am I right?

16  A    Yes.

17  Q    Okay.  And those endorsements will oftentimes have in

18  them specific terms dealing with such things as aggregate

19  limits, and how they apply, won't they?

20  A    They can.  Yes.

21  Q    Okay.  Is another thing that you can have in an

22  endorsement is a cancellation of a policy?

23  A    You could, yes.

24  Q    Okay.  So is it fair to say where you only had the

25  declaration page of a policy you -- you -- your assumptions

1  included that the -- that the endorsements did not provide

2  for aggregates, did not result in the cancellation of the

3  policy, and did not do other things that would have precluded

4  coverage for an abuse claim?

5  A    Yes.  We relied only on the evidence that we had, so to

6  the extent we only had a dec page, that's correct.  We used

7  the information in the dec page, but also indicated that on

8  the listing so that it was clear what we were using.

9  Q    Okay.  And am I right that -- did Century assert to BSA

10  that it didn't have sufficient evidence of the pre-1962

11  policies in order to prove up those policies for coverage?

12  A    I believe so.  I believe there were some questions

13  regarding policy evidence.

14  Q    Okay.  And is it also true that Century asserted pre-

15  petition that a number of the policies that were alleged pre-

16  '76, BSA didn't have sufficient -- either BSA or the local

17  councils didn't have sufficient evidence to establish

18  coverage under those policies?

19  A    Again, I have no reason to -- to believe differently,

20  if that's what you're asserting -- you're telling me today.

21  Q    Okay.  Now, have you heard of something called a

22  specimen policy?

23  A    I have.

24  Q    Okay.  Is it -- tell us, what is a specimen?  In

25  insurance -- in the insurance world.

1  A      Well, my understanding of a specimen policy, it is just

2  a -- sort of a sample, like policy of what coverage could be.

3  Q      Okay.  And it's only -- it's only part of what -- of

4  what would be part of the policy, right?  It doesn't include,

5  say, the dec page, or any of the endorsements, for instance,

6  right?

7  A      I think that's right.

8  Q      Okay.  And it -- and the specimen actually is just

9  that, it's sort of -- it's -- it's an example, it's not

10 actually part of the policy that was issued to Boy Scouts, am

11 I right?

12 A      I would have to see what specific instance you're

13 talking about, but if it's just a specimen policy without

14 limits or information, then we would not have used that as a

15 policy.

16 Q      Okay.  Were there many instances pre-'71 where the only

17 documentary evidence you had in a file for associated with

18 saying -- asserting that it was I&A coverage, was the

19 specimen form?

20 A      Again, I don't know how many instances there were of

21 that.  I -- I just can't say.

22 Q      Okay.  And Ms. Gutzler, were these kinds of issues, the

23 issues about whether there was sufficiency of evidence pre-

24 '76 of the policies, were those all things that would be

25 played out in litigation between the Boy Scouts and the local

1  councils in a coverage litigation?

2  A     Yes.  I believe so.

3  Q     Okay.  Have you heard of a defense asserted to coverage

4  that's sort of loosely termed the expected or intended

5  defense, or the fortuity defense?

6  A     Yes, I've heard of that.

7  Q     Okay.  And can you tell us in general terms what it is?

8  A     Yes, I think when an insurer asserts an expected or

9  intended defense, that relates to whether or not they believe

10 the insured either expected or intended the incident that is

11 a question to have happened, and that relates specifically to

12 certain language in the policies.

13 Q     Okay.  And have you heard of situations where insurers

14 have asserted lack of fortuity or an -- or the so-called

15 expected or intended defense in connection with specific

16 abused claims for which coverage is sought?

17 A     Have I ever heard of that?

18 Q     Yeah.

19 A     Happening?  Yes.

20 Q     Okay.  And -- and -- and under this expected or

21 intended defense, if a policy holder knew or should have

22 known about an abuser's actions, coverage might not be

23 available, or at least, that's the insurer's contention,

24 isn't it?

25 A     Well, I can -- I can agree with you that that would be

1  the insurer's contention, but I'm not here trying to make a

2  determination as to whether an expected or intended provision

3  in a policy is applicable or not.

4  Q    And I'm not asking you to.  I'm just asking you is that

5  something that's subject to litigation in the -- in coverage

6  litigation in the -- outside of bankruptcy?

7  A    Yes.

8  Q    Okay.  Could this coverage defense of expected or

9  intended come into play, for example, for claims arising in

10  Guam, where a specific priest, Father Brouillard, is alleged

11  to have abused multiple boys over a long period of time with

12  the knowledge of the bishop there?

13          MS. ARNONE:  Objection.  This is speculative and

14  it assumes facts that are not in evidence before this Court.

15          THE COURT: Sustained.

16          MS. ARNONE:  I don't think this witness has any

17  basis of knowledge to know about Father Brouillard's abuse,

18  about any notice that the archdiocese or Boy Scouts may have

19  had about that abuse, or whether that defense would apply or

20  not to those claims.

21          THE COURT:  Sustained.

22          MR. SCHIAVONI:  I --

23  BY MR. SCHIAVONI:

24  Q    Is this kind of defense, this expected or intended

25  defense, a defense that would be fact-specific to individual

1 claims?

2 A    I -- I would assume so.  Again, I didn't look at the

3 coverage that way or the claims, so -- I just -- I'm -- I

4 would assume so, but I don't know that I want to make a

5 determination on -- on that.

6 Q    Okay.  Did certain of the policies that you have for

7 local councils on your chart -- were they issued on a multi-

8 year term basis?

9 A    Yes.  Some were.

10 Q    All right.  Can -- can you tell us what's the

11 difference between a policy that's issued on a -- on a term

12 and an annual basis, and it's -- this is a simple question,

13 I'm not -- there's not a trick here, it's like, so you -- you

14 can give a simple answer.

15 A    Yes.  A policy that's listed on a term basis might be

16 for multiple periods of time, so potentially a three-year

17 period of time.

18 Q    Did you assume, in preparing your charts, that all of

19 the local council policies that were issued on term basis for

20 multiple years had a separate -- were -- were issued -- well,

21 strike that.  Let me ask it this way:  For those policies

22 that were term policies that were issued -- that are listed

23 on your chart, did you list them just once, or did you list

24 them for each year separately on your -- on your chart?

25 A    And we're speaking just about local council?

1    Q      Yes.

2    A      They would have been listed separately.

3    Q      Right.  So when -- if you just simply count up the

4    lines, to make a simple point, it -- it looks like there's

5    more policies than there are, right?  Because a number of the

6    policies are for three-year terms?

7    A      Right.  I think this morning I referred to them as

8    policy periods, not policies.

9    Q      Okay.  Were many of the alleged I&A policies, policies

10   that were issued on a term basis for multiple years rather

11   than in one year?

12   A      Sure, there were some.  And it would be easy to

13   identify those looking at the list.  The policy number would

14   be the same.  So, yeah, I think there's some.  I don't know

15   if I would describe it as many.  We could look, but yes,

16   there would be some.

17   Q      For policies of this type, I&A policies that were on a

18   term basis, did you make the assumption that there was a

19   separate occurrence limit available in each and every one of

20   the years for those term policies?

21   A      Yes.

22   Q      Okay.  And the issue of whether or not the -- the

23   policy had a per-occurrence limit for one year, or the

24   multiple or separate ones for each of the terms, that would

25   be an issue that would be determined by a -- a reading of the

1  policy in full; am I right?

2  A     Yes.  That and potentially a coverage court.

3  Q     Right.  It -- it -- it would be a legal determination,

4  fundamentally, at the end of the day, right?

5  A     Yes.

6  Q     Applying the facts to the law of those policies, right?

7  A     The language of the policies and the law, yes.

8  Q     Okay.  And you didn't have complete copies of many of

9  the policies in -- in order to put before a fact finder the

10  full information about the terms of those policies, right?

11  A     Correct.

12  Q     And that's one of the reasons why you had to make an

13  assumption about how the per-occurrence limits applied,

14  right?

15  A     Yes.

16  Q     Okay.  And am I right that if the I&A policies have

17  a -- if -- if the occurrences apply on a term basis, in other

18  words, there's one occurrence for the term rather than on an

19  annual -- annual basis, all those -- all the policies you've

20  listed for three years as having three separate occurrence

21  limits, it'd all be collapsed into one occurrence limit,

22  right?

23  A     Sure.

24  Q     Now, are you familiar with -- and -- and that would be

25  an issue that would be subject to coverage litigation between

1 Century and the Boy Scouts, Century and the local councils;

2 am I right?

3 A    Yes.

4 Q    Okay.  Now, are you familiar with the term combined

5 single limit?

6 A    I am.

7 Q    Okay.  And can you tell us what -- what a combined

8 single limit is?

9 A    Yeah, a combined single limit is when the limit when

10 applied to a combination of different limit types.  So bodily

11 injury and property damage or something like that would have

12 a single combined limit.

13 Q    Okay.  Can -- if you have a policy with multiple

14 insureds that are insured under that policy, can you -- does

15 the term combined single limit, can it also apply to applying

16 one limit to all the insureds under the policy?

17            MS. ARNONE:  Objection.  This calls for a legal

18 conclusion about what the meaning of an occurrence is, and

19 whether it applies to different insureds individually,

20 which --

21            MR. SCHIAVONI:  But it doesn't honestly.

22            MS. ARNONE:  -- (inaudible) case on this around

23 the country.  There is.

24            MR. SCHIAVONI:  I'm just asking --

25            MS. ARNONE:  There is.

1          MR. SCHIAVONI:  I'm not asking for a legal

2    determination, Your Honor.  I'm just asking for a -- the --

3    it's -- you just heard it the prior line of questioning.  I

4    want to know what's -- what are assumptions here, what

5    aren't.  I'm asking for basic insurance terms here.

6          THE COURT:  Overruled.  Go ahead.  I'm not taking

7    it as a legal determination.  Go ahead.

8    A    I can answer with what we did and how we treated that,

9    but we did not include separate occurrence limits for every

10   insured party under a policy.  So for example, a policy that

11   insured both the local councils and the Boy Scouts, we did

12   not include two separate per-occurrence limits.

13   Q    Okay.  You've -- in doing allocations of the course of

14   your career, you've had to -- sometimes do allocations where

15   you made -- there's been an issue about whether the

16   occurrence limits apply separately to each insured, or

17   whether there -- there's one combined limit that applies to

18   all insureds under the policy at once, right?

19   A    Yes.  In my career, I've dealt with that.

20   Q    Okay.  And, ma'am, there's -- I -- I want to read to

21   you a term that appears in -- in some of the policies for

22   I&A.  And I'm going to ask you if you're familiar with it.

23   The inclusion of this in this policy of more than one insured

24   shall not operate to increase the limits of the company's

25   total liability to any insureds covered by this policy beyond

1  the limits set forth in the declarations.  Have you -- did

2  you read that -- that clause in the -- in the I&A policies

3  and apply it as part of your allocation?

4  A    As I said, we applied a single limit -- per-occurrence

5  limit, for all insured entities under those policies.  That's

6  the application that we used.

7  Q    All right.  Let's just -- let's just focus on that for

8  a second.  If -- so if we -- under how you did this work, if

9  there was a claim alleging abuse -- abuse of a Scout against

10 the Boy Scouts, the charter, and the local council, and the

11 limit of the policy, the per-occurrence limit was 500,000,

12 and it was paid to satisfy -- that $500,000 was paid out to

13 the local council, would that, given -- given how you have

14 applied your allocation -- not what the law is, but just what

15 you've done, would extinguish that occurrence limit for that

16 policy?

17 A    For purposes of the allocation that I performed, that

18 would -- yes, that would extinguish the liability.

19 Q    Have you heard of a term in insurance policies called

20 other insurance -- an -- another insurance clause or another

21 insurance provision?

22 A    Yes.

23 Q    Okay.  And can you tell us generally what that kind of

24 clause is about?

25 A    Yeah.  Other occurrence -- other insurance clauses

1  relate to -- they're written about what other potential

2  insurance might be available to respond to a particular

3  claim.

4  Q     Okay.  And did you -- in doing your allocation with

5  respect to Century, did you go through the policies, look at

6  the other insurance clauses, and apply them to determine what

7  the allocation would be at Century?

8  A     No.  I -- I think I've been pretty clear about how we

9  applied our assumptions in -- and it didn't differ based on

10 reading of each individual policy in that regard.

11 Q     Okay.  And -- and, ma'am, if -- if there were

12 allocations -- if -- if -- if there were reallocations made

13 to other insurance because of those clauses, to an I&A

14 policy, that would --- would that reduce the allocation to

15 I&A?

16 A     Can you -- can you restate that?

17 Q     Sure.  If there was, in fact, another insurance clause

18 in an I&A policy, and there was other insurance available,

19 would it reduce your allocation to I&A that you did as part

20 of your work here?

21 A     That's not an assumption that we used or took into

22 account, so I think I would -- with the allocations that we

23 did, we didn't take that kind of thing into account.

24 Q     Right.  And that's totally fine.  I'm just trying to

25 get at if that -- that's something that could further reduce

1  the allocation to I&A; am I right?

2  A     Yeah, I think that's possible.

3  Q     Okay.  And if the policies, the I&A policies,

4  were -- that were pre-'76 have an occurrence on a term basis

5  rather than an annual basis, that's something that could

6  reduce your allocation to I&A also because you assumed and

7  annual basis, right?

8  A     Well, I think when you are using a trigger of a first

9  encounter trigger, each -- each survivor is still an

10  occurrence, so whether that occurrence limit was over three

11  periods of time separately, or one three-year period, as long

12  as the per-occurrence limit were touched by the first

13  encounter agreement -- or first encounter trigger, I think it

14  would end up being the same.

15  Q     And ma'am, I want to just go to the -- if there were

16  policies that were deemed -- that you have lifted on you list

17  for I&A pre-'76, that were lost, that a court were to find

18  that there was insufficient evidence for, that you've

19  otherwise listed, that would reduce the allocation to I&A,

20  wouldn't it?

21  A     If a court were to find that those policies didn't

22  exist, yes.

23  Q     Okay.  Now, you were asked a couple of questions about

24  the Aloha Council; do you remember that?

25  A     I do.

1  Q     Okay.  And you were asked whether Century I&A

2  in -- whether your recollection was that they insured the

3  Aloha Council, and -- and I think that you -- you gave

4  whatever testimony you did.  I don't want to recount it, but

5  you -- you were asked some questions along those lines; do

6  you remember that?

7  A     I do.

8  Q     Okay.  Ma'am, is it correct that Guam was not part of

9  the Aloha Council prior to 1971?

10 A     I don't know that off the top of my head.

11 Q     Isn't -- there's a -- places on your chart where you

12 list charter and -- and I think -- and then below it unknown.

13       Can you tell us what that's supposed to mean?

14 A     Yes.  On our listing we have a column labeled charter,

15 and there's three potential values underneath that.  One of

16 them is insured, which indicate that our review indicated

17 those charters were insured under those policies.  There's

18 the -- there's a no, which would indicate that they were not

19 insured under those policies, and then there's unknown, which

20 means we were not able to determine whether or not charters

21 were insured or not.

22 Q     Now, ma'am, you -- in the work you did, the allocations

23 you did, the assessment of reasonableness, were you looking

24 at Boy Scout claims -- claims -- strike that.  Was the work

25 you were doing focused on claims for abuse involving

1 | Scouting?

2 | A     Yes.

3 | Q     Okay.  And was -- in -- in offering the opinions you

4 | did about the reasonableness of the settlements, am I correct

5 | that you were offering opinions about the reasonableness of

6 | the settlements to settle claims for -- for abuse in

7 | Scouting -- sexual abuse in Scouting?

8 | A     Yes.  That was my understanding.

9 | Q     And in offering the opinions you did about

10 | reasonableness, did you understand that those claims for

11 | abuse in Scouting could be asserted -- the same claims could

12 | be asserted against the Boy Scouts, the local council, and

13 | the charter?

14 | A     Yes.

15 | Q     And you've looked at those claims in their totality and

16 | you made -- the opinions you reached were about the

17 | reasonableness of the settlements for those claims; am I

18 | right?

19 | A     Yes.  And, again, we've received those claim values

20 | from Dr. Bates, and my understanding from Dr. Bates is that

21 | they were the full claim value.

22 | Q     Okay.  So Ms. Arnone asked you some questions about

23 | whether you were offering opinions about -- about releases.

24 |       Do you remember those questions?

25 | A     Yes.

1  Q      Did you understand her and ask -- and when she was

2  asking you those questions as to whether or not you were

3  opining on the -- the legal reasonableness of third -- of

4  these releases?

5  A      I was not opining on the legalness -- or reasonableness

6  of those releases.

7  Q      Were you purporting in any way to suggest that you were

8  not, in fact, opining on the reasonableness of the -- of the

9  amounts paid for the Boy Scout claims?

10 A      I think you asked that with a couple of nots, but I --

11 I was not -- I was opining on it as it relates to the Boy

12 Scout claims.

13 Q      Okay.  Thanks for curing my otherwise defective

14 question, ma'am.  I -- I am -- with that, I'm going to hang

15 my shingle up for the moment.  And thank you very much.

16            MR. SCHIAVONI:  Thank you, judge, for your

17 patience.

18            THE COURT:  Thank you.  I see a hand up from a

19 Mr. Lee.  Mr. Lee, did you file an objection?

20            MR. LEE:  I filed an objection --

21            THE COURT:  I'm sorry?

22            MR. LEE:  -- to -- I'm sorry, Your Honor, an

23 objection to what?

24            THE COURT:  To confirmation?

25            MR. LEE:  No.  I -- I am -- I represent Clarendon,

1  I am in the same category as Schiavoni.

2           THE COURT:  Ah.  Thank you, Mr. Lee.

3           MR. LEE:  Yes.  And -- and I should be very short,

4  Your Honor.

5           No more than 30 seconds.

6                    CROSS-EXAMINATION

7  BY MR. LEE:

8  Q    Ms. Gutzler, thank you very much for appearing today.

9  You just had a -- a series of questions and answers with Mr.

10 Schiavoni, I wanted to know with respect to the various

11 answers you gave, the rules of the road, and the effects that

12 you testified to, if I were to ask you questions related to

13 the Clarendon policies that were actually or allegedly issued

14 to local councils, would you give the same answers?

15 A    I believe so, by and large, yes.

16          MR. LEE:  Thank you, Your Honor.  That's all I

17 have.

18          THE COURT:  Thank you, Mr. Lee.  Mr. Ruggeri?

19          MR. RUGGERI:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21 BY MR. RUGGERI:

22 Q    Good afternoon, Ms. Gutzler.  My name is James Ruggeri,

23 and I'm counsel for Hartford in this proceeding.  I'll kick

24 it off as Mr. Schiavoni did.  We've never met, have we?

25 A    I think maybe in the past a long time ago, but --

1  Q    Long, long time ago, if ever, right?  Long,

2  long --

3  A    Yes.

4  Q    We never -- we never met in connection with your

5  engagement in this matter, did we?

6  A    No.

7  Q    I want to start with following up, Ms. Gutzler, Ms.

8  Arnone asked you some questions about the strength of

9  Hartford's coverage defenses, and I'd like to direct your

10  attention to your declaration at Paragraph 68.  And that's

11  Page 23 to 42.

12  A    Okay.

13  Q    And in your declaration at Paragraph 38, you reference

14  what you call three counter-claims by Hartford, and that's

15  three defenses that you're aware that Hartford has raised in

16  connection with its coverage dispute with Boy Scouts of

17  America; is that correct?

18  A    Yes.

19  Q    And then if you go to Paragraph 69, you reference an

20  adversary proceeding that Hartford filed in the Bankruptcy

21  Court; do you see that?

22  A    I do.

23  Q    And I went down and I looked at -- at Footnote 94

24  refers to Boy Scouts' motion to dismiss.  I'd like to show

25  you a copy of what's been marked as JTX3-1.

1        MR. RUGGERI:  Please, Your Honor?

2   Q    And Ms. Gutzler, do you recognize this as a copy of

3   Hartford's complaint that is filed in the bankruptcy action?

4   And -- and that being a complaint to which you're referring

5   in Paragraph 69?  You can go to the next page, please?

6   A    I probably -- but yes.

7   Q    Yes.  You -- you -- you reference three defenses, but

8   you weren't seeking to enumerate those three defenses as the

9   only defenses that Hartford's raised in connection with its

10  coverage dispute with Boy Scouts, were you?

11  A    No, I was not.

12  Q    And this -- this pleading, which maybe thankfully Your

13  Honor haven't had a chance to focus on or a reason to focus

14  on it, is 37 pages long if we go to the end.  And it's ten

15  counts long.  You -- you weren't seeking to supplant any of

16  the -- the defenses we've raised there, were you?

17  A    No.  I was not.

18  Q    Okay.  And -- and you said that you didn't discuss the

19  strength or weaknesses of Hartford's coverage defenses, but,

20  as you tell us in Paragraph 69 of your declaration, you do

21  understand that one of the coverage defenses that Hartford

22  raised is that the abuse claims arise out of a single

23  occurrence.  You -- you know that to be correct.  That's

24  Hartford's position, right?

25  A    I understand that, yep.

1  Q    And while you said -- told the Court that you didn't

2  discuss the strength of Hartford's position, I'm correct,

3  aren't I, that when you modeled the liability and modeled the

4  liability to Hartford, you did not assume a single

5  occurrence?  You didn't assume Hartford's position, did you?

6  A    No.  I didn't.

7  Q    Your assumption was that each claimant constituted a

8  separate occurrence for purposes of your modeling, correct?

9  A    Yes.

10 Q    Okay.  Now, I do want to talk a little bit about the --

11 go back to Paragraph 63 of your declaration because I want to

12 be sure that I'm clear.  I'm not sure I was this morning.  Am

13 I correct that what you did is you modeled different

14 scenarios using claim numbers and claim values provided by

15 Dr. Bates?

16 A    That's right.

17 Q    Okay.  And Dr. Bates gave information on the 16,000

18 claimants for the tort distribution, right?

19 A    Yes.

20 Q    And he gave you 47,000 claimants for the TDP

21 distribution, right?

22 A    Yes.

23 Q    And you -- you listened in on some of Dr. Bates'

24 testimony, you told us.  Were -- were you here when Dr. Bates

25 told us that the 16,000 were what he believed were best

1  representative of those filed in the tort system?

2  A    I believe I heard that.

3  Q    Okay.  And Ms. Arnone asked if you -- you only

4  allocated 16,000 or 47,000 -- you did that based on your

5  reliance on the information provided by Dr. Bates, right?

6  A    That's correct.

7  Q    It wasn't within the scope of -- of your assignment to

8  kick the tires or -- or double-check that information that

9  you received from Dr. Bates, was it?

10  A    It was not.

11  Q    And you didn't just pick and choose from the 16,000 or

12  the 47,000 claimants, did you?

13  A    No.  I ran --

14  Q    Okay.  You did --

15  A    -- I ran both.

16  Q    -- you -- you -- you have -- you ran both, but you ran

17  both -- you ran it for each and every one of the 16,000 in

18  the tort distribution, right?

19  A    Yes.

20  Q    And -- and you ran it for each and every one of the

21  47,000 in the TDP distribution, correct?

22  A    Yes.

23  Q    And if we look at the (inaudible), I should say that

24  and -- and in building your model, you ran those claims and

25  claim values according to the model that you built using the

1  assumptions that are set forth on JTX1047; is that right?

2  A    Those assumptions regarding coverage, yes.

3  Q    Right.  It says Exhibit 8 Policy Allocation

4  Assumptions.  We went through that this morning, didn't we?

5  A    Yes.  It's -- it's those coverage assumptions from what

6  policies are in play as well as other assumptions that we've

7  discussed.

8  Q    So -- right.  Using the assumptions that we discussed,

9  including those identified in JTX1047, and using the claim

10  numbers and claim values provided to you by Dr. Bates, we see

11  set forth at -- at Paragraph 62 of your declaration -- the

12  allocations for each of the carriers and each of the --

13  the -- the rows, if you will identify there, right?

14  A    Yes.

15  Q    And -- and so we see that, based on your assumptions,

16  based on a claim numbering claim data provided by Dr. Bates,

17  we see that your range for Hartford running from the 2.4 to

18  3.6, depending on Court distribution or TDP distribution is

19  between 477 million and 767 million dollars, right?

20  A    That's correct.

21  Q    And so each -- for each and every one of those

22  scenarios set forth in your declaration, Hartford's

23  settlement amount of 787 is higher than each and every one of

24  those scenarios, right?

25  A    Yes.

1  Q     Okay.  And -- and Ms. Arnone also asked you some

2  questions about whether your model includes allocations to

3  policies issued directly to the charter organizations; do you

4  remember those questions?

5  A     Yes, I do.

6  Q     And your answer was you didn't run to those policies,

7  right?

8  A     Correct.

9  Q     Am I correct, Ms. Gutzler that as you sit here today,

10 you don't know whether Hartford issued any policies directly

11 to the Archbishop of Agana, do you?

12 A     I have no idea.

13 Q     Sitting here today, you -- that number could be zero as

14 far as you know, right?

15 A     Sure.

16 Q     Okay.  That's all I have.

17           MR. RUGGERI:  Thank you, Your Honor.

18           THE COURT:  Thank you.  Mr. Martin?

19           MR. ERNEST MARTIN:  I think I'm left.

20           THE COURT:  (Indiscernible.)

21           MR. ERNEST MARTIN:  Thank you, Your Honor.

22           THE COURT:  Take your witness back.

23           MR. ERNEST MARTIN:  I appreciate it.

24           THE COURT:  Yeah.

25 //

1              REDIRECT EXAMINATION

2   BY MR. ERNEST MARTIN:

3   Q     So Ms. Gutzler, just a few questions for you.  And Mr.

4   Ruggeri did talk to you a little bit about the information

5   that you looked at from Mr. Bates.  And I take it you relied

6   upon the claim information that was provided to you by Bates;

7   am I correct?

8   A     Yes.  That's correct.

9   Q     And -- and I know that you didn't listen to the

10  entirety of Mr. Bates' testimony, but are you aware that Mr.

11  Bates testified that his valuation included all claims

12  including future claims?

13  A     Yes.  I think I heard him say that.

14  Q     Okay.  And again, you relied on Dr. Bates' evaluation,

15  correct?

16  A     I did.

17  Q     So if Dr. Bates' valuation included future claims, your

18  analysis would also incorporate future claims as well,

19  correct?

20  A     Yes.  That'd be correct.

21  Q     Okay.  Now I want to draw your attention to your

22  declaration at Paragraph 132.  And Pete, if you could get

23  that on the screen, I'd appreciate it, please.  You said here

24  the purpose of the IRO is to provide claimants that believe

25  their abuse claim is worth more than the maximum value

1  available under the TDP with the right to have their claim

2  evaluated to potentially receive a higher award than is

3  available through the TYPICALLY DEVELOPING PEERS; is that --

4  did I read that correctly?

5  A     Yes, you did.

6  Q     Okay.  And there was some question that was asked of

7  you as to whether you had listened to the trial testimony of

8  Mr. Azer (phonetic), do you remember that?

9  A     Yes, I do.

10 Q     And are you aware that Mr. Azer testified that the IRO

11 was added to the TDP to reflect the BSA's pre-petition claims

12 that had been resolved in excess of 2.7 million; do you

13 remember that?

14         MR. CHRISTIAN:  Objection, Your Honor.  Objection,

15 Your Honor.  The witness testified on cross examination that

16 she did not hear Mr. Azer's trial testimony.

17         MR. ERNEST MARTIN:  Oh -- okay.  Is that correct?

18         THE WITNESS:  I don't know.

19         MR. ERNEST MARTIN:  Okay.

20 Q     I'd -- I'd like to show you then, the testimony of Mr.

21 Azer, if you -- Pete, if you could get that, I think it is at

22 Page 381 of the trial testimony starting at Line 13.  I would

23 like you to read that, Ms. Gutzler.

24 A     Which page?

25 Q     It would be -- it's Page 381, Line 13, to --

1   A     Is that what you have -- okay.

2   Q     -- Page 382, second line.  And can -- can you just read

3   that?

4   A     Line 13 starts with no, absolutely not, so --

5   Q     So why don't you move up so we can read -- we can see

6   the -- the question to which Mr. Azer is responding, Pete.

7   Thank you.  So let me go ahead and -- and read that.  Thank

8   you.  The question was -- and this was to Mr. Azer -- did you

9   at any time when you were negotiating the TDPs, intend the

10  IRO process to be leveraged in order to compel the excess

11  insurers to finally come to the table, and contribute funds

12  in this important cause?  Mr. Azer answered, no, absolutely

13  not.  Again, we created the IRO process because we understood

14  that we had pre-petition claims that exceeded the 2.7

15  million, right?  That is why we did it.  We didn't do it to

16  pressure any insurers.  We didn't do it to create leverage.

17  Again, I have no idea what the neutral is going to do with

18  the claims, and there may not even be claims that go anywhere

19  near that we had, and we need to make everything consistent.

20  That was the goal.  Now, you -- now you've seen that, and you

21  have now read Mr. Azer's testimony.  Now, let me ask you,

22  given your knowledge of the TDP, would you agree that the TDP

23  -- or do you know that the TDP has a cap in it of 2.7

24  million?

25  A     Yes.

1          MR. CHRISTIAN:  Objection, Your Honor.  This

2  witness is not an expert on the TDPs.  And I don't see the

3  relevance of this line of testimony.

4          MR. ERNEST MARTIN:  Well, she -- she's read the

5  TDPs.

6          MR. CHRISTIAN:  She's an expert.  She's being

7  offered to present an expert opinion, and it's not about the

8  TDPs.

9          MR. ERNEST MARTIN:  If you'll give me some leeway,

10  I'm -- I'm -- I'll get there.

11          THE COURT:  Let me -- let me see how you connect

12  it.

13          MR. ERNEST MARTIN:  Okay.

14  Q    So would you agree that with the cap of 2.7 million,

15  that that would, in essence, provide a windfall for the

16  excess carriers if there were pre-petition claims that

17  exceeded 2.7 million?

18  A    Well, with the cap at 2.7 million and the TDP, yes,

19  that would make it difficult, if -- if even possible to hit

20  certain of the excess carriers.

21  Q    And -- and it's the removal of that windfall that would

22  provide this leverage for the excess carriers to settle,

23  correct?

24  A    Yes.

25          MR. CHRISTIAN:  Objection:  leading.

1          THE COURT:  Sustained.

2    Q    So -- so Ms. Gutzler, you stated that the purpose of

3    the IRO was to provide the claimants that believe their abuse

4    claims is worth more than the maximum value available under

5    the TDP with the right to have their claim evaluated at a

6    higher award; remember that?

7    A    Yes.

8    Q    Okay.  So are you offering an opinion today that the

9    very purpose of the IRO was to create leverage?

10   A    No.

11   Q    Okay.  And let me ask you one last question.  In any of

12   the opinions that you have provided today or in connection

13   with your scope of engagement for the BSA, did you rely on

14   attorney/client privileged materials in arriving at your

15   conclusions?

16   A    No.  Did not.

17          MR. ERNEST MARTIN:  No further questions, Your

18   Honor.

19          THE COURT:  Thank you.

20          MR. CHRISTIAN:  Your Honor, may I have one or two

21   questions on recross?

22          THE COURT:  Yes, related to the liberal redirect

23   that happened.

24          MR. CHRISTIAN:  Yes.  Of course, Your Honor.

25   Again, it's David Christian for Great American Continental

1  and speaking on behalf of other certain insurers who are

2  objecting to the plan.  Good afternoon.

3                       RECROSS-EXAMINATION

4  BY MR. CHRISTIAN:

5  Q     So are you aware that the prior version of the TDP when

6  you issued your earlier expert reports about claimants who

7  resort to the tort system?

8  A     Yes.

9  Q     And -- and that tort system would not have the cap that

10 Mr. Martin just asked you about, correct?

11 A     Correct.

12 Q     Okay.  Thank you.

13             MR. CHRISTIAN:  No further questions.

14             THE COURT:  Thank you.

15             MR. RUGGERI:  Your Honor, James Ruggeri.  I forgot

16 to do one thing.  I would offer into evidence JTX 3-1, which

17 is the adversary proceeding complaint that we filed in the

18 Bankruptcy Court.

19             THE COURT:  Any objection?

20             MR. ERNEST MARTIN:  No objection.

21             THE COURT:  Okay.  It's admitted.

22         (Exhibit JTX 3-1 received in evidence)

23             MR. RUGGERI:  Thank you, Judge.

24             THE COURT:  Ms. Arnone?

25             MS. ARNONE:  Your Honor, I just have a few

1  additional questions.

2                    RECROSS-EXAMINATION

3  BY MS. ARNONE:

4  Q    To your -- let me take (inaudible) lower hand here.

5  That's obnoxious, sorry.  To your knowledge, does -- does BSA

6  have all the policies that were issued to BSA from January

7  1st, 1976, to January 1st, 1983?

8  A    I guess I couldn't say for sure that that they have

9  every policy.  I think we've done a good depiction of what we

10  have.  I don't know that anyone could say there's no way

11  there's another policy out there.

12  Q    Were there any gaps in coverage?

13  A    Not that I recognized.

14  Q    Okay.  You were also asked some questions about multi-

15  year policies, and I know you testified as to that that you,

16  also, didn't think that it was particularly relevant -- I

17  guess I'm putting words in your mouth there -- if -- if, in

18  fact, you were assuming just the first abuse, and you trigger

19  that policy all the way up.  But I wanted to ask you a couple

20  questions about those multi-year policies anyway.  So you

21  reviewed quite a lot of these policies that were issues to

22  Boy Scouts, correct?

23  A    To the Boy Scouts?  Yes, yeah.

24  Q    And do you recall -- when you were reviewing those

25  policies, do you recall seeing any annualization of limits

1 provisions in those policies?

2 A    Yes, related to the Boy Scouts' policies, we did do an

3 analysis, and this is pre-petition.  But we did an analysis

4 with counsel of the annualization language in those policies.

5 Q    And can you explain to the Court what an annualization

6 of limits provision is in an insurance policy?

7 A    Yes.  It, I think, is whether a multi-year

8 policy -- there'll be potentially a provision that describes

9 whether those limits apply to each and every period of a

10 particular policy or in total for the timeframe.

11 Q    Okay.  And do those provisions in particular make it so

12 that the policy limits by only -- or they apply on an annual

13 basis instead of to a three-year term, for example.

14 A    Yes, the language can -- can make it go one way or the

15 other.

16 Q    And you did review the Boy Scout policies for those

17 provisions?

18 A    Yes, they were reviewed for those provisions.

19 Q    Do you recall seeing those provisions in -- in a fair

20 number of the Boy Scout policies?

21 A    Again, the number -- I'm not sure the right number, but

22 I know there's language in some of the policies related to

23 that.  But again, that work was done pre-petition by KCIC's

24 consulting team to look at those policies and that language

25 and to assess the value, whether it was -- was or was not

1  annualized.

2  Q    Okay.  You were also asked some questions about the

3  claims evaluations that Dr. Bates performed, and the fact

4  that your analysis was based on what Dr. Bates provided you

5  about the value of the claims, correct?

6  A    Yes, that's correct.

7  Q    And I think you were, also, asked about Dr. Bates

8  assuming that all three tortfeasors that he derived values

9  based on accumulation of the liability of various different

10  tortfeasors that might be responsible for those claims; is

11  that correct?

12  A    Yes --

13  Q    You recall that question?

14  A    -- my understanding was that the value tortfeasors

15  provide us -- provided to us where in aggregate.

16  Q    Okay.  So there's actually a couple of different things

17  that go on with allocating among tortfeasors, right?  One is

18  that you would be allocating among tortfeasors for Scouting-

19  related abuse, and another is if there were any non-Scouting-

20  related abuse that was occurring with Scouting-abuse, as

21  well, there would be an allocation there between Scouting-

22  related abuse and non-Scouting-related abuse.  So my question

23  is, if Dr. Bates' conclusions about the amount of Scouting-

24  related abuse versus the amount of Church-related abuse were

25  unfounded, would that have impacted your analysis, if it

1  impacted his plain valuation?

2  A    If Dr. Bates' valuation were to change -- the numbers

3  were to change on a claim level or an aggregate, yes, that

4  would impact my analysis.

5  Q    Okay.  Okay.  You were also shown the chart that was in

6  Paragraph 62 of your declaration.  And I just want to ask a

7  question or two more about that one.

8         MS. ARNONE:  And if someone could pull up her

9  declaration, that might be easiest.  Paragraph 62.

10 Q    So I believe you testified just a little bit ago in

11 response to questions that you were modeling these different

12 scenarios based on the claims value that Dr. Bates provided

13 to you, correct?

14 A    Yes.

15 Q    And then so for the $2.4 billion VW Tort Distribution

16 column, that was based on 16,000 claim values that Dr. Bates

17 provided to KCIC, correct?

18 A    Yes.

19 Q    Okay.  And then similarly for the column all the way

20 over to the right, the $3.6 billion DW Tort Distribution,

21 that was based on 16,000 claim values that Dr. Bates provided

22 to you, correct?

23 A    That's right.

24 Q    Okay.  And these aren't jury verdict award numbers that

25 Dr. Bates provided to you, correct?

1  A     Well, right.  Again, I don't want to get too far into

2  what Dr. Bates did, but, yeah, I think it's safe to say

3  they're not jury-awarded amounts.

4  Q     Well, and I -- my point was, we are assuming I think

5  with this model, correct, that you've created that the

6  Claimants would be stuck with whatever claim value Dr. Bates

7  has assigned to them in determining how much insurance

8  coverage is available for that claim?

9  A     Right, just using just these valuations; that's

10 correct.

11 Q     Okay.

12 A     I think that performing the models that we did assumes

13 an overall aggregate value, and that's essentially what we

14 did here.  I think, again, I mentioned before that my claim

15 analysis is a simulation, and that can certainly change

16 amongst the claims or which claims.  But the aggregate value

17 is the same.

18 Q     If Dr. Bates hadn't provided claim values, what would

19 you have done to determine the insurance exposures?

20 A     I guess I would have recommended to counsel that they

21 find us someone to get us claim value -- values on a claim

22 level.  I mean, in order to do an allocation, you need the

23 values on some sort of claim level because that's the only

24 way to determine what coverage could even potentially be

25 implicated.

1  Q     Well, you could take the number of occurrences time --

2  times the number of policy limits, right?

3  A     That would assume that you knew that a particular claim

4  was going to hit a certain policy.

5  Q     Sure.  But the maximum potential exposure for an

6  insurer under its policy would be the policy limit, correct?

7  A     Sure.

8  Q     Okay.  Did you analyze Hartford's exposure with any

9  other model other than the values that were provided by Dr.

10 Bates at any point?

11 A     No, just the models that were provided by Dr. Bates.

12 Q     And I guess same question for Century, Zurich, and

13 Clarendon, did you ever analyze their exposure using any

14 other model, like -- something more like jury numbers instead

15 of the values provided by Dr. Bates?

16 A     No, all of our modeling was based on the valuations

17 provided by Dr. Bates.

18 Q     Okay, and then -- I'm sorry.  One more question about

19 this -- this chart in 62, and then I think I'm done.  You

20 were asked a question about Dr. Bates including future claims

21 in his modeling.  Do you remember that?

22 A     Um-hum, yes.

23 Q     Okay.  So under the columns for 2.4 Billion DD -- DW

24 Tort Distribution and the columns for 3.6 Billion DW Tort

25 Distribution, you said that's 16,000 Claimants, correct?

1  A    Well, that's the number of claims he associated a value

2  with.

3  Q    Sure.  So would that include any -- if he was, also,

4  attributing value to the future claim, that would be the

5  existing claims in the bankruptcy, plus -- plus any future

6  claims?

7  A    Well, I believe that Dr. Bates -- again, I don't really

8  want to talk too much about Dr. Bates' analysis, but my

9  understanding is he calculates an aggregate value, and that

10 aggregate value includes future claims.  Then he does a

11 simulation of applying that value to certain claims in order

12 to prepare an allocation.

13 Q    Okay.  So he came to an overall number and then divided

14 it out among a certain number of Claimants?

15         MR. ERNEST MARTIN:  Objection.  Calls for

16 speculation.

17 A    Yes.  My understanding -- again, I'll just stick with

18 that I received these valuations from Dr. Bates, and his

19 methodology for getting to those would be questions you'd

20 have to ask him.

21 Q    Sure, okay.  No further questions.

22         THE COURT:  Thank you.

23         MR. ERNEST MARTIN:  Nothing further.

24         THE COURT:  Very good.  Thank you for your

25 testimony, Ms. Gutzler.  You're excused.

1           MS. GUTZLER:  Thank you.

2       (Witness excused)

3           MR. ERNEST MARTIN:  And, Your Honor, just one

4  thing I wanted to bring to the Court's attention.  We had

5  talked about yesterday how I would be reaching out with the

6  certain insurers to arrive at some exemplar policies, and I

7  wanted to report that we have made some progress in coming to

8  some agreements.  And we will be producing those -- or excuse

9  me -- requesting admission of those documents shortly.  But I

10 just wanted you to know that we are working on that, and

11 we're getting that done.

12          THE COURT:  Great, thank you.  Mr. Abbott?

13          MR. ABBOTT:  Thank you, Your Honor.  Your Honor,

14 the next two witnesses are in support of confirmation are

15 being presented by the TCJC, so we'll hand it off to them,

16 Your Honor.

17          THE COURT:  Okay.

18          MR. MALIONEK:  Good afternoon, Your Honor.  Robert

19 Malionek of Latham & Watkins on behalf of the Church of Jesus

20 Christ of Latter Day Saints, TCJC as we call it.  Our next

21 witness is -- is Paul Rytting.  We submitted his declaration.

22 Originally we filed it on Saturday the 19th --

23          THE COURT:  Yes --

24          MR. MALIONEK:  -- in hopes that he would be able

25 to testify early this week.  He's been on standby.  We

1  received one limited set of objections from the certain

2  insurers.  We worked through those.  We then resubmitted,

3  refiled his declaration, and that is at Docket Number 9449

4  with each of the exhibits attached to it.  We, also, just to

5  be safe, submitted each of the attachments to his declaration

6  as a joint exhibit.  We've received no other objections to

7  his declaration as revised.

8           Your Honor, you should have a binder with

9  Mr. Rytting's declaration and all those exhibits.

10          THE COURT:  I do have a binder.

11          MR. MALIONEK:  And so --

12          THE COURT:  But it's in chambers.  So I need to

13  get it before we start.  And you're going to give some

14  limited live testimony?

15          MR. MALIONEK:  It's just -- I -- I would say, Your

16  Honor, maybe 20 minutes just to supplement and only to

17  address some issues that have arisen related to TCJC and

18  Scouting-related claims that have come up during the trial.

19          THE COURT:  Okay.  Let's take five minutes before

20  we go to Mr. Rytting, and I will get what I need to get out

21  here on the bench.

22          MR. MALIONEK:  Thank you, Your Honor.

23          THE COURT:  Thank you.  We're in recess.

24      (Recess taken at 4:04 p.m.)

25      (Proceedings resumed at 4:10 p.m.)

1          THE COURT:  This is Judge Silverstein.  We're back

2    on the record.

3          MR. MALIONEK:  Thank you, Your Honor.  So now I

4    think that you have the binder in front of you.  I was just

5    about ready to move -- it's Docket Number 9449 and the

6    accompanying exhibits into evidence.

7          THE COURT:  Any objections?

8          MR. PFISTER:  Good afternoon, Your Honor.  Rob

9    Pfister from the Klee/Tuchin Firm on behalf of the P.C.,

10   V.A., and Zalkin.  We do not object to the admission of the

11   declaration subject, of course, to cross-examination.

12         MR. KREBS:  Good afternoon, Your Honor.  This is

13   Konrad Krebs on behalf of Great America.  I'm serving the

14   insurer, and we, also, do not object.

15         THE COURT:  Thank you.  And it's admitted.

16   They're admitted.

17      (Rytting declaration and exhibits received in evidence)

18         MR. MALIONEK:  Thank you, Your Honor.  So we do

19   understand that the certain insurers -- they -- they gave us

20   notice that they'll have a limited cross.  And then just

21   before the afternoon session started up today, we received

22   notice from Mr. Pfizer's firm that they have, I believe, a

23   limited set of cross questions, as well.

24         THE COURT:  Um-hum.

25         MR. MALIONEK:  Okay.

1            THE COURT:  Thank you.

2            MR. MALIONEK:  That's great.  Our -- our hope is,

3  certainly, then, Your Honor, that we'll be able to have the

4  witness go up and down today.

5            THE COURT:  We'll see.

6            MR. MALIONEK:  Now we just need to have him on the

7  screen.

8            THE COURT:  Mr. Rytting, this is Judge

9  Silverstein.  I need to swear you in.  Can you raise your

10  right hand please?  Do you affirm your word that you will

11  tell the truth, the whole truth, and nothing but the truth to

12  the best of your knowledge and ability?

13            MR. RYTTING:  Yes.

14        PAUL RYTTING, WITNESS FOR THE DEBTORS, AFFIRMED

15            THE COURT:  Please state your full name and spell

16  your last name for the record.

17            MR. RYTTING:  Paul Rytting, R-Y-T-T-I-N-G.

18            THE COURT:  Thank you.

19            MR. MALIONEK:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21  BY MR. MALIONEK:

22  Q    Mr. Rytting, where are you joining us from today?

23  A    My office in Salt Lake City.

24  Q    And can you confirm for the Court that there's no one

25  else in the room with you and you don't have any materials

1  related to this case immediately around you?

2  A     Yes.

3  Q     So let me just start by asking you a few questions

4  about your roles and responsibilities with TCJC.  I'll --

5  I'll start -- I'll start generally.  So where are you

6  employed?

7  A     Church of Jesus Christ of Latter Day Saints.

8  Q     What's your current job title?

9  A     I'm the director of the risk management division.

10  Q     How long have you held that position?

11  A     I've had that position since 2002, 20 -- 20 years.

12  Q     When did you begin working for TCJC?

13  A     I was first employed in December of 1991.  I was the

14  manager of claims and litigation for about ten years, a short

15  stint as director of legal services for human resources, and

16  then in 2002 became the director of risk management.

17  Q     And can you explain what are your responsibilities as

18  director of risk management?

19  A     The risk management division oversees -- has executive

20  oversight of the Church's global safety, insurance,

21  environmental operations worldwide, and that would include

22  claims and litigation.

23  Q     Are you, also, a member of TCJC?

24  A     I am.  I was -- I was baptized at the age of eight.

25  Q     Okay, so for how long have you been a member?

1  A      That makes it about 50 --

2  Q      I'm sorry I'm making you give your age, then.

3  A      About 56 years.

4  Q      And have you held any volunteer positions with TCJC?

5  A      Yes, I've -- I've served in -- in capacities involving

6  the youth.  I've been a bishop of the Church.  I've been a

7  state president of the Church, as well.

8  Q      All right.  Let me have you describe the relationship

9  that TCJC had with the Boy Scouts of America.  In your

10 position and based on your own experience, are you familiar

11 with the relationship TCJC had with the BSA in this country?

12 A      Yes.

13 Q      Can you describe it?

14 A      The Church and the Boy Scouts of America entered a

15 relationship over a hundred years ago back in 1913.  We

16 became one of the first affiliate partners of the Boy Scout

17 program in the United States.  We became their first

18 chartered organization and continued so for over a hundred

19 years until we separated in December of 2019.

20 Q      Okay.  Can you just describe for the Court what a

21 chartered organization is?

22 A      A chartered organization is an organization that

23 embraces the program that is put forth by the Boy Scouts of

24 America.  We agreed as a chartered organization to provide

25 volunteer leaders.  We agreed to register boys.  We agreed to

1  provide a facilities for Boy Scouts meetings.  And in

2  exchange, the Boy Scouts of America agrees to provide

3  training, materials, resources, indemnification insurance

4  coverage, and -- and provide the support that we need to

5  further Boy Scout programs.

6  Q    Did the Boy Scouts of America have an official role

7  with the TCJC?

8  A    Yes.

9  Q    What was that?

10 A    Well, as -- as a chartered organization, the Church had

11 a decision -- the Church has a decision as to whether to run

12 its own youth programs, activity programs for young men or --

13 but instead, the Church chose to embrace and adopt the Boy

14 Scouts of America as its sole activity program for young men

15 of the Church of Jesus Christ of Latter Day Saints.

16 Q    Are you aware of any other Church organizations

17 or -- or other organizations that made Scouting their

18 official activity program for youth?

19 A    That I am unaware.

20 Q    So for TCJC sponsored Scouting troops, at what age

21 would young men who are part of TCJC join Scouting?

22 A    The Church, rather than the young men or his parents,

23 would, in fact, enroll any young men at the age of eight into

24 the Cub Program and would continue to enroll young men who

25 are members of the Church through the age of 18.

1  Q      And who were leaders of TCJC sponsored Scouting troops?

2  A      They're volunteer members, usually parents of young men

3  who were part of the Scouting program and members of local

4  congregations who would volunteer to receive training to

5  become Boy Scout leaders.

6  Q      Was there a process for approving leaders of TCJC

7  sponsor Scouting troops?

8  A      Yeah, there's -- there's sort of two -- a dual process.

9  One would be the Boy Scout process where a volunteer who

10 elects to participate as a Boy Scout leader would complete an

11 application, fill in the information needed.  That

12 application would be submitted to the local Scout council.

13 The local Scout council would, then, conduct its own vetting

14 process and then give us notification of whether that leader

15 has been approved for the particular position.

16      At the same time, a local prospective Boy Scout leader

17 would be interviewed by his or her bishop to determine

18 fitfulness to serve with the youth.  That person would,

19 then -- the -- the leader would, then, present that person's

20 name before a local congregation where the Scout unit might

21 be sponsored to make sure that there's no concerns by the

22 general congregation of] the Church.  And then upon approval

23 from the local Scout council, that person would commence his

24 or her volunteer service.

25 Q      Okay, let me shift gears.  I'd like to ask you about

1  the TCJC's process for handling claims.  I'll start

2  generally, and then we can get into its process for handling

3  claims related to abuse.

4  A      Okay.

5  Q      So can you give examples of the range of claims that

6  you address as director of risk management?

7  A      We would -- we would handle a wide variety of claims,

8  liability claims, casualty claims from slip-and-falls to

9  accidents on Church activities or Scout activities to auto

10 accidents to contract disputes to -- to the child abuse

11 issues that we're talking about today.

12 Q      Let me ask you -- let's focus on the child abuse cases

13 that we're talking about as part of this case.  Can you

14 describe the process TCJC has followed in handling sex abuse

15 claims asserted against it?

16 A      Just against the Church or against the Church and the

17 Boy Scouts?

18 Q      You tell me.  If there's a claim that's asserted

19 against TCJC, how would you handle it?

20 A      Well, we receive either some sort of a notification of

21 an incident where abuse may have occurred, and we would

22 immediately involve our legal counsel in conducting an in-

23 depth investigation into the allegations or into the

24 incident.  We'd talk to the survivor of the abuse, to the

25 family of the abused, to the alleged perpetrator of the

1  abuse, to people who might know or may have been witnesses in

2  the circumstances surrounding the abuse.  And then determine

3  whether or not there was legal basis and -- and take and

4  manage the case from there.

5  Q    Would TCJC do anything as part of that investigation to

6  determine whether the claim was Scouting-related?

7  A    Yes, in our interviews with the local individuals

8  involved or surrounding the incident, we would determine if

9  the incident occurred on a -- during a Church activity or

10  during a Church service or during a Boy Scouts service or

11  during a Church -- Boy Scout campout or activity.

12  Q    Okay.  So you've been with TCJC since 1991.  I'd like

13  to understand the process that you just described for how

14  TCJC would investigate sex abuse claims.  Did you do anything

15  when you started working for TCJC to familiarize yourself

16  with the process that TCJC had followed before you started

17  work?

18  A    Yes, when I first started, I was given a stack of

19  claims that we were monitoring involving the Church, and some

20  of those claims involved incidents, accidents, injuries,

21  litigation claims arising from Church-sponsored Boy Scout

22  troops or packs, and as we would -- as I looked at the file,

23  it was evident that the process and the protocol would be to

24  contact the national headquarters of the Boy Scouts of

25  America.  They have a risk management division that's similar

1  to our risk management division, notify them of the claim.

2  Oftentimes, they'd already know about the claim, and request

3  that they indemnify the Church and defend the Church and

4  retain counsel for the Church and its leaders and handle the

5  case.

6  Q     And would the Boy Scouts of America generally do that

7  after you would request it in your experience?

8  A     Yes, they would -- they would take over the case and

9  sometimes we -- when we felt that there was a strategic

10 advantage, we would ask the Boy Scouts to actually retain

11 separate legal counsel for us, or if we didn't like the legal

12 counsel that they were using to defend either the Boy Scouts

13 and the Church, we would ask for separate legal

14 representation.  And they would take over the case, fund the

15 fees, and if there was a settlement, they would pay for the

16 indemnity.

17 Q     Okay.  Let me ask you about how the claims -- these

18 claims were asserted in your experience, generally.  When

19 there was an abuse claim that was made against TCJC that was

20 Scouting-related, in your experience, generally, who would

21 the survivor allege was responsible?

22 A     If -- if it was a demand letter from a plaintiff, the

23 letter is usually addressed to the Church and to the Boy

24 Scouts of America, maybe the local council, maybe the

25 national headquarters.  If it was a lawsuit, we would often

1  see that the plaintiff would include the Church, the Scout

2  troop, Scout leaders, Boy Scouts of America, the local

3  council, as many defendants as there could be possible claims

4  against.

5  Q     So in your experience, generally, the claims or the

6  lawsuits would be brought against all of those defendants as

7  part of the same claim, the same lawsuit?

8  A     Yes, almost always.

9  Q     And in your experience, were those lawsuits over a

10 Scouting-related abuse claim generally litigated separately

11 or all together?

12 A     No, they were always -- they were always one

13 proceeding, one action, one jurisdiction, one venue, and

14 sometimes there'd be multiple defendants, as I've testified,

15 with multiple, you know, legal teams representing the

16 defendants.  But it would all be resolved in the one case.

17 Q     So you wouldn't see or -- would you see any claims,

18 generally speaking, that were litigated against the Boy

19 Scouts and litigated against TCJC for the same claim

20 separately?

21 A     No.

22 Q     Okay.  So let me have you go into a little bit detail

23 about the steps that TCJC would follow in coordinating with

24 the BSA on these Scouting-related abuse claims.  You had said

25 that after your investigation would determine that a claim

1  was Scouting-related, you submitted that or you put the Boy

2  Scouts on notice; is that right?

3  A    That's correct.  We usually would prepare a letter with

4  either the demand letter or the summons and complaint, and if

5  the -- if the documents from the survivor's attorney would

6  indicate a Scout activity, we would highlight that.  And if

7  it didn't, we would highlight, based on our investigation,

8  that these claims arose from a Scout-related incident or

9  involving a Scout leader.

10  Q    Okay.  And you've already talked about how the Boy

11  Scouts generally would provide defense or offer of counsel

12  and indemnification.  What I'd like to ask is did you have an

13  expectation in your role as director of risk management for

14  TCJC whether the Boy Scouts would provide coverage to TCJC

15  for these abuse claims?

16  A    Yes, we certainly had an expectation.  We -- we knew as

17  a chartered organization that they had at least past 1984

18  insurance coverage for chartered organizations.  We knew that

19  we had paid registration fees for boys, for leaders.  We

20  provided facilities and as part of those contributions to the

21  Boy Scouts, we raised funds for the Boy Scouts, the

22  expectation was not only would they provide us with

23  leadership materials and training, but they would also

24  provide indemnification, and that had been the practice for

25  decades before I showed up and for at least a decade after I

1  began working with the Church of Jesus Christ of Latter Day

2  Saints.

3  Q    Mr. Rytting, beyond that practice, did you see support

4  for that expectation regarding indemnification documented

5  anywhere?

6  A    Yes, we would see -- we would see notices come from

7  headquarters, Boy Scout headquarters, assuring chartered

8  organizations that there was primary coverage for chartered

9  organizations.  We knew that part of our registration fees or

10 part of the chartered agreement that's signed every year with

11 the chartered organizations in the Scouts includes a

12 provision that talks about the Scouts providing liability

13 coverage.

14 Q    All right.  And you had started to talk about the fees

15 that TCJC would pay to the Boy Scouts.  Can you describe

16 generally the financial support that TCJC provided to the Boy

17 Scouts over time?

18 A    Yes.  Since the Church is centrally governed when it

19 came to its embracing of the Boy Scout program rather than

20 have, you know, each ward or each congregation make a

21 decision for itself, the Church would actually register each

22 boy at the beginning of each year and pay for his or -- his

23 registration, register each Scout leader and pay for that

24 registration fee, register each troop or pack and pay for

25 that registration fee.  We also conducted annual Friends of

1   Scouting drives, which were sponsored, where we would collect

2   money that were contributed to the Boy Scouts.  The Church

3   also provided, usually held the weekly Scout meetings at its

4   chapels across the country and Canada that we did not charge

5   for but we donated as part of our responsibilities as a

6   chartered organization.

7   Q    Did any TCJC Church leaders play any role in leadership

8   with respect to the Boy Scouts?

9   A    Yes, the Boy Scouts did us the honor on multiple

10  occasions of selecting Church leaders, some of our highest

11  leaders, and in one case the president of the Church of Jesus

12  Christ of Latter Day Saints, Thomas Monson, sat as a member

13  of its national council, which I believe is its national

14  board of directors for over a decade, and thus also

15  demonstrating the Church's commitment to the Scouts and the

16  Scouts' commitment to the Church.

17  Q    All right.  And Mr. Rytting, you had testified about

18  how TCJC used the Boy Scouts of America program as its

19  official youth activity program.  Let me ask you, from your

20  perspective as director of risk management for TCJC, would

21  TCJC have played the same role in Scouting if the BSA did

22  not, as you described, generally indemnify TCJC for abuse

23  claims?

24  A    The indemnification and insurance and hold-harmless was

25  a big deal to us.  I mean, we have our own properties.  We

1  could have had our own functions.  We could have held our own

2  youth program.  But we believed in and endorsed and embraced

3  the Boy Scouts.  But in doing so, we did so with the full

4  expectation that claims arising from Scout activities would

5  be a matter that the Boy Scouts would handle and not the

6  Church.

7  Q    And let me ask you about claims that were -- abuse

8  claims that were settled that were asserted against TCJC that

9  were Scouting-related.  From your experience as director of

10  risk management, did the BSA and TCJC coordinate on issues of

11  settling Scouting-related abuse claims?

12  A    Yeah, it was -- it was a coordinated partnership effort

13  initially.  Later on, as -- as abuse cases became,

14  unfortunately, more frequent, and also cases reached back

15  into more distant times where occurrences took place, rather

16  than accepting those cases and defending those cases on

17  behalf of the Church, the Boy Scouts would begin being more

18  selective about whether they were going to indemnify the

19  Church.  And in some cases, even though we were convinced it

20  occurred on a Scout activity or involved a Scout leader, if

21  the Boy Scouts said we're not going to cover this one, we had

22  no choice but to sometimes defend those and pay settlements

23  on those cases.

24  Q    And were there times when BSA -- the BSA and TCJC

25  coordinated with respect to apportioning the amount of

1   responsibility in paying settlements to survivors?

2   A    There -- there may have been a very few cases where the

3   Church paid some and the Scouts paid some, and but -- but at

4   the end of the day, it was our belief that these cases all

5   arose from -- were related to Boy Scout activities.

6   Q    Did TCJC ever pay more in any of these settlements than

7   it believed was its share of responsibility for a Scouting-

8   related claim?

9   A    Yes, like I've testified, some cases where we were

10  convinced that it was clearly occurred during a Boy Scout

11  activity, and the Scouts had decided not to cover it, not to

12  defend us, we had a choice to either try to resolve the case

13  or, in the worst -- and get some, you know, money to the

14  survivors, or to go to trial and in most cases, we would try

15  to get the case settled.  We would make a payment, and

16  sometimes the Scouts would not make a payment or reimburse us

17  for our legal fees.

18  Q    Let me ask you about those settlements.  When TCJC

19  entered into settlement -- settlements with survivors related

20  to a Scouting-related abuse claim, did TCJC have a practice

21  relating to obtaining releases?

22  A    Well, yeah, we -- I mean, we're never going to settle a

23  case unless we can get a release.  And if there was an

24  element of Scouting or if it was related to Scouting, even

25  sometimes over my objections, our general counsel has a

1  policy that he would always -- we would include the Boy

2  Scouts of America in those settlement agreements and

3  hopefully seek some contribution or reimbursement down the

4  road.

5  Q     In those times that you had discussed where the Boy

6  Scouts did not indemnify TCJC, would the TCJC bring lawsuits

7  against the Boy Scouts?

8  A     No, we never did.  We -- we felt that there were

9  several factors.  There may have been times where I wanted

10  personally to bring those lawsuits, but you got to remember,

11  we had 105-year relationship with the Boy Scouts.  The

12  president of the Church was on the national council of the

13  Boy Scouts, and as partners in this effort to raise boys with

14  moral character, we didn't feel like it was appropriate, and

15  those types of actions never occurred.

16  Q     Now, did TCJC ultimately end its relationship with the

17  Boy Scouts as a chartered organization?

18  A     Yes, in -- in December -- December 31st of 2019, the

19  Church formally terminated its 108-year relationship with the

20  Boy Scouts.  It was announced in 2018 that that relationship

21  was going to terminate, and since that time, we've not had an

22  official relationship with the Scouting program.

23  Q     And TCJC's decision to terminate its relationship with

24  the Boy Scouts have anything to do with the way in which sex

25  abuse claims were handled?

1  A      We -- we were -- we were certainly very concerned about

2  the trajectory of abuse claims that were now being asserted

3  against the Scouts.  We did not want to get caught up in the

4  -- in the whirlwind of those types of claims.  We were

5  getting more and more frustrated with how many cases the

6  Scouts refused to participate in in resolving cases.  And so,

7  yes, it certainly was a factor in the decision.

8  Q      After TCJC ended its relationship with the Boy Scouts

9  in 2019, did TCJC continue to provide any financial

10 assistance to the Boy Scouts?

11 A      Yeah, I think that even after it was announced, we

12 still did one more round, even though the separation was

13 announced and all the Church members knew that we weren't

14 going to be involved in Scouting as of December 31st, 2019, I

15 believe in late 2019, we made a payment -- we did a Friends

16 of Scouting drive, where we went around one more time and

17 gathered contributions for the local Scout councils.  I

18 remember that year, we also paid the Philmont Ranch a quarter

19 of a million dollars because we would no longer be sending

20 and using the Philmont location as we had done for decades.

21        And I believe that a payment was made even after we

22 separated from Scouting because we knew the impact that it

23 would have on -- on Scouts USA as well as Scouts Canada.

24 Q      And can you give approximately the total amount of

25 financial assistance TCJC provided to the Boy Scouts after

1  terminating the relationship in 2019?

2  A    Yeah, I would say that it was in the millions of

3  dollars that we provided assistance where there was really no

4  obligation to do so.

5  Q    Okay.  Let me ask you about the Boy Scouts bankruptcy

6  and the TCJC settlement as part of the bankruptcy.  Does TCJC

7  assert claims against the Boy Scouts in this bankruptcy?

8  A    We do.  We -- we assert a claim for those cases that

9  I've already testified as to where we felt like we were stuck

10  with the legal fees and any settlement amounts where the

11  claim clearly, in our opinion, rose from the Scout activity,

12  and -- and so we feel like it's any other creditor in this

13  bankruptcy, we have the right to assert those claims.

14  Q    Right.  And can you approximate the amount of the claim

15  that the -- that TCJC has asserted against the Boy Scouts?

16  A    Yeah, we believe the -- the settlements and the

17  liquidated damages for part of that -- those claims are

18  approximately $60 to 65 million.

19  Q    Now, since the Boy Scouts filed this bankruptcy

20  proceeding, what role has TCJC played in it?

21  A    Well, when -- when -- when the Scouts filed for

22  bankruptcy in, let's say, February of 2020, I think it was,

23  we marshaled together a small team of attorneys and -- and

24  asked that group to monitor the -- the proceedings, monitor

25  the bankruptcy, participate in the mediation, identify if and

1  when and whether the Church should participate in any

2  settlement, especially since we still had a bunch of claims

3  that involved both the Church and the Boy Scouts.  So that

4  team has reported back to us on a weekly basis for two years

5  now about what was happening with the Boy Scout bankruptcy.

6  Q    Did you, Mr. Rytting, personally participate in any

7  mediation sessions?

8  A    Yes, I -- I attended some mediations.  I was in New

9  York and that -- Mr. Kerry, Mr. Gallagher, the two mediators,

10 I meet with the Debtor's team.  I met with a couple of the

11 survivor group, at least their legal team, and so I have been

12 involved in these proceedings.

13 Q    Okay.  Now, ultimately, TCJC did enter into a

14 settlement in this case, correct?

15 A    Yes, we did.

16 Q    What is TCJC contributing as part of its settlement

17 that is part of the proposed plan of reorganization?

18 A    My understanding is that we are contributing and are

19 prepared to deposit into the bankruptcy trust $250 million

20 and in addition to contributing that amount, we are prepared

21 to waive our $64-million claim that we have in the

22 bankruptcy.  We are prepared to vote to approve the plan.

23      We're prepared to waive and surrender any rights that

24 we had or have or may have against BSA insurance carriers for

25 claims that may or may not be part of this bankruptcy

1   proceeding.

2   Q    And under the TCJC settlement terms, what is TCJC

3   receiving in return for these contributions?

4   A    Well, for one thing, we're -- we're going to receive a

5   great deal of relief, assuming that the plan is approved,

6   that these funds will quickly, rather than have a long,

7   drawn-out process, get into -- get to the survivors whose

8   lives have been shattered, who are in need of assistance in

9   many different ways.  So we'll be relieved to have that.  But

10  in addition to that, we'll be grateful as an organization to

11  have some finality to these cases.  We expect to have any

12  case where the Church is involved to be released from those

13  cases, to have settlement agreement from those cases, and --

14  and we will hopefully all move forward.

15  Q    From your perspective as director of risk management,

16  would TCJC enter into this settlement without receiving a

17  release?

18  A    I -- I -- as director of risk management, I would not

19  recommend that.  Why would we -- why would we make such a

20  generous, significant contribution to a bankruptcy only to

21  face ongoing litigation from these very cases for the months

22  and years to come?  So, no, I don't think the Church would

23  enter into this settlement agreement if we did not receive

24  these releases.

25  Q    And now with respect to the Scouting-related abuse

1  claims based on your role, if the plan is not approved with

2  the TCJC settlement, what do you think from your role, from

3  your perspective, would happen with respect to the Scouting-

4  related abuse claims asserted against TCJC?

5  A    Well, I don't know the ins and outs of the bankruptcy,

6  but I assume that those cases all end up being unresolved.

7  Survivors get no near time compensation.  Plaintiffs'

8  attorneys would bring those cases against the Church and the

9  Boy Scouts, and we would meet again in -- across the country

10  in all different venues in -- in litigating these cases one

11  by one.

12  Q    In your capacity, sir, as director of risk management

13  for TCJC, do you believe that the terms of the TCJC

14  settlement are fair and reasonable, from your perspective?

15  A    From what I reviewed and what's been reported to us by

16  our legal team, we believe that the contributions of the

17  Church are very generous.  We believe that the Church's

18  willingness to waive its claim in the bankruptcy is also very

19  generous.  And I think it represents a significant portion of

20  a bankruptcy statement that should be and that we feel good

21  about and that we feel is more than fair.

22  Q    And do you believe that it's fair and reasonable to the

23  survivors?

24  A    Well, you know, fair in my -- in my frame of mind, fair

25  in the survivors' mind might mean different things.  But here

1  we are in a bankruptcy proceeding, and my understanding is --

2  and you'll hear from our expert shortly that the amount that

3  we've paid for the number of claims that are tied to the

4  Church will compensate -- will be a generous compensation to

5  the victims of claims arising out of Church-sponsored Scout

6  incidents.

7  Q    Okay.  Thank you, Mr. Rytting.  I have no other

8  questions, Your Honor, at this time.

9              THE COURT:  Thank you.  Mr. Krebs.

10             MR. KREBS:  Thank you, Your Honor.  Again, for the

11 record, this is Konrad Krebs with Clyde & Co on behalf of

12 Great American and certain insurers.

13                        CROSS-EXAMINATION

14 BY MR. KREBS:

15 Q    Good evening, Mr. Rytting.  Pleasure to meet you.

16 Mr. Rytting, through -- I believe we sent you a witness

17 binder.

18       Did you receive that?

19 A    I've got a box here that somebody told me that might be

20 a witness binder that I'm not supposed to touch on fear of

21 death.  But, yeah, I think --

22 Q    You may open that if you'd like.  Although I will

23 advise that I think, if you have a copy of your declaration,

24 that's probably all we're going to look at.  But if not, the

25 declaration is the first exhibit in that binder.  So I just

1  ask that you grab it.

2  A    Let me just pull open this box.

3  Q    Sure.  Thank you.

4  A    And can I say that this binder is even -- even eclipses

5  the one that our legal counsel gave us.  So --

6  Q    I apologize.  I think there's a transcription there

7  that will make for good recycling when we're done.

8  A    Thank you.

9  Q    Mr. Rytting, I know throughout your testimony -- oh,

10 I'll give you -- I'll let you open that up.  Just -- so

11 throughout your testimony, I think we've been referring to

12 the Church of Jesus Christ as TCJC.  May I continue to refer

13 to it in that way?

14 A    You bet.

15 Q    All right.  Thank you.  So Mr. Rytting, you've been the

16 director of risk management for the TCJC throughout the

17 entire scope of this bankruptcy, correct?

18 A    Yes.

19 Q    Okay.  And in that role, you already testified that you

20 personally attended at least one mediation, correct?

21 A    Yes.

22 Q    All right.  Did you attend any other mediations, either

23 via phone or Zoom?

24 A    No.

25 Q    Okay.  When you were present at that mediation, was

1  your counsel present?

2  A    Yes.

3  Q    Okay.  And when you were not present, were there other

4  instances where your counsel updated you on the progress of

5  the mediation?

6  A    Yes, as testified, we received weekly updates from our

7  legal team as to how things were going in the bankruptcy.

8  Q    I just wanted to clarify that involved -- also included

9  updates on the progress of the mediation.

10  A    Correct.

11  Q    Okay.  Great.  Did you either participate directly

12  or -- excuse me.  Did you participate directly at all in any

13  of the negotiations over the TCJC settlement?

14  A    Our legal team did the primary negotiation of the

15  settlement.

16  Q    Okay.

17  A    With feedback and input from those of us here at Church

18  headquarters.

19  Q    And with that feedback when the settlement was reached,

20  were you briefed on that settlement?

21  A    Absolutely.

22  Q    All right.  And did you have an opportunity to review

23  the term sheet for that settlement?

24  A    I have looked -- I've looked at the term sheet.  I

25  don't know each line.  It's a -- it's a significant document.

1    But I'm aware of what's in the term sheet.

2  Q    That's great.  I wouldn't expect you to know every

3  line.  And based on that review and -- and conferring with

4  counsel, do you believe that the settlement that was reached

5  is in the best interest of the TCJC?

6  A    Yes, we do.

7  Q    Okay.  All right.  So moving on, I'd like you

8  to -- you can now turn to your declaration, please.  And I

9  think Mr. Spaulding -- we'll put that on the screen, if

10 that's easier for you.  And I'd like to turn your attention

11 to Page 10 of Paragraph 24.  And I'm going to draw your

12 attention, it's the -- it's about a third to halfway through

13 the -- that paragraph, the sentence that starts with

14 "pursuant to the TCJC settlement".  I'm just going to read

15 that quickly.  It says pursuant to the TCJC settlement, on

16 the effective date of the plan, subject to the terms and

17 conditions more fully described in the TCJC settlement

18 agreement, the TCJC will, i, deposit $250 million in cash

19 into escrow, ii, consent pursuant to the plan to the

20 assignment and transfer by the Debtors, local councils, and

21 any other co-insureds of any and all rights attributable to,

22 A, the abuse insurance policies, the abuse insurance

23 coverage, the insurance settlements, agreements, and claims

24 that are under and proceeds (inaudible), B, the insurance

25 actions, and C, the insurance action recoveries; and iii,

1  with respect to the indirect abuse claims, claim numbers 1248

2  and 12,530 filed by the TCJC, consent to the waiver of

3  indemnity claims over 64 million plus unliquidated contingent

4  claims as well as release its claims for indemnification

5  and/or contribution as part of the TCJC settlement.  Now,

6  that was a long sentence.  But did I read it right?

7  A     You did.

8  Q     All right, thank you.

9  A     It is a long sentence.

10 Q     So is it fair to say that that paragraph describes the

11 TCJC's objections under the settlement agreement?

12 A     Yes, that's what the Church is planning to surrender or

13 give as part of this settlement.

14 Q     Perfect.  That's what the Church is contributing and

15 the rights it's giving out.

16 A     Correct.

17 Q     And the $250-million cash contribution described in i,

18 that is the largest contribution of any chartered

19 organization involved in this bankruptcy, correct?

20 A     That's my understanding that it is, yes.

21 Q     Great.  Turning to the next paragraph, which is

22 Paragraph 25, that's a little shorter.  That paragraph reads,

23          "In exchange for the TCJC's settlement

24 contribution to the settlement trust described above, the

25 TCJC will become a protected party under the plan with all

1  the benefits and protections of the channeling injunction."

2      Is that correct?

3  A    That is correct.

4  Q    All right.  And then, the next sentence and -- excuse

5  me, and then -- so that statement in Paragraph 25 is

6  discussing what the TCJC received in the settlement for its

7  $250 million contribution and for the rights it gave up in

8  the preceding paragraph, correct?

9  A    That's correct.

10 Q    All right.  And then, the next sentence says, "As in

11 the consideration, the TCJC expects to receive," that's

12 referring to the prior sentence, including the statement

13 about being a protected party, correct?

14 A    That's correct.

15 Q    All right.  And sir, my understanding is you're trained

16 as a lawyer, so you know what consideration is, right?

17 A    Yes.

18 Q    All right.  Perfect.  Mr. Rytting, in Paragraph 25,

19 there is no mention of proposed findings of fact or

20 conclusions of law, correct?

21 A    No.

22 Q    All right.  Perfect.  that's all I have.  Thank you.

23 Thank you, Mr. Rytting.

24           MR. KREBS:  Thank you, Your Honor.

25           THE COURT:  Thank you.  Mr. Pfister?

1     MR. PFISTER:  Thank you, Your Honor.

2                   CROSS-EXAMINATION

3    BY MR. PFISTER:

4    Q     Good afternoon, Mr. Rytting.  Good to see you again.

5    A     Nice to see you, Mr. Pfister.

6    Q     Thank you.

7              MR. PFISTER:  And for Your Honor's reference, I

8    will be using -- you should have received a cross binder from

9    us.  I'll be using just the Rytting declaration that was

10   admitted into evidence, Docket 9449, and I'll be using two

11   tabs from our cross binder, Tab 4, which is JTX 369, and

12   Tab 7, which is the TCJC's brief in this case in support of

13   confirmation.  It is Docket Number 9107 filed on March 2nd,

14   of 2022.  And as I had indicated previously and in some of my

15   questions with other witnesses, we are planned proponents in

16   the main and have one narrow objection, and that is to the

17   TCJC mixed claims definition.  So the scope of my examination

18   today of the witness pertains to that.

19   Q     So with that, sir, Mr. Rytting, could you take a look

20   at Page 5 of your declaration, under Heading C.

21   A     Okay.

22   Q     Heading C there reads, "Claims against the BSA and TCJC

23   often arise from the same facts."  Did I read that correctly?

24   A     Yes.

25   Q     And the word often there is important, isn't it?

1    A     It is.

2    Q     Because if the claims always arise from the same facts,

3    you certainly would have said that in your declaration.  But

4    instead, you say that often arise from the same facts, right?

5    A     Correct.

6    Q     Okay.  And if we could look now at the Tab 7, which is

7    the TCJC brief in support of confirmation, Docket 9107.

8          MR. PFISTER:  And Ms. Gurvitz from my firm, if she

9    can share the cover page of that on the screen.

10   A     And again, tell me what document this is and I'm going

11   to use whatever is up on the screen rather than try

12   to --

13   Q     That's fine.  We're only going to be looking at one

14   page of it.  It is -- but it is the brief that Mr. Malionek

15   and his firm filed on behalf of the TCJC in support of

16   confirmation of the plan in this case.  It was tendered to

17   the Court on the same date as your declaration.  So it's the

18   statement of the Church in support of confirmation.

19         MR. PFISTER:  And Ms. Gurvitz, if we could please

20   go to Page 10 of the document, which is PDF Page 20 on the

21   screen.  This in the factual background section of the brief.

22   Q     And can you read for me, please, Heading 3, and how

23   that is described in the brief?

24   A     "Claims against the BSA and TCJC arise from the same

25   facts."

1  Q     Okay.  And the word often is missing there; isn't it?

2  A     It is not there.

3  Q     Okay.  And it is not your testimony that claims against

4  the BSA and the TCJC always arise from the same facts.  It's

5  only that they often do, right?

6  A     The statement in my declaration, I'm sure we can go

7  hypotheticals until the end of the day, sometimes, we will

8  get a statement of facts from a victim or a survivor where

9  we're not sure what occurs until we complete a full

10 investigation.  And so whether I make a statement with the

11 word often and whether our counsel does not include the

12 often, I don't believe is material, but that's obviously

13 something that is important to you.

14 Q     Okay.

15            MR. PFISTER:  And Sasha, if we can take that down.

16 Q     That actually is a great segue into a couple of

17 questions I wanted to ask (inaudible) on your declaration.

18            But let me ask a few questions about Mr. Malionek's

19 questions of you, the live questions a few moments ago.  You

20 had indicated -- three points I'd like ask you about --

21 first, you said that when the risk management department

22 investigates the claims, you do an interview to determine

23 whether the claim or the abuse occurred at Church or at a

24 Scouting event.  That's what I wrote down.  I'm not a

25 shorthand person, but does that sound about that to you?

1  A      Yes.

2  Q      Okay.  And that's important, right?  You make that

3  inquiry to determine whether the abuse happened at Church or

4  at a Scouting-related event because that's something that is

5  an important inquiry and it's something that's important to

6  the analysis, right?

7  A      Yes.

8  Q      Okay.  And sometimes, I imagine, there are abuse claims

9  that happened entirely at the Church or in connection with

10 Church only and have no Scouting connection.  Is that, in

11 fact, the case?

12 A      Yes.

13 Q      And I -- sometimes, there are claims that happen

14 entirely at Scouting and in connection with Scouting where

15 every single event or facet of the claim arises from

16 Scouting; is that also the case?

17 A      Yes.

18 Q      Okay.  And then, is it also the case that sometimes

19 there's a middle ground, and certain portions of the abuse,

20 certain facets of the relationship between the perpetrator

21 and the victim, certain elements of the notice that may have

22 been received about the perpetrator's proclivities or

23 potential for abuse, certain of that may arise in the Church

24 context, and certain of that may arise in the Scouting

25 context; isn't that right?

1   A      We have seen some of those instances.

2   Q      Okay.  Second point I wanted to cover on Mr. Malionek's

3   direct live exam of you, I believe you testified that you

4   never saw a claim litigated against BSA and TCJC separately.

5          Did I get that right?

6   A      That's my recollection.

7   Q      Okay.  Now, you're not stating, though, that there

8   aren't -- that in claims where both BSA and TCJC were a

9   defendant, that there were not instances in which BSA and the

10  BSA local council were dismissed from the claim and that the

11  claim proceeded against the TCJC alone.  That's not your

12  testimony, correct?

13  A      No.  My testimony -- as a matter of fact, we've had

14  those cases where the BSA, in fact, did file motions to have

15  the national council dismissed from the case, and the Church

16  was left to -- or the Church troop or the Church leaders were

17  left as the sole defendants.  And sometimes those were

18  defended by -- most of the times, those were defended by Boy

19  Scouts, and sometimes they weren't.

20  Q      Okay.  So I just want to make sure the record's clear

21  that when you say you never saw a claim litigated against BSA

22  or BSA, you know, affiliated defendants on the one hand

23  versus the TCJC on the other, that you -- that what you were

24  saying is you saw complaints filed, you saw often times

25  multiple defendants would be named in the complaint, but, you

1  know, things happened during litigation, settlements are

2  reached, certain defendants are dismissed, and it is

3  sometimes the case that the TCJC stands alone in litigation.

4      And that is consistent with your testimony, correct?

5  A    Well, I think it's important to note that there are --

6  when I say I've never seen a case, what I'm referring to is a

7  situation where the same survivor brings one case against the

8  Boy Scouts involving an abuse or a series of abuses, and

9  then, they bring a separate case in a totally different

10 proceeding against the Church on those same facts.

11 Q    Okay.  I understand your testimony.  Thank you.  And

12 then, I believe with Mr. Malionek, your testimony was you

13 "There may have been a few cases where the Church paid some

14 and the BSA paid some."  And that was with regard to paying

15 settlements.  Do you recall that testimony?

16 A    I do.

17 Q    Okay.  Now, where you present during the testimony of

18 Mr. Griggs, the national coordinating counsel for defense for

19 the BSA?

20 A    No.

21 Q    Okay.  Did you read Mr. Griggs' declaration, which is

22 at Docket 9273, that was entered into evidence in this trial?

23 A    No.

24 Q    Okay.  Are you aware that in Paragraph 4 of that

25 declaration, Mr. Griggs testified, "Abuse claims brought

1  against TCJC were handled differently.  TCJC generally bore

2  its own costs of litigation and at least an equal share of

3  the liability it incurred in the settlement of abuse claims."

4       Do you disagree with Mr. Griggs' testimony?

5  A    I believe your question was do I -- was I aware of that

6  testimony.  No, I'm not aware of that testimony.  And taking

7  one statement from his testimony without any further context,

8  I guess I don't know that I can respond appropriately to your

9  question.

10 Q    Okay.  Well, let me just ask it without regard to it

11 being Mr. Griggs' testimony.  Do you disagree with the

12 proposition that the TCJC generally bore its own costs of

13 litigation and at least an equal share of the liability it

14 incurred in the settlement of abuse claims?

15 A    No, I would not agree with that.  I think that's an

16 overgeneralization about how these abuse cases were resolved.

17      And I can recall cases where BSA took 100 percent of

18 the defense cost and indemnity, and there are cases, like you

19 just read, where the Church took its lion share of the

20 defense costs and indemnification.  And there's a myriad of

21 factors that went into those decisions, and they're all case

22 by case situations.

23 Q    Okay.  Thank you.  So let's go back now to your

24 declaration, Docket 9449.  We looked at Heading C, and the

25 work that the word often can sometimes do.  Let's look

1  instead now at Paragraph 15 of your declaration.  And just

2  let me know when you have it in front of you.

3  A      I'm ready.

4  Q      Okay.  I'm going to read you the first sentence.  My

5  first question's going to be did I read that correctly.  "For

6  abuse claims in these Chapter 11 cases involving TCJC male

7  youth as victims, the claims cannot be severed into

8  independent causes of action for claims that are related to

9  Scouting and those that are not."  Did I read that correctly?

10 A      Yes.

11 Q      Okay.  Now, you're not here today, and I understand

12 you're a gentleman with much experience in this realm, but

13 you're not here today as an expert witness, are you?

14 A      No.

15 Q      And you weren't proffered or disclosed as an expert

16 witness by your client, were you?

17 A      I hope not.

18      Q      You weren't, I can assure you.  And in fact, the

19 TCJC has an expert witness, who we'll be hearing from next,

20 who opined completely different matters.  You know, the

21 sentence that I read to you about the claims cannot be

22 severed into independent causes of action, you're not giving

23 the Judge testimony about how to apply bankruptcy law, are

24 you?

25 A      No.

1  Q     Okay.  And you are not making a blanket statement about

2  every claim that has been filed in this case and the facts

3  and circumstances of those claims and precisely how those

4  claims could be litigated or dealt with in the future, right?

5  A     I believe all I'm saying is what you've already read in

6  my first sentence of the declaration.

7        Q.  Understood.  And then, your declaration, that

8  paragraph goes on to talk about a case captioned, Hizer

9  versus the TCJC, and a decision by Judge Akin in Oregon

10 regarding the scope of the automatic stay 105.  Is that a

11 fair description of the rest of Paragraph 15?

12 A     Yes.

13 Q     Okay.  And once again, you're not here as an expert

14 witness or someone to tell the Judge what the legal effect of

15 a 105 or a 362 determination is with respect to how

16 bankruptcy works, right?

17 A     No.

18 Q     Okay.  Last portion of the main declaration I want to

19 ask you about is the next paragraph, which is one sentence.

20       I'm going to read it, and my first question will be did

21 I read it correctly.   This is Paragraph 16.  "Thus, while

22 some abuse complainants have asserted claims for sexual abuse

23 against TCJC in the tort system without naming the BSA as a

24 defendant or otherwise joining the BSA, I am not aware of any

25 abuse claims filed in these Chapter 11 cases that involve

1  allegations of abuse unrelated to Scouting."  Did I get that

2  right?

3  A    That is exactly what it says in the declaration.

4  Q    Okay.  I found this to be a puzzling sentence.  Am I

5  correct that it boils down to an assertion that in the Boy

6  Scouts' bankruptcy case, all of the claims that were filed

7  involve Scouting?

8  A    I'm not an expert about who filed these claims.  All

9  I'm saying in this declaration based on counsel from our

10  legal team is that any claim in this bankruptcy certainly

11  ought to be related to Scouting or it ought not to be in this

12  bankruptcy.

13  Q    Okay.  But you're not making a statement about having

14  examined, you know, what the claim forms ask or what they say

15  or what they may solicit as to the TCJC's involvement or

16  potential liability with respect to any claim.  That's not

17  what you're saying here in Paragraph 16; is that right?

18  A    I'm saying that it seems that any claim in this

19  bankruptcy proceeding ought to have some relation to Scouting

20  activity, Scout leader, or a Scout.

21  Q    Got it.  Okay.  Now, I'd like to look at two exhibits

22  to your declaration.  And just to orient you on these,

23  they're Exhibit H and Exhibit J.  So if you look in your

24  declaration onto the next page, you can see that Exhibit H is

25  talked about in Footnote 9 as an example of a hold-harmless

1  agreement for properties or facilities owned by TCJC.

2  A    Yes.

3  Q    You can see that Exhibit J is an exemplar letter

4  accepting tender of defense.  Does that seem right to you?

5  A    Yes.

6  Q    So let's turn, then, please, to Exhibit H, to your

7  declaration.  And this is an April 29th, 2011, letter called

8  Re Hold-Harmless Agreement.  And it forwards this hold-

9  harmless agreement that's attached to it.  Do you see that?

10  A    Yes.

11  Q    Okay.  And if we look at the actual hold-harmless

12  agreement, I'll summarize the opening part, and then, I'm

13  going to focus -- what I really want to focus on which is the

14  very end of the hold-harmless agreement.  But am I correct

15  that this document is an agreement regarding a year of use,

16  from March 1 of 2011 through March 1 of 2012, of properties

17  owned by the TCJC that might be used or rented to the Boy

18  Scouts of America or local councils for official Scouting

19  activities.  Is that what this pertains to?

20  A    Yes.

21  Q    Okay.  And this is an agreement that the TCJC, which is

22  described as the indemnitee, or with its employees, and

23  officers, and directors, the indemnitees, that the Boy

24  Scouts, or BSA, will indemnify, hold free and harmless,

25  assume liability for, and defend the indemnitees regarding

1  cost, expenses, and the like.  And then, this is where I'm

2  really focusing in.  It's right after the definition of

3  claim, and it's the fourth line from the bottom.  It says,

4  arising or alleged.  Do you see that?

5  A     Yes.

6  Q     So this is the description of what's going to

7  indemnified.  It's, "a claim that is 'arising or alleged to

8  have arisen out of the acts or omissions from an official

9  Scouting activity or the Boy Scouts of America and/or its

10 local councils in the use of real or personal property belong

11 to the indemnitees to the extent that the claim is not

12 attributable to or the result of the acts or omissions of the

13 indemnitees.'"  Did I read that correctly?

14 A     Yes.

15 Q     Okay.  And is it your understanding of this document,

16 then, that to the extent certain claims may arise that are,

17 in fact, attributable to the acts or omissions of the Church

18 itself that the BSA would not owe indemnification for those

19 acts; is that right?

20 A     That's correct.

21 Q     Okay.  Let's look, then, please, at Exhibit J, which is

22 a few pages later.  And this is a May 16th, 1991, letter from

23 Duane -- to, pardon me, Duane Litell (phonetic), do you see

24 that?

25 A     Yes.

1  Q     This pertains to an accident, apparently a death,

2  unfortunately, that occurred on or about January 6th of 1989.

3        And this -- the second paragraph of the document

4  indicates that the Boy Scouts agrees to defend and indemnify

5  the Church in regards to any claim or litigation initiated as

6  a result of the accident, which resulted in the death in

7  1989.  Do you see that?

8  A     Yes.

9  Q     And what I want to focus on is the next paragraph.

10       I'll read it, and then, my first question will be did I

11 read it correctly.  "If future investigation or discovery

12 indicates that the accident or incident resulting in redacted

13 individual's death did not arise out of an official Scouting

14 activity, the position of Boy Scouts of America will be

15 reconsidered, and defense and indemnification withdrawn."

16       Did I get that right?

17 A     Yes.

18 Q     Okay.  Let's take that down.  Those are the questions I

19 have on your declaration itself.  The final thing I'd like to

20 ask you about is a document that's been marked as JTX 369.

21       And again, that is, I believe it's Tab 4 in the binder.

22 And let me know when you have that in front of you.

23 A     I'm looking at it on the screen.

24 Q     Okay.

25 A     Now it disappeared.  I'll pull it up if --

1  Q     On the screen is fine, if that works for you.  So this

2  is a letter from Jeff Bjork of Latham & Watkins to Nancy

3  Linder of White & Case, from October -- pardon me, from

4  January 26th of 2021.  Latham & Watkins and Mr. Bjork, that

5  is the TCJC's counsel in this bankruptcy case, right?

6  A     Correct.

7  Q     And Mr. Linder of White & Case is Debtor's counsel in

8  the bankruptcy case, right?

9  A     Yes.

10  Q     Now, I'm not going to ask much about the letter itself,

11  but the third paragraph attaches a letter from you, a

12  November 19, 2003, letter from Paul Rytting, director of

13  Church risk management, requesting indemnity for two abuse

14  claims where the abuse was alleged to have occurred between

15  1968 and 1973.  A copy of that letter is attached hereto as

16  Exhibit B.  Do you see that?

17  A     Yes.

18  Q     Okay.  So let's scroll down to Exhibit B, take a look

19  at that letter, and I'll ask you first -- and I know this

20  wasn't attached to your declaration, so let me just first ask

21  you, do you recall seeing this letter previously?

22  A     Yes.

23  Q     Okay.  Is this a letter --

24         MR. PFISTER:  And Sasha, if we can show him the

25  cover page, which we are, and then, if we can show him the

1  signature page.

2  Q     And I won't ask if you personally signed it because it

3  looks like someone may have signed it on your behalf.  But is

4  this a letter that you authored and authorized?

5  A     Yes.

6  Q     Okay.  So let's go up to the first page.  And as the

7  letter from Mr. Bjork indicated, this concerns two cases

8  regarding abuse from the 1960s and 1970s.  The way the letter

9  is structured is case number 1, and all the names obviously

10 are redacted.  There's case number 1, there's case number 1,

11 and then, there's an ask at the end.  So case number 1, let's

12 go to the second page.  We're on case number 1.  And there's

13 some bullet points.  So this is a letter that you were

14 writing to BSA to ask them to defend and indemnify or

15 actually, in this instance, to reimburse the Church for

16 amounts that it spent in defense and indemnity of these two

17 Oregon cases; is that right?

18 A     Yes.

19 Q     And so in your letter, where you were laying out the

20 factual basis for the claims and the resolutions of the

21 claims, we're looking here at case 1, you pointed out that

22 the abuse occurred in 1971 and 1972.  You pointed out that

23 the individual claimant joined a Church-sponsored troop

24 because it was the only one functioning in the area at the

25 time but that the claimant is not and never has been a member

1  of the Church.  And you write, you know, thus, redacted

2  claimant's "only connection to the Church is his

3  participation in its Boy Scout troop."  And then, you go on

4  to the describe the costs that the Church incurred.  Is that

5  correct?

6  A    Yes.

7  Q    And the reason that you emphasized that the claimant

8  had no -- the claimant in this case number 1 had no

9  preexisting relationship with the Church, wasn't a member,

10  only connection to the Church is the Boy Scout troop and that

11  he happened to have joined a Church-sponsored troop because

12  it was the only one in the area.  You mentioned those facts

13  because those were important facts, right?

14  A    Yeah, I think they're important facts.  I think that

15  they give rise to the connection with the Boy Scouts, and I

16  think that they're information that the Boy Scouts may or may

17  not have known about when the case was filed.

18  Q    Okay.  So that's case number 1.  And then, case number

19  2 is a little bit different.  So again, the names are blacked

20  out.  It's a bit hard to refer to them.  But the second case,

21  this is also Oregon-related, concerned two victims, and the

22  bottom of the first paragraph describes some of the

23  allegations.  It alleges that these individuals, these

24  survivors, participated in BSA and Church activities from

25  1968 until 1973, correct?

1  A     That's what it says.

2  Q     And then, it indicates that these individuals allege

3  that the -- I imagine that's the perpetrator's name is

4  blacked out -- but that that individual was a high priest in

5  the Church and was also a Cub Scout leader in a pack

6  affiliated with the Church.  Do you see that?

7  A     Yes.

8  Q     And if we could go to the next page.  Looking at the

9  first full paragraph, again, this appears to be a reference

10 to the perpetrator, that the perpetrator was a known child

11 abuser, and that a prior lawsuit from two later victims had

12 revealed evidence that Scout officials and Church officials

13 were made aware of this perpetrator's abuse prior to his

14 abuse of either one or both of these two victims; do you see

15 that?

16 A     Yes.

17 Q     And then, there's the second sentence indicates that

18 counsel -- the Plaintiff's counsel has argued that both BSA

19 and the Church were responsible for allowing -- it appears

20 with the redactions -- for allowing the perpetrator to get

21 close to the victim or the victims.  Is that a fair summary

22 of portions of your description here, of your -- of the

23 claims when you were asking BSA to indemnify?

24 A     Yes.

25 Q     Okay.  So then, let's look at the third part of the

1  letter, which is the ask portion.  It's called Renewed

2  Request for Indemnification.  If we could turn to the next

3  page, please.  First full paragraph, first full sentence, you

4  write that, "In light of BSA's historical commitment to

5  handle claims, the Church has also exercised rigorous

6  restraint in the claims that it tenders to BSA."  Do you see

7  that?

8  A    Yes.

9  Q    And the rigorous restraint that the Church exercised,

10  it's true, is it not, that that involved once again a careful

11  examination of the extent to which the abuse was truly

12  Church-related versus whether it was truly BSA-related; isn't

13  that right?

14  A    You're asking to opine on a letter that I drafted over

15  20 years ago.  I used the words rigorous restraint, and it

16  could certainly mean that.  It could certainly just mean

17  rigorous restraint.

18  Q    Maybe you're just a rigorously restrained person.  I

19  guess that's true, true as a possibility.  Okay.  Fair

20  enough.  Let's look at the second-to-last paragraph, then,

21  where you say, "We would respectfully request that the BSA

22  indemnify the Church to the fullest extent possible, but in

23  any case, at least 50 percent of the fees and settlement

24  amounts occurred in the settlement of these claims."  Do you

25  see that?

1  A      Yes.

2  Q      Okay.  And it's true, is it not, that the reason the

3  Church was willing to pay a portion of the liability,

4  notwithstanding its claims against BSA, is because especially

5  with respect to the second claim, the Church recognized that

6  there was both a Scouting and a non-Scouting component to the

7  claim.  That is that there was allegations that both the

8  Church and the Scouts were aware of the abuser's past history

9  and the membership of the victims in the Church and the like,

10 isn't that correct?

11 A      I don't agree with your interpretation of that, if

12 that's what you're asking.

13         MR. PFISTER:  If I could have just one moment,

14 Your Honor.

15         THE COURT:  Yes.

16         MR. PFISTER:  Okay.  And Sasha, if we can take

17 that down.  Okay.  I have no further questions at this time.

18         Thank you, Mr. Rytting.

19         THE COURT:  Thank you.

20         Any other cross-examination?

21         MS. DUMAS:  Yes, Your Honor.

22         THE COURT:  Ms. Dumas.

23         MS. DUMAS:  Thank you.

24                     CROSS-EXAMINATION

25 BY MS. DUMAS:

1  Q     Good afternoon, Mr. Rytting.  My name is Gilion Dumas.

2  I represent some of the claimants who are objecting to the

3  plan.  I have a few follow-up questions.  Can you hear me

4  okay?

5  A     Loud and clear.  Thank you.

6  Q     Okay.  Thank you.

7           MS. DUMAS:  Could we get that exhibit back, that

8  JTX 369, that letter that was just up there?  And I think I

9  might need the help of Mr. Pfister's helper, if that is

10 possible.  Mr. Pfister, did you disappear for good?

11          MR. PFISTER:  I did not disappear for good.  Ms.

12 Gurvitz --

13          MS. DUMAS:  Oh, thank you.

14          MR. PFISTER:  -- (inaudible), and I think she's

15 helping you with it.

16          MS. DUMAS:  Wonderful.  Thank you very much.  And

17 I'd like to see the penultimate page of that letter, I think

18 right before his signature page.  Something flashed or am

19 I -- well, it's not -- there we go.  All right.  Yep, there

20 we go, the request for indemnification part.  It's so tiny.

21          Bear with me why I try to read there.  Oh, thank

22 you.  Okay.  Could you go to the last page?  I think what I

23 saw was on the last page.  There we go.

24 Q     Do you see that sentence right there at the top, where

25 it says, our understanding is that BSA provided these

1  services to the Church as a chartered organization pursuant

2  to an unwritten gentlemen's agreement at the highest level of

3  BSA and the Church, that, in part, reflected BSA's

4  appreciation for the continued and generous financial and

5  other support that the Church provides BSA."  Did I read that

6  sentence correctly?

7  A     Yes.

8  Q     And does that mention of an unwritten gentlemen's

9  agreement refer to the indemnification and defense

10 arrangement that you talked about in your declaration?

11 A     Yes.  My recollection is that phrase refers to the

12 protocol, the pattern, the course of conduct that we had

13 become accustomed to in tendering cases to the BSA.

14 Q     Okay.  So you had no written contract of

15 indemnification with BSA at least in the 1990s when you

16 started there; is that an accurate summary?

17 A     Well, depends on what you want to call a written

18 contract.  There's the chartered organization agreement.

19       There is chartered organizations were named as

20 additional insured on BSA insurance policies.  If those

21 constitute written contracts, then -- then so be it.  I mean,

22 I'm referring more to the course of time that we (inaudible)

23 over decades with the Boy Scouts.

24 Q     Okay.  So setting aside the course of conduct and

25 focusing only on written agreements, you have the insurance

1  policies, correct?

2  A    Correct.

3  Q    Okay.  And do you know what year the TCJC first

4  included in the BSA policies?

5  A    Well, according to this letter, the representation from

6  the director of risk management for BSA was that we were

7  included as secondary -- chartered organizations were

8  included with -- as secondary coverage, with secondary

9  coverage in '83, and then, in '84, chartered organizations

10 enjoyed primary coverage.

11 Q    Okay.  And as far as the charter agreements go, the

12 annual -- let me back up.  As a chartered organization, the

13 TCJC had to sign a charter agreement every year with the BSA,

14 correct?

15 A    No, I'm not clear on starting from 1913, how that all

16 rolled out.  There were obviously changes over the 105-year

17 history of the Church's relationship with the BSA, and that

18 is why I continue to refer to it as a course of conduct in

19 most of my testimony.

20 Q    Okay.  But at least -- once you started there in 1991,

21 you're aware that chartered organizations had to do annual

22 charters with the BSA, correct?

23 A    We renewed our registration every January of every year

24 that we were a chartered organization of the Boy Scouts.

25 Q    Okay.

1          MS. DUMAS:  And Gurvitz, you could take that

2    document.  Thank you.

3    Q     And the sample charter agreement that you used as an

4    exhibit with your declaration, and I'm not going to even

5    attempt to share my screen to do that, but I can refer you to

6    the exhibit that it was.  I believe it's Exhibit G of your

7    declaration.  It's an annual charter agreement.

8    A     Yes.

9    Q     That's a very recent annual charter agreement sample,

10   isn't it?

11   A     I have no idea what version this was or what year it

12   was passed, but it certainly does -- it is titled annual

13   charter agreement between charter organization and Scout

14   counsel.

15   Q     Okay.  And it's one from, like, the -- within the last

16   ten years, right?

17   A     I don't have any idea.

18   Q     Okay.  Where did you get that?

19   A     Just from Scout materials that have been generated and

20   provided to chartered organizations over the years.

21   Q     But where did you get this particular one that you used

22   as an exhibit?

23   A     I don't know.

24   Q     Okay.  All right.  And then other than insurance

25   agreements and the annual charter documents that you signed

1   every year as a chartered organization, you supplied two

2   exhibits to your declaration that talk about insurance

3   indemnification of chartered organizations.  One was Exhibit

4   F to your declaration.

5   A      Yeah.  Do you want to give me the title?

6   Q      All right, sure.  Let's see, it's Exhibit F, and it's

7   called -- it looks like it's a -- it's called Boy Scouts of

8   America Resolution Regarding Insurance and Indemnification of

9   Chartered Organizations and Use of Charter Agreement in Civil

10  Litigation.

11  A      Thank you.

12  Q      You see that?

13  A      Yeah.

14  Q      It also has no date on it.  But it is signed by Wayne

15  Brock.  Do you see that on page 2?

16  A      Yeah, and I see a date right above Wayne Brock's name,

17  October 30th, 2013.

18  Q      Okay.  Good, you're better at details than I am.  Okay.

19         So that was 2013.  Do you recall ever seeing any kind

20  of resolution like that prior to October 20 or October 30,

21  2013?

22  A      I don't recall.

23  Q      Okay.  All right.  Let me see.  When you say that the

24  TCJC had a claim in this case for $64 million in claims that

25  the Church had settled and wanted to recoup that money from

1  the Boy Scouts, how many claims or settlements did that

2  cover?

3  A    I don't have the specific number.  A lot.

4  Q    Over 100?

5  A    I can't tell you.  I think that the next witness will

6  maybe have some of that detail in her testimony.  But I don't

7  recall the precise number of cases where we paid some

8  indemnification or some legal fees involving the Boy Scouts

9  that we feel we have a right to reimbursement for.

10  Q    Okay.  Were those settlements the Boy Scouts -- excuse

11  me -- were those settlements in cases that the Boy Scouts

12  were involved in at all or were they cases that LDS handled

13  them completely on its own, and then, now, was trying to seek

14  indemnification in this bankruptcy case?

15  A    Both.  They were cases where we carried the freight for

16  the entire case.  There were some cases where the Boy Scouts

17  only contribute less than what we wanted them to, but to get

18  the matter resolved, we put in some additional funding.  So

19  there's a wide variety of those types of cases.

20  Q    Okay.  When you talk about the course and practice of

21  indemnification and defense, are you trying to say that the

22  liability of any sex abuse claims of the TCJC is derivative

23  of BSA's liability?

24          MR. MALIONEK:  Objection, Your Honor.  I think it

25  calls for a legal conclusion.  I think we already established

1  that Mr. Rytting is not being offered as an expert witness.

2          THE COURT:  Overruled.  If he can answer.

3  A     Yeah, can you repeat your question?

4  Q     Okay.  Well, you've talked a lot about indemnity in

5  this -- in your testimony.  And so I'm trying to figure out

6  if what you are really trying to say is that you believe that

7  TCJC's liability in sex abuse claims is derivative of BSA's

8  liability.

9  A     Yeah, even I -- I'm not sure what you mean specifically

10 in this context by derivative.  What my testimony is is that

11 as a chartered organization, as long as we embraced the Boy

12 Scout program, and provided the Boy Scout leaders, and

13 administered the program, and provided the facilities, that

14 the Boy Scouts had the primary obligation to provide defense

15 indemnity and protection for chartered organizations that

16 might be caught up in Boy Scouts claims.

17 Q     Okay.  And that's mostly under the insurance policies

18 that were provided for you?

19 A     It's under insurance policies.  It's pursuant to a

20 course of conduct that we've followed year after year.  It's

21 included in the chartered organization statements.  It's

22 included in that board of director's minutes that you

23 referred to.  It's part of a bunch of different factors.

24 Q     Okay.  But when you said bunch of different factors,

25 there is no contract of indemnity other than the documents

1   we've talked about that you can point me to, is there?

2   A     No.

3   Q     Okay.  Thank you.  That's all my questions.

4             THE COURT:  Thank you.  Anyone else for cross?

5             Mr. Buchbinder?

6             MR. BUCHBINDER:  Thank you, Your Honor.  And I

7   promise I will be very brief.

8                         CROSS-EXAMINATION

9   BY MR. BUCHBINDER:

10  Q     Mr. Rytting, good afternoon, sir.

11  A     Good afternoon.

12  Q     Referring to Paragraph 24 of your declaration, you

13  spoke there or wrote there regarding a waiver of the $64

14  million in indirect abuse claims, correct?

15  A     Yes.

16  Q     In agreeing to waive the $64 million in indirect

17  claims, were you provided with an analysis of the likelihood

18  of recovering on the $64 million indirect abuse claims?

19            MR. MALIONEK:  Your Honor, I'll object to the

20  extent that this is requesting Mr. Rytting to disclose any

21  analysis provided to him by counsel.

22            THE COURT:  Right at the moment, it's a yes-or-no

23  question.  It's overruled.

24  A     Yes.

25  Q     And was that analysis that you weren't likely to

1  receive a meaningful recovery on the $64 million indirect

2  abuse claim?

3          MR. MALIONEK:  Your Honor, same objection now.

4  That he's asking about the substance.  He can lay a

5  foundation for where he learned this.

6          THE COURT:  Yes.  Please lay a foundation.

7  Q    Well, Mr. Rytting, in your capacity as a risk manager

8  of The Church of Jesus Christ, you have advisors, right?

9  A    Yes.

10  Q    Did one of your advisors provide you with advice on the

11  likelihood of recovering on the $64 million indirect abuse

12  claim?

13  A    Our legal team, as well as experts hired, have provided

14  us feedback, summaries, opinion as to what that amount is as

15  well as based on how the bankruptcy is going, whether there's

16  a likelihood of recovering on that claim or an unlikelihood.

17  I mean, that's a moving target over the past two years --

18  that changes -- seems to change week by week.

19  Q    Well, let me ask it a different way, Mr. Rytting.

20  You're an attorney.  You're familiar with the plan, I take

21  it?

22  A    Generally.

23  Q    Okay.  The indirect abuse claims are classified as

24  Class 9 claims; isn't that correct?

25  A    I don't know enough about the plan to know what they're

1  classified and what Class 9 means.

2  Q    Well, Class 9 is the indirect abuse claims.  Have you

3  been advised by your advisors or in reading the plan, have

4  you come to an assessment that the indirect abuse claims are,

5  for all practical purposes, subordinated to the Class 8

6  direct abuse claims?

7            MR. MALIONEK:  Objection, Your Honor.  It's the

8  same objection as before with respect to privilege.

9            THE COURT:  I'll sustain it with respect to

10 privilege.  If he knows the answer some other way, he can

11 respond.

12 A    The only way I can answer for that is by disclosing

13 information based on communication with our legal team that

14 has been monitoring in this case.

15 Q    All right.  Let me try it one more way, Mr. Rytting.

16 If you weren't waiving the $64 million indirect abuse claim,

17 would you have any realistic expectation of receiving a

18 dividend on the claim?

19 A    Yes.

20 Q    When?

21 A    By virtue of the fact that -- what would I get when the

22 plan -- when a plan is approved?

23 Q    Do you think you'd receive payment immediately?

24 A    No.

25 Q    When do you think you'd receive payment?

1  A      I have no idea.

2  Q      Were you given any advice as to when you might receive

3  payment?

4          MR. MALIONEK:  If that's a yes or no, Your Honor,

5  I don't have any objection.  If it's anything further, I do.

6  A      Nobody's told me a date, a time that we might expect

7  payment on our $64 million claim in the bankruptcy.

8  Q      Do you often waive $64 million claims?

9  A      As far as I know, this is the first time in my

10 experience that we've waived a claim of that significance.

11 Q      Thank you, Mr. Rytting.  I have no further questions.

12          THE COURT:  Any other cross?  I see no one.

13          MR. MALIONEK:  Your Honor?

14          THE COURT:  Yes.

15          MR. MALIONEK:  If there is no more cross, Your

16 Honor, I was waiting to see, I have a few questions on

17 redirect, if that's okay.

18          THE COURT:  yes.

19                     REDIRECT EXAMINATION

20 BY MR. MALIONEK:

21 Q      Mr. Rytting, you were asked about whether you're a

22 lawyer and whether you're offering legal opinions as an

23 expert.  Do you remember that?

24 A      Yes.

25 Q      And you were asked about that in connection with your

1  declaration.  Do you remember that, too, you were shown your

2  declaration?

3  A     Yes.

4  Q     All right.

5           MR. MALIONEK:  Can we please pull up Mr. Rytting's

6  declaration?  Just look at the first page for now.

7  Q     Mr. Rytting, was your declaration based on your

8  background as a lawyer and giving expert legal advice to the

9  Court?

10 A     No.

11 Q     Okay.  What was your declaration based on?

12 A     My declaration was based on my experience as director

13 of the risk management division of The Church of Jesus Christ

14 of Latter Day Saints.

15 Q     Okay.  And is it also based on your 30 years of

16 experience in -- with respect to risk management with TCJC?

17 A     Yes.

18 Q     Okay.

19           MR. MALIONEK:  Keep that up for now.

20 Q     Let me just ask you a few other questions.  Mr.

21 Pfister, I apologize if I'm mispronouncing it, Mr. Pfister

22 asked you some questions a few different buckets of claims as

23 hypotheticals.  He asked as to some abuse claims, some of

24 them might be related to TCJC only, absolutely no

25 relationship to Scouting; do you remember that?

1    A    Yes.

2    Q    For those claims that have absolutely no relationship

3    to Scouting and relate only to TCJC, is it your understanding

4    that TCJC is seeking a release in this case?

5    A    No.

6    Q    The second bucket that Mr. Pfister asked you about is

7    that there's some abuse claims that relate solely to the BSA,

8    solely related to Scouting, absolutely unrelated to TCJC.

9    Based on your experience, Mr. Rytting, has TCJC borne any

10   responsibility for those kinds of claims that are entirely

11   unrelated to TCJC and only involving Scouting?

12   A    Yes, we've seen a couple of those claims that the

13   Scouts didn't take that we felt like they should.

14   Q    Okay.  And you were asked about a third category, which

15   is where there are some claims that involve both TCJC and

16   Scouting; do you remember that?

17   A    Yes.

18   Q    Now, can we turn to the sentence that you were asked

19   about, which is on Page 6, Paragraph 15?  It's the first

20   sentence.

21              MR. MALIONEK:  If we could pull that up.

22   Q    Mr. Rytting, you remember you were asked about this

23   sentence?

24   A    Yes.

25   Q    Okay.  What's your basis for the statement that you

1   made here?

2   A    My basis is, is that the investigation reveals facts or

3   evidence that indicate in any way that the claim arise from a

4   Scout activity in part or in whole or from -- in a Scout, in

5   relation to or related to the Scout program.  They should be

6   part of this bankruptcy.

7   Q    And do you stand by that statement in your declaration,

8   Mr. Rytting?

9   A    Yes.

10  Q    Okay.

11        MR. MALIONEK:  I have no other questions, Your

12  Honor.

13        THE COURT:  Okay.

14        MR. PFISTER:  Your Honor, may I ask one question?

15  Two questions in follow up to that?

16        THE COURT:  Yes.

17        MR. PFISTER:  Okay.  Thank you.

18                    RECROSS-EXAMINATION

19  BY MR. PFISTER:

20  Q    So Mr. Rytting, then, thinking back to the letter that

21  you wrote, the rigorously restrained letter, in 2003, where

22  you described the two cases.  Case 1 had effectively no TCJC

23  connection short of the fact that the person wanted to join

24  the Scouting troop, and that was the only one that was

25  available.  Do you recall that?

1  A      I do.

2  Q      And then, the second claim was the one where there was

3  a Church connection, the abuser was both a high priest and a

4  Scout leader and that the allegations were that the -- both

5  the Church and the Scouts knew of prior abuse by that

6  individual.  So you recall that testimony or that description

7  of the claim?

8  A      Yes.

9  Q      And so in response to Mr. Malionek's questions, I just

10 want the record to be clear that your settlement or what you

11 think is being released in this case is not just Claim 1, but

12 it's Claim 2, as well.  Your contention, and your

13 understanding, and your argument here, and I don't think it's

14 a factual argument, that's why I'm not doing a lot of factual

15 examination on it, but you believe that TCJC is getting

16 released for the entirety of that second claim, even the part

17 about the Church's own independent knowledge of the abuser,

18 who was a high priest at the Church; is that right?

19 A      Yes.

20 Q      Okay.  Thank you, sir.

21          THE COURT:  Okay.

22          MR. MALIONEK:  Nothing further from me, Your

23 Honor.

24          THE COURT:  Thank you.  Mr. Rytting, you're

25 excused.

1          MR. RYTTING:  Thank you.

2          THE COURT:  Okay.  Mr. Abbott?

3          MR. MALIONEK:  Your Honor, the next -- I'll go.

4   I'm not sure which of us is going to go next.  The next

5   witness, I think, in order is another TCJC witness that is

6   our expert on valuation of TCJC's Scouting-related claims.

7   We're happy to proceed now, if Your Honor would like, or pick

8   it up in the morning.

9          THE COURT:  No, I don't think we're going to start

10  a witness a quarter to 6:00, Eastern time.  So we will pick

11  up with the witness in the morning.  Let me do -- let me know

12  how many people think they're going to cross Ms. Horowitz.

13         MR. KREBS:  This is Konrad Krebs from (inaudible),

14  and I expect to have just a few minutes of cross.

15         THE COURT:  And --

16         MR. PFISTER:  Your Honor, Rob Pfister from

17  (inaudible).  I expect to have one or two questions and maybe

18  a minute or two.  I'm just going to confirm that she doesn't

19  have anything to do with my issue, and then, I'll be done.

20         THE COURT:  Okay.  And Ms. Dumas, you don't --

21         MS. DUMAS:  I don't think I'm going to have

22  anything unless something comes up in her other testimony.

23         THE COURT:  Okay.  Thank you.  Then, we'll start

24  with her first thing.  For planning purposes, I have a

25  meeting that I need to attend, so we're going to take an

1  early lunch, early relative to what we've been doing, and

2  we're going to break a little after 12:00 and come back

3  probably at about quarter to 2:00.

4          MR. SCHIAVONI:  Thank you, Judge.  It's like State

5  court, two hours for lunch.

6          THE COURT:  Yeah, that's me.  Okay.  Okay.  So

7  that's what we're going to do for tomorrow.

8          MR. ABBOTT:  Your Honor, one additional issue we

9  just wanted to alert the Court to, if we may.  The last

10 witness that we frankly expect to get on tomorrow and finish

11 tomorrow is Mr. Lundberg.  Your Honor, we had initially

12 listed him as -- by declaration.  We do intend to provide

13 approximately 30 or 45 minutes of direct for Mr. Lundberg

14 because we believe given all that's happened, that would be

15 helpful to the Court.  So just wanted to let the Court know

16 that and obviously the parties, as well.  We're not aware of

17 any objection to that, Your Honor.

18         THE COURT:  Okay.  So I'm looking at the pretrial

19 order.  We have Ms. Horowitz, Ms. Nowns (phonetic), and then,

20 Mr. Lundberg, and then, that completes the Debtor's

21 witnesses?

22         MR. ABBOTT:  That's my understanding, Your Honor.

23         THE COURT:  Okay.  Thank you.  Okay.  We will

24 begin tomorrow at 10 o'clock, Eastern.

25         MR. MALIONEK:  Thank you, Your Honor.  See you

1  tomorrow morning.

2          THE COURT:  We're adjourned.

3      (Proceedings concluded at 5:58 p.m.)

1                            CERTIFICATION

2                We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 24, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    March 24, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     March 24, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                           March 24, 2022

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable