**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | **Re: D.I. 9280** |

**THE SETTLING INSURERS' STATEMENT IN SUPPORT OF ADMISSION OF
THE DECLARATION OF BRIAN WHITTMAN**

The Settling Insurers[1] files this Statement in support of admission of the *Declaration of Brian Whittman in Support of Confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 9280] (the "Whittman Declaration"). In support of this Statement, Century states as follows:

**STATEMENT**

RCAHC objected to certain paragraphs of Mr. Whittman's direct testimony declaration, several of which relate to the insurer settlements and Debtors' exercise of their business judgment in approving the term sheet. In objecting to these paragraphs, RCAHC argued that (i) the Debtors directed Mr. Desai and Mr. Azer not to answer questions addressing these issues during their deposition as the Debtors' Rule 30(b)(6) designees and (ii) the Debtors inappropriately attempt to rely on privileged mediation communications as a basis to support the reasonableness of the settlements. Lujan & Wolff joined RCAHC's now withdrawn objection. The Guam Diocese

---

[1] The "Moving Settling Insurers" are identified in the signature blocks at the end of this filing and represent each of the settling insurance company groups. In addition, Hartford's counsel has authorized us to identify Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company as joining.

1

Committee did not join RCAHC's objection. It asserted that Mr. Whittman lacked foundation for his testimony and/or that certain sentences constituted legal conclusions. It did not assert that it had been precluded from questioning Mr. Whittman in any way. These objections should be overruled and Mr. Whittman's declaration and related testimony should be admitted in full.

    A.    **Several Insurers Have Made Clear on the Record that Full Releases Are Critical**

It is not necessary for Mr. Whittman to pierce mediation privilege to testify that it was essential to the settling insurers to be granted a full release to provide funding for the Plan. Century addressed this issue many times in its pleadings and on the record. In fact, in its objection to the RSA, Century devoted an entire section of its brief to explaining why it viewed the RSA as illusory as it did not provide for the full release.[2] Counsel for Century, AIG and other insurers also explained the need for full releases multiple times on the record at hearings held in these Chapter 11 Cases.

**JTX-1-494, SEPT. 22, 2021 HEARING TRANSCRIPT**

- **Tancred Schiavoni (Century):** "And by the way, it also just creates, you know, *a complete inability to resolve the case if nobody can be given a release here because all the claims can re-morph themselves back through, you know, the charters* coming in because you understand like what fundamentally is happening here is, for each and every claim, you know, the assertion is that somehow, you know, all three of them are involved in the claim." JTX-1-494, Sept. 22, 2021 Hr'g Tr. at 15:7–13.

- **Tancred Schiavoni (Century):** "So that if the -- it's one of the reasons, Judge, in connection with the RSA you got extensive briefing from us all about how the RSA was like essentially delivering illusory relief. So the Boy Scouts -- so *you have a claim where a charter is involved, the local council is involved, and the Boy Scouts. And the -- you know, if you only release one of them and not the other two, the whole claim gets re-pled into one or the other of them here*." JTX-1-494, Sept. 22, 2021 Hr'g Tr. at 15:14–21.

---

[2]   *See* JTX 1-180, D.I. 5707 (Sealed Version), JTX 1-185, D.I. 5723 (Redacted Version).

- **Tancred Schiavoni (Century):** "*So it's an essential provision of the whole plan that needs to be addressed and needs to be more robustly described.* And this element that's missing entirely, the suggestion that this is really driven by, you know, what the coverage program is, is completely inconsistent with everything we've heard up until, you know, this hearing." JTX-1-494, Sept. 22, 2021 Hr'g Tr. at 15:22–16:2 (emphasis added).

- **Michael Rosenthal (AIG):** "I also believe, Your Honor, that we should be discussing an additional disclosure, which is -- my client, for example, if we were to settle, if we were to decide to settle, we would want -- as Mr. Schiavoni said, *we would want a full and complete release of all of our BSA-related obligations, which might predate 1976*. […] there should be some kind of disclosure, so that we wouldn't have to resolicit for that reason; *some kind of disclosure that some of the insurers may, in fact, want or demand in any settlement, a full release of their chartered organization exposure related to BSA, which is, as Mr. Schiavoni said, what Hartford has also requested*." JTX-1-494, Sept. 22, 2021 Hr'g Tr. at 18:19–19:6 (emphasis added).

**JTX-1-509, DEC. 21, 2021 HEARING TRANSCRIPT.**

- **Tancred Schiavoni (Century):** "The notion of a Boy Scouts-only restructuring is just a shorthand for liquidation. There's no way -- just read Mr. Ryan's expert report that he put in for the Methodists and sort of being the fundamental, you know, real brains behind the settlement that we got done here, it's essential. And that shows up in the original local council settlement conditions their payment on a satisfactory resolution of the charter issue." JTX-1-509, Dec. 21, 2021 Hr'g Tr. at 86:1–8.

- **Tancred Schiavoni (Century):** "The Hartford settlement has a most-favored-nation clause, but it was also conditioned on a satisfactory resolution of the charter issue. *And, for us, it was essential. There's no way people are going to make a payment only to be sued all over again.* Your Honor had extensive briefing from us in connection with the RSA about illusory nature of releases. *Having that was key*. And Mr. Ryan worked with us on that to get us that release in connection with the Methodists." JTX-1-509, Dec. 21, 2021 Hr'g Tr. at 86:9–17 (emphasis added).

- **Tancred Schiavoni (Century):** "There is no bankruptcy; *this is absolutely integral to the whole bankruptcy getting this -- getting the charters released.*" JTX-1-509, Dec. 21, 2021 Hr'g Tr. at 88:10–12 (emphasis added).

- **Philip Anker (Hartford):** "But the basic proposition that *there was going to have to be peace with insurance -- with chartered organizations or some carve-out for one or two, before insurance companies were going to pay hundreds of millions of dollars is both, common sense and is something that has always*

3

- *been part of this plan.*" JTX-1-509, Dec. 21, 2021 Hr'g Tr. at 73:10–14 (emphasis added).

- **Philip Anker (Hartford):** "*Does anyone really think that anyone that the local councils, the insurance companies are going to pay hundreds of millions of dollars*, a pot of money that is now approaching $3 billion, *without obtaining complete peace of claims relating to Scouting* – not relating – unrelated to Scouting, but related to Scouting? Of course not. That's not the real world. *The real world is, one way or the other, that protection has to be there*. JTX 1-509, Dec. 21, 2021 Hr'g Tr. At 74:1-9 (emphasis added).

- **Philip Anker (Hartford)**: "But *the basic notion that local councils were not going to spend 600-plus-million dollars and insurers weren't going to spend hundreds upon hundreds of millions or more, only to be sued*, continue to be sued with respect to Scouting, by all the same claimants, *that was – has been on the table from day one and common sense would tell you that has to be the case*. There is no Boy Scouts-alone plan here that makes sense and that is something that's been a reality from day one." JTX 1-509, Dec. 21, 2021 Hr'g Tr. At 75:4-12 (emphasis added).

The record is clear that the releases were critical for the insurers and, absent releases, insurance settlements were unlikely. So, while stating that it was "common sense" may have been an overly shorthand way to describe the basis for Mr. Whittman's testimony concerning these releases, the fact that those releases were critical to the settled insurers – and why that was so -- was well-known and had been repeatedly expressed on the record throughout these cases.

Mr. Whittman played a role in formulating the settlements and is intimately familiar with the Debtors' finances. He ought to be permitted to testify, if the objections are sustained.

### B. Mr. Desai Answered All Questions Concerning Business Judgment Topics for Which He Was Designated to Testify

RCAHC asked the Court to block the Debtors' testimony concerning its business judgment on the basis that its questioning has allegedly been limited but, as demonstrated below, Mr. Desai answered all questions posed to him on business judgment as the Debtors' corporate designee. The Guam Diocese Committee did not join this objection. In any event, Mr. Desai was designated to testify regarding the Debtors' business judgment in connection with the topics sought by the

4

RCAHC concerning the Century Term Sheet (RCAHC Topic # 10), certain revisions to the Plan (RCAHC Topic # 11), and the Debtors' settlements with other insurers (RCAHC Topics # 12–14). He answered each of the questions for which he was designated to testify. For each of those topics, Mr. Desai testified about the types of information that the boards and task forces considered and explained why it was a valid exercise of their business judgment. For example, Mr. Desai offered the following responses to questions on the noticed topics related to the Century Term Sheet:

- ***Paragraph 9***[3]

    Q. Please explain why Debtors validly exercise their business judgment in agreeing to Paragraph 9 in this release of Settling Insurers in the Century Term Sheet.

    A. While the negotiations were taking place with various parties, including Century/Chubb, counsel for the Debtors had provided several updates to the Bankruptcy Task Force, along with the National Executive Committee and the National Executive Board of the Boy Scouts of America and in actively providing us with real-time information, providing us with the efforts that are being made to secure agreements with various insurers prior to an upcoming plan filing deadline, and at this time, prior to a deadline on the vote that was needed for survivors of historical abuse, coupled with the various parameters that the BSA, through the Bankruptcy Task Force, the bankruptcy -- I'm sorry, the National Executive Committee and the National Executive Board, our counsel were instructed to continue to negotiate with insurers like Century/Chubb in order to effectuate a meaningful resolution that would allow for additional dollars to be placed into the Settlement Trust to, again, achieve one of the BSA's principal objectives, which is to equitably compensate all the victims of sexual abuse.
    . . .
    A. So there were conversations related to the interplay, if you will, of prior settlements, the interplay and the need for continuing to negotiate to secure additional dollars in order to equitably compensate victims of abuse, how Chartered·Orgs would be treated under this type of settlement agreement and/or the terms of it that were being negotiated, along with who would be a settling party that would join in these discussions in order to effectuate a formal settlement, what that would mean to the overall timeline, if you will, for emergence and/or a confirmation hearing for the BSA and how this could continue to, like the Hartford Agreement, serve as a building block for allowing other parties to be a Settled Party

---

[3] Transcript of March 9, 2022 Deposition of Devang Desai ("Desai Tr.") at Tr. at 21:5–24:10. A true and correct copy of the excerpt of the Transcript of March 9, 2022 Deposition of Devang Desai is attached hereto as **Exhibit A**.

5

- *Paragraph 10*[4]

    Q. Is it your testimony, Mr. Desai, that in entering into Paragraph 10 of the Century Term Sheet, Exhibit 3, that the Debtor validly exercised its business judgment?

    A. Absolutely.

    Q. Please tell us the basis for that.

    A. I will defer you, Mr. Lloyd, to my prior answer a few months ago concerning how the Debtor came to authorize the entry into this agreement.

    I would also add on to there that based upon conversations with our counsel, considering all of the other factors that I had previously laid out and based upon various conversations held by, not only the Bankruptcy Task Force, our National Executive Committee and the board, we felt that it was the right thing to do to enter into this agreement with Century/Chubb.

The responses related to other provisions of the Century Term Sheet referred back to these and other responses when explaining that the Debtors validly exercised their business judgment.[5] Mr. Desai similarly testified in response to questions concerning the revisions to certain Plan provisions for which he was designated to testify.[6]

Mr. Desai also answered each of the questions for which he was designated to testify about the Zurich and Clarendon settlements.[7]

*Topic 13 (Zurich Settlement)*

---

[4] Desai Tr. at 30:23–31:15.
[5] *See* Desai Tr. at 36:21–37:21 (Paragraph 11); *id*. at 37:22–39:7 (Paragraph 13); *id.* at 48:6–50:16 (Paragraph 13); *id*. at 56:14–59:1 (Paragraph 10); *id*. at 66:23–67:10 (Paragraph 14); *id.* at 67:18–68:7(Paragraph 15); *id.* at 126:25–127:15 (Paragraph 12); *id.* at 128:24–129:20 (Paragraph 12); *id.* at 130:19–131:10 (Paragraph 12).
[6] *See, e.g.*, Desai Tr. at 71:1–23 (explaining that the Debtors validly exercised their business judgment in including the definition "BSA Cash Sharing Amount"); *id.* at 72:22–73:17 (explaining that the Debtors validly exercised their business judgment when including the revised definition "Chartered Organization Contribution"); *id.* at 76:2–77:17 (explaining that the Debtors validly exercised their business judgment when including the revised definition "Contributing Chartered Organization"); *id.* at 78:20-79:11 (explaining that the Debtors validly exercised their business judgment when including the definition "Limited Protected Party Injunction").
[7] Desai Tr. at 114:24-116:23, 118:2-22.

Q. And in coming to testify today about the Debtors' exercise of its business judgment in respect to the Zurich Insurance Settlement Agreement, entering into that agreement, is it fair to say that you're generally familiar with the terms and conspiracy of this agreement?

A. Yes, sir.

Q. And is it the Debtors' position that the Debtors validly exercised their business judgment in entering into the Zurich Insurance Settlement Agreement?

A. Yes.

Q. And beyond the information that you have provided to us today, in respect to – beg your pardon – the Century Term Sheet, the February 15, 2022 Plan and the Hartford Settlement Insurance Agreement, is there any information for you to share in respect to the information that the Debtors considered in exercising their business judgment to enter into the Zurich Insurance Settlement Agreement?

A. The only other thing I would add, and I may have said this previously, but as we continued to evolve in the ability to build a larger settlement trust, the various settlements with insurers all have some interplay in them as it relates to the various definitions that we spent some time on today, and so the agreements needed to continually be modified and negotiated. And as you saw, there were several conversations, both with our advisors through the BTF and the NEC process, but there were also many ongoing mediation sessions that the parties engaged in, in order to achieve what we previously set out to achieve during the initial Hartford Settlement Agreement, which was to protect our Chartered Organizations and as we continued to build on the number of settlements with various insurers and the number of parties that eventually joined these agreements, the parties had to go back and certainly negotiate certain points to allow for the entry of others to come in. And so our advisors were very active in that process and in terms of the Board of the NEC or the BTF, we were kept abreast of the various updates, negotiations, real-time updates, if you will, even from our advisors as to how agreements and the status of those negotiations were going and where parties were having some level of discussion or breakdown and what could we do in working through the mediator to help facilitate some consensus among the various parties.[8]

- *Topic 14 (Clarendon Settlement)*

Q. Mr. Desai, I'm showing you what's been marked as Exhibit 7, and this is – bears a document locate at the top of 8817-3. It says: Filed February 2nd – I'm sorry, filed February 15, 2022 and it's got the Case No. 20-10343-LSS. This is filed in the Debtors' Bankruptcy and it says Exhibit 3, Clarendon Insurance Settlement Agreement. And in coming here today to be the representative deponent of the Debtors in respect to the

---

[8] Desai Tr. at 114:24-116:23.

exercise of their business judgment to enter into the Clarendon Insurance Settlement Agreement, is it fair to say, sir, that you are generally familiar with the terms and conditions of this document?

A. Yes, sir.

Q. And is it the Debtors' position that they validly exercised their business judgment in deciding to enter into the Clarendon Insurance Settlement Agreement?

A. Yes, sir.

Q. And beyond the information that you shared with us with respect to the Century Term Sheet, the February 2022 plan, the Hartford Insurance Settlement Agreement and the Zurich Insurance Settlement Agreement, is there anything different or additional that you have to share about the Debtors' exercise of the business judgment in respect to the Clarendon Insurance Settlement Agreement?

A. No, sir.[9]

The paragraphs of the Whittman Declaration that RCAHC objected to before withdrawing their objection do not introduce the specific views or suggestions made by any mediation party; it simply references the fact that extensive mediation occurred to reach the settlements. And Mr. Desai responded to the questions covered by those paragraphs. He was only instructed by counsel not to answer when the questions required he disclose specific legal advice or a specific party's position in mediation.

    C.    **The Debtors May Rely on Board Minutes to Show that the Board Validly Exercised its Business Judgment**

The Court addressed the scope of privilege when a party is seeking to establish the exercise of its business judgments in connection with the hearing to approve the Restructuring Supporting Agreement ("RSA"). At that time, the Court found that the Debtors could use the minutes of the Debtors' board meetings and testimony about them to show the process BSA employed to evaluate

---

[9] Desai Tr. at 117:20-118:22.

the RSA.[10] This Court has only abrogated mediation privilege for a limited scope of issues. *See* JTX 1-502, Nov. 19, 2021 Hr'g Tr. at 45:12–46:7 ("the focus was on the TDPs in my ruling . . . [and] the claims matrices, which are embedded in the TDPs, and even the settlement trust agreement . . . I did not go beyond that in my October ruling and I don't see a basis in what I've read and heard to broaden that ruling"). None of the questioning related to those issues.

Here the Debtors point to the meetings of the Debtors' boards and task forces to support the Debtors' business judgment in entering into the Plan and the settlements incorporated into it. The witness was able to testify as to the exercise of business judgment through those meetings and process for reviewing the provisions of the Century Term Sheet.

## **CONCLUSION**

For the foregoing reasons, the Court should admit the Whittman Declaration in full.

---

[10] JTX 2674, Aug. 12, 2021 Hr'g Tr. at 141:13–18 ("I do believe that the redactions are either probably mediation privilege or attorney-client privilege."); JTX 2938, Aug. 13, 2021 Hr'g Tr. at 78:3–17 (admitting the Board minutes fin the context of the Debtors' business judgment).

Dated:  March 22, 2022

Respectfully Submitted,

By:  /s/ Stamatios Stamoulis
      Stamatios Stamoulis (No. 4606)

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York  10036-6537
Telephone: 212-326-2000

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

Robert D. Cecil, Jr. (No. 5317)
TYBOUT, REDFEARN & PELL
501 Carr Road, Suite 300
Wilmington, Delaware 19899
Phone: (302) 658-6901
Email: rcecil@trplaw.com

Mark D. Plevin (admitted *pro hac vice*)
Kevin D. Cacabelos (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone: (415) 986-2800
Email: mplevin@crowell.com,
kcacabelos@crowell.com

Tacie H. Yoon (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Email: tyoon@crowell.com,
rjankowski@crowell.com

*Attorneys for American Zurich Insurance Company, American Guarantee Insurance Company, and Steadfast Insurance Company*

Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail: summersm@ballardspahr.com
mcclambc@ballardspahr.com

-and-

Harry Lee (admitted *pro hac vice*)
John O'Connor (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail: hlee@steptoe.com
joconnor@steptoe.com
bgrindrod@steptoe.com

*Attorneys for Clarendon National Insurance Company, as successor in interest by merger to Clarendon America Insurance Company; River Thames Insurance Company Limited, as successor in interest to Union America Insurance Company; and Zurich American Insurance Company, as successor to Maryland Casualty Company, Zurich Insurance Company, and American General Fire & Casualty Company*

11

SIMPSON THACHER & BARTLETT LLP
Mary Beth Forshaw (*pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone:   212 455 2000
Facsimile:   212 455 2502

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone:   302 999 1540
Facsimile:   302 762 1688

*Counsel for Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company, f/k/a Industrial Insurance Company of Hawaii, for themselves and certain policies issued by Industrial Indemnity Company, International Insurance Company, United States Fire Insurance Company, and North River Insurance Company*

SIMPSON THACHER & BARTLETT LLP
Mary Beth Forshaw (*pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

STAMOULIS & WEINBLATT LLC
Stamatios Stamoulis
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688

*Counsel for Federal Insurance Company*