## Exhibit 1

**IN THE DISTRICT COURT OF GUAM**
**TERRITORY OF GUAM**
**BANKRUPTCY DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| ARCHBISHOP OF AGANA, a Corporation Sole, | Case No. 19-00010 |
| Debtor | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGANA**

Dated:  November 29, 2021

CORE/3515288.0002/171179132.3

**Table of Contents**

ARTICLE I INTRODUCTION .................................................................................. 7

ARTICLE II NOTICE TO HOLDERS OF CLAIMS ............................................. 8

ARTICLE III EXPLANATION OF CHAPTER 11 ............................................... 10

    3.1.  Overview of Chapter 11 ...................................................................... 10

    3.2.  Chapter 11 Plan ................................................................................... 10

    3.3.  Confirmation of a Chapter 11 Plan .................................................... 11

    3.4.  Summary of Classification and Treatment of Claims ........................ 12

ARTICLE IV QUESTIONS AND ANSWERS REGARDING THIS    DISCLOSURE
    STATEMENT AND THE PLAN ....................................................... 12

    4.1.  Why is the Committee sending me this Disclosure Statement? ......... 12

    4.2.  What happens to my recovery if the Plan is not confirmed, or does not go effective . 13

    4.3.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
    Plan goes effective, and what do you mean when you refer to "Confirmation,"
    "Effective Date" and "Consummation?" ............................................ 14

    4.4.  Will there be any releases granted to parties other than the Debtor as part of the Plan?
    ............................................................................................................. 14

    4.5.  Will there be any injunctions entered pursuant to the Plan? .............. 14

    4.6.  How do I vote for or against the Plan? ............................................... 14

    4.7.  What is the deadline to vote on the Plan? .......................................... 15

    4.8.  Why is the Bankruptcy Court holding a Confirmation Hearing? ....... 15

    4.9.  When is the Confirmation Hearing scheduled to occur? .................... 15

    4.10. What is the purpose of the Confirmation Hearing? ............................ 15

    4.11. What role does the Bankruptcy Court play after the Confirmation Hearing? ............. 15

    4.12. Does the Debtor recommend voting in favor of the Plan? ................. 15

ARTICLE V VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN .......................... 16

    5.1.  Manner of Voting on Plan ................................................................... 16

    5.2.  Claim Holders Entitled to Vote .......................................................... 16

    5.3.  Classes Impaired and Entitled to Vote on the Plan ............................ 16

    5.4.  Vote Required for Class Acceptance ................................................... 17

ARTICLE VI THE DEBTOR AND ITS OPERATIONS ..................................... 17

    6.1.  General Background ............................................................................ 17

ARTICLE VII THE CHAPTER 11 CASE ............................................................ 19

    7.1.  The Chapter 11 Filing .......................................................................... 19

    7.2.  Retention of Counsel ........................................................................... 19

    7.3.  Appointment of Creditors' Committee ................................................ 20

    7.4.  Unknown Claims Representative ......................................................... 20

CORE/3515288.0002/171179132.3

7.5. Bar Dates and Objections to Claims ............................................. 20
7.6. Plan Exclusivity ......................................................................... 21
7.7. Post-Petition Litigation .............................................................. 21
7.8. Mediation Efforts ....................................................................... 21
7.9. Real Property of Parishes, Programs and Schools ...................... 21
7.10. Insurance ................................................................................... 22
ARTICLE VIII SUMMARY OF THE PLAN ..................................... 23
8.1. General ...................................................................................... 23
8.2. Classification and Treatment of Claims Under the Plan ............. 25
ARTICLE IX .......................................................................................... 25
9.1. ADMINISTRATIVE CLAIMS ................................................. 25
9.2. Treatment. .................................................................................. 25
9.3. Professional Claim Filing Deadline. ........................................... 26
ARTICLE X ........................................................................................... 26
10.1. Statutory Fees ............................................................................ 26
ARTICLE XI .......................................................................................... 27
11.1. PRIORITY TAX CLAIMS. ....................................................... 27
ARTICLE XII PRIORITY CLAIMS (CLASS 1) .................................. 27
12.1. Definition.. ................................................................................. 27
12.2. Treatment .................................................................................. 27
ARTICLE XIII GOVERNMENTAL UNIT CLAIMS (CLASS 2) ......... 27
13.1. Definition.. ................................................................................. 27
13.2. Treatment .................................................................................. 27
ARTICLE XV TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS (CLASS 3) ...... 27
15.1. Definition.. ................................................................................. 27
15.2. Treatment .................................................................................. 27
15.3. Summary .................................................................................... 27
15.4. Stipulated Judgments ................................................................. 29
ARTICLE XVI UNKNOWN TORT CLAIMS (CLASS 4) ................... 29
16.1. Definition.. ................................................................................. 29
16.2. Treatment .................................................................................. 29
ARTICLE XVII GENERAL UNSECURED CLAIMS (CLASS 5) ....... 30
17.1. Definition. .................................................................................. 30
17.2. Treatment .................................................................................. 30
ARTICLE XVIII BANK OF GUAM (CLASS 6) .................................. 30

18.1. Class 6 Definition. . ................................................................. 30

**ARTICLE XIX FIRST HAWAIIAN BANK (CLASS 7)** ............................... 31

19.1. Class 7 Definition. ................................................................. 31

**ARTICLE XX BANK OF HAWAII (CLASS 8)** ............................................ 32

20.1. Class 8 Definition. ................................................................. 32

20.2. Class 8 Treatment ................................................................. 32

**ARTICLE XXI SMALL BUSINESS ADMINISTRATION (CLASS 9)** ......... 32

21.1. Class 9 Definition. ................................................................. 32

21.2. Class 9 Treatment ................................................................. 33

**ARTICLE XXII MEANS FOR EXECUTION OF THE PLAN** ..................... 33

22.1. TOGGLE PLAN ..................................................................... 33

22.2. OPTION 1: TRUST FORMATION AND FUNDING ..................... 33

22.3. OPTION 2: TRUST FORMATION AND FUNDING ..................... 34

22.4. PAYMENT OF PROFESSIONAL FEES .................................... 35

22.5. PAYMENTS EFFECTIVE UPON TENDER ............................... 36

22.6. ESTABLISHMENT OF TRUST ............................................... 36

22.7. PURPOSE, FORMATION AND ASSETS ................................. 36

22.8. ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST. .......................................................................... 36

22.9. TAX MATTERS ..................................................................... 37

22.10.    APPOINTMENT OF THE TRUSTEE ................................. 37

22.11.    RIGHTS AND RESPONSIBILITIES OF TRUSTEE. ........... 37

22.12.    TRANSFERRED INSURANCE INTERESTS. ..................... 38

11.A SPECIAL DISTRIBUTION CONDITIONS ..................................... 41

22.13.    INVESTMENT POWERS; PERMITTED CASH EXPENDITURES ................. 42

22.14.    REGISTRY OF BENEFICIAL INTERESTS ......................... 42

22.15.    NON-TRANSFERABILITY OF INTERESTS ....................... 42

22.16.    TERMINATION .............................................................. 42

22.17.    IMMUNITY; LIABILITY; INDEMNIFICATION. ................. 42

22.18.    TREATMENT OF TORT CLAIMS .................................... 43

22.19.    OPTION 1 CONTROL OF TRUST REAL PROPERTY ASSETS .................... 48

22.20.    FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY ASSETS 49

22.21.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 49

**ARTICLE XXIII CONDITIONS TO EFFECTIVE DATE** ......................... 50

**23.1. NOTICE OF EFFECTIVE DATE** ........................................................ **50**

**23.2. EFFECT OF NON-OCCURRENCE OF CONDITIONS** ........................... **50**

**ARTICLE XXIV EFFECT OF CONFIRMATION** ............................................. **50**

**24.1. DISSOLUTION OF UCC** ................................................................... **50**

**24.2. DISCHARGE AND INJUNCTION** ...................................................... **50**

**24.3. CHANNELING INJUNCTION** ............................................................ **51**

**24.4. EXCULPATION; LIMITATION OF LIABILITY** .................................... **53**

**24.5. TIMING** ......................................................................................... **53**

**24.6. NO BAR ON CERTAIN CLAIMS** ...................................................... **53**

**ARTICLE XXV INCORPORATION OF CHILD PROTECTION PROTOCOLS** ..... **53**

**ARTICLE XXVI THE REORGANIZED DEBTOR** ............................................ **54**

**26.1. CONTINUED CORPORATE EXISTENCE** .......................................... **54**

**26.2. VESTING OF ASSETS** .................................................................... **54**

**26.3. IDENTITY OF OFFICERS OF REORGANIZED DEBTOR** ..................... **54**

**26.4. FURTHER AUTHORIZATION** ........................................................... **54**

**ARTICLE XXVII MISCELLANEOUS PROVISIONS** ....................................... **54**

**27.1. RETENTION OF JURISDICTION.** ...................................................... **54**

**27.2. ASSUMPTION OF EXECUTORY CONTRACTS** ................................... **56**

**27.3. INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES** ........................................................................................... **56**

**27.4. DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS** ..... **57**

**27.5. RESERVATION OF RIGHTS** ............................................................. **57**

**27.6. NON-APPEALABLE ORDER** ............................................................ **57**

**27.7. AMENDMENTS AND MODIFICATIONS** ............................................ **57**

**27.8. U.S. TRUSTEE REPORTS** ............................................................... **58**

**27.9. NO WAIVER** ................................................................................... **58**

**27.10.    TAX EXEMPTION** .................................................................. **58**

**27.11.    NON-SEVERABILITY** ............................................................... **58**

**27.12.    REVOCATION** ......................................................................... **58**

**27.13.    CONTROLLING DOCUMENTS** ................................................. **58**

**27.14.    GOVERNING LAW** ................................................................... **58**

**27.15.    NOTICES** ................................................................................ **59**

**27.16.    FILING OF ADDITIONAL DOCUMENTS** ................................... **59**

**27.17.    POWERS OF OFFICERS** ........................................................... **59**

**27.18.    DIRECTION TO A PARTY** ......................................................... **59**

**27.19.    SUCCESSORS AND ASSIGNS** ................................................... **59**

27.20.     **CERTAIN ACTIONS** ........................................................... 59

27.21.     **FINAL DECREE** ................................................................... 59

27.22.     **PLAN AS SETTLEMENT COMMUNICATION** ...................... 60

27.23.     **OTHER RIGHTS** ................................................................... 60

**ARTICLE XXVIII CONFIRMATION PROCEDURES** ........................................ 60

28.1. Solicitation of Votes; Acceptance ................................................. 60

28.2. Confirmation Hearing ................................................................... 60

28.3. Best Interests of Creditors Test .................................................... 62

28.4. Feasibility ..................................................................................... 62

28.5. Cram Down .................................................................................. 62

**ARTICLE XXIX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ............................................................................. 63

29.1. Liquidation Under Chapter 7 of the Bankruptcy Code ................ 63

29.2. Alternative Chapter 11 Plans ....................................................... 63

**ARTICLE XXX CERTAIN FEDERAL INCOME TAX CONSIDERATIONS** ........... 64

30.1. The Trust ...................................................................................... 64

30.2. Federal Income Tax Consequences to Holders of Claims ............ 65

**ARTICLE XXXI VOTING INSTRUCTIONS** ...................................................... 66

**ARTICLE XXXII CONCLUSION** ..................................................................... 66

**DISCLOSURE STATEMENT**

On January 16, 2019 (the "Petition Date"), the Archbishop of Agana, a Corporate Sole (the "Archbishop" or "Debtor") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Territory of Guam (the "Bankruptcy Court"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). After the Petition Date, pursuant to §§1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (as defined above, the "Committee") to serve in the Debtor's Case. The Committee consists of seven (7) individuals who hold Tort Claims against the Debtor.

The Committee seeks confirmation of its Chapter 11 Plan of Reorganization (as it may hereafter be amended or modified, the "Plan"). Pursuant to §1125 of the Bankruptcy Code, the Debtor now submits this Disclosure Statement (the "Disclosure Statement") in connection with the Plan.

## ARTICLE I

## INTRODUCTION

The Committee provides this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan. All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in its entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in its entirety by reference to the Plan.[1]

BY ORDER DATED_____, 2022 (THE "DISCLOSURE STATEMENT ORDER"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN, AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE CREDITORS OF THE DEBTOR TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

ONLY HOLDERS OF ALLOWED CLAIM IN CLASSES 3, 4, 6, 7, 8, AND 9 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED ACCEPTING CLASSES 1, 2, 5, AND 10, THE COMMITTEE IS SOLICITING ACCEPTANCES OF THE PLAN FROM ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTOR. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

CORE/3515288.0002/171179132.3

EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY THE DEBTOR BY 5:00 P.M. (PREVAILING GUAM TIME), ON_____, 2022 (THE "VOTING DEADLINE").

The Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan. No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement. All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for_____ at _____ ___ .M. (Guam Time) (the "Confirmation Hearing") at the U.S. Courthouse, 520 W. Soledad Avenue, Hagatna, 96910, Guam. This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing. At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## ARTICLE II

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT AND ALL EXHIBITS THERETO WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT WILL GOVERN. UNLESS OTHERWISE SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. THIS DISCLOSURE STATEMENT DOES NOT REFLECT EVENTS THAT MAY OCCUR AFTER THAT DATE AND MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

**NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ESTIMATED VALUE OF THE DEBTOR'S PROPERTY AND/OR THE ESTIMATED ASSETS TO BE GENERATED FROM THE LIQUIDATION OF THE DEBTOR'S ASSETS, ARE AUTHORIZED BY THE COMMITTEE OR DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR**

ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PROPOSED PLAN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE COMMITTEE FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE COMMITTEE'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, THE COMMITTEE AND ITS ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR WILL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE COMMITTEE FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

ALTHOUGH THE COMMITTEES PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE COMMITTEE'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.

Each Holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. Except for the Committee and certain of the Professionals it has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Committee. You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

**After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan pursuant to the procedures set forth in the Solicitation Package, which will be sent under separate cover.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE COMMITTEE URGES ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

## ARTICLE III

## EXPLANATION OF CHAPTER 11

### 3.1.    Overview of Chapter 11

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its operations in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a "Debtor-in-Possession" unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's Case, the Debtor remains as the Debtor-in-Possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or operations. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed Chapter 11 plan.

### 3.2.    Chapter 11 Plan

The formulation of a Chapter 11 plan is the principal purpose of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate. A Chapter 11 plan may provide anything from a complex restructuring of a debtor's operations and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of a plan, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan. The Plan incorporates what the Committee believes provides a fair and equitable allocation of the Debtor's assets that will be distributed to creditors and treatment of all Claims against the Debtor.

After a Chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, Section 1125 of the Bankruptcy Code requires the Committee to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical

reasonable investor to make an informed judgment about the Plan. This Disclosure Statement is presented to Holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

### 3.3.    Confirmation of a Chapter 11 Plan

If all classes of Claims accept the Plan, the Bankruptcy Court may confirm the Plan if the Bankruptcy Court independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. The Committee believes that the Plan satisfies all the applicable requirements of Section 1129(b)(1) of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or, where applicable, interest in a particular class vote in favor of a plan for the Bankruptcy Court to determine that such class has accepted the Plan. Rather, a class of claims or interests will be deemed to have accepted a plan if the Bankruptcy Court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class. Only the Holders of Allowed Claims and Tort Claims who actually vote will be counted as either accepting or rejecting the Plan.

Furthermore, classes that are to receive no distribution under a plan are conclusively deemed to have rejected such plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

Classes 3, 4, 6, 7, 8, and 9 are impaired under the Plan and entitled to vote on the Plan.

Classes 1, 2, 5, and 10 are deemed unimpaired under the Plan and are deemed to accept the Plan.

In general, a Bankruptcy Court also may confirm a Chapter 11 plan even though fewer than all the classes of impaired claims of a debtor accept such plan. For a Chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, a plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that have not accepted the plan.

Under Section 1129(b)(1) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class.

The Committee believes that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.

### 3.4.    Summary of Classification and Treatment of Claims

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to Holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Committee believes that a broad overview of what, in their opinion, the Debtor and Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan. This summary is qualified in its entirety by reference to the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | Tort Claims Other Than Unknown Tort Claims | Impaired | Yes |
| 4 | Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | Unknown Contingent Claims | Impaired | No |
| 7 | Secured Claims of Bank of Guam | Impaired | Yes |
| 8 | Secured Claims of First Hawaiian Bank | Impaired | Yes |
| 9 | Secured Claims of the Bank of Hawaii | Impaired | Yes |
| 10 | Small Business Administration | Unimpaired | No |

As discussed in the Liquidation Analysis attached hereto as **Exhibit 1**, the Committee estimates that recoveries for Holders of Classes 3 through 10 will be greater than in liquidation under a hypothetical Chapter 7 of the Bankruptcy Code because the total amount of property available for distribution is greater under the Plan than in liquidation under Chapter 7. In addition, the Committee believes that distributions under a Chapter 7 case would likely be delayed due to the time it would take a Chapter 7 trustee to assess the Debtor's assets, review and analyze claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

## ARTICLE IV

## QUESTIONS AND ANSWERS REGARDING THIS
## DISCLOSURE STATEMENT AND THE PLAN

### 4.1.    Why is the Committee sending me this Disclosure Statement?

The Committee is seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the preparation and approval of

a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

The Plan is based on four methods of funding. The first method of funding is through the sale of Archbishop real property. The Archbishop has previously sold the Accion Hotel, for which proceeds of approximately $5.2 million remain in a separate account. The Committee further proposes to sell additional real property. The real property will consist of two groups. The first is the real property indisputably owned by the Debtor, which, including the proceeds of the Accion, the Committee estimates is worth approximately $9 million. The second is the real property in which the Parishes and Schools allegedly hold an equitable interest, and which is subject to litigation with the Committee, Adv. P. No. 19-00001 (Bankr. D Guam). The Committee estimates this second group of property has a value in the amount of roughly $26 million.

Secondly, the Debtor will contribute $8 million in cash currently held in bank accounts held in its own name, and which does not include the Accion sale proceeds. The Debtor also alleges it hold several million dollars for the benefit of the Parishes and Schools, which amounts are also which is subject to litigation with the Committee, Adv. P. No. 19-00001 (Bankr. D Guam). The Committee proposes $1,538,437.46 of the disputed cash be used to fund the Plan.

Third, the Plan requires the Reorganized Debtor continue to pay creditors $1,000,000 per year for five years after the Plan is Confirmed.

Fourth, the Pan will be funded by the Debtor's insurance companies. Either the Debtor will transfer its rights to insurance to a rust established for Tort Claimants and the Trust will litigate to obtain judgments against the insurance companies or the insurance companies will settle with the Trust for up to $45 million related to the Debtor's direct insurance policies and $55 million related to policies issued to the Boy Scouts of America, but in which the Debtor hold a separate, independent right from the Boy Scouts of America as an insured.

Thus, between the three forms of funding the Plan, it is expected the Tort Claimants will receive the grand total sum of between $23,000,000 and $141,538,437.46, which will be payable to the trust set up through the Plan and Disclosure Statement process. These funds will be allocated pursuant to the Trust Distribution Protocols attached as an exhibit to the Trust Agreement. In addition, a fund in an amount to be determined will be established by the Reorganized Debtor to pay Unknown Tort Claimants pursuant to the Plan, the Trust Distribution Protocols, and the Trust.

### 4.2.    What happens to my recovery if the Plan is not confirmed, or does not go effective?

If the Plan is not confirmed, the Committee believes it is unlikely that the Debtor will be able to reorganize. The Plan memorializes a comprehensive scheme to fund the trust, to an allocation of substantially all of the nonessential assets of the Debtor and a substantial contribution of the Parishes' assets to the trust, for the sole and exclusive benefit of the Tort Claimants and Unknown Tort Claimants. In addition, confirmation of the Plan is necessary to effectuate the settlement with the Debtor's insurance carriers that will be used to fund the Plan and the Trust created pursuant to the Plan for the benefit of Holders of Tort Claims and Unknown Tort Claims. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated in the Plan could be implemented and what Holders of Claims would ultimately receive on account of their Claims. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan on account of,

among other things, the cost of negotiating, drafting and potentially litigating an alternative Plan, as well as complex litigation regarding Tort Claims and the potential loss of funds from insurance carriers pursuant to settlements. Moreover, non-confirmation of the Plan may result in dismissal of the Case in its entirety. For a more detailed description of the consequences of this scenario, see "Best Interests of Creditors Test," which begins on page 62 hereof, and the Liquidation Analysis attached as **Exhibit 1** to this Disclosure Statement.

**4.3.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"[2]**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "Effective Date" means the later of 90 days after confirmation or the date that all conditions to the Plan have been satisfied or waived. Distributions will only be made after the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy Claims, the time that the Abuse Claims Reviewer requires to complete his analysis of certain Tort Claims, the amount of Claims outstanding against the Debtor, and the Trustee's business judgment. The Abuse Claims Reviewer analyzes the Tort Claims pursuant to the Trust Distribution Protocols. The Trust will distribute the funds after review of the Tort Claims is complete pursuant to the terms of the Plan, the Confirmation Order, the Trust Distribution Protocols, the Trust Agreement and any other applicable Plan Documents.

**4.4.    Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes. See "Exculpation and Limitation of Liability," which begins on page 53 and Channeling Injunction which begins on page 23, as well as the Supplemental Settling Insurer Injunction proposed in Plan Article 7. A Tort Claimant's Distribution is conditioned upon the Tort Claimant delivering a General Release to Protected Parties. The Ballots for the Tort Claimants contain the releases.

**4.5.    Will there be any injunctions entered pursuant to the Plan?**

Yes. The Settling Insurer Entities obtain the "Channeling Injunction," which begins on 52 and "Supplemental Injunction," which begins on page 23. The Channeling Injunction will preclude Claimants from pursuing Claims against the parties protected by such Channeling Injunction whether or not such Claimants receive a Distribution under the Plan.

**4.6.    How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of a Claim in Classes 3,4,6, 7,8, and 9 (collectively, the "Voting Classes"), you may vote for or against the Plan by

---

[2] The descriptions' capitalized terms in response to this question are qualified in their entirety by reference to the definitions in the Plan.

completing the Ballot and returning it as set forth in the Solicitation Packages which will be mailed out. See "Voting Instructions," which begins on page 67.

**4.7.**    What is the deadline to vote on the Plan?

All Ballots must be actually received by the Debtor no later than 5:00 p.m. (Guam Time) on _____, 2022 (the "Voting Deadline").

**4.8.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**4.9.    When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2020 to take place at _____ a.m. (Guam Time) before the Honorable Judge Tydingco-Gatewood, United States Bankruptcy Judge, in the U.S. Courthouse, 520 W. Soledad Avenue, Hagatna, 96910, Guam. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Debtor and certain other parties, by no later than _____, 2022 at 5:00 p.m. (Guam Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, it might not be considered by the Bankruptcy Court.

**4.10.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds a debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**4.11.    What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Case and the Plan. A detailed description of the Bankruptcy Court's post-confirmation jurisdiction is provided in Section 15.1 of the Plan.

**4.12.    Does the Committee recommend voting in favor of the Plan?**

Yes. The Committee recommends voting for the Plan because the Plan provides for a larger distribution, at the estimated Effective Date of the Plan, to the Debtor's unsecured creditors, including Holders of Tort Claims and Unknown Tort Claims, than would otherwise result from liquidation or any other reasonably available alternative. Accordingly, the Committee recommends that Holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan.

# ARTICLE V

## VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN

### 5.1.    Manner of Voting on Plan

Before voting, this Disclosure Statement, as well as the Plan, should be read in its entirety. You should only use the Ballot sent to you in the Solicitation Package to cast your vote for or against the Plan.

**Ballots must be completed, dated, signed and returned pursuant to the procedures set forth in the Solicitation Package.**

### 5.2.    Claim Holders Entitled to Vote

Under the Bankruptcy Code, any holder of a claim in a class that is "impaired" under the Plan is entitled to vote to accept or reject a plan, unless such class of claims neither receives nor retains any property under the plan (in which case such class is deemed to have rejected the plan). Bankruptcy Code §1124 provides generally that a Claim is impaired if the legal, equitable or contractual rights of the claim are altered.

Subject to the exceptions provided below, any Holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim Holder has filed a Proof of Claim with respect to a Disputed Claim. Pursuant to Federal Rule of Bankruptcy Procedure 3018(a), Class 3 Tort Claims will be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 3 Tort Claims will be determined pursuant to the Trust Distribution Protocols.

A Holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an Order of the Bankruptcy Court in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan. In other words, only Holders of Allowed Claims in Classes, 3,4, 6, 7, 8, and 9, may vote to accept or reject the Plan. A Claim to which an objection has been filed by the Debtor or any other party-in-interest no later than _____, 2022, or a Claim (i) that is listed on the Debtor's schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding Proof of Claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Order. Upon request of a party-in-interest, the Bankruptcy Court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Claims, Tort Claims and Unknown Tort Claims will not be counted. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 5.3.    Classes Impaired and Entitled to Vote on the Plan

Claim Holders in Classes, 3, 4, 6, 7, 8, and 9 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan. Any controversy as to whether any Claim or Class of Claims is impaired under the Plan will, after notice of any hearing, be determined by the Bankruptcy Court.

### 5.4.  Vote Required for Class Acceptance

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of allowed claims in that class who cast ballots.[3] Class 3 Claims and Class 4 Claims will be estimated at $1.00 each for voting purposes only. As such, if more than half of the number of Class 3 Tort Claimants who vote cast Ballots in favor of the Plan, will be deemed to have accepted the Plan. The vote for Class 4 will be cast by the Unknown Claims Representative.

## ARTICLE VI

## THE DEBTOR AND ITS OPERATIONS

### 6.1.  General Background

a.  Pre-Petition

Every Catholic entity, including the Debtor, is subject to church law also called Canon Law. The Debtor is structured and operates in accordance with Canon Law and is a juridic person under Canon Law. The Debtor is also a legal civil entity, organized as a Corporation Sole under Guam Statutes 18 G.C.A § 10102, that holds and administers property in trust for the benefit of the Roman Catholic Church on Guam and allows the Archdiocese, Parishes, Schools, and cemeteries, to function according to civil law as a single legal person under the total control of the Archbishop. As its pastor, the Archbishop holds full legal and equitable title to all church properties within the Archdiocese and directs all civil affairs of the Debtor.

The Roman Catholic Church is comprised of territories, known as Archbishops and Dioceses, each of which is subject to the authority of an Archbishop or Bishop who is responsible for the spiritual and pastoral well-being of the people who live within that Archbishop or Diocese.

The first Catholic church was established on Guam in 1668 by Jesuit priests, including Diego Luis de San Vitores. Catholics in Guam were part of the Diocese of Cebu, the Philippines. The United States acquired Guam after the Spanish-American War of 1898. In 1902, the Apostolic Prefecture of Mariana Islands was established which included Guam. In 1911, the Apostolic Vicariate of Guam was canonically erected. In 1946, Guam was added from the suppressed Vicariate Apostolic of Marianne, Caroline, and Marshall Islands. In 1965, the Vatican elevated the apostolic vicariate to the Diocese of Agana, as a suffragan diocese to the Roman Catholic Archdiocese of San Francisco. In 1984, in response to the growth of Catholicism in Guam, the Diocese of Agana was elevated to the Archbishop of Agana ("Archbishop").

The Archbishop serves the entire Territory of Guam. There are 26 Parishes and approximately 145,000 Catholic individuals within the Archbishop. These individuals and Parishes are served by approximately 30 priests and 24 deacons. Each Parish is expected to help fund the Archbishop. The Archbishop has policies relating to the financial affairs of the Parishes and each Parish is expected to operate in conformity with those policies. Beginning July 1, 2017, the assessment that each Parish pays

---

[3] In the case of Tort Claims based on Sexual Abuse Proof of Claim Forms and Unknown Tort Claims, such claims will be deemed allowed in the amount of $1.00 claims for voting purposes only.

to fund the general operations of the Archbishop is set at twenty percent (20%) of the Parish's ordinary income (principally the collections taken at Mass). Additionally, each Parish promotes an annual appeal to the parishioners for support of the operations of the Archbishop. As a religious organization, the Archbishop has no significant, ongoing for-profit business activities or business income. The Archbishop's revenue primarily derives from donations and Parish assessments.

In addition to the 26 Parishes, there are 10 Catholic schools on Guam, educating Pre-K to 12th graders (collectively, the "Schools"), with a total enrollment of over 3,000 students. The Parishes and Schools are under the fiscal or operating control of the Archbishop.

Each Archdiocese is expected to fund the ministry of its Archbishop, as well as the pastoral programs needed locally. The Debtor funds Archbishop Byrnes and his pastoral responsibilities (such as visiting people throughout Archbishop, tending to correspondence, meeting with consultative groups, and other matters allowing him to provide episcopal ministry for the priests and people of the Archbishop).

The Archbishop pastoral offices (the "Archdiocese") include: Office of the Chancellor (responsibilities include administering the services provided by the Archbishop's Chancery and engaging in pastoral planning), Office of Finance (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Office of Safe Environment (responsibilities include establishing "safe environment" programs, working with parents, civil authorities, clergy, parish staffs, educators, and community organizations to provide education and training about ways to make and maintain a safe environment for children), Office of Stewardship and Development (responsibilities include Parish development efforts and programs to support a culture of stewardship), Office of Human Resources (responsibilities include providing human resources guidance and information to pastors and administrators and promoting fair employment opportunities for all persons in recruitment, hiring, training, transfer, promotion, layoff, recall, leave of absence, compensation, and separation from employment), Office of Communications (responsibilities include publication of diocesan websites, social media and other communications), Office of Vocations (responsibilities include recruitment, education and formation of seminarians and candidates for permanent diaconate), Office of Catholic Education (responsibilities include leadership development and ensuring Catholic identity in schools), and Office of the Metropolitan Tribunal (responsibilities include interpreting and applying the laws of the Church in the protection and vindication of rights as well as determination of the status of persons in the Church).

b.    Need for Reorganization

Over the last several decades, many clergy members in the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of sexual abuse. This was left unaddressed for decades. Instead, survivors of clergy sexual abuse were ignored, called liars, shamed, and were left abandoned by the Church. Not only did the Church's inaction cause lasting trauma on survivors, the space created by the silence allowed sexual abuse to continue.

On September 23, 2016, Governor Eddie Calvo signed Bill 326-33 into law removing the statute of limitations on civil suits for childhood sexual abuse occurring on Guam. Soon thereafter, the Archbishop was served with numerous lawsuits asserting that claimants were sexually abused by various priests, brothers and lay people serving Parishes or institutions within the Archbishop. At the Petition Date, there were approximately 190 lawsuits pending against the Archbishop. As of the Date, 255 claimants filed Tort Claims against the Debtor, and additional claims were filed aft the Bar Date.

Of the 255 Tort Claims, approximately 140 implicate the Boy Scouts of America, approximately 107 implicate the Capuchin Franciscans, approximately 15 implicate the Sisters of Mercy, approximately five implicate the Sisters of Notre Dame, and one implicates the Congregation of Holy Cross. Each of these entities have been named as co-Defendants in at least some of these cases.

In June 2018, the Plaintiffs, the Archbishop, the Boy Scouts of America, the Capuchin Franciscans, the Sisters of Mercy and the Congregation of Holy Cross entered into a Pre-Mediation Protocol. Pursuant to the Protocol, the Archbishop and the other co-Defendants conducted limited discovery, including sworn statements of the Plaintiffs, in preparation for mediating the claims.

In September 2018, the Archbishop, on behalf of the entirety of the Archdiocese, attempted to reach a mediated resolution with the Plaintiffs, co-Defendants, and insurance carriers that provided or allegedly provided Policies covering the relevant time periods. The mediation was unsuccessful. Faced with likely prospect of adverse judgements against the Archbishop in the on-going litigation, the Archbishop was concerned that its financial viability and ability to carry on its mission was in jeopardy. In addition, although the Archbishop was current on its vendor obligations, it faced other financial issues in addition to claims involving allegations of clergy sexual abuse. As a result, and in an effort to bring the greatest measure of justice to the greatest number of victim survivors, on January 16, 2019, the Archbishop filed a Chapter 11 Bankruptcy Petition.

c.      Response to Sexual Abuse

In February 2017, Coadjutor Archbishop Byrnes adopted the United States Conference of Catholic Bishops Charter for the Protection of Children and Young People (June 2011) and the Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons (May 2006). In October 2017, he promulgated three distinct documents, specific to the Archbishop, in order to implement the above charter. The Committee considers these procedures inadequate to prevent future abuse of children in the Church. The Committee thus proposes much more elaborate child protection protocols be instituted as part of this Plan.

## ARTICLE VII

## THE CHAPTER 11 CASE

### 7.1.    The Chapter 11 Filing

The Debtor commenced its Case on January 16, 2019 (the "Petition Date"). The Debtor's Case was assigned to the Honorable Frances M. Tydingco-Gatewood, United States District Judge. The Bankruptcy Court has entered several orders in this Chapter 11 Case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the Bankruptcy Court's website: www.gud.uscourts.gov.

### 7.2.    Retention of Counsel

Subsequent to the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the Debtor-in-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code. By order of the Court, Elsaesser Anderson, Chtd. was authorized to act as bankruptcy counsel for the Debtor for this Case, Law Offices of John Terlaje as local counsel, Patterson Buchanan Fobes and Leitch, Inc. P.S. as special counsel and Blank Rome, LLP as insurance counsel.

### 7.3.    Appointment of Creditors' Committee

The Committee retained the law firm of Stinson LLP to represent it throughout this Case. Since its appointment, the Committee has taken an active role in the Debtor's Case and been involved in virtually every major event that transpired during the Chapter 11 process, including taking an active role in asset sales to maximize the value for the Estate.

The Committee has also performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors. The Committee also commenced certain litigation to enhance creditor recoveries as discussed below.

### 7.4.    Unknown Claims Representative

On January 15, 2020, the Debtor moved for the appointment of U.S. District Judge Michael R. Hogan, retired, as Unknown Claims Representative for the Debtor-in-Possession. The Unknown Claims Representative is the legal representative for those Claimants filing Tort Claims as defined in Section 2.104 of the Plan, for which a claim was not timely filed on the Bar Date. The Unknown Claims Representative's responsibilities and duties include: (i) undertaking an investigation and analysis to assist the Bankruptcy Court in determining the estimated number of Unknown Tort Claims and claim amounts held by the Unknown Tort Claimants; (ii) filing Proofs of Claim on behalf of all Unknown Tort Claimants by the Bar Date or any Bankruptcy Court ordered extension thereof; (iii) negotiating with the Debtor and other appropriate parties the Plan provisions for the evaluation, determination, and amounts of Unknown Tort Claims and number of Unknown Tort Claimants; (iv) advocating the legal position of the Unknown Tort Claimants before the Bankruptcy Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Unknown Tort Claimants; (v) taking all other legal actions reasonably necessary to represent the interests of the Unknown Tort Claimants; and (vi) serving as an independent fiduciary acting on behalf of all Unknown Tort Claimants.

Once the Unknown Claims Representative has completed his analysis, he will issue his Report and Recommendation. The number of Unknown Tort Claimants will be estimated. The treatment of Unknown Tort Claims is set forth below in the discussion of the treatment of Class 4 Claims.

### 7.5.    Bar Dates and Objections to Claims

By Order dated May 1, 2019 (the "Bar Order"), the Bankruptcy Court set August 15, 2019 (the "Bar Date") as the last day for creditors, including Tort Claimants, to file a proof of claim. A notice of the Bar Date was sent to in excess of 200 parties. In addition, publication notice of the Bar Date was made in approximately 28 regional, national, and local newspapers on multiple occasions.

The Debtor and the Committee's professionals have reviewed the Claims filed by creditors. A total of 259 Tort Claims have been timely filed in the Debtor's Chapter 11 Case. The Tort Claims identify various Parishes where the abuser came into contact with the survivor within the Archbishop. The Tort Claims describe that the Claimants were all minors between three and seventeen years of age when the abuse began. At least 43 priests and lay religious and others are identified as abusers.

In addition, 46 non-Tort Claims, including Parishes and schools, were scheduled, of which 14 proofs of claim have been timely filed.

To the extent the Debtor has the right to object to Claims (only the Trust has the right to object to Tort Claims) and deems it prudent and/or cost effective to object to Claims, the Plan provides that the Debtor has sixty (60) days from the Effective Date to file objections to filed Claims. If the Debtor fails to object to a properly filed Claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed if such Claim is a non-Tort Claim and will be entitled to the Distribution under the Plan applicable to the particular class in which such Claim is classified. The Plan provides that Tort Claims will not be Allowed Claims, but treated as provided in the Plan.

### 7.6.    Plan Exclusivity

Pursuant to §1121 of the Bankruptcy Code, a debtor-in-Possession is granted a 120-day exclusive period from the Chapter 11 filing date to file a Plan of Reorganization. During such time, only the Debtor can file a Plan of Reorganization. However, the Bankruptcy Code provides that the Court can increase a debtor's exclusive period to file and confirm a Plan of Reorganization for cause shown up to eighteen (18) months after commencement of the case. The Debtor's exclusive right to file a Plan has terminated.

### 7.7.    Post-Petition Litigation

**Adversary Proceeding 19-0001 - Complaint (Declaratory Judgment Regarding Property of the Estate)**

During the course of the bankruptcy, the Committee filed a Complaint (Declaratory Judgment regarding property of the estate) at Case No. 19-00001. The Complaint seeks to have the assets of the Parishes and Schools be determined to be assets of the Debtor. The Debtor asserts that, under principles of Canon law certain property that is held in title by the Archbishop is, in fact, property of the Parishes, Schools rather than property of the Debtor's estate. The Committee disputes that assertion, and argues that all property in title by the Archbishop is, in fact, property of the Archbishop's estate pursuant to applicable U.S. and Guam Civil law. The Committee was granted summary judgment on most issues relating to its lawsuit in July 2021, but one or more discreet issues still remain for trial. A trial has been scheduled for February 2022. If the Committee wins its case at trial, the Committee's Plan will proceed under Option 1, as described in this document. If the Debtor wins at trial, the Committee's Plan will proceed under Option 2, as described in this document.

### 7.8.    Mediation Efforts

After the Case was commenced, the Debtor and Committee held multiple mediations over several years, pursuant to an Order of the Bankruptcy Court, with the oversight and support of the mediator appointed in this case, the Honorable Judge Robert J. Faris. Unfortunately these mediation sessions did not result in a resolution.

### 7.9.    Real Property of Parishes, Programs, and Schools

In its Bankruptcy petition and Schedules, the Debtor disclosed millions of dollars' worth of real property belonging to Parishes and schools that it alleges are being held in trust by the Debtor for such Parishes and programs. Therefore, the Debtor takes the position that the property listed on Exhibit 9 to the Bankruptcy petition and Schedules is held for the benefit of the Parishes, schools, and institutions of the Archbishop, and is not property of the Estate.

The Committee has challenged the position that the properties set forth in Exhibit 9 to the Bankruptcy petition and Schedules are not property of the Estate and, as described above, will proceed to trial against the Debtor with respect to such issues in February 2022.

### 7.10.  Insurance

#### a.  Background

After an extensive search for historical liability policies, the Debtor identified certain insurers that issued policies to the Debtor that may apply to the Tort Claims alleging clergy sexual abuse.

National Union insured the Debtor during the period from 1972 to 1993, when National Union started adding sexual abuse exclusions to its policies. The National Union policies are alleged to be owner, landlord, and tenant ("OLT") policies. The policies provide liability coverage for covered injuries arising out of the ownership, maintenance or use of an insured premises and its operations. The National Union policies have $100,000 per person limits and $300,000 per occurrence limits.

Prior to this Case, National Union agreed to participate in the defense of certain lawsuits, subject to a reservation or rights, asserting that it reserved its rights on numerous grounds, including the right to deny coverage to the extent that the alleged sexual abuse did not occur during the applicable policy period; that OLT policies do not cover sexual abuse; that sexual abuse is not an "accident" or "occurrence" from the standpoint of the abuser or the insured; and that the alleged acts constitute intentional acts.

In addition to National Union, the Debtor maintains that Continental Insurance Company (and/or companies affiliated with it) ("CNA") provided the Debtor with liability insurance prior to 1972. The Debtor contends that secondary evidence demonstrates that CNA insured the Debtor from approximately 1960 to 1964. The Debtor maintains that the CNA policies have $25,000 per occurrence limits, which in 1964 were increased to $100,000 per occurrence. The Debtor also contends that CNA likely continued to provide liability insurance to the Debtor until 1972.

The Debtor also maintains that CNA insured the Debtor from 1950 to 1951. The Debtor contends that the CNA policy from 1950 to 1951 provided liability coverage with a $10,000 per person limit and $20,000 per accident limit. In addition, the Debtor contends it is likely that CNA also insured the Debtor from 1951 to 1960.

CNA asserts that, despite numerous searches, CNA has not found in its records any policies that insure the Debtor or evidence of such policies. CNA asserted that it is reserving its rights on numerous grounds, including the right to deny coverage to the extent that the Debtor fails to demonstrate the existence of the alleged policies or the material terms or conditions of any alleged policies; that a claim does not seek recovery for damages caused by an accident, incident, or occurrence; that the injuries at issue were expected or intended from the perspective of the insured; that any injury did not take place on the property or premises of the insured; and that any bodily injury did not take place during any alleged policy period.

Prior to this Case, National Union and CNA participated in mediation to resolve plaintiffs' claims and disputes. After this Case commenced, National Union and CNA participated in mediation on November 29, 2019, pursuant to an Order of the Bankruptcy Court, before the Honorable Judge Robert J. Faris in Agana, Guam. After that mediation concluded early on the first day without reaching a settled,

National Union and CNA remained engaged in resolution efforts. National Union has offered the Debtor $12 million and CNA has offered $1 million to settle with the Debtor. The Committee believes these proposed settlements are not reasonable given the likely exposure faced by these insurance companies.

In addition to insurance coverage from National Union and CNA, the Debtor contends that certain insurance policies issued to the Boy Scouts of America ("BSA") cover the Debtor as an insured and/or an additional insured. Insurers that provided primary liability insurance coverage to the BSA include Chubb, as successor to Insurance Company of North America, and Hartford. Prior to this Case, Chubb agreed to participate in the defense of certain suits against the Debtor, subject to a reservation of rights. Hartford acknowledged that the Debtor may qualify as an insured under a Hartford policy but stated that it needed additional information and asserted that it reserved all rights. The Committee will allow the BSA insurers to participate in the plan for a combined aggregate contribution of $55 million.

**Supplemental Injunction**. If the insurance companies agree to pay reasonable settlements, as set forth in the Plan, they may qualify as Settling Insurer Entities and will be entitled to receive the benefit of a Supplemental Injunction under the Plan and Order confirming such Plan pursuant to 11 U.S.C. §§ 105(a) and 363. Any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, Perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Settling Insurer Entities' Settlements) against any of the Protected Parties, Settling Insurer Entities, or the Policies, which, directly or indirectly, relate to, any of the Policies, any Tort Claims or any Related Insurance Claims, would be permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurer Entities, and/or the Policies

.

# ARTICLE VIII

## SUMMARY OF THE PLAN

The Committee submits that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Case were hypothetically converted to Chapter 7. Therefore, the Debtor submits that the Plan is in the best interests of the Creditors and the Debtor recommends acceptance of the Plan by holders of Claims in Classes 3, 4, 6, 7, 8, and 9.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

### 8.1.    General

a.    Brief Explanation of Chapter 11

Chapter 11 is the principal business or operations reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business or operations for the benefit of itself and its creditors. Upon the filing of a petition for reorganization under Chapter 11 and during the

pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect claims or enforce liens against the Debtor, including the commencement of any sexual abuse litigation.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case. In general, a plan divides the claims against a debtor into separate classes and allocates plan distributions among those classes. If the legal, equitable and contractual rights of a class are unaffected by a plan, such class is considered "unimpaired". All unimpaired classes are deemed to have accepted a plan and therefore are not entitled to vote thereon. Bankruptcy Code §1126(g), on the other hand, provides that all classes of claims that do not receive or retain any property under a plan on account of such claims are deemed to have rejected such plan. All classes of claims that are considered "impaired" are entitled to vote on a plan.

Under the Bankruptcy Code, acceptance of a plan is determined by class; therefore, it is not required that each holder of a claim in an impaired class vote in favor of a plan in order for the Bankruptcy Court to confirm a plan. Generally, each impaired class must vote to accept a plan; however, the Bankruptcy Court may confirm a plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept a plan and certain other statutory tests are satisfied. Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject such plan but who will nonetheless be bound by such plan if it is confirmed by the Bankruptcy Court.

Section 1129(a)(10) of the Bankruptcy Code will be satisfied if an impaired Class of Claimants accepts the Plan by a vote of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan. The Committee requests confirmation of this Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept this Plan pursuant to Section 1126(c) of the Bankruptcy Code. The Committee reserves the right to modify this Plan to the extent that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

b.    Acceptance of the Plan

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired class of claims votes to accept the plan; and (b) the plan meets the other requirements of §1129(a). As explained above, classes that are unimpaired are deemed to have accepted the plan and therefore are not entitled to vote thereon, and classes that do not receive or retain any property under the plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims classified in impaired Classes that are to receive distributions under the Plan.

An impaired class of claims will be deemed to have accepted a plan if holders of at least two-thirds in dollar amount and a majority in number of claims in such class who cast timely ballots vote to accept the plan.

Section 1129(a)(10) of the Bankruptcy Code will be satisfied if an impaired Class of Claimants accepts the Plan by a vote of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan. The Committee requests confirmation of this Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept this Plan pursuant to Section 1126(c) of the Bankruptcy Code. The

Committee reserves the right to modify this Plan to the extent that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

   c.  Classification of Claims Generally

  Bankruptcy Code Section 101(5) defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

  Bankruptcy Code Section 1123 provides that a plan of reorganization will designate classes of claims against a debtor. Bankruptcy Code Section 1122 further requires that each class of claims contain only claims that are "substantially similar" to each other. The Committee believes that it has classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that a Holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Committee would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

## 8.2. Classification and Treatment of Claims Under the Plan

  The following describes the classification of Claims under the Plan and the treatment that Holders of Claims, whether Tort Claims or otherwise, are to receive if the Plan is confirmed and becomes effective. A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

## ARTICLE IX

  **9.1.**  **ADMINISTRATIVE CLAIMS.** As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims including Professional Claims, and Priority Tax Claims will not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims will be treated separately as unclassified Claims on the terms set forth in this Article.

  **9.2.**  **Treatment.** Each holder of an allowed Administrative Claim, excluding Professional Claims, against the Archdiocese will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such Claim. Each holder of an Allowed Professional Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Professional Claim, unless the holder agrees in writing to other treatment of such Claim and subject to the provisions of Section 5.2 of this Plan.

a.      Administrative Filing Deadline.

1.      Except as otherwise set forth in this Plan, requests for allowance and payment of Administrative Claims, excluding Professional Claims, must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court (the "Administrative Claims Filing Deadline"). Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline will be forever barred from asserting such Claims against the Archdiocese, the Reorganized Debtor, any Settling Insurer (to the extent applicable), the Trust, or any of their property. Administrative Claims representing obligations incurred by the Archdiocese after the Effective Date (including, without limitation, Claims for professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. In addition, holders of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

2.      All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph will control over any contrary deadline set forth in any requests for payment of Administrative Claims.

**9.3.    Professional Claim Filing Deadline**.

All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) will file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

# ARTICLE X

**10.1.    Statutory Fees.** All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date will be paid by the Reorganized Debtor as soon as practicable after the Effective Date. After the Effective Date, the Trust will pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed, but in no event will the payments made to the Trust made pursuant to Article IV, V, or VI by any Person other than the Debtor be considered "disbursements" under 28 U.S.C. § 1930, nor will any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930. The Reorganized Debtor will file post-Effective Date quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee will not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate. The Reorganized Debtor will remain responsible for any pre-Effective Date reporting and pre-Effective Date unpaid fees.

## ARTICLE XI

**11.1.   PRIORITY TAX CLAIMS.** With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor will (i) pay such Claim in cash as soon as practicable after the Effective Date from its ongoing operations, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Archdiocese or Reorganized Debtor, as applicable, in writing, provided such treatment is no less favorable to the Archdiocese than the treatment set forth in clause (i) of this sentence.

## ARTICLE XII
### PRIORITY CLAIMS (CLASS 1)

**12.1.   Definition.** A Class 1 Claim means an allowed Claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

**12.2.   Treatment.** Unless the holder of an allowed Class 1 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor will pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

## ARTICLE XIII

### GOVERNMENTAL UNIT CLAIMS (CLASS 2)

**13.1.   Definition.** A "Class 2 Claim" means an allowed Claim of Governmental Units not otherwise included in Article II or Section 4.1 above.

**13.2.   Treatment**. Unless the holder of an allowed Class 2 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor will pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

## ARTICLE XV

### TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS (CLASS 3)

**15.1.   Definition.** A Class 3 Claim means a Tort Claim other than an Unknown Tort Claim ("Class 3 Claim").  A "Class 3 Claimant" will mean a holder of a Class 3 Claim.

**15.2.   Treatment.** Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 3 Claimants will be assigned to, assumed and treated by the Trust as further provided in Article VI, the Trust Agreement, and the Trust Distribution Plan. Class 3 Claims will be paid in accordance with the provisions of the Trust and Trust Distribution Plan.

**15.3.   Summary**. The Plan creates a Trust to fund payments to Class 3 Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. The Trust will be funded

as provided in Articles IV ,V, and VI, including by contributions from the Archdiocese and others and the assignment of the Transferred Insurance Interests. The Trust will make distributions to the Class 3 Claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which will represent the sole recovery available to Class 3 Claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 3 Claimants against the Non-Settling Insurers.

No Class 3 Claimant will receive any payment on any award unless and until such Class 3 Claimant has executed the Release attached as to the Plan. Each Class 3 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 3 Claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, the Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). The Class 3 Claims will not be released or enjoined as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, any other Protected Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Any release of Class 3 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 3 Claims. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim will not be liable for any Protected Party's share of causal liability or fault. In no event may a Class 3 Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim will be provided by the Trustee with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and will not be liable for any Protected Parties' share of liability or fault. The Trust will be obligated to provide copies of the Class 3 Claimants' releases and certifications to any of the Protected Parties or Settling Insurers upon request provided that such Protected Parties or Settling Insurers have signed a confidentiality agreement encompassing such information.

The Trust will fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust will indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust will pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 3 Claims, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of distributions Class 3 Claimants receive, or are entitled to receive, based on the Trust Distribution Plan. For the avoidance of doubt, determinations by the Tort Claims Reviewer and/or any distributions entitled to be received from the Trust will not constitute a determination of any Protected Party's liability or damages for Class 3 Claims. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 3 Claims. Any such recoveries by the Trust from Non-Settling Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan. To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the assignment and transfer of the Transferred Insurance Interests to the Trust, results in a forfeiture of coverage, this Plan preserves the Non-Settling Insurers' rights to the extent required under their respective Non-Settling Insurer Policies and applicable law.

**15.4.    Stipulated Judgments.** Certain Class 3 Claimants may enter into agreements with the Archdiocese, the Reorganized Debtor, or any other Protected Party for settlement of a Tort Claim consistent with and to the extent authorized by applicable non-bankruptcy law. If a Class 3 Claimant enters into such an agreement with the Archdiocese, the Reorganized Debtor, or any other Protected Party, the Trust will pursue any judgment against the Non-Settling Insurer on behalf of the Class 3 Claimant. Any recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to the Trust Distribution Plan.

## ARTICLE XVI

## UNKNOWN TORT CLAIMS (CLASS 4)

**16.1.    Definition.** A Class 4 Claim means an Unknown Tort Claim ("Class 4 Claim"). A "Class 4 Claimant" will mean a holder of a Class 4 Claim.

**16.2.    Treatment**. The Reorganized Debtor will assume liability for Unknown Tort Claims and establish the Unknown Tort Claim Reserve Fund in the amount of the greater of (i) $500,000.00 or (ii) the amount designated by the Unknown Tort Claim Representative in Plan Exhibit A. The Reorganized Debtor will make distributions to the Class 4 Claimants, as provided in Trust Distribution Plan, up to the amount of the Unknown Tort Claim Reserve Fund, which fund will represent the sole recovery available to Class 4 Claimants in respect to any obligation owed by the Settling Insurers. Distribution made pursuant to the Trust Distribution Plan, however, does not preclude or affect claims or recoveries by Class 4 Claimants against the Non-Settling Insurers.

No Class 4 Claimant will receive any payment on any award unless and until such Class 4 Claimant has executed the Release attached as Exhibit F to the Plan. Each Class 4 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 4 claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections

6.14(i) and (j). The Class 4 Claims will not be released or enjoined as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, and such Non-Settling Insurer or are fully adjudicated, resolved and subject to Final Order, but recourse is limited as described above.

The Trust will fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 4 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust will indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 4 Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust will pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 4 Claims. Any release of Class 4 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Class 4 Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 4 Claims. Nothing in this Article requires any Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or a Settling Insurer and such Claims are reserved. But in no event may a Class 4 Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party.

Class 4 Claimants will provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 4 Claim pursuant to the factors in the Trust Distribution Plan.

## ARTICLE XVII

### GENERAL UNSECURED CLAIMS (CLASS 5)

**17.1.   Definition.** A Class 5 Claim means (1) any Claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such Claim timely filed a Claim.

**17.2.   Treatment**. Each holder of a Class 5 Claim will receive, directly from the Reorganized Debtor, payment in full of such allowed Class 5 Claim, without interest, on the Effective Date.

## ARTICLE XVIII

### BANK OF GUAM (CLASS 6)

**18.1.   Class 6 Definition.** A Class 6 Claim means the Claim of Bank of Guam, which is comprised of the Class 6A, 6B Claims, and 6C Claims.

      a.      **Class 6A Definition**. A Class 6A Claim means the secured portion of the claim of the Bank of Guam in the approximate amount of $5,238,040.27 minus payments made since the Petition Date, secured against the Debtor's deposit accounts with the Bank of Guam.

b.    **Class 6A Treatment**. The Reorganized Debtor will assume the 6A Claim and all pre-petition date loan documents will remain in full force and effect, except as follows. The deposit accounts securing the Class 6A Claim will vest in the Reorganized Debtor, but will no longer secure the Class 6A Claim and the Bank of Guam will waive any right of set off on those deposit accounts.  The Bank of Guam will receive replacement mortgages on the real property listed on Plan Exhibit Q in an amount equal to the Class 6A Claim and the Class 6B Claim.

c.    **Class 6B Definition**. A Class 6B Claim means the unsecured portion of the claim of the Bank of Guam in the approximate amount of $7,087,092.88.

d.    **Class 6B Treatment**. The Reorganized Debtor will assume the Class 6B Claim and all pre-petition date loan documents will remain in full force and effect.

e.    **Class 6C Definition**. A Class 6C Claim means the guaranty obligations of the Debtor related to the Catholic Social Service loans with the Bank of Guam.

f.    **Class 6C Treatment**. The Reorganized Debtor will not assume any liability or obligations related to the Class 6C Claim.

## ARTICLE XIX

## FIRST HAWAIIAN BANK (CLASS 7)

**19.1.    Class 7 Definition.** A Class 7 Claim means the secured claims of the First Hawaiian Bank, which are comprised of the Class 7A, Class 7B, and Class 7C.

a.    **Class 7A Definition**. A Class 7A Claim means the Secured Claims of the First Hawaiian Bank in the approximate amount of 4,385,946.41, minus payments made since the Petition Date, secured under that certain negative pledge agreement recorded on ten parcels of real property and under that certain security agreement.

b.    **Class 7A Treatment**. The Reorganized Debtor will assume the Class 7A Claim and all pre-petition date loan documents will remain in full force and effect, except as follows. The collateral securing the Class 7A Claim will vest in the Reorganized Debtor, but will no longer secure the Class 7A Claim and the First Hawaiian Bank will waive any right of set off on those deposit accounts. First Hawaiian Bank will receive replacement mortgages on the real property listed on Plan Exhibit R in an amount equal to the secured portion of the Class 7A Claim.

c.    **Class 7B Definition**. A Class 7B Claim means the Secured Claim of First Hawaiian Bank in the approximate amount of $1,843.40, less payments made since the case was filed, is secured by a 2014 Hyundai Elantra Limited.

d.    **Class 7B Treatment**. The Class 7B claim will be paid in full from the Debtor's cash on hand on the Effective Date. First Hawaiian Bank's lien on the 2014 Hyundai Elantra Limited will survive with the same extent, validity, and priority, as before the Petition Date.

e.    **Class 7C Definition**. A Class 7C Claim means any purported guaranty liability of the Debtor related to the obligations of the Catholic Cemeteries of Guam, Inc. to First Hawaiian Bank.

f.    **Class 7C Treatment**. The Reorganized Debtor will not assume any liability or obligations related to the Class 7C Claim.

## ARTICLE XX

## BANK OF HAWAII (CLASS 8)

**20.1.    Class 8 Definition.** A Class 8 Claim means the secured claim of the Bank of Hawaii in the approximate amount of $222,260.98, payments made since the Petition Date, which Claim is secured against the Debtor's deposit accounts with the Bank of Hawaii.

**20.2.    Class 8 Treatment**. The Reorganized Debtor will assume the Class 8 Claim and all pre-petition date loan documents will remain in full force and effect, except as follows. The deposit accounts securing the Class 8 Claim will vest in the Reorganized Debtor, but will no longer secure the Class 8 Claim and the Bank of Hawaii will waive any right of set off on those deposit accounts.  The Bank of Hawaii will receive replacement mortgages on the real property listed on Plan Exhibit S in an amount equal to the secured portion of the Class 8 Claim.

## ARTICLE XXI

## SMALL BUSINESS ADMINISTRATION (CLASS 9)

**21.1.    Class 9 Definition.** A Class 9 Claim means the Secured Claims of the Small Business Administration in the amount of $1,303,384.58 secured by mortgages on the following real property:

| Debtor Prefix | Related Entity | Legal |
| --- | --- | --- |
| CHP2 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3-1, Chalan Pago |
| CHP1 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3NEW-R3, Chalan Pago |
| SIN12 | Saint Jude Thaddeus Catholic Church | Lot 1, Block 17, Tract 232, Sinajana |
| MAN1 & MAN8 | Santa Teresita Catholic Church | Lot 2285-2-3, Mangilao |
| BAR22 | San Vicente School | Lot 2364-1-7-NEW, Barrigada |
| BAR30 | San Vicente School | Lot 2365-1-1, Barrigada |
| BAR28 | San Vicente School | Lot 5437 (Old Bullcart Trail between Lot 2364-1-7 and 2365-1-1), Barrigada |

| | | |
|---|---|---|
| BAR25 | San Vicente School | Lot 2265-Rem-8-1, Barrigada |
| BAR24 | San Vicente School | Lot 2265-Rem-8-2, Barrigada |

**21.2.   Class 9 Treatment**. If the Plan is implemented pursuant to Section 5.2, the Reorganized Debtor will assume the Class 9 Claim and all pre-petition date loan documents will remain in full force and effect and the mortgages securing the Class 9 Claim will remain and encumber the interest of the Reorganized Debtor to the same extent, validity, and priority as prior to the Petition Date. If the Plan is implemented pursuant to Section 5.3, the Reorganized Debtor will not assume any liability on the Class 9 Claim and the mortgages securing the Class 9 Claim will encumber only the interest the party or parties holding an equitable interest in the mortgaged property.

## ARTICLE XXII

## MEANS FOR EXECUTION OF THE PLAN

**22.1.   TOGGLE PLAN.** The means of implementing the Plan will depend on the outcome of the pending litigation captioned Official Committee of Unsecured Creditors v. Archbishop of Agaña, 19-ap-00001 (Bankr. D. Guam). Should the Official Committee of Unsecured Creditors prevail and the Court enter judgment affirming that the Debtor holds legal and equitable title to certain disputed property, then the Plan will be implemented as set forth in Section 5.2 (Option 1). If, however, the Court finds that the Debtor does not hold an equitable interest in certain of the disputed property, the Plan will be implemented as set forth in Section 5.3 (Option 2).

**22.2.   OPTION 1: TRUST FORMATION AND FUNDING**

a.      **Purpose, Formation, and Assets**. The Trust will be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan. The proposed Trust Agreement and Trust Distribution Plan are attached hereto as Plan Exhibit D.

b.      **Funding.**

1.      **Summary**. This Plan will be funded from the sources and in the manner set forth in this Section.

2.      **Contributions**. Cash and other assets will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein:

3.      **Debtor Real Estate**. The Debtor will transfer the parcels of real property listed on Plan **Exhibit G** to the Trust, free and clear of all claims, liens, and encumbrances pursuant to 11 U.S.C. § 1123(a)(5)(d);

4.      **Debtor Cash Contribution.** The Debtor will transfer $9,538,437.46 to the Trust.

5.      **Settling Insurer Contributions**. The Settling Insurers will transfer to the Trust the respective Settlement Amounts set forth in Section 7.11(1)-(3).

6.      **Unknown Claims**. The Reorganized Debtor will establish the Unknown Tort Claim Reserve Fund.

**7.      Reorganized Debtor Payments.** For five years following the Effective Date, the Reorganized Debtor will pay the Trust $1,000,000.00 on the anniversary date of the Effective Date, for a total cash contribution following the Effective Date of $5,000,000.00.

c.      Additional Trust Assets: All Rights and Recoveries Against Non-Settling Insurers. In addition to the funds and real property transferred to the Trust, the Transferred Insurance Interests of the Archdiocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date.  In addition, the Interests of the other Protected Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. The foregoing assignment and transfer will not be construed as an assignment and transfer of the Non-Settling Insurer Policies.

**d.      Vesting.** On the Effective Date, all Trust Assets will vest in the Trust, and the Archdiocese and other Protected Parties will be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Protected Party, and Settling Insurers, as applicable, will take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Archdiocese, the other Protected Parties and the Settling Insurers will have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan.

**e.      Releases**. Subject to the specific provisions of the Plan, if the Plan is implemented under this Section 5.2, then the Persons listed under **Exhibit U** the ("**Alleged Equitable Owners**") will be included in the definition of Protected Parties and shall benefit from the discharges, injunctions, releases, plan provisions, and waivers granted by this Plan to Protected Parties.

### 22.3.    OPTION 2: TRUST FORMATION AND FUNDING

a.      **Purpose, Formation, and Assets**. The Trust will be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan. The proposed Trust Agreement and Trust Distribution Plan are attached hereto as Plan Exhibit D.

b.      **Funding.**

1.      **Summary**. This Plan will be funded from the sources and in the manner set forth in this Section.

2.      **Contributions.** Cash and other assets will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein.

3.      **Debtor Real Estate**. The Debtor will transfer the parcels of real property listed on Plan **Exhibit T** to the Trust, free and clear of all claims, liens, and encumbrances pursuant to 11 U.S.C. § 1123(a)(5)(d);

4.      **Debtor Cash Contribution.** The Debtor will transfer $8,000,000.00 to the Trust.

5.      **Settling Insurer Contributions**. The Settling Insurers transfer to the Trust the respective Settlement Amounts set forth in Plan Section 7.11(1)-(3).

6.      **Unknown Claims.** The Reorganized Debtor will establish the Unknown Tort Claim Reserve Fund.

7.      **Reorganized Debtor Payments.** For five years following the Effective Date, the Reorganized Debtor will pay the Trust $1,000,000.00 on the anniversary date of the Effective Date, for a total cash contribution following the Effective Date of $5,000,000.00.

c.      **Additional Trust Assets:** All Rights and Recoveries Against Non-Settling Insurers. In addition to the funds transferred to the Trust, the Transferred Insurance Interests of the Archdiocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date.  In addition, the Interests of the other Protected Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. The foregoing assignment and transfer will not be construed as an assignment and transfer of the Non-Settling Insurer Policies.

d.      **Vesting**. On the Effective Date, all Trust Assets will vest in the Trust, and the Archdiocese and other Protected Parties will be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Protected Party, and Settling Insurers, as applicable, will take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Archdiocese, the other Protected Parties and the Settling Insurers will have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan**.**

e.      **No Release of Equitable Owners.** Notwithstanding anything in the Plan to the contrary, if the Plan is implemented under this Section 5.3, then the Persons listed under Plan **Exhibit U** the ("Equitable Owners") are not a Protected Parties and will not benefit from any discharge, injunction, release, plan provision, or waiver contained in this Plan. All claims held by any Claimant against the Equitable Owners are specifically preserved and nothing in this Plan may be used as a defense of any kind by the Equitable Owners to such claims. When so required by applicable law, a Tort Claimant may bring an action against an Equitable Owner in the name of the Reorganized Debtor, but is limited to recovery in such an action to the assets, including assets whereby the Reorganized Debtor holds legal title but the Equitable Owner hold a beneficial interest, of the Equitable Owner(s), but Tort Claimants will have no recourse against the assets of the Reorganized Debtor whereby the Reorganized Debtor holds both legal title and the sole beneficial interest. Nothing in this Section will abridge the rights of Tort Claimants to seek recovery from Non-Settling Insurers.

**22.4.    PAYMENT OF PROFESSIONAL FEES.** The Reorganized Debtor will pay all unpaid Allowed Professional Claims accruing through the Effective Date, (i) within seven (7) days after the

later of the Effective Date or the Bankruptcy Court's order on such Claims, or (ii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Professional Claim and the Debtor.

**22.5.    PAYMENTS EFFECTIVE UPON TENDER**. Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment is due. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

**22.6.    ESTABLISHMENT OF TRUST**. On or before the Confirmation Date, the Trust will be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 467B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.467B-1(d)(1). The Trustee will be classified as the "administrator" within the meaning of Treasury Regulation Section 1.467B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

**22.7.    PURPOSE, FORMATION AND ASSETS.** The Trust will be established for the purposes described in this paragraph. The Trust will receive the transfer and assignment of assets as provided in Articles IV and V, including the Debtor Cash Contribution, the Debtor Real Estate, and the Transferred Insurance Interests, of which the Trust is, and will be deemed to be, the sole assignee. The Trust will make distributions to the Class 3 claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust will pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. The Trust will fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party are not defended or otherwise reimbursed for their defense expenses by any Non-Settling Insurer. The Trust will indemnify the Archdiocese, the Reorganized Debtor, and any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust will fund the costs and expenses in executing these functions, all such functions to be executed in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan, with the aim of preserving, managing, and maximizing Trust Assets to pay Class 3 claimants and with no objective to continue or engage in the conduct of a trade or business. The proposed Trust Agreement and Trust Distribution Plan are attached to this Plan as **Exhibit D**.

**22.8.    ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST.**

a.    **General Corpus**. The following distributions and payments will be made from the general corpus of the trust:

**1.    Distributions.** Distributions on Class 3 Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

2.    **Tort Claims Reviewer**. The Trustee will retain the Tort Claims Reviewer. Fees payable to the Tort Claims Reviewer for review of Class 3 Claims and Class 4 Claims will be paid from the Trust.

3.    **Trust Administrative Fees**. All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement will be paid by the Trust, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

4.    **Indemnity**. The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan will be made from the corpus of the Trust.

**22.9.    TAX MATTERS**. The Trust will not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee will file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Guam law and the regulations promulgated thereunder, and will pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**22.10.    APPOINTMENT OF THE TRUSTEE**. The initial Trustee has been identified in Exhibit D to this Plan. The Trustee will commence serving as the Trustee on the Confirmation Date; provided, however, that the Trustee will be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Archdiocese and the UCC, and will be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

**22.11.    RIGHTS AND RESPONSIBILITIES OF TRUSTEE**.

a.    The Trustee will be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and will have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including (to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits only) the powers of a trustee under Sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges). If there is any inconsistency or ambiguity between the Plan and Confirmation Order, on the one hand, and the Trust Agreement, on the other hand, with respect to the Trustee's authority to act, the provisions of the Plan and Confirmation Order will control. Among other things, the Trustee:  (1) will liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary to and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

b.      Notwithstanding the foregoing, the Archdiocese, the Reorganized Debtor, and the Trust acting for itself and on behalf the Estate, will be deemed to have waived, effective upon the Effective Date:

1.      Any and all Claims under Sections 547, 548, 549 and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Archdiocese in the ordinary course of business prior to the Effective Date; and

2.      Any and all Claims and Causes of Action: (i) seeking the substantive consolidation of the Archdiocese and any other Person or an order deeming any such Person and the Archdiocese to be an "alter-ego" of the other or any other similar Claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under Section 544 of the Bankruptcy Code.

The Confirmation Order will state that, absent permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding will be commenced in any forum other than the Bankruptcy Court against the Trustee in its/his/her official capacity, with respect to its/his/her status, duties, powers, acts, or omissions as Trustee.

**22.12. TRANSFERRED INSURANCE INTERESTS**.

a.      Enforcement of Transferred Insurance Interests Against Non-Settling Insurers.

1.      As set forth in Article V, the Transferred Insurance Interests are assigned and transferred to the Trust. The Trust will be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 3 Claim and will be entitled to assert and/or assign to any Tort Claimant all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs. The Trust will also have the right to pursue judgment against Non-Settling Insurers to determine the amount of coverage available for Protected Parties' liability for Tort Claims. The foregoing transfer will not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. The Trust will be fully authorized to act in its own name, or in the name of any Protected Party, to enforce any right, title, or interest of any Protected Party in the Transferred Insurance Interests. No limitations on recovery from Non-Settling Insurers will be imposed by virtue of the fact that the Archdiocese is in bankruptcy or by any distribution from the Trust to any Tort Claimant. The transfer of the Transferred Insurance Interests will not affect any Non-Settling Insurer's duty to defend, but to the extent that a failure to defend or a separate agreement between the Archdiocese, the Reorganized Debtor, or any other Protected Party and any Non-Settling Insurer gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trust will be entitled to the benefit of such monetary obligation or policy proceeds. Any recovery by the Trust on an action against a Non-Settling Insurer for a determination of coverage for Protected Parties' liability for Tort Claims will become a Trust Asset and will be distributed as provided in this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust's recourse to the Archdiocese and the other Protected Parties will be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under this Plan,

including any indemnification obligations of the Reorganized Debtor for Covered Non-Tort Claims under section 16.4, or as otherwise provided by the Plan. The Trust will have no liability for Covered Non-Tort Claims and holders of Covered Non-Tort Claims will have no recourse to the Trust with respect to such Claims.

2. The Trust will have full access to coverage issued by the Non-Settling Insurers to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Protected Parties prior to the confirmation of the Plan and the transfer of the Transferred Insurance Interests to the Trust, but Plan confirmation will not relieve the Debtor (or the Trust if applicable) from any obligation under any Non-Settling Insurance Policy. The Non-Settling Insurers will retain any and all coverage defenses, except any defense regarding or arising from the assignment and transfer of the Transferred Insurance Interests. Notwithstanding the foregoing, confirmation or effectuation of the Plan will not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Archdiocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Protected Party or Settling Insurer under the Plan. The Plan is binding on Non-Settling Insurers as provided under this Section 6.7(a)(2).

3. The assignment and transfer of the Transferred Insurance Interests to the Trust does not affect the Archdiocese's, the Reorganized Debtor's, other Protected Parties', or any Non-Settling Insurer's right to contest the Archdiocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the assignment and transfer of the Transferred Insurance Interests, the Archdiocese, the Reorganized Debtor, and any other Protected Party will not be relieved of any obligations or duties under any Non-Settling Insurer Policy (including without limitation any duty to cooperate) and will continue to honor such duties and obligations as required by such applicable Non-Settling Insurer Policies and applicable law. The transfer and assignment of the Transferred Insurance Interests does not affect any insurers' rights, obligations, or duties under applicable Non-Settling Insurer Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Tort Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Archdiocese, the Reorganized Debtor, or any other Protected Party.

4. The Bankruptcy Court will determine at the Confirmation Hearing (i) whether the assignment of the Transferred Insurance Interests provided for in this Section is valid, and (ii) whether such transfer or the discharge and injunctions set forth in Sections 13.2 and 13.3, or any other term of the Plan, void, defeat, or impair the insurance coverage issued by the Non-Settling Insurers. If a party in interest (which, for this purpose, will include the Non-Settling Insurers) fails to timely file an objection to the proposed assignment and transfer of the Transferred Insurance Interests to the Trust or other terms of the Plan related to the Non-Settling Insurer Policies by the date set to file such objections, that party in interest will be deemed to have irrevocably consented to the assignment of Transferred Insurance Interests and other Plan terms related to such Non-Settling Insurer Policies and will be forever barred from asserting that the assignment of the Transferred Insurance Interests or other Plan terms affect the ability of the Trust or Tort Claimants to pursue the Non-Settling Insurers, or any of them, for insurance coverage.

5. In the event that the Bankruptcy Court enters a Final Order determining that the assignment of the Transferred Insurance Interests is valid and does not defeat or impair coverage

under the Non-Settling Insurer Policies, following the Effective Date, the Trust will assume responsibility for, and be bound by, only such obligations of the Archdiocese and other Protected Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Protected Parties will not be relieved of any obligations the Protected Parties may have under Non-Settling Insurer Policies.

6.      The Reorganized Debtor will cooperate and assist the Trust in enforcing any right or prosecuting any claim based on the Transferred Insurance Interests. This cooperation includes, but is not limited to, providing access to documents and electronic information and providing clergy, employees, agents, and volunteers to testify in depositions and at trial.

**b.      Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.**

1.      If the Bankruptcy Court does not enter a Final Order approving the assignment and transfer of the Transferred Insurance Interests to the Trust, then the assignment will not occur and pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is hereby appointed as the representative of the Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's Interests against the Non-Settling Insurers with respect to the Tort Claims. Any recoveries on such Interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trustee as the Archdiocese's and the Estate's representative provided for in this Section 6.7(b)(1) is valid, and does not defeat or impair the insurance coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, will be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, will include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest will be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trustee to pursue Non-Settling Insurers, or any of them, for insurance coverage. In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, then, following the Effective Date, the Trustee will assume responsibility for, and be bound by, only such obligations of the Archdiocese and other Protected Parties under Non-Settling Insurer Policies as are necessary to act as the representative of the Archdiocese and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trustee's appointment will not relieve the Archdiocese, the Reorganized Debtor or the other Protected Parties from any obligation that such entities may have under the Non-Settling Insurer Policies. Nothing contained in this Section 6.7(b)(1) will affect the rights and remedies of a Person who is not a Protected Party but is an insured or additional insured with the Archdiocese or is asserting rights under a Non-Settling Insurer Policy.

2.      In the event that a Final Order is entered holding that: (a) the assignment of the Transferred Insurance Interests, or (b) the appointment of the Trustee as the Archdiocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Archdiocese, the Reorganized Debtor, and each of the Protected Parties will retain their Interests under each Settling Insurer and Non-Settling Insurer Policy.

i.      At the request of the Trust, the Reorganized Debtor and the other Protected Parties will assert their Interests against a Non-Settling Insurer, including, but not limited to,

by filing a lawsuit for recovery of policy proceeds. All recoveries by the Reorganized Debtor and the other Protected Parties will be paid to the Trust. The Reorganized Debtor and the other Protected Parties will select and retain counsel to pursue their Interests against Non-Settling Insurers pursuant to this Section 6.7(b), subject to the Trustee's approval, which approval will not be unreasonably withheld.

ii.    The Trust will pay the reasonable attorneys' fees, costs and expenses that are incurred by the Reorganized Debtor and the other Protected Parties in pursuing, pursuant to this Section 6.7(b), its Interests against Non-Settling Insurers.

iii.    The Trust will, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section 6.7(b), reimburse the Reorganized Debtor and each of the Protected Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing its Interests against Non-Settling Insurers, but will not compensate the Reorganized Debtor or any other Protected Party for any time any of its employees expend. Upon receipt by the Reorganized Debtor or other Protected Party, all recoveries received by the Reorganized Debtor or other Protected Party from Non-Settling Insurers will be deemed to be held in trust for the benefit of the Trust and will be remitted by the Reorganized Debtor or other Protected Party to the Trust as soon as practicable following the Reorganized Debtor's or other Protected Party's receipt of such recoveries.

**11.A    SPECIAL DISTRIBUTION CONDITIONS.**

c.    With respect to Class 3 Claims only, the Trust will maintain sufficient funds to pay any potential reimbursements to Medicare and will complete the following "Medicare Procedures":

1.    the Trustee will determine whether each Tort Claimant with a Date of Injury after December 5, 1980 is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Eligible");

2.    upon request, the Trust will provide to a Settling Insurer or the Reorganized Debtor information sufficient to allow them to perform their own SSA queries to the extent they wish to do so;

3.    in the event that one or more Tort Claimants with Dates of Injury after December 5, 1980 is/are identified as Medicare Eligible, the Trust will complete a query to the CMS for each such Tort Claimant to determine whether any payment ("Conditional Payment") made pursuant to Section 1395y(b)(2)(B) of the MSPA has been made to or on behalf of that Tort Claimant arising from or relating to treatment for Abuse;

4.    if any Conditional Payment has been made to or on behalf of that Tort Claimant, the Trustee will, within the time period called for by the MSPA, reimburse the appropriate Medicare Trust Fund for the appropriate amount, and submit the required information for that Tort Claimant to the appropriate agency of the United States government.

d.    Compliance with the provisions of this Section 6.8 will be a material obligation of the Trust in favor of the Settling Insurers under any settlement agreements between any of those insurers and Archdiocese, which authorizes funding to the Trust.

e.    With the exception of Unknown Tort Claims, the Trust will defend, indemnify and hold harmless the Protected Parties and the Settling Insurer Entities from any Medicare Claims, and

any Claims related to the Trust's obligations under this Section. The Reorganized Debtor will defend, indemnify, and hold harmless the Protected Parties and the Settling Insurer Entities from any Claims concerning the Unknown Tort Claims, including Medicare Claims.

**22.13.  INVESTMENT POWERS; PERMITTED CASH EXPENDITURES**. All funds held by the Trust will be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

**22.14.  REGISTRY OF BENEFICIAL INTERESTS**. To evidence the beneficial interest in the Trust of each holder of such an interest, the Trustee will maintain a registry of beneficiaries.

**22.15.  NON-TRANSFERABILITY OF INTERESTS**. Any transfer of an interest in the Trust will not be effective until and unless the Trustee receives written notice of such transfer.

**22.16.  TERMINATION**. The Trust will terminate after its liquidation, administration, and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement. The Trust will terminate no later than the sixth (6th) anniversary of the Effective Date.

**22.17.  IMMUNITY; LIABILITY; INDEMNIFICATION.** Neither the Reorganized Debtor or its respective members, designees, or professionals, nor the Trustee or any duly designated agent or representative of the Trustee, nor their respective employees, will be liable for the acts or omissions of any other member, designee, agent, or representative of such Trustee, except that the Trustee will be liable for his/her/its specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Trustee may, in connection with the performance of his/her/its functions and in his/her/its sole and absolute discretion, consult with his/her/its attorneys, accountants, financial advisors, and agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee will not be under any obligation to consult with his/her/its attorneys, accountants, financial advisors, or agents, and his/her/its determination not to do so will not result in the imposition of liability on the Trustee unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, or fraud.

b.      No recourse will ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant, or other professional retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or this Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, will be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as will under the term of any such Trust Agreement be liable therefore or will be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for his/her/its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust will not be covered by a bond.

c.      The Trust will defend, indemnify, and hold harmless the Trustee, his/her/its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Guam is entitled to indemnify and defend its directors, trustees, officers, and employees against any and all liabilities, expenses, Claims, damages or losses incurred by them in the performance of their duties hereunder.

1.      Additionally, the Reorganized Debtor, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Trust or Trustee or respective agents, with respect to: (i) the Chapter 11 case and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 3 Claims, (iii) the administration of the Trust and the implementation of the Trust Distribution Plan, or (iv) any and all activities in connection with the Trust Agreement, will be indemnified and defended by the Trust, to the same extent that a corporation or trust organized under the laws of Guam is from time to time entitled to indemnify and defend its own officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor or Reorganized Debtor, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided that, with respect to amounts paid in settlement, the Trust has approved such amounts in advance, such approval not to be unreasonably withheld.

2.      Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Trustee, the Debtor, the Reorganized Debtor, and their respective agents in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Trust, will be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee, the Debtor, the Reorganized Debtor, and their respective agents, to repay such amount in the event that it will be determined ultimately by Non-Appealable Order that such Trustee, the Debtor, the Reorganized Debtor, and their respective professionals, officers, and directors is not entitled to be indemnified by the Trust.

### 22.18.  TREATMENT OF TORT CLAIMS.

a.      **TRUST LIABILITY**. On the Effective Date, the Trust will automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to section 16.4; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Trust Distribution Plan; and (iii) the right to pursue the Transferred Insurance Interests.  Except as otherwise provided herein, the Trust does not assume any liabilities of the Archdiocese or Reorganized Debtor, in whole or in part, in regards to any Tort Claims that are not released, nor the liabilities of the Settling Insurers.

b.      **ASSESSMENT OF TORT CLAIMS.**

1.      Each Tort Claim will be assessed by the Tort Claims Reviewer in accordance with the Trust Distribution Plan to determine whether the Tort Claimant is entitled to a distribution under the Trust. The Archdiocese or the Reorganized Debtor will reasonably cooperate with the Tort Claims Reviewer and the Trustee as requested by the Tort Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Trust Distribution Plan, but will not be required to act in any way that violates any duty to cooperate with a Non-Settling Insurer. Under no

circumstance will the Tort Claims Reviewer's review of a Class 3 Claim, a Class 4 Claim, or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer.

   **c.**   **Distribution Plan Claimants.** All Tort Claimants (i) whose Survivor Claims do not implicate coverage from any Non-Settling Insurer and (ii) who the Survivor Claims Reviewer determines to be entitled to a distribution, will be deemed "Distribution Plan Claimants" and will receive a distribution in the amount(s) at the time(s) determined by the Survivor Claims Reviewer pursuant to the Trust Distribution Plan. A Distribution Plan Claimant must execute a release of all of his or her Survivor Claims against the Settling Insurers and the Protected Parties as set forth in Plan Exhibit E or Plan Exhibit F, as applicable. Any payment on a Survivor Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

   **d.**   **Litigation Plan Claimants**

   1.   All Tort Claimants whose Survivor Claims are covered or are alleged to be covered, under any Non-Settling Insurer Policy will automatically be deemed "Litigation Claimants" under the Plan, and will retain the right to: (i) pursue his or her Survivor Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Survivor Claim; and (ii) proceed in a Direct Action against any Non-Settling Insurer to the extent allowed by applicable law ("a Litigation Claim"). A Litigation Claimants' recovery on a Litigation Claim is limited as provided herein. The Settling Insurers will not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers will not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person be able to recover any amount from a Settling Insurer in connection with a Litigation Claim.

   2.   Litigation Claimants will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions from the Trust.

   3.   If necessary in the Trustee's discretion, the Trustee may establish a reserve for payment of a claim held by a Litigation Claimant in the amount that would have been awarded to the Litigation Claimant if such Claimant were a Distribution Plan Claimant. The creation and existence of this reserve is not a settlement, release, accord or novation of the Litigation Claims and cannot be used by any third party as a defense to any alleged joint liability with any Protected Party. For avoidance of doubt, the creation and existence of this reserve does not affect, diminish or impair a Litigation Claimant's rights to collect a judgment, including a judgment based on joint and several liability, against any Non-Settling Insurer or Person that is not a Protected Party, except as expressly provided herein. The Trustee may establish one reserve for all of the Litigation Claims but no Litigation Claimant will have any interest in any portion of the reserve in excess of the amount determined for that Litigation Claimant under the Trust Distribution Plan, and then only in the event that the Litigation Claimant prevails on his Litigation Claim. Neither the Trust's payment of, or reserving monies on account of, the Survivor Claims nor the Survivor Claims Reviewer's review of a Survivor Claim, will: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Survivor Claim, either individually or in the aggregate with other Survivor Claims, in any coverage litigation with any Non-Settling Insurers.

**e.    Legal Effect of Estimation of Claims and Distributions under Trust Distribution Plan.** The Tort Claims Reviewer's determinations are for estimation purposes only and will not be a finding or fixing of the fact or liability or the amount payable for any Tort Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan. The determination of qualification, estimation of claims, and payment of distributions is not an admission of liability by any Protected Party or the Trust with respect to any Tort Claims and has no res judicata or collateral estoppel effect on any Protected Party, the Trust, or any Non-Settling Insurer. Any payments by the Trust to Tort Claimants in connection with their Tort Claims is not a release of the Debtor nor an accord or novation of the Debtor's liability on account of the Class 3 and Class 4 Claims. The Trust's act of making a distribution is immaterial to, and will not be construed as, a determination or admission of the Archdiocese's, the Reorganized Debtor's, or any other Protected Party's liability for, or damages with respect to, any Class 3 or Class 4 Claim. The determination of qualification, estimation of claims, and payment of distributions is not a settlement, release, accord, or novation of Class 3 or Class 4 Claims and cannot be used by any third party as a defense to any alleged joint liability. The determination of qualification, estimation of claims, and payment of partial distributions does not impair a Litigation Claimant's rights to obtain a judgment, including a judgment based on joint and several liability, against a Protected Party or any Non-Settling Insurer or other Person, for purposes of establishing the Protected Party's liability on the Tort Claim, but any such judgment awarded to a Litigation Claimant will be reduced by the amount of distributions already paid by the Trust to such Litigation Claimant on his or her Tort Claim(s). Neither the Tort Claims Reviewer's review of a Tort Claim and determination of qualification, nor the Trust's estimation of claims or payment of distributions will (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages, either individually or in the aggregate, in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of claims and payment of distributions does not constitute a triggering event for liability under any Non-Settling Insurer Policy nor does it create an admission of the fact of liability or the extent of damages on behalf of the Protected Parties.

**f.    RELEASE AND DISCHARGE OF TORT CLAIMS.** No Tort Claimant will receive any payment on any award unless and until such Tort Claimant has executed the Release attached as Exhibit E or Exhibit F to this Plan, as applicable. Each Tort Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and the other Protected Parties that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Tort Claimants specifically reserve, and do not release, any and all claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j).

**g.    The Tort Claims will not be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Protected Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

With respect to all other Claims, except as otherwise provided in the Plan, the Debtor's liability on account of such Claims will be discharged pursuant to the provisions of 1141(d). The Tort Claimants' release, in whole or in part, of their Class 3 or Class 4 Claims will be pursuant to the principles set forth in 7 G.C.A. § 24605.The Class 3 and Class 4 Claimants will expressly reserve their rights against other Persons (other than Protected Parties), including joint tortfeasors, who will remain severally liable on any Class 3 and Class 4 Claims. Any Person (other than a Protected Party) that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim will not be liable for any Protected Party's share of causal liability or fault.

h.    **TRUST RIGHTS AGAINST NON-SETTLING INSURERS**. The Trust retains the right to pursue Non-Settling Insurers for the Archdiocese's, the Reorganized Debtor's, and any other Protected Party's liability to Tort Claimants, including for any distributions made to Litigation Claimants.

i.    **DISTRIBUTIONS TO TORT CLAIMANTS**.  A Distribution Plan Claimant, who the Tort Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan. Any payment on a Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

j.    **LITIGATION CLAIMS**. In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of any reserve set for that Litigation Claimant's Litigation Claim, plus an additional $1,000.

1.    In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery will be turned over to the Trust for handling pursuant to this Plan. Such recovery will first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining will be distributed in a manner consistent with the Trust Distribution Plan.

k.    Subject to the provisions of Article 6.14(e), the Trust's payment to a Litigation Claimant that has recovered a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds respecting such Class 3 Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

l.    If a Non-Settling Insurer has refused to defend a Protected Party with respect to any Litigation Claim, the Trust will advance or reimburse the Protected Party for reasonable and necessary attorneys' fees and other expenses incurred in defending the Litigation Claim. If any Non-Settling Insurer has refused to indemnify a Protected Party with respect to any settlement or judgment of a Litigation Claim, the Trust will indemnify the Protected Party for any judgment or settlement incurred by the Protected Party on such Litigation Claim, provided the Trust has consented in advance

to any such settlement, such consent not to be withheld unreasonably. If all insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, that Litigation Claimant  must sign a covenant not to execute against  that Protected Party's assets (other than Non-Settling Insurer Policies or proceeds or other assigned rights or interests), under which the Litigation Claimant will agree to seek recovery only from Non-Settling Insurers for any judgment the Litigation Claimant obtains against any Protected Party, in exchange for a stipulated judgment and assignment of insurance rights, as authorized by law. If any judgment on any Tort Claim is within the retention of any Non-Settling Insurer Policy, and all insurers have denied indemnity for such judgment, then the Trust will fund the judgment. The Trust's advancement or reimbursement of the Protected Party for such defense costs and/or judgment or settlement payments, and any distributions made by the Trust to the Litigation Claimant and other Class 3 Claimants (or by the Reorganized Debtor to any Claim 4 Claimants), will not affect, diminish or impair the Trust's right to bring any claims against any Non-Settling Insurers for refusing to defend and/or indemnify the Protected Party, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law.

      **m.**    As of the Effective Date, the Trustee will be deemed to have the right to join or intervene into the Insurance Coverage Adversary Proceeding and to pursue recoveries against any Non-Settling Insurers to the same extent as the Debtor.

      n.    Nothing in the Plan, Confirmation Order or any Plan Document will impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Tort Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, in connection with a Tort Claim. All such obligations with respect to Non-Settling Insurers will be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

      o.    If the Litigation Claimant fails to prosecute his Litigation Claim to final judgment or settlement of the claim, or a Final Order is entered finding that no Protected Party has liability to such Tort Claimant on account of his Tort Claim, any reserve maintained by the Trust on account of such Tort Claim will revert to the non-reserved assets of the Trust and the Litigation Claimant will have no recourse against the Trustee, the Trust, any Protected Party, or any Settling Insurer.

      p.    **OBJECTIONS AND LITIGATION AFTER THE EFFECTIVE DATE**.

      1.    Regardless of whether a Class 3 Claimant is a Distribution Plan Claimant or a Litigation Claimant, the Trustee may object to that Class 3 Claimant's Claim.  The Trustee's right to object to a Class 3 Claimant's Claim after the Effective Date will not affect or impair any right the Archdiocese, the Reorganized Debtor, other Protected Parties, and/or Non-Settling Insurers may have under the Non-Settling Insurer Policies or applicable law to object to such Class 3 Claims. The Reorganized Debtor may object to any Class 4 Claimant's Claim.

      2.    The Protected Parties will comply with all obligations under the Non-Settling Insurer Policies and applicable law. The Trustee, to the extent required by the Non-Settling Insurer Policies implicated by such Tort Claims and applicable law, will also cooperate with the Non-Settling Insurer in the defense of such judicial proceeding contemplated in Section 6.13(p)(1). In the event of a dispute between a Non-Settling Insurer and the Trustee regarding whether the Trustee must allow such Non-Settling Insurer to control the defense of such Tort Claim, or the extent of anyone's duty to cooperate, such dispute will be resolved by the court hearing such dispute.

Case 19-00001 Doc # FIRST DISCLOSURE STATEMENT Page 47 of 69

q. **CLAIM WITHDRAWAL**. A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant will still be subject to Section 13.2 of the Plan, the Channeling Injunction, and the Supplemental Settling Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Tort Claim will revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan. Each Protected Party, Non-Settling Insurer, Settling Insurer, and the Trust will retain any and all defenses that may exist in respect to such Tort Claim.

**22.19. OPTION 1 CONTROL OF TRUST REAL PROPERTY ASSETS.** If the Plan is implemented pursuant to Section 5.2, the Trustee's rights, powers, duties, and obligations provided in the Plan and the Trust Agreement, are subject to the following provisions with regard to any of the Trust's real property assets:

1. **PARTITIONING OF CERTAIN PROPERTY**. The Trustee will, within ninety (90) days after the Effective Date, hire a surveyor and take all steps necessary and prudent to partition the properties listed on Plan Exhibit O (the "Partitioned Parcels") as follows:

2. **RETAINED PARCELS**. The Trustee will retain the portion of the Partitioned Parcels substantially consistent with the boundaries indicated in blue on the maps included as Exhibit P (the "Retained Parcels").

3. **PRESERVED PARCELS**. Within thirty (30) days after the Trustee obtains permission from all government authorities to segment the Retained Parcels, the Trustee will convey to the Reorganized Debtor the portion (the "Debtor Preserved Parcels") of the Partitioned Parcels that are not the Retained Parcels.

4. **EQUITABLE RIGHTS IN THE PRESERVED PARCELS**. From the Effective Date, until the date the Trustee conveys legal title to the Debtor Preserved Parcels, the Reorganized Debtor will retain all rights as the sole equitable owner of the Preserved Parcels, including, but not limited to, the right to occupy, use, possess, control, maintain, and exclude others from the same, subject only to the Trustee's rights arising under and related to this Section 6.15(a).

5. **TIME LIMITS ON HOLDING REAL PROPERTY**. The Trust will not hold any real property assets for longer than five (5) years after the Effective Date. Should the Trust continue to hold real property assets for more than five (5) years after the Effective Date, a Trust beneficiary may bring a motion with the Bankruptcy Court to compel the sale of the real property asset(s), and the Bankruptcy Court will grant such motion, unless:

i. The real property asset(s) is the subject of an executed purchase agreement with a good faith buyer and the transaction is scheduled to close within 120 days;

ii. The Trustee has accepted an offer to purchase the real property asset, but the transaction is the subject of pending litigation; or

iii. The Trustee obtains permission from the Bankruptcy Court to hold the real property asset for more than five years, which permission will be granted only for cause, including, but not limited to (i) the Trustee demonstrates the value of the real property asset will increase by at least 20% of its current value over a specific amount of time, not to exceed 12 months; (ii) an act

of God or other force majeure prevents the sale of the real property asset or substantially diminishes the value of the real property asset; or (iii) a delay in selling the real property asset is otherwise in the best interest of the Trust's beneficiaries.

### 22.20.  FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY ASSETS.

On the Effective Date of the Plan, the Real Property Assets will be sold to Trust, pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Archdiocese, the Catholic Entities, and Tort Claimants. The Trust is a good faith purchaser of such assets within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable consideration and the sale complies with the Bankruptcy Code and applicable non-bankruptcy laws.

### 22.21.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor that have not been rejected by Order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under Section 365(b) (1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute. The contracts which will be assumed by the Debtor, shown in their total amount, are as follows:

CathoNet, LLC - Financial Platform

Docomo Pacific — Mobile and Internet Service

Guam Capital Investment Corp. — Crisis Pregnancy Center Bldg. Lease

Guam Reef Hotel — Ground Lease (Expired but will Renew)

Guam Telephone Authority — Telephone Equipment Lease

Leonilo Alger — Lease on Thrift Store

Mt. Carmel Alumni and Endowment Foundation — Memorandum of Understanding

School Operation

Pacific Solar and Photovoltaics — Solar Panel Lease

R&D Investment — Lease

Risk Partner Tools and Management Risk — Fixed Asset Platform

# ARTICLE XXIII

## CONDITIONS TO EFFECTIVE DATE

The Plan will not become effective unless and until each of the following conditions will have been satisfied in full in accordance with the provisions specified below:

**Entry of Confirmation Order**. The Confirmation Order has become a Non-Appealable Order, provided, however, that this condition may be waived if so agreed in writing by the Debtor and the UCC;

**Plan Documents.** All Schedules and Exhibits to the Plan will have been duly completed by the Plan Proponents and filed with the Court and all agreements and releases referred to in the Plan will have been duly executed by all parties thereto and filed with the Court, in each case in form and substance satisfactory to the Debtor, the Committee, and the Settling Insurers; and

**The Trust**. The Trust will have been formed.

**Funding.** The Debtor will make the payment to the trust as provided in 5.2(b)(2)(ii) or 5.3(b)(2)(ii), respectively.

**23.1.    NOTICE OF EFFECTIVE DATE**. The Plan Proponents will file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**23.2.    EFFECT OF NON-OCCURRENCE OF CONDITIONS**. If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the disclosure statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust or the Settling Insurers; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

# ARTICLE XXIV

## EFFECT OF CONFIRMATION

**24.1.    DISSOLUTION OF UCC**. On the Effective Date, the UCC will dissolve automatically, whereupon their members, Professionals and agents will be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties will continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which will remain in full force and effect according to their terms, provided that such parties will continue to have a right to be heard with respect to any and all applications for Professional Claims.

**24.2.    DISCHARGE AND INJUNCTION**.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Archdiocese will be discharged from, and its liability will be extinguished completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, based on conduct occurring before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under the Bankruptcy Code Section 501, such Claim is allowed under Bankruptcy Code Section 502, or the holder of such Claim has accepted the Plan.

For clarity, the Debtor is not discharged from Unknown Tort Claims, Unknown Contingent Claims or Non-Settling Insurer Policy Claims, but recourse with respect to Non-Settling Insurer Policy Claims is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j) above.

Tort Claimants and the Trust will be permitted to name the Archdiocese in any proceeding to resolve whether the Archdiocese has liability for Tort Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and will not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Archdiocese's liability for Tort Claims under Non-Settling Insurer Policies. The limitations otherwise set forth in the Plan on a Tort Claimant's recovery will not in any way limit the Non-Settling Insurers' obligations under the Non-Settling Insurer Policies or the Tort Claimants' and/or Trust's recoveries against the Non-Settling Insurers for the Non-Settling Insurers' conduct in connection with the defense or settlement of a Tort Claim, including on any judgments in excess of the limits of a Non-Settling Insurer Policy.

24.3.   CHANNELING INJUNCTION. Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.

a.      In consideration of the undertakings of the Protected Parties and Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy Code:

1.      any and all Channeled Claims are channeled into the Trust and will be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

2.      all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing,

or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

i.      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

ii.     enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;

iii.    creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;

iv.     asserting, implementing or effectuating any Channeled Claim of any kind against:

a.  any obligation due any of the Protected Parties or Settling Insurers;

b.  any of the Protected Parties or Settling Insurers; or

c.  the property of any of the Protected Parties or Settling Insurers.

v.      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

vi.     asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or Settling Insurers.

Notwithstanding anything to the contrary in this Article or the Plan, Tort Claimants and the Trust will be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Sections 6.14(i) and (j).

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  It is intended that the channeling of the Channeled Claims

**as provided in this Section 13.3 will inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

**The Channeling Injunction will not be for the benefit of Non-Settling Insurers.**

**The Channeling Injunction will be effective with respect to the Settling Insurers Entities as of the date that the Trust receives the amount(s) set for in Section 7.11.**

**24.4.    EXCULPATION; LIMITATION OF LIABILITY**.  From and after the Effective Date, none of the Exculpated Parties will have or incur any liability for, and each Exculpated Party will be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party will be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and the Archdiocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals will be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

**24.5.    TIMING**. The injunctions, releases, and discharges (including the Channeling Injunction and Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code will only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the other conditions to effectiveness of the Insurance Settlement Agreement are fully met.

**24.6.    NO BAR ON CERTAIN CLAIMS**. Notwithstanding the foregoing, nothing in this Plan will be construed to bar (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing clause under an insurance policy other than the Settling Insurer Policies; or (c) a Tort Claim against a Protected Party that is not released or enjoined under the Plan, to the extent set forth herein.

## ARTICLE XXV

## INCORPORATION OF CHILD PROTECTION PROTOCOLS

**25.1.    CHILD PROTECTION PROTOCOLS. The Child Protection Protocols attached to the Plan are incorporated into the Plan.**

# ARTICLE XXVI

## THE REORGANIZED DEBTOR

**26.1. CONTINUED CORPORATE EXISTENCE**. The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Guam Code 18 § 10101 et seq. having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

**26.2. VESTING OF ASSETS**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets will vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, Claims, and Interests of creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order. The Reorganized Debtor is expressly authorized, as of the Effective Date, to transfer legal title to the Inadvertently Titled Real Property to the respective equitable title owners of such properties without further order of the Bankruptcy Court.

**26.3. IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**. In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on **Exhibit J**.

**26.4. FURTHER AUTHORIZATION**. The Reorganized Debtor will be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

# ARTICLE XXVII

## MISCELLANEOUS PROVISIONS

**27.1.** RETENTION OF JURISDICTION.

a. By the Bankruptcy Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court will retain: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction will include jurisdiction:

1.    over disputes concerning the ownership of Claims;

2.    over disputes concerning the distribution or retention of assets under the Plan;

3.    over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims;

4.    over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Archdiocese, the Estate, or Trust, or property abandoned or transferred by the Archdiocese, the Estate, or the Trust;

5.    over motions to approve any Insurance Settlement Agreements entered into after the Effective Date by the Trustee;

6.    over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets;

7.    the removal of the Trustee and the appointment of a successor Trustee;

8.    over matters relating to the subordination of Claims;

9.    to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10.    to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

11.    to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to this Plan and any Insurance Settlement Agreement;

12.    over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

13.    over requests for allowance of payment of Claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

14.    over all Fee Applications;

15.    over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

16.    over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of Claims, including holders of Class 3, Class 4 or Class 4 Claims;

17.    over disputes concerning the existence, nature, or scope of the Archdiocese's discharge, including any dispute relating to any liability arising out of the termination of

employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

18.     to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Archdiocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

19.     to enter a Final Decree closing the Chapter 11 case;

20.     to enforce all orders previously entered by the Bankruptcy Court; and

21.     over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan, including, but not limited to, disputes arising out of or related to the Transferred Insurance Interests or the rights and obligations of the Non-Settling Insurers on and after the Effective Date.

b.     By the District Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Section 1334, on and after the Effective Date, the District Court will retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

c.     Actions to Collect Amounts Owed Pursuant to the Plan. Notwithstanding anything to the contrary in this Section, the Archdiocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to the Plan for any settlements embodied in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with this Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

d.     Case Closure. The existence and continued operation of the Trust will not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

**27.2.    ASSUMPTION OF EXECUTORY CONTRACTS**. On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court, and except as otherwise provided in the Plan, Confirmation Order, or Insurance Settlement Agreements, each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, will be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date with no cure amount due. The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**27.3.    INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES**. The obligation of the Archdiocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members, or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Archdiocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Guam

pertaining to the Archdiocese, will be deemed and treated as executory contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code Section 365 as of the Effective Date, with no cure amount due. Notwithstanding the foregoing, under no circumstances will the Archdiocese, the Trust, or the Reorganized Debtor assume or be responsible for any alleged indemnification of any Person against whom the Archdiocese has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

**27.4.   DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS**. After the Effective Date, the Reorganized Debtor will defend and indemnify any Protected Party with respect to any Covered Non-Tort Claim and, if so required by any Insurance Settlement Agreements, will defend and indemnify the Settling Insurers with respect to any Covered Non-Tort Claims.  For clarity, effective upon the Trust's receipt of the Settlement Amount (as defined in the The Settling Insurers Settlement Agreement), the Reorganized Debtor will indemnify the any Settling Insurers Entities from and against all other Claims (except for Channeled Claims) that are subject to any indemnity obligation to the Settling Insurers under any Insurance Settlement.  As to any Claim against the Trust that qualifies as a Covered Non-Tort Claim, the Reorganized Debtor will also undertake on behalf of the Trust the enforcement of the injunctions set forth in Articles VII and XIII, will defend the Covered Non-Tort Claim, and, if judgment is entered on such Claim, will indemnify the Trust for any liability for such Claim.   The Reorganized Debtor may not seek insurance coverage for the Claims defended or indemnified under this Section from the Settling Insurers under any Settling Insurer Policy. Nothing in this provision or any other Plan provision is intended to suggest that any Person is entitled to obtain a judgment on a Covered Non-Tort Claim or Channeled Claim, that such judgment would be covered under any Settling Insurer Policy, or that any Person is entitled to seek coverage for such judgment against any Protected Party or Settling Insurer in violation of the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction, as applicable. For the avoidance of doubt, nothing contained in this Section or the Plan is intended to provide, expand, modify or add coverage for the Archdiocese or any other Protected Party under any Settling Insurer Policy to cover the Archdiocese's indemnification of any Covered Non-Tort Claims.

**27.5.   RESERVATION OF RIGHTS**. In accordance with the provisions of this Plan, the Archdiocese reserves the right to sell property of the Estate or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan will be filed as a Supplemental Plan Document, and approval of such sale or settlement will be considered at the confirmation hearing or as soon thereafter as is practicable.

**27.6.   NON-APPEALABLE ORDER**. Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Non-Appealable Order may be jointly waived by the Plan Proponents upon written notice to the Bankruptcy Court provided that Plan Proponents first obtain the consent of all Archdiocesan Settling Insurers.

**27.7.   AMENDMENTS AND MODIFICATIONS**. The Plan Proponents may jointly modify the Plan at any time prior to the confirmation hearing in accordance with Section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may jointly modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all

creditors and other parties in interest will not be required unless directed by the Bankruptcy Court. Notwithstanding any provision of this Plan to the contrary, the provisions of Article VII and Sections 13.2 through 13.4 are intended to be an integrated set of provisions that implement and supplement the Insurance Settlement Agreements that may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

**27.8.   U.S. TRUSTEE REPORTS**. From the Effective Date until the case is closed, the Reorganized Debtor will, within thirty (30) days of the end of each fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines. The Reorganized Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

**27.9.   NO WAIVER**. The failure of the Archdiocese to object to any Claim for purposes of voting will not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Trustee's right to object to such Claim, in whole or in part.

**27.10.   TAX EXEMPTION**. Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date will be deemed to be made pursuant to and under the Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, including without limitation the transfer by the Reorganized Debtor of title to the Inadvertently Titled Real Property as referenced in Section 15.2 above, and will not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded will, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**27.11.   NON-SEVERABILITY**. Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Plan Proponents.

**27.12.   REVOCATION**. The Plan Proponents reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.

**27.13.   CONTROLLING DOCUMENTS**. In the event and to the extent that any provision of the Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of the Plan or Trust Agreement, as applicable, will control and take precedence. In the event and to the extent that any provision of the Trust Agreement (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of this Plan, this Plan will control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the Confirmation Order will control and take precedence.

**27.14.   GOVERNING LAW**. Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case

the governing law of such agreements will control) will be governed by, and construed and enforced in accordance with, the laws of the Territory of Guam, without giving effect to conflicts of law principles.

**27.15.  NOTICES**. Any notices or requests by parties in interest under or in connection with the Plan will be in writing and served either by: (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and will be deemed to have been given when received by the following parties:

If to the Archdiocese or the Reorganized Debtor:

> [contact information]
> If to the Trust or the Trustee:

**27.16.  FILING OF ADDITIONAL DOCUMENTS**. At any time before substantial consummation, the Archdiocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**27.17.  POWERS OF OFFICERS**. The officers of the Archdiocese or the Reorganized Debtor, as the case may be, will have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**27.18.  DIRECTION TO A PARTY**. On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**27.19.  SUCCESSORS AND ASSIGNS**. The Plan will be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**27.20.  CERTAIN ACTIONS**. By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Archdiocese under the Plan, including: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Archdiocese or organizational structure of the Archdiocese will be deemed to have occurred and will be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

**27.21.  FINAL DECREE**. Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor, Trustee or such other party as the Bankruptcy Court may designate in the Confirmation Order, will file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 case.

**27.22. PLAN AS SETTLEMENT COMMUNICATION**. The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are Disputed as to validity or amount (including Tort Claims and the Insurance Litigation), except as otherwise provided above. Accordingly, the Plan, the disclosure statement, and any communications regarding the Plan or the disclosure statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Nothing herein or in any confirmed Plan is intended to constitute a compromise of Tort Claims.

**27.23. OTHER RIGHTS**. Except as expressly set forth in this Plan, nothing in the Plan will preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Guam law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims.

## ARTICLE XXVIII

## CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met. This includes, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of Holders of Claims in each impaired Class.

### 28.1. Solicitation of Votes; Acceptance

The Debtor is soliciting the acceptance of the Plan from all Holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder. Using this criteria, Holders of only Claims in Classes 3, 4, 6, 7, 8, AND 9, re entitled to vote on the Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Classes 1,2,5, AND 10 will be deemed to have accepted the Plan if the Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that has cast Ballots on the Plan and that are eligible to vote for or against the Plan. Class 3 Claims will be estimated at $1.00 each for voting purposes only. The actual amount payable to Holders of Allowed Class 3 Claims will exceed $1.00. This is consistent with the procedure followed in other mass tort bankruptcy cases and the Tort Proof of Claim forms intentionally did not provide for a dollar amount for the Claims as the Claims are unliquidated tort claims.

### 28.2. Confirmation Hearing

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing after the period for submission of Ballots has expired. The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any

party in interest may object to confirmation of the Plan. Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules. Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Frances M. Tydingco-Gatewood, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice. **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Committee has complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Committee has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and with public policy; and (b) the Debtor has disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. See "Best Interests of Creditors Test" below.

7.      Unless the Committee is required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the Holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.      Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor.

11. The Debtor believes that the Plan has been submitted in good faith and that, upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

### 28.3. Best Interests of Creditors Test

As mentioned above, confirmation of the Plan requires that each Holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Committee believes that in a hypothetical liquidation all creditors will receive less than they will likely receive under the Plan. Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1. The Plan incorporates the Trust Distribution Protocols. There is likelihood that a Chapter 7 Trustee will be unable to implement the Trust Distribution Protocols or a similar Plan in the absence of a confirmed Chapter 11 Plan. As such, substantial estate resources would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2. A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to 11 U.S.C. § 326. Any such payment would dilute the amount of funds available to pay creditors.

3. The Parishes and schools would not get the Channeling Injunction and/or releases provided in the Plan, nor would they make the substantial contributions that they are making under the Plan without such injunctions and/or releases.

4. The Settling Insurer Entities would not get the Channeling Injunction and/or releases provided in the Plan, nor would they make the substantial contributions they are making under the Plan without such injunctions and/or releases.

In addition, it is unlikely that the Settling Insurer Entities would voluntarily contribute without the corresponding benefit of final resolution of Tort Claims. Annexed hereto as Exhibit 1 is a Liquidation Analysis. The Liquidation Analysis indicates that in a liquidation, Holders of Unsecured Claims would receive a lesser distribution than provided under the Plan.

### 28.4. Feasibility

The Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization. Because (i) all the Tort Claims will be resolved pursuant to the Plan, (ii) the Reorganized Debtor will not be financially liable on account of any Tort Claims that occurred prior to the Petition Date except as provided in the Plan, and (iii) distributions will be made only to the extent of existing assets or future recoveries, the Reorganized Debtor and the Committee believes the Plan is feasible.

### 28.5. Cram Down

The Bankruptcy Code provides a mechanism by which a Plan may be confirmed even if it has been rejected by an impaired Class of Claims. Under the "cram down" provisions of the Bankruptcy

Code (§1129(b)), the proponent of the Plan (in this case the Committee) may request that it be confirmed despite its rejection by an impaired Class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired Class and (ii) is fair and equitable with respect to such Class.

The Bankruptcy Code sets forth specific guidelines for determining whether a Plan is fair and equitable with respect to a particular Class of Claims. For unsecured Claims, as are those in Classes 3, 4, 11 and 12, a Plan must provide that equity interest Holders do not receive or retain any property on account of their interest. The Committee submits that this test which is applied to traditional corporations is inapplicable to not-for-profit corporations as there are no equity interests or junior creditors or the Holders of Claims that are junior to Claims of a non-accepting Class are not receiving any property under the Plan.

In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting Class unless certain modifications are made to the terms and conditions of such non-consenting Class' treatment under the Plan, Committee reserves the right, without re-solicitation, to propose such modification to such non-consenting Class' treatment and to confirm the Plan.

## ARTICLE XXIX

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Committee has evaluated numerous alternatives to the Plan, including, without limitation, dismissal of the case or the conversion of the Case to Case under Chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtor by a Chapter 7 Trustee. After studying these alternatives, the Committee has concluded that the Plan is the best alternative and will maximize recoveries of Holders of Claims. The following discussion provides a summary of the analysis of the Debtor supporting its conclusion that a Chapter 7 liquidation of the Debtor will not provide higher value to Holders of Claims.

### 29.1.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no Chapter 11 Plan can be confirmed, the Case of the Debtor may be converted to a case under Chapter 7 (assuming the Debtor consents), in which event a Trustee would be elected or appointed to liquidate the Debtor's assets for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. In addition to the factors discussed above, the Committee believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Trustee for bankruptcy and professional advisors to such Trustee and (2) the erosion in value of assets in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" environment in which such a liquidation would likely occur and non-participation in the Plan by the Parishes, schools and Settling Insurer Entities. Accordingly, the Committee has determined that confirmation of the Plan will provide each Holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under Chapter 7.

A discussion of the effects that a Chapter 7 liquidation would have on the Holders of Claims is set out in the Liquidation Analysis, attached as Exhibit 1 hereto.

### 29.2.    Alternative Chapter 11 Plans

If the Plan is not confirmed, any other party in interest could undertake to formulate a different Chapter 11 Plan. Such a Chapter 11 Plan might involve either a reorganization and continuation of the business of the Debtor or an orderly liquidation of the properties and interests in property of the Debtor. With respect to an alternative Chapter 11 Plan, the Committee has examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Committee believes that the Plan, as described herein, enables Holders of Claims to realize the best recoveries under the present circumstances.

## ARTICLE XXX

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER. NEITHER THE COMMITTEE NOR THE COMMITTEE'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in this Case.

**30.1.   The Trust**

The Trust is a "qualified settlement fund" ("QSF") within the meaning Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B. The Trust is characterized as a QSF because:

a.      The Trust is established pursuant to an Order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

b.      The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to sexual abuse (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relate to: a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and,

c.      The Trust is a trust under state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1.      The Trust must use a calendar taxable year and the accrual method of accounting.

2.      If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

3.      The Trust takes a fair market value basis in property contributed to it by the Debtor.

4.      The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and Estate (currently 35%). The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.      The Trust may deduct from its gross income a limited number of administrative expenses; the Trust in not entitled to deduct distributions paid to its beneficiaries.

6.      The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to Claimants.

### 30.2.    Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a Distribution to a Claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a Distribution in repayment of the principal amount of a loan is generally not included in the Claimant's gross income. Distributions to Tort Claimants may not be taxable as it may be considered compensation for personal injuries.

The federal income tax consequences of a Distribution to a Claimant may also depend on whether the item to which the Distribution relates has previously been included in the Claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a Distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the Distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss. Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the Distribution in income when received.

A Claimant receiving a Distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with

respect to that item. This income or loss may be ordinary income or loss if the Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a Claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the Claimant as a result of receiving a Distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Claimant's hands.

## ARTICLE XXXI

## VOTING INSTRUCTIONS

Solicitation Packages which will include copies of (i) the Disclosure Statement Approval Order, (ii) the Notice of Disclosure Statement Approval and Confirmation Hearing, (iii) the approved Form of Disclosure Statement (together with the Plan annexed thereto), and (iv) the form of Ballot will be sent to creditors. Procedures and deadlines for submitting the Ballot will be included in such Solicitation Package.

## ARTICLE XXXII

## CONCLUSION

The Committee believes that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Committee urges Holders of Claims to vote to accept the Plan by so indicating on its Ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: November 29, 2021

Respectfully submitted,

By _____

**Leo Tudela**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**ITS: CHAIRMAN**

*/e/Robert T. Kugler*
**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGAÑA**

EXHIBIT 1

## LIQUIDATION ANALYSIS[4]

| Assets | Debtor's Estimated Liquidation Value |
|---|---|
| Debtor Operating Cash | $7,348,774.93 |
| Allegedly Restricted Cash for Parishes and Schools | $5,908,270.88 |
| Accounts Receivable | $603,890.00 |
| Personal Property | $25,000.00 |
| Real Property (non-parish and school) | $12,543,265.00 |
| Real Property (Parishes and Schools) | $50,000,000.00 |
| Asset Total | $70,520,929.93 |

| Liabilities | Debtor's Estimated Liquidation Value |
|---|---|
| Trade Payables | $100,000.00 |
| Professional Fees | $750,000.00.00 |
| Statutory Fees | $500,000 |
| Bank of Guam Secured Claim | $8,234,606.00 |
| First Hawaiian Bank Secured Claim | $4,056,801.00 |
| Bank of Hawaii Secured Claim | $200,000.00 |
| SBA Secured Claim | $934,238.00 |
| Total Priority Liabilities | $14,775,645 |
| Other Unsecured Claims | $4,117,805.00 |
| Tort Claims (Debtor estimated value) | 26,800,000 |

---

[4] The Court did not approve the Committee to have an independent financial advisor. Accordingly, the Committee has used the Debtor's proposed asset and liability values. The Committee contests the categorization of various property by the Debtor, and this Liquidation Analysis applies the Committee's theory of what is in and out of the estate.

| Liabilities | Debtor's Estimated Liquidation Value |
|---|---|
| Total Liabilities | $60,469,095.00 |
| **Net Assets** | **$10,051,835.00** |