<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                                   .  Courtroom No. 6
 6                                 .  824 Market Street
                 Debtors.          .  Wilmington, Delaware 19801
 7                                 .
                                   .  Friday, March 25, 2022
 8   . . . . . . . . . . . . . . . 10:05 a.m.

 9
                     TRANSCRIPT OF ZOOM TRIAL (DAY 10)
10         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtors:          Derek C. Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT
14                                & TUNNELL, LLP
                               1201 North Market Street
15                             16th Floor
                               Wilmington, Delaware 19899
16
                               Jessica C. Lauria, Esquire
17                             Glenn M. Kurtz, Esquire
                               Sam Hershey, Esquire
18                             WHITE & CASE, LLP
                               1221 Avenue of the Americas
19                             New York, New York 10020

20   Audio Operator:           Brandon J. McCarthy, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1   APPEARANCES (CONTINUED):

2   For the Debtors:            Michael C. Andolina, Esquire
                                WHITE & CASE, LLP
3                               111 South Wacker Drive
                                Suite 5100
4                               Chicago, Illinois 60606

5   For AIG, on behalf of
    Certain Insurers:           James Hallowell, Esquire
6                               GIBSON DUNN & CRUTCHER, LLP
                                200 Park Avenue
7                               New York, New York 10166

8   For Lujan & Wolff
    Claimants:                  Delia Lujan Wolff, Esquire
9                               LUJAN & WOLFF, LLP
                                238 Archbishop Flores Street
10                              DNA Building, Suite 300
                                Hagatna, Guam
11
    For the Committee of
12  Unsecured Creditors
    For Archdiocese of
13  Agana:                      Edwin Caldie, Esquire
                                STINSON LLP
14                              50 South Sixth Street, Suite 2600
                                Minneapolis, Minnesota 55402
15
    For Great American:         Konrad R. Krebs, Esquire
16                              CLYDE & CO., LLP
                                340 Mt. Kemble Avenue
17                              Suite 300
                                Morristown, New Jersey 07960
18
    For the TCJC:               Robert J. Malionek, Esquire
19                              LATHAM & WATKINS, LLP
                                1271 Avenue of the Americas
20                              New York, New York 10020

21  For the Zalkin Law Firm
    and Pfau Cochran Vertetis
22  Amala, PLLC:                Robert J. Pfister, Esquire
                                KTBS LAW, LLP
23                              1801 Century Park East
                                26th Floor
24                              Los Angeles, California 90067

25

1  APPEARANCES (CONTINUED):

2  For Travelers Insurance
   Company:                      Louis J. Rizzo, Jr., Esquire
3                                REGER RIZZO & DARNALL
                                 2929 Arch Street
4                                13th Floor
                                 Philadelphia, Pennsylvania 19104
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:

3    Agenda
     Item 1:   Third Modified Fifth Amended Chapter 11 Plan
4              of Reorganization for Boy Scouts of America
               and Delaware BSA, LLC
5              (D.I. 8813, filed 02/15/22)

6

7    WITNESSES CALLED
     BY THE TCJC:                                           PAGE
8
          JESSICA HOREWITZ
9         Direct examination by Mr. Malionek                   9
          Cross-examination by Mr. Pfister                    38
10        Cross-examination by Mr. Krebs                      46

11

12   WITNESSES CALLED
     BY THE DEBTORS:                                        PAGE
13

14        KATIE NOWNES-WHITAKER
          Direct examination by declaration
15        Cross-examination by Ms. Lujan Wolff               61
          Redirect examination by Mr. Hershey                70
16

17        AARON LUNDBERG
          Direct examination by Mr. Andolina                 76
18        Cross-examination by Mr. Rizzo                     100

19

20

21

22

23

24

25

1                              EXHIBITS

2  EXHIBITS:                                    PAGE

3  JTX-91 through 913                             60

4  JTX-1097(a)                                    79

5  JTX-1322                                       60

6  JTX-2664                                       73

7  JTX-2948                                       72

8

9  DECLARATIONS:                                 PAGE

10 1) Declaration of Jessica Horewitz             8

11 2) Declaration of Katie Nownes-Whitaker        60

12 3) Declaration of Aaron Lundberg              81

13 Transcriptionists Certificate                 119
14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 10:05 a.m.)

2           THE COURT:  Good morning.  We're here again on

3  confirmation of the Boy Scouts plan.

4           Mr. Abbott.

5           MR. ABBOTT:  Good morning, Your Honor.  Derek

6  Abbot, Morris Nichols, for the Boy Scouts.

7           Your Honor, I just wanted to bring up one

8  scheduling matter before we jump into Ms. Horewitz this

9  morning.  As Your Honor may recall, there were some -- there

10 were some evidentiary matters the Court took under

11 consideration with respect to Mr. Whittman's declaration.

12 The debtors have filed a supplemental response.  Yesterday,

13 the Guam committee filed a response to that.  And Your Honor,

14 we just need to deal with that.

15          It was unclear to us whether Your Honor wanted to

16 hear further argument on that.  We, obviously, can simply put

17 Mr. Whittman on to do live what they objected to in the

18 declaration, and the Court could hear that and rule on the

19 balls and strikes as it happens.  But we just wanted to flag

20 that issue for the Court because we are in a position to put

21 him back on, perhaps at the end of the day today, to work

22 through those issues, but just wanted to raise it for the

23 Court.

24          THE COURT:  Okay.  I haven't read what's been

25 filed, so I'll have to do that, and then I can tell you --

1  and then we can discuss, I guess, what needs to happen, but I

2  haven't read those submissions.

3  　　　　　Mr. Abbott, you're muted.

4  　　　　　MR. ABBOTT:  My apologies, Your Honor.

5  　　　　　That's fine, Your Honor.  We can deal with that as

6  the Court wishes.  And I'll just turn it over to Mr. Malionek

7  for Ms. Horewitz now.

8  　　　　　THE COURT:  Okay.  Thank you.

9  　　　　　MR. MALIONEK:  Thank you again, Your Honor.

10 Robert Malionek of Latham & Watkins on behalf of TCJC.

11 　　　　　Just like yesterday, I wanted to start off by

12 referencing the fact that we have a binder that was sent to

13 chambers a couple of days ago.  We don't know if you have

14 that in front of you, Your Honor.

15 　　　　　THE COURT:  I should.  Yes.

16 　　　　　MR. MALIONEK:  All right.  Thank you.

17 　　　　　So Dr. Horewitz's testimony was submitted to the

18 Court, filed at Docket Number 9400, that was on Friday.

19 　　　　　We served demonstratives from Dr. Horewitz, that's

20 at DDX-110, for use with her testimony; we served those on

21 Tuesday.  And we understand that those are both in your

22 binder.  Tab 1 is Dr. Horewitz's declaration with her CV

23 attached, and her demonstratives, DDX-110, are at Tab 3.  Do

24 you have that, Your Honor?

25 　　　　　THE COURT:  I do.

1        MR. MALIONEK:  Okay.  We've received no

2  objections, so I would move now for Dr. Horewitz's

3  declaration, including her attached CV, as Docket Number 9400

4  into evidence.

5        MR. PFISTER:  No objection -- good morning, Your

6  Honor.  Rob Pfister from the Klee Tuchin firm.  No objection

7  from the PCVA and Zalkin firms.

8        MR. KREBS:  Good morning, Your Honor.  Konrad

9  Krebs with Clyde & Co. on behalf of the certain insurers, and

10 no objection.

11       THE COURT:  Thank you.  It's admitted.

12     (Horewitz Declaration received in evidence)

13       MR. MALIONEK:  Thank you, Your Honor.

14       So, as with Mr. Rytting, we have a short -- it's a

15 supplemental direct beyond the declaration, perhaps 30

16 minutes at most, to address the sufficiency of TCJC's

17 settlement as part of the plan, and that includes issues that

18 have come up during the trial, including the apportionment of

19 responsibility to TCJC of all of the scouting related claims

20 filed in this bankruptcy.

21       And Mr. Pfister, do you have the ability to share

22 screen?  Okay.

23       Thank you, Your Honor.  We're ready.

24       THE COURT:  Okay.  It's doctor, correct?  Dr.

25 Horewitz.  Can you -- I need to swear you in.  Can you raise

1  your right hand, please?

2   JESSICA HOREWITZ, WITNESS FOR THE CHURCH OF JESUS CHRIST OF

3                    LATTER-DAY SAINTS, AFFIRMED

4           THE COURT:  Please state your full name and spell

5  your last name for the record.

6           THE WITNESS:  Jessica Horewitz, H-o-r-e-w-I-t-z.

7           THE COURT:  Thank you.

8           MR. MALIONEK:  Thank you.

9                      DIRECT EXAMINATION

10  BY MR. MALIONEK:

11  Q    And it is Dr. Horewitz, correct?

12  A    It is.

13  Q    What degrees do you have?

14  A    I have a Bachelor's Degree, a Master's Degree, and a

15  Doctoral Degree in Economics.

16           MR. MALIONEK:  Okay.  And Your Honor, we don't

17  plan to go in detail through Dr. Horewitz's background.

18  There's no need to do that, it's all in the declaration and

19  CV, but just a few background questions to start things off.

20  BY MR. MALIONEK:

21  Q    Dr. Horewitz, can you just confirm that there's no one

22  else in the room with you, that you have no materials related

23  to this case immediately around you?

24  A    That's correct.

25  Q    Okay.  Where are you joining us from?

1  A     My home office in Fairfax, Virginia.

2  Q     And just as a brief introduction at the outset, what

3  were you asked to do in this case on behalf of TCJC?

4  A     I was retained by counsel for TCJC, Latham & Watkins,

5  to review the proposed cash settlement TCJC is offering into

6  the bankruptcy and analyze whether or not it was sufficient

7  to cover reasonable expected liabilities arising from TCJC's

8  claims in the bankruptcy.

9  Q     Okay.  Now, as a shorthand, when you refer to the

10  sufficiency of the TCJC settlement contributions, can I refer

11  to that term as the "sufficiency of the settlement"

12  throughout this, just as a shorthand to refer to the analysis

13  you just described?

14  A     Yes.

15  Q     So, again, just some limited questions about your

16  background and your qualifications.

17       Can you provide an overview of your experience

18  conducting claims evaluations, including in the mass tort

19  context?

20  A     Yes.  For the last 25 or so years, I have used my

21  education and experience in statistical and analytical tools

22  to evaluate claims in product liability and mass tort

23  settings.  Most of the time, my analysis is used by private

24  and publicly held companies in their financial reporting and

25  planning purposes.

1          I also work in corporate restructure, mergers and

2    acquisitions, bankruptcy, insurance litigation, and

3    commutation.

4    Q     Have you served as an expert in cases, for example, in

5    which Dr. Bates was also involved?

6    A     I have.

7    Q     About how many times?

8    A     You know, I've probably been directly in litigation

9    with Dr. Bates two or three times, but probably involved with

10   him in other matters, including consulting matters, 15, 20

11   times.

12   Q     And what's your current position, Dr. Horewitz?

13   A     I am the President of Gnarus Advisors, LLC, and a

14   principal on the consulting staff.

15   Q     Is this case your first time conducting an analysis

16   related to the valuation of sex abuse claims?

17   A     It is not.

18   Q     And have you testified in court as a mass tort claims

19   valuation expert before?

20   A     I have.

21   Q     Have you been qualified by courts as an expert in that

22   area?

23   A     Yes.

24              MR. MALIONEK:  So, Your Honor, if I can -- based

25   on Dr. Horewitz's testimony and her submitted declaration and

1  CV, and the fact that there's been no challenge to her

2  qualifications, we would proffer her as an expert in claims

3  valuation, including in the mass tort context.

4           THE COURT:  I hear no objections.

5           MR. PFISTER:  No objection, Your Honor.

6           THE COURT:  Thank you.

7           I will accept her as an expert in those areas.

8           MR. MALIONEK:  Thank you, Your Honor.

9  BY MR. MALIONEK:

10 Q    So, Dr. Horewitz, just as an overview, can you describe

11 the methodology that you used to reach your expert opinions

12 regarding the sufficiency of the TCJC settlement?

13 A    Yes.  My assignment in this matter was not to

14 specifically quantify what the value of the TCJC claims would

15 be, but rather to determine whether or not the expected

16 reasonable value of those claims was under a particular

17 threshold, the two-hundred-and-fifty-million-dollar cash

18 contribution that TCJC is proposing to make into the

19 bankruptcy.

20      So, rather than approach this as a problem of coming up

21 with a specific number, I needed to determine a range of

22 values that were likely or reasonable and, in some sense,

23 less likely to stress test whether or not the total liability

24 would fall below that threshold.  In order to do so, I

25 proceeded in four steps:

1   Needing to know the number of claims that would be

2 leading to liability;

3   The average value of those claims;

4   The apportionments that would be attributed to TCJC;

5   And then look at any potential insurance that would

6 also contribute to the value.

7 Q Okay.  And let me jump to your ultimate opinions first,

8 and then we'll step back and walk through each of those

9 different steps of your methodology in a bit more detail.

10   So, first, without considering the value of TCJC's

11 insurance contribution, what conclusion did you reach

12 regarding the sufficiency of TCJC's cash contribution of $250

13 million to the settlement trust?

14 A I conclude that the $250 million is sufficient to cover

15 the -- TCJC's expected reasonable liabilities under almost

16 all circumstances, except under the least likely, most

17 extreme circumstances.

18 Q Okay.  And second, once you factor in TCJC's

19 contribution of its insurance rights, what conclusions did

20 you reach regarding the sufficiency of the TCJC settlement?

21 A The TCJC settlement, including insurance, is more than

22 adequate to cover the liabilities that TCJC is expecting.

23 Q And just to be clear, while analyzing the two-hundred-

24 and-fifty-million-dollar cash contribution and the value of

25 the insurance rights, did your analysis even consider the

1  contribution of TCJC's sixty-four-million-dollar

2  indemnification claim that is filed in this bankruptcy?

3  A    No.

4  Q    By the way, are you aware of any other expert in this

5  case who conducted an analysis of the sufficiency of the TCJC

6  settlement?

7  A    Yes, Dr. Bates.

8  Q    Okay.  Have you watched some of the trial as it's gone

9  on?

10  A    I have.  I saw Dr. Bates' testimony a few days ago.

11  Q    Okay.  And what did Dr. Bates conclude with respect to

12  the sufficiency of the TCJC settlement?

13  A    He concluded that the TCJC settlement would be

14  sufficient to cover TCJC liabilities at the midpoint of his

15  range of expected liabilities and at each point below the

16  midpoint.

17  Q    Are you aware of any other expert in this case who

18  conducted an analysis of the sufficiency of the TCJC

19  settlement?

20  A    No.

21  Q    Okay.  So let's briefly walk through each of the four

22  steps of your analysis in turn.

23           MR. MALIONEK:  Can we pull up DDX-110 please?

24       (Pause)

25           MR. MALIONEK:  And let's just go back to the first

1  page, please.

2  BY MR. MALIONEK:

3  Q    Just to -- well, March 23rd is when we thought,

4  perhaps, Dr. Horewitz, you were going to go on, so sorry to

5  make you wait.

6        Who created these demonstratives?

7  A    My team and I did.

8  Q    Okay.  Now let's start with the first step in your

9  analysis.

10        MR. MALIONEK:  If we could turn to Page 2.

11  Q    This is regarding the count of scouting related TCJC

12  claims.  Is that right?

13  A    It is.

14  Q    Okay.  So how did you start off your analysis to

15  identify the number of scouting related claims against TCJC?

16  A    I received the (indiscernible) data from Bates White,

17  as prepared by Bates White, that had 82,209 claims related to

18  the submitted POCs.  And as I reviewed the data, it became

19  very clear that the vast majority of them, 74,264 of them,

20  had no mention of TCJC as a chartered organization.  And

21  there were three or four data fields in which that

22  information was captured.  We searched across all of them to

23  determine that TCJC was not mentioned in those 74,000 claims,

24  so we excluded those claims from our analysis.

25        At that point, it was important to then determine which

1  of the remaining claims would have value in the tort system

2  to TCJC.  And the next step we did was eliminate 5,481

3  claims, where there was no abuse allegation alleged.  And I

4  understand that, without an abuse allegation, there wouldn't

5  be value in the tort system.  And that left me with 2,454

6  claims that involved TCJC and had an abuse allegation.

7  Q    Okay.  So just to make sure that we're all on the same

8  page before we move on, the claims that you excluded from

9  your valuation are those that have -- that you've concluded

10  have nothing to do with TCJC.

11  A    Correct.

12         MR. MALIONEK:  All right.  Let's move to Slide 3,

13  please.

14  BY MR. MALIONEK:

15  Q    So, after excluding those claims that had nothing to do

16  with TCJC in your analysis, what did you do with respect to

17  those remaining 2,454 potential TCJC claims?

18  A    I then reviewed those 2,400 and change remaining claims

19  to determine if they had value in the tort system.  It's not

20  only the lack of an abuse allegation or no mention of TCJC

21  that means the claim would have no value to TCJC.  So the

22  bubbles that you see inside the larger one are the factors

23  that I considered:

24         Whether or not there was a prior settlement;

25         If the claimant was 18 or under at the time of the

1    abuse;

2        If there was an abuser named;

3        And whether or not the statute of limitations allowed

4    the claim to be brought.

5        And in doing so, again, I refer back to my assignment

6    here wasn't to come up with the exact number that I thought

7    the liability would be, it was also to make sure that, under

8    lots of different conditions, a range of possible conditions,

9    that the settlement was sufficient.

10        So I first approached my analysis in what I call the

11    "baseline," where I said, if this was operating in the tort

12    system, what might we expect.

13        We would expect claims with a prior settlement to be

14    excluded.  And at the top green bubble, you can see there

15    were 15 of those.

16        I then said let's apply statute of limitations, and

17    1,555 claims were excluded because they wouldn't make it

18    through a statute of limitations screening.

19        Three hundred and twenty-nine, after the statute of

20    limitations, didn't name an abuser.

21        And an additional 21 claims, the claimant was over 18.

22        And so that gave me a baseline scenario of 534 claims

23    that remained out of the 82,000 that named TCJC and would

24    have value in the tort system.

25    Q    Okay.  So just --

1  A      However --

2  Q      Just to --

3  A      Go ahead --

4  Q      -- break it --

5  A      -- please.

6  Q      Oh, I'm sorry, but just -- I want to make sure we're

7  all on the same page again.

8        So that's the -- what you just referred to for your

9  baseline scenario, that's the top, right green circle.  Is

10  that right?

11  A      Yes.

12  Q      Okay.  And then did you base the rest of your analysis

13  on those 534 TCJC claims in your baseline scenario?

14  A      No.  I needed to stress test my analysis by allowing

15  for some of those positions that I just discussed to be

16  loosened.

17        I still decided that, if there was a prior settlement,

18  there wouldn't be an additional settlement, so I excluded

19  those 15 claims.

20        But then I looked very carefully of statute of

21  limitations.  And I understand that there has been some

22  discussion about loosening statute of limitations laws in the

23  case of sex abuse.  And so I removed all of the statute of

24  limitations constraints, except for the State of Utah, where

25  I allowed those to remain.  And so, instead of excluding

1  1,555 claims due to statute of limitations, I excluded just

2  638 of those claims.

3       I then filtered again on abuser name but allowed for

4  the possibility that a description of the abuser, physical

5  abuser, was sufficient.  It didn't need to just be the name.

6       And by the time I got through those screens, there were

7  only four claims left that were excluded due to age.

8       And that led me to what I would call a very

9  conservative, high scenario of possibly 1,379 claims having

10  value to the TCJC in the bankruptcy.

11  Q    When you say, as compared to your baseline scenario,

12  this was a "very conservative, high scenario," can you

13  describe what you mean?

14  A    Yeah.  I mean, this requires that every state, except

15  Utah, remove their statute of limitations laws associated

16  with sex abuse claims.  And I think that's a very unlikely

17  event.  It's more likely that a few or some states might do

18  something like that.

19       And so I believe that the true count of claims that

20  would be valued is somewhere between 534 and about 900.  It's

21  not going to be as high as the 1,379.

22  Q    All right.  And Dr. Horewitz, I -- just to think about

23  a question that you might be asked on your cross-examination:

24  You're not a lawyer.  Is that right?

25  A    I am not.

1  Q      So what did you base your analysis on with respect to

2  your statute of limitations assumptions, including with

3  respect to the State of Utah?

4  A      Discussions with counsel.  I understand that the State

5  Constitution in Utah is such that any change to the statute

6  of limitations laws would be declared unconstitutional.  And

7  I understand from counsel that a challenge of that has

8  already occurred, and so it's beyond the scope of reasonable,

9  far beyond, that the statute of limitations would be removed

10 in the State of Utah.

11        So I really do consider this to be a bright line and

12 the 1,379 to be quite a high value for the claim count.

13              MR. MALIONEK:  Okay.  So let's move to the next

14 slide.

15 BY MR. MALIONEK:

16 Q      So, Dr. Horewitz, once you completed your analysis

17 regarding the number of potential scouting related abuse

18 claims alleged to involve TCJC and you created your baseline

19 scenario and your very conservative high scenario, what was

20 the second step of your analysis?

21 A      I needed to assign the value to these claims.  And so I

22 looked to an average settlement value across the sex abuse

23 claims that I saw in the bankruptcy and the tort system

24 related to BSA.

25 Q      Okay.  So how did you conduct your analysis?

1  A       I received two data sets, also from Bates White:  One

2  showed settlements that had been made prior, from 2010

3  through 2020, and one that showed settlements from 2016 to

4  2020.

5        I chose the data set that had settlements from 2016 to

6  2020, due to some anomalous results in the older data, and

7  then I began analysis to determine an average value using

8  those 262 claims.

9  Q       Okay.  And what was the result of that analysis?

10 A       The result of that analysis is what you see here on the

11 slide.  There were a total of -- of the 262, I excluded

12 claims that were associated with an outlier and arrived at

13 235 claims that would  be used in my analysis, and those had

14 an average value of 344,998, which I will discuss as 350,00

15 just for simplicity.

16       I then wanted to make sure I was being consistent with

17 how I approached my claim counts.  And in determining the 534

18 and 1,379 possible claims, one of the exclusions I made were

19 claims where there was unknown or unconfirmed or missing

20 abuse allegations.

21       So I, again, looked to the data set of the settled

22 (indiscernible) I had access to, removed those that had no

23 allegation of abuse.  That left me with 179 claims with an

24 average value of 428,341, or 430,000 for simplicity.

25 Q       So, by making those exclusions -- that's on the second

1  row of your chart here, correct?  After making those

2  exclusions, it left you with a higher average claim value?

3  A    It did.  And again, this was necessary for my analysis.

4  As I'm stress testing the value that these claims might have

5  had in the tort system, I need to look at a high or a less

6  likely valuation to make sure that I'm capturing the range of

7  possibilities that may or may not fall under the cash value

8  of the settlement.

9  Q    Okay.  And did you do anything else, in terms of

10 exclusions or adjustments with respect to determining the

11 range of average values for these settlements, or is that

12 everything?

13 A    Yes.  I -- I excluded some high outlier claims that

14 were definitively not associated with TCJC.

15 Q    Okay.  Can you describe those?

16 A    Yeah.  There was one named abuser in the database,

17 Hacker.  And he had tremendously high values that are

18 statistical outliers, they are functional outliers.  And my

19 research and questions confirmed that Hacker was not

20 associated with TCJC.  And so including those claims in the

21 average value that we were applying to TCJC claims would have

22 been inappropriate, so I excluded those claims.

23     And that's what you see here on this slide is the

24 average values associated with claims in the database after

25 the Hacker claims were excluded.

1   Q     Okay.  So then, just to conclude and to bring the Judge

2   over to the right-hand column of your top analysis, what was

3   your -- what was the result of your analysis regarding the

4   range of potential settlement values?

5   A     The average settlement value I would expect for the --

6   the claims that involved TCJC in the BSA databases, between

7   three hundred and fifty and $430,000.

8   Q     And did you compare that range against the results of

9   any other experts in the case?

10  A     I did.  Dr. Bates provided a detailed analysis of claim

11  values in his report.  And I show here at the bottom of the

12  slide (indiscernible) that his valuation range was between a

13  hundred and fifty and $440,000, which is very similar to my

14  range.  My range is maybe a little bit tighter than that.

15        And then I updated Dr. Bates' analysis to say what if

16  Dr. Bates had excluded the Hacker claims, as I did, as not

17  appropriate to speak to the TCJC liability.  And I arrived at

18  a range of average claim values of between 80,000 and

19  205,000, which confirmed for me that my valuation of three

20  hundred and fifty to 440,000 was appropriately conservative

21  for the purposes of my analysis.

22  Q     Okay.  So how would you compare the midpoint of the

23  range of claim values that Dr. Bates found as against the

24  midpoint of the range of claim values that you found?

25  A     His was certainly lower.

1    MR. MALIONEK:  Okay.  So let's turn to the next

2  slide, please.

3  BY MR. MALIONEK:

4  Q    Once you then conducted the first two steps of your

5  analysis to determine the number of potential TCJC related

6  scouting claims, and then also the potential range of value

7  of abuse claims, what was the next step in your analysis?

8  A    I now have a val -- a total valuation, kind of the

9  claim count times the average value, it gets you a total of

10  what those claims might be.

11    But we know that TCJC doesn't pay the entire face value

12  of the claims.  These are Boy Scouts of America claims, and

13  TCJC pays a portion of that.  And so I did an apportionment

14  analysis to determine what a reasonable apportionment to a

15  charter organization would be.

16  Q    Okay.  Are you aware if anyone else offered as an

17  expert in this case performed any kind of apportionment or

18  allocation analysis?

19  A    No.

20  Q    All right.  Can you explain how you conducted your

21  apportionment analysis with respect to the analysis you

22  performed related to the TCJC related scouting claims?

23  A    Yes.  I was provided by counsel a list of verdict

24  summaries of sex abuse cases that had previously been

25  decided, and I identified two cases that I could rely upon to

1  determine an apportionment.

2        And in these verdicts, it was very important for there

3  not only to be an apportionment to the abuser but to other

4  responsible parties and more than one other responsible

5  party.  If there was simply a school or a national

6  organization, that didn't help me determine what portion of

7  the non-abuser liability might go to a chartered

8  organization.

9        In two of the cases, in Menzies v. Los Angeles and

10  Confidential v. Watchtower, which you see here, there was an

11  apportionment, not just to the national organization, but to

12  a chartered and/or local organization.

13        In Menzies v. Los Angeles, the non-abuser liability was

14  split 50/50 between the national organization and the

15  chartered or local organization.  And so I thought that that

16  was one benchmark one might use.

17        In Confidential v. Watchtower, the non-abuser liability

18  was split two-thirds to the national organization and one-

19  third to the chartered or/local organization, so there was

20  another benchmark that I had.

21        And I'll note that the portion that goes to the

22  chartered and local organizations might also be shared or

23  split between a chartered organization.  So, in Menzies v.

24  Los Angeles, had there been not just a chartered

25  organization, but a local, that half that goes to chartered

1  organizations might be much smaller, maybe even a quarter, if

2  it was split, and the same with the third.

3       So this analysis led me to the conclusion that the

4  apportionment between national organization and chartered

5  and/or local organization really wouldn't be greater than 50

6  percent and could be as little as 25 percent or smaller.

7  Q    Okay.  So, just to make sure that we're all on the same

8  page, does your valuation analysis take into account the

9  value of every portion of every claim asserted against TCJC

10 in this bankruptcy case?

11 A    It does.

12           MR. MALIONEK:  Okay.  Let's move to the next

13 slide.

14 Q    So, Dr. Horewitz, what did you do next, after, as part

15 of your apportionment analysis in this case?

16 A    So now I have all of the pieces:

17      I have a range of the number of claims that go from an

18 expected baseline to something that stresses the analysis, a

19 conservative high.

20      I have the range of average values from the 350,000 to

21 the 430,000.

22      And I have an apportionment.

23      So I can determine what the expected TCJC potential

24 liability is for those claims.  And so now we just multiply

25 this out.

1        If I look only at the baseline scenario, where there's

2   534 claims, those top 2 row, I have two different average

3   values I might apply to those -- to that 534 claim count; 50

4   percent apportionment, the total liability would be expected

5   to be just under 100 million to about $115 million.

6        However, I also need to look at the stressed or

7   unlikely scenario that there would be 1,379 claims valued.

8   Again, those 1,379 are valued both at the three-hundred-and-

9   fifty- and four-hundred-and-thirty-thousand-dollar possible

10  value at the highest possible apportionment I considered of

11  50 percent.  And I arrive at total TCJC liability of between

12  two hundred forty-one and $296 million.

13  Q    Okay.  Now, applying this, this slide is titled

14  "Potential liability of TCJC at 50 percent apportionment."

15            MR. MALIONEK:  Can we move to the next slide.

16  BY MR. MALIONEK:

17  Q    Once you determined that TCJC's potential liability

18  range, can you explain, then, using your apportionment

19  analysis, how those amounts compare to TCJC's, just its two-

20  hundred-and-fifty-million-dollar cash contribution, as part

21  of its settlement.

22  A    Yes, the blue bar and the yellow bar that you see on

23  the far left of the slide are the high and the low numbers we

24  just saw on the previous page; something just south of $100

25  million and just under $300 million.  And the green

1  horizontal line shows you the two-hundred-and-fifty-million-
2  dollar settlement.

3       Quite clearly, the $296 million that we had the highest
4  number on the previous page is just above the value of the
5  cash settlement.  This is -- it doesn't concern me terribly
6  because we know that the $296 million is at the highest claim
7  count, which is unlikely, the highest settlement average and
8  the highest important to TCJC.  So, those are compounding of
9  three unlikely model inputs to arrive at that number.

10       The two bars in the middle show what the TCJC
11  contribution or the value might be the apportionment was at
12  33 percent and you can see, clearly, that even at the highest
13  claim count and the highest value per claim, the total TCJC
14  expected liability falls well under the cash contribution,
15  which is even more the case at lower levels of apportionment
16  that you can see on the far right.

17  Q    So, for example, on the far right, if TCJC were
18  apportioned 25 percent of the liability, can you explain what
19  that shows, with respect to, and as you compare it to the
20  two-hundred-and-fifty-million-dollar cash contribution, just
21  the cash contribution TCJC is making.

22  A    Yes.  Under all circumstances of expected number of
23  claims and expected claim value is the average apportionment
24  to TCJC is 25 percent, the cash contribution is well above
25  that expected liability.  There is a big cushion there.

 1  Q    Okay.  Now, in addition to discussing, as you did, with

 2  respect to this slide, the value of the sufficiency of the

 3  two-hundred-and-fifty-million-dollar cash contribution by

 4  TCJC as against these ranges of claim values and claim

 5  counts, did you also analyze the impact of TCJC's

 6  contribution of its insurance rights?

 7  A    I did.

 8        MR. MALIONEK:  All right.  Can we move to the next

 9  slide.

10  BY MR. MALIONEK:

11  Q    Why did you analyze the impact of TCJC's insurance

12  rights?

13  A    Well, TCJC is contributing their insurance rights as

14  part of the settlement and those have a material value that

15  they're bringing to the trust.

16  Q    All right.  Can you describe, then, your analysis, once

17  your factor in TCJC's contribution of its insurance rights on

18  top of its two-hundred-and-fifty-million-dollar cash

19  contribution.

20  A    Yes.  The first step I did was look at the analyses

21  that TCC expert Ms. McNally had done, as well as Ms. Gutzler,

22  and Ms. Gutzler did not divide her insurance analysis into

23  pieces so that I could look at what the chartered

24  organization portion of the insurance value would be.

25        TCC expert Ms. McNally did not, and so I was able to

1 tease out what the expected contribution value of the

2 insurance rights would be under her assumptions and then I

3 discounted those, as Mr. Coleman suggested might happen.  So,

4 the two-hundred-and-seventy-seven-million-dollar blue line

5 you see here takes into account both, the TCJC two-hundred-

6 and-fifty-million-dollar cash contribution and a twenty-five

7 or twenty-seven-million-dollar insurance right contribution,

8 under some fairly strict assumptions that were made by the

9 TCC.

10 Q    Okay.  And did you consider any other evaluations, with

11 respect to TCJC's insurance rights?

12 A    I did.  The insurance coverage assumptions made by the

13 TCC were somewhat restrictive and specific and under (audio

14 interference) counsel, I relaxed two of those assumptions;

15 one being, I toggled the first-encounter rule that was used

16 by the TCC into a continuance trigger and, secondly, I

17 removed the fronting word "deductible" portion as not

18 applicable to insureds, only to named insureds, meaning the

19 BSA.  And in relaxing those two assumptions, at the direction

20 of counsel, I arrived at a different (audio interference) for

21 the insurance portion.

22 Q    Okay.  And how did those adjustments, then, impact your

23 analysis?

24        MR. MALIONEK:  Can we move to the next slide,

25 please.

 1          THE WITNESS:  When I relaxed those two

 2  assumptions, the value, the cash contribution, plus the

 3  insurance is much greater than it was in the TCC analysis, up

 4  to about $410 million in total.  So, the insurance portion

 5  grew substantially with a relaxing of those two assumptions.

 6          And you can see here that there is no scenario

 7  under which, on this page, the value of TCJC's contribution

 8  is not sufficient to cover the expected liabilities, and

 9  there's a significant cushion.

10  BY MR. MALIONEK:

11  Q    Okay.  So, just to break down your conclusions,

12  Dr. Horewitz, and then I'll come back to this slide in a

13  minute -- I want to ask you about one other exhibit -- but

14  just to break it down, based on your analysis, what opinion

15  did you reach regarding the sufficiency of the TCJC

16  settlement, based solely on its two-hundred-and-fifty-

17  million-dollar cash contribution?

18  A    Based solely on the two-hundred-and-fifty-million-

19  dollar cash contribution, the TCJC's contribution is

20  sufficient, under all reasonable circumstances, of

21  apportionment and valuation.

22  Q    And what conclusion did you reach, for once factoring

23  in the value of TCJC's insurance rights, as contributed to

24  the Settlement Trust, and how that relates to the sufficiency

25  of its overall settlement?

1  A     The TCJC contribution of cash and insurance is more

2  than sufficient to cover the expected value of TCJC's claims

3  in the BSA bankruptcy, under all reasonable conditions.

4  Q     And you mentioned the term "cushion" and I asked you

5  this before, but just to be clear, you did not even take into

6  account the contribution of TCJC's sixty-four-million-dollar

7  indemnification claim; is that right?

8  A     That's right.

9  Q     So, Dr. Horewitz, you did say that you have been

10 watching the testimony in this case.

11       Did you see the testimony of Paul Rytting, the director

12 of risk management for TCJC yesterday?

13 A     I did.

14 Q     Do you recall that he was asked some questions related

15 to, I'll call them "mixed claims"; do you remember that?

16 A     I do.

17 Q     What's your understanding of what a mixed claim is,

18 based on what you heard in the questioning and the answers of

19 Dr. Rytting?

20 A     My understanding is that a mixed claim is one that is

21 not essentially one defendant, whether it's BSA or TCJC or

22 some other church or community organization.  It is -- it has

23 multiple responsible parties or a single responsible party

24 that maybe has multiple roles.

25 Q     Okay.  And let me ask you to take a look at one exhibit

 1  that Mr. Rytting was shown; it's JTX-369.

 2       This is a --

 3            MR. MALIONEK:  If you'd just blow that up, Gayle,

 4  please.

 5  BY MR. MALIONEK:

 6  Q    This is a 2000 -- January 2021 letter from Latham &

 7  Watkins to Matt Linder at White & Case.

 8       Did you review this document?

 9  A    I did.

10  Q    Okay.  And do you recall that Mr. Rytting was asked

11  some questions related to claims or types of claims that are

12  referred to in this letter?

13  A    I do.

14            MR. MALIONEK:  Can we turn to page 9 of this

15  document, and there's a reference there to point 2 -- it's

16  towards the bottom, if you can blow that up -- point 2 and

17  then through the end.  Yes, thank you.

18  BY MR. MALIONEK:

19  Q    So, there's a point 2 there.

20       I think when Mr. Rytting was asked questions, he was

21  asked questions related to, quote, Claim 2.

22       Do you recall that?

23  A    I do.

24  Q    Okay.  This is titled as a claim -- by a claimant whose

25  name is redacted versus the Corporation of the President of

1         The Church of Jesus Christ of Latter-Day Saints and

2   Cascade Pacific Council and Boy Scouts of America, et al.

3         Do you see that?

4   A     I do.

5   Q     And let me just focus on, and this is what

6   Mr. Rytting's focus was directed to, the last sentence, which

7   starts with the complaint.  It says that the complaint

8   alleges that the redacted claimant's name -- or excuse me --

9   alleges that the perpetrator's redacted name, acting within

10  the scope and course of his duties as Mormon priest in his

11  leadership roles and as BSA Scout leader.

12        Do you see that?

13  A     I do.

14  Q     And Mr. Rytting was asked if a claim such as that, this

15  Claim 2, or as was referred to as "mixed claim," if that

16  would be included in the release that TCJC is seeking in this

17  case and Mr. Rytting said, "Yes."

18        Do you remember that?

19  A     I do.

20  Q     Okay.

21             MR. MALIONEK:  So, now, if we could go back to

22  your DDX-110, your demonstratives, and look at Slide 9.

23             Okay.  Thank you.

24  BY MR. MALIONEK:

25  Q     So, I just want to make sure I'm clear about a couple

1  of things.  With this Claim 2 that I just referenced, was

2  that being included in your apportionment and valuation

3  analysis?

4  A     Yes.

5          MR. PFISTER:  Your Honor, I -- pardon me -- Your

6  Honor, Rob Pfister from the Klee Tuchin firm.

7          I object to this line of questioning as to whether

8  any specific claim in a trial exhibit is included within

9  damages.  This is not within the scope of what Dr. Horewitz's

10 report was tendered on.  It was clearly at the basis of

11 aggregate liability, not claim-by-claim liability.

12         And, second, there's a second independent

13 objection, given Dr. Horewitz's testimony, in response to

14 Mr. Malionek's questions as to what she understands a quote,

15 unquote, mixed claim is, I don't think the testimony, and the

16 incorrectness of that assertion, I don't think the testimony

17 has any foundation.

18         MR. MALIONEK:  Your Honor, may I very briefly?

19         THE COURT:  Yes.

20         MR. MALIONEK:  Rule 703 says very clearly that an

21 expert may base an opinion on facts or data in the case that

22 the expert has been made aware of or personally observed.

23         And the Third Circuit has applied that, including

24 in the Hill case in 2006 and in another Third Circuit case in

25 2009, United States v Grades (phonetic):

1          An expert is allowed to observe testimony that

2   comes out during trial and if relates to any area in which

3   the expert has conducted analysis, may offer opinions with

4   respect to the evidence as it has come up.

5          And that's what Dr. Horewitz is doing.

6          THE COURT:  I'll just -- but how does that jibe

7   with determining whether one specific claim is within her,

8   the subject of her opinions when she didn't do it on a claim-

9   by-claim basis?

10         MR. MALIONEK:  Let me ask a few questions, Your

11  Honor, of the witness if you don't mind, and I'll explain the

12  foundation for it --

13         THE COURT:  Okay.

14         MR. MALIONEK:  -- if that's okay, Your Honor?

15         THE COURT:  Okay.

16  BY MR. MALIONEK:

17  Q    Dr. Horewitz, just to be clear, are all portions of all

18  claims in this bankruptcy that involve TCJC accounted for in

19  your analysis?

20  A    Yes.

21  Q    So, just to make sure that we're all on the same page,

22  on an overall basis, your valuation analysis takes into

23  account the value of every portion of every claim asserted

24  against TCJC in this case?

25  A    Yes.

1  Q     And the claims that you excluded from your analysis are

2  Scouting-related claims that have nothing to do with TCJC; is

3  that correct?

4            MR. PFISTER:  Objection, Your Honor; leading, at

5  this point.

6            THE COURT:  Sustained.

7  BY MR. MALIONEK:

8  Q     Dr. Horewitz, are the claims that you excluded as

9  Scouting-related, do they involve TCJC at all?

10 A     (No verbal response.)

11 Q     The claims that you excluded --

12           MR. MALIONEK:  Let's go back to slide 2, if you

13 don't mind, just to make it clear.

14 BY MR. MALIONEK:

15 Q     The claims that you excluded from your analysis, do

16 they involve TCJC?

17 A     The 74,274 do not.

18 Q     Okay.  So, is your conclusion, Dr. Horewitz, that

19 TCJC's contributions, as set forth in the TCJC settlement are

20 more than sufficient to cover any portion of any claim for

21 which TCJC may be liable?

22 A     Yes.

23 Q     Okay.  I have no other questions at this time.

24           MR. MALIONEK:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1           Okay.  Cross-examination, Mr. Pfister?

2           MR. PFISTER:  Yes.  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4  BY MR. PFISTER:

5  Q     Once again, Rob Pfister from the Klee Tuchin firm, on

6  behalf of PCBA and Zalkin, which are plan supporters, except

7  as to the scope of release for TCJC.

8        Good morning, Dr. Horewitz.  It's good to see you

9  again.

10 A     Good morning.

11 Q     You've used some terminology today concerning

12 allocation and important of liability between BSA and the

13 TCJC; is that correct?

14 A     Yes.

15 Q     And, indeed, I believe Mr. Malionek asked you if you

16 were, in fact, the only expert in this case who has done any

17 economic or -- pardon me -- I believe Mr. Malionek confirmed

18 that you are the only expert in this case who has done any

19 analysis of apportionment or allocation.

20       And you confirmed that you were, in fact; is that

21 right?

22 A     I am not the only expert who did allocation and the

23 only expert who did apportionment.

24 Q     Okay.  Certainly, many experts have done insurance

25 allocation, but let's use -- I thank you for clarifying my

1  terms -- let's use apportionment, then, given all the

2  testimony that's previously been offered with respect to

3  insurance allocation.

4       So, if I refer to apportionment, can we agree that

5  that's the -- that when we use that term or when you use that

6  term in your testimony, what you mean is the division or --

7  it's hard not to use the word "allocation" -- but the

8  allocation of liability that may or may not be made with

9  respect to which Defendant in a multi-defendant case is

10 responsible to bear a portion of the Plaintiffs' damages.

11      Would that be a fair way of using the word

12 "apportionment"?

13 A     Yes.

14 Q     Okay.  Now, Mr. Malionek anticipated one of my

15 questions, which is, you are not a lawyer, correct?

16 A     I am not.

17 Q     And you are not offering any legal opinion on

18 apportionment of damages in the tort system; is that right?

19 A     That's right.

20 Q     Okay.  And you are not offering any legal opinion as to

21 the scope of any bankruptcy release or the permissible scope

22 of what may be released in connection with the bankruptcy

23 case; is that correct?

24 A     Yes.

25 Q     Okay.  Mr. Malionek showed you JTX-369 in your

1  examination.

2       Had you seen that document prior to yesterday?

3  A     No.

4  Q     So, it's a document you never saw prior to yesterday.

5       You never used in any of your work and analysis in this

6  case up to yesterday, right?

7  A     That's the document we looked at, at the very end, just

8  to confirm?

9  Q     Yeah, that's correct.

10      JTX-369 was the one that was originally a letter.  It

11  was in the form of a letter and if you remember, I -- if you

12  watched my examination of Mr. Rytting, we talked about the

13  facts of some of the cases in a 2003 letter that he had sent.

14 A     Yes, the first time I saw that was yesterday during

15  your cross-examination.

16 Q     Okay.  And the cases that are described, or the facts

17  of the cases that are described in the letter in JTX-369,

18  that is the two Oregon cases, have you ever heard of either

19  of those cases before?

20 A     No.

21 Q     And do you have any knowledge of the underlying facts

22  of those cases, beyond what Mr. Rytting wrote in his

23  correspondence in JTX-369?

24 A     I don't.

25 Q     Okay.  And so, any opinion you could offer as to

1  whether the TCJC's settlement contribution or settlement

2  amount encompasses liability in connection with those cases,

3  first of all, that would strictly be an economic analysis,

4  right?

5  A    Yes.

6  Q    Okay.  And it would be an analysis based not on the

7  specific facts of those cases, or, in fact, any other proof

8  of claim that may be at issue that these cases, but in fact,

9  what you did is you looked at two examples of apportionment

10  in different contexts and you drew some conclusions from

11  those two examples; is that right?

12         MR. MALIONEK:  And, Your Honor, just to make an

13  objection here.  Mr. Pfister, I think, split his question

14  into two.  He first referred to these two specific cases, but

15  then broadened it to say that Dr. Horewitz's analysis doesn't

16  apply to any other such claims in this bankruptcy and I think

17  that lacks foundation.

18         THE COURT:  Oh, I didn't hear it that way.  I

19  thought you morphed into her two cases she used in her

20  apportionment and I didn't understand that.

21         So, can you start again.

22         MR. PFISTER:  I would prefer to start again, yes.

23  Thank you.

24         THE COURT:  Okay.  Go ahead.

25  BY MR. PFISTER:

1  Q      So, the analysis that you did on apportionment, where
2  you came up with some -- those two figures, the 25 percent
3  and the 50 percent, that analysis is based on your
4  examination of two specific cases that are non, Boy Scouts-
5  related cases; is that right?
6  A      The data on that slide are based on those two cases,
7  but my implementation of my apportionment is based on more
8  than that.  If you -- I'll leave it up to you whether or not
9  you want to bring up the slide, but it was very clear to me
10 from my experience in these kinds of mass tort liabilities
11 that there are occasions where you have multiple responsible
12 parties.  And when I looked at the bubbles under the non-
13 abuser apportionment, there were very clearly three bubbles.

14        There are lots of different ways you can apportion
15 liability two three pieces and I'll note that the first
16 bubble, which is kind of parent or other, often doesn't get
17 any apportionment is my understanding.  So, let's call it two
18 solid bubbles.

19        So, you have two pieces.  Logic and my experience says
20 to me that allocating it 50/50 makes no sense; however, this
21 is the Boy Scouts of America bankruptcy, so it also would
22 make sense to me if a larger than 50 percent apportionment
23 went to the Boy Scouts and something less went to chartered
24 organizations, local councils, other groups.

25        And so, on its face, from a logic perspective, 50/50

1  seemed to me to be a high-end, average apportionment, and

2  then values underneath it would be reasonable.  I decided

3  that I wouldn't go below 25 percent in reviewing the data and

4  forming my conclusions, because as I said earlier, it's the

5  high end of the range that's more important to me to

6  determine that the settlement is sufficient.  It doesn't need

7  to be sufficient for the low end of the range; it needs to be

8  sufficient for the high.

9  Q    Okay.  So, I think I can -- I don't think I need, then,

10  to go through the two cases, the Menzies (phonetic) and the

11  Confidential v Watchtower case, given what I understand the

12  scope of your analysis is.

13        But let me just make sure I tie that up by asking you,

14  again, to repeat the definition that you gave of a mixed

15  claim in response to Mr. Malionek's questions.  What do you

16  understand a mixed claim to be under this plan?

17            MR. PFISTER:  And to preempt any objection, Your

18  Honor, I certainly am not asking her to testify as to a mixed

19  claim.  I don't think she has the definition right.  I just

20  want to make sure we get on the record what the witness

21  thinks the definition of mixed claim is.

22            THE WITNESS:  Well, I --

23            MR. MALIONEK:  Your Honor, can I make an objection

24  and ask for a clarification?

25            I'm trying to understand that Mr. Pfister is

1  asking what Dr. Horewitz, for purposes of her analysis,

2  understands a mixed claim to be and for purposes of her

3  testimony, as she heard from Mr. Rytting yesterday, as

4  opposed to any understanding she may have of what the legal

5  definition is or the definition is under the plan, because I

6  think that would be a separate matter and not one for which

7  there's any foundation.

8          MR. PFISTER:  Maybe, Your Honor, I could ask a

9  different question that might clear up Mr. Malionek's issue.

10         Let me try it slightly differently.

11         THE COURT:  Okay.

12  BY MR. PFISTER:

13  Q    Okay.  Dr. Horewitz, did you -- have you used the

14  claim -- pardon me.

15       Dr. Horewitz, have you used the term "mixed claim" in

16  any of your testimony by declaration or by expert report,

17  prior to today in this case?

18  A    No, I don't think I even used it today.

19  Q    Okay.  So, in any of your written testimony, that is,

20  the declaration that's been offered into evidence as

21  Docket 9400, and in any of your expert reports in this case,

22  you never used the term once, "mixed claim"; is that correct?

23  A    That's correct.

24  Q    Okay.  Now, I believe I heard you say, and I don't have

25  real time, so I'm just basing it on my handwritten notes, but

1  I believe your testimony was, in response to one of

2  Mr. Malionek's questions today that, quote, a mixed claim is

3  one that is not one defendant, end quote.

4       Did I hear that incorrectly?

5  A    I believe you got that right.

6  Q    I didn't hear you; there was a skip in the Zoom.

7  A    Apologies.

8       Can you repeat it, just repeat it just one more time.

9  Q    Sure.  Quote -- a mixed claim is, quote, one that is

10 not one defendant, end quote.

11 A    Yes, although, I think I qualified it to say, to be one

12 defendant in two separate roles.

13 Q    Okay.  So, your -- first of all, sitting here today,

14 you have not previously used the term "mixed claim" in any of

15 your testimony or reports, right?

16 A    Correct.

17 Q    And then when Mr. Malionek asked you some questions and

18 used the term "mixed claim" in your testimony this morning,

19 you gave that testimony based on the view that a mixed claim

20 is one where there is more than one defendant, that is,

21 that's your understanding on which your testimony is based;

22 is that right?

23           MR. MALIONEK:  Your Honor --

24           THE WITNESS:  With the qualification that it can

25 be one defendant with multiple roles.

1          MR. MALIONEK:  That was to be my objection, Your

2  Honor.  Yes.

3          MR. PFISTER:  Okay.  With that, Your Honor, I

4  don't have any further questions.

5          Thank you, Dr. Horewitz.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you.

8          Mr. Krebs?

9          MR. KREBS:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11  BY MR. KREBS:

12  Q    Good morning, Dr. Horewitz.

13      My name is Hunter Krebs.  I'm with the law firm of

14  Clyde & Co.  I'll be questioning you on behalf of Great

15  American Insurance Company and the Certain Insurers in this

16  case.

17      Dr. Horewitz, I heard you state that your heard Mr.

18  Rytting's testimony yesterday, correct?

19  A    I did.

20  Q    All right.  And did you hear his testimony that the

21  TCJC is making the largest cash contribution of any chartered

22  organization in this case?

23  A    I did.

24  Q    Okay.  Part of your written testimony that was

25  submitted to the Court addresses the value of future claims

1  impacting the TCJC.

2      Do you recall that?

3  A    Yes.

4  Q    Okay.  So, in your written testimony, you opine that

5  future claims are unlikely to have a significant impact on

6  TCJC liability, correct?

7  A    I believe that's right.

8  Q    Okay.  And in that written testimony, you said that as

9  high as 81 percent of TCJC claims arise in states that you

10  have been informed, do not allow latent memory claims,

11  correct?

12  A    Yes, that's in my report.  Yes.

13  Q    Perfect.

14      And so, the flipside of that is, only 19 percent of

15  TCJC claims arise in states that do allow latent memory

16  claims, correct?

17  A    Yes.

18  Q    Okay.  I'm a lawyer, so my math is not always the best.

19      So, continuing on the math, so, of the, roughly, 82,000

20  claims in this case, then, you would estimate that between

21  534 and 1379 are TCJC claims, correct?

22  A    Are TCJC claims that would have value in the tort

23  system.

24  Q    Yeah.  Thank you for the clarification.

25      So, applying that 19 percent that we discussed earlier,

1  it's possible that as few as 101 claims of the existing

2  82,000 claims in this case arise in states where latent

3  memory claims are allowed and involved with TCJC, correct?

4  A    Yes.

5  Q    All right.  Do you know what percentage of the total

6  abuse claims that is?

7  A    Of the 82,000?

8  Q    Yes, of the 82,000.

9  A    I do not.

10 Q    If I said -- if I represented it was about a tenth of 1

11 percent, would that be -- sound right?

12 A    I would say that is small enough, yeah.

13 Q    Perfect.

14      So, does the fact that so few TCJC claims arise in

15 states that allow for repressed memory claims inform your

16 conclusion that there's a very small likelihood of TCJC

17 future claims?

18 A    Yes, but that's not based on the 82,000; it's just

19 based on my analysis of the TCJC jurisdictions.

20 Q    Perfect.

21      So, to address your conclusion that there is a small

22 likelihood of future claims involving the TCJC, are you able

23 to quantify how small of a likelihood?

24 A    No.

25 Q    Is it possible, based on your modeling that there will

1  be no future claims involving the TCJC?

2  A     Yes.

3  Q     Okay.  And you provided an opinion on the range of

4  values of future abuse claims involving the TCJC, correct?

5  A     I provided a range of values of the existing 534 to

6  1379.

7  Q     Okay.  So, none of that value was attributable to

8  future abuse -- to future claims?

9  A     None of it is directly applicable to future abuse

10 claims, but the whole purpose of having a high end of my

11 range is exactly, they capture this kind of uncertainty.

12        There may be factors that we don't account for here,

13 but because the high end of my range has significantly

14 stressed the model, that variation is captured in the

15 totality of my range.

16 Q     So, is it fair to say that even in the high end of your

17 model, though, only a small amount of that value is

18 attributable to future claims?

19 A     I don't specifically attribute it to anything.

20 Q     Okay.  Moving on.

21        You testified a little bit about some insurance

22 assumptions in your testimony.

23        Do you recall that testimony?

24 A     I do.

25 Q     All right.  And the conclusions, you testified that the

1  conclusions about insurance are based on assumptions provided

2  by counsel, correct?

3  A     Yes.

4  Q     And those assumptions include whether chartered

5  organizations are covered under BSA policies?

6  A     Yes.

7  Q     All right.  And whether chartered organizations must

8  pay deductibles under fronting policies?

9  A     Yes.

10 Q     All right.  And those assumptions include trigger of

11 coverage?

12 A     Yes.

13 Q     And those assumptions include the applications of

14 aggregate versus per-occurrence policy limits, correct?

15 A     Yes.

16 Q     All right.  And is it true that you have no basis for

17 this understanding, other than the instructions of counsel?

18 A     For the understanding that those are the factors that I

19 need to do an allocation?

20 Q     Yes, exactly.

21 A     I know from the breadth of my experience in mass tort

22 and insurance coverage work, that those are important model

23 inputs.

24 Q     Okay.  And the inputs that you selected were selected

25 based upon the advice of counsel, correct?

1   A      Yes.

2   Q      All right.  Thank you.

3          And if you changed some of those assumptions, it

4   wouldn't necessarily change the outcomes of your model; is

5   that true?

6   A      It would necessarily change the outcome of the value of

7   the insurance coverage, however, I disagree that it would

8   change my ultimate conclusion that the settlement is

9   sufficient.

10  Q      That's fine.

11         And my question was only about the conclusions about

12  insurance.

13  A      Yes.

14  Q      And you also testified in your written testimony about

15  the value of the insurance program, with respect to the TCJC;

16  is that true?

17  A      I do.

18  Q      Okay.  And your conclusions about the value, of the

19  alleged value of the TCJC's insurance rights through the BSA

20  insurance program are based upon information about the total

21  value of the BSA insurance program; is that correct?

22  A      It's based upon the total value, as divided between

23  chartered organizations and named insureds.

24  Q      Got it.

25         And so, the source where you derived the information

1  about the total value of BSA's insurance program was the

2  expert reports authored by Ms. Katherine McNally and Mr. Mark

3  Coleman, true?

4  A     Yes.

5  Q     Okay.  And neither Ms. McNally, nor Mr. Coleman have

6  testified in this case, correct?

7  A     That's my understanding.

8  Q     All right.  And neither of their reports are currently

9  in evidence?

10  A     That's right.

11  Q     Okay.  Next topic, Dr. Horewitz, is you excluded some

12  claims -- I think you previously testified you excluded some

13  claims from your analysis; is that correct?

14  A     From the PSE database?

15  Q     Yes.

16  A     Yes.

17  Q     Okay.  And is it fair to say that by excluding, you

18  assigned zero value to the TCJC's overall liability and

19  (indiscernible), correct?

20  A     For those claims, yes.

21  Q     For those claims, exactly.

22        So, other than those claims -- and I'm just going to

23  run through it a little bit -- you assigned no values to the

24  TCJC for those claims where the allegation of abuse was

25  missing or unknown; is that correct?

1   A      Correct.

2   Q      Okay.  And so that was 5,481 claims?

3   A      I don't recall the number.

4   Q      All right.  And I'll represent to you that that was

5   what was on that slide that we previously looked at, and if

6   that's wrong, I intended to just poll those numbers.

7          And then you assigned zero value to --

8               MR. MALIONEK:  Excuse me, Mr. Krebs.  Do you want

9   me to just pull up the demonstrative just to make it easier

10  or is it not necessary?

11              MR. KREBS:  I don't think it's necessary.  I'm

12  almost to the point.  It'll be quick.

13  BY MR. KREBS:

14  Q      If the numbers are -- sound wrong, let me know.

15         But you assigned zero value to 74,274 claims that don't

16  implicate the TCJC; is that true?

17  A      That there's no mention in the PSE database of TCJC.

18  There may be mention of a local council, a different church,

19  or community group or none at all, but there's definitely no

20  mention of TCJC.

21  Q      Okay.  Perfect.

22         And then zero value to 15 claims that were subject to a

23  prior TCJC settlement, correct?

24  A      Correct.

25  Q      Okay.  And so, my math is that after removing those

1    claims, which is 82,209 claims minus 500 -- 5,481, minus

2    74,274, minus 15, there are 2,439 claims remaining; is that

3    true?

4    A    I think if you do the math in that straight subtraction

5    that might be true, but what you might be missing is that

6    some claims might be eliminated for more than one reason, and

7    so there's overlap, and order of the elimination matters.

8    Q    I see.

9         So, and (indiscernible), I think the -- you

10   subsequently -- you also assigned the value of zero for any

11   claims presumptively barred by statute of limitations,

12   correct?

13   A    Differently in my two highest -- baseline and highest

14   scenarios, but yes.

15   Q    Okay.  And based on that premise, you assigned between

16   638 and up to 1,555 claims of zero value, based on statute of

17   limitations, depending on whether the baseline or the high

18   model, correct?

19   A    Yes, after I've already done the previous exclusions,

20   yes.

21   Q    Okay.  So, my math might be slightly off, based on some

22   of this information, and I apologize again, but -- so after

23   taking out and removing claims with missing allegations,

24   claims that didn't implicate the TCJC, or claims that were

25   already settled, there are approximately between 26 and as

1  high as 64 claims of the remaining claims were assigned zero

2  value in your model, due to the application of the statute of

3  limitations; is that true?

4  A    I don't know that I follow that.

5  Q    Okay.  Is it fair -- so, if 1,555 claims were barred by

6  the statute of limitations and let's say there are -- and I

7  understand the numbers might be a little off -- but there

8  were 2,439 claims remaining after we removed all those other

9  claims, there would be roughly, roughly 64 percent of those

10 remaining claims would be barred by a statute of limitation.

11       Does that sound right?

12 A    That's about right.

13 Q    Okay.  Perfect.  I'll settle for "about right."

14       Thank you, Dr. Horewitz.

15            THE COURT:  Is there any other cross-examination

16 of Dr. Horewitz?

17       (No verbal response)

18            THE COURT:  I don't see any.

19            Redirect?

20            MR. MALIONEK:  No redirect, Your Honor.

21            THE COURT:  Thank you, Dr. Horewitz.

22            You're excused.

23            THE WITNESS:  Thank you, Your Honor.

24       (Witness excused)

25            MR. MALIONEK:  Your Honor, TCJC has no other

1  witnesses at this time.

2           THE COURT:  Thank you.

3           Okay.  What's next?

4           MS. LAURIA:  Your Honor, this is Jessica Lauria.

5           Can you hear me?

6           THE COURT:  I can.

7           MS. LAURIA:  Thank you, Your Honor.

8           Our next witness is from the voting solicitation

9  group -- it's going to be presented by Sam Hershey from

10 White & Case -- it's Katie Nownes.

11          And I believe I see Mr. Hershey on the screen.

12          MR. HERSHEY:  Good morning, Your Honor.

13          It's Sam Hershey from White & Case.

14          Can Your Honor see and hear me?

15          THE COURT:  I can.  You're a little delayed there,

16 but maybe that'll clear up.

17          MR. HERSHEY:  Now, Ms. Nownes is on standby to

18 appear -- no, it's not.  I see Your Honor shaking your head.

19          THE COURT:  Yeah.  No, you're not coming in

20 clearly.

21          MR. HERSHEY:  All right.  Well, what I was going

22 to say, Your Honor, if you can hear me, is Ms. Nownes is on

23 standby.  Maybe it takes sense to take a five-minute break to

24 get her on and during that break, I'll try to resolve this

25 issue.

1            THE COURT:  Okay.  Great.  Thank you.

2            We'll take a five-minute recess.

3            MR. HERSHEY:  Thank you very much.

4      (Recess taken at 11:15 a.m.)

5      (Proceedings resumed at 11:22 a.m.)

6            THE COURT:  Okay.  Mr. Hershey?

7            MR. HERSHEY:  Good morning, again, Your Honor.

8            Can you hear me clearly now?

9            THE COURT:  Much better, thank you.

10            MR. HERSHEY:  Great.  Thank you.

11            I moved rooms to try to fix the problem.  And if

12   it happens again, I'm actually dialed in, so I can speak

13   through the phone, and even though my video may be choppy,

14   the audio should be clear.

15            THE COURT:  Okay.

16            MR. HERSHEY:  Your Honor, I'm joined now by Katie

17   Nownes in the virtual courtroom.

18            Ms. Nownes submitted a declaration, which is at

19   D.I. 9397, which I'll be offering into evidence in lieu of

20   direct, live testimony.

21            Before I do that, I want to note a few things on

22   the record, if I may.  First, there were no objections to any

23   of the paragraphs in Ms. Nownes' declaration.  There were

24   objections raised by the Certain Insurers as to a few of the

25   exhibits to Ms. Nownes' declaration.

1          I am pleased to report that the debtors have

2  conferred with the Certain Insurers and resolved those

3  objections and I will walk the Court through what the debtors

4  and the Certain Insurers have agreed and Mr. Hallowell, who I

5  see is on the screen and was my negotiating partner, can

6  chime in if he disagrees with anything that I say.

7          So, first, Your Honor, the Certain Insurers are

8  withdrawing their objection to Exhibit 5 of Ms. Nownes'

9  declaration, which is JTX-91 through JTX-913; those are the

10 ballots, the master ballots and related materials that were

11 submitted to Omni in this case.

12         Additionally, Your Honor, the Certain Insurers are

13 also withdrawing their objection to Exhibit 7 to Ms. Nownes'

14 declaration, which is JTX-14; those are the proofs of claim

15 filed in this case.  And I want to note that the Certain

16 Insurers are withdrawing their objections, subject to the

17 understanding, which is shared by the debtors, that those

18 proofs of claim are been offered not for the truth of the

19 matter asserted in those proofs of claim, but just as a

20 record of the claims filed.

21         Additionally, as to remaining exhibits, the

22 debtors will withdraw Exhibit 6 to Ms. Nownes' declaration,

23 which is JTX-1424 and the debtors will not seek to offer

24 JTX-4 through this witness and have, instead, identified

25 certain court filings that the Certain Insurers have agreed

1 to admit into evidence.

2      And I'll note that the Certain Insurers and the

3 debtors are in the process of negotiating a broader

4 stipulation regarding exhibits that we offer into evidence

5 and those documents will be included on that stipulation.

6      I want to note one more thing, Your Honor.  There

7 is a typo in Ms. Nownes' declaration that I want to correct

8 on the record.  The debtors refer in the declaration to

9 JTX-1332.  We meant to refer to JTX-1322.  We have given

10 notice of this error to the parties and I just want the

11 record to reflect that we are offering JTX-1322, not

12 JTX-1332.

13      THE COURT:  1322?

14      MR. HERSHEY:  That's right, Your Honor.

15      With that, Your Honor, unless you have any

16 questions, and subject to any comments from Mr. Hallowell, I

17 would offer Ms. Nownes' declaration and exhibits into

18 evidence, subject to the comments I just made on the record

19 today.

20      MR. HALLOWELL:  This is Jim Hallowell of Gibson,

21 Dunn & Crutcher, for AIG and the Certain Insurers, and Mr.

22 Hershey has fairly and accurately reported the substance of

23 our agreements with the debtors, with regard to the exhibits

24 and we have no objections, as Mr. Hershey reported, to Ms.

25 Nownes' declaration.

1           THE COURT:  Thank you.

2           Okay.  Then Ms. Nownes' declaration will be

3  admitted into evidence and the exhibits will be admitted as

4  subject to the statements that were just made on the record.

5      (Nownes Declaration received in evidence)

6      (Exhibit JTX-91 through 913 received into evidence)

7      (Exhibit JTX-1322 received into evidence)

8           MR. HERSHEY:  Thank you, Your Honor.

9           And with that, Your Honor, Ms. Nownes is available

10  and ready to be sworn in for cross-examination.

11           THE COURT:  Okay.  Ms. Nownes, please raise your

12  right hand.

13      (Oath administered)

14     KATHERINE NOWNES-WHITAKER, DEBTORS' WITNESS, AFFIRMED

15           THE WITNESS:  I do.

16           THE COURT:  Please state your full name and spell

17  your last name for the record.

18           THE WITNESS:  Katherine Nownes-Whitaker.

19  N-o-w-n-e-s-W-h-i-t-a-k-e-r.

20           THE COURT:  Mr. Hallowell?

21           MR. HALLOWELL:  Your Honor, the Certain Insurers

22  have no cross-examination for this witness.

23           THE COURT:  Thank you.

24           Does anyone have cross-examination?

25           Ms. Wolff?

1          MS. LUJAN WOLFF:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MS. LUJAN WOLFF:

4   Q    Delia Lujan Wolff, representing certain survivors of

5   abuse.

6          Good morning, Ms. Nownes-Whitaker.  You are the chief

7   operating officer of Omni Agent Solutions?

8   A    Yes, I am.

9   Q    And as the COO of Omni, you're familiar with the

10  tabulation of votes on the debtors' plan in this case?

11  A    Yes, I am.

12  Q    And Omni is the administrative agent of debtors,

13  correct?

14  A    Yes, we are.

15  Q    And as administrative agent, Omni had the sole -- had

16  the responsibility of tabulating the vote in this case,

17  correct?

18  A    Correct.

19  Q    And only Omni tabulated the vote in this case; is that

20  correct?

21  A    Correct.

22  Q    Now, you're aware that there was a limited, extended

23  voting deadline?

24  A    Correct.

25  Q    And so, after the limited, extended voting deadline,

1  you filed a supplemental declaration regarding the

2  supplemental final voting report; is that correct?

3  A    Correct.

4  Q    And I believe that that -- your declaration, with the

5  supplemental voting report is identified as Joint Exhibit

6  2951.

7          MS. LUJAN WOLFF:  And, I'm sorry, Your Honor, I

8  wanted to note that I believe my co-counsel provided the

9  Court with a binder for --

10          THE COURT:  I do have a binder.  It has Joint

11  Exhibit 2948.

12          MS. LUJAN WOLFF:  Yes, Your Honor.  I just wanted

13  to make sure that you had it with you.

14          THE COURT:  Yes.

15          MS. LUJAN WOLFF:  Okay.

16  BY MS. LUJAN WOLFF:

17  Q    And so, Ms. Nownes-Whitaker, the results of the

18  Class 8, direct-abuse claims vote, the survivor vote after

19  the limited, extended voting deadline was a voter acceptance

20  of 85.72 percent; is that correct?

21  A    If that's what's on my declaration.

22      I apologize, there were a lot of percentages.

23  Q    No problem.  I understand.

24      Okay.  So, the voter acceptance rate is reflected in

25  your declaration in the supplemental voting report, final

1  voting report, correct?

2  A     Correct.

3  Q     And, I'm sorry, I can't pull that up.  I actually don't

4  have it.

5        But I want to ask you, Omni -- well, the results of the

6  Class 8, direct-abuse claim vote, the survivor vote, it was

7  broken down into a summary chart organized by local council.

8        Are you aware of that?

9  A     I am aware of that.

10 Q     And the results of the survivor vote, the Class 8,

11 direct-abuse claim vote was also broken down into a summary

12 chart, organized by groups of chartered organizations.

13       You're aware of that?

14 A     I am aware of that.

15 Q     Okay.  And these summary charts were prepared by Omni?

16 A     No, they were not.

17 Q     But you're familiar with the results of these -- you're

18 familiar with the breakdown of the survivor vote by local

19 council, correct?

20 A     It is posted on our website.

21 Q     Okay.  Well, let me show you a document.  It's marked

22 as Joint Exhibit 2948.  I'm going to share my screen.

23       Okay.  Now, do you see this, ma'am?

24 A     I see that.

25 Q     Yes.  I am sorry.  I -- let me try to -- I'm having

1  trouble.  Let me -- okay.  I'm going to scroll up.  Sorry, my

2  computer is a tad slow.

3       Okay.  So, this is a document, it's at Docket

4  Number 9305, filed March 11th, 2022, and it's titled "Notice

5  of revised summary final voting report data with respect to

6  local councils and chartered organizations named in abuse

7  survivor proofs of claim."

8       Now, have you ever seen this document, Ms.

9  Nownes-Whitaker?

10 A    I have not.

11 Q    Okay.  Well, I'm going to scroll down.  So, this has

12 been marked as Joint Exhibit 2948.  I'm going to go to

13 Exhibit A and maybe you might have seen Exhibit A.

14      Exhibit A is identified as "Supplemental final voting

15 report Class 8 summary local councils."  And this is

16 Exhibit A.

17      Now, you see here that it says here:

18           Distribution of supplemental final voting report,

19 Docket Number 9275, Class 8 direct-abuse claim results by

20 local council.

21      And then you see that there's a chart below, correct?

22 A    I see that.

23 Q    And the first column is local councils and then,

24 accept, reject, total, and then acceptance rates.

25      Now, have you ever seen this Exhibit A?

1   A       I have not.

2   Q       So, you're not familiar at all with the organization of

3   the survivor vote by local council?

4   A       I am not.

5   Q       Is anyone at Omni familiar with this?

6   A       No.

7   Q       Do you know how the debtors would have obtained this

8   information, without Omni?

9   A       The --

10          MR. HERSHEY:  I'm going to object to that

11  question.  She -- Ms. Nownes has not testified that the

12  debtors obtained this information without Omni.

13          MS. LUJAN WOLFF:  Okay.

14  BY MS. LUJAN WOLFF:

15  Q       I'm going to scroll up.

16          Did -- well, let me ask you, in response to

17  Mr. Hershey's comment, did -- to your knowledge, did debtors

18  obtain this information with the assistance of Omni?

19  A       No, we supplied all the voting reports, yes.

20  Q       Okay.  And when you say the "voting reports," you're

21  talking about the summary -- the supplemental voting report?

22  A       Yes.

23  Q       Okay.  And so, do you know who would have supplied this

24  information of the survivor vote, broken down by local

25  council to debtors?

1  A    I believe that would have been the debtors' financial

2  advisors.

3  Q    Okay.  But Omni has the capacity to organize the

4  survivor vote by local council?

5  A    We did not.

6  Q    Okay.  Now, you are familiar, however, with what you

7  said was a report that's posted on Omni's website for the

8  debtors' case, correct?

9  A    We do have it posted on Omni's website.

10  Q    And that is an Excel report?

11  A    I do not know.

12  Q    Okay.  And do you know who prepared that -- the

13  document that you're referring to that was posted on the Omni

14  website?

15  A    I do not know.

16  Q    Okay.  Well, let me just share my screen to -- we'll go

17  to the debtors' case just to make sure we're talking about

18  the same thing.  I apologize, I just need to set it up.

19        Okay.  Do you see that, ma'am?

20  A    I do.

21  Q    So, this is the Omni's website for the Boy Scouts of

22  America bankruptcy case, correct?

23  A    Yes, it is.

24  Q    And I'm going to the documents tab and the dropdown

25  menu has documents here.  And we'll go to the second document

1  identified in this dropdown menu.  It says, "Updated local

2  council, chartered organization final voting report data."

3        Have you seen that before?

4  A    I have seen this website, yes.

5  Q    Okay.  So, I'm going to share my screen again to show

6  the document.

7        Okay.  Ma'am, do you see this?  It's an Excel

8  spreadsheet.

9  A    I see it, yes.

10 Q    So, have you seen this before?

11 A    No, I have not seen that document.

12 Q    Okay.  So, you don't know if this is the document that

13 is posted onto the Omni website?

14 A    I do not.

15 Q    So, you're not sure what exactly the document is that

16 was posted on the Omni website; you just know it's at the

17 documents tab?

18 A    Correct.

19 Q    Okay.  Now, do you know who prepared this document -- I

20 know you said that you didn't see it, but let me ask you, do

21 you know who prepared the document that Omni posted on the

22 documents tab?

23 A    I do not.

24 Q    Okay.  Now, did Omni, at any time, tabulate the

25 survivor vote by local council?

1  A      We did not.

2  Q      Did Omni, at any time, ever tabulate the survivor vote

3  by chartered organization?

4  A      We did not.

5  Q      And you're aware that there are over 40,000 chartered

6  organizations in this case, correct?

7  A      Yes, I am.

8  Q      And you're aware that there are approximately 250 local

9  councils in this case, correct?

10  A      Approximately.  I will take your word on that.

11  Q      Okay.  And so, as to the survivor vote, is it your

12  testimony that Omni only tabulated the total survivor vote as

13  to acceptance and rejection of the plan?

14  A      That is correct.

15  Q      And, of course, also, identifying who selected the

16  expedited distribution, correct?

17  A      That is correct.

18  Q      Did Omni conduct any other tabulation of the survivor

19  vote after the limited, extended voting deadline?

20  A      We also tabulated the opt-outs; that was another box on

21  the ballot.

22  Q      Thank you.  Yes, thank you for reminding me.

23         Besides that, was there anything else that Omni

24  tabulated of the survivor vote?

25  A      Those were the only three boxes on the ballot.  Yes,

1  that's what we tabulated.

2  Q     Okay.  Did Omni ever go through the proofs of claim to

3  sort which survivors -- I'm sorry, let me stop sharing my

4  screen -- okay, did Omni ever go through the survivor proofs

5  of claim to, I guess, to determine what local councils were

6  identified by survivors?

7  A     No, we didn't.

8  Q     Okay.  Did Omni go through the proofs of claim to sort

9  what survivors identified chartered organizations?

10 A     No, we did not.

11 Q     Okay.  And do you know who did that work, if anyone

12 did?

13 A     I believe, again, it was the financial advisors for the

14 debtors.

15 Q     Okay.  And that's Alvarez & Marsal?

16 A     Alvarez & Marsal and Bates White.

17 Q     Bates White, okay.

18       Okay.  Well, thank you, ma'am.  I don't think I have

19 any other questions.  Thank you.

20 A     Thank you.

21            THE COURT:  Thank you.

22            Any other cross-examination of Ms. Nownes-

23 Whitaker?

24     (No verbal response)

25            THE COURT:  I don't see anyone.

1      Any redirect?

2          MR. HERSHEY:  Yes, Your Honor.  If I may, I'll do

3  a very short redirect.

4                    REDIRECT EXAMINATION

5  BY MR. HERSHEY:

6  Q    Okay.  Ms. Nownes, did the debtors ever ask you to

7  perform a breakdown of the total vote by local council and

8  chartered organization?

9  A    No, they did not.

10  Q    Other than a breakdown by class in other cases, have

11  you ever done any other breakdown by category of the final

12  vote?

13  A    No, we have not.

14  Q    Okay.  Did you personally review every item that was

15  posted to the Omni website?

16  A    No, I have not.

17  Q    Would someone on your team have reviewed every item

18  that was posted on the website?

19  A    Yes, we have a docket team, a website team, and a QC

20  team that does that.

21  Q    Okay.  And are you aware -- you testified that you

22  believe A&M and Bates White contributed to the breakdown that

23  Ms. Wolff pointed you to.

24      Do you have any knowledge if the information provided

25  in that breakdown has been verified by the debtors or anyone

1  at BSA?

2  A    I do not know.

3  Q    Do you know whether it was based on what survivors put

4  on their proofs of claim?

5  A    That is the information we provided, the proofs of

6  claim.

7  Q    To be clear, you provided the proofs of claim to whom,

8  exactly?

9  A    White & Case, Bates White, A&M.

10           MR. HERSHEY:  I have no further questions, Your

11  Honor.  Thank you.

12           THE COURT:  Thank you.

13           MS. LUJAN WOLFF:  And, Your Honor, I apologize.  I

14  neglected to move Joint Exhibit 2948 into evidence, and that,

15  Your Honor, is in the binder.  That is the notice of revised

16  summary final voting report data with respect to local

17  councils and chartered organizations named in abuse survivor

18  proofs of claim at Docket 9305.

19           MR. HERSHEY:  So, Your Honor, this is a document

20  that I believe was prepared by the debtors, so we don't

21  object to it coming into evidence with the understanding that

22  it is not for the truth of the matters asserted therein; it's

23  kind of tabulating what's asserted in proofs of claim.  So,

24  like the proofs of claim that have been admitted not for the

25  truth, this document can be admitted as a tabulation of

1  information provided in those proofs of claim, but not for

2  the truth.

3       MS. LUJAN WOLFF:  And, Your Honor, I don't believe

4  that the tabulation purports to determine actual liability of

5  local councils identified therein.  It is just a summary of

6  the local councils that survivors identified in their proofs

7  of claim and so I don't disagree with Mr. Hershey's

8  characterization.  I mean, it's not to prove actual liability

9  or -- these are the local councils and chartered organization

10 groups, I guess, ascertained from the proofs of claim.

11       So, Your Honor, we request that that be admitted

12 into evidence.

13       THE COURT:  Okay.  I will admit it, subjects to

14 the limitations that have been discussed.

15     (Exhibit JTX-2948 received into evidence)

16       MS. LUJAN WOLFF:  Your Honor, I also move to admit

17 into evidence the Excel report, which is marked as Joint

18 Exhibit 2446 and --

19       MR. HERSHEY:  Your Honor -- sorry.

20       MS. LUJAN WOLFF:  -- and that, Your Honor, I

21 believe was provided to the Court -- I'm sorry -- it's Joint

22 Exhibit 2664, and that is the Excel report that was provided

23 to Your Honor in, I believe, a thumbdrive.  It's a big file.

24       MR. HERSHEY:  Yeah, Your Honor, again, this is a

25 document created by the debtors and their advisors.  There's

1  no objection to it being offered into evidence with the

2  *caveat* that it's a tabulation of assertions on proofs of

3  claim and, therefore, not being offered for the truth.

4           THE COURT:  Okay.  Then I will admit it with that

5  *caveat*.

6           And Ms. Wolff, is that's what's in this envelope

7  that I have, do you think?

8           MS. LUJAN WOLFF:  Yes, Your Honor.  It's the Excel

9  report that has the full breakdown by proof of claim,

10  redacted as to survivor name.

11          THE COURT:  Okay.  JTX-2664.

12      (Exhibit JTX-2664 received into evidence)

13          MS. LUJAN WOLFF:  Yes, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MS. LUJAN WOLFF:  Thank you.

16          MR. HERSHEY:  Thank you, Your Honor.

17          THE COURT:  Okay.  Ms. Nownes-Whitaker, you are

18  excused.

19          THE WITNESS:  Thank you.

20      (Witness excused)

21          THE COURT:  Okay.  We're on a roll.

22          MR. ABBOTT:  Your Honor, the next witness would be

23  Mr. Lundberg, but I know the Court had talked about -- we

24  estimated, I think, 30 to 45 minutes there for direct -- I

25  know the Court has suggested that there was an engagement

1  that Your Honor had that we couldn't avoid that was somewhere

2  around noon or 12:15 to about 1:45.

3          We would prefer to try to do him all at once, Your

4  Honor, if we could, so I would suggest coming back after

5  lunch to start with Mr. Lundberg, if that will work for the

6  Court.

7          THE COURT:  Okay.  If you don't think we can get

8  him in before 12:15, then, yes.  If you think he would be

9  done by 12:15, I'm willing to stay.

10         MR. ABBOTT:  Your Honor, we think it's 30 to 45

11  minutes.  That leaves us only 25 here.  I think it's

12  unlikely, plus, unclear what cross will emerge from that.  I

13  would suggest after lunch.

14         THE COURT:  Okay.  Then we are in recess until

15  quarter to 2:00.

16         MR. ABBOTT:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18     (Recess taken at 11:49 a.m.)

19     (Proceedings resumed at 1:42 p.m.)

20         THE COURT:  Good afternoon.  We are back on the

21  record in the Boy Scouts confirmation hearing.

22         Mr. Abbott?

23         MR. ABBOTT:  Thank you, Your Honor.

24         As I suggested, we're going to start next with

25  Mr. Lundberg.  I will turn it over to Mr. Andolina for that

1  examination.

2          THE COURT:  Mr. Andolina?

3          MR. ANDOLINA:  Good afternoon, Your Honor.

4          Mike Andolina of White & Case on behalf of the Boy

5  Scouts of America.  It's nice to see you again.

6          We're here for the presentation of Aaron Lundberg,

7  who is the BSA's youth protection expert.  We have filed

8  Mr. Lundberg's declaration at Docket Number 9396.

9          Does Your Honor have the binder for Mr. Lundberg?

10         THE COURT:  I do.

11         MR. ANDOLINA:  Okay.  In that binder should be a

12 tab with his expert report, as well as a tab with Exhibit L

13 to the plan, which is the enhanced youth protection measures,

14 as well as some demonstratives that we intend to use.

15         Does Your Honor have all those materials?

16         I think the Exhibit L was delivered separately to

17 Your Honor.

18      (Pause)

19         THE COURT:  Yes, it was.  I have that.

20         MR. ANDOLINA:  Perfect, Your Honor.

21         And I see Mr. Rizzo on the screen.  Just so we can

22 be clear, Your Honor, we are not intending to offer

23 Mr. Lundberg's expert report into evidence, but we do have an

24 agreement with the Certain Insurers to stipulate to the

25 admission of his CV, which Appendix 1 to his expert report

1  and that is at page 23 of Docket Number 9396-1.

2           THE COURT:  Okay.  And the Certain Insurers are

3  the only ones who have filed an objection, correct?

4           MR. ANDOLINA:  That's correct, Your Honor.  There

5  was no objection as to any of the paragraphs of the

6  declaration.  It was limited to the expert report.  So, I

7  think everything is resolved with respect to the declaration

8  of Mr. Lundberg.

9           THE COURT:  Very good.

10           MR. ANDOLINA:  Your Honor, if you would be able to

11  swear in Mr. Lundberg, I think we can set a distance record,

12  as he is joining us from Santiago, Chile, for today's

13  testimony.

14           THE COURT:  Okay.  Very good.

15           Mr. Lundberg, will you raise your right hand.

16       (Oath administered)

17        AARON LUNDBERG, DEBTORS' WITNESS, AFFIRMED

18           THE WITNESS:  I do.

19           THE COURT:  Please state your full name and spell

20  your last name for the record.

21           THE WITNESS:  Aaron Lundberg, L-u-n-d-b-e-r-g.

22           THE COURT:  Thank you.

23                    DIRECT EXAMINATION

24  BY MR. ANDOLINA:

25  Q    Good afternoon, Mr. Lundberg.

1  A      Good afternoon.

2  Q      Mr. Lundberg, can you explain to the Court your

3  educational background.

4  A      I have a bachelor's in psychology from Texas Tech

5  University and I have a masters in social work from the

6  University of Texas, Arlington.

7              MR. ANDOLINA:  And, Your Honor, apologies for

8  putting that up without your permission, but we would like to

9  share DDX-105 as Mr. Lundberg goes through some of his

10 background with Your Honor's permission.

11             THE COURT:  That's fine.

12             I'm not sure I have the demonstratives, but that's

13 fine.  Oh, I do.

14             MR. ANDOLINA:  Okay.  Terrific, Your Honor.

15             And they are at DDX-14, and I believe there are 6

16 pages we provided to the Court.

17             THE COURT:  Okay.

18 BY MR. ANDOLINA:

19 Q      And Mr. Lundberg, where are you currently employed?

20 A      I have been employed for 20 years at Praesidium.  I am

21 currently the president and CEO.

22 Q      And what does Praesidium do?

23 A      Praesidium is a risk-management company that

24 specifically helps organizations that serve children and

25 vulnerable adults to reduce the risk of their consumers from

1  being abused within their organizations.  So, our mission is

2  to help those organizations prevent any type of abuse to

3  occur and if something does occur, we work with those

4  organizations to respond in a compassionate and transparent

5  way in the best interests of the survivors, as well as the

6  communities.

7  Q     During your 20 years at Praesidium, how many

8  organizations have you been involved in examining?

9  A     I have been directly involved in hundreds, doing a

10 variety of consultation, trainings, some leadership

11 development.  And then our team has been involved in more

12 than 5,000 -- working with more than 5,000 clients.

13 Q     And during your time at Praesidium, have you also been

14 involved in presentations to organizations?

15 A     I have.  And so, I have done many professional

16 conferences both, invited and accepted, and I have done

17 hundreds of trainings for both, volunteers and staff members,

18 but also advanced trainings to leadership and board members.

19 Q     And just directing your attention to your CV at pages 2

20 through 4 --

21          MR. ANDOLINA:  I don't know if Mr. Beall can pull

22 that document up.

23 BY MR. ANDOLINA:

24 Q     On pages 2 through 4 of your CV, Mr. Lundberg, are

25 those the presentations or among the presentations that you

1  have made in connection with youth protection?

2  A    Those are among the conferences and professional

3  presentations that I have done, but I have done many others

4  to individual organizations.

5  Q    And you've also written numerous articles on youth

6  protection; is that correct?

7  A    That is correct.

8  Q    And those are identified, at least some of them, on

9  page 6 of this CV?

10  A    That is correct.

11         MR. ANDOLINA:  Your Honor, I don't believe I did

12  before, but if we could move for the admission of

13  Mr. Lundberg's CV, since it's a portion of a Trial Exhibit

14  1097, we just identified it as 1097(a).

15         MR. RIZZO:  No objection, Your Honor.

16         THE COURT:  It's admitted.

17      (Exhibit JTX-1097(a) received into evidence)

18  BY MR. ANDOLINA:

19  Q    Going back to your experience, Mr. Lundberg, can you

20  give the Court some examples of the types of organizations

21  that you have worked with.

22  A    Sure.  So, we truly do work with any organization that

23  puts one person in charge of another; however, you can

24  generally group them into four categories.  And so, we worked

25  significantly in the education world, and so we work with

1  hundreds of public, private, and charter K through 12

2  organizations, so across the United States, but also

3  internationally.  And then we also work to a significant

4  degree within the higher-ed world.  So, we work with colleges

5  and university systems to help them develop and implement

6  youth protection plans.

7       The next category is social service agencies.  And so,

8  we work with some very small, but also some of the largest

9  organizations that provide services to children and

10 vulnerable adults who have been abused or mistreated, whether

11 that's through foster care, residential treatment, a lot of

12 community-based programming, lots of, like, homeless shelters

13 and so forth.

14      And then the next is religious institutions.  And so,

15 we serve a large number of just small, independent churches,

16 as well as many of the major denominations to help them

17 develop systems and resources that they can implement within

18 their churches.

19      And then last but not least, we work within the youth-

20 development world.  And so, we work with camps, youth sports

21 organizations, mentoring organizations, and just about all --

22 not all, but close to all -- of the major youth-serving

23 organizations and this would be the same category that we

24 would put Boy Scouts of America in.

25           MR. ANDOLINA:  Your Honor, at this point, I'd like

1  to have Mr. Lundberg certified by the Court as an expert in

2  youth protection and the prevention of child sexual abuse.  I

3  don't believe there are any objections to that, but I'd like

4  to tender him at this point.

5             THE COURT:  Any objections?

6             MR. RIZZO:  No objection, Your Honor.

7             THE COURT:  He will be accepted as an expert in

8  that field.

9             MR. ANDOLINA:  Thank you, Your Honor.

10            I would also like to offer, before we get on to

11 the direct questioning, Mr. Lundberg's declaration, in full,

12 and I believe there were no objections to that, as well.

13            MR. RIZZO:  No objection, Your Honor.

14            THE COURT:  Okay.  Thank you.

15            It's admitted.

16       (Lundberg Declaration received in evidence)

17            MR. ANDOLINA:  Thank you, Your Honor.

18 BY MR. ANDOLINA:

19 Q    Mr. Lundberg, when were you retained by the BSA?

20 A    November of 2021.

21 Q    And what did the BSA retain you to do?

22 A    The BSA retained us to do an evaluation of their Youth

23 Protection Program.

24 Q    Can you walk the Court through your evaluation process.

25            MR. ANDOLINA:  And I'd like Mr. Beall to put on

1   the screen, DDX-106 to aid you in that testimony.

2            THE WITNESS:  Sure.  So, when we work with any

3   large youth-serving organization, what we always recommend

4   that we start out doing, and so we did this the same as we

5   would with any organization that we work with, with the BSA,

6   is to take a look at their systems at a headquarters level

7   that have been used to communicate their policies and their

8   procedures and so on and so forth.

9            So, what we did was we did a review of four main

10  areas within their organization.  We looked at the screening

11  protocols of how adults, whether it's a volunteer or an

12  employee, are screened within -- to -- into the organization,

13  prior to having access to youth.  We looked at how employees

14  and volunteers were trained to identify abuse and prevent

15  abuse and respond.  We evaluated their policies and

16  procedures in two different areas; one, their policies and

17  procedures regarding appropriate and inappropriate boundaries

18  between adults and youths, and then next, the procedures that

19  they had in place to manage high-risk activities that had

20  been associated with abuse.  And then, lastly, we looked at

21  their responding procedures.

22  BY MR. ANDOLINA:

23  Q    So, as you began your valuation across those four

24  levels, what steps did you take to learn about the BSA's

25  Youth Protection Program?

1  A     We took multiple sources, and so we like to, as much as

2  possible, use various data points and we try to triangulate,

3  so at least we have three data points that confirm any of our

4  conclusions or considerations.

5      And so, we did a series of interviews with BSA

6  employees and volunteers, and that ranged from upper-level

7  leadership, including Roger Mosby, the CEO, as well as the

8  national board of directors.  We met with Boy Scout

9  leadership who are involved directly in implementing BSA's

10  Abuse Prevention Program.

11      And then we met with, we went a step down and met with

12  council leadership.  So, we went to the local councils and

13  met with a couple of the executives there to learn about how

14  the BSA protocols, nationally, are implemented within their

15  local councils.

16      Next, we participated in a number of meetings with the

17  Survivors Working Group and BSA, as well as met with them.

18  And the intent was to listen to their insights, their

19  opinions, and where they felt like things could be evaluated

20  and improved upon.

21      And then, lastly, we looked at written materials, so

22  policies and procedures.  We looked at their training

23  curricula.  We looked at samples of their incidence reports,

24  and any third-party publications that have been written that

25  are public to anybody in regards to the BSA operations.

1  Q     I want to take you back to your reference to the BSA

2  employees that actually administer, on the national level,

3  the Youth Protection Program.  Can you describe your

4  interviews with those folks and who they were and why you

5  were talking to them.

6  A     Sure.  And so, when we meet with leadership, we talk to

7  them about two things and try to identify two things.  First

8  is their role in the abuse-prevention efforts within their

9  organization and, secondly, their commitment.

10       And so, what we know from working with thousands of

11 clients is, you can have all the right pieces in place, but

12 if you don't have leadership's commitment, they don't go very

13 far.  And so, we wanted to get a good sense from them both,

14 about the specifics of their program, as well as how involved

15 they are in that program.

16       And then we met with the, essentially, the team at BSA

17 who were responsible for not just developing a lot of the

18 programming that they had put into place over the years, but

19 as well as implementing it and providing resources to the

20 local councils so they can implement it.

21 Q     And did you make any observations, with respect to the

22 team regarding their sort of training and commitment?

23 A     So, we found both, through our individual interviews

24 and also through our various meetings with them, that they

25 all knew the youth -- their Youth Protection Program, even at

1  the highest levels, to a very specific degree.

2        And then, they were all very committed to this effort

3  and all had a good understanding that while they have done a

4  lot of important work over the years, that good is never good

5  enough, and that they were committed to always taking a

6  critical view of their procedures in the hopes to always be

7  able improve those.

8  Q     You mentioned your meetings with the BSA and the

9  Survivors Working Group.

10        Did you also meet directly with the Survivor Working

11  Group outside the presence of any BSA volunteers, employees,

12  and representatives?

13  A     We did.  We had the opportunity to meet with some

14  representatives from the Survivors Working Group that, as you

15  mentioned, there were no BSA representatives in that, and

16  able to do two things; one, able to learn from them directly

17  where they felt like improvements could be made or we could

18  focused our evaluation and they did both.  And then,

19  secondly, it gave them an opportunity to ask questions of us

20  and learn more about our organization and why do we have the

21  expertise to be doing this work.  And so, we were able to

22  talk to them about our work and our experience and answer any

23  questions that they had.

24  Q     You mentioned some of the written materials that you

25  reviewed, in addition to, I believe you referenced, incident

1  reports, codes of conduct.

2        Did you also review the BSA's Barriers to Abuse?

3  A    We did.

4  Q    Let me direct you to DDX-107.

5        Can you describe for the Court, Mr. Lundberg, what

6  BSA's Barriers to Abuse is.

7  A    Sure.  And so, BSA's Barriers to Abuse is their

8  umbrella program where most, but not all, of their abuse-

9  prevention efforts lie.  And so their Barriers to Abuse works

10 to essentially frame their abuse-prevention efforts.

11 Q    And there are sort of two aspects to the Barriers to

12 Abuse in terms of requirements on entry and then ongoing

13 requirements, and perhaps you could describe that for the

14 Court.

15 A    Yeah, sure.  And I think maybe a little context would

16 help in terms of how these two aspects are very significant

17 in abuse prevention.  But, essentially, when an offender --

18 in order for an offender to be successful within an

19 organization, they have to have access within that

20 organization, they must have privacy, and they must have

21 control.

22        And so, that is not BSA's paradigm; that is

23 Praesidium's, based on our research and evaluation and how we

24 help.  And so, what you see here is BSA's efforts to limit

25 all three of those.  And so, for example, they have certain

1  requirements that must be done, prior to an adult, an

2  employee or volunteer, ever having access to youth.  And so,

3  they have to pass, like, criminal background checks, they

4  have to pass the volunteer screening database check, they

5  have to be fully trained before they have access to youth.

6       And then they have to learn about what policies and

7  procedures are in place if they choose to engage and

8  volunteer or continue to be employed.

9       And so, what you see on the left-hand side is all of

10 those different items.  And as you heard me reference, they

11 all are directly related to ensuring that we're employing

12 safe people and that we are doing a good job of controlling

13 for any kind of privacy and ensuring that people who come

14 into an organization see that commitment.

15      And then once an employee or volunteer are in the

16 organization, BSA has put in place a number of items to help

17 reduce the privacy between adults and minors.  And so, first,

18 a significant step is banning one-on-one adult and youth

19 interactions.  And so, that is a very clear way of them doing

20 their best to preserve any kind of -- or get rid of any kind

21 of privacy.  They have employed a buddy system with Scouts so

22 that they're not alone.  And then they require any suspected

23 abuse or anything that is just inappropriate, not even to the

24 level of abuse, but that gets reported.

25      And then they have also taken steps to ensure that they

1  have very transparent programs and heavily encourage parent

2  involvement, so they have as many eyes and ears on their work

3  as possible.

4  Q    So, following your review of various documentation and

5  your interviews with BSA personnel and local council

6  personnel and meeting with the Survivor Working Group, did

7  you come to any conclusions with respect to your evaluation

8  of the BSA's Youth Protection Program?

9  A    We did.

10 Q    And maybe first on a high level, could you share with

11 the Court what your conclusions were.

12 A    So, through the methodology that I discussed, what we

13 did was we took BSA's policies and procedures program,

14 compared it to our best-practice standards, as well as

15 industry best-practice standards.  And after we incorporated

16 all of that information and did that analysis, what we found

17 was that BSA has taken great care and put a lot of work into

18 ensuring that they're developing and continuing to improve

19 upon a comprehensive safety program.

20      So, we found their program to be very comprehensive and

21 each of their four areas that we had mentioned before, they

22 either meet or exceed industry standards, compared to their

23 peers.

24 Q    And let me refer you to DDX-108, which references the

25 four categories that you described to the Court before.

1      Did you make any evaluations with respect to any of

2 these categories that stand out to you, Mr. Lundberg?

3 A     Yeah.  I mean, when we evaluated these areas, what we

4 found was that the standards that they put in place, for

5 example, screening, is they ensured that any individual,

6 prior to having access, go through a background check and a

7 vetting process, per se.  And what is significant with Boy

8 Scouts of America is they centralized that, so that's not up

9 to all of the local council entities; they have centralized a

10 component of that to ensure that that is being done and it is

11 being done in a certain way.

12      They have put together training programs for volunteers

13 and staff that I note that they have solicited outside

14 expertise on, to help ensure that everyone is able to

15 identify warning signs and suspected abuse and to understand

16 what their policies are at BSA.  And they have put out

17 information for both, parents and youth, in terms of what

18 parents can know about keeping their youths safe and what

19 youths can do to protect themselves.

20      We found that they had some important policies in

21 regards to managing high-risk activities, so not just one-on-

22 one, like I identified earlier, but also things like

23 transportation, bathrooms, and hygiene.  And then they have

24 policies in regards to boundaries between adults and youths.

25      And then last, but not least, they have a centralized

1   reporting procedure, which is really important for an

2   organization their size to do everything they can to minimize

3   barriers from an interaction that happens as a camp-out, that

4   that gets all the way to national so they can help respond,

5   to the extent.

6   Q    In connection with your evaluation, Mr. Lundberg, did

7   you also identify for the BSA, considerations on how to

8   improve their Youth Protection Program?

9   A    We did.

10  Q    And can you briefly describe those for the Court.

11  A    Yes.  And I think you can break our recommendations up

12  into two categories.  The first is we made some

13  considerations for BSA as they move forward to further

14  enhance their protocols in the areas and some others that you

15  see on the screen, as well as a number of follow-up items,

16  that we identified, that it would be worth for BSA to further

17  explore and to see if things that are happening within the

18  field can be enhanced in regards to abuse prevention.

19  Q    Were both, your findings and your considerations,

20  provided to the BSA in your December 5th, 2021 report?

21  A    Yes, they were.

22  Q    After providing that report to the BSA on

23  December 5th, 2021, what did Praesidium do, if anything, in

24  continuing to work with the BSA?

25  A    After we delivered our report, we had numerous

1  meetings.  I believe it was seven meetings with various BSA

2  leadership, as well as meetings that included BSA leadership

3  and the Survivors Working Group.

4  Q    And did you review Mr. Mydle's (phonetic) testimony

5  with respect to those meetings, Mr. Lundberg?

6  A    I did.

7  Q    And did you participate in the meeting that Mr. Mydle

8  talked about, I believe it was on December 14th, with the

9  Survivors Working Group and the Boy Scouts National Executive

10 Committee?

11 A    I did.

12 Q    And did you have any reactions with respect to that

13 meeting?

14 A    Yes.  And so, that meeting was a very, very powerful

15 meeting, I think to everybody involved.  And so, just for

16 context, the meeting involved members of the Survivors

17 Working Group, as well as BSA leadership, including some

18 board members, who were participating.  And it was both,

19 emotional, in the sense that we heard from survivors tell

20 about what had happened to them, and then also emotional,

21 because many of the board members, or the board members on

22 the call, were able to really listen and reflect what they

23 were saying.  It just provided a very poignant example of

24 essentially why we are doing this work.

25 Q    In addition to working with the Survivor Working Group,

1  did you also work to synthesize some of the youth protection

2  proposals that were provided to the BSA by the TCC?

3  A    Yes, so the other purpose for the meetings was to

4  review the various recommendations that had been made in

5  regards to BSA's Youth Protection Program.  So, we made our

6  recommendations.  The SWG made their recommendations.  And

7  the TCC made their recommendations.

8       And so, what BSA was working to do was to look at all

9  the different recommendations that had been made, plus,

10 obviously, what they are already doing, and taking a very

11 detailed approach to then, consolidate all of those and then

12 operationalize those into a follow-up plan.

13 Q    And what was Praesidium's role in connection with that

14 synthesis of recommendations from you, from the Survivors

15 Working Group, and from the TCC?

16 A    Our role, I think, was twofold; one, it was certainly

17 to continue to listen to survivors and listen to their

18 thoughts on what could be done to improve the safety

19 protocols, but also the contexts and the expertise that we

20 bring is, we have vast knowledge in regards to not just best-

21 practice standards for preventing abuse, and so to ensure

22 that these systems that were being made essentially met the

23 standards for really helping to ensure protection.

24      But also, we know to a very detailed degree what other

25 youth-serving organizations and how they tackle very similar

1 problems.  And so, not only the industry aspect -- the

2 industry standards aspect of it is, ensure they are matching

3 that, but also providing any consultation that we can that

4 can reflect what's been working in other areas.

5 Q    And following the engagement with the TCC and the

6 Survivors Working Group and Praesidium, did you have an

7 understanding that the various constituencies ultimately came

8 to an agreement with respect to the BSA's youth protection

9 enhancements?

10 A    I do.

11 Q    And that agreement was embodied as Exhibit L to the

12 plan?

13 A    Yes.

14 Q    Can you talk for a little bit, and I'll refer the Court

15 to a demonstrative that we have previously seen, DDX-7, with

16 respect to some of the highlights of the enhancing the

17 protection plan and, of course, additional aspects of the

18 enhanced plan that you consider to be important.

19 A    Sure.  So, the plan includes a lot of really important

20 next steps for BSA on continuing to improve their youth-

21 protection protocols.  And when you look at everything in the

22 plan, you can break it up essentially into a number of

23 different arenas.

24      And so, first and foremost, what we know, and what I

25 referenced in the beginning is, leaderships involvement is

1  essential and in order for an organization, any organization
2  to really make great strides, you really need two things.

3       So, one is a youth-protection executive.  And so, a
4  youth-protection executive is essentially so they can
5  coordinate and be that expert within the BSA and help be very
6  strategic in that approach.  And then the second important
7  piece to it is that there is a multidisciplinary committee
8  that represents different stakeholders so that they can have
9  various thoughts, opinions, and really good discussion about
10  what should be done.

11       And so, the Enhanced Youth Protection Plan both, calls
12  for the hiring of a youth-protection executive.  The BSA is
13  committed for the Youth-Protection Committee, which will
14  include survivors to be part of the vetting process of that
15  youth-protection executive.

16       And then, next, they will developing a Youth-Protection
17  Committee that includes the BSA team, that would include
18  leadership from local councils, chartered organizations, and
19  then survivors.  And so, this committee is going to be really
20  important as BSA moves forward with their strategic plan to
21  help to ensure that they are on the right path.

22       And so, the next area that I think is important to
23  highlight is they're going to make some (audio
24  interference) --

25            THE COURT:  Mr. Lundberg, I can't hear you

1  anymore.

2          Is it just me?

3      (No verbal response)

4          THE COURT:  I can't hear.

5      (Pause)

6          THE COURT:  Mr. Andolina, can you hear me?

7      (No verbal response)

8          THE COURT:  Mr. Andolina, can you hear me?

9          MR. ANDOLINA:  I can hear you now, Your Honor.

10          THE COURT:  Okay.  Now, I can hear you.

11          MR. ANDOLINA:  Okay.

12          THE COURT:  I'm not sure what happened, but it was

13  right after you asked your question that I lost, and Mr.

14  Lundberg started speaking, that I lost you.

15          MR. ANDOLINA:  Okay.

16  BY MR. ANDOLINA:

17  Q    Let's go back, Mr. Lundberg.

18      I believe before the Court's audio cut out, I had asked

19  you to describe, from your perspective, the key aspects of

20  the BSA's Enhanced Youth Protection Plan.  So, would you be

21  able to explain to the Court from your perspective on that

22  issue, I think that would be helpful.

23  A    Sure.  And does that go back to the beginning piece of

24  the youth-protection executive and the Youth-Protection

25  Committee, as well?

1          THE COURT:  I got the committee; I got through --

2          THE WITNESS:  Gotcha.

3          THE COURT:  -- the multidisciplinary committee.

4          THE WITNESS:  Okay.  So, yeah, the next piece is

5   that the enhanced Youth Protection Program includes updating

6   many of their existing policies, as well as their trainings.

7          And so this involves things like ensuring that

8   they have the most up-to-date training curricula.  So they've

9   committed to hiring outside experts to come in and review the

10  training curricula, as well as some of their policies and

11  procedures, and provide guidance in how they can ensure that

12  the training is the latest and greatest, as well as requiring

13  adults to receiving training annually.  And so that's

14  something else that's of significance that they've included.

15         They have agreed to increase the frequency of

16  screening and so they will be screening adults, the

17  background screening every two years, and then looking at

18  some of their policies and procedures regarding the high-risk

19  activities and always looking to improve those areas.

20         The next thing that I think is of significance is

21  the enhanced Youth Protection Plan includes a lot of the

22  follow-up information and really going deeper into the review

23  and using an expert third party in that review.  So that, now

24  that this plan has been put in place, getting into more of

25  the details and reviewing some very specifics of their

1  program to see if there's any enhancements that could be

2  made.

3           And then last, but certainly not least, the plan

4  includes an expansion of both survivor representation and

5  recognition.  And so throughout the plan, but then also in

6  some very specific areas, the enhanced Youth Protection Plan

7  looks to involve survivors and, specifically, with either in

8  the Youth Protection Committee, also on the National

9  Executive Board, including survivors on board of local

10  councils; and then, within those areas, ensuring that they

11  have an equal voice, and they've committed to survivors

12  having an equal voice within different areas.

13           And then the second piece of it is a commitment to

14  essentially acknowledge that this has happened and have

15  remembrance and have respect in various ways to ensure that

16  this issue is on the forefront for BSA moving forward.

17  BY MR. ANDOLINA:

18  Q     Mr. Lundberg, was every suggestion from the survivor

19  working group, the TCC, the BSA, and Praesidium ultimately

20  adopted as part of the enhanced Youth Protection Plan?

21  A     No, it -- no.

22  Q     And what's your reaction to that?

23  A     So the vast majority of the recommendations were

24  included in the plan and I would say almost all of -- if not

25  all of the significant recommendations were incorporated;

1  however, there were some that weren't and, from Praesidium's

2  viewpoint, from my viewpoint, it's entirely appropriate.

3           And so an organization as large as BSA and the

4  fact that it's a federated organization, it has to be very

5  thoughtful and strategic in regards to how they roll out and

6  implement protocols.  And so any organization, when you're

7  dealing with hundreds of thousands of youth and hundreds of

8  thousands of adults who work there, you want to put great

9  care into what's being done because, if we do something the

10 wrong way, it's really hard to undo it and it leaves a bad

11 taste and mistrust, frankly, in the field of those

12 initiatives.

13          And so, with any organization that we're working

14 with and certainly with organizations the size of BSA, we

15 recommend not doing everything at once.  And what we

16 understood from BSA and what's included in the plan is that

17 they haven't taken anything off the table.  They didn't say

18 no to the ones they're not moving forward to right away, they

19 said, yes, we need to consider these, but we need to further

20 evaluate what this means to us and the youth protection

21 efforts.

22 Q    Overall, Mr. Lundberg, what is your opinion of the

23 enhancements provided in the Youth Protection Plan that's

24 included in the BSA's plan of reorganization?

25 A    I think it's a significant step forward.  I think it

1  both provides a lot of concrete to-dos that are going to

2  impact the program and further impact the culture of safety

3  within BSA.  And then, second, I think it's going to act as a

4  really good framework moving forward.  And so when they begin

5  working with the Youth Protection Committee and the Youth

6  Protection executive, I think they're going to have a

7  framework that they can build on and that they can use to

8  continuously evaluate what they do with the goal of, as they

9  have stated, working towards, always working towards being

10 the gold standard for abuse protection.

11 Q    And, in your opinion, what is the import of the fact

12 that the Youth Protection Plan is supported by the Survivor

13 Working Group and the TCC?

14 A    I think it's essential.  And so hearing from survivors

15 and hearing about their insights and their unique experiences

16 only made the Youth Protection Plan that much richer and I

17 think BSA will continue to benefit from their input and

18 insights.

19 Q    Finally, Mr. Lundberg, during the course of your

20 engagement did you form an opinion as to the BSA's

21 leadership's commitment to youth protection?

22 A    I did.

23 Q    And what is that opinion?

24 A    I felt like BSA's leadership was very sincere and

25 sincere in a couple ways:  very sincere in wanting to hear

1 from survivors and understand -- even though very difficult,

2 but understand those experiences that they have been through,

3 and very sincere in their efforts to have one of the best

4 Youth Protection programs there is.  So there wasn't one

5 individual who we spoke to who wasn't self-critical of their

6 program.  So they knew that they had -- they'd been working

7 hard and they put things in place and they're very, very

8 committed, but they also felt like -- they also knew that

9 they always need to be staying on top of this and this is

10 something that they always are going to need to improve on.

11 And so a -- you know, a message of zero tolerance is

12 certainly what they communicated striving for.

13 Q      Thank you, Mr. Lundberg.

14          MR. ANDOLINA:  Your Honor, I have no further

15 questions for Mr. Lundberg.

16          THE COURT:  Thank you.

17          Mr. Rizzo, cross.

18          MR. RIZZO:  Thank you, Your Honor.  Good

19 afternoon, Louis Rizzo for the Travelers Insurance Companies

20 and on behalf of certain insurers.

21                    CROSS-EXAMINATION

22 BY MR. RIZZO:

23 Q      Mr. Lundberg, good afternoon.  I have some questions

24 about what it sounds like from your direct testimony was the

25 process that you were involved in in coming to the opinions

1  you've told us about today.

2          Would you agree that this is a process that has

3  been unfolding in terms of your involvement in it?

4  A    Yes, the process that we've been involved in.  Yes.

5  Q    So that process began with your attention, your

6  evaluation and assessment of the policies, procedures, and

7  the interviews and so forth that you told us about, and that

8  led to the production of your report; correct?

9  A    Correct.

10 Q    And with the report you included some considerations

11 for improvement, I think this attorney used, that were

12 presented to the BSA; right?

13 A    Correct.

14 Q    Once those were in hand, it sounds like the process

15 continued where there were meetings and discussions with

16 various groups and constituencies about their views and their

17 own thoughts about areas or considerations for improvement;

18 fair to say?

19 A    Correct.

20 Q    And now we've heard today about sort of the synthesis

21 of these various views and recommendations, and it sounds

22 like your report -- you support, I should say, that synthesis

23 that's represented in the Youth Protection Program --

24 A    I do.

25 Q    Okay.  And so, with that process having evolved and

1  that program having been developed, has it -- in your view,

2  has it been implemented, is it underway?

3  A    I'm not sure, I'm not aware.

4  Q    Are you aware --

5  A    I know -- yeah, I know that a number of the steps that

6  were in there are -- actually, were already starting to be

7  implemented prior to that.  And so I do know that there were

8  things that were already in work, but since our last meeting

9  I'm not sure what else has been done.

10 Q    It sounds like you had an opportunity to either view or

11 consider the testimony that we heard from Meidl in this case?

12 A    Yeah --

13 Q    And is it --

14        MR. ANDOLINA:  Your Honor?  Your Honor, if I may

15 intervene here?  I'm not sure the insurers have -- I know the

16 insurer has not objected to any aspect of the BSA Youth

17 Protection Plan, they haven't objected to any aspect of his

18 declaration, and so I'm just not sure why we're getting

19 questions from the certain insurers on these issues.

20        THE COURT:  I'm not sure where Mr. Rizzo is going,

21 but I'll let him ask some questions.

22        MR. RIZZO:  I have a few questions, Your Honor,

23 just dealing with implementation and how this -- how this is

24 or is not intentionally tied to plan approval.

25        THE COURT:  And how's it --

1          MR. RIZZO:  And I'll be --

2          THE COURT:  -- related to the insurers' objection?

3          MR. RIZZO:  Well, Your Honor, as you know, we have

4    issues, broad issues with plan approval and one of the things

5    I think everyone is sensitive to here is the notion of youth

6    protection now and going forward, and our questions really

7    are focused on the notion that, whether or not this plan is

8    approved, these procedures that Mr. Lundberg has told us

9    about and has described as best practices can in fact be

10   implemented regardless of plan approval status.

11         MR. ANDOLINA:  Your Honor, I'd object to that

12   entire line.  If he's going to ask Mr. Lundberg to imagine a

13   hypothetical world where we don't have plan approval, we

14   don't have Exhibit L adopted, I just think that's completely,

15   one, beyond the scope of direct, and it's also not relevant

16   to Mr. Lundberg's testimony.

17         THE COURT:  Yeah, I think you should be asking the

18   BSA about this if you're asking anybody about this.

19         MR. RIZZO:  Well, I just -- I would like to hear

20   Mr. Lundberg's views in terms of his -- based on his

21   knowledge of discussions with both BSA management and the

22   other constituencies, if he's aware of any barriers to

23   implementing this plan.  We know we're going to deal

24   separately with plan approval but are there any barriers that

25   he's aware of to implementing this plan now.

1          MR. ANDOLINA:  Same objection, Your Honor.  I

2    think this is completely outside the realm of Mr. Lundberg's

3    testimony, in addition to the fact that many of the triggers

4    of the plan directly deal with the effective date, and if you

5    want to start asking him legal questions about the impact of

6    the bankruptcy, I just think it's totally inappropriate for a

7    youth protection expert.  The insurers can make their legal

8    arguments in closing and through other witnesses.

9          THE COURT:  I don't see how this relates to the

10   objection that the certain insurers filed, so I'm going to

11   sustain the objection.

12          MR. RIZZO:  Very well.  One further question, if I

13   may, Your Honor, that relates to a term --

14   BY MR. RIZZO:

15   Q    -- Mr. Lundberg, that you used, you used the phrase

16   "best practices" in your direct testimony and that's a term

17   of art, is it not?

18   A    I'm sorry, a term of art?

19   Q    Yeah.  The best practices, that phrase has a meaning or

20   import in your field in the sense of --

21          (Pause)

22          THE COURT:  I'm having trouble again.

23          (Pause)

24          THE COURT:  Can you hear me, Mr. Andolina?  No.

25          (Discussion off the record)

1               THE COURT:  Can you hear me now?

2          (Discussion off the record)

3               THE COURT:  We'll take five minutes.  Yeah, we're

4    going to take a recess.

5          (Recess taken at 2:39 p.m.)

6          (Proceedings resumed at 2:44 p.m.)

7               THE COURT:  My apologies.  Everyone can hear now?

8    Okay.

9               MR. ANDOLINA:  Can you hear us now, Your Honor?

10              THE COURT:  Yes.

11              MR. ANDOLINA:  I think when we broke I had

12   sustained my own objection, but we can let --

13         (Laughter)

14              MR. ANDOLINA:  -- we can let Mr. Rizzo ask the

15   question again, if he wants to, the one you didn't hear.

16              THE COURT:  Okay.

17   BY MR. RIZZO:

18   Q    I just wanted to confirm, Mr. Lundberg, our

19   understanding of the term you used, "best practices," when

20   you described the Youth Protection procedures as constituting

21   best practices, by that you mean, that's essentially state-

22   of-the-art procedures that are in place here?

23              MR. ANDOLINA:  Objection, Your Honor.  The

24   insurers have no standing to be questioning on youth

25   protection, they haven't raised any objection to all related

1  youth protection and, again, I think this is an inappropriate

2  line.

3          THE COURT:  Sustained.

4          MR. RIZZO:  It's my final question, Your Honor,

5  and --

6          THE COURT:  It's sustained.

7          MR. RIZZO:  Well, no further questions, Your

8  Honor.

9          THE COURT:  Thank you.

10         Anyone else?

11     (No verbal response)

12         THE COURT:  Any redirect?

13         MR. ANDOLINA:  No, Your Honor.  Thank you very

14  much.

15         THE COURT:  Thank you.

16         Thank you, Mr. Lundberg.  You're excused.

17     (Witness excused)

18         THE COURT:  Mr. Abbott?

19         MR. ABBOTT:  Your Honor, I believe Mr. Kurtz was

20  going to address the Court next regarding the balance of the

21  debtors' case.  It looks like he's having a bit of difficulty

22  himself.  It must be contagious.  Let's give him a moment, if

23  we may?

24         THE COURT:  Okay.

25         MR. KURTZ:  Your Honor, can you hear me?

1          THE COURT:  I can.

2          MR. KURTZ:  Okay.  So it looks like for some

3   reason my video, which is showing as being on, is not

4   showing, but that shouldn't stop me.  Glenn Kurtz on behalf

5   of the debtors.

6          There's just a couple of items that I wanted to

7   raise.  One is that the debtors continue to work with the

8   certain insurers to finalize the exhibits that we can admit

9   and we think that we'd benefit maybe from having a little

10  more time to do that.  And, in that respect, the debtors

11  would intend to rest on Monday morning, first thing,

12  hopefully, with a completely consented-to list of exhibits.

13         If there's anything remaining that we think we

14  need that we can't get agreement on -- and, as of now, I'm

15  not sure I'm seeing that -- then we'll address that with you

16  first thing Monday morning, if that is okay.

17         THE COURT:  Okay, that's fine.

18         MR. KURTZ:  The second issue is we thought that we

19  would -- we just have a little bit of time and I don't want

20  to use up too much time today, but we thought we would have a

21  very short, maybe 15-minute-or-less direct of Brian Whittman,

22  and that would alleviate the need for Your Honor to read

23  briefs and rule on argument because we think we can supply

24  the appropriate foundation for Your Honor to take the

25  evidence that is otherwise subject to dispute here and get

1  rid of it, without having to go through a lot more reading

2  and a lot more argument for Your Honor.

3           MR. CALDIE:  Your Honor, may the Guam Committee be

4  heard on this issue?

5           THE COURT:  Yes.

6           MR. CALDIE:  Thank you, Your Honor.  The Guam

7  Committee objects to the debtors' request to offer Mr.

8  Whittman as a witness for the third time.

9           Prior to this trial, the debtors' position was

10 that the witnesses could be offered by declaration with

11 limited live testimony.  This was done for purposes of

12 efficiency and convenience, according to the debtors, and the

13 debtors' request was granted and incorporated into Your

14 Honor's pretrial order.  That order requires permission of

15 Your Honor or consent of all parties to call a witness more

16 than once.  The Guam Committee does not consent to Mr.

17 Whittman's being called for a third time.

18          Mr. Whittman was called first ten days ago, last

19 Tuesday, March 15th, to testify to, quote, "all subjects

20 other than feasibility."  That's quoting from the pretrial

21 order.  Various objecting parties, including the Guam

22 Committee, chose to rest on their objections to Mr.

23 Whittman's declaration at that time, did not cross-examine

24 Mr. Whittman.

25          The debtor did not reserve its right to recall Mr.

1   Whittman at a later date for anything other than feasibility.

2   The debtor did not take that opportunity to proffer anything,

3   the debtor did not take that opportunity to directly examine

4   Mr. Whittman on the issues for which he was set to testify on

5   March 15th to establish foundation.  In fact, quite to the

6   contrary, the debtors made a point on March 15th on the

7   record to clarify that other parties would have no further

8   opportunity to cross-examine Mr. Whittman on anything but

9   feasibility.

10          Debtors' counsel said something to the effect of,

11  with respect to future testimony, that concerns feasibility;

12  if he's testifying regarding anything else, those questions

13  should come in now.  And the Judge indicated -- the Court

14  indicated at that time that it agreed.  The debtors later

15  called Mr. Whittman on Friday, March 18th, one week ago, to

16  testify on feasibility.  The debtors took their examination,

17  other parties had their opportunity as well, and then Mr.

18  Whittman was excused.

19          Your Honor, it is the Guam Committee's belief that

20  after the debtors' failure to get their case in through Mr.

21  Whittman on March 15th, they devised a strategy to get that

22  desired testimony in through other witnesses.  And at that

23  point, despite representations to this Court that they were

24  attempting to resolve objections to Mr. Whittman's

25  declaration, we, the Guam Committee, heard absolutely nothing

1  from the debtors about resolving our objections, nothing, for

2  ten days.  For ten days, as the debtors' case in chief

3  continued to be presented, nothing was done to resolve

4  foundational issues relating to conclusory and commonsense

5  statements in Mr. Whittman's declaration, and nothing was

6  attempted in terms of resolving our client's objections.

7         So the Guam Committee was surprised when it saw

8  the debtors file something seeking to clarify the record not

9  on our objections, Your Honor, but on the Ad Hoc Catholic

10 Group's objections to Mr. Whittman and our joinder to those

11 objections.  And the debtors' filing on those narrow issues,

12 of course, forced the Guam Committee to respond on the

13 record, which we did.  Nothing was said in the debtors'

14 filing, by the way, nothing at all about bringing an excused

15 witness back to testify to establish foundation on the

16 witness stand for a third time.

17        And now, literally in the final moments of their

18 case in chief and hamstrung by their failure to elicit

19 testimony they hoped to get in through Mr. Whittman

20 originally -- they can't get it through other witnesses now -

21 - the debtors now seek to get Mr. Whittman back on the stand

22 yet again, for a third time, after Mr. Whittman, as an

23 excused witness, has had the freedom and ability to observe

24 the debtors' case in chief unfold, partake in the benefit of

25 protected, strategic discussions with advisers, other

1  parties, and after Mr. Whittman had the freedom and benefit

2  of reading ancillary materials, hearing the comments of

3  others, and all of the things that excused witnesses do.

4          It was only after all of that and after a quiet

5  ten-day delay, engineered and controlled exclusively by the

6  debtors, and after making it clear that no one else could

7  cross-examine Mr. Whittman on anything other than feasibility

8  after March 15th, it's only after all of that that now we

9  hear just this morning from the debtors that they want to try

10 to resolve the issues in his declaration through live

11 testimony.  The Guam Committee's answer is no.  There is no

12 reason for Mr. Whittman to re-testify; everybody has had

13 their due.

14         The Guam Committee requests Your Honor deny any

15 request to allow Mr. Whittman to re-testify.  The debtors

16 should not get two or, in this case, three bites at the same

17 apple.  The debtors should not be allowed to spring its

18 request that Mr. Whittman re-testify on the parties the

19 morning of.  It would be impossible to discern with any

20 reliable certainty whether Mr. Whittman's proposed testimony

21 was compromised by information he's learned since being

22 excused and it should not be put on the Guam Committee to

23 have to do that.

24         The debtors should live with the consequences of

25 their decision, their choice to delay resolution of

1  objections to Mr. Whittman.  They were content with legal

2  argument about it and that's what they should be allowed.

3  Any other outcome would be manifestly unfair to the Guam

4  Committee and it would raise new questions rather than

5  resolve old ones with respect to the evidentiary record.

6          So the Guam Committee stands on its objections to

7  Mr. Whittman's declaration and we respectfully ask for a

8  ruling on our objections, and we further respectfully ask

9  this Court to deny the debtors' request to bring Mr. Whittman

10 back to the virtual witness stand for a third time.

11         Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. KURTZ:  Your Honor, may I briefly respond to

14 this?

15         In the first place, Mr. Whittman had two roles,

16 one was as an expert and that was with respect to

17 feasibility; that has nothing to do with any of this.  We're

18 dealing with his testimony as a fact witness.

19         We stated on the first day when Mr. Whittman was

20 offered -- or the second day, I suppose, when Mr. Whittman

21 was offered that we would address any foundational problems

22 with the testimony through direct, if that's what we needed

23 to do.  Ultimately, there were some objections made, as is

24 noted by the Roman Catholics, not by the Guam Committee, and

25 we've resolved those.

1       So the reason that we didn't address this for a

2   period of time was that the party that actually raised the

3   objection has withdrawn them and, therefore, this testimony

4   was admissible.  Nonetheless, the Guam Committee, which never

5   raised a timely objection, only joined, never described a

6   basis for an objection, just joined, there was nothing left

7   to join to.

8       We've tried to get this in through the direct

9   declaration.  We have foundational -- or foundational

10  objections that we think we can address through live

11  testimony.  It is important testimony for third party

12  releases.

13      I feel like I should note that the Guam -- as

14  maybe the Guam cases are maybe 77 zero out of about 82,000.

15  So they're standing up and trying to prevent the development

16  of a record that affects 82,000-plus claims that are not

17  their claims.  This subject could have been covered on day

18  one and they would have had to object on day one or cross-

19  examine on day one, and they're, therefore, in the same

20  position they ever were in.  They could have cross-examined

21  ten days, they could cross-examine today.  There's no

22  prejudice.  It's simply a matter of putting Mr. Whittman back

23  on the stand to confirm his foundation for offering the

24  testimony that's in the declarations.

25      If Your Honor had ruled that the testimony in the

1  declarations was inadmissible on the basis of foundation, we

2  would have had an opportunity to fix it then.  Your Honor has

3  not admitted the testimony yet, we're supplying the

4  foundation and, if Your Honor was to rule that it was in

5  admissible for foundational reasons, we'd have an opportunity

6  to fix it then.  That's sort of the way it works with

7  declarations and directs.  The witness was there, he was

8  ready.  It was only because the objectors were the Roman

9  Catholics and because we were working with and ultimately

10  reached a resolution with the Roman Catholics that this

11  didn't get all resolved on day one.

12          We're re-raising it to supplement the record,

13  there's nothing wrong with supplementing the record.  As

14  estate fiduciaries, we have an obligation to bring the proper

15  record, and I don't think that 70-odd claims from Guam should

16  prevent that from happening.  They have an ability to cross,

17  they have their objection; we ask that Mr. Whittman be

18  allowed to proceed.

19          THE COURT:  Ms. --

20          MR. CALDIE:  Your Honor, may I?

21          THE COURT:  -- Ms. Wolff.

22          MR. CALDIE:  Please.

23          MS. LUJAN WOLFF:  Hi, Your Honor.  Just to respond

24  to Mr. Kurtz.  Lujan claimants did join in the Catholic

25  Committee's objections.  And so, although the Catholic

1  Committee did settle, our joint -- we did not withdraw our

2  objections.  And so, Your Honor, those objections haven't

3  disappeared with the Catholic Committee's settlement, and so

4  I just wanted to raise that.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. CALDIE:  Your Honor, may I?  Edwin Caldie for

8  the Guam Committee.

9              THE COURT:  Yes.

10             MR. CALDIE:  Thank you, Your Honor.

11             We just heard argument from the debtors that they

12  stated on the second day that they'd address foundational

13  questions through direct.  They had an opportunity to do that

14  and did not.  And it makes -- it's antithetical to what they

15  said that day when they told everyone you need to either

16  cross now or forever hold your piece, we took them at their

17  word.  And while a fiduciary may have an obligation to

18  provide fulsome information, they also have an obligation to

19  protect the record and to provide information in a proper

20  manner and to proceed in a trial like this in a proper

21  manner.

22             There is -- I need to correct something

23  foundationally incorrect.  We have a written objection, filed

24  timely, on the docket.  So it is just factually inaccurate to

25  assert that we all did was join.  We had our own objections,

1  we objected to almost every single paragraph that the

2  Catholic Ad Hoc Group did, but I don't need to belabor that.

3  That's just obviously an oversight by the debtors.  We did

4  file a timely objection.

5          The last I checked, Your Honor, the number of

6  creditors, especially when it's multiples, objecting to a

7  plan, if you only have a few, you're still entitled to due

8  process.  If you have an objection to a plan, you're entitled

9  to a full-throated, full objection to that plan.  And to

10  suggest that the voices of 77 or 78 people who were sexually

11  assaulted as children should be set aside and silenced for

12  the greater good, from the debtors' perspective, is offensive

13  for reasons that I won't even elaborate on.

14          A cross-examination of this witness would be

15  materially different today, very seriously different, because

16  this person was excused.  We have a pretrial order that

17  addresses this issue directly.  The Guam Committee does not

18  consent to this witness being called again.  The debtor had a

19  chance to resolve these foundational issues for ten days;

20  instead, they let their case in chief conclude before they

21  decided to do it.  They also had an opportunity to resolve

22  our objections, which were timely filed and separate and

23  distinct from those raised by the Catholic Ad Hoc Committee;

24  they didn't do that either.  This is by design.

25          The Guam Committee strenuously opposes Mr.

1  Whittman taking the stand for a third time.  Thank you.

2          MR. KURTZ:  Just one quick point.  One is we're

3  not asking for consent, we're asking for the Court's

4  discretion to allow the permission.  We understand we don't

5  have consent.

6          Two is the foundational cure would occur only

7  after Your Honor ruled.  Your Honor still has not ruled on

8  those issues, so they're completely ripe.

9          And, three, the debtors haven't suggested that any

10  claimants' voices not be heard.  What we have stated is that

11  maybe 70 voices shouldn't override the greater good of 82,000

12  other voices.  So there's a lot of claimants here and they

13  all have to be accommodated, not just the Guan plaintiffs.

14          THE COURT:  Okay.  Well, I'll be honest with you,

15  I have a recollection of this dispute, but I don't have a

16  recollection of the particulars of this dispute.  And I'm

17  going to go back and read the transcript and take a look at

18  the objections that were made.  I do recall that I was

19  surprised that there was no cross at the time and surprised,

20  probably, that there was no direct at the time.  So -- but

21  those to me seemed to probably be strategic decisions.

22          So I'm going to take a look at that and I will let

23  you know once I've taken a look at it whether I will permit

24  Mr. Whittman to testify again.

25          MR. KURTZ:  Your Honor, we'll have him available

1 | Monday.

2 |        MR. CALDIE:  Thank you, Your Honor.

3 |        THE COURT:  Okay.

4 |        MR. KURTZ:  I think that brings us, I think, to

5 | the end of our day.  It certainly, I think, brings us to the

6 | end of the debtors' case and the case of the plan supporters,

7 | subject only to some housekeeping relating to exhibits and

8 | then Your Honor's ruling with respect to Mr. Whittman.

9 |        So I can't issue the magic words that the debtors

10 | rest yet, subject to rebuttal, but I can say that I think

11 | we're done for today.

12 |        THE COURT:  Okay.  Thank you very much.  Then we

13 | are adjourned -- I don't have my calendar in front of me --

14 | until Monday morning at 10 o'clock.

15 |        MR. KURTZ:  Thank you, Your Honor.

16 |        THE COURT:  Thank you.

17 |     (Proceedings concluded at 3:02 p.m.)

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                           CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 24, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    March 24, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                           March 24, 2022

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25