## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br><u>Hearing Date</u>: TBD<br><u>Objection Deadline</u>: April 14, 2022, at 4:00 p.m. (ET) |

## DEBTORS' MOTION
## FOR ENTRY OF AN ORDER, PURSUANT TO
## SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE,
## AUTHORIZING THE DEBTORS TO (I) SELL CERTAIN REAL
## PROPERTY LOCATED IN CHARLOTTE, NORTH CAROLINA AND
## (II) ENTER INTO A NEW NON-RESIDENTIAL REAL PROPERTY LEASE

Boy Scouts of America (the "<u>BSA</u>") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "<u>Debtors</u>"), submit this motion (this "<u>Motion</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Order</u>"): (a) approving and authorizing the BSA's sale (the "<u>Sale</u>") of certain real property located at 2109 & 2121 Westinghouse Boulevard, Charlotte, North Carolina 28273 (the "<u>Warehouse and Distribution Center</u>") to Edgewater Industrial, LLC (the "<u>Purchaser</u>"), for a purchase price of $13,500,000, free and clear of any interests in such property, on the terms and conditions set forth in the purchase and sale agreement dated as of December 23, 2021 (the "<u>Sale Agreement</u>"), the Reinstatement of and First

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Amendment to Purchase and Sale Agreement dated as of January, 25, 2022 (the "First Amendment"), the Second Amendment to Purchase and Sale Agreement dated as of January 28, 2022 (the "Second Amendment"), and the Third Amendment to Purchase and Sale Agreement dated as of March 14, 2022 (the "Third Amendment"), a true and correct copy of each is attached to the Proposed Order as Exhibits 1, 2, 3, and 4 respectively; (b) authorizing the Debtors to enter into a new non-residential lease for the Warehouse and Distribution Center, on the terms and conditions substantially similar to those set forth in Exhibit F to the Sale Agreement (the "Seller Lease"); and (c) granting related relief.  In support of this Motion, the Debtors submit the declaration of Brian Whittman, a Managing Director with Alvarez & Marsal North America, LLC (the "Whittman Declaration"), which is attached hereto as **Exhibit B**.  In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      The Debtors commenced these cases on February 18, 2020, and they continue to operate their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

2.      On March 5, 2020, the United States Trustee for the District of Delaware appointed an official committee of tort claimants (the "Tort Claimants' Committee") and an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code.

3.      On April 24, 2020, the Court appointed James L. Patton, Jr. (the "Future Claimants' Representative") as the representative of future abuse claimants pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code.

4.      On September 30, 2021, in advance of solicitation, the Debtors filed the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] (the "Disclosure Statement").  On February 15, 2022, the Debtors filed the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (as such may be amended, modified, or supplemented from time to time, the "Plan").  A hearing to consider confirmation of the Plan began on March 14, 2022 and remains ongoing.

5.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and other bases for the relief requested in this Motion are sections 105 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rules 2002-1, 6004-1 and 9013-1.

## BACKGROUND

**A.**    **The Warehouse and Distribution Center and the BSA Settlement Trust Contribution**

7.    The Warehouse and Distribution Center is a nearly 12 acre parcel of land together with two buildings, a 149,882 square foot industrial building (the "Industrial Building") and a 2,970 square foot retail building (the "Retail Building," and, together with the Industrial Building, the "Buildings").  Historically, the Warehouse and Distribution Center served as the BSA's main hub for receiving and shipping all supplies, merchandise, and apparel for Scout Shops, online customers, wholesale distributors, and to Local Councils.  Whittman Decl. ¶3.

8.    The Warehouse and Distribution Center had an estimated value of $11,000,000 as of May 2021, which is consistent with an estimated value between $10,900,000 and $11,700,000 made in in November 2020, based on third-party broker opinions of value which are further supported by negotiations with potential purchasers, all of which contemplate a leaseback to BSA at current market rates.  *Id*. ¶3.  Following the dedicated marketing and sale process described below, the Debtors entered into an agreement, subject to Court approval, to sell the Warehouse and Distribution Center for a purchase price of $13,500,000 (the "Purchase Price") and leaseback the property subject to the terms of the Sale Agreement and Seller Lease.  *Id*. ¶4.  The Seller Lease contemplates that the BSA will leaseback the property for a term of 24 months at an annual base rent of $687,834.00 for the first year, and $709,233.24 for the second year.  *Id*. ¶4.  The leaseback of the property is contemplated in the Debtors' Financial Projections as shown in Exhibit E to the Disclosure Statement.  Pursuant to the Plan, the Debtors will receive the proceeds of the Sale, which are estimated to be approximately $13,408,000 net of charges, negotiated repairs and prorated taxes.  *Id*. ¶4.  No commissions will be paid in conjunction with the Sale.  *Id*. ¶4.

9.    The Debtors' Plan provides that the BSA Settlement Trust Contribution will include, among other things, "(i) if the Warehouse and Distribution Center is not sold prior to the

Effective Date, all of the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value, which is valued at approximately $11,600,000 or (ii) if the Warehouse and Distribution Center is sold prior to the Effective Date, the BSA Cash Sharing Amount, if any." *See* Plan, Art. I.A.45d. The "BSA Cash Sharing Amount" depends on the net unrestricted cash and investments at the time of sale and is defined as "(a) if the Warehouse and Distribution Center has been sold prior to the Effective Date and (b) if the amount of Unrestricted Cash and investments to be retained by Reorganized BSA after the calculation of Net Unrestricted Cash and Investments is greater than $39,000,000 if the Effective Date occurs before May 1, 2022 or $28,000,000 if the Effective Date occurs before June 1, 2022 or $19,000,000 if the Effective Date occurs after June 1, 2022, an amount equal to 50% of the difference between the amount of Unrestricted Cash and Investments to be retained by Reorganized BSA and the foregoing thresholds, capped at $7,000,000. *See* Plan, Art. I.A.42.

**B.    The Marketing Process**

10.    In October 2020, the Debtors enlisted the services of several real estate brokers in the Charlotte marketplace to provide a broker opinion of the value of the sale of the Warehouse/Distribution Center and adjacent Retail Store location subject to a leaseback requirement. Whittman Decl. ¶5. In connection with its services to the Debtors, CBRE and Foundry Commercial each prepared broker opinions of value for the Warehouse and Distribution Center as of November, 2020 and May, 2021, respectively (each a "Broker Opinion" and together the "Broker Opinions"). A true and correct copy of each Broker Opinion is attached to the Whittman Declaration. Based on its analysis of the market, Foundry Commercial recommended an "as is" target price for a ten-year sale leaseback transaction of $11,000,000 for the property and CBRE recommended a range centered around $11,350,000. Whittman Decl. ¶5.

11.     During the pendency of these cases, the Debtors fielded numerous calls regarding interest in the property and inquiries regarding a potential sale of the Warehouse and Distribution Center. *Id*. ¶6. Ultimately, the Debtors received two initial, qualified offers for the Warehouse and Distribution Center in the amounts of $11,550,000 and $12,000,000. *Id.* ¶6. Upon considering the Broker Opinions and the two qualified offers they received for the Warehouse and Distribution Center, the Debtors and the two potential purchasers engaged in arm's-length and good-faith negotiations including multiple rounds of increases to the offers and ultimately a request for a best and final offer that resulted in final offers of $12,935,000 and $13,500,000. *Id.* ¶6. The Debtors and the Purchaser ultimately agreed on the highest and best purchase price of $13,500,000. *Id.* ¶6.

12.     Following entry into the Sale Agreement with the Purchaser, the BSA and the Purchaser began a diligence period which was twice extended and has now closed. *Id.* ¶7. At the completion of the diligence period the BSA and Purchaser agreed to the Third Amendment which included a $70,955.00 purchase price credit provided for the benefit of the Purchaser as an accommodation for certain conditions discovered during the due diligence period including necessary roof repairs. *Id.* ¶7. The estimated Sale proceeds of approximately $13,408,000 are net of this purchase price credit. *Id.* ¶7.

## C.     The Sale Agreement

13.     Consistent with the requirements of Local Rule 6004-1, the material terms of the Sale Agreement as it relates to the Warehouse and Distribution Center are set forth in the following table. All capitalized terms used but not otherwise defined in the following table have the meaning ascribed to such terms in the Sale Agreement.

| Summary of Material Terms of Sale Agreement | |
|---|---|
| **Purchase Price (Section 2)** | $13,500,000.<br><br>Subject to a $70,955.00 purchase price credit for the benefit of the Purchaser agreed to as part of the Third Amendment. |
| **Legal Description of Assets (Section 1)** | The address of the property is 2109 & 2121 Westinghouse Boulevard, Charlotte, North Carolina 28273.  It is described as: (a) that certain lot, tract or parcel of real estate more particularly described in Exhibit A of the Sale Agreement, together with all plants, shrubs and trees located thereon, and together with all rights, ways and easements appurtenant thereto, including, without limitation, all of Seller's right, title and interest in and to the land underlying and the air space overlying any public or private ways or streets crossing or abutting said real estate; and (b) All buildings, structures and other improvements of any and every nature located on the Land and all apparatus, and fixtures attached or affixed, actually or constructively, to the Land or to any such buildings, structures or other improvements. |
| **Termination (Sections 12(c))** | If any of the conditions precedent provided in paragraph 12(a) and/or 12(b) have not been satisfied or waived in writing as of the Closing Date, then the party benefited by such failed condition(s) precedent may, at its option, by written notice delivered to the other party no later than the Closing Date, terminate this Agreement in writing, whereupon Buyer and Seller shall have no further obligations, one to the other, with respect to the subject matter of this Agreement, except for obligations expressly surviving termination. In the event this Agreement is terminated as a result of the failure of any condition set forth in paragraph 12(a) and Buyer is not in default hereunder, Escrow Agent shall return the Earnest Money to Buyer. |
| **Sale to Insider**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(A)* | The transaction contemplated by the Sale Agreement does not include any sales to Insiders as that term is defined in Bankruptcy Code section 101(31). |
| **Agreements with Management**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(B)* | No agreements with management are contemplated under the Sale Agreement. |
| **Releases (Section 5(a))**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(C)* | The Purchaser shall indemnify and hold BSA harmless from and against any and all claims for injury to person or damage to property to the extent directly resulting from the activities of Purchaser, its representatives and agents on the Property, excluding, however, claims arising out of (i) any loss, liability, cost or expense to the |

| | |
|---|---|
| | extent arising from or relating to the acts or omissions of Seller or Seller's representatives or agents, (ii) any latent defects in the Property discovered by Purchaser, or (iii) the discovery of, or the accidental or inadvertent spread or release of, any Hazardous Materials resulting from Purchaser's investigations (unless the Hazardous Materials are brought onto the Property by Purchaser, its representatives or consultants). |
| **Private Sale/No Competitive Bidding**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(D)* | The Debtors do not contemplate conducting an auction for the sale of the Assets.  The Assets were marketed by the Debtors and their representative resulting in a competitive bidding process with multiple potential purchasers and a Purchase Price that exceeded Broker Opinions. |
| **Closing and Other Deadlines (Section 4)**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(E)* | The Closing shall take place through the offices of the Title Company or Escrow Agent, no later than 5:00 p.m. (ET) on the business day that is the date that is the later of (a) on or before the date that is seven (7) days after the end of the Due Diligence Period, or (b) the date that is seven (7) days after Seller has obtained and provided a copy to Buyer of a final, non-appealable order from the bankruptcy court with jurisdiction over Seller's pending Chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") bearing case number 20-10343 (LSS) (the "Bankruptcy Case") approving the sale of the Property to Buyer pursuant to this Agreement and Buyer's lease of the Property to Seller pursuant to the Seller Lease (as hereinafter defined in Paragraph 11(b)) (the "Court Order"); provided, however, unless waived by both Buyer and Seller, in no event shall the Closing Date be later than, the earlier of (i) the date that is sixty (60) days after the end of the Due Diligence Period, (ii) the effective date of the plan of reorganization of Seller confirmed by the Bankruptcy Court, provided that (A) the sale of the Property by Seller to Buyer pursuant to this Agreement, and (B) the lease of the Property by Seller from Buyer pursuant to the Seller Lease are not in violation of the Bankruptcy Plan, or (iii) the expiration of the time period for any party to appeal the Court Order. |
| **Good Faith Deposit (Sections 3(a))**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(F)* | On or before the date that is three (3) business days after the Effective Date (as defined in the Sale Agreement), Buyer shall deliver to the Escrow Agent the sum of $50,000 (which sum, together with all interest actually earned thereon during the term of the Purchase Agreement, is the "Initial Earnest Money"). If Buyer does not terminate this Agreement pursuant to Paragraph 5(a) hereof, then, within three (3) business days following the Due Diligence Expiration Date (as defined below), Buyer shall deliver to Escrow Agent an additional sum of $150,000 (which sum, together with all interest actually earned thereon during the term of this Agreement, is herein called the "**Additional Earnest Money**"). |
| **Interim Arrangements with Proposed Buyer** | The Debtors are not entering into any interim agreements or arrangements with the Purchaser. |

| *Del. Bank. L.R. 6004-1(b)(iv)(G)* | |
|---|---|
| **Use of Proceeds**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(H)* | The Sale Agreement does not place any restrictions on the Debtors' use of the proceeds obtained from the Sale. |
| **Tax Exemption**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(I)* | The Sale Agreement and this Motion do not seek to have the Sale Transaction declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(J)* | Local Bankruptcy Rule 6004-1(b)(iv)(J) does not apply because the Sale Agreement does not consist of a sale of substantially all of the Debtors' assets. |
| **Sale of Avoidance Actions**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(K)* | The Debtors do not propose to sell any avoidance actions or otherwise limit their rights to pursue avoidance claims under chapter 5 of the Bankruptcy Code under the Sale Agreement or this Motion. |
| **Requested Findings as to Successor Liability (Section 12)**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(L)* | A condition precedent to the closing of the Sale Agreement is that the Court shall have entered an order approving the sale of the Property to Purchaser pursuant to the Sale Agreement and Purchaser's lease of the Property to BSA pursuant to the Seller Lease. |
| **Sale Free and Clear of Unexpired Leases**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(M)* | There are no unexpired leases. |
| **Credit Bid**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(N)* | The purchase price does not include a credit bid. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>*Del. Bank. L.R. 6004-1(b)(iv)(O)* | The Proposed Order contains a waiver of the stay under Bankruptcy Rule 6004(h). |

**D.**    **The Seller Lease**

14.    Upon consummation of the Sale, BSA intends to lease the Warehouse and Distribution Center back from Purchaser.  Accordingly, the Seller Lease is a necessary and integral part of the Sale.  Whittman Decl. ¶8.  The initial term of the Seller Lease will be for a period of 24 months commencing on the closing date of the Sale.  Upon expiration of the initial term, subject to the terms and condition contained in the Seller Lease, BSA will have the option to renew the lease for two additional four-year periods.  Seller Lease at ¶ 2.D.(1).  The salient terms of the New Lease are as follows.

| PERIOD | ANNUAL BASE RENT RATE PER SQUARE FOOT | ANNUAL BASE RENT | MONTHLY INSTALLMENTS OF BASE RENT |
|---|---|---|---|
| Year 1 | $4.50 | $687,834.00 | $57,319.50 |
| Year 2 | $4.64 | $709,233.24 | $59,102.77 |

## RELIEF REQUESTED

15.    By this Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014, the Debtors request entry of the Proposed Order: (a) approving and authorizing the Sale of the Warehouse and Distribution Center to the Purchaser, free and clear of any interests in such property, on the terms and conditions set forth in the Sale Agreement; (b) authorizing the Debtors to enter into the Seller Lease; and (c) granting related relief.

16.    The Debtors request that the Court approve the Sale free and clear of any and all liens, claims, encumbrances, mortgages, and other interests, excluding any liabilities expressly assumed by the Purchaser or the Purchaser's affiliates under the Sale Agreement, with any such

interests attaching only to the proceeds of the Sale with the same validity, force and effect which they now have against the Warehouse and Distribution Center.

## BASIS FOR RELIEF

**A.      The Sale Should Be Approved as a Proper Exercise of the BSA's Sound Business Judgment.**

17.      The Sale, the terms of which are set forth in the Sale Agreement, satisfies section 363(b) of the Bankruptcy Code with respect to sales outside of the ordinary course of a debtor's business.  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

18.      Under section 363(b), courts in this jurisdiction require only that the debtor "show that a sound business purpose justifies" the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring a "good business reason" for use under section 363(b) of the Bankruptcy Code); *see In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 145–57 (3d Cir. 1986) (implicitly adopting the "articulated business justification" and good-faith tests of *Lionel,* 722 F.2d at 1070); *see also Del & Hudson Ry.*, 124 B.R. at 176 (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*,

416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

19.    When applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence.") (quoting *Smith v. v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re First Wellington Canyon Assocs.*, No. 89-593 (CPK), 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) (stating that "the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

20.    Here, substantial business justifications support the Sale of the Warehouse and Distribution Center to the Purchaser on the terms set forth in the Sale Agreement. The Warehouse and Distribution Center represents a critical contribution to the Debtors' operating liquidity. Whittman Decl. ¶9. However, the Warehouse and Distribution Center also provide necessary ongoing value to the Debtors' current operations which cannot be readily replaced. *Id*. ¶9. Accordingly, the Plan provides that if the Warehouse and Distribution Center is contributed directly to the BSA Settlement Trust, it would be subject to the mandatory Leaseback Requirement. This would require the Settlement Trust to oversee and manage the property as landlord or sell the property subject to the Leaseback rights which could cause the trust to incur additional costs and/or achieve a lower value for the property. The Sale contemplated by this motion allows the BSA to maintain current operations through the Seller Lease, and enhances the ability of the Debtors to meet their financial needs through the end of these cases. This benefits all creditors and stakeholders.

21.     The purchase price under the Sale Agreement is fair and reasonable.  As described above, the purchase price of $13,500,000 was the result of an arm's length negotiation between two competing qualified bidders.  Whittman Decl. ¶6.  The final purchase price also exceeds by $2,150,000 and $2,500,000 the $11,000,000 and $11,350,000 estimates provided in the Broker Opinions.  *Id.* ¶5.  Moreover, the Sale Agreement, which is the culmination of more than a year of diligent work by the Debtors, was negotiated in good faith and at arm's length.  *Id.* ¶10.

22.     Approval of the Sale of the Warehouse and Distribution Center as a private sale is appropriate under the circumstances, and the Debtors do not believe a public auction is necessary to maximize value.  Bankruptcy Rule 6004(f)(1) provides that "sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f).  In addition to obtaining the Broker Opinions, which indicated an estimated market value of the property in the range of $11,000,000 to 11,350,000, the Debtors engaged in communications and negotiations regarding the sale of the Warehouse and Distribution Center over a period of more than one year. The Debtors received two qualified offers for the Warehouse and Distribution Center and, after engaging in arm's-length, good-faith negotiations with the highest bidder, agreed on a purchase price of $13,500,000.  Whittman Decl. ¶6.  The Debtors believe that further marketing efforts for public sale are unlikely to result in higher or otherwise better offers for the Warehouse and Distribution Center.  *Id.* ¶8.  In addition, as part of the agreement attached to the *Eleventh Mediators Report* [D.I. 8772] (the "TCC Term Sheet"), the Debtors negotiated and agree with the TCC, the FCR, the Coalition, the Ad Hoc Committee of Local Councils, and the Pfau/Zalkin claimants with respect to the Debtors' proposed Sale to provide liquidity to the BSA during the bankruptcy process, subject to the BSA Cash Sharing Amount.  Whittman Decl. ¶9.  The sale of

the Warehouse and Distribution Center is a critical part of the Debtors having sufficient liquidity to reach the end of the chapter 11 process.

23.    The Sale Agreement is the product of good-faith, arm's-length negotiations between the Debtors and the Purchaser.  Although the Bankruptcy Code does not define the term "good faith purchaser," the Third Circuit, interpreting section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases 'in good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d 143, 47.  To constitute a lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  Due to the absence of a bright-line test for good faith, the determination is based on the facts and circumstances of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (Bankr. E.D.N.Y. 1986) (quoting *Rock Indus. Mach. Corp.*, 572 F.2d at 1198).

24.    The Purchaser is not affiliated with, or an insider of, the Debtors or any related entity.  Whittman Decl. ¶10.  Accordingly, the Debtors request that the Court find that the Purchaser is a good-faith purchaser under section 363(m) of the Bankruptcy Code and that the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code.

25.    In light of the foregoing, the Debtors respectfully submit that selling the Warehouse and Distribution Center to the Purchaser on the terms set forth in the Sale Agreement is supported by Debtors' sound business judgment and is in the best interests of the Debtors' estates and creditors.

**B.      The Sale Should Be Approved Free and Clear of Liens, Claims, and Encumbrances.**

26.      Pursuant to the Sale Agreement, the closing of the Sale is contingent upon the Debtors' conveying title to the Warehouse and Distribution Center free and clear of any and all liens, assessments, easements, security interests, and other encumbrances excluding permitted exceptions.  Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if  "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f).

27.      The Debtors seek this Court's approval to sell the Warehouse and Distribution Center to the Purchaser free and clear of all liens, assessments, easements, security interests, and other encumbrances.  The Debtors are unaware of any claims that are secured by the Warehouse and Distribution Center.  Whittman Decl. ¶3.  Accordingly, the sale of the Warehouse and Distribution Center free and clear will not prejudice any of the Debtors' creditors.  Furthermore, should the Debtors become aware of a lien or other secured interest on or in the Warehouse and Distribution Center, the Debtors believe that the purchase price will exceed the value of any such liens or interests, thereby satisfying the conditions for a sale free and clear under section 363(f)(3). Upon closing of the Sale, existing liens, claims and encumbrances, if any, will attach to the net proceeds of the sale in the order of their priority, with the same validity, force and effect which they now have against the Warehouse and Distribution Center.  Accordingly, the Debtors submit

that the Warehouse and Distribution Center may be sold free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

### C.    The Seller Lease Should Be Approved.

28.    Although the Debtors believe that entry into the Seller Lease is likely an ordinary course transaction, as it is contemplated as part of the Sale, the Debtors, out of an abundance of caution, request authority to enter into the Seller Lease as necessary component of the Sale. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon sound business judgment.  *See, e.g., In re Martin* (*Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. at 153 ("In determining whether to authorize the use, sale or lease of property under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business purpose" test of *In re Lionel Corp.* and requiring good faith); *In re Del. and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business purpose" test in the *Abbotts Dairies* decision).

29.    The decision to enter into the Seller Lease falls well within the Debtors' sound business judgment.  While the Sale will allow the Debtors to generate much needed liquidity for its continued operations, the Debtors will have a continued need to use the Warehouse and Distribution Center going forward.  Whittman Decl. ¶8.  Relocating BSA's main hub for receiving

and shipping all supplies, merchandise, and apparel when the Warehouse and Distribution Center remains available would be a waste of the Debtors resources and an unnecessary distraction from normal operations.    Additionally, the economic terms contained in the Seller Lease are substantially consistent with prevailing market rates for similar facilities.    The Debtors do not believe a suitable alternative facility could be leased at a lower price and, even if an alternative location could be located, the transition costs would far outweigh any potential savings.  *Id*. ¶8.  Further the structure of the lease – a two year term with the option to extend the lease term for two periods of four years each – provides significant flexibility should the Debtors' needs change in the future.  Whittman Decl. ¶4.

30.    For the reasons stated above and based upon an analysis of the Debtors' ongoing and future business prospects, the Debtors' management believes that BSA's entry into the Seller Lease pursuant to the terms and conditions set forth therein is in the best interests of the Debtors' estates.    Accordingly, the Debtors respectfully submit that their decision to enter into the Seller Lease is well within their sound business judgment and the relief requested herein should be granted.

## WAIVER OF BANKRUPTCY RULE 6004(h)

31.    To successfully implement the Sale, and given the nature of the relief requested herein and the deadlines in the Sale Agreement, the Debtors respectfully request (a) a finding that the notice requirements under Bankruptcy Rule 6004(a) have been met, and (b) a waiver of the 14-day stay under Bankruptcy Rule 6004(h).  The relief requested herein is essential to avoid the potential accrual of unnecessary administrative expenses.  Accordingly, the Debtors submit that, to the extent that Bankruptcy Rule 6004(h) applies, ample cause exists to justify a waiver of the 14-day stay.

## NOTICE

32.      Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Purchaser; (iii) counsel to the Tort Claimants' Committee; (iv) counsel to the Creditors' Committee; (v) counsel to the Future Claimants' Representative; (vi) counsel to the Ad Hoc Committee of Local Councils; (vii) counsel to JPMorgan Chase Bank National Association; (viii) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and such other and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March 31, 2022
        Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/  Tori L. Remington*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Tori L. Remington (No. 6901)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com
        tremington@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION