WHITE & CASE

April 15, 2022

**VIA ECF**

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

whitecase.com

The Honorable Laurie Selber Silverstein
824 N. Market Street, Sixth Floor, Courtroom #2
Wilmington, DE 19801

RE: *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS)

Dear Chief Judge Silverstein:

We write on behalf of the Debtors in the above-referenced proceeding in response to questions raised by this Court on April 14, 2022 relating to certain decisions rendered in *W.R. Grace*.

Specifically we address the applicability of *In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009) ("**W.R. Grace I**"); *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018) ("**W.R. Grace II**"); and *In re W.R. Grace & Co.*, 13 F.4th 279 (3d Cir. 2021) ("**W.R. Grace III**," and together with W.R. Grace I and II, the "**W.R. Grace Decisions**"). The Debtors believe that the W.R. Grace Decisions are instructive on at least two topics relevant to confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (as amended, modified, or supplemented from time to time, the "**Plan**").[1] Namely, the W.R. Grace Decisions provide guidance relevant to (i) this Court's "related to" jurisdiction and (ii) consideration of "derivative liability."

## I.    Related To Jurisdiction

In *W.R. Grace I*, the Third Circuit examined a bankruptcy court's related-to subject matter jurisdiction over litigation between nondebtor third parties, applying the generally accepted standard set forth in *Pacor* – whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[2]    The Third Circuit restated its well-established principle "that an inchoate claim of common law indemnity is not, in and of itself, enough to establish the bankruptcy court's subject matter jurisdiction."[3]    Aware of this rule, the Debtors have not relied upon common law indemnity as the basis for this Court's "related to"

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

[2]    *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

[3]    *In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009) (finding that any effect on the estate would be indirect and contingent on intervening litigation).

WHITE & CASE

jurisdiction in this case.[4]  Instead, the Debtors articulated several independent bases for "related to" jurisdiction that include (i) a common identity of interest, (ii) shared insurance, (iii) contractual indemnification and (iv) the BSA's reversionary interest in Local Council property.

A.  Common Identity of Interest.

At trial, the Debtors extensively documented the tripartite relationship and the interconnectedness among Local Councils, Chartered Organizations, and the BSA.  This tripartite group, led by the BSA through programming, standards, and methods of operation, shares the same "product" and same mission.  Indeed, it is solely through Local Councils and Chartered Organizations that the BSA is able to deliver the overall mission of Scouting at the local level.  The prepetition history of Scouting-related abuse cases further illustrates their interconnectedness.  Hundreds of prepetition suits name a Local Council and/or Chartered Organization as a co-defendant alongside the BSA, and the Debtors' prepetition practice was to defend such cases jointly with the goal of settling the claims subject to receipt of a release of all members of the tripartite group.

The close affiliation and devotion to a shared, single charitable mission establish an identity of interest.  In contrast, in *W.R. Grace I*, the debtor shared no common identity of interest with the defendant, the state of Montana.  As the Third Circuit observed, Montana "is ***not even*** a private entity, let alone ***an entity in the business, as Grace was, of producing asbestos products***. Instead, Montana's potential liability is based on an independent legal duty that Montana's Supreme Court has decided that the State, as sovereign, owes to its people, namely, a governmental duty to warn about hazards at Grace's site."[5]

B.  Shared Insurance.

Similarly, there was no shared insurance at issue in *W.R. Grace I*.  Here, the Debtors have shown that the Debtors, Related Non-Debtor Entities, Local Councils, and Chartered Organizations are insureds under many of the BSA Insurance Policies and certain Local Council Insurance Policies, and they share in the rights to the proceeds of such policies.  In the event that an abuse survivor asserts a claim against a co-insured non-Debtor, the amount of proceeds available to the Debtors' creditors, including abuse survivors, will be depleted.  This is the case even if the insurance is a "per-occurrence" policy, as claims based on the same occurrence against multiple covered parties are still subject to a limit that would be reduced each time amounts are paid. Such dollar-for-dollar reduction of the Debtors' assets, missing from *W.R. Grace I,* is exactly the type of action that could

---

[4]    As the Debtors asserted in their pleadings and during oral argument, the Debtors also believe the Court has "arising in" and "arising under" jurisdiction.

[5]    591 F.3d at 173 (emphasis added).

The Honorable Laurie Selber Silverstein, p. 3
April 15, 2022

adversely affect a debtor's reorganization and is sufficient to establish an identity of interest and, therefore, "related to" subject-matter jurisdiction.[6]

### C. Contractual Indemnification.

A third, and independently viable, basis for "related to" jurisdiction, is the Local Council and Chartered Organization claims for contractual indemnity against the BSA. These claims are evidenced by, among other things, the filed proofs of claim in these cases, which assert a right of indemnification, reimbursement, and/or contribution against the Debtors for Abuse Claims related to Scouting, including contractual rights of indemnity.[7]  These claims rely on, among other theories, indemnification agreements entered into with the BSA or the claimants status as covered parties under the BSA Insurance Policies. Numerous insurers have also filed proofs of claims citing, among other rights, recoupment, set-off, contribution, and contractual indemnification obligations.[8]  Certain of the non-Debtor Protected Parties or Limited Protected Parties and Opt-Out Chartered Organizations could also argue that their contracts with the Debtors and/or insurance policies to which they are also a beneficiary require the Debtors to advance litigation costs related to defending against Abuse Claims in a non-bankruptcy forum, consistent with historic practice.  Accordingly, any Abuse Claims related to Scouting asserted against these non-Debtor protected parties could cause them to seek to collect from the Debtors or their property, thus having a conceivable effect on the Debtors' estates.  Indeed, TCJC specifically alleges "contractual arrangements whereby the BSA has agreed to indemnify the Church for losses and include the Church as an additional, shared, and/or co-insured party under certain insurance."[9]

These contractual claims for indemnification, reimbursement, and/or contribution are distinguishable from the common law claims at issue in *W.R Grace I*.  In that instance, there was no contractual relationship between Montana and the debtor and what was alleged was, at best, a common law theory of indemnity that claims could ultimately carry through to the debtor.[10]  Here, the non-Debtor protected parties have certain ongoing contractual relationships with the Debtors and have alleged a right to "automatic" indemnification under multiple theories including certain

---

[6]    *See, e.g., SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*, 388 B.R. 579, 584 (Bankr. D. Del. 2008) ("Depletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate."); *see also MacArthur Co. et al. v. Johns-Manville Corp. et al.*, 837 F.2d 89, 92-93 (2d Cir. 1988) (noting that where "third parties [sought] to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct …[.] plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets."); *In re Quigley Co. Inc.*, 676 F.3d 45, 47 (2d Cir. 2012) ("[W]here litigation of the suits against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").

[7]    *See, e.g*., Proofs of Claim Nos. 710, 1248, 1789, 2631, 3209, 6090, 6156, 6363, 6523, 6940, 7277, 7366, 8191, 8324, 8414, 8714, 9147, and 9916.

[8]    *See, e.g*., Proofs of Claim Nos. 982, 989, 4321, 8174, 8176, 8191, and 9379.

[9]    *See.* Proof of Claim No. 12530.

[10]    591 F.3d at 174.

The Honorable Laurie Selber Silverstein, p. 4
April 15, 2022

contractual arrangements.  Courts have held that a contractual, automatic right to indemnification from the debtor can provide the basis for "related to" jurisdiction, unlike the mere "potential" for a disputed claim for common law indemnification at issue in *W.R Grace I*.[11]  *Finally*, unlike *W.R. Grace I*, the Debtors here have a well-established historic practice of funding joint defense efforts on behalf of the non-Debtor protected parties.  This historic practice, in connection with the ongoing contractual relationships, and outstanding claims for contractual indemnification establish that continued litigation against any of the protected parties would likely impact the Debtors' estates.

      D.   Reversionary Interest in Local Council Property (Including Indemnification).

Additionally, as more fully addressed in the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114], the BSA's bylaws and Rules and Regulations, as well as the form of bylaws for Local Councils, grant the BSA a reversionary interest in Local Council's property under certain circumstances.[12]  Chartered Organizations have also asserted that Local Councils are contractually obligated to indemnify them and their representatives for liability associated with Abuse Claims. As introduced at the confirmation hearing, Local Councils annual charters include indemnification provisions for the benefit of Chartered Organizations. Such a contractual indemnity claim results in "automatic" liability for the Local Council upon the assertion of any Abuse Claim against a Chartered Organization.  In addition, certain of the Local Council Insurance Policies provide coverage for Chartered Organizations as additional insureds.  Accordingly, any Abuse Claim against a Local Council that would act to deplete the assets of the Local Council or any Abuse Claim against a Chartered Organization that would result in indemnification by a Local Council, and/or Local Council Insurance Policies, would directly implicate the Debtors reversionary interest and trigger an automatic diminishment of the BSA's interest in Local Council property.  In either case, an Abuse Claim against either a Local Council or Chartered Organization would directly implicate the BSA's reversionary interest, which is property of the Debtors' estates.

In contrast to *W.R. Grace I*, the Debtors here have articulated several distinct bases for "related to" jurisdiction, none of which relies solely on a common law theory of indemnification.  Accordingly, the Debtors believe *W.R. Grace I* is distinguishable from the facts at hand and this Court has the necessary "related to" jurisdiction to confirm the Plan including the Scouting-related release and channeling injunction.

---

[11]    *Compare In re W.R. Grace* 412 B.R. 657, 669 (D. Del. 2009) (automatic right to contractual indemnification is sufficient for related to jurisdiction) *with W.R Grace* 591 F.3d at 172 ("a potential indemnification under common law is not enough to established a bankruptcy court's subject matter jurisdiction").

[12]    *See* JTX-234, BSA Bylaws Art. VI § 1, Cl. 2; JTX-291, BSA Rules and Regulations, Art. III Council or Unit Assets Upon Dissolution at 9; JTX-147, Form of Local Council Bylaws, Art. X, Cl. 3; JTX-358, Form of Annual Unit Charter Agreement 2020 ("The Local Council agrees to: . . . [i]ndemnify the Chartered Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America.").

WHITE & CASE

## II.    Derivative Liability

The Third Circuit's decisions in *W.R. Grace II* and *W.R. Grace III* are distinguishable from this case on grounds that they were interpreting statutory requirements of section 524(g) of the Bankruptcy Code, which is distinct from this Court's analysis regarding whether to approve the Scouting-related release and channeling injunction under sections 105(a), 1123, and 1129.[13] Resolution of *W.R. Grace II* and *W.R. Grace III* turned on the statutory requirements in section 524(g)(4)(A)(ii) of the Bankruptcy Code[14]—the controlling legal standard for third-party channeling injunctions in asbestos cases.[15]  In *Combustion Engineering*, the Third Circuit stressed that section 524(g) provides standards for a channeling injunction that apply only in an asbestos case.[16]

Here, although the Bankruptcy Code and developed case law do not specify the types of parties that are entitled to the protection of a channeling injunction in a mass tort case not involving asbestos, the Debtors were mindful that the Court's jurisdiction is not infinite.  The facts underlying the Scouting-related Abuse Claims against the Local Councils' and Chartered Organizations' satisfy the standards set forth in *Continental* and *Master Mortgage* and the

---

[13]    11 U.S.C. § 524(g); *see also W.R. Grace II*, 900 F.3d 126, 130 (discussing Congress' intent to create section 524(g) as a basis to address the "unique problems and complexities associated with asbestos liability," which involves issuing a channeling injunction that bars asbestos-related actions against "third parties who are alleged to be directly or indirectly liable for the debtor's conduct along with claims or demands against it").

[14]    "[A third-party-claims channeling] injunction may bar any action directed against a third party who is identifiable from the terms of such injunction ... and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

   (I)      the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

   (II)     the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

   (III)    the third party's provision of insurance to the debtor or a related party; or

   (IV)     the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party.

11 U.S.C. §524(g)(4)(A)(ii).

[15]    *W.R. Grace III*, 13 F.4th at 283-84.

[16]    *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 237 n.50 (3rd Cir. 2004) ("The Plan proponents cite to several cases where § 105(a) injunctions in favor of non-debtors were approved, including [*Dow Corning*, *Drexel*, and *A.H. Robbins*] . . . .  But these cases are readily distinguishable, given that none involved either asbestos or § 524(g). Whatever may be the limits of § 105(a) in other contexts, we hold only that § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g), which is the means Congress prescribed for channeling the asbestos liability of a non-debtor.").

The Honorable Laurie Selber Silverstein, p. 6
April 15, 2022

channeling injunction was specifically tailored to take into account the Third Circuit's guidance. "The proper inquiry," according to the Third Circuit, "is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it. . . .[T]his approach does not require the reviewing court to decide state-law claims on the merits. It does, however, require it to ascertain what liability under the relevant law demands."[17] A claim against a third party is not precluded from being derivative simply because it is based on the third party's own misconduct.[18]  The mere fact that "a third party is alleged to have engaged in some wrongdoing is not enough to render a claim against it *independent if its liability depends on the debtor's liability*."[19]

The main theories of liability against Local Councils and Chartered Organizations are (i) negligence and (ii) respondeat superior.  A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.[20]  A respondeat superior theory of liability applies to a "person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other, regardless of whether joint and several liability or several liability is the governing rule for independent tortfeasors who cause an indivisible injury."[21]

The negligence claims that underlie the Scouting-related Abuse Claims asserted against the Protected Parties, Limited Protected Parties and Opt-Out Chartered Organization are not, and in fact can never be, "wholly separate from the debtor's liability."[22]  Similar to the plaintiffs' claims against the insurer in *W.R. Grace II* and *III*, the liabilities of these parties in this case "depend[] on the debtor's liability."[23]  Such claims are based upon the Scouting system that the BSA designed and specifically chartered the Local Councils and Chartered Organizations to implement, in accordance with BSA's Rules and Regulations, at a local level.  The BSA has a protocol that Local Councils and Chartered Organizations follow with respect to handling volunteers.  Importantly, a part of that protocol involves the BSA maintaining an ineligible volunteer file.  These plaintiffs also rely on the BSA-created youth protection standards and Scouting programming, which are key to the plaintiffs' various negligence theories of liability.  Indeed, it is these policies and procedures that will guide factfinders to determine whether there was negligence.  The abuse

---

[17]  *W.R. Grace III*, 13 F.4th at 286.

[18]  *Id*.

[19]  *Id* (emphasis added).

[20]  Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (2010).

[21]  Restatement (Third) of Torts: Apportionment Liab. § 13 (2000).

[22]  900 F.3d at 137.

[23]  *Id* at 136.

WHITE & CASE

The Honorable Laurie Selber Silverstein, p. 7
April 15, 2022

survivors cannot make a case under these negligence theories of liability without directly implicating the Debtors' asserted wrongdoing. Nor could the Local Councils or Chartered Organizations properly respond to a case under these negligence theories without implicating the BSA's standards, programing, management and the ineligible volunteer files. Like the programs themselves, the liability in these negligence cases is nested within a system that necessarily implicates the BSA. This reality is reflected in the Debtors historic practice of jointly defending and settling abuse claims on behalf of Local Councils and Chartered Organizations.

To be sure, in *W.R. Grace II,* the court acknowledged "there may be cases in which the involvement of the debtor's product is only incidental (for example, if a piece of building material containing Grace asbestos in a CNA office fell and struck someone). There too the presence of the debtor's asbestos would not render the third-party's liability derivative."[24] The Debtors have drafted the Plan to address this concern by providing, with respect to Mixed Claims, that only those portions arising from Scouting will be channeled and released. Like the piece of building material containing asbestos falling on a passerby, the Plan does not channel Claims, or those portions of a Mixed Claim, unrelated to Scouting. As asserted in briefings and during oral argument, the Debtors also believe that, as to the TCJC, the integration of Scouting into the TCJC that was demonstrated by the record before the Court, together with the inextricably intertwined nature of claims asserted against TCJC and the BSA (and other bases for jurisdiction described above and in other briefing in connection with confirmation), make such claims necessarily Scouting-related. The Debtors believe that the Court has ample evidence to confirm the Plan and grant the releases embodied therein.

Very truly yours,

*/s/ Jessica C. Lauria*

**Jessica C. Lauria**
White & Case LLP

**E** jessica.lauria@whitecase.com

*/s/ Derek C. Abbott*

**Derek C. Abbott**
Morris, Nichols, Arsht & Tunnell LLP

**E** DAbbott@morrisnichols.com

Cc:      All counsel of record (via ECF)

---

[24]   900 F.3d at 137.