**EXHIBIT A**

**TRUST DISTRIBUTION PROCEDURES**

# BOY SCOUTS OF AMERICA

## TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

**A.**    **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims as further set forth herein in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse Claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below).  These Trust Distribution Procedures (the "**TDP**") are adopted pursuant to the Settlement Trust Agreement by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").   These TDP are intended to provide substantially similar treatment for Allowed Abuse Claims, including Future Abuse Claims.   These TDP, inclusive of the various options and elections set forth herein, including the Expedited Distribution Election, the Tort System Alternative and the Independent Review Option, provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these TDP in consultation with the Claims Administrators, Future Claimants' Representative, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of the Settlement Trust Assets.

**B.**    **General Principles**.  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these TDP are founded on the following principles:

      1.      objective Claim eligibility criteria;

      2.      clear and reliable proof requirements;

      3.      administrative transparency;

      4.      a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

      5.      prevention and detection of any fraud; and

      6.      independence of the Settlement Trust and Settlement Trustee.

**C.**    **Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation

to pay, Allowed Abuse Claims. The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these TDP. The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights and other causes of action. The amount of any installment payments, initial payments, or payment percentages established under these TDP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Abuse Claim has against the Debtors and/or Protected Parties, as assumed by the Settlement Trust.

      **D.**    **Sole and Exclusive Method**. These TDP and any procedures designated in these TDP, including the Individual Review Option, shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim that is subject to the Channeling Injunction with respect to the Protected Parties.

      **E.**    **Interpretation**. The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

      **F.**    **Confidentiality**. All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions. The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction. Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials (i) reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement, or to pursue any other claims transferred or assigned to the Settlement Trust by the holder of the Abuse Claim or operation of the Plan and (ii) subject to the consent of a Direct Abuse Claimant or with redactions or other mechanism to preserve the confidentiality of a Direct Abuse Claimant, where the submission contains non-privileged information that is relevant to the Allowed Amount of another Direct Abuse Claimant's Claim. Nothing in these TDP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents or other information to any Abuse Claimants or their respective counsel, except as provided for in the Document Appendix.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

      **A.**    **Incorporation of Plan Definitions**. Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these TDP by reference. To the extent that a term is defined in these TDP and the Plan and/or the Settlement Trust Agreement, the definition contained in these TDP controls.

**B.**    **Definitions**. The following terms have the respective meanings set forth below:

1.    **"Abuse Claim"** shall have the meaning ascribed to it in the Plan, which definition includes Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.    **"Abuse Claimants"** shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.    **"Base Matrix Value"** shall mean the base case value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C) to be used to value Abuse Claims and that may be identified in connection with the description of the Scaling Factors in Article VIII.C.

4.    **"Claims Matrix"** shall mean (as specifically defined and described in Article VIII.B) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier.

5.    **"CPI-U"** shall mean the Consumer Price Index For All Urban Consumers: All Items Less Food & Energy, published by the United States Department of Labor, Bureau of Labor Statistics.

6.    **"Direct Abuse Claimant"** or **"Survivor"** shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

7.    **"Indirect Abuse Claimant"** shall mean the holder of an Indirect Abuse Claim.

8.    **"Exigent Health Claim"** shall mean a Direct Abuse Claim for which the Direct Abuse Claimant has provided a declaration under penalty of perjury from a physician who has examined the Direct Abuse Claimant within one hundred and twenty (120) days of the declaration in which the physician states that there is substantial medical doubt that the Direct Abuse Claimant will survive beyond six (6) months from the date of the declaration.

9.    **"FIFO"** shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Settlement Trust.

10.    **"FIFO Processing Queue"** shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claims Submissions.

11.    **"Maximum Matrix Value"** shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.B) that represents the maximum Allowed Claim Amount achievable through the matrix calculation for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.C.

12.    **"Mixed Claim"** shall have the meaning ascribed to it in the Plan.

13.     **"Non-BSA Sourced Assets"** shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Settlement Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Companies.

14.     **"Scaling Factors"** shall mean (as specifically defined and described in Article VIII.C) the factors identified to consider with respect to each Abuse Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Proposed Allowed Claim Amount.

**C.     Interpretation; Application of Definitions and Rules of Construction**. For purposes of these TDP, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these TDP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these TDP may be reasonably interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these TDP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these TDP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (8) "or" is not exclusive; and (9) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

## ARTICLE III
## TDP ADMINISTRATION

**A.     Administration**. Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these TDP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims. The Claims Administrators shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these TDP and provide information necessary for the Settlement Trustee to implement these TDP.

**B.     Powers and Obligations**. The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrators are set forth in the Settlement Trust Agreement. The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination under these TDP.

**C.**     **Consent Procedures**.  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these TDP pursuant to Article XIV.B below, and on such matters as are otherwise required below and in Article 1.6 of the Settlement Trust Agreement.  Such consent shall not be unreasonably withheld.

## ARTICLE IV
## CLAIMANT ELIGIBILITY

**A.**     **Direct Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant, other than holders of Future Abuse Claims must:

(1)     have a Direct Abuse Claim;

(2)     have timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust as provided below; and

(3)     submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims can only be timely submitted as follows:

(i)     a Direct Abuse Claim for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust;

(ii)     a Direct Abuse Claim alleging abuse against a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Local Council as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim would be timely under applicable state law if a state court action were filed against the Local Council on the date on which the Direct Abuse Claim is submitted to the Settlement Trust, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust; or

(iii)     a Direct Abuse Claim alleging abuse against any Protected Party other than a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Protected Party as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim and would be (x) timely under applicable state law if a state court action were filed against the Protected Party on the date on which the Direct Abuse Claim is submitted to the Settlement Trust and (y) meets any applicable deadline that may be set by the Bankruptcy Court in connection with such Protected Party becoming a Protected Party in accordance with the Plan and Confirmation Order, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust.

Any Direct Abuse Claim that is not timely submitted based on the foregoing shall be deemed untimely and Disallowed.

**B.**    **Indirect Abuse Claims**.[1]    To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order (to the extent applicable);

(2)    must have an Indirect Abuse Claim that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof, (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law; and

(3)    must establish to the satisfaction of the Settlement Trustee or, to the extent applicable, by a final determination in an Insurance Action that:

(a)    such Indirect Abuse Claimant has paid in full all or the Claim holder's total share of the liability and/obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these TDP (as to which the holder of the Allowed Indirect Abuse Claim seeks payment);

(b)    the Indirect Abuse Claimant has forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim); and

(c)    the Indirect Abuse Claim is not otherwise subject to a valid defense, including, without limitation, that such Indirect Abuse Claim is barred by a statute of limitations or repose or by other applicable law.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates,

---

[1]    Indirect Abuse Claims may include claims for the payment of defense costs, deductibles or indemnification obligations; provided that the Plan's Discharge Injunction, Channeling Injunction, Insurance Entity Injunction and Plan Documents shall not be deemed to preclude a Non-Settling Insurance Company from exercising its rights of setoff and recoupment (to the extent setoff and recoupment are permitted under applicable law) against the Settlement Trust as to any deductible obligation on account of an Abuse Claim that has been or could have been asserted against any Protected Party but for the Discharge Injunction, Channeling Injunction or the Insurance Entity Injunction; provided that, the Settlement Trust and Protected Parties reserve all rights to dispute the ability for a Non-Settling Insurance Company to exercise such rights pursuant to the applicable Insurance Policy, related deductible agreement, the Plan Documents as amended by this section, and any applicable law.

would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. No Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Abuse Claimant or to the Settlement Trust in respect of such claim for which the Settlement Trust would have liability, and in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim, *provided that* an Indirect Abuse Claimant may assert against the Settlement Trust an Indirect Abuse Claim for the recovery of defense costs solely to the extent permitted under applicable law.

      **C.**    <u>**Future Abuse Claims**</u>.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

      (1)    have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date;

      (2)    as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

      (3)    submit the Future Abuse Claim to the Settlement Trust in accordance with these TDP, (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii), if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.E(iii) below; and

      (4)    have not filed a Chapter 11 POC.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

**ARTICLE V**
<u>**GENERAL TRUST PROCEDURES**</u>

      **A.**    <u>**Document Appendix**</u>.  As more fully described in the Document Appendix, the Settlement Trustee may require other parties to the Document Appendix and third parties to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Document Obligations**").

      **B.**    <u>**Document Access**</u>.  The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged information and documents obtained by the Settlement Trust pursuant to the Document Appendix to facilitate their submissions with respect to their Direct Abuse Claims. Such access shall include IV files (the Volunteer Screening Database), Troop Rosters, and non-privileged information and documents provided to the Settlement Trust by Direct Abuse Claimants that are not confidential and are relevant to the Allowed Amount of other Direct Abuse Claimants' Claims. A court of competent jurisdiction

shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these TDP.

      **C.**    **Assignment of Insurance Rights**. The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code. Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law. Notwithstanding the foregoing, the Settlement Trust, rather than any Protected Party, shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums, deductibles, and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim. Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law.

      **D.**    **Deceased Abuse Survivor**. The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

      **E.**    **Statute of Limitations or Repose**. The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the jurisdiction where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

**ARTICLE VI**
**EXPEDITED DISTRIBUTIONS**

      **A.**    **Minimum Payment Criteria**. A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the "**Expedited Distribution**"): (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order

(the "**Expedited Distribution Election**"); (ii) in connection with the Expedited Distribution Election, the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Chapter 11 POC or Future Abuse Claim; and (iii) the Direct Abuse Claimant (or an executor) has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. Direct Abuse Claimants that make the Expedited Distribution Election will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

      **B.**    **Process and Payment of Expedited Distributions**. Direct Abuse Claimants who have properly made the Expedited Distribution Election and who met the criteria set forth in Article VI.A(ii) and (iii) above, shall be entitled to receive their Expedited Payment upon executing an appropriate release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A**. A Direct Abuse Claimant who does not make the Expedited Distribution Election and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP. The Settlement Trustee shall not seek reimbursement for any Expedited Distribution from any Non-Settling Insurance Company. An Abuse Claim resolved via Expedited Distribution shall not be considered an Insured Abuse Claim (as defined below).

**ARTICLE VII**
**CLAIMS ALLOWANCE PROCESS**

      **A.**    **Trust Claim Submissions**. Each Abuse Claimant that does not make the Expedited Distribution Election may instead elect (1) to pursue recovery from the Settlement Trust pursuant to these TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**") or (2) to pursue the Independent Review Option, as set forth therein. In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and such signature and oath must be of the Abuse Claimant individually (or of an executor); (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by

9

healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee. The questionnaire shall be approved by the STAC and the Future Claims Representative but, at a minimum, will require Direct Abuse Claimants to confirm his/her name, date of birth, home address, dates of abuse, frequency of abuse, and level of abuse. The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "**Trust Claim Submission Date**". No recovery will be provided to an Abuse Claimant that does not timely submit a questionnaire. The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim. To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations. Non-material changes to the claims questionnaire may be made by the Settlement Trustee without the consent of the STAC and the Future Claimants' Representative.

      **B.**   **Claims Evaluation**. The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed. After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Document Obligations, and any follow-up materials or examinations (including, without limitation, any Settlement Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

      **C.**   **Settlement Trustee Review Procedures**. The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Settlement Trustee Interview or any other follow-up, and documents obtained through the Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

          **1.**   **Initial Evaluation Criteria**. The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

              (a)   the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

              (b)   the Direct Abuse Claim was timely submitted to the Settlement Trust under Article IV.A; and

              (c)   the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving all Protected Parties.

If any of these criteria are not met after such notice and opportunity as the Settlement Trustee deems appropriate to permit any defects in the Submitted Abuse Claim to be corrected, then the Submitted Abuse Claim shall be a Disallowed Claim.

2.    **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed (the "**General Criteria**"):

(a)    <u>Alleged Abuse</u>.  The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(b)    <u>Alleged Abuser Identification</u>.  The Abuse Claimant has either (i) identified an alleged abuser (*e.g.*, by the full name or last name) or (ii) provided specific information (*e.g.*, a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop) about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities;

(c)    <u>Connection to Scouting</u>.  The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) (i) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities,  and (ii) that a Protected Party may be negligent or may otherwise bear legal responsibility.

(d)    <u>Date and Age</u>.  The Abuse Claimant has either:  (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts (*e.g.*, the approximate date and/or age at the time of alleged Abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(e)    <u>Location of Abuse</u>.  The Abuse Claimant has identified the venue or location of the alleged Abuse.

3.     **Submitted Abuse Claims That Satisfy the General Criteria**. To the extent that a Submitted Abuse Claim meets the evidentiary standard set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4.     **Submitted Abuse Claims That Do Not Satisfy the General Criteria**. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim – after an opportunity for the Abuse Claimant to discover information from the Settlement Trust as provided in these TDP – does not meet the evidentiary standard set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements. If the Settlement Trustee finds that any of the factors set forth in Article VII.C.2(a)-(c) with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim.

D.     **Disallowed Claims**. If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**"). If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII. Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

E.     **Allowed Abuse Claims**. If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

F.     **Claims Determination**. If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D, and subject to any further adjustment if the Direct Abuse Claimant exercises the Independent Review Option.

**G.    Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**") within thirty (30) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**").  Any Abuse Claimant who fails to submit a Reconsideration Request to the Settlement Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Abuse Claim or the Proposed Allowed Claim Amount. Each Reconsideration Request must be accompanied by payment of $1,000 as an administrative fee for reconsideration. The Settlement Trustee shall have the authority to waive the administrative fee in appropriate cases, based on the circumstances of the Abuse Claimant. The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request. The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request. The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Settlement Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim.  Thereafter, the Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described below in Article XII.

**H.    Claim Determination Deferral**.  For a period of up to twelve (12) months from the Effective Date, and by an election exercised at the time of the Trust Claim Submission, Direct Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling Factor described below in Article VIII.E.(iii) (statute of limitations defense) may elect to defer the determination of their Proposed Allowed Claim Amounts to see if statute of limitations revival

legislation occurs, *provided*, *however*, that this claim determination deferral window shall close for all Direct Abuse Claims twelve (12) months from the Effective Date at which time such Submitted Abuse Claims shall be determined based on then applicable Scaling Factors.

      **I.**      **Prevention and Detection of Fraud**.  The Settlement Trustee shall propose procedures to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis) to the Bankruptcy Court for approval. The Settlement Trustee shall work with the Claims Administrators to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or Claims Administrators to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions, any of which may include Settlement Trustee Interviews.  Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

## ARTICLE VIII
## CLAIMS MATRIX AND SCALING FACTORS

**Claims Matrix and Scaling Factors**.  These TDP establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the **"Claims Matrix"**) that schedules six types of Abuse (the **"Abuse Types"**) and designates for each Abuse Type a Base Matrix Value, and Maximum Matrix Value, and certain scaling factors (the **"Scaling Factors"**) identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims.   The Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Claims Matrix have all been selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim.  The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX.  In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the TDP).

      **A.**      **Claims Matrix**.  The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim

in each tier. The first two columns of the Claims Matrix delineate the six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse. The Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier prior to application of the Scaling Factors described in Article VIII.D (the "**Base Matrix Value**"). The maximum Claims Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after Claims Matrix review and application of the Scaling Factors described in Article VIII.C (the "**Maximum Matrix Value**"). The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee. If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers. Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U. The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |

| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant. Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
|---|---|---|---|
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator. Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation. Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching. Adult Abuse Claims. | $3,500 | $8,500 |

**B.    Scaling Factors**. After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to determine the Proposed Allowed Claim Amount for each Allowed Abuse Claim.    Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust or the Direct Abuse Claimant through the Document Obligations.  These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Matrix Value of the Allowed Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Abuse Claim. *See* Article VIII.F for illustrative example.

**C.    Aggravating Scaling Factors**. The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

(i)    **Nature of Abuse and Circumstances**. To account for particularly severe Abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of Abuse with a single perpetrator with such perpetrator having accessed the victim as an employee or volunteer within BSA-sponsored scouting. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would

not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

a.      Extended duration and/or frequency of the Abuse;

b.      Exploitation of the Abuse Claimant for child pornography;

c.      Coercion or threat or use of force or violence, stalking; and

d.      Multiple perpetrators involved in sexual misconduct.

(ii)    **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario involving a perpetrator as to whom there is no other known allegations of Abuse. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

a.      1.25 if the abuser was accused by at least one (1) other alleged victim of Abuse;

b.      1.5 if the abuser was accused by five (5) or more other alleged victims of Abuse;

c.      2.0 if the abuser was accused by ten (10) or more other alleged victims of Abuse; and

d.      1.25 to 2.0 if there is evidence that the Protected Party knew or should have known (i) the abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that danger, or (ii) of the prior Abuse or the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from that danger.

(iii)   **Impact of the Abuse**. To account for the impact of the alleged Abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged Abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5. This factor is to be evaluated relative to a hypothetical base case scenario of a victim of Abuse who suffered the typical level of Abuse-related distress within the tier to which the Allowed Abuse Claim was assigned. The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor. The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

17

a.  <u>Mental Health Issues</u>:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

b.  <u>Physical Health Issues</u>:  This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

c.  <u>Interpersonal Relationships</u>:  This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.  <u>Vocational Capacity</u>:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.  <u>Academic Capacity</u>:  This includes school behavior problems.

f.  <u>Legal Difficulties</u>:  This includes criminal difficulties, bankruptcy, and fraud.

**D.    Mitigating Scaling Factors**.  The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim.  Each mitigating factor is to be evaluated relative to a hypothetical base case scenario of a timely asserted Abuse Claim with supporting evidence that demonstrates, by a preponderance of the evidence, Abuse by a perpetrator that accessed the victim as an employee, agent or volunteer of a Protected Party, as a registered Scout or as a participant in Scouting within BSA-sponsored Scouting.  If statute of limitations revival legislation occurs in a particular jurisdiction, the Settlement Trustee may modify the applicable Scaling Factor (as described below) relevant thereto on a go-forward basis and determine Proposed Allowed Claim Amounts for Abuse Claims in such jurisdiction thereafter based on such modified Scaling Factor.  Included in the hypothetical base case scenario is that the applicable period under a statute of limitations or repose for timely asserting such Abuse Claim against any potentially responsible party will not have passed.  The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of these factors.  Such factors may include the following:

(i)    **Absence of Protected Party Relationship or Presence of a Responsible Party that Is Not a Protected Party**.

a.    <u>Familial Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also had a familial relationship with the Abuse Claimant. Familial Abuse— even if the perpetrator was an employee, agent or volunteer of a Protected Party, and the Abuse occurred in connection with BSA-related Scouting— should result in a significant reduction of the Proposed Allowed Claim Amount.

b.    <u>Other Non-Scouting Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also maintained a non-familial relationship with the Abuse Claimant through a separate affiliation, such as a school, or a religious organization, even if the perpetrator was an employee, agent or volunteer of a Protected Party, or the Abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control. Factors to consider include how close the relationship was between the perpetrator and the victim outside of their Scouting-related relationship, whether Abuse occurred and the extent of such Abuse outside of their Scouting relationship, and applicable law related to apportionment of liability. In such event, the Settlement Trustee shall determine and apply a mitigating Scaling Factor that accounts for such other relationship and the related Abuse. By way of example, if the Settlement Trustee determines after evaluation of an Allowed Abuse Claim and application of all of the other Scaling Factors that the perpetrator, who was an employee, agent or volunteer of a Protected Party for BSA-related Scouting, also was the primary teacher (at a non-Protected Party entity or institution) of the Abuse Claimant outside of BSA-related Scouting, and if numerous incidents of Abuse occurred outside of Scouting before one incident of BSA-related Scouting Abuse occurred, the Settlement Trustee shall apply a mitigating Scaling Factor as a material reduction of the Proposed Allowed Claim Amount.

c.    <u>Other Responsible Non-Protected Party</u>. The Abuse Claimant may have a cause of action under applicable law for a portion of his or her Direct Abuse Claim against a responsible entity, such as a Chartered Organization, that is not a Protected Party. By way of example, if the Settlement Trustee determines after evaluation of a Submitted Abuse Claim that (i) a Chartered Organization that is not a Protected Party is responsible under applicable law for a portion of the liability and (ii) a Protected Party(ies) are not also liable for the same portion of the liability) (taking into account the relevant jurisdiction's prevailing law on apportionment of damages), the Settlement Trustee shall apply a final Scaling Factor to account for such non-Protected Party's portion of the liability.

(ii) **Other Settlements, Awards, Contributions, or Limitations**. The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system. The Settlement Trustee also should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as agreed and reasonably likely to be received contributions from other, non-Protected Party sources that are related to the Abuse. By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the Abuse occurred. Notwithstanding the foregoing, where an Abuse Claimant has obtained a recovery based on the independent liability of a third party for separate instances of Abuse that occurred without connection to Scouting activities, or on the Non-Scouting portion of a Mixed Claim, no mitigating factor or reduction in value will be applied based on that recovery.

(iii) **Statute of Limitations or Repose**. If the evidence provided by the Abuse Claimant or otherwise obtained by the Settlement Trustee results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system as to all Protected Parties against whom the Direct Abuse Claim was timely submitted (as set forth in Articles IV.A) due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee shall apply an appropriate Scaling Factor based on the ranges set forth in Schedule 1 hereof and giving due consideration to any changes in the applicable law; *provided, however,* the Settlement Trustee will weigh the strength of any relevant evidence submitted by the Abuse Claimant to determine whether the statute of limitations could be tolled or deemed timely under applicable law, and may apply a higher Scaling Factor if such evidence demonstrates to the Settlement Trustee that tolling or a finding of timeliness would be appropriate under applicable state law.

(iv) **Absence of a Putative Defendant.** If the Direct Abuse Claim could be diminished because such claim was not timely submitted against BSA or another Protected Party (as set forth in Articles IV.A) (a **"Missing Party"**), such that in a suit in the tort system, such Direct Abuse Claim would be burdened by an "empty chair" defense due to the absence of a Missing Party(ies), the Settlement Trustee shall apply a mitigating Scaling Factor to account for a Missing Party's absence. By way of example, where a timely submitted Direct Abuse Claim was not timely submitted against BSA (*i.e.*, the Abuse Claimant failed to timely file a Chapter 11 POC) but was only timely submitted against the Local Council and/or another Protected Party (as set forth in Articles IV.A(ii) and (iii)), such absence of the BSA due to BSA's discharge would be the basis for such a substantial reduction. Any Direct Abuse Claim that is reduced due to the absence of the BSA under this mitigating Scaling Factor shall only be payable, as reduced, from Settlement Trust Assets contributed by the applicable Local Council or Chartered Organization, pro rata with all other Direct Abuse entitled to share in the Settlement Trust Assets contributed by such Local Council or Chartered Organization.

E. **Allowed Abuse Claim Calculus**. After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to

the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Matrix Value of the Claim and the Scaling Factors applied to the Claim. In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Matrix Value for the Claim's assigned Claims Matrix tier. By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000. As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

     **F.**    **Optional Chartered Organization Release**. To have the opportunity to exclusively share in any settlement proceeds received from a Chartered Organization that becomes a Protected Party as provided below in Article IX.F, a Direct Abuse Claimant must execute either (i) the conditional release of the Chartered Organization(s) against whom the Abuse Claimant has an Abuse Claim, that will become effective as to that Abuse Claimant if the Chartered Organization(s) against whom the Abuse Claimant conditionally released becomes a Protected Party(ies), in the form attached as **Exhibit B** (the "**Settling Chartered Organizations Release**"), or (ii) the non-conditional release of all Chartered Organizations in the form attached as **Exhibit C** (the "**Voluntary Chartered Organization Release**").

## ARTICLE IX
## PAYMENT OF FINAL DETERMINATION ALLOWED ABUSE CLAIM

     **A.**    **Payment Upon Final Determination**. Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section 4.1 of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive a payment of such Final Determination based on the Payment Percentage then in effect as described in Article IX.B and IX.C (unless such Claimant has exercised the Independent Review Option, in which case payment will be withheld until that determination is complete). For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

     **B.**    **Initial Payment Percentage**. After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

     **C.**    **Supplemental Payment Percentage**. When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims (including estimated Future Abuse Claims), warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose

Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

D. **Release**. In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit, as a precondition to receiving any payment from the Settlement Trust, an executed release in the form attached hereto. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A** hereto. The form of the Settling Chartered Organization Release applicable to an Abuse Claimant who has elected to provide a conditional release to certain Chartered Organizations shall be substantially in the form of **Exhibit B** hereto. The form of the Voluntary Chartered Organization Release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount shall be substantially in the form of **Exhibit C** hereto. The form of the release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount but who does not elect to execute the Voluntary Chartered Organization Release shall be substantially in the form of **Exhibit D** hereto.

E. **FIFO Claims Process Queuing and Exigent Health Claims**. The Settlement Trust shall review all Trust Claim Submissions for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to Expedited Distributions, Exigent Health Claims, or Submitted Abuse Claims electing to defer determination of their Allowed Claim Amounts for up to twelve (12) months from the Effective Date pursuant to Article VII.H above. An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the Abuse Claimant's Trust Claim Submission Date. If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants. An Abuse Claimant that seeks recovery on account of an Exigent Health Claim based on an Allowed Claim Amount determined through the matrix shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these TDP. Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D above.

F. **Source Affected Weighting**.

1. Notwithstanding the Initial Payment Percentage and the Supplemental Payment Percentages applied hereunder, Non-BSA Sourced Assets shall be allocated (after deducting an estimated pro rata share of Settlement Trust expenses and direct expenses related to

the collection of such Non-BSA Sourced Assets) all or in part (the "Source Allocated Portion") only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Assets absent the Plan's Discharge and Channeling Injunction and (2) are held by Direct Abuse Claimants that execute a conditional release, the form of which is attached as **Exhibit B**, releasing all claims against all Chartered Organizations if the Settlement Trust enters into a global settlement making such Chartered Organization a Protected Party. The Settlement Trustee shall establish separate payment percentages (each, a "Source Allocated Payment Percentage") in accordance with the Settlement Trust Agreement to effectuate the distribution of the Source Allocated Portions of any Non-BSA Sourced Assets.

2.      Solely for purposes of allocating Non-BSA Sourced Assets, if a Direct Abuse Claimant exercises the Independent Review Option, then the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the lesser of (i) the Allowed Claim Amount determined through the matrix calculation for the applicable tier and after application of the Scaling Factors under Article VIII or (ii) the amount of the Accepted Settlement Recommendation (the **"UMS ASR Source Allocated Portion Claim"**). For all other Direct Abuse Claims with Allowed Abuse Claims against the United Methodist Entities, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the amount of Final Determination.

3.      Solely for purposes of allocating Non-BSA Sourced Assets, if an Accepted Settlement Recommendation (as defined in Article XIII.A) results in a Direct Abuse Claimant having an Excess Award Share claim under Article XIII.E that identifies a Chartered Organization (or an affiliate that becomes a Protected Party by virtue of such settlement, together an **"Applicable Chartered Organization"**, but in any case excluding the United Methodists Entities) that provides Non-BSA Sourced Funds, the portion of such Claim to be satisfied from the Source Allocated Portion funded by such settlement shall be based on the lesser of (i) $2,700,000 or (ii) the amount of the Accepted Settlement Recommendation (the **"ASR Source Allocated Portion Claim"**). For all other Direct Abuse Claims with Allowed Abuse Claims against the Applicable Chartered Organization, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion shall be based on the amount of Final Determination.

4.      Once the Settlement Trust has paid in full all (i) Final Determination Allowed Abuse Claim Amounts of Direct Abuse Claimants with a claim against the Applicable Chartered Organization, and (ii) ASR Source Allocated Portion Claims, and UMS ASR Source Allocated Portion Claims, as applicable, then the remainder, if any, of the Source Allocated Portion shall be used to pay Excess Award Shares that identify the Applicable Chartered Organization until all such Accepted Settlement Recommendations are paid in full. If there is a remainder of a Source Allocated Portion after payment of the foregoing amounts, then that remainder shall be distributed to all holders of Allowed Abuse Claims pursuant to the applicable payment percentage. Amounts received by Direct Abuse Claimants on account of the and UMS ASR Source Allocated Portion Claims or the ASR Source Allocated Portion Claims, as applicable, shall not reduce the Excess Award Share; provided, however, that in no event shall a Direct Abuse Claimant receive greater than payment in full of the Excess Award Share.

23

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST
## AGAINST NON-SETTLING INSURANCE COMPANIES

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) rights and obligations under the Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim. The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim, and any all rights with respect to a Responsible Insurer in connection with the Independent Review Option, and to enter into agreements with any Non-Settling Insurance Company to become a Settling Insurance Company, subject to the terms and limitations set forth in the Trust Agreement and Article XIII herein. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust. The Settlement Trustee will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims.

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

**A.** **Indirect Abuse Claims**. To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B hereof. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX hereof.

**B.** **Offset**. The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as being against any Protected Party(ies) whose liability was paid by the Indirect Abuse Claimant.

C. **Court Review**. Within thirty (30) days after an Indirect Abuse Claimant receives written notice from the Settlement Trust of the proposed allowed amount of its Indirect Abuse Claim or denial thereof (the "**Judicial Review Election Deadline**"), an Indirect Abuse Claimant may notify the Settlement Trust of its intention to seek a *de novo* review of the Trustee's determination of its Indirect Abuse Claim in accordance with this TDP (including Article IV.B

hereof) by a court of competent jurisdiction (a "**Judicial Review Election**"). Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Review Election Notice**") by the Judicial Review Election Deadline. Unless the Settlement Trustee agrees to extend the Judicial Review Election Deadline, an Indirect Abuse Claimant who fails to so submit a Judicial Review Election Notice by the Judicial Review Election Deadline shall be deemed to accept the disallowance of its Indirect Abuse Claim or the Proposed Allowed Claim Amount (as applicable) and shall have no right to seek any further review of its Indirect Abuse Claim. An Indirect Abuse Claimant that makes a Judicial Review Election may not seek costs or expenses against the Settlement Trust in any judicial proceeding commenced on account of its Judicial Review Election and the Settlement Trust may not seek costs or expenses against the Indirect Abuse Claimant. In no event shall the submission and/or filing of a Judicial Review Election Notice entitle the holder of an Indirect Abuse Claim to request or receive treatment different than the treatment provided for under this TDP (including Article IV.B hereof). The *de novo* review provided for herein shall be to determine the allowed amount of the Indirect Abuse Claim under and in accordance with this TDP. All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at any judicial proceeding commenced on account of the Indirect Abuse Claimant's Judicial Review Election. Upon entry of final non-appealable order of a court competent jurisdiction fixing the allowed amount of the Indirect Abuse Claim, if any, such Indirect Abuse Claim shall be deemed an "Allowed Indirect Abuse Claim" and paid in accordance with Article IX hereof.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

A.    **Remedies after Disallowance or Exhaustion of Claims Allowance Procedures**. Within thirty (30) days after a Direct Abuse Claimant receives an Allowed Claim Notice or Claim Notice on its Proof of Claim following a Reconsideration Request in accordance with Article VII.G (the "**Tort Election Deadline**"), an Abuse Claimant may notify the Settlement Trust of its intention to seek a *de novo* determination of its Abuse Claim by a court of competent jurisdiction (a "**TDP Tort Election Claim**"), subject to the limitations set forth in this Article XII. Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Election Notice**") by the Tort Election Deadline. Unless the Settlement Trustee agrees to extend the Tort Election Deadline, Claimants who fail to so submit and/or file a Judicial Election Notice by the Tort Election Deadline shall be deemed to accept the disallowance of their Abuse Claims or the Proposed Abuse Claim Amounts (as applicable) and shall have no right to seek any further review of their Abuse Claims. An Abuse Claimant that asserts a TDP Tort Election Claim may not seek costs or expenses against the Settlement Trust in the lawsuit filed and the Settlement Trust may not seek costs or expenses against the Abuse Claimant. Any recoveries for a TDP Tort Election Claim from outside the Settlement Trust in respect of a Protected Party's liability are payable to the Settlement Trust and the Abuse Claimant shall be paid in accordance with Articles XII.G and IX hereof.

B.    **Supporting Evidence for TDP Tort Election Claims**. TDP Tort Election Claims in the federal courts shall be governed by the rights and obligations imposed upon parties to a contested matter under the Federal Rules of Bankruptcy Procedure, *provided, however*, that an

Abuse Claimant that prosecutes in any court a TDP Tort Election Claim after seeking reconsideration from the Settlement Trust shall not have the right to introduce into evidence to the applicable court any information or documents that (i) were requested by the Settlement Trustee and (ii) were in the possession, custody or control of the Abuse Claimant at the time of a request by the Settlement Trust, but which the Abuse Claimant failed to or refused to provide to the Settlement Trust in connection with the claims evaluation process in these TDP. The Abuse Claimant's responses to requests by the Settlement Trustee for documents or information shall be subject to Rule 37 of the Federal Rules of Civil Procedure, as applicable under the Federal Rules of Bankruptcy Procedure, and/or any comparable State Rule of Civil Procedure. An Abuse Claimant shall not have the right to disclose any Proposed Abuse Claim Amount received from the Settlement Trust to any court in connection with a Tort Election Claim. Subject to the terms of any protective order entered by a court, the Settlement Trustee shall be permitted to introduce as evidence before a court all information and documents submitted to the Settlement Trust under these TDP, and the Abuse Claimant may introduce any and all information and documents that he or she submitted to the Settlement Trust under these TDP.

C.    **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**. The Settlement Trustee may authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimant in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**" and together with a TDP Tort Election Claim, "**Tort Election Claims**"). STAC Tort Election Claims shall not be required to exhaust any remedies under these TDP before commencing or continuing such lawsuit. No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee in accordance with the Settlement Trust Agreement. Fifty percent (50%) (or less if determined by the Settlement Trustee) of any amounts paid with respect to a judgment for, or a settlement of, a STAC Tort Election Claim by a Non-Settling Insurance Company, as to a policy as to which a Protected Party has assigned relevant insurance rights to the Settlement Trust, shall be paid over to the Settlement Trust.

D.    **Tender to Non-Settling Insurance Company**. If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided in Article XII.A and XII.C herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**"). The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit. The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

E.    **Parties to Lawsuit**. Any lawsuit commenced under Article XII of these TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued. The Abuse Claimant may name any person or

entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law.  Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Protected Parties so long as they are not an additional insured or an Insurance Company as to an Insurance Policy issues to the BSA.

      **F.**    **Defenses**.  All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.

      **G.**    **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied.  If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, *provided that*, exclusive of amounts payable pursuant to Article XII.C (in the event such amounts exceed the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix), any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Abuse Claims that are Allowed Abuse Claims as liquidated under these TDP (excluding this Article XII).  By way of example, presume (1) there is an Abuse Claimant asserting tier one abuse that achieves a $5 million verdict for his or her STAC Tort Election Claim against the Settlement Trust, and (2) a Non-Settling Insurance Company pays $750,000 in coverage under a policy providing primary coverage, $375,000 of which is paid directly to the Abuse Claimant and $375,000 of which is paid over to the Settlement Trust pursuant to Article XII.C.  Although the unpaid amount of such Allowed Abuse Claim would be $4,625,000, the maximum total payment that the Abuse Claimant can recover from the Settlement Trust (before the non-subordinated portion of all other Abuse Claims that are Allowed Abuse Claims are paid in full) is $2,700,000 (the Maximum Matrix Value in tier one), or an additional $2,325,000, paid pursuant to the terms of Article IX hereof.  For the avoidance of doubt, the limit on the Settlement Trust liability under this Article XII.G shall not apply or inure to the benefit of any Non-Settling Insurance Company, and the Settlement Trust shall be able to obtain coverage, subject to Article X hereof, for the full Allowed Claim Amount obtained by the Abuse Claimant through a Tort Election Claim.

      **H.**    **Settlement or Final Judgment**.  If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurance Company or other person or entity involved in a Tort Election Claim or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant shall be entitled to proceed with the Tort Election Claim for any reason (*e.g.*, if there are persons or entities that are not Protected Parties to collect from).  Alternatively, the Abuse Claimant can elect to terminate the Tort Election Claim without prejudice and have its Abuse Claim determined through these TDP (*i.e.*, as if no STAC Tort Election Claim had been made), in which event the Abuse Claimant may submit relevant evidence from the Tort Election Claim that the Settlement Trustee shall take into account in evaluating the Abuse Claim under these TDP.  Such Abuse Claimant may be provided other alternatives by the Settlement Trust if it had been pursuing a STAC Tort Election Claim.

I.      **Payment of Judgments by the Settlement Trust**.  Subject to Article XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these TDP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the applicable Protected Parties' liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth in Article IX.D above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust (assuming an Initial Payment Percentage has been established by the Settlement Trust at that time).  Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any applicable Payment Percentage as determined by the Settlement Trust.

J.      **Litigation Results and Other Abuse Claims**.  To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria, the Settlement Trustee, subject to the terms of these TDP and the Settlement Trust Agreement and the approval of the Bankruptcy Court or District Court, after appropriate notice and opportunity to object, may appropriately modify the Scaling Factors or General Criteria on a go-forward basis for use in evaluation of Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount Final Determination had previously been made.

K.      **Tolling of Limitations Period**.  The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim from the earliest of (A) as to a Protected Party, the actual filing of the claim against the Protected Party, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; or (B) as to the Debtor, the Petition Date or prior to the Petition Date by an agreement or otherwise.

## ARTICLE XIII
## INDEPENDENT REVIEW OPTION

A.      **Direct Abuse Claimant's Independent Review Option**.  Direct Abuse Claimants shall have the opportunity for a Direct Abuse Claimant to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Settlement Trust) (a "**Neutral**") make a settlement recommendation (the "**Settlement Recommendation**") to the Settlement Trustee seeking to replicate to the extent possible the amount a reasonable jury might award for the Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Direct Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law (the "**Independent Review Option**").  The Settlement Recommendation determined by the Neutral, if accepted by the Settlement Trustee (an "**Accepted Settlement Recommendation**"), shall be the allowed amount of the Direct Abuse Claim in accordance with the Plan against (i) the Debtors, (ii) other Protected Parties, and (iii) Chartered Organizations.  The Direct Abuse Claimant must assign its Direct Abuse Claim against any Chartered Organization and all other rights and claims arising out of its Direct Abuse Claim to the Settlement Trust as a condition to receiving the Accepted Settlement Recommendation, and the Settlement Trust shall have the right and power to assert and/or resolve any such claims assigned to it consistent with the Plan.  If the Settlement Trustee declines to follow the Neutral's recommendation as to the Allowed Claim Amount for an Independent Review Claim (a "**Recommendation Rejection**"), within forty-five (45) days after

the holder being served notice of the Recommendation Rejection, the holder of such Direct Abuse Claim may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of the Direct Abuse Claim. Such Direct Abuse Claimant shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Direct Abuse Claimant. Notwithstanding the foregoing, any amount of an Accepted Settlement Recommendation or Allowed Claim Amount for an Abuse Claim that proceeds under this Independent Review Option in excess of a multiple of five (5) times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP (excluding Claims liquidated under this provision or under Article XII (regarding Tort Election Claims).

B.    **Time to Select Independent Review Option**. Direct Abuse Claimants, other than Future Abuse Claimants, shall initially have until six (6) months after the Effective Date, to elect to participate in the Independent Review Option. In addition, in order to participate in the Independent Review Option, the Direct Abuse Claimant must complete and submit the Trust Claim Submission by six (6) months after the Effective Date to enable the Settlement Trust to establish reserves. If a Direct Abuse Claimant pursues a non-channeled Chartered Organization and the Settlement Trust settles with the Chartered Organization in question such that claims against it become channeled (a) the Settlement Trust shall provide notice of such settlement to any Direct Abuse Claimants that are pursuing any non-channeled Chartered Organizations and (b) such Direct Abuse Claimants shall have thirty (30) days from notice of the effectiveness of the Settlement Trust's settlement to select the Independent Review Option at that time.

C.    **Excess Award Fund**. The Settlement Trust shall maintain a fund for the sole purpose of funding the portion of Accepted Settlement Recommendations that are in excess of $1 million (the "**Excess Award Fund**"). The Excess Award Fund shall be funded with certain proceeds from the Trust's collection of insurance policy proceeds from non-settling insurers as set forth below.[2]

D.    **Accepted Settlement Recommendation of Less Than $1 Million**. If the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim. The Accepted Settlement Recommendation shall supersede the determination of the amount of the claim under the TDP, whether higher or lower, subject to limitations set forth in Article XIII.E below. If the Neutral makes an Accepted Settlement Recommendation of $1 million or less but greater than zero, then the Settlement Recommendation shall be paid by the Settlement Trust in accordance with Article IX, including any applicable payment percentage, and the Direct Abuse Claimant shall receive nothing from the Excess Award Fund.

---

[2] The sources of recovery for the fund or Direct Abuse Claimants are (i) the Debtors' or Local Counsels' non-settled shared insurance policies excess of the primary layer of coverage, and (ii) in the absence of a global settlement making a Chartered Organization a Protected Party, certain Chartered Organizations' separate non-settled insurance rights, collectively referred as Responsible Insurers, as defined below.

E.    **Accepted Settlement Recommendation of $1 Million or More**.  If the Neutral makes an Accepted Settlement Recommendation of $1 million or more, then the Direct Abuse Claimant shall receive (i) an allowed claim against the Settlement Trust equal to $1 million (the **"Trust Share"**), to be paid pursuant to Article IX and subject to any applicable payment percentage from Settlement Trust Assets other than the Excess Award Fund (the **"General Trust"**), and (ii) an allowed claim against the Settlement Trust equal to the amount of the Settlement Recommendation in excess of the Trust Share (the **"Excess Award Share"**) which shall be paid solely and exclusively from the Excess Award Fund as set forth below.

F.    **Costs Paid By Direct Abuse Claimants**.    The costs associated with the independent review shall be paid by the Direct Abuse Claimant and not the Settlement Trust, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such obligation shall be offset by the administrative fee paid by the Direct Abuse Claimant. Recovery of such costs may be sought from any insurer subject to the applicable terms and conditions of any insurer's policy, to the extent such costs constitute reasonable and necessary costs payable under an applicable non-settled insurance policy, and the Settlement Trust may reimburse the Direct Abuse Claimant for such costs to the extent that the non-settled insurance policy reimburses the Settlement Trust.  Any recoveries by the Settlement Trust on account of its own costs will be distributed to Direct Abuse Claimants as set forth below.  If the cost to the Settlement Trustee of processing the Independent Review Option is less than the administrative fees charged, the Settlement Trustee shall reimburse the unused balance to the Direct Abuse Claimant.

G.    **Requirements for Obtaining a Settlement Recommendation**.    To obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide the following:

(i)    Sexual Abuse Survivor Proof of Claim signed and dated by the Direct Abuse Claimant, with completion of all applicable fields, including the substantive narrative of the Abuse and damages (to be completed at the time of submission to the Neutral or after the completion of discovery);

(ii)    Payment to the Settlement Trust of an administrative fee in the amount of $10,000 at the time of the election for Independent Review Option and a further additional administrative fee in the amount of $10,000 immediately prior to the Neutral's review.  The Settlement Trustee shall have the authority to waive administrative fees in appropriate cases, based on the circumstances of the Direct Abuse Claimant. To the extent a Direct Abuse Claimant is dissatisfied with the Settlement Trustee's decision on waiver of fees, such decision will be reviewable by the Bankruptcy Court.  Any Direct Abuse Claimant that elects not to proceed with the Neutral's review after the opportunity to pursue discovery shall not be required to pay the second $10,000 and shall not be precluded from pursuing their claim under the TDP (as if no election to pursue an Independent Review Option had been made);

(iii)    Confirmation that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting related event where the Abuse occurred by:

a)     Direct Abuse Claimant's name on a roster;

b)     evidence that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: a photograph, a membership card, or document that reflects the Direct Abuse Claimant's rank in a Scouting unit); or

c)     a sworn statement by a third-party witness (who will agree to a deposition by the Neutral, if requested) that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred.

(iv)    Direct Abuse Claimant must provide evidence that the perpetrator was in a Scouting unit, worked or volunteered with a Scouting unit, worked or volunteered with a Local Council, Chartered Organization or the BSA, or worked or volunteered at a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: the perpetrator's name being on a Scouting roster, a photograph of the perpetrator, or a sworn statement by a third party witness who will agree to a deposition if requested by the Neutral);

(v)    Direct Abuse Claimants must provide evidence that the claim is timely under the applicable statute of limitations, including satisfying any recognized exception to the relevant statute of limitation under the applicable state law;

(vi)    Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of a Direct Abuse Claim, and evidence regarding the Direct Abuse Claimant's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed. Damages must be supported by an expert report (the cost of which shall be paid by the Direct Abuse Claimant); and

(vii)    Direct Abuse Claimant shall be subject to up to a single sworn six-hour interview, mental health examination or supplemental signed and dated interrogatory responses at the discretion of the Neutral or upon the reasonable request of a Responsible Insurer.

**I.**     **Discovery.** The Direct Abuse Claimant shall be entitled to discovery from the Settlement Trust (as successor to the BSA and Local Councils) and from third parties in accordance with the Document Appendix.

**J.**     **Other Defenses.** In making her determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

**K.**     **Insurer Participation.**

(i)    The Settlement Trust will provide prompt notice to any potentially responsible non-settling insurer(s) ("Responsible Insurers") of any claim for which the Direct Abuse Claimant has elected the Independent Review Option.

(ii)    Any Responsible Insurer shall be given a reasonable opportunity to participate in the Independent Review. Any Responsible Insurer who chooses to participate may review and comment on the Neutral's evaluation, including attending any interview or deposition. Any Responsible Insurer may raise and present any potentially applicable defenses to the Abuse Claim to the Neutral, at their own expense. Such defenses must be considered and evaluated, as reasonably appropriate, by the Neutral.

(iii)    Upon the Settlement Trustee's receipt of the Settlement Recommendation from the Neutral, the Settlement Trustee shall provide notice and seek consent from any applicable Responsible Insurer.

(iv)    If the Settlement Trustee determines that the Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Settlement Trustee may exercise any and all rights available to it under applicable law, and the Settlement Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.

(v)    The Settlement Trust shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms.

**L.    Collection of the Independent Award**. The Trust (as assignee) shall be free to collect on the basis of the Accepted Settlement Recommendation, and associated costs of the Independent Review Option, from any Responsible Insurer that refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible in such a manner as it sees fit, including by seeking coverage for one or more Accepted Settlement Recommendations on a consolidated basis and to enter into comprehensive settlements with any Responsible Insurer. To the extent allowed under applicable state law, the BSA and Local Councils shall reasonably cooperate with the Settlement Trustee in the foregoing (it being understood that the foregoing cooperation shall not require the expenditure of funds), including consenting to entry of a non-recourse judgment limited solely to the recovery of insurance proceeds from any Responsible Insurer to the extent doing so would not violate the terms of the applicable policy or applicable law. In addition, the Settlement Trustee may seek the cooperation of the applicable Chartered Organization. Funds collected from the Responsible Insurer shall be allocated to the survivor and the Excess Award Fund as follows:

(i)    **Collections Applicable to Identified Excess Award Shares**:

(1)    Amounts awarded that are applicable to the expenses incurred by Direct Abuse Claimants in pursuing the Independent Review Option, or that are

awarded for any bad faith claim will be allocated 100% to the Direct Abuse Claimant.

(2) Amounts awarded from any policy of a Responsible Insurer that does not have applicable aggregate limits will be allocated 100% to the Direct Abuse Claimant.

(3) Amounts collected in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits shall be awarded 80% to the Direct Abuse Claimant, with the balance contributed to the General Trust until the Direct Abuse Claimant has collected 80% of the Excess Award Share. Thereafter policy proceeds shall be divided 70% to the Direct Abuse Claimant and 30% to the General Trust until the Direct Abuse Claimant has received the full amount of the Excess Award Share.

(ii) **Settlement with Potentially Responsible Insurers that Fully Release a Policy or Policies**:

(a) 80% of the proceeds derived from a comprehensive settlement with a Responsible Insurer shall be contributed to the Excess Award Fund and 20% of the proceeds derived from a comprehensive settlement with an Responsible Insurer shall be General Trust funds available to pay all Direct Abuse Claimants; provided that once all holders of Excess Award Shares (other than holders of Late Claims (as defined below)) have received (or been reserved for an amount equal to) 80% on account of their Excess Award Shares, 70% shall be contributed to the Excess Award Fund and 30% shall be General Trust funds available to pay all Direct Abuse Claimants.

For the avoidance of doubt, collections from separate insurance of a Chartered Organization received as part of a comprehensive Chartered Organization settlement shall go to the General Trust, for distribution to Direct Abuse Claimants with Direct Abuse Claims pursuant to Article IX.F.

**M.** **Payment of Excess Independent Awards**. The Excess Award Fund shall be used to pay the Excess Award Shares. The Excess Award Fund will be allocated and paid on account of such Excess Award Shares subject to a payment percentage calculated specifically for the Excess Award Fund. Once the Excess Award Shares are paid in full, the remaining funds in the Excess Award Fund shall become General Trust funds available to pay all Allowed Direct Abuse Claims.

**N.** **Administrative Guidelines**.

(i) Direct Abuse Claimants (other than holders of Future Abuse Claims and except as provided immediately below) will have until January 1, 2023, to pay the initial administrative fee and elect to submit their claim for the Independent Review Option.

(ii)     After January 1, 2023, a Direct Abuse Claimant (other than a Future Abuse Claimant) may still elect the Independent Review Option (other than with respect to a Direct Abuse Claimant that was pursuing a Chartered Organization with respect to a Direct Abuse Claim that was not subject to the Channeling Injunction) but shall only be entitled to recover (a) against a Responsible Insurer to the same degree as the Direct Abuse Claimants that filed claims prior to January 1, 2023, (b) from any Excess Award Fund reserved from any settled insurance applicable to their Direct Abuse Claims, or (c) share in a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a determination is made by the Neutral on the Direct Abuse Claim. The Settlement Trustee shall establish a reserve in the Excess Award Fund for Future Abuse Claims that may elect the Independent Review Option and for possible Claims against the Settlement Trust that may arise as a result of a Claimant being enjoined from continuing to seek recovery from a Chartered Organization with respect to a Claim that was not subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and the Chartered Organization. Other than reserving for and paying Future Abuse Claims and Direct Abuse Claims that become subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and a Chartered Organization on the basis described above, the Settlement Trust will have no duty to reserve or make distributions to any Direct Abuse Claimants who file claims after January 1, 2023 (**"Late Claims"**) except that should the Late Claim be timely pursuant to Section IV.A.ii or iii and exercise the Independent Review Option, the Excess Award Share attributable to such Late Claim may share on a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a Settlement Recommendation is made by the Neutral on the Late Claim. The last date to file a Late Claim for the Independent Review Option shall be January 1, 2026.

(iii)    If a Neutral's Settlement Recommendation determines that a Chartered Organization not protected by the Channeling Injunction is responsible for all or a portion of liability for a Direct Abuse Claim assigned to the Settlement Trust, at the request of the claimant, the Settlement Trustee may in its discretion, assign back to the claimant all rights to pursue the Chartered Organization and its insurers for the allocated portion of liability established through the Independent Review Option. The Direct Abuse Claimant in his discretion may then bring an action in any Court of competent jurisdiction against the Chartered Organization and its insurers to recover the allocated portion of liability and any additional damages, including punitive damages against the Chartered Organization and extracontractual damages against the affected insurers that may be assessed by the Court. Any recovery by way of judgment or settlement will be first applied to reimburse the Direct Abuse Claimant for his fees and expenses in prosecuting the Direct Abuse Claims and the remainder will be allocated in accordance with the Independent Review Option, provided that any punitive or extra-contractual damages shall be awarded solely to the Direct Abuse Claimant.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**A.**      **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

**B.**      **Amendments**.  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP.  Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) to materially alter the Independent Review Option, or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

**C.**      **Severability**.  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**D.**      **Offsets**.  The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim, without duplication as to the mitigating factors (*e.g.*, as to other responsible parties) on a dollar for dollar basis based on any amounts paid, agreed, or reasonably likely to be paid to the holder of such Claim on account of such Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

**E.**      **Governing Law**.  These TDP shall be interpreted in accordance with the laws of the State of Delaware. Notwithstanding the foregoing, the evaluation of Abuse Claims under these TDP and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII or the jurisdiction where such Abuse Claim could have been filed under applicable law.

## Schedule 1

**Mitigating Scaling Factor Ranges for Statutes of Limitation or Repose by State**

| Legend | |
| --- | --- |
| **Tier** | **Scaling Factor** |
| Open | 1.0 |
| Gray 1 | .50-.70 |
| Gray 2 | .30-.45 |
| Gray 3 | .10-.25 |
| Closed | .01-.10 |

| **State** | **Tier** |
| --- | --- |
| Alabama | Closed |
| Kansas | Closed |
| Oklahoma | Closed |
| Puerto Rico | Closed |
| South Dakota | Closed |
| Utah | Closed |
| Wyoming | Closed |
| ZZ / Federal | Closed |
| Connecticut | Gray 1 |
| DC | Gray 1 |
| Delaware | Gray 1 |
| Georgia | Gray 1 |
| Illinois | Gray 1 |
| Massachusetts | Gray 1 |
| New Mexico | Gray 1 |
| Oregon | Gray 1 |
| Washington | Gray 1 |
| Iowa | Gray 2 |
| Minnesota | Gray 2 |
| New Hampshire | Gray 2 |
| North Dakota | Gray 2 |
| Ohio | Gray 2 |
| Pennsylvania | Gray 2 |

| | |
|---|---|
| South Carolina | Gray 2 |
| Tennessee | Gray 2 |
| West Virginia | Gray 2 |
| Alaska | Gray 3 |
| Florida | Gray 3 |
| Idaho | Gray 3 |
| Indiana | Gray 3 |
| Kentucky | Gray 3 |
| Maryland | Gray 3 |
| Michigan | Gray 3 |
| Mississippi | Gray 3 |
| Missouri | Gray 3 |
| Nebraska | Gray 3 |
| Nevada | Gray 3 |
| Rhode Island | Gray 3 |
| Texas | Gray 3 |
| Virgin Islands | Gray 3 |
| Virginia | Gray 3 |
| Wisconsin | Gray 3 |
| Arizona | Open |
| Arkansas | Open |
| California | Open |
| Colorado | Open |
| Guam | Open |
| Hawaii | Open |
| Louisiana | Open |
| Maine | Open |
| Montana | Open |
| New Jersey | Open |
| New York | Open |
| North Carolina | Open |
| Vermont | Open |

## EXHIBIT A

## EXPEDITED DISTRIBUTION

## CLAIMANT RELEASE AND INDEMNIFICATION
## IN CONNECTION WITH EXPEDITED DISTRIBUTION
## FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST

To receive payment of an Expedited Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrator by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct,

1

or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in <u>Article X.F</u> of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the

Settling Insurance Companies (as determined pursuant to <u>Section X.F.3</u> of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

 "**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) elected to resolve his or her Abuse Claim for the Expedited Distribution in accordance with the Chapter 11 Plan and Confirmation Order, (ii) timely submitted to the Trust a properly and substantially completed, non-duplicative proof of claim or Future Abuse Claim, and (iii) personally signed his or her proof of claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplemented his or her proof of claim to so provide such verification.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I in the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

3

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided, however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Expedited Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim as a result of the election to receive the Expedited Distribution in accordance with the Plan and Confirmation Order.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

4

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of

doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

"**Released Parties**" means the Trust, the Trustee, the STAC, the Claims Administrator, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrator, the Protected Parties, or the Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

 "**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Expedited Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties and the Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to payment of my Award due from the Trust.

C.       Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Expedited Award, I do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.       I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.       I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.       I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.       I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees and Chartered

Organizations, including those that are not Protected Parties and Limited Protected Parties. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

H.      In further consideration of the benefit of an Expedited Award, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrator arising from my failure to comply with the terms of this Release.

I. I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Expedited Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Expedited Award, to the extent applicable.

Claimant or Legal Representative Printed Name:  _____

Claimant or Legal Representative Signature:  _____

Date:  _____

**EXHIBIT B**

**CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH
DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair

1

practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

2

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of a Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I of the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered

3

Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement .

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided, however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors' and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released.  All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors

in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance

6

Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.        In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected

7

Parties or any Chartered Organizations that become a Protected Party after the execution of this Release) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.        I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of (i) any holder of a Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.        I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to any Chartered Organization that is currently a Protected Party or becomes a Protected Party after the execution of this Release (or that is an Insured Party Releasee as provided in paragraph C above) and that this Release will not become effective against any Chartered Organization that is not a Contributing Chartered Organization (or Insured Party Releasee) as of the Release Date unless and until such Chartered Organization becomes a Protected Party.

I. I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party, provided, however, that under the Trust Distribution Procedures, Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) are held by Claimants that execute this or a similar Release. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

J.        In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

K.        I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

9

Claimant or Legal Representative Printed Name:    _____

Claimant or Legal Representative Signature:    _____

Date:    _____

## EXHIBIT C

## NON-CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS

## CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair

1

practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

2

"**Channeling Injunction**" means the permanent injunction provided for in <u>Article X.F</u> of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to <u>Section X.F.3</u> of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I in the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered

3

Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided*, *however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

4

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors

5

in bankruptcy and may not be Participating Chartered Organizations is attached as <u>Exhibit K</u> to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

**"Perpetrator"** means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

**"Protected Parties"** means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

**"Release Date"** means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, that the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

**"Released Parties"** means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

**"Scouting-related"** means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

**"Settling Insurance Company"** means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an

order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

 "**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties or any Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the

Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered

Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.      I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and as of the Release Date I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees or Chartered Organizations, including those that are not Protected Parties and Limited Protected Parties. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

H.      I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party (and to any Chartered Organization that is an Insured Party Releasee), provided, however, that under the Trust Distribution Procedures Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) execute this or a similar Release. For the avoidance of doubt, nothing in this Release shall limit or impair my rights to share in any settlement proceeds received by the Trust from a Chartered Organization.

I. In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

J.      I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:    _____

Claimant or Legal Representative Signature:    _____

Date:    _____

**EXHIBIT D**

**FINAL DETERMINATION**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH
DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure

1

to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims

2

against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) has satisfied the eligibility criteria section forth in Articles IV and XIII of the Trust Distribution Procedures, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I in the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional

insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered

5

Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

**"Release Date"** means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

**"Released Parties"** means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

**"Scouting-related"** means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

**"Settling Insurance Company"** means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

**"STAC"** means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

**"TDP"** means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

7

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an **"Insured Party Releasee"**), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any (i) holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.      In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and

attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

I. I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:    _____

Claimant or Legal Representative Signature:    _____

Date:    _____

# EXHIBIT B

# SETTLEMENT TRUST AGREEMENT

**BSA SETTLEMENT TRUST AGREEMENT**

**DATED AS OF [●], 2022**

**PURSUANT TO THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN**

**OF REORGANIZATION (WITH TECHNICAL MODIFICATIONS) FOR**

**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

## Table of Contents

ARTICLE 1. AGREEMENT OF TRUST ........................................................ 2

Section 1.1    Creation and Name ............................................................... 2

Section 1.2    Purposes ............................................................................... 2

Section 1.3    Transfer of Assets ................................................................ 2

Section 1.4    Acceptance of Assets ........................................................... 3

Section 1.5    Receipt of Proceeds ............................................................. 3

Section 1.6    Beneficiaries ........................................................................ 3

Section 1.7    Jurisdiction .......................................................................... 4

Section 1.8    Privileged and confidential information ................................ 4

Section 1.9    Relation-back election ......................................................... 4

Section 1.10    Employer identification number ......................................... 4

Section 1.11    Relationship to Plan ........................................................... 4

ARTICLE 2. POWERS AND TRUST ADMINISTRATION ........................... 4

Section 2.1    Powers .................................................................................. 4

Section 2.2    Limitations on the Trustee, STAC and FCR ............................ 8

Section 2.3    General Administration ........................................................ 10

Section 2.4    Accounting ........................................................................... 10

Section 2.5    Financial Reporting .............................................................. 10

Section 2.6    Claims Reporting .................................................................. 10

Section 2.7    Names and addresses ............................................................ 11

Section 2.8    Sexual Abuse Survivors Advisory Committee ....................... 11

Section 2.9    Transfers of the Trust Corpus .............................................. 12

i

ARTICLE 3. ACCOUNTS, INVESTMENTS, EXPENSES .................................................. 12

Section 3.1    Accounts. ........................................................................................................ 12

Section 3.2    Investment Guidelines. ................................................................................. 13

Section 3.3    Payment of Trust Operating Expenses. ..................................................... 13

ARTICLE 4. CLAIMS ADMINISTRATION AND DISTRIBUTIONS ........................... 13

Section 4.1    Claims Administration and Distributions. ................................................ 13

Section 4.2    Applicability and Review of Payment Percentage. .................................. 14

Section 4.3    Supplemental Payments. .............................................................................. 15

Section 4.4    Manner of Payment. ..................................................................................... 16

Section 4.5    Delivery of Distributions. ............................................................................. 16

Section 4.6    Medicare Reimbursement and Reporting Obligations. ........................... 16

ARTICLE 5. TRUSTEE; DELAWARE TRUSTEE ........................................................... 17

Section 5.1    Number of Trustees. ...................................................................................... 17

Section 5.2    Term of Service, Successor Trustee. ........................................................... 17

Section 5.3    Appointment of Successor Trustee. ............................................................ 17

Section 5.4    Trustee Meetings. .......................................................................................... 18

Section 5.5    Compensation and Expenses of Trustee. .................................................... 19

Section 5.6    Trustee's Independence. ............................................................................... 19

Section 5.7    Standard of Care; Exculpation. ................................................................... 19

Section 5.8    Protective Provisions. .................................................................................... 21

Section 5.9    Indemnification. ............................................................................................. 21

Section 5.10    Bond. ............................................................................................................. 22

Section 5.11    Delaware Trustee. ........................................................................................ 22

ii

Section 5.12    Meeting Minutes..................................................................................25

Section 5.13    Matters Requiring Consultation with STAC and FCR................................25

Section 5.14    Matters Requiring Consent of STAC and FCR........................................25

Section 5.15    Matters Requiring Special Approval:  PP Settlements, Limited Protected Party Injunction Date Extensions and Certain Employment Matters..................................26

Section 5.16    Trustee's and STAC's Employment of Professionals...............................27

ARTICLE 6. SETTLEMENT TRUST ADVISORY COMMITTEE ...................................28

Section 6.1    Members; Action by Members.............................................................28

Section 6.2    Duties...........................................................................................28

Section 6.3    STAC Information Rights....................................................................28

Section 6.4    [Reserved.]....................................................................................29

Section 6.5    Term of Office.................................................................................29

Section 6.6    Appointment of Successor..................................................................29

Section 6.7    Compensation and Expenses of the STAC................................................30

Section 6.8    Procedures for Consultation with and Obtaining the Consent of the STAC.......30

ARTICLE 7. THE FCR...............................................................................................31

Section 7.1    Duties...........................................................................................31

Section 7.2    FCR Information Rights......................................................................31

Section 7.3    Term of Office.................................................................................31

Section 7.4    Appointment of Successor..................................................................32

Section 7.5    FCR's Employment of Professionals.....................................................32

Section 7.6    Compensation and Expenses of the FCR.................................................32

Section 7.7    Procedures for Consultation with and Obtaining the Consent of the FCR. ......33

ARTICLE 8. GENERAL PROVISIONS.......................................................................34

iii

Section 8.1      Irrevocability..................................................................................34

Section 8.2      Term; Termination............................................................................34

Section 8.3      Outgoing Trustee Obligations...........................................................35

Section 8.4      Taxes.............................................................................................35

Section 8.5      Modification....................................................................................37

Section 8.6      Communications...............................................................................37

Section 8.7      Severability.....................................................................................37

Section 8.8      Notices...........................................................................................38

Section 8.9      Successors and Assigns.....................................................................38

Section 8.10     Limitation on Transferability; Beneficiaries' Interests.........................39

Section 8.11     Exemption from Registration............................................................39

Section 8.12     Entire Agreement; No Waiver...........................................................39

Section 8.13     Headings.........................................................................................39

Section 8.14     Governing Law................................................................................39

Section 8.15     Settlor's Representative....................................................................40

Section 8.16     Dispute Resolution...........................................................................40

Section 8.17     Independent Legal and Tax Counsel..................................................41

Section 8.18     Waiver of Jury Trial........................................................................41

Section 8.19     Effectiveness...................................................................................41

Section 8.20     Counterpart Signatures.....................................................................42

EXHIBIT 1  AGGREGATE SETTLEMENT CONSIDERATION ....................................44

EXHIBIT 2  CERTIFICATE OF TRUST .................................................................45

EXHIBIT 3  TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS ..............46

**EXHIBIT 4  INVESTMENT GUIDELINES**........................................................................ 47

## BSA SETTLEMENT TRUST AGREEMENT

This BSA Settlement Trust Agreement (this "**Trust Agreement**"), dated as of [●], 2022, and effective as of the Effective Date, is entered in accordance with the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, dated as of [●], 2022 (as it may be amended, modified, or supplemented, the "**Plan**"),[1] by Boy Scouts of America (the "**Settlor**," the "**BSA**" or, after the Effective Date (as defined in the Plan) "**Reorganized BSA**"); the Future Claimants' Representative for the Trust identified in Section 7.1 hereof (together with any successor serving in such capacity, the "**FCR**"); Honorable Barbara J. Houser (Ret.) or Barbara J. Houser LLC (as applicable), as trustee (together with any successor serving in such capacity, the "**Trustee**"); [●] as the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"); and the members of the Settlement Trust Advisory Committee who are the individuals further identified on the signature pages here (together with any successors serving in such capacity, the "**STAC**").

## RECITALS

(A)    The BSA and its affiliate, Delaware BSA, LLC (together, the "**Debtors**") have, or contemporaneously with the execution of this Trust Agreement will have, reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the Bankruptcy Court, administered and known as In re Boy Scouts of America and Delaware BSA, LLC, Case No. 20-10343 (Bankr. D. Del. 2020) (LSS) (collectively, the "**Chapter 11 Cases**").

(B)    BSA is executing this Trust Agreement in its capacity as Settlor to implement the Plan and to create the BSA Settlement Trust (the "**Trust**") for the benefit of the holders of Class 8 Direct Abuse Claims and Class 9 Indirect Abuse Claims (together, the "**Abuse Claims**").

(C)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(D)    The Plan and Confirmation Order provide, among other things, for the creation of the Trust to satisfy all Abuse Claims in accordance with this Trust Agreement, the Plan and the Confirmation Order.

(E)    The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Plan and Confirmation Order with respect to the channeled Abuse Claims, as provided therein (the "**Channeled Claims**").

---

[1]    All capitalized terms used but not otherwise defined herein shall have their respective meanings as set forth in the Plan or in the Confirmation Order, as applicable, or, if not defined therein, as set forth in the TDP (as defined in Section 1.2 below).

(F)    The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors in accordance with the Plan, the Aggregate Settlement Consideration (as defined in Section 1.3), as described in **Exhibit 1** shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtors or their affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the Channeled Claims and as provided in Section 1.3.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1.
## AGREEMENT OF TRUST

Section 1.1    *Creation and Name.* BSA as Settlor hereby creates a trust known as the "**BSA Settlement Trust**" which is the Trust provided for and referred to in the Plan. The Trustee may transact the business and affairs of the Trust in the name of the BSA Settlement Trust Fund and references herein to the Trust shall include the Trustee acting on behalf of the Trust. It is the intention of the parties hereto that the Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§ 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement, including the Exhibits hereto (the Confirmation Order, the Plan and this Trust Agreement, including all Exhibits hereto, which includes the TDP as defined in Section 1.2 below, collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

Section 1.2    *Purposes.* The purposes of the Trust are to (i) assume all liability for the Channeled Claims, (ii) administer the Channeled Claims and (iii) make distributions to holders of compensable Abuse Claims, in each case in accordance with the Trust Distributions Procedures for Abuse Claims attached hereto as **Exhibit 3** (the "**TDP**"). In connection therewith, the Trust shall hold, manage, protect and monetize the Trust Assets (as defined in Section 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries (as defined in Section 1.6(a) below). For the avoidance of doubt, all Abuse Claims asserted against the Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the TDP.

Section 1.3    *Transfer of Assets.* Pursuant to the Plan, on the Effective Date, the Trust will receive and hold all right, title and interest in and to the consideration described in Article IV.D of the Plan and set forth on **Exhibit 1** hereto (the "**Aggregate Settlement Consideration**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Aggregate Settlement Consideration shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtors or their affiliates, any creditor or any other person or entity, other than as provided in the Channeling Injunction with respect to Channeled Claims, and except that the Pfau/Zalkin Restructuring Expenses shall be or shall have been paid from the Trust Assets to the extent authorized under Article V.T of the Plan. The Debtors or Reorganized BSA shall execute and

deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Aggregate Settlement Consideration to the Trust.

Section 1.4    *Acceptance of Assets.* In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly accepts the transfer to the Trust of the Aggregate Settlement Consideration, subject to the terms of the Trust Documents. The Trust shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the Aggregate Settlement Consideration and neither the Debtors nor any other person or entity transferring such Aggregate Settlement Consideration will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate Settlement Consideration, or the Trust.

(b)    Except as otherwise provided in the Plan, Confirmation Order or Trust Documents, the Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Channeled Claims that the Debtors or the Reorganized BSA have or would have had under applicable law.

(c)    No provision herein or in the TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations (as defined in Section 8.4(a) below).

(d)    Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or other terms of the Plan or Confirmation Order.

(e)    In this Trust Agreement and the TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

Section 1.5    *Receipt of Proceeds.*

The proceeds of any recoveries from any litigation or claims of the Trust (including the Actions) will be deposited in the Trust's accounts and become the property of the Trust.

Section 1.6    *Beneficiaries.*

(a)    The beneficial owners (within the meaning of the Act) of the Trust shall be the holders of Abuse Claims (the "**Beneficiaries**").

(b)    The Beneficiaries shall be subject to the terms of this Trust Agreement and Trust Documents, including without limitation, the TDP.

Section 1.7    *Jurisdiction.* The Bankruptcy Court shall have continuing jurisdiction with respect to the Trust; provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

Section 1.8    *Privileged and Confidential Information.*

The transfer or assignment of any Privileged Information to the Trustee pursuant to the Document Agreement (as defined in the Plan) shall not result in the destruction or waiver of any applicable privileges pertaining thereto. Further, with respect to any such privileges: (a) they are transferred to or contributed for the purpose of enabling the Trustee to perform his or her duties to administer the Trust; (b) they are vested solely in the Trustee and not in the Trust, the STAC, the FCR, the SASAC (as defined in Section 2.8(a) below), or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of an Abuse Claim; and (c) the Trustee shall keep, handle and maintain such Privileged Information in accordance with the terms of the Document Agreement. Notwithstanding the foregoing, nothing shall preclude the Trustee from providing Privileged Information to any Insurance Company as necessary to preserve, secure, or obtain the benefit of any rights under any Insurance Policy.

Section 1.9    *Relation-back election.*

Pursuant to the Document Agreement, if applicable, the Trustee and the Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

Section 1.10    *Employer identification number.*

Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

Section 1.11    *Relationship to Plan.*

The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order and therefore, this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the TDP, the provisions of the Plan or the Confirmation Order, each document shall have controlling effect in the following order: (1) the Confirmation Order; (2) the Plan; (3) this Trust Agreement; and (4) the TDP.

**ARTICLE 2.**
**POWERS AND TRUST ADMINISTRATION**

Section 2.1    *Powers.*

(a)    The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "qualified settlement fund" under Section 468B of the Tax Code and the regulations promulgated pursuant thereto. Further, the Trustee may, unilaterally and

without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

(b)     The Trustee is and shall act as the fiduciary to the Trust in accordance with the provisions of this Trust Agreement. The Trustee shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner prescribed by the Trust Documents. Subject to the limitations set forth in the Trust Documents, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or advisable to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. Nothing in the Trust Documents or any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law. In addition to all powers enumerated in the Trust Documents, including, but not limited to, the Trustee's powers and authority in respect of the interpretation, application of definitions and rules of construction set forth in Article I of the Plan to the fullest extent set forth therein, from and after the Effective Date, the Trust shall succeed to all of the rights and standing of the Debtors with respect to the Aggregate Settlement Consideration in its capacity as a trust administering assets for the benefit of the Beneficiaries.

(c)     Except as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(d)     Without limiting the generality of Sections 2.1(a) and (b) above, and except as limited in the Trust Documents and by applicable law, the Trustee shall have the power to:

(i)     supervise and administer the Trust in accordance with the Trust Documents, including the TDP;

(ii)     adopt procedures to allow valid Abuse Claims ("**Allowed Abuse Claims**"), and determine an allowed liability amount for each Allowed Abuse Claim (the "**Allowed Claim Amount**") in accordance with the TDP (including adopting procedures to implement the Independent Review Process under the TDP);

(iii)     establish an initial payment percentage (the "**Initial Payment Percentage**") with respect to Allowed Abuse Claims and adjust the Initial Payment Percentage and any subsequent Payment Percentage as set forth in Section 4.2 below;

(iv)     establish and adjust payment percentages for Excess Award Shares from with respect to the Excess Award Fund and for Allowed Abuse Claims entitled to share in particular PP Settlements on a priority basis consistent with the Trust Documents;

(v)     receive and hold the Trust Assets, and exercise all rights with respect thereto including the right to vote and sell any securities that are included in such funds;

(vi)    invest the monies held from time to time by the Trust in accordance with Section 3.2;

(vii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper and consistent with the other terms of the Trust Documents;

(viii)    enter into leasing, financing or other agreements with third parties, as determined by the Trustee, in his or her discretion, to be useful in carrying out the purposes of the Trust;

(ix)    determine and pay liabilities and pay all fees and expenses incurred in administering the Trust, managing the Trust Assets and making distributions in accordance with the Trust Documents (the "**Trust Operating Expenses**");

(x)    establish accounts and reasonable reserves within the Trust, including the Excess Award Fund in accordance with the Independent Review Process, as determined by the Trustee, in his or her discretion, to be necessary, prudent or useful in administering the Trust;

(xi)    sue, be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding;

(xii)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as this Trust Agreement provides or the fiduciary duties of the Trustee permits and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(xiii)    pay reasonable compensation and reimbursement of expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires;

(xiv)    compensate the Trustee, Delaware Trustee, the FCR and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee, the Delaware Trustee, the STAC members, and the FCR for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xv)    compensate professionals for services, costs and expenses incurred prior to the Effective Date in accordance with the terms of the Plan and Confirmation Order;

(xvi)    execute and deliver such instruments as the Trustee considers advisable or necessary in administering the Trust;

(xvii)  timely file such income tax and other tax returns and statements required to be filed and timely pay all taxes, if any, required to be paid from the Trust Assets and comply with all applicable tax reporting and withholding obligations;

(xviii) require, in respect of any distribution of Trust Assets, the timely receipt of properly executed documentation (including, without limitation, IRS Form W-9) as the Trustee determines in his or her discretion necessary or appropriate to comply with applicable tax laws;

(xix)  resolve all applicable lien resolution matters;

(xx)  register as a responsible reporting entity ("**RRE**") and timely submit all reports under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") as required under Section 4.6 below;

(xxi)  determine the form(s) of release required to be executed by a Beneficiary in connection with a distribution on account of an Abuse Claim in accordance with the TDP;

(xxii)  enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of the Trust Documents;

(xxiii)  in accordance with Section 5.9 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.7(a) below) solely from the Trust Assets and to the fullest extent permitted by law;

(xxiv)  delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable investment advisors or investment managers without liability for any action taken or omission made because of any such delegation;

(xxv)  delegate any or all of the authority conferred with respect to the protection, preservation, and monetization of the non-cash Trust Assets;

(xxvi)  initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all legal actions and other proceedings related to any asset, liability, or responsibility of the Trust, including the Actions (as defined in the Plan);

(xxvii) enter into structured settlements and other similar arrangements with any Beneficiary (including a minor or other person in need of special consideration) upon such terms as the Trustee and such Beneficiary (or such Beneficiary's counsel or other authorized person) agree, in all cases in accordance with the TDP, including the Independent Review Process;

(xxviii)contract for the establishment and continuing maintenance of a website (the "**Trust Website**") to aid in communicating information to the Beneficiaries and their counsel or other authorized persons;

7

(xxix)  take any and all actions appropriate or necessary in order to carry out the terms of the Trust Documents;

(xxx)  except as otherwise expressly provided in the Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of Delaware; and

(xxxi)  at the Trustee's sole discretion, retain one or more consultants in order to assist the Trustee and the Claims Administrators in evaluating and determining whether one or more Abuse Claims may be fraudulent.

(e)  The Trustee shall have the power to (i) authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimants against the Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim in accordance with the provisions of Article XII.B of the TDP (a "**STAC Tort Election Claim**"), and (ii) enter into any settlement that causes an Insurance Company to become a Settling Insurance Company or a Chartered Organization to become a Contributing Chartered Organization (and thereby a Protected Party) (a "**PP Settlement**"), provided however, the powers set forth in this Section 2.1(e) shall in each case be subject to the provisions of the Trust Documents including Sections 5.13, 5.14 and 5.15(a) below.

(f)  The Trustee shall take all actions necessary or advisable for the enforcement of the non-monetary commitments of Reorganized BSA with respect to Child Protection as set forth in the Plan and Confirmation Order.

(g)  The Trustee shall consult with the STAC and the FCR on the matters set forth in Section 5.13 below. The Trustee shall obtain the consent of the STAC and the FCR prior to taking action with respect to the matters as set forth in the Trust Documents including Section 5.14 below, as and to the extent set forth therein.

Section 2.2    *Limitations on the Trustee, STAC and FCR.*

(a)  Notwithstanding anything in the Trust Documents to the contrary, the Trustee shall not do or undertake any of the following:

(i)  guaranty any debt;

(ii)  make or enter into any loan of Trust Assets;

(iii)  make any transfer or distribution of Trust Assets other than those authorized by the Trust Documents;

(iv)  engage in any trade or business with respect to the Trust Assets or proceeds therefrom, provided, however, that the Trustee shall (i) hold, manage, protect and monetize the Trust Assets which shall not be deemed to constitute a trade or business;

(v)  engage in any investment of the Trust Assets, other than as explicitly authorized by this Trust Agreement; and

(vi)    engage in any activities inconsistent with the treatment of the Trust as a "qualified settlement fund" within the meaning of Treasury Regulations issued under Section 468B of the Tax Code.

(b)    Excess Insurance Settlements.

(1)    As to insurance policies that provide coverage after the primary insurance limit has been exhausted or used up or that extend the limit of insurance coverage of the primary policy or the underlying liability policy ("**Excess Insurance**"), settlements that would make the insurance carrier a Protected Party as to such policy(ies) ("**Excess Insurance Settlements**") will not be entered into by the Trust until after the initial deadline for filing Independent Review Claims under the TDP. Exceptions to this include: (A) Excess Insurance Settlements involving insurance with aggregate limits where the settlement is for 90% or more of the remaining aggregate limits; and/or (B) an Excess Insurance Settlement that is proposed by the Trustee and approved by at least five (5) members of the STAC and the FCR so long as the Trustee supports the settlement and determines that the proposed settlement is in the best interests of the Trust and that one or more of the separately identified Specified Circumstances are present. In such circumstance, the Trustee may effectuate the proposed Excess Insurance Settlement without Bankruptcy Court approval. Notwithstanding the foregoing, if a STAC member dissents from approval of the proposed Excess Insurance Settlement and wants the Trustee to seek Bankruptcy Court approval of the proposed settlement, such settlement shall be conditioned on the Bankruptcy Court finding that the proposed settlement is in the best interest of the Trust and that the Trustee has reasonably determined that one or more of the Specified Circumstances exist.

(2)    In assessing Excess Insurance Settlements, the Trustee and STAC will consider principally the interests of Beneficiaries who hold Abuse Claims (whether such Abuse Claims are determined through the Independent Review Process or through Claims Matrix and Scaling Factors under the TDP) that enhance the collection of Excess Insurance.

(3)    Excess Insurance Settlements must be supported by an independent expert opinion that the settlement value is fair in light of the expected liabilities against the insurance, unless *de minimis*. The Trust shall recover the cost of such expert opinion from the first dollars paid on account of such settlement. The expert must take into account the opinions of the holders of Independent Review Claims whose claims are covered by the insurer at issue.

(4)    Unless the Excess Insurance settlement is for an aggregate limit excess policy settled at or above 90% of the available aggregate limit, the Trustee and STAC shall consider the opinions of Direct Abuse Claimants that hold Independent Review Claims covered by the insurer at issue; and

(c)    Chartered Organization Settlements.

No Chartered Organization may become a Contributing Chartered Organization under a PP Settlement: (1) absent a separate contribution to the Trust in an amount that the Trustee finds acceptable after taking into account the value of the claims against the Chartered Organization and the Chartered Organization's ability to pay (from assets and separate insurance), (2) if the PP Settlement is made on behalf of more than one Chartered Organization (or its affiliated entities)

and the funds are not coming directly from a Chartered Organization (or its affiliated entities) or an insurance company directly insuring the Chartered Organization (or its affiliated entities), unless the terms of the PP Settlement afford all holders of Direct Abuse Claims that had maintained lawsuits that were permitted by the Channeling Injunction against any of such Chartered Organizations (or its or their affiliated entities) prior to the proposed PP Settlement an opportunity to opt out and maintain their lawsuits, and (3) absent approvals by the STAC and/or FCR and/or Bankruptcy Court as required by the Trust Documents.

Section 2.3      *General Administration.* The Trustee shall act in accordance with the Trust Documents.  The Trustee shall establish the location of the principal office of the Trust and may change the location of the principal office or establish other offices at other locations in his or her discretion.

Section 2.4      *Accounting.* The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year.  The Trustee shall maintain the books and records relating to the Trust Assets and income and the payment of Trust Operating Expenses and other liabilities of the Trust.  The detail of these books and records and the duration of time during which the Trustee shall keep such books and records shall be such as to allow the Trustee to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided however, that the Trustee shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of Trust liabilities.

Section 2.5      *Financial Reporting.*

(a)      The Trustee shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustee, to audit the Annual Report.  Within one hundred twenty (120) days following the end of each calendar year, the Trustee shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements.  The Trustee shall publish a copy of such Annual Report on the Trust Website when such report is filed with the Bankruptcy Court.

(b)      All materials filed with the Bankruptcy Court pursuant to this Section 2.5 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

Section 2.6      *Claims Reporting.* Within one hundred twenty (120) days following the end of each calendar year, the Trustee shall cause to be prepared and filed with the Bankruptcy Court an annual report containing a summary regarding the number and type of Abuse Claims disposed of during the period covered by the financial statements (the "**Annual Claims Report**").  The Trustee shall

post a copy of the Annual Claims Report on the Trust Website when such report is filed with the Bankruptcy Court.

(b)    Within forty-five (45) days following the end of each calendar quarter, the Trustee shall cause to be prepared a quarterly claims report containing a summary regarding the number and type of Abuse Claims disposed of during the quarter (the "**Quarterly Claims Report**"). The financial information set forth in the Quarterly Claims Report shall be unaudited. The Trustee shall post a copy of the Quarterly Claims Report on the Trust Website; the Quarterly Claims Report need not be filed with the Bankruptcy Court.

Section 2.7    _Names and addresses._

The Trustee shall keep a register (the "**Register**") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Trust Documents. The Trustee may rely upon this Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each Abuse Claim holder as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trustee. The Trustee may deliver distributions and notices to counsel for any Beneficiary identified in such Beneficiary's proof of claim or proper notice of a name or address change.

Section 2.8    _Sexual Abuse Survivors Advisory Committee._

(a)    There shall be a Sexual Abuse Survivors Advisory Committee which shall consist of six (6) individual abuse survivors (such individuals, together with their successors, the "**SASAC**").[2]

(b)    The SASAC may attend and participate in such meetings as shall be called by the Trustee and/or the STAC ("**SASAC Meetings**") from time to time as determined by the Trustee and/or STAC respectively in their discretion, and the Trustee and STAC shall provide periodic reporting to the SASAC. There shall be not less than one (1) SASAC Meetings in each calendar year. The Trustee and/or the STAC shall propose, and be available, to consult with the SASAC at least quarterly, and shall use their reasonable best efforts to keep the SASAC advised of any material matters of the Trust, as determined by the Trustee and/or STAC in their reasonable judgment.

(c)    The SASAC may have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), which access may be made available as determined by the Trustee.

(d)    The members of the SASAC shall not be entitled to compensation for their services; the members of the SASAC shall be reimbursed promptly for all reasonable and documented out-of-pocket costs and expenses incurred in connection with their attendance at all

---

[2]    The initial members of the SASAC shall consist of three (3) individuals selected by the Coalition, subject to the reasonable consent of the TCC, and three (3) individuals selected by the TCC, subject to the reasonable consent of the Coalition.

SASAC Meetings set forth in Section 2.8(b). The Trust shall include a description of the amounts paid under this Section 2.8 in the Annual Report to be posted on the Trust's Website.

Section 2.9    *Transfers of the Trust Corpus.*

To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court or other competent court of jurisdiction.

# ARTICLE 3.
## ACCOUNTS, INVESTMENTS, EXPENSES

Section 3.1    *Accounts.*

(a)    The Trustee shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with Reorganized BSA or their affiliated persons or others. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

(c)    The Trustee may maintain a segregated account to hold any assets thereof for the benefit of the holders of Future Abuse Claims (the "**Future Abuse Claims Reserve**") to the extent required to implement the TDP. Trust Operating Expenses directly allocable to the administration of Future Abuse Claims and the Future Abuse Claims Reserve shall be charged against any Future Abuse Claims Reserve, as reasonably determined by the Trustee.

(i)    [Reserved for the administration of the Future Abuse Claims Reserve, if any.]

(d)    The Trustee may maintain segregated accounts to hold any assets received as a result of or in connection with a PP Settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand (the "**Chartered Organization Abuse Claims Reserve**") to the extent required to implement the TDP. The Trust shall hold the assets thereof for the benefit of holders of Allowed Abuse Claims that (i) could have been satisfied from that source absent the Plan's Discharge and Channeling Injunction and (ii) are held by Direct Abuse Claimants that execute a conditional release releasing all claims against all Chartered Organizations pursuant to the terms of the TDP ("**Chartered Organization Abuse Claims**"). Trust Operating Expenses directly allocable to the administration of Chartered Organization Abuse Claims and the Chartered Organization Abuse Claims Reserve shall be charged against the Chartered Organization Abuse Claims Reserve, as reasonably determined by the Trustee.

(i)     [Reserved for the administration of the Chartered Organization Abuse Claims Reserve.]

(e)     The Trustee may maintain segregated accounts to hold any assets received as a result of or in connection with any settlement for the benefit of the holders of Excess Award Shares including maintaining the Excess Award Fund as and to the extent required to implement the TDP in connection with the Independent Review Process. Expenses directly allocable to the administration of the Excess Award Fund shall be charged against the Excess Award Fund, as reasonably determined by the Trustee.

(f)     The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Beneficiaries and the payment of Trust Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the Internal Revenue Code ("**IRC**") or Treasury Regulations.

Section 3.2    *Investment Guidelines.*

(a)     The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as Exhibit 4 (the "**Investment Guidelines**").

(b)     Pursuant to the Plan, the Trust shall hold certain non-liquid assets. The Trustee shall own, protect, oversee, insure and monetize such non-liquid assets in accordance with the Trust Documents. This Section 3.2(b) is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)     Cash proceeds received by the Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the Trust as set forth in Section 1.2 above.

Section 3.3    *Payment of Trust Operating Expenses.* All Trust Operating Expenses shall be payable out of the Trust Assets. None of the Trustee, Delaware Trustee, the STAC, the FCR, the Beneficiaries nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any Trust Operating Expense or any other liability of the Trust.

## ARTICLE 4.
## CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Section 4.1    *Claims Administration and Distributions.* The Trust shall fairly and reasonably compensate Allowed Abuse Claims and shall pay up to the full value of such claims, solely in accordance with the Trust Documents, including the TDP (and, for the avoidance of doubt, including without limitation the provisions of Article XI, Article XII.C. and G, and Article XIII of the TDP). The TDP shall be subject to amendment or modification only to the extent expressly set forth in the TDP. There shall be two (2) Claims Administrators to oversee the administration

13

of claims.  The initial Claims Administrators shall be (1) Honorable Michael Reagan (Ret.) principally to serve in the role of Claims Administrator for the Independent Review Process and (2) Honorable Diane Welsh (Ret.) principally to serve in the role of Claims Administrator for the Abuse Claims otherwise administered under the TDP.    Successor Claim Administrators will be selected only if approved by at least five (5) members of the STAC and with the reasonable consent of the FCR.

        (b)    The Trustee shall employ individuals to serve as the Neutrals in the Independent Review Process under the TDP, giving due weight in the selection process to prior service as a retired judge with tort experience.

        (c)    Among the Trust Assets are funds contributed from Pachulski Stang Ziehl & Jones LLP (the **"PSZJ Contribution"**).  The Trustee shall have discretion to use such part of the PSZJ Contribution as the Trustee may determine to distribute to holders of Abuse Claims in recognition of their positive contributions made prior to, during or after the Chapter 11 Cases benefiting survivors of childhood sexual abuse and preventing abuse.

Section 4.2    _Applicability and Review of Payment Percentage._

        (a)    Because there is uncertainty in the prediction of both the total amount of the Trust's liabilities and the amount of the Trust Assets, no guarantee can be made as to the total payment the Trust will be able to pay for any Allowed Abuse Claim.  The Trustee shall determine from time to time the percentage of value that holders of present and future Abuse Claims are likely to receive from the Trust Assets available for distribution on account of compensable Abuse Claims. As soon as practicable after the Effective Date, the Trustee shall establish an Initial Payment Percentage.

        (b)    The Initial Payment Percentage shall apply to all Allowed Abuse Claims to be paid by the Trust until the Trustee, with the consent of the STAC and the FCR, determines that the Initial Payment Percentage should be changed to assure that the Trust shall be in a financial position to pay present and future holders of similar Allowed Abuse Claims in substantially the same manner (the Initial Payment Percentage, as it may be changed from time to time pursuant to this Section 4.2, the **"Payment Percentage"**).

        (c)    No less frequently than once every twelve (12) months, commencing on the first month end (or such other period as is practicable for computational purposes) following the first anniversary of the Effective Date, the Trustee shall compare the Abuse Claims distribution forecasts for the Trust on which the then-existing Payment Percentage was based with the actual Abuse Claims filings and distributions of the Trust to date. If the results of the comparison suggest the potential for shortfalls in Trust Assets for continued Abuse Claims distributions at the then applicable Payment Percentage, the Trustee shall undertake a reconsideration of the Payment Percentage. The Trustee may reconsider the Payment Percentage at shorter intervals if the Trustee deems such reconsideration is appropriate or if requested to do so by the STAC or the FCR. The provisions of this Section 4.2(c) may be modified by the Trustee with the consent of the STAC and the FCR.

(d)     The Trustee shall base the determination of any Payment Percentage on current estimates of the number, types, and values of present and future Abuse Claims, the current Trust Assets, all anticipated Trust Operating Expenses, and any other material matters that are reasonably likely to affect the sufficiency of Trust Assets available to pay the present and future holders of Abuse Claims.

(e)     The Trustee shall base the determination of any payment percentage for the Excess Award Fund on current estimates of the number, types, and values of present and future Excess Award Shares, the current amount of the Excess Award Fund and any other material matters that are reasonably likely to affect the sufficiency of Trust Assets available to pay the present and future holders of Excess Award Shares.

(f)     The Trustee shall base the determination of any payment percentage for any segregated fund resulting from the contributions of or on behalf of a Contributing Chartered Organization on current estimates of the number, types, and values of present and future Abuse Claims entitled to share in that fund under the Trust Documents and any other material matters that are reasonably likely to affect the sufficiency of Trust Assets available to pay the present and future holders of those Abuse Claims.

Section 4.3     _Supplemental Payments._

(a)     If the Trustee, with the consent of the STAC and the FCR, increases the Payment Percentage, the Trust shall make supplemental payments to all Beneficiaries who previously liquidated their Abuse Claims and received payments based on a lower Payment Percentage (with adjustments, if any, as set forth in the TDP).  The amount of any such supplemental payment to a Beneficiary shall be the liquidated value of the Abuse Claim in question times the applicable newly adjusted Payment Percentage, less all amounts previously paid by the Trust to the Beneficiary (with adjustments, if any, as set forth in the TDP) with respect to the Abuse Claim.

(b)     The Trustee's obligation to make a supplemental payment to a Beneficiary shall be suspended in the event the payment in question would be less than $250 after application of the Payment Percentage at that time. The amount of a suspended payment to the holder of any Abuse Claim shall be added to the amount of any prior supplemental payment(s) that was/were also suspended because it/they collectively would have been less than $250, and the Trustee's obligation shall resume to pay any such aggregate supplemental payments due the Beneficiary at such time that the cumulative aggregate amount exceeds $250.

(c)     Notwithstanding anything herein or in the TDP, the Trustee reserves all powers expressly granted to him or her by the Plan and the Confirmation Order with respect to the administration of Abuse Claims.

Section 4.4    *Manner of Payment.* Distributions from the Trust to the Beneficiaries may be made by the Trustee on behalf of the Trust or by a disbursing agent retained by the Trust to make distributions on behalf of the Trust.

Section 4.5    *Delivery of Distributions.*

(a)    Distributions shall be payable to the Beneficiary (or to counsel for the Beneficiary) on the date approved for distribution by the Trustee (the "**Distribution Date**") in accordance with the terms of the Trust Documents, including the TDP. With respect to each compensable Abuse Claim approved for payment, distributions shall be made only after the Trustee has determined that all obligations of the Trust with respect to each such Abuse Claim have been satisfied. In the event that any distribution to a Beneficiary is returned as undeliverable, no further distribution to such Beneficiary shall be made unless and until the Trustee has been notified of the then current address of such Beneficiary, at which time such distribution shall be made to such Beneficiary without interest; provided however, that all distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date. After such date, (i) all unclaimed property or interests in property shall revert to the Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), (ii) the Abuse Claim of such Beneficiary shall be released, settled, compromised and forever barred as against the Trust, and (iii) all unclaimed property interests shall be distributed to other Beneficiaries in accordance with the Trust Documents, as if the Abuse Claim of such Beneficiary had been disallowed as of the date the undeliverable distribution was first made. The Trustee shall take reasonable efforts to obtain a current address for any Beneficiary with respect to which any distribution is returned as undeliverable.

(b)    In the event the Trust holds cash after paying all Trust Operating Expenses and making all distributions contemplated under the Trust Documents, such remaining cash shall be distributed to a national recognized charitable organization of the Trustee's choice to the extent economically feasible, which charitable organization shall be independent of the Trustee, the STAC and the FCR and, to the extent possible, shall have a charitable purpose consistent with the protection of children from sexual abuse or its ramifications. No Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

(c)    Notwithstanding any provision in the Trust Documents to the contrary, no payment shall be made to any Beneficiary on account of any Abuse Claim if the Trustee determines that the costs of making such distribution is greater than the amount of the distribution to be made.

Section 4.6    *Medicare Reimbursement and Reporting Obligations.*

(a)    The Trust shall register as a Registered Reporting Entity ("**RRE**") under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("**MMSEA**").

(b)    The Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust. The Trust, in its capacity as an RRE,

shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)    Before making distributions to Beneficiaries (or Beneficiaries' counsel), in respect of any Abuse Claim, the Trustee shall obtain a certification that said Beneficiary (or such Beneficiary's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

## ARTICLE 5.
## TRUSTEE; DELAWARE TRUSTEE

Section 5.1    *Number of Trustees.* In addition to the Delaware Trustee appointed pursuant to Section 5.11 hereof, there shall be one (1) Trustee. The initial Trustee shall be Honorable Barbara J. Houser (Ret.) or Barbara J. Houser LLC (as applicable). For the avoidance of doubt, there shall be at least one (1) Trustee serving at all times (in addition to the Delaware Trustee).

Section 5.2    *Term of Service, Successor Trustee.*

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal pursuant to Section 5.2(c) below, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)    The Trustee may resign at any time upon written notice to the STAC and FCR with such notice filed with the Bankruptcy Court. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by consent of (i) at least two/thirds (2/3) majority of the STAC and (ii) the FCR, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder. For the avoidance of doubt, any removal of the Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

Section 5.3    *Appointment of Successor Trustee.*

(a)    In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any successor Trustee, such vacancy shall be filled by the STAC and the

FCR as set forth herein. The STAC will nominate an individual to serve as successor Trustee. If the majority of the STAC then in office and the FCR agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee. In the event that a majority of the STAC and the FCR cannot agree on a successor Trustee, the matter will be resolved pursuant to Section 8.16 below.

(b)    Immediately upon the appointment of any successor Trustee pursuant to Section 5.3(a) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, and (iv) the termination of the Trust pursuant to Section 8.2 below.

Section 5.4    *Trustee Meetings.*

(a)    **Regular Meeting**. The Trustee shall hold regular meetings with the STAC and the FCR not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustee contemplated by this Section 5.4.

(b)    **Special Meetings**. Special meetings of the Trustee with the STAC, the SASAC and/or the FCR, either jointly or separately, may be called by the Trustee by giving written notice to the STAC, the SASAC and/or the FCR not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Participation in Meetings by Telephone Conference**. The Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another. Participation in a meeting pursuant to this Section 5.4(c) shall constitute presence in person at such meeting.

(d)    **Waiver of Notice**. Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall

constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(e)  **Adjournment**.  A meeting may be adjourned by the Trustee to another time and place.

Section 5.5  *Compensation and Expenses of Trustee.* The Trustee shall receive compensation from the Trust for his or her services as Trustee. The initial amount of the Trustee's compensation shall be [●] and shall be adjusted annually thereafter as reasonably determined by the majority of the STAC and FCR.  The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by the Trustee in the course of carrying out his or her duties as Trustee in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustee.  The amounts paid to the Trustee for compensation and expenses shall be disclosed in the Annual Report.

Section 5.6  *Trustee's Independence.*

(a)  The Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Reorganized BSA, their affiliated persons, or any Non-Settling Insurer.  No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Cases.  For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)  The Trustee, and the Delaware Trustee, shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)  Persons dealing with the Trust, the Trustee, and the Delaware Trustee with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust, the Trustee or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustee, the Delaware Trustee, the Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.7  *Standard of Care; Exculpation.*

(a)  As used herein, the term "**Trust Indemnified Party**" shall mean the Trustee, the Delaware Trustee, the Claims Administrators, the members of the STAC, the FCR, the SASAC and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)  No Trust Indemnified Party shall be liable to the Trust, any other Trust Indemnified Party, any Beneficiary or any other Person for any damages arising out of the creation, operation, administration, enforcement or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction. To the fullest extent permitted by applicable law, the Trust

19

Indemnified Parties shall have no liability for any action in performance of their duties under this Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers and other professionals retained by the Trust Indemnified Parties. None of the provisions of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers. Any Trust Indemnified Party may rely, without inquiry, upon writings delivered to it under any of the Trust Documents, which the Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person. Notwithstanding the foregoing, nothing in this Section 5.7 shall relieve the Trust Indemnified Parties from any liability for any actions or omissions arising out of the willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction; provided that in no event will any such person be liable for punitive, exemplary, consequential or special damages under any circumstances. Any action taken or omitted by the Trust Indemnified Parties with the approval of the Bankruptcy Court, or any other court of competent jurisdiction, will conclusively be deemed not to constitute willful misconduct, bad faith, or fraud.

(c)     The Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any Person in connection with the affairs of the Trust or for any liabilities or obligations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud, and all Persons claiming against the Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Trust, shall look solely to the Trust Assets for satisfaction of any such claims.

(d)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood and agreed by the parties hereto and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, [including Section 3806 of the Act,] and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.7 and its subparts.

(e)     The Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Trust against all liabilities arising out of the creation, operation, administration, enforcement or termination of the Trust, including actions taken or omitted in fulfillment of their duties with respect to the Trust, except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(f)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

Section 5.8     _Protective Provisions._

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.8.

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor to any Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Beneficiaries, it is hereby understood and agreed by the Parties and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustee, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.7 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

Section 5.9     _Indemnification._

(a)     Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust, including a statutory trust organized under the laws of the State of Delaware, is entitled to indemnify, hold harmless and defend such persons against any

and all liabilities, expenses, claims, damages or losses (including attorneys' fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding or operations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)    The Trustee shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

Section 5.10    *Bond.* The Trustee and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 5.11    *Delaware Trustee.*

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware, or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this

Section 5.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.11(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.  The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 5.11(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee, provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 5.11(d) below, provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

23

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused,

24

directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

Section 5.12    *Meeting Minutes.*

The minutes of proceedings of the Trustee shall be kept in written form (which may be electronic) at such place or places designated by the Trustee, or, in the absence of such designation, at the principal office of the Trust.

Section 5.13    *Matters Requiring Consultation with STAC and FCR.*

The Trustee shall consult with the STAC and the FCR on each of the following:

(a)    The form(s) of release to be executed by a Beneficiary;

(b)    An annual estimate of the budget for the Trust Operating Expenses; and

(c)    The administration, investment of assets of, and expenses to be charged against the Future Abuse Claims Reserve, if any;

Section 5.14    *Matters Requiring Consent of STAC and FCR.*

The Trustee shall obtain the consent of the STAC and the FCR, or, otherwise, Bankruptcy Court approval in the event of a dispute in accordance with Section 8.16 hereof, for the items listed below:

(a)    The determination of the Initial Payment Percentage and any subsequent adjustment to the Payment Percentage;

(b)    Any proposed modification to the indemnification provisions of the Trust Agreement;

(c)    Any proposed sale, transfer or exchange of Trust Assets (other than an insurance buy-back) above $5,000,000 (any proposed sale of Trust Assets below such amount shall not require STAC and FCR consent);

(d)    Any proposed material modifications to the Trust Agreement and/or the TDP, if and as required by the consent provisions set forth therein;

(e)    Any proposed increase or decrease in the size of the Future Abuse Claims Reserve, if any;

(f)    The commencement or continuation of a lawsuit by Direct Abuse Claimants against the Trust pursuant to a STAC Tort Election Claim, as set forth in Article XII.C of the TDP; and

(g)    The form and substance of the questionnaire required in connection with a Trust Claim Submission under the TDP (which is to be executed under oath by the Abuse Claimant individually (or an executor)).

Section 5.15    *Matters Requiring Special Approval:  PP Settlements, Limited Protected Party Injunction Date Extensions and Certain Employment Matters.*

(a)    PP Settlements.

In addition to limitations otherwise set forth in the Trust Documents including Section 2.2 above, any PP Settlement with a Chartered Organization or Insurance Company must be in an amount acceptable to the Trustee and either (1) obtain the approval of at least four (4) STAC members and the reasonable consent of the FCR or (2) Bankruptcy Court approval.  If Bankruptcy Court approval is sought, the Trustee must provide notice to the affected parties and approval of the PP Settlement shall be reviewed by the Bankruptcy Court under the Bankruptcy Rule 9019 standard and must be found to be in the best interest of the beneficiaries of the Trust. The members of the STAC may hire counsel at the expense of the Trust to oppose any such PP Settlement before the Bankruptcy Court.  Regardless of whether Bankruptcy Court approval is sought, the Trustee must provide notice of any PP Settlements to the affected parties (including holders of Direct Abuse Claims and Indirect Abuse Claims, as applicable).

(b)    Limited Protected Party Injunction Date Extensions.

(i)    Extensions of the Limited Protected Party Injunction Date for the Post-Confirmation Interim Injunction may be granted by the Trust as follows:

(A)    *First Extension*:  A six (6) month extension of the Plan's initial Limited Protected Party Injunction Date may be afforded with the approval of a majority of the STAC and the consent of the FCR to any Chartered Organization that is a Limited Protected Party, and for which the Trustee articulates good cause for believing that the Trust might settle with such Chartered Organization on a global basis (the "**First Extension**"), provided that unanimous approval of the STAC and FCR are required to afford the First Extension to any Chartered Organizations that individually, or in combination with other Chartered Organizations with which they are organizationally affiliated, are named in fewer than 25 Proofs of Claim filed by Direct Abuse Claimants;

(B)    *Second Extension*:  A subsequent six (6) month extension of the First Extension may be afforded with unanimous approval of the STAC and FCR to any Chartered Organization for which an extension was granted as described in Section 5.15(b)(i)(A) above with which the Trustee is negotiating to finalize settlement (the "**Second Extension**"); and

(C)    *Further Extension*:  An extension beyond the Second Extension may be afforded with unanimous approval of the STAC and FCR and approval of the

Bankruptcy Court to any Chartered Organization for which an extension was granted as described in Section 5.15(b)(i)(B) above.

(ii)    Within thirty (30) days after the expiration of the initial Limited Protected Party Injunction Date and each extension thereof in Section 5.15(b)(i)(A)-(C), the Trustee shall publish a list of the Chartered Organizations that are subject to the Post-Confirmation Interim Injunction.

(c)    Certain Employment Matters:

The Trustee must obtain approval of at least five (5) members of the STAC and the reasonable consent of the FCR for employment of a successor Claims Administrator pursuant to Section 4.1(a) or employment of legal counsel to the Trust.  Alternatively, if such support is not provided within five (5) business days following notice to the STAC, the Trustee may seek Bankruptcy Court approval of such employment without regard to the provisions of Section 8.16. In the event the Trustee requires counsel to present such matters to the Bankruptcy Court, or otherwise requires personal counsel, the Trustee may engage counsel for such purpose without STAC consent or Bankruptcy Court approval.

(d) Reorganized BSA Meetings with the Trustee:

Reorganized BSA shall meet with the Trustee at such reasonable times and at such reasonable places as may be determined by the Trustee.

Section 5.16    *Trustee's and STAC's Employment of Professionals.*

(a)    The Trustee may, but is not required to, retain and/or consult accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed appropriate by the Trustee to assist in matters for the Trust within the Trustee's purview (the **"Trustee Professionals"**).  The Trustee shall consult with the STAC and the FCR regarding the retention of the Trustee Professionals, provided, however, that no approval from the STAC or the FCR is required for the retention of Trustee Professionals.  For the avoidance of doubt, Trustee Professionals does not include legal counsel whose employment is governed by Section 5.15(c) above.

(b)    The STAC may, but is not required to, retain and/or consult, legal counsel and such other parties deemed appropriate by the STAC to assist in matters within the STAC's purview (the **"STAC Professionals"**), provided however that (i) the selection of such professional(s) shall be approved by at least five (5) members of the STAC, and (ii) selection of STAC Professionals under this Section 5.16(b) is separate from and has no effect on the retention of counsel by members of the STAC under Section 5.15(a) to oppose a PP Settlement.  If a majority of the STAC vote to hire counsel and cannot obtain the requisite supermajority approval following five (5) business days' notice to all STAC members, they may seek authorization from the Bankruptcy Court to approve such engagement.

## ARTICLE 6.
## SETTLEMENT TRUST ADVISORY COMMITTEE

Section 6.1      *Members; Action by Members.* The STAC shall be composed of seven (7) members appointed to represent the interests of holders of current Abuse Claims. Three (3) members of the STAC have been appointed by the Coalition of Abused Scouts for Justice (the "**Coalition**" and such individuals, the "**Coalition Appointees**"), three (3) members of the STAC have been appointed by the Official Committee of Tort Claimants (the "**TCC**" and such individuals, the "**Committee Appointees**"), and one (1) member of the STAC has been appointed by Pfau, Cochran, Vertetis Amala PLLC and The Zalkin Law Firm, P.C. (hereinafter, with their successors, "**Pfau/Zalkin**," and such individual, the "**Pfau/Zalkin Appointee**"). Additional alternates may be designated prior to the commencement of the Confirmation Hearing on the Plan, if proposed by the TCC, Coalition and Pfau/Zalkin, and publicly identified thereby or thereat and may be designated after the Effective Date by, as applicable, the Committee Appointees, Coalition Appointees or Pfau/Zalkin Appointees subject to the same consent rights applicable to the appointment of successor STAC members in Section 6.6 hereof.

The initial STAC members shall consist of the following (a) Coalition Appointees: (1) Adam Slater; (2) Sean Higgins; (3) Kenneth M. Rothweiler; (b) Committee Appointees: (1) Jordan Merson; (2) Paul Mones; (3) Christopher Hurley; and (c) the Pfau/Zalkin Appointee: (1) Irwin Zalkin.   The alternate STAC members are: (1) Deborah Levy (Coalition); (2) Peter Janci (Committee); and (3) Michael Pfau (Pfau/Zalkin).

Except as otherwise set forth in the Trust Documents, the STAC shall act by majority vote of STAC members then serving, provided however, the STAC may continue to act in the event of one or more vacancies on the STAC, in which case majority vote of the STAC members then serving shall be required for action by the STAC.

Section 6.2      *Duties.* The members of the STAC (and their designees) shall serve in a fiduciary capacity representing current holders of Abuse Claims. The STAC shall not have any fiduciary duties or responsibilities to any party other than holders of current Abuse Claims. Except for the duties and obligations expressed in this Trust Agreement and the TDP, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the STAC. To the extent that, at law or in equity, the STAC has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other parties hereto, or any Beneficiary, such duties and liabilities are replaced by the duties and liabilities of the STAC expressly set forth in this Trust Agreement and the TDP. The applicable designated alternate STAC member for another STAC member may vote and act in that STAC member's stead when that STAC member is unavailable.

Section 6.3      *STAC Information Rights.*

The STAC shall have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), and information available to the Trustee, which access shall be made available as determined by the Trustee in his or her discretion.

Section 6.4    [Reserved.]

Section 6.5    *Term of Office.*

(a)    Each member of the STAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) below, (iii) his or her removal pursuant to Section 6.5(c) below, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)    A member of the STAC may resign at any time by written notice to the other members of the STAC and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)    A member of the STAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the member of the STAC has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings. Such removal shall require the majority vote of the other members of the STAC and such removal shall take effect only upon the approval of the Bankruptcy Court.

Section 6.6    *Appointment of Successor.*

(a)    In the event of a STAC member vacancy, (i) if the vacancy has occurred with respect to a Coalition Member, the remaining Coalition Members shall nominate a successor STAC Member, (ii) if the vacancy has occurred with respect to a Committee Member, the remaining Committee Members shall nominate a successor STAC Member, (iii) if the vacancy has occurred with respect to a Pfau/Zalkin Member, Pfau/Zalkin shall nominate a successor STAC Member.  Successor STAC members appointed by the Coalition Members shall be subject to the consent of at least fifty percent (50%) of the Committee Members and the Pfau/Zalkin Member, successor STAC Members appointed by the Committee Members shall be subject to the consent of at least fifty percent (50%) of the Coalition Members and Pfau/Zalkin Member, and a successor STAC member appointed by Pfau/Zalkin shall be subject to the consent of at least fifty percent (50%) of the Coalition and Committee Members; provided, however, that if such consent is withheld, the Member(s) seeking to appoint a successor STAC Member may seek a ruling from the Bankruptcy Court that the consent was unreasonably withheld and that the successor STAC Member may be appointed; and provided, further, that if an alternate is nominated to be a successor STAC Member, all necessary consents shall be deemed to have been granted.

(b)    Each successor member of the STAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) above, (iii) his or her removal pursuant to Section 6.5(c) above, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(c)    No successor STAC member shall be liable personally for any act or omission of his or her predecessor STAC member. No successor STAC member shall have any

duty to investigate the acts or omissions of his or her predecessor STAC member. No STAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 6.7    *Compensation and Expenses of the STAC.* The members of the STAC (or their designees, as applicable) shall not be entitled to compensation for their services but shall be reimbursed promptly for all reasonable and documented ordinary and customary out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, subject to the limitation of Section 8.16 below. The Trust shall include a description of the amounts paid under this Section 6.7 in the Annual Report to be posted on the Trust's Website.

Section 6.8    *Procedures for Consultation with and Obtaining the Consent of the STAC.*

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the STAC pursuant to Section 5.13 above, the Trustee shall provide the STAC with written advance notice of the matter under consideration, to the extent practicable, and with all relevant information and documents concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the STAC with such reasonable access to the consultants and other advisors retained by the Trust and its staff (if any) as the STAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the STAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee, to the extent practicable.

(ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 6.8(a), the Trustee shall take into consideration the time required for the STAC to meet and consult as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least five (5) business days after providing the STAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived in writing by the STAC or at a meeting where the STAC and Trustee are present, or the Trustee determines in his reasonable discretion that definitive action is required earlier.

(b)    Consent Process.

(i)    In the event the Trustee is required to obtain the consent of the STAC pursuant to the Trust Documents, the Trustee shall provide the STAC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the STAC as much relevant additional information concerning the proposed action as is requested by the STAC and as is reasonably practicable under the circumstances. The Trustee shall also provide the STAC with such reasonable access to the Trust consultants and other advisors retained by the Trust and its staff (if any) as the STAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the STAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)    For matters not requiring supermajority consent of the STAC and subject to the provisions of Section 5.14 above:

(A)    The STAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee, in writing, of its consent or its objection to the proposed action within five (5) business days of receiving the original request for consent from the Trustee, unless the Trustee extends the time for such response. The STAC may not withhold its consent unreasonably. If the STAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the STAC does not advise the Trustee, in writing, of its consent or its objections to the action within five (5) business days of receiving notice regarding such request (or within such additional time as may be granted by the Trustee in his or her discretion), the STAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(B)    If, after following the procedures specified in this Section 6.8(b), the STAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the STAC shall resolve their dispute pursuant to Section 8.16 below, provided however in that event the STAC shall have the burden of proof to show the validity of the STAC's objection.

## ARTICLE 7.
## THE FCR

Section 7.1    _Duties._ There shall be one FCR for the Trust. The initial FCR is James L. Patton, Jr. so long as he is the FCR in the Chapter 11 Cases as of the Effective Date. The FCR shall serve in a fiduciary capacity on behalf of the holders of Future Abuse Claims, representing the interests of holders of Future Abuse Claims against the Debtors for the purpose of protecting the rights of such persons. The FCR shall not have any fiduciary duties or responsibilities to any party other than the holders of Future Abuse Claims. Except for the duties and obligations expressed in the Trust Documents, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the FCR. To the extent that, at law or in equity, the FCR has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other parties hereto, or to any Beneficiary, such duties and liabilities are replaced by the duties and liabilities of the FCR expressly set forth in the Trust Documents.

Section 7.2    _FCR Information Rights._

The FCR shall have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), and information available to the Trustee, which access shall be made available as determined by the Trustee.

Section 7.3    _Term of Office._

(a)    The FCR shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) below, (iii) his or her removal pursuant to Section 7.3(c) below, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)    The FCR may resign at any time by written notice to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    At the request of the Trustee, the FCR may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the FCR has received notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as a pattern of repeated non-attendance at scheduled meetings.

Section 7.4    *Appointment of Successor.* In the event of the death, resignation or removal of James L. Patton, Jr. as the initial FCR, such vacancy shall immediately be filled by a successor to be appointed pursuant to the terms and conditions of this agreement, who shall thereafter serve as FCR pursuant to the terms of the Trust Documents. In the event of the death, resignation, or removal of any successor FCR, such vacancy shall be filled with an individual nominated by the Trustee, with the consent of the STAC. In the event the STAC does not consent to the individual nominated by the Trustee, then the successor FCR shall be appointed by the Bankruptcy Court. Immediately upon any successor FCR filing a vacancy as provided in this Section 7.4, all rights, titles, duties, powers and authority of the predecessor FCR hereunder shall be vested in and undertaken by the successor FCR without any further act. No successor FCR shall be liable personally for any act or omission of any predecessor FCR. No predecessor FCR shall be liable personally for any act or omission of any successor FCR. No FCR shall be required to post any bond or other form of surety of security unless otherwise ordered by the Bankruptcy Court.

Section 7.5    *FCR's Employment of Professionals.* The FCR may, but is not required to, retain and/or consult legal counsel and such other parties deemed by the FCR to be qualified as experts on matters submitted to the FCR (the "**FCR Professionals**"), provided however that no FCR Professionals may be retained to act on behalf of any individual holder of an Abuse Claim.

(b)    The fees and expenses of the FCR Professionals shall be paid from any Future Abuse Reserve Fund, or the Trust if there is no Future Abuse Reserve Fund established and maintained, and a description of the amounts paid under this Section 7.5 (in the aggregate with the amounts paid under Section 7.6 below) shall be described in the Annual Report to be posted on the Trust Website.

Section 7.6    *Compensation and Expenses of the FCR.*

(a)    The FCR shall receive compensation from any Future Abuse Reserve Fund, or the Trust if there is no Future Abuse Reserve Fund established and maintained, in the form of payment at the FCR's normal hourly rate, as such rate may be adjusted by the FCR from time to time, for services performed, subject to the approval of the Trustee. The Trust will promptly reimburse the FCR for all reasonable and documented out-of-pocket costs and expenses incurred by the FCR in connection with the performance of his or her duties hereunder.

32

(b)     The compensation, out-of-pocket costs and expenses of the FCR shall be paid from any Future Abuse Reserve Fund, or the Trust if no Future Abuse Reserve Fund is established and maintained, and a description of the amounts paid under this Section 7.6 (in the aggregate with the amounts paid under Section 7.5 above) shall be described in the Annual Report to be posted on the Trust Website.

Section 7.7     *Procedures for Consultation with and Obtaining the Consent of the FCR.*

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the FCR pursuant to Section 5.13 above, the Trustee shall provide the FCR with written advance notice of the matter under consideration, and with all relevant information and documents concerning the matter as is reasonably practicable under the circumstances, to the extent practicable.  The Trustee shall also provide the FCR with such reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such matter, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee, to the extent practicable.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 7.7(a), the Trustee shall take into consideration the time required for the FCR, if he or she so wishes, to engage and consult with his or her own independent advisors as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least five (5) business days after providing the FCR with the initial written notice that such matter is under consideration by the Trustee, unless such period is waived in writing by the FCR or at a meeting where the FCR and Trustee are present or the Trustee determines in his reasonable discretion that definitive action is required earlier.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the FCR pursuant to the Trust Documents, the Trustee shall provide the FCR with a written notice stating that his or her consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action, to the extent practicable.  The Trustee shall provide the FCR as much relevant additional information concerning the proposed action as is requested by the FCR and as is reasonably practicable under the circumstances.  The Trustee shall also provide the FCR with such reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such action, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee, to the extent practicable.

(ii)     The FCR must consider in good faith and in a timely fashion any request for his or her consent by the Trustee, and must in any event advise the Trustee, in writing, of his or her consent or objection to the proposed action within five (5) business days of receiving the original request for consent from the Trustee, unless the Trustee extends the time for such

33

response. The FCR may not withhold his or her consent unreasonably. If the FCR decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the FCR does not advise the Trustee, in writing, of his or her consent or objection to the proposed action within five (5) business days of receiving the notice from the Trustee regarding such request (or within such additional time as may be granted by the Trustee in his or her discretion), the FCR's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following, the procedures specified in this Section 7.7(b), the FCR continues to object to the proposed action and to withhold his or her consent to the proposed action, the Trustee and/or the FCR shall resolve their dispute pursuant to Section 8.16 below, provided however in that event the FCR shall have the burden of proof to show the validity of the FCR's objection.

## ARTICLE 8.
## GENERAL PROVISIONS

Section 8.1    _Irrevocability._ To the fullest extent permitted by applicable law, the Trust is irrevocable. The Settlor shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) have any rights or role with respect to the management or operation of the Trust, or the Trustee's administration of the Trust.

Section 8.2    _Term; Termination._

(a)    The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

(b)    The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Trust because (i) all reasonably expected assets have been collected by the Trust, (ii) all distributions have been made to the extent set forth in the TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and Trust Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    Following the dissolution and distribution of the Trust Assets, the Trust shall terminate, and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(d)    After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed. The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until distribution of all the Trust Assets. For purposes of this provision, Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $50,000 and no further actions are pending or have yet to be

34

brought. At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of: (i) the first anniversary of the final distribution of the Trust Assets, and (ii) the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided however, that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to the Trust without giving Reorganized BSA the opportunity to take control of such books, records, documents and/or files.

(e)    Upon termination of the Trust and accomplishment of all activities described in this agreement, the Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his agents or representatives). The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

Section 8.3    *Outgoing Trustee Obligations.*

In the event of the resignation or removal of the Trustee, the resigning or removed Trustee shall:

(a)    execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

(b)    deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee;

(c)    otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee; and

(d)    irrevocably appoint the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

Section 8.4    *Taxes.*[3]

(a)    The Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B

---

[3]    Note: The matters in this section 8.4 are to be discussed.

of the IRC, as amended (the "**QSF Regulations**"), Reorganized BSA shall timely make an election to treat the Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

(b)    The Trustee shall be the "administrator" of the Trust within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust, if any, out of the Trust Assets, which assets may be sold by the Trustee to the extent necessary to satisfy tax liabilities of the Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of Trust as a qualified settlement fund and a grantor trust, within the meaning of the QSF Regulations, and (iv) take no action that could cause the Trust to fail to qualify as a qualified settlement fund and a grantor trust within the meaning of the QSF Regulations.

(c)    As soon as reasonably practicable after the Effective Date, but in no event later than one hundred twenty (120) days thereafter, the Trust shall make a good faith valuation of the Aggregate Settlement Consideration and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In connection with the preparation of the valuation contemplated hereby, the Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary.

(d)    The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement. In order to receive distributions, all Beneficiaries shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a payment or distribution unless or until such information is delivered; provided however, that, upon the delivery of such information, the Trustee shall make such delayed payment or distribution, without interest. Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Trust. In no event shall any escheat to any federal, state or local government or any other entity.

(e)    The Trust agrees to indemnify, defend and hold Reorganized BSA and its affiliates harmless on an after-tax basis from and against all taxes, losses, claims and expenses incurred by Reorganized BSA or its affiliates or any Taxes for which Reorganized BSA or its affiliates are otherwise liable, in each case resulting solely from, arising out of, or incurred with respect to, any claims that may be asserted by any party based on, attributable to, or resulting from the election to treat the Trust as a "grantor trust" within the meaning of the QSF Regulations

36

pursuant to Section 8.4(a), provided, however, the Trust shall be entitled to participate with Trust Professionals reasonably acceptable to Reorganized BSA in the protest, objection, defense or similar process involving any inquiry, discovery, request for information, audit, examination, suit or other proceeding which could result in liability to the Trust under this Section 8.4(e).

Section 8.5    *Modification.*

(a)    Material modifications to this Trust Agreement, including Exhibits hereto, may be made only with the consent of the Trustee, the majority of the STAC, and the FCR (which consent in each case shall not be unreasonably withheld, conditioned or delayed) and subject to the approval of the Bankruptcy Court; provided however, that the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make minor corrective or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement, provided such minor corrective or clarifying amendments shall not take effect until ten (10) days after notice to the Bankruptcy Court. Except as permitted pursuant to the preceding sentence, the Trustee shall not modify this Trust Agreement in any manner that is inconsistent with the Plan or the Confirmation Order without the approval of the Bankruptcy Court.   The Trustee shall file notice of any modification of this Trust Agreement with the Bankruptcy Court and post such notice on the Trust Website.

(b)    Notwithstanding subsection (a) of this Section 8.5, no material modifications may be made to Section 2.2(b), Section 5.15, Section 6.6, and this Section 8.5(b) of this Trust Agreement without the consent of the Trustee, the unanimous consent of the STAC, the consent of the FCR and subject to the approval of the Bankruptcy Court.

(c)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) the Trust's qualified settlement fund status and grantor trust status under the QSF Regulations, or (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.

Section 8.6    *Communications.* The Trustee shall establish and maintain the Trust Website and post on the Trust Website the information required by this Trust Agreement, and such other information as the Trustee determines.

Section 8.7    *Severability.* If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or

unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 8.8      _Notices._ Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustee:

with a copy (which shall not constitute notice) to:


To the Delaware Trustee:

with a copy (which shall not constitute notice) to:


To the FCR:

with a copy (which shall not constitute notice) to:


To the STAC:

with a copy (which shall not constitute notice) to:


To Reorganized BSA:

with a copy (which shall not constitute notice) to:

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

Section 8.9      _Successors and Assigns._ The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Trustee, the STAC, the FCR, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in

the case of the Trust and the Trustee, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.11 above.

Section 8.10    *Limitation on Transferability; Beneficiaries' Interests.* The Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, the Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, the Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Trustee to be distributable as distributions in accordance with the Trust Documents. For the avoidance of doubt, the Beneficiaries shall have only such rights as expressly set forth in the Trust Documents.

Section 8.11    *Exemption from Registration.*

The Parties hereto intend that the rights of the Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 8.12    *Entire Agreement; No Waiver.*

The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 8.13    *Headings.* The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

Section 8.14    *Governing Law.*

This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following

provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the STAC, or the FCR set forth or referenced in this Trust Agreement. 12 Del. C. § 3540 shall not apply to the Trust.

Section 8.15    *Settlor's Representative.*

Pursuant to the Document Agreement (as defined in the Plan), Reorganized BSA is hereby irrevocably designated as the **"Settlor's Representative"** and is hereby authorized to take any action consistent with Reorganized BSA's obligations under the Document Agreement that is reasonably requested of the Settlor by the Trustee. Pursuant to the Document Agreement, the Settlor's Representative shall cooperate with the Trustee and the Trust's officers, employees and professionals in connection with the Trust's administration of the Aggregate Settlement Consideration, including, but not limited to, providing the Trustee or his or her officers, employees and professionals, upon written request (including e-mail), reasonable access to information related to the Aggregate Settlement Consideration, including, without limitation, delivery of documents in the possession of, or witnesses under the control of, Reorganized BSA [and others] to the extent that the Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request, without the need for a formal discovery request.

Section 8.16    *Dispute Resolution.*

(a)    Except as provided in Sections 2.2(b) (Excess Insurance Settlements), 5.15(a) (PP Settlements), 5.15(b) (Limited Protected Party Injunction Date Extension), 5.15(c) (Certain Employment Matters) and Section 5.2(c) (Removal of Trustee for Cause), the dispute resolution procedures of this Section 8.16 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Beneficiaries hereof, arising under or with respect to this Trust Agreement. For the avoidance of doubt, this section does not apply to disputes arising under Section 5.15(a) and (b) as the approval process for PP Settlements and Limited Protected Party Injunction Date Extensions set forth in those sections is the exclusive method for obtaining approval of a PP Settlement or a Limited Protected Party Injunction Date Extension.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed fifteen (15) days from the date the Notice of Dispute is

received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. If the Trustee, FCR and STAC consent, a dispute hereunder may be resolved by alternative dispute resolution.

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.7 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within seven (7) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court. In the case of any dispute pursuant to this Section 8.16(d), if the dispute arose pursuant to the consent provision set forth in Section 4.1(b), 4.7, 5.14, 5.15(c) or 5.16, the Court shall initially determine, by a preponderance of the evidence, whether the party or parties who withheld consent were reasonable in such action. If the Court so determines, then the Court will determine whether the requested action is in the best interests of the Trust and its Beneficiaries.

(e)    Notwithstanding anything to the contrary in section 8.16(a), the Trust shall bear the reasonable costs and expenses of the STAC and the FCR in connection with any dispute that arises under this Trust Agreement.

Section 8.17    *Independent Legal and Tax Counsel.*

All parties to this Trust Agreement have been represented by counsel and advisors of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and shall not be construed either strictly for or against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the IRS or the taxing authorities of any state or territory of the United States of America.

Section 8.18    *Waiver of Jury Trial.*

Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

Section 8.19    *Effectiveness.*

This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

Section 8.20    *Counterpart Signatures.*

This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[SIGNATURE PAGES TO FOLLOW]*

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLOR]

[TRUSTEE]

[DELAWARE TRUSTEE]

[STAC MEMBERS]

[FCR]

**EXHIBIT 1**
**AGGREGATE SETTLEMENT CONSIDERATION**

**EXHIBIT 2**
**CERTIFICATE OF TRUST**

**EXHIBIT 3**
**TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS**

# EXHIBIT 4
## INVESTMENT GUIDELINES

**EXHIBIT C**

**CONTRIBUTING CHARTERED ORGANIZATION
SETTLEMENT CONTRIBUTION**

The Contributing Chartered Organization Settlement Contribution is comprised of the following monetary contributions, which shall be contributed to the Settlement Trust on the terms set forth in the applicable settlement agreements attached to the Plan as <u>Exhibit J,</u> as applicable.

| United Methodist Entities | $30,000,000 |

**EXHIBIT D**

**CONTRIBUTING CHARTERED ORGANIZATIONS**

1.      United Methodist Entities

# EXHIBIT E

## FOUNDATION LOAN TERM SHEET

<u>National Boy Scouts of America Foundation Loan to Boy Scouts of America</u>

<u>Summary of Terms and Conditions</u>

| | |
|---|---|
| **Lender** | National Boy Scouts of America Foundation (the "***Lender***") |
| **Borrower** | Boy Scouts of America (the "***Borrower***") |
| **Guarantor** | Arrow WV, Inc. (the "***Guarantor***") |
| **Facility** | $42.8 million term loan (the "***Loan***"), which shall be borrowed in a single draw on the effective date of the Plan (the "***Effective Date***"). <br><br> As used herein, the "***Plan***" means the Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [Dkt. No. 20], as may be amended on terms acceptable to Lender. |
| **Term** | 10 years commencing on the Effective Date. |
| **Interest Rate & Interest Payments** | 6.5%, subject to default interest of 2.0% on overdue amounts. <br><br> Interest shall be payable on a quarterly basis, with the first payment due at the end of the first fiscal quarter ended after the Effective Date. All outstanding interest shall be due and payable at maturity of the Loan. |
| **Principal Payments** | Principal payments shall be based on 10% per annum amortization. Such payments shall be made in equal quarterly installments for the duration of the Loan with the first payment due at the end of the first fiscal quarter ended after the Effective Date. All outstanding principal shall be due and payable at maturity of the Loan. |
| **Prepayments** | Voluntary prepayments permitted without penalty. |
| **Security** | Second lien pledge of the Arrow Intercompany Note and proceeds received in respect thereof. <br><br> As used herein, the "***Arrow Intercompany Note***" means that certain Amended and Restated Promissory Note dated as of March 21, 2019 in the original principal amount of $350,000,000, executed by the Guarantor and payable to the Borrower. |
| **Use of Proceeds** | To fund working capital and general corporate purposes of the Borrower; provided that, for the avoidance of doubt, proceeds of the Loan shall not be used for Unauthorized Purposes. <br><br> As used herein, "***Unauthorized Purposes***" includes, without limitation, payments to any creditors' trust pursuant to the terms of the confirmed Plan, any direct or indirect payments to tort claimants, and any payments or transactions that would be considered "self-dealing" under the Internal Revenue Code or could otherwise give rise to excise tax. |
| **Representations and Warranties** | Usual and customary for loans of this type. |

| | |
|---|---|
| **Affirmative and Negative Covenants** | Usual and customary for loans of this type, including, without limitation, (a) prohibitions on actions that could be construed as self-dealing, and (b) extension of the maturity of the Arrow Intercompany Note from March 31, 2029 to a date that is later than the maturity date of the Loan. |
| **Financial Covenants** | Usual and customary for loans of this type with customary cushions. |
| **Reporting Requirements** | Usual and customary for loans of this type. |
| **Events of Default** | Usual and customary for loans of this type, including cross-acceleration solely to the JPMorgan Bank, N.A. credit facilities in existence on the Effective Date that are senior by way of contract to the Loan, as such credit facilities may be amended from time to time. |
| **Remedies** | Usual and customary for loans of this type. |
| **Assignment** | The Borrower cannot assign the Loan without the consent of the Lender.<br><br>The Lender can assign the Loan at any time with the Borrower's consent, provided that if the Borrower is in payment or bankruptcy default under the Loan, then the Lender can assign the Loan without the consent of the Borrower. |
| **Conditions Precedent to the Loan** | Usual and customary for loans of this type, including, without limitation:<br><br>(a) the execution and delivery of loan documentation reasonably satisfactory to the Borrower and the Lender and consistent with this Summary of Terms and Conditions, containing conditions to borrowing, repayment terms, representations, warranties, covenants, and events of default usual and customary for this type of loan;<br><br>(b) the execution and delivery of an intercreditor and subordination agreement reasonably satisfactory to the Lender, between the Borrower, the Lender, and JPMorgan Chase Bank, N.A.;<br><br>(c) JPMorgan Chase Bank, N.A. shall have consented to the Borrower's pledge to Lender of a second lien security interest in the Arrow Intercompany Note and proceeds received in respect thereof;<br><br>(d) the satisfactory completion of the Lender's reasonable due diligence and the obtaining of any approvals or consents deemed necessary or appropriate upon the advice of counsel to the Lender;<br><br>(e) entry of a confirmation order on terms reasonably acceptable to the Lender; and<br><br>(f) the effectiveness of the Plan containing terms acceptable to the Borrower and the Lender. |
| **Expenses and Indemnification** | Usual and customary for loans of this type, including, without limitation, indemnification by the Borrower of the Lender of any losses suffered by the |

|  | Lender in the event that it is ultimately determined that the Borrower used the loan proceeds for Unauthorized Purposes. |
|---|---|
| **Governing Law** | Texas. |
| **Release** | The release by the Borrower of the Lender with respect to any and all claims, and inclusion of the Lender within all Plan releases, including as a "***Released Party***" and "***Protected Party***" under the Plan. |
| **Payment of Fees and Expenses** | The Borrower will pay the fees and expenses, including reasonable attorneys' fees, of the Lender associated with the preparation, execution, administration, and enforcement of the Loan and any subsequent amendment or waiver with respect thereto. The Lender shall not be required to file an application for payment of fees and expenses with the bankruptcy court. |

**EXHIBIT F**

**LOCAL COUNCIL SETTLEMENT CONTRIBUTION**

## I.    Local Council Settlement Contribution – General

In addition to the other components of the Local Council Settlement Contribution specified in the Plan,[1] the Local Councils shall contribute the following to the Settlement Trust on the Effective Date:

(1)    at least $300 million of Cash to be paid on the Effective Date (the "<u>Cash Contribution</u>");

(2)    Unrestricted properties[2] with a combined Appraised Value (as defined below) of $200 million (the "<u>Property Contribution</u>"), which shall be reduced on a dollar-for-dollar basis by any Cash Contribution in excess of $300 million, *provided* that the methodology and procedures related to property selection and acceptance are provided for below; and

(3)    the DST Note, in the principal amount of $125 million,[3] issued by the DST on or as soon as practicable after the Effective Date.[4]  The principal terms of the DST Note are set forth in the DST Note Mechanics described below.

A listing of each Local Council's total expected contribution is included in the Disclosure Statement, including a specific break-down between the (i) Cash Contribution and (ii) Property Contribution.  Any actual or anticipated changes in contributions for any Local Council will be set forth in the Plan Supplement; *provided, however*, that the Debtors shall file a notice on the Effective Date reflecting the final amount of each Local Council's cash contribution and property contribution.  Notwithstanding any change in the Cash Contribution or Property Contribution for any Local Council, the aggregate amount of the Cash Contribution and the Property Contribution shall not be less than $515 million in any circumstance (and the Cash Contribution shall not be less than $300 million in any circumstance).

---

[1]    All terms that are capitalized but not otherwise defined on this Exhibit F have the meanings ascribed to such terms in the Plan.

[2]    "<u>Unrestricted</u>" properties are defined as those properties not included in the BSA-defined Restriction Tiers 1 – 2 (Tier 1: Property limited to Boy Scout use only – any conveyance causes reversion or transfer of property to 3rd party. Tier 2: Property limited to Boy Scout use only – no reversionary clause).

[3]    Up to $25 million of the DST Note is being contributed by the Local Councils as part of the Contributing Chartered Organization Settlement Contribution.

[4]    The DST may be any other type of entity that ensures the DST Note is balance-sheet neutral as to the BSA and Local Councils, as determined by the BSA in consultation with the Ad Hoc Committee, and, in such event, each reference in the Plan, including this Exhibit F, to DST shall be deemed a reference to the actual entity that issues the DST Note.

## II.    Property Contribution

The Property Contribution shall be structured as follows:  The relevant Local Council shall agree to (a) retain title to the property (and pay insurance, property taxes, other associated ownership costs and any yet unremoved debt, all on a current basis), subject to, at the election, cost, and expense of the Settlement Trust, a mortgage in favor of the Settlement Trust) (b) post (and keep continuously posted unless otherwise agreed by the Settlement Trust) the property for sale within thirty days following the Effective Date with a qualified real estate broker that will use standard and customary marketing practices, (c) present any written sale offer to the Settlement Trust for approval, (d) present to the Settlement Trust for its review and approval all final proposed terms of any sale and purchase offers (including price, timing and other terms) ("Proposed Final Terms"); *provided* that if any Proposed Final Terms would impose additional costs on the Local Council and the Settlement Trust accepts such Proposed Final Terms, at the Local Council's option any such additional costs shall be deducted from the proceeds or paid by the Settlement Trust, and not by the Local Council,[5] (e) remit the proceeds of the sale to the Settlement Trust at closing net of posting/listing/marketing fees, escrow fees, sales commissions, and other typical costs of sale.[6] The Settlement Trust may review the marketing and sales efforts undertaken by the Local Council and request that the Local Council make changes to such marketing and sales efforts as are appropriate and lawful; provided that any costs associated with such changes will be paid, at the option of the Local Council, by the Settlement Trust or out of the proceeds of any sale.  If the Settlement Trust is unsatisfied with the sales and marketing effort, the Settlement Trust shall have the right to require the Local Council to promptly transfer the property to the Settlement Trust by quitclaim deed.  If there is a shortfall or surplus of net proceeds as compared to Appraised Value, the Settlement Trust shall bear the risk of the shortfall and keep the surplus.  If the property is not sold on or before the third anniversary of the Effective Date, the Local Council and the Settlement Trust each shall have the right to require the prompt transfer of the property to the Settlement Trust by quitclaim deed.  If the Local Council receives a cash offer for the property the value of which is at least equal to its Appraised Value, the Settlement Trust shall accept the offer if no superior offer is made within thirty days (or, if a lesser time is specified in an offer received, then such lesser time) or accept a quitclaim deed for the property.

The "Appraised Value" shall be determined as follows:

> (A)    In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that does not have a restriction in Restriction Tiers 3-5[7] ("Lower Tier Restriction"), as reasonably determined by the Debtors' property review counsel

---

[5]    By way of non-exclusive example, if the Proposed Final Terms requires the Local Council to retrofit a water system and the Settlement Trust accepts the Proposed Final Terms, the costs of the retrofit will, at the Local Council's option be paid (or reimbursed) out of the sale proceeds or paid by the Settlement Trust.

[6]    For the avoidance of doubt, the proceeds of the sale shall be first applied to any debt or liens remaining on the property, which debt shall have already been reflected in the Appraised Value of the property as described below.

[7]    A Tier 3-5 Restriction shall mean any of the following:  (1) Tier 3: property limited to Boy Scout or similar use or recreational area; (2) Tier 4: Property subject to conservation easement or other grantor or donor restrictions on development; (3) Tier 5: Property subject to leases to 3rd party (*e.g.*, office space, cell tower, oil and gas), zoning restrictions, easements or other similar encumbrances.

and specified on Exhibit 2 to Exhibit B to the Disclosure Statement, which summarizes the restricted appraisal reports or broker opinions of value conducted by JLL Valuation & Advisory Services, LLC ("JLL"), CBRE, Inc. ("CBRE") or Keen-Summit Capital Partners LLC in connection the BSA's chapter 11 case prior to June 10, 2021 (the "Specified Appraisals"): (1) the appraised amount set forth in any such Specified Appraisal (using the average of high and low values of such Specified Appraisal, if applicable) or (2) if the applicable Local Council elects a Qualified On-Site Appraisal, the amount established by the average of (1) and the appraised amount in such Qualified On-Site Appraisal (using, for the Qualified On-Site Appraisal, the average of high and low values, if applicable);

(B)     In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that has a Lower Tier Restriction: (a) the appraised amount set forth in a Specified Appraisal if such Specified Appraisal accounts for such Lower Tier Restriction or (b) if the Specified Appraisal does not account for such Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the property taking into account the Lower Tier Restriction.

(C)     In the case of a contribution of only a portion of a particular Camp, Service Center, Scout Shop or other property to the Settlement Trust, whether or not subject to a Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the specific parcel and acreage proposed to be contributed, taking into account any Lower Tier Restriction;

*provided*, that, in the case of (A), (B), or (C) the Appraised Value shall be net of any debt encumbering the property and that no new debts shall be placed on any property subject to the Property Contribution except any mortgages in favor of the Settlement Trust.

The applicable Local Councils and the BSA shall engage in reasonable good faith efforts to ensure all properties subject to the Property Contribution accurately reflect all restrictions that are known to (or should be reasonably known to) exist in any appraisal that is used to determine a property's Appraised Value.

In the event a restriction that was not considered by any appraisal used to determine Appraised Value is subsequently determined to exist, such appraisal shall not be eligible to determine Appraised Value, and, to the extent necessary, within a reasonable period of time, new appraisals shall be conducted and/or the relevant Local Council shall contribute additional unrestricted properties or cash to the Settlement Trust to the extent necessary to ensure the total Appraised Value of all property or properties contributed by such Local Council is equal to or exceeds the Appraised Value of property that such Local Council had originally agreed to contribute.

A "Qualified On-Site Appraisal" shall mean an appraisal conducted by a licensed real property appraiser from the geographic region where the property is located and conducted in compliance

with the Uniform Standards of Professional Appraisal Practice; *provided* that the Claimant Representatives (or, if the appraisal is commenced after the Effective Date, the Settlement Trust) shall have five (5) business days to object to any licensed real property appraiser selected by the Local Council if such appraiser is either affiliated with the Local Council or is not qualified to conduct such an appraisal by the applicable licensing authority in the geographic region where the property is located. The costs associated with any Qualified On-Site Appraisals will be borne by the Local Council. If the applicable Local Council has not commissioned a Qualified On-Site Appraisal as of the date that the Plan is filed, it will do so as soon as possible.

## III.    DST Note Mechanics

On the Effective Date, at the request of the Ad Hoc Committee, solely to facilitate payments from the LC Reserve Account, the DST shall be established, and the DST shall issue the DST Note in favor of the Settlement Trust in the principal amount of $125 million. Local Councils shall make monthly contributions into an account (and any replacement thereof) owned by the DST (the "LC Reserve Account") in an amount equal to the Required Percentage of the Local Councils' respective payrolls. Until the DST Note is extinguished, the LC Reserve Account shall be used only to fund contributions to the Pension Plan in accordance with the next sentence and, to the extent of any excess, to pay any Payment Amounts due under the DST Note. If at any time (including the end of any Plan Year) (a) the present value of the accumulated benefits for the Pension Plan, as determined in accordance with the requirements set forth in the definition of "Excess Balance" below for the most recently ended Plan Year, exceeds (b) the market value of the assets of the Pension Plan (clause (a) minus clause (b) being the "Shortfall Amount"), funds in the LC Reserve Account will be deposited into the Pension Plan up to the lesser of the Local Councils' collective pro rata share of the Shortfall Amount or the balance in the LC Reserve Account.

The DST Note shall be: (i) interest bearing at a rate of 1.5% per annum and without recourse except as to the LC Reserve Account; (ii) secured by a lien on the LC Reserve Account; (iii) payable on each Payment Date in an amount equal to the applicable Payment Amount; and (iv) prepayable in whole or in part at any time without premium or penalty. The unpaid balance of the DST Note (if any) remaining on the Payment Date that is the fifteenth anniversary of the First Payment Date (the "DST Note Maturity Date") shall be automatically extinguished and shall be considered forgiven and satisfied after giving effect to any required payment on such date. Other than the lien on the LC Reserve Account, the Settlement Trust shall have no other recourse for payment under the DST Note.

"Cushion Amount" means: (i) from the Effective Date until the first June 1 that is at least one year after the Effective Date (the "First Cushion Date"), $134.86 million; (ii) from the day following the First Cushion Date until June 1 of the following year (the "Second Cushion Date"), $124.86 million; (iii) from the day following the Second Cushion Date until June 1 of the following year (the "Third Cushion Date"), $114.86 million; (iv) from the day following the Third Cushion Date until June 1 of the following year (the "Fourth Cushion Date"), $104.86 million; and (v) from the day following the Fourth Cushion Date until June 1 of the following year (the "Fifth Cushion Date"), $100 million; and (vi) from the day following the Fifth Cushion Date to and including the DST Note Maturity Date, $100 million.

"Excess Balance" means the amount in excess of the applicable Cushion Amount, if any, by which (a) the sum of (i) the market value of the assets of the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year plus (ii) the balance of the LC Reserve Account as of the month-end preceding the applicable Payment Date exceeds (b) the present value of the accumulated benefits for the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year calculated using a 6.5% annual interest rate, net of expenses, so long as the Pension Plan continues to be a Cooperative and Small Employer Charity (CSEC) plan. The actuarial report shall be prepared in accordance with actuarial standards, past practice, and applicable law.

The Debtors have conducted a current experience study by the Pension Plan actuary with respect to the demographic assumptions for the Pension Plan (*e.g.*, rates of retirement, termination, spousal age difference, commencement age and forms of payment) (the "2021 Experience Study"). After implementing changes based on the 2021 Experience Study, demographic assumption changes, with the exception of annual updates to mortality improvement projection scales, will not be made without a subsequent experience study, and economic assumption changes will not be made without an asset liability management study. Reorganized BSA will not commission any such studies until five (5) years after the Effective Date of the Amended Plan unless there are material changes to Internal Revenue Code § 433 (governing CSEC plans). In the event of such a material change, Reorganized BSA shall commission any such studies only if it reasonably believes, in consultation with the Pension Plan actuary, that such study is required. During the term of the DST Note, on an annual basis, Reorganized BSA will provide advance notice to the Settlement Trustee of any proposed material changes that the Pension Plan actuary intends to make to its actuarial assumptions and methodologies that increase the present value of accumulated benefits under the Pension Plan by more than 1.0%. Reorganized BSA will confer in good faith with the Settlement Trustee regarding any such proposed changes. In addition, if the Pension Plan is amended in any regard which increases the present value of benefits under the Pension Plan, such amendments will be disregarded in the calculation of the present value of accumulated benefits for the purposes of the DST Note.

"Payment Amount" means an amount, if any, on each Payment Date, payable solely from the LC Reserve Account, equal to the least of: (x) the Excess Balance on such Payment Date, (y) the remainder of the balance of $100 million accumulated at 1.5% annual interest, as amortized by any amounts previously paid; and (z) the amount in the LC Reserve Account.

"Payment Date" means, unless the DST Note is prepaid in full, May 31 of each year starting on the first May 31 after the Effective Date (or starting on the first business day that is at least thirty (30) days after the Effective Date if the Effective Date occurs between May 1 and May 31) (the "First Payment Date") until the fifteenth anniversary of the First Payment Date.

"Plan Year" means the period from February 1 to and including January 31 of the following year.

"Required Percentage" means an amount equal to 12% of a Local Council's payroll, less any pension plan related expenses which are estimated to be approximately 0.50% of such payroll, less the Local Council employer contribution match for employee contributions to the section 403(b) defined contribution benefit plan, which percentage will not exceed 4.5% of participating employee payroll until at least $50 million of the DST Note principal has been paid, at which point

the employer contribution match percentage will not exceed 6% until the DST Note has been paid in full (principal and interest).

# EXHIBIT G

## LOCAL COUNCILS

Abraham Lincoln
Alabama-Florida
Alamo Area
Allegheny Highlands
Aloha
Andrew Jackson
Anthony Wayne Area
Arbuckle Area
Atlanta Area
Baden-Powell
Baltimore Area
Bay Area
Bay-Lakes
Black Hills Area
Black Swamp Area
Black Warrior
Blackhawk Area
Blue Grass
Blue Mountain
Blue Ridge
Blue Ridge Mountains
Buckeye
Buckskin
Bucktail
Buffalo Trace
Buffalo Trail
Caddo Area
Calcasieu Area
California Inland Empire
Cape Cod and Islands
Cape Fear
Capitol Area
Cascade Pacific
Catalina
Central Florida
Central Georgia
Central Minnesota
Central North Carolina
Chattahoochee
Cherokee Area (469)
Cherokee Area (556)
Chester County
Chickasaw
Chief Cornplanter
Chief Seattle
Chippewa Valley

Choctaw Area
Cimarron
Circle Ten
Coastal Carolina
Coastal Georgia
Colonial Virginia
Columbia-Montour
Connecticut Rivers
Connecticut Yankee
Conquistador
Cornhusker
Coronado Area
Cradle of Liberty
Crater Lake
Crossroads of America
Crossroads of the West
Dan Beard
Daniel Boone
Daniel Webster
De Soto Area
Del-Mar-Va
Denver Area
East Carolina
East Texas Area
Erie Shores
Evangeline Area
Far East
Five Rivers
Flint River
French Creek
Gamehaven
Garden State
Gateway Area
Georgia-Carolina
Glacier's Edge
Golden Empire
Golden Gate Area
Golden Spread
Grand Canyon
Grand Columbia
Grand Teton
Great Alaska
Great Rivers
Great Salt Lake
Great Smoky Mountain
Great Southwest

Great Trail
Greater Alabama
Greater Hudson Valley
Greater Los Angeles Area
Greater New York
Greater Niagara Frontier
Greater St. Louis Area
Greater Tampa Bay Area
Greater Wyoming
Greater Yosemite
Green Mountain
Greenwich
Gulf Coast
Gulf Stream
Hawk Mountain
Hawkeye Area
Heart of America
Heart of New England
Heart of Virginia
Hoosier Trails
Housatonic
Illowa
Indian Nations
Indian Waters
Inland Northwest
Iroquois Trail
Istrouma Area
Jayhawk Area
Jersey Shore
Juniata Valley
Katahdin Area
Lake Erie
Las Vegas Area
LaSalle
Last Frontier
Laurel Highlands
Leatherstocking
Lincoln Heritage
Long Beach Area
Longhorn
Longhouse
Longs Peak
Los Padres
Louisiana Purchase
Marin
Mason-Dixon

Mayflower
Mecklenburg County
Miami Valley
Michigan Crossroads
Mid-America
Middle Tennessee
Mid-Iowa
Midnight Sun
Minsi Trails
Mississippi Valley
Mobile Area
Monmouth
Montana
Moraine Trails
Mount Baker
Mount Diablo Silverado
Mountain West
Mountaineer Area
Muskingum Valley
Narragansett
National Capital Area
Nevada Area
New Birth of Freedom
North Florida
Northeast Georgia
Northeast Illinois
Northeast Iowa
Northeastern Pennsylvania
Northern Lights
Northern New Jersey
Northern Star
Northwest Georgia
Northwest Texas
Norwela
Occoneechee
Ohio River Valley
Old Hickory
Old North State
Orange County
Oregon Trail
Ore-Ida
Overland Trails
Ozark Trails
Pacific Harbors
Pacific Skyline
Palmetto

Pathway to Adventure
Patriots' Path
Pee Dee Area
Pennsylvania Dutch
Piedmont
Piedmont
Pikes Peak
Pine Burr Area
Pine Tree
Pony Express
Potawatomi Area
Prairielands
Puerto Rico
Pushmataha Area
Quapaw Area
Quivira
Rainbow
Redwood Empire
Rio Grande
Rip Van Winkle
Rocky Mountain
Sagamore
Sam Houston Area
Samoset
San Diego-Imperial
San Francisco Bay Area
Santa Fe Trail
Seneca Waterways
Sequoia
Sequoyah
Shenandoah Area
Silicon Valley Monterey Bay
Simon Kenton
Sioux
Snake River
South Florida
South Georgia

South Plains
South Texas
Southeast Louisiana
Southern Sierra
Southwest Florida
Spirit of Adventure
Suffolk County
Susquehanna
Suwannee River Area
Tecumseh
Texas Southwest
Texas Trails
Theodore Roosevelt
Three Fires
Three Harbors
Three Rivers
Tidewater
Transatlantic
Trapper Trails
Tukabatchee Area
Tuscarora
Twin Rivers
Twin Valley
Ventura County
Verdugo Hills
Virginia Headwaters
Voyageurs Area
W.D. Boyce
Washington Crossing
West Tennessee Area
Westark Area
Western Los Angeles County
Western Massachusetts
Westmoreland-Fayette
Winnebago
Yocona Area
Yucca

**EXHIBIT H**

**RELATED NON-DEBTOR ENTITIES**

Arrow WV, Inc.
Atikaki Youth Ventures Inc.
Atikokan Youth Ventures Inc.
BSA Asset Management, LLC
BSA Commingled Endowment Fund, LP
BSA Endowment Master Trust
Learning for Life
National Boy Scouts of America Foundation

**EXHIBIT I**

**INSURANCE SETTLEMENTS**

**Hartford Insurance Settlement.** The Plan incorporates the Hartford Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8816-1 and is attached hereto as Exhibit I-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Hartford Policies set forth in the Hartford Insurance Settlement Agreement (the "Hartford Insurance Settlement"), pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Hartford Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by Hartford to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by Hartford, of the Hartford Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, (v) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in the Hartford Insurance Settlement Agreement, (vi) the Allowance of the Hartford Administrative Expense Claim, and (vii) certain other settlements, compromises, and releases as set forth in the Hartford Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartford, including findings and conclusions designating Hartford as a good-faith purchaser of the Hartford Policies.

**Century and Chubb Companies Insurance Settlement.** The Plan incorporates the Century and Chubb Companies Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8907-1 and is attached hereto as Exhibit I-2, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Century and Chubb Companies Policies set forth in the Century and Chubb Companies Insurance Settlement Agreement (the "Century and Chubb Companies Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Century and Chubb Companies Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by the Century and Chubb Companies to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by the Century and Chubb Companies, of the Century and Chubb Companies Policies, free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity (as such terms are defined in the Century and Chubb Companies Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (v) certain other settlements, compromises, and releases as set forth in the Century and Chubb Companies Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the

Century and Chubb Companies, including findings and conclusions designating the Century and Chubb Companies as a good-faith purchaser of the Century and Chubb Companies Policies.

**Zurich Insurance Settlement.**    The Plan incorporates the Zurich Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8817-2 and is attached hereto as Exhibit I-3, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Zurich Insurer Policies set forth in the Zurich Insurance Settlement Agreement (the "Zurich Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Zurich Insurance Settlement Agreement, (ii) the Participating Chartered Organization Insurance Assignment, (iii) the sale by the Debtors and the Estates, and the purchase by the Zurich Insurers, of the Zurich Insurer Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Zurich Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Zurich Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (iv) certain other settlements, compromises, and releases as set forth in the Zurich Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the Zurich Insurers, including findings and conclusions designating the Zurich Insurers as good-faith purchasers of the Zurich Insurer Policies.

**Clarendon Insurance Settlement.**    The Plan incorporates the Clarendon Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8907-3 and is attached hereto as Exhibit I-4, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Clarendon Insurance Policies set forth in the Clarendon Insurance Settlement Agreement (the "Clarendon Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Clarendon Insurance Settlement Agreement, (ii) the assignment of the Clarendon Local Council Policies issued by Clarendon to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by Clarendon, of the Clarendon Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Clarendon Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Clarendon Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (v) certain other settlements, compromises, and releases as set forth in the Clarendon Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Clarendon, including findings and conclusions designating Clarendon as a good-faith purchaser of the Clarendon Policies.

**EXHIBIT I-1**

**HARTFORD INSURANCE SETTLEMENT AGREEMENT**

*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT I-2**

**CENTURY AND CHUBB COMPANIES INSURANCE SETTLEMENT AGREEMENT**

*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT I-3**

**ZURICH INSURANCE SETTLEMENT AGREEMENT**

*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT I-4**

**CLARENDON INSURANCE SETTLEMENT AGREEMENT**

*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT J**

**CHARTERED ORGANIZATION SETTLEMENTS**

**United Methodist Settlement**.    The Plan incorporates the United Methodist Settlement Agreement, which was filed on the docket of the Chapter 11 Cases and attached hereto as <u>Exhibit J-2</u>, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements set forth in the United Methodist Settlement Agreement (the "<u>United Methodist Settlement</u>") pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, including, as provided in the United Methodist Settlement Agreement, payment of the United Methodist Settlement Contribution to the Settlement Trust as a compromise and settlement of all Abuse Claims against United Methodist Entities and certain Claims by United Methodist Entities against the Debtors, Local Councils, and other parties in interest, and disputes relating to the Plan. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the United Methodist ad hoc committee.

**Roman Catholic Settlement**.  The Plan incorporates the Roman Catholic Settlement Agreement, which was filed on the docket of the Chapter 11 Cases on March 17, 2022, and attached hereto as <u>Exhibit J-3</u>.  Pursuant to the Roman Catholic Settlement, all Roman Catholic Entities, other than those that have specifically opted out of such treatment (and do not withdraw such opt-out) and other than those that are debtors in bankruptcy as of the Confirmation Date that have not advised Debtors' counsel in writing that they wish to make the Participating Chartered Organization Insurance Assignment, shall be treated as Participating Chartered Organizations.

**EXHIBIT J-1**

**[RESERVED]**

**EXHIBIT J-2**

**UNITED METHODIST SETTLEMENT AGREEMENT**
*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT J-3**

**ROMAN CATHOLIC SETTLEMENT AGREEMENT**

*(as filed on the docket of the Chapter 11 Cases)*

**EXHIBIT K**

**CHARTERED ORGANIZATIONS THAT ARE DEBTORS IN BANKRUPTCY**

**(SUBJECT TO CHANGE)**

> **THE FOLLOWING IS A LIST OF CHARTERED ORGANIZATIONS THAT THE BSA IS AWARE ARE CURRENTLY DEBTORS IN BANKRUPTCY. IF THE BSA BECOMES AWARE OF ADDITIONAL CHARTERED ORGANIZATIONS IN BANKRUPTCY, IT WILL PROMPTLY REVISE THIS EXHIBIT.**

\*    Indicates any Chartered Organization listed below that has advised the Debtors' counsel in writing that it wishes to be treated as a Participating or Contributing Chartered Organization, as applicable.

1.    Archbishop of Agaña, a Corporation Sole, Chapter 11 Debtor in Possession, District Court of Guam, Territory of Guam, Bankruptcy Division, Case 19-00010.

2.    The Diocese of Buffalo,\* New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Western District of New York, Case No. 20-10322.

3.    The Diocese of Camden,\* New Jersey, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the District of New Jersey, Case No. 20-21257.

4.    The Diocese of Rochester,\* New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Western District of New York, Case No. 19-20905.

5.    The Roman Catholic Diocese of Syracuse,\* New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Northern District of New York, Case No. 20-30663.

6.    The Roman Catholic Diocese of Rockville Centre,\* New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Southern District of New York, Case No. 20-12345.

7.    Roman Catholic Church of the Archdiocese of Santa Fe,\* Chapter 11 Debtor in Possession, United States Bankruptcy Court for the District of New Mexico, Case No. 18-13027.

8.    The Norwich Roman Catholic Diocesan Corporation,\* Chapter 11 Debtor in Possession, United States Bankruptcy Court for the District of Connecticut, Case No. 21-20687.

9.    All Saints Episcopal Church,\* Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Northern District of Texas, Case No. 21-42461.

10.   The Roman Catholic Church of the Archdiocese of New Orleans,\* Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Eastern District of Louisiana, Case No. 20-10846.

# EXHIBIT L

## YOUTH PROTECTION
## PROGRAM

Non-Monetary Commitments. The BSA will not compromise the safety of our youth, volunteers, and employees. We are all responsible and must hold each other accountable to provide a safe environment for all participants. Safety is a value that must be taught and reinforced at every opportunity and nothing is more important than protecting our Scouts from abuse. BSA is dedicated to becoming the Gold Standard in abuse prevention. Because of this commitment, we are and will always seek to bolster our abuse prevention efforts. In furtherance of these efforts, the BSA shall take the following actions to promote healing and reconciliation and to continue the BSA's efforts to prevent abuse from occurring in Scouting in the future:

1) Hire a Youth Protection Executive ("YPE"): No later than six months from the Effective Date, retain a youth protection executive with extensive expertise in the prevention, recognition, and response to abuse within institutions, whose responsibilities shall include all aspects of youth protection, including:[1]

   a) Youth protection policies and training.

   b) Monitoring compliance with training requirements.

   c) Implementing and monitoring the youth protection champions in Local Councils, as part of an overall effort to adopt best practices and drive standardization of youth protection measures among Local Councils and Chartered Organizations.

   d) Advocating for continued, embedded youth protection culture in the BSA, among adults and Scouts.

2) On or as soon as practicable following the Effective Date, form a Youth Protection Committee ("YPC"): The BSA shall form a committee including members from the BSA, Local Councils, Chartered Organizations, and nominees of the Tort Claimants' Committee, and nominees of the Survivors Working Group. Assuming there are a sufficient numbers willing to serve on the YPC, members nominated by the Tort Claimants' Committee and the Survivors Working Group shall be in equal numbers, respectively, and shall, in combination, be at least half the total membership of the YPC. The YPE will present to the YPC no less than twice per year.

   a) The BSA will present to the YPC on the BSA's current Youth Protection Program (the "Youth Protection Program"), including regarding the implementation of the actions set forth below, as soon as practical, but no later than six months from the Effective Date.

   b) The BSA will report annually to the YPC on changes to BSA's Youth Protection Program, compliance in the field, and trends of abuse identified and addressed during the period between meetings. This report shall also be shared with the Organization (defined below) and each Local Council's Executive Commitee.

   c) To the extent reasonably practicable, it is intended that the YPC be involved in all aspects of youth protection at the BSA, through discussion, consultation and review with the YPE.

---

[1] In advance of the hiring, the BSA intends to establish an ad hoc selection committee, which shall include at least one survivor nominated by the SWG and at least one survivor nominated by the TCC. The BSA further intends that the YPE will report to the Chief Scout Executive or Assistant Chief Scout Executive.

3) Update Existing Policies:

   a) Update Scouting's Barriers to Abuse: All adults staying overnight in connection with a Scouting activity must be registered as a leader or adult program participant.[2]

   b) Update criminal background checks on all registered leaders every two years. All camp staff at long-term overnight camps and day camps will be registered as camp staff so as to receive a criminal background and VSD check annually. Camp staff will also be required to attend BSA's Understanding and Preventing Youth on Youth Abuse Training during staff training and before they work with youth members at camp.

   c) Update policies and procedures related to, and provide additional guidance on, inappropriate physical and verbal interactions, gift-giving and the supervision of bathroom and shower areas.

   d) Consolidate all aspects of the BSA's youth protection materials into a "Youth Protection Manual" and "Adult Leadership Manual" or similar structure to put requirements and resources in a centralized location. These materials should be consolidated and updated within 12 months of the Effective Date, in coordination with the YPE and the YPC.

   e) Update the BSA website main menu to specifically highlight BSA's abuse prevention requirements, policies for conduct with youth, trainings and reporting procedures.

4) Review and Enhance Training Materials:

   a) Perform a comprehensive review of Youth Protection training to ensure the training is clinically evidence- and research-based and reflective of survivor-informed experiences, including but not limited to:

      i) Grooming techniques and case examples that demonstrate the need for early detection and reporting of suspected predatory behavior.

      ii) Use of more scenario-based training to help engage the learner and apply the information to "real life" scenarios, including the use of "safety moments" for youth members and adult leaders and parents based upon actual incidents.

      iii) Updated content on youth-to-youth abuse prevention, including how to identify and interrupt inappropriate behaviors that can lead to abuse.

      iv) The evaluation will be performed by the YPE in consultation with an independent organization (the "Organization") with experience in evidence-based empirical research on the prevention of childhood abuse and neglect, including sexual abuse of

---

[2]   Cub Scout Programs (Overnight): Cub Scout parents or legal guardians taking part in an overnight program with their own child are not required to register as leaders but must review the BSA's Barriers to Abuse with a unit leader before the activity. Cub Scout youth can only attend with and must be supervised by their own parent or legal guardian at all times, or a registered adult member of the BSA who is attending with their child. A registered leader must be present at any time the parent or legal guardian is with other youth members other than their own. Cub Scout camping is limited to a Local Council's designated locations with appropriate facilities and Barriers to Abuse materials will be prominently posted at all locations for such programs.

children. The YPC will have the opportunity to interview entities and reasonable consent rights in the BSA's selection of the Organization.[3]

    v) The materials shall be evaluated and updated by the YPE, in consultation with the Organization or a successor organization, every two years.

b) Create and implement an annual refresher youth protection course for all leaders and parents who accompany Scouts on Scouting activities. The refresher will include but shall not be limited to reinforcing core content and BSA polices, including Scouting's Barriers to Abuse requirements, reporting and responding to policy violations and reports of abuse. In addition, the refresher will include advanced information based on recent incident trends and technological advances implicating youth protection issues, including changes in the last year.

5) Conduct Additional Policy Review and Evaluation:

a) The BSA will further work with the Organization to evaluate key issues, including but not limited to:

    i) How the BSA's Youth Protection requirements are implemented at the local level.

    ii) Key roles in the organization that need advanced youth protection training.

    iii) Strategies to ensure there are no gaps between member registration dates and training expiration dates.

    iv) The extent to which monitoring and supervision practices are understood, implemented, and enforced in Scouting programs, including in various Scouts programs (including camps and High Adventure Base programs).

    v) Potential risks unique to specific Scouting programs, including programs where youth assume leadership and/or employment positions.

    vi) Additional guidelines for overnight activities, including tenting and lodging and cabin accommodations.

    vii) Potential risks relating to female Scouts.

    viii)    Attitudes and behavior towards diverse Scouts and cultures.

---

[3] The YPE shall solicit RFPs to serve as the Organization, which shall include qualified entities recommended by the YPC's members. The BSA has retained Praesidium, which has performed work to date regarding the BSA's Youth Protection Program. The BSA has stated that it will recommend that the YPE inrerview Praesidium to serve as the Organization. The TCC and Survivors Working Group have no objection to the YPE interviewing Praesidium to serve as the Organization.

ix) How Local Councils and Chartered Organizations can provide a trauma-informed response to individuals who come forward to report abuse and identify necessary resources for this function.

x) Potential additional camp-specific risks and policies and procedures.

b) The evaluation will be provided to the YPE and YPC on the specific issues above, as well as its assessment of the current Youth Protection Program. Specific recommendations for additional reasonable improvements to the Youth Protection Program will be considered and implemented by the BSA.

c) Changes to the Youth Protection Program will be reflected on the BSA's website and training will be reasonably adjusted to reflect changes.

d) The items recommended and adopted, as well as the items recommended and rejected or modified by the BSA, will be reported to the Organization, the YPC, and each Local Council's Executive Committee, along with the reasoning behind any rejected or modified recommendations.

6) Further Focus on Youth Protection as Part of Scouting Programming:

a) The BSA will work with subject-matter experts to continue to review, develop and implement youth protection training to help Scouts learn to recognize abuse, react to protect themselves, and tell a trusted adult. This will be embedded and required at every rank in each program of Scouting. Materials will include meeting plans and resources for youth, parents, and leaders. These rank advancement requirements will be age-appropriate and may include opportunities for Scouts to learn about subjects such as smart choices online (cyber bullying/grooming); being an upstander not a bystander; grooming techniques and sexual abuse; safe touch and unsafe touch; sexual peer pressure; sexual abuse in the family; bullying and hazing; and other expert-informed subjects.

b) The BSA will designate one month per year to emphasize the importance of youth protection and preventing child sexual abuse throughout Scouting programs. This annual campaign will be dedicated to raising awareness and preventing child abuse within Scouting and throughout society. This focused campaign will be implemented at the unit, council, and national level.

7) Enhance Incident Reporting:

a) The BSA, together with the YPE, shall provide confidential quarterly summary reports to the NEC, Audit and Risk Management Committee, and YPC (including the Organization), on all child sexual abuse incidents that result in a youth or adult offender being placed on the Volunteer Screening Database.

b) Incidents that result in a youth or adult offender being placed on the Volunteer Screening Database for child sexual abuse must be reported to the affected Troop's parents,

volunteers associated with the affected Troop, and the affected Charter Organization. [4] The Local Council will provide notification to its Executive Committee. Notification will also be provided to the the YPE, YPC, and the Organization as part of the summary reports required by 7(a).

8) Enhance Auditing Requirements: Local Councils will be required to submit evidence of compliance with youth protection and membership standard guidelines, including training, incident review and reporting. The evidence will be provided to the YPE, the Organization, and the YPC. The YPE shall work with the Organization to assess this compliance, and shall provide the YPC with its and the Organizations conclusions in that regard.

9) Form Unit Leader Working Groups: In connection with the YPC, Local Councils, and Chartered Organizations establish unit leaders' working groups to regularly identify, discuss and develop additional ways to protect youth in Scouting, which could include, for example:

a) Improving the implementation of Scouting's Barriers to Abuse to help prevent incidents in the areas with higher risk potential.

b) Appropriate supervision during nighttime or sleep hours, bathroom and shower facilities.

c) Observed inappropriate youth behavior.

d) How to continuously reinforce youth safety to parents, youth and leaders.

e) Standardization of best practices across Local Councils and Chartered Organizations.

10) Expand Survivor Representation:

a) As required by the BSA by-laws, an otherwise qualified survivor of abuse in Scouting shall be nominated to serve and shall be placed on the National Executive Board of the BSA. (The criteria for selecting this Board member will be the same as the criteria for the other Board members.)

b) The BSA and AHCLC will recommend that each Local Council agree to nominate and place an otherwise qualified survivor of abuse in Scouting on their local council board at all times. (The criteria for selecting these Board members will be the same as the criteria for the other board members.)

c) It is the intention of the BSA and the AHCLC that the presence of Survivors on such boards is emblematic of a sincere effort to listen to survivors' voices. In addition, the BSA and Local Councils will explore with the YPC additional measures to expand survivor representation, including recruiting survivors to the BSA and Local Council boards.

11) Promote Survivor Recognition and Remembrance:

a) In consultation with the YPC, design and install a place of remembrance for all child sexual abuse survivors at a prominent location at each of the BSA's High Adventure Bases, which

---

[4]    To protect survivors and encourage reporting, such reports will provide notification that a youth protection violation and removal occurred, but will not describe the specific incident. To the extent possible, such notification will occur prior to any parent meeting.

will serve as a nationally recognized statement of BSA's commitment to recognize the abuses of the past and to prevent abuse in the future. The BSA shall encourage Local Councils to consider similar opportunities.

b) Create a Survivor-Focused Path to Eagle Scout, where pursuit of Eagle requirements was not continued because of Abuse-related reasons. Input from the YPC will be solicited.

c) Survivor Scouter Pin: In consultation with the YPC, create a recognition, e.g. the "Phoenix" award, to honor survivors that despite the pain and suffering they endured as a youth, were able to break through the despair and provide value and honor to themselves and their community.

12) Support a Youth Protection Seminar: The BSA, under the leadership of the YPE, will coordinate with Local Councils and Chartered Organizations to plan a Youth Protection Seminar for Scout Executives, volunteer leaders and other key constituents, to foster sharing of best practices and information regarding youth protection trends.

13) Volunteer Screening Database

a) The BSA will work with the YPC to assess how the names of adult perpetrators of child sexual abuse in Scouting and other information can be made public or used in connection with a database accessible to other youth serving organizations. Specifically, the BSA agrees to work with the YPC on a protocol that makes confirmed past child abusers in Scouting, and future confirmed child abusers in Scouting, publicly known.

b) The protocol will take into account factors including: (i) the desire to make public adult perpetrators of child sexual abuse in Scouting; (ii) adequate protections for survivor identities; (iii) consideration regarding the protection of third parties, including survivor family members and volunteers; (iv) a notification process regarding any publication; (v) issues related to privacy and liability related to publication; and (vi) the potential appointment or retention of an appropriate neutral party to supervise the evaluation and review of the VSD.

c) The BSA will take a leadership role and re-engage with other YSOs and agencies including but not limited to the National Center for Missing and Exploited Children to explore the feasibility of and advocate for a shared national database of adults who have been excluded from working with youths for youth protection related offenses.

d) The Trust Agreement shall be modified to provide the Settlement Trustee with the authority to request an order of the Bankruptcy Court relating to the publication of materials included in the VSD, no earlier than one year after the Effective Date. The Plan shall be amended to specifically provide that the Bankruptcy Court retain jurisdiction to adjudicate such request. All parties in interest, including the Reorganized Debtors, shall have the right to object to and contest any request made by the Settlement Trustee.

14) Prospective Reporting:

a) The BSA is committed to working with the YPC to discuss and improve transparency and accountability with respect to any future instances of sexual abuse, including the

dissemination of information relating to abuse statistics, consistent with practices of other youth-serving organizations, and what information may be appropriately made available on the BSA's website.

b) The BSA also agrees to work with the YPC on a protocol to ensure that at the request of a Scout parent or legal guardian, summary information regarding youth or adult offenders being placed on the Volunteer Screening Database for child sexual abuse for a specific Troop or unit is provided. The BSA agrees to finalize this protocol no later than 6 months following the Effective Date.

15) Youth Protection Leadership

a) The BSA will continue to engage with youth protection experts to monitor best practices utilized by youth serving organizations, and will work with the YPC to continue to explore partnership opportunities, including with academic institutions and other youth protection organizations, to collaborate and share data, including consideration of factor-based analysis and other methodologies to prevent abuse. [5]

b) The BSA will work with the YPC to take a leadership role in youth protection, including:

i) Supporting federal legislation for certified volunteer programs, unsuitable leader reporting and a database for youth serving organizations or those added into database.

ii) Holding a meeting, at least once every two years, with recognized sexual abuse experts and other similarly situated organizations to discuss best practices and innovations in youth protection.

---

[5] The BSA and YPC shall consider the best way to utilize the redacted Proofs of Claim filed in the BSA chapter 11 cases, as well as information from the VSD.

## SCHEDULE 1

## ARTWORK

# ARTWORK

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.167 | Where Brook and River Meet | A. Boulard after a painting by B. W. Leader | n. d. | 17 5/8" x 27 1/8" with margins | Hand colored etching |
| 2011.064.306 | Portrait of Abraham Lincoln | After George Henry Hall by an Unknown artist (Contemporary) | n. d. | 33 1/8" x 24 1/2" | Oil on relined canvas |
| 2011.064.242 | Dr. James E. West | Albert A. Rose (Contemporary) | n. d. | 40" x 30" | Oil on canvas |
| 2011.064.241 | Portrait of Gale F. Johnson | Albert A. Rose (Contemporary) | n. d. | 30" x 25" | Oil on canvas |
| 2011.064.204 | Native American Village | Andy Jansen (Contemporary) | n. d. | 10" x 13" | Ink on paper |
| 2011.064.315 | Triumph and Tragedy | Angelini | 2008 | | Oil on Canvas |
| 2012.051 | Big Doing's When King Richard Had a Rodeo | Beard, Daniel Carter | n.d. | | |
| Johnston gift | Fight Scene | Beard, Daniel Carter | n.d. | | |
| 2011.064.181 | Lord Baden Powell | Benjamin Eggleston (Contemporary) | n. d. | 51 1/2" x 43" | Ink on Paper |
| 2011.064.159 | Butterfly's | Bentley and Bentley (Contemporary) | 1990 | 30" x 24" x 3" | Butterfly triptych collage with Plexiglas box |
| 2011.064.160 | Butterfly's | Bentley and Bentley (Contemporary) | 1990 | 30" x 24" x 3" | Butterfly triptych collage with Plexiglas box |
| 2011.064.161 | Butterfly's | Bentley and Bentley (Contemporary) | 1990 | 30" x 24" x 3" | Butterfly triptych collage with Plexiglas box |
| 2011.064.162 | Butterfly's | Bentley and Bentley (Contemporary) | 1990 | 30" x 24" x 3" | Butterfly triptych collage with Plexiglas box |
| 2011.064.163 | Butterfly's | Bentley and Bentley (Contemporary) | 1990 | 30" x 24" x 3" | Butterfly triptych collage with Plexiglas box |
| 2011.064.217 | Old Ironside | Betty Mahony (Contemporary) | n. d. | 18" x 24" | Oil on canvas |
| Unknown | A Century of Values | Bill Manilow | n.d. | | Acrylic? |

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.164 | Boyscout Membership | C. K. Berryman (Contemporary) | 1940 | 12 1/2" x 14 1/8" | Ink on paper |
| 2011.064.243 | The Mountaineer | Carl Clemens Moritz Rungius (1869-1959) | n. d. | 50" x 60" | Oil on canvas |
| Unknown | Scout's Signaling Friendship | Caserta | 1945 | | |
| 2011.064.170 | In a Welch Valley | Charles Chauvel after a painting by B. W. Leader | n. d. | 18 1/2" x 28 1/2" with margins | Hand colored etching |
| 2011.064.171 | Surrey's Pleasant Hills | Charles Chauvel after a painting by B. W. Leader | n. d. | 21 1/2" x 17" with margins | Hand colored etching |
| 2016.019 | Scouts at Campfire Singing | Charles Towne | 1930s | | Oil on unstretched canvas |
| Unknown | New Jersey State Trooper and Scout | Dave ? | n.d. | | |
| 2011.064.225 | Greenhead Alert | David Moss (Contemporary) | n. d. | 16 1/4" x 24 7/8" with margins | Color off-set lithograph |
| 2011.064.226 | Pheasants in the Snow | David Moss (Contemporary) | n. d. | 16 3/8" x 24 7/8" with margins | Color off-set lithograph |
| 2011.064.227 | Wild Wings | David Moss (Contemporary) | 1985 | 16 1/2" x 24 7/8" with margins | Color off-set lithograph |
| 2011.064.176 | Lincoln Memorial | Dean Cornwell ( 1892- 1960) | n. d. | 38" x 35" | Oil on canvas |
| 2011.064.175 | Uncle Sam's Air Force; "Boy Scout and Pilot" | Dean Cornwell ( 1892- 1960) | 1952 | 38 1/8" x 35 1/2" | Oil on canvas |
| 2011.064.177 | Wright Brothers | Dean Cornwell ( 1892- 1960) | n. d. | 38" x 35" | Oil on canvas |
| 2011.064.174 | Boy Scout and Father at Nathan Hale Statue | Dean Cornwell (1892- 1960) | n. d. | 40" x 36 1/4" | Oil on relined canvas |
| 2011.064.215 | America's Strength | Don Lupo (Contemporary) | n. d. | 26" x 19 1/2" | Watercolour over off-set lithograph |
| Unknown | Your Career in Scouting | Don Lupo (Contemporary) | n.d. | | |
| OA | Brotherhood Barn | E. Urner Goodman | n.d. | | Oil on Canvas |
| 2011.064.316 | Treasure Island | E. Urner Goodman | | | Oil on Canvas |

2

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.187 | Liberty Bell | Earnest Henry (Contemporary) | n. d. | 25" x 26" | Oil on canvas |
| 2011.064.231 | Forward on Liberty's Team | Earnest Pascoe (1922- 1996) | 1954 | 33" x 23" | Oil on canvas |
| 2011.064.211 | The Measure of a Man | Edward D. Kuckes (Born 1901) | 1957 | 20" x 16" | Ink on paper |
| 2011.064.222 | Ellsworth H. Augustus | Eugene A. Montgomery (Contemporary) | n. d. | 40" x 30" | Oil on canvas |
| 2011.064.223 | Portrait of Alden G. Barber | Eugene A. Montgomery (Contemporary) | n. d. | 42" x 32" | Oil on canvas |
| 2011.064.224 | Portrait of Irving Feist | Eugene A. Montgomery (Contemporary) | n. d. | 42" x 32" | Oil on canvas |
| Unknown | Eagle in Flight | F.P. Smith | n.d. | | |
| 2011.064.182 | General Omar Bradley | Frank Eliscu (Born 1912) | 1990 | 16 1/2" high without base | Cast bronze sculpture with brown patina |
| 2011.064.220 | Coke, "Boy Scouts Come to a Halt" | Fredric Kimball Mizen (1888- 1965) | n. d. | 32 1/2" x 37 1/2" | Oil on canvas which has been relined |
| 2011.064.119 | Scout Bugler, Swimming Call | Harold N. Anderson (Contemporary) | n.d. | 28" x 21 1/2" | Oil on Canvas |
| 2011.064.120 | Sea Scout at Ship's Wheel | Harold N. Anderson (Contemporary) | n.d. | 30" x 20" | Oil on Canvas |
| 2011.064.244 | They See a Vision That Once Was Yours | Harold van Schmidt (Contemporary) | 1951 | 29" x 37" | Oil on canvas |
| 2011.064.168 | Boy's Life Cover | Harrison Cady (1877- 1970) | 1938 | 17 5/8" x 27 1/8" | Ink and watercolour on paper |
| 2011.064.191 | A Scout is Brave | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.192 | A Scout is Cheerful | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.193 | A Scout is Clean | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.194 | A Scout is Courteous | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.195 | A Scout is Friendly | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.196 | A Scout is Helpful | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.197 | A Scout is Kind | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.198 | A Scout is Loyal | Henry "Hy" Hintermeister (1902- 1972) | n. d. | 15" x 10" | Gouache on paper |

3

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.199 | A Scout is Obedient | Henry "Hy" Hintermeister (1902-1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.200 | A Scout is Reverent | Henry "Hy" Hintermeister (1902-1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.201 | A Scout is Thrifty | Henry "Hy" Hintermeister (1902-1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.202 | A Scout is Trustworthy | Henry "Hy" Hintermeister (1902-1972) | n. d. | 15" x 10" | Gouache on paper |
| 2011.064.189 | Achievement | Henry "Hy" Hintermeister (1902-1972) | n. d. | 24" x 18" | Oil on canvas |
| 2011.064.190 | Adventure | Henry "Hy" Hintermeister (1902-1972) | n. d. | 24" x 18" | Oil on canvas |
| 2011.064.228 | Johnston Historical Museum | Herbert Mott (Contemporary) | n. d. | 10 1/2" x 22 1/2" | Gouache and pencil on paper |
| 2011.064.230 | Portrait of Baden-Powell | Hjordis Nyberg (Contemporary) | n. d. | 40" x 30" | Oil on canvas |
| 2011.064.188 | Tait McKenzie Statue | Homer Hill (Contemporary) | n. d. | 24" x 18" | Gouache on paper and collage |
| 2011.064.172 | Boy Scout | Howard Chandler Christy (1873–1952) | 1936 | 60" x 40" | Oil on canvas |
| 2011.064.312 | Portrait of Norton Clapp | J. Anthony Wills (Contemporary) | n. d. | 43" x 34" | Oil on masonite |
| 2011.064.165 | Giant Eagle, Planes, and Scout | James Bingham (Contemporary) | n. d. | 34 1/2" x 30 1/4" | Oil on relined canvas |
| 2011.064.130 | "Common Puffin", "Tufted Puffin", and "Rhinoceros Auklet" | James Carter Beard (1837– 1913) | 1904 | 6 3/4" x 5 1/16" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.140 | "Hudson Bay Lemming", "Field Mouse", "Red Backed Mouse", and "Northwest Vole" | James Carter Beard (1837– 1913) | 1904 | 12" x 11" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.150 | "Sunfish", "Calico Bass", Yellow Perch", and "Small Mounted Black Bass" | James Carter Beard (1837– 1913) | 1904 | 9 1/2" x 12 7/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.121 | American Spotted Chimera | James Carter Beard (1837– 1913) | 1904 | 6" x 11" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.123 | Australian Lung Fish | James Carter Beard (1837– 1913) | 1904 | 6 3/4" x 12 3/4" | Ink and watercolour on paper mounted to cardboard |

4

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.124 | Black Footed Albatross | James Carter Beard (1837- 1913) | 1904 | 9 1/8" x 10 1/4" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.125 | Bluefish | James Carter Beard (1837- 1913) | 1904 | 4 5/8" x 7" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.126 | Bullhead Catfish | James Carter Beard (1837- 1913) | 1904 | 6" x 7 3/4" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.127 | California Grey Whales Attacked by Killer Whales | James Carter Beard (1837- 1913) | 1904 | 10 3/8" x 15 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.128 | Canadian Lynx | James Carter Beard (1837- 1913) | 1904 | 8 1/2" x 10 3/4" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.129 | Common Dolphins | James Carter Beard (1837- 1913) | 1904 | 10 1/2" x 15 5/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.131 | Congo Snake | James Carter Beard (1837- 1913) | 1904 | 13 1/4" x 18 1/4" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.132 | Devil Fish | James Carter Beard (1837- 1913) | 1904 | 9 1/4" x 14 3/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.133 | Elaine Eel | James Carter Beard (1837- 1913) | 1904 | 5 7/8" x 10 7/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.134 | Florida Wood Rat | James Carter Beard (1837- 1913) | 1904 | 9 1/8" x 11" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.135 | Flying Fish | James Carter Beard (1837- 1913) | 1904 | 5 5/8" x 9 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.136 | Flying Foxes (Bats) | James Carter Beard (1837- 1913) | 1904 | 17" x 12 1/4" | Ink and watercolour on paper mounted to cardboard |

5

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.137 | Glacier Bear | James Carter Beard (1837-1913) | 1904 | 9 7/8" x 11 3/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.138 | Grey Squirrel | James Carter Beard (1837-1913) | 1904 | 9 1/4" x 14 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.139 | Hell Bender | James Carter Beard (1837-1913) | 1904 | 12" x 16 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.141 | Jumping Mouse | James Carter Beard (1837-1913) | 1904 | 8 1/2" x 7" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.142 | Loon and Murres | James Carter Beard (1837-1913) | 1904 | 6 7/8" x 8 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.143 | Manatee | James Carter Beard (1837-1913) | 1904 | 14" x 8 7/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.144 | Menobranchas | James Carter Beard (1837-1913) | 1904 | 13" x 18" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.145 | Pocket Gophers | James Carter Beard (1837-1913) | 1904 | 6" x 11" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.146 | Ribbon Seals | James Carter Beard (1837-1913) | 1904 | 12 3/8" x 15 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.148 | Spider Monkeys | James Carter Beard (1837-1913) | 1904 | 13 7/8" x 9 1/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.149 | Squirrel | James Carter Beard (1837-1913) | 1904 | 10 1/2" x 15 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.151 | Stellar's Sea Lions | James Carter Beard (1837-1913) | 1904 | 9 1/4" x 13 7/8" | Ink and watercolour on paper mounted to cardboard |

6

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.152 | Stormy Petrel | James Carter Beard (1837- 1913) | 1904 | 8 1/4" x 8 1/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.153 | Tarpon | James Carter Beard (1837- 1913) | 1904 | 5 1/4" x 9 1/16" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.122 | The Angler | James Carter Beard (1837- 1913) | 1904 | 5 7/8" x 10 3/4" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.147 | The Spanish Mackerel | James Carter Beard (1837- 1913) | 1904 | 5" x 5 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.154 | Two Spined Stickleback | James Carter Beard (1837- 1913) | 1904 | 3 1/2" x 11 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.155 | Typical Pocket-Mouse and Kangaroo Rat | James Carter Beard (1837- 1913) | 1904 | 10 3/4" x 10 7/8" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.156 | Unicorn Whales | James Carter Beard (1837- 1913) | 1904 | 10 1/2" x 16 1/2" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.157 | Woodchuck | James Carter Beard (1837- 1913) | 1904 | 8 1/8" x 10" | Ink and watercolour on paper mounted to cardboard |
| 2011.064.158 | Daniel Carter Beard | James Henry Beard (1812- 1893) | 1888 | 12" x 19 3/8" | Oil on board |
| 2011.064.212 | Saturday Evening Post Cover | James Lewicki (Born 1917) | 1960 | 23 1/2" x 21 1/2" | Ink and watercolour on board |
| 2011.064.309 / 1998.111 | Santa Claus and Scout | Jay Vance (Contemporary) | n. d. | 13 1/2" x 10 1/4" | Gouache on paper |
| None | Scout Crossing-Jamboree | Jeff Segler | 2017 | | |
| None | Scouting's Tribute to Law Enforcement | Jeff Segler | 2018 | | |
| 2011.064.278 | Untitled Scout | Jeff Segler (Contemporary) | n. d. | 36" x 28" | Oil on canvas |
| 2011.064.166 | Mustangs | John Gutson (La Mothe) Borglum (1867- 1941) | 1904 | 20 3/4" x 32" x 16" | Cast bronze multiple sculpture with green-brown patina |

7

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| Unknown | Eagle and Eagle Scout Medal | John Steven Wilson | n.d. | | |
| 2011.064.214 | "Weapons for Liberty"; March 2 Saturday Evening Post Cover | Joseph Christain Leyendecker (1874-1951) | 1918 | 40" x 27 1/4" | Oil on canvas |
| 2011.064.213 | Saturday Evening Post Cover/ Scouts Signaling | Joseph Christain Leyendecker (1874-1951) | 1911 | 30 1/4" x 21 1/4" | Oil on canvas |
| None | 100th Anniversary of the Order of the Arrow | Joseph Csatari | 2012 | | |
| 2003.111 | Portrait of Chope Phillips | Joseph Csatari | 1971 | | Oil on masonite |
| Unknown | "100th Anniversary of World Scouting" | Joseph Csatari | 2007 | 32" x 26" | Oil on Canvas |
| Unknown | 100th Anniversary of Eagle Scouts | Joseph Csatari | 2012 | | Oil on Canvas |
| Unknown | 90th Anniversary of Boys Life | Joseph Csatari | 2001 | | Oil on Canvas |
| Unknown | A Scout is Reverent, Study | Joseph Csatari | n.d. | | |
| Unknown | Reading Partners | Joseph Csatari | 2002 | 30" x 24" | Oil on Canvas |
| Unknown | Scouting Hero's | Joseph Csatari | 2007 | 32" x 26" | Oil on Canvas |
| Unknown | Scouting Salutes Community Organizatons | Joseph Csatari | 2009 | 32" x 25" | Oil on Canvas |
| Unknown | Scouting through the Years | Joseph Csatari | 1978 | | Oil on Canvas |
| Unknown | Scoutmaster and Scout, study | Joseph Csatari | n.d. | | Pencil on paper |
| Unknown | Sketch, "To Rich" | Joseph Csatari | n.d. | | sketch |
| None | Walter Scott, Jr. | Joseph Csatari | 2012 | | |
| Unknown | Year of the Volunteer | Joseph Csatari | 2008 | 32" x 25" | Oil on Canvas |
| 2011.064.088 | "Prepared To Do a Good Turn" or "9/11" | Joseph Csatari (Contemporary) | 2002 | 40" x 31" | oil on canvas |
| 2011.064.118 | 100th Anniversary Salute to Scouting | Joseph Csatari (Contemporary) | 2009 | | Oil on Canvas |
| 2011.064.066 | 1976 Handbook Cover | Joseph Csatari (Contemporary) | 1975 | 27 1/2" x 38" | oil on board |
| 2011.064.082 | A Good Turn | Joseph Csatari (Contemporary) | 1992 | 40" x 32" | oil on canvas |
| 2011.064.110 | A Good Turn, study | Joseph Csatari (Contemporary) | n. d. | 10" x 8" | pencil on paper |
| 2011.064.092 | A Scout is Reverent | Joseph Csatari (Contemporary) | ca. 1994 | 20" x 16" | oil on board |
| 2011.064.116 | A Winner, study | Joseph Csatari (Contemporary) | n. d. | 10 1/4" x 7 3/4" | pencil on paper |

8

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.070 | After Hours | Joseph Csatari (Contemporary) | 1980 | 30" x 24" | oil on canvas |
| 2011.064.107 | After Hours, study | Joseph Csatari (Contemporary) | n. d. | 9 1/2" x 7 1/2" | pencil on paper |
| 2011.064.109 | Building a Fire, study | Joseph Csatari (Contemporary) | 1987 | 14" x 10" | pencil on paper |
| 2011.064.083 | Character Counts | Joseph Csatari (Contemporary) | 1994 | 36" x 30" | oil on canvas |
| 2011.064.091 | Charles L. Sommers, High Adventure Base | Joseph Csatari (Contemporary) | ca. 1999 | 36" x 30" | oil on canvas |
| 2011.064.093 | Come On, Join Us | Joseph Csatari (Contemporary) | n. d. | 24" x 19" | acrylic on canvas |
| 2011.064.090 | Cub Scout 75th Anniversary "Cub Scout 75th Anniversary" or "A Winner" | Joseph Csatari (Contemporary) | 2004 | 34" x 27" | oil on canvas |
| 2011.064.089 | Dreams Become a Reality in Venturing | Joseph Csatari (Contemporary) | 2003 | 34" x 27" | oil on canvas |
| 2011.064.114 | Duty to God and Country, study | Joseph Csatari (Contemporary) | n. d. | 13 1/2" x 10 1/2" | pencil on paper |
| 2011.064.105 | Eagle Court of Honor | Joseph Csatari (Contemporary) | n. d. | 31" x 23" | oil on canvas |
| 2011.064.106 | Eagle Court of Honor, study | Joseph Csatari (Contemporary) | n. d. | 30" x 22" | pencil on paper |
| 2011.064.068 | Eagle Service Project | Joseph Csatari (Contemporary) | 1978 | 38" x 29" | oil on canvas |
| 2011.064.072 | Family Camping | Joseph Csatari (Contemporary) | 1982 | 32 1/2" x 25" | oil on canvas |
| 2011.064.081 | Florida Sea Base | Joseph Csatari (Contemporary) | 1991 | 41" x 32" | oil on canvas |
| 2011.064.115 | Florida Sea Base, study | Joseph Csatari (Contemporary) | n. d. | 20" x 15 1/2" | pencil on paper |
| 2011.064.065 | Gift of a Lifetime | Joseph Csatari (Contemporary) | 1968 | 20 1/4" x 16 1/4" | oil on canvas |
| 2011.064.062 | Higher Vision | Joseph Csatari (Contemporary) | 1964 | 22 5/16" x 18 5/16" | oil on canvas |
| 2011.064.075 | It's a Boy's Life | Joseph Csatari (Contemporary) | 1985 | 32" x 24" | oil on canvas |
| 2011.064.087 | National Jamboree Fort A. P. Hill, Virginia | Joseph Csatari (Contemporary) | 2001 | 30" x 24" | oil on canvas |
| 2011.064.314 | National Scouting Museum Founders | Joseph Csatari (Contemporary) | 2013 | 35.75" x 24.50" with margin | Oil on Canvas |
| 2011.064.111 | Official Call, study | Joseph Csatari (Contemporary) | n. d. | 11 1/2" x 8 1/2" | pencil on paper |
| 2011.064.084 | Out of the Past Into the Future (Pass it On?) | Joseph Csatari (Contemporary) | 1996 | 34" x 27" | oil on canvas |
| 2011.064.104 | Pass It On | Joseph Csatari (Contemporary) | n. d. | 36" x 28" | oil on canvas |
| 2011.064.098 | Portrait of Arch Munson, Jr. | Joseph Csatari (Contemporary) | n. d. | 40" x 30 1/4" | oil on canvas |
| 2011.064.095 | Portrait of Ben H. Love | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |
| 2011.064.099 | Portrait of Charles M. Pigott | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |

9

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.096 | Portrait of Dr. Thomas C. MacAvoy | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |
| 2011.064.094 | Portrait of Edward Joullian III | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |
| 2011.064.100 | Portrait of Harvey L. Price | Joseph Csatari (Contemporary) | n. d. | 31" x 25" | oil on canvas |
| 2011.064.103 | Portrait of J. L. Tarr | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |
| 2011.064.101 | Portrait of Jere B. Ratcliff | Joseph Csatari (Contemporary) | n. d. | 36" x 30" | oil on canvas |
| 2011.064.102 | Portrait of Robert W. Reneker | Joseph Csatari (Contemporary) | n. d. | 40" x 30 3/8" | oil on canvas |
| 2011.064.097 | Portrait of Sanford N. McDonnell | Joseph Csatari (Contemporary) | n. d. | 40" x 30" | oil on canvas |
| 2011.064.080 | Scouting for all Seasons | Joseph Csatari (Contemporary) | 1990 | 40" x 34" | oil on canvas |
| 2011.064.117 | Scouting For All Seasons, study | Joseph Csatari (Contemporary) | n. d. | 15 3/4" x 15" | pencil on paper |
| 2011.064.085 | Scouting Values | Joseph Csatari (Contemporary) | 1996 | 36" x 28" | oil on canvas |
| 2011.064.113 | Scoutmaster, study | Joseph Csatari (Contemporary) | n. d. | 13 1/2" x 10 1/2" | pencil on paper |
| 2011.064.108 | Scouts Are Patriotic, study | Joseph Csatari (Contemporary) | n. d. | 13" x 9 1/2" | pencil on paper |
| 2011.064.112 | Scouts Hiking, study | Joseph Csatari (Contemporary) | n. d. | 14" x 12" | pencil on paper |
| 2011.064.074 | Spirit Lives On | Joseph Csatari (Contemporary) | 1985 | 34" x 26" | oil on canvas |
| 2011.064.067 | The New Spirit | Joseph Csatari (Contemporary) | 1976 | 33" x 25" | oil on canvas |
| 2011.064.064 | The Ordeal | Joseph Csatari (Contemporary) | 1967 | 22" x 18" | oil on canvas |
| 2011.064.071 | The Patrol Leader | Joseph Csatari (Contemporary) | 1981 | 26" x 21" | oil on canvas |
| 2011.064.069 | The Reunion | Joseph Csatari (Contemporary) | 1979 | 32" x 24" | oil on canvas |
| 2011.064.079 | The Scoutmaster | Joseph Csatari (Contemporary) | 1989 | 44" x 36" | oil on canvas |
| 2011.064.073 | The Strength of Scouting Through Volunteers OR Thank You, Scout Volunteers | Joseph Csatari (Contemporary) | 1983 | 30" x 24" | oil on canvas |
| 2011.064.063 | Thomas J. Watson, Jr. | Joseph Csatari (Contemporary) | 1965 | 28" x 22" | oil on canvas |
| 2011.064.086 | Urban Good Turn | Joseph Csatari (Contemporary) | 1997 | 30" x 25" | oil on canvas |
| 2011.064.076 | Values That Last a Lifetime | Joseph Csatari (Contemporary) | 1986 | 36" x 28" | oil on canvas |
| 2011.064.077 | Winter Camping Scene | Joseph Csatari (Contemporary) | 1987 | 40" x 30" | oil on canvas |
| 2011.064.078 | You Can Do It | Joseph Csatari (Contemporary) | 1988 | 30" x 24" | oil on canvas |
| 2011.064.317 | Happy 90th Birthday BSA | Joseph Csatari (Contemporary) Artist | 2000 | | Oil on Canvas |
| 2011.064.318 | The Summit or Summit Bechtel Reserve | Joseph Csatari (Contemporary) Artist | 2013 | | Oil on Canvas |
| None | Live Scouting's Adventures | Josh Hunt | n.d. | | |
| 2011.064.206 | Brown and Bigelow Calendar | Keely (Contemporary) | 1970 | 33" x 11" | Oil on board |
| 2011.064.310 | Man to Man | L. D. Warren (Born 1906) | 1956 | 10 1/2" x 8 7/8" | Ink on paper |

10

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.186 | The Spirit Lives On | Larry Frost (Contemporary) | n. d. | 44" x 36" | Oil on masonite |
| 2011.064.311 | Boy Scout Saluting | Lawrence Wilbur (1897- 1988) | n. d. | 16 1/2" x 13 1/2" | Oil on unstretched canvas |
| 2012.056 | Lady with Scarf | Leyendecker, J.C. | n.d. | | Oil Study |
| 2011.064.216 | Portrait of George H. Fisher | Lurtos (Contemporary) | n. d. | 26" x 19 1/2" | Oil on board |
| 2011.064.205 | Miriam Lumpkin Rand Johnston | Marion D. Johnson (1892- 1966) | n. d. | 23 1/2" x 19 1/2" | Pastel on paper |
| 2011.064.282 | Scouting in the World | Martha Jane Starr (Contemporary) | n. d. | 49" x 19" | 25 petit points on three panels |
| 2011.064.283 | Scouting in the World | Martha Jane Starr (Contemporary) | n. d. | 49" x 19" | 25 petit points on three panels |
| 2011.064.281 | Scouting in the World | Martha Jane Starr (Contemporary) | n. d. | 49" x 19" | 25 petit points on three panels |
| 2011.064.284 | Trail to Eagle | Martha Jane Starr (Contemporary) | n. d. | 24 3/8" x 19 3/8" | 8 petit points on three panels |
| 2011.064.221 | Portrait of Elbert Fretwell in a Scout Uniform | Martin Mockford (Contemporary) | 1954 | 20" x 16" | Oil on canvas |
| 2011.064.238 / 1999.050 | Eagle in Flight / "The Eagle" | Maynard Reece (Born 1920) | 1980 | 16" x 24" | Oil on canvas |
| Unknown | Portrait of Baden-Powell | McKean | 1967 | | |
| 2011.064.169 | Fort A. P. Hill | Milton Arthur Cardiff (Born 1907) | 1981 | 14" x 10 1/4" | Ink and pencil on paper and collage |
| Unknown | 1939 World's Fair | Monte Crews | n.d. | | Oil on Canvas |
| 2011.064.239 | Onward...For God and My Country | Paul Remmey (Contemporary) | n. d. | 18 1/4" x 37" | Oil on canvas |
| 2011.064.286 | Portrait of Dr. Arthur Schuck | Paul Trebilcock (1902- 1981) | n. d. | 44" x 34" | Oil on canvas |
| 2011.064.300 | America's Boypower, Project SOAR | Paul Troth (Contemporary) | 1971 | 9" x 7 1/4" | Ink on paper |
| 2011.064.184 | "Trail to Manhood" | Peter M. Fillerup (Contemporary) | 1984 | 84" high | Cast bronze sculpture with brown patina |
| 2011.064.183 | Maquette for "Trail to Manhood" | Peter M. Fillerup (Contemporary) | 1991 | 16 1/4" without base | Cast bronze sculpture with brown patina |
| 2011.064.279 | Scouting Family | R. Skemp (Contemporary) R.S. Kemp or R. Skemp | n. d. | 18" x 14 1/2" | Oil on board |
| Unknown | Citizenship: BSA | Remington Schuyler (1884- 1955) | 1925 | 30" x 21 1/2" | Oil on Canvas |

11

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.245 | Cub Scouts Running an Indoor Course | Remington Schuyler (1884- 1955) | n. d. | 6 1/2" x 22 1/2" | Ink on paper |
| 2011.064.246 | Indian and Travois | Remington Schuyler (1884- 1955) | 1920 | 10" x 30" | Oil on canvas |
| 2011.064.247 / 1988.045 | Indian in Canoe (triptych) | Remington Schuyler (1884- 1955) | 1922 | 20" x 11"; 20" x 33"; and 20" x 11" | Oil on canvas |
| 2011.064.249 | Scout Sign Up | Remington Schuyler (1884- 1955) | n. d. | 13 1/2" x 12 5/8" | Ink on paper |
| 2011.064.250 | Scout with Binoculars | Remington Schuyler (1884- 1955) | n. d. | 4 1/2" x 6 1/2" | Ink on paper |
| 2011.064.251 | Scout with Native American | Remington Schuyler (1884- 1955) | n. d. | 7 5/8" x 7 5/8" | Ink on paper |
| 2011.064.252 | Scouts and Important Holidays | Remington Schuyler (1884- 1955) | n. d. | 9 1/4" x 27" | Ink and coloured pencil on paper |
| 2011.064.253 | Scouts Around a Campfire | Remington Schuyler (1884- 1955) | n. d. | 8 1/2" x 7 3/4" | Ink on paper |
| 2011.064.254 | Scouts at Doorway to Sky Patrol Building | Remington Schuyler (1884- 1955) | n. d. | 8 3/4" x 8 1/2" | Ink on paper |
| 2011.064.255 | Scouts Building a Log Structure | Remington Schuyler (1884- 1955) | n. d. | 7 3/4" x 6 1/2" | Ink on paper |
| 2011.064.256 | Scouts Cooking at Camp | Remington Schuyler (1884- 1955) | n. d. | 5 7/8" x 6 7/8" | Ink on paper |
| 2011.064.257 | Scouts Hiking Near Totem Pole | Remington Schuyler (1884- 1955) | n. d. | 9" x 7 1/2" | Ink on paper |
| 2011.064.261 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 31" x 27" | Charcoal on paper |
| 2011.064.262 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 36" x 26 1/2" | Charcoal on paper |
| 2011.064.263 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 32" x 27" | Charcoal on paper |
| 2011.064.264 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 31" x 27" | Charcoal on paper |
| 2011.064.265 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 30" x 27" | Charcoal on paper |
| 2011.064.258 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 27 1/2" x 27" | Charcoal on paper |
| 2011.064.259 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 28 1/2" x 27" | Charcoal on paper |
| 2011.064.260 | Scouts in Winter Camp (One of ten in the series) | Remington Schuyler (1884- 1955) | n. d. | 29 1/2" x 27" | Charcoal on paper |
| 2011.064.266 | Scouts on a Hike | Remington Schuyler (1884- 1955) | n. d. | 16" x 14" | Ink on paper |
| 2011.064.267 | Scouts on Hike Near Seashore | Remington Schuyler (1884- 1955) | n. d. | 7 3/4" x 7" | Ink on paper |

12

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| Unknown | Scouts on Lookout (with binoculars)( | Remington Schuyler (1884- 1955) | n.d. | | Oil on Canvas |
| 2011.064.268 | Scouts Resting Along a Trail | Remington Schuyler (1884- 1955) | n. d. | 22 1/2" x 19 1/4" | Charcoal on paper |
| 2011.064.269 | Scouts Setting Up Camp Near a Lake | Remington Schuyler (1884- 1955) | n. d. | 6" x 6 7/8" | Ink on paper |
| 2011.064.270 | Scouts Sitting in Front of a Teepee | Remington Schuyler (1884- 1955) | n. d. | 8" x 8" | Ink on paper |
| 2011.064.271 | Scouts Swimming and Diving | Remington Schuyler (1884- 1955) | n. d. | 7 1/2" x 7 1/2" | Ink on paper |
| 2011.064.272 | Scouts Washing Up at Camp | Remington Schuyler (1884- 1955) | n. d. | 9 3/8" x 8 1/4" | Ink on paper |
| 2011.064.273 | Scouts Welcoming a New Member | Remington Schuyler (1884- 1955) | n. d. | 9 1/2" x 7" | Ink on paper |
| 2011.064.248 | Sitting Scouts Dressed as Native Americans | Remington Schuyler (1884- 1955) | n. d. | 7 3/4" x 7 3/4" | Ink on paper |
| 2011.064.274 | The Second Class Requirements | Remington Schuyler (1884- 1955) | n. d. | 11 1/2" x 6 5/8" | Ink on paper |
| 2011.064.275 | The Tenderfoot Requirements | Remington Schuyler (1884- 1955) | n. d. | 11 1/4" x 6 5/8" | Ink on paper |
| 2011.064.276 | Tippy | Remington Schuyler (1884- 1955) | n. d. | 12" x 15 5/8" | Ink on jointed irregular paper |
| 2011.064.277 | Two Scouts at Picketburg Sign Post | Remington Schuyler (1884- 1955) | n. d. | 15" x 14" | Ink on paper |
| 2011.064.207 | Portrait of Gale F. Johnson (Johnston?) | Robert "Bob" Kovacs (Contemporary) | 1966 | 24" x 20" | Oil on canvas |
| 2011.064.208 | Portrait of J. F. Kennedy in Scout Uniform | Robert "Bob" Kovacs (Contemporary) | 1966 | 34" x 29 1/2" | Acrylic on rawhide |
| 2011.064.209 | Portrait of Joseph A. Burton, Jr. | Robert "Bob" Kovacs (Contemporary) | 1967 | 30" x 24" | Oil on canvas |
| 2011.064.210 | Portrait of Lady Baden-Powell | Robert "Bob" Kovacs (Contemporary) | 1967 | 24" x 20" | Oil on canvas |
| 2011.064.219 | The Boy Scout | Robert Tait McKenzie (1867– 1938) | 1937 | 73" high | Cast bronze sculpture with brown patina |
| 1992.060.001 -.004 | "Four Season" portfolio | Rockwell, Norman (1894-1978) | 1976 | 13 1/2" x 13 1/4" | Lithograph |
| 2011.064.001 | A Daily Good Turn | Rockwell, Norman (1894-1978) | 1918 | 30.25 x 22.25" | Oil on canvas |
| 2011.064.036 | A Good Sign All Over the World | Rockwell, Norman (1894-1978) | 1961 | 29" x 25" | Oil on relined canvas |
| 2011.064.005 | A Good Turn | Rockwell, Norman (1894-1978) | 1924 | 32.125 x 27.125" | Oil on relined canvas |
| 2011.064.038 | A Great Moment | Rockwell, Norman (1894-1978) | 1963 | 43 1/4" x 35 x 1/4" | Oil on canvas |
| 2011.064.017 | A Guiding Hand | Rockwell, Norman (1894-1978) | 1944 | 38 x 29.125" | Oil on canvas |
| 2011.064.013 | A Scout is Friendly | Rockwell, Norman (1894-1978) | 1941 | 33 x 22" | Oil on relined canvas |
| 2011.064.006 | A Scout is Loyal | Rockwell, Norman (1894-1978) | 1930 | 44 x 34" | Oil on relined canvas |
| 2011.064.024 | A Scout is Reverent | Rockwell, Norman (1894-1978) | 1952 | 28 x 22" | Oil on canvas |
| 2011.064.016 | All Together | Rockwell, Norman (1894-1978) | 1945 | 30 x 24" | Oil on canvas |

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.011 | America Builds for Tomorrow | Rockwell, Norman (1894-1978) | 1936 | 34 x 25" | Oil on relined canvas |
| 2011.064.045 | America's Manpower Begins with Boypower | Rockwell, Norman (1894-1978) | 1969 | 34" x 26" | Oil on canvas |
| 2011.064.042 | Beyond the Easel | Rockwell, Norman (1894-1978) | 1967 | 29 1/4" x 27" | Oil on canvas |
| 2011.064.029 | Boy and Dogs, New Puppies | Rockwell, Norman (1894-1978) | 1956 | 27 1/4" x 25 1/4" | Oil on canvas |
| 2011.064.031 | Boy Scout Hiking | Rockwell, Norman (1894-1978) | 1957 | 35 1/4" x 21" | Oil on canvas |
| 2011.064.051 | Boy Scouts Pledging 60th Boy's Life | Rockwell, Norman (1894-1978) | c. 1968 | 13" x 12" | oil on canvas |
| 2011.064.052 | Boypower, Manpower | Rockwell, Norman (1894-1978) | 1970 | 24" x 24" | charcoal on paper |
| 2011.064.040 | Breakthrough for Freedom | Rockwell, Norman (1894-1978) | 1965 | 23 x 18" | Oil on canvas |
| 2011.064.035 | Can't Wait | Rockwell, Norman (1894-1978) | 1970 | 39" x 29" | Oil on canvas |
| 2011.064.057 | Can't Wait | Rockwell, Norman (1894-1978) | 1960 | 23 1/2" x 18 3/4" with margins | colour lithograph |
| 2011.064.007 | Carry On | Rockwell, Norman (1894-1978) | 1932 | 45 x 31 1/2" | Oil on relined canvas |
| 2011.064.043 | Come and Get It | Rockwell, Norman (1894-1978) | 1968 | 37 1/4" x 31 1/4" | Oil on canvas |
| 2011.064.032 | Ever Onward | Rockwell, Norman (1894-1978) | 1958 | 37" x 29 1/8" | Oil on relined canvas |
| 2011.064.021 | Forward America | Rockwell, Norman (1894-1978) | 1949 | 46.5 x 36.125" | Oil on canvas |
| 2011.064.019 | Friend in Need | Rockwell, Norman (1894-1978) | 1947 | 38 x 19.125" | Oil on canvas |
| 2011.064.046 | From Concord to Tranquility | Rockwell, Norman (1894-1978) | 1971 | 26 1/2" x 21 1/4" | Oil on canvas |
| 2011.064.039 | Growth of a Leader | Rockwell, Norman (1894-1978) | 1964 | 30 1/4" x 23 1/4" | Oil on relined canvas |
| 2011.064.027 | High Adventure at Philmont | Rockwell, Norman (1894-1978) | 1955 | 52 1/2" x 44 1/4" | Oil on relined canvas |
| 2011.064.033 | Homecoming | Rockwell, Norman (1894-1978) | 1959 | 44" x 33" | Oil on relined canvas |
| 2011.064.015 | I Will Do My Best | Rockwell, Norman (1894-1978) | 1943 | 39 x 28" | Oil on canvas |
| 2011.064.044 | Irving Feist | Rockwell, Norman (1894-1978) | 1969 | 20" x 16" | Oil on masonite |
| 2011.064.018 | Men of Tomorrow | Rockwell, Norman (1894-1978) | 1946 | 37 x 29" | Oil on canvas |
| 2011.064.028 | Mighty Proud | Rockwell, Norman (1894-1978) | 1956 | 30 1/4" x 25" | Oil on canvas |
| 2011.064.023 | On My Honor | Rockwell, Norman (1894-1978) | 1951 | 46 x 34" | Oil on canvas |
| 2011.064.008 | On to Washington | Rockwell, Norman (1894-1978) | c. 1933 | 30.125 x 24.125" | Oil on relined canvas |

14

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.020 | Our Heritage | Rockwell, Norman (1894-1978) | 1948 | 42.125 x 32.125" | Oil on canvas |
| 2011.064.034 | Pointing the Way | Rockwell, Norman (1894-1978) | 1960 | 37 1/2" x 28 3/4" | Oil on relined canvas |
| 2011.064.002 | Red Cross Man in the Making (A Good Scout) (A Scout is Kind) | Rockwell, Norman (1894-1978) | 1916 | 30 x 22" | Oil on canvas |
| 2011.064.041 | Scouting is Outing | Rockwell, Norman (1894-1978) | 1966 | 26 1/8" x 21" | Oil on canvas |
| 2011.064.003 | Scouting Makes Real Men Out of Boys (Some Day This May Save An Army) | Rockwell, Norman (1894-1978) | 1916 | 30.125 x 22.125" | Oil on canvas |
| 2011.064.010 | Scouts of Many Trails | Rockwell, Norman (1894-1978) | 1936 | 40.5 x 28.5" | Oil on relined canvas |
| 2011.064.004 | Straight Talks from the Scoutmaster | Rockwell, Norman (1894-1978) | 1923 | 30.125 x 22.125" | Oil on relined canvas |
| 1993.049.001 | Study for "The Scoutmaster" | Rockwell, Norman (1894-1978) | 1956 | 12 1/4" x 10" | Oil on posterboard with inscription on mat |
| 2011.064.056 | Study for Grandma's Recipe | Rockwell, Norman (1894-1978) | n. d. | 11" x 9 1/2 | oil on paper |
| 2011.064.048 | Study for Spirit of America | Rockwell, Norman (1894-1978) | c. 1928 | 17" x 10 7/8" | pencil on paper |
| 2011.064.050 | Study for The Spirit of 1976 | Rockwell, Norman (1894-1978) | 1974 | 14" x 10 1/2" | oil on paper |
| 2011.064.049 | Study for Washington or International Scouting | Rockwell, Norman (1894-1978) | c. 1933 | 13" x 10" | oil on paper |
| 2011.064.053 | Study for We Thank Thee, O'Lord | Rockwell, Norman (1894-1978) | 1972 | 1 1/2" x 9" | oil on canvas mounted to board with reverse oil on glass |
| 2011.064.055 | Study for Weapons for Liberty | Rockwell, Norman (1894-1978) | n. d. | 11" x 8" | oil on paper |
| 2011.064.022 | The Adventure Trail | Rockwell, Norman (1894-1978) | 1950 | 36 x 27.25" | Oil on canvas |
| 2011.064.009 | The Campfire Story | Rockwell, Norman (1894-1978) | 1934 | 32.125 x 24.125" | Oil on canvas |
| 2011.064.025 | The Right Way | Rockwell, Norman (1894-1978) | 1953 | 36 x 30" | Oil on canvas |
| 2011.064.012 | The Scouting Trail | Rockwell, Norman (1894-1978) | 1937 | 26 x 20" | Oil on relined canvas |
| 2011.064.026 | The Scoutmaster | Rockwell, Norman (1894-1978) | 1954 | 45x36" | Oil on canvas |
| 2011.064.037 | To Keep Myself Physically Strong | Rockwell, Norman (1894-1978) | 1962 | 35 1/4" x 29 1/4" | Oil on relined canvas |
| 2011.064.030 | Tomorrow's Leader | Rockwell, Norman (1894-1978) | 1957 | 40" x 34 1/8" | Oil on relined canvas |

15

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.047 | We Thank Thee, OLord | Rockwell, Norman (1894-1978) | 1972 | 34 1/2" x 27 1/2" | Oil on canvas mounted to board |
| 2011.064.054 | We Thank Thee, OLord, study | Rockwell, Norman (1894-1978) | 1972 | 30 3/4" x 24 3/4" | charcoal on paper |
| 2011.064.014 | We, Too, Have A Job To Do | Rockwell, Norman (1894-1978) | 1942 | 32 x 21" | Oil on relined canvas |
| 2011.064.233 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 25 1/2" x 40" | Pastel on paper |
| 2011.064.235 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 25 1/2" x 30 1/2" | Pastel on paper |
| 2011.064.236 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 28 1/2" x 31" | Pastel on paper |
| 2011.064.237 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 25 1/2" x 32" | Pastel on paper |
| 2011.064.232 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 24 1/2" x 21 1/2" | Pastel on paper |
| 2011.064.234 | Untitled from the "Health, Safety, and First Aid" series | Ruth Pisano (Contemporary) | n. d. | 19 1/2" x 24 1/2" | Pastel on paper |
| Unknown | Scouts | S. Johnson | n.d. | | Color Pencil on Paper |
| 2011.064.313 | James West | S. Posie Wood (Contemporary) | n. d. | 7 7/8" x 5 7/8" with margin | Mono- toned etching |
| 2011.064.185 | Monk and Jester | Salvatore Frangiamore (1853- 1915) | 1885 | 28" x 18" | Watercolour on paper |
| 2011.064.218 | Public Attention | Shaw McCutcheon (Contemporary) | 1969 | 18" x 14 1/2" | Ink on paper |
| 2011.064.285 / 1998.118 | Trail to Eagle | Ted Summers (Contemporary) | 1950s | 24" x 50" | |
| 2011.064.294 | Boy Scouts of America, Region Eight | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.297 | Boy Scouts of America, Region Eleven | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.291 | Boy Scouts of America, Region Five | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.290 | Boy Scouts of America, Region Four | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.295 | Boy Scouts of America, Region Nine | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.287 | Boy Scouts of America, Region One | Tricomi (Contemporary) | 1972 | 20" x 16" | Oil on canvas |
| 2011.064.293 | Boy Scouts of America, Region Seven | Tricomi (Contemporary) | 1972 | 20" x 16" | Oil on canvas |
| 2011.064.292 | Boy Scouts of America, Region Six | Tricomi (Contemporary) | 1972 | 20" x 16" | Oil on canvas |
| 2011.064.296 | Boy Scouts of America, Region Ten | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |
| 2011.064.289 | Boy Scouts of America, Region Three | Tricomi (Contemporary) | 1972 | 20" x 16" | Oil on canvas |
| 2011.064.298 | Boy Scouts of America, Region Twelve | Tricomi (Contemporary) | 1972 | 16" x 20" | Oil on canvas |

16

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.288 | Boy Scouts of America, Region Two | Tricomi (Contemporary) | 1972 | 20" x 16" | Oil on canvas |
| 2011.064.299 | National Conference, Order of the Arrow | Tricomi (Contemporary) | 1971 | 20" x 24" | Oil on canvas |
| Unknown | Boy Scouts | Unknown | n.d. | | Goache on Paper |
| Unknown | Boy Scouts, Camping and Cooking | Unknown | n.d. | | Oil on Paper |
| Unknown | BSA National Museum in Kentucky | Unknown | n.d. | | |
| Unknown | Character Counts with #50 Race Car | unknown | n.d. | | |
| Unknown | Cub Scout | unknown | n.d. | | Oil on Canvas |
| Unknown | Cub Scout with Rocket and Bike | Unknown | n.d. | | |
| Unknown | Cub Scouts at a Picnic | Unknown | n.d. | | Oil on Paper |
| Unknown | Elbert Fretwell Portrait | unknown | n.d. | | |
| Unknown | Portrait of Glen | Unknown | n.d. | | |
| Unknown | Scout and Scoutmaster with People Looking On | Unknown | n.d. | | |
| None | Steady at the Helm | Unknown | n.d. | | |
| None | Stephen D. Bechtel, Jr. | Unknown | 2011 | | |
| 2011.064.304 | Lord Baden Powell | Unknown (19th- 20th century) | c. 1900 | 26" x 14" | Pastel on paper |
| 2011.064.305 | Perry R. Bass | Unknown (19th- 20th century) | 1984 | 19" high with base | Cast bronze sculpture with brown patina |
| 2011.064.301 | Edward C. Joullian III | Unknown (Contemporary) | 1985 | 19 3/4" high with base | Cast bronze sculpture with brown patina |
| 2011.064.302 | Ellsworth H. Augustus | Unknown (Contemporary) | 1985 | 19 1/4" high with base | Cast bronze sculpture with brown patina |
| 2011.064.303 | George W. Pirtle | Unknown (Contemporary) | 1984 | 18 3/4" high with base | Cast bronze sculpture with brown patina |
| 2011.064.307 | Public Relations | Unknown (Contemporary) | n. d. | 11 7/8" x 8 7/8" | Ink on paper |
| 2011.064.308 | Sanford N. McDonnel | Unknown (Contemporary) | 1985 | 21" high with base | Cast bronze sculpture with brown patina |
| Unknown | Portrait of Unknown Man | W. Scott | n.d. | | |
| 2011.064.178 | Dr. Fretwell, Donald, and Mickey | Walt Disney ( 1901- 1966) | 1944 | 26" x 26" | Pencil on paper (print?) |
| 2011.064.179 | Good Scouts | Walt Disney (1901- 1966) | n. d. | 15 3/8" x 13 1/8" | Ink wash on paper |

17

| OBJECT ID | TITLE | CREATOR | DATE | IMAGE SIZE | MEDIUM |
|---|---|---|---|---|---|
| 2011.064.180 / 1999.057 | Sea Scouts | Walt Disney (1901- 1966) | n. d. | 15 3/8" x 13 1/8" | Gouache on celluloid |
| 2011.064.203 | Boy Scouts of America, 25th Anniversary | Walter Beach Humphrey (1892- 1966) | 1935 | 30 1/4" x 26 1/4" | Oil on relined canvas |
| 2011.064.280 | National Archives | William Arthur Smith (1918- 1989) | n. d. | 38" x 35" | Oil on canvas |
| Unknown | Portrait of Mortimer Schiff | Wilson | n.d. | | Oil on Canvas |
| 2011.064.229 | Scout with English Sailor | Z. P. Nikolaki (Contemporary) | n. d. | 30" x 23" | Mixed media on unstretched canvas |

18