# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BOY SCOUTS OF AMERICA AND | ) | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OPINION

**Introduction**

    This is an extraordinary case by any measure.

    This is a mass tort case. It involves sexual abuse claims. The debtor, Boy Scouts of America ("BSA"), is a household name. It is a national, nonprofit organization. Over the one hundred plus years of its existence, BSA delivered its Scouting mission through, and in partnership with, tens of thousands of non-debtor entities.

    This is a case about trust—or more accurately—lack of trust. Boys and their families put their faith in a lionized institution, which failed many of them. These boys—now men— seek and deserve compensation for the sexual abuse they suffered years ago. Abuse which has had a profound effect on their lives and for which no compensation will ever be enough. They also seek to ensure that to the extent BSA survives, there is an environment where sexual abuse can never again thrive or be hidden from view.

    This is a case that has been emotionally charged. 82,209 claimants filed proofs of claim asserting sexual abuse. Claimants have actively participated in this case through an official creditors committee, an ad hoc committee and *pro se*. The court has received over 1000 letters from claimants who each have their own story to tell, many for the first time.

Given what is at stake, it is not surprising that claimants hold strongly different views regarding how this case should conclude, even whether this debtor should continue to exist.

This is also a case about an institution that seeks to continue with its mission. BSA currently serves over one million boys and girls across the country, providing them with opportunities to learn self-sufficiency and leadership skills that can contribute to the betterment of society.

TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

I.    Prepetition ...................................................................................................... 1

    A.  The Delivery of Scouting and the Relationship Between and Among BSA, Local
        Councils and Chartered Organizations .......................................................... 1

        1.  Boy Scouts of America ........................................................................ 1

        2.  Local Councils .................................................................................... 2

        3.  Chartered Organizations ..................................................................... 5

        4.  Related Non-Debtor Entities .............................................................. 6

    B.  Sexual Abuse Lawsuits ................................................................................ 7

    C.  Overview of the Boy Scouts Insurance Program........................................... 10

        1.  Coverage Under BSA Insurance Policies............................................. 10

            a.  Coverage for BSA as the Insured.............................................. 10

            b.  Coverage for Local Councils as Additional Insureds................. 12

            c.  Coverage for Chartered Organizations as Additional Insureds .. 13

        2.  Overview of Local Council Insurance .................................................. 13

        3.  Chartered Organization Insurance Policies ......................................... 14

        4.  Combined Single Limits ...................................................................... 14

    D.  Prepetition Coverage Litigation .................................................................... 16

    E.  Prepetition Resolutions and Attempts to Resolve Abuse Claims ..................... 19

II.   Postpetition Events........................................................................................... 20

    A.  The Bar Date ............................................................................................... 21

    B.  Mediation.................................................................................................... 24

    C.  The Plan Process and Voting......................................................................... 24

        1.  Solicitation......................................................................................... 24

        2.  The Initial Voting Results ................................................................... 29

        3.  Continued Mediation and Further Insurance Settlements .................... 30

        4.  Additional Settlements with Chartered Organizations ......................... 31

        5.  The Resolution with the TCC.............................................................. 33

        6.  The Settlement Trust Agreement and the Trust Distribution Procedures, as
            Amended ............................................................................................ 35

            a.  The Settlement Trust Agreement.............................................. 35

            b.  The Trust Distribution Procedures ........................................... 36

i

7. Chartered Organizations ................................................................. 44
    a. Contributing Chartered Organizations ...................................... 45
    b. Participating Chartered Organizations ...................................... 46
    c. Opt-Out Chartered Organizations ............................................ 47
8. Youth Protection................................................................................ 48
9. Plan Modifications, Supplemental Disclosure and Voting.................... 52
10. The Confirmation Hearing .............................................................. 53
    a. The Objectors ........................................................................ 53
    b. Plan Supporters ..................................................................... 56
    c. The Hearing .......................................................................... 56

JURISDICTION ............................................................................................ 56

DISCUSSION ................................................................................................. 57

I.    Additional Findings Related to Direct Abuse Claims............................................ 57

    A. The Aggregate Value of the Direct Abuse Claims ........................................... 57

    B. The Potential Available Coverage of Non-Settling Insurance Companies for Allocated and Unallocated Claims .................................................................. 66

    C. The Plan is a 100% Plan with Respect to Direct Abuse Claims ....................... 69

II.   The Settlements................................................................................................... 72

    A. The Settling Insurer Settlements .................................................................... 73

    B. The Settling Insurer Settlements Meet the *Martin* Standard............................ 74

       1. Hartford....................................................................................................... 76

       2. Century........................................................................................................ 77

       3. Zurich.......................................................................................................... 79

       4. Clarendon .................................................................................................... 80

    C. The Buyback of the Abuse Insurance Policies ............................................... 83

       1. The Abuse Insurance Policies Issued by Hartford and Century as well as the Proceeds of Those Policies are Property of the Estate .......................... 87

       2. The Automatic Stay Prevents a Sale Free and Clear of the Archbishop's Interests ................................................................................................... 93

          a. The Buyback of the Abuse Insurance Policies is Not Part of the Claims Resolution Process.................................................................... 94

          b. A Violation of the Automatic Stay Does Not Depend on Whether the Prohibited Action May be Favorable to the Estate .............. 97

          c. The "Dueling Debtor" Argument Favors the Archbishop ......... 99

ii

3.  The Abuse Insurance Policies Can be Sold Free and Clear of the Lujan Claimants' Direct Action Rights ........................................................ 102

    a.  The McCarran-Ferguson Act Does Not Reverse Preempt Any Code Section or Plan Provision that Permits the Channeling of Direct Abuse Claims to the Settlement Trust........................................ 102

    b.  Section 363(d)(1) Does Not Apply to the Lujan Claimants' Direct Action Rights .......................................................................... 110

    c.  The Abuse Insurance Policies Can be Sold Free and Clear of the Lujan Claimants' Direct Action Rights Under § 363(f)........................ 111

D. The Releases ................................................................................... 113

  1.  The Scouting-Related Releases ......................................................... 114

    a.  Definitions ................................................................................ 114

    b.  The Third Circuit's Decision in *In re Continental Airlines Holding, Inc.* ................................................................................................. 115

    c.  Subject Matter Jurisdiction ....................................................... 117

      i.  Bankruptcy Jurisdiction Exists Over Direct Abuse Claims Asserted Against Local Councils and Chartered Organizations ................................................................................................. 117

      ii.  Bankruptcy Jurisdiction Exists Over the Direct Abuse Claims Asserted Against the Related Non-Debtor Entities ......... 125

      iii.  Bankruptcy Jurisdiction Exists Over Direct Abuse Claims Asserted Against Debtors' Officers and Directors and Other Representatives............................................................. 125

    d.  Statutory Authority ................................................................... 127

    e.  The Scouting-Related Releases (Except with Respect to TCJC) Meet the *Continental* Standard ........................................................ 129

      i.  The Parties' General Positions ...................................... 131

      ii.  The *Master Mortgage* Factors ........................................... 133

        (a) Identity of Interest .................................................. 133

        (b) Contribution of Substantial Assets to the Reorganization ............................................................................. 140

          (1) Settling Insurers ............................................... 141

          (2)  Local Councils ................................................. 141

          (3) The Chartered Organizations ............................. 145

            (i)  United Methodist Entities ............................. 145

            (ii) The Participating Chartered Organizations.... 146

iii

(iii) The Opt-Out Chartered Organizations ......... 148

(iv) Related Non-Debtor Entities and Representatives ................................................................. 148

(c)  A Substantial Majority of the Impacted Creditors Agree ................................................................. 149

(d)  The Plan Provides a Mechanism for the Payment of All, or Substantially All, of the Claims of the Class or Classes Affected by the Injunction ..................................... 149

(e)  The Injunction is Essential to Reorganization Such that Without it There is Little Likelihood of Success..... ................................................................. 151

iii.  The *Continental* Hallmarks ........................................... 163

E.  The TCJC Settlement ................................................................. 168

III.  The Findings ................................................................................... 171

A.  Finding x: The "Fair and Equitable" Finding ................................. 176

B.  Finding aa: The Historical Consistency Finding ............................. 184

C.  Finding w: The Binding Finding ................................................... 185

D.  Finding y: The Allowed Claim Finding ......................................... 187

E.  Finding z: The Good Faith Finding ............................................... 188

IV.  The Confirmation Standards – Section 1129 ....................................... 189

A.  Section 1129(a)(1) ...................................................................... 189

1.  Section 1122 ......................................................................... 190

2.  Section 1123(a) ..................................................................... 194

a.  Section 1123(a)(4) ............................................................. 195

i.  Girl Scouts ...................................................................... 195

ii.  The Lujan Claimants and I.G. ......................................... 198

b.  Section 1123(a)(5) ............................................................. 200

c.  Section 1123(a)(7) ............................................................. 200

B.  Section 1129(a)(3) ...................................................................... 212

1.  The Certain Insurers' Objection ............................................. 213

a.  The Drafting of the TDP ..................................................... 213

b.  The TCC Term Sheet .......................................................... 217

c.  Quantum of Liability .......................................................... 222

d.  The Trust Distribution Procedures ...................................... 224

            e.  Statute of Limitations/Negligence ............................................ 232

      2.  The TDP Fees ...................................................................... 235

      3.  The Lujan Claimants' Objection ......................................... 238

      4.  Mr. Schwindler's Objection ............................................... 238

  C. Section 1129(a)(7) ...................................................................... 239

      1.  Section 1129(a)(7) Applies to Nonprofits............................ 242

      2.  All Other Objections are Overruled .................................... 242

V.     Remaining Insurance Issues............................................................ 248

  A. Assignment of Insurance Rights .................................................. 248

  B. Assignment of Non-Debtor Insurance Rights ............................... 254

  C. Indirect Abuse Claims/Setoff and Recoupment/Reinsurance/Self-Insured Retentions ................................................................................. 256

VI.    The United States Trustee's Remaining Objections............................ 261

  A. The Consensual Third-Party Releases .......................................... 261

  B. Exculpation/Exculpation Injunction ............................................ 267

VII.   Remaining Objections of Pro Se Claimants ...................................... 268

VIII.  Conclusion.................................................................................... 269

# BACKGROUND[1]

## I.    Prepetition

### A.    *The Delivery of Scouting and the Relationship Between and Among BSA, Local Councils and Chartered Organizations*

#### 1.    *Boy Scouts of America*

BSA was created as a body corporate and politic of the District of Columbia by An Act of the Seventy-Fourth Congress of the United States on December 6, 1915 and signed into law by President Woodrow Wilson on June 15, 1916.[2] It is a nonprofit entity.[3] BSA's mission is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."[4] BSA's Charter calls for an executive board comprised of United States citizens with the number, qualifications and term of office to be set forth in bylaws.[5]

---

[1] This Opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable in contested matters by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). These findings of fact draw on the trial testimony and the admitted exhibits. Further, while I am making findings, much of the facts were uncontroverted. The import of the facts, however, is very much in dispute. I thank the parties for supplying a joint set of exhibits. Individual exhibits are referred to as "JTX ___." Transcripts of hearings [ECF 9341 (Day 1), 9354 (Day 2), 9389 (Day 3), 9406 (Day 4), 9407 (Day 5), 9454 (Day 6), 9455 (Day 7), 9482 (Day 8), 9490 (Day 9), 9497 (Day 10), 9517 (Day 11), 9530 (Day 12), 9562 (Day 13), 9563 (Day 14), 9564 (Day 15), 9578 (Day 16), 9616 (Day 17), 9638 (Day 18), 9639 (Day 19), 9646 (Day 20), 9648 (Day 21), and 9656 (Day 22)] are referred to by day of the trial, e.g. "Day 1 Hr'g Tr." Capitalized terms not defined herein have the meaning ascribed to them in the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8813].

[2] JTX 468; *see also* JTX 1-1 at 1.

[3] JTX 1-1 at 1.

[4] JTX 1-1 at 1.

[5] JTX 468 Sec. 5.

Today, BSA is governed by a National Executive Board comprised of 72 volunteer members elected yearly at an annual May meeting.[6] The members of the National Executive Board are selected by the voting members of the National Council, who are 1200 volunteers, including the president and council commissioner of each Local Council.[7] Each Local Council also elects one additional Board member per every 5000 members of such Local Council.[8]

The National Executive Board created a 12-person National Executive Committee to carry out the Board's directives and manage BSA's day-to-day affairs.[9] Some of the National Executive Committee members chair various standing committees (e.g. audit, human resources, finance, mission, reputation and strategy committee).[10]

### 2. Local Councils

While BSA sets the content and structure of the Scouting program, to accomplish its mission, BSA relies on its 250 Local Councils.[11] A Local Council has jurisdiction over a set

---

[6] Day 1 Hr'g Tr. 19:20-25–20:1-3.

[7] Declaration of Devang Desai in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9279; admitted into evidence Day 1 Hr'g Tr. 75:12-19] ("Desai Decl.") ¶ 6.

[8] Desai Decl. ¶ 6.

[9] Day 1 Hr'g Tr. 20:4-25–21:1.

[10] Day 1 Hr'g Tr. 20:4-25-21:1. Six of its members comprise the Bankruptcy Task Force, which was formed in July 2020 as a working group to interface with BSA's professional advisors on a regular basis to understand the bankruptcy restructuring process and advise the National Executive Committee and the National Executive Board on the process. Day 1 Hr'g Tr. 21:6-21.

[11] Declaration of Brian Whittman in Support of Confirmation of The Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9280; admitted into evidence Day 2 Hr'g Tr. 38:6] ("Whittman Decl.") ¶ 14; Declaration of William S. Sugden in Support of Confirmation of The Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9316; admitted into evidence Day 5 Hr'g Tr. 127:22-24] ("Sugden Decl.") ¶ 10.

geographical area within the United States.[12] Each Local Council is a separate, independent non-profit entity organized under the laws of its respective state, but consistent with BSA's Bylaws and Rules and Regulations.[13]

BSA has an annual chartering process for all Local Councils and BSA can refuse to renew or revoke a charter at any time in its sole discretion in the best interest of Scouting.[14] The annual Local Council Charter sets out the relationship between the national organization and Local Councils.[15] Each Local Council is charged with ensuring that BSA's Scouting program is available to all scout units (e.g. troops, dens, packs) in the Local Council's area.[16] This is accomplished by, among other things, "maintaining standards in policies, protecting official badges and insignia and reviewing and making recommendations regarding unit leadership and finances."[17]

Each Local Council is responsible for its own operations, including programming, fund raising and recruiting membership into the Scouting program.[18] Local Councils own and operate their own camps and provide educational programs and leadership training.[19] Local Councils collect membership fees and support the sale of Scouting merchandise.[20]

---

[12] JTX 468 Art. VI Sec. 1.

[13] Day 1 Hr'g Tr. 17:9-13; Whittman Decl. ¶ 14; Sugden Decl. ¶ 10; Desai Decl. ¶ 13, JTX 468 Art. VI Sec. 6.

[14] JTX 468 Art. VI Sec. 4; Day 1 Hr'g Tr. 17:14-15; *see e.g.,* JTX 7-3 (BSA-PLAN_00438595).

[15] Day 1 Hr'g Tr. 17:14-17; *see e.g.,* JTX 7-3.

[16] Desai Decl. ¶ 13.

[17] JTX 468 Art. VI Sec. 5; Day 1 Hr'g Tr. 17:18-18:2

[18] Day 1 Hr'g Tr. 17:18-21; *see* Sugden Decl. ¶ 11; Whittman Decl. ¶ 15.

[19] Whittman Decl. ¶ 15.

[20] Sugden Decl. ¶ 11.

Local Councils also recruit Scouts and volunteer leaders, provide opportunities for rank advancement and enforce BSA rules and regulations.[21]

In exchange for shared services, other fees and reimbursements and for their assistance in delivering the Scouting mission, BSA provides to Local Councils certain back-office functions, such as IT services and HR services and also permits Local Councils to use BSA's intellectual property, trademarks, logos and badges.[22] BSA also maintains the Boy Scouts of America Retirement Plan for Employees Pension Plan, which covers Local Council employees.[23] The Pension Plan has filed tax returns as a "single employer pension plan" with BSA and all Local Councils defined as a "single controlled group of participating employers under common control."[24]

BSA also has a residual interest in all Local Council property.[25]

---

[21] Whittman Decl. ¶ 15.

[22] Day 1 Hr'g Tr. 17:21-24; Sugden Decl. ¶ 11; Whittman Decl. ¶ 17.

[23] Whittman Decl. ¶ 252 n.46.

[24] Whitman Decl. ¶ 252 n.46.

[25] JTX 468 Art. VI Sec. 1. Article VI, Section 1, Clause 2 of the Boy Scouts of America National Council Bylaws provides:

> Constructive Trust on Council Properties. All funds raised and property owned by local councils in the name of Scouting shall be subject to and in accordance with the principles of a construction trust for the benefit of Scouting as set forth in the Rules and Regulations of [BSA]. The National [Executive] Council may request councils to provide information regarding assets, funds, properties, and indebtedness, and councils shall supply such information in a timely manner. Upon termination of a local council charter or dissolution of a council, all rights of management and ownership of local council property shall become vested in the National [Executive] Council for use in accordance with the Rules and Regulations of [BSA]. Local council articles of incorporation and bylaws shall include or be revised to incorporate this provision at the time of chartering or the next charter renewal.

*See also* JTX 147 Art. X Sec. 2. Article X Section 2 of Local Council Bylaws (October 2017) which, in pertinent part, provides:

> The corporation may hold title to real property in its own name provided it is stated in the deed that in the event of the dissolution of the council or the revocation or lapse of its charter said trustee or trustees will, after satisfying any claims against such unit or council to which

### 3. *Chartered Organizations*

To accomplish its mission, BSA also relies on tens of thousands of Chartered Organizations which work directly with Local Councils to help deliver Scouting in their respective local communities.[26] Chartered Organizations can be religious, civic or community institutions.[27] In general, Chartered Organizations provide facilities for Scout meetings and other infrastructure at the local level; they can also provide assistance with selection of troop leaders and volunteers.[28]

The relationship between a Local Council and a Chartered Organization is memorialized in an Annual Unit Charter Agreement which spells out their respective obligations.[29] Among other things, the Local Council is to provide camping opportunities, administrative support and professional staff to assist the Chartered Organization.[30] The exact role of the Chartered Organization can vary. Sometimes a Chartered Organization

---

such real estate may be subject, convey said property or, if sold, pay the net proceeds of such sale in accordance with the Bylaws and Rules and Regulations of the Boy Scouts of America.

The corporation may hold title to real property and maintain accounts wherein securities or funds are deposited in the corporation's name provided, however, in accordance with the Bylaws and Rules and Regulations of the Boy Scouts of America, such assets are deemed to have been raised or obtained for the benefit of Scouting of America and are subject to a constructive trust for the benefit of Scouting. Either the Articles of Incorporation or the Bylaws shall be filed with the applicable state agency maintaining corporate records to provide public notice of such constructive trust and notice that the assets, real property or net proceeds from the conveyance of real property are subject to such a restriction in the event of the dissolution of the local council or the revocation or lapse or its charter.

[26] Sugden Decl. ¶ 55; Whittman Decl. ¶ 16. A complete list of Chartered Organizations can be found at *Boy Scouts of America Restructuring Website*, http://omniagentsolutions.com/bsa/ (last visited July 21, 2022).

[27] Day 1 Hr'g Tr. 18:9-10; Sugden Decl. ¶ 10; Whittman Decl. ¶ 16.

[28] Day 1 Hr'g Tr. 18:12-18; Sugden Decl. ¶ 10; Whittman Decl. ¶ 16.

[29] Whittman Decl. ¶ 16; JTX 264; JTX 358.

[30] Day 1 Hr'g Tr. 17:18-18:2; Desai Decl. ¶ 13; JTX 264.

merely provides use of a building, sometimes members of the organization are volunteers and sometimes members of the organization (or their children) are Scouts.[31]  In any event, for its part, the Chartered Organization utilizes the Scouting program to further the specific goals of the Chartered Organization related to youth character development, career skill development, community service, patriotism and military and veteran recognition or faith-based youth ministry.[32]

The Chartered Organization also participates in Local Council leadership.  The BSA Charter provides that the membership of each Local Council shall consist of a Chartered Organization representative from each Chartered Organization as well as members at large.[33]

### 4.  Related Non-Debtor Entities

BSA receives services from six non-debtor affiliates which are directly or indirectly wholly-owned by, or subject to the control of, BSA.  BSA Asset Management, LLC is a Delaware limited liability company providing investment management and advisory services to BSA.[34]  It also manages BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP ("Endowment Fund").[35]  BSA Endowment Master Trust is a nonprofit trust established for investing funds contributed by BSA and certain Local Councils in the Endowment Fund.[36]  The National Boy Scout Foundation is a

---

[31] Day 5 Hr'g Tr. 97:1-18.

[32] Day 5 Hr'g Tr. 97:1-18.; JTX 264.

[33] JTX 468 Art. VI Sec. 7.

[34] Whittman Decl. ¶ 19.

[35] Whittman Decl. ¶ 19.

[36] Whittman Decl. ¶ 20.

nonprofit corporation that partners with certain Local Councils to provide support for major-gift fundraising efforts.[37] Learning for Life is a nonprofit corporation providing career education and mentorship programs.[38] Arrow WV, Inc. is a nonprofit corporation that owns, develops and leases the Summit High Adventure Base in West Virginia to BSA.[39] Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc. are nonshare capital corporations formed under the laws of Canada owning and operating portions of the Northern Tier High Adventure Base.[40]

### B. Sexual Abuse Lawsuits

Notwithstanding BSA's laudable mission, prepetition, BSA, Local Councils and Chartered Organizations were named as defendants in hundreds of lawsuits in which plaintiffs alleged sexual abuse ("Abuse").[41] The complaints detail horrific allegations ranging from harassment to inappropriate touching to penetration.[42] Some complaints

---

[37] Whittman Decl. ¶ 21.

[38] Whittman Decl. ¶ 22.

[39] Whittman Decl. ¶ 23.

[40] Whittman Decl. ¶ 24.

[41] *See e.g.,* JTX 2232, JTX 2910 through 2923, JTX 2926 through 2930, JTX 2940 through 2942, and JTX 2945. "Abuse" is defined in the Plan as:

> sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

Plan Art. I.17.

[42] *See e.g.,* JTX 2911, 2921.

7

detail one event of Abuse while others detail a protracted "grooming" process.[43] Some

complaints contain lengthy and detailed allegations of rampant child Abuse within Scouting

ranks since at least 1920 and further allege that BSA kept secret records of volunteers who

were alleged to have molested Scouts (the so-called ineligible volunteer files or perversion

files).[44]

Plaintiffs allege that BSA, Local Councils and Chartered Organizations comprise a

"tightly integrated, hierarchal organizational" under BSA's "control at the top."[45] Some

complaints allege this relationship places BSA in direct control over Local Councils and

Chartered Organizations[46] while others assert Local Councils and Chartered Organizations

---

[43] See *e.g.*, JTX 2919, 2920, 2921.

[44] *See e.g.,* JTX 2913, 2916, 2921.

[45] *See e.g.,* JTX 2912, 2920, 2921.

[46] *See e.g.,* JTX 2910 ¶ 5 (BSA and the Aloha Council Cahmorro District "have power to appoint, supervise, monitor, restrict and fire each person working with children within the Defendants' Scouting program."); ¶ 6 (at all times the perpetrator "was under the supervision" of BSA and the Aloha Council Cahmorro District.").

are acting within their scope of authority as BSA's agents.[47]   Other complaints similarly

allege that adult volunteers are BSA's agents and are approved only with BSA's blessing.[48]

Plaintiffs assert various legal theories for holding some or all defendants liable for the

harm suffered, including negligence, gross negligence, negligent retention, negligent

supervision, fraudulent concealment, willful and wanton misconduct, constructive fraud

and breach of fiduciary duty.[49]   Some complaints contain separate allegations and/or counts

---

[47] *See e.g.*, JTX 8; 2919. *See also* JTX 2921:

    30.  A local scouting troop cannot exist without the support of a chartering organization that has received a charter from the BSA authorizing the chartering organization to implement and run the BSA's scouting program.

    35.  This chartering system reveals the BSA's consent to allow local chartering organization to operate the scouting program on its behalf and the chartering organizations' consent to operate the local troops subject to the BSA's control or right to control.  Accordingly, the chartering organizations, such as SILVER SPRINGS SHORES, are the agents of the BSA.

    36.  The BSA uses a similar structure in relation to its local Councils, such as the NORTH FLORIDA COUNCIL.  The BSA issues a charter to an approved local Council authorizing the local Council to administer the scouting program to the local scout troops within the region on behalf of the BSA.

    40.  The Chartering system shows the BSA's consent to allow local Councils to operate the scouting program on its behalf within a specific geographic region, and the local Councils consent to operate the scouting program subject to the BSA's control or right to control.  Thus, the local Councils are agents of the BSA.

    41.  The BSA cannot operate its scouting program without the consent and cooperation of the local Councils and chartering organizations.  Conversely, the chartering organizations and local Councils cannot operate and supervise local scouting troops with the consent of the BSA.

    42.  At all relevant times, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER SPRINGS SHORES were serving as Defendant the BSA's agents by implementing and maintaining the BSA's scouting program on a local level.

[48] *See e.g.*, JTX 8 (BSA-PLAN_01088771) ¶ 42 ("Collectively, BSA, the Local Councils, and the local organizations would select the leaders of the Boy Scout Troops. . . although BSA retained and exercised the ultimate authority to decide who could be a Troop Leader. BSA also had the right to control the means and manner of staffing, operation, and oversight of any Boy Scout Troop[.]"); JTX 2912, 2913, 2919, 2921.

[49] *See e.g.*, JTX 2910, 2911, 2913, 2921.

against each named defendant.[50]  Other complaints lump defendants together, or define

"Defendants" as all named defendants, attributing all conduct to all defendants.[51]  Plaintiffs

seek both economic and non-economic damages, punitive damages and non-monetary relief

such as posting the names of known abusers, establishing a toll free number to report abuse

and sending letters of apology.[52]

### C.  Overview of the Boy Scouts Insurance Program

#### 1.  Coverage Under BSA Insurance Policies

##### a.  Coverage for BSA as the Insured

BSA has had some form of primary and/or excess comprehensive general liability

insurance in place covering Abuse claims since at least 1935.[53]  The terms of BSA's policies

vary over time and include policies that have a per occurrence limit, an aggregate limit or

both.[54]

For the years 1935 through most of 1971, and 1979 through approximately 1996,

Insurance Company of North America (Century)[55] issued primary insurance policies to BSA

---

[50]  *See e.g.*, JTX 2920, 2921.

[51]  *See e.g.*, JTX 2917, 2918.

[52]  *See e.g.*, JTX 2910 through 2912.

[53]  Day 9 Hr'g Tr. 12:10-11; Declaration of Nany Gutzler [ECF 9398; admitted into evidence Day 9 Hr'g Tr. 8:14] ("Gutzler Decl.") ¶ 9.  Consistent with the agreement reached by the parties to resolve various motions *in limine*, Ms. Gutzler's testimony (and thus my findings that rely on it) is not being admitted for the purpose of determining insurance coverage issues.  *See* Agreed Order Regarding Certain Insurers' Motion *in Limine* to Exclude Opinion Testimony of Nancy Gutzler, Katheryn McNally and Mark Kolman and Denying Certain Insurers' Motion *in Limine* to Exclude Testimony of Michael Burnett [ECF 9411].

[54]  Gutzler Decl. ¶¶ 7, 8.

[55]  Century Indemnity Company ("Century"), is the successor to CCI Insurance Company, the successor to Insurance Company of North America and Indemnity Insurance Company of North America ("INA").  Century Indemnity Company's Memorandum of Law in Support of Approval of the Century and Chubb Companies' Settlements Incorporated into the Debtors' Chapter 11 Plan [ECF 9111].

with varying per occurrence limits, but no aggregate limits for Abuse claims.[56] From September 1971 to 1978, Hartford[57] issued primary policies to BSA that also contained per occurrence limits, but no aggregate limits for Abuse claims.[58]

Beginning in 1969 and through 1982, in addition to primary coverage, BSA began to purchase excess insurance policies.[59] The vast majority of the excess policies provided per occurrence limits, but no aggregate limit.[60] Accordingly, once the underlying primary insurance is exhausted, the excess policies may need to pay the per occurrence limits numerous times without exhausting.[61] Certain of the excess policies in these years have settled, but others are available to provide coverage.[62]

Beginning in 1983, BSA insurance policies generally provide for aggregate limits applicable to Abuse claims.[63] BSA also began procuring significantly more excess insurance with higher aggregate limits.[64]

From 1986 through 2018, BSA purchased primary and first-layer excess "matching deductible policies" that require BSA to pay or reimburse deductibles before excess coverage

---

[56] Gutzler Decl. ¶ 9; ¶ 79.

[57] Hartford means Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company ("Hartford").

[58] Gutzler Decl. ¶ 9; ¶ 64.

[59] Gutzler Decl. ¶ 10.

[60] Gutzler Decl. ¶ 10.

[61] Gutzler Decl. ¶ 10; Day 9 Hr'g Tr. 13-14.

[62] Day 9 Hr'g Tr. 13-14.

[63] Gutzler Decl. ¶ 11; Day 9 Hr'g Tr. 14:21-25.

[64] Gutzler Decl. ¶ 11.

attaches over and above either a primary policy or a first-layer excess policy.[65]  Also, from 1986 through 2018, BSA purchased multiple layers of excess insurance that, in most years, provide over $140 million in excess insurance coverage.[66]

From 1983 forward, certain policies are exhausted, and certain insurers are insolvent, but there is $3.6 billion worth of available aggregated coverage, the actual value of which will not be known until all claims have hit the policies and been paid.[67]

### b. Coverage for Local Councils as Additional Insureds

Prior to 1971, Local Councils were not covered under BSA insurance policies.[68] Beginning in 1971 through 1974, BSA gave Local Councils the ability to pay a premium to become an additional insured under BSA's general commercial liability policies.[69]  Many Local Councils availed themselves of this opportunity and by 1975 a substantial number of Local Councils were additional insureds under BSA policies.[70]

From 1975 through the end of 1977, all Local Councils were additional insureds under Hartford's insurance policies issued to BSA.[71]  Beginning in 1978 through the present, BSA implemented a General Liability Insurance Program by which all Local Councils were added as named insureds under insurance policies issued to BSA.[72]

---

[65]  Gutzler Decl. ¶ 12; Day 9 Hr'g Tr. 15:15-19.

[66]  Gutzler Decl. ¶ 13.

[67]  Gutzler Decl. ¶ 11; Day 9 Hr'g Tr. 18:7-12.

[68]  Gutzler Decl. ¶ 16.

[69]  Gutzler Decl. ¶ 17.

[70]  Gutzler Decl. ¶ 17.

[71]  Gutzler Decl. ¶ 18; Day 9 Hr'g Tr. 19:6-7.

[72]  Gutzler Decl. ¶ 18.

### c. *Coverage for Chartered Organizations as Additional Insureds*

Prior to 1976, BSA's insurance policies did not include language that referenced Chartered Organizations.[73] Beginning in 1976, BSA policies issued by Hartford included an endorsement referencing "sponsors" as additional insureds.[74] Then, in 1978, BSA began to include Chartered Organizations as insureds under BSA insurance policies, with some variation in coverage provided by primary and excess layers.[75]

### 2. *Overview of Local Council Insurance Policies*

KCIC (Debtors' retained insurance consultant) undertook significant efforts to locate evidence of insurance purchased separately by Local Councils that may be available to respond to claims of Abuse.[76] KCIC's efforts brought forth primary and secondary evidence that: (i) from 1965 to 1972, the Insurance Company of North America administered a Scout Blanket Liability Program under which Local Councils could apply for insurance with limits of $250,000, $500,000 or $1,000,000.[77] Approximately 300 Local Councils participated in this program.[78] Policies issued under the Scout Blanket Liability Program also insured Chartered Organizations.[79]

Evidence also exists that Hartford, New Hampshire Insurance Company, Travelers Insurance Companies, Maryland Casualty Company and CNA subsidiaries issued policies

---

[73] Gutzler Decl. ¶ 19.

[74] Gutzler Decl. ¶ 19.

[75] Gutzler Decl. ¶ 19.

[76] Gutzler Decl. ¶ 20; Day 9 Hr'g Tr. 19:21-22:11.

[77] Gutzler Decl. ¶ 22.

[78] Gutzler Decl. ¶ 22.

[79] Day 9 Hr'g Tr. 103:22-104:2.

to Local Councils.[80]  Certain of these policies may have included Chartered Organizations

as additional insureds, but others had no reference to Chartered Organizations or sponsors.[81]

### 3. *Chartered Organization Insurance Policies*

KCIC did not undertake to do any analysis of insurance that Chartered

Organizations may have obtained on their own.

### 4. *Combined Single Limits*[82]

Separate and apart from any aggregate limits, the primary BSA insurance policies,

while again, varying in terms, generally provide for a Combined Single Limit.  For example,

the INA policy in place for the period 1/1/78 to 1/1/81 provides:

> Regardless of the number of (1) Insureds under this policy, (2) persons or
> organizations who sustain personal injury, property damage or malpractice or (3)
> claims made or suits brought on account of personal injury, property damage or
> malpractice, the Company's liability is limited as follows:

> Personal Injury Liability, Property Damage Liability and Malpractice Liability, the
> limit of the company's liability for all damages, including damages for care and loss
> of services, arising out of personal injury, including death at any time resulting there
> from, sustained by one or more persons and for all damages, including damages for
> loss of use, arising out of injury to or destruction of property, shall not exceed the
> amount stated in the declarations as a single limit as the result of any one
> occurrence.

> For the purposes of determining the limit of the Company's liability, all personal
> injury, properly damage and malpractice arising out of continuous or repeated
> exposure to substantially the same general conditions shall be considered as arising
> out of one occurrence.

---

[80] Gutzler Decl. ¶¶ 23, 24.

[81] Gutzler Decl. ¶¶ 25, 26; Day 9 Hr'g Tr. 22:7-19, 104:3-105:17.

[82] Because of the voluminous nature of the insurance policies, I asked the parties to submit an
agreed upon representative set of insurance policies for the record.  Day 8 Hr'g Tr. 202:14-23; Day 9
Hr'g Tr. 202:3-11.  This directive resulted in three stipulations: (i) Joint Stipulation Between
Debtors, Century, Hartford, Zurich and Clarendon Regarding Admission of Insurance Policies
[ECF 9508] and (ii) Stipulation Among Debtors and Debtors in Possession, and Munich
Reinsurance America, Inc., formerly known as American Re-Insurance Company, Regarding Policy
NO. M-1027493 [ECF 9510] and (iii) Joint Stipulation Between Debtors and Certain Insurers
Regarding Admission of Insurance Policies [ECF 9529].

The inclusion in this policy of more than one insured shall not operate to increase the limits of the company's total liability to all insureds covered by this policy beyond the limits set forth in the declarations. [83]

Similarly, the Hartford policy for the period for 1/1/72 to 1/1/73 provides:

III. Limits of Liability

Regardless of the number of (1) insureds under the policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

Coverage A – The limit of bodily injury liability stated in the schedule as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the company for all damages because of bodily injury liability stated in the schedule as applicable to each occurrence. [84]

---

[83] JTX 4000-2 at BSA-PLAN_00485363 (INA policy for period 1/1/78-1/1/81 issued to BSA); *see also* JTX 4000-4 at BSA-PLAN_00486961 (INA policy for period 3/1/90 to 3/1/91 issued to BSA) (same); JTX 4000-6 at ABC000056262 (INA policy for period October 20, 1967 to October 20, 1970 issued to Keystone Area Council Boy Scouts of America) ("Regardless of the number of (i) Insureds under this policy . . . INA's liability is limited as follows:  With respect to Bodily Injury Liability, the limit of liability stated I the declarations as applicable to 'each person' is the limit of INA's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence . . .").

[84] JTX 4000-8 at HFBKPLAN016202 (Hartford policy for period 1/1/72-1/1/73 issued to BSA); JTX 4000-9 at HFBKPLAN015060, HFBKPLAN015184 (Hartford policy for period 1/1/75-1/1/76 issued to BSA) (substantially the same); JTX 4000-10 at BSA-PLAN_00251757 (Hartford policy for period 1/1/77-1/1/78 issued to BSA)("Regardless of the number of (i) insureds under this policy . . .Coverage A — The total liability of the company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the schedule as applicable to 'each occurrence'."); JTX 4000-11 at HART-BK001457, HART-BK001458  (Hartford policy for period 10/29/70 to 10/29/73 issued to Hawk Mountain Council Boy Scouts) (substantially the same); JTX 4000-12 at HFBKPLAN011755 (Hartford policy for period 7/1/72-8/31/73 issued to Golden Empire Council) (substantially the same); JTX 4000-13 at HFBKPLAN012410 (Hartford umbrella policy effective date 3/10/75 issued to Lewiston Trail Council) ("Limits of Liability: Regardless of the number of persons and organizations who are *insureds* under this policy and regardless of the number of claims made and suits brought against any or all *insureds*, the total limit of the company's liability for *ultimate net loss* resulting from any one occurrence shall be the *occurrence* limit stated in the declarations; provided, however, that the company's liability shall be further limited to the amount stated as the aggregate limit in the declarations with respect to all *ultimate net loss* caused by one or more *occurrences* during each annual period while this policy is in force commencing from its effective date and arising out of either (1) *products-completed operations liability*; or (2) occupational diseases of employees of *insureds*, such limit applying separately to (1) and (2).") .

Century argues that provisions like the above establish that the single limit (e.g. $500,000 per occurrence) is the limit of the policy regardless of the number of insureds.[85] If BSA, a Local Council and a Chartered Organization are all insureds under a BSA purchased policy and the per occurrence limit is $500,000, the insurer must pay, at most, $500,000 for an occurrence of Abuse and not $1,500,000.

### D. Prepetition Coverage Litigation

Pre-bankruptcy, BSA, certain Local Councils and multiple insurance companies were litigating insurance coverage issues in two jurisdictions.

In 2017, National Surety Corporation sued BSA, Chicago Area Council, Inc,. Boy Scouts of America and Chicago Area Council Boy Scouts of America, Inc. along with 21 other insurance companies in Illinois state court seeking declaratory relief related to excess liability policies issued to BSA for policy years 1983 and 1984.[86] Specifically, National Surety Corporation alleges that no coverage exists with respect to certain underlying lawsuits alleging Abuse by repeat abuser Thomas Hacker and thus, it had no duty to defend or indemnify its insured.[87] The underlying lawsuits allege that BSA knew that Hacker was a predator and permitted and/or failed to prevent the Abuse. National Surety Company

---

[85] Through counsel's objections to questions directed to Ms. Gutzler, the Guam Committee suggested this is a contested insurance coverage issue. Regardless, I find and conclude for purposes of confirmation only and the issues I must decide that Century's reading of the policy and its position on any coverage dispute is at least as plausible as the Guam Committee's. As such, and as discussed *infra*, any payout on the policy to a Local Council or a Chartered Organization defeats BSA's ability to draw on the policy for the same occurrence.

[86] JTX 162 ¶ 1, JTX 202 ¶ 1.

[87] Thomas Hacker was a notorious abuser who was convicted of sexual misconduct (unrelated to Scouting) in 1970 and was placed in the ineligible volunteer files at that time. He later moved, registered with Scouting under an alias and went undetected. He abused numerous boys. After losing defense motions based on statute of limitations, BSA ultimately settled with sixteen plaintiffs for $89.1 million. *See* Day 2 Hr'g Tr. 122:3-124:7.

asserts multiple reasons for lack of coverage, including that: (i) the alleged conduct was not

an "accident," (ii) the alleged conduct was "expected or intended," (iii) punitive damages

are not insurable, (iv) the underlying insurance was not exhausted and (v) there is no

coverage for personal injury which takes place outside the coverage period.[88]

In this Illinois litigation, the Chubb Defendants and Century assert a counterclaim

against BSA and Chicago Area Council.  These insurers allege, among other things, that the

policies issued by Century to BSA during the relevant years do not provide coverage for two

of the plaintiffs in the underlying lawsuit because the agreed-to settlement amounts were

unreasonable or attributable to punitive damages exposure.[89]

In 2018, BSA and certain Local Councils sued The Hartford Accident and Indemnity

Co., and First State Insurance Co. in a Texas state court seeking declaratory judgments

regarding defendants' coverage obligations.[90]  BSA and the Local Councils allege that they

are defendants in lawsuits alleging Abuse over multiple periods and in multiple geographic

locations on the theory that BSA and the Local Councils were negligent in failing to prevent

the Abuse.  In this coverage action, BSA and the Local Councils assert that a dispute exists

because the insurance companies have denied coverage contending that: (i) claims

throughout the country against BSA asserting Abuse are the result of a single occurrence

and thus the policies are exhausted after payment of one claim; (ii) there is a lack of

evidence that certain claimed policies exist; (iii) certain policies are exhausted as aggregate

---

[88] *See generally* JTX 202.

[89] JTX 202 Counterclaim Count I ¶¶ 3-4.

[90] JTX 181.

17

limits have been paid and (iv) for certain renewed policies, only one occurrence is permitted for all periods.[91]

Separately, in 2018, BSA and certain Local Councils sued Insurance Company of North America, Century Indemnity Company, Allianz Global Risks US Insurance Company ("Allianz") and National Surety Corporation in a Texas state court seeking declaratory relief that coverage is available under numerous insurance policies for several underlying lawsuits alleging Abuse.[92]  In the complaint, BSA and the Local Councils allege that "the significant increase in sexual abuse claims over the last several years has resulted in an increase in disputes with [BSA's and plaintiff Local Councils'] insurers.[93]  BSA seeks to resolve various disputes with the defendant insurance companies, including application of the First Encounter Agreement[94] to the underlying lawsuits, failure to pay defense costs and

---

[91] JTX 181; *see also* JTX 182. Hartford also filed an adversary proceeding in the bankruptcy case, *see* Adv. Pro. No. 20-50601.

[92] JTX 185.

[93] JTX 185 ¶ 37.

[94] The First Encounter Agreement is between BSA, INA and Century:

Q: Okay. So let's just take a look at that. This is an agreement. Who is it between?

A: The Boy Scouts, along with INA and Century Indemnity.

Q: Okay. And what did you understand this agreement to be?

A: This is the -- what -- what I've been calling it, the "first encounter agreement." It has a section within the agreement that says that they will consider the date of first abuse or the first encounter as the single trigger date.

Q: Okay. And where are you looking, in terms of the application of that first encounter?

A: So Paragraph 7 reads:

"The 'first encounter rule' shall mean that, for purposes of determining coverage under any policy, the date of occurrence pertaining to any sexual molestation claim shall be the date when the first act of sexual molestation took place, even if additional acts of sexual molestation or additional personal injuries arising therefrom also occurred in subsequent

failure to indemnify BSA for settlements paid to plaintiffs in the underlying lawsuits.

Further, BSA accuses Allianz of unfair or deceptive acts or practices.

### E. Prepetition Resolutions and Attempts to Resolve Abuse Claims

In August 2016, Debtors retained Ogletree Deakins Nash, Smoak & Stewart, P.C.

("Ogletree") as its national coordinating counsel to oversee Abuse litigation; Bruce Griggs is

the engagement partner.[95] At its height, Mr. Griggs oversaw a team of six attorneys and

three paralegals working on approximately 350 claims asserting Abuse against BSA, Local

Councils and/or Related Non-Debtor Entities.[96] He was aware of claims made against

BSA, Local Council and Chartered Organizations together; conversely, Mr. Griggs was not

aware of any claims made against a Chartered Organization that did not include claims

against either BSA or a Local Council.[97] A claim could consist of a lawsuit or a pre-suit

demand letter.[98] From its engagement through February 2020, Ogletree resolved

approximately 250 of the 350 claims it was handling.[99]

In preparation for his role as BSA's national coordinating counsel, Mr. Griggs

familiarized himself with BSA's prior defense strategy.[100] Prior to Ogletree's retention, BSA

---

policy periods. And all damages arising out of such additional acts of sexual molestation or additional personal injuries shall be deemed to have been occurred" – "incurred during the policy year when the first act of sexual molestation took place."

Day 9 Hr'g Tr. 31:24-32:21.

[95] Declaration of Bruce Griggs in Support of Confirmation of The Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9273; admitted into evidence Day 2 Hr'g Tr. 58:9-12] ("Griggs Decl.") ¶ 3.

[96] Griggs Decl. ¶¶ 3, 7.

[97] Griggs Decl. ¶ 6.

[98] Griggs Decl. ¶ 11.

[99] Griggs Decl. ¶ 7.

[100] Griggs Decl. ¶ 4.

secured releases for applicable Local Councils and Chartered Organizations when settling cases brought against BSA.[101]  In keeping with BSA's previous practice, Mr. Griggs also obtained releases for Local Councils and Chartered Organizations when settling claims against BSA[102]

In October 2019, BSA invited certain attorneys representing survivors to New York City for a mediation session to attempt an out-of-court resolution of Abuse claims.[103]  The lawsuits were straining BSA's finances and BSA determined it could not continue to address the lawsuits on a case-by-case basis.[104]  At that time, BSA was named as a defendant in approximately 275 lawsuits asserting Abuse and the pace of filings was accelerating driven at least in part by state legislation loosening applicable statutes of limitations.[105]  BSA was also aware of 1400 other claims not yet the subject of lawsuits.[106]  The meeting was unsuccessful.

From 2017 through 2019, BSA spent more than $150 million on settlements and legal and related professional fees and costs in addressing Abuse claims.[107]

## II.    Postpetition Events

Debtors each filed a voluntary petition under chapter 11 of the United States Bankruptcy Code on February 18, 2020 (the "Petition Date").  The filing was driven by the

---

[101]  Griggs Decl. ¶ 4.

[102]  *See e.g.*, JTX 8.

[103]  *See e.g.*, Day 2 Hr'g Tr. 109:11-110:17; JTX 1663, 1664.

[104]  Whittman Decl. ¶ 42.

[105]  Whittman Decl. ¶ 42.

[106]  JTX 1-1 at 3.

[107]  JTX 1-1 at 5.

prepetition Abuse claims.[108]  Since the filing, BSA and Delaware BSA, LLC have been operating as debtors-in-possession.[109]

On March 5, 2020, the Office of the United States Trustee ("UST") formed two committees: a Committee of Unsecured Trade Creditors ("UCC") and a Committee of Tort Claimants ("TCC").[110]  On April 24, 2020, I appointed James L. Patton as the future claims representative ("FCR").[111]  Additionally, an ad hoc committee of Local Councils ("Local Council Committee") formed in the first few days of the case.  On July 24, 2020, a self-named Coalition of Abused Scouts for Justice ("Coalition") announced its appearance in the case.  The Coalition is a splinter group from the TCC.[112]

Over 9500 motions, objections or other documents appear on the BSA docket.

### A. The Bar Date

By Order dated May 26, 2020 ("Bar Date Order"),[113] a bar date of November 16, 2020 ("Bar Date") was set as the date by which all holders of prepetition claims, including Abuse claims, had to file proofs of claim.  Two different forms of notice and two different proof of claim forms were approved in the Bar Date Order.  The proof of claim form for

---

[108]  Whittman Decl. ¶ 42.

[109]  The two bankruptcy cases are jointly administered.  Delaware BSA, LLC has no real operations.

[110]  Notice of Appointment of Committee of Unsecured Trade Creditors [ECF 141]; Notice of Appointment of Committee - Tort Claimants [ECF 142].

[111]  Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants, Nunc Pro Tunc to the Petition [ECF 486].

[112]  *See* JTX 1-225 ¶ 16.

[113]  Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims [JTX 1-25].

holders of claims unrelated to Abuse allegations is the Official Form 410. The proof of claim form for survivors of Abuse, titled Sexual Abuse Survivor Proof of Claim, is in six Parts over twelve pages and requests information in both "check the box" and narrative form.

In addition to approving a typical notice process, the Bar Date Order also approved an extensive supplemental noticing campaign designed by an advertising and notification consulting firm.[114] Based on a review of BSA's historical data (including historical claims) as well as a 2010 Gallup Survey that included a question on Scouting, the consulting firm concluded that over 54% of former Scouts were men over 50 years old.[115] The campaign, therefore, was designed to reach approximately 95.9% of men age fifty and over in the United States an average of 6.5 times.[116] The campaign also had the goal of reaching its secondary target of men over 18 and its tertiary target of women over 18.[117] The campaign included television, radio, print, streaming and online spots directed at broad audiences (readers of national magazines) and targeted audiences (such as the military, USO Centers and BSA media).[118]

The plaintiffs' bar also played an active (some have argued aggressive) role in targeting potential claimants by instituting a massive advertising campaign of its own. No less than 16 separate firms/entities associated with plaintiff law firms ran at least 10,999

---

[114] JTX 1-14. Declaration of Shannon R. Wheatman, Ph.D in Support of Procedures for Providing Direct Notice and Supplemental Notice Plan to Provide Notice of Bar Date to Abuse Survivors [ECF 556; admitted into evidence by Stipulation ECF 9509] ("Wheatman Decl.").

[115] Wheatman Decl. ¶ 32, ¶ 34.A.iii.

[116] Wheatman Decl. ¶ 93.

[117] Wheatman Decl. ¶ 38.

[118] Wheatman Decl. ¶ 46.

advertisements (ranging from radio spots to thirty minute infomercials) directed at Abuse claimants from May 26, 2020 to August 24, 2020.[119] In response, Debtors filed a motion seeking a supplemental bar date order preventing what Debtors deemed to be false and misleading statements.[120] Many of the plaintiff law firms named in the motion as well as the Coalition objected on First Amendment grounds. After two hearings, supplemental briefing and an announcement of a consensual form of order agreed to by Debtors and several plaintiff law firms, an Order was entered memorializing the agreed-to concessions and ruling on the remaining outstanding objection.[121] The Order provides that those law firms subject to the Order are prohibited from continuing to make statements (i) suggesting that Abuse claimants may remain anonymous; (ii) indicating a specific value of any potential compensation trust and (iii) suggesting that Abuse claimants will never have to be deposed, appear in court or otherwise prove their claims.[122] Any further law firm advertisement is required to refer Abuse claimants to the official claims agent website and to include the Bar Date.

More than 100,000 proofs of claim were filed with Omni Agent Solutions ("Omni"), the claims agent, including 82,209 unique and timely claims asserting Abuse.[123] Many of the same law firms that advertised extensively were retained by thousands of clients alleging Abuse at the hands of BSA.

---

[119] JTX 1-401 ¶ 37.

[120] JTX 1-401 ¶ 42.

[121] JTX 1-409.

[122] JTX 1-409 ¶ 10.A.

[123] Declaration of Makeda S. Murray in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9317; admitted into evidence Day 6 Hr'g Tr. 29:3-6].

## B. Mediation

On the first day of the case, Debtors filed a motion seeking to appoint a mediator and send certain matters to mediation. After a contested hearing, by Order dated June 9, 2020, I appointed three mediators "for the purpose of mediating the comprehensive resolution of issues and claims in BSA's chapter 11 case through a chapter 11 plan . . . , which includes, without limitation, all matters that may be the subject of a motion seeking approval by the court of solicitation procedures and/or forms of plan ballots, a disclosure statement, or a confirmation of a chapter 11 plan."[124] Through the beginning of the confirmation hearing, and even thereafter, one or more of the mediators filed twelve mediator reports reporting on progress and attaching term sheets and/or settlement agreements reflecting resolutions reached during the course of mediation.

## C. The Plan Process and Voting

### 1. Solicitation

The plan presented for confirmation is the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC. ("Plan").[125] As evident from its title, the Plan is not the first or even the fourth version of a proposed plan of reorganization.

On the first day of the case, Debtors filed a placeholder plan. The Second, Third, Fourth and Fifth Amended plans were filed between March 1, 2021 and September 15,

---

[124] JTX 1-26 ¶ 2. Three mediators became two, and then one, after one resigned and one was terminated.

[125] JTX 1-353.

24

2021.[126] The plan that was originally solicited ("Solicitation Plan") was filed on September 30, 2021,[127] the day after the Disclosure Statement was approved on September 29, 2021.[128]

The Plan classifies Debtors' claims and equity interests into ten classes.[129] Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are unimpaired, presumed to accept and not entitled to vote. Class 10 (Interests in Delaware BSA) is impaired, deemed to reject and not entitled to vote. The impaired, voting classes are:

| | |
|---|---|
| Class 3A | 2010 Credit Facility Claims |
| Class 3B | 2019 RCF Claims |
| Class 4A | 2010 Bond Claims |
| Class 4B | 2012 Bond Claims |
| Class 5 | Convenience Claims |
| Class 6 | General Unsecured Claims |
| Class 7 | Non-Abuse Litigation Claims |
| Class 8 | Direct Abuse Claims |
| Class 9 | Indirect Abuse Claims |

Per a resolution embodied in a Settlement Term Sheet among Debtors, JPMorgan Chase Bank, N.A. (Debtors' lender) ("JPM") and the TCC, the funded indebtedness held by the holders of claims in Classes 3 and 4 is reinstated with extended maturities to ten years

---

[126] Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 20]; Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 2293]; Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 2592]; Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 5368]; Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF. 5484]; Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 6212].

[127] Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 6443].

[128] Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 6445] ("Disclosure Statement").

[129] The Plan and the Solicitation Plan do not differ in their classification of claims.

after the Effective Date, with a two year moratorium on principal payments.[130] Class 5 Convenience Claims, which are general unsecured claims less than $50,000 (or a claim reduced to that amount), are paid in full. Holders of Class 6 General Unsecured Claims, which is any claim against a Debtor that is not an administrative claim or a claim in another class, will receive their pro rata share of $25 million. Debtors project that Class 6 will receive recoveries between 75% and 95%.

Class 7 is comprised of approximately 55 wrongful death and personal injury claims (non-Abuse related) and seven other litigation claims, including the claims of Girl Scouts of the United States of America for trademark infringement. This class retains the right to receive full payment of its claims from available insurance proceeds, including both Abuse Insurance Policies and Non-Abuse Insurance Policies (both as defined in the Plan). Any unsatisfied portion of such a claim may also receive $50,000 as a Convenience Class claim. Debtors project a 100% recovery on these claims.

Class 8 is comprised of Direct Abuse Claims. These are claims of individuals for Abuse.[131] Class 9 is comprised of Indirect Abuse Claims. In general, Class 9 claims are claims for contribution, indemnity, reimbursement, or subrogation that could be asserted by insurance companies, Local Councils or Chartered Organizations. Both Direct Abuse Claims and Indirect Abuse Claims are channeled to a trust ("Settlement Trust") to be

---

[130] The resolution with JPM is attached to the First Mediators' Report (JTX 1-33 Ex. A) and provides for the treatment of non-Abuse claims, treatment of JPM's secured claims and resolves any estate challenges to JPM's prepetition security interests.

[131] In the Plan, Direct Abuse Claim means "an Abuse Claim that is not an Indirect Abuse Claim." In turn, the definition of "Abuse Claim" is a lengthy, detailed description identifying those entities against whom a claim of Abuse is asserted. It includes Future Abuse Claims (as defined in the Plan), Indirect Abuse Claims and Direct Abuse Claims.

processed, liquidated and paid in accordance with the Settlement Trust Agreement and the

Trust Distribution Procedures ("TDP").

As set out in the Disclosure Statement, the Solicitation Plan contemplated that

funding for the Settlement Trust would come from multiple sources. <u>One</u>, BSA is to make a

contribution of cash, real property and personal property valued at $219 million. <u>Two</u>,

Local Councils, collectively, are to make a contribution of (x) cash and real property, in the

amount of $500 million, (y) an interest bearing variable obligation note in the amount of

$100 million ("DST Note") and (z) the Local Council Insurance Rights.[132] <u>Three</u>, the

Settlement Trust is to receive all of the insurance rights of BSA, Local Councils and

Contributing Chartered Organizations. <u>Four</u>, pursuant to a settlement among Debtors, the

Coalition, the FCR, the Local Council Committee and the Church of Jesus Christ of the

Latter-Day Saints ("TCJC") attached to the Sixth Mediators' Report, TCJC agrees to make

a cash contribution of $250 million plus certain insurance rights to the Settlement Trust for

---

[132] The definition of Local Council Insurance Rights is:

> Local Council Settlement Contribution. The Local Councils shall make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution. If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "**Local Council Insurance Rights**"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.

Plan Art. V.S.1.a. The Local Council contribution is dependent upon an acceptable resolution of issues related to Chartered Organizations, including as to insurance and indemnity claims. As discussed *infra*, the Local Council contribution increased as a result of further negotiations.

payment of Direct Abuse Claims related to TCJC that arose in connection with its sponsorship of one or more Scouting units. [133] Five, pursuant to a settlement among Debtors, the FCR, the Coalition, the Local Council Committee and Hartford, also attached to the Sixth Mediators' Report, Hartford agrees to make a contribution to the Settlement Trust in the amount of $787 million in exchange for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including additional insureds.[134] Six, there is a mechanism for additional insurance companies to become Settling Insurance Companies by making monetary contributions to the Settlement Trust. Seven, there is a mechanism by which Chartered Organizations can make contributions to the Settlement Trust and become Contributing Chartered Organizations, or can choose one of two other options. Of note, the TCC was not a party to the settlement with Hartford or TCJC.

Consistent with Dr. Bates's valuation at the time (see *infra*), in the Disclosure Statement, Debtors project recoveries for both Direct Abuse Claims and Indirect Abuse Claims based on a range of $2.4 billion to $7.1 billion.[135] The calculation (as qualified in the Disclosure Statement) yields 10-21% on the lower range and 31 to 63% on the higher range, in each instance with additional insurance rights expected to yield up to a 100% recovery.

---

[133] JTX 1-292, Ex. B. As finally documented, Notice of Filing of Exhibits I-1 and J-1 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Redlines Thereof Ex. 3 [ECF 8816-3], the "TCJC Settlement Agreement."

[134] JTX 1-292, Ex. A. As finally documented, Notice of Filing of Exhibits I-1 and J-1 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Redlines Thereof Ex. 1 [ECF 8816-1], the "Hartford Settlement Agreement." As set forth in the Disclosure Statement, Hartford's contribution was subject to Hartford's satisfaction with the treatment of Chartered Organizations as it impacts Hartford's Policies. JTX 1-296 at 14-15.

[135] In the Disclosure Statement, Debtors state the estimated amount of Indirect Abuse Claims is unknown since they are unliquidated, contingent and subject to § 502(e). *See* JTX 1-296 at 30 n.44. But, Debtors urge that Indirect Abuse Claims, to the extent viable, are included in the Bates White estimated range because they are capped as set forth in the Trust Distribution Procedures.

## 2. *The Initial Voting Results*

As reflected in the Initial Nownes-Whitaker Declaration,[136] with respect to Debtor BSA, the Solicitation Plan received 100% acceptance by Classes 3A, 3B, 4A, 4B, over 98% acceptance by Class 5 and over 99% acceptance by Class 6.  With respect to Debtor Delaware BSA, LLC, the Solicitation Plan received 100% acceptance by Classes 3A, 3B, 4A, and 4C.  The remaining classes also accepted the Solicitation Plan by the requisite amounts[137] as reflected in the ballot tabulation:

### Debtor BSA

| Class | # Votes | Accept | Reject |
|-------|---------|--------|--------|
| Class 7 | 6 | 4 = 66.67% | 2 = 33.33% |
| Class 8 | 53,596 | 39,430 = 73.57% | 14,166 = 26.43% |
| Class 9 | 6710 | 4,666 = 69.57% | 2,042 = 30.43% |

### Debtor Delaware BSA, LLC

| Class | # Votes | Accept | Reject |
|-------|---------|--------|--------|
| Class 9 | 753 | 599 = 79.55% | 154 = 20.45% |

---

[136] Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8345; admitted by Stipulation ECF 9509] ("Initial Nownes-Whitaker Declaration").

[137] Each claimant in Classes 7, 8 and 9 voted his/her/its claim in the amount of $1.00 so that the percentage of acceptance/rejection by number is equivalent to the percentage of acceptance/ rejection by amount.

### 3. *Continued Mediation and Further Insurance Settlements*

Notwithstanding solicitation and as contemplated in the Disclosure Statement, Debtors and the other mediation parties continued their attempts to resolve disputes. Settlements reached post-solicitation with Century/Chubb, Zurich and Clarendon[138] add another $871 million from Settling Insurance Companies as well as an additional $40 million from Local Councils on account of Chartered Organizations.

Attached to the Seventh Mediator's Report filed December 14, 2021, is a Term Sheet reflecting a settlement among Debtors, Century/Chubb, the Local Council Committee, the Coalition, the FCR and certain state court council, which, in general (and subject to final documentation), provides that Century will buy back its insurance policies and obtain certain releases for a payment of $800 million to the Settlement Trust.[139] The Century settlement is significant because, among other things, it established/clarified a baseline for an acceptable resolution to claims of Chartered Organizations against Abuse Insurance Policies[140] that had been left to further negotiation in the Hartford Term Sheet. The Century settlement also required BSA and Local Councils to make additional contributions to the Settlement Trust on behalf of Chartered Organizations in the form of: (i) $15 million in cash and an increase of $25 million in the DST Note from Local Councils ("Supplemental LC Contribution") and (ii) up to $100 million from BSA and Local Councils tied to future

---

[138] The settlements with Hartford, Century/Chubb, Zurich and Clarendon are, collectively, the "Settling Insurer Settlements."

[139] JTX 2834 Ex. A ¶ 3. As finally documented, JTX 1-355 Ex. 1, the "Century Settlement Agreement."

[140] Abuse Insurance Policies means "collectively, the BSA Insurance Policies, and the Local Council Insurance Policies. Abuse Insurance Polices do not includes Non-Abuse Insurance Policies or Postpetition Insurance Policies." Plan Art I.20.

membership increases on account of Chartered Organizations' continued sponsorship of Scouting Units ("Settlement Growth Payment").

Attached to the Ninth Mediator's Report filed December 22, 2021 is a Term Sheet among Debtors, Zurich,[141] the FCR, the Coalition and the Local Council Committee reflecting, subject to final documentation, a settlement by which Zurich will buy back its insurance policies and obtain certain releases for a payment of $52,500,000 to the Settlement Trust.[142] It is largely modeled after the Century settlement.

Attached to the Tenth Mediator's Report filed January 3, 2022 is a Term Sheet among Debtors, Clarendon,[143] the Local Council Committee, the Coalition and the FCR reflecting, subject to final documentation, a settlement by which Clarendon will buy back its insurance policies and obtain certain releases for a payment of $16,500,000 to the Settlement Trust.[144] It is also largely modeled after the Century settlement.

### 4. *Additional Settlements with Chartered Organizations*

After solicitation, Debtors also continued to work with organized Chartered Organizations to reach resolutions. Attached to the Eight Mediator's Report filed January 3, 2022 is a Term Sheet (subject to final documentation) among Debtors, the United Methodist Ad Hoc Committee ("Methodist Committee"), the Coalition, the Local Council

---

[141] Zurich means American Zurich Insurance Company, American Guarantee & Liability Insurance Company and Steadfast Insurance Company ("Zurich").

[142] JTX 1-312, as finally documented, JTX 1-355 Ex. 2, the "Zurich Settlement Agreement."

[143] Clarendon means Clarendon National Insurance Company (as successor in interest by merger to Clarendon American Insurance Company), River Thames Insurance Company (as successor in interest to UnionAmerica Insurance Company Limited) and Zurich American Insurance Company (as successor in interest to Maryland Casualty Company, Zurich Insurance Company and American General Fire & Casualty Company) ("Clarendon").

[144] JTX 1-316, as finally documented, JTX 1-355 Ex. 3, the "Clarendon Settlement Agreement."

Committee and the FCR reflecting an agreement by which (i) the United Methodist Entities (as defined therein) will contribute $30 million to the Settlement Trust and (ii) the Methodist Committee will recommend to the United Methodist BSA leadership team that it agree to lead a fundraising effort to raise an additional $100 million for the Settlement Trust from other Chartered Organizations.[145]  In addition to its financial contribution, the United Methodist Entities agree to continue to partner with BSA as Chartering Organizations through 2036 and cooperate with youth protection efforts.  Further, the Methodist Committee agrees to support the Plan and recommend to holders of Direct Abuse Claims that they support the Plan.

Attached to the Twelfth Mediator's Report filed March 17, 2022 is a Term Sheet among Debtors, the Roman Catholic Ad Hoc Committee ("Roman Catholic Committee"), the FCR, the Coalition, the Local Council Committee and certain Settling Insurance Companies by which certain Roman Catholic Entities (as defined in the Term Sheet) are treated as Participating Chartered Organizations under the Plan.[146]  The Roman Catholic Committee agrees to work with BSA and Local Councils to improve Scouting at least through the year 2036 and the Roman Catholic Committee commits to encourage the U.S. Council of Bishops to recommend that all Roman Catholic Entities do so as well.  The Roman Catholic Committee also agrees to support confirmation of the Plan, withdraw significant confirmation-related discovery requests as well as objections to evidence offered in support of confirmation by Plan supporters and withdraw its own expert reports and its

---

[145] JTX 1-311.

[146] JTX 2959.

objection to confirmation.  The Roman Catholic Committee also agrees to cooperate and support BSA's youth protection efforts.

### 5.  *The Resolution with the TCC*

As set forth above, the TCC did not support the Solicitation Plan, the Settling Insurer Settlements or any of the mediated resolutions.  That changed on February 10, 2022 when the Eleventh Mediator's Report was filed.[147]  Attached to that report is a Term Sheet among Debtors, the TCC, the FCR, the Coalition, the Local Council Committee and the Pfau/Zalkin claimants ("TCC Term Sheet").[148]  The Term Sheet is also supported by numerous state court counsel representing holders of Direct Abuse Claims who agree to recommend that their clients who previously voted to reject the Plan change their votes to acceptances.  The terms of the TCC Term Sheet are also subject to definitive documentation, but were to be incorporated into the Plan by way of modifications.

The TCC Term Sheet contains numerous, detailed terms.  Some of the highlights (which are discussed more fully *infra*) are:

(i)    The TCC will withdraw its opposition to the Plan and the settlements with Hartford, Century/Chubb, Zurich and Clarendon.

(ii)   The reworking of the definition of Abuse Claim in the Plan and the introduction of a new term, "Mixed Claim."  A Mixed Claim is a Direct Abuse Claim that makes allegations of Abuse related to Scouting and also makes allegations of Abuse occurring prior to the Petition Date that are unrelated to Scouting ("Non Scouting Abuse").

---

[147]  JTX 1-350.

[148]  The Pfau/ Zalkin Claimants are Abuse claimants represented by two separate law firms, The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC.

(iii) A return to the treatment of Chartered Organizations embodied in the Solicitation Plan (and a retreat from the offer to Chartered Organizations under the Century settlement) such that Chartered Organizations who do not choose to be Opt-Out Chartered Organizations are now Participating Chartered Organizations and must provide consideration to the Settlement Trustee to become a Contributing Chartered Organization entitled to full releases from holders of Direct Abuse Claims.

(iv) The redirection of the Supplemental LC Contribution so that it is now consideration for the extension of a preliminary injunction prohibiting the continuation of lawsuits against Participating Chartering Organizations/ Limited Protected Parties to give them an opportunity to negotiate with the Settlement Trustee to become Contributing Chartered Organizations/Protected Parties.[149]

(v) An additional option in the TDP for liquidation of Direct Abuse Claims—the Independent Review Option.

(vi) The adoption of a specific Youth Protection Program.

(vii) The reconstitution of the composition of the Settlement Trust Advisory Committee (see below) as well as the establishment of voting requirements on certain actions.

(viii) An agreement that Debtors will consult with the TCC, the FCR and the Coalition on the presentation of the testimony of Dr. Bates and Ms. Gutzler at

---

[149] This preliminary injunction has been in place since March 30, 2020.

the confirmation hearing as well as certain required findings related to the

same.

The terms of the TCC Term Sheet were ultimately incorporated into the Plan.

> ### 6. *The Settlement Trust Agreement and the Trust Distribution Procedures, as Amended*[150]
>
> #### a. *The Settlement Trust Agreement*

The Plan contemplates the creation of a Settlement Trust to receive the contributions

from BSA, Local Councils and settling parties.[151]  The purpose of the Settlement Trust is to,

among other things:

> assume liability for all Abuse Claims, to hold, preserve,
> maximize and administer the Settlement Trust Assets [as defined
> in the Plan], and to direct the processing, liquidation, and
> payment of all compensable Abuse Claims in accordance with
> the Settlement Trust Documents [as defined in the Plan].[152]

BSA creates the Settlement Trust pursuant to the Settlement Trust Agreement.[153]  The

Settlement Trust is a statutory trust under Chapter 38 of title 12 of the Delaware Code[154] and

it is the § 1123(b)(3)(B) estate representative as specifically spelled out (and qualified) in the

Plan.[155]  The beneficial owners of the Settlement Trust ("Beneficiaries") are the holders of

---

[150] Capitalized terms not defined in this Section have the meaning ascribed to them in the TDP. The TDP contain a lot of commentary.  To the extent that the commentary is inconsistent with conclusions reached in this Opinion, any future iteration of the TDP should be revised to eliminate the unnecessary rhetoric.

[151] Plan Art. IV.

[152] *See* Plan Art. IV.B.1.

[153] The BSA Settlement Trust Agreement is attached as Exhibit B to the Plan (the "Settlement Trust Agreement").

[154] Settlement Trust Agreement Art. 1.1.

[155] Plan Art. IV.C.2.

Abuse Claims (defined in the Settlement Trust as the holders of Class 8 Direct Abuse Claims and Class 9 Indirect Abuse Claims).[156]

In addition to the statutorily required Delaware trustee, the Settlement Trust Agreement provides for one other trustee ("Settlement Trustee").[157] BSA has nominated the Hon. Barbara Houser (ret.) to serve as the Settlement Trustee. The Settlement Trust Agreement also provides for two Claims Administrators to oversee the administration of claims—one each to oversee the Claims Matrix Process/Expedited Distribution election and the Independent Review Option discussed below.[158]

The Settlement Trust Agreement further provides for the creation of a Settlement Trust Advisory Committee ("STAC").[159] Pursuant to the TCC Term Sheet, the STAC will be comprised of three members chosen by the Coalition, three members chosen by the TCC and one member chosen by the Pfau/Zalkin Claimants. All members are lawyers that represent holders of Direct Abuse Claims. As discussed more fully below, the STAC has a certain oversight/consulting role with respect to the Settlement Trustee.

### b. *The Trust Distribution Procedures*[160]

The TDP create four processes by which Direct Abuse Claims are liquidated and an Allowed Claim Amount (or, a Final Determination) is determined. These processes are: (i) the Expedited Distribution election, (ii) evaluation under the Claims Matrix ("Claims

---

[156] Settlement Trust Art. 1 Sec. 1.6(a); Recital (B).

[157] Settlement Trust Art. 5 Sec. 5.1.

[158] Settlement Trust Art. 4 Sec. 4.1(a).

[159] Settlement Trust Art. 6.

[160] The TDP are attached as Exhibit A to the Plan.

Matrix Process"), (iii) the Tort System Alternative, and (iv) the Independent Review Option.

The Expedited Distribution election permits a holder of a Direct Abuse Claim ("Direct Abuse Claimant") to receive a payment of $3,500 on account of his claim with a minimal level of review. A Direct Abuse Claimant must have timely submitted a "substantially completed" proof of claim signed by the claimant (not his lawyer) under penalty of perjury.[161] He must also have elected the Expedited Distribution on his ballot.[162] Under the TDP, Direct Abuse Claimants will receive their Expedited Payment upon executing certain required releases.[163] Seven thousand three hundred eighty-one (7381) Direct Abuse Claimants made the Expedited Distribution election.[164]

Under the Claims Matrix Process, a Direct Abuse Claimant must: (i) make a Trust Claim Submission to the Settlement Trust, which includes a completed questionnaire signed under oath, the production of all records in his possession, custody or control related to the Abuse (including records regarding past or expected recoveries from any source) and a signed agreement to produce further records and documents upon request of the Settlement Trustee, (ii) consent to a Trustee Interview (including by healthcare professionals) and (iii) consent to a written and/or oral examination under oath, if requested.[165] The Settlement

---

[161] TDP Art. VI.A.

[162] Plan Art. III.B.10(b)(i).

[163] TDP Art. VI.B.

[164] Supplemental Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Submission of Votes and Final Tabulation of Ballots Cast in Connection with the Limited Extended Voting Deadline for Holders of Claims in Class 8 and Class 9 on the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC. [ECF 9275] ("Supplemental Nownes-Whitaker Declaration").

[165] TDP Art. VII.A.

Trustee performs an Initial Evaluation to see if these submissions meet the requisite criteria. If so, the claim submission moves to the next step.  If not, the Direct Abuse Claim is a Disallowed Claim.

In the next step, the Settlement Trustee evaluates all claims that were not disallowed for compliance with the General Criteria.  These General Criteria are: (i) identification of alleged acts of Abuse; (ii) identification of the abuser by either name or specific information such that the Settlement Trustee can determine whether the alleged abuser was an employee, agent or volunteer of a Protected Party or associated with Scouting and the Abuse directly relates to Scouting activities; (iii) the Abuse is connected to Scouting and a Protected Party "may bear legal responsibility;" (iv) identification of the date of the Abuse directly or through other evidence and (v) identification of the venue or location of the Abuse.  If the claim submission meets the General Criteria and the materials submitted do not contain false or deceptive information, the Direct Abuse Claim is deemed an Allowed Abuse Claim.  If the submitted materials do not meet the General Criteria or if they contain fraudulent and/or deceptive material, the Direct Abuse Claim is deemed a Disallowed Claim.[166]

An Allowed Abuse Claim is then run through the Claims Matrix and Scaling Factors.  The Claims Matrix establishes six tiers of Abuse types and provides a Base Matrix Value and Maximum Matrix Value to each tier, as follows:[167]

---

[166] TDP Art. VII.C.

[167] TDP Art. VIII.A.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. Anal or<br><br>Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant. Oral Contact by a Youth<br><br>Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |

| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator.<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography. | $75,000 $ | $337,500 |
| 6 | Sexual Abuse-No Touching.<br><br>Adult Abuse Claims | $3,500 | $8,500 |

The Settlement Trustee assigns an Allowed Abuse Claim to one of the six tiers and applies the Scaling Factors to the Base Matrix Value to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim. While the Maximum Matrix Value is just that— the maximum that can be awarded by the Settlement Trustee in the Claims Matrix Process, the Base Matrix Value is not a minimum amount, but merely a starting point for the calculation of a Proposed Allowed Claim Amount.

If a Direct Abuse Claimant is satisfied with the Proposed Allowed Claim Amount proposed by the Settlement Trustee or takes no further action with respect to it, then it becomes the Allowed Claim Amount.[168]

If a Direct Abuse Claimant is dissatisfied with the Settlement Trustee's Proposed Allowed Claim Amount, he may make a Reconsideration Request within thirty days of receiving the determination.[169] Alternatively, he may notify the Settlement Trustee that he intends to seek a de novo determination of his claim by a court of competent jurisdiction

---

[168] TDP Art. VII.E.

[169] TDP Art. VII.G.

(the "TDP Tort Election.").[170] The Final Determination/Allowed Abuse Amount of a Direct Abuse Claim that goes through the TDP Tort Election is the amount awarded in the lawsuit.[171] The Tort System Alternative also includes a STAC Tort Election option which permits the commencement or continuation of a lawsuit by a Direct Abuse Claimant against the Settlement Trust to obtain the Allowed Claim Amount.[172] The Allowed Claim Amount in these instances is the final judgment less any payments actually received and retained by the Direct Abuse Claimant, but if the claimant receives a judgment in excess of the Maximum Matrix Value for the applicable tier, that additional amount is subordinate in right of distribution to the prior payment in full of all other Allowed Abuse Claims.[173] If one of these methods of liquidation is chosen or permitted, the Settlement Trustee shall provide notice to any Non-Settling Insurance Companies and seek defense in accordance with the terms of any relevant insurance policies.[174]

The Independent Review Option contemplates recoveries above the values stated in the Claims Matrix and is designed to permit Direct Abuse Claimants with higher value claims to potentially receive a higher award and directly trigger excess insurance coverage.[175] Under the Independent Review Option, a Direct Abuse Claimant can have his claim evaluated by a neutral third party (a retired judge with tort experience on a panel

---

170 TDP Art. XII.A. An Abuse Claimant can also make a TDP Tort Election Claim if dissatisfied with the results of his Reconsideration Request.

171 TDP Art. XII.H.

172 TDP Art. XII.C.

173 TDP Art. XII.G.

174 TDP Art. XII.D.

175 Gutzler Decl. ¶¶ 132-134.

maintained by the Settlement Trust) who makes a Settlement Recommendation to the Settlement Trustee. The Neutral's Settlement Recommendation seeks to replicate the amount a reasonable jury would award taking into account relative shares of fault and the standard of proof applicable under applicable state law.[176]  A Direct Abuse Claimant has six months after the Effective Date of the Plan to select this Option.

The submissions required under the Independent Review Option have parallels to those required under the Claims Matrix Process, but, generally require "confirmation of" or "evidence that" the criteria is satisfied.  For example, a Direct Abuse Claimant must submit evidence that he was in a Scouting unit by submitting a photograph, a membership card or document that reflects the claimant's rank in Scouting or a sworn statement from a third party, who will agree to a deposition if requested.  The Direct Abuse Claimant must also provide evidence that that the claim is timely under an applicable statute of limitations, including satisfying any recognized exceptions under applicable law.  And, the Direct Abuse Claimant "shall be subject to" a six hour sworn interview, mental health examination or signed and dated supplemental interrogatories.[177]  The Direct Abuse Claimant is also entitled to certain discovery from the Settlement Trust.[178]

The Settlement Trustee is required to provide notice to "any potentially responsible non-settling insurer(s)" of any claim for which the Independent Review Option is selected. Those insurers are given a "reasonable opportunity" to participate in the Independent Review and may review and comment on the Neutral's evaluation, including attending any

---

[176]  TDP Art. XIII.A.

[177]  TDP Art. XIII.G.

[178]  TDP Art. XIII.I.

interview or deposition and raising and presenting (at the insurer's cost) applicable defenses to a claim.[179]

If the Settlement Trustee accepts the Neutral's Settlement Recommendation, that amount is the Allowed Claim Amount of the Direct Abuse Claim.[180] The Settlement Trustee must then provide notice to the applicable Non-Settling Insurance Company(ies) and seek consent. The insurer may elect to pay the Allowed Claim Amount or decline to do so. If the Responsible Insurer declines to pay, the Settlement Trustee may sue under the applicable insurance policies.[181]

If the Settlement Trustee declines to accept the Neutral's recommendation, within forty-five days of service of a notice of rejection, the Direct Abuse Claimant may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to liquidate his claim.[182]

If the Settlement Trustee accepts a recommendation of zero, the Direct Abuse Claimant shall receive zero and may not pursue any Protected Parties. If the settlement Trustee accepts a recommendation under $1 million the award is paid from the Settlement Trust.[183] If the Settlement Trustee accepts a recommendation that is $1 million or more, the first $1 million of the award is paid from the Settlement Trust and the excess is collected from the Excess Award Fund.[184] The Excess Award Fund is funded from comprehensive

---

[179] TDP Art. XIII.K.

[180] TDP Art. XIII.A.

[181] TDP Art. XIII.K, L.

[182] TDP Art. XIII.A.

[183] TDP Art. XIII.D.

[184] TDP Art. XIII.E.

settlements reached by the Settlement Trustee with a Non-Settling Insurance Company with 80% of such settlement proceeds contributed to the Excess Award Fund, and 20% of the proceeds remaining with the General Trust funds.[185]

Amounts collected by the Settlement Trustee from Non-Settling Insurance Companies in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits are awarded 80% to the Direct Abuse Claimant, with the balance contributed to the General Trust until the Direct Abuse Claimant has collected 80% of the Excess Award Share. Thereafter policy proceeds are divided 70% to the Direct Abuse Claimant and 30% to the General Trust.[186]

If the Neutral's Settlement Recommendation determines that a Chartered Organization not protected by the Channeling Injunction (e.g. an Opt-Out Chartered Organization) is responsible for some or all of a Direct Abuse Claim assigned to the Settlement Trust, at the claimant's request, the Settlement Trustee may assign back to the claimant its right to pursue the Chartered Organization and its insurer for that allocated share. The Direct Abuse Claimant can bring an action in a court of competent jurisdiction against the Chartered Organization and its insurers to obtain a judgment for damages.[187]

### 7. *Chartered Organizations*

While Chartered Organizations may have claims against Debtors, the lens through which to view them relative to confirmation is as the beneficiary of the channeling injunction and/or the recipient of third-party releases.

---

[185] TDP Art. XIII.L(ii)(a).

[186] TDP Art. XIII.L(i)(3).

[187] TDP Art. XIII.N(iii).

The Plan provides Chartered Organizations with three alternatives. A Chartered Organization can choose to be a Contributing Chartered Organization, a Participating Chartered Organization or an Opt-Out Chartered Organization. These alternatives determine their respective post-confirmation exposure to Abuse Claims and, depending on the choice, also resolve their claims against BSA.

### a. *Contributing Chartered Organizations*

To become a Contributing Chartered Organization, a Chartered Organization must make a monetary contribution to the Settlement Trust. It must also release its rights to or interests in the BSA Insurance Policies and Local Council Insurance Policies[188] as well as its rights in its own insurance policies covering Abuse Claims and claims against both Settling and Non-Settling Insurance Companies. It must also waive all claims against Debtors, including Indirect Abuse Claims.[189]

In exchange for this consideration, all Abuse Claims regardless of when such claims arose are channeled to the Settlement Trust. Further, a Contributing Chartered Organization is a Protected Party and therefore the beneficiary of third-party releases from Releasing Parties, which include holders of Abuse Claims.

TCJC and the United Methodist Entities are the only two Contributing Chartered Organizations at this time.

---

[188] These rights and interests will be assigned to the Settlement Trust or otherwise sold back to the Settling Insurers, as applicable.

[189] *See* Plan Art. I.A.85.

### b. *Participating Chartered Organizations*

If a Chartered Organization takes no action with respect to its Chartered Organization status, it is a Participating Chartered Organization.[190]  No monetary contribution is required.  Instead, a Participating Charter Organization must assign and transfer to the Settlement Trust all rights, claims, benefits, or Causes of Action under or with respect to the (a) Abuse Insurance Policies (but not the policies themselves), (b) the Participating Chartered Organization Insurance Actions, (c) the Insurance Action Recoveries and (d) the Insurance Settlement Agreements.

In exchange for this contribution of insurance rights as well as contributions made by others, all Abuse Claims that are alleged to first arise from January 1, 1976 forward are channeled to the Settlement Trust.   Additionally, any Abuse Claims that pre-date January 1, 1976 are channeled to the Settlement Trust to the extent covered under an Abuse Insurance Policy issued by a Settling Insurance Company.

---

[190] Plan Art. I.A.199. provides:

199. "Participating Chartered Organization" means a Chartered Organization (other than a Contributing Chartered Organization, including the TCJC and the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment.  Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached hereto as Exhibit K.  For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

A Participating Chartered Organization also becomes a Limited Protected Party and therefore receives releases from Releasing Parties, including holders of Abuse Claims, for all Abuse Claims alleged to have occurred on or after January 1, 1976 (parallel with the channeling of such claims) and any Abuse Claims alleged to have occurred prior to January 1, 1976 that are covered under an insurance policy issued by a Settling Insurance Company that meet certain criteria.[191]

Participating Chartered Organizations also receive the protection of the Post Confirmation Interim Injunction—a twelve-month injunction (subject to further extension) from prosecution of Abuse Claims beginning on the Effective Date—to afford Participating Chartered Organizations an opportunity to negotiate an appropriate contribution with the Settlement Trust to become a Contributing Chartered Organization.[192] This protection is paid for by the $40 million Supplemental LC Contribution.

All but a couple of hundred of the more than 100,000 Chartered Organizations listed on the Omni website are Participating Chartered Organizations.[193]

### c. Opt-Out Chartered Organizations

An Opt-Out Chartered Organization is a Chartered Organization that objected to the Plan or informed Debtors' counsel that it does not wish to become a Participating Chartered Organization.[194] A Chartered Organization that is itself a debtor in a bankruptcy case as of the Confirmation Date is also placed in this category unless it affirmatively informs Debtors'

---

[191] Plan Art. X.J.3, X.J.6.

[192] Plan Art. X.D.

[193] Day 20 Hr'g Tr. 16-19.

[194] Plan Art. I.A.196.

counsel that it wishes to be a Participating Chartered Organization and make the necessary assignments.

An Opt-Out Chartered Organization does not voluntarily relinquish any rights to the BSA Insurance Policies or the Local Council Insurance Policies and retains its own rights in any insurance policies it procured.[195]

An Opt-Out Chartered Organization is not a Protected Party or a Limited Protected Party and does not receive a release. Notwithstanding, Abuse Claims are channeled to the Settlement Trust to the extent that the Abuse Claim is covered by an insurance policy issued by a Settling Insurance Company. This channeling of Abuse Claims effectively acts as a release.

### 8. *Youth Protection*

Direct Abuse Claimants have participated in this case officially through the TCC, unofficially, but in an organized fashion, through the Coalition and *pro se*. Additionally, certain Direct Abuse Claimants testified or provided argument at confirmation. Many of them supported the notion that any resolution with BSA must include enhanced youth protection measures.[196] Certain Direct Abuse Claimants testified that a successful plan of reorganization could not exist without improvements in youth protection sounding in transparency, third-party professional engagement and survivor recognition and activism.[197]

---

[195] Plan Art. V.S.1.g(ii). But, assuming approval of the buyback of its insurance policies under § 363(f), Opt-Out Chartered Organizations will lose their rights or interests in the Abuse Insurance Policies issued by Settling Insurers.

[196] Day 4 Hr'g Tr. 10:22-25. "I can't tell you how many survivors contacted us and said, regardless of whatever financial result comes of this, we want to make sure there is applicable and appropriate youth protection measures."

[197] Day 4 Hr'g Tr. 10:3-11:11; Day 8 Hr'g Tr. 3:11-23.

The TCC did not support the Plan until an agreement on youth protection measures was achieved.

In November 2021, the Coalition formed a Survivor Working Group specifically to engage in negotiations with BSA about youth protection.[198] The Survivor Working Group is comprised of fifteen members of diverse educational backgrounds, employment, economic circumstances and race/ethnic identity.[199] The Survivors Working Group first met with members of BSA's National Executive Committee, the Local Council Committee and Praesidium's[200] child protection experts on November 12, 2021.[201] On December 16, 2021, the Survivors Working Group finalized an "issues list" for BSA's review.[202] BSA responded in late January, 2022 seeking further clarification on issues and solutions.[203] On January 30, 2022, the Survivors Working Group began negotiating with BSA on the exact terms of the youth protection enhancements. The TCC "flanked" the Survivors Working Group for eight days of negotiations before the TCC, the Survivors Working Group and BSA agreed on the terms included in the Eleventh Mediator's Report.[204] Following agreement, both the TCC and the Survivors Working Group support confirmation of the Plan.[205]

---

[198] Day 8 Hr'g Tr. 18:12-24.

[199] Day 8 Hr'g Tr. 20:20-21:2.

[200] Praesidium is a consulting service retained by BSA specializing in preventing Abuse of children and vulnerable adults.

[201] Day 8 Hr'g Tr. 23:10-17.

[202] Day 8 Hr'g Tr. 29:4-9.

[203] Day 8 Hr'g Tr. 29:13-25.

[204] Day 8 Hr'g Tr. 31:16-22.

[205] Day 4 Hr'g Tr. 9:25-11:11; Day 8 Hr'g Tr. 34:23-35:2.

The Youth Protection terms are memorialized as Exhibit L to the Plan and contain numerous, detailed provisions. Some of the highlights are:

(i)    Hiring a "Youth Protection Executive" with responsibilities over all aspects of youth protection including implementing and monitoring policies and trainings at the Local Council and Chartered Organization level.

(ii)   Creating a "Youth Protection Committee" comprised of members from BSA, Local Councils, Chartered Organizations, the TCC, and the Survivors Working Group that will work alongside the Youth Protection Executive in all aspects of youth protection.

(iii)  Updating existing BSA policies such as requiring routine criminal background checks, registering all adults staying overnight in connection with Scouting activities as adult leaders and consolidating all aspects of BSA's youth protection materials into a single, accessible, manual.

(iv)   Enhancing training materials to ensure the training is clinically evidence- and research-based and reflective of survivor-informed experiences.

(v)    Integrating youth protection into the Scouting program through educational programs designed to teach Scouts how to recognize and report inappropriate behavior.

(vi)   Enhancing incident reporting procedures through mandatory notifications to an affected Troop's parents, Chartered Organization, Local Council Executive Committee, Youth Protection Executive and Youth Protection Committee when an adult offender is placed on the Volunteer Screening Database.

(vii)    Expanding survivor representation by requiring a qualified survivor of Scouting Abuse to serve on the National Executive Board as well as each Local Council Executive Board.

(viii)    Promoting survivor recognition by establishing a place of remembrance for all child Abuse survivors at prominent locations at each of BSA's High Adventure Bases and creating a survivor-focused path to Eagle Scout.

(ix)    Enhancing volunteer screening by exploring opportunities to both make the Volunteer Screening Database public and share the database with other youth servicing organizations.[206]

The agreed-upon terms coupled with BSA's existing youth protection program meet or exceed industry standards relating to volunteer and employee screening, Abuse identification and prevention training, internal policies and procedures and response procedures.[207] Further, the enhanced youth protection program provides a framework for continuously evaluating and working toward BSA's goal of becoming the "gold standard" in Abuse prevention.[208]

As both the Direct Abuse Claimants and Debtors recognize, enough is never enough when it comes to youth protection.[209] The Survivors Working Group did not get every term

---

[206] JTX 1-353 Ex. L. at 1-8.

[207] Day 10 Hr'g Tr. 88:4-23.

[208] Day 10 Hr'g Tr. 99:3-10.

[209] Day 8 Hr'g Tr. 35:10-17; Day 17 Hr'g Tr. 14:9-12.

it felt was important.[210]  Overall, however, the Survivors Working Group and TCC are

pleased with the enhancements made to youth protection.[211]

### 9. Plan Modifications, Supplemental Disclosure and Voting

On February 15, 2022, Debtors filed the Plan incorporating the post-solicitation

settlements and resolutions.  They also filed executed versions of the Century Settlement

Agreement, the Zurich Settlement Agreement, the Clarendon Settlement Agreement, the

Hartford Settlement Agreement and the agreements with TCJC and the United Methodist

Ad Hoc Committee.[212]  After a hearing, Debtors submitted supplemental disclosures

targeted to holders of claims in Class 8 and Class 9 explaining the modifications.[213]  The

notices provided a summary of the modifications to the Plan and offered each holder in

Class 8 and Class 9 an opportunity to change his/its vote.  At the conclusion of the

extended voting period, the results for Classes 8 and 9 were:

**Debtor BSA**

| Class | # Votes | Accept | Reject |
|-------|---------|--------|--------|
| Class 8 | 56,536 | 48,463 = 85.72% | 8,073 = 14.28% |
| Class 9 | 7,239 | 5,966 = 82.41% | 1,273 = 17.59% |

---

[210]  Day 8 Hr'g Tr. 34:8-9.

[211]  Day 8 Hr'g Tr. 35:1-12.

[212]  Notice of Filing of Exhibits I-2, I-3, I-4 and J-2 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8817].

[213]  Supplemental Disclosure Regarding Plan Modifications and Summary of Chartered Organizations' Options Under the Debtors' Modified Chapter 11 Plan of Reorganization, Opt-Out Election Procedures for Participating Chartered Organizations, and Supplemental Voting Deadline of March 7, 2022 at 4:00 pm (Eastern Time) for Holders of Class 9 Indirect Abuse Claims [ECF 8904]; Notice of Supplemental Voting Deadline of March 7, 2022 at 4:00 p.m. (Eastern Time) for Holders of Class 8 Direct Abuse Claims and Limited Disclosure Regarding Changes in Debtors' Chapter 11 Plan of Reorganization [ECF 8905].

**Debtor Delaware BSA, LLC**

| Class 9 | 775 | 628 = 81.03% | 147 = 18.97% |

### 10. *The Confirmation Hearing*

In contemplation of a contested confirmation hearing, on October 8, 2021, I entered a Scheduling Order detailing a discovery schedule for both fact and expert witnesses, containing objection, reply and motions *in limine* deadlines, and establishing a confirmation hearing date of January 24, 2022.[214]  Due to discovery disputes and the extended voting deadline the confirmation hearing date was twice extended ultimately commencing on March 14, 2022.

#### a. *The Objectors*

Objections to all or some aspect of the Plan were timely filed by thirty-nine parties.[215] While several objections (or portions thereof) were resolved before or during the course of the confirmation hearing, ultimately, there is much to be decided.  For the most part, the objectors reside in one of two camps—Non-Settling Insurance Companies or holders of Direct Abuse Claims.

Taking the lead role for the Non-Settling Insurance Companies at trial was the Certain Insurers.[216]  Their main objection raises issues as to good faith, certain proposed

---

[214]  Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief [ECF 6528].

[215]  *See* Addendum A for a list of objections and/or supplemental objections filed.

[216]  The Certain Insurers are: (i) the AIG Companies, (ii) The Continental Insurance Company and Columbia Casualty Company, (iii) Indian Harbor Insurance Company on behalf of itself and as successor in interest to Catlin Specialty Insurance Company, (iv) Travelers Casualty and Surety Company, Inc. (f/k/a/ Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company; (v) Arrowood Indemnity Company, (vi) Gemini Insurance Company, (vii) National Surety Corporation and Interstate Fire & Casualty Company, (viii) Allianz Global Risks US Insurance Company; (ix) Argonaut Insurance Company and Colony Insurance

53

findings, and the provisions of the TDP. They also raise specific issues relative to their Indirect Abuse Claims.

On the Direct Abuse Claimant side, three objectors, the Archbishop of Agaña a Corporation Sole, ("Archbishop"), the Lujan Claimants[217] and the Official Committee of Unsecured Creditors for the Archbishop of Agaña ("Guam Committee"),[218] focused on rights held by either the Archbishop or Direct Abuse Claimants with claims against both the Archbishop and BSA. The Archbishop filed its own bankruptcy case under chapter 11 in the District Court of Guam, Territory of Guam, Bankruptcy Division in 2019.[219] The Guam Committee, consisting of seven individuals who hold tort claims against the Archbishop, was appointed by the Office of the United States Trustee. The Lujan Claimants assert claims against both BSA and the Archbishop of Agaña stemming from Abuse perpetrated by Father Louis Brouillard, a Catholic priest and Scoutmaster. They allege that Brouillard abused them not only as a Scoutmaster, but in his capacity as a Catholic priest in settings unrelated to Scouting. The Guam Committee objects to the third-party releases and the buyback of the insurance policies free and clear of the Archbishop's rights as a co-insured

---

Company, (x) Liberty Mutual Insurance Company, (xi) General Star Indemnity Company; (xii) Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company; and Great American E&S Insurance Company, (xiii) Arch Insurance Company.

[217] Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection filed by Guam Committee [ECF 8708] ("Lujan Claimants' Objection").

[218] *See e.g.,* Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agaña (Bankr. D. Guam 19-00010) to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8683].

[219] *See e.g,.* Joinder of Archbishop of Agaña, a Corporation Sole, to the Roman Catholic Ad Hoc Committee's Objection to the Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8687].

under the policies. The Lujan Claimants join in those objections and also assert that the

insurance policies may not be sold (or bought back) free and clear of their right to sue

insurers directly under Guam law.[220]

Other Direct Abuse Claimants represented by the law firm of Dumas & Vaughn,

LLC (the "D&V Claimants"), other counsel or appearing *pro se* join in the objections to the

third-party releases as did the Office of the United States Trustee. The Girl Scouts of the

United States of America, Claimant I.G., Mr. Pai, Jane Doe and certain pro se claimants

also raise specific confirmation issues related to their claims.

---

[220] At argument, Debtors raised for the first time the issue of the Guam Committee's standing to object to confirmation. Citing *In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487-88 (Bankr. D. Del. 1994), Debtors argue that as a creditor of a creditor (the Archbishop of Agaña), the Committee is not a party-in-interest under § 1109 and so cannot file objections in this case. *See* Day 19 Hr'g Tr. 8:18-9:23. Debtors also assert that the Guam Committee may not participate in this case because it did not receive permission from the Guam bankruptcy court to act on behalf of the Archbishop of Agaña. Debtors submitted into evidence the motion of the Guam Committee in the Guam Bankruptcy for "derivative standing to enforce the automatic stay and take other actions" (JTX 4015) ("Derivative Standing Motion"), the objection of the Archbishop to that motion (JTX 4016, 4017) and numerous other filings in response to the Derivative Standing Motion (JTX 4018 through 4026). The Derivative Standing Motion was ultimately denied, as moot, in a Final Order Approving Stipulation and Denying Derivative Standing Motion as Moot (JTX 4027), which was an agreed order submitted by the Guam Committee and the Archbishop of Agaña. Notwithstanding, the Guam Committee contends that it is a party in interest in the BSA bankruptcy case under the plain meaning of § 1109 and, in any event, it does not need derivative standing to object to confirmation in the BSA case because it did not bring an adversary proceeding. *See* Day 19 Hr'g Tr. 86:19-87:9.

I disagree. The Guam Committee is not a creditor of this estate. Indeed, while members of the Guam Committee may have claims against BSA which they may assert on their own behalf, the Guam Committee, as a committee, has no claims whatsoever against BSA. Moreover, the Guam Committee cites to no case for the proposition that §1109 contemplates that a committee in one bankruptcy case is a party-in-interest in another bankruptcy case. Finally, the Guam Committee cites to no case for the proposition that a committee does not need derivative standing to file an objection in a contested matter (as opposed to an adversary proceeding) when it is asserting a debtor's claims. In this case, where the Guam Committee sought relief to advance the position of the Archbishop of Agaña, and that relief was denied after the Guam Committee agreed to a form of order, I conclude that the Guam Committee does not have standing to appear in this case. Nonetheless, by the time Debtors raised this argument, the Guam Committee had fully participated in the evidentiary portion of the trial and the Archbishop of Agaña thereafter adopted the Guam Committee's legal arguments. *See* Day 19 Hr'g Tr. 176:3-11. Accordingly, I will address the Guam Committee's legal contentions.

### b. *Plan Supporters*

Responses and/or replies were filed.[221]  Current supporters of the Plan include the
UCC, JPM, the TCC, the Coalition and the Local Council Committee.  Hartford, Century,
Zurich, Clarendon, the Roman Catholic Committee, the Methodist Committee, TCJC, the
Pfau/Zalkin Claimants and certain law firms that represent members of the Coalition are
generally supportive of the Plan.

### c. *The Hearing*

During three weeks of evidentiary hearings twenty-six witnesses were called by live
testimony, declaration or a combination of both and portions of six video depositions were
played.  Additionally, over one thousand exhibits were admitted into evidence.
Subsequently, I reviewed designated and counter-designated portions of eight depositions.
The record is closed.[222]

I also entertained six days of oral argument, which proceeded in accordance with a
chart of "Confirmation Closing Issues" prepared by Debtors.[223]  Each objecting party was
provided with an opportunity to present argument on legal issues encompassed within its
objection.  A specific time slot was provided for *pro se* objectors.  At the conclusion of
argument, I took the matter under advisement.

## JURISDICTION

Jurisdiction exists over this case under 28 U.S.C. § 1334.  Confirmation is a core
proceeding under 28 U.S.C. § 157(b)(2).  Except as further discussed below, no objector has

---

[221] *See* Addendum A for a listing of filings made in support of the Plan.

[222] A few evidentiary objections were taken under advisement during trial.  I rule on those herein.

[223] The chart was circulated and discussed at least twice in advance of argument.  During those
discussions, I asked if there were any confirmation issues not reflected on the chart.  No party
suggested any additional issues.

contested that this court can enter a final order on confirmation consistent with the United States Constitution.[224]

## DISCUSSION

To confirm a plan of reorganization, a debtor must prove by a preponderance of the evidence that all elements of § 1129 of the Code are satisfied.[225] Preponderance of the evidence means that a fact that the proponent is attempting to prove is more likely to be true than not.[226]

Rulings on several key issues are fundamental to the nature of this Plan and impact many of the § 1129 factors. Accordingly, before walking through § 1129, I will first make additional findings on the aggregate value of the Direct Abuse Claims and the available unsettled insurance.[227] I will then turn to the Settling Insurer Settlements, which involve the buyback of insurance policies "free and clear" and require third-party releases and channeling injunctions. I will then address the "Findings" required under the Plan.

## I.    Additional Findings Related to Direct Abuse Claims

### A.    The Aggregate Value of the Direct Abuse Claims

While the lead up to confirmation suggested that the issue of the aggregate value of Direct Abuse Claims would be a hotly contested matter, the settlement with the TCC

---

[224] Discussion of jurisdictional issues surrounding the third-party releases and channeling injunction are addressed separately, *infra*.

[225] *See e.g., In re Tribune Co.*, 464 B.R. 126, 151-152 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018); *In re Purdue Pharma L.P.*, 633 B.R. 53, 61 (Bankr. S.D.N.Y. 2021), *vacated*, 635 B.R. 26 (S.D.N.Y 2021). While the *Purdue Pharma* opinion was vacated, I cite it where I find the reasoning persuasive.

[226] *In re Lafferty*, 2019 WL 10431875 at *3 (Bankr. M.D. Pa. Dec. 20, 2019) ("To establish a fact by the preponderance of the evidence means to prove that the fact is more likely true than not true.") (internal citations omitted).

[227] These findings are made for purposes of confirmation only.

brought relative peace on this front.  Part of this resolution resulted in only one valuation expert testifying at trial.  Dr. Charles Bates, chairman of Bates White LLC and Debtors' retained expert was qualified without objection as an expert in claim valuation, mass tort matrixes and trust distribution structures.  He spent approximately eight hours on the stand.[228]  One of his four assignments was to estimate the total value of Direct Abuse Claims and Future Claims as of the filing of the petition assuming the claims would be resolved at values consistent with prepetition settlements.  Within the scope of this work, he was asked to evaluate trends in the proofs of claim submitted in the BSA case.

Dr. Bates employed a frequency severity methodology to determine an aggregate value for the Direct Abuse Claims.  The frequency severity model is an accepted valuation methodology within the valuation community and Dr. Bates has employed this methodology in every mass tort case in which he has provided expert testimony.[229]  The frequency severity model takes guidance from historical claims about their values and characteristics to come up with averages for groups of claims within the historical data pool.  It then applies those averages to groups of claims within the subject pool that share similar characteristics to come up with an aggregate valuation of the subject pool.[230]  This methodology necessarily includes testing though scenario analysis which requires an

---

[228] Dr. Bates presented his testimony through the use of thirty-four demonstratives.  At the conclusion of his testimony, Debtors moved to admit the demonstratives into evidence.  I took the matter under advisement.  I decline to admit the demonstratives into evidence.  While exceedingly helpful, they are not evidence and they present a view of the facts—Dr. Bates's view—not just the facts.

[229] Day 6 Hr'g Tr. 115:4-116:1.

[230] Day 6 Hr'g Tr. 116:11-19.

evaluation of the assumptions used to value and group the claims to see the impact on the analysis if factors are changed.

Consistent with the severity frequency methodology, Dr. Bates first analyzed historical data about BSA's prepetition settlements with Abuse claimants as provided to him by Ogletree Deakins.[231] For the most part, Dr. Bates disregarded data pre-dating Ogletree's retention because the recordkeeping pre-Ogletree did not record important facts surrounding the claims; rather it was kept for accounting purposes.[232] Further, the Ogletree data was superior because Dr. Bates could discuss facts of each case with Mr. Griggs, as necessary.[233] The Ogletree data yielded 262 prepetition claims (the "Historical Abuse Claims").

Dr. Bates made several observations about the Historical Abuse Claims. First, there is a wide variation in the settlements amounts.[234] In grouping the Historical Abuse Claims by size of payment to claimants (dismissed without payment, four and five figure payments, six figure payments and seven figure payments), Dr. Bates concluded that a significant amount of the aggregate value of the settlements was concentrated in a small number of high value claims.[235] He further isolated the most severe claims (penetration claims) and observed a distinct bimodal distribution pattern. Fifty-five percent of the claims were resolved for less than $300,000 and about thirty-three percent of the claims settled for over $900,000. Relatively few claims settled for values in between.

---

[231] Day 6 Hr'g Tr. 56:18-21, 100:13-18.

[232] Day 6 Hr'g Tr. 101:14-18.

[233] Day 6 Hr'g Tr. 103:4-10.

[234] Day 6 Hr'g Tr. 104:20-105:15.

[235] Day 6 Hr'g Tr. 106:5-10.

To explain the bimodal distribution, Dr. Bates looked at the facts underlying the Historical Abuse Claims and identified repeat abusers as the primary driver of highest settlement values.[236] Dr. Bates equates repeat abuser to institutional responsibility/ knowledge.[237] Dr. Bates also observed that the settlement average is higher for claims involving penetration followed by claims involving other sex acts and then claims involving groping/touching. Using this data, Dr. Bates established a benchmark value for penetration claims of $212,500 for once-identified abusers and $975,000 for repeat abusers. He then discounted those values by 54% for claims of other sex acts ($114,750/$526,500) and by one-half again for claims of groping/touching ($57,375/$263,250).

Having analyzed the Historical Abuse Claims and established his benchmarks, Dr. Bates next turned to the proofs of claim filed in the bankruptcy case. Dr. Bates segmented the proofs of claim filed by Direct Abuse Claims ("Proofs of Claim") into categories that overlap the data in the Historical Abuse Claims based on severity (penetration, other sex acts and groping/touching) and whether the abuser was a repeat abuser or once-identified abuser. In order to do so, Dr. Bates excluded Proofs of Claims that did not reflect the name an abuser, where the claims were presumptively barred, where the claimant was not a minor when first abused and which did not contain an allegation of Abuse.[238] He then discounted the Historical Abuse Claims benchmarks by 20% to account for the age difference between the claimants asserting Historical Abuse Claims and claimants who filed the Proofs of

---

[236] Day 6 Hr'g Tr. 112:5-114:20.

[237] Day 6 Tr. 112:5-114:20.

[238] Day 6 Hr'g Tr. 129:22-131:8.

Claim.[239] Dr. Bates also applied assumptions for "other relationships."[240] Applying the

Historical Abuse Claim benchmarks to this set of data and assumptions results in an

aggregate Initial Benchmark Valuation of $2.5 billion.[241]

To test his assumptions, Dr. Bates next developed a list of "plus" and "minus"

factors that would move the Initial Benchmark Valuation up or down, as applicable.[242]

These factors account for unknowable future possibilities such as (i) a change in the legal

landscape (e.g. passing of revival statutes), (ii) one or more claimants supplying information

not currently contained in the Proofs of Claim or (iii) more future claimants coming

forward.[243] To account for these, Dr. Bates determined a relative likelihood and the relative

impact of each factor.[244] He landed on a 50% variance around his first Initial Benchmark

---

[239] The Historical Abuse Claims reflect that the age of the claimant is highly reflective of the claim. Settlement values decrease significantly based on the delay in asserting the allegations. Day 6 Hr'g Tr. 139:9-140:14.

[240] An "other relationship" is a non-BSA relationship between a victim and an abuser. This is another proxy for institutional responsibility.

[241] The Initial Benchmark Valuation changed over time. In Spring 2021, when using data from Proofs of Claim in Tranche IV, Dr. Bates arrived at an Initial Benchmark Valuation of $4.75 billion, which was used in connection with Debtors' estimates in the Disclosure Statement. In Fall, 2021, when using data from the Proofs of Claim in Tranche VI, Dr. Bates arrived at an Initial Benchmark Valuation of $5.84 billion. This revision in the Initial Benchmark Valuation accounted for (i) the passage of revival statutes in four states and (ii) amendments to several thousand proofs of claim adding the names of abusers and the Abuse suffered. These changes necessarily raised the Initial Benchmark Valuation. In continuing to review the Tranche VI data, Dr. Bates observed that there were anomalous single-Abuse claims that resulted in relatively high-value settlements. Day 6 Hr'g Tr. 183:5-184:5. Through additional research in the ineligible volunteer files and/or contemporaneous news reports of the Abuse, Dr. Bates learned that claims classified as single abuser claims were, in actuality, repeat abuser claims. Day 6 Hr'g Tr. 185:9-20. Updating that information in the Tranche VI data set resulted in the $2.5 billion Initial Benchmark Valuation. These changes in the Initial Benchmark Valuation were the result of updated information and not any change in the methodology. Day 6 Hr'g Tr. 186:5-11.

[242] Day 6 Hr'g Tr. 165:8-12; 175:21-176:2.

[243] Day 6 Hr'g Tr. 174:8-180:17.

[244] Day 6 Hr'g Tr. 180:18-25.

Valuation of $4.75 billion to create an appropriate valuation range of $2.4 to $7.1 billion for the Direct Abuse Claims.[245] The valuation range is inclusive of future claims.[246] The range was admittedly large reflective of the inherent uncertainties in the Direct Abuse Claims.[247]

Since the creation of that range, Dr. Bates reviewed the expert reports filed by others in this case, received additional information regarding repeat abusers (*see* fn. 241, *supra*) and performed additional analysis. One of the "biggest questions" Dr. Bates sought to answer was why so many Proofs of Claim were filed in the case as opposed to the prepetition average of fifty per year.[248] He came to two conclusions. The first reason is claimant privacy/hesitancy to come forward in a public setting with their claims.[249] This is reflected in the Proofs of Claim. Ninety-eight percent of the Direct Abuse Claimants did not check the box which would make their proof of claim public and more than eighty-five percent indicated they had never told anyone they were abused.[250] But, holders of Direct Abuse Claimants are willing to come forward in this forum. The second reason is the economic

---

[245] Day 6 Hr'g Tr. 181:1-5.

[246] To determine the impact of future abuse claimants (a plus factor) on his Benchmark Valuation, Dr. Bates performed a regression analysis and estimated that 400 future claims would be asserted. Day 6 Hr'g Tr. 198:20-25–199:1-19. He testified this followed the downward trend in the trajectory of claims since the 1960s. Certain objectors sought to seize on Mr. Patton's testimony that the FCR believes there are 11,000 future claimants. I give no evidentiary weight to that testimony. Mr. Patton was not offered for this purpose, he is not an expert, and there was no support offered for this position.

[247] Day 6 Hr'g Tr. 97:8-23.

[248] Day 6 Hr'g Tr. 135:21-25; 142:15-143:3.

[249] Day 6 Hr'g Tr. 143:4-9.

[250] Day 6 Hr'g Tr. 143:10-22. Dr. Bates's testimony was that 98 percent of survivors did not check the box that would make their proof of claim private. Read in context, that is in error. The proof of claim form provides that the submission **"will be maintained as <u>confidential</u> unless you expressly request that it be publicly available by checking the 'public' box <u>and</u> signing below."** JTX 1475 at 3 (emphasis in original).

considerations of claimants and their attorneys.[251]  Dr. Bates observed that "recovery
attorneys" did not mass-recruit these Direct Abuse Claimants until the bankruptcy case was
imminent.  He noted the lack of mass advertising for Abuse cases as compared to
mesothelioma cases or Roundup cases, the expense of such advertising and the statute of
limitations defenses which could make Abuse cases more expensive to litigate.[252]  Based on
these observations, Dr. Bates concluded that Abuse claims will not be brought in the tort
system unless the value is sufficiently high for law firms to make a reasonable return on
investment and claimants to overcome their privacy concerns.[253]

To test his hypothesis, Dr. Bates conducted a thought experiment/economic
simulation assuming that a minimum claim value of $200,000 would merit bringing the case
in the tort system.  He chose $200,000 because the median wealth of the individuals
asserting Direct Abuse Claims is between $200,000 and $300,000.[254]  A typical 40%
contingency fee would yield $80,000 for the law firm, which must cover costs and a profit.
The result of his thought experiment confirmed his view that the value of a Direct Abuse
Claim, on average, will be less than the average value of Historical Abuse Claims although
the aggregate of such claims could be significant.  Using a pool of 47,433 claims, he

---

[251] Day 6 Hr'g Tr. 143:4-9.

[252] Day 6 Hr'g Tr. 187:19-188:3.

[253] Day 6 Hr'g Tr. 143:23–145:11.  Dr. Bates finds confirmation for his conclusions in the record in
this case, specifically JTX 1-225, Verified Statement of Kosnoff Law, Pllc Pursuant to Rule of
Bankruptcy Procedure 2019.

[254] Day 6 Hr'g Tr. 156:22-157:23.

concluded that only 1171 of them would yield enough value to be filed in the tort system.[255] Dr. Bates concludes that this forum—a mass tort bankruptcy case with TDP that reduce the cost to present claims and at the same time assure relative confidentiality—permit these claims to be filed in the bankruptcy case, when they would not have been filed in the tort system.[256]

This scenario analysis also confirms Dr. Bates's conclusions that the Proofs of Claim pool is generally weaker than the Historical Abuse Claims pool. For example, he believes the link between the abuser and the level of institutional responsibility is tenuous as most abusers were volunteers and not employees, and the vast majority of the claims reflected in the Proofs of Claim reflect once-identified abusers where the vast majority of the Historical Abuse Claims involve repeat abusers.[257]

Having employed a frequency severity methodology, including testing by scenario analysis, Dr. Bates concludes that it is more likely that the value of Direct Abuse Claims is in the lower quartile of his previous range, or between $2.4 and $3.6 billion.[258]

---

[255] Dr. Bates ran this simulation using a pool of the Proofs of Claim created by another expert. Of the 47,433 claims, 46,262 did not have value over the $200,000 assumed value. In this simulation, the average value of a Direct Abuse Claim is $74,000 and the aggregate value is $3,463,600. As applied to the 82,209 Proofs of Claim, Dr. Bates believes at least 70,000 of such claims would not have been brought in the tort system. Day 7 Hr'g Tr. 27:2-10.

[256] Day 6 Hr'g Tr. 146:15-148:18.

[257] Day 7 Hr'g Tr. 27:11-29:10.

[258] Day 6 Hr'g Tr. 97:10-23; *See also* Day 6 Hr'g Tr. 190:17-191:6.

Q And do you have a reasonable degree of confidence as an expert in claim valuation that your range of 2.4 to $7.1 billion is an appropriate valuation range for the current abuse claims?

A I believe it is. I think, to a reasonable degree of scientific certainty, that would be the range, based on the information. It's a wide range, albeit reflective on the uncertainty that exists. But I think that range is a reliable range for that purpose.

Q And do you have a reasonable degree of confidence as an expert in claim valuation that the value of the current abuse claims will fall within the lower quartile of 2.4 to $3.6 billion?

Notwithstanding his valuation, as Dr. Bates recognizes, only a claim-by-claim analysis performed by the Settlement Trustee as contemplated by the TDP will establish the actual amount of any individual Direct Abuse Claim or the aggregate amount of Direct Abuse Claims.[259]

Dr. Bates's analysis was thorough and credible based on the data available. It was also undisputed. No other expert testified on the aggregate valuation of the Direct Abuse Claims. Cross-examination by the Certain Insurers did not challenge the aggregate valuation of the Direct Abuse Claims. Cross-examination by the Lujan Claimants, the Guam Committee and the D&V Claimants questioned the data points and "pluses" and "minuses" used in Dr. Bates's analysis and emphasized his lack of knowledge of specific facts of the underlying cases. They also established that Dr. Bates did not gather information from the plaintiffs' bar, conduct legal analysis of the import of his "plus" and "minor" factors or review specific complaints. But, none of the objectors challenged his use of the frequency severity model, suggested another analysis or undercut his conclusions. Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims. Accordingly, I

---

A    I -- I do. I think that is reflective of the most likely outcome, based on what I know at this time.

[259] Day 6 Hr'g Tr. 128:15-22.

Q    Was it your understanding that the settlement trustee would have the ability to obtain additional data where -- to extent there was any uncertainty in the data that is available today to the proof of claims?

A    The trust distribution procedures have that opportunity and I think require the trustee to develop an additional questionnaire to gather additional information for the use in valuing these claims.

conclude based on the record of evidence presented and the information known to date regarding the Direct Abuse Claims, that the aggregate valuation of the Direct Abuse Claims is most likely between $2.4 billion and $3.6 billion.

**B.    *The Potential Available Coverage of Non-Settling Insurance Companies for Allocated and Unallocated Claims***

As set forth in the Background Section, both BSA and Local Councils purchased insurance that responds to Direct Abuse Claims.  Ms. Gutzler modeled the value of BSA's and Local Councils' insurance programs by employing a set of assumptions.  She testified that this is a routine analysis performed by both insurers and insureds to evaluate coverage potentially available to pay underlying claims.[260]  Her task was to allocate tens of thousands of underlying Direct Abuse Claims across thousands of liability policies.[261]  Ms. Gutzler was offered and accepted without objection as an expert on allocation of claims to insurance policies.[262]

In order to make an allocation, Ms. Gutzler uses certain factual assumptions regarding policies (based on primary and secondary evidence)[263] as well as allocation methodology assumptions, which are more legal in nature and provided by Debtors' insurance counsel.[264]  She also testified that the assumptions are reasonable based on her review of underlying information.[265]  The "trigger date" assumption assumes that the date of first Abuse would determine the policy year a claim is allocated to.  This assumption is

---

[260]  Gutzler Decl. ¶ 32 n.57.

[261]  Gutzler Decl. ¶ 42; Day 9 Hr'g Tr. 73:3-17.

[262]  Day 9 Hr'g Tr. 8:4-16.

[263]  Day 9 Hr'g Tr. 27:11-18.

[264]  Gutzler Decl. ¶ 42.

[265]  Gutzler Decl. ¶ 42.

consistent with the First Encounter Agreement entered into between BSA and Century in 1996 and followed by many other insurance companies.[266] The "occurrence" assumption (i.e. how many time a policy would pay) is the "survivor" approach (i.e. each survivor, no matter how many times he was abused, is a single occurrence).[267] Ms. Gutzler also assumes an aggregate limit on the matching deductible policies between 1988 and 2008 based on the fact that Zurich and Clarendon, which are higher in the tower, agreed to settle for significant sums relative to her allocation modeling of different assumptions.[268] Finally, Ms. Gutzler assumes joint and several liability among all defendants after discussions with Mr. Griggs as to how BSA handled claims in settlement prepetition.

Applying her allocation model to five of Dr. Bates's aggregate claim valuations, Ms. Gutzler concludes that the potential allocation to solvent Non-Settling Insurance Companies (i.e., not Hartford, Century/Chubb, Zurich and Clarendon) is between $321,319,886 and $400,546,854 depending on which of Dr. Bates's aggregate claim valuation is used.[269]

---

[266] Paragraph 7 of the First Encounter Agreement, as read into the record by Ms. Gutzler, provides:

> The first encounter rule shall mean that, for purposes of determining coverage under any policy the date of occurrence pertaining to any sexual molestation claim shall be the date when the first act of sexual molestation took place, even if additional acts of sexual molestation or additional personal injuries arising therefrom also occurred in subsequent policy periods. And all damages arising out of such additional acts of sexual molestation or additional persona injuries shall be deemed to have been occurred – incurred during the policy year when the first act of sexual molestation took place.

Day 9 Hr'g Tr. 32:10-21, 33:5-36:2.

[267] Day 9 Hr'g Tr. 29:2-36:2, 87:13-88:4.

[268] Day 9 Hr'g Tr. 36:24-38:13.

[269] Gutzler Decl. ¶¶ 62, 118; Day 9 Hr'g Tr. 106:24-108:25.  In her declaration, Ms. Gutzler provides an allocation for each of Dr. Bates's $2.4 Billion BW Tort Distribution, $3.0 Billion TDP Distribution, $3.3 Billion TDP Distribution, $3.6 Billion TDP Distribution, and $3.6 Billion BW Tort Distribution.  Her narrative, and her testimony do not reflect an actual opinion for the $2.4

Ms. Gutzler then analyzes potential coverage from Non-Settling Insurance Companies on policies that receive no allocation in her modeling. The lack of allocation could be because limits of lower tier policies are not fully exhausted due to the value of claims allocated to that year. These higher tier policies, however, are still at risk for coverage depending on the actual determination of claim values in given years. Ms. Gutzler concludes that the total limits of coverage potentially available under policies issued by Non-Settling Insurance Companies to both BSA and Local Councils is between $4,295,878,628 and $4,404,844,433, again, depending on which claim valuation is used.[270] Ms. Gutzler notes that while it is difficult to precisely quantify the expected value of these policies without additional information, her experience is that insurers often settle policies with no current allocation to mitigate risk.[271] Current non-allocation simply means it is less likely that these insurers will be required to pay out based on current valuation scenarios.[272] She also opines, however, that the Independent Review Option, which is designed to ensure that excess layers of coverage are triggered, increases the odds that the value of higher level excess policies will be unlocked.[273]

Ms. Gutzler's analysis was methodical and credible. It was also undisputed. As with Dr. Bates, no other expert testified on allocation. While the Guam Committee, on

---

Billion BW Tort Distribution presumably because the Settlement Trust assets exceed $2.4 billion without these additional sources of funding.

[270] Gutzler Decl. ¶ 121; Day 9 Hr'g Tr. 40:13-41:11. Ms. Gutzler determined the total limits of coverage potentially available for each of Dr. Bates's $3.0 Billion TDP Distribution, $3.3 Billion TDP Distribution, $3.6 Billion TDP Distribution, and $3.6 Billion BW Tort Distribution.

[271] Gutzler Decl. ¶ 122.

[272] Gutlzer Decl. ¶ 120.

[273] Gutzler Decl. ¶¶ 131-134.

cross-examination, questioned certain assumptions, the cross-examination did not undermine Ms. Gutzler's credibility nor undercut her opinions. Ms. Gutzler was quite candid that other assumptions could have been employed.[274] Similarly, on cross examination by the Certain Insurers, Ms. Gutzler acknowledged that there are thousands of modeling variations that could be run, though the results might not necessarily differ.[275] But, neither the Guam Committee nor the Certain Insurers offered an expert to opine as to the reasonableness of other assumptions, the unreasonableness of Ms. Gutzler's assumptions or any alternative allocation.

Based on the record and my assessment of her credibility, there is no reason to disregard Ms. Gutzler's analysis and conclusions, which I accept for purposes of confirmation as her best estimate of what coverage may be available based on the potential aggregate values of Direct Abuse Claims. Accordingly, I conclude based on the record of evidence presented and the information known to date regarding the Direct Abuse Claims, that the potential allocation to solvent Non-Settling Insurance Companies is between $321,319,886 and $400,546,854 and the total limits of coverage potentially available under policies issued by Non-Settling Insurance Companies to both BSA and Local Councils is between $4,295,878,628 and $4,404,844,433.

### C. The Plan is a 100% Plan with Respect to Direct Abuse Claims

Based on the testimony of Dr. Bates and Ms. Gutzler, and the value of the contributions and settlements, I conclude that if the Plan is confirmed, Direct Abuse Claims will more likely than not be paid in full. The Initial Benchmark Valuation of the aggregate

---

[274] Day 9 Hr'g Tr. 29:5-31:15.

[275] Day 9 Hr'g Tr. 62:4-15.

Abuse Claims is $2.5 billion with a range between $2.4 billion and $3.6 billion. The assets available to the Settlement Trust to satisfy those claims are:

| | Initial Funding | Funding Over time |
|---|---|---|
| BSA | $78,200,000[276] | $80,000,000 (BSA Settlement Trust Note)<br><br>$75,000,000 (Share of Settlement Growth Payment) |
| Local Councils | $515,000,000 | $125,000,000 (DST Note)<br><br>$25,000,000 (Share of Settlement Growth Payment) |
| Methodist Committee | $30,000,000 | $100,000,000 (Seek to Raise) |
| Insurance Settlements | $1,656,000,000 | |
| Range of Allocated Insurance against Non-Settling Insurance Companies | $321,319,886 - $400,546,854 | |
| Range of Unallocated Insurance against Non-Settling Insurance Companies | $4,295,878,628 - $4,404,844,433 | |
| Additional Contributions Chartered Organizations | Unknown | |

The fully noncontingent funding is $2,484,200,000, which is already within the range of Direct Abuse Claims albeit just slightly, and only $16 million below Dr. Bates's $2.5 billion Initial Benchmark Valuation. The committed, but contingent funding could bring another $200 million into the Settlement Trust. These funds, together with the available allocated insurance against Non-Settling Insurance Companies brings the total to

---

[276] This amount excludes any cash component.

$3,005,519,886 to $3,084,746.854, well over the Initial Benchmark Valuation and quite comfortably within the aggregate range. Finally, the Settlement Trust assets include an additional $4 billion in currently unallocated insurance against Non-Settling Insurance Companies.[277]

I have excluded from this analysis the $250 million contribution from TCJC because, as set forth below, I cannot approve that settlement as it is based on a release of Non-Abuse Claims. Of course, BSA and TCJC may come to another monetary arrangement and if so, the Settlement Trust Assets will be increased by that amount. Alternatively, the Settlement Trust Assets include whatever claims BSA has against TCJC.

I have also excluded any additional contributions from other Chartered Organizations. Under the Plan, Participating Chartered Organizations may choose to become Contributing Chartered Organizations by contributing funds to the Settlement Trust. I have no evidence, however, from which to draw any conclusions regarding the magnitude of any such contributions. Nonetheless, these Chartered Organizations are also a source of additional funds.

I have also excluded Pachulski Stang's voluntary contribution of 10% of the total amount of fees it bills to the Settlement Trust.[278]

---

[277] I understand that the unallocated insurance is not currently triggered by the modeled claims in the range of $2.4 billion to $3.6 billion. Nonetheless, Ms. Gutzler testified that it is not unusual for insurers to settle policies with no current allocation in order to mitigate risk.

[278] Application of the Official Tort Claimants' Committee for Entry of an Order, Pursuant to 11 U.S.C. §§ 328 and 1103, Fed. R. Bank. P. 2014 and Local Rule 2014-1, Authorizing and Approving the Employment and Retention of Pachulski Stang Ziehl & Jones LLP as Counsel to the Tort Claimants' Committee Effective as of March 4, 2020 [ECF 292] ¶ 9.

Based on the Initial Benchmark Value, the aggregate range of Direct Abuse Claims and the Settlement Trust Assets, I conclude that Debtors have shown by a preponderance of the evidence that Direct Abuse Claims will be paid in full.

## II.    The Settlements

Not every resolution of a disagreement in a bankruptcy case is a settlement for purposes of Bankruptcy Rule 9019.  Debtors mediated with numerous parties and entered into various agreements, which they termed "Settlement Agreements" documented by term sheets and/or formally finalized agreements, some of which were eventually baked into the Plan.  Certain of these "Settlement Agreements," however, are not truly settlement agreements, but rather consensual resolutions of Plan terms or resolutions of confirmation objections.  Here, the Roman Catholic Committee settled its objection to the Plan and became a Participating Chartered Organization.  Similarly, the settlement that brought the TCC on board required changes to the Plan in order to resolve its objection and obtain its recommendation that holders of Direct Abuse Claims accept the Plan.  Neither of these consensual resolutions requires court approval.  Whether these resolutions become effective depends on whether the Plan is confirmed.

Certain actual settlements are not the subject of objections.  Those settlements are the settlement between JPM and the Creditors' Committee and the settlement with the Methodist Committee.

The remaining settlements did draw objections.  The Guam Committee and the Lujan Claimants object to each of the Settling Insurer Settlements and the Pfau/Zalkin Claimants and Mr. Washburn object to the TCJC settlement.  The objections to the TCJC settlement relates solely to the third-party release aspect of the agreement and so will be addressed in that context.

### A. The Settling Insurer Settlements

The Settling Insurer Settlements bring an aggregate of $1,656,000,000 to the

Settlement Trust from which holders of Abuse Claims will receive distributions. Without

these settlements, there is no Plan.

As set forth above, with the help of the mediators, Debtors entered into settlements

with Hartford, Chubb, Zurich and Clarendon (collectively, the "Settling Insurers"). The

settlements are similar in structure and provide for: (i) the payment by the insurer of an

agreed amount on an agreed schedule to the Settlement Trust to be used to pay Abuse

Claims; (ii) the assignment of the Local Council Insurance Policies to the estate and the sale

of the Local Council Insurance Policies and the BSA Insurance Policies (collectively, the

"Abuse Insurance Policies") to the insurer under § 363 free and clear of all claims and

interests of all parties; and (iii) a complete release from all parties (i.e. other Protected

Parties,[279] the Limited Protected Parties/Participating Chartered Organizations, the FCR,

the Coalition and the Settlement Trust) of all causes of action arising out of their respective

insurance policies and any liability for Abuse Claims. The settlement also requires the

channeling to the Settlement Trust of the claims of holders of Abuse Claims for various

periods of time, which differs based on whether the claim relates to a Contributing

Chartered Organization, a Participating Chartered Organization or an Opt-Out Chartered

Organization. Through this combination of affirmative relief and protections, the Settling

Insurers will obtain a complete release of liability for Abuse Claims on behalf of themselves,

---

[279] Protected Parties means Debtors, Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the Settling insurance Companies and the Contributing Chartered Organizations, but only with respect to Abuse Claims as defined. Plan Art. I.207.

the named insured(s) under their policies and any additional insureds (whether specifically named or categorically identified).

As settlements that embody sales of estate property out of the ordinary course, both the standard for approving settlements and the standard for approving sales are relevant to determine whether the settlements can be approved. The channeling and release provisions are measured under the *Continental*[280] standard.

### B. The Settling Insurer Settlements Meet the Martin Standard

In their written objections (both original and supplemental), neither the Guam Committee nor the Lujan Creditors object on the grounds that the Settling Insurer Settlements fail to meet the *Martin*[281] standards. Neither object to the proposed settlement amounts or the settlement of the current or future coverage litigation. Rather, the objections only address two components of the settlements – the third-party releases and the "free and clear" aspect of the buyback of the Abuse Insurance Policies. Nonetheless, at argument, each argued that Debtors' evidence was conclusory. Accordingly, I will briefly address the settlement standard.

Settlements and compromises of estate claims are favored in bankruptcy cases which generally seek to foster consensual resolution.[282] The court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise" to determine whether the settlement is fair and equitable.[283]

---

[280] *Gilman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203 (3d Cir. 2000).

[281] *Martin v. Kane (In re A & C Prop.),* 784 F.2d 1377, 1381 (9th Cir. 1986).

[282] *See e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968); *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996) (citation omitted).

[283] *Martin,* 91 F.3d at 393.

The criteria the court should use in striking this balance are well established in the Third Circuit: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[284] From a practical perspective, the first and third factors are often considered together.[285]

Whether to approve a settlement is within the sound discretion of the court.[286] The court need not be convinced that the settlement is the best possible compromise to approve it; instead, the court "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness."[287] Although the court may not substitute the trustee's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, "a court may nonetheless take into account the [Trustee's] business judgment in recommending a settlement as well as the opinions of the [Trustee] and the parties to the settlement."[288] Nonetheless, the court does not conduct a "mini-trial" on the merits. Instead, it canvasses the issues to see if the settlement falls below the lowest point in the range of reasonableness.

I conclude that the Settling Insurer Settlements meet the *Martin* standards. The testimony of Mr. Desai, Mr. Whitman, Mr. Patton and Ms. Gutzler all support the

[284] *Id.*

[285] *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012) (citing *In re Nutraquest*, 434 F.3d 639, 646 (3d Cir. 2006)).

[286] *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (citation omitted).

[287] *Id.* (quoting *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008)).

[288] *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (citations omitted).

settlements. Through the Settling Insurer Settlements, Debtors are resolving complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims. As Mr. Desai testified, in exercising its business judgment to approve each settlement, BSA considered (i) the defenses raised by each insurer to their coverage obligations, (ii) the cost of the litigation if settlement were not reached; (iii) that the Coalition, the FCR and Local Councils all supported these settlements, (iv) the amount of each settlement, (v) any solvency issues and (vi) the role of each insurer in objecting to matters in the bankruptcy case.[289] Further, each Settling Insurer Settlement was the result of arms-length negotiations with the assistance of a mediator.[290]

A summary of the evidence is as follows.

### 1. Hartford

The Hartford settlement brings $787 million into the Settlement Trust.

Hartford brought both prepetition coverage litigation and postpetition coverage litigation against not only BSA, but other insurers challenging its coverage obligations.[291] The insurance coverage litigation raises complex issues, including BSA's duty to cooperate and the "expected and intended" defense to coverage. Further, Hartford took the position that all Abuse equals one occurrence. Ms. Gutzler testified that if Hartford were to prevail on that theory it would substantially limit the amount Hartford would be obligated to pay for Direct Abuse Claims.[292] Such a result would no doubt be seized upon by other insurers.

---

[289] Desai Decl. ¶ 27.

[290] JTX 1-292, 1-312, 1-434, 2834.

[291] See Section I.D., supra; Hartford Accident and Indemnity Company et al. v. Boy Scouts of America et al., Adv. Pro. 20-50601; Whittman Decl.¶¶ 92-94.

[292] Gutzler Decl. ¶ 70.

Mrs. Gutzler also testified that only secondary evidence exists for $26 million of per occurrence limits under Hartford policies, raising another coverage issue to overcome.[293] In addition to its pre- and post-petition coverage litigation, Hartford filed a proof of claim asserting unliquidated claims for contribution, subrogation and/or allocation.[294]

The National Executive Committee met no less than four times before approving the final settlement agreement with Hartford.[295] Its deliberations included active discussions with advisors, followed by directions regarding settlement parameters.[296] Mr. Whittman also concurs in this decision. Mr. Whittman participated in mediation discussions and confirms the arms-length nature of the negotiations.[297]

The Hartford Settlement also resolves the outstanding disputes over the original Hartford settlement.[298]

### 2. *Century*

The Century settlement brings $800 million into the Settlement Trust.

Century and BSA were embroiled in two lawsuits over prepetition coverage obligations.[299] Issues include the application of the First Encounter Agreement, BSA's

---

[293] Gutzler Decl. ¶¶ 71, 72.

[294] JTX 14-37.

[295] Desai Decl. ¶¶ 31-35.

[296] Desai Decl. ¶ 33

[297] Whittman Decl. ¶ 94.

[298] BSA and Hartford agreed to a settlement which was incorporated into an earlier version of the Plan. As part of a restructuring support agreement with the Coalition, the TCC and the FCR, BSA sought declaratory relief that it had no obligation to consummate the agreement and Hartford had no damages as a result. While I approved Debtors' entry into the restructuring settlement agreement, I did not grant the declaratory relief. The Hartford settlement resolves disputes arising out of the first agreement with Hartford.

[299] *See* Section I.D., *supra.*

alleged failure to cooperate and BSA's alleged breach of the consent to settlement clauses. Century also asserts that there are no coverage obligations if the underlying claim was barred by a statute of limitations.[300]  Further, 12%-15% of the total value of Century's coverage is supported solely by secondary evidence.[301]

The National Executive Committee or Bankruptcy Task Force met no less than eight times before approving the final settlement agreement with Century.[302]  In addition to a discussion of the proposed terms of the settlement, BSA's advisors presented the National Executive Committee with an analysis of the Century and Chubb Insurance Groups, their connectedness to BSA and Century's financial health.[303]  The presentation also included a comparison to the Hartford Settlement.[304]  Further discussions included consideration of the impact on Chartered Organizations, other mediation parties and strategic alternatives.[305]

BSA had significant concerns regarding Century's ability to honor its agreements going forward.[306]  The presentations by BSA's advisors included information regarding Century's financials.[307]  Century is in runoff paying claims under policies issued by Insurance Company of North America.[308]  As Ms. Gutzler testified, "Century is not an income-generating insurer through the continued receipt of premiums and there is

---

[300] *See e.g.*, Gutzler Decl. ¶ 83; JTX 1-143 at 26; JTX 1-281 at 18-19.

[301] Gutzler Decl. ¶ 87.

[302] Desai Decl. ¶¶ 38-45.

[303] Desai Decl. ¶ 41.

[304] Desai Decl. ¶ 41.

[305] Desai Decl. ¶¶ 44, 45.

[306] Day 1 Hr'g Tr. 51:16-52:24.

[307] Day 8 Hr'g Tr. 90:13-18.

[308] Gutzler Decl. ¶ 86.

significant uncertainty regarding the assets available to satisfy Century Indemnity Company's obligations to the Debtors and to Century's other policyholders."[309]

Mr. Whittman advised BSA with respect to the Century settlement and recommended it be accepted.[310] He, too, was concerned about Century's ability to pay any future judgments considering, among other things, that Century has a statutory surplus of $25 million.[311] As was the FCR.[312]

### 3. *Zurich*

The Zurich settlement brings $52.5 million into the Settlement Trust.

Zurich issued excess insurance to BSA between 1989 and 2018, with underlying matching-deductible policies between 1989 and 2008.[313] Zurich and BSA were not involved in prepetition coverage litigation. Nonetheless, throughout the case, Zurich has articulated coverage defenses that it would assert in the event that BSA and/or the Settlement Trustee seek coverage, including that it has no coverage obligation unless and until self-insured

---

[309] Gutzler Decl. ¶ 86.

[310] Whittman Decl. ¶¶ 129-131.

[311] Whittman Decl. ¶ 133.

[312] Day 8 Hr'g Tr. 90:13-91:3; *see also* Declaration of James L. Patton, Jr. in Support of Confirmation of the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9395, admitted into evidence (as qualified), Day 7 Hr'g Tr. 101:5-7] ("Patton Decl.") ¶ 22 ("Importantly, it resulted in Century and the Chubb Companies contributing $800 million to the Settlement Trust. I believe this contribution to be substantial in any context, but it is particularly substantial (and was particularly hard-fought) here because of questions surrounding Century's financial viability. The potential for recovery against Century also had to be weighed against the likelihood of protracted future litigation. This likelihood presented a significant risk because of the uncertainty regarding both the success of collecting under the insurance policies as well as the amount of Century's assets that would remain after such litigation. The Century and Chubb Companies Insurance Settlement avoided this outcome while also providing the largest single contribution to the Settlement Trust.").

[313] Gutzler Decl. ¶ 93.

retentions of $1 million are paid.[314]  Ms. Gutzler testified that Zurich's defenses, if

successful, would substantially reduce or even eliminate coverage.[315]  She also testified that

coverage would be at risk if the matching-deductible policies were determined not to have

aggregate limits.[316]

The National Executive Committee met at least three times to discuss the Zurich

settlement with its advisors, which was modeled on the Century settlement.[317]

### 4. *Clarendon*

The Clarendon settlement brings $16.5 million into the Settlement Trust.

Clarendon issued primary policies to certain Local Councils from 1957 to 1979 and

excess policies to BSA between 2003 and 2006.[318]  The terms of certain policies issued to

Local Councils are supported only by secondary evidence which carries with it the risk that

a court might find the evidence insufficient to prove the existence or terms of those

policies.[319]  As with Zurich, the matching-deductible aggregate limit concern is also present

---

[314] *See e.g.,* JTX 1-134 at 1.

[315] Gutzler Decl. ¶ 95

[316] Gutzler Decl. ¶ 95.  Ms. Gutzler testified: "Zurich raised a number of the same coverage defenses as the other insurers, which, if successful, would substantially reduce or even eliminate the coverage available for Abuse Claims under their policies.  In addition to these litigation risks based on coverage defenses, a substantial amount of the Zurich coverage would be at risk if the underlying Century and Liberty Mutual matching-deductible policies are determined not to have aggregate limits.  In such a circumstance, the BSA would be required to pay virtually all claims which did not exceed the per occurrence limit for such matching-deductible policies, regardless of the number of Abuse Claims in the relevant policy term.  If Zurich succeeded in arguing that the matching deductible policies had no aggregate limit, the majority of coverage for Abuse Claims allocated to Zurich's excess policies would be at risk."

[317] Desai Decl. ¶¶ 49-51.

[318] Gutzler Decl. ¶ 102.

[319] Gutzler Decl. ¶ 104.

with the Clarendon policies issued to BSA.[320]  Further, the Clarendon insurance policies

contain a $1 million self-insured retention.[321]

The National Executive Committee met at least three times to discuss the Clarendon

settlement with its advisors, which was modeled on the Century settlement.[322]

Ms. Gutzler's allocation analysis also supports each of the Settling Insurer

Settlements.  Ms. Gutzler allocated claims to each of the Settling Insurers using the same

assumptions she used to allocate claims to Non-Settling Insurance Companies.  This

exercise returned the following results:[323]

| Category | $2.4 Billion BW Tort Distribution | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|---|
| Century/ Chubb | $1,250,666,311 | $1,434,919,710 | $1,546,479,054 | $1,884,155,500 | $1,834,263,558 |
| Hartford | $   477,535,263 | $   698,331,465 | $   765,648,955 | $   767,419,261 | $   716,358,283 |
| Zurich | $     73,826,900 | $     61,216,969 | $     66,183,646 | $     74,187,281 | $     83,752,366 |
| Clarendon | $       3,878,517 | $       6,564,759 | $       7,434,084 | $       9,070,978 | $       7,855,750 |

---

[320]  Gutzler Decl. ¶ 104.

[321]  JTX 4000-15 at BSA-PLAN_00491911.

[322]  Desai Decl. ¶¶ 55-57.

[323]  Gutzler Decl. ¶ 62.

As can be seen from the above, the Hartford payment falls above the highest allocation of claims based on Dr. Bates's aggregate range for Direct Abuse Claims. The Clarendon payment does as well. The Zurich payment, while falling below Ms. Gutzler's allocation, is not so far below that it is unreasonable given potential coverage defenses, cost and delay.

The Century payment is the only payment that falls well below Ms. Gutzler's allocation. But, it is not outside the realm of possibilities (or, below the lowest rung on the ladder). Century and BSA were litigating coverage issues before the bankruptcy cases were filed, the issues are complex and uncertain. As importantly, it is undisputed that, unlike the other carriers, there is significant concern about collection. Century is in runoff with a relatively di minimis surplus capital.

Further, all three groups representing holders of Direct Abuse Claims (the TCC, the Coalition and the FCR) now support the Settling Insurer Settlements. Each has had the opportunity to review the coverage defenses as well as Century's financial status. They have determined to support the settlements individually and collectively. Their support satisfies me that Debtors have met their burden to show that the Settling Insurer Settlements are in the paramount interest of creditors. The expense and delay in resolving these complex issues heightens the need for settlements so that distributions can be made to claimants.

Overall, I find that the claims being compromised bring significant value to the estate, enabling Debtors to fund the Settlement Trust with substantial insurance proceeds in a timely fashion. While the record could perhaps be more fulsome on the actual coverage issues, presiding over this case has brought a general familiarity with the existing (and potential future) coverage disputes that have and are likely to arise in this case absent

settlement.  Of course, I need not decide those issues to approve the Settling Insurer Settlements.

The Guam Committee and the Lujan Claimants believe Debtors should have considered the settlements at more granular levels, including the effect of the Settling Insurer Settlements on the particular claims of the Lujan Claimants.  But, the Settling Insurer Settlements qua settlements (i.e. the money coming into the Settlement Trust) does not disadvantage the Lujan Claimants more than other creditors.  Given the nature of mass tort litigation, it is impossible to focus on specific creditors when reviewing a resolution of obligations under insurance policies against which coverage can be sought on 82,209 claims. Without these settlements, coverage disputes would have to be determined on a claim-by-claim basis.  These aggregate resolutions do away with the need to resolve individual coverage disputes on a large subset of these claims.

As the *Martin* case tells us, the settlement need not be the best that can be achieved, it need only be above the lowest point in the range of reasonableness.  Debtors have met this evidentiary hurdle.

### C.  The Buyback of the Abuse Insurance Policies

Section 363(b) permits the sale of assets of the estate other than in the ordinary course of business.  That sale may be free and clear of any interest in that property if one of five disjunctive factors listed in § 363(f) are met.[324]

---

[324] Section 363(f) provides:

(f)    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

Debtors and other plan supporters, including the Settling Insurers, rely on opinions and/or orders entered in mass tort cases permitting the buyback/settlement of insurance policies free and clear of all interests, beginning with *Johns-Manville*.[325] There, the bankruptcy court approved a settlement with insurers of insurance coverage litigation relating to underlying asbestos lawsuits. The Second Circuit ruled that because the insurance policies were property of the estate and the bankruptcy court properly exercised jurisdiction over Manville's assets, it could approve a sale free and clear of interests of entities that had derivative rights against the policy, including Manville's distributors who could only recover on liabilities resulting from Manville's conduct.[326] In *Dow Corning*,[327] the court held that neither a Michigan statute nor a Louisiana direct action statute prevented the sale of debtor's insurance policies free and clear of those interests. Both of these cases are in the context of the unique complexities present in mass tort bankruptcies, such as this, in which insurance often is the most significant asset to satisfy massive, unliquidated tort liabilities. And, they were both reorganizations.

---

    (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)     such interest is in bona fide dispute; or

    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See also In re Kellstrom Industries, Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (analyzing the five disjunctive factors).

[325] *MacArthur Company v. Johns-Manville Corporation (In re Johns Manville Corporation)*, 837 F.2d 89, 90 (2d Cir. 1988).

[326] The Second Circuit also noted, in *dicta*, that asbestos victims with direct liability claims also held derivative rights because they are seeking to collect from Manville's insurance policies based on Manville's conduct. *Id.* at 92.

[327] *In re Dow Corning*, 198 B.R. 214, 233-238, 244-245 (Bankr. E.D. Mich. 1996).

No Local Council objects to the buyback of the Abuse Insurance Policies to the Settling Insurers free and clear of whatever interests they have as an insured or additional insured under those policies. No Local Council objects to the buyback of the BSA Insurance Policies. And, as part of the Local Council Contribution, Local Councils are assigning to BSA any insurance policies they own (i.e. the Local Council Insurance Policies), which are then being sold to the Settling Insurers. The sale free and clear of their interests, therefore, is clearly consensual and thus permissible under § 363(f)(2).

Similarly, with one exception, no Chartered Organization objects to the buyback or sale of the Abuse Insurance Policies to the Settling Insurers free and clear of whatever interests they have as an additional insured under those policies. The lack of objection of a Chartered Organization is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2).[328]

Only the Lujan Claimants and the Guam Committee (and, therefore, the Archbishop) object to the § 363 sale. They argue that the buyback of the Abuse Insurance Policies is not permitted free and clear of the Archbishop's rights as an additional insured under any BSA policy or a policy issued to the Aloha Council.[329] The Lujan Claimants and

---

[328] *Matter of Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994).

[329] The Lujan Claimants present this argument in jurisdictional terms as well. Lujan Claimants' Objection at 41 ("Lacking jurisdiction over nondebtors' interests in BSA insurance policies, the Court cannot sell the polices free and clear of the coinsureds' interest, including the Archbishop of Agaña's interests, and cannot enjoin the coinsureds from exercising their rights as to the policies."). The Lujan Claimants have no standing to raise the rights of the Archbishop. This objection to the extent it pertains to this issue is overruled.

the Guam Committee also contend that such policies cannot be sold free and clear of the Lujan Claimants' direct action rights under Guam's direct action statute.[330]

Preliminarily, I note two items. First, as I understand it, there is a dispute over whether any Settling Insurers issued any insurance policies covering Abuse to the Aloha Council, and/or whether at the time of the issuance of any policies, the Aloha Council included the territory of Guam. The Settling Insurers contend they did not. The Lujan Claimants contend such insurance policies exist. In support of their respective positions, the Lujan Claimants and Century both designated portions of the December 2, 2021 deposition of Jesse Lopez, the Rule 30(b)(6) deponent of the Boy Scouts of America for the Hawaii and Guam chapter.[331] Having reviewed the designated portions of the Lopez deposition and Schedule 3 to the Plan, which lists insurance policies issued by Insurance Company of North America to "Aloha (104) Kilauea 1922-1972 (103)" and "Aloha (104); Maui County 1915-2019 (102)," there is insufficient evidence to resolve this dispute. Accordingly, I cannot rule out the possibility that at least Century issued an insurance policy to the Aloha Council that may cover Abuse that took place on Guam.[332] Second, the Lujan Claimants and the Guam Committee make the same arguments with respect to insurance policies issued to BSA and the Aloha Council. They do not differentiate between the policies issued

---

[330] The Guam Committee does not have standing to raise the arguments of the Lujan Claimants or other individuals who have claims against the Archbishop.

[331] The Lujan Claimants object to Century's designations as they were late filed. While true, I reviewed Century's designated portions, and given my conclusion, I overrule the Lujan Claimants' objection.

[332] While Debtors and the Lujan Claimants stipulated to the admissibility of certain exhibits [ECF 9591], those exhibits do not include any insurance policies issued to the Aloha Council. Further, the exemplar insurance policies in the record do not include any insurance policies issued to the Aloha Council.

to BSA and any policies that may have been issued to the Aloha Council. Neither do Debtors. Accordingly, except where specifically set forth below, neither will I.

### 1. *The Abuse Insurance Policies Issued by Hartford and Century as well as the Proceeds of Those Policies are Property of the Estate*[333]

There is no question that the Abuse Insurance Policies issued by Hartford and Century to BSA are property of the estate.[334] The BSA Insurance Policies were purchased by BSA. Any Local Council Insurance Policies, once assigned to BSA in connection with the Plan, will be property of the estate.[335] Objectors appear to recognize this basic property right.

The Guam Committee and the Lujan Claimants, however, contend that the proceeds of the Abuse Insurance Policies issued by Hartford and Century are not property of the estate. Objectors primarily rely on the Third Circuit's decision in *First Fidelity*.[336] In *First Fidelity*, prepetition, a chapter 13 debtor (McAteer) purchased a credit life insurance policy as security for a vehicle installment loan and named the lender (First Fidelity) as the primary beneficiary and himself as the secondary beneficiary. After debtor crammed down the car loan to fair market value through his chapter 13 plan, he died. The insurance

---

[333] Throughout the confirmation hearing, the Lujan Claimants and the Guam Committee focused their arguments on Abuse claims arising between 1976 and 1983 and on Century and Hartford. *See e.g.,* Guam Committee Objection (listing policies in which the Archbishop has an interest) [ECF 8683] ¶ 6. Neither Zurich nor Clarendon appear to have issued policies during these years. JTX 1040. *See also* JTX-4027 at 1-3. During argument on this issue, however, counsel for the Lujan Claimants stated she was also seeking to preserve whatever rights the Archbishop or the Lujan Claimants have in respect of policies for any year. While this is a bit belated, my conclusions apply equally to Zurich and Clarendon.

[334] *See e.g., ACandS, Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (citation omitted) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of the bankruptcy estate."); *In re Downey Financial Corp*, 428 B.R. 595 n.29 (Bankr. D. Del. 2010) (collecting cases).

[335] 11 U.S.C. § 541(a)(7).

[336] *First Fidelity Bank v. McAteer*, 985 F.2d 114, 119 (3d Cir. 1993).

company paid the lender an amount consistent with the insurance agreement, but that exceeded the cramdown value. The debtor's wife sought to recover from the lender the amount that exceeded the fair market value. The bankruptcy court ordered the turnover of the difference and the district court affirmed. The Third Circuit reversed. The court held that while the debtor owned the policy, the lender, not the debtor, was the primary beneficiary and neither the debtor's bankruptcy nor the cramdown altered the terms of the policy.

There are multiple ways in which the BSA bankruptcy case and the Abuse Insurance Policies differ from *First Fidelity*. <u>One</u>, BSA or the Local Council, as applicable, both own the Abuse Insurance Policies and is the named insured under the policies.[337] Neither BSA nor the Local Council named another party as the primary beneficiary. Although there may

---

[337] *See e.g.*, JTX 4000-2 at BSA-PLAN_00485360 through BSA-PLAN_00485363. The Declarations page lists the Named Insured as "Boy Scouts of America-National, Regional and all Local Councils." The policy further provides:

PERSONS OR ENTITIES INSURED

The unqualified word "Insured" includes:
    (a) The Named Insured, named in the Declarations of this policy.
    (b) Scout Officials and employees whether or not registered with the Boy Scouts of America; units and their sponsors (charter organizations), and all volunteer workers working at the request of a scout official whether or not registered with the Boy Scouts of America; any organization or proprietor with respect to real estate management for the Named Insured; as respects Established Camps or Troop Camps, any affiliated troop or council.
    (c) Any person, organization, trustee, estate or governmental entity to whom or to which the Named Insured is obligated by virtue of a written contract or by the issuance or existence of a permit, to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of the Named Insured or to facilities of, or facilities used by the Named Insured and then only for the limits of liability specified in such contract, but in no event for limits of liability in excess of the applicable limits of liability of this policy.
    (d) Any Scout Official as defined herein and any Unit with respect to the use of a non-owned automobile in the scout activities of the Named Insured or any Unit; the donors and owners of non-owned automobile while being used in the scout activities of the Named Insured or any Unit.
    (e) Any vendor of Named Insured's products.

be additional insureds under many of the Abuse Insurance Policies, no party has a greater right to the proceeds then BSA or the Local Council does. Two, the Lujan Claimants argue that the policy proceeds are not payable to BSA as the policyholder, but to injured persons, including her clients.[338] Unlike in *First Fidelity*, however, the Lujan Claimants have not directed me to any provision of any Abuse Insurance Policy that provides that claimants are insureds. Their position is contrary to the evidence. Three, the insurance company did not dispute liability or coverage in *First Fidelity*. Here, as set forth in the Background Section, not only is liability on the underlying claims an issue, so too, there are numerous coverage disputes. Four the amount owed to First Fidelity is a liquidated amount based on the amount remaining on one car loan. Here, the claims of BSA for coverage under the Abuse Insurance Policies issued by Hartford and Century are based on unliquidated personal injury claims—82,209 of them. The Lujan Claimants' claims against the Aloha Council are similarly unliquidated personal injury claims. While Dr. Bates has placed an aggregate range of value on the claims for purposes of making informed decisions on the standards of confirmation, the actual amount of claims generally, and of claims that could trigger coverage under the policies issued by Hartford and Century is unknown and unknowable without a resolution of each and every claim. Five, First Fidelity involved one insurance policy. Here, there are thousands of Abuse Insurance Policies, numerous of which were issued by Hartford and Century. While Ms. Gutzler allocated liability to the Abuse Insurance Policies issued by the Settling Insurers for purposes of making informed decisions on the standards of confirmation, the actual allocation is unknown and unknowable until

---

[338] *See e.g.,* Day 19 Hr'g Tr. 167:3-13.

not only all of the underlying claims are liquidated, but all of the insurance coverage issues are resolved.

The analysis of whether the proceeds of the Abuse Insurance Policies are property of the BSA estate is more analogous to the cases discussing Directors, Officers and Corporate Liability Insurance Policies (a "D&O Policy").[339] It has long been the law in this district that whether the proceeds of D&O Policies are property of the estate turns on the facts and circumstances of both the policies and the claims asserted.[340] In *Allied Digital*, a chapter 7 trustee sued the debtor's former officers and directors for damages in connection with a leveraged buyout. The directors and officers moved for reimbursement of their defense costs under the corporation's D&O Policy. The D&O Policy provided for coverage for both directors and officers (Coverage A) and coverage for the company that purchased the policy (Coverage B). As described by the court, "the coverage followed the liability." The policy provided direct coverage to directors and officers for judgments and settlements for covered claims as well as defense costs, but only if the corporation had not indemnified them (Coverage A). If the corporation had indemnified the directors and officers, then the corporation would be entitled to reimbursement (Coverage B). The policy also provided direct coverage to the corporation for securities claims, but all securities claims had already been adjudicated and/or were barred by statutes of limitations.

---

[339] *See e.g., Nutraquest*, 434 F.3d at 639 n.4 (generally, insurance policy proceeds are property of the estate, with the exception to that rule arising when policy proceeds only payable to a third party).

[340] *In re Allied Digital Technologies, Corp.*, 306 B.R. 505, 509-510 (Bankr. D. Del. 2004) (D&O Policy); *In re World Health Alternatives*, 369 B.R. 805, 810 (Bankr. D. Del. 2007) (D&O Policy); *In re SN Liquidation, Inc.*, 388 B.R. 579, 584 (Bankr. D. Del. 2008) (D&O Policy); *but see, In re Selectbuild Illinois*, 2015 WL 3452542 at *10 (Bankr. D. Del. 2015) (declining to apply D&O Policy analysis to commercial general insurance policy because there was no assertion that the additional insured's claim to the policy for indemnification would reduce the reorganized debtor's ability to obtain proceeds for its own claims.)

After canvassing case law, the court established four rules:

1. "[w]hen a debtor's liability insurance policy provides direct coverage to the debtor the proceeds are property of the estate, because the proceeds are payable to the debtor."

2. "[w]hen the liability insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate."

3. "[w]hen there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."

4. "[w]hen the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate."[341]

Because the directors' and officers' defense costs were real, the indemnification coverage to the company was hypothetical, and there was no chance of any securities litigation, the *Allied Digital* court held that the proceeds were not property of the estate.[342] As evidenced by the above rules, however, the "debtor's interest in the proceeds requires protection from depletion and overrides the interest of the directors and officers."[343]

The result of such an analysis here is that the proceeds of the Hartford and Century Abuse Insurance Policies are property of the estate. The Abuse Insurance Policies provide direct coverage—indemnity, and in many cases, defense—to BSA or the Local Council. This indemnification obligation is not hypothetical or speculative. 82,209 unique and

---

[341] *Allied Digital*, 306 B.R. at 512.

[342] *Id.* at 512-13. The court also observed that the trustee's real concern was as a potential judgment creditor (i.e., that the payment of defense costs would reduce policy limits that could pay any judgment the trustee eventually obtained against the directors and officers), not as an insured.

[343] *Id.* at 511. *Allied Digital* and *First Fidelity* are not inconsistent. The *Allied Digital* case does not address a policy with a named primary and named secondary insured.

timely proofs of claim asserting Direct Abuse Claims were filed against BSA. Depletion of the proceeds of these policies would have an adverse effect on the estate.

The Guam Committee and the Lujan Claimants appear to argue that because many of the relevant Abuse Insurance Policies in their years have no aggregate limits, that payment to the Archbishop under the policies cannot impact BSA or diminish the estate. Even putting aside Hartford's argument that all Abuse equals one occurrence, this argument flies in the face of the Combined Single Limits contained in these same policies. Ms. Gutzler testified that the Combined Single Limit means that all insureds are subject to the single per occurrence limits. In these circumstances, to the extent the Archbishop is allowed to draw on the proceeds to pay the Archbishop's share of liability for a given claimant, it would diminish proceeds that are available to pay BSA's or the Aloha Council's share of liability on those same claims. Whether that is actually the case cannot be known until all of the Lujan Claimants' claims are liquidated, but this impact is neither speculative nor hypothetical. Rather, if I credit the Lujan Claimants' perception of the value of their claims,[344] it is a foregone conclusion that an insurance payment on behalf of the Archbishop would diminish proceeds necessary to pay the Lujan Claimants' claims against BSA. The Lujan Claimants' argument also ignores the premise of this Plan, which is based on the buyback of the policies, bringing almost $1.6 billion into the estate.

Here, there is: (i) a settlement of an insurance policy in a mass tort case which proposes a reorganization, not a liquidation, and in which the insurance policies and proceeds are key assets (ii) a policy that contains either aggregate limits or combined single

---

[344] JTX 2946 (complaint seeking $10 million in damages); Day 19 Hr'g Tr. 214:5-215:21 (alluding to claims of over $5 million each).

limits and (iii) the additional insured (i.e. the Archbishop) has filed a claim against the estate. In this context, I conclude that the Abuse Insurance Policies issued by Hartford and Century and the proceeds of those policies are property of the estate. Accordingly, they can be sold consistent with § 363 (but, as discussed immediately, below also consistent with other applicable provisions of the Bankruptcy Code). To the extent that *SoyNut Butter*[345] and cases cited therein are inconsistent with this analysis, they are not persuasive in this specific context.

### 2. *The Automatic Stay Prevents a Sale Free and Clear of the Archbishop's Interests*

Section 362(a)(3) provides that the filing of a bankruptcy petition operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[346] The Guam Committee and the Lujan Claimants argue that the sale of the Abuse Insurance Policies free and clear of the Archbishop's interests as an additional insured is a violation of the stay in the Archbishop's bankruptcy case.[347] In support of their position, they primarily rely on *Palmdale Hills*[348] for the proposition that there is no "bankruptcy to bankruptcy" exception for the automatic stay. In that case, the Ninth Circuit ruled that it is not a violation of the automatic stay for

---

[345] *In re SoyNut Butter Company*, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018) (a liquidating case); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 976 (Bankr. N.D. Ill. 1992) (liquidating case, where relief requested would "enjoin a named insured, who is neither a debtor in this bankruptcy nor a creditor of the Debtor, from asserting claims under an insurance policy that it contracted for and paid.").

[346] 11 U.S.C. § 362.

[347] Whitmann Decl. ¶ 197. As an Opt-Out Chartered Organization, the only rights affected here are the Archbishop's rights as an additional insured under BSA Insurance Policies and Local Council Insurance Policies. The Archbishop retains its rights under BSA Insurance Policies and Local Council Insurance Policies issued by Non-Settling Insurance Companies as well as any insurance policies purchased by the Archbishop, even if issued by a Settling Insurer.

[348] *Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 654 F.3d 868, 874-875 (9th Cir. 2011).

Debtor A to object in its case to a proof of claim filed by Debtor B, but it is a violation of the automatic stay for Debtor A to seek to subordinate Debtor B's claim. In coming to its conclusion, the court characterizes objecting to a proof of claim as defensive and subordinating a claim as offensive.

Debtors' and certain of the Settling Insurers' response is multi-pronged. First, Debtors argue that they are not attempting to exercise control over property of the Archbishop, but merely resolving a debtor/creditor issue raised by the Archbishop in its proof of claim. Second, Debtors argue that the sale does not violate the automatic stay as to the Archbishop because the Archbishop's bankruptcy estate is receiving the benefit of its bargain under the Abuse Insurance Policies. Finally, Debtors argue, relying on cases in the executory contract context that this court can approve a sale in the "dueling debtor" context. Debtors do not argue that the Archbishop's rights as an additional insured are not property of the Archbishop's estate.

   *a. The Buyback of the Abuse Insurance Policies is Not Part of the Claims Resolution Process*

The Archbishop of Agaña, through counsel, filed a proof of claim in this case for an unspecified amount delineating two types of claims: an "Insurance Claim" and "a Contingent Claim." It reads in relevant part:

   A. <u>The Insurance Claim</u>

   The Archbishop asserts a claim against the Debtor, the Debtor's assets and/or the Debtor's insurers for insurance coverage under all insurance policies issued to the Debtor or any of its subsidiaries, councils, chapters or affiliates, under which the Archdiocese or any of its parishes or affiliated entities may be entitled to insurance coverage or some other benefit, whether as a named or additional insured or otherwise, and which may provide coverage for any claims asserted against the Archdiocese or any of its parishes or affiliated entities (i) in the Bankruptcy of the Archdiocese, Case No. 19-00010 (Bankr. D. Guam), or (ii) otherwise arising from known and unknown tort claims involving the Debtor, or any of its subsidiaries,

94

councils, chapters or affiliates, and the Archdiocese or any of its parishes or affiliated
entities. The Archdiocese reserves all rights under the policies and at law.

### B. Contingent Claim

The Archdiocese and its parishes and affiliated entities have or may have
contingent claims for contribution, indemnification, allocation of fault and/or
damages against the Debtor and/or its subsidiaries, councils, chapters or affiliates,
none of which are yet matured or liquidated, arising out of or with respect to claims
asserted against the Archdiocese or any of its parishes or affiliated entities (i) in the
Bankruptcy of the Archdiocese of Guam, Case No. 19-00010 (Bankr. D. Guam), or
(ii) otherwise arising from known and unknown tort claims involving the Debtor, or
any of its subsidiaries, councils, chapters, or affiliates, and the Archdiocese or any of
its parishes or affiliated entities.

### C. No Waiver

The filing of this Proof of Claim is not an acknowledgement or admission that the
Bankruptcy Court has jurisdiction over the Archdiocese with respect to any matter
other than the Proof of Claim, and the Archdiocese reserves all rights with respect
thereto. The Archdiocese does not waive, and hereby expressly reserves all rights to
supplement and amend the Proof of Claim from time to time, as it may deem
necessary or appropriate. The Archdiocese reserves any and all rights of setoff or
recoupment under the Bankruptcy Code of applicable law.[349]

Debtors argue that by looking at the four corners of the proof of claim, the Archbishop has

submitted to the jurisdiction of this court for purposes of every interest the Archbishop has

in the Abuse Insurance Policies and that BSA is addressing that interest through the Plan.[350]

While Debtors' argument has surface appeal, Debtors cite no case for the proposition

that the claims resolution process includes selling property in which a creditor claims an

interest (through a proof of claim or otherwise).[351] No doubt, the Archbishop's filing of the

---

[349] Proof of Claim No. 6436, filed 11/13/20. All claims were admitted into evidence as JTX 14.
The Archbishop asserts rights on behalf of the Archdiocese, or any of its parishes or affiliated entities
that may be entitled to insurance coverage under a policy issued to BSA or any of its subsidiaries,
councils, chapters or affiliates.

[350] Jurisdiction does not appear to be the pertinent inquiry. I clearly have jurisdiction to approve a
sale under § 363.

[351] Compare *In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126, 138 (3d Cir. 1999) (noting that the
claims-allowance process is not synonymous with the restructuring of the debtor-creditor
relationship).

proof of claim permits me to determine whether the Archbishop has an interest in any Abuse Insurance Policy, but that is not the dispute before me. The sale of the Abuse Insurance Policies goes beyond determining whether the Archbishop has an interest in any of the policies and, in fact, assumes that it does. If the Archbishop has no interest in the Abuse Insurance Policies, then a "free and clear" sale is meaningless, or surplusage, as to it.

Debtors also contend that the "No Waiver" paragraph means that Debtors agreed to submit all matters related to insurance to this court for determination only reserving its right to assert jurisdiction-based arguments on other matters. Once, again, I have not been asked to rule on the Archbishop's claims or determine whether the Archbishop has an interest in the policies. To the extent that BSA contends that the Archbishop can waive the automatic stay, as the Guam Committee points out, the Third Circuit appears to disagree.[352]

Notwithstanding, I am troubled by the Archbishop's apparent change of position on what is sufficient for its purposes. In joining the objection filed by the Roman Catholic Committee, the Archbishop "object[ed] to any attempt to compromise the additional insured status of the Chartered Organizations, without a corollary channeling injunction in its favor in the BSA bankruptcy."[353] That corollary channeling injunction exists, yet, the Archbishop joined and adopted the Guam Committee's objections during trial. This change of heart, however, must be sorted by the judge presiding over the Archbishop's bankruptcy case.

---

[352] *See ACandS,* 435 F.3d at 259 (citing *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir. 1992)).

[353] JTX 4017 (Declaration of James R. Murray, Special Insurance Counsel to The Archbishop of Agaña) ¶ 12.

### b.  A Violation of the Automatic Stay Does Not Depend on Whether the Prohibited Action May be Favorable to the Estate

Debtors and Hartford both argue that the Plan provides the Archbishop with the benefit of its bargain and so there is no violation of the automatic stay.  The argument somewhat mirrors the Archbishop's initial thoughts on the "corollary channeling injunction."

Debtors' argument is: (i) the BSA Insurance Policies issued by Hartford and Century provide for indemnity and defense, (ii) all of the Direct Abuse Claims that the Archbishop could tender to Hartford and Century for defense are being channeled to the Settlement Trust, (iii) the Archbishop, therefore, will never have to defend a Direct Abuse Claim,[354] (iv) the Archbishop will also no longer be responsible for payment of a Direct Abuse Claim because those claims will be paid pursuant to the TDP therefore, (v) Hartford's and Century's indemnity obligations are satisfied and the Archbishop has no further claim for indemnity under the Abuse Insurance Policies.  Debtors also point out that the indemnity obligation is not only accelerated and fulfilled, but that it resolves any and all insurance coverage defenses such as the "expected and intended" defense or whether the Archbishop is actually covered by the BSA Insurance Policies.  Hartford took a slightly different approach arguing that the automatic stay, and particularly, § 362(a)(3), is meant to prevent acts that diminish the estate.  It argued that (i) because the Archbishop will never have to defend against or pay Direct Abuse Claims (ii) there is no diminishment of the Archbishop's estate by selling the policies back to the Settling Insurers.

---

[354] Of course, the Archbishop will have to defend non-Abuse Claims (i.e., abuse claims unrelated to Scouting), but those claims are not covered by the BSA Insurance Policies.

The Guam Committee and the Lujan Claimants respond that this argument is more one of adequate protection. They also argue that § 363 does not negate § 362 and that the Guam bankruptcy court is the court in which the Archbishop's assets are to be administered. I agree.

While, again, Debtors' position has surface appeal, this argument really speaks to adequate protection.[355] Neither Debtors nor Hartford cited me to a case for the proposition that a non-debtor can exercise control over a debtor's property as long as the action does not diminish the value of the property of the estate or even increases it. In *ACandS*, an arbitration proceeding brought prepetition to determine an allocation issue under an insurance policy ended in a postpetition decision that had the "effect" of terminating the debtor's insurance coverage. The debtor moved before a United States District Court to vacate the award, including on the grounds that it violated the automatic stay. The district court denied the motion and affirmed the arbitration award. The Third Circuit reversed. In finding a violation of the automatic stay, the Third Circuit held that "section 362(a)(3) has consistently been interpreted to prevent acts that diminish future recoveries from a debtor's insurance policies."[356] But the Court did not hold the opposite as it did not need to address whether actions that exercise control over property of the estate, but do not diminish the estate, violate the automatic stay. The Third Circuit also rejected the carriers' argument that equity precludes application of the automatic stay. The court ruled that if an equitable exception exists, it rests solely in the bankruptcy court that can grant relief from the stay.

---

[355] The argument is a compelling adequate protection argument for Chartered Organizations not in bankruptcy.

[356] *ACandS*, 435 F.3d at 261.

Here, the exchange of the channeling injunction for the Archbishop's rights as an additional insured under the Abuse Insurance Policies might be an appropriate exchange. The Guam bankruptcy court might lift the stay to permit the exchange to be made, but permission is still required.

### c.  The "Dueling Debtor" Argument Favors the Archbishop

Finally, Debtors urge that the automatic stay does not prevent this court from approving the sale because BSA is exercising its fundamental right under the Code to sell its property and/or to confirm a plan. For this proposition, Debtors rely on *Noranda*.[357] There, two companies who were counterparties to a long-term bauxite sales agreement filed separate chapter 11 bankruptcy cases days apart in different courts. The buyer of the bauxite brought a first day motion to reject the contract; the seller of the bauxite brought a first day motion to assume the same contract. Without a discussion of the automatic stay, the court presiding over the buyer's bankruptcy case approved the rejection of the executory contract over the objection of the debtor/seller's argument that the court should apply a heightened standard of scrutiny to the rejection motion. While sympathetic to the debtor/seller's plight, the court found no special statutory treatment for rejection of a contract simply because the counterparty is a debtor.[358]

*Noranda* is distinguishable. First, apparently the debtor/seller did not raise the automatic stay because the court does not address it.[359] Second, rejection of a contract is

---

[357] *In re Noranda Aluminum, Inc.*, 549 B.R. 725 (Bankr. E.D. Mo. 2016).

[358] *See also In re Old Carco LLC*, 406 B.R. 180, 212 (Bankr. S.D.N.Y. 2009).

[359] *See also In re Sun City Investments, Inc.*, 89 B.R. 245, 249 (Bankr. M.D.Fla. 1988) (holding in *dicta* and without discussion that rejecting debtor does not need to file motion for relief from stay in counterparty's bankruptcy case before filing motion to reject contract in its case); *but see In re Railyard Company, LLC*, 562 B.R. 481, 487 (Bankr. D.N.M. 2016) (recognizing that in a dueling debtor case,

simply a breach.[360]  With certain exceptions, by rejecting the contract, the debtor is

exercising its right not to perform.[361]  While there is certainly an effect on the counterparty

to the contract, the contract still exists.  It is not terminated.  Third, Debtors cite no case for

the proposition that the breach of a contract by nonperformance is a violation of the

automatic stay.[362]

The "dueling debtor" cases are more prevalent in the proof of claim context

discussed in *Palmdale Hills* where Debtor B files a claim in Debtor A's bankruptcy case.

Generally, courts conclude that no relief from stay is necessary for Debtor A to object to

Debtor B's proof of claim.  Conversely, courts generally conclude that it is a violation of the

automatic stay (so that relief from stay is necessary) for Debtor A to seek to subordinate

Debtor B's claim.  This differentiation seems to mirror the distinction courts make in

applying § 362(a)(1) in continuing to defend a prepetition complaint filed by a debtor (which

is not a violation of the stay) and continuing to prosecute a counterclaim (which is, and

requires relief from stay).

---

rejection trumps assumption and using that as a basis, in part, to grant relief from stay to permit the
rejecting debtor to litigate the rejection motion to conclusion).

[360] *Mission Products v. Tempnology*, 139 S. Ct. 1652, 1661 (2019).

[361] *Old Carco*, 406 B.R. at 212.

[362] The Supreme Court's most recent pronouncement instructs that § 362(a)(3) prohibits affirmative
actions, not passive actions such as non-performance.  *City of Chicago, Illinois v. Fulton*, 141 S.Ct. 585,
590 (2021) ("the language used in § 362(a)(3) suggests that merely retaining possession of estate
property does not violate the automatic stay.  Under that provision, the filing of a bankruptcy
petition operates as a "stay" of "any act" to "exercise control" over the property of the estate.  Taken
together, the most natural reading of these terms—"stay," "act," and "exercise control"—is that
§ 362(a)(3) prohibits affirmative acts that would disturb the status quo of estate property as of the
time when the bankruptcy petition was filed.").

The *Palmdale* Court explains that in objecting to a claim, Debtor A is not harming Debtor B's estate nor is Debtor A exercising control over Debtor B's estate, but is simply determining whether the claim is one that should be allowed. If the objection is successful, Debtor B "still has the claim, but its façade of validity has been stripped away to reveal that the claim is (and always has been) worthless."[363] Equitable subordination, on the other hand, changes the character of the claim and value of the claim and can even result in a secured creditor's lien being transferred to the estate.[364] While Debtor B starts with a valid, enforceable claim against the estate, by virtue of subordination, the lien could be wrested from Debtor B's estate and given to Debtor A.

While I agree with BSA that it is exercising its fundamental right to sell property of the estate and to confirm a plan, I conclude based on the law presented to me, that the automatic stay prevents me from approving the sale of the Abuse Insurance Policies free and clear of whatever interests the Archbishop has. Through the Plan, I am not being asked to determine what interest the Archbishop may have in the Abuse Insurance Policies or the claim the Archbishop has against the BSA estate. Nor is the Guam Committee or the Lujan Claimants arguing that the automatic stay prevents BSA from selling the Abuse Insurance Policies back to the Settling Insurers or confirming the Plan. Rather, their position is relatively narrow. They argue that the automatic stay prevents the sale of the Abuse Insurance Policies free and clear of the Archbishop's interest. I agree. To be sure, the

---

[363] *Palmdale*, 654 F.3d at 875.

[364] *Id.* at 875-876 (citing 11 U.S.C. § 510(c)(2)).

Archbishop's interest may be affected by the sale, but neither objector has argued that this effect is a violation of the automatic stay.[365]

### 3. The Abuse Insurance Policies Can be Sold Free and Clear of the Lujan Claimants' Direct Action Rights

The Lujan Claimants also contend that their direct action rights are an interest in property that cannot be sold "free and clear of" without their consent because (i) the Plan violates the McCarron-Ferguson Act to the extent it extinguishes the Lujan Claimant's right to sue an insurance company and (ii) § 363(d)(1) requires application of non-bankruptcy law to nonprofit entities. Assuming Debtors can sell the Abuse Insurance Policies free and clear of their direct action rights, the Lujan Claimants argue they are not adequately protected.

#### a. The McCarran-Ferguson Act Does Not Reverse Preempt Any Code Section or Plan Provision that Permits the Channeling of Direct Abuse Claims to the Settlement Trust

The McCarran-Ferguson Act provides in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."[366] The Act was enacted in response to a Supreme Court decision concluding that insurance transactions are subject to federal regulation under the Commerce Clause.[367] The McCarron-Ferguson Act is intended to confirm that states, not the federal government, can regulate the business of insurance.[368] The McCarron-Ferguson Act, therefore, is an

---

[365] Because, as set forth below, I am approving the channeling injunction, the Archbishop will get the benefit of the insurance buyback in any event.

[366] 15 U.S.C. §1012(b).

[367] *Securities & Exch. Com'n v. National Securities*, 393 U.S. 453, 458-59 (1969).

[368] *Id.*

exception to the standard preemption rules between federal and state statutes (in certain situations) and is said to "reverse preempt" federal law.[369]

In enacting the McCarron-Ferguson Act, Congress was concerned around regulations regarding the contract of insurance, the type of policy that could be issued, its reliability, interpretation and enforcement.[370] The focus of pre-emptive state regulation is the relationship between the insurance company and its policyholder.[371] "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance.'"[372]

In a thorough Report and Recommendation, Judge Burke recently explained the Third Circuit standard for application of the McCarron-Ferguson Act and the step-by-step analysis the court must undertake.[373] The court must first assess a threshold question: whether the conduct regulated by the state constitutes the "business of insurance." If it does not, the inquiry ends and the McCarran-Ferguson Act does not apply.[374] If the threshold question is answered in the affirmative, then reverse preemption will apply if three requirements are met: (i) the federal law at issue does not specifically relate to the business

---

[369] *In re Patriot National, Inc.*, 623 B.R. 696, 709 (D. Del. 2020).

[370] *National Securities*, 393 U.S. at 460.

[371] *Id.* at 460 (ruling that state regulation of relationship between insurance company and its stockholders does not reverse preempt the Securities Act of 1933 and finding that no conflict exists between the federal law and state law).

[372] *Id.* at 460 (section of the state statute aimed at protecting the interests of those holding stock in insurance companies is a securities regulation, not a regulation of the business of insurance within the meaning of the McCarran-Ferguson Act.); *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 501 (1993).

[373] *U.S. v. Delaware Department of Insurance*, 2021 WL 3012728 at *10-16 (D. Del. July 16, 2021) *report adopted* 2021 WL 4453606 *10 (D. Del. Sept. 29, 2021) *appeal docketed*, No. 21-3008 (3d Cir. Nov. 1, 2021).

[374] *Id.* at *10.

of insurance; (ii) the state law regulating the activity was enacted for the purpose of

regulating the business of insurance; and (iii) applying federal law would invalidate, impair

or supersede the state law.[375]

In order to assess the threshold question of whether the challenged conduct

constitutes the "business of insurance" the court must first articulate the challenged

conduct.[376] Here, the Lujan Claimants assert that the McCarron-Ferguson Act reverse

preempts any provision of the Bankruptcy Code that could support the channeling of its

direct action claims against insurance companies to the Settlement Trust. Channeling those

claims, they assert, runs directly counter to the Guam direct action statute which provides

that the Lujan Claimants may sue these insurance companies. The Guam direct action

statute provides:

> Liability Policy: Direct Action. On any policy of liability insurance the injured
> person or his heirs or representatives shall have a right of direct action against the
> insurer within the terms and limits of the policy, whether or not the policy of
> insurance sued upon was written or delivered in Guam, and whether or not such
> policy contains a provision forbidding such direct action, provided that the cause of
> action arose in Guam. Such action may be brought against the insurer alone, or
> against both the insured and insurer.[377]

---

[375] *Id.* at *9 (citing *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999)).

[376] *Id.* at *12.

[377] 22 G.C.A. § 18305. The Lujan Claimants' universe of alleged prohibited action is much broader
as they argue that "[t]o the extent that the Plan prohibits Lujan Claimants from directly suing
insurers of the BSA, local councils, chartered organization, or any entity against whom Lujan
Claimants or any of them have a claim, the Plan violates the McCarran-Ferguson Act." Lujan
Claimants' Objection at 25-26. The Lujan Claimants only citation to Guam law, however, is to the
Guam direct action statute, which says nothing about suing any party other than an insurance
company.

On its face, the Guam statute's focus is on who can sue an insurance company. While it might seem that ends the analysis, it does not. The court must next determine whether this conduct amounts to the "business of insurance."

The Supreme Court has established three criteria for determining whether a particular practice is part of the business of insurance: "(1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry."[378] "None of these criteria is necessarily determinative in itself."[379]

Applying these three factors to the Guam direct action statute reveals that this statute is not part of the business of insurance. The Guam direct action statute is not directed at the relationship between the insured and the insurer and it does not dictate the terms of the insurance policy. Instead, it is aimed at a non-party to the insurance contract and a party adverse to both the insured, if liability is disputed as it is here, and the insurer. It is not aimed at policyholder protection, but rather at the protection of a stranger to the contract. As for the first factor, permitting an injured party to sue his offender's insurer does not transfer or spread the risk between the insurer and the insured or otherwise address the underwriting of risk. That risk is established at the time the contract is entered into not at the time of suit.[380] As for the second factor, permitting an injured party to sue is not an

---

[378] *Delaware Department of Insurance* at *13 (citing *Sabo v. Metro. Life Ins. Co.,* 137 F.3d 185, 191 (3d Cir. 1988) (citing *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211-21 (1979)).

[379] *Id.* (citing *Pireno,* 458 U.S. at 129).

[380] *See e.g., Fabe,* 508 U.S. at 511 (Scalia, J., dissenting) (describing the spreading of risk in an insurance policy).

integral part of the policy relationship between the insurer and the insured.  As for the third factor, the Guam direct action statute is not directed at parties in the insurance industry, or even a purchaser of insurance.  A consideration of these three factors, then, leads to the conclusion that the Guam direct action statute does not constitute the "business of insurance" for purposes of the McCarron-Ferguson Act.

Judge Burke notes, however, that the above factors are just the starting point of the inquiry and so he assesses how the Supreme Court describes the business of insurance.  The Supreme Court in *National Securities* explains:

> Certainly the fixing of rates is part of [the "business of insurance"] ... [t]he selling and advertising of policies ... and the licensing of companies and their agents ... are also within the scope of the statute.  Congress was concerned with the type of state regulation that centers around the contract of insurance .... The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance."  Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to[o] must be placed in the same class.  But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.  Statutes aimed at protecting or regulating this relationship, directly or indirectly[,] are laws regulating the "business of insurance."[381]

Arguably, the Guam direct action statute could fall into the "enforcement" language above.  But, the statute in no way protects or regulates the relationship between the insurance company and the policyholder.  In other words, it is not for the protection of policyholders.

Along those lines, the Supreme Court has steadily focused on who the state statute is aimed at and what it is meant to protect.  So, in *National Securities*, the Court looked at two different sections of a state statute that needed to be satisfied before the State Director of Insurance could approve a merger between two insurance companies.  The first part of the

---

[381] *National Securities*, 393 U.S. at 460 (internal citations omitted).

statute required the Director of Insurance to conclude that the merger would not be

inequitable to stockholders of the insurance company and the second section of the statute

required that the merger not "substantially reduce the security and service to be rendered to

policyholders." The Court concluded that the first section was not a state attempt to

regulate the business of insurance because "the state has its attention on stockholder

protection; it is not attempting to secure the interests of those purchasing insurance

policies."[382] This part of the statute therefore, was not "within the scope" of the McCarran-

Ferguson Act.[383] The second part of the statute, which was for the protection of

policyholders, was ruled to be related to the business of insurance. Even so, the Court

concluded that the McCarron-Ferguson Act did not bar application of the Securities

Exchange Act of 1934 because it found no conflict between the state and federal statutes.

Similarly, in *Fabe*,[384] the Court focused on policyholder protection in ruling on the

interplay between a federal priority statute, which grants debts owed to the United States

government a first priority status and a state priority statute which grants debts to

governmental entities a fifth priority status in an insurance company liquidation. In an

insurance company liquidation, the governments' claims are behind (i) administrative

expenses, (ii) specified wage claims, (iii) policyholders' claims and (iv) claims of general

creditors. The Court held that the Ohio priority statute deals with enforcement of the

contract by ensuring payment of policyholders and so falls within the "business of

insurance" "because it is central to the policy relationship between insurer and insured and

---

[382] *Id.*

[383] *Id.*

[384] *Fabe*, 508 U.S. at 500 (1993).

is confined entirely to entities within the insurance industry."[385]  Notwithstanding this

general finding, the Court ruled that the Ohio statute was enacted for the purpose of

regulating business to the extent that it regulates policyholders, but "to the extent that it is

designed to further the interests of other creditors, it is not a law enacted for the purpose or

regulating the business of insurance."  The Court then held that the priority accorded to

administration expenses "is reasonably necessary to further the goal of protecting

policyholders," but that the priority given to employee wage claims and general unsecured

creditors is not "because their connection to the ultimate aim of insurance is too tenuous."[386]

Given this guidance, I conclude that the Guam direct action statute was not enacted

for the purpose of regulating insurance because it is designed to further the interests of

injured parties and not policyholders.  While the Lujan Claimants cite (and quote) the

statute, they provide no context, either by way of caselaw or legislative history as to the

import of the statute or the legislature's purpose in enacting it.[387]  The District Court of

Guam, however, explains that "[d]irect action statutes serve the general purpose of

permitting an injured person to sue the liability insurance carrier directly; thereby, *protecting*

*the public at large* by providing remuneration from the financially responsible entity."[388]

Further, the Guam District Court describes the direct action as procedural in nature, not

---

[385] *Id.* at 504.

[386] *Id.* at 509.

[387] Neither Debtors nor any objector does an in-depth analysis of the effect, or lack thereof, of the McCarran-Ferguson Act on the ability to channel the Lujan Claimants' claims.  The Coalition does suggest in a somewhat conclusory fashion that § 1123(a)(5) preempts the McCarron-Ferguson Act, but it cites no cases for the proposition that § 1123(a)(5) precepts other federal law.

[388] *Heikkila v. Sphere Drake Ins. Underwriting Management, Ltd.*, 1997 WL 995625 at *4 (D. Guam Aug. 29, 1997) (emphasis supplied) (citing *Capital Ins. & Sur. Co. v. Globe Indem. Co.*, 382 F.2d 623, 625 (9th Cir. 1967)).

substantive.  The statute is "not a cause of action, but merely a citation of a procedural

statute that enables a [p]laintiff to name [a defendant's] insurer(s) in any substantive claim

(s)he may have against [defendant]."[389]  The goal of this statute, therefore, is not

policyholder protection nor does it change the payment provisions of the policy or the

spread of risk between the insurer and insured.  Instead, it is a procedural law granting

standing to sue or, at best, some collection remedy for a creditor of the policyholder in the

event the creditor can prove the policyholder's liability and the policy covers the loss.

The Lujan Claimants argue that the above three factors are satisfied relying on *Evans,*

a case interpreting the Louisiana direct action statute.[390]  The *Evans* Court held that

Louisiana's direct action statute reversed preempted the Federal Arbitration Act defeating a

defendant insurance company's motion to compel arbitration in a class action lawsuit.

*Evans* is distinguishable.  First, the analysis of the Louisiana statute was somewhat cursory.

Second, the *Evans* court downplays the fact that the Louisiana statute regulates the insured-

injured person relationship, not the insurer-insured relationship, addressing it in a footnote.

It finds this distinction immaterial because the Louisiana direct action statute expressly

provides for an additional intent—that insurance policies are executed for the benefit of all

injured persons as well.  The Lujan Claimants do not cite to any authority for the

proposition that the Guam direct action statute has this purpose, nor do they make that

---

[389] *Cruz Reyes v. U.S.,* 2010 WL 5207583 at *7 (D. Guam Dec. 15, 2010) (dismissing count of a complaint, without leave to amend, as count entitled Direct Action Against Insurers "does not allege anything not alleged elsewhere in the Complaint") (citing *Torres-Troche v. Municipality of Yauco,* 873 F.2d 499, 502 (1st Cir. 1989)) (direct-action statute merely procedural); *Ruiz Rodriguez v. Litton Industries Leasing Corp.,* 574 F.2d 44, 45-46 (1st Cir. 1978) (same).

[390] *Evans v. TIN, Inc.,* 2012 WL 2343162 (E.D. La. June 20, 2012). Lujan Claimants' Objection at 32-33.  The Lujan Claimants insert this analysis into the second part of the McCarran-Ferguson standard.

argument. Third, the Guam District Court has stated that the Louisiana direct action statute has "no binding, and little persuasive, effect" on Guam's direct action statute.[391] As that court observed when it ruled in 1997, there is no evidence that the Guam statute was adopted in whole or in part from the Louisiana statute, Louisiana's statute had undergone legislative and judicial modifications that "render any modern comparison [of the two statutes] meaningless," including a major revision after the Guam statute was enacted and the Guam statute remained, as of then, unchanged.[392]

Because I conclude that the Guam direct action statute does not regulate the business of insurance as that term is used in the McCarron-Ferguson Act, I need not perform the second part of the analysis. The Guam direct action statute does not prohibit the channeling of the Lujan Claimants' claims to the Settlement Trust thereby effectively extinguishing their procedural right to sue an insurance company.

### b. *Section 363(d)(1) Does Not Apply to the Lujan Claimants' Direct Action Rights*

The Lujan Claimants next assert that § 363(d)(1) prevents the impairment of their direct action rights, which they argue is impermissible citing to general insurance law equating a buyback of an insurance policy to a rescission of the insurance contract.

Section 363(d)(1) provides:

The trustee may use, sell, or lease property under subsection (b) or (c) of this section—

(i)    in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust.[393]

---

[391] *Heikkila* at *4 n.4.

[392] *Id.*

[393] 11 U.S.C. § 363 (d)(1).

Section 363(d)(1) does not aid the Lujan Claimants. There appears to be little caselaw interpreting this section of the Code. The statutory language and the scant caselaw, however, suggest that § 363(d)(1) is aimed at laws that directly govern the nonprofit debtor in sales of property, not common law of general application to all entities having nothing to do with the entity's status as a nonprofit.[394] This conclusion also comports with § 541(f)[395] and § 1129(a)(16),[396] which the authors of the leading bankruptcy treatise state should be considered together with § 363(d)(1) and "establish a regime in which charitable type organizations in bankruptcy, such as hospitals, cannot be sold to profit-making, taxpaying entities without compliance with state law, such as state laws that require state-law regulatory approval for the sale of not-for-profit hospitals to for-profit buyers."[397] Accordingly, I am not persuaded that the law of general application cited by the Lujan Claimants prevents any impairment of their direct action rights.

### c. The Abuse Insurance Policies Can be Sold Free and Clear of the Lujan Claimants' Direct Action Rights Under § 363(f)

Next, the Lujan Claimants argue that the Insurance Policies cannot be sold free and clear their direct action rights under § 363(f) because none of the requisites for such a sale

---

[394] *See e.g., In re Gardens Regional Hospital and Medical Center*, 567 B.R. 820, 826 (Bankr. C.D. Cal. 2017) (discussing whether closed nonprofit hospital debtor is required to obtain consent of the state attorney general in light of state statute requiring a nonprofit entity operating a health facility to obtain authorization of attorney general when selling material assets to a for profit entity).

[395] 11 U.S.C. § 541(f) provides: "Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title."

[396] 11 U.S.C. § 1129(a)(16) provides: "All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."

[397] 5 COLLIER ON BANKRUPTCY ¶ 541.30 at 541-130 (16th Ed.).

are met. Debtors and other plan supporters argue that both §363(f)(4) and (f)(5) permit the sale.

Section 363(f)(4) provides that a trustee may sell property free and clear of an interest that is in "bona fide" dispute. Debtors argue that the Lujan Claimants' direct action rights are in dispute because their Direct Abuse Claims are disputed claims. The Lujan Claimants respond that their direct action rights, themselves, are not in dispute even if their Direct Abuse Claims are. Section 363(f)(5) provides that the trustee can sell property free and clear of an interest if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." Debtors contend that a money judgment is exactly what the Lujan Claimants seek by way of their direct action rights. The Lujan Claimants provide no real response to this contention.

I conclude that the Lujan Claimants can be compelled to accept a money judgment on account of their direct action rights, and agree with Debtors that this remedy is the exact one they seek. Accordingly, I find that Debtors may sell the Abuse Insurance Policies free and clear of the Lujan Claimants' interests.[398]

Finally, the Lujan Claimants' argue that they are entitled to adequate protection. The Lujan Claimants propose that they receive priority rights to the proceeds of the insurance buybacks. As discussed above, however, the Guam direct action statute is procedural in nature. It does not provide the Lujan Claimants with rights in the Abuse Insurance Policies themselves. And, as the statute was enacted to protect the public at large, it is not clear why the Lujan Claimants should take precedence over other claimants who

---

[398] Given this ruling, I need not determine whether the Lujan Claimants' direct action rights are in bona fide dispute.

Case 20-10343-LSS    Doc 10393-5    Filed 09/21/22    Page 121 of 282

would also look to the policy albeit after a judgment. At best, any interest in the Abuse Insurance Policies is inchoate. The Lujan Claimants have not established that BSA (or any other insured) is liable for their claims and no evidence of record establishes that BSA, the Aloha Council or any Chartered Organization has admitted liability to the Lujan Claimants. Under these circumstances, no adequate protection is required.

If it were, however, I conclude that the Lujan Claimants are adequately protected. By processing their claims against the Settlement Trust, they will receive their share of Trust Assets, including proceeds of the sale. At their election, they can choose the Independent Review Option and thereby seek recoveries (through the Settlement Trust) from Non-Settling Insurance Companies. Further, as creditors of an Opt-Out Chartered Organization, they can pursue their claims directly against any Non-Settling Insurance Companies, even outside the Settlement Trust. Finally, I have concluded that Direct Abuse Claims will be paid in full. Given the rights at issue, I find this combination to be sufficient for purposes of adequate protection in the event it is appropriate.

### D. The Releases

There are three distinct set of releases in this case. The first set of releases are specific to the Abuse Claims ("Scouting-Related Releases"). These are found in the Channeling Injunction (Article X.F and X.G), the Insurance Entity Injunction (Article X.H), Releases by Holders of Abuse Claims (Article X.J.3) and Releases among Contributing Chartered Organizations and Settlement Parties (Article X.J.5). Except for the latter, which is a consensual release among certain parties, the Scouting-Related Releases are nonconsensual third-party releases. These releases run in favor of the Settling Insurance Companies, Local Councils, Chartered Organizations and their Representatives and have been the main subject of contention. The Scouting-Related Releases were demanded by parties making

contributions to the Settlement Trust. Holders of Abuse Claims object to these releases on jurisdictional and other grounds.

The next set of releases are by Debtors and their estates. These releases are found in Releases (Article X.J1 and 2). Debtors' releases are consensual and no party has objected to these releases on jurisdictional basis or otherwise.

The final set of releases are given by all holders of Claims to the Released Parties (Article X.J.4). Creditors in voting classes could choose to opt-out of these releases by checking a box on their ballot or objecting to the Plan.[399] Creditors in non-voting classes could opt-out of these releases by objecting to the Plan. Only the UST has objected to these releases. The UST's objection will be addressed in conjunction with other objections he has made.

## 1. *The Scouting-Related Releases*
### a. *Definitions*

A refresher on a few helpful terms frame the discussion of the Scouting-Related Releases.

The Scouting-Related Releases release claims that holders of Abuse Claims have against Local Councils, Chartered Organizations (Contributing, Participating and Opt-Out), Settling Insurance Companies and their respective Representatives. By definition, these releases relate solely to claims for Abuse that occurs in Scouting. Abuse, Abuse Claims and Scouting are all defined terms and comport with common-sense meanings.

---

[399] Order (I) Approving The Disclosure Statement And The Form And Manner Of Notice, (II) Approving Plan Solicitation And Voting Procedures, (III) Approving Forms Of Ballots, (IV) Approving Form, Manner, And Scope Of Confirmation Notices, (V) Establishing Certain Deadlines In Connection With Approval Of The Disclosure Statement And Confirmation Of The Plan, And (VI) Granting Related Relief [ECF 6438] Ex. 2-3 (Class 5 and Class 6 Ballot), Ex. 2-4 (Class 7 Ballot), Ex. 2-5 (Class 8 Master Ballot).

- Abuse means sexual conduct or misconduct.[400]

- Abuse Claim means a claim against a Protected Party (Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations (TCJC, United Methodists), Settling Insurance Companies and their respective representatives for prepetition Scouting-related Abuse.[401]

- Scouting means any program, activity or service associated with BSA's, any Local Council's, any Related-Non-Debtor Entity's or any Chartered Organization's involvement in or sponsorship of units or programs offered pursuant to BSA's charter.[402]

As can be seen, the concept that Abuse is related to Scouting is embedded in the definition of Abuse Claim. Abuse unrelated to Scouting is not an Abuse Claim and therefore (with the exception of TCJC, which will be separately discussed), is not released.

The distinction between Abuse Claims and non-Scouting related Abuse claims is carried through in the definition of Mixed Claim.

- Mixed Claim means a claim that asserts both an Abuse Claim and a claim of Abuse unrelated to Scouting.[403]

In consistent fashion, the Abuse Claim portion of a Mixed Claim is released under the Plan. Claims for Abuse unrelated to Scouting (with the TCJC exception) are not.

### b.   The Third Circuit's Decision in In re Continental Airlines Holding, Inc.[404]

In *Continental*, the Third Circuit was faced with the issue of the validity of plan provisions releasing debtor's officers and directors and permanently enjoining the filing of shareholder class action claims. After canvassing its sister-circuits on the issue and

---

[400]  Plan Art. I.17.

[401]  Plan Art. I.18.

[402]  Plan Art. I.258

[403]  Plan Art. I.184.

[404]  *Continental*, 203 F.3d 203, 212 (3d Cir. 2000).

reviewing cases that either permitted or prohibited third-party releases, the Court declined to establish a standard as under any applicable standard, the releases before it did not pass muster. The Third Circuit did, however, set forth what it called the "hallmarks" of permissible, nonconsensual releases, namely: fairness and necessity to the reorganization supported by specific factual findings.

In its canvas of other circuits, the Third Circuit noted that some circuits were flexible in "extraordinary cases." For example, in *Drexel* and *Manville*, the Second Circuit upheld releases in plans of reorganization with "widespread claims against co-liable parties" in which consideration was provided to the enjoined parties.[405] The Fourth Circuit upheld such releases in *Robins*, a mass tort case.[406] The Fifth Circuit distinguished these cases from *Zale*, noting that in both *Drexel* and *Manville*, the enjoined claims were channeled to a trust to permit recovery on the enjoined claims.[407]

Since 2000, when *Continental* was decided, the Third Circuit and courts within the circuit have approved plans containing third-party releases when appropriate and consistent with *Continental's* guidelines.[408] Indeed, Judge Dorsey recently approved third-party releases in *Mallinckrodt*, an opioid case.[409]

---

[405] *Id.* (citing *Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc.*, (*In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 640, 649 (2d Cir. 1988)).

[406] *Id.* (citing *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989)).

[407] *Id.* at 213 (citing *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995)).

[408] *See e.g., United Artist Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003); *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011).

[409] *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022).

116

The Third Circuit has also ruled that a bankruptcy court has both statutory and constitutional authority to enter a final order confirming a plan containing nonconsensual third-party releases and injunctions if these provisions are "integral to the debtor-creditor relationship."[410]  Notwithstanding its ruling, the Court did not rule on the ultimate issue—whether the releases were appropriate in the context of that case—as it concluded that the remainder of the appeal was equitably moot.  The Court did, however, once again reference the *Continental* hallmarks and it stressed the need to approach the granting of nonconsensual releases "with the utmost care."[411]

Eleven objections to the Scouting-Related Releases were filed by (or on behalf of) certain holders of Direct Abuse Claims: the Lujan Claimants, the D&V Claimants, claimants represented by Linder Sattler Rogowsky LLP, claimants represented by Parker Waichman, Jane Doe, Mr. Cook, appearing pro se, Mr. Cutler, appearing pro se, Mr. Schwindler, appearing pro se, and Mr. Washburn, appearing pro se.  The Guam Committee also objects as do the Certain Insurers[412] and the UST.  The Pfau/Zalkin Claimants object solely to the third-party release of TCJC.

### c.  Subject Matter Jurisdiction

#### i.  *Bankruptcy Jurisdiction Exists Over Direct Abuse Claims Asserted Against Local Councils and Chartered Organizations*

The Lujan Claimants, the Guam Committee and the D&V Claimants attack the Scouting-Related Releases and channeling injunction on multiple fronts, beginning with

---

[410]  *Millennium*, 945 F.3d at 126.

[411]  *Id.* at 139.

[412]  Old Republic and Liberty adopted the Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan ("Certain Insurers' Objection") [ECF 8695].

subject matter jurisdiction. Relying on *Pacor*,[413] they argue that bankruptcy jurisdiction does not exist over their respective claims against Local Councils, Chartered Organizations or others that might receive a release or channeling injunction under the Plan because (i) the Lujan Claimants' prepetition lawsuits against the Archbishop have been stayed and any plan confirmed in the Archbishop's case will not release any claims against BSA as the Ninth Circuit prohibits third-party releases, (ii) the D&V Claimants whose claims have been removed to federal courts within the Ninth Circuit cannot receive third-party releases as the Ninth Circuit does not permit them and (iii) whether lawsuits have been filed or not, neither Local Councils nor Chartered Organizations have made contribution or indemnification claims in the prepetition lawsuits filed by the Lujan Claimants or the D&V Claimants so that any resolution of claims against a non-debtor are a mere precursor to a second suit against BSA for indemnification. The argument, therefore, is that there is no related-to jurisdiction over claims sought to be released against these entities. Other holders of Direct Abuse Claims make similar arguments.

None of the objectors address either "arising in" or "arising under" jurisdiction. As Debtors point out, however, this is a confirmation hearing. A confirmation hearing is a proceeding that "by its nature, and not the particular factual circumstance, could arise only

---

[413] *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

in the context of a bankruptcy case."[414]  Bankruptcy jurisdiction exists here, therefore, as this

proceeding "arises in" in this bankruptcy case.[415]

Notwithstanding, as I have noted in the past, courts and counsel are accustomed to

analyzing third-party releases in the context of related-to jurisdiction and I will do so here.[416]

In *Combustion Engineering*, the Third Circuit focused on related-to jurisdiction (without first

addressing "arising in" jurisdiction).  The Court noted that while there may be a similarity

between an analysis of whether related-to jurisdiction exists and whether claims can

---

[414] *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014), *appeal dismissed sub nom., In re New Century TRS Holdings Inc.*, 526 B.R. 562 (D. Del. 2014), *aff'd sub nom., In re New Century TRS Holdings, Inc.*, 619 Fed.Appx. 46 (3d Cir. 2015) (citation omitted).  *See also Stoe v. Flaherty*, 436 F.3d 209, 218 (3d Cir. 2006), *as amended* (Mar. 17, 2006)  (citing 1 COLLIER ON BANKRUPTCY ¶ 3.01[4][c][iv] at 3–31 (15th Ed. Rev. 2005) (noting that "administrative matters" such as allowance and disallowance of claims, orders in respect to obtaining credit, determining the dischargeability of debts, discharges, confirmation of plans, orders permitting the assumption or rejection of contracts, are the principal constituents of "arising in" jurisdiction, and that "[i]n none of these instances is there a 'cause of action' created by statute, nor could any of the matters illustrated have been the subject of a lawsuit absent the filing of a bankruptcy case.") (citation omitted)).

[415] *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013) ("It may or may not be appropriate for a court exercising bankruptcy jurisdiction to confirm a plan containing a third-party release—and, if it is appropriate, the manner and degree of relation of the released claim to the case are certainly factors in the analysis—but the court undoubtedly has jurisdiction to adjudicate the plan, even without recourse to its related-to jurisdiction.").

[416] *See In Millennium Lab Holdings II, LLC.*, 575 B.R. 252, 287 n.160 (Bankr. D. Del. 2017) (questioning whether the traditional related-to analysis is the proper analytical framework with respect to plans containing releases and positing that a related-to analysis might more properly stand as a check on the outer boundaries of permissible releases as a substantive matter and noting the bankruptcy court opinion in *In re Lower Bucks Hosp.*, 471 B.R. 419, 448 n.45 (Bankr. E.D. Pa. 2012), *aff'd sub nom. Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303 (E.D. Pa. 2013), *aff'd sub nom. In re Lower Bucks Hosp.*, 571 Fed.Appx. 139 (3d Cir. 2014)), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd on other grounds In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126 (3d Cir. 2019), *cert. denied* 140 S.Ct. 2805 (May 26, 2020)).

ultimately be enjoined under a plan, the two analyses are distinct and jurisdiction must exist independent of any plan provisions.[417]

Debtors propose several bases for related-to jurisdiction, but primarily rely on two—an identity of interest between Debtors and the released parties and the impact on property of the estate if Direct Abuse Claimants are allowed to pursue claims against the released parties.

I conclude that related-to jurisdiction exists to grant the releases of Local Councils and Chartered Organizations (and, in the case of the Archbishop, the related orders). First, based on my findings in Section I.A above, I conclude that it takes all three constituencies—BSA, Local Councils and Chartered Organizations—to deliver the Scouting program. BSA sets the structure and content of the Scouting program. BSA charters Local Councils on an annual basis to ensure that Scouting is available in their geographic locations. Local Councils annually charter Chartered Organizations and the two work together to form troops, pacs, dens and other units and to provide Scouting experiences to boys and girls. As Mr. Desai credibly testified, "because of the interconnectedness of a local council with the national organization and our local chartering partners, we can't continue to deliver the mission of Scouting without them."[418] Further, prepetition, plaintiffs often treated BSA, Local Councils and Chartered Organizations as jointly responsible for Direct Abuse Claims, pleading that each was responsible for the conduct not only of themselves, but of others. A lawsuit against a Local Council or a Chartered Organization, therefore, could have an immediate impact on BSA. Plaintiffs allege one harm—a singular Direct Abuse Claim—

---

[417] *In re Combustion Eng'g Inc.*, 391 F.3d 190, 224-225 (3d Cir. 2004).

[418] Day 1 Hr'g Tr. 263:14-264:1.

and they seek a single recovery from BSA, a Local Council and a Chartered Organization (as well as a perpetrator and perhaps others).

Second, the leadership among BSA, Local Councils and Chartered Organizations is reciprocal in nature. Each Chartered Organization has a seat on the board of its Local Council and each Local Council has two or more members on the National Council that elects the National Executive Board.

Third, from at least 1976 forward, Debtors provided insurance to both Local Councils and Chartered Organizations. As evidenced by the exemplars of the primary insurance policies and based on the findings made in Section I.C, above, while those policies vary in terms, they contain Combined Single Limits which restrict recoveries for a single occurrence regardless of the number of insureds. Accordingly, if an insurer paid out its per occurrence limits to plaintiff A to either a Chartered Organization or Local Council, there would be no insurance remaining to respond to a claim on the policy by BSA for Abuse alleged against it by plaintiff A. Similarly, beginning in 1983, BSA insurance policies provide for aggregate limits applicable to all claims. Payment of any claims against any insured counts against the aggregate limits, thereby depleting the insurance policies.

Fourth, BSA has a residual interest in Local Council property. While that interest is, of course, subject to all superior interests, including the payment of valid claims against the Local Council, that interest is nonetheless property of the estate. Any diminishment of that interest impacts Debtors and property of the estate.

Fifth, Chartered Organizations have asserted contractual and common law claims for indemnification arising out of their relationship with both BSA and Local Councils.[419]

---

[419] *See e.g.*, JTX 14-1 through 14-15.

In recognition of the critical roles that Chartered Organizations and Local Councils play in delivery of Scouting, on October 30, 2013, BSA resolved

I.  That the Corporation [BSA] will endeavor to continue to maintain and provide primary general liability insurance for Chartered Organizations for those organizations in connection with covered claims made as a result of the delivery in connection with official scouting activities.

II.  That, in addition to maintaining and providing the aforesaid liability insurance, the Corporation shall defend and indemnify Chartered Organizations, and their employees, directors, officers, members and volunteers, who act in good faith and against whom claims are asserted based upon the Corporation's membership standards.

III.  That the Corporation will indemnify to the fullest extent permitted by the law of the state where the Chartered Organization is domiciled against an award of punitive damages against any Chartered Organization, its employees, directors, officers [sic] members and volunteers who act in "Good Faith". This provision would not apply to any conduct or occurrences prior to the adoption of this Resolution.[420]

Similarly, Local Councils agree to indemnify Chartered Organizations in the Annual Unit Charter Agreement:

The Local Council agrees to:

•  Provide primary general liability to cover the Chartered Organization, its board, officers, COR, employees, and adult volunteers for authorized Scouting activities. Indemnify the Chartered Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America.[421]

For any or all of these reasons, and certainly from a combination of the above,

related-to jurisdiction exists over claims made against Chartered Organizations and Local

---

[420] JTX 797. The Resolution also provides:

VII.  In civil actions pending or filed against a Chartered Organization, the Corporation's legal counsel will not use the language of the Charter Agreement or the Charter Renewal Agreement, or any similar document outlining the responsibilities of the parties, to shift liability from the Corporation to the Chartered Organization.

[421] JTX 264.

Councils. There is no question that the outcome of a lawsuit against a Chartered

Organization or Local Council can "conceivably have [an] effect on the estate being

administered in [this] bankruptcy case." Plaintiffs, including objectors to jurisdiction,

allege, among other things, that BSA controls Local Councils and Chartered Organizations

and is responsible for their actions (and vice versa). And, any call by Local Councils and

Chartered Organizations on BSA's insurance has the potential to diminish property of the

estate. No second suit is necessary for these impacts to occur. Similarly, the contractual

obligations of BSA and Local Councils to indemnify Chartered Organizations is immediate.

No second lawsuit is necessary to establish the existence of this liability.[422] A ruling in a

lawsuit against a Chartered Organization or Local Council has an immediate impact on

Debtors' estates.

      The Lujan Claimants argue that the automatic stay in the Archbishop's case

necessarily means that claims against the Archbishop could never impact these estates.

That is not at all clear. The plan put forward by the Guam Committee in the Archbishop's

case contains an "offer" to BSA's insurers (founded on the Archbishop's status as a

Chartered Organization and an additional insured under BSA's policies) to settle claims in

that case for $55 million.[423] If approved, and not a violation of BSA's automatic stay, such a

---

[422] The D&V Claimants appear to argue that because the obligations under the Annual Unit Charter Agreement are of recent vintage (and did not exist at the time most of the underlying Direct Abuse Claims occurred), this agreement cannot support related-to jurisdiction. The D&V Claimants cite no law for the proposition that subject matter jurisdiction looks backwards to the time of the underlying harm.

[423] JTX 2657.

settlement could "conceivably" direct assets away from BSA and its creditors in favor of the Archbishop and its creditors.[424]

Finally, the Lujan Claimants and the D&V Claimants argue that because their clients have sued in states that fall within the jurisdiction of the Ninth Circuit, releases could never be approved in any bankruptcy filed by one of those Local Councils or Chartered Organizations so that any judgment could never impact the estates. Even assuming somehow this argument is relevant, it completely ignores the impact of the shared insurance and the contractual indemnification obligations and those Local Councils and Chartered Organizations who do not file bankruptcy cases.

The test is "conceivable" impact on the estate. In this analysis, I do not have to determine to an absolute certainty that an underlying lawsuit will impact the estate. Based on all the above factors, I conclude that it is more than "conceivable" that such lawsuits will. Bankruptcy jurisdiction exists.

---

[424] The Lujan Claimants also argue that BSA's position that an identity of interest exists between and among BSA, Local Councils and Chartered Organizations is inconsistent with historical positions taken in litigation. The Lujan Claimants cite two state court opinions from the 1990s in which BSA was held not liable for the acts of a Local Council. This argument is not persuasive for several reasons. The cases date to the 1990s and are based on the facts of those cases. The more recent history is that BSA defends its Local Councils and Chartered Organizations, settles its cases, and settles for all BSA parties. Moreover, to the extent inconsistency could defeat jurisdictional arguments, the Lujan Claimants' pleadings in their own prepetition litigation seek to hold BSA liable for the acts of both the Aloha Council and the Archbishop of Agaña, notwithstanding the Lujan Claimants' argument here that I should credit these two 1990 state court cases. *See* Day 21 Hr'g Tr. 88:7-13; 4/21/2022 Lujan & Wolf Letter to Court [ECF 9693].

*ii.    Bankruptcy Jurisdiction Exists Over the Direct Abuse Claims Asserted Against the Related Non-Debtor Entities*

Prepetition, Jane Doe sued BSA, Learning for Life, a Related Non-Debtor Entity, and other entities and/or persons asserting claims based on Abuse. While she has objected to the Scouting-Related Releases, Jane Doe does not assert a lack of bankruptcy jurisdiction.[425]

For many of the same reasons, related-to jurisdiction exists over claims against Related Non-Debtor Entities. Each of the Related Non-Debtor Entities is directly or indirectly wholly owned by BSA and either helps to deliver Scouting (Learning for Life), owns or operates property that BSA uses in delivering its mission (Arrow WV, Inc., Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc.) or assists BSA in its financial activities (BSA Asset Management, LLC, BSA Commingled Endowment Fund, BSA Endowment Master Trust, National Boy Scouts of America Foundation). Further, each of these entities is a named insured under various insurance policies.[426] As with Local Councils and Chartered Organizations, a judgment against a Related Non-Debtor Entity will have a "conceivable" impact on the estate. Bankruptcy jurisdiction exists.

*iii.    Bankruptcy Jurisdiction Exists Over Direct Abuse Claims Asserted Against Debtors' Officers and Directors and Other Representatives*

The Plan provides Scouting-Related Releases to the "Released Parties" and their "Representatives." Released Parties includes Debtors, Reorganized Debtors and Related

---

[425] No other party with a claim against a Related Non-Debtor Entity participated in the confirmation hearing.

[426] Whittman Decl. ¶ 203 ("All of the Related Non-Debtor Entities are additional insured under certain of the BSA Insurance Policies and they are contributing their rights under those policies as consideration for these releases."); *See e.g.,* JTX 10-36 (Named Insured is "Boy Scouts of America, National Council and all of its affiliates and subsidiaries and all Local Councils and all their affiliates and subsidiaries and Learning for Life."); JTX 10-37 (same).

Non-Debtor Entities.[427] As relevant here, Representatives includes Debtors' officers and directors. Again, no party has asserted that bankruptcy jurisdiction does not exist over any claims against Debtors' officers and directors. And, no party to my recollection has asserted any claim, much less an Abuse Claim, against an officer or director.

Debtors argue that an identity of interest exists between Debtors and their seventy-two member, volunteer National Executive Board who have engaged on all issues bankruptcy as well as continuing their regular function overseeing Scouting. Moreover, BSA's Charter and Bylaws provide the officers and directors with contractual rights to both indemnification and advancement.[428]

---

[427] Other Released Parties include the Creditors' Committee, the members of the Creditors Committee in their capacities as such, the Tort Claimants' Committee; the members of the Tort Claimants Committee in their capacities as such, the FCR, the Coalition, JPM, the Settling Insurance Companies, the Foundation, in its capacity as lender under the Foundation Loan Agreement, the Ad Hoc Committee, the members of the Ad Hoc Committee in their capacities as such, the Creditor Representative, the Contributing Chartered Organizations and the Mediators.

[428] JTX 234 Art XIII Sec. 1.

The Corporation shall indemnify any person who was, is, or is threatened to be made a named defendant or respondent in any action, suit, or proceeding, civil or criminal (a "Proceeding"), because such person, or a person of whom such person is the legal representative, (i) is or was a member of the Executive Board, a committee of the Executive Board, a subcommittee of a committee of the Executive Board, or an officer of the Corporation; or (ii) while a member of the Executive Board, a committee of the Executive Board, a subcommittee of the Executive Board, or an officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, agent, or employee of another corporation or organization, to the fullest extent that a nonprofitcolporation may grant indemnification to such a person under applicable law, without subjecting the Corporation to any income or excise tax under the Internal Revenue Code of 1986, as amended, or the corresponding provision or provisions of any subsequent United States Internal Revenue law or laws; provided, however, that any right to indemnification from the Corporation under this provision shall not extend to any matter as to which such person shall have engaged in wanton or willful misconduct in the performance or neglect of a duty owed to the Corporation. Any right to indemnification under this provision shall be a contract right and shall include the right to be paid by the Corporation expenses incurred in defending such Proceeding in advance of its final disposition to the maximum extent permitted under applicable law. Any person who has requested an advancement of expenses under this provision and has not received such advance within 30 days of such request may thereafter bring suit against the Corporation to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting such claim. In any such action, the burden of proof shall be on the Corporation to prove the claimant is not entitled to such

Related-to jurisdiction exists over claims against Debtors' officers and directors by virtue of BSA's indemnification/advancement obligations.  If sued, BSA will be required not only to indemnify an officer or director for any losses, but to advance funds to cover defense of any lawsuit.[429]  The obligation is established through BSA's charter and bylaws; no second suit is necessary for there to be a conceivable impact on the estate.

Related-to jurisdiction also exists over claims of Representatives of Local Councils and Chartered Organizations due to Local Councils' obligation to indemnify Chartered Organizations.  To the extent that indemnification is called upon, it decreases BSA's residual interest in the Local Council, thereby diminishing BSA's bankruptcy estate.  Again, no additional lawsuit is necessary for this liability to be triggered or the diminishment of the estate to occur.

### d.  Statutory Authority

The Guam Committee, the Lujan Claimants, the D&V Claimants and the United States Trustee argue that there is no statutory authority for a court—bankruptcy or district—to grant third-party releases.

In *Continental*, the Third Circuit stated that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here."[430]  Notwithstanding, the Court did not adopt the logic of

---

payment.  The rights conferred herein shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, bylaw, vote of the Executive Board or a committee or subcommittee thereof, agreement or otherwise.  This provision shall not be deemed to limit any power or exclude any right of the Corporation to provide any additional or other indemnity or right, or to maintain insurance or a similar arrangement for or on behalf of any person.  If this provision should be invalid or ineffective in any respect, the validity and effect of this provision in any other respect shall not be affected.

[429]  *Millennium*, 591 B.R. at 583-84.

[430]  *Continental*, 203 F.3d at 211.  The one instance is § 524(g).

those courts precluding third-party releases in all instances.  Rather, for the next twenty

years, the Third Circuit (and courts within this circuit) has permitted nonconsensual third-

party releases in narrow circumstances where the releases are fair and necessary to the

reorganization.[431]  The Third Circuit reiterated that conclusion in *Millennium*, and while it

did not reach the merits of the third-party releases granted in that instance, it did conclude

that a bankruptcy court is constitutionally authorized to confirm a plan containing

nonconsensual third-party releases if it concludes that the releases are integral to the debtor-

creditor relationship.  While I hesitate to read further into the Court's conclusion, the ruling

suggests an implicit recognition that the granting of third-party releases is still permissible as

part of the confirmation process.

The granting of such releases, therefore, must be found in the bankruptcy court's

ability, in appropriate circumstances, to exercise its inherent equitable power consistent with

§§ 105(a), 1123(a)(5) and 1123(b)(6) of the Bankruptcy Code.[432]  Section 1123(a)(5) permits a

plan to provide adequate means for its implementation and § 1123(b)(6) provides that a plan

may include "any other appropriate provision not inconsistent with the applicable

provisions of this title."  Third-party releases are not inconsistent with other provisions of

this title.  While the Code does not explicitly authorize releases, neither does it prohibit

them.  The *Continental* standard aids the court in navigating between these two poles.

The objectors rely heavily on the inclusion of § 524(g) in the Code post-*Manville* for

the proposition that nonconsensual third-party releases are not appropriate in any other

setting.  While § 524(g) permits third-party releases in the asbestos context, it does not

---

[431]  *See e.g., United Artists*, 315 F.3d at 227; *Global Indus.*, 645 F.3d at 206.

[432]  *See Purdue Pharma*, 633 B.R. at 105 and cases cited therein.

prohibit them in other contexts. When it enacted § 524(g), Congress included a rule of

construction, which provides that: "[N]othing in subsection (a) [what would be codified as

§ 524(g) and (h)] shall be construed to modify, impair, or supersede any other authority the

court has to issue injunctions in connection with an order confirming a plan of

reorganization."[433] The legislative history confirms the rule of construction.[434] Section

524(g), therefore, does not prohibit the granting of third-party releases in the non-asbestos

context.[435]

    For these reasons, I conclude that there is statutory authority to grant third-party

nonconsensual releases.

    *e.*   **The Scouting-Related Releases (Except with Respect to TCJC) Meet the Continental Standard**

    Notwithstanding that bankruptcy jurisdiction exists and, in appropriate

circumstances, I have constitutional authority to enter a final order granting releases, if the

releases do not meet the *Continental* standard then they cannot be granted.

---

[433] Bankruptcy Reform Act, Pub. L. 103-394 § 111(b) (1994).

[434] *Purdue Pharma*, 633 B.R. at 102 (citing H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4, 1994) ("[S]ection [524(h)] contains a rule of construction to make clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan of reorganization. Indeed, Johns-Manville and UNR firmly believe that the court in their cases had full authority to approve the trust injunction mechanism. And other debtors in other industries are reportedly beginning to experiment with similar mechanisms. The Committee expresses no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind. The Committee has decided to provide explicit authority in the asbestos area because of the singular and cumulative magnitude of the claims involved. How the new statutory mechanism works in the asbestos area may help the Committee judge whether the concept should be extended into other areas.")).

[435] Similarly, § 524(e) does not preclude releases in the appropriate context. *See Mallinckrodt*, 639 B.R. at 868 n.70 (releases are not the equivalent of a discharge).

By any measure, the scope and sheer number of releases contemplated in this Plan is extraordinary, if not unprecedented.  The Settling Insurers are being granted nonconsensual third-party releases as are Related Non-Debtor Entities, officers and directors and all their Representatives.  Debtors also seek releases (full or partial) of 250 Local Councils and over 100,000 Chartered Organizations.[436]  But, with perhaps some exceptions,[437] a holder of a Direct Abuse Claim is releasing one Local Council and one Chartered Organization.[438]  To be perfectly clear, Perpetrators are not receiving releases.

The size of the claimant pool is also unprecedented (so I am told), at least in the context of sexual abuse cases.  The Direct Abuse Claimant pool total is 82,209 unique and timely filed claims.  Comparatively, the actual number of parties objecting is few.  Seven law firms representing 569 claimants[439] and three claimants appearing *pro se*, object to the releases.  While the absolute number of objectors is not insignificant, as a percentage of the Direct Abuse Claimants, they are less than one percent.  Nothing in this Opinion is meant to minimize their strongly held positions.

The amount contributed to the Settlement Trust is the also unprecedented (so I am told).

---

[436] While technically not "Released Parties," the Participating Chartered Organizations and the Opt-Out Chartered Organizations benefit from the channeling injunction, which is in the nature of a release, and so should be judged by the same standard.

[437] Approximately 3000 Proofs of Claim assert a claim against two Local Councils.  *See* Disclosure Statement Ex. F.

[438] Only the Lujan Claimants argue that certain "orders" within the Archbishop are listed as Chartered Organizations receiving Scouting-Related Releases.  The parishes and schools within the Archdiocese have been held to be unincorporated divisions of the Archdiocese and not separate entities.  *See e.g.,* JTX 4034 at 8.

[439] The Lujan Claimants (72), the D&V Claimants (67), Linder Sattler Claimants (58, "most of which" voted to reject the Plan), Parker Waichman (331); Pfau/Zalkin (14, 43, respectively). Jane Doe is also represented.

Given the unparalleled nature of this case, I do not make these decisions lightly. I am guided in large part by the nature of this case, the way in which plaintiffs who brought prepetition lawsuits viewed the third parties, the testimony I heard from survivors and, of course, the law.

### i.    *The Parties' General Positions*

Debtors contend that the Scouting-Related Releases are necessary to BSA's successful reorganization as well as to maximize recoveries to holders of Abuse Claims. They argue that the contributions and Scouting-Related Releases are all intertwined. Without the Scouting-Related Releases, the settlements with the Settling Insurers and the resolution with Local Councils could not be achieved. Importantly, without the releases granted to Chartered Organizations, Debtors contend they could not unlock the value of Debtors' insurance assets and the consideration provided by Local Councils. Debtors conclude, therefore, that in these extraordinary cases, the Scouting-Related Releases are fair and necessary to their reorganization.

Objectors question both the necessity for and fairness of the Scouting-Related Releases. With respect to the Settling Insurers, they argue that the releases are driven not by BSA's need, but by the Settling Insurers' need to get out from under their contractual obligations (i.e. the insurers' exposure drove the releases). They argue some lesser amount could have been paid to secure BSA's discharge, but permit additional insureds to continue to access insurance under the very same policies. Objectors further argue that Chartered Organizations did not ask for releases, but are getting them, and have not paid any consideration for their releases. Finally, objectors argue that the releases are not necessary because Debtors filed previous plans, including the Solicitation Plan, which did not contain explicit releases of Chartered Organizations. Objectors also broadly question whether the

131

releases are fair, asserting that their clients should be able to pursue all non-debtors and that they are not being adequately compensated for their claims otherwise.

Both Debtors and Objectors couched their argument in terms of the *Master Mortgage*[440] factors. While *Master Mortgage* is not the law of the Third Circuit for approval of nonconsensual third-party releases, those factors, as well as others, can inform the analysis of whether the *Continental* hallmarks have been met.[441] The *Master Mortgage* factors are: whether (i) there is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) the non-debtor has contributed substantial assets to the reorganization; (iii) the injunction is essential to reorganization such that without it, there is little likelihood of success; (iv) a substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment and (v) the plan provides a mechanism for the

---

[440] *In re Master Mortgage*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

[441] *Millennium*, 591 B.R. at 584 ("the *Master Mortgage* factors, while helpful guideposts, are not controlling; also, they are not 'an exclusive list of considerations, nor are they a list of conjunctive requirements'"); *see also In re 710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433 at *14 (Bankr. D.N.J. Mar. 5, 2014) (holding *Master Mortgage* guideposts are "not considered requirements for the approval of third-party releases, but ... may be instructive to the court"); *Mallinckrodt*, 639 B.R. at 875 n.103 (concluding that it is unnecessary to consider the *Master Mortgage* factors, but, in any event, the factors are satisfied.); *see also Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*, 2021 WL 3145612 at *13 (D. Del. July 26, 2021) ("To grant non-consensual releases, a court must assess 'fairness, necessity to the reorganization, and [make] specific factual findings to support these conclusions.' *Continental Airlines*, 203 F.3d at 214. These considerations might include whether: '(i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.,* whether the non-consenting creditors received reasonable compensation in exchange for the release.'"). *See also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (deciding whether to grant third-party release "is not a matter of factors and prongs").

payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[442] Factor (iii) speaks to necessity; the other four factors generally speak to fairness. I will review these factors, but, of course, return to the *Continental* "hallmarks."

### ii.    The Master Mortgage Factors
### (a) Identity of Interest

The evidence is clear that there is an identity of interest between Debtors and all entities receiving third-party releases. Both Mr. Desai and Mr. Sugden testified at length in their declarations and live testimony of the interrelationship between BSA, Local Councils and Chartered Organizations. As I have previously found, it takes all three levels of organization to deliver Scouting—national, which sets policy and provides administrative services, Local Councils, which charter Chartered Organizations, recruit Scouts and volunteer leaders and enforce BSA rules and regulations, and Chartered Organizations, which provide facilities and use Scouting to further one of their goals of youth character development, career skill development, community service, patriotism, military and veteran recognition or faith-based youth ministry. Moreover, from 1976 forward BSA included Local Councils and Chartered Organizations as additional insured under the BSA Insurance Policies.

Equally, if not more importantly, Mr. Griggs testified that prepetition, plaintiffs often sued BSA, Local Councils and Chartered Organizations together. Conversely, he was not aware of any claims made against a Chartered Organization that did not include a claim against either BSA or a Local Council. Complaints filed prepetition by the Lujan Claimants and the D&V Claimants are no exception. For example, prepetition, Mr. Aguon (who

---

[442] *Master Mortgage*, 168 B.R. at 935 (canvassing courts and listing factors courts consider in adopting a permissive view of releases).

testified at trial) sued BSA, the Aloha Council and the Archbishop of Agaña (as well as

others) asserting that all defendants were negligent in hiring and retaining Brouillard,

breached a fiduciary duty and confidential relationship with the plaintiff and are all

vicariously liable for the abuser under a theory of respondent superior. Mr. Aguon also

alleges that each defendant is the agent, servant and/or employee of the other defendant, is

the alter ego and partner of the other defendants, and each defendant ratified the acts of the

others.[443] So, too, complaints filed by the D&V Claimants naming BSA and TCJC assert

that BSA was a "vertically-integrated organization" with BSA at the top of the structure and

sponsoring organizations and local councils at the "lower levels." The D&V Claimants

allege that BSA and TCJC "jointly agreed to control and operate Scout troops."[444] Further,

---

[443] JTX 2947 ¶ 14 ("Each defendant is the agent, servant and/or employee of other defendants, and each defendant was acting within the course and scope of his, her or its authority as an agent, servant and/or employee of the other defendants." Defendants, and each of them, are individuals, corporations, alter egos and partnerships of each other and other entities which engaged in, joined in and conspired with the other wrongdoers in carrying out the tortious and unlawful activities described in this Complaint; and defendants, each of them, ratified the acts of the other defendants as described in this Complaint.").

[444] See e.g., JTX 2912 ¶ 27 ("At all material times to this Complaint, BSA was a vertically-integrated organization. The national BSA organization was at the top of the structure. BSA national established goals, standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local employees and volunteers to implement its goals, standards, and rules. The lower levels of BSA included sponsoring organizations, local councils, troop committees, and troops. Defendant BSA and LDS Defendants jointly agreed to control and operate Scout troops, such as those troops Plaintiffs were members of, in Idaho. Troops operated at the lowest level of Scouting, and many Scout troops were "sponsored" by the LDS Defendants through individual wards in the LDS Church. Defendant BSA and LDS Defendants jointly selected, approved, and/or retained adult volunteers to lead Scout troops, in positions such as Assistant Scoutmasters or Scoutmasters ("Scout leaders"). Defendant BSA possessed the right of final approval of adult volunteers as Scout leaders, including adult volunteers that were also members of the LDS Church. In the course of operating Scout troops, Defendants also had the right to control the physical details of Scout leaders' performance of their duties on behalf of Defendants. In performing these duties for Defendants, Scout leaders were acting in the time and space limits of their agency with Defendants, were motivated at least in part by a desire to serve Defendants, and these actions were of a type that they were required to do on behalf of the Defendants."); JTX 2914 ¶ 11 (substantially the same); JTX 2915 ¶ 14 (substantially the same).

they allege that "Defendants fraudulently misrepresented, failed to disclose and/or actively concealed the dangers and prevalence of child abuse in Scouting."[445]

Mr. Desai also testified to the relationship between Debtors and the Non-Debtor Related Entities. Each serves a specific function for BSA and/or Local Councils. And, the only objector asserting a Direct Abuse Claim against a Non-Debtor Related Party asserts claims against BSA, Learning for Life, a Chartered Organization and others. Jane Doe asserts that "[t]he BSA and LFL jointly promoted, facilitated and administered Explorer programs throughout the country, including the Explorer Program sponsored and controlled by [Chartered Organization]."[446] Further, there is no record that any of the Non-Related Debtor Entities is involved in anything other than Scouting.

BSA's Representatives also share an identity of interest with Debtors. As detailed above, BSA's Representatives have both indemnification and advancement rights against Debtors such that a suit against them is, in essence, a suit against Debtors and/or will deplete BSA's assets.

Finally, the Settling Insurers have an identify of interest with Debtors for purposes of a third-party release analysis because they are Debtors' insurers. No holder of a Direct Abuse Claim has argued that he has a separate claim against any Settling Insurer on account of its own conduct. Even the Lujan Claimants' direct action rights are not on account of insurer conduct.

---

[445] *See e.g.*, JTX 2912 ¶ 121.

[446] Objection of Jane Doe to Confirmation of Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Non-Debtor Releases and Injunctions Therein [ECF 8674] ("Jane Doe Objection") ¶ 8.

The Guam Committee and the Lujan Claimants argue that there is no identity of interest between BSA and the Archbishop because the Archbishop and BSA are separate entities and have independent duties to holders of Direct Abuse Claims. They argue that nothing prevents BSA and the Settling Insurers from resolving BSA's liability for Direct Abuse Claims, while preserving the Archbishop's separate liability for those very same claims. The D&V Claimants add that Local Councils are separate entities.

It is true that BSA, Chartered Organizations and Local Councils are separate entities, but that is not the standard. If BSA, Local Councils and Chartered Organizations were not separate entities, then third-party releases would not be needed. Similarly, if BSA, Local Councils and Chartered Organizations did not have separate duties and liability, then, again, third-party releases would not be necessary.[447] Moreover, objectors' position ignores the reality of how these claims have historically been pursued as well as the shared insurance. Their position also ignores how these claims have been settled. As Mr. Griggs testified, BSA took on the defense of claims brought prepetition and settled those claims on behalf of BSA, the Local Council and the Chartered Organization. The Historical Abuse Claim settlement values encompass all facets of Scouting-Related liability—national, Local Council and Chartered Organization.[448]

---

[447] *Purdue Pharma*, 633 B.R. at 104 ("true third-party releases involve claims that are independent of the debtor's estate's claims at least on a legal basis, if not as a factual basis." (citing *Drexel Burnham*, 960 F.2d at 288, 293 (release of securities laws claims against officers and directors proper); *Manville Corp.*, 837 F.2d at 90-92 (claims of co-insured and direct claims of personal injury claimants against debtor's insurance properly enjoined as part of plan's resolution of claims against insurers); *Exide Holdings*, 2021 WL at *15 (claims against plan funders as potentially responsible parties properly enjoined as part of resolution of debtor's cleanup obligations); *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 50, 56-57 (S.D.N.Y. 2006) (claims against non-debtor affiliates and their fiduciaries)).

[448] The Guam Committee questions whether the settlement values provided by Mr. Griggs to Dr. Bates reflect value for the share of liability of all of BSA, Local Councils and Chartered Organizations. Based on the record, I conclude that it does. *See e.g.,* Griggs Decl. ¶ 9 (Griggs

136

Significant time was also spent discussing the nature of "derivative liability" or "derivative claims" as it relates to third-party releases. The Lujan Claimants and the D&V Claimants argue that only derivative claims can be released consistent with the *Continental* standards and that the claims against Local Councils and Chartered Organizations are independent and separate of any wrongdoing by BSA.

In a series of decisions in the *W.R. Grace* bankruptcy case,[449] the Third Circuit explored "derivative" claims in the separate context of the statutory requirements of § 524(g). In these decisions, individuals working at Grace's plaint in Montana sued CNA (Grace's insurer) for their asbestos-related injuries. The workers alleged that CNA was aware of their asbestos exposure at the plant as well as the dangers associated with that exposure, and that CNA had an independent duty to warn them of that danger. The workers alleged that when CNA failed to do so, it breached a separate duty owed to those workers.

In exploring claims properly channeled under § 524(g), the Court rejected both a "but for" test and an "own conduct" standard, and instead found that the appropriate inquiry is whether the third party's liability is "wholly separate" from the debtor's or instead depends on it. The court also stated that the workers could not make out a case under the relevant

---

negotiated "settlements of Abuse Claims on behalf of the BSA, Local Councils, and Chartered Organizations"), ¶ 7 ("Between 2017 and 2019, approximately $160 million was spent by, or on behalf of, BSA, Local Councils, and Chartered Organizations in resolving Abuse Claims."), ¶ 37 ("When determining whether to settle a claim and the value of the claim, I would consider (i) the cost of defending the sexual abuse claim through trial and appeal, (2) the degree or risk that the BSA, the Local Council or the Chartered Organization could be found liable by a reasonable jury, and (3) the anticipated amount that a reasonable jury would award."); Day 7 Hr'g Tr. 76:8-21.

[449] *In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009) ("*W.R. Grace I*"); *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018) ("*W.R. Grace II*"); *In re W.R. Grace & Co.*, 13 F.4th 279 (3d Cir. 2021) ("*W.R. Grace III*").

law without directly implicating Grace's wrongdoing. In applying that standard to the claims at issue, the Court did not divorce itself from the underlying facts pled by the workers.[450] Neither will I do so here.

Direct Abuse Clamaints repeatedly implicate BSA's wrongdoing in their claims against Local Councils and Chartered Organizations. To again take examples from the prepetition Complaints filed by Mr. Aguon and the D&V Claimants, plaintiffs assert that (i) BSA and Local Councils controlled the selection of Scout leaders and exercised ultimate authority over who could be a Scout leader,[451] (ii) BSA conspired with the Local Council and Chartered Organization in carrying out the tortious and unlawful conduct described in the complaint[452] and (iii) BSA was aware of the Abuse perpetrated against scouts since

---

[450] *W.R. Grace III*, 13 F.4th at 288 ("We decline to apply the law with a willful ignorance to the facts of this case.").

[451] JTX 2947 ¶ 6; JTX 2912 ¶ 142 ("Defendant BSA represented that the Scout leaders it selected, controlled and/or approved were appropriate and trustworthy mentors and leaders for young boys"); *See also id.* ¶ 141 ("At all times relevant to this Complaint, Defendant BSA invited and encouraged Plaintiffs to participate in the Scouting program it administered and controlled. Its invitation created a special, fiduciary relationship, wherein Plaintiffs and their parents relied upon Defendant BSA's years of expertise and judgment in selecting morally upright and trustworthy men to lead Scout troops and other Scouting activities, such as BSA Camps. Plaintiffs and their parents gave Defendant BSA authority to act in loco parentis over Plaintiffs at BSA meetings, camping trips, hiking trips, and in private social situations during Scouting activities. Defendant BSA also invited Plaintiffs to enter into a commercial relationship by requiring him to pay yearly dues and other fees and required purchases, in exchange for participating in Scouting.").

[452] JTX 2947 ¶ 14 ("Each defendant is the agent, servant and/or employee of other defendants, and each defendant was acting within the course and scope of his, her or its authority as an agent, servant and/or employee of the other defendants. Defendants, and each of them, are individuals, corporations, alter egos and partnerships of each other and other entities which engaged in, joined in, and conspired with the other wrongdoers in carrying out the tortious and unlawful activities described in this Complaint; and defendants, each of them, ratified the acts of the other defendants as described in this Complaint."); *See also* (JTX 2914) ¶ 11 ("At all material times to this Complaint, BSA was a vertically-integrated organization. The national BSA organization was at the top of the structure. BSA national established goals, standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local employees and volunteers to implement its goals, standards, and rules. The lower levels of BSA included sponsoring organizations, local councils, troop committees, and troops. Many troops were "sponsored" by the LDS Defendants through individual wards in the LDS Church. Defendant BSA and LDS Defendants jointly agreed to control

138

shortly after its inception, kept that information secret and BSA did nothing to change the

Boy Scouts program.[453]

---

and operate Cub Scout and Boy Scout packs, dens, and troops ("troops"), such as those troops
Plaintiffs John Does XXI, XXII, [--] and [--] were members of, in Idaho. Defendant BSA selected,
approved, and/or retained adult volunteers to lead Scout troops, in positions such as Assistant
Scoutmasters or Scoutmasters ("Scout leaders"). In troops sponsored by LDS Defendants,
Defendant BSA and the LDS Defendants jointly selected, approved, and/or retained adult
volunteers to act as Scout leaders. Defendant BSA possessed the right of final approval of adult
volunteers as Scout leaders, including adult volunteers that were also members of the LDS Church.
Jn the course of operating Scout troops, Defendant BSA also had the right to control the physical
details of Scout leaders' performance of their duties on behalf of Defendant BSA. In troops
sponsored by both Defendants, both Defendants had the right to control the physical details of
Scouts leaders' performance of their duties. In performing these duties for Defendant, Scout leaders
were acting in the time and space limits of their agency with Defendants, were motivated at least in
part by a desire to serve Defendants, and these actions were of a type that they were required to do
on behalf of the Defendants.").

[453] JTX 2947 ¶ 39 ("Upon information and belief, shortly after its inception, the BSA became aware
that a significant number of its adult Scout leaders, employees, servants, officers, volunteers, and/or
agents were using their position of trust and authority to manipulate and sexually abuse young boys
participating in the BSA's Scouting program."); ¶ 40 ("Surprisingly, the BSA still continued to
promote the safety, trustworthiness, and wholesomeness of its program, even though it has been
secretly removing scoutmasters for child sexual abuse at an alarming rate since the 1920's. Its own
records demonstrate that the BSA has long known yet concealed from its members, Scouts, and
Scouts parents that Scouting attracts pedophiles in large numbers and that Scouts, far from being
safe, are at heightened risks of sexual abuse by child molesters. The BSA misrepresented to
members, Scouts and Scouts parents that the Scouts were safe in Scouting programs and they made
this misrepresentation to Norman and Norman's parents and/or guardians."); ¶ 49 ("The BSA and
Aloha Council knew that Scouting, a closed system over which the Boys Scouts held exclusive
control related to participation and access, was and still continues to be used by child molesters to
gain access to and the trust of Scouts, other boys, their families and the community. The BSA and
Aloha Council knew the majority of boys were abused during one-on-one situations, and that
Norman, Norman's parents and/or guardians, and the families of other Boy Scouts would consider
this to be material risk. Nevertheless, the BSA and Aloha Council did nothing to warn Norman,
Norman's parents/or guardians, or any of the other Boy Scouts or their parents and/or guardians of
the risk of molestation by Scout leaders, employees, servants, officers, volunteers, and/or agents of
BSA, and the BSA did nothing to change the Boy Scout program prior to the representations and
omissions they made to Norman, Norman's parents and/or guardians, or any other Boy Scouts or
their parents and/or guardians regarding Brouillard. Instead the BSA continued to make the same
representations and omissions to Norman, Norman's parents and/or guardians, or any of the other
Boy Scouts or their parents and/or guardians, knowing they were false and knowing they were being
relief upon by them."); See also JTX 2912 ¶ 147 ("Despite the special relationship that Defendant
BSA maintained with Plaintiffs prior to and during their time in Scouting, Defendant BSA never
made any warnings or issued any warning in the Boy Scout Handbook, in materials to Plaintiffs'
parents, in the Scout application and registration materials, or elsewhere in BSA materials that
Scout leaders were not always safe and trustworthy, that they might make sexual demands or
advances, or that significant numbers of Scout leaders had abused boys in the past. This list of

Accordingly, to the extent that the constraints on channeling claims found in § 524(g) may be relevant to or informative in non-asbestos mass tort cases,[454] I find on the facts here that claims against Local Councils and Chartered Organizations are not wholly separate from claims against BSA and therefore are "derivative" for purposes of the channeling injunction.

### (b) Contribution of Substantial Assets to the Reorganization

The Plan is based upon the establishment of the Settlement Trust and the Trust Assets contributed to it. The Trust Assets include the $1.656 billion contributed by the Settling Insurers, the $665 million contributed by Local Councils, the $30 million contributed by the United Methodist Entities and BSA's, Local Councils' and the Contributing and Participating Chartered Organizations' rights in BSA's insurance policies and their own policies. I find that each of these contributions—which are both monetary and non-monetary—is substantial in nature and, together with the additional Trust Assets, result in a trust that will pay Direct Abuse Claims in full.[455]

---

omissions is not exclusive. Despite its knowledge of the use of Scouting by child molesters, Defendant BSA knowingly failed to change the Scouting program in any meaningful way to attempt to reduce the number of Scouts abused by Scout leaders until after Plaintiffs' time in Scouting, and nonetheless concealed this material fact.").

[454] The Third Circuit also explored derivative liability in the statutory framework of § 524(g) in *Combustion Engineering. See e.g., Combustion Eng'g*, 391 F.3d 234-238. The Court recognized that injunctions issued in mass tort non-asbestos cases are readily distinguishable from injunctions issued pursuant to § 524(g). *Id.* n.50.

[455] *Mallinckrodt*, 639 B.R. at 874 ("Substantial consideration is being given in exchange for the releases in the form of a well-funded trust to which opioid claimants can turn for potential compensation."). A well-funded trust need not pay claimants in full for the contribution to be substantial. *See Purdue Pharma*, 633 B.R. at 107 (contribution paying only a fraction of allowed claims and leaves third-party with substantial wealth, but fair given the specific factual circumstances of the case).

#### (1) Settling Insurers

As for the Settling Insurers, this analysis is essentially the same as the analysis of whether the settlement was fair under the *Martin* test. I have found each to be fair in light of the coverage issues at play, the allocation analysis performed by Ms. Gutzler and, in the case of Century/Chubb, the concerns regarding collection in the future.

#### (2) Local Councils

The Local Council contribution was a product of mediation.[456] The total amount of the contribution, which grew over time from an initial offer of $300 million, was negotiated with the Coalition, the TCC and the FCR. The Local Council contribution now consists of $515 million in cash and property, the $125 million DST note, their rights as additional insureds under the BSA Insurance Policies, the contribution of the rights in their own Insurance Policies (which Mr. Whittman valued at between $464 million and $1.13 billion) and their share ($25 million) of the Settlement Growth Payment.

The internal allocation of the Local Council contribution was determined through an iterative process led by the Local Council Committee that resulted in a formula ("Formula") which generated contributions eventually signed off on by all Local Councils. Mr. Sugden, a member of the Local Council Committee testified at length through declaration and on the stand regarding the derivation of the Formula.[457] As Mr. Sugden explained, as a starting point, the amount of the Local Council contribution had to be both acceptable to the claimant constituency and financially achievable for Local Councils.[458] Each Local Council

---

[456] Sugden Decl. ¶¶ 18, 20. This resolution with the TCC, FCR and Coalition, aided by the mediators, was first memorialized in the Restructuring Support Agreement and earlier iterations of the Plan. Sugden Decl. ¶ 47; Whittman Decl. ¶ 208.

[457] *See generally*, Sugden Decl.; Day 5 Hr'g Tr. 130:3-186:16.

[458] Sugden Decl. ¶ 21.

is a separate entity, differently positioned in terms of financial position, the claims it may face and defenses it may have to claims.[459]

The Formula was viewed as a way to drive a global resolution. The Local Council Committee believed a global resolution was necessary for several reasons. First, it was necessary to unlock the insurance proceeds as each Local Council is an additional insured under BSA's insurance policies. Second, Local Councils' separate viability are in many ways dependent on the viability of every other Local Council and BSA. Local Councils and BSA are part of a control group with respect to their Retirement Plan. The PBGC takes the position that BSA and Local Councils are jointly and severally liable for any termination liability that might arise. Further, BSA is dependent on Local Councils for significant revenue based on membership assessments. Non-participation by some Local Councils could threaten not only the viability of BSA, but BSA's ability to provide services to participating Local Councils. Third, while Local Councils are regional, Scouting has a national profile. A resolution that does not preserve the national character of Scouting would be viewed as a failure by Local Councils and, perhaps, donors and members.[460]

The Formula went through many iterations as it evolved from December 2020 to June 2021. The factors driving the Formula were tweaked during that period, but the underlying factors considered: each Local Council's total net assets, the raw number of claims filed against each Local Council (based on the Bates White data) and the applicable statute of limitations.[461] As a result of conversations with Local Councils as well as a

---

[459] Sugden Decl. ¶ 22.

[460] Sugden Decl. ¶ 26.

[461] Sugden Decl. ¶ 28. Most Local Councils are located in jurisdictions that have not enacted a revival window in which to bring Direct Abuse Claims and many are located in jurisdictions whose state constitution do not permit such legislation. Thus, many Local Council have never defended

response to a proposal from BSA (which was rejected by Local Councils), the Local Council Committee added several guardrails to the Formula which capped the amount a Local Council was required to contribute notwithstanding the Formula-generated contribution. Those Guardrails included: (i) limiting the highest amount any Local Council would contribute so that it was not incentivized to file its own bankruptcy case and (ii) ensuring that no Local Council was required to contribute more than the greater of (x) its contribution under the (rejected) BSA proposal or (y) the second iteration of the Formula.[462] Finally, "Bridge the Gap" mechanisms were put in place, notwithstanding the Guardrails, in order to meet the new (and higher) $500 million demand from the Coalition. Those Bridge-the-Gap mechanisms were targeted asks to certain Local Councils who could afford to make a larger contribution while remaining financially viable or who were contributing less than 85% of their liquidity guardrail.[463] The negotiations/discussions with Local Councils took thousands of hours and were among the most complicated negotiations Mr. Sugden has ever undertaken.[464]

The Local Council Committee solicited letters of intent from Local Councils to fund a Local Council contribution in the amount of $500 million (in cash and property). As Mr. Sugden testified, the Local Council Committee was unwilling to support higher amounts

---

Direct Abuse Claims and would consider the likely cost of litigation in their decision to support any global resolution.  Sugden Decl. ¶ 26.c.v.

[462] Sugden Decl. ¶ 36.

[463] Sugden Decl. ¶ 39.

[464] Sugden Decl. ¶ 48.

because it did not think they would be achievable.[465]  The Local Council Committee also supported the DST Note as further consideration.

Mr. Whittman analyzed the Local Council Contribution relative to the insurance rights they are contributing to the Settlement Trust and the rights in the BSA Insurance Policies that they are foregoing.  He also analyzed the Formula relative to each Local Council's unrestricted net assets, number of claims and geographic location (for statute of limitations analysis) and ability to contribute.  Mr. Whittman concluded that the Formula provided a "fair and reasonable" basis for the allocation and maximized the value that was being contributed to the Settlement Trust.[466]  Finally, as further detailed below, Mr. Whittman performed a liquidation analysis and concluded that the Local Council Contribution of $600 million is greater than the aggregate liquidation value of Local Councils.[467]

The Local Council Contribution is substantial.  It was the result of negotiation under the auspices of the mediators.  It increased over time from $300 million to the current contribution of $665 million in cash and property and the contribution of valuable insurance rights.  Further, Mr. Whittman's uncontroverted conclusion is that the contribution to the Plan is greater than the result of a liquidation of Local Councils in the aggregate.

Objectors do not really quibble with the aggregate amount *per se*, but rather focus on the individual Local Council(s) against whom they could assert claims and argue that individual Local Councils are not contributing enough relative to their assets or the number

---

[465] Sugden Decl. ¶ 42.

[466] Whittman Decl. ¶¶ 220-235.

[467] Whittman Decl. ¶ 268.

of claims against them. Similarly, some objectors divide a Local Council's net assets by the number of claims asserted against it in the Proofs of Claim to arrive at a "per claim" amount, which they deem insufficient.[468]  But, the Local Council Contribution cannot be viewed in this light. It is a collective contribution made by Local Councils for the benefit of all Local Councils and was arrived at after a year of mediation with the TCC, the Coalition and the FCR, all of whom had an incentive to ensure that the Formula maximized recoveries. The internal allocation was also negotiated to include global participation, which maximized, indeed made possible, the Settling Insurer Settlements. Nothing in the *Continental* hallmarks precludes collective consideration or prevents one party, in appropriate circumstances, from contributing funds for the benefit of another.

### (3) The Chartered Organizations
### (i) United Methodist Entities

No one objects to the contribution of the United Methodists Entities, which includes a $30 million monetary contribution and rights as an insured or additional insured under the Abuse Insurance Policies, the waiver of their Indirect Abuse Claims and their commitment to raise another $100 million from Chartered Organizations. The United Methodist Entities also agree to remain affiliated with BSA through 2036 and be part of the Survivor Working Group.[469]

I find these contributions to be substantial. The United Methodist Church is a group of affiliated congregations and regional bodies with authority dispersed at different levels.[470]

---

[468] The Disclosure Statement and Plan Supplement provide the necessary information to make these calculations.

[469] Day 5 Hr'g Tr. 103:12-17.

[470] Day 5 Hr'g Tr. 88:5-90:14.

It formed an ad hoc committee to participate in the BSA bankruptcy case, particularly, in the mediation. The $30 million contribution was arrived at as part of the mediation process and will be raised from offering plates across the United Methodist Church in the United States.[471] Not only do the contributions further fund the Settlement Trust, but the settlement with the United Methodist Entities helps unlock the Settling Insurer Settlements as they are additional insureds under the BSA Abuse Policies and it makes the Local Council contribution possible. Moreover, as the United Methodist Entities are currently the largest Chartered Organization group, with more than 184,000 Scouts[472] and 6,183 Chartered Organizations,[473] their commitment to continue to work with Scouting helps to ensure both the future of Scouting and the contribution of the Settlement Growth Payment to the Settlement Trust.

### (ii) The Participating Chartered Organizations

Contributions for the releases/channeling injunction of Participating Chartered Organizations comes in three forms. First, contributions are made on their behalf by others. As previously stated, as a result of further mediation, Local Councils agreed to the Supplemental LC Contribution of $40 million in two forms: an additional contribution from

---

[471] Day 5 Hr'g Tr.97:19-99:1; 103:22-105:9. Each of the 54 conferences committed to their share and 95% of the funds will be raised within the first year. *Id.* 105:25-106:4. Notwithstanding, Bishop Schol is concerned about raising necessary funds: "Our resolution really tries to take into account all the things that survivors are asking for. In terms of our financial settlement, I'll be honest, we were concerned about that, not just because the difficulty of raising that, particularly from congregations and particularly because some of these claims are older claims and congregations where those claims occurred are no longer the same congregation; first things, one of the congregations in New Jersey in the 1970s was an all-white congregation. It had several hundred worshippers. Today, in that urban community, that congregation has about 25 or 30 worshippers, African American, Caribbean, Filipino; it's just a completely different congregation today. The other was that we were promised that the Boy Scouts would care for liabilities as it related to Scouting.").

[472] Whittman Decl. ¶ 139.

[473] Day 5 Hr'g Tr. 95:20–23.

a built-in overage to the Formula (at least $15 million) and the increase of the DST note from $100 million to $125 million.[474] While the Supplemental LC Contribution was agreed to in January 2022, it was still the subject of mediation with the TCC, which led to the resolution of the consideration to be paid by or on behalf of Participating Chartered Organizations.[475] Local Councils also agreed to fund 25% of the Settlement Growth Payment, which aligns the future of BSA, Local Councils and Chartered Organizations.[476]

Second, the Participating Chartered Organizations are assigning to the Settlement Trust their rights under BSA Insurance Policies and Local Council Insurance Policies as well as any of their own insurance policies to the extent they cover Abuse and are issued by Settling Insurers. Participating Chartered Organizations are also assigning to the Settlement Trust their own causes of action against Non-Settling Insurance Companies for the period prior to January 1, 1976. Third, Participating Chartered Organizations are waiving their Indirect Abuse Claims.

The consideration is substantial when considered together. The waiver of insurance rights assists the $1.67 billion payment made by the Settling Insurers. In addition to the Supplemental LC Contribution paid on their behalf, the waiver of contribution of rights under insurance policies unlocks the Local Council contribution. It also provides the Settlement Trustee a chance to negotiate with Chartered Organizations for additional contributions in exchange for future releases of pre-January 1, 1976 Abuse Claims and to negotiate with Non-Settling Insurance Companies with respect to the $400 million in

---

[474] Sugden Decl. ¶ 56.

[475] Sugden Decl. ¶ 58.

[476] Sugden Decl. ¶ 56.

allocated insurance and $4 billion in unallocated insurance. Thus, the consideration both facilitates the establishment of a Settlement Trust that can pay all claims and eliminates substantial Indirect Abuse Claims.[477]

### (iii) The Opt-Out Chartered Organizations

The Opt-Out Chartered Organizations are not making any of their own contributions to the Settlement Trust. Rather, the claims are being channeled in order to unlock the Settling Insurer Settlements. In other words, a portion of the Settling Insurers' contribution is made on behalf of the Opt-Out Chartered Organizations.[478]

### (iv) Related Non-Debtor Entities and Representatives

The BSA Settlement Trust Contribution is made on behalf of BSA, Related Non-Debtor Entities and their Representatives. The National Boy Scout Foundation is also providing a loan in the amount of $42.8 million, which is critical to ensure BSA's liquidity going forward.[479] Arrow WV, Inc. is continuing to guarantee the JPM loan to BSA and permits BSA the continued use of the Summit High Adventure Base.[480] Related Non-Debtor Entities are also contributing their rights under the BSA Insurance Policies to the Settlement Trust.[481] The Representatives—certainly those on the National Executive Board—are all volunteers.

---

[477] Counsel for the Local Council Committee represented that Chartered Organizations filed 14,000 Indirect Abuse Claims. Day 20 Hr'g Tr. 95:21-24; JTX 14. Such claims could be asserted against both BSA and Local Councils.

[478] Patton Decl. ¶ 32.

[479] JTX 1-33 (Settlement Term Sheet among Debtors, JPM and the UCC).

[480] JTX 1-33 (Settlement Term Sheet among Debtors, JPM and the UCC).

[481] Whittman Decl. ¶ 203.

### (c) A Substantial Majority of the Impacted Creditors Agree

After the settlement with the TCC, 85.72% of the Direct Abuse Claimants (who voted) and 82.41% of the Indirect Abuse Claims (who voted) accepted the Plan. The Certain Insurers, the Guam Committee and the D&V Claimants argue that other mass tort cases have garnered a greater percentage of votes (90% +) while Debtors tout cases that have received lesser or equal percentages of votes (75%, 82.98%).[482] The Guam Committee and the Lujan Claimants also point out that holders of Direct Abuse Claims against the Aloha Council rejected the Plan as their acceptance rate was only 44.5%.[483]

Given the highly charged nature of this case (including among holders of Direct Abuse Claims), the overall acceptance rates are a substantial majority. To the extent that there is a floor on what is a "substantial majority," the 75% figure in § 524(g) could be used as a proxy. I also reject the idea of looking at the vote at the individual Local Council level or, to the extent possible, Chartered Organization level. This Plan has been put forth and solicited as a global resolution. I recognize that some objectors disagree with that concept as a matter of first principle. But, permitting exceptions will unravel the Plan.

### (d) The Plan Provides a Mechanism for the Payment of All, or Substantially All, of the Claims of the Class or Classes Affected by the Injunction

Debtors, the TCC, the Coalition and the FCR all argue that the Plan "provides a mechanism" for the payment of all or substantially all of the claims in Class 8. I concluded,

---

[482] The Certain Insurers cite to eight cases, including *Millenium*, 945 F.3d at 132 (93%) and *In re AOV Indus.*, 792 F.2d 1140, 1143 (D.C. Cir. 1986) (90%). *See* Certain Insurers' Objection ¶ 79. Debtors cite to orders in *In re TK Holdings Inc. (Takata)*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (74% to 78.18%) and *The Weinstein Co. Holdings, LLC*, Case No. 18-10601 (MFW) (Jan. 26, 2021) (82.98%). *See* Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Confirmation Objections ("Debtors' Memorandum of Law") ¶ 294 n.443-444 [ECF 9114].

[483] JTX 2948; Day 21 Hr'g Tr. 96:13-97:1.

based on the information known to date about the Direct Abuse Claims as analyzed by Dr. Bates, that the Plan provides for payment in full.

The Certain Insurers' sole basis for objecting to the Scouting-Related Releases is that this prong of the *Master Mortgage* standard is not satisfied because Class 8 and Class 9 Claims will not be paid in full given that the TDP will "undoubtedly generate claim values that far exceed the values that could be obtained in the tort system."[484] This is simply a rehash of the Certain Insurers' argument that the TDP will result in inflated values for Direct Abuse Claims (*see* Section IV.B, *infra*). In this context, however, the Certain Insurers have no standing to raise the recoveries to another class, and their cursory footnote reference to Class 9 does not fairly raise an issue as to that class.[485] Regardless, payment in full is only one of the five *Master Mortgage* factors and is not necessary to meet the *Continental* hallmarks.[486]

---

[484] *See* Certain Insurers' Objection ¶ 82; Day 22 Hr'g Tr. 66:6-17.

[485] *See* Certain Insurers' Objection ¶ 85 n.126. The entire footnote reads: "There is no guarantee for payment in full of Class 9 claims, which are also impacted by the Channeling Injunction. Even assuming that the updated report by Dr. Bates is accurate, the Debtors do not even attempt to suggest that Class 9 claims will receive similar treatment." Again, at argument, the Certain Insurers paid lip service to their Class 9 claims but focused on whether Class 8 claims were paid in full. Day 21 Hr'g Tr. 60-67.

[486] *Millennium*, 591 B.R. at 586 (finding "payment in full" factor satisfied where recoveries to affected creditors dwarf recoveries in a liquidation); *710 Long Ridge Road,* 2014 WL 886433 (Bankr. D. N.J. Mar. 5, 2014) (approving third-party releases where class rejected plan, but receiving at least a 33% recovery of contingent and unliquidated claims, well in excess of liquidation value); *See also Purdue Pharma*, 633 B.R. at 107 ("More relevant than the prospect of full payment, therefore, is the Third Circuit's focus on the fairness of the settlement to the third-party claimants") (citing *Exide Holdings*, 2021 WL at *13).

### (e) The Injunction is Essential to Reorganization Such that Without it There is Little Likelihood of Success

The Plan includes a series of agreements that together provide the basis for 82,209 claimants asserting Abuse to seek compensation from a Settlement Trust with assets expected to pay them in full. In order for the Settlement Trust to receive these assets, the Scouting-Related Releases and the channeling of Abuse Claims to the Settlement Trust are required. Parties to the mediation testified that the releases were required by the Settling Insurers so that they could have finality with respect to their settlements. In response to a question of whether it was "theoretically possible" to secure a deal with the Settling Insurers without "one hundred percent" of the releases, Mr. Whittman testified:

> I believe [the releases] were necessary in order to maximize the value of the policies, I believe they were necessary in order to secure this deal that is a set of interlocking, interrelated deals that have been voted on by the constituents that have supported this plan, and I believe that a narrowing of releases, to the extent that it would have been possible to get to some sort of deal would have been a deal that would have been significantly less value for the trust, as any narrowing of release creates risk and any risk creates—economically, logically, you're going to reserve and hold back for that risk.[487]

Mr. Patton, who was also involved in negotiations with the Settling Insurers, among others, concurs:

> The scope of the Channeling Injunction and the issue of who would be included among the Protected Parties and Limited Protected Parties were the subjects of extensive negotiations by and among the Abuse Claimants' Representatives and representatives of the entities who would ultimately become Protected Parties and Limited Protected Parties. Without the Channeling Injunction in its current form, including with respect to Participating Chartered Organizations and Opt-Out

---

[487] Day 11 Hr.'g Tr. 79:11-21. *See also e.g.,* Day 11 Hr'g Tr. 80:2-12 (Mr. Whittman testified: "I don't believe the Hartford would have paid the $787 million it is paying now absent the releases it's receiving in the plan. And, you know, in particular I would note that they had a so-called MFN provision in their term sheet that said that, to the extent that any additional releases were added on by other insurers, they would get the benefit of those releases, and they also had the specific provision in their term sheet related to the need to address chartered organization releases and cover off their exposure for chartered organizations, and that issue was addressed because the term sheet and the settlement agreement.").

Chartered Organizations, Settling Insurance Companies would not have entered into the Insurance Settlements.[488]

So, does Mr. Sugden:

> Q    Mr. Sugden, would the settling insurers have made their contributions to the settlement trust without the releases of chartered organizations?

> A    Absolutely not.[489]

The same is true for Local Councils.  As Mr. Sugden testified:

> The releases and channeling injunctions contained in the Plan are essential to the settlements embodied in the Plan, including the Local Council Settlement Contribution.  This is true for the releases/channeling injunctions of Abuse Claims against Local Councils and their Representatives, as well as the releases of Abuse Claims against Chartered Organizations and their Representatives to the extent provided in the Plan.

> First, if Abuse Claims against Local Councils are not channeled to the Settlement Trust, Local Councils will not make the Local Council Settlement Contribution.  This is made clear in their letters of intent, which are expressly contingent on "[e]ntry of a channeling injunction and releases covering our Local Council (including any predecessors to our Local Council, and any trusts or entities that support Local Council operations), our Local Council's board members, volunteers and employees (other than alleged perpetrators)."  Indeed, it is not reasonable to expect that Local Councils will contribute hundreds of millions of dollars of direct and indirect consideration — in addition to their valuable insurance rights — to the Settlement Trust while still retaining potential liability for Abuse Claims.  The same is true for Abuse Claims against any Representatives of a Local Council — without coverage for these individuals, a Local Council will likely face indemnity/ contribution claims from such Representatives, rendering a "global resolution" illusory.  Local Councils' ability to continue their operations and to support the Scouting mission depends on complete release of Abuse Claims against them.[490]

---

[488]  Patton Decl. ¶ 31.

[489]  Day 5 Hr'g Tr. 187:21-24.

[490]  Sugden Decl. ¶¶ 67-68.  *See also Id.* ¶¶ 69, 70 (footnote omitted):

Local Councils will also not contribute to the Settlement Trust unless Indirect Abuse Claims — including indemnity, contribution, and subrogation claims from insurers and Chartered Organizations — against Local Councils are released and channeled as well.  I understand that, since 2014, the form of charter agreement that Local Councils have executed with Chartered Organizations each year contains the following language: "The Local Council agrees to: . . . [i]ndemnify the Charter Organization in accordance with the resolutions and policies of the

Moreover, BSA's business plan and financial projections are premised on the Plan,

which in turn, is premised on the releases for Local Councils, Chartered Organizations and

Non-Debtor Related Entities.[491] Membership drives BSA's finances, which in turn depends

on Local Councils and Chartered Organizations to both maintain and recruit Scouts.[492]

Membership also drives membership revenue and supply sales and "indirectly impacts

virtually every other line of the P&L."[493] As previously found, recruitment occurs at the

Local Council and Chartered Organization level, not at the national level. As Mr.

Whittman testified, without the releases at the Local Council level, he expects there to be

---

National Executive Board of the Boy Scouts of America." Charter Organizations have asserted, including during these chapter 11 cases, that this provision creates a contractual indemnity obligation of Local Councils with respect to any Abuse Claims asserted against a Charter Organization. The Certain insurers have also asserted that they have contingent Indirect Abuse Claims against Local Councils. While Local Councils would likely dispute such claims, the cost and distraction of litigating them would frustrate Local Councils' ability to operate. Again, it is not reasonable to expect that Local Councils will make the substantial financial contribution (including giving up their insurance coverage) contemplated by the Plan while still retaining potential exposure on indemnity/contribution/subrogation claims brought by Chartered Organizations or insurers. Indeed, under the Plan, Local Councils are funding certain protections for Chartered Organizations — see Paragraphs 56 and 57 above. The Local Council that I represent — and all other Local Councils that I have interacted with — would not agree to do so, nor to fund the Local Council Settlement Contribution more generally, if they could still face such litigation from Chartered Organizations regarding Abuse Claims after the Effective Date.

From my personal interactions with Local Councils, I am confident that without the releases and channeling injunctions contained in the Plan of (a) Local Councils, (b) Local Councils' Representatives, (3) Chartered Organizations, and (4) Chartered Organizations' Representatives, Local Councils will not make the Local Council Settlement Contribution or the Supplemental LC Contribution.

[491] Day 5 Hr'g Tr. 34:23-35:14.

[492] Day 5 Hr'g Tr. 36:10-16.

[493] Day 5 Hr'g Tr. 36:10-16. Financial Projections for the years 2021-2025 show Registration Fees and Supply Operations are $811 million of Total Revenues of $1,360 million, or 60%. Other revenue for that period is National Services Fees $43 million, Event/Conference Fees $24 million, High Adventure Bases (gross) $312 million, Contributions and Bequests $50 million, GLIP Revenues/Unit Charter Fees $37 million, National Jamboree Fees $21 million, Other Revenues $62 million. JTX 1118 (Chart 6) as updated by JTX 1435 (Chart 3).

"significant" Local Council bankruptcy filings.[494] Mr. Sugden concurs.[495] And, based on his interactions with Chartered Organizations during the bankruptcy, Mr. Whittman believes that absent the releases in favor of the Chartered Organizations, there would be a significant impact on membership and operations and the Plan would not be feasible.[496] Conversely, he believes the releases under the Plan in exchange for their insurance rights would not provide a reason for Chartered Organizations to depart.[497]

Based on the evidence presented, I am satisfied that without the Scouting-Related Releases in favor of the Settling Insurers, Non-Debtor Related Entities, Local Councils, Chartered Organizations and their Representatives, the Settling Insurers and Local Councils would not make their monetary contributions to the Settlement Trust. So, too, the Participating Chartered Organizations, Related Non-Debtor Entities and their respective Representatives who are additional insureds would not contribute their insurance rights to the Settlement Trust. The Scouting-Related Releases and Channeling Injunction unlock these monetary contributions as they bring as complete relief as possible for the contributors. The Scouting-Related Releases and the Channeling Injunction are the

---

[494] Day 5 Hr'g Tr. 35:15-24.

[495] *See e.g.,* Sugden Decl. ¶ 11 ("Thus, if a Local Council were to dissolve or file for bankruptcy, it would be difficult for National BSA to reestablish the community ties necessary for a successful Scouting program.").

[496] Day 5 Hr'g Tr. 35:25-36:9; *see also* JTX 725 (8/9/21 email from Bishop David Bard from the United Methodist Church, Methodist Conference (prior to resolution with United Methodist Entities) encouraging churches in his conference to change their relationship with scouting units, not to renew charters (but agree to a Facilities Use Agreement drafted by The United Methodist Church) and stating that BSA needs to propose a better plan that protects your church).

[497] Day 5 Hr'g Tr. 47:2-12. *See also id.* 48:10-15 ("So, in other words, I [Mr. Whittman] believe that the chartered organizations feel that they are well treated or property treated under the plan. That has been evidenced by the fact that relatively few chartered organizations have either opted out of that treatment or have objected to the plan.")

cornerstone of the Plan.  Without the global settlement of insurance coverage disputes with

BSA's two primary carriers (Hartford and Century) these cases would devolve into a morass

of coverage litigation, and recoveries to holders of Abuse Claims would be delayed for

countless years.  These settlements also provided a template for settlements with Zurich and

Clarendon and may serve as the template for future settlements with Non-Settling Insurance

Companies.

The same holds true for Local Councils.  Local Councils' collective contribution and

the Formula that created it seek to ensure that Local Councils do not themselves file

bankruptcy proceedings and that Chartered Organizations remain with the Scouting

program.  Given the interconnected nature of the delivery of Scouting, Local Council

existence and continued Chartered Organization affiliation is critical to BSA's existence as a

national organization.  The recruiting function at the local level ensures membership and,

relatedly, BSA's fiscal viability.

Objectors attempt to downplay the necessity of the Scouting-Related Releases on

several fronts.  First, Objectors argue that the Settling Insurers would have been willing to

settle for either the same amount or some lesser amount without the releases and channeling

injunctions in favor of Local Councils and Chartered Organizations.  Objectors argue that

neither BSA, the FCR or presumably the Coalition or the TCC asked directly that the

Settling Insurers exclude additional insureds suggesting that the negotiations were not truly

rigorous enough.  I reject this argument.  It is illogical to believe that these settlements

could be achieved without releases and this conclusion is supported by the record.  The

Scouting-Related Releases were the subject of hard-fought negotiations with the help of

seasoned mediators.  There was no incentive for the Coalition, the TCC or the FCR to leave

money on the table or to hand out releases at whim.  Indeed, the TCC did not come on board until after solicitation.

Objectors also argue that Debtors previously filed a standalone plan (the so-called "toggle plan").  This plan was always a backup in the event no other plan could be confirmed.  It is not a true resolution and would leave claimants racing to the courthouse, filing suits across the country, and BSA in shambles.  While, apparently, Mr. Whittman testified such a plan was feasible in some sense for BSA, the evidence presented calls that unexplored conclusion into question.[498]  The uncontroverted testimony is that BSA needs Local Councils and Chartered Organizations to fulfill its mission.  A program that is not national in scope will draw fewer donors and members threatening the survival of both Local Councils and BSA.

In any event, "feasible" is not necessarily confirmable nor does it assure substantial—much less full—recoveries for holders of Direct Abuse Claims.  The relevant disclosure statement for the toggle plan provides:

> The Plan provides for two paths to reorganize the Debtors.  The first plan of reorganization is a "Global Resolution Plan," which provides the framework for global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies, in exchange for contributions by such parties to the Settlement Trust for the benefit of Abuse victims, including the contribution of substantial insurance assets.  The Global Resolution Plan has been designed to maximize and expedite recoveries to Abuse victims.  The Debtors strongly encourage all holders of Direct Abuse Claims to vote in favor of the Global Resolution Plan.
>
> If the holders of Abuse Claims do not provide a sufficient number of votes to accept the Plan (or the Bankruptcy Court otherwise finds that the Global Resolution Plan is not confirmable), the Debtors will be required to seek confirmation of the back-up to the Global Resolution Plan, a "BSA Toggle Plan."  The BSA Toggle Plan provides for the resolution of Abuse Claims and other Claims against only the Debtors,

---

[498] I say "apparently" because while on cross-examination objectors refer to some earlier testimony that previous plans were feasible, there was no exploration of the topic.

thereby reducing the potential recoveries under the Plan for the holders of Direct Abuse Claims from as much as 100% of their Claims under the Global Resolution Plan to as little as 1% of their Claims. Holders of Direct Abuse Claims must provide a sufficient number of votes in favor of the Plan in order to ensure they will receive the treatment afforded by the Global Resolution Plan and not the treatment provided in the default BSA Toggle Plan.[499]

At the Disclosure Statement hearing, counsel for the TCC expressed strong views on the

toggle plan:

> MR. STANG:   Your Honor, the tort claimants' committee opposed the extension to exclusivity because there's not a single survivor representative group that supports the debtors' plan. The debtor refers to its plan as a toggle plan. It is a death trap plan. It has as Plan A, a bad solution, as Plan B, a worse solution.

---

[499] JTX 1-413 Art. II.A. *See also id.*:

By contrast, the BSA Toggle Plan does not provide for the resolution of Abuse Claims against Local Councils and Contributing Chartered Organizations. Specifically, unlike the Global Resolution Plan, the BSA Toggle Plan does not "channel" Abuse Claims against the Local Councils and the Contributing Chartered Organizations (along with Abuse Claims against the BSA) to a Settlement Trust. Instead, the BSA Toggle Plan provides a process by which Abuse Survivors may obtain compensation for Abuse from the BSA only. Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, forces Abuse Survivors to seek compensation on account of their Claims against Local Councils and Chartered Organizations by filing independent lawsuits in the tort system against such entities. This will necessarily entail lengthy, complicated litigation. Unlike the current Chapter 11 Cases, where Abuse Survivors will receive equitable, consistent treatment through one, consolidated process, if the Plan defaults to the BSA Toggle Plan, Abuse Survivors will be competing for judgments and settlements against Local Councils and Chartered Organizations in multiple venues, resulting in a "rush to the courthouse." Moreover, the delays and uncertainties inherent in such a scenario, as well as the more limited contributions that will be made to the Settlement Trust in these Chapter 11 Cases, will likely produce inferior outcomes and recoveries for Abuse Survivors than would be achieved under the Global Resolution Plan.

Indeed, without the ability of the Local Councils and Contributing Chartered Organizations to contribute assets to the Settlement Trust, the Settlement Trust will necessarily have substantially fewer assets to distribute to Abuse Survivors. Additionally, under the BSA Toggle Plan, the BSA is only assigning its own rights and interests to the Insurance Policies to the Settlement Trust, thereby making liquidation of the Insurance Policies more difficult. Additionally, Insurers will not agree to settle piecemeal litigation under the BSA Toggle Plan as opposed to entering into a final global resolution with respect to their policies under the Global Resolution Plan.

Moreover, Local Councils will likely face multiple litigations on account of Abuse Claims that are no longer stayed. Many Local Councils will not have the financial wherewithal or capacity to address numerous litigation claims individually and may choose to file chapter 11 or chapter 7 bankruptcy petitions. This could result in numerous bankruptcy cases across the country, which will significantly impair the ability of any holder of Direct Abuse Claims to receive a recovery from these Local Councils.

<center>*    *    *</center>

Death trap Plan B is apparently what the tort claimants committee asked for. Well, I guess if somebody had bothered picking up the phone to really ask us about it, they might have heard what the problem is. This is the problem with death trap Plan B. And this was conferred to me by debtors' counsel when we asked about it. Boy Scouts get their discharge. They put in whatever they put in, this combination of property and cash -- mostly property -- there's no backstop for the value, by the way, it's kind of worth it is what it is, and we'll get to that later I guess in (indiscernible). And everyone can go to the local councils and can go to the charter organizations. The reason that there's a death trap Plan B is if the settlement trust reached -- if the litigation that proceeded after confirmation caused a local council to come to the trust and say, can you get us a channeling injunction, a post-confirmation channeling injunction and protection from this litigation, here's enough money to satisfy you, everyone agrees this is right amount of money, can you get us protection, because we're saying uncle; we've had enough. We were clearly told by the Boy Scouts that does not exist under death trap Plan B.[500]

As both Debtors and the TCC stated over a year ago, without the potential for third-party releases, a BSA plan spirals into a "death trap" of litigation with minimal recoveries in sight. Now, the contributions the TCC contemplated have been negotiated and the recoveries contemplated by this Plan to holders of Abuse Claims are assured. Many survivors have been waiting for thirty, forty or even fifty years to tell their stories and receive a meaningful recovery. This Plan makes that happen.

Objectors argue that certain of the Scouting-Related Releases and injunctions are not necessary because they were not in the Solicitation Plan, or certain earlier versions of the Plan. Objectors overlook the nature of the negotiations with the Settling Insurers, which began with Hartford pre-solicitation, followed by Century/Chubb post-solicitation and then Zurich and Clarendon. When the plan was solicited, the agreement with Hartford was contained in a Term Sheet subject to definitive documentation. Several provisions in the

---

[500] Disclosure Statement Hearing May 19, 2021 [ECF 4716] Hr'g Tr. 73:9-14; 80:21-81:16. Plan A contained the first settlement with Hartford, which has been superseded by the Hartford Settlement Agreement.

<center>158</center>

Term Sheet contemplated that Hartford would be a Protected Party entitled to releases from holders of Abuse Claims and that it would need to be satisfied with respect to treatment of Chartered Organizations.[501] The Disclosure Statement also clearly provides that Hartford's contribution of $787 million was subject in all respects to a resolution of rights of Chartered Organizations to Hartford's insurance policies and the treatment of Chartered Organizations as it impacts those policies.[502]

On a more specific point, the Lujan Claimants and the Guam Committee argue that the releases and injunctions are unnecessary with respect to the Archbishop because the agreements with the Settling Insurers provide:

> Bankrupt Chartered Organizations. The BSA shall use its best efforts to work with the Roman Catholic Ad Hoc Committee and the Chartered Organizations that are debtors in bankruptcy (the eight bankrupt entities identified on Exhibit K to the Plan, which may be amended to the extent that additional Chartered Organizations file for

---

[501] *See e.g.,* JTX 1-292 at 4 ("(viii) **Chartered Organizations**. Under the Plan, the Debtors, the Coalition, the FCR and the Trust shall secure an assignment to the Trust of, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford. The Debtors, the Coalition and the FCR shall use their best efforts to settle with the Chartered Organizations."); id ((xi) **Trust Distribution Procedures.** (". . . Hartford shall be included as a releasee in any form of relate attached to the Trust Distribution Procedures to the same extent as BSA, Local Council and Chartered Organizations are, such that Claims for coverage for Claims for Abuse are not made under Abuse Insurance Polices issued by Hartford by, or as a result of Claims of Abuse made by, holders of Abuse Claims who receive payment from the Trust. . . ."); Day 11 Hr'g Tr. 110:17-25 (Mr. Whittman testifying: "What I would note, and I think I said it before, is that The Hartford Settlement Agreement has a specific condition in it, the term sheet, I should say, has a specific condition in it that issued -- I forgot the exact words -- but issues related to chartered organization releases would need to be addressed as a condition of that agreement. And they were not addressed at this time; they were subsequently addressed and incorporated into the current plan in front of the Court.").

[502] *See* Disclosure Statement at 15 ("Hartford is expected to make a contribution of $787 million to the Settlement Trust for the payment of Abuse Claims in exchange for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional insureds under the Hartford Policies, which interests will be channeled to the Settlement Trust; Hartford will be included as a Settling Insurance Company and Protected Party under the Plan, and receive the benefits of the Channeling Injunction. Hartford's contribution is subject to resolution of Chartered Organization rights to Hartford policies in a manner that is acceptable to Hartford. All references throughout this Disclosure Statement to Hartford's contribution assume that Hartford is satisfied with the Plan's treatment of Chartered Organizations as it impacts Hartford Policies. . .").

bankruptcy protection prior to entry of the Confirmation Order, each a "Bankrupt Chartered Organization") to obtain written consent for such Bankrupt Chartered Organizations to consent to the terms of this Agreement. To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, such Bankrupt Chartered Organization shall automatically be deemed to be an Opt-Out Chartered Organization for all purposes hereunder. The Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organization shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan. The Parties consent to the foregoing provisions covering the Settling Insurers to apply to any other Settling Insurance Company. The Settling Insurers reserve all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.[503]

This language suggests an option to negotiate with a bankrupt Chartered Organization to obtain its consent to the settlement agreement, but provides that non-consent is not a breach of the agreement. This is not a concession that such releases are unnecessary. It is a recognition that the automatic stay might pose a challenge to obtaining certain relief. A resolution with Chartered Organizations was required by both the Settling Insurers and Local Councils. Neither is an unreasonable, or somehow extraneous, position. The Settling Insurers are seeking to buy complete relief; they do not want to pay more than once for Abuse Claims by a given claimant. Local Councils also want to pay only once; they understandably do not want to be subject to indemnification claims from Chartered Organizations on the very claims they are resolving.

Further, the Releases and Channeling Injunction while broad in scope align with the years in which insurance was provided. As for the Archbishop, it has chosen to be an Opt-Out Chartered Organization. The Lujan Claimants, therefore, and any other holders of

---

[503] *See e.g.,* JTX 1-355 (Century Settlement Agreement) ¶ 12.

Abuse Claims against the Archbishop are free to immediately pursue their claims against

the Archbishop, consistent with the automatic stay in the Archbishop's bankruptcy case, "to

the extent that" the Abuse Claim is not covered by an insurance policy issued by a Settling

Insurance Company. The relevant part of the Channeling Injunction provides that:

> the sole recourse of any holder of an Opt-Out Chartered Organization Abuse Claim
> against an Opt-Out Chartered Organization on account of such Opt-Out Chartered
> Organization Abuse Claim shall be to and against the Settlement Trust pursuant to
> the Settlement Trust Documents, and such holder shall have no right whatsoever at
> any time to assert such Opt-Out Chartered Abuse Claim against any Opt-Out
> Chartered Organization or any property or interest in property of any Opt-Out
> Chartered Organization.[504]

To emphasize the narrow channeling of Opt-Out Chartered Organization Abuse Claims to

the Settlement Trust, the Plan provides:

> **4.      Reservations.  Notwithstanding anything to the contrary in this
> Article X.F., the Channeling Injunction shall not enjoin:**
>
> **b.      the rights of holders of Abuse Claims to assert such an Abuse Claim
> against (i) a Limited Protected Party to the extent such Abuse Claims arose prior
> to January 1, 1976 and are not covered by an insurance policy issued by a Settling
> Insurance Company and (ii) *an Opt Out Chartered Organization to the extent that such
> Abuse Claim is not covered by any insurance policy issued by a Settling Insurance
> Company.*[505]**

Accordingly, the Lujan Claimants are not enjoined from pursuing the Archbishop for Abuse

Claims, but recoveries may not come from an insurance policy issued by a Settling

Insurance Company.[506]  Debtors' counsel illustrates by way of example:

---

[504] Plan Art. X.F.1(d). An Opt-Out Chartered Abuse Claim is, by definition, Scouting-related and it must be covered by an insurance policy issued by a Settling Insurance Company.  Plan Art. I.195.

[505] Plan Art. X.F.4.b (bold in original; italics supplied).

[506] This concept follows into the Insurance Injunction.  Plan Art. X.H.3.(d) ("**Reservations. Notwithstanding anything to the contrary in this Article X.H, the Insurance Entity Injunction shall not enjoin: . . . . d. the rights of any Person to prosecute (i) an Abuse Claim against an Opt-Out Chartered Organization *to the extent that* such Claim is not covered under an insurance policy by a Settling Insurance Company, or (ii) an Abuse Claim against a Limited Protected Party to the extent that such Abuse Claim arose prior to January 1, 1976 and is not covered under an**

In other words, these Agaña claim holders are not enjoined from asserting their claims against the Archbishop of Agaña prior to 1976, which is when the policies kick in that the settling insurance companies have issued, but even after 1976 to the extent that those claims are not covered by a settling insurance company. I'll give an example. If you have a claim in year 1978, and that 1978 policy was issued by Century to the tune of $500,000, and the Agaña Claimant has a claim of what it believes is $2 million -- and we haven't settled with the excess layers, so we're just talking about the primary layer. The Agaña Claimant -- the claim is channeled up to the $500,000, but if they want to go against the Archbishop of Agaña with respect to the rest, provided it's not covered by a settling insurance company, this language makes it clear that that abuse claim can be asserted against Agaña, even to the extent it's a Scouting-related abuse claim.[507]

As Debtors' counsel explained during argument the phrase "to the extent that" does all the work.[508]

As for Participating Chartered Organizations, all Abuse Claims that first arose prior to January 1, 1976 and are not covered by an insurance policy issued by a Settling Insurance Company are not channeled to the Settlement Trust. Holders of Abuse Claims against Participating Chartered Organizations will be able to sue Participating Chartered Organizations on those claims after the one year (as it may be extended) Limited Protected Party Injunction Date for those claims not channeled.[509] But, if the Abuse Claim first arose after January 1, 1976 or is covered by a Settling Insurance Company, the Settlement

---

insurance policy issued by a Settling Insurance Company.") (bold in original; italics supplied). It also follows to the Releases by Holders of Abuse Claims. Plan Art. X.J.3.

[507] Day 21 Hr'g Tr. 169:23-170:14.

[508] Day 21 Hr'g Tr. 167:15-175:13. The Guam Committee also objects to the Scouting-Related Releases alleging they incentivize the Archbishop to become a Participating Chartered Organization. The choices of the Archbishop are not an issue for this court.

[509] Limited Protected Party Injunction Date means "the twelve (12) month period following the Effective Date, s may be extended pursuant to the Settlement Trust Agreement, to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization. Art. I.177.

Trustee, not the holder of the Abuse Claim, will pursue those recoveries and/or settle with a Non-Settling Insurance Companies.

To the extent that the Settlement Trustee seeks to settle with a Non-Settling Insurance Companies, in addition to the procedures provided in the Trust Agreement, such a settlement will need to be noticed to holders of Abuse Claims to the extent that the settlement includes Abuse Claims that are not channeled to the Settlement Trust.

### iii.    *The Continental Hallmarks*

Returning to the *Continental* hallmarks, the question is whether the Scouting-Related Releases are fair and necessary to the reorganization? I conclude that they are. For all the reasons I have just stated, these nonconsensual releases are necessary to the reorganization both to confirm this Plan and to ensure that BSA's Scouting program continues. The nonconsensual releases underlie the Plan which is premised on the contributions of over $2.5 billion in cash to the Settlement Trust as well as insurance assets worth up to another $4 billion plus. The undisputed evidence is that without the Scouting-Related Releases, the Settling Insurers would not settle their liability. In that world, even if holders of Direct Abuse Claims were able to sue Local Councils and Chartered Organizations, the insurance proceeds may or may not be available. As I previously held, the BSA Abuse Policies and proceeds are property of the estate, and they will remain so even if the Scouting-Related Releases are not granted. Objectors do not explain how these assets could be unlocked even if judgments against Local Councils or Chartered Organizations are obtained. The Settling Insurer Settlements permit these assets to be accessed more quickly and definitively.

The Scouting-Related Releases are also necessary to bring Local Councils on board. The evidence is unrefuted that without releases for Local Councils and Chartered Organizations, BSA is likely to suffer a drop in membership, significantly affecting revenue

163

and putting into serious question BSA's ability to continue as a national organization. BSA needs to resolve the Abuse litigation in order to move forward. While it may still need to play a role in post-confirmation Abuse litigation, this Plan, supported by the Scouting-Related Releases, minimizes BSA's involvement and permits it to focus on its mission.

I also find that the Scouting-Related Releases are fair. As to holders of Direct Abuse Claims, this is a 100% plan, or, as BSA, the TCC, the Coalition and the FCR prefer to say, the Plan provides a mechanism for payment of all or substantially all Direct Abuse Claims. Holders of Direct Abuse Claims are therefore being treated fairly for the releases they are granting. Moreover, the Plan provides for more timely assessment and payment of Direct Abuse Claims and provides for a more equal treatment across claimants who will be assessed consistently under the TDP. The Scouting-Related Releases are also consistent with the way that claimants sued and settled claims with BSA—as a group. Prepetition, claimants, including the Lujan Claimants and the D&V Claimants, treated BSA, Local Councils and the Chartered Organizations as one organization, each liable for the actions of the others and with BSA in ultimate control.

Further, Class 8 accepted this Plan by over 85%. While I understand objectors' strongly held view that they are better off individually if left to their own litigation, this is a mass tort case. There are 82,209 claimants whose views need to be considered, and as I said previously, in the context of this case, I consider 85% to be overwhelming acceptance. Without this Plan, litigation goes one of two ways. Claimants may race to courthouses across the country suing Local Councils and Chartered Organizations. While these entities have other assets, many if not most of these entities are nonprofit organizations whose own assets are subject to restrictions that further delay and complicate recoveries. Alternatively,

164

as to some claimants, they will recover only the pennies that a BSA-only bankruptcy plan would bring as many lawyers have not agreed to represent them except in the context of this bankruptcy proceeding.[510] Neither path is fair.

The TDP provide holders of Direct Abuse Claims with multiple options to pursue litigation in the tort system as to all or some of their claim. The TDP provide claimants with both a tort system option and the Independent Review Option. Holders of Abuse claims against Opt-Out Chartered Organizations can sue Chartered Organizations non-debtors. Holders of Abuse claims against Participating Chartered Organizations can sue the Chartered Organization and other non-debtors for Abuse first arising prior to January 1, 1976, and not covered by a Settling Insurer policy.

Finally, Dr. Kennedy, Co-Chair of the TCC[511] and survivor and Mr. Meidl, a member of the Survivor Working Group, both offered moving, and sometimes painful, testimony in support of the Plan. It is a fair characterization to say that both men had a healthy dose of skepticism with respect to BSA's intentions as well as the possible outcome

---

[510] *See e.g.,* JTX 1-463 Ex. B (emphasis in the original).

### Professional Employment Agreement

I.  **Purpose of Representation:** The undersigned hereby agree(s) to employ Eisenberg Rothweiler, Kosnoff Law, and AVA Law Group as attorneys-at-law to represent the undersigned in claims against the Boy Scouts of America. The undersigned agrees that said attorneys are granted the right to associate with other law firms in the prosecution of the claim, if they feel that such is in the client(s) best interests.

II. **Scope of Representation:** By signing this Engagement Agreement, you understand and agree that AIS Counsel is committing to represent you **only** in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse claims against BSA. You have the right to terminate the representation at any time, subject to our right to recoup fees and expenses as provided by law.

[511] Mr. Kennedy was involved in over 350 separate meetings in his role as Co-Chair of the TCC.

of the bankruptcy case. Notwithstanding, both men now support the Plan. Their support

evidences an awareness of their fellow survivors and the need for global resolution.

Dr. Kennedy explained that the TCC ultimately came on board in February, 2022,

after being satisfied with three aspects of the Plan: (i) the Youth Protection Program,

including the hiring of a youth protection executive, (ii) trust governance, including

processes for future settlements and (iii) the addition of the Independent Review Option in

the TDP.[512] He also testified to the importance of resolution for survivors:

Q:    Let's turn to alternative to confirmation of the plan for survivors. Are there
any alternatives to confirmation of the plan that is before the Court that efficiently
and expeditiously lead to a resolution of the survivor claims—

A      No.

Q --   that were filed in this bankruptcy?

A      No, there are not.

Q      Would you explain why not, please?

A      For survivors, a big portion of this bankruptcy is some degree of resolution.
And if this bankruptcy does not go through, as a group, it is going to put probably, in
a best case scenario, those survivors that had pending lawsuits back into court. For
many, many survivors, there will be no resolution. They do not have a viable path
forward. We know how long it takes for things to work through court, even under
that best case scenario. But another thing that the TCC has been thinking about, and
that's the fact we -- we looked at who filed claims. We don't get to see individual
claims, but we're allowed to ask questions about broad numbers. And -- and one of
the important issues that the Court needs to understand here is that there's
approximately 12,400 claimants, survivors over the age of 70, 12,400; 2,200 of those
are over the age of 80. And the TCC really has looked at this and has thought long --
long and hard about how many more survivors are going to pass away before there's
resolution. And as a survivor, I can tell you, having some degree of resolution, it is
an important component in your life. And the thought of throwing back over 12,000
claimants into a situation where, basically, they've lost 2 years of their life and
perhaps there's no path forward, and they're never going to, in their lifetime, see a
resolution, that weighed heavy -- heavily on our mind. We have a survivor on the
TCC who is pushing 80 years old and -- and is out driving for Door Dash to make

---

[512] Day 4 Hr'g Tr. 10:19-12:5.

ends meet. We think about survivors like that, and we want there to be a viable alternative to resolution, and we think that the bankruptcy provides that.

Q    Does the plan potential approval by the Court start the process of closure for survivors?

A    It does.[513]

Mr. Meidl, who is representing himself in these bankruptcy cases, testified to his

desire to be involved in a meaningful way to bring about change in BSA and the

development of the Youth Protection Program, which was his primary concern. He also

testified to the importance of resolution:

Q    Given the current state of BSA, which now includes the youth protection termsheet and the proposal for the YPC, which was important for you, do you have a view of BSA's efforts towards youth protection?

A    I do. Enough is never enough. And with the addition of these non-economic terms within the plan, it's much better. I can feel comfortable with that. And I'm particularly excited -- if that's the proper word -- about the youth protection committee because I know that there will be embedded survivors. So, overall, I'm pleased. Am I satisfied that it's done? No. But I'm -- yeah, I'm, overall, pleased.

Q    And do you support confirmation of the plan?

A    Simple question, complicated answer. But the -- the short answer is yes, I absolutely do. It's complicated because I don't know everything about the economics. Frankly, I don't -- I'm not going to say I don't care because I do. It was a very important part of me getting involved. But I -- I know how torturous this experience was, not just for me, but for many other survivors. And to be two plus years into this, with all the machinations, all the money spent, all the pain of ripping off our scabs to file those proofs of claim and watch this slog on, I -- I would say it's just time. It's time for survivors to know that we have something on the books. I'm not so naive as to think this is over because I listen to hearings and I hear what's being said in the cross and direct examination. Whatever happens, I don't know. I don't control that. So, yes, I do.[514]

---

[513] Day 4 Hr'g Tr. 14:4-15:20.

[514] Day 8 Hr'g Tr. 35:6-36-:9.

As for the Certain Insurers, they did not really object on the basis of any Indirect Abuse Claims they may hold. Rather. their objection mirrored their objection to the TDP. Perhaps this is because the Certain Insurers seek to leave themselves optionality with respect to future third-party releases in this case or others. No insurer put on evidence of their Indirect Abuse Claims, and many have argued that any remaining obligations are conditions precedent rather than claims against the estate (*see* Section V, *infra*). Further, Mr. Whittman testified that holders of claims in all classes fare better under the Plan than they do in a chapter 7 case. Holders of Indirect Claims voted to accept the by 82.41 percent. Given their arguments on releases, any attempt to derail the Plan on this ground rings hollow. The concerns regarding their Indirect Abuse Claims are properly handled elsewhere.

This is an extraordinary case crying out for extraordinary solutions. Two years of mediation by capable lawyers has yielded a Plan supported by Debtors, JPM, the UCC, the TCC, the FCR, the Coalition, the Settling Insurers and 85.72% of Direct Abuse Claimants. The combination of the monetary and non-monetary aspects of the Plan are fair to the holders of Abuse Claims.

### E. The TCJC Settlement

Throughout this Opinion, I have noted one exception to the appropriateness of the Scouting-Related Releases, namely, the settlement with TCJC. The settlement brings significant funds to the Settlement Trust, $250 million. In return, it requires a release of all claims against TCJC, not just Abuse Claims (i.e. Scouting-related claims).

The Pfau/Zalkin Claimants object to the third-party release provided to TCJC arguing that the court does not have bankruptcy jurisdiction over Abuse claims unrelated to Scouting. Both Debtors and TCJC argue that jurisdiction exists and that a full release of

TCJC is warranted and supported by the evidence. They also contend that in the historic 105-year relationship between TCJC and BSA, TCJC acted as a Local Council more than a Chartered Organization. It is undisputed that Scouting was the official activity program for young men affiliated with TCJC beginning in the 1920s and that all boys involved with the church were automatically enrolled in Scouting at age 8.[515] It is also true that claims against TCJC and BSA often arise from the same facts. From this, TCJC concludes that every instance of Abuse that a claimant could allege relating to TCJC necessarily occurred in Scouting.

Jurisdiction may exist over the non-Scouting related Abuse claims such that a consensual release could be appropriate. Given the overlapping nature of some of the factual allegations that claimants allege in their complaints, lawsuits against TCJC may have a conceivable impact on the estate. Nevertheless, I decline to approve the third-party releases over objection because (i) it is unclear that the evidence supports the release, and in any event (ii) the TCJC Settlement stretches third-party releases too far.

My conclusion is best illustrated by an example explored with Paul Rytting, Director of Risk Management for TCJC.[516] In a November 19, 2003 letter to BSA, Mr. Rytting describes two claims that TCJC defended and settled after BSA declined to defend or indemnify TCJC.[517] The letter describes the two claims as follows:

> Case 1:  Plaintiff: all Abuse occurred on Scouting outings; joined church-sponsored troop because it was only functioning troop in the area; never member of church. Perpetrator: both a Scoutmaster and Mormon priest

---

[515] Declaration of Paul Rytting in Support of TCJC's Settlement and Confirmation of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("Rytting Decl.") ¶ 7 admitted into evidence Day 9 Hr'g Tr. 204:17.

[516] Rytting Decl. ¶1.

[517] JTX 369.

Case 2: <u>Plaintiff</u>: members or prospective converts to church; participated in both church activities and scout activities from 1968 to 1973.
<u>Perpetrator</u>: both a Mormon priest and a cub scout leader; allegations in complaint state he was acting within the course and duties as Mormon priest in his leadership roles and as BSA scout leader; alleges both TCJC and Scouts aware of prior Abuse; alleges Abuse in both scouting and church activities

In settling the cases, TCJC obtained releases for two Church corporations and related entities, a Local Council, Boy Scouts of America in Oregon and BSA.

Under the TCJC settlement, TCJC would receive a release for both Case 1 and Case 2. On its facts, Case 1 might be all Scouting-related Abuse. The claimant is not a member of the church and all Abuse occurred on Scouting outings. But, Case 2 presents a strikingly different scenario. The claimant is a church member who alleges Abuse occurred during both church functions and Scouting activities. Both intuitively and by definition in the Plan, Case 2 is a Mixed Claim—part Scouting-related, part not.

Case 2 shows the fallacy of TCJC's conclusion: while all Abuse that occurred during a Scouting activity might also be TCJC-related, the reverse is not necessarily true.[518] In this sense, TCJC is like any other Chartered Organization—it is using Scouting to further its own mission. Further, while a Local Council has no mission or business other than Scouting, TCJC clearly does.

Moreover, while the evidence may support a conclusion that $250 million is sufficient for TCJC to obtain a release of Scouting-related Abuse, it does not support a conclusion that it is sufficient for a release of all Abuse allegations against TCJC. In support of the consideration being paid for the releases, Debtors put forth the testimony of Dr. Bates

---

[518] This appears to be no different than any other clergy/scout leader scenario.

and TCJC put forth the testimony of Dr. Horewitz.[519]  Using slightly different

methodologies, both experts concluded that the $250 million payment was reasonable.  Dr.

Horewitz opined that "I conclude that TCJC's Settlement is sufficient to cover TCJC's

likely liability arising out of Abuse Claims filed in these bankruptcy proceedings."[520]  Dr.

Bates concluded that the settlement with TCJC "is sufficient to cover its expected liability of

the midpoint of the range is what I have estimated."[521]  In coming to these conclusions, both

Dr. Horewitz and Dr. Bates used the Historical Abuse Claim data for 2016-2020 and

settlement values supplied by Mr. Griggs.[522]  On the record presented, however, these

conclusions conflict with the underlying data supplied by Mr. Griggs.  As I previously

found, the settlement values provided by Mr. Griggs and derived from the Historical Abuse

Claims data reflect the settlement of claims against all BSA-related entities (i.e. BSA, Local

Councils and the Chartered Organizations).  The record does not reflect that the settlement

values for the Historical Abuse Claims captures consideration for non-Scouting related

Abuse.

 For these reasons, I decline to approve the TCJC Settlement.

## III. The Findings

 As a condition precedent to confirmation of the Plan, Debtors require the court to

make certain "findings and determinations" ("Findings") "as shall enable the entry of the

---

[519]  Day 10 Hr'g Tr. 11:24-12:7.  Dr. Horewitz was qualified, without objection, as an expert in claims valuation, including in the mass tort context.

[520]  Declaration of Jessica Horewitz in Support of TCJC's Settlement and Confirmation of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9400] admitted into evidence Day 10 Hr'g Tr. 8:1-11 ("Horewitz Decl.") ¶ 48.

[521]  Day 6 Hr'g Tr. 99:2-6.

[522]  Horewitz Decl. ¶¶ 20, 21, 25; Day 6 Hr'g Tr. 56:18-21; 100:13-18.

Confirmation Order."[523] According to Debtors, the Findings are designed "among other things, to ensure that the Injunctions, Releases and Discharges in Article X shall be effective, binding and enforceable."[524]

The Findings that raise concerns are:

w.    the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority)

x.    (i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court as required

---

[523] I say "Debtors" because it is their plan, but it is clear that the Coalition is behind the Findings.

[524] Plan Art. IX.A.3. Notwithstanding this requirement, there is a lengthy footnote detailing who the findings are not binding on:

The findings and determinations set forth in Article IX.A.3.jj, Article IX.A.3.l, Article IX.A.3.w, Article IX.A.3.x, Article IX.A.3.y, Article IX.A.3.z, and Article IX.A.3.aa shall not be binding on the Settling Insurance Companies or TCJC. The Settling Insurance Companies' agreement in the Insurance Settlement Agreements not to object to entry of such findings and determinations in the Confirmation Order does not indicate the Settling Insurance Companies' support for such findings and determinations, and no party shall argue that the Settling Insurance Companies agreed to or acquiesced in such findings and determinations in any proceeding. Rather, the Settling Insurance Companies are designated as Protected Parties under the Plan, and as a result, the Settling Insurance Companies take no position on such findings and determinations or on the Trust Distribution Procedures. The findings and determinations set forth in Article IX.A.3.jj, Article IX.A.3.l, Article IX.A.3.w, Article IX.A.3.x, Article IX.A.3.y, Article IX.A.3.z, and Article IX.A.3.aa shall not be binding on the United Methodist Entities. The agreement in the TCJC Settlement Agreement and the United Methodist Settlement Agreement not to object to entry of such findings and determinations in the Confirmation Order does not indicate TCJC or the United Methodist Entities' respective support for such findings and determinations, and no party shall argue that TCJC or the United Methodist Entities agreed to or acquiesced in such findings and determinations in any proceeding. Rather, TCJC and the United Methodist Entities are designated as Protected Parties under the Plan, and as a result, TCJC and the United Methodist Entities take no position on such findings and determinations or on the Trust Distribution Procedures.

Plan Art IX.A.3. n.3.

by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

y.      the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures and is not (i) the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the Zurich Insurers Settlement Contribution, the Clarendon Settlement Contribution, the TCJC Settlement Contribution, the United Methodist Settlement Contribution, contributions by other Settling Insurance Companies, or any component(s) of such contributions, or (ii) the initial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of Abuse Claims provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures;

z.      the Plan and the Trust Distribution Procedures were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code; and

aa.     the Base Matrix Values in the Trust Distribution Procedures *subject to adjustment based on Aggravating Scaling Factors and Mitigating Scaling Factors (each as defined tin the Trust Distribution Procedures)*, are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes.

I have questioned the necessity for and the legal basis of the Findings in the context of confirmation since they were first proposed and there was a robust discussion of the Findings at the Disclosure Statement hearing. At a high level, the Certain Insurers object to the Findings as designed to prejudice their rights in future insurance coverage litigation. The Coalition counters, also at a high level, that the Findings are necessary to preclude post-confirmation litigation on the process embodied in the TDP. The Coalition contends that I must approve everything from the matrix values themselves, to the treatment of the statute of limitations defense, to the Base Matrix Values and Scaling Factors as either "appropriate"

173

and/or "fair" and/or "equitable." And, that I must find that each of these components "provide for a fair and equitable settlement of Abuse Claims."

Much ink and much trial time was taken up trying to justify the Findings, substantially all of which relate, directly or indirectly, to the TDP. Accordingly, I will first address the general question I have posed in this case for some time: how does one evaluate trust distribution procedures, if at all? And, if one does evaluate trust distribution procedures, what standard applies?

Trust distribution procedures, such as the TDP here, establish the method by which claims channeled to a trust will be resolved. While these procedures invariably differ somewhat in each case, the procedures encompass the means by which claims will be submitted, processed, liquidated and paid. For example, the TDP include: Article IV: Claimant Eligibility; Article VI: Expedited Distributions; Article VII: Claims Allowance Process; Article VIII: Claims Matrix and Scaling Factors; and Article IX: Payment of Final Determination Allowed Abuse Claim. This is treatment.

That it is treatment is evidenced by Plan itself. For Class 8, there is a lengthy section under the heading "Treatment" for holders of Direct Abuse Claims.[525] This section spells out the contributions going into the Settlement Trust, the Expedited Distribution election, and the resolution of claims against all Protected Parties, which include Debtors. The relevant language is:

> each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the

---

[525] Plan Art. III.B.10.

174

Settlement Trust *and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.*[526]

The FCR recognizes the TDP as treatment. As Mr. Patton testified ". . . from a legal point of view, the trust distribution procedures and the trust agreement are part of the plan. It's -- if it were possible to write it down on a single page, it would have been dropped into the plan as a description of the treatment of that class. It's just -- you know, it's just the way it is."[527] The TCC, the FCR, the Coalition and the Pfau/Zalkin Claimants also recognize the TDP as treatment, albeit in the context of the insurers' Indirect Abuse Claims.[528]

What determinations a court must make regarding treatment of general unsecured claims in order to confirm a plan depends on whether a class has accepted or rejected the plan. Pursuant to § 1129(a)(8), if the class is unimpaired, the court must determine whether the class has accepted the plan.[529] If it has, the inquiry stops as to the class. Put simply, in the first instance, the creditors in the class speak for themselves as to the "fairness" of their treatment. If the class rejects the plan, then pursuant to § 1129(b)(1), if requested, the court shall confirm a plan if "it does not discriminate unfairly" and "is fair and equitable" to that dissenting class.[530] Section 1129(b)(2) specifies in detail how to determine whether that standard is met.[531] The court is required to make these findings because the plan is being

---

[526] Plan Art. III.B.10 (emphasis supplied).

[527] Day 7 Hr.'g Tr. 195:13-20; *see also* Day 7 Hr'g Tr. 194:9-11 ("The trust distribution procedures and the TDP are the plan. In fact, it's just a very long-winded description of the treatment of the members of that class . . .").

[528] *See* 4/21/2022 Letter from Pachulski Stang Ziehl & Jones [ECF 9690].

[529] 11 U.S.C. § 1129(a)(8).

[530] 11 U.S.C. § 1129(b)(1).

[531] Section 1129(b)(2) provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

"crammed down" over the wishes of the class.  Put simply, a rejecting class does not believe

its treatment is "fair."[532]  That this is a mass tort case does not change the standard.

I will now turn to the specific Findings, starting with Finding x.

### A. *Finding x: The "Fair and Equitable" Finding*

x.        (i) the procedures included in the Trust Distribution Procedures pertaining to
the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution
Procedures pertaining to the calculation of the Allowed Claim Amounts, including
the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum
Matrix Values, and Scaling Factors (each as defined in the Trust Distribution
Procedures), are appropriate and provide for a fair and equitable settlement of Abuse

---

(A)        With respect to a class of secured claims, the plan provides—
        (i) (I) that the holders of such claims retain the liens securing such claims, whether
the property subject to such liens is retained by the debtor or transferred to another entity, to
the extent of the allowed amount of such claims; and
        (II) that each holder of a claim of such class receive on account of such claim
deferred cash payments totaling at least the allowed amount of such claim, of a value, as of
the effective date of the plan, of at least the value of such holder's interest in the estate's
interest in such property;
        (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to
the liens securing such claims, free and clear of such liens, with such liens to attach to the
proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of
this subparagraph; or
        (iii) for the realization by such holders of the indubitable equivalent of such claims.
(B)        With respect to a class of unsecured claims—
        (i) the plan provides that each holder of a claim of such class receive or retain on
account of such claim property of a value, as of the effective date of the plan, equal to the
allowed amount of such claim; or
        (ii) the holder of any claim or interest that is junior to the claims of such class will
not receive or retain under the plan on account of such junior claim or interest any property,
except that in a case in which the debtor is an individual, the debtor may retain property
included in the estate under section 1115, subject to the requirements of subsection (a)(14) of
this section.
(C)        With respect to a class of interests—
        (i) the plan provides that each holder of an interest of such class receive or retain on
account of such interest property of a value, as of the effective date of the plan, equal to the
greatest of the allowed amount of any fixed liquidation preference to which such holder is
entitled, any fixed redemption price to which such holder is entitled, or the value of such
interest; or
        (ii) the holder of any interest that is junior to the interests of such class will not
receive or retain under the plan on account of such junior interest any property.

---

[532] As discussed elsewhere in this Opinion, dissenting creditors in accepting classes have their own
protections, as do creditors who assert they are misclassified or that a plan discriminates among
classes.  Each of these situations has its own standard.

> Claims based on the evidentiary record offered to the Bankruptcy Court as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law.

The Coalition argues that Finding x is appropriate on multiple grounds. First, it argues such findings are common in mass tort bankruptcy cases and cite to multiple orders presumably containing such findings. Orders are just that—orders. Without knowing the context, whether the finding was contested and if so, the reasoning of the judge in including the finding, an Order is of no assistance.

Second, the Coalition argues that § 1129(a)(1) and § 1123(a)(5) require Finding x because a plan must provide adequate means to achieve Debtors' objective of "confirm[ing] a plan that provides fair and equitable compensation to Survivors."[533] The Coalition then argues that the TDP provide the framework for resolving Abuse Claims. It also argues that the procedures in the TDP are fair because they approximate settlements Debtors would have paid outside of bankruptcy. These arguments naturally raise several questions. Why does Debtors' objective govern what a court has to find for purposes of confirmation? If Debtors' objective was to provide unfair and inequitable compensation to survivors, would I have to make those findings? If Debtors' pre-bankruptcy settlements themselves were not "fair" would that make a difference? And, how do I determine whether Debtors' prepetition settlements were fair? As I observed at argument, I have no basis to know

---

[533] Statement of the Coalition of Abused Scouts for Justice and FCR in Support of Confirmation of Third Modified Firth Amended Chapter 11 Plan of Reorganization for BSA and Delaware BSA [ECF 9190] ("Statement of the Coalition") ¶ 62.

whether Debtors' prepetition settlements were "fair" or not.[534]  What I do know is that Class 8 accepted the process and recoveries established in the TDP, i.e., their treatment.

Third, the Coalition argues that "the TDP and related Plan provisions reflect a negotiated settlement and must be approved by this court under Bankruptcy Rule 9019 and § 1123 of the Bankruptcy Code."[535]  The Coalition argues that the TDP are a settlement of the Abuse Claims against the estate.  I disagree.  As I have stated elsewhere in this Opinion, not all resolutions are settlements.  The TDP do not settle any Abuse Claims.  Rather, the TDP establish a process under which Abuse Claims may ultimately be settled.  What happened here was a negotiation that resulted in TDP that Debtors, the Coalition, the FCR, various plaintiff firms and, ultimately, the TCC support.  Debtors are supposed to negotiate plans, as are official committees (i.e. the TCC).  Other constituencies are often involved.  But, a Plan is not a settlement.  It gets solicited.  And, if the vote fails, debtors can cram down treatment.[536]

The authority cited in this section of the Statement of the Coalition once again includes many Orders, which are neither authoritative nor helpful.  But, the Coalition does cite three cases which merit discussion.  In *Mallinckrodt*, Judge Dorsey discusses his approval of the "Opioid Settlement" negotiated with forty state and U.S. territory Attorneys General.  That settlement provided for Mallinckrodt to fund one or more trusts with $1.6 billion in cash, certain warrants and other assets.  Certain equity holders argued that the

---

[534] *See e.g.,* Day 17 Hr'g Tr. 188:12-192:3.  While I received lots of evidence on the process by which Debtors settled claims prepetition, I did not receive evidence with regard to the individual settlements reached.

[535] Statement of the Coalition ¶ 70.

[536] If we were in a cramdown posture, I doubt the Coalition would ask me to ignore the vote or argue that the TDP are a settlement that could somehow be approved on a Rule 9019 standard.

settlement was too costly and entered into unnecessarily because Mallinckrodt had defenses to the litigation. Judge Dorsey applied the *Martin* factors and evaluated the opioid litigation on a global basis concluding that a settlement was in Mallinckrodt's best interest and was on the low end of such settlements with other pharmaceutical companies. In approving the settlement, Judge Dorsey did not approve the particulars of the trusts (indeed, the particulars do not seem to appear in the decision). Rather, Judge Dorsey's approval of the Opioid Settlement is more akin to the settlements with the Settling Insurers, which I did evaluate, individually, under the *Martin* standard. How one would even evaluate the TDP under the *Martin* standard is not readily apparent.

In *Nutritional Sourcing*, debtors proposed a plan that contained two subclasses of general unsecured creditors: "Pueblo Trade Claims" and "Pueblo General Unsecured Claims." The distinction was important because a certain senior note was contractually subordinated only to Pueblo's trade creditors. Debtors adduced testimony that the definition of "Pueblo Trade Claims" was negotiated among debtors, the official committee, the indenture trustee of the senior note, two noteholders, and claimants in the Pueblo Trade Claims class, but not any claimants in the Pueblo General Unsecured Claims class. Over objection, Judge Walsh does state that the defined term was a settlement because it was negotiated as part of the plan. He then evaluates the settlement under the *Martin* standard. While I always hesitate to disagree with Judge Walsh, I do so here. I do not believe the negotiation of the definition by these parties was a settlement; rather, it was a negotiation over classification and treatment.[537] In any event, the dispute resolved is not remotely similar to the TDP.

---

[537] The objections were based on classification (§ 1122), equal treatment (§ 1123) and cramdown

Finally, the Coalition cites *G-1 Holdings*,[538] in which the court approves a "Global Settlement" of asbestos-related personal injury claims contained in a plan of reorganization. In describing the "Global Settlement," the court includes detail of the calculation of the cash component of the debtor's contribution to an asbestos trust in addition to a note secured by a letter of credit. The court's approval of the Global Settlement does not specifically mention nor specifically approve the trust distribution procedures. Rather, the trust distribution procedures, generally, are referenced in the court's analysis of compliance with § 524(g). Even in that section, however, the details of the trust distribution procedures are not specifically enumerated or approved.

Fourth, the Coalition argues that I must make a "fair and equitable" finding to confirm a plan that includes third-party releases under § 1129(a)(1), §1123(b)(6) and § 105(a).[539] After citing the *Master Mortgage* standards, none of which asks a court to evaluate the method of liquidating claims, the Coalition argues that several cases "illustrate the application" of the standard to plans that include channeling injunctions. The first case cited is *Millennium*, which is wholly factually distinguishable from this mass tort case and, again, did not address the method by which claims were liquidated and paid. Next, the Coalition cites Blitz, which, is simply an Order. Finally, the Coalition cites—or, more

---

(§ 1129(b)), which were not a subject of the decision. Judge Walsh did not approve the settlement for two reasons. The evidence was not sufficient. The class impacted by the defined term was not at the negotiating table. Judge Walsh concluded that neither the debtor's representatives ("who were motivated to create a plan that would receive the requisite percentage of votes") nor the creditors committee (which, while having a fiduciary duty lacked a cross-section of debtors' creditors) adequately represented the Pueblo General Unsecured Claims. Judge Walsh also ignored the vote of the affected class because several subsequently came forward by way of objection and he concluded that they did not fully appreciate the definition.

[538] *In re G-1 Holdings, Inc.*, 420 B.R. 216 (D.N.J. 2009).

[539] Statement of the Coalition ¶¶ 89-98.

accurately, incorrectly cites—the bankruptcy court ruling in *Global Industrial*.[540] The

Coalition states that "in approving the channeling injunction for silica-related claims the

court in GIT specifically found that the 'GIT plan is fundamentally fair and equitable' to

holders of such claims in that the GIT Plan, the TDP and the Trust Agreement provided

appropriate mechanisms for the payment and valuation of such claims."[541] In fact, at the

cited page (*15), the court is not addressing current claims. Rather, the court is addressing

holders of demands (i.e., future claims):

> 94. The GIT Plan is fundamentally fair and equitable to holders of **APG Silica Demands**. Specifically, the GIT Plan, the APG Silica TDP, and the APG Silica Trust Agreement provide for mechanisms, including but not limited to structured, periodic, or supplemental payments, pro rata distributions, matrices, periodic review of estimates of the numbers and values of APG Silica Trust Claims and APG Silica Demands, and periodic adjustment of the payment percentage, which provide reasonable assurance that the APG Silica Trust will value, and be in a financial position to pay all or some portion of the value of similarly situated APG Silica Trust Claims and APG Silica Demands in substantially the same manner. (Pahigian Decl., ¶ 18.)[542]

Nowhere on the cited page does the court address any base claim values or scaling factors

that may exist in the Global Industrial silica trust.

---

[540] *In re Global Indus. Tech., Inc.*, 2013 WL 587366 (Bankr. W.D. Pa. Oct. 12, 2012). It is unclear whether this is an Order or an opinion in Findings form.

[541] Statement of the Coalition ¶ 95.

[542] *Global Indus.*, 2013 WL 587366 at *15 (emphasis supplied).

The *Global Industrial* court's finding appears to be a combination of the requirements

of § 524(g)(2)(B)(ii)(V)[543] and § 524(g)(4)(B)(ii).[544] As the Third Circuit states:

> Many of [the] requirements [of § 524(g)] are specifically tailored to protect the due
> process rights of future claimants. For example, a court employing a
> § 524(g) channeling injunction must determine that the injunction is "fair and
> equitable" to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), and must appoint a
> futures representative to represent their interests. 11 U.S.C. § 524(g)(4)(B)(i). The
> court must also determine that the plan treats "present claims and future demands
> that involve similar claims in substantially the same manner." 11 U.S.C.
> § 524(g)(2)(B)(ii)(V). Finally, the statute requires that a 75% super-majority of
> claimants whose claims are to be addressed by the trust vote in favor of the plan. 11
> U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).[545]

---

[543]  11 U.S.C. § 524(g)(2)(B)(ii)(V) provides:

(B) The requirements of this subparagraph are that –

(V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate
through mechanisms such as structured, periodic, or supplemental payments, pro rata
distributions, matrices, or periodic review of estimates of the numbers and values of present
claims and future demands, or other comparable mechanisms, that provide reasonable
assurance that the trust will value, and be in a financial position to pay, present claims and
future demands that involve similar claims in substantially the same manner.

[544]  11 U.S.C. § 524(g)(4)(B)(ii) provides:

(B) Subject to subsection (h), if, under a plan of reorganization, a kind of demand described
in such plan is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) in
connection with which an injunction described in paragraph (1) is to be implemented, then
such injunction shall be valid and enforceable with respect to a demand of such a kind made,
after such plan is confirmed, against the debtor or debtors involved, or against a third party
described in subparagraph (A)(ii), if –

(ii) the court determines, before entering the order confirming such plan, that identifying such debtor

or debtors, or such third party (by name or as part of an identifiable group), in such injunction with

respect to such demands for purposes of this subparagraph is fair and equitable with respect to the

persons that might subsequently assert such demands, in light of the benefits provided, or to be

provided, to such trust on behalf of such debtor or debtors or such third party.

[545]  *Combustion Eng'g*, 391 F.3d at 234 n.45. *See also In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359
(3d Cir. 2012) ("Congress codified the Johns-Manville trust mechanism as a "creative solution to
help protect ... future asbestos claimants," H.R.Rep. No. 103–835, at 47 (1994), *reprinted in* 1994
U.S.C.C.A.N. 3340, 3348, in the Bankruptcy Reform Act of 1994, Pub.L. 103–394, § 111, 108 Stat.
4106, 4113–17 (codified at 11 U.S.C. § 524(g)-(h)). Congress intended the trusts as a means to give

These requirements, including the "fair and equitable" requirement, appear to serve as a proxy for how future claimants would vote on a plan if they could. Holders of current claims do not need a proxy. They actually vote. No one has argued that the TDP do not treat holders of current claimants and future claimants in substantially the same manner or that future claimants will receive less as a percentage recovery than holders of current claims. Mr. Patton, the FCR, testified that his advisors helped him to fashion TDP that ensure that future claimants are treated the same as current claim holders and that they will receive the same recoveries. That is what § 524(g), if it were applicable here, requires.

Finally, the Coalition argues that I must make a "fair and equitable" finding in connection with § 1129(a)(3)'s good faith finding. The Coalition asserts that multiple courts within the Third Circuit base their good faith finding on whether the plan provides a "fair and equitable" resolution of personal injury claims. Once, again, however, the Coalition cites me to confirmation orders, not opinions.[546]

None of the Coalition's rationales require me to find that the Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors "are appropriate and provide

---

"full consideration" to the interests of future claimants by ensuring their claims would be compensated comparably to present claims, while simultaneously enabling corporations saddled with asbestos liability to obtain the "fresh start" promised by bankruptcy. 8 H.R.Rep. No. 103–835, at 46–48. To achieve these goals and "protect the due process rights of future claimants," section 524(g) imposed "many statutory prerequisites" that must be satisfied before a channeling injunction may issue. *Combustion Eng'g*, 391 F.3d at 234 n.45.").

[546] While not identified as such, *In re Maremont Corp.*, 601 B.R. 1 (Bankr. D. Del. 2019) (Findings of Fact, Conclusions of Law and Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Prepetition Solicitation Procedures, and (III) Confirming the Modified Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code) is an Order.

for a fair and equitable settlement of Abuse Claims" in order to confirm the Plan. I decline to do so.[547]

### B. *Finding aa: The Historical Consistency Finding*

aa.     the Base Matrix Values in the Trust Distribution Procedures *subject to adjustment based on Aggravating Scaling Factors and Mitigating Scaling Factors (each as defined in the Trust Distribution Procedures)*, are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes.

The original text of this Finding did not include the italicized language. The italicized language was suggested by the TCC's counsel during argument in response to my observation that the evidence did not support the Finding as originally drafted. The very fact that the required Finding had to be adjusted in an attempt to conform to the evidence suggests the Finding is unnecessary to confirmation. It also suggests that I should not enter Finding aa, which is imprecise at best.

In essence, Finding aa seeks a blessing of the Base Matrix Value, which Dr. Bates testified (and I previously found) was "not magic" and only a starting point to arrive at a Final Determination.[548] Further, the Base Matrix Value itself is never actually "adjusted" as it does not change. In any event, I cannot find that the Base Matrix Values, as adjusted, are "consistent with Debtors' historical abuse settlements and litigation outcomes" because I do

---

[547] I would be remiss if I did not acknowledge the combined two days of trial time spent adducing evidence on whether the processes in the TDP for liquidating Direct Abuse Claims are "like" or "mirror" the tort system. Two dedicated witnesses (Michael Burnett and Karen Bitar) and portions of at least two other witnesses (Mr. Griggs and Mr. Azer) testified about assessment of claims, discovery (factual and expert), motion practice, federal/state rules of procedure, burdens of proof, settlement strategy and other decision-making processes. Presumably, the testimony was offered in support of or in opposition to Finding x, and perhaps, Finding aa. This testimony also raises issues about the nature of trust distribution procedures, generally, and the proper role of a trustee of such a trust. To the extent a court might ever have to rule on whether a claims process in trust distribution procedures are "like" the tort system, given the acceptance by Class 8, I do not need to do so here.

[548] Under the TDP, the Final Determination is the "Allowed Claim Amount" for a claim.

not know the ultimate outcome of any given "adjustment." To know if the outcomes under the TDP are "consistent with the Debtors' historical abuse settlements and litigation outcomes," one would need to compare the outcome of the process (i.e. the Final Determination/Allowed Claim Amount) with Debtors' prepetition settlements and litigation outcomes to determine if there is consistency between the two. This Finding is necessarily future-looking and I do not have a crystal ball. It also requires a claim-by-claim analysis, which no one has done. I decline to make Finding aa even if it could be made.

### C. *Finding w: The Binding Finding*

w.    the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority).

Finding w seems innocuous enough at first glance. But, if it is, why is it necessary?

Section 1141 of the Code provides for the effect of confirmation of a plan. With exceptions not relevant here, § 1141(a) provides: ". . . the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan." And as the Coalition notes, there is abundant common law on the doctrine of *res judicata* and collateral estoppel as it applies to orders confirming plans.[549] Any order entered in these cases will be final when it is entered. It will

---

[549] Statement of the Coalition ¶ 114 ("Again, this finding should be non-controversial. In the Third Circuit, "[a] plan's preclusive effect is a principle that anchors bankruptcy law: '[A] confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation.'" *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)); *see also Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280

185

have the effect it has. Does the inclusion of the term "Plan Documents"[550] change

something? I simply don't know. Once again, the Coalition cites no case law to support its

request, instead citing what appear to be uncontested confirmation orders.

The Coalition argues that Finding w is necessary to ensure that the Certain Insurers

are bound by the Plan. They argue that the elimination of this provision somehow feeds

into the Certain Insurers' arguments that a plan must be "insurance neutral" and carve

insurers out. I do not see the elimination of Finding w as providing the Certain Insurers

with a "neutral" plan. It simply means that the Code and appropriate caselaw will govern

in any subsequent proceedings.

Moreover, the TCC's requested findings in the Term Sheet with respect to experts,

although confusing, could be interpreted to suggest that findings of this Court are not subject

to § 1141 and applicable law. I will not join in the confusion by entering unnecessary

findings or legal conclusions that do not mirror, and arguably contradict, the Code.[551] The

---

B.R. 573, 592 (Bankr. D. Del. 2002) ("[A] confirmed plan acts as a binding contract on all the
parties thereto"); 8 COLLIER ON BANKRUPTCY ¶ 1141.02 (16th ed. 2021) ("A confirmation order
operates as a final judgment. The doctrine of res judicata bars all questions that could have been
raised pertaining to the confirmed plan, including questions concerning the treatment of any creditor
under the plan, the discharge of liabilities, or disposition of property . . . In sum, a creditor may not
collaterally attack a conformation order. A creditor must object to plan confirmation; if the
bankruptcy court overrules the objection, the objecting creditor must take an appeal of the order.").

[550] Plan Art. I.213. "Plan Documents" means, collectively, the Plan, the Disclosure Statement, the
Disclosure Statement Order, each of the documents that comprises the Plan Supplement, and all of
the exhibits and schedules attached to any of the foregoing. The Plan Documents shall be in form
and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort
Claimants' Committee, the Future Claimants' Representative, Hartford, the Century and Chubb
Companies, Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Settling
Insurance Companies all in accordance with their consent rights, and (b) the Creditors' Committee
and JPM in accordance with their consent rights under the JPM / Creditors' Committee Term
Sheet.

[551] Much to the apparent chagrin of many attorneys who appear before me, this is one of my
common refrains.

*res judicata* or collateral estoppel effect of any Order I issue confirming the Plan is for a

future court to decide in the context of specific litigation.

### D. *Finding y: The Allowed Claim Finding*

> y.      the right to payment that the holder of an Abuse Claim has against the
> Debtors or another Protected Party or a Limited Protected Party is the amount of
> such Abuse Claim as determined under the Trust Distribution Procedures and is not
> (i) the BSA Settlement Trust Contribution, the Local Council Settlement
> Contribution, the Contributing Chartered Organization Settlement Contribution, the
> Participating Chartered Organization Settlement Contribution, the Hartford
> Settlement Contribution, the Century and Chubb Companies Settlement
> Contribution, the Zurich Insurers Settlement Contribution, the Clarendon Settlement
> Contribution, the TCJC Settlement Contribution, the United Methodist Settlement
> Contribution, contributions by other Settling Insurance Companies, or any
> component(s) of such contributions, or (ii) the initial or supplemental payment
> percentages established under the Trust Distribution Procedures to make
> distributions to holders of Abuse Claims provided, however, that nothing herein shall
> determine that any insurer is obligated to pay the Debtors' or another Protected
> Party's or a Limited Protected Party's liability so determined under the Trust
> Distribution Procedures.

Debtors seek inclusion of Finding y in direct response to decisions in two cases:

*Flintkote*[552] and *Fuller-Austin*.[553] Both are insurance coverage decisions addressing how much

an insurer is "obligated to pay" in the context of a post-confirmation asbestos trust—the full

liquidated value of the claim or the trust payment percentage. After examining relevant

law, the underlying insurance policy and the applicable trust distribution procedures, each

court ruled that the insurer was obligated to pay only the trust payment percentage. The

Coalition argues this is a windfall to insurers by virtue of the filing of a bankruptcy case and

Finding y will help to lessen any possible confusion on the part of coverage courts.

What insurers are obligated to pay under their policies is an insurance coverage issue

that is not before the court. On the other hand, the allowed amount of a claim is a matter of

---

[552] *Flintkote Co. v. Aviva PLC*, 177 F.Supp. 3d 1165 (N.D. Cal. 2016).

[553] *Fuller-Austin Insulation v. Highlands Insurance Company*, 135 Cal. App. 4th 958 (2006).

bankruptcy law. Here, the allowed claim is determined under the TDP. It is not

inappropriate—and perhaps necessary—to acknowledge that in a finding albeit the language

in Finding y is imprecise.[554] The allowed amount of a claim does not necessarily correlate

to what an insurer is "obligated to pay" or what a "loss" is under its insurance policy and

Finding y does not equate the two. Whether an insurance coverage court will find any

relevance to Finding y is for that court to consider.[555] A modified version of Finding y may

be included in any Order confirming the Plan.

### E. *Finding z: The Good Faith Finding*

z.      the Plan and the Trust Distribution Procedures were proposed in good faith
and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy
Code.

Section 1129(a)(3) requires that in order to confirm a plan, the court find that it has

been proposed in good faith and not by any means forbidden by law. I will address this

good faith requirement in the proper context. As for Finding z, it does not mirror the Code.

Its focus, again, is the TDP.[556] The Coalition contends that the entire framework of the Plan

is a resolution of Direct Abuse Claims and that if the TDP do not exhibit a fundamental

fairness to those claimants, the Plan "should not" be confirmed. The Coalition then talks in

nuance, arguing that its proposed good faith finding "only establishes that the TDP are in

---

[554] The language appears to come from the definition of "claim." *See* 11 U.S.C. § 105(5)(A). As recognized in § 502, if a claim draws an objection the court shall *determine the amount* of such claim" and *"shall allow such claim* in such [determined] amount" except to the extent that the claim falls within certain exceptions. 11 U.S.C. § 502(b) (emphasis supplied).

[555] This is not an issue unique to mass tort cases. In non-mass tort cases, the *allowed amount* of a claim is determined by the bankruptcy court in the event of a dispute (although the claim could be *liquidated* in the bankruptcy court or in another court). Whether in such cases an insurer must pay the allowed amount of the claim under an available insurance policy raises the same issue.

[556] Contrast this to Finding w, which seeks a ruling for all Plan Documents. Does the exclusion here mean the remainder of the Plan Documents were not proposed in good faith?

good faith and does not speak to an obligation to pay claims" while also arguing that "a coverage court *may* very well choose to consider a good-faith finding made by this Court in evaluating the appropriateness" of future coverage denial.[557]

I ruled in connection with Finding x that § 1129(a)(3) does not justify a finding that the component parts of the TDP (Allowed Claim Amounts, Base Matrix Values, Maximum Matrix Values, Scaling Factors) are appropriate or fair and equitable. Finding z appears to be a back door, or perhaps "belts and suspenders" way to get to these same findings. I decline to make Finding z. I will make any good faith finding consistent with my discussion of that confirmation requirement.

## IV. The Confirmation Standards – Section 1129

Some preliminary thoughts are in order. All voting classes accepted the Plan, therefore, only the requirements of § 1129(a) are in play; section § 1129(b) (cramdown) is not an issue. Some of the objections implicate more than one Code section. I will walk straight through the § 1129(a) standards and try not to be repetitive. I will only address confirmation standards that have drawn objections.[558]

### A. *Section 1129(a)(1)*

Section 1129(a)(1) provides that to confirm a plan, it must comply with the applicable provisions of title 11. Relying on legislative history, this section has been interpreted to mean that the plan complies with § 1122 and § 1123 of the Code, which govern classification and contents of a plan, respectively.[559]

---

[557] Statement of the Coalition ¶ 56 (emphasis in the original).

[558] Based on the record, any confirmation requirements that did not draw an objection are satisfied.

[559] *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) (citing H.R.Rep. No. 595, 95th Cong., 2nd Sess. 412 (1977), U.S.Code Cong & Admin.News 1978 pp. 5963, 6368; S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong & Admin.News 1978 pp. 5787, 5912; *In*

### 1. Section 1122

Section 1122(a) provides: "Except as provided in subsection (b) of this section [a convenience class], a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[560] The Third Circuit recognizes that plan proponents have significant flexibility in placing similar claims in multiple classes if there is a rational basis to do so.[561]

There are three objections to classification. The Lujan Claimants argue that because they have a direct right to sue BSA's insurers, they should not be classified with claimants who do not have such a direct action right. They also argue that because they have an "open civil statute of limitations to bring suit for child sexual abuse," they should be separately classified as the Bankruptcy Code requires separate treatment.[562] Mr. Schwindler makes a similar argument grounding his contention that the Plan does not differentiate between claimants who brought their lawsuits prepetition and those who did not in the Equal Protection Clause.[563] Mr. Washburn, a survivor appearing *pro se*, argues that Debtors

---

*re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 340 (D. Colo. 1996); *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr.S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988)).

[560] 11 U.S.C. § 1122(a).

[561] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993); *Mallinckrodt*, 639 B.R. at 864.

[562] Lujan Claimants' Objection at 44.

[563] Frank Joseph Schwindler's Objection to Confirmation of Debtor's Second Modified Fifth Amended Chapter 11 Plan or Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8761] ("Schwindler Objection") at 9-13.

should have placed Direct Abuse Claims in the same class as Non-Abuse Claims.[564] None of the objectors cite any law in support of their respective positions.

I overrule these objections. As to the Lujan Claimants and Mr. Schwindler, I find that their claims against BSA are substantially similar to other claimants in their class as they are similar in legal character vis-à-vis BSA. "It is the nature of [the] claims being classified that is significant not the nature of other claims or interests a creditor might have."[565] Here, the Lujan Claimants' claims and Mr. Schwindler's claim are identical to the claims of others in Class 8. All have unliquidated personal injury claims against BSA. That the Lujan Claimants have a procedural right to sue BSA's insurers directly, does not change the character of their claims against BSA nor does the existence of an "open statute of limitations." The statute of limitations is a defense and does not change the character of a personal injury claim. Indeed, it would be impracticable to attempt to determine the strengths and weaknesses of 82,209 disputed, unliquidated personal injury claims, with the statute of limitations being just one difference among claimants.[566] Finally, whether the claim was brought prepetition or filed as a proof of claim does not alter the fundamental

---

[564] Lonnie Washburn's Objection to Confirmation of the Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9007] ("Washburn Objection") ¶ 19.

[565] AOV Indus., 792 F.2d at 1150-1151 (ruling that the existence of a third party guarantor is irrelevant for classification purposes) (quoting In re Martin's Point Ltd. P'ship, 12 B.R. 721, 727 (Bankr. N.D. Ga. 1981)).

[566] During the trial there was much discussion about the statute of limitations defense. As Mr. Griggs testified, his experience is that even in states with closed statutes of limitations, courts are hesitant to dismiss on statute of limitations grounds. See e.g., Griggs Decl. ¶¶ 23-26; Day 2 Hr'g Tr. 73:5-11, 123:4-124:2. The statute of limitations defense is a mitigating factor in the TDP.

nature of the claim.[567] A rational basis exists for placing all prepetition Direct Abuse Claims in the same class.

As for Mr. Washburn's argument that Direct Abuse Claims (Class 8) and Non-Abuse Claims (Class 7) should have been placed in the same class, a plan proponent may separately classify similar claims if there is a reasonable or rational basis for doing so.[568] Here, I find that a rational basis exists. It is true that the Direct Abuse Claims and most of the Non-Abuse Claims are substantially similar in that such claims are unliquidated personal injury claims. But, this is a mass tort case filed to bring resolution to (what is now) 82,209 Direct Abuse Claims; the case was not filed to resolve the sixty-two Non-Abuse Claims. This separate classification also ensures that the votes of holders of Non-Abuse Claims are not overwhelmed by the vote of Class 8 claimants. At the same time, there is no suggestion, much less evidence, that Class 7 was created to provide an accepting impaired class, and indeed, it is not necessary to satisfy that confirmation requirement.[569]

---

[567] Although Mr. Schwindler grounds his argument in the Equal Protection Clause of the 14th Amendment, Mr. Schwindler's objection is more properly viewed as an objection to the treatment of Direct Abuse Claims (Class 8) under § 1122. It is fundamental that the Equal Protection Clause applies only to state and local governments, and that the Due Process Clause of the 5th Amendment "reverse incorporates" its requirements on the federal government. *See In re Adams*, 214 B.R. 212, 217 (BAP 9th Cir. 1997). Moreover, even if Mr. Schwindler's objection is viewed as an Equal Protection argument, Mr. Schwinder, as an unsecured creditor holding a Class 8 Claim, is not in any recognized "suspect class," such that his treatment would be scrutinized under the Supreme Court's rational basis test. *See In re Ward*, 595 BR. 127 (Bankr. E.D.N.Y. 2018) ("A statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification") (internal quotations omitted).

[568] *Mallinckrodt,* 639 B.R. at 857; *In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014).

[569] *Mallinckrodt,* 639 B.R. at 857 (noting the "one clear rule" that similar claims cannot be separately classified to gerrymander an affirmative vote on the plan) (citing *In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991), on reh'g (Feb. 27, 1992)). But see In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) (fulsome analysis questioning whether the "one clear rule" is the

Debtors have met their burden with respect to § 1122(a).

correct standard and suggesting that any gerrymandering concerns should be addressed in an § 1129(a)(3) analysis), *aff'd* 255 B.R. 445 (E.D. Mich. 2000).

## 2. *Section 1123(a)*

Section 1123 addresses contents of plans. Subsection (a) lists eight mandatory requirements.[570] Objections were filed implicating three of these requirements §§ 1123(a)(4), (a)(5) and (a)(7).[571]

---

[570] 11 U.S.C. § 1123(a) provides in full:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another

194

### a. *Section 1123(a)(4)*

Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class" unless the holder agrees to a less favorable treatment. The Third Circuit has concluded that this requirement means that all claimants must have the same opportunity to recover on their claims.[572] Girl Scouts, the Lujan Claimants and Claimant I.G. contend that the Plan provides them with less favorable treatment than others within their respective classes.

### i. *Girl Scouts*

Girl Scouts asserts a Non-Abuse Claim against BSA and its claim, therefore, is classified in Class 7. The claim sounds in trademark infringement, trademark dilution and unfair competition and arose after BSA started accepting girls into its Scouting program and dropped the reference to "boy" (referring solely to Scouts or Scouting, generally) including in its advertising and recruiting. Pre-bankruptcy, Girl Scouts sued BSA in the United States District Court for the Southern District of New York seeking injunctive relief and monetary damages including corrective marketing damages, disgorgement of profits and attorneys'

---

class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

[571] Based on a review of the remaining subsections and there being no objections, I conclude that these subsections are satisfied.

[572] *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)).

fees.[573] Early in the bankruptcy case, I granted relief from stay so that Girl Scouts could pursue injunctive relief and liquidate its prepetition claims.[574]

Girl Scouts argues that it is not provided the same treatment as all other holders of claims in Class 7 because (i) its claim for disgorgement, which is about $5 million or 30% of its claim, "may not be covered" by the available insurance policies that provide for recoveries to Class 7. Girl Scouts asserts that the applicable insurance policies exclude claims for disgorgement such that the Plan "immediately limits its maximum recovery by 30% regardless of the strength of its claim." Girl Scouts also asserts that there is a substantial risk that BSA "could compromise or otherwise void applicable insurance coverage" leaving Girl Scouts with no recovery. On the other hand, Girl Scouts contends that all other claimants in Class 7 are subject to no such limitations and will recover fully on their claims. It also argues that no other Class 7 claimant will have to engage in a coverage dispute. Girl Scouts suggests that the easy fix is for BSA to pay any deficiency that might arise.

BSA counters that Girl Scouts' argument is based on speculation, including that it will be entitled to any recovery at all as its claim, which as of the beginning of the confirmation hearing, was unliquidated, contingent and disputed. BSA also argues that it is speculative that Girl Scouts will not settle within what the policy provides and/or that it will also then lose a coverage dispute. Moreover, BSA argues that Girl Scouts has an equal opportunity to recover on its claims, but is not entitled to equality of result. Finally, BSA

---

[573] *Girl Scouts of the United States of America v. Boy Scouts of America*, 1:2018-cv- 10287 (AKH), United States District Court for the Southern District of New York (the "Trademark Litigation").

[574] *See generally*, Girl Scouts of the United States of America's Objection to Debtors' Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8679].

suggests that it is likely that the District Court will rule in favor of BSA in the Trademark Litigation. As the confirmation hearing was underway, the District Court did rule on the Trademark Litigation, granting summary judgment to Boy Scouts and dismissing Girl Scouts' complaint.[575]

Girl Scouts did not submit any evidence in support of its objection. While two of the relevant insurance policies were admitted into evidence,[576] Girl Scouts did not direct me to any particular provisions listing exclusions. More importantly, Girl Scouts' cross-examination of Mr. Azer directly contradicts the premise of Girl Scouts' objection. Mr. Azer testified that the insurers are currently defending the Trademark Litigation and paying BSA defense costs, albeit subject to a reservations of rights (as is common), and that in his view the Girl Scouts' claim is covered. He testified that coverage of disgorgement of profits is a "hot area" in coverage litigation now, but that there is New York and Delaware case law holding that a disgorgement exclusion does not apply unless the disgorgement is pursuant to a government order.[577]

I conclude that Girl Scouts' claim, assuming it has one, is receiving the same treatment as other claimants in Class 7. All claimants in Class 7 retain the right to receive full payment of their respective claims from available insurance proceeds. The evidence is that there is available insurance for Girl Scouts' claim, even the portion of the claim for disgorgement. Moreover, the Trademark Litigation has been dismissed. In these circumstances, and based on the evidence, I overrule this objection.

---

[575] *See* Opinion and Order Granting Defendant's Motion for Summary Judgment, dated April 7, 2020, lodged in this case at ECF 9605.

[576] JTX 1457, 1458.

[577] *See generally* Day 4 Hr'g Tr. 275:2-281:4.

### ii.    *The Lujan Claimants and I.G.*

In a one-paragraph objection, the Lujan Claimants once again rely on their direct action rights. They contend that the Lujan Claimants are treated unequally as they are "being forcibly deprived" of their direct action rights for the same treatment as others in Class 8. The Lujan Claimants cite no case law in support of this objection.

This argument is really just the flip side of the Lujan Claimants' § 1122(a) argument. I have already determined that the Lujan Claimants' direct action rights do not warrant separate classification because they are procedural in nature and do not constitute a separate cause of action. Similarly, I find that the loss of these procedural rights, which do not permit more than a 100% recovery, does not constitute inequal treatment. As Debtors argue, the Lujan Claimants' direct action rights are just another way of getting to the same insurance coverage as other claimants. The Code stops this race to the courthouse.

I.G. argues that because claimants' state law rights against Local Councils and Chartered Organizations vary enormously and they hold different economic rights against non-debtors the Plan violates § 1123(a)(4).[578] He argues that because of the different economic rights "creditors with superior claims against more solvent non-debtors are being compelled to relinquish those valuable claims, but are receiving the same treatment as those without such claims."[579] I.G. cites to *AOV Industries*[580] for the proposition that there is disparate treatment when "unequal consideration [is] tendered for equal payment." Perhaps

---

[578] Without citing to any evidence, I.G. baldly asserts that "a clear majority of those [Survivors] proposed to be solicited have no claim enforceable against these entities." Limited Objection of Claimant "I.G." to Plan of Reorganization [ECF 8692] ("I.G. Objection") ¶ 2. An argument that a claimant has different economic rights is more properly a § 1122 issue.

[579] I.G. Objection ¶ 5.

[580] *AOV Indus.*, 792 F.2d at 1152.

anticipating Debtors' response, I.G. asserts in the I.G. Objection that it is "not unworkable" to establish how claimants are differently affected.[581] At argument, counsel for I.G. contended that I.G. had the only claim against the Ozark Trails Council and that a basis exists to have his client carved out.

Debtors counter that the court is not required to weigh the strengths or weaknesses of each claim within a class, that all § 1123(a)(4) requires is that claimants have the same opportunity to be compensated for their claims against the debtor, that the right to receive pro rata shares of debtor's property does not apply to settlement payments made by third parties and that *AOV* has been held to be inapplicable/unworkable in mass tort cases.

I generally agree with Debtors. Claims in Class 8, including I.G.'s, are all disputed and unliquidated. The treatment for each claimant in Class 8 is specified in the TDP, which provide each claimant multiple avenues to liquidate his claim, at the election of the claimant. I.G. contends that somehow all of these claims could be separately evaluated now, perhaps suggesting that they could be placed into some unspecified number of classes, but I.G. makes no attempt to show how that could happen. It cannot. I.G. also generally contends that his claims are superior to other claimants in Class 8, but there is no evidence to support that proposition nor even to suggest that he is on the "losing end" of the Local Council Formula. Indeed, his whole objection is very generalized and hypothetical.[582]

---

[581] I.G. Objection ¶ 6.

[582] I.G.'s lone factual assertion is inaccurate as the evidence of record is that 181 Survivors asserted timely proofs of claim naming Ozark Council. To be complete, the evidence is that 181 Claimants filed timely proofs of claim naming Ozark Council, including 13 claimants whose claims are not presumptively barred and one pending lawsuit. The Ozark Council is also named by one claimant in a multiple-Local Council allegation. Disclosure Statement Ex. F.

As for *AOV*, it is not law of the Third Circuit, nor did I.G. cite Third Circuit law for the proposition that "equal treatment" means "equality of consideration." The *AOV* dissent cautioned against the rule adopted by the majority as over expansive and the *AOV* Court specifically limited its ruling to the facts before it.[583] As this case, with 82,209 claims exemplifies, such a rule is unworkable here as I.G. would have the court analyze the claims each claimant may have against others. At bottom, I.G.'s objection is really to the third-party releases, which has been addressed separately under the appropriate standard.[584]

Debtors have complied with § 1123(a)(4).

### b. *Section 1123(a)(5)*

Section 1123(a)(5) provides, in relevant part that a plan shall provide adequate means for its implementation. Given my rulings with respect to the settlements, the buyback of the insurance policies and the third-party releases, there is nothing remaining to be addressed.

### c. *1123(a)(7)*

The Certain Insurers, Allianz and Mr. Schwindler object to the governance provisions of the Settlement Trust in one of two ways. They contend that the composition of the STAC is improper and/or that the STAC's ability to restrict or veto the Settlement Trustee's authority to take certain actions may impede her duty to act independently and in the best interest of the Trust and its beneficiaries. Mr. Schwindler also specifically objects to Kenneth Rothweiler's service on the STAC.

---

[583] *AOV Indus.*, 792 F.2d at 1154, 1156. (Starr, J., concurring in part, dissenting in part).

[584] At argument, counsel for I.G. disavowed the §1123(a)(4) argument and contended that his real objection was one of substantive consolidation. Day 19 Hr'g Tr. 288:17-289:17. While the words "substantive consolidation" do appear in one sentence of his objection, I.G. did not brief substantive consolidation. Neither did I.G. speak up when I asked parties before argument commenced whether there were any legal issues not included on Debtors' list of Closing Confirmation Issues. Day 16 Hr'g Tr. 39:2-3. I will not consider an argument raised in a cursory fashion in the objection and at trial.

The STAC was initially comprised of seven members, five chosen by the Coalition and two by the TCC. Pursuant to the TCC Term Sheet, now the Coalition chooses three members, the TCC chooses three members and the Pfau/Zalkin Claimants choose one member. All members are lawyers that represent holders of Direct Abuse Claims.[585]

The Certain Insurers argue that the appointment to the STAC of attorneys who represent holders of Direct Abuse Claimants on a contingency fee basis (30%-40%) and therefore stand to benefit from the claims paid to a subset of the Trust's beneficiaries, violates the public policy concerns expressed in § 1123(a)(7) and § 1129(a)(5)(A) and of the Code.[586]

Section § 1123(a)(7) provides:

Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall contain only provisions that are consistent with the interest of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer director, or trustee.[587]

Similarly, § 1129(a)(5)(A) provides in, arguably, pertinent part:

(i)     The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.[588]

---

[585] *See* Settlement Trust Agreement Sec. 6.1. The Coalition's appointees are Adam Slater, Sean Higgins and Kenneth Rothweiler. The TCC's appointees are Jordan Merson, Paul Mones and Christopher Hurley. The Pfau/Zalkin Claimants' appointee is Irwin Zalkin.

[586] The Certain Insurers Objection ¶¶ 166-170.

[587] 11 U.S.C. § 1123(a)(7).

[588] 11 U.S.C. § 1129(a)(5)(A)(i), (ii).

The Certain Insurers rely on two cases to support their position.  In *Digerati* the court declined to confirm a chapter 11 plan of a publicly traded company where, among other things, certain shareholders objected to the continued employment of the chief executive officer and chief financial officer and no independent directors were proposed.[589]  In *Beyond.com,* the court expressed concern under § 1129(a)(5)(A) where debtor failed to disclose a proposed liquidating trustee's current affiliations.[590]

In response, Debtors argue that § 1129(a)(5) is inapplicable to the members of the STAC.  They cite to *Eagle Pitcher*,[591] an asbestos mass tort case, in which the District Court for the Southern District of Ohio ruled that § 1129(a)(5) does not apply to a trustee of a settlement trust because he is not a director, officer or voting trustee of a debtor.[592]  All the more, the court ruled, § 1129(a)(5) does not apply to members of a trust advisory committee.  Debtors also respond that the objection as a whole is based on pure speculation of how the STAC will perform its duties in the future.[593]  The Coalition did not directly respond to this argument, but in response to other arguments made by the Certain Insurers argues that the creation of a trust advisory committee consisting of plaintiff lawyers is a "typical and widely accepted facet of chapter 11 plans involving mass torts" and this case should be no different.[594]

---

[589]  *In re Digerati Technologies, Inc.*, 2014 WL 2203895 at *7 (Bankr. S.D. Tex. May 27, 2014).

[590]  *In re Beyond.com Corp.*, 289 B.R. 138, 144-45 (N.D. Cal. 2003).

[591]  *In re Eagle Pitcher Industries*, 203 B.R. 256, 267-268 (S.D. Ohio 1996).

[592]  *Id.*

[593]  Debtors' Memorandum of Law ¶ 589.

[594]  Statement of the Coalition ¶ 158.

Sections 1123(a)(7) and 1129(a)(5) do not apply to members of a trust advisory committee particularly in a case, such as this one, where the debtor is reorganizing and will emerge post-confirmation. As the *Eagle Pitcher* court states, members of a trust advisory committee do not fall neatly with the categories enumerated in those sections. But, I also agree with the *Eagle Pitcher* court, that to the extent that a trust advisory committee with veto powers exercises them to prevent a trustee from fulfilling her duties, that trustee must be able to petition the court for appropriate relief.[595] That issue is addressed, below.

Separately, Allianz objects to the composition of the STAC arguing that holders of Indirect Abuse Claims "are not contemplated" to be members of the STAC.[596] As Debtors' point out, Allianz does not cite any cases, applicable law or provisions of the Code that require Debtors to consult with the insurers about the composition of the STAC. I note that neither Allianz nor any other insurer asked to be placed on the STAC or for the appointment of independent members, so I question the sincerity of this objection.

Mr. Schwindler specifically objects to Mr. Rothweiler's participation on the STAC because he is not independent. Mr. Schwindler is correct that Mr. Rothweiler is not independent, but the proposed Settlement Trustee is. Given the dramatically reduced veto powers, discussed below, I overrule this objection.

---

[595] *Eagle Pitcher*, 203 B.R. at 268. The Certain Insurers objected to Debtors' original selection for Settlement Trustee, but have not voiced an objection to the current nominee.

[596] Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Request for Relief From the Plan Discharge and Injunction Provisions [ECF 8696] ("Allianz Objection") ¶ 39.

Relying on § 1129(a)(5)(A) and § 1123(a)(7), the Certain Insurers also contend that the STAC's ability to restrict the Settlement Trustee's authority to act may impede the Settlement Trustee's duty to act independently and in the best interest of the Settlement Trust in disregard of the public policy concerns expressed in these sections.[597] The Certain Insurers presented Professor Jack F. Williams as an expert witness on corporate and organizational governance and he was accepted as such, over objection.[598] Professor Williams is a tenured full professor at Georgia State University College and an adjunct professor at St. John's University in the Bankruptcy LLM program and has taught courses, including on Delaware statutory trusts.[599] He has also been appointed by bankruptcy courts or retained by various bankruptcy participants to review governance structures and decision-making processes in multiple contexts.[600]

Professor Williams testified that proper organizational governance is important to ensure the objectives, guiding principles, and goals of the Settlement Trust are achieved in a legitimate process.[601] Professor Williams identified "well-accepted norms" of proper organizational governance as "transparency, accountability, reliability and responsibility, trust and trust-making, and the independence or disinterestedness of the agents of the

---

[597] Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan [ECF 9033] ("Certain Insurers Supplemental Objection") ¶¶ 63, 66.

[598] Day 13 Hr'g Tr. 32:22-33:13.

[599] Professor Williams' CV is found at JTX 1140.

[600] Day 13 Hr'g Tr. 11:24-25, 12:1-20.

[601] Day 13 Hr'g Tr. 37:9-10.

trust."[602] To familiarize himself with the corporate governance architecture of the Settlement Trust, Professor Williams completed both a vertical analysis of the proposed governance structure in the Settlement Trust Agreement and a horizontal comparative analysis with other chapter 11 settlement trust governance structures involving substantial child sex Abuse claims.[603]

Professor Williams opines that the Settlement Trust Agreement creates a situation incompatible with the well-accepted norms of proper organizational governance.[604] The Settlement Trustee's responsibilities are to adjudicate claims and disburse payments. In her role, she owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse Claims, which is defined to include holders of Direct Abuse Claims, Indirect Abuse Claims and Future Claimants.[605] The members of the STAC on the other hand do not owe a fiduciary duty to the Settlement Trust.[606] The STAC owes a duty only to a subset of the Beneficiaries—namely, current holders of Abuse Claims.[607] Professor

---

[602] Day 13 Hr'g Tr. 37:11-17.

[603] Day 13 Hr'g Tr. 35:14-21, 36:8-17.

[604] Day 13 Hr'g Tr. 49:8-14.

[605] Settlement Trust Agreement Sec. 2.1(b); Plan Art. I.18; Day 13 Hr'g Tr. 47:17-24.

[606] The Settlement Trust Agreement Sec. 6.2 expressly states the STAC does not owe a fiduciary duty to the Settlement Trust.

[607] Day 13 Hr'g Tr. 47:3-48:7; Settlement Trust Agreement Sec. 6.1, Sec. 6.2. Section 6.2 of the Settlement Trust Agreement seems to draw distinctions between the STAC itself and the members of the STAC. Each member of the STAC in his or her capacity as a lawyer has fiduciary duties to his or her client. Nothing in the Settlement Trust Agreement or in this Opinion should be read to relieve any attorney of his or her duties to clients. Further, I may disagree with Professor Williams' position that the STAC (or its members) and the FCR do not, collectively, have a duty to all Beneficiaries that equals the entirety of the beneficiary universe. As I read sections 6.1, 6.2, 1.6 and Recital B, it appears that the members of the STAC have taken on a fiduciary duty to holders of Indirect Abuse Claims as well as Direct Abuse Claims. But, Professor Williams is correct that neither the members of the STAC nor the STAC, itself, have a fiduciary duty to the Settlement Trust.

Williams opines that because the scope of the Settlement Trustee's responsibilities is greater than her authority as constrained by the STAC, serious governance concerns are presented.[608] Professor Williams identified multiple provisions of the Settlement Trust Agreement, as originally drafted, that give rise to this scenario.

In response to Professor Williams' testimony, the TCC, the FCR, the Pfau/Zalkin Claimants and the Coalition filed proposed revisions to the Settlement Trust Agreement and placed those revisions on the record during the hearing as well.[609] The operative provisions and the corresponding revisions are summarized as follows:

---

[608] Day 13 Hr'g Tr. 49:8-14.

[609] Notice of Filing of Revised Exhibit B (Settlement Trust Agreement) to the Debtors Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Redline Thereof [ECF 9560] ("Revised Settlement Trust Agreement"); Notice of Tort Claimants' Committee's Filing of Redlined Revised Pages of Exhibit B (Settlement Trust Agreement) to the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 9595]; Day 17 Hr'g Tr. 211-231.

| Provision | Original Settlement Trust Agreement | Revised Settlement Trust Agreement |
|---|---|---|
| 5.14(g)<br>Form and Substance of Questionnaire to be submitted by holders of Direct Abuse Claims | Requires Consent of STAC and FCR<br><br>= veto power | Consent of STAC and reasonable consent of FCR or bankruptcy court approval<br><br>≠ veto power<br><br>15-day informal negotiation period |
| 4.1(b)<br>Employment of Neutral in Independent Review Process | Requires consent of super majority of STAC members and reasonable consent of FCR<br><br>= veto power | Settlement Trustee hires in sole discretion<br><br>≠ veto power<br>≠ dispute resolution process |
| 4.1(a)<br>Employment of Successor Claims Administrators | Requires consent of a super majority of STAC members and reasonable consent of FCR<br><br>= veto power | Consent of STAC and reasonable consent of FCR<br><br>≠ veto power<br>≠ dispute resolution process<br><br>STAC has 5 days to approve or Settlement Trustee may seek bankruptcy court approval[610] |
| 4.7<br>Employment of Claims Administrator professionals | Requires consent of STAC members and reasonable consent of FCR<br><br>= veto power | Section 4.7 Deleted.<br><br>≠ veto power<br>≠ dispute resolution process<br><br>Settlement Trustee hires in sole discretion. 2.1(d)(xxxi) |
| 5.16<br>Employment of Financial Advisor (and other Trustee Professionals) | Requires consent of a super majority of STAC members and reasonable consent of FCR<br><br>= veto power | Settlement Trustee hires in sole discretion<br><br>≠ veto power<br>≠ dispute resolution process<br><br>STAC and FCR have consulting rights |

[610] There is an inconsistency in the Revised Settlement Trust Agreement regarding whether bankruptcy court approval is permissible in the event the STAC and FCR do not provide consent. *Compare* Sec. 4.1 and 5.15(c) of the Settlement Trust Agreement.

| 5.15(c) Settlement Trustee's retention of Legal Counsel | Requires consent of a supermajority of STAC members and reasonable consent of FCR<br><br>= veto power | Consent of supermajority of STAC members and reasonable consent of FCR<br><br>≠ veto power<br>≠ dispute resolution process<br><br>STAC has five days to obtain supermajority STAC approval or Settlement Trustee may seek bankruptcy court approval |
|---|---|---|
| 5.15(a) Protected Party Settlement; | Requires consent of supermajority of STAC members<br><br>If one STAC member objects, Settlement Trustee must seek bankruptcy court approval, which applies entire fairness standard.<br><br>The objecting STAC member may retain own counsel at the Trust's expense. | Consent of four STAC members and reasonable consent of FCR or bankruptcy court approval on notice to affected parties.<br><br>Bankruptcy court applies entire fairness standard and must find settlement to be in the best interest of the Beneficiaries of the Settlement Trust.<br><br>The members of STAC may retain counsel at the Trust's expense to oppose settlement.<br><br>≠ veto power<br>≠ dispute resolution process |
| 6.8(b) Timing Out Provisions | Failure of Settlement Trustee to obtain requisite supermajority precludes proposed action. | Deleted. |

Two issues raised by the Certain Insurers remain.  The Certain Insurers persist in their objection that the Settlement Trustee should not be required to seek supermajority STAC consent to retain counsel.[611]  While I, too, questioned this requirement, the resolution set forth above satisfies my concern.  If the STAC does not approve the Settlement Trustee's choice of counsel within five days, she may file a motion to seek court approval.  I have no doubt the Settlement Trustee will not feel constrained by what is now, essentially,

---

[611] Day 18 Hr'g. Tr. 119:5-120:6.

consultation rights. This objection is overruled. With the amendments to the Settlement Trust and access to the bankruptcy court on all disagreements between the Settlement Trustee and the STAC, the STAC's function now more accurately comports with its name—the Settlement Trust **Advisory** Committee.

The Certain Insurers also question why bankruptcy court review of any settlement reached by the Settlement Trustee with a Protected Party should be judged under the entire fairness standard.[612] The Certain Insurers argue that the correct standard for approving the Protected Party Settlements should be Bankruptcy Rule 9019.[613] No justification for a higher standard in this context was made. I see no reason to impose a higher burden than required under the Code. This objection is sustained.

Finally, I raise my own concern. Revised Exhibit B Section 5.15(a) addresses post-confirmation settlements with Non-Settling Insurance Companies or Chartered Organizations. This section requires notice to affected parties only when the Settlement Trustee seeks bankruptcy court approval of such a settlement.[614] This means that no notice is required if a majority of the STAC approves the settlement notwithstanding that there may be holders of Direct Abuse Claims (and perhaps Indirect Abuse Claims) who are seeking relief from those same Protected Parties. This notice requirement arguably conflicts with the notice requirements in the Plan (Art IV.J.1, K.1). In any event, I will require notice.

---

[612] Revised Settlement Trust Agreement Sect. 5.15(a).

[613] Certain Insurers Supplemental Objection ¶ 70.

[614] Revised Settlement Trust Agreement Sec. 5.15(a).

Relatedly, but separately, the Certain Insurers also raise public policy concerns surrounding the "lack of fraud prevention measures" in the Settlement Trust/TDPs. They contend that the derivation of the Direct Abuse Claims together with the manner in which the proofs of claim were filed by claimants' lawyers mandate that the TDPs contain strong fraud prevention measures.[615] Debtors do not respond directly to these allegations, but rather point to their own good faith in proposing the Plan and TDPs, the ability of the Settlement Trustee to require an examination and the integrity of the proposed Settlement Trustee.

The nomination of retired Judge Hauser together with the changes to the oversight authority of the STAC go a long way to allay concerns raised by the Certain Insurers. Nonetheless, the record supports the implementation of strong fraud prevention measures in connection with review of Direct Abuse Claims. The signature page of the proof of claim form provides three cautionary statements above the signature line:

**Penalty for presenting a fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152, 157 and 3571.**

> **I have examined the information in this Sexual Abuse Survivor Proof of Claim and have a reasonable belief that the information is true and correct.**

> **I declare under penalty of perjury that the foregoing statements are true and correct.[616]**

The record shows, however, that in many instances, lawyers who signed proofs of claim for their clients, or whose signature was affixed to a proof of claim, did not personally review

---

[615] Despite their purported concerns, the Certain Insurers did not move to designate any votes as they had presaged they might do, nor challenge in any way the vote count.

[616] JTX 2953.

the proofs of claim or speak with the client.[617]  Further, certain lawyers tried to distance themselves from their signatures.  Some testified that their signature was not as an individual, but as an agent of their law firm and, as such, the signature was an attestation that the firm examined the information and the firm had a reasonable belief that the information on the form is true and correct.[618]  Moreover, the only two mental health professionals who testified (Dr. Conte put forward by the Coalition and Dr. Treacy put forward by the Certain Insurers) expressed concern that the way that the claims were generated likely resulted in the submission of fraudulent claims at the expense of survivors.[619]

While no one questions the integrity of the proposed Settlement Trustee, it is appropriate, generally, and in this case in particular given the record, to require that the Settlement Trustee engage in a process that will ferret out any fraudulent claims.  This ensures the integrity of the Settlement Trust and protects survivors from dilution of their rightful recoveries.  Notwithstanding a nod toward the potential for fraudulent claims in the TDPs, the TDPs do not provide for specific procedures nor did the Certain Insurers suggest any.  If the Plan is confirmed, the Confirmation Order will provide that the Settlement Trustee will propose procedures to suss out fraudulent claims taking into account factors she deems appropriate, which can include a cost/benefit analysis.  Those procedures will be

---

[617] Day 13 Hr'g Tr. 195:12-201:6; Day 13 Hr'g Tr. 214:19-21; 201:7-203:1; 204:1-22.  Many attorneys also testified that they have since amended proofs of claim to now include the signature of the claimant. *See e.g.,* Day 12 Hr'g Tr. 243:18-23; 245:3-4; Day 13 Hr'g Tr. 198:16-199:1.

[618] Day 13 Hr'g Tr. 202:4-204:18.  One law firm obtained a legal ethics opinion stating that the firm had an ethical duty to file proofs of claim before the bar date even if the firm had incomplete information.  Day 12 Hr'g Tr. 244:2-245:2.

[619] Day 11 Hr'g Tr. 202:1-203:8; Day 12 Hr'g Tr. 230:15-232:18.

presented to the court. The STAC will have no consent rights or veto rights with respect to the proposed procedures. In addition to disallowance of a claim, penalties may include seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 and seeking sanctions from the court.

### B. Section 1129(a)(3)

Section 1129(a)(3) provides that the court shall confirm a plan only if "the plan has been proposed in good faith and not by any means forbidden by law."[620] The Code does not define good faith in this context. To determine whether this requirement is satisfied, the court looks to see if the plan (1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected and (3) exhibits a fundamental fairness in dealing with the creditors.[621] "The important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[622] So, courts look at whether the plan was proposed honestly and with a basis for believing that a reorganization can be achieved focusing more on the process of developing the plan than the contents.[623] "Good faith is shown when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering value to creditors."[624] On the other hand, courts may find that a plan

---

[620] 11 U.S.C. § 1129(a)(3).

[621] *W.R. Grace*, 475 B.R. at 87-88.

[622] *In re Emerge Energy Serv. LP*, 2019 WL 7634308 at \*16 (Bankr. D. Del. Dec. 5, 2019) (quoting *Combustion Eng'g*, 391 F.3d at 246.).

[623] *Id.*

[624] *Id.* (quoting *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 243 (Bankr. S.D.N.Y. 2014) (quoting *In re Chemtura Corp.*, 439 B.R. 561, 575-76 (Bankr. S.D.N.Y. 2010)).

is not proposed in good faith if it is the product of, or allows for, collusion[625] or if the record demonstrates a breach of fiduciary duty in connection with the plan.[626] In all events, however, denial of bankruptcy relief based on a lack of good faith "should be confined carefully and is generally utilized only in . . . egregious cases."[627]

Since perhaps the inception of the bankruptcy case, but certainly since the hearing on the Disclosure Statement, the Certain Insurers have insisted that Debtors "ceded the pen" to plaintiff representatives (either, the Coalition, the TCC or the FCR) in the drafting of the TDP. They argue that the Plan and the TDP are the result of a collusive bargain between Debtors and the plaintiff constituencies to inflate Debtors' claim exposure at the Certain Insurers' expense. They argue that the most visible illustration of this collusion is the lack of "insurance neutrality" and the Base Matrix values.

### 1.  The Certain Insurers' Objection
#### a.  The Drafting of the TDP

Because of their allegations of bad faith, I permitted insurers to take discovery into the mediation process with respect to the development of the TDP. In their confirmation objection, the Certain Insurers represent that "the results of that discovery were damning."[628] I disagree. The record developed at trial shows that Mr. Azer, Debtors' insurance counsel, penned the initial draft of the TDP. Mr. Azer had a hard deadline of

---

[625] *In re Am. Capital Equip., LLC*, 688 F.3d 145, at 158 (3d Cir. 2012) (collusion includes "'[a]n agreement to defraud another or to do or obtain something forbidden by law.'") (quoting Black's Law Dictionary (9th ed. 2009)).

[626] *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 143-144 (Bankr. D. N.J. 2010) (finding, on the record presented, that no demonstration of fiduciary duty occurred).

[627] *In re Falch*, 450 B.R. 88, 93 (Bankr. E.D. Pa. 2011) (quoting *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991)); *In re Walker*, 628 B.R. 9, 17. (Bankr. E.D. Pa. 2021).

[628] Certain Insurer's Objection ¶ 187.

April 13, 2021 to develop the TDP. To do so, he reviewed draft trust distribution procedures sent to him by Hartford's counsel in February as well as trust distribution procedures from other mass tort cases. Mr. Azer testified that he converted Hartford's draft document from a pdf to word to use as a template. He kept components of Hartford's draft that "made sense" such as an expedited distribution concept and certain scaling factors. He also imported general concepts from other trust distribution procedures including claims matrixes. Mr. Azer did receive two proposals from the Coalition with some terms, most of which were unacceptable, and some of which came too close to the deadline to consider. The first filed version of the TDP did not contain any of the Coalition's proposals.[629]

Thereafter, Mr. Azer never gave up the pen. Mr. Azer testified that Debtors had an interest in the TDP because they needed a confirmable plan and that they spent significant time negotiating protections for insurers' contractual rights.[630] Counsel for the Certain Insurers walked Mr. Azer through the TDP (and, various redlines[631]) in minute detail by focusing on provisions that were modified or eliminated after negotiations with counsel for the Coalition.[632] Mr. Azer's drafts contained in numerous places language to the effect that nothing in a specific provision "shall modify, amend or supplement" an insurance policy or be interpreted to do so. After much negotiation with the Coalition, the multiple occurrences of this language ended up in one paragraph:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending or supplementing, the terms of any Insurance Policy or rights

---

[629] Day 4 Hr'g Tr: 37:20-39:24; Declaration of Adrian Azer in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9309; admitted into evidence Day 4 Hr'g Tr. 234:15] ("Azer Decl.") ¶ 7.

[630] Day 4 Hr'g Tr. 39:25-40:22.

[631] JTX 507, 518, 3025, 1358.

[632] The Coalition collected comments from the FCR and the TCC. *See* Patton Decl. ¶ 37.

and obligations under an Insurance Policy assigned to the Settlement Trust to the
extent such rights and obligations are otherwise available under applicable law and
subject to the Plan and Confirmation Order. The rights and obligations, if any, of
any Non-Settling Insurance Company relating to these TDP, or any provision
hereof, shall be determined pursuant to the terms and provisions of the Insurance
Policies and applicable law.[633]

Mr. Azer testified that he believes this language encompasses all of the language that was

deleted in the numerous provisions in the TDP and achieves his goal of preserving the

Insurers' rights under their contracts.[634] Some of this language was arrived at in the back

and forth of drafts and some was a result of mediation sessions.[635] Mr. Azer also testified as

to certain specific provisions that he drafted (x) requiring the Settlement Trustee to

cooperate with the Non-Settling Insurance Companies in the claims process and (y)

specifying that the claim amount shall be subject to any contractual, legal or equitable rights

of the Non-Settling Insurance Companies.[636] These provisions were struck by the Coalition

and are not in the final version of the TDP.

---

[633] TDP Art. V.C.

[634] Day 4 Hr'g Tr. 102:14-24; 63:7-16. Mr. Azer explained that "both his team and the claimant team both said this is really confusing to have [the language] in lots of different places where it could be in one place." *Id.* 133:6-9. *See also id.* 149:6-25.

[635] *See e.g.*, Day 4 Hr'g Tr. 152:25-153:16.

[636] *See e.g.*, JTX 518 Art. V.C., Art. VII.B., C.

**Cooperation.** The Settlement Trust shall perform all obligations under the Insurance Policies issued by the Non-Settling Insurance Companies in order to maintain coverage and obtain the benefit of coverage under such policies. Such obligations shall include any requirement to share documents, witnesses, or other information with the Non-Settling Insurance Companies, to the extent required under the relevant Insurance Policies (the "Trust Cooperation Obligations"). In addition, the parties to the Cooperation Agreement shall provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "Cooperation Agreement Obligations" and together with the Trust Cooperative Obligations, the "Cooperation Obligations"). Other than their Cooperation Agreement Obligations owed to the Settlement Trust, the Settlement Trust's counterparties to the Cooperation Agreement shall no obligation to act in any capacity in the claims resolution process under these CAP.

**Scaling Factors.** The Settlement Trustee shall utilize the claims matrix (the "Claims Matrix") and scaling factors ("Scaling Factors") set forth below in sections Article VII.B and VII.C as the

Based on this record, I cannot find that Debtors colluded with the Coalition or other plaintiff representatives to intentionally deprive insurers of their rights. I cannot find that Debtors abdicated their responsibility to negotiate a plan or proceeded in bad faith. There is nothing that requires Debtors to negotiate a plan that is "insurance neutral," which is not a concept in the Bankruptcy Code.[637] Mr. Azer did, in fact, negotiate to maximize the value of Debtors' insurance assets for the benefit of the Settlement Trust and, ultimately, Abuse Claimants.[638] The Non-Settling Insurance Companies may have preferred Mr. Azer's "belts and suspenders" language, but I will not weigh into the apparent disagreement on drafting conventions.[639] If Mr. Azer failed in his endeavor, and the TDP somehow creates a defense in subsequent insurance litigation, the Non-Settling Insurance Companies may reap that benefit. But, that is not certain. While there is nothing in the TDP that requires the Settlement Trustee to cooperate with the Non-Settling Insurance Companies under the Claims Matrix process, there is nothing that prohibits the Settlement Trustee from taking

basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim, after Final Determination, shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (i.e., the Protected Parties' legal obligation to pay such Direct Abuse Claim); provided, however, that any Allowed Claim Amount determined to be the Protected Parties' liability for a irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article VIII. In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim shall be subject to any contractual, legal, or equitable rights the Non-Settling Insurance Companies have under the applicable Insurance Polices be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the CAP.)

637 *Purdue Pharma*, 633 B.R. at 63 ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect.").

638 *See e.g.,* Day 4 Hr'g Tr. 40:4-17. (Mr. Azer: "We needed to make sure that we were taking into consideration the interests of claimants, but also making sure that we preserved the rights of our insurers, right? That is a significant asset to the estate, and we needed to make sure that we were protecting our insurers' contractual rights.").

639 *See e.g.,* Day 4 Hr'g Tr. 124:24-125:5; 126:10-13.

any and all actions that she believes are appropriate or required to ensure that the Settlement

Trust's insurance rights are maximized rather than compromised.[640]

The Certain Insurers' arguments that Debtors colluded with the Coalition, rather

than negotiated with the Coalition, is wholly unsupported by the record.

### b. *The TCC Term Sheet*

The Certain Insurers also contend that the more recently minted Term Sheet between

Debtors and the TCC results in a collusive quid pro quo that permits Debtors to obtain

confirmation of the Plan using Dr. Bates's aggregate value range of $2.4 billion to $3.6

billion while plaintiffs will be free post-confirmation to use inflated Base Matrix values that

will cause the aggregate value of claims to exceed Dr. Bates's range.[641] The Certain Insurers

also contend that the TCC Term Sheet gives the "Claimant Representatives" (i.e. the TCC,

the FCR and the Coalition) control over the presentation of Dr. Bates's testimony and adds

an additional impermissible finding.

The TCC Term was executed on February 9, 2022 and resolved the TCC's objections

to confirmation. Among its provisions is an agreement as to expert reports. These terms

mandate that Debtors' confirmation submission and any proposed confirmation order will

provide, among other things, that (i) Dr. Bates's aggregate value range is a non-binding

---

[640] *See e.g.,* Statement of the Coalition ¶ 162. As will be discussed, many claims subject to the Claims Matrix process will likely never reach any excess policy issued by a Non-Settling Insurance Company.

[641] Day 18 Hr'g Tr. 56:6-18. (Mr. Doren argues: "The purpose of this, Your Honor, I believe the evidence proves, is that, this way, the debtors, with a low aggregate amount of liability, can get or hope they can get the channeling injunction they seek because all claims will be paid. The creditors, on the other hand, will not be burdened by a low aggregate value and they know that the debtor will state that the base matrix values are consistent with their historical abuse claims, so that they can use those higher values, those inflated values, to get claims paid after the Court is gone, after the debtor is gone. They can fall back on that matrix in order to get claims paid at inflated prices, and the evidence proves that, Your Honor.")

estimation of Debtors' liability and not the result of a contested hearing, (ii) Debtors will

consult with the Claimant Representatives with respect to Dr. Bates's direct testimony; and

(iii) Debtors will not argue that the court must or should make any findings concerning the

aggregate amount of Debtors' liability for Direct Abuse Claims to confirm the Plan and will

not support the entry of any such findings.[642] While, on the surface, this provision of the

---

[642] JTX 1-350 at 9-10.

- The Debtors' confirmation submissions, including any proposed Confirmation Order, will provide that: (1) the Expert Report of Charles E. Bates, dated December 5, 2021, the Rebuttal Expert Report of Charles E. Bates, dated January 5, 2022, and the Supplemental Expert Report of Charles E. Bates, dated January 25, 2022 (collectively, the "Bates Report") and any aggregate amount of liability for Abuse Claims supported or presented by Debtors in connection with confirmation:

  o  has not been agreed to by any other party;

  o  its estimate of the Debtors' potential liability was not the result of a contested hearing or other adversarial process; and

  o  its conclusions are not a binding estimation of the Debtors' liability, nor are the Debtors or the Settlement Trust bound to its allocation of liability to insurance.

  (2) the Expert Report of Nancy A. Gutzler, dated December 5, 2021, the Supplemental Expert Report of Nancy A. Gutzler, dated December 29, 2021, Rebuttal Expert Report of Nancy A. Gutzler, dated January 5, 2022, and the Second Supplemental Report of Nancy A. Gutzler, dated January 27, 2022 (collectively, the "Gutzler Report");

  o has not been agreed to by any other party,

  o its estimates of the Debtors' potential liability, and insurance allocations, were not the result of a contested hearing or other adversarial process, and

  o its conclusions are not a binding estimation of the Debtors' liability and insurance allocations.

  (3) the actual amount of the liability of the Debtors for Abuse Claims will be liquidated and determined pursuant to the TDP and Trust Agreement (subject to all of the terms and conditions of the Plan).

- The Debtors shall consult with Claimant Representatives in good faith on the form of any proffers or statements of direct testimony to be provided by Dr. Bates and Ms. Gutzler in connection with the confirmation hearing, and such proffers will be truthful and consistent with their own opinions and support the positions that (i) the Debtors have satisfied the applicable legal standards for the approval of the non-debtor releases, injunctions, and the settlements in the Plan, and (ii) the Plan and amended TDP are a mechanism (which includes the agreed financial contributions and the rights transferred

TCC Term Sheet appears troubling, upon closer examination it is not. Based on the timeline of Dr. Bates's reports and the record at the hearing, I find no collusion.

First, there could be no collusion or quid pro quo regarding Dr. Bates's ultimate opinion. As the TCC Term Sheet reflects, Dr. Bates issued three expert reports dated December 5, 2021, January 5, 2022 and January 25, 2022, which were prior to the execution of the TCC Term Sheet. The Certain Insurers had each of these expert reports. They did not point to any difference between the reports and Dr. Bates's testimony.[643]

Second, Debtors' agreement to consult with the Claimant Representatives on Dr. Bates's testimony was appropriately qualified—his testimony had to be both truthful and

---

to the Trust to pursue Non-Settling Insurance Companies and Chartered Organizations) that collectively provides for payment of all, or substantially all, of the Abuse Claims.

- The Debtors will support the assertion that the value ranges set forth in the TDP are consistent with and based on the Debtors' historical Abuse Claims settlement values.

- No party will be prohibited from offering any other estimate of the Debtors' potential liability or allocation of that liability to insurance, or from filing a limited objection to the Plan relating solely to the Bates Report, provided that the Claimant Representatives shall consult with the Debtors in good faith on the form of any proffers, declarations, or statements of direct testimony, provided further that the Debtors and Claimant Representatives will in all events support, and will not dispute, the positions that: (i) the Debtors have satisfied the applicable legal standards for the approval of the non-debtor releases, injunctions, the settlements in the Plan, and (ii) the Plan and amended TDP are a mechanism (which includes the agreed financial contributions and the rights transferred to the Trust to pursue Non-Settling Insurance Companies and Chartered Organizations) that collectively provides for payment of all, or substantially all, of the Abuse Claims.

- The Debtors will not argue that the Bankruptcy Court must or should make any findings concerning the aggregate amount of the Debtors' liability for Abuse Claims to confirm the Plan and will not support the entry of any such findings. To the extent any finding purporting to find or establish the aggregate amount of the Debtors' liability for Abuse Claims is made, any Claimant Representative may withdraw their support of the Plan on that basis.

[643] The Certain Insurers objected to the admission of Dr. Bates's expert reports. Because they were hearsay, they were not admitted into evidence. It was not suggested that the expert reports could be admitted for any other purpose such as to rebut this argument.

consistent with his opinions. To the extent that these consulting rights had the potential to color Dr. Bates's testimony in any way, I find that they did not. Again, the Certain Insurers did not argue that any portion of Dr. Bates's testimony contradicted his expert reports. Further, Dr. Bates's testimony was definitive and in no way hedged. He set out his opinions, his methodology and the progression of the Initial Benchmark Valuation and the aggregate range.

Third, Debtors' agreement to support the assertion that the value ranges (presumably, in the Claims Matrix) are consistent with and based on Debtors' Historical Abuse Claim settlement values is not any concession at all. Debtors have taken this position since they established the Claims Matrix and in support of that position offered the testimony of both Mr. Griggs and Dr. Bates. Indeed, in the Disclosure Statement, Debtors state: "[t]he Base Matrix Value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier, in each case based on historical abuse settlements and litigation outcomes which included release for all BSA-related parties, including the BSA and all other putative Protected Parties to such actions, prior to application of the Scaling Factors described in Article VIII.D of the Trust Distribution Procedures."[644] Whether Debtors are correct may be in dispute, but it has clearly been their position.

Fourth, the TCC Term Sheet requires that the Plan include an additional finding, that "[t]he Base Matrix Values in the Trust Distribution Procedures are based on and consistent with the Debtors' historical abuse settlements and litigations outcomes." I have

---

[644] Disclosure Statement at 223.

already addressed this Finding and declined to enter it.[645] For purposes of good faith, I conclude that an agreement to request a finding from the court is not so egregious as to deny confirmation.

Finally, the Certain Insurers argue that in subsequent coverage litigation they will be estopped from arguing that the Base Matrix Values are inflated as this court will have found that the calculation of all those amounts is fair and equitable such that the Plan is not proposed in good faith. Once, again, I have already declined to make such a finding. But, I have two observations here. One, the Certain Insurers retained an expert to opine on the TDP. Dr. Bates testified that he was aware that the Certain Insurers' expert opined that the TDP Base Matrix Value for penetration claims should be $200,000.[646] The Certain Insurers, however, chose not to use their expert during the confirmation hearing to support their argument that the TDP produce over-inflated values.[647] Two, Dr. Bates's testimony was clear: the Base Matrix Values in the TDP are a starting point, not an ending point. In his words, the Base Matrix Values are not "magic number[s];" rather, any number could be used, including the Certain Insurers' expert's apparent starting place of $200,000; one would simply have to modify the Scaling Factors appropriately.[648] Dr. Bates testified that the benefit of his Base Matrix Value of $600,000 for a penetration claim, is that it permits

---

[645] *See e.g., In re Wash. Mut., Inc.*, 461 B.R. 200, 240 (Bankr. D. Del. 2011) (Court concluded that noteholders trading on insider information obtained in settlement negotiations for the purposes of profit and influencing the reorganization in their own interests was improper, but declining to find the plan was not proposed in good faith. Noteholders' actions did not have negative impact on the plan and any harm could be remedied.).

[646] Day 6 Hr'g Tr. 215:10-15.

[647] It is also somewhat ironic, therefore, that the Certain Insurers object to the TCC's decision not to have its expert testify at trial.

[648] Day 6 Hr'g Tr. 215:16-218:10.

reasonable multipliers to be utilized to obtain values at both ends of his bimodal distribution (i.e. $300,000 and below and $900,000 and above). Dr. Bates further testified at length about how to properly apply the Scaling Factors (both positive and negative) so claims are paid consistent with his valuation range. Again, Dr. Bates did not testify as to the value of any individual claim and he did not testify that the value of a penetration claim is $600,000. Rather, he testified that the Settlement Trustee will gather facts to determine the appropriate amount of a given claim on a claim-by-claim basis.

In some ways (perhaps many ways) the use of the term "Base Matrix Value" is deceptive. It is not an average and it is not a minimum. It is simply a starting place. The Certain Insurers could have chosen to put on their expert to challenge the Base Matrix Value or otherwise clear up any confusion, but they did not. This appears to be all optics. Any misperception, especially when the Certain Insurers chose not to challenge the Base Matrix value through their own expert, is not so egregious as to deny confirmation.[649]

### c.  *Quantum of Liability*

Sprinkled throughout their confirmation objection, including in the good faith section, the Certain Insurers argue that the Plan ensures payment of claims barred by an applicable statute of limitations and, citing to *Global Industrial*,[650] contend that the Plan "'materially alters the quantum of liability that insurers would be called upon to absorb,'" making it all but certain that non-settling insurers will be saddled with risks and liabilities far different from what they bargained for."[651] They further contend that plaintiff firms ginned

---

[649] I also note that the Disclosure Statement contains seven pages discussing the Claims Matrix and Scaling Factors and the TDP were an exhibit to the Plan, as solicited.

[650] *Global Indus.*, 645 F.3d at 201.

[651] Certain Insurers Objection ¶ 184. They also argued that the Coalition's and FCR's "handpicked" Settlement Trustee worked to further insure inflated claim values. *Id.* ¶ 185. Since the objection was

up proofs of claim.  The Certain Insurers also submitted evidence that some plaintiff law firms filed proofs of claim without complete, or sometimes little or no, vetting of claims and that this "explosion" of claims alone is grounds to deny confirmation of the Plan.[652]

There is no getting around the fact that pre-bankruptcy Debtors were facing a few hundred to 1700 Abuse claims and there are now 82,209 Direct Abuse Claims that must be resolved.  But, I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation.  There is no doubt that plaintiff lawyers aggressively advertised for clients which, apparently, is nothing new.  But, there is no evidence from which I can conclude that plaintiff firm advertising alone created the groundswell of Direct Abuse Claims.  As discussed *supra*, with the help of an advertising and notification consulting firm, Debtors also engaged in a significant advertising campaign designed to reach approximately 95.9% of men age fifty and over in the United States an average of 6.5 times as well as secondary and tertiary markets.  Further, any number of other reasons could exist for the upsurge in claims, including, generally, lower barriers to entry in bankruptcy (regardless of advertising), a more welcoming environment for the assertion of Abuse claims (i.e. less stigmatization of Abuse victims; the "me too" movement), opening of statute of limitations windows, solace in numbers (i.e. the knowledge that you are not the only Abuse victim) and the Bar Date itself (which both invited Abuse survivors to file claims and established a deadline by which claims had to be filed or be potentially barred forever).  In any event, having presided over these cases, I have no doubt that insurers would have

---

filed, a new Settlement Trustee has been selected and the Certain Insurers posed no objection to this candidate.

[652] Day 11 Hr'g Tr. 204:18-212:10, 212:21-231:4; Day 12 Hr'g Tr. 238:19-253:20; Day 13 Hr'g Tr. 194:1-213:6, 213:21-225:3.

made the same objections had there been "only" 50,000 proofs of claim filed or 25,000 proofs of claim or 10,000 proofs of claim.

While the upsurge in claims undoubtedly gives insurers standing to appear and be heard in these cases—and they have done so in abundance—the logical extension of their argument is that no entity with mass tort liabilities can file a bankruptcy case because claims might increase exponentially. A debtor's ability to obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules. The remedy for inappropriate behavior, if any, rests with state supreme courts and/or disciplinary counsel around the country, any appropriate remedy in this court for persons who failed to perform appropriate diligence before signing proofs of claim and appropriate procedures in the TDP to ferret out any fraudulent claims. Denying confirmation, however, is not an appropriate or proportional remedy.[653]

### d. The Trust Distribution Procedures

I am also not convinced that the TDP will necessarily result in increased cost or liability to Non-Settling Insurance Companies. While, of course, there is the potential, it is really not possible to know until claims are assessed. As exemplified by the prepetition insurance coverage litigation described *supra*, while there may be some issues that are global in nature, insurance coverage litigation is often before the coverage court on whether an insurer must pay a specific settlement entered into by the insured without the insurer's consent. This would appear to be a fact intensive inquiry.

---

[653] *See e.g., In re Cushman*, 589 B.R. 469 (Bankr. D. Me. 2018) (discussing possible sources of sanctions for deficient proof of claim filing practices).

In support of the position that the TDP will result in an increased quantum of liability, the Certain Insurers offered Professor Harrington as an expert on insurance and economics; he was not offered (or accepted) as an expert on insurance coverage litigation or legal matters.[654] Professor Harrington is a tenured professor at the Wharton School of the University of Pennsylvania teaching courses on risk management and insurance and publishing in the area of insurance economics, insurance markets and insurance regulation.[655] He offered four opinions regarding insurers' risk which focus on the Findings in the Plan and the TDP:

> First, the plan and TDPs interfere with key rights in non-settling insurers' insurance policies and impair those rights, especially regarding specific contractual provisions associated with defense and related provisions.

> My second opinion is that the plan findings, as proposed, prejudice insurers' rights, notwithstanding language in the plan and the TDPs which purportedly preserves those rights.

> My third opinion is that the plan and the TDPs would increase non-settling insurers' quantum of liability.

> And my fourth opinion is a bit more general. But I believe that, when you have debtors and plaintiffs' representatives propose and develop a plan and TDPs with little or no insurer input, that that presents an inherent potential for those parties to benefit at the expense of insurance companies, compared to what would be the case absent bankruptcy.[656]

As a life-long academic, Professor Harrington has never advised an insurance company on risk, assisted or participated in insurance coverage litigation or advised whether to pay a claim and he does not know how insurers actually participate in the defense of any claim.[657]

---

[654] Day 12 Hr'g Tr. 17:1-13.

[655] Day 12 Hr'g Tr. 6:8-8:24.

[656] Day 12 Hr'g Tr. 18:2-22.

[657] Day 12 Hr'g Tr. 87:16-89:8; 106:14-107:11.

As is evident, notwithstanding the specific and narrow nature of his expertise, Professor Harrington's opinions wander outside his academic expertise into interpretation of the Plan and TDP and speak generally about "prejudice" to litigation outcomes, an area in which he was not offered and admittedly has no expertise.

Professor Harrington testified, generally (and within his expertise), to four key clauses in CGL (commercial general liability) policies that help reduce a "moral hazard" and permit insurers to offer coverage at lower premiums thereby encouraging the "take-up" of liability insurance in the business community.[658] These clauses include: (i) the right and/or duty to defend the insured, the right to associate in the defense of the insured and the right to investigate applicable legal liability; (ii) the duty of the insured to cooperate with the insurer in the investigation and defense of the claim; (iii) the insurance company's right to consent to settlements under the policy and the related "no action" clause that does not permit the insurance company to be sued until after a trial or an agreed settlement and (iv) the anti-assignment clause.[659] Professor Harrington testified that these clauses align the interests of the insurance company and the insured to help control the cost of claims.[660] Further, he testified that these clauses anticipate that claims will be brought in the tort system.[661]

---

[658] *See generally*, Day 12 Hr'g Tr. 19:3-20:13. A moral hazard is "the possibility that an insured, once the insurance company is paying for claims or losses, the insured may have less incentive to prevent loss or less incentive to limit the size of losses or claims once they occur." Day 12 Hr'g Tr. 19:21-25.

[659] Day 12 Hr'g Tr. 19:4-21:15.

[660] Day 12 Hr'g Tr. 22:4-14.

[661] Day 12 Hr'g Tr. 23:20-24:2.

Professor Harrington then testified (outside his expertise) that the TDP and the Findings would make it more "challenging" for an insurance company to assert its contractual rights in any subsequent coverage action.[662] He testified that all methods of evaluating and paying claims under the TDP would increase an insurer's quantum of liability. For example, to support his opinion on increased quantum of liability, Professor Harrington relies on (i) his read of the Independent Review Option, which he believes does not provide an insurer with the same level of participation in the defense of a claim and (ii) the fact that the Claims Matrix Process will be used to evaluate many claims that Dr. Bates testified would never have been brought in the tort system based on claim hesitancy and law firm economics.[663] Professor Harrington's bottom line is that there is the "inherent possibility" that the drafting of a plan and trust distribution procedures without insurer input will increase insurer's liability.[664]

Professor Harrington's testimony actually highlights the fact intensive, forward-looking nature of the inquiry. Ms. Gutzler's analysis shows that BSA excess policies issued by Non-Settling Insurance Companies generally kick in after $500,000 in primary limits and that where a Non-Settling Insurance Companies is in the first layer of coverage there is a

---

[662] Day 12 Hr'g Tr. 51:2-15.

[663] Day 12 Hr'g Tr. 52:15-54:7. A payment under the Expedited Distribution election will never hit an excess policy.

[664] Day 12 Hr'g Tr. 55:4:-11. In fact, Professor Harrington suggests that it is not possible for trust distribution procedures to be consistent with an insurer rights unless insurers develop and/or approve the processes:

> A: And I understand that if there is going to be a plan and there is going to be a trust distribution procedure, there could be a role for an expedited distribution, but that notwithstanding, it doesn't change the fact that, unless the insurance companies have been involved in developing that and approved of that, it's inconsistent with their contractual rights.

Day 12 Hr'g Tr. 98:10-16.

matching deducible of $1 million. Dr. Bates tested his claim hesitancy/law firm economics theory using a $200,000 yardstick. His hypothesis, therefore, leads to the conclusion that the Non-Settling Insurance Companies' policies will not be triggered by Direct Abuse Claims that would not have been brought in the tort system. The Certain Insurers' quantum of liability, therefore, is not increased. That Dr. Bates may be incorrect (as he did not value any individual Direct Abuse Claim), only highlights the current uncertainty.[665] More fundamentally, however, it is unclear why an insurers' quantum of liability should be measured by what claims *would have been* brought rather than what claims *could have been* brought. As Dr. Bates also testified, the claims that would not have been brought, still have value. If those claims attach to a given policy, then this was the risk insurers agreed to take on when they wrote the policy.[666]

Professor Harrington also acknowledged that the cost to resolve 82,000 claims in the tort system could be substantially more than resolving those claims under the TDP. As he testified:

> Q:    But, Dr. Harrington, you acknowledge that these claims exist now, right? I mean, there are 82,000 claims that exist now that have to be resolved in some fashion.
>
> A:    That, I acknowledge, yes.

---

[665] The Certain Insurers' expert's apparent opinion also supports a conclusion that most claims will never reach an excess policy.

[666] This is the same argument that the Certain Insurers use to challenge the existence of the Independent Review Option. It was not hidden that the Independent Review Option was added to permit those claimants with high value claims to recover more than the Maximum Claim Value in the Claims Matrix. The TCC and the Pfau/Zalkin Claimants persuaded others that the Maximum Claim Value artificially capped claims and arguably let excess carriers off the hook for the very claim values that would trigger their policies. The addition of the Independent Review Option, however, does not increase an insurers' quantum of liability. A policy will attach, or it will not, based on the size of the claim and the terms of any and all relevant policies.

Q:    Okay. And do you also acknowledge that the cost to resolve those claims in the tort system is more expensive than the cost to resolve those claims under the TDP?

A:    My impression would be that if you resolved all 82,000 claims in the tort system under that hypothetical that there would be substantial costs associated in resolving those claims, which could exceed the amounts associated with resolving them under the TDP, the overall cost of resolving the claims in the TDP would depend on many things that haven't been determined, including the cost of the settlement trustee and the cost to insurers involved with investigating claims they may be presented with and so on. But I missed the point here in terms of the applicability. The point here would be that, if you could settle a tort claim for $3,500 in the (indiscernible), it might have been sensible to do so. That doesn't change the fact that the TDP and the petition and the associated TDP have greatly exceeded the number of claims compared to what would have occurred under the tort system and insurance companies are now going to be asked to respond for a vast increase in number of claims without the rights they would have had under the tort system and for claims that will be resolved outside of the tort system.

Q:    So, you're not suggesting that we go out and litigate 82,000 claims, right?

A:    No. [667]

Professor Harrington also conceded that he does not know how insurance companies participate in the underlying Abuse litigation, so his conclusions about the actual impact of any loss of contractual rights is all in the hypothetical. [668]

Moreover, Professor Harrington further conceded that he had never considered what I dubbed the "reverse moral hazard" and so this has not factored into his analysis. As related by Debtors' counsel during cross-examination, the reverse moral hazard is the "*Fuller-Austin* scenario" (*see supra*) in which an insurance company's obligations may actually decrease because of the bankruptcy case if a coverage court determines that the insurer's obligation under the applicable policy to pay a loss is limited to what the trust

---

[667] Day 12 Hr'g Tr. 103:2-104:6.

[668] Day 12 Hr'g Tr. 106:14-107:11

actually pays out (the payment percentage) as opposed to the actual amount of the allowed claims against a debtor.

Finally, Professor Harrington's testimony was riddled with conclusions based on his reading of the TDP, the Findings, the Plan and his conclusions about how a coverage court will interpret the Plan and any Order entered by this court. His bottom line is that it will be "exceedingly difficult" for an insurer to argue that they are not responsible for any Allowed Amount determined under any portion of the TDP.[669]

While I accept Professor Harrington's testimony that insurance policies contain multiple clauses that factor into the economic pricing of policies, I do not accept his opinions regarding the impact of the TDP (or his reading of them), the Findings, or his conclusions about the "difficulty" an insurance company may face in future coverage litigation. As I have already observed, while (with a few exceptions) the Claims Matrix Process does not contain provisions requiring the Settlement Trustee to tender claims to Non-Settling Insurance Companies or permit insurer participation, nothing prohibits her from doing so. I will not anticipate how the Settlement Trustee will perform her duties, but I am confident she will be mindful of the need to maximize the insurance assets. Moreover,

---

[669] Day 12 Hr'g Tr. 62:20-63:19.

Q: Whether something is going to be -- something can be raised by the insurers and whether that is addressed by the plan or the confirmation order that is something that can be raised by the insurers in post-confirmation litigation, right?

A: It might be possible that they can raise it, but the thrust of my testimony here regarding these findings is that the overall thrust of these findings will make it exceedingly difficult for any insurer to argue that, say, the allowed amounts or payments to particular persons are somehow that not the insurers responsibility given the language that is included in these findings.

\* \* \*

A: I'm taking the position that it would be exceptionally difficult for the insurance company to argue these things given the imprimatur of the bankruptcy court on these findings.

I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered.  As even Professor Harrington acknowledged, he does not know "how anything will come out."[670]

Accepting Professor Harrington's opinions leads to one of three conclusions, all of which I reject.  <u>One</u>, a company facing mass tort liability cannot file bankruptcy because an insurer's quantum of liability will, of necessity, increase.  <u>Two</u>, an insurer must be given the right to develop or approve trust distribution procedures designed to liquidate personal injury claims or the insurer's contractual rights will, necessarily, be compromised or it will be "more difficult" to raise positions in subsequent insurance coverage litigation.  This position gives too much leverage to insurance companies.  <u>Three</u>, a plan and trust distribution procedures must be "insurance neutral."  As I have already found, this is a standing concept.  While it is a tool debtors may choose to use and may offer significant benefits to a bankruptcy case, "insurance neutrality" is not required.

In any event, on the record presented, I do not conclude that any potential increase in the quantum of liability precludes a finding of good faith under § 1129(a)(3).

---

[670] Day 12 Hr'g Tr. 65:2-14.

Q: But we don't know one way or another how that is going to come out, right?  That is an assumption that you're making.

A:  I don't know how anything will come out.  I will just stand by what I have already said about my understanding based on the contract provisions and their economic basis for having these things resolved in the tort system with various rights can be prejudiced by the overall procedures.  Then these findings, basically, implying that everything is consistent with history and fair, and equitable, and appropriate. That makes it very difficult for insurance companies to assert any contractual rights they may have. The language preserving those rights notwithstanding.

Many of Professor Harrington's concerns are alleviated because I am not entering most of the Findings.

### e. *Statute of Limitations / Negligence*

The Certain Insurers also object to confirmation on the ground that the Plan does not satisfy § 1129(a)(3)'s good faith requirement because the Settlement Trustee might pay claimants who have not proven negligence or whose claims may be barred by the applicable statute of limitations.  The Certain Insurers cite to *Zenith*[671] for the proposition that the Plan must not only comply with the provisions of the Code but must also comply with "any relevant 'applicable nonbankruptcy law,' including state contract and tort law."[672]

*Zenith* was a prepackaged Chapter 11 plan negotiated between a debtor corporation and its controlling shareholder.  Certain parties objecting to the plan argued that §1129(a)(3) required the court to evaluate the prepackaged plan under Delaware's entire fairness standard of review as the controlling shareholder was to receive 100% of the equity in exchange for debt forgiveness and new funding.  There, Judge Walrath agreed with the plan objectors and found that "section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law)."  Judge Walrath then went on to evaluate the transaction giving rise to the prepackaged plan under Delaware's entire fairness standard.

However, the result was different in *Coram Healthcare Corp.*[673]  There, parties objected to a chapter 11 plan under § 1129(a)(3) because the debtor's CEO served the interests (by way of an employment contract) of both the estate and one of the debtor's large creditors, thereby making the proposed chapter 11 plan suspect given that the debtor's large creditors had authority over its CEO who was involved in formulating the chapter 11 plan.  Judge

---

[671] *In re Zenith Elecs Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999).

[672] Certain Insurer's Objection ¶ 101.

[673] *In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001).

Walrath found that the chapter 11 plan was formed without regard to the "separate boundaries necessary between a creditor and a debtor," but declined to analyze whether the plan was submitted in good faith by examining the CEO's conflict of interest under the entire fairness standard of review. Judge Walrath explained that the situation in *Zenith* involved one transaction—the plan. She explained that, under the facts of the *Coram* case, she would have to examine "every single action of the Debtors" which could not be done given "the CEO's pervasive role in the affairs of the corporation."

In the case at bar, *Zenith* is distinguishable because, as explained by Judge Walrath, it involved a single transaction (the plan) between a controlling shareholder and the debtor which, under Delaware corporate law, would be evaluated under the entire fairness standard of review. Here, like in *Coram,* there is not one transaction to examine. Determining whether a specific claimant has proven negligence or whether a specific claim is barred by an applicable statute of limitations cannot be done on a claim-by-claim basis in the context of confirmation.

Even if *Zenith* was not distinguishable, I conclude that these objections do not prevent a good faith finding because the objections are not grounded in "law." There is no "law" that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant whose claim is time barred. Indeed, the uncontroverted testimony of Mr. Griggs is that prepetition BSA was not often successful in asserting statute of limitations defenses even in states where the defense was viable, and that even when BSA prevailed on a statute of limitations defense it still might subsequently settle the claim.[674]

---

[674] Griggs Decl. ¶¶ 22-26.

Further, the TDP take into account a potential statute of limitations defense through the mitigating Scaling Factors. With Mr. Griggs's input, including a State-by-State Statute of Limitations Review and Historical Analysis,[675] BSA places each State in one of five categories (open, Gray 1, Gray 2, Gray 3 and closed).[676] The TDP establish a multiplier for each category (1, .5-.7, .3-.45, .1-.25, .01-.1, respectively). So, for example, for a claimant with a Tier 1 claim in a State placed in the "closed category" the Settlement Trustee will apply a multiplier of .01-.1 to the Base Matrix Value of $600,000. If all other Scaling Factors result in a multiplier of 1, such that the Base Matrix is not otherwise affected positively or negatively, that claimant will have an Allowed Abuse Claim between $6,000 and $60,000. In the abstract, I cannot find based on the record before the court that this result means the Plan was not proposed in good faith.[677] Nor can I conclude based on the record before the court, that the payment, or even existence of this claim, increases the quantum of liability for any primary insurer much less any excess insurer.

Similarly, there is no "law" that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant who has not proven negligence. The Claims Matrix Process (to which this objection appears to be directed), requires as a General Criteria that the Direct Abuse Claimant "provides information showing (or the Settlement Trustee otherwise determines) (i) that the Direct Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities, and (ii) that a Protected Party *may bear legal*

---

[675] JTX 360.

[676] TDP Sched. 1.

[677] The Certain Insurers did not present evidence of their own State-by-State analysis of statutes of limitations or suggest different multipliers.

*responsibility*."[678]  Mr. Azer testified that the language is meant to include, but not be limited

to, legal theories of negligence.[679]  One would think this would suffice to satisfy the Certain

Insurers' objection, but apparently it did not.  Given Debtors' intent, the word "negligence"

should be added to Art. VII.C.2(c).

Other than this wordsmithing, the Certain Insurers' objections are overruled.

### 2.  *The TDP Fees*

The UST objects to the fees required to be paid to participate in the Independent

Review Option.  The TDP require that a Direct Abuse Claimant pay an initial $10,000 fee

upon making the election to participate in the IRO and pay another $10,000 fee

immediately prior to the Neutral's review.[680]  These two fees are called "administrative

fees."  As the TDP state, the costs associated with the IRO are to be borne by the Direct

Abuse Claimant, not the Settlement Trust and "[s]uch obligation shall be offset by the

administrative fee paid by the Direct Abuse Claimant."[681]  If the cost to the Settlement

Trustee of processing the IRO claim is less than the administrative fee, the unused balance is

returned to the Direct Abuse Claimant.[682]  The TDP do not state how any fees above the

administrative fee are assessed and paid by the Direct Abuse Claimant.  The Settlement

---

[678]  TDP Art. VII.C.2(c).

[679]  Day 14 Hr'g Tr. 41:4-14.

[680]  TDP Art. XIII.G(ii).

[681]  TDP Art. XIII.F.

[682]  TDP Art. XIII.F.

Trustee has the authority to waive the initial fee in "appropriate cases, based on the circumstances of the Direct Abuse Claimant."[683]

Mr. White, who is incarcerated, also objects to this fee as well as the $1000 fee for reconsideration of determinations made under the Claims Matrix Process given prison wages. Mr. White contends that the Plan violates his Constitutional rights and discriminates against claimants who are unrepresented and incarcerated.[684] Mr. MacDougall objects to the Plan, generally, and contends that the BSA should be liquidated. He also specifically objects to the fees for the Independent Review Option.[685]

The only evidence that came in on the $20,000 administrative fee is from Mr. Griggs. He testified that the IRO is for higher value claims (such as those alleging abuse by Hacker) in which BSA would seek more expansive discovery. He testified that the cost of defending such claims could exceed $1 million and that plaintiffs would also bear significant costs in moving forward, which would typically exceed $20,000.[686] In argument, counsel for the Pfau/Zalkin Claimants suggested that the administrative fee is less that what a plaintiff would incur outside of bankruptcy and that his view is that "state court counsel who would normally incur these costs in going forward with the claim would front these fees for their

---

[683] TDP Art. XIII.G(ii).

[684] Confirmation Brief [ECF 9291].

[685] 01/28/2022 Letter to Court from Gregory MacDougall [ECF 8734]; 02/16/2022 Letter to Court from Gregory MacDougall [ECF 8972].

[686] Griggs Decl. ¶ 64.

clients as part of their normal engagement."[687] Counsel argued that it was fair under the circumstances and noted the safety value for waiver of the fee.[688]

The UST grounds its objection in § 1129(a)(3) good faith. I do not think this argument falls squarely under this confirmation standard. As stated above, § 1129(a)(3) examines whether the plan fosters a result consistent with the Bankruptcy Code's objectives and delivers value to creditors. The UST has not shown that this provision is somehow the result of collusion or was negotiated in bad faith. Whether it is fair to creditors likely turns on which method of liquidation a Direct Abuse Claimant chooses. The administrative fee shifts the cost of the Settlement Trust to the claimant who chooses the IRO, which requires more significant Settlement Trust resources. If it did not, those fees would be borne by Abuse Claimants, generally. I cannot say this provision strikes an improper balance.

Nor do I think the fees implicate any legally cognizable discrimination standard. I am sensitive, however, to the concern raised by the UST, Mr. White and Mr. MacDougal that those without counsel and/or incarcerated may be unable to avail themselves of the IRO. In the claims allowance process in bankruptcy court, a claimant bears his own costs, but not those of the objector or the court. Accordingly, to the extent that a Direct Abuse Claimant is dissatisfied with the Settlement Trustee's decision on waiver of fees—and she should be able to waive both $10,000 assessments as well as a fee for reconsideration—such decision will be reviewable by the court.

---

[687] Day 17 Hr'g Tr. 260:17-21.

[688] Counsel suggested both the initial $10,000 fee and the subsequent $10,000 fee could be waived. That does not appear to be the case.

### 3. *The Lujan Claimants' Objection*

The Lujan Claimants contend that the Plan was not proposed in good faith because Debtors: (i) "gamed the system" by creating Delaware BSA, LLC in order to file in the Third Circuit (which permits third-party releases) rather than in the Fifth Circuit (which, does not); (ii) proposed multiple plans that violate the stay in the Archbishop's bankruptcy case; (iii) modified the Plan late in the voting process and did not disclose material changes and (iv) seek to deprive creditors of their rights against third parties.[689] Debtors respond that none of the reasons is grounds for finding a lack of good faith. I agree.

The Lujan Claimants' argument regarding the formation of Delaware BSA, LLC is not supported by any evidence, but in any event, comes too late. The Lujan Claimants waited two years before raising any venue concerns. I will not deny confirmation on an argument that should have been made two years ago. The remaining grounds are simply disagreement over the terms of the Plan and treatment of the Lujan Claimants' claims and, perhaps, the Archbishop's decisions as a Chartered Organization. These are not grounds for finding a lack of good faith.

### 4. *Mr. Schwindler's Objection*

Mr. Schwindler contends the Plan is nor proposed in good faith largely because BSA is maintaining the same "flawed organization structure" which, he believes, will continue to fail BSA in the future. Mr. Schwindler believes that Local Councils are not truly independent entities and should not be treated as such. He posits a plan in which BSA changes its organizational and operational structure (including decreasing Local Councils

---

[689] Lujan Claimants' Objection at 42-44.

by two-thirds and shrinking their real property holdings and employees). In other words, Mr. Schwindler envisions an entirely different BSA going forward.

BSA is not obligated to propose a plan that comports with Mr. Schwindler's vision. The Plan fosters a result consistent with the Code, is proposed for the purpose of reorganizing and delivers value to creditors. That there might be another plan, or even a better one, is not grounds to find a lack of good faith.[690]

### C. Section 1129(a)(7)

Section 1129(a)(7), the "best interest of creditors test," is a protection for individual creditors whose claims are impaired.[691] Even if voting results in an accepting class, a plan may not be confirmed unless each holder of a claim has accepted the plan or "will receive or retain under the plan on account of such claim . . . value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."[692] Six objectors assert that Debtors have not satisfied § 1129(a)(7).

---

[690] *See e.g., In re Spansion, Inc.,* 426 B.R. 114, 140 (Bankr. D. Del. 2010) (quoting *In re Celotex,* 204 B.R. 586, 611-12 (Bankr. M.D. Fla. 1996) ("This Court's responsibility with respect to consideration of the Plan is to consider as a matter of law (i) whether the Plan Proponents have met their burden under the Bankruptcy Code, (ii) whether each impaired class has accepted the Plan and (iii) the merits of any timely filed objections to the Plan. The Court need **not** and ought **not** consider if a proposed plan is the "**best**" **plan** of reorganization that could be promulgated, providing for the highest return to creditors of the Debtors' Estates. Instead, the Chapter 11 process is controlled by the various constituencies in a case, including holders of Claims and Interests. It is not the Bankruptcy Court's role to substitute its judgment for the judgment of the various classes of creditors who have voted overwhelmingly in favor of the Plan. Accordingly, the Bankruptcy Court is not required to compare the Plan to a hypothetical plan. Therefore, in order to meet their obligations under Section 1129(a)(7) of the Bankruptcy Code, Plan Proponents must prove that the distribution to creditors under the Plan is no less valuable, as of the Effective Date of the Plan, than the distribution such creditors would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.").

[691] *Bank of America Nat't Trust & Sav. Ass'n v. 203 N. LaSalle II,* 526 U.S. 434, 414 n.13 (1999).

[692] 11 U.S.C. §1129(a)(7).

The Lujan Claimants' argument is somewhat fluid in nature, but in essence, the argument appears threefold: (i) Mr. Whittman's Local Council analysis is not reliable because there is a lack of transparency into Local Councils' assets and liabilities, which can only be remedied through their own bankruptcy proceedings; (ii) the releases and injunctions in the Plan prevent the Lujan Claimants from pursuing their claims against nondebtors and receiving recoveries under policies issued by Non-Settling Insurance Companies and (iii) the Plan prevents creditors from receiving compensation in the Guam bankruptcy case based on proofs of claim filed in that proceeding.[693]

The D&V Claimants assert that the best interest test is not met because the Plan contains third-party releases and because in order to receive a distribution under the Plan, the claimant must sign a release of all Protected Parties.

Jane Doe, who holds a Direct Abuse Claim, argues in her written objection that Debtors failed to do a "proper liquidation analysis" because they made no attempt to account for recoveries from Participating Chartered Organizations.[694]

---

[693] Lujan Claimants' Objection at 20-23.

[694] Jane Doe Objection ¶ 44. In her written objection (which was based on the liquidation analysis contained in the Disclosure Statement), Jane Doe contends that Debtors failed to conduct a proper liquidation analysis because Debtors did not include insurance recoveries in their analysis. Jane Does does not explain the significance of that exclusion nor did she cross-examine Mr. Whittaker at trial on his subsequent testimony that contains an explanation for why insurance was not included in the analysis. Mr. Whittman explains his liquidation analysis does not account for insurance recoveries "on the basis that recoveries from such proceeds are assumed to be the same or greater under the Plan than in a liquidation." Whittman Decl. ¶ 274. He also testified that Debtors contend the aggregation of the insurance rights as provided for in the Plan maximizes those recoveries. Finally, Mr. Whittman estimates additional litigation costs absent a plan of $459 million to $822 million. All of this testimony is unrebutted. This portion of the Jane Doe objection is overruled.

Mr. Washburn asserts in his written objection that Debtors do not meet the best interest test and leaves Debtors to meet their burden of proof. He does not expound on his argument.[695]

Mr. Schwindler does not specifically object on these grounds, but Debtors treat his objection as if he did. Mr. Schwindler, among other things, objects to releases of Chartered Organizations and Local Councils.[696]

Mr. Pai, as the administrator of the Estate of Jared Pai, holds a Class 7 Claim (Non-Abuse Litigation Claims).[697] Holders of Class 7 claims are projected to receive a 100% recovery under the Plan. Mr. Pai asserts that Debtors cannot satisfy the best interests test because in a chapter 7 liquidation: (i) he would retain his right to satisfy any state court judgment he receives from applicable insurance proceeds and (ii) the Settlement Trustee must consent to any settlement of his claim and his ability to receive proceeds from the insurance policies.

Debtors respond, generally, that (i) the best interest test is not applicable to nonprofits; but if it is, (ii) the plain meaning of § 1129(a)(7) does not require that the court consider the value of third party claims in a liquidation analysis; but, in any event (iii) the Whittman liquidation analysis shows that all creditors will receive at least what they would

---

[695] Washburn Objection ¶¶ 25-29. While given the opportunity to present argument, Mr. Washburn did not do so.

[696] Schwindler Objection at 30.

[697] Mr. Pai is the administrator of the Estate of Jared Pai, who died in 2015 in a car accident that occurred while returning home from the Philmont Scout Ranch. In 2016, Mr. Pai commenced a prepetition action against BSA and others seeking damages against BSA for wrongful negligence by an agent, institutional negligence, wrongful death and survival. Objection of Eric Pai, as Administrator of the Estate of Jarred Pai to Confirmation of the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8677] ("Pai Objection") ¶¶ 1-2.

receive in a liquidation and finally, (iv) the Plan pays creditors in full.  Local Councils

counter that they have been entirely transparent regarding their assets and liabilities.

### 1. *Section 1129(a)(7) Applies to Nonprofits*

Debtors initially argue that they need not meet this test as Debtors are nonprofits.

Debtors contend that because their cases cannot be converted involuntarily to chapter 7

cases,[698] it makes no "legal or logical sense" to require Debtors to prove that creditors would

receive at least as much as in a hypothetical liquidation.  The UST counters that

§ 1129(a)(7) does not contain an exception for nonprofits and notes that § 1129(a)(16)

specifically references nonprofits.  Jane Doe also contends there is no exception for

nonprofits in the best interest test.[699]  No party cites a case directly on point.

I agree with the UST and Jane Doe.  Section 1129(a)(7) is a confirmation

requirement and there is no exception for nonprofits.  Even if one could look beyond the

plain language of the statute, there is nothing illogical about requiring a nonprofit to show

that it can meet this requirement in order to obtain the benefits of a confirmed plan.  A

nonprofit has options if it is in financial distress.  It can voluntarily file a bankruptcy case

under either chapter 11 or chapter 7 or it can look to its state law alternatives.  But, to obtain

a discharge in bankruptcy, it must meet all applicable requirements of § 1129.

### 2. *All Other Objections are Overruled*

Courts have differed on the interpretation of § 1129(a)(7) in the context of a plan that

provides for third-party releases.  Once again, I turn to the plain language of the statute.  In

order to confirm a plan, a debtor must prove by a preponderance of the evidence that a

---

[698]  11 U.S.C. §1112(c).

[699]  Jane Doe Objection ¶ 43.

dissenting creditor "will receive or retain under the plan *on account of such claim* . . . value, as of the effective date of the plan, that is not less than the amount that such holder would *so receive or retain* if the debtor were liquidated under chapter 7 of this title on such date."[700] As was pointed out in *Purdue*, "as a matter of grammar," the required comparison "apparently is between the amount that the objecting creditor would receive under the plan on account of its claim and what it would 'so' receive—that is, on account of its claim—if the debtor were liquidated under chapter 7.[701] This reading leaves an analysis of third-party releases to the relevant third-party standard (in the Third Circuit, *Continental*).

The *Ditech*[702] and *Quigley*[703] decisions, on which objectors primarily rely, do not address the plain language argument. These courts state that claims against a third party should be included in the best interest test if they are neither speculative nor incapable of estimation and exist as of the date of the hypothetical chapter 7 case.[704]

Both the *Ditech* and the *Quigley* courts denied confirmation. The *Ditech* decision turned, in large part, on § 363(o), a section not applicable here. Put simply, § 363(o) provides that a purchaser of consumer credit debt "shall remain" subject to all claims related to the underlying contracts, thus expressly preserving the very type of third-party claims that the plan there would have released.[705] In *Quigley*, the court was able to determine the value

---

[700] 11 U.S.C. §1129(a)(7) (emphasis supplied).

[701] *Purdue Pharma*, 633 B.R. at 111.

[702] *In re Ditech Holding Corp.*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019).

[703] *In re Quigley Co. Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010).

[704] *Ditech*, 606 B.R. at 615 "[W]hen weighing specific claims [against third parties] in a liquidation analysis, the claims cannot be speculative or incapable of estimation and should exist as of the date selected for valuation in a hypothetical chapter 7 case." (citing *Quigley*, 437 B.R. at 145-46).

[705] 11 U.S.C. § 363(o) ("Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer

of the third-party claims based on a history of settlements apportioning 77% of the liability on the underlying asbestos claims to the debtor and 23% of the liability to the to-be released third-party. Given the 7.5% payout under the plan, the court ruled that even if a hypothetical chapter 7 case resulted in no payout on claims, a dissenting creditor would be left to pursue claims against the third-party estimated to be worth 23% of that same claim.

Debtors argue that the third-party claims being released here are speculative. Debtors distinguish *Quigley* as having only one co-defendant/released third-party, together with a 20-year history of settlements. Here, Debtors point out that there are 82,209 different claims against tens of thousands of different third-parties such that it would be impossible to value any particular claims. They also rely on Dr. Bates's conclusion that while he can value claims in the aggregate he cannot, and did not, value any single Direct Abuse Claim. Moreover, Debtors correctly point out that many holders of Direct Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim. Further, in response to the Lujan Claimants in particular,[706] Debtors point to the prepetition settlement of claims against BSA for Abuse committed by the same perpetrator, Brouillard, which settled for $57,000. Finally, Debtors argue that "there's a mechanism in this plan for payment in full."[707]

---

credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.").

[706] The Lujan Claimants are the only objectors who engage directly on this issue.

[707] Day 19 Hr'g Tr. 53:1-3.

The Lujan Claimants disagree. They argue that their claims are not speculative and their lawsuits were filed prepetition. They argue that the amount of each of their claims cannot be judged by the prepetition settlement history of claims filed by others against the same perpetrator. Rather, they contend that their claims should be valued at $10 million, the request in each of their complaints, or at least at $5 million by comparing their claims to those brought against Hacker. During argument, counsel for the Lujan Claimants also walked through the towers of insurance that exist by year, arguing that her clients would receive more in a chapter 7 because they would have access to this insurance. For example, from 1978 to 1981, the Lujan Claimants assert that BSA has primary insurance of $500,000 per occurrence plus excess insurance of $10 million per occurrence in 1978, excess insurance of $15 million per occurrence in 1979, excess insurance of $15 million per occurrence in 1980 and excess insurance of $21.65 million per occurrence in 1981.

Notwithstanding their legal positions, Debtors put forward the testimony of Brian Whittman, via declaration.[708]    Mr. Whittman is a Managing Director in the Commercial Restructuring Practice at Alvarez & Marsal North America, LLC and Debtors' restructuring advisor.[709] In a thorough and detailed analysis, Mr. Whittman performed three separate liquidation analyses. Mr. Whittman performed a liquidation analysis of Debtors and Related Non-Debtor Entities.[710] Mr. Whittman performed a liquidation analysis of Local Councils.[711] He also performed a consolidated liquidation analysis of Debtors, Related

---

[708]  Whittman Decl. ¶¶ 240-281.

[709]  Whittman Decl. ¶ 1.

[710]  Whittman Decl. ¶¶ 243-258.

[711]  Whittman Decl. ¶¶ 259-269.

Non-Debtor Entities and Local Councils.[712]  Finally, he performed a sensitivity analysis

related to the $1.1 billion PBGC claim as well as additional expense necessary to secure

recoveries on insurance in a liquidation mode.  Based on his analyses, Mr. Whittman

concluded that "each Class of Creditors will recover more under the Plan than they would

in a hypothetical liquidation.[713]  No party cross-examined Mr. Whittman on his liquidation

analysis or, except for the Lujan Claimants' transparency arguments, in any way challenged

Mr. Whittman's specific calculations, assumptions or conclusions.  Admittedly, however,

Mr. Whittman's liquidation analysis does not include an evaluation of the assets or

liabilities of any Chartered Organization.

Initially, I conclude that the Lujan Claimants' transparency argument is without

merit.  The Disclosure Statement contains individual balance sheet information for each

Local Council and significant information on each Local Council is in a BSA database

available to all objectors.[714]  Additionally, in connection with his analysis of the Local

Council contribution, Mr. Whittman did a significant evaluation of Local Councils' assets

and liabilities.  Further, the Lujan Claimants are in a better position than most in terms of

access to Local Council (and Chartered Organization information).  As they repeatedly

point out, the Lujan Claimants have claims in the Archbishop of Agaña's bankruptcy case,

which predates the BSA case, and therefore have had an ability to obtain information in that

case as well.[715]  Of course, the Lujan Claimants, who participated in confirmation discovery,

---

[712] Whittman Decl. ¶¶ 269-273.

[713] Whittman Decl. ¶ 281.

[714] See e.g., Disclosure Statement Ex. D-1; *Boy Scouts of America v. A.A. et al.*, Adv. Pro. No. 20-50527 [ECF 72] (Stipulation and Agreed Order).

[715] Many of the Lujan Claimants are members of the Guam Committee.

were free to propound whatever discovery they thought was appropriate.  To the extent a lack of transparency is a challenge to Mr. Whittman's conclusions in his liquidation analysis, that objection is overruled.

I also conclude that Mr. Pai waived his objection or it was resolved.  Significant changes were made to the Plan in response to the objection made by Mr. Pai (and others) regarding the necessity of the Settlement Trustee's consent to any settlement of his claim and his ability to receive proceeds from the insurance policies.[716]  Mr. Pai did not thereafter pursue his objection at the hearing.  Nor does his written objection overcome Mr. Whittman's conclusion that Class 7 creditors are being paid in full under the Plan.

Finally, I conclude that the plain language of the statute does not appear to require the inclusion in a liquidation analysis of the value of any third-party claims released under the Plan.  Two courts have taken a different view of § 1129(a)(7) and have determined it appropriate to include third-party claims in the best interest analysis on the facts of their respective cases.  I think the better view is to apply the plain language of the statute and resolve third-party releases in the context of the release standard.  But, on these facts, I do not need to decide whether the best interest test ever requires third-party claims to be included and, if so, under what circumstances.  Nor need I decide whether the chance to seek recovery from a third party is "value" for purposes of the test or whether the objector has to support its objection with evidence.[717]  Here, I have already determined based on the

---

[716] *See* Debtors' Memorandum of Law ¶ 464.

[717] *See e.g., In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) ("The Equity Committee argues that the Plan releases claims held by the Debtors' equity security holders that would be available to them in a Chapter 7 liquidation, citing the same unsupported claims against the Released Lender Parties. The Court already addressed these claims herein. More importantly, even assuming that the claims have merit, the Equity Committee has offered no credible evidence that holders of HERO Common Stock would recover greater value in a chapter 7 case than they are

record presented that holders of Direct Action Claims will be paid in full under the Plan. In

that circumstance, the Plan, by definition, meets the best interest test as to claimants in

Class 8.[718] And, Mr. Whittman's uncontroverted testimony is that each Class of claims is

receiving more than it would in a chapter 7 case.

## V.    Remaining Insurance Issues

In addition to their more general issues with respect to the Plan, individual insurers

also object to specific provisions they believe impact the policies they issued.

### A. *Assignment of Insurance Rights*

Allianz asserts that the Plan impermissibly seeks to modify its Insurance Policies and

Reinsurance Agreements.[719]  More specifically, Allianz argues that certain provisions that

generally appear in commercial general liability insurance policies must be assigned along

with rights under the policies.  Arguing that Third Circuit case law mandates that a chapter

11 plan can neither increase its pre-petition obligations nor impair its contractual rights,

Allianz argues that the Plan does just that as only BSA's "rights, claims, benefits or Causes

of Actions under the Abuse Insurance Policies" are assigned to the Settlement Trust, but not

---

to receive under the Plan. The Debtors' Liquidation Analysis shows that, even in the high range of estimated liquidation values, there would be no excess value to distribute to holders of HERO Common Stock. Therefore, based on the record before me, I conclude that the Plan satisfies the best interests test of Bankruptcy Code section 1129(a)(7)") (footnotes omitted).

[718] *See e.g., Quigley*, 437 B.R. at 145 (quoting Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate Over Non–Debtor Releases in Chapter 11 Reorganizations,* 23 EMORY BANKR. DEV. J. 13, 76–77 (2006) ("In a chapter 7 proceeding, a creditor may recover any deficiency from a solvent co-obligor if the liquidation distribution does not completely satisfy the creditor's claim. Therefore, since the dissenting creditor would receive payment in full on its claim in a chapter 7 bankruptcy from either the debtor, the co-obligor, or a combination of the two, the dissenting creditor must receive full payment under the debtor's chapter 11 plan of reorganization if the codebtor receives a release.  Otherwise, the plan violates the best-interests test.") (footnotes omitted)).

[719] Allianz Objection ¶¶ 29-42.

the Insurance Policies themselves and not BSA's obligations under the Abuse Insurance Policies.

Here, Allianz fairly raised in its objection to confirmation the issue of whether a debtor can assign its rights under a non-executory contract without simultaneously assigning the concomitant obligations and burdens.[720] It relies on a ruling in *American Home Mortgage* for the proposition that "the *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365" as well as cases that more generally hold that rights under insurance contracts are not altered or re-written in bankruptcy cases. Liberty also raised this issue in its objection on similar grounds.[721]

Debtors do not respond directly to this objection or attempt to distinguish the cited cases in any way. On the one hand, Debtors argue that the concept of insurance neutrality is a judicial construct and is simply a matter of standing, not a requirement for confirmation of a plan.[722] On the other hand, Debtors argue that the Plan preserves all of the Non-Settling Insurance Companies' rights and remedies and does not rewrite or modify their insurance policies pointing to Article X.M and the protective language in the TDP.[723] The Coalition (responding to what they term as Liberty's concern) argues that the *cum onere* principle is not relevant as it applies only to executory contracts, but it does not respond

---

[720] Allianz Objection ¶ 30.

[721] Joinder and Objection of Liberty Mutual Insurance Company to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8698] ("Liberty Objection") ¶ 20 n.9.

[722] Debtors' Memorandum of Law ¶ 413.

[723] Debtors' Memorandum of Law ¶ 414.

specifically to Allianz's cases. The Coalition further argues that the transfer of the insurance rights under the Plan is consistent with *Federal Mogul*.[724]

Debtors are correct that "insurance neutrality" is a standing concept that appears to have arisen in the context of mass-tort cases in order to prevent insurance companies from objecting to confirmation. The two cases cited by Allianz arise in just that context and discuss whether the specific language in the relevant plan leaves insurers' rights unimpaired such that they do not have standing to object to confirmation. In *Global Industrial*, the court ruled that the plan was not "insurance neutral" as that term was used in *Combustion Engineering* and remanded the case directing the court to hear the objecting insurers' confirmation objections. It did not hold that a plan had to be insurance neutral. In *Combustion Engineering*, the court determined that "insurance neutrality" language required by the bankruptcy court was, in fact, neutral, but the modified language added by the district court was not. Ultimately, the Third Circuit reinstated the bankruptcy court's language and concluded that the insurers did not have appellate standing to challenge the addition of the neutrality provision. Neither of these decisions guarantee an insurance company an "insurance neutral plan," rather these decisions recognize that if a plan is not "insurance neutral," insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard. That concept does not aid insurers here.

Similarly, *Federal Mogul* does not answer the question nor aid the TCC on the *cum onere* argument. The plan at issue in *Federal Mogul* provided that Federal Mogul's "rights to recovery" under liability insurance were assigned to a § 524(g) trust. The plan also contained "insurance neutrality" provisions "granting insurers the right to assert against the

---

[724] 4/21/2022 Letter from Pachulski Stang Ziehl & Jones [ECF 9690] at 2.

trust any defense to coverage already available under the policies, excepting only the defense that the transfer to the trust violated the policies' anti-assignment provisions."[725] The Third Circuit ruled that § 1123(a)(5)(b) pre-empted provisions in a private contract that prohibits assignment. The court did not, however, have before it the argument made here: whether the rights can be transferred without the correlative obligations.[726]

Unfortunately, I cannot answer the question here either. While certain insurance policies were admitted into evidence, the many provisions defining obligations are not uniform nor necessarily governed by the same law.[727] Moreover, as Judge Sontchi stated in *American Home*: "[u]nder the common law of contracts, there is a distinction between the assignment of rights under a contract, the delegation of duties under a contract, and the transfer of rights and obligations under a contract. [ ] Under the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied."[728]

---

[725] *Federal-Mogul*, 684 F.3d at 363.

[726] The Court does suggest that defenses which would exist only because of the bankruptcy case should be viewed skeptically: "Insurers also urge that the anti-assignment defense is no different from the other defenses specifically preserved to them under the plan's insurance neutrality, and so should also be preserved. We disagree. Insurers could have offered the fact-specific coverage defenses preserved to them in any asbestos proceeding prior to bankruptcy. By contrast, the anti-assignment defense here would exist only after and by virtue of the bankruptcy reorganization and could be invoked by an insurer against any claim by the Trust, no matter how meritorious. Moreover, to the extent a determination rested on the legitimacy of the TDP as a method of adjudication, it could invite courts to second-guess the judgment of Congress and the bankruptcy court." *Id.* at 380 n.38.

[727] *See* JTX 10-1 through 10-39. Most of these policies do not have a readily apparent governing law provision.

[728] *In re American Home Mortg.*, 402 B.R. 87, 92-93 (Bankr. D. Del. 2009) (emphasis supplied). The recognition of this common law contract principle appears to clash with the statement that a non-executory contract must be taken *cum onere.*

251

Assuming § 363 is the operative section (which is not clear as the Coalition, at least, invokes § 1123(a)(5), presumably (B)),[729] Debtors can transfer their property rights consistent with applicable state law.[730] The real question is what is the consequence. Once again, I am not in a position to answer that question.

---

[729] What is clear is that the Plan provides that the Insurance Policies are not executory contracts and no insurer has argued otherwise.

   F    Insurance Policies.

   1.   Notwithstanding anything to the contrary herein, all Insurance Policies issued to or entered into by the Debtors prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; provided, however, that to the extent any Insurance Policy is determined to be an Executory Contract, then, subject to Article IV.V, and notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

Plan Art. VI.F.1.

[730] *See e.g., Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997) (ruling that § 363(b) and § 704 are general enabling statutes and citing *In re Bishop College,* 151 B.R. 394, 398–99 (Bankr. N.D. Tex. 1993) for the proposition that "§ 704 is merely an enabling statute that gives the trustee the authority to dispose of property "if the Debtor would have had the same rights under state law").

In his recent decision in *Weinstein*,[731] Judge Ambro discusses whether remaining obligations in the contract at issue are material such that "the parties considered a breach [of the obligation] to be vital to the existence of the contract"[732] (and the contract is executory) or whether the remaining obligations are conditions precedent, which are "events whose occurrence triggers an obligation" (and, therefore not executory).[733] Judge Ambro concludes, on the facts there, that a non-executory contract had been sold under § 363 with any contingent claim owed at the time of the sale treated as a prepetition claim paid pro rata with other prepetition claims. The court did not have to decide whether the counterparties' remaining obligations were all prepetition claims or conditions precedent because the purchaser of the contract agreed to pay all post-sale obligations.

Whether obligations under the Non-Settling Insurance Companies' policies are prepetition claims or conditions precedent cannot be decided in a vacuum. Each contract will need to be interpreted under applicable law in the context of a specific dispute. All I can hold today is that, in the first instance, state law will determine that question. If the obligations form the basis for claims, they will be treated accordingly. If the obligations are conditions precedent, then the Non-Settling Insurance Companies may be able to assert those conditions as a defense to performance.

---

[731] *Spyglass Media Group, LLC v. Bruce Cohen Productions (In re Weinstein Company Holdings LLC)*, 997 F.3d 497 (3d Cir. 2021).

[732] *Id.* at 508 (citing 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2018)).

[733] *Id.* at 509 (citing *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012)).

**B. *Assignment of Non-Debtor Insurance Rights***

Allianz also objects to the assignment to the Settlement Trust of the rights, claims

and benefits of Causes of Action of Related Non-Debtor Entities, Local Councils and

Contributing Chartered Organizations to the Abuse Insurance Policies. Allianz contends

that § 1123(a)(5) does not apply to preempt anti-assignment provisions in non-debtor

contracts and cites to *Federal Mogul* and *Combustion Engineering* for support.[734] Debtors

respond that the assignment of insurance rights is part of the consideration for the

Channeling Injunction and thus I can approve the assignment over any anti-assignment

provisions.[735] The Coalition contends that the *Combustion Engineering* court did not decide

the issue, but had it done so, it would have concluded that neither the Bankruptcy Code nor

state law prohibits the assignment.[736] Citing to bankruptcy and state court cases, the

Coalition argues that it is well established that assignment of an insurance policy is

permitted when the events giving rise to a loss have occurred because there is no material

increase in risk to the insurer.[737] In any event, both Debtors and the Coalition argue that the

"savings clause" ensures the benefit of the transfers even if the assignment is not

permissible. The Plan provides:

> Local Council Settlement Contribution. The Local Councils shall make, cause to be
> made, or be deemed to have made, as applicable, the Local Council Settlement
> Contribution. *If a Local Council is unable to transfer its rights, titles, privileges, interests,
> claims, demands or entitlements,* as of the Effective Date, to any proceeds, payments,
> benefits, Causes of Action, choses in action, defense, or indemnity, now existing or
> hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or
> unmatured, disputed or undisputed, fixed or contingent, arising under or attributable
> to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims

---

[734] Certain Insurers' Objection ¶ 150 n.179, 180.

[735] Debtors' Memorandum of Law ¶¶ 465-466.

[736] Statement of the Coalition ¶¶ 184-195.

[737] Statement of the Coalition ¶¶ 184-195.

thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "Local Council Insurance Rights"), *then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights*; provided, however, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.[738]

The Coalition is correct that the *Combustion Engineering* Court did not decide this specific issue, but the *Federal Mogul* Court cautions that the scope of § 1123(a)(5) preemption is not unlimited. While state law anti-assignment provisions relative to non-debtor contracts would appear not to suffer from any concerns beyond those relevant to debtor contracts, I decline to extend § 1123(a)(5) in the way the Coalition suggests when I need not.

Whether an anti-assignment clause in an insurance policy prohibits assignment is, in the first instance, a matter of state law. Having reviewed the cases cited by the Coalition, it is clear that this determination is made by reference to the policy, state law and a conflict of law analysis, if necessary.[739] In order to determine, therefore, whether a non-debtor policy or any rights thereunder can be assigned, I would need to examine each policy under applicable state law, an analysis I am not in a position to do. In the event that an assignment is not permitted, however, I see no issue with the "savings clause." The Certain Insurers argue that I cannot approve the savings clause because I cannot order non-debtor parties to perform in the fashion described in the clause. But, I am not doing so. The savings clause merely reflects the agreement struck with the non-debtor parties who have

---

[738] Plan Art. V.S.1.a. (emphasis supplied).

[739] *In re ACandS, Inc.*, 311 B.R. 36, 41 (Bankr. D. Del. 2004) (issue is whether under Pennsylvania law contracts can be assigned notwithstanding an anti-assignment provision); *CCH America, LLC v. American Casualty Company of Reading, Pennsylvania*, 2014 WL 626030 at *6-8 (Del. Super. 2014) (performing a conflict of laws analysis and concluding that under either Delaware or Wisconsin law, an assignment after the loss occurred did not violate the anti-assignment clause in the policy).

agreed to contribute their insurance rights to the Settlement Trust either through an outright assignment (if possible) or through the cooperation mechanism in the savings clause.

The Certain Insurers also assert that the Plan, the assignment or the savings clause language somehow assigns insurance policies that do not exist. They contend that Debtors and/or Local Councils have no evidence that policies exist in certain years or rely on scant secondary evidence of the existence of a policy. This issue will be resolved by a coverage court in the event of any disputes. Nothing in the Plan prevents a Non-Settling Insurance Company from asserting that the Settlement Trustee has not met any burden she has to prove the existence of a policy.

The Certain Insurers' objections based on assignment of Abuse Insurance Policies is overruled.

### C. *Indirect Abuse Claims / Setoff and Recoupment / Reinsurance / Self-Insured Retentions*

Allianz and Liberty object to the treatment of Indirect Abuse Claims on multiple grounds. It appears that objections to provisions regarding reinsurance contracts, claims under retrocessional contracts, self-insured retentions and deductibles have been resolved.[740] It also appears that objections regarding setoff and recoupment have been resolved.[741] The

---

[740] Day 22 Hr'g Tr. 123:3-124:174. The Coalition also contends, that any objections to these provisions are based on a misreading of the Plan. Statement of the Coalition ¶¶ 173-174.

[741] Day 22 Hr'g Tr. 123:3-9.

only possible remaining objection[742] appears to surround Article IV.B of the Trust

Distribution Procedures.[743]

---

[742] I say "possible objection" because the parties stated they were working on resolving remaining objections and the subsequent filings do not clearly list remaining objections. *See* Statement Regarding Closing Argument of Liberty Mutual Insurance Company in Support of Joinder and Objection to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9689]; 4/21/2022 Letter from Pachulski Stang Ziehl & Jones [ECF 9690].

[743] TDP Art. IV.B provides:

Indirect Abuse Claims.  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)     must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(2)     must have an Indirect Abuse Claim that is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or subordination under sections 509(c) or 510 of the Bankruptcy Code; and

(3)     must establish to the satisfaction of the Settlement Trustee that:

(a)     such Indirect Abuse Claimant has paid in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these TDP (and which has not been paid by the Settlement Trust);

(b)     the Indirect Abuse Claimant and the person(s) to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)     the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)     the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

With respect to Article IV.B, I make the following rulings.

1.      To the extent that Allianz and/or Liberty object to the process of resolving Indirect Abuse Claims because it is different than the process for resolving Direct Abuse Claims, this objection is overruled. It is evident that the claims are different in nature and the factors and analysis that go into resolving these claims are, of necessity, different.

2.      To the extent that Allianz or Liberty object to treatment of Class 9 Claims, those objections are overruled. As with the Direct Abuse Claims, Class 9 accepted its treatment and insurers are, therefore, bound by the class vote.

3.      To the extent that Allianz or Liberty object to the lack of judicial review of the allowance of their claims, this objection is well taken. While neither insurer cited a case for the proposition that their claims cannot be reviewed in the first instance by the Settlement Trustee, I agree that a claimant who objects to the delegation of its claim to a settlement trust must have the right to judicial review of the outcome of the trust process. The allowance of a claim is distinct from treatment of a claim and the class vote does not bind a dissenting creditor with respect to whether its claim is allowed.[744] Whether this is a due process concept or simply the application of § 502 of the Code, I agree with objectors that they are entitled to judicial review of their claims once the Settlement Trustee has made her determinations.

4.      To the extent Debtors or the Coalition contend that the treatment of the Indirect Abuse Claims is a "settlement" that can be approved under Rule 9019, I disagree. I refer the parties to the reasoning set forth *supra* with respect to Class 8 Direct Abuse Claims.

---

[744] No supporter of the Plan cited to a case for the proposition that, absent consent, judicial review could be supplanted.

5.      Allianz also seeks relief from the discharge injunction to proceed with its prepetition insurance coverage litigation in the event that the Plan is confirmed.   During argument, Debtors' counsel did not disagree with that concept, but suggested that the Settlement Trustee be given ninety days to get her bearings and retain counsel for the litigation. I agree.

6.      The Certain Insurers also take issue with the retention of jurisdiction provisions in the Plan. As the parties know, the court cannot enlarge its subject matter jurisdiction by agreement of the parties or otherwise. I will retain jurisdiction to the fullest extent permitted under the Code.  Further, the Plan specifically provides that:

> Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Action(s).  Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.[745]

These comments together with this Plan provision are sufficient to address any jurisdictional objections raised.

With respect to Article V.C of the TDP,[746] I make the following rulings.

---

[745] Plan Art. XI.A.

[746] Article V(c) of the TDP provides:

**Assignment of Insurance Rights**. The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code.  Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-

1.      To the extent there remains an objection to the words "applicable law" (as opposed to "applicable non-bankruptcy law," that objection is overruled. This Plan does not weigh in on what law governs coverage disputes.

2.      Any objection that the Plan requires an insurer to drop down and pay a self-insured retention, is overruled. Article V.C. specifically provides that "Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law."

3.      Whether an insurance company is required to "drop down" is, in the first instance, a matter of state law. Whether the failure to pay a self-insured retention is a defense or condition precedent to payment by an insurer is determined by looking at the terms of the policy under applicable law (which can include relevant public policy concerns).[747] As with other obligations, I cannot make a blanket determination.

---

Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law. Notwithstanding the foregoing, the Settlement Trust, rather than any Protected Party, shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums, deductibles, and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim. Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law.

[747] *See Am. Safety Indem. Co. v. Vanderveer Estates Holding, LLC (In re Vanderveer Estates Holding, LLC)*, 328 B.R. 18 (Bankr. E.D.N.Y. 2005) *aff'd sub nom.*, *Am. Safety Indem. Co. v. Official Comm. Of Unsecured Creditors*, 2006 WL 2850612 (E.D.N.Y. 2006) (interpreting Illinois law, under which self-insured retentions constitute primary coverage, and finding that debtor's failure to pay self-insured retentions pursuant to policy did not relieve insurer of obligations under policy); *see also Pinnacle Pines Comm. Ass'n v. Everest Nat. Ins. Co.*, 2014 WL 1875166 (D. Ariz. May 9, 2014) (explaining that courts consider the "state's public policy or statute prohibiting an insurer from refusing to pay where an insured could not satisfy the SIR due to bankruptcy or insolvency," and finding that, given the language of the policy, the debtor's bankruptcy did not absolve the insurance company from having to provide coverage); *Rosciti v. Ins. Co. of PA*, 659 F.3d 92, 97 (1st Cir. 2011) (interpreting Rhode Island law, which holds that a debtor's discharge in bankruptcy does not affect liability of a debtor's

260

## VI.    The United States Trustee's Remaining Objections

The United States Trustee objects to certain provisions of the Plan that have not yet

been addressed.

### A.    *The Consensual Third-Party Releases*

Article X.J.4, Releases by Holders of Claims, provides that all Releasing Claim

Holders release all Released Parties from any claims existing before the Effective Date of the

Plan related to Debtors, their estates or assets.  "Releasing Claim Holders" means:

> collectively, (a) all holders of Claims that vote to accept the Plan and do not opt out
> of the releases set forth in Article X.J.4; (b) all holders of Claims that are presumed to
> accept the Plan, except for holders of such Claims that file a timely objection to the
> releases set forth in Article X.J.4; (c) all holders of Claims entitled to vote on the Plan
> and who vote against the Plan and do not opt out of the releases set forth in Article
> X.J.4; and (d) all of such Persons' predecessors, successors and assigns, subsidiaries,
> affiliates, current and former officers, directors, principals, shareholders, members,
> partners, employees, agents, advisory board members, financial advisors, attorneys,
> accountants, investment bankers, consultants, representatives, management
> companies, and other professionals, and all such Persons' respective heirs, executors,
> estates, servants and nominees, in their respective capacities as such.  No holder of a
> Claim in a Class that is Impaired under the Plan will be deemed a "Releasing Claim
> Holder" to the extent such holder abstained from voting.[748]

More simply put, to avoid providing a release: (i) a holder of a claim who votes on the Plan

(for or against) must affirmatively opt-out by checking a box on his ballot or (ii) a holder of

a claim in an unimpaired class must file an objection.  A claimant who abstains from voting

does not provide a release.

---

insurer for damages caused by the debtor and holding that "[i]n light of [Rhode Island's] public
policy, we conclude that the Retained Limit Provision cannot be enforced here.  To do so would
have the ultimate effect of allowing ICSOP to avoid its obligations thanks to Monaco's bankruptcy,
a result which is contrary to the public policy of Rhode Island."); *Pak-Mor Manuf. Co. v. Royal Surplus
Lines Ins. Co.*, 2005 WL 3487723 (W.D. Tex. 2005) (applying Texas law in considering whether
insurance company's obligations under its insurance contract were triggered despite insured's failure
to pay SIR and holding that insurance company's obligations were not triggered under the plain
language of the policy.).

[748] Plan Art. I.247.

261

The UST objects to these releases arguing they are, in fact, nonconsensual and a violation of due process rights.[749] The UST also objects to releases given by the 22 categories of persons listed in (d), which the UST calls the "Related Releasing Parties," arguing that these parties will likely not have received notice that they are providing releases at all.[750]

Courts are split on the issue of whether consent to releases must be affirmative or may be accomplished by inaction. This specific issue—can consent be inferred from the failure to respond to an opt out solicitation—was thoroughly discussed by Judge Dorsey in *Mallinckrodt*. In response to the UST and SEC's objections[751] to the releases in their chapter 11 plan, the debtors argued that the releases at issue were consensual because the releasing parties had an opportunity to opt out and, to the extent they chose not to do so, their consent was manifested by their silence.[752] Through their claims and noticing agent, the debtors demonstrated that their solicitation packages included instructions on how to opt out of the releases and that the opt out provision was conspicuous and easy to understand. In fact, by the end of the voting period, the debtors had received 2,200 opt out forms, which demonstrated that their "noticing efforts successfully informed claimants of their rights and

---

[749] *See* United States Trustee's Objection to Confirmation of the Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8710] ("UST Objection") ¶¶ 22-44; ¶ 75 ("[t]here will be no affirmative consent to the Releases by Holders of Claims from those who are presumed to accept the Plan, or who vote to reject the Plan, or are a Related Releasing party. In addition, those who are presumed to accept the Plan, or are a Related Releasing Party will not even be able to opt out.") ¶ 76.

[750] UST Objection ¶ 77.

[751] The Pension Trust also objected to the releases but, because it had opted out of them, Judge Dorsey found that it lacked standing to object. *See Mallinckrodt*, 639 B.R. at 860-861.

[752] *Id.* at 876.

that the releases are therefore consensual."[753]  Judge Dorsey explained that the judicial

system utilizes this "failure to act" notion often, for example, in the context of default

judgments, bar dates and consent to the entry of final orders by a bankruptcy court.

Judge Dorsey followed Judge Sontchi in concluding that the issue is one of notice.[754]

Judge Dorsey made specific findings about whether parties had notice of the releases and

emphasized the importance of receiving such notice.  He specifically expressed that the

result in *Mallinckrodt* may have "been quite different if the notice regarding the ability to opt

out was insufficient."[755]  But, because the debtors' noticing efforts were sufficient, and

because *Mallinckrodt* was "a very well-known case with a very active body of creditors and

stakeholders," and "[t]he issues involved ha[d] generated significant public interest,"[756] he

concluded that the plan's releases were well-known and that parties in interest had

"countless opportunities to object."  For clarity's sake, Judge Dorsey makes clear that "any

creditor that claims they did not receive notice of their right to opt out will have the

opportunity to seek relief from the Court to exercise their rights."[757]  In his ruling, Judge

Dorsey also believes it is significant that *Mallinkcrodt* is a mass tort case.

I agree that the issue, as raised, is one of notice.  As in *Mallinckrodt*, claimants here

were well aware of the opportunity and need to opt-out or object to the third-party releases

in the Plan.  The need to opt-out of the releases is prominently placed on the first page of

---

[753] *Id.* at 878.

[754] *Id.* at 879-880.

[755] *Id.* at 880

[756] *Id.*

[757] *Id.* at 881.

each ballot (carried over to the second page, as appropriate), in bold, all caps and surrounded by a box.  For example, the Ballot for Class 8 reads:

## BALLOT FOR CLASS 8 (DIRECT ABUSE CLAIMS)

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING YOUR BALLOT CAREFULLY BEFORE COMPLETING THIS BALLOT.

YOU MUST COMPLETE FOUR (4) ITEMS ON THIS BALLOT:

1. VOTE TO ACCEPT OR REJECT THE PLAN

2. DECIDE WHETHER TO MAKE THE OPTIONAL $3,500 EXPEDITED DISTRIBUTION ELECTION

3. DECIDE WHETHER TO OPT OUT OF THE THIRD PARTY RELEASE

4. SIGN YOUR BALLOT

ACCESS TO SOLICITATION MATERIALS:

THE PLAN, THE DISCLOSURE STATEMENT, AND THE SOLICITATION PROCEDURES ORDER MAY BE ACCESSED, FREE OF CHARGE, AT HTTPS://OMNIAGENTSOLUTIONS.COM/BSA-SABALLOTS.

YOU HAVE RECEIVED A PAPER FORMAT OF THESE MATERIALS WITH THIS SOLICITATION PACKAGE. IF YOU NEED TO OBTAIN ADDITIONAL SOLICITATION PACKAGES, PLEASE CONTACT OMNI AGENT SOLUTIONS (THE "SOLICITATION AGENT") BY (A) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT 866-907-2721, (B) EMAILING BSABALLOTS@OMNIAGNT.COM, (C) WRITING TO BOY SCOUTS OF AMERICA BALLOT PROCESSING, C/O OMNI AGENT SOLUTIONS, 5955 DE SOTO AVENUE, SUITE 100, WOODLAND HILLS, CA 91367, OR (D) SUBMITTING AN INQUIRY ON THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://OMNIAGENTSOLUTIONS.COM/BSA.

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY 4:00 P.M. (EASTERN TIME) ON DECEMBER 14, 2021 (THE "VOTING DEADLINE").

IF YOU VOTE TO ACCEPT OR REJECT THE PLAN, YOU WILL BE RELEASING THE RELEASED PARTIES FROM ANY AND ALL CLAIMS/CAUSES OF ACTION TO THE EXTENT PROVIDED IN ARTICLE X.J.4 OF THE PLAN UNLESS YOU

**"OPT-OUT" OF SUCH RELEASES. YOU MAY "OPT-OUT" OF SUCH RELEASES AND YOU MUST INDICATE SUCH "OPT-OUT" IN THE BALLOT.[758]**

Further, the ballots contain the full language of the releases in Article X.J.4. As evidenced by Affidavits of Service, Omni served the Solicitation Plan, Disclosure Statement and ballots to those entitled to service and served the Notice of Non-Voting Status on those parties in unimpaired classes who were not entitled to vote.[759] Notice was also published in the USA Today, The New York Times, The Wall Street Journal and Prison Legal News.[760]

That claimants paid attention to the notice is evidenced by the numbers of claimants who actually exercised the option to opt-out:

**Debtor BSA**

| Class | Total Votes | Total Opt-Outs |
|-------|-------------|----------------|
| 3A | 1 | 1 |
| 3B | 1 | 1 |
| 4A | 1 | 1 |
| 4B | 1 | 1 |
| 5 | 73 | 5 |
| 6 | 153 | 6 |
| 7 | 6 | 4 |
| 8 | 55,536 | 22,004 |
| 9 | 7,239 | 5,005 |

---

[758] JTX 1-426.

[759] JTX 1-315, JTX 2951.

[760] JTX 1-308.

**Debtor Delaware BSA, LLC**

| Class | Total Votes | Total Opt-Outs |
|-------|-------------|----------------|
| 3A    | 1           | 1              |
| 3B    | 1           | 1              |
| 4A    | 1           | 1              |
| 4B    | 1           | 1              |
| 9     | 775         | 609            |

While the percentage of voters who chose to opt-out of the releases varies across classes, on the whole the percentage is significant. Given the record, I conclude that the opt-out releases in this case are appropriate.

I also conclude that holders of claims were not deprived of their due process rights. The UST correctly argues that due process requires notice of the "appropriate nature of the case" and a meaningful opportunity to be heard."[761] The UST argues that the breadth of the release, which includes known and unknown claims, as well as the dense nature of the description deprived claimants of an ability to understand the releases they were being asked to provide.

Based on Ms. Nownes-Whittaker's declarations, holders of claims received sufficient notice of the proposed releases. As evidenced from the example set forth above, the releases were prominently featured on the face of the ballot itself as well as in the disclosure statement. Though undoubtedly complicated, the numbers of claimants who opted-out of the releases also suggests that claimants were given meaningful notice.[762]

---

[761] UST Objection ¶ 23 (citing *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

[762] If a claimant can subsequently show improper notice under *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (discussing notice due to known and unknown creditors), the court will entertain appropriate relief.

266

I cannot, however, find that the 22 categories of persons listed in (d) of the defined term Releasing Claim Holders (i.e. the UST's Related Releasing Parties) received notice. Related Releasing Parties are not necessarily creditors in these bankruptcy cases. If a Related Releasing Party is a creditor, he is covered under subsections (a) through (c). If in the future, a Related Releasing Party raises claims that actually belong to a creditor and were released by the creditor, that can be sorted when it occurs. But, given my conclusion that a request for opt-out consent must be grounded in adequate notice, it is inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status.

### B. *Exculpation / Exculpation Injunction*

The UST also contends that the exculpation provision does not comport with Third Circuit law as it is not limited to estate fiduciaries, provides for exculpation of acts that occur prepetition or post-Effective Date, the Exculpation Injunction does not reflect the claims that are the subject of the exculpation and the injunction also enjoins assertion of setoff and recoupment. Debtors respond that each of these matters has been addressed and/or corrected.

My review of the Plan provisions does not reflect Debtors' purported corrections. One, the Reorganized Debtors, which do not exist until the Effective Date and take no actions between the Petition Date and the Effective Date, should be removed from the definition of Exculpated Parties. Two, unless and until Debtors' settlement with Pachulski Stang is approved, Pachulski Stang shall not be an Exculpated Party.[763] Three, Debtors

---

[763] Debtors agreed to separately move for approval of their settlement with Pachulski Stang. Similarly, Debtors' agreement with respect to the Coalition's fees will be brought separately. All parties' rights to object to these resolutions is preserved. Because each involves funds (Pachulski's coming into the estate and the Coalition's outgoing), those motions should be brought promptly.

have not appropriately accounted for setoff and recoupment rights against Exculpated

Parties, which rights must be preserved.

## VII.    Remaining Objections of Pro Se Claimants

I have addressed many of the objections of claimants appearing pro se in the body of

this Opinion. I address any remaining objections here.

Mr. Cutler's objection consists of "Topics on which Pro-Se Claimant SA-101730 &

SA-47539 submits objections."[764] The topics are listed in the form of statements or

questions, but there is no elaboration or evaluation of the topics. Many, if not all, of the

topics he listed have been addressed. The one area that Mr. Cutler affirmatively challenges

is the vote. He asserts, without evidence, that the voting results are false. During his

argument,[765] Mr. Cutler presented his unsatisfactory experience with Omni, but he did point

to any evidence of fraud, and there is nothing in the record to support this allegation. Mr.

Cutler's objection is overruled.

Mr. Schwindler objects that the votes of Direct Abuse Claimants making the

Expedited Distribution election skewed the voting in Class 8 and should not be counted. He

posits that this subset of Direct Abuse Claimants was solicited by plaintiff firms for the sole

purpose of increasing their payouts and provides recoveries to claimants who will never

have to substantiate their claims. He also posits that counting the votes of claimants who

make the Expedited Distribution election undermines the integrity of the voting process.

---

[764] Pro-Se Claimant Numbers SA-101730 & SA-47539 Disclosure of Topics on which Claimant
Submits in Connection with its Plan Objections [ECF 8657].

[765] Day 18 Hr'g Tr. 30:16-50:1.

The voting process was specifically designed so that there would be transparency surrounding the Expedited Distribution election and the vote count in Class 8. In order to elect an Expedited Distribution, a Direct Abuse Claimant had to make that election on his ballot. As reflected in the Supplemental Nownes-Whitaker Declaration, 7381 Direct Abuse Claimants elected an Expedited Distribution, including 70 who did not vote to accept or reject the Plan. Subtracting those who elected the Expedited Distribution and did vote results in an acceptance rate in Class 8 of 84.79% and a rejection rate of 15.21%, or less than a one percentage point change in the vote.

While the Expedited Distribution election had the potential to skew the vote in Class 8, it did not. Thus, I do not have to grapple with the issue of whether such a skewed vote creates a legal impediment to the acceptance by Class 8.

## VIII.    Conclusion

Debtors have decisions to make regarding the Plan and need sufficient time to determine how to proceed. At their convenience, counsel to Debtors may reach out to chambers to schedule a status conference.

Dated: July 29, 2022

Laurie Selber Silverstein
United States Bankruptcy Judge

**Addendum A**

## OBJECTIONS TO CONFIRMATION

Texas Taxing Authorities' Objection to the Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 6266]

Limited Objection of William McCalister, Jr. to Plan of Reorganization [ECF 6948]

Objection to Confirmation of Plan filed by W.D. [ECF 7663, 7664]

Letter Regarding Abuse filed by B.C. [ECF 7920, 7921]

Letter Regarding Abuse filed by D.W. [ECF 8374, 8375]

Oracle America, Inc.'s Rights Reservation and Cure Objection Regarding Debtors' Proposed Assumption of Oracle's Contracts in Connection with the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("Rights Reservation") [ECF 8639]

Pro-Se Claimant Disclosure of Topics on Which Claimants Submits in Connection with its Plan Objections filed by M.C. [ECF 8657, 8658]

Reservation of Rights and Objections of Everest National Insurance Company to Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8672]

Objection of Jane Doe to Confirmation of Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Non-Debtor Releases and Injunctions Therein [ECF 8674]

AT&T Corp.'s Limited Objection to Cure Amounts Set Forth in Plan Supplement [ECF 8675]

Objection of Parker Waichman LLP to Confirmation of the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of American and Delaware BSA, LLC [ECF 8676]

Objection of Eric Pai, as Administrator of the Estate of Jarred Pai to Confirmation of the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8677]

Girl Scouts of the United States of America's Objection to Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8679]

Objection of The Official Committee of Unsecured Creditors for the Archbishop of Agaña (Bankr. D. Guam 19-00010) to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8683]

Objection of Markel Insurers to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8684]

Munich Reinsurance America, Inc., Formerly Known as American Re-Insurance Company's Joinder to Certain Objections and Separate Objection to the Plan [ECF 8685]

The Roman Catholic Ad Hoc Committee's Objections to Confirmation of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8686, 8689, 8796]

Joinder of Archbishop of Agaña, a Corporation Sole, to the Roman Catholic Ad Hoc Committee's Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8687]

Joinder of The Norwich Roman Catholic Diocesan Corporation to the Roman Catholic Ad Hoc Committee's Objection to the Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8688]

Joinder of Archdiocese of New York Parishes to the Objection of the Roman Catholic Ad Hoc Committee's Objections to Confirmation of Debtors' Plan of Reorganization [ECF 8690]

Limited Objection of Claimant I.G. to Plan of Reorganization [ECF 8692]

Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan and Appendix to Certain Insurers Objection to Confirmation of Debtors Chapter 11 Plan [ECF 8695, 8697, 8793, 8825, 8858]

Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions [ECF 8696, 8778]

Joinder and Objection of Liberty Mutual Insurance Company to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8698, 8763]

Old Republic Insurance Company's (A) Joinder to Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan; (B) Partial Joinder to Allianz Insurers' Objection to the Plan; (C) Supplemental Objection to the Plan; and (D) Reservation of Rights [ECF 8699]

Joinder by Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company to Allianz Insurers Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions [ECF 8700]

Joinder by Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company to Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan [ECF 8703]

Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection Filed by Guam Committee [ECF 8708]

Zuckerman Spaeder LLP's Objection to Confirmation of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 8709]

United States Trustee's Objection to Confirmation of the Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8710]

Letter Regarding Plan Filed by G.M. [ECF 8734, 8735]

Dumas & Vaughn Claimants' Objection to Confirmation of the Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Joinder to the Objection of the United States Trustee [ECF 8744]

Objection of Linder Sattler Rogowsky LLP (LSR) to Confirmation of the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8745]

Objection to Confirmation of Debtor's Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC Filed by F.S. [ECF 8762, 8764]

Brown & Bigelow's Objection to Confirmation of Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8766]

Limited Objection of the Tort Claimants' Committee to Findings Related to the Valuation of Abuse Claims in Connection with Confirmation of Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 8768, 8812]

Limited Objection of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC to Treatment of TCJC in Debtors' Second Modified Fifth Amended Plan of Reorganization [ECF 8769, 8832]

Declaration of Jason P. Amala in Support of the Limited Objection of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC to Treatment of TCJC in Debtors' Second Modified Fifth Amended Plan of Reorganization [ECF 8770, 8833]

Joint FCR and Coalition (I) Motion for Entry of an Order (A)(1) Striking Portions of Bates Rebuttal Report and the Entire Bates Supplemental Report and (2) Precluding Testimony Related to Improper Valuation Opinion or (B) in the Alternative, Granting Movants Leave to Submit a Rebuttal Report; and (II) Limited Objection to Confirmation of the Plan [ECF 8771, 8811]

## SUPPLEMENTAL OBJECTIONS TO CONFIRMATION

Letter Regarding Plan Filed by G.M. [ECF 8972,8973]

Objection to Confirmation of the Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC Filed by L.W. [ECF 9007, 9008]

United States Trustee's Objection to Confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9015]

Supplemental Plan Objection Filed on Behalf of Abuse Claimant SA-29655 [ECF 9017]

Reservation of Rights and Limited Objection of TCJC with Respect to Payment of Pfau/Zalkin Restructuring Expenses [ECF 9018]

Supplemental Reservation of Rights and Objection of Everest National Insurance Company to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 9020]

Limited Objection of Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. to Exculpation of Pachulski Stang Ziehl & Jones in Debtors' Third Modified Fifth Amended Plan of Reorganization [ECF 9021]

Supplemental Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agaña (Bankr. D. Guam 19-00010) to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9023]

The Roman Catholic Ad Hoc Committee's Supplemental Objection to Confirmation of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [ECF 9028]

Lujan Claimants' Supplemental Objection to Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objections of United States Trustee and Guam Committee [ECF 9031]

Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan [ECF 9033]

Response to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts and Delaware BSA, LLC Filed by D.W. [ECF 9291, 9292]

Renewal of Motion for an Order Finding Requests to Debtors and Patriots' Path Council, BSA for Admissions Propounded by Claimant #39 on October 3, 2021 via Amended Request for Admissions & Documents Admitted as a Matter of Law & Requesting that this Pleading by Considered as a Supplement to Objections to Confirmation of the Plan [ECF 9516, 9518]


## FILINGS IN SUPPORT OF CONFIRMATION

Hartford's Brief in Support of Confirmation of The Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9096]

Statement of the Ad Hoc Committee of Local Councils in Support of Confirmation of the BSA's Plan of Reorganization [ECF 9098]

Reply of the Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC in Support of the Debtors' Third Modified Fifth Amended Plan of Reorganization [ECF 9100, 9156]

Tort Claimants' Committee's (I) Statement Regarding Proposed Corrections to Settlement Trust Agreement and (II) Reply to Confirmation Objections to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [ECF 9106, 9194]

Statement of The Church of Jesus Christ of Latter-Day Saints, a Utah Corporation Sole in Support of Confirmation of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and in Reply to Plan Objections [ECF 9107, 9201]

Statement of the Creditors' Committee in Support of Confirmation of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [Dkt. No. 8813] and in Response to Objections Thereto [ECF 9108]

Declaration of Michael J. Merchant in Support of The Church of Jesus Christ of Latter-Day Saints' ("TCJC") Statement in Support of Confirmation of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and in Reply to Plan Objections [ECF 9109, 9202]

Memorandum of Law of Century Indemnity Company in Support of Approval of the Century and Chubb Companies Settlements Incorporated into the Debtors Chapter 11 Plan [ECF 9111]

Statement of JPMorgan Chase Bank, National Association in Support of Confirmation and Joinder to the Debtors' Memorandum of Law in Support of Confirmation [ECF 9112]

Declaration in Support of Samantha Indelicato to the Memorandum of Law of Century Indemnity Company in Support of Approval of the Century and Chubb Companies' Settlements Incorporated into the Debtor's Chapter 11 Plan [ECF 9113]

Statement of the Coalition of Abused Scouts for Justice and Future Claimants' Representative in Support of Confirmation of Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (ECF 9115, 9190]

Joinder of the Tort Claimants' Committee to Reply of the Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC in Support of the Debtors' Third Modified Fifth Amended Plan of Reorganization [ECF 9164]

The Roman Catholic Diocese of Paterson's Statement in Support in Plan Confirmation and Joinder in Arguments Made by the Debtors, Hartford and Century, All in Opposition to Arguments Made by the RCAHC [ECF 9321]