**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
|  | Hearing Date: January 19, 2023 at 10 a.m. Objection Deadline: January 12, 2023 at 4 p.m. |

### MOTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES

The Coalition of Abused Scouts for Justice (the "**Coalition**"), by and through its undersigned counsel, hereby submits this motion (the "**Motion**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), approving the Debtors' proposed payment of the Coalition Restructuring Expenses[2] pursuant to sections 363(b) and 1129(a)(4) of the Bankruptcy Code or, alternatively, section 503(b) of the Bankruptcy Code.

Attached hereto as **Exhibits B-1**, **B-2**, **B-3**, **B-4**, **B-5**, **B-6**, **B-7**, **B-8**, and **B-9** are the Declarations of Adam P. Slater, Anne Andrews, Kenneth M. Rothweiler, Michael L. Atkinson, Gabriel J. Le Chevallier, James L. Patton, Edwin J. Harron, Kami Quinn and Tristan Axelrod submitted in support of this Motion. And, attached hereto as **Exhibits C-1**, **C-2**, **C-3**, **C-4**, **C-5** &

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 10296) (the "**Plan**").

C-6 are the verified fee statements of Brown Rudnick, LLP, Province, LLC, Parsons Farnell & Grein, LLP, Monzack, Mersky & Browder, P.A., Robbins, Russell, Englert, Orseck & Untereiner LLP ("**Robbins Russell**"), and Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**"), which statements provide a summary of the work performed by each Coalition professional.  The Coalition also relies on the *Third Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019* (Dkt. No. 1997), and the Exhibits and Declarations attached thereto, each of which is incorporated herein by reference.  In support of the Motion, the Coalition respectfully states as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Coalition confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other bases for the relief requested in the Motion and the Plan are sections 105(a), 363(b), and 1129(a)(4) of the Bankruptcy Code and Bankruptcy Rule 9019 or, alternatively, section 503(b) of the Bankruptcy Code.

## INTRODUCTION

2.      Extraordinary cases require extraordinary efforts, and, in the case of the law firms that formed the Coalition, a substantial contribution which was instrumental in building an historic

compensation fund for the benefit of Survivors of Scouting Abuse and in constructing and confirming a Plan by which that fund will be disbursed to Survivors through the Settlement Trust.

3.      The Court has issued its opinion regarding the BSA's Plan.  *See* Dkt. No. 10136 (the "**Opinion**").  The Court approved the Channeling Injunction and various settlements, each of which the Coalition took a primary role in structuring and negotiating.  The settlements that provide for the initial funding of the Settlement Trust would not exist but for the Coalition' role among the Survivor groups and its impact on these Chapter 11 Cases.

4.      The law firms that formed the Coalition did so at great risk and expense to them. The Coalition is an ad hoc group that took on a role in the Chapter 11 Cases that was different from the roles of the Official Committee of Tort Claimants (the "**TCC**"), the Future Claimants' Representative (the "**FCR**"), and the Pfau/Zalkin Firms (collectively, with the Coalition, the "**Survivor Representatives**").  The TCC (as an official committee) and the FCR (as an official estate representative) each had the ability to retain estate funded professionals.  Neither had to go out-of-pocket for any professional fees or expenses.

5.      The law firms that formed the Coalition understood that a global plan would not be confirmed in these Chapter 11 Cases absent their participation, which brought approximately 75% of the Survivors to the table.  This made it possible for a global plan to be negotiated and confirmed, which plan will make the value of the Debtors' most significant assets available to pay most Survivors in their lifetimes.  While each of the Survivor Representatives was essential in these Chapter 11 Cases, and ultimately had to work together for the Plan to be confirmed, it is clear that this outcome could not have been achieved without the Coalition.

6.      Since its inception, the Coalition sought to play a constructive role in these Chapter 11 Cases.  Doing so was not always an easy task.  The Coalition faced multiple roadblocks

and criticism that is a matter of public record.  But the Coalition and its professionals never took their eye off the objective and helped forge the path for the best possible outcome for Survivors.

7.    In October of 2021, Coalition counsel organized and formed the Survivor Working Group—a group of Survivors who agreed to play an important role in ensuring that non-monetary consideration and youth protection reforms were a significant component of the Debtors' reorganization.  *See* Exhibit C-6 at ¶¶ 13-19.  The Survivor Working Group was successful in securing the BSA's commitment to implement the Safe Scouting initiative and a dedicated seat on the BSA's national board for a Survivor.

8.    The Coalition, and along with the FCR,[3] negotiated settlements with Hartford, Century, Zurich, Clarendon, the TCJC, the Methodists, and the Roman Catholics, and formulated, drafted, and convinced the Debtors to adopt (through the critical Century settlement) the plan architecture that unlocked the full value of the insurance settlements for the Survivors and resolved the complex and challenging Chartered Organization issues which many thought to be insoluble.

9.    The Debtors, through the Plan, agreed to and seek authorization to pay the Coalition Restructuring Expenses.  This is unquestionably an appropriate exercise of their business judgment given the essential role that the Coalition played and will continue to play in these Chapter 11 Cases.  The payment of the Coalition Restructuring Expenses is also appropriate under the substantial contribution standard.

10.    No party involved in these cases—and no party that followed what happened in these extraordinary cases—could credibly contend that the Coalition's work was "duplicative" of

---

[3]    The FCR was the Coalition's invaluable partner in pushing this case towards confirmation. Neither could have done it without the other.  Particularly in times when the TCC was not moving in the same direction, the Coalition needed a partner that was a U.S. Trustee-appointed fiduciary, and the FCR needed a group that represented the interests of Survivors with filed claims.

any estate funded professionals.  The Coalition fulfilled a role that was not being assumed by the other Survivor Representatives.  As a result of the Coalition's hard work, Survivors will receive enhanced compensation and closure, and other parties, such as the soon-to-be reorganized Debtors (the survival of which was always an open question since the Petition Date) and various settling co-liable entities, will move forward and receive the benefit of orderly peace.  Under any legal standard that the Court could apply, the Motion should be granted.

## BACKGROUND

11.      The Debtors filed for bankruptcy on February 18, 2020, over two and a half years ago.  The Debtors retained multiple professionals, including, among others, Sidley Austin LLP (and later White & Case, LLP), as restructuring counsel, Haynes & Boone, LLP, as insurance counsel, Alvarez & Marsal North America, LLC, as financial advisor, and Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel.  *See* Dkt. Nos. 204, 205, 206, 210 & 1566.

12.      On March 5, 2020, the United States Trustee appointed the TCC.  *See* Dkt. No. 142. The TCC retained, among other firms, Pachulski, Stang, Ziehl & Jones LLP ("**PSZJ**") as its restructuring counsel, Pasich LLP as its insurance counsel, and Berkeley Research Group, LLC as its financial advisor.  *See* Dkt. Nos. 292, 293 & 729.  The members of the TCC include Survivors. Certain law firms that represented those members participated in meetings and remained affiliated with the TCC throughout the Chapter 11 Cases.

13.      On March 18, 2020, the Debtors moved for an order appointing James L. Patton as the legal representative for future claimants.  *See* Dkt. No. 223.  The Court approved Mr. Patton's appointment on April 24, 2020.  *See* Dkt. No. 486.  Thereafter, Mr. Patton, as the FCR, retained Young, Conaway, Stargatt & Taylor, LLP as restructuring counsel, Gilbert LLP as insurance counsel, and Ankura Consulting Group, LLC as a consultant.  *See* Dkt. Nos. 243, 495 & 496.

A.    **Formation of the Coalition of Abused Scouts for Justice**

14.    The Coalition appeared in the Chapter 11 Cases on July 24, 2020—approximately four and a half months after the TCC was appointed.  *See* Dkt. No. 1040.  Several law firms,[4] some of whom were once affiliated with the TCC, formed the Coalition.   These firms believed that absent a serious intervention, the Debtors would not reach the settlements required for the Debtors to maximize value for Survivors and confirm a global resolution plan.

15.    After its formation, the Coalition retained professionals.   The Coalition hired Brown Rudnick LLP as its restructuring counsel, Province, LLC as its financial advisor, Parsons Farnell & Grein, LLP as its insurance counsel, Monzack, Mersky & Browder, P.A. as its Delaware counsel, and Robbins Russell as its litigation counsel.[5]   The Coalition also retained Akin Gump as litigation counsel (successor to Robbins Russell).   Akin Gump established and oversaw the Survivor Working Group and assisted in the development of the youth protection procedures the Debtors ultimately adopted.

16.    As one of its first acts, the Coalition filed a Rule 2019 statement and a motion to participate in the mediation.  *See* Dkt. Nos. 1053 (as superseded and amended), 1161, 1257, 1432 & 1510.  This was met with intense opposition.

---

[4]    The State Court Counsel who formed the Coalition were:  (i) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (ii) Kosnoff Law PLLC, (iii) AVA Law Group, Inc., (iv) Andrews & Thornton, (v) ASK LLP, and (vi) Slater Slater Schulman LLP.  *See* Dkt. No. 1429 at ¶ 1 fn. 2. As of October 13, 2020, the Coalition firms included:  (i) Junell & Associates PLLC, (ii) Krause & Kinsman LLC, (iii) Marc J. Bern & Partners LLP, (iv) Motley Rice LLC, (v) Napoli Shkolnik PLLC, (vi) Reich & Binstock LLP, (vii) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (viii) Andrews & Thornton, (ix) ASK LLP, and (x) Slater Slater Schulman LLP.  *See* Dkt. No. 1510.
Kosnoff Law PLLC and AVA Law Group, Inc. left the Coalition on September 29, 2020 shortly after it was formed.  Thereafter, Mr. Kosnoff became a vocal critic of the Coalition.

[5]    In the first quarter of 2022, Robbins Russell combined with Kramer Levin Naftalis & Frankel LLP.

17.    The TCC filed a 23-page objection to the Coalition's Rule 2019 statement (*see* Dkt. No. 1228) and a 16-page objection to the Coalition's request to participate in the mediation (*see* Dkt. No. 1231).    Certain insurers objected to the Coalition's Rule 2019 statement and participation in the mediation.  *See* Dkt. Nos. 1220, 1222, 1224 & 1230.  Even the United States Trustee filed an objection.  *See* Dkt. No. 1223.

18.    The Coalition sought to reach an agreement with the United States Trustee.  Certain Coalition-affiliated law firms had the right under their fee agreements to surcharge their clients for their share of the Coalition's professional fees and expenses.  The Coalition firms agreed not to do so here to resolve the United States Trustee's objection, underlined provided, underlined however, that this agreement could not be used against the Coalition in connection with its right to be reimbursed for its fees and expenses.  *See* Dkt. No. 1510.  On this point, the Coalition's Rule 2019 Statement provides:

> The Coalition acknowledges that neither it nor State Court Counsel will charge back the fees of any of the Coalition's professionals to the individual survivors in any way, including by reducing an individual survivor's claim distribution; provided, however, that the Coalition expressly reserves its right to seek a "substantial contribution" claim and/or seek reimbursement for the fees and expenses incurred by Coalition Counsel under a chapter 11 plan.  Nothing herein is intended to prejudice or limit the Coalition's right to seek such claim or reimbursement, and nothing herein is intended to limit the U.S. Trustee's right to object to such claim or reimbursement.

*Id.* at ¶ 2.  The intent was for the Coalition's substantial contribution claim and/or reimbursement for its expenses to be considered in a manner consistent with the law firms' contractual rights as they exist in the absence of, and without being prejudiced by, the concessions made in connection with the Coalition's Rule 2019 statement.[6]  The United States Trustee did not object to or seek to impose a similar agreement on any other ad hoc group in the Chapter 11 Cases.

---

[6]    *See* Dkt. No. 1997, *Third Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019*.    Law firms—or State Court Counsel—representing Survivors, which formed the Coalition, have the right under their engagement letters to charge Survivors for their expenses related to the enforcement of the Abuse Claims, including their

19.    Following lengthy hearings and considerable briefing, the Court approved the Coalition as a mediation party and approved the adequacy and sufficiency of the Coalition's amended Rule 2019 statement.  *See* Dkt. Nos. 1572 & 1573.

20.    From the outset of its participation in these cases, the Coalition observed that the TCC, the Debtors and the Local Councils were at an impasse.  The TCC was focused on the quantum of the Local Councils' contributions to any settlement[7] and whether various entities— *i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction.[8]  Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

### B.    General Requirements for Global Insurance Settlements

21.    The Coalition recognized that some of the Debtors' insurers were interested in settling and how beneficial such potential settlements could be for Survivors.  But the insurers had a key requirement—global peace.  To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was

---

share of the Coalition Restructuring Expenses.  *Id.* at Ex. A-3 (engagement agreements) & Ex. B (declarations).

[7]    *See TCC Objection to Debtors' Third Motion for an Order Extending the Debtors' Exclusive Periods*, Dkt. No. 2506 at ¶ 17 (asserting that "the aggregate value of the Local Councils' assets exceeds $4 billion" and that the "Local Councils, who have yet committed to contribute the $300 million alluded to in the Plan, are proposing to receive a non-consensual release in exchange for contributing far less than the 1% of the childhood sexual abuse claims that arose under their watch for decades.")

[8]    *See id.* at ¶¶ 10, 17 (asserting that the "Local Councils and Chartered Organizations have failed to show they will substantially contribute towards the Boy Scout's reorganization to satisfy [the second *MM* factor] in their attempt to qualify for a channeling injunction" and that "the cash and other asserts to be contributed under the Plan by the Local Councils and Chartered Organizations are not substantial.")

essential to collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the Local Councils, and the Chartered Organizations.

22.    Consistent with the "peace premium" concept, insurers generally will not pay adequate amounts to buyback or otherwise settle a policy—and may not settle the policy at all— if there is an appreciable risk of other insureds being able to continue to seek coverage against them under the policy.  That would defeat the point of the sale and/or settlement.  There are exceptions, such as where the seller/insured agrees to indemnify the insurer against future coverage claims.  But an insurer most likely will not accept an indemnity from an insolvent entity or an entity that may become insolvent.

23.    Given these self-imposed, but logical, negotiation constraints on insurers, it is often better to secure the rights of key other insureds or establish a framework for resolving those other insureds' rights under the policies before reaching settlements with the insurers.  Law firms aligned with the TCC, who represent approximately 10% of the Survivors, maintained that their clients would suffer a "a significant loss on the value of the claims" if they lost the right to sue Local Councils and Chartered Organizations in the tort system.[9]  Such lawsuits, if initiated or continued, could trigger the Debtors' insurance policies and, therefore, preclude the "global peace" needed to facilitate settlement and the accompanying "peace premium."  The law firms affiliated with the

---

[9]    *See*, *e.g.*, *Zalkin Law Firm Claimants Objection to Disclosure Statement*, Dkt. No. 3276 at ¶¶ 10-14 (asserting that "the Zalkin Law Firm Claimants," which "account for 73 of [the] California-based claims, and 16 of the New York claims," have "claims against non-Debtor entities—either a local council individually or a local council and a charter organization"— that have "significant assets" and that such claimants would suffer "a significant loss on the value of the claims" under BSA's Plan); Sept. 21, 2021 Hr'g Tr. 175:10-180:20 ("ZALKIN … [M]y best case is against the local council …  Orange County Council has substantial assets … If I were to pursue this case in the State Court system, I am confident … that I'm going to settle this case somewhere in the neighborhood of [$2.5] to $3 million, minimum, and if I take it to trial, I have a very good probability of getting a jury to give me a verdict of somewhere between [$7] and $10 million.")

Coalition, in contrast, represent approximately 75% of the Survivors, and sought to achieve a timely resolution that would be beneficial to all Survivors.

24.     The Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that had a realistic chance of being acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021. But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over vehement and vigorous objections of the Coalition, the TCC and the FCR.  *See* Dkt. No. 2624 (the "**First Hartford Settlement**").

  **C.**  <u>**First Hartford Settlement Agreement**</u>

25.     The First Hartford Settlement was problematic for several reasons.

26.     <u>**First**</u>, the $650 million settlement amount, even if it was not illusory (which it indisputably was), was too low.

27.     <u>**Second**</u>, the $650 million amount was also subject to material reduction.  *See* First Hartford Settlement at § II.E.  The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of the Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  *Id.*

28.     As the Court knows, Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million—*i.e.*, roughly ***only half*** the amount Hartford ultimately agreed to pay following negotiations with the Coalition.

29.    **Third**, the First Hartford Settlement did not contain a firm commitment to pay anything.  The Debtors had not secured the rights of the key other insureds under Hartford's policies.  The First Hartford Agreement itself made it clear that the Hartford dollars were only real if additional settlements were reached that provided Hartford "global peace" under the policies it agreed to purchase.  *Id.* at § I.A.

30.    **Fourth**, the First Hartford Settlement did not ensure that the settlement proceeds would flow through to the Survivors.  The First Hartford Settlement contemplated a "free and clear" sale of the policies issued by Hartford to the BSA, with the interests of additional insureds attaching to the sale proceeds.  *Id.* at § II.C & Ex. 2, ¶ J.

31.    Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

32.    **Fifth**, the First Hartford Settlement was married to Trust Distribution Procedures that Hartford had drafted and delivered to the Debtors to create new coverage defenses to the Survivors' detriment.  Shortly after the First Hartford Settlement was announced, the Debtors filed TDPs drafted off the Hartford form.  Unsurprisingly, the form TDPs Hartford provided to the Debtors **mirrored** the TDPs in *Fuller-Austin Insulation Co. v. Highland Ins. Co*., 135 Cal. App. 4th 958 (Cal. Ct. App. 2006), a case well-known to this Court, and were clearly designed to give the insurers the ability to use the Debtors' bankruptcy as a new coverage defense or as an excuse to deny or limit coverage at the Survivors' expense.

33.    The Coalition submits that the Hartford-TDPs were designed to give non-settling insurers the *Fuller-Austin* defense so that if the Court failed to approve the Hartford settlement

(for any reason) and Hartford become a non-settling insurer, Hartford would be a non-settling insurer under a *Fuller-Austin* plan that could be used to defeat the Survivors' ability to recover on their Abuse Claims.  A plan that implemented the Hartford TDPs (or similar proposals from insurers) very well could have provided for the massive loss and value redistribution between Survivors (who endured unimaginable suffering and harms) and insurers (who had the benefit of decades of premiums).

### D.    The Coalition Leads Negotiations with the Local Councils

34.    After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR joined the TCC's objection to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working together on the framework for a competing plan. *See* Dkt. Nos. 2506, 2668 & 2672.

35.    The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors.  The Coalition did not believe that a global deal could be accomplished if the TCC required a billion-dollar cash contribution from the Local Councils.

36.    The Coalition, through its financial advisors at Province, evaluated the Local Council proposals and determined that it could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their own policies to the Settlement Trust.  Reaching a settlement with the Local Councils was critical to unlocking the full value of the Debtors' insurance assets because the Local Councils are additional insureds under the Debtors' policies.

37.     Given the Debtors' decision to enter into the First Hartford Settlement, the Coalition played a key role in negotiations with the Local Councils.  The Local Councils, the Coalition, the FCR, and the TCC began negotiating a settlement separate and apart from the Debtors.  This settlement and the related plan structure was more attractive, provided more value, and, critically, provided a much more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced vociferous, unified creditor opposition.

38.     A product of these negotiations was the Restructuring Support Agreement ("**RSA**") to which the BSA, the Ad Hoc Committee of Local Councils, the Coalition, the TCC and the FCR were all parties.  *See* Dkt. No. 5466.  As Richard Mason, counsel for the Ad Hoc Committee of Local Councils, stated on the record, the Coalition overcame "an artillery barrage of criticism" and was a "constructive force" for the "global resolution" reflected in the RSA.  *See* Aug. 16, 2021 Hr'g Tr. 187:4-7.

E.      **The Restructuring Support Agreement**

39.     The RSA reflected three key accomplishments.

40.     **First**, the Debtors and Local Councils agreed to contribute up to $850 million on the Effective Date to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase of approximately $300 million from the amounts previously committed.  *See* Dkt. No. 4108 at 14-155 (describing the Debtors' $119 million pre-RSA contribution and the Local Council's $425 million pre-RSA contribution).

41.     Because these contributions are due on the Effective Date, the Settlement Trust will have access to immediate funding and will not have to wait until the entry of a final, non-appealable

order before it can begin making payments to Survivors.  The Coalition played an important role in these changes.[10]

42.    In fact, the Debtors' financial advisor, Brian Whittman, testified without objection or contradiction that having the ability to negotiate with the Coalition provided benefits to the Debtors' estates and created efficiencies because it gave the Debtors (and other parties) "the ability to speak with a single party that represents a large number of claimants"—the same rationale offered to and accepted by the Bankruptcy Court and the District Court in *In re Mallinckrodt PLC*, No. 20-12522-JTD, 2022 WL 906458 (D. Del. Mar. 28, 2022), which authorized the reimbursement of professional fees and expenses incurred by an ad hoc group of tort claimants. *See* Aug. 12, 2021 Hr'g Tr. 125:10-126:23.

43.    **Second**, the Local Council contribution solved for the first piece of the insurance puzzle—*i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

44.    The Local Council settlement was contingent on a satisfactory resolution of the Abuse Claims asserted against the Chartered Organizations.  The Local Councils were concerned

---

[10]    *See* Aug. 12, 2021 Hr'g Tr. 232:4-20 ("Q.  The Boy Scouts and the local councils are making contributions to the settlement trust under the RSA; is that correct?  [WHITTMAN].  That is correct.  Q.  Did those contribution amounts change while the RSA was being negotiated?  A. They did.  Q.  How did they change?  A.  The contribution of the Boy Scouts increased over time from $120 million to a target of where between two hundred twenty and $250 million, depending on the time of emergence.  The contribution of the local councils, depending on exactly when you start the clock, increased from either 300 million to $425 million up to the $500 million, plus the $100 million ESP (indiscernible) for a total of $600 million.  Q.  Did the coalition play a role in that increase?  A.  They did.").  A copy of the transcript of the August 12, 2021 hearing on the RSA is attached hereto as **Exhibit D**.

that if Scouting-related Abuse Claims were asserted against the Chartered Organizations, they would lose key relationships necessary to maintain and continue Scouting programs.

45.     Most stakeholders recognized that the Boy Scouts would cease to exist, and no reorganization would be possible, unless Chartered Organizations continued to make their resources available to the Boy Scouts.  In fact, the Local Council settlement did not represent a hard commitment to pay anything unless the Chartered Organization issues were resolved.

46.     **Third**, the RSA replaced Hartford's *Fuller-Austin* TDPs with TDPs designed to preserve the Debtors' insurance assets, not give the insurers new defenses, and not rewrite or vitiate fundamental obligations under the policies that represent core public policy related to the insurance industry.  The RSA, which the Coalition took a lead role in negotiating and drafting,[11] reflected a clear commitment that the TDPs not create new coverage defenses—*i.e.*, defenses that would not exist if the Debtors did not confirm a plan that included TDPs.

47.     Despite these accomplishments, the Debtors found themselves in a corner.  The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out."

48.     The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford.  As set forth in the RSA, the Debtors made it a key requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.  *See* RSA at § II.A.(viii) & V.B.(v).

---

[11]     *See* Dkt. Nos. 2668 & 2672 at ¶¶ 23-32.  The Coalition and the FCR were the first parties to raise the *Fuller-Austin* issue and highlight the insurers' efforts to use the Debtors' bankruptcy to obtain an improper discharge of their own coverage obligations to the Survivors' detriment. The potential loss of value—over $4 billion—was real.

49.     But the Court ruled against the Debtors on this issue.  The Court also declined to approve the provisions in the RSA pertaining to the Debtors' payment of the Coalition professional fees and expenses.  The Court ruled that the Coalition's professional fees and expenses could not be paid absent a showing of a "substantial contribution" under section 503(b) of the Bankruptcy Code, and that the Court would re-visit the issue at the end of the case.[12]

50.     Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted in opposition to the Second Hartford Settlement (as defined below) that even if Hartford "increased its inadequate offer of $650 million to an equally subpar offer of $787 million," the TCC would not support it, particularly if "the $787 million" would "be used to compensate all survivors."  *See* Dkt. No. 6225 at ¶ 10.  The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

**F.      Coalition and the FCR Negotiate Settlements with Hartford
          and the TCJC, and the Coalition Organizes the Survivor Working Group**

51.     Faced with this difficult if not daunting situation, the Coalition and the FCR decided that they had to move forward without the TCC.  For the months that followed (*i.e.*, mid-August 2021 through December 2021), the Coalition and the FCR negotiated multiple insurance settlements, developed, and completed the plan architecture for resolving the Chartered

---

[12]   The Coalition argued that section 363(b), and not section 503(b), supplied the applicable legal standard since the Debtors were seeking authority to pay the Coalition's restructuring expenses.  *See* Dkt. No. 5680.  On this issue, the Coalition cited to Judge Drain's decision in *Purdue* and Judge Dorsey's second decision in *Mallinckrodt*, as well as the leading case law that led to those decisions.  *Id.*  This Court rejected the Coalition's argument and held that "the standard to apply is a 503 standard, the requirement to find a substantial contribution."  *See* Aug. 19, 2021 Hr'g Tr. 19:21-20:1 (attached as **Exhibit E**).

Organization's rights under the BSA's insurance policies.  And the Coalition organized the Survivor Working Group to ensure the implementation of youth protection reforms and a BSA board seat for a Survivor representative.  *See* Exhibit C-6 at ¶¶ 13-19.

52.    **First**, the Coalition and the FCR negotiated a new settlement with Harford. Following negotiations with the Coalition, the FCR, and their advisors, Hartford agreed to pay $787 million—a **$387** million increase from what would have been the approximately $400 million value of the First Hartford Settlement which had been negotiated by the Debtors.  *See* Dkt. No. 6210 at Ex. A (the "**Second Hartford Settlement**").

53.    Critically, Hartford was persuaded to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  *Id.* at § i.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  *Id.* at § ii.  This was critical because it means that additional funds will be available to pay Survivors on the Effective Date.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.  *Id.* at §§ x & xi.  It cannot be understated how important and material these improvements were.

54.    The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required "the Debtors, the Coalition and the FCR and the Trust to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford."  *Id.* at § viii.  To fully unlock Hartford's $787 million, a solution to the Chartered Organization's rights under the Abuse Insurance Policies still had to be found.

55.    **Second**, the Coalition and the FCR negotiated a settlement with The Church of Jesus Christ of Latter-day Saints (the "**TCJC**").  *See* Dkt. No. 6210 at Ex. B (the "**TCJC**

**Settlement**").  The TCJC undertook a careful review of all filed claims that implicated the TCJC and concluded that Coalition firms represented the vast majority of Abuse Claims to which the TCJC ascribed significant value.

56.    Coalition firms assisted by Coalition professionals engaged in extensive discussions regarding the filed proofs of claim that implicated the TCJC, and the Coalition, along with the FCR, negotiated the framework for a settlement with the TCJC for all Scouting-related Abuse Claims.  As a result of these negotiations, the TCJC agreed to pay $250 million based on tort system values, assign its insurance rights, and waive its Indirect Abuse Claims against the Settlement Trust.  While the Court did not approve this settlement, it provided much needed momentum and showed that settlements could be reached with Chartered Organizations.

57.    **Third**, in October of 2021, the Coalition took the lead in organizing the Survivor Working Group.  *See* Exhibit C-6 at ¶ 14.  The Coalition recognized that for Survivors to support any plan, they would have to overcome their severe distrust of the BSA.  *Id.*  For months, the Survivor Working Group worked to develop youth protection policies, engaged with the BSA and various Local Councils, and drafted and negotiated a term sheet the Debtors ultimately adopted. One of the deal points was that a Survivor serve on the BSA National Executive Board—something the BSA initially opposed but ultimately accepted when the Coalition refused to back down.

### G.    The Post-1976 Chartered Organization Proposal

58.    In order to realize the values of the Local Council settlement and the Second Hartford Settlement, the Chartered Organization issue still had to be solved.  The Coalition's professionals, aided by the FCR's professionals, began working on a solution in July and August of 2021, which they shared with the Debtors and the Local Councils in early August.

59.     The solution—developed primarily by the Coalition's counsel—was to channel Scouting-related post-1976 Abuse Claims[13] against Chartered Organizations that did not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies.  The Coalition believed that this could be done through the Plan, with proper notice to all Chartered Organizations whose rights were being affected.

60.     The Chartered Organization would benefit.  The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance.  The Coalition expected that few, in any, Chartered Organizations would object for this reason.  With the Chartered Organizations' rights in the settled policies secured, the Coalition could achieve its goal of collecting the rights of all insureds under the Debtors' policies.

61.     The Debtors accepted this architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.  *See* Dkt. No. 6212.  The Coalition's counsel was the primary architect of the post-1976 Chartered Organization proposal and drafted the plan language necessary to implement it.  The Chartered Organization architecture that became a cornerstone of the Plan that secured $2.4 billion in unincumbered assets was developed by the Coalition (working in collaboration with the FCR).  *See id.*

**H.      The Coalition and the FCR Negotiate a Settlement with Century and Chubb**

62.     Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors.

---

[13]   Prior to 1976, the Chartered Organizations were not additional insureds under the BSA's insurance policies.  *See* Disclosure Statement at Art. II.E.2 ("Chartered Organizations were not named or additional insureds under any of the BSA Insurance Policies prior to 1976. Therefore, neither the BSA nor the Insurance Companies have any obligation to defend or indemnify, *i.e.*, pay settlements or judgments, with regard to Chartered Organizations for any Abuse Claims prior to 1976 in connection with such policies.")

These negotiations were primarily between the Coalition, the FCR, and Century and did not include other parties.  The Coalition and the FCR sought a framework that would facilitate a settlement with Century and fully resolve the Chartered Organization issues to everyone's satisfaction.

63.    Through discussions with Century, the Coalition and the FCR became aware of additional Chartered Organization issues that had to be addressed.  **First**, Chartered Organizations asserted rights under Local Council policies issued by Century that pre-dated 1976.  Thus, the post-1976 plan architecture, standing alone, was inadequate to afford Century "global peace." **Second**, Chartered Organizations had their own Century policies that covered Scouting-related Abuse Claims, some of which also pre-dated 1976.

64.    **Third**, certain Chartered Organizations announced their intent—or at least threatened—to "opt-out," object to the Plan, and argue that their rights were being impaired.  The Coalition and the FCR had to develop a framework that accounted for "opt-outs" to ensure that such objections would either not be filed or would be withdrawn prior to the confirmation hearing.

### i.    Changes to the Chartered Organization Structure

65.    After months of intense work, the $800 million settlement with Century was announced, as reflected in the term sheet filed on December 14, 2021.  *See* Dkt. No. 7745-1 (the "**Century Term Sheet**").  The Century Term Sheet embodied the final architecture developed principally by the Coalition for solving the Chartered Organization issues in the Chapter 11 Cases.  The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet.  The Century Term Sheet required the Debtors to implement the following changes to the proposed plan of reorganization.

66.    **First**, Chartered Organizations that did not object to the Plan would get the benefit of two injunctions—the post-1976 injunction (covering all Scouting-related Abuse Claims arising on or after 1976) and a second insurance injunction (covering Scouting-related Abuse Claims arising prior to or after 1976 where the Abuse Claims are covered by a policy issued by a settling insurer).  This change addressed pre-1976 Abuse Claims that could trigger policies issued to the Local Councils and the Chartered Organizations.

67.    **Second**, Opt-Outs—*i.e.*, Chartered Organizations that objected to the Plan—would get the benefit of the insurance injunction only.  *See* Century Term Sheet at § 13.  This was critical for two reasons.  First, the insurance injunction would effectively bar Abuse Claims against Opt-Outs that could trigger the settling insurer's indemnification obligations for Scouting-related Abuse Claims, thus affording Century "global peace" and the resulting "peace premium" reflected in the $800 million settlement amount.  Second, Opt-Outs could not seek adequate protection in the form of a lien against the settlement proceeds.  This was critical to the Coalition.

      ii.      **The "Free and Clear" Provisions**

68.    At the insistence of the Coalition and the FCR, the $800 million settlement proceeds had to be contributed to the Settlement Trust on a "free and clear" basis.

69.    The Debtors had the ability to sell their policies under section 363 of the Bankruptcy Code.  Per the Century Term Sheet, the Local Councils were required to contribute the policies issued to them by the settling insurers to the Debtors' estates (with the insurers' consent), which policies would then also be sold under section 363 of the Bankruptcy Code. *See* Century Term Sheet at § 6.  The use of section 363 afforded settling insurers the ability to rely on section 363(f) and applicable case law.  Chartered Organizations that objected and opted out could assert claim for adequate protection under section 363(e) of the Bankruptcy Code.

70.     Adequate protection in this circumstance simply could not come in the form a lien against the settlement proceeds.  That would have meant that the settlement proceeds would be encumbered and, therefore, could not be used to pay Survivors.  This was not a viable option from the Coalition's perspective.

71.     The Coalition identified an alternative form of adequate protection—channel the Abuse Claims that could trigger policies sold back to the insurers under section 363 of the Bankruptcy Code to the Settlement Trust.  Channeled claims cannot be asserted against parties protected by the Channeling Injunction.  If those parties have insurance that provides coverage for such Abuse Claims, the insurance loses all value (making adequate protection, in a sense, unnecessary) the instant the Abuse Claims are channeled.

72.     Post-injunction, the insurance rights lost by Chartered Organizations would have provided coverage for Abuse Claims that could not be asserted against them.  Channeling Abuse Claims where the settling insurers' policies provided coverage for Scouting-related Abuse Claims afforded the Chartered Organizations adequate protection (including the Opt-Outs), and, at the same time, left the settlement proceeds completely unencumbered (for the Survivors' benefit).

73.     The Coalition, working with the FCR, created a framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, delivered the *full value* of the $800 million Century settlement—as well as all other insurance settlements—to the Settlement Trust for the Survivors' benefit.   And, since Chartered Organizations that objected to the Plan could not keep the Settlement Trust from being able to pay Survivors, the Chartered Organizations could not gain undue leverage by objecting to the Plan.

I.        **The Coalition and the FCR Negotiate a Settlement with the United Methodists**

74.       As explained above, the Chartered Organization architecture in the Plan was largely the creation of the Coalition.  But convincing the Debtors and the Local Councils to fully embrace it was another task.  The United Methodists wanted full Protected Party status, but the United Methodists' proposed contribution was based on the amount that the BSA was paying on a per claim basis.  *See* Mar. 18, 2022 Trial Tr. 107:3-13 (direct examination of Bishop Schol) (attached as **Exhibit F**).

75.       Further, the United Methodists publicly threatened to discontinue their relationship with Scouting if a satisfactory deal was not reached.  The Debtors and the Local Counsels informed the Coalition and the FCR that the United Methodists were critical to the Debtors' future and the Plan's feasibility.  The Coalition and the FCR, in acknowledgement of this fact and the United Methodists' ongoing non-monetary contributions to the Debtors, agreed to support a $30 million United Methodists settlement.  *See* Dkt. No. 7884-1.

76.       Related to this settlement—although set forth in the Century Term Sheet (Dkt. No. 7745-1)—the Local Councils also agreed to provide the Supplemental LC Contribution, which provides for $40 million in additional consideration to the Settlement Trust.  This contribution—namely, its use but not its amount—was modified by the TCC Term Sheet discussed below.

J.        **The Coalition and the FCR Negotiate Settlements with Zurich and Clarendon**

77.       The Debtors announced the $800 million settlement with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

78.      And it led to two more settlements with excess carriers—Zurich and Clarendon—worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiated by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's work and leadership in the Chapter 11 Cases.  Without the Coalition, none of the foregoing insurance settlements would have occurred.

### K.      **The TCC Opposes Plan Confirmation**

79.      The TCC was not a party to the settlements negotiated and drafted by the Coalition and the FCR between mid-August and December of 2021.  The TCC did not draft the Century Term Sheet, the Hartford Term Sheet, or the Plan language used to unlock the insurance assets and the Local Council contribution.  The TCC actively opposed the confirmation of the Plan.

### L.      **Preliminary Voting Results**

80.      Voting on the Plan closed on December 28, 2021.  Notwithstanding the Coalition's best efforts, the Plan came up just short of the 75% approval vote constituting the section 524(g) threshold applicable in asbestos cases, which has been viewed as an important threshold to support channeling injunctions and non-debtor releases in non-asbestos mass tort bankruptcy cases.  *See* Dkt. No. 8345-1.  Of the holders of Direct Abuse Claims who voted, 74%—nearly 40,000 Survivors—accepted the Plan.  The remaining 26% voted to reject the Plan.

81.      TCC firms uniformly opposed the Plan by significant margins.  *See id.*  Coalition firms, all of which had their Survivor-clients complete individual ballots to fend off potential challenges by parties trying to defeat the Plan (including non-settling insurers), supported the Plan

by significant margins.  *See id.*  The Coalition firms worked tirelessly to encourage voter turnout and ensure that ballots were completed and recorded correctly.  This was a heavy lift by the Coalition firms and proved critical to the confirmation of the Plan.

### M.    Further Mediation with the TCC and the Pfau/Zalkin Firms

82.    The Coalition had hoped to utilize the Plan, as amended to include the Coalition's final architectural for resolving the Chartered Organizations' rights in the insurance policies, to negotiate additional insurance settlements for the benefit of all Survivors prior to the confirmation of the Plan.  The Coalition believed that additional settlements could have been reached for the Survivors' benefit, and that many of the objections filed regarding the confirmation of the Plan could have been avoided.  This did not occur after the voting deadline passed without the 75% approval threshold being reached.

83.    The Coalition could not deliver a global plan by itself.  The support of the TCC and the Pfau/Zalkin Firms was essential.  All efforts turned to the TCC, the law firms associated with its members, and the Pfau/Zalkin firms (represented by KTBS Law LLP).

84.    The Debtors sought to reach an agreement with the TCC and certain TCC-affiliated firms that opposed the Plan to increase the percentage of holders of Direct Abuse Claims who voted in favor of the plan.  The parties returned to mediation in January 2022.  The KTBS firm—counsel to the Pfau-Zalkin firms—took an important role in these negotiations.

85.    The KTBS firm proposed an independent review process designed to afford Survivors with high value claims the ability to obtain enhanced awards.  Under this proposal, claims would be evaluated by retired judges.  These neutrals could then issue awards in amounts that greatly exceed the maximum awards available under the general TDPs.  But this does not mean that independent review awards would be paid from general trust assets.

86.    Direct Abuse Claims allowed in amounts over $1 million are bifurcated.  The first million of any allowed Abuse Claim remains a claim against the general trust.  Any incremental amount over $1 million is a claim against newly created Excess Award Fund.  The Excess Award Fund is the exclusive source of recovery for the portion of any award over $1 million.  The Excess Award Fund has no initial funding.

87.    The funding of the Excess Award Fund is entirely dependent on Plan's ability to preserve and monetize the unsettled excess insurance coverage.  This made the preservation of the unsettled coverage even more critical.  If the Plan created new defenses that could be used to deny coverage, claims processed through independent review would not be paid anything on account of excess coverage—even though such excess coverage would have been available had the Debtors not filed for bankruptcy.

## N.    The TCC Term Sheet

88.    After weeks of additional mediation, the Debtors, the AHCLC, the Coalition, the TCC, the Pfau/Zalkin Firms, and the FCR entered into a term sheet (Dkt. No. 8772-1) (the "**TCC Term Sheet**").

89.    The TCC Term Sheet provided for the following provisions:  (a) the independent review process for Abuse Claims developed by KTBS (in consultation with counsel for the Coalition and the FCR); (b) changes to the composition of the STAC; (c) the TCC's and Pfau/Zalkin's ability to veto future settlements with insurers prior to the Effective Date; (d) the Debtors' ability to retain the cash proceeds from the sale of Scouting U and the National Distribution Center (together, worth approximately $13.5 million);[14] (e) the Debtors commitment

---

[14]    But for the TCC Term Sheet, the cash proceeds from the sale of Scouting U and the National Distribution Center would have been contributed to the Settlement Trust.

to implement the youth protection measures; and (f) the Debtors renewed commitment to pay the Coalition's Restructuring Expenses (a commitment made as part of ongoing settlement negotiations).  *See* Dkt. No. 8772-1.

### O.      Plan Confirmation and the Court's Ruling on the Plan

90.      The TCC Term Sheet resulted in approximately 85% of the holders of Direct Abuse Claims—an additional 10% of the Survivor constituency—supporting the Plan.  Recognizing that the independent review process—which was critical to obtaining the TCC's support and reaching the 85% threshold—was dependent on the preservation of the unsettled insurance coverage, the Coalition and the FCR jointly drafted a 124-page brief in support of confirmation that addressed the issues raised in the objections filed by the non-settling insurers.  *See* Dkt. Nos. 9115 & 9190-1. The Coalition understood that the objecting, non-settling insurers' goal was to use the confirmation of the Plan to avoid paying anything to Survivors, including those who elected for independent review.

91.      Following weeks of testimony, the Court issued its lengthy and thorough Opinion regarding the confirmation of the Plan.  The Court approved the releases and Channeling Injunction for the benefit of the settling insurers, the Local Councils, and the Chartered Organizations.  The Court approved the core architecture developed largely by the Coalition that resolved the Chartered Organization issues.  *See* Opinion at 85 ("The lack of objection of a Chartered Organization is also consensual for purposes of § 363").

92.      And, except for the TCJC Settlement, the Court approved all of the settlements negotiated by the Coalition and the FCR, thus securing over $2.4 billion in initial funding for the Settlement Trust.  But for these settlements negotiated in the face of intense opposition, the Court could have denied confirmation.  *Id.* at 73.  In fact, the Court commented that "[w]ithout the[]

settlements" negotiated by the Coalition and the FCR with the insurers between August of 2021 and December of 2021, "there is no Plan." *Id.*

P. **The Coalition Restructuring Expenses**

93.    The Coalition's professional team was both extremely lean and highly qualified and experienced in mass tort bankruptcies.   The Coalition Restructuring Expenses are among the lowest in these Chapter 11 Cases.

94.    A month-by-month break down of the Coalition's Restructuring Expenses, as compared to comparable fees and expenses paid by the Debtors to their professionals and the TCC's professionals is set forth below (fees reflected herein are gross fee estimates from fee application submissions prior to any reductions by the fee examiner).

| Month | Debtors[15] | TCC[16] | Coalition[17] |
|---|---|---|---|
| August 2020 | $2,149,048 | $658,721 | $684,028 |
| September 2020 | $1,426,337 | $588,902 | $352,727 |
| October 2020 | $1,918,319 | $2,286,279 | $628,054 |
| November 2020 | $2,508,545 | $504,479 | $244,779 |
| December 2020 | $2,525,945 | $1,122,157 | $515,132 |
| January 2021 | $2,949,606 | $2,853,505 | $1,078,338 |
| February 2021 | $3,683,796 | $893,448 | $1,058,329 |
| March 2021 | $3,696,653 | $1,287,178 | $1,469,880 |
| April 2021 | $4,371,553 | $2,686,831 | $1,038,693 |
| May 2021 | $3,880,582 | $1,517,192 | $936,935 |
| June 2021 | $4,018,023 | $1,858,880 | $1,134,203 |
| July 2021 | $4,471,903 | $1,569,000 | $1,049,683 |
| August 2021 | $4,808,130 | $1,093,800 | $1,095,239 |
| September 2021 | $4,076,307 | $1,347,686 | $1,279,024 |

---

[15]    Includes (a) Sidley Austin, LLP (restructuring counsel), (b) White & Case, LLP (restructuring counsel), (c) Haynes & Boone, LLP (insurance counsel), (d) Alvarez & Marsal North America, LLC (financial advisor), and (e) Morris, Nichols, Arsht & Tunnell, LLP (Delaware counsel).

[16]    Includes (a) PSZJ (restructuring counsel), (b) Pasich LLP (insurance counsel), and (c) Berkeley Research Group, LLC (financial advisor).

[17]    Includes (a) Brown Rudnick LLP (restructuring counsel), (b) Province, LLC (financial advisor), (c) Parson Farnell & Grein, LLP (insurance counsel), (d) Monzack, Mersky & Browder, P.A. (Delaware counsel), (e) Robbins Russell (litigation counsel), and (f) Akin Gump (litigation counsel).

| Month | Debtors[15] | TCC[16] | Coalition[17] |
|---|---|---|---|
| October 2021 | $4,962,135 | $2,894,526 | $1,784,800 |
| November 2021 | $7,066,952 | $2,834,590 | $2,003,192 |
| December 2021 | $5,288,784 | $4,046,894 | $1,558,694 |
| January 2022 | $7,566,273 | $4,424,232 | $664,801 |
| February 2022 | $6,756,883 | $2,515,469 | $613,348 |
| March 2022 | $9,982,092 | $2,612,365 | $689,742 |
| April 2022 | $3,931,945 | $1,307,108 | $392,985 |
| May 2022 | $1,366,167 | $170,855 | $66,083 |
| June 2022 | $755,196 | $196,399 | $31,336 |
| July 2022 | $798,696 | $209,890 | $40,998 |
| August 2022 | $1,869,118 | $866,125 | $431,061 |
| Total: | **$96,828,981** | **$42,346,509** | **$20,842,083** |

95.    The foregoing chart does **not** include all of the Debtors' and the TCC's professionals' fees and expenses.  During the August 2020 to August 2022 period, the Debtors incurred an additional $54.0 million in professional fees and expenses, including $29.1 million for Omni Agent Solutions and $11.5 million for Bates White (excluding ordinary course professionals).  In addition, the foregoing chart does not include the fees and expenses incurred by Brown Rudnick in September and October of 2022.[18]  The Coalition's team—on a combined basis—represent less than 15.0% of the professional fees and expenses incurred by the Debtors and the TCC.

## ARGUMENT

96.    There are two legal standards that this Court could apply to the Debtors' request to pay the Coalition Restructuring Expenses.  The Court could apply the "substantial contribution standard" that it applied when it denied the motion to approve the RSA.  *See* Aug. 19, 2021 Hr'g

---

[18]    Brown Rudnick's fees and expenses for September and October of 2022 total $156,036.30. The aggregate fees and expenses described in the Coalition fee statements attached as Exhibit C-1 through Exhibit C-6 is $21,007,881.01.  The amount that the Debtors seek to pay under Article V.T.1 of the Plan for the Coalition Restructuring Expenses is capped at $21 million.  If the Court follows *Mallinckrodt* and *Purdue*, the payment of the Coalition Restructuring Expenses would be limited to $21 million.

Tr. 19:21-20:1 (applying the substantial contribution standard).  Or the Court could follow the rulings in *Mallinckrodt* and *Purdue* and apply the business judgment standard.  Regardless of which standard the Court applies, the Motion should be granted, and the proposed reimbursement of the Coalition Restructuring Expenses should be approved in all respects.

### A.    <u>The Motion Should be Granted Under the Business Judgment Standard</u>

97.    The Debtors recognize the key role the Coalition served throughout the Debtors' cases and seek to pay the Coalition Restructuring Expenses under sections 1129(a)(4) and 363(b) of the Bankruptcy Code in connection with the Plan.  Consistent with the District Court's decision in *In re Mallinckrodt PLC*, No. 20-12522-JTD, 2022 WL 906458 (D. Del. Mar. 28, 2022), this request, made by the Debtors, should be considered under the business judgement standard. *See* Plan at Article V.T.

98.    In *Mallinckrodt*, the debtors sought authority to reimburse, among other parties, two ad hoc groups representing tort victims for the cost of their restructuring advisors—the exact relief sought by the Debtors here in the Plan.

99.    The **first** ad hoc group included state Attorneys General and the judicially appointed Plaintiffs' Executive Committee of the Opioid Multidistrict Litigation that represented the interests of several political subdivisions, cities, counties, Federally Recognized American Indian Tribes, and other victims.

100.    The **second** ad hoc group represented approximately 1,300 local governments.

101.    Each of the governmental plaintiffs asserted tort claims based on damages caused by the Opioid crisis stemming from the *Mallinckrodt* debtors' conduct.  The first ad hoc group was a party to a pre-petition reimbursement agreement which obligated the debtors to reimburse its restructuring expenses, but the second ad hoc group was not a party to a pre-petition agreement.

Ultimately, the Bankruptcy Court and the District Court approved the reimbursement of both ad hoc groups' restructuring expenses, but a dive into each Court's reasoning is apt for this case.

102.    The *Mallinckrodt* debtors moved for authority to pay the ad hoc groups' restructuring fees and expenses under section 363(b).  The United States Trustee objected and argued—contrary to Judge Drain's ruling in *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 19, 2019, Hr'g Tr. 155:6-158:4) (attached as **Exhibit G**)—that such fees and expenses could only be paid at the end of the case under section 503(b) upon a showing of a substantial contribution.[19]

103.    In its initial decision, Judge Dorsey largely adopted the United States Trustee's argument, rejected the debtors' position that the business judgment standard applies (as well as the actual ruling in *Purdue*), and denied the debtors' motion without prejudice to the parties' right to seek reimbursement under section 503(b) at the end of the cases.[20]

104.    This Court adopted the logic of Judge Dorsey's initial ruling when it denied the Debtors' request to reimburse the Coalition for its restructuring fees and expenses in connection with the RSA.  *See* Aug. 19, 2021 Hr'g Tr. 19:21-20:1.

---

[19]    *In re Purdue Pharma L.P.*, No. 19-23649, *supra*, Hr'g Tr. 157:13-158:4 ("I concluded that the proper standard to review this motion under is, in fact, the standard applicable which I believe is applicable to both sections, 363(b) and Section 365 of the Bankruptcy Code. … But, ultimately whether I'm applying 365 or 363(b) here, I believe it's the same standard for me to apply which is whether the entry into the agreement and the performance of it including the ongoing payment of the professional fees is a proper exercise of business judgment and in the best interest of the debtors and their estates and creditors.").

[20]    *See In re Mallinckrodt, PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 14, 2020, Hr'g Tr. 34:8-20) (attached as **Exhibit H**) ("The debtors argue it is the general business judgment standard that applies in any application made by a debtor under Section 363 to use debtor's assets outside the ordinary course and the court should defer to the debtor's business judgment. On that point I disagree with the debtors.  In the circumstances where a debtor is seeking to pay post-petition fees and expenses of a general unsecured creditor the standard to be applied in approving those payments is the standard provided for in Section 503, that is the payments in recognition of a substantial contribution provided by that creditor to the bankruptcy estate.").

105.     Judge Dorsey, however, ultimately rejected the United States Trustee's argument, applied the business judgment standard, and in a subsequent decision, delivered prior to this Court's ruling on the RSA, approved the debtors' request to reimburse the ad hoc groups for their restructuring fees and expenses. *See In re Mallinckrodt, PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Jan. 19, 2021) (attached as **Exhibit I**).

106.     After Judge Dorsey's initial decision, the *Mallinckrodt* debtors, recognizing the importance of the ad hoc groups in achieving a successful reorganization, tried again and, on December 30, 2020, filed a second motion seeking to assume the reimbursement agreement in place as to the first ad hoc group—*i.e.*, by invoking section 365 of the Bankruptcy Code—and to enter into a new reimbursement agreement with the second ad hoc group—*i.e.*, by invoking section 363(b) of the Bankruptcy Code.

107.     In considering this second motion, the Bankruptcy Court modified its previous analysis and applied, consistent with Judge Drain's ruling in *Purdue*, the business judgment standard. *Id.* at Hr'g Tr. 9:25-10:4 ("I conclude that the debtors have met their burden of establishing the sound exercise of their business judgment under Sections 363 and 365 in assuming and/or entering into the reimbursement agreements with the professionals of the ad hoc groups at issue."). Neither set of reimbursement agreements in *Mallinckrodt* was tied to a restructuring support agreement. In fact, as to the second ad hoc group, the *Mallinckrodt* debtors simply sought authority to reimburse their restructuring fees and expenses under section 363(b).

108.     Certain objecting parties appealed Judge Dorsey's decision to grant the second motion and the payment of the ad hoc group's restructuring fees and expenses. District Court Judge Leonard P. Stark heard the appeal and affirmed Judge Dorsey's ultimate decision. *Mallinckrodt*, 2022 WL 906458.

109.    In a lengthy decision, the District Court unequivocally held that "§ 503(b)'s substantial contribution standard has **_no role_** in assessing compliance with §§ 363(b) or 365(b)" and that the "business judgment standard" is, as a matter of law, the correct legal standard when a debtor is seeking authority to pay the reasonable fees and expenses of an ad hoc group of tort claimants.  *Id.* at *11-13 (emphasis added).  This follows from the plain language of the statutes: section 503(b) addresses a ***creditor's request*** to pay professional fees whereas section 363(b) applies to a ***debtor's request*** to use estate assets to pay professional fees.  *Id.* at *5 & *9.  The language of section 363(b) is applicable regardless of when the request for payment is made.[21]

110.    The District Court's ruling in *Mallinckrodt* is consistent with—and followed—Judge Drain's ruling on this same issue in *Purdue*, where the debtors were authorized to reimburse the expenses of similar ad hoc groups (who were either parties to or not parties to pre-petition reimbursement agreements) under sections 363(b) and 365 of the Bankruptcy Code under nearly identical reasoning.  *See In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 19, 2019, Hr'g Tr. 155:10-23) (explaining that section 503(b) is "not rendered meaningless" by the

---

[21] The *Mallinckrodt* Court's reference relief being sought prospectively versus "on a retrospective basis" is obviously not the issue. *Id.* at *5. As a practical matter, a debtor can request authority to pay professional fees whenever it wants to do so. A debtor could, as happened here, seek to pay professional fees under an RSA (or through a fee agreement) at the beginning of a chapter 11 case. And a debtor could seek pay professional fees under plan at the end of a case. *See, e.g., In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. June 19, 2020) (Dkt. Nos. 8048 & 8053, PG&E Plan at Article 4.25(c)) (confirming plan that required debtors to reimburse holders of subrogation tort claims $55 million in professional fees incurred throughout the chapter 11 cases). In either situation, the legal standard is business judgment and not substantial contribution. As a practical matter, a creditor can only request the payment of professional fees under section 503(b) on a "retroactive" basis because the creditor must point to the specific work that it did in the chapter 11 case to merit the award. It does not follow, however, that any time a request to pay professional fees is made toward the end of a chapter 11 case that the substantial contribution standard applies. As the Court's analysis in *Mallinckrodt* and *Purdue* shows, the timing of the request is not the relevant inquiry when deciding which legal standard applies. The issue is who is making the request.

application of the business judgment standard to a ***debtor's request*** to pay professional fees under section 363(b) because "in most cases" the debtor will not make such a motion and "if the creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(d) and (b)(4).")

111.    District Judge Stark's, Judge Dorsey's and Judge Drain's analysis speak to the issue before this Court.  Both the Coalition and the parties the debtors in *Mallinckrodt* and *Purdue* sought to reimburse are ad hoc groups that represent tort victims.  The Coalition and the ad hoc groups in *Mallinckrodt* and *Purdue* provided clear benefits to the debtors' estates and created efficiencies in negotiations that were essential to reaching settlements.

112.    Both the ad hoc groups in *Mallinckrodt* and *Purdue* and the Coalition here incurred significant professional fees and expenses that ultimately resulted in the confirmation of chapter 11 plans.  And both the ad hoc groups in *Mallinckrodt* and *Purdue* and the Coalition here played a vital role in those restructurings.  The Debtors amply satisfy the business judgment standard, and this Court's willingness to confirm a global settlement plan built on the Coalition's hard work shows that the reimbursement of the Coalition's fees and expenses under section 363(b) is appropriate.

113.    As in *Mallinckrodt* and *Purdue*, the Debtors initially moved for authority to pay the Coalition's professional fees and expenses through the RSA motion whose aim was to finalize negotiations in connection with and develop support for a Plan that met the Debtors' restructuring goals.  This Court considered that request by the Debtors based on Judge Dorsey's initial ruling in *Mallinckrodt*, ruled that the "substantial contribution" standard applies, and deferred its consideration of the Coalition's Reimbursement Expenses to after confirmation.

114.    Like the second motion filed by the *Mallinckrodt* debtors, the Debtors here renewed their request to pay the Coalition Restructuring Expenses under the Plan and, again, in the TCC

Term Sheet.  The Coalition is bringing the instant Motion because the Court—at the Disclosure Statement hearing—directed that the Coalition file a Motion separate and apart from the Plan.  *See* Sept. 29, 2021 Hr'g Tr. 103:21-105:1 (attached as **Exhibit J**).

115.    But this does not change the legal analysis because, as in *Mallinckrodt* and *Purdue*, the Debtors are seeking to pay the Coalition Restructuring Expenses under the Plan.  *See id.* at 104:13-15 ("THE COURT:  … a plan may also be an appropriate vehicle for a debtor to request certain relief, like [section] 363 is an appropriate vehicle.").

116.    Article V.T.1 of the Plan was drafted to ensure that the Coalition could continue to press its case for reimbursement consistent with the Debtors' stated intent to pay the Coalition Restructuring Expenses and the legal standard applied by the Courts in *Mallinckrodt* and *Purdue*.[22] This Court's prior ruling on the RSA and the Disclosure Statement should not prejudice the Coalition or the nature and timing of when reimbursement was sought and for what purpose.

117.    The fact that the Coalition complied with this Court's direction and waited until post-confirmation to obtain reimbursement for its restructuring expenses does not undermine the relief sought here.  If anything, the fact that the payment of the Coalition Restructuring Expenses constitutes a proper exercise of the Debtors' business judgment is substantiated here by the

---

[22] *See* Plan at Article V.T.1 ("The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Coalition Restructuring Expenses."); *see also* Sept. 29, 2021 Hr'g Tr. 105:4-107:12 ("[W]e're happy to file a motion, Your Honor, but I don't want the procedure that the Court just suggested to be something that is limiting or prejudicing us on that respect because I don't think that is fair. …    If the Court is intending to impose the standard that would apply on a motion for substantial contribution in the context where … a debtor had not sought this — and in fact I would note, under the plan, the language currently reads as the reorganized debtor that is seeking to make that payment — … again, I think that that is the correct standard and we would like the opportunity to brief that to the Court.")

Coalition's valuable, concrete actions and the confirmation of the Plan—evidence that did not yet exist in *Mallinckrodt* or *Purdue*. A contrary result here could provide the Debtors with a windfall at the expense of the very parties that made the confirmation of a global plan possible.

118. Finally, the Coalition's agreement with the United States Trustee in respect of its Coalition's Rule 2019 Statement does not change the analysis. Coalition firms' agreement to not surcharge clients was expressly made "without prejudice" to the Coalition's right to seek reimbursement of its restructuring fees and expenses. *See* Dkt. No. 1510. This Court, therefore, should analyze the request without regard to the Rule 2019 statement.

119. Furthermore, there is no evidence that the tort victims in *Mallinckrodt* and *Purdue* would have had to pay the ad hoc group's professional fees and expenses had the debtors' request to reimburse them under section 363(b) been denied. What the Coalition firms agreed to in the Rule 2019 statement is not relevant.

**B.**      <u>**The Motion Should be Granted Under Section 503(b) of the Bankruptcy Code**</u>

120. Assuming, *arguendo*, that the Court does not apply the business judgment standard, the Motion should be granted under section 503(b) of the Bankruptcy Code. Section 503(b)(3)(D) and (b)(4) authorize the bankruptcy court to award compensation to creditors for their restructuring expenses incurred in making a "substantial contribution" in a chapter 11 case.

121. In pertinent part, section 503(b) of the Bankruptcy Code provides:

> (b)      After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including —
>
>                     …
>
> (3)      the actual, necessary expenses . . . incurred by –
>
> (D)      a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this

title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(4)    reasonable compensations for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

11 U.S.C. § 503(b).

122.    The Coalition is an ad hoc group of creditors—namely, approximately 18,000 holders of Abuse Claims—that incurred the Coalition Restructuring Expenses.[23]  The Coalition Restructuring Expenses are for the reasonable compensation and actual expenses of the Coalition's attorneys and accountants for services rendered in connection with the Chapter 11 Cases.  The issue under section 503(b) is whether the Coalition made a "substantial contribution."

123.    In reviewing "substantial contribution" requests, courts in the Third Circuit must determine "whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (internal quotations omitted); *accord In re Worldwide Direct, Inc.*, 334 B.R. 112, 121 (Bankr. D. Del. 2005).  "[S]ervices which substantially contribute to a case are those which foster and enhance . . . the progress or reorganization." *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986); *accord Lebron* 27 F.3d at 944; *Worldwide Direct* 334 B.R. at 123.

124.    While courts in this Circuit are asked to parse through self-interest, the standards in this Circuit are not impossible to meet.  Indeed this Court has said, "[i]n determining whether a

---

[23]    The Court held that the Coalition itself is an "entity" or "organized group[]" representing creditors—namely, Survivors—in the Chapter 11 Cases.  *See* Dec. 10, 2021 Hr'g Tr. at 6:9-16 ("the word 'entity' … is broad enough to include organized groups such as [the Coalition]") (attached as **Exhibit K**).

creditor has met [its] burden, courts consider the following factors:  1) whether the services were rendered solely to benefit the client or to benefit all parties in the case; 2) whether the services provided direct, significant and demonstrable benefit to the estate; and 3) whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." *Worldwide Direct*, 334 B.R. at 122.

125.    Work that advances self-interest as part of its benefit cannot be a basis to reject a substantial contribution award, as pure altruism could never be the standard.   *See In re DeVal Corp.*, 601 B.R. 725, 736 (E.D. Pa. 2019) ("[N]othing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503") (quoting *In re DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir. 1997)); *accord In re Grasso*, 519 B.R. 137, 14 (Bankr. E.D. Pa. 2014).  The record of these Chapter 11 Cases, demonstrate all the hallmarks of multiple and sustained substantial contributions.

### i.        The Coalition Made a Substantial Contribution

126.    Throughout the Chapter 11 Cases, the Coalition drove support for the confirmation of a global resolution plan that would provide fair and equitable compensation to Survivors in their lifetimes.  The Coalition did so in the face of a near constant artillery barrage of criticism from every party that opposed the Plan.  Absent the $2.4 billion settlement fund that the Coalition took a lead role in building through its extraordinary efforts, the Plan could not have been confirmed.

127.    In fact, had the First Hartford Settlement stood at $400 million—$387 million less that the amount negotiated by the Coalition and the FCR after the RSA hearing—and established a "benchmark" for future insurance settlements, over half a billion dollars in Survivor compensation could have been lost.  And the Chartered Organization architecture developed

largely by the Coalition ensures that $2.4 billion is being contributed to the Settlement Trust on a "free and clear" basis and can be used to pay Survivors.

128.    The $2.4 billion amount was critical to the Court's finding that the Channeling Injunction could be approved.  As the Court found in its Opinion, the "fully noncontingent funding is $2,484,200,000, which is already within the range of Direct Abuse Claims albeit just slightly, and only $16 million below Dr. Bates's $2.5 billion Initial Benchmark Valuation."  Opinion at 70. Absent the settlements negotiated by the Coalition and the FCR, the Court could have been entirely reliant on the value of non-settled insurance coverage when it considered the legal standard for approving the Plan releases and the Channeling Injunction.

129.    Moreover, even though the Court did not make all the "Findings" requested by the Coalition, the Court-approved TDPs which are not ambiguous on the "payment" versus "claim amount" issue and, therefore, are not reasonably susceptible to a *Fuller-Austin* interpretation.  The Court stated that it would consider a modified version of "Finding Y" in the Confirmation Order to clarify the fact that the "allowed amount of a claim does not necessarily correlate to what an insurer is 'obligated to pay' or what a 'loss' is under its insurance policy."  *Id.* at 188.  This modified finding was ultimately included in the Confirmation Order.

130.    And, critically, the Court made a "good faith" finding consistent with section 1129(a)(3) of the Bankruptcy Code.  The non-settling insurers specially objected to the Plan and argued that it was proposed in bad faith and was the product of a collusive deal.  The Court thoroughly considered the evidence and rejected the insurers' arguments on this issue.  *Id.* at 213-31.  Even though the Court "declined to make Finding Z," the Court made the very "good faith" finding that the Coalition wanted the Court to make.

131.    Further, since the Plan does not purport to exempt the non-settling insurers from otherwise applicable principles of *res judicata* and collateral estoppel—*i.e.*, the insurers' version of so-called "neutrality"—the insurers will be hard pressed to relitigate "good faith" and "collusion" before future courts.  A coverage court **may** very well choose to consider this Court's good faith finding.  *Id.* at 189.  Even though the Court "declined to make Finding W," the Court refused to give the non-settling insurers their version of "insurance neutrality," in effect granting exactly what the Coalition was seeking.  The Opinion sets the stage for a fair fight in future coverage litigation between the Settlement Trustee and the non-settling insurers.

132.    If the Court considers the world that existed when the Debtors entered into the First Hartford Settlement—*i.e.*, effectively, a $400 million deal with Hartford, TDPs designed to mirror *Fuller-Austin* and give the non-settling insurers new coverage defenses, combined with the insurers' version of "neutrality" under which section 1141 of the Bankruptcy Code and legal doctrines, including the doctrines of *res judicata* and collateral estoppel, would have no application whatsoever—and the world that exists **today**, substantial progress was made such that the unsettled insurance coverage does have real value—potentially over $4.3 billion.  *See* Opinion at 69.  Simply put, the Plan creates a mechanism for full payment—as this Court held—and achieves the Coalition's ultimate objective:  fair and equitable compensation for all Survivors of abuse in Scouting.

### ii.    The Coalition Did Not Duplicate the Work of the TCC or the Debtors

133.    The Coalition's efforts were not duplicative of the TCC's efforts or even the Debtors' efforts.  To state the obvious:  the TCC was not involved in the negotiations that took place between mid-August and December of 2021.

134.    Century, Hartford, Zurich, and Clarendon negotiated with the Coalition and the FCR.  The First Hartford Settlement showed that reaching a deal with the Debtors was pointless unless the majority of the creditors supported the deal.  The fact that the Debtors signed a settlement with Hartford that they knew had no support from any Survivor groups meant that the Debtors could not credibly take the lead in these negotiations.  As in *Mallinckrodt*, the existence of an organized ad hoc group that represented the majority of Survivors is what made key and critical negotiations possible.

135.    The settlements with Century, Hartford, Zurich, and Clarendon were negotiated with the Coalition and the FCR in the first instance and then brought to the Debtors towards the end of the process after material terms were agreed to and the agreements themselves were largely drafted.

136.    The Century Term Sheet was the product of negotiations between the Coalition, the FCR, and Century and solutions to problems developed in large part by the Coalition.  The Debtors played a role, but unique circumstances of this case required the Coalition—as the representative voice for nearly 75% of the Survivors—to vigorously take the laboring oar on all of these settlements and drive these Chapter 11 Cases to a successful conclusion.  The Coalition's role—by necessity—was unique, extraordinary, and non-duplicative of any other party in the Chapter 11 Cases.

### iii.    The Coalition's Efforts Transcended Pure Self-Interest

137.    In the Third Circuit, "[i]nherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."  *Lebron*, 27 F.3d at 944.

138.    The Coalition firms that went out-of-pocket here to fund the Coalition and its professionals obviously represent Survivors.   And the confirmation of the Plan created a Settlement Trust that will be used to pay Survivors (including Survivors represented by TCC affiliated firms and Survivors who have no legal counsel).  The Coalition firms, in many instances, will get paid under their contracts as Abuse Claims are liquidated and paid in accordance with the TDPs.  And the Survivors that comprise the Coalition will receive distributions on account of their Abuse Claims under the Plan.  But to say that the benefits received by the Debtors' estates were incidental to the Coalition's pursuit of its own self-interest would be overly simplistic.

139.    The benefits to the Debtors' estates are obvious and substantial, but they were not guaranteed.  Rather, they were hard-fought by the Coalition and often on multiple fronts and flanks. The Coalition could have put its "pens down" after the Court denied the RSA motion or, alternatively, joined the TCC in its efforts to defeat the Plan.  Had the Coalition done either of these things, the Debtors' reorganization would have failed.

140.    The Coalition firms could have litigated thousands of Abuse Claims against Local Councils and Chartered Organizations in state court.  This path may have resulted in fewer Survivors receiving compensation, but the ability to obtain punitive damages and high verdicts could have placed each of the Coalition firms in a comparable place in terms of their overall recovery.  The Coalition firms had multiple options, each of which would have been consistent with their own economic interests.  The Coalition here chose a path that saved the Boy Scouts, made it possible for the Debtors to reorganize, and created a multi-billion settlement fund for Survivors—all while taking intense fire from objecting parties.

141.    The Coalition did what it said it would do.  The Coalition, acting at all times professionally and in a worker-like fashion, formulated solutions to key obstacles and was

instrumental in obtaining the Survivors' support.  Without the Coalition's hard work, the Plan had no chance of achieving the Survivor support necessary to confirm a plan with a channeling injunction and third-party releases.  The Coalition opted to pursue a course of action that provided extensive benefits to the Debtors and multiple constituencies.

142.    The benefits conveyed here by the Coalition were not "incidental."  A successful reorganization is a "substantial benefit."  The continuation of Scouting is a "substantial benefit."  Billions being paid to Survivors—who have suffered a lifetime of pain—while they are still alive is a "substantial benefit."  And, finally and indisputably, "Safe Scouting" is a "substantial benefit."

143.    When compared to the professional fees and expenses paid to comparable groups of tort claimants in *Mallinckrodt*, *Purdue* and *PG&E*, the denial of the relief requested herein could not only create a split of authority within this District, but it would also be manifestly unjust.  Respectfully, the Motion should be granted.

**CONCLUSION**

WHEREFORE, the Coalition respectfully requests that the Court enter an order granting the Motion and granting such other and further relief as the Court deems just and proper.

Dated:  December 29, 2022          MONZACK MERSKY AND BROWDER, P.A.
Wilmington, Delaware

*/s/ Rachel B. Mersky*
Rachel B. Mersky
(DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone:      (302) 656-8162
Facsimile:      (302) 656-2769
E-mail:          RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail:  EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*