**<u>EXHIBIT B</u>**

DECLARATIONS

# **EXHIBIT B-1**

SLATER DECLARATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF ADAM P. SLATER IN SUPPORT OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES

I, Adam P. Slater, being duly sworn, hereby declare as follows:

1.     I am a Partner of the law firm Slater Slater Schulman, LLP based in its office located at 488 Madison Avenue, 20th Floor, New York, New York 10022.  I helped found the Coalition of Abused Scouts for Justice (the "**Coalition**").   I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2]  Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.     The Coalition was formed by certain law firms that were once affiliated with the Official Committee of Tort Claimants (the "**TCC**").  These firms believed that absent a serious

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

intervention, the Debtors would not reach the settlements required for the Debtors to maximize value for Survivors and confirm a global resolution plan.

3.      After its formation, the Coalition retained professionals.  The Coalition hired Brown Rudnick LLP, as restructuring counsel, Province, LLC, as financial advisor, Parsons Farnell & Grein, LLP, as insurance counsel, Monzack, Mersky & Browder, P.A., as Delaware counsel, and Robbins, Russell, Englert, Orseck & Untereiner LLP, as litigation counsel.  The Coalition also retained Akin Gump Strauss Hauer & Feld LLP, as litigation counsel (successor to Robbins Russell).  I was selected as one of primary negotiators on behalf of the Coalition.

4.      From the outset of its participation in these cases, the Coalition observed that the TCC, the Debtors and the Local Councils were at an impasse.  The TCC was focused on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction.  Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

5.      The Coalition recognized that some of the Debtors' insurers were interested in settling and how beneficial such potential settlements could be for Survivors.  But the insurers had a key requirement—global peace.  To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was essential to collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the Local Councils, and the Chartered Organizations.

6.      The Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that had a realistic chance of being

acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021.  But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

7.    The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to material reduction.  The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

8.    The First Hartford Settlement was also contingent upon a subsequent deal being reached that addressed the rights of various insureds under the Abuse Insurance Policies issued by Hartford, including the Local Councils.  The First Hartford Settlement also did not ensure that the settlement proceeds would flow through to the Survivors.

9.    The First Hartford Settlement contemplated a "free and clear" sale of Hartford's policies, with the interests of additional insureds potentially attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

10.    After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR, in addition to TCC, objected to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working on the framework for a competing plan.  *See* Dkt. Nos. 2506, 2668 & 2672.  The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors.  The Coalition did not believe that a global deal could be accomplished if the TCC required a $4 billion cash contribution from the Local Councils.

11.    The Coalition, through its financial advisors at Province, evaluated the Local Council proposals and determined that it could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their own policies to the Settlement Trust.  Reaching a settlement with the Local Councils was critical to unlocking the full value of the Debtors' insurance assets because the Local Councils are additional insureds under the Debtors' policies.

12.    Given the Debtors' decision to enter into the First Hartford Settlement, the Coalition played a leading role in negotiations with the Local Councils.  The Local Councils, the Coalition, the FCR, and the TCC began negotiating a settlement separate and apart from the Debtors.  This settlement and the related plan structure was more attractive, provided more value, and, critically, provided a much more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced unified creditor opposition.  I was personally involved in the negotiations with the Local Councils.

13.    A product of these negotiations was the Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties.  The

Coalition overcame an artillery barrage of criticism and was a constructive force for the global resolution reflected in the RSA.

14.     The RSA reflected several accomplishments.  The Debtors and Local Councils agreed to contribute up to $850 million on the Effective Date to the Settlement Trust— approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase of approximately $300 million from the amounts previously committed. Because these contributions are due on the Effective Date, the Settlement Trust will have access to immediate funding and will not have to wait until the entry of a final, non-appealable order before it can begin making payments to Survivors.  The Coalition played an important role in these changes.

15.     The Local Council contribution solved for the first piece of the insurance puzzle— *i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

16.     The Local Council settlement was contingent on a satisfactory resolution of the Abuse Claims asserted against the Chartered Organizations.  The Local Councils were concerned that if Scouting-related Abuse Claims were asserted against the Chartered Organizations, they would lose key relationships necessary to maintain and continue Scouting programs.  It was my understanding that the Boy Scouts would cease to exist, and no reorganization would be possible unless Chartered Organizations continued to make their resources available to the Boy Scouts. The Local Council settlement did not represent a hard commitment to pay anything unless the Chartered Organization issues were resolved.

17.    Despite these accomplishments, the Debtors found themselves in a corner.  The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out."  The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford.  As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.

18.    But the Court ruled against the Debtors on this issue.  Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted that even if Hartford "increased its inadequate offer of $650 million to an equally subpar offer of $787 million," the TCC would not support it, particularly if "the $787 million" would "be used to compensate all survivors."  *See* Dkt. No. 6225 at ¶ 10.  The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

19.    Faced with this difficult if not daunting situation, the Coalition and the FCR decided that they had to move forward without the TCC.  For the months that followed, the Coalition and the FCR negotiated multiple insurance settlements, developed, and completed the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.  Moreover, the Coalition organized the Survivor Working Group to ensure the implementation of youth protection reforms.  I was personally involved with these negotiations.

20.     First, the Coalition and the FCR negotiated a new settlement with Harford. Following negotiations with the Coalition, the FCR, and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the approximately $400 million negotiated by the Debtors.

21.     Critically, Hartford was persuaded to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

22.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford.  To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

23.     Second, the Coalition and the FCR negotiated a settlement with The Church of Jesus Christ of Latter-day Saints (the "**TCJC**").  *See* Dkt. No. 6210 at Ex. B (the "**TCJC Settlement**").  The TCJC undertook a careful review of all filed claims that implicated the TCJC and concluded that Coalition firms represented the vast majority of Abuse Claims to which the TCJC ascribed significant value.  Coalition firms assisted by Coalition professionals engaged in extensive discussions regarding the filed proofs of claim that implicated the TCJC, and Coalition, along with the FCR, negotiated the framework for a settlement with the TCJC for all Scouting-related Abuse Claims.  As a result of these negotiations, the TCJC agreed to pay $250 million

based on tort system values, assign its insurance rights, and waive its Indirect Abuse Claims against the Settlement Trust. While the Court did not approve this settlement, it provided much needed momentum and showed that settlements could be reached with Chartered Organizations.

24.     Third, in October of 2021, the Coalition took the lead in organizing the Survivor Working Group. The Coalition recognized that for Survivors to support any plan, they would have to overcome their severe distrust of the BSA. For months, the Survivor Working Group worked to develop youth protection policies, engaged with the BSA and various Local Councils, and drafted and negotiated a term sheet the Debtors ultimately adopted. One of the deal points was that a Survivor serve on the BSA National Executive Board.

25.     The Coalition knew that to realize the values of the Local Council settlement and the Second Hartford Settlement, the Chartered Organization issue still had to be solved. The Coalition's professionals, aided by the FCR's professionals, began working on a solution in July and August of 2021, which they shared with the Debtors and the Local Councils in early August.

26.     The solution—developed primarily by the Coalition's counsel—was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that did not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies. The Coalition believed that this could be done through the Plan, with proper notice to all Chartered Organizations whose rights were being affected.

27.     The Chartered Organization would benefit. The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance. The Coalition expected that few, in any, Chartered Organizations would object for this reason. With the Chartered Organizations' rights in the settled policies secured, the Coalition could achieve its goal of collecting the rights of all insureds under the Debtors' policies.

28.    The Debtors accepted this architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.  *See* Dkt. No. 6212.  The Coalition's counsel was the primary architect of the post-1976 Chartered Organization proposal and drafted the plan language necessary to implement it.  The Chartered Organization architecture that became a cornerstone of the Plan that secured $2.4 billion in unincumbered assets was developed by the Coalition (working in collaboration with the FCR).

29.    Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. These negotiations were primarily between the Coalition, the FCR, and Century and did not include other parties.  The Coalition and the FCR sought a framework that would facilitate a settlement with Century and fully resolve the Chartered Organization issues to everyone's satisfaction.  I was directly involved with the negotiations with Century.

30.    After months of intense work, the $800 million settlement with Century was announced, as reflected in the term sheet filed on December 14, 2021.  *See* Dkt. No. 7745-1 (the "**Century Term Sheet**").  The Century Term Sheet embodied the final architecture developed principally by the Coalition for solving the Chartered Organization issues in the Chapter 11 Cases. The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet.  The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization.  The work of the Coalition was vital to creating the framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver the full value of the $800 million Century settlement—as well as all other insurance settlements— to the Settlement Trust for the Survivors' benefit.

31.     As explained above, the Chartered Organization architecture in the Plan was largely the creation of the Coalition.  But convincing the Debtors and the Local Councils to fully embrace it was another task.  The United Methodists wanted full Protected Party status, but the United Methodists' proposed contribution was based on the amount that the BSA was paying on a per claim basis.  Further, the United Methodists publicly threatened to discontinue their relationship with Scouting if a deal was not reached.

32.     The Debtors and the Local Counsels informed the Coalition and the FCR that the United Methodists were critical to the Debtors' future and the Plan's feasibility.  The Coalition and the FCR, in acknowledgement of this fact and the United Methodists' ongoing non-monetary contributions to the Debtors, agreed to support a $30 million United Methodists settlement.  *See* Dkt. No. 7884-1.  Related to this settlement—although set forth in the Century Term Sheet (Dkt. No. 7745-1)—the Local Councils also agreed to provide the Supplemental LC Contribution, which provides for $40 million in additional consideration to the Settlement Trust.

33.     The Debtors announced the $800 million settlement negotiated with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

34.     And it led to two more settlement with excess carriers—Zurich and Clarendon— worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiate by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered

contributions to the Settlement Trust would not exist but for the Coalition's work and leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: November 23, 2022                    /s/ Adam P. Slater_____
       New York, New York                    Adam P. Slater

**<u>EXHIBIT B-2</u>**

ANDREWS DECLARATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF ANNE ANDREWS IN SUPPORT OF
### MOTION OF THE COALITION OF ABUSED SCOUTS FOR
### JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
### PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES

I, Anne Andrews, being duly sworn, hereby declare as follows:

1.      I am a Partner of the law firm Andrews & Thornton, LLP based in its office located at 4701 Von Karman Ave., Suite 300, Newport Beach, California  92660.  I helped found the Coalition of Abused Scouts for Justice (the "**Coalition**").    I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2]  Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.      The Coalition was formed by certain law firms that were once affiliated with the Official Committee of Tort Claimants (the "**TCC**").  These firms believed that absent a serious

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

intervention, the Debtors would not reach the settlements required for the Debtors to maximize value for Survivors and confirm a global resolution plan.

3.      After its formation, the Coalition retained professionals.  The Coalition hired Brown Rudnick LLP, as restructuring counsel, Province, LLC, as financial advisor, Parsons Farnell & Grein, LLP, as insurance counsel, Monzack, Mersky & Browder, P.A., as Delaware counsel, and Robbins, Russell, Englert, Orseck & Untereiner LLP, as litigation counsel.  The Coalition also retained Akin Gump Strauss Hauer & Feld LLP, as litigation counsel (successor to Robbins Russell).  I was selected as one of primary negotiators on behalf of the Coalition.

4.      From the outset of its participation in these cases, the Coalition observed that the TCC, the Debtors and the Local Councils were at an impasse.  The TCC was focused on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction.  Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

5.      The Coalition recognized that some of the Debtors' insurers were interested in settling and how beneficial such potential settlements could be for Survivors.  But the insurers had a key requirement—global peace.  To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was essential to collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the Local Councils, and the Chartered Organizations.

6.      The Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that had a realistic chance of being

acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021.  But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

7.      The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to material reduction.  The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

8.      The First Hartford Settlement was also contingent upon a subsequent deal being reached that addressed the rights of various insureds under the Abuse Insurance Policies issued by Hartford, including the Local Councils.  The First Hartford Settlement also did not ensure that the settlement proceeds would flow through to the Survivors.

9.      The First Hartford Settlement contemplated a "free and clear" sale of Hartford's policies, with the interests of additional insureds potentially attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

10.     After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR, in addition to TCC, objected to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working on the framework for a competing plan. *See* Dkt. Nos. 2506, 2668 & 2672.  The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors.  The Coalition did not believe that a global deal could be accomplished if the TCC required a $4 billion cash contribution from the Local Councils.

11.     The Coalition, through its financial advisors at Province, evaluated the Local Council proposals and determined that it could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their own policies to the Settlement Trust.  Reaching a settlement with the Local Councils was critical to unlocking the full value of the Debtors' insurance assets because the Local Councils are additional insureds under the Debtors' policies.

12.     Given the Debtors' decision to enter into the First Hartford Settlement, the Coalition played a leading role in negotiations with the Local Councils.  The Local Councils, the Coalition, the FCR, and the TCC began negotiating a settlement separate and apart from the Debtors.  This settlement and the related plan structure was more attractive, provided more value, and, critically, provided a much more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced unified creditor opposition.  I was personally involved in the negotiations with the Local Councils.

13.     A product of these negotiations was the Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties.  The

Coalition overcame an artillery barrage of criticism and was a constructive force for the global resolution reflected in the RSA.

14.      The RSA reflected several accomplishments.  The Debtors and Local Councils agreed to contribute up to $850 million on the Effective Date to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase of approximately $300 million from the amounts previously committed. Because these contributions are due on the Effective Date, the Settlement Trust will have access to immediate funding and will not have to wait until the entry of a final, non-appealable order before it can begin making payments to Survivors.  The Coalition played an important role in these changes.

15.      The Local Council contribution solved for the first piece of the insurance puzzle—*i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

16.      The Local Council settlement was contingent on a satisfactory resolution of the Abuse Claims asserted against the Chartered Organizations.  The Local Councils were concerned that if Scouting-related Abuse Claims were asserted against the Chartered Organizations, they would lose key relationships necessary to maintain and continue Scouting programs.  It was my understanding that the Boy Scouts would cease to exist, and no reorganization would be possible unless Chartered Organizations continued to make their resources available to the Boy Scouts. The Local Council settlement did not represent a hard commitment to pay anything unless the Chartered Organization issues were resolved.

17.     Despite these accomplishments, the Debtors found themselves in a corner.  The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out."  The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford.  As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.

18.     But the Court ruled against the Debtors on this issue.  Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted that even if Hartford "increased its inadequate offer of $650 million to an equally subpar offer of $787 million," the TCC would not support it, particularly if "the $787 million" would "be used to compensate all survivors."  *See* Dkt. No. 6225 at ¶ 10.  The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

19.     Faced with this difficult if not daunting situation, the Coalition and the FCR decided that they had to move forward without the TCC.  For the months that followed, the Coalition and the FCR negotiated multiple insurance settlements, developed, and completed the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.  Moreover, the Coalition organized the Survivor Working Group to ensure the implementation of youth protection reforms.  I was personally involved with these negotiations.

20.     First, the Coalition and the FCR negotiated a new settlement with Harford. Following negotiations with the Coalition, the FCR, and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the approximately $400 million negotiated by the Debtors.

21.     Critically, Hartford was persuaded to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

22.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford.  To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

23.     Second, the Coalition and the FCR negotiated a settlement with The Church of Jesus Christ of Latter-day Saints (the "**TCJC**").  *See* Dkt. No. 6210 at Ex. B (the "**TCJC Settlement**").  The TCJC undertook a careful review of all filed claims that implicated the TCJC and concluded that Coalition firms represented the vast majority of Abuse Claims to which the TCJC ascribed significant value.  Coalition firms assisted by Coalition professionals engaged in extensive discussions regarding the filed proofs of claim that implicated the TCJC, and the Coalition, along with the FCR, negotiated the framework for a settlement with the TCJC for all Scouting-related Abuse Claims.  As a result of these negotiations, the TCJC agreed to pay $250

million based on tort system values, assign its insurance rights, and waive its Indirect Abuse Claims against the Settlement Trust. While the Court did not approve this settlement, it provided much needed momentum and showed that settlements could be reached with Chartered Organizations.

24. Third, in October of 2021, the Coalition took the lead in organizing the Survivor Working Group. The Coalition recognized that for Survivors to support any plan, they would have to overcome their severe distrust of the BSA. For months, the Survivor Working Group worked to develop youth protection policies, engaged with the BSA and various Local Councils, and drafted and negotiated a term sheet the Debtors ultimately adopted. One of the deal points was that a Survivor serve on the BSA National Executive Board.

25. The Coalition knew that to realize the values of the Local Council settlement and the Second Hartford Settlement, the Chartered Organization issue still had to be solved. The Coalition's professionals, aided by the FCR's professionals, began working on a solution in July and August of 2021, which they shared with the Debtors and the Local Councils in early August.

26. The solution—developed primarily by the Coalition's counsel—was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that did not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies. The Coalition believed that this could be done through the Plan, with proper notice to all Chartered Organizations whose rights were being affected.

27. The Chartered Organization would benefit. The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance. The Coalition expected that few, in any, Chartered Organizations would object for this reason. With

the Chartered Organizations' rights in the settled policies secured, the Coalition could achieve its goal of collecting the rights of all insureds under the Debtors' policies.

28.    The Debtors accepted this architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.  *See* Dkt. No. 6212.  The Coalition's counsel was the primary architect of the post-1976 Chartered Organization proposal and drafted the plan language necessary to implement it.  The Chartered Organization architecture that became a cornerstone of the Plan that secured $2.4 billion in unincumbered assets was developed by the Coalition (working in collaboration with the FCR).

29.    Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. These negotiations were primarily between the Coalition, the FCR, and Century and did not include other parties.  The Coalition and the FCR sought a framework that would facilitate a settlement with Century and fully resolve the Chartered Organization issues to everyone's satisfaction.  I was directly involved with the negotiations with Century.

30.    After months of intense work, the $800 million settlement with Century was announced, as reflected in the term sheet filed on December 14, 2021.  *See* Dkt. No. 7745-1 (the "**Century Term Sheet**").  The Century Term Sheet embodied the final architecture developed principally by the Coalition for solving the Chartered Organization issues in the Chapter 11 Cases. The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet.  The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization.  The work of the Coalition was vital to creating the framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver

the full value of the $800 million Century settlement—as well as all other insurance settlements—to the Settlement Trust for the Survivors' benefit.

31.     As explained above, the Chartered Organization architecture in the Plan was largely the creation of the Coalition.  But convincing the Debtors and the Local Councils to fully embrace it was another task.  The United Methodists wanted full Protected Party status, but the United Methodists' proposed contribution was based on the amount that the BSA was paying on a per claim basis.  Further, the United Methodists publicly threatened to discontinue their relationship with Scouting if a deal was not reached.

32.     The Debtors and the Local Counsels informed the Coalition and the FCR that the United Methodists were critical to the Debtors' future and the Plan's feasibility.  The Coalition and the FCR, in acknowledgement of this fact and the United Methodists' ongoing non-monetary contributions to the Debtors, agreed to support a $30 million United Methodists settlement. *See* Dkt. No. 7884-1.  Related to this settlement—although set forth in the Century Term Sheet (Dkt. No. 7745-1)—the Local Councils also agreed to provide the Supplemental LC Contribution, which provides for $40 million in additional consideration to the Settlement Trust.

33.     The Debtors announced the $800 million settlement negotiated with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

34.     And it led to two more settlement with excess carriers—Zurich and Clarendon—worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiate by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local

Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's work and leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: November 23, 2022                    /s/ Anne Andrews
   Newport Beach, California            Anne Andrews

## **EXHIBIT B-3**

ROTHWEILER DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF KENNETH M. ROTHWEILER IN SUPPORT**
**OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR**
**JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'**
**PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Kenneth M. Rothweiler, being duly sworn, hereby declare as follows:

1.      I am the co-founding shareholder and a Partner of the law firm Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. based in its office located at 1634 Spruce Street, Philadelphia, Pennsylvania  19103.  I helped found the Coalition of Abused Scouts for Justice (the "**Coalition**").  I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2] Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.      The Coalition was formed by certain law firms that were once affiliated with the Official Committee of Tort Claimants (the "**TCC**").  These firms believed that absent a serious

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

intervention, the Debtors would not reach the settlements required for the Debtors to maximize value for Survivors and confirm a global resolution plan.

3.      After its formation, the Coalition retained professionals.   The Coalition hired Brown Rudnick LLP, as restructuring counsel, Province, LLC, as financial advisor, Parsons Farnell & Grein, LLP, as insurance counsel, Monzack, Mersky & Browder, P.A., as Delaware counsel, and Robbins, Russell, Englert, Orseck & Untereiner LLP, as litigation counsel.   The Coalition also retained Akin Gump Strauss Hauer & Feld LLP, as litigation counsel (successor to Robbins Russell).   I was selected as one of three negotiators on behalf of the Coalition.   I was also tasked with the role of spokesperson for the Coalition.   In this role, I interfaced with both print and broadcast media.   I was also the organizer and moderator for weekly Town Halls that were attended by thousands of Survivors.

4.      From the outset of its participation in these cases, the Coalition observed that the TCC, the Debtors and the Local Councils were at an impasse.   The TCC was focused on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction.   Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

5.      The Coalition recognized that some of the Debtors' insurers were interested in settling and how beneficial such potential settlements could be for Survivors.   But the insurers had a key requirement—global peace.   To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was

essential to collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the Local Councils, and the Chartered Organizations.

6.     The Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that had a realistic chance of being acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021. But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

7.     The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to material reduction.  The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion. Century settled for $800 million.   Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

8.     The First Hartford Settlement was also contingent upon a subsequent deal being reached that addressed the rights of various insureds under the Abuse Insurance Policies issued by Hartford, including the Local Councils.  The First Hartford Settlement also did not ensure that the settlement proceeds would flow through to the Survivors.

9.     The First Hartford Settlement contemplated a "free and clear" sale of Hartford's policies, with the interests of additional insureds potentially attaching to the sale proceeds.  Under

this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies. If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

10.    After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR, in addition to TCC, objected to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working on the framework for a competing plan. *See* Dkt. Nos. 2506, 2668 & 2672. The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors. The Coalition did not believe that a global deal could be accomplished if the TCC required a $4 billion cash contribution from the Local Councils.

11.    The Coalition, through its financial advisors at Province, evaluated the Local Council proposals and determined that it could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their own policies to the Settlement Trust. Reaching a settlement with the Local Councils was critical to unlocking the full value of the Debtors' insurance assets because the Local Councils are additional insureds under the Debtors' policies.

12.    Given the Debtors' decision to enter into the First Hartford Settlement, the Coalition played a leading role in negotiations with the Local Councils. The Local Councils, the Coalition, the FCR, and the TCC began negotiating a settlement separate and apart from the Debtors. This settlement and the related plan structure was more attractive, provided more value, and, critically, provided a much more realistic opportunity for a confirmable exit from chapter 11

than the BSA-Hartford plan, which faced unified creditor opposition.  I was personally involved in the negotiations with the Local Councils.

13.    A product of these negotiations was the Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties.  The Coalition overcame an artillery barrage of criticism and was a constructive force for the global resolution reflected in the RSA.

14.    The RSA reflected several accomplishments.  The Debtors and Local Councils agreed to contribute up to $850 million on the Effective Date to the Settlement Trust— approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase of approximately $300 million from the amounts previously committed. Because these contributions are due on the Effective Date, the Settlement Trust will have access to immediate funding and will not have to wait until the entry of a final, non-appealable order before it can begin making payments to Survivors.  The Coalition played an important role in these changes.

15.    The Local Council contribution solved for the first piece of the insurance puzzle— *i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

16.    The Local Council settlement was contingent on a satisfactory resolution of the Abuse Claims asserted against the Chartered Organizations.  The Local Councils were concerned that if Scouting-related Abuse Claims were asserted against the Chartered Organizations, they would lose key relationships necessary to maintain and continue Scouting programs.  It was my understanding that the Boy Scouts would cease to exist, and no reorganization would be possible

unless Chartered Organizations continued to make their resources available to the Boy Scouts. The Local Council settlement did not represent a hard commitment to pay anything unless the Chartered Organization issues were resolved.

17.     Despite these accomplishments, the Debtors found themselves in a corner.  The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out."  The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford.  As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.

18.     But the Court ruled against the Debtors on this issue.  Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted that even if Hartford "increased its inadequate offer of $650 million to an equally subpar offer of $787 million," the TCC would not support it, particularly if "the $787 million" would "be used to compensate all survivors."  *See* Dkt. No. 6225 at ¶ 10.  The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

19.     Faced with this difficult if not daunting situation, the Coalition and the FCR decided that they had to move forward without the TCC.  For the months that followed, the Coalition and the FCR negotiated multiple insurance settlements, developed, and completed the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.  Moreover,

the Coalition organized the Survivor Working Group to ensure the implementation of youth protection reforms.  I was personally involved with these negotiations.

20.     First, the Coalition and the FCR negotiated a new settlement with Harford. Following negotiations with the Coalition, the FCR, and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the approximately $400 million negotiated by the Debtors.

21.     Critically, Hartford was persuaded to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

22.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford.  To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

23.     Second, the Coalition and the FCR negotiated a settlement with The Church of Jesus Christ of Latter-day Saints (the "**TCJC**").  *See* Dkt. No. 6210 at Ex. B (the "**TCJC Settlement**").  The TCJC undertook a careful review of all filed claims that implicated the TCJC and concluded that Coalition firms represented the vast majority of Abuse Claims to which the TCJC ascribed significant value.  Coalition firms assisted by Coalition professionals engaged in extensive discussions regarding the filed proofs of claim that implicated the TCJC, and the

Coalition, along with the FCR, negotiated the framework for a settlement with the TCJC for all Scouting-related Abuse Claims. As a result of these negotiations, the TCJC agreed to pay $250 million based on tort system values, assign its insurance rights, and waive its Indirect Abuse Claims against the Settlement Trust. While the Court did not approve this settlement, it provided much needed momentum and showed that settlements could be reached with Chartered Organizations.

24.     Third, in October of 2021, the Coalition took the lead in organizing the Survivor Working Group. The Coalition recognized that for Survivors to support any plan, they would have to overcome their severe distrust of the BSA. For months, the Survivor Working Group worked to develop youth protection policies, engaged with the BSA and various Local Councils, and drafted and negotiated a term sheet the Debtors ultimately adopted. One of the deal points for which I personally advocated was that a Survivor serve on the BSA National Executive Board. When I raised this issue with the BSA's counsel, I was told that the BSA would not agree to this. I informed the BSA's counsel that without a board seat, my Firm would not support the Plan. The BSA ultimately accept our demands and agreed that a Survivor would serve on the BSA National Executive Board. This will likely lead to Survivor board seats at the Local Council level nationwide.

25.     The Coalition knew that to realize the values of the Local Council settlement and the Second Hartford Settlement, the Chartered Organization issue still had to be solved. The Coalition's professionals, aided by the FCR's professionals, began working on a solution in July and August of 2021, which they shared with the Debtors and the Local Councils in early August.

26.     The solution—developed primarily by the Coalition's counsel—was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that did not object to

the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors'
and the Local Councils' policies. The Coalition believed that this could be done through the Plan,
with proper notice to all Chartered Organizations whose rights were being affected.

27.    The Chartered Organization would benefit. The proposed injunction would cover
the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance. The
Coalition expected that few, in any, Chartered Organizations would object for this reason. With
the Chartered Organizations' rights in the settled policies secured, the Coalition could achieve its
goal of collecting the rights of all insureds under the Debtors' policies.

28.    The Debtors accepted this architecture and implemented it into the Fifth Amended
Plan filed on September 15, 2021. *See* Dkt. No. 6212. The Coalition's counsel was the primary
architect of the post-1976 Chartered Organization proposal and drafted the plan language
necessary to implement it. The Chartered Organization architecture that became a cornerstone of
the Plan that secured $2.4 billion in unincumbered assets was developed by the Coalition (working
in collaboration with the FCR).

29.    Beginning in September 2021, the Coalition and the FCR began negotiating with
another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors.
These negotiations were primarily between the Coalition, the FCR, and Century and did not
include other parties. The Coalition and the FCR sought a framework that would facilitate a
settlement with Century and fully resolve the Chartered Organization issues to everyone's
satisfaction. I was directly involved with the negotiations with Century.

30.    After months of intense work, the $800 million settlement with Century was
announced, as reflected in the term sheet filed on December 14, 2021. *See* Dkt. No. 7745-1 (the
"**Century Term Sheet**"). The Century Term Sheet embodied the final architecture developed

principally by the Coalition for solving the Chartered Organization issues in the Chapter 11 Cases. The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet. The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization. The work of the Coalition was vital to creating the framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver the full value of the $800 million Century settlement—as well as all other insurance settlements— to the Settlement Trust for the Survivors' benefit.

31.     As explained above, the Chartered Organization architecture in the Plan was largely the creation of the Coalition. But convincing the Debtors and the Local Councils to fully embrace it was another task. The United Methodists wanted full Protected Party status, but the United Methodists' proposed contribution was based on the amount that the BSA was paying on a per claim basis. Further, the United Methodists publicly threatened to discontinue their relationship with Scouting if a deal was not reached.

32.     The Debtors and the Local Counsels informed the Coalition and the FCR that the United Methodists were critical to the Debtors' future and the Plan's feasibility. The Coalition and the FCR, in acknowledgement of this fact and the United Methodists' ongoing non-monetary contributions to the Debtors, agreed to support a $30 million United Methodists settlement. *See* Dkt. No. 7884-1. Related to this settlement—although set forth in the Century Term Sheet (Dkt. No. 7745-1)—the Local Councils also agreed to provide the Supplemental LC Contribution, which provides for $40 million in additional consideration to the Settlement Trust.

33.     The Debtors announced the $800 million settlement negotiated with Century on December 14, 2021. *See* Dkt. No. 7745-1. Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021. With these changes, the

Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

34.    And it led to two more settlement with excess carriers—Zurich and Clarendon—worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiate by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's work and leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 23, 2022
      Philadelphia, Pennsylvania

*Kenneth M. Rothweiler*

Kenneth M. Rothweiler

**EXHIBIT B-4**

ATKINSON DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF MICHAEL ATKINSON IN SUPPORT
OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR
JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Michael Atkinson, being duly sworn, hereby declare as follows:

1.     I am a Principal of the Province, LLC based in its office located at 36 S. Charles Street, Suite 2310, Baltimore, Maryland  21201.  I serve as financial advisor to the Coalition of Abused Scouts for Justice (the "**Coalition**").  I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2]  Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.     From the outset of its participation in these cases, the Coalition observed that the TCC, the Debtors and the Local Councils were at an impasse.  The TCC was focused on the

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction. Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

3.      The Coalition sought to play a constructive role in these Chapter 11 Cases. I helped the Coalition evaluate the Debtors' and the Local Councils' assets and insurance rights to arrive at settlement ranges that had a realistic chance of being acceptable to the Local Councils and the Debtors. The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021. But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

4.      After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR, in addition to TCC, objected to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working on the framework for a competing plan. *See* Dkt. Nos. 2506, 2668 & 2672. The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors.

5.      The Coalition did not believe that a global deal could be accomplished if the TCC required a $4 billion cash contribution from the Local Councils. I evaluated the Local Council proposals and determined that the Coalition could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their

own policies to the Settlement Trust.  This settlement was ultimately incorporated into the Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and FCR were all parties.

6.       I also assisted the Coalition in evaluating various insurance settlements, including the Second Hartford Settlement ($787 million), the TCJC Settlement ($250 million), the Century Term Sheet ($800 million), the settlement with the United Methodists ($30 million), and the settlements with Zurich ($52.5 million) and Clarendon ($16.5 million).  Each of the foregoing settlements would not exist but for the Coalition's work and leadership in the Chapter 11 Cases.

7.       A month-by-month break down of the Coalition's Restructuring Expenses (in thousands), as compared to comparable fees and expenses paid by the Debtors to their professionals and the TCC's professionals is set forth below (fees reflected herein are gross fee estimates from fee application submissions prior to any reductions by the fee examiner).

*$US thousands*

| Month | Debtors[3] | TCC[4] | Coalition[5] |
|---|---|---|---|
| August 2020 | $2,149 | $659 | $684 |
| September 2020 | $1,426 | $589 | $353 |
| October 2020 | $1,918 | $2,286 | $628 |
| November 2020 | $2,509 | $504 | $245 |
| December 2020 | $2,526 | $1,122 | $515 |
| January 2021 | $2,950 | $2,854 | $1,078 |
| February 2021 | $3,684 | $893 | $1,058 |
| March 2021 | $3,697 | $1,287 | $1,470 |
| April 2021 | $4,372 | $2,687 | $1,039 |
| May 2021 | $3,881 | $1,517 | $937 |
| June 2021 | $4,018 | $1,859 | $1,134 |

---

[3]   Includes (a) Sidley Austin, LLP (restructuring counsel), (b) White & Case, LLP (restructuring counsel), (c) Haynes & Boone, LLP (insurance counsel), (d) Alvarez & Marsal North America, LLC (financial advisor), and (e) Morris, Nichols, Arsht & Tunnell, LLP (Delaware counsel).

[4]   Includes (a) Pachulski, Stang, Ziehl & Jones LLP (restructuring counsel), (b) Pasich LLP (insurance counsel), and (c) Berkeley Research Group, LLC (financial advisor).

[5]   Includes (a) Brown Rudnick LLP (restructuring counsel), (b) Province, LLC (financial advisor), (c) Parson Farnell & Grein, LLP (insurance counsel), (d) Monzack, Mersky & Browder, P.A. (Delaware counsel), (e) Robbins, Russell, Englert, Orseck & Untereiner LLP (litigation counsel), and (f) Akin Gump Strauss Hauer & Feld LLP (litigation counsel).

| Month | Debtors[3] | TCC[4] | Coalition[5] |
|---|---:|---:|---:|
| July 2021 | $4,472 | $1,569 | $1,050 |
| August 2021 | $4,808 | $1,094 | $1,095 |
| September 2021 | $4,076 | $1,348 | $1,279 |
| October 2021 | $4,962 | $2,895 | $1,785 |
| November 2021 | $7,067 | $2,835 | $2,003 |
| December 2021 | $5,289 | $4,047 | $1,559 |
| January 2022 | $7,566 | $4,424 | $665 |
| February 2022 | $6,757 | $2,515 | $613 |
| March 2022 | $9,982 | $2,612 | $690 |
| April 2022 | $3,932 | $1,307 | $393 |
| May 2022 | $1,366 | $171 | $66 |
| June 2022 | $755 | $196 | $31 |
| July 2022 | $799 | $210 | $41 |
| August 2022 | $1,869 | $866 | $431 |
| Total: | $96,829 | $42,347 | $20,842 |

8.    The foregoing charter was created using documents filed on the docket in the Chapter 11 Cases and my review of invoices that the Coalition has collected.

9.    In addition, a breakdown of each Coalition professional's fees and expenses on a month-by-month basis is attached hereto as **Exhibit 1**.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 12, 2022
        Baltimore, Maryland                    Michael Atkinson

4

# EXHIBIT 1 [6]

*$US thousands*

| Month | Brown Rudnick | Province | Parsons Farnell | Monzack Mersky | Robbins Russell | Akin Gump | Total |
|---|---|---|---|---|---|---|---|
| July 2020 | $74 | $0 | $0 | $0 | $0 | $0 | $74 |
| August 2020 | $610 | $0 | $0 | $0 | $0 | $0 | $610 |
| September 2020 | $280 | $0 | $0 | $73 | $0 | $0 | $353 |
| October 2020 | $570 | $0 | $0 | $58 | $0 | $0 | $628 |
| November 2020 | $229 | $0 | $0 | $16 | $0 | $0 | $245 |
| December 2020 | $298 | $165 | $44 | $7 | $0 | $0 | $515 |
| January 2021 | $571 | $375 | $112 | $20 | $0 | $0 | $1,078 |
| February 2021 | $560 | $367 | $95 | $36 | $0 | $0 | $1,058 |
| March 2021 | $438 | $373 | $61 | $20 | $578 | $0 | $1,470 |
| April 2021 | $508 | $115 | $17 | $30 | $368 | $0 | $1,039 |
| May 2021 | $526 | $235 | $21 | $38 | $117 | $0 | $937 |
| June 2021 | $787 | $278 | $47 | $23 | $0 | $0 | $1,134 |
| July 2021 | $679 | $285 | $45 | $40 | $0 | $0 | $1,050 |
| August 2021 | $679 | $326 | $53 | $37 | $0 | $0 | $1,095 |
| September 2021 | $735 | $436 | $63 | $45 | $0 | $0 | $1,279 |
| October 2021 | $905 | $449 | $66 | $39 | $0 | $325 | $1,785 |
| November 2021 | $1,072 | $399 | $69 | $56 | $0 | $408 | $2,003 |
| December 2021 | $807 | $308 | $29 | $43 | $0 | $370 | $1,559 |
| January 2022 | $466 | $134 | $46 | $11 | $0 | $8 | $665 |
| February 2022 | $513 | $63 | $7 | $23 | $0 | $7 | $613 |
| March 2022 | $544 | $61 | $11 | $57 | $0 | $17 | $690 |
| April 2022 | $360 | $2 | $2 | $30 | $0 | $0 | $393 |
| May 2022 | $55 | $1 | $8 | $2 | $0 | $0 | $66 |
| June 2022 | $25 | $6 | $0 | $0 | $0 | $0 | $31 |
| July 2022 | $31 | $7 | $1 | $2 | $0 | $0 | $41 |
| August 2022 | $375 | $40 | $7 | $9 | $0 | $0 | $431 |
| September 2022 | $98 | $10 | $6 | $9 | $0 | $0 | $124 |
| October 2022 | $58 | $8 | $3 | $5 | $0 | $0 | $74 |
| Total: | $12,851 | $4,445 | $814 | $731 | $1,063 | $1,135 | $21,040 |

---

[6]  Total compensation and reimbursement sought by the Coalition professionals is slightly understated in Exhibit 1 above due to month-to-month rounding differences.  Actual amounts of fees and expenses incurred are provided at Exhibit C to the Motion, together with supporting materials.

## **EXHIBIT B-5**

LE CHEVALLIER DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF GABRIEL J. LE CHEVALLIER IN SUPPORT
OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR
JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Gabriel J. Le Chevallier, being duly sworn, hereby declare as follows:

1.       I am a Partner of the law firm Parsons Farnell & Grein, LLP based in its office located at 1030 S.W. Morrison Street, Portland, Oregon  97205.  I served as insurance counsel to the Coalition of Abused Scouts for Justice (the "**Coalition**").   I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2]  Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.       I first became involved with the Chapter 11 Cases in December of 2020.  It was my understanding that the Debtors and the Local Councils were at an impasse.  The TCC was focused

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction. Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

3.    The Coalition recognized that some of the Debtors' insurers were interested in settling and how beneficial such potential settlements could be for Survivors. But the insurers had a key requirement—global peace. To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was essential to collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the Local Councils, and the Chartered Organizations.

4.    Consistent with the "peace premium" concept, insurers generally will not pay adequate amounts to buyback or otherwise settle a policy—and may not settle the policy at all— if there is an appreciable risk of other insureds being able to continue to seek coverage against them under the policy. That would defeat the point of the sale and/or settlement. There are exceptions, such as where the seller/insured agrees to indemnify the insurer against future coverage claims. But an insurer most likely will not accept an indemnity from an insolvent entity or an entity that may become insolvent.

5.    Given these self-imposed, but logical, negotiation constraints on insurers, it is often better to secure the rights of key other insureds or establish a framework for resolving those other insureds' rights under the policies before reaching settlements with the insurers. Law firms affiliated with the TCC, who represent approximately 10% of the Survivors, maintained that their clients would suffer a "a significant loss on the value of the claims" if they lost the right to sue

Local Councils and Chartered Organizations in the tort system.  Such lawsuits, if initiated or continued, could trigger the Debtors' insurance policies and, therefore, preclude the "global peace" needed to facilitate settlement and the accompanying "peace premium."

6.      The Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that had a realistic chance of being acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021. But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

7.      The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to reduction. The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

8.      Third, the First Hartford Settlement did not contain a firm commitment to pay anything.  The Debtors had not secured the rights of the key other insureds under Hartford's policies.  The First Hartford Agreement itself made it clear that the Hartford dollars were only real if additional settlements were reached that provided Hartford "global peace" under the policies it agreed to purchase.  Fourth, the First Hartford Settlement did not ensure that the settlement

proceeds would flow through to the Survivors.  The First Hartford Settlement contemplated a "free and clear" sale of the policies issued by Hartford to the BSA, with the interests of additional insureds attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

9.      After the Debtors entered into the First Hartford Settlement, the Coalition and the FCR, in addition to TCC, objected to the Debtors' request for an extension of exclusivity, and the Coalition, the TCC and the FCR began working on the framework for a competing plan.  *See* Dkt. Nos. 2506, 2668 & 2672.  The Coalition believed in value maximization, fairness and equity in claims administration and distribution and consensus building—the end goal could not be liquidation, which would serve no one, but a confirmable plan that garnered sufficient resources for all Survivors.  The Coalition did not believe that a global deal could be accomplished if the TCC required a $4 billion cash contribution from the Local Councils.

10.     The Coalition, through its financial advisors at Province, evaluated the Local Council proposals and determined that it could support a settlement for $600 million that included an assignment of the Local Council's insurance rights in the BSA's policies and their own policies to the Settlement Trust.  Reaching a settlement with the Local Councils was critical to unlocking the full value of the Debtors' insurance assets because the Local Councils are additional insureds under the Debtors' policies.

11.     Given the Debtors' decision to enter into the First Hartford Settlement, the Coalition played a leading role in negotiations with the Local Councils.  The Local Councils, the Coalition, the FCR, and the TCC began negotiating a settlement separate and apart from the

Debtors. This settlement and the related plan structure was more attractive, provided more value, and, critically, provided a much more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced unified creditor opposition. A product of these negotiations was the Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties. *See* Dkt. No. 5466.

12.    The RSA reflected several key accomplishments. First, the Debtors and Local Councils agreed to contribute up to $850 million to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils. This represented an increase of approximately $300 million from the amounts previously committed. *See generally* Dkt. No. 4108 at 14-155.

13.    Second, the Local Council contribution solved for the first piece of the insurance puzzle—*i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies. The Local Council settlement was contingent on a satisfactory resolution of the Abuse Claims asserted against the Chartered Organizations. The Local Council settlement did not represent a hard commitment to pay anything unless the Chartered Organization issues were resolved.

14.    Despite these accomplishments, the Debtors found themselves in a corner. The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out." The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford. As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which

settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA. But the Court ruled against the Debtors on this issue.

15.    Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases. The TCC asserted that even if Hartford "increased its inadequate offer of $650 million to an equally subpar offer of $787 million," the TCC would not support it, particularly if "the $787 million" would "be used to compensate all survivors." *See* Dkt. No. 6225 at ¶ 10. The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

16.    Faced with this difficult if not daunting situation, the Coalition and the FCR decided that they had to move forward without the TCC. For the months that followed, the Coalition and the FCR negotiated multiple insurance settlements, developed, and completed the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.

17.    The Coalition and the FCR negotiated a new settlement with Harford. Following intense negotiations with the Coalition, the FCR, and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the $400 million amount previously negotiated by the Debtors. *See* Dkt. No. 6210 at Ex. A (the "**Second Hartford Settlement**"). Coalition and the FCR persuaded Hartford to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain. Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan. Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

18.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford.  To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

19.     In order to realize the values of the Local Council settlement and the Second Hartford Settlement, the Chartered Organization issue still had to be solved.  The Coalition's professionals, aided by the FCR's professionals, began working on a solution in July and August of 2021, which they shared with the Debtors and the Local Councils in early August.

20.     The solution—developed primarily by the Coalition's counsel—was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that did not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies.  The Coalition believed that this could be done through the Plan, with proper notice to all Chartered Organizations whose rights were being affected.

21.     The Chartered Organization would benefit.  The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance.  The Coalition expected that few, in any, Chartered Organizations would object for this reason.  With the Chartered Organizations' rights in the settled policies secured, the Coalition could achieve its goal of collecting the rights of all insureds under the Debtors' policies.

22.     The Debtors accepted this architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.  *See* Dkt. No. 6212.  The Coalition's counsel was the primary architect of the post-1976 Chartered Organization proposal and drafted the plan language

necessary to implement it.  The Chartered Organization architecture that became a cornerstone of the Plan that secured $2.4 billion in unincumbered assets was developed by the Coalition (working in collaboration with the FCR).

23.     Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. These negotiations were primarily between the Coalition, the FCR, and Century and did not include other parties.  The Coalition sought a framework that would facilitate a settlement with Century and fully resolve the Chartered Organization issues to everyone's satisfaction.

24.     After months of intense work, the $800 million settlement with Century was announced, as reflected in the term sheet filed on December 14, 2021.  *See* Dkt. No. 7745-1 (the "**Century Term Sheet**").  The Century Term Sheet embodied the final architecture developed principally by the Coalition for solving the Chartered Organization issues in the Chapter 11 Cases. The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet.  The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization.

25.     Under the Coalition's plan architecture, Chartered Organizations that did not object to the Plan would get the benefit of two injunctions—the post-1976 injunction (covering all Scouting-related Abuse Claims arising on or after 1976) and a second insurance injunction (covering Scouting-related Abuse Claims arising prior to or after 1976 where the Abuse Claims are covered by a policy issued by a settling insurer).

26.     Opt-Outs—*i.e.*, Chartered Organizations that objected to the Plan—would get the benefit of the insurance injunction only.  This was critical for two reasons.  First, the insurance injunction would effectively bar Abuse Claims against Opt-Outs that could trigger the settling

8

insurer's indemnification obligations for Scouting-related Abuse Claims, thus affording settling insurers "global peace."  Second, Opt-Outs could not seek adequate protection in the form of a lien against the settlement proceeds.  This was critical to the Coalition.

27.    At the insistence of the Coalition and the FCR, all insurance settlement proceeds had to be contributed to the Settlement Trust on a "free and clear" basis.  The Debtors had the ability to sell their policies under section 363 of the Bankruptcy Code.  Per the Century Term Sheet, the Local Councils were required to contribute the policies issued to them by the settling insurers to the Debtors' estates (with the insurers' consent), which policies would then also be sold under section 363 of the Bankruptcy Code.  The use of section 363 afforded settling insurers the ability to rely on section 363(f) and applicable case law.  Chartered Organizations that objected and opted out could assert claim for adequate protection under section 363(e) of the Bankruptcy Code.

28.    Adequate protection in this circumstance simply could not come in the form a lien against the settlement proceeds.  That would have meant that the settlement proceeds would be encumbered and, therefore, could not be used to pay Survivors.  This was not a viable option from the Coalition's perspective.

29.    The Coalition identified an alternative form of adequate protection—channel the Abuse Claims that could trigger policies sold back to the insurers under section 363 of the Bankruptcy Code to the Settlement Trust.  Channeled claims cannot be asserted against parties protected by the Channeling Injunction.  If those parties have insurance that provides coverage for such Abuse Claims, the insurance loses all value (making adequate protection, in a sense, unnecessary) the instant the Abuse Claims are channeled.

30.    Post-injunction, the insurance rights lost by Chartered Organizations would have provided coverage for Abuse Claims that could not be asserted against them.  Channeling Abuse Claims where the settling insurers' policies provided coverage for Scouting-related Abuse Claims afforded the Chartered Organizations adequate protection (including the Opt-Outs), and, at the same time, left the settlement proceeds completely unencumbered (for the Survivors' benefit).

31.    The work of the Coalition was vital to creating a framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver the full value of the $800 million Century settlement—as well as all other insurance settlements—to the Settlement Trust for the Survivors' benefit.  And, since Chartered Organizations that objected to the Plan could not keep the Settlement Trust from being able to pay Survivors, the Chartered Organizations could not gain undue leverage by objecting to the Plan.

32.    The Debtors announced the $800 million settlement negotiated with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

33.    And it led to two more settlements with excess carriers—Zurich and Clarendon—worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiate by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 23, 2022                    /s/ Gabriel J. Le Chevallier
       Portland, Oregon                    Gabriel J. Le Chevallier

**<u>EXHIBIT B-6</u>**

PATTON DECLARATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF JAMES L. PATTON IN SUPPORT OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES

I, James L. Patton, being duly sworn, hereby declare as follows:

1.      I am a Partner of the law firm Young Conaway Stargatt & Taylor, LLP based in its office located at Rodney Square, 1000 North King Street, Wilmington, Delaware 19801. I also serve of the Future Claimants' Representative in the above-captioned Chapter 11 Cases. I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2] Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called upon to testify, I would competently testify to the facts set forth herein.

2.      The Debtors filed for bankruptcy on February 18, 2020, nearly two and a half years ago. On March 18, 2020, the Debtors moved for an order appointing me as the legal representative

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

for future claimants. *See* Dkt. No. 223. The Court approved my appointment on April 24, 2020. *See* Dkt. No. 486. Thereafter, I, in my capacity as the Future Claimants' Representative, retained Young, Conaway, Stargatt & Taylor, LLP, as restructuring counsel, Gilbert LLP, as insurance counsel, and Ankura Consulting Group, LLC, as a consultant. *See* Dkt. Nos. 243, 495 & 496.

3.        The Coalition appeared in the Chapter 11 Cases on or about July 24, 2020. The Coalition, which is an ad hoc group, was represented by Brown Rudnick LLP. At the time the Coalition appeared in the Chapter 11 Cases, the TCC, the Debtors and the Local Councils were at an impasse. The TCC was focused on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction. Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

4.        The Coalition sought to act and, in fact, served as a constructive force in the Chapter 11 Cases. On or about April 16, 2021, the Debtors announced that they had entered into the First Hartford Settlement. Neither I nor any other Survivor representative, committee, or Survivor group supported this settlement before or after the Debtors entered into it.

5.        The First Hartford Settlement was problematic for several reasons. First, the $650 million settlement amount was too low. Second, the $650 million amount was subject to reduction. The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion. Century settled

for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

6.      The First Hartford Settlement was also contingent upon a subsequent deal being reached that addressed the rights of various insureds under the Abuse Insurance Policies issued by Hartford, including the Local Councils.  The First Hartford Settlement also did not ensure that the settlement proceeds would flow through to the Survivors.

7.      The First Hartford Settlement contemplated a "free and clear" sale of Hartford's policies, with the interests of additional insureds potentially attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

8.      After the Debtors' announced the First Hartford Settlement, the Coalition, the TCC and myself (and our advisors) entered into discussions to develop an alternative plan.  At this time, the Coalition took a lead role in negotiations with the Local Councils to develop a plan structure that would provide a more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced unified creditor opposition.  This work ultimately resulted in a Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and myself (in my capacity as the Future Claimants' Representative) were all parties.  *See* Dkt. No. 5466.

9.      The RSA reflected several key accomplishments.  First, the Debtors and Local Councils agreed to contribute up to $850 million to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase

of approximately $300 million from the amounts previously committed. *See generally* Dkt. No. 4108 at 14-155. The Coalition was the driving force behind these changes. In fact, having the Coalition as a negotiation partner was critical to the Debtors' reorganization because it gave the Debtors the ability to speak with a single party that represented a large number of claimants. This proved essential to the Debtors' ability to propose a confirmable plan.

10.     Second, the Local Council contribution contemplated under the RSA solved for a part of the insurance puzzle—*i.e.*, the collection of the Local Council's insurance rights in the policies that Hartford wanted to buy back. Third, the RSA included Trust Distribution Procedures that were designed to preserve the Debtors' insurance assets and not give the insurers new coverage defenses. These accomplishments were attributable, in large part, to the Coalition's work.

11.     Despite these accomplishments, the Debtors found themselves in a corner. The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out." The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford. As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA. But the Court ruled against the Debtors on this issue.

12.     Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases. The TCC asserted that even if Hartford increased its inadequate offer of $650 million to an equally subpar offer of $787 million, the TCC would not support it, particularly if the $787 million would be used to compensate all survivors. The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential

exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

13.    The Coalition and I decided to move forward without the TCC.  For the months that followed, the Coalition and I were tasked with negotiating multiple insurance settlements and developing and completing the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.

14.    The Coalition and I negotiated a new settlement with Harford.  Following intense negotiations involving the Coalition, myself and our advisors, Hartford agreed to pay $787 million—a $387 million increase from the $400 million amount previously negotiated by the Debtors.  *See* Dkt. No. 6210 at Ex. A (the "**Second Hartford Settlement**").  The Coalition and I persuaded Hartford to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan. Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

15.    The Second Hartford Settlement required the Debtors, the Coalition and me to secure an assignment to the Trust, or otherwise resolve to the parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford. To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

16.    The Coalition's professionals took a lead role in developing a solution to this issue. The Coalition's solution was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that do not object to the Plan and, therefore, could be deemed to assign

and/or release their rights under the Debtors' and the Local Councils' policies.  The Chartered Organizations would benefit.  The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance.  The Debtors accepted the Coalition's architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.

17.    Beginning in September 2021, the Coalition and I began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors.  The Coalition, Century, and I landed on what became the final architecture for solving the Chartered Organization issue in the Chapter 11 Cases, which is reflected in the term sheet filed on December 14, 2021.  *See* Dkt. No. 7745-1.  I largely credit the Coalition and its legal team with solving the Chartered Organization issues in the Chapter 11 Cases and creating a framework that would deliver settling insurers the "global peace" necessary for insurance settlements to be consummated and, at the same time, delivered the full value of those settlements—to the Settlement Trust for the Survivors' benefit.

18.    Together, the settlements negotiated by the Coalition and me are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: November 23, 2022                         /s/ James L. Patton
       Wilmington, Delaware                      James L. Patton

# **EXHIBIT B-7**

HARRON DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF EDWIN J. HARRON IN SUPPORT
OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR
JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Edwin J. Harron, being duly sworn, hereby declare as follows:

1.       I am a Partner of the law firm Young Conaway Stargatt & Taylor, LLP based in its office located at Rodney Square, 1000 North King Street, Wilmington, Delaware 19801. I serve as restructuring counsel to James L. Patton, in his capacity as the Future Claimants' Representatives in the Chapter 11 Cases. I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2] Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called upon to testify, I would competently testify to the facts set forth herein.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

2.      On March 18, 2020, the Debtors moved for an order appointing James L. Patton as the legal representative for future claimants.  *See* Dkt. No. 223.  The Court approved Mr. Patton's appointment on April 24, 2020.  *See* Dkt. No. 486.  Thereafter, Mr. Patton, as the Future Claimants' Representative (the "**FCR**"), retained Young Conaway Stargatt & Taylor, LLP as restructuring counsel.

3.      The Coalition appeared in the Chapter 11 Cases on or about July 24, 2020.  The Coalition, which is an ad hoc group, was represented by Brown Rudnick LLP.  I worked closely with David J. Molton and Eric R. Goodman during the Chapter 11 Cases to solve problems necessary for the Debtors to propose a viable plan of reorganization.  The Coalition was the FCR's invaluable partner in pushing the Chapter 11 Cases towards confirmation.  Neither could have done it without the other.  Particularly, at times when the TCC presented an obstacle, the FCR needed a partner that represented a substantial number of Survivors.

4.      At the time the Coalition appeared in the Chapter 11 Cases, the TCC, the Debtors and the Local Councils were at an impasse.  The TCC was focused on the quantum of the Local Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils and the Chartered Organizations—should be treated as Protected Parties and receive the protections afforded by a channeling injunction.  Neither the TCC nor the Debtors had developed a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for the Survivors' benefit.

5.      It was my understanding that some of the Debtors' insurers were interested in settling and that such settlements could be beneficial for Survivors.  But the insurers had a key requirement—global peace.  To afford the insurers global peace and extract a "peace premium" out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was essential to

collect (and be able to settle) the rights of all insureds under the policies—i.e., the Debtors, the Local Councils, and the Chartered Organizations.

6.    Consistent with the "peace premium" concept, insurers generally will not pay adequate amounts to buyback or otherwise settle a policy—and may not settle the policy at all— if there is an appreciable risk of other insureds being able to continue to seek coverage against them under the policy.  That would defeat the point of the sale and/or settlement.  There are exceptions, such as where the seller/insured agrees to indemnify the insurer against future coverage claims.  But an insurer most likely will not accept an indemnity from an insolvent entity or an entity that may become insolvent.

7.    Given these self-imposed, but logical, negotiation constraints on insurers, it is often better to secure the rights of key other insureds or establish a framework for resolving those other insureds' rights under the policies before reaching settlements with the insurers.  Law firms affiliated with the TCC, who represent approximately 10% of the Survivors, maintained that their clients would suffer a "a significant loss on the value of the claims" if they lost the right to sue Local Councils and Chartered Organizations in the tort system.  Such lawsuits, if initiated or continued, could trigger the Debtors' insurance policies and, therefore, preclude the "global peace" needed to facilitate settlement and the accompanying "peace premium."

8.    It was my understanding that the Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that it believed had a realistic chance of being acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021.  But these plans were put on hold when the Debtors

unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

9.     The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to reduction. The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

10.     Third, the First Hartford Settlement did not contain a firm commitment to pay anything.  The Debtors had not secured the rights of the key other insureds under Hartford's policies.  The First Hartford Agreement itself made it clear that the Hartford dollars were only real if additional settlements were reached that provided Hartford "global peace" under the policies it agreed to purchase.  Fourth, the First Hartford Settlement did not ensure that the settlement proceeds would flow through to the Survivors.  The First Hartford Settlement contemplated a "free and clear" sale of the policies issued by Hartford to the BSA, with the interests of additional insureds attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

11.     After the Debtors' announced the First Hartford Settlement, the Coalition, the TCC and the FCR entered into discussions to develop an alternative plan.  At this time, the Coalition

took a lead role in negotiations with the Local Councils to develop a plan structure that would provide a more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford plan, which faced unified creditor opposition. This work ultimately resulted in a Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties. *See* Dkt. No. 5466.

12.    The RSA reflected several key accomplishments. First, the Debtors and Local Councils agreed to contribute up to $850 million to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils. This represented an increase of approximately $300 million from the amounts previously committed. *See generally* Dkt. No. 4108 at 14-155. The Coalition was the driving force behind these changes. In fact, having the Coalition as a negotiation partner was critical to the Debtors' reorganization because it gave the Debtors the ability to speak with a single party that represented a large number of claimants. This proved essential to the Debtors' ability to propose a confirmable plan.

13.    Second, the Local Council contribution solved for the first piece of the insurance puzzle—*i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

14.    Despite these accomplishments, the Debtors found themselves in a corner. The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out." The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford. As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which

settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.  But the Court ruled against the Debtors on this issue.

15.    Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted that even if Hartford increased its inadequate offer of $650 million to an equally subpar offer of $787 million, the TCC would not support it, particularly if the $787 million would be used to compensate all survivors. The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

16.    The Coalition and the FCR decided to move forward without the TCC.  For the months that followed, the Coalition and the FCR were tasked with negotiating multiple insurance settlements and developing and completing the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.

17.    The Coalition and the FCR negotiated a new settlement with Harford.  Following intense negotiations involving the Coalition, the FCR and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the $400 million amount previously negotiated by the Debtors.  See Dkt. No. 6210 at Ex. A (the "**Second Hartford Settlement**").  The Coalition and the FCR persuaded Hartford to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

18.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford.  To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

19.     The Coalition's professionals took a lead role in developing a solution to this issue. The Coalition's solution was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that do not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies.  The Chartered Organizations would benefit.  The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance.  The Debtors accepted the Coalition's architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.

20.     Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. The Coalition, the FCR and Century landed on what became the final architecture for solving the Chartered Organization issue in the Chapter 11 Cases, which is reflected in the term sheet filed on December 14, 2021.  The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet.  The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization.

21.     Under the Coalition's plan architecture, Chartered Organizations that did not object to the Plan would get the benefit of two injunctions—the post-1976 injunction (covering all

Scouting-related Abuse Claims arising on or after 1976) and a second insurance injunction (covering Scouting-related Abuse Claims arising prior to or after 1976 where the Abuse Claims are covered by a policy issued by a settling insurer).

22.     Opt-Outs—*i.e.*, Chartered Organizations that objected to the Plan—would get the benefit of the insurance injunction only.  This was critical for two reasons.  First, the insurance injunction would effectively bar Abuse Claims against Opt-Outs that could trigger the settling insurer's indemnification obligations for Scouting-related Abuse Claims, thus affording settling insurers "global peace."  Second, Opt-Outs could not seek adequate protection in the form of a lien against the settlement proceeds.

23.     At the insistence of the Coalition and the FCR, all insurance settlement proceeds had to be contributed to the Settlement Trust on a "free and clear" basis.  The Debtors had the ability to sell their policies under section 363 of the Bankruptcy Code.  The Local Councils were required to contribute the policies issued to them by the settling insurers to the Debtors' estates (with the insurers' consent), which policies would then also be sold under section 363 of the Bankruptcy Code.  The use of section 363 afforded settling insurers the ability to rely on section 363(f) and applicable case law.  Chartered Organizations that objected and "Opt-Out" could assert claim for adequate protection under section 363(e) of the Bankruptcy Code.

24.     Adequate protection in this circumstance could not come in the form a lien against the settlement proceeds.  That would have meant that the settlement proceeds could be encumbered and, therefore, could not be used to pay Survivors.  This was not a viable option.

25.     The Coalition identified an alternative form of adequate protection—channel the Abuse Claims that could trigger policies sold back to the insurers under section 363 of the Bankruptcy Code to the Settlement Trust.  Channeled claims cannot be asserted against parties

protected by the Channeling Injunction.  If those parties have insurance that provides coverage for such Abuse Claims, the insurance loses all value (making adequate protection, in a sense, unnecessary) the instant the Abuse Claims are channeled.

26.    Post-injunction, the insurance rights lost by Chartered Organizations would have provided coverage for Abuse Claims that could not be asserted against them.  Channeling Abuse Claims where the settling insurers' policies provided coverage for Scouting-related Abuse Claims afforded the Chartered Organizations adequate protection (including the Opt-Outs), and, at the same time, left the settlement proceeds completely unencumbered (for the Survivors' benefit).

27.    The work of the Coalition was vital to creating a framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver the full value of the $800 million Century settlement—as well as all other insurance settlements—to the Settlement Trust for the Survivors' benefit.  And, since Chartered Organizations that objected to the Plan could not keep the Settlement Trust from being able to pay Survivors, the Chartered Organizations could not gain undue leverage by objecting to the Plan.

28.    The Debtors announced the $800 million settlement with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

29.    And it led to two more settlement with excess carriers—Zurich and Clarendon—worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiated by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million),

Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 23, 2022                    /s/ Edwin J. Harron
       Wilmington, Delaware                    Edwin J. Harron

## **EXHIBIT B-8**

QUINN DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF KAMI E. QUINN IN SUPPORT
OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR
JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Kami E. Quinn, being duly sworn, hereby declare as follows:

1.      I am a Partner of the law firm Gilbert, LLP based in its office located at 700 Pennsylvania Avenue, SE, Suite 400, Washington, DC  20003.  I serve as insurance counsel to James L. Patton, in his capacity as the Future Claimants' Representatives in the Chapter 11 Cases.  I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2]  Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would competently testify to the facts set forth herein.

2.      On March 18, 2020, the Debtors moved for an order appointing James L. Patton as the legal representative for future claimants.  *See* Dkt. No. 223.  The Court approved Mr. Patton's

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

appointment on April 24, 2020. *See* Dkt. No. 486. Thereafter, Mr. Patton, as the Future Claimants'

Representative (the "**FCR**"), retained Gilbert LLP as insurance counsel.

3.      The Coalition appeared in the Chapter 11 Cases on or about July 24, 2020. The

Coalition, which is an ad hoc group, was represented by Brown Rudnick LLP and Parsons Farnell

& Grein, LLP. I worked closely with Gabriel J. Le Chevallier, David J. Molton and Eric R.

Goodman during the Chapter 11 Cases to solve problems necessary for the Debtors to propose a

viable plan of reorganization. The Coalition was the FCR's invaluable partner in pushing the

Chapter 11 Cases towards confirmation. Neither could have done it without the other. Particularly,

at times when the TCC presented an obstacle, the FCR needed a partner that represented a

substantial number of Survivors.

4.      At the time the Coalition appeared in the Chapter 11 Cases, the TCC, the Debtors

and the Local Councils were at an impasse. The TCC was focused on the quantum of the Local

Councils' contributions to any settlement and whether various entities—*i.e.*, the Local Councils

and the Chartered Organizations—should be treated as Protected Parties and receive the

protections afforded by a channeling injunction. Neither the TCC nor the Debtors had developed

a plausible, let alone adequate, framework to unlock the value of the Debtors' insurance assets for

the Survivors' benefit.

5.      It was my understanding that some of the Debtors' insurers were interested in

settling and that such settlements could be beneficial for Survivors. But the insurers had a key

requirement—global peace. To afford the insurers global peace and extract a "peace premium"

out of any settlement of the Debtors' insurance assets for the Survivors' benefit, it was essential to

collect (and be able to settle) the rights of all insureds under the policies—*i.e.*, the Debtors, the

Local Councils, and the Chartered Organizations.

6.     Consistent with the "peace premium" concept, insurers generally will not pay adequate amounts to buyback or otherwise settle a policy—and may not settle the policy at all—if there is an appreciable risk of other insureds being able to continue to seek coverage against them under the policy.  That would defeat the point of the sale and/or settlement.  There are exceptions, such as where the seller/insured agrees to indemnify the insurer against future coverage claims.  But an insurer most likely will not accept an indemnity from an insolvent entity or an entity that may become insolvent.

7.     Given these self-imposed, but logical, negotiation constraints on insurers, it is often better to secure the rights of key other insureds or establish a framework for resolving those other insureds' rights under the policies before reaching settlements with the insurers.  Law firms affiliated with the TCC, who represent approximately 10% of the Survivors, maintained that their clients would suffer a "a significant loss on the value of the claims" if they lost the right to sue Local Councils and Chartered Organizations in the tort system.  Such lawsuits, if initiated or continued, could trigger the Debtors' insurance policies and, therefore, preclude the "global peace" needed to facilitate settlement and the accompanying "peace premium."

8.     It was my understanding that the Coalition, through its advisors, evaluated the Debtors' and the Local Councils' assets and insurance rights and arrived at a settlement range that it believed had a realistic chance of being acceptable to the Local Councils and the Debtors, which settlements could then serve as the foundation for negotiations with the insurers.  The Coalition wanted to enter into a restructuring support agreement with the Debtors regarding the terms of a global resolution plan in early 2021.  But these plans were put on hold when the Debtors unilaterally entered into a settlement with Hartford over the Coalition's, the TCC's and the FCR's vehement and vigorous objections.

3

9.      The First Hartford Settlement was problematic for several reasons.  First, the $650 million settlement amount was too low.  Second, the $650 million amount was subject to reduction. The First Hartford Settlement contained a "Century Clause" that meant that the $650 million would be reduced if Century—an entity that had been designed to pay the environmental and asbestos liabilities of Insurance Company of North America and its affiliates and which had been in runoff (not earning premiums for new policies) since 1996—paid less than $1.3 billion.  Century settled for $800 million.  Under the First Hartford Settlement, Harford's payment obligation would have reduced to $400 million.

10.     Third, the First Hartford Settlement did not contain a firm commitment to pay anything.  The Debtors had not secured the rights of the key other insureds under Hartford's policies.  The First Hartford Agreement itself made it clear that the Hartford dollars were only real if additional settlements were reached that provided Hartford "global peace" under the policies it agreed to purchase.   Fourth, the First Hartford Settlement did not ensure that the settlement proceeds would flow through to the Survivors.  The First Hartford Settlement contemplated a "free and clear" sale of the policies issued by Hartford to the BSA, with the interests of additional insureds attaching to the sale proceeds.  Under this framework, the money paid by Hartford to buy back its policies could have been encumbered and diverted to pay Chartered Organizations that did not release their rights in the Debtors' policies.  If this occurred, the Survivors would not realize the full (or potentially any) benefit of the First Hartford Settlement.

11.     After the Debtors' announced the First Hartford Settlement, the Coalition, the TCC and the FCR entered into discussions to develop an alternative plan.  At this time, the Coalition took a lead role in negotiations with the Local Councils to develop a plan structure that would provide a more realistic opportunity for a confirmable exit from chapter 11 than the BSA-Hartford

plan, which faced unified creditor opposition.  This work ultimately resulted in a Restructuring Support Agreement ("**RSA**") to which the BSA, the Local Councils, the Coalition, the TCC and the FCR were all parties.  *See* Dkt. No. 5466.

12.     The RSA reflected several key accomplishments.  First, the Debtors and Local Councils agreed to contribute up to $850 million to the Settlement Trust—approximately $250 million from the Debtors and $600 million from the Local Councils.  This represented an increase of approximately $300 million from the amounts previously committed.  *See generally* Dkt. No. 4108 at 14-155.  The Coalition was the driving force behind these changes.  In fact, having the Coalition as a negotiation partner was critical to the Debtors' reorganization because it gave the Debtors the ability to speak with a single party that represented a large number of claimants. This proved essential to the Debtors' ability to propose a confirmable plan.

13.     Second, the Local Council contribution solved for the first piece of the insurance puzzle—*i.e.*, the collection of the Local Councils' insurance rights in the policies that the insurers wanted to buy back—but it did not solve the second piece of the insurance puzzle—*i.e.*, the Chartered Organizations' rights in those same policies.

14.     Despite these accomplishments, the Debtors found themselves in a corner.  The First Hartford Settlement locked the Debtors into certain terms and with no "fiduciary out."  The path laid out by the RSA, a path that was far more likely to lead to a successful reorganization that achieved the Debtors' stated goal of providing the Survivors with equitable compensation, required that the Debtors have a clean break from Hartford.  As set forth in the RSA, the Debtors made it a requirement that the Court permit them to walk away from the First Hartford Settlement—which settlement was never submitted to the Court for approval—as a condition to the Debtors' commitments under the RSA.  But the Court ruled against the Debtors on this issue.

15.     Without an approved RSA, the Debtors and the Local Councils were faced with the BSA not having a viable exit from the Chapter 11 Cases.  The TCC asserted that even if Hartford increased its inadequate offer of $650 million to an equally subpar offer of $787 million, the TCC would not support it, particularly if the $787 million would be used to compensate all survivors. The Debtors, in contrast, were paralyzed by the Court's ruling on the RSA and the potential exposure to a substantial administrative expense claim arising from their failure to negotiate for a "fiduciary out" in the First Hartford Settlement.

16.     The Coalition and the FCR decided to move forward without the TCC.  For the months that followed, the Coalition and the FCR were tasked with negotiating multiple insurance settlements and developing and completing the plan architecture for resolving the Chartered Organization's rights under the BSA's insurance policies.

17.     The Coalition and the FCR negotiated a new settlement with Harford.  Following intense negotiations involving the Coalition, the FCR and their advisors, Hartford agreed to pay $787 million—a $387 million increase from the $400 million amount previously negotiated by the Debtors.  See Dkt. No. 6210 at Ex. A (the "**Second Hartford Settlement**").  The Coalition and the FCR persuaded Hartford to drop the so-called Century Clause so that the $787 million would not be contingent upon Century paying an amount certain.  Hartford also agreed to pay $137 million on the Effective Date and prior to the entry of a final, non-appealable order confirming the Plan.  Hartford also agreed to not oppose the TDPs designed to preserve the Debtors' unsettled insurance coverage.

18.     The Second Hartford Settlement, however, still did not resolve the Chartered Organization issue.  The Second Hartford Settlement required the Debtors, the Coalition and the FCR to secure an assignment to the Trust, or otherwise resolve to the Parties' satisfaction,

Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford. To fully unlock Hartford's $787 million, the parties still had to find a solution to the Chartered Organization's rights under the Abuse Insurance Policies.

19.     The Coalition's professionals took a lead role in developing a solution to this issue. The Coalition's solution was to channel Scouting-related post-1976 Abuse Claims against Chartered Organizations that do not object to the Plan and, therefore, could be deemed to assign and/or release their rights under the Debtors' and the Local Councils' policies. The Chartered Organizations would benefit. The proposed injunction would cover the entirety of the Abuse Claims and not just the amount covered by the Debtors' insurance. The Debtors accepted the Coalition's architecture and implemented it into the Fifth Amended Plan filed on September 15, 2021.

20.     Beginning in September 2021, the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. The Coalition, the FCR and Century landed on what became the final architecture for solving the Chartered Organization issue in the Chapter 11 Cases, which is reflected in the term sheet filed on December 14, 2021. The Coalition's counsel and Century's counsel were the primary drafters of the Century Term Sheet. The Century Term Sheet required the Debtors to implement changes to the proposed plan of reorganization.

21.     Under the Coalition's plan architecture, Chartered Organizations that did not object to the Plan would get the benefit of two injunctions—the post-1976 injunction (covering all Scouting-related Abuse Claims arising on or after 1976) and a second insurance injunction (covering Scouting-related Abuse Claims arising prior to or after 1976 where the Abuse Claims are covered by a policy issued by a settling insurer).

22.    Opt-Outs—*i.e.*, Chartered Organizations that objected to the Plan—would get the benefit of the insurance injunction only.  This was critical for two reasons.  First, the insurance injunction would effectively bar Abuse Claims against Opt-Outs that could trigger the settling insurer's indemnification obligations for Scouting-related Abuse Claims, thus affording settling insurers "global peace."  Second, Opt-Outs could not seek adequate protection in the form of a lien against the settlement proceeds.

23.    At the insistence of the Coalition and the FCR, all insurance settlement proceeds had to be contributed to the Settlement Trust on a "free and clear" basis.  The Debtors had the ability to sell their policies under section 363 of the Bankruptcy Code.  The Local Councils were required to contribute the policies issued to them by the settling insurers to the Debtors' estates (with the insurers' consent), which policies would then also be sold under section 363 of the Bankruptcy Code.  The use of section 363 afforded settling insurers the ability to rely on section 363(f) and applicable case law.  Chartered Organizations that objected and "Opt-Out" could assert claim for adequate protection under section 363(e) of the Bankruptcy Code.

24.    Adequate protection in this circumstance could not come in the form a lien against the settlement proceeds.  That would have meant that the settlement proceeds could be encumbered and, therefore, could not be used to pay Survivors.  This was not a viable option.

25.    The Coalition identified an alternative form of adequate protection—channel the Abuse Claims that could trigger policies sold back to the insurers under section 363 of the Bankruptcy Code to the Settlement Trust.  Channeled claims cannot be asserted against parties protected by the Channeling Injunction.  If those parties have insurance that provides coverage for such Abuse Claims, the insurance loses all value (making adequate protection, in a sense, unnecessary) the instant the Abuse Claims are channeled.

26.     Post-injunction, the insurance rights lost by Chartered Organizations would have provided coverage for Abuse Claims that could not be asserted against them.  Channeling Abuse Claims where the settling insurers' policies provided coverage for Scouting-related Abuse Claims afforded the Chartered Organizations adequate protection (including the Opt-Outs), and, at the same time, left the settlement proceeds completely unencumbered (for the Survivors' benefit).

27.     The work of the Coalition was vital to creating a framework that would deliver settling insurers the "global peace" necessary for settlements to occur and, at the same time, deliver the full value of the $800 million Century settlement—as well as all other insurance settlements— to the Settlement Trust for the Survivors' benefit.  And, since Chartered Organizations that objected to the Plan could not keep the Settlement Trust from being able to pay Survivors, the Chartered Organizations could not gain undue leverage by objecting to the Plan.

28.     The Debtors announced the $800 million settlement with Century on December 14, 2021.  *See* Dkt. No. 7745-1.  Following this, the updated Chartered Organization architecture was implemented into the Plan filed on December 18, 2021.  With these changes, the Plan could provide settling insurers with global peace, thus securing both the Hartford and Century settlements.  It also removed the contingency in the Local Counsel settlement.

29.     And it led to two more settlement with excess carriers—Zurich and Clarendon— worth $69 million.  *See* Dkt. No. 7929-2 & 8102-1.  Together, the settlements negotiated by the Coalition and the FCR are worth over $2.4 billion—BSA (approximately $78 million), Local Councils ($640 million), Hartford ($787 million), Century ($800 million), Zurich ($52.5 million), Clarendon ($16.5 million), and the United Methodists ($30 million).  These unencumbered contributions to the Settlement Trust would not exist but for the Coalition's leadership in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 23, 2022                    /s/ Kami E. Quinn
       Washington, DC                         Kami E. Quinn

## **EXHIBIT B-9**

## **DECLARATION OF TRISTAN AXELROD**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

Debtors.[1]

Chapter 11

Case No. 20-10343 (LSS)

(Jointly Administered)

**DECLARATION OF TRISTAN AXELROD IN SUPPORT
OF MOTION OF THE COALITION OF ABUSED SCOUTS FOR
JUSTICE FOR ENTRY OF AN ORDER APPROVING THE DEBTORS'
PROPOSED PAYMENT OF THE COALITION RESTRUCTURING EXPENSES**

I, Tristan Axelrod, being duly sworn, hereby declare as follows:

1.      I am an associate attorney at the law firm of Brown Rudnick LLP, located at One Financial Center, Boston MA 02111. I am a member in good standing of the bar of the Commonwealth of Massachusetts. I serve as counsel to the Coalition of Abused Scouts for Justice (the "**Coalition**"). I submit this declaration (this "**Declaration**") in support of *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (the "**Motion**") filed concurrently herewith.[2] Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called upon to testify, I would competently testify to the facts set forth herein.

2.      Attached as Exhibit D to the Motion is a true and correct copy of the transcript of a hearing held by this Court on August 12, 2021 in the Chapter 11 Cases.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 9696) (the "**Plan**").

3.      Attached as Exhibit E to the Motion is a true and correct copy of the transcript of a hearing held by this Court on August 19, 2021 in the Chapter 11 Cases.

4.      Attached as Exhibit F to the Motion is a true and correct copy of the transcript of a hearing held by this Court on March 18, 2022 in the Chapter 11 Cases.

5.      Attached as Exhibit G to the Motion is a true and correct copy of the transcript of a hearing held by the United States Bankruptcy Court for the Southern District of New York in *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) on November 19, 2019.

6.      Attached as Exhibit H to the Motion is a true and correct copy of the transcript of a hearing held by the United States Bankruptcy Court for the District of Delaware in *In re Mallinckrodt PLC, et al.*, Case No. 20-50850 (JTD) on December 14, 2020.

7.      Attached as Exhibit I to the Motion is a true and correct copy of the transcript of a hearing held by the United States Bankruptcy Court for the District of Delaware in *In re Mallinckrodt PLC, et al*, Case No. 20-50850 (JTD) on January 19, 2021.

8.      Attached as Exhibit J to the Motion is a true and correct copy of the transcript of a hearing held by this Court on September 29, 2021 in the Chapter 11 Cases.

9.      Attached as Exhibit K to the Motion is a true and correct copy of the transcript of a hearing held by this Court on December 10, 2021 in the Chapter 11 Cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 23, 2022
      Boston, Massachusetts

/s/
Tristan G. Axelrod, Esq.

2