# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.*,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: January 19, 2023 at 10:00 a.m. (ET)**<br>**Objection Deadline: January 12, 2023 at 4:00 p.m. (ET)** |

## SUMMARY OF ARENTFOX SCHIFF LLP FEES AND EXPENSES RELATED TO MOTION TO ALLOW SUBSTANTIAL CONTRIBUTION CLAIM OF THE ROMAN CATHOLIC AD HOC COMMITTEE

| | |
|---|---|
| Name: | ArentFox Schiff LLP[2] |
| Authorized to Provide Professional Services to: | Roman Catholic Ad Hoc Committee |
| Period for which compensation and reimbursement are sought: | May 1, 2021 – April 30, 2022 |
| Amount of Compensation sought as actual, reasonable, and necessary: | $2,051,513.30[3] |
| Amount of Expense Reimbursement sought as actual, reasonable, and necessary: | $49,468.35[4] |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] During the pendency of these cases, Schiff Hardin merged with ArentFox LLP to form ArentFox Schiff LLP [Docket No. 9088].

[3] Compensation sought by claimant reflects voluntary reduction of $103,375.00 in value of time worked during the period.

[4] Reimbursement of expenses sought by claimant reflects voluntary reduction of $13,090.85 in expenses that were incurred in the period.

## COMPENSATION BY PROFESSIONAL
## <u>MAY 1, 2021 THROUGH APRIL 30, 2022</u>

| Name of Professional Individual | Position, year assumed position, prior relevant experience, year of obtaining relevant license to practice | Hourly Billing Rate (including changes) | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Everett J. Cygal | Partner since 2002; joined firm in 2001. Member of Illinois Bar since 1993. Member of New York Bar since 2002. | $750 | 701.90 | $526,425.00 |
| David M. Spector | Partner since 2001; joined firm in 2001. Member of Illinois Bar since 1971. Member of New York Bar since 2002. | $750 | 111.00 | $83,250.00 |
| M. Neil Lloyd | Partner since 2001; joined firm in 1994. Member of California Bar since 2017. Member of Illinois Bar since 1994. | $730 | 639.30 | $466,381.50 |
| J. Mark Fisher | Partner since 1984; joined firm in 1978. Member of Illinois Bar since 1978. | $711 | 408.40 | $290,372.40 |
| Catherine Masters | Counsel since 2021; joined firm in 1982. Member of Illinois Bar since 1983. | $650 | 76.60 | $49,790.00 |
| Jin Yan | Partner since 2018; joined firm in 2011. Member of Illinois Bar since 2010. Member of DC Bar since 2022. | $580 | 552.30 | $320,334.00 |
| Daniel J. Schufreider | Joined the firm as an associate in 2014. Member of Illinois Bar since 2015. | $560 | 336.00 | $188,160.00 |
| Jasmine Dela Luna | Joined the firm as an associate in 2018. Member of Illinois Bar since 2019. | $441 | 37.00 | $16,317.00 |

| | | | | |
|---|---|---|---|---|
| Sarah M. Oligmueller | Joined the firm as an associate in 2019. Member of Illinois Bar since 2021. | $427 | 22.20 | $9,479.40 |
| Christopher Methven | Litigation Senior Paralegal Specialist; joined firm in 2001. | $306 | 329.00 | $100,674.00 |
| Claudia Banks | Research Librarian; joined the firm in 2011. | $300 | 1.10 | $330.00 |
| | **TOTAL** | | **3,214.80** | **$2,051,513.30** |

| | |
|---|---|
| **Grand Total** | **$2,051,513.30** |
| **Attorney Compensation** | **$1,950,509.30** |
| **Total Attorney Hours** | **2,884.70** |
| **Blended Attorney Rate** | **$676.16** |

## COMPENSATION BY PROJECT CATEGORY
## MAY 1, 2021 THROUGH APRIL 30, 2022

| Project Category | Hours | Amount |
|---|---|---|
| Asset Analysis and Recovery (AA) | 0.00 | $0.00 |
| Litigation/Adversary Proceedings (AP) | 0.00 | $0.00 |
| Business Operations (BO) | 0.00 | $0.00 |
| Case Administration (CA) | 209.60 | $120,674.60 |
| Court Appearances/Communications/Hearings (CH) | 217.40 | $148,790.70 |
| Creditor Inquiries (CI) | 164.00 | $116,589.00 |
| Financing/Cash Collateral/DIP (CR) | 0.00 | $0.00 |
| Employment Applications/Objections (EA) | 0.00 | $0.00 |
| Employee Benefits/Pensions (EB) | 0.00 | $0.00 |
| Executory Contracts and Leases (EC) | 0.00 | $0.00 |
| Fee Applications/Objections (FA) | 0.00 | $0.00 |
| Tax Issues/Corporate Matters (MA) | 0.00 | $0.00 |
| Committee Communications/Meetings (MC) | 0.00 | $0.00 |
| Relief from Stay Proceedings (MR) | 0.00 | $0.00 |
| Claims Administration and Objections (PC) | 0.00 | $0.00 |
| Plan and Disclosure Statement (PL) | 2,613.20 | $1,658,237.40 |
| Asset Disposition/Use, Sale (SA) | 0.00 | $0.00 |
| Communications with Debtors or Trustee (TR) | 10.60 | $7,221.60 |
| Utilities (UM) | 0.00 | $0.00 |
| Valuation (VT) | 0.00 | $0.00 |
| Non-Working Travel (NWT) | 0.00 | $0.00 |
| **TOTAL** | **3,214.80** | **$2,051,513.30** |

**EXPENSE CATEGORY**
**MAY 1, 2021 THROUGH OCTOBER 31, 2022**

| Expense Category | Amount |
|---|---|
| Court Reporter (Reliable Copy Service, Inc.) | $28,150.65 |
| Digital Scanning/Reproduction (Bluestar Computer Solutions, Inc.) | $9,275.45 |
| Federal Express | $2,201.93 |
| In-House Copies (10 cents per page for color and black/white) | $1,572.30 |
| In-House Scanning (15 cents per page) | $570.90 |
| Meals (reimbursement not requested) | $0.00 |
| Supplies (Purchase of Hard Drive for Discovery - Apricorn 1TB Aegis Fortress FIPS 140-2 Level 2 Validated 256-Bit Encrypted Hard Drive for BSA Claims Production) | $440.88 |
| Travel (Airfare) | $1,985.73 |
| Travel (Car Rental) | $339.02 |
| Travel (Car Service/Taxi) | $374.47 |
| Travel (Internet) | $8.00 |
| Travel (Lodging) | $4,549.02 |
| Travel (Parking/Mileage) (reimbursement not requested) | $0.00 |
| **TOTAL** | **$49,468.35** |

| | | | TRAVEL DETAIL (EXCEPT MEALS) | | |
|---|---|---|---|---|
| **Date** | **Provider** | **AFS Professional** | **Description; Destination** | **Amount** |
| 05/20/21 -05/21/21 | United Airlines | David Spector | Airfare; Chicago/Omaha, NE; Economy; Travel to Attend Meeting | 648.80 |
| 05/20/21 | Uber | David Spector | Car Service; Airport/Hotel; Travel to Attend Meeting | 43.67 |
| 05/20/21 -05/21/21 | Aloft (Omaha, NE) | David Spector | Lodging; Travel to Attend Meeting | 132.07 |
| 05/20/21 | n/a | David Spector | Taxi; Home/Airport; Travel to Attend Meeting | 53.40 |
| 05/21/21 | n/a | David Spector | Taxi; Airport/Home; Travel to Attend Meeting | 48.50 |
| 07/27/21 | American Airlines | David Spector | Agent Fee; Travel to Attend Mediation (Airfare: Main Cabin Extra) | 78.13 |
| 07/30/21 -08/05/21 | American Airlines | David Spector | Airfare; ORD (Chicago)/LGA (NYC); Economy; Travel to Attend Mediation | 796.80 |
| 07/30/21 | Avis | David Spector | Car Rental; Travel to Attend Mediation | 339.02 |
| 07/30/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 623.00 |
| 07/30/21 | n/a | David Spector | Taxi; DS Home/Airport; Travel to Attend Mediation | 53.40 |
| 07/31/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 685.06 |

| 08/01/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 589.25 |
|---|---|---|---|---|
| 08/02/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 589.25 |
| 08/03/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 589.25 |
| 08/04/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | 589.25 |
| 08/05/21 | n/a | David Spector | Taxi; Airport/DS Home; Mediation | 55.50 |
| 08/13/21 | JW Marriott Essex House (New York) | David Spector | Lodging; Travel to Attend Mediation | -40.01 |
| 09/29/21 -10/01/21 | United Airlines | Everett Cygal | Airfare to Attend Mediation; United Airlines; Roundtrip travel; ORD (Chicago) / LGA (NYC); Economy | 462.00 |
| 09/29/21 -09/30/21 | New York Renaissance Hotel | Everett Cygal | Lodging; Guest room and taxes; To Attend Mediation | 791.90 |
| 10/01/21 | Uber | Everett Cygal | Car Service; Western Springs, IL / ORD (Chicago); Car service to/from ORD (Chicago) to Attend Mediation | 120.00 |
| 12/30/21 | United Airlines | Neil Lloyd | Internet; Working in flight on return from California re Century discovery to RCAHC, Whittman supplemental report. | 8.00 |
| **TOTAL** | | | | **$7,256.24** |

## <u>VERIFICATION</u>

I, J. Mark Fisher, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and based on the information and records available to me:

a)      I am a Partner with the applicant firm, ArentFox Schiff LLP and have been admitted to appear before this Court *pro hac vice*.

b)      I am familiar with the work performed on behalf of the Roman Catholic Ad Hoc Committee by the professionals in the firm.

c)      I have reviewed the foregoing charts related to ArentFox Schiff LLP's fees and expenses submitted with this Motion and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I have reviewed Del. Bankr. L.R. 2016-2, and submit that the Motion substantially complies with such rule.

/s/ *J. Mark Fisher*
J. Mark Fisher

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.*,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**SUMMARY OF POTTER ANDERSON & CORROON LLP FEES AND
EXPENSES RELATED TO MOTION TO ALLOW SUBSTANTIAL
CONTRIBUTION CLAIM OF THE ROMAN CATHOLIC AD HOC COMMITTEE**

Name: _____ Potter Anderson & Corroon LLP

Authorized to Provide Professional Services to: _____ Roman Catholic Ad Hoc Committee

Period for which compensation
and reimbursement are sought: _____ February 17, 2021 through April 30, 2022

Amount of Compensation sought as actual,
reasonable, and necessary: _____ $1,485,121.00

Amount of Expense Reimbursement sought
as actual, reasonable, and necessary: _____ $51,021.22

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## COMPENSATION BY PROFESSIONAL
## FEBRUARY 17, 2021 THROUGH APRIL 30, 2022

| Name of Professional Individual | Position, year assumed position, prior relevant experience, year of obtaining relevant license to practice | Hourly Billing Rate (including changes) | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Jeremy W. Ryan | Joined firm as a Partner in 2009. Member of DE Bar since 2001. | $820 $880 | 143.1 826.3 | $117,342.00 $727,144.00 |
| L. Katherine Good | Joined firm as Partner in 2019. Member of PA Bar since 2007. Member of DE Bar since 2008. | $770 | 108.2 | $83,314.00 |
| Jesse L. Noa | Joined firm as an Associate in 2013. Member of DE Bar since 2014. | $600 $625 | 6.4 172.7 | $3,840.00 $107,937.50 |
| R. Stephen McNeill | Joined firm as an Associate in 2008. Counsel in 2019. Member of DE Bar since 2008. | $600 | 1.6 | $960.00 |
| Aaron H. Stulman | Joined firm as an Associate in 2019. Member of DE Bar since 2012. Member of NY Bar since 2014. | $580 | 240.5 | $139,490.00 |
| D. Ryan Slaugh | Joined firm as an Associate in 2016. Member of DE Bar since 2016. | $450 $525 | 24.9 88.1 | $11,205.00 $46,252.50 |
| Jesse D. Hamrick | Joined firm as a Law Clerk in 2020. Certified Limited Practice Licensee in 2020. | $385 | 0.4 | $154.00 |
| Elizabeth R. Schlecker | Joined firm as a Law Clerk in September 2020. Certified Limited Practice Licensee in December 2020. Member of DE Bar since 2022. | $385 $450 | 13.6 341.0 | $5,236.00 $153,450.00 |

| | | | | |
|---|---|---|---|---|
| Cynthia S. Giobbe | Joined firm as a Paralegal in 2019. Paralegal since 2003. | $305 | 24.0 | $7,320.00 |
| | | $320 | 226.8 | $72,576.00 |
| Nolley M. Rainey | Joined firm in 2007. Paralegal since 2016. | $290 | 3.4 | $986.00 |
| Lauren C. Huber | Joined firm as a Paralegal in 2019. Paralegal since 2018. | $290 | 2.2 | $638.00 |
| | | $305 | 21.2 | $6,466.00 |
| Litigation Support | In-house Technology and Computer Support for Potter Anderson & Corroon LLP | $270 | 3.0 | $810.00 |
| | **TOTAL** | | **2,247.4** | **$1,485,121.00** |

| | |
|---|---|
| **Grand Total** | **$1,485,121.00** |
| **Attorney Compensation** | **$1,396,325.00** |
| **Total Attorney Hours** | **1966.8** |
| **Blended Attorney Rate** | **$709.9** |

## COMPENSATION BY PROJECT CATEGORY
## FEBRUARY 17, 2021 THROUGH APRIL 30, 2022

| Project Category | Hours | Amount |
|---|---|---|
| Asset Analysis and Recovery (AA) | 0.40 | $328.00 |
| Litigation/Adversary Proceedings (AP) | 385.9 | $199,326.50 |
| Business Operations (BO) | 0 | $0.00 |
| Case Administration (CA) | 1,014.9 | $832,469.50 |
| Court Appearances/Communications/Hearings (CH) | 196.9 | $109,954.50 |
| Creditor Inquiries (CI) | 0.3 | $135.00 |
| Financing/Cash Collateral/DIP (CR) | 0 | $0.00 |
| Employment Applications/Objections (EA) | 0.1 | $45.00 |
| Employee Benefits/Pensions (EB) | 0 | $0.00 |
| Executory Contracts and Leases (EC) | 0 | $0.00 |
| Fee Applications/Objections (FA) | 0 | $0.00 |
| Tax Issues/Corporate Matters (MA) | 0 | $0.00 |
| Committee Communications/Meetings (MC) | 0 | $0.00 |
| Relief from Stay Proceedings (MR) | 0 | $0.00 |
| Claims Administration and Objections (PC) | 0 | $0.00 |
| Plan and Disclosure Statement (PL) | 648.9 | $342,862.50 |
| Asset Disposition/Use, Sale (SA) | 0 | $0.00 |
| Communications with Debtors or Trustee (TR) | 0 | $0.00 |
| Utilities (UM) | 0 | $0.00 |
| Valuation (VT) | 0 | $0.00 |
| Non-Working Travel (NWT) | 0 | $0.00 |
| **TOTAL** | **2,247.4** | **$1,485,121.00** |

**EXPENSE CATEGORY**
**FEBRUARY 17, 2021 THROUGH APRIL 30, 2022**

| Expense Category | Amount |
|---|---|
| Copies (10 cents per page) | $0.00 |
| Color Copies (25 cents per page) | $0.00 |
| Digital Scanning/Reproduction (DLS Discovery) | $0.00 |
| Legal Research – Westlaw | $17.26 |
| Postage | $0.00 |
| Federal Express | $1,258.45 |
| Long Distance / Client Telephone | $8.59 |
| Miscellaneous Court Costs (CourtCall) | $200.00 |
| Pacer Electronic Records | $934.90 |
| Special Delivery & Daily Runner Services (Parcels, Inc.) | $35,503.10 |
| Court Reporter (Reliable) | $4,322.97 |
| Paralegal Overtime | $0.00 |
| Meals | $1,433.51 |
| Transportation/Lodging | $7,342.44 |
| **TOTAL** | **$51,021.22** |

## BUSINESS MEAL DETAIL

| Date | Provider | Meal & Number of People | Description | Amount |
|------|----------|-------------------------|-------------|--------|
| 10/1/21 | Ruth's Chris Steak House | Dinner for 5 | Attendance at mediation | $428.30 |
| 10/26/21 | Opa Opa | Dinner for 1 | Attendance at mediation | $13.75 |
| 11/2/21 | Ruth's Chris Steak House | Dinner for 4 | Attendance at mediation | $556.93 |
| 1/18/22 | Bud & Marilyn's | Breakfast for 1 | Attendance at mediation | $17.25 |
| 1/18/22 | Ritz Carlton Cast & Plow | Lunch for 1 | Attendance at mediation | $90.18 |
| 1/19/22 | Ritz Carlton Cast & Plow | Breakfast for 1 | Attendance at mediation | $37.76 |
| 1/19/22 | Ritz Carlton Cast & Plow | Dinner for 2 | Attendance at mediation | $126.84 |
| 1/20/22 | Ritz Carlton Cast & Plow | Breakfast for 2 | Attendance at mediation | $71.14 |
| 3/13/22 | JW Marriott Chicago | Dinner for 2 | Prepare for Confirmation Hearing | $65.24 |
| 3/14/22 | JW Marriott Chicago | Lunch for 1 | Discuss Confirmation Hearing | $26.12 |
| **TOTAL** | | | | **$1,433.51** |

# TRAVEL DETAIL

| Date | Provider | Destination & Number of People | Amount |
|------|----------|-------------------------------|--------|
| 8/4/21 | Wilmington Parking Authority | Jeremy Ryan – Parking at train station for mediation | $6.00 |
| 8/4/21 | Amtrak | Jeremy Ryan - Round trip from Wilmington, DE to Penn Station, NY for mediation | $76.00 |
| 8/18/21 | Wilmington Parking Authority | Jeremy Ryan – Parking at train station for mediation | $6.00 |
| 8/18/21 | Amtrak | Jeremy Ryan – Round trip from Wilmington, DE to Penn Station, NY for mediation | $170.00 |
| 9/30/21 | Amtrak | Jeremy Ryan - Round trip from Wilmington, DE to Penn Station, NY for hearing | $152.50 |
| 9/30/21 | Renaissance NY Times Square | Jeremy Ryan – Lodging for mediation | $407.42 |
| 11/1/21 | Amtrak | Jeremy Ryan - Round trip from Wilmington, DE to Penn Station, NY for hearing | $183.50 |
| 11/2/21 | Renaissance NY Times Square | Jeremy Ryan – Lodging for mediation | $197.97 |
| 1/15/22 | American Airlines | Jeremy Ryan – Airfare for attendance at mediation | $157.60 |
| 1/18/22 | Philadelphia Parking Authority | Jeremy Ryan – Parking at PHL Airport for mediation | $72.00 |
| 1/18/22 | Uber | Jeremy Ryan – Uber from LAX to hotel for mediation | $65.35 |
| 1/18/22 | The Ritz Carlton – | Jeremy Ryan – Lodging for mediation | $1,176.15 |

| | | | |
|---|---|---|---|
| | Marina Del Rey | | |
| 1/21/22 | Uber | Jeremy Ryan – Uber from hotel to LAX following mediation | $48.17 |
| 1/24/22 | American Airlines | Jeremy Ryan – Round trip airfare for attendance at mediation | $475.00 |
| 1/25/22 | Marriott Beverly Hills | Jeremy Ryan – Lodging for mediation | $829.36 |
| 1/25/22 | Uber | Jeremy Ryan – Uber rides to and from hotel for mediation | $149.84 |
| 3/13/22 | Philadelphia Parking Authority | Jeremy Ryan – Parking at PHL Airport for confirmation hearing | $96.00 |
| 3/13/22 | American Airlines | Jeremy Ryan – Round-trip airfare from PHL to Chicago for confirmation hearing | $697.62 |
| 3/13/22 | Uber | Jeremy Ryan – Uber ride from Chicago O'Hare to hotel for confirmation hearing | $80.66 |
| 3/13/22 | JW Marriott Chicago | Jeremy Ryan – Lodging for confirmation hearing | $2,295.30 |
| **TOTAL** | | | $7,342.44 |

## <u>VERIFICATION</u>

I, Jeremy W. Ryan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and based on the information and records available to me:

a)        I am a Partner with the applicant firm, Potter Anderson & Corroon LLP and have been admitted to appear before this Court.

b)        I am familiar with the work performed on behalf of the Roman Catholic Ad Hoc Committee by the professionals in the firm.

c)        I have reviewed the foregoing charts related to Potter Anderson's fees and expenses submitted with this Motion and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I have reviewed Del. Bankr. L.R. 2016-2, and submit that the Motion substantially complies with such rule.

/s/ *Jeremy W. Ryan*
Jeremy W. Ryan (No. 4057)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.*,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**SUMMARY OF MACKINAC PARTNERS, LLC FEES AND EXPENSES RELATED TO MOTION TO ALLOW SUBSTANTIAL CONTRIBUTION CLAIM OF THE <u>ROMAN CATHOLIC AD HOC COMMITTEE</u>**

Name:                                                                    <u>Mackinac Partners, LLC</u>

Authorized to Provide Professional Services to:    <u>Roman Catholic Ad Hoc Committee</u>

Period for which compensation
and reimbursement are sought:                              <u>November 5, 2021 through March 21, 2022</u>

Amount of Compensation sought as actual,
reasonable, and necessary:                                     <u>$432,420.00</u>

Amount of Expense Reimbursement sought
as actual, reasonable, and necessary:                     <u>$0.00</u>

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**COMPENSATION BY PROFESSIONAL**
**NOVEMBER 5, 2021 THROUGH MARCH 21, 2022**

| Name of Professional Individual | Position | Hourly Billing Rate (including changes) | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Melissa S. Kibler | Senior Managing Director | $825 | 228.5 | $118,512.50 |
| Neema Varghese | Director | $550 | 145.5 | $80,025.00 |
| Patrick Waite | Director | $475 | 206.3 | $97,992.50 |
| Zach Weissenborn | Associate | $250 | 177.5 | $44,375.00 |
|  |  | $325 | 66.2 | $21,515.00 |
|  | **TOTAL** | | **824.0** | **$432,420.00** |

| | | |
|---|---|---|
| **Grand Total** | | **$432,420.00** |
| **Total Hours** | | **824.0** |
| **Blended Rate** | | **$524.78** |

**<u>VERIFICATION</u>**

I, Melissa S. Kibler, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and based on the information and records available to me:

a)        I am a Senior Managing Director, Turnaround & Restructuring with the applicant firm, Mackinac Partners, LLC.

b)        I am familiar with the work performed on behalf of the Roman Catholic Ad Hoc Committee by the professionals in the firm.

c)        I have reviewed the foregoing charts related to Mackinac Partners, LLC's fees and expenses submitted with this Motion and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I have reviewed Del. Bankr. L.R. 2016-2, and submit that the Motion substantially complies with such rule, except to the extent a waiver is requested herein.


*/s/ Melissa S. Kibler*
Melissa S. Kibler

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.*,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: January 19, 2023 at 10:00 a.m. (ET)** **Objection Deadline: January 12, 2023 at 4:00 p.m. (ET)** |

## MOTION (I) TO ALLOW SUBSTANTIAL CONTRIBUTION CLAIM OF THE ROMAN CATHOLIC AD HOC COMMITTEE AND (II) FOR WAIVER OF CERTAIN REQUIREMENTS OF LOCAL RULE 2016-2

The Roman Catholic Ad Hoc Committee (the "RCAHC"), by and through its undersigned counsel, hereby moves (the "Motion") (a) pursuant to section 503(b) of title 11 of the United States Code (the "Bankruptcy Code") seeking an award and payment of administrative expenses based upon its substantial contribution in connection with the chapter 11 cases of the above-captioned debtors (the "Debtors" or "BSA") and (b) for a waiver of certain requirements of Local Rule 2016-2(d), and in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. "This is an extraordinary case by any measure." *In re Boy Scouts of Am. and Delaware BSA, LLC*, 642 B.R. 504, 517 (Bankr. D. Del. 2022) (the "Opinion"). In order for

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's Opinion [Docket No. 10136], the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 10316] (the "Supplemental Confirmation Order") and the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 10296] (the "Plan"), as applicable.

extraordinary cases to reach successful conclusions, the parties involved must contribute in extraordinary ways.

2.      The foundation of BSA's business model is the reliance on tens of thousands of Chartered Organizations to provide the volunteer labor, free meeting spaces and fundraising support through which Scouting is delivered.  That is why Chartered Organizations have been referred to throughout these cases as "the lifeblood of Scouting."

3.      Notwithstanding their essential nature, Chartered Organization and their continued support were taken for granted at the outset of these cases.  The plan filed on the Petition Date proposed to strip the Chartered Organizations of all their rights and interests as additional insureds in the BSA and Local Council Insurance Policies, assigning those policies to a trust, without Chartered Organizations receiving anything in return.  For Chartered Organizations to receive any releases, they would have to make an undefined contribution on top of the forced contribution of their insurance rights.

4.      For the next 16 plus months, no current Chartered Organization took an active role in these cases.  The Debtors, however, filed four additional plans over those 16 months, all of which proposed substantially the same, if not worse, treatment for Chartered Organizations than was proposed on the Petition Date—a forced contribution of property rights without any release or consideration in return.

5.      Following the filing of the proposed Fourth Amended Plan on July 2, 2021, the RCAHC and, until it settled, the United Methodist Ad Hoc Committee (the "UMAHC" and, with the RCAHC, the "Ad Hoc Committees") determined that without an active voice in these proceedings and a presence in the mediation efforts, the rights of Chartered Organizations would continue to be trampled upon to such a degree that the continued willingness of Chartered

Organizations to serve as the lifeblood of Scouting would be imperiled. Thus commenced an eight plus month period of near continuous engagement by the RCAHC to gain and protect a fair and equitable treatment of Chartered Organizations, a treatment not just for the RCAHC's constituents, but a treatment available to all Chartered Organizations.

6.      The Plan that this Court ultimately approved has a dramatically better, just and fair treatment of Chartered Organizations. All Chartered Organizations are eligible to receive full releases for and channeling of (i) Abuse Claims arising on or after January 1, 1976, and (ii) any pre-1976 Abuse Claims for which there was coverage provided by a Settling Insurance Company. Chartered Organizations retained all their rights against Non-Settling Insurance Companies. In addition, Chartered Organizations had the option to make their own contribution to the Plan and receive a full release and channeling of all Abuse Claims.

7.      For the many Chartered Organizations that had little or no involvement with BSA prior to 1976, the Plan now provides a full and complete release and channeling of Abuse Claims without any out-of-pocket contribution by the Chartered Organization. For the remainder, the Plan eliminates the vast majority of Abuse Claims against them and, if Non-Settling Insurance Companies ultimately settle, potentially all Abuse Claims, again without any out-of-pocket contribution. Chartered Organizations will be freed of their BSA related liabilities and positioned to continue support and deliver the mission of Scouting alongside BSA and the Local Councils.

8.      These results were achieved only through active involvement of the Ad Hoc Committees and eventually, solely the RCAHC. All other active Chartered Organizations, to the extent they were even aware of what was transpiring in these cases, were able to rely on those efforts to gain the significant protections the Plan now affords all Chartered Organizations—a resolution that benefits Chartered Organizations and BSA going forward.

9.    The RCAHC believes its efforts and the results achieved are the paradigm of a substantial contribution—meaningful engagement that resulted in demonstrable benefit to the Debtors' estates and their creditors, most specifically the 100,000 plus Chartered Organizations that will be receiving releases under the Plan. Accordingly, the RCAHC respectfully submits that the Motion should be granted and an administrative expense claim should be allowed up to the agreed upon amount of $1,500,000.

## **BACKGROUND**

### A.  Chartered Organizations Are Vital to the Debtors

10.    On the Petition Date, February 18, 2020, the Debtors filed a voluntary petition for relief under the Bankruptcy Code.

11.    As the Court is aware, the Debtors operate through their Chartered Organizations and Local Councils.[3] Chartered Organizations are the thousands of local organizations across the country, including faith-based institutions, that sponsor and form units, known as troops or packs, and are led by volunteer adults appointed by the Chartered Organizations. *See Debtors' Informational Brief* [Docket No. 4]. As of the Petition Date, there were more than 41,000 active Chartered Organizations. *Id.* The Chartered Organizations sponsor more than 81,000 local Scouting units throughout the country. In addition to providing adult volunteer leaders, the Chartered Organizations also provide meeting space and other support to the packs or troops that they sponsor. *See Debtors' Informational Brief.*

---

[3]  The Debtors also charter independently incorporated Local Councils to facilitate the delivery of the Scouting program. As of the Petition Date, there were 261 Local Councils, covering geographic regions varying in size, population and demographics. *Id.* The Debtors indicated that the relationship between the Debtors and the Local Council is similar to that of a franchisor and franchisee.

12.     As admitted throughout these cases, Scouting depends on uncompensated volunteers from Chartered Organizations like Roman Catholic archdiocese, diocese, churches, and schools as well as rent free access to facilities to hold the weekly Scouting meetings of troops. Under the umbrella of Roman Catholic Chartered Organizations, there were approximately 110,903 members of BSA programs as of November 1, 2021, and the Roman Catholic Church was the second largest sponsoring organization behind only the United Methodist Church. Kibler Report ¶ 41 (accounting for approximately 12% of all BSA members). Most of the Chartered Organizations, including most of the Roman Catholic Entities, were unrepresented throughout these cases. *See* Sept. 21, 2021, Hr'g Tr. 166-67. The RCAHC formed, in part, to protect the interests of all Chartered Organizations, and in particular, the Chartered Organizations affiliated with the Roman Catholic Church.

13.     On June 25, 2021, the RCAHC filed its Notice of Appearance [Docket No. 5420][4] along with its verified statement pursuant to Rule 2019 [Docket No. 5421].[5] In connection with its formation, the RCAHC hired Schiff Hardin LLP (now ArentFox Schiff LLP) ("ArentFox Schiff") as its counsel and Potter Anderson & Corroon LLP ("Potter Anderson")[6] as its co-counsel. The RCAHC's Rule 2019 statement was amended three times, as follows:

      a.   On July 29, 2021, the RCAHC filed an amended verified statement pursuant to Rule 2019 [Docket No. 5825], noting two additional members.

---

[4] Potter Anderson and ArentFox Schiff appeared on behalf of Catholic Mutual Relief Society of America on February 25, 2021 [Docket No. 2269] ("Catholic Mutual"). Catholic Mutual was also a member of the RCAHC.

[5] The RCAHC initially consisted of seven members: (i) Catholic Mutual; (ii) Roman Catholic Diocese of Souix City; (iii) Roman Catholic Diocese of Joliet; (iv) Roman Catholic Diocese of Omaha; (v) Roman Catholic Diocese of Winona-Rochester; (vi) Roman Catholic Archdiocese of Washington, D.C.; and (vii) Roman Catholic Archdiocese of Atlanta.

[6] Potter Anderson also served as co-counsel to the UMAHC with Bradley Arant Boult Cummings LLP ("Bradley").

b. On December 17, 2021, the RCAHC filed its second amended verified statement pursuant to Rule 2019 [Docket No. 7805], noting four additional members.

c. On February 9, 2022, the RCAHC filed its third amended verified statement pursuant to Rule 2019 [Docket No. 8740], noting two resignations from the RCAHC.

**B. The RCAHC's Strategy to Pursue Plan Improvements for All Chartered Organizations**

### 1. The RSA and the Fourth Amended Plan

14.    Recognizing that negotiations amongst the key constituencies were underway and noticeably absent from those discussions were any party vying for the rights of Chartered Organizations, the RCAHC immediately sought to be included in the mediation process in order to protect the rights of its members and all Chartered Organizations.  Indeed, at a status conference on July 7, 2021, the Debtors admitted that Chartered Organizations are "essential" to the Debtors and are the "lifeblood of scouting."  Hr'g Tr. 68:2-8.  At the same time, the Debtors acknowledged (after questioning from the Court) that they would engage with Chartered Organizations going forward.

15.    The July 7 status conference followed the filing of a proposed restructuring support agreement (the "RSA") [Docket No. 5466] and the Fourth Amended Plan [Docket No. 5484] that severely impinged on the rights of all Chartered Organizations.  As with the prior four plans filed by the Debtors, the Fourth Amended Plan proposed to assign all of the Debtors' and Local Councils' Insurance Policies, the Abuse Insurance Policies, to a trust free and clear of Chartered Organizations rights as additional insureds under the Abuse Insurance Policies.  In addition, the Fourth Amended Plan and the RSA contained provisions meant to subordinate any claims

Chartered Organizations may have against BSA or the Local Councils for indemnification related to Abuse Claims as well. In short, the Fourth Amended Plan proposed to fully protect BSA and the Local Councils, strip away Chartered Organizations' property rights, contribute that property to a trust without Chartered Organizations receiving any release or benefit and leaving Chartered Organizations totally exposed in the tort system going forward.

16.     On July 22, 2021, the Ad Hoc Committees filed a joint objection to the Debtors' motion to enter into and perform under the RSA [Docket No. 5676] (the "RSA Objection"). In the RSA Objection, the RCAHC pointed out that the RSA neglected an entire constituency that makes scouting possible—Chartered Organizations. RSA Obj. ¶ 1. The RCAHC argued that the RSA contained no protections for any Chartered Organizations, and instead sought to impair their insurance and indemnification rights as additional insureds under policies purchased by the Debtors and non-debtor Local Councils. *Id.* ¶ 2-3. Any recovery by Chartered Organizations under the RSA was speculative, at best, and instead, guaranteed future litigation amongst the parties. *Id.* ¶ 3. The RCAHC further pled that the Debtors be instructed to engage with the RCAHC on issues that affect Chartered Organizations. *Id.* ¶ 5.

17.     At the hearing for approval of the RSA, the RCAHC argued for the denial of the RSA because it did not protect the rights of Chartered Organizations and did not have the benefit of any extensive or robust negotiations with any Chartered Organizations, including the RCAHC, and at best, those discussions are only just beginning. Aug. 16, 2021, Hr'g Tr. 199:2-10; *see also* Aug. 19, 2021, Hr'g Tr. 6:19-20 (noting that no Chartered Organizations or insurance companies were parties to the RSA). On August 19, 2021, the Court approved the RSA with certain exceptions, including the denial of a request for the payment of the Coalition's fees at that time. Ultimately, the parties to the RSA would abandon the RSA.

18.     On August 17, 2021, the Ad Hoc Committees filed their 35-page objection to the Debtors' Fourth Amended Plan [Docket No. 6067] (the "DS Objection"). They argued, among other things, that the disclosures contained in that proposed plan were inadequate as they related to Chartered Organizations as a whole and the plan was facially unconfirmable by seeking to eliminate property rights in insurance and contractual indemnification rights of all Chartered Organizations in exchange for little to no value (and without consent). DS Obj. ¶ 1-2.

### 2. August and September Mediation Efforts

19.     While the UMAHC had participated in mediation efforts going back to early 2021, engagement with the UMAHC was minimal to non-existent from February through July of 2021. It was only after the Ad Hoc Committees began to take positions before this Court about their unhappiness with the treatment of Chartered Organizations, that an effort to engage the Ad Hoc Committees in the mediation began in earnest.

20.     The Ad Hoc Committees attended several in-person sessions in New York City over the course of August and September. While the content of the discussions remains confidential, they were the first discussions at which parties acknowledged the proposed treatment of Chartered Organizations was problematic and needed to be addressed. The Ad Hoc Committees were clear that their participation in the process was not to obtain settlements for just Roman Catholic and United Methodist denominations, but that interest was in a broad solution for all Chartered Organizations. The Ad Hoc Committees were concerned that the continued support of Chartered Organizations for Scouting would be threatened if Chartered Organizations were abandoned to the tort system while BSA and the Local Councils obtained complete releases for themselves. The guiding principle was that resolution could not be limited to those Chartered Organizations with the resources and commitment to participate in the chapter 11 process.

21.     While no resolutions were reached during those sessions, for the first time there was an acknowledgement that Chartered Organizations had rights that needed to be respected vis-à-vis the Abuse Insurance Policies.  The RCAHC and UMAHC advanced the position that if the Abuse Insurance Policies were to be compromised, benefits of such compromise must flow to all insureds, including Chartered Organizations.

### 3.  The Fifth Amended Plan and Disclosure Statement Hearing

22.     On September 15, 2021 the Fifth Amended Plan was filed.  For the first time, there was a positive movement in the treatment of Chartered Organizations and a recognition of the rights Chartered Organizations had in the Abuse Insurance Policies.  As with the Plan, the Fifth Amended Plan, proposed three treatment options for Chartered Organizations.

23.     For the first time, the default treatment of Chartered Organizations provided a release for Abuse Claims in exchange for the contribution of additional insured rights in the Abuse Insurance Policies.  The proposal in the Fifth Amended Plans was to release all Abuse Claims arising after January 1, 1976.  This was a dramatic change in BSA and the Local Councils' approach to Chartered Organizations after 18 months of plans that prejudiced Chartered Organizations.  Notably, this change occurred after the Ad Hoc Committees' active participation in court hearings and participation in meaningful mediation sessions.

24.     While the Ad Hoc Committees were encouraged by the progress in the plan treatment of Chartered Organizations, there was still significant concerns about the treatment in total, the prejudicing of insurance rights and other provisions of the plan that led the Ad Hoc Committees to believe the Fifth Amended Plan had serious confirmability defects.  Rather than seek to derail the plan solicitation process or use the disclosure statement hearing as a proxy for confirmation issues, the RCAHC and the UMAHC consciously chose to be productive participants in the disclosure statement hearing, cabining the issues raised to ensure that Chartered

Organizations received a solicitation package that plainly and honestly informed the Chartered Organizations of their rights, their proposed treatments, the choices to be made and the consequences of each decision.

25. The Court held a five-day disclosure statement hearing from September 21, 2021 through September 29, 2021. Principally, the RCAHC lobbied the Court and the Debtors for a "plain English" description of the terms of the plan and disclosure statement to be add to the solicitation packets going out to parties in interest. From a due process standpoint, the plain English description was important because the legalese-laced plan and disclosure statement were dense and complex, and many of the Chartered Organizations were unrepresented volunteers. Sept. 21, 2021, Hr'g Tr. 167-69. The RCAHC raised an additional due process consideration on behalf of all Chartered Organizations—most were not scheduled creditors and did not file proofs of claim and therefore, would not receive any of the solicitation procedures. However, because the plan clearly affected the rights of Chartered Organizations, they were entitled to receive notice and have an opportunity to object. *Id.*

26. The Court agreed with the RCAHC on both counts, greatly benefitting all Chartered Organizations. First, the Court ruled that the Debtors must include a plain English description of the plan because "it will be difficult for the volunteer organizations who are not represented to comprehend the 300 pages and focus in on exactly what is happening to them." *Id.* at 169:4-8; *see also* Sept 22, 2021, Hr'g Tr. 215:23-217:3 (the Court agreeing with the RCAHC that the effect of the Hartford settlement on Chartered Organizations needs to be explained appropriately in the disclosure statement and plan). The Debtors and the Court delegated responsibility for ensuring adequate, plain English disclosures of the contents of the plan to the Ad Hoc Committees. *See,*

*e.g.*, Sept. 21, 2021, Hr'g Tr. 59, 169; Sept. 22, 2021, Hr'g Tr. 16, 42, 46, 55; Sept. 23, 2021, Hr'g Tr. 104-106.

27.     Second, the Court also agreed with the RCAHC that all Chartered Organizations, whether creditors or not, needed to be served with the solicitation packages directly.  Sept. 23, 2021, Hr'g Tr. 125:24-126:1.  This ruling benefitted all Chartered Organizations who may have otherwise had their property rights taken from them without their consent or knowledge.  It cannot be understated that these issues likely would not have been brought to the Court's attention and rectified, for the benefit of all Chartered Organizations, without the efforts of the RCAHC.

28.     While the hearing was ongoing, the Ad Hoc Committees took the pen and authored a first draft plain English summary of the Fifth Amended Plan specifically tailored for Chartered Organizations.  In large part, this was the document used for solicitation.  The Ad Hoc Committees laid out in understandable detail what proposed treatments of Chartered Organizations were available to choose from, the historical indemnification of Chartered Organizations by BSA and the Local Councils, the rights of Chartered Organizations in the Abuse Insurance Policies and the consequences of the various treatment elections.  The plain English description of the plan allowed all Chartered Organizations, not just Catholic Chartered Organizations, to understand what their proposed treatment was under the Debtors' Fifth Amended Plan.

**4.     Post-Disclosure Statement Mediation Efforts**

29.     From there, the RCAHC set out on a dual-track strategy of mediating a resolution for Chartered Organizations while preparing to litigate should mediation not be fruitful.

30.      The Ad Hoc Committees participated in multiple formal and informal mediation sessions.  In some instances, the sessions were organized by the Court appointed mediators.  In other instances, the Ad Hoc Committees convened negotiating sessions with other key stakeholders from their own initiative, such as the Coalition, the Local Councils and Century.

31.     The goals of the Ad Hoc Committees in those negotiations were two-fold.  First, was to agree on terms by which Chartered Organizations' additional insurance rights would be addressed so that insurance companies would have the ability to buy-back their Abuse Insurance Policies from BSA and the Local Councils.  Second was to negotiate the terms of a financial contribution for each denomination that would allow the entirety of each denomination to receive a full release and channeling of all abuse claims.

32.     While the RCAHC was not able to come to terms on a settlement for the Roman Catholic Church, the mediation efforts did result in significant improvements for all Chartered Organizations.  The primary benefit was that Chartered Organizations received a full release channeling of all Abuse Claims in years where there was coverage provided by a Settling Insurance Company regardless of whether the claim arose before or after 1976.  In addition, all non-Roman Catholic Chartered Organizations were getting complete releases and channeling of Abuse Claims without having to make a separate financial contribution (other than the UMAHC and the TCJC). This progress was evidenced in the Second Modified Fifth Amended Plan filed on December 18, 2021.

**5.  The RCAHC's Litigation Efforts**

33.     A significant concern of the RCAHC following the filing of the Second Modified Fifth Amended Plan was the extent to which BSA, the Local Councils and the Settling Insurance Companies proposed to impair not just the Abuse Insurance Policies but also insurance policies purchased by Chartered Organizations independent of their involvement with BSA going back many decades.  Further, the language in the Second Modified Fifth Amended Plan pursuant to which Chartered Organizations were receiving releases and channeling of Abuse Claims left open questions of whether, or which, Abuse Claims against Chartered Organizations were being

released and channeled. Thus, the RCAHC continued with the litigation efforts that began shortly after this Court approved the Disclosure Statement.

34.    On October 8, 2021, the RCAHC served its first set of requests for production of documents and interrogatories of the Debtors [Docket No. 6541] and joined in the discovery requests of various parties in connection with confirmation of the Debtors' proposed plan [Docket Nos. 6542 & 6545]. Between October 2021 and March 2022, , the RCAHC issued or joined in the notices of depositions of all significant parties and witnesses in the case [Docket Nos. 6976, 6977, 6978, 7017, 7018, 7165-7168, 8293-8299, 8307-8308, 8376, 8451 & 8472]. The RCAHC also responded to discovery sought of it [Docket No. 6666].

35.    During the months of December, January, February and March of 2022, the RCAHC took numerous depositions including multiple depositions of BSA's Rule 30(b)(6) designees such as Devang Desai, Adrian Azer, and Brian Whittman. Mr. Whittman was also deposed as an expert witness. The RCAHC also deposed 30(b)(6) designees of Settling Insurance Companies including those of Hartford and Century as well as the then proposed trustee, Eric Green.

36.    To assist in the development of their objections to confirmation of the plan, on November 5, 2021, the Ad Hoc Committees engaged Mackinac Partners, LLC ("Mackinac") to serve as financial consultants and Melissa S. Kibler to serve as a testifying expert in connection with the feasibility requirement for confirmation of the Debtors' plan. The Ad Hoc Committees also engaged Michael L. Averill as a testifying expert in connection with respect to insurance policy issues. On December 5, 2021, the RCAHC served the Expert Report of Michael L. Averill [Docket No. 7573], and on December 17, 2021, the RCAHC served the Expert Report of Ms. Kibler [Docket No. 7975].

**C. The RCAHC Prosecuted its Confirmation Objections for the Benefit of All Chartered Organizations and Litigated Various Confirmation Discovery Issues**

37.     On February 4, 2022, the RCAHC filed its confirmation objection [Docket No. 8686] (the "Confirmation Objection").  At its core, the RCAHC Confirmation Objection sought to highlight and emphasize for the Court and all parties-in-interest, including affected Chartered Organizations, that the Second Modified Fifth Amended Plan proposed to alter, impair and extinguish Chartered Organizations own insurance policies while potentially leaving the Chartered Organizations exposed to liability and defense costs associated with Abuse Claims.

38.     While this issue applied to all Chartered Organizations, no other Chartered Organization could raise the issue because the Second Modified Fifth Amended Plan contained a death trap provision.  Any Chartered Organization that filed a confirmation objection would forfeit its status as a Contributing Chartered Organization (which all other Chartered Organizations were) and would be treated as an Opt-Out Chartered Organization.  The consequence to other Chartered Organizations was dire—they would sacrifice the full release and channeling of Abuse Claims promised to them.

39.     The RCAHC also raised the significant issues presented by the language of the releases and channeling injunction contained for Participating Chartered Organizations. Specifically, that the language was vague, impermissible and, at best, required coverage litigation to determine whether an Abuse Claim against a Participating Chartered Organization was released and channeled.  At the time, the injunction issues raised in the Confirmation Objection applied only to Roman Catholic Chartered Organizations since all other Chartered Organizations were being treated as Contributing Chartered Organizations.

40.     That, however, would quickly change because on February 10, 2022, the Eleventh Mediator's Report was filed and on February 14, 2022 the Third Modified Fifth Amended Plan

was filed. For the vast majority of Chartered Organizations, the change in treatment was monumental. Chartered Organizations had been stripped of their status as Contributing Chartered Organizations and lost the full complement of releases and channeling of Abuse Claims and were reduced to Participating Chartered Organizations. Thus, all other Chartered Organizations now faced the same set of issues that demanded the RCAHC file the Confirmation Objection. Of course, there was still a death trap provision in the plan, so all other Chartered Organizations could not complain about having their treatment materially changed for the worse on the eve of confirmation. Only the RCAHC, due to its structure as an ad hoc committee, could continue to raise issues common to all Chartered Organizations without fear of triggering the death trap.[7]

41. On February 11, 2022, between the filing of the Eleventh Mediator's Report and the latest iteration of the plan, the Court held a status conference related to confirmation issues. During that hearing, the RCAHC reiterated the due process and notice issues that affect all Chartered Organizations. *See generally* Feb. 11, 2022, Hr'g Tr. 48-55. The RCAHC noted that, despite discovery efforts, no party fully understands the scope of the Channeling Injunction and the differences between a full injunction and one that is only tied to applicable insurance. *Id.*

42. Also on February 17, 2022, the RCAHC filed an objection to the Debtors' motion for approval of supplemental notices regarding plan modifications [Docket No. 8876], arguing that the Debtors finally acknowledged that the Plan was materially modified and affected creditors needed to be informed and given an opportunity to recast their ballots.

43. On February 25, 2022, the RCAHC filed its supplemental confirmation objection [Docket No. 9028] (the "Supplemental Confirmation Objection" and together with the

---

[7] It should be noted, however, that the Third Modified Fifth Amended Plan was also revised in an attempt to silence the RCAHC from litigating the concerns of Chartered Organizations. The death trap language was revised to try and specifically target members of the RCAHC and have the death trap apply to them as members of the RCAHC.

Confirmation Objection, the "Confirmation Objections"), arguing that the revised plan added a deathtrap provision triggered off of the filing of an objection to the plan (as opposed to voting on the plan) in an attempt to silence the RCAHC, its members, and other Chartered Organizations. Supp. Confirmation Obj. ¶ 1. The deathtrap provision, as argued by the RCAHC, violated numerous provisions of the Bankruptcy Code. The RCAHC also highlighted that the plan stripped Contributing Chartered Organization status from tens of thousands of Chartered Organizations. Finally, the RCAHC renewed many of the objections made in the Confirmation Objection in order to demonstrate that changes made to the plan did not fix the previously identified issues and that now applied to all Chartered Organizations.

### D. The RCAHC Settlement

44. During the first week of the confirmation hearing, the RCAHC was able to reach an agreement with BSA, the Local Councils, the Settling Insurance Companies and the TCC. On March 17, 2022, the Debtors filed the Mediator's Twelfth Report attaching the RCAHC's Term Sheet [Docket No. 9387]. While many of the terms were particular to the RCAHC and Roman Catholic Chartered Organization, there were a number of significant modifications required to be made to the plan for the benefit of all Chartered Organizations. Most importantly, the plan was clarified to make it clear that Chartered Organizations' rights to coverage, including defense costs, for Abuse Claims under Chartered Organizations' own insurance policies were not being impaired. Term Sheet ¶ 9. The Plan was also modified to make it clear that the releases and channeling injunctions applied to all insureds and co-insureds under policies being sold back, not just those insureds within the narrow definition of a Chartered Organization Term Sheet ¶ 8. A data room of insurance policies is required to be created and made available to all Chartered Organizations so that Chartered Organizations could determine with specificity whether a pre-1976 Abuse Claim was released and channeled. Term Sheet ¶ 11 and 12. Finally, the parties agreed to establish a

Chartered Organization Advisory Group so that there would be a body to voice Chartered Organizations future concerns to Judge Houser. Term Sheet ¶ 9.

45.     The RCAHC Settlement was incorporated into the Plan and approved by the Confirmation Order, Opinion, and Supplemental Confirmation Order.

46.     The path from the initial Fourth Amended Plan to the Plan that was confirmed was long and difficult for all parties. For the RCAHC, the value of its efforts can only be measured by what was achieved for all Chartered Organizations.

47.     The journey began with Chartered Organizations being stripped of all of their rights under the Abuse Insurance policies and abandoned to the tort system while receiving nothing in return. They were to get no releases, no channeling of Abuse Claims against them, the loss of their indemnification rights against BSA and the Local Councils and all of their claims subordinated. Along the way, Chartered Organizations' own insurance policies became threatened too.

48.     The confirmed Plan, however, is night and day in its treatment of Chartered Organizations. All Abuse Claims arising from 1976 forward are released and channeled. A significant amount of pre-1976 Abuse Claims, those covered by policies issued by Settling Insurance Companies (present and future), are also being released and channeled. Chartered Organizations own insurance policies remained unimpaired.

49.     That was only obtained by the hard work and commitment of the RCAHC and, prior to its settlement, the UMAHC. Chartered Organizations, the lifeblood of scouting and a significant creditor body in these cases, are now being treated fairly and equitably. That result for all Chartered Organizations is a substantial contribution to these cases made by the RCAHC. Accordingly, the RCAHC is entitled to reimbursement of reasonable expenses and professional fees under sections 503(b)(3) and (4) of the Bankruptcy Code.

50.     The total professional fees and expenses incurred by the RCAHC in connection with these cases is $4,069,543.87.  Of those fees and expenses, $2,100,981.65 was incurred by ArentFox Schiff, $1,536,142.22 was incurred by Potter Anderson[8], and $432,420.00 was incurred by Mackinac.  A complete listing of ArentFox Schiff's, Potter Anderson's, and Mackinac's fees and expenses are attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**, respectively.

## JURISDICTION AND VENUE

51.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

52.     Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, the RCAHC hereby consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BASIS FOR RELIEF

### I.     The RCAHC Made a Substantial Contribution to These Cases.

53.     Section 503(b) of the Bankruptcy Code authorizes the bankruptcy court to award compensation to creditors for their legal and other expenses incurred in making a substantial contribution in a case.  The section, in relevant part, provides as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –

. . .

---

[8]  The fees and expenses of Potter Anderson set forth in this Motion are only the fees and expenses billed to the RCAHC.  During the period Potter Anderson represented both the RCAHC and the UMAHC, Potter Anderson allocated fees and expenses to each client with fees for services jointly benefitting both clients, such as attendance at hearings, allocated equally among the two clients.

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –

. . .

(D) a creditor, an indenture trustee, and equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

     . . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. §§ 503(b)(3)(D) & (b)(4).

54.     The policy behind these provisions of section 503(b) is to promote meaningful participation in the reorganization process. *See generally In re Jartran, Inc.,* 732 F.2d 584, 586-87 (7th Cir. 1984) (explaining that section 503(b) is meant to encourage creditors to extend credit after the bankruptcy filing "to enable the bankrupt[cy] to function" so that the debtors' reorganization can be successful).

55.     Section 503(b)(3) specifically excludes compensation and reimbursement of a kind specified in 503(b)(4). That section covers reimbursement for professional fees. If an entity that qualified for administrative expense priority seeks reimbursement for professional fees, it must seek such reimbursement under (b)(4) rather than (b)(3).

56.     To that end, subsections 503(b)(3) and (b)(4) provide a statutory mechanism for awarding administrative expenses to committee members, such as this RCAHC, and bankruptcy courts have wide discretion to determine the amount of expenses to award under section 503. *In re Lister*, 846 F.2d 55, 56 (10th Cir. 1988).

57.     Generally, whether to allow administrative expenses under section 503(b)(3)(D) is a question of fact left to the bankruptcy court's discretion. *Lebron v. Mechem Fin. Inc.*, 27 F.3d

937, 946 (3d Cir. 1994) (stating that a determination of whether or not a substantial contribution to a reorganization has been made is a question of fact). In this regard, the burden of proof is on the applicant to demonstrate by a preponderance of the evidence that it has made substantial contribution in the case. *See In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); *In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007), *aff'd*, 406 F. App'x 634 (3d Cir. 2011).

58.     The term "substantial contribution" is not defined in the Bankruptcy Code. *In re M&G USA Corp.*, 599 B.R. 256, 262 (Bankr. D. Del. 2019). Generally, substantial contribution is narrowly defined given "[t]he integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to significant and tangible benefits to the creditors, debtors, or the estate." *In re D.W.G.K. Rests., Inc.*, 84 B.R. 684, 690 (Bankr. S.D. Cal. 1988). Courts have found that an applicant satisfies the test for providing a substantial contribution when the applicant's activities "resulted in an actual demonstrable benefit to the debtor's estate and the creditors." *Summit Metals*, 379 B.R. at 50 (quoting *Lebron*, 27 F.3d at 944); *see generally M&G USA Corp.*, 599 B.R. at 262 ("[N]early all courts and the leading bankruptcy treatise agree that the contribution must provide 'tangible, clearly demonstrable benefits to the estate.'" (quoting Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY, ¶ 503.10 (15th ed. 2015))).

59.     In determining whether an applicant has made a substantial contribution, courts have examined several factors, including: "whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct benefit upon the estate; and whether the services were duplicative of services performed by others." *Summit Metals*, 379 at 51. As the Third Circuit had noted, "the existence of self-interest cannot in

and of itself preclude reimbursement." *Lebron*, 27 F.3d at 944. Further expounding on this topic, the Third Circuit stated that:

> "[S]ubstantial contribution" should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate.

*Id.* Stated differently, activities that are designed to benefit the debtor's estate, that do in fact provide such a benefit and that are undertaken without an expectation of reimbursement are entitled to reimbursement. *See In re FF Holdings Corp*, 343 B.R. 84 (D. Del. 2006) (negotiating alternative debtor in possession financing and persuading another creditor to withdraw its objection to confirmation "substantially contributed" to chapter 11 case); *In re Worldwide Direct, Inc*., 334 B.R. 112, 123 (Bankr. D. Del. 2005) (allowing administrative expense for attorney's fees incurred by member of the creditors committee for services that the committee specifically requested the creditor's attorney to perform); *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 176 (Bankr. D. Del. 2004) (allowing administrative expense for attorney's fees incurred by stockholders for drafting key plan provisions, participating in hearings, and aiding during the reorganization process.).

60.     Indeed, "corroborating evidence by a disinterested party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a substantial contribution." *M&G*, 599 B.R. at 262. Moreover, a court "may take into account its first-hand observance of the services provided throughout the entire chapter 11 case in determining whether an applicant has demonstrated that it made a substantial contribution to the case." *Id.* Finally, a creditor that ensures a consensual confirmation of a plan by persuading a key creditor to withdraw its objection to confirmation, or similarly, ensuring that key parties to a reorganization are content with their treatment under a plan, allows

the estate to avoid losses that may have resulted otherwise. *Id.* "Therefore, in some limited circumstances, creditor activities which result in meaningful settlements and a consensual process may constitute a substantial contribution to reorganization." *Id.* (granting a substantial contribution motion).

61.     Here, the RCAHC's involvement throughout the cases resulted in an actual demonstrable benefit to the Debtors' estates and creditors in a number of ways.

62.     As discussed above, Chartered Organizations are essential to the Debtors and are the lifeblood of Scouting, but until the RCAHC's involvement, no party represented their interests in these cases.   Other than the TCJC, which was no longer active with BSA, the Ad Hoc Committees were the only Chartered Organizations to participate in hearings before this Court, no other Chartered Organization rose to defend the rights of Chartered Organizations. The initial iterations of the Plan, the RSA, and the settlements that the Debtors reached with various parties in these cases demonstrated a lack of Chartered Organization involvement while their rights were improperly impaired without consent.   These initial agreements provided no protections for Chartered Organizations and, instead, sought to strip away Chartered Organizations property rights for the benefit of others..

63.     However, upon its entrance into these cases, the RCAHC sought immediate and real involvement in the mediation process and pressed legal issues that affected not only the members of the RCAHC but all Chartered Organizations throughout the pendency of these cases. The RCAHC prepared and litigated lengthy objections to the RSA, Disclosure Statement, and Plan. In its RSA Objection, the RCAHC argued, among other things, that the RSA impaired rights for all Chartered Organizations and guaranteed future litigation amongst the parties (whether in connection with confirmation of the Plan or post-confirmation).   In its Disclosure Statement

Objection, the RCAHC pushed for, and received approval of, a plain English description of the terms of the Plan and Disclosure Statement for the benefit of all creditors, but in particular, the unrepresented, volunteer Chartered Organizations. Agreeing with the RCAHC, the Court noted that "it will be difficult for the volunteer organizations who are not represented to comprehend the 300 pages and focus in on exactly what is happening to them." Sept. 21, 2021, Hr'g Tr. at 169:4-8; *see also* Sept. 22, 2021, Hr'g Tr. 215:23-217:3 (the Court agreeing with the RCAHC that the effect of the Hartford settlement on Chartered Organizations needs to be explained appropriately in the disclosure statement and plan). The RCAHC was the principal drafter of the plain English disclosures. Through its Disclosure Statement Objection, the RCAHC was also successful in ensuring that the solicitation materials were served on all Chartered Organizations, whether or not known creditors, because the Plan affected their rights—again improving disclosure to the Debtors' creditors as a whole.

64.　　Throughout the cases, the RCAHC continued its dual-track goals of litigating issues that affected the rights of Chartered Organizations while also mediating those same issues in hopes of reaching a consensual resolution that benefitted all parties. Therefore, the RCAHC and its professionals attended countless mediation sessions with the Debtors and other key stakeholders.

65.　　It was the RCAHC and the UMAHC that were charged with ensuring that a plain English summary of the plan and disclosure statement were provided to Chartered Organizations. Without such a summary tens of thousands of volunteer Chartered Organizations with little or no access to legal counsel would have been left to digest hundreds of pages of dense legal documents.

66.　　Through its 96-page Confirmation Objection and additional Supplemental Confirmation Objection, the RCAHC raised and litigated issues of concern to all Chartered Organizations. And, it must be noted, it did so when other Chartered Organizations had been

silenced by the death trap provisions penalizing any Chartered Organization that objected to confirmation.

67.     Significantly, after arm's length, hard-fought, and extensive negotiations between the RCAHC, the Debtors, and the Debtors' other key constituencies, the RCAHC reached a settlement that finally ensured that all Chartered Organizations would be treated fairly and equitably.  In exchange for the contribution of their property rights in the Abuse Insurance Policies, unlocking billions of dollars of value, Chartered Organizations will receive releases and channeling of all 1976 forward Abuse Claims and a significant number of pre-1976 Abuse Claims (which will only grow as other insurance companies settle).  Chartered Organizations' own insurance policies were not impaired, withstanding extraordinary pressure by Settling Insurance Companies to do so.  The parties further agreed to establish the Chartered Organization Advisory Group, a member of which shall be a member of the RCAHC, to advise the Settlement Trustee regarding Chartered Organizations' concerns as to any future insurance settlements and claims issues.

68.     The tangible benefits that directly flowed from the RCAHC's efforts in these cases are real and substantial.  In addition to the foregoing, BSA will benefit from the members of the RCAHC's continued support of Scouting through 2036.  Additionally, the Chartered Organization Advisory Group will provide needed oversight going-forward and Chartered Organizations will be permitted to defense costs in enforcing the injunction, benefitting all Chartered Organizations.

69.     As noted above, the Court "may take into account its first-hand observance of the services provided throughout the entire chapter 11 case in determining whether an applicant has demonstrated that it made a substantial contribution to the case."  *M&G*, 599 B.R. at 262.  The RCAHC believes it is appropriate to do so in these cases. It is undeniable the progress made for

all Chartered Organizations correlated to the RCAHC's entry into and active participation during these cases. The Court bore witness to the RCAHC's advocacy and concern for all Chartered Organizations, that Chartered Organizations needed to be afforded due process and receive a fair and equitable treatment.

70. The RCAHC respectfully requests approval of the Motion, granting the RCAHC's fees and expenses as administrative expenses, up to the agreed upon cap of $1,500,000, and payable in accordance with the RCAHC Term Sheet.[9]

## II. Certain Information Requirements in Local Rule 2016-2(d) Should Be Waived.

71. Pursuant to Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), a request for payment of a substantial contribution claim must include certain information requirements that are typically included in fee applications filed by retained professionals in this district. However, Local Rule 2016-2(h) provides that an "entity within the scope of this Rule may request that the Court waive, for cause, one or more of the information requirements of this Local Rule." Under the circumstances of these cases, the RCAHC submits that cause exists to waive certain of these requirements with respect to the fees of Mackinac.

72. In accordance with its ordinary and customary business practices, and consistent with industry standards, Mackinac does not regularly record time in tenths of an hour increments, nor do its invoices to clients contain detailed activity descriptions with the detail required by Local

---

[9] The RCAHC also believes that the Motion could be granted under the business judgment standard in a similar vein to the requests that were approved in *Mallinckrodt*. *See In re Mallinckrodt PLC*, 2022 WL 906458 (D. Del. Mar. 28, 2022). The RCAHC Term Sheet provides that the Reorganized Debtors "shall" reimburse the RCAHC for amounts paid to its professionals for reasonable, documented, and contractual fees and expenses not to exceed $1,500,000. Accordingly, while this Motion is being brought by the RCAHC, it is done so with the support and agreement of the Reorganized Debtors. Accordingly, in the event that the Court is not inclined to grant the Motion under 503(b), the RCAHC respectfully requests that it be granted under the Debtors' business judgment.

Rule 2016-2(d), unless it is retained as a professional in a bankruptcy case. Moreover, in cases where Mackinac is retained to provide expert testimony, a waiver of the requirements to provide time detail is appropriate in most cases to protect work-product privilege or other applicable privileges or confidentiality. Likewise, Mackinac's invoices do not typically contain the detailed expense information required by Local Rule 2016-2(e).

73. Because Mackinac was not retained as an estate professional in the cases, its client invoices did not contain the information required by Local Rule 2016-2. A modification of these requirements is typically sought by financial advisors retained under section 327 at the outset of their engagement and granted in connection with their retention. The RCAHC submits that the time and expense involved in retroactively modifying its invoices and time entries to comply with these requirements would impose a significant burden on Mackinac and an unnecessary and significant expense upon the RCAHC.[10]

74. Additionally, while ArentFox Schiff and Potter Anderson billed time in 1/10 hour increments, they did not break out the time similar to how they would if they were retained as estate professionals. For similar reasons as above, the time and expense of retroactively breaking out the time within each of the invoices to strictly comply with the Local Rules would impose a significant burden. Moreover, the fees and expenses incurred by the RCAHC's professionals far exceed the cap of $1,500,000 for which reimbursement is sought.

75. Accordingly, the RCAHC respectfully submits that a waiver of the requirements of Local Rule 2016-2(d) is necessary and appropriate in these cases.

---

[10] As all time billed to this matter fell under a single category, Mackinac's time detail does not break the time out by project category.

## NOTICE

76.     Notice of this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the Debtors; (iii) counsel for the Official Committee of Unsecured Creditors; (iv) counsel for the Official Committee of Tort Claimants; and (v) all persons and entities that have filed a request for service in these cases pursuant to Bankruptcy Rule 2002.  The RCAHC submits that, under the circumstances, no other or further notice is required.

*[Remainder of Page Left Intentionally Blank]*

WHEREFORE, the RCAHC respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**; (i) granting the relief requested in connection with the Motion and (ii) granting for such other and further relief as the Court deems just and proper.

Dated: December 29, 2022
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

/s/ *Jeremy W. Ryan*
Jeremy W. Ryan (Bar No. 4057)
Aaron H. Stulman (Bar No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
           astulman@potteranderson.com

- and -

**ARENTFOX SCHIFF LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: everett.cygal@afslaw.com
           david.spector@afslaw.com
           mark.fisher@afslaw.com
           neil.lloyd@afslaw.com
           jin.yan@afslaw.com
           daniel.schufreider@afslaw.com

*Counsel to the Roman Catholic Ad Hoc Committee*