IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

**RESPONSE OF THE OFFICIAL COMMITTEE OF
TORT CLAIMANTS TO THE MOTIONS BY THE COALITION AND
PFAU/ZALKIN FOR PAYMENT OF RESTRUCTURING EXPENSES**

The Official Committee of Tort Claimants (the "**TCC**") responds to the Coalition of Abuse Scouts for Justice's (the "**Coalition**") *Motion Approving the Debtors' Proposed Payment of the Coalition's Restructuring Expenses* [Docket No. 10808] (the "**Coalition Motion**") and Pfau Cochran Vertetis Amala PLLC's ("**Pfau**") and The Zalkin Law Firm, P.C.'s ("**Zalkin**" and, together with Pfau, "**Pfau/Zalkin**") *Motion Allowing the Settlement Trust to Pay or Reimburse Pfau/Zalkin Restructuring Expenses* [Docket No. 10809] (the "**Pfau/Zalkin Motion**" and, together with the Coalition Motion, the "**Motions**"). In support thereof, the TCC respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     The TCC does not object to the ultimate relief requested by the Coalition and Pfau/Zalkin in the Motions[2] – the payment of their requested restructuring expenses in the

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] The TCC agreed to not object to such relief in the TCC Term Sheet.  This response does not address the legal issues relating to the propriety of the requested substantial contribution claims.

respective amounts of $21 million and $3.5 million – for their work that, in conjunction with the work of the TCC, resulted in the ultimate confirmation of the Plan in this chapter 11 case, a result that would not have been possible without the diligent efforts of ***all three*** survivor representative groups – the TCC, the Coalition and Pfau/Zalkin.  However, in an attempt to emphasize their individual roles in this case to support the payment of their substantial contribution claims, the Coalition and, to a lesser extent, Pfau/Zalkin, have minimized (and at times have been outright dismissive of) the integral role that the TCC played in this case, both individually and as part of the joint efforts of the three survivor representative groups – each of which played varying, additive and vital roles in the ultimate successful outcome of this case.  The TCC, therefore, files this response to provide a brief overview of the TCC's involvement and critical role in this case to address and clarify any such mischaracterizations or inaccurate, limiting portrayals of its role.

   2.  The TCC's goals from the outset of this case were three-fold.  First, the creation of a settlement trust with sufficient cash and assets to provide meaningful distributions to Survivors commensurate with the decades of abuse suffered by Survivors.  Second, a settlement trust administered by an individual who is independent, with the highest level of integrity, and no ties to any person, group, or professional.  Third, improved child protection measures to help ensure that childhood sexual abuse never happens again.

   3.  The TCC accomplished its goals on behalf of the Survivors, and these provisions were incorporated in the plan ultimately approved by this Court.  This accomplishment for Survivors was not based solely on the work of the TCC.  Nor was it based solely on the work of either the Coalition or Pfau/Zalkin standing alone. Rather, the TCC, the Coalition, and Pfau/Zalkin each played critical, significant and differing roles in moving the case forward to its ultimately successful conclusion – a plan that maximizes the recoveries to Survivors and provides robust and

independent governance and oversight, and enhanced youth protection programs designed to ensure the safety and security of those involved in the Boy Scouts.

4. There is no basis to minimize or denigrate the significant role of the TCC in this case, and it is not necessary to do so in order to recognize the significant roles and contributions of the Coalition and Pfau/Zalkin, and to reimburse them, as requested, based on these contributions. The TCC should not need to be "pushed down" so that others may "rise." This is a case where each of the survivor representative groups, with similar, yet unique, priorities and goals were able to work – between and among themselves and with the Debtors and other constituencies – towards mutually acceptable frameworks and joint solutions on one of the nation's most complex and emotionally charged chapter 11 cases to date. Like a relay race, each of the survivor representative groups held the baton at certain times, passing it back and forth when appropriate. In the end, based on the significant efforts of those involved, all crossed the finish line together.

5. In sum, the TCC does not object to the granting of the relief sought by the Motions, but provides an overview of the integral and important role that the TCC played in this chapter 11 case to clarify that the successful outcome in this case involved the joint effort and work of ***all*** survivor group representatives – including the critical involvement of, and services provided by, the TCC.

**OVERVIEW OF THE FIVE STAGES OF THIS CHAPTER 11 CASE AND THE INVOLVEMENT AND ROLES OF THE TCC AND OTHER SURVIVOR REPRESENTATIVE GROUPS LEADING TO CONFIRMATION OF THE PLAN**

6. Over the past 2½ years, this complex chapter 11 case proceeded through five distinct stages – with the survivor representative groups' roles and involvement evolving through each stage. The final stage, with the combined support of the survivor representative groups, culminated in the approval of the *Third Modified Fifth Amended Plan of Reorganization* [Docket

3

No. 10296] (the "**Plan**"). Reaching this goal on behalf of Survivors was not an accomplishment that was, or could have been, obtained by a single survivor representative group, but required the concerted joint effort of each of the TCC, the Coalition and Pfau/Zalkin. This effort necessarily entailed a process that evolved over the pendency of the case as each group was included in, or excluded from, the mediation process, addressed its priorities, and negotiated to improve the monetary recoveries and non-monetary outcomes for Survivors. A brief overview of the evolution of the chapter 11 case and the dynamics and involvement of the survivor representative groups during these stages is as follows:[3]

7. *The Initial Stage*. During the initial stage following commencement of the Debtors' case, the TCC worked in conjunction with the primary members of the Coalition and Pfau. At this juncture, four of the law firms (that later became part of the Coalition) were counsel to two members of the TCC, and Pfau was (and continues to be) counsel to a member of the TCC. During the early stages of the case, the TCC worked together with these law firms, jointly formulating restructuring strategies.

8. *The Second Stage*. Approximately five months after the formation of the TCC, the Coalition (breaking off from the TCC) formed to pursue restructuring objectives that differed from those of the TCC and Pfau. During the second stage of the case, the TCC and Pfau continued to work together while the Coalition established its role and embarked on an alternative restructuring strategy – which strategy was at times met by opposition by the TCC and Pfau, as the TCC and Pfau sought to negotiate and implement differing priorities and issues on behalf of Survivors.

---

[3] This response necessarily does not walk through the entirety or specifics of the history of this case, but assumes the Court's familiarity with the major case milestones as generally described in the Motions.

4

9. *The Third Stage*. During the third stage of the case, the TCC and the Coalition worked diligently to resolve the majority of their differences, and were able to come together with the Debtors to formulate a set of acceptable restructuring objectives – culminating in the TCC and the Coalition entering into a restructuring support agreement with the Debtors. Pfau was not supportive of certain of the restructuring goals envisioned by the restructuring support agreement and, at this juncture, joined with Zalkin to form Pfau/Zalkin to advance the issues they believed were integral and missing from the restructuring support agreement and proposed plan structure.

10. *The Fourth Stage*. During the fourth stage of the case, following the abandonment of the restructuring support agreement structure, the Coalition on its own reached agreement with the Debtors and certain insurance carriers, which led to the initial formulation of a plan. While this early version of the plan included certain aspects that the TCC supported, the TCC and Pfau/Zalkin had been effectively excluded from the mediation and negotiation process during this period, and the proposed plan lacked material components and thus failed to garner the support of either the TCC or Pfau/Zalkin constituencies. As a result, the TCC and Pfau/Zalkin opposed confirmation of the plan, leading to the Debtors' failure to garner a sufficient number of votes to support confirmation of the plan. The failure to obtain sufficient votes from Survivors supporting the Coalition-only supported plan resulted in the Debtors' determination that it could not proceed with solely a Coalition supported plan, and its reconsideration of the exclusion of the TCC and Pfau/Zalkin from the mediation process, leading to the final stage of the case.

11. *The Final Stage – the Mediation and Plan*. After the prior iteration of the plan was rejected, it became clear to the Debtors and the Coalition that there would be no consensual or confirmable plan without the involvement of the TCC and Pfau/Zalkin. It was finally at this juncture that the TCC and Pfau/Zalkin were included in the mediation process, negotiations ensued

and their issues were addressed, leading to the fifth and final stage of the case. This stage involved the TCC, the Coalition, and Pfau/Zalkin working together, with the Debtors and others constituencies, to formulate the Plan – a Plan that clearly incorporated and addressed the TCC's specific restructuring objectives and goals, along with those of Pfau/Zalkin, that had not previously been addressed in the Coalition-only backed plan structure. The Plan that addressed the TCC and Pfau/Zalkin issues – recovery to Survivors, independent oversight and youth protection – had the support of the TCC and Pfau/Zalkin, and was able to garner overwhelming support from Survivors. This was the Plan ultimately confirmed by the Court.

12. The individual efforts of each of the TCC, the Coalition, and Pfau/Zalkin were significant and valuable in their own right. However, it would not have been possible to confirm the Plan without the participation and support of the TCC, the Coalition, and Pfau/Zalkin working together. The TCC, the Coalition, and Pfau/Zalkin each played different but meaningful roles that alone proved unable to advance this chapter 11 case to its successful conclusion. The confirmation of the Plan demonstrates that each of the survivor representatives groups – including the TCC – played an essential role that was necessary to the successful outcome of this case for Survivors.

13. Certain of the notable efforts of the TCC, individually and in conjunction with the other survivor representative groups, are highlighted below. In addition, the TCC clarifies certain statements or intimations in the Motions that do not fairly or accurately reflect the reality of the TCC's involvement in connection with this case.

**A.    Bar Date and Preliminary Injunction**

14. At the outset of the chapter 11 cases, the TCC litigated and was instrumental in formulating the twelve page abuse proof of claim form that will serve as the initial basis for

evaluating and ultimately resolving the over 82,000 claims asserted against the Debtors, Local Councils, Chartered Organizations and Settling Insurance Companies.

15. In addition, the TCC negotiated the scope and terms of a preliminary injunction with respect to the assertion of pre-petition litigation against non-debtors that provided the necessary stabilization to allow the primary constituencies in this case breathing space to negotiate, compromise, and ultimately develop a confirmable plan. Thereafter, the TCC (supported by other survivor representative groups over time) negotiated extensions of the preliminary injunction in exchange for critical information regarding the Local Councils and their assets, including information regarding restricted and unrestricted property (and the basis for any restriction), the sale of property in which the Debtors arguably held a contingent interest, and thousands of troop rosters that contained information necessary to preserve claims against Chartered Organizations prior to the expiration of the applicable statute of limitations (*i.e.*, claims that continue to be enforceable against non-settled insurance). As described in further detail below, this information, and the TCC's investigation and analysis thereof, provided the basis for the settlements with the Debtors and Local Councils that are reflected in the confirmed Plan.

**B.**     **Settlements With Settling Insurance Companies**

16. Following the Debtors' entry into the initial settlement with Hartford, the TCC and the Coalition were unified in their opposition to the Hartford insurance settlement. That unification resulted in the TCC/Coalition-supported restructuring support agreement that provided for the initial settlements with the Debtors and Local Councils that were used to provide a foundation for future settlements with other key parties and ultimately form the basis of a confirmable plan.

17. Following the abandonment of the restructuring support agreement structure, the Coalition, along with the FCR, negotiated and structured the four insurance settlements (Hartford,

Century, Zurich and Clarendon) that were eventually supported and approved under the Plan.[4] The Coalition's efforts to negotiate these agreements, along with the settlements with the Debtors and the Local Councils, provided a foundation for the Debtors to ultimately propose a plan that would address the three critical components to any plan acceptable to Survivors: meaningful compensation, independently administered trust, and enhanced youth protection measures.

18.    The TCC acknowledges the Coalition's role in negotiating the insurance settlements, which the TCC ultimately did not object to in the context of the global plan resolution. The Coalition's characterization of its efforts during and following this period of time, however, disregards the significant contributions of the TCC relating to the integrated aspects of the ultimate plan agreement.

C.    **Settlement With the Debtors**

19.    By way of example, the TCC was the survivor representative that investigated and analyzed the Debtors' assets and liabilities and their financial wherewithal to make meaningful contributions to compensate Survivors. Following the appointment of the TCC, the TCC pressed for and obtained access to the Debtors' financial and cash management systems (which also provided transparency into certain financial and operational aspects of the Local Councils). Through this access, the TCC was able to analyze the Debtors' operations and project the cash and other assets necessary for the Debtors to continue as a going concern. Based on this information

---

[4] These settlements were reached at a time when the TCC had been effectively excluded from the mediation process, and were reached without input or approval of the TCC. While the TCC ultimately did not oppose the settlements as part of the global plan resolution, it was the TCC's position that the settlements were insufficient and objectionable.

DOCS_SF:108343.5

and analysis, the TCC created the framework from which the ultimate settlement with the Debtors was achieved.

20.     In the end, the global settlement with the Debtors and others would not have been possible without the TCC and Coalition working together, but the TCC's work in connection with the formulation and establishment of the upper and lower limits of the Debtors' ability to contribute formed the basis of an acceptable settlement range.  Without the TCC's investigation into, and in-depth analysis of, the Debtors' assets, operations and ability to pay, such settlement parameters would not have been developed, and the settlement with the Debtors within these parameters would not have been obtained.

**D.     The Local Council Settlement**

21.     Likewise, the TCC was the survivor representative that investigated and analyzed the assets, liabilities and business operations of the Local Councils.  The TCC undertook liquidation and operational analyses of all 250 Local Councils on a council-by-council basis.  In making its contribution demands on the Local Councils which led to the settlement with the Local Councils, the TCC understood the amount of cash the Local Councils had on hand, the extent of their real and personal property holdings, the extent of valid restrictions on such property, and the operational and liquidity requirements for each Local Council that would still permit each Local Council to make a meaningful and equitable contribution without jeopardizing its ability to continue as a going concern.

22.     In the Coalition Motion, the Coalition asserts that it "took the lead" in the negotiations with the Local Councils.  It was, however, the TCC that formulated the basis to increase the contribution from the Local Councils.  It was the TCC that analyzed and negotiated an additional $100 million contribution from the Local Councils that was tied to excess pension

contributions, and it was the TCC that worked to ensure that such contribution would be secure notwithstanding the willingness of the Coalition to relinquish these amounts under certain circumstances.

23.     Like the settlement with the Debtors, the settlement with the Local Councils could not have been achieved without the efforts of both the TCC and the Coalition.  The efforts of neither the TCC nor the Coalition should be disparaged as together they resulted in a significant source of recovery for Survivors.

**E.**     **Youth Protection Protocols**

24.     The TCC agrees with the Coalition that youth protection was a gating item for all survivor representative groups if there was to be a global settlement of the case.  However, the TCC takes issue with the Coalition's description of the importance of its individual role, and its portrayal of the TCC's role as somehow limited or unnecessary.  While the Coalition, through the Survivor Working Group, played an important part in certain respects, it was the TCC that took the lead and paved the way to the development and inclusion of robust youth protection protocols in this case.

25.     As the estate representative for all Survivors, the TCC was in continuous contact with Survivors throughout the pendency of the bankruptcy – Survivors who expressed that they not only wanted the Debtors and the Local Councils to make meaningful monetary contributions, but also wanted to ensure that the abuse that happened to them would never happen to another person.  Thus, it was essential that the Debtors revisit, revise, and implement youth protection measures and protocols that would provide for adequate and appropriate oversight of the tens of

DOCS_SF:108343.5

thousands of children involved in programs controlled by the Debtors, Chartered Organizations and Local Councils.

26. The revised youth protection protocols that were negotiated and developed, and ultimately resulted in those set forth in the Plan, took place in three phases. The first phase, led by the TCC, was set forth in the restructuring agreement term sheet, which provided that the Debtors were required to: (a) provide a report regarding the current youth protection program; (b) engage an entity to evaluate BSA's youth protection program; (c) consider a protocol for disclosing BSA's volunteer screening database; (d) turnover troop rosters; and (e) provide other related discovery. The non-monetary commitments in the restructuring agreement term sheet established a blueprint for what was to come in a plan. It was the TCC that single-handedly negotiated this initial framework of youth protection provisions.

27. The input on youth protection from the Coalition was the second phase, through the Survivor Working Group, which was formed in October 2021. The Survivor Working Group, led by the Coalition, was instrumental in obtaining a Survivor representative on the BSA board. This was not only a meaningful change from BSA's prior closed-door policy regarding its governance and oversight regarding childhood sexual abuse, but it served to provide Survivors with a "seat at the table" where they would have transparency into the oversight and implementation of youth protection measures intended to put a stop to decades of abuse. The addition of a Survivor representative on BSA's board, a point pushed forward by the Survivor Working Group, substantially enhanced the youth protection provisions that had been negotiated by the TCC in the first phase.

28. The third phase followed the TCC's successful efforts to oppose the initial plan. At this juncture, the TCC took the lead on youth protection issues in the mediation and entered into

further negotiations with the Debtors to strengthen and improve on the youth protections that has been previously outlined by the TCC in the restructuring agreement term sheet. Again, it was the TCC, led by Co-Chair Dr. Doug Kennedy, along with TCC counsel, other members and state court counsel, who attended multiple-day mediation sessions in Los Angeles in January 2022, resulting in the final youth protections provisions that are memorialized in Exhibit L of the Plan.

29. In its Motion, however, the Coalition appears to go to unnecessary lengths to question the role, contribution, and fees incurred by the TCC with respect to the comprehensive youth protection measures that were approved under the Plan. The TCC finds the Coalition's portrayal disturbing, and necessitating a response, as it was the TCC that not only took the lead role on the youth protection issues, but was the survivor representative group engaged with the Debtors that negotiated and memorialized the youth protection protocols found in the Plan.

F.  **Trust Distribution Procedures**

30. As the Coalition states in its Motion, trust distribution procedures ("**TDP**") of any plan were vitally important because they could not be designed to limit non-settling insurers' obligations to fund covered claims to out-of-pocket contribution paid by the Debtors (often referred to as the *Fuller-Austin* issue). It is not, however, accurate for the Coalition to state, as it does in its Motion, that it took the "lead" role in negotiating and drafting the TDP on behalf of Survivors. As an essential part of any mass tort plan, the form of the TDP was critical to the TCC. Along with the Coalition, the TCC drafted, revised, and negotiated the TDP, including the provisions relating to the appointment of an independent settlement trustee and the terms of the settlement trust agreement. The TCC was an integral part of the process, and in no manner took a

"supporting role" to the Coalition in connection with the formulation and final iteration of the TDP approved in connection with the Plan.

31.     In addition, an essential component of the TDP was the independent review option ("**IRO**"), which was developed by Pfau/Zalkin. The IRO provides a path for claims based on especially egregious facts to be evaluated in ranges that could exceed maximum values in the primary TDP. The TCC played a key role in negotiating to resolve differences between the Coalition and Pfau/Zalkin, and the Debtors, with respect to the provisions of the IRO. Apart from the settlements reached and approved by the Plan, the TDP (including the IRO) was likely the single most important feature of the Plan. The TDP, IRO and the Plan framework itself were not the work of a single survivor representative group – but required the input of, and contributions by, the TCC, the Coalition, and Pfau/Zalkin to obtain Survivor approval of the Plan.

G.    **The TCC's Primary Restructuring Objectives Were Met and are Reflected in the Confirmed Plan**

32.     As detailed herein, the TCC had three primary restructuring goals from the outset its formation: (a) the creation of a settlement trust with assets sufficient to provide meaningful and proportional distributions to Survivors; (b) administration of the settlement by an independent non-partisan trustee with the highest level of integrity; and (c) youth protection programs that serve to prevent the future occurrence of childhood sexual abuse.

33.     Each of the above restructuring goals were achieved through the TCC's participation and contribution – both through its individual efforts and in conjunction with the efforts of the other survivor representative groups – which collective efforts resulted in increasingly favorable recoveries and protections for all Survivors.

34.     *First*, on the effective date of the Plan, the Settlement Trust will be funded with approximately $2.5 billion in cash and other assets. In addition, the Settlement Trust will also

have the right to enforce (or settle) the Debtors' insurance rights to further supplement the value in the Settlement Trust for the purpose of making meaningful distributions to Survivors. The TCC was integral to the settlements reached with the Debtors and the Local Councils to provide $800 million in plan funding, did not object to the settlements reached with the Settling Insurance Companies as part of the global plan resolution, and was directly involved in ensuring the preservation of the Settlement Trust's access to the additional/excess insurance, which could provide up to an additional $4 billion for the benefit of Survivors. Notably following the settlement with the Methodists (which was entered into without the TCC's input or support and was, in the TCC's view, insufficient), the TCC made it clear that there would be no consensual plan resolution if additional settlements were reached without the consent of the TCC, the FCR and the Coalition. The TCC also obtained the commitment that, following the effective date of the Plan, any settlements would require the consent of the settlement trustee.

35. *Second*, the TCC required the appointment of a truly independent and experienced settlement trustee under the Plan, and made it clear that it would not support a trustee with connections to certain parties, notwithstanding its prior agreement reached by the Coalition and the Debtors. The TCC located, recommended and implemented the appointment of recently retired Hon. Barbara Houser as the Settlement Trustee to administer the Settlement Trust. Judge Houser served for over 20 years on the bankruptcy bench in the Northern District of Texas and, for the 20 years prior to her taking the bench, was a highly regarded bankruptcy attorney. As a recently retired bankruptcy judge, Judge Houser is of the highest integrity and independence, and does not have ties to any parties or professionals in the Debtors' cases, nor do the two claims administrators who will also evaluate the Abuse Claims in accordance with the Plan. The Settlement Trust Advisory Committee is composed of representatives from each of the three survivor representative

groups: three designated by the TCC, three designated by the Coalition, and one designated by Pfau/Zalkin. The provision for the fair, impartial, and efficient administration of the Settlement Trust, with Judge Houser as the independent Settlement Trustee, was negotiated by the TCC and the TCC led the formulation of this process that will be implemented under the Plan.

36. *Third*, youth protection protocols were a necessary condition to any plan that would have the support of the TCC. As discussed above, the TCC's substantial participation, formulation, and contributions regarding youth protection – in particular during the mediation process following the failure of the Coalition-only supported plan that failed to obtain sufficient Survivor support – were essential elements to a settlement and the ultimate confirmation of the Plan supported by all survivor representative groups.

37. Notwithstanding the downplaying of the TCC's role in the Motions, the TCC's path to achieving its restructuring goals was hard fought, and the TCC was directly involved in ensuring that the TCC's restructuring objectives were reflected in the Plan. These objectives could not have been achieved absent negotiations with, and participation and contributions by, each of the TCC, the Coalition and Pfau/Zalkin.

## CONCLUSION

38. The TCC, as it agreed in connection with the TCC Term Sheet, has no objection to the requested payment of the expenses of Coalition and Pfau/Zalkin based on their substantial contributions to this chapter 11 case. This response was necessitated to address any mischaracterization in the Motions as to the nature and scope of the TCC's role and its representation of the interests of Survivors. The TCC's role in this chapter 11 case was not limited or inconsequential, and any intimation or statement to the contrary is without basis. The TCC played a critical and important role in this case as did the Coalition and Pfau/Zalkin. Based on the

efforts of the survivor representative groups – both individually and jointly – the Plan confirmed by this Court embodies the restructuring objectives sought by Survivors. Such efforts are deserving of compensation, and subject to the clarifications as to the TCC's role set forth herein, and reserving its rights in connection with the final fee application process, the TCC does not object to the granting of the relief sought in the Motions.

Dated: January 12, 2023  PACHULSKI STANG ZIEHL & JONES LLP
Wilmington, Delaware

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073) (admitted pro hac vice)
Alan J. Kornfeld (CA Bar No. 130063) (admitted pro hac vice)
Debra I. Grassgreen (CA Bar No. 169978) (admitted pro hac vice)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: rpachulski@pszjlaw.com
         akornfeld@pszjlaw.com
         dgrassgreen@pszjlaw.com
         joneill@pszjlaw.com

*Counsel for the Official Tort Claimants' Committee*