## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

BOY SCOUTS OF AMERICA
AND DELAWARE BSA, LLC,[1]

Debtors.

Chapter 11

Case No. 20-10343 (LSS)

Re: D.I. 10808, 10809, & 10815

## UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR MOVANTS FILED DECEMBER 29, 2022

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), through his undersigned attorneys, hereby files his *Omnibus Objection to Payment of Compensation and Reimbursement of Expenses for Movants Filed December 29, 2022* (referred to collectively as the "Substantial Contribution Motions") (D.I. 10808, 10809, & 10815).[2] The U.S. Trustee is filing this omnibus objection because there are issues of fact and law common to the Substantial Contribution Motions. Additionally, the U.S. Trustee provides motion-specific discussion herein where appropriate.

## PRELIMINARY STATEMENT

Section 503 of the Bankruptcy Code ("Section 503") governs a non-debtor party's request for compensation for a substantial contribution to a bankruptcy case. The Substantial

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] *Motion of the Coalition of Abused Scouts for Justice for Entry of an Order Approving the Debtors' Proposed Payment of the Coalition Restructuring Expenses* (D.I. 10808); *Motion of Pfau Cochran Vertetis Amala PLLC and the Zalkin Law Firm, P.C. for an Order Pursuant to Bankruptcy Code Section 363(b), 1129(a)(4), and 503(b) Allowing Payment or Reimbursement of the Pfau/Zalkin Restructuring Expenses by the Settlement Trust* (D.I. 10809); and *Motion to Allow Substantial Contribution Claim of the Roman Catholic Ad Hoc Committee* (D.I. 10815). The moving parties are referred to in this Objection as: the Coalition of Abused Scouts for Justice (the "Coalition"); Pfau Cochran Vertetis Amala PLLC and the Zalkin Law Firm, P.C. ("Pfau/Zalkin"); and The Roman Catholic Ad Hoc Committee (the "RCAHC").

Contribution Motions filed by non-debtors Pfau/Zalkin, the Roman Catholic Ad Hoc Committee, and the Coalition for Abused Scouts for Justice (collectively, the "Movants") fail to satisfy the Section 503 requirements for approval for three reasons. First, the benefit, if any, to the debtors' estates from the Movants' services was incidental to the Movants' desires to protect their clients' own interests, either by increasing the potential for recoveries or securing other benefits under the Plan. Second, the work performed by Movants' professionals was duplicative of other parties' efforts in the cases. Finally, the Movants have failed to provide sufficient evidentiary support for the substantial contribution claims. [3]

Movants attempt to compensate for this inadequacy by arguing that their requests should be governed by the business judgment standard because the court in *Mallinckrodt* approved ad hoc group fees on that basis.[4] In *Mallinckrodt*, the debtors had pre-petition fee reimbursement agreements with the ad hoc groups, the reimbursement requests were prospective, and the *Mallinckrodt* debtors—not the ad hoc groups—moved early in their cases to assume the agreements. Here, none of those factors exist: there were no pre-petition reimbursement agreements because both ad hoc groups formed post-petition; the groups' work is concluded (absent a reversal of the confirmation order on appeal); and the request (embodied in the RSA) for reimbursement came more than a year into these cases and did not come from the debtors.

---

[3] The Coalition attached nine declarations in support of its Motion, with three coming from individuals affiliated with the Future Claims Representative ("FCR")—Mr. Patton, and two of the FCR's attorneys.  The Coalition is the only Movant that has proffered evidence from a third party also involved in the case in support of its Motion.

Pfau/Zalkin attaches a single declaration from Jason P. Amala, an attorney at Pfau, one of the firms making the request, and no additional evidence in support.

The RCAHC does not support its Motion with any Declaration in support or other information from sources beyond its factual recitation in its Motion for Substantial Contribution.

[4] *In re Mallinckrodt PLC*, Civ. No. 21-167-LPS, 2022 WL 906458 (D. Del. Mar. 28, 2022).

Therefore, Section 503 governs the Substantial Contribution Motions, and they should not be granted.[5]

## JURISDICTION

1.      The U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District under 28 U.S.C. § 586(a)(3). Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

2.      In every bankruptcy case, The United States Trustee is authorized by 28 U.S.C. § 586(a)(3)(A) to "revie[w] . . . applications for compensation and reimbursement filed under section 330 of title 11," and to "fil[e] with the court comments to such application, and, if the United States Trustee considers it to be appropriate, objections to such application." 11 U.S.C. § 586(a)(3)(A)(i),(ii). The United States Trustee performs this statutory duty in all cases, even when a fee examiner or other fee review entity has been appointed.

3.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised in this pleading.

---

[5] Further, to the extent the Movants seek approval of the reasonableness of any fees or expenses identified in the Substantial Contribution Motions now, the U.S. Trustee objects, as parties in interest, including the Fee Examiner, should have sufficient time to evaluate the fees and expenses submitted for approval.

## STATEMENT OF FACTS

4.      On February 18, 2020, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Bankruptcy Court entered an order jointly administering the cases for administrative purposes. On March 5, 2020, the U.S. Trustee appointed an Official Committee of Unsecured Creditors ("UCC") and a Committee of Tort Claimants ("TCC").

5.      With their petitions, the Debtors filed a plan and disclosure statement (D.I. 20 and 21) which provided that the Debtors, Chartered Organizations, Insurers, and Local Councils would fund a trust for the payment of holders of "Abuse Claims"—a class of unsecured creditors with claims related to sexual abuse against not only the Debtors, but also against various non-debtor third parties. The Debtors proposed that, in exchange for their contributions to the trust, the contributing parties would receive releases and be protected by a channeling injunction.

6.      On the Debtors' motion, the Court entered an order on April 24, 2020 appointing James L. Patton, Jr., ("Mr. Patton" or the "FCR") as the legal representative for Future Claimants (D.I. 486).

7.      On July 29, 2020, the Coalition filed an initial Rule 2019 statement, which stated that it was formed around July 18, 2020 (D.I. 1040). The Coalition retained Brown Rudnick and Monzack Mersky Browder and Hochman, P.A. as counsel. (D.I. 1253 *Notice of Substitution of Counsel for the Coalition of Abused Scouts for Justice* )(indicating Monzack Mersky Browder and Hochman, P.A. was replacing Blank Rome LLP as Delaware Counsel for the Coalition). Many parties, including the U.S. Trustee, objected to the Coalition's initial Rule 2019 statement on grounds that it contained insufficient disclosures (*e.g.,* D.I. 1219, 1223, 1224 and 1228). After discovery and motion practice, the Court entered an order on October 23, 2020, approving the *Second Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to*

*Bankruptcy Rule 2019* (D.I. 1429) (the "Amended 2019 Statement"), as supplemented by the

*Supplement to Amended Verified Statement of the Coalition of Abused Scouts for Justice*

*Pursuant to Bankruptcy Rule 2019* (the "Supplement") (D.I. 1510). (D.I. 1572 at ¶ 2). The

Supplement contained an acknowledgment that neither the Coalition nor State Court Counsel

would "charge back the fees of any of the Coalition's professionals to individual survivors in any

way, . . ." but will reserve the right to seek a "substantial contribution" claim or reimbursement

of fees or expenses under a Chapter 11 Plan. (D.I. 1510 at ¶ 2).

8.      Between March 2021 and May 2021, the Debtors filed three amended plans. Each

contained additional information and disclosures, such as the proposed settlement trust

agreement and trust distribution procedures, and memorialized settlements. In March 2021, the

Debtors settled with JPMorgan Chase and the Unsecured Creditors Committee. In April 2021,

the Debtors proposed a $1,500 "expedited distribution" option that allowed claimants to receive

a quick distribution in exchange for a full release of the Debtors and all protected parties, and the

Debtors also settled with Hartford Insurance Company for a payment of $650 million.

9.      By May 2021, more than 150 parties, including the TCC, had filed objections to

the Debtors' various amended plans.

10.     On June 18, 2021, the Debtors filed the *Third Amended Chapter 11 Plan of*

*Reorganization* ("Third Amended Plan") (D.I. 5368) and accompanying Disclosure Statement

(D.I. 5369). In the Third Amended Plan, the Debtors (i) increased the contribution from the

Local Councils, (ii) materially revised the TDPs, (iii) added "Coalition Restructuring Expenses"

as a new defined term, and (iv) stated (in a footnote) that the Court may conclude that the

Debtors are not obligated to pursue approval of their settlement with Hartford.

11.    On July 1, 2021, the Debtors filed their *Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform under the Restructuring Support Agreement, and (II) Granting Related Relief* ("RSA Motion") (D.I. 5466), along with an accompanying Motion to Shorten (D.I. 5468) requesting that the matter be heard on July 20, 2021. In the RSA Motion, the Debtors (i) asked for authority to enter into a restructuring support agreement with the TCC, the Coalition, and the FCR and (ii) sought a ruling that the Debtors were not obligated to seek approval of their settlement with Hartford. RSA Mot. ¶¶ 13 & 15.

12.    A day later, the Debtors filed a *Fourth Amended Chapter 11 Plan of Reorganization* (D.I. 5485) and accompanying disclosure statement (D.I. 5485), which proposed to (i) replace the Hartford settlement with the terms of the RSA, (ii) increase the expedited distribution to $3,500 per claimant, and (ii) pay the fees and expenses of the Coalition. (D.I. 5484).[6]

13.    In its substantial contribution motion, the RCAHC states that its activities in these cases began in earnest after July 2, 2021, and that over the course of the next eight plus months, it acted with "near continuous engagement . . . to gain and protect a fair and equitable treatment of Chartered Organizations, a treatment not just for the RCAHC's constituents, but a treatment available to all Chartered Organizations." (D.I. 10815 at ¶ 5).

---

[6] "Payment of Coalition Restructuring Expenses. On the Effective Date, Reorganized BSA shall reimburse State Court Counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by State Court Counsel but not yet paid to Coalition Professionals for, reasonable, documented and contractual professional and advisory fees and expenses incurred by the Coalition Professionals from July 24, 2020 to and including the Effective Date up to the aggregate amount of $10,500,000 (the "Coalition Effective Date Fee Cap"), and amounts otherwise payable in excess thereof shall be payable, if at all, by the Settlement Trust after the Effective Date. For the avoidance of doubt, fees and expenses of the Coalition Professionals paid by the Debtors on monthly basis following the effective date of the Restructuring Support Agreement pursuant to the RSA Approval Order shall not count against or reduce the Coalition Effective Date Fee Cap. Notwithstanding anything to the contrary in the Plan, the Coalition Restructuring Expenses shall not be subject to the terms of Article II.A.2."

14.     After holding a status conference on the RSA Motion on July 7, 2021, the Court

held another one on July 27, 2021, to discuss the timing of arguments on the RSA Motion, as the

parties agreed that the RSA Motion's treatment of the Hartford settlement was a gating issue.

Initially, the Court told the parties that the hearings on July 29 and 30 would go forward, even

though the Debtors had additional discovery to produce.[7] Debtors' counsel then advised the

Court that the RSA would expire the next day—July 28—and the parties had not agreed on an

extension. Upon hearing that, the Court said, "Okay. I changed my mind. We're not going

forward with the RSA hearing on Thursday. If the parties – the parties haven't agreed to extend

the deadline. I am not having people prepare. I am not having people take depositions. I am not

having people continue to discuss. So that hearing is canceled and if the debtors want to re-notice

that hearing they can ask for permission to do so. I am not going to make parties who are not

party to the RSA to continue to prepare for a hearing that may be meaningless." Tr. 7/27/21

26:25-27:8. (D.I. 5803).

15.     On July 29, 2021, the Debtors announced that the RSA parties had agreed to an

extension of the RSA termination date. The Court then set the RSA Motion for hearing on

August 12, and 13, 2021, with the Disclosure Statement hearing to follow on August 24, 2021.

16.     Although Pfau/Zalkin disclosed in its substantial contribution motion that it

engaged counsel in August 2021, it did not file that 2019 statement until November 12, 2021

(D.I. 7180). On August 9, 2021, Pfau/Zalkin, along with other plaintiff's firms representing

similarly-situated abuse claims, filed a supplemental objection to the RSA. (D.I. 5916).

---

[7] The Court indicated at the July 27 status conference that, "if I determine that the witnesses are now testifying about topics from which they were precluded from testifying at deposition I am unlikely to hear that testimony." (Tr. 7/27/21 25:13-15) (D.I. 5803).

17.    On August 12, 13, and 16, 2021, the Court heard argument on the RSA Motion, and on August 19, 2021, the Court—with two important exceptions—granted the RSA Motion in an oral ruling. The Court concluded that it would approve the RSA but would not make findings with respect to the Hartford settlement and would not approve payment of the fees and expenses of the Coalition's professionals. With respect to Coalition fees, the Court stated:

> I agree with Judge Dorsey's recent analysis of the 363/503 issue in Mallinckrodt. Debtors can use Section 363 as a vehicle to bring a request to pay fees of a creditor while a creditor's request is properly brought under Section 503(b). But in either event, the standard to apply is a 503 standard, the requirement to find a substantial contribution.

> Here, I have several concerns that cause me to deny the request at this point in time. First, the Coalition's members are abuse victims, the very same constituency that the Official Committee of Tort Claimants represents. The logical question is whether services are being duplicated.

> While Coalition counsel argues that there is now consideration between the Coalition, the Official Committee, and the FCR, something that I can see in the filings before me, that does not ensure lack of duplication.

> Second, in connection with the Rule 2019 motion directed at the Coalition and its request to become a mediation party, there was much discussion regarding how the Coalition would work and who would pay for it. I have reviewed the Coalition's filing, Docket Item 1429, and it states in bold print, "Coalition counsel are being paid by State Court counsel. Coalition members will not in any way be responsible for the fees of Coalition counsel."

> The cost of the Coalition's professionals was to be borne by the State Court counsel who formed the Coalition, not their clients. Payment by Boy Scouts and certainly any payment by the investor trust comes directly or indirectly out of their clients' pockets and, indeed, the pockets of all abuse victims. While one can argue that on a relative scale that's not that great, any funds diverted from abuse victims, especially to pay an obligation of their lawyers, needs to be closely examined.

> Third, it needs to be clear that the Coalition is making a substantial contribution.

> . . .

> In the circumstances of this case, I think it is necessary to see the outcome of the Coalition's efforts. I also note that because of invocation of mediation

privilege, there was no evidence on the role of the Coalition played in the mediation and in the RSA.

Tr. 8/19/21 19:21-25 to 21:1-22. (D.I. 6098).

18.     Neither the Debtors nor any other party ever submitted an order approving the RSA.

19.     On September 15, 2021, the Debtors filed their *Fifth Amended Chapter 11 Plan of Reorganization* ("Fifth Amended Plan") (D.I. 6212) and accompanying Disclosure Statement (D.I. 6213). The Fifth Amended Plan: (i) contained a revised Hartford Settlement; (ii) retained the material terms of the RSA, including the requirement to pay the fees and expenses of the Coalition's professionals; (iii) added a settlement with The Church of Jesus Christ of Latter Day Saints ("TCJC") in the amount of $250 million; and (iv) included new provisions affecting Chartered Organizations, including the scope and extent of releases applicable to them.

20.     On September 29, 2021, after five days of hearing beginning on September 21, 2021, the Court approved the *Modified Fifth Amended Chapter Plan of Reorganization* (D.I. 6443) for solicitation.[8] The Court set the confirmation hearing for January 24, 2022, with a December 14, 2021, voting deadline.

21.     The Court held a number of status conferences between September 30, 2021, and the December 14, 2021, voting deadline to resolve numerous motions to compel discovery or motions for protective orders.  There was also motion practice among the parties relating to the need to address confusion among survivors as part of the voting process. The Debtors extended the voting deadline to December 28, 2021, (D.I. 7608) and, on December 18, 2021, filed another amended plan containing another $940 million in guaranteed trust funding from settlements,

---

[8] The modifications accounted for changes agreed to by parties in interest or directed to be made by the Court during the five-day disclosure statement hearing.

along with the potential for an additional $100 million in funding and material revisions to the treatment of Chartered Organizations. (D.I. 7832).

22.      At a hearing on December 21, 2021, the Court heard the request of certain insurers to modify the confirmation schedule as result of the multiple amended plans with significant amendments, resulting unanticipated and unbriefed legal issues, and the large amount of still-uncompleted discovery. The Debtors also announced an additional $99 million in additional settlements that would have to be documented. The Court agreed and adjourned confirmation from January 24, 2022, to February 22, 2022, but did not extend the December 28, 2021, voting deadline. (D.I. 7910).

23.      The Debtors submitted two voting declarations, one on January 4, 2022, and one on January 17, 2022.[9] On February 10, 2022, three days after the February 7, 2022, plan objection deadline, the Debtors filed the Eleventh Mediator's Report (D.I. 8772), which disclosed settlements with the TCC and the Pfau/Zalkin claimants.

24.      At a hearing on February 11, 2021, the Debtors also disclosed that, in addition to documenting the new settlements and incorporating them into the plan, they also had further material plan revisions, including: (i) significant modification to the treatment of Chartered Organizations; (ii) the addition of a "Independent Review Option" to the TDPs; (iii) revisions to the definition of Abuse Claim; (iv) overhaul of the BSA Youth Protection Program;  and (v) agreement by the Debtors and TCC to not object to up to $3.5 million in substantial contribution

---

[9] *Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Preliminary Voting Report") (D.I. 8141) with respect to the solicitation of votes and the preliminary tabulation of Ballots cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 7832) (as subsequently amended on February 15, 2022, D.I. 8813) and *Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (D.I. 8345) (the "Original Final Voting Report").

fees to the Pfau/Zalkin claimants. The Debtors proposed adjourning the Confirmation Hearing to March 1, 2022, to give creditors an opportunity to change their vote.

25.     On February 15, 2022, the Court adjourned the Confirmation Hearing to March 9, 2022 and set February 25, 2022, as the deadline for filing supplemental confirmation objections.

26.     The Debtors then filed their *Third Modified Fifth Amended Chapter 11 Plan of Reorganization* (the "Third Modified Fifth Amended Plan"), on February 15, 2022 (D.I. 8813). Article V.T. of the Third Modified Fifth Amended Plan contained language that memorialized the Payment of Coalition and Pfau/Zalkin Restructuring Expenses and was ultimately included in the confirmed version of the Plan. *Id.* at p. 87-89. The provision provided in full:

T. Payment of Coalition and Pfau/Zalkin Restructuring Expenses.

1. On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse state court counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by state court counsel but not yet paid to Coalition Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Coalition Professionals (the "Coalition Restructuring Expenses") from the Coalition's inception up to and including the Effective Date, up to a maximum amount equal to the lesser of (x) (a) $950,000 per month for the period from August 16, 2021 up to and including the Effective Date (pro-rated for any partial month), plus (b) $10,500,000 and (y) $21,000,000; provided, however, that, without limiting the foregoing, under no circumstance shall the Debtors or Reorganized BSA have any obligation to (i) pay or reimburse the Coalition, any of its members, or any Persons affiliated with the Coalition for any costs, fees or expenses other than the Coalition Restructuring Expenses or (ii) pay or reimburse any Coalition Restructuring Expenses that constitute transaction, success or similar contingent fees. The Coalition shall provide the Debtors a reasonable estimate of the total Coalition Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date. Notwithstanding anything to the contrary in the Plan, the Coalition Restructuring Expenses shall be subject to the terms of Article II.A.2, with the following modifications: (x) Coalition Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are Coalition Professionals, shall include time entry detail, which may be

redacted for privilege; and (y) payment or reimbursement of Coalition Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner. For the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law.

2. On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, the Settlement Trust shall reimburse state court counsel for amounts they have paid to KTBS Law and Michel Horton (the "Pfau/Zalkin Professionals") for, and/or pay the Pfau/Zalkin Professionals for amounts payable by state court counsel but not yet paid to Pfau/Zalkin Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Pfau/Zalkin Professionals (the "Pfau/Zalkin Restructuring Expenses"); provided, however, that, without limiting the foregoing, (i) the the Pfau/Zalkin Restructuring Expenses shall be paid from the Settlement Trust Assets and (ii) the Pfau/Zalkin Restructuring Expenses shall be in an aggregate amount not to exceed $3,500,000. Under no circumstance shall the Debtors or Reorganized BSA have any obligation to pay or reimburse, from the Settlement Trust Assets, the Pfau/Zalkin Professionals, any of its members, or any Persons affiliated with the Pfau/Zalkin Professionals or any Pfau/Zalkin Restructuring Expenses that constitute transaction, success or similar contingent fees. The Pfau/Zalkin Professionals shall provide the Settlement Trust a reasonable estimate of the total Pfau/Zalkin Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date. Notwithstanding anything to the contrary in the Plan, the Pfau/Zalkin Restructuring Expenses shall be subject to the terms of Article II.A.2, with the following modifications: (x) Pfau/Zalkin Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are Pfau/Zalkin Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Pfau/Zalkin Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner. For the avoidance of doubt, the Pfau/Zalkin Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, the Coalition, or the Future Claimants' Representative, and the retention of the Pfau/Zalkin Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in

any way prejudice or limit the payment of the Pfau/Zalkin Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law.

27.     At a hearing held at the Debtors' request on February 18, 2022, the Court

adjourned the Confirmation Hearing from March 9, 2022, to March 14, 2022, due to the Debtors'

having delayed service of the plan revisions announced on February 11, 2022.[10] On March 10,

2022, the Debtors filed a supplemental voting declaration reflecting the final status of votes in

Classes 8 and 9.[11]

28.     The confirmation trial began on March 14, 2022, and continued through April 18,

2022, for a total of 22 days of trial.

29.     On March 17, 2022, midway through the confirmation trial, the Debtors filed a

Twelfth Mediator's Report, which contained a settlement with the RCHAC. (D.I. 9387). Section

13 of the RCAHC Settlement provided that the Debtors were obligated to pay $1.5 million of the

RCHAC's restructuring expenses if the plan went effective:

> On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse the RCAHC amounts they have paid to its counsel, ArentFox Schiff LLP and Potter Anderson & Corroon LLP (the "RCAHC Professionals") for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the RCAHC Professionals (the "RCAHC Restructuring Expenses"); provided, however, that, without limiting the foregoing, the RCAHC Restructuring Expenses shall be in an aggregate amount not to exceed $1,500,000, any award of such fees shall be payable by Reorganized BSA over the course of the twenty four (24) month

---

[10] The Court stated: "And we really are at a week after when I thought notice would get to parties, because we didn't anticipate this hearing today.  So, we're going to start the hearing, the confirmation hearing now on the 14th; a few days later to give parties a few more days to take a look at the newest changes, which I think are warranted in this complex case."

[11] *Supplemental Declaration of Catherine Nownes-Whitaker Of Omni Agent Solutions Regarding the Submission of Votes and Final Tabulation of Ballots Cast In Connection With the Limited Extended Voting Deadline for Holders of Claims In Class 8 and Class 9 On the Third Modified Fifth Amended Chapter 11 Plan Of Reorganization For Boy Scouts Of America And Delaware BSA, LLC* (D.I. 9275)

period following the Effective Date of the Plan in four equal installments with the first installment due six (6) months following the Effective Date of the Plan. Notwithstanding anything to the contrary in the Plan, the RCAHC Restructuring Expenses shall be subject to the terms of Article II.A.2 of the Plan, with the following modifications: (x) RCAHC Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are RCAHC Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of RCAHC Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner.

This provision is incorporated into the plan as section I.259.

30.     At the conclusion of the confirmation trial, the Court took confirmation of the Plan under advisement and issued an extensive opinion on July 29, 2022. (D.I. 10136). The opinion is reported as *In re BSA*, 642 B.R. 504 (Bankr. D. Del. 2022). The opinion at footnote 763 notes that "Debtors' agreement with respect to the Coalition's fees will be brought separately." 642 B.R. at 678. On September 8, 2022, the Court entered its *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*. (D.I. 10316).

31.     Given the myriad issues still in dispute between plan proponents and plan opponents, numerous notices of appeal were filed by the September 22, 2022, deadline, and those appellate matters are currently consolidated under *National Union Fire Insurance Co. of Pittsburgh PA v. Boy Scouts of America*, Case No. 22-cv-1237 (D. Del. 2022). On December 23, 2022, the appellate parties submitted a letter proposing issues for oral argument. Oral argument on the consolidated appeals is now set for February 9-10, 2023.

## ARGUMENT

**A.     The Substantial Contribution Motions are Premature**

32.     Before addressing the merits of the Substantial Contribution Motions, the Court must address a gating issue: whether these motions can be considered now, when the Plan has not yet gone effective because of the ongoing appeals and other unsatisfied conditions precedent. Regardless of the Coalition and Pfau/Zalkin's legal theories, Article V.T.1. & 2. of the Plan both provide that fees and expenses sought under the Motions are not payable until the Effective Date.[12] Section 13 of the RCHAC settlement contains similar language and presents the same issue.

33.     While one interpretation of this language is that the Movants may, at any time, file a substantial contribution motion, an-equally plausible interpretation is that such relief is not appropriate until the effective date has occurred. From the standpoint of judicial economy, given the retrospective posture of the Substantial Contribution Motions, it may be prudent for the Court to defer consideration of allowance of the requested fees and expenses until after appeals have been exhausted. How can any of the Movants be judged to have substantially contributed to the estates before the Plan, which they all point to as the measure of their achievements in the case, is consummated? The Substantial Contribution Motions are, at best, premature, and if the Movants satisfy their burden and obtain approval of their requests for payment of fees, that approval should be contingent on the occurrence of the Plan's effective date.

**B.      The "Substantial Contribution" Standard Governs the Substantial Contribution Motions**

34.     Section 503(b)(3)(D) of the Bankruptcy Code provides for administrative expenses of the estate for the "actual, necessary expenses" incurred by a "creditor" or an "equity security holder. . . in making a substantial contribution in a case." Section 503(b)(4) provides for

---

[12] "On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law." Plan Art. V.T.1. & 2.

the allowance for the "reasonable compensation for professional services rendered by an attorney

or an accountant if an entity who expense is allowable under" section 503(b)(3). The Third

Circuit interpreted the "substantial contribution" standard in *Lebron v. Mechem Financial, Inc.*,

27 F.3d 937 (3d Cir. 1994); *Lebron* is binding precedent in this District.

   **i.**   ***The Business Judgment Standard Does Not Apply to the Substantial Contribution Motions***

  35.  In its Substantial Contribution Motion, the Coalition argues that the correct

standard by which to evaluate its request for fees is the business judgment standard, derived from

sections 363 and 365 of the Bankruptcy Code and discussed in *In re Mallinckrodt PLC*, Civ. No.

21-167-LPS, 2022 WL 906458 (D. Del. Mar. 28, 2022). Coalition Mot. ¶¶ 97-98. Pfau/Zalkin

does the same. Pfau/Zalkin Mot. ¶¶ 43-44. RCAHC posits relief under that theory as a secondary

alternative to analysis under 503(b). RCAHC Mot. ¶ 70 n. 9. All of the Movants are attempting

to proceed under the wrong standard.

  36.  First, as part of the August 19, 2021, oral ruling on the RSA, the Court stated that

the correct standard for evaluating the Coalition's request for allowance of fees and expenses

was the "substantial contribution" standard of 503: "Debtors can use Section 363 as a vehicle to

bring a request to pay fees of a creditor while a creditor's request is properly brought under

Section 503(b). But in either event, the standard to apply is a 503 standard, the requirement to

find a substantial contribution" (Tr. 8/19/21 19:21-25) (D.I. 6098). The Movants should not be

attempting to evade the Court's prior ruling on this point.[13]  *See In re AMC Investors, LLC*, 637

B.R. 43, 66-67 (Bankr. D. Del. 2022) ("law of the case" doctrine requires that, once an issue has

---

[13] The RCAHC proceeds first on a substantial contribution theory, but posits the Court could alternatively approve the request under the Debtors' business judgment as well, "Accordingly, while this Motion is being brought by the RCAHC, it is done so with the support and agreement of the Reorganized Debtors. Accordingly, in the event that the Court is not inclined to grant the Motion under 503(b), the RCAHC respectfully requests that it be granted under the Debtors' business judgment." RCAHC Mot. ¶ 70 n. 9

been decided, parties may not relitigate that issue in the same case; the decision should continue to govern the same issues in subsequent stages of the same case) (internal citations omitted).

37.    Second, the Movants' reliance on *Mallinckrodt* is misplaced due to the vastly different factual postures of the two cases. The facts of these cases are not analogous to the situation in *Mallinckrodt*. There, the debtors requested authority to ***prospectively*** compensate professionals of other parties in interest—two groups of governmental entities not eligible to serve on an official committee under Section 1102, and a third group of unsecured noteholders representing about 84 percent of an issuance of notes that would likely bear the post-confirmation operational impacts of decisions made in connection with the Plan. Here, assuming a favorable outcome to the Movants on appeal, their activities in these cases are at an end. The *Mallinckrodt* debtors sought to pay the ad hoc groups' fees with an eye toward fostering a collaborative mediation process involving the ad hoc groups and other stakeholders going forward. 2022 WL 906458 at *13 ("In approving the Second Fee Motion, the Bankruptcy Court imposed two additional requirements to further ensure that any reimbursements benefit the estate as a whole. 'First, if the mediator informs the Court that the mediation has failed and there are no further prospects for proceeding with mediation, reimbursement of all fees and costs will cease, pending further order of the Court;' and '[s]econd, if the mediator advises the Court that one or more of the ad hoc groups being reimbursed under this order are not acting in good faith in connection with the negotiations, then all reimbursements to those identified parties will cease immediately pending further order of the Court, and any fees and expenses already paid will be subject to disgorgement following a hearing and an opportunity to be heard.'"). Here, absent a reversal on appeal, the Movants' work has concluded, and therefore none of the analysis under Sections 363 and 365 applied in *Mallinckrodt* is germane to the Movants' requests.

38.    Second, *Mallinckrodt* is distinguishable based on the nature of the ad hoc groups seeking payment of fees in the two cases. *Mallinckrodt* involved two ad hoc groups representing governmental entities: "the Governmental Plaintiff Ad Hoc Committee, representing states and U.S. territories holding opioid claims;" and "the Multi-State Governmental Entities Group ('MSGE Group'), consisting of local governmental entities with opioid-related claims" and a third ad hoc group, "the Unsecured Notes Ad Hoc Group, consisting of holders of Mallinckrodt's guaranteed unsecured notes." 2022 WL 906458 at *2. Under section 1102 of the Bankruptcy Code, governmental entities are not eligible to serve on official committees. *See* 11 U.S.C. § 1102(b) (using "persons" to describe the ordinary members of an official committee); 11 U.S.C. § 101(41) ("'[P]erson' includes individual, partnership, and corporation, but does not include governmental unit …."). The *Mallinckrodt* "Unsecured Notes Ad Hoc Group" was identified as the equity holder of the reorganized *Mallinckrodt* under the terms of the plan at the center of the negotiations, and therefore was not a party whose interests could have been adequately represented by an estate representative or another party already participating in the cases.

39.    Here, in contrast, there was no risk of a key constituency in these cases abandoning negotiations, given that one of the negotiating parties was the TCC, formed under a statutory mandate and with fiduciary duties to the abuse survivors. The Coalition, on the other hand, formed to represent a specific sub-set of the abuse survivors. Both the Coalition and Pfau/Zalkin are duplicative of the TCC and the FCR in terms of their ultimate goals and responsibility to advocate for survivors of abuse. As for the RCAHC, it was not the only Chartered Organization to appear in these cases, and many issues relevant to the RCAHC and Chartered Organizations in general were at stake as the parties negotiated the treatment of the TCJC and other Chartered Organizations under the Plan.

40.    Third, notwithstanding the Movants' attempt to posture their requests as being those of the Debtors, the Movants filed the Substantial Contribution Motions and are the ones seeking retroactive approval for their fees. The Debtors are not the moving parties and have not joined in any of the Substantial Contribution Motions. In contrast, in *Mallinckrodt*, the debtors had pre-petition agreements with the three ad hoc groups whose fees they sought to pay. Early in the *Mallinckrodt* cases, the debtors in possession requested court authority (i) to assume those pre-petition contracts under Code section 365 and (ii) to enter into post-petition agreements with RSA party professionals with whom they did not have executed reimbursement agreements under section 363. While the relief the *Mallinckrodt* debtors sought under Sections 363 and 365 was the payment of professional fees for ad hoc groups in the case, the debtors (1) brought the motion and (2) provided accompanying evidence in support of their request. Here, while the Debtors may be restrained from opposing the relief sought by the Movants pursuant to settlements and provisions of the Plan, these requests for payment come on motions filed by the Coalition, Pfau/Zalkin, and the RCAHC. None of the Movants have the ability to exercise the Debtors' powers under Section 363, and none of the fee agreements here existed prepetition, as neither the Coalition nor the RCAHC even existed prepetition. *See In re Embrace Sys. Corp.*, 178 B.R. 112, 122 (Bankr. W.D. Mich. 1995) ("By definition, an assumption means that a contract already exists. Section 365 does not govern the standards by which a debtor may enter into new contracts postpetition; rather, it sets forth requirements for a debtor to either assume or reject a contract that was already in existence prepetition and has not yet expired.")

ii.    ***The Substantial Contribution Motions Do Not Satisfy the Requirements of Section 503(b)***

41.    The Movants fail to demonstrate that they made a substantial contribution to these cases, and, as a result, the Substantial Contribution Motions should be denied. The Movants have

not overcome the presumption in the Third Circuit's *Lebron* decision that they acted only in the

clients' and classes' own self-interest. Likewise, the Movants are unable to show that their

actions were designed to benefit the estate as a whole; the Movants' actions were the incidental

result of protecting their own interests.

42.     Bankruptcy Code section 503(b) provides in pertinent part:

> After notice and a hearing, there shall be allowed administrative
> expenses, other than claims allowed under section 502(f) of this
> title, including—
>
> [ . . . ]
>
> (3) the actual, necessary expenses, other than compensation and
> reimbursement specified in paragraph (4) of this subsection,
> incurred by—
>
> [ . . . ]
>
> (D) a creditor, an indenture trustee, an equity security
> holder, or a committee representing creditors or equity security
> holders other than a committee appointed under section 1102 of
> this title, in making a substantial contribution in a case under
> chapter 9 or 11 of this title;
>
> [ . . . ]
>
> (4) reasonable compensation for professional services rendered by an
> attorney or an accountant of an entity whose expense is allowable under
> subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection,
> based on the time, the nature, the extent, and the value of such services, and
> the cost of comparable services other than in a case under this title, and
> reimbursement for actual, necessary expenses incurred by such attorney or
> accountant.

43.     Section 503(b)(3)(D) thus provides administrative expense status for the actual,

necessary expenses of a creditor that makes a substantial contribution in a chapter 9 or 11 case.

Section 503(b)(4) provides administrative expense status for the reasonable fees and actual,

necessary expenses of such entity's attorneys and accountants. Section 503(b)(3)(D) must be

narrowly construed so that administrative expenses will be held to a minimum. *See In re*

*Worldwide Direct, Inc.*, 334 B.R. 112, 122 (Bankr. D. Del. 2005) (quoting *In re Granite*

*Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997)).

44.    Section 503(b)(3)(D) has two purposes: (1) to encourage creditors to participate

meaningfully in the reorganization process; and (2) to minimize fees and administrative expenses

and thereby maximize creditor recoveries. *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944

(3d Cir. 1994). A creditor makes a substantial contribution if its efforts provide an "actual and

demonstrable benefit to the debtor's estate and the creditors." *Id.* at 943-44 (citation omitted)

(quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)); *see In re Worldwide Direct, Inc.*, 334

B.R. at 121.

45.    A benefit that the estate receives incident to a creditor's protection of its own

interests is not a substantial contribution. *See Lebron*, 27 F.3d at 944. The *Lebron* Court

concluded its analysis of §503(b)(3)(D) by stating that activities which primarily further the

interest of the applicant are not reimbursable:

> Most activities of an interested party that contribute to the estate will also, of
> course, benefit that party to some degree, and the existence of self-interest
> cannot in and of itself preclude reimbursement. Nevertheless, the purpose of
> Section 503(b)(3)(D) is **to encourage activities that will benefit the estate as a
> whole**, and in line with the twin objectives of § 503(b)(3)(D), "substantial
> contribution" should be applied in a manner that excludes reimbursement in
> connection with activities of creditors and other interested parties which were
> designed primarily to serve their own interests and which, accordingly, would
> have been undertaken absent an expectation of reimbursement from the estate.

*Id.* (emphasis added); *see In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del.

2004) ("Inherent in substantial contribution, however, is the requirement that the benefit received

by the estate be more than incidental to the applicant's self-interest.").

46.    Creditors are presumed to act in their own interest "until they satisfy the court that

their efforts have transcended self-protection." *Lebron*, 27 F.3d at 944 (citations omitted). The

activities that a Section 503(b)(3)(D) applicant has engaged in are "presumed to be incurred for

the benefit of the engaging party and are reimbursable if, but only if, the services 'directly and materially contributed' to the reorganization." *Id.* at 943-44 (citation omitted).

47.    When determining if a claimant has met its burden, courts consider whether the services provided (a) were only for the benefit of the claimant or were for the benefit of all parties in the case; (b) directly, significantly and demonstrably benefited the estate; and (c) were duplicative of the services provided by professionals for the creditors' committee, the committee itself, debtor and its attorneys, or other fiduciaries and their professionals. *See In re Worldwide Direct, Inc.*, 334 B.R. at 122 (citing *In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993)).

48.    The Movants must prove by a preponderance of the evidence that they made a substantial contribution to these cases. *See In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993). In attempting to meet its burden, the applicant must introduce more than self-serving statements about its involvement in the case. *In re Worldwide Direct, Inc.*, 334 B.R. at 123 (citing *In re Buckhead America Corp.*, 161 B.R. at 15). "'Corroborating testimony by a *disinterested* party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation for activities which otherwise might not constitute a substantial contribution.'" *In re Worldwide Direct, Inc.*, 334 B.R. at 123 (citing *In re Buckhead America Corp.*, 161 B.R. at 15) (emphasis in original). Extensive participation in a case is not enough to justify a substantial contribution award. *In re Worldwide Direct, Inc.*, 334 B.R. at 123 (citing *In re Granite Partners*, 213 B.R. at 445); *see In re Summit Metals, Inc.*, 379 B.R. 40, 53 (Bankr. D. Del. 2007).

49.    A substantial contribution applicant has the burden of establishing that a "causal connection" exists between services provided and contribution to the estate. *See In re Worldwide*

*Direct, Inc.*, 334 B.R. at 121-22. For an applicant's reasonable professional fees to be allowable under Section 503(b)(4), the court must find that the applicant has a claim under Section 503(b)(3). *See id.*, 334 B.R. at 120-21.

50.     The Movants have failed to overcome the presumption that they acted primarily in their own self-interest. As ad hoc groups, the analysis of this issue is slightly different than when evaluating a single creditor's contribution. Ad hoc groups pool resources of similarly-situated creditors and represent the members of the group in the proceedings. *See In re Premier Int'l Hldgs., Inc.*, 423 B.R. 58, 76 (Bankr. D. Del. 2010) ("Collective action of creditors through the use of an ad hoc committee or group is a form of leverage, wherein the parties utilize other group members' holdings to obtain a greater degree of influence on the case. This enables theoretically better returns than if creditors were to act individually in a case. This is especially true, for example, where a group or committee controls one-third of a class of claims, which might allow the group to block confirmation of a plan[;]" quoting *In re Washington Mut., Inc*., 419 B.R. 271, 279-80 (Bankr. D. Del. 2009)). Therefore, to make a substantial contribution to the debtors' estates, the Movants' activities must benefit parties beyond those in the ad hoc group's plan class to merit reimbursement of reasonable professional fees and expenses. Providing a benefit solely to the ad hoc group's plan class does not benefit the estate as a whole, but rather is the equivalent of an individual creditor seeking payment of its own claim or other favorable treatment as part of the plan.

51.     The Coalition sought to enhance the treatment of its survivor clients under the Plan. Pfau/Zalkin did the same for its clients, which it viewed as distinguishable from the broader class of survivors. Pfau/Zalkin Mot. ¶ 2. The RCAHC advocated to advance the interests

of Chartered Organizations and to secure protections for them – for example, the benefits of the

Channeling Injunction. RCAHC Mot. ¶ 31.

52.     The Movants' actions were self-motivated, with incidental—if any—benefit to the

estates. They do not rise to the level of a substantial contribution that would justify the award of

an administrative claim pursuant to 11 U.S.C. § 503(b). Many of the Movants' primary activities

in monitoring filings by other parties and hearings, engaging in discovery, performing research,

and submitting pleadings are routine activities typically undertaken by individual creditors even

in cases where an official committee of unsecured creditors has been appointed. *See In re*

*American Plumbing & Mech., Inc.*, 327 B.R. 273, 283 (Bankr. W.D. Tex. 2005) (stating that

"expected or routine activities in a Chapter 11 case do not constitute substantial contribution.").

Likewise, participation in mediation and settlement discussions is not an extraordinary activity,

and the premise of these chapter 11 cases from their inception was to seek a resolution that

would maximize payment to survivors and streamline litigation against entities like Chartered

Organizations, Local Councils, and Insurers. (D.I. 20) (initial plan at Art. I.A.107 & Art. IV.E).

Unlike the ad hoc group of mechanic's lienholders in *In re M&G USA Corp.*, 599 B.R. 256

(Bankr. D. Del. 2019), the Movants' actions here did not smooth the path to a consensual

confirmation by obviating further litigation, but instead set the stage for a pitched confirmation

fight. *See* 599 B.R. at 263-64.  The Movants' routine creditor activities (i.e., facilitating and

encouraging negotiations leading to settlements) do not constitute a substantial contribution to

these cases—they did not avoid an extensive confirmation trial, multiple amended plans and

related hearings, several extensions of the voting deadline, and months of contested,

acrimonious, and lengthy discovery and related disputes. Not only that, but the parties appealing

the confirmation order contend that the settlements touted by the Movants in their Substantial

Contribution Motions are not consistent with the Bankruptcy Code and applicable law. *See id.* at 263-64.

53.     Movants' participation in the Plan negotiations benefited the Movants' respective constituents, while providing only incidental benefits to those similarly situated who, with the exception of the RCAHC,[14] were already represented directly by the estate-compensated TCC and FCR. The Substantial Contribution Motions frequently focus on the "benefit" for Survivors in the case of the Coalition and Pfau/Zalkin, and for the RCAHC, with respect to Chartered Organizations as a group. Of the purported benefits the Coalition conferred during the cases, the Coalition can identify only one instance where that benefit flowed to the Debtors' estates as a whole—when discussing the Debtors and other parties' ability to speak with a single entity representing a large number of claimants—but otherwise concentrated exclusively on what benefit would flow to Survivors. Coalition Mot. ¶¶ 2, 10, 20, 31, 42, & 62. The Coalition's assertion that it provided a single voice for Survivors and the negotiating counterparty is reductive and simplistic. The approval of the Disclosure Statement and Solicitation procedures was only the beginning of tense exchanges among the Coalition, Pfau/Zalkin, the TCC, and other attorneys representing survivors. D.I. 7447, 7460, 7461, 7467, & 7690. Confusion regarding the varied recommendations made by subsets of the collective groups representing survivors resulted in supplemental solicitation of the survivor classes under the Plan and multiple voting reports— the opposite effects of having a beneficial, single, group. D.I. 8141, 8345, & 9275.

54.     While settlements which increased the funds available to survivors were a positive development for one of the key constituencies in these cases, those settlements primarily benefited the Coalition and Pfau/Zalkin's respective groups and were consistent with goals for

---

[14] Other Chartered Organizations, like the TCJC, were involved in these cases and actively engaged in settlement discussions as well.

the TCC and FCR as well. Other parties sought to be bound, like non-settling Insurers, certainly did not view settlements among the Debtors, the survivor representatives, and settling insurers as conferring a benefit to the estates as a whole. Likewise, extensive participation in a case, without more, does not justify a substantial contribution award. *See Summit Metals*, 379 B.R. 40, (Bankr. D. Del. 2007). Continued actions to seek a seat at the negotiating table do not on their own add value to the estate as a whole. The Movants have failed to demonstrate that their actions went beyond positions that they were already bound to take on behalf of their constituents, and the Substantial Contribution Motions should not be granted.

**C.    The Movants' Actions were Duplicative of the Actions Taken by Other Parties**

55.    In order to prove that it made a substantial contribution, a party must prove that its efforts did not duplicate those provided by estate fiduciaries and their professionals. *See In re Worldwide Direct, Inc.*, 334 B.R. at 122 (citing *In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993)) (determining if a claimant has met its burden, courts consider whether the services provided (a) were only for the benefit of the claimant or were for the benefit of all parties in the case; (b) directly, significantly and demonstrably benefited the estate; and (c) were duplicative of the services provided by professionals for the creditors' committee, the committee itself, debtor and its attorneys, or other fiduciaries and their professionals); *see also In re Summit Metals, Inc.*, 379 B.R. 40, 51 (Bankr. D. Del. 2007) *aff'd* 406 F. App'x 634 (3d Cir. 2011) ("[W]hether services were duplicative of services performed by others" is one of several factors courts in this District examine when reviewing substantial contribution requests); *In re Spansion Inc.*, 2014 Bankr. LEXIS 2175 at * 9-10, Case No. 09-10690-KJC, (Bankr. D. Del. May 14, 2014) (noting that when an ad hoc equity committee's actions were almost completely duplicative of another ad hoc group of convertible notes, there was no substantial contribution).

56.     The Plan's treatment of abuse survivors was the central issue in these cases and the focus of myriad parties in interest. The Coalition and Pfau/Zalkin's participation was at all times in addition to the efforts of the TCC and FCR—estate fiduciaries already being compensated by the estate. Given the importance of the Chartered Organizations to the Debtors' ability to continue operating going forward, there was minimal risk of the Debtors taking actions that would be detrimental to the ability to continue those relationships as part of the reorganization.

57.     The Movants' professionals did not perform any services that were otherwise not already supplied by other parties in interest. Both the TCC and FCR had interests that aligned with those of the survivors represented by the Coalition and Pfau/Zalkin, and the official committees took actions that helped to further those interests while promoting a settlement with those parties willing to settle. The Coalition and Pfau/Zalkin, on the other hand, sought to improve their own positions by seeking payment of their counsel fees—a continued, multi-stage effort certainly not beneficial to the estates. The Court previously declined to approve the fee payment provisions of the RSA for the Coalition, and the Court should not permit them now. As part of its recognition as a party that could participate in these cases, the Coalition agreed to terms targeted at avoiding additional legal fees being passed on to survivors joining the Coalition. Now, even though those terms reserved the Coalition's right to pursue substantial contribution, any substantial contribution award to the Coalition would, in effect, act to force all survivors to pay for the actions of the Coalition's bankruptcy professionals. As the Court noted in its August 19 RSA ruling, "The cost of the Coalition's professionals was to be borne by the State Court counsel who formed the Coalition, not their clients. Payment by Boy Scouts and certainly any payment by the investor trust comes directly or indirectly out of their clients'

pockets and, indeed, the pockets of all abuse victims." *See* Tr. 8/19/21 19:21-25 to 21:1-22. (D.I. 6098).

58.     The Coalition's substantial contribution motion offers many examples of how it worked in tandem with the FCR, including in negotiations with certain insurers, but sought benefits that would ultimately flow to survivors.[15]  Differences in strategy and approach between the TCC and the Coalition/Pfau/Zalkin do not eliminate the duplication in advancing the interests of Survivors, and the Movants' requests for fees only act to further reduce the funds that will ultimately be available to compensate survivors. Objections to the Debtors' request to extend exclusivity to solicit a plan came first from the TCC, and were followed on by the Coalition and the FCR. (D.I. 2506, 2668, & 2672). Again, the Coalition engaged in activity that the TCC was already providing as a fiduciary on behalf of survivors, and did so with the FCR as a joint party to the objection. *Id.* The Coalition, Pfau/Zalkin, the TCC, and the FCR all acted to maximize Survivor recoveries as part of these chapter 11 cases, sometimes at cross-purposes, and sometimes in tandem, but those same survivors should not be forced to bear the expense of the estates compensating all four parties.

59.     The RCAHC's motion presents a less dire example of duplicative services, but other Chartered Organizations did appear in these cases, and all constituencies in the case recognized that any global resolution would necessarily need to address issues shared across the Chartered Organizations in some way. Given the importance of the Chartered Organizations,

---

[15] Coalition Mot. ¶¶ 62 & 73: "the Coalition and the FCR began negotiating with another primary insurer—Century—for an $800 million settlement for the benefit of all Survivors. These negotiations were primarily between the Coalition, the FCR, and Century and did not include other parties. The Coalition and the FCR sought a framework that would facilitate a settlement with Century and fully resolve the Chartered Organization issues to everyone's satisfaction." & "The Coalition, working with the FCR, created a framework that would deliver settling insurers the 'global peace' necessary for settlements to occur and, at the same time, delivered the full value of the $800 million Century settlement—as well as all other insurance settlements—to the Settlement Trust for the Survivors' benefit."

parties like the RCAHC were at little risk of any draconian or prejudicial measures being thrust upon them as part of a plan, and especially as part of any framework geared to achieving optional relief to Chartered Organizations. *See* Nownes-Whitaker Decl. ¶ 4 (discussing the Supplemental Chartered Organization Opt Out Deadline).

### D.    Movants Have Produced Insufficient Evidence to Support Their Substantial Contribution Requests

60.    The Coalition is the only Movant that has supplied evidentiary support from a party unrelated to the Movants in support of the Substantial Contribution Motions, by proffering three declarations from FCR-related parties (Mr. Patton, along with two attorneys retained by the FCR). (D.I. 10808-3 Exs. B-6, B-7, & B-8). As discussed above, notwithstanding the Coalition proffering evidence from the FCR, nearly every statement in Mr. Patton's Declaration, as well as those of Mr. Harron and Ms. Quinn, portray the Coalition and the FCR moving in lockstep, both performing the actions that the Coalition points to as justifying the Substantial Contribution request. Coalition Mot. Ex. B-6 ¶¶ 13-18 ("the Coalition and I . . . the Coalition and I. . . the Coalition and me . . . the Coalition and I. . . .the Coalition and me. . .."); Coalition Mot. Ex. B-7 & B-8 ¶¶ 16-29 "The Coalition and the FCR" throughout). The FCR is an estate-compensated party, and because of the unknown quantity of future claims the FCR had every incentive to reach settlements or take other actions that would fund payment of claims for Survivors to the greatest extent possible.

61.    While better than the other Movants in attempting to meet some of the requirements of case law, the Coalition's "third party" evidence is undercut by how frequently the FCR parties supplying that evidence identify duplicative action, as both the FCR and Coalition worked toward the same objectives. Also, the Debtors' representatives present no new supporting evidence. The Coalition's reliance on Mr. Whittman's testimony during the August

12, 2021, hearing on the RSA Motion repeats evidence and argument that the Court considered and declined to find supported payment of the Coalition's fees and expenses as part of the requested RSA relief. Coalition Mot. ¶ 42; Tr. 8/12/21 126:3-20.

62.     Pfau/Zalkin provided one declaration from an attorney at the Pfau firm, Jason P. Amala, but provided no independent evidence to support its assertions about its contribution. No independent third party has provided testimony suggesting that Pfau/Zalkin's actions provided a benefit to the estate sufficient to be judged a substantial contribution. The record is devoid of any evidence to satisfy the requirements articulated in *Worldwide Direct* that evidence come from disinterested parties rather than self-serving assertions of the applicant.

63.     The RCAHC does not provide any declaration in support of its motion; only the statement of facts in the RCAHC Motion are provided to support the request for fees and expenses. No independent third party has provided testimony suggesting that the RCAHC's actions resulted in a substantial contribution. The record is devoid of any evidence to satisfy the requirements articulated in *Worldwide Direct* that evidence come from disinterested parties rather than self-serving assertions of the applicant.

64.     The U.S. Trustee reserves any and all rights, remedies, and obligations found at law, equity, or otherwise.

[Remainder of page left blank intentionally]

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court deny the relief requested by the Movants, and issue an order accordingly.

Dated: January 31, 2023
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**Regions 3 and 9**

By: */s/ Timothy J. Fox*
Timothy J. Fox, Jr., Esq. (DE Bar No. 6737)
Hannah M. McCollum, Esq.
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
Timothy.Fox@usdoj.gov