1                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3  IN RE:                      .  Chapter 11
                               .
4  BOY SCOUTS OF AMERICA AND   .  Case No. 20-10343
   DELAWARE BSA, LLC,          .
5                              .  (Jointly Administered)
                               .
6                              .  Courtroom No. 6
                               .  824 North King Street
7            Debtors.          .  Wilmington, Delaware 19801
                               .
8                              .  Wednesday, April 19, 2023
   . . . . . . . . . . . . . . .  10:00 a.m.
9
                         TRANSCRIPT OF HEARING
10         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                CHIEF UNITED STATES BANKRUPTCY JUDGE
11

   APPEARANCES:
12

   For the Debtors:           Derek C. Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT
                                 & TUNNELL, LLP
14                            1201 North Market Street
                              16th Floor
15                            Wilmington, Delaware 19899

16

17

18
   (APPEARANCES CONTINUED)
19
   Audio Operator:            Brandon J. McCarthy
20

21 Transcription Company:     Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Coalition of
   Abused Scouts for
3  Justice:                    Cameron Moxley, Esquire
                               David Molton, Esquire
4                              Eric Goodman, Esquire
                               BROWN RUDNICK LLP
5                              7 Times Square
                               New York, New York 10036
6

7  For the US Trustee:         Timothy Fox, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
8                              844 King Street, Suite 2207
                               Lockbox 35
9                              Wilmington, Delaware 19801

10 For the TCC:                Richard Pachulski, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
11                             10100 Santa Monica Boulevard
                               13th Floor
12                             Los Angeles, California 90067

13 For Pfau Cochran,
   Zalkin Law Firm:            Thomas Patterson, Esquire
14                             KTBS LAW LLP
                               1801 Century Park East
15                             26th Floor
                               Los Angeles, California 90067

16

17

18

19

20

21

22

23

24

25

1

<u>INDEX</u>

2

<u>MOTIONS</u>:                                                                          <u>PAGE</u>

3

4

Agenda
Item 3:  Motion of The Coalition of Abused Scouts for              6
         Justice for Entry of an Order Approving the
         Debtors' Proposed Payment of The Coalition
         Restructuring Expenses
         (D.I. 10808, filed 12/29/22)

5

6

7

Agenda
Item 4:  Motion of Pfau Cochran Vertetis Amala PLLC and          58
         The Zalkin Law Firm, P.C. for an Order Pursuant
         to Bankruptcy Code Section 363(b), 1129(a)(4),
         and 503(b) Allowing Payment or Reimbursement of
         the Pfau/Zalkin Restructuring Expenses by the
         Settlement Trust (D.I. 10809, filed 12/29/22)

8

9

10

11

Agenda
Item 5:  Joint Motion of the Debtors, Official Committee          83
         of Tort Claimants, Future Claimants'
         Representative, and Coalition of Abused Scouts
         for Justice, Pursuant to 11 U.S.C. §§ 105(A)
         and 363(B), for Entry of an Order (I)
         Authorizing the Debtors to Advance Funding to
         Facilitate the Establishment of the Settlement
         Trust, (II) Authorizing the PSZJ Firm to Advance
         Funding Under the PSZJ Contribution to
         Facilitate the Establishment of the Settlement
         Trust, (III) Authorizing the Future Settlement
         Trustee and Claims Administrators to Begin
         Preparatory Work, and (IV) Granting Related
         Relief (D.I. 11010, filed 02/28/23)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  INDEX

2   DECLARATIONS:                                        PAGE

3   1)   Declaration of Adam Slater                     13

4   2)   Declaration of Anne Andrews                    13

5   3)   Declaration of Kenneth Rothweiler              13

6   4)   Declaration of Michael Atkins                  13

7   5)   Declaration of Gabriel Le Chevallier           13

8   6)   Declaration of James Patton                    13

9   7)   Declaration of Kami Quinn                      13

10  8)   Declaration of Tristan Axelrod                 13

11  9)   Declaration of Edwin Harron                    13

12  10)   Declaration of William Sugden                 15

13  11) Supplemental Declaration of James Patton        15

14  12) Supplemental declaration of Tristan Axelrod     15

15

16  EXHIBITS:                                           PAGE

17  Exhibits C1, C2, C3, C4, C5, C6                     14
            Fee Statements

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:00 a.m.)

2         THE COURT:  Please be seated.  Good morning.

3         MR. ABBOTT:  Good morning, Your Honor.  Derek

4    Abbott of Morris Nichols here for the debtors today.

5         We had a number of matters on the agenda today.

6    Literally, as we walked out of the building to head over,

7    Your Honor, we received an email that the Third Circuit had

8    denied the various motions for stay pending appeal.  As a

9    result, Your Honor, the debtors intend to go affective at the

10   earliest opportunity.  And, that may -- well --

11        THE COURT:  Does that moot the last item?

12        MR. ABBOTT:  Your Honor, it's not clear to me that

13   it moots it.  While it may, I think my proposal would be that

14   we would just work through the agenda.  Mr. Pachulski may

15   want to address the Court on that motion, but that's a fair

16   question that I'm sure he'll have an answer for, Your Honor.

17        THE COURT:  Okay.

18        MR. ABBOTT:  Your Honor, we were going to start

19   with Agenda Item 2, which was a claim objection -- or a

20   resolution of a claim objection ultimately.  The Court did

21   enter that order this morning. So, I will turn the motion

22   over to the Coalition for Agenda Item 3 which is their

23   substantial contribution motion.

24        THE COURT:  Okay.  Mr. Molton.

25        MR. MOLTON:  Good morning, Your Honor.

1              THE COURT:  Good morning.

2              MR. MOLTON:  A real pleasure to be here especially

3    today.  I think this is my first time in your Courtroom on

4    this case after three years, so it's good to be here.  And

5    especially with the news that we just heard, Your Honor.

6              Just to set the table, I'm just going to give a

7    little bit of opening remarks and turn it over to Cameron

8    Moxley who will handle the majority of the motion and answer

9    any questions you may have, and deal with putting in whatever

10   evidence, all the evidence, that we're going to be offering.

11             But first of all, Judge, I am David Molton of

12   Brown Rudnick on behalf of the Coalition of Abused Scouts for

13   Justice and I do want to acknowledge with me today are my

14   partners, Cameron Moxley and Eric Goodman.  And it's really,

15   as I said, a privilege, absolute privilege, to be appearing

16   here in person in your Courtroom today particularly since, I

17   think, the dozens of appearances we've had here have been on

18   the Hollywood squares, at least for me, and it's just

19   wonderful.

20             Your Honor, to set the table, as I mentioned, I'm

21   just going to give some opening remarks.  I wanted to address

22   the Court before I turn the roster over to my partner,

23   Cameron Moxley.  You may recall, Judge, three years ago,

24   about probably a little less during one of my first

25   appearances in this case, I represented to Your Honor that

1  the Coalition, the Coalition of Abused Scouts for Justice,

2  was here then and was here always to move this case forward.

3  Always in a forward direction, one step at a time, rolling up

4  our sleeves, and ready to work to achieve a confirmed plan

5  that would provide justice and compensation to survivors.

6         I also alluded, on numerous occasions, that this

7  was probably the most difficult case I've ever been in, and

8  I'm going to say that again today even though there's a bunch

9  of other difficult cases I'm in right now.  And the fact that

10  we've gotten to a -- not a confirmed plan with a clean

11  affirmance by Judge Andrews and now a stay denial by the

12  Third Circuit just is a remarkable achievement to everybody

13  in this Courtroom who really worked so hard notwithstanding,

14  you know, all the challenges and the difficulties that Your

15  Honor is well aware of.  But, really, at the end of the day,

16  work together to achieve that goal.

17         As I know, Your Honor is aware of the history of

18  this case and the challenges we all face, not just the

19  Coalition, and we are proud of the work we've done on behalf

20  of the Coalition and all the interested parties in this case.

21         I do want to acknowledge, Doug Kennedy, chair of

22  the TCC sitting over there.  He wasn't yet introduced.  Judge

23  Houser, our Trustee for the Boy Scout Trust as of today.

24  Good morning, Madam Trustee.  And also, Rich Pachulski and

25  Debra Grassgreen on behalf of the TCC who've also worked

1   extremely hard as well as the folks you know from Young

2   Conaway who are somewhere here for the SCR, and then, of

3   course, the debtor and the debtors counsel who, not

4   withstanding, are -- sometime issues with them were able to

5   get to the stay.  And also, I want to acknowledge behind me

6   somewhere is a representative from the ad hoc committee of a

7   local councils, Will Sugden, who played an important role.

8   And I want to acknowledge, Rachel Mersky, our local counsel

9   as well.

10          In any event, Your Honor, as Your Honor knows,

11  nothing can ever fully compensate survivors for what they

12  endured, but the plan makes good on the goal of survivors

13  that has been espoused by the Coalition, by the TCC, and

14  others.  Specifically, to establish a way forward that gets

15  all survivors recoveries as soon as possible and in their

16  lifetime.  You've heard me say that before.  We're at the

17  cusp of moving that forward.

18          And in the process, Judge, a venerable, historic,

19  and iconic institution of Boy Scouts, which at times look

20  like it was teetering on the edge of oblivion, survives and

21  goes forward remarkably improved with the help of all the

22  hands in this room.  With a focus on youth safety protection

23  and concrete governance and other changes designed to cement

24  that changed culture, they are now able to exit bankruptcy

25  and go forward with their mission, new and improved with the

1  constituence in this Courtroom walking with them to do so.

2         Your Honor, none of this was easy.  I'm going to

3  take -- I'm going to steal something from Mr. Puchalski, and

4  we've been talking a great deal over the last few months,

5  indeed, over the last year.  This truly did take a village,

6  Judge, and we're really proud of all that has been

7  accomplished here to bring justice to the so many people who

8  fought for it so long.

9         I'm going to put a fine point on it and emphasis

10 one or more, two, things that I trust came through in our

11 papers and I'm sure will be made clear, but I say it, again,

12 our motion is not about minimizing other people's

13 contributions, but focusing on what we did and the specific

14 acts that the Coalition did at specific times to clear the

15 way to allow everybody to walk to a confirmed plan.

16        So many professionals, firms, advisors, and so

17 many people contribute mightily to this historic outcome.

18 The largest abuse compensation fund in the history of the

19 United States.  Many mediation sessions involving numerous

20 parties and the insurers, the settling insurers, among them

21 as well the settling chartered organizations coming up with

22 creative solutions with us in sessions that, at times, lasted

23 through midnight and I remember one lasting till 3:00 o'clock

24 in the morning.

25        Our motion -- and I want to thank also Mr.

1  Gallagher.  I don't know if he's listening, but our mediator

2  who, again, walked us through to get us to this point.  Our

3  motion, I think, focuses on the contributions that we made

4  which we think were significant, substantial, and benefited

5  all survivors, all creditors, and the Boy Scouts itself.

6  Working with others is how we got things done and from day

7  one, we sought partners willing to constructively work with

8  us, Your Honor.  At key moments in the trajectory of this

9  case, we found those partners, we worked with them, we rolled

10 up our sleeves and step, by step, by step we put together the

11 foundation that led to today.

12         One thing I want to say before I turn the rostrum

13 over to Mr. Moxley, I want to thank Your Honor and the

14 Court's staff for all of your tireless work on what has been

15 a most challenging case.  I can tell you that as practicing

16 lawyer it is a joy to know that Your Honor always considers

17 in ways the party's positions and papers, and you always

18 listen.  And we know that even if Your Honor has a particular

19 view, different than what we do, the ruling that comes out is

20 clearly considered and has grappled with all the arguments.

21         I know I will speak for all in this case thanking

22 you, Your Honor, the Court, for your attention and focus on

23 these matters.  With that, Your Honor, unless the Court has

24 any particular questions for me, it's my privilege to turn

25 this over to Mr. Moxley who's appeared before you in this

1    case and other cases.  And, I'm going to let him do the hard

2    work.  How about that?

3              THE COURT:  I'll ask him my question.  Mr. Moxley.

4              MR. ABBOTT:    Your Honor, just briefly, I'll

5    interrupt to let the Court know that the notice of effective

6    date has been filed with the Court.

7              THE COURT:  Okay.

8              MR. MOXLEY:  Good morning, Your Honor.

9              Judge, Cameron Moxley, of Brown Rudnick on behalf

10   of the Coalition.  Judge, I have had the privilege of

11   appearing in your Courtroom before.  Not in this case, but in

12   the much less well attended Courtroom.  But it's very nice to

13   be with you, Judge.

14             Your Honor, before launching into the substance of

15   the argument, which the Court may or may not wish to dive

16   into in detail, I'll be guided by you, Your Honor, as to how

17   much detail you want prepared, obviously, to discuss all the

18   arguments and all the evidence.  But first, I thought I would

19   provide a brief status update which you probably are already

20   aware of from some of the opening remarks.  Second, just so

21   that the evidentiary record is complete on our motion, I'd

22   like to take the step of just moving those declarations into

23   evidence.  And then finally, launching into some of the

24   substantive arguments, Your Honor.  If that pleases the

25   Court, I'll begin.

1          THE COURT:  Yes.

2          MR. MOXLEY:  Very good.  Thank you, Judge.

3          Your Honor, we're happy to report what the

4  Trustee's omnibus response on the consensual resolution

5  document, which was filed at 11111 on the docket, reported

6  which is that provided that the Court is amenable to granting

7  the relief sought in the motion under Section 503(b), there

8  are no objectors to the relief sought on that basis, Judge.

9  The Coalition has worked with the Trustee and Ms. Lujan Wolff

10  and her claimants who were the only objectors.  The TCC filed

11  a response, but did not object to the relief sought.  And so,

12  there are no objectors standing before you, Judge, on this

13  motion today.

14          While there are no objections, just so that the

15  record is complete, Your Honor, as I mentioned, we would like

16  to go ahead and walk through the process just of admitting

17  the evidence.

18          THE COURT:  Yes.

19          MR. MOXLEY:  Okay.  Excellent, Judge.

20          I would note, Judge, that I believe, if not all,

21  most of our declarants are either in the Courtroom today or

22  are available by Zoom if the Court has any questions.  I

23  would just note for the record that we surveyed those who

24  filed responses to our motion and none of the parties who

25  filed responses intend to question any of the declarants.

1          THE COURT:  Okay.

2          MR. MOXLEY:  So, Your Honor, with that, at this

3  time, on behalf of the Coalition, I would ask that the

4  following declarations, which are attached to our motion at

5  Docket 10808, be admitted into evidence in support of the

6  motion.   Specifically, Judge, those are Exhibits B1, B2, B3,

7  B4, B5, B6, B7, B8, and B9.  And, those exhibits are

8  respectively, Your Honor, the declarations of Adam Slater,

9  Anne Andrews, Kenneth Rothweiler, Michael Atkinson, Gabriel

10 Le Chevallier, James Patton, Edwin Harron, Kami Quinn, and

11 Tristan Axelrod.  And those are all filed, Your Honor, at

12 Docket 10808-3.

13          With that, Your Honor, the Coalition requests that

14 the Court admit those declarations into evidence at this

15 time.

16          THE COURT:  I will admit them as unopposed.

17      (Declarations received into evidence)

18          MR. MOXLEY:  Thank you, Your Honor.

19          Your Honor, the Coalition also asks that the Court

20 admit into evidence, Exhibits C1, C2, C3, C4, C5, and C6,

21 each of which is attached to the Coalition's motion at Docket

22 10808-4.  These exhibits, Your Honor, constitute the

23 respective verified fee statements of Brown Rudnick, Province

24 LLC, Parsons Farnell & Grein, LLP, the Monzack Mersky Firm,

25 the Robbins Russell Firm, the Akin Gump Firm.  And those

1  respective statements, Your Honor, provide a summary of the

2  work performed by each of the Coalition professionals.

3         In moving these fee statements into evidence, I

4  would note that in our proposed order, the U.S. Trustee

5  retains the right to examine the fees submitted.  Your Honor,

6  with that, I would ask that those Exhibits C verified

7  statements be admitted into evidence.

8         THE COURT:  They will be admitted without

9  objection.

10      (Fee statement exhibits received into evidence)

11         MR. MOXLEY:  Thank you, Your Honor.

12         And finally, Judge, in terms of the evidentiary

13  record, the Coalition would also move into admission the

14  declarations attached to the Coalition's reply brief which is

15  at Docket 11107.  And specifically, Your Honor, those are the

16  declaration of Mr. Sugden which is attached to the

17  Coalition's reply brief at Docket 11107-2; the supplemental

18  declaration of Mr. Patton which is at Docket 11107-3; the

19  declaration of Tristan Axelrod at 11107-4; and the

20  declaration of Mr. Goodman at Docket 11107-5.  And I believe

21  the admission -- or the motion to admit those is also

22  unopposed, Your Honor.

23         THE COURT:  Okay.  Then they will be admitted as

24  unopposed.

25      (Declarations received into evidence)

1         MR. MOXLEY:   Thank you, Your Honor.

2         Judge, on the basis of this evidentiary record

3    that's now into evidence, I would just make a few substantive

4    points Your Honor.

5         First, again, the relief sought is now unopposed.

6    As detailed in our reply and in the U.S. Trustee's response

7    concerning the consensual resolution that we have reached,

8    the United States Trustee reviewed the record in this case

9    and the evidentiary record the Coalition has made on this

10   motion, and the U.S. Trustee has reached the conclusion that

11   it does not object to the motion provided as granted under

12   Section 503(b).   We submit the Court should reach the same

13   conclusion.

14        Ms. Lujan Wolff's clients, as well, no longer

15   object to the motion in the revised order that we have

16   proposed.   As I mentioned, the TCC filed a response to the

17   motion but the TCC also does not oppose the relief sought in

18   the motion.   So, no one, Judge, standing here today objects

19   to the motion being granted.

20        I am, Your Honor, prepared to answer any questions

21   that you have.   I'd be happy to walk through our views of the

22   law and the evidence under both standards, the business

23   judgement standard and the 503(b) standard -- or I'm sorry,

24   and the 363 standard.   But if Your Honor has specific

25   questions, I wanted to make sure that I'm responsive to the

1  Court's inquiries.

2           THE COURT:  I do have questions and we'll start

3  with the standard, and we'll end with the order, and I'll

4  have questions in between.

5           MR. MOXLEY:  Excellent, Your Honor.

6           THE COURT:  So, with respect to the standard, and

7  I understand the resolution with the Office of the United

8  States Trustee resolves their issues so there's not another

9  precedent out there with respect to 363.  So, I understand

10 why the order is crafted the way that it is.  But tell me why

11 this should be reviewed under 363 given where we are?

12          MR. MOXLEY:  Sure, Your Honor.

13          And the reason is actually fairly straight forward

14 from our perspective.  It's because of -- the inquiry turns

15 on who is asking to pay the fees.  So, here we have a

16 situation, just as we did in Mallinckrodt and Purdue, where

17 you have the debtor, via the plan, previously via the RSA,

18 but via plan now which even the first Mallinckrodt decision

19 recognized was a proper vehicle for the debtor to seek the

20 authority to pay fees.  You have the debtor asking for that

21 via the plan.  The debtor submitted the plan and that's who's

22 asking for the relief so that's why it's appropriate for it

23 to be a 363 standard, Your Honor.

24          I would just say, and I appreciate the Court is

25 probably very, very well aware of this, but just for the

1  record I should say the Coalition feels strongly that it

2  meets both standards.  And if you think about it, Your Honor,

3  the substantial contribution standard is actually a higher,

4  more difficult standard to meet.  You have to show that

5  you've made a substantial contribution to the case, and it's

6  viewed from the perspective of the creditor asking for fees

7  as opposed to the debtor asking for authorization to exercise

8  its business judgement to pay fees.  So, that's the

9  distinction, Your Honor, between the two standards that's the

10 most key; is who it is that is proposing to pay the money.

11        THE COURT:  So, I understand that would be the

12 case in the context of the motion under 363 to use the

13 debtor's cash out of the ordinary course of business.  But if

14 we're talking about through the plan, which is how I read

15 this and how you're explaining it to me, then why isn't

16 1129(a)(4) the correct standard as the Lehman Court

17 evaluated.

18        MR. MOXLEY:  Well, we have a situation, Judge, I

19 think where here we have precedent that's specifically on

20 point in this Court and in this district that says that when

21 the ability to pay a creditors fees are sought via the plan

22 this way, that 363 is the appropriate standard.

23        THE COURT:  Was Mallinckrodt -- and Mallinckrodt

24 wasn't in the plan, was it?

25        MR. MOXLEY:  The Mallinckrodt Court actually

1 specifically said, I can give Your Honor the cite, but it

2 actually specifically said that asking via a plan is one way

3 in which the 363 is the appropriate standard.

4 　　　　　THE COURT:  But I don't think he did it.  Did

5 Judge Dorsey do it in the context of a plan or did he just --

6 　　　　　MR. MOXLEY:  No.

7 　　　　　THE COURT:  Yeah.  No.  He didn't.  So, he just

8 made that comment.

9 　　　　　MR. MOXLEY:  That's right.

10 　　　　　THE COURT:  Okay.  And so, what precedent is it in

11 this district that would say 363 is the correct standard?

12 　　　　　MR. MOXLEY:  I think, Your Honor, that it's --

13 maybe there isn't a specific case that specifically says that

14 363 is the correct standard in this district, but we think

15 that the cases that -- and we've laid this all out in our

16 papers, Your Honor, the cases we think are clear that when in

17 similar circumstances like this in other districts where the

18 ability to pay a creditors fees are sought via the plan that

19 this is the appropriate standard.  But even if the Court were

20 to decide it is not the appropriate standard, we think that

21 we need all of -- any applicable standard we would need.

22 　　　　　THE COURT:  Any standard.

23 　　　　　MR. MOXLEY:  Yes.

24 　　　　　THE COURT:  Okay.  Let's assume for the moment

25 that the 363 standard exists.  What evidence do I have, in

1  the record, from the debtor, as to the debtor's business

2  judgement?

3         MR. MOXLEY:  Well, Your Honor, what you have in

4  the record on -- the M&G case, Judge Shannon's case,

5  specifically says that on a motion like this, the Court is

6  permitted to take into account the entirety of the Chapter 11

7  case including the Court's own observations and experiences

8  in the case.

9         We cited in our papers, and Your Honor heard, at

10  various points, at various conferences, for example, Mr.

11  Whittman say that the Coalition provided, you know, helpful -

12  - was a helpful, sort of, participant in the process, et

13  cetera.  So, there's -- we cited some of those various pieces

14  of the record in our pleadings here in our brief, Your Honor.

15  And so, you're allowed to take into account the entirety of

16  the case.  And if you look at the entirety of the record, we

17  think there are lots of points along the way where you heard

18  from various parties including the debtors that the Coalition

19  provided a substantial contribution to these cases.

20         THE COURT:  Okay.  So, two questions there.  Are

21  those cases in the context of 363 or substantial

22  contribution?

23         MR. MOXLEY:  I think the M&G case was in the

24  context of substantial contribution.

25         THE COURT:  Okay.

1    MR. MOXLEY:  Which, again, we submit that we need

2  and that is the proposed order.

3    THE COURT:  I'm trying to understand the two

4  different standards and the evidentiary basis for each.

5    MR. MOXLEY:  Right.  So, Your Honor, we think that

6  -- I think we've cited some of the authority as well that the

7  debtors don't actually need to put in additional evidence to

8  support the plan.  The plan was proposed.  We had a

9  confirmation hearing and the plan was confirmed.  And so, on

10  the totality of, sort of, all of that, I think we've cited

11  this in our papers, Your Honor, that the debtor doesn't have

12  to submit additional declarations, et cetera.  It is

13  appropriate for them to put in the plan the payment of the

14  fees and for that to be the request.

15    THE COURT:  Well, that can be the request, but

16  then I am to judge the request.  So, the question I have is

17  what evidentiary basis -- normally when you're looking at a

18  debtor and business judgement, I get evidence about what the

19  board approved, or what they considered, or what they didn't

20  consider, and who they sought advice from, et cetera.  And I

21  don't see any of that in the record that I have.

22    MR. MOXLEY:  Well, you have it, Your Honor, not

23  necessarily from the debtor, but it's appropriate for Your

24  Honor to consider the evidence that we have now admitted in

25  support of the motion which outlines, at various points, the

1   various contributions and steps that the Coalition undertook

2   that disinterested parties as well.  And, Your Honor --

3           THE COURT:  But they're not the debtor.

4           MR. MOXLEY:  They're not the debtor --

5           THE COURT:  I'm focused on the debtor because 363

6   standard is the debtor's business judgement, not anybody

7   else's business judgement.

8           MR. MOXLEY:  Right.  But for all of the reasons

9   that are set forth in the record that's now before you and

10  admitted into evidence in sort of the motion, the debtor was

11  also part of those as well.  And so, while the debtor didn't

12  necessarily submit the declarations we did, that's part of

13  the evidentiary record before the Court.  And so, it seems to

14  me that the Court has more than enough evidence to say -- I

15  mean, there's more evidence, I think, here, Your Honor, than

16  we've seen in some of the other cases.

17          THE COURT:  There could be.  But I'm focused on

18  the debtor and I see nothing from the debtor.

19          MR. MOXLEY:  We did cite to Mr. Whittman's

20  testimony, I think, Your Honor, and --

21          THE COURT:  And Mr. Whittman is not the debtor.

22          MR. MOXLEY:  Fair enough, Your Honor.  Fair

23  enough.

24          THE COURT:  Okay.  I just want to make sure I'm

25  not missing anything because if there's something you can

1  point me to where the debtor provided evidence, but I don't

2  see it.

3          MR. MOXLEY:  I think, Your Honor, obviously, I

4  can't point to a declaration that isn't there, so I'm not

5  going to do that.  What I would say is that if you look at

6  our papers, Your Honor, I think we cited to various points

7  along the way where the debtor -- excuse me, Your Honor.

8          (Pause)

9          MR. MOXLEY:  Your Honor, I'm reminded that Mr.

10 Whittman testified on behalf of the debtor in support of the

11 RSA and so while Mr. Whitman was not the debtor, he was

12 testifying on behalf of debtor in support of the RSA and that

13 was the first instance, of course, where the debtor sought to

14 have the Coalition, the reimbursement expenses, paid.

15          THE COURT:  I did take a look at that.  And, it's

16 very short, conclusory, and unfinished, actually, evidence.

17 But, okay, I will consider whether I consider that.

18          MR. MOXLEY:  Thank you, Your Honor.

19          THE COURT:  Okay.  I'll think about what the

20 proper standard is for this because I think it's a question.

21 And I don't think there's anything in this -- well, there's

22 nothing in this circuit that's binding that's precedential.

23 And so, I will think about what the appropriate standard is.

24          MR. MOXLEY:  Thank you, Your Honor.

25          So, as Your Honor considers that question, I would

1   just -- and I know the Court is aware of this, but just for

2   the record, the Coalition firmly believes that we meet both

3   standards.  And so, whichever standard applies, you know, we

4   would submit that the Court has the ability to grant the

5   motion and the relief, if sought, under the 503(b) standard

6   is unopposed.  And so, we would just emphasize that, Your

7   Honor, as well.

8           THE COURT:  If I'm considering it, and it maybe

9   goes to the 363 standard, and it might go the substantial

10  contribution standard, what, if any, weight should I give or

11  should I consider at all that this debtors a non-profit.

12          MR. MOXLEY:  We would submit, Your Honor, that

13  none of the cases that we have cited to actually turn on that

14  question on terms of whether the debtor is a non-profit or --

15  none of the cases turn on that issue.

16          And so, I don't think that that has to weigh in

17  here, Your Honor.  I mean, there are things that are

18  extraneous to the record that I'm loathed to go into because

19  I don't want to say something to the Court that muddies the

20  record, but we don't think that is an issue.  The debtors

21  will have the ability to make the payment.  And so, that's

22  not a concern.

23          THE COURT:  Well, that's another question that I

24  have.  If this payment were not made, would this be money

25  that is contributed to the trust under the formula that's in

1  the plan?

2          MR. MOXLEY:  So, it would be, but let me make a

3  couple of points on that, if I might, Your Honor.

4          So, there's a formula, a sharing formula, that

5  goes up to -- so, let me just take one step back.  So, the

6  Boy Scouts are entitled, Your Honor, to the first $19 million

7  of cash after the effective date payments are made.  And the

8  BSA and the trust would split any cash between $19 million

9  and $33 million.  And the trust gets everything above $33

10  million.

11          And so, there's -- when you look at, and again,

12  Your Honor, I fully appreciate the Court wanting to make

13  decisions based on the record that's before it and this

14  material is not necessarily before you.  But when you look at

15  the assumptions that, we understand, are made from the

16  debtors in terms of the cash available, the debtors will

17  retain some cash after the effective date payments are made

18  and after the fees, if Your Honor grants the motion, are paid

19  as well.

20          THE COURT:  Some cash.  So, I'm not sure I know

21  what that means.  The debtors will retain some cash.

22          MR. MOXLEY:  The amount of money is above the $19

23  million threshold.  But, Your Honor, I'm not sure -- frankly,

24  if I may speak candidly to the Court, I'm not sure that it's

25  appropriate for me necessarily to be engaging in the sources

1  and uses, financial aspects of this because I don't think --

2         THE COURT:  Maybe somebody else can answer that

3  question for me.  But the question I have, and not right this

4  moment, but at a later point.  So, I'm going to engage with

5  Mr. Moxley.  No.  You can stay there, Mr. Moxley.

6         I'll engage, but somebody else, when we're done,

7  can answer this question for me.  The question is, I hope,

8  somewhat straightforward which is if this money were not paid

9  to the Coalition for the Coalition's fees, would this money

10 be going into the trust?

11        MR. MOXLEY:  I think the answer, Your Honor, is

12 some of it would.  Yes.

13        THE COURT:  Okay.

14        MR. MOXLEY:  Your Honor, I should say though that,

15 of course, the fact that the trust exists, we think, is

16 because in part, not solely, as Mr. Molton said, it takes a

17 village, but is, in part, because of the substantial

18 contribution that the Coalition made.  And so, while it is

19 true that some of this money may, if not paid to the

20 Coalition, would go into the trust.  The fact that the trust

21 exists and has the amount of money, which is large, as Your

22 Honor knows, in it is, in part, not solely, but in part due

23 to our efforts.

24        THE COURT:  Okay.  Well, one of the reasons I

25 asked that question is because, as the parties know, when the

1  Coalition was formed, and we had several hearings with

2  respect to the 2019 disclosures and the request to be a

3  mediation party, one of the issues that I raised and others,

4  but I raised, was who's paying for this.  Is it coming out of

5  the claimants' pockets or is it coming out of a law firm's

6  pockets?  And the answer was it's coming out of a law firm's

7  pockets.

8          MR. MOXLEY:  Your Honor, we deal with that issue

9  in detail in our opening brief -- just so Your Honor has the

10 cites for the record as you consider this, I would just point

11 you to Paragraph 18 of our opening brief which cites to the

12 2019 statements and the evidence that's now in the record

13 concerning the engagement agreements that certain of the

14 Coalition firms have with their clients.

15          And Your Honor, I know given the question, I know,

16 is sensitive and aware of this issue, but certain of the

17 Coalition firms did have the ability, under their engagement

18 agreements with their clients, to surcharge their clients.

19 We agreed in coming to a compromise with the United States

20 Trustee to make it clear that we would not be surcharging the

21 clients for the Coalition related expenses, but that was

22 expressly provided that it did not -- that we reserved the

23 right to either seek a substantial contribution -- seek our

24 fees in connection with a substantial contribution motion or

25 to be reimbursed for those fees if, as has now happened, the

1  plan provided that the Coalition fees would be paid under

2  certain parameters.

3         And so, that issue was thought through at the

4  time, Your Honor.  Your Honor's memory is completely correct,

5  that is how we outlined that issue and it is in our papers

6  and in the evidence that is before the Court.

7         THE COURT:  I saw that and, again, sort of two

8  thoughts.

9         One, that may have been some agreement you had

10 with the United States Trustee.  That's really not how it was

11 presented to me, and I asked the question.  And, two, isn't

12 this effectively a surcharge regardless of how you look at it

13 because if the money would go into the trust, then it's a

14 surcharge to the claimants.

15         MR. MOXLEY:  No because these are charges that are

16 lessoned when you -- they're not, Your Honor, because the

17 individual firms would be able to charge their specific

18 clients for these related issues.

19         THE COURT:  Some of them.

20         MR. MOXLEY:  Some of them.  Yes.  Yes, Your Honor.

21         THE COURT:  Well, actually, it's more of a

22 surcharge then to people who aren't their clients.

23         MR. MOXLEY:  We don't see it that way, Your Honor,

24 but what I would just, again, re-emphasize is the fact that

25 we're able to talk about this large pot of money is because

1  of the work that the Coalition did in part and along with all

2  of our partners and others; all of the survivor

3  representatives.

4         We say, specifically, and let me just point Your

5  Honor to the fact that we say specifically in our opening

6  brief as well that all of the survivor representatives were

7  essential.  That was the word, I think, that we used in our

8  brief, were essential to this whole process.  And, we were

9  among them.  And so, all of that work went into bringing

10  about this pot of money.

11         And so, we would just submit, Your Honor, that we

12  did envision and deal with this issue at the outset and this

13  was how we envisioned it playing out, was either a

14  substantial contribution motion or the plan would provide

15  this.  And we reserved on that issue and that's where we find

16  ourselves today, Your Honor.

17         THE COURT:  So, you don't think I get to consider

18  the issue that this money would otherwise go to creditors?

19         MR. MOXLEY:  Your Honor, it's not that you don't

20  get to consider it.  You can consider -- as we've said, and

21  as Judge Shannon's decision says, the Court is permitted, in

22  this context, to consider the entirety of the Courts

23  experience in these Chapter 11 cases.  And it is in that

24  context in focusing on the entirety experiences with these

25  Chapter 11 cases that I'm making that argument that while

1  some money will not go into the trust, if it goes to pay our

2  fees, the fact that we did that work created the trust.

3         And so, I think, that in the totality of those

4  circumstances, the Court can consider all of that and when

5  you consider all of that, we would argue and respectfully

6  submit that you should conclude that it is appropriate for

7  the Coalition fees to be paid because on the whole, in light

8  of all the work that was done, it brought about this big pot

9  of money.

10         THE COURT:  So, that's kind of more of a common

11  fund argument.  I mean, it's sort of morphing into some

12  different argument.  You created the common fund.

13         MR. MOXLEY:  I'm not trying to create some new

14  argument.  I'm very simply stating what the M&G case said

15  which is that the Court is entitled to consider the entirety

16  of the record and in the Courts own experiences and

17  observations in the entire course of the Chapter 11 cases,

18  and we would just respectfully submit that when you look at -

19  - when Your Honor looks back and considers the years that

20  this case has been proceeding, the Coalitions work, and now

21  the evidence that's before you on this motion, we

22  respectfully submit that the calculous should come out that

23  the motion should be granted.

24         THE COURT:  Okay.  Let me ask this question, which

25  I think is unique to this case, among other unique aspects of

1  this case.  The Coalition here represents the exact same

2  constituency as the committee, the official committee.

3          MR. MOXLEY:  Your Honor, not exactly.  I mean, I

4  think we would say we represent a subset.

5          THE COURT:  Okay.  But it's constituency.  We had

6  an official trade creditors, if you will, committee.  And

7  then we had a tort claimants committee.  And, this is just

8  another tort claimants committee.  Let's put it that way.

9  This is just another tort claimants committee with other

10 members that are not on the official committee.

11         MR. MOXLEY:  We're an ad hoc group, Your Honor.

12 And, I think that the -- we set forth in our papers, sort of,

13 the factual background.  Those are all in the declarations as

14 well as to how the committee came about.  I think that if

15 Your Honor considers all of that evidence and the course of

16 the cases, what you'll find is that different constituencies

17 played different roles and took different approaches

18 throughout the course of the case.  And our approach was

19 different at certain points in time, and the efforts of all

20 survivor representatives ended up where we are today which is

21 a very positive place for all of us to be.

22         THE COURT:  The evidence of a different approach,

23 I think, is there, but my words now, the ad hoc committee,

24 the Coalition, was essentially a splinter group from the

25 committee.  Is that a fair characterization?

1       MR. MOXLEY:  I don't know if splinter has a

2  pejorative, sort of, tone to it in Your Honors mind or in any

3  other person's mind, but I would just say we represent

4  survivors and the TCC represents survivors.  That is true,

5  Your Honor.

6       THE COURT:  Okay.  And, what I wasn't sure, and it

7  wasn't in the papers, was were the committee members on the

8  official committee -- if you know, and if you don't, that's

9  obviously -- then you can't answer it.  But were the, and

10  I'll just make up the numbers -- there were two -- let's say

11  there were two members on the official committee who were

12  represented by two different law firms, and they decided they

13  no longer wanted to be on the committee.  Were the members

14  off the committee or did the law firms just stop representing

15  them or what happened?

16       MR. MOXLEY:  Your Honor, first, I want to be

17  candid with the Court so I don't know that I'm necessarily --

18       THE COURT:  And if you don't know, you don't know.

19       MR. MOXLEY:  Yes. But let me just, if I may Your

20  Honor, if I may just leap ahead a bit.

21       THE COURT:  Yes.

22       MR. MOXLEY:  I think Your Honor's questions go to

23  the question of whether there -- in what's relevant for the

24  motion, I would respectfully submit, is whether there was

25  duplication of effort.

1           THE COURT:  No, but we'll get to that.

2           MR. MOXLEY:  Okay.

3           THE COURT:  We'll get to that.  I am just trying

4  to figure out, because in this case and in a couple of my

5  other mass tort cases, the law firms conflate themselves with

6  their clients, okay.  They conflate themselves with their

7  clients.  So, of course, we know that law firms who had

8  clients that were on the official committee also had clients

9  who are not on the official committee, okay.  I'm sure every

10  one of them did.

11           So, what I am curious about is did the

12  constituency -- maybe this is a better way to say it: Did the

13  constituency of the official committee ever change?

14           MR. MOXLEY:  No.  I think the --

15           THE COURT:  Members stayed the same?

16           MR. PACHULSKI:  Yes.  Your Honor, (indiscernible).

17           THE COURT:  Okay.  So, the members were always the

18  same.  Thank you, Mr. Pachulski.

19           MR. PACHULSKI:  Yes, Your Honor.  They were.

20           MR. MOLTON:  Your Honor, David Molton stepping up.

21  My understanding is the members of the official committee

22  remain the same throughout the entire case.  I don't think

23  they were represented following the start of the Coalition in

24  their individual capacities as claimants by the law firms

25  that came over and worked with their client base to form the

1   committee which had 18,000, as Your Honor knows, signed

2   consents to be on the ad hoc committee.

3           THE COURT:  Is that where it ended up, at 18,000?

4           MR. MOLTON:  I think it's 18,000.

5           THE COURT:  And change?

6           MR. PACHULSKI:  18,000 and change.  If I can just

7   add a few other points because Ms. Lauria confirmed that one-

8   third goes to Boy Scouts, two-thirds goes to the Trust.  Mr.

9   Whittman, you know, if I'm wrong, I'm sure he will jump up.

10  That is what we got.

11          If I can answer two other questions or three other

12  questions.  All substantial contribution motions, to some

13  extent, depending on the case, impact the amount of money

14  that will go to the entire creditor pool.  That is what it is

15  about.

16          THE COURT:  Of course.

17          MR. MOLTON:  Whether it's tort, whether it's

18  funded debt, whatever it is, and most ad hoc committees in

19  other cases are represented by an official creditors

20  committee in some respect.  For example, in the opioid

21  bankruptcies where the official committee in those

22  bankruptcies made a point, and we represent Government

23  agencies.  We have a fiduciary duty to represent Government

24  agencies.

25          THE COURT:  But they can't be on a committee.

1          MR. MOLTON:  They can't be on the committee.

2    There are other situations, Judge, that, you know, also ad

3    hoc committees aren't necessarily precluded from sitting on a

4    creditors committee and they operate.  To the extent they

5    make a substantial contribution motion that is not an

6    element.  The fact is that the committee represents their

7    interest in a fiduciary capacity, doesn't -- isn't a silver

8    bullet on that point, Judge.

9          Lastly, I do want to note two other points because

10   it's important.  All of this, including Your Honor's point

11   regarding how much is taken out of the -- the amount that

12   goes to the $2.5 billion fund that I think, based on the

13   evidence submitted, Your Honor will see the substantial

14   contribution and extraordinary contribution that the

15   Coalition made to build that fund.  All of that has been

16   vetted by the official committee and its representatives.

17         They have not objected, Judge.  That is part of

18   this case.  That is an important record point, evidentiary

19   point that Your Honor needs, I submit, to consider.  You

20   know, all of this is part of how we got here and they have

21   weighed in on that.  That weighing in on that has to be taken

22   with some weight.

23         Lastly, Judge, Your Honor asked about what -- you

24   know, the debtor.  The debtor had agreed to pair fees, as you

25   know, on the RSA.  That was a signed agreement.  That then

1   got put into a plan, the debtor's plan, that agreement.  That

2   is the debtor's business judgment.

3              THE COURT:  Yeah, but I have to judge it.

4              MR. MOLTON:  I understand that.

5              THE COURT:  Independently --

6              MR. MOLTON:  I understand.

7              THE COURT:  -- as Judge Drain said in Purdue, not

8   the part that anybody cited to me, but the part that I read.

9              MR. MOLTON:  Yeah, okay.  I am just saying that

10  those are -- you say what evidence.  You are going to judge

11  that evidence, but I am saying there is that evidence, Judge.

12  So, you asked that question and all I am trying to do is

13  assist Your Honor in focusing on the evidence.

14             THE COURT:  Thank you.

15             MR. MOLTON:  Thank you.

16             THE COURT:  I forget what my question was to you,

17  Mr. Moxley.

18             MR. PACHULSKI:  I think I could possibly answer

19  it, Your Honor.  I apologize.  Do you want me to stand at the

20  podium and answer?

21             THE COURT:  Yes, please.  The podium picks it up

22  better for the record.

23             MR. PACHULSKI:  Your Honor, Richard Pachulski of

24  Pachulski Stang Ziehl & Jones on behalf of the TCC.

25             I just -- Your Honor had asked about the committee

1  versus the lawyers.

2          THE COURT:  Yes.

3          MR. PACHULSKI:  So, two committee members were

4  represented by Coalition members.  When the Coalition decided

5  to move on or those lawyers decided to move on those

6  committee members are represented by other counsel.  There is

7  a third committee member that was represented by counsel, but

8  separately represented the interest of other creditors; that

9  is Mr. Fowl [ph].  That is the next thing.

10          So, he continued to represent the committee, but

11  understood the issues or, at least, concluded, and he'd have

12  to speak for himself, but Mr. Amble is here, who is his

13  partner, that the determination was made that he had other

14  interests, as happens many times in cases, and that he would

15  pursue those interests separately from his fiduciary duty in

16  his representation of his client on the committee.

17          So, he had other people and he took positions that

18  related to the other people, but he still had a client on the

19  committee.  Ultimately, it was that committee member that

20  would make the determination on the committee.  It was very

21  clear, and just so Your Honor appreciates how this works you

22  would have calls that would have the committee members with

23  their counsel, but there were lots of – when it came down to

24  the bottom line of decision making the committee members made

25  those decisions.  They, in many cases, made it without the

1  presence of their lawyers. That was the determination that in

2  this particular case, every case is different, that the

3  committee members had made their own determination that it

4  was their decision; that it was not their lawyers' decision.

5          THE COURT:  They were right.

6          MR. PACHULSKI:  And we certainly never tried to

7  convince them otherwise.  They were right.  They were the --

8  and Mr. Kennedy, whose here who could testify or speak to it,

9  was very clear about that with us.  You take the orders from

10  us, you do not take it from our counsel.

11          So, I wanted to put it on the record as to what

12  the facts were. I am not trying to take any position with it.

13  As we've said, we have no objection.  We have put it in.

14  This was a case that did take a lot of effort, and I can

15  speak to it later if Your Honor is interested, but I did want

16  the record clear since Your Honor asked a very direct

17  question.

18          THE COURT:  Thank you.

19          MR. PACHULSKI:  I wanted to give you a direct

20  answer.  Thank you again, Your Honor.

21          THE COURT:  Thank you.  I appreciate it.

22          MR. MOXLEY:  Your Honor, I apologize that I had to

23  phone not one, but two friends.  You couldn't have had more

24  qualified friends then Mr. Molton and Mr. Pachulski.  So,

25  thank you, Your Honor.

1        Your Honor, unless the Court has any other

2   questions, I think that -- oh, I'm sorry, did Your Honor have

3   a question?

4        THE COURT:  Well, no, I don't have another

5   question on that. I am somewhat struggling, which is why I'm

6   asking the questions, with the idea that a group that really

7   is representing -- representing is probably the wrong word,

8   but that is the same constituency as the committee and a

9   specialized committee here, not a general committee.

10       Obviously, several firms disagreed with the way

11  the official committee was going.  That is fine.  Usually

12  those disputes are handled internally.  That is a committee

13  functions, right, members disagree, they go back and forth,

14  they negotiate, they come up with a resolution that not

15  everybody is happy with, but accounts for all the different

16  positions that the members have, and all of their different

17  types of claims, etc.

18       Here, that didn't happen.  Here, those who were

19  unhappy with the direction of the committee went and formed

20  their own group.  They can do that, no problem.  My question

21  is should they get their fees paid for that.  Forming the

22  other group, no issue.  Present your position, no issue.

23  Can't work it out internally, that's fine.  But should their

24  fees be paid when I have a group, an official committee, that

25  is charged and has the fiduciary obligation to the entire

1 survivor constituency.  I am struggling with that.

2          MR. MOXLEY:  And as Your Honor struggles with that

3 can I offer a couple of thoughts.

4          THE COURT:  Yes.  I would like your thoughts.

5          MR. MOXLEY:  So, a couple of things.  Number one,

6 there is -- we make in our papers two things.  I want to

7 start first with the fact that we make in our papers the

8 public policy argument that these types of ad hoc groups can,

9 at times, in certain cases and certain contexts, we should

10 submit this is one, add benefit to moving the case forward

11 toward resolution and we think the evidence before the Court

12 on this motion shows that this is one of those cases.

13          The question that Your Honor is struggling with is

14 whether in this context a group like the Coalition ought to

15 have its fees paid.  We submit that Your Honor has the two

16 different standards in which to judge that question.  We

17 think that the business judgment standard is the right

18 approach and that the debtors are properly exercising that

19 business judgment standard here.

20          If Your Honor thinks it's the 503(b) standard, we

21 think that what we have done we have come forward and shown

22 you the evidence for how we have made a substantial

23 contribution that was non-duplicative.  And at different

24 points and different times in the case our group and other

25 survivor representative groups took different approaches,

1  worked with different members and different constituencies

2  throughout.  And in doing so, Your Honor, all of that work by

3  all the different survivor representatives ended up in the

4  positive place that we're in today.

5          So, we would just bring it all the way back, Your

6  Honor, to, again, that the Court can consider the entirety of

7  the record before it and the Court's own observations and

8  experiences.  When you couple that with the evidence in

9  support of the motion we think that all of that calculous

10 suggests that the motion ought to be granted.

11         THE COURT:  So, you think that non-duplicative

12 means we took different approaches or we didn't precisely

13 duplicate work.

14         MR. MOXLEY:  Right.

15         THE COURT:  And that is what you think non-

16 duplicative means.

17         MR. MOXLEY:  I do, Your Honor, because it's not a

18 situation where a Coalition -- let's say a representative for

19 the Coalition, like myself, attended a deposition as did one

20 of Mr. Pachulski's colleagues attend a deposition, and we

21 billed for the same time doing exactly the same thing.  That

22 is not what we are talking about.

23         We are talking about our group doing different

24 work and different approaches, undertaking things that other

25 people were not undertaking, and they were undertaking things

1 that we were undertaking.  There was a duplication.  That is

2 our point, Your Honor.

3          To the extension that there were some

4 duplications, again, the proposed order provides that our fee

5 statements are submitted for review, etc., and so we think

6 that the process plays out the right way when you think about

7 it that way, Your Honor.

8          THE COURT:  Well, for example, both the committee

9 and the Coalition evaluated the ability of the local councils

10 to make a contribution.

11          MR. MOXLEY:  Yes.

12          THE COURT:  They came to different results, but

13 they did the same work.  They each did an analysis.

14          MR. MOXLEY:  And then the question becomes, I

15 think, Your Honor -- may I answer your question?

16          THE COURT:  Yes.

17          MR. MOXLEY:  Yes, analysis done.  The question

18 then becomes to what end.  The Court, I think, on this

19 motion, can say, well, to a positive end the Coalition did

20 work, analyzed that, reached a conclusion, that led them to

21 engage with certain parties in certain ways at certain key

22 points in the case.  That led to -- that moved the case

23 forward toward resolution and that is really, at the end of

24 the day, I think, the ultimate standard for Your Honor to

25 consider which is whether or not it was constructive,

1  substantial, etc.  I think that the evidence is clear that it

2  was.

3           THE COURT:  So, is your position that if I find

4  that the Coalition was constructive throughout the case that,

5  sort of, is the end of the analysis.

6           MR. MOXLEY:  If we're looking -- let's just take a

7  substantial contribution, if we're looking at that the case

8  law, I think, is clear that what we have to show is a

9  demonstrable substantial contribution that led to the cases

10 going forward, non-duplicative, and that it was, sort of,

11 moving the cases toward resolution.  I think we check all

12 those boxes, Judge.

13          I think the evidence on that, that is unopposed,

14 is clear that we check all those boxes.  That is if Your

15 Honor thinks about it under the 503(b) standard. If Your

16 Honor thinks about it under the 363 standard, obviously, then

17 the debtor can make that assessment.  We respectfully submit

18 that they have.

19          I will stop talking for a moment, Your Honor.

20          MR. MOLTON:  Judge, one of the attributes of being

21 in Court is you get notes, actually physically passed to you

22 instead of texts while you're trying to talk.

23     (Laughter)

24          MR. MOLTON:  I would ask you to read the Sugden

25 declaration, Will Sugden, and that's a disinterested party.

1  That is the ad hoc local council group. He was with every

2  party here throughout the course.  Mr. Sugden is in Court

3  today.

4           THE COURT:  I see him.

5           MR. MOLTON:  I'm sure he'd be willing to answer

6  your questions under oath if necessary.  But Mr. Sugden's

7  declaration, we think, answers all of your questions, Your

8  Honor.  I'd ask you to read it.  It talks about not --

9  however you want to judge it and whether contributive in

10 material contribution is the standard, we believe on certain

11 crucial points in this case where Boy Scouts was teetering on

12 the edge of a freefall bankruptcy -- Your Honor was witness

13 to it, I don't have to remind Your Honor -- whether or not

14 they could have existed as a non-profit, an iconic historic

15 institution.  We believe that we have provided the solution,

16 the creative solution, that broke through those impediments,

17 whether it be with the local councils.  It was a step by

18 step, as Your Honor knows.  Each step produced the next step

19 that got us to today.

20           The agreements -- now, listen, everybody can

21 differ on how to approach the case and the TCC had a

22 different view.  Why they had that different view we were

23 working with Hartford and Century.  Your Honor said without

24 those settlements there would be no plan. Without denigrating

25 anybody's contribution to today, which is a significant day,

1  a historic day, is something I know Your Honor is proud of,

2  but we're all proud of.  Those were crucial, crucial

3  breakthroughs both in terms of legal innovation, how to deal

4  with 12,000, I think, Ms. Lauria, chartered organizations you

5  had said at some point.  How to resolve those issues. How to

6  resolve the issues with the local councils, the shared

7  insurance; all those things got wrapped up first in Hartford

8  and then solved in Century.  We move forward to today.

9          I would submit, Your Honor, that those two

10  contributions, contributions I will call them because it

11  called substantial contributions, marked critical

12  breakthroughs without which we couldn't have been here right

13  now with a $2.5 billion historic compensation fund for the

14  benefit of all the people we're here for.

15          I would also mark -- I know Your Honor is

16  struggling with the issue, well, the committee represents us.

17  It's a specialized committee.  On the Purdue and Mallinckrodt

18  committee there sits personal injury claimants.  They have,

19  nonetheless, an ad hoc group of personal injury opioid

20  claimants, PI claimants.  I think in Mallinckrodt, through

21  the plan, they got their substantial contribution.  We will

22  be able to pull that to you if Your Honor wants us to and

23  supply it to you.  I know in Purdue the same thing.  As Your

24  Honor knows, we're still waiting to --

25          THE COURT:  Purdue has a lot of money.

1          MR. MOLTON:  But notwithstanding, Judge --

2          THE COURT:  <u>Purdue</u> has a lot of money.

3          MR. MOLTON:  -- the same issue talked about.  Its

4    in every bankruptcy.  A substantial contribution, if you meet

5    it, you've actually provided a benefit to all the creditors,

6    all the creditors.  You know, the argument the code provides

7    with, of course, the Judge being the gatekeeper, and that's

8    what you're doing right now, the code provides that

9    notwithstanding, yes, there are certain dollars that will be

10   shifted from one pot to someplace else that is appropriate

11   pursuant to the statute because of the result of that work

12   for the benefit of all.

13         We submit the record here, unopposed,

14   dispositively shows that.  We're thrilled to be here today.

15   And, Your Honor, you know, I would also mention that the

16   plan, itself, which provided for us to go forward with this

17   motion, was voted in favor, as Your Honor knows, by the very

18   people that you are talking about right now.  So, I am saying

19   there is a legion of record evidence and issues, as you

20   purview the record, that supports the Coalition's relatively

21   modest request in the scheme of what was done.

22         That is all I have to say, if Your Honor has

23   nothing further from me.

24         THE COURT:  Thank you.

25         MR. MOXLEY:  Thank you, Your Honor. I certainly

1   can't top that.  I apologize that it's taken a village for me

2   to deliver this argument.  But thank you, Your Honor.

3           THE COURT:  Make sure before you step back --

4           MR. MOXLEY:  Oh, of course.  Yes, Your Honor.

5           THE COURT:  One question I have is do the fee

6   applications -- not applications, but submissions on fees do

7   they include all the professionals fees for all the work they

8   have done in the case or have -- I will just ask for Brown

9   Rudnick to start out with, was any of it pulled out?  Did you

10  look at it and say, you know what, I think this was really

11  for the benefit of my individual client and not for the

12  entire estate.  Any part of the fees taken out on that basis,

13  as you see in some of the cases where the Court says, well,

14  this part of their fees, yes, but not this aspect where they

15  were just working, just benefited their individual clients.

16          MR. MOXLEY:  Your Honor, Mr. Goodman signed our

17  verified fee statement.  So, I will let him answer the

18  question.

19          THE COURT:  Mr. Goodman.

20          MR. GOODMAN:  Good morning.

21          THE COURT:  More of the village, yes.

22          MR. GOODMAN:  Yes.  The answer to your question,

23  as the party who signed the verified fee statement, is that

24  we included, for Brown Rudnick speaking, the fees billed

25  through the case.  There did hit a point where we realized,

1  because it was a capped number, there was, sort of, no point

2  in including anything beyond that because, you know, we're

3  limited to the agreement with the debtors to the 21.

4         I will note that Mr. Moxley and I were actually

5  having a discussion last night about this very question that

6  I anticipated the Court would be answering.  It's like, you

7  know, how do you call out when this was being done, and you,

8  sort of, look at the key accomplishments in terms of the work

9  of the local councils, the work that we did with Hartford,

10 the work that we did with Century.  And I am going to

11 personally thank Tank Schiavoni for the three months that we

12 spent together as well as Marybeth Forshaw and Steve Warren,

13 because if I didn't do that I would feel bad about myself.

14        In order to be able to be in a position to do all

15 of the things that we did and the things that we came up with

16 in terms of getting a plan put together that we thought could

17 get across the finish line, yeah, there were points in the

18 case where you may say, well, filing the motion to

19 participate in the mediation is that really there.  Well, if

20 that hadn't been granted we're not in the room with the local

21 councils, we're not in the room with Hartford, we're not in

22 the room with Century; none of that work gets done.  And I

23 don't think a plan gets done if we're not there doing those

24 things.

25        So, we did include the entirety.  We did not call

1  back out.  But I will note that, pursuant to our negotiations

2  with Mr. Fox at the U.S. Trustees Office, one thing that was

3  important to them was that our fee application go through the

4  full, you know, review by a fee examiner, be subject, you

5  know, to a final fee application.  So, if the Court were

6  inclined to grant the motion, you know, but for another day,

7  would be the ability for the fee examiner and the Court to

8  consider some of those issues.

9         We thought as a threshold matter, we would first

10 find out if there's even any point to doing that because if

11 the Court, obviously, is going to deny then we are not in a

12 position where you would, I think, undertake that analysis.

13         THE COURT:  Okay.

14         MR. GOODMAN:  Thank you.

15         THE COURT:  The other question I have, specific to

16 the applications, is Robbins, Russell, I remember discussions

17 with, I guess, is it Mr. Robbins -- my recollection was he

18 was representing some of the individual law firms in certain

19 of the issues that were before the Court that implicated

20 those firms directly.  So, can someone explain to me, thank

21 you, his firm's application.

22         MR. GOODMAN:  Eric Goodman, again, Your Honor.  I

23 think my title, by the time this case rests, may be Boy Scout

24 historian.

25         THE COURT:  Okay.

1          MR. GOODMAN:  The answer to your question, I

2    believe that Mr. Russell that that application would have

3    specifically included only Coalition, large work, and that

4    any work that was specifically done for Anderson Thornton

5    would not have been included in that fee statement.

6          MR. MOXLEY:  Your Honor, the 30(b)(6) deposition

7    of the Coalition was handled by Mr. Robbins as well, as part

8    of that.

9          THE COURT:  Okay.  I think the only other question

10   I may have is that in the motion --

11         MR. MOXLEY:  Our opening brief, Your Honor?

12         THE COURT:  Yes.  Paragraph 140, 1-4-0, of the

13   motion, Docket 10808 --

14         MR. MOXLEY:  Yes, Your Honor. I'm with you.

15         THE COURT:  -- it says the Coalition firms could

16   have litigated thousands of abuse claims against local

17   councils and chartered organizations in State Court.  This

18   path may have resulted in fewer survivors receiving

19   compensation, but would have, I'm skipping some words, placed

20   each of the Coalition firms in a comparable place in terms of

21   their overall recovery.

22         I have a question about that factually.  But my

23   first question is why do you think it was important to put

24   that paragraph in this motion?

25         MR. MOXLEY:  I think what we're trying to show

1  with this paragraph, Your Honor, is, essentially, that the

2  Coalition had an opportunity, if it strategically or,

3  otherwise, with its clients chose to pursue a different

4  litigation strategy.  We chose a litigation strategy as the

5  substantial contribution standard requires for us to do work

6  that was beyond just our own self-interest.

7        So, we were trying to show that this wasn't the

8  only option for us to do, which is to take the steps and take

9  the various approaches at different key points in time to do.

10  We could have done taken a different approach and what I

11  think we're saying there, Your Honor, is that not only could

12  we have done so, but it may have been economically the same

13  or different in some way if we had taken different

14  approaches.

15        The approach we wanted to take and that we pursued

16  was to try to drive the cases forward toward a resolution

17  that allowed for the goals that Mr. Molton had outlined in

18  his opening remarks which were, number one, to get survivors

19  paid timely in their lifetime for the pain and suffering they

20  endured and to also, if possible, allow the scouting positive

21  mission to continue just new and improved with youth

22  protection concrete steps in place.

23        So, what we think we're trying to say there,

24  Judge, is that all of our collective work as a Coalition was

25  geared toward pursuing that strategy which benefited not just

1  ourselves and our clients, but the estate.  That is, sort of,

2  the point of the motion.

3          Another villager has arrived.

4      (Laughter)

5          MR. GOODMAN:  I thought that was a great answer

6  and I have nothing to add to that.

7          I just want to correct the record earlier, the

8  Robbins Russell Firm did not defend a 30(b)(6) witness.  That

9  was actually the Akin Gump Firm, Abid Qureshi, I believe, was

10  the attorney who was present for that exam.  The Robbins

11  Russell Firm was brought in to handle the estimation motion

12  and those matters relating to the case.  That was something

13  that they handled specifically.

14          So, I just wanted to make sure that that was clear

15  because I think the earlier statement was inaccurate.

16          THE COURT:  Okay.  Thank you.

17          MR. GOODMAN:  Thank you.

18          THE COURT:  So, Mr. Moxley, I appreciate that

19  response on Paragraph 140 which I will give some thought to.

20  Is that counterfactual with respect to, at least, some of the

21  Coalition firms who have engagement letters that limit their

22  representation to only bringing a claim in the Boy Scouts

23  bankruptcy or a collective action and not to take on

24  individual lawsuits against either the Boy Scouts, the local

25  councils, or any other defendant.

1         MR. MOXLEY:  Your Honor, its difficult for me to

2    go through all of the individual engagement letters at the

3    podium right now, but I would just say that that may have

4    been the case with respect to engagements for some, but the

5    Coalition, as a group, as an ad hoc group, had the ability to

6    take different strategic positions at different points in

7    time.  The overriding strategic goal always was what I just

8    stated earlier.  I won't restate it again for the record. It

9    was what I stated earlier which was to bring these cases

10   toward a resolution for the benefit of the estates and all.

11        That was the Coalition's goal.  That is a goal and

12   that was work that was undertaken.  I think the point of this

13   paragraph, and some of the other paragraphs in our briefing,

14   was not just focused on our own clients' unique interests,

15   but for the estates as well.

16        I hope that answers your question, Your Honor.

17        THE COURT:  Okay. Thank you.

18        MR. MOXLEY:  Thank you very much, Your Honor. It's

19   been a privilege to stand here on behalf of the Coalition and

20   in your courtroom.

21        THE COURT:  Mr. Moxley, you have been under my

22   fire before.

23      (Laughter)

24        THE COURT:  So, as -- and I appreciate it because

25   you always try to answer my questions and I very much

1  appreciate that.  You don't sidestep them, so I appreciate

2  it.

3          MR. MOXLEY:  Thank you for your comments, Your

4  Honor.

5          THE COURT:  Thank you.

6          MR. MOXLEY:  I very much appreciate it.  Thank

7  you.

8          THE COURT:  Okay.  Mr. Fox.

9          MR. FOX:  Good morning, Your Honor.  May I please

10  the Court, Tim Fox, on behalf of the United States Trustee.

11          I just wanted to rise briefly to confirm on the

12  record the representations made in my office's response,

13  filed at Docket Item 11111.  I think that's the correct

14  number of 1's.

15          Your Honor, as our papers indicated, we initially

16  were concerned with the record with respect to the request

17  and a legal standard continues to be a pressing concern for

18  my office as well.  For some of the reasons Your Honor

19  questioned Coalition counsel.  At the podium here today, my

20  office still would posit that the 363 or Mallinckrodt

21  standard, that they present in their papers, is not

22  applicable here on these facts and circumstances, and the

23  response reserves all rights with respect to that issue.

24          But, with respect to the record, as supplemented

25  through the additional declarations submitted by Mr. Sugden

1  and the second declaration of Mr. Patton, that resolves some

2  of the factual concerns that my office posited in its omnibus

3  objection that was filed at Docket Item 10944.

4          And, Your Honor, with the revised form of order,

5  the United States Trustee would not object to their relief

6  sought here today.  Again, with the important procedural

7  safeguards as to the review of the fee statements that

8  Coalition council noted on the record as well.

9          THE COURT:  Thank you.  That reminded me that I

10  had a question on the order, and that was submitted under

11  certification of counsel.

12          MR. MOXLEY:  A question for me, Your Honor?

13          THE COURT:  Could be, Mr. Moxley.

14      (Laughter)

15          THE COURT:  The question I have on the form of

16  order is Paragraph 7 which I'm sure was in response to the

17  objection that was raised by Ms. Lujan and the insurers, I

18  think, with respect to the impact on the appeal and not

19  wanting any order here to have any impact on the appeal which

20  I appreciate that concern.  But the question I have here is

21  whether I can order this and, quite frankly, whether the

22  Court of Appeals would care whether I ordered it or not.

23          Nothing in this order shall impair, prejudice,

24  moot, or, otherwise, affect the rights of any parties in any

25  appeals of the confirmation order, et cetera.  It's sort of

1  like when you ask me to find in my confirmation order that,

2  upon a certain event, the plan will be substantially

3  consummated.  I don't make those decisions, and I routinely

4  strike that because that's something the Appeals Court does.

5        And so, I just wonder -- I have no problem with

6  the concept that what I'm doing here, to the extent I grant

7  the motion, should not impact the appeal, but I just have

8  some concern about that particular provision.  And one

9  thought I had was whether it should just be an agreement

10 among the parties that they're not going to raise that the

11 (indiscernible) wouldn't raise the particular issues on

12 appeal.

13        MR. MOXLEY:  So, Your Honor, a couple points.

14        Your Honor is correct as to the genesis of this.

15 It was a request from Ms. Lujan Wolff.  We agree with the

16 Court that whether this is in this order or not, it doesn't

17 affect their ability.  They actually wanted something

18 expressed.  We are willing to do that.  We're happy to agree

19 to that on the record and state that nothing with respect to

20 the proposed order -- if Your Honor wishes to strike this,

21 the Coalition does not intend to raise that issue.

22        THE COURT:  Well, I don't want to strike it

23 without some agreement from other people.  I'm not trying to

24 undue something to the extent that I get there.  I'm throwing

25 it out there right now.  Recognize, I'm not going to rule

1  today.  I'm going to take this under advisement.

2          So, there will be some time to have some

3  discussion, but I'm just really, sort of, questioning whether

4  I can or should have this provision in my order and, if so,

5  what's the real impact of it and is it getting the parties

6  where they want to be.  And that's why I'm raising it.

7          MR. MOXLEY:  And I don't know if Ms. Lujan Wolff

8  is on the Zoom.  I can't see that from my advantage point,

9  Your Honor --

10          THE COURT:  She certainly asked for permission and

11  I granted it so that she did not have to come in from Guam

12  for this.

13          MR. MOXLEY:  So, just to round up the record for

14  the Coalition here, Your Honor is correct.  It's the genesis.

15  Your Honor is correct that we would agree to such a thing and

16  we're happy to proceed however the Court wishes on that

17  provided that Ms. Lujan Wolff is comfortable as well.

18          THE COURT:  Okay.  I'm just raising it.  You all

19  can talk about it in the meantime.

20          MR. MOXLEY:  Thank you.

21          MR. FOX:  Thank you, Your Honor.  Again, Tim Fox,

22  on behalf of the United States Trustee.

23          Just want to pause in case Your Honor has any

24  questions of my office regarding the response or any of our

25  papers with respect to the standard issue.

1          THE COURT:  No.  I understood your papers.  They

2    voiced many of the same questions I had.  I noted because I

3    had my questions first and then I read your papers.  So, I

4    appreciate them.  I think you raised important issues.  I

5    understand the resolution and how you came to it and why

6    you're agreeable to where you are.  So, no, I don't have any

7    questions.

8          Thank you.

9          MR. FOX:  Thank you, Your Honor.

10         THE COURT:  Okay.  So, I think that concludes the

11   Coalitions motion.  I know we have --

12         MR. ABBOTT:  The Pfau Cochran, I believe, is the

13   next motion on the agenda.

14         THE COURT:  Pfau Cochran.  Let's take 10 minutes.

15         MR. ABBOTT:  Thank you, Your Honor.

16         THE COURT:  We're in recess.

17      (Recess taken at 11:17 a.m.)

18      (Proceedings resumed at 11:30 a.m.)

19         THE CLERK:  Please rise.

20         THE COURT:  Please be seated.

21         MR. MOXLEY:  Your Honor?

22         THE COURT:  Mr. Moxley.

23         MR. MOXLEY:  Yes, Your Honor.  Before we move to

24   the next agenda item, I just wanted to offer -- again,

25   Cameron Moxley of Brown Rudnick, for the record, for the

1  Coalition.

2          If the Court would like a submission that details

3  where money would go depending on, you know, the motion being

4  granted as between the trust, the debtors, and the Coalition,

5  we'd be happy to make a submission so the Court has the

6  concrete numbers if that would be helpful for the Court.

7          THE COURT:  Sure.  Thank you.

8          MR. MOXLEY:  Thank you, Your Honor.

9          THE COURT:  Thank you.  Mr. Patterson.

10          MR. PATTERSON:  Good morning, Your Honor.  Tom

11  Patterson of KTBS Law for the motion at Docket 10809 of Pfau

12  Cochran and the Zalkin Law Firm for an order pursuant to

13  various code sections that we'll talk about allowing payment

14  or reimbursement of restructuring expenses.

15          Your Honor, let me start with the easiest stuff,

16  housekeeping.  I would like to move the admission of the

17  declaration of Jason Amala which is attached as Exhibit B to

18  the motion I just referenced, as well the declaration of

19  Richard Pachulski at Docket 11091 and Exhibit C to the motion

20  which is a fee statement of the time records and the project

21  billing statements.

22          So, working my way up in degree of difficulty, let

23  me also address a question the Court had about whether or not

24  our fee statements include all of the time incurred or

25  whether we edited time out.  And, we do have a footnote that

1  addresses a fee reduction that we imposed on ourselves for

2  either what we refer to as client specific matters and time

3  incurred in objecting to the TCJC settlement.  There was an

4  argument that, successfully objecting to that settlement, was

5  in the benefit to the estate but we can understand the irony

6  in advancing that argument and it didn't do that.

7          Next, I just wanted to point out, sort of, a

8  mathematical observation which is that although we are

9  seeking $3.5 million, the total fees in our fee statement,

10  through last Fall through August of 2022, totaled about $6.3

11  million.  Of that, $3.9 million -- and we have a paragraph, I

12  think, in the motion that deals with the fees on a month by

13  basis.  I can refer the Court to it.

14          But, effectively, around $2.3, it's on Page 21 of

15  the motion, Your Honor, Paragraph 40, is the table, and if

16  you, like me, pull out your iPhone and add up the numbers in

17  the far-right hand column, you will learn hopefully what I

18  learned which is that around $2.3 million of the fees, pre-

19  date the mediation, and I'll talk about that in a minute, and

20  $3.9 million, beginning in January, covered the mediation

21  period and thereafter.

22          And, if the Court looks at that table, the Court

23  will see, expectedly, that the first four months are a very

24  considerable effort, January through April, being the

25  mediation and the confirmation process, and then a

1   significant fall off, and then a big jump in August of 2022

2   when the Court issued its decision regarding plan

3   confirmation and we proceeded to work with the constituents

4   regarding the effect of that.

5           As the Court may recall, under the TCC, so called

6   TCC settlement, the term sheet, there were various

7   requirements for plan confirmation that the parties agreed

8   to, not all of which were satisfied by the Court's decision

9   especially with regard to what, I think, people have called

10  "the findings" or "the supplemental findings".  And we worked

11  with the constituents in an effort to come up with a

12  consensus approach regarding that so that parties could waive

13  that requirement and allow confirmation to proceed with

14  whatever findings the Court would make regarding that which

15  we talked about, I think, during that monthly maybe to month

16  following.

17          So, those are just a couple of, sort of, minor

18  items that I wanted -- oh and one last housekeeping item,

19  Your Honor, which is that Paragraph 7 that the Court drew the

20  Coalitions attention to, dealing with the effect on appeal,

21  was a provision that we included in the order at the request

22  of the United States Trustee so that the order would match

23  the Coalitions order.

24          Ms. Lujan Wolff had objected to the Coalitions

25  motion and therefore its standing.  Ms. Lujan Wolff did not

1   object to the Pfau/Zalkin motion.  And so, whatever the Court

2   does, if it strikes it, there's no procedural auditee that's

3   created by that because there was no objection.  On the other

4   hand, if there's an agreeable way of working it out, then

5   we're clearly happy to do that given that we put it in in the

6   first place.

7           My appreciation of that provision was that it was

8   intended to avoid us arguing that the fact of the allowance

9   of the fees and potentially the payment of those fees

10  wouldn't be an argument that mooted the appeals.  And, if

11  it's viewed as a mootness issue then, of course, we're happy

12  to sign on to that, whether it's out of Court through an

13  agreement or through an order that the Court signs.

14          So, with that aside, Your Honor, I wanted to start

15  with just the Lebron case, it's always good to start with the

16  cases, which says that -- it's a on the one hand, on the

17  other hand decision.

18          THE COURT:  It's a nice way to say it.

19          MR. PATTERSON:  It's -- because the purpose

20  of 503(b) is to encourage creditors to participate

21  meaningfully; on the other hand, it's also to minimize

22  expenses and maximize recoveries.  So, to qualify, to get

23  through the eye of that needle, a claimant has to demonstrate

24  actual demonstrable benefit, and I think other cases refer to

25  a direct material benefit.

1        Your Honor, we are -- our villagers do not take

2   credit for building the whole town.

3        (Laughter)

4        MR. PATTERSON:  We did a series of very discrete

5   things that were somewhat fanatic, but I just wanted to

6   summarize for the Court's benefit.  The first is what people

7   refer to as the "IRO" or the independent review option, which

8   was a mechanism in the plan in the TDP that actually solved a

9   number of problems and created a number of enhancements.  It

10  created a vehicle for those who believed that the TDP

11  value -- that their claims could exceed the TDP values,

12  provided them with a method of pursuing claims on a basis

13  that they could demonstrate that and obtain a recovery.

14        It also created a mechanism for establishing

15  claims that excess insurance might respond to --

16        THE COURT:  Uh-huh.

17        MR. PATTERSON:  -- because a lot of the excess

18  insurance policies had thresholds that would not, or could

19  not, be met by establishing values in accordance with the

20  existing TDP; of course, establishing claims only, you know,

21  to the extent those contracts were -- the contracts would be

22  responsive to those claims.  It wasn't intended to do

23  anything beyond that.

24        And third, sort of recognizing both of those

25  things through the showing mechanism, inherent in it, it was

1  a way to increase recovery for all creditors, all the

2  survivors, because as the Court may recall, a percentage of

3  the monies realized on account of independent review of

4  claims, to the extent there were assets recovered on account

5  of insurance through those claims, those assets would be

6  shared somewhat with the general TDP creditors.  In addition,

7  an IRO claimant had to give up a portion of their TDP claim,

8  so it reduced the drag on the existing TDP pot and, thereby,

9  created an additional benefit for the survivors in the

10 general TDP pot.

11              And I would submit, Your Honor, that that

12 mechanism is a pretty classic case for a substantial

13 contribution benefit because it did increase the assets

14 available for everybody and created a benefit that was not

15 merely incidental to the benefit that my clients were

16 pursuing on behalf of their own clients.  First, it was

17 available to all the high-value claims.  And I know I've been

18 involved, and others have been involved in cases where, at

19 the end of the day, the resolution of the objecting, you

20 know, group of plaintiffs is to give them a value or give

21 them a status that is, you know, unique to them, and we never

22 pressed for that.  Everything we pressed for and advanced and

23 everything that was agreed to, is something that would be, a

24 benefit that would be enjoyed by any survivor who qualified

25 for the conditions under it.  And we know that there are

1  many, many survivors who will qualify under this benefit if

2  they choose to take advantage of it.

3          Second, Your Honor, the mixed claims, or the

4  definition of abuse claim, is a theme that we developed early

5  on during the disclosure statement process.  We believe the

6  definition, as crafted, was overly broad.  And what we found

7  was that whether we believed that or not, no one else did,

8  and so it took a considerable amount of effort to get that

9  appended and it did not end up getting changed until we got

10 involved in the mediation process that I can talk about in a

11 minute.

12          Third, one of the very important things to our

13 clients, again for the benefit of everybody, was that future

14 settlements with charter organizations or insurance companies

15 would have to be supported by fair value opinions or the

16 views of those who had claims that would be impacted by that

17 insurance or chartered organizations, and a series of those

18 provisions were built into the trust at our behest.

19          Next, Your Honor, the document appendix, which was

20 a document part of the plan that dealt with the sharing of

21 information that survivors could access, particularly, for

22 the independent review option, but also generally for TDP

23 claims.  We felt that that document appendix needed to be

24 modified in a number of ways to ensure that survivors had

25 access to information that was available that they would need

1   to establish their claims.

2          The Court may recall there was a lot of discussion

3   about the TDP values and discussions about, you know, the

4   liability-showing requirement for TDP and a lot of that

5   depends on things like notice and a lot of that depends on

6   tiers, on things like whether or not the abuser was a serial

7   abuser and so forth.  And what the document appendix does,

8   and is intended to do, is to make information available to

9   survivors to allow them to show the level that their claim

10  can be established at, and also to allow the trust to be able

11  to mind the information that survivors provide and use it,

12  you know, to triangulate in on, you know, for example, a

13  serial abusers.  It may be that people don't know the name of

14  their abuser, you know, a lot of this happened when people

15  were kids, but if you get information into a database about

16  when something happened and where it happened and you,

17  through viewing the data, realize that there is a cluster

18  around a year or two in a neighborhood, then that gives the

19  trustee the ability to investigate that and see whether or

20  not, unbeknownst to any of the individual survivors, that

21  there was, in fact, a serial abuser.  And that could be

22  important for the trust in establishing the tier or the level

23  of enhancement that that survivor might be entitled to under

24  the TDP.

25          Lastly, Your Honor, and all these are listed in

1  the motion and more, but I wanted to hit the highlights of

2  the supplemental findings that the Court possessed and made,

3  following its decision in the plan modifications, was a very

4  significant effort that was undertaken following the Court's

5  decision.  The Court's decision, as written, was going to

6  require some plan modifications and we worked with the other

7  constituents.  And I think by that point, it's fair to say

8  that with respect to the issues that were -- that Pfau/Zalkin

9  had advanced, you know, particularly the independent review

10 option and so forth, you know, the other constituents looked

11 to us for what would be acceptable resolutions of the issues

12 that that created.

13        And I'm being somewhat elliptical, Your Honor,

14 because I want to talk about process, but the actual nuts and

15 bolts of it, I think a lot of it is protected by various

16 privileges.

17        Oh -- sorry -- lastly, Your Honor, I think, along

18 with a number of otherwise, I think Pfau/Zalkin did create a

19 mechanism that was important to increasing the vote when the

20 preliminary tabulation came in, and at least our view was

21 that it probably didn't meet the threshold for satisfying the

22 confirmation standard in the third-party release case, you

23 know, based on the number and based on some of the work that

24 we had done about where the voting came from and the

25 expedited payments and so forth.

1          We had had a series of Zooms with Pfau/Zalkin, who

2    organized with state court counsel across the country, in

3    which we had discussed the issues that we had with the plan

4    during the fall.  And when we went into the mediation, you

5    know, the people that we had been in touch with, were aware

6    of the priorities that we were pursuing, and when we

7    announced that we were -- what the result of that was, a

8    number of them recommended to their clients to change their

9    vote on the plan and vote in favor of the plan.  And we

10   believe that was a significant part of allowing the plan to

11   proceed to confirmation with the requisite vote.

12          As the U.S. Trustee points out, it's awfully hard

13   for those of us who got up every morning and attended the

14   trial to call this a consensual confirmation, but, first, the

15   fact that it got to confirmation, I think was a significant

16   effort and, second, I think it's fair to say that it was

17   largely, certainly among the survivor constituency, a

18   consensual plan, and we think we played some role in that.

19          So from our standpoint, Your Honor, the process

20   that we went through was a very challenging one.  Through the

21   fall, we were sort of trying to understand the plan.  We

22   were -- you know, we were not invited to the mediation; sort

23   of a degree of social exclusion I hadn't experienced since

24   the eighth grade --

25          (Laughter)

1          MR. PATTERSON:  -- but there it was.  But we did

2    get involved in the mediation at the right point, and the

3    point that I wanted to make here is that if we had not done

4    the work in the fall, we would not have been able to do the

5    work in the mediation.  The plan was so complex, the

6    interaction with the insurance settlements, as those were, in

7    fact, being amended during the solicitation process.  The

8    Century settlement came out that also had a backdoor

9    chartered organization settlement, and so forth.  If we

10   hadn't done that work, we would have been the village idiot,

11   and we may have been described that way anyway, but at least

12   we were knowledgeable village idiots by that point and that

13   enabled us, I think, to advance some of the priorities that

14   we did, and did it in a way that was intended to contribute

15   to a plan that could be confirmed and that would benefit

16   everybody.

17          So, again, we never negotiated for a private

18   benefit or a parochial benefit; it was always that these were

19   priorities that everybody should benefit from and,

20   ultimately, people did and we got where we got.

21          So, that is sort of what I would like the Court to

22   bear in mind as it considers this application.  I know the

23   Court had some questions for Mr. Moxley.  There's one that I

24   wanted to answer that I hope is helpful, and the question was

25   regarding the debtors' business judgment and what evidence

1  the debtor has regarding business judgment, if that's the arm

2  that we would proceed under.

3        And, again, Your Honor, we have the same agreement

4  with the United States Trustee, which is that, you know, we

5  are oddly willing to proceed under the most rigorous standard

6  if the Court approves it on that basis, but alternatively, we

7  have reserved on 363 and 1129(a)(4) and the U.S. Trustee has

8  reserved their opposition to that.

9        So, from our standpoint, the provision to pay the

10  Pfau/Zalkin fees was put into the plan, was in the plan, and

11  at the outset of the confirmation hearing, the Court heard a

12  great deal of testimony regarding the debtors' decision to

13  file this plan, as opposed to another plan, discussion

14  regarding the modifications to the plan through the TCC term

15  sheet and the corporate and business judgment process that

16  the debtor followed in connection with that.  And I believe

17  that that umbrella testimony is sufficient to support the

18  debtors' business judgment with regard to its decision to pay

19  the restructuring fees to Pfau/Zalkin.

20        1129(a)(4) requires that the fees be reasonable,

21  and so from our standpoint, if we proceed in that arm or

22  under that statute, our view is that we're here to establish

23  that the three and a half is reasonable and complete the set

24  of findings that would be necessary for the Court to approve

25  it under that basis.  But that is not the basis I'm urging,

1   but because the Court had a question regarding that, I wanted

2   to provide that alternative analysis.

3          Lastly --

4          THE COURT:  Let me ask you on that --

5          MR. PATTERSON:  Yes, Your Honor?

6          THE COURT:  -- on the standards --

7          MR. PATTERSON:  Yeah?

8          THE COURT:  -- so 363, 1129(a)(4), substantial

9   contribution, what do you view as the intersection --

10          MR. PATTERSON:  Sure.

11          THE COURT:  -- or lack of intersection --

12          MR. PATTERSON:  Sure.

13          THE COURT:  -- of those provisions?

14          MR. PATTERSON:  Sure.  I mean, I think 363

15   and 1129(a)(4) stand on one side and 503(b) stands on the

16   other.  I think if we're proceeding under 503(b) purely,

17   then, and the Court were to then -- and the Court were not to

18   accept the 363, 1129(a)(4) argument, then we would just be

19   under 503(b).  And I think that the debtors' view or decision

20   to support the payment would be, I mean, an evidentiary point

21   worth whatever it's worth, but not entitled to particular

22   deference with regard to establishing the requirements.

23          We've always acknowledged, for our part, at least,

24   that if we have to proceed under 503(b), then it's 503(b).

25   But if we proceed under a 363, 1129(a)(4), our view is that

1  the debtors' business judgment and including the proposal in

2  the plan, the provision in the plan to pay it, is entitled to

3  business judgment deference, as any aspect of the plan is,

4  subject to the requirement that we show that the amount is

5  reasonable, as required by 1129(a)(4).

6        THE COURT:  I don't know if I've thought about a

7  debtor's plan being subject to 363, or is that just a

8  particular part of the plan that you think is subject to 363?

9        MR. PATTERSON:  Well, I think -- no, I appreciate

10  that.  I mean, I think that -- I mean, one way to view it is

11  that 1129(a)(4) stands on its own.  I think that from our

12  standpoint, the decision to support it and to put it in the

13  plan was in the TCC term sheet, which our view was, was sort

14  of a 363 decision and then the plan, itself, is subject to

15  deference, business judgment deference with respect to a

16  legal provision, because the overall plan was supported under

17  that standard at the confirmation trial.

18        THE COURT:  Say that last part again for me.

19        MR. PATTERSON:  Sure.  The decision, the debtors'

20  decision to enter into the TCC term sheet is probably

21  reviewed under 363, but --

22        THE COURT:  And I approved that, but it was

23  never -- with two exceptions, and then it was never put in

24  front of me again for an order, right, because I didn't

25  actually approve it.

1        MR. PATTERSON:  Your Honor, I want to be clear

2   because we may be talking (indiscernible).  I'm not talking

3   about the restructuring support agreement that was put before

4   Your Honor in hesitate summer of 2021.

5        THE COURT:  Oh, okay.

6        MR. PATTERSON:  I'm talking about the TCC term

7   sheet we attached at confirmation to our reply.

8        THE COURT:  Oh, the TCC term sheet, okay.

9        MR. PATTERSON:  Yeah.  That was the product of the

10  mediation that --

11        THE COURT:  Yes, okay.

12        So that -- so give me the standard again --

13        MR. PATTERSON:  Sure.  I think the debtors'

14  decision --

15        THE COURT:  -- how you reconcile those two.

16        MR. PATTERSON:  -- to enter into the TCC term

17  sheet is reviewed under 363.  And the debtor adduced

18  testimony at confirmation about why it entered into that term

19  sheet.  And then the debtors', the actual commitment to pay

20  the fees is under 1129(a)(4), which is also reviewed under

21  business judgment, because it's under the umbrella of the

22  debtors' corporate process by which it decided to propose a

23  plan.

24        So long as the provision is legal, I mean, the

25  Court -- and it is -- but 1129(a)(4) requires a showing of

1  reasonableness, and so if we proceed under that arm, then

2  what we are here today is to show that the 3 and a half

3  million is reasonable in the context of the case and the

4  context of what our overall fees were.

5          THE COURT:  And what do you think "reasonable"

6  means in 1129(a)(4)?"

7          MR. PATTERSON:  Boy, Your Honor, I mean, I think

8  "reasonable" in that context, I'm not sure there are many

9  constraints on it.  I mean, I think it can't offend the

10 contents, either in amount or in nature.  It has to be fees

11 that were paid for something that were proper, you know, not

12 for something that was improper.  So I that that full, sort

13 of panoply, is open to the Court.  I think the amount has to

14 be reasonable.  I think the tasks for which the claimant is

15 being compensated have to be proper tasks, within the context

16 of the plan in Chapter 11.

17         THE COURT:  Thank you.  I've been wondering about

18 this because this is a provision that, quite frankly, just

19 gets glossed over in every single case, right?

20         MR. PATTERSON:  Yeah.

21         THE COURT:  Who focuses on this?  Nobody, except

22 now, maybe.

23         MR. PATTERSON:  Right.

24         THE COURT:  Okay.

25         MR. PATTERSON:  Lastly, I wanted to address one

1  element of your conversation with Mr. Moxley that's also

2  addressed in the case law, which is the effort and fees can't

3  be duplicative.  And I think it sort of emerged that

4  "duplicative" can mean sort of a number of different things

5  here.

6          But from our standpoint, I just want to say that

7  the matters that we worked on and the improvements that I

8  indicated to you for the most part, other than increasing the

9  vote and supplemental findings where we worked with the other

10  constituents, these were not duplicative in that there were

11  not mechanisms in the plan to deal with these issues.  And so

12  the provisions that we added, with regard to the IRO,

13  changing the definition of abuse claim, mechanisms for

14  approving future settlements, these were provisions that were

15  not there and, therefore, our effort was not duplicative of

16  what someone else was doing.  So, I think in that respect, we

17  meet that standard, to the extent it's a constraint.

18          THE COURT:  No, I appreciate that.  In some ways,

19  and I'm not sure how this -- why it should be this way, but

20  in some ways, I think Pfau Cochran request is, as you say,

21  more of a classic kind of request and the duplicativeness is

22  not something as I'm concerned about as I am, as I've

23  expressed with the Coalition, which dealt with the entire

24  case, if you will --

25          MR. PATTERSON:  Right.

1          THE COURT:  -- which dealt with the entire case

2    from almost start to finish versus what Pfau Cochran did,

3    which was fairly targeted to a particular group of particular

4    interests, but yet, I think, did go beyond that and benefit

5    parties of the same -- in the same position, but not within

6    the group, note within Pfau Cochran's group.  So, it's -- I'm

7    not sure it should be that way, but as I was reviewing

8    things, it struck me that this is a somewhat easier

9    application to deal with, at least on the duplicativeness

10   front, but I appreciate that.

11         MR. PATTERSON:  Your Honor, that really concludes

12   the areas that I wanted to draw the Court's attention to, but

13   if the Court has any questions, of course --

14         THE COURT:  The only thing I noticed, which I

15   found interesting, when reading through the motion is that

16   your firm's engagement changed --

17         MR. PATTERSON:  Yes.

18         THE COURT:  -- from an hourly rate to a

19   contingency-fee basis and I don't know what to do with that.

20         Should that matter at all?

21         MR. PATTERSON:  Your Honor, I don't think so.  The

22   fees for which we seek reimbursement are strictly at our

23   applicable hourly rates.

24         THE COURT:  Uh-huh.

25         MR. PATTERSON:  So we are not seeking to be

1  compensated on a contingent basis, sort of trying to quantify

2  the benefit and do that.

3          So this amount of money would be credited against

4  the fees due under the engagement letter; it would not be in

5  addition to those.  And from our point of view in thinking

6  about this when it was first raised, it's really a way of

7  spreading the extraordinary cost that Pfau/Zalkin bore in

8  advancing these arguments and in advancing the mechanism and

9  implementing the mechanism, among those who are generally

10 going to benefit from it.

11         But the fact that our underlying arrangement with

12 Pfau/Zalkin is on a contingent fee shouldn't affect this

13 application, which is strictly for our reimbursement on an

14 hourly basis.

15         THE COURT:  Okay.  And your -- these fees that are

16 requested here come directly from the trust; is that correct?

17         MR. PATTERSON:  Yes, they do, Your Honor.  The --

18 so when the discussions turned to a 503(b) or other payment

19 to our firm or, really, I mean, I always think of it as to

20 our firm, but the proper way to view it and the better way to

21 think of it is that it's a payment to Pfau/Zalkin to

22 compensate them for having Patterson and Bussel stay up stay

23 up all night.

24         So when the discussion turned to that, it was at a

25 point in time when the debtors' resources were effectively

1  spoken for in terms of the commitment that it was going to

2  make or able to make with regard to the confirmation of the

3  plan and the payments under it, and so therefore, what was

4  proposed and agreed to was that the payment to our firm would

5  be made from the trust, although, essentially from the monies

6  that the debtors would be contributing to the trust.

7          Virtually, all the money in the trust, other than

8  the local counsel money, is in a sense, debtor money.  the

9  insurance -- it's the debtors' original insurance policies

10  and the debtor contributions and so forth.  So, the debtor is

11  paying it, but what it was effectively saying is, we're not

12  going to pay it and everything else, so why don't you just

13  take it from the trust once the money is in the trust, and

14  that is what was agreed to.

15          THE COURT:  One other question.  Do you know

16  whether the Pfau Cochran firm and the Zalkin firm could pass

17  your firm's fees along to their clients as an expense in

18  their engagement letters?

19          MR. PATTERSON:  I know they cannot.  I know they

20  are not and cannot.

21          THE COURT:  Should that concern me?

22          MR. PATTERSON:  Your Honor, I think it's a --

23  there's two sides to that coin.  I think from the way I look

24  at it, it's sort of a harmonious approach, which is that this

25  is something that Pfau/Zalkin themselves would have to pay

1   for if it were not somewhat reduced by the 503(b) or

2   substantial contribution claim, and so they are not foisting

3   the additional cost on their clients.  And as a matter of

4   fairness, they are, instead, asking that all claimants bear a

5   portion of this expense under 503(b) or under the business

6   judgment standard in 1129(a)(4).

7           And I think that for these purposes, I think that

8   Pfau/Zalkin as having a contingent fee share of the recovery,

9   you know, can be regarded as standing in the shoes and being

10  a creditor for these purposes, so they are being reimbursed

11  as creditors in the sense that they have a share of the

12  recovery.

13          THE COURT:  Well, that was -- okay, that was going

14  to be my question, is did they fall under 503?  Are they are

15  creditor that can seek the --

16          MR. PATTERSON:  I think they're the creditor --

17          THE COURT:  -- a substantial contribution?

18          MR. PATTERSON:  I think they're the creditor that

19  can seek because they have a share of the recovery themselves

20  and agreed to share a part of that recovery with us.

21          THE COURT:  Certainly, their clients could seek --

22          MR. PATTERSON:  Yes.

23          THE COURT:  -- because they have a claim against

24  the estate.

25          MR. PATTERSON:  Well, it's kind of an odd

1 circumstance.  I mean, I think if we brought this on behalf

2 of the individual claimants, then the Court might say, But if

3 this is of no economic consequence to them, why am I hearing

4 from them?

5        THE COURT:  Right.  But if they're not present and

6 they aren't the applicant, can I grant it?

7        MR. PATTERSON:  Well, I think so, Your Honor.  I

8 think that to the extent that Pfau/Zalkin are, themselves, by

9 having a contingent fee arrangement, have a portion of the

10 claim, then they are a creditor, at least for those limited

11 purposes and have that standing.

12        THE COURT:  Another wonderful mass tort issue.

13        Okay.  Thank you.  Very helpful.

14        MR. PATTERSON:  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. MOXLEY:  May I be heard briefly, Your Honor?

17        THE COURT:  Mr. Moxley?

18        MR. MOXLEY:  Oh, I'm sorry.  Were you -- did you

19 want to address this motion?

20        MR. FOX:  Yes.

21        MR. MOXLEY:  After this motion, Your Honor.

22        THE COURT:  Mr. Fox?

23        MR. FOX:  Good afternoon.  Yes, good afternoon,

24 Your Honor.  May I please the Court?  Tim Fox on behalf of

25 the United States Trustee.

1          Consistent with my statements earlier, again, the

2   U.S. Trustee is resolved on this relief sought pursuant to

3   the revised form of order.

4          With respect to the standard issue, we make the

5   same reservation of rights.  Your Honor, to the extent that

6   you would like any clarification on that, as it relates to

7   this specific application, I'd be happy to address that, but

8   for the most part, I believe our papers address it.

9          I would note that if you would like some

10  supplemental briefing on the 1129(a)(4) issue, I don't think

11  we got too far into the weeds of that element, so I would

12  offer that to the extent that it would be helpful at some

13  point.

14          THE COURT:  Thank you.

15          MR. FOX:  Thank you, Your Honor.

16          THE COURT:  Mr. Patterson?

17          MR. PATTERSON:  Thank you, Your Honor.  Tom

18  Patterson.

19          I didn't want to -- I wanted to clarify something.

20  With regard to whether or not Pfau/Zalkin could pass on the

21  cost of our fees to their underlying clients, I'm advised

22  that under their retention agreements, they would have the

23  right to.

24          THE COURT:  Oh, okay.

25          MR. PATTERSON:  But I'm certainly correct in

1    saying that they have made the decision not to do that.

2              THE COURT:  Okay.  Thank you.

3              MR. PATTERSON:  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              MR. MOXLEY:  Thank you, Your Honor.  Again,

6    Cameron Moxley of Brown Rudnick for the Coalition.

7              Two quick points, Your Honor.  I just -- I didn't

8    rise for this purpose, but since I'm here, the Coalition was

9    a party to the typically term sheet, just for the record -- I

10   think the Court knows that -- but, second, we received an

11   email from Mr. Schiavoni, who the Court will know submitted a

12   letter that was an attachment to the Goodman declaration.

13   It's been admitted into evidence in support of our motion.

14             Mr. Schiavoni is on the Zoom and has asked for the

15   opportunity to address the Court, but given he's on Zoom and

16   it was our motion, we thought that it would be appropriate

17   for us to ask if the Court would indulge and allow Mr.

18   Schiavoni to speak and address the Court on the motion.

19             THE COURT:  Well, I'm not sure.  Maybe he didn't

20   file an objection, right, and there's no -- this is just a

21   statement that's attached to the declaration?

22             MR. MOXLEY:  It's a statement attached to the

23   declaration, yes.  He's on the Zoom and he's just asked if he

24   could make a comment to the Court.

25             THE COURT:  No, I think not.  I think I have an

1   evidentiary record.  I'm going to keep my evidentiary record

2   and I've just heard argument.

3          MR. GOODMAN:  Your Honor, just following up on one

4   point that came out during the conversation with

5   Mr. Patterson regarding the duplication issue?

6          THE COURT:  Yes.

7          MR. GOODMAN:  I think you noted that, you know,

8   from your perspective, he was involved in the discrete issue

9   on the IRO and from your perspective that made things

10  somewhat easier because there was that discrete issue.

11         I would just like to note that when it came to the

12  settlements with Hartford and Century, I think the record

13  shows unequivocally that there was no duplication between the

14  Coalition or the TCC; in fact, at the time, and you know,

15  even today, I don't think the TCC was not supportive of the

16  Hartford settlement as the record reflects and the TCC

17  certainly was opposed to the Century settlement.  Those were

18  assessments where there wasn't an involvement where you had

19  two folks in the room.  I think that was something that we

20  did in this case is what the evidentiary record reflects.

21         And I just wanted to note on the duplication

22  issue, you know, there are obviously points that are, where

23  we're in the same position in terms of the IRO, where there's

24  things where I think we would point to and say that there

25  just simply was no duplication.

1          THE COURT:  Thank you.

2          MR. GOODMAN:  Thank you.

3          THE COURT:  Okay.

4          MR. ABBOTT:  Your Honor, the next item on the

5    agenda is the joint motion -- what we've been calling the

6    "funding motion," Your Honor, and I'll just turn it over to

7    Mr. Pachulski, who I think would like to address the Court on

8    that.

9          THE COURT:  Okay.

10         MR. PACHULSKI:  Thank you again, so much, Your

11   Honor.  Richard Pachulski of Pachulski Stang Ziehl & Jones,

12   on behalf of the TCC.

13         If I'm going to make the argument, it's going to

14   be like CSPAN will be to an empty courtroom, because at this

15   point, it is moot.  The effective date has occurred, which

16   we're all very proud of, so we don't have to argue that

17   today.

18         I did want to make, because my statement to

19   Mr. Molton (phonetic) on our phone call has been used a few

20   times and I want to correct a piece of that, because I did

21   some research before this hearing, because I thought I might

22   be asked something about the substantial contribution awards

23   or requests and that is that "It takes a village."  That's

24   actually not the complete idiom, Your Honor.  The complete

25   idiom is "It takes a village to raise a child"; that's the

1   correct portion.

2              And the reason I raise it is because in this case,

3   it was applicable because we've now hit the effective date

4   and what I'm trying to figure out if it's raising a child now

5   that the birth has happened or it's raising a child because

6   it's going to college and we all have some respite from it.

7              So, but this doesn't happen without Your Honor and

8   you are a major part of that village, and for that, the TCC

9   and all of us thank you.  So, I thought it was applicable for

10  the end of this hearing to correct the idiom.

11             Thank you, Your Honor.

12             THE COURT:  Okay.  Thank you.

13             Mr. Abbott?

14             MR. ABBOTT:  Your Honor, that concludes the agenda

15  for today, so I think we can, if the Court wishes, adjourn.

16             THE COURT:  Thank you.  Then, we're adjourned.

17             COUNSEL:  Thank you, Your Honor.

18             (Proceedings concluded at 12:09 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of our

5      knowledge and ability.

6

7      /s/ William J. Garling                  April 20, 2023

8      William J. Garling, CET-543

9      Certified Court Transcriptionist

10     For Reliable

11

12     /s/ Mary Zajaczkowski                   April 20, 2023

13     Mary Zajaczkowski, CET-531

14     Certified Court Transcriptionist

15     For Reliable

16

17

18

19

20

21

22

23

24

25