## Exhibit A

## Compendium of Selected Confirmation Hearing Testimony



Transcript of

**In Re: BOY SCOUTS OF AMERICA**

**and DELAWARE BSA, LLC**

March 28, 2022

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

1      UNITED STATES BANKRUPTCY COURT

2          DISTRICT OF DELAWARE

3    IN RE:                    : CHAPTER 11

4    BOY SCOUTS OF AMERICA AND  : CASE NO.

5    DELAWARE BSA, LLC,         : 20-10343 (LSS)

6           Debtors.           : (Jointly Administered)

7                    -  -  -

8

9    ------------------------------------------

10                  Chapter 11

11              Case No. 20-10343 (LSDD)

12              824 North Market Street

13              Wilmington, Delaware 19801

14

15   Monday, March 28, 2022

16   10:00 a.m.

17

18   TRANSCRIPT OF BOYS SCOUTS OF AMERICA

19   BEFORE THE HONORABLE LAURIE SILBER SILVERSTEIN

20   UNITED STATES BANKRUPTCY JUDGE

21                    COPY

22

23

24   REPORTED STENOGRAPHICALLY BY:

25   Jennifer Billstein-Miller, RMR, CRR, CCR-NJ and
     Notary Public

1  along with the Certain Insurers'
2  designations, what you'll see also include
3  all counterdesignations.
4       THE COURT:  Okay.
5       MR. DOREN:  Third, there have
6  been a number of proofs of claims that
7  were used as exhibits in the depositions.
8       In most cases, those documents
9  are not necessary to understand the
10 testimony.  So we did not put them up on
11 the screen, you'll see.  In the few
12 instances where we may be using the
13 documents, any personal identifying
14 information has been redacted.
15       In that same vein, there are a
16 few instances where the witness referred
17 to a claimant by name.  And we haven't
18 beeped that out, but we have deleted the
19 audio.  So you may see lips moving and no
20 words.  That is when someone's name is
21 being uttered.
22       And then, lastly, all of these
23 depositions were taken remotely, of
24 course.  So when a document was on the
25 screen, that meant that the witness' image

1  shrunk and was off to one side.  Since, as
2  I've suggested, we've removed a number of
3  these documents, we did our best to
4  increase the image of the witness.
5       And you'll see some moments of
6  pixilation of the image of the witness
7  when it goes from a smaller image that we
8  made larger because there's no longer a
9  document.  It's not an equipment
10 malfunction.  It's just a technology
11 malfunction.
12       And unless the Court has any
13 questions, I'll now introduce our first
14 witness.
15       THE COURT:  Okay.  One second.
16 Mr. Moxley.
17       MR. MOXLEY:  Good afternoon,
18 Your Honor.  Cameron Moxley of Brown
19 Rudnick on behalf of the coalition.
20       I'd just like to flag for
21 the Court -- and I believe Mr. Doren can
22 correct me if I misstate anything here.
23 But when he referenced that this includes
24 designations plus counterdesignations,
25 what the parties, I believe, have agreed

1  to is that, with respect to witnesses
2  whose deposition designations will be
3  played for the Court during this process
4  of the insurers' case in chief, that that
5  is a full set of the designations and that
6  it may be smaller and, in many cases, is
7  smaller than what was submitted to
8  the Court in writing.
9       MR. DOREN:  Thank you, sir.  I
10 agree with that.
11      MR. MOXLEY:  Thank you.
12      MR. DOREN:  So, in other words,
13 Your Honor, what you're seeing on video is
14 what you'll be seeing from these
15 witnesses.  And there will be no other
16 designations that you'll have to read in
17 transcript form.
18      THE COURT:  Okay.  Great.
19      MR. DOREN:  The first witness
20 will be Dr. John Conte.  Dr. Conte is a
21 professor emeritus at the University of
22 Washington.  He was proffered as an expert
23 witness by the TCC to opine on the
24 characteristics of the allegations
25 survivor profiles and legal issues

1  presented by the proof of claims filed in
2  this bankruptcy.
3       Dr. Conte was deposed on
4  February 25th, 2022.  And we now tender
5  Dr. Conte's testimony.
6           -   -   -
7           (Whereupon, a video clip was
8       played for the record.)
9           -   -   -
10      Q.   So as we were saying from, since --
11 from 1990 to 2017, you were a professor in the
12 school of social work at the University of
13 Washington?
14      A.   Correct.
15      Q.   And you didn't teach any legal -- any
16 legal classes?
17      A.   No.  I taught ethics, and some
18 professional ethics have a basis in the law.
19           I mean, the duty to report child
20 abuse and neglect, the duty called Tarasoff to
21 report when a client is danger to someone else,
22 recordkeeping, and that kind of thing.
23           So there are some ethics that
24 incorporate legal concepts, but I have
25 certainly never taught a course directly on the

1  law or on legal concepts.

2          I've done professional workshops

3  on ethics and ethical decision-making, which

4  has included some legal principles.  But I

5  don't represent myself as an expert on the law

6  but rather the extent to which the law touches

7  on practice issues.

8      Q.   Now, the next section we have in your

9  CV is testimony, and this goes on for some

10 pages -- many pages.

11          It describes case after case

12 here.  If you'd like, I can I scroll through

13 them.  And we're going to ask questions about

14 each one.  I'm just kidding.  We have --

15     A.   Oh, my heart.

16     Q.   So is it fair to say you've evaluated

17 thousands of survivors of sexual abuse in your

18 professional career?

19     A.   That is fair.

20     Q.   And in these -- is your role -- in

21 most of the cases that I just scrolled through,

22 did you have a similar role in those cases?

23     A.   Yes, primarily to evaluate the

24 individual who has alleged harm or damage from,

25 usually, sexual abuse.  Once in a rare while,

1  it might be something like adult rape or some

2  kind of other traumatic event, but mostly

3  sexual abuse.

4      Q.   Am I right that your report said you

5  mostly represent the plaintiff side in these

6  matters?

7      A.   Typically, that's who seems to ask,

8  yes.

9      Q.   What percentage, roughly, would you

10 say you've represented the defendant side?

11     A.   Again, very small.  1 percent maybe.

12 It could be less than 1 percent.  It's -- I

13 don't get asked very often.  I love it when I

14 am asked, but I just don't get asked very

15 often.

16     Q.   What do you love about it?

17     A.   You know, it's a -- this is a

18 personal feeling I have.

19          If I catch myself thinking

20 something in a defense case that I wouldn't

21 think in another case, then I have identified a

22 potential bias.

23          And my job as an expert is, as

24 much as possible, to be aware of biases that

25 may unduly influence my opinion.  And the best

1  way to test that is in a defense case because

2  I've worked with so many victims.

3          And, you know, to be frank, I've

4  devoted my career to understanding sexual

5  abuse.

6          Early in my career, I did

7  prevention research.  I'm doing prevention

8  again.

9          But in a forensic matter, I have

10 to be very careful not to be an advocate,

11 because my real client is the trier of fact.

12 So I like defense cases.  I think sometimes

13 defense attorneys I may drive a little crazy

14 because I do bend over backwards to be

15 completely objective.

16          So that's why I like them.  I'd

17 like to do more, but I just don't get asked.

18     Q.   So what materials did you review in

19 preparing your ability to compare the lists

20 provided to you with the pool of claims in the

21 bankruptcy?

22     A.   Nothing.  I was not asked to do that.

23     Q.   Okay.  Did you review any proofs of

24 claims that -- I know you were involved in

25 reviewing the proof of claim form.

1          Did you review any completed

2  proofs of claims?

3      A.   No.

4      Q.   Okay.  And I'm guessing you didn't

5  conduct any forensic assessments of any of the

6  claimants in the Boy Scouts bankruptcy, to your

7  knowledge?

8      A.   I said you're correct.

9      Q.   Okay.  Okay.  And you have not done

10 any work to evaluate the legal defenses in any

11 of the claims in the bankruptcy?

12     A.   You're correct.

13     Q.   Okay.  So is it fair to say that your

14 comparison analysis is based on your general

15 understanding of claims that have been filed in

16 the past against the Boy Scouts for sex abuse?

17     A.   And other cases.  That's correct.

18     Q.   Okay.  Well, when -- I'm talking

19 about the ability to say this pool is similar

20 to the Boy Scouts.

21          The part of that equation that

22 relates to the Boy Scouts is based on your

23 general understanding of claims against the

24 Boy Scouts in the past?

25     A.   Well, I did not -- I make no

Page 270

1  judgment.  I had access to no data about the
2  pool.
3       Q.   Okay.  Did you --
4       A.   All I -- I'm sorry.
5       Q.   No.  Please continue.
6       A.   All I have is the -- and all I was
7  asked to do was to review the included and
8  excluded classifications to determine, based on
9  my experience, if they were appropriately
10  classified.
11            Whether they represent the total
12  pool, which is a validity question, I was not
13  asked to address, and I have no information to
14  address that question.
15       Q.   Good morning, Dr. Conte, my name is
16  Peg Warner.  I represent Allianz, the insurance
17  company in this matter.  And I'm with the law
18  firm of McDermott Will & Emery.
19       A.   Nice to meet you.
20       Q.   At the time that you wrote your
21  January 5, 2022, rebuttal of Dr. Treacy's
22  report, what did you know with regard to the
23  number of sexual abuse claims that have been
24  made against the Boy Scouts in this bankruptcy
25  proceeding?

Page 271

1       A.   That there were over 80,000 claims.
2       Q.   How about before the bankruptcy?
3  What is your knowledge of the number of sexual
4  abuse claims against the Boy Scouts prior to
5  the bankruptcy proceeding?
6       A.   I don't know specifically.
7       Q.   Did you ever try to find out?
8       A.   No.
9       Q.   There were less than 2,000 claims
10  made against the Boy Scouts prior to the
11  bankruptcy, and now there are 80,000.
12            Did you form an opinion about
13  the circumstances that might cause that
14  differential?
15       A.   Yes.
16       Q.   What is your opinion?
17       A.   Well, just to be -- you asked me a
18  question.  I'm under oath, so I'm going to
19  answer.
20            I think a significant portion of
21  that 80,000 are probably not real claims.  I
22  believe that the claimants who really were
23  abused and, in this case, your client have an
24  identical interest, which is the false claims.
25            I think personally, as somebody

Page 272

1  who has devoted almost four decades working
2  with and on behalf of victims, I think some
3  attorneys who have advertised for clients have
4  contributed to this avalanche of cases.  And
5  the problem is the truly victimized claimant is
6  put at a disadvantage by the way this has been
7  handled.
8            And just to be completely honest
9  with you, I find it extremely distasteful.  And
10  it makes me angry that people who are really
11  deserving are going to end up being hurt by
12  this whole process.
13       Q.   And you know, Dr. Conte, that
14  Dr. Treacy actually addressed that very issue
15  and concern in her report?
16       A.   She did, but she provided no data.
17  For example, she said secondary gain is a major
18  issue.  Well, of course.  Secondary gain is
19  always an issue.
20            She provides no method to
21  identify those cases in which secondary gain
22  or, frankly, fraud is being perpetrated.
23            And -- the application of
24  knowledge from children to adults doesn't help
25  it at all.

Page 273

1       Q.   Dr. Conte, my name is Mitch Karlan,
2  and I represent AIG.  I just have a few
3  questions.  I know you have a time deadline.
4       A.   Nice to meet you.
5       Q.   I want to ask you some questions
6  about any facts or assumptions or data that
7  Mr. Kornfeld provided to you in connection with
8  your work on this case.
9            Did you tell him that you
10  concluded that a substantial number of the
11  82,000 were fraudulent?
12       A.   I'm sure I did.  I don't recall
13  specifically, but I know I mentioned that in
14  the development of the proof of claim form.
15  And that's been my opinion, and I've not been
16  reluctant to share it.
17            So I don't recall specifically,
18  but I'm sure I did.
19            -   -   -
20            (Whereupon, the video clip
21            concluded.)
22            -   -   -
23            MR. DOREN:  Your Honor, our next
24  witness is Mr. Adam Slater.
25            Mr. Slater is a partner at



Transcript of

**In Re: BOY SCOUTS OF AMERICA**

**and DELAWARE BSA, LLC**

March 29, 2022

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

1      UNITED STATES BANKRUPTCY COURT

2          DISTRICT OF DELAWARE

3   IN RE:                    : CHAPTER 11

4   BOY SCOUTS OF AMERICA AND   : CASE NO.

5   DELAWARE BSA, LLC,         : 20-10343 (LSS)

6          Debtors.           : (Jointly Administered)

7                     -   -   -

8

9   -------------------------------------------

10                  Chapter 11

11              Case No. 20-10343 (LSDD)

12               824 North Market Street

13              Wilmington, Delaware 19801

14

15   Monday, March 29, 2022

16   10:00 a.m.

17

18   TRANSCRIPT OF BOYS SCOUTS OF AMERICA

19   BEFORE THE HONORABLE LAURIE SILBER SILVERSTEIN

20   UNITED STATES BANKRUPTCY JUDGE

21                  **COPY**

22

23

24   REPORTED STENOGRAPHICALLY BY:

25   Jennifer Billstein-Miller, RMR, CRR, CCR-NJ and
     Notary Public

1      MS. WARNER:  Your Honor, if we
2  could have just a couple minutes to switch
3  out folks if we're putting up Dr. Treacy.
4      THE COURT:  Yes.
5      MR. DOREN:  Your Honor, just by
6  way of introduction, I will say that the
7  next witness being call by the Certain
8  Insurers is Dr. Eileen Treacy, and the
9  examination is being handled by Ms. Peg
10 Warner.
11     THE COURT:  Okay.  Do we need
12 five minutes, or are we good?
13     THE WITNESS:  I think I'm here.
14     MS. WARNER:  The witness and
15 counsel are ready to go.
16     THE COURT:  Okay.  I need to
17 swear you in.
18     Is it Dr. Treacy?
19     THE WITNESS:  It is.
20     THE COURT:  Okay.  Dr. Treacy,
21 can you raise your right hand, please.
22     Do you affirm your word that you
23 will tell the truth, the whole truth, and
24 nothing but the truth to the best of your
25 knowledge and ability?

1      THE WITNESS:  I do.
2      THE COURT:  Please state your
3  full name and spell your last name for the
4  record.
5      THE WITNESS:  My name is
6  Dr. Eileen Treacy, T-R-E-A-C-Y.
7      THE COURT:  Thank you.
8      Ms. Warner.
9      MS. WARNER:  May I proceed,
10 Your Honor?
11     THE COURT:  You may.
12          -  -  -
13      E X A M I N A T I O N
14          -  -  -
15 BY MS. WARNER:
16     Q.   Good afternoon.  I'm Peg Warner.  I'm
17 from the law firm of McDermott Will & Emery.  I
18 represent the Allianz Global Risk US Insurance
19 Company, and today I'm presenting the witness
20 on behalf of Certain Insurers.
21     Where are you?
22     A.   I am in Freehold, New York, which is
23 upstate in the Catskills.
24     Q.   Is there anyone in the room with you,
25 ma'am?

1      A.   No.
2      Q.   Do you have any materials before you
3  related to this case?
4      A.   No.
5      Q.   Can you please provide the Court with
6  your education?
7      A.   I went to Herbert H. Lehman College
8  in the Bronx, which is part of the City
9  University of New York, and graduated with a
10 degree in psychology.
11     I went on for the master's
12 degree in psychology at the New School for
13 Social Research.  And then I went on for the
14 PhD in psychology at Fordham University in a
15 specialization in what's called applied
16 developmental technology.
17     Q.   What is applied developmental
18 psychology?
19     A.   I have to define "developmental"
20 first.
21     Developmental psychology is the
22 study of growth and change through the
23 lifespan.  So it examines normative
24 development, but it also examines when
25 development gets thrown off course by trauma or

1  by disability.
2      Applied developmental is when
3  you try to take all of that stuff from the
4  research labs and from the libraries and
5  actually apply it in real-life people.
6      Q.   Dr. Treacy, have you received any
7  additional training beyond your education?
8      A.   Yes, I have.
9      Q.   And what is it?
10     A.   I have been trained by law
11 enforcement in sex crimes investigations, both
12 for adults and children.  I've been trained by
13 the FBI, by the New York City Police
14 Department, and New York State Police.
15     Q.   And what was that training about,
16 generally?
17     A.   Sex crimes investigation, both sexual
18 assault and sexual abuse cases, both involving
19 children and adults.
20     The FBI school was a weeklong
21 school.  The other schools have been -- they're
22 annual.  I actually am participating in one of
23 them.  I'm training tomorrow with the New York
24 State Police.
25     Q.   Can you describe your professional

1  life briefly?
2      A.    Sure.  When I got out of college, I
3  was an early childhood teacher in the
4  South Bronx while going for my master's degree
5  at night.
6              The next job that I had was as
7  the project coordinator of the victim treatment
8  and research clinic, and that was at Columbia
9  University's College of Physicians and
10  Surgeons.
11             That was one of the first grants
12  from the National Institute of Mental Health to
13  study the long-term effects of sexual abuse and
14  assault on women's lives.  So we had a victim
15  group of 400 women, and we had a control group
16  of 200 nonvictims in that research.
17             From there, I came back into the
18  community and accepted a position as the
19  executive director of a very large multiservice
20  center in the Northwest Bronx.  We ran programs
21  from preschool programs, head start, up to
22  senior citizens programming, all kinds of youth
23  programming.  And it was there that I developed
24  and implemented the child sexual abuse
25  counseling and prevention program that covered

1  all of Bronx County for children.
2              Eventually, we got to the
3  point -- it started out just with teenagers,
4  adolescents.  And eventually I got enough money
5  that we were able to run the programming from
6  preschoolers all the way up to children 18 to
7  20 years of age.
8      Q.    Have you authored any publications?
9      A.    Yes.  There are two papers that came
10  out of the Columbia work, which I just
11  mentioned.
12             One was on sexual dysfunctions
13  as a long-term consequence of sexual abuse and
14  assault on women's lives, and the other was in
15  terms of depression as another long-term
16  consequence.  I'm coauthor on that with a
17  number of people who were on the project.
18             I'm a single author on a paper
19  called "Sexual Abuse and Disability."
20             I am coauthor of two chapters in
21  a forensic social work textbook about New York
22  State forensic interviewing best practices,
23  which is another one of my publications.  Once
24  again, I'm one of the authors on that.
25             I'm coauthor of another handbook

1  called "New York State Forensic Interviewing
2  Best Practices for Vulnerable Populations."
3  That was specifically designed for the New York
4  State Justice Center for the protection of
5  people with special needs.  So it was trying to
6  apply the forensic interviewing techniques
7  dealing with special needs populations.
8      Q.    Have you held any teaching positions?
9      A.    Yes.  I taught at Lehman College for
10  33 years part-time in the psychology
11  department.  I was also in the graduate
12  department of guidance and counseling.
13      Q.    Now, you mentioned earlier that you
14  are on the faculty of the New York State
15  forensic interviewing best practices.
16             Can you tell us a little bit
17  about that.
18      A.    Sure.  That's actually one of my baby
19  projects that I'm very proud about.
20             In New York, we have what's
21  called the Children Justice Task Force.  The
22  governor appoints people to this task force,
23  multidisciplinary.
24             From that, it was developed that
25  New York State needed to have a uniform

1  protocol on how child cases, child sexual abuse
2  and severe physical abuse cases, were handled
3  because it was catch-as-catch-can.  You know,
4  where you lived is whether or not you got
5  justice.
6              So we started writing this in
7  2000.  We finished writing it in 2002.  We
8  then -- and "we," I mean, it was a steering
9  committee of about ten of us from four
10  disciplines, medical -- I'm sorry -- not
11  medical -- mental health, law -- law
12  enforcement and CPS, child protective services.
13             And we, then, spent a year
14  developing curriculum and a training video, and
15  then we went out on the road.  And from 2004 to
16  2016, I was on faculty.  And we were doing a
17  very intensive three-day program once a month
18  around the state for both law enforcement and
19  CPS and mental health and legal.
20             And the third day involved
21  bringing in actors to actually practice doing
22  the forensic interviewing in front of faculty
23  members and getting feedback.  So that's best
24  practices.
25             So it's a protocol that can be

1  used after training and sex crimes
2  investigations with children, and it's also
3  used for the investigation of serious physical
4  abuse.
5      Q.   Will you be doing that training
6  anytime soon?
7      A.   Well, actually, I'm doing part of
8  that tomorrow.  That will be part of what I'm
9  doing tomorrow.
10          Tomorrow I'm presenting on
11  cultural and developmental issues in sex abuse
12  investigations.
13     Q.   Do you have any idea how many
14  personnel from New York State, the various
15  agencies that you laid out, will be attending
16  that training?
17     A.   It is a statewide training, so
18  they're expecting about 225 to 250 people.  I'm
19  really excited because this is the first live
20  presentation since the pandemic.
21     Q.   Dr. Treacy, what types of consulting
22  work have you undertaken throughout your
23  career?
24     A.   The consulting work basically has
25  been either training or working on cases, and

1  the working on cases can take a few different
2  forms.  It can take -- and for family court
3  purposes, children are very frequently sent to
4  me for an evaluation of what's going on in
5  terms of whether or not the case is a sex abuse
6  case or whether it's something else.  And that
7  is through the family courts of New York State.
8          Sometimes the law firm
9  enforcement will call me in, when they're
10  investigating, if it's a difficult case or if
11  the person is somebody with special needs.
12          Also the various district
13  attorneys bring me in.  Various defense
14  attorneys bring me in to evaluate what may be
15  going on or to assist them.
16          So sometimes it's a hands-on
17  actual evaluation or forensic interview.
18  Sometimes it's just a paperwork review to
19  assist lawyers.  Sometimes it's reviewing the
20  work of another expert to help the attorneys
21  prepare for cross-examination of that expert.
22          So it takes a few different
23  forms.
24     Q.   So, Dr. Treacy, I don't want to get
25  too personal, but how long have you been doing

1  this work as a psychologist?
2      A.   It's fine to get personal.  I'm not
3  one that worries about that aging stuff too
4  much.
5          It's been about 45 years that
6  I've been working this type of work.  You know,
7  it's changed through the years, obviously.  But
8  I've been doing this a long time.  It's kind of
9  like both vocation and advocation.
10     Q.   So if you could describe for us this
11  45 years of work.
12          What do you consider your
13  specialty?
14     A.   Sexual abuse, sexual assault, and
15  developmental psychology.
16     Q.   Dr. Treacy, approximately how many
17  patients have you evaluated, either as children
18  or as adults, who allege that they were
19  sexually abused as children?
20     A.   Probably between 2,700 and 2,800.
21     Q.   And of those, the number you just
22  laid out, how many of those were adults who
23  claim that they had been sexually abused as a
24  child?
25     A.   Probably between 4 and 500.

1      Q.   And of those patients, both the
2  children and the adults who were survivors,
3  approximately how many did you interview and
4  test as part of your evaluation?
5      A.   All of them.  The numbers I'm
6  speaking are just my own work through the
7  years.
8      Q.   In addition to your practice as a
9  psychologist, have you served in any capacity
10  before courts in cases involving allegations of
11  child sexual abuse?
12     A.   Yes.
13     Q.   And how have you served courts in
14  that capacity?
15     A.   I've served court as an independent
16  expert who is brought in either by the court or
17  stipulated to by all parties in family court
18  proceedings to conduct an independent sexual
19  abuse evaluation to find out what was going on
20  with any particular child.
21          And I've also served as an
22  expert witness in probably -- it's well over
23  650 cases I've testified in.
24     Q.   Approximately how many times have you
25  served as a court-appointed neutral to evaluate

1  allegations of child sexual abuse?
2      A.   I would say probably about -- around
3  400 of them.
4            But I do need to say that
5  whoever is bringing me in, my autonomy as an
6  independent expert is what's up front.  That's
7  what's in any contracts that I have, that I'm
8  independent, that I'm not there to rubber-stamp
9  whoever is hiring me.
10     Q.   Can you give Judge Silverstein an
11  overview of in which state and federal courts
12  you have served as a court-appointed neutral in
13  cases involving child sexual abuse allegations?
14     A.   Well, I've testified pretty much -- I
15  have not testified in the western part of the
16  state.  So let me start in Long Island.
17           Both Nassau and Suffolk
18  Counties, I testified in family and criminal,
19  and I testified in the federal courthouse out
20  there.
21           In terms of New York City
22  itself, I've testified in all five boroughs,
23  both family and criminal.  And I testified in
24  the federal courthouse in Manhattan.
25           Then going up, West Chester

1  County, I testified in family, criminal, and
2  the federal courthouse.
3            Now, going north, Putnam County,
4  both -- yes, both family and criminal.
5            Dutchess County, both family and
6  criminal.
7            Columbia County, both family and
8  criminal.
9            Albany County, just -- no.  I
10  testified in both, actually, in Albany County.
11           Then going more north,
12  Rensselaer County, Wayne County, Warren County,
13  Essex County, Franklin County, just criminal.
14           And then on the other side of
15  the river, Rockland, both family and criminal.
16           Orange, both family and
17  criminal.
18           Sullivan both.
19           Greene County, just criminal.
20           Albany County, both.
21           And that's about it for New York
22  State, I think.
23     Q.   Dr. Treacy, when serving as a
24  court-appointed neutral, what typically is your
25  role?

1      A.   In criminal court, I'm not testifying
2  about a specific evaluation.  It's more general
3  educational testimony.
4            I consider myself as an expert
5  in court when -- to be a teacher.  I'm
6  teaching, basically educating about
7  developmental psychology and child sexual abuse
8  in family court.
9            In criminal court -- oh, I'm
10  sorry.  That's what I was just talking about
11  was criminal court.
12           In family court, it's different.
13  Family court, I've actually conducted an
14  evaluation of the child.
15           In very, very rare instances, I
16  have testified as a result of paperwork review
17  where the judge and the attorney for the child
18  have felt that the child was so wounded that
19  bringing up the issue of abuse could
20  precipitate additional acts of self-harm.  And
21  in those instances, I have not evaluated the
22  child myself but have reviewed all of the
23  records that would be available.
24           These are children who have been
25  psychologically hospitalized numerous times as

1  a result of suicide attempts and other types of
2  self-harm.
3            In civil court, I'm basically
4  testifying to my evaluations.
5            So the only place that I don't
6  have hands-on contact with the victims is in
7  criminal court.  My testimony is not directed
8  to the victim; it's just directed more to the
9  research.
10     Q.   Now, in these situations where you've
11  been retained as a court-appointed neutral,
12  what do you do to help the Court assess the
13  reliability of the allegations of child sexual
14  abuse?
15     A.   I conduct interviews and I do
16  testing -- trauma testing, behavioral testing.
17  And with the children, I also do a brief
18  screener IQ.
19     Q.   What about in civil cases?  Have you
20  been involved in any civil cases brought by
21  adults who claimed childhood sexual abuse?
22     A.   Yes, I have.
23     Q.   And what do you do in those cases?
24  Do you have a different process?
25     A.   No.  The process is always

1  interviewing and testing.  The testing is
2  different obviously for the adults than the
3  children, and the testing is even different for
4  different age groups of the children.
5       Q.   Do you have experience in recent and
6  pending New York State Child Victims Act cases?
7       A.   Yes, I do.
8       Q.   And do you understand when I refer to
9  those cases as CVA cases?
10      A.   Yes, I do.
11      Q.   In these civil cases, the New York
12 State CVA cases, are you typically retained for
13 plaintiffs or defendants?
14      A.   So far, I've just been retained by
15 plaintiffs.  But one county in the state has
16 retained me -- their department of law retained
17 me to help them figure out which of the CVA
18 cases against the county, like for foster care
19 and for children who were in group homes and
20 the like, to help them figure out how to assess
21 the reliability of those cases.
22            So I guess it's both, because
23 they're the defendant -- the county is the
24 defendant in that instance, so I'm helping the
25 county figure that out.

1            And then in other instances,
2  it's been private law firms that have been
3  hired me to do CVA evaluations.
4       Q.   Have you ever been qualified --
5       A.   On my screen now, it says "Clifton
6  Johnson."
7       Q.   Dr. Treacy, have you been qualified
8  as an expert regarding child sexual abuse in a
9  civil case?
10      A.   Yes.
11      Q.   Approximately how many times?
12      A.   About 10 to 12.
13      Q.   Do you have experience with the
14 indictment or criminal prosecution of Roman
15 Catholic priests for crimes related to alleged
16 child sexual abuse?
17      A.   Yes, I do.  I've had involvement with
18 that on two levels.  One was I was involved
19 with the grand jury investigation of the
20 Archdiocese of Rockland Center in New York.
21 And that involved about 20-something priests.
22            And then I have had maybe ten
23 criminal cases where I have testified as an
24 expert for the prosecution.
25      Q.   And in those cases that you just

1  referenced, what role did you play with regard
2  to the assessment of the reliability of the
3  child sexual abuse allegations?
4       A.   In the criminal cases, I was just
5  testifying as an expert.  I did not interview
6  any of the children involved in that case.  As
7  I said, I'm not allowed to do that in New York.
8            And in the grand jury, I was
9  privy to all of the information before the
10 grand jury.
11      Q.   Have you been retained to assist law
12 enforcement agencies to evaluate the
13 reliability of child sexual abuse allegations?
14      A.   Yes, I have.
15      Q.   How many times?
16      A.   Oh, geez.  I would say a couple of
17 thousand times.
18            We, here in New York, do cases
19 of multidisciplinary.  So it's not CPS doing
20 one investigation and law enforcement doing
21 another.  We do it together.
22            So if law enforcement -- law
23 enforcement basically is in on all 2,200 of the
24 children that I've evaluated in New York State
25 because now we work as a team.

1            At the beginning of my career,
2  that didn't happen.  This really wasn't until
3  the '90s that we finally got the two
4  disciplines to have one investigation instead
5  of parallel investigations.
6            So since the '90s, all of my
7  cases that could be considered to be able to go
8  criminally, I've had law enforcement
9  involvement.  I just got a law enforcement
10 referral from the State Police just this week.
11      Q.   In all of this work, Dr. Treacy, as a
12 psychologist in private practice, your work as
13 a court-appointed neutral, and your work as a
14 consulting or testifying expert, what is the
15 process that you employ to assess the
16 reliability of child sexual abuse allegations?
17      A.   With children?
18      Q.   Yes.
19      A.   With children, I come in -- I come in
20 blind.  And I do that for family court cases
21 because there's a lot of research that
22 indicates that professionals have a tendency to
23 confirm information that they're given in
24 advance.  It's called the Rosenthal effect.
25            So I come in blind.  I only know

1  the name of the child, the age of the child,
2  and whether the child has any special needs
3  status or drugs, medications.
4          I conduct developmental
5  assessments, which is basically establishing
6  rapport, finding out about the child's life.
7  It's the equivalent of almost a psychosocial
8  history with the adult, but it's just child
9  bound.
10          I do an IQ screener unless the
11  child has an individualized education plan,
12  IEP.  Because that already entails testing, so
13  I wouldn't repeat it.
14          I do an assessment of their
15  memory capability, whether or not they're
16  swearable, and what their perception is about
17  various touching behaviors.  And then what's
18  conducted basically is investigative
19  interviews.
20          The children under eight, I
21  administer to the parents.  I administer the
22  trauma symptom checklist for young children,
23  the child sexual abuse behavior inventory, and
24  the child behavior checklist.
25          With the kids over eight, I do

1  the trauma symptom checklist for children
2  because I can administer that directly to the
3  child.  I also have the adults fill out a child
4  behavior checklist and, up to 12, child sexual
5  behavior inventory.
6          So it's a combination of
7  interviewing and testing.  And in New York
8  State, all of it is taped.
9      Q.  And is your process any different for
10  adult survivors who allege child sexual abuse?
11      A.  There's overlap, and then there's
12  some difference.
13          Unless the adult has a
14  developmental delay or disability, I don't do
15  any IQ testing.  And if they do have a
16  disability, generally that's already been done;
17  so I don't need to do it with adults.  So that
18  part is different.
19          I do establish a report, gather
20  information about their lives, but it's a
21  called a psychosocial interview.  So that
22  entails getting their educational background;
23  their employment background; their partner
24  relationship history and their sexual history;
25  and whether or not the family of origin had any

1  high-risk factors for sexual abuse; and then,
2  of course, testing.
3          The adults -- I use two measures
4  consistently with the adults, the Trauma
5  Symptom Inventory-2, which is the update from
6  the original Trauma Symptom Inventory -- so
7  I'll refer to that as the TSI-2 -- and the
8  other one is the Detailed Assessment of
9  Posttraumatic Stress, DAPS.  And I will refer
10  to that as the DAPS.
11      Q.  Dr. Treacy, I'm now going to direct
12  your attention to what has been marked as
13  JTX1189, which Mr. Spalding will now, please,
14  put up on the screen.
15          Dr. Treacy, what is JTX1189?
16      A.  That is my CV.
17      Q.  Did you prepare this CV?
18      A.  I did.
19      Q.  Is your CV up to date?
20      A.  It's up to date except for a couple
21  of law firms that have referred CVA cases to me
22  in the last month or so.
23          MS. WARNER:  Your Honor, I offer
24      JTX1189 into evidence.
25          MR. STONER:  No objection,

1      Your Honor.
2          MS. WARNER:  Thank you,
3      Your Honor.  I saw that by lip-reading.
4  BY MS. WARNER:
5      Q.  Dr. Treacy, have you received any
6  awards for your work?
7      A.  I have.
8      Q.  Could you just give us an example of
9  the awards you've received?
10      A.  I've received the Susan B. Anthony
11  Award.
12          I've received awards from local
13  parent groups in Bronx County.
14          I've received the New York
15  Advisory Task Force Against Sexual Assault
16  award from them.
17          I've received United Irish
18  Counties Association Award.  I am Irish.
19          And that's all I'm remembering
20  right now.
21      Q.  Dr. Treacy, which entities engaged
22  you in this case?
23      A.  I'm sorry?
24      Q.  Which entities engaged you in this
25  case?

1    A.    The insurance companies.  The
2  insureds, I guess, you're calling them.
3    Q.    Are you charging for your services?
4    A.    Yes.
5              MS. WARNER:  Your Honor, based
6       on her knowledge, experience, training,
7       and education, we proffer Dr. Eileen
8       Treacy as an expert in sexual abuse,
9       developmental psychology, and forensic
10      evaluation of sex crimes.
11             MR. STONER:  No objection,
12      Your Honor.
13             Your Honor, I believe you're on
14      mute, so we can't hear.
15             THE COURT:  Can you hear me now?
16             MS. WARNER:  Yes.
17             THE COURT:  Okay.  Sorry about
18      that.
19             But, yes, I will accept
20      Dr. Treacy as an expert in the identified
21      areas.
22  BY MS. WARNER:
23    Q.    Dr. Treacy, when you evaluate a
24  person who claims to have been sexually abused
25  as a child, how do you go about assessing the

1  reliability of that person's statements?
2    A.    I interview them.  I conduct a
3  psychosocial, as I mentioned earlier.  And I
4  also evaluate whether or not there's evidence
5  of the sexual abuse dynamics in their
6  statements.
7    Q.    Is there a best practice in the field
8  of psychology, based upon your experience, to
9  assess the reliability of claims of child
10  sexual abuse?
11    A.    Yes.
12    Q.    What is that best practice?
13    A.    The best practice is interviewing and
14  testing -- testing for posttraumatic stress --
15  posttraumatic stress disorder and related
16  symptomology as well as interviewing.  So it's
17  two basic components, interviewing and testing.
18    Q.    Now, Dr. Treacy, based on your
19  experience, can you explain to us how male
20  adult victims process their childhood sexual
21  abuse?
22    A.    Yes.  This has to do with memory.
23  When -- memory has three processes.
24             Memory has encoding.  That's the
25  input.  Think the computer.

1             Then it has storage, which is
2  hit "save."
3             And then it's retrieval, pulling
4  the information back up.
5             So when one thinks about adults
6  recalling what happened to them as children, it
7  very much depends how the information is
8  encoded, how the information is originally put
9  in.
10             Okay.  So the information is put
11  in through a child's eyes.  And so the
12  information -- when they're retrieving that
13  information as an adult, it's retrieved with --
14  sounding very -- I'll use the technical term --
15  "child idiosyncratic."  That means through the
16  eyes of the child, from the child's
17  perspective, so that it is not an adult's
18  memories that are being pulled up; it's a
19  child's memories that are being pulled up.
20             And that very much depends on
21  how the person encodes it.  So this is one of
22  the reasons -- for example, for children who
23  are plied with alcohol and such, it's more
24  difficult for them to remember what happened to
25  them because alcohol interferes with memory.

1    Q.    Now, when you have been engaged to
2  assess an adult male victim who alleges child
3  sexual abuse during their childhood, what steps
4  do you take to assess the reliability of their
5  memories and allegations?
6    A.    I'm examining whether or not their
7  statements -- and, of course, I have to ask
8  questions that reflect this.  The questions
9  involve the sexual abuse dynamics of
10  engagement, sexual interaction, secrecy,
11  disclosure, and supression.
12             So those five sexual abuse
13  dynamics, that's what I'm examining when I'm
14  talking to adults.  So my questions are framed
15  in such a way to gather that information.
16             And, in fact, this is part of
17  the training tomorrow, is about how -- teaching
18  people how to ask questions that can elicit
19  that kind of information.  Because it's
20  complicated.  It's not something one can just
21  go to the library and look up.  You know, how
22  do you talk to somebody about the engagement
23  phase?  Because the engagement phase has three
24  different prongs.
25             I don't know if you want me to

1  explain that.
2       Q.   I think we'll get to that in a
3  minute, Doctor.
4            First, I'd like to ask you:
5  What were you asked to do in this case?
6       A.   What I was asked to do in this case
7  was initially review the trust distribution
8  procedure, the TDP, and provide my opinion back
9  to the attorneys about my read of that
10 document, my concerns about that document, and
11 any flaws that might be in that document.  That
12 was the first thing I was tasked with.
13           The second thing I was tasked
14 with, I was provided with two groups of proofs
15 of claim, or POCs, that totaled 39 POCs so that
16 I could get a sense of what information and
17 what data was collected in that POC -- in those
18 POCs.
19           So that was what I was
20 originally asked to do.
21      Q.   What experience did you draw upon
22 when you were conducting your analysis of these
23 materials that you've just described to
24 the Court?
25      A.   Well, I was drawing from my

1  education, training, and experience.
2  Basically, I was reviewing this with the mind's
3  eye from my entire career, which has been
4  dedicated to helping victims and also trying to
5  get rid of cases that were not cases.
6       Q.   Dr. Treacy, could you please state
7  the opinions you've formed?
8       A.   The opinion that I formed is that the
9  TDP is not an adequate tool for assessing
10 whether or not somebody was, in fact, abused as
11 a child.
12           The one part of the TDP that I
13 thought was the strongest was the impact
14 component, because the impact component really
15 did cover all of the areas that are impacted as
16 a result of sexually abuse.  So that, I thought
17 was -- you know, I would give that part of the
18 TDP a good grade.
19           But, otherwise, I saw a lot of
20 flaws.  It's very hard to capture on paper the
21 experiences that people go through, especially
22 the traumatic experience of sexual abuse
23 because sexual abuse, in and of itself, is very
24 psychologically complicated for the victims.
25 It's very -- it's very complicated for the

1  victims.
2            So putting something -- thinking
3  paper can capture -- encapsulate that is rather
4  hard.
5            But that was my opinion of the
6  TDP.
7       Q.   And did you submit a report setting
8  forth your opinions?
9       A.   Yes, I did.
10      Q.   And was that in or around
11 December 2021?
12      A.   Yes, it was.  I think it was December
13 the 5th.
14      Q.   Excuse me?
15      A.   I thought it was December the 5th.
16 That date is sticking in my brain.
17      Q.   I believe you're correct.
18           Now, did you submit an amended
19 report in this case?
20      A.   I did.
21      Q.   How did you amend your report?
22      A.   I had transposed or inverted a
23 number, and so I had to change that number.
24      Q.   Was there any other change to the
25 report?

1       A.   No.
2       Q.   Did that change with regard to that
3  one transposition affect the opinions?  Did it
4  change your opinions in any way?
5       A.   No.
6       Q.   Now, Dr. Treacy, were you asked to
7  assess the reliability of any specific claimant
8  or any specific groups of claimants in this
9  case?
10      A.   No, I was not.
11      Q.   Were you asked to assess the value of
12 any claimant or any specific group of claimant
13 in this case?
14      A.   No.
15      Q.   You mentioned that you reviewed these
16 39 proofs of claim.
17           Why did you review the proofs of
18 claim?
19      A.   Because I wanted to get a sense of
20 their context; you know, what information was
21 being gathered in this proof of claim.
22           I've never done a case like this
23 before, and so I really needed to get a sense
24 of what kind of information was being gathered
25 and the manner in which it was being gathered.

# IN RE: BOY SCOUTS OF AMERICA and DELAWARE BSA LLC

1  Because reliability is a very important issue
2  in sex abuse cases.
3       Q.   Did you come to form any opinion
4  after reviewing the proof of claim form?
5       A.   Yes, I did.
6       Q.   What was your opinion?
7       A.   That the proofs of claims are not an
8  adequate way to assess whether somebody was
9  truly victimized or whether they were not.
10      Q.   Now, Dr. Treacy, a little bit ago you
11 talked about sexual abuse dynamics, I believe?
12      A.   I did.  I did.
13      Q.   What attributes or dynamics of sexual
14 abuse of children are important, in your
15 experience, in assessing the reliability of
16 allegations?
17      A.   I'll start out by giving the kudos to
18 creating this to Dr. Suzanne Sgroi, S-G-R-O-I,
19 who formulated these in a book called "Handbook
20 of Clinical Intervention in Child Sexual Abuse"
21 back around 1983.
22            In this, there are five sexual
23 abuse dynamics.
24            The first dynamic is called
25 engagement.  Now, there are three tasks that

1  the offender has during the engagement phase.
2            First of all, the offender has
3  to gain access and opportunity to the child.
4  They have to establish themselves in a trusted
5  authority position over the child.  And the
6  third prong is that they have to begin the
7  process of breaking down the child's inhibitors
8  about sex.
9            In other words, they have to
10 normalize sexual behavior.  And the media very
11 often refers to this as grooming.  That's the
12 third prong, breaking down the inhibitors about
13 sex.
14            When those three are achieved,
15 it moves on into the second phase of the sexual
16 abuse dynamics, and that is sexual interaction.
17 Now, it is actual sexual interaction going on.
18            Usually, it's progressive and
19 it's hierarchical.  So it starts out at the
20 lower end of the continuum of sexual behaviors.
21 It might be exposing oneself's private parts or
22 asking the child to expose his or her private
23 parts.  It might move to touching.  It could be
24 touching oneself or touching each other.  But,
25 generally speaking, those are the entry points

1  for this.
2            And then, as the child becomes
3  acclimated to this -- the offenders are always
4  testing the waters, so they don't move like,
5  boom, full speed ahead.  They generally will
6  move ahead to make sure that the child doesn't
7  disclose.
8            So we can see a progression in
9  the sexual behaviors over time.  And anything
10 people can do as adults sexually, they can do
11 it to children.
12            Overlapping chronologically with
13 the sexual interaction phase is secrecy.  Now
14 the task of the offender is to keep the
15 youngster quiet about the sexual abuse.  And
16 that -- people understand overt threat.  "If
17 you tell, blah-blah will happen to you."
18            What people have more difficulty
19 understanding is that, very often, especially
20 with your good offenders, they don't even need
21 to do the overt threat because the child
22 already has a perception of a negative outcome
23 if they tell about this.  "I'll get in trouble.
24 My mommy will be upset," whatever the issue may
25 be.

1            So in secrecy, we look at both
2  what the child's perception was about telling
3  and what the offender said or didn't say about
4  telling.
5            Then we get to disclosure.  And,
6  generally speaking, there are two forms of
7  disclosure.  Although there are some other
8  forms, but they're far, far less frequent.
9            Disclosure can be purposeful,
10 and that is just how it sounds.  Purposeful
11 disclosure is when the child makes up his or
12 her mind to come forward and tell someone about
13 the sexual abuse.  And when they do that, they
14 have a reason for so doing.  And it's very
15 important for investigators to elicit that
16 information.
17            The other purposeful disclosure,
18 as I said, has a purpose.  And that, you need
19 to find out.
20            Accidental disclosure is when,
21 somehow or another, the case is, quote, found.
22 Maybe the third party walks in while the abuse
23 is going on.  Maybe the child develops a
24 sexually transmitted infection.  Maybe the
25 child gets pregnant.  Maybe the child starts

1  sexually acting out and somebody says,
2  "Johnnie, where did you learn that?"  And it
3  might come out that way, and that's an
4  accidental disclosure.
5          But whatever way the disclosure
6  comes out, what happens then in the life of the
7  child is all hell breaks loose because there's
8  all kinds of adults then asking questions of
9  the kid and the family.  And the family is
10  like, "Why didn't you tell me?  Why didn't you
11  tell me?"  So there's a lot of -- it sets a
12  crisis atmosphere disclosure.
13          And so, finally, what we see at
14  the end of this, which is the final phase, is
15  supression.  Supression.  And sex abuse is not
16  the only place that we see supression.
17          "Supression" means efforts to
18  push away painful material.  And so we examine
19  how is the child reacting to the disclosure in
20  the aftermath of the disclosure and how is the
21  family reacting to the child.
22          In cases that get known to the
23  broader community, like some of the religious
24  cases that we've had, the community might also
25  be involved in the life of the child and the

1  family.
2          So we look at the child's own
3  coping mechanisms, how is the child coping with
4  this -- this is also sometimes referred to as
5  defense mechanisms -- and then how is the
6  family reacting to the child.  So external to
7  the child, what's going on.  So that's what's
8  examined in supression.
9          And that was a quick summary of
10  the sexual abuse dynamics.
11      Q.  Now, Dr. Treacy, based upon your
12  experience, do you evaluate these five sexual
13  abuse dynamics when determining the reliability
14  of claims by adults that they had been sexually
15  abused as children?
16      A.  Absolutely.  Yes, in every single
17  case that I've done.
18          These five dynamics are kind of
19  like a golden light in knowing where to go to
20  evaluate cases.  It's very, very helpful.
21      Q.  Well, Dr. Treacy, when reviewing the
22  TDP and the claim form in this case, did you
23  form an opinion whether the TDP and the claim
24  form put forth an acceptable process for
25  evaluating these sexual abuse dynamics for each

1  of the claimants here?
2      A.  Not adequately, no.  There were a few
3  things in there -- in the POCs that allowed me
4  to look for some of the sexual abuse dynamics
5  in individual claims.
6          So I did try to overlay the
7  sexual abuse dynamics with some of the
8  information available in the POCs.  And I was
9  able to pick out four questions that tapped
10  into sort of the sexual abuse dynamics, but
11  it's not enough.
12      Q.  Does the fact that the TDPs require
13  claimants to provide all medical records to the
14  settlement trustee affect your opinion about
15  whether the process is sufficient for
16  evaluating reliability?
17      A.  No, it doesn't.  Because,
18  unfortunately, in valid sex abuse cases, we
19  only get medical evidence about 10 percent of
20  the case.  And that was at the time the
21  children were children, so actual child cases.
22          So medical records wouldn't be
23  the best place to get information about --
24  unless it was very acute and the child was
25  injured in the course of the sexual assault.

1          But most child molesters, unless
2  they're sadistic child molesters, don't hurt
3  the children because they want to continue
4  abusing them.  So they don't want anybody to
5  see this.
6          If it was an acute injury, that
7  would be probably in the medical records, but
8  the chances of that are rather slim.
9      Q.  In psychology, what is malingering?
10      A.  Malingering is a very important
11  concept in forensics.
12          Malingering is when somebody is
13  either overreporting behavior, like trying to
14  make themselves look sicker than they really
15  are in order to get something, or trying to
16  make themselves look in a better light.
17          We refer to this as faking good
18  or faking bad in an effort to get some type of
19  secondary gain out of making that, you know --
20  that either overreporting or underreporting
21  behavior.
22      Q.  In your opinion, what information
23  would the settlement trustee need to have
24  available to assess that a claimant in this
25  case is making false allegations or

1  exaggerating the impact of their abuse?
2      A.    They would have to be interviewed by
3  a person who has expertise as to sexual abuse,
4  and they would have to be tested using the
5  objective measures that I mentioned earlier,
6  the TSI-2 and the DAPS.
7      Q.    Based upon your experience with child
8  sexual abuse cases, how can the Court ensure
9  that the requisite information to assess
10  reliability and impact is gathered in the trust
11  administration process?
12      A.    It would have to require that the
13  claimants wish to go forward, that they would
14  have to be interviewed by a person with
15  expertise in sexual abuse and tested
16  objectively.
17      Q.    Is it your opinion that currently,
18  because testing and interviews are not present,
19  there is not sufficient basis for the
20  settlement trustee to evaluate reliability?
21      A.    The most updated TDP allowed for a
22  sworn six-hour mental health evaluation, if it
23  was so deemed by the trustee.  So it was not
24  required; it was up to the trustee to ask for
25  such an evaluation.

1          But it didn't clear up what kind
2  of mental health evaluation.  It didn't clear
3  up that the evaluation had to be focused on
4  sexual abuse and what psychological impact the
5  victim may have had.
6          So I don't think it was clear
7  enough in requiring it, first of all, for
8  people who are going forward.
9          And, second of all, it didn't
10  say specifically sexual abuse interviews.
11  Because you could get a mental health
12  evaluation of, like, your elementary school
13  education.  You could get a mental health
14  evaluation of your sex life.
15          You could get a mental health
16  evaluation of many things, but it needs to be
17  specified that it's about the sexual abuse
18  history.  And I don't think it would take
19  six hours for the claimants to go through that
20  at all.  I don't think it would take six hours.
21      Q.    So let's go back to the proof of
22  claim form itself.
23      A.    Okay.
24      Q.    Do you believe that that proof of
25  claim form, the way it's laid out, is

1  sufficient to evaluate reliability of these
2  allegations by these claimants?
3      A.    No.  No.  Because it's just checking
4  boxes.
5          There was -- the only place that
6  it allowed for a narrative was one question,
7  which was a good one.  It was the abuse
8  narrative.  But the instruction on it made it
9  optional.
10          So it wasn't even a requirement
11  of the person completing the POC to fill out
12  the abuse narrative.  It was just left there as
13  an option.
14          Checking boxes is not enough to
15  determine reliability of abuse.
16      Q.    Now, Dr. Treacy, based on your review
17  of the 39 proofs of claim that you discuss --
18  and I'm now referring you back to the sexual
19  abuse dynamics that you detailed.
20          Did you form an opinion whether
21  information is missing from the POCs form that,
22  in your experience, would assist with
23  addressing these sexual abuse dynamics?
24      A.    I think I got lost in that question.
25  I apologize.  Could you do it again?

1      Q.    It was a long question.  Let me try
2  it one more time.  I'll break it up.
3          You said earlier you reviewed 39
4  proofs of claim?
5      A.    Right.
6      Q.    And you, then, discussed with us the
7  sexual abuse dynamics in the practice of
8  applied psychology?
9      A.    Right.
10      Q.    Now, did you form an opinion, based
11  upon looking at both of those items, whether
12  information is missing from the POC form?
13      A.    Oh, yes.  There's a lot of
14  information missing from the POC forms.
15      Q.    What is it -- what information, in
16  your opinion, is missing?
17      A.    There wasn't enough information about
18  the grooming.  It just had a check -- check if
19  there was grooming, if you were given any gifts
20  or anything like that.  So there was no explain
21  or, you know, describe this further.
22          There was -- in terms of the
23  sexual interaction, they did have boxes that
24  you could check.  But there, again, was no
25  follow-up about how these sexual behaviors were

1　introduced to the claimants.
2　　　　　　In terms of secrecy, it didn't
3　have anything about -- other than threat.  It
4　had an overt threat, but it didn't say anything
5　about implicit threat, the child's own
6　perception of what happened.
7　　　　　　It had -- it did ask if there
8　was a prior disclosure.  That was on the POC.
9　But it didn't say what elicited the disclosure,
10　so you don't know how the disclosure came out
11　and what prompted the disclosure.
12　　　　　　And you don't know much about
13　the disclosure because all of this is, again,
14　checking a box.
15　　　　　　And you don't know anything
16　about -- well, we know something about impact
17　because there was more boxes that you could
18　check for where the claimant felt they were
19　impacted.  But, again, no follow-up, no ability
20　to clarify.  Excuse me.
21　　　Q.　Now, when you formed your opinion and
22　wrote your report, did you reference any key
23　factors of abuse?
24　　　A.　I did.  I did.
25　　　Q.　Could you explain to us what you

1　referenced and why you think they were
2　important?
3　　　A.　Okay.  When I was going through the
4　POCs, as I said, I was trying to see if the
5　POCs elicited any information about the sexual
6　abuse dynamics.
7　　　　　　I found that four questions on
8　the POC did involve some of the sexual abuse
9　dynamics.
10　　　　　　And do you want me to say what
11　the four were?
12　　　Q.　Go ahead, please.
13　　　A.　Okay.  The four were -- there was a
14　checkbox for grooming.  So we had that.
15　　　　　　There was a checkbox -- there
16　was a number boxes if there was progression in
17　the sexual behavior.  So the grooming would go
18　to the engagement phase.
19　　　　　　The progression in the sexual
20　behaviors would go to the sexual interaction
21　phase.
22　　　　　　The abuse narrative goes to the
23　sexual interaction phase.
24　　　　　　And there was a question about
25　threat.  Again, another box checked.  There was

1　a question about threat, and that goes to the
2　secrecy phase.
3　　　　　　So those four questions went to
4　the sexual abuse dynamics.
5　　　　　　And I added two other questions
6　that I thought went to the issue of possible
7　corroboration from an investigatory point of
8　view, and that was if there was a prior
9　disclosure.
10　　　　　　For example, one of the POCs
11　that I reviewed, the gentleman had,
12　unfortunately, been psychiatrically
13　hospitalized.  And he disclosed the sexual
14　abuse while he was hospitalized, so there would
15　be collaboration of his report.
16　　　　　　So the prior report was going to
17　provide me with some sense of corroboration.
18　So I included that in the six key factors, and
19　I included signed by victim because a few of
20　the ones that I referred were signed by
21　attorneys, not the victims themselves.
22　　　　　　MS. WARNER:  Your Honor, I'm
23　　　told that I'm out of focus, which is
24　　　probably not unusual.
25　　　　　　But I'm told I have stay very

1　　　still, so I'm trying to not move at all to
2　　　hopefully be more in focus.  But that's
3　　　not important.  The witness is in focus.
4　BY MS. WARNER:
5　　　Q.　So, Dr. Treacy, do you, generally, in
6　your practice, when you're evaluating child
7　sexual abuse allegations, look to these six key
8　factors of abuse?
9　　　A.　Not those six key factors.  I look to
10　the five sexual abuse dynamics.
11　　　　　　The reason I was looking at
12　these six, because four of them were related to
13　sexual abuse dynamics and two of them were
14　related to potential corroboration.  So that's
15　why I picked these six.
16　　　　　　But in my practice, I'm
17　examining the sexual abuse dynamics, the five
18　that I mentioned earlier.
19　　　Q.　Dr. Treacy, we're now going to place
20　on the screen Exhibit 2 to your December 5,
21　2021, report in this case.  It's a spreadsheet
22　labeled "Key Factors of Abuse Summary
23　Statistics," which is the first page of
24　JTX2205.
25　　　　　　MS. WARNER:  Mr. Spalding, could

1    you please display the first page of
2    JTX2205.
3             THE WITNESS:  I'm going to
4    switch glasses.
5    BY MS. WARNER:
6        Q.    That's good because the next question
7    I'm going to ask you is:  Do you recognize the
8    first page of JTX2205?
9        A.    I do recognize it.
10       Q.    And why do you recognize it,
11   Dr. Treacy?
12       A.    Because I had asked the gentleman
13   from Roux, R-O-U-X, who put this together, the
14   statistician, Marc, if he could please go
15   through the data from the sixth iteration of
16   the Bates White Boy Scouts data.  I wanted to
17   see what percentages of overall population
18   would demonstrate these dynamics or these six
19   key factors that I mentioned.
20             And so he was able to do that
21   for me, and that's what you see at the top of
22   the screen there.
23       Q.    So for the record, Dr. Treacy, you
24   actually asked for this, JTX2205, first page to
25   be put together by Mr. Marc Scarcella?

1        A.    That's correct.
2        Q.    Now, did you ask to see this data
3    about all 82,209 proofs of claim in this case?
4        A.    I did.
5             MS. WARNER:  Mr. Spalding, would
6        you now, please, highlight Column H in
7        this table.  It's the column with the
8        heading "Percentage claims with at least
9        four key factors of abuse."  Thank you.
10   BY MS. WARNER:
11       Q.    Do you see that?
12       A.    Yes, I see it.
13       Q.    Dr. Treacy, did you form an opinion
14   concerning the significance, if any, of the
15   data in this Column H as it relates to what
16   information is available to evaluate the
17   reliability of the claimants' allegations here?
18       A.    I did.
19       Q.    And what opinion did you form?
20       A.    This column is particularly important
21   because I was being -- I was somewhat liberal
22   saying four of the key factors were present.
23             Only 50 percent of all the
24   claims had four of the factors present, which
25   said, to me, that there had to be a tightening

1    up of the manner in which this case was handled
2    to improve the reliability of the process, that
3    this wasn't going to be reliable enough, that
4    these forms and paperwork weren't reliable
5    enough.
6        Q.    You just referred to the paperwork.
7    And earlier in your testimony, you talked about
8    a paper claim form.
9             Do you have an opinion about
10   whether a paper claim form or other only
11   written submissions can substitute for
12   interviews and objective testing for purposes
13   of evaluating reliability of child sexual abuse
14   allegations?
15       A.    I have an opinion.
16       Q.    What is that opinion?
17       A.    My opinion is it's just not adequate.
18   These cases are very complex.  And individuals
19   who have been really abused really deserve to
20   get compensated for what they've gone through.
21             And the bogus cases are the
22   cases that kind of may have jumped on the wagon
23   because they saw something on Facebook or
24   whatever.  They need to be called out.
25       Q.    Dr. Treacy, are you aware that the

1    claimants in this case may submit new written
2    claim forms to the settlement trust that may
3    differ from the proofs of claim that they've
4    already submitted?
5        A.    I've been told that.
6        Q.    Do you have an opinion about whether
7    a new or a different written submission to the
8    settlement trust can provide a sufficient
9    process to evaluate the reliability of child
10   sexual abuse allegations here?
11       A.    I do have an opinion.
12       Q.    What is it?
13       A.    I don't think it's enough.  I don't
14   think you can do this on paper.
15             Unless, let's say, that the new
16   claim information includes psychological
17   interviewing and testing by a legitimate person
18   doing it.  If they submit that in paper, that
19   would be fine with me.
20             But I think that -- given this
21   population, I think it's really important to
22   have the objective matters to -- particularly
23   to evaluate faulty reporting.
24       Q.    Now, Dr. Treacy, you remember your
25   deposition was taken in this case?

1      A.    Yes, I do.  I actually remember
2    Mr. Stoner.
3      Q.    And are you familiar with certain
4    criticisms that were made of your opinions by
5    way of the questions posed to you during that
6    deposition?
7      A.    Yes, I am.
8      Q.    What were those criticisms?
9      A.    That what I'm suggesting is just
10   unwieldy because of the size of this
11   population.
12     Q.    How do you respond to those
13   criticisms?
14     A.    I just have to respond by saying, you
15   know -- I don't want to sound like preaching
16   here.
17           But I have really guided my
18   career, and I have to keep that up.  I'm a
19   teacher and I teach, and I'm here as an expert
20   to teach.
21           Just because something is a big
22   job doesn't mean you have -- do it in a
23   half-ass way.  I don't want to be rude.  But
24   it's a big job, then you figure out how to do
25   it right.

1            The only way I know how to do an
2    assessment, whether or not it's a real case or
3    it's not a real case, is by doing interviewing
4    and testing.  So just because something is big,
5    you shouldn't throw out the solution if it's
6    difficult.
7      Q.    Dr. Treacy, as a practicing
8    psychologist, a court-appointed neutral, a
9    forensic evaluator, are there best practices
10   that you could recommend to the Court
11   concerning how to efficiently and effectively
12   conduct these interviews and objective testing?
13     A.    I think that probably the trustee or
14   the judge could coordinate with a national
15   organization that has people who could do
16   proper testing around the country and that they
17   know how to do these evaluations, and they
18   would refer the cases out to these experts
19   around the country and partner with that
20   organization to get this job done properly and
21   have some level of supervision over it.
22           You know, we're able now to do
23   the Zoom stuff.  So theoretically, you know,
24   people -- the people doing the actual
25   interviewing and testing could be supervised

1    without it being very expensive because it
2    could be just done on Zoom.
3      Q.    Dr. Treacy, I want to shift now, and
4    I want to ask you questions about the
5    evaluation of impact of child sexual abuse on a
6    person.
7      A.    Okay.
8      Q.    What, if any, experience do you have
9    in assessing the impact of child sexual abuse?
10     A.    Each one of my kids I test for it.
11     Q.    What about adult survivors?
12     A.    Same thing.  I don't know that
13   they're survivors when they come in the door.
14   That has to be assessed.
15           The -- the testing is the way to
16   do it.  I mean, the tests are available now.
17   It's not like -- at the beginning of my career,
18   none of this stuff was out here.
19           To me, the testing is really --
20   it's objective.  You could have -- you know, I
21   could give another ten psychologists this --
22   you know, this test and they would come up with
23   the same score.
24           And so it's not as subjective
25   like a Rorschach or something like that where

1    you could get ten different opinions.
2            So, you know, these tests have
3    been normed.  They've been validated.  Their
4    reliability has been assessed.  Their validity
5    has been assessed.  So it seems to me they
6    should be used.
7      Q.    Do you use these objective tests when
8    you evaluate for child sexual abuse?
9      A.    For child sexual abuse in both adults
10   and children, I utilize the test.
11           Now, the TSI is for adults.  So
12   I don't use that with the children.  I use a
13   trauma symptom checklist for children.
14     Q.    And what about when you're a
15   court-appointed neutral?  Do you use the
16   objective tests then?
17     A.    Every single case.  Every single
18   case.
19     Q.    What about when you're involved with
20   child protective cases?
21     A.    Every single case.
22     Q.    So let me see if I understand this,
23   Dr. Treacy.
24           The interviews and the tests
25   assess reliability?

1      A.    Yes.

2      Q.    But the tests also measure the degree

3  of impact of abuse on a claimant?

4      A.    Correct.

5      Q.    Do you recall -- so you've referenced

6  these two types of tests, the TSI-2 and the

7  DAPS, correct?

8      A.    Correct.

9      Q.    And based upon your experience, what

10  about these tests that you recommend here make

11  them appropriate tools for assessing the impact

12  of child sexual abuse when people were

13  children?

14      A.    It allows you to assess the various

15  areas of impact.  It allows to you assess such

16  things as posttraumatic stress and then even,

17  within posttraumatic stress, the various

18  symptom clusters that you have because you have

19  intrusion, intrusive thoughts; you have

20  avoidance, trying to push the material away;

21  and you have physiological arousal, not sexual

22  arousal but hyper, you know, that they react to

23  environmental stuff, so -- and total

24  posttraumatic stress.

25            So you could examine within

1  posttraumatic stress, but you could also look

2  at things like substance abuse.  And that's

3  very important in this population because

4  that's how a lot of these folks cope is they

5  dissociate by drinking or drugging.

6            And so that can be assessed, and

7  that's very important in their current

8  day-to-day life.

9            You can assess their anxiety.

10  You can assess their depression.  You can

11  assess if they're having sexual dysfunction.

12  You can assess if they have poor

13  self-reference.

14            It's a marvelous way, and it

15  will give guidance to folks who want to go into

16  counseling or therapy to help themselves feel

17  better about themselves after this is all said

18  and done.  The tests are guidance.

19            And they allow you to rate the

20  level of severity of the posttraumatic stress

21  as mild, moderate, or severe.

22            So the tests have an objective

23  number.  Because they're normed, they have a

24  T-score, and they have standard deviation.  So

25  I can literally sit and look at the scoring

1  page and know how somebody is doing.

2      Q.    Based upon your experience, is a best

3  practice to administer these objective tests

4  when you meet with adult survivors of child

5  sexual abuse?

6      A.    It is best practice to do so.

7      Q.    Now, Dr. Treacy, do these tests, the

8  TSI-2 and the DAPS tests, assess the impact of

9  child sexual abuse at the time it occurs or,

10  for an adult who alleges abuse when he was a

11  child, in present day form, present-day terms?

12      A.    The DAPS does both.  The DAPS has

13  what's called peritraumatic distress,

14  peritraumatic dissociation.  The DAPS has two

15  scales.

16            "Peritraumatic" means during the

17  trauma.  So the DAPS does have two scales that

18  measures at the time of the trauma as well as

19  the present day.  The TSI does not.

20            However, the TSI is stronger on

21  its validity scales, because that was

22  specifically what was worked on for the second

23  version of the TSI.

24      Q.    Now, Dr. Treacy, I want to go back to

25  the TDPs.

1            What provisions in the TDPs, if

2  any, in your view, assist with the evaluation

3  of the impact that alleged child sexual abuse

4  has had on any of the adult claimants in this

5  case?

6      A.    The section of the TDP that pertains

7  to this was the revision that would allow the

8  trustee to require -- well, at the present, it

9  says the trustee has the option to say that the

10  six-hour sworn mental health evaluation would

11  have to be done.

12            My recommendation is that,

13  rather than saying six-hour mental health

14  evaluation, say specifically a sexual abuse

15  evaluation as well as the -- evaluating the

16  impact of the trauma using objective tests,

17  such as the TSI-2 and the DAPS.

18      Q.    In your experience as a

19  court-appointed neutral with law enforcement

20  and with government agencies like child

21  protective services, Dr. Treacy, have you ever

22  determined that allegations of child sexual

23  abuse were not reliable?

24      A.    Yes, I have.

25      Q.    Based upon your 45 years of

1  experience with child sexual abuse evaluations,
2  can you provide us with an estimate of how
3  often over the years you have concluded that
4  the allegations were unreliable?
5       A.   Yes, I can.  It's about 40 to
6  45 percent of the allegations.  But, again, I
7  have to say that, with the caveat, I don't get
8  your normal run-of-the-mill case.  I tend to
9  get the cases that are at the extreme end of
10  the normal bell curve.
11       So I get more extreme cases
12  than -- I wouldn't call my cases average.  So I
13  don't think that 40 to 45 percent would pertain
14  to, like, an emergency room setting or it
15  wouldn't pertain necessarily to a mental health
16  clinic.  It would pertain probably to people
17  like myself around the country who really have
18  been doing this for a long time.
19       Q.   Now, in your experience as a
20  psychologist, a court-appointed neutral, and an
21  investigator of child sexual abuse matters,
22  what weight do you afford self-reported
23  allegations and self-reported information as
24  compared to the results of the objective tests,
25  the TSI-2 and the DAPS tests, concerning

1  reliability of these allegations?
2       A.   I can't put any weight on self-report
3  unless it's investigated, unless it's
4  corroborated by objective testing and by
5  interviewing.
6       Q.   Now, I want to ask you a similar
7  question, but now I want to focus specifically
8  on the evaluation of impact of child sex abuse
9  of a particular person.
10       In your experience as a
11  psychologist, as a court-appointed neutral, and
12  as an investigator working on forensic cases
13  for law enforcement, what weight do you afford
14  self-reported information as compared to the
15  results of the testing that you've described?
16       A.   I can't put any weight on it and
17  especially -- especially in situations where
18  there's potential of secondary gain.
19       Q.   What do you mean by "secondary gain"?
20       A.   Secondary gain is when somebody says
21  that something happened to them when it really
22  did not happen to them but for another -- what
23  we refer to as secondary gain motivation.
24       So, for example -- I'll give a
25  couple of examples.  You have a teenager who's

1  running around doing poorly at school.  Dad
2  says, "You're not going to hang around with
3  that kid anymore.  You've got to come straight
4  home from school."
5       Then the bad kid's friend tells
6  him, "Go to the guidance counselor and say your
7  dad touched you, and then you can come hang out
8  me."
9       Secondary gain motive is to be
10  able to go hang out with the bad friend.
11       Mom and Dad broke up.  Mom wants
12  to leave the state.  Sex abuse allegation comes
13  up.
14       These are examples of secondary
15  gain motive.
16       In this case -- and I know all
17  the lawyers have gone back and forth to say,
18  well, every case that's a trial case is -- you
19  know, a tort case -- I think I heard that
20  word -- is always about money.
21       But in this instance, money is
22  the secondary gain motive.  And so that needs
23  to be ruled in or ruled out.  And that can't be
24  ruled in or ruled out by checking a box.  It
25  has to be person-to-person contact evaluating

1  that particular motive.
2       Q.   Dr. Treacy, did you see or hear any
3  of the testimony of the claimants' attorneys
4  that were played before the Court?
5       A.   No, I didn't hear any of that.
6       Q.   Will you offer any opinions about the
7  process any of the claimants' attorneys in this
8  proceeding used for obtaining information from
9  their clients about allegations of child sexual
10  abuse?
11       A.   No.  No.  I have no opinion about
12  that.
13       Q.   Dr. Treacy, why do you feel so
14  strongly about requiring the TDP to include a
15  process for interviews and objective testing of
16  claimants?
17       A.   The reason I feel so strongly about
18  this is that I've dedicated my entire career
19  towards trying to help victims.  And I believe
20  the real victims in this case deserves to be
21  compensated well for what they have and that
22  that money should not be diluted by potential
23  fraud.
24       So, in my opinion, the real
25  victims deserve to be well compensated, and the

1  people who are fraudulent deserve nothing.
2           MS. WARNER:  I have no further
3  questions at this time.
4           I pass the witness.
5           THE COURT:  Thank you.
6           Mr. Stoner.
7           MR. STONER:  Good afternoon,
8  Your Honor.  Michael Stoner with Haynes
9  and Boone for the debtors.
10          -   -   -
11          E X A M I N A T I O N
12          -   -   -
13  BY MR. STONER:
14      Q.   Dr. Treacy, it's nice to see you
15  again.
16      A.   Nice to see you as well.
17      Q.   So, Dr. Treacy, I wanted to talk to
18  you a little bit about your experience with
19  trust distribution procedures.
20          Aside from this case, do you
21  have any experience with trust distribution
22  procedures?
23      A.   None.
24      Q.   You've never consulted on procedures
25  for what should be included in a trust

1  distribution procedure?
2       A.   No.  This is the first time I've ever
3  done anything like this at all.
4       Q.   When you were forming your opinion,
5  did you look at any other mass tort trust
6  distribution procedures?
7       A.   I wouldn't even know where to begin.
8  I didn't even have that thought.
9       Q.   And you have no experience
10  administering a settlement trust, correct?
11      A.   Oh, no, I don't.
12      Q.   And you've never consulted with a
13  settlement trustee with respect to
14  administering a settlement trust, correct?
15      A.   Correct.
16      Q.   And you have never provided any
17  opinions before with respect to what should be
18  included in a trust distribution procedure,
19  correct?
20      A.   That's correct.
21      Q.   Have you ever been involved in
22  creating a framework for resolving thousands of
23  sexual abuse claims?
24      A.   No.  No, I have not.
25          Do you mind if I take a sip of

1  my tea?
2       Q.   No, not at all.
3       A.   Thank you.
4       Q.   So, Dr. Treacy, did you do anything
5  to familiarize yourself with the BSA's
6  prepetition practices for resolving sexual
7  abuse claims?
8       A.   No.
9       Q.   Did you look at whether the BSA's
10  defense counsel required clinical interviews
11  for the purposes of settling claims?
12      A.   I don't know.  I did not -- I have no
13  knowledge about that.
14      Q.   Did you look at whether or not the
15  BSA's insurance companies required that
16  claimants sit for clinical interviews for the
17  purposes of settling claims?
18      A.   No.
19      Q.   And you don't know whether or not the
20  BSA's defense lawyers required the testing that
21  you referenced in your opinion before
22  settling --
23      A.   No, I don't.  I don't know
24  anything -- anything that the BSA has done in
25  the past in handling these kind of cases.

1       Q.   And are you aware that the BSA did,
2  in fact, settle claims without relying on
3  clinical interviews?
4       A.   No, I'm not aware of that.
5       Q.   And are you aware of the fact that
6  the BSA did, in fact, settle claims without
7  requiring the objective testing that you
8  mentioned?
9       A.   Nope.  I didn't know that either.
10      Q.   Are you familiar -- do you have an
11  awareness of the fact that the BSA's goals in
12  drafting the TDP were to emulate its
13  prepetition practices?
14      A.   No.  I didn't have -- that's out of
15  my realm.
16          MR. STONER:  Can you put up
17  Mr. Azer's declaration at page 2.
18  BY MR. STONER:
19      Q.   I'll direct you to paragraph 5, the
20  second sentence.
21      A.   Can you make it a bit bigger, please?
22      Q.   Yeah.  And I'll read for you the
23  relevant sentence.
24      A.   Okay.  You said 5?
25      Q.   Yeah.  "The operative TDP were

1  designed by the debtors to emulate, to the
2  greatest extent practicable, the prepetition
3  practices of the BSA and its insurance
4  companies for investigating, evaluating,
5  valuing, and resolving direct abuse claims."
6          Did I read that correctly?
7      A.  Yes, you did.
8      Q.  And since you didn't do anything to
9  familiarize yourself with the BSA's prepetition
10 practices, you can't say, one way or another,
11 whether the TDPs are consistent with the BSA's
12 prepetition practices, correct?
13     A.  That's correct.
14     Q.  And so none of your testimony is tied
15 to the actual practices that the BSA and its
16 insurers had with respect to resolving abuse
17 claims, correct?
18     A.  That's correct.
19     Q.  I'd like to direct your attention to
20 the day 2 transcript.  This is Mr. Griggs'
21 testimony.
22          Do you know who Mr. Griggs is?
23     A.  No.
24     Q.  Bruce Griggs is the national
25 coordinating counsel for the Boy Scouts of

1  America.  He was a witness in this case.
2          MR. STONER:  Can we go to
3      page 154, please.
4  BY MR. STONER:
5      Q.  And I'll direct your attention to
6  line 18.
7          It says: "Okay.  The first was
8  a mental health expert.  Do you recall that?"
9          His answer was: "Right.  So we
10 thought that would be a useful examination.  We
11 retained a mental health expert, typically in
12 the jurisdiction where the case filed, to have
13 them do an examination."
14         MR. STONER:  Can you go to the
15     next page, Pete.
16     "But it typically did not happen
17     in every case, and it typically wasn't
18     very useful."
19 BY MR. STONER:
20     Q.  Do you see that testimony?
21     A.  I do.
22     Q.  Did I read that correctly?
23     A.  You did.
24     Q.  So based on this testimony, would you
25 agree that Mr. Griggs would not find medical

1  examinations of all the claimants useful in
2  resolving sexual abuse claims?
3      A.  You just said "medical evaluations"?
4      Q.  Yes.
5      A.  Yes.
6          MR. STONER:  We can take that
7      down.
8  BY MR. STONER:
9      Q.  Now, in your report, you refer to the
10 need for clinical interviews and testing due to
11 the secondary gain motive, correct?
12     A.  In part, due to the secondary gain
13 motive.
14     Q.  And the existence of a financial
15 secondary gain motive would be no different in
16 the TDPs than it would be in a lawsuit,
17 correct?
18     A.  Correct.
19     Q.  And it would be no different than a
20 demand letter?
21     A.  I'm not quite sure what a demand
22 letter is.
23     Q.  Well, if a claimant wrote a letter
24 saying, "I was abused, and I don't want to file
25 a lawsuit yet, but I want you to pay me money

1  to resolve the claim."
2      A.  Okay.  Okay.  There would be a
3  secondary gain motive in that as well.
4      Q.  And there would be no difference
5  between a secondary gain motive in those
6  various situations, correct?
7      A.  Correct.
8      Q.  And so the BSA and its insurers, on a
9  prepetition basis, were involved with claims
10 that implicated a secondary gain motive,
11 correct?
12     A.  Yes.
13     Q.  And based on the testimony that
14 you've seen, they resolved those claims without
15 requiring claimant interviews, correct?
16     A.  Well, you just showed me something
17 that said that there was a mental health
18 component that was built in.  But it didn't say
19 it was sexual abuse specializing -- or
20 specifically.  That's a better word.
21         So they did try to do some type
22 of interviewing that didn't seem to work out,
23 according to that witness.
24     Q.  Right.  He said it wasn't very
25 useful, correct?

1    A.   Correct.
2    Q.   So I'll direct your attention to
3  Article VII.A. of the trust distribution
4  procedures.  We'll pull it up on the screen.
5    A.   Okay.
6          MR. STONER:  It's JTX1-353, and
7      we're going to page 162.
8  BY MR. STONER:
9    Q.   And I believe the second sentence
10  starts "In order to properly make a trust claim
11  submission, each submitting abuse claimant
12  must" -- and if we go down to romanette
13  number iii -- "execute an agreement to be
14  provided or made available by the settlement
15  trust with the questionnaire" -- and then going
16  down to ii -- "consent to and agree to
17  cooperate in any examinations requested by the
18  settlement trustee, including by healthcare
19  professionals selected by the settlement
20  trustee."
21          Do you see that provision?
22    A.   I do.
23    Q.   Do you have a view as to whether or
24  not a clinical interview would constitute an
25  examination?

1    A.   Probably so.  I don't -- you know,
2  I'm not an attorney.  So if somebody said to me
3  "Would you consider the evaluation that you did
4  to be an examination of sexual abuse?" I would
5  say yes.
6    Q.   And what about the objective testing?
7  Would you consider that an examination?
8    A.   I would consider that to be part of
9  the examination, yes.
10    Q.   Okay.  And it says here that the
11  abuse claimant must consent to and agree to
12  cooperate in any examinations requested by the
13  settlement trustee, correct?
14    A.   That's correct.  I know that from
15  reading it before, but I don't see it now.
16          Is it also here?
17    Q.   It's in Section ii, consent to and
18  agree to cooperate in any examinations.
19    A.   Okay.  That's --
20    Q.   So there's no limitations to the type
21  of examinations that the settlement trustee can
22  request under these TDP, correct?
23    A.   That's correct.
24    Q.   And the settlement trustee would have
25  the discretion to require clinical interviews

1  if she found it helpful, correct?
2    A.   Well, it says here "requested."  It
3  doesn't say "required."
4    Q.   Okay.  So if we go down to the next
5  sentence -- or if we go down to the bottom of
6  the page, it says:  "No recovery will be
7  provided to an abuse claimant that" -- if we go
8  to the next page -- "does not timely submit a
9  questionnaire.  The abuse claimant's breach or
10  failure to comply with the terms of his or her
11  agreement made in connection with his or her
12  trust claim submission shall be grounds for
13  disallowance or significant reduction of his or
14  her abuse claim."
15          Do you see that?
16    A.   I do.
17    Q.   So the settlement trustee may not be
18  able to compel an interview, but they can
19  reduce or disallow the claim if the claimant
20  refuses to cooperate, correct?
21    A.   Yes.  This looks to me like it's
22  about submitting a questionnaire, not
23  necessarily about getting an interview or
24  testing.
25    Q.   Well, I think there are two

1  provisions.  The first sentence deals with the
2  questionnaire.
3    A.   Okay.
4    Q.   And then the second sentence deals
5  with the terms of his or her agreement made in
6  connection with his or her trust claim
7  submission.
8    A.   Okay.  Okay.
9    Q.   And do you recall that one of the
10  things that they had to agree to was to consent
11  to any medical examinations by the settlement
12  trustee?
13    A.   Any examinations, not just medical.
14    Q.   Right.
15    A.   Okay.
16    Q.   And so based on this, the settlement
17  trustee has the ability to either compel -- the
18  settlement trustee has the ability to either
19  perform the testing and the interviews that you
20  recommended or reduce or disallow the claim,
21  correct?
22    A.   Yes, that's true.
23    Q.   And so it seems to me that the major
24  difference between what you've outlined in your
25  testimony and what the TDPs currently provide

1  for is that the settlement trustee should not
2  have any discretion as to whether or not to
3  require the testing and the interviews and they
4  should be mandated, correct?
5      A.  Yes.
6      Q.  And you're saying that -- and this is
7  your opinion even though you've never been
8  involved in the administration of a settlement
9  trust?
10     A.  Yes.  Because this is best practices,
11 so it would have to be across the board.
12     Q.  And this is your opinion even though,
13 historically, the BSA and its insurance
14 companies resolved claims without requiring
15 this testimony?
16     A.  Correct.
17     Q.  And this is your opinion even though
18 you haven't considered any impact on the
19 aggregate cost on the settlement trust?
20     A.  That's true.
21     Q.  And you haven't considered any impact
22 on the aggregate time it will take to
23 administer the settlement trust, correct?
24     A.  For all 82,000 people, no, I have
25 not.

1      Q.  And is it your testimony -- is it
2  your opinion that the -- let me take a step
3  back.
4          You're aware that the TDP also
5  provide for an expedited trust distribution
6  mechanism, correct?
7      A.  I am aware of that.
8      Q.  This wasn't addressed in your direct
9  testimony, but is it your opinion that those
10 claimants who elect for the expedited trust
11 distribution should be required to go through
12 the clinical interview?
13     A.  No.  I think that -- I don't think
14 that that would be necessary for that
15 population.
16     Q.  And the same question -- and for that
17 population, it would also not be necessary to
18 go through the objective testing, correct?
19     A.  Correct.
20     Q.  So this -- so your opinion would only
21 relate to those claimants seeking to resolve
22 their claim through a trust claim submission or
23 the independent review option, correct?
24     A.  Correct.
25     Q.  Now, one of the -- you talked a lot

1  about the reliability of a claimant's report in
2  your direct testimony.
3          Can you explain to me --
4  reliability doesn't allow you to make a
5  determination as to whether or not the abuse
6  occurred, correct?
7      A.  That's correct.  But it helps making
8  that determination.
9      Q.  And it would be an ethical breach, I
10 believe you testified in your deposition, for
11 you to make that determination, correct?
12     A.  You're absolutely correct.
13          I cannot go to the ultimate
14 issue.  The only parties that can go to the
15 ultimate issue is a judge and a jury.
16          It's not -- it's not --
17 psychologists are not allowed to do that.  The
18 clause in our ethical canon is called "beyond
19 competency."
20          So what we're doing -- if we're
21 doing that, we're making a legal determination
22 even though we're not trained to do so.  So
23 that's why it would be considered a violation
24 of ethics.
25     Q.  So, at most, it would be just a data

1  point for the settlement trustee to consider in
2  making the evaluation, correct?
3      A.  I think you're minimizing it a little
4  bit, but I'll say okay.
5      Q.  And the settlement trustee can
6  provide whatever weight he or she wants to give
7  to that report, correct?
8      A.  I assume so, yes.
9      Q.  And so the settlement trustee can
10 exercise the discretion as to how much value to
11 put on that report in making the decisions,
12 correct?
13     A.  Yes.
14          By "value," you mean weight or
15 money or --
16     Q.  Well, with respect -- it can be
17 either to the weight of any of the factors, the
18 overall valuation of the claim, any of the
19 decisions that the settlement trustee is making
20 with respect to the administration of a trust
21 claim submission.
22     A.  Okay.  I understand.
23     Q.  And so since the settlement trustee
24 is going to be -- have the discretion as to the
25 value of the report and the testing in making

1  its decision-making, wouldn't it make sense for
2  the settlement trustee to also have the
3  discretion as to whether to require that
4  testing?
5      A.   I don't know.  I don't know.
6  Because, again, I said I had to do this by best
7  practices.  And I don't know how trained
8  everybody is on these kind of things.
9           That's kind of why I'm here
10 today because it's more complicated -- sex
11 abuse is pretty complicated, and I don't know
12 what knowledge you require of these trustees.
13 I don't have enough background to know.
14     Q.   Do you know who the settlement
15 trustee is -- do you know who the proposed
16 settlement trustee is in this case?
17     A.   I don't know who the person is, but I
18 heard that they have a very good reputation and
19 that they are very trustworthy.
20     Q.   And do you have any basis to believe
21 that the settlement trustee would not be able
22 to determine when clinical interviews would be
23 useful to her evaluation of a claim under the
24 TDP?
25     A.   I have trouble answering that because

1  it's like a -- it's ambiguous to me because all
2  I -- I know very little about this person.  And
3  I do want to be optimistic about this, but I'm
4  not quite sure I have enough information to be
5  able to answer your question.
6      Q.   So you don't know, one way or the
7  other, whether or not the settlement trustee
8  has the ability to decide whether or not a
9  clinical interview would be useful to her
10 evaluation of a claim?
11     A.   I would hope so.  I would hope so.
12     Q.   And if the settlement trustee were
13 able to make that determination as to whether
14 or not clinical interviewing and objective
15 testing would be useful to her evaluation of
16 the claim, would it, then, make sense to leave
17 in her discretion whether or not to actually
18 expend the cost and time in pursuing that?
19     A.   I think that's a lawyer question.  I
20 don't think I'm the person to try to answer
21 that.  I think that has to be worked out with
22 you folks.
23     Q.   Well, you're offering an opinion as
24 to revisions to the TDP, aren't you?
25     A.   I am.  But I'm basing that on me

1  being a psychologist and my ethical canon.
2           And that question that you asked
3  me really is something that the lawyers would
4  have to work that out.
5      Q.   Why can't you answer that question
6  with respect to your opinion as a psychologist?
7      A.   Because I have to go to the top bar.
8  You know, I have to treat these people who are
9  making these claims as if they were in my
10 family, the way I'd want my family treated.
11          And so holding the bar that high
12 means that I would prefer to have everybody
13 evaluated properly.
14     Q.   So is it your testimony that your
15 recommendations to the TDP are the top bar for
16 evaluating the reliability of a claim?
17     A.   Top bar psychologically, yes.
18     Q.   And you don't know whether or not the
19 BSA used the, quote, top bar on a prepetition
20 basis?
21     A.   I have no idea.
22     Q.   And you don't know whether --
23     A.   I don't know that there was some
24 mental health person involved, but I don't know
25 what area -- their area of expertise was.  It

1  didn't say anything about sexual abuse
2  specialization.
3      Q.   And you don't have any opinion as to
4  whether the BSA's insurance companies, when
5  settling claims prepetition, required the top
6  bar?
7      A.   Oh, I don't know.
8      Q.   I believe, in one hearing, the
9  recommendations that you made were referred to
10 as the Rolls Royce of testing.
11          Would that be a fair
12 characterization?
13          MS. WARNER:  Objection.  There's
14     no foundation for that here with regard to
15     who made that comment.
16          THE COURT:  Sustained.
17 BY MR. STONER:
18     Q.   Okay.  I'd like to talk a little bit
19 about the testing that you described.
20          You described it as objective
21 testing, correct?
22     A.   Yes.
23     Q.   And the basis for your opinion that
24 it's objective testing is because the scores
25 are normed, correct?

1    A.    That's correct.
2    Q.    It's not because the inputs into the
3  tests are objective, correct?
4    A.    No.  Because everybody would do this
5  objective -- like, if I said to you, "How
6  many" -- let's say you were taking the test --
7  "How many times in the last month did you have
8  anxiety?" and you say, "Often," that's your
9  perception of how frequent this is.  Okay.
10         So the person filling out the
11  test is going to have their own subjective
12  evaluation of whatever the answer may be, but
13  that doesn't make the test subjective.  It
14  makes it objective because it's normed, it's
15  validated, and it is reliable and that any
16  score has a particular meaning.
17   Q.    But what I'm saying, it's not like
18  measuring blood pressure or taking a
19  temperature where it's an objective number in
20  the input, correct?
21   A.    Let me give you an example.
22         IQ tests are objective tests
23  because each person is answering the questions.
24  That's their own answer.  That would be
25  considered subjective.  But IQ tests are

1  considered objective tests.
2         This is no different.  IQ tests
3  have a mean of 100 and a standard deviation of
4  15.  The tests that I'm recommending have a
5  standard mean of 50 and a standard deviation of
6  10.
7         So I would very much -- unless
8  somebody just said "no" on an IQ test -- and
9  this is possible, to your point, that somebody
10  could go in and say, "I don't know.  I don't
11  know.  I don't know.  I don't know.  I don't
12  know."  And they would get rated as being much
13  lower than their competency because whoever was
14  giving the test let them get away with that.
15  And they would score zero.
16   Q.    So that's the subjective piece
17  that goes to support your point.
18   Q.    Well, you would agree that the inputs
19  into the tests are subjective, correct?
20   A.    Yes.  The response to test items are
21  subjective.
22   Q.    And the answers that, I believe, that
23  you give in these tests is things like "often,"
24  "quite often," "rare," something like that,
25  correct?

1    A.    Yes.  It has to do with the degree to
2  which the person is experiencing a particular
3  behavior or symptom.
4    Q.    And there's no guidance in the
5  administration of the test as to whether or not
6  something would be considered "often" or "quite
7  often," correct?
8    A.    No.  Unless the question was posed to
9  the person administering the test.
10   Q.    And, similarly, there would be no
11  way --
12   A.    The test -- may I just complete that
13  answer.
14         The test assumes a sixth grade
15  level of reading comprehension.
16   Q.    Well, two individuals could be
17  experiencing the same symptom, and one could
18  think that it's experiencing it often and the
19  other experiencing it quite often even though
20  they're experiencing it the same amount of
21  time, correct?
22   A.    Yes.  And that's why we have the
23  validity scales built in to measure that.
24   Q.    I wanted to make sure I understood
25  something with respect to the objective testing

1  that we've been discussing.
2         Tests don't provide any insight
3  into whether or not the abuse occurred,
4  correct?
5    A.    This is a good question because the
6  tests are correlational.  They're not causal.
7         So you cannot make from the
8  test -- let's say somebody does the test.  They
9  have a very high PTSD scale score.  All I can
10  say -- again, this is my ethical canon.
11         I cannot make a causal
12  statement.  I can't say, "Because this person
13  was a victim of sexual abuse as a child, that
14  is the reason why they have a high PTSD score."
15  Because it's correlational data.
16         So the test is a correlational.
17  It's not causal.  So you are right.
18         And that's why, ethically, I
19  can't go to the veracity issue, and I can't go
20  to the believability issue because of just that
21  issue that you raised.  So that is a good
22  question.
23   Q.    And so when we're saying that they're
24  used to assess reliability, we're talking about
25  the reliability of the symptomatology; we're

1  not referring to the reliability with respect
2  to the underlying event?
3      A.  You have to go back to the interview
4  process.
5          If the interview process is
6  evaluating whether this person's statements are
7  consistent with sexual abuse, we go back to our
8  five sexual abuse dynamics.
9          And that's where the reliability
10 issue would pertain to the interview.  And
11 that's more about the sexual abuse dynamics.
12 The tests are more related to the impact.
13     Q.  Right.  The tests don't deal with the
14 reliability of whether or not the abuse
15 occurred?
16     A.  Correct.  That's correct.
17         You can say that PTSD is
18 present.  And if you have particular
19 PTSD-related or sexual symptomology, that
20 brings it a little bit closer, but it's not
21 causal data.
22     Q.  You refer -- you've referred several
23 times to your view that these are the best
24 practices.
25         Do you know if these are the

1  best practices for mass tort settlements?
2      A.  Oh, no.  I don't know anything about
3  that, no.
4      Q.  Do you know --
5      A.  No, I don't --
6      Q.  I'm sorry.  Finish.
7      A.  This is a new land for me.  I'm in
8  the land of family court and criminal court.
9  This is not something that I have experienced
10 with a case that this is size.
11         I mean, I've done some Catholic
12 Church stuff.  That's similar.  But I haven't
13 done anything like this.
14     Q.  So you don't know if these are the
15 best practices for trust distribution
16 procedures, similarly, correct?
17     A.  Correct.
18     Q.  And do you know whether these are the
19 best practices for claims in the tort system?
20     A.  I have no idea.
21     Q.  And do you know whether anyone in the
22 tort system actually uses these interviews?
23     A.  I don't know.
24     Q.  Do you know whether, in the tort
25 system, anyone uses the tests that you're

1  referring to?
2      A.  I don't know.
3      Q.  Okay.  So my recollection from your
4  deposition is that your hourly rate was $250 an
5  hour; is that correct?
6      A.  That's for clinical work.  For -- my
7  hourly for this type of thing is 450 an hour.
8      Q.  Yeah.  Sorry.  I wasn't very clear on
9  that.
10         I was speaking about your
11 clinical work.
12     A.  Correct.
13     Q.  And conducting a claimant interview
14 would fall within the clinical work basket,
15 correct?
16     A.  That's correct.
17     Q.  And administer -- and scoring --
18     A.  Scoring the test would probably take
19 45 minutes to an hour for each one, but I'm
20 not -- I'm not trying to promote myself to do
21 these evaluations for everybody.  This is not a
22 self-promotion tour here.
23     Q.  I'm not asking to you do them for
24 everybody because I am quite certain it would
25 be an impossibility.

1          But I just want to go through
2  and make sure I understand the time it will
3  take, the cost it will take for each of these
4  recommendations.
5      A.  Okay.
6      Q.  I believe, in your deposition, you
7  indicated that a claimant interview would
8  typically take approximately 60 to 90 minutes;
9  is that correct?
10     A.  That's correct.  It would take --
11 again, it depends on the degree of anxiety in
12 the individual.
13         60 to 90 minutes would be about
14 appropriate.
15     Q.  And I believe you testified that you
16 typically would not review any documents before
17 that, correct?
18     A.  Typically, yes.
19     Q.  But you would spend additional time
20 reviewing documents relating to the claim after
21 the interview, correct?
22     A.  Correct.
23     Q.  And the amount of time that would
24 take would depend on the amount of documents,
25 correct?

1    A.    Yes.
2    Q.    On average, can you approximate how
3 much time you spend reviewing documents after a
4 claimant interview?
5    A.    You want me to try to average it out?
6 Oh, boy.
7              Because I have some cases that
8 have none, and I have some cases that I have
9 cartons and cartons.  I told you about the
10 one-on-one.
11             For every hour -- I had a man in
12 an institution.  He had so many intellectual
13 deficits and behavioral problems that they had
14 to write it, no doubt, every hour by hand, not
15 by computer.
16             On average, I would say the
17 review -- I would average it out to about
18 between an hour and hour and a half.  If I had
19 to average the whole population from none up to
20 the extreme, like the one I explained to you, I
21 would say an hour, an hour and a half.
22             Often, in these cases, there's
23 not a whole lot of documentation for the
24 adults.
25    Q.    And then after that you would

1 typically prepare a report to the person who
2 retained you, correct?
3    A.    Yes.
4    Q.    And I believe that you indicated it
5 would typically take approximately two hours to
6 prepare a report; is that correct?
7    A.    It depends on the report, but I would
8 say an hour and a half to two hours.
9    Q.    So, on average, between 60 to
10 90 minutes for a clinical interview; 60 to
11 90 minutes for document review, understanding
12 that that can fluctuate based on the specific
13 claim; and about an hour and a half to
14 two hours for writing a report.
15             Would it be conservative to say
16 that it would take about four hours total for a
17 clinical interview of your time?
18    A.    I would say between four and six,
19 depending on the experience with the scoring.
20    Q.    I'm sorry.  I'm only referring to a
21 clinical interview right now, not scoring.
22    A.    Oh, I'm sorry.  I was thinking you
23 were trying to put it all together.
24             I put it all together, and it
25 became -- it was around six hours.

1    Q.    Okay.  So it was your view it's about
2 six hours for clinical interviews and --
3    A.    Scoring and report writing.
4    Q.    -- scoring and testing and report
5 writing.
6              So that would come out to
7 approximately $1,500, on average, per claim?
8    A.    Are you multiplying that by 250?
9    Q.    Yeah.
10    A.    Okay.  I'll trust your numbers.
11    Q.    And I believe you testified that you
12 weren't recommending this for the entire sample
13 of claimants, just those not selecting the
14 expedited distribution trust, correct?
15    A.    Correct.
16    Q.    And so taking out the approximately
17 7,000 or so expedited trust distribution
18 claimants, 1,500 times 75,000 comes out to
19 approximately $112,500,000.
20             Does that sound about right?
21    A.    I have no idea.  I didn't do the
22 math.
23             And that hasn't been my task.
24 I'm not here to do the math.  I'm here to
25 provide my opinion about the interviewing and

1 testing.
2    Q.    I understand.
3              But there are real-world
4 considerations that need to be -- there are
5 real-world considerations, correct?
6    A.    No, I understand that.  But that's
7 not my role here.
8    Q.    Do you know if any -- do you know
9 where that money will come from to implement
10 all of these recommendations?
11    A.    No.
12    Q.    Do you know if any of the insurance
13 companies that you are testifying on behalf of
14 have offered to pay that amount?
15    A.    I don't know.
16    Q.    So I'm also going to take a look at
17 the amount of time.
18             I think you said between, I'll
19 say, five hours for everything all in.  That's
20 the midpoint between four and six.
21             Fair enough?
22    A.    Fair enough.
23    Q.    So five hours times 75,000 claims.
24             That's 375,000 hours.
25    A.    Now, can I ask you something?  Why do

1  you think the expedited cases are only going to
2  involve 7,000?
3      Q.  I believe it because that's the
4  approximate number that have elected the
5  expedited distribution.  That's why I'm telling
6  you that.
7      A.  Oh, they elected?  That's already
8  been established?  I didn't know that.
9          Okay.  I'll stop asking
10 questions.
11     Q.  So if we take 375,000 hours and
12 divide that by 2,000 business hours in a year,
13 that comes out to 187.5 years of work, which
14 would be a lot of work, correct?
15     A.  Yes.
16     Q.  And would likely have a significant
17 delay on the resolution of these claims,
18 correct?
19     A.  Again, I don't know what's the norm
20 here in terms of resolution of these cases.  So
21 I'm really not -- I know that you need to do
22 this, but I'm not here for this purpose.  I'm
23 here really to try to help with the --
24     Q.  Are you aware of anyone who's --
25 who's conducted this analysis about the impact

1  of the aggregate cost on the administration of
2  the settlement trust?
3      A.  I don't know if anyone has.
4      Q.  Are you aware of anyone who has
5  conducted this sort of analysis with respect to
6  the impact of the aggregate time for the
7  administration of the settlement trust?
8      A.  I don't know.
9          MR. STONER:  Okay.  I believe
10     that is all that I have for you right now.
11         THE WITNESS:  Thank you.
12         MR. STONER:  Thank you,
13     Dr. Treacy.
14         THE COURT:  Is there any other
15     cross?
16         I do see that.
17         Dr. Treacy, would you like a
18     break?
19         THE WITNESS:  I would like to
20     make another cup of tea, if you don't mind
21     waiting for that.
22         THE COURT:  Let's take ten
23     minutes.
24         THE WITNESS:  Okay.  Thank you.
25         THE COURT:  We're in recess.

1          -  -  -
2          (Whereupon, a short recess was
3      taken.)
4          -  -  -
5          THE COURT:  Okay.  We're back on
6  the record.
7          Mr. Kornfeld.
8          MR. KORNFELD:  Thank you,
9  Your Honor.
10         -  -  -
11     E X A M I N A T I O N
12         -  -  -
13 BY MR. KORNFELD:
14     Q.  Alan Kornfeld for the TCC.
15         Good afternoon, Dr. Treacy.
16     A.  Good afternoon, Mr. Kornfeld.
17     Q.  I'm just going to have a few lines of
18 questions.
19         First of all, you said you had
20 worked on a Catholic Church sexual abuse case.
21         Was that a bankruptcy case that
22 you worked on?
23     A.  No.
24     Q.  Are you aware that 27 Catholic
25 dioceses have filed for bankruptcy due to

1  sexual abuse claims in the United States to
2  date?
3      A.  I was aware of the number.  I didn't
4  know it was that specific number.  But I was
5  aware there were a few here in New York State.
6      Q.  Indeed, there were.
7          Are you aware of any of those
8  Catholic diocese bankruptcies in New York State
9  where the court mandated interviews of the
10 sexual abuse claimants?
11     A.  No, I have no awareness of any of
12 these procedures.
13     Q.  Are you aware that no court in any of
14 the 27 sexual abuse bankruptcy cases that have
15 been filed by Catholic entities has the court
16 ordered interviews of any claimants?
17     A.  No, I'm not aware of that.
18     Q.  Are you aware that, in any of those
19 27 diocese bankruptcies, the courts have not
20 ordered testing -- whether it be DAPS, TSI, or
21 any other testing -- of any of the claimants?
22     A.  No, I'm not aware of that.
23     Q.  Have you heard of the USA Gymnastics
24 bankruptcy that was due to the horrific sexual
25 abuse perpetrated by the team doctor?

1      A.    I'm not aware of the bankruptcy.  I
2  was aware of the case in -- the criminal part
3  of the case, but I don't have any knowledge
4  bankruptcy.
5      Q.    Well, there was a bankruptcy.
6            So you're not aware also, in
7  that bankruptcy, that the court did not order
8  interviews or testing of any of the sexual
9  abuse claimants, correct?
10     A.    Correct.  I'm not aware of that.
11           Is it okay with you too if I sip
12  my tea as we talk?
13     Q.    Of course.
14     A.    I'm so used to having to ask
15  permission in court.
16     Q.    No.  I'm not wearing the black robes
17  here, and I have a feeling that the person who
18  is wouldn't be upset if you drink your tea too.
19     A.    Thanks.
20     Q.    Did any of the insured counsel who
21  retained you, Dr. Treacy, tell you that
22  interviews are not required in any of the
23  sexual abuse bankruptcies that have taken place
24  in the United States to date?
25     A.    No, they did not.

1      Q.    Have any of the insured counsel who
2  have retained you told you, Dr. Treacy, that,
3  in any of the sexual abuse bankruptcy cases
4  that have been filed in the United States to
5  date, testing has not been required?
6      A.    They did not.
7      Q.    So your testimony today is not about
8  what the practices are in bankruptcy sexual
9  abuse cases, correct?
10     A.    My testimony is not specific to the
11  bankruptcy.  It's just general testimony about
12  how you can assess whether or not there's
13  sexual abuse.
14     Q.    And it's not about anything that has
15  been done in any bankruptcy case, correct?
16     A.    According to your representation, I
17  would say you're correct.
18     Q.    Thank you.
19           Dr. Treacy, you were asked about
20  the questionnaire that is going to be used to
21  assess reliability of claims pursuant to the
22  trust distribution procedures by the settlement
23  trustee.
24           Do you remember those questions
25  on cross-examination by Mr. Stoner?

1      A.    I do.
2      Q.    Dr. Treacy, what would you suggest to
3  the settlement trustee -- who, indeed, as you
4  testified, is well respected.
5            What should she include in that
6  questionnaire?
7      A.    She should include questions about
8  the five sexual abuse dynamics and something to
9  tap into symptomatology and the extent --
10     Q.    And what --
11     A.    Pardon.  -- the extent of this
12  symptomatology.
13     Q.    Thank you.
14           What questions should she ask to
15  determine whether the claim is legitimate
16  versus, as you put it before, fraudulent?
17     A.    I have a whole PowerPoint on that
18  question that I developed.
19           If you remember, I testified
20  that one of the counties here retained me in
21  defense of their cases about how to do
22  depositions and how to get to that information.
23           But it all goes back to the five
24  sexual abuse dynamics.  And I did two two-hour
25  presentations for them in training them to do

1  just what you're asking me.
2            So the short answer is we would
3  have to go back to my testimony about the
4  sexual abuse dynamics and ask questions about
5  each one of them in a way that was open-ended.
6      Q.    Would you just briefly summarize what
7  those sexual abuse dynamics for us are, please?
8      A.    Sure.
9            The first is engagement.  What
10  was the relationship of the offender before the
11  touching started?  What kind of contact did you
12  have with the offender?  What other kinds of
13  things did you do with the offender?  Was there
14  any exchange of any goods or goodies in the
15  process of getting to know the offender?  How
16  was the offender different from other adults
17  that you had been around?  That would go to
18  engagement.
19           The sexual interaction.  How did
20  the touching start out?  What happened next?
21  What happened after that?
22           Secrecy would be what did
23  so-and-so say to you about telling people about
24  this?  What were your own worries about telling
25  about this?  That would go to secrecy.

1      What finally made you come
2  forward?  How did everybody find out about
3  this?  That would go to disclosure.
4      How did your family react to
5  you?  How did your brothers and sisters, how
6  did your mom -- like, more specific in the
7  family -- after this came out?  How did your
8  friends react to you after this came out?
9      You know, to be brief, that
10  would be the type of questions that would need
11  to be asked.  But if you notice, they're all
12  open-ended.
13      Q.   Very much appreciated.
14      And those open-ended questions
15  on the five factors that you outlined would
16  help the trustee assess whether the claim was
17  reliable, correct?
18      A.   That's correct.
19      Q.   What questions would you suggest that
20  the trustee include in her questionnaire to
21  assess the damages that the abuse claimant has
22  suffered and the severity of the damages?
23      A.   Let me think about that for a minute.
24  Because the tests are so comprehensive.  It's
25  hard to imagine not using them.

1      I guess you'd have to ask
2  open-ended questions as to what areas of your
3  life have been affected by your abuse, or how
4  has your family life been affected?  How has
5  your sexual life been affected?  How has your
6  educational efforts been affected?  How has
7  your employment been affected?  Questions of
8  that nature.
9      Basically, this is the strong
10  part of the TDP itself is that -- remember that
11  it said all these different areas of impact?
12  Basically, it's asking open-ended questions
13  about that -- those areas that could be
14  potentially impacted.
15      And I guess you'd have to say
16  how and to what extent, and you'd have to give
17  some definition, or as you folks seem to use
18  the term "guidance," about how to quantify
19  whatever the thing was.
20      Q.   Thank you.  That's very helpful.
21      Besides these reliability and
22  damages or impact questions on the
23  questionnaire, are there any other key
24  questions that you would tell the settlement
25  trustee to include on her questionnaire?

1      A.   I would need -- I would need a whole
2  lot more time to be able to answer that
3  question.
4      I wasn't joking when I said I
5  did two two-hour trainings with these
6  attorneys -- and these were very experienced
7  attorneys -- on how to use these questions in
8  their depositions.
9      So I think we're doing tip of
10  the iceberg with that.  It would have to be in
11  much more depth, like a sitdown, you know,
12  really going through the phases and making sure
13  that it was understood what these things mean.
14      I don't think I could do that --
15  like in an answer for cross-examination, you
16  know, I don't think I can.
17      Q.   And if the settlement trustee picked
18  up the phone and called you and asked you to
19  chat about these issues, would you be prepared
20  to do that?
21      A.   Of course.  Of course.
22      MR. KORNFELD:  Thank you,
23  Doctor.
24      No further questions at this
25  point.

1      THE WITNESS:  Thank you.
2      THE COURT:  Thank you.
3      Mr. Moxley.
4      MR. MOXLEY:  Good afternoon,
5  Your Honor.
6           -   -   -
7      E X A M I N A T I O N
8           -   -   -
9  BY MR. MOXLEY:
10      Q.   Good afternoon, Dr. Treacy.
11      THE COURT:  She can't see you
12  yet.  Oh, there you go.
13      MR. MOXLEY:  Can you see me now,
14  Dr. Treacy?
15      THE WITNESS:  I can.  I can see
16  your eyes.  That always helps.
17      MR. MOXLEY:  Excellent.  Good
18  afternoon, Doctor.
19      Your Honor, I just have a few
20  questions for Dr. Treacy, if I may.
21      THE COURT:  Yes, you may.
22      MR. MOXLEY:  Thank you, Judge.
23  BY MR. MOXLEY:
24      Q.   Dr. Treacy, on direct examination by
25  Ms. Warner you were shown JTX2205.

1      That was the Excel file that
2  Roux prepared at your request, correct?
3      A.   Yes.
4           MR. MOXLEY:  Okay.  I'd like to
5  bring that up.
6           And, Ms. Warner, if I may, given
7  you had highlighting added to that, I was
8  hoping that your assistant could assist in
9  bringing that up with the highlighting
10  that was added.
11          MS. WARNER:  Yes.
12          Mr. Spalding, please do so.
13          MR. MOXLEY:  Thank you
14  Ms. Warner.
15  BY MR. MOXLEY:
16      Q.   Okay.  Dr. Treacy, you should see, on
17  your screen now, what's been marked as JTX2205.
18          Do you see that file?
19      A.   I do.
20      Q.   Okay.  And you see that Column H
21  which is entitled "Percent claims with at least
22  four key factors of abuse" is highlighted
23  there?
24      A.   Yes, I do.
25      Q.   Okay.  And, Dr. Treacy, I believe, on

1  direct, you testified that that column was
2  particularly important to you.
3           Do you recall that?
4      A.   I do.
5      Q.   And Column H there shows that
6  50 percent of the claims overall had at least
7  four of the key factors of abuse, correct?
8      A.   Yes.
9      Q.   Okay.  And Column H also shows that
10  68 percent of penetration claims have at least
11  four of the key factors of abuse, correct?
12      A.   That's correct.
13      Q.   Okay.  And, Dr. Treacy, you're aware
14  that there are approximately 82,000 proofs of
15  claim alleging sexual abuse in this case; is
16  that right?
17      A.   Yes.
18      Q.   Okay.  So, Dr. Treacy, Column H on
19  JTX2205 tells us that approximately 41,000
20  proofs of claim, based on the analysis that you
21  requested Roux do, have at least four of the
22  key factors of abuse, correct?
23      A.   That's correct.
24          MR. MOXLEY:  You can take that
25  down now, Ms. Warner, and your assistant.

1      Thank you very much.
2  BY MR. MOXLEY:
3      Q.   Finally, Dr. Treacy, on direct, I
4  believe you testified, of course, that you're
5  compensated for your work in this case, right?
6      A.   Yes.
7      Q.   Okay.  And you're being paid by the
8  objecting insurers; is that right?
9      A.   The checks that I've been getting say
10  "Boy Scouts Defense Fund" -- "Boy Scouts of
11  America Defense Fund."  That's the checks that
12  I've been receiving in payment.
13      Q.   I see.
14          Let me direct you -- do you
15  happen to have your expert report with you,
16  Dr. Treacy?
17      A.   It's on the other side of the table.
18          Do you want me to go get it?
19      Q.   That's okay.
20          MR. MOXLEY:  What I can do
21  actually -- with the Court's permission, I
22  can share my screen just to bring that up
23  quickly, if I may.
24          THE COURT:  That's fine.
25          MR. MOXLEY:  Thank you, Judge.

1           THE COURT:  You should be able
2  to do it.
3           MR. MOXLEY:  Okay.  Thank you,
4  Your Honor.
5  BY MR. MOXLEY:
6      Q.   Okay.  Dr. Treacy --
7      A.   Let me switch glasses.
8      Q.   Oh, sure.
9      A.   Okay.  All right.
10      Q.   Dr. Treacy, you see, on the screen
11  now, it says "Affirmative Report of Eileen C.
12  Treacy, PhD."
13          Do you see that?
14      A.   I do see that.
15      Q.   I'll scroll down to paragraph 38 of
16  your report.
17          You see there the section
18  "Retention and Compensation"?
19      A.   Yes.
20      Q.   And, Doctor, you specify there the
21  insurance companies that engaged you on behalf
22  of themselves and other insurers objecting to
23  plan confirmation.
24          Do you see that?
25      A.   Yes, I do.

1  Q.  And that's accurate, Dr. Treacy?
2  A.  Yes, it is.
3  Q.  Okay.
4  A.  The checks are still coming from this
5  defendant's fund.
6  Q.  Thank you, Doctor.
7      Do you understand, Dr. Treacy,
8  that the objecting insurers issued policies --
9  insurance policies to the debtors to provide
10 coverage for abuse claims?
11 A.  Yes, I can understand that.
12 Q.  Do you know that the objecting
13 insurers issued policies to the debtors that,
14 arguably, provide coverage for the abuse
15 claims?
16 A.  Yes.
17 Q.  And do you know how survivors of
18 sexual abuse in scouting would be compensated
19 under the bankruptcy plan that's proposed here?
20 A.  I saw the matrix and the TDP, so I
21 saw that.  I didn't calculate it out, you know,
22 to try to figure what kind of compensation they
23 would get.  But I did see the matrix.
24 Q.  Okay.  Let me ask you this:  Do you
25 know that abuse claims will be channeled to and

1  ultimately paid by a settlement trust that's
2  established if the plan is confirmed?
3  A.  Yes, I did understand that.
4  Q.  Okay.  And do you know, Dr. Treacy,
5  what assets will be available to the trustee --
6  I'm sorry -- to the settlement trust to pay
7  survivors under the plan?
8  A.  No, I don't know that.
9  Q.  In your view, Dr. Treacy, should the
10 individuals who suffered abuse and can pass all
11 the tests that you've outlined be compensated?
12 A.  Very much so.  Very much so.
13 Q.  So if reliability of a claim can be
14 established, those individuals should be
15 compensated, correct?
16 A.  Yes.  The legitimate victims should
17 definitely be compensated.
18 Q.  And I believe, on direct, Dr. Treacy,
19 you testified that legitimate victims should be
20 well compensated; is that right?
21 A.  Yes, it is right.
22 Q.  How would you define "well
23 compensated"?
24     MS. WARNER:  Objection,
25 Your Honor.  This is beyond the scope of

1  the direct.
2      And specifically she said she
3  was not, in any fashion, opining on
4  valuation of these claims.
5      MR. MOXLEY:  Your Honor, if I
6  may respond.
7      Ms. Warner asked Dr. Treacy
8  specifically why she was so passionate
9  about this issue.
10     Your Honor, can you still hear
11 me?
12     THE COURT:  I can.
13     MR. MOXLEY:  Okay.  Ms. Warner,
14 on direct, asked the doctor why she was so
15 passionate about this issue, and she gave
16 that as her answer.  It goes directly to
17 what she was asked on direct.
18     MS. WARNER:  Your Honor, I do
19 not believe the door was opened on that.
20 Her answer to the question was that she
21 cared about fair claims and she cared
22 about fraudulent claims.
23     She has not rendered an opinion
24 on valuation.
25     THE COURT:  Sustained.

1      MR. MOXLEY:  Thank you,
2  Your Honor.
3      And thank you, Dr. Treacy, for
4  your time.
5      I have no further questions,
6  Judge.
7      THE WITNESS:  Thank you.
8      THE COURT:  Any other
9  cross-examination?
10     I don't see anyone.
11     Any redirect, Ms. Warner?
12     MS. WARNER:  Yes, just a few,
13 Your Honor, if I may.
14     THE COURT:  Yes.
15         -  -  -
16     E X A M I N A T I O N
17         -  -  -
18 BY MS. WARNER:
19 Q.  Now, Dr. Treacy, Mr. Stoner, on
20 cross, put out Article VII of the TDP, which is
21 the new TDP filed in February of 2022.
22     You understand that?
23 A.  Yes.
24 Q.  And is it your understanding that the
25 settlement trustee is not required, it's not

1  mandatory to conduct those examinations that he
2  asked you about?
3      A.   That's correct.
4      Q.   On cross-examination, you were asked
5  if the Boy Scouts had settled cases before the
6  bankruptcy proceedings without interviews and
7  testing.
8           Do you recall that?
9      A.   Yes, I do.
10     Q.   Did you have an understanding that,
11 prior to the bankruptcy proceeding, certain of
12 those claims were actually in litigation?
13     A.   I had no knowledge really about any
14 past litigation.
15     Q.   Does the fact that claims were
16 settled before the bankruptcy with allegedly no
17 interviews and testing change your opinions
18 about the best practices to evaluate the
19 reliability of -- and impact of the 82,000-plus
20 claims that are now involved postbankruptcy?
21     A.   No.  No, it doesn't change my
22 opinion, because I've been involved with a lot
23 of institutions that had to create change to
24 properly deal with victims before.
25     Q.   You were asked on cross about the

1  proofs of claim.
2           You recall that?
3      A.   Yes.
4      Q.   Do you have an opinion whether it is
5  important for claimants to sign these proofs of
6  claim in this proceeding?
7      A.   Yes, I do have an opinion about that.
8      Q.   What's your opinion?
9      A.   That when the claimant is the person
10 who completes the form and signs the form under
11 oath, it makes the document more reliable.
12     Q.   Dr. Treacy, you were also asked, on
13 cross, about your experience with regard to the
14 reliability of child sexual abuse claims.  You
15 were asked that by several of the persons that
16 crossed you.
17          You recall, on direct, that you
18 testified that 40 to 45 percent of claims, in
19 your experience, are not reliable?  Do you
20 remember you said that?
21     A.   I didn't say "claims."  I said
22 "cases."
23     Q.   Correct.  Thank you for --
24 psychologists refer to cases.  I understand.
25          Now, you also said that it was

1  your experience -- that your experiences was
2  atypical, and I think you said that your cases
3  were at the top of the curve.
4           Do you have an opinion about
5  what percentage of false or unreliable
6  allegations of child sexual abuse are typical?
7      A.   I don't think that -- there's been
8  research on this directly going to CPS and law
9  enforcement.  And that research was done by the
10 American Council of Conciliators and another
11 study by Jones out in Colorado.
12          And they had found, in
13 children -- in children -- this is not adults,
14 going back -- in children, the rate of false
15 report was around 5 and 16 percent.
16     Q.   And what about with regard to what
17 you said on direct, that adult survivors
18 perceive sexual abuse through the lens of when
19 they were a child?
20     A.   That's how it's incorporated.  Yes,
21 that's how it's incorporated into their memory
22 system.
23     Q.   And so, on that basis, is it your
24 view that the possibility of false allegations
25 by adult claimants are exacerbated by these

1  secondary gain motives that you described?
2      A.   Exactly.  Yes, I do.
3           I teach, and I will even bring
4  this tomorrow.  I teach that, in every single
5  sex abuse case, people should always be saying
6  to themselves "What else could be going on here
7  besides sexual abuse?  What other motive could
8  be going on here besides sexual abuse?"
9           And so that is the reason that
10 I'm bringing this up here because there's a
11 clear secondary gain issue, a lot of money.  So
12 that certainly needs to be considered.
13     Q.   So you were asked on cross, by
14 several people, about the expense or the cost
15 of the recommendations that you have made here
16 to the Court, right?
17     A.   I have.
18     Q.   Now, did you read Dr. Conte's
19 deposition?
20     A.   I did read his deposition.
21     Q.   Did you watch the clip of his
22 deposition that was played to Judge Silverstein
23 earlier this week?
24     A.   Yes, I did.
25     Q.   And did you see that Dr. Conte -- by

1    the way, do you know Dr. Conte?
2        A.    Yes, I do know Dr. Conte.  I was
3    actually a participant in one of his early
4    studies of expert evaluations in sexual abuse
5    cases dating back in the '80s.  I've attended
6    lectures that he's presented at conferences.
7    I'm aware of his literature.  He's published
8    extensively in this area, and he's been a
9    leader in the sexual abuse world.
10       Q.    Do you have a high professional
11   regard for Dr. Conte in the field of child
12   sexual abuse?
13       A.    I do.
14       Q.    Now, did you see, in his deposition
15   and in the clip that was played for the Court,
16   his concern about the number of potential
17   fraudulent claimants in the bankruptcy process
18   here?
19       A.    Yes, I did see that.
20       Q.    Do you share his concern?
21       A.    I absolutely share his concern.  I
22   worry about those fraudulent cases preventing
23   the real victims from getting the compensation
24   that they deserve.
25       Q.    Are you aware of -- you were asked

1    some questions on cross about other
2    bankruptcies involving child sexual abuse.
3              Do you recall that?
4        A.    I do.
5        Q.    Dr. Treacy, in your general knowledge
6    of sexual abuse cases that have, unfortunately,
7    arisen in our society, are you aware of any
8    other situation where, prior to bankruptcy,
9    there were less than 2,000 claims and,
10   postbankruptcy, there were over 82,000 claims
11   brought?
12       A.    No, I'm not aware of anything like
13   that.
14       Q.    Well, you testified also that you
15   have a concern about fairly compensating real
16   victims, right?
17       A.    Absolutely.
18       Q.    Are you aware that, in this
19   bankruptcy proceeding, the settlement trust
20   that have you've been asked a lot of questions
21   about today will be funded with over
22   $2.7 billion?
23       A.    No, not until you said that.
24       Q.    I'm going to represent to you that
25   that's the situation here.

1              And so my question to you,
2    Dr. Conte, based upon what you've testified to
3    to today --
4        A.    Dr. Treacy.
5        Q.    Excuse me.  Sorry about that.
6              So based upon what you testified
7    today, Dr. Treacy, in your view, based upon
8    what you've testified that are best practices
9    in the field of applied psychology and child
10   sexual abuse, that if up to 1/23 of the trust
11   assets here had to go to assess the true and
12   valid claims, in your view, as a practicing
13   psychologist and a forensic evaluator of child
14   sexual abuse for over 45 years, do you think
15   that's a good practice?
16       A.    I do.  I do.  I know there's a lot of
17   cases, and I know this is complex, but it
18   doesn't mean that you should not do the highest
19   standard that you can do.
20             MS. WARNER:  I have no further
21   questions.
22             MR. MOXLEY:  Your Honor, if I
23   may have brief recross on the redirect.
24             THE COURT:  Okay.  Mr. Moxley.
25             MR. MOXLEY:  Your Honor, I

1    apologize for not putting my hand up.
2              It's Cameron Moxley of Brown
3    Rudnick on behalf of the coalition.
4              Your Honor, Ms. Warner, on
5    redirect, just asked about fair
6    compensation.  So I'd like, if I could, to
7    just ask my question.
8                     -   -   -
9              E X A M I N A T I O N
10                    -   -   -
11   BY MR. MOXLEY:
12       Q.    Dr. Treacy, I believe, when you were
13   asked questions by Ms. Warner previously today,
14   you had referenced that legitimate victims
15   should be well compensated.
16             Do you recall saying that?
17       A.    I do.
18       Q.    And what, in your view, is fair
19   compensation for someone who has been sexually
20   abused?
21             MS. WARNER:  Objection.
22   Objection.
23             Dr. Treacy.
24             Objection.  At no time, in
25   direct or redirect, was Dr. Treacy asked

1  any question about specific valuation, and
2  that's the question that Mr. Moxley is
3  trying to ask.  It's beyond her opinion,
4  and the door has not been opened.
5       MR. MOXLEY:  Your Honor, I renew
6  my request to be able to ask that
7  question.
8       THE COURT:  I'm going to
9  overrule the objection based on the last
10 question that was asked on direct.
11      Go ahead.
12      THE WITNESS:  I do not do this
13 type of work, so -- I can't see you,
14 Mr. Moxley.
15      MR. MOXLEY:  Oh.  Dr. Treacy,
16 can you see me now?
17      THE WITNESS:  Yes, I can.  It's
18 difficult for me if I can't make eye
19 contact.  That's why I can't be a Zoom
20 teacher.
21      I can't give a value because I
22 don't know how old people -- you know, I
23 don't do evaluation.  When I get asked to
24 do that, you know what I generally say?
25 That's beyond my competency.

1       I'm not an economist.  I'm not
2  somebody who figures these things out, and
3  I don't even know what the norm would be
4  for somebody who had gone through and
5  maintained secrecy on this all these years
6  and the effect that it could have on
7  people.
8       And I believe there will be
9  differential effects across -- you know,
10 you could have two sibs -- I have two sibs
11 at present who have very different
12 outcomes from going through very similar
13 abuse.
14      So I don't feel -- I wouldn't
15 feel that I can testify as an expert to
16 your question.
17 BY MR. MOXLEY:
18      Q.  Dr. Treacy, have you seen a situation
19 ever where you've been made aware of
20 compensation that a sexual abuse victim has
21 received and you thought to yourself that was a
22 fair amount of compensation for those damages
23 done?
24      A.  No, I haven't -- I'm sorry.
25      MS. WARNER:  Go ahead.  Answer.

1       THE WITNESS:  No, I can't say
2  that because I don't do a whole lot of
3  these civil cases.  Remember, I'm in
4  family court.  I'm in criminal court.  I
5  don't do a lot of these cases, so I'm
6  lacking knowledge.
7       And I'm not trying to skirt
8  around your question, Mr. Moxley.  I just
9  don't have an answer.
10      MR. MOXLEY:  Thank you,
11 Dr. Treacy.
12      Thank you, Judge.
13      THE COURT:  Thank you.
14      Mr. Stoner.
15      MR. STONER:  Yes.
16           -  -  -
17      E X A M I N A T I O N
18           -  -  -
19 BY MR. STONER:
20      Q.  Dr. Treacy, I believe that you were
21 asked questions during your redirect regarding
22 the potential for false claims in this sample
23 set.
24      Do you recall that?
25      A.  Yes, I do.

1       Q.  The clinical interviews that you've
2  recommended be incorporated into the TDP are
3  not able to determine whether or not something
4  is a false claim, correct?
5       A.  Oh, you can pretty much say if
6  something is or is not consistent with sexual
7  abuse.  My report -- my line in my report, it's
8  my expert opinion that, if I'm dealing with a
9  child, the child's statements, behavior, and
10 affect are consistent with sexual abuse or are
11 not consistent with sexual abuse.
12      So we do get to consistency with
13 sexual abuse, which is reliability.
14      Q.  Yes.  But you testified that you
15 cannot state whether or not the abuse occurred
16 through a clinical interview, correct?
17      A.  That's correct.
18      Q.  And you cannot use the testing to
19 determine whether or not a claim is fraudulent,
20 correct?
21      A.  Well, you can use the testing for
22 that if you have the validity scales indicating
23 that somebody is malingering.
24      Q.  Whether or not somebody is
25 malingering does not address whether or not the

1  abuse, in fact, occurred, correct?
2      A.    It does not -- no, it does not have a
3  one-to-one with that.  You're correct.
4      Q.    I believe that you testified that --
5  in your deposition that the basis for your view
6  that there may be false claims in this sample
7  was based on the existence of secondary
8  motive -- secondary financial gain motive and
9  the volume of claims.
10            Does that sound correct?
11     A.    I don't think I said "the value of
12 claims."
13     Q.    I'm sorry.  The volume of claims.
14     A.    I'm sorry.  Yes, that is correct.
15     Q.    And did you not consider any other
16 factors for that opinion, correct?
17     A.    Well, I considered that there were a
18 couple of thousand claims before the
19 bankruptcy, and then there was 82,000 claims
20 with the bankruptcy.  I considered that.
21     Q.    And you have not been -- you have not
22 analyzed whether any specific claims are
23 fraudulent in this case, correct?
24     A.    That's correct.
25     Q.    And you have not identified any

1  specific claims that are fraudulent in this
2  case, correct?
3      A.    That's correct.
4      Q.    And you have never -- have you ever
5  been involved in any scouting cases involving
6  sexual abuse?
7      A.    No.  This is the first case that I
8  had involving the Boy Scouts.  But, as I said,
9  I don't do a lot of civil work.
10     Q.    In your -- in the civil work that
11 you've done, have you ever determined that a
12 campaign was a false claim due to a secondary
13 gain motive for financial gain?
14     A.    Yes -- well, due to only financial
15 gain?  No.  No, I have not.
16            MR. STONER:  Okay.  No more
17        questions, Your Honor.
18            THE COURT:  Thank you.
19            Ms. Warner, anything further?
20            MS. WARNER:  Nothing further.
21            THE COURT:  Thank you.
22            Thank you, Dr. Treacy.  You're
23        excused.
24            THE WITNESS:  Thank you, Judge.
25            Mr. Doren.

1            MR. DOREN:  Good evening,
2  Your Honor.  It is 5:21.  Just so
3  the Court has all the data points
4  necessary to decide where it stands for
5  the evening, we do have a 30-minute video
6  option available of another witness.  Or,
7  obviously, if the Court prefers to adjourn
8  for the evening...
9            THE COURT:  Okay.  Well, the
10 effort is good, so let's go with the
11 30-minute video.
12            MR. DOREN:  Very good,
13 Your Honor.
14            The next witness is Mr. Jonathan
15 Schulman.  Mr. Schulman is a partner at
16 Slater Slater Schulman.
17            Mr. Schulman's law firm is a
18 member of the coalition and, according to
19 the 11th mediator's report, represents
20 14,170 claimants in this action.
21            Mr. Schulman personally signed
22 approximately 400 proof of claim forms.
23            Mr. Schulman was deposed on
24 February 1, 2022.  And we now tender
25 Mr. Schulman's testimony.

1            THE COURT:  Thank you.
2            -   -   -
3            (Whereupon, a video clip was
4        played for the record.)
5            -   -   -
6      Q.    Good morning, Mr. Schulman.  My name
7  is Alec Zadek.  I represent Liberty Mutual
8  Insurance Company, and I'll be deposing you
9  today.
10            Slater Slater Schulman
11 represents more than 15,000 people who have
12 filed proof of claims in the Boy Scout
13 bankruptcy proceeding; is that right?
14     A.    I believe it's between 14,000 and
15 15,000.
16     Q.    Is it fair to state that the training
17 that your firm provided to the
18 paraprofessionals for interacting with
19 potential claimants in this proceeding was
20 based on obtaining information necessary to
21 complete the proof of claim forms that would be
22 filed in this proceeding?
23     A.    Certainly in part.
24     Q.    And Slater Slater Schulman prepared
25 those training materials based on its