# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**Reply Deadline: September 21, 2023 at 4:00 p.m. (ET)**
**Hearing Date: September 26, 2023 at 2:00 p.m. (ET)**

## DECLARATION OF HON. BARBARA J. HOUSER (RET.) IN SUPPORT OF THE SETTLEMENT TRUST'S MOTION FOR APPROVAL OF AN AUDIT PROGRAM FOR IDENTIFYING POTENTIALLY FRAUDULENT SURVIVOR CLAIMS

I, Barbara J. Houser, declare as follows:

1. I am the trustee (the "*Settlement Trustee*") of the BSA Settlement Trust (the "*Settlement Trust*"). I make this declaration in support of the Settlement Trust's motion for approval of an audit program requested by the Court for the purpose of identifying potentially fraudulent claims (the "*Audit Program Motion*")[2] [Docket No. 11443].

2. I am over the age of eighteen years. This declaration (the "*Declaration*") is based on my personal knowledge and experience, my review of relevant documents, and my supervision of various people who report to me as Settlement Trustee. If called as a witness, I could and would competently testify to the facts set forth below. As Settlement Trustee of the Settlement Trust, I am duly authorized to make this Declaration.

---

[1] The Reorganized Debtors in these chapter 11 cases, together with the last four digits of each Reorganized Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms not defined herein have the meanings used in the Audit Program Motion.

A.  **Settlement Trustee**

3. I became the Settlement Trustee on April 19, 2023. As Settlement Trustee, I am ultimately responsible for all of the work of the Settlement Trust, including reconciling, validating, and resolving all Abuse Claims and managing all of the diverse assets now owned by the Settlement Trust.

4. Prior to my appointment as Settlement Trustee, I was a nationally recognized insolvency lawyer before my appointment as a United States Bankruptcy Judge in the Northern District of Texas in 2000. I handled complex chapter 11 cases, including mass tort cases, as a lawyer. I served as a Bankruptcy Judge for 22 years and as Chief Bankruptcy Judge in my district for well over a decade. During my judicial career, I handled tens of thousands of bankruptcy cases, including presiding over the allowance and disallowance of claims in each of those cases. My last assignment as a judge was to serve as leader of a five-federal-judge mediation team charged with assisting the parties in resolving all disputes in the historic insolvency proceedings involving the Commonwealth of Puerto Rico and certain of its instrumentalities. I concluded my judicial career in January 2022 and began taking on fiduciary roles in bankruptcy cases like my role here as Settlement Trustee.

B.  **Claims Administrators**

5. Randi Ilyse Roth and Hon. Michael J. Reagan (Ret.) are the Settlement Trust's claims administrators (the "**Claims Administrators**"). Under my supervision, Ms. Roth and Judge Reagan will administer and reconcile, validate, and evaluate all Abuse Claims and assist

me in distributing funds to Survivors that hold valid Abuse Claims in a fair and equitable manner.

6. Before her work on behalf of childhood sexual abuse survivors, Ms. Roth served in a judicial adjunct role in one of the largest civil cases and one of the largest criminal cases in America involving claims processes. Ms. Roth practiced law as a civil legal services attorney for decades, representing low-income clients in individual actions and in class action litigation in both urban and rural settings across the country. Ms. Roth is a founding member of the Academy of Court-Appointed Neutrals ("**ACAN**"). She has served on ACAN's board of directors and executive committee for many years and is currently its president. She is a primary author of the original 2006 version of the ACAN bench book, *Appointing Neutrals Handbook*.

7. Judge Reagan spent nearly two decades on the United States District Court for the Southern District of Illinois, most recently serving as chief judge from 2015 to 2019. Judge Reagan managed more than 5,000 civil cases and settled cases valued at more than $2 billion. As a jurist in one of the busiest courts in the country for class-action litigation, he gained extensive experience managing mass torts, class actions, personal injury, and pharmaceutical and product-liability matters. He has extensive experience interacting with victims of childhood sexual abuse.

### C. Claims Processor

8. The claims processor (the "**Claims Processor**") is a premier claims processing firm with significant experience assisting with the administrative aspects of the design, approval, and implementation of claim-reconciliation protocols required to resolve numerous claims in settlements arising from contexts including class actions, multi-district litigation, bankruptcy proceedings, and government enforcement actions.

9. The Claims Processor is experienced with using third-party documents in conjunction with allegations and supporting documents provided by Survivors to identify potentially fraudulent claims. The "Document Appendix" is an informational protocol that governs the production of, access to, and scope of information held by BSA, Local Councils (and their predecessors), and Chartered Organizations to help support the validation and evaluation of Direct Abuse Claims and the enforcement of insurance rights applicable to Direct Abuse Claims.

10. The Claims Processor includes professionals with significant experience and training in fraud and includes Certified Public Accountants ("*CPAs*"), Certified Fraud Examiners ("*CFEs*"), and consultants Certified in Financial Forensics ("*CFFs*"). CFEs and CFFs are specifically trained and credentialed fraud professionals who possess a unique set of diverse skills in preventing, detecting, and investigating fraud. CPAs, CFEs, and CFFs are held to high ethical standards, and they must pass rigorous exams to earn their credentials, complete continuing education and work experience requirements. Moreover, the Claims Processor's leadership team includes an individual who spent 26 years with the FBI and served as its Deputy Director.

### D. The Review of Information Submitted by the Claim Questionnaire

11. As set forth in greater detail in the Plan, more than 82,000 Abuse Claims were filed and channeled to the Settlement Trust under the Plan. Pursuant to the Settlement Trust Agreement and the Trust Distribution Procedures, as Settlement Trustee, I am charged with administering, processing, evaluating, and making distributions to the holders of valid and allowed Direct Abuse Claims.

12. Under the Audit Program, and as part of the evaluation of Abuse Claims pursuant to the Trust Distribution Procedures, the Settlement Trust will review and validate Abuse Claims

in two separate groups.  The first group consists of claims by Survivors who elected to receive an "Expedited Distribution."  Under the Trust Distribution Procedures, a Survivor who chose an Expedited Distribution is entitled to receive a single payment of $3,500, provided that the Direct Abuse Claim satisfies certain criteria.  For such claims, the Audit Program will focus on rooting out any potentially fraudulent and/or duplicative claims by validating identifying information—including full Social Security numbers, full birth dates, full names, and addresses—against the data provided during the bankruptcy case in the proof of claim form.  The Expedited Distribution process does not require the collection or assessment of details about the abuse in part because the parties agreed that the Settlement Trust would not seek reimbursement from insurers for the payment of Expedited Distribution claims.

13.   The second group of Direct Abuse Claims (approximately 75,000) are those held by Survivors who elected to have their claim evaluated under the Trust Distribution Procedures (and the "Independent Review Option" or "IRO" as it is commonly referred to). Under the Trust Distribution Procedures and IRO, Survivors must submit detailed information for extensive vetting and evaluation by the Settlement Trust.  The vetting and evaluation will include: (a) the identity verification procedures outlined for Expedited Distribution claimants described above; (b) "entity or individual verification" to ensure that the individual Survivors are who they say they are; (c) the completion of a very detailed claims questionnaire (the "*Claims Questionnaire*") that asks Survivors to provide: (i) narrative explanations of the abuse and its impact; (ii) detailed answers to factual questions; and (iii) documents to support the Direct Abuse Claim; (d) the use of data analytics to screen for fraud (*i.e.*, screening for multiple questionnaires containing suspiciously similar narratives, etc.); (e) development of indicia of credibility that assess the totality of the circumstances (meaning, the level of credibility that emerges from the

extent to which the answers provided to the open narrative and specific factual questions within the Claims Questionnaire and the documents supporting the Claims Questionnaire are internally consistent); (f) quality control/quality assessment program and random sampling and testing; (g) in certain appropriate circumstances, the Settlement Trust can and will ask for interviews with the Survivors; and (h) the Claims Questionnaires must be signed under penalty of perjury by the Survivor, and additionally must be signed by the Survivor's counsel if represented.[3] A true and correct copy of the Claims Questionnaire is annexed hereto as **Exhibit A**.

### E. The Audit Program

14. Through my oversight, the Settlement Trust, including the Claim Administrators, the Claim Processor, the Settlement Trust's general counsel, and certain advisors to the Settlement Trust, collectively dedicated well over 1,000 hours in the design of the Claims Questionnaire and in developing an audit program (the "***Audit Program***") to safeguard the integrity and fairness of the Abuse Claims review and validation process. The Audit Program was designed to implement rigorous fraud prevention and detection procedures as the validation of Abuse Claims is a key principle set forth in the Trust Distribution Procedures. The Audit Program was designed to identify fraudulent Direct Abuse Claims so that the Settlement Trust's assets are preserved and only distributed to the holders of valid Abuse Claims in accordance with the terms and conditions of the Trust Distribution Procedures.

15. The Audit Program has four components: (a) prevention; (b) detection; (c) governance and structure of the Settlement Trust (*i.e.*, the Settlement Trustee, Claims Administrators, and Claims Processor); and (d) investigative workflow procedures, which consist

---

[3] Counsel to Survivors will be required to attest to having conducted due diligence and not having learned anything inconsistent with Survivor's answers on the Questionnaire.

of the application of the first three components to the facts under review for each Abuse Claim (the "**Investigative Workflow Procedures**"). I summarize the first three components of the Audit Program below. The Investigative Workflow Procedures were annexed as an exhibit to the Audit Program Motion but were filed under seal. The Investigative Workflow Procedures were filed under seal because I believe the Settlement Trust's ability to review and identify potentially fraudulent claims would be prejudiced or compromised if Survivors and/or their counsel had access to the application process used by the Settlement Trust to detect potentially fraudulent or invalid Abuse Claims.

    a. **Prevention Measures**

        i. **Imposition of Consequences for Fraud**

16. To pursue a Direct Abuse Claim against the Settlement Trust, each Survivor must complete and submit to the Settlement Trust responses to a detailed Claims Questionnaire. The process of developing the Claims Questionnaire involved more than 12 weeks of work by the Claims Administrators, the staff of the Claims Processor, Trust General Counsel, and me. Based on information available to me, I estimate that more than 1,000 hours were involved in this process. The Claims Questionnaire was shared with the Certain Insurers in connection with discussions regarding the Audit Program.

17. The information provided by each Survivor in response to the Claims Questionnaire will enable the Settlement Trust to review and evaluate individual Direct Abuse Claims consistent with the terms of the Trust Distribution Procedures. As part of the Settlement Trust's Audit Program, each Claims Questionnaire must be signed individually under oath and under penalty of perjury. Additionally, if a Survivor is represented by an attorney, the attorney must also sign the Claims Questionnaire swearing that he or she has used reasonable due

diligence investigating the Direct Abuse Claim, and based upon the investigation, has no reason to believe that the information provided by the Survivor is incorrect.

18. A Survivor who is determined to have submitted a fraudulent claim to the Settlement Trust will forfeit any right to receive a distribution from the Settlement Trust and may be subject to further prosecution and/or sanctions. To the extent I believe it appropriate, I will refer cases involving violation of federal and/or state law to the appropriate prosecuting authority for its review and possible prosecution. Similarly, if a lawyer or law firm is complicit in the submission of a fraudulent claim to the Settlement Trust, I will take further action as necessary and appropriate.

### ii. Mechanisms for Reporting Potential Fraud

19. To encourage individuals to come forward with valuable information that can help uncover and address suspicious and fraudulent activities, I established multiple mechanisms to report concerns of fraud or wrongdoing: (a) confidentially via email; (b) confidentially by calling the whistleblower hotline; and/or (c) anonymously by completing a web form.

20. Allegations of fraud will be evaluated and investigated initially by the Claims Processor, with the opportunity for further escalation to the applicable Claims Administrator and ultimately to me when warranted.

### iii. Background Screening and Code of Conduct

21. My appointment as Settlement Trustee and the appointments of the Claims Administrators were previously approved by this Court. The Claims Processor and any other vendor working for the Settlement Trust with access to confidential claimant data either have undergone, or will undergo, an extensive background screening process, which will be re-performed annually. The screening includes, but is not limited to, a review of criminal history

records at the county, state, federal and international levels, and a review of government watch lists, such as those from the Office of Foreign Asset Control ("***OFAC***"), the Federal Bureau of Investigation ("***FBI***"), and the Denied Persons List. In addition, a nationwide review of registered sex offenders has, or will be, conducted. This screening accesses public records information from each state regarding the presence or location of offenders, who, in most cases, have been convicted of sexually violent offenses against adults and children.

22. I, as Settlement Trustee, along with the Claims Administrators, the Claims Processor, and any other vendor working for the Settlement Trust, must also adhere to an ethical code of conduct established by the Settlement Trust. The code requires all of us to behave in a manner consistent with the Settlement Trust's objective to achieve fairness and consistency in handling all Survivors' claims.

### iv. Information Security

23. I have been advised that the Settlement Trust's Claims Management System (the "***System***") is designed with industry-leading security and protection principles and controls to establish a secure environment to mitigate potential fraud risks.

24. Through the Claims Processer, the System follows industry-leading standards and best practices for information security management and secure communication protocols. The Claims Processor has the System regularly audited by independent third parties to test the security and privacy control framework, and all transmissions are secured by advanced encryption technologies.

25. The System's information security controls include individual user accounts and authentication requirements similar to those used by banks and other financial institutions, and an intrusion detection system is integrated to monitor the System for suspicious activity.

26. User access roles are defined by job responsibility and control the functionality data users have access to in the System. The System uses the "least privilege" principle, which limits access to sensitive data to those that have a business need for it, given their job responsibilities.

27. Additionally, System access for attorneys and claimants is limited to their specific filings and supporting documents. That means no claimant will have access to any other claimant's information or supporting documents through the System.

### b. Detection Measures

#### i. Identity Verification

28. Identity verification procedures are performed to verify that claimants are authentic and match the Survivor. Verification procedures may include confirming an individual's identity through data points such as Survivor's name, address, phone number, social security number ("*SSN*"), and date of birth ("*DOB*"). Verification procedures may utilize public records and/or other proprietary data sources. Additional verification procedures may be taken to detect fraudulent claim filings, leveraging OFAC and sanctions watch-lists as deemed necessary.

29. Verification procedures may be performed to verify that law firms representing Survivors are registered businesses in good standing. Verification procedures may also be performed to determine whether attorneys representing claimants are licensed to practice law. Further review of disciplinary history of representing attorneys may be conducted through state bar directories.

### ii. Data Analytics

30. Rule-based analysis and advanced analytics are used and continuously updated to analyze claims data and identify patterns or anomalies that may indicate potentially suspicious and/or fraudulent activities. These analytics include identifying potentially duplicative claim filings by analyzing claims with similar personal identifying attributes (*e.g.*, SSN) and using available data to identify claims involved in prior settlements. Advanced analytics are used to identify outliers and higher risk claim filings for potential fraud review by detecting patterns and schemes consistent with previously identified fraudulent claim filings.

31. Survivor-provided information is analyzed to identify potential duplicate or altered documentation. This includes analyzing claim files for templated language used across multiple claims (*e.g.*, repeated use of the same narrative of abuse).

32. Direct Abuse Claims may be sampled for additional review based upon procedures implemented by the Claims Processor and the Settlement Trust. This sampling will be conducted using statistical and risk-based methodologies (*e.g.*, sampling procedures may be performed based on allowable claim amount).

33. Data has been or will be collected from various sources, including insurers, indicating prior settlements with Survivors alleging sexual abuse related to Scouting. This information will be used by me, as Settlement Trustee, when the Claims Administrator and I review mitigating factors under Article VIII. D. (ii) ("Other Settlements, Awards, Contributions or Limitations") of the Trust Distribution Procedures.

### c. Governance and Structure

34. As described above, I, as Settlement Trustee, along with the Claims Administrators, the Claims Processor and the other vendors working with sensitive claimant

data, all have significant experience working with sexual abuse victims and/or high-profile victim's compensation programs. Claims analysts have experience understanding patterns and characteristics of alleged abusers and are skilled in developing an abuser's *modus operandi* and assessing the plausibility of allegations within a claim to recognize fraud schemes.

F. **Claims Processing Portal**

35. On August 4, 2023, the Settlement Trust launched its claims processing portal for the first group of Survivors of Direct Abuse Claims. This first group was comprised of the approximately 7,000 Survivors who selected the $3,500 Expedited Distribution liquidated payout when they submitted their ballots to vote to accept or reject the Plan. As of the filing of this Declaration, the Settlement Trust has distributed approximately $150,000 to 57 Expedited Distribution claimants who were determined to be eligible to receive compensation from the Settlement Trust. Additional Expedited Distribution claimants who are determined to be eligible to receive compensation will be paid on October 3, 2023, with the intention that monies will continue to flow to eligible Expedited Distribution claimants every two weeks thereafter until all such claimants have been paid.

36. The Settlement Trust launched its claims processing portal for all remaining Claimants on August 17, 2023. An estimated 75,000 additional Claimants and/or their counsel either have received or are eligible to receive credentials to access the claims processing portal. By accessing the secure claims processing portal, Claimants and their counsel have access to the detailed Claims Questionnaire the Settlement Trust prepared consistent with the terms of the Trust Distribution Procedures, along with detailed instructions for the submission of the Claims Questionnaires and supporting documents to the Settlement Trust once the Claims Questionnaire is completed by the Claimant (and counsel if represented). As of the date of this

Declaration, 418 Claims Questionnaires have been completed and submitted to the Settlement Trust, another 59 Claims Questionnaires are awaiting signature before they can be submitted, and another 1,847 Claims Questionnaires are in the process of being filled out.

### G. The Investigative Workflow Procedures

37. The Audit Program, including the Investigative Workflow Procedures, was developed independently by me, with the assistance of the Claims Administrators and the Claims Processor. The Claims Administrators have extensive experience evaluating and administering mass claims, and the Claims Processor is a premier claims processing firm with significant experience assisting with the administrative aspects of the design, approval, and implementation of protocols for resolving thousands of claims in settlement contexts, including class actions, multi-district litigation, bankruptcy proceedings, and government enforcement actions.

38. The formulation of the Audit Program did not include any consultation with review by, or comment from the "Settlement Trust Advisory Committee" (the "*STAC*"), any counsel to a Survivor, or any other party that is not an advisor or vendor to the Settlement Trust or overseen by me. The Audit Program was developed independently from any third party not under contract with the Settlement Trust to help ensure that the validation of Abuse Claims is not compromised in any fashion.

39. With the comprehensive and specific information submitted under oath by way of the Claims Questionnaire and the review of such information using the Investigative Workflow Procedures, I believe that the Audit Program is designed to uncover potentially fraudulent Abuse Claims. I am confident that the prevention and detection measures implemented by me under the governance and structure of the Settlement Trust (*i.e.*, the Settlement Trustee, Claims

Administrators, and Claims Processor) will maintain the integrity of the validation process contemplated by the Court.

40. The Claim Questionnaire distributed to all Survivors and their counsel empowers me to require Survivors sit for an interview if the facts and circumstances warrant such action. I am ready to use such power if and when the facts and circumstances warrant it.

41. I personally—as well as other Settlement Trust representatives and counsel—have had several exchanges regarding the Audit Program with multiple groups of insurers. Before the filing of the Audit Program Motion, I, along with one of the Claims Administrators and a representative of the Claims Processor, met with counsel to the Certain Insurers, along with counsel to other insurers.[4] I provided a written version of the Audit Program and the Claims Questionnaire to those insurers willing to sign a non-disclosure agreement, and I requested and received their feedback. For those insurers that did not sign and return a non-disclosure agreement before the initial meeting, I explained the Audit Program in detail verbally, solicited their input, and answered questions posed by them. I later met with counsel to several insurers who had subsequently signed a non-disclosure agreement to discuss the Audit Program in greater detail. Although no agreement has been reached to date, I remain willing to continue to meet with counsel for the Certain Insurers in hopes of either coming to agreement or narrowing the issues in dispute before the hearing on the Audit Program Motion.

42. Now that the Settlement Trust (i) is actively collecting information in connection with the submission of completed Claims Questionnaires to the Settlement Trust by Survivors, and (ii) wishes to begin its analysis and evaluation of those completed Claims Questionnaires, it

---

[4] The Certain Insurers were the only insurers who filed an objection to the Settlement Trust's Audit Program, *see* [Docket No. 11464]; other insurers with whose counsel I met while developing the Audit Program did not file an objection.

is imperative for the Settlement Trust to have Court authority to implement the Audit Program to help ensure that only valid claims receive distributions from the Settlement Trust and that all potentially fraudulent claims are fully vetted to determine whether they should ultimately be allowed or disallowed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of September 2023 at Fort Collins, Colorado.

*/s/ Barbara J. Houser*
Hon. Barbara J. Houser (Ret.)

# **EXHIBIT A**

**(Claim Questionnaire)**

**Filed Under Seal**