**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC,<br><br>Debtors.¹ | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

Hearing Date:  October 5, 2023 at 10:00 a.m. (ET)

**PACHULSKI STANG ZIEHL & JONES LLP'S REPLY TO THE
UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO FINAL PROFESSIONAL FEE
APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Pachulski Stang Ziehl & Jones LLP ("PSZJ"), counsel to the Official Tort Claimants' Committee ("TCC") in the above-captioned chapter 11 cases, submits this reply (the "Reply") to the objection filed by the Office of the United State Trustee [Docket No. 11448] (the "Objection") with respect to the *Final Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel to the Tort Claimants' Committee for the Period From March 4, 2020 Through April 19, 2023* [Docket No. 11300] (the "PSZJ Final Fee Application"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      By the Objection, the U.S. Trustee requests reductions of PSZJ's fees requested by the PSZJ Final Fee Application in an amount over $1.4 million. Other than "hindsight review," which is contrary to binding Third Circuit law, the U.S. Trustee does not provide any legal or factual justification for the requested $1.4 million reduction. The U.S. Trustee appears to be focused on fee reductions so that the Debtors' "Net Unrestricted Cash and Investments" as of

---

¹ The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

the Plan's effective date is satisfied in order for excess cash to be transferred to the Settlement Trust, which is admirable, but that is not the standard for disallowing fees. PSZJ is the only estate professional who has committed to contribute 10% of all of its fees allowed on a final basis, which is currently projected to be approximately $3,800,000, to the Settlement Trust.

2. The U.S. Trustee's requested reduction is in addition to more than $11 million in contributions and voluntary reductions already agreed to or made by PSZJ in connection with these chapter 11 cases to date. As reflected herein and in the PSZJ Final Fee Application, all of PSZJ's fees are compensable when reviewed under section 330 of the Bankruptcy Code as they were reasonable, necessary and appropriate under the circumstances as the Court-appointed fee examiner determined after reviewing the fees and expenses of PSZJ and all other estate professionals for the duration of the case.[2] To the extent PSZJ's fees and expenses are approved by the Court, PSZJ will be the only estate professional that has voluntarily provided this level of support for, and compensation to, the estate and Survivors. As discussed in detail herein, further reductions would be contrary to applicable law, duplicative of those already agreed to and approved, unreasonable, and without any justification other than one that can only be characterized as excessive, particularly considering PSZJ's agreed upon or otherwise voluntarily reduced fees.

A.   **PSZJ's Specific Responses to the U.S. Trustee's Objection**

3. The U.S. Trustee's Objection falls into two categories: (1) requested reductions based upon estate professionals on behalf of their clients (not just PSZJ) ultimately not obtaining certain relief sought in connection with the approval of the RSA and the requested Plan findings; and (2) further reduction of fees purportedly related to the Kosnoff matter. As discussed

---

[2] *See Fee Examiner's Final Report Regarding Final Fee Application of Pachulski Stang Ziehl & Jones LLP* [Docket No. 11494] at Para. 21.

below, none of these circumstances provide a legally or factually sound basis for further reduction of PSZJ's already significantly reduced fees.

    a. Reductions Based on a Failure to Obtain Certain Requested Relief in Connection With Final Approval of the RSA and Approval of <u>Contested Plan Findings Are Neither Legally Nor Factually Supportable</u>

4.    The U.S Trustee seeks a reduction of PSZJ's fees in the amount of $300,926 relating to the RSA approval process and the amount of $589,101.50 relating to the Plan confirmation findings. In support, the U.S. Trustee points to the following: (1) the parties' unwillingness to submit a form of order approving the RSA to the Court demonstrates that the approval process did not benefit the estate; (2) the absence of any order approving the RSA demonstrates that the RSA and the parties' efforts to seek its approval were unnecessary to advance the bankruptcy cases and protect client interests; and (3) the fees associated with the RSA and the Plan confirmation findings did not provide an "actual benefit to the estate" since they were not fully or finally approved by the Court. The basis for the U.S. Trustee's position with respect to fees incurred in connection with these matters is contrary to the legal standard of review in the Third Circuit and factually without basis. The fees associated with the RSA and confirmation findings were reasonable and justifiable at the time such fees were incurred and therefore, under applicable law, are compensable.

    i. The Standard Applied By the U.S. Trustee Seeking <u>Reductions of PSZJ's Fees Conflicts With Binding Third Circuit Law</u>

5.    The fee standard utilized by the U.S. Trustee in requesting the reductions of fees relating to the RSA and the Plan findings is contrary to binding Third Circuit law. The Third Circuit has firmly rejected an actual-material-benefit standard and has held that section 330 of the Bankruptcy Code permits a court to compensate a professional for services that were objectively reasonable at the time they were rendered. The standard of review properly applied here is not

based on hindsight and does not require that a professional demonstrate that its fees led to a quantifiable net benefit to the estate. In the U.S Trustee's view, allowance of fees is dependent on the professional winning, which would be an impossible test to satisfy in light of the multiple estate professionals representing constituencies having varying and conflicting interests and goals. The actual test is whether the services were reasonable when undertaken.

6.     In *Hospital Partners of America*, "[t]he Third Circuit has made it clear that § 330(a)(4)(A) does not go so far as to require the Court to disallow fees simply because the estate ultimately does not profit from the services of the professionals in question." *See In re Hosp. Partners of Am., Inc.*, 597 B.R. 763, 766-67 (Bankr. D. Del. 2019), *citing In re Top Grade Sausage, Inc.*, 227 F.3d 123, 132 (3rd Cir. 2000). "Instead, for services to be compensable under section 330(a)(4)(A) of the Bankruptcy Code, they must only have been 'reasonably likely to benefit the debtor's estate' *at the time they were rendered*, not in 'hindsight.'" *Id.* at 766-67 (emphasis in original). *See also 3 Collier on Bankruptcy* ¶ 330.03 (16th ed. 2023) ("Rejecting an actual-material-benefit standard, a number of courts, including the Courts of Appeals for the Second, Third, Fifth and Ninth Circuits, have determined that section 330 permits a court to compensate a professional ... for services that were objectively reasonable at the time they were rendered."). "As a practical matter, bankruptcy professionals are not guarantors of the success of a particular theory, proceeding, or strategy. The standards set forth in § 330 reflect the realities of legal practice, where trustees or professionals often act without complete information about what the ultimate results of those actions might be." *Hosp. Partners*, 597 B.R. at 767. Section 330 "permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles – that is, services that were objectively reasonable at the time they were made – even when those gambles do not produce an 'identifiable, tangible, and material benefit.' What matters is that,

prospectively, the choice to pursue a course of action was reasonable." *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 274 (5th Cir. 2015).

7. The fee reductions requested by the U.S. Trustee in connection with the RSA and the Plan findings are based on a hindsight review, impermissibly imposing an "actual-material-benefit standard" on a review of PSZJ's fees and judging the fees solely on the basis that an order approving the RSA was never ultimately entered and ***all*** of the findings as sought were not ultimately approved. Neither demonstrates that PSZJ's services on behalf of the TCC were unreasonable at the time they were rendered. In fact, as detailed below, PSZJ's services were objectively reasonable at the time they were rendered and, thus, the requested disallowance of PSZJ's fees is contrary to Third Circuit law.

    ii. The RSA Related Fees Are Based on Services That
      <u>Were Objectively Reasonable When Rendered and Are Compensable</u>

8. The absence of an order ultimately approving the RSA does not render the fees incurred in connection with the RSA non-compensable because they were objectively reasonable at the time such fees were incurred, and are thus properly allowed under the Third Circuit standard discussed above. The cases cited by the U.S. Trustee do not require this Court to apply a different standard. *See e.g., In re Value City Holdings, Inc.,* 436 B.R. 300, 305 (Bankr. S.D.N.Y. 2010) ("In evaluating the award of professional fees, courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered."). In *Value City Holdings*, the court overruled the U.S. Trustee's fee objection seeking a 10% reduction or holdback in connection with the professionals' final fee applications, stating that:

> Here, the Professionals rendered services in a manner "commensurate with the expected gain" from those efforts. Even if the Professionals turned out to be wrong in dedicating themselves to their clients a "court does not

> determine 'reasonableness' through hindsight." … The fees here are … compensable regardless of the ultimate outcome because a reasonable lawyer would have performed similar services in attempting to maximize the value of the estate in these circumstances. …
>
> Inevitably, the UST's position leads to questioning the concept of success in the context of chapter 11, a subject that is not a proper inquiry in determining reasonableness of fees.

436 B.R. at 306-07.

9.  The cases cited by the U.S. Trustee to justify its request that this Court impose a "hindsight review" here simply stand for the uncontroversial position that if services are objectively **un**reasonable at the time they were rendered, the court may disallow such fees. *See e.g., Id.*; *Crawford v. Riley Law Group LLP (In re Wolverine, Proctor & Schwartz, LLC)*, 527 B.R. 809, 837, 842 (D. Mass. 2015), *aff'd,* 2018 U.S. App. LEXIS 38389 (1st Cir. Feb. 16, 2018) (affirming bankruptcy court's finding that it was not objectively reasonable for counsel to a chapter 7 trustee to have continued to pursue loan recharacterization and equitable subordination litigation where the evidence at the close of discovery made it clear that the trustee would face disabling difficulty under the court's own precedential opinion establishing the conduct necessary to justify the claims, such that it was not a reasonable exercise of judgment to pursue the claims through trial); *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995) (attorney for chapter 11 trustee was not entitled to fees for services performed in pursuing preference claims after it became reasonably obvious that the actions would not yield net gain to estate).[3] Indeed, as the Seventh Circuit explained in *Taxman Clothing*: "We emphasize the words 'reasonably obvious.' The standard is an objective one: did a time come when a reasonable lawyer in [counsel]'s position

---

[3] The U.S. Trustee's citation to *In re Engel*, 124 F.3d 567, 575 (3rd Cir. 1997) in this regard – which deals with the disapproval of a fee application of criminal defense counsel whose services only benefitted the individual chapter 11 debtor and not the estate – is not applicable to this case. The other cases cited by the U.S. Trustee in its Objection speak generally to the standard of review under section 330 and are thus non-controversial in this respect.

would have abandoned the suit? And it allows room for differences in judgment. When abandonment is not the obviously right course, when reasonable professionals could differ over the right course, the professional is not to be penalized[.]" *Id.* Likewise, the U.S. Trustee's objection based on its disagreement with the professionals' procedural and substantive approach to seeking approval of the RSA does not provide a basis for penalizing the professionals seeking such approval.

10. In this case, the services undertaken by PSZJ in representing the TCC were reasonably based on the case status at the time. The TCC, along with the Debtors, the Future Claimants Representative ("FCR") and the Coalition for Abused Scouts ("Coalition"), negotiated and entered into the RSA because it provided the framework for the terms of a plan acceptable to all major case constituencies, including with respect to the approval of settlements with Local Councils, the inclusion of Chartered Organization insured claims, the structure for future settlements with insurance companies, and the trust distribution procedures. Prior to entry into the RSA, however, the Debtors had entered into a settlement with a single insurer, Hartford; the terms of which were not acceptable to the TCC, the FCR or the Coalition. The parties thereafter negotiated the terms of the RSA, which provided for the structure of a plan that had the support of the Debtors, the TCC, the FCR and the Coalition. The RSA was premised on the Court approving the RSA and finding that the Debtors had no administrative liability to Hartford based on the Debtors abandoning the prior Hartford settlement (which settlement had not been approved by the Court).

11. The Court approved the terms of the RSA, subject to certain changes, but declined to make a finding that the Debtors had no administrative liability to Hartford. Without this limitation of liability finding, the **Debtors** refused to submit an order approving the RSA (and

the TCC could not force the other parties to proceed under the RSA as it required an agreement among all).  The Debtors also refused to further engage with the TCC regarding the terms of an acceptable plan, turning their attention to a plan structure having only the support of Hartford and the Coalition (which plan structure was prejudicial to Survivors and was opposed by the TCC). Neither PSZJ nor the TCC had any ability to force the Debtors to submit an order approving the RSA, as it was premised on a consensually negotiated plan agreement that the Court would not fully approve.  Ultimately, without approval of the Hartford liability finding and without submission or entry of an order, the RSA expired by its own terms while the Debtors chose instead to change course and negotiate without including the TCC.

12. Had the RSA been approved as reasonably contemplated by the parties at the time, however, it would have embodied a plan structure that had the agreement of the Debtors, the TCC and the other Survivor representative groups, which would have avoided much of the plan confirmation litigation that ensued.  Moreover, contrary to the U.S. Trustee's assertion, it was not unreasonable to think that the Court might approve the limitation on liability provision as being in the best interest of the estate, especially since the agreement with Hartford *did not have prior Court approval*.  Thus, at the time, the TCC's support of the RSA was objectively reasonable and provided an economical and consensual path forward on terms acceptable to the Survivor groups as a whole.  The fact that an order approving the RSA – through no fault of the TCC or PSZJ – was not entered does not change the intrinsic value of PSZJ's services based on then extant factual landscape.  At the time, it made good sense for the TCC to support the RSA.  Thus its counsel's time is compensable, and there are no grounds to disallow PSZJ's fees incurred in pursuing approval of the RSA.

> iii. The Fees Related to the Confirmation Findings Are Based on Services That Were Objectively Reasonable When Rendered and Are Compensable

13. Similarly, the fact that the Court did not make each and every one of the Plan confirmation findings requested by all of the Survivor groups (not just the TCC) does not make the pursuit of such findings unreasonable or non-compensable.

14. In support of its Objection in this regard, the U.S. Trustee asserts that all parties should have known that the Court would never ultimately approve the findings based on what the U.S. Trustee terms the Court's "preliminary guidance" regarding certain requested findings during the disclosure statement process. But questions and thoughts from the bench regarding whether the Court could or should make certain findings at a future juncture, or the manner in which the Court might or might not be able to do so, was not a ruling or a determination on these issues.[4] Professionals were not, as the U.S. Trustee asserts, "cautioned" to avoid proceeding down a particular path, and the Court never ruled that that this issue "was not capable of being resolved."[5] This is far from a situation where, as was the case in *Wolverine, Proctor & Schwartz*, the professionals moved forward notwithstanding the existence of a contrary published opinion by the presiding judge on an issue. For example, in the *Wolverine, Proctor & Schwartz* case cited by the U.S. Trustee, the bankruptcy judge had issued a prior opinion on the standard that needed to be met in order to establish a recharacterization claim. The court concluded that, under the standard established by its published opinion, the trustee and her professionals should have

---

[4] Objection, ¶ 35.

[5] Objection, ¶¶ 61-62. The U.S. Trustee's citation to *In re Keene Corp.*, 205 B.R. 690, 708-09 (Bankr. S.D.N.Y. 1997), for the analogy that "Michelangelo should not charge Sistine Chapel rates, to paint a barn" and that "he should not employ the entire Florentine school on the project," and the U.S. Trustee's use of this case to support a "further corollary" that "Michelangelo should not devote time to details of a project that he's already been cautioned to avoid," is inapposite as the case neither provides for this "further corollary," nor did the Court in this case caution or rule that the professionals should avoid seeking the Plan findings.

known by the close of discovery in the case that they could not prove the facts necessary to justify recharacterization as articulated by the court in its prior decision, thus providing the grounds for reduction of fees following the close of discovery. *Wolverine, Proctor & Schwartz*, 527 B.R. at 833-36. The situation here is entirely different from that found in *Wolverine, Proctor & Schwartz*. The parties' request for the Plan findings here was reasonable under the circumstances and the work in connection therewith is compensable.

15. The Plan findings, and the pursuit thereof or objection thereto, were an essential part of the plan confirmation process, from all parties' perspectives, because the findings would serve to dictate the ultimate terms and the parameters of the rights and obligations of the Debtors, the Survivors and the Certain Insurers under the Plan. Following the hotly contested plan confirmation hearings, the Court approved twenty-one Plan confirmation findings. After consideration of the arguments on all sides, certain of the findings were modified and a few were ultimately not approved. The fight for their inclusion, however, was made by all Survivor representative groups as they were deemed reasonable and necessary to appropriately protect the rights of Survivors. Indeed, the findings sought by the Survivor representative groups were specifically designed to provide protection from contrary findings requested by the Certain Insurers that would have undermined the ability of the trustee to effectively administer the settlement trust (*i.e.*, essential insurance rights would have been limited and substantial value for Survivors lost).

16. While the TCC and other Plan supporting parties did not obtain ***all*** of the findings they requested for the protection of the Survivor constituency, the form of the findings that were ultimately approved would not have been achievable without advocating for the findings in their entirety in the first instance. The TCC, along with all of the other plan supporters were

pushing against findings that the Certain Insurers were advocating that were at the other end of the spectrum and served to undermine or compromise the insurance rights – worth more than $4 billion – being assigned to the Settlement Trust. The fact that the Court approved most, but not all, of the findings sought by the TCC and other Survivor representatives, does not mean that seeking such findings was unreasonable based on the circumstances present – and the rights of Survivors needing protection – when such work was undertaken.

17. Moreover, the U.S. Trustee's "broad brush" objection to 10 days of trial time for all professionals simply because the term "TDP" is reflected in the transcript of the confirmation hearing on those days[6] goes too far as there were many aspects of the TDP – apart from the few findings that were ultimately not approved – that were the subject of the confirmation hearing, including audit protocols to prevent potentially fraudulent claims, whether in person interviews should be required of all Survivors, the matrix value for each type of abuse, among many other issues that were each integral to the Court's approval of the Plan. The confirmation hearings, while lengthy, were not unreasonably lengthy in light of the complexity of the numerous issues that needed to be addressed by the Plan supporters in this unprecedented chapter 11 case, especially in light of the objections to the Plan and the TDP raised by the Certain Insurers and others. Disallowance of all professional time related to 10 days of the confirmation hearing because the Court did not ultimately approve a few of the Plan findings sought by the Plan supporters for the protection of Survivors' rights is not justified, appropriate, or supported by the law or facts of this case.

18. In sum, the Third Circuit standard for approval of professional fees requires objective reasonableness at the time services are rendered. The standard is not that counsel, viewed

---

[6] Objection, ¶ 39.

in hindsight, must have prevailed on all aspects of the relief sought. This standard reflects the realities of legal practice, where professionals often must act without complete information about what the ultimate results of those actions might be. The pursuit of the RSA and the Plan confirmation findings were areas where the professionals did not have perfect information about the ultimate outcome, but the relief was pursued for the benefit of their constituencies in a highly contested case (which issues are still on appeal before the Third Circuit) where different parties held varying and inconsistent goals and objectives. From the outset of the case, prior to its recommendations to the TCC, PSZJ conducted an ongoing analysis to determine which actions to reasonably undertake in the best interests of the TCC and Survivors. The pursuit of the RSA and the Plan confirmation findings were objectively reasonable to pursue at the time PSZJ undertook its work, and its fees are thus compensable.

  b. Further Reductions in PSZJ Fees Ostensibly Related to the Kosnoff Matter Are Not Appropriate

19. As set forth below, PSZJ already provided *$3 million* in reductions related to the Kosnoff matter: (1) a write-off of $750,000 in PSZJ fees related to the transmission of the Kosnoff communication approved pursuant to the PSZJ Settlement; (2) a $1,250,000 payment to the Debtors' estate – which amount reflects the total asserted amount of damages to the estate related to the Kosnoff matter (no party asserted any damages other than the professional fees incurred by other professionals in the asserted amount of $1.25 million) approved pursuant to the PSZJ Settlement; and (3) an additional voluntary write-off of $1 million in fees that could be potentially tied to the Kosnoff matter.

20. Notwithstanding these significant voluntary amounts already provided by PSZJ – and the U.S. Trustee's acknowledgement that the PSZJ Settlement resolved the matters

from the Debtors' perspective[7] and that this Court approved the PSZJ Settlement without reservation as to additional monetary reductions[8] – the U.S Trustee now seeks a further reduction of PSZJ's fees in the amounts of: (1) $83,765.50 for fees related to the Voting Ombudsman Motion, asserting that such fees were not necessary and did not benefit the estate; and (2) $436,431.60, reflecting an across-the-board 10% reduction of all of the non-traveling fees incurred by Mr. Lucas *during the entire pendency of the case* solely because he was involved in the editing and transmission of the Kosnoff related communication.

21. Particularly in light of the significant reductions already taken by PSZJ related to the Kosnoff matter, any further reduction of PSZJ's fees based on the Kosnoff matter would be unjustified, as well as being prejudicial and punitive and contrary to this Court's prior approval of the PSZJ Settlement which resolved the monetary aspects of PSZJ's contribution and fee reductions based on the Kosnoff matter.

      i. <u>PSZJ Agrees to Waive Fees Related to the Voting Ombudsman Motion</u>

22. Prior to the transmission of the Kosnoff communication on November 5, 2021, and leading up to the Plan voting deadline,[9] it became increasingly apparent to the TCC that Survivors were receiving conflicting information regarding the voting process from their state court counsel. In particular, the more than 17,000 clients jointly represented by three separate

---

[7] Objection, ¶ 65.

[8] See Objection, ¶¶ 33, 48, 65, 67 (acknowledging that the PSZJ Settlement was approved subject only to the Court's ability to impose an appropriate **non-monetary** sanction). Unquestionably, the requested fee reductions are monetary in nature.

[9] The Disclosure Statement was approved by the Court on September 30, 2021. At that time, the Debtors' solicitation efforts began and parties were permitted to communicate with creditors regarding the plan and whether to accept or reject. *See In re Century Glove, Inc.*, 860 F.2d 94 (3rd Cir. 1988) ("Thus, we find that Sec. 1125 does not on its face empower the bankruptcy court to require that all communications between creditors be approved by the court …. A creditor may receive information from sources other than the disclosure statement.").

firms (Kosnoff Law, Eisenberg Rothweiler, and AVA Law, collectively referred to as "AIS"), which represented approximately 20% of the Survivor creditor body, were receiving conflicting information and advice about whether and how to vote to accept or reject the plan. AIS clients also were not provided with ballots, but were instead sent a "voting app" that was not timely provided, was not accessible to all, and often resulted in confusion. These difficulties (all of which existed prior to the transmission of the Kosnoff communication) created an untenable situation, and provided the basis for the determination by the TCC at the time that the circumstances warranted the appointment of a neutral ombudsman to serve as an independent resource and source of logistical information for Survivors. The TCC made the determination to bring the Voting Ombudsman Motion to minimize the risk that the plan would need to be resolicited and to ensure that no Survivor was at risk of having their vote disenfranchised.

23. Even though these issues existed, and needed remedying in order to protect the integrity of the voting process, PSZJ agrees to waive $83,765.50 in fees for such services.

          ii. A Wholesale Reduction of Mr. Lucas' Fees
              For the Entire Case is Duplicative, Punitive and Unwarranted

24. The U.S. Trustee's requested ten percent (10%) reduction of Mr. Lucas's fees for the ***entire*** case is nothing more than an arbitrary penalty that fails to take into account the reasonable, necessary and appropriate services Mr. Lucas provided during the entirety of the case that were ***wholly unrelated*** to the transmission of the Kosnoff communication. The Kosnoff transmission occurred on November 5, 2021, which included Mr. Lucas's calls with Mr. Kosnoff, the editing of the communication, and its transmission. None of Mr. Lucas's time – nor any other PSZJ's attorney time – in connection with any aspect of the Kosnoff matter was billed to the estate.

25. PSZJ has already paid or written-off the amount of ***$3 million*** based on its involvement with the Kosnoff matter. The firm voluntarily agreed to its "punishment" which has

taken the form of $1.75 million in write-offs and the payment of $1.25 million reflecting the asserted amount of fees incurred by estate professionals (which was the only allegation of harm to the estate), and the monetary aspects of the PSZJ Settlement were approved by the Court.  PSZJ has also agreed to an additional $1 million in fee reductions for work which could arguably be related to the Kosnoff matter.  There are simply no grounds to impose an additional penalty in the form of a wholesale 10% cut of Mr. Lucas' fees – fees which span the entirety of the case and, contrary to the U.S. Trustee's assertion that the requested reduction is based on Mr. Lucas' "direct conduct,"[10] are wholly unrelated to the Kosnoff matter.

B.     **A Wholesale "Discretionary" Reduction of Professional Fees is Not Warranted**

26.     The U.S. Trustee requests that, even if the Court does not sustain the Objection on the specific grounds set forth by the U.S. Trustee, this Court has the authority to impose a discretionary reduction on the fees of the professionals in this case.  While this Court undoubtedly has discretion with respect to the final approval of professional fees, this discretion is bounded by the legal standard applicable to the "objectively reasonable" review of fees standard in the Third Circuit which, for the reasons set forth herein, warrants approval of the requested fees.  The professional fees in this case do not warrant a separate, discretionary, across-the-board reduction – especially in light of the reductions already taken and agreed-to.

27.     In support of its request, the U.S. Trustee points to the recent opinion in *In re SC SJ Holdings LLC*, 2023 Bankr. LEXIS 1729 (Bankr. D. Del. July 11, 2023), where Judge Dorsey imposed a 10% reduction in fees based on billing inefficiencies.  Notwithstanding an acknowledgement by the U.S. Trustee that billing inefficiency issues have already been separately addressed in this case – and reductions agreed to – pursuant to the Court-approved fee examiner

---

[10] Objection, ¶ 67.

process in this case,[11] the U.S. Trustee urges the Court to impose an additional across-the-board reduction based on work related to the RSA and Plan findings. The U.S. Trustee's argument here is circular: Even if the Court finds the work necessary and compensable, it should still use its discretion to reduce the fees because the U.S. Trustee believes that such work is not necessary and compensable. The U.S. Trustee further asserts that, if the Court cuts professional fees, it will inure to the benefit of others (*i.e.*, the Settlement Trust). But neither of these arguments are the test in the Third Circuit. The test for allowance of professional fees is not based on hindsight, and it is not based on whether reduced fees would allow additional funds to flow to the Settlement Trust. The test is not, as the U.S. Trustee urges, that because the Court has the authority to award lesser compensation than sought, it should exercise this authority to reduce professional fees that would otherwise be compensable. The standard is whether the work was objectively reasonable at the time it was undertaken. For the reasons set forth herein, PSZJ submits that the services it provided as counsel to the TCC satisfy the Third Circuit standard and should be approved as requested.

C. **PSZJ's Contributions, Payments and Write-Offs Already Total Over $11 Million**

28.   PSZJ has already voluntarily undertaken or agreed to the following contributions, payments and write-offs:

- *First*, PSZJ's commitment to the TCC and Survivors to make a contribution of 10% of its allowed fees – estimated to be approximately $3.8 million – to the Settlement Trust.

- *Second*, pursuant to the PSZJ Settlement with BSA, PSZJ paid $1,250,000 to the estate to be utilized to foster the BSA's youth protection program, which amount reflects the total agreed-to amount of fees incurred by other estate professionals in connection with the Kosnoff communication, and which was memorialized and approved as part of the Court-approved PSZJ Settlement.

---

[11] Objection, ¶ 68.

- ***Third***, pursuant to the PSZJ Settlement with BSA, PSZJ wrote-off $750,000 in fees as a result of PSZJ's role in the transmission of the Kosnoff communication, which amount was also approved by the Court pursuant to the PSZJ Settlement.

- ***Fourth***, PSZJ voluntarily wrote-off an additional $1,000,000 in fees arising from confirmation-related issues that arguably could have been related to the transmission of the Kosnoff communication.

- ***Fifth***, PSZJ agreed to additional write-offs in the amount of $661,872 in response to specific requests of the fee examiner during the course of the case [Docket No. 11494].

- ***Sixth***, PSZJ voluntarily did not increase its hourly billing rates in 2021, 2022 and 2023 in the ordinary course,[12] resulting in *de facto* reductions in its fees (had such annual increases been implemented in the ordinary course) in the annual amounts of $2,438,712, $1,279,043 and $151,817, respectively, for a total fee reduction of $3,869,572.

29.     Therefore, in total, PSZJ has already reduced its fees in this chapter 11 case by over $11 million. Of that amount, more than $6.46 million is based on agreements with the TCC, BSA, or the Fee Examiner and more than $4.8 million is based on PSZJ's voluntarily reductions.[13] The request by the U.S. Trustee for over $1.4 million more in reductions is not justified when viewed under the appropriate standard of review under Third Circuit law (which looks to the reasonableness of the services when undertaken, not based on hindsight or after-the-fact second-guessing), nor are the reductions appropriate in light of the circumstances, including PSZJ's already unparalleled contributions to the estate and Survivors. Viewed in the appropriate light, and for the reasons discussed herein as to the propriety of PSZJ's provided services in connection with the RSA and the Plan findings at the time such fees were incurred, and the combination of the substantial voluntary fee reductions in addition to the already agreed-to and

---

[12] In 2021, 2020 rates were utilized; in 2022, 2021 rates were utilized; and in 2023, 2022 rates were utilized.

[13] Of the $4.8 million in voluntary reductions, approximately $580,000 relates to a reduction in fees billed my Mr. Lucas at reduced rates in 2021, 2022, and 2023, as reflected in Paragraph 28 and footnote 12.

approved payments and write-offs of fees reached with respect to a resolution of the Kosnoff matter, PSZJ requests that the Court overrule the U.S. Trustee's request for further fee reductions by way of the Objection.

## CONCLUSION

30. For all of the reasons set forth herein, PSZJ believes that further reductions of its professional fees are not warranted and requests that this Court approve the PSZJ Final Fee Application in its entirety.

Dated: October 2, 2023
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Alan J. Kornfeld (CA Bar No. 130063)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (DE Bar No. 4042)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: rpachulski@pszjlaw.com
         akornfeld@pszjlaw.com
         dgrassgreen@pszjlaw.com
         joneill@pszjlaw.com

*Counsel to the Official Tort Claimants' Committee*