## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>         Debtors. | Case No. 20-10343 (LSS)<br><br>Chapter 11<br>(Jointly Administered)<br><br>**Hearing Date: November 20, 2023**<br>**Response Deadline: November 13, 2023** |

### RESPONSE TO TRUSTEE'S CONSOLIDATED RESPONSE AND TRUSTEE'S DECLARATION ON BEHALF OF SURVIVOR/CLAIMANT D. S.

D. S., ("Movant"), by and through his undersigned counsel, hereby responds to the Trustee's Response and Trustee's Declaration to Movant's Motion to change his election to opt into the expedited payment/convenience class.

### INTRODUCTION

D.S. requests that the Trustee simply allow him to change his election from expedited/convenience class to either the Standard or Independent Review Options. The Trustee's arguments, in both the Response and her Declaration can be boiled down to two basic points: first, that the Third Amended Plan forbids it, both in specific language and in its intent and spirit; second, that it is too difficult or unwieldly or expensive for the Trustee to allow D.S. to agree to this relief, as it would have also then require them to allow this for all other Claimants/Survivors those making similar or other arguments, through this Motion, or at any time in the future.

D.S., through his attorneys, argue here that Trustee's analysis of the Plan is not correct in that the Plan prohibits allowing D.S. to change from an expedited option to another option. No black letter language says explicitly that. The Trustee also incorrectly argues that the spirit and intent of the Plan was to make it set in stone. Not only is this contrary to the intent of the spirit of

the entire Agreement and Plan, but in fact, it is clear that at least several changes have been made in the administration of the Plan, by the Trustee, including extending of deadlines for the Independent Review Option and not even setting a deadline, as of yet, for the submission of "Standard' claims.  The Trustee's arguments that it is too much of a burden to allow these changes is a chimera.  The Trustee's job is to administer these claims however that needs to be done, and in any case, if she feels like it does not have to power to grant the relief requested by D.S., this Court does. Lastly, The Court should grant this relief because the equities greatly favor D.S.; he has a good faith claim, based on the Tier/Guidelines for a considerable award in a Standard claim, or for an even greater award if he were able to elect the Independent Review Option.

## ARGUMENT

Neither the specific language of the Plan nor its intent or an interpretation of it supports denying D.S. the requested relief.  The specific language that the Trustee references in support of her argument that the language in the Plan forbids a change in election by D.S. is:

> *A Direct Abuse Claimant who does not make the Expedited Distribution Election . . . in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election . . . shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election . . . will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP.*

Simply stated the Trustee is wrong.  The first sentence is irrelevant to D.S. and his request for relief here as he is not seeking to elect the expedited distribution now, but is instead seeking to de-select it.

2

The Trustee also quotes the Plan: "Direct Abuse claimant who makes the Expedited Distribution Election… shall have no further remedies against the Settlement Trust…"  At first glance, this might appear to support the Trustee's argument. D.S., however, urges the Court to look at the following sentence, also quoted in the Plan and by the Trustee in supposed support of her argument: "Direct Abuse Claimants that make the Expedited Election Option will not be eligible to further receive any further distribution on account of their Direct Abuse Claim pursuant to the TDP."  Clearly, the purpose of the referenced language of the Plan was not to set in stone the election of the choice as to what option was wanted.  Rather, the purpose was to prevent someone who chose the expedited option and received $3,500, to then "have his cake and eat it also," by allowing that claimant to get the money and then say it wants more money by either of the other two options.  Such an outcome would be grossly unfair to other claimants!

Similarly, in B. para. of her Response, the Trustee says the following:

> *The Trust Distribution Procedures ("TDP") also make clear that the Trustee is not permitted to allow a claimant to change their election regarding Expedited Distribution. "[N]either the Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including . . . (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline . . . or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan." TDP, Art. XIV.*

Here, despite the Trustee saying the TDP makes it clear that the "Trustee is not permitted to allow a claimant to change their election regarding Expedited Distribution," the actual language cited of the Plan, as cited correctly by the Trustee, states "Neither the Trustee nor the STAC or Future Claimant's Representatives may amend the TDP in a material manner, including**…(iii) to add an opportunity to make an Expedited Distribution Election for a claim by a Chapter 11 POC**

**after the voting deadline"** (Emphasis added.)  The Plan is silent with regard to the relief that D.S.

is requesting which clearly distinguishes D.S. it from someone seeking the opposite relief.

Regarding the that implicit intent of the Plan was to prevent D.S. from being able to correct

his mistaken election, the Trustee herself supports D.S.'s argument here when she presents the

history and intent of having an option box to choose the Expedited Distribution on the Ballot for

the Plan:

> "The Court ultimately required Abuse Claimants to elect whether to pursue
> Expedited Distribution on the same ballot on which they voted on the Plan, noting
> that 'it would be helpful to know who was voting and what their choice is . . . I
> think it's important to understand the vote.' Sept. 28, 2021 Hr'g Tr., 235:4-20.

The Court, unlike the Trustee, understood that the main purpose of having the Claimants make a

preliminary choice at that time that they intended to take the Expedited Distribution was primarily

and perhaps only to know the extent of the "class" that **might** choose the expedited distribution

option, in order to make decisions about the expedited distribution option and other parts of the

Plan, **if it was approved**, not to have it be a final and irrevocable decision on the parts of those

Claimants/Survivors, or for it to be set in stone.

**Additionally, the fact that there was a Questionnaire, that the Trustee submitted to**

**all claimants requesting the expedited payment option that the Trustee REQUIRED all**

**claimants to fill out and file with the Trustee in order to qualify for the expedited payment**

**option, with an accompanying additional DEADLINE (originally November 3, 2023, but**

**since extended due to this Motion) for any claimants who originally checked the box**

**(mistakenly or not, indicating that they wanted the expedited payment option).  In this**

**Questionnaire, the claimants had to again indicate his/her intention to take the expedited**

**option.  The Questionnaire supports D.S.'s arguments that when he checked the box for**

**expedited payment on the Ballot, it was not intended by the Plan or any of the Plan sponsors or other parties to be a final choice.**

The Trustee makes also various arguments, that even if she had the power to do so, she cannot grant D.S. the relief that he seeks because then everyone would be able to change their mind and make different decisions about what they want resulting in the Trustee having to set different deadlines and send out different orders or directives or recoup money.

Starting with the last point first, D.S. has not received any money. D.S. did not fill out or file with the Trust the Questionnaire which the Trustee is requiring of each claimant who opted to receive an expedited distribution when completing the ballot before they can actually receive the expedited payment. The Trustee does not have to recoup any money from D.S. or from any other claimant who is seeking, at this early stage to change their election.

Additionally, if as the Trustee argues, the letter and spirit of the Plan and having people to choose this option was final, query why did the Trustee require a subsequent questionnaire, which asks claimants to reaffirm the option in order to receive the expedited distribution of $3,500 and informs the claimants that the failure to timely complete the questionnaire will result in the claimants being unable to receive the expedited $3,500 payment.

Because of D.S. has not received any payment and has not completed the questionnaire, D.S. is situated far differently than any claimant who completed the questionnaire reaffirming their decision to receive the expedited $3,500 payment and actually received the expedited payment. A potential request by a different claimant to change their election after completing a questionnaire that reaffirms their decision to opt into the expedited payment and has actually received such a payment would have to be reviewed on its own merits but it is absurd to suggest that D.S.'s situation and request is remotely close such hypothetical claimant.

Moreover, the Trustee has already extended deadlines for the expedited distribution questionnaire, and the Independent Review Option, and has not even set a deadline for the Standard (Review).  If the Trustee would agree, or the Court would allow D.S. to choose either the Standard Review or the IRO, he would be within the timelines for doing so.

Next, while not arguing here on behalf of other Movants or others in similar situations- as each specific claimant has their unique claims and circumstances each/any of them- which the Court is asked to grant relief to also here, the Trustee offers several complaints that basically state that giving D.S. the relief that he is requesting would require the Trustee to do so for everyone in a similar or analogous situation, which would result in logistical chaos.  This is an exaggeration at best.

In her Response and/or Declaration, the Trustee states that 7,300 claimants elected Expedited Distribution when they voted.  The Trustee says that these claimants elected that option "when voting to accept the Plan."  Unless this is a misprint, this is irrelevant to D.S. as he chose the Option, mistakenly, when he voted to reject the proposed Plan! It is irrelevant whether someone voted to accept or reject the plan when they checked the box for the expedited option, unless the Trustee is saying that only those voting to accept the plan can be held to their choice on the Ballot to take the expedited option!

Whether the number of people who actually chose the Expedited Option on the Ballot was 7,300 or greater than that (if it also included D.S. and others like him voted to reject the Ballot yet mistakenly or otherwise checked the box for the Expedited Option), the Trustee says more than 4,500 have completed the questionnaire, 515 have signed the Release and 276 have received payment.  Accordingly, the number of people who have actually received any payment is very small, compared to the number of people either checked the box or even

who have filled out the questionnaire.  So, while there may be legal or other administrative complications because of that, it would be much less that than the numbers that the Trustee is complaining of.  Also, if the Trustee and/or the Court were to allow those 276 to keep their money and also choose either the Standard Review or the IPO, that money could be deducted from whatever award is received through either of those two procedures.  (It is extremely unlikely that the Trust would "lose" money that way, as it is extremely unlikely that any claim would be valued at less than $3,500 at the conclusion of either the Standard Review or IPO.)  Also, as the Trustee concedes, she does not know how many of those 276 would choose either the Standard Review or the IPO.  Similarly, of the more than 4,500 claimants who completed and sent in the Questionnaire, as the Trustee also concedes, she does not know how many of those would elect to change their mind and not continue to want to receive the $3,500 expedited option.  Unless the Trustee is assuming that most of them made a mistake when they checked the box on the Ballot, or especially when they completed the Questionnaire, it is fair to assume that many or most of them would not change their mind.

The Trustee also argues that part of this logistical nightmare would involve having to change or extend existing deadlines and/or inform Claimants of this and of possible changes in procedures or their choices, and how difficult this would be. This has already been done before, as stated earlier, with the extension of deadlines, etc., and it is part of the Trustee's job.  The Trustee does not have to "reinvent the universe," but find solutions to perhaps complicated and vexing circumstances.  Surely this is not beyond the powers of a Trustee in general, or this Trustee in particular.

With respect to particular deadlines, and the Trustee's stated fear that changing these deadlines, IF NECESSARY, in order to grant D.S. relief here, would affect the rights of

others who are relaying on the stated deadlines, again, there is NO deadline as of now for the **Standard Review Claimants. Those** claimants and/or their attorneys are able to and have already begun to complete the questionnaires and submit the appropriate documentation so that that process can continue, and others can do so in the future up until the Trustee sets a deadline for that.  For people who chose or want to choose the IRO, that deadline to do so is not until February 2024, and that does seem onerous for people who even now, if they mistakenly or otherwise chose the expedited payment option when they voted on the Ballot, were to be allowed to choose that IRO.  (This deadline does not currently, on information and belief, require COMPLETING the IRO process, but only electing to do so and advancing a $10,000 fee, which also provides for a fee waiver under certain circumstances.)

Lastly, with respect to this part of the Trustee's arguments, in her Response and Declaration, she raises the objection that this would cause extreme "confusion" for all concerned, including other claimants.  Without resorting to sarcasm, in truth, the entire process of the making a claim for compensation for abuse at the hands of the Boy Scouts and related parties has been extremely confusing and anxiety-producing and complex for not only claimants, but all the other actors involved, (including the Court which remarked at one point that this was one of the most complex bankruptcy cases that she had been involved in.) There have been innumerable stops and starts, changes in direction, objections and appeals-including an on-going appeal- mediations, votes on proposed Plans, hearings, etc.

Nevertheless, all the actors and parties involved have endevoured to continue the process and find solutions, sometimes making compromises, rather than to say that this is too complicated or difficult or confusing. While the Trustee had not been involved until relatively late in this whole process, she has been extremely diligent in holding frequent "Town Meetings", and appearing

personally in them, to hear complaints, answer questions, provide explanations, etc.  She can continue to do this with respect to this particular set of potential problem(s).

The facts that D.S. has presented in his initial Motion are that D.S. never intended to elect the expedited payment option, despite checking the box, and did not understand the consequences that the election would constitute a complete release of claims that would be a final decision which he could not undo. See Declaration of D. S. attached as Exhibit 2 to the Motion of D.S.. Additionally, D.S.'s Attorney never advised him to select this option and would not have advised him to the select this option given the knowledge of the facts of the case. See Declaration of Attorney Tyler H. Fox attached as Exhibit 3 to the Motion of D.S..

The written ballot was 23 pages long and was faulty, ambiguous, misleading or otherwise confusing in that a claimant is requested to vote on whether or not to accept the $3,500.00 expedited payment, in one paragraph, but the ballot does NOT mention, state or even imply that election is final or irrevocable, and/or that it will prevent him from later changing his mind or choosing another option.  A claimant who completes the questionnaire and receives a $3,500 payment cannot make the compelling argument that D.S. is able to make - that by inadvertently checking a box on a 23 page ballot that D.S. made a simple mistake, has not actually received the benefit of the expedited payment and has notified the Trustee that want to change the election because it would severely prejudice him by requiring him to release and valuable claim for a dollar amount that is far less than what he would reasonably expect to receive should he be allowed to fully participate in the process available to those claimants who did not opt to receive the expedited payment.

Neither the Plan, the Trust Agreement nor the ballot state that D.S. cannot correct his mistake and change his inadvertent election to receive an expedited payment of $3,500 in exchange

for a release of his claim that he believes is worth substantially more than $3,500. Nor is it too late from an equitable standpoint to change his election. D.S. has not submitted the required questionnaire needed to receive the $3,500 payment and complete the election to receive the expedited payment and D.S. certainly has not received anything to date to compensate him for a release of claims. Accordingly, the Trustee is still evaluating who qualifies for the expedited payment. The only thing that the Trustee has done to date because of D.S.'s inadvertent election is to email a questionnaire to D.S. informing him that in order to complete the election, he needs to complete the questionnaire. D.S., on the other hand, would be severely prejudiced by mistakenly releasing a valuable claim to compensate him for the abuse that he suffered and which has adversely impacted his life for a mere $3,500.

While this a fairly unique situation, bankruptcy courts routinely address a request to correct a mistake utilizing the *Pioneer* standard. In this case, the equities greatly favor granting D.S. the specific relief granted, in general, and as applied in *Pioneer Inv. Services v. Brunswick Associates*, 507 U.S. 380, 395 (1993)

In general, it would be extremely inequitable to deny D.S. the opportunity to rescind his mistake and be allowed to choose either the Standard Review - or most likely - the IRO, and be forced to accept something that he did not want in the beginning, does not want now, and would never want. Not only would this be wrong, but it totally flies in the face of the supposed spirit and intent of ALL the parties and thousands of individuals representing claimants, attorneys, mediators, etc. in proposing settlements, Plans, etc. Everyone agrees that nothing can make up for the horrible abuse and degradation that D.S.- and other claimants/survivors- suffered while being abused and after, but everyone agreed that compensation was a primary way of somehow "valuing" this pain and suffering and damage. Everyone understood that abuse was also an abuse of power

which made victims/survivors feel powerless and helpless not only while the abuse occurred, but for many, most if not all of them, for the rest of their lives.  Forcing this decision on D.S., and others, only reinforces the feeling for them that they are powerless.

Specifically, D.S., in addition to the loss of efficacy and sense of power, stands to lose potentially and probably an incredible amount of money that he would otherwise get by choosing the Standard Review- or most likely- the IRO.  D.S.'s claim, as applied to the Matrix, puts him in the Top Tier, and has a base value of $600,000, and a top value of $2,700,000. See D.S.'s Sexual Abuse Survivor Proof of Claim, previously submitted as an exhibit along with his Motion, p. 8, section M., narrative and as excerpted below:

> At the Jamboree, I was in the building that they were using as a cafeteria/mess hall to feed us boy scouts. I was working as a kitchen helper there. One of the Scoutmasters there talked me into going into his tent with him after dinner, saying he had something to show to me. After we got there, he started rubbing me on my crotch-my pants were on- while we were standing there- asking me how it felt, did I like it. Then he unzipped my pants and told me to unzip his pants, and told me to pull out his penis and took my penis out with his hand around it. He was using my penis to show me how to masterbate  (sic) and telling him to the same to him. He asked me if I had been with a boy before, and he told me to take my pants off and he took his pants off, and told me to lay down on floor on his sleeping bag and laying on my stomach. He got on his knees behind me and felt him put his penis behind my legs and between his butt cheeks, and penetrated me until he came into me. He said let me clean you up, wiped me up and continued to masterbate me to get me to come, and I did. He thanked me and said we will do it again sometime. Then he told me to go back to my troop. I then went back to the camping area of my Troop, Troop #60. I was very embarrassed and felt I did something wrong! The next day, I saw him again in the kitchen/cafeteria. Between lunch and dinner, he told me if I did not want to clean dishes- which was my job at the end of each day- I could go to his tent and he could "clean me up." Then in the evening, after dinner, I went to his tent and he started rubbing me through my pants, unzipped me and stroking me and with his other hand, he had me play with his penis, and then got me to get on my stomach and raped me again in my buttocks. he then masterbated me again, like the day before, when he was cleaning me up. He told me not to tell anyone because we will both be in big trouble, gave me a hug and told me to go back to my Troop, and reminded me not to tell anyone. The next morning, Sunday morning, he was not in the kitchen. I never saw him again as this was the last day of the jamboree.

D.S.'s claim has none of Article VIII of the Approved Plan's Mitigating Scaling Factors (it is within the Statute of Limitations in CA, and in fact, as the Exhibit accompanying the Motion indicates, a lawsuit was filed in CA. on his behalf) and has several of the Aggravating Scaling Factors.  Using the Matrix Calculator as a rough guide, his base claim of $600,000, multiplied by 1.5 ("Nature and Circumstances" of the Abuse) and by 1.5 again (Impact" of the Abuse) could be "worth" approximately $1,350,000, making D.S. an excellent candidate for the IRO!

*Pioneer* essentially sets the standard for a Motion of this sort, laying out a four part test, as follows:

**Danger of prejudice to the opposing party**.  To begin with, it is instructive to note who is the "opposing party" to the Motion of D.S., a survivor of severe sexual abuse at the hands of the Boy Scouts. It is not the BSA, nor the Local Council or chartering organization nor any other entity associated with the Boy Scouts or other Debtors, nor one or more of the myriad of insurers or other parties who have been involved in either supporting or opposing any or all of the mediations, proposed plans, meetings, etc. related to this process. They apparently have not objected at all, thereby indicating that they have not been prejudiced. It is the Trustee who is opposing it.  The Trustee's job is to administer the terms of the Bankruptcy Plan which was approved by the Court, not to determine who is eligible for compensation and under what terms. Here, the Trustee is essentially inserting itself as a "party" would. The Trustee would suffer no prejudice if the Court were to grant relief as requested in D.S.'s Motion, but merely continue to due her job of administering the Trust, under whatever modified and/or new terms as determined by the Court's decision. In short, the Trustee would suffer no "prejudice," if the Motion were granted, but, as argued above, D.S. is likely to suffer extreme prejudice if the Motion is not granted!

**Length of the Delay and its impact on judicial proceedings**. The Court should not have to take an inordinately long period of time to make its decision with regard to my client's Motion. Similarly, if the Court rules in his favor, and allows him to switch to a Standard- or again, most likely- an IRO, as a deadline has not yet been established for the Standard Review, and the current deadline for merely making a decision, paying $10,000- not even beginning much less completing the IRO process is not until February 2024, a ruling with respect to D.S, would not cause a delay. To the extent that the Court needs to rule on D.S.'s Motion along with other similar Motions, that may cause more significant delay in deciding the Motion(s) and/or fostering relief, but it will not impact on "judicial proceedings" of the Court, but in the Administration of the Trust.

**Reason for the delay, including whether it was in the reasonable control of the Movant**. The reason for the "delay" is due to what D.S. is requesting, relief from the Court due to an excusable mistake on his part, in checking a box, almost two years ago, on a Ballot designed for claimants like him to vote on a proposed Plan, and whose design, including the box which indicated that the claimant/voter wanted an EDO, as apparently noted by the Court was intended to give the Court an early indication of how many people might want a proposed Expedited Distribution Option, not as a final and irrevocable decision by the Claimant that his claim was worth and he only wanted to accept $3,500 for his pain and suffering and damages. D.S. did not recall selecting this option when submitting his Ballott and his attorney discovered that D.S. had apparently selected the expedited payment option shortly before D.S. filed his Motion to correct his mistake. While the Ballot in question was obviously not designed to mislead anyone, it did mislead D.S. (and others), and was not designed in a way that clearly enough indicated that a decision to take the EDO was final. That was not within D.S.'s control.

**Whether the movant acted in good faith**. The Court has read D.S.'s affidavit, so she can make her own determination if the Motion is in good faith. Any delay in either judicial proceedings and/or the administration of the Trust does not give an advantage or an undeserved benefit, other than to hopefully receive what is just compensation for the horrible wrongs done to him.

## CONCLUSION

D.S. was sexually abused at the hands of the Boy Scouts years ago. The abuse irreparably altered the course of his life, permanently damaging him severely and irrevocably. The BSA, other debtors, insurers, creditor organization, mediators, claimant/survivors and numerous others worked together to try to shape and fashion process whereby remedies for the wrongs, including just monetary compensation could be awarded to claimant/survivors. As part of this process, a Ballot was to be completed by each of the claimant/survivors, voting of whether or not they accepted or rejected the Plan. (This was the primary purpose of the Ballot.) Along with that, in order to get a preliminary head count of how many claimant/survivors might want to take a "quick claim" $3,500 award, claimants were asked to check the box if they wanted they wanted the expedited payment of $3,500. There was not sufficient or clear language in the Ballot to let claimants know that the decision was final (if indeed the intent was to make such a selection final). Regardless of the purpose of providing the option for the expedited payment in the Ballot, D.S. innocently mistakenly checked the box indicating a selection of the expedited payment. Now, even knowing that D.S. said he never intended to make a final or any decision saying he wanted the $3,500 quitclaim, and knowing that D.S.'s claim is most likely "worth" many times that amount if he were to be allowed to rescind that checking of the box and apply for the IRO, the Trustee refuses to allow D.S. to rescind that election (even though the Trustee herself has made changes to the process, with the Court's permission) and is requesting the Court to deny the relief sought

14

to D.S.  The purpose of the Expedited Payment (option) was designed to give a **benefit** to survivors that might be quicker or easier for claimant/survivors- at the potential loss of considerably far greater recovery.  It was not designed to punish them for making a mistake.  It was a choice given to them; now the Trustee, is taking away such choice and the power given to them and is, in essence, re-traumatizing them.

WHEREFORE, D.S. requests that he be permitted to modify his ballot where he mistakenly opted into the $3,500.00 expedited payment/convenience class to retract that election in order to fully participate in the Standard Review or the Independent Review Option available under the Plan and provide Movant such other relief as is just and proper.


Dated:  November 13, 2023                       GELLERT SCALI BUSENKELL & BROWN LLC

                                                                   */s/ Charles J. Brown, III*
                                                                   Charles J. Brown, III (DE 3368)
                                                                   1201 N. Orange Street, 3rd Floor
                                                                   Wilmington, DE 19801
                                                                   Phone: 302-425-5813
                                                                   Fax: 302-425-5814
                                                                   Email: cbrown@gsbblaw.com

                                                                   *Counsel for D.S.*

*Of Counsel:*

Tyler H. Fox, Esq.
(MA BBO #176860)
135 Antrim Street, Suite #2
Cambridge, MA 02139
Phone: (857-260-3105)