1

<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND   .
     DELAWARE BSA, LLC,          .  (Jointly Administered)
 5                               .
                                 .  Courtroom 2
 6                               .  824 Market Street
                Debtor.          .  Wilmington, Delaware 19801
 7                               .
                                 .  Tuesday, September 28, 2021
 8   . . . . . . . . . . . . . .  . 10:11 a.m.

 9                   TRANSCRIPT OF ZOOM HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10             CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Madaline Dungey, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
</pre>

1  those matters, but that's going to be the hallmark is parties

2  cooperating and getting documents and other discovery out.

3          Okay.  Ms. Lauria?

4          MS. LAURIA:  Thank you, Your Honor, and we will,

5  obviously, work on putting together a proposed scheduling, as

6  Mr. Kurtz suggested.  I think what that leaves for purposes

7  of rounding out the disclosure and solicitation process are

8  three issues.  And maybe I would propose to go in this order,

9  just because of the impact that the issues may have on the

10 documents.

11         The first is how to treat that $3,500 expedited

12 distribution election because that flows through the ballots

13 and the plan and the disclosure statements, and I do believe

14 it is one of the truly remaining substantive issues left it

15 may make sense to take that first.

16         Next, we have, and I think Mr. Ollinder (phonetic)

17 will go through with you anything that may remain on the

18 disclosure statement.  Knock on wood, we've been

19 communicating with folks during the course of today, and I'm

20 hoping that those are relatively limited issues.  And then,

21 finally, I believe Mr. O'Neal will pick back up with the

22 solicitation procedures, everything other than that $3,500

23 expedited distribution.  Also, I understand that he's had

24 some constructive conversations with the TCC Today, so

25 hopefully we've rounded those out as well.

1           I'm not sure if you want to turn to any of that

2     tonight, Your Honor.  I'm ready to go on the $3,500 expedited

3     distribution issue and why the change was made to the ballot

4     over the weekend if that makes sense.

5           THE COURT:  Yes, let's do that.

6           MS. LAURIA:  Thank you, Your Honor, and what I'd

7     like to do is just give you --

8           MR. STANG:  Excuse me, Your Honor, that is our

9     motion.  I think that's our motion.  I don't know why

10    Ms. Lauria is addressing something that we filed.  It's not

11    an order shortening time.  We haven't had a ruling on it, and

12    it's -- if you think that the $3,500 issue and our

13    classification motion are the same thing, we're the ones that

14    filed it.

15          MS. LAURIA:  Your Honor, we --

16          THE COURT:  Okay, well, the debtors have made a

17    change -- the debtors have made a change to their plan, so

18    I'm going to hear both of you.

19          MR. STANG:  Okay.

20          THE COURT:  Don't worry about it.  No one gets an

21    advantage over the other, but there's a change in the plan.

22    I noticed it in the plan, and let's talk about it.

23          MR. STANG:  Okay.

24          MS. LAURIA:  Your Honor, and I certainly didn't

25    mean to cut the TCC off in that regard.  We did make the

1  change to the plan.  I thought it would make sense to explain

2  why.  Also, we didn't file a written objection simply because

3  we haven't had the time to do it.  So I thought it might make

4  sense to put some perspective on this.  What I'd like to do

5  is just give a brief, a very brief history of the $3,500

6  expedited distribution and then go into why it is that we

7  made the change over the weekend to the plan and the ballots.

8          And I guess I would chalk this up to the category

9  of no good deed goes unpunished in this case.  You know,

10  throughout 2021, this literally the entirety of this year

11  we've had various conversations with parties on all sides of

12  this proceeding concerning some sort of expedited

13  distribution mechanic.  That includes both folks on the

14  survivor side and folks on the -- on the insurer side.

15          And when we came to resolution around the RSA with

16  the TCC and the coalition, we all agreed to a $3,500

17  expedited distribution.  And that was embodied in both the

18  fourth amended plan, the RSA, as well as the plan that we

19  went forward on, the fifth amended plan.

20          When we came to that understanding, speaking for

21  the debtors and really for myself in particular, because I

22  probably was at the middle of this decision, we were

23  contemplating two different mechanisms for soliciting -- I'm

24  using that in the little "s" sense of the word -- soliciting

25  the elections on the expedited distribution.  The first was

1   just getting those indications through the trust process

2   itself, and, in fact, as I mentioned earlier in the hearing,

3   there is a mechanism in the TDP and this existed, you know,

4   well before this weekend where the trustee would, in fact,

5   review the proof of claim, insure that the proof of claim was

6   substantially complete, and insure that the individual itself

7   signed the proof of claim form, not just the attorney, but

8   the individual itself signed the proof of claim form.  So we

9   thought about doing an election mechanism in connection with

10  the TDP.

11          The second option was in connection with the

12  balloting process, and that is what we elected to do, again

13  going back to the fourth amended plan.  The logic behind

14  that, Your Honor, was really one of efficiency and ease of

15  administration for both the claimants themselves as well as

16  the trust.  Our view was we were going to be sending out a

17  massive solicitation to 82,000 individuals, and with that

18  touchpoint with those individuals we should gather as much

19  information as we possibly could, including whether or not

20  those individuals wanted to take the $3,500 election.

21          As you undoubtedly saw in the confirm- -- in the

22  disclosure statement objections, we received a ton of

23  objections from the insurers to the $3,500 election.  And

24  those were along the lines of some of what you heard from

25  Mr. Rosenthal and Mr. Schiavoni today that the debtors were

1   attempting to do vote buying by putting the $3,500 election

2   on the ballot, that we were trying to carry the class by

3   buying votes with respect to that election.  And I can assure

4   you, Your Honor, that is absolutely not what our intention

5   was ever with respect to that $3,500 election.

6           But we proceeded to keep it on the ballot as we

7   went into last week's hearing.  And as we sat there, and I

8   think it was on the 23rd, when we got to the solicitation

9   procedures, we heard Mr. Stang and Mr. Smola describe very

10  convincingly the complications with the balloting process

11  here, and in particular the fact that we included on the

12  ballot this election to settle a claim, you know, not just

13  whether or not you're going to vote up or down on the plan

14  but actually settle a claim.

15          And, you know, when we went back and looked at the

16  transcript, Mr. Stang made a very impassioned speech about

17  the fact that due to rules of professional conduct an

18  attorney has an obligation to consult with its client about

19  the settlement of any claim.

20          And as we heard Mr. Smola further describe the

21  difficulties that many of the plaintiff lawyers have in

22  communicating with their clients due to confidentiality

23  concerns and the sensitive nature of the claim, it struck us

24  as, you know, we had added that to the ballot to try to ease

25  the administrative burden on both the plaintiffs and the

1  trust, but it became apparent after last week that we were,

2  in fact, increasing the burden, maybe unnecessarily so, on

3  the plaintiff lawyers.

4         In fact, we have 70 to 75,000 individuals that are

5  represented by counsel.  Whether those individuals are

6  completing master ballots or not, that's a lot of people.

7  That ranges from lawyers representing one person or a few

8  hundred persons to, I think, Mr. Smola indicated he

9  represents 4,000 persons, to Mr. Rothweiler who said his firm

10  of 10 lawyers represent 16 to 17,000 people.

11         As you know, and we just heard, we're on a very

12  tight timeframe.  We are contemplating a 60-day solicitation

13  period, and from our perspective for those lawyers to advise,

14  based on what I heard last week on whether you could or

15  should elect the option, it depends on a couple of things.

16         One, first you have to determine whether your

17  client is eligible, so whether they did complete a proof of

18  claim and whether they signed it.  We've now heard that, I

19  think, 20,000 amendments have been made to the proofs of

20  claim.  A big number of those are to substitute individual

21  signatures for attorney signatures, but that sort of part one

22  is assessing that.

23         And, next, you need to assess whether or not the

24  client should, in fact, take the $3,500 election.

25         So it struck us that we were maybe asking for too

1  much on the ballot given the timeframe and given the number

2  of claimants that are indeed represented by counsel and given

3  their ability to determine eligibility versus, you know,

4  whether or not they should even take the settlement.

5         So we thought in the face of that, and I think

6  Your Honor said last week, the expedited distribution is

7  turning into the tail that's wagging dog.  That is never what

8  we intended with the expedited distribution, so if that's

9  going to be a hardship on plaintiffs, I think our view was

10  take that off the ballot.

11         The TCC we now understand didn't like that.  They

12  want that on the ballot.  I think that from our perspective,

13  you know, there may be a balance where it can remain on the

14  ballot but rather than jam people with the voting deadline

15  and particularly those individuals who are represented by

16  counsel who needs to advise all of their clients whether

17  they're eligible and whether to accept you can have it on the

18  ballot and then also have an opportunity to take the election

19  via the trust process or via the trustee, we don't like that.

20  That sounds kind of confusing to me.

21         But at the end of the day I think we were just

22  simply trying to strike the balance between making the ballot

23  less complicated, not forcing individual lawyers to feel like

24  they needed to provide individual advice to clients on

25  eligibility and whether or not to settle and sort of delink

1   it from that process and, again, also delink it from the

2   accusations that we're trying to do some sort of vote buying

3   because that was certainly never the intention.

4          I have looked at the TCC's classification motion.

5   I'm happy to respond to that now, too.  We don't think it's

6   appropriate, and we think it's legally wrong.  But just to be

7   clear, when we made that change to the ballot believing that

8   change was really in the wake of I think what we all heard

9   last week in terms of extreme complications around the voting

10  process itself.  That was the genesis for the change.

11         You know, under bankruptcy rule 3013, one, we

12  don't have an accepted plan yet.  3013 speaks to an accepted

13  plan and whether we need to look at classification in the

14  context of an accepted plan.  God willing we get to an

15  accepted plan, but those aren't the facts before us today,

16  and, secondly, we think classifying the direct abuse claims

17  in the same class is appropriate.

18         1122(a) says substantially similar claims go

19  [interposing] the same class.  As I read the committee's

20  pleading, I think maybe what they're talking about is

21  disparate treatment within the class.  And the cases that

22  have evaluated disparate treatment under 1123(a)(4) have all

23  concluded that so long as you give everyone an equal -- first

24  of all, it specifically speaks to giving a creditor the

25  opportunity to take less.

1           And it, second, speaks to the case law that is

2    speaks to sort of an equal opportunity that the opportunity

3    to take an election is given equally to all class members.

4    So we don't think it's appropriate now.  We don't think it's

5    correct to separately classify them.  We're happy to brief

6    that more fully in connection with the confirmation hearing,

7    but we really don't think that's an issue that pertains to

8    the ballot or not or trying to deconfuse the ballot.  I think

9    they're simply suggesting that there is some difference

10   between, I don't -- big claims and small claims.  And we just

11   don't think that's appropriate under the law to distinguish

12   folks on that basis.

13          So, again, happy to do a hybrid if people think

14   that's more appropriate.  I think that's confusing.  We

15   thought the ballot was over burdening people, but that's the

16   background, and that's how we found ourselves here today on

17   that issue.

18          THE COURT:  Thank you.

19          Mr. Stang?

20          MR. STANG:  Thank you, Your Honor.  Today's my

21   birthday, and so I maybe as a present I can get an extra five

22   minutes.

23          MR. GOODMAN:  Your Honor, I don't mean to

24   interrupt Mr. Stang, but there are others who may want to

25   speak in support of this and I think Mr. Stang is going to

1 | speak in opposition.  I wasn't sure if you wanted me to go

2 | now or wait until later.

3 | THE COURT:  Mr. Stang, what would you prefer?

4 | It's your birthday.

5 | MR. STANG:  Let's hear it all at once, Your Honor.

6 | THE COURT:  Mr. Goodman?

7 | MR. GOODMAN:  Okay.  I was right, to be fair.

8 | Again, Eric Goodman, (inaudible) counsel for the

9 | coalition.  The plan, as filed by the debtors back in April,

10 | provided for a $1,500 expedited distribution.  That was under

11 | the global resolution plan but not the toggle plan.  That's,

12 | you know, April, so many months ago.

13 | That did change under the plan filed in July.  The

14 | amount of the expedited distribution went up from 1,500 to

15 | 3,500.  We also insisted on upping the standard.  The

16 | requirement changed so that the proof of claim must be

17 | complete and signed by the survivor under penalty of perjury.

18 | That was added by the coalition and the TCC.

19 | The TCC back in July supported the expedited

20 | distributed.  Since the RSA terminated, the TCC has made it

21 | clear that this was going to become a significant voting and

22 | plan confirmation issue for them.

23 | In addition, the insurers I think have always

24 | consistently suggested that they would argue that the

25 | expedited distribution was the equivalent of buying votes.

1         I will fight very, very hard on issues that I

2    think are major issues, issues that I care about, issues that

3    are important to survivors and the survivors receiving a fair

4    recovery in this case.

5         I don't agree with the insurers.  I don't agree

6    with the TCC, but I also know a distraction when I see one.

7    I think that the trustee should be able to pay nuisance

8    values, especially when the payment is less than the cost of

9    reviewing the claim.

10        I also think that it might be a bit unfair at this

11   point for people to make the election of 3,500.

12        You heard from Mr. Rothweiler that the amount of

13   funding in the trust could go up significantly in the coming

14   months.  So it may be, you know, unfair to even ask people to

15   make that election right now.

16        Given those factors, we support the debtor's

17   change in this regard.  I do think it gets rid of an issue of

18   potential distraction.  Given the current state of affairs, I

19   do think it makes sense for this to be something that is done

20   later and not at the voting stage.  Thank you, Your Honor.

21        THE COURT:  Thank you.

22        Mr. Patterson?

23        MR. PATTERSON:  I was going to defer to Mr. Stang,

24   Your Honor.  I'm on Mr. Stang's side.

25        THE COURT:  All right.  Okay.

1          Mr. Stang?

2          MR. STANG:  Thank you, Your Honor.  Your Honor,

3    this is not an example of no deed -- no good deed goes

4    unpunished.  This is an example of no self- serving deed goes

5    un noticed because that's really what's happening here.

6          This is not a gesture by the debtor to relieve

7    over-burdened state court counsel from actually getting the

8    informed consent of their clients.  Not a single person at

9    the hearings last week said that they couldn't effectively

10   communicate with their client regarding this election.

11         In fact, the debtor's schedule, the abbreviated

12   schedule you just heard about was on file.  No one said they

13   couldn't accomplish this.  For all of my differences with

14   Mr. Rothweiler, he said just within the last two hours that

15   they are in constant contact with their clients, fielding

16   thousands of phone calls a month, regularly communicating

17   with them in some fashion.

18         So this idea that the debtor is doing the

19   plaintiffs' bar a favor, it's a favor no one asked for.  And

20   so I really think that we need to look at this from two

21   perspectives.

22         One is should it be a separate class.  That's the

23   subject of our motion, and should it be on the ballot because

24   those could be two different things.

25         Now, you said last week that it was important to

1  understand the voting, to see where this -- on this issue

2  where the support was coming from.  That's how I interpreted

3  your comments, and we cited to the transcript in our motion.

4          The elimination of the $3,500 election from the

5  ballot makes it impossible to track who's voting for this

6  plan as -- if you think of them as people who elect for the

7  3,500 and people that will go into the TDP either to litigate

8  their claims if that's permitted under the TDP or through the

9  TDP process.

10         If you don't make people indicate their election

11  on the ballot, we will never know the level of support that's

12  being given to the class by those folks because one thing --

13  everyone talks about we've got to put this stuff in context.

14  Here's the context.  No court since these abuse cases started

15  being filed in 2002, I think, has ever crammed down on a

16  survivor class.  No one.  But what is going on here is that

17  the plan proponents want that class to be as big as possible

18  and to get them all to vote yes.

19         If this is a separate class, those yes votes, the

20  people electing for the 3,500 don't count towards the vote

21  tallies on the impaired class.  They don' want that.  This is

22  in effect kind of stuffing the ballot box.  I thought it was

23  gerrymandering, but it's really stuffing the ballot box.

24  They want as many yes votes in there as possible, and that's

25  a creditor who is going to get 2,500.  They want that person

1   to vote yes.  And you'll come out with the 80+ percent

2   approval rating of this by that class.

3            But if those people who are getting at least below

4   $3,500 under the TDP and when you look at the chart that we

5   have proposed and the debtor has accepted for inclusion in

6   the disclosure statement, there are a lot of people $3,500

7   and under and there are a lot of people in that -- in a

8   higher number, maybe 5,000, 7,000 who will take the 3,500 and

9   not take the risks and the delay associated with being in the

10  TDP.

11           So that's what's really going on here.  They want

12  to maximize the people in the class, get them to vote yes,

13  and then those people may elect the 3,500 but they have in

14  effect they've impacted the voting, and, frankly, I think

15  they have distorted the voting.

16           When I spoke to this issue last week, and I think

17  I -- Mr. Smola will speak for himself.  We didn't say that it

18  was too complicated or that the professionals couldn't do it.

19  We talked about integrity, the integrity of the voting

20  system, making sure that counsel who was signing the master

21  ballot were acting in the first capacity as Mr. Goodman

22  described it as kind of collectors of the ballots.  And that

23  there were no shenanigans going on with people not accurately

24  recording their client's vote.  Or in the second capacity,

25  actually making the decision themselves, which would be

1  backed up by power of attorney, which issue I think we've
2  resolved as we'll get through the solicitation motion.  But
3  no one opposed the idea that they couldn't communicate with
4  their clients effectively to get an informed consent on what
5  to do.

6          I don't think the hybrid that Ms. Lauria was
7  suggesting really makes sense because it doesn't give you
8  that measure of who is supporting the plan in that class.
9  Whose money is really at risk?  Who's rolling the dice and
10  who is not?  Because the $3,500 if you take that election,
11  you're not rolling the dice.  And while it is true that the
12  trustee does have to check to make sure that the signature is
13  on the claim form and that it is substantially completed,
14  that's not really a -- in my opinion a substantive review
15  process.  That's checking a signature block and seeing how
16  many answers were given.  It's not even looking at the
17  answers.

18          I don't think is an issue of vote buying because
19  if you put those people in a separate class, and every plan
20  that I've had any experience with has always had the
21  convenience class, the nuisance class, as someone described
22  it as a separate class.  Well, if they're in a separate
23  class, they're not -- the vote buying is not an issue because
24  they're not tilting the impaired class to acceptance.

25          So I think that if you have separate

1  classification this concern about vote buying goes away.

2          3013 does not deal with a, quote, "accepted plan."

3  It's not what the language says.  It says for the purposes of

4  the plan and its acceptance, the court may on motion direct

5  determine classes or creditors.

6          It doesn't say after the plan has been accepted or

7  after voting is completed.  This is the time to do it.  This

8  is the time to make the plan accurately reflect what is going

9  on in the case.

10          And everyone will have the opportunity to take the

11  election.  There will be no discrimination amongst abuse

12  survivors, but if you take the election, you're in an

13  unimpaired class and you're deemed to have voted yes.  Well,

14  you're unimpaired.  I guess you're -- you're not voting at

15  all, I'm sorry.  You're not voting at all.  I get an -- I

16  get -- I get an erasure on that one because it's my birthday.

17          I made a mistake, and so to me this is about

18  integrity of the voting system, being able to keep track of

19  who is voting how and how that is really going to affect your

20  view of where the support is coming from in the plan, and if

21  you do it any other way, we will never know if, in fact, the

22  survivors whose claims are really at risk are supporting

23  this.

24          People have called this the tail wagging the dog.

25  I don't -- you may have -- I think you may have used that

1 expression, Judge.  We don't know that.

2        There could be 10,000, 15,000, we estimate using

3 our chart the TDP values that we're talking about that

4 possibly as many as 25,000 people might be making that

5 election because under the distribution scheme and given the

6 current plan settlements, that's about how many people it

7 might make sense to take that election.  It cries to the

8 inadequacy of the settlements, please.  We won't get started

9 on that, but this is not the tail wagging the dog.  This may

10 be the dog.

11        So, Your Honor, we think it makes sense.  It

12 reflects the concerns you expressed last week.  We think

13 keeping it on the ballot absolutely is necessary so we can

14 track where the support of the survivors really is and whose

15 money is at risk here, if you will, and we think it should be

16 in a separate class to avoid the issue of vote buying, and we

17 think it makes it cleaner.  So that's all, Your Honor.

18        THE COURT:  Thank you.

19        Mr. Patterson?

20        MR. PATTERSON:  Thank you, Your Honor.  I lack the

21 history that so many people here have, and so I look at it

22 very, very simply.  This is a plan that provides for

23 alternative treatments.  The two alternative treatments give

24 the claimant a fundamentally different interest or stake in

25 the outcome of the plan.

1          One, reduces the claim if pertinent or actually

2   potentially increase their distribution to $3,500.  Accepts

3   that, executes the required releases and moves on with life.

4          The second is going to be tied up with the TDP

5   process, payment percentages, hold backs, whatever set aside

6   there is for the futures and all the rest of that

7   architecture for many, many years and except getting more

8   money overtime, hopefully, maybe not, but agreeing to take

9   that risk in exchange for potentially a greater distribution.

10          *Ex ante*, leaving everything else aside, leaving

11  this case aside, ex ante, those are two different classes,

12  and that is why the first time I think I drafted a plan and I

13  had a little nifty -- I thought I could collapse it and I put

14  in my little trade class, this is what you get, but if you

15  agree to reduce your claim, then you get this little amount

16  of money, and I thought I had made an efficient move.  And we

17  went to a disclosure statement hearing, it was a small case,

18  and the partners let me kind of run with it so I could get my

19  nose bloodied and learn how to practice law.  And I did.  The

20  judge said those are two classes, Mr. Patterson.  Those

21  people have different rights.  Those are different classes.

22  Read 1122 before you come back.  And so that's -- that is the

23  correct analysis.

24          Now, this Court need not resolve the 3013 motion

25  in the sense of deciding they're separate classes today, but

1  this goes back to what the history that I am familiar with,

2  which was last week.  And I raised this issue because I

3  wanted to make sure, we were talking about a number of issues

4  related to how we're going to count the votes, how we're

5  going to measure the votes for master mortgage, and I said

6  and by the way, Your Honor, I just want you to know we may

7  bring a 3013 motion because we think these people are

8  fundamentally in a different class.

9          And, Your Honor, said -- you know, I think I'm not

10  surprised given the papers that that is something someone is

11  going to do, and we'll have all the information.  And I was

12  completely satisfied with that because having the information

13  is the important part here.  At the end of the day, the Court

14  can decide the 3013 motion later, but the balloting issue is

15  really the key issue.

16          And I don't think you need a starker case than to

17  look at combustion engineering, and when that case went up to

18  the Third Circuit and the fact that the vast majority of the

19  votes have been delivered by people whose rights were

20  fundamentally different.

21          They, in that case they were receiving some money

22  from one trust and had a spillover claiming to the other

23  trust in a small amount.

24          And the Third Circuit -- in that case it was an

25  artificial impairment case, but the principle is really the

1  same.  And the debtor is given a certain amount of discretion

2  with regard to classification and treatment, but when the

3  purpose or when the underlying effect of that is to conceal

4  what the real support is for the plan by people who have a

5  real and meaningful economic state in it, or to separate out

6  people who have a different economic stake in it, then that

7  is improper classification or improper treatment.

8         Your Honor, I think this issue of eligibility and

9  the other little things, that's a complete red herring.  The

10 election can be I elect to take this treatment, but I

11 understand that I have to comply with the requirements of the

12 trust in order to receive it.

13        That -- this is not something that ought to get in

14 the way.  We heard loud and clear from the coalition lawyers

15 that they were able to do all the solicitation necessary, and

16 the idea that there has been a revisiting of this principle

17 with regard to the 3,500, frankly, it doesn't really -- it

18 doesn't really hold water.

19        Finally, Your Honor, with respect to the point

20 that the integrity of the balloting could be put at issue,

21 first, no one has said that.  That's speculation.  I think

22 it's a red herring, but even leaving that aside, this is an

23 election that's going to have to be made at some point.  And

24 a 60-day balloting period that we have for this purpose given

25 the focus that people are going to have on this process,

1  given the materials that they are going to be receiving,

2  given the communications that all of the lawyers are going to

3  be making with their clients, there is no better time to

4  ascertain what the claimant's preference is in this regard

5  than now.

6          This is the time when they are focused on the

7  issue.  To suggest that they would get a standalone piece of

8  paper at some point in the future that advises them about it,

9  that wouldn't be meaningful.  This is the time that they are

10  focused on it.  This is the time that people are in

11  communication with them.

12          Your Honor, I was a little disappointed to see the

13  switch about.  I understand that the debtor wants to have a

14  valid vote and a meaningful vote to record the votes on the

15  plan and really gauge the support, and I think if they really

16  want to do that, they would want to know are people who are

17  accepting this plan truly the people who are impacted by the

18  insurance settlements, who are impacted by the third- party

19  releases, who are impacted by the loss of their rights in the

20  tort system?  And that's what this gauges, Your Honor.

21          I'm happy to answer any questions the Court has.

22          THE COURT:  Thank you.  I don't have any

23  questions.

24          Mr. Smola?

25          MR. SMOLA:  Thank you, Your Honor.  Can you hear

1  me okay?

2          THE COURT:  I can.

3          MR. SMOLA:  I'll just be very brief.  With respect

4  to Ms. Lauria's point about the $3,500, frankly, that is the

5  least of a plaintiff's lawyer's concern for the informed

6  consent they need to obtain for their clients.  A yes vote in

7  this case, as I have sort of said three or four times now,

8  potentially compromises a case against a third party, a local

9  counsel, and potentially compromises a case against another

10  third-party non-debtor, a chartering organization, and every

11  lawyer that votes yes in this case is going to have to get

12  affirmative consent from their clients in order to execute

13  that vote and is going to have to inform their clients that

14  they are potentially compromising those other cases.

15          Certainly, the $3,500 was an additional

16  consideration, but it's really those first two considerations

17  that drive the communication we as plaintiff's lawyers have

18  to get from our clients in order to compromise their claims

19  by way of a yes vote.

20          Thank you, Judge.

21          THE COURT:  Thank you.

22          Ms. Lauria?

23          MS. LAURIA:  Thank you, Your Honor, and I will

24  also be brief.  I want to just put some meat to the bones of

25  something that Mr. Goodman said, which is from the

1 plaintiff's perspective, as the settlement amounts increase

2 in this case, so do their recovery percentages under the TDP

3 matrix.

4           And I'm going to point the Court to the blackline

5 disclosure statement that we filed in the overnight hours.

6 It's docket 6385-2, and I'm going to ask the Court to turn

7 to -- it's page 40 of 507 of the PDF or page 33 of the

8 disclosure statement itself.

9           And while you're getting there, Your Honor, I just

10 want to set the stage for what this is.  Mr. Stang has

11 referenced multiple times that they prepared a recovery

12 chart.  It provides for pittance of recoveries, and that the

13 debtors endorsed it, apparently, by putting it in the

14 disclosure statement, and, therefore, that proves that a huge

15 number of folks may take the $3,500 under our plan.

16           That's simply not the case.  What Mr. Stang failed

17 to mention was that the debtors provided their own recovery

18 chart where we took the TDP values.  We applied the scaling

19 factors as they pertain to the -- and, again, Your Honor,

20 it's page 33 of the black line, page 40 of 507 of docket

21 number 6385-2.  We applied the scaling factors for the

22 statute of limitations, and then we applied various recovery

23 percentages at both the base claim amount under the TDP, as

24 well as the max claim amount.  The base claim amount of 10

25 percent we calculated based on the Bates White estimation of

1  a 7.1 billion trust applying the Hartford distribution, the

2  distribution from the local councils, as well as the $100

3  million Delaware Statutory Trust note, as well as the debtors

4  own contribution.  The 63 percent recovery is assuming the

5  valuation is at Bates White's low end, which is $2.4 billion,

6  but, again, utilizing the same assumptions and then it is our

7  contention, of course, that claimants may receive up to a 100

8  percent recovery as additional insurance settlements come in

9  the door based on the Bates White estimation.

10        And if you just glance through this chart, you

11  will see whether you're talking about in-statute claims for

12  non-touching that appears on page 35, or out-of-statute

13  claims versus various states in the scaling factors, the

14  difference between a 10 percent recovery or a 63 percent

15  recovery could formulate the difference between electing a

16  $3,500 expedited distribution or not.  You see that

17  repeatedly including even in the more severe abuse claim

18  category types.

19        So we do think that more information, and, again,

20  this is just to add to Mr. Goodman's point, there is a

21  dramatic difference between recovery percentages depending

22  upon the dollars that are in the trust and also depending

23  upon the ultimate value of the -- the liabilities that the

24  trust is confronting.

25        Beyond that, Your Honor, I will say that as we

1  said, I guess it was last week, we think many of the voting

2  issues can be dealt with on the back end.  Maybe we

3  misinterpreted the statements of counsel last week at the

4  hearing, but at the end of the day we felt like this truly

5  was turning into the tail that was wagging the dog and that

6  it was appropriate to remove it from the ballot.

7          Thank you, Your Honor.  Unless you have any

8  questions for me, that concludes our views of this topic.

9          MR. STANG:  Your Honor, may I make one comment

10  about this issue of the moving target of the settlements?

11          THE COURT:  Yes.

12          MR. STANG:  I think this works, I think this might

13  work.  The notion that I heard was essentially let people opt

14  into it later at some undefined period of time after the

15  effective date.  And that, of course, is the problem that I

16  tried to identify.  I thought Mr. Patterson made it as well,

17  that we just don't know if the people voting yes really have

18  skin in the game.

19          But you could have an approach that says you have

20  to make the election, and you can opt out later.

21          If it turns out that on the effective date of the

22  plan they've doubled, just to use Mr. Rothweiler's hopeful

23  example or even, you know more than doubled the settlements,

24  people might go, you know what, maybe I shouldn't have taken

25  that election.  But we don't know.  There could be no more

1  settlements.  I have no idea who Mr. Schiavoni is talking

2  about talking to in settlements.  I thought he was talking to

3  us, but apparently not because he met with the coalition

4  yesterday, but we don't know.  The settlement numbers might

5  not change at all, so the idea that someone makes the

6  election, we know they are electing, and they can, in effect,

7  opt out of that election so that they are not damaged by an

8  increasing pot of money.  Maybe that is a resolution to this,

9  but we really feel the need to keep track of who's making

10  this election so we can see if it's skewing the voting, and

11  the idea that we could take up the classification issue at

12  the confirmation hearing is interesting.  Maybe that's a way

13  of doing it, but we really need to identify these folks so we

14  can see whether people with significant interest in the

15  issues that Mr. Patterson identified are voting yes or not.

16          THE COURT:  Mr. Goodman?

17          MR. GOODMAN:  Thank you, Your Honor.  Eric

18  Goodman, counsel for the coalition.  I'd just like to speak

19  on one issue.  1122(a) provides that a plan may place a claim

20  or interest in a particular class only if such claim or

21  interest is substantially similar to the other claims or

22  interest.  I think we satisfy that here plainly because all

23  of the claims in Class 8 are survivor claims.  On the

24  treatment issue, that's actually an 1123(a)(4), not 1122, and

25  1123(a)(4) provides that the plan shall provide the same

1   treatment for each claim or interest of a particular class

2   unless the holder of a particular claim or interest agrees to

3   a less favorable treatment of such particular claim or

4   interest.

5          The plan does provide for the same treatment.  It

6   provides the same options, you know, what people decide to do

7   later on if -- if they decide to accept less favorable

8   treatment for reasons that are personal to them, I don't

9   think that impacts the analysis under 1122 or 1123 at all.

10  That's my only point, Your Honor.

11         THE COURT:  So I haven't read the motion yet.

12  That's my -- I have to confess when I heard it was under

13  3013, I said what rule is that, but the but I see it's there,

14  and my gut reaction is it's not a classification issue

15  because all of the holders in the class have the same legal

16  rights *vis-à-vis* the debtors, and because they all have the

17  same options.  They all have the same opportunities with

18  respect to their recoveries, depending, of course, on what

19  abuse they suffered.

20         But -- so I don't know if it's a classification

21  issue, but my gut reaction is it's not.  But the reason I

22  thought this information would be helpful had more to do with

23  the channeling injunction request and the third-party release

24  request that I'm going to be -- that I'm being asked to make.

25  And not necessarily a cram down issue, although I guess I

1  hear that, too.  But or the channeling injunction and the

2  third-party releases appropriate under the relevant

3  standards?

4         And in that regard, I thought it would be helpful

5  to know who was voting and what their choice is.  Of course,

6  I could have been in a situation where there was no choice.

7  You just -- there's no convenience class.  You just are

8  funneled into the trust, and if you end up with, you know,

9  $19 for a non- touching claim on a 10 percent recovery, then

10  you get $19.  You don't have the option to get $3,500.  But

11  I'll confess I hadn't -- I did note these charts.  I hadn't

12  thought about this issue in connection with the charts.

13         I do think counsel is going to have to have

14  communication with their clients with respect to voting on

15  this plan, and it's a complicated plan and it does - - even

16  whether one accepts it or rejects it is a complicated

17  decision, much less whether one accepts the particular offer

18  of $3,500.

19         I don't know if it's a classification issue, but I

20  think it's important to understand the vote.  I don't know

21  about an opt out.  I don't know if that's something the

22  debtors or anyone else would accept.  So I think it needs to

23  stay on the ballot.

24         MR. PATTERSON:  Thank you, Your Honor.

25         THE COURT:  Thank you.