1

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                      .    Chapter 11
IN RE:                                .
                                      .    Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND             .
DELAWARE BSA, LLC,                    .
                                      .    Courtroom No. 2
                                      .    824 North Market Street
                                      .    Wilmington, Delaware 19801
                                      .
                   Debtors.           .    September 29, 2021
. . . . . . . . . . . . . . . . .          12:30 P.M.

       TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                  UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899

                         - and -

                         Jessica C. Lauria, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020


Audio Operator:          Dana L. Moore, ECRO

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

1     THE COURT: Okay. Ms. Grassgreen, I see you have
2 your hand up.
3     MS. GRASSGREEN: Thank you, Your Honor, two points.
4 One, we discussed yesterday the 3500 election and that we did
5 get the documents last night and some further this morning
6 reflecting that in both the plan and the TDP. We do have one
7 proposed change to the TDP. It's a section of the TDP with
8 respect to amendments, to just make it clear that the TDP
9 cannot be amended to allow that later election without your
10 approval since you've ordered that the election be made on the
11 ballot. So we will send that language over, so that is one
12 comment.
13     And then I apologize, because it was Mr. Lucas who
14 was handling this and he had to go to the airport, but I think
15 Mr. Stang had one more comment on the document we were just
16 talking about that also relates to the 3500 election and I was
17 just trying to get to that page, but perhaps Mr. Stang can
18 just provide that.
19     MR. STANG: Yes, Your Honor, on Exhibit -- I'm
20 sorry, Document 6420-1, page 31 of 264. The paragraph starts,
21 "Expedited distribution election." That's -- I'm just wait
22 for a moment when you tell me you're there.
23     THE COURT: I'm there --
24     MR. STANG: Okay.
25     THE COURT: -- but let's give others a moment.

1     MR. STANG: Our -- I'll tell you what our concern
2 is -- our concern is that people who are making this election
3 need to make it on the ballot and should not believe that they
4 can do it after the balloting is completed.
5     And so if you go down to the third line of that
6 paragraph, it says, "The bankruptcy court" --
7     MS. GRASSGREEN: I apologize, Mr. Stang, can you
8 repeat what page number you're on of --
9     MR. STANG: Sure.
10    MR. GRASSGREEN: -- Docket 6420-1?
11    MR. STANG: Sure. I'm on Docket 6420-1 and at the
12 top of the document it says page X of 264, this is page 31 of
13 264.
14    MS. GRASSGREEN: Thank you.
15    MR. STANG: Okay. So, Your Honor, the focus is on
16 the word "may elect." This suggests that the election to take
17 the $3500 can be done otherwise. We would ask that the word
18 "may" be replaced as "shall."
19    THE COURT: Which line down?
20    MR. STANG: The third line down, Your Honor. And
21 if we eliminated all the verbiage it would say, "Each holder
22 of a properly completed, non-duplicative proof of claim shall
23 elect on his or her ballot to receive an expedited
24 distribution," not "may elect." Obviously, they're not
25 required to take the $3500, but --

```
 1                THE COURT:  That's what it sounds like.
 2                MR. STANG:  Right.
 3                THE COURT:  That's what it makes it sound like.
 4                MR. STANG:  Well --
 5                THE COURT:  So that doesn't work.
 6                MS. GRASSGREEN:  I think we can go with "may only
 7    elect," may only elect.  Does that work?
 8                MR. STANG:  Or "may elect only on his or her
 9    ballot."
10                MS. GRASSGREEN:  Yeah, that's the concept.
11                MR. STANG:  That's the same -- that perhaps sounds
12    better.
13                THE COURT:  Okay, I don't know if that change is
14    necessary, but if there's some agreed-upon language, you can
15    put it in.
16                MR. STANG:  I guess I'm asking the debtor if
17    they'll -- well, I don't know if you want to do it now, Judge.
18    We're all here, but whatever you'd like.
19                MR. O'NEILL:  We're happy to work on any language
20    to further clarify, Your Honor.  We think it's perfectly clear
21    as is, but we'll talk to the TCC about it.
22                MR. STANG:  Your Honor, counsel can --
23                THE COURT:  What I think -- what I think would be
24    helpful is on the ballot itself, particularly the ballot for
25    Class A direct abuse claims -- and I don't know if it flows
```

1  over into any other ballot or not, but I think it would be
2  helpful to identify this ballot is being used for multiple
3  things.  So it's a ballot to accept or reject the plan, it's
4  an election -- it's, you know, you can -- well, it's releases,
5  right?  Opt in, opt out, opt out of the releases, and it's -
6  - if you want to elect the $3500 expedited distribution.
7            So I think right on the front, maybe even before
8  your box, that you say 1, 2, 3, here's the three things you've
9  got to do on this ballot, so people know that there's three
10 things you can do on this ballot -- I think there's only
11 three.  If there's a fourth, put the fourth, but I think it
12 should be real boom, boom, boom, here's what this piece of
13 paper does, it's more than a ballot.
14           MR. O'NEILL:  We can certainly do that, Your Honor.
15 And, just for clarity's sake, would you like that on the
16 master ballot as well or given that the firms are more likely
17 to --
18           THE COURT:  You can put it on the master ballot, it
19 won't hurt.  I don't know if it needs to go on any other
20 ballot, but this is something that I commonly do with my
21 ballots is I make sure people know, it's usually an opt-out
22 release or whatever, given a release that here, here's
23 something, so that they don't forget to read the ten pages and
24 do what it says at the end.
25           MR. O'NEILL:  Understood.  Thank you, Your Honor.

1    THE COURT: Okay.
2    (Pause)
3    THE COURT: Let me see if I had any other comment
4 from before.
5    (Pause)
6    THE COURT: Okay. Does anyone else have any
7 comments on the ballots?
8    (No verbal response)
9    THE COURT: Okay. What's next?
10   MR. O'NEILL: I believe that's all, Your Honor. As
11 I represented earlier, you know, we'll endeavor to get all
12 these documents on the docket tonight in final form for
13 solicitation.
14   THE COURT: Okay. Well, thank you, then. I
15 appreciate all the juggling people have done to be able to get
16 on the Zoomcast for these hearings. I appreciate your work on
17 this and again recognize that, not unlike many cases, these
18 documents turn quickly and at the last minute, but I do think
19 I have very sophisticated counsel on this Zoomcast who are
20 used to dealing with these situations and can assimilate an
21 incredible amount of information in a small period of time.
22   Mr. Higgins, I see your hand is up.
23   MR. HIGGINS: Yes. Good afternoon, Your Honor,
24 Sean Higgins from Anderson Thornton, state court counsel. My
25 partner, Anne Andrews, is a member of a Coalition.

1               I have a question, slash, concern.  Did I hear that
2   an election can only be made for the easy payment -- or
3   advance payment, rather, on the ballot?  Because, if that's
4   what I heard, my concern is about people who abstain from
5   voting, for example, and whether that's really rewriting the
6   TDP, because the TDP does not require a vote one way or
7   another on the plan in order to collect the easy payment.  So
8   what you're doing is forcing people to vote in a way that
9   directly contradicts their rights under the TDP.
10              So it's one thing, if they do vote, they make the
11  election, but if they don't vote -- all kinds of reasons
12  people don't vote, can't be located, people move -- there are
13  all kinds of legitimate reasons people won't vote or can't
14  vote and they shouldn't be prejudiced by their failure to
15  vote.
16              MR. STANG:  Your Honor, as far as Mr. Higgins'
17  concern is, you're not required to vote to make the election.
18  You don't have to vote yes or no, you could just make the
19  election and that election would count if the plan is
20  confirmed.
21              MR. HIGGINS:  But the TDP requires that election to
22  be made in a claim form as part of a claims process.  It is an
23  entirely separate process from the voting.  As I said, people
24  may not appear, may not know they need to appear to make an
25  election in the next 60 days.

1    THE COURT: That's why we're going to change the
2 caption of the ballot to make certain that people know up
3 front this is your chance to do it. And I agree that they
4 don't have to vote yes or no, I guess they can just return the
5 ballot. It's being used in multiple ways.
6    If that's inconsistent with the TDPs -- which no
7 one has mentioned before, so thank you for raising that, Mr.
8 Higgins -- then that needs to be corrected.
9    Mr. Brady?
10    MR. BRADY: Yes, Your Honor. Just to clarify for
11 the FCR, we had negotiated that future claimants when they
12 came to the trust could make a trust submission to elect the
13 expedited distribution. So, obviously, they don't vote, but I
14 just wanted to confirm that that would remain the same for
15 future claimants.
16    MR. STANG: Your Honor, it would not -- the TCC's
17 position is that, when a future claimant comes forward, they
18 should be able to make the $3500 election at that time.
19    THE COURT: That makes sense because they are not a
20 current claimant and they do not have the possibility of
21 making that election.
22    MR. STANG: Right.
23    THE COURT: So that makes sense.
24    MR. HIGGINS: What if -- Your Honor, what if a
25 voter doesn't feel comfortable making an election until they

1  know what the final version of the plan is?  Because,
2  obviously, one of the biggest and hardest things for a lawyer
3  to give informed consent to his client on whether to take the
4  3500 is what the final deal is.  So the numbers in the TDP are
5  nice, but are they real, as we sit here today, and how real
6  are they?  So how could we give informed consent -- and this
7  is particularly true for the lower classifications of the
8  grid, if you will, the ones that will come closer to the 3500,
9  how can we tell the client whether they are likely to fair
10 better than that under the TDP when we're in the middle of
11 mediations and there's all these outstanding issues?
12            I don't think this is the appropriate time to
13 require the election and every other mass tort that I've seen
14 this, it's all part of the claims process, because it's only
15 after confirmation that an attorney can really get the
16 informed consent on that $3500 election and that's after
17 confirmation.  So I worry that we're asking people to make
18 decisions in the dark on the 3500 and it's sort of a fiction.
19            MR. STANG:  Well, Your Honor, this is --
20            MS. LAURIA:  Your Honor, if I may?  I know Mr.
21 Stang has been heard a few times on this.
22            MR. STANG:  Well --
23            MS. LAURIA:  This is exactly the concern that I
24 raised yesterday that at the time of the -- that counsel is
25 providing advice to their clients, they would not have full

1  and complete information to make the election.  I guess I
2  would again go back to the hybrid approach that I mentioned
3  yesterday, whether that's a preliminary election followed by a
4  final election or, you know, your first shot at what direction
5  you're going depending on where the plan is at then.
6              MR. STANG:  Your Honor, we are revisiting what I
7  thought was decided yesterday and you know what our concerns
8  are and why we feel the need and you expressed the need to
9  know who is voting the -- who -- of the people, how many were
10 taking the $3500 election.  I suggested to do exactly what Mr.
11 Higgins is raising now, which he didn't raise -- which he
12 didn't raise yesterday, is an opt-out.  You say you want the
13 3500 and at some time, if the landscape changes, you can opt
14 out of that, but going into the vote when we know what the
15 settlements are, we should know to what extent people electing
16 the $3500 are voting for a plan that, in effect, they don't
17 have the same level of skin in, if you will.
18             This is really important and we can't not know
19 this.
20             MS. LAURIA:  Your Honor, I would only respond,
21 again, it surprises me that we have a difference of opinion
22 with the TCC.  I don't know why they would not want survivors
23 to have an additional opportunity to get a recovery in this
24 case and not be bound by a ballot that incidentally, as we saw
25 in the disclosure statement, is going to be due December 14th,

1  rather than -- you know, I understand that that can provide us
2  some visibility, but they should also have the opportunity to
3  revisit this election in connection with the TDP.  It should
4  not be a use-it-or-lose-it balloting situation.
5        MR. STANG:  Well, perhaps Ms. Lauria doesn't
6  understand what I mean by opt out, we're not in conflict.  If
7  the circumstances change and the settlement amount -- the
8  global settlement reaches $15 billion, yeah, people are going
9  to have a different thought about the 3500, but when they
10 vote, they will know what the settlement amount is and their
11 counsel can advise them as to the pluses or minuses of making
12 the election.  I didn't say people were locked in forever, I
13 didn't say that.  I said -- I got very short shrift yesterday
14 when I suggested this.  So I was trying to give people
15 flexibility --
16       MR. HIGGINS:  But you're --
17       MR. STANG:  -- (indiscernible) --
18       MS. LAURIA:  Well, you're locking them into the
19 initial election --
20       MR. STANG:  No --
21       MS. LAURIA:  -- without full information.
22       MR. HIGGINS:  You're saying --
23       MR. STANG:  -- no --
24       MR. HIGGINS:  -- (indiscernible) --
25       MR. STANG:  -- that's not what's happening at all.

1 | They're not locked in.
2 |     THE COURT: Okay, hold on. I think I said
3 | yesterday that, if you all could work this out, maybe it would
4 | work, but we did have this discussion yesterday.
5 |     So let me ask this question: is there anyone who
6 | objects to an opt-out?
7 |     MR. HIGGINS: Your Honor, if I may? I think the
8 | problem for me with this approach, the opt-out itself isn't a
9 | problem, it's the reverse. It's telling survivors who don't
10 | vote that they can't opt-in and that's --
11 |     THE COURT: No, they can opt in. They don't have
12 | to vote to accept or reject, they can just send in their
13 | ballot with the opt-in on the $3500. If they don't want to
14 | accept or reject the plan, they can -- just like you can -- I
15 | don't know what this one says -- opt out of a release even if
16 | you don't vote.
17 |     MR. HIGGINS: But it's also a timing issue. The
18 | voting period is a very discrete 60-day period and the claims
19 | process, which is when this is done in every other mass tort
20 | I've seen -- I've never seen that election be forced upon
21 | people in the voting ballot, whether they vote or not -- is
22 | there are all kinds of legitimate reasons people will not
23 | appear to get -- you know, to make an election on the ballot.
24 | When you set a deadline for a claims process, that is the part
25 | of the process that the claimants are working with their

1  lawyers and they know the elections are going to need to be
2  made.  I just don't see why --
3              THE COURT:  This is different.
4              MR. HIGGINS:  What's that?
5              THE COURT:  This is different.
6              MR. HIGGINS:  How is it different?
7              THE COURT:  Because the plan is different --
8              MR. HIGGINS:  I think --
9              THE COURT:  -- because we're making it different.
10             MR. HIGGINS:  I think certain interests are making
11 it different because they really want to disenfranchise people
12 and survivors and what happened to them if they make the
13 election when making the election has nothing to do with the
14 extent of their abuse.  I just don't think now is an
15 appropriate time to make the election.
16             THE COURT:  I understand that, but there are many
17 concerns that have been raised here and we've already been
18 through this.  If people want an opt-out, I don't know -- I
19 haven't heard a lot of discussion about that.  I think I said
20 go talk about that.  So --
21             MR. PATTERSON:  We have no objection to the opt-
22 out, Your Honor.  And I would just add that this issue of
23 whether or not to make the election because there may be
24 additional settlements and so forth, well, that's the very
25 same issue that applies to voting on the plan.  I mean, you

1  know, people may want to wait and see what happens, vote late,
2  they may change their vote depending on what happens.  There
3  could be a number of circumstances, but the $3500 election is
4  really no different in that regard from voting on the plan.  I
5  think --
6              THE COURT:  I think it's --
7              MR. PATTERSON:  -- the Court had it right --
8              THE COURT:  -- I think it's no different than many
9  cases where in fact settlements happen after confirmation and
10 you don't know, and you vote on the plan and you decide what
11 you do.
12             MR. PATTERSON:  Yep.
13             THE COURT:  Mr. Goodman?
14             MR. GOODMAN:  Yes, Your Honor, Eric Goodman on
15 behalf of Brown Rudnick.  I do -- Eric Goodman, Brown Rudnick,
16 on behalf of the Coalition.  Sorry, it's been a very long,
17 long several days and Your Honor's observations are correct,
18 we have all been working nights and weekends on this case to
19 get to where we are today.
20             I just wanted to offer this observation and I take
21 the Court's prior ruling as it is, but I do think that putting
22 this on the ballot in a way where a survivor has to make this
23 election when they vote is going to result in most survivors
24 not taking the 3500.  And I think the fear is that, if they
25 do, that their votes won't be counted or, if they are counted,

1  they won't be given the same weight.  And I think survivors
2  wants to be heard, they want their voices to be heard, and any
3  thought that that in fact would not occur as a result of
4  taking the 3500, I think, will result in people just simply
5  not taking that option.
6          I will note that the trust distribution procedures
7  I don't think need to be changed.  Article 6(b) explicitly
8  states that abuse claimants who have properly elected to
9  receive the expedited distribution in accordance with the plan
10 and confirmation order, you know, would be entitled to receive
11 that payment.  So the trust distribution procedures already
12 defer to the plan on this issue.  So, if the plan or these
13 procedures are changed, I think that would flow through.
14         But, given that, the concern that I raise now and I
15 continue to have is that, by taking this away, it does limit
16 the flexibility that the trustee will have.  Thirty five
17 hundred dollars is likely more -- I'm sorry, 3500 is
18 significantly less than I think the cost of reviewing a claim
19 would end up being and by taking this path away for a lot of
20 folks who decide, you know, at the voting stage that they want
21 their vote to count and they don't want anyone to come in and
22 suggest that their vote doesn't count the same as other
23 survivors, it may mean that just we end up in a world where
24 very, very few people have taken this option.  And because it
25 had to be done at the voting stage, it means that the

```
 1  trustee's hands are tied and he can't make this option
 2  available for claimants.
 3             So I don't think that that's a good outcome, but I
 4  accept that that's where we are.  I wanted to note that I
 5  thought the TDP is already intact on this issue.
 6             Thank you, Your Honor.
 7             MR. STANG:  Your Honor, do you need any further
 8  argument on this?
 9             THE COURT:  I don't think so.  Let me suggest this.
10  I don't know where people come up with the idea that someone
11  who takes a $3500 election's vote will not be counted.  That
12  is a misimpression.  And if people want to go out and sell it
13  that way, that's on them, but that is not what is happening
14  here.
15             But I also think, given the relief that has been
16  requested by the debtors that's supported by certain
17  constituencies and not supported by others, that it's
18  important to know, it's important to know in connection, as
19  I've said, at least with the channeling injunction and the
20  releases, it's important to know how many people want the
21  $3500 election.  That does not mean their votes do not count.
22             MR. GOODMAN:  Your Honor --
23             THE COURT:  So --
24             MR. GOODMAN:  I'm sorry.
25             THE COURT:  -- but if people are going to go out
```

1  and sell it that way, I can't do anything about that.  I think
2  it would be a misimpression that people would be conveying and
3  that would be a shame; that would just be a shame.
4          MR. GOODMAN:  Your Honor, if I may just briefly
5  respond further?  The fear -- and if the TCC wants to correct
6  me on this issue, I would appreciate them doing so, but my
7  understanding is that the intent of certain parties that
8  oppose the confirmation of this plan is to ask the Court to
9  move everyone who elects the 3500 into a separate class, in a
10 sense that -- and, therefore, excluding them when it comes
11 time to do the overall vote as to whether or not the holders
12 of direct abuse claims have voted to accept or reject the plan
13 under 1126.
14          And I think the intent, again, for folks who want
15 to defeat the plan is that, if they can pull out the $3500
16 expedited distribution voters, that the voters left will not
17 meet the threshold.  I obviously don't know if that in fact
18 will occur -- the voting hasn't happened yet, so that may not
19 make a difference -- but I think that that is one of the
20 attacks that people who are opposed to this plan are intent on
21 launching, and I think that's where the concern comes from.
22          THE COURT:  You can have all the concerns you want.
23 Okay?  But people who are advising their clients should advise
24 them on the strength of their claims and the plan, and their
25 recoveries as they see them to date.  And it is not unusual to

1  not know what your recoveries are going to be when you vote on
2  a plan or to have a range that's significantly large enough
3  that you don't know what your recoveries are going to be.
4          So this is not an unusual situation and, if parties
5  start putting information out there, it will snowball and
6  people will vote on misinformation then.  I can't control
7  that.  If people want an opt-in, I haven't heard anyone
8  suggest that's not possible, then that would be the plan.
9  Okay?
10         So -- but we also don't want to get to a situation
11 where we're at confirmation and we need certain information
12 and we don't have it because then the plan may not be
13 confirmed.
14         So I'm not revisiting the election on the ballot.
15 If the parties want to add an opt-in -- and I think there's
16 unanimous -- I'm not hearing anybody object to that -- they're
17 saying it in different ways, but I'm not hearing anybody
18 object to that -- then --
19         MS. GRASSGREEN:  Excuse me, opt out, Your Honor;
20 opt out.
21         MR. PATTERSON:  Opt out, Your Honor, opt out.
22         THE COURT:  Well, I'm sorry, an opt out.  I'm not
23 hearing anyone object to that.
24         MR. PATTERSON:  No objection.
25         THE COURT:  If that's the plan that people want to