## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 10808** |

## OPINION

The matter before me is the most recent attempt of the Coalition of Abused Scouts for Justice ("Coalition") to have its professionals' fees paid by the estate (or others). By its Motion[1] the Coalition seeks payment of $21,007,881.01 in fees and/or expenses ("Fees") billed to the Coalition by six firms: Brown Rudnick LLP (lead bankruptcy counsel), Province, LLC (financial advisor), Parsons Farnell & Grein, LLP (insurance coverage counsel), Monzack Mersky & Browder (bankruptcy co-counsel), Robbins, Russell, Englert, Orseck & Untereiner LLP (litigation counsel), and Akin Gump Strauss Hauer & Feld LLP (special litigation counsel) (collectively, "Coalition Professionals"). The Coalition contends that the matter is governed by § 363 and/or §1129(a)(4), but alternatively seeks payment under §503(b).

---

[1] Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses, ECF No. 10808.

The Coalition supports the Motion with nine declarations: three filed by members of

the law firms that formed the Coalition,[2] two filed by Coalition Professionals,[3] three filed by

the Future Claims Representative ("FCR") and his counsel[4] and one filed by an attorney for

a member of the Ad Hoc Committee of Local Councils.[5]  The Coalition also filed the

Axelrod Declaration,[6] which attached various transcripts of hearings in this and other cases.

Finally, the Coalition filed Verified Fee Statements of each of the Coalition Professionals.[7]

---

[2] Motion Ex. B-1 (Decl. of Adam P. Slater in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3 ("Slater Decl."); Motion Ex. B-2 (Decl. of Anne Andrews in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3 ("Andrews Decl."); Motion Ex. B-3 (Decl. of Kenneth M. Rothweiler in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3 ("Rothweiler Decl.").

[3] Motion Ex. B-4 (Decl. of Michael Atkinson in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3; Motion Ex. B-5 (Decl. of Gabriel J. Le Chevallier in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3.

[4] Motion Ex. B-6 (Decl. of James L. Patton in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3; Motion Ex. B-7 (Decl. of Edwin J. Harron in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3; Motion Ex. B-8 (Decl. of Kami E Quinn in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3.

[5] Omnibus Reply in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses Ex. B (Decl. of William S. Sugden in Connection with Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 11107-2.

[6] Motion Ex. B-9 (Decl. of Tristan Axelrod in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses), ECF No. 10808-3.

[7] Motion Ex. C (Verified Fee Statements), ECF No. 10808-4.

Two objections were filed to the Motion. Both were resolved prior to the hearing by language added to the proposed form of order.[8] The Lujan Claimants sought to ensure that any order entered on this Motion could not negatively impact their appeal of the confirmation order currently before the Third Circuit.[9] The Office of the United States Trustee's ("UST") objection was primarily based on the relevant legal standard but also pointed to: (i) a lack of evidence of a substantial contribution, (ii) the number of key constituencies in the case that contributed to the confirmation of the plan and (iii) the Coalition's self-interest sufficient to defeat recovery under *Lebron*.[10]

The Official Committee of Tort Claimants ("TCC") filed a Response[11] to the Motion. While not objecting to the ultimate relief requested, the TCC took umbrage with the Coalition's recitation/characterization of the TCC's role in the bankruptcy case and provided a counter-narrative to that portrayed by the Coalition. In its Omnibus Reply[12], the Coalition defended the statements made in the Motion and further distinguished itself from the TCC.

---

[8] Certification of Counsel Regarding Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses, ECF No. 11092.

[9] Lujan Claimants' Limited Obj. and Joinder in United States Tr.'s Obj. to Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses, and Reservation of Rights, ECF No. 10941.

[10] United States Tr.'s Omnibus Obj. to Payment of Compensation and Reimbursement of Expenses for Movants Filed Dec. 29, 2022, ECF No. 10944 (citing *Lebron v. Mechem Fin., Inc.*, 27 F.3d 937 (3d Cir. 1994)). The language crafted to resolve the UST's objection provides that the award of fees is under § 503(b)(9) subject to the ability of the Fee Examiner and the UST to review the fees and object on all grounds other than that the substantial contribution standard was satisfied.

[11] Resp. of Off. Comm. of Tort Claimants to Mots. by Coalition and Pfau/Zalkin for Payment of Restructuring Expenses, ECF No. 10861.

[12] Omnibus Reply in Supp. of Mot. of Coalition of Abused Scouts for Justice for Entry of Order Approving Debtors' Proposed Payment of Coalition Restructuring Expenses, ECF No. 11107.

The Boy Scouts of America and Delaware BSA, Inc. ("BSA" or "Debtors") did not file anything.

At a hearing held on April 19, 2023, I heard argument, but no additional witness testimony was offered. I took the matter under advisement. This is my decision.

## Jurisdiction

Jurisdiction exists. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(a), (o).

## I.    The Standard

I recently grappled with the relevant standard to apply to a request to pay fees and expenses of an ad hoc committee. In a bench ruling in the *Kidde-Fenwal* case,[13] I determined that (i) § 363 is the procedural mechanism by which a debtor seeks this relief, (ii) § 503(b) is the procedural mechanism by which a creditor seeks this relief and (iii) sections 363 and 503 are not mutually exclusive (i.e. a request under § 363 is not prohibited because of the existence of § 503) nor are they contradictory (so resort to judicial canons of construction is unnecessary). In doing so, I was persuaded by district court decisions in *Bethlehem Steel*[14] and *Mallinckrodt*.[15]

In my bench ruling, I also noted that the more difficult analysis is how to judge a § 363 request of this nature. My thinking remains the same:

> In my view, the more difficult question is whether to approve the request under section 363. The court may approve a request under section 363 if it is a proper exercise of the debtor's business judgment. As I stated during argument, given that section 363 requires notice and a hearing as well as court approval, I agree

---

[13] I placed my bench ruling on the docket. Bench Ruling, *In re Kidde-Fenwal, Inc.*, No. 23-10638 (Bankr. D. Del. Nov. 7, 2023), ECF No. 601 ("Kidde-Fenwal Bench Ruling").

[14] *In re Bethlehem Steel Corp.*, No. 02-2854, 2003 WL 21738964 (S.D.N.Y. July 28, 2003).

[15] *In re Mallinckrodt PLC*, No. 21-167, 2022 WL 906458 (D. Del. Mar. 28, 2022).

with those judges who carefully weigh all supporting and opposing views and determine in the court's judgment, whether the debtor's decision makes good business sense. Here, as the UST points out, Debtor's decision is not an operational one to which greater deference may be owed. Rather, as [debtor's chief transformation officer] articulates it—the decision is a strategic one about what Debtor believes may pave a more efficient path to an exit.

In considering Debtor's decision, then, I have to evaluate Debtor's judgment in this case. In doing so, it is appropriate to consider the existence of section 503 as an alternative for a creditor to pursue. That this consideration is appropriate is evident from the decisions made in other cases, including the bankruptcy courts' respective decisions in *Purdue* and in *Mallinckrodt* (at least as I glean from a reading of the transcripts[a]). In each of those cases, the court did not accept the fee payment arrangement as originally proposed by the debtor. Rather, the courts recognized the challenging situation of determining, in the circumstances of the case before them, whether the expenditure of a debtor's funds to pay these expenses, which diminishes—or could diminish—funds available to pay creditors, is a best use. Therefore, in both *Purdue* and *Mallinckrodt*, which are most analogous, after hearing concerns raised by objectors, the court added additional conditions on payment. Those additional conditions permitted a backwards looking view at the time of payment to see if the ad hoc committee's actions, as anticipated when the section 363 motion was approved, benefited all of the parties in the case and/or whether the ad hoc committee was constructive, generally. For example, in *Mallinckrodt*, Judge Dorsey imposed two additional requirements. Une: if mediation fails and there are no further prospects for a mediated resolution, all reimbursement of fees and costs would cease. Two: if the mediator advised the court that an ad hoc group was not participating in the mediation in good faith, all reimbursements would cease and any fees and expenses previously paid would be subject to disgorgement following notice and an opportunity for a hearing.[b] Those conditions bring the standard of review on fees requested by ad hoc committee professionals closer to a general administrative claim or substantial contribution standard then to a review of professional fees under section 330. As noted in *Perdue,* additional safeguards put the ad hoc committee at some risk.[c][16]

---

[a] *See In the Matter of Purdue Pharma L.P.*, Case No. 12-23649 (Drain, J.), 11/19/2019 Transcript of Oral Argument, Dkt. No. 550; *see also In re Mallinckrodt PLC*, Case No. 20-50850 (Dorsey, J.), 1/19/2021 Transcript of Court Decision, Dkt. No. 1189.
[b] *Mallinkrodt*, Transcript of Court Decision at 11:21-12:9.
[c] *Purdue Pharma*, Transcript of Oral Argument at 167:7-19.

Here, the Motion is brought by the Coalition, not Debtors; accordingly, the proper

procedural mechanism is § 503.

---

[16] Kidde-Fenwal Bench Ruling 5–7.

The Coalition seeks to avoid this conclusion by arguing that I should consider previous requests by Debtors for permission to pay the Fees. The Coalition first points to the inclusion in a Restructuring Support Agreement ("RSA") of BSA's commitment to fund the Fees.[17] A term sheet attached to the RSA provided for payment of "reasonable, documented and contractual" fees of the Coalition's professionals of up to $950,000 per month from the effective date of the RSA through the effective date of a described plan. It also provided for reimbursement of fees already paid to Coalition Professionals from July 24, 2020 to the effective date of the RSA of up to $10.5 million.[18] For the reasons set forth in my August 19, 2021 bench ruling, I declined to approve the RSA as submitted because of two features—the Coalition Fee request and the findings requested related to the first Hartford settlement.[19] At that time, I held that while debtors can use § 363 as a vehicle to bring a request to pay an ad hoc committee's fees, the standard to apply in reviewing the request is the § 503 substantial contribution standard. I then expressed multiple concerns about making such a finding at that time, including: (i) that the Coalition represented the same constituency as the TCC, (ii) the fee arrangement with members of the Coalition and (iii) whether the Coalition met the standard for making a substantial contribution. Ultimately, the parties abandoned Debtors' request to enter into and perform under the

---

[17] Debtors' Mot. for Entry of Order, Pursuant to Sections 363(b) and 105(a) of Bankruptcy Code, (I) Authorizing Debtors to Enter into and Perform under Restructuring Supp. Agreement, and (II) Granting Related Relief, ECF No. 5466 ("RSA Mot.").

[18] Ex. A at 19 (Boy Scouts of America Reorganization Term Sheet) to Ex. 1 (Restructuring Supp. Agreement) to RSA Mot. Ex. A (Proposed Order), ECF No. 5466-2.

[19] Aug. 19, 2021 Hr'g Tr. 19:2–28:7, ECF No. 6098.

RSA because no order was filed after the hearing. The RSA does not serve as a continuing request by Debtors to pay the Fees pursuant to § 363.

The Coalition next points to a sentence in Article V.T.1 of the Plan,[20] which was drafted in response to my announcement at the disclosure statement hearing that I would not consider the Coalition Fees as part of the confirmation hearing. Neither this provision nor the referenced portion of my comments at the disclosure statement hearing[21] aid the Coalition. A review shows no "mandate" that the Coalition file a motion,[22] only that an appropriate motion be filed.[23] Debtors did not file the Motion. Debtors did not submit an affidavit in support of the Motion. Debtors did not testify at the hearing on the Motion. Debtors' counsel did not speak in support of the Motion. It is difficult to conclude, therefore, that § 363 is the appropriate standard.[24]

---

[20] Motion 35 n.22 (quoting, in part, Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, at Article V.T.1, ECF No. 10296):

> The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Coalition Restructuring Expenses.

[21] *Id.* (citing Sept. 29, 2021 Hr'g Tr. 105:4–107:12, ECF No. 6437).

[22] Omnibus Reply 28.

[23] *See also In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 678 n.763 (Bankr. D. Del. 2022) ("Debtors agreed to separately move for approval of their settlement with Pachulski Stang. Similarly, Debtors' agreement with respect to the Coalition's fees will be brought separately. All parties' rights to object to these resolutions is preserved.").

[24] While the Motion says it is brought under both § 363 and § 1129(a)(4), the Coalition does not discuss the confirmation standard by which the request should be judged or how the fees should be reviewed for "reasonableness." At least one court has held that § 1129(a)(4) does not serve as a basis to make a payment, rather, it establishes a requirement that any payments to be made pursuant to a plan be reasonable. *See In re Lehman Bros. Hldgs. Inc.*, 508 B.R. 283, 294 n.9 (S.D.N.Y. 2014).

Ultimately, however, the standard—as applied here—does not dictate the outcome. As I have laid out above, even if § 363 is the appropriate standard, I am required to determine whether the debtor is properly exercising its business judgment and to bring the court's independent judgment to bear on that issue. That determination may properly consider the role of the ad hoc committee, its contributions (or expected contributions) to the case, the specific circumstances of committee formation and what ability parties and the court will have to consider specific requested fees. The court does not merely rubber stamp a debtor's decision. At the RSA hearing, I expressed multiple concerns about approving the Coalition's fees. Those concerns still resonate and are, in fact, confirmed by the submissions made on the Motion.

## II.    The Evidence/Court Observations[25]

### A.    The Formulation of the Coalition and the TCC

The evidence, in the form of the multiple declarations, supports the Coalition's narrative that it was a significant player in the bankruptcy case and worked constructively toward the confirmation of a plan. The declarations submitted by Coalition-related declarants focus on the Coalition's role in settlements with several insurance companies and the Ad hoc Committee of Local Councils. The declaration submitted by the FCR and his professionals as well as Mr. Sugden also attest to the constructive nature of the Coalition and point to specific "key accomplishments" they ascribe to the Coalition.[26] That the

---

[25] As the Coalition notes, "[t]he record on a substantial contribution motion includes the entire record 'throughout the entire chapter 11 case,' including the Court's own observations." Omnibus Reply 4 n.7 (*citing In re M&G USA Corp.*, 599 B.R. 256, 262 (Bankr. D. Del. 2019); *In re Deval Corp.*, 592 B.R. 587, 599 (Bankr. E.D. Pa. 2018)).

[26] Many of these declarations contain similar, if not identical, language in describing the nature of the case and the Coalition's contributions.

Coalition played a major and constructive role in the case is really not in dispute and is consistent with my observations of the dynamics of the case since the Coalition was formed.

What is also consistent with my observations of the dynamics of the case, however, is the different (and somewhat combative) way in which the Coalition and the TCC describe each other's contributions in their respective submissions. The TCC's Response suggests that the Coalition "minimize[s] or denigrate[s]" the TCC's "significant role" in the case and that "[t]he TCC should not need to be 'pushed down' so that others may 'rise.'"[27] The Motion suggests that the TCC's position with the Ad Hoc Committee of Local Councils led to an impasse (impliedly, insurmountable) without the intervention of the Coalition. In the Coalition's Omnibus Reply, the Coalition continues to take primary, if not sole, credit for many of the milestones in the case while contending it is accurately describing the relative roles of the two committees.

That this combative relationship exists is not surprising. The Coalition appeared in the cases on July 24, 2020—approximately four months after the bankruptcy filing. Certain personal injury law firms ("PI Firms") that determined to form the Coalition were once "affiliated" with the TCC.[28] Once formed, the Coalition immediately hired the cadre of professionals typically retained by a committee of tort claimants in a bankruptcy case (e.g. restructuring counsel, financial advisors, insurance counsel and litigation counsel) mirroring

---

[27] Response 3.

[28] Slater Decl. ¶ 2 ("The Coalition was formed by certain law firms that were once affiliated with the Official Committee of Tort Claimants (the "TCC"). These firms believed that absent a serious intervention, the Debtors would not reach settlements required for the Debtors to maximize value for Survivors and confirm a global resolution plan."); Andrews Decl. ¶ 2 (same); Rothweiler Decl.¶ 2 (same). While no declarant states it in this fashion, it would appear that their clients were getting outvoted in discussions on TCC strategy for the case.

in skill set the team of professionals hired by the TCC.  And, as gleaned from a review of the

Verified Statements, the Coalition proceeded to engage in every aspect of the bankruptcy

case.

While the membership of an ad hoc group is not typically the subject of significant or

extensive hearings, it can be—and it was here.  The Coalition sought to participate in the

proposed global mediation (i.e. become a Mediation Party), which was opposed by the

TCC.  Further, certain insurers asserted that the Coalition was not complying with Federal

Rule of Bankruptcy Procedure 2019 as its submissions were heavily redacted.  The details of

the structure of the Coalition evolved over the course of the several-month litigation.  As

described in a bench ruling addressing the sufficiency of the Rule 2019 statements,

ultimately: (i) the members of the Coalition are survivors who signed a written

acknowledgement placed on the docket, (ii) the survivors are all clients of one (or more) of

the ten PI Firms identified in a supplemental declaration filed by the Coalition, (iii) the PI

Firms, not the Coalition members, instruct Coalition Professionals as to positions to be

taken in the case, (iv) the PI Firms chose five survivors to comprise an advisory board,

which meets with the PI Firms to deliberate actions taken by the Coalition and (v) the

Coalition's Professionals  represent the collective, not any individual survivor.  At the time

of my bench ruling, there were approximately 7,500 survivors who had signed the written

acknowledgment.  Brown Rudnick represents that there are currently over 18,000

members.[29]

---

[29] Statement of Brown Rudnick LLP as Co-counsel for Coalition of Abused Scouts for Justice,
Regarding Professional Services Rendered and Expenses Incurred from July 21, 2020 Through
October 31, 2022, at 10, in Mot. Ex. C-1 (Brown Rudnick Statement), ECF No. 10808-4 ("Brown
Rudnick Statement").

As part of their Rule 2019 submissions and in support of becoming a Mediation Party, the Coalition represented:

> 11.    **Coalition Counsel are being paid by State Court Counsel. Coalition Members will not, in any way, be responsible for the fees of Coalition Counsel.** See Exhibit A-2, A-4 ("I further acknowledge and agree that a portion of the fees and expenses incurred by Brown Rudnick and MMBH will be paid by [FIRM] and any payment of such fees and expenses by [FIRM] will not increase the fees and expenses owed by me under the terms and conditions of my Employment Agreement or Retainer Agreement with [FIRM].[30]

Further, the Request for Written Acknowledgement sent to and signed by each member provides that the survivor acknowledges and agrees that the PI Firm representing him will pay a portion of the fees and expenses incurred by the Coalition's law firms and will not increase fees and expenses he owes the PI Firm.[31]

---

[30] Second Am. Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019 5, ECF No. 1429 ("Verified Statement") (emphasis in original).

[31] Verified Statement Ex. A-4 (Written Request for Acknowledgment), ECF No. 1429-1. The complete acknowledgement reads:

Request for Written Acknowledgment

I acknowledge and agree that **[FIRM]** has joined, as a representative for its clients, the Coalition of Abused Scouts for Justice (the "Coalition" or the "Ad Hoc Committee"), an ad hoc committee representing the collective interests of its members (i.e., Boy Scout sexual abuse victims) in the Boy Scouts Chapter 11 jointly administered bankruptcy cases pending before the United States Bankruptcy Court for the District of Delaware, Case No. 20-10343 (the "Chapter 11 Cases"). I further acknowledge and agree that the Coalition has retained experienced bankruptcy counsel, Brown Rudnick LLP ("Brown Rudnick"), and Delaware counsel, Monzack Mersky Browder and Hochman, P.A. ("MMBH"), to represent the collective interests of its members. I further acknowledge and agree that I have been provided with access to and an opportunity to review a copy of the Coalition's Confirmation of Engagement with Brown Rudnick dated July 21, 2020 and the Coalition's Engagement Agreement with MMBH dated September 13, 2020 (together, the "Engagement Letters"), and that I consent and agree to becoming a member of the Ad Hoc Committee in accordance with and subject to the terms of the Engagement Letters. I further acknowledge and agree that a portion of the fees and expenses incurred by Brown Rudnick and MMBH will be paid by **[FIRM]** and any payment of such fees and expenses by **[FIRM]** will not increase the fees and expenses owed by me under the terms and conditions of my Employment Agreement or Retainer Agreement with **[FIRM]**. I have had an opportunity to consult with my legal counsel about the terms of the Brown Rudnick and

The PI Firms also filed redacted versions of their retention agreements with their clients. Some, but not all, of their agreements provide that the only forum in which the firm will represent its client is in the bankruptcy proceeding.[32] In the Motion, the Coalition says

---

MMBH engagement and my participation as a member of the Coalition. I further acknowledge and agree that **[FIRM]** has authority to represent my interests and to direct and instruct Brown Rudnick and MMBH in connection with the activities of the Coalition and the Chapter 11 Cases, and to engage and retain on the Coalition's behalf, and at no additional cost to me, other professional advisors, including, without limitation, financial advisors and insurance counsel, to assist the Coalition in its efforts.

Executed on [        ] _____, 2020        By: _____

[32] *See e.g.* AIS Professional Employment Agreement in Verified Statement Ex. A-3 (State Ct. Counsel Exemplar Engagement Letters), ECF No. 1429-1 (emphasis in original).

II. Scope of Representation: By signing this Engagement Agreement, you understand and agree that AIS Counsel is committing to represent you **only** in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse claims against BSA. You have the right to terminate the representation at any time, subject to our right to recoup fees and expenses as provided by law.

*See also* Boy Scouts of America—Attorney-Client Agreement in Verified Statement Ex. A-3 (State Ct. Counsel Exemplar Engagement Letters), ECF No. 1429-1 (emphasis in original).

1. **LIMITED REPRESENTATION**. Client retains the Firms [Andrews & Thornton, AAL, ALC and ASK LLP] for the limited purpose of filing of bankruptcy claims against BSA. This limited representation includes the following:

a. **Firms are not bringing any claims outside of bankruptcy proceedings**. Firms are only handling the processing of Client's claims against BSA. This means that Firms will not be filing any lawsuits or bringing any claims against any party outside of the bankruptcy process, including but not limited to any parents, volunteers, outside organizations, or other individuals. If Client wishes to pursue any claims against any entity outside of the bankruptcy court process, Client will need to immediately hire separate counsel.

b. **Firms are not taking action to preserve claims or protect the statute of limitations**. A statute of limitations is the legal deadline within which you must file a civil claim. If Client does not file a claim within the applicable statute of limitations, Client's claim may be lost forever. Client understands that Firms are not taking any action to file claims against any parties within the applicable statute of limitations. If the statute of limitations expires after you have signed this agreement but before another responsible entity declares bankruptcy, your bankruptcy claim may be lost forever. If Client wishes to preserve claims and not have them lost forever because the statute of limitation has expired, Client will need to immediately hire separate counsel.

the law firms that formed the Coalition "brought approximately 75% of the Survivors to the table."[33]

B. *The Requested Fees*

The fee submissions made by the Coalition Professionals are voluminous and generally detail the services provided. While I have not reviewed them line-by-line, even a cursory review of the submissions confirm that the Coalition involved itself in every inch of the case. The Brown Rudnick submission breaks its fees into thirteen categories that cover the range of services any estate professional would provide: Case Administration, Meeting and Communications with Creditors, RSA, Plan and Disclosure Statement, Mediation, Organizational Matters, Claims and Proofs of Claim, Assumption and Rejection of Leases, Contested Matters and Adversary Proceedings, TCC-Kosnoff, 2004 Defense, Estimation and Fee Statement.[34]

The description of these categories in Brown Rudnick's submission reveals services provided to the Coalition that were for the benefit of PI Firms. For example, Brown Rudnick says the Coalition "played a lead role in responding to a motion filed by the Debtors to amend their bar date order requesting an unlawful prior restraint on speech between all attorneys worldwide and their prospective clients regarding the process and potential outcomes in these Chapter 11 Cases."[35] The challenged speech was to certain PI Firm's individual advertising programs designed to generate clients. Also in that category,

---

[33] Motion 3.

[34] Each of these categories is descriptive though somewhat broad. For example, in the Mediation category there are entries regarding plaintiff law firm advertising, a supplemental bar date motion and Rule 2019 issues. Similar entries appear in the Organizational Matters category.

[35] Brown Rudnick Statement at 11.

is the Coalition's "lead role in seeking amendment of the bar date order to permit electronic signatures and signatures of attorneys."[36] The purpose of this request was to aid survivors and/or their PI Firms in submission of individual survivor claims. Similarly, Brown Rudnick records time opposing Century and Hartford's "Rule 2004 discovery on Survivors and their counsel alleging in effect widespread fraud."[37] Like the first amendment issue, the Rule 2004 discovery was not directed to the Coalition as an ad hoc committee, but to individual survivors and their PI Firms.

The Brown Rudnick submission also reveals at least one category of unnecessary services. For example, the TCC & Kosnoff category is for services on a subject that Debtors' professionals were aggressively pursuing on behalf of the estate. There was no need for the Coalition to join in for this matter to be submitted to the court and resolved. More, generally, many of the services provided supplemented or overlapped with services provided by Debtors' professionals or duplicated services provided by the TCC's professionals although the Coalition and TCC often took opposing views.

Evident from the submission, and confirmed at the hearing on the Motion, is that Brown Rudnick took no time culling through the Coalition Professionals' time records. Rather, the Coalition seeks reimbursement of all time spent on the engagement, subject only to the negotiated cap.

## III.    **Application of the Law**

The Coalition does not meet any standard for reimbursement of fees. Its failure to review the Verified Fee Statements to assess which services were beneficial to the estate or

---

[36] *Id.*

[37] *Id.* at 13.

were at least reasonable dooms its request. More fundamentally, however, the Coalition's contribution did not transcend its self-interest, services rendered were duplicative and any reimbursement runs counter to the Coalition's representations to the court, and more importantly, its promise to its members.

A party may be entitled to reimbursement of its fees and expenses under § 503(b)(4) if its efforts resulted in "an actual and demonstrable benefit to the debtor's estate and its creditors."[38] Even so, because a creditor is presumed to be acting in his own self-interest, the court must conclude that the creditor's actions were "designed to benefit others" in order to award fees as a substantial contribution.[39] This standard is a compromise between the "twin objectives" of encouraging "meaningful participation by creditors in the reorganization process" and minimizing administrative expenses to preserve assets for creditor recoveries.[40] Accordingly, § 503(b)(4) is narrowly construed.[41]

Courts applying the standard consider multiple factors, including: "1) whether the services were rendered solely to benefit the client or to benefit all parties in the case; 2) whether the services provided direct, significant and demonstrable benefit to the estate; and, 3) whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys."[42] Further, "[r]eimbursement is

---

[38] *Lebron*, 27 F.3d at 944 (citation omitted).

[39] *Id.* at 946.

[40] *Id.* at 944 (citation omitted).

[41] *In re Worldwide Direct, Inc.*, 334 B.R. 112, 122 (Bankr. D. Del. 2005).

[42] *In re Buckhead Amer. Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993) (citing *In re Jack Winter Apparel, Inc.*, 119 B.R. 629, 633 (E.D. Wis. 1990) (internal citation omitted)).

improper where the activities of the interested parties are designed to serve primarily their own interests and would have been undertaken without an expectation of reimbursement from the estate."[43]  The creditor has the burden of making its case by a preponderance of the evidence.

As set forth above, no party really argues that the Coalition Professional's services were not constructive or did not provide a benefit to the estate.  Here, the real issues are whether the services duplicated those of estate professionals and whether the services transcended self-interest.

The Coalition argues that it did not duplicate the work of Debtor or the TCC relying on its role in the settlements reached with Century, Hartford, Zurich and Clarendon.  The Coalition contends: "[t]o state the obvious:  the TCC was not involved in the negotiations that took place between mid-August and December of 2021" and that the settlements with the insurers were "then brought to the Debtors towards the end of the process after material terms were agreed to and the agreements themselves were largely drafted."[44]  The Coalition then argues that "the unique circumstances of this case required the Coalition—as the representative voice for nearly 75% of the Survivors—to vigorously take the laboring oar on all of these settlements and drive these Chapter 11 Cases to a successful conclusion."[45]

Again, assuming all of this to be true does not lead to the conclusion that services provided by the Coalition did not duplicate the role that Debtors or the TCC played in the

---

[43] *Worldwide Direct*, 334 B.R. at 121 (quoting *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del. 2004)).

[44] Motion 40–41.

[45] *Id.* at 41.

case. Debtors and the TCC were statutorily charged with reaching resolutions they believed appropriate and driving the case to a conclusion. Moreover, the Fees do not merely encompass work performed on the multiple settlements during the mid-August to December 2021 timeframe. Rather, the Fees span the period from July 21, 2020 through October 31, 2022 and cover work far beyond the scope of the settlements. The Fees include everything from case administration to the plan and disclosure statement, work that certainly was within the purview of Debtors and/or the TCC. The Coalition's "soup to nuts" approach to the case mirrored the work of an official committee.[46]

Moreover, the Coalition has not shown that its work transcended self-interest. In discussing this factor, the Coalition discounts any suggestion that its work primarily benefited its membership—the 18,000 survivors. Instead, the Coalition focuses on the PI Firms and their interests. The Coalition states:

> The Coalition firms could have litigated thousands of Abuse Claims against Local Councils and Chartered Organizations in state court. This path may have resulted in fewer Survivors receiving compensation, but the ability to obtain punitive damages and high verdicts could have placed each of the Coalition firms in a comparable place in terms of their overall recovery. The Coalition firms had multiple options, each of which would have been consistent with their own economic interests. The Coalition here chose a path that saved the Boy Scouts, made it possible for the Debtors to reorganize, and created a multi-billion settlement fund for Survivors—all while taking intense fire from objecting parties.[47]

---

[46] Similarly, the proffered argument that the Coalition and TCC were at odds on key parts of the plan does not dispel the notion of duplication. Each pursued different strategies and had a different view of settlements, but the TCC and the Coalition each performed the same work to be in a position to make their respective assessments and interact with the other players in the case. Ultimately, the Coalition did not succeed on its own in obtaining the vote it believed necessary to confirm the plan. The support of the TCC and those survivors who supported the TCC's position was required to obtain the 85% acceptance of the survivor class.

[47] Motion 42 (emphasis added).

First, this argument appears to be counter-factual, at least with respect to some of the PI Firms. As detailed *supra*, at least some of these firms had retainer agreements limiting their engagement to pursuit of claims in the bankruptcy case, warning survivors that the firms were not taking actions against other organizations and that statutes of limitations could expire on such suits. These firms, therefore, had one interest—to maximize recoveries (and, therefore their fees) in the bankruptcy case. Indeed, the sheer number of clients (represented to be approximately 60,000) suggests that even those PI Firms without limited engagements would make more in a bankruptcy proceeding. From this viewpoint, representing 75% of the survivor constituency makes it difficult to find that the Coalition was not acting in its own self-interest: the interests of <u>survivors</u>, not the PI Firms.

Second, as discussed *supra*, certain of the services provided by Coalition Professionals clearly were for the benefit of the PI Firms who would have had to respond (or not) to motions challenging their actions or those of their clients. The Coalition's efforts meant that the PI Firms did not need to expend their own time, or could expend less time, on these issues. But, Survivors are already paying their respective PI Firms to pursue their claims, which includes filing proofs of claims. And, neither the estate (nor creditors) should pay to sort out the PI Firm's respective advertising decisions. While the PI Firms' organization as a group may have assisted Debtors in resolving matters by providing a single point of negotiation, that, alone, is not sufficient to justify reimbursement of fees on these types of issues.

Moreover, in considering this request, I take into account a factor not present in other cases cited to me: in signing up members, survivors were told that the Fees would be

paid by the PI Firms and that survivors' fees and expenses would not increase.[48]  The Coalition also represented to the court in the context of the Rule 2019/Mediation Party dispute that: "**Coalition Counsel are being paid by State Court Counsel**" and that survivors would not—**in any way**—be responsible for the fees of Coalition Professionals. Here, reimbursement of the Coalition's Fees will be borne two-thirds by the Settlement Trust and one-third by the reorganized Debtors.[49]  If the Motion is granted, members of the Coalition are paying part of the Fees.[50]

Finally, the Coalition suggests that the UST's objection to the Motion (and, by extension, any denial of the Motion) does not promote reorganizations.  The Coalition suggests that the formation of ad hoc groups, in and of itself, is a sign of unusual circumstances and a need to go outside "the fold" of an official committee.[51]  While this seems apparent to the Coalition, it is not to me.  Here, certain PI Firms chose to break from their clients on the official committee and form a separate group due to disagreements over strategy.  Paying fees of a splinter group from estate funds does not encourage resolution of

---

[48] *See also* Oct. 14, 2020 Hr'g Tr. 34:23–35:2, ECF No. 1540 ("Your Honor, we also have acknowledged in our papers that the individual survivors be Coalition members themselves are not responsible for payment of the Coalition fees and expenses, that the professionals, those fees are being paid by state court councils directly.") *Id.* at 40:21–41:9 ("So, Your Honor, especially given now that the membership of the Coalition is restricted to the members that sign affirmative consents, and those affirmative consents, Your Honor . . . acknowledged that the fees and expenses will be borne by the State Court Counsel . . . ."). Any agreement with the UST in resolving concerns over the Rule 2019 submissions reserving the right of the Coalition to make a substantial contribution claim or otherwise be paid by the estate does not erase the agreement made with members or the representations made to the court.

[49] Apr. 19, 2023 Hr'g Tr. 25:8–12; 33:6–10, ECF No. 11131 ("[O]ne-third goes to Boy Scouts, two-thirds goes to the Trust.").

[50] *Id.*

[51] Omnibus Reply 31.

intra-committee disagreements. Were this to become an accepted practice, it could lead to debtors not only choosing their adversaries—but paying them.

Further, by any measure, the PI Firms had a hefty financial incentive to participate in the BSA bankruptcy case because of their own stake in the recoveries of their clients. Typical contingency fee arrangements are in the range of 25% to 40% of recoveries, often after expenses. The existence of a $2.4 billion trust (the largest of its kind ever, so it has been represented) is incentive enough. It is easy to see that their efforts would be undertaken without any expectation of reimbursement from the estate.[52]  Indeed, the Coalition is currently defending its handiwork as a participant in the appeals of the confirmation order; it is not leaving that work in the hands of the reorganized Debtors and their counsel. The Coalition's continued participation confirms the powerful financial incentive that led the PI Firms to take a lead role in crafting the plan in the first instance and to encourage their clients to vote for it.

**Conclusion**

The Coalition has not met its burden to prove that it provided a substantial contribution to the estate or even that Debtors' previous decisions to pay the Fees were a proper exercise of Debtors' business judgment. The PI Firms believed their strategy for the Boy Scouts of America bankruptcy case was the best for their clients and so they formed the Coalition. The PI Firms believed that the Coalition Professionals were the best advocates of their position and so instructed them to engage in every aspect of the case and duplicate the scope of an official committee. This was their prerogative. The only question is whether

---

[52] In their respective advertising campaigns, many of these same PI Firms were projecting a $1.5 billion trust. The financial incentive was enough for many PI Firms to mount significant advertising campaigns.

the Coalition's Professionals' Fees should be paid by anyone other than the PI Firms.  The answer is no.

   For the reasons set forth above, the Motion is denied.  A separate order will be entered.


Dated:  December 5, 2023

Laurie Selber Silverstein
United States Bankruptcy Judge