IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 20-10343 (LSS) |
| | ) | |
| BOY SCOUTS OF AMERICA AND | ) | Chapter 11 |
| DELAWARE BSA, LLC,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docs: 11,566, 11,577, 11579, 11580, 11,630 11,640 and 11,XXXX |
| | ) | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CERTAIN CLAIMANTS OF THE KRAUSE & KINSMAN, THE ROBERT PAHLKE LAW GROUP, AND DAVIS BETHUNE & JONES LAW FIRMS MOTIONS TO CORRECT ELECTION FROM THE EXPEDITED PAYMENT OPTION TO THE TRUST ("MATRIX") CLAIMS PROCESS OR INDEPENDENT REVIEW**

COMES NOW, the Movants, (the "**Claimants**") by and through the undersigned counsel, and files this *Supplemental Memorandum in Support of Certain Claimants of the Krause & Kinsman, the Robert Pahlke Law Group and Davis Bethune & Jones Law Firms Motions to Correct Election From the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent Review* (the "**Memorandum**"). This Memorandum is filed consistent with the Court's direction following the November 20, 2023, oral argument on the Movants' previously filed *Motions to Correct Election from the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent Review* (the "**Motions**"), **Dkts**. 11,566, 11,577, 11579, 11580, 11,630, and 11,XXXX, to address questions raised by the Court during argument. *Transcript regarding Hearing Held 11/20/2023*, at p. 120/5-17. **Dkt** 11,640 (the "**Transcript**").

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each debtor's federaltax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC(4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 7503.

## QUESTIONS PRESENTED

1.  *Why is the* <u>Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership</u>, *507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993) "excusable neglect" standard applicable to the Motions*:

In the *Transcript* at page 14/14-16, the Court asked why is *Pioneer* "the correct standard? And I have been struggling with what the standard should be assuming I can do it." The premise of the Court's inquiry is that the *Pioneer* facts are very different from the facts underlying the Motions. Consequently, the *Pioneer* court's "excusable standard" may be inapplicable to the Motions.

The factual setting underlying *Pioneer* was an unsecured creditor's failure to file a proof of claim before the claims bar date. *Pioneer*, US at 384. Those facts were further complicated by the creditor's attorney's failure to act timely. *Id*. Indeed, many cases that reply to *Pioneer* bear a similar fact pattern to that case. *See e.g.*, **Dkts** 2659, 6108, 7237, 8249, 8538, 9538 and 10042. However, that fact pattern, i.e., the timeliness of a filing is not dispositive of the breadth of *Pioneer's* excusable neglect standard. Quite the contrary.

*Pioneer* was decided based on FEDERAL RULE OF BANKRUPTCY 9006(b)(1)'s good cause standard. The court did so, in part, by analogizing and referencing that standard against the FEDERAL RULES OF CIVIL PROCEDURE corollary in RULE 6(b) and examining the underlying Congressional intent. The Supreme Court's discussion is enlightening. Acknowledging the various circuit court's approach to "excusable neglect," the court went on to say:

> There is, of course, a range of possible explanations for a party's failure to comply with a court-ordered filing deadline. At one end of the spectrum, a party may be prevented from complying by forces beyond its control, such as by an act of God or unforeseeable human intervention. At the other, a

party simply may choose to flout a deadline. In between lie cases where a party may choose to miss a deadline although for a very good reason, such as to render first aid to an accident victim discovered on the way to the courthouse, as well as cases where a party misses a deadline through inadvertence, miscalculation, or negligence.

*Id*. at 387-88. The court then summarized the petitioner's position on what should or should not constitute "excusable neglect." Rejecting the petitioner's narrow position, the court declared:

> We think that petitioner's interpretation is not consonant with either the language of the Rule or the evident purposes underlying it. First, the Rule grants a reprieve to out-of-time filings that were delayed by "neglect." The ordinary meaning of "neglect" is "to give little attention or respect" to a matter, or, closer to the point for our purposes, "to leave undone or unattended to esp[ecially] through carelessness." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 791 (1983) (emphasis added). The word therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness. Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry "their ordinary, contemporary, common meaning." . . . Hence, by empowering the courts to accept late filings "where the failure to act was the result of excusable neglect," RULE 9006(b)(1), Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.

*Id*. at 388-89 (case citation omitted).

If this Court is persuaded that the factual issue before it is each claimant's failure to timely make their election by way of their ballot, then the *Pioneer* court's expression of what constitutes "excusable neglect" clearly contemplates that "inadvertence, mistake, or carelessness" falls within the excusable neglect standard. The common thread for every claimant falling within the Court's own category 1, i.e., mistake, *Transcript* at 8/18 to 9/6, is that they timely filed their ballot but *mistakenly* elected the expedited payment group.

Hence, for clients of the Krause & Kinsman and Davis Bethune & Jones law firms, all of whom fall within the Court's category 1, *Pioneer's* "excusable neglect" standard is "the right standard because it is, kind of, the standard that fits the problem."[2]

Several facts drove the outcome in *Pioneer*. One such fact was "the lack of any prejudice to the debtor or to the interests of efficient judicial administration." *Pioneer*, US at 397-98. It should be noted that the Debtors filed no objection to any of the Motions. Nor did they take a position at oral argument. From this silence, it should be recognized that the Debtors perceived no prejudice nor any impediment to efficient judicial administration of the bankruptcy. Another fact driving the *Pioneer* result was the absence of "any indication at all of bad faith." *Id*. at 398. Again, the Debtors took no position on the issue. For her part, the Trustee did not argue prejudice, efficiency, or bad faith. *See* **Dkts.** 11,565, 11,600, and 11, 602 (not a single reference in any of the Trustee's objections to any prejudice, any deleterious impact on judicial administration, or bad faith related to the relief sought in the Motions).

Last, as set out in the Robert Pahlke Law Group's motion, **Dkt**. 11,577 at pp.5-12, *Pioneer* established a four-part analysis. As set out that motion, the Pioneer factors are satisfied without repeating that analysis here. Finally, the *Pioneer* court's critical factual predicates for relief, i.e., the lack of prejudice, no deleterious impact on judicial

---

[2] As alluded to earlier, at pp 3-4, if the Court is persuaded that the issue before it is timeliness in making the election, then *Pioneer* provides the appropriate analytical framework to apply to the Motions. Conversely, if the Court concludes that issues arising out of the Motions are unrelated to timing, *Pioneer* is helpful but not dispositive. As discussed herein, if the issue is rooted in the claimant's election error, then principles of contract interpretation offer a well-worn analytical framework to address the Motions.

administration, and bad faith, are matched by the Motions.

2.    *What cannons of contract interpretation apply to the Court's analysis of the Plan, Solicitation Procedures and Trust Distribution Procedures?*

In the *Transcript* at page 27/3-6, the Court asked "[i]s there some canon of construction that I should be looking at to determine what to do with a plan that is silent on the issue." Later, the Court compounded this question when it inquired if the hierarchy of documents plays a role in interpretation. *Id*. at 85/12.

The threshold question here is the nature of the relief sought by the Motion and whether that relief requires modification of a confirmed plan or merely an interpretation of that plan. To be clear, the Movants are not seeking, nor do they believe, the Plan must be modified for the Court to grant the relief requested in the Motions. Accordingly, the Movants assert that the task before the Court is limited to interpreting the Plan and related documents.

At the outset, it is worth noting that this Court retained jurisdiction over all aspects of the bankruptcy case and the Plan. **Dkt.** 10316 at p. 67-68, ¶ 75. As such, when interpreting a confirmed plan, the Court applies contract principles to determine the meaning of confirmed plans. *In re SS Body Armor I, Inc.*, 2021 Bankr. LEXIS 1527, *10 (Bankr. D. Del. June 7, 2021). The parameters of contract principles are well-worn. Applying Delaware law, contract interpretation is a question of law. *See Rhone-Polenc Basis Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). The intention of Delaware law is to interpret a contract to effectuate the intent of the parties. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). The Court must first determine whether a contract is unambiguous as a matter of law. *Northwestern*

*Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *GB Biosciences Corp. v. Ishihara Sangyo Kaisha*, Ltd., 270 F. Supp. 2d 476, 481-82 (D. Del. 2003). If the contract's language is unambiguous, the Court interprets the contract based on the plain meaning of the language on the document's face. *GB Biosciences*, at 482; *see also Lorillard Tobacco* at 739. Delaware law also requires a court to "read a contract as a whole" and "give each provision and term effect, so as not to render any part of the contract mere surplusage." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) Delaware adheres to the "objective theory of contracts," which means that a contract should be interpreted as it "would be understood by an objective, reasonable third party." *Id.*

When a contract is silent on an issue or matter, as here, Delaware courts apply the concept of an implied covenant. *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015). The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005). If a contract is silent, the implied covenant can be employed "to analyze unanticipated developments or to fill gaps in the contract's provisions." *Id.* When deploying an implied covenant analysis, a court must "assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec v. Shrader*, 991 A.2d 1120, 1125- 26 (Del. 2010).

At the hearing, the Court expressed concern that the Plan was silent on a claimant's ability to change their election later. This is true notwithstanding that during

the confirmation hearing on September 29, 2023, the issue of changing the election was clearly raised. *Transcript* at pp. 11/4 (*citing* **Dkt.** 6437 at pp. 99/6 to 102/24 discussion relating to opting out of the $3,500 election). The Court noted that despite the unanimity of all parties that a claimant could opt out of Expedited Distribution Election, such a provision was never added to the Plan. As to the Expedited Distribution Election, the Plan states:

> A Direct Abuse Claimant who does not make the Expedited Distribution Election . . . in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election . . . shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election . . . will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP. Plan, Art. VI (emphasis added).

*Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC,* at ART. VI. **Dkt.** 10296.

From this language, the Trustee argued that the Plan language forbade any change of election. That argument, however, not only misconstrues the plain language used but also ignores a fundamental principle of contract interpretation. As Delaware law requires, reading this language within the plain meaning of the words does nothing to foreclose or otherwise address a claimant's ability to change their election. Specifically, the ART VI language does not address the finality of a claimant's election.

This language, however, raises another issue that touches upon the Court's concern that the Plan is silent as to election finality. Specifically, in limiting the Election Distribution Election, the Plan manifests the Plan constituencies' willingness to impose

limits upon the claims process. In so doing, under the principle of *expression unius est exclusion alterius*, the mention that one thing is included implies that another thing is expressly excluded. While the Court was concerned that the Plan is silent about the finality of an election or the ability to change an election, the consequence of that omission can be accounted for as intentional. That intent is reflected by the fact that the Plan constituencies knew of and imposed other limits upon the Election Distribution Election. *See Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted); *Microstrategy Inc. v. Acacia Research Corp.*, 2010 Del. Ch. LEXIS 254, 2010 WL 5550455, *7 (Del. Ch. Dec. 30, 2010) (interpreting an unambiguous provision, the court found that the "use of different language in the two sections shows the parties knew how" to provide coverage when intended, which made the absence of such language in the other provision suggest the same coverage was not present); *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999) (applying the interpretative maxim of expression unius est exclusion alterius—the expression of one thing is the exclusion of another—to find that a health insurance provision did not impliedly exclude procedures in one section because the insurance contract expressly excluded procedures in another) (citing *Walt v. State*, 727 A.2d 836, 840 (Del. 1999).

In sum, under Delaware law, the Plan's silence, combined with its limitation on the Election Distribution Election, supports this Court finding that an implied covenant

allowing a claimant to change their election is consistent with the parties' reasonable expectations. *Dunlap* at 441. If the Court needs any further convincing of the parties' intent, it only needs to look at the confirmation hearing transcript, **Dkt.** 6437 at pp. 99/6 to 102/24, cited during oral argument – all parties participating in the confirmation hearing agreed that a claimant could change their election.

The silence of the Plan, the Solicitation Procedures Order, or the Trust Distribution Procedures to address the finality of an election left open to reasonable minds the possibility that, consistent with those documents, an election could be changed. It cannot be true that this was the intent of the parties. Nor should these circumstances conspire to the prejudice of a claimant.

Lastly, as others have argued, the Solicitation Order, at ART. V(D)(8) gives the Court the authority to withdraw or amend ballots. Specifically, it notes that:

> "After the Voting Deadline, a Ballot may only be withdrawn or modified pursuant to an order of the Bankruptcy Court authorizing such withdrawal or modification. Any such withdrawal or modification shall be detailed in the Voting Report filed by the Solicitation Agent."

As the Court duly noted during the hearing, this provision tracks RULE 3018(a), which would yield the result sought here under appropriate circumstances.

## FINAL ARGUMENTS

As argued during oral argument, this Court has broad equitable powers to pass on a wide range of problems arising from the administration of bankrupt estates. *Pepper v. Litton*, 308 U.S. 295, at n 11 (1939). They have been invoked to the end that fraud will not prevail, that substance will not give way to form, and that technical considerations will not prevent substantial justice from being done. Indeed, that power is reflected and

embodied in statute 11 U.S.C. § 105 and common law.  Section 105(a) authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See also, United States v. Energy Resource Co.*, 495 U.S. 545, 549, 110 S. Ct. 2139, 109 L. Ed. 2d 580 (1990)(acknowledging § 105 as authorizing relief not specifically authorized elsewhere in the Bankruptcy Code.)

It boggles the mind that the Boy Scouts' bankruptcy was made necessary by the ungodly abuse suffered by tens of thousands of victims and that, at the end of this bankruptcy, those victims will be meaningfully denied the only fundamental benefit that bankruptcy can deliver solely because they made an otherwise innocuous mistake of checking an incorrect box.

## NOTICE

The Krause & Kinsman law firm, The Robert Pahlke Law Group, and Davis Bethune & Jones law firms, on behalf of certain of their respective clients do adopt the argument of other claimant's counsel;

Dated: December 8, 2023                              Respectfully Submitted,

                                                    **CONAWAY LEGAL, LLC**

                                                   */s/ Bernard G. Conaway*
                                                   Bernard G. Conaway, Esquire (DE 2856)
                                                   1007 North Orange Street, Ste. 400
                                                   Wilmington, DE 19801
                                                   Phone: (302) 428-9350
                                                   Email: *bgc@conaway-legal.com*

*Counsel to Certain Clients of Krause & Kinsman, The Robert Pahlke Law Group, and Davis Bethune & Jones Law Firms*