## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | Dkt. Nos. 11532, 11552, 11561, 11562, 11563, 11564, 11566, 11567, 11570, 11579, 11599 |

### OPINION

The Plan[1] confirmed in the Boy Scouts of America bankruptcy case channeled all abuse claims to a Settlement Trust[2] for liquidation and payment. The Plan and the Trust Distribution Procedures ("TDP")[3] provide holders of Direct Abuse Claims[4] three options for liquidation and payment: (i) an Expedited Distribution of $3,500, (ii) the Independent Review Option or (iii) the general review process capped by the maximum values in the

---

[1] Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, ECF No. 10316-1. Terms not defined herein have the meaning set forth in the Plan or the Trust Distribution Procedures, as appropriate.

[2] The BSA Settlement Trust created by Boy Scouts of America pursuant to that certain BSA Settlement Trust Agreement. Ex. B to Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, ECF No. 10316-1.

[3] Trust Distribution Procedures, Ex. A to Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, ECF No. 10316-1.

[4] A Direct Abuse Claim is defined in the Plan as "an Abuse Claim that is not an Indirect Abuse Claim." Plan, art. I.A.99. For purposes of the motions before me it is enough to know that it includes the claims of survivors of abuse suffered as a consequence of participation in scouting.

Claims Matrix.[5]  A holder of a Direct Abuse Claim selected the Expedited Distribution

option by checking a box on his ballot.

The Motions[6] seek relief with respect to the Expedited Distribution option.  Each

Motion was filed by or on behalf of a holder of a Direct Abuse Claim who checked the box

on his respective ballot electing to receive the Expedited Distribution.[7]  Based on a variety of

legal theories (or sometimes no legal theory at all), each claimant seeks to change/rescind or

revoke his respective Expedited Distribution election in order to participate in one of the

other two options.  Because I have determined that to grant this request would constitute an

amendment to the Plan, the Motions must be denied.

---

[5] *See generally In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 541-546 (Bankr. D. Del. 2022) ("Confirmation Opinion"), *supplemented by* Suppl. Findings of Fact and Conclusion of Law and Order Confirming the Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022) ("Confirmation Order"), *aff'd* 650 B.R. 87 (D. Del. 2023), *appeal docketed*, No. 23-1668 (3d Cir. Apr. 11, 2023).

[6] Motion to Change Election to Opt into Expedited Payment/Convenience Class or Other Necessary Relief on Behalf of Survivor Claimant D. S., ECF No. 11532; Motion to Change Election to Opt into Expedited Payment/Convenience Class, ECF No. 11552; Motion to Change Election to Opt into Expedited Payment/Convenience Class or Other Necessary Relief on Behalf of Survivor Claimant B.B., ECF No. 11561; Motion to Change Election to Opt into Expedited Payment/Convenience Class or Other Necessary Relief on Behalf of Survivor Claimant D.M., ECF No. 11562; Motion to Change Election to Opt into Expedited Payment/Convenience Class or Other Necessary Relief on Behalf of Survivor Claimant M.G., ECF No. 11563; Motion to Change Election to Opt into Expedited Payment/Convenience Class or Other Necessary Relief on Behalf of Survivor Claimant R.N., ECF No. 11564; Motion to Correct Election from the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent Review Option, ECF No. 11566; Motion to Change Election to Opt into Expedited Payment/Convenience Class, ECF No. 11567; Motion to Change Election From Expedited Payment/Convenience Class and Other Necessary Relief on Behalf of Survivor Claimant J.D., ECF No. 11570; Motion to Correct Election from the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent Review Option - Davis, Bethune & Jones LLC, ECF No. 11579; Motion to Authorize Revocation of Expedited Distribution Election on the Grounds of Mistake, Inadvertence and Injustice, ECF No. 11599.

[7] Those holders of Direct Abuse Claims who allege that their signatures were forged on the ballot will be addressed in a separate ruling and are not the subject of this Opinion.

*Background*

    *A. Approval of Solicitation Procedures*

On September 30, 2021, after a multi-day hearing and numerous amendments to Plan-related documents, the Solicitation Order[8] was entered. The Solicitation Order approved voting and tabulation procedures, forms of ballots and the package of solicitation materials to be mailed to claimants. The solicitation package included the Confirmation Hearing Notice, the Disclosure Statement with all exhibits, the Plan and, where appropriate, a ballot. The Solicitation Order set a voting deadline of December 14, 2021, which was ultimately extended to March 4, 2022 for holders of Abuse Claims.[9]

Holders of Direct Abuse Claims were solicited as Class 8 creditors either directly or through their counsel, at the holder's election. Accordingly, two forms of Class 8 ballots were approved—a Ballot for Class 8 (Direct Abuse Claims) and a Class 8 Direct Abuse Claim Master Ballot. The front page of the Ballot for Class 8 (Direct Abuse Claim) ("Ballot") informed holders that there were four items to be completed on the Ballot:

1. VOTE TO ACCEPT OR REJECT THE PLAN
2. DECIDE WHETHER TO MAKE THE OPTIONAL $3,500 EXPEDITED DISTRIBUTION ELECTION
3. DECIDE WHETHER TO OPT OUT OF THE THIRD PARTY RELEASE
4. SIGN YOUR BALLOT[10]

---

[8] Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief, ECF No. 4638.

[9] Order (I) Amending and Scheduling Certain Supplemental Dates and Deadlines in Connection with Confirmation of Debtors' Plan of Reorganization and (II) Approving a Limited Supplemental Voting Deadline for Class 8 Direct Abuse Claims and Class 9 Indirect Abuse Claims, ECF No. 8830.

[10] Form of Individual Ballot for Class 8 Direct Abuse Claims 1, Ex. 2-6 to Solicitation Order, ECF No. 6438-1 (emphasis in original).

The front page also cautioned claimants to read the instructions carefully before filling out the Ballot. Page 3 of the Ballot is largely devoted to a description of the Expedited Distribution election.[11]

The Expedited Distribution election itself appears on page 6 of the Ballot as Item 3:

**Item 3.  Expedited Distribution Election.**

Please note that if you make the Expedited Distribution election set forth in Item 3, you must still complete the remaining Items on the Ballot.

> If the Plan is confirmed as set forth above and in the Plan, the holder of an eligible Direct Abuse Claim ELECTS to:
>
> ☐    Receive the Expedited Distribution of a one-time Cash payment from the Settlement Trust in the amount of $3,500.00 conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures, in exchange for a full and final release in favor of the Settlement Trust, the Protected Parties, and the Chartered Organizations.

---

[11]  The full text of the description of the $3,500 Expedited Distribution option on page 3 of the Ballot states as follows:

> **IMPORTANT INFORMATION REGARDING THE ELECTION TO RECEIVE AN EXPEDITED DISTRIBUTION OF $3,500.00**
>
> Each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect at Item 3 of this Ballot to receive an Expedited Distribution, which, as specified in the Plan, is a one-time Cash payment from the Settlement Trust in the amount of $3,500.00 conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures, in exchange for a full and final release in favor of the Settlement Trust, the Protected Parties and the Chartered Organizations.
>
> The Settlement Trust shall make the Expedited Distributions on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution Procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee. **This election must be made on a properly and timely completed and delivered Ballot in accordance with the instructions set forth herein, and shall only be effective if the Plan is confirmed and the Effective Date occurs.**
>
> **IF SELECTING THE $3,500 OPTION, YOU MUST INDICATE THIS ON THIS BALLOT. YOU WILL NOT BE ABLE TO CHOOSE THIS OPTION AT A LATER DATE UNLESS THE COURT APPROVES OTHERWISE.**

Ballot 3 (emphasis in original). These instructions are largely repeated in the Instructions section of the Ballot on page 18.

By signing the Ballot, the claimant acknowledges that he has received a copy of the Disclosure Statement and Plan and that, among other things, he "understands and, if accepting the Plan, agrees with the treatment provided for [his] Claims under the Plan."[12]

*B. The Plan*

The Ballot did not create the classes of claims or the Expedited Distribution option. Rather, the Expedited Distribution election on the Ballot implemented the Plan. The Plan establishes Class 8 as an impaired class and provides that liability for those claims is assumed by the Settlement Trust and "processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents."[13] The Plan also provides that holders of Class 8 claims may elect to receive the Expedited Distribution, which is defined in the Plan as "a one-time Cash payment from the Settlement Trust of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures."[14] The Plan further provides that the election is made on the Ballot.[15]

---

[12] Ballot 15. The Master Ballot contains the same information and admonitions. It requires the attorney to record for each of his clients whether that client accepts or rejects the Plan, elects the Expedited Distribution and/or opts out of the third-party release. Form of Master Ballot for Class 8 Direct Abuse Claims 16, Ex. 2-5 to Solicitation Order, ECF No. 6438-1.

[13] Plan, art. III.B.10.b.ii.

> "Settlement Trust Documents" means, collectively, (a) the Settlement Trust Agreement, (b) The Trust Distribution Procedures, (c) the Document Appendix, (d) the Confirmation Order, and (e) any other agreements, instruments and documents governing the establishment, administration and operation of the Settlement Trust, which shall be substantially in the forms set forth as exhibits hereto or in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the terms thereof.

Plan, art. I.A.274.

[14] Plan, art. I.A.126.

[15] Article III.B.10.b.i of the Plan provides in relevant part:

The Expedited Distribution is detailed in Article VI of the TDP. The TDP provides

that the claimant must elect the Expedited Distribution in accordance with the Plan and sets

out the criteria and minimal documentation that must be submitted to obtain the $3,500

payment. The following two sentences succinctly summarize the effect of the election:

> *A Direct Abuse Claimant who does not make the Expedited Distribution Election* and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust *may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election* (or Future Abuse Claimant who elects to receive the Expedited Distribution) *shall have no other remedies with respect to any Direct Abuse Claim* he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. [16]

---

In addition, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, subject to criteria set forth in the Trust Distribution Procedures, in exchange for providing a full and final release in favor of the Settlement Trust, the Protected Partis and the Chartered Organizations. The Settlement Trust shall make the Expedited Distributions on one or more dates occurring on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

[16] TDP, art. VI.B (emphasis added). Article VI reads in full:

## ARTICLE VI
## EXPEDITED DISTRIBUTIONS

**A. Minimum Payment Criteria.** A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the **"Expedited Distribution"**): (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order (the **"Expedited Distribution Election"**); (ii) in connection with the Expedited Distribution Election, the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Chapter 11 POC or Future Abuse Claim; and (iii) the Direct Abuse Claimant (or an executor) has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such

The TDP also specifically provides that a Direct Abuse Claimant who makes the Expedited

Distribution election is "not eligible to receive any further distribution" on account of his

Direct Abuse Claim.[17]  In contrast, "[e]ach Abuse Claimant that does not make the

Expedited Distribution Election may instead elect" to (i) pursue recovery from the

Settlement Trust pursuant to the TDP or (ii) pursue the Independent Review Option.[18]

    *C.  Results of the Expedited Distribution Election*

    The solicitation proceeded per the Solicitation Order, as amended.  Seven thousand

three hundred eighty-one (7,381) holders of Class 8 claims elected the Expedited

---

verification.  Direct Abuse Claimants that make the Expedited Distribution Election
will not have to submit any additional information to the Settlement Trust to receive
payment of the Expedited Distribution from the Settlement Trust.

    **B.  Process and Payment of Expedited Distributions**.  Direct Abuse Claimants
who have properly made the Expedited Distribution Election and who met the criteria
set forth in Article VI.A(ii) and (iii) above, shall be entitled to receive their Expedited
Payment upon executing an appropriate release, which shall include a release of the
Settlement Trust, the Protected Parties, and all Chartered Organizations.  The form of
release agreement that a Direct Abuse Claimant who makes the Expedited
Distribution Election must execute is attached as **Exhibit A**.  A Direct Abuse Claimant
who does not make the Expedited Distribution Election and a Future Abuse Claimant
who does not elect to receive the Expedited Distribution in accordance with the
deadlines and procedures established by the Settlement Trust may not later elect to
receive the Expedited Distribution.  A Direct Abuse Claimant who makes the
Expedited Distribution Election (or Future Abuse Claimant who elects to receive the
Expedited Distribution) shall have no other remedies with respect to any Direct Abuse
Claim he or she has against the Settlement Trust, Protected Parties, Chartered
Organizations, or any Non-Settling Insurance Company.  Direct Abuse Claimants that
make the Expedited Distribution Election (or Future Abuse Claimant who elects to
receive the Expedited Distribution) will not be eligible to receive any further
distribution on account of their Direct Abuse Claim pursuant to these TDP.  The
Settlement Trust shall not seek reimbursement for any Expedited Distribution from
any Non-Settling Insurance Company.  An Abuse Claim resolved via Expedited
Distribution shall not be considered an Insured Abuse Claim (as defined below).

(emphasis in original).

[17] *Id.*

[18] TDP, art. VII.A.

Distribution on their Ballots. Of those, 6729 claimants voted to accept the Plan, 585

claimants voted to reject the Plan and 70 claimants did not vote to either accept or reject the

Plan.[19]

***Procedural Posture***

On September 8, 2022, after a month-long contested confirmation hearing as well as

certain supplemental proceedings, the Confirmation Order[20] was entered. The

Confirmation Order was affirmed by the District Court and is currently on appeal to the

Third Circuit Court of Appeals. The District Court order has not been stayed. On April 19,

2023, Debtors filed a Notice of Effective Date[21] and, pursuant to the terms of the Plan, the

Settlement Trust was established and the Settlement Trustee has begun her work.[22]

The Motions were filed between October 11, 2023 and November 10, 2023—over

two years after the Solicitation Order was entered, over one year after the Confirmation

---

[19] Final Tabulation Summary – Class 8 and Class 9, Ex. A to Suppl. Decl. of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast in Connection with the Limited Extended Voting Deadline for Holders of Claims in Class 8 and Class 9 on the Third Modified Fifth Am. Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, ECF No. 9275-1. *See also* Confirmation Opinion, 642 B.R. at 679.

[20] Confirmation Order, 2022 WL 20541782, *aff'd* 650 B.R. 87 (D. Del. 2023) *appeal docketed*, No. 23-1668 (3d Cir. Apr. 11, 2023).

[21] Notice of Entry of Confirmation Order and Occurrence of Effective Date of Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, ECF No. 11119.

[22] *See generally* Decl. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Supp. of her Consolidated Resp. in Opp'n to (1) Survivor Claimant D.S.'s Mot. to Change Election to Opt into Expedited Payment/Convenience Class, D.I. 11532; and (2) Mot. to Change Election to Opt Into Expedited Payment/Convenience Class, D.I. 11552, ECF No. 11565-1 ("Houser Declaration"); Suppl. Decl. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Supp. of her Consolidated Resps. in Opp'n to Mots. to Allow [D.I. 11565, 11600, 11602, 11608, 11612], ECF No. 11626. ("Houser Supplemental Declaration").

Order was entered and nearly six months after the Plan went effective.  Movants uniformly represent that they mistakenly elected the Expedited Distribution treatment by affirmatively checking the box on the Ballot.  The 238 claimants represented by AVA Law Group assert that they realized their mistakes in 2022.[23]  The remaining thirty-five (35) claimants represented by other counsel assert that they recognized their mistake (or a previous failure to correct the mistake) in the August 2023 timeframe when the Settlement Trustee opened access to a trust portal created as part of the administration of the Settlement Trust.  Citing various legal theories, or none at all, each claimant seeks to be relieved from his election of the Expedited Distribution option.

The Motions were greeted with objections by the Settlement Trustee.  In all, the Settlement Trustee filed four objections, which, collectively, respond to each Motion.[24]  The Settlement Trustee confirms that she denied requests by each Movant to revoke his election as she does not believe the Plan or the TDP gives her authority to permit a change of

---

[23]  Ex. B to Motion to Change Election to Opt into Expedited Payment Convenience Class, ECF No. 11552-3 (declarations from 227 claimants dated on various dates in January 2022 with the remainder dated from February 1, 2022, through November 18, 2022).

[24]  Consolidated Resp. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, In Opp'n to (1) Survivor Claimant D.S.'s Mot. to Change Election to Opt into Expedited Payment/Convenience Class, D.I. 11532, and (2) Mot. to Change Election to Opt into Expedited Payment/Convenience Class, D.I. 11552, ECF No. 11565; Consolidated Resp. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Opp'n to Mots. to Change Elections of Expedited Distribution [D.I. 11561, 11562, 11563, 11566, 11570], ECF No. 11600; Consolidated Response of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Opp'n to Mots. to Change Elections of Expedited Distribution [D.I. 11564, 11567, 11575, 11577, 11578, 11579], ECF No. 11602; Resp. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Opp'n to the Mot. to Compel Appropriate Relief of E.C., D.I. 11547, ECF No. 11608; Resp. of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, in Opp'n to Mots. to Authorize Revocation of Expedited Distribution Elections on the Grounds of Mistake, Inadvertence and Injustice [D.I. 11599], ECF No. 11612.

election.  She also opposed the Motions on the merits arguing that the relief was not

supported by applicable caselaw.

The parties organized to schedule a combined hearing on the Motions for November

20, 2023.  Prior to the hearing, I was informed that the parties agreed that all of the

declarations filed in support of or in opposition to the Motions would come into evidence.[25]

No live testimony or other evidence was offered at the hearing.

Argument was presented by counsel for all Movants and the Settlement Trustee.[26]

As with the pre-hearing submissions, counsels' arguments focused on the Solicitation Order,

Rule 60(b) and appeals to equity.  From the outset of the argument, I asked questions about

the proper standard to address this situation.  For example, I pressed counsel on whether

Rule 60 could be the proper standard[27] and inquired as to what general equitable powers

Movants thought could serve as a basis for the relief.[28]  I also asked what effect confirmation

of the Plan had on the standard.[29]  Given my questions, I provided all parties the

---

[25] When questioned, counsel for certain of the Movants responded that I was to give the declarations whatever weight I thought they deserved.  *See* 11/20/2023 Hr'g Tr. 7:16-8:15.  No other party disputed this response.

[26] E.C., who is representing himself *pro se*, participated via Zoom.  Technical difficulties prevented him from being heard and I stated on the record that I would have a separate hearing, if necessary, for E.C. to make his arguments.  11/20/2023 Hr'g Tr. 70:24-71:25.  E.C has since made numerous additional filings.  A single hearing on all of E.C.'s filings will be scheduled and E.C.'s motion is not part of this Ruling.

[27] *E.g.*, 11/20/2023 Hr'g Tr. 14:14-16:4.

[28] *E.g.*, 11/20/2023 Hr'g Tr. 97:1-9.

[29] *E.g.*, 11/20/2023 Hr'g Tr. 27:3-22.

opportunity to make an additional submission on the legal standard. Many parties took
advantage of this invitation.[30] The Motions are now ripe for decision.

*Discussion*

## I.    The Law

In the simplest terms, each Movant seeks an order permitting him to revoke his
election of the Expedited Distribution treatment for his Direct Abuse Claim because he
mistakenly checked the applicable box on his Ballot. Though post-hearing submissions on
the questions raised during argument was invited, no party provided legal authority
addressing treatment elections made on a ballot and only one party even mentioned the
concern about the effect of confirmation on the requested relief.[31] Because this decision

---

[30] Supp. Br. in Supp. of Claimants' Mot. to Change Election, ECF No. 11663; Joint Suppl. Briefing
in Supp. of Mot. to Change Election to Opt into Expedited Payment/Convenience Class or Other
Necessary Relief on Behalf of Survivor Claimants R.N., D.M., M.G. and B.B., ECF No. 11664;
Suppl. Briefing in Supp. of Mot. to Change Election to Opt into Expedited Payment/ Convenience
Class or Other Necessary Relief on Behalf of Survivor Claimant D. S., ECF No. 11665; Suppl. to
Mot. to Change Election to Opt into Expedited Payment/Convenience Class, ECF No. 11666; Br.
in Supp. of Mot. to Change Election from Expedited Payment/Convenience Class and Other
Necessary Relief on Behalf of Survivor Claimant J.D, ECF No. 11667; Supp. Br. in Supp. of Mot. to
Authorize Revocation of Expedited Distribution Elections on the Grounds of Mistake, Inadvertence
and Injustice, ECF No. 11668; Suppl. Resp. of the Honorable Barbara J. Houser (Ret.), in her
Capacity as Trustee of the BSA Settlement Trust, in Supp. of her Opp'ns to Mots. to Allow Changes
to Claimant Elections of Expedited Distribution [D.I. 11565, 11600, 11602, 11608, 11612, and
11624], ECF No. 11669; Suppl. Mem. in Supp. of Certain Claimants of the Krause & Kinsman, the
Robert Pahlke Law Group, and Davis Bethune & Jones Law Firms Motions to Correct Election
from the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent
Review, ECF No. 11670.

[31] The Krause & Kinsman claimants recognized the issue: "The threshold question here is the
nature of the relief sought by the Motion and whether that relief requires modification of a
confirmed plan or merely interpretation of a plan." But, they did not answer the question,
proceeding straight to an analysis of contract interpretation. Suppl. Mem. in Supp. of Certain
Claimants of the Krause & Kinsman, the Robert Pahlke Law Group, and Davis Bethune & Jones
Law Firms Motions to Correct Election from the Expedited Payment Option to the Trust ("Matrix")
Claims Process or Independent Review at 5, ECF No. 11670.

impacts not only the current Movants, but other claimants who may seek to change their election, chambers conducted its own research.[32]

*A. Ballot elections*

Independent research uncovered five decisions that address, in some fashion, a treatment election made in connection with solicitation of a plan. In *Channel One Communications*, the court considered a motion styled "Motion to Reform Ballot Accepting Reorganization Plan and Revoke Election to Treat Class 3 Unsecured Claim As A Class 2 Administrative Claim."[33] A creditor with a general unsecured claim of $62,766.88 timely filed its proof of claim and timely returned a ballot voting in favor of a liquidating plan. On the ballot, the creditor affirmatively elected to voluntarily reduce its claim to $500 and participate as a class 2 creditor thereby receiving payment in full. After receipt of its $500 check, the creditor filed the motion asserting that its election on the ballot was erroneous. The court denied the motion concluding in summary fashion that it should not exercise its equitable powers under the circumstances of the case and finding that the debtor and the official creditors committee relied on convenience class elections when settling multiple claims. The court did not discuss the implications of the confirmed plan.

In *Hills Stores*,[34] a confirmed plan provided for holders of general unsecured claims to elect one of three treatment options: (x) an equity distribution of preferred, convertible and

---

[32] Indeed, since the filing of the Motions, six additional motions have been filed. Further, the Trustee states that she has denied requests from approximately 500 claimants seeking to change their election, including both claimants who had elected the Expedited Distribution and sought to rescind it and claimants who had not elected the Expedited Distribution on their ballots but now sought to make the election. Houser Decl. ¶ 6.

[33] *In re Channel One Communications*, 125 B.R. 236, 236 (Bankr. E.D. Mo. 1991).

[34] *In re Hills Stores Co.*, 167 B.R. 348 (Bankr. S.D.N.Y. 1994) (I have omitted the facts about the sale of claims and submission of two ballots for ease of discussion).

common stock, (y) cash and equity and (z) a pro rata distribution of cash, notes and stock. The election was to be made on the ballot, which had to be returned by a specified deadline. Failure to return a timely ballot resulted in debtor making the election for the creditor. Due to a "mailroom error," American Credit Indemnity Company's ballot was not received until after the return date and accordingly, it did not receive its preferred distribution option. When American Credit filed a motion under Bankruptcy Rule 9006(b)(1) to have its ballot deemed timely filed, Hills Stores objected arguing that excusable neglect could not be proven and that granting the motion would unleash a flood of similar motions. After a request from the court for supplemental papers on the *res judicata* effect of the confirmation order, Hills Stores then argued that the request really constituted an impermissible modification of the confirmed plan. Because the court found that the American Credit could not show excusable neglect, it did not address either the modification or the *res judicata* argument.

In *American Body Armor*,[35] class 6 creditors were given multiple options for treatment under a plan. The ballot sent to class 6 creditors contained three voting options: (x) accept the plan and elect the cash option, (y) accept the plan and elect the stock option, and (z) reject the plan. Creditor Osprey did not vote to accept or reject the plan, but after confirmation Osprey reached out to the reorganized debtor to inquire how to elect the stock option. Osprey was informed it was too late to make the election so Osprey moved for permission to elect the stock option. The court first held that because the plan was silent

---

[35] *In re Am. Body Armor & Equip., Inc.*, 172 B.R. 659 (Bankr. M.D. Fla. 1994).

about how and when to elect the stock option, jurisdiction existed to decide the issue as it was one of interpretation and not a modification of the plan.[36]

After an evidentiary hearing, the court ruled that the motion was moot because it was unable to enforce the plan as all stock had already been issued.  In considering the merits anyway, the court ruled that Osprey was on notice regarding the need to make the election by the voting deadline.  Even though the notice was ambiguous, it was "sufficient to put Osprey on notice that the ballot deadline could apply to the election as well as the ballot" and to "require Osprey to inquire about the mechanics of the election."[37]  The court further noted that "equity aids the vigilant, not those who slumber on their rights."[38]  Ultimately, Osprey's failure to act before becoming bound by the plan prohibited the court from providing a remedy.

In *Allied Supermarkets*,[39] a plan of arrangement permitted Class 3 debentureholders to elect either a cash payment or a combination of cash and common stock, with the election to be made on a form accompanying the proxy statement.  Creditors who did not complete the form and return it prior to confirmation were deemed to elect the cash only payment.

---

[36] *Id.* at 662 ("This is a question of interpretation and does not involve modification of the plan. Both the plan and disclosure statement state that failure to elect stock constitutes election of the cash option.  However, the plan does not address how to make the election.  Because the mechanics of the election are not addressed in the plan, the question is one of interpreting an omission.  The question of when the default cash option takes effect is an interpretation issue, because the plan states that failure to elect constitutes election of the cash option and is subject to interpretation.").

[37] *Id.* at 664.

[38] *Id.* (citing *Christopher v. Am. Universal Ins. Grp. Inc. (In re Christopher)*, 148 B.R. 832, 836 (Bankr. N.D. Tex. 1992)).

[39] *In the Matter of Allied Supermarkets*, 21 B.R. 45 (Bankr. E.D. Mich. 1982) (case under the Bankruptcy Act).

The court-approved procedures required the solicitation of registered holders of stock (not beneficial holders) in connection with the plan of arrangement. Bear, Stearns was the registered holder for $360,000 of Allied Supermarkets debentures. Bear, Stearns elected to receive cash and stock on behalf of certain beneficial holders; it did not do so for a second group because Bear, Stearns's database mistakenly did not include this second group. When Allied Supermarkets refused to allow Bear, Stearns to belatedly make the election for the second group of beneficial holders, Bear, Stearns sought permission from the court to file a tardy election, which it contended was a "procedural modification of the Plan not substantially affecting the rights of other creditors concerned with the Plan."[40]  Bear, Stearns also contended that its request "concerns a claim."

The court found that Bear, Stearns's inaction with respect to the second group of beneficial holders constituted an election of the cash only option.  It then concluded that "this motion by Bear Stearns is an attempt to modify the Plan by revoking its earlier election" and not a claims-related matter as Bear, Stearns urged.[41]  The court further concluded (based on the Bankruptcy Act and the terms of the plan of arrangement) that it did not have jurisdiction to grant the motion. But, assuming it had jurisdiction, the court concluded that the terms of the Plan were binding and that any discretion under the Bankruptcy Act to carry out the terms of the plan of arrangement did not warrant granting relief.  Among other things the court found the failure to make the election was the "direct result of an error made by Bear, Stearns itself," Bear Stearns did not demonstrate that there

---

[40] *Id.* at 47.  Bear, Stearns brought the motion because it bought the election rights of the beneficial holders of the second group. *Id.* at 46.

[41] *Id.* at 48.

was no harm to others, "[o]ther creditors were required to take a cash distribution because of their failure to elect prior to confirmation" and "[t]here is no compelling reason to treat Bear, Stearns differently."[42] This court, too, did not directly address the effect of confirmation.

Finally, in *Centennial Healthcare*,[43] the plan placed holders of general liability claims and professional liability claims in Class 16 and provided holders of claims two options. A holder could elect to: (x) pursue insurance proceeds and waive distribution under the plan ("Insurance Option") or (y) share pro rata in a fund created under the plan in a then-unknown amount (i.e., a distribution option). The plan provided for the election to be made on the ballot. If a claimant failed to make an election, he was deemed to have elected the Insurance Option.[44]

Certain tort claimants timely filed ballots but made no treatment election. The day prior to the voting deadline, those tort claimants filed a motion to extend the time in which they could elect their treatment or permit them to change their ballots pursuant to Bankruptcy Rule 3018(a). The court denied the motion. The court recognized that the plan required the election to be made on the ballot and that under the terms of the plan, the tort claimants' failure to make an election resulted in the Insurance Option treatment. The court also ruled:

---

[42] *Id.* at 48-49. *See also id.* at 49 ("Bear, Stearns has not offered a single argument which would allow this Court to rule that equity demands that a tardy election be permitted. Bear, Stearns' problems and losses in this matter were caused by none other than Bear, Stearns.")

[43] *In re Centennial Healthcare Corp.*, No. 02-74974, 2004 WL 5848015 (Bankr. N.D. Ga. Mar. 19, 2004).

[44] *Id.* at *1.

> The Court has no authority to require Debtors to give movants additional time to make an election. It is not the Court's Plan; it is the Debtors' Plan. To change the terms of the Plan is to amend it, which is [sic] the Court does not have the power to do. All the Court can do is to confirm the Plan or deny confirmation. Bankruptcy Rule 3018 permits the amendment of a ballot to change a vote for cause shown. Movants are not proposing to change their vote against the plan. The election of one of the two options was not a vote on the plan, and nothing in the form of ballot, which the Court approved, required a claimant to vote in order to make an election. In any event, movants offered no evidence showing good cause for changing their ballot in any way.[45]

In other words: if the plan was confirmed, the tort claimants were "stuck with the Insurance Option."[46]

Certain of the cases suggest, if not rule, that a motion to change a treatment election is, in reality, an amendment to a plan if it is inconsistent with the plan. But, no case includes a reasoned analysis of the implications of plan confirmation on its decision.

*B.    Effect of Confirmation*

It is uncontroversial that a confirmed plan of reorganization binds all parties in interest, including debtors and creditors.[47] Moreover, once the court confirms a plan for a corporate debtor, only the plan proponent or the reorganized debtor can seek to modify the plan.[48] The Reorganized Debtor is not a movant in its current capacity or as successor to

---

[45] *Id.* at *3.

[46] *Id.* at *2.

[47] 11 U.S.C. § 1141(a); *Kravitz v. Samson Energy Co., LLC (In re Samson Resources Corp.)*, 590 B.R. 643, 649 (Bankr. D. Del. 2018) (collecting cases).

[48] 11 U.S.C. § 1127(b). *See also In re Vencor, Inc.*, 284 B.R. 79, 85 (Bankr. D. Del. 2002) (collecting cases); *In re Logan Place Properties, Ltd.*, 327 B.R. 811, 814 (Bankr. S.D. Tex. 2005) (as post-confirmation trust is not the plan proponent nor the reorganized debtor, § 1127 prohibits any modification by the trust). *Cf.* 11 U.S.C. § 1127(e) (if debtor is an individual, the debtor, the trustee, the United States Trustee or any holder of an allowed unsecured claim can seek to modify the plan under specified circumstances).

the Plan proponent.  Accordingly, if the Motions amount to a request for a plan

modification—as suggested by both the *Allied Supermarkets* and *Centennial Healthcare*

Courts—the Motions must be denied.[49]

Two recent cases out of this district are instructive.  In *NorthEast Gas*,[50] a reorganized

debtor asked the court to reopen its bankruptcy case to "reconsider the amount of allowed

first lien claims, bifurcate those claims into secured and deficiency claims, and adjust the

amount of" the reinstated first lien debt.[51]  No objection was filed, but the court had its own

reservations about the ability to grant the request and asked for briefing.  In a thorough

decision, the court denied the motion.

Under the confirmed plan, holders of First Lien Claims were allowed in the amount

of $539 million and holders of those claims received their *pro rata* share of (x) 100% of the

equity of the reorganized debtor and (y) $200 million of reinstated first lien debt.  The

holders of these claims were impaired and voted in favor of the plan.  By its motion, the

reorganized debtor sought to bifurcate the first lien claims into a secured claim of $475

million and a deficiency claim of the balance, thereby increasing the reinstated debt by $275

million.  The reorganized debtors argued that "the only impact of the relief . . . would be to

reallocate how the proceeds from a disposition of the assets are allocated as between the

---

[49] Even a reorganized debtor or plan proponent cannot modify a plan after it has been substantially consummated.  11 U.S.C. § 1127(b).  Because here the Reorganized Debtor is not a Movant, I need not decide whether the Plan has been substantially consummated.  I also decline to do so because this issue is currently before the Third Circuit in connection with the appeal of the Confirmation Order.

[50] *In re NorthEast Gas Generation*, LLC, 639 B.R. 914 (Bankr. D. Del. 2022).

[51] *Id.* at 917.

bank's reinstated secured debt and its 100% equity stake."[52] No other changes were proposed. The court rejected the arguments that (i) the change was simply reforming the correct value of the collateral at the time of confirmation and (ii) it could reconsider the amount of the claim under either § 502(j) or § 105. Rather, the court concluded that while the reorganized debtor did seek to reconsider an allowed claim it also sought to change the treatment of that claim.[53]

Having determined that the relief sought by the reorganized debtor could not be approved based on § 502(j), the court next examined whether the proposed relief amounted to an amendment of the plan or merely a clarification/interpretation of it.[54] The court found that the plan did not envision the proposed change as it had no provision allowing for the modification of treatment. The reorganized debtor argued, however, that the parties intended the reinstated debt to reflect the value of the collateral such that there was a "gap" in the plan that the court could fill to reflect that intent. Acknowledging cases in which courts hold that a court can clarify a plan that is ambiguous or silent, the court nonetheless, concluded that the requested change was not "a minor clarification of the Plan or necessary to fill a gap or further the intent of the parties." Rather, it concluded that the motion was an attempt to change an unambiguous term of the plan and that unambiguous terms of a plan

---

[52] *Id.* at 918 (alteration in original) (internal quotation omitted).

[53] *Id.* at 920-24; *In re Rickel & Assocs.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001).

[54] The parties conceded that the plan had been substantially consummated and the court found that to be an absolute bar to modification under 11 U.S.C. § 1127(b). *NorthEast Gas*, 639 B.R. at 922.

must be enforced.  The court also concluded that a court cannot use § 105 and/or any

equitable power to circumvent the requirements of § 1127.[55]

In *SC SJ Holdings*,[56] the reorganized debtors sought relief from "certain aspects" of

their confirmed plan.  The reorganized debtors needed relief in order to bring malpractice

actions against their bankruptcy counsel that were otherwise barred by debtor releases

contained in the plan.  The reorganized debtors claimed that the releases were obtained

without informed consent and in violation of their attorneys' ethical obligations.  They also

argued that they did not and could not know of the malpractice pre-confirmation.  Relying

on Rule 60(b)(1) and (5), the reorganized debtors argued that changed circumstances and/or

excusable neglect were bases for relief from the confirmation order and/or plan.[57]  Not

surprisingly, the law firm objected.  In a ruling from the bench, the bankruptcy court denied

---

[55] *Id.* at 924 (citing *Rickel*, 260 B.R. at 678 ("The proponents of the motion nevertheless contend that I can modify the Plan pursuant to the general equitable power of the Court under § 105(a) or the provisions of Fed.R.Civ.P. 60(b).  Neither contention has merit.  A bankruptcy court cannot exercise its equitable powers outside of the confines of the Bankruptcy Code, or disregard its specific commands.  Consequently, it cannot modify a plan under § 105(a), and produce a result at odds with the specific provisions of § 1127(b).") (internal citations omitted)).

[56] *In re: SC SJ Holdings, LLC v. Pillsbury Winthrop Shaw Pittman LLP (In re SC SJ Holdings, LLC)*, No. 22-689 (MN), 2023 WL 2598842 (D. Del. 2023), *appeal docketed*, No. 23-1731 (3d Cir. Apr. 28, 2023).

[57] Federal Rule of Civil Procedure 60(b), made applicable by Federal Rule of Bankruptcy Procedure 9024, provides in relevant part:
  (b) Grounds for Relief from a Final Judgment, Order or Proceeding.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
      (1) mistake, inadvertence, surprise, or *excusable neglect*;
                    *              *              *
      (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; *or applying it prospectively is no longer equitable*.

(emphasis added).

the motion concluding that the substantial consummation of the confirmed plan precluded amendment, that the plan could not be revoked because the motion was filed outside the 180-day period for such relief and that Rule 60(b) could not be used as a means to circumvent § 1127 and/or § 1144.  The District Court affirmed.

In affirming the Bankruptcy Court, the District Court agreed that a plan can be modified only before substantial consummation, which had already occurred.  The District Court rejected the argument that the reorganized debtors were not seeking a "modification" of the plan, but rather only "limited relief," namely to excise only the portion of the releases that were improperly obtained (and thereby argued to be ineffective and unenforceable).  Considering the substance of the request over the form, the District Court held that a change that is "'directly contrary to the express provisions of the [p]lan' constitutes a modification within the meaning of § 1127(b)."[58]  It also rejected the argument that a carve out from the debtor releases of only one released party (while leaving the remainder of the releases in place) somehow took the relief outside the scope of § 1127.[59]  Finally, the District Court

---

[58] *SC SJ*, 2023 WL 2598842, at *5 (quoting *In re Daewoo Motor Am., Inc.*, 488 B.R. 418, 425-26 (C.D. Cal. 2011)) (alteration in original). *See also* 7 Collier on Bankruptcy ¶ 1127.03[2][a] (Richard Levin & Henry Sommer eds., 16th ed. 2023) ("Courts have routinely rejected attempts by plan proponents to circumvent section 1127(b) and change the plan merely by calling the request a motion to modify the confirmation order, or a motion for reconsideration, or to modify a plan-related document, or any application that nonetheless affects rights under the plans, such as a motion to clarify or a motion to classify claims.") (citations omitted).

[59] *SC SJ*, 2023 WL 2598842, at *5 ("Contrary to Debtors' argument, the fact that they wish to modify the release provisions to carve out only one particular group of attorneys, while leaving those provisions in place as to all other attorneys, other professional, and principals, does not take Debtors' requested relief outside of the scope of § 1127(b).  That provision limits all plan modifications, regardless of the magnitude of the requested change.").

rejected the argument that Rule 60(b) may be used to obtain relief that cannot be obtained under § 1127 noting that a rule of procedure cannot nullify a statutory provision.[60]

This admittedly long recitation of the caselaw boils down to the following:

1. The court should look at the substance of the relief requested in a motion rather than the form.

2. If the relief requested is directly contrary to a provision of a confirmed plan, the motion should be treated as a request to modify the plan.

3. After a plan has been confirmed, only the reorganized debtor or plan proponent may ask the court to modify the plan.

4. If the relief requested amounts to a request to modify the plan, the relevant standard is § 1127. Neither general equitable principles, § 105 nor Rule 60(b) can serve as a basis to obtain relief.

## II. Application of the Law to the Instant Matter

### A. The Motions, in Substance, are a Request to Amend the Plan

The Plan has been confirmed. The Movants, who are each the holder of a Class 8 Abuse Claim, are neither plan proponents nor a reorganized debtor. Accordingly, if the relief sought amounts to a plan modification, then the Motions must be denied.

Each of the Movants asserts he made a mistake in electing the Expedited Distribution on his Ballot and seeks relief in some form from the Solicitation Order.[61] In her

---

[60] *SC SJ*, 2023 WL 2598842, at * 6 ("As the Third Circuit has explained, a rule of procedure cannot 'negate the substantive impact of [a] restriction contained' in a provision of the Bankruptcy Code or 'validly provide' a movant 'with a substantive remedy that would be foreclosed by' such a statutory provision.") (alteration in original) (quoting *In re Fesq*, 153 F.3d 113, 116-17 (3d Cir. 1998)).

[61] The claimants represented by Babin Law have a slightly more complicated fact pattern. These claimants assert they originally made the Expedited Distribution election by mistake, realized the mistake and informed counsel who worked with eBallot, a private company Babin Law hired in connection with the solicitation of its clients, to correct that mistake. Ultimately, through a combination of errors, the claimants were still reflected in Babin Law's Master Ballot as having elected the Expedited Distribution. Given my conclusions, the reason for the mistaken election as received by Omni is not relevant. In contrast, the Settlement Trustee has withdrawn objections to

objections, the Trustee also focuses on the Solicitation Order. But, looking at substance over form, I am persuaded by the above cases that as each Movant is asking for treatment that is inconsistent with the Plan, the Movants really seek an amendment of the Plan.[62]  It is the Plan—not the Solicitation Order—that dictates Movants' treatment.  The Plan provides that holders of Direct Abuse Claims who made the Expedited Distribution election on their Ballots are entitled to receive a one-time payment of $3,500 and nothing else.  Movants each affirmatively checked the box electing the Expedited Distribution and so, under the Plan, are treated as receiving the Expedited Distribution.

Each Movant now seeks to revoke his earlier election.  It makes no difference that each Movant seeks to carve out an exception just for himself and leave others as treated under the Plan.  It makes no difference that each Movant might characterize his Motion as seeking "limited relief."  This is a request for treatment different than that dictated by the Plan.

Nor is this relief the reconsideration of a claim under § 502(j).  Section 502(j) permits a claim that has been allowed or disallowed to be reconsidered, and if reconsidered for that claim to then be allowed or disallowed according to the equities of the case.[63]  The Babin Law claimants argue that the Settlement Trustee "has determined that Claimants' claims are

---

motions in which claimants provided evidence that Omni's records were in error.  *See* Notice of Withdrawal (D.I. 11578), ECF No. 11611.

[62]  *See Rickel*, 260 B.R. at 677 (debtor cannot change a plan by seeking to modify the confirmation order).

[63]  11 U.S.C. § 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case.").

'Allowed Abuse Claims' entitled to the Expedited Distribution under the Plan" such that
the court can reconsider those claims.[64]

First, to the extent that the Settlement Trustee's recognition of Movants' Expedited
Distribution election is an allowance of a claim, the Settlement Trustee is correct.  As
discussed above, each of the Movants checked the Expedited Distribution election on their
ballot.  Second, § 502(j) does not address treatment under a plan.[65]  While the Babin Law
claimants cite four cases[66] to support this argument, they fail to mention that Judge Walrath
discussed and distinguished each of these cases in *NorthEast Gas*.[67]  As Judge Walrath
correctly concluded, each of those decisions is distinguishable because it was either (i) a case
under chapter 13 that relies on § 1329, which has a different standard for reclassification of
claims and modification of a plan, (ii) is based on lack of notice or (iii) did not involve a
change in treatment.[68]  As she further recognized, to the extent that some aspect of the relief
sought could be classified as a reconsideration of a claim, the relief does not solely implicate
that section, rather Movants also seek to change their treatment under the Plan.[69]  Third,

---

[64] Suppl. Br. in Supp. of Claimants' Mot. to Change Election 5, ECF No. 11663.

[65] *See Allied Supermarkets*, 21 B.R. at 48 (seeking to change a treatment election is not a claims-related
issue); *NorthEast Gas*, 639 B.R. at 920 (recognizing that allowance of claim and treatment of claim
are separate concepts).

[66] *See United States Dep't of the Treasury – Internal Revenue Serv. v. EB Holdings II, Inc.*, 2021 WL
535467, at *4 (D. Nev. Feb. 11, 2021); *In re Disney*, 386 B.R. 292, 303 (Bankr. D. Colo. 2008); *In re
Davis*, 404 B.R. 183, 188 (Bankr. S.D. Tex. 2009); *In re Van Dyke*, 286 B.R. 858, 861 (Bankr. C.D. Ill.
2001).

[67] *NorthEast* Gas, 639 B.R. at 919.  In fact, it looks like Babin Law lifted the description of these four
cases directly from the decision without attribution and without noting the opposite conclusion the
decision reached.

[68] *Id.*

[69] *Id.* at 920.

while the Babin Law claimants contend there is nothing in the Plan that prohibits this relief, to the extent it is based on § 502(j), Movants point to no language in the Plan or TDP that permit me (or any court) to reconsider an Expedited Distribution election.[70]

As the relief sought is directly contradicted by the Plan granting such relief would constitute an amendment to the Plan.

### B. *The Plan Does Not Permit the Court to Amend the Plan*

Certain Movants argue—in a somewhat blanket fashion—-that a court has the power to amend a plan of reorganization. No authority has been cited for this proposition, the Code does not provide authority and the *SC SJ* and *NorthEast Gas* cases suggest this is not the law.[71]

Other Movants argue that the terms of the Plan permit the court to amend it pointing to language in the TDP.[72] The TDP does not permit the court, on its own or on the initiative of a creditor, to amend the Plan. Rather, the TDP permits the Settlement Trustee to amend the TDP in certain circumstances. But, even the Settlement Trustee is prohibited from amending the TDP "without the written consent of the Settlement Trust Advisory Committee ("STAC") and the Future Claimants' Representative ("FCR"), as provided in the Settlement Trust Agreement."[73] In turn, the STAC and/or the FCR can propose

---

[70] *Compare* TDP, art. VII.G (providing for reconsideration by the Settlement Trustee of claims resolved through the Claims Matrix process and the ability to pursue the claim further in the tort system).

[71] *See also* 7 *Collier on Bankruptcy* ¶ 1127.03[2][a] ("Courts are not permitted to make *sua sponte* postconfirmation modifications.").

[72] No party cited Article XII.B of the Plan (Amendment or Modification of the Plan), which provides the terms under which the Debtor reserves the right to amend the Plan. As already stated, Boy Scouts does not seek to modify the Plan.

[73] TDP, art. XIV.B provides:

amendments to the Settlement Trustee.[74]  Regardless, absent court approval, neither the

Settlement Trustee, the STAC nor the FCR may amend the TDP in a "material manner"

including "(i) to provide for materially different treatment for Abuse Claims, . . . (iii) to add

an opportunity to make an Expedited Distribution Election for a claim represented by a

Chapter 11 POC after the Voting Deadline, . . . or (v) in a manner that is otherwise

inconsistent with the Confirmation Order or Plan."[75]  The Settlement Trustee does not seek

to amend the TDP and actively opposes the Motions.  And, to the extent it might be

relevant, neither the STAC nor the FCR weighed in on the Motions.  Thus, the TDP does

not aid Movants.

Next, some Movants point to the definition of Trust Distribution Procedures in the

Plan to emphasize that the definition contemplates potential amendments.  But, the defined

---

**Amendments.**  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP. Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) to materially alter the Independent Review Option, or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan. Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

[74] TDP, art. XIV.B.

[75] *Id.*

term only contemplates amendments "in accordance with the terms of the TDP."[76] Thus, this is not helpful either.

Finally, contrary to the argument of at least one Movant, the retention of jurisdiction section in the Plan does not provide me with broad authority to amend the Plan in my discretion.[77] As a general matter, the court cannot reserve jurisdiction to do something it cannot do. Nor have Movants cited any authority that a reservation of jurisdiction provision gives the court carte blanche to change a confirmed plan.

Movants rely on two provisions of the Plan in support of their argument. First, the Plan provides that the court retains jurisdiction to modify the Plan after confirmation consistent with the Bankruptcy Code and Bankruptcy Rules.[78] As set forth above, however, the requested relief is inconsistent with the Code, which does not permit a creditor to request a modification of a confirmed plan. Second, the Plan provides that the court retains jurisdiction to "correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan."[79]

---

[76] "'Trust Distribution Procedures' means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached hereto as Exhibit A, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Claims." Plan, art.I.A.289.

[77] This dispute is not a question of jurisdiction. No party has argued that the court does not have jurisdiction to decide the Motions and I can easily conclude that I do. While I may not have power to address or resolve Abuse Claims under the TDP, the Motions also concern the interpretation of the Plan, so jurisdiction exists over these disputes. *See NorthEast Gas*, 639 B.R. at 918; *Am. Body Armor*, 172 B.R. at 662.

[78] Plan, art. XI.C.1.

[79] Plan, art. XI.C.2.

This provision cannot be a roving commission to modify the Plan.  Rather, this provision

appears to envision jurisdiction to correct a defect, omission or deficiency as necessary to

ensure the Plan can be implemented.[80]  The Plan has been implemented.  Thus, Movants are

left to argue, as some Movants did, that either the plan is ambiguous and needs clarification

or that the Plan is silent on the issue and/or creates a gap or "void" in the Plan that the

court can fill.

   *C.  The Plan is not Ambiguous and there is no "Gap" to be Filled.*

   A plan of reorganization is governed by principles of contract interpretation.[81]  The

Confirmation Order and the Plan provide that Delaware law governs situations, such as

here, where neither the Bankruptcy Code nor other federal law is applicable.[82]  Delaware

courts construe contracts to give effect to the intent of the parties.[83]  Under Delaware law,

---

[80]  It is difficult to differentiate a specific task among the 33 separate paragraphs addressing retention of jurisdiction, which often appear to overlap.  But, again, a court cannot retain jurisdiction to do something it cannot otherwise do.

[81]  *NorthEast Gas*, 639 B.R. at 923 (citing *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007)).

[82]  Confirmation Order ¶ 71; Plan, art. XII.H.  The TDP provides:

> These TDP shall be interpreted in accordance with the laws of the State of Delaware. Notwithstanding the foregoing, the evaluation of Abuse Claims under these TDP and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII or the jurisdiction where such Abuse Claim could have been filed under applicable law.

TDP, art. XIV.E.  The requested relief does not cause me to evaluate the substance of any claim, accordingly the TDP also is governed by Delaware law for purposes of determining the Motions.  I also note that the only Movant who cited law on contract interpretation cited exclusively to Delaware law.  Suppl. Mem. in Supp. of Certain Claimants of the Krause & Kinsman, the Robert Pahlke Law Group, and Davis Bethune & Jones Law Firms Mots. To Correct Election from the Expedited Payment Option to the Trust ("Matrix") Claims Process or Independent Review 5-10, ECF No. 11670.

[83]  *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

absent an ambiguity in the contract, the contract is enforced pursuant to its terms.[84]   Courts

should not twist unequivocal language in the guise of interpreting a contract.[85]   A contract is

ambiguous when the contested language "is susceptible to more than one reasonable

interpretation."[86]   And, "an interpretation is unreasonable if it produces an absurd result or a

result that no reasonable person would have accepted when entering the contract."[87]

Disagreement over interpretation does not render terms ambiguous.[88]

  I do not find the Plan to be ambiguous on the Expedited Distribution election or

treatment.   Movants point to no language pertaining to the election or treatment of Direct

Abuse Claims that can be reasonably interpreted more than one way.   The Plan provides

that holders of Direct Abuse Claims who want the Expedited Distribution must make the

choice on the Ballot.   The Plan provides that such an election entitles the claimant to a one-

time payment of $3,500 and nothing else.   Moreover, there is no provision of the Plan that

permits the claimant to later change his election—either because he changes his mind or

because he made a mistake on his Ballot.[89]   Neither does this straight-forward reading of the

Plan yield an absurd result; there is nothing absurd about the finality of an election to join a

---

[84] *Allied Capital v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[85] *Id.*

[86] *Weinberg*, 294 A.3d at 1044 (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

[87] *Id.* (quoting *Manti Holdings*, 261 A.3d at 1208 (internal citations omitted)).

[88] *Id.* (citing *Manti Holdings*, 261 A.3d at 1208).

[89] *Compare with Allied Supermarkets*, 21 B.R. 45 (mistake by Bear, Stearns) and *SC SJ*, 2023 WL 2598842 (alternative argument that debtor mistakenly provided releases).

convenience class.  While the Plan could have been drafted to permit claimants to change

their election (*see below*), it was not.

Nevertheless, Movants jump on this absence of express language in the Plan to argue

that the failure to expressly prohibit a change in the Expedited Distribution election

inexorably leads to the conclusion that the election is revocable or not final.  I do not accept

this proposition.  Silence on revocability does not make the Plan ambiguous, rather it leaves

nothing to be interpreted or clarified.[90]  Neither the Plan nor the TDP speak in provisional

terms.  Holders of Direct Abuse Claims were provided with a choice; the Plan does not

provide that holders can change their elections once made.  If silence equates to

revocability, all holders of Direct Abuse Claims who elected the Expedited Distribution

could change their mind at any time, with seemingly no deadline to do so, a result the

Settlement Trustee contends creates significant difficulties in administering the Trust.[91]

Taking Movants' argument to its logical conclusion, any action not expressly prohibited by

the Plan and TDP would be permitted.

While I conclude that the Plan is not ambiguous, could the "silence" on finality be a

"gap" that needs to be—and should be—filled?  Delaware law analyzes this issue through

the process of contract construction in the context an implied covenant.[92]  The court first

---

[90] *In re Ampace Corp.*, 279 B.R. 145, 153 (Bankr. D. Del. 2002) (plan providing a time limit in which trustee could object to claims without language providing that the deadline could be extended leaves "nothing in the Plan for the Court [to] interpret or clarify;" "absent such [extension] language, unless the Plan is otherwise modified in accordance with § 1127(b), both parties are bound by the terms of the Plan and the Objections Deadline contained therein.").

[91] At argument, some counsel suggested the Settlement Trustee should set a deadline for "opting out" of the Expedited Distribution election.  This suggestion simply puts in place a second deadline and the potential for further litigation.

[92] *In re El Paso Pipeline Partners, L.P. Derivative Litigation*, No. 7141-VCL, 2014 WL 2768782, at *17 (Del. Ch. June 12, 2014) (distinguishing contract construction from contract interpretation); *Reklam*

determines whether the contract is "truly silent" on the subject at issue "revealing a gap."[93] If a gap exists, then "the court must determine whether the implied covenant should be used to supply a term to fill the gap."[94]

The Delaware courts are clear: "[n]ot all gaps should be filled."[95] A party cannot obtain relief from the court though contract construction for terms it was unsuccessful in negotiating.[96] Further, "[t]he Delaware Supreme Court has provided guidance in this area by admonishing against a free-wheeling approach to the implied covenant."[97] Courts should be cautious as gap filling is only an "occasional necessity . . . to ensure that parties' reasonable expectations are fulfilled."[98] If the court determines the gap should be filled, the court can only supply "those terms that the parties would have agreed to . . . if they had thought to address them."[99] "Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are

---

*v. Bellator Sport Worldwide LLC*, No. 16-cv-285, 2017 WL 5172397, at *5 (D. Del. Nov. 8, 2017 ) (R. & R. adopted 2017 WL 5985562 (D. Del. Dec. 1, 2017).

[93] *El Paso*, 2014 WL 2768782, at *17.

[94] *Id.*

[95] *Id.*

[96] *Id.* at *18.

[97] *Id.* (citing *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).

[98] *Id.* (quoting *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005); *Oxbow Carbon & Minerals Holdings v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) ("the covenant is a limited and extraordinary legal remedy") (quoting *Nemec*, 991 A.2d at 1128) (declining to apply covenant where no gap exists and the issue could have easily been anticipated).

[99] *El Paso*, 2014 WL 2768782, at *18 (quoting *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013) (overruled on other grounds)).

too obvious to need expression."[100] The court does not supply terms as an equitable remedy for events that "could have been anticipated, but were not, that later adversely affected one party."[101] Further, "[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[102]

Notwithstanding a review of the Delaware case law and Movants' supplemental submissions, it is not clear exactly how to determine whether a contract is "truly silent" on an issue or whether a "gap" actually exists. Movants want me to construe the lack of an express term of irrevocability to imply revocability and to insert that concept into the Plan as a gap filler. I hesitate to find a gap, however, because neither revocability nor irrevocability is an inherent trait of a convenience class election, and I have concluded the Plan is not ambiguous. Accordingly, the Plan is not "truly silent."

To show that a "gap" exists and that the Expedited Distribution election was intended to be revocable, almost all Movants cite to the discussion of the Expedited Distribution at the Disclosure Statement hearing. The TDP, generally, as well as the Ballot were a significant topic of that hearing including on both days four and five. After a robust discussion, I concluded that the Expedited Distribution election would be made on the Ballot, not after the Effective Date as part of the trust administration process, to ensure that at the confirmation hearing the court and parties had information relevant to Debtors'

---

[100] *Id.* (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, No. C.A. 15388, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd*, 708 A.2d 989 (Del. 1998)).

[101] *Oxbow Carbon*, 202 A.3d at 507, 507 n.109 (finding no gap exists and noting that the trial court's opinion suggested use of implied covenant to correct an extreme and harsh result).

[102] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015) (quoting *Allied Capital*, 910 A.2d at 1035) (citations omitted).

request for third party releases.[103] Subsequently, in response to a renewed suggestion that I

reconsider that decision, TCC counsel suggested the ability to "opt out" of that election at a

later date.[104] As Movants noted, no counsel spoke up to oppose that suggestion and some

supported it. I did not direct inclusion (or not) of any optionality, concluding only that

Debtors could incorporate optionality in their plan if they so chose.[105] Debtors did not do

so. Debtors did not amend the treatment section of the Plan or TDP in response to this

colloquy either to: (i) permit those who had elected the Expedited Distribution on the Ballot

to later change their election in their discretion or (ii) permit those who had not chosen the

Expedited Distribution to subsequently choose that option in their discretion. Instead, the

Plan and TDP were amended solely to reflect a restriction on the ability to amend the Plan

to permit claimants to later make an Expedited Distribution election without court

approval.[106]

    This extensive discussion of the Expedited Distribution and the Ballot at the

Disclosure Statement hearing underscores the singular focus throughout these bankruptcy

cases on the treatment of Direct Abuse Claims. This treatment was negotiated, renegotiated

---

[103] 9/28/2021 Hr.'g Tr. 208:4-236:3; *see also* Confirmation Opinion, 642 B.R. at 679.

[104] 9/29/2021 Hr'g Tr. 86:3-103:18. As evident from the transcript, the discussion became a bit muddled as counsel at times spoke past each other.

[105] 9/29/2021 Hr.'g Tr. 102:14-103:1.

[106]    MS. GRASSGREEN: Thank you, Your Honor, two points. One, we discussed yesterday the 3500 election and that we did get the documents last night and some further this morning reflecting that in both the plan and the TDP. It's a section of the TDO with respect to amendments, to just make clear that the TDP cannot be amended to allow that later election without your approval since you've ordered that the election be made on the ballot. So we will send that language over, so that is one comment.

9/29/2021 Hr'g Tr. 86:3-12

33

and, at different times, contested by Debtors, the TCC, the Coalition for Abused Scouts for Justice, the FCR and numerous insurance companies.  Further, holders of Direct Abuse Claims could have—and some did—raise issues regarding treatment in confirmation objections.  None raised this particular issue.

Where treatment of Direct Abuse Claims was thoroughly vetted by multiple sophisticated parties, some of whom are fiduciaries to the estate, and impacts 82,000 claimants, I hesitate to find a gap exists.  But, in these circumstances, I do not hesitate to conclude that to the extent there is a gap, it should not be filled.[107]  The treatment of Direct Abuse Claims, including the Expedited Distribution, was the central focus of the Boy Scouts bankruptcy case, the subject of intense negotiation and the subject of a disclosure statement and confirmation hearing.  These are circumstances in which a court should be "most chary" to fill any gaps.[108]  I decline to do so.

> D. *Because the Motions Amount to a Request for Modification of the Plan, no relief is Available*

Some Movants provide a variety of theories in support of the requested relief.  For completeness, I will briefly respond to certain arguments.

---

[107] *See e.g.*, *Oxbow Carbon*, 202 A.2d at 507 (declining to apply implied covenant because, among other reasons, issue could have been anticipated); *Allied Capital*, 910 A.2d at 1035 ("Furthermore, courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.  The original parties to the $10 Million Note were sophisticated players who had experience in negotiating the particulars of a debtor-creditor relationship. . . . The implied covenant is not a fall-back position to be argued when you now wish your predecessor-in-interest had done a better job of negotiating the contract in the first place.") (internal citation omitted).

[108] *Nationwide Emerging Managers*, 112 A.3d at 897 (citation omitted).

    *(i)      The court can grant the relief based on the general equity powers of the court.*

While the bankruptcy court is a court of equity, the court cannot use its equitable

powers in derogation of the Bankruptcy Code, or specifically, to permit amendment of a

plan other than in accordance with § 1127.[109]

    *(ii)     The court can grant relief under Rule 60(b) because each Movant made a mistake.*

First, a rule of procedure cannot supersede the requirements of a statute, including

§ 1127.[110] Even if it could, the Motions were filed after the one-year time period prescribed

by Rule 60(b)(1) regardless of whether one should look at the date of the entry of the

Solicitation Order or the Confirmation Order.[111] Second, Rule 60(b)(6) cannot be used to

get around the time limitations in Rule 60(b)(1).[112] Third, it is not clear from the

---

[109] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); *NorthEast Gas*, 639 B.R. at 924-26 (thoroughly discussing cases and concluding that § 105 cannot be used to modify a plan contrary to § 1127).

[110] *SC SJ*, 2023 WL 2598842, at *6 ("As the Third Circuit has explained, a rule of procedure cannot 'negate the substantive impact of [a] restriction contained' in a provision of the Bankruptcy Code or 'validly provide' a movant 'with a substantive remedy that would be foreclosed by' such a statutory provision." (quoting *In re Fesq*, 153 F.3d 113, 116-17 (3d Cir. 1998)) (alteration in original) (thoroughly discussing cases and concluding that Rule 60 (b) cannot be invoked to produce a result contrary to § 1127).

[111] An order approving a disclosure statement is not a final order. *In re Elsinore Shore Assoc.*, 82 B.R. 339, 341 (D.N.J. 1988); *see also In re Worldcom, Inc.*, No. M-47 HB, 2003 WL 21498904, at *2 (S.D.N.Y. June 30, 2003) (collecting cases).

[112] *Kemp v. United States*, 596 U.S. 528, 533 (2022) ("[Rule 60(b)(6)] is available only when Rules 60(b)(1) through (b)(5) are inapplicable."); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993) ("[Rule 60(b)(1) and (b)(6)] are mutually exclusive, and thus a party who failed to take timely action due to "excusable neglect" may not seek relief more than a year after the judgment by resorting to subsection (6)."); *Boney v. United States*, No. 17-197, 2023 WL 4686050, at *3 (D. Del. July 21, 2023) ("Notably, the Rule 60(b)(6) catch-all provision is to be utilized when the requested relief is not available in the enumerated categories of (b)(1)-(3). When the requested relief falls into one of three sub-categories, the catch-all provision is not available. *See Walsh v. United States*, 639 F. App'x 108, 111 (3d Cir. 2016); *see also Barnett v. Neal*, 860 F.3d 570, 573 (2017) (noting 'if the asserted grounds for relief fall within the terms of the first three clauses of Rule 60(b), relief under the catchall provision is not available.').").

declarations submitted into evidence that each of the Movants would be able to prove excusable neglect under the *Pioneer*[113] standard if that standard applies in this context.  The delay in bringing the Motions after awareness of the mistake might be a factor significantly weighing against granting the Motions in a significant number of cases.  Fourth, certain claimants contend that they were confused by the Ballot thus leading to their mistake.  While complicated, the Ballot was sufficiently clear to permit parties to understand how to fill it out.  Creditors are also charged with reading the Disclosure Statement and Plan.[114]  And, those represented by counsel, had an additional resource.[115]  Finally, while certain attorneys state they did not, or would not have, counseled their clients to elect the Expedited Distribution option some of the declarations are vague about whether counsel actually advised their clients on this critical election.

   (iii)  *The Court can Order that the Ballots be Withdrawn pursuant to Rule 3018.*

  Rule 3018 provides that "[f]or cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection."  The "acceptance or rejection" referenced in the Rule is a vote to accept or reject the Plan.  Movants are not seeking to change their vote on the Plan.  The election of the Expedited Distribution option is wholly separate from the vote on the Plan.  Rule 3018 says

---

[113] *Pioneer*, 507 U.S. at 395.

[114] *See Am. Body Armor*, 172 B.R. 664 (noting in reasoned dicta that even on ambiguous notice of an election deadline a creditor required to "inquire about the mechanics of the election" if confused).

[115] Moreover, *Pioneer* is clear that a client "must be held accountable for the acts and omissions of their attorneys." 507 U.S. at 396-97 (citing *United States v. Boyle*, 469 U.S. 241 (1985); *Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962); *Smith v. Ayer*, 101 U.S. 320, 326 (1880)).

nothing about changing this wholly separate decision.[116] And, again, a rule of procedure cannot supercede the requirements of a statute.

       *(iv)     Movants did not complete the Expedited Distribution election.*

Certain Movants argue that the Expedited Distribution election was not complete because they did not know if the Plan would be confirmed or because in order to receive the Expedited Distribution a claimant must sign a release. First, creditors always make decisions on plans without knowing whether the plan will be confirmed. Second, as the Plan provides, the receipt of the Expedited Distribution is subject to satisfaction of the criteria set forth in the TDP. Those criteria are not part of the election, rather they are conditions to receiving the $3,500 distribution that a claimant elected (e.g. submitting your signed proof of claim form and signing a release).[117]

**Conclusion**

I recognize the conclusion in this matter yields a harsh result. I acknowledge that Movants allege their claims would be worth thousands, or even millions, more if permitted to pursue one of the other two treatment options provided by the Plan. I also recognize that Movants have waited many years for acknowledgement and recompense. The circumstances are also unfortunate as each Movant had counsel to advise him in completing his ballot, ensuring and/or confirming correction of any mistaken elections and timely bringing the matter to the attention of the court prior to confirmation of the Plan. But the

---

[116] *Centennial Healthcare*, 2004 WL 5848015, at *3.

[117] Plan, art. I.A.126, art. III.10.b.i.

harsh outcome does not permit me to ignore the Plan or the law regarding amending a plan.[118]

The remedy sought through the Motions is not one the court can provide.  Movants are bound by the Expedited Distribution election made on their Ballots.

Separate Orders will issue.


Dated:  February 5, 2024

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[118] While recognizing the harsh nature of this result for these Movants, I do not accept the general proposition advanced by some counsel in argument that no holder of a Direct Abuse Claim would knowingly accept $3,500 in exchange for a multi-million-dollar claim.  This argument is directly counter to views expressed by many survivors during the course of the bankruptcy case who seek recognition from Boy Scouts of the harm they suffered while a scout, do not wish to be re-traumatized by continued discussion of their abuse and want to keep their abuse private.  Among other things, the Expedited Distribution serves these aims.