




21 July 2025

Clerk of Court
U.S Bankruptcy Court
District of Delaware
824 N Market St
3rd Floor
Wilmington, DE 19801

**IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,
CASE: 20-10343 [LSS]**

Dear Clerk of Court:

Please file the enclosed Motion for an order directing the BSA Settlement Trustee to provide specific information to all sexual abuse claimants - and - directing the Trustee to cease forcing claimants to negotiate settlements with former attorneys to receive disbursements, and present to the Court for consideration.

Thank you for your time and assistance.

Regards



**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

RECEIVED
2025 JUL 30 AM 9:20
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:**<br><br>**BOY SCOUTS OF AMERICA, AND DELAWARE, BSA, LLC,**<br><br>**Reorganized Debtors.** | **Chapter 11**<br><br>**Case No. 20-10343 (LSS)**<br><br>**(Jointly Administered)** |

**MOTION FOR AN ORDER DIRECTING THE BSA SETTLEMENT TRUSTEE TO PROVIDE SPECIFIC INFORMATION TO ALL SEXUAL ABUSE CLAIMANTS**
**-AND-**
**DIRECTING THE TRUSTEE TO CEASE FORCING CLAIMANTS TO NEGOTIATE SETTLEMENTS WITH FORMER ATTORNEYS TO RECEIVE DISBURSEMENTS**

**COMES NOW** [REDACTED] original claimant number 72, *pro se*, and moves the court for an order directing the BSA Settlement Trustee to cease forcing claimants to negotiate settlements with former attorneys to receive disbursements, and to provide specific information to all sexual abuse claimants, specifically:

- **A monthly report in spreadsheet format for all submitted claims which includes at a minimum:**
  - **Total number of claims submitted to the Trust by:**
    - Total number of claims allowed
    - Total number of claims disallowed
    - Total number of claims not yet determined
  - ***Breakdown of all allowed claims by:***
    - State (with statute of limitations factor shown)
    - Local Council
    - Tier
      - Highest number of aggravating factors
      - Lowest number of aggravating factors
      - Average number of aggravating factors

- Highest number of mitigating factors
- Lowest number of mitigating factors
- Average number of mitigating factors
- Highest settlement value
- Lowest settlement value
- Average settlement value

- **Breakdown of all disallowed claims by:**
  - State
  - Local Council
  - Tier
  - Cause for disallowance

- **A full and complete explanation of each of the following as part of individual claim determination notices:**
  - **Each claimed aggravating factor disallowed by Trust**
  - **Each mitigating factor applied to claim by Trust**

**DISCUSSION**

BACKGROUND

The Court conducted a hearing on March 19, 2025, during which Schwindler complained about the lack of transparency by the BSA Settlement Trust, and problems with communication with both the Trust and his attorney.[1] The Trustee was directed to address the questions related to transparency, and to begin posting monthly reports on the docket. The Court also suggested the Trustee should look into expediting [redacted] claim.

At the conclusion of the hearing, [redacted] was provided with a look at the Trustee's monthly report as posted online by a counselor at his prison. He responded by providing a specific critique of that report, and attempted to explain why the Trustee's monthly report information is insufficient. He also provided a detailed

[1] [redacted] had written a letter to the Court on January 22, 2025, and the Court had ordered the Trustee to respond to specific points raised within the letter. (D.I. 12664/12665)

explanation of the problems he was having with his attorney; suggesting his experiences were not isolated,[2] and that the Court needed to address unethical behavior by attorneys in this case.[3] The Court again ordered the Trustee to respond to [REDACTED] concerns.

The Trustee's response (D.I. 12833) was dismissive of complaints about what [REDACTED] characterized as a lack of transparency, and added that those complaints were moot due to him having accepted the Trust's proposed settlement of $1,389,312. The Trustee's response t[REDACTED] grievances concerning attorney Alan R. Zibelman advised the Court that the Trust would not issue a payment to Schwindler because that attorney had filed a lawsuit against [REDACTED] for having terminated him, and had claimed to have a lien agains[REDACTED] settlement from the Trust. The Trustee opined that this issue related to counsel would likely necessitate a hearing by the Court.

[REDACTED] responded to D.I. 12833 by letter to the Court on May 26, 2025, and specifically requested the Court to schedule a hearing related to the issues raised within this motion.[4] In this letter [REDACTED] claimed he is not alone in this situation of frustration with a predatory (and unethical) lawyer and a non-caring

---

[REDACTED] prediction in this regard has been proven to be accurate as illustrated by Agenda Item #5 for the July 16, 2025, hearing on Z.B.'s objections to former counsel's charging lien, and the Trustee's actions in response thereto. (D.I. 12912)

[3] This March 20, 2025, letter is found at D.I. 12771/12772.

[4] Given the fact [REDACTED] May 26, 2025, letter did not result in the requested hearing, while the situation involving Z.B. has been heard on July 16, 2025, Schwindler has included the issue within this motion, because it is his belief that "something" needs to be done about the unethical attorneys involved in this case.

(non-transparent) Trustee. He reported that thousands of claimants are members of Facebook groups dedicated to this case, and that those claimants post complaints every day:

> "(1) about the exhorbitant expenses being eaten up by the Trustee and her minions;
>
> (2) about the lack of consistency and transparency by the Trust (we're apparently too stupid to understand that the decisions are fact specific, so we have no need to know what other similarly situated claimant's cases are being compensated); and
>
> (3) about the absolutely do-nothing (and unethical) lawyers we mostly had to retain just to access the process, etc., etc., etc."

It is unknown whether the Court received or filed this letter, but the Trustee was not ordered to respond to it, nor was the requested hearing scheduled.

While [redacted] cannot access the BSA Trust's website with his inmate tablet, he can access Facebook. Exactly as reported in his May 26, 2025, letter, the degree of frustration and anger about the entire process related to this case has reached a critical level. There're claimants who've been driven to the point of dispair, and others who are well beyond angry. People will put up with a lot, but they generally rebel at what they perceive to be unfairness - and this entire process long ago passed into that realm.

THE LAWYERS

The case of [redacted] former "lawyer" is not unique. After the Plan was approved [redacted] sought an advance against his settlement because he needed money to continue his challenge to conviction, as well as for basic living expenses, including medical care. He applied online to Lawyers Funding Group. Attorney Alan R. Zibelman is the managing partner of that company. After several weeks of

communications, including one phone call arranged through the prison, Zibelman advised [redacted] he would be approved for a $3,000 advance, BUT, he needed to retain a lawyer first.

[redacted] contacted a Georgia attorney he has assisted with paralegal type work, and she (Iymaan Williams, Georgia Bar #659855) drew up a *pro bono* representation agreement which was forwarded to Lawyers Funding Group. Zibelman responded by saying the contract with Ms. Williams wasn't acceptable, BUT even though it would be illegal for him to advance money to Schwindler if he represented him, he'd be happy to represent [redacted] and would ("wink, wink") arrange for an "associate" to make the advance. Zibelman claimed to [redacted] he represents "more that 200 claimants in the BSA case". How many of those were unethically induced to retain Zibelman in a fashion similar to [redacted] How many other attorneys used similarly unethical means to gain numbers of claimant clients?

Since [redacted] had no choice, he agreed to allow Zibelman to "represent" him, but that representation did not extend to [redacted] original lawsuit against the Patriots Path Council, BSA, or the bankruptcy proceedings. In exchange for Zibelman arranging for the $3,000 advance, [redacted] agreed to pay Zibelman 33% of whatever settlement he received. Zibelman, in fact, contacted "associates" who advanced $3,000 to [redacted] at rates which are illegal where he's incarcerated in Georgia.[5] Those associates demanded more than 100% interest.

---

[5] Georgia law prohibits champerty, and strictly regulates which companes can make lawsuit funding non-recourse loans; while converting such agreements to loans for funds at interest in cases where settlement is assured - such as with this case.

As reported by the Trustee in D.I. 12833, Zibelman contacted the Trust on [REDACTED] behalf exactly once, by email in December, 2023. THAT, and submitting the Trust's Claims Questionnaire (completed by [REDACTED] was ALL Zibelman did as [REDACTED] lawyer,[6] besides arranging for his "associates" to make the advance, and advising [REDACTED] to forego Independent Review because "it would take too long". When [REDACTED] requested copies of documents in March, 2025, Zibelman told him to submit his request again in a few weeks. When [REDACTED] asked why the Trust was taking so long making a determination in his case, Zibelman lied about having been told by "a personal contact within the Trust" it was because [REDACTED] had filed a lawsuit prior to the bankruptcy.

It's no secret claimants have been complaining about unethical and unresponsive attorneys since the outset of this case. It's also no secret it was the claimants' attorneys and BSA who wanted one big bankruptcy rather than a bunch of little ones by those local councils where BSA sexual abuse victims had open statutes of limitations. For the BSA, it was a way to protect the overwhelming majority of its

[6] As the Court is well aware, [REDACTED] has appeared *pro se* during numerous hearings in this case. He was claimant #72 because his *pro se* lawsuit against the Patriots Path Council, BSA (and nobody else) predated the BSA bankruptcy. [REDACTED] submitted his own claim to Omni, and was among the first to do so. He was *pro se* in the U.S. Bankruptcy Court for the District of New Jersey. He conducted 100% of the discovery in his case - including getting admissions from the BSA that the individual who sexually abused him for over a year was a professional employee of the local council, and that employee was not only terminated for sexually abusing other scouts at precisely the same location as [REDACTED] reported, he was known to have abused many more than 5 others. He completed the Trust's Claims Questionnaire himself, as well. Rather obviously, there was nothing for Zibelman to do as far as actually representing [REDACTED]

assets (which were, are, and always have been in the hands of the local councils).[7] For the lawyers, it was (is and will continue to be) a big payday without the necessity of actually doing much work (no discovery, no drafting pleadings, no court appearances/arguments).

Like so many of the claimants, [REDACTED] has complained about Alan Zibelman for quite some time. The Trustee said in D.I. 12732 it had forwarded him the form to terminate counsel at some point in the past (probably late 2023 - which undoubtedly precipitated Zibelman's one contact with the Trust). Unfortunately, Schwindler never received that form. If he had, he would definitely have completed and submitted it.

The final straw for [REDACTED] was Zibelman's refusal to provide an accounting of hours after weeks of delay providing documents.[8] In D.I. 12833, the Trustee reported [REDACTED] requested the form again after the March 19, 2025, hearing, and submitted it on April 22, 2025. Zibelman, of course, responded by filing lawsuit

---

[REDACTED] was recently contacted by one of the other BSA sex abuse claimants. That individual worked as a ranger at the Mortimer L. Schiff Scout Reservation in Morris County, NJ, near the same time [REDACTED] worked there making TV commercials for the BSA. (This was the long time National Training Center for the BSA which the BSA claimed to not have sufficient information with which to answer discovery about in 2022.) The "informant" advised [REDACTED] a recent study had verified the BSA (and its local council) owned almost one billion dollars worth of assets in three counties of northwest NJ. Combine that fact with the fact the BSA previously admitted its insurance coverage at the time provided $250,000 per occurence, with no aggregate limit. Since [REDACTED] molested [REDACTED] well over 150 times in 1961 and 1962, it would not have been unreasonable for him to have a $37,500,00 claim against that policy and the local council.

[8] After reviewing Zibelman's representation contract, and noting it provided for Zibelman to receive no more than $375 in payment for actual hours worked in the event his services were terminated by [REDACTED] Ms. Williams had advised [REDACTED] to request an acounting of hours. When Zibelman refused to provide an accounting, Ms. Williams advised [REDACTED] to terminate representation and file a Bar Grievance for unethical conduct.

against [redacted] for having the audacity to fire him for not doing anything. The Philadelphia, PA, Bar Association refused to accept a grievance from Schwindler.

The Trust responded to Zibelman's meritless claims by impounding all payments to [redacted] When he complained about all of this in his May 26, 2025, letter, a courtesy copy was provided to the Trust's attorneys. Ms. Amy Gernon (Trust Counsel) advised [redacted] he could not receive anything from the Trust until such time as he reached a settlement with Zibelman - even though no court had granted Zibelman a lien. Once again, [redacted] had no choice. The Bar Association had no interest in enforcing its own rules. The Trust didn't care a whit about who the victim is in this case. The Court didn't respond to the May 26, 2025, letter or D.I. 12833.

[redacted] "agreed" to allow the Trust to pay $5,000 to Zibelman, and $6,000 to his "associates" while he received $9,839.68 from the intial distribution (or about 47%), plus 15% of all future distributions. In other words, Zibelman, who did nothing, or next to nothing, and whose "recruitment" of [redacted] as a client was unethical at best, will receive approximately $210,000 in the event the full settlement is paid. AND THIS IS THE PROBLEM hundreds of claimants are having with equally as unethical and unresponsive attorneys. If there was ever a bankruptcy trust which ought to take especial care for the claimants, the BSA Settlement Trust should be that trust, BUT, as the claimants have learned the hard way, this case was captured by the lawyers very early on.

The Court has made several attempts to rein in the lawyers since early 2020. Whether anything can be done about Zibelman, the Court needs to direct the Trustee

to cease forcing claimants such as [redacted] to negotiate with terminated attorneys in order to receive disbursements such as happened in this case. No BSA sexual abuse victim should ever be permitted to be forced by the Trust to agree to pay an attorney who performed virtually no work on the claimant's behalf even a dollar more than that attorney's hourly rate for hours actually billable without a court's order to do so. In [redacted] case, Zibelman could not have expended more than 15 to 20 hours - almost all of which would've been related to facilitating the advance. At $375 per hour, that's a maximum of $7,500 for 20 hours, and that's over $200,000 less than Zibelman demanded, and the Trust forced upon [redacted]

TRANSPARENCY

Monthly Report

The "demand" for a monthly report in spreadsheet format for all submitted claims which includes the information set forth above is precisely what well over a thousand BSA sexual abuse claimants have been clamoring for on various Facebook discussion groups for months. As a group, the claimants are tired of being "blown off" by lawyers and the Trust. The spreadsheet information sought doesn't include any confidential personal information, and is similar to reports provided (by the Trust Claims Committee) during the bankruptcy.

There's a basic rule about information. Those with it (the Trust) assume a proprietary interest in holding onto it, because this is a source of their power and authority. The corollary to the basic rule is that the less information the holder of information shares, the more suspect that holder of information becomes in the eyes of the persons who seek the relevant information being held. The Trust has 100% of the

information sought, but refuses to share it. The lack of transparency has caused large numbers of those most directly affected by the information to lose trust in the Trustee and the Trust.

The Trust will respond that it provides an adequate monthly report online and on the docket, and no one really needs the information sought. While the report is undoubtedly sufficient in the eyes of the various lawyers involved, those lawyers aren't affected by the work of the Trust except in their bank accounts. The sexual abuse claimants, on the other hand, have a visceral need to believe the entire process is open, transparent, and above all, fair. The ONLY way the Court or the Trustee can retain the trust of the people this entire case is all about, is for the Trustee to provide as much information as possible, even when that appears to the lawyers to be irrelevant or unnecessary.

The Trustee used to tell the Court how transparent it was because regular "town hall" meetings were conducted online. Unfortunately, few can remember when the last of those "town halls" occurred, nor remember any specific valuable information from those events. It should be intuitively obvious to the most casual of observers that a "town hall" which doesn't permit or address the questions of the "rabble" and "riff raff" isn't of much value to anyone, while a "town hall" that never occurs is useless. One of the interesting things the U.S. Navy learned in the late sixties and early seventies was that virtually all grievances were alleviated by having ships' commanding officers conducting open mic "town halls" monthly. What was true for unhappy sailors is equally true for unhappy BSA sexual abuse claimants.

The requested monthly report in spreadsheet format for all submitted claims broken down as set forth above is not an unreasonable request, and would take very little effort by the Trust to produce. All this information is already in the Trust's data banks. The Trust has I.T. professionals capable of producing this report with next to no effort. They and the Trustee are being paid out of the sexual abuse claimants' pockets. There's no reason why they shouldn't respond to those claimants' reasonable requests. The Court knows full well that if this was a mass tort proceding that the lawyers would be demanding information of precisely this sort.

Individual Claim Determination Notices

[REDACTED] briefly addressed this issue in his May 26, 2025, letter to the Court. As with each of the issues discussed in the three letters to the Court this year, [REDACTED]s nowhere near the only sexual abuse claimant unable to get straight answers. In this case, the Trust issued a claim determination notice for [REDACTED] Claim I.D. Number SST[REDACTED] in which it found his claim was in Matrix Tier 1 from an "open" jurisdiction. It further stated that all ten of the possible aggravating factors applied (but didn't elaborate on any of them):

- **Nature of Abuse and Circumstances**
    - Extended duration of the abuse
    - Extended frequency of the abuse
    - Coerced or threatened by the abuser
- **Abuser Profile**
    - Abuser was accused by five (5) or more other alleged victims of abuse
- **Impact of the Abuse**
    - Mental health
    - Physical health
    - Interpersonal relationships
    - Vocational capacity

- Academic capacity
- Legal difficulties

The Trust then added it had found one mitigating factor:

- **Absence of a Protected Party Relationship or Presence of a Responsible Party that is not a Protected Party**
    - Other responsible non-Protected Party

Without the mitigating factor, [redacted] claim theoretically should have had a matrix value of $2,700,000. The Trust's proposed settlement was for $1,389,312. [redacted] attempted to question two of the factors "found" by the Trust, but as usual, no response was forthcoming. Unable to get a response, and unable to seek reconsideration due to indigency and inability to replace previously obtained proofs for each aggravating and mitigating factor, [redacted] reluctantly agreed to accept the Trust's determination.

In the 1803 case, ***Marbury v. Madison***, Chief Justice Marshall endorsed the common law requirement as set forth by William Blackstone, ***Volume 3, Commentaries on the Laws of England, 23***, mandating a remedy for every wrong:

> "It is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded. . . . For it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress."

It appears to be an unfortunate fact of life that this supposedly fundamental principle of American law: ***Ubi Jus, Ibi Remedium,*** doesn't apply to Schwindler, or any other sexual abuse claimant in this case.

The Trust acknowldges [redacted] name appears in at least six claims,

but is incapable of grasping the fact [redacted] was employed by a number of local councils between 1955 and 1963 (as admitted by the BSA in response to request for admissions on March 11, 2022), and by the BSA's own confidential personnel record report for [redacted] termination by the Morris-Sussex Area Council, BSA, dated February 27, 1963. [redacted] was known to have been molesting children for **decades** (in addition to the two mentioned in the 1963 incident). Combine these documents with the ***San Diego Tribune***'s article concerning [redacted] and the BSA's cover-up of his sexual abuse of minors, dated February 17, 2013 (which identified two more abuse victims), as well as [redacted]s correspondence confirming that the "few years older version" of [redacted] named in [redacted] initial lawsuit was a "foster son" [redacted] had "adopted" and molested beginning when [redacted] was employed by the Niagara Falls, NY Area Council, BSA.

No rational person would conclude that someone who molested at least six minors between Fall of 1961 (when he began molesting [redacted] and the beginning of 1963 (when he was terminated after being caught in the act of molesting another scout at the same location [redacted] reported), didn't molest quite a few others between his employment in 1955, and 1963, especially when the BSA's own records admit this behavior of [redacted] had persisted "for decades". So, let's be honest, BSA employee [redacted] was quite probably the most prolific abuser in this case, and most of his victims are too dead to file claims, but there are well over ten of them.

Worse than the unserious evaluation of [redacted] profile, the finding that there existed an "[o]ther responsible non-Protected Party" is simply not supported

anywhere. Who was this party? [REDACTED] sued only the Patriots Path Council, BSA for a reason. [REDACTED] was the Morristown District Executive (professional employee), and Mount Allamuchy BSA Camp Director. No one else was involved, neither was any entity other than the local council.

[REDACTED] Scoutmaster at the time [REDACTED] abuse began, [REDACTED] had nothing to do with [REDACTED] abuse, and was only marginally aware, if he was aware at all, of the relationship between [REDACTED] and [REDACTED] There were, in fact, no adults or organizations who would have known anything beyond the fact that [REDACTED] was often with or around [REDACTED] exactly as the "foster son" from the Niagara Falls, NY area had once been before [REDACTED] moved to the job in NJ).[9]

It's beyond ridiculous to believe any adult associated with scouting in 1961 and 1962 would have thought anything about a 13 or 14 year old scout having what for all outward appearances was a mentoring relationship with the director of the camp the kid worked for. If none of the adults involved would have thought anything was unusual, there is less than zero probability either of the organizations which sponsored the BSA Troops [REDACTED] was associated with would have any involvement whatsoever.[10]

**IF** the BSA Trust had responded [REDACTED] inquiries on this point, or

[9] As [REDACTED] reported in his lawsuit and claim documents, other scouts employed at Allamuchy in 1962 suspected something was wrong with the relationship, but no one - adult or minor - said anything to anyone until AFTER [REDACTED] was terminated as camp director in June, 1962.

[10] This is why neither chartering organization was named in the original lawsuit, and why they were dismissed from liabilty in the New Jersey courts. They were dismissed from liability so that the BSA would not be able to try to shift responsiblity to organizations other than the local council. Apparently, the Trust intends to try to shift responsibility anyway.

more correctly, **IF** it had sought clarification on this point before making the unsupported determination, it's pretty obvious [redacted] claim would have been valued at or near $2,700,000. But, just like the BSA deliberately covered-up [redacted] abuse of [redacted] and then harrassed and retailiated against him as a young teenager, the BSA Settlement Trust isn't much concerned about the impact of its decisions or actions.

Why should the Trust be expected to explain things like determining "facts" out of thin air? How else can any claimant refute a non-fact "fact" like the presence of an anonymous "other responsible non-Protected Party"? How can an indigent, incarcerated claimant whose copies of proofs have either been "lost" by the prison system, or never returned by his former attorney vindicate his right to receive a truthful evaluation of his claim? And, if a claimant like [redacted] can't do this, how can any claimant with lesser communication skills, an unresponsive attorney and/or uncooperative prison adminstration, etc., expect to do so?

***Ubi Jus, Ibi Remedium?*** Not for [redacted] or any similarly situated claimant as long as the Trust doesn't have to actually explain such determinations and findings of "facts" such as what "other responsible non-Protected Party" means. If any federal court in the country made such a finding, and failed to specify what it was talking about, the aggrieved party would simply file a Rule 60 Motion to get a clarification or correction, but good luck with that as a claimant getting such a revised finding from the Trust, because there is no remedy available. "Post a bond, and maybe we'll reconsider the finding several months from now" is not a remedy in cases like this.

## CONCLUSION

The Court should enter an order directing the Trustee:

1. Cease forcing claimants such as [redacted] to negotiate with former attorneys in order to receive disbursements;
2. To provide full and complete amplifying explanations for findings of aggravating and mitigating factors reported on individual claim determination notices;
3. To provide a monthly report for all submitted claims in spreadsheet format which at a minimum includes the following:Total number of claims submitted to the Trust by:
    a. Total number of claims submitted to the Trust by:
        i. Total number of claims allowed
        ii. Total number of claims disallowed
        iii. Total number of claims not yet determined
    b. Breakdown of all allowed claims by:
        i. State (with statute of limitations factor shown)
        ii. Local Council
        iii. Tier
        iv. Highest number of aggravating factors
        v. Lowest number of aggravating factors
        vi. Average number of aggravating factors
        vii. Highest number of mitigating factors
        viii. Lowest number of mitigating factors
        ix. Average number of mitigating factors
        x. Highest settlement value
        xi. Lowest settlement value
        xii. Average settlement value
    c. Breakdown of all disallowed claims by:
        i. State
        ii. Local Council
        iii. Tier
        iv. Cause for disallowance
4. Such relief for [redacted] related to the Trust's incorrect findings as to "abuser profile" and "other responsible non-Protected Party", and as to attorney Alan R. Zibelman as is equitable and just.

Respectfully submitted this 21st day of July, 2025.

RECEIVED
2025 JUL 30 AM 9:21
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I certify I've served counsel for debtors an the BSA Settlement Trustee by email to:

**Attorneys for the Reorganized Debtors**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Sophie Rogers Churchill (No. 6905)
Avery Jue Meng (No. 7238)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
aremming@morrisnichols.com
srchurchill@morrisnichols.com
ameng@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted pro hac vice)
Matthew E. Linder (admitted pro hac vice)
Laura E. Baccash (admitted pro hac vice)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
mlinder@whitecase.com
laura.baccash@whitecase.com

**Attorneys for the Honorable Barbara J. Houser (Ret.), in her capacity as Trustee of the BSA Settement Trustee**

**A.M. SACCULLO LEGAL, LLC**
Mark T. Hurford (DE Bar No. 3299)
27 Crimson King Drive
Bear, DE 19701
Telephone: (302) 836-8877
Facsimile: (302) 836-8787
Email: mark@saccullolegal.com

- and -

**GILBERT LLP**
Kami E. Quinn (admission pro hac vice)
Emily P. Grim (admission pro hac vice)
Michael B. Rush (admission pro hac vice)
Sarah A. Sraders (admission pro hac vice)
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone: (202) 772-2200
Facsimile: (202) 772-3333
Email: quinnk@gilbertlegal.com
grime@gilbertlegal.com
rushm@gilbertlegal.com
sraderss@gilbertlegal.com

This 21st day of July, 2025.





Retail







RDC 99

U.S. POSTAGE PAI
FCM LG ENV
LAKE JUNALUSKA
NC 28745
JUL 21, 2025
**$2.17**
S2324N506993-4

**FIRST CL**

Clerk of Court
U. S. Bankruptcy Court
District of Delaware
824 N. Market St.
3rd Floor
Wilmington, DE 19801