## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Reorganized Debtors. | (Jointly Administered) |
|  | Dkt. Nos. 11296, 11298, 11300, 11302, 11316, 11317, 11448, 11510, 11511, 11512, 11513, 11515, 11518 |

### <u>MEMORANDUM OPINION</u>

I am once again called to review fees in the Boy Scouts bankruptcy case—this time of

estate professionals.  Here, the Office of the United States Trustee ("UST") objected to the

final fee applications of thirteen professionals.  Resolutions were reached with seven; six

remain: White & Case LLP, Morris Nichols Arsht & Tunnell LLP and Haynes and Boone,

LLP represented Debtors, Pachulski Stang, Ziehl & Jones LLP ("PSZJ") represented the

Tort Claimants' Committee ("TCC") and Young Conaway Stargatt & Taylor, LLP and

Gilbert LLP represented the Future Claimants' Representative ("FCR").  The objection is

targeted to three specific areas: (i) the filing and prosecution of the Restructuring Support

Agreement, (ii) time spent at the confirmation hearing seeking certain Findings (defined

below) and (iii) as to TCC counsel only, time spent on the "Kosnoff Communications."

The UST contends that professional time charged to the estates for these services should not

be awarded under § 330 of the United States Bankruptcy Code because they were not

necessary.  As for the Kosnoff Communications, the UST also contends that a further

reduction is appropriate to address certain attorney conduct.

The UST should be commended for its thoughtful approach to review of the final fee applications, which was a monumental task. As the UST recognizes, the bankruptcy courts have significant discretion when it comes to approval of fees. Having considered the UST's objection, my own observations of the services provided in the context of this case and the fees as they stand after voluntary reductions made by the professionals on their own initiative and after negotiations with the Fee Examiner and the UST, I will overrule the objection and award the fees on a final basis.

BACKGROUND[1]

On February 18, 2020, Boy Scouts of America and Delaware BSA, LLC (collectively "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The UST appointed the TCC on March 5, 2020. James L. Patton, Jr. was appointed the FCR on April 24, 2020. Each of the professionals whose fee applications are subject to objection were subsequently approved to represent their respective clients. Once Debtors' plan of reorganization became effective, each professional ("Applicant(s)") submitted its Final Fee Application.[2] Collectively, Applicants seek approval of $146 million in fees for the work they performed over a roughly three-year period.

---

[1] This Memorandum Opinion constitutes my findings of fact and conclusions of law.

[2] Debtors' Professionals: Combined Thirty-First Monthly (for the Period April 1, 2023 through April 19, 2023), Tenth Interim (for the Period May 1, 2022 through July 31, 2022), Eleventh Interim (for the Period August 1, 2022 through November 30, 2022), Twelfth Interim (for the Period December 1, 2022 through March 31, 2023), and Final Appl. of Haynes and Boone, LLP, as Special Insurance Counsel for the Debtors and Debtors in Possession, for Allowance of Compensation and Reimbursement of Expenses Incurred for the Period from February 18, 2020 through and including April 19, 2023, Dkt. No. 11302; Thirteenth Interim Fee Appl. (for the Period February 1, 2023 through April 19, 2023) and Final Appl. of Morris, Nichols, Arsht & Tunnell LLP, as Bankruptcy Co-Counsel for the Debtors and Debtors in Possession, for Allowance of Compensation and for Reimbursement of All Actual and Necessary Expenses Incurred for the Period February 18, 2020 through April 19, 2023, Dkt. No. 11317; Eleventh Interim and Final Fee Appl. of White & Case LLP, as Attorneys for the Debtor and Debtor in Possession, for Allowance of Compensation and

2

The UST timely objected seeking disallowance of approximately $3.3 million of those fees.[3] Each Applicant filed a reply, which in addition to making argument, generally details that professional's billing practices and prior reductions to requested fees.[4] After an evidentiary hearing and oral argument, I took the Final Fee Applications under advisement.[5]

---

Reimbursement of Expenses, Dkt. No. 11316.  Citations to "Dkt. No." in this opinion refer to the docket in this case unless otherwise indicated.

FCR's Professionals:  Twelfth Interim and Final Fee Appl. of Gilbert LLP, Insurance Counsel to James Patton, Jr., the Future Claimants' Representative, for Allowance of Compensation and Reimbursement of Expenses, Dkt. No. 11298; Combined Thirty-Seventh Monthly and Final Appl. of James L. Patton, Jr. as the Legal Representative for Future Claimants and Young Conaway Stargatt & Taylor, LLP as Counsel to the Legal Representative for Future Claimants for Allowance of Compensation and Reimbursement of Expenses for the Interim Period from April 1, 2023 to April 19, 2023 and the Final Period from February 18, 2020 to April 19, 2023, Dkt. No. 11296.

TCC Professionals:  Final Appl. for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel to the Tort Claimants' Committee for the Period from March 4, 2020 through April 19, 2023, Dkt. No. 11300.

[3] United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11448 ("Objection").

[4] Reply of White & Case LLP in Opp'n to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11510; Pachulski Stang Ziehl & Jones LLP's Reply to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11511 ("PSZJ Reply"); Reply of Gilbert LLP in Opp'n to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11512; Young Conaway Stargatt & Taylor, LLP's Reply in Supp. of Its Final Fee Appl., Dkt. No. 11513; Morris Nichols Arsht & Tunnell LLP's Joinder to Reply of White & Case LLP in Opp'n to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11515; Joinder of Hayes Boone, LLP, to White & Case LLP's Reply in Opp'n to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expenses, Dkt. No. 11518.

[5] The only evidence presented at the hearing was a declaration filed by White & Case in support of its fee application.  Decl. of Matthew E. Linder in Supp. of Reply of White & Case LLP in Opp'n to the United States Trustee's Omnibus Obj. to Final Professional Fee Appls. for Compensation and Reimbursement of Expense, Dkt. No. 11510-1 ("Linder Declaration").  The other facts surrounding Applicants' respective billing practices and previous reductions were representations in their fee applications and/or replies.  The UST did not take issue with the details of the representations although it argues that the previous voluntary and/or agreed-to reductions did not address the areas identified in the Objection.

*Restructuring Support Agreement*

One of the earliest settlements in the bankruptcy case was reached between Debtors and Hartford Accident & Indemnity Company ("Hartford Settlement").[6] In its basic terms, Hartford agreed to buy back the insurance policies it issued to Debtor for $650 million subject to certain adjustments. Hartford would receive a debtor release and third-party releases. Per its terms, the Hartford Settlement could be brought before the court for approval as a standalone settlement under Bankruptcy Rule 9019 (if Hartford made that request) or be incorporated into a plan. Debtors incorporated the Hartford Settlement into their Second Amended Plan.[7]

None of the TCC, the FCR or the Coalition[8] supported the Hartford Settlement, declaring their "unequivocal view . . . that any plan of reorganization that includes the Hartford Settlement will be overwhelmingly voted down by the survivor community . . . ."[9] Faced with this opposition, three months later, Debtors entered into a Restructuring Support Agreement ("RSA"),[10] which set forth the contours of a plan of reorganization. The RSA was ultimately supported by the TCC, the FCR, the Coalition, the Local Council

---

[6] Settlement Agreement and Release between Hartford and BSA, Dkt. No. 2624-1.

[7] Proposed Amendments to Second Am. Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC arts. I.A.118, I.A.186(a), I.A.219, V.R.4, Ex. I, Dkt. No. 4107.

[8] The Coalition of Abused Scouts for Justice was an ad hoc group of personal injury claimants. *See In re Boy Scouts of America*, Case No. 20-10343, 2023 WL 8449557, at *5 (Bankr. D. Del. Dec. 5, 2023), Dkt. No. 11652.

[9] Joint Letter in Opp'n to the Hartford Settlement, Dkt. No. 5469-1.

[10] Ex. 1 to Proposed Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief, Dkt. No. 5466-2.

Committee[11] and numerous state court counsel representing abuse survivors.  In broad

terms, the RSA provided for: (i) Debtors' $250 million contribution to a trust for the benefit

of abuse survivors, (ii) a commitment by the Local Council Committee to use reasonable

efforts to obtain an aggregate contribution of $600 million from Local Councils, (iii) a

commitment by state court counsel to recommend voting in favor of a plan as outlined in

the RSA, (iv) payment of certain monthly fees to the Coalition and (v) the inclusion of

various findings in any order confirming a plan.[12]  It did not include the Hartford

Settlement.  Instead, the RSA required Debtors to "seek a determination of the Bankruptcy

Court that the Debtors have no obligations under the Hartford Settlement."[13]

I held a three-day evidentiary hearing on Debtors' motion to approve the RSA and

took the matter under advisement.  Ruling from the bench on August 19, 2021, I concluded,

with two exceptions, that the RSA was a sound exercise of Debtors' business judgment and

could be approved.[14]  I determined that the issue of Debtors' obligations to Hartford under

the Hartford Settlement could not be determined in the context of the RSA.  I also

determined that I would not approve the Coalition's fees at that time.  Recognizing that I

had not approved the motion in total, I observed that the parties were free to "proceed with

the RSA without the findings regarding the Hartford settlement agreement and fees for the

Coalition, or not."[15]  No form of order approving a revised RSA was submitted.

---

[11] An Ad Hoc Group of Local Councils brought about a resolution with the Local Councils at large.

[12] RSA, Ex. A.

[13] RSA art. II.A.viii.

[14] RSA Bench Ruling Tr., Aug. 19, 2021, Dkt. No. 6098.

[15] *Id.* at 28:10-12.

Nonetheless, the basic deal reflected in the RSA formed the basis for the fourth amended plan and, together with further settlements, made its way into the Modified Fifth Amended Chapter 11 Plan of Reorganization, which was sent out for solicitation.[16] I confirmed a plan of reorganization approximately thirteen months later on September 8, 2022.

*The Findings*

To the best of my recollection, the request for certain findings originated in the RSA. During the disclosure statement hearing, I previewed certain concerns regarding the findings. As discussed in the UST's Objection, I offered preliminary thoughts on the insurance assignment finding, the inclusion of the Trust Distribution Procedures in the good faith finding, the fair and reasonable finding concerning the Trust Distribution Procedures and the allowed claim finding.[17] The findings, in somewhat modified form ("Findings"), were included in the solicitation version of the plan as waivable conditions precedent to confirmation.[18]

The Debtors included the Findings in the plan at the insistence of the Coalition and the FCR.[19] White & Case believed that if Debtors refused to seek the Findings as part of

---

[16] Modified Fifth Am. Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Dkt. No. 6443 ("Modified Fifth Amended Plan").

[17] Disclosure Statement Hr'g Tr. 140:16-145:23, Sept. 28, 2021, Dkt. No. 6436.

[18] Modified Fifth Amended Plan, art. IX.

[19] Linder Decl. ¶ 10 ("As stated in the Reply, the Findings were a deal term for the Coalition and Future Claimants' Representative."). *See also In re Boy Scouts of America*, 642 B.R. 504, 621 n.523 (Bankr. D. Del. 2022) ("Confirmation Opinion") ("I say 'Debtors' because it is their plan, but it is clear that the Coalition is behind the Findings.").

confirmation, the Coalition and FCR would have withdrawn their support.[20]  The parties

presented testimony and argument regarding the Findings over the course of the twenty-two

day, contested confirmation hearing.  Ultimately, I refused to make most of the Findings.[21]

Subsequently, Debtors were able to persuade the Coalition and the FCR to waive these

conditions precedent to confirmation[22] and I entered the Confirmation Order.[23]

*Kosnoff Communications*

Kosnoff Law, PLLC; Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. and

AVA Law Group, Inc. formed Abused in Scouting as a vehicle through which to market to

and represent abuse survivors.  The three law firms were successful in their marketing

endeavors and represented in their collective Rule 2019 statement that they jointly represent

15,103 abuse survivors.[24]  Notwithstanding their joint representation of clients, the law firms

disagreed about whether to accept or reject the plan.  This came to a head during the

solicitation process.

---

[20]  Linder Decl. ¶ 10 ("If the Debtors had declined to continue seeking Court approval of the Findings, White & Case believed that the Coalition and Future Claimants' Representative would have ceased their support for the Plan.").

[21]  Confirmation Opinion, 642 B.R. at 625-632.

[22]  Linder Decl. ¶ 11 ("Following the Court's issuance of the Confirmation Opinion, certain Plan supporters who had previously been unwilling to waive the conditions precedent relating to the Findings agreed to waive such conditions.  These waivers allowed the Debtors to obtain entry of the Confirmation Order and later emerge from bankruptcy.").

[23]  Suppl. Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Am. Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, Case No. 20-10343, 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), Dkt. No. 10316 ("Confirmation Order") *aff'd in part and rev'd in part* 137 F.4th 126 (3d Cir. 2025).

[24]  Verified Statement of Abused in Scouting Pursuant to Rule of Bankruptcy Procedure 2019 ¶ 9, Dkt. No. 5917 (sealed).

This private disagreement spilled into the court proceedings when the TCC, which did not support the plan when solicited, decided to assist Mr. Kosnoff in his endeavors to defeat it. PSZJ partner John Lucas reached out to Mr. Kosnoff offering assistance in revising a letter to abuse survivors urging rejection. Once finalized, a covering email from Mr. Kosnoff as well as the revised letter were sent on Mr. Kosnoff's behalf from the TCC's official email account to over 19,000 abuse claimants. In addition to urging rejection of the plan, the Kosnoff Communications attacked the character of Mr. Rothweiler and linked to Mr. Kosnoff's Twitter feed which featured more invective related to this case. The Kosnoff Communications caused significant confusion among abuse claimants and resulted in substantial litigation expenses.[25]

Several steps were taken to remedy the situation. One, Debtors and the TCC submitted an agreed order imposing certain interim conditions on further communications through official TCC channels.[26] Two, the TCC's lead counsel, James Stang, as well as Mr. Lucas were replaced as front-facing counsel by others within their firm. Three, PSZJ and Debtors reached a settlement which was memorialized—and ultimately approved— under which PSZJ: (x) wrote off $750,000 in fees and expenses related to the Kosnoff

---

[25] *See, e.g.*, Debtors' Emergency Mot. for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief, Dkt. No. 7118; Status Report Regarding Debtors' Emergency Mot. (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief, Dkt. No. 7250; Emergency Mot. of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief, Dkt. No. 7445 (sealed).

[26] Agreed Interim Order on Debtors' Mot. (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief, Dkt. No. 7401.

Communications and (y) made a payment to the estate of $1,250,000 reflecting an amount asserted as damages to the estate (*i.e.*, professional fees incurred by other professionals related to the Kosnoff Communications) ("PSZJ Settlement").[27] <u>Four</u>, PSZJ represents that it voluntarily wrote off another $1 million in fees that could be "potentially tied" to the Kosnoff Communications.[28] <u>Five</u>, in direct response to the Objection, PSZJ agreed to write-off another $83,765.50 for fees related to the TCC's motion to appoint a voting ombudsman.[29]

## The UST Objection

As stated, the UST targets fees in the above three areas.  To identify fees associated with prosecution of the RSA, the UST performed a text search of the Final Fee Applications for the terms "restructuring support agreement," "RSA" and "plan support agreement" for the period from April 2021 through December 2021.[30]

The UST applied a different methodology for targeting compensation related to the Findings, which the UST represents are not as susceptible to text-search based identification.  As a proxy, the UST searched the trial transcript for the word "TDP,"[31]

---

[27] The approval of the PSZJ Settlement was "without prejudice to the rights of all parties in interest to object to any fees of PSZJ pursuant to 11 U.S.C. § 330, and subject to this Court's review and authority to impose any appropriate non-monetary sanctions, if any."  Confirmation Order § G, 2022 WL 20541782, at *5.

[28] Final Fees Oral Arg. Tr. 40:25-41:2, Oct. 5, 2023, Dkt. No. 11530.  *See also* PSZJ Reply ¶ 19, ¶ 24 ("None of Mr. Lucas's time – nor any other PSZJ's attorney time – in connection with any aspect of the Kosnoff matter was billed to the estate.").

[29] PSZJ Reply ¶ 23; Final Fees Oral Arg. Tr. 58:6-13.

[30] Final Fees Oral Arg. Tr. 67:2-70:23; Obj. Ex. C at 1-13, Dkt. No. 11448-3; Obj. Ex. E at 1-45, Dkt. No. 11448-5; Obj. Ex. F at 2-155, Dkt. No. 11448-6; Obj. Ex. G at 1-4, Dkt. No. 11448-7; Obj. Ex. H at 1-20, Dkt. No. 11448-8; Obj. Ex. K at 1-26, Dkt. No. 11448-11.

[31] Obj. 39; Final Fees Oral Arg. Tr. 75:17-78:4.  The UST does not seek to disallow fees for "all the work spent on research[,] analysis, preparation of documents submitted at trial."  *Id.* at 76:17-19.

reasoning that "if the Findings had been more circumscribed the length of the evidentiary portion of the trial may have been condensed."[32] This review identified ten of the twenty-two days of the confirmation hearing which the UST, therefore, contends were not necessary and, as such, not compensable.[33]

Application of the above methodologies results in the UST's request for a reduction of fees in the following amounts.

| PROFESSIONAL | RSA FEES | CONFIRMATION FEES |
|---|---|---|
| Haynes & Boone | $99,414.50 | $178,701.50 |
| MNAT | $124,683.50 | $246,937.50 |
| White & Case | $1,481,764.00 | $513,627.00 |
| Gilbert | $17,717.50 | $160,274.00 |
| YCST/Patton | $176,337.00 | $164,287.00 |
| PSZJ | $300,926.00 | $589,801.50 |

Finally, the UST seeks a flat 10% reduction to non-travel compensation billed by Mr. Lucas during the entire pendency of the case to address his role in editing and distributing the Kosnoff Communications.

JURISDICTION

Subject matter jurisdiction exists over this contested matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

DISCUSSION

A court's authority and obligation to review professionals' fee applications are well settled.[34] "Analytically, section 330(a) provides a two-tier test for determining whether and

---

[32] Final Fees Oral Arg. Tr. 76:19-22.

[33] Obj. ¶ 39 (summary chart).

[34] *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1994).

in what amount to compensate professionals in bankruptcy cases. First, the court must be satisfied that the professionals performed actual and necessary services. Second, the court must assess a reasonable value for those services." [35] The applicant bears the burden of proof. [36]

For purposes of the first-tier analysis, "actual" requires that the services for which the professional billed must have been performed. This is not an issue here because the UST does not question that Applicants only billed for services they actually rendered.

Unlike in its colloquial use, in the context of § 330 "necessary" does not mean that the action is essential. Rather, "[n]ecessary services are those that aid the professional's client in fulfilling its duties under the Code." [37] While "necessary" is not defined, subsection (a)(4)(A) provides some guidance as the court is not permitted to award fees for "unnecessary duplication of services" and "services that were not (I) reasonably likely to

---

[35] *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861 (Bankr. D. Del. 2004). Section 330(a) provides in part: "the court may award . . . a professional employed under section 327 or 1103—a reasonable compensation for actual, necessary services rendered . . . by such professional." 11 U.S.C. § 330(a)(1). *See also Busy Beaver*, 19 F.3d at 848 ("[O]nce having determined the service provider is an eligible recipient, the amount of compensation—its reasonableness—is to be 'based on the nature, extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title.' 11 U.S.C.A. § 330(a)(1) (1993).").

[36] *See, e.g., Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 260 (3d Cir. 1995).

[37] *In re Grasso*, 586 B.R. 110, 156 (Bankr. E.D. Pa. 2018) (quoting *In re Ben Franklin Retail Store, Inc.*, 227 B.R. 268, 270 (Bankr. N.D. Ill. 1998)). *See also Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 128 (2015) (holding professional fees compensable only for services rendered to benefit the client).

benefit the debtor's estate or (II) necessary to the administration of the case."[38]  The court

does not consider § 330 necessity with the benefit of hindsight.[39]

Together, the statutory language and applicable caselaw require a threshold showing

that the services provided were (i) actual, (ii) necessary and (iii) in compliance with §

330(a)(4)(A).  None of these requirements demand that professionals be successful to be

awarded fees.[40]  Instead, the court "must conduct an objective inquiry based upon what

services a reasonable professional would have performed in the same circumstances."[41]

The second tier analyzes the reasonable value of the services rendered.[42]  The court's

determination of the reasonable value of the services starts from the "bankruptcy judge's

experience with fee petitions and his or her expert judgment pertaining to appropriate billing

---

[38]  With exceptions not relevant here § 330(a)(4)(A) provides:

> (A)    [T]he court shall not allow compensation for—
>    (i)      unnecessary duplication of services; or
>    (ii)     services that were not—
>       (I)      reasonably likely to benefit the debtor's estate; or
>       (II)     necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).  *E.g.*, *In re Jade Mgmt. Servs.*, 386 Fed.Appx. 145, 151 (3d Cir. 2010).

[39]  *E.g.*, *In re Allegiance Coal USA Ltd.*, 661 B.R. 874, 890 (Bankr. D. Del. 2024).

[40]  *See, e.g.*, *In re Hosp. Partners of Am., Inc.*, 597 B.R. 763, 767 (Bankr. D. Del. 2019) ("bankruptcy professionals are not guarantors of the success of a particular theory, proceeding, or strategy"); *In re Haimil Realty Corp.*, 579 B.R. 19, 27 (Bankr. S.D.N.Y. 2017) ("Services that are performed well, with due adherence to an attorneys' duties and in the good faith litigation of disputes that need to be litigated, are 'necessary' and 'beneficial' services for which compensation is owed, regardless of whether the client won or lost the underlying case.").

[41]  *Channel Master*, 309 B.R. at 861-62 (cleaned up).  *See also In re Value City Holdings, Inc.*, 436 B.R. 300, 306 (Bankr. S.D.N.Y. 2010) ("The fees here are likewise compensable regardless of the ultimate outcome because a reasonable lawyer would have performed similar services in attempting to maximize the value of the estate in these circumstances.").

[42]  *Busy Beaver*, 19 F.3d at 848-49 (holding paralegals eligible for compensation under § 330(a)(1) but determining rate of reasonable compensation through § 330(a)(3)).

practices, founded on an understanding of the legal profession."[43]  Subject to the statutory

prohibitions in § 330(a)(4)(A), what constitutes reasonable compensation is a fact-specific

determination entrusted to the discretion of the court.[44]  "The court may . . . award

compensation that is less than the amount of compensation that is requested"[45] including as

a discretionary reduction for requests related to actual and necessary services.[46]  Further,

---

[43] *Busy Beaver*, 19 F.3d at 854.  Note that the concept of "necessary" services also works its way into a determination of whether the fees are "reasonable."  Indeed, the word "necessary" occurs four times in § 330—in (a)(1)(A), (a)(1)(B), (a)(3)(C) and (a)(4)(A)(ii)(II).  It also occurs with a negative prefix in subsection (a)(4)(A)(i).  I do not need to unravel these nested references in order to resolve the dispute before me.

[44] 11 U.S.C. § 330(a)(1); *Busy Beaver*, 19 F.3d at 841 ("the wording of § 330(a) . . . imbues the court with discretionary authority").  *See also In re: SC SJ Holdings LLC*, Case No. 21-10549 (JTD), 2023 WL 4842101, at *3 (Bankr. D. Del. July 11, 2023) ("At least in part, the bankruptcy court's broad discretion is due to the fact that no matter how close the court comes to an objective determination of a reasonable fee, [the fee determination] is still, in the final analysis, a substantially subjective exercise.") (quoting *Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109 (3d Cir. 1999) (internal quotation omitted) (alterations in original)).

Section 330(a)(3) mandates that the court consider:

> the nature, the extent, and the value of such services, taking into account all relevant factors, including—
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
> 11 U.S.C. § 330(a)(3).  Certain of these considerations overlap with the first-tier analysis.

[45] 11 U.S.C. § 330(a)(2).

[46] *See, e.g.*, *SC SJ*, 2023 WL 4842101, at *7-9 (reducing fees by 10% in addition to voluntary 15% reduction to address "over-lawyering" and excessive staffing of "very senior attorneys").

rather than engage in a granular review of each line item billed to the estate, the court may reduce fees through across-the-board cuts to arrive at what it determines to be reasonable.[47]

## I.      Services Rendered Seeking Court Approval of the RSA Were Necessary

The UST objects to all services (and, thus all fees) related to the negotiation and presentation of the RSA as not "necessary" under § 330(a)(3).  He contends that when the services were rendered, they were not necessary to the administration of the estate because a reasonable professional would not "expect the Court to alter rights between the Debtors and a party that was not a signatory to the RSA"—namely, Hartford.[48]  Further, the UST contends that fees should not be awarded because Debtors did not ultimately present an order for signature after succeeding in obtaining approval of most of the RSA: "[a] reasonable attorney would not have spent months seeking approval of an RSA, only to substantially prevail and then not submit an order to memorialize the support of the signatories."[49]

Applicants assert that one cannot view the services relative to the RSA in a vacuum. They contend that the RSA was one but step on the way to what was ultimately the successful, confirmed plan that included many of the heavily-negotiated provisions of the RSA.  In other words, Applicants contend that these services were necessary to the

---

[47] *Id.* at *9 (citing *Top Jet Enters., Ltd. v. Kulowiec*, 2022 WL 1184245, at *5 (S.D.N.Y. Apr. 21, 2022) (holding in a nonbankruptcy case where fees associated with a motion to compel were awarded that "[t]he Court has broad authority to make across-the-board percentage cuts in hours, as opposed to an item-by-item approach, to arrive at the reasonable hours expended.")).

[48] Obj. ¶ 57.

[49] Obj. ¶ 59 (citing *Value City*, 436 B.R. at 306).

administration of the case and beneficial at the time the services were rendered because they provided the fundamental structure that led to the successful confirmation in this case.

I agree with Applicants. The RSA memorialized a consensual resolution of numerous issues among Debtors, the FCR, the TCC, the Unsecured Creditors' Committee, Debtors' senior secured lender, the Coalition, the Local Council Committee and certain State Court Counsel. Among other benefits, consensual resolution with those parties was likely to substantially reduce litigation costs and preserve estate resources for the benefit of creditors.[50] Examined at that time, the negotiation and pursuit of the RSA were "necessary" in that those services were beneficial at the time they were rendered. The RSA's provisions that formed the baseline compromises among the signatories to the agreement resolved numerous outstanding disputes and committed the signatories to supporting a plan containing those resolutions.

The UST's objection does not focus so much on the negotiation of the RSA itself or the multiple compromises reflected in it. Rather, the UST contends that a reasonable estate professional would not seek court approval of the RSA because it also required Debtors to "seek a determination of the Bankruptcy Court that the Debtors [had] no obligations under the Hartford Settlement."[51] The UST argues that pursuing the RSA was futile because the Court could not prevent Hartford from seeking a remedy if Debtors breached the Hartford Settlement as "where there is a breach, there is a remedy."[52]

---

[50] *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.' 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993.")).

[51] RSA § II.A.viii.

[52] Final Fees Oral Arg. Tr. 61:12-14.

While Debtors' decision to proceed in this fashion was not successful, I cannot determine that it was the product of poor advice, lack of candor with the client regarding potential outcomes or that the fees incurred to go forward with approval of the RSA were disproportionate to the risk of loss.[53]  No controlling authority explicitly mandated denial of the motion to approve the RSA and I did not reach the merits as my ruling hinged on the procedural posture as raised in the objection filed by Hartford.[54]  Additionally, had Debtors simply breached the Hartford Settlement and faced the resulting consequences as the UST appears to advocate,[55] they risked an administrative expense which Hartford alleged had the potential to plunge the case into administrative insolvency.[56]  Instead of taking that risk, Debtors chose to seek a finding that they were not obligated to seek approval of the Hartford Settlement.  I conclude that Applicants provided necessary services by seeking approval of the RSA when faced with an unsettled legal question and the alternative of potentially incurring a substantial administrative expense.

The UST also argues that counsel's services related to the RSA were not necessary because after "substantially prevailing" on the motion to approve the RSA, counsel did not present a form of order granting the motion.  This mischaracterizes my ruling.  The motion was not granted.  I found that entry into the RSA was a sound exercise of Debtors' business

---

[53] *Compare with In re Haimil Realty Corp*, 579 B.R. at 27-33.

[54] Since my ruling, one court in the Third Circuit has granted the type of relief sought on similar, if not identical facts, albeit in the context of an adversary proceeding.  *Century Indem. Co. v. The Diocese of Camden (In re: The Diocese of Camden)*, Case No. 20-21257, Adv. Pro. 22-01123, 2024 WL 5252453 (D.N.J. Dec. 30, 2024).

[55] Obj. ¶ 56.

[56] RSA Hr'g Tr. 69:8-15, Aug. 16, 2021, Dkt. No. 6068.

judgment, but I refused to approve the provisions of the RSA addressing the Hartford

Settlement and the Coalition's fees. I, therefore, denied relief. While I expressed

willingness to grant the requested relief absent those provisions, neither Debtors nor any of

the other parties to the RSA were obliged to file a new order conforming with my ruling or

renegotiate the RSA on terms I would approve. It follows, then, that a reasonable attorney

may decline to submit an order approving less than all the relief requested.

Because the services associated with the RSA were actual and necessary, they are

compensable. No party objected to the requested fees on the grounds that the compensation

requested for the services provided is unreasonable and I cannot conclude that it is based on

my own review. Accordingly, the Objection to Applicants' fees related to the RSA is

overruled.

**II.    Services Rendered in Pursuit of the Findings at the Confirmation Hearing Were Necessary and Are Entitled to Reasonable Compensation**

The UST next objects to the time billed for attendance at the portions of the

confirmation hearing related to the Findings. The UST asserts that, prior to the

confirmation hearing, including at the disclosure statement hearing, I repeatedly

"cautioned" Applicants against pursuing the Findings. Applicants' efforts to do so were

therefore duplicative, futile and unnecessary.

The UST analogizes this scenario to that in *Wolverine*,[57] in which the bankruptcy

court reduced a trustee's fees for continuing unnecessary litigation past the point where a

reasonable attorney would have realized he was unlikely to succeed. The bankruptcy court

had previously issued a written decision on the issue presented (the appropriate standard for

---

[57] *Crawford v. Riley Grp. LLP (In re Wolverine, Proctor & Schwartz, LLC)*, 527 B.R. 809, 842 (D. Mass. 2015), *aff'd*, Case No. 15-1461, 2018 WL 11429198 (1st Cir. Feb. 16, 2018).

recharacterization of a loan as equity). The trustee attempted to persuade the judge to change her mind and adopt an alternative standard. In reducing the trustee's fees, the bankruptcy court concluded that a reasonable attorney would have abandoned the litigation on a factual basis at the conclusion of discovery. The district court affirmed the reduction of fees, but for a different reason. It did not take issue with the trustee challenging the presiding bankruptcy judge's prior opinion. Instead, the district court affirmed the fee reduction, reasoning:

> [T]he [t]rustee chose not to appeal the court's articulation of the [standard] and its application to the facts. The [t]rustee knew that the presiding judge held a particular view on the scope of the test that was not favorable to her case, but she also should have known that [the appellate courts] could take a different approach on *de novo* review. The [t]rustee voted with her boots when she abandoned her claim without appeal.[58]

*Wolverine* is distinguishable, but I also respectfully disagree with both courts' conclusions to the extent they are invoked as establishing *per se* rules. First, as Applicants assert, my statements at the disclosure statement hearing regarding the Findings were not rulings or determinations on the Findings—much less a reasoned decision. Rather, my comments were meant to put the parties on notice of my misgivings regarding the requested relief as well as an invitation (some might say, warning) that significant briefing would be necessary to convince me of the appropriateness of that relief.

Second, I would not necessarily reduce counsel fees for trying to convince me to change a position, even one reached in a published opinion. Judges are allowed to re-think or re-evaluate positions previously taken, including on legal standards. Subsequent decisions of other judges might be persuasive as may be arguments made by different

---

[58] *Id.* at 836.

18

counsel. Or, a judge's thinking may simply become more developed based on further experience with the topic at hand.

Third, I would not necessarily reduce counsel fees for not appealing an adverse decision of a lower court. Counsel challenging a binding Circuit decision must recognize and be prepared from the start to appeal at each step. But, for the reasons just articulated, attempting in good faith to persuade a trial court to change its decision is not necessarily beyond what a reasonable professional may determine is appropriate under specific circumstances. Similarly, determining not to take an appeal from the trial court's decision to stick with her previous view might be what a reasonable professional would do.

When faced with a judgment call, multiple courses of conduct can each be found to be "necessary" for purposes of § 330. Here, the FCR was among those seeking the Findings; neither Debtor nor the TCC insisted on them. In fact, Debtors included and advocated for the Findings because they "were a deal term for the Coalition and [FCR]" and Debtors' counsel "believed that the Coalition and [FCR] would have ceased their support for the Plan" without them.[59] Based on the record I have and my observations during the case, I find and/or conclude that a reasonable professional could have performed identically to each Applicant in these same circumstances. A reasonable professional (FCR counsel) could have counseled his client to pursue the Findings through confirmation and a reasonable professional (Debtor counsel and TCC counsel) could have counseled his client to support that request under the circumstances. Thus, the services provided were necessary for purposes of § 330.

---

[59] Linder Decl. ¶ 10.

Having determined pursuit of the Findings was necessary, it would be inappropriate to disallow fees associated with the ten trial days at issue in their entirety. In support of a partial reduction, the UST argues that "[r]easonable time spent does not necessarily include all time actually expended."[60] While this is true, no specific instance of unreasonableness warranting reduction has been argued or is readily discernable upon my independent review of the fee applications.

I will not reduce Applicants' compensation for zealously advocating for their client's position on the Findings at the confirmation hearing, nor do I think any reduction of fees related to the time spent presenting related evidence is warranted.

### III. The Court Declines to Exercise Its Discretion to Impose a Fee Reduction or Order Other Sanctions on Pachulski Stang Ziehl & Jones on Account of the Kosnoff Communications

The UST also seeks a $434,431.60 reduction to the compensation requested in PSZJ's final fee application (a flat 10% reduction of the amount billed for non-travel time by Mr. Lucas throughout the pendency of this case) to "address" Mr. Lucas's "direct conduct" related to the Kosnoff Communications.[61] PSZJ responds that such a reduction would, as a monetary sanction, be contrary to the terms of the PSZJ Settlement. It also asserts that no reduction or sanction is warranted because "[t]he firm voluntarily agreed to its 'punishment'" through the PSZJ Settlement and other voluntary reductions.[62]

The ability of the UST to object to and for me to review PSZJ's fees requested under § 330 was reserved when I approved the PSZJ Settlement through the Confirmation Order.

---

[60] *In re Eckert*, 414 B.R. 404, 410 (Bankr. N.D. Ill. 2009).

[61] Obj. ¶¶ 45, 67.

[62] PSZJ Reply ¶ 25.

The terms of the Confirmation Order did not abrogate, in any way, my statutory obligation to independently review PSZJ's fee applications.[63] Consistent with that duty, I must ensure that PSZJ's final fee application complies with § 330, including as it relates to the Kosnoff Communications.[64] But, given that all time related to the Kosnoff Communications has been written off, there would appear to be nothing left for me to review under § 330 on that front.

Nonetheless, the UST seeks a 10% reduction to the amount billed by Mr. Lucas for services provided over the course of the entire case because of his participation in the Kosnoff Communications. Procedurally, the UST frames its request as one under § 330 and cites to *SC SJ* for the premise that § 330 permits a flat 10% fee reduction. It does, but *SC SJ* is inapposite. There, the court elected to make an across-the-board, percentage-based reduction for inefficient staffing and excessive use of senior attorneys for tasks below their paygrade (*i.e.*, considerations contemplated by § 330(a)(3)) rather than examining each billing entry individually.[65] Here, the UST's framing conflicts with the character of the reduction and is divorced from the § 330 analysis. The argument is not rooted in claims that Mr. Lucas's standard rate was excessive, that he billed inordinate time throughout the case

---

[63] *Busy Beaver*, 19 F.3d at 841.

[64] The fact that PSZJ—or any other professional—voluntarily reduced its fees is also no bar to a court's review or reductions under § 330. In fact, every professional paid by the estate is obligated to exercise its billing judgment *before* submitting its fee application. *See In re: Merced Falls Ranch, L.L.C.*, No. 11-19212-13-11, 2013 WL 3155448 (Bankr. E.D. Cal. June 20, 2013) (discussing the role of billing judgment in invoicing clients). The exercise of billing judgment may reduce unreasonable fees to a point the reviewing court deems reasonable. But such necessary reductions, whether applied across the board (*e.g.*, a 10% rate reduction negotiated with the client) or for specific services (*e.g.*, writing off excessive associate time for research), do not otherwise impact the court's objective review.

[65] *SC SJ*, 2023 WL 4842101, at *9 (citing *Top Jet Enters.*, 2022 WL 1184245, at *5).

or similar objections.  The proposed reduction is punitive.  At bottom, the UST opposes approving otherwise allowable fees to penalize PSZJ for Mr. Lucas's role in the Kosnoff Communications and to deter similar actions in the future.  This is a monetary sanction.

Such a sanction faces at least two fatal barriers.  First, § 330 is not a procedurally proper vehicle by which to seek sanctions.[66]  Second, even assuming *arguendo* that sanctions could be imposed in this procedural posture, the court-approved PSZJ Settlement prohibits further monetary sanctions against PSZJ.  The PSZJ Settlement resolved all monetary penalties potentially arising from PSZJ's actions related to the Kosnoff Communications.  I therefore decline to reduce PSZJ's fees as a sanction for that conduct.

Finally, to bring closure on this issue, I also decline to impose any non-monetary sanctions on PSZJ.  Previous public discussions of the Kosnoff Communications as well as the discussion here are sanction enough.

CONCLUSION

For the foregoing reasons, I will overrule the Objection and grant the Final Fee Applications.  Applicants are directed to submit a form of order consistent with this Memorandum Opinion under certification of counsel after circulating the draft to the United States Trustee.

Dated: August 15, 2025

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[66]  *See e.g. Rubner & Kutner, P.C. v. U.S. Trustee (In re Lederman Enters.)*, 997 F.2d 1321, 1322-23 (10th Cir. 1993) (characterizing denying fees requested for unnecessary work as a statutory imperative rather than a penalty).  Litigants may pursue sanctions through other procedural means.  *See, e.g., NNN 400 Capital Center, LLC v. Wells Fargo Bank, N.A. (In re: NNN 400 Capital Center 16, LLC)*, Case No. 16-12728, Adv. Pro. No. 18-50384, 2019 WL 5073844 (Bankr. D. Del. Oct. 9, 2019) (imposing fee-shifting sanctions under § 105); Fed. R. Bankr. P. 9011(c) (governing sanctions for misrepresentations to the court).