**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20–10343 (LSS) |
| Reorganized Debtors. | (Jointly Administered) |

**MOTION OF LIBERTY MUTUAL INSURANCE COMPANY**
**TO ENFORCE THE CONFIRMATION ORDER AND PLAN**

---

[1]    The Reorganized Debtors (or the Debtors, as applicable) in these Chapter 11 Cases, together with the last four digits of each Reorganized Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 11

    I.     The LMIC Policies ................................................................................ 11

    II.    Approximating the Value of Abuse Claims ....................................... 12

    III.   Confirmation of the Plan and Subsequent Appellate Proceedings. .................... 16

    IV.   Post–Confirmation Activities Regarding the Trust ............................. 18

JURISDICTION ................................................................................................ 23

ARGUMENT ................................................................................................... 24

    I.     LMIC Holds a Valid Indirect Abuse Claim Against the Trust. .......... 24

    II.    The Trust Must Reimburse LMIC For Any Amounts LMIC Pays to the Trust. ................................................................................................ 25

         A.    The LMIC Policies are Matching Deductible Policies Under Which LMIC Is Entitled to Reimbursement for Any Amounts It Advances Under the LMIC Policies. ................................. 26

         B.    The Trust, As Assignee and Successor–In–Interest to BSA, Stands in the Shoes of the Insureds under the LMIC Policies ............................ 28

         C.    LMIC Is Entitled To Assert Its Rights of Recoupment and Setoff ......... 31

    III.   The Plan, TDP, and Trust Agreement Require (I) Payment in Full for Indirect Abuse Claims and (II) Equal Treatment of Direct Abuse Claims and Indirect Abuse Claims. ................................................ 34

         A.    The TDP Mandate Equal Economic Recovery for Direct and Indirect Abuse Claims ................................................ 36

         B.    The Trustee Has a Fiduciary Obligation to Treat All Trust Beneficiaries Equally. ................................................ 37

         C.    Absent Necessary Corrections to the Trust's Implementation of the TDP, Abuse Claims Cannot Be Paid in Full ................................. 38

12402282

IV.    This Court Has Authority to Require the Trustee to Comply with the
Plan and Confirmation Order and to Fashion an Appropriate Remedy............... 43

CONCLUSION...................................................................................................................... 45

12402282

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Galaz v. Katona (In re Galaz)*,
    841 F.3d 316 (5th Cir. 2016) ................................................31

*Houk v. Comm'r*,
    173 F.2d 821 (5th Cir. 1949) ...............................................31

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
    896 F.2d 54 (3d Cir. 1990) ..................................................34

*In re BlockFi, Inc.*,
    No. 22-19361 (MBK) (Bankr. D.N.J. May 13, 2024) ...........................23

*In re BSA*,
    137 F.4th 126 (3d Cir. 2025) ........................................18, 29, 30

*In re BSA*,
    642 B.R. 504 (Bankr. D. Del. 2022) ................................... *passim*

*In re Combustion Eng'g.*,
    391 F.3d 190 (3d Cir. 2004)................................................37

*In re Congoleum Corp.*,
    636 B.R. 362 (Bankr. D.N.J. 2022) ........................................44

*In re Corp Grp. Banking S.A.*,
    No. 21-10969 (JKS) (Bankr. D. Del. Sep. 5, 2024).........................23

*In re Intermet Corp.*,
    No. 08-11859 (KG), 2009 Bankr. LEXIS 2613 (Bankr. D. Del. Sept. 2, 2009)......43

*In re Lazy Days' RV Ctr. Inc.*,
    724 F.3d 418 (3d Cir. 2013).................................................23

*In re Mallinckrodt PLC*,
    99 F.4th 617 (3d Cir. 2024) ...............................................33

*In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) ........................44

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).......................................13

*In re SelectBuild III., LLC*,
  No. 09-12085 (KJC), 2015 Bankr. LEXIS 1790 (Bankr. D. Del. May 28,
  2015) ...............................................................................................................................33

*In re TPC Grp.*,
  No. 22-10493 (CTG) (Bankr. D. Del. Feb. 22, 2023) ...........................................23

*In re Univ. Med. Ctr.*,
  973 F.2d 1065 (3d Cir. 1992) ................................................................................32

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ..................................................................................37

*JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*,
  607 F.3d 114 (3d Cir. 2010) ..................................................................................33

*Lantern Entm't LLC v. Bruce Cohen Prods. et al (In re The Weinstein Co.
  Holdings LLC)*,
  Ch. 11 Case No. 18-10601 (MFW), Adv. Case No. 18-50924 (D. Del. Jan. 4,
  2019) (MFW) ........................................................................................................32

*Local Loan Co. v. Hunt*,
  292 U.S. 234 (1934) ..............................................................................................23

*Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minn., LLC)*,
  47 F.4th 193 (3d Cir. 2022) ...................................................................................23

*Miller v. Zurich Am. Ins. Co. (In re WL Homes LLC)*,
  563 B.R. 512 (Bankr. D. Del. 2017) ......................................................................32

*Nat'l Union Fire Ins. Co. v. BSA (In re BSA)*,
  650 B.R. 87 (D. Del. 2023) ...............................................................17, 29, 31, 39

*Public Serv. Co. of N.H. v. N.H. Elec. Coop. Inc. (In re Public Serv. Co. of N.H.)*,
  884 F.2d 11 (1st Cir. 1989) ...................................................................................33

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.*,
  628 F.3d 725 (5th Cir. 2010) .................................................................................31

*Sherr v. Winkler*,
  552 F.2d 1367 (10th Cir. 1977) .............................................................................37

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ..............................................................................................23

*U.S. v. Bond*,
  762 F.3d 255 (2d Cir. 2014) ..................................................................................30

*Wolf v. Weinstein,*
    372 U.S. 633 (1963)....................................................................................................37

*Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak),*
    406 F.3d 214 (3d Cir. 2005)......................................................................................23

**Statutes**

11 U.S.C. § 105.............................................................................................................43

11 U.S.C. §105(a) ...................................................................................................1, 8, 43

11 U.S.C. § 363.............................................................................................................33

11 U.S.C. § 365.............................................................................................................33

11 U.S.C. § 553.............................................................................................................34

11 U.S.C. § 1123(b)(3) ..................................................................................................30

11 U.S.C. § 1142 .....................................................................................................1, 8, 43

11 U.S.C. § 1142(a) .......................................................................................................43

11 U.S.C. § 1142(b) .......................................................................................................43

11 U.S.C. § 553(a) .........................................................................................................33

28 U.S.C. § 157(b)(2)(A)...............................................................................................23

28 U.S.C. § 1334...........................................................................................................23

28 U.S.C. § 1409(a) ......................................................................................................23

Pursuant to Bankruptcy Code sections 1142 and 105(a), Liberty Mutual Insurance Company ("LMIC"),[2] by and through its undersigned counsel, hereby files this motion (the "Motion") seeking entry of an order of this Court directing the Settlement Trust established by the Plan (the "Trust") to comply with the terms of the TDP[3] that BSA and the other Plan Proponents represented to the Court would result in payment in full of Abuse Claims and requiring the Settlement Trustee (the "Trustee") to discharge her fiduciary duty to LMIC and other Indirect Abuse Claimants.  LMIC also requests that the Court either (i) order that the Trust establish the Required Reserves in a manner that would ensure that the corpus of the Trust is not exhausted before Indirect Abuse Claims can be satisfied, or (ii) adjudicate the controversy that exists between LMIC and the Trustee by confirming that LMIC may exercise its rights under the Plan, namely, its rights of recoupment and setoff that were memorialized in the TDP.  Absent necessary corrections to the Trust's implementation of the TDP, Abuse Claims (Direct or Indirect) cannot be paid in full.  LMIC submits that, by granting the relief requested herein, the Court can ensure that the values assigned to Direct Abuse Claims align with BSA's pre–petition values—which the TDP were designed to emulate—which will benefit all Abuse Claimants.  In support of the Motion, LMIC respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Trustee has alleged that Liberty Mutual is obligated to tender ███████████ to the Trust through Q2 2025.  Of that amount, ████████████ (the "Alleged Amount") reflects

---

[2]   While the movant is solely LMIC, the term "Liberty Mutual" refers to LMIC, its affiliates and subsidiaries.

[3]   Capitalized terms used herein but otherwise undefined shall have the meanings ascribed to them in the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC [D.I. 10296] (inclusive of all prior iterations, modifications, amendments, and supplements, the "Plan"), the TDP, or the Trust Agreement (each as defined in the Plan), as applicable. References to "D.I." refer to this Court's docket in the case *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS), unless otherwise denoted.

the Trust's position as to liability for Direct Abuse Claims that the Trust processed through Q2 2025 that is allocable to the LMIC Policies (as defined herein).

2.      The Trust has calculated the Alleged Amount by employing a process that lacks any nexus with the evidence that supported the Court's confirmation of the Plan or BSA's pre–petition practice.  BSA represented to this Court, the District Court, and the Third Circuit that, under the confirmed Plan, Indirect Abuse Claims would be allowed and liquidated pursuant to the same process as the underlying Direct Abuse Claims.[4]  BSA also represented that the Trust ultimately would be able to pay *all* Abuse Claims in full, and votes were solicited based on a 100% recovery.[5]

3.      The ability to pay all Abuse Claims in full was a critical element to BSA achieving confirmation of its Plan, including the various injunctions contained in the Plan that channel all Abuse Claims away from BSA and the Protected Parties to the Trust.  BSA solicited its Plan by representing that holders of Abuse Claims would be paid in full.  Without such a showing, BSA likely would not have received the votes it needed, nor would it have been able to satisfy the requirements for this Court to confirm a Plan containing such injunctions and third–party releases. To carry its burden of proof, BSA relied on the uncontroverted expert reports and sworn testimony of its expert, Dr. Charles Bates, in which he concluded that the likely aggregate value of Abuse Claims, after applying the scaling factors in the TDP, was within the range of approximately $2.4 billion to $3.6 billion (the "Initial Benchmark Valuation").[6]  BSA further relied on Nancy Gutzler's

---

4       *See, e.g.*, TDP at Art. XI.A ("Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX hereof").

5       *See, e.g.*, Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. 6445] ("Disclosure Statement") at Art. II.H, IX.D.

6       *See* Debtors' Response to the Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. 8234] ("BSA's

expert reports and sworn testimony to conclude that the amount of allocated insurance coverage available from Non-Settling Insurers to compensate Direct Abuse Claimants fell within the range of approximately $321 million to $401 million.[7]  The Initial Benchmark Valuation represented a downward revision in Dr. Bates' original valuation of Abuse Claims.  It came in response to allegations by the Tort Claimants' Committee (the "TCC") that the Plan was unconfirmable and lacked sufficient support from Direct Abuse Claimants.[8]

4.    The Court concluded that this range of potential recoveries from Non-Settling Insurers, taken together with the $2,484,200,000 in "non-contingent funding" and $200 million in "committed but contingent funding" to the Trust, meant that the distributable assets that the Trust held or reasonably could be expected to hold was "well over the Initial Benchmark Valuation and quite comfortably within the aggregate range."[9]  Dr. Bates' testimony and expert report therefore established a factual basis upon which the Court could conclude that Abuse Claims "more likely than not" would be paid in full under the Plan pursuant to the TDP.[10]

5.    Despite the Court's conclusion after hearing the Debtors' evidence in support of confirmation, the Trust's processing of approximately 60% of Direct Abuse Claims[11] has fallen

---

Response to TCC") at Ex. A, Rebuttal Expert Report of Charles E. Bates, Jan. 5, 2021 (the "Bates Rebuttal Report"), at ¶ 12.

[7]    Declaration of Nancy Gutzler [D.I. 9398] ("Gutzler Decl."), at ¶ 118; *In re BSA*, 642 B.R. 504, 559 (Bankr. D. Del. 2022) (hereinafter, *BSA I*).

[8]    *See* The Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware, LLC [D.I. 8190] at ¶ 7.

[9]    *BSA I,* 642 B.R. at 561.

[10]    *Id.* at 560.

[11]    The Scouting Settlement Trust's Monthly Program Statistics as of November 4, 2025 reported that the Trust has determined 47,670 claims out of 64,316 questionnaires submitted (which equals approximately 74.1% of claims). However, LMIC is only aware of the aggregate allowed amount of 35,783 Direct Abuse Claims (approximately 60% of claims), which amount was $20,571,754,218.  *See* Declaration of the Hon. Barbara J. Houser (Ret.), *Nat'l Surety Corp. v. Houser, et al.*, No. 2017-CH-14975 (Ill. Cir. Ct. Aug. 12, 2025) [D.I. 778] (the "Illinois Decl."), at ¶ 9, attached hereto as **Ex. A**.

3

well outside of this "aggregate range," well outside of the range the Debtors' expert allocated to the Non-Settling Insurers, and well outside even of the total amount of limits Ms. Gutzler identified.  This leads, reluctantly, to the conclusion that there has been and continues to be a fundamental breakdown between what the Plan and TDP were designed to do—pay all Direct and Indirect Abuse Claims in full—and how the Plan and TDP have been implemented—such that Abuse Claims will not be paid in full.[12]  Had the Trustee, in her capacity as a fiduciary to *all* Abuse Claimants, followed the TDP allowance and valuation processes that led Dr. Bates to conclude that Abuse Claims would be paid in full, it is unlikely that she would have informed Direct Abuse Claimants (as she has now done) that such claims likely will not be paid in full.[13]  Recent updates from the Trust, along with filings made by certain Direct Abuse Claimants, make clear that Direct Abuse Claimants are unlikely to see anything approaching payment in full of their claims notwithstanding the representations that BSA made to those claimants when soliciting votes to confirm its Plan.

---

[12]  *See* Becky Yerak, *Boy Scouts Sex-Abuse Claims Reach $7 Billion*, WALL ST. J. PRO.: BANKRUPTCY (June 6, 2025), https://www.wsj.com/articles/boy-scouts-sex-abuse-claims-reach-7-billion-double-its-estimates-6afe81c3?mod=Searchresults_pos1&page=1 (on file with author).  The delay in payment, as well as the recent revelation that Abuse Claims may not be paid in full, has resulted in Direct Abuse Claimants expressing their own concerns with the Court.  *See, e.g.,* Letter Regarding Settlement [D.I. 13008] ("I was told by my attorney . . . that I will not see any of my net settlement award, that's only what the Trustee hope[s] to pay me. . . . the Plan that I voted for and agree[d] to does not state that in Section 4.1 (claims administration and distributions full value of such claims)."); Letter Regarding Settlement [D.I. 12857] ("[A]ccording to the Scouting Settlement Trust, Claims Administrator Randi Roth, in a letter sent to me regarding my claim stated 'It is possible that the client will never receive 100% of his allowed claim.'  I believe BSA has failed to abide by their Chapter 11 Reorganization Plan because compensation has not been paid promptly, as claims are allowed by the Scouting Settlement Trust.")

[13]  *See 16.6 How Much money will I get in the end?  What percentage of my allowed claim amount can I expect to receive once all the distributions to me have been paid?* SCOUTING SETTLEMENT TRUST HELP CENTER (Jun. 20, 2025), https://www.scoutingsettlementtrust.com/s/article/16-6-How-much-money-will-I-get-in-the-end-What-percentage-of-my-allowed-claim-amount-can-I-expect-to-receive-once-all-the-distributions-to-me-have-been-paid#:~:text=The%20Trust%20does%20not%20know,on%20the%20factors%20explained%20above ("The Trust does not know how much Claimants will receive on allowed claims, but it almost certainly will not be 100% of the allowed amount.").

12402282

6.      The Trust has administered claims in a manner inconsistent with the Plan and TDP (as well as the pre–petition period) and has made untethered demands on Liberty Mutual and other Non-Settling Insurers.  The net result is that some two years after the Trust's inception, Direct Abuse Claimants have received distributions limited to 1.5% of their allowed claims and any meaningful enhancement to that amount is dependent on the correct application of the TDP, as requested herein, and potentially years of coverage litigation.

7.      Liberty Mutual has repeatedly attempted to engage with the Trustee to discuss the Trust's ballooning demands, including the many errors that the Trust has made in assessing liability under the LMIC Policies that have produced inflated demands.  On September 25, 2025, for the first time, the Trust provided a response to Liberty Mutual's many objections and inquiries (the "September 25 Letter").[14]  That response came shortly after LMIC, in an act of its continued good faith conduct toward BSA—and now, the Trustee, as BSA's successor–in–interest— advanced $3,380,485 to the Trust (the "Payment").[15]  The Payment represents the remaining limits under four (4) of the umbrella fronting policies that LMIC issued to BSA.  Consistent with the terms of the LMIC Policies (which the Plan and Confirmation Order did not alter), LMIC requested reimbursement from the Trust for the Payment.  Through its September 25 Letter, the Trust (i)

---

[14]    *See* Letter from Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee, to Kim V. Marrkand, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Couns. to Liberty Mutual, (Sept. 25, 2025), attached to the *Declaration of Kim V. Marrkand* (the "Marrkand Decl.") filed contemporaneously herewith as **Ex. 14**.  To reduce the burden on the Court, LMIC has omitted the majority of the original attachments to **Ex. 2, 4, 9, 11, 13, and 14** to the Marrkand Decl.  However, these attachments are available to the Court upon request.

[15]    As discussed herein, Liberty Mutual has responded to each demand through Q1 2025 that it has received from the Trust with its own analysis of the Trust's demands.  Prior to the September 25 Letter, the Trust had not engaged Liberty Mutual or provided an explanation as to why the Trust disagrees with Liberty Mutual's analysis. Instead, the Trust had continued processing Direct Abuse Claims and sending Liberty Mutual additional demands without explanation.  Believing that the Trust was unlikely to respond to any requests for information, LMIC chose to advance the Payment, consistent with its pre–petition practice and in line with the provisions in the LMIC Policies.  Now, the Trustee's positions set forth in the September 25 Letter have concretely demonstrated that the Trust and LMIC disagree on critical issues that are ripe for decision by this Court, including what rights LMIC can exert under the Plan Documents (particularly, the TDP).

rejected LMIC's request for reimbursement, stating that LMIC is only entitled to assert an Indirect Abuse Claim, and (ii) repudiated LMIC's ability to exercise its rights of recoupment and setoff against current and future demands.

8.      The September 25 Letter brings into focus the Trust's strategy for dealing with Non-Settling Insurers like Liberty Mutual: amass demands that disregard key assumptions that informed this Court's aggregate valuation of Abuse Claims, as well as the applicable terms and conditions in the insurance policies and the parties' pre–petition course of performance, in an attempt to increase the Trust's leverage over Non-Settling Insurers.  Left unchecked, the Trust's actions will continue to prejudice LMIC in the extreme, which, as an insurer that wrote "fronting policies" for BSA, was never intended to have *any* exposure under those policies.  The Alleged Amount *against LMIC alone* currently ███████████.  Through August 2025, the Trust had processed Direct Abuse Claims in the amount of over $20.5 billion on account of approximately sixty percent (60%) of Direct Abuse Claims evaluated under the Matrix Claims process.[16]  This amount exceeds—by nearly sixfold—the highest estimated value of Direct Abuse Claims that the Debtors' expert, Dr. Bates, testified he expected the TDP process to yield for *all* Direct Abuse Claims.[17]  Ms. Gutzler estimated that, in addition to the funds received through settlements with the Settling Insurers that seeded the Trust, approximately $300 million to $400 million could be allocated to Non-Settling Insurers.[18]  Thus, the Alleged Amount is ████████████

---

[16]    *See* Illinois Decl.  As aforementioned, the Trust has now processed approximately 74.1% of Direct Abuse Claims. However, the Trust has not published the aggregate allowed amount of those claims (only the claim disbursement amount).

[17]    *See* Bates Rebuttal Report at ¶ 12 (estimating Direct Abuse Claims at a range of $2.4 billion to $3.6 billion).

[18]    Ms. Gutzler included in her testimony that the total limits of the policies of the Non-Settling Insurers could be in the range of $4 billion; limits, however, are not equivalent to allocated liability, as Ms. Gutzler explained in the Gutzler Decl. at ¶¶ 8, 117-118, 129, 134.

12402282

███████████████████████████████████

████████████████████

9.      The Court can bridge the divide between the Alleged Amount and the amounts contemplated at confirmation by requiring that the Trust comply with the Plan and Confirmation Order.  Specifically, the Court should require the Trustee to employ the TDP in a manner consistent with Dr. Bates' sworn testimony, which uncontroverted testimony was the basis for the Court's finding that Direct Abuse Claims would be paid substantially in full.  Such an Order is necessary, because the Trust now has informed Liberty Mutual that "any statements made by BSA *or its experts* during the bankruptcy proceedings are *not binding* on the Trust."[19]  Such an Order is further necessary, because, without it, LMIC, as the holder of an Indirect Abuse Claim, bears the real risk that the Trust's process for liquidating Direct Abuse Claims in contravention of Dr. Bates' methodology and pre–petition practice will result in a lack of funds available to satisfy LMIC's Indirect Abuse Claim.  This result prejudices LMIC and raises serious questions regarding the Trust's ability to treat all Beneficiaries of the Trust (Indirect and Direct Abuse Claimants) equally.

10.     The fact that LMIC might shoulder the risk of the Trust exhausting its assets before it can satisfy LMIC's Indirect Abuse Claim is at odds with the Plan, Confirmation Order, and testimony that BSA adduced at confirmation.  In addition to BSA soliciting sworn testimony that *all Abuse Claims will be paid in full*, a number of BSA's experts testified—and the Plan and Confirmation Order provide—that the Plan does not modify, amend, or supplement insurers' contractual rights.  The LMIC Policies that LMIC wrote for BSA are "fronting policies."  LMIC is entitled to be reimbursed "dollar for dollar" for any amounts that LMIC may choose to advance under the LMIC Policies and has therefore demanded that the Trustee comply with the terms of

---

[19]    September 25 Letter at 6 (emphasis supplied).

12402282

the Plan and Confirmation Order—which left unaltered the terms of the LMIC Policies—and reimburse the Payment.

11.     As an alternative to immediate reimbursement, because LMIC has advanced the Payment, LMIC has amended its proof of claim to assert a partially-liquidated Indirect Abuse Claim in the amount of the Payment. BSA represented to its creditors and this Court that such claims would be paid in full. Due to the Trust's actions, that prior representation now rings hollow. Consequently, LMIC must ensure that it can continue to assert its rights under the unaltered LMIC Policies, the Plan, and the Confirmation Order. In addition to its right to be reimbursed in full for any advances made under the LMIC Policies, if the Trust fails to reimburse LMIC for any advances, LMIC is entitled to assert its rights of recoupment and setoff against any amount that the Trust may allege LMIC owes. Because the Trust has now informed LMIC that the Trust will *not* reimburse LMIC for the Payment, LMIC is entitled to—and intends to—exercise its rights of recoupment and setoff. However, the Trust has also stated unequivocally that "neither of [those rights] is available in these circumstances" notwithstanding that the TDP expressly preserves such rights.[20]

12.     The Trustee owes a fiduciary duty to administer the Trust for the benefit of ***all*** Abuse Claimants, including Indirect Abuse Claimants such as LMIC.[21] The Trustee must take certain protective (and remedial) steps to ensure she is able to discharge her Court–ordered fiduciary duty to LMIC as an Indirect Abuse Claimant. LMIC respectfully requests that, pursuant to the authority vested in it under the Plan and Confirmation Order, as well as sections 105(a) and 1142 of the Bankruptcy Code, the Court order the Trustee as follows:

---

[20]     September 25 Letter at 8.

[21]     *See BSA 1*, 642 B.R. at 641.

12402282

a.    **<u>First, the Court should Require the Trustee to Implement Dr. Bates'</u> <u>Methodology</u>**.  The Court relied on testimony from Dr. Bates to rebut valuations offered by the TCC that would have shown Abuse Claims could not be paid in full.  Instead, the Court concluded that, based on Dr. Bates' testimony, the likely aggregate value of Abuse Claims, after applying the scaling factors in the TDP, was within the range of approximately $2.4 billion to $3.6 billion, meaning Direct Abuse Claims would be paid in full.[22] The Court also recognized, however, that, because Dr. Bates did not conduct a claim–by–claim analysis to arrive at his estimate, the aggregate value of Abuse Claims ultimately "could be lower, it could be within the range, [or] it could be higher."[23]  LMIC submits that the Court's conclusion that the aggregate value of Abuse Claims likely would fall within the range of $2.4 billion to $3.6 billion is consonant with its finding that the aggregate value could be above or below this range.  However, as set forth in the *Declaration of Yvonne N.D. Swaim* attached hereto as **Ex. B** (the "<u>Swaim Decl.</u>"), the Trust has ***not*** applied the same scalars that Dr. Bates testified were a critical component of valuing Abuse Claims under the TDP.[24]  If the Trust is allowed to continue liquidating Direct Abuse Claims without applying the proper scalars, then the value of Direct Abuse Claims could climb above $30 billion—***ten times*** the upper limit of the range for Abuse Claims that Dr. Bates testified would result from proper application of the TDP.  And the Alleged Amount allocated to LMIC ███████████████ ████████████████    The Court should order the Trust to adopt the same scaling factors that Dr. Bates used to arrive at his valuation.[25]

b.    **<u>Second, the Court Should Require the Trustee to Discharge Her</u> <u>Fiduciary Obligations to Indirect Abuse Claimants</u>**.  The Settlement Trust Advisory Committee ("<u>STAC</u>"), which effectively governs the Trust,[26] serves as fiduciary only to Direct Abuse Claimants.[27]  In contrast, the Trustee has fiduciary obligations to all Abuse Claimants—including Indirect Abuse Claimants—as well as to the Trust itself.[28]  The Certain

---

[22]    *See id.* at 560.

[23]    Sept. 1, 2022 Tr. [D.I. 10288], at 48:22-23.

[24]    *See* Swaim Decl., at ¶¶ 5-10.

[25]    In each of the demands that the Trust has issued to Liberty Mutual, it expressly reserved the right to revise the amount for which it is seeking payment from Liberty Mutual.  *See, e.g.*, Letter from Kami. E. Quinn, Esq. to Liberty Group, dated May 29, 2025, attached to the Marrkand Decl. as **Ex. 11**, at 2.  With the application of the correct scaling factors, the Trust would then apply that methodology both retroactively to adjust the Alleged Amount and going forward as to any additional Direct Abuse Claims that are liquidated.

[26]    *See BSA I*, 642 B.R. at 641.

[27]    *See id.* at 641 n.606.

[28]    *See id.* at 641 ("The Settlement Trustee's responsibilities are to adjudicate claims and disburse payments.  In her role, she owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse

12402282

Insurers raised this fiduciary duty "mismatch" during the course of Plan confirmation, noting that the Trustee's ability to exercise her professional judgment based on her fiduciary duties to all Abuse Claimants is subject to consent by the STAC (and other parties, including the FCR), none of whom has a fiduciary duty to Indirect Abuse Claimants or to the Trust itself.[29]  This misalignment in fiduciary duties between the Trust and its oversight bodies has now manifested through the Trust's allowance of inflated Direct Abuse Claim values, which will effectively prevent holders of Abuse Claims (both Direct and Indirect) from receiving compensation that even comes ***close*** to approaching the 100% recovery they were told they would receive by BSA and its experts.  The Court should require the Trustee to fulfill her fiduciary obligation to Indirect Abuse Claimants when valuing and liquidating Direct Abuse Claims, as mandated by the Plan and TDP.

c.    **Third, the Court Should Provide Appropriate Relief by (i) Ordering the Trustee to Establish Reserves Sufficient to Satisfy LMIC's Indirect Abuse Claim or (ii) Adjudicating an Existing Dispute Concerning LMIC's Rights Under the Plan**.  The Court specifically retained post–confirmation jurisdiction (i) over reserve–related disputes in the Plan; and (ii) to enforce and interpret the Plan and Plan Documents (which includes the TDP).[30]

1.    The Court has authority to order the Trust to establish reserves in an amount sufficient to satisfy LMIC's Indirect Abuse Claim.  The TDP require that Indirect Abuse Claims receive the same treatment as Direct Abuse Claims.  However, as the Trust continues to liquidate Direct Abuse Claims in an amount that far exceeds any estimated range of values proffered by the Debtors' experts without applying the scaling factors critical to Dr. Bates' opinion, it is virtually certain that the balance of the Trust Assets will be eroded for the sole benefit of Direct Abuse Claimants.  Absent a sufficient reserve, there will be no assets in the Trust to satisfy Indirect Abuse Claims.  Allowing the Trust to continue liquidating Direct Abuse Claims consistent with current practices without establishing a reserve to pay Indirect Abuse Claims vitiates the requirement under the TDP that all Abuse Claims be treated equally.

2.    Alternatively, the Court could adjudicate LMIC's rights under the Plan, including the TDP.  The TDP provide that LMIC, as an

---

Claims, which is defined to include holders of Direct Abuse Claims, Indirect Abuse Claims and Future Claimants."); Trust Agreement at § 2.1(b).

[29]    Mar. 30, 2022 Tr. [D.I. 9562], at 66:22-67:18 ("This mismatch of fiduciary duties so that the settlement trustee's scope of responsibility is greater than her scope of authority presents serious governance concerns when we apply those both to the guiding principles in the TDP[] and to well-accepted norms of good organizational governance.").

[30]    *See* Plan at Art. XI.C.4, 13.

12402282

Indirect Abuse Claimant, retains the right to exercise its common law and contractual rights of recoupment and setoff. The Trust has stated that neither of those rights "is available" to LMIC. Under the confirmed Plan, the Court retained jurisdiction to, among other things, "enforce and interpret the terms and conditions of the Plan [and] Plan Documents" and "hear and determine any other matters related [to the Plan], including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases".[31] LMIC therefore submits that the Court can adjudicate the live controversy between LMIC and the Trust by confirming that LMIC, pursuant to the TDP, can exercise its rights of recoupment and setoff.

13.     By fashioning a remedy that enforces the confirmed Plan and the protections afforded to LMIC as an Indirect Abuse Claimant, the goal of compensating the Abuse Claimants remains in place. By applying the scalar factors that were the bedrock foundation of Dr. Bates' methodology, there is a greater likelihood that Abuse Claimants will be paid in full as the values assigned to an Abuse Claim will align more closely to BSA's pre–petition values, which the TDP were designed to emulate.

## FACTUAL BACKGROUND

### I.     The LMIC Policies.

14.     Prior to the Petition Date, LMIC issued certain insurance policies consisting of (i) primary liability policies (the "Primary Policies"), and (ii) excess umbrella liability policies (the "Umbrella Policies" and, together with the Primary Policies, the "LMIC Policies") to BSA. The LMIC Policies were in place during the periods of 1996–2008.

15.     As both Ms. Gutzler and Mr. Adrian Azer, counsel for BSA, testified at the Confirmation Hearing, and as admitted by the Debtors in their Opening Day Informational Brief,[32] the LMIC Policies are "fronting policies", as evidenced by the fact that they are "matching

---

[31]   *Id.* at Art. XI.C.4, 18.

[32]   *See* Debtors' Informational Brief [D.I. 4] at 36.

12402282

deductible" policies with aggregate limits.[33]    If LMIC elects to advance some or all of the deductible on a specific claim, the insureds are required to "***promptly***" reimburse LMIC for such an advance.[34]    Consequently, the insureds under the LMIC Policies—not LMIC—bore and continue to bear all the responsibility for defending, paying, and resolving sex abuse claims brought against the insureds during the periods of the LMIC Policies.

## II.    Approximating the Value of Abuse Claims.

16.    On February 18, 2020 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases.

17.    As of the Petition Date, BSA was a defendant in approximately 275 lawsuits and was aware of approximately 1,400 additional claimants who had not filed suit.[35]    By November 16, 2020, however, more than 82,000 claims had been filed against the Debtors' estate.[36]    This Court is familiar with the disputes that arose during this case regarding certain various plaintiffs' firms, the TCC and the Coalition of Abused Scouts for Justice ("Coalition"), leading to, among other things, revisions to plaintiffs' counsel's improper advertising, as well as sanctions. Ultimately, the claimants' bar coalesced to agree that certain of these lawyers, representing among the largest groups of claimants, would have a majority seat on the STAC,[37] which effectively serves as the governing board for the Trust.[38]    The Trustee has a fiduciary duty to holders of *both* Direct

---

[33]  *See* Mar. 17, 2022 Tr. [D.I. 9408], at 89:12-25; Mar. 24, 2022 Tr. [D.I. 9490], at 45:16-23, 46:10-14; 47:20-48:9.

[34]  *See, e.g.*, Deductible Endorsement in Umbrella Policy No. TH1-191-409751-118, effective from March 1, 1997 to March 1, 1998 (as stipulated to by BSA and LMIC and entered into evidence at D.I. 9675) (the "1998 Deductible Endorsement").  LMIC advanced the Payment pursuant to four Umbrella Policies, each of which include identical language with respect to prompt reimbursement.

[35]  *BSA I*, 642 B.R. at 532.

[36]  *See id.* at 534.

[37]  *See id.* at 541.

[38]  *See id.* at 641.

Abuse Claims and Indirect Abuse Claims.[39]  In contrast, members of the STAC have a duty only to their clients, all of whom are Direct Abuse Claimants.[40]

18.    BSA needed "overwhelming support" from abuse claimants in order to confirm a plan that contained channeling injunctions and third–party releases.[41]  Liberty Mutual, along with certain other of BSA's pre–petition insurers (collectively, the "Certain Insurers"), demonstrated at the confirmation trial that this need resulted in BSA making a number of concessions, including, among other things, BSA agreeing to include, at the insistence of counsel for Direct Action Claimants, insurance–prejudicial provisions in the Plan and TDP.[42]  The Certain Insurers forcefully objected to those parts of the Plan and TDP that, among other things, would (i) result in inflated valuations of Direct Abuse Claims in contrast to BSA's historical practices; (ii) attempt to bind the Certain Insurers to determinations by the Trust as to the validity and value of Direct Abuse Claims; and (iii) otherwise attempt to abrogate the Certain Insurers' rights in coverage litigation.[43]

19.    As BSA's search for "overwhelming" support among claimants evolved, so, too, did the evidentiary basis upon which BSA would rely to "prove" that all Abuse Claims would be paid in full.  In a filing to this Court, BSA revealed a growing schism between itself and the claimants over the value of Abuse Claims and support for the Plan, assigning much of the blame

---

[39]    *See id.*; Trust Agreement at § 2.1(b).

[40]    *See* Trust Agreement at § 6.2.

[41]    *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (holding that, in the extraordinary case where the debtor seeks a channeling injunction and third-party releases, courts consider a number of factors, including whether the plan received 'overwhelming' support by those affected, typically at least 90%; and whether it provides for the 'payment of all, or substantially all, of the claims of the class or classes' affected); *see also BSA I*, 642 B.R. at 596-97.

[42]    *See* Opening Brief of Certain Insurers, *Nat'l Union Fire Ins. v. BSA (In re BSA)*, No. 20-10343-LSS (D. Del. Nov. 7, 2022) [D. Del. D.I. 45] at 48-51, attached hereto as **Ex. C**.

[43]    *See id.* at 61-63; *see also* Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan [D.I. 8793-1]; Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan [D.I. 9033].

12402282

to the ongoing disputes between the TCC and the Coalition.[44]  Dr. Bates sought to correct the mistakes made by the TCC's valuation expert, who was never called to testify, that led the TCC to value Abuse Claims in excess of $25 billion.[45]  To foreclose this growing schism, including justifying how "the Debtors anticipate *payment in full* to holders of allowed claims in Class 8 ***in accordance with the [TDP]***",[46] BSA relied on the Bates Rebuttal Report, through which Dr. Bates revised his estimated range of aggregate Abuse Claim liability—from $2.4 billion to $7.1 billion —to a lower, "more likely" range of $2.4 billion to $3.6 billion.[47]  Starting from that valuation, the Debtors concluded that, based on "the size of contributions already being made to the Settlement Trust" and "the expected value of non-settling insurance rights and non-settling chartered organization claims", the Plan was likely to result in full payment of Direct Abuse Claims.[48]

20.    As the Debtors repeatedly represented to the Court, they designed the TDP to "emulate" BSA's pre–petition claims values.  Mr. Azer testified that "[w]hen we were talking about this in the prepetition context . . . if someone could show me that we had legal responsibility based upon the information we get, [the TDP] are meant to kind of emulate the liability phase of looking at things."[49]  One of the most significant pieces of evidence admitted by the Debtors, through Dr. Bates, was that the aggregate value of pre–petition claims fell into two tranches:  single abuser or multiple abuser claims and that, between those two tranches, the multiple abuser claims resulted in the highest settlement values and highest proportion of the overall payments made by

---

[44]    *See* BSA's Response to TCC at ¶¶ 2-6.

[45]    *See* Bates Rebuttal Report at ¶¶ 10-12, 73.

[46]    BSA's Response to TCC at ¶ 7 (emphasis supplied).

[47]    Bates Rebuttal Report at ¶ 12.

[48]    BSA's Response to TCC at ¶ 7.

[49]    Mar. 17, 2022 Tr. [D.I. 9408] at 271:19-25.

14

12402282

BSA.[50]  As Dr. Bates testified, single abuser claims were rarely brought in the tort system because the plaintiff's bar could not meet their burden to show notice to—and, hence, liability of—BSA.[51]

21.     In his rebuttal report, Dr. Bates updated BSA's historical settlement data and explained that his original report misclassified numerous repeat abuser settlements as single abuser settlements.[52]  With this new data point, Dr. Bates revised his TDP simulation to set mitigating and aggravating scalars that the Trustee should apply when liquidating Abuse Claims "to have the Trust make payments consistent with the tort system simulation" that Dr. Bates had used as a baseline for valuing Abuse Claims.[53]  Dr. Bates then concluded that single abuser Abuse Claims must be **_reduced by 90%_** from the Base Matrix Values to be "reflective of BSA's likely low average responsibility for Abuse Claims."[54]

22.     Dr. Bates testified that the 90% reduction in the value of single abuser claims from the Bates Rebuttal Report was "an estimate of the way the result will come out. . . if she [the Trustee] implements the plan properly[.]"[55]  Dr. Bates went on to testify that "the TDP[] require the trustee to essentially evaluate the claims based on . . . [how] they would have [been] evaluated in the tort system" and that "typically for the single abuser cases that would result in scalars that would reduce the factors to **_less than 10 percent_**."[56]  He also concluded that "any person who is doing their job diligently, who applies the procedures like the TDP and gathers the information that would be useful, appropriate for answering these questions and studying the tort history would

---

50    Bates Rebuttal Report at ¶¶ 74, 96-97; Mar. 22, 2022 Tr. [D.I. 9455], at 18:18-23, 26:1-5; 26:22-27:6; 28:2-19.

51    Mar. 22, 2022 Tr. [D.I. 9455] at 28:2-19.

52    Bates Rebuttal Report at ¶¶ 15-16.

53    _Id._ at ¶ 97.

54    _Id._

55    Mar. 22, 2022 Tr. [D.I. 9455] at 42:1-10.

56    _Id._ at 43:10-20 (emphasis supplied).

15

be able to basically arrive at what would be reasonable outcomes consistent with the tort history that was fair and equitable."[57]

23.    Dr. Bates reached his range of $2.4 billion to $3.6 billion as an estimate for Abuse Claims after running the Abuse Claims through a TDP simulation.[58]  To reach his conclusion, Dr. Bates assumed that the mitigating scalars that would be used in evaluating Abuse Claims under the TDP "are reflective of the average from the tort simulation" that included a 90% discount for single abuser claims.[59]  In response to a line of questioning by the Certain Insurers, Dr. Bates testified that he read the TDP to include this mitigating scalar and believed that the Trustee would apply that discount based on the history of BSA's settlement of single–abuser claims.[60]  Dr. Bates' testimony and expert reports provided uncontroverted evidence that led this Court to conclude— no fewer than seven times in its confirmation opinion—that Direct Abuse Claims would be paid in full.[61]

## III.    Confirmation of the Plan and Subsequent Appellate Proceedings.

24.    While the TDP approved by the Bankruptcy Court in conjunction with confirmation of the Plan do not explicitly cite Dr. Bates's 90% reduction for single abuser claims, on July 29, 2022, the Court issued its opinion finding that "Dr. Bates's analysis was thorough and credible based on the data available."[62]  The Court went on to "conclude based on the record of evidence

---

[57]    Mar. 21, 2022 Tr. [D.I. 9454] at 292:3-12.

[58]    Bates Rebuttal Report at ¶ 28 ("I created a BSA Trust simulation model that uses the rules of the TDP to assign values to each Abuse Claim based on what is known about each Abuse Claim and a hypothetical set of aggravating and mitigating scalars to account for unknown Abuse Claim attributes.").

[59]    Mar. 21, 2022 Tr. [D.I. 9454] at 293:12-22.

[60]    Mar. 22, 2022 Tr. [D.I. 9455] at 44:11-54:18.

[61]    *BSA I*, 642 B.R. at 560, 562, 586, 602, 607, 608, 666 ("[B]ased on the information known to date about the Direct Abuse Claims . . . the Plan provides for payment in full.").

[62]    *BSA I*, 642 B.R. at 558.

presented and the information known to date regarding the Direct Abuse Claims, that the aggregate

valuation of the Direct Abuse Claims is most likely between $2.4 billion and $3.6 billion."[63]

25.    In denying confirmation of a prior version of the Plan, the July 29, 2022 opinion

provided a roadmap for BSA to fix the infirmities the Court had identified.[64]   Armed with that

guidance, on September 6, 2022, the Debtors filed the Plan.  On September 8, 2022, the Plan was

confirmed by this Court.[65]

26.    On March 28, 2023, the United States District Court for the District of Delaware

(the "<u>District Court</u>") affirmed this Court's confirmation of the Plan.[66]   In affirming the

Confirmation Order, the District Court found that "the TDP is explicit in ***not modifying*** the

insurance policies and preserving the policy obligations as they existed prepetition[.]"[67]

---

[63]    *Id.*

[64]    For example, the Court declined to make Finding "aa" (which was requested by the Coalition).  Finding "aa" provided that the "Base Matrix Values in the [TDP] subject to adjustment based on Aggravating Scaling Factors and Mitigating Scaling Factors (each as defined in the [TDP]) are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes."  *Id.* at 630.  The Court stated:

> To know if the outcomes under the TDP are 'consistent with the Debtors' historical abuse settlements and litigation outcomes,' one would need to compare the outcome of the process (i.e. the Final Determination/Allowed Claim Amount) with Debtors' prepetition settlements and litigation outcomes to determine if there is consistency between the two. This Finding is necessarily future-looking and I do not have a crystal ball. It also requires a claim-by-claim analysis, which no one has done.

Now, a "crystal ball" is no longer needed.  The Trust has conducted a claim-by-claim analysis, and the Trust's proposed Allowed Claim Amounts are ***not*** consistent with the Debtors' prepetition settlements and litigation outcomes due to the Trust's failure to apply the proper scaling factors.

[65]    Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC [D.I. 10316] (the "<u>Confirmation Order</u>").

[66]    *Nat'l Union Fire Ins. Co. v. BSA (In re BSA)*, 650 B.R. 87, 192 (D. Del. 2023) (hereinafter, *BSA II*).

[67]    *Id.* at 145 (emphasis supplied).

17

27.     The Certain Insurers, among other parties, appealed the Confirmation Order to the U.S. Court of Appeals for the Third Circuit (the "Third Circuit").[68]  On May 13, 2025, the Third Circuit affirmed in part and reversed in part the District Court's decision, and remanded to the District Court.[69]  The Third Circuit, which affirmed the District Court's decision as to the Certain Insurers, found that "the Confirmation Order and Plan already preserve [the Certain Insurers'] rights and defenses under their policies[.]"[70]  Additionally, the Third Circuit adopted the *cum onere* reasoning that the Certain Insurers have raised before this Court and the District Court, holding that "a plan cannot be confirmed when it incorporates provisions that impermissibly impair counterparts' rights."[71]  The Third Circuit also made clear that Certain Insurers' rights and defenses remain regardless of whether the Trustee recognizes them in any coverage action.[72]

## IV.    Post–Confirmation Activities Regarding the Trust.

28.     Pursuant to the Insurance Assignment in the Plan, certain assets were assigned and transferred to the Trust, including "all [] rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves)[.]"[73]  As assignee, the Trustee is the successor–in–interest to the insureds and stands in their shoes with

---

[68]   LMIC incorporates herein in full the arguments set forth in the Opening Brief of Certain Insurers, *In re Boy Scouts of Am. and Del. BSA, LLC,* No. 23-1668 (consolidated) (3d Cir. Jul. 24, 2023) [3d Cir. D.I. 67], attached hereto as **Ex. D**.

[69]   *See In re BSA*, 137 F.4th 126, 142 (3d Cir. 2025) (hereinafter, *BSA III*).  On July 15, 2025, the District Court remanded the proceedings to this Court "for consideration and entry of the Proposed Order or another appropriate order implementing the [Third Circuit's] Opinion and Mandate".  *See* Order Remanding Appeal, *Nat'l Union Fire Ins. Co. v. Boy Scouts of Am. and Delaware BSA, LLC,* No. 22-1237-RGA (Consolidated) [D. Del. D.I. 268].

[70]   *BSA III*, 137 F.4th at 142.

[71]   *Id.* at 165.

[72]   *See id.* ("[T]he Settlement Trustee's litigating positions are not evidence of the meaning of the Plan or Confirmation Order, nor does the Settlement Trustee authoritatively interpret those documents and the provisions contained in them that preserve the Certain Insurers' rights and defenses").

[73]   *See* Plan at Art. I.A.157.

18

12402282

respect to their rights and obligations under the LMIC Policies.[74]  Pursuant to the Plan and related

documents, the Trust has been funded with, among other assets, approximately $2.7 billion in cash

plus all rights under the Insurance Actions, Insurance Action Recoveries, and Insurance Settlement

Agreements of BSA and the Protected Parties (collectively, the "Trust Assets").[75]

29.     On July 18, 2023, the Trustee filed a complaint (the "Complaint") in the Northern

District of Texas against the Non-Settling Insurers, including Liberty Mutual, and additional

alleged insurers of BSA and various Local Councils (the "Texas Action").[76]  The Complaint sought

a declaratory judgment regarding the defendant–insurers' alleged obligations to pay insurance

proceeds in connection with Direct Abuse Claims.[77]  The  Texas Action was stayed for several

months  pending  the  U.S.  Supreme  Court's  anticipated  decision  in  *Harrington  v.  Purdue*

*Pharma, L.P.*,[78] and the Third Circuit appeals.[79]  Prior to the stay, the defendants filed motions to

dismiss, which, given the stay, were not acted upon.  The stay in the Texas Action has been lifted.[80]

On September 11, 2025, the Trustee filed an amended complaint (the "Amended Complaint") in

---

[74]   *See id.* at Art. IV.C.2; X.Q.

[75]   *See id.* at Art. IV.D; Trust Agreement at § 1.3, Ex. 1.

[76]   *See* Complaint, *Houser v. Allianz Global Risks US Ins. Co., et al.*, No. 3:23-cv-01592-S (N.D. Tex. Jul. 17, 2023) [N.D. Tex. D.I. 1], attached hereto as **Ex. E**.

[77]   *See id.*  The Complaint also alleged that defendant-insurers breached their duties to indemnify and acted in bad faith.

[78]   603 U.S. 204 (2024).

[79]   *See* Order Staying and Administratively Closing Case Pending Ruling in *Harrington v. Purdue Pharma, L.P.* [N.D. Tex. D.I. 339]; Order Denying Motion to Reconsider Stay Pending Ruling in *Harrington v. Purdue Pharma, L.P.* [N.D. Tex. D.I. 373]; Order Staying and Administratively Closing Case Pending Third Circuit Appeals [N.D. Tex. D.I. 394]; Order Reopening Case [N.D. Tex. D.I. 430].

[80]   The court in the Texas Action held a status conference on August 28, 2025 where Judge Scholer directed the Trustee to file an amended complaint, which was filed on September 11, 2025.  Based on that ruling, Judge Scholer ruled that the pending motions to dismiss were moot.  Responsive pleadings, including new motions to dismiss, were filed on October 2, 2025.  Briefing on the motions is expected to close by mid-November 2025.  At the status conference, Judge Scholer introduced the court-appointed mediator, recently retired federal district court Judge Barbara Lynn, to the parties.

the Texas Action.[81] The Amended Complaint adds several counts of breach of contract but does not otherwise significantly revise the Complaint.

30.     While the Trustee has put the LMIC Policies at issue in the Texas Action, in line with the admissions made by BSA in this Court, the LMIC Policies are matching deductible policies with aggregate limits.  To the extent LMIC were to advance any payments under the LMIC Policies, under the terms of the LMIC Policies, the Trust would then be obligated to reimburse LMIC "***promptly***" for any amounts that LMIC advances, just as BSA was obligated to "promptly" reimburse LMIC for any advances prior to BSA filing bankruptcy.[82]  As every Court reviewing the issue has recognized, BSA's insurance policies were not (and could not have been) altered by BSA's bankruptcy.  Consequently, the Trust, as successor–in–interest to BSA, is currently obligated to "promptly" reimburse LMIC for the Payment.[83]  LMIC has learned through the September 25 Letter that the Trust will not honor that obligation.  Accordingly, pursuant to the Plan, LMIC now holds a partially-liquidated Class 9 Indirect Abuse Claim—which is subject to the same treatment as Class 8 Direct Abuse Claims—in the amount of the unreimbursed Payment.  Because it holds an Indirect Abuse Claim, LMIC is entitled to exercise its rights of setoff and recoupment against any present or future demand by the Trust under the LMIC Policies.  Notwithstanding the terms of the LMIC Policies, the testimony of the Debtors and their experts at the Confirmation Hearing, and the parties' pre–petition course of performance whereby only

---

[81]   *See* First Amended Complaint, *Houser v. Allianz Global Risks US Ins. Co., et al.*, No. 3:23-cv-01592-S (N.D. Tex. Jul. 17, 2023) [N.D. Tex. D.I. 516], attached hereto as **Ex. F**.

[82]   *See* 1998 Deductible Endorsement; Deductible Endorsement in Primary Policy No. TB1-191-409751-126, effective from March 1, 2006 to March 1, 2007 (as stipulated to by BSA and LMIC and entered into evidence at D.I. 9675) (the "2006 Deductible Endorsement").

[83]   *Id*.

BSA—and never LMIC—handled and paid all sex abuse claims,[84] the Trust has issued demands to LMIC under the LMIC Policies for the Alleged Amount in connection with Direct Abuse Claims processed by the Trust.

31.    The Trust issued these demands to Liberty Mutual on September 10, 2024; December 4, 2024; February 26, 2025; May 29, 2025; and September 11, 2025.[85]  Liberty Mutual has provided a lengthy response to each demand,[86] explaining in detail why, in relevant part, the Trust's allocation of liability to Liberty Mutual under the LMIC Policies is erroneous.[87]  Relevant here, in its responses on February 10, 2025 (in response to the Q3 2024 demand) and May 27, 2025 (in response to the Q4 2024 demand), LMIC offered to advance payment under the LMIC Policies, consistent with the language in the LMIC Policies and the parties' pre–petition course of performance, upon the Trustee's written confirmation that the Trust would reimburse LMIC for any such payment.[88]  The Trustee did not engage meaningfully with the responses until the September 25 Letter.[89]

---

[84]    While BSA controlled the defense, handling and resolution of all Abuse Claims, it often requested LMIC to advance payment for a defense counsel invoice, settlement amount or other cost.  In that event, BSA thereafter promptly honored its obligation to reimburse LMIC for any such advance.  *See* Liberty Mutual's Objections and Answers to Debtors' First Set of Interrogs. to Liberty Mutual (Oct. 18, 2021), attached to the Marrkand Decl. as **Ex. 1**.

[85]    *See* Letters from Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee, to Couns. to Liberty Group (Sept. 10, 2024), (Dec. 4, 2024), (Feb. 26, 2025), (May 29, 2025), (Sept. 11, 2025), attached to the Marrkand Decl. as **Ex. 2, 4, 9, 11, and 13**, respectively.

[86]    Liberty Mutual has provided a lengthy response to each demand with the exception of the September 11, 2025 demand, to which Liberty Mutual's response is forthcoming.

[87]    *See* Letters from Kim V. Marrkand, Esq., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Couns. to Liberty Mutual, to Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee (Oct. 10, 2024), (Feb. 10, 2025), (May 27, 2025), (August 26, 2025), attached to the Marrkand Decl. as **Ex. 3, 8, 10, and 12**, respectively.

[88]    *See* Letters from Kim V. Marrkand, Esq., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Couns. to Liberty Mutual, to Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee (Feb. 10, 2025), (May 27, 2025), attached to the Marrkand Decl. as **Ex. 8 and 10**, respectively.

[89]    On December 31, 2024, the Trustee sent Liberty Mutual a two-page communication that reserved all rights but stated that the Trustee did not "believe that it would be productive to provide a point-by-point response to [Liberty Mutual's] coverage positions at this time".  *See* Letter from Kami E. Quinn, Esq., Gilbert LLP, Couns. to the

21

32.     On December 4, 2024, Liberty Mutual sent a letter to Ms. Kami E. Quinn (counsel to the Trustee) demanding that the Trustee establish reserves against the Trust Assets in the Alleged Amount (the "Required Reserves").[90]  Liberty Mutual informed Ms. Quinn that, should the Trustee fail to establish the Required Reserves and tender proof thereof to Liberty Mutual, Liberty Mutual reserved its right to request that this Court order the Trust to establish the Required Reserves.[91]  On December 13, 2024, Ms. Quinn informed Liberty Mutual that the Trustee declined to establish the Required Reserves.[92]

33.     On August 26, 2025, LMIC made the Payment, exhausting the remaining limits of four (4) of the Umbrella Policies issued by LMIC, and notified the Trustee it would seek reimbursement, as provided for under the LMIC Policies.[93]

34.     Contemporaneously herewith, LMIC filed an Amended Proof of Claim asserting an Indirect Abuse Claim in the Alleged Amount, which Indirect Abuse Claim is partially liquidated in the amount of the Payment [Claim No. [__], modifying Claim Nos. 4971, 14610, and 14611] (the "Amended Claim").

---

Trustee, to Bryana T. McGillycuddy, Esq. and Douglas R. Gooding, Esq., P.C., Choate, Hall & Stewart LLP, Couns. to Liberty Mutual (Dec. 31, 2024), attached to the Marrkand Decl. as **Ex. 7**.

[90]  *See* Letter from Douglas R. Gooding, Esq., P.C., Choate, Hall & Stewart LLP, Couns. to Liberty Mutual, to Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee (Dec. 4, 2024), attached to the Marrkand Decl. as **Ex. 5**.

[91]  *See id*.

[92]  *See* Letter from Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee, to Douglas R. Gooding, Esq., P.C., Choate, Hall & Stewart LLP, Couns. to Liberty Mutual (Dec. 13, 2024), attached to the Marrkand Decl. as **Ex. 6**.

[93]  *See* Letter from Kim V. Marrkand, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Couns. to Liberty Mutual, to Kami E. Quinn, Esq., Gilbert LLP, Couns. to the Trustee (Aug. 26, 2025), attached to the Marrkand Decl. as **Ex. 12**.

12402282

## JURISDICTION

35.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).[94] "Bankruptcy Court[s] plainly [have] jurisdiction to interpret and enforce [their] own prior orders."[95]  Indeed, bankruptcy courts frequently issue orders enforcing confirmed plans and directing parties to act in accordance with such confirmation orders.[96]  This Court expressly retained jurisdiction to enforce the Confirmation Order and Plan.  LMIC consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

36.     Venue is appropriate under 28 U.S.C. § 1409(a).

---

[94]  *See, e.g.*, *Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minn., LLC)*, 47 F.4th 193, 199 (3d Cir. 2022) (motion to interpret plan and confirmation order was a core proceeding).

[95]  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934)); *see also In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 423 (3d Cir. 2013) (citing *Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak)*, 406 F.3d 214, 224 (3d Cir. 2005) (bankruptcy courts "plainly ha[ve] jurisdiction to interpret and enforce . . . [their] plan and confirmation order" and are, in fact, "well suited to provide the best interpretation" of the plan and confirmation order)).

[96]  *See* Order Enforcing the Discharge Injunction Under the Debtors' Chapter 11 Plan of Liquidation re: Docket No. 1028 and Ordering Certain Related Relief, *In re Corp. Grp. Banking S.A.*, No. 21-10969 (JKS) (Bankr. D. Del. Sept. 5, 2024) [D.I. 1047] (granting claimants' motion to enforce confirmation order and directing Litigation Trustee to "suspend and take all steps necessary to continue its suspension of any further distributions" to holders of certain unsecured notes claims until certain lawsuits filed in Chile had been withdrawn); Order Granting in Part the Motion to Enforce and Granting the Motion to Remand and Opinion, *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. May 13, 2024) [D.I. 2302-2303] (granting in part insurers' motion to enforce confirmed plan and confirmation order that limited the wind-down debtors' ability to bring claims against the insurers in state court); Memorandum Opinion and Order Regarding Motion to Enforce Chapter 11 Plan and Confirmation Order, *In re TPC Grp., Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. Feb. 22, 2023) [D.I. 1430-1431] (granting in part plan sponsors' motion to enforce the plan and enjoin certain tort plaintiffs from filing claims against plan sponsors).

## ARGUMENT

### I.    LMIC Holds a Valid Indirect Abuse Claim Against the Trust.

37.    Through the Amended Claim, LMIC has asserted a valid Indirect Abuse Claim against the Trust for the Alleged Amount.  LMIC's Amended Claim fits squarely within the Plan's definition of Indirect Abuse Claim, as it is based upon LMIC's right to reimbursement for any amounts LMIC may choose to advance to the Trust on account of a specific Direct Abuse Claim.

38.    The Plan defines "Indirect Abuse Claim" as follows:

> "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever . . . including any indemnification, reimbursement, hold–harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self–insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with Article IV.D.I.[97]

39.    Indirect Abuse Claims must be "asserted exclusively against the [Trust] and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents."[98]  The Settlement Trust Documents include the TDP and the Trust Agreement.[99]

40.    To receive compensation from the Trust, an Indirect Abuse Claimant must, among other requirements:

> establish "to the satisfaction of the [Trustee] or, to the extent applicable, by a final determination in an Insurance Action that: (a) such Indirect Abuse Claimant has paid in full all or the Claim

---

[97]    Plan at Art. I.A.153 (emphasis in original).

[98]    *Id.* at Art. III.B.11(b)(i).

[99]    *See id.* at Art. I.A.274.

12402282

holder's total share of the liability and/or obligation of the [Trust] to
a Direct Abuse Claimant to whom the [Trust] would otherwise
have had a liability or obligation under these TDP (as to which the holder
of the Allowed Indirect Abuse Claim seeks payment)[.]"[100]

41.     Because LMIC has made the Payment to the Trust, the Trust immediately owes

LMIC that amount.  LMIC's Indirect Abuse Claim is based upon that reimbursement obligation

that the Trust has told LMIC it will not honor.  Because the Amended Claim is a partially

unliquidated claim for reimbursement that is owed to LMIC under a pre–petition insurance policy,

it meets each of the elements of a valid Indirect Abuse Claim.

**II.     The Trust Must Reimburse LMIC For Any Amounts LMIC Pays to the Trust.**

42.     The LMIC Policies require BSA and other insureds under the LMIC Policies to

reimburse LMIC for any amounts it advances.  Throughout the parties' business relationship and

at all times prior to the Petition Date, it is uncontroverted that BSA (on behalf of itself and the

other insureds) did so without exception.

43.     As the successor–in–interest to the insureds under the LMIC Policies, the Trust

stands in the shoes of the insureds (as repeatedly admitted by BSA's experts, as well as lawyers

representing the claimants' bar).[101]  The Trust is therefore required to comply with the insureds'

obligations under the LMIC Policies and adhere to the parties' historical practices, and is bound

by the admissions made by the Debtors during the Chapter 11 Cases.  These obligations include

---

[100]   TDP at Art. IV.B.3.

[101]   For example, Eric Goodman of Brown Rudnick, representing the Coalition (a joint plan proponent), stated that
"[t]he trust here under the plan—this is in Article IV.B.1—is assuming the liability for the abuse claims. It's an
assumption, right?  That's why I used the—not legal term, but also used in cases, stepping into the shoes, right? . . .
The trust is stepping into the shoes of the Boy Scouts for that purpose."  Apr. 6, 2022 Tr. [D.I. 9616], at 201:20-
202:6.

12402282

the reimbursement of the Payment to LMIC as well as any other amounts that LMIC elects to advance to the Trust on account of a Direct Abuse Claim.[102]

A.   The LMIC Policies are Matching Deductible Policies Under Which LMIC Is Entitled to Reimbursement for Any Amounts It Advances Under the LMIC Policies.

44.    Each of the Primary Policies contains a deductible endorsement which provides, in pertinent part, that the Primary Policy contains a $1 million deductible, the erosion of which erodes the limits of liability.[103]  Evidencing the parties' no–risk–transfer arrangement, the deductible endorsement in each of the Primary Policies states that, if the insured fails to pay amounts within the deductible, and LMIC chooses to advance the deductible, the insured will, in turn, ***promptly*** reimburse LMIC for those advancements.[104]

45.    Each of the Primary Policies also contains an Amendment – Limits of Liability Endorsement, which provides that the limit of liability under such Primary Policy for "Personal Injury" including bodily injury is $1 million per occurrence and $1 million in the aggregate.[105] Accordingly, the deductible and limits of liability endorsements reflect that the per–occurrence limit and aggregate limit of each Primary Policy match the deductible of such Primary Policy, and the per–occurrence limit and aggregate limit of each Primary Policy match each other.

---

[102]  The Trust claims that it is not bound by BSA's pre–petition practices or positions.  *See* September 25 Letter at 6.

[103]  *See, e.g.*, 2006 Deductible Endorsement.

[104]  *See id*.  In addition to the LMIC Policies themselves, BSA's obligation to reimburse and guarantee LMIC for any amounts owed under the LMIC Policies are detailed in a series of reimbursement and agreements.  A sample agreement — that certain Agreement for Guarantee of Deductible Reimbursement dated as of March 1, 2000 (the "Exemplar Guarantee Agreement") — was stipulated to by BSA and LMIC and entered into evidence at D.I. 9675.  The Exemplar Guarantee Agreement provides that LMIC "may advance any part or all of the deductible amount on behalf of Policyholder for claims which are the sole and exclusive liability of Policyholder.  Policyholder agrees to reimburse Liberty Mutual for such payments, and any allocated loss adjustment expenses and costs applicable to such claims."  The provision setting forth the reimbursement obligations of BSA and the other "named insureds" under the LMIC Policies did not materially change throughout the period of the LMIC Policies.

[105]  *See, e.g.*, Limits of Liability Endorsement in Primary Policy No. TB1-191-409751-126, effective from March 1, 2006 to March 1, 2007 (as stipulated to by BSA and LMIC and entered into evidence at D.I. 9675).

12402282

46.    The Umbrella Policies contain limits of liability per occurrence, and in the aggregate, ranging from $1 million to $4 million.  In each Umbrella Policy, the deductible matches the limits of liability.[106]  As aforementioned, the deductible endorsement in each of the Umbrella Policies states that, if the insured fails to pay amounts within the deductible, and LMIC advances the deductible, the insured will, in turn, ***promptly*** reimburse LMIC for those advancements.[107] Additionally, the Umbrella Policies each contain an SIR.  The SIRs range from $1 million to $4 million per occurrence; in each Umbrella Policy, the SIR equals the limits of liability in the applicable Umbrella Policy.[108]

47.    At the very outset of BSA's bankruptcy proceedings, BSA admitted that, in the LMIC Policies, the "deductible matches the limit of liability."[109]  Moreover, in connection with Plan confirmation, BSA's witnesses repeatedly acknowledged that the LMIC Policies are "matching deductible" policies.  BSA's expert, Nancy Gutzler, testified:

> Starting in 1986 and continuing through 2018, the BSA purchased primary and first–layer excess policies that have deductibles that match the policies' limits of liability, dollar for dollar.  The "matching deductible" policies required the BSA pay or reimburse the deductibles before excess coverage attached to cover the remaining value of a claim to the extent it exceeded the limits of the underlying policies. . . .[110]

---

[106]    *See, e.g.,* 1998 Deductible Endorsement.

[107]    *See id.*; *see also* Exemplar Guarantee Agreement, at ¶ 4.

[108]    *See, e.g.*, Retention Endorsement — Aggregate Exhaustion in Umbrella Policy No. TH1-191-409751-118, effective from March 1, 1997 to March 1, 1998 (as stipulated to by BSA and LMIC and entered into evidence at D.I. 9675).

[109]    Debtors' Informational Brief [D.I. 4] at 36 (stating that, from 1986 to 2018, BSA "altered its insurance program" and "procur[ed] primary insurance and excess policies where the deductible matches the policy's limit of liability. These policies are more commonly referred to as 'fronting' policies").

[110]    Gutzler Decl. at ¶ 12.

12402282

48.     During the Confirmation Hearing, Ms. Gutzler testified that, in a "matching deductible" policy, "the deductible amount of the policy matches the limit of the policy."[111]  Ms. Gutzler further testified that, "while the insurer might pay the claim, the policyholder would have a deductible" and would "reimburse the insurer dollar–for–dollar."[112]  In the context of modeling the insurance coverage potentially available for sexual abuse claims, Ms. Gutzler made the legal assumption, relying upon the advice of BSA's counsel, that certain "matching deductible" policies, including the Primary Policies, included aggregate limits of liability.[113]  This Court found that Ms. Gutzler "[a]ssume[d] an aggregate limit on the matching deductible policies between 1988 and 2008."[114]

49.     Therefore, as BSA and its experts have repeatedly acknowledged, the LMIC Policies are structured such that if LMIC advances a payment under an LMIC Policy, the insured must reimburse LMIC for the advanced amount.  Additionally, at all times prior to the Chapter 11 Cases, BSA, on behalf of itself and the other insureds did, in fact, reimburse LMIC for any amounts that LMIC advanced.[115]

B.      **The Trust, As Assignee and Successor–In–Interest to BSA, Stands in the Shoes of the Insureds under the LMIC Policies.**

50.     Relevant here, the Trust is the assignee and successor–in–interest to BSA's rights and obligations under the LMIC Policies.  As such, the Trust has no fewer—and no greater—rights than BSA, the assignor.  Thus, as the District Court and the Third Circuit each confirmed, the happenstance of bankruptcy does not change or vitiate the parties' obligations and rights under

---

[111]   March 24, 2022 Tr. [D.I. 9490] at 19:9-11.

[112]   *Id.* at 19:12-15.

[113]   Gutzler Decl. at ¶¶ 12, 42, 51; March 24, 2022 Tr. [D.I. 9490] at 35:22-25; 45:16-23; 46:10-14; 47:20-48:9.

[114]   *BSA I*, 642 B.R. at 559.

[115]   *See* discussion *supra* n. 84 and accompanying text.

pre–petition insurance policies.[116]   Similarly, the Trust cannot vitiate the pre–petition history between BSA—its assignor—and the uncontroverted admissions made by BSA and its experts during the Chapter 11 Cases.

51.   The TDP provide that the Trust "has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies[.]"[117]  This Court held to be "uncontroverted" the principle that "if the contract's being assigned, that the [Trust] takes on the benefits and the burdens[.]"[118]  The District Court held that the Plan's transfer to the Trust of the insureds' rights and obligations under their Insurance Policies did not abrogate the contractual rights of Non-Settling Insurers such as Liberty Mutual.[119]  Indeed, the District Court found that the TDP are "explicit in not modifying the insurance policies and *preserving the policy obligations as they existed pre–petition*."[120]  The District Court also determined that "Insurers' rights and obligations under an Insurance Policy are preserved 'to the extent such rights and obligations are otherwise available under applicable law.'"[121]  Finally, the Third Circuit determined that, as a matter of law, the Certain Insurers' applicable rights and defenses under the insurance policies could not be altered by the Plan.  The Third Circuit held that the Plan "already preserve[s] all of the [insurers'] rights and defenses" in their insurance policies,

---

[116]   *See BSA II*, 650 B.R. at 146-47; *BSA III*, 137 F. 4th at 164-66.

[117]   TDP at Art. V.C.

[118]   Apr. 14, 2022 Tr. [D.I. 9496], at 205:25-206:4.

[119]   *See BSA II*, 650 B.R. at 146-47.

[120]   *Id*. at 146 (emphasis supplied).

[121]   *Id.* (citing TDP at Art. V.C).

12402282

so it was unnecessary to "rewrite the Plan and [thereby] fasten suspenders to this already well–secured belt."[122]

52.     Three courts have now ruled that the Plan preserves both the Non-Settling Insurers' rights under the Insurance Policies, as well as the insureds' obligations thereunder, as they existed pre–petition.  As assignee and successor–in–interest to the insureds with respect to the LMIC Policies, the Trust is now the party that must comply with those obligations.

53.     Article X.Q of the Plan states:

> Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV.C), and none shall have any successor or transferee liability of any kind or character; provided, however, that Reorganized BSA and the Settlement Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

54.     Article IV.C of the Plan, in turn, states: "the Settlement Trust shall assume the liabilities, obligations, and responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims[.]"  Article IV.C also designates the Trust as the "estate representative pursuant to section 1123(b)(3) of the Bankruptcy Code, with the exclusive right . . . to enforce each of the Settlement Trust Causes of Action and the Insurance Actions[.]"[123]  As an estate representative under section 1123(b)(3), the Trustee's powers and duties are dictated by the Plan, the Confirmation Order, and the Trust Agreement.[124]  The Plan allows the Trustee, among other things,

---

[122]  *BSA III*, 137 F.4th at 142, 166.

[123]  Section 1123(b)(3) of the Bankruptcy Code states that a plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate," or the "retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest".  11 U.S.C. § 1123(b)(3).

[124]  *See, e.g.*, *U.S. v. Bond*, 762 F.3d 255, 260 (2d Cir. 2014) ("[T]he powers of a bankruptcy trustee or debtor-in-possession are set out by Congress in the Code, whereas the powers of the Liquidating Trustee are found in the Plan and in the Liquidating Trust Agreement and conferred by the bankruptcy court").

30

to bring Insurance Claims on behalf of the insureds; therefore, as BSA's experts acknowledged and the Court recognized, the Trust "stands in the shoes" of the insureds.[125]

55.    Moreover, as assignee to BSA's rights and obligations under the LMIC Policies, the Trust "stands in the same position as its assignor stood."[126]    The positive aspects of assigned rights are "accompanied by their corollary negatives," and consequently, an assignee's rights "are also subject to defenses existing at the time of the assignment that would have been available against the assignor had there been no assignment."[127]    Therefore, the Trust retains the original rights and obligations—no more and no less—of the insureds under the LMIC Policies and is affirmatively obligated to "emulate, to the greatest extent practicable, the prepetition practices of the BSA and its insurance companies"[128] when processing Direct Abuse Claims.

C.    <u>LMIC Is Entitled To Assert Its Rights of Recoupment and Setoff.</u>

56.    Through its objections to the Plan and the Amended Claim, LMIC asserted and preserved its rights of recoupment and setoff against the Trust, which LMIC may exercise against the Trust to the same extent that it was entitled to do so against the insureds.  Furthermore, LMIC's recoupment and setoff rights were memorialized in the TDP.[129]    To the extent LMIC is not

---

[125]    *See* April 14, 2022 Tr. [D.I. 9656], at 278:8-10 ("[THE COURT]: . . . The trust is stepping into the shoes, if you will, of the Debtor in these contracts."); *see also* testimony cited *supra* n. 101.

[126]    *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (quoting *Houk v. Comm'r*, 173 F.2d 821, 825 (5th Cir. 1949)).

[127]    *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 325 (5th Cir. 2016); *Quality Infusion Care, Inc.*, 628 F.3d at 729 (stating that because the assignee stands in the same position as its assignor stood and takes "no greater and no less" than the rights of the assignor, the assignee "is also subject to any defenses, limitations, or setoffs that could be asserted against the assignor's rights") (citations omitted).

[128]    *BSA II*, 650 B.R. at 181.

[129]    TDP at Art. IV.B n.1 ("[T]he Plan's Discharge Injunction, Channeling Injunction, Insurance Entity Injunction and Plan Documents shall not be deemed to preclude a Non-Settling Insurance Company from exercising its rights of setoff and recoupment (to the extent setoff and recoupment are permitted under applicable law) against the Settlement Trust as to any deductible obligation on account of an Abuse Claim"); *id.* at Art. V.C ("in the event that a Non-Settling Insurance Company pays [any] self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that

31

12402282

reimbursed in full for the Payment it has made—which is required under the confirmed Plan and the terms of the LMIC Policies—LMIC is entitled to, and intends to, exercise each of these rights in accordance with applicable law.

57. First, LMIC is entitled to exercise its equitable right of recoupment. The equitable doctrine of recoupment provides that, so long as the creditor's claim "arises out of the identical transaction as the debtor's, that claim may be offset against the debt owed to the debtor, without concern for the limitations put on the doctrine of the setoff by [Bankruptcy Code] section 553."[130] In this Circuit, to exercise the right of recoupment, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."[131] Both LMIC's Indirect Abuse Claim against the Trust and the Trust's demand to Liberty Mutual for the Alleged Amount stem from the Trust's unilateral allowance of individual Abuse Claims. Because each Abuse Claim is a single liquidation, LMIC's right of equitable recoupment applies on a claim–by–claim basis.[132]

58. Second, because the *cum onere* principle applies to BSA's assignment to the Trust of the rights and obligations of BSA and the other Named Insureds under the LMIC Policies, the assignment constitutes a *de facto* assumption of the LMIC Policies.[133] Viewing the assignment as

---

reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim").

[130] *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1080 (3d Cir. 1992).

[131] *Id.* at 1081.

[132] *See, e.g., Miller v. Zurich Am. Ins. Co. (In re WL Homes LLC)*, 563 B.R. 512, 518 (Bankr. D. Del. 2017) (holding that the affirmative defense of recoupment could apply to offset a return premium owing to the debtor against amounts that the debtor otherwise would owe under a self-insured retention because "[t]o allow [the debtor] to enjoy the benefits of the Return Premiums and relieve it of the burden of the SIR would be inequitable.").

[133] *See* Jan. 14, 2019 Tr., *Lantern Entm't LLC v. Bruce Cohen Prods. et al (In re The Weinstein Company Holdings LLC)*, Ch. 11 Case No. 18-10601 (MFW), Adv. Case No. 18-50924 (D. Del. Oct. 17, 2018) (MFW) [D.I. 44] (filed Jan. 18, 2019) at 137:4-6 (Judge Walrath explaining that "the concept of a sale free and clear of all liens, claims and interests [under section 363 of the Bankruptcy Code] does not mean that you can sell the benefits of a contract, but not its obligations"). Judge Walrath explained that "the difference between 365 and 363 transfers is simply that a sale under 363 does not obligate the buyer to cure . . . prior payment defaults that the debtor would

12402282

an assumption, LMIC would be entitled in the ordinary course of business to enforce its rights under the LMIC Policies, including the dollar-for-dollar reimbursement requirement. Even assuming that the assignment of the LMIC Policies is not viewed as a *de facto* assignment, in the alternative, LMIC meets the requirements to assert the traditional right of setoff under section 553(a) of the Bankruptcy Code.

59.     Generally, section 553(a) recognizes and preserves creditors' setoff rights that already exist under applicable nonbankruptcy law when four conditions exist: (i) the creditor holds a "claim" against the debtor that arose before the commencement of the case; (ii) the creditor owes a "debt" to the debtor that also arose before the commencement of the case; (iii) the claim and debt are "mutual"; and (iv) the claim and debt are each valid and enforceable.[134] The Amended Claim meets each of these criteria.

- LMIC's entitlement to reimbursement for funds advanced under the LMIC Policies arose decades prior to the Chapter 11 Cases, when LMIC and the insureds executed the various LMIC Policies, including the related endorsements.[135]

- LMIC's obligation, if any, to the Trust for any Abuse Claim also arose pre–petition. Third Circuit caselaw provides that a mass tort claim "arises" at the time of the exposure or abuse.[136] If an LMIC Policy is found to be responsive to an Abuse Claim, the abuse must necessarily have occurred pre–petition and, as a consequence, the alleged debt arose pre–petition as well.

---

have to, otherwise, be obligated to make." *Id.* at 137:7-11. Cure costs are not relevant here. In all other respects, the assignment under section 363 of the Bankruptcy Code operates, in a practical sense, identically to an assumption under section 365 of the Bankruptcy Code.

[134]   11 U.S.C. § 553(a); *see Public Serv. Co. of N.H. v. New Hampshire Elec. Coop. Inc. (In re Public Serv. Co. of N.H.)*, 884 F.2d 11, 14 (1st Cir. 1989) ("[S]etoff may flourish in bankruptcy proceedings only where mutuality of obligation exists: a prepetition debt, *i.e.*, a debt which arose prior to commencement of the bankruptcy case, is owed by Creditor A to Debtor, while at the same time Creditor A has some claim against Debtor which likewise arose prior to commencement of the bankruptcy case").

[135]   *See In re Mallinckrodt PLC*, 99 F.4th 617, 621 (3d Cir. 2024) ("[M]ost contract claims arise when the parties sign the contract. That is when the parties fix their liability—even if it is still unliquidated or contingent. Once the parties agree to a contingent right to payment, the claim exists. And once the claim exists, bankruptcy can reach it") (cleaned up); *In re SelectBuild III., LLC*, No. 09-12085 (KJC), 2015 Bankr. LEXIS 1790, at *20 (Bankr. D. Del. May 28, 2015) (citing *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010)).

[136]   *See, e.g., In re Grossman's Inc.*, 607 F.3d at 125.

33

- LMIC's claim against the Trust and alleged debt of the Trust are mutual. Debts are mutual if they are "in the same right and between the same parties, standing in the same capacity."[137] Both the claim and the debt are between LMIC and the Trust, as assignee and successor–in–interest to the insureds.

- Neither party disputes that the indemnification and reimbursement provisions in the LMIC Policies are contractually valid and enforceable.

60.    Therefore, LMIC is entitled to exercise its statutory right of setoff under section 553 of the Bankruptcy Code and applicable state law.

61.    In conclusion, having made the Payment to the Trust, LMIC is entitled to recoup the Payment or set off the Payment against current or future demands made by the Trust under the LMIC Policies.

## III.    The Plan, TDP, and Trust Agreement Require (I) Payment in Full for Indirect Abuse Claims and (II) Equal Treatment of Direct Abuse Claims and Indirect Abuse Claims.

62.    The Plan and TDP entitle holders of Direct and Indirect Abuse Claims to receive an equal economic recovery.[138]    The Trustee is a fiduciary to all Beneficiaries of the Trust.[139] LMIC, as an Indirect Abuse Claimant, is a Beneficiary.[140]    Therefore, the Trustee will violate her fiduciary duty to *Indirect* Abuse Claimants (including LMIC) if she continues to liquidate *Direct* Abuse Claims in a manner inconsistent with pre–petition practice and the TDP.    This process will deplete the Trust Assets and thereby guarantee sufficient funds will not remain in the corpus of the Trust to satisfy the Trust's obligations to Indirect Abuse Claimants.

---

[137]    *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 59 (3d Cir. 1990).

[138]    *See* TDP at Art. XI.A; Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections [D.I. 9114] (the "Plan Confirmation Brief") at ¶ 118 ("Indirect Abuse Claims, including those sought pursuant to rights of subrogation or indemnification, will be paid on par with Direct Abuse Claims").

[139]    Trust Agreement at § 2.1(b); *BSA I*, 642 B.R. at 641 ("The Settlement Trustee's responsibilities are to adjudicate claims and disburse payments.  In her role, she owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse Claims, which is defined to include holders of Direct Abuse Claims, Indirect Abuse Claims and Future Claimants.").

[140]    Trust Agreement at § 1.6.

12402282

63.     During the pendency of the Chapter 11 Cases, as well as post–confirmation, BSA and its experts repeatedly asserted that all Abuse Claims would be paid in full.  However, as discussed previously and below, the Trust has processed approximately 60% of Direct Abuse Claims and, upon information and belief, the Trust has liquidated those claims in an amount surpassing $20 billion.[141]  Even with approximately 60% of the Direct Abuse Claims processed, such amount exceeds by $16 billion the valuation of Direct Abuse Claims presented to this Court by the Debtors and exceeds the Trust Assets by approximately $17.3 billion.

64.     The Trust's allowance and valuation processes are completely unmoored from the assumptions that informed Dr. Bates' valuation of Abuse Claims.  Those assumptions, which the Court found to be "credible" and accepted when evaluating the *Master Mortgage* factors, provided for the payment in full of Abuse Claims.[142]  Even putting that aside, the Trustee's work to date proves why the Court should order the Trustee to comply with the Plan and Confirmation Order and fashion an appropriate remedy, including to establish the Required Reserves.  LMIC cannot risk—nor should it be required to risk—that, after making the Payment, the Trust will fail to satisfy LMIC's resulting Indirect Abuse Claim.  The Trustee cannot both discharge her fiduciary duty to LMIC and simultaneously seek to recover a windfall at LMIC's expense.  As well-settled by the findings of this Court, the District Court and the Third Circuit, insurers' rights—and insureds' obligations—remain protected and intact.

---

[141]   *See* Illinois Decl. at ¶ 9.

[142]   *See BSA I*, 642 B.R. at 607 ("I concluded, based on the information known to date about the Direct Abuse Claims as analyzed by Dr. Bates, that the Plan provides for payment in full").

12402282

A.      The TDP Mandate Equal Economic Recovery for Direct and Indirect Abuse Claims.

65.      The Plan unambiguously obligates the Trust to pay Indirect Abuse Claims.[143]  The Trust does not dispute that "the sole recourse of any holder of an Abuse Claim against a Protected Party" is the Trust.[144]  Liberty Mutual, together with the other Certain Insurers, objected to confirmation of the Plan based on, among other issues, a concern that the TDP provided for discriminatory treatment of Indirect Abuse Claims when compared to treatment of Direct Abuse Claims.[145]  BSA contested those characterizations in the brief it filed with this Court in support of confirmation, in which BSA represented that "the Plan and TDP do not unfairly discriminate against Indirect Abuse Claims because, among other reasons, holders of Indirect Abuse Claims are estimated to receive a recovery of up to 100% after accounting for contributions and insurance rights.  The TDP make clear that Indirect Abuse Claims, including those sought pursuant to rights of subrogation or indemnification, will be paid on par with Direct Abuse Claims."[146]

66.      The requirement that all Abuse Claims receive equal treatment goes beyond representations that BSA made to this Court.  The TDP explicitly require Indirect Abuse Claims

---

[143]  Plan at Art. III.B.11.b.(i) ("[A]s of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the [Trust] without further act, order, or court order," and Indirect Abuse Claims "shall . . . be asserted exclusively against the [Trust] and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents."); Art. IV.V ("The [Trust] shall . . . pay Indirect Abuse Claims, in accordance with the [TDP], that may arise from deductibles or other charges.").

[144]  *See* Complaint [N.D. Tex. D.I. 1] at ¶ 108 (quoting Plan at Art. X.F.1).

[145]  *See* Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan [D.I. 8793-1] at ¶ 161 ("The Settlement Trust represents a classic 'fox guards the henhouse' approach whereby the Settlement Trustee is beholden only to the STAC and FCR, each of whom is not disinterested and, in the case of the STAC, has substantial financial incentives to maximize recoveries for only certain of the trust beneficiaries, the [Direct] Abuse Claimants, to the detriment of others, the insurers and Chartered Organizations holding Indirect Abuse Claims").

[146]  Plan Confirmation Brief [D.I. 9114] at ¶ 118 (citing Disclosure Statement [D.I. 6445] at Art. II.H).

36

to "be subject to the same liquidation and payment procedures as the [Trust] would have afforded the holders of the underlying valid Direct Abuse Claims[.]"[147]

B.     The Trustee Has a Fiduciary Obligation to Treat All Trust Beneficiaries Equally.

67.     As set forth above, LMIC has asserted a valid Indirect Abuse Claim against the Trust.  The Plan's definition of "Abuse Claims" includes Indirect Abuse Claims.[148]  And, the Beneficiaries of the Trust are holders of Abuse Claims.[149]  Thus, as the holder of an Indirect Abuse Claim, LMIC is a Beneficiary of the Trust.

68.     The Trust Agreement states that "[t]he Trustee is and shall act as the fiduciary to the Trust in accordance with the provisions of this Trust Agreement."[150]  This Court has previously found that the Trustee acts as fiduciary for all Abuse Claimants.[151]  The Trustee, therefore, must "hold, manage, protect and monetize the Trust Assets  . . . in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries".[152]

69.     It is black–letter law that a trustee serving in a bankruptcy proceeding is a fiduciary with an obligation to treat all parties fairly.[153]  Moreover, "equality of distribution among creditors is a central policy of the Bankruptcy Code[.]"[154]  Although the STAC is a fiduciary only to Direct

---

[147]   TDP at Art. XI.A.

[148]   Plan at Art. I.A.18.

[149]   Trust Agreement at § 1.6(a).

[150]   *Id.* at § 2.1(b).

[151]   *BSA I*, 642 B.R. at 641 ("The Settlement Trustee's responsibilities are to adjudicate claims and disburse payments. In her role, she owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse Claims, which is defined to include holders of Direct Abuse Claims, Indirect Abuse Claims and Future Claimants.").

[152]   Trust Agreement at § 1.2.

[153]   *See, e.g.*, *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir. 1977) (citing *Wolf v. Weinstein*, 372 U.S. 633, 649-50 (1963)).

[154]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *In re Combustion Eng'g.*, 391 F.3d 190, 239 (3d Cir. 2004)).

12402282

Abuse Claimants,[155] the Trustee is a fiduciary to both Direct Abuse Claimants and Indirect Abuse Claimants.[156]  As fiduciary to both classes of claimants, the Trustee may not discriminate between Direct and Indirect Abuse Claimants when allocating the Trust Assets.   However, as aforementioned, the "governing board" of the Trust is the STAC, which is not required to (and has no incentive to) protect the interests of Indirect Abuse Claimants such as LMIC.  All signs currently indicate that the Trust Assets will be exhausted before Indirect Abuse Claims can be satisfied.  This outcome—which is clearly incompatible with the Trustee's fiduciary obligation to treat Indirect Abuse Claimants equally to Direct Abuse Claimants—is a direct consequence of the Trust's choice to repudiate BSA's past practices and the methodology that Dr. Bates testified would lead to payment in full of Abuse Claims.[157]  It is unclear, at this point in time, what role the STAC has played, if any, in the soaring claim values that bear no reasonable resemblance to BSA's pre–petition values and do not align with the range of values estimated by Dr. Bates.

C.    Absent Necessary Corrections to the Trust's Implementation of the TDP, Abuse Claims Cannot Be Paid in Full.

70.    BSA repeatedly represented to this Court that all Abuse Claimants would receive payment in full.[158]  In addition to the exhaustive testimony and analysis presented by Dr. Bates, the Disclosure Statement approved by this Court anticipates an expected recovery of "up to 100%" on account of Indirect Abuse Claims.[159]  Relying on Dr. Bates' testimony, this Court found that "the

---

[155]   Trust Agreement at § 6.2.

[156]   *Id.* at § 2.1(b).

[157]   As aforementioned, the Trust informed Liberty Mutual of its position that "any statements made by BSA *or its experts* during the bankruptcy proceedings are *not binding* on the Trust."  September 25 Letter at 6 (emphasis supplied).

[158]   *See* Plan Confirmation Brief [D.I. 9114] ¶¶ 118 ("holders of Indirect Abuse Claims are estimated to receive a recovery of up to 100% after accounting for contributions and insurance rights"); ¶ 294 n.445 ("Indeed, Class 8 and Class 9 will receive payment in full"); ¶ 306 ("the Plan creates a mechanism for the payment of all, or substantially all of the Abuse Claims in full").

[159]   Disclosure Statement [D.I. 6445] at Art. II.H, IX.D.

12402282

aggregate valuation of the Direct Abuse Claims is most likely between $2.4 billion and $3.6 billion."[160]  BSA made the same "paid in full" argument before the District Court,[161] which agreed with BSA.[162]

71.     Recently, however, the Trustee admitted that "[t]he Trust does not know how much Claimants will receive on allowed claims, but it almost certainly will not be 100% of the allowed amount."[163]  Additionally, the results of an empirical study by a leading bankruptcy scholar have cast further doubt on the ability of the Trust to pay all Abuse Claims in full.[164]

72.     This stunning turn of events has occurred because, among other things, as set forth in the Swaim Decl., the Trust has not applied the 90% discount to single abuser claims.[165]  In addition, upon information and belief, the Trust generally allocates nearly 100% of the liability to BSA—and, on occasion, even zero liability to the abuser—and makes awards at inflated amounts that do not "emulate" BSA's pre–petition values.[166]  As of September 11, 2025, 24,891 single-

---

[160]   *BSA I*, 642 B.R. at 558.

[161]   Debtors-Appellees' Consolidating Answering Brief, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al. v. Boy Scouts of America & Delaware BSA, LLC*, No. 22-01237 (D. Del. Dec. 7, 2022) [D.I. 66] at 50 n.22, 86, 164, 166, 169, 175, 182 n.57, 183, 184, 184 n.58, 186, 189, 190, 199 n.65, 214, 231, 237, 245, attached hereto as **Ex. G.**

[162]   *BSA II*, 650 B.R. at 159 ("BSA argues . . . the Plan provides for payment in full of Abuse Claims.  I agree with BSA.")

[163]   *16.6 How Much money will I get in the end?  What percentage of my allowed claim amount can I expect to receive once all the distributions to me have been paid?*  SCOUTING SETTLEMENT TRUST HELP CENTER (Feb. 12, 2024), https://www.scoutingsettlementtrust.com/s/article/16-6-How-much-money-will-I-get-in-the-end-What-percentage-of-my-allowed-claim-amount-can-I-expect-to-receive-once-all-the-distributions-to-me-have-been-paid#:~:text=The%20Trust%20does%20not%20know,on%20the%20factors%20explained%20above; *7.10 Will I receive payment of my full allowed amount if my claim is determined to be an Allowed Abuse Claim?*  SCOUTING SETTLEMENT TRUST HELP CENTER (Oct. 22, 2024) https://www.scoutingsettlementtrust.com/s/article/Will-I-receive-payment-of-my-full-allowed-amount-if-my-claim-is-determined-to-be-an-Allowed-Abuse-Claim ("[T]he percentage of each Allowed Abuse Clam that will be paid depends on the amount of available funds in the Trust and the aggregate amount of all Allowed Abuse Claims.").

[164]   *See* MELISSA B. JACOBY, UNJUST DEBTS: HOW OUR BANKRUPTCY SYSTEM MAKES AMERICA MORE UNEQUAL (The New Press 2024).

[165]   *See* Swaim Decl. at ¶¶ 5-10.

[166]   Liberty Mutual expressly reserves and does not waive its right to seek discovery from the Trust regarding the process that it has employed to value and liquidate Direct Abuse Claims and to present additional evidence to the Court concerning the basis for the relief sought through this Motion.

12402282

abuser Matrix Claims for which awards have been issued have been noticed to Liberty Mutual by the Trust as "potentially covered by" Liberty Mutual's policies.[167]  The Trust did not apply a single-abuser discount to a single one of these 24,891 Matrix Claim awards.[168]

73.    The Trust has reported that claims have been processed in amounts surpassing $20 billion in the aggregate.[169]  This eye–popping amount exceeds by $13 billion the highest end of the range of the highest valuation put forth by Dr. Bates (valuing Direct Abused Claims at a range between $2.4 billion and $7.1 billion), *before* Dr. Bates reduced the range to between $2.4 billion and $3.6 billion.[170]  And as of August 12, 2025, the Trust had only processed approximately 60% of the Direct Abuse Claims.[171]

74.    Based on empirical data, it is highly improbable that, without adherence to the TDP and the 90% reduction for single abuser claims, the Trust can pay all Abuse Claims in full (despite BSA's repeated assertions to the contrary).[172]  Given that 60% of Direct Abuse Claims were valued at approximately $20.57 billion, if the Trust's process continues on the same trajectory, the aggregate allowed amount of all Direct Abuse Claims will equal approximately $34.1 billion.  The Trust has or will have access to approximately $2.7 billion in cash, assuming that all of the

---

[167]  *See* Swaim Decl. at ¶ 6.

[168]  *See id.* at ¶¶ 7-10.

[169]  *See* Illinois Decl. at ¶ 9.

[170]  *See BSA I*, 642 B.R. at 555-57.

[171]  *See* Illinois Decl. at ¶ 9.

[172]  The Trust has admitted that it "does not know how much Claimants will receive on allowed claims, but it almost certainly will not be 100% of the allowed amount." *16.6 How Much money will I get in the end?  What percentage of my allowed claim amount can I expect to receive once all the distributions to me have been paid?*  SCOUTING SETTLEMENT TRUST HELP CENTER (Jun. 20, 2025), https://www.scoutingsettlementtrust.com/s/article/16-6-How-much-money-will-I-get-in-the-end-What-percentage-of-my-allowed-claim-amount-can-I-expect-to-receive-once-all-the-distributions-to-me-have-been-paid#:~:text=The%20Trust%20does%20not%20know,on%20the%20factors%20explained%20above.

12402282

"contingent" funding identified by Ms. Gutzler and this Court is funded.[173]  As shown below, even assuming the most extreme favorable outcomes with respect to the Trust's potential additional funding sources, it is likely that the Trust will only have access to approximately $3.1 billion.

75.     Ms. Gutzler identified potential additional funding to the Trust from three sources: (i) additional settlements with Non-Settling Insurers for amounts allocated to Non-Settling Insurer policies; (ii) additional settlements with Non-Settling Insurers for policies that did ***not*** receive allocations (what Ms. Gutzler calls the "NSNA Insurers"); and (iii) additional contributions from Chartered Organizations.[174]  Apart from the Payment, the Trust "has not received any payment for any Abuse Claim", and "[n]o insurer has affirmed that it will pay any amount for any Abuse Claim for which it has received a demand for payment in compliance with its policies."[175]  Ms. Gutzler's projection that the Trust will receive up to $400 million from Non-Settling Insurers for funds allocated to their policies[176] is thus highly optimistic and relies upon a court adopting the Trust's incorrect theory that, even though it is the assignee and successor–in–interest to BSA, it is not bound by its assignor's admissions, its course of performance or findings of this Court.[177]  And, while Ms. Gutzler envisioned that the Trust could potentially reach settlements with other Chartered Organizations, no such post–confirmation settlements have been announced.[178]

76.     The below chart assumes for demonstration purposes the most extreme possible outcome under every single source of funding that Ms. Gutzler identified as available or potentially

---

[173]  *See* Gutzler Decl. at ¶¶ 110-113; *BSA I*, 642 B.R. at 561 ("The fully noncontingent funding is $2,484,200,000 . . . [t]he committed, but contingent funding could bring another $200 million into the Settlement Trust").

[174]  *See id.* at ¶¶ 118, 121, 128.

[175]  Illinois Decl. at ¶ 7.

[176]  Gutzler Decl. at ¶ 118.

[177]  *See* September 25 Letter at 6.

[178]  *See id.* at ¶¶ 127-28.

available to the Trust, excluding Ms. Gutzler's conjecture regarding potential recoveries under the NSNA Insurers' policies.[179]  Even were these extreme hypothetical assumptions to occur, Direct Abuse Claimants would still receive approximate recoveries of only **9%** of their allowed claims— a far cry from the 100% that BSA represented they would receive under the Plan.

| Trust Assets | Trust Liabilities |
|---|---|
| Settlement Funds: $2.7 billion[180] | Direct Abuse Claims: $34.1 billion |
| Additional Settlements with Non-Settling Insurers for Allocated Policies: $400.5 million | |
| Additional Contributions from Chartered Organizations: $50 million[181] | |
| Art Auctions: $10 million[182] | |
| Total: $3,160,500,000.00  (Approx. $3.1 billion) | Total: $34.1 billion |
| Difference: $31 billion<br>Percentage Recovery: 9% | |

77.    Thus, it is critical that the Court require the Trustee to comply with the Plan and Confirmation Order that was grounded in Dr. Bates' methodology for valuing Direct Abuse

---

[179]  Ms. Gutzler was quite candid in admitting that her discussion of the NSNA Insurers' policies was solely an arithmetic exercise — she simply added up the limits and did no other analysis.  *See id.* at ¶ 121.  This Court did not include coverage limits under the NSNA Insurers' policies when concluding that the Debtors have "shown by a preponderance of the evidence that Direct Abuse Claims will be paid in full".  *BSA I*, 642 B.R. at 561.  As discussed herein, the Court's conclusion was based on Dr. Bates' Initial Benchmark Valuation of the aggregate Abuse Claims at $2.5 billion (with a range between $2.4 billion and $3.6 billion), and the NSNA Insurers' policies are not triggered by those modeled claims.  *See id.* at 560, 561 n.277.  There is no basis in law or fact to categorize unallocated policy limits as funds that could be potentially available to the Trust.

[180]  As noted above, this number presumes that the funding this Court characterized as "contingent" is realized.  *See BSA I*, 642 B.R. at 561.

[181]  The Trust's pre-confirmation settlement with the Methodist Committee provided $30 million in initial funding, with the Methodist Committee seeking to raise an additional $100 million over time.  *See BSA I*, 642 B.R. at 561.  Additionally, Ms. Gutzler's declaration contemplated an additional $250 million settlement with the Church of Jesus Christ of Latter-Day Saints, which this Court declined to approve.  *See id.* at 621; Gutzler Decl. at ¶ 126.  Based on post–confirmation events to date, additional settlements with other Chartered Organizations will most likely equal $0.  However, LMIC assumes the amount of $50 million to present an optimistic scenario for this line item.

[182]  The initial auction of 25 artworks from the BSA Trust collection realized $4,644,375.  Press Release, Heritage Auctions, HERITAGE AUCTIONS' INITIAL OFFERING OF SCOUTING ART REALIZES $3.7 MILLION TO BENEFIT SURVIVORS OF SEXUAL ABUSE (Nov. 15, 2024), https://historical.ha.com/heritage-auctions-press-releases-and-news/heritage-auctions-initial-offering-of-scouting-art-realizes-3.7-million-to-benefit-survivors-of-sexual-

Claims.  The Court can fashion a remedy that will require the Trustee to discharge her fiduciary duties to *all* Abuse Claimants, including by ensuring that the Trust will have sufficient funds to reimburse LMIC on account of its Indirect Abuse Claim.  Absent such a remedy, all signs point toward complete exhaustion of the Trust Assets in the near future.  This is, of course, unfair to Direct Abuse Claimants who relied on BSA's repeated representations that they would be paid in full.  It is also unfair to LMIC, which cannot and should not be required to bear the risk that the Trust cannot satisfy LMIC's Indirect Abuse Claim.  Therefore, in order to enforce the TDP and ensure that the Trustee discharges her fiduciary obligation to Indirect Abuse Claimants, the Court should require the Trustee to comply with the terms of the Plan and Confirmation Order and order an appropriate remedy that will protect LMIC's rights.

## IV.    This Court Has Authority to Require the Trustee to Comply with the Plan and Confirmation Order and to Fashion an Appropriate Remedy.

78.    The Court has the authority under sections 105 and 1142 of the Bankruptcy Code to order specific performance with the terms of the Plan, including the TDP.  Section 1142(a) of the Bankruptcy Code provides that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court."[183]  To ensure compliance with the terms of a confirmed plan, the Bankruptcy Court "may direct the debtor and any other necessary party . . . to perform any other act . . . that is necessary for the consummation of the plan."[184]  Moreover, it is axiomatic that section 105(a) of the

---

abuse.s?releaseId=5101#:~:text=The%20initial%2025%20offerings%20from%20the%20BSA,final%20hammer%20price%2C%20the%20lots%20realized%20$%2C644%2C375.  Because the total amount that the Trust will receive from art auctions is unknown, LMIC has doubled the initial amount for purposes of demonstration only.

[183]    11 U.S.C. § 1142(a).

[184]    11 U.S.C. § 1142(b); *see In re Intermet Corp.*, No. 08-11859 (KG), 2009 Bankr. LEXIS 2613, at *13 (Bankr. D. Del. Sept. 2, 2009) ("Sections 105 and 1142(b) of the Bankruptcy Code provide courts with broad authority to order parties to comply with reorganization plans. . . . It is incumbent upon the Court to make certain that the Plan which creditors overwhelmingly supported is given effect.") (internal citations omitted).  Section 1142(a)

Bankruptcy Code gives this Court "the power and the jurisdiction to enforce its valid orders."[185] Indisputably, this Court possesses authority to interpret its own Confirmation Order and enforce both the findings it made thereunder and the terms of the Plan.[186]

79.     In its opinion providing a roadmap for confirmation of the Plan, the Court's conclusion that "if the Plan is confirmed, Direct Abuse Claims will more likely than not be paid in full" was "[b]ased on the testimony of Dr. Bates and Ms. Gutzler[.]"[187]  As set forth in this Motion, Dr. Bates testified that the TDP were designed to incorporate a 90% discount to the value of a single–abuser claim.[188]  None of the single–abuser claims  noticed to Liberty Mutual for which the Trust has issued an award include that discount.[189]  By failing to apply that mitigating scalar to its valuation of Direct Abuse Claims, the Trust is liquidating claims in a manner inconsistent with the methodology that Dr. Bates testified would lead to payment in full of Abuse Claims.  The Court relied on that testimony to reach its conclusion that Direct Abuse Claims "more likely than not" would be paid in full.  Reaching that conclusion was necessary to satisfy one of the material factors under *Master Mortgage*, which standard, in turn, needed to be satisfied for the Court to approve the Plan.

80.     LMIC respectfully submits that it is both necessary and appropriate for the Court to order the Trustee to comply with the terms of the TDP that Dr. Bates testified would result in payment in full of Abuse Claims and to honor her fiduciary duty to LMIC and other Indirect Abuse

---

requires "the debtor and any other entity organized or to be organized for the purpose of carrying out the plan" (*i.e.*, the Trust) to "carry out the plan and [ ] comply with any orders of the court."  11 U.S.C. § 1142(a).

[185]   *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991).

[186]   *See, e.g.*, *In re Congoleum Corp.*, 636 B.R. 362, 372 (Bankr. D.N.J. 2022) (bankruptcy courts can enforce findings reached in confirmation orders).

[187]   *BSA I*, 642 B.R. at 560.

[188]   Mar. 22, 2022 Tr. [D.I. 9455] at 44:11-54:18.

[189]   Swaim Decl. at ¶¶ 5-10.

12402282

Claimants as well as the Direct Abuse Claimants. Likewise, to preserve LMIC's rights that are protected under the Plan, the Court should either (i) order the Trust to establish the Required Reserves in a manner that would ensure that the corpus of the Trust is not exhausted before Indirect Abuse Claims can be satisfied or (ii) adjudicate the controversy that exists between LMIC and the Trustee by confirming that LMIC may exercise its rights under the Plan, namely, its rights of recoupment and setoff that were memorialized in the TDP.

## **CONCLUSION**

81.     The Plan and Confirmation Order left unaltered the rights and obligations of all parties under BSA's insurance policies, including the LMIC Policies. LMIC advanced the Payment and has sought reimbursement from the Trust. The Trust has chosen not to honor its obligation—as successor–in–interest to BSA—to promptly reimburse LMIC. Consequently, LMIC now holds a valid, presumptively allowed, partially-liquidated Indirect Abuse Claim against the Trust.

82.     LMIC has identified a material risk that LMIC's Indirect Abuse Claim will not be paid in full based on the Trust's processes for allowing and valuing Direct Abuse Claims. As a creditor of the estate holding a valid Indirect Abuse Claim, LMIC has standing to demand that the Trust comply with the Plan and Confirmation Order by liquidating all Abuse Claims in a manner consistent with the evidence that BSA offered at confirmation to support its conclusion that all Abuse Claims would be paid in full. Without such assurances, and because the Trust has refused to reimburse LMIC in full for the Payment, LMIC also requests that the Court either require the Trust to implement the Required Reserves or confirm that LMIC may exercise its rights of recoupment and setoff against any additional valid demands made by the Trust.

*[Remainder of page intentionally left blank]*

45

12402282

**WHEREFORE,** LMIC respectfully requests that this Court enter an Order (i) requiring the Trust to implement the TDP consistent with Dr. Bates's testimony that would result in payment in full of Abuse Claims, (ii) requiring the Trustee to discharge her fiduciary duty to LMIC and other Indirect Abuse Claimants, and (iii) granting such further relief that the Court deems just and proper to preserve LMIC's rights under the Plan, including (a) requiring the Trust to establish the Required Reserves, or (b) adjudicating the controversy that exists over LMIC's ability to exercise its rights of setoff and recoupment that were expressly preserved under the Plan.

Dated: November 10, 2025

SEITZ, VAN OGTROP & GREEN, P.A.

*/s/ R. Karl Hill*
R. Karl Hill (Del. Bar No. 2747)
222 Delaware Avenue
Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888–0600
Email: khill@svglaw.com

–and–

Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Boston, MA 02110
Telephone: (617) 248–5000
dgooding@choate.com
jmarshall@choate.com

–and–

Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542–6000
KVMarrkand@mintz.com
LBStephens@mintz.com

*Attorneys for Liberty Mutual Insurance Company*

46

12402282

## <u>CERTIFICATE OF SERVICE</u>

I, R. Karl Hill, hereby certify that on the 10th day of November 2025, I caused a copy of

the *Motion of Liberty Mutual Insurance Company to Enforce the Confirmation Order and the Plan*

to be served to all parties by operation of the Court's electronic filing system.

*/s/ R. Karl Hill*
R. Karl Hill, Esq. (DE No. 2747)

47

12402282