**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>     Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Objection Deadline: March 3, 2026 at 4:00 p.m. (ET)**<br>**Hearing Date: TBD** |

**MOTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE FOR JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE**

James L. Patton, Jr., the duly-appointed legal representative for future claimants in these chapter 11 cases and under the Trust Agreement (defined below) (the "Future Claimants' Representative" or "FCR"), by and through his undersigned counsel, hereby submits this motion (this "Motion")[2] seeking judicial resolution of a dispute between the FCR and the Honorable Barbara J. Houser (Ret.) (the "Trustee"), in her capacity as trustee of the BSA Settlement Trust (the "Trust"), regarding the Trustee's Requested Payment Percentage (defined below), as required by the Trust Agreement.  In support of this Motion, the FCR respectfully states as follows:

**JURISDICTION AND VENUE**

1.	The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C.

---

[1]  The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of each Reorganized Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (defined below) or Trust Agreement (defined below), as applicable.

§ 157(b)(2), and the FCR confirms his consent, pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The FCR brings this Motion pursuant to sections 7.7 and 8.16 of the Trust Agreement.  As set forth more fully below, the Trust Agreement contains dispute resolution procedures that require disputes under the Trust Agreement to first be the subject of an informal resolution process that shall not exceed fifteen days, unless extended by the parties.  Trust Agreement § 8.16.  If the parties cannot resolve the dispute informally, the disputing party may invoke the formal dispute resolution process in the Trust Agreement by filing a motion in the Court requesting judicial resolution within seven days of receipt of the last counterparty's statement of position.  *Id.*

## BACKGROUND

**A.     General**

3.      The Debtors commenced these cases on February 18, 2020.  The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1.

4.      On September 8, 2022, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10316] (the "Initial Confirmation Order") confirming the *Third Modified Fifth Amended Chapter 11 Plan of*

*Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10296] (the "Plan").  On March 28, 2023, the United States District Court for the District of Delaware entered the Order [D.I. 11057] affirming the Initial Confirmation Order.   The Effective Date of the Plan occurred on April 19, 2023.

5.    On July 21, 2025, this Court entered an agreed order modifying the Initial Confirmation Order in the manner prescribed by the United States Court of Appeals for the Third Circuit (the "Third Circuit").  *See Order, Pursuant to May 13, 2025 Decision of the United States Court of Appeals for the Third Circuit, Modifying Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 12966] (together with the Initial Confirmation Order, the "Confirmation Order").  On October 13, 2025, certain parties filed a Petition for Writ of Certiorari with the United States Supreme Court requesting that the Supreme Court review the decision of the Third Circuit in connection with their appeal of the Confirmation Order.  The Supreme Court denied the Petition for Writ of Certiorari on January 12, 2026, and the time to seek rehearing has expired, so the Confirmation Order is final.

6.    The Trust was established pursuant to the Confirmation Order and the Plan, and is governed by the *BSA Settlement Trust Agreement* (the "Trust Agreement").  Mr. Patton was designated as the future claimants' representative for the Trust pursuant to Article 7.1 of the Trust Agreement.  In this capacity, Mr. Patton represents the interests of holders of "Future Abuse Claims" for the purpose of protecting the rights of such persons.  "Future Abuse Claim" is defined in the Plan as:

> any Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is

> attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained the age of eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose[.]

Plan Art. I.A.134. The FCR's constituency largely consists of Persons who, as of the date immediately preceding the Petition Date, had not attained the age of eighteen.[3] Additionally, the FCR anticipates that some "repressed memory" claims may also be filed in the future. Future Abuse Claims were not subject to the Bar Date (as defined in the Plan), and there currently exists no deadline by which they must be submitted.[4]

7.      During the hearing to consider confirmation of the Plan, Dr. Bates, the Debtors' abuse claims consultant and advisor, estimated that 400 to 600 Future Abuse Claims would be asserted. Mar. 21, 2022 Hr'g Tr. at 256:14-20. In contrast, the FCR, with the assistance of Ankura Consulting Group LLC ("Ankura"), his claims evaluation and financial valuation consultant, estimated approximately 11,000 Future Abuse Claims. Mar. 22, 2022 Hr'g Tr. at 144:12-16. As noted by counsel to the FCR during the hearing to consider confirmation of the Plan, the resolution of the disparity between these estimates, for the purposes of setting the Payment Percentage, was left to be determined in the future. Apr. 12, 2022 Hr'g Tr. at 164:14-16.

**B.      The Payment Percentage Dispute**

8.      The Trust Agreement authorizes the Trustee, with the consent of the Settlement Trust Advisory Committee (the "STAC") and FCR, to establish an Initial Payment Percentage

---

[3]  The FCR's professionals have determined that the average age of first Abuse is eleven years old.

[4]  Statutes of limitation and repose apply to Abuse Claims, and Abuse Claims filed after such deadlines are not barred, but are subject to a scaling factor set forth in the Trust Distribution Procedures.

with respect to distributions to Allowed Abuse Claims and to adjust the Initial Payment Percentage as set forth in the Trust Agreement.  The Trustee, with the consent of the FCR and STAC, established the Initial Payment Percentage as 1.5% of the amount of Allowed Abuse Claims.  The Initial Payment Percentage did not account for any forecasts of Future Abuse Claims.  Rather, it was premised upon the notion that certain substantial insurance settlement funds held in escrow would become available once the Confirmation Order was final, after which the parties could set a new Payment Percentage, which took into consideration the forecasts of Future Abuse Claims.  Therefore, the FCR believed it was appropriate to consent to the Initial Payment Percentage so that the Trust could promptly begin processing claims and making payments to as many survivors as possible.

9.      On December 12, 2025, the Trustee requested that the STAC and FCR consent to an increase in the Initial Payment Percentage by an incremental 4.5%, resulting in an aggregate Payment Percentage of 6%.  The Trustee engaged PricewaterhouseCoopers LLP ("PwC") to prepare a forecast of Future Abuse Claims and trust expenses upon which she based her proposed Payment Percentage increase.  The PwC forecast projected that there would be approximately 500 additional Future Abuse Claims (the "PwC Forecast") submitted to the Trust.  PwC also projected Trust expenses and the amount the Trust would be able to pay claimants if there were no additional insurance recoveries.[5]  The PwC Forecast, however, suffers from several significant flaws.  Notably, PwC makes assumptions about the data used to calibrate its model that are arbitrary and not supported by either the data or the relevant literature.  The PwC Forecast also fails to account

---

[5]  The FCR agrees with the Trustee that any increase to the Payment Percentage should not account for recoveries on contingent assets.

for the effects on claim values of inflation as required by the Trust Distribution Procedures. Finally, the PwC Forecast assumes that the Trust will terminate five years from now.

10. During the five-day consent period provided under the Trust Agreement for the FCR to consider the Trustee's proposed 6% payment percentage, the Trust's professionals gave the FCR and Ankura a presentation regarding the Trustee's analysis and rationale behind the Trust's proposed Payment Percentage increase. After consulting with Ankura, the FCR determined that the proposed 6% payment percentage was likely too high to provide reasonable assurance that the Trust will value, and be in a financial position to pay, present Abuse Claims and Future Abuse Claims in substantially the same manner. *See* 11 U.S.C. § 524(g)(B)(2)(ii)(IV)(bb). The FCR informed the Trustee within the five-day consent period that he was unwilling and unable to consent to her proposed increase. The Trustee declined to extend the five-day consent period, thereby triggering the informal dispute resolution procedures in the Trust Agreement.

11. The Trustee, the FCR, and their professionals subsequently engaged in discussions regarding the proposed Payment Percentage increase, and the Trustee and the FCR agreed to several extensions of the informal dispute resolution period, with the final extension ending on February 11, 2026. During the informal dispute resolution period, the FCR, the Trustee and BSA held several meetings with their professionals to seek to resolve the payment percentage question. The FCR requested that the Trust, BSA and the FCR's respective professionals work together to understand their methodologies and the nature of their differences so that the FCR could make a more informed decision on whether to grant his consent to the proposed Payment Percentage increase. Ultimately, despite numerous discussions between the two sides, the FCR advised the Trustee that he could not consent to the Trustee's proposal, because, as discussed below, it is premised on multiple flawed assumptions.

12.     The FCR also proposed to resolve the dispute between the parties by consensually increasing the Initial Payment Percentage by 3.2% to an aggregate Payment Percentage of 4.7%—an increase that the FCR submits is appropriate to provide reasonable assurance of substantially similar treatment to all holders of Abuse Claims.  The Trustee subsequently proposed, and the FCR agreed, to increase the Payment Percentage to 4.7% effective immediately while the Court decides the appropriateness of a further increase in the Payment Percentage at this time.[6]

## RELIEF REQUESTED

13.     By this Motion, the FCR requests entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) holding that the FCR acted reasonably in withholding his consent to the Requested Payment Percentage and (ii) finding that it is in the best interest of the Trust and its beneficiaries to adopt the lower payment percentage advocated by the FCR.

## BASIS FOR RELIEF

14.     Pursuant to the Trust Agreement, the Trustee, with the consent of the STAC and FCR, may adjust the Initial Payment Percentage.  Trust Agreement § 4.2(b).  Section 7.7 of the Trust Agreement sets forth procedures for obtaining the consent of the FCR pursuant to the Trust Documents.  Specifically, in the event the Trustee is required to obtain the consent of the FCR, the Trustee shall provide the FCR with written notice describing in detail the nature and scope of the action the Trustee proposes to take, among other things.  *Id.* at § 7.7.  The FCR must advise the Trustee of his consent or objection to the proposed action within five business days of receiving the request for consent from the Trustee, unless the Trustee extends the time for such response.

---

[6] The Trustee slightly reduced her proposed increase to the Payment Percentage from 6% to 5.9% (the "Requested Payment Percentage").  This reduction is due to the Trustee implementing the claim inflation required by Article VIII.A of the Trust Distribution Procedures prior to this next distribution.  The effect of making the inflation adjustment was to require the Trustee to lower her proposed 6% to 5.9%.

*Id.* The FCR may not withhold his consent unreasonably. *Id.* If the FCR decides to withhold consent, he must explain in detail his objections to the proposed actions. *Id.* If, after following the foregoing procedures, the FCR continues to object to the proposed action and withhold his consent, the FCR and Trustee shall resolve their dispute pursuant to section 8.16 of the Trust Agreement.

15.     Section 8.16 of the Trust Agreement provides that any dispute under the Trust Agreement shall first be the subject of informal negotiations, which shall not exceed fifteen days from the date a notice of dispute is received by the counterparty unless such period is modified by written agreement. If the disputing party and the counterparty cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures set forth in section 8.16 of the Trust Agreement. Specifically, a disputing party may seek judicial review of the dispute by filing with the Court a motion requesting judicial resolution of the dispute. *Id.* Any such motion "shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust." *Id.* The Court shall initially determine, by a preponderance of the evidence, whether the party who withheld consent was reasonable in such action. *Id.* If the Court so determines, it will then decide whether the requested action is in the best interests of the Trust and its beneficiaries. *Id.* For the reasons set forth herein, the FCR's decision to withhold consent to the Requested Payment Percentage was reasonable, and the Requested Payment Percentage is not in the best interests of the Trust and its beneficiaries.

16.     This issue is not new.  In June 2024, Ankura participated in a videoconference with the Trustee regarding its forecast of Future Abuse Claims (the "Initial Ankura Report") and shared certain materials with the Trustee following that teleconference that supported the Initial Ankura Report.  The Initial Ankura Report estimated that there would be approximately 11,300 compensable Future Abuse Claims asserted against the Trust.  Nevertheless, it does not appear that the Trustee accounted for the Initial Ankura Report in her determination of the Requested Payment Percentage.

17.     After receiving the Trustee's request to modify the Initial Payment Percentage in December of 2025, Ankura updated the Initial FCR Forecast to reflect actual Trust experience to date.  Ankura's most recent report reflecting its forecast and its analysis of PwC's work (the "Revised Ankura Report") is attached hereto as **Exhibit B**.  The Revised Ankura Report estimates that there will be approximately 11,000 compensable Future Abuse Claims, in addition to those already filed with the Trust.[7]  Ankura worked diligently to understand PwC's methodology, even experimenting by adopting PwC's method while correcting PwC's errors.  Nevertheless, the two sides remain far apart and there remains a large delta between the forecast reflected in the Revised Ankura Report and the PwC Forecast used to calculate the Requested Payment Percentage.  Given this significant disparity and certain additional shortcomings in the methodology the Trustee used to determine the Requested Payment Percentage, the FCR determined to withhold his consent to the Trustee's proposal, and to seek judicial intervention in accordance with the procedures set forth in the Trust Agreement.

---

[7] Notably, actual Trust filing data aligns with the Revised Ankura Report.  As of the date of this Motion, 123 Future Abuse Claims have already been submitted to the Trust.  This data very closely comports with the expected number of Future Abuse Claims that the FCR's professionals predicted in the Revised Ankura Report, lending credence to the Revised Ankura Report rather than the PwC Forecast.

9

18.    In taking these actions, the FCR acted reasonably in withholding his consent to the Requested Payment Percentage, as the FCR believes that the Trustee's analysis in arriving at the Requested Payment Percentage contains numerous critical errors, including:

a.    The PwC Forecast does not account for historical tort experience, which is critical for a proper forecast of Future Abuse Claims.  Instead, the PwC Forecast is based on an extrapolation of observed Trust filings.  Among the problems with reliance on this limited sample is that virtually no Trust claims have been filed by minors, even though nearly 15% of tort cases initiated against the Debtors before the Petition Date were by victims within that demographic.  A proper analysis must consider both the Trust data and tort data, which, together imply that additional Future Abuse Claims will be filed by claimants who were minors as of the Petition Date.

b.    The PwC Forecast relies on the count of claims filed with the Trust, by first year of Abuse.  A critical assumption PwC makes is that every victim who was first abused during or before 2006 came forward and submitted a claim with the Trust.  However, this ignores the empirical evidence and academic consensus that there exists a significant delay from Abuse to filing for victims of Abuse.  PwC fails to consider this delay in their analysis.  Since the count of Trust claims filed from abuse year 2006 is incomplete, the PwC Forecast—based on these unadjusted counts—is necessarily an under-prediction of Future Abuse Claims.

c.    The PwC Forecast is based on arbitrary assumptions, including, among other things, that there will be a decrease in Trust submissions of 5 percentage points per year of Abuse between 2007 and 2020.  PwC offered no justification for this rationale.

d.    The entire PwC Forecast is based on a single data point: claims received by the Trust for Abuse year 2006.

e.    The PwC Forecast assumes that there was no remaining Abuse in the years immediately prior to the bankruptcy.  The Future Claimants' Representative and his professionals agree that BSA has made significant changes over the last decade to combat Abuse.  However, Abuse continued to occur as of the Petition Date, and there is uncertainty regarding the size of the reduction of Abuse.  There is no viable, statistical basis for PwC's assumption of no remaining Abuse.

f.    The PwC Forecast fails to adjust for inflation when valuing claim payments notwithstanding that this adjustment is required by the Trust Distribution Procedures.  When corrected, the actual amount needed to pay all claimants the Requested Payment Percentage is $38 million higher than estimated by the Trust.

g.   In determining the Requested Payment Percentage, the Trustee assumed that the Trust would cease operating in the next five years. Yet, a sizable portion of the FCR's constituency is not subject to a statute of limitations for filing Abuse Claims. Thus, the assumption is flawed, as the Trust needs to continue well into the future to ensure that all Future Claimants have ample opportunity to receive compensation for the abuse they suffered.

h.   The Trustee's analysis is supported by a five-year operating budget for the Trust. This budget does not account for expenses into the future beyond this time period. While it is often difficult to predict what the operating expenses of a trust will be more than five years into the future, predicting that there will be zero expenses is inappropriate.

19.   The FCR recognizes the significance of his decision to withhold consent regarding the Requested Payment Percentage. However, given the numerous flaws in the analysis and reasoning used by the Trustee in arriving at the Requested Payment Percentage, he had no choice but to withhold his consent. The Requested Payment Percentage puts all of the risk of underpayment on holders of Future Abuse Claims. Indeed, if the PwC Forecast is off by even three hundred Future Abuse Claims, the Trust would not have sufficient funds to pay all Future Abuse Claims at the Requested Payment Percentage. The Requested Payment Percentage jeopardizes the amount available to pay holders of Future Abuse Claims, and risks leaving them with nothing, or a payment at a drastically lower Payment Percentage.

20.   A central tenet of the Bankruptcy Code, as well as section 524(g) of the Bankruptcy Code, is equal treatment of creditors. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) (*citing Begier v. IRS*, 496 U.S. 53, 58 (1990)) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code."). While not explicitly applicable to these cases, section 524(g) and the policies underlying it are instructive given that sexual abuse claims present complexities similar to those raised by asbestos-related claims.[8]   Section 524(g) "explicitly

---

[8]  This Court has recognized that, while not directly applicable to these cases, the standards set forth in section 524(g) of the Bankruptcy Code may be used as a proxy. *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 607 (Bankr. D. Del. 2022) ("To the extent that there is a floor on what is a "substantial majority," the 75% figure in

requires that an asbestos trust value and pay all 'present claims and future demands that involve similar claims in substantially the same manner.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012) (citing 11 U.S.C. § 524(g)(B)(2)(ii)(V)). Ultimately, section 524(g) "requires courts to ensure that there will be sufficient funds available for both future [claims] and present claims to receive similar treatment." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

21.     Section 524(g) also sets forth the standard by which proposed changes to the Payment Percentage should be evaluated. This provision requires asbestos settlement trusts to "operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide *reasonable assurance* that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(B)(2)(ii)(IV)(bb)) (emphasis added). "Reasonable assurance" demands more than optimism and requires concrete and reliable evidence that "payment is 'probable, not merely possible or hopeful[.]'" *In re Struckoff*, No. BR 25-70101-JAD, 2025 WL 3497008, at *2 (Bankr. W.D. Pa. Dec. 4, 2025) (citing *In re Kloberdanz*, 83 B.R. 767, 773 (Bankr. D. Colo. 1988)).

22.     The Requested Payment Percentage is simply too high and makes payments to holders of Future Abuse Claims merely speculative, as opposed to probable, in contravention of the "reasonable assurance" requirement and the policies underlying the Bankruptcy Code. There is no assurance, let alone a reasonable assurance, that the Requested Payment Percentage will allow for equal treatment of all Abuse Claims considering the deficiencies discussed above. If

---

§ 524(g) could be used as a proxy."). In addition, section 524(h) of the Bankruptcy Code retroactively blessed *Johns-Manville* and other cases that relied on section 105 of the Bankruptcy Code prior to the enactment of section 524(g) to enjoin future claims, suggesting that the requirements of section 524(g) must be satisfied to channel future claims under section 105.

distributions were made to claimants at the Requested Payment Percentage, those payments would be impossible to recover if the Trustee's assumptions prove to be incorrect.  On the other hand, a lower Payment Percentage would result in holders of Future Abuse Claims being treated the same as current Abuse claimants.  Moreover, if the Trustee's analysis in determining the Requested Payment Percentage proves to be correct, all claimants could receive further distributions.  Any possible harm caused to current Abuse claimants in the form of payment delay is incomparable with the possible prejudice from reduced payment amounts, or no payment at all, that holders of Future Abuse Claims could suffer if the Requested Payment Percentage were implemented.

23.     The FCR has worked with the Trustee in an effort to find a middle ground, recognizing that the process of estimating Future Abuse Claims is imperfect, and litigation is disfavored.  To that end, the FCR continues to support a Payment Percentage of 4.7%.  This Payment Percentage is in the best interests of all parties at this relatively early stage as it will best position the Trust to be able to pay present and future Abuse Claims in substantially the same manner.

24.     For the reasons set forth above, the FCR respectfully requests the Court determine that (i) the FCR acted reasonably in withholding his consent to the Requested Payment Percentage, and (ii) it is in the best interests of the Trust and its beneficiaries to adopt the 4.7% Payment Percentage advocated by the FCR.

## NOTICE

25.     Notice of this Motion has been given to: (a) counsel to the Trustee; (b) counsel to the Reorganized Debtors; (c) the Office of the United States Trustee for the District of Delaware; and (d) those persons who have formally appeared in these chapter 11 cases and requested service

pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the FCR submits that no additional notice need be given.

## CONCLUSION

WHEREFORE, the FCR respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:  February 17, 2026

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Kenneth J. Enos (No. 4544)
Ashley E. Jacobs (No. 5635)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
        eharron@ycst.com
        kenos@ycst.com

*Counsel to the Future Claimants' Representative*

14