**EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Reorganized Debtors.[1] | (Jointly Administered) |
| | **Ref. Docket No.** _____ |

**ORDER GRANTING MOTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE FOR JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE**

Upon the motion (the "Motion")[2] of the FCR seeking judicial resolution of a dispute between the FCR and Trustee regarding the Requested Payment Percentage; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given and no other or further notice being necessary; and upon the record herein; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

---

[1] The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of each Reorganized Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The FCR acted reasonably in withholding his consent to the Requested Payment Percentage.

3.      It is in the best interests of the Trust and its beneficiaries to adopt a Payment Percentage of 4.7%.

4.      The Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

## EXHIBIT B

**Revised Ankura Report**



# An Analysis of the Payment Percentage Increase Proposed by the Scouting Settlement Trust

Prepared by Thomas Vasquez, Ph.D. and Michael Northeim, M.S.

Ankura Consulting Group, LLC, Washington, DC

Date: February 17th, 2026



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

Contents

**INTRODUCTION**.............................................................................................................................. **3**

**SECTION I: ANKURA'S FORECAST OF FUTURE ABUSE CLAIMS AND PAYMENT PERCENTAGE** ................................ **4**

*Evidence of the Delay from Abuse to Filing in the Historical Tort Data* .............................................11
*Evidence of the Delay from Abuse to Filing in Academic Literature*..................................................15

**SECTION II: ANALYSIS OF THE TRUSTEE'S PROPOSAL**...........................................................................**18**

SUMMARY OF CONCLUSIONS.................................................................................................................18
THE PWC FORECAST............................................................................................................................19
ADJUSTMENT TO CLAIMS FORECAST .....................................................................................................20
ADJUSTMENTS TO ACTUARIAL ANALYSIS ................................................................................................24
*No Adjustment for Inflation* ...............................................................................................................24
*No Attempt to Forecast When Future Abuse Claims Will Be Filed* ....................................................25

**CONCLUSION: RISKS TO THE TRUST** .....................................................................................................**26**

**APPENDIX A: CV OF THOMAS VASQUEZ PH.D.** ........................................................................................**27**

**APPENDIX B: CV OF MICHAEL NORTHEIM, M.S.** ......................................................................................**32**

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

## Introduction

We have been asked by the Future Claimants' Representative ("FCR") of the Scouting Settlement Trust (the "Trust") to give an opinion on the Trust's proposal to increase the payment percentage to 5.9%. As outlined below, it is our opinion that the Trust can support a payment percentage of 4.7%. The focus of our analysis is the determination of the number and value of Future Abuse Claims.

The Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC[1] (the "Plan") defines a Future Abuse Claim as any "Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of 'repressed memory,' to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose[.]" The number of Future Abuse Claims arising as a result of repressed memory is expected to be small, given the strong evidentiary burden required. All subsequent references to "Future Abuse Claims" will pertain to those claims arising from alleged abuse of a Person who, as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age.

To reach this conclusion we have reviewed the following information provided by the Trust ("Trust Data"):

- An anonymized database of all 64,327 Abuse Claims filed against the Trust as of December 19, 2025, containing information such as claimant birth year, abuse year(s), and claim status.
- Aggregate-level information of average Abuse Claim values.
- A forecast of Future Abuse Claims prepared by the Trust's Abuse Claims Administrator PricewaterhouseCoopers ("PwC").
- The Trust's estimate of Trust assets, earnings, and expenses through 2030.

Additionally, we have reviewed:

- The Boy Scouts of America ("BSA") Historical Tort Claims data ("Tort Data"), which is a data set of historical tort claims filed against the BSA alleging sexual abuse. This data set contains 1,325 historical claims and was produced in June of 2019, prior to the bankruptcy.

---

[1] Doc. 10296, filed 9/6/2022. Capitalized terms not defined here are defined within this document.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States                    +1.202.797.1111

- The relevant academic literature concerning evidence of the delay between abuse and disclosure for victims of childhood sexual abuse ("CSA").

There are two sections of this report. Section I provides Ankura's forecast of Future Abuse Claims and the evidence relied upon to produce this forecast. Section II provides an analysis of the Trust's forecast of Future Abuse Claims and adjusts for several methodological errors made when calculating a payment percentage of 5.9%.

## Section I: Ankura's Forecast of Future Abuse Claims and Payment Percentage

Analysis of the Trust Data and Tort Data together imply that additional Future Abuse Claims will be filed. When considering the distributions of age at filing for the two data sets, we see that claimants in the Tort Data are considerably younger than claimants in the Trust Data. This is illustrated in Figure I.1. This difference is to be expected when considering the different mechanisms by which claimants file tort claims versus Abuse Claims. In the tort system, a claimant is strictly limited by his or her state's Statute of Limitations ("SOL"). Many people who would have otherwise filed in the tort system in the past were barred from doing so because of the applicable SOL. The BSA bankruptcy and corresponding Trust structure allowed these people to file Abuse Claims. Those that were minors as of the Petition Date were not required to file a POC prior to the Bar Date of November 16, 2020. These younger filers still have additional time to file Abuse Claims. For this reason, we expect additional Future Abuse Claims to be filed by claimants who were minors as of the Petition Date.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



Figure I.1
Distribution of Age at Filing
Based on all Trust Claimants and 2000-2019 Tort Claimants

To estimate Future Abuse Claims, we align the age distribution of Abuse Claims with the age distribution of Tort claims. Two conclusions are clear. First, the proportion of older claimants is significantly higher than observed in the historical Tort Data. Second, there are virtually no younger claimants in the Trust Data when compared to what is observed in the historical Tort Data. Our focus was on the missing younger filers. The Trust has assumed that the reason there are no young filers is that there was no remaining abuse in the years immediately prior to the bankruptcy. We have concluded that there is no viable, statistical basis for the Trust's assumption of no remaining abuse. Indeed, we have calculated that there will be approximately 11,100 young filers, of which only 123 have filed with the Trust to date. Table I.2 provides this calculation.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States                    +1.202.797.1111

### Table I.2
### Forecast of Future Abuse Claims (Minors as of Petition Date)

| Age Group | Pre-Petition Tort Claims[1] | | Post-Petition Trust Claims | |
| | Filings | Percentage | Filings | Percentage |
|---|---|---|---|---|
| 0 to 17 | 138 | 14.7% | 123 | 0.2% |
| 18 and Older | 798 | 85.3% | 64,204 | 99.8% |
| | 936 | 100% | 64,327 | 100% |

| Age Group | Trust Claims Plus Future Abuse Claims | Percentage Including Future Abuse Claims |
|---|---|---|
| 0 to 17 | 11,100 | 14.7% |
| 18 and Older | 64,200 | 85.3% |
| | 75,300 | 100% |

Note: Totals may not add up due to rounding.

[1] Tort claims filed 2000 or later.

To determine the impact that Future Abuse Claims have on the payment percentage, we calculate total indemnity by multiplying Future Abuse Claims with the average value associated with these Future Abuse Claims. The Trust did not provide Ankura with claimant-level dollar amounts paid to holders of Abuse Claims. Instead, Ankura was provided only with overall Abuse Claim averages. We have used these averages in our calculation of total indemnity. We assume Future Abuse Claims will follow the distribution of Expedited, IRO, and Matrix Abuse Claim elections as seen in the current claim population. We assume the Abuse Claim value for Expedited elections to be $3,500, the estimated Abuse Claim value for IRO elections to be $960,000, and the estimated Abuse Claim value for Matrix elections to be the average of an allowed Matrix Abuse Claim. Using this methodology, we calculate the average value of Future Abuse Claims as $550,000. Table I.3 illustrates this calculation.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

Table I.3
Average Value and Indemnity by Claim Type

| Claim Type | Count | Average Value | Indemnity ($ millions) |
|---|---|---|---|
| Current Claims | | | |
| Direct Abuse Claim | | | |
| Expedited | 6,000 | $3,500 | $20 |
| IRO | 200 | $960,000 | $190 |
| Matrix | 57,800 | $600,000 | $34,510 |
| Subtotal: Direct Abuse Claim | 64,000 | $540,000 | $34,720 |
| Other Claims[1] | 200 | $2,780,000 | $680 |
| Subtotal: Current Claims | 64,200 | $550,000 | $35,390 |
| Future Abuse Claims | 11,100 | $550,000 | $6,120 |
| Grand total | 75,300 | $550,000 | $41,510 |

Note: Totals may not add up due to rounding.

[1]Other Claims includes Indirect Abuse Claims and Other Protected Party ("OPP") Claims.

Next, we calculate the payment percentage needed to pay all 75,300 Abuse Claims (64,200 current Abuse Claims and 11,100 Future Abuse Claims) equally. This is done by dividing the available funds to claimants (Trust assets minus present value of expenses) by the present value of total liability. Table 1.4 below shows this calculation.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States                                    +1.202.797.1111

Table I.4

Payment Percentage ($ millions)[1]

|  | Net Present Value |
|---|---|
| **[a] Assets** | |
| Initial Assets | $1,980 |
| Earnings | $280 |
| Total: Assets | $2,260 |
| | |
| **[b] Expenses** | |
| Trust Expenses | $160 |
| Taxes | $160 |
| Total: Expenses | $310 |
| | |
| **[c] Indemnity** | |
| Current Claims | $35,390 |
| Future Abuse Claims | $6,120 |
| Less: Already Filed | -$70 |
| Total: Indemnity | $41,450 |
| | |
| Payment Percentage | 4.7% |

$$\frac{[a] - [b]}{[c]}$$

Note: Totals may not add up due to rounding.

[1]Assets provided by the Trust. Earnings, expenses, and taxes were estimated by the Trust through 2030.

The Trust provided their forecast of assets, income, claimant payment and administrative costs through 2030. Table I.5 below shows the values provided by the Trust[2].

---

[2] SST - Materials for Dec 19 STAC Meeting_9.pdf produced by the Trust on 12/12/2025.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

Table I.5
Trust Forecast Through 2030 ($ thousands)

| | Interest Rate | 3% | 3% | 3% | 3% | 3% |
|---|---|---|---|---|---|---|
| | | 2026 | 2027 | 2028 | 2029 | 2030 |
| **Starting Balance** | | | | | | |
| Total Income (taxable and non-taxable) | | | | | | |
| Total Expenses | | | | | | |
| Net Income | | | | | | |
| Estimated Potential Taxes | | | | | | |
| **Projected Ending Balance** | | | | | | |

Table I.6 below provides a summary of the Trust's initial calculation of a 6.0% payment percentage based on the limited information provided by the Trust. We understand that the Trust has since revised their proposed payment percentage to 5.9%.

Table I.6
Payment Percentage Calculated by the Trust

| | $ Millions |
|---|---|
| [a] Assets Available to Pay Claims | $2,160 |
| | |
| Indemnity | |
| [b] Expedited | $21 |
| [c] All Other Claims | $35,646 |
| Subtotal: Indemnity | $35,667 |
| | |
| Payment Percentage[1] | 6.0% |

$$\frac{[a] - [b]}{[c]}$$

[1]The Trust initially proposed a payment percentage of 6.0%. We understand that the Trust has since revised their proposed payment percentage to 5.9%.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

Table I.7 shows the reasons for difference between our calculation of the appropriate payment percentage forecast and the estimated payment percentage provided by the Trust. There are two categories of differences.

The first is the calculation of Future Abuse Claims. The reason for the significant difference results primarily from the Trust's belief that all abuse has been eliminated in recent years. We believe that the low number of Abuse Claims filed by young persons is due to the long, academically established understanding that abused persons delay reporting such abuse.

The second difference is due to the treatment of inflation and the assumed term of the Trust. We believe that the Trust calculations do not include the inflation adjustment required by the TDP. The Trust assumes that it will be closed in 2030. We do not understand the basis for this assumption. Indeed, under our forecast there will be a significant number of Abuse Claims filed after 2030. Therefore, consistent with our forecast of Future Abuse Claims, we expect the Trust to remain open for many years after 2030.

Table I.7
Adjustments to Payment Percentage Proposed by Trust

| | Payment Percentage | |
| | Low Claims Estimate (20 Additional Years of Lag) | High Claims Estimate (25 Additional Years of Lag) |
| --- | --- | --- |
| **Payment Percentage Proposed by Trust** | **5.9%** | **5.9%** |
| Reason for Adjustment | | |
| Claims Forecast | | |
| Adjust for Delay from Abuse to Filing | -0.4% | -0.8% |
| Subtotal: Claims Forecast | -0.4% | -0.8% |
| Actuarial Analysis | | |
| Apply Inflation to Supplemental Payment | -0.1% | -0.1% |
| Estimate Trust Cash Flows Beyond 2030 | -0.5% | -0.4% |
| Subtotal: Actuarial Analysis | -0.7% | -0.5% |
| Total Change | -1.0% | -1.3% |
| Adjusted Payment Percentage | 4.9% | 4.6% |
| **Average Adjusted Payment Percentage** | **4.7%** | |

Note: Totals may not add up due to rounding.

A key difference between our calculation of the appropriate payment percentage and the Trust's is the number and timing of Future Abuse Claims.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

The Trust estimates that there will be only approximately 600 Future Abuse Claims filed. We estimate that there will be approximately 11,100 Future Abuse Claims. This difference results from two completely different assumptions. The Trust assumes that abuse was eliminated in recent years and therefore there can be very few Future Abuse Claims. However, we assume that the Trust is ignoring substantial evidence, both in the Tort Data and in the academic literature, that a significant percentage of the victims do not disclose their abuse until an older age.

### Evidence of the Delay from Abuse to Filing in the Historical Tort Data

Analysis of the Tort Data reveals that many claimants wait decades before filing a claim. We call this delay between abuse and filing a "lag." For an intuitive understanding of the lag, see Figure I.8.



Figure I.8
Count of Claims Filed by Abuse Year as of 1990 and 2019

This graph shows the counts of claim filings by year of abuse, observed at two distinct points in time: as of 1990 and as of 2019. We can see that, for each year of abuse, there is a significant increase in the count of claim filings observed after allowing for additional years of lag. As time goes on, we observe significant increases in claim filings for a given year of abuse. We can see

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States                    +1.202.797.1111

that, as of 1990, the Tort Data was severely incomplete for abuse that occurred between 1980 and 1990. Averaging across different abuse years, we can measure the effect of allowing for additional lag on the count of observed claim filings. As illustrated in Figure I.9, we see that the average percentage increase in the observed claim filings increases significantly as we account for additional years of lag. These additional claim filings are "missing" from the Trust Data observed in 2025.



Figure I.9
Percentage Increase in Observed Claim Filings

It is critical to account for the existence of the lag in the forecast of Future Abuse Claims. Any forecast of Future Abuse Claims produced using the Trust Data must be adjusted for this lag to avoid undercounting Abuse Claims that we expect to file after a significant delay.

For example, a Boy Scout victim who was abused in 2006 would have been between the ages of 18 and 31 at the Bar Date. Figure I.10 shows the distribution of age at filing in the Tort Data for claims filed 2000 or later. We can see that it is precisely this age range (between 18 to 31) for which it is the least likely for a victim to file an Abuse Claim.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



Figure I.10
Distribution of Age at Filing

As shown in the figure, those victims that do not file as minors generally wait until their 40's, 50's, or older to file a claim. The average age at filing is 42, and the median age is 47. If not for the Bar Date, many victims who were abused in 2006 and have not yet filed with the Trust would eventually come forward and file in the future.

Further analysis of the Tort Data reveals that the delay between abuse and filing has been increasing. Table I.11 shows that the delay from abuse to filing more than doubled in the 20 years leading up to the BSA bankruptcy.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

## Table I.11
### Average Lag From Abuse to Filing in the Tort Data

| File Year | Claim Count | Average Lag (Years) |
|---|---|---|
| 1975 to 1979 | 2 | 0 |
| 1980 to 1984 | 47 | 1 |
| 1985 to 1989 | 113 | 2 |
| 1990 to 1994 | 131 | 5 |
| 1995 to 1999 | 94 | 7 |
| 2000 to 2004 | 110 | 16 |
| 2005 to 2009 | 92 | 17 |
| 2010 to 2014 | 371 | 31 |
| 2015 to 2019 | 363 | 38 |

We believe that this increase in the average delay from abuse to filing is likely a result of SOL legislation over the past 20 years increasing the maximum age by which a victim of CSA must file a claim and the opening of various "windows" during which claimants that would otherwise be barred by SOL could file for a limited amount of time. Figure I.12 illustrates that as states have continued to expand their SOL legislation, annual claim counts have increased. This is strong evidence that victims of CSA often wait to file their claims and are responsive to updates in the legal environment that allow them to file later in life.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT



Figure I.12
Total Claims By File Year

### Evidence of the Delay from Abuse to Filing in Academic Literature

A review of the relevant academic literature produces two strong conclusions: (1) the majority of the victims of CSA delay disclosure until adulthood, and (2) this delay is, on average, very long, taking several decades. As stated by McElvaney (2013), "[t]*here is consensus in the research literature that most people who experience sexual abuse in childhood do not disclose this abuse until adulthood, and when disclosure does occur in childhood, significant delays are common.*"[3] Similarly, Tener and Murphy (2015) confirm that "[t]*he concept of delay of disclosure has been extensively reported in the literature.*"[4]

Child USA, a non-profit think tank whose mission is to fight child abuse, neglect, and maltreatment, published a factsheet in 2024 on the topic of delayed disclosure.[5] In it, they reference many of the studies that we reviewed. Their main conclusion, headlined by the

---

[3] McElvaney, R. (2013), Disclosure of Child Sexual Abuse: Delays, Non-Disclosure and Partial Disclosure. What the Research Tells Us and Implications for Practice, Child Abuse Review, 24: 159-169.
[4] Tener, D., and Murphy, S. (2015), Adult Disclosure of Child Sexual Abuse: A Literature Review, Trauma, Violence, & Abuse 2015, Vol. 16(4) 391-400
[5] https://childusa.org/wp-content/uploads/2024/06/Delayed-Disclosure-2024.pdf

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States                                    +1.202.797.1111

introductory sentence written with boldface and capitalized letters is that "*not all victims disclose, but for the CSA victims who do disclose, the vast majority need decades to come forward*."

The majority of CSA victims delay disclosing their abuse until adulthood. London et al. (2008) conducted a review of contemporary research and found that between 55% and 70% of those who had experienced sexual abuse as a child delayed disclosure until adulthood.[6] Hebert et al. (2009), based on a representative sample of more than 800 adults found that as few as one in five disclosed CSA during childhood.[7] Hunter (2011) conducted a small-scale survey of 22 adult participants and found that "[*s*]*eventeen out of 22 participants did not tell anyone what happened to them as children*."[8] McGill and McElvaney (2023)[9] was based on a small-sample survey of adults and adolescents who were victims of child sexual abuse. Half of the adults did not disclose CSA until adulthood, with delays as long as 29 years.

Research found the length of the delay to be significant. McElvaney (2002) analyzed a sample of ten adults in Ireland who had made formal complaints of CSA and found delays ranging from 20 years to 50 years.[10] A Swedish study of 122 women who had experienced CSA found that only 32% disclosed during childhood (before the age of 18) while the majority (68%) waited until adulthood. Further, this delay was up to 49 years, with an average of 21 years.[11] Easton (2012) analyzed a large survey of nearly 500 male child sexual abuse survivors. He found that the range of age at "telling first" was from age 4 to age 72, with the mean age being 32. The length of delay from abuse to "telling first" was, on average, 21 years, and the delay until first in-depth discussion was 28 years, on average. Alaggia et al. (2019) undertook a systematic review of 15 studies of adults and found that the mean age of disclosure for adult participants was between 40

---

[6] London, K., Bruck, M., Wright, D. B., & Ceci, S. J. (2008), Review of the Contemporary Literature on How Children Report Sexual Abuse to Others: Findings, Methodological Issues, and Implications for Forensic Interviewers. Memory, 16(1), 29–47.

[7] Hebert, M., Tourigny, M., Cyr, M., McDuff, P., & Joly, J. (2009), Prevalence of Childhood Sexual Abuse and Timing of Disclosure in a Representative Sample of Adults from Quebec, Canadian Journal of Psychiatry, 54(9), 631–636.

[8] Hunter, S. (2011), Disclosure of Child Sexual Abuse as a Life-Long Process: Implications for Health Professionals, The Australian and New Zealand Journal of Family Therapy, 32, 159–172.

[9] McGill, L. and McElvaney, R. (2023), Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis, Journal of Interpersonal Violence, 2023, Vol. 38(1-2) NP1163–NP1186

[10] McElvaney, R. (2002), Delays in Reporting Childhood Sexual Abuse and Implications for Legal Proceedings. In D. P. Farrington, C. R. Hollin, & M. McMurran (Eds.), Sex and Violence: The Psychology of Crime and Risk Assessment (pp. 138–153). Routledge.

[11] Jonson E, Lindblad F. (2004), Disclosure, Reactions and Social Support: Findings from a Sample of Adult Victims of Child Sexual Abuse, Child Maltreatment 9(2): 190–200.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

and 50 years of age.[12] London et al (2008) observed that disclosures mainly occurred either promptly or many years after the abuse.[13]

Some studies document gender differences in the pattern of disclosure, finding that men tend to delay for longer than women. O'Leary and Barber (2008) surveyed approximately 300 adult child abuse victims in Australia, nearly evenly divided between men and women.[14] They found that 45% of men took more than 20 years to disclose the abuse.

There has also been research into the underlying reasons why disclosure is so often and so significantly delayed. McGill and McElvaney (2023) identify various reasons.[15] Some of these reasons are external. For example, they claim that "[m]*any children experience fears about not being believed ... similar findings have been described with adults.*" Also, "[f]*ear of negative consequences following disclosure is a common theme identified across age brackets.*" The negative consequences they point to include hurting those they care about and losing post-abuse achievements such as their psychological balance, partner, or children. Importantly, they also point to internal reasons why disclosure is difficult and delayed. Specifically, *"[a] further factor that has been found to influence both children and adults' disclosure decisions has been the individual's own emotional response to the abuse: guilt, shame and self-blame following abuse have been associated with delayed disclosure in both young people ... and adults following sexual abuse as a child."*

In conclusion, we have seen strong evidence in academic research that delayed disclosure is both frequent and significant. We have not seen any findings to the contrary. It is also worth mentioning that the literature summarized here is recent; all the work was published after 2000, with many of them after 2010. We have not seen anything in the literature that would indicate a shortening of the delay in the disclosure of child sexual abuse.

---

[12] Alaggia, R., Collin-Vezina, D., and Lateef, R. (2019), Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000–2016), Trauma, Violence, & Abuse, 20(2), 260–283.

[13] London, K., Bruck, M., Wright, D. B., & Ceci, S. J. (2008), Review of the Contemporary Literature on How Children Report Sexual Abuse to Others: Findings, Methodological Issues, and Implications for Forensic Interviewers. Memory, 16(1), 29–47.

[14] O'Leary, P. J., and Barber, J. G. (2008), Gender Differences in Silencing Following Childhood Sexual Abuse, Journal of Child Sexual Abuse, 17(1), 133–143.

[15] McGill, L. and McElvaney, R. (2023), Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis, Journal of Interpersonal Violence, 2023, Vol. 38(1-2) NP1163–NP1186

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

## Section II: Analysis of the Trustee's Proposal

The Trustee's proposal is to increase the payment percentage from 1.5% to 5.9%. This section details our opinions and analysis.

### Summary of Conclusions

A payment percentage of 5.9% does not allow for equal payment to all Future Abuse Claims. Our conclusion is based on two categories of issues with the Trust's calculation.

- The Trust's forecast of Future Abuse Claims contains a significant methodological flaw: it does not consider the delay between abuse and filing of a claim. As described in more detail below, a critical assumption made within the forecast is that *every* victim of CSA aged 18 or older at the Bar Date filed an Abuse Claim with the Trust. This assumption is key to the Trust's forecast of Future Abuse Claims, runs counter to all empirical analysis and academic research on the subject, and leads to a significant undercounting of Future Abuse Claims.
- The Trust fails to adjust for inflation when valuing Abuse Claim payments. In addition, the Trust assumes that the Trust will be closed at the end of 2030 with no additional payments to claimants and no additional administrative/operating costs.

After correcting these issues, the Trust's forecast could more reasonably support a payment percentage of between 4.6% and 4.9%. Table II.1 summarizes the effect that these errors have on the Trust's calculations of payment percentage.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

Table II.1
Adjustments to Payment Percentage Proposed by Trust

| | Payment Percentage | |
| --- | --- | --- |
| | Low Claims Estimate (20 Additional Years of Lag) | High Claims Estimate (25 Additional Years of Lag) |
| **Payment Percentage Proposed by Trust** | **5.9%** | **5.9%** |
| Reason for Adjustment | | |
| Claims Forecast | | |
| Adjust for Delay from Abuse to Filing | -0.4% | -0.8% |
| Subtotal: Claims Forecast | -0.4% | -0.8% |
| Actuarial Analysis | | |
| Apply Inflation to Supplemental Payment | -0.1% | -0.1% |
| Estimate Trust Cash Flows Beyond 2030 | -0.5% | -0.4% |
| Subtotal: Actuarial Analysis | -0.7% | -0.5% |
| Total Change | -1.0% | -1.3% |
| Adjusted Payment Percentage | 4.9% | 4.6% |
| **Average Adjusted Payment Percentage** | **4.7%** | |

Note: Totals may not add up due to rounding.

## The PwC Forecast

The PwC Forecast estimates that an additional approximately 500 Future Abuse Claims will be filed against the Trust. This is produced by taking a single data point (Abuse Claims filed by claimants abused in 2006) and by assuming that total claims will decrease by 5 percentage points each year of abuse between 2007 and 2020. This produces PwC's estimate of total Abuse Claims for those abused between 2007 and 2020. All claimants abused in 2006 must be at least 18 years old by the Petition Date[16], and PwC claims this makes it an appropriate calibration period from which to forecast Future Abuse Claims. PwC then subtracts from this number the Abuse Claims received by the Trust to date for abuse that occurred between 2007 and 2020. PwC makes no attempt to estimate when these Future Abuse Claims will be filed and makes no attempt to estimate or adjust for the lag between abuse and filing. Table II.2 provides an illustration of the PwC Forecast.

---

[16] Minimum age for a Cub Scout is five years old, and Petition Date was February 18, 2020.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

Table II.2
PwC Forecast of Future Abuse Claims

| Abuse Year | Claims Received to Date | Claims as a Percentage of Abuse Year 2006 | Forecasted Claims | |
| --- | --- | --- | --- | --- |
| | | | Total Claims | Future Abuse Claims |
| 2000 | 316 | n/a | 316 | n/a |
| 2001 | 275 | n/a | 275 | n/a |
| 2002 | 228 | n/a | 228 | n/a |
| 2003 | 198 | n/a | 198 | n/a |
| 2004 | 166 | n/a | 166 | n/a |
| 2005 | 162 | n/a | 162 | n/a |
| 2006 | 127 | n/a | 127 | n/a |
| 2007 | 101 | 95% | 121 | 20 |
| 2008 | 100 | 90% | 115 | 15 |
| 2009 | 71 | 85% | 108 | 37 |
| 2010 | 78 | 80% | 102 | 24 |
| 2011 | 56 | 75% | 96 | 40 |
| 2012 | 42 | 70% | 89 | 47 |
| 2013 | 32 | 65% | 83 | 51 |
| 2014 | 42 | 60% | 77 | 35 |
| 2015 | 18 | 55% | 70 | 52 |
| 2016 | 14 | 50% | 64 | 50 |
| 2017 | 27 | 45% | 58 | 31 |
| 2018 | 22 | 40% | 51 | 29 |
| 2019 | 11 | 35% | 45 | 34 |
| 2020 | 1 | 30% | 39 | 38 |
| | | | | 503 |

Note: Assumes minimum age at abuse of 5 years old.

### Adjustment to Claims Forecast

The PwC Forecast relies on the count of Abuse Claims filed with the Trust, by first year of abuse. A critical assumption PwC makes is that every victim who was first abused during or before 2006 came forward and submitted an Abuse Claim. However, this ignores the empirical evidence and academic consensus that there exists a significant delay from abuse to filing for victims of CSA (as discussed above). PwC fails to consider this delay in their analysis. Since the

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

count of Abuse Claims filed from abuse year 2006 is incomplete, the PwC Forecast – based on these unadjusted counts – is necessarily an underprediction of Future Abuse Claims.

Adjusting the PwC Forecast to account for this delay from abuse to filing produces substantially higher forecasts of Future Abuse Claims. To do this, we adjust the number of Abuse Claims received by the Trust for each abuse year by the average percentage increase observed historically in the Tort Data. We recognize that more recent abuse years have more "missing" Abuse Claims. Thus, we apply a smaller adjustment for older abuse years and a larger adjustment for more recent abuse years. These adjustments are derived from the average percentage increases provided in Figure I.9, above. As a sensitivity, we apply this adjustment considering 20 and 25 additional years of lag.

Had the PwC Forecast assumed an average of 20 additional years of delay from abuse to filing, we would expect to see over 800 Abuse Claims from abuse year 2006 and subsequently a total Future Abuse Claims forecast of over 6,600 claims. Had the PwC Forecast assumed an average of 25 additional years of delay from abuse to filing, we would expect to see over 1,500 claims from abuse year 2006 and subsequently a total Future Abuse Claims forecast of over 12,500 claims. This is illustrated in Table II.3.

Table II.3
Adjusted PwC Forecast of Future Abuse Claims

| | | | Adjusted PwC Claims Forecast | | | | | |
| | | | Low Claims Estimate (20 Additional Years of Lag) | | | High Claims Estimate (25 Additional Years of Lag) | | |
| Abuse Year | Claims Received to Date | Claims as a Percentage of Abuse Year 2006 | Percentage Increase | Adjusted Total Claims | Future Abuse Claims | Percentage Increase | Adjusted Total Claims | Future Abuse Claims |
|---|---|---|---|---|---|---|---|---|
| 2000 | 316 | n/a | 239% | 1,073 | n/a | 457% | 1,762 | n/a |
| 2001 | 275 | n/a | 257% | 982 | n/a | 557% | 1,806 | n/a |
| 2002 | 228 | n/a | 280% | 868 | n/a | 637% | 1,680 | n/a |
| 2003 | 198 | n/a | 315% | 821 | n/a | 715% | 1,613 | n/a |
| 2004 | 166 | n/a | 371% | 782 | n/a | 807% | 1,506 | n/a |
| 2005 | 162 | n/a | 457% | 903 | n/a | 921% | 1,655 | n/a |
| 2006 | 127 | n/a | 557% | 834 | n/a | 1085% | 1,505 | n/a |
| 2007 | 101 | 95% | | 793 | 692 | | 1,431 | 1,330 |
| 2008 | 100 | 90% | | 751 | 651 | | 1,355 | 1,255 |
| 2009 | 71 | 85% | | 709 | 638 | | 1,280 | 1,209 |
| 2010 | 78 | 80% | | 668 | 590 | | 1,205 | 1,127 |
| 2011 | 56 | 75% | | 626 | 570 | | 1,130 | 1,074 |
| 2012 | 42 | 70% | | 584 | 542 | | 1,054 | 1,012 |
| 2013 | 32 | 65% | | 542 | 510 | | 979 | 947 |
| 2014 | 42 | 60% | | 501 | 459 | | 904 | 862 |
| 2015 | 18 | 55% | | 459 | 441 | | 829 | 811 |
| 2016 | 14 | 50% | | 417 | 403 | | 753 | 739 |
| 2017 | 27 | 45% | | 376 | 349 | | 678 | 651 |
| 2018 | 22 | 40% | | 334 | 312 | | 603 | 581 |
| 2019 | 11 | 35% | | 292 | 281 | | 527 | 516 |
| 2020 | 1 | 30% | | 251 | 250 | | 452 | 451 |
| | | | | | 6,688 | | | 12,565 |

Note: Assumes minimum age at abuse of 5 years old.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States                                    +1.202.797.1111

Using the Adjusted PwC Forecast and the average value of Future Abuse Claims for the calculation of payment percentage, the total Allowed Amount increases to between $39.1 billion and $42.3 billion depending on the number of years of lag for which we adjust. This reduces the payment percentage by between 0.4% and 0.8%, as shown in Table II.4.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

Table II.4
Correction to Payment Percentage (Step 1)
Adjust for Delay from Abuse to Filing

| Adjustment | Claim Count | Allowed Amount | Total Funds Available to Pay Claims | Change in Payment Percentage[1] |
|---|---|---|---|---|
| | | | ---------- ($ millions) ---------- | |
| Original PwC Forecast | | | | |
| Future Abuse Claims | 600 | $274 | $16 | |
| Current Claims[2] | 64,200 | $35,393 | $2,142 | |
| | 64,800 | $35,667 | $2,160 | n/a |
| | | | | |
| Low Claims Estimate (20 Additional Years of Lag) | | | | |
| Future Abuse Claims | 6,800 | $3,687 | $204 | |
| Current Claims[2] | 64,200 | $35,393 | $1,956 | |
| | 71,000 | $39,080 | $2,160 | -0.4% |
| | | | | |
| High Claims Estimate (25 Additional Years of Lag) | | | | |
| Future Abuse Claims | 12,700 | $6,927 | $354 | |
| Current Claims[2] | 64,200 | $35,393 | $1,806 | |
| | 76,900 | $42,320 | $2,160 | -0.8% |

Note: Totals may not add up due to rounding.

[1]Payment percentage calculated as total funds available to pay claims divided by total Allowed Amount.

[2]Includes Expedited, IRO, Matrix, Indirect, and OPP Claims.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**

2000 K Street NW, 12th Floor
Washington, DC 20006
United States                    +1.202.797.1111

## Adjustments to Actuarial Analysis

There are two actuarial problems with the Trustee's proposal Specifically, (1) the supplemental payment does not include an inflation factor adjustment, as required by the TDP and (2) there is no attempt to estimate the impact of the Trust operating beyond 2030.

## No Adjustment for Inflation

The TDP specifies that "Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U. The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative."[17] Since the Effective Date was April 19, 2023, the Trust applied an inflation adjustment of 2.4% to claims not yet paid or determined as of April 19, 2025.[18]

All claimants that receive a supplemental payment in 2026 are entitled to this inflation adjustment as well. There is no indication that this inflation adjustment was included in the supplemental payment calculated by PwC. When corrected, the actual amount needed to pay all claimants the proposed supplement payment of 4.4% is $38 million higher than estimated by the Trust. Adding an inflation adjustment to the supplemental payment further reduces the payment percentage by 0.1%, as shown in Table II.5.

Table II.5
Correction to Payment Percentage (Step 2)
Apply Inflation to Supplemental Payment

| Adjustment | Supplemental Payment Without Inflation | Inflation on Supplemental Payment | Change in Payment Percentage |
|---|---|---|---|
| | -------- ($ millions) -------- | | |
| Original PwC | $1,568 | $38 | -0.1% |
| Low Claims Estimate (20 Additional Years of Lag) | $1,518 | $36 | -0.1% |
| High Claims Estimate (25 Additional Years of Lag) | $1,471 | $35 | -0.1% |

---

[17] Doc. 10296, Exhibit A, Article VIII, page 15.
[18] https://www.scoutingsettlementtrust.com/s/article/7-43-What-is-the-CPI-U-Adjustment-and-how-will-it-impact-my-claim

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

## No Attempt to Forecast When Future Abuse Claims Will Be Filed

The Trust's professionals make no attempt to forecast when Future Abuse Claims will be filed and paid, and no attempt to estimate the cost of operating the Trust beyond 2030. While it is often difficult to predict what the operating expenses of a trust will be more than five years into the future, predicting that there will be zero expenses is inappropriate. Instead, we take the five-year budget provided by the Trust and assume that operating expenses will decrease by roughly 1% per year until the closure of the Trust. The Trust is also expected to continue to earn interest on Trust assets as it continues to operate and pay claimants.

These assumptions are entered into a cash flow model to account for omissions by the Trust's professionals. Table II.6 provides the final correction to the payment percentage, after accounting for the full life of the Trust. This final correction reduces the payment percentage by between 0.4% and 0.5%.

Table II.6
Correction to Payment Percentage (Step 3)
Estimate Trust Cash Flows Beyond 2030

| | Low Claims Estimate (20 Additional Years of Lag) | High Claims Estimate (25 Additional Years of Lag) |
|---|---|---|
| | -------- ($ million) -------- | |
| **Assets** | | |
| Initial Assets | $1,980 | $1,980 |
| Earnings | $230 | $300 |
| Total: Assets | $2,200 | $2,280 |
| **Expenses** | | |
| Trust Expenses | $160 | $160 |
| Taxes | $140 | $160 |
| Total: Expenses | $300 | $320 |
| **Indemnity** | | |
| Current Claims | $35,390 | $35,390 |
| Future Abuse Claims | $3,690 | $6,930 |
| | $39,080 | $42,320 |
| Payment Percentage | 4.9% | 4.6% |
| **Average Payment Percentage** | **4.7%** | |

Note: Totals may not add up due to rounding.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States                                    +1.202.797.1111

## Conclusion: Risks to the Trust

An increase in the payment percentage to 5.9% would result in the unequal treatment of Future Abuse Claims. Two main categories of errors contribute to the unreasonably high payment percentage proposed by the Trust: the Future Abuse Claims forecast used by the Trust and the actuarial analysis produced to calculate the payment percentage.

The forecast of Future Abuse Claims produced by PwC is critically flawed, as it does not account for the well-documented delay from abuse to filing by CSA victims. Clear evidence for this delay can be found both by analyzing the historical Tort Data and reviewing the academic literature. Failing to account for this delay necessarily produces a significant underprediction of Future Abuse Claims. Correcting for this flaw, the PwC Forecast increases by between 6,000 and 12,000 additional Future Abuse Claims.

Additionally, the cash flow analysis produced by the Trust contains significant actuarial errors. Specifically, the Trust fails to account for inflation when calculating the supplemental payment to claimants. When corrected, the supplemental payments increase by more than $38 million. Further, the Trust's forecast assumes that it will close in 2030. It does not produce any forecast of when Future Abuse Claims will be filed and paid, and it does not account for any additional operating expenses beyond this point.

A payment percentage of 4.7% would allow for equal treatment of both Current and Future Abuse Claims. The method by which we forecast 11,100 Future Abuse Claims is consistent with the historical Tort Data and the academic literature and ensures equal treatment for all claimants.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

## Appendix A: CV of Thomas Vasquez Ph.D.

Dr. Vasquez is a Senior Managing Director at Ankura Consulting Group (Ankura) in the New York office. Dr. Vasquez has over 35 years of experience in management consulting for private sector clients, the development of economic models for US and foreign governments to analyze and develop tax, expenditure and regulatory policy and providing expert testimony over a wide range of issues.

Dr. Vasquez has provided management consulting services for private sector companies in a wide array of industry sectors. The services include identifying methods to: (1) increase the stock price or value of the company; (2) leverage the firm's brand asset; (3) assist underperforming companies and (4) provide general valuation services.

Dr. Vasquez has assisted US and foreign governments in the development of tax, expenditure and regulatory policy. The services include the development of large scale micro-economic models to allow policymakers to determine individual and company behavioral reactions to tax and regulatory policy.

Dr. Vasquez has provided expert testimony, depositions and analytical litigation support on a broad spectrum of issues involving statistical techniques, computer simulation, economic behavior and economic models, including, among others:

- Evaluating the economic and non-economic loss from bodily injury claims. In recent years, Dr. Vasquez has designed the algorithm for determining the damage from the BP Gulf Oil Spill, the NFL Concussion Settlement, the GM Ignition Failure settlement fund, the Takata air bag rupture litigation and virtually all of the major asbestos settlement trusts.
- Using statistical models to forecast a company's future liability from lawsuits related to its former production of asbestos including the following representative assignments – National Gypsum Corporation, the Fibreboard Corporation, Owens Corning, Congoleum, Western MacArthur, Burns and Roe, Inc. and Specialty Products Holding Corp.,
- Using statistical models to forecast a company's future liability from lawsuits related to its former sales of products.
- Using statistical models to determine the settlement value of bodily injury and financial loss claims resulting from exposure to a wide range of hazardous or defective materials or activities.
- The statistical analysis of the determinants of supply and demand in certain industry segments for use in business valuations, determining the reasonable compensation levels in closely held and other companies and the impact of regulation and tax policy on prices, sales and production.

Prior to joining Ankura, Dr. Vasquez was a vice president at Analysis, Research & Planning Corporation (ARPC) from 1998 through 2016. From 1997 to 1998, Dr. Vasquez was the president and CEO of Yankelovich Partners, Inc., a leading market research firm. While at

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

Yankelovich Partners, Dr. Vasquez had responsibility for engagements designed to determine the best approach to maximize the value of the client's firm. These engagements involved understanding the source of the value components of the firm – value of the firm's brand, product/service lines responsible for increasing (decreasing) stock price, the role of joint products and other key components of the firm's value.

From 1993 to 1997, Dr. Vasquez was the National Partner in Charge of Corporate Transactions Services for KPMG Peat Marwick. In this role he practiced in and led four of KPMG's national practices. One practice area was in the area of litigation support. This area involved almost exclusively the use of highly trained professionals in providing expert testimony in a wide range of litigation issues. The second practice area involved providing consulting services in the bankruptcy and troubled company area. This area involved analyzing the condition and prospects of a company in financial distress, generally involving recommendations for expense control, revenue growth, elimination/sale of product and distribution lines and the elimination/selling of production sites. The third area is investment banking. This area focused on three major components: (1) buying and/or selling of companies for middle market clients; (2) advice to non-public clients preparing an Initial Public Offering, and (3) advice to clients on methods to increase share price and/or cash flow in anticipation of sale. The fourth area was business valuation. This area focused on the valuation of businesses in a wide range of settings including bankruptcy, fairness opinions, mergers and acquisitions, estate planning and other venues requiring valuation services.

Dr. Vasquez served on the Firm's Board of Directors from 1993 to 1997 and served as the Chairman of the Board's Strategic Planning Committee.

Prior to selling his firm to KPMG, Dr. Vasquez was the founder and President of the Policy Economics Group. Dr. Vasquez was responsible for all data base development and tax simulation modeling for federal and state government clients in the United States as well as foreign governments including among others Egypt, Pakistan, Hungary, the former Soviet Union, Trinidad-Tobago, Virgin Islands, Guam, El Salvador and Guatemala. Dr. Vasquez also developed similar models using specialized industry data bases to determine tax impacts and behavioral responses for commercial firms, industry associations and law firms. These models were also used to formulate the client's strategic direction, market initiatives and value maximization strategies.

Prior to establishing the Policy Economics Group, Dr. Vasquez was the Deputy Director for the U.S. Department of the Treasury Office of Tax Analysis. While there, he guided U.S. tax policy analysis and designed large micro-simulation models and data bases for the U.S. Treasury Department and the Joint Tax Committee of the U.S. Congress. He appeared before Congress to provide testimony on such issues as capital gains taxation. He also designed numerous

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

specialized models and data bases for analyzing policy issues at the company, industry, and individual levels.

**Professional Experience:**
President and CEO, Yankelovich Partners Inc., 1997 to 1999
National Partner in Charge, Corporate Transactions Services, KPMG Peat Marwick, 1993 to 1997.
Managing Partner, Policy Economics Group, KPMG Peat Marwick, 1987 to 1993.
Founder and President, Policy Economics Group, 1983 to 1987.
Deputy Director, Office of Tax Analysis, U.S. Department of the Treasury, 1979 to 1983.
Assistant Director, 1978 to 1979; Fiscal Economist, 1972 to 1976.
Chief Economist, New York State Economic Development Board, 1977 to 1978.
Staff Economist, Congressional Joint Committee on Taxation, 1976.
Staff Economist, American Enterprise Institute for Public Policy Research, 1972.

**Education:**
Ph.D., Economics, Clark University, 1973.
M.A., Economics, Clark University, 1972.
B.S., Mathematics, State University of New York - Potsdam, 1970.

**Legal Experience and Testimony:**
National Gypsum Company Bankruptcy Proceedings, 1991
      Deposition
      Testimony
Gerald Ahern, et. al. vs. Fiberboard Corporation, et. al., 1994
      Deposition
      Testimony
Ezell Thomas, et. al. vs. R.J. Reynolds Tobacco Company, et. al., 1999
      Deposition
Fiberboard Corporation and Owens Corning vs. R.J.Reynolds Tobacco Company, et. al., 1999
      Deposition
Western Mac Arthur Company and Mac Arthur Company vs. General Accident Insurance Co. of America; United States Fidelity & Guaranty Co.; Argonaut Insurance Company, 1999
      Affidavit
CSX Transportation, Inc. and American Home Ins. Co., 2000
      Deposition
ADR Proceeding Celotex vs. Travelers Casualty and Surety Co. and London Market Insurers, 2000
      Deposition, 2004
      Testimony, 2004
Owens Corning Bankruptcy Proceedings, 2001
      Deposition, 2004

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

Trial Testimony, 2005

Michael Albanese vs. Compaq Computer Corporation, 2002

Affidavit

ADR Proceeding ACandS, Inc. vs. Travelers Casualty and Surety Co., 2003

ASARCO (2003)

Deposition, 2003

Western Mac Arthur Company and Mac Arthur Company Bankruptcy Proceedings, 2003

Oglebay Norton Bankruptcy Proceedings, 2004

Deposition, 2004

Trial Testimony, 2004

Halliburton Bankruptcy Proceedings, 2004

Congoleum vs Ace Ins. Et al, 2005

Deposition, 2005

Trial Testimony, 2006

Gene B. Griego, et al., Plaintiffs, vs. Bechtel National, Inc. et al., Defendants

Deposition, 2005

Sandra Sue Fullen, et al, Plaintiffs v. Philips Electronics North America Corporation, a Delaware corporation, et al., Defendants

Deposition, 2005

St. Paul Fire and Marine Insurance Company, Plaintiff, vs. A.P.I., Inc., Defendant and Counter-Claimant

Deposition, 2005

Dana Corporation Bankruptcy Proceedings, Case No. 06-10354(BLR), 2007

Deposition, 2007

Trial Testimony, 2007

API, INC. Asbestos Settlement Trust v. Atlantic Mutual Insurance Company; Civil No. 09-0665 (JRT/JJG); United States District Court, D. Minnesota; July 9, 2010.

Deposition, 2010

Applebee's International, Inc., DineEquity, Inc. and Weight Watchers International, Inc. Sheree Shepard and Anthony Watts, On Behalf of Themselves and All Others Similarly Situated vs. DineEquity, Inc. et al.; United States District Court; District of Kansas; No. 08-cv-2416.

Deposition, 2010

API, Inc. Asbestos Settlement trust, et al. v. Zurich American Insurance Company, et al. Court File No. 09-CV-975 (JRT/JJG)

Deposition, March 29, 2011

Tronox Incorporated, Tronox Worldwide, LLC f/k/a; Kerr-McGee Chemical Worldwide LLC, and Tronox, LLC, f/k/a Kerr-McGee Chemical LLC vs. Anadarko Petroleum Corporation and Kerr-McGee Corporation

Deposition 2012

Specialty Products Holding Corp., et al Bankruptcy proceedings, Case No. 10-11780(JFK), 2012

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

Deposition, 2012
Trial Testimony, 2013
David M. Elsea, et al, vs U.S. Engineering Company and Jackson County, Missouri; Case No. 1016-CV159-76; Circuit Court of Jackson County, Missouri at Kansas City.
Deposition, 2016
Snyder, et al. -v- California Insurance Guarantee Association; Case No. RG13666656
Deposition 2017
Deposition 2018

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States                                        +1.202.797.1111

### Appendix B: CV of Michael Northeim, M.S.

Michael Northeim is a Senior Managing Director at Ankura with over a decade of professional experience leveraging analytics to solve complex economic, legal, and business issues. He is based in Washington, DC. Since joining Ankura in 2017, Mr. Northeim has worked on multiple engagements involving complex litigations and class action settlements, specializing in economic, financial, and public health matters. These engagements include the Foreign Exchange Antitrust Class Actions in the US and Canada, expert analysis on antidumping disputes within the steel industry, liability forecasts involving various public health issues such as PFAS, Roundup, talc, tobacco and opioids, valuations of claims involving sexual abuse, torture, and human rights violations, and various forecasting and actuarial work for multiple large asbestos bankruptcies and trusts. Mr. Northeim has significant experience developing and analyzing a wide variety of data sets, including government sources such as LADMF, ARCOS, CDC Wonder and NSDUH, as well as numerous proprietary databases. Mr. Northeim currently leads a large and diverse team of economists, data scientists, and legal experts within the Mass Torts practice.

Prior to joining Ankura, Mr. Northeim worked at Cisco Systems, advising leadership on a wide range of financial, operational, and analytical matters. This experience includes managing a budget of $200million annually as a financial analyst, developing complex process automation algorithms and global compliance procedures as a global process manager, and overseeing a team of data analysts conducting an overhaul of analytics and reporting to top leadership.

Mr. Northeim's professional experience includes:

- Acted as a settlement and claims advisor on $2.3 billion Foreign Exchange Antitrust settlement administration, Case No. 13-cv-7789. Produced single database of all foreign-exchange traders across 16 banks and 13 years. Created novel clustering algorithm in R to identify unique claimants across over a dozen data sources. Built linear and logistic regression models to impute missing data where necessary. Led a team of up to five other data scientists to process and value over 100,000 highly complex claims. Provide advisory services at all key stages including class certification, damage calculations, notice, and distributions to claimants.
- Analyzed the solvency of the California Wildfire Fund under alternative scenarios that would allow for payment of wildfire victims not currently covered under the fund.
- Forecasted future claims related to sexual abuse claims in the Boy Scouts of America bankruptcy. Analyzed claim filing rates, settlement rates, and average settlement values for common injuries.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

ankura.com

- Acted as a damages expert in a landmark human rights case. Estimated damages related to sexual assault, torture, and other injuries committed by the al-Bashir regime.
- Served as Notice Administrator for settlement in Corrente et al v. The Charles Schwab Corporation.
- Acted as economic expert on antidumping disputes between the United States and several Korean steel manufacturers. Developed linear and time series models to analyze counterfactual scenarios, published findings to the US Department of Commerce for review across a number of expert reports. Cases include:
  - Administrative Review of the Antidumping Order on Oil Country Tubular Goods from Korea (A-580-870)
  - Administrative Review of the Antidumping Order on Heavy Walled Rectangular Goods from Korea (A-580-880)
  - Administrative Review of the Antidumping Order on Welded Line Pipe from Korea (A-580-876)
- Provided expert opinion regarding the uses and limitations of the Social Security's Death Master File.
- Acted as economic and data expert for numerous asbestos trusts and pre-trust bankruptcy negotiations. Created liability forecasts using epidemiological and economic data to predict future financial exposure of a firm based on specific product and disease groups. Utilize models to manage future cash flows of trusts as well as to make key decisions in bankruptcy proceedings. Led teams of 50+ analysts through discovery and estimation analysis. Select asbestos engagements include:
  - In re Bestwall LLC, No. 17-31795 (LTB) (Bankr. W.D.N.C. 2017)
  - In re DBMP LLC, No. 20-30080 (JCW) (Bankr. W.D.N.C. 2020)
  - In re Aldrich Pump LLC, No. 20-30608 (JCW) (Bankr. W.D.N.C. 2020)
  - In re Murray Boiler LLC, No. 20-30609 (JCW) (Bankr. W.D.N.C. 2020)
  - NGC Bodily Injury Trust (est. 2003)
  - Western Asbestos Settlement Trust (est. 2004)
  - JT Thorpe Settlement Trust, California (est. 2006)
  - Thorpe Insulation Company Asbestos Settlement Trust (est. 2007)
  - The Burns and Roe Personal Injury Settlement Trust (est. 2009)
- Served as an advisor on litigation related to Zantac and exposure to ranitidine. Generated database of all claims filed and analyzed distribution of claim inventory, including diseases and claimant demographics.
- Supported claims expert during bankruptcy proceedings of a large talc producer, acting as principal economic and data advisor. Created forecast of future ovarian cancer and mesothelioma claims using epidemiological and economic data.
- Created damages models for several state and local governments alleging costs incurred from widespread opioid addiction. Gathered data from public and private sources including the DEA, CDC, NSDUH, and local budgets to test assumptions of plaintiffs and defendants. Produced visualizations in R and Tableau to communicate results to client.

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT



**Washington, DC**
2000 K Street NW, 12th Floor
Washington, DC 20006
United States

+1.202.797.1111

- Created damages model related to lead-paint based harm in single family homes and condominiums that estimated the number of affected homes and the costs of abatement.
- Acted as a principal data analyst for a dispute involving tobacco sales on Native American Reservations. Developed several complex economic models to estimate sales from a small sample of the area.
- Served as an advisor in due diligence discussions pertaining to PFAS exposure and potential future liability.
- Provided expert opinion on a liability forecast created to value future claims from Roundup exposure and co-authored a report of opinions.
- Assisted in the development and execution of allocation model to distribute funds from the US Victims of State Sponsored Terrorism Fund.

**Professional Experience:**
Senior Managing Director, Ankura Consulting, 2026 to current
Managing Director, Ankura Consulting, 2024 to 2026
Senior Director, Ankura Consulting, 2022 to 2024
Director, Ankura Consulting, 2020 to 2022
Senior Associate, Ankura Consulting, 2017 to 2020
Financial Analyst, Cisco Systems, 2015 to 2016
Global Process Manager, Cisco Systems, 2014 to 2015
Business Analyst, Cisco Systems, 2013 to 2014
Data Analyst, Volt Workforce Solutions, 2012 to 2013

**Education and Certifications:**
MS, Analytics, North Carolina State University, 2017
BS, Economics, North Carolina State University, 2013
BS, Finance, North Carolina State University, 2013

SAS Certified Advanced Programmer for SAS 9, 2017
SAS Certified Base Programmer for SAS 9, 2017
SAS Certified Predictive Modeler Using SAS Enterprise Miner 13, 2017
SAS Certified Statistical Business Analyst Using SAS 9: Regression and Modeling, 2017

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT