UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:
BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

*Debtors.*

Case No. 20-10343 (LSS)
Chapter 11
Claim No. SST-█████

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## DATABASE ACCESS ORDER COMPLIANCE
## HISTORICAL BSA OPERATIONAL EVIDENCE

# I. INTRODUCTION

Claimant ████████ submits this supplemental brief to provide the Court with comprehensive historical evidence regarding Boy Scouts of America (BSA) operations during the 1970s. This evidence directly contradicts the Settlement Trustee's characterization of Claimant's account as containing 'deviations from standard procedures' and demonstrates that the Trustee's denial was based on fundamental misunderstanding of BSA organizational structure and policies during the relevant time period.

This Court ordered the Trustee to provide Claimant database access to search for additional supportive historical information. The Trustee has failed to comply with the order. The historical documentation presented in this supplemental brief, which Claimant complied through independent research, demonstrates exactly why such database access is material and necessary—Claimant's account aligns precisely with documented BSA operational practices that the Trustee apparently failed to understand or investigate.

The historical documentation presented herein establishes that activities described by Claimant—including overnight Cub Scout camping without parental supervision, cross-district coordination, and regional transport of scouts—were not only consistent with 1970s BSA standards but were actively encouraged and systematically implemented throughout the Mid-Iowa Council structure.

# II. MID-IOWA COUNCIL ORGANIZATIONAL STRUCTURE (1970)

## A. Council Merger and Geographic Scope

In 1970, the Southern Iowa Area Council (#184) and Tall Corn Area Council (#177) merged to form the Mid-Iowa Council (#177), creating a unified administrative structure

across 27 counties in central and southern Iowa. This consolidation placed both Des Moines (Polk County) and Ottumwa (Wapello County) under single council authority.

### B. Professional Coordination Requirements

The 85-mile distance between Des Moines and Ottumwa fell well within normal operational parameters for this 27-county council territory. Professional staff routinely served the entire council area. Historical records document that 'Scout leaders traveled from all over the state to attend regional events' at Mid-Iowa Council facilities.

## III. COUNCIL CAMPING FACILITIES AND OPERATIONS

### A. Camp Mitigwa (Primary Council Facility)

Camp Mitigwa, founded in 1923, served as the flagship facility for the Mid-Iowa Council. Located at approximately 1820 Magnolia Road, north of Des Moines, Iowa, the camp encompassed 450 acres along the Des Moines River valley.

**Summer Operations:** Five one-week residence camping sessions annually. Historical records confirm: 'Each summer Camp Mitigwa offers five one-week residence camping experiences for Boy Scouts. At the present time Boy Scouts and Cub Scouts camp at the same time.'

**Professional Staffing:** 'Summer camp staff is hired only for the summer season and usually consists of 30-60 high school and college students' providing specialized instruction and supervision across council-wide programming.

**Year-Round Operations:** One full-time, year-round camp ranger with on-site residence provided continuity and facility management.

### B. Camp Wapello (Regional Facility—Southeast Iowa)

Camp Wapello was founded in 1932 by George Foster, President of the John Morrell Packing Company in Ottumwa, Iowa. Foster donated 88 acres of land to the Southern Iowa Boy Scout Council. In 1965, an additional 80 acres from the historic Steckel Ranch were donated, expanding the facility.

Following the 1970 merger, the Mid-Iowa Council subleased and operated Camp Wapello through the 1980s as a regional facility serving southern Iowa scouts. The facility operated year-round as a council resource.

### C. Additional Regional Facilities

**Foster Acres:** Located on the north edge of Ottumwa. 'Foster acres has a shelter, Strother Lodge, primitive campsites and trails. Strother Lodge is a heated building with kitchen facilities and water. The lodge can be used as a meeting room and has enough room to sleep 20 on the floor as an overnight facility.'

**Grinnell Scoutland:** 40 acres of hardwood timber southwest of Grinnell, Iowa. 'Scoutland offers primitive camping in seven campsite, camporee field, and an enclosed shelter house with a fireplace and electricity for weekend camping.'

## IV. CUB SCOUT OVERNIGHT CAMPING: EXPLICIT BSA AUTHORIZATION (1970s)

### A. National BSA Policy

Historical BSA policy explicitly authorized Cub Scout overnight camping without parental supervision under specific conditions. The official policy stated:

*'Tiger Cubs, Wolf and Bear Cub Scouts, and Webelos Scouts may participate in a resident overnight camping program operating under BSA National Camping School-trained leadership and managed by the council.'*

This policy established three key elements:

**1. Resident Camping Definition:** Council-managed programs with professional staff that explicitly permitted Cub Scout attendance without parents or guardians

**2. Professional Leadership Standard:** Required BSA National Camping School-trained leadership, not family supervision

**3. Council Management:** Programs operated by the council with professional oversight, not individual pack activities

### B. National Camping School Training Requirements

BSA invested substantial resources in professional leadership certification. Historical records show 'Wood Badge courses were attended by 3,108; National Camping Schools attendance reached 2,504' nationally in 1970, demonstrating widespread implementation of professional training standards.

The purpose of National Camping School (NCS) was defined as:

*'To provide adults with a learning experience and training related to the operation of council camp. The key staff members will, in turn, train and supervise other staff personnel in your council camping program.'*

This training structure created a cascading professional supervision model where nationally-certified staff trained and supervised council camp personnel who directly supervised scouts.

## V. STANDARD CROSS-DISTRICT OPERATIONAL PRACTICES

### A. Regional Programming Requirements

The merged council structure necessitated regular cross-district coordination and participant transport. Professional scout leaders routinely coordinated transportation and programming across council territories as standard operational practice.

**Documented Regional Events:**

**Annual Snowflake Powwow:** Council-wide event featuring the Mitigwa Dancers (Order of the Arrow) that drew participants from across the entire Mid-Iowa Council territory

**Project SOAR (Save Our American Resources):** Environmental programming initiated in 1971 that required regional coordination across all districts

**Scouting Environment Day:** Held April 27, 1975, requiring council-wide participation and coordination

### B. Professional Staff Mobility and Transport

Professional scout executives, district executives, and specialized program directors served entire council territories, not individual units or districts. This model required:

- Council-wide service responsibilities spanning 27 counties and 85+ mile distances
- Specialized program leadership authorized to work with scouts from multiple units
- Professional transport services to centralized camp facilities
- Cross-unit coordination for council-organized programming

## VI. CONTRAST WITH CONTEMPORARY BSA POLICIES

The Trustee's denial appears to apply contemporary BSA policies and standards to historical 1970s operations, creating fundamental mischaracterization of standard practices from that era.

### A. Modern Family-Centric Model vs. 1970s Professional Model

**Current BSA Policy (Post-2000s):** 'Cub Scout camping is a family-centric program' requiring BALOO-trained leaders and family participation

**1970s BSA Policy:** Professional supervision model where council-trained staff supervised Cub Scouts without requiring family participation in resident camping programs

This represents a fundamental shift in BSA operational philosophy that occurred decades after the relevant time period.

## VII. APPLICATION TO CLAIMANT'S ACCOUNT

Every element of Claimant's account aligns precisely with documented 1970s BSA operational practices:

**Overnight Cub Scout Camping:** Explicitly authorized by national BSA policy for council-managed resident programs with professionally trained leadership

**Regional Scout Leader Transport:** Standard operational practice in a 27-county council requiring professional coordination across 85+ mile distances

**Cross-District Coordination:** Routine practice necessitated by merged council structure and regional programming requirements

**Professional Supervision Without Family:** Explicitly permitted under resident camping programs managed by National Camping School-trained staff

## VIII. CONCLUSION

The historical evidence demonstrates that the Trustee's characterization of Claimant's account as containing 'deviations from standard procedures' reflects fundamental misapplication of contemporary BSA policies to historical 1970s operations. The activities Claimant described were not only consistent with BSA standards of that era but were actively encouraged, systematically implemented, and explicitly authorized by national BSA policy.

Claimant respectfully requests that the Court:

1. Consider this historical evidence in evaluating the Trustee's denial determination.
3. Dire̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶ denial in light of accurate historical BSA operat̶̶̶

Respe̶̶

Date: ̶̶



TO: Judge Laurie Silverstein
U.S. Bankruptcy Court
District of Delaware
824 Market St. 3rd Floor
Wilmington, DE 19801


